UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE: CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                .
                                 .          Detroit, Michigan
                                 .          April 2, 2014
                  Debtor.        .          9:00 a.m.
. . . . . . . . . . . . . . .


HEARING RE. NOTICE OF PRESENTMENT OF ORDER BY:
DEBTOR IN POSSESSION CITY OF DETROIT (#2921);
ORDER TO SHOW CAUSE WHY EXPERT WITNESSES SHOULD NOT BE
APPOINTED (#3170); MOTION TO ADJOURN HEARING REGARDING
THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER, PURSUANT TO
SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT
AGREEMENT AND GRANTING RELATED RELIEF HEARING (#3287);
EX PARTE MOTION TO EXTEND RE. DISCLOSURE STATEMENT
APPROVAL SCHEDULE (#3317)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRAD ERENS
                       77 West Wacker Drive
                       Chicago, IL  60601
                       (312) 269-4050

                       Jones Day
                       By:  THOMAS CULLEN
                       51 Louisiana Ave., N.W.
                       Washington, DC  20001-2113
                       (202) 879-3924

                       Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

APPEARANCES (continued):

```
For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For the Official       Dentons US, LLP
Committee of           By:  SAM J. ALBERTS
Retirees:              1301 K Street, NW, Suite 600, East Tower
                       Washington, DC  20005
                       (202) 408-7004

                       Dentons US, LLP
                       By:  CAROLE NEVILLE
                       1221 Avenue of the Americas, 25th Floor
                       New York, NY  10020-1089
                       (312) 632-8390

For the State of       Dickinson Wright
Michigan:              By:  STEVEN HOWELL
                       500 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3425
                       (313) 223-3033

For Detroit            Clark Hill, PLC
Retirement Systems-    By:  ROBERT GORDON
General Retirement     151 South Old Woodward, Suite 200
System of Detroit,     Birmingham, MI  48009
Police and Fire        (248) 988-5882
Retirement System
of the City of
Detroit:

For the Detroit        Erman, Teicher, Zucker &
Fire Fighters            Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police         400 Galleria Officentre, Suite 444
Officers Associa-      Southfield, MI 48034
tion and the           (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

For Ambac              Arent Fox, LLP
Assurance              By:  CAROL CONNOR COHEN
Corporation:           1717 K Street, NW
                       Washington, DC  20036-5342
                       (202) 857-6054
```

APPEARANCES (continued):

For FMS:              Schiff Hardin, LLP
Wertmanagement:       By:  RICK FRIMMER
                      233 South Wacker Drive
                      Chicago, IL  60606-6473
                      (312) 258-5511

For Detroit Retired   Lippitt O'Keefe, PLLC
City Employees        By:  RYAN C. PLECHA
Association,          370 East Maple Road, 3rd Floor
Retired Detroit       Birmingham, MI  48009
Police and Fire       (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For Syncora           Kirkland & Ellis, LLP
Holdings, Ltd.,       By:  STEPHEN HACKNEY
Syncora Guarantee          NOAH ORNSTEIN
Inc., and Syncora     300 North LaSalle
Capital Assurance,    Chicago, IL  60654
Inc.:                 (312) 862-3062

For Bank of           Davis, Polk & Wardwell, LLP
America:              By:  MARSHALL S. HUEBNER
                      450 Lexington Avenue
                      New York, NY  10017
                      (212) 450-4099

Court Recorder:       Kristel Trionfi
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE CLERK:  Court is in session.  Please be seated.

2    Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Good morning.  I'd like to begin with

4    the notice of presentment regarding the financing order,

5    please.

6    MR. ERENS:  Good morning, your Honor.  Brad Erens,

7    E-r-e-n-s, of Jones Day on behalf of the city.  Your Honor,

8    we're pleased to be here for hopefully approval of the

9    quality of life financing that your Honor previously approved

10   on a preliminary basis in January.  We presented the revised

11   order to you as part of our notice of presentment.  We do

12   have some objections.  I think most of the objections relate

13   to procedurally where we are.  It's the city's view that,

14   again, your Honor approved this loan subject to presentment

15   of an order that comported with your ruling on January 16th,

16   and that's what we did.  The objections take the position

17   that this is a completely new financing.  For the reasons we

18   set forth in our reply to those objections, that's not the

19   case.  If your Honor has any questions, we're happy to answer

20   them.

21       Your Honor issued an order on March 24th asking us

22   to provide additional information.  We attached that as

23   exhibits to our reply.  We filed blacklines of the financing

24   documents.  We provided a schedule of expenditures and budget

25   as Exhibit F to the reply to the objections, and we provided

1  some other information just showing that the loan is no

2  different than the portion of the loan previously sought and

3  approved by your Honor on January 16th, so to the city that's

4  where we are.  Again, happy to answer any questions or we can

5  just go to the objections, but we'd reserve time to reply.

6          THE COURT:  All right.  Thank you.  Who would like

7  to be heard regarding this?

8          MR. MARRIOTT:  Good morning, your Honor.  Vince

9  Marriott, Ballard Spahr, representing EEPK and affiliates,

10  although I rise on behalf of a group of objectors and will

11  speak on their behalf as well as my own clients.

12          Mr. Erens is correct.  Our objection to the proposed

13  order for the latest iteration of post-petition financing was

14  procedural.  In other words, it is our view that the city

15  needs to proceed by motion rather than by mere presentment of

16  a proposed order.  The presentment comes some six weeks after

17  the hearing on the original proposed financing and is with

18  respect to a different loan than the city was proceeding with

19  respect to the last time around.  This Court may have offered

20  guidance to the city the last time around as to what it would

21  approve, but what the Court indicated it would approve then

22  was not the loan the city had at the time.  In other words,

23  the Court was not approving this loan because this loan did

24  not exist six weeks ago.  That matters, your Honor, because

25  circumstances have changed from where they were the last time

1    the city filed a motion seeking approval of post-petition

2    financing, and the city should be required to make a case for

3    this loan under present circumstances, not a different loan

4    under prior circumstances.

5         Now, what are the present circumstances and why do

6    they require a new showing by the city following a new motion

7    and a new hearing?  Well, for one thing, Judge, we're six

8    months past the RFP that went out with respect to the prior

9    financing, which, in any event, was for a different loan,

10   different purposes, different amount.  A determination that

11   the terms and conditions reflected in the loan -- new loan

12   are the best available to the city for a smaller loan with a

13   different purpose today can't be made from the record of the

14   last hearing.

15        Judge, moreover, because the uses of the loan are

16   not the same, questions as to need and structure arise that

17   the city should have to address.  Specifically, no part of

18   this loan is being used to retire existing debt.  Its only

19   use now is for what the city used to call quality of life

20   purposes but which it indicated at the last hearing was

21   really for working capital purposes.  Nonetheless, the loan

22   is still structured as a term loan with all the proceeds

23   advanced at once rather than as a revolving credit, which is

24   far more typical of short-term working capital financing.

25   This results in what is likely to be unnecessary interest

1  expense since the city will be paying interest on loan
2  proceeds that it is not using until it -- unless it expends
3  all of the loan proceeds on the day of funding, which there's
4  no evidence it will do, which leads your Honor to an even
5  more fundamental question, which is whether at this stage of
6  the case with confirmation three and a half months away under
7  the present schedule it needs to borrow any money at all or
8  this will just result in expense but no benefit.

9          The Court requested that the city provide a schedule
10  of proposed expenditures to support the new loan.  To my
11  understanding of schedule, the city did not do that.  The
12  city provided you with illustrative but not binding
13  categories of potential expenditures.  The real question,
14  your Honor, at this stage of the case is how much of these
15  proceeds can actually be spent between now and the end of the
16  case when the loan comes due.  Are there any, quote, unquote,
17  shovel ready projects?  If so, what are they, how much will
18  they cost, and why would the city be borrowing and paying
19  interest on more than those shovel ready costs, if any?

20          In short, Judge, the case that the city made the
21  last time around doesn't make the case for this loan this
22  time around.  Accordingly, the city should not be permitted
23  to proceed by presentment of a form of order but should be
24  required to proceed in the normal fashion by motion and a
25  hearing, and that's our view.

1       THE COURT:  Thank you, sir.  Would anyone else like

2  to be heard?  Response, please.

3       MR. ERENS:  Thank you, your Honor.  I guess we heard

4  two points, two main points in the objections.  One is

5  somewhat new or at least a little different than what was

6  filed, which is why is the city doing this now, especially

7  with confirmation arguably on the horizon.  There are clear

8  answers to that, your Honor.  Again, that wasn't really the

9  main point of the filed objection, but we will respond.  The

10  city has numerous projects that it really needs to attend to.

11  I think it's sort of obvious to everybody that there is a lot

12  of work to be done in the city.  This loan originally, from

13  the city's perspective, was scheduled to close at the end of

14  2013, of course, subject to the court process.  It couldn't

15  be guaranteed that that was the case, but the city had

16  projects ready to go back then and has projects ready to go

17  right now and is in the position that actually it has

18  deferred this infrastructure spending for some time and it is

19  ready to go the date the loan closes.

20       In terms of the argument that the loan is just being

21  used for working capital, I don't quite understand that, your

22  Honor.  We did provide a schedule, again, at your request to

23  indicate what the city intends to use the money for, and,

24  again, the illustrative examples are police and fire, fleet,

25  maintenance, repair, staffing.  This is not working capital

1　in the sense of just funding deficits and the like.  We have

2　actual hard asset projects that are ready to go, also blight

3　removal, another major category.  So with respect to that

4　type of issue, again, the city would simply say we're ready

5　to go.  We have projects that we want to spend the money on,

6　and we will be spending the money on those projects if and

7　when the loan closes.

8　　　　　With respect to the issues about why now with

9　confirmation so close, again, it's the same issue.  I mean

10　this is money that the city intends to spend, and it has

11　deferred these types of projects for some time and would like

12　to go forward.

13　　　　　With respect to the procedural issue, I guess, which

14　is what was really in the filed objection, the notice of

15　presentment has now been out for approximately -- I believe

16　we filed it on March 6, so it's not like we filed the notice

17　of presentment and were here two days later.  This process

18　has been out there now for more than three weeks.  I guess I

19　would say, one, a motion was not something we think was

20　required based on the Court's prior ruling.  Your Honor

21　preliminarily approved the loan.  But, nonetheless, we don't

22　really see the prejudice.  We filed the order.  The parties

23　responded with the objection that they responded to, and

24　we're now at the hearing.

25　　　　　With respect to the record, which I suppose is the

1    other aspect that was raised, does the record reflect -- or

2    does the record support, I suppose I should say, the entry of

3    the order, we think, yes, your Honor, clearly it does.  The

4    record reflected a process whereby the city solicited

5    interest in this loan.  Parties were asked and some did

6    submit proposals just for this portion of the loan rather

7    than the entirety of the loan at the time, which, again, was

8    the swap portion and then this portion.  And it is the city's

9    and its advisors' collective wisdom that this is the best

10   loan available for this portion of the financing, the quality

11   of life financing.  The Barclays offer has always been the

12   best offer, and there's no reason to believe there is a

13   better offer out there.  I suppose the issue about

14   confirmation cuts both ways in the sense of this loan is

15   really only expected to be out for a relatively short period

16   of time from now until confirmation, so if you think about

17   it, if the city were to go out and solicit interest in a new

18   process, which would take a lot of time, it probably means

19   the loan would not actually close before confirmation.  And

20   we don't expect to get a better deal, but we would have to

21   pay another commitment fee for a new loan, and with the loan

22   only being out for a short period of time, it's unrealistic

23   really to believe that the city would save money through a

24   new process.  I can go through those details if you'd like to

25   understand better, but a commitment fee for a new process

1    would almost invariably eat up any benefit to a party

2    offering a lower price, but, again, the city doesn't believe

3    a lower price is out there, and that's reflected in the

4    testimony that was given to your Honor back, I believe, in

5    December and January and based on the collective wisdom of

6    the city and its advisors.

7         So, your Honor, we're ready to go.  We're eager to

8    go.  We've got projects to fund, and we are hopeful that you

9    will approve the loan at this time.  Thank you.

10        THE COURT:  All right.  Thank you.  Stand by,

11   please.  Okay.  Would anyone else -- are you all set?

12        MR. ERENS:  Yes, I think so.

13        THE COURT:  Okay.  Would anyone else like to be

14   heard?  All right.  The Court is going to enter the order

15   that was submitted by the city or an order with minor

16   modifications to it if that's appropriate at this point in

17   time.  The Court will overrule the objections at this time.

18   As the Court sees it, there are three such objections.  One

19   is as to the adequacy of the record previously made to

20   justify the present loan and the present order approving that

21   loan.  The second is as to the timing of this loan, and the

22   third is the question of whether the procedure that the city

23   has employed for the entry of this order violates any of the

24   procedural rights of the objecting parties.

25        The Court concludes that the record is adequate,

1   indeed, more than adequate to support the Court's approval of
2   the loan as it presently has been requested.  The loan, as it
3   has been requested now, is sufficiently similar to the
4   loan -- the portion of the loan that the Court previously
5   approved that there is, in the Court's conclusion, no need
6   for any further development of the record in order to justify
7   this present loan.  The considerations that led the Court to
8   approve the loan the last time, in the Court's view, still
9   apply and still support the approval of the loan.

10          As to the timing, the Court concludes that the
11  record does establish a certain urgency to obtain these funds
12  to begin the projects that the city feels the need to
13  commence at this time.  This Court has previously held that
14  the city is service delivery insolvent.  It is not providing
15  sufficient services to meet the basic needs of its citizens,
16  and this loan will provide the city with the means to begin
17  to make up that deficit, and it's important and urgent for
18  the city to do that.  The city recognizes that importance and
19  that urgency, and the time to begin is now, if not before
20  now.

21          As to the procedural rights of the objecting
22  parties, the Court concludes that the process that the city
23  has employed, this notice of presentment process, has given
24  all of the objecting parties a fair opportunity to object and
25  to be heard regarding the relief that the city seeks here.

1    Could the city have filed a new motion?  Of course it could

2    have, but was it required to in order to provide the

3    objecting parties with a sufficient opportunity to understand

4    what the city was trying to do and to object to it if they

5    did object?  It did, so you may submit an appropriate order.

6             MR. ERENS:  All right.  Thank you very much, your

7    Honor.  Your Honor mentioned minor modifications.  Is that

8    something your Honor intends to do or directions?

9             THE COURT:  If you're satisfied with the order that

10   was attached to the notice, that's fine.  I just didn't know

11   if there were changes that needed to be made in the meantime.

12            MR. ERENS:  I don't believe so, your Honor, but we

13   will confirm and get back to your chambers.

14            THE COURT:  Okay.

15            MR. ERENS:  Thank you.

16            THE COURT:  Let's turn our attention to the order to

17   show cause why an expert witness should not be appointed.

18   Who'd like to be heard regarding this matter?

19            MR. CULLEN:  I'll go first, your Honor.

20            THE COURT:  All right.

21            MR. CULLEN:  Thomas Cullen of Jones Day representing

22   the city.  May it please the Court, good morning, your Honor.

23   I'd like to emphasize at least two things with respect to the

24   city's response to this.  Number one, we were basically

25   meaning to affirm the Court's broad discretion to do what the

1  Court feels it needs to build the record we all need to
2  accomplish our common work here.  We made certain suggestions
3  that we thought could be included in such an order, which we
4  thought furthered some of those objectives.  These are not
5  must things, of course.  These are considered things within
6  the Court's broad authority, which we recognize under 706,
7  and we think the overall process is a good one.  And we think
8  that if the Court gets the experts that it needs or the
9  stature of person that the record might need for this that
10 those people will be the kind of people who set their own
11 agenda to some degree.
12         I thought it was -- I think it might be necessary
13 for us to address some of the talk about the city trying to
14 hijack the process or something of the sort, and if I could
15 digress briefly, what happened was is that we were working on
16 a draft 706 order to submit to the Court at the time the
17 Court's order came down and had been thinking about the issue
18 for some time.  And in order to look at the feasibility of
19 that, we had gone out to talk to what we thought was a
20 preeminent expert who had refused to be a paid expert because
21 he thought it inconsistent with his scholarly integrity, and
22 he made the handsome offer that is reflected in our papers.
23 That happened before the Court's order came down.  So far
24 from trying to hijack the process, I was left in -- we were
25 left in a position where we'd done some thinking about this.

 1   We'd contacted an eminent individual who made a handsome
 2   offer, and I could either be cute about that or share that
 3   with the Court, which is what we decided to do.  But the
 4   basic message is that we think that the input of such expert
 5   or experts would be useful to the Court.  We think that a
 6   procedure here, because we have a fast track, as other
 7   motions will indicate this morning -- the procedure here
 8   requires some thought, and that's why we suggested the mini
 9   hearing, joint deposition, deposition in front of the Court,
10   call it what you will, I think clearly within the Court's
11   powers under 706 to get the expert's views in front of the
12   Court and the parties in an open forum subject to cross-
13   examination but at a point prior to the actual confirmation
14   hearing so that we could -- all the parties and the Court
15   could use those views, which would be part of the record, to
16   inform our positions and to, as we said in our papers, enrich
17   the record and direct our questioning and our focus better as
18   we move forward.  That's where we were coming from with these
19   things.  It is all in aid of -- we've got a common job of
20   work here.  It's a hard job.  Outside help from eminent
21   individuals beholden to no one is a great idea to help us all
22   do our work on behalf of the city, so that's -- we're in
23   favor.  We think it's within the Court's authority.  It's
24   within the Court's authority to do it any of the which ways
25   suggested to the Court, so we submit these ideas to the

1  Court's discretion and prudence.

2          THE COURT:  Thank you, sir.

3          MR. MARRIOTT:  Good morning again, your Honor.

4  Vince Marriott, EEPK and affiliates, again speaking for a

5  larger group.  We filed a comment as well as a suggested

6  edited version of both orders.  Our concern, as we expressed

7  in our papers, is not with the idea of the court-appointed

8  expert but with the scope that that appointment would

9  involve.  Our concern is that feasibility narrowly defined is

10  too limiting a scope for such an expert.  Determining whether

11  or not the city can meet or can reasonably be expected to

12  meet the obligations under its plan tends to push the plan

13  process in a direction toward the city limiting itself to the

14  minimum possible, the less the plan provides the city will do

15  for creditors and itself.

16          THE COURT:  I'm not sure I understand why that's so.

17  I assume that parties who object to the plan on the grounds

18  that the plan does not meet the best interest of creditors

19  test will submit evidence of that, and that issue will have

20  to be dealt with as part of the plan confirmation process.

21          MR. MARRIOTT:  We will submit evidence of that,

22  Judge, but because the requirements of the Bankruptcy Code

23  tie feasibility and best interest of creditors together,

24  they're really two sides of the same coin.  It seems to us

25  that limiting the expert's scope to feasibility and not

1  having the expert also look at issues relative to best
2  interest such as, yes, the city -- what the city proposes to
3  do works, but so would other things that would be better for
4  creditors and result in a greater return to creditors, would
5  be better for the city and result in a better revitalization
6  of the city --
7           THE COURT:  No, but here's what --
8           MR. MARRIOTT:  I think all the --
9           THE COURT:  Here's what motivated me to suggest
10 this, and it is precisely the argument you've just made.  I
11 have doubted that any creditor will argue that the city's
12 plan is not feasible.  Quite to the contrary, creditors will
13 argue that the city can do more.  And it was that lack of
14 adversary process as to feasibility together with the
15 extraordinary importance of feasibility that led me to
16 suggest this.  I have no doubt but that the adversary process
17 will work fully as to the best interest of creditors test.
18 What concerns me and what led to this hearing this morning is
19 whether the adversary process will work as to feasibility.
20           MR. MARRIOTT:  And our concern is sort of a
21 corollary, which is if the expert is limited to feasibility
22 narrowly construed --
23           THE COURT:  Um-hmm.
24           MR. MARRIOTT:  -- that that will push the process
25 toward, for want of a better word, privileging feasibility

1    over best interests, and it is our view that you can't

2    privilege feasibility over best interests, that they are

3    joined at the hip, both are required to confirm a plan, and

4    that if there is to be a court-appointed expert on one piece

5    of the whole, that to prevent that from being privileged and

6    to give the Court and the parties the opportunity to explore

7    independently best interests as well, that the scope of the

8    expert's engagement really should be both.  And I don't know

9    that it meaningfully burdens the expert beyond feasibility

10   only.  The expectation is the expert is going to be looking

11   at what the city plans to do and in looking at what the city

12   plans to do will no doubt have views as to whether or not the

13   city could be doing different things that would result in

14   better outcomes.  And our concern, again, is pushing the

15   process toward feasibility, being put on a pedestal and best

16   interest being secondary -- and that would be an outcome

17   that, in our view, would be not only inconsistent with

18   Chapter 9 but would result in a confirmation process that was

19   not going to lead to the best possible result.  Do you have

20   any other questions of what we submitted?  I think it's

21   relatively self-explanatory.

22           Oh, the other thing -- I'm sorry.  I should make one

23   other point.  The other thing that concerned us about the

24   form of order was that it suggested that the expert, whatever

25   his or her scope, would consult with the city only.

1     THE COURT:  Yeah.  I agree with you about that, and

2  that's a change that will have to be made.

3     MR. MARRIOTT:  Okay.  That was the other thing.

4     THE COURT:  Right.

5     MR. MARRIOTT:  Do you have anything further for me,

6  your Honor?

7     THE COURT:  No, just to thank you for the

8  suggestions you and the city and the others made in response

9  to my order to show cause.  I found many of them to be very

10 helpful and will incorporate many of them in the final order.

11    MR. MARRIOTT:  There may be others who wish to speak

12 who I was --

13    THE COURT:  Sure.

14    MR. MARRIOTT:  -- not speaking on behalf of.

15    MR. ALBERTS:  Good morning, your Honor.  Sam Alberts

16 from Dentons on behalf of the Official Committee of Retirees.

17 We join in with the statements that have been made by Mr.

18 Marriott about the concern of balance.  I would just like to

19 add one other point on that.  I think that it is important

20 that if this Court were to retain an expert for himself --

21 and I understand the purpose of it and the desire to keep a

22 close eye on whether feasibility truly is met or whether or

23 not it's just being sort of sloughed off to the side to cut a

24 deal, but there is an issue of perception, and I think that

25 this case is very visible.  There is a lot of concern in the

1   community that the process is fair and that the various

2   interests of the party are being perceived equally by those

3   that are involved in the process. And what I would suggest

4   is that it is important for this expert not just to focus on

5   the feasibility side of the test but also the best interest

6   side because in addition to giving, I think, that expert a

7   more fulsome view of the case and what may be truly doable

8   and feasible, it will also give, I think, more confidence to

9   people who are looking at this process that the expert is

10  truly looking at the right issues in a balanced way. And I

11  realize that in normally the adversarial process the city

12  would be arguing on one side. We'd be arguing on the other.

13  The Court has its own experts. I think that people are going

14  to want to know that this Court is being informed in a

15  balanced way, so I would rise to suggest that is another

16  reason for expanding the scope.

17          Now, with that said, I don't think the scope should

18  be as an uber-expert, and I don't think that's what the Court

19  was suggesting, some expert that would override all of the

20  other experts in this case, but as someone who was helping to

21  inform the Court. So with that, your Honor, unless the Court

22  has any questions --

23          THE COURT: Yeah. It is the Court's intent that

24  this expert, assuming we can find one, would be treated in

25  all practical senses like the other experts.

1          MR. ALBERTS:  Okay.  Thank you very much, your

2    Honor.

3          MR. HOWELL:  Good morning, your Honor.

4          THE COURT:  Mr. Howell.

5          MR. HOWELL:  Steven G. Howell, Dickinson Wright,

6    special assistant attorney general appearing on behalf of the

7    State of Michigan.  We are here this morning to support the

8    Court's order.  We share the Court's concern on feasibility.

9    We have expressed that concern numerous times to the city and

10   to the other parties that we have spoken to during the course

11   of this case.  We have pushed on that issue on a regular

12   basis.  We believe that the greatest opportunity for success

13   in this case exists now, and we must get it right the first

14   time.  We believe that the success achieved must be long-term

15   and lasting.  Feasibility is the key to that.  And we defer

16   to the Court to judge best what it feels is most helpful in

17   coming to its decision, and so, your Honor, we stand in

18   support of the Court's entry of an order for an expert on

19   feasibility.  Thank you, your Honor.

20          THE COURT:  Thank you, sir.

21          MR. GORDON:  Good morning, your Honor.  Robert

22   Gordon on behalf of the Detroit Retirement Systems.  I'll be

23   brief.  I will presume that the Court has seen our papers as

24   well.  We suggested some wordsmithing around some of the

25   order to make clear what retentions are relevant, both the

1    applicants and the applicants' firm and things of that

2    nature.  We also generally express concern about the

3    nomination process and other things that would ensure an

4    arm's length process.

5            The only other thing I wanted to mention is that we

6    do join in the general concern about elevating feasibility

7    over best interests.  I certainly understand and would

8    respect the Court's concern about a lack of adversarial

9    process with respect to the feasibility issue itself, but we

10   would just simply urge the Court to consider ways to make

11   sure that feasibility does not become the end-all, be-all and

12   elevate it over the other issues, so we just wanted to

13   join --

14           THE COURT:  I do have a couple of questions for you

15   about issues that I think your paper raised.  As a general

16   matter, I think that any party who has information that the

17   expert decides in his or her judgment he or she needs ought

18   to cooperate with that expert.  I take it there couldn't be

19   any objection to that.

20           MR. GORDON:  None, your Honor.

21           THE COURT:  Okay.  The question then becomes what to

22   order, if anything, about how such requests for information

23   are actually accomplished and how the responses to those

24   requests for information are actually accomplished.  It

25   strikes me as potentially cumbersome to involve the Court

1   every time an expert wants something from a party and that we

2   ought to be able to devise some less formal but nevertheless

3   properly transparent process to do that, so that's my goal --

4   excuse me -- that's my goal for that.  It doesn't seem to me

5   to be appropriate or even necessary to prohibit ex parte

6   communications, per se, between the expert and the parties to

7   the extent the expert in his or her judgment wants

8   information to go directly to the party.  I do think it's

9   appropriate to prohibit ex parte communication between the

10  expert and the Court, and I indicated, I think, in one of the

11  suggested orders that any of those kinds of communications

12  ought to be in writing.  Are we together so far?

13          MR. GORDON:  Yes, your Honor, although I think

14  I've -- in certain situations I could imagine where the

15  expert may have -- I'm actually sort of thinking out loud,

16  and I shouldn't be doing that and may be saying something

17  against my own interest, but I would want the expert to have

18  some flexibility to be able to confer with you.  It is the

19  court-appointed expert, and I understand that in other cases

20  there has been some methodology in limited circumstances for

21  communication with the Court, so I'm less troubled about that

22  than I am about --

23          THE COURT:  Well, I appreciate that, but --

24          MR. GORDON:  Sure.

25          THE COURT:  -- as Mr. Alberts has pointed out,

1    everything -- everyone is watching everything we do here.

2            MR. GORDON:  Yes, your Honor.

3            THE COURT:  So I'm going to -- I want to try to

4    devise some means by which the expert can expeditiously

5    obtain the information needed to do the job that is at the

6    same time as transparent as possible, and, of course, any

7    such communications are subject to discovery, depositions or

8    cross-examination, et cetera.  Okay.

9            The other question I had for you, the one you

10   mentioned about the actual selection process, it will be --

11   it would be extremely helpful to me to have input in the

12   selection process.  Again, the question becomes how to

13   balance the need to do this expeditiously with the importance

14   of that input, so what I'm thinking of doing is inviting a

15   small subset of you all to participate with me in the

16   interview process and to do that interview actually in open

17   court on the record so that anyone who's interested can at

18   least sit in on if not participate in the interviews.  And I

19   certainly agree with whoever made the comment that this

20   interview is not a Daubert hearing.  To the extent we need a

21   Daubert hearing, we can do that later.  This is just a

22   selection interview.  Okay.

23           MR. GORDON:  Agreed.

24           THE COURT:  So what I'm thinking of is one

25   representative of the city to participate and two

1  representatives from the objecting parties' side, so I want

2  to ask the city to nominate someone, and I want all of you on

3  the objecting side to meet and confer and nominate four

4  attorneys from a cross-section of you from which I will

5  select two.  Is there any objection to that?  So I and three

6  of you will interview this person -- or these applicants, I

7  should say.  So we'll set a deadline for the applications.  I

8  will narrow the field down to the -- I don't know -- three or

9  four or five to be interviewed, and then we'll conduct the

10  interviews.  Sir.

11        MR. ALBERTS:  Your Honor -- I apologize, your Honor.

12  When you say the nomination of four, you mean four attorneys

13  to help the Court interview the witness.  Does the Court also

14  ask from the other parties to -- or give us an opportunity to

15  nominate potential experts as well, or is that --

16        THE COURT:  Well, I have very mixed feelings about

17  that specific question.  My concern is that, as some of you

18  observed in your papers, if a party nominates a witness,

19  there's a public perception of some kind of connection, and I

20  don't want that, so my preference would be for you to solicit

21  applications yourselves if that's what you want to do.  Now,

22  I will forewarn you when you do that that one of the

23  interview questions will be, "Who have you spoken to about

24  this nomination?" so I mean eventually it's all going to come

25  out.

1          MR. ALBERTS:  Right.

2          THE COURT:  But I think the optics of it are better

3    if we follow that route rather than you make nominations.  I

4    know the rule allows for that.  I don't think it requires

5    that, though.

6          MR. ALBERTS:  Okay.  I appreciate that, your Honor.

7    So if an expert witness or somebody may be interested, they

8    should contact the Court directly?

9          THE COURT:  They should submit an application.

10         MR. ALBERTS:  Yeah.  Okay.  Thank you very much,

11   your Honor.

12         THE COURT:  Yeah.

13         MS. PATEK:  Good morning, your Honor.  Barbara Patek

14   on behalf of the public safety unions.  And I think a lot of

15   what I'm going to say is going to be addressed, but I did

16   want to, for the record, make a couple of comments on behalf

17   of the public safety unions because we are the group who

18   stands, I think, on both sides of the feasibility

19   determination.  And I think with the process that the Court

20   has indicated is going to be put in place, a lot of our

21   concerns are going to be addressed, but I think mainly what I

22   wanted to say is obviously there are a number of tremendous

23   advocates in this courtroom, and we're all advocates for our

24   particular constituency.  And I think that it's very

25   important that this expert be truly independent if there can

1   be such a thing and, you know, that economics, as we know, if

2   that's the direction we're going, is not a science in the

3   same way that calculus or chemistry is a science.  And given

4   the city's great political latitude in terms of framing the

5   feasibility question, one thing that the public safety unions

6   do not want to see get lost in the mix is the idea that it's

7   not just are the dollars and cents there to pay what has to

8   be paid going forward, which is obviously important to us

9   because if we're going to make an agreement with the city, we

10  want to know that we're going to continue to be paid, but the

11  flip side of that, as the Court recognized in its eligibility

12  opinion and in the comments it made earlier today about the

13  service delivery insolvency, is that particularly in the case

14  of public safety, you're dealing with a group of people who

15  the record in front of the Court says, you know, the morale

16  is low.  They're underpaid.  They're undermanned.  They're

17  working in very difficult conditions, and they're now facing

18  not only cuts in their paychecks but in their pensions going

19  forward.  And I think the need -- included in the need to

20  provide those essential services has to be that human part of

21  the equation.  And I'm not talking about as a sympathy factor

22  but is the city going to be able to keep and retain a high

23  quality group of people to continue to perform those

24  services, and I think those are my comments, for the record.

25  Thank you, your Honor.

1          THE COURT:  Thank you.

2          MS. CONNOR COHEN:  Carol Connor Cohen from Arent Fox

3    for Ambac Assurance Corporation.  Your Honor, I will be very

4    brief.  I just want to return briefly to the feasibility,

5    best interest issue.  I think that -- and we very much

6    appreciate your Honor's comments that you will view this

7    independent expert like the other experts in the case, but

8    the reality is that the independent expert is going to be

9    likely viewed as somehow more independent, more influential

10   because he or she is independent and not, you know, one of

11   the parties', you know, hired guns, to use a pejorative

12   phrase.  And for that reason, we think it really is important

13   that the independent expert look at both sides of the coin,

14   look at both feasibility and best interest, because if

15   they're only looking at whether the city can make the plan

16   work and not whether the city has also done everything it can

17   do, it's likely to skew the analysis, and that's all I want

18   to say.  Thank you.

19         THE COURT:  Thank you.  Would anyone else like to be

20   heard?  Mr. Cullen.

21         MR. CULLEN:  Briefly, your Honor.  With respect to

22   the small issue of how to arrange the communications, it's

23   between the expert and the parties.  It seems to me that

24   there are two alternatives available, one slightly more

25   formal, one slightly less.  One is that the experts and the

1  parties could just keep a log of contacts and the nature of
2  the contacts and then make those logs available at a given
3  time.  If that's -- if that provides insufficient control or
4  is thought to, then we could just have the expert or the
5  parties memorialize in a brief letter or note when such
6  contacts occurred, either one, so then you'd have kind of
7  real time notice of what was going on.
8            THE COURT:  Um-hmm.
9            MR. CULLEN:  Either would be acceptable to the city.
10  I think either would be workable without putting a logjam in
11  the process.  And with respect to the interview process, I
12  assume that one of the -- one of the other things it won't be
13  like is a confirmation hearing that won't be -- you know, no
14  French kissing in high school as an objection or anything of
15  that nature, but also with respect to --
16            THE COURT:  I won't ask you what you meant by that.
17            MR. CULLEN:  Well, let's not reminisce, your Honor,
18  but the -- but I think that in the nomination process or in
19  the identification process -- and I would regard what we did
20  with Professor Glaeser as more of an identification than a
21  nomination, but that's terminology.  But there may be other
22  people that come to us, and we might encourage them to -- we
23  might encourage them to apply as well.
24            THE COURT:  Um-hmm.
25            MR. CULLEN:  And I would -- and I would urge the

1  Court, as it thinks about these things -- and maybe it's

2  responsive to what the parties have said -- that it may help

3  the Court to have more than one, and it may be interesting or

4  not interesting to the Court that some might offer or prefer

5  to do it pro bono.  I think that's an -- I think that's an

6  interesting point for the Court to wrestle with.  All right.

7  Thank you, your Honor.

8          THE COURT:  All right.  Sir.

9          MR. FRIMMER:  Good morning, your Honor.  Rick

10  Frimmer, Schiff Hardin, representing FMS.  More of an

11  observation than anything else, as you correctly point out,

12  the world is sort of watching.  Ever since the docket

13  reflected the order to show cause, I know I have and I'm sure

14  other people have heard from many industry professionals

15  wanting to know how they get in on the action, so to speak.

16  I would suggest to your Honor that you're going to be

17  inundated with RFP's.

18          THE COURT:  Um-hmm.

19          MR. FRIMMER:  So I was wondering whether you had any

20  thoughts about what -- the paradigm qualifications you're

21  looking for and whether you intend to narrow the field.  Are

22  you looking for an academic, financial industry type folks?

23  It just might be helpful to narrow it if you had notions

24  about that --

25          THE COURT:  Um-hmm.

1       MR. FRIMMER:  -- because -- or else you may have

2   hundreds of responses to your RFP.

3       THE COURT:  Thank you.  To be less flip, again, I'm

4   of two minds on the subject.  On the one hand, I'm interested

5   in efficiency, which I think is the concern you're expressing

6   here.  On the other hand, I don't want to be so efficient

7   that I exclude by definition someone who might be really

8   good, and I'm not sure that academic versus nonacademic makes

9   sense, so so far in my thinking I've declined to be any more

10  specific than I outlined in the proposed order.

11      MR. FRIMMER:  As I say, mine is just an observation

12  that the --

13      THE COURT:  Thank you.

14      MR. FRIMMER:  -- panel of three, so to speak, that

15  ultimately will assist you are going to have to weed through

16  probably three categories of folks that are going to respond

17  to this.  You know, some may be what I would refer to -- what

18  I could refer to as urban planner types.

19      THE COURT:  Right.

20      MR. FRIMMER:  Some -- most, I think, will be the

21  kind of financial advisory firms that do M&A work and all of

22  whom will be eminently qualified to --

23      THE COURT:  Yeah.

24      MR. FRIMMER:  -- numbers, so to speak.

25      THE COURT:  Right.  And you raise a good point.  The

 1  urban planning person who can look at the city's assumptions
 2  may not be the same person who can look at the Excel
 3  spreadsheet on the cash flows and projections.
 4           MR. FRIMMER:  That's my point.
 5           THE COURT:  So that's why I sort of left open the
 6  possibility in the order that it may be two experts or maybe
 7  more.  I don't know.  I'm open to what makes sense --
 8           MR. FRIMMER:  Well, again --
 9           THE COURT:  -- without burdening the process --
10           MR. FRIMMER:  Yeah, and without delay.
11           THE COURT:  -- and without compromising the
12  efficiency we all need.  Thank you.
13           MR. FRIMMER:  So I made the point.  I mean it's
14  really more for you to think about, but --
15           THE COURT:  Thank you.
16           MR. FRIMMER:  -- you know, the consequences are
17  that, you know, if the panel -- that three-person panel along
18  with your Honor -- if it's more of an academic type, that
19  person will have to likely retain the numbers crunchers.  If
20  it's a numbers cruncher, they'll probably have to work with
21  an urban planner because -- I think the city noted this in
22  their papers, and I think this was a perfectly legitimate
23  observation that feasibility, if you will, broadened or not,
24  still involves not only the question on do the numbers add up
25  but also the underlying assumptions --

1          THE COURT:  Right.

2          MR. FRIMMER:  -- from a planning standpoint --

3          THE COURT:  Correct.

4          MR. FRIMMER:  -- so that's why I pointed it out.

5          THE COURT:  Thank you, sir.  I think there was one

6   more or a couple more.  Okay.  Sir.

7          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

8   on behalf of the retiree association parties.  I rise briefly

9   just to suggest to the Court that on the creditors' side, it

10  may be prudent to increase the number above two for the wide

11  array of creditors in this case without getting cumbersome,

12  but I think limiting it to two could possibly have a negative

13  impact, and to maybe allow the creditors to caucus and

14  suggest a number that's above two but in the realm of

15  efficiency I think would be prudent.

16         THE COURT:  Okay.

17         MR. PLECHA:  Thank you.

18         THE COURT:  No.  That's fine.  If you all think we

19  can do this efficiently with more than two on your side, I'm

20  certainly willing to consider that.  Mr. Alberts, was there

21  something further you wanted to say?

22         MR. ALBERTS:  No.  Mr. Plecha had said his own

23  piece.

24         THE COURT:  He said it.  Okay.  All right.  Well,

25  let's see.  Today is Wednesday.  By Monday or Tuesday of next

1   week, can you get me your suggestions to serve on the
2   interview committee?  I do want to get the solicitation order
3   out today, so I will make the revisions to that and get that
4   entered today, and then we'll set a deadline for the
5   applications and an interview date.  All right.

6           We will next turn our attention to the motion to
7   adjourn tomorrow's hearing.

8           MR. HACKNEY:  Your Honor, good morning.  Stephen
9   Hackney on behalf of Syncora.  I rise on behalf of a number
10  of parties.  I think a large majority of the objectors have
11  joined in the motion.  I'd like to briefly run through the
12  rationale behind the motion and then also bring one
13  additional concern to the Court's attention that has sort of
14  come into focus this week with the depositions rather than
15  waiting to spring it on you tomorrow if we do go forward.

16          The continuance we've requested -- we've asked for a
17  continuance on the order of seven to ten days, and it's
18  principally in the -- principally of the view of just
19  allowing us better time to prepare and organize the hearing.
20  While we've had the term sheet, as you know, since early
21  March, we did not have the rather lengthy legal briefs that
22  were filed until a week ago Friday.  We did not have the
23  settlement agreement itself and the proposed order until late
24  last Wednesday.  And as you know, these are detailed complex
25  documents in their own right that in themselves relate to

1   other detailed and complicated contracts, and so our point

2   was just a simple one, which is that we believe a short

3   continuance also taking in light of the fact that we were

4   just in depositions on Monday will allow the parties to

5   better prepare their arguments and also better organize the

6   hearing, for example, by doing things like reaching some

7   agreement about -- with respect to the prior hearing, which

8   exhibits should still come in and which portions of that

9   hearing people think should be applicable to this hearing and

10   which should not.  That's something that's more efficiently

11   done outside of the courtroom rather than trying to negotiate

12   it in front of you and having there be ambiguity about what's

13   in evidence and what isn't until we start the hearing, so

14   that is an example of a mechanical benefit that we could get

15   from a short adjournment.  There won't be any prejudice to

16   the city by a short adjournment, your Honor, because, of

17   course, they will --

18         THE COURT:  Didn't I already suggest that I didn't

19   see any reason why everything in the prior hearing can't be

20   considered evidence in this hearing?

21         MR. HACKNEY:  What I took your statement to mean at

22   the last hearing was you had a colloquy with Mr. Hertzberg

23   where he said the prior hearing should come in in its

24   entirety, and I thought that you said can't it all just be

25   submitted and then I'll decide which of it is relevant and

1  which of it is not, but I may have misunderstood your point.

2  I know there are times where in bench trials, right, you --

3        THE COURT:  Well, I said that in utter agreement of

4  what Mr. Hertzberg was saying, not to suggest anything

5  different.

6        MR. HACKNEY:  Okay.  Well, I misunderstood then.  I

7  would note, I guess, for example, Mr. Buckfire testified at

8  length in the prior hearing about the prior forbearance

9  agreement.  That's the type of thing where there may be

10  portions of Mr. Buckfire's testimony that are still relevant.

11  It seems to me that there are large portions of his testimony

12  that might not be relevant.  My suggestion is that it would

13  be better for the parties to have clarity, to the extent they

14  can, about what they're contending from the prior hearing and

15  what they're not.

16        Your Honor, it's a short continuance, and it's a

17  small point, which is just that there is a lot going on in

18  this motion.  It's very important.  It's complicated.  I can

19  tell you, as one of the lawyers that's preparing on it, that

20  it was just to make an argument that we think that we can put

21  the hearing together for you better if we have a little

22  additional time.

23        I do want to raise something that is more important

24  and more substantial.  I don't want to wait till tomorrow to

25  bring it to your attention, assuming I lose my adjournment

1   motion.  There is a -- there's an emerging issue that's

2   important and that is factually intensive that relates to the

3   service corporations, so if you go back to the original term

4   sheet, what I would submit was less clear in that term

5   sheet -- it was clear the liens were all going to be released

6   on the collateral.  I would submit that the injunction and

7   how the service corps were going to be handled was less clear

8   to me.  You'll then see that a wave of objections come in

9   that are raising points about the structuring problems

10  relating to the service corporations trying to understand now

11  you're not including these service corporations, how are you

12  deciding their rights.  And this goes to the core of the

13  motion because the city's goal here is to free up the gaming

14  collateral, and the lien is on the gaming collateral that's

15  held at least in the first instance -- and this is hotly

16  debated -- by the service corporations, so this is an

17  important issue.

18          Now, if I can say something that I would say is a

19  little bit of a recurring issue in this case is there's a

20  tendency by the city to file these motions that are a bit

21  threadbare when it comes to sort of the rationale of

22  relatively complicated legal issues.  Then the objections do

23  a lot of work that try and suss out what all the objections

24  are, and then right before the hearing the city will file

25  very lengthy, very detailed briefs detailing all of these

1    things, what their responses are, what their thinking was

2    about why they can do what they're doing in the motion.  And

3    that happened certainly on the first forbearance agreement.

4    I would say it's happened again here because the original

5    motion was basically like this settlement is basically the

6    same as the other settlement, so all the reasons from the

7    first settlement rationale in that hearing, they all apply,

8    and it basically just quoted all the different parts of the

9    transcript from that hearing.  But then when we all pointed

10    out, no, no, no, there are major structural and legal

11    differences here that you have to take account of, then what

12    we get back are 90 pages of briefs a week ago Friday that do

13    go into a lot of different issues that you will not see in

14    the prior pleadings.  Of equal importance, though, is the

15    fact that this service corp question -- on a week ago Friday

16    when they filed their briefs, the city came out with a new

17    rationale for why you can decide the rights of the service

18    corporations, and it was somewhat twofold.  The first thing

19    they said is, well, the service corporations have acquiesced

20    in the motion, so they haven't objected, so you can do

21    whatever you want to them.  And then the flip side of that,

22    they said, well, the service corporations are a shell, and so

23    you can disregard them and do whatever you want with their

24    rights.  Those were the two rationales.

25         Now, let me first note that this issue is a big

ticket issue in the COP and validity lawsuit.  This is one of
the city's core allegations in that lawsuit, so this is not
some kind of modest, you know, factual issue.  This has
implications for many different things.  Many large financial
issues kind of relate to this structure, the use of the
service corps at the center of this structure, the nature of
the composition of the service corps, which have city
employees, city council members, et cetera.  I'm sure that
you've seen a lot of the pleadings on this.  And I should
note also that this issue is further contentious by the fact
that the city and the swap counterparties themselves disagree
between each other with respect to this issue of the service
corporations because, of course, the swap counterparties in
their brief do a pretty thorough job establishing the
legality and vitality of the service corporations, so it
isn't just me saying that this is a big ticket disagreement
issue that has wide-ranging implications.  You can actually
see it in their briefs.

This issue is, you know, further nuanced a bit by
the fact that the service corporations were apparently
sufficiently alive and well in July of last year to sign up
to the forbearance agreement and represent that they were
validly existing and authorized to enter into the agreement
but now are apparently sham corporations that are lying there
dormant and incapable of doing anything, and I would say it's

1   also further -- raises important due process questions like,
2   for example, my review of the motion that was filed, and I
3   will -- I've checked this personally.  I believe others in my
4   office have checked it.  I don't think that motion was served
5   on the service corporations, so making this acquiescence
6   argument when the motion itself wasn't served on the service
7   corporations I think has significant due process issues, and
8   it's complicated further by the fact that in the COP and
9   validity case recently, the service corporations' counsel
10  appeared and negotiated a stipulation about what they are
11  going to do in that case.  And I don't know what the story is
12  behind how that law firm was retained or how it came to
13  represent the service corporations.  My point is simple.
14  There is a lot going on here with respect to the service
15  corporations, and I think that my view coming into today's
16  hearing was to say to you that if tomorrow's hearing is not
17  going to decide the rights of the service corporations,
18  including not obliterate their liens or bind them to
19  agreements they haven't signed, then I don't think that this
20  is a basis to continue the hearing.  But if the city's
21  rationale of acquiescence or the fact that they're a shell
22  corporation is something that they are going to attempt to
23  put forward despite the fact that neither of the witnesses
24  that we deposed this week have any firsthand knowledge about
25  the service corporations -- both were clear that they

 1  disclaimed any knowledge -- there isn't any documentary

 2  evidence on the exhibits that have been disclosed.  If they

 3  are going to attempt to have you base your ruling on those

 4  rationales or make findings about those things, then I think

 5  we have to all take a step back and consider, wait a second,

 6  how is this going to work from the standpoint of discovery

 7  and litigating this issue, does it need to be coordinated

 8  with the other proceeding, et cetera.  That was the way I saw

 9  this breaking down.  I didn't want to stand up and say that

10  tomorrow because you can see the way it dovetails with our

11  continuance motion.  To the extent you agree it is an issue,

12  you can see it could affect the schedule, and that was what I

13  wanted to bring to your attention.  Thank you.

14          THE COURT:  Thank you, sir.

15          MR. MARRIOTT:  Your Honor, Vince Marriott on behalf

16  of EEPK.  I just want to, before the city has their

17  opportunity, emphasize the significance of this issue of

18  whether or not the service corporations are shells.  That

19  allegation was made in support of approval of the settlement

20  agreement for the first time that I'm aware of in the city's

21  omnibus response to objections.  It is significant to the

22  validity of litigation where billions of dollars are -- well,

23  nominal billions are at issue where an allegation has been

24  made in support of invalidity that the service corporations

25  existed only on paper and are shams.  Insofar as the city

1   intends at the hearing on the settlement agreement to seek

2   approval of the settlement agreement in part on the basis

3   that the service corporations are shell corporations, that

4   has implications far beyond the settlement agreement. It is

5   a complex factual and legal question as to which we would be

6   entitled to significant discovery. When I asked Mr. Orr at

7   his deposition on Monday whether the city intended to

8   introduce evidence at the hearing on the swap settlement in

9   support of the assertion that the service corporations are

10   shell entities, his response was, "I don't know."

11           Insofar as the city wants to reserve the ability to

12   argue and present evidence on that point in connection with

13   the settlement agreement, we think that it has to be stopped

14   and we have to have a discovery schedule to deal with that

15   specific issue. If the city is prepared to say, no, we will

16   not seek a finding on that point and we will not seek

17   approval of the settlement agreement on the basis in whole or

18   in part of an allegation that the service corporations are

19   shell corporations, then I -- then this concern goes away.

20           THE COURT: Thank you, sir.

21         MR. HERTZBERG: Your Honor, Robert Hertzberg on

22   behalf of the city, Pepper Hamilton. Unlike counsel prior to

23   me, I'm not going to do my opening statement today on the

24   service corp issues. I'd like to address first a couple of

25   the issues raised and then get into some of the allegations

1   made in the motion.

2          First, counsel for Syncora was concerned that we

3   didn't follow the proper process on service of the motion to

4   compromise on the service corps.  If you look at the

5   docket -- and I'm sure he could have looked at the docket --

6   he would have seen that we served Lewis & Munday with the

7   motion on March 12th and that they're the registered agents.

8   We also have served Butzel Long, who's now appeared on behalf

9   of the service corps in the COPs litigation, as soon as they

10  appeared with this motion also, so service isn't an issue.

11         Second, I want to clear up another misunderstanding

12  that was put on the record.  Mr. Hackney indicated that they

13  have seen the term sheet since early March.  In fact, Syncora

14  has had the term sheet since mid-February.  As I indicated at

15  the prior hearing, we gave it to them or the bank -- we

16  authorized the banks to give it to Syncora in mid-February,

17  and they did.  So when they stand up today and say that we've

18  had the term sheet since March, it's a little disingenuous,

19  to say the least.

20         In regard to the service corporations, Mr. Marriott

21  indicates to the Court that the motion or the omnibus reply

22  all of a sudden indicated that the service corps were shams.

23  Well, in fact, the COPs complaint, as we call it, which was

24  filed on January 31st of this year, had an allegation that

25  the service corporations were shams in it, so it didn't just

1  come in.  This has been a known fact that it was the city's

2  position in the COPs complaint as early as January 31st.  We

3  are only seeking in the settlement an injunction against the

4  service corps suing.

5          Now, let's address some of the issues raised

6  actually in the motion now and a little background.  The

7  depositions, as required, were taken on Monday at my offices

8  of Mr. Gaurav Malhotra and Mr. Kevyn Orr.  They had their

9  time.  Each party -- several parties examined the witnesses

10  on the depositions.  And shortly thereafter on Monday the

11  rough drafts of the transcripts were sent out by the court

12  reporter, Monday, the same day as the depositions.  Second,

13  on yesterday, Tuesday, the actual final drafts or final

14  deposition transcripts came out.

15          The settlement agreement that they complain about

16  not having adequate time to examine was served on -- as we

17  told the Court it would be, on March 26, and one of the

18  complaints is -- and by the way, they make an issue about a

19  supplemental settlement agreement being filed the next day.

20  As everyone knows and just to point out for the Court's

21  benefit the reason a supplemental was filed, there was a

22  corruption in the document.  The document is identical.

23  There was some corruption when it got filed in the document

24  itself.  Nothing changed.  Not a word on the document

25  changed.  So it was filed on the 26th like we promised the

1  Court.  They claim they haven't had time to adequately review

2  the settlement agreement, a 28-page settlement agreement.

3  When you look at the actual settlement agreement, if you take

4  out the signature pages and that, it's really a 20-page

5  agreement, 20 pages.  These are some of the largest most

6  preeminent law firms in the country who have come before this

7  Court and said they can't get through a 20-page settlement

8  agreement in eight days prior to a hearing on the settlement.

9  I'm just not buying that, your Honor.  It's not that hard,

10  especially when it almost identically tracks the term sheet

11  previously produced.

12       Their second basis for the adjournment is that there

13  was massive discovery dumped on them and they haven't had an

14  opportunity to sort their way through it.  Once again,

15  massive law firms, preeminent law firms in the country,

16  haven't had the opportunity to do this.

17       What was produced?  Well, first, let's back up to

18  the depositions.  Only four of the documents or e-mails that

19  were produced were actually used at the depositions of the

20  two witnesses.  Second, here's the documents that were

21  produced.  The Court can look at them.  I would suggest to

22  the Court that over 95 percent of these are simply minor e-

23  mails that say, "We'll do a conference call at four."  "No.

24  How about two?  How about tomorrow?  Can we talk about this

25  issue?"  There's not substance in these.  We, through an

1   overabundance of caution, produced a mass of e-mails.

2   There's nothing in them except for about ten of them.  If the

3   Court is willing, we would give this to the Court.  I bet you

4   the Court could get through these in a one- to two-hour

5   period, but they'll tell you they haven't had adequate time

6   to get through this stuff.  I'm not buying that, your Honor.

7   There's nothing in there that couldn't be reviewed within a

8   two-hour period at most.

9         They say that novel claims are involved here, and

10   that's why they need an adjournment.  There's nothing novel

11   here.  It's an $85 million settlement that has a bar order in

12   it and provides for releases.  There's nothing novel.

13   They've all seen it before in their career a hundred times.

14         They claim that there's -- Syncora points out or

15   claims there's two material differences from the term sheet,

16   and then they tell you in the motion to adjourn what they

17   are.  One is the use of the words "specified plan."  Yes,

18   it's a definitional term, but what it defines is already

19   something that was in the term sheet, so it only puts in a

20   definitional term.

21         Second, they claim that the settlement diminishes

22   the obligation of the city to make payment.  That's not what

23   it says.  The city is 100 percent obligated to make payment.

24   There was only a provision put in that the city would use its

25   best efforts if the money became trapped within the holding

1  accounts.  Nothing changed, your Honor, no material

2  differences, one adding a term to a definition, the other

3  making sure the city uses its best efforts.

4        Then they complain about the blackline order, that

5  there's this massive blacklined order that they haven't had

6  an opportunity to get through.  One, we did it as a courtesy

7  to the Court and to the parties to give the blackline order

8  well before the hearing.  This was a courtesy.  We had no

9  obligation to do it.  We did it eight days before to give

10 them the opportunity so if there is an issue at the hearing,

11 they can come before the Court and raise the issue or discuss

12 it with us in advance.  While they were busy preparing,

13 especially Syncora, all these different motions, DIA

14 subpoena, public lighting appeal briefs, motion to adjourn

15 the disclosure, motion to adjourn this, they could have been

16 reviewing these documents or the 20-page settlement

17 agreement.  They've had more than adequate opportunity.

18       Then they allege that we didn't produce the draft

19 term sheets and the settlement agreements.  This Court

20 specifically said we did not have to produce them.  At the

21 hearing in which the Retiree Committee requested them in

22 number two of their request, the Court specifically said we

23 do not have to produce the items set forth in number two.

24 That was term sheets and settlement agreements.  So when we

25 produced this stack of documents, we took out the drafts of

1  the term sheet and the drafts of the settlement agreements

2  because you said we didn't have to produce them, and we

3  didn't.

4  Syncora has objected to everything in this case.

5  They've taken the carpet bombing approach.  Everything that

6  the city tries to accomplish, they move to adjourn or they

7  object to or they raise issues at the hearing.  The service

8  corps are not an issue before the Court tomorrow.  They've

9  been properly served.  Court have any questions?

10  THE COURT:  So just to pin you down on this --

11  MR. HERTZBERG:  Okay.

12  THE COURT:  -- it's not the city's intent to request

13  a finding as a result of the hearing on this motion, the

14  motion to approve the settlement, that the service corps are

15  shell or sham corporations.

16  MR. HERTZBERG:  No, your Honor.

17  THE COURT:  That's correct?

18  MR. HERTZBERG:  That's correct.

19  THE COURT:  Thank you.

20  MR. HUEBNER:  Good morning, your Honor.  For the

21  record, I'm Marshall Huebner of Davis, Polk & Wardwell on

22  behalf of Bank of America.  Your Honor, suffice it to say

23  that we find the procedural motion before us to be rather

24  without merit and do take a little bit of exception to the

25  opening argument on one issue at tomorrow's hearing that they

1  took a shot at today, so let me be very surgical and precise
2  with respect to what's actually up today.

3  Number one, my memory, your Honor, is exactly as
4  yours.  I thought you actually were quite clear in your
5  ruling when we were actually before you properly about the
6  scheduling of this hearing that all the evidence from the
7  prior multi-day trial could, in fact, be used and was
8  admissible.  They're welcome to use whatever they like.  I
9  actually don't think it'll be the focus of tomorrow's
10 hearing.  It's just not an open issue.  And to suggest that
11 really it would go much better for you if we all just took a
12 bunch of days and fought about this, that's what the month
13 was for.  As a reminder, your Honor denied the debtor's
14 request to expedite this hearing and, in fact, set it for
15 substantially longer than is required either by the local
16 rules or by the national rules, and they've had 31 days to
17 prepare for this hearing.  To say now the day before, "We
18 haven't had time yet," is really totally inappropriate.

19 Number two, your Honor, the fact that Mr. Hackney
20 didn't tether his argument about the service corporations in
21 any of the documents but just said it kind of shows you what
22 you need to know, which is that he's just throwing dust in
23 your eyes, and it's not really there, and let me explain why
24 quite precisely.  Number one, there's a substantial section
25 of the term sheet called "Concerning the Service

1    Corporations."  What was originally agreed to is exactly what

2    is going forward tomorrow.  Number two, there's specific

3    sections of the order that did not change that were filed

4    almost a month ago that addressed the service corporations.

5    Nothing is new.  Three, there is a section of the debtor's

6    brief, the opening brief, that is 42 pages long and actually

7    measurably longer than their reply brief, contrary to what

8    was suggested to you, that addresses the service

9    corporations.  And, four, most importantly, is exactly the

10   colloquy you just had.  There is no finding of any kind about

11   the service corporations and whether or not they're shams

12   because unsurprisingly, your Honor, we disagree very

13   vehemently.  Our view, as you know, on the merits, were they

14   ever to be reached, which they are not because this is a 9019

15   settlement, is that the transactions were appropriate, the

16   liens were appropriate, the service corporations were

17   appropriate.  Their view is to the contrary, and that's what

18   we've settled.  So if Mr. Marriott stood up and said, "Your

19   Honor, here it is.  Paragraph 39 of the order says I hereby

20   find the service corporations are shells, and we're not ready

21   to litigate tomorrow and it's not fair.  They just snuck it

22   into the order," maybe that would be a legitimate basis for

23   an improper motion to reconsider your scheduling order,

24   improper, by the way, for lots of reasons, including the fact

25   that a week ago there was a contested discovery hearing, and

 1   your Honor ruled on precisely with even more exactitude and
 2   delineation what the schedule would be for this hearing,
 3   including what day things were being filed and by when the
 4   depositions were, and it was very finely reticulated.  And so
 5   what do they actually have; right?  What they actually have
 6   is we'd like a little more time.  And to reiterate and not at
 7   great length but some of what Mr. Hertzberg said -- and also
 8   I should note that, you know, the schedule that your Honor
 9   set, we should not actually lose sight of its generosity.
10   The reply briefs, which, as we all know, are often filed 48
11   hours before a contested hearing, were filed 13 days before
12   the contested hearing.  Oftentimes plan support agreements,
13   all sorts of documents are filed five days before a voting
14   deadline or ten days before a voting deadline, and there are
15   hundreds or even thousands of pages of documents that
16   sophisticated law firms need to digest to appear at
17   confirmation.  This is one settlement agreement.  And by the
18   way, the two examples that they chose were -- they actually
19   proved the case.  I'm not sure I could have come up with
20   better examples of how nothing has changed.  What are their
21   two examples?  The term sheet says the debtors shall keep
22   paying the monthly amounts and the counterparties shall
23   receive it.  And in doing the documentation they said, you
24   know, "Once we've paid it, we can't promise that you'll
25   receive it.  What if a nuclear bomb hits the custodian and

1    the money is just vaporized; right?" So we said, "Okay. You

2    know what? That's reasonable. You can't promise who you

3    don't control, so just say 'best effort.' We're fine with

4    that." That's an example of a radical change that a party

5    makes a motion to a federal court, needs to adjourn a

6    hearing? And the second one, your Honor, on specified plan,

7    I'm actually holding -- and I will not go through it because

8    I think it would not be necessary unless the Court wanted it,

9    but I have a color blackline showing how every single concept

10    basically of specified plan is right there in the term sheet.

11    The term sheet said we'll vote in favor of a plan that

12    provides the treatment contained herein, and then sprinkled

13    throughout the term sheet are these chunky sections that say

14    what a plan has to say. We just put them in one place and

15    used a defined term with a few other relatively minor

16    changes, and so the notion that, you know, the Court should

17    essentially pass the deadline for even making a motion to

18    reconsider, they should have a third or a fourth bite at the

19    scheduling of this hearing is really entirely inappropriate.

20          You know, leaving aside the content of this, I would

21    also note that the notion that Kirkland & Ellis, which has

22    potentially the largest litigation department in the United

23    States, actually filed a pleading that said there were 516

24    pages of discovery, not 516,000, not 516 million, 516 pages,

25    total pieces of paper, and eight days is not sufficient for

1  us to prepare for a hearing, I could not have signed that

2  pleading, and I'll leave it at that.

3        But suffice it to say, your Honor, that the

4  depositions happened.  Everyone got to ask all the questions

5  they wanted.  They were not particularly cut off in time.

6  Nobody left the hearing angry and frustrated, as far as we

7  can -- the depositions -- they put the documents they wanted

8  to in front of the witnesses proving that they had time to do

9  what they wanted to, and this like fifth bite at the apple to

10  move it onto their schedule.  None of their substantive

11  arguments bear any weight, and they've had so much more time

12  than the debtors asked for or that any rule requires, and

13  there is no factual basis.

14        The last thing I would say in terms of the proposed

15  order, your Honor, which, again, we could walk through right

16  now if it were helpful to the Court, but to be clear, we went

17  out and tried to resolve objections.  We listened hard.  We

18  e-mailed everybody, including the remaining objectors, and

19  said, "Please communicate with us.  We want to work things

20  out wherever we can narrow issues, wherever we can take your

21  language."  So we're twice being penalized for doing the

22  right thing.  Probably 90 or 80 or 70 percent of the

23  relatively minimal changes in the blackline order were to

24  resolve other objections, and two of them are now resolved,

25  and so it's a double courtesy.  One, we had a highly

communicative process to narrow the hearing as much as
possible, and we're still working on language with Mr.
Marriott, for example, and with others to try to further
resolve everything we can.  I will stay up all night.  I'm
here in Detroit.  Let me make a public announcement.  We want
to resolve everything we can.  But to say that because we had
the extreme courtesy to everybody to say in case you're
interested, here's the current version of the order mostly
because we're taking relatively minor changes to address
others' concerns, now the whole hearing should be adjourned,
it's crazy.

So, your Honor, it's a very troubling motion in
addition to the fact that they, frankly, slipped in a bunch
of oral argument about the service corporations, which really
has no place.  There's no finding about them.  There's one
narrow injunction.  They were properly served.  We're all in
Detroit.  We're ready to go.  This is a 9019 settlement.  We
know what the facts are, and we'd like to proceed tomorrow.
Thank you.

THE COURT:  Thank you.  Would anyone else like to be
heard?

MR. HACKNEY:  Do you mind if I respond?

THE COURT:  No, no.  Go ahead, sir.

MR. HACKNEY:  There were a number of things that
were said.  I'd like to just try and confine my response to

1    some of the more important ones.  The first thing I wanted to

2    follow up on, your Honor, is that the notion of acquiescence,

3    the idea that the service corps have acquiesced in the motion

4    and haven't objected and asserted their rights, is something

5    that I think is highly connected to the allegation that they

6    are a shell corporation because both of these -- both of

7    these parties are saying --

8          THE COURT:  Okay.  But I invite you to make that

9    argument at the hearing.

10          MR. HACKNEY:  Fair enough.  And I raise it today to

11   not surprise you at the hearing.  That's part of how I view

12   my role as an officer of the court because I do think it is a

13   big issue, and it is an argument that we will be raising.

14          The second thing I wanted to say, your Honor, is

15   that there's no question that we -- if we have to, we can try

16   up a hearing at anytime.  You can try up something in an

17   hour.  You could try it up tomorrow.  You can pick an issue,

18   and we'll show up and try the issue to you.  But I am someone

19   who is experienced in trial work, and I do have the judgment

20   and experience to make suggestions to the Court about how we

21   can better organize things, and this was my professional

22   judgment.  These things have come in.  The devil is in the

23   details with a lot of these pleadings, and remember it's easy

24   for Mr. Huebner to say it's all clear as a bell.  They're the

25   ones that are doing all of this drafting.  They're the ones

that have been in control of these documents for a long time. Remember, we heard that this was a big emergency on April 2nd, but they didn't actually give us the settlement agreement for over three and a half weeks, so the way the schedule is being described here I think is kind of misleading. It's like we're supposed to understand everything about the settlement agreement and the revised order from the term sheet even though there are changes and even though we don't have the legal rationale until they give us their reply briefs. I view it -- I'm living it -- as being much more compressed than the way it is being portrayed, and I will add this. This is a big motion. You may recall from the last time we were in front of you you asked Mr. Hertzberg what is the emergency. That was my argument. What's the emergency? You asked Mr. Hertzberg that. I don't think he really answered the question. I think he said this agreement drives the plan, and I think what you have to understand is that whether the -- if the agreement were continued one month or two months, it has no impact on the cash flow of the city because they're going to comply with the terms of the collateral agreement as they've been doing to date through the end of the plan, and then there are different ways they pay off the remainder, so there's no emergency from the standpoint of the city or relating to this motion. What they want to do is they want

 1   to take this very controversial settlement agreement that is
 2   a settlement between only parties A and B of a complicated
 3   structure that everyone has agreed is complicated and has
 4   many different parties involved and that we assert that this
 5   settlement between A and B trods upon the rights of C and the
 6   rights of D and that that itself is a controversial concept
 7   in the area of Rule 9019 -- what I'm saying is not disputed.
 8   They want to -- it's not disputed in the sense that that's --
 9   these are controversial legal issues.  They want to take this
10   agreement around, and they want to bang away at retirees and
11   bang away at bondholders and say, "Now we've got you.  We're
12   going to cram you down.  And we're going to use this impaired
13   assenting class, and we're going to -- and that's what we're
14   going to do, so you better get in the boat."  So this is very
15   important, and that is why we are suggesting that we
16   shouldn't just kind of sidle into court with part of the
17   theory that's emerged ten days ago being, "Oh, the service
18   corporations that are manned by city employees and city
19   council members, they've acquiesced in the city's motion to
20   destroy their liens and to bind them to the agreement as if
21   they had signed it even though they haven't."  That's a big
22   issue, and neither of them have said because they can't,
23   "Well, we're not asking you to make that finding."
24           One last point, and then I'll sit down.  Thank you
25   for your patience.  I have to take exception to the notion

1    that Syncora is a carpet bomber; that we are a terrorist.

2    You know, you saw public statements by the city this week

3    demeaning Syncora and saying Syncora is throwing the kitchen

4    sink at everything and, you know, Syncora is just -- this is

5    their scorched earth strategy. You know, we asked for a one-

6    week continuance. Mr. Huebner says he couldn't even deign to

7    sign that pleading, and the city's press statements say that

8    we're engaged in a scorched earth litigation strategy. You

9    know, in the disclosure statement context, we get a bunch of

10   material dumped on us three days before our objection is due,

11   and we put a motion in in advance of that saying, "Shouldn't

12   there be some adjustment to the schedule here?" And that is

13   decried as well as more scorched earth litigation from

14   Syncora. And what I would say here, your Honor, is that

15   there are many times when you are asserting your legal rights

16   that it may not be popular to do so but that the way the

17   legal system works is that you have to assert those rights in

18   order to be heard on them, and it may not be popular or it

19   may not be what the city wants us to do, but I think it's

20   unfair. I think the constant ad hominem attacks against

21   Syncora as if we are, you know, committing war crimes when we

22   submit these briefs to the Court, I think it's unhealthy, and

23   I take exception to that suggestion that we've done anything

24   improper in the way we've proceeded in this court.

25           THE COURT: Thank you. All right. The Court will

1   take this under advisement for ten minutes, and we'll

2   reconvene at 10:35, please.

3            THE CLERK:  All rise.  Court is in recess.

4        (Recess at 10:29 a.m., until 10:40 a.m.)

5            THE CLERK:  All rise.  Court is in session.  Please

6   be seated.  Recalling Case Number 13-53846, City of Detroit,

7   Michigan.

8            THE COURT:  The Court concludes that the record does

9   not establish cause to adjourn tomorrow's hearing.

10  Accordingly, the motion to adjourn it is denied.  Since the

11  city has agreed that the issue of whether the service

12  corporations are shell corporations or sham corporations will

13  not be a matter for litigation tomorrow, all that remained to

14  the argument for the adjournment that the Court heard was a

15  matter of convenience and not a matter of addressing any

16  specific issue of prejudice or harm by proceeding tomorrow,

17  so, in the Court's view, this does not establish cause.

18           Let's turn our attention to --

19           MR. HERTZBERG:  Your Honor --

20           THE COURT:  Sir.

21           MR. HERTZBERG:  -- one thing I just want to clarify.

22  Is the record from the prior hearing in evidence for

23  tomorrow?

24           THE COURT:  It is.

25           MR. HERTZBERG:  Okay.  Thank you.  And all the

1  exhibits that were introduced?

2          THE COURT:  Yes.

3          MR. HERTZBERG:  Thank you.

4          THE COURT:  Let's turn our attention now to the

5  final hearing regarding the schedule for the disclosure

6  statement approval.  Before we do that, however, I'd like to

7  ask you all to consider a matter of personal favor for me.

8  In your arguments to the Court, let's keep the war analogies

9  to a minimum, if not eliminate them from our discussion

10 altogether.  Phrases like "scorched earth" and "nuclear" and

11 "carpet bombing" really are not necessary or appropriate in a

12 courtroom context, so let's just not use them.  Okay.

13         MR. ORNSTEIN:  Good morning, your Honor.  Noah

14 Ornstein from Kirkland & Ellis on behalf of Syncora.

15 Unfortunately, with accommodating that favor, I'll have to

16 redo my entire opening.

17         THE COURT:  And let me guess.  You'd like an

18 adjournment to do that.

19         MR. ORNSTEIN:  Appreciate it.  No, your Honor.  I'll

20 try to keep the presentation very short.  There are a number

21 of people I know who would like to get up and speak also.

22 Your Honor, we really do think this is ultimately about

23 efficiency and fairness.

24         THE COURT:  Could you pull that microphone closer to

25 you --

1          MR. ORNSTEIN:  Certainly; certainly.

2          THE COURT:  -- or aimed more towards you?

3          MR. ORNSTEIN:  And I'll kneel a little, too.

4          THE COURT:  There you go.

5          MR. ORNSTEIN:  We really do think it's about

6    efficiency and fairness, your Honor.  Your Honor, typically a

7    debtor files a robust or a somewhat robust disclosure

8    statement and then the 28-day clock begins to click even if

9    that disclosure statement does require that it be

10   supplemented.  Your Honor, that wasn't the case here.  On

11   February 21st the city filed a disclosure statement that was

12   substantially and materially incomplete by its own terms, and

13   then the city did not provide disclosures on a rolling basis,

14   as I believe it said it would, thereafter.  And then on March

15   31st, your Honor, 38 days later, the city filed what is a

16   monster of a disclosure statement amendment, hundreds and

17   hundreds of pages of new material for parties to digest and

18   reconcile to understand.  The city did, of course, obtain an

19   extension, as is appropriate, but it was only a two-day

20   extension.  And, your Honor, we have made substantial efforts

21   to review the amended disclosure statement and the plan, of

22   course, and to form an educated view on the whys and hows and

23   the implications of the many changes, but, your Honor, we

24   don't think that there is enough time presently in the

25   schedule for parties to really figure out what they

1    reasonably still need to know, what all those implications

2    truly are, and we think that the process, for the city's

3    benefit also, will be benefitted by having some more time for

4    parties to be able to make those determinations, to actually

5    be able to confer with the city to produce refined objections

6    so that hopefully the issues around information gaps are

7    substantially narrowed from where they might be today if

8    parties were to file their objections, and ultimately we

9    think that will lead to what should be a smoother disclosure

10   statement hearing.

11          Your Honor, we think it's reasonable and required

12   that parties do have a reasonable period for review of the

13   disclosure statement.  It is effectively a new document that

14   we've now had in our hands for 48 hours, and we don't think

15   that the request for two weeks is unreasonable.  We are

16   willing, of course, and open to being constructive around

17   scheduling, but we do think it is warranted, your Honor, that

18   there be an extension of the timetable to permit parties to

19   do the work they need to do around the disclosure statement.

20          THE COURT:  Thank you.

21          MR. MARRIOTT:  Good morning again, your Honor.

22   Vince Marriott, EEPK.  I rise in part to make a point that I

23   made last time we were here, which is that this case really

24   isn't the City versus Syncora.  There are large groups of

25   constituencies that have views regarding how the city has

1   conducted the case that are not altogether positive.  I think

2   your order to show cause regarding an expert was interesting

3   because of the responses.  I think the responses illuminated

4   some interesting things about the dynamics of this case.  I

5   thought it was of particular interest to see so many of the

6   constituencies grasping at the idea of an expert as a

7   lifeline for somebody who might actually take a hard look at

8   assets and operations with an eye toward maximizing creditor

9   recoveries within the context of recovery for Detroit.

10        Monday the city filed a revised plan and disclosure

11   statement, which, while bearing structural similarities to

12   the previous plan, is materially different and worse for

13   creditors economically.  It is a plan that, you know, at

14   least as of 8 a.m. this morning has the support of no major

15   constituency.  We are eight months into this case, and the

16   city has just filed a plan that moves backwards away from

17   consensus rather than towards it.  In my view, this is

18   because the city has not engaged in a collaborative effort

19   toward consensus but, rather, has been trying to beat

20   creditors into submission.

21        There needs to be, in my view anyway, some sort of

22   reset here.  A selected and appropriately charged court-

23   appointed expert would be one element of such a reset which

24   would bring creditors back into the process in a way that

25   they have not been for awhile.  The other would be putting an

1    end to city-created unrealistic, inefficient, and unfair time

2    frames within which to respond to complex documents affecting

3    billions of dollars of claims and the future of Detroit.  If

4    the plan process is going to continue with moving target

5    plans and disclosure statements, creditors and parties in

6    interest should at least have a reasonable period of time to

7    respond to each iteration.  This is a major change from what

8    was there before.  Tacking a couple of days on to review

9    hundreds of pages just is not affording to creditors and

10   ultimately to the Court the sort of review and comment that

11   this case really calls for.  Thank you.

12            THE COURT:  I appreciate the depth of concern that

13   your comments reflect, but my question to you is we're

14   talking about a disclosure statement which, in my experience,

15   admittedly in Chapter 11, not in Chapter 9, but,

16   nevertheless, material, I think, is that of all of the papers

17   in a case, the disclosure statement may be the least

18   important in that nobody but the lawyers who are retained to

19   object to it actually read it, so what are we talking about

20   here?

21            MR. MARRIOTT:  I have an answer to that, your Honor,

22   which doesn't directly rebut what you just said.  The answer

23   to that is this.  The disclosure statement approval, while

24   perhaps in a vacuum, is a relatively -- is relatively less

25   consequential than, of course, confirmation.

1          THE COURT:  Um-hmm.

2          MR. MARRIOTT:  It, nevertheless, begins a process,

3    including solicitation, and where this plan process will

4    break down is if we have a disclosure statement and a plan

5    that changes materially again.

6          THE COURT:  It undoubtedly will when and if

7    settlements are reached.

8          MR. MARRIOTT:  Correct.  And sending out something

9    that's --

10          THE COURT:  If our --

11          MR. MARRIOTT:  But once we -- once solicitation --

12          THE COURT:  If we adjourn confirmation every time

13    there's a settlement, we'll never get there.

14          MR. MARRIOTT:  But once the plan -- once the plan

15    has gone out for solicitation -- first of all, we know that

16    this plan is -- doesn't work for anybody because it's worse

17    than the last plan, and nobody was happy with the last plan.

18    It seems to me to be not advantageous to the process to keep

19    it moving to then start soliciting a plan that is just --

20    can't use a martial metaphor here but that will prompt

21    vigorous --

22          THE COURT:  Thank you.

23          MR. MARRIOTT:  -- opposition from all concerned.  It

24    just seems to -- the point I'm making is although the request

25    here for a two-week extension is focused --

1          THE COURT:  Isn't a better answer to that for you
2   all to get serious in mediation?

3          MR. MARRIOTT:  Judge, it would be unwise for me to
4   comment on the success of the mediation process so far.

5          THE COURT:  Then I'll withdraw my question.

6          MR. MARRIOTT:  But the two-week extension sought
7   here as and to the extent that it would -- and it would
8   require a rollout of some of the other dates, although
9   nominally with respect to disclosure statement alone, in
10  fact, preserves, at least in my view, the integrity of the
11  process insofar as, you know, rushing to approve a disclosure
12  statement that relates to a plan that is going to result in
13  vigorous and extended opposition seems unproductive.

14         THE COURT:  But if I take that to its logical
15  conclusion, we don't send out a disclosure statement or a
16  plan for balloting until when?  A whole lot more people agree
17  to it?

18         MR. MARRIOTT:  Well, I understand, Judge, that any
19  argument can prove too much, and I can certainly understand
20  how mine could as well, but in the context of a -- what
21  amounts to a whole new plan and a whole new disclosure
22  statement filed two days ago --

23         THE COURT:  Um-hmm.

24         MR. MARRIOTT:  And when I say "whole new," I
25  understand that there are structural similarities --

1          THE COURT:  Right.

2          MR. MARRIOTT:  -- but economically it's meaningfully

3     different, and the disclosure statement has been meaningfully

4     supplemented by an exhibit package and by significant other

5     documents that without arguing to you now that we need to

6     keep rolling it and rolling it and rolling it, it seems to me

7     it makes sense to do it this time for that reason.

8          THE COURT:  And just for the record, even though I

9     retracted the question, I will clarify it that when I meant

10    you all should get serious about mediation, I meant the city,

11    too, but still the question is withdrawn.

12         MR. MARRIOTT:  Okay.  Other questions?

13         THE COURT:  No.  Thank you.

14         MR. MARRIOTT:  Thank you.

15         MS. NEVILLE:  Carole Neville from Dentons on behalf

16    of the Retiree Committee.  Your Honor, we second what Mr.

17    Marriott has just said, but on a much more mundane level, we

18    sent the city a very detailed commentary on the original

19    disclosure statement --

20         THE COURT:  Um-hmm.

21         MS. NEVILLE:  -- and got back on March 28th we'll

22    either fix this or we won't and then two days later got a

23    major revision.  Just on a mundane level, I would have to

24    file a very voluminous objection to disclosure that can be

25    resolved if we had a little bit more time.  In two days or

1 three days, whatever we have left, I can't go back to Mr.

2 Bennett and Ms. Lennox -- and we've been working very hard on

3 the retiree solicitation package -- and resolve all of the

4 issues that I raised, and they're serious.  There are

5 seriously misleading statements in the disclosure statement

6 that we would like to have fixed.

7        THE COURT:  Um-hmm.

8        MS. NEVILLE:  So I'm asking for more time just for

9 what you normally do in a disclosure statement is to resolve

10 the objections that we have.

11        THE COURT:  Um-hmm.  Thank you.

12        MR. CULLEN:  Good morning, your Honor.  Thomas

13 Cullen, Jones Day, for the city.  A couple of observations.

14 All of this has occurred within the context of your Honor's

15 March 6th order, which I have in front of me here, which the

16 city understood and I think we all understood established a

17 schedule that had several characteristics.  One, it was very

18 close-knit in terms of the relationship of one day to another

19 in the process.  Number two, it was geared to get us to a

20 conclusion with the plan and to put pressure on the parties

21 to get to conclusions on various aspects of the plan because

22 the city needs to move through this process.  Number three,

23 it's a very demanding schedule.  It's hard on the horses.

24 There's no doubt about it.  I take that as an agricultural

25 rather than a military, but --

 1          THE COURT:  I'm never going to hear the end of this,

 2   am I?

 3          MR. CULLEN:  I'm sorry, your Honor.  Part of the

 4   process --

 5          THE COURT:  Why is Mr. Hertzberg laughing the

 6   loudest?

 7          MR. HERTZBERG:  I just heard it.  I didn't hear it

 8   the first time.  Mr. Erens had to tell me.

 9          THE COURT:  Okay.

10          MR. CULLEN:  And so as part of this, you know, kind

11   of iterative process -- and this came up at the original

12   hearing -- February 21st the original plan, March 6th the

13   order, March 14th the deadline for parties to make objections

14   and issues, and we got a lot.  We got a lot of objections and

15   issues, and we've been working hard to respond to those.  And

16   I think that as the Court's order says in the block in the

17   middle on page 1 that this is only part of the process

18   between the parties of sharing information about the plan and

19   what can and can't be done with respect to the plan.  It is

20   going on alongside a process of mediation, and that process

21   of mediation has been vigorous, has consumed a lot of time,

22   has consumed a lot of emotion on both sides, but has been

23   going on at a fairly vigorous rate.  So it's been going on on

24   two levels at that time, and the voluminousness of the

25   objections led to a voluminous amount of changes.  And what

1    we thought and came to your Honor with was the idea that

2    incorporating these changes took us longer than we thought.

3    We were going to miss our deadline by a couple of days, so we

4    moved a couple of the other deadlines by the same couple of

5    days attempting to maintain the integrity of your Honor's

6    schedule.

7           One of the particularly chewy items of disclosure

8    has been the plain language disclosure to go to the retirees

9    or the people who aren't financial professionals, and Ms.

10   Lennox, as was pointed out on our side, has been taking the

11   lead on that and working hard at that.  We're hoping -- we're

12   trying to make progress on that.  With the best faith in the

13   world, it is very difficult to make lawyers think like real

14   people, so we're working at that, and we hope to -- we do

15   hope to have some progress on that, but what we're afraid of

16   here with respect to this motion -- and we are sympathetic to

17   the demands on everyone.  This has been a demanding process,

18   but it has been a demanding process for the city beyond the

19   realm of the professionals as well, and we'd like to move it

20   along.  And we would not like to do things in this schedule

21   that would actually push off the solicitation date, that

22   would push off the other dates that really drive attention to

23   the plan.

24          I would note in passing that nearly all of the

25   objections to the disclosure fly into the teeth of 1125.

1   Apparently the disclosure is adequate enough for everybody to
2   say they don't like it, and 1125 really says is there
3   adequate information to give the parties a meaningful basis
4   to say yes or no.  And what they're telling you is with
5   respect to the current configuration of the plan, there's
6   adequate information.  It tells me no.  We're hoping to
7   change that in the course of the mediation process and
8   continuing negotiation.  We're hoping to have emendations and
9   settlements to the plan as we move forward.  That's what
10  we're all working on, but as of right now, the plan, as your
11  Honor has said, has served that at least modest function set
12  forth in the statute, which is have I told you enough to let
13  you know whether or not you want to say yes or no.  Well,
14  that, unfortunately, is, yes, I know enough to say no.  So
15  what we're trying to do here is maintain the integrity of the
16  Court's schedule while recognizing we have an iterative
17  multi-level process going on, recognizing that we're going to
18  want to change the plan.  We want this not to be the last
19  iteration of this, I think.  I think that the parties -- all
20  the parties want it not to be the last iteration, but the
21  parties also want -- and the Court's schedule does this -- a
22  balance between a fair consideration of the alternatives
23  available to the city and the parties and the need to push
24  this along, the need to put the pressure of time and process
25  on those parties, so that's all I have, your Honor.

1      THE COURT:  Thank you.  All right.  The Court is

2  going to take this under advisement and look at the issue of

3  whether there is a bit of slippage in the schedule that we

4  can take advantage of here but to maintain at the same time

5  the confirmation hearing schedule that we have established,

6  so I will issue a new scheduling order if that's appropriate

7  hopefully by the end of today.

8      Before we conclude, however, I do want to have a

9  conversation with Ms. Lennox.  Will you approach the lectern,

10 please?  Since you have been nominated as the point person

11 for the city on retiree disclosure issues --

12     MS. LENNOX:  Yes, sir.

13     THE COURT:  Is that a fair nomination?

14     MS. LENNOX:  That is a fair nomination.

15     THE COURT:  It has been widely reported by the press

16 that retirees who vote for the plan will receive more under

17 the plan than retirees who vote against the plan or not to

18 accept the plan.  After spending an hour with a really bright

19 law clerk diving into the weeds of your plan and disclosure

20 statement, we came to the conclusion that while that may be

21 true in some circumstances, it is not true in all

22 circumstances.  Is that correct?

23     MS. LENNOX:  Let me explain how certain provisions

24 of the plan work, and it all has to do --

25     THE COURT:  Well, I don't want the explanation.

1   What I want from you is your commitment again --

2          MS. LENNOX:  Yes.

3          THE COURT:  -- that in whatever explanation you

4   provide to the retirees and to the public as to what retirees

5   will be paid and when and under what circumstances some may

6   receive more of a cut than others, it is perfectly

7   understandable.

8          MS. LENNOX:  I commit to that, your Honor.  And, in

9   fact, I am not doing this in a vacuum.  I am doing this --

10  I've been having three weeks of discussion with the Retiree

11  Committee counsel, the pension fund counsel, counsel for the

12  retiree associations, counsel for the safety unions, and

13  counsel for AFSCME.  They've all seen the drafts.  I've

14  received several rounds of comments on them for this exact

15  reason.  We all want to be sure that what we give to people

16  is clear, accurate, and understandable, so I would expect to

17  be filing something with the Court in the near term for the

18  Court's approval to get the process started.  That document

19  will undoubtedly change between now and the disclosure

20  statement hearing as the plan changes, and I think we have

21  made significant progress.  I think there's one technical

22  issue that we're trying to work through now, but, please, I

23  want the Court to be assured that the city is not taking it

24  upon itself to do this without the input from the affected

25  parties, and we take the Court's --

1    THE COURT:  And I appreciate that, but I'm

2  reconsidering here as I think about this my decision to let

3  go of my question to you --

4    MS. LENNOX:  Okay.

5    THE COURT:  -- because I'm concerned about the press

6  reporting of the plan because people will make decisions

7  probably much more on what they read in the newspaper than

8  what they read in the disclosure statement; right?

9    MS. LENNOX:  I think, unfortunately, that's true.

10    THE COURT:  So I mean is it accurate what the press

11  has reported that under your present plan --

12    MS. LENNOX:  Under the present plan --

13    THE COURT:  -- simply and straightforwardly, if a

14  retiree votes to reject the plan, they will receive less

15  pension?

16    MS. LENNOX:  No.  The decision is based on a class

17  vote.  The class vote determines whether the outside funding

18  comes in or not.

19    THE COURT:  All right.  Well, to the extent you can

20  work with the media to correct any misimpressions they have

21  about not only how the plan deals with these claims but any

22  other claims, it's in everyone's best interest to have

23  accurate reporting.

24    MS. LENNOX:  I wholeheartedly agree, your Honor.

25    THE COURT:  So I encourage you to deal with those

1  people.

2        MS. LENNOX:  We do deal with them on a daily basis,

3  and we do answer their calls.  I can certainly see if there's

4  an education --

5        THE COURT:  Well, but this is more than just

6  answering their calls.  This is taking a proactive --

7        MS. LENNOX:  Active education session.

8        THE COURT:  -- approach in contacting reporters

9  whose stories need correction.

10       MS. LENNOX:  Understood, your Honor.

11       THE COURT:  My own dealing with them is that --

12  suggests that they want to report accurately, and they're

13  doing the best they can, and they're by and large doing a

14  really good job.

15       MS. LENNOX:  I don't disagree, your Honor.

16       THE COURT:  But there are occasionally details that

17  need correction, and they're happy to do that when you help

18  them --

19       MS. LENNOX:  Understood.

20       THE COURT:  -- or when they are helped, yeah.

21       MS. LENNOX:  We'll devise a plan to reach out --

22       THE COURT:  All right.  Anything else for today?

23  Yes, ma'am.

24       MS. NEVILLE:  Your Honor, I'd like to add to what

25  Ms. Lennox has said because we have been working very closely

1  on that supplement, and it is very clear what happens to the
2  retirees when they vote.  The document that has been filed is
3  not, and that is why I really wanted more time.
4          THE COURT:  I agree with you.
5          MS. NEVILLE:  And the press is reporting on that.
6          THE COURT:  I agree with you.  It literally took my
7  really bright law clerk and I an hour to wade through this to
8  try to figure out what retirees will be paid.  It was very
9  complex --
10          MS. NEVILLE:  Right.
11          THE COURT:  -- and it won't work.
12          MS. NEVILLE:  The supplement we've been working on
13  is really clear --
14          THE COURT:  Okay.  Thank you.
15          MS. NEVILLE:  -- but this document isn't.
16          THE COURT:  Right.  All right.  Anybody else have
17  anything for today?  All right.  We're in recess.
18      (Proceedings concluded at 11:09 a.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    April 4, 2014
_____             _____
Lois Garrett