| | | |
|---|---|---|
| In re ) | | Chapter 9 |
| ) | | |
| CITY OF DETROIT, MICHIGAN, ) | | Case No. 13-53846 |
| ) | | |
| Debtor. ) | | Hon. Steven W. Rhodes |
| ) | | |
| ) | | |

-------------------------------------------------------

**OBJECTION OF JAMIE S. FIELDS TO THE CITY OF DETROIT'S AMENDED PLAN OF ADJUSTMENT DATED MARCH 31, 2014,**

**PRELIMINARY STATEMENT**

COMES NOW creditor and Detroit Police Department (DPD) uniformed retiree and city of Detroit resident JAMIE S. FIELDS, attorney acting *in pro per,* hereby objects to the Amended Plan for the Adjustment of Debts of City of Detroit, Michigan dated March 31, 2014 (Doc. 3380) ("Plan"). The Plan currently before the consideration of this Court should not be confirmed as it suffers from various deficiencies pursuant to Section 1129 of the Bankruptcy Code ("Code"). The Plan has not "been proposed in good faith" pursuant to section 1129(a) (3) of the Code, which requires the Plan be "fair and equitable" in dealing with creditors. Jamie S. Fields will show that the Plan, as proposed, is patently unconfirmable in light of the fact it is not feasible; it is not fair and equitable; and it does not offer retirees "all they (retirees) can reasonably expect to receive under the circumstances."

Section 1129(a) (11) of the Code, commonly referred to as the "feasibility test," requires a finding by the Court that confirmation of the Plan is not likely to be followed by the need for further financial reorganization. 11 U.S.C. §1129(a) (11). *In re Belco Vending, Inc.,* 67 B.R. 234, 236 (Bankr. D. Mass. 1986). A plan is not feasible when if implemented, it is "likely to be followed by….. the need for further financial reorganization, of the debtor or any successor to the debtor under the plan," in violation of Section 1129 of the Bankruptcy Code. 11 U.S.C. § 1129(a) (11). The "feasibility" standard encompassed in Section 1129(a) (11) examines, among other things, the proponent's ability to consummate the provisions of the proposed plan. See *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989). ("This definition [of feasibility] has been slightly broadened and contemplates whether the debtor can realistically carry out its Plan…and whether the Plan offers a reasonable prospects of success and is workable").

Those Cities that exited bankruptcy without a feasible Plan quickly found themselves in fiscal distress again. The city of Mack's Creek, Missouri, for example, filed for bankruptcy in 1998, then for a second time in 2000, and in 2012 the city was dissolved altogether. Westminster, Texas filed in 2000, and then again only four years later. Prichard, Alabama filed for bankruptcy at the end of 1999, came out of bankruptcy in 2007, and in 2009 found itself again in bankruptcy proceedings.

The Plan is also unconfirmable because it only serves to obfuscate and confuses retirees as to their treatment. From the appointment of an EM for the city of Detroit who has a bankruptcy background to public assurances that there were no intentions to reduce pensions (e.g., pensions are "sacrosanct") to the City's pre-petition proposal to pay only 10%[1] of their owed pension obligations to the proposed Plan offering to pay nothing into the Detroit Police and Fire Retirement System (PFRS) it has been a City choreographed and orchestrated Kabuki Theatre.

---

[1] Pre-petition proposal of 10 cents on the dollar.

It is abundantly clear that the City's goal from the start was to obviate all promises it made to retirees relative to pensions and healthcare. The Plan calls for the City to redirect the monies the pensioners and other creditors would otherwise be entitled to allow the City toward improved municipal services. Surely, a laudable goal, a but hollow one since the Plan does not provide any concrete benchmarks of what constitutes "adequate" public services, or does not establish a nexus between the monies proposed to be spent and improved services.

The City wants to do exactly what it has done for the last fifty years – spend recklessly without a feasible plan – and hope for different results. The NY Times paraphrased it as *For Detroit, a Crisis of Bad Decisions and Crossed Fingers*, March 11, 2014.

I. **OBJECTION TO THE CITY'S AMENDED PLAN OF ADJUSTMENT**

   a. **The Plan is Not Feasible and, therefore, Does Not Comply with the Requirements of Section 1129(a) (11).**

In a Chapter 9 case, it is important that the municipality retains sufficient tax revenues to provide the services that its inhabitants require." 6 COLLIER ON BANKRUPTCY ¶ 943.03[7] (16th ed. 2013); 12 see also 5 NORTON, supra, § 90:20 ("The basic consideration is reasonableness. The court should consider evidence of the municipality's tax base, its services requirements to its inhabitants…"). The Court has said it's "particularly important" to determine whether the plan is feasible, to assure the delivery of municipal services.

Generally speaking, the alternative to chapter 9 is dismissal of the case, permitting every creditor to fend for itself. An interpretation of the "best interests of creditors" test to require that the municipality devote all resources available to the repayment of creditors would appear to exceed the standard. However, creditors and the Court have an obligation to ensure that monies that the City proposes to spend post-bankruptcy are necessary and does not unduly or unreasonably shield monies available now or that would be available in the future to satisfy creditor's claim.

The City's Plan presents a vague fog of opaque reasoning that residents deserve adequate public services and that by throwing money into pots with one hand, labeled blight, public safety, etc. while taking it out of retiree's pockets with the other hand will improve City services.

b. **The Plan Does Not Define "Adequate" City Services**

Rodney Dangerfield was once asked, "How do you like your wife?" His answer was, "Compared to what?" Without a standard for comparison, evaluating public services can leave the same sense of mystery. How efficient are current City of Detroit services? We are often left with vague reputations and anecdotes and very rarely with hard facts. The EM and Mayor come up with pithy anecdotes regarding poor municipal services at the drop of a hat – the underlying truth of which is often undeniable – but fail to answer the basic question of why are services so bad when Detroit's general fund budget is much larger than more populous cities?[2] Detroit is before the Court, not because of retirees or legacy costs, rather the malaise the City finds itself in is because it spent and continues to spend money like a "drunken sailor" and now, having run out of taxpayer monies, the City wishes to continue their irrational and reckless spending and mismanagement with the retirees monies.

From 2008-2012 the City of Detroit spent 100 million dollars more annually than it took in as revenues. Even post-petition the city has shown its penchant for overspending and total disregard for taxpayer assets. For example, hiring a police chief at $225,000 a year, the highest chief's salary in the country, whereas the City of New York with a population 12 times greater than Detroit pays its police chief, who had previously served as Chief of Police for the city of Los Angeles, and has a record of unparalleled success, $205,180.

---

[2] Detroit is the 18th largest city in terms of population. Its general fund budget is twice as large (1.1 billion dollar) as Charlotte, NC (561 million dollars).

The city of Detroit has a spending problem not a revenue problem and bankruptcy does not provide a magic bullet to reasonably ensure that the city provides adequate City services in the future. It is up to the Court to ensure that the Plan is feasible and workable by requiring a Plan that lays out a detailed and realistic road-map for the future of Detroit. While the City's Disclosure Statement correctly asserts that "700,000 city residents deserve adequate city services" imposing draconian cuts on retirees will not further the City's goals.

There is a broad variation between cities for the cost of municipal services. These differences in resource deployment and delivery of services between cities does not seem to be driven by exogenous factors (e.g., spending does not generally correlate with population, per capita income, geographic size, labor conditions - union vs. non-union - or differences in workloads). Rather research leads to the conclusion when assessing the relative efficiency of resource allocation among municipal governments, management and policy choices are what matter. **Research shows Cities spend what they spend because they choose to spend it.[3]**

Once a city decides which services it should deliver to which citizens at what level, management generally has broad discretion on how they will deliver those services. The choice of delivery model – the mix of capital and labor, the organizations and technologies deployed, and how they are sourced – is generally entirely discretionary to management. The quality of these choices have significant cost implications.

The good news is that the level of efficiency is within the City's control and there is no shortage of examples from other cities where responsible city governments have made different strategic and operational choices.

---

[3] White Paper, David Edwards, *IBM, Smarter, Faster, Cheaper, an Operations Efficiency Benchmark Study of 100 American Cities* (2011).

The bad news for the City is contrary to its assertions, or finger-pointing placing blame on the "usual suspects" or scapegoats as to why Detroit "is not working efficiently" and claiming that the City is hamstrung by among other things – labor unions, operational environment, and relative poverty – these factors do not appear to be genuine obstacles to efficiency in local government service delivery. Since research shows that these exogenous variables do not appear to effect efficiency, it appears that endogenous ones (caused from within or of the City's leaderships own design) must be operative. It is therefore hard not to conclude that the most important factor in determining the relative efficiency of any city is management.[4]

c. **Public Safety Benchmarks**

In most surveys of City residents, the top three concerns are non-working street lights, trash pickup and public safety. The City has privatized trash removal. While costing essentially the same as pre-petition the outsourcing will provide better services (e.g., increased bulk removal).

The state legislature authorized a lighting authority which is a separate entity from City government. It was formed to direct the rebuilding of Detroit's outdated street lighting system. It can borrow large sums of money by pledging a $12.5-million portion of the $40 million in annual city utility tax revenue proceeds.

The other major citizen concern, public safety, is not only important because it affects the City's quality of life, but because it also comprises over half of the City's overall annual budget. As previously stated, the City's Plan contains no benchmarks or goals on what constitutes adequate services. Therefore, how can the City even begin to determine how many personnel and other resources are required to achieve the outcomes they desire (although they offer no specificity on their expected outcomes)?

---

[4] *Id*

1. **Police Department**

New York City reduced police personnel by 20% between 1999 and 2009 and the crime rate declined by 44%. Research has shown that the standard practices of policing - employing more sworn officers, random motorized patrolling, rapid response and criminal investigation —failed to reduce crime when applied generally throughout a jurisdiction (*The Changing Environment for Policing,* 1985-2008 David H. Bayley and Christine Nixon, 2009).

The City wants to have their cake and eat it too. On one hand the City wants to redirect copious amounts of future revenue to ostensibly improve what they claim is the deplorable condition of public safety and the DPD as a justification to not fund PFRS nothing for the next 10 years and very little for the following 10 years. While at the same time the DPD continually lauds their progress despite the influx of any monies. The DPD issued a "Plan of Action"[5] (Exhibit A) that directly contradicts the City's Disclosure Statement and triumphs the staggering improvements achieved vis-à-vis a combination of reorganization, new leadership and "sleight of hand" (e.g., changing the way some statistics are calculated). These are several inconsistencies between the City's Disclosure Statement and the DPD's Plan of Action issued on January 9, 2014 (**Exhibit 1**):

**Police Response Times**: **The City's Claim:** The DPD's many administrative challenges have contributed to its widely publicized operational difficulties. As of the Petition Date, the DPD's average response time during for top priority emergency calls was 58 minutes (the national average police response time was 11 minutes).

**The DPD Disputes the City's Claim:** On Page 28, under Item 7 titled "Redefine Priority One Calls" the report contains the following statement: The DPD has been penalizing itself in the way that it counts Priority 1 calls. The widespread report that DPD requires 58 minutes on average to respond to crimes-in-progress calls is incorrect. DPD classifies so many calls as Priority 1 that, in 2012, 42 percent of DPD runs were classified as Priority 1, compared with just 10 percent in New York City, which applies the Priority 1 classification only to crimes in progress.

---

[5] Page 5 of the report states that "the consulting firms Conway MacKenzie, Inc., and The Bratton Group, LLC assisted the DPD in developing the Strategic Plan of Action.

The City also claimed the national response time is 11 minutes, however, there are no national averages for response times, there is no standardization and there are too many variables between agencies for meaningful comparisons. A rapid response to 9-11 calls has not been shown to reduce crime or even to lead to increased chances of arrest" *What Can Police Do to Reduce Crime, Disorder, and Fear?* (David Weisburd and John E. Eck ANNALS, AAPSS, 593, May 2004).

**The DPD's Secondary Employment Program: The City's Claim** It has been reported that in recent years certain business owners have taken the extraordinary step of hiring off-duty police officers and renting police cruisers to patrol sections of the City underserved by the DPD. Orr Declaration, at ¶ 32.

**The DPD Disputes the City's Claim: DPD's Strategic Plan:** Many opportunities exist for a Secondary Employment Program for sworn members of the Detroit Police Department. Secondary Employment has not been adequately promoted by the DPD and has not received enough attention from the City and the DPD under past administrations. Having uniformed police officers working these details-under guidelines regarding what type of details are permissible-increases police presence in high traffic areas at no cost to our City.

The DPD will begin marketing secondary employment availability to businesses. DPD will develop guidelines for use of officers, their powers and acceptable venues for assignment. Consider establishing enforcement (not mandate) for certain entities to use secondary employment as safety mechanism, including clubs, construction/road closures, gas stations, etc. DPD will evaluate options to streamline the entire secondary employment process. Time Frame: By calendar year Q1 2014\

**DPD's Fleet Replacement Plan: The City's Claim:** The City intends to make the following investments in DPD over the next 10 years: $129.3 million to initiate and maintain a fleet vehicle replacement program on a three-year cycle.

**The DPD Takes the City's Plan under Advisement**: The DPD stated that they would establish a vehicle fleet replacement cycle. The DPD states it will undertake a fleet requirements analysis to determine how many vehicles are actually needed-both marked and unmarked and develop a replacement policy. The DPD's Action Plan 1 states: Perform a full inventory, including indicating how each vehicle is used and to whom assigned. Phase 2: The DPD will begin to purchase and replace one-third of its fleet on an annual basis. Funds are available and have been identified within the Emergency Manager's restructuring dollars allocated to DPD.

The Plan is merely rehashes the City's decades old policy of spend first – ask questions later. But having run out of taxpayer's money the City want to finance its reckless spending on the backs of retirees which violates the Code.

**Crime**

From 2002-2012 crime in Detroit (Part 1 crimes) is down 23.82%. The preliminary (unofficial) numbers for the first 6 months of 2013 showed another reduction of over 10%. And in the first 3 months of 2014 (January 1 – March 31) crime is down 15%, over the same period last year. From January 1, 2002 through March 31, 2014 crime in Detroit is down by over 35% yet the number of sworn officers has decreased by approximately 30% since. The population declined approximately 22% from 2002 to 2012.

**2. Fire Department**

Based on research the challenge is that fire spending has not been linked to the outcome (the risk associated with fires).[6] Fire spending has traditionally been driven by a single key performance output: response time. Delivering a service based on a quality of service level (response time) rather than on the outcome (risk of loss due to fire) – has obvious cost implications.

An analysis done by Deloitte for the City of Memphis found no statistical relationship between fire loss and response time for calls responded to under 15 minutes (Deloitte 2007). A potential reason for this is that fire dynamics are often determined before the fire apparatus arrives due to varying differences in structure layout and access to both air and fuel, (Cortez, 2001) suggests that even with longer response times of 10-12 minutes (because of delays in detection of fire events, additional delays in notification, and normal dispatch, turnout, and response times) the incidence rate of flashover is still low**.** Within reasonable ranges, response times do not seem to matter substantially. A study by (Challands, 2009) suggests that property damage is not impacted significantly by response times.

---

[6] White Paper, David Edwards, *IBM, Smarter, Faster, Cheaper, an Operations Efficiency Benchmark Study of 100 American Cities* (2011).

## II. THE CITY'S PLAN IS NOT FAIR AND EQUITABLE AND DOES NOT OFFER RETIREES MORE THAN THEY COULD RECEIVE OUTSIDE OF BANKRUPTCY

The City asks the Court to allow it to discharge PFRS pre-petition UAL by supplanting the City's obligation to fund the UAL with the states/DIA/foundation's partial funding if forthcoming. In addition, the City's Plan provides Jamie S. Fields a recovery of approximately 6% toward his healthcare from March 1, 2014 to December 31, 2014 as a result of the healthcare settlement and an unknown or indeterminable amount thereafter.

The City's proposal to not pay anything toward their pre-petition PFRS UAL[7], coupled with their proposal to pay nothing post-petition to PFRS for pension obligations for the next 10 years (until 2023) and minuscule payments for the following 10 years (until 2033) is unprecedented in the history of municipal bankruptcy. The U.S. Supreme Court long ago held that a municipal debtor is required to propose a plan that devotes a "fair" amount of "probable future revenues" for "satisfaction of creditors." *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 420 (1943).

While the Plan offers no monies to PFRS, in contrast, the Plan treats every other material category of creditors and class of claims – including bondholders – much more favorably, honoring the City's obligation to repay claims over time from future revenues. Those creditors have been promised distributions with expected net present values ranging from more than 15% to 100% of their claims. In the process, the Plan provides treatment for all creditors – other than Jamie S. Fields, and other similarly situated retirees – superior treatment to that offered in the pre-bankruptcy offer of 10% of the UAL[8] highlighting the punitively discriminatory treatment that the City seeks to impose on Jamie S. Fields and other retirees.

---

[7] The amount of UAL for PFRS is disputed.

[8] It is interesting to note that the City claims the UAL for the City of Detroit Retirement System is 3.5 billion dollars and 10% which was offered pre-bankruptcy would be 350 million dollars which is "coincidentally" what the state of Michigan has offered as part of a proposal earmarked for city of Detroit pensions. However, the states money is meant

### a. Retiree Health Care Benefits

The Plan fails to comply with other applicable statutory provisions in violation of section 943(b) (1) of the Code. The City entered bankruptcy using the exaggerated unfunded health care amount of 5.7 million. It appears, the City simply tallied up the estimated amount that it would owe for healthcare over retirees expected lifespan, without discounting those projected expenses to present value.

Regardless of how the City arrived at the figure, using it to inflate or exaggerate the City's fiscal health, was disingenuous because most cities have "pay as you go health care" and in fact until 2004 municipalities did not have to report "unfunded" health care liabilities. Even the cities that pre-fund their health care the average funding level is 0-5%.

Rather, that asserting some unquantified number in the aggregate, Jamie S. Fields argues that the city should use present day, more concrete and quantifiable numbers. Prior to the bankruptcy petition, Jamie S. Fields had City provided health care. The City offered to allow Jamie S. Fields to continue his City sponsored coverage for a rate in excess $2,300 per month or a cost greater than $27,000 yearly. The City has provided Jamie S. Fields $125 per month or $1,500 per year or less than a 6% recovery, considerably less than other unsecured creditors.

### b. Pension Benefits

The City is required to "pay down" the retirement system's unfunded liability much in the same way an individual would "pay down" a mortgage usually over a thirty year period. Even using the City's guesstimate of a PFRS funding level of 82%, PFRS is a healthy well-funded system. Morningstar's benchmark for a well-funded system is greater than 80%. It should be noted that the state retirement system (MERS) is currently funded at 63%.

---

to supplant any City effort to address the Retirement System's UAL and supplants the money the City originally (pre-bankruptcy) offered.

## III. THE PLAN DOES NOT SATISFY THE STATUTORY REQUIREMENTS FOR CONFIRMATION

Section 943(b) of the Code establishes the requirements for confirmation of a Plan. The burden is on the City to prove by a preponderance of the evidence that it has satisfied those requirements, e.g., *In re Pierce County Housing Auth.,* 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) ("The debtor bears the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence.") (Citing *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31 (Bankr. D. Colo. 1999)); see also *Liberty Nat'l Enters. v. Ambanc La Mesa L.P.* (*In re Ambanc La Mesa L.P.*), 115 F.3d 650, 653 (9th Cir. 1997) (same burden on chapter 11 debtor).

### a. The Plan Is Not In The Best Interests Of Creditors

The Plan is not "in the best interests of creditors" as required by section 943(b) (7) of the Code. 11 U.S.C. §943(b) (7). The phrase "best interests of creditors" broadly stated embodies the core requirement that a proposed plan provide a recovery to each creditor that is superior to that otherwise available to the creditor. This basic protection for dissenting creditors has been part of statutory bankruptcy law for well over a century. The earliest bankruptcy laws specifically required that both corporate plans of reorganization (Chapter 11) and municipal Plans of Adjustment (Chapter 9) be in the "best interests of creditors."

In the 1978 overhaul of the Bankruptcy Act, Congress added specificity to the "best interests" test applicable in chapter 11, requiring a dissenting creditor to receive or retain "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a) (7). The legislative history explains that this provision "incorporates the former 'best interests of creditors' test found in chapter 11, but spells out precisely what is intended." H.R. REP. NO. 95-595, 1st Sess. 412 (1977).

At the same time, for municipal restructuring under Chapter 9 Congress maintained the historic "best interests" terminology in section 943(b) (7). The legislative history notes that the newly-formulated chapter 11 test "is phrased in terms of liquidation of the debtor. Because that is not possible in a municipal case, the test here is phrased in its more traditional form, using the words of art 'best interests of creditors.'" H.R. REP. NO. 95-595, 1st Sess. 400 (1977). The purpose of the "best interests" test, however, remained unchanged. Specifically, in both Chapter 9 and Chapter 11, the test operates as the key protection for individual dissenting creditors.

If a dissenting class rejects a proposed Plan, the protections of the "best interests" test apply to all individual dissenting creditors, even those whose claims are classified within a class that has accepted the Plan. *Bank of Am. Nat'l Trust & Savs. Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."). Thus, "[i]f even one dissenting member of an impaired class would get less under the Plan than in a hypothetical liquidation, the fact that the class as a whole approved the Plan is immaterial." See, e.g., *In re Sierra-Cal*, 210 B.R. 168, 171 (Bankr. E.D. Cal. 1997) (the "best interests" test "cannot be finessed by a 'cram down' under § 1129(b)").

Consequently, the "best interests" test "is one of the strongest protections individual creditors have." *Adelphia*, 361 B.R. at 364 as "a cornerstone of the theoretical underpinnings of Chapter 11. It stands as an 'individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation.'" (COLLIER ON BANKRUPTCY ¶ 1129.03[7] (15th ed.); see, *In Re Bonner Mall Partnership*, 2 F.3d 899, 914 n.35 (9th Cir. 1993 ("**Creditors are given guarantees as individual creditors under the best interests test**.") (Emphasis in original). As the legislative history makes clear, the same holds true in Chapter 9.

Simply put, "the best interests test . . . is designed to protect individual creditors even in the face of majority support for a Plan." *Adelphia*, 361 B.R. at 367. This has been true in municipal restructurings for as long as Chapter 9 has existed. As the Supreme Court held long ago, "minorities under the various reorganization sections of the Bankruptcy Act cannot be deprived of the benefits of the statute by reason of a waiver, acquiescence or approval by the other members of the class. The applicability of that rule to proceedings under Chapter 9 is plain. [T]he fact that the vast majority of security holders may have approved a Plan is not the test of whether that Plan satisfies the statutory standard. The former is not a substitute for the latter. They are independent." *Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943).

As shown below, the City's Plan provides Jamie S. Fields, and similarly situated retirees, a recovery far less than that which they can reasonably expect under the circumstances and that which it could achieve in the absence of the City's Chapter 9 case. As a result, the Plan is not in the "best interests" of Jamie S. Fields, and other similarly situated retirees, and hence does not satisfy section 943(b) (7) of the Code.

**b. The "Best Interests" Test Requires The City To Provide Jamie S. Fields A Reasonable Recovery Under The Circumstances.**

The Supreme Court has stated: "The best interests of creditors test does not mean liquidation value as under Chapter 11 of the Bankruptcy Act. In making such a determination, it is expected the bankruptcy court should make findings as detailed as possible to support a conclusion that this test has been met." 124 Cong. Rec. H 11,100 (Sept. 28, 1978), S 17,417 (Oct. 6, 1978); see 5 NORTON BANKR. L. & PRAC. 3d § 90:20 (2014).

In *Kelley*, the debtor proposed a Plan that would provide bondholders a recovery of approximately 57 cents on the dollar. *Kelley*, 319 U.S. at 417-18. A "very small minority" of bondholders objected. Id. The Supreme Court reversed an order of confirmation on the grounds that the bankruptcy court had not made findings of fact that would enable it to conclude, among other things, that the Plan was in the best interests of creditors. In particular, the Court held that it was necessary for the bankruptcy court to assess the debtor's ability to pay claims from future tax revenues: "[W]here future tax revenues are the only source to which creditors can look for payment of their claims, considered estimates of those revenues constitute the only available basis for appraising the respective interests of different classes of creditors. In order that a court may determine the fairness of the total amount of cash or securities offered to creditors by the Plan, the court must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for satisfaction of creditors." Id. at 420.

The common theme of *Kelley* is consideration of the municipal debtor's future ability to pay. Under *Kelley*, a plan that impairs and discharges debt based upon a static "snapshot" of the debtor's current assets and liabilities does not satisfy the "best interests" test. To achieve confirmation over the objection of a dissenting impaired creditor, the debtor must prove that the Plan devotes a "fair" amount of "probable future revenues" for "satisfaction of creditors." *Id*. at 420.

While a "fair" amount is subject to interpretation it is evident that the City's proposal to pay nothing for the next ten years is not "fair." It has been well chronicled the City's abysmal efforts to collect the revenues owing if (e.g. property taxes, parking tickets, etc.), therefore, even if the City's population declines, the City by increasing its ability to collect revenues owed can provide much higher revenue than the Plan anticipates.

The Disclosure Statement and the Plan of Adjustment do not contain any discussion of "Detroit Future City" or the "Detroit Works Project" strategic long-range plans that were funded by foundations and included input from 300,000 City residents on how to readjust the size of the City's footprint by focusing on its most stable neighborhoods. The Plan calls for vastly reduced or eliminated public services in under-populated. Neither the City's Disclosure nor their Plan discussed the anticipated savings of these proposed strategies which would necessarily involve less police protection, bus service and trash refuse expenses among other potential savings.

Relatedly, the "best interests" test also has been interpreted as an inquiry into whether "a proposed plan provide[s] a better alternative for creditors than what they already have." *Mount Carbon*, 242 B.R. at 34 (citing 4 COLLIER ON BANKRUPTCY ¶ 943.07[7] (15th ed. 1999)) (dicta due to the fact that the parties had stipulated that the plan at issue satisfied the "best interests" test); see *Pierce County*, 414 B.R. at 718 (same). So phrased, the test "require[s] a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case.

If PFRS continued to pay out current benefits, including cost of living adjustments (COLA) and was cost neutral (it neither gained nor lost monies on its investments) PFRS could continue to pay its current level of benefits for 8-10 years. However, since over 60% of pension benefits are paid as a result of the fund's investment earnings it is conceivable that the benefits could continue for a considerably longer period. In addition, if PFRS was liquidated and each retiree was paid his pro-rata present value share of the fund. Some individual retirees, depending on the present day value of their pension and other actuarial determinations, may be better off being "cashed out" of the retirement system than receiving the City's reduced benefits including elimination of COLA which is equivalent to a substantial PFRS pension benefit reduction over time.

## IV. THE CITY'S AMENDED PLAN OF ADJUSTMENT UNFAIRLY PUNISHES JAMIE S. FIELDS AND OTHER RETIREES FROM EXERCISING THEIR RIGHTS

Section 1123(a) (4) guarantees that each class member will be treated equally, regardless of how he or she vote on the Plan. Where the receipt of valuable benefits in a plan is conditioned on a vote to accept that plan, there is a very real possibility of dissuading or silencing opposition to the plan. The Plan, while properly separating PFRS and DGRS into separate classes (10 and 11 respectively), improperly links their voting rights together (e.g., both classes have to accept the DIA/State settlement if forthcoming and agree to drop future litigation).

GRS treatment is dissimilar to PFRS creating a possibility of providing separate treatment to two classes that in all practicality voted as one. Although voting in separate classes their pension claims have in reality been lumped in the same class despite differential treatment. The distribution of certain benefits to some claimants but not others within a class or two classes combined for voting purposes violates section 1123(a)(4). *Adelphia*, 361 B.R. at 363-64.

## V. DENIAL OF THE PLAN OF ADJUSTMENT WOULD NOT HARM THE CITY.

An underlying theme is that allowing the City to proceed is the only way that it will emerge from its current financial situation. There is no reason to believe this is the case. A Chapter 9 is fundamentally different from a Chapter 11 where the alternative is most likely liquidation of the company's assets. That is not true in situations involving municipal debtors where it is much more difficult for creditors to execute upon any judgment that may be obtained. Thus, denial of the Plan will not result in the collapse of the City. In fact, denial of the City's Plan may actually speed the restructuring process. Denying confirmation may actually speed up the process by forcing the City to negotiate and come up with a realistic plan

Bankruptcy is not the exclusive means for cities to address their financial problems. In fact, some commentators believe that non-bankruptcy options provide better ways for cities to restructure. For example, in 2003, Pittsburgh was faced with a $34 million budget deficit and total debts of $879 million. The state created a financial board to oversee the city's finances, and bankruptcy was avoided. A similar result was achieved for the City of New York in the 1970's. Thus, cities in severe financial distress can, and do, recover outside of bankruptcy. See, e.g., Omer Kimhi, *Chapter 9 of the Bankruptcy Code: A Solution in Search of a Problem*, 27 Yale J. on Reg. 351 (2010) 22 Id. at 389. 23 Id.

## RESERVATION OF RIGHTS

Jamie S. Fields reserves all rights to object to the Plan on any and all grounds, including, without limitation, those not mentioned in this Objection.

## CONCLUSION

The Amended Plan of Adjustment discriminates against Jamie S. Fields, and fails many of the Code's statutory prerequisites for confirmation of a Plan of Adjustment. For all of the foregoing s/predicated on the forgoing arguments and grant such other and further relief as the Court deems appropriate under the circumstances.

/s/ Jamie S. Fields_____
Jamie S. Fields (P-52808)
555 Brush
Detroit, Mich. 48226
(313) 570-3906
jeansartre@msn.com