# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

### THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' OBJECTION TO THE AMENDED DISCLOSURE STATEMENT WITH RESPECT TO AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) ("**AFSCME**") -- the representative of the interests of between at least forty and fifty percent (40-50%) of the about 11,943 retired City of Detroit (the "**Debtor**" or the "**City**") non-uniformed retired employees (the "**AFSCME Retired Employees**") and about 2,523 active City employees (the "**AFSCME Active Employees**", and together with the AFSCME Retired Employees, the "**AFSCME Employees**"), or about seventy percent (70%) of the active non-uniformed union-represented employees -- through its undersigned counsel, hereby submits this objection (the "**Objection**") to the adequacy and approval of the *Amended Disclosure Statement With Respect to Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 3382] (the "**Disclosure Statement**") proposed to accompany the *Amended Plan for the Adjustment of Debts of the City of Detroit*

[Docket No. 3380] (the "**Plan**").  In support of this Objection, AFSCME respectfully states as follows:[1]

### PRELIMINARY STATEMENT

1.      It is bad enough that the Disclosure Statement describes a Plan that, at bottom, if confirmed (which AFSCME does not believe it could be) would violate Michigan law, eviscerate and perpetuate the trampling of the constitutionally protected rights of the AFSCME Employees, and leave many AFSCME Employees facing individual bankruptcy and unable to afford basic life necessities such as rent, mortgage payments, drugs, medical insurance, or the like.[2]

---

[1] AFSCME continues to believe that the arguments and objections it has previously raised in the context of the City's eligibility for chapter 9 protection (*see* Docket Nos. 1156, 1227, 1467, 1695, collectively the "**AFSCME Eligibility Briefing**"), if sustained in AFSCME's favor in the current appeal pending before the United States Court of Appeals for the Sixth Circuit (*Michigan Council 25 of the American Fed. of State, County and Municipal Employees, AFL-CIO, et al. v. City of Detroit, Michigan, et al.* (6th Cir., Case No. 14-1211)), prevent this Court from proceeding with approval of the Disclosure Statement and/or confirmation of the Plan.  These arguments include (but are not limited to) that: (i) chapter 9 is in excess of congressional authority under Article I of the United States Constitution; (ii) chapter 9 is facially invalid under the United States Constitution on the ground that it is at odds with the principles of federalism embodied in the Tenth Amendment to the Constitution; (iii) the principles of federalism embodied in both the Tenth Amendment to the Constitution and 11 U.S.C. § 903, among other sections of the Bankruptcy Code, stand as a bar to the impairment of accrued pension rights in this chapter 9 case in light of the Pensions Clause contained in Art. IX, Section 24 of the Michigan Constitution; (iv) the Governor's authorization for the City to be a debtor under chapter 9 was void *ab initio* and of no legal force and effect because it violated the protection of accrued pension rights by the Pensions Clause of the Michigan Constitution and/or the protection of local self-governance by the strong Home Rule provisions of the Michigan Constitution; (v) this case should be dismissed as not filed in good faith as required under 11 U.S.C. § 921(c); and (vi) the City failed to satisfy the eligibility requirement under 11 U.S.C. § 109(c)(5)(c) because negotiations with its creditors were not impracticable. In light of this Court's ruling on these issues in the *Opinion Regarding Eligibility* [Docket No. 1945], AFSCME will not re-argue these and other objections previously ruled on by the Court (now the subject of the pending appeal). AFSCME does, however, fully reassert as if set forth fully herein all such arguments made in Docket Nos. 1156, 1227, 1467, 1695 and/or at the hearing(s) regarding the City's eligibility.

[2] The Court disallowed parties from objecting to the Disclosure Statement on the basis that the Plan is patently unconfirmable, despite the recognized concept that, to the extent a plan cannot be confirmed, approval of a disclosure statement "is a misleading and artificial charade which should not bear the imprimatur of the court."  *See In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990); *see also, e.g.*, *In re Sparkle Stor-All Eaton Township, LLC*, No. 11–30382, 2011 WL 4542709, at *5 (Bankr. N.D. Ohio Sept. 28, 2011) ("[E]ven if the disclosure statement provided 'adequate information' about the proposed plan . . . which it does not, the proposed plan is still not confirmable on its face and the disclosure statement . . .  thus cannot be approved as a basis for plan vote solicitation."); *In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *cf. In re Dow Corning Corp.*, 237 B.R. 380, 384 n.1 (Bankr. E.D. Mich. 1999) (court considered whether plan was "patently unconfirmable" at the disclosure statement hearing).

*AFSCME expressly reserves all rights to argue the various reasons for the patent unconfirmability of the Plan in future pleading(s) it intends to file in connection with the Plan confirmation process,* **and notes for the record that**

2.      Yet, incredibly and inexplicably, the City seeks to eviscerate the rights of creditors such as AFSCME and AFSCME Employees without providing certain critical information, including facts and details essential for any informed judgment regarding the Plan. To put it bluntly, AFSCME believes that the City has failed to provide large amounts of critical information.

3.      Among other things, as explained below, the Disclosure Statement fails to provide or disclose adequate information regarding the following:

a.      the anticipated treatment of, estimated amounts available for and sources of recovery to, AFSCME Employees that are Holders of Class 11 GRS Pension Claims[3] and the risks and potential effect of the proposed slashing of pension and OPEB benefits on individual AFSCME Employees living at or near the poverty line and the concomitant effect of such actions on the City and its immediate environs;

b.      the State Contribution Agreement, including the consequences of a Class 11 (or Class 10) Pension Claim Holder voting no and the possibility of Non-Accepting Holders losing entitlement to the State Settlement Benefit Amount as part of such Holder's GRS Adjusted Pension Amount;

c.      the actuarial methodology and appropriateness of specified rates of return utilized to calculate the actual pension underfunding with respect to the GRS Pension Claims;

d.      the basis for Class 5 providing the Swap Counterparties with Secured Claims that will "remain secured by the Pledged Property" (*i.e.* the

---

**the Plan is patently unconfirmable** because, *inter alia*, (i) the Plan does not provide for equality of treatment to creditors within Class 11 (and within Class 10), *i.e.* not every creditor holding a GRS Pension Claim (or PFRS Pension Claim) will receive the same recovery as every other creditor within the same class, in violation of 11 U.S.C. § 1123(a)(4) (and § 1129(b), in the event of a cramdown); (ii) numerous aspects of the Plan violate 11 U.S.C. § 943(b)(4), including the (a) proposed treatment of GRS Pension Claims owed to AFSCME Employees, (b) proposed potential violations of the City's Privatization Ordinance, and (c) the proposed continuing pledge of Pledged Property (*i.e.* casino revenues) to Class 5 Holders of COP Swap Claims; and (iii) the Plan is not in the best interests of dissenting creditors (which violates 11 U.S.C. § 943(b)(7)) and/or is not "fair and equitable" with respect to dissenting impaired classes, including classes such as Classes 11, 12 and 14, because outside chapter 9, creditors could exercise certain remedies against the City (such as collecting a judgment against the City through a tax assessment or enforcing the Pensions Clause of the Michigan Constitution, Article IX, Section 24) and in order to avoid this result, the City, acting rationally and with due care, would seek to monetize certain assets, including the DIA Assets and the DWSD assets, which would pay down creditors beyond what they are getting under the proposed Plan.

[3] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Disclosure Statement or, alternatively, the Plan.

-3-

collateral pledged by the City under the COP Swap Collateral Agreement) when such liens violate the Michigan Gaming Control and Revenue Act, MCL §§ 432.201-432.226 *et seq.,* as amended by Michigan Public Act 306 of 2004 and the risk that the pledge of such liens renders the Plan unconfirmable pursuant to Bankruptcy Code section 943(b)(4);

e.    the anticipated recovery (or lack thereof) for OPEB Claims held by AFSCME Active Employees and the basis for omitting Active OPEB Claims (as defined below) from the aggregate allowed dollar amount of Class 12 OPEB;

f.    the value of significant assets and how such assets bear on the best interests of creditors test and potential recoveries to creditors (either in chapter 9 or outside of chapter 9 if the case were dismissed and creditors were left to state law remedies), including (i) approximately 62,000 pieces of artwork in the DIA Collection not valued by Christie's; (ii) the City's parking assets which the City may seek to monetize; (iii) the value of City owned but unutilized land, and how such land may be utilized to benefit all creditors; and (iv) the potential value of significant uncollected taxes, debts and other funds owed to the City discussed below;

g.    the DIA Settlement, and how such settlement is reasonable and in the best interests of creditors given the wholesale transfer of all DIA Assets in the DIA Collection for a future contingent payment of approximately $816 million from certain Foundations and from the State of Michigan as consideration for the "shield[ing] of the DIA Collection from potential sales to satisfy creditors of the City"; and

h.    the aggregate dollar amount of Other Unsecured Claims being resolved under the Plan (*i.e.* the Disclosure Statement currently provides no basis to support the aggregate recovery to "Other Unsecured Claims" of approximately 15%, particularly when the aggregate claim amount of "Other Unsecured Claims" is listed as undetermined).

4.    Accordingly, approval of the Disclosure Statement should be denied absent the provision of information sufficient for all creditors – including AFSCME Employees – to make an informed choice regarding the Plan. The Disclosure Statement as currently drafted falls far short of satisfying the statutorily required "adequate information" standard, and this Court should not countenance approval of such a document.

## GENERAL BACKGROUND

5.      On July 18, 2013 (the "**Petition Date**"), the City filed a petition for relief in this Court, thereby commencing the instant chapter 9 proceeding.

6.      On December 5, 2013, this Court entered the "Order for Relief Under Chapter 9 of the Bankruptcy Code" (the "**Order for Relief**") and issued the accompanying "**Eligibility Opinion**."  In its Order for Relief and Eligibility Opinion, the Court held, *inter alia*, that chapter 9 is constitutional, the City met all of the statutory eligibility requirements to be a debtor under chapter 9, and also found that accrued pension rights may lawfully be impaired in this bankruptcy case through judicial confirmation of a "plan of adjustment" proposed by the City.

7.      AFSCME has vigorously pursued its appellate rights with respect to the Order for Relief and Eligibility Opinion, and on Friday, February 21, 2014, the Sixth Circuit granted AFSCME's (and other appellants) petition for permission to appeal the Order for Relief.

A.      **Background Specific to this Objection**

8.      On February 21, 2014, the City filed the original version of the Plan and Disclosure Statement.  On March 6, 2014, the Court entered the *Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 2937] (as amended by the *Third Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 3632], the "**Scheduling Order**").

9.      Pursuant to the Scheduling Order, on March 14, 2014, AFSCME sent the City, via counsel, approximately 25 requests for additional and adequate information to be included in the Disclosure Statement (the "**Information Requests**").  On March 28, 2014, AFSCME received a letter from the City indicating, with respect to each specific Information Request, that either (i) "the Disclosure Statement contains all information necessary to provide adequate information"

-5-

or (ii) the City would make "further revisions to the Disclosure Statement that address the" request.

10.     On March 31, 2014, the City filed the amended Disclosure Statement and Plan. Among other things, the Disclosure Statement, as amended, purports to provide "adequate" information to creditors, including AFSCME and AFSCME Employees, to enable such creditors to make an informed decision on whether to vote for or against the Plan. A discussion of certain of the information provided in (and missing from) the Disclosure Statement relevant to AFSCME's objections follows.

## 1.     Disclosures Regarding Class 11 GRS Pension Claims (and Class 10 PFRS Claims) and State Contribution Agreement

11.     At first glance, the Disclosure Statement *appears* to provide much information regarding the anticipated treatment to Holders of Class 11 GRS Pension Claims (and Class 10 PFRS Pension Claims). *See* Disclosure Statement, at pages 8-15; 24-25. In particular, the City has drafted a chart (Disclosure Statement, at pages 12) that depicts what GRS Pension Claim Holders will receive if the Classes 10 and 11 vote yes or no on the Plan.

12.     However, upon closer review, much information is lacking. For example, Holders of Classes 11 GRS Pension Claims (and Class 10 PFRS Claims) are told that part of their recovery is based on receipt of certain portions of the State Contribution, but the details regarding the conditions to the State funding the State Contribution (including the State Contribution Agreement itself) are not attached to the Disclosure Statement or Plan.

13.     Furthermore, buried on page 35 of the Disclosure Statement is the statement that "if the release set forth at Section III.D.7.b of the Plan is not approved by the Bankruptcy Court, Non-Accepting Holders shall not be entitled to the State Settlement Benefit Amount as part of such Holder's GRS Adjusted Pension Amount." Yet, in the section earlier in the Disclosure

Statement, this concept is not plainly discussed, and it is very difficult for a GRS Pension Claim Holder to predict or understand how much less such a Claim will receive for a "no" vote in the event the comprehensive release to the State is not approved.

14. Additionally, regarding the calculation and payment of PFRS and GRS Pension Claims under Classes 10 and 11, the Disclosure Statement notes vaguely that "[a]dditional benefits may be provided to those Holders of PFRS Pension Claims and GRS Pension Claims who are most in need." *See* Disclosure Statement, at page 15. However, the Disclosure Statement is silent regarding what poverty level will be used, how much money will be provided, and how this calculation will be accomplished.

15. With respect to calculating the approximate anticipated value of expected Allowed PFRS Claims and Allowed GRS Claims, the City chooses to utilize "among other assumptions", respectively, a 6.50% (Class 10) and 6.25% (Class 11) discount rate to value liabilities/investment return rate to calculate projected future asset growth. *See* Disclosure Statement, at pages 9-11.

16. The Disclosure Statement discusses the anticipated cuts to Holders of GRS Pension Claims as a percentage of expected pension payments, but assumes a higher recovery on the front end to GRS Pension Claims from DWSD payments, without explaining the risk factors related to the DWSD payments not being available.

**2. Disclosures Regarding Class 12 OPEB Claims**

17. Proposed Class 12 discussed in the Disclosure Statement classifies and/or aggregates all OPEB Claims with an Estimated Aggregate Allowed Amount of $3,184,900,000. *See* Disclosure Statement, at page 25. In the context of the Eligibility Opinion, the City estimated OPEB underfunding claims to be in the range of $5.7 billion, and later in the Disclosure Statement, the City itself notes that its "List of Claims estimated liabilities in the

-7-

aggregate amount of $5.718 billion for UAAL associated with the OPEB Plans. This amount included the present value of OPEB liabilities for active employees of the City not yet retired." *See* Disclosure Statement, at page 83.

18.     Accordingly, although the Disclosure Statement recognizes that the Plan seeks to classify and "aggregate" all OPEB Claims, it only classifies allowed OPEB Claims worth $3,184,900,000 and does not appear to classify or provide any recovery for the additional approximately $2.5 billion of OPEB Claims of active City employees not yet retired (the "**Active OPEB Claims**").  The propriety of this is highly questionable, and the City fails to openly discuss why it chooses to ignore the Active OPEB Claims.

### 3.     Disclosure Regarding the DIA Settlement and Value of DIA Collection and Other Assets

19.     The Disclosure Statement discusses that the DIA Settlement, if approved, would "shield the DIA Collection" (*i.e.* the entirety of the DIA artwork owned by the City) from the City's creditors (*see* Disclosure Statement, at page 128), and as consideration, the State, DIA Corp. and the Foundations will pledge/sign an "irrevocable commitment" to fund $816 million over a twenty (20) year period.  *See* Disclosure Statement, at pages 47-48.  Although the Disclosure Statement discloses the appraisal of the Appraised Art comprised of approximately 2,781 works of art (outright owned by the City), it also states that the DIA Collection consists of approximately 65,000 works of art (which the City may own), but provides no value for the entirety of the DIA Collection.  Disclosure Statement, at pages 74, 127-28,

20.     Additionally, the Disclosure Statement does not disclose any value regarding the DWSD, the value of other significant assets owned by the City (or previously transferred by the City, including land transferred to the Detroit Downtown Development Authority), and possible

-8-

additional value of uncollected and/or significant receivables or debts (including debts owed by the State) the City could collect to satisfy creditor claims.

### 4. Disclosure Regarding Other Unsecured Claims

21.     The Disclosure Statement wishfully (but apparently without any basis) projects an estimated percentage recovery of 15% to Class 14 Other Unsecured Claims (*see* Disclosure Statement, at page 26), yet fails to explain how it arrives at such recovery given the estimated aggregate allowed claims in Class 14 is listed as "unknown" and the New B Notes (which provide for the major source of recovery for Other Unsecured Claims) contain a fixed face amount of $650 million (*see* Disclosure Statement, at page 93).

### 5. Disclosures Regarding Class 5 Swap Secured Claims

22.     Class 5 of the Disclosure Statement provides the Swap Counterparties, as Holders of COP Swap Claims, with Allowed Secured Claims payable over a certain period of time following the Effective Date (depending on certain circumstances) and which Claims, until paid in full, will "remain secured by the Pledged Property" (*i.e.* the collateral pledged by the City under the COP Swap Collateral Agreement).  *See* Disclosure Statement, at page 20.  However, the Disclosure Statement fails to disclose, in the context of a Bankruptcy Code section 943(b)(4) analysis (or otherwise), that such continued liens in the Pledged Property may violate the Michigan Gaming Control and Revenue Act, MCL §§ 432.201-432.226 *et seq.,* as amended by Michigan Public Act 306 of 2004, and the risk that the pledge of such liens renders the Plan unconfirmable pursuant to Bankruptcy Code section 943(b)(4).

### <u>OBJECTION</u>

23.     "Disclosure is the 'pivotal' concept in [a bankruptcy] reorganization." *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (quoting 5 COLLIER ON BANKRUPTCY, ¶ 1125.03 (15th ed. 1992)); *In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988)

(citing same). In particular, in the context of a proposed plan of adjustment, section 1125 of the Bankruptcy Code (made applicable in chapter 9 through section 901 of the Bankruptcy Code) requires that the debtor provide "adequate information" sufficient to enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1); *see, e.g.*, *Oneida*, 848 F.2d at 417 ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.'").

24. "[T]he purpose of the disclosure statement is 'to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan.'" *In re County of Orange*, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997) (citation omitted); *cf. In re Pierce County Housing Auth.,* 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) (discussing requirement that a disclosure statement contain adequate information in a chapter 9 case, made applicable by Bankruptcy Code section 901). At the core, and in the most basic terms, a creditor must be able to determine "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *cf. In re Malek,* 35 B.R. 443, 443-44 (Bankr. E.D. Mich. 1983). Adequate disclosure "is required even if all parties are subject to cram down, because 'the opportunity for parties to appear and express a dissenting voice would be drastically reduced'" otherwise. 7 COLLIER ON BANKRUPTCY, ¶ 1125.02[1] (16th ed. 2013) (quoting *In re Jeppson*, 66 B.R. 269, 297 (Bankr. D. Utah 1986)).

25. The City, as the Plan proponent, bears the ultimate burden of demonstrating "compliance with the requirement to disclose adequate information." *In re Michelson*, 141 B.R.

715, 720 (Bankr. E.D. Cal. 1992).  For the reasons set forth below, the City has failed to satisfy its burden with respect to the Disclosure Statement.

**A.      The Disclosure Statement Lacks Adequate Information Regarding The Expected Recovery To AFSCME Employees That Are Holders Of Class 11 GRS Claims**

26.      The Disclosure Statement needs to state clearly what AFSCME Employees that are Holders of Class 11 GRS Claims will receive under the Plan and how such GRS Claims will be treated under the Plan.  While the Disclosure Statement discusses pension reductions of 26% (assuming Classes 10 and 11 vote to accept the Plan, the DIA Settlement is approved, and the State Contribution Funding is received), the Disclosure Statement does not discuss the actual conditions regarding receipt of the State Contribution Funding (indeed, the finalized State Contribution Agreement is not attached to the Plan or Disclosure Statement).  Moreover, as noted above, the Disclosure Statement seems to bury the fact that the 26% cut could be further reduced (even if the DIA Settlement is approved and even if Classes 10 and 11 vote to accept the Plan) if the release set forth at Section III.D.7.b of the Plan is not approved by the Bankruptcy Court, in which case Holders of Classes 10 or 11 Pension Claims that vote "no" on the Plan will apparently not be entitled to the State Settlement Benefit Amount as part of such Holder's GRS Adjusted Pension Amount.  Thus, for example, the chart on page 12 of the Disclosure Statement must add a scenario for a creditor that votes "no" and thus does not receive the State Contribution Amount.  Additionally, it is impossible for AFSCME Employees holding GRS Pension Claims to predict or understand how much less such a Claim will receive for a "no" vote in the event the comprehensive release to the State is not approved.  This potential reduced amount (and the details of how much a reduction will actually occur) for a "no" vote must be disclosed clearly.

27.     Moreover, the Disclosure Statement provides that the proposed recovery to Holders of GRS Claims can be increased down the road (what the City calls "restored") based on certain future funding levels of the GRS, and to the extent there is pension restoration, any such restoration "will first be used to increase the GRS Adjusted Pension Amount to existing retirees; additional pension restoration will be used to increase the GRS Adjusted Pension Amount to terminated vested employees and active employees."  *See* Disclosure Statement, at page 14. However, the Disclosure Statement does not explain any basis for why the restoration will occur first to existing GRS retirees, and then to terminated vested employees and active employees. Creditors need to understand the basis for this distinction in future benefits restoration.

28.     Furthermore, Holders of GRS Claims that are at or near the poverty level face additional uncertainty and lack necessary disclosure.[4]  While the Disclosure Statement notes vaguely with respect to Classes 10 and 11 that "[a]dditional benefits may be provided to those Holders of PFRS Pension Claims and GRS Pension Claims who are most in need," the Disclosure Statement is silent regarding what criteria for determinations of such need will be used or what portion of the DIA Settlement/State Contribution will go to pay such claims. Moreover, the Disclosure Statement fails to explain what recoveries such claimholders close to the poverty level would receive if they voted for the Plan but the DIA Settlement were not approved because Classes 10 or 11 reject the Plan.

29.     Finally, it appears that nearly $2.5 billion of OPEB Claims for active City employees are not included or aggregated in Class 12, leaving Holders of Active OPEB Claims to wonder how such claims will be treated or classified under the Plan or the City's basis for not providing any recovery to such Claims.

---

[4] While the City notes that determining this level will depend on/reference "federal poverty levels", this benchmark lacks specificity and clarity and is meaningless to potential Holders seeking information to determine what their actual GRS Claim may be.

**B.** **The Disclosure Statement Fails To Disclose The Risks And Potential Effects Of The City's Proposed Impairment Of Pension And OPEB Claims**

30.    While the City discusses various risk factors in the Disclosure Statement, the City fails to include any disclosure regarding the risk that the City has underestimated the nature and extent of the effects of the City's proposed impairment of Pension Claims, including GRS Claims held by AFSCME Employees.  In particular, AFSCME Employees that may live from pension check to pension check currently (even if such check is minimally above the "poverty" line, however that is defined) may be scraping by on rent, mortgage or insurance payments now, but may be forced into personal bankruptcy, unable to afford their home or critical drugs or worse, if pensions are cut.  *See, e.g.*, Laura Wilson Letter to Court [Docket No. 2874]; Ariane L. Girty Letter to Court [Docket No. 2877]; Gloria J. Whitfield Letter to Court [Docket No. 2878]. The City should disclose that the Court will consider the effects of pension cuts in analyzing whether the Plan satisfies the best interests of creditors test and/or whether the Plan is fair and equitable in the face of such potential outcome.

31.    Moreover, the City must disclose the risk that its financial projections do not properly take into account the added poverty rolls it may need to support, and further, the effect of such pension cuts on the morale of the AFSCME Employees, the likely increase in crime and decaying social atmosphere, and all that comes with the proposed pension cuts.  *Cf. Malek,* 35 B.R. at 444 (requiring disclosure of factors that may cause risk of income or financial instability, if such risk exists under the plan); *In re Bermuda Bay, LLC*, No. 09-32133, 2009 WL 5218071, at *7 (Bankr. E.D. Va. Dec. 31, 2009) (requiring amendment of the disclosure statement to reveal potential actions or events that might threaten the reorganization).

32.    Here, the City has not acknowledged the serious risks associated with significant pension and OPEB impairment.

**C.   The Disclosure Statement Fails To Disclose Adequate Information Regarding The City's Calculation Of Actuarial GRS Pension Underfunding**

33.    The City's estimation of underfunded Pension Claims (including the GRS Pension Claims being estimated at $2.299 billion and PFRS Pension Claims estimated at $1.588 billion) and the resulting significant potential pension cuts proposed by the City to Pension Claims are mainly due to the City's calculation of pension underfunding using, "among other assumptions", a 6.50% (Class 10) and 6.25% (Class 11) discount rate.  The City proposes these discount rates with minimal explanation that is simply inadequate, especially when viewed with reference to the Michigan state pension system, which utilizes an 8% discount rate.[5]

34.    The City must provide adequate disclosure and its bases for utilizing discount rates that are well below the average discount rates for pension systems around the country, including Michigan.  *Cf. Malek*, 35 B.R. at 444 ("The Debtor is required to make a full, clear, and complete disclosure of all underlying assumptions.").  Furthermore, the City must provide information regarding why it chooses different rates for the GRS Claims versus the PFRS Claims (6.50% versus 6.25%, respectively), which difference increases the underfunding (and decreases the recoveries) with respect to the GRS Claims.[6]

**D.   The Disclosure Statement Fails to Disclose Significant Asset Values And Potential Revenue Sources That Bear On Creditor Recoveries And The Application Of The Best Interests Of Creditors Test**

35.    While numerous sections of the Disclosure Statement discuss the DIA Settlement, the Disclosure Statement does not provide any hint at the value of approximately 62,000 pieces

---

[5]  *See* Moody's Investors Service, *Adjusted Pension Liability Medians for US States*, *available at* http://www.ncsl.org/documents/summit/summit2013/online-resources/Moody-Adjusted-Pension-Liability-Medians.pdf

[6]  The City should disclose average rates used by public pensions, and Michigan in particular.  See Moody's Investors Service, Adjusted Pension Liability Medians for US States, available at http://www.ncsl.org/documents/summit/summit2013/online-resources/Moody-Adjusted-Pension-Liability-Medians.pdf.

of artwork in the DIA Collection which were not valued by Christie's and which some reports estimate to be worth up to $10 billion. This highly critical information must be disclosed, both in the context of asset value discussions in the Disclosure Statement and in the discussion regarding the Plan satisfying the "best interests test".

36.     The Disclosure Statement also should disclose other possible uses for the DIA Collection (as the DIA Settlement has numerous contingencies and uncertainties discussed below), including alternative arrangements such as leases/selling shares in DIA artworks to individual investors, while letting the city keep rights to the display and physical custody of the works.

37.     This lack of disclosure of highly critical information regarding the DIA Collection is all the more surprising as the City has known for months that the value of the full DIA Collection would be an issue at plan confirmation. *See, e.g.*, *Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Appointing and Directing the Debtor to Cooperate with a Committee of Creditors and Interested Persons to Assess the Art Collection of the Detroit Institute of Arts Based on Arms-Length Market Transactions to Establish a Benchmark Valuation* [Docket No. 1833] (the "**Art Motion**"); *Reply of Creditors to Debtor's Objection to Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Appointing and Directing the Debtor to Cooperate with a Committee of Creditors and Interested Persons to Assess the Art Collection of the Detroit Institute of Arts Based on Arms-Length Market Transactions to Establish a Benchmark Valuation* [Docket No. 2497] (the "**Art Reply**").

38.     While there may be some debate (adequately disclosed) regarding whether the City would have access to the entirety of the DIA Collection for the benefit of its creditors, it

seems likely (as detailed in the Art Motion and Art Reply) that outside of chapter 9, creditors would exercise certain remedies against the City (such as collecting a judgment against the City through a tax assessment) and in order to avoid this result, the City, acting rationally and with due care, would seek to monetize the DIA Collection Art, a valuable asset that is not essential to the health, safety or welfare of its residents.

39. In general, "[a] description of available assets and their value is a vital element of necessary disclosure." *In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985); *see also In re Hirt*, 97 B.R. 981, 982 (Bankr. E.D. Wis. 1989) (disclosure inadequate where there was "a lack of detail as to assets and liabilities"). Indeed, Congress long ago recognized that "[a] plan is necessarily predicated on knowledge of the assets and liabilities being dealt with." S. REP. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907. The Disclosure Statement fails to provide this basic information regarding the DIA Collection.

40. Additionally, AFSCME understands – and the Disclosure Statement should therefore disclose – significant other potential asset and revenue sources exist that could increase recoveries to creditors, including:

    a.    potential City parking asset value/contemplated transactions regarding same and whether these assets are taken into account in the existing projections;

    b.    valuation of land owned by the City, and anticipated use of proceeds of any transaction regarding such land, including an explanation how the existing projections account for such proceeds;

    c.    the estimated value of the DWSD;

    d.    significant tax abatements given by the City to certain parties, including significant abatements to those in downtown, midtown and Northwest Detroit, which could potentially be clawed back;

    e.    past due debts that remain uncollected (including debts owed from the State), improper tax breaks and land transfers given to the wealthy (which could potentially be negated or clawed back for the benefit of creditors),

and implementation of the Detroit Coalition of Unions Tentative Agreement; and

  f. land transferred from the City to the Detroit Downtown Development Authority for lack of equivalent value;

  41. The values of all the above-listed assets impact on best interests test; indeed, the section of the Disclosure Statement regarding the "best interests test" is inadequate and does not provide any real valuation as to what certain creditors could reasonably expect to achieve outside of chapter 9.

  42. The Disclosure Statement should also disclose (i) the significant wage concessions given by AFSCME Employees over the years in exchange for promised pension benefits, and how the City is now seeking to "double dip" against AFSCME Employees under the Plan in cutting the AFSCME Employee's hard earned pensions; (ii) the fact that the City is being overcharged for use of certain state and county facilities; and (iii) money wasted by the City due to the City's lack of compliance with the Detroit privatization ordinances.

**E. The Disclosure Statement Fails To Attach the Actual Proposed Terms Of The DIA Settlement And Fails To Provide Sufficient Information For Creditors To Understand The Reasonableness Of The Settlement**

  43. As discussed in the Disclosure Statement, the Plan seeks approval of the DIA Settlement which, as noted above, would "shield the DIA Collection" from the City's creditors and would apparently – immediately upon the Effective Date – lead to the irrevocable transfer of all 65,000 pieces of art comprising the DIA Collection. The Disclosure Statement must disclose and provide adequate information supporting the reasonableness of this settlement and wholesale transfer of 65,000 pieces of art where only approximately 2,800 pieces (less than 5% of the total pieces of art in the DIA Collection) have been valued at between $452 and $866 million. The DIA Collection would evidently be transferred to a trust immediately upon the effectiveness of the Plan (presumably only assuming Classes 10 and 11 vote in support of the Plan), yet the

-17-

obligations of the Foundations and State to fund its portions of the settlement are apparently nothing more than "commitments" which come due over 20 years, with no disclosure provided concerning what happens to the DIA Collection if the State or the Foundations default on their funding obligations and/or the DIA Corp. defaults on its obligation to raise an additional $100 million.

44.    Furthermore, given the lack of valuation provided for all of the assets part of the DIA Collection, the Disclosure Statement fails to provide any basis (let alone a reasonable basis) for a creditor to evaluate whether the $816 million in funding commitments (assuming such commitments were to actually materialize in the long run) is worth the value of the art being irrevocably transferred to a trust free from the reach of the City's creditors.

45.    The actual State Contribution Agreement also must be disclosed so creditors can fully understand the deal and the State obligation(s) thereunder. The Disclosure Statement must also disclose the risk that future State legislatures seek to back out of the State's funding obligations, and what approvals still need to be obtained at the State level for the State Contribution Agreement to actually go through as currently anticipated.

**F.    The Disclosure Statement Fails To Provide Information Sufficient To Inform General Unsecured Claim Holders What Their Recovery Will Be**

46.    In addition to the Disclosure Statement failing to provide AFSCME Employees with sufficient information regarding Class 11 GRS Pension Claim recoveries, the Disclosure Statement also fails to provide adequate information regarding the amount to be recovered by Holders of Other Unsecured Claims.

47.    While the City projects an estimated 15% recovery to Holders of Other Unsecured Claims, given the fact that the estimated aggregate amount of Allowed Other Unsecured Claims is unknown, and the recovery being proposed to Other Unsecured Claims are New B Notes with

a fixed face amount, it is unclear (at best) how the City can predict a 15% recovery. The basis for this recovery amount must be disclosed and cannot be left to guesswork.

**G.   The Disclosure Statement Fails To Disclose The Potential Improper Security Interests Granted To Holders of Class 5 COP Swap Claims**

48.    Finally, Class 5 of the Disclosure Statement proposes to provide the Swap Counterparties, as Holders of COP Swap Claims, with Allowed Secured Claims (as allowed pursuant to the COP Swap Settlement) payable over a certain period of time following the Effective Date and which Claims, until paid in full, shall "remain secured by the Pledged Property" (*i.e.* the collateral pledged by the City under the COP Swap Collateral Agreement). *See* Disclosure Statement, at page 20.

49.    However, the Disclosure Statement fails to disclose, in the context of a Bankruptcy Code section 943(b)(4) analysis (or otherwise), that such continued liens in the Pledged Property may violate the Michigan Gaming Control and Revenue Act, MCL §§ 432.201-432.226 *et seq.,* as amended by Michigan Public Act 306 of 2004, and the risk that the pledge of such liens renders the Plan unconfirmable pursuant to Bankruptcy Code section 943(b)(4). This risk should be clearly disclosed.

WHEREFORE, AFSCME respectfully requests that for the reasons set forth herein, the Court should deny approval of the Disclosure Statement and grant such other and further relief as the Court deems proper.

Dated: April 7, 2014

      **LOWENSTEIN SANDLER LLP**
      By: /s/  *Sharon L. Levine*
      Sharon L. Levine, Esq.
      Philip J. Gross, Esq.
      65 Livingston Avenue
      Roseland, New Jersey 07068
      (973) 597-2500 (Telephone)
      (973) 597-6247 (Facsimile)
      slevine@lowenstein.com

pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191
(313) 566-4787 (Telephone)
(313) 964-4490 (Facsimile)
richardmack@millercohen.com

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## CERTIFICATE OF SERVICE

      The undersigned certifies that on April 7, 2014, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:   April 7, 2014

                            */s/ Philip J. Gross*
                            Philip J. Gross
                            **LOWENSTEIN SANDLER LLP**
                            65 Livingston Avenue
                            Roseland, New Jersey 07068
                            (973) 597-2500 (Telephone)
                            pgross@lowenstein.com