# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------------x
:
In re                                        : Chapter 9
:
CITY OF DETROIT, MICHIGAN,      : Case No. 13-53846
:
                  Debtor.      : Hon. Steven W. Rhodes
:
:
-------------------------------------------------------------x

## OBJECTION OF FINANCIAL GUARANTY INSURANCE COMPANY TO MOTION OF THE CITY OF DETROIT FOR APPROVAL OF THE PROPOSED DISCLOSURE STATEMENT

US_ACTIVE:\44443994\14\45259.0007

Financial Guaranty Insurance Company ("**FGIC**") files this objection (the "**Objection**") pursuant to the *Third Amended Scheduling Order*, entered on April 2, 2014 [Docket No. 3632] (the "**Scheduling Order**"), and objects to the *Motion of the City of Detroit for Approval of the Proposed Disclosure Statement* [Docket No. 2713] filed by the City of Detroit, Michigan (the "**City**" or the "**Debtor**") in the above-captioned case (the "**Chapter 9 Case**") on February 21, 2014 (the "**Motion**") seeking entry of an order approving the proposed *Disclosure Statement with Respect to Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 2709] (the "**Initial Disclosure Statement**" and, as amended on March 31, 2014 [Docket No. 3382], the "**Disclosure Statement**"). In support of this Objection, FGIC respectfully states as follows:

## PRELIMINARY STATEMENT

1. Notwithstanding the City's efforts to address many of the inadequacies originally identified by creditors, the City's Disclosure Statement still fails to disclose many key assumptions underlying the City's Plan and the conditions and risks associated with them. As will be demonstrated below, unless this information is disclosed, the Disclosure Statement is not only inadequate but, in many respects, it is misleading.

2. For example, the substantial recoveries provided to holders of Pension Claims are propped up on the DIA Settlement, *i.e.*, the "Grand Bargain," and the State Contribution. While the DIA Settlement purports to be a "comprehensive settlement regarding the DIA Assets," and some principal terms of this settlement are now provided, creditors are never told exactly what is being settled, how strong or weak the resolved claims are, or what those claims could potentially be worth. Indeed, the value of the vast majority of the artwork housed at the DIA has been ignored. How can creditors tell if they are getting a "bargain" without understanding what they may be giving up and at what cost? And the City has assumed,

1

US_ACTIVE:\44443994\14\45259.0007

and apparently expects voting creditors to assume, that the numerous preconditions to the DIA Settlement will be consummated; creditors are told nothing about the likelihood that these conditions will actually be met, or what steps the City has taken or must take to meet them. Moreover, notwithstanding the fact that the Plan can still go effective if the DIA Settlement falls through, the City has not disclosed how most unsecured creditors will be treated, what their recovery percentages will be, and what it will do with the artwork if the settlement collapses.

3.     Similarly, the City does not address in the Disclosure Statement how recoveries will be impacted if, contrary to the City's assumptions, the DWSD does not prefund its share of the UAAL, or there are no lenders willing to provide the City with an Exit Facility. Even more egregious is the City's failure to disclose the consequences of a potential disgorgement by the Pension Systems of the proceeds of the 2005 and 2006 COPs transactions in the event the City is successful in its litigation to invalidate the COPs. And, even if all of the settlements and assumptions on which the Plan relies hold true, the City does not explain in the Disclosure Statement how the Plan will be implemented by the future leaders of the City, or how they will be bound to its terms. This void raises a significant, if not unsurmountable, feasibility question.

4.     While much of the information in the Disclosure Statement is relevant and informative, when it comes to presentation of the key premises off which recoveries are driven, creditors are provided with mere conjecture and gloss. Creditors require a full and fair disclosure of how their claims will be treated, what resources are being used to fund that treatment, and what the key risks are to realizing the proposed treatment. Creditors are entitled to understand what the Plan offers and what alternative recoveries they may face if certain provisions of the Plan ultimately are not accomplished, so creditors can make an informed decision about whether

US_ACTIVE:\44443994\14\45259.0007

to accept or reject the Plan. The Disclosure Statement does not provide a balanced presentation of the Plan and fails to give a straight answer to these questions. As a result, votes from creditors that rely on its information may be tainted.

## **FACTUAL BACKGROUND**

5.    On July 18, 2013, the City filed a petition for relief under chapter 9 of the Bankruptcy Code in the Bankruptcy Court.

6.    On February 21, 2014, the City filed the Initial Plan, the Initial Disclosure Statement, and the Motion.

7.    On March 6, 2014, the Court entered the Scheduling Order, which provided that March 14, 2014 "is the deadline for parties to make a good faith effort to advise counsel for the City in writing of any request to include additional information in the disclosure statement."

8.    In accordance therewith, on March 14, 2014, FGIC, together with Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "**Syncora**"), provided counsel for the City with a joint written request for additional information the "**Initial Request**").

9.    On March 27, 2014, the City filed its *Ex Parte Emergency Motion of Debtor for an Order Extending the Deadline for Filing Disclosure Statement Objections Set Forth in the Court's Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 3236], in which the City (i) expressed its intention "to file an amended Disclosure Statement . . . [that] will include many revisions in response to informal requests for the inclusion of additional information in the Disclosure Statement provided to the City by various parties . . . (as well as other revisions arising as a result of the City's continuing negotiations with parties in interest)" and (ii) requested an extension of the deadline for filing objections to the Disclosure Statement. In

US_ACTIVE:\44443994\14\45259.0007

response, and also on March 27, 2014, the Court entered the Deadline Extension Order, which extended the objection deadline to April 3, 2014.

10.    On March 28, 2014, by letter to counsel, the City responded to the joint written request for additional information submitted by FGIC and Syncora (the "**Response Letter**"). In the Response Letter, the City agreed to provide certain additional information requested by FGIC and Syncora but, in response to many of their requests, merely stated its position that further information was *not* necessary.

11.    On March 28, 2014, certain parties filed a motion to extend the deadline to file objections to the Disclosure Statement. In response, on April 2, 2014, the Court entered the Scheduling Order establishing April 7, 2014, as the new objection deadline.

12.    On March 31, 2014, the City filed the Disclosure Statement and the Plan.

13.    After reviewing changes to the Initial Disclosure Statement (as reflected in the Disclosure Statement and its exhibits), as well as additional updated information made available by the City, FGIC has narrowed the scope of the information set forth in the Initial Request to reflect its view on what additional information remains necessary. The updated request is set forth in **Exhibit B** attached hereto and explained in more detail herein.

**THE DISCLOSURE STATEMENT DOES NOT PROVIDE
ADEQUATE INFORMATION AND SHOULD NOT BE APPROVED**

14.    The City has failed to provide creditors with "adequate information" to assess the proposed Plan, as required by section 1125(b) of the Bankruptcy Code (made applicable in chapter 9 be section 901(a)). 11 U.S.C. § 1125(b) (providing that a plan may not be solicited without a "written disclosure statement approved, after notice and a hearing, by the court as containing adequate information"); *id.* § 901(a). For purposes of the Bankruptcy Code, "adequate information" means:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan .
> . . .

11 U.S.C. § 1125(a)(1). Although courts are left to determine "what constitutes adequate information . . . on a case-by-case basis under the facts and circumstances presented," *see In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988), this determination must be guided by the purpose for disclosure, which is to provide creditors with "the opportunity to arrive at an independent and informed judgment [about the plan]." *In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983). Generally, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Keisler*, No. 08-34321, 2009 WL 1851413 at *4 (Bankr. E.D. Tenn. June 29, 2009) (citing *In re Ferretti,* 128 B.R. 16, 19 (Bankr. D.N.H. 1991)); *see* Disclosure Statement Procedures Hr'g Tr. Feb. 25, 2014 32:17-22 (instructing the City that the Disclosure Statement must disclose the "two facts that creditors are most interested in in determining how to vote, . . . how much [they are] going to be paid and when") (the relevant portion of the transcript is attached hereto as **Exhibit A**).

15. The City's proposed Disclosure Statement does not comply with these standards. The Document suffers from numerous deficiencies, which are enumerated in the list attached hereto as **Exhibit B**. More generally, and without being exhaustive, the Disclosure Statement should include more information in the following categories or on the following topics:

US_ACTIVE:\44443994\14\45259.0007

16.    **Balanced Presentation of Plan**.  A disclosure statement must provide a full and balanced disclosure of both the proposed benefits of a plan, as well as any risks to actually achieving such benefits.  *See In re Cardinal Congregate I,* 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) ("[A] disclosure statement must contain all pertinent information bearing on the success *or failure* of the proposals in the plan of reorganization") (emphasis added); *In re Egan*, 33 B.R. 672, 675-76 (Bankr. N.D. Ill. 1983) ("The Disclosure Statement is intended to be a source of factual information upon which one can make an informed judgment about a reorganization plan.  It is not intended to be an advertisement or a sales brochure.").  The City's proposed Disclosure Statement, seemingly, only discusses the alleged benefits of the Plan.

17.    For instance, in the Disclosure Statement, the City selectively describes the benefits of certain transactions and settlements, without divulging their risks or opportunity costs.  For example, while the Disclosure Statement identifies certain conditions to the effectiveness of the DIA Settlement, *see* Disclosure Statement at 47-48 (describing conditions), it fails to clearly disclose the status of its current efforts to satisfy these conditions.  The City does not describe what steps have been and still must be taken to obtain (i) the affirmation by County authorities of DIA Corp. funding obligations, (ii) the approval by the Attorney General, or (iii) the agreement of the State to provide the State Contribution.  There is no indication as to the expected timing of receiving these approvals or whether there is reason to doubt that such approvals will be obtained.  Such information is relevant for creditors to determine whether or not the proposed DIA Settlement will likely be consummated.  Compounding this, the City fails to disclose how unsecured creditors' recoveries (other than holders of Pension Claims) may be affected if the DIA Settlement falls apart (instead merely suggesting, without further explanation or detail, that all holders of unsecured claims will receive lower recoveries if the settlement does

not occur). *See id.* at 60 ("If the DIA Settlement does not occur, or if the full amounts of the

DIA Proceeds and the State Contribution are not received, then the recoveries on account of all

Unsecured Claims, including Pension Claims, will be the lower recoveries estimated in the Plan,

including for Classes 10 and 11.").  The City also does not explain how, without the proceeds of

the DIA Settlement and the State Contribution, it will fund the reduced recoveries given to

Pension Claimants given that "[t]here [will be] no funding available to the pension funds from

the City's General Fund through June 30, 2023." *Id.* at 11.

        18.    Furthermore, although the City describes the COPs litigation commenced

by the City seeking invalidation and disallowance of all claims related to $1.5 billion of COPs

issued to fund the GRS and PFRS UAAL, and also mentions that certain parties have asserted

that, if the City is successful in its litigation, the Retirement Systems must disgorge the proceeds

of such securities, the City never explains how such disgorgement would affect creditor

recoveries or the estimated UAAL for the GRS and the PFRS.  Similarly, the Plan assumes

certain transactions will be consummated – such as the Exit Facility and the DWSD contribution

to the GRS UAAL – but the Disclosure Statement provides no information to assess the basis for

and the degree of risk (or certainty) associated with these assumptions, and likewise does not

explain how creditor recoveries will be impacted if these assumptions prove false.  This is

inconsistent with the general requirement that disclosure statements should provide "information

relevant to the risks being taken by the creditors," *Keisler*, 2009 WL 1851413 at *4, to accurately

assess "what [they are] going to get . . . and what contingencies there are to getting [their]

distribution."  *Id.*; *see also Cardinal Congregate I,* 121 B.R. at 765 ("Where . . . the satisfaction

of claims and interests is dependent upon the debtor's ability to . . . consummate contemplated

transactions, it is not overly demanding for the Court to require detailed disclosure of the facts and assumptions underlying the debtor's belief that it will accomplish its reorganization effort.").

19.     Without information of this kind, the Disclosure Statement presents a one-sided misleading view of the proposed Plan.  Accordingly, FGIC requests information be added to the Disclosure Statement to ensure that creditors receive a *balanced* description of the proposed Plan and understand what they are voting on and what risks they may be assuming. *See* Exhibit B §§ 1(d)-(f), 2, 3, 4.

20.     **Feasibility of Plan**.  The Disclosure Statement also fails to provide information necessary to assess the feasibility of the Plan.  A disclosure statement must "provide sufficient . . . information to determine if the projections for operations subsequent to confirmation are feasible."  *Malek*, 35 B.R. at 444; *see also In re Microwave Prods. of Am., Inc.*, 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989) ("The purpose of the disclosure provisions . . . is to provide holders of claims and interests with 'adequate information' . . . in order for them to be able to make an informed judgment as to the feasibility of the plan.").  Moreover, "[w]here . . . the satisfaction of claims and interests is dependent upon the debtor's ability to improve its financial performance . . . ," the debtor should provide "detailed disclosure of the facts and assumptions underlying the debtor's belief that it will accomplish its reorganization effort." *Cardinal Congregate I,* 121 B.R. at 767.  As discussed, the City does not disclose the consequences that may result if the COPs Claims are invalidated and the Retirement Systems must disgorge the proceeds of the COPs Transactions, including how it will fund any increased claims.  In addition, the City does not explain whether and how future City mayors and City Councils will be held accountable to the terms of the Plan and the City's budget so that, for example, they cannot simply decide to spend in excess of the $1.5 billion currently budgeted for

8

the Reinvestment and Restructuring Initiatives.  Creditors are not told what, if any, restrictions there will be on the City's management and operations after its emergence from chapter 9, or who will be in control of the City post-emergence and what will happen after Kevyn Orr's 18-month term expires.  Without more disclosure about these topics, which relate to the reliability of the City's financial projections, creditors cannot adequately assess the feasibility of the Plan.  Accordingly, FGIC requests the City supplement the Disclosure Statement with such information.  *See* Exhibit B § 5.

21.     **DIA Settlement Information**.  The Disclosure Statement fails to disclose the information necessary for creditors to evaluate the economic merits of the DIA Settlement.  A disclosure statement should disclose information about any issues to be settled pursuant to a proposed plan so that creditors can understand what is being settled and whether the settlement is reasonable.  In order to make this assessment, creditors need the same type of information as would be provided to the Court in support of approval of a settlement.  *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 224 (Bankr. S.D.N.Y. 2007) (noting that "while a Plan may contain a settlement, any such settlement (like the Fed. R. Bankr. P. 9019 settlements that are more common in chapter 11 cases) must pass muster for fairness, under standards articulated by [the courts,]" and, in determining whether to approve such a settlement, considering the same factors applicable in the context of a settlement under Bankruptcy Rule 9019, *i.e.*, whether the settlement was "fair and equitable . . . based on 'the probabilities of ultimate success should the claim be litigated'" and a comparison of "the terms of the compromise with the likely rewards of [not compromising]") (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968)); *In re MQVP, Inc.*, 477 F. App'x 310, 313-14 (6th Cir. 2012; attached hereto as **Exhibit C**) (noting that a proposed settlement in a bankruptcy

US_ACTIVE:\44443694\1\1445259.0007

9

proceeding should be evaluated by determining "the underlying facts" and "whether the compromise is fair and equitable" based on, among other factors, an "estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled") (quoting *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988)); *see also* Swap Forbearance Agreement Hr'g Tr. Jan. 16, 2014 7:20-22 (noting that, when analyzing a proposed settlement, "[b]asic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation") (quotation omitted) (the relevant portion of the transcript is attached hereto as **Exhibit D**.  Here, the Disclosure Statement does not contain information about the strengths and weaknesses of the issues to be resolved pursuant to the DIA Settlement, and also does not disclose the value of a significant portion of the DIA Collection that is the subject of such settlement (including (i) the estimated value of such assets, (ii) restrictions on such assets, including ownership and transfer restrictions, and (iii) how such restrictions, if any, impact the value of such assets).  The Disclosure Statement also does not explain what would happen to the DIA Assets if the DIA Settlement is not consummated.  Accordingly, FGIC requests information regarding the DIA Settlement, including the Plan's treatment of the DIA Assets if the DIA Settlement is not consummated, be added to the Disclosure Statement.  *See* Exhibit B § 1(a)-(c).

US_ACTIVE:\44445694\14\45259.0007

## CONCLUSION

22.     Based upon the foregoing, FGIC urges the Court to enter an Order

denying approval of the Disclosure Statement unless the information requested herein is added to

the Disclosure Statement.

Dated: April 7, 2014
        Birmingham, Michigan

                                         /s/  Mark R. James
                                        Ernest J. Essad Jr.
                                        Mark R. James
                                        WILLIAMS, WILLIAMS, RATTNER &
                                        PLUNKETT, P.C.
                                        280 North Old Woodward Avenue, Suite 300
                                        Birmingham, MI 48009
                                        Telephone:  (248) 642-0333
                                        Facsimile:  (248) 642-0856
                                        Email:  EJEssad@wwrplaw.com
                                        Email:  mrjames@wwrplaw.com

                                         – and –

                                        Alfredo R. Pérez
                                        WEIL, GOTSHAL & MANGES LLP
                                        700 Louisiana Street, Suite 1600
                                        Houston, TX  77002
                                        Telephone: (713) 546-5000
                                        Facsimile:  (713) 224-9511
                                        Email:  alfredo.perez@weil.com

                                        *Attorneys for Financial Guaranty Insurance
                                        Company*

US_ACTIVE:\44443694\1\45259.0007

**Exhibit A**

**Disclosure Statement Procedures Hearing Transcript Excerpt**

US_ACTIVE:\44443694\1\45259.0007

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        February 25, 2014
                    Debtor.     .        2:01 p.m.
. . . . . . . . . . . . . . . .

HEARING RE. MOTION OF THE CITY OF DETROIT FOR APPROVAL OF
      DISCLOSURE STATEMENT PROCEDURES (DKT#2714)
     BEFORE THE HONORABLE STEVEN W. RHODES
        UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:         Jones Day
                        By:  DAVID G. HEIMAN
                             HEATHER LENNOX
                        North Point
                        901 Lakeside Avenue
                        Cleveland, OH  44114-1190
                        (216) 586-3939

                        Jones Day
                        By:  BRUCE BENNETT
                        555 South Flower Street, Fiftieth Floor
                        Los Angeles, CA  90071-2452
                        (213) 243-2382

For Erste               Ballard Spahr, LLP
Europaische             By:  VINCENT J. MARRIOTT, III
Pfandbrief-und          1735 Market Street, 51st Floor
Kommunalkreditbank      Philadelphia, PA  19103-7599
Aktiengesellschaft      (215) 864-8236
in Luxemburg, S.A.:

For Detroit             Clark Hill, PLC
Retirement Systems-     By:  ROBERT GORDON
General Retirement      151 South Old Woodward, Suite 200
System of Detroit,      Birmingham, MI  48009
Police and Fire         (248) 988-5882
Retirement System
of the City of
Detroit:

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee, Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP<br>By: RYAN BLAINE BENNETT<br>300 North LaSalle<br>Chicago, IL 60654<br>(312) 862-3062 |
| For the Official Committee of Retirees: | Dentons<br>By: CAROLE NEVILLE<br>CLAUDE MONTGOMERY<br>1221 Avenue of the Americas, 25th Floor<br>New York, NY 10020-1089<br>(312) 632-8390 |
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP<br>By: KELLY DIBLASI<br>767 Fifth Avenue<br>New York, NY 10153<br>(212) 310-8032 |
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By: CAROL CONNOR COHEN<br>1717 K Street, NW<br>Washington, DC 20036-5342<br>(202) 857-6054 |
| For FMS Wertmanagement: | Schiff Hardin, LLP<br>By: J. MARK FISHER<br>6600 Sears Tower<br>Chicago, IL 60606<br>(312) 258-5710 |
| For National Public Finance Guarantee Corporation: | Jaffe, Raitt, Heuer & Weiss, PC<br>By: PAUL R. HAGE<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034<br>(248) 351-3000 |
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Lippitt O'Keefe, PLLC<br>By: RYAN C. PLECHA<br>370 East Maple Road, 3rd Floor<br>Birmingham, MI 48009<br>(248) 723-6263 |

APPEARANCES (continued):

```
For the Detroit        Erman, Teicher, Zucker &
Fire Fighters             Freedman, P.C.
Association, the        By:  BARBARA A. PATEK
Detroit Police         400 Galleria Officentre, Suite 444
Officers Associa-      Southfield, MI 48034
tion and the           (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

For Dexia              Allard & Fish, PC
Holdings, Inc., &      By:  DEBORAH L. FISH
Dexia Credit Local:    2600 Buhl Building
                       535 Griswold
                       Detroit, MI  48226
                       (313) 961-6141

For Assured            Chadbourne & Parke, LLP
Guaranty Municipal     By:  LAWRENCE A. LAROSE
Corp.:                 30 Rockefeller Plaza
                       New York, NY  10012
                       (212) 408-1140

For AFSCME:            Lowenstein Sandler, LLP
                       By:  PHILLIP J. GROSS
                       65 Livingston Avenue
                       Roseland, NJ  07068
                       (973) 597-6246

For International      Cohen, Weiss & Simon, LLP
Union, UAW, and        By:  JOSHUA J. ELLISON
the Flowers            330 West 42nd Street, 25th Floor
Plaintiffs:            New York, NY  10036-6976
                       (212) 356-0229

For Wilmington         Drinker, Biddle & Reath, LLP
Trust Company,         By:  HEATH ROSENBLAT
N.A.:                  1177 Avenue of the Americas, 41st Floor
                       New York, NY  10036-2714
                       (212) 248-3248

For Committee of       Morrison & Foerster, LLP
Unsecured              By:  BRETT HOWARD MILLER
Creditors:             1290 Avenue of the Americas, 40th Floor
                       New York, NY  10104
                       (212) 468-8051
```

```
Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1  notice with a blackline whenever we go through one of these

2  changes.

3  In any event, I think that it'll get better. I

4  think comments from everyone here, if well-intentioned with a

5  view to getting a disclosure statement document out that's at

6  least accurate with respect to a plan that people may not

7  like, we will generate a better disclosure statement, and I

8  think one of the things we all have to concentrate on is a

9  better disclosure statement not just for the lawyers and

10  other professionals in the case that focus on this for a

11  living but a better disclosure statement for people who

12  don't, and that's the part, I suspect, that's going to be the

13  most difficult. We look forward to all the help and

14  cooperation we can get from everybody else, and thank you for

15  your Honor's attention.

16  THE COURT: Okay. My only advice regarding your

17  disclosure statement is, in my experience, there are two

18  facts that creditors are most interested in in determining

19  how to vote, and so I invite you to figure out a way to

20  highlight these two facts for each type of creditor you've

21  got and simplify it. The two facts are how much am I going

22  to be paid and when.

23  MR. BRUCE BENNETT: I understand that, your Honor.

24  We'll try hard to do that. I should also suggest that we --

25  that with respect to retirees, we're thinking about a

**Exhibit B**

**List of Necessary Information**

US_ACTIVE:\44443694\1\45259.0007

Financial Guaranty Insurance Company ("**FGIC**") hereby requests that the City of Detroit (the "**City**") include the following additional information in the *Disclosure Statement with respect to Plan of Adjustment of Debts of the City of Detroit*, dated March 31, 2014 [Docket No. 3382] (as the same may be amended, the "**Disclosure Statement**"):

1.    **DIA Settlement**[1]

  a.    An explanation of the strengths and weaknesses of the issues to be resolved pursuant to the DIA Settlement and why such settlement is reasonable.

  b.    The aggregate fair market value of the works of art in the DIA Collection that were not included in Christie's Preliminary Report or Final Report, including an explanation of any limitations or restrictions on the ownership, title, acquisition, donation, transfer, use, display, reproduction, sale or disposition of such works and an analysis of how any such limitations or restrictions impact the value of such works.

  c.    An explanation of how the Plan will address the DIA Assets if the DIA Settlement does *not* become effective.

  d.    An explanation of the status of each of the following conditions to the Foundations' participation in the DIA Settlement set forth in section IV.E.3 of the Disclosure Statement: "(h) the affirmation by County authorities of certain existing funding obligations with respect to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; and (j) the agreement of the State to provide the State Contribution in an aggregate amount of up to $350 million," in each case including (i) all risks associated with, (ii) any legislative or other approvals required for, and (iii) the expected timing of, the fulfillment of such condition.

  e.    An explanation regarding how the treatment of, and the estimated percentage recoveries for, each class of creditors holding Unsecured Claims other than classes 10 and 11 (*i.e.*, classes 7, 8, 9, 12, 13 and 14) will change if the DIA Settlement and/or State Contribution Agreement do *not* become effective, including backup information detailing how the City calculated such recovery estimates.

  f.    An explanation of how recoveries to holders of Pension Claims (classes 10 and 11) will be funded if the if the DIA Settlement and/or State Contribution Agreement do *not* become effective.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement or the *Amended Plan for the Adjustment of Debts of the City of Detroit*, dated March 31, 2014 [Docket No. 3380] (as the same may be amended, the "**Plan**"), as applicable.

US_ACTIVE:\44443694\1\45259.0007

2. **DWSD Share of GRS UAAL**

    a.    An explanation of the basis for and likelihood that DWSD will accelerate, or prefund, its allocable share of the GRS UAAL to the GRS, including all necessary approvals and risks associated therewith.

    b.    An explanation regarding how the treatment of, and the estimated percentage recoveries for, each class of creditors holding Unsecured Claims (classes 7, 8, 9, 10, 11, 12, 13 and 14) will change if the DWSD does *not* prefund its allocable share of the GRS UAAL to the GRS, including backup information detailing how the City calculated such recovery estimates.

3. **Certificates of Participation**

    a.    An explanation of the consequences of a successful claim by the Funding Trusts, Beneficial Holders and/or insurers against the GRS and the PFRS to disgorge the proceeds received in connection with the 2005 and 2006 COPs transactions, in the event the City is successful in its litigation to invalidate the COPs.

    b.    The estimated UAAL for the GRS and the PFRS, assuming the GRS and PFRS are required to disgorge the proceeds received in connection with the 2005 and 2006 COPs transactions.

    c.    The estimated percentage recoveries, along with backup information detailing how the City calculated such recovery estimates and how the City would fund such recoveries, for all Unsecured Claims (claims in classes 7, 8, 9, 10, 11, 12, 13 and 14), assuming the GRS and PFRS are required to disgorge the proceeds received in connection with the 2005 and 2006 COPs transactions.

4. **Exit Financing**

    a.    An explanation of the City's efforts to obtain the Exit Facility, including the status of the City's negotiations with potential lenders and the material terms of any potential transactions.

    b.    An explanation of the consequences of the City's failure to obtain an Exit Facility, including the impact on the estimated percentage recoveries on account of all Unsecured Claims (claims in classes 7, 8, 9, 10, 11, 12, 13 and 14), along with backup information detailing how the City calculated such impact.

US_ACTIVE:\44443694\1\45259.0007

5.      **Failure to Achieve Projected Financial Performance**

a.      Page 61 of the Disclosure Statement indicates that the Projections are dependent upon, among other things, the successful implementation of the City's budget and confirmation of the Plan in accordance with its terms. An explanation regarding:

i.      the management and operations of the City after emergence from chapter 9, including any limitations or restrictions with respect thereto, whether and for how long the City will remain in receivership under the control of an emergency manager pursuant to Public Act 436, and what will happen upon the completion of Kevyn Orr's 18-month term (*i.e.* will the governor continue his term or appoint a new emergency manager?); and

ii.     the extent to which, after the City emerges from chapter 9 and the receivership pursuant to Public Act 436 terminates, the City's mayor and the City Council will be required to implement the Plan and the City's budget, including the Restructuring and Reinvestment Initiatives attached to the Disclosure Statement as Exhibit I.

US_ACTIVE:\44445894\1\45259.0007

**Exhibit C**

*In re MQVP, Inc.*
**477 F. App'x 310, 313-14 (6th Cir. 2012)**

477 Fed.Appx. 310
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

In re MQVP, INC., Debtor,
William Hindelang and Global Online
Certifications, Inc., Appellants,
v.
Mid–State Aftermarket Body Parts Inc., Keystone
Automotive Industries, Inc., LKQ Corporation,
and Chapter 7 Trustee Charles J. Taunt, Appellees.

No. 10–2225. | April 13, 2012.

## Synopsis

**Background:** In Chapter 7 case, trustee sought approval of settlement to resolve two trademark infringement lawsuits being litigated by debtor, which held registered service mark for supply chain quality and assurance program in the aftermarket auto crash parts industry. The United States Bankruptcy Court approved the settlement. Creditors with former equity interest in debtor appealed. The United States District Court for the Eastern District of Michigan affirmed. Creditors appealed.

**Holding:** The Court of Appeals, Julia Smith Gibbons, Circuit Judge, held that approval of settlement that involved a payment of $1.2 million to the estate was not an abuse of discretion.

Affirmed.

**\*310** On Appeal from the United States District Court for the Eastern District of Michigan.

Before: GIBBONS, GRIFFIN, and DONALD, Circuit Judges.

## Opinion

JULIA SMITH GIBBONS, Circuit Judge.

This case arises out of a Chapter 7 bankruptcy proceeding involving debtor MQVP, Inc. Before conversion to Chapter 7, MQVP had been litigating two separate lawsuits alleging trademark infringement. The trustee of the MQVP estate sought approval from the bankruptcy court of a settlement to resolve these suits, which involved a payment of $1.2 million to the estate. Appellants and MQVP creditors William Hindelang and Global Online Certifications, Inc. objected to the proposed settlement on grounds that the trustee had not met his burden of showing that the settlement was reasonable. After a hearing, the bankruptcy court approved the settlement, and the district court subsequently affirmed.

For the following reasons, we affirm.

### I.

Debtor MQVP, Inc. maintained the registered service mark MQVP, which represented a supply chain quality and assurance **\*311** program in the aftermarket auto crash parts industry. The purpose of the MQVP program, in which aftermarket car part manufacturers, distributors, and insurance companies participated, was to certify the quality and traceability of aftermarket parts that were manufactured and sold. On August 17, 2006, MQVP filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. On July 18, 2007, the bankruptcy court converted the case to a Chapter 7 proceeding, and Charles J. Taunt was appointed trustee.

MQVP was involved in two lawsuits that are relevant to this case. In the first, known as the "Arkansas litigation" because it was filed in the Eastern District of Arkansas, Mid–State Aftermarket Body Parts filed suit against MQVP seeking a declaratory judgment that it had not infringed MQVP's trademark. MQVP counterclaimed, alleging violations of the Lanham Act, unfair business practices, tortious interference, unfair competition, and conversion. The district court granted summary judgment in favor of Mid–State, but the Eighth Circuit reversed and remanded, finding that there were material, disputed issues of fact for trial. *Mid–State Aftermarket Body Parts, Inc. v. MQVP, Inc.,* 466 F.3d 630, 631–32, 634 (8th Cir.2006.)

In the second proceeding, known as the "Michigan litigation" because it was first filed in bankruptcy court in the Eastern District of Michigan, MQVP filed suit against

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.     1

Keystone Automotive Industries, claiming violations of the Lanham Act, unfair business practices, tortious interference, unfair competition, and conversion. Keystone filed various counterclaims. Although the case began in the bankruptcy court in the Eastern District of Michigan, it was later transferred to the district court. Thus, prior to the conversion of its bankruptcy case to Chapter 7, MQVP was actively litigating two federal cases. The entities against which MQVP was litigating—Keystone and Mid–State—are associated with the LKQ Corporation and are collectively referred to as "LKQ."

Although settlement negotiations in Michigan failed, the parties eventually reached a proposed agreement in the Arkansas litigation that covered both lawsuits. In relevant part, the proposed settlement provided for (1) the dismissal with prejudice of both the Arkansas and Michigan litigations; (2) the payment of $1.2 million by LKQ to the trustee; (3) the assignment of certain intellectual property of MQVP to LKQ; and (4) the withdrawal of all claims filed by LKQ against the estate.

The trustee then asked the bankruptcy court to approve the proposed settlement. Two creditors, Global Online Certifications, Inc. and William Hindelang, the former sole shareholder of the debtor (collectively, "Global Online"), objected to the settlement agreement. In a nonevidentiary hearing before the bankruptcy court, Global Online argued that the dollar amount of the settlement was too low and that the trustee had failed to meet his burden of showing that the settlement was reasonable. Global Online admitted that it had submitted no evidence in support of its objection; it maintained only that the trustee had not met his burden. It also acknowledged that, under the settlement, it would receive around $130,000. No other creditors had any objections; in fact, MQVP's largest creditor supported the settlement.

The bankruptcy court approved the settlement. The bankruptcy judge noted that the following factors influenced her decision to approve the settlement: (1) there was no evidence of collusion among the parties, as competent counsel for the plaintiff **\*312** and defendants had engaged in serious litigation for several years; (2) counsel was experienced in trademark infringement litigation, the basis of both the Michigan and Arkansas suits; (3) there was sufficient time for discovery in each case, even though the plaintiffs might have wanted more; (4) going to trial in each case would have been both time-consuming and risky; (5) a $1.2 million settlement was more beneficial to the estate than the possibility of a zero dollar recovery; (6) the largest creditor supported the settlement, while the two objecting creditors were

relatively small; (7) the major witness for the plaintiff was potentially uncooperative and might have weakened plaintiff's chances of recovery; and (8) the area of law was complex.

Global Online appealed to the district court the bankruptcy's court's order approving the settlement. Global Online argued that the trustee did not offer, and the bankruptcy court did not require, any evidence regarding the propriety of the proposed settlement. After a hearing, the district court upheld the decision of the bankruptcy judge.

We review "the bankruptcy court's decision directly, according no deference to the district court." *Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.,* 606 F.3d 835, 837 (6th Cir.2010) (internal quotation marks omitted). We review the bankruptcy court's findings of fact for clear error and questions of law *de novo. Id.* The bankruptcy court's approval of a settlement agreement is reviewed for an abuse of discretion. *Lyndon Prop. Ins. Co. v. E. Ky. Univ.,* 200 Fed.Appx. 409, 413 (6th Cir.2006).

## II.

At the heart of this case is whether the bankruptcy court abused its discretion by approving the settlement agreement that the trustee proposed.[1] A trustee in bankruptcy has the authority to seek a settlement of claims available to the debtor, but any proposed settlement is subject to the approval of the bankruptcy court, which enjoys "significant discretion." *See* Fed. R. Bankr.P. 9019(a); *In re Rankin,* 438 Fed.Appx. 420, 426 (6th Cir.2011). "The very purpose of such a compromise agreement 'is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.' " *In re Bard,* 49 Fed.Appx. 528, 530 (6th Cir.2002) (quoting *In re A & C Props.,* 784 F.2d 1377, 1380–81 (9th Cir.1986)). Indeed, " '[t]he law favors compromise and not litigation for its own sake....' " **\*313** *In re Fishell,* 47 F.3d 1168, —— (6th Cir.1995) (table) (quoting *A & C Props.,* 784 F.2d at 1380–81)).

[1]     Also before this court is LKQ's Motion to Take Judicial Notice or Supplement the Record. LKQ filed this motion in response to Global Online's assertion in its reply brief that LKQ had cited docket entries and pleadings which it had failed to designate pursuant to Federal Rule of Appellate Procedure 6(b)(2)(B)(ii). Global Online contends that LKQ's citations to these items must be stricken.

We find it unnecessary to resolve this question because the bankruptcy court already had before it the documents—in one form or another—to which Global Online objects. Although LKQ cites a handful of un-designated entries on the bankruptcy court docket sheet to describe this case's procedural background, those same facts are found in other docket entries that were properly designated. Further, assuming that LKQ was required to designate certain pleadings in the Michigan and Arkansas lawsuits under Rule 6(b)(2)(B)(ii) before citing them, the bankruptcy court judge had before her the entire docket sheets in both the Michigan and Arkansas district court cases—documents which Global Online *itself* designated as part of the record on appeal. Finally, although LKQ refers to a few un-designated pleadings in the Michigan litigation when it was still in bankruptcy court, these pleadings were filed before the very same judge who conducted the hearing at issue here.

When determining whether to approve a proposed settlement, the bankruptcy court may not rubber stamp the agreement or merely rely upon the trustee's word that the settlement is reasonable. *Reynolds v. C.I.R.,* 861 F.2d 469, 473 (6th Cir.1988). Rather, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *Id.* The Supreme Court has set forth the general factors to be considered by the bankruptcy judge in determining whether a proposed settlement is fair and equitable:

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the

terms of the compromise with the likely rewards of litigation.

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). In Bard, this court summarized how other federal courts had implemented the Supreme Court's guidance in *TMT Trailer*—and distilled four factors for bankruptcy courts to consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Bard,* 49 Fed.Appx. at 530. Though *Bard* is an unpublished opinion, we have continued to apply its four-factor test when considering challenges to proposed settlement agreements in bankruptcy cases. *See Lyndon Prop. Ins. Co. v. Katz,* 196 Fed.Appx. 383, 387 (6th Cir.2006); *see also Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir.1988) (setting forth three-part test similar to that articulated in *Bard* ). Importantly, however, "[a] bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision, and set out the reasons for his decision." *Fishell*, 47 F.3d at —— (quoting *In re Am. Corp.,* 841 F.2d 159, 163 (7th Cir.1987)). Finally, bankruptcy courts and district courts in this jurisdiction generally accord some deference to the trustee's decision to settle a claim. *See In re Media Cent., Inc.,* 190 B.R. 316, 321 (E.D.Tenn.1994) (citing *Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir.1988)); *In re Smithey,* No. 10–30310, 2011 WL 3102308, at *6–7 (Bankr.N.D.Ohio, July 25, 2011); *In re Engman,* 331 B.R. 277, 298–99 (Bankr.W.D.Mich.2005); *In re West Pointe Props. L.P.,* 249 B.R. 273, 281 (Bankr.E.D.Tenn.2000).

### A.

The first two *Bard* factors—the probability of success in the litigation and the difficulties in the manner of collection—are related and can be analyzed together. In

**\*314** this inquiry, we attempt "to estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled" in order to determine whether the bankruptcy court abused its discretion. *In re Nicole Energy Servs., Inc.,* 385 B.R. 201, 239 (S.D.Ohio 2008) (internal quotation marks omitted). However, we "need not make a precise determination of the outcome ... since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim." *Id.* (internal quotation marks omitted). We consider both the stated reasons of the bankruptcy court judge as well as additional facts in the record that could have supported her decision. *See Fishell,* 1995 WL 66622, at *3; *In re Haven, Inc.,* 326 B.R. 901, 2005 WL 927666, at *4 (6th Cir.BAP2005) (table).

Regarding the first two *Bard* factors, the bankruptcy judge noted that: (1) there was a risk that there would be no recovery at all; (2) competent counsel had litigated the case and had "a sense of the value of the case and the time value of money;" and (3) a key witness for the plaintiff might not have been cooperative. And, although not specifically discussed by the bankruptcy judge, the following evidence was also before her: (1) an order from the Arkansas litigation, indicating that many documents that were key to the plaintiff's case had been lost or destroyed; (2) unsworn statements by the trustee that jury verdicts in similar cases averaged between $40,000 and $50,000 in Arkansas, and between $80,000 and $90,000 in Michigan; and (3) an indication by the trustee's counsel that, even if MQVP were successful in either litigation, it was likely that there would be an appeal—which the estate could not afford to litigate. All of these considerations, which inform the general inquiry into the probability of success and the difficulties of collecting judgments in the two litigations, appear to weigh in favor of the bankruptcy court's approval of the settlement. Nonetheless, Global Online makes several arguments why these considerations are insufficient to render the settlement reasonable.

First, Global Online cites *In re Cohara* in support of its argument that it was impermissible for the bankruptcy court to rely upon the trustee's unsworn statement that $1.2 million was significantly higher than the average jury verdict in Michigan and Arkansas for similar cases. *In re Cohara,* 324 B.R. 24, 28 (6th Cir.BAP2005) ("Assertions by counsel do not constitute probative evidence.") (internal quotation marks omitted). Yet decisions of bankruptcy appellate panels do not bind this court. *Phar–Mor, Inc. v. McKesson Corp.,* 534 F.3d 502, 507 (6th Cir.2008). Moreover, in *Cohara,* the bankruptcy appellate panel was particularly loath to rely on the debtor's unsworn statements because that was the *only*

evidence she submitted in support of her argument that she should be allowed to voluntarily dismiss her Chapter 7 case. 324 B.R. at 28. That is not the case here: the lengthy and complex litigation history and the approval of the largest creditor provided additional evidence upon which the bankruptcy court could rely. *See* Parts B–C, *infra*. Further, the debtor made the unsworn statements in *Cohara,* whereas here the trustee made the statements in question. A trustee, unlike debtors or creditors, owes "fiduciary obligations to the estate and its myriad interests," *In re Big Rivers Elec. Corp.,* 355 F.3d 415, 440 (6th Cir.2004), and his decision to settle a claim is accorded some measure of deference. *In re Media Cent., Inc.,* 190 B.R. at 321. Finally, there is little concern that the bankruptcy judge was unduly swayed by the trustee's statements regarding average verdicts; she openly acknowledged that the trustee's testimony was not sworn—and in so doing **\*315** signaled that she was according it less weight.

Second, Global Online claims that the bankruptcy court erred by observing that the plaintiff's key witness had not been cooperative and would have weakened the chances of success in the litigations. The bankruptcy judge made this observation on the basis of an affidavit submitted by the trustee that indicated that, based on several email communications, the witness was not being cooperative. Unlike the trustee's testimony about average verdicts, this statement was presented in the form of a sworn affidavit. And although Global Online is correct that it was not given a chance to cross-examine the trustee regarding this statement, Global Online was not automatically entitled to an evidentiary hearing on this issue. *Depoister v. Mary M. Holloway Found.,* 36 F.3d 582, 586 (7th Cir.1994); *cf. In re Century Offshore Mgmt. Corp.,* 119 F.3d 409, 412 (6th Cir.1997) (holding that bankruptcy court was not required to conduct evidentiary hearing before granting summary judgment). In any event, the bankruptcy judge herself downplayed the significance of this fact, recognizing that Global Online objected to the assertions made in the affidavit. She stated the following:

> There is some concern, although that was rejected by the objecting creditor, that the ... major witness here is at odds to some extent with the trustee in this case and was not necessarily going to be an easy witness for the plaintiffs ... to have to work with. *It was certainly a concern, although primarily what the Court is looking at is the risks of litigation ... in a case where the law is very complex and the time*

13-53846-tjt    Doc 3848    Filed 04/07/14    Entered 04/07/14 13:38:22    Page 27 of 34

*already spent in this case is enormous.*

(emphasis added). It appears that the bankruptcy judge considered this piece of evidence but did not rely upon it heavily, much as she did in the case of the trustee's statements regarding average verdicts. To do so was to use—not abuse—her discretion.

Finally, and perhaps most persuasively, Global Online asserts that the bankruptcy court failed to analyze the probabilities of winning at trial and how much could be won, instead merely noting that there was a risk that recovery could be zero. It is true that the risk of a zero recovery exists in every lawsuit, and it might have been preferable for the trustee to have compared the rough probability of a zero recovery with the probability of success and the potential range of recoveries at trial and to have presented this data to the bankruptcy court. However, the trustee's failure to quantify the probabilities of success is not fatal.

In *Bard,* the trustee presented no expert testimony on the value of the debtor's lawsuit, while the debtor offered expert testimony that placed the probability of success at 75% and estimated damages of up to $4 million, with a lowest reasonable settlement offer of $750,000. *Bard,* 49 Fed.Appx. at 531. Despite this expert testimony, we affirmed a settlement agreement that netted just $92,500 because other evidence suggested that the lawsuit was somewhat weak and that "any recovery at all for the Bards was far from a certainty." *Id.* at 529, 532–33. Here, Global Online did not articulate its objections to the proposed settlement in *any* detail or attach exhibits or affidavits, and so is in a comparably weaker position than the debtor in *Bard,* who introduced expert testimony valuing likely jury awards and reasonable settlement offers. Admittedly, there were factors in *Bard,* absent here, that severely undermined the prospects of a successful litigation outcome. *See id.* at 532. Nonetheless, the bankruptcy court in this case did have before it evidence of problems **\*316** that dampened the ultimate chances of litigation success: discovery problems due to numerous missing documents, a potentially uncooperative key witness, and an inability to fund an appeal. Moreover, adversarial and competent parties, acting at arm's length, arrived at the $1.2 million settlement figure after rather intense negotiations and years of litigation—a fact not easily disregarded.

It may have been preferable for the trustee to have attempted to calculate the probabilities of success and the range of recoveries more concretely and to have presented this evidence in an affidavit. *See, e.g., In re Doctors*

*Hosp. of Hyde Park, Inc.,* 474 F.3d 421, 428–29 (7th Cir.2007) (setting forth range of litigation outcomes). But Global Online has not cited, and research has not revealed, a single case in which the bankruptcy court's failure to demand or rely upon a numerical calculation of the odds of success and potential gains of litigation constituted an abuse of discretion. Accordingly, the first two *Bard* factors weigh in favor of the bankruptcy judge's approval of the settlement.

### B.

The third *Bard* factor—the "complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it"—strongly supports the bankruptcy court's ruling. *See Bard,* 49 Fed.Appx. at 530. On this point, the bankruptcy court noted that the parties had been locked in serious litigation for seven years in Arkansas and for three years in Michigan. She also observed that "the law is very complex and the time already spent in this case is enormous." The bankruptcy judge had a solid basis upon which to make this assessment: MQVP first filed the Michigan trademark infringement complaint in her own court. She also had before her the extensive docket sheets in both cases. Moreover, the trustee's counsel noted that the case presented legal complexities, stating that "[t]he product that MQVP had was very specific and very unique, and finding case law, finding the exact situation to—or the exact discovery to prove to the Court the case was not a simple task." The mere fact that the Arkansas litigation had already been to the Eighth Circuit—resulting in remand to hold a trial—further demonstrated the complexity of the case. Indeed, the Eighth Circuit found that "[t]he many uncertain and outright disputed issues of material fact ... permeate the chaotic record in this case...." *Mid–State,* 466 F.3d at 634. Global Online appears to admit so much in its brief, but it contends that "[t]he fact that a case is very fact intensive does not mean that the case is complex." Yet as this court's own bankruptcy jurisprudence recognizes, "[t]he fact-intensive nature of [a] dispute also means that any litigation would be time-consuming and expensive." *Fishell,* 1995 WL 66622, at \*4. And this case has already been both expensive and time-consuming, dragging on ten years if the two lawsuits are combined.

### C.

The fourth *Bard* factor, which considers "the paramount interest of the creditors and a proper deference to their reasonable views," also strongly supports the bankruptcy court's decision. *Bard,* 49 Fed.Appx. at 530. As the bankruptcy judge recognized, the largest creditor, Results Systems Corporation ("Results"), supported the settlement. Results stood to lose the most by settling if the litigation was in fact worth more than $1.2 million; thus, its views were properly given substantial weight. Results stated that it had already spent "hundreds and hundreds of thousands of dollars to litigate in four different **\*317** courts" to recover on its claim and that as a result, "we'd really like to get paid. We've waited long enough.... We don't want to take the risk of a zero at trial. We can't afford a zero at trial." Results had indeed already waited nearly ten years to be paid—a long period of time in bankruptcy cases by this court's own measure. *See Bard,* 49 Fed.Appx. at 533 (finding noteworthy the fact that creditor had already waited five years for payment). Finally, the bankruptcy court noted that the two objecting creditors were only a "minority ... of the creditor pool." The near unanimity among creditors here, including the largest one, weighs in favor of approval of the settlement. *See In re Bell & Beckwith,* 87 B.R. 476, 480–81 (N.D.Ohio 1988) (affirming bankruptcy judge's approval

of settlement in part on grounds that only one creditor had objected to the settlement, while the rest of the creditors, including the largest, had no objections); *see also Matter of Foster Mortg. Corp.,* 68 F.3d 914, 917 (5th Cir.1995) ("While the desires of the creditors are not binding, a court should carefully consider the wishes of the majority of the creditors.") (internal quotation marks omitted).

## III.

Upon analyzing the *Bard* factors, we find that the bankruptcy judge did not abuse her discretion in approving the settlement and therefore affirm the decision of the district court.

### Parallel Citations

2012 WL 1233019 (C.A.6 (Mich.))

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit D**

**Swap Forbearance Agreement Hearing Transcript Excerpt**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
         MICHIGAN,               .
                                 .        Detroit, Michigan
                                 .        January 16, 2014
                 Debtor.         .        2:00 p.m.
. . . . . . . . . . . . . . .

BENCH OPINION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  GREGORY SHUMAKER
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

                       Jones Day
                       By:  CORINNE BALL
                       222 East 41st
                       New York, NY  10017-6702
                       (212) 326-7844

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For UBS and Bank       Warner, Norcross & Judd, LLP
of America             By:  SCOTT WATSON
Merrill Lynch:         111 Lyon Avenue, NW - Suite 900
                       Grand Rapids, MI  49503
                       (616) 752-2465

For UBS AG:            Bingham McCutchen, LLP
                       By:  JARED R. CLARK
                       399 Park Avenue
                       New York, NY  10022-4689
                       (212) 705-7770

APPEARANCES (continued):

```
For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  WILLIAM E. ARNAULT
Syncora Guarantee,   300 North LaSalle
Inc., and Syncora    Chicago, IL  60654
Capital Assurance,   (312) 862-3062
Inc.:

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  JENNIFER K. GREEN
General Retirement   500 Woodward Avenue, Suite 3500
System of Detroit,   Detroit, MI  48226
Police and Fire      (313) 965-8300
Retirement System
of the City of       Clark Hill, PLC
Detroit:             By:  ROBERT D. GORDON
                     151 South Old Woodward, Suite 200
                     Birmingham, MI  48009
                     (248) 988-5882

For Erste            Ballard Spahr, LLP
Europaische          By:  VINCENT J. MARRIOTT, III
Pfandbrief-und       1735 Market Street, 51st Floor
Kommunalkreditbank   Philadelphia, PA  19103-7599
Aktiengesellschaft   (215) 864-8236
in Luxemburg, S.A.:

For David Sole:      Jerome D. Goldberg, PLLC
                     By:  JEROME D. GOLDBERG
                     2921 East Jefferson, Suite 205
                     Detroit, MI  48207
                     (313) 393-6001

For Financial        Williams, Williams, Rattner &
Guaranty Insurance     Plunkett, PC
Company:             By:  MARK R. JAMES
                     380 N. Old Woodward Ave., Suite 300
                     Birmingham, MI  48009
                     (248) 642-0333

For Ambac            Arent Fox, LLP
Assurance            By:  CAROLINE TURNER ENGLISH
Corporation:         1717 K Street, NW
                     Washington, DC  20036-5342
                     (202) 857-6178

For FMS              Schiff Hardin, LLP
Wertmanagement:      By:  RICK FRIMMER
                     233 South Wacker Drive, Suite 6600
                     Chicago, IL  60606
                     (312) 258-5573
```

APPEARANCES (continued):

```
For Detroit Retired    Lippitt O'Keefe, PLLC
City Employees         By:  RYAN C. PLECHA
Association,           370 East Maple Road, 3rd Floor
Retired Detroit        Birmingham, MI  48009
Police and Fire        (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:
```

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068
```

```
Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1  bankruptcy court is charged with an affirmative obligation to
2  apprise itself of the underlying facts and to make an
3  independent judgment as to whether the compromise is fair and
4  equitable," close quote.

5      In _In re. Rankin_, 438 Federal Appendix 420, 426,
6  Sixth Circuit, 2011, the Court quoted at some length from the
7  Supreme Court's decision in _Protective Committee for_
8  _Independent Stockholders of TMT Trailer Ferry, Inc._ v.
9  _Anderson_, 390 U.S. 414, 1968.  Quote, "There can be no
10  informed and independent judgment as to whether a proposed
11  compromise is fair and equitable until the bankruptcy judge
12  has appraised -- apprised himself of all of the facts
13  necessary for an intelligent and objective opinion of the
14  probabilities of ultimate success should the claim be
15  litigated.  Further, the judge should form an educated
16  estimate of the complexity, expense, and likely duration of
17  such litigation, the possible difficulties of collecting on
18  any judgment which might be obtained, and all other factors
19  relevant to a full and fair assessment of the wisdom of the
20  proposed compromise.  Basic to this process in every
21  instance, of course, is the need to compare the terms of the
22  compromise with the likely rewards of litigation."

23      In light of these authorities, the Court has
24  undertaken the required inquiry.  It has gone to some length
25  to form an intelligent and objective opinion of the