UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                      ) Case No. 13-53846
                                            )
CITY OF DETROIT, MICHIGAN,                  ) In Proceedings Under
                                            ) Chapter 9
                    Debtor.                 )
                                            ) Hon. Steven W. Rhodes
                                            )

## OAKLAND COUNTY'S OBJECTION TO THE CITY OF DETROIT, MICHIGAN'S PROPOSED AMENDED DISCLOSURE STATEMENT

Oakland County, Michigan ("Oakland County"), a contingent creditor and party in interest in the above-captioned case, by and through its undersigned counsel, hereby files its Objection To The City of Detroit, Michigan's (the "City") Amended Disclosure Statement [Docket No. 3382] (the "Disclosure Statement"), and in support thereof states as follows:

### INTRODUCTION

1. Oakland County is a party to several contracts with the City pursuant to which the City, through The Detroit Water and Sewer Department ("DWSD"), supplies water to, and controls and treats wastewater for, Oakland County. Accordingly, Oakland County is a party in interest herein and is a contingent creditor of the City subject to the City's determination of whether to assume or reject its contracts with Oakland County. To the extent the City rejects any of the City's contracts with Oakland

County, Oakland County's rejection damage claim would be treated as a general unsecured claim in Class 14 (Other Unsecured Claims) of the Plan.

## OBJECTIONS

I. **THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION.**

2. Section 1125(b) of the Bankruptcy Code (made applicable in chapter 9 cases by Section 901(a)) provides:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b). "Adequate information" is defined in section 1125 as being:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

11 U.S.C. § 1125 (a)(1). See also In re Lower Bucks Hosp., 488 B.R. 303, 317 (E.D. Pa. 2013), ("What constitutes 'adequate information' is determined on a case-by-case basis."); In re Radco Props., Inc., 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009) (same); In re Texas Extrusion Corp., 844 F.2d 1142, 1157 (5th Cir. 1988) (providing that the

2
13-53846-tjt Doc 3855 Filed 04/07/14 Entered 04/07/14 15:50:20 Page 2 of 18

information required will necessarily be governed by the circumstances of the case); <u>In re Ionosphere Clubs, Inc.</u>, 179 B.R. 24, 29 (S.D.N.Y. 1995) (same). The determination of what constitutes adequate information is subjective, and within the discretion of the bankruptcy court. <u>See</u> <u>Ionosphere Clubs</u>, 179 B.R. at 29. A disclosure statement should not be approved if it fails to provide sufficient information about risks regarding the means by which a plan is to be funded. <u>See</u> <u>In re Cardinal Congregate I</u>, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990). A disclosure statement must contain all material information relating to the risks posed to creditors and equity holders under the proposed plan of reorganization. <u>See</u> <u>In re Unichem Corp.</u>, 72 B.R. 95 (Bankr. N.D. Ill. 1987).

3. In this case, the Disclosure Statement is lacking "adequate information" in several material areas. Specifically, the Disclosure Statement fails to provide, minimally, the following critical information:

> a. The risks associated with operating the DWSD, including, (i) rate determinations; (ii) the need to increase rates and any anticipated rate setting disputes or litigation; (iii) specifics regarding Capital Improvement Projects that may be necessary to maintain the water and sewer systems and the proposed source of funding for any such projects; (iv) financing difficulties[1]; and (v) collection issues.

---

[1] Particularly in light of the recent downgrades in the DWSD's bond ratings by several of the major credit rating agencies. <u>See</u> **Exhibit A**.

b. A list of executory contracts by and between DWSD and the non-debtor wholesale and retail customers of DWSD to be assumed and/or rejected, the basis upon which any such decision will be made, or the impact on the financial projections and the feasibility of the Plan in the event such executory contracts are assumed and/or rejected.

c. A substantive discussion with regard to the factors to be considered by the City in connection with deciding whether the City will enter into the "DWSD Transaction" (as defined in the Plan).

d. Information with regard to the feasibility of the Plan in the event the City enters into the "DWSD Transaction" including whether the Plan will need to be amended by the City in such instance.

e. Any explanation of why DWSD is being required to pre-fund the pension liabilities when no other City department is being required to do so or the legal basis for requiring DWSD to do so.

f. The City's assessment of any increase in water and sewer rates that may be necessitated by the 'rate stability plan' and required 10-year pre-funding or the factual or legal basis for imposing any such increase.

g. Whether the requirement of the Plan that the DWSD fund (or prefund) $675 million constitutes an improper or illegal debt of the DWSD in that such debt is not for payment of reasonable actual costs of service

but rather constitutes a payment by the DWSD to fund expenses of the City necessitated by the City's prior mismanagement of the DWSD.

h. The legal justification for separately classifying and providing disparate treatment of similarly situated creditors and the risks imposed on confirmation of the Plan by such classification and disparate treatment.

i. Missing exhibits to the Plan — many of which are also referenced in the Disclosure Statement and the other documents referenced in the Disclosure Statement that are not otherwise generally available to the public.

II. **THE DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE THE PLAN IS NOT CONFIRMABLE.**

4. The Plan is patently unconfirmable. Thus, in addition to lacking adequate information, the Disclosure Statement also cannot be approved. Among other deficiencies, the City's Plan contains an impermissible classification scheme that unfairly discriminates in its treatment of creditors holding unsecured claims. See In re Am. Capital Equip., LLC, 688 F.3d 145, 154 (3d Cir. 2012) (Explaining that it is now well accepted that a court may disapprove of a disclosure statement if the plan could not possibly be confirmed.); In re Holley Garden Apartments, Ltd., 223 B.R. 822 (Bankr. M.D. Fla 1998)(declining to approve a disclosure statement because the plan could not be confirmed where the debtor failed to establish a justifiable reason for its proposed classification scheme); In re Curtis Center Ltd. Partnership, 195 B.R. 631, 638 (Bankr.

5
13-53846-tjt Doc 3855 Filed 04/07/14 Entered 04/07/14 15:50:20 Page 5 of 18

E.D. Pa. 1996) (declining to approve the debtor's disclosure statement based on improper classification of claims, because "a disclosure statement should be disapproved where the plan it describes is patently unconfirmable").

5. It is unlikely that all classes of creditors will accept the City's Plan. Accordingly, the section 1129(b)'s "cram down" standards, including the requirement that the Plan "not discriminate unfairly," will be triggered. 11 U.S.C. § 1129(b)(1). The Plan patently violates that statutory command.

6. The Plan's proposed distribution scheme could not be more discriminatory. By way of example, creditors in Class 10 (PFRS Claims) are estimated to receive a 31-49% distribution (representing an estimated monthly benefit payment of 86-94%) while creditors in Class 14 (Other Unsecured Claims) are estimated to receive only a 15% distribution. See Disclosure Statement at II.A.2.(a) and II.B. No legal justification for such discrimination is provided in the Disclosure Statement.

7. The basic function of section 1129(b)'s prohibition on unfair discrimination is straightforward – it operates to ensure that a plan does not "single[] out the holder of some claim or interest for particular treatment." In re Tucson Self-Storage, Inc., 166 B.R. 892, 898 (9th Cir. BAP 1994). Thus, "[c]ourts have denied confirmation of Chapter 11 plans that proposed widely disparate treatment of similarly situated creditors as unfairly discriminatory." Tucson Self-Storage, 166 B.R. at 898.

8. "[T]he proposed discrimination [must have] a reasonable basis and [be] necessary for reorganization." 7 Collier on Bankruptcy ¶ 1129.03[3][a] (15th ed. Rev. 1997); see also, In re Ambanc Le Mesa L.P., 115 F.3d 650, 656 (9th Cir. 1997)

6

(Establishing four criteria to determine fairness within section 1129(b)(1): "(1) the discrimination must be supported by a reasonable basis; (2) the debtor could not confirm or consummate the Plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of the discrimination is directly related to the basis or rationale for the discrimination."

9. As an alternative to the 4-part test recited in <u>Ambanc</u>, courts have adopted a "rebuttable presumption" standard under which a plan is presumed unfair and discriminatory when it provides for "a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments)" in comparison to payments made to "another class of the same priority." <u>In re Armstrong World Indus.</u>, 348 B.R. 111, 121 (D. Del. 2006) (quotations omitted); see <u>In re Dow Corning Corp.</u>, 244 B.R. 696, 701-03 (Bankr. E.D. Mich. 1999) (Rejecting 4-part test and adopting "rebuttable presumption" standard "in which a rebuttable presumption of unfair discrimination would arise where: 'there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.'")

10. "Courts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors, while at least two courts decided that unfair discrimination did not exist

7
13-53846-tjt   Doc 3855   Filed 04/07/14   Entered 04/07/14 15:50:20   Page 7 of 18

when the difference in recoveries was 4% or less." In re Tribune Co., 472 B.R. 223, 243 (Bankr. D. Del. 2012); see, e.g., Tucson Self-Storage, 166 B.R. at 898 (unfair discrimination where plan provided 100% recovery for unsecured trade creditors and 10% to unsecured deficiency claims); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 231 (Bankr. D.N.J. 2000) ("Courts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment (50% or more) to similarly situated creditors."); In re Sentry Operating Co., 264 B.R. 850, 863-64 (Bankr. S.D. Tex. 2001) (unfair discrimination where plan provided for 100% recovery for one class of unsecured claims and 1% recovery to another class of unsecured claims); In re Crosscreek Apartments, Ltd., 213 B.R. 521, 538 (Bankr. E.D. Tenn. 1997) (unfair discrimination where plan provided for 100% recovery for one class of unsecured claims and 50% recovery to another class of unsecured claims); In re Barney & Carey Co., 170 B.R. 17, 25-26 (Bankr. D. Mass. 1994) (unfair discrimination where plan provided for unsecured deficiency claims to be paid 100% over ten years and for unsecured trade claims to be paid 15% upon consummation); In re Cranberry Hill Assocs., L.P., 150 B.R. 289, 290-91 (Bankr. D. Mass. 1993) (unfair discrimination where plan provided for 100% recovery for one class of unsecured claims and 50% recovery to another class of unsecured claims); In re Aztec Co., 107 B.R. 585, 591 (Bankr. M.D. Tenn. 1989) (unfair discrimination where plan provided for a class of unsecured claims to be paid in full and for a class of unsecured deficiency claims to be paid 3%).

11. Here, the City proposes to pay Other Unsecured Claims (which would include Oakland County in the event that the City rejects any of its contracts) 15% while

paying other, similarly-situated unsecured claims far more (i.e., 31-49% distribution which represents an estimated monthly benefit payment of 86-94%). No justification for such disparate treatment appears in the Disclosure Statement.

12. This gross disparity in treatment clearly amounts to unfair discrimination and renders the Plan unconfirmable on its face under section 1129(b)(1). Thus, the Disclosure Statement cannot be approved. <u>Am. Capital Equip</u>, <u>supra</u>, <u>Holley Garden Apartments</u>, <u>supra</u>; and <u>Curtis Center</u>, <u>supra</u>.

### III. OAKLAND COUNTY'S COMPLIANCE WITH THE COURT'S MARCH 6, 2014 PROCEDURES ORDER.

13. By letter dated March 13, 2014, and consistent with the Court's March 6, 2014 *Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 2937] (the "<u>Plan Deadlines Order</u>") Oakland County advised counsel for the City in writing of Oakland County's request that the City include additional information in the Disclosure Statement. By letter dated March 28, 2014, counsel for the City responded to certain, but not all, of the issues raised in Oakland County's March 13, 2014 letter thereby necessitating the filing of the instant Objection.

### IV. RESERVATION OF RIGHTS.

14. Oakland County hereby reserves and preserves all of its rights, remedies, and arguments in connection with this Objection to the Disclosure Statement and reserves all rights to supplement this Objection and to be heard before the Court with regard to the arguments set forth in this Objection, as well as reserves the right to make

any other applicable arguments, including those raised in other objections and/or other joinders to the objections raised by other parties with respect to the Disclosure Statement.

**WHEREFORE**, Oakland County respectfully requests that approval of the Disclosure Statement be denied in its present form, and that the City be required to amend the Disclosure Statement to provide adequate information, including, but not limited to, the information discussed herein.

Respectfully Submitted,

Dated: April 7, 2014

**CARSON FISCHER, P.L.C.**

By: */s/ Joseph M. Fischer*
Joseph M. Fischer (P13452)
Robert A. Weisberg (P26698)
Christopher Grosman (P58693)
4111 Andover Road, West – Second Floor
Bloomfield, Michigan 48302-1924
Telephone: (248) 644-4840
Facsimile: (248) 644-1832
Email: JFischer@CarsonFischer.com
RWeisberg@CarsonFischer.com
CGrosman@CarsonFischer.com

*Counsel for Oakland County, Michigan*

## CERTIFICATE OF SERVICE

    I, Joseph M. Fischer, hereby certify that the foregoing *Oakland County's Objection To The City of Detroit, Michigan's Proposed Amended Disclosure Statement* was filed and served via the Court's electronic case filing and noticing system on this 7th day of April, 2014.

                                                                                       /s/ *Joseph M. Fischer*
                                                                                      Joseph M. Fischer (P13452)

# Exhibit A



**STANDARD & POOR'S
RATINGS SERVICES**
McGRAW HILL FINANCIAL

# RatingsDirect®

# Detroit Water And Sewer Revenue Bond Ratings Lowered To 'CCC' On Vulnerability To Default; Remains On Watch Negative

**Primary Credit Analyst:**
Scott D Garrigan, Chicago (1) 312-233-7014; scott.garrigan@standardandpoors.com

**Secondary Contact:**
Corey A Friedman, Chicago (1) 312-233-7010; corey.friedman@standardandpoors.com

CHICAGO (Standard & Poor's) March 25, 2014--Standard & Poor's Ratings Services said that it has lowered its ratings on Detroit's water and sewer revenue bonds to 'CCC' from 'BB-'. The ratings remain on CreditWatch with negative implications, indicating that Standard & Poor's could lower them further within 90 days as the city moves through the bankruptcy process.

"We lowered our rating because we view the obligations as currently vulnerable to nonpayment," said Standard & Poor's credit analyst Scott Garrigan. In Standard & Poor's view, the city's Plan of Adjustment indicates that the treatment of the water- and sewer-related debt classes could involve an exchange offer where investors receive less value than the promise of the original securities. We view such an exchange as tantamount to a default.

"We could remove the rating from CreditWatch, or even raise the rating," said Mr. Garrigan, "if we determine that there is a diminished likelihood of an exchange offer involving less value than the original promise." In determining this, we will consider the answers to additional information as we consider appropriate, based on our criteria.

RELATED CRITERIA AND RESEARCH

Related Criteria
• Criteria For Assigning 'CCC+', 'CCC', 'CCC-', And 'CC' Ratings, Oct. 1, 2012

13-53846-tjt    Doc 3855    Filed 04/07/14    Entered 04/07/14 15:50:20    Page 13 of 18

Related Research
- Rating Implications Of Exchange Offers And Similar Restructurings, May 12, 2009

Complete ratings information is available to subscribers of RatingsDirect at www.globalcreditportal.com and at spcapitaliq.com. All ratings affected by this rating action can be found on Standard & Poor's public Web site at www.standardandpoors.com. Use the Ratings search box located in the left column.  Alternatively, call one of the following Standard & Poor's numbers: Client Support Europe (44) 20-7176-7176; London Press Office (44) 20-7176-3605; Paris (33) 1-4420-6708; Frankfurt (49) 69-33-999-225; Stockholm (46) 8-440-5914; or Moscow 7 (495) 783-4009.

Copyright © 2014 Standard & Poor's Financial Services LLC, a part of McGraw Hill Financial. All rights reserved.

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of Standard & Poor's Financial Services LLC or its affiliates (collectively, S&P). The Content shall not be used for any unlawful or unauthorized purposes. S&P and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED, OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P's opinions, analyses, and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P does not act as a fiduciary or an investment advisor except where registered as such. While S&P has obtained information from sources it believes to be reliable, S&P does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

To the extent that regulatory authorities allow a rating agency to acknowledge in one jurisdiction a rating issued in another jurisdiction for certain regulatory purposes, S&P reserves the right to assign, withdraw, or suspend such acknowledgement at any time and in its sole discretion. S&P Parties disclaim any duty whatsoever arising out of the assignment, withdrawal, or suspension of an acknowledgment as well as any liability for any damage alleged to have been suffered on account thereof.

S&P keeps certain activities of its business units separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain business units of S&P may have information that is not available to other S&P business units. S&P has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P reserves the right to disseminate its opinions and analyses. S&P's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription) and www.spcapitaliq.com (subscription) and may be distributed through other means, including via S&P publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

# FitchRatings

**Fitch Downgrades Detroit, MI's Sr and Sub Water Revs & Sewer Revs; Negative Watch Maintained**  Ratings  Endorsement Policy

28 Feb 2014 5:04 PM (EST)

Fitch Ratings-Chicago-28 February 2014: Fitch Ratings has downgraded the following ratings on the city of Detroit, Michigan (the city) bonds issued on behalf of the Detroit Water and Sewerage Department (DWSD) listed below. In addition, Fitch maintains the Rating Watch Negative on the bonds:

--$1.1 billion senior lien water revenue bonds to 'BB+' from 'BBB+';
--$565 million second lien water revenue bonds to 'BB' from 'BBB'.
--$1.6 billion senior lien sewer revenue bonds to 'BB+' from 'BBB+';
--$788 million second lien sewer revenue bonds to 'BB' from 'BBB'.

SECURITY

Senior lien water and sewer bonds are separately secured by a first lien on net revenues of each water and sewer system (the systems). Second lien bonds are separately secured by a second lien on the net revenues of each system after payment of senior lien bonds.

KEY RATING DRIVERS

BELOW INVESTMENT-GRADE RATING REFLECTS WEAK OPERATIONS: The system continues to exhibit weak financial performance, with fiscal 2013 unaudited results missing forecasts. Fitch believes financial improvement over the near term is unlikely given recent disclosure regarding the full scope of customer delinquencies. Fitch's concerns about delinquencies are further exacerbated by the city's status as a bankrupt entity.

UNCERTAINTY DRIVES THE WATCH: A key assumption underpinning Fitch's ratings is that water/sewer bondholders are legally protected from impairment under Chapter 9 given the clear intent of the bankruptcy code to carve out debt supported by special revenues. Nonetheless, there remains uncertainty surrounding the city Emergency Manager's (the EM) attempt to impair system bondholders under the city's Plan of Adjustment (the POA), including removal of the call provision and subordination of bondholder security interest combined with threatened reduction in interest coupon. Fitch believes that there is no legal basis to compel bondholders to accept such impairment as proposed in the POA.

SEPARATE OPERATIONS: All system funds and accounts are maintained separate and distinct from other city funds including the city's general fund. Excess system funds are invested by the bond trustee for and at the direction of DWSD.

HIGHLY LEVERAGED DEBT PROFILE: The systems' debt load is expected to remain elevated for the foreseeable future. Borrowing needs for sewers are moderate and for water, minimal.

EXPANSIVE SERVICE TERRITORY: The systems provide essential services to a broad area. The water system covers roughly 43% of Michigan's population, with over 70% of operating revenues coming from wealthier suburban customers. The sewer system includes roughly 30% of Michigan's population, with over 50% of operating revenues coming from suburban customers.

STRONG RATE-ADJUSTMENT HISTORY: The governing body has instituted virtually annual rate hikes in support of financial and capital needs. While there have been recent changes in the city's governance structure through the appointment of the EM, Fitch does not view this change as a concern at this time.

RATING SENSITIVITIES

IMPAIRMENT OF BONDHOLDERS: Fitch would almost certainly view the court's confirmation of the POA as filed, or a similar variation whereby bondholders are impaired, as a distressed debt exchange leading to a ratings downgrade to as low as 'D'.

WEAKENED FINANCIAL PROFILE: DWSD's inability to maintain at least breakeven operations would likely result in a further downgrade.

SUSTAINED RATE INCREASES AND IMPROVED COLLECTIONS: Management's ability to consistently increase rates while improving residential retail collections will be important in maintaining the rating.

CREDIT PROFILE

CHAPTER 9 LEGAL PROTECTIONS AND SEPARATION FROM CITY OPERATIONS

The ratings continue to consider Fitch's view that there is substantial protection provided to the DWSD's system debt as it constitutes special revenue obligations under Chapter 9 of the bankruptcy code. The ratings also consider a separation of system funds from other city funds as required under city charter and the bond ordinance; billing and collection of rates and charges by DWSD; relative autonomy by the department's governing structure to oversee the affairs of the system without undue influence by the city; and retention of surplus funds by the system.

DWSD is an enterprise fund of the city and therefore is not entirely free from potential city influence. Any actions taken that directly or indirectly change this historical paradigm could exert immediate and significant credit pressure on system bonds.

NEGATIVE WATCH MAINTAINED ON CITY'S PROPOSED POA

The Negative Watch continues to reflect uncertainty regarding potential event risks related to the EM's actions that attempt to impair DWSD bondholders. The filing of the POA is just another step in the process but does provide more insight on exactly how the city plans to treat all creditors.

Fitch sees no apparent reason for DWSD bondholders to accept any impairment (including voting for the POA) given the very strong legal position of this debt within Chapter 9 bankruptcy proceedings. Should the POA be confirmed as filed and thereby result in impairment to bondholders, Fitch would almost certainly view the action consistent with a distressed debt exchange and downgrade the rating on the bonds to 'D'.

The POA proposes various impairments to DWSD bondholders either if a transaction transferring operation of DWSD's assets to a regional utility authority (the GLWA) is effected or DWSD remains a department of the city. The POA scenario that transfers water/sewer operations to GLWA would impair the call protection of existing non-callable bonds (class 1B and 1D claims in the case of water and sewer bondholders, respectively) whether existing bondholders were issued exchange bonds or the bonds were cash defeased subsequent

to confirmation of the POA. For bondholders receiving exchange bonds, the security interest would also be impaired, as bondholders' current security pledge would be subordinated to a new transfer payment from GLWA to the city, with no cap of the transfer payment specified in the POA.

Bondholders voting against the POA would be impaired as a result of receiving different interest coupons than currently held, with such coupons virtually guaranteed to be lower than the existing coupons; bondholders voting for the POA may elect to receive exchange bonds with coupons that are the same as the existing bonds' coupons.

Impairments to bondholders under the POA scenario where DWSD remains a department of the city are essentially identical as under the GLWA transfer. The only exception is that existing DWSD bonds could be reinstated prior to the effective date of the POA as opposed to being cash defeased.

WEAK FINANCIALS AND UNCERTAINTY DRIVE DOWNGRADE

The system's fiscal 2013 audited results are unavailable. The delay is due to unresolved issues relating to the city's bankruptcy filing and the application of appropriate financial accounting and related disclosures in this scenario. Recently issued DWSD unaudited results for fiscal 2013 show all-in sewer bond debt service coverage (DSC, including senior, subordinate and junior lien state revolving fund debt) at 0.95x as calculated by Fitch, well below its original projection of 1.22x. DSC for the water bonds was slightly higher at 1.14x but also below prior expectations of 1.29x.

The decrease in DSC is primarily due to a decline in retail and wholesale revenues. The sewer system met its sum-sufficient rate covenant for fiscal 2013 largely due to the bond documents' exclusion from net revenues non-cash annual OPEB accrued expenses (totaling $13.6 million). This approach differs from Fitch's calculation of DSC which incorporates financial accruals. Bond ordinance debt service coverage based on the unaudited results for sewer was 1.02x and for water was 1.24x.

Significant delinquencies by city retail customers likely also account for some of the revenue decline. While the system has experienced above-average delinquencies for several years, new delinquent account information provided by DWSD reveals the severity of the problem. Approximately 65% of the city's residential water and sewer customers are at least 60 days delinquent as of Jan. 3, 2014. Fitch believes the recent disclosure in conjunction with challenges to remedy this issue in the already pressured operating environment supports a below investment-grade credit profile. Management reports addressing the delinquency problem is a top priority and has begun implementation of more timely shut-offs.

Fitch believes the system's liquidity metrics likely remain below average although unrestricted cash balances for fiscal 2013 have not been fully reported. As of the most recent financial audit (fiscal 2012), days cash on hand was a relatively low 131 days for sewer and 183 days for water.

DWSD estimates that fiscal 2014 revenues to date are running below budgeted levels, again, due to lower system billings. The systems' operating expenses are estimated to be under budget as a result of attrition and other non-personnel cuts. DSC for fiscal 2014 is projected to total 1.3x for sewer and 1.35x for water. However, Fitch believes DWSD may have difficulty achieving the level of revenue growth forecasted assuming base year revenues from 2013 unaudited results. Consequently, Fitch expects fiscal 2014 DSC to be lower than DWSD's projections, possibly significantly.

Sewer system revenues are likely to perform closer to projections starting in fiscal 2015 because of a recently adopted process to simplify rate setting for all suburban sewer customers. Under the new process, suburban customers will have one fixed-rate to pay on a monthly basis, eliminating fluctuations that are typical with volumetric charges. Currently, volumetric charges account for approximately 65% of the suburban sewer bill.

LOSS OF LARGEST WATER CUSTOMER INTERMEDIATE TERM PRESSURE

DWSD is poised to lose its largest wholesale customer when the 35-year contract to sell water to Flint, MI expires on April 16, 2014. Flint accounted for $22 million (or 6%) of the system's total billed revenue for fiscal 2013. Flint's departure from the system is expected to happen sometime over the next three to five years, adding pressure to DWSD's already narrow finances.

The rating assumes relative stability in the wholesale customer base. Management maintains that there are few viable options other than DWSD for most wholesale customers to purchase treated water. The system's ability to absorb the revenue impact from losing its largest customer and maintain all-in sum-sufficient DSC is key to stability in underlying credit quality.

SYSTEM LEVERAGE REMAINS HIGH

Fitch expects leverage for both systems to remain high for the foreseeable future. DWSD's sewer debt profile is relatively weak with long-term debt per customer totaling a high $3,830 for sewer and $2,079 for water. Principal payout is slow with only 28% of sewer debt maturing in 10 years; 26% for water.

The systems' 2015-2019 capital improvement plans (CIP) total approximately $505 million each for water and sewer. Near-term debt issuances totaling $128 million for sewer is expected in fiscal 2015 with $155 million for water in fiscal 2016.

The water CIP is largely unchanged from the previous plan and the sewer CIP reflects a 31% decrease in planned spending. Capital cost containment reflects management efforts to preserve cash by deferring certain projects for approximately 18 months. Management has also planned the deferral of certain capital projects while it completes and implements a strategic facilities plan (SFP) during fiscal 2014. The SFP will prioritize future capital investments.

BROAD SERVICE AREA ENHANCES SYSTEM STABILITY

The water system is a regional provider serving around 4.2 million people or nearly 43% of Michigan's population, including the city's population of over 700,000. The system serves the city on a retail basis and 124 communities through 84 wholesale contracts. The service territory consists of an area of 138 square miles in Detroit and 981 square miles in eight counties.

The sewer system is a regional provider serving around 2.8 million people or nearly 30% of Michigan's population, including the city. The system serves the city on a retail basis and 76 communities through 22 wholesale contracts. The service territory consists of an area of 138 square miles in Detroit and 850 square miles in three counties.

Population and customer growth for both systems have experienced modest annual declines for a number of years. Detroit's population in particular has experienced continuous decline, but suburban areas have picked up most of the migration.

CONSISTENT SYSTEM RATE INCREASES

The board has consistently raised rates to meet financial and capital needs. However, unfavorable operating conditions (including very high delinquencies) and rising fixed costs have muted the positive revenue impact. For fiscal 2013, the board raised charges 9.9% and 6.7% for city retail and suburban wholesale customers, respectively. For fiscal 2014, DWSD implemented 4% increases on July 1 and another 4% increase has been proposed for fiscal 2015. Annual increases of 4% are preliminarily forecast for fiscals 2016-2019.

Rate flexibility is hampered by weak income levels in the city. Retail rates for the sewer system well exceed Fitch's 1% of median household income (MHI) affordability benchmark (1.8%) given the weak MHI within the city. The water system's retail rates remain around Fitch's MHI.

Contact:

Primary Analyst
Adrienne M. Booker
Senior Director
+1-312-368-5471

Fitch Ratings, Inc.
70 W. Madison Street
Chicago, IL 60602

Secondary Analyst
Doug Scott
Managing Director
+1-512-215-3725

Committee Chairperson
Jessalynn Moro
Managing Director
+1-212-908-0608

Media Relations: Elizabeth Fogerty, New York, Tel: +1 (212) 908 0526, Email: elizabeth.fogerty@fitchratings.com.

Additional information is available at 'www.fitchratings.com'.

In addition to the sources of information identified in Fitch's Revenue-Supported Rating Criteria, this action was additionally informed by information from Creditscope.

Applicable Criteria and Related Research:

--'Revenue-Supported Rating Criteria' (June 2013);
--'U.S. Water and Sewer Revenue Bond Rating Criteria' (July 2013);
--'2014 Water and Sewer Medians' (Dec. 2013);
--'2014 Outlook: Water and Sewer' (Dec. 5, 2013).

**Applicable Criteria and Related Research:**
2014 Outlook: Water and Sewer Sector
2014 Water and Sewer Medians
U.S. Water and Sewer Revenue Bond Rating Criteria
Revenue-Supported Rating Criteria

**Additional Disclosure**
Solicitation Status

ALL FITCH CREDIT RATINGS ARE SUBJECT TO CERTAIN LIMITATIONS AND DISCLAIMERS. PLEASE READ THESE LIMITATIONS AND DISCLAIMERS BY FOLLOWING THIS LINK: HTTP://FITCHRATINGS.COM/UNDERSTANDINGCREDITRATINGS. IN ADDITION, RATING DEFINITIONS AND THE TERMS OF USE OF SUCH RATINGS ARE AVAILABLE ON THE AGENCY'S PUBLIC WEBSITE 'WWW.FITCHRATINGS.COM'. PUBLISHED RATINGS, CRITERIA AND METHODOLOGIES ARE AVAILABLE FROM THIS SITE AT ALL TIMES. FITCH'S CODE OF CONDUCT, CONFIDENTIALITY, CONFLICTS OF INTEREST, AFFILIATE FIREWALL, COMPLIANCE AND OTHER RELEVANT POLICIES AND PROCEDURES ARE ALSO AVAILABLE FROM THE 'CODE OF CONDUCT' SECTION OF THIS SITE. FITCH MAY HAVE PROVIDED ANOTHER PERMISSIBLE SERVICE TO THE RATED ENTITY OR ITS RELATED THIRD PARTIES. DETAILS OF THIS SERVICE FOR RATINGS FOR WHICH THE LEAD ANALYST IS BASED IN AN EU-REGISTERED ENTITY CAN BE FOUND ON THE ENTITY SUMMARY PAGE FOR THIS ISSUER ON THE FITCH WEBSITE.

Copyright © 2014 by Fitch Ratings, Inc., Fitch Ratings Ltd. and its subsidiaries.