# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

## OBJECTION OF ASSURED GUARANTY MUNICIPAL CORP. TO MOTION OF THE CITY FOR APPROVAL OF THE PROPOSED DISCLOSURE STATEMENT

Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured"),[1] a creditor and party in interest in the above-captioned chapter 9 case of the City of Detroit, Michigan (the "City"), hereby files this objection to the Motion of the City of Detroit for Approval of the Proposed Disclosure Statement [Docket No. 2713] (the "Motion")[2], and respectfully states as follows:

---

[1] Assured is a monoline insurer that provides financial guarantees to the U.S. public finance market. Assured and its affiliates insure or reinsure approximately $2.24 billion in gross aggregate principal amount of outstanding bonds issued by the City, including water supply system bonds, sewage disposal system bonds, and unlimited tax general obligation bonds.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Amended Disclosure Statement With Respect to Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 3382] (the "Amended Disclosure Statement") or the Amended Plan for the Adjustment of Debts of the City of Detroit (March 31, 2014) [Docket No. 3380] (the "Amended Plan").

## PRELIMINARY STATEMENT

1.      In accordance with this Court's direction, Assured has made a good faith effort to reach an agreement with the City regarding the information inadequacies of the Amended Disclosure Statement.[3] Despite this good faith effort, the Amended Disclosure Statement fails to contain adequate information, as required by section 1125 of the Bankruptcy Code, for Assured and other creditors in Classes 1B, 1C, 1D, and 8 to make an informed decision to accept or reject the Amended Plan.

2.      As this Court recently reminded the City, "there are two facts that creditors are most interested in in determining how to vote . . . how much am I going to be paid and when."  Hearing Transcript, February 19, 2014, at 32:17–22. The Amended Disclosure Statement's threadbare descriptions with respect to approximately $6.05 billion of Detroit Water And Sewerage Department (the "DWSD") bond claims and over $350 million of Unlimited Tax General Obligation ("UTGO") claims—two of the most significant constituencies in these cases, which together constitute a substantial portion of all the claims against the City—fail to meet these basic requirements and reveal that the current draft of the now-Amended Plan remains little more than a placeholder.  For example, while the

---

[3]    As described below, Assured complied with this Court's March 6, 2014 Procedures Order (as defined below), by sending a letter to counsel for the City on March 14, 2014, requesting additional information in an effort to resolve Assured's preliminarily identified deficiencies in the Initial Disclosure Statement (as defined below).

Amended Plan states that the City would like to engage in some sort of transaction to extract significant money from the DWSD, and explains that the ultimate treatment of DWSD Bondholders could vary widely based upon whether such a transaction occurs, the Amended Disclosure Statement provides absolutely no meaningful guidance as to what form such a transaction may ultimately take or any of the risks attendant thereto. Equally egregious, the Amended Disclosure Statement provides no meaningful information regarding the form of compensation the UTGO Bondholders would ultimately receive under the Amended Plan. In short, the Amended Disclosure Statement fails to provide even the most basic information regarding claim treatment under the Amended Plan, to say nothing of the significantly detailed disclosure that is appropriate in a case of this size and magnitude, complexity, and importance.

3.     Accordingly, this Court should deny the Motion or, in the alternative, require that the City further amend the Amended Disclosure Statement to address the information inadequacies discussed herein.

## BACKGROUND

4.     On July 18, 2013, the City filed a voluntary petition for the adjustment of debt under chapter 9 of the Bankruptcy Code.

5.     On February 21, 2014, the City filed its Disclosure Statement With Respect to Plan for the Adjustment of Debts of the City of Detroit [Docket No.

3

2709] (the "Initial Disclosure Statement") and the Plan for the Adjustment of Debts of the City of Detroit (February 21, 2014) [Docket No. 2708] (the "Initial Plan") and the Motion.

6.      On March 6, 2014, this Court entered the Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Docket No. 2937] (the "Procedures Order").

7.      Pursuant to the Procedures Order, on March 14, 2014, Assured sent a letter to counsel for the City, which identified deficiencies in the Initial Disclosure Statement and requested additional disclosure (the "March 14 Letter," a true and correct copy of which is attached hereto as Exhibit "A").

8.      On March 27, 2014, the City filed an *ex parte* motion stating that it intended to file an amended disclosure statement and plan of adjustment on March 31, 2014, and requesting that this Court enter an order extending the deadline for the parties to file objections to the Amended Disclosure Statement by a mere two days, through April 3, 2014.   Shortly thereafter, this Court entered an order granting the requested two-day extension.

9.      On March 28, 2014, the City responded by letter (the "City's March 28 Letter," a true and correct copy of which is attached hereto as Exhibit "B") to Assured's March 14 Letter.   In the City's March 28 Letter, the City declined to substantively respond to any of the requests made by Assured in its March 14

Letter. Instead, the City reiterated that it intended to file an amended disclosure statement and amended plan of adjustment that would address certain (but not all) of the deficiencies giving rise to Assured's requests and stated that it would upload certain additional (but mostly unspecified) information to the virtual data room established by the City.

10. On March 31, 2014, the City filed the Amended Plan and Amended Disclosure Statement, which differ radically in substance and form from the Initial Plan and Initial Disclosure Statement.

11. After reviewing the Amended Plan and Amended Disclosure Statement, and determining the enormous degree to which they differed from the Initial Plan and Initial Disclosure Statement, Assured, as well as several other parties, requested an extension of the deadline for filing objections to the Amended Disclosure Statement.

12. After a hearing on April 2, 2014, this Court entered an order further extending the deadline to object to the Amended Disclosure Statement through April 7, 2014.

## OBJECTION

13. Section 1125 of the Bankruptcy Code, which is applicable in this case pursuant to section 901 of the Bankruptcy Code, requires a plan proponent to obtain approval of a disclosure statement before soliciting votes to accept a plan.

5

11 U.S.C. §§ 901(a), 1125(b); see also In re Cnty. of Orange, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997) ("Section 1125 is incorporated into chapter 9 by § 901(a).").

14. "[T]he purpose of the disclosure statement is 'to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan.'" In re Cnty. of Orange, 219 B.R. at 560 (quoting Duff v. U.S. Trustee (In re California Fidelity, Inc.), 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996)); see also Mid-Towne Assocs. v. U.S. Dep't of Hous. and Urban Dev. (In re Mid-Towne Assocs.), 36 F.3d 1097 (Table), No. 93-3290, 1994 WL 487347, at *3 (6th Cir. Sept. 8, 1994) ("The purpose of a § 1125(b) disclosure statement is to solicit acceptances or rejections and the statement must contain adequate information, as defined in § 1125(a), for such purpose.").

15. For purposes of approval of a disclosure statement, "adequate information" is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); see also In re Cnty. of Orange, 219 B.R. at 560 ("Adequate information means information which is sufficiently specific as to enable a

6

hypothetical reasonable investor to . . . make an informed judgment about the plan . . . .") (internal quotations omitted).

16.    Courts review the adequacy of disclosure statements on a case-by-case basis, and frequently consider a non-exhaustive list of nineteen disclosure factors.  See, e.g., In re Commonwealth Group-Mocksville Partner, LP, --- B.R. ---, No. 12-34319, 2013 WL 1728056, at *2 (Bankr. E.D. Tenn. Apr. 22, 2013); In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1992); In re Malek, 35 B.R. 443 (Bankr. W.D. Mich. 1983).  Among the factors relevant to Assured's interests are: (1) a complete description of the available assets and their value; (2) the anticipated future of the debtor; (3) the source of the information provided in the disclosure statement; (4) the accounting and valuation methods used to produce the financial information in the disclosure statement; (5) an estimate of all administrative expenses, including attorneys' fees and accountants' fees; (6) any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan; and (7) information relevant to the risks being taken by the creditors and interest holders.[4]

---

[4]    Other factors include: (1) the circumstances that gave rise to the filing of the bankruptcy petition; (2) a disclaimer, which typically indicates that no statements or information concerning the debtor or its assets or securities are authorized, other than those set forth in the disclosure statement; (3) information regarding claims against the estate; (4) a summary of the plan of reorganization; (5) the collectability of any accounts receivable; (6) the actual or projected value that can be obtained from avoidable transfers; (7) the existence, likelihood and possible success of non-bankruptcy litigation; (8) the tax consequences of the plan; and

In re Commonwealth Group-Mocksville Partner, LP, 2013 WL 1728056, at *2 (quoting Cardinal Congregate I, 121 B.R. at 765); see also In re Microwave Prods. of Am., 100 B.R. 376, 377–78 (Bankr. W.D. Tenn. 1989) (quoting In re Metrocraft Pub. Services, Inc., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)).

17.     In addition to these factors, courts have frequently noted that "a case may arise in which disclosure of all these enumerated factors is still not sufficient to provide adequate information for the creditors to evaluate the plan." Metrocraft, 39 B.R. at 568.; see also Cardinal Congregate I, 121 B.R. at 765; In re Scioto Val. Mortg. Co., 88 B.R. 168, 168 (Bankr. S.D. Ohio 1988).  Accordingly, a plan proponent must ultimately demonstrate that a disclosure statement contains "all pertinent information bearing on the success or failure of the proposals in the plan" and "information relating to the risks posed to creditors and equity interest holders under the proposed plan . . . ."  Cardinal Congregate I, 121 B.R. at 765–66; see also In re Cnty. of Orange, 291 B.R. at 560 ("In other words, the purpose of the disclosure statement is 'to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan.'") (quoting Duff v. United States Trustee (In re California Fidelity, Inc.), 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996)); Scioto, 88 B.R. at 172 ("It is imperative . . . that

_____

(9) the relationship of the debtor with affiliates.  In re Commonwealth Group-Mocksville Partner, LP, 2013 WL 1728056, at *2.

8

the Debtor disclose all pertinent information so that [any holder of a claim or interest] can cast an informed vote accepting or rejecting the plan.").

18. Where a disclosure statement fails to provide adequate information, a motion to approve the disclosure statement should be denied. See, e.g., Cardinal Congregate I, 121 B.R. at 767–68. For example, approval of a disclosure statement may be denied where the disclosure statement: (a) contains an inadequate discussion regarding the nature, identity and proposed treatment of certain claims; (b) does not sufficiently explain the consequences of a contemplated or proposed transaction; (c) fails to identify how certain plan-related metrics were calculated; (d) lacks adequate definitions; or (e) does not contain a detailed textual description of the debtor's postpetition performance. See id. As detailed below, the City's Amended Disclosure Statement suffers from **all** of these flaws, among others, and thus, the Motion should be denied.

## I. Information Inadequacies Related to DWSD Claims

19. Assured insures several series of DWSD Bonds giving rise to claims in Classes 1B, 1C, and 1D, and is entitled to vote all claims arising from the securities that it insures.[5] In accordance with this Court's Procedures Order,

---

[5] See Declaration of Samuel S. Kohn in Support of Limited Objection of Ambac Assurance Corporation, Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation to Motion of the City of Detroit for Entry of an Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment, Ex.'s A–D [Docket No. 2820].

Assured made a good faith effort to preliminarily identify deficiencies in the Initial Disclosure Statement related to these classes, and requested, pursuant to its March 14 Letter, the necessary additional information from the City. Rather than respond directly to the requests made in Assured's March 14 Letter, the City responded that it would provide a small subset of the requested information in the Amended Disclosure Statement. See City's March 28 Letter, at 8. Indeed, the Amended Disclosure Statement, when filed, merely confirmed Assured's suspicion that the City simply has not yet settled on a workable treatment for DWSD Bondholders. Thus, despite Assured's requests for additional information, the Amended Disclosure Statement's discussion of the treatment of DWSD Bondholders remains a mere placeholder that fails to contain adequate information for Assured and other voters in Classes 1B, 1C, and 1D to make an informed judgment about the Amended Plan.

A.    Interest Rate Reset Chart

20.    In order to be eligible for approval, a disclosure statement must contain, among other things, "[i]nformation regarding the accounting and valuation methods used in preparation of the Disclosure Statement's financial exhibits." Cardinal Congregate I, 121 B.R. at 767. Here, the City's key financial exhibit related to the treatment of holders of DWSD Bonds is grossly deficient.

10

21.     The Amended Disclosure Statement provides that holders of DWSD Bonds giving rise to claims in Classes 1B, 1C, or 1D may receive either New DWSD Bonds or New GLWA Bonds,[6] which will have an interest rate calculated by reference to the Interest Rate Reset Chart that is attached as Exhibit I.A.159 to the Amended Plan (the "Interest Rate Reset Chart").   See Amended Disclosure Statement, at 44–46.   The Amended Disclosure Statement does not include any explanation of the methodology used to prepare the chart.   See Cardinal Congregate I, 121 B.R. at 767 (requiring disclosure of the methodology for assumptions).   Moreover, the Amended Disclosure Statement fails to provide any information as to why the interest rates reflected in the Interest Rate Reset Chart are appropriate and will permit confirmation of the Amended Plan.

22.     Assured requested, in the March 14 Letter, an explanation of the prior iteration of the Interest Rate Reset Chart, including, but not limited to, information relating to the methodology for deriving the interest rates reflected in the chart; comparable municipal credits that would substantiate the proposed rates reflected in the chart; and any reports or analyses prepared in or relied on in the development of the chart.   See March 14 Letter, at ¶ I.A.   The City has failed to

---

[6]     As discussed in more detail below, whether DWSD Bondholders will receive New DWSD Bonds or New GLWA Bonds will depend on whether the City consummates a "DWSD Transaction."   Alternatively, under certain circumstances, particular holders of CUSIPs of DWSD Bonds may receive New Existing Rate DWSD Bonds or New Existing Rate GLWA Bonds, in which case the Interest Rate Reset Chart will be irrelevant to that particular CUSIP of DWSD Bonds.

11

provide this information.  Thus, while the latest version of the Interest Rate Reset Chart is a modest improvement over the City's previous effort, it nevertheless remains fatally flawed in that it provides no basis for anyone to determine how the figures it contains were derived and whether they are tied to market realities.

23.     Without additional information relating to the Interest Rate Reset Chart, Assured and other holders of claims in Classes 1B–1D cannot make an informed decision regarding whether to vote to accept or reject the Amended Plan. As set forth in the Amended Disclosure Statement, holders of claims in Classes 1B–1D would be impaired under the Amended Plan.  See Amended Disclosure Statement, at 28–30.  This impairment is the result of, in significant part, the City's proposal to reduce the interest rate that will be payable to holders of DWSD Bonds.  Without the information requested in the March 14 Letter, Assured cannot determine whether such impairment is based on defensible (or even rational) metrics.

B.      Potential DWSD Transaction

24.     A disclosure statement may not be approved if it fails to provide "detailed disclosure of the facts and assumptions underlying the debtor's belief that it will accomplish" transactions that are contemplated by the debtor's plan. Cardinal Congregate I, 121 B.R. at 767.  Moreover, "a proper disclosure statement must clearly and succinctly inform the average . . . creditor *what it is going to get*,

12

when it is going to get it, and what contingencies there are to getting its distribution." In re Commonwealth Group-Mocksville Partner, LP, --- B.R. ---, No. 12-34319, 2013 WL 1728056, at *3 (Bankr. E.D. Tenn. Apr. 22, 2013) (quoting In re Ferretti, 128 B.R. 16, 19 (Bankr. D. N.H. 1991)) (emphasis added). The Amended Disclosure Statement fails both of these tests.

25.     The Amended Disclosure Statement provides that "[t]he City may enter into a transaction (the 'DWSD Transaction') that would include the transfer of the functions of the DWSD to a to-be-formed Great Lakes Water Authority (the 'GLWA')." Amended Disclosure Statement, at 121. However, rather than provide any concrete details regarding such a DWSD Transaction, the Amended Disclosure Statement merely provides that "[t]o date, negotiations among the City and the Counties [that would participate in the formation of the GLWA] have not yet resulted in any agreement with respect to the formation of the GLWA." Id. at 122. In other words, as of now, the City has no idea whether there will be a DWSD Transaction, what such a transaction would ultimately accomplish, and what creditors in Classes 1A–1F would need to consider with respect to such a transaction when deciding whether to accept or reject the Amended Plan.

26.     Charitably, the City does disclose that "[t]he City will only enter into a DWSD Transaction if it enables the City to make larger, more rapid or more certain distributions to at least some of its creditors as compared to the

13

distributions specified in the Amended Plan and described in this Disclosure Statement." Id. at 121. Unfortunately, any modest utility of this vague statement is completely undercut by the lack of any disclosure regarding what would constitute "larger, more rapid or more certain distributions," and which classes of creditors are contemplated by the phrase "at least some of its creditors." Id.

27.     In the March 14 Letter, Assured requested the details of all potential DWSD Transactions that the City is considering or has considered, including the potential operations and maintenance expenses of the GLWA, the projected revenues and expenses of the GLWA, the assets to be transferred, and all related material risks. See March 14 Letter, at ¶ I.B. This information was not provided in the City's March 28 Letter—and apparently cannot be—because nine months after filing for bankruptcy protection the City itself still does not yet know what form the DWSD Transaction may take and what risks it may impose upon existing DWSD Bondholders.

28.     The City's decision regarding whether to consummate a DWSD Transaction will have at least two profound effects on Assured (and potentially many more from as yet undisclosed terms). First, if the City consummates a DWSD Transaction, holders of Claims in Classes 1A–1D would not receive new bonds issued by the City and secured by the revenues of the DWSD. Instead, holders of Claims in those classes would receive either New GLWA Bonds or New

14

Existing Rate GLWA Bonds, which would be secured by the revenues of the GLWA—a newly created entity that would be separate and distinct from the City. See Amended Disclosure Statement, at 28–30, 45–46, 121–22.

29.     Second, although holders of the New GLWA Bonds and New Existing Rate GLWA Bonds would ostensibly receive first liens on the revenues of the new GLWA, the "operations and maintenance expenses" of the GLWA would be excluded from those liens. See id. at 45–46. The GLWA's "operations and maintenance expenses," in turn, would "include the amount of any lease payment payable to the City's General Fund . . . ." Id. at 46. Although the ultimate terms of any such lease are unknown (or at least undisclosed) at this time, the Amended Disclosure Statement contemplates that "[t]he GLWA would make annual payments to the City for the term of the lease in an amount equal to the DWSD's total allocable share of the City's liabilities under the COPs and OPEB liabilities." Id. at 122. Thus, if a GLWA transaction is consummated, the Amended Plan would structurally subordinate the secured claims of the DWSD Bondholders to the claims of unsecured creditors who should have no recourse to DWSD revenues.

30.     In sum, the DWSD Bondholders stand to receive radically different treatment under the Amended Plan depending on whether or not a DWSD Transaction is consummated. If a DWSD Transaction is consummated, the DWSD Bondholders will receive new bonds that are issued by an entity other than the

15

City, that will be of unknown credit quality, and that will be structurally subordinate to an enormous, and entirely artificial and unnecessary, lease payment. The City should be required to disclose all of the information requested in Assured's March 14 Letter with respect to the DWSD, any contemplated or potential DWSD Transaction, and the proposed GLWA, so that Assured and other similarly-situated creditors can understand the full extent of their proposed impairment under the Amended Plan. Such information may also address concerns regarding the Amended Plan's feasibility.

C.   Proposed Sale or Privatization of the DWSD and/or
     Solicitation of Bids to Operate and Manage the DWSD

31.   A disclosure statement may not be approved if it does not provide disclosure regarding any property sales that will be used, in whole or in part, to fund plan distributions.  See Cardinal Congregate I, 121 B.R. at 767.  Moreover, in addition to providing the details of any such proposed property sale, a disclosure statement must "contain a discussion of any efforts to date, as well as intended future efforts, to bring about a sale or refinancing of the property." Id.  Here again, the City has failed to disclose adequate information.

32.   In addition to providing no clear disclosure regarding the form and consequences of potential DWSD Transactions, the City is apparently also considering a sale, privatization, or other alternative restructuring of the DWSD in lieu of entering into a DWSD Transaction.  See Amended Disclosure Statement, at

16

122–23; see also *Orr's Alternative: Privatize or Sell Detroit Water Department*, THE DETROIT NEWS (Mar. 12, 2014, 1:16 PM), http://www.detroitnews.com/article/20140312/METRO01/303120020, a true and correct copy of which is attached hereto as Exhibit "C." Indeed, on March 25, 2014, the City formally solicited proposals and bids from third parties interested in taking control of the DWSD. See Request for Information for Potential Operators of Detroit Water and Sewage Disposal Systems for Detroit Water and Sewerage Department, issued by the City of Detroit, Kevyn D. Orr, Emergency Manager (March 25, 2014) (the "RFI"). Pursuant to the RFI, the Emergency Manager indicated that the City is considering virtually all options with respect to a restructuring of the DWSD, including, without limitation: (a) an operations and management agreement, with payments to be made to the City; (b) a long-term lease and concession arrangement; or (c) an outright sale.[7] The Amended Disclosure Statement, however, contains **no** information whatsoever regarding the rationale for, likely effects of, or risks associated with any of these possible alternatives to the type of DWSD Transaction described in the Amended Plan.

33. In the March 14 Letter, Assured requested additional information regarding any sale or privatization of the DWSD that the City is considering or has considered, including the scope of the DWSD-related assets that may be

---

[7] The RFI requires interested parties to submit initial responses on or before April 7, 2014, and final binding proposals by June 1, 2014.

transferred, any potential purchasers, a detailed discussion of the process and timing of any sale or privatization, and the contemplated treatment of existing liens if the DWSD were to be sold or privatized. See March 14 Letter, at ¶ I.N.

34.     In response to these requests, the City stated that it "intends to make extensive supplemental disclosures with respect to DWSD and related matters in the amended Plan and Disclosure Statement and in the Plan Supplement." City's March 28 Letter, at 8. While the Amended Disclosure Statement now at least acknowledges that the City is considering alternatives to the DWSD Transaction, it nevertheless fails to provide the overwhelming majority of information requested by Assured in connection with those alternatives. See Amended Disclosure Statement, at 122–23.

35.     The sale or privatization of the DWSD would mark a significant departure from the structure currently contemplated by the Amended Plan and Amended Disclosure Statement. It is unclear how such a sale or privatization would affect holders or insurers of DWSD Bonds, and whether such a transaction would exacerbate the proposed impairment of holders of claims in Classes 1A–1F.

36.     In short, a sale or privatization of the DWSD would raise a host of discrete legal and factual issues that are completely unaddressed by the Amended Disclosure Statement. It is imperative that the Amended Disclosure Statement be revised to include complete disclosure regarding the approach to restructuring the

18

DWSD that the City actually intends to pursue, and the potential consequences to DWSD Bondholders of such a restructuring.[8] Such information is necessary for interested parties to understand how a vital department tasked (under the Amended Plan) with generating significant revenues for the City will operate, and how potential outcomes of the RFI process may affect the DWSD Bondholders and the overall feasibility of the City's Amended Plan.

D.  DWSD Contributions to GRS

37.  The treatment of the City's pension liabilities has been of critical importance throughout this chapter 9 case. The Amended Disclosure Statement provides that the DWSD will "accelerate, or prefund, the majority of its full allocable share of the GRS UAAL" over a ten year period (the "DWSD Prefunding"). Amended Disclosure Statement, at 11. In aggregate, the DWSD Prefunding would amount to approximately $675 million. See id. at 24, 34. Together with certain revenues from the DIA Proceeds, the DWSD Prefunding would be the exclusive source of contributions to the GRS through June 30, 2023. See id. Although unclear, the Amended Disclosure Statement's exhibits appear to assume that this pension prefunding would be treated as an "operations and maintenance expense" of the DWSD, the payment of which would be structurally

_____

[8]  The March 14 Letter did not contain any requests for information in connection with the RFI as Assured was not made aware of the RFI until it was issued on March 25, 2014.

senior to payments to the holders of the New DWSD Bonds or New Existing Rate DWSD Bonds.  See Amended Disclosure Statement Ex. L, at 2, 9–10.

38.   The  Amended  Disclosure  Statement,  however,  provides  no information regarding: (a) the City's rationale or legal authority for compelling the DWSD to prefund the majority of its allocable share of GRS UAAL over the accelerated 10-year period; (b) the basis for treating such prefunding as an operations and maintenance expense; (c) the actuarial and other information used by the City to calculate the $675 million allocation of GRS UAAL to the DWSD; (d) how $675 million could be extracted from the DWSD; or (e) the degree to which such prefunding treatment would exacerbate the impairment of DWSD Bondholders.  Indeed, in response to Assured's requests for such information, see March 14 Letter, at ¶ I.E, the City refused to disclose any substantive information, and suggested that disclosure, if any, would be made at a later date.  See City's March 28 Letter, at 8.

39.   Imposing an accelerated, structurally senior $675 million obligation on the DWSD may substantially impair holders of claims in Classes 1A–1F.  At the very least, such prefunding may substantially increase the risks associated with relying on DWSD revenues as collateral.  Accordingly, the City must disclose information sufficient to cure all the deficiencies noted in paragraph 38, above.

20

E.  Covenants in DWSD Bond Documents

40.  The Amended Disclosure Statement provides that the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New GLWA Bonds, and the New Existing Rate GLWA Bonds "shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving" the replacement bonds.  Amended Disclosure Statement, at 44–46.

41.  In the March 14 Letter, Assured requested confirmation that the covenants associated with the applicable series of DWSD Bonds will be retained unchanged.  See March 14 Letter, at ¶ I.D.  Assured also requested the documentation for the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New GLWA Bonds, and the New Existing Rate GLWA Bonds.  See March 14 Letter, at ¶¶ I.I, VI.A.1–2, 4–5.

42.  In response to Assured's request, the City revised the Initial Disclosure Statement in two ways.  First, the City clarified that DWSD Claims will be classified by "applicable CUSIP" rather than by "applicable DWSD Series." This change is entirely appropriate.

43.  More important, however, is the second revision, which fails to answer Assured's request for confirmation that existing rate covenants would be maintained under the Amended Plan.  Instead, the City has introduced further ambiguity (and, indeed, internal contradiction) to the Amended Disclosure

21

Statement by stating that, if a DWSD Transaction is consummated "[t]he GLWA would provide bond covenants **comparable** to present bond covenants." Amended Disclosure Statement, at 122 (emphasis added). "Comparable" bond covenants, of course, may prove to be a far cry from "the same" bond covenants. Indeed, the City's requirement that all parties responding to the RFI "commit[] to limit[ing] rate increases to no more than 4% per year for the first 10 years" suggests that the City may be considering impairing existing rate covenants, which contain no such limitation. See id. at 123; RFI. Although the City could have resolved this problem by providing the definitive bond documentation, as requested in Assured's March 14 Letter, the City has failed to do so.

44. Without the information requested in the March 14 Letter, Assured and other similarly-situated creditors cannot determine the full extent of the Amended Plan's proposed impairment of their claims. The documents underlying the existing DWSD Bonds are, in aggregate, thousand of pages long and contain, among many other critical provisions, multiple provisions relating to the City's obligations with respect to maintaining appropriate rates for the water and sewer systems. Such rate covenants are a vital protection against impairment of Assured's collateral. Unless Assured is provided the actual proposed documentation for the New DWSD Bonds, New Existing Rate DWSD Bonds, New GLWA Bonds, and New Existing Rate GLWA Bonds—and an ample opportunity

22

to review such documentation ahead of the voting deadline—it will not be able to truly determine what it would receive under the Amended Plan in satisfaction of its DWSD Claims.

      F.     The City has Not Provided any Disclosure
                with Respect to a Potential New DWSD Issuance

45.    The City has previously stated that it intends to issue new Sewage Disposal System Revenue Bonds and has taken a number of steps required by state law to effectuate such issuance. <u>See</u> Emergency Manager Order No. 22 "Order Ratifying and Approving Resolution of the Board of Water Commissioners Authorizing Publication of Note of Intent to Issue Sewage Disposal System Revenue Bonds" issued by Emergency Manager Kevyn Orr on January 30, 2014 ("<u>EM Order No. 22</u>", a true and correct copy of which is attached hereto as Exhibit "D"). EM Order No. 22 provides, in relevant part, that the City intends to issue New Sewage Disposal System Revenue Bonds in a principal amount not to exceed $350 million on a first priority basis, *pari passu* with the existing Senior Lien bonds secured by the net revenues of the DWSD Sewer System (the "<u>New DWSD Issuance</u>"). As of February 7, 2014, the City indicated that it was considering the possibility that the New DWSD Issuance would be issued in connection with the Amended Plan. The City also indicated that the financing would be completed by June 2014 and that the New DWSD Issuance was expected to have market terms, including "call protection." On March 12, 2014, the Michigan Department of

23

Treasury and Michigan Finance Authority, on behalf of the City, circulated a "Request for Proposal for Underwriting Services" (the "RFP," a true and correct copy of which is attached hereto as Exhibit "E"). Through the RFP, the City solicited proposals from "investment banking firms interested in serving as a senior manager or co-manager for a [DWSD] revenue bond issue of approximately $150 million . . . ." RFP, at 1. According to the RFP, the anticipated scheduled closing for one or more proposed new issues is on or before June 30, 2014. See id. at 6.

46.   In the March 14 Letter, Assured requested additional information regarding the New DWSD Issuance including, among other things, the contemplated material terms of the New DWSD Issuance and the projected effect of the issuance on the City's financial projections. See March 14 Letter, at ¶¶ I.F, H. Despite these requests, the Amended Disclosure Statement continues to provide no information whatsoever with respect to the New DWSD Issuance.

47.   Without clarification as to whether the City actually intends to proceed with the New DWSD Issuance, Assured and other similarly-situated creditors cannot determine the full extent of the Amended Plan's proposed impairment of their claims. Further, if the City intends to proceed with the New DWSD Issuance, Assured must be informed of its terms and its anticipated or potential effect on the financial status of the DWSD or GLWA for multiple reasons. Most obviously, the existing DWSD Bond Documents, specifically the

24

sale orders of certain series of DWSD Bonds and corresponding insurer supplements, contain provisions that limit the ability of the City to issue new DWSD Bonds. Any attempt by the City to issue new DWSD Bonds as it has proposed to do under the RFP will likely result in litigation against the City. The Amended Disclosure Statement fails to advise creditors of this litigation risk, and its possible effects on the Amended Plan.

48.     Second, and as the City has acknowledged, the City cannot go forward with any New DWSD Issuance that would be *pari passu* with any existing DWSD Bonds without, at the very least, satisfying certain debt service coverage ratios that would show Assured to be substantially oversecured.

49.     Third, even if a *pari passu* New DWSD Issuance were to leave current DWSD Bondholders oversecured, it could substantially increase the overall risk level associated with their collateral package. Such increased risk would likely require that higher interest rates be paid to holders of DWSD claims.

50.     The Amended Disclosure Statement should be revised to address all of these risks, and to provide all other information with respect to the New DWSD Issuance that was requested in the March 14 Letter.

G.     The City has Not Disclosed the Risks Associated with Stripping "Call Protection" from the DWSD Bonds

51.     The corresponding bond documents of certain series of DWSD Bonds currently provide for "call protection." The Amended Disclosure Statement,

25

however, indicates that definitive documentation governing the New DWSD Bonds, New Existing Rate DWSD Bonds, the New GLWA Bonds, and New Existing Rate GLWA Bonds shall provide that the DWSD or GLWA, as appropriate, "may prepay or redeem all or any portion of the [corresponding new security] at any time at its option and without penalty or premium." <u>See</u> Amended Disclosure Statement at 44–46. The Amended Disclosure Statement, however, lacks any discussion of the implications of stripping the DWSD Bonds of their call protection, nor does the Amended Disclosure Statement contain any discussion or financial analysis of the value of the call protection.

52. The DWSD Bondholders stand to receive radically different treatment under the Amended Plan as a consequence of the City's proposed stripping of call protection. The City should be required to disclose all of the information regarding stripping the DWSD Bonds of their call protection so that Assured and other similarly-situated creditors can understand the full extent of their proposed impairment under the Amended Plan.

## II.  <u>Information Inadequacies Related to UTGO Claims</u>

53. Assured insures several series of UTGO Bonds giving rise to claims in Class 8. Assured requested additional information related to this class in its March 14 Letter. As detailed below, the Amended Disclosure Statement does not

contain any information, much less adequate information, for Assured and other voters in Class 8 to make an informed judgment about the Amended Plan.

A.    Terms of the Plan UTGO Notes

54.    The Amended Disclosure Statement provides that holders of securities giving rise to claims in Class 8 will receive Plan UTGO Notes in full satisfaction of their claims.  See Amended Disclosure Statement, at 21, 32.  The Amended Disclosure Statement, however, provides *no* details regarding the material terms of the Plan UTGO Notes.  Indeed, the Amended Disclosure Statement fails to even state that the Plan UTGO Notes will be a "means of implementation of the plan." Id. at 44–55.  Instead, it only contains the following brief and generic description of the Plan UTGO Notes:

> The maturity(ies) of the Plan UTGO Notes shall be no longer than the existing maturity(ies) of each series of Unlimited Tax General Obligation Bonds receiving Plan UTGO Notes. The Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream the present value of which is equal to approximately 15% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective date.

Id. at 32.[9]

---

[9]    In contrast, the Amended Disclosure Statement provides more detailed descriptions of the terms of the other new securities that would be issued by the City under the Plan.  See Amended Disclosure Statement, at 44–47.  Indeed, although the Plan specifically contemplates that the terms of the New UTGO Plan Notes would be set forth in Exhibit I.A.210 to the Plan, that exhibit is currently missing.

55.     In the March 14 Letter, Assured requested information regarding the terms of the Plan UTGO Notes, including a description of the obligation, the initial principal amount, the interest rate, and the form of the Plan UTGO Notes.  See March 14 Letter, at ¶¶ II.A, G.  Additionally, Assured requested that the City make available the Plan UTGO Notes Documents, which were not provided with the Initial or Amended Disclosure Statement.  See March 14 Letter, at ¶ VI.A.7.  Rather than provide even such basic information in a timely manner, the City has responded that it will make the required disclosures at some unspecified date "prior to the Voting Deadline."  City's March 28 Letter, at 9.

56.     As noted above, the most basic function of a proper disclosure statement is to inform creditors what they will receive under a proposed plan.  See In re Commonwealth Group-Mocksville Partner, LP, 2013 WL 1728056, at *3.  The Amended Disclosure Statement fails this most basic test because the information it contains regarding the proposed treatment of UTGO creditors is meaningless.  The Amended Disclosure Statement fails to disclose such basic facts about the proposed Plan UTGO Notes as their: (a) initial aggregate principal amount; (b) interest rate; (c) maturity date; (d) amortization schedule; (e) insurance, if any; and (f) collateral, if any.  Unsurprisingly, given the Amended Disclosure Statement's failure to provide such basic primary facts about the Plan UTGO Notes, it also fails to disclose pertinent secondary information, such as the

28

methodology used by the City to calculate and justify the (as of yet to be proposed) interest rate. In short, the Amended Disclosure Statement lacks any detail that would allow holders of UTGO claims to properly assess the Amended Plan and determine whether they should vote to accept or reject it.

B. The UTGO Millage

57. The Amended Disclosure Statement also fails to provide adequate information regarding the mills pledged to support the UTGO bond debt, most recently assessed at 9.6136 mills (the "UTGO Millage"). The Amended Disclosure Statement is devoid of information regarding the historical collection, historical use, projected collection, or projected use of the UTGO Millage.

58. Compounding these problems is the City's acknowledgment that it may lose its ability to levy the UTGO Millage if the UTGO Bonds are impaired under the Amended Plan. See Amended Disclosure Statement, at 61. The Amended Disclosure Statement provides that "[i]n the event the City is precluded from levying [the UTGO Millage], it anticipates borrowing funds sufficient to replace this lost revenue." Id. Indeed, the City's ten-year financial projections include one restructuring scenario in which there is a "reduction in [the UTGO Millage] to reflect treatment of UTGO as unsecured and corresponding reduction in property tax revenues." Amended Disclosure Statement Ex. J, at 5.

59.     Assured has repeatedly requested that the City provide additional information with respect to the UTGO Millage since virtually the beginning of this case.   Most recently, in its March 14 Letter, Assured requested information regarding the collection and use of the UTGO Millage, including: (i) the historical ten-year UTGO Millage collection rates; (ii) the projected ten-year UTGO Millage collection rates; (iii) the balance, credits, and debits of all funds created under the UTGO Bond Documents; (iv) whether the UTGO Millage is being used to make set-asides on account of the secured general obligation bond series 2010(A); and (v) the use of the UTGO Millage since the petition date.  See March 14 Letter, at ¶ II.B.

60.     Despite the fact that the Amended Disclosure Statement provides no information on these topics, the City glibly responded to these requests by stating that "[t]he City believes that the Disclosure Statement contains all information necessary to provide adequate information with respect to the subject matter of these requests."  City's March 28 Letter, at 10.

61.     Assured also requested information regarding: (a) the legal basis for the City to continue to impose the UTGO Millage if the UTGO Bonds are impaired; and (b) the terms of any potential borrowing contemplated by the City to replace the revenues of the UTGO Millage.  See March 14 Letter, at ¶ II.C.  Here

again, the City declined to provide any additional information.  See City's March 28 Letter, at 11.

62.    As Assured has argued in the UTGO Litigation, the UTGO Millage secures the UTGO bond debt that gives rise to claims in Class 8.  Accordingly, information regarding how the UTGO Millage has historically been used and how the City proposes to use the UTGO Millage after emergence from bankruptcy is of vital concern to UTGO creditors, who have a right to understand the risks they face based on the current status of their collateral and how the City proposes to divert that collateral under the Amended Plan.

63.    Additionally, applicable state law explicitly states that the UTGO Millage must be segregated and used only to satisfy UTGO bond debt.  See MCL § 141.2701.  A plan of adjustment, of course, cannot be confirmed if it would violate state law on a going-forward basis.  See 11 U.S.C. § 943(a)(4).  The City must therefore disclose whether it does, in fact, intend to divert the UTGO Millage and why it believes that it is permitted to do so.  Without this information, creditors cannot accurately assess whether the Amended Plan is confirmable.

64.    Moreover, while the City has rightfully acknowledged that it may ultimately be prohibited from continuing to collect all the UTGO Millage if the Amended Plan impairs UTGO creditors, and has further acknowledged that it will seek to borrow funds to address any resulting shortfall, it has not provided any

information regarding the potential source of such borrowed funds, the terms on which such a loan would be made, or how such a loan would affect the City's proposed Amended Plan as a whole. The City has thus acknowledged that it may require additional funding beyond what is provided for in the Amended Plan, but has provided no details that would allow creditors to properly assess whether such additional funding can realistically be obtained. Without that information, creditors cannot accurately assess the feasibility of the Amended Plan and determine whether they should vote in favor of it.

C.     Potential Effect of UTGO Litigation

65.     The Amended Disclosure Statement contains a brief description of the UTGO Litigation and provides, without explanation, "[t]hat litigation, [or] the settlement thereof, may have an effect on the City's ability to continue to collect the [UTGO Millage]."   Amended Disclosure Statement, at 78. The Amended Disclosure Statement, however, provides no information as to the effect of a ruling in the UTGO Litigation that the UTGO Bonds are secured.  In the March 14 Letter, Assured requested this information.  See March 14 Letter, at ¶ II.H.  Once again, the City declined to provide disclosure.  See City's March 28 Letter, at 13.

66.     The City's statement that the UTGO Litigation, or the possible settlement thereof, may have some undisclosed and amorphous "effect" on the Amended Plan demonstrates that the City's entire proposed treatment of Class 8,

and all disclosures related thereto, are lacking, at best. The City must provide disclosure regarding the specific consequences to creditors of all classes that may or will occur if the City does not prevail in the UTGO Litigation.

### D. Market Reaction to New UTGO Plan Notes

67. The Amended Disclosure Statement acknowledges that holders of new securities issued under the Amended Plan, including the UTGO Plan Notes, may encounter "limited market acceptance of City credit . . . ." Amended Disclosure Statement, at 62. In its March 14 Letter, Assured requested the results of any analysis or modeling conducted by the City regarding the anticipated market reaction to the Plan UTGO Notes, including how that reaction may vary depending on whether the Plan UTGO Notes are insured. See March 14 Letter, at ¶ II.E. The City failed to provide the requested disclosure. See City's March 18 Letter, at 12.

68. Ultimately, the market provides the true test of the value of plan consideration. Especially in light of the amorphous terms of the proposed Plan UTGO Notes, Class 8 creditors cannot truly determine the value of what they stand to receive under the Amended Plan without an understanding of how the Plan UTGO Notes are likely to be received by the market. Accordingly, the City must disclose the information requested in Assured's March 14 Letter, as well as the projected credit ratings of the Plan UTGO Notes on the Effective Date of the Amended Plan.

33

E.    Insurance

69.    The Amended Disclosure Statement provides no information regarding whether payment under the proposed Plan UTGO Notes would be insured by any financial guaranty insurance company.  As with tax-exempt status, bond insurance provides a potentially significant economic advantage that may materially affect the market value of the proposed Plan UTGO Notes. Accordingly, the City should be required to disclose whether payment of amounts to be owed under the Plan UTGO Notes will be insured.

## III.    Bond Insurer Claims

70.    The Bond Insurers, including Assured, have asserted several claims against the City, including, but not limited to, direct claims for contractual reimbursement of charges, fees, costs, losses, liabilities, and expenses incurred by the Bond Insurers in connection with their respective insurance policies, reimbursement agreements, and applicable bond documents.  Moreover, Assured, as well as certain other Bond Insurers, have or will claim the right to vote some or all of the claims arising under the debt that they insure.  The Amended Disclosure Statement fails to disclose how the claims asserted by the Bond Insurers will be treated under the Amended Plan.  Accordingly, in its March 14 Letter, Assured requested that the City provide disclosure regarding the City's proposed Amended Plan treatment of Bond Insurer Claims, including specific treatment for each

34

category of claims asserted by the Bond Insurers.  See March 14 Letter, at ¶ III.
The City's sole concession to this demand was to clarify that the Amended Plan
would not limit section 509 of the Bankruptcy Code's application, if any, to the
Bond Insurers' claims.  See Amended Disclosure Statement, at 40.  No further
information has been provided.  See City's March 28 Letter, at 13.

71.    An    acceptable    disclosure    statement    must    provide    "detailed
information regarding the nature of . . . claims and should specifically identify the
holders of such claims."  Cardinal Congregate I, 121 B.R. at 767.  Moreover, a
"complete discussion of the [Amended Plan's] proposed treatment of these claims
is necessary."  Id.  In the absence of such information, the Bond Insurers, including
Assured, are completely bereft of information regarding how they will be treated
under the Amended Plan.  Accordingly, the City must provide the full scope of
information regarding treatment of Bond Insurer Claims requested in Assured's
March 14 Letter.

## IV.    Other Informational Inadequacies

72.    The Amended Disclosure Statement also fails to provide adequate
information regarding other aspects of the Amended Plan that may affect Assured.
Accordingly, Assured requested additional information related to these information
inadequacies in its March 14 Letter.  As detailed below, the Amended Disclosure

Statement does not contain adequate information for Assured and other voters to make an informed judgment about the Amended Plan.

A.     Tax Treatment

73.     The Amended Disclosure statement contains inadequate information regarding the potential tax consequences of various securities to be issued in connection with the Amended Plan.   Specifically, the Amended Disclosure Statement provides that "[a]s of the date of this Disclosure Statement, it is not known whether interest on any New Securities other than the New DWSD Bonds or the New GLWA Bonds will be taxable or tax-exempt for U.S. federal income tax purposes."  Amended Disclosure Statement, at 143.  The City should provide such information so that creditors may properly evaluate the consideration to be provided.

B.     Professional Fee Reserve

74.     The Amended Disclosure Statement discusses the implementation of a Professional Fee Reserve without any discussion as to the source or amount of such funding.  See Amended Disclosure Statement, at 48.  Assured requested this information in the March 14 Letter.  See March 14 Letter, at ¶ V.I.

75.     As a creditor of the City, Assured has a right to know the amount of funds that will be dedicated to the Professional Fee Reserve to cover administrative expenses, and, more importantly, how this substantial cost will be paid under the

36

Amended Plan as the allocation of this financial burden may significantly implicate Assured's ultimate treatment thereunder. Accordingly, the City should disclose the additional details requested in the March 14 Letter regarding the source and amount of the Professional Fee Reserve, before any of the City's creditors, let alone Assured, can make an informed judgment about the Amended Plan.

## CONCLUSION

WHEREFORE, Assured respectfully requests that the Court enter an order: (a) denying the Motion or in the alternative requiring the City to further amend the Amended Disclosure Statement to address the information inadequacies discussed herein, and (b) granting Assured such other and further relief as may be just and proper.

Dated: New York, New York
April 7, 2014

**CHADBOURNE & PARKE LLP**

By: _/s/ Lawrence A. Larose_
Lawrence A. Larose
Samuel S. Kohn
Eric Daucher
30 Rockefeller Plaza
New York, NY 10012
Telephone: (212) 408-5100
llarose@chadbourne.com
skohn@chadbourne.com
edaucher@chadbourne.com

*Attorneys for Assured Guaranty Municipal Corp.*

37