# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| | ) |
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| | ) **Re: Docket No. 2713** |

## OBJECTION TO MOTION OF THE DEBTOR
## FOR APPROVAL OF THE PROPOSED DISCLOSURE STATEMENT

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this objection to the *Motion of the City of Detroit for Approval of the Proposed Disclosure Statement* [Doc. No. 2713], seeking entry of an order approving the proposed *Disclosure Statement with Respect to Plan for the Adjustment of Debts of the City of Detroit* [Doc. No. 2709], as amended on March 31, 2014 [Doc. No. 3382]. In support of its objection, Syncora respectfully states as follows:

### Preliminary Statement

1. This case is the largest and most complex chapter 9 filing in history. And, despite such size and complexity, the confirmation timetable remains atypically expedited. One would expect that, if ever there were a case in which disclosure would abound and would be clear, it would be here. To be sure, the City's proposed amended disclosure statement (the "Amended Disclosure

Statement") is robust. But it is not robust in the way that Section 1125 of the Bankruptcy Code requires. Instead, the Amended Disclosure Statement — much like the City's approach to the chapter 9 process generally — is materially deficient. It lacks information that would actually enable a hypothetical investor to understand the true character, risks, value, and opportunity costs of accepting the City's proposed recovery.

2.     The Amended Disclosure Statement at least is clear in one regard. The City is unwavering in its Chapter 9 strategy formed before it filed for bankruptcy: "pursue as many revitalization initiatives as possible"[1] and "defend against calls for expense reduction and monetizing assets to pay creditors."[2] As has been true throughout this entire chapter 9 process, the City's refusal to provide meaningful information while, at the same time, proposing little recovery to creditors will drive no consensus whatsoever. Here we are, over a year after Mr. Orr's appointment as emergency manager and 8 months since the petition date, and the City has failed to reach consensus with any of its key creditor constituents.

3.     As a matter of law, the City has not satisfied — indeed cannot satisfy — its burden of showing that the Amended Disclosure Statement contains the "adequate information" required under section 1125 of the Bankruptcy Code. For

---

[1]     Presentation to the City of Detroit, 57 (Jan. 29, 2013), attached hereto as Exhibit A.

[2]     *Id.* at 27.

2

starters, information regarding key settlements embodied in the Amended Plan is illusive.  The Amended Disclosure Statement, much like its predecessor, neglects to include exhibits and key documents referenced in, relating to, and in some instances incorporated into, the Amended Disclosure Statement and the City's plan of adjustment (the "Amended Plan").  Further, key financial and operational assumptions and expectations underpinning the various aspects of Amended Plan, including the City's spending plans, asset values, creditor recoveries, and plan implementation, are insufficiently disclosed, if at all.

4.     Additionally, the City stonewalling creditors apparently because it believes it has already treated them too badly to hope to garner consensus, or is oblivious or does not care about what is in the best interests of its stakeholders, satisfies *no* legal test. *See e.g.*, Ex Parte Motion to Extend Re. Disclosure Statement Hr'g Trans. 71:1-14, Apr. 2, 2014 ("MR CULLEN:  Apparently the disclosure statement is adequate enough for everybody to say they don't like it, and 1125 really says is there adequate information to give the parties a meaningful basis to say yes or no.  And what they're telling you is with respect to the current configuration of the plan, there's adequate information . . . enough to say no").  But, "[a] debtor cannot seek relief under the Code and then attempt to circumvent its requirements to the detriment of its creditors."  *In re Copy Crafters*

*Quickprint,Inc.*, 92 B.R. 973, 985 (Bankr. N.D. N.Y. 1988) (court addressing adequacy of disclosure statement).

5.      The City's creditors have no bases on which to assess the Amended Plan's impact on their rights, or the nature, value, and risk of proposed creditor recoveries under the Amended Plan.   Because it would be impossible for a hypothetical investor to make an informed judgment about the Amended Plan based on the Amended Disclosure Statement, the Court should deny its approval. Now is the time to change the City's chosen course for this case for the benefit of Detroit's citizens and creditors.

## **Background**

6.      On February 21, 2014, the City filed, among other things, a plan (the "Original Plan") [Doc. No. 2708] and a skeletal disclosure statement (the "Original Disclosure Statement") [Doc No. 2709].   According to the City, the Original Disclosure Statement contained "descriptions and summaries of provisions of the Plan." (Original Disclosure Statement p 2).   The Original Disclosure Statement also referenced plan exhibits as well as other documents which informed the treatment of creditors under the Original Plan.  But many, if not most, of these key summaries and documents were missing from the Original Disclosure Statement and the Original Plan.

4

7.     Prior to and after the filing of the Original Disclosure Statement, many of the City's creditors requested information and discovery relating to the City's settlements and assets.  But the City has routinely and successfully opposed such requests for information and discovery.  *See e.g.,* Motion to Assume Forbearance Agreement Hr'g Trans. 128:2-18, Aug. 2, 2013 (discussing denial of discovery regarding forbearance agreement); *Order Denying Motion of Syncora Under Rule 2004* [Doc. No. 1662] (Nov. 12, 2013) (discovery denied regarding DIP financing); *Order Regarding Motion of the Objectors for Leave to Conduct Limited Discovery in Connection with Motion of the Debtor for a Final Order* [Doc. No. 1743] (Nov. 15, 2013) (discovery allowed, in part, and denied, in part, regarding DIP financing); *Order (I) Authorizing the Debtor to Enter into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Other Related Relief* [Doc. No. 1955] (Dec. 6, 2013) (discovery denied regarding lighting transaction); Motion to Adjourn Hearing, Motion to Compel the Production of Privilege Log, Pretrial Conference Hr'g Trans. 42:3-19 (Dec. 13, 2013) (discussing denial of discovery and adjournment regarding DIP financing and City's DIP financing motion, respectively); *Order Denying Motion to Compel Production of Privilege Log* [Doc. 2194] (Dec. 17, 2013) (discovery denied regarding access to privilege log relating to City's production of documents in connection with DIP Motion); Motion of the City of Detroit for Approval of

5

Disclosure Statement Procedures Hr'g Trans. 18:12-17, Feb. 25, 2014 (discussing denial of disclosure regarding adequacy of the disclosure statement); *Order Denying Motion for Entry of an Order Appointing and Directing the Debtor to Cooperate with a Committee of Creditors and Interested Persons to Assess the Art Collection of the Detroit Institute of the Arts* [Doc. No. 2534] (Jan. 22, 2014) (discovery denied regarding valuation of art collection); and *Order Granting, in part, and Denying, in part, Motion of the Official Committee of Retirees to Compel Production of Documents* [Doc. No. 3098] (Mar. 20, 2014) (discovery denied regarding certain documents relative to the proposed Settlement and Plan Support Agreement with Swap Counterparties).

8.     For its part, the City has provided little and, in many instances, no information in response to creditors' requests for information throughout this case. This continues despite the City's various assurances to the Court and parties in interest both on and off the record that it would provide information, as described in previous filings with this Court. *See, e.g.*, Art Motion Hr'g Tr. 9:15-18; 15:18-21, Jan. 22, 2014 (referencing various instances of the City assuring the Court and parties in interest that it would provide parties with the information they request); *see also* Scheduling Motion Hr'g Trans. 48:7-22, Mar. 5, 2014 (referencing same).

9.     On March 6, 2014, the Court entered the *Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's*

6

*Plan of Adjustment* [Docket No. 2937] (the "<u>Scheduling Order</u>"). The Scheduling Order set, among other things, March 14, 2014, as "the deadline for parties to make a good faith effort to advise counsel for the City in writing of any request to include additional information in the disclosure statement." On March 14, 2014, Syncora, together with Financial Guaranty Insurance Company, requested that additional information be included in the Disclosure Statement, in accordance with the Scheduling Order (the "<u>Information Request</u>"), attached hereto as Exhibit B. And while the Scheduling Order, among other things, set April 8, 2014, as the deadline for the City to file an omnibus reply to Disclosure Statement objections, the Scheduling Order did not mandate in any way that the City comply with parties' requests to include additional information in the Disclosure Statement.

10. On March 28, 2014, the City responded — in the most basic sense of the word — to the Information Request. Of the 46 requests for information and documentation contained in the Information Request, the City responded to 25 requests with some variation of: "The City believes that the Disclosure Statement provides all current information necessary to provide adequate information with respect to [the requested subjected matter/analysis]. The City may make further revisions to the Disclosure Statement that address the subjection matter of this request." Of the 21 remaining requests, the City's responses were generic and/or nonresponsive. All told, the City effectively dismissed the Information Request.

7

Based on information and belief, the City responded in kind to other key creditors' requests for information.

11.　Until now, there have been few checks in this case on the City's disregard for disclosure and due process — without which creditors cannot possibly defend against the City's proposals, as is their legal right. And so, unsurprisingly, on March 31, 2014, 38 days after the filing of the Original Disclosure Statement, the City filed an Amended Plan and an Amended Disclosure Statement lacking in information parties actually need to protect their rights. With this filing, the City — yet again — begs for litigation with effectively all of its creditor constituencies.

12.　The Amended Disclosure Statement at best provides some high-level details surrounding the bankruptcy transaction. It, however, makes no attempt to meaningfully quantify or analyze how the City's various initiatives will benefit the City's citizens and its other stakeholders. It makes no attempt to educate the City's citizens and its other stakeholders regarding the risks of its proposed transactions or to creditor recoveries, or regarding potential future tax increases, financing costs, costs of doing business in the ordinary course, or other costs on account of its actions in bankruptcy. And it contains nowhere near enough relevant information for approval under section 1125 of the Bankruptcy Code.

8

## Legal Standard

13. "One of the fundamental policies underlying the Chapter 11 reorganization process is disclosure. The disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization." *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. E.D. Ohio 1988). In chapter 9 cases, "as in Chapter 11 cases, creditors and interested parties must be properly notified of all vital steps in the reorganization and confirmation process so that they have the opportunity to protect their interests." *In re City of Colorado Springs Creek Gen. Improvement Dist.*, 177 B.R. 684, 690 (Bankr. D. Colo. 1995). Thus, a disclosure statement should contain information that would permit a creditor or other party in interest to fairly and fully assess the pros and cons of a proposed plan of adjustment and cast its vote for or against such a plan on a fully informed basis.

14. Section 1125 of the Bankruptcy Code, made applicable to cases under chapter 9 by section 901 of the Bankruptcy Code, provides the framework for such disclosure. It states that a disclosure statement should be approved only if the disclosure statement contains "adequate information." Section 1125(b) of the Bankruptcy Code reads as follows:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or

9

interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing *adequate information*.

11 U.S.C. §1125(b) (emphasis added). "Adequate information" is defined in section 1125(a)(1) to mean:

Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interest in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan. …

11 U.S.C. §1125(a)(1).

15.     To satisfy the mandates of section 1125 of the Bankruptcy Code, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D. N.H. 1991). Thus, a disclosure statement should be approved *only* if it contains information that would allow the average unsecured creditor to fully and fairly assess the key economic terms of the plan, the risks associated therewith, and the impact of such on its recovery.  And, while the type and amount of information required to be contained in a disclosure statement varies from case to case, section 1125 of the Bankruptcy Code is biased toward more disclosure rather than less. *See, e.g., Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362

(3d Cir. 1996) (stating that "[b]ecause creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated").

16.     The City bears the burden of providing adequate information as that term is defined in section 1125(a)(1) of the Bankruptcy Code.  "Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing 'adequate information' to 'enable a creditor to make 'an informed judgment' about the Plan."  *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3rd Cir. 2003) (*quoting* 11 U.S.C. § 1125(a)(1)).     Indeed, the "'burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it.' This proposition, is based on Code § 1129(a)(2), which is incorporated into chapter 9 by § 901(a)."  *In re County of Orange*, 219 B.R. 543, 561 (Bankr. C.D. Ca. 1997) (*quoting Everett v. Perez*, 30 F.2d 1209, 1213 and n. 5 (9th Cir. 1994)).  Given creditors' reliance on the disclosure statement, it is "the debtor's *obligation* to provide sufficient data to satisfy the Code standard of adequate information."  *Id.* (citations omitted) (emphasis added).  The City has not carried its burden.  And despite the Court's Scheduling Order and creditors'

KE 30169562

guiding information requests, the Amended Disclosure Statement still comes up short.

17. Because the City has failed to sustain its burden, the Court should deny the Amended Disclosure Statement. In fact, the Court should question the City's entire approach in this case and its intentions for its citizens as it continues to flout bankruptcy law, force costly and protracted litigation and severely burn bridges with its spectrum of creditors.

## **Argument**

### I. **The Disclosure Statement Fails to Meet the Standard for Adequate Disclosure.**

18. The City has not satisfied its burden of setting forth adequate information that would "enable a … [creditor] to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). The Amended Disclosure Statement by its own terms is incomplete. Much of the content it does contain is insufficient and the Amended Plan attached thereto is *still* missing 18 exhibits — all of which are critical to the Amended Plan and many of which are referenced directly in the Amended Disclosure Statement. To wit, the Amended Disclosure Statement incorporates by reference various settlements and agreements, including the State Contribution Agreement,[3] the Plan COP Settlement, and the DIA Settlement, but

---

[3] Capitalized words used but not defined herein have the meanings ascribed to them in the Amended Disclosure Statement or Amended Plan, as applicable.

12

fails to attach the applicable documents or describe with sufficiency, or any, specificity the terms thereof. At a minimum, a disclosure statement that is missing key documents and details that directly inform the treatment of the debtor's creditors cannot possibly provide those creditors the adequate information to which they are entitled under section 1125 of the Bankruptcy Code. The City — unequivocally and unapologetically — has not shown otherwise.

19. For example, in *In re Cardinal Congregate I*, creditors of the debtor, a group of retirement living facilities, objected to the debtor's disclosure statement as "inadequate." 121 B.R. 760 B.R. 760 (Bankr. S.D. Ohio 1990). The bankruptcy court "independently reviewed the Disclosure Statement" and found that it "lacks certain necessary information" — information that is similarly missing from the City's Disclosure Statement, as described more fully below. *Id.* at 766-67.

20. First, the *Cardinal* court found, among other things, that the "Disclosure Statement contains an inadequate discussion of the claims held by various affiliates of [the debtor]" and that the disclosure statement needs to provide "more detailed information regarding the nature of these claims …. Additionally, a more complete discussion of the Amended Plan's proposed treatment of these claims is necessary." *Id.* at 767. Here, for instance, the Amended Disclosure Statement does not sufficiently describe the basis for the COP Swap Claims or their treatment under the Amended Plan if the Swap Settlement is approved or if it

is denied.  The Amended Disclosure Statement also does not provide adequate information in support of the Amended Plan's treatment of the UTGO and LTGO Bond Claims as unsecured.  Generally, the Amended Disclosure Statement fails to provide all unsecured creditors with the quality of information to which they are entitled regarding their treatment under the Amended Plan.

21.    Also, the *Cardinal* court held that a disclosure statement needed to include "a discussion of the anticipated future of the debtor's business."  *Id.*  The court explained that

> [m]erely attaching *pro forma* income calculations to the Disclosure Statement is insufficient.  A more detailed analysis of the projected income, expenses, and surplus funds available for satisfaction of claims and interests is appropriate.  Further, the Disclosure Statement should clearly identify all assumptions made in calculating *pro forma* information and should set forth those facts supporting all estimates. Information regarding the accounting and valuation methods used in preparation of the Disclosure Statement's financial exhibits must also be included.

*Id.*  Likewise, in the instant case, the Amended Disclosure Statement fails to provide financial projections and associated assumptions and scenario analyses sufficient to allow creditors to make an assessment of the true value and risks attendant to their consideration.

22.    Clearly here, given the volume of deficiencies in the Amended Disclosure Statement and the Amended Plan that it describes, the Amended Disclosure Statement should not be approved.  To be sure, creditors would need a

level of disclosure not present here to even properly assess the full universe of information that would constitute "adequate information."  It follows that not every specific piece of information missing in the Amended Disclosure Statement is addressed below.  Instead, this objection highlights certain of the most significant disclosure deficiencies.

### A. The Disclosure Statement Fails to Describe the Nature and Risks of Recoveries

23.    "A disclosure statement should … contain all material information relating to the risks posed to creditors … under the proposed plan of reorganization."  *Cardinal Congregate*, 121 B.R. at 765.  Here, the Amended Disclosure Statement is overrun with ambiguity, poorly disclosed or undisclosed conditionality, and unrealized, and potentially unrealizable, promises to creditors.  So determining the risks posed to creditors is impermissibly difficult.

24.    To be sure, the Amended Disclosure Statement fails to provide, or inadequately provides, the financial and operational assumptions underpinning the Amended Plan — information that a creditor would need to assess the risks posed to creditors under a plan of adjustment.  For example, among others:

- The Amended Disclosure Statement topically describes New B Notes that are designated for non-pension unsecured creditors.  The notes pay interest only (no principal) for the first 10 years after the Effective Date.  Principal payments would commence in year 11 and continue for an additional 20 years. (Sec. IV.A.1).  But the City provides no forecasts beyond the first 10 years in the Amended Disclosure Statement.  (Sec. III.B.2).   Thus, the 15%

KE 30169562

recovery provided for unsecured creditors generally may be closer to 0% on a risk adjusted basis. (Sec. III.B.2).

- It is unclear in the Amended Disclosure Statement whether the 15% recovery for non-pension unsecured creditors represents a present value estimate. If not, again, recoveries would be much lower than disclosed. (Sec. III.B.2).

- The Disclosure Statement does not address how the City would respond to a scenario in which the City's pension funds experience a loss — a return below the City's assumed rates of 6.25% for GRS and 6.5% for PFRS (Sec. II.A.2; Sec. VII.B.5.b.4) — in a particular year, and the potential impact of any such action on the City satisfying its obligations to other unsecured creditors.

- The City proposes to create new defined benefit plans that will be funded, in part, by employer contributions of 10% for police and fire and 5% for general employees. (Plan Exhibits I.A.202.b, I.A.148.b). The City does not disclose how these contribution percentages will be adequate to provide the new benefits, and how the City's obligations to other unsecured creditors may be impacted if they are inadequate.

- The Disclosure Statement makes clear that no DWSD Transaction is presently on the table. (Sec. VIII.K.1). But it does not quantify the risks of various transaction structures if a transaction can even be consummated. For instance, the City states generically: "If DWSD cannot prefund its actual allocable share to the GRS pension fund [based on the occurrence of the DIA Settlement and the State Contribution Agreement], then the cuts to the GRS pension beneficiaries would have to be higher than those contemplated in the Plan." (Sec. II.A.2).

- The City includes projected revenues from the DWSD Transaction in its financial projections, but there is *no* DWSD transaction regarding which to project revenues. As a result, such projections are questionable in light of the uncertainties in regionalizing or outsourcing the department. What is clear is that the City intends that "impairments of Claims under the Plan will permit DWSD to conduct substantial and necessary revenue enhanced capital improvements using revenues that would otherwise have been unavailable to DWSD and applied instead to service the City's debt." (Sec. VIII.K.1).

KE 30169562

- The Amended Disclosure Statement describes no reforms in the City's administration that would assure creditors that safeguards will be put into place to ensure, or at the very least, make more possible, the City's success post-emergence, including the City's ability to honor and comply with the terms of the Amended Plan.

25. Because the Disclosure Statement does not provide a hypothetical investor information to determine the true risks and values associated with its recovery, the Court should deny the Disclosure Statement.

**B.    The Amended Disclosure Statement Fails to Provide Information in Support of its Reinvestment and Restructuring Initiatives**

26. "[A] disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization." *Cardinal Congregate*, at 765. But the Amended Disclosure Statement fails to describe how the City's reinvestment and restructuring initiatives will benefit its citizens or creditors. The City's disclosures regarding such initiatives include no clearly stated and specific vision or expectations for the City, including targets for population growth, tourist growth, new real estate development, new business starts, or other identifiable success metrics. The City's proposed expenses resemble more of a wish-list of the City's departments than a targeted and calibrated municipal revitalization plan. (Sec. IX.A). Accordingly, none of the City's stakeholders can readily determine the probable success or failure of the City's proposals, or, related, the impact of those proposals on their interests.

17

27.     Additionally, the Amended Disclosure Statement provides for revitalization spending of $1.5 billion.  (Sec. IX.A).  This represents a $250 million increase in spending over the amount provided for in the City's June 14, 2013 Proposal.  (Sec. IX.A).  The City provides no justifications for this additional and substantial spending, which otherwise could presently benefit existing creditors.

28.     And in light of the City's infamous and long-standing reputation for financial and operational mismanagement, the City fails to address how it will managerially right the ship post-emergence.  In that vein, the City acknowledges that "[s]ignificant labor cost savings may be achievable by rationalizing staffing levels and reducing employee headcounts.  Consolidation of departments and elimination of redundant functions will be implemented where service improvements or cost savings can be achieved."  (Sec. IX.B). The City assures that "[w]here cost savings or service improvements can be achieved, the City will explore potential outsourcing functions." (Sec. IX.B).  Yet, without substantive detail, these statements are nothing but political platitudes.  Departmental structures appear to mainly remain intact and privatization, regionalization, and public-private partnerships are not proposed for departments that could benefit from them, such as, but not limited to, Municipal Parking, Public Works, Recreation, Building and Safety, Planning and Development, Administrative Hearings, Information Technology Services and Workforce Development. (Sec.

IX.A).  Indeed, there is nothing in the Amended Disclosure Statement that suggests that the City will not end up in the same position post-emergence that lead to its present predicament.

### C.    The Amended Disclosure Statement Fails to Provide Adequate Information in Support of Efforts to Monetize City Assets

29.    The City provides no discussion in the Amended Disclosure Statement about how creditors are benefiting from monetization of the City's various assets (with the exception of the City's art held at the DIA and, even there, the details are inadequate, even misleading).  If creditors are not benefiting from the monetization of assets, the City provides no explanation why not and on what legal bases the City may deny creditors additional recovery value.

30.    For example, among others:

- The Amended Disclosure Statement makes clear that value derived from the City's world-class (and unencumbered) art collection (namely, the DIA Proceeds and payments pursuant to the State Contribution Agreement) will be designated solely for the recovery of holders of Pension Claims.  But the Amended Disclosure Statement does not articulate why and how it is legally permissible that other unsecured creditors do not share in that property or that this private sale is in the best interests of creditors.

- The City avoids addressing why it is legally permissible for the City to transfer to the DIA _**all**_ of the art collection — not just the art works Christie's valued, and _**all**_ related real estate, buildings and other art assets, in exchange for an amount that is, in fact, lower on a present value basis than the lowest end of Christie's valuation range for only a subset of the art collection. (Plan Exhibit I.A.79).

- The Amended Plan very conservatively sets an assumed rate of return on the assets designated for Pension Claims, and proposes to share the anticipated

19

profits with the holders of Pension Claims by potentially restoring their benefits and/or reducing the City's future contributions to their pension plans. (Art. I. A.150, 204). For other unsecured creditors, the City offers no such "upside" participation. In the Original Plan, the City proposed to offer revenue-participation "C Notes," however, this component has been eliminated, and without explanation, from the Amended Plan.

- On November 12, 2013, the City and the State agreed to a lease whereby the State would lease Belle Isle Park from the City for 30 years. The terms of the lease are such that the State will invest between $15 million and $20 million to upgrade and repair portions of the park during the first three years of the lease. But, during that time, the City will continue to pay for Belle Isle Park's water and sewer services — an estimated $1.5 million and $2.5 million, respectively, per year. The City will retain no value in and will generate no revenue from the park. Furthermore, the receipts from $11-per-vehicle "Recreation Passport," which will provide access to all of Michigan State parks, will be collected by the State, and not the City. The City fails to show that it had considered other, financially beneficial lease alternatives. Furthermore, the City provides no information in support of its lease agreement with the State or that this was the best way to maximize the value of this significant asset. (Sec. VIII.K.5).

- The City owns an estimated 22 square miles of land within the City limits. The City describes much of this land as vacant and overgrown. And without providing any valuations for such properties, the City states conclusively that the land has "limited present commercial value." (Sec. VII.A.5(b)). While this may be an accurate assessment of the land in its existing state, the City provides no valuations or any other information to support this sweeping declaration. And the City presents no view on the future value of the real estate assuming the City has a successful reboot. And it certainly appears again, without explanation, that the City is not minimizing creditor losses by looking to share with creditors the potential upside in the real estate.

### D. The Amended Disclosure Statement Contains Inadequate Information Regarding Settlements

31. Much of the Amended Plan is predicated upon the consummation of certain settlements and agreements between the City and third parties. And yet, the

Amended Disclosure Statement provides little, if any, certainty regarding the likelihood that these transactions will come to fruition and when. Furthermore, the Amended Disclosure Statement provides mere outlines and summaries of these crucial transactions as placeholders for the specific terms and forms of documents that presumably do not yet exist, and that would provide creditors the need-to-know information to which they are entitled to make an informed judgment whether to accept or reject the Amended Plan.

32.  Section IV of the Amended Disclosure Statement explains that the DIA Settlement is a means for implementing the Amended Plan. Indeed, the non-occurrence of the DIA Settlement would have a significant negative impact on the recoveries of Allowed Pension Claims. And yet, the true terms of the deal are absent from the actual body of the Amended Disclosure Statement.

33.  A review of the DIA Settlement Term Sheet, which is tucked away among hundreds of pages of exhibits, indicates that the DIA settlement generates proceeds equal only to the *present value* (but payments are spread over 20 years) — so some small fraction— of $466 million (the low end of Christie's valuation range) for assets that go far beyond, and are worth far more, than what Christie's valued. Nowhere in the body of the Amended Disclosure Statement does it specifically disclose that "[a]s a result of [the] settlement, at Closing, all right, title and interest in the *Museum Assets* shall be conveyed to The DIA to be held in

perpetual trust for the benefit of the people of the City and the State." (Plan Exhibit I.A.79). Museum Assets includes all of the following:

1. the Museum Building;
2. the Frederick Lot;
3. the cultural center underground garage;
4. the (whole) art collection;
5. all assets of any kind located on or within the real estate described in 1-4 and used in the operations of the Museum including easements and property rights;
6. intangible property rights;
7. records, books, files; and
8. monies held by the City designated for the DIA.

(Plan Exhibit I.A.79, Exhibit A). The Amended Disclosure Statement does not explain and provides no information in support of why the present value of $466 million over 20 years is fair consideration for property no doubt worth in the aggregate billions of dollars. In the absence of this information, which dictates what recovery, if any, the holders of Allowed Pension Claims and other unsecured creditors will or could receive and when, such creditors have far less than "adequate information" upon which to base a determination as to whether they should vote for or against the Amended Plan.

34. The Amended Disclosure Statement does not provide adequate information regarding the treatment of COP Swap Claims under the Amended Plan. The terms of the City's proposed Swap Settlement are not provided for in the body of the Amended Disclosure Statement or as an exhibit to the Amended Disclosure Statement or the Amended Plan. Notably, the Amended Disclosure

Statement does not even describe what exactly the Swap Claims are that are being settled or the bases for their classification and impaired status. All that can be gleaned from the Swap Settlement for plan purposes is that it gratuitously attempts to create "[t]he existence of a significant impaired accepting class" that will "allow the City to confirm a plan of adjustment over a dissenting class vote." (Swap Settlement Motion ¶ 6).

35. The Amended Disclosure Statement suggests that the PFRS and GRS Settlements described in the Original Disclosure Statement have been replaced by the "State Contribution Agreement," which accounts for the settlement of Pension Claims. Still the Amended Disclosure Statement provides no documents or further information about the State Contribution Agreement. Of course, the Amended Disclosure Statement also fails to provide the status of the State Contribution Agreement, discussion of the inevitable approvals necessary and political hurdles to consummate the transaction and its effect on and/or relation to the DIA Settlement, which, according to the DIA Settlement Term Sheet is a condition to its effectiveness.

36. The Amended Disclosure Statement similarly fails to provide the form of Plan COP Settlement Documents. The Amended Plan provides that the " 'Plan COP Settlement' means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.s.iii.A and definitively set forth in

the Plan COP Settlement Documents." (Art. I.A.207). Although the Amended Plan states that settling claimants will be deemed to have an allowed claim equal to 40% of the aggregate unpaid principal amount of their COPs, the Amended Plan and Amended Disclosure Statement provide no further terms regarding the Plan COP Settlement, including those regarding which claims the Plan COP Settlement may release. (Art. II.B.3.s). Accordingly, holders of COP Claims and other creditors who are impacted by the Plan COP Settlement, are provided no meaningful way to understand the significance or value of this settlement or the proposed treatment of their claims under the Amended Plan.

*[The remainder of this page is intentionally left blank.]*

KE 30169562

## Conclusion

37.     The Amended Disclosure Statement in its current form cannot be approved absent material amendments and modifications.  Critically, the City's poor disclosure calls into question the real impact of its decisions on its citizens and other stakeholders.  At various other stages in this case, the City has managed to limit or altogether avoid disclosure and yet still move forward with its aggressive confirmation schedule.  But now the jig is up.  The Amended Disclosure Statement must be denied.  Due process, bankruptcy law and fundamental fairness require it.

38.     For the foregoing reasons, Syncora respectfully requests that the Court deny the approval of the City's Amended Disclosure Statement.


*[Remainder of this page intentionally left blank]*

25

Dated: April 7, 2014

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*