# Exhibit A

# Presentation to the City of Detroit



# Presentation to The City of Detroit

Detroit, Michigan
January 29, 2013

DTMI00128731

**Confidential**

1

# PART I – INTRODUCTION

DTMI00128732

**Confidential**



# The Jones Day Team


**Stephen Brogan**


**Corinne Ball**


**Heather Lennox**


**Kevyn Orr**


**Bruce Bennett**


**Aaron Agenbroad**



DTMI0012873

**Confidential**

3

DTMI00128734

[Speaker Notes For Slide: 3]

The Jones Day Team:

Stephan Brogan
Corinne Ball
Heather Lennox
Kevyn Orr
Bruce Bennett
Aaron Agenbroad

[Brogan voiceover:   Although I will not be heavily involved in the representation, I wanted to (i) provide my personal statement of Jones Day's commitment to this project and (ii) highlight the qualities of the team members that will manage this project on a day-to-day basis. ]

**Confidential**

# Jones Day's
# Qualifications and Commitment

- **Midwestern Roots – Continuing Presence and Practice**

- **Substantial Ties to Michigan and the 6th Circuit**

- **Belief in the Importance of a Strong Detroit**

- **Unsurpassed Expertise Where Detroit Needs It**

- **Historical Focus on Teamwork and Collaboration**

- **Know and Work Well With City's Other Advisors**

- **Firm-Wide Commitment to Detroit**



**Confidential**

5

DTMI00128735

[Speaker Notes For Slide: 5]

Jones Day's Commitment to the Detroit Project

Jones Day's roots are in the Midwest and a large part of our practice is centered there.

Many of Jones Day's clients are based in Detroit and in Michigan.
(Over 100 Michigan-based clients in the past 2 years.)
Long-standing representation of GM.
Special benefits counsel to, and good contacts with, Blue Cross of Michigan.
25 lawyers were 6th Circuit Clerks.
27 lawyers were clerks in federal courts in the 6th Circuit (Ohio, Michigan, Tennessee, Kentucky).
28 lawyers were US Supreme Court Clerks.
116 lawyers have one or more degrees from Michigan institutions (including 98 lawyers with 111 degrees from the University of Michigan alone).

We believe that a strong Detroit is vital to the state, the region and the country.

Jones Day has unsurpassed expertise and capabilities in the areas of greatest importance to Detroit and would be honored to be called upon to help.

Jones Day has a longstanding reputation for teamwork and collaboration, both within our own organization and when working with clients, related parties and other professional firms.
This strength will be particularly important in this matter.
We know and can work well with the other advisors retained by the City and it will be critical that everyone pulls together in the same direction.

When a client engages Jones Day, it engages the entire firm, and this would be regarded as an engagement of utmost importance for the firm as a whole.
We are committed to providing whatever resources are needed to advance Detroit's restructuring goals.
The City will have the support of each and every part of the Firm.

**Confidential**

DTMI00128736

# P<span>ART</span> II – G<span>ENERAL</span> O<span>BSERVATIONS</span>

**Confidential**

DTMI00128737



[Speaker Notes For Slide: 7]

Jones Day's Priority for Today's Meeting

It is much more important that we discuss issues the City, the State and the FAB want to discuss rather than issues that we have identified.

We are prepared to walk through the presentation and invite dialog along the way, but are also prepared to put our presentation to one side and cover topics that interest you and address your questions and concerns.

We have studied Detroit's situation extensively and we have some preliminary views on a path forward.

**Confidential**

8

DTMI00128738

# Detroit's Substantial Progress

- **Improved Cash Flows**
- **Significant Headcount Reduction**
- **Implementation of CETs**
- **Planning to Address Pension/OPEB**
- **Payroll Systems Outsourcing**
- **Public Lighting Authority**
- **Regional Transportation Authority**
- **Initiatives to Drive Revenue/Reduce Expenditures**

DTMI00128739



**Confidential**

[Speaker Notes For Slide: 9]

The City, working with the FAB and the State, already has made substantial progress in addressing its financial challenges.

Improved Cash Flows (Expected improvement of ~$62MM in FY 2013)

Significant Headcount Reduction (from ~12K in Nov. 2011 to ~10K in Nov. 2012)

Implementation of CETs (Despite delays, large majority of CETs are in place)

Planning to Address Pension/OPEB (e.g., recently closed the Police & Fire Retirement System to new employees, retention of Milliman to assist in revamping benefits for retirees and active employees)

Payroll Systems Outsourced

Public Lighting (Public Lighting Authority established; rate increases)

Regional Transportation Authority (authority established; new funding committed)

Initiatives to Drive Revenue or Reduce Expenditures (Belle Isle lease to the state, funding support for new arena and commercial development via Detroit Downtown Development Authority, grant and loan support for Detroit's Eastern Market through the Community Revitalization Program)

DTMI00128740

**Confidential**

10

# Formidable Challenges Remain

- **Substantial Debt (Bonds, POCs, Swaps)**
- **Pension/OPEB Liabilities**
- **Labor Issues (Costs, Work Rules)**
- **Detroiters' Quality of Life/Redevelopment of the City**
- **Development of Multi-Year Budget**
- **Reversing Economic Trends**
- **Encouraging New Investment in Detroit**
- **Political Obstacles to Reform**
- **EPA/Clean Water Act Case**
- **High Unemployment and Crime Rates**



DTMI00128741

**Confidential**

[Speaker Notes For Slide: 11]

Notwithstanding the foregoing, many challenges remain.

Debt and related obligations (e.g., swaps)

Pensions and other retiree benefits (OPEB).

Labor costs, work rules and related issues.

Implementation of strategies to improve Detroiters' quality of life and redevelop the City.

Development of multi-year budget upon which restructuring can be based.

Identification of further options for saving/raising funds and stabilizing revenues (reversing trends) and encouraging new investment in Detroit.

Political obstacles to reform.

EPA and Clean Water Case before Judge Cox.

High unemployment.

High crime rate.

**Confidential**

DTMI00128742

# Out of Court Solutions Are Preferred

- Benefits of Well Planned Out-Of-Court Restructuring

    - ➢ **Less Disruptive**
    - ➢ **Less Publicity**
    - ➢ **Less Expensive**
    - ➢ **Less Reputational Damage**
    - ➢ **Less Political Impact**

- Consensus or Near Consensus Necessary for a Successful Out-of-Court Restructuring

    - ➢ *Extremely Difficult to Achieve in Practice*



DTMI00128743

**Confidential**

13

[Speaker Notes For Slide: 13]

A well planned and carefully implemented effort to resolve Detroit's difficulties out of court is vitally important for several reasons:

An out-of-court solution is preferable for a number of reasons.
Less disruptive.
Less publicity during process.
Less expensive.
Less damage to City reputation.
Less political impact.

An out of court solution requires consensus or near consensus of affected constituencies.
This is extremely hard to achieve in practice.

Note: Could mention the possibility of a moratorium on payments being negotiated in support of an out of court solution.

DTMI00128744

**Confidential**

14

# Impact of Possible
# Emergency Manager Appointment

- **Expansive Power**
  - ➢ **Power of City Government**
  - ➢ **Ability to Reject, Modify or Terminate CBAs**
  - ➢ **Ability to Commence Chapter 9 Filing Quickly, if Warranted**
  - ➢ *Can Create Negotiating Leverage (Negotiating with the Backdrop of Bankruptcy)*

- **Hot-Button Political Issue**

- **Relationship With Elected Officials Must Be Established**

- **Possible Legal Challenges (Delay and Risk)**



**Confidential**

DTMI00128745

Appointment of an Emergency Manager may offer the City greater powers to address some issues.

The appointment of an Emergency Manager could impact the City's restructuring efforts in a number of ways:

Expansive powers over all aspects of City government could be used to promote and expedite restructuring (e.g., budget; procurement; contracts; labor negotiations; ability to adopt ordinances related to financial condition).
Could streamline certain political/bureaucratic/legal requirements to restructuring activities.
Ability to reject, modify or terminate CBAs under certain circumstances.
Ability to commence chapter 9 filing quickly under PA 72 and PA 436 (assuming State approval).
Emergency manager powers can create negotiating leverage (negotiating in the backdrop of bankruptcy).
Hot-button political issue.
Potentially unpopular option with certain segments of the public, unions, other stakeholders.
The Emergency Manager's relationship with elected officials would have to be developed.
Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions.
Appointment of an Emergency Manager could result in legal challenges (e.g., federal & state constitutional challenges)
Could delay progress until resolved
Could lead to challenges of the legality and enforceability of any actions taken by the Emergency Manager.

**Confidential**

DTMI00128746

# Out-of-Court Plan Should Contemplate the Possibility of Chapter 9

- **Simplify and Shorten Any Chapter 9 Case, if Out-of-Court Effort Fails**

    ➢ **Out-of-Court Agreements Can Be Used in Chapter 9**

- **Creates Leverage in Creditor Negotiations**

    ➢ **Negotiating in the Shadow of Chapter 9**
    ➢ **Motivate Municipal Bond Market Participants**

- **Bolster Eligibility for – and Success in – Chapter 9 By Establishing Good-Faith Record of Seeking Creditor Consensus**



DTMI00128747

**Confidential**

[Speaker Notes For Slide: 17]

Any restructuring plan should be designed so that it could be implemented in a chapter 9 case, if necessary.

Even if an out-of-court plan cannot be implemented, agreements that are reached can form the basis for a chapter 9 plan of adjustment, thus simplifying and shortening any chapter 9 case.

Creditors understand that a troubled municipality has greater leverage in a chapter 9 case. Accordingly, developing an out-of-court restructuring plan that can later be implemented in chapter 9 if necessary can create leverage in favor of a negotiated deal.
This is particularly the case if an Emergency Manager is appointed because the threat of a chapter 9 filing – including a potential moratorium on payments – will be more tangible, and possibly more imminent.
The combination of an Emergency Manager and a proposal that could be implemented in chapter 9 could be the most effective way to motivate investors in the municipal bond market.

A good-faith effort to pursue an out of court restructuring plan will establish a clear record of seeking creditor consensus before seeking chapter 9 relief.
This will deflect any eligibility complaints based on alleged failure to negotiate or bad faith.

DTMI00128748

**Confidential**

# If Chapter 9 Needed, Planning Is Key

- Any Bankruptcy Filing Should Be Accompanied By:

  - Fully Developed Plan of Adjustment / Detailed Term Sheet

    -OR-

  - Clearly Articulated, Reasonable Restructuring Plan, Already Shared with Creditors

  *This approach will help demonstrate that Chapter 9 was commenced to facilitate realistic solutions to problems. Chapter 9 is __not__ an additional symptom of those problems.*



**Confidential**

19

DTMI00128749

[Speaker Notes For Slide: 19]

If a chapter 9 case becomes necessary, the commencement of a bankruptcy should be accompanied by either:

(1) A fully developed Plan of Adjustment or detailed term sheet for a Plan of Adjustment

– or –

(2) A clearly articulated, reasonable plan for resolving the City's financial difficulties – previously discussed with key constituencies – that can quickly be incorporated into a Plan of Adjustment.

~ ~ ~

This approach is intended to allow the City to describe a chapter 9 case as facilitating realistic solutions for the City's problems and not as an additional symptom or symbol of the intractability of those problems.

DTMI00128750

**Confidential**

# PART III – INITIAL PLANNING CONSIDERATIONS

DTMI00128751

**Confidential**



# Establish Long-Term
# Goals and Promote Inclusiveness

- **Reach Consensus of City Team on Long-Term Goals and Steps to Achieve Them**

- **Then, Include All Constituents in Planning and Negotiations**
  - ➤ **Obtain – and Seriously Consider – Input From All Sources**
  - ➤ **Defuse Political Opposition Through Listening and Documentation**
  - ➤ **Establish Sub-Teams for Key Issues**
  - ➤ **Coordinated "Hub-and-Spoke" Approach:  Sub-Teams Report to Central Hub**
  - ➤ **Establish a Strong Record of Inclusiveness and Consideration of All Options**

- ***The City (both the Office of the Mayor and City Council), the State and the FAB should strive to coordinate their efforts in all respects.  Any differences and tensions among these groups can and will be exploited by adversaries.***



DTMI00128752

**Confidential**

[Speaker Notes For Slide: 22]

Set Long-Term Goals and Build a Strategy of Inclusiveness

A key to a comprehensive restructuring plan will be to reach consensus at the City (in consultation with its advisors, the FAB and the State) on the restructuring steps needed to achieve a durable long-term solution to the City's issues.

Thereafter, as many constituents as possible should be included in planning and negotiations.

Input should be obtained from all sources, documented and treated seriously, even if proposals appear unrealistic. Good listening skills are helpful. This can help defuse political opposition.
Sub-teams can be established by the City and its advisors to address particular issues (labor, pension/benefits, asset sales, redevelopment, capital markets, etc.).
Individual groups can report regularly to central core team of key officials and advisors (i.e., the Hub).
Jones Day often uses this Hub-and-spokes approach to manage a complex restructuring efficiently and in a coordinated manner.
Establish a strong record (i.e., for future litigation) of (i) inclusiveness with respect to all constituencies and (ii) consideration of all options and proposals received.

The City (both the Office of the Mayor and City Council), the State and the FAB should strive to coordinate their efforts in all respects. Any differences and tensions among these groups can and will be exploited by adversaries.

DTMI00128753

**Confidential**

23

# Multi-Year Budget: Set Spending Priorities Within Realistic Revenue Projections

- **Basis for Any Restructuring Agreements**

  - ➤ **Build on Budget Work to Date**
  - ➤ **Identify All Revenue Sources (Including Future Sources)**
  - ➤ **Strive for Conservative/Achievable Revenue Estimates**
  - ➤ **Incorporate Cost Savings from Outsourcing and Other Initiatives**

- *The Budget should include funds needed to assure the proper functioning of the City and appropriate investments to revitalize the City over the long term.*



DTMI00128754

**Confidential**

[Speaker Notes For Slide: 24]

Set spending priorities within realistic revenue projections.

A multi-year budget that includes revenue and expense projections will be the basis for determining amounts available for distribution to creditors – critical to any restructuring agreements in or out of court.
Jones Day understands that substantial work has been done in this area, and that this is a major challenge.
The City must create credibility in the face of an unsettled revenue picture.
All revenue sources should be identified, including future sources (such as monetizing assets or reallocation of state/county revenue).
At the same time, the City should strive for realistic (conservative) revenue projections to assist in planning and build credibility.
Cost savings through additional outsourcing and other initiatives should be incorporated where reasonable (e.g., exploration of regionally-based options/alternatives).

This Budget should include funds needed to assure the proper functioning of the City and appropriate investments to revitalize the City over the long term.
Projected revenues should be targeted to reinvestment where possible, with a mechanism to cover shortfalls as necessary (e.g., business, state or federal partnerships).

DTMI00128755

**Confidential**

25

# Prepare to Defend the Budget

- **Defend Spending at Levels Needed to Assure Long–Term Viability**

  - ➤ **Focus on "Who Does Detroit Serve?"**
  - ➤ **Establish Case for Reinvestment**
  - ➤ **Defend Against Calls for Expense Reduction and Monetizing Assets to Pay Creditors**

- **Characterize Detroiters as "Customers "**

  - ➤ **Must Treat Citizens with Respect**
  - ➤ **Attractiveness of City to Residents and Businesses is Key**

- **Restructuring is About Revitalization, Not Just Creditor Recoveries**



**Confidential**

DTMI00128756

[Speaker Notes For Slide: 26]

Prepare to Defend the Budget.

The Budget will have to be defended against creditor criticism that it provides for excessive expenditures in light of the city's financial circumstances.
We are prepared to build this case and address any concerns, including Constitutional or other legal challenges.

Although there is not much law in this area, Jones Day believes that the City can defend a decision to spend revenues at a level necessary to assure that the City functions properly and can attract residents and businesses.
Focus on "Who does Detroit serve?"
The citizens of Michigan benefit from a revitalized Detroit serving as an engine/economic driver for the state economy.
Need to establish a credible case that stability and restoration are key elements of reinvestment in Detroit.
At the same time, need to defend against approaches that focus on expense reduction and monetizing assets to pay creditors.
This will require daily coordinated effort of the City and its advisors, in further collaboration with the State.
We learned this lesson from Orange County – daily collection of information, discussion of core group, documentation of actions taken or considered and communication are key.

City should characterize its residents as "customers," a class of constituents that ordinarily is accorded significant benefits in business reorganizations.

Creditors may attempt to characterize residents as the "owners" or "voters" who should make sacrifices to facilitate payment of creditor claims.
The changes in the population of the City indicates that citizens can "vote with their feet" by leaving. A viable restructuring for a strong and vibrant Detroit must treat its citizens with respect, just as a successful business in the private sector treats its customers.
But also must focus on "absentee" customers to obtain City services without contributing sufficiently to the City.

DTMI00128757

**Confidential**

# Explore All Avenues to Pay Creditors

- **Creditors (and any Bankruptcy Court) Expect Reasonable Efforts to Minimize Shortfalls to Creditors**

- **Must Explore Long List of Options for Saving or Raising Money**

  - ➤ **Raising Taxes and Fees**
  - ➤ **Non-Core Asset Sales**
  - ➤ **Reducing Expenses**

  - ➤ **Borrowing Options**
  - ➤ **Pay-Per-Use Taxation**
  - ➤ **Regional Solutions**

- **Any Savings Must Be Consistent with the City's Revitalization Plans**

*A record should be established that all avenues have been explored to minimize the concessions sought from stakeholders, to bolster the notion of shared sacrifice and to support the City's case for debt reduction if a Chapter 9 ultimately is commenced.*



DTMI00128758

Confidential

Creditors – and ultimately the Bankruptcy Court if a chapter 9 case is filed – will expect that the City exert reasonable efforts to reduce or eliminate any shortfall in amounts available to pay creditors.

Must find the right way to fix the deterioration in the City's balance sheet, including the rate and maturity of debt.
Recent events have driven to too much short term debt (for a municipality).
Must be able to assure both municipal debtholders and legacy creditors that this is not just a process of imposing more undesirable terms.

In practice, the City will be required to develop long lists of options for saving or raising money, evaluate the practicality of each of the options identified and pursue promising approaches.

In past cases, creditors have suggested:
Raising taxes and fees.
Selling assets creditors deemed to be excess or not required.
Reducing expenses.
Borrowing against revenue streams generated by municipal assets.
Borrow surplus amounts in funds administered by the municipality

Revenue enhancement alternatives should be explored, encouraged and defended, even in a chapter 9 setting.  For example:
Pay-Per-Use Taxation.  Consider implement pay-per-use taxation model as (1) impetus for voluntary compliance with "Core Detroit" infrastructure and service rationalization initiatives and/or (2) means to capture revenue from surrounding suburban communities that have historically expanded as Detroit's city center shrunk.

Regional cooperation/solutions also should be explored.

Any savings ultimately must be consistent with the plans to revitalize Detroit.

A record should be established that all avenues have been explored to minimize the concessions sought from stakeholders, to bolster the notion of shared sacrifice and to support the City's case for debt reduction if a chapter 9 ultimately is commenced.
Even in chapter 9, all pre-bankruptcy efforts should be highlighted to demonstrate the City's good faith efforts to resolve issues.
This also will help drive a model of equitable shared sacrifice of all stakeholders.
Given initiatives underway relating to labor and benefits, it appears that the municipal bondholders, swap participants and monoline insurers likely will be the last contributor and must understand the entire picture of sacrifices obtained over time.

DTMI00128759

**Confidential**

# Exploring Creditor Recoveries: Challenges and Lessons Learned

- Raising Taxes:  Difficult and Possibly Counterproductive

  ➢ Tax <u>Relief</u> May Be Needed to Promote Investment

- Asset Sales Pose Challenges to Generating Substantial Revenue

  ➢ Sales of Assets to Pay Creditors May Not Promote Revitalization

- Reducing Expenditures Should Not Undermine Restructuring Goals

- Borrowing May Be Limited by Legal Restrictions

  *Notwithstanding any challenges, the City will have to demonstrate to interested parties that all of these alternatives, and perhaps others, have been fully and fairly evaluated.*



DTMI00128760

Confidential

30

In Jones Day's experience:

Raising additional taxes, particularly given the economic hardship in Detroit, may be difficult (if not impossible) and may be counterproductive.
In fact, an evaluation of means to increase private investment dollars in Detroit suggest the need for tax relief and incentives.

Efforts by municipalities to sell or monetize asset often pose challenges to generating material value.
Disputes over the use of proceeds can undermine the benefits of an asset sale, while eroding the municipality's asset base.
Notwithstanding the foregoing, there are exceptions and unique and creative structures for asset monetization can and should be explored.
Working with the State to maximize asset revenues and cut costs could be a viable alternative to asset sales.
Regional initiatives also could be explored (joint redevelopment, sharing of services, joint purchasing arrangements).
Note: Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash).

Troubled municipalities have reduced expenditures repeatedly even before financial difficulties become acute. That is true in Detroit, but additional reductions should be evaluated where feasible without undermining the City's restructuring goals.
Given the recent sacrifices already imposed on employees and legacy creditors, the City should focus prompt attention on municipal debtholders and investors who have in some cases improved their positions.

Borrowing surplus amounts in funds administered by the municipality is complicated by State and/or Federal restrictions encumbering such funds.

Using proceeds of borrowings against revenue streams to pay City obligations is also affected by laws restricting use of the underlying assets and revenue streams.

Notwithstanding any challenges, the City will have to demonstrate to interested parties that all of these alternatives, and perhaps others, have been fully and fairly evaluated.

**Confidential**

DTMI00128761

# Equitable Shared Sacrifice Among Creditor Groups

- **Equitable Does Not Mean Equal**
  - ➢ **Parties Have Different Rights and Protections (Constitutional, Contractual, Legal)**

- **Tension Between Employees/Retirees and Bondholders/Investors**
  - ➢ **Employee/Retiree Sacrifices Must Be Sufficient, but Should Not Undermine Ability to Recruit and Retain**
  - ➢ **Employees and Retirees Already Have Made Sacrifices, While Municipal Debtholders Have Improved Position**
  - ➢ **Should Look at Entire Restructuring Process: Equality of Sacrifice Cannot Be Measured at a Single Point in Time**

- **Legal Uncertainty Regarding Sixth Circuit Treatment of Legacy Claims**

- **Consider Expanding Sacrifices Regionally**

*The City will have to develop a proposal for
dealing effectively with the issues of equitable sacrifice.*



32

Confidential

DTMI00128762