Allocation of Sacrifice Among Competing Creditor Groups

In general, under United States bankruptcy law, including chapter 9 of the Bankruptcy Code, amounts available for distribution to creditors must be allocated in an equitable manner. "Equitable" generally means equally unless there are meaningful distinctions among the rights of competing creditors.

Recent chapter 9 cases and out of court negotiations involving troubled municipalities have involved significant disputes about whether or not workforce related claims (including claims for pension and other retiree benefits) should have some form of priority over claims for borrowed money and other commercial claims.

Pension and employee benefit commitments often are included in executory contracts. This reality may also permit some kinds of distinctive treatment from other creditor claims. In that regard, cuts in employee benefits and wages should be reasonably calibrated so that Detroit civil service compensation is market appropriate: cuts should not be so severe that the City cannot attract and retain qualified civil servants.

While legacy creditors are already being asked to make sacrifices, and have done so over the past number of months, municipal debt investors have been improving their positions. Municipal bondholders, swap participants and monoline insurers must be asked to make sacrifices compared to legacy creditors over an extended look back period. Equality of sacrifice cannot fairly be measured at a single point in time.

Tensions between statutes that protect the rights of municipal employees and the ability of municipal debtors to impair collective bargaining agreements have led to differing outcomes in bankruptcy court.
Outside of bankruptcy, Michigan employees enjoy certain constitutional protections for benefits (primarily accrued pension benefits). These protections have analogues in Michigan statutes and Detroit regulations, separate and apart from protections that may be included in CBAs, but are nevertheless considered "contractual" promises. Section 365 of the Bankruptcy Code – which is applicable to Chapter 9 proceedings – would provide Detroit with the ability to evaluate all of its "executory contracts" (including CBAs). Moreover, certain stringent restrictions on the rejection of CBAs otherwise applicable in bankruptcy do not apply in chapter 9.
Sections 903 and 904 of the Bankruptcy Code protect the power of a State to control municipalities and prohibit bankruptcy courts from interfering with the governmental power of the debtor. These provisions can be read to limit the ability of bankruptcy courts to disregard state law within chapter 9.
Thus, bankruptcy courts presiding over chapter 9 proceedings have reached differing conclusions with respect to the extent to which state laws protecting employees impact a debtor's ability to address CBA or other contractual benefits issues.
　　　≫ For example, in Orange County, certain county employee coalitions successfully prevented the debtor from modifying CBAs in a manner inconsistent with California law in connection with certain seniority rights.
　　　≫ On the other hand, in Vallejo, the bankruptcy court held that the filing of a Chapter 9 petition effectively foreclosed the application of state law in the CBA context. The Stockton court generally seconded Vallejo's approach regarding the primacy of federal law in chapter 9 in upholding the debtor's ability to reduce contractual OPEB benefits.
It is unclear whether bankruptcy courts within the Sixth Circuit – perhaps the most pro-union Circuit in the nation – would adopt the Orange County or the Vallejo/Stockton approach to incorporation of state law into chapter 9 proceedings.

The City also could look to expand sacrifices regionally, particularly in connection with shared services and shared benefits. Pursuing regional sacrifice may generate untested legal issues.

The City will have to develop a proposal for dealing effectively with the issues of equitable sacrifice.

DTMI0012873

# PART IV – COMPONENTS AND CONSIDERATIONS FOR RESTRUCTURING PLAN

**Confidential**



DTMI00128764

# Key Plan Components

- **Pensions and Benefits**
- **Labor**
- **Municipal Debt**
- **Funds for Reinvestment**

**Confidential**

35



DTMI00128765

# Contrasting Approaches
# in Recent Chapter 9 Cases

- **Stockton, California**
  - ➤ Continued Pension Contributions to CalPERS as Protected by State Law
  - ➤ Ceased Retiree Health Plan Premiums
  - ➤ Proposed Impairment of Certain Bond Debt, Pensions Unimpaired
  - ➤ Restructuring Opposed by Municipal Bondholders

- **San Bernardino, California**
  - ➤ Ceased Pension Contributions to CalPERS, Seeking Impairment
  - ➤ Restructuring Opposed by CalPERS and Labor, and Supported by Municipal Bondholders

- **Central Falls, Rhode Island**
  - ➤ New State Law Created Lien in Favor of Municipal Debt Service Payments
  - ➤ Bondholders Paid 100%; Pensions/Benefits Sharply Cut
  - ➤ Policy to Favor Investors and Protect Credit Ratings



Confidential

DTMI00128766

[Speaker Notes For Slide: 36]

Pensions and Benefits in pending California cases

The City of Stockton (population 300,000) and the City of San Bernardino (population 215,000) filed chapter 9 cases within a month of each other in mid-2012.

Like many California municipalities, both cities have very large liabilities in respect of unfunded pension and employee benefit obligations. However, each has a taken a different course of action with respect to those liabilities.
Upon filing for bankruptcy, San Bernardino ceased contributions to the California Public Employee Retirement System (CalPERS) for amounts due in respect of unfunded pension obligations (both pre- and post-bankruptcy filing), and indicated that it intends to impair the claims of CalPERS like any other unsecured claim in the bankruptcy case.
Stockton, on the other hand, has continued making contributions to CalPERS and vowed to leave all CalPERS claims (the largest claims in the case) unimpaired under any plan of adjustment.

Stockton – supported by CalPERS – asserts that its obligations to CalPERS are mandated by state law and cannot be impaired in a chapter 9 case due to the limitations of sections 903 and 904 of the Bankruptcy Code.

Interestingly, Stockton has ceased paying retiree health care premiums related to promised health care benefits. Upon motion by the retirees to seek to force the city to resume such payments, the bankruptcy court issued a lengthy and important opinion touching on many questions of state sovereignty and supremacy of bankruptcy law, ultimately holding that section 904 of the Bankruptcy Code prohibited the court from granting the requested injunction against the city. In re City of Stockton, 478 B.R. 8 (Bankr. E.D. Cal. 2012). The effect of the court's opinion was to leave the retirees without a remedy, except for negotiating their treatment under the chapter 9 plan of adjustment.

The Stockton and San Bernardino cases are proceeding along parallel but opposite tracks.

In San Bernardino, due to the city's cessation of contributions to CalPERS, both CalPERS and labor groups have objected to the city's chapter 9 petition and argued, among other things, that the city will be incapable of confirming a plan of adjustment that impairs the CalPERS claims. Bondholders and bond insurers have responded in support of the city and in opposition to the CalPERS and labor objections.

In Stockton, due to the city's statement that it will not seek to impair CalPERS (and instead will seek only to impair bondholders and other unsecured creditors), it is the bondholders and bond insurers who have objected to the city's chapter 9 petition, arguing among other things that the city will be unable to confirm a chapter 9 plan of adjustment that does not impair the CalPERS claim. CalPERS has responded in support of the city and in opposition to the bondholders and bond insurers.

The cases likely will produce one or more decisions that touch upon the role and efficacy of state pension and labor law in a chapter 9 case and, when appeals ensue, ultimately may produce circuit-level authority regarding whether or not federal bankruptcy law governs in this context.

~ ~ ~

In Rhode Island, a municipality effectively accorded priority to borrowed money creditors.

Central Falls, Rhode Island filed for chapter 9 protection in August 2011, suffering from structural budget deficits and burdensome/unpayable pension and retiree benefit obligations.

DTMI00128767

# Legacy Creditors – Pensions and OPEB

- **Unfunded OPEB and Pension Liabilities Pose Challenges**

  - ➤ **Unfunded OPEB Liabilities Pose the Greater Challenge**

- **Pensions Have Substantial Underfunding, but Also Significant Plan Assets**

  - ➤ **OPEB is Much Larger and Unfunded**
  - ➤ **Health Premiums Exceed Debt Service on General Obligations**

- **Equitable Restructuring of Legacy Obligations Possible**

  - ➤ **Fewer Legal Protections for OPEB Than Pensions**
  - ➤ **Pensions Constitutionally Protected, but Reasonable Changes Possible**

- *Formulation of Unified Labor Negotiation Strategy Critical to Success*



DTMI00128768

**Confidential**

[Speaker Notes For Slide: 38]

Legacy Creditors (Pensions and OPEB)

Detroit has significant OPEB liabilities and unfunded pension liabilities (i.e., unfunded actuarial accrued liabilities reported as approximately $5.7 billion and $643 million, respectively).
Recent work by Milliman suggests that unfunded pension liabilities are substantially greater than $643 million and may exceed $2 billion.

Given the magnitude of these liabilities, sound and long-term restructuring of Detroit's obligations will require across the board sacrifice from legacy creditors.

As between pension and retiree health (OPEB), OPEB poses the greater liability challenge. Pensions have substantial underfunding, but also significant plan assets; by contrast, there is no funding of OPEB and it is a significant cash drain. The City's annual health premiums far exceed principal and interest payments on general obligations.

Tools are available for an equitable restructuring.
OPEB has less legal protections under state law than pensions, providing a greater ability to cut and equitably restructure.
Pensions have certain state constitutional protections, but reasonable pension changes may be made that avoid the legal strategy of having to argue that federal bankruptcy law under chapter 9 overrides state constitutional protections.

Formulating a unified labor negotiation strategy will be critical to success. The benefit structure should be holistically analyzed to determine what changes are appropriate and necessary and can be rationally justified by other retained benefits.

DTMI00128769

Confidential

39

# Potential Pension Reform Initiatives

- Jones Day Has Significant Public and Private Pension Experience

  - We Know, Respect and Are Prepared to Work with the City's Other Advisors on Benefit Issues
  - Plan Must Be Developed Collaboratively Between City and Its Advisors

- A Framework for Pension Reform Could Include the Following Elements:

  - Require All New Employees to Participate in DCPs, Rather than DBPs
  - Prospectively Eliminate COLAs for active members
  - Raise Retirement Ages, Reduce Early Retirement Subsidies
  - Consider Changes to Secondary/Ancillary Features of DBPs

- *We believe that existing basic pension formulas can be preserved for current active members while saving significant sums for Detroit*



Confidential

40

DTMI00128770

[Speaker Notes For Slide: 40]

Potential Pension Reform Initiatives.

We understand that the City has engaged other pension and benefit experts on these issues.
We know, regularly work with and respect the City's other advisors and would look forward to working with them to refine the recommendations to fit within a restructuring or chapter 9 strategy.
We have significant public pension experience, and well know the differences between federally-regulated private sector arrangements and public plans.

We have begun the process of evaluating the pension issues facing the City. Any plan would need to developed based on the collaborative work of the City and its advisors after further review. Based on what we know, and our experience in other matters, we believe a framework for pension could include the following elements:
Require all new employees to participate in defined contribution plans, rather than defined benefits plans.
Prospectively eliminate COLAs for all active members.
Raise retirement ages for certain employees, reduce early retirement subsidies.
Additional changes to secondary and ancillary features of defined benefit pension arrangements.

Proposed changes could allow most existing basic pension formulas to be preserved for current active members while saving significant sums for the City. But legislative action – e.g., amendment to the City Charter and Ordinances – may be necessary to achieve certain of these changes.
If needed, chapter 9 could be used as a means to further cut back or compromise "accrued financial benefits" otherwise protected under the Michigan Constitution.

DTMI0012877I

**Confidential**

# Potential OPEB Reform Initiatives

- **Evaluate Benefits of De-linking Retiree Health Plan from Active Employee Health Plan Design and Contribution Structure**

- **Design of a New Replacement OPEB Plan Could Include the Following:**
  - ➤ **Increase Retirement Age**
  - ➤ **Transition Younger Retirees to State-Based Exchanges and Federal Subsidies under Affordable Care Act**
  - ➤ **Increase Use of the Medicare Programs – Part A, Part B, and Part D**
  - ➤ **Impose Reasonable Retiree Premiums (For Existing Retirees, Link to COLAs)**
  - ➤ **Audit Records to Cut Off Funding to Unqualified Dependants**
  - ➤ **Consider Defined Contribution Model for Future Retirees**

- **Consider Funding of OPEB through Tax-Exempt Trust**

- **Evaluate Required Scope of Coverages under City Code**

- **Be Prepared for Argument that Adverse 6th Circuit Law Applies**
  - ➤ **6th Circuit Adverse Cases Involve Private Sector Plans, but Unions Likely Will Argue They Are Applicable Here**



**Confidential**

DTMI0012872

42

Potential OPEB Reform Initiatives.

We have begun the process of evaluating the OPEB issues facing the City. Any plan needs to address both the long-term OPEB liability, and the significant annual cost for coverage. This would need to be developed based on the collaborative work of the City and its advisors after further review. Based on what we know, and our experience in other matters, we believe a framework for OPEB obligations could include some or all of the following elements:

The City Should Evaluate "De-Linking" of Benefits Under Retiree Health Plans from Plan Design and Contribution Structure for Active Employees.
Linking OPEB benefits to plan for active employees generates large inefficiencies and costs. It will be more difficult to address the $5.7 billion underfunding of OPEB benefits without severing this link.

Design New Replacement OPEB Plan
Retiree healthcare currently is provided to many younger individuals who are not objectively recognized as retirees. Modifications could increase retirement age to cover only "true" retirees (as opposed to persons in their 40s), to decrease costs and transition younger retirees to state-based exchanges (based on residence) and available federal subsidies under Affordable Care Act.
Better use of the Medicare programs – Part A, Part B, and Part D (drug benefits) to provide the fundamental coverage to true retirees.
Impose reasonable retiree premiums; link retiree premiums to pension COLAs.
Audit records to cut off funding of benefits to ineligible dependents.
Consider defined contribution model for retirees.

Also Consider Funding of OPEB through a Tax Exempt Trust
Available in the non-ERISA, governmental plan setting based on existing IRS guidance (e.g., Private Letter Ruling 201136007; September 9, 2011).
Provides more flexibility than a VEBA, but still need cash or other assets to fund such a trust, so this may not be a viable approach.

Language in the Detroit City Code establishing the OPEB obligations may allow argument that the scope of currently offered coverages is not required.

Also, unlike accrued pension benefits, OPEB obligations are not constitutionally protected.

Must be aware, and wary, of Sixth Circuit law that is favorable to unions/retirees and adverse to actions the City may wish to take.
Much of the most concerning Sixth Circuit law is predicated on federal ERISA and the Labor Management Relations Act (relating to private sector plans), which are inapplicable to municipal plans.
But we should anticipate an argument that this reasoning should be applied as a matter of state law to municipal plans, and the City should be prepared for that.

Chapter 9 could be used, or threatened, as a means to accomplish a compromise of benefit costs (rejecting contracts or compromising claims).

Confidential

43

# Labor Issues

- **Renegotiation of CBAs Must Focus on Economic Stability**

- **Immediately Conduct Supporting Financial Analysis**

  - ➢ **Establish Necessary Savings**

  - ➢ **Demonstrate Fair Allocation Between Personnel and Non-Personnel Costs**

- **Demonstrate a Commitment to the Unions That They Are Partners**

  - ➢ **Demonstrate That Near-Term Sacrifices Provide Long-Term Benefits**

- **Formulate Easy-to-Understand Messages for Membership/Public**

- **Consider Need to Amend City Charter and Code, or other Legislative Action, for Pension/OPEB Changes**



DTMI00128774

**Confidential**

44

Labor

Renegotiating collective bargaining agreements to terms that provide economic sustainability will be key to the City's recovery.

Financial analysis must be conducted at the outset – and must be unimpeachable – to show the savings needed and how those necessary savings are being allocated between personnel vs. non-personnel related costs.

Will need to demonstrate a commitment to unions that they are partners in this process and the near term sacrifices will provide longer term benefits to their members (preservation of jobs – a return to financial health for Detroit).

In addition to conveying these economic needs at the bargaining table, we must be prepared to provide simple, easy to understand messaging to the membership and the public.

City charter and ordinances governing pensions may provide an additional hurdle that will need to be overcome via legislative amendment. Renegotiating collective bargaining agreements will not automatically supersede ordinances and charter. There appears to be somewhat more flexibility on the retiree medical expenses, but here too there may be a need for legislative action.

DTMI0012875

**Confidential**

# Municipal Debt – Overview of Approach

- **Viable Threat of Chapter 9 is Critical**

  - ➤ **Only Chapter 9 Allows Non-Consensual Impairment of Municipal Debt**

- **Fair Sacrifice Needed from Municipal Debtholders**

  - ➤ **Employees/Retirees Already Sacrificed (and May Again)**
  - ➤ **Investors Accepted City's Credit and Were Compensated for Risk**
  - ➤ **Investors Have Adjusted Credit Terms to Their Benefit as City's Finances Worsened**

- **City Should Make Clear That It is Not Prepared to Dedicate Scarce Resources to Prefer Debtholders over Residents, Businesses and Revenue-Driving Activities**

- **Refinanceable Bond Debt Presents a Unique Opportunity**

  - ➤ **Potential for Advantageous Fixed Rates Over an Extended Term**



**Confidential**

46

DTMI0012876

Municipal Debt   [Emphasize Jones Day's significant expertise/experience with respect to municipal finance, a core competency that may separate Jones Day from other firms.]

Chapter 9 is only real mechanism to impair significant debt without consent, so the viable threat of chapter 9 is critical especially to deal with municipal debtholders.  This creates real leverage.
Sacrifice by municipal debtholders is important, especially since employees and retirees have already made real personal sacrifices, and may be asked for more.
Providers and investors in funded debt accepted the City's credit and were compensated for the risk.
We are prepared to deal with these parties as creditors of the City in transparent and fair manner.
It should be made clear that the City is not prepared to dedicate scarce  resources to prefer debtholders over residents, businesses and revenue driving activities.
Any effort of General Obligation creditors to obtain the collateral protections of special revenue bonds should be approached with caution.

Different types of debt receive different treatment in municipal bankruptcy cases.
General obligation bonds are treated as general debt in chapter 9.   A municipality is not required to make payments of either principal or interest on account of such bonds during the case.
Certain restrictions on how debt may be readjusted in traditional bankruptcy proceedings do not apply in chapter 9.  Thus, Detroit would be able to impose favorable terms upon general obligation bonds (e.g., the imposition of non market interest; drastically extended repayment terms; delays in cash payments) pursuant to a Plan of Adjustment, the only caveat being that such terms are consistent with State law.
Chapter 9, however, provides certain protections to creditors holding liens upon special project revenues.  This may be of particular importance to Detroit, given the scope of its special project debt (e.g., bonds issued in connection with the construction/overhaul of water and sewer plants, collateralized with the revenues and fees earned by such projects).
Specifically, the "special revenues" from these projects remain subject to the liens of the bondholders in the specific projects and those revenues (1) must be used to fund the "necessary operating expenses" of the special project or to pay back bondholders and (2) may not be diverted to support the general obligations of the municipality.
Defining what constitutes the "necessary operating expenses" of a given special project has been the subject of litigation in other chapter 9 cases (most recently, Jefferson County); courts appear inclined to interpret the phrase narrowly.  The Jefferson County case is for review by the Eleventh Circuit.

With a credible threat of chapter 9, the City has leverage:
Cramdown in chapter 9 is possible if there is one accepting impaired class, meaning that a non-accepting class of debtholders could be bound by the Plan of Adjustment to compromise their debt.
Amortizations of debt suggest that municipal debt holders have been adjusting their credit terms to their benefit as the City's finances have worsened.  This supports a greater sacrifice at this point by debtholders.
This also appears to a readily re-financeable structure, and there is a unique opportunity to obtain advantageous fixed rates for an extended period if the negotiations are conducted properly.

Confidential

DTMI0012877

# Municipal Debt – Other Issues

- **Carefully Evaluate POC Debt and Related Swaps**
  - ➤ **Unique Structure Could Raise Restructuring Issues**

- **Swap Termination Issues**
  - ➤ **Termination Rights Generally Protected in Bankruptcy**
  - ➤ **Recent Grant of Collateral Still Can Be Evaluated for Fraudulent Transfer**
  - ➤ **Consider Other Market Transactions to Address Swaps**

- **Engage Monoline Insurers Promptly with Coordinated Message**

- **Coordinate Funding Solutions with State**
  - ➤ **State Likely Instrumental in Financing, Revenue-Generating and Cost-Cutting Transactions**
  - ➤ **Several Recent Examples**
  - ➤ **Consider Eligibility Ramifications**

- **Should Pursue Achieving Some Excess Debt Capacity, Flexibility**



DTMI00128778

Confidential

48

[Speaker Notes For Slide: 48]

Treatment of POC debt and related swaps should be carefully evaluated because the unique structure could raise issues in a restructuring.

Swap counterparties may assert termination rights and must be addressed promptly.
Can build on negotiations that have been ongoing.
Termination rights not impacted by bankruptcy do to safe harbors, but treatment of claims may remain an issue.
Notwithstanding safe harbors, recent granting of collateral on swap debt could be avoidable if there was fraud. LIBOR rate cases may be relevant.
City should consider addressing swaps through market transactions.

For substantial insured debt, the credit insurers will have to be engaged in a meaningful way at the outset.
Jones Day is experienced dealing with monoline insurers with the economic interest relating to insured debt.
Monolines are involved in both bond and POC debt.

Funding solutions should be coordinated with the State, which is expected to be an instrumental party in any new financing transaction or other revenue generating or cost cutting transactions (e.g., Belle Isle lease, regional transportation authority, funding to support Detroit Downtown Development Authority and possible new arena and commercial developments).
Again, receipt of State funding out-of-court may implicate eligibility concerns.

Debt negotiations should account for need for some excess debt capacity to cover potential shortfalls, provide flexibility and, if needed, fund any legacy debt solutions.

DTMI0012879

**Confidential**

# PART V –
# ADDITIONAL PROCESS POINTS

**Confidential**



DTMI00128780

# Pay Careful Attention to Political Implications of Restructuring

- **All Decisions and Actions Will Have Political Implications and Consequences**

- **Political Implications of Proposals Should Be Identified and Vetted as Early as Possible**

- **Ensure that All Statements Are Consistent with Overall Communications Plan**

*The Jones Day team has extensive experience in cases of national significance and understands this imperative.*



**Confidential**

51

DTMI00128781

Every decision and action taken by the City in responding to its financial crises will have political implications and, potentially, political consequences.

Political aspects of all proposed actions have to be identified and vetted as early as possible.

Every statement (including any court filings or arguments in court) must be consistent with an overall communications plan.

Statements made in collective bargaining must be carefully considered. Prospect of negotiation positions and statements being leaked to media outlets is significant.

Must be strong sensitivity to public relations campaigns by various constituencies.

The Jones Day team has extensive experience in cases of national significance and interest and understands these imperatives.

**Confidential**

52

DTMI00128782

# Understand and Anticipate Positions of Creditors

- **Employees/Retirees Will Argue:**
  - ➤ **Obligations Cannot Be Modified as a Matter of Law**
  - ➤ **Modifications Make City Less Attractive to Qualified Job Candidates**
  - ➤ **Continuing Contractual Relationship Should Be Preferred over Debt**

- **Debtholders/Monoline Insurers Will Argue:**
  - ➤ **Repayment of Debt Essential to Continuing Access to Credit Markets**
  - ➤ **State Has a Moral/Practical Obligation to Ensure Repayment**
  - ➤ **Defer – and Provide Security for – Obligations Instead of Impairment**

- **City Responses Must Be Reasoned and Consistent**

- **Concessions Will Not Be Made to Give Any Group an Unfair Advantage**

- **Critically, New Revenues Must Be Preserved for Reinvestment**
  - ➤ **New Funders Cannot Be Compelled to Accede to Creditor Demands**
  - ➤ **Earmark New Money for Legally/Politically Sound Revitalization Activities**



DTMI00128783

**Confidential**

[Speaker Notes For Slide: 53]

Anticipated Positions of Creditors:

Municipal employees and their representatives will contend:
Obligations to them cannot be modified as a matter of law.
Obligations to employees should not be modified because the City has to be able to attract job candidates and cannot fall behind pay and benefit packages provided by either nearby municipalities or other unionized businesses.
Obligations to employees do not have to be impaired to the same extent as borrowed money creditors because their claims are connected to contracts that have to continue in effect.

Debt holders and insurers will contend:
Repayment of borrowed money claims is essential to access to financing markets going forward.  This argument is used to justify extreme budget austerity and asset sales, whether or not beneficial on a long term basis.
The State of Michigan has a moral or practical obligation to ensure repayment of City debt.  This argument is used to attempt to convince the State to contribute State resources to the satisfaction of City debt and to induce the State to pressure the City to make choices favoring debt repayment over other priorities.
Deferral of obligations, even if ability to pay in the future is uncertain or questionable, is a preferred approach to deal with inability to satisfy obligations.  Usually this approach is coupled with demands for security that will improve the position of borrowed money creditors in any subsequent debt restructuring.

The City must be prepared to respond to these competing points of view in a reasoned and consistent manner.

Concessions should not be made to one group – such as debtholders – to give them an unfair advantage.

Most critically, as the City gains access to new revenues, it must develop an approach that preserves those revenues for reinvestment in the City and not just to pay off preexisting debts.
As seen in the Chrysler case, new funders or buyers cannot be compelled to accede to creditor demands.
New money may be earmarked for revitalization activities as long as the transaction is legally and politically sound.

DTMI0012784

**Confidential**

54

# Plan of Adjustment Issues

- Enabling Legislation May Be Necessary

  - ➤ <u>E.g.</u>, Authorization of Financing Techniques
  - ➤ Identify and Draft Necessary Legislation Early to Avoid Delays

- Best Interests Test

  - ➤ Demonstrate Reasonable Efforts to Satisfy Debts to the Extent Possible

- Cram Down: Impose Terms of Plan on Dissenting Creditor Classes

  - ➤ A Municipality Must Raise Taxes to the Extent Possible Without Triggering a "Death Spiral"
  - ➤ Expert Testimony on Tax Burdens May Be Needed

*It is crucial to focus on the plan approval standards throughout the debt adjustment process in case a Chapter 9 case is required.*



Confidential

DTMI00128785

Plan of Adjustment

The goal of a chapter 9 filing for Detroit would be to emerge with a successful "Plan of Adjustment," in which the City's debts are reduced and/or restructured in a manner that is feasible given its budget and consistent with its long term revitalization strategy

The Plan of Adjustment is a document that would establish the treatment of the various classes of creditors' claims against Detroit.

Enabling Legislation May Be Necessary

Often, transactions contemplated by or specified in a Plan of Adjustment must be also authorized by legislation.

Examples of such legislation include authorization of financing techniques.

Needed legislation should be identified and drafted as early in the process as possible to avoid delays as bills move their way through the legislature.

Key Confirmation Standards

Best Interests Test

Applicable to all creditors, whether or not the creditor is in a class that has accepted the plan.

As generally applied, requires a troubled municipality to make reasonable efforts under all the circumstances to satisfy its debts to the greatest extent possible. The strategy outlined above should help us support this finding.

Cram Down

Confirmation of a non-consensual plan is possible under chapter 9.

Senior classes must be paid before more junior classes can receive any distribution.

Applied to municipalities with unlimited taxing power, a municipality must use its ability to raise taxes the extent possible without triggering a "death spiral" that would ultimately destroy the municipality.

Traditionally, this question has been determined based upon expert testimony.

Tax burdens in other comparable municipalities should be important as well.

It is crucial to focus on these standards through the debt adjustment process and continuing to build the case that if necessary, the City can confirm a Plan of Adjustment that does not provide for payment in full of all indebtedness.

DTMI00128786

# Any Chapter 9 Process
# Should Be Comprehensive

- Plans of Adjustment Address Narrow Range of Economic Compromises

- Other Fundamental Changes Must Occur Outside the Plan Context

- Any Chapter 9 Process Should Pursue as Many Revitalization Initiatives as Possible

- Negotiating in Chapter 9 – or Its Shadow – Is a Powerful Tool for Revitalization

- The City Should Take Advantage of Its Opportunity for Long-Term, Comprehensive Solutions



DTM00128787

Confidential

[Speaker Notes For Slide: 57]

Any Chapter 9 Process Should Be Comprehensive

A chapter 9 Plan of Adjustment can only accomplish a narrow band of economic compromises.

This type of debt restructuring is critical, but other fundamental changes of great importance can only occur outside of the Plan of Adjustment.

If a chapter 9 case is commenced, the City should use the process to address as many additional items as possible, not just the core debt readjustment issues in a Plan of Adjustment.

Negotiating in the chapter 9 environment – or even in the shadow of chapter 9 – is a powerful tool to pursue the City's revitalization agenda.

DTMI00128788

**Confidential**

# Key Restructuring Lessons

- **Develop Comprehensive Plan, Supported by Defensible Budget and Assumptions**

- **Develop Out-of-Court Approach That Translates to Chapter 9**

- **Set Clear Positions Early**

- **Be Inclusive and Communicate**

- **Pursue Shared Sacrifice Without Compromising Long-Term Revitalization Goals**

DTMI00128789

**Confidential**



59

[Speaker Notes For Slide: 59]

Key Restructuring Lessons

Develop comprehensive plan, supported by defensible budget and assumptions.

Develop out-of-court approach that will work if needed in chapter 9.

Set positions early.

Be inclusive and communicate.

Pursue shared sacrifice without compromising long-term revitalization goals.

**Confidential**

60

DTMI00128790

# PART VI – OTHER ISSUES

**Confidential**



13-53846-tjt    Doc 3865-2    Filed 04/07/14    Entered 04/07/14 17:42:54    Page 29 of 39

DTMI00128791

# Select Asset Monetization Issues

- **Evaluate Impact of Any Asset Sale on Chapter 9 Eligibility**

- **Water and Sewer**
  - ➤ **Various Legal and Practical Challenges Facing Monetization of DWSD Assets**
  - ➤ **Regional Stakeholders Will Seek Input**
  - ➤ **Consider Collaboration with EPA and Regional Partners to Develop Creative Solutions**

- **Lease/Operating Agreements**
  - ➤ **Could Evaluate for Airport or Other Assets**
  - ➤ **Recent Collaborations with State Could Be a Model**

- **Airport Privatization Under FAA Pilot Program**



**Confidential**

DTMI00128792

Asset Sale/Privatization/Monetization Issues (Select Issues)
Concerns regarding eligibility for Chapter 9 may be implicated by asset monetization.
Any transaction should be reviewed and structured to address any eligibility issues (e.g., earmarking of funds).

Water and Sewer
Detroit Water and Sewer Department services much of southeast Michigan (Wayne, Oakland, Macomb counties).
Much of the DWSD's infrastructure is owned and operated by these surrounding counties (and the communities located therein), complicating efforts at restructuring.
DWSD services nearly 100 "first-tier" and "second-tier" customers (e.g., from the surrounding counties), all of whom would seek input with respect to restructuring.

Monetization of assets could be challenging.
The Detroit City Charter prohibits the sale of "any city-owned public utility furnishing water and sewerage services, unless approved by a majority of city voters voting on the question at a regular or special election."
Statutes/codes/caselaw may require that funds received from disposition be allocated (e.g., to pension/OPEB liabilities) in a fashion that frustrates ability to allocate funds towards restructuring initiatives.
Monetization of assets may trigger consequences under existing debt and derivative documents.
Open question whether limited universe of "purchasers" could assume liabilities.
An emergency manager, a chapter 9 proceeding or changes to law could be required to overcome obstacles.

Consider different rate structures, regional authority.

EPA litigation complicates the circumstances.

Possibly could explore with EPA and other recipients of services how to make this self-sustaining and profitable.

Negotiating in the shadow of bankruptcy could provide useful leverage for creative solutions.

Combination Lease/Operating Agreement
Could be used for airport or other assets.
The proposed Belle Isle lease may be a model for this kind of transaction.
With respect to the Coleman Young airport, for example, Detroit could evaluate entering into an arrangement combining a lease of airport property with an airfield operating agreement, with the end result being similar to the transfer of possession and operating responsibility to a private operator while falling short of a full lease of the airport.
Under this model, Detroit would remain responsible for major operating and development decisions, but the burden of operating the airport on a daily basis would be alleviated.
Might be more attractive to airport than FAA pilot program to sell asset that we can discuss (comes with various conditions).

Airport Privatization Under FAA Pilot Program [De-emphasize in light of potential unavailability of program]
Privatization of Detroit airports historically impeded by federal aviation law preventing cities from retaining the proceeds of an airport sale or transfer.
A recent FAA pilot program – adopted by Congress in 1996 – for the privatization of airports, however, may allow Detroit to privatize an airport freed from federal restrictions on the use of proceeds.
Program recently used to sell Midway Airport, with cash value going to the City of Chicago
Under the program, the FAA is authorized to exempt up to ten airports from the relevant federal statutory and regulatory requirements (i.e., to repay Federal grants; return

DTMI00128793

# Prepare for Legal Challenges

- In a Chapter 9 Setting, Legal Challenges of Various Actions Are Inevitable

  - ➢ Jones Day Is Well Positioned to Address These Challenges
  - ➢ Substantial 6th Circuit Experience
  - ➢ Knows How to Expedite Review

- Various Challenges to PA 436/Emergency Manager Authority Possible

  - ➢ Challenges at Ballot Box:  Renewed Referendum Process
  - ➢ Other Legal Challenges in Court
  - ➢ Challenges Could Cause Delay, Threaten Progress
  - ➢ Jones Day Can Work With the City's Current Advisors to Address Efficiently

JONES DAY®

Confidential

64

DTMI00128794

[Speaker Notes For Slide: 64]

Prepare for Legal Challenges

If a chapter 9 case is commenced, it is anticipated that parties will to raise numerous legal challenges to the City's efforts.
Jones Day is well prepared and positioned to address these challenges.
We have substantial 6th Circuit experience.
Also know how to expedite proceedings.

The City also should be prepared to address expected challenges to PA 436 and the Authority of any Emergency Manager.
These challenges could delay restructuring initiatives or threaten to overturn progress made under these authorities.

Challenges could include:
Challenges at Ballot Box. Critics of PA 436 have already indicated that legal challenges to the law will be forthcoming. Stand Up for Democracy (which led the effort to reject PA 4) has suggested that it will begin a similar referendum process with respect to PA 436 (although appropriation component of PA 436 may insulate it).
Legal Challenges. Critics of PA 436 are likely to challenge the statute on grounds that the powers over contracts granted to emergency managers (including the power to reject, modify or terminate CBAs) violate the Contracts Clause of the U.S. Constitution.
Further challenges could include (1) whether PA 436 can be insulated from the referendum process through inclusion of a minor appropriation, (2) whether the law properly grants unelected emergency managers the power to displace elected officials/disenfranchise the electorate and (3) whether PA 436 was properly enacted in light of the voter rejection of PA 4 (which has been characterized by some as "substantially similar").

Confidential

65

DTMI00128795

# EPA Litigation Issues

- **Restructuring Strategy Must Account for EPA Litigation and Rulings of Judge Cox**

- **Consider Approaches to Consolidate Issues with the Rest of the Restructuring Process**

- **Consider How EPA Litigation Could Impede or Assist Detroit in Chapter 9**

**Confidential**



DTMI00128796

[Speaker Notes For Slide: 66]

Other EPA Litigation Issues

Need to coordinate strategy with relevant aspects of EPA litigation, including rulings regarding CBAs and bargaining

Consider approaches to consolidate these discrete issue with the rest of the restructuring process.

Consider how EPA case could impede or be used to assist in any chapter 9 case.

**Confidential**

DTMI00128797

# P<small>ART</small> **VII** – C<small>ONCLUSION</small>

DTMI00128798

**Confidential**



# Jones Day Is the Right Choice for Detroit

- **We are committed to this project, which we view as a matter of particular importance given our Midwestern, industrial roots**

- **We are committed to working with the City and its advisors and stakeholders to find and pursue real solutions that will revitalize the City of Detroit**

- **We have a wealth of experience, expertise, creativity and energy throughout our firm**

- **We are here to help, as part of the team, in whatever way we can**



DTMI00128799

**Confidential**

69

[Speaker Notes For Slide: 69]

Jones Day Is the Right Choice for Detroit:

We are committed to this project, which we view as a matter of particular importance given our Midwestern, industrial roots.

We are committed to working with the City and its advisors and stakeholders to find and pursue real solutions that will revitalize the City of Detroit.

We have a wealth of experience, expertise, creativity and energy throughout our firm.

We are here to help, as part of the team, in whatever way we can.

**Confidential**

DTMI00128800

# ANNEX A:
# THE REST OF THE JONES DAY TEAM

**Confidential**



DTMI00128801