# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 9 |
| | : | |
| CITY OF DETROIT, MICHIGAN, | : | Case No. 13-53846 |
| | : | |
| Debtor. | : | Hon. Steven W. Rhodes |
| | : | |

## NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION'S
## OBJECTION TO DISCLOSURE STATEMENT

2748755.1

## Table of Contents

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT .................................................................................................3

I.     The City's Disclosure Statement Fails To Provide The Adequate Information Necessary To Allow Creditors To Make An Informed Judgment Regarding The Plan ...............................................................3

     A.     General Standard ........................................................................3

     B.     The Disclosure Statement Fails To Provide Material Information Relevant To The Treatment Of Creditors Holding Claims Related To The DWSD Bonds ......................................6

          1.     There Is No Concrete Information Regarding The Proposed DWSD Transaction Or Alternative Privatization ......................................................................6

          2.     There Is No Definitive Treatment Of Creditors Holding DWSD Bonds ..............................................................11

          3.     The Disclosure Statement Must Include Definitive Documentation Related To The Issuance Of New Bonds15

          4.     The Disclosure Statement Should Contain Additional DWSD Financial Information .......................................17

          5.     There Is No Discussion Of, Or Justification For, The Allocation of Pension Costs to DWSD ..........................18

     C.     The Disclosure Statement Fails To Explicitly Address The Treatment Of National's Claims...............................................19

     D.     The Disclosure Statement Fails To Provide Other Material Information Relevant To Evaluating Whether To Support The City's Plan................................................................................23

i

1.      The Disclosure Statement Contains Insufficient Information Relating To The Calculation And Treatment Of Pension and OPEB Claims ........................................23

2.      The Disclosure Statement Must Include Additional Information Related To The DIA Collection .................25

3.      The City Must Remedy The Following Issues With Respect To Its Reinvestment Initiatives And Financial Projections ...................................................................27

        a.      Exit Facility .........................................................27

        b.      Issues Related To Reinvestment Initiatives Requiring Additional Clarity.................................28

        c.      Exhibits I and J To The Disclosure Statement Must Be Updated .........................................................30

        d.      Other Miscellaneous Disclosures Related To City Operations .........................................................32

4.      The Disclosure Statement Fails To Describe Certain Material Risk Factors.......................................................33

E.      Additional Missing Documentation And Terms.......................34

CONCLUSION .........................................................................................34

2748755.1

**<u>Table of Authorities</u>**

**Page(s)**

<small>**CASES**</small>

*In re Cardinal Congregate I,*
   121 B.R. 760 (Bankr. S.D. Ohio 1990) ...........................................................5, 34

*In re City of Stockton, CA,*
   Case No. 12-32118 (Bankr. E.D. Cal. Nov. 21, 2013)........................................31

*In re Commonwealth Group-Mocksville Partners, LP,*
   2013 WL 1728056 (Bankr. E.D. Tenn. Apr. 22, 2013)..................................3, 21

*In re Ferretti,*
   128 B.R. 16 (Bankr. D.N.H. 1991).....................................................................21

*In re Genesee Cement, Inc.,*
   31 B.R. 442 (Bankr. E.D. Mich. 1983)..................................................................5

*In re Jefferson County, Alabama,*
   Case No. 11-05736 (Bankr. N.D. Ala. August 8, 2013)....................................31

*In re Malek,*
   35 B.R. 443 (Bankr. E.D. Mich. 1983)............................................................3, 4

*In re Microwave Prods. of Am., Inc.,*
   100 B.R. 376 (Bankr. W.D. Tenn. 1989)..............................................................4

*In re Scioto Valley Mortg. Co.,*
   88 B.R. 168 (Bankr. S.D. Ohio 1988) ............................................................3, 4

*Matter of CDECO Maritime Construction Inc.,*
   101 B.R. 499 (Bankr. N.D. Ohio 1989).................................................................4

<small>**STATUTES**</small>

11 U.S.C. § 1125 .....................................................................................passim

National Public Finance Guarantee Corporation ("National"), by and through its respective undersigned attorneys, respectfully submits this objection to the Motion of the City of Detroit for Approval of the Proposed Disclosure Statement [Doc. No. 2713] (the "Objection"), and in support hereof, states as follows:

## PRELIMINARY STATEMENT

1.      The 600-page length of the Disclosure Statement belies the dearth of essential information that creditors need to evaluate whether or not to support the City's Plan.[1]   Among other things, the City's Disclosure Statement lacks information related to the treatment of creditors holding DWSD Sewer Bonds, DWSD Water Bonds, DWSD Revolving Bonds, and the specific treatment of claims held by National.  In addition, the Disclosure Statement fails to provide key financial information that is essential to evaluating the proposed payments under the Plan, whether such payments are in the best interests of creditors, the efficacy of the City's proposed reinvestment initiatives, and whether the Plan, as it currently exists, represents the best path forward for the City and its creditors.

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Amended Disclosure Statement with Respect to Plan for Adjustment of Debts of the City of Detroit [Doc. No. 3382] (the "Disclosure Statement"), or the Amended Plan for the Adjustment of Debts of the City of Detroit (March 31, 2014) [Doc. No. 3380] (the "Plan"), as applicable.

2. On March 14, 2014, in accordance with the Bankruptcy Court's Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Doc. No. 2937], National advised the City by letter of various requests for additional information to be included in the Disclosure Statement. On March 31, 2014, the City filed an amended version of the Disclosure Statement. Despite the amendment, the Disclosure Statement continues to lack descriptions of material terms and necessary discussions of issues of critical importance to creditors to evaluate the Plan.

3. It is vital that the City refrain from glossing over critical details that are necessary to understanding not just where Detroit has been, but where it hopes to be in the future. The circumstances leading to this bankruptcy case were undoubtedly complicated, and the City's proposed Plan is similarly complex. For these reasons, it is essential that the Disclosure Statement provide additional information such that creditors can gain greater clarity on the advisability of the City's proposed path forward. Unless the City includes this additional information (described in greater detail below), the Disclosure Statement will not contain "adequate information" within the meaning of section 1125 of the Bankruptcy Code and should not be approved for distribution to creditors for purposes of soliciting votes on the Plan.

## ARGUMENT

**I.    The City's Disclosure Statement Fails To Provide The Adequate Information Necessary To Allow Creditors To Make An Informed Judgment Regarding The Plan**

### A.    General Standard

4.    Section 1125 of the Bankruptcy Code requires a disclosure statement to provide "adequate information", defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

5.    To determine whether a disclosure statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code, courts generally consider a number of typical categories of information.[2] These categories are not exhaustive, and a disclosure statement containing all such information may still lack adequate information. *See In re Scioto Valley Mortg.*

---

[2] These categories include (i) a description of the business; (ii) a history of the debtor prior to filing; (iii) historical financial information; (iv) a description of the material terms of the plan; (v) a description of how the plan is to be implemented; (vi) a liquidation analysis; (vii) the retention and compensation of management; (viii) financial projections; (ix) pending and contemplated litigation; (x) transactions with insiders; and (xi) the probable tax consequences of the plan. *In re Malek*, 35 B.R. 443, 443-45 (Bankr. E.D. Mich. 1983); *see also, In re Commonwealth Group-Mocksville Partners, LP*, 2013 WL 1728056 at *2 (Bankr. E.D. Tenn. Apr. 22, 2013) (listing similar factors).

*Co.*, 88 B.R. 168, 171 (Bankr. S.D. Ohio 1988) ("[A] case may arise where all of the foregoing information is still not sufficient to provide adequate information upon which the holders of claims or interests may evaluate a plan."). What a disclosure statement "must contain [is] information that is material, important, and necessary for creditors and shareholders to properly evaluate a plan and make a reasonable informed decision on the plan." *In re Microwave Prods. of Am., Inc.*, 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989); *see also In re Malek*, 35 B.R. at 444-45 ("The Code requires that adequate information . . . be of such a nature that parties be able to reach an informed judgment about the plan. Without information sufficient to allow parties voting on the plan the opportunity to arrive at an independent and informed judgment, the disclosure statement cannot be approved.").

6.     At bottom, a disclosure statement must be tailored to the breadth of the creditor body. *Matter of CDECO Maritime Construction Inc.*, 101 B.R. 499, 500 (Bankr. N.D. Ohio 1989) ("In weighing the extent of necessary disclosure, it is appropriate . . . to take into account the creditor body and others for whose enlightenment the disclosure statement is designed."). In situations like Detroit, which has an incredibly diverse population of creditors, each with widely-divergent interests, courts pay particular attention to objections aimed at improving the adequacy of the disclosure statement. *See In re Scioto Valley Mortgage Co.*, 88

4

2748755.1
13-53846-tjt    Doc 3866    Filed 04/07/14    Entered 04/07/14 18:07:38    Page 8 of 41

B.R. at 172 ("In reality, the Debtor and affected creditors are better-situated than is the Court to assess the extent of disclosure needed to satisfy the standard imposed by § 1125 because they possess a breadth of information which is unavailable to the Court."). Disclosures related to the proposed treatment of a creditor's claim are of critical importance. *See In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) (denying approval of disclosure statement for, among other reasons failing to "contain . . . detailed information of [certain] claims", requiring "a more complete discussion of the [plan's] proposed treatment of these claims", and finding that the debtor's future projections were wholly-insufficient to address how claims would be paid); *In re Genesee Cement, Inc.*, 31 B.R. 442, 444 (Bankr. E.D. Mich. 1983) (denying approval of disclosure statement for failing to adequately describe the effect of cramdown on unsecured creditors).

7.      The Disclosure Statement continues to suffer from numerous deficiencies precluding a finding that the Disclosure Statement contains adequate information.  The Disclosure Statement cannot be approved because it fails to provide, among other things, material information related to (i) the treatment of creditors holding claims related to the DWSD Water Bonds, DWSD Sewer Bonds, and DWSD Revolving Bonds (collectively, the "DWSD Bonds"); and (ii) the treatment of National's claims against the City.  These shortcomings prevent the Disclosure Statement from answering the two specific questions that are most

important to creditors in determining how to vote: "how much am I going to get paid and when[?]"[3] In addition, the Disclosure Statement fails to provide other material information necessary for evaluating the Plan, including items related to the calculation and treatment of Pension Claims and OPEB Claims, the DIA Collection, the City's financial projections, and a fulsome discussion of particular risk factors associated with the Plan. Without this information, creditors, including National, are simply unable to make an informed decision as to whether or not to vote in favor of the City's proposed Plan.

**B.** **The Disclosure Statement Fails To Provide Material Information Relevant To The Treatment Of Creditors Holding Claims Related To The DWSD Bonds**

      **1.** **There Is No Concrete Information Regarding The Proposed DWSD Transaction Or Alternative Privatization**

8.     The DWSD Transaction is a keystone of the City's Plan. Yet, the Disclosure Statement reveals next to no details regarding the rationale for the proposed structure of the transaction, the criteria the City is using to evaluate whether to enter into the transaction, who will oversee the process, any timing issues related to the transaction, or the current status of negotiations (other than to say that no deal has been reached) all of which are essential for creditors to evaluate the viability of the DWSD Transaction and the likelihood that the

---

[3] Hr. Tr. (Feb. 25, 2014) 32:16-22.

transaction will even be consummated. Indeed, the City has not provided creditors with a description or copies of any definitive documentation necessary to implement the DWSD Transaction. In describing the means for implementing the Plan, the City merely states that it may "enter into a DWSD Transaction that would include the formation of the GLWA to conduct the operations currently conducted by the DWSD." (Disclosure Statement 45; *see also* Disclosure Statement 121.) The extent of the City's discussion regarding the criteria for entering into the DWSD Transaction, the risks associated with doing so, and the mechanics involved for implementation, is limited to the City stating that it "will enter into a DWSD Transaction only if it enables the City to make larger, more rapid or more certain distributions to at least some of its creditors as compared to the Distributions specified in the Plan and described in this Disclosure Statement." (Disclosure Statement 121.)

9. The City must amend the Disclosure Statement to include additional detail regarding the DWSD Transaction. For example, the Disclosure Statement should contain a description of the proposed regional authority, including issues related to management, oversight, and ongoing compliance with state law (either in connection with the DWSD Transaction or the proposed privatization). The City should provide information aimed at assisting creditors in understanding why the DWSD Transaction is in the best interests of creditors. The Disclosure Statement

7

should detail the risks inherent in proceeding with the DWSD Transaction.  The City should also disclose the specific mechanics for the proposed DWSD Transaction, the specific amount[4] and justification for any lease payment or other payment to the City, and the rationale for making such payment an obligation that is senior to the claims of the current holders of DWSD Bonds.  Included in this discussion should be a detailed disclosure of the current status of any negotiations with the Counties regarding the DWSD Transaction, copies of any definitive agreements (including memoranda of understanding) exchanged between the City and the Counties, and a description of the principal issues remaining to be resolved before the DWSD Transaction can be closed.  The City should also explain to creditors how it intends to implement DWSD Transaction in accordance with applicable Michigan law, both if the DWSD Transaction is consummated prior to or after the Effective Date.

10.    In addition, the Disclosure Statement states that the City is alternatively seeking to privatize the DWSD.  With respect to the newly-disclosed alternative of developing a "public-private partnership for the operation and management of the water system and sewage disposal system currently operated

---

[4] The Disclosure Statement provides that "[t]he GLWA would make annual payments to the City for the term of the lease in an amount equal to DWSD's total allocable share of the City's liabilities under the COPs and OPEB liabilities" but fails to disclose what that figure would be, much less any discussion as to the calculation of the allocation of liabilities to DWSD.  (Disclosure Statement 122.)

8

DWSD," the Disclosure Statement must be amended to contain additional detail necessary to evaluate whether this alternative is in the best interests of creditors. (Disclosure Statement 123.) As an initial matter, although there are a number of issues related to treatment of claims that are directly tied to the DWSD Transaction, the Disclosure Statement is unclear as to how the implementation of this public-private partnership may affect such treatment. The Disclosure Statement refers to this potential transaction as a "discrete DWSD Transaction that would not involve the creation of a regional authority." (Disclosure Statement 122.) Yet, the term "DWSD Transaction" is specifically defined to include the creation of the GLWA. Thus, it is unclear whether the creation of the public-private partnership would in fact constitute a DWSD Transaction for purposes of triggering the related treatment of claims. As discussed further below, under the proposed Plan, a DWSD Transaction will change the instruments that creditors will receive, and affect key terms including the identity of the issuer, the applicable interest rates, the loss of call protection, and the stripping of consent rights. The City must be clear whether the public-private partnership is intended to constitute a DWSD Transaction.

11. Although the City has listed several broad characteristics that parties must demonstrate in connection with any proposal in response to the DWSD RFI, the City does not disclose any information as to how the City will evaluate the

proposals. Moreover, and as with the DWSD Transaction, the Disclosure Statement contains no information regarding the timing of this proposed alternative, nor the likelihood of the City entering into such a transaction. The City should identify the parties that submitted proposals in response to the DWSD RFI, along with the details of such proposals, and the City's methodology for evaluating the various proposals. This discussion should address why the public-private partnership is more or less beneficial to creditors than the DWSD Transaction, as well as why any transaction may be preferable to maintaining the status quo and leaving management of the water and sewer system with the DWSD.

12. Finally, especially in light of the fact that the City contemplates obtaining preauthorization from the Bankruptcy Court to enter into a potential DWSD Transaction or public-private partnership at some unspecified time in the future (assuming neither is consummated by the Effective Date), it is imperative that the Disclosure Statement address who will oversee and manage this process.[5] In particular, the City should disclose, among other things, who will be responsible

---

[5] Relatedly, the Disclosure Statement fails to provide any information regarding *the City's* governance after emerging from bankruptcy. The Plan contains a multitude of proposed reinvestment strategies and activities. The successful implementation of any of these strategies will depend greatly on the City's post-Effective Date management. As a result, the Disclosure Statement should address the roles and responsibilities that the Mayor, Emergency Manager, and any other relevant governmental representative or authority may have in implementing the Plan, in addition to issues related to the City's transition out of bankruptcy.

for evaluating whether to enter into either the DWSD Transaction or public-private partnership, who will be responsible for negotiating the as-yet unspecified terms of either transaction, and whether the City intends to seek input from creditors as to the desirability of entering into either transaction.

## 2. There Is No Definitive Treatment Of Creditors Holding DWSD Bonds

13. The Disclosure Statement is vague, incomplete, and does not sufficiently inform holders of claims related to the DWSD Bonds (i.e., Classes 1A-1F) about the treatment of their claims, and the justification for such treatment. As an initial matter, the City does not explain or justify why holders of claims related to the DWSD Bonds are being impaired at all under the Plan. The only thing mentioned in the Disclosure Statement as to the impairment of creditors holding special-revenue debt is "that the impairment of Claims under the Plan will permit DWSD to conduct substantial and necessary revenue enhanced capital improvements using revenues that would otherwise had been unavailable to DWSD and applied instead to service the City's debt." (Disclosure Statement 121.) The Disclosure Statement should be amended to include additional detail regarding the City's economic rationale for impairing claims related to the DWSD Bonds.

2748755.1

14.     Moreover, a creditor reading the Disclosure Statement's discussion of the proposed treatment of claims in Classes 1A-1D would likely be unable to understand what that creditor will actually receive under the Plan.  For example, with respect to holders of claims in Classes 1A-1D, the Plan proposes multiple potential recoveries, all of which depend chiefly on whether the DWSD Transaction is consummated by the Effective Date,[6] in addition to (i) whether the creditor elects a particular treatment; (ii) whether the class accepts the Plan, and (iii) whether the City may cramdown a particular treatment on a dissenting class of creditors.  (*See* Disclosure Statement 78-80.)  The following grid illustrates this variety of potential treatments available to Classes 1A-1D:

---

[6] Holders of claims in Classes 1E-1F will also receive different treatment (i.e., reinstatement or New GLWA Revolving Bonds) depending on whether the DWSD Transaction is consummated by the Effective Date.

12

| DWSD Transaction | Creditor Elects Treatment | Class Accepts | Potential Cramdown | Potential Recoveries | | |
|---|---|---|---|---|---|---|
| | | | | New Bonds | Cash / Reinstatement | Existing Rate Bonds |
| **Consummated On The Effective Date** | Yes | Yes | N/A | N/A | Cash | New Existing Rate GLWA Bonds |
| | Yes | No | Yes | New GLWA Bonds | Cash | N/A |
| | No | Yes | N/A | New GLWA Bonds | Cash | N/A |
| | No | No | Yes | New GLWA Bonds | Cash | N/A |
| **Not Consummated On The Effective Date** | Yes | Yes | N/A | N/A | Reinstatement | New Existing Rate DWSD Bonds |
| | Yes | No | Yes | New DWSD Bonds | Reinstatement | N/A |
| | No | Yes | N/A | New DWSD Bonds | Reinstatement | N/A |
| | No | No | Yes | New DWSD Bonds | Reinstatement | N/A |

2748755.1

15.     As evident from the table above, there is no reasonable way for a creditor to ascertain what treatment it will actually be afforded under the Plan. Most of the possible treatments are selected at the City's discretion. Although creditors have the option to elect a specific treatment (New Existing Rate Water/Sewer Bonds), whether they receive their elected treatment depends on (i) whether the class as a whole accepts the Plan, and (ii) whether the City decides to provide cash or reinstate the claim instead. Even then, the election is somewhat artificial because a creditor will make that election not knowing whether a DWSD Transaction will be consummated on the Effective Date. And now, for the first time, the revised Plan includes a provision whereby a creditor that makes this election is barred from objecting to the Plan in any way. (*See, e.g.*, Plan § II.B.3.a.ii.) The absence of any method to definitively determine what treatment a holder of claims related to the DWSD Bonds precludes a determination that the Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code.

16.     Compounding this lack of clarity with respect to the treatment of claims related to the DWSD Bonds is the fact that the City has reserved the right to unilaterally change the treatment of such claims in the future if something akin to the DWSD Transaction is ultimately consummated after the Effective Date. Should the City "permit the lease or transfer of assets currently used in DWSD's

14

operations to one or more authorities formed to provide water and/or sewer services," the terms of the New DWSD Bonds and New Existing Rate DWSD Bonds, as applicable, will be amended to "(i) include the amount of any lease payment payable to the City's General Fund; and (ii) exclude such amount from the liens securing" the bonds. (Disclosure Statement 45.) As a result, creditors receiving either New DWSD Bonds or New Existing Rate DWSD Bonds are at risk of having their collateral reduced by unspecified amounts at unspecified times in the future.[7] This failure to accurately and definitively set forth the treatment that creditors in Classes 1A-1D will receive must be remedied before the Disclosure Statement can be approved.

### 3. The Disclosure Statement Must Include Definitive Documentation Related To The Issuance Of New Bonds

17. Simply put, the City has failed to provide any documentation related to the definitive terms of the New DWSD Bonds, New Existing Rate DWSD Bonds, New GLWA Bonds, New Existing Rate GLWA Bonds and New GLWA

---

[7] As discussed above, the definitive terms of the transaction along with detailed guidance as to the parties overseeing the implementation of any future DWSD Transaction is critical to evaluate whether the City's requested preauthorization is appropriate.

15

Revolving Bonds.[8]  This information is necessary to allow creditors to evaluate the City's proposed treatment of their claims related to the DWSD Bonds.

18.    In addition to the missing documentation, the City must provide additional discussion related to the justification for the proposed terms.   For example, to determine the applicable interest rates for the New DWSD Bonds and the New GLWA Bonds, creditors must refer to the Interest Rate Reset Chart, attached as Exhibit I.A.159 to the Plan.  The Disclosure Statement contains no discussion of how the City arrived at the calculations presented in the Interest Rate Reset Chart.  At a minimum, the City should provide an explanation of the market justification for the disclosed rates on a class-by-class basis.  In doing so, the City should provide examples of market rates for similar structures and systems.  The City should also explain the rationale for issuing new instruments that strip existing call protections as well as change-in-control or consent rights.  Relatedly, the Disclosure Statement should provide additional information regarding the tax exempt status of interest payments made on new bonds issued to holders of DWSD Bonds.

---

[8] The City describes certain general terms of the New DWSD Bonds, New Existing Rate DWSD Bonds, New GLWA Bonds, and New Existing Rate GLWA Bonds including the principal and interest rate.  With respect to "Other Terms", the City simply states that these newly-issued bonds "otherwise shall have the same terms and conditions as the applicable" DWSD Bonds.  The City should confirm that the covenants associated with the applicable DWSD Bonds, including rate covenants, will apply to any new bonds.

19.     Apart from the issuance of the New DWSD Bonds and New GLWA

Bonds described in the Disclosure Statement, Emergency Manager Order No. 22,

entered January 30, 2014, provides that the City intends to issue New Sewage

Disposal System Revenue Bonds (the "New Sewer Bonds") in a principal amount

not to exceed $350,000,000 on a first priority basis, *pari passu* with the existing

first lien bonds.[9]  The Disclosure Statement is silent regarding the issuance of these

New Sewer Bonds and should be amended to include additional information

including the terms of the New Sewer Bonds, as well as the impact on the City's

financial projections attached to the Disclosure Statement based on the issuance (or

non-issuance) of these New Sewer Bonds.

### 4.     The Disclosure Statement Should Contain Additional DWSD Financial Information

20.     To assist creditors in evaluating both the performance of the DWSD

and the related decision of whether the DWSD Transaction is in their best interests,

the Disclosure Statement should include a full and complete disclosure of the

DWSD's projected operations for the next 40 years.  Such 40-year projections are

typical for this type of public financing.  In particular, the City should include

(i) projected statements of income and cash flow for the 10 years ended 2023 (and

related notes); (ii) balance sheets for the last two fiscal years (actual), and pro

---

[9]     Available   at   <http://www.detroitmi.gov/Portals/0/docs/EM/Order%2022.pdf>
(last accessed April 1, 2014).

forma balance sheets giving effect to the GLWA or other proposed authority if the DWSD Transaction is not consummated prior to the Effective Date (and related notes); (iii) auditors' reports on these historical financial statements; and (iv) a summary of projected capital needs both if the DWSD Transaction closes and if it does not.

21.     Exhibits K and L to the Disclosure Statement should be updated to (i) include information related to the rate-payer/customer base; (ii) provide a list of the top ten customers as a percentage of total revenues; and (iii) specifically identify the interest rates related to existing debt that the City is basing its financial information on. This financial information is necessary to allow creditors to evaluate the viability of the DWSD Transaction.

### 5.     There Is No Discussion Of, Or Justification For, The Allocation of Pension Costs to DWSD

22.     As described in the Disclosure Statement, part of the treatment the City proposes for Class 11 GRS Claims includes "pension-related payments received by the City from the DWSD equal to approximately $675,000,000." (Disclosure Statement 24.)   Nothing in the Disclosure Statement discusses or justifies the allocation of $675 million of pension obligations to the DWSD, except to say that it represents the DWSD's "portion of the GRS pension plan underfunding."   (Disclosure Statement 11.)   The Disclosure Statement should contain a detailed allocation analysis for these obligations, along with a proposed

timeline for payment by the DWSD, and an explanation of the acceleration or prefunding of this obligation which is only mentioned, but not discussed. (*See* Disclosure Statement 11 ("Importantly, the Plan assumes that DWSD will accelerate, or prefund, the majority of its full allocable share of the GRS UAAL . . . . The City believes that such prefunding is consonant with applicable state law and local law that permits DWSD to be charged, and pay directly to the GRS, its allocable share of the periodic contributions to be made to the GRS as a cost and expense of operating the City's water and sewer systems.")).

### C.     The Disclosure Statement Fails To Explicitly Address The Treatment Of National's Claims

23.     As stated throughout this case, National is a municipal bond insurer and a creditor and party in interest in this chapter 9 proceeding. National has insured a number of bonds issued by the City and City authorities totaling approximately $2.4 billion. These insured bonds include certain of the DWSD Bonds and Unlimited Tax General Obligation Bonds.[10] Prior to the Bar Date, and prior to the filing of the Disclosure Statement, National (and its ultimate parent company, MBIA Insurance Corporation) filed thirteen (13) proofs of claim

---

[10] National's insured bonds also include Parking Bonds. Although the Plan currently provides for reinstatement of the Parking Bonds, National is informed that the City is exploring the potential marketing and sale of the City's parking system and related assets. If that is the case, the City should discuss such efforts along with the potential impact on creditors holding Class 6 Parking Bond Claims.

2748755.1

(collectively, the "National Claims").[11]  Twelve of the National Claims assert claims against the City for, among other things, (i) principal and interest due under the applicable bond documents; (ii) amounts due to National for payment owed under its respective insurance policies; (iii) contractual reimbursement for charges, fees, costs, losses, liabilities, and expenses incurred by National in connection with its respective policies and applicable bond documents; and (iv) amounts potentially due to MBIA Insurance Corporation to the extent it is required to make payments on policies that have been transferred to National.[12]  The Disclosure Statement fails to describe the specific treatment for each of these categories of claims asserted by National.

24.      Despite the enormous economic stake in the City held by National, the Disclosure Statement is remarkably silent as to the treatment of the National Claims under the Plan.  Although the amendments to the Plan and Disclosure Statement now refer to a "Bond Insurance Policy Claim" as being a "Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy" (Plan § I.A.32), there is nothing in the Plan or the Disclosure Statement that clearly describes how such claims will be classified or treated.  In particular, National is

---

[11] The National Claims consist of Claim Nos. 1029, 1031, 1040, 1046, 1070, 1077, 1084, 1091, 1034, 1042, 1067, 1095, 1099.

[12] The remaining National Claim was filed on behalf of the holders of Unlimited Tax General Obligation Bonds.

unable to determine from the information included in the Disclosure Statement the specific treatment of any portion of the National Claims. This information is critical to National and goes to the heart of what type of disclosure is required to satisfy the adequate information requirement. *See Commonwealth Group-Mocksville Partners*, 2013 WL 1728056 at *2 (Bankr. E.D. Tenn. Apr. 22, 2013) (stating that a disclosure statement must clearly inform the average creditor "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution"); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (same).

25. Although the Plan establishes several classes of claims related to the DWSD Bonds and Unlimited Tax General Obligation Bonds, it is unclear whether any of these classes are meant to encompass the *entire* portion of the National Claims. For example, the Plan defines "DWSD Class A Sewer Claims" as "any Claim against the City arising under or evidenced by the DWSD Class A Sewer Documents, including a Claim for principal and interest on the DWSD Class A Sewer Bonds." (Plan § I.A.96.) The "DWSD Class A Sewer Documents," in turn, are defined as "the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Class A Sewer Bonds, as set forth on Exhibit I.A.98, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related

instruments and all related Bond Insurance Policies." (Plan § I.A.98.) Thus, it appears that the DWSD Class A Sewer Claims are meant to encompass at least some portion of the National Claims, but there is no specific discussion addressing the different components to the National Claims and the specific treatment afforded to each.

26.     There is no provision whatsoever for the portions of the National Claims that relate to, among other things, amounts due to National for payment owed under its respective insurance policies, including contractual reimbursement for charges, fees, and expenses incurred by National in connection with its respective insurance policies. These additional portions of the National Claims are distinct from the claims for principal and interest contemplated by Classes 1A-1F (DWSD Bonds) and 8 (Unlimited Tax General Obligation Bonds), and must be, at the very least, separately identified. Without the certainty of knowing what class the National Claims fall under, and without any discussion of the proposed treatment of the entirety of National's Claims, National is unable to evaluate how its claims will be treated under the Plan. Moreover, a clear designation of the National Claims, along with a discussion of the treatment of such claims, is necessary to allow other creditors to evaluate their expected distributions under the Plan.

**D.** **The Disclosure Statement Fails To Provide Other Material Information Relevant To Evaluating Whether To Support The City's Plan**

27. In addition to the deficiencies in specifying treatment for claims related to the DWSD Bonds and Unlimited Tax General Obligation Bonds, the Disclosure Statement fails to provide adequate information regarding, among other things, the City's proposed treatment of pension and OPEB claims, the DIA Collection, other issues related to the City's reinvestment initiatives and financial projections, and the risk factors associated with the Plan. Additional information regarding each of these significant components of the Plan is necessary to provide creditors the ability to evaluate, compare, and potentially challenge the City's proposed treatment of claims.

        **1.** **The Disclosure Statement Contains Insufficient Information Relating To The Calculation And Treatment Of Pension and OPEB Claims**

28. One of the primary drivers of the City's Plan is the proposed treatment of the GRS Pension Claims, the PFRS Pension Claims, and related OPEB Claims. As the Bankruptcy Court is no doubt aware, the calculation of these claims has been the subject of dispute since the beginning of this case. (*See e.g.*, The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees' Pretrial Brief Regarding the City of Detroit's Eligibility to Obtain Relief Under Chapter 9 of the

Bankruptcy Code [Doc. No. 1227] at 53 ("While the City alleges that it was forced to suspend certain payments to 'conserve its dwindling cash', the main portion of the payments not made revolve around the City's pension obligations, *and those obligations are subject to dispute as to the ultimate amount required to be paid* . . . . Treasurer Dillon admitted that as late as the filing date, the City had not calculated the correct underfunding liability with respect to the pension obligations.") (emphasis added); Disclosure Statement 10 (noting that although the Retirement Systems estimated UAAL at $984.9 million, "[t]he City believes that the UAAL figures reported by the Retirement Systems were substantially understated").)

29.     Given the dispute over these calculations, it is imperative that the City disclose how it calculated the amounts for each of the GRS Pension Claims, PFRS Pension Claims, and OPEB Claims, and how the recovery ranges of 36-45%, 31-49%, and 15%, respectively, were calculated, along with the justification for providing such recoveries.   Among other items that should be included in the Disclosure Statement to adequately address these issues, the following information should be provided: (i) a standalone exhibit demonstrating these calculations to facilitate creditors' analysis; and (ii) a pro forma analysis of the GRS Pension

Claim, PFRS Pension Claim, and related OPEB Claim amounts before and after emergence from Chapter 9.[13]

### 2. The Disclosure Statement Must Include Additional Information Related To The DIA Collection

30. The City's discussion of the DIA, the current value of the entire DIA Collection, and the nature of the DIA Settlement lacks sufficient detail to permit creditors to evaluate the City's proposals under the Plan as they relate to the DIA. (*See* Disclosure Statement 74.) The value of the DIA Collection, which the City estimates consists of approximately 65,000 pieces of art, has also been the subject of great interest since the beginning of this case, and yet the Disclosure Statement fails to even provide the City's estimate or analysis of the value of the entire art collection. Instead, the City states that it engaged Christie's to appraise only a minimal portion of the DIA Collection, consisting of 2,773[14] works of art, or *less than 5%* of the total works contained in the DIA Collection. (Disclosure Statement 128.) Moreover, Christie's only "performed a detailed appraisal of only 1,741 of

---

[13] In producing this analysis, the City should (i) separate pension gross assets and liabilities from OPEB gross assets and liabilities; (ii) detail the impact of benefit reductions on the City's obligations going forward; (iii) explain how the transition to the Patient Protection and Affordable Care Act and Medicare is being factored into the OPEB Claim recovery calculation; and (iv) explain how the retroactive adjustments related to Annuity Savings Fund Accounts will be applied, and describe the impact on the City's obligations to GRS Pension Claim holders.

[14] This figure refers to the final appraisal conducted by Christie's. (Disclosure Statement 128.)

the 2,773 works" because those pieces "accounted for 'over 99% of the total projected value' of the Appraised Art." (Disclosure Statement 128.) The remaining pieces of art "not given detailed, individual appraisals are items currently held in storage which have 'modest commercial value.'" (Disclosure Statement 128.) Although this portion of the DIA Collection was appraised at a value ranging between $452 million and $866 million, it should be clear the sample size is simply too small to accurately project the value of the entire DIA Collection. The City should amend the Disclosure Statement to provide its view of the value of the entire DIA Collection, the aggregate fair market value of the works of art that were not included in Christie's reports, information related to the current ownership of the DIA Collection, and the City's conclusion (and rationale for arriving at such a conclusion) regarding its ownership rights for the entire DIA Collection.

31. A significant portion of the treatment of the PFRS Claims and GRS Claims is tied to the $366 million pledge included as part of the DIA Settlement. The description of the DIA Settlement lacks details regarding the process by which that settlement was reached, and the Disclosure Statement fails to contain definitive documentation beyond a term sheet. (Disclosure Statement 47, 128; Plan Exhibit I.A.79.) For example, the City states, without elaboration, that a condition to the Foundation's participation in the DIA Settlement is "the

affirmation by County authorities of certain existing funding obligations with respect to DIA Corp." (Disclosure Statement 48; *see also* Plan Exhibit I.A.79 at 15.) Not only must all of the terms of the DIA Settlement be explained in greater detail, but the City must also explain its justification for allocating the DIA Proceeds solely to Classes 10 and 11.[15]

### 3. The City Must Remedy The Following Issues With Respect To Its Reinvestment Initiatives And Financial Projections

#### a. Exit Facility

32. First, the City states that it will seek to obtain a $300 million Exit Facility on the Effective Date. This Exit Facility is to be used both to "provide the City with necessary cash to satisfy its near-term obligations and begin to implement its proposed reinvestment initiatives." (Disclosure Statement 60.) To provide creditors with an adequate opportunity to evaluate the desirability of the Exit Facility, the City should disclose the detailed terms of and definitive documentation for the proposed Exit Facility, in addition to a description of the process the City undertook to obtain the Exit Facility.

---

[15] Although the term sheet provides that funding "shall be used only to pay Pensions as provided in this Term Sheet and the confirmed Plan of Adjustment," the Disclosure Statement does not address why such a condition is appropriate under the circumstances. (Plan Exhibit § I.A.79 at 16.)

27

### b.    Issues Related To Reinvestment Initiatives
####      Requiring Additional Clarity

33.    The Disclosure Statement describes a range of reinvestment initiatives, costing approximately $1.5 billion, that the City proposes to undertake over the next ten years.  (Disclosure Statement 129-136.)  So that creditors may evaluate the efficacy of such reinvestment initiatives, the Disclosure Statement should be amended to provide additional information with respect to the City's proposals for public safety, blight removal, and labor.

34.    With respect to police-related initiatives, the City should provide comparisons of the City's proposed solutions with those that have been implemented in comparably-sized cities.  These comparisons should include both costs and assumed efficiencies gains.  With respect to fire-related initiatives, the City should disclose that both the current staffing ratio of number of employees required to produce one full time equivalent, along with the City's projected ratio going forward, are above typical staffing arrangements.  In doing so, the City should explain its rationale for the proposed staffing ratios.

35.    With respect to blight removal, the City should disclose and quantify the potential direct and indirect benefits resulting from the elimination of blighted structures (including reductions in overtime, workers compensation, and equipment maintenance).  The City should also detail its proposal to manage the blight remediation program in light of the multiplicity of organizations and

regulatory requirements implicated in blight removal. (*See, e.g.*, Disclosure Statement 97 ("The intractability of blight removal is compounded by the complex regulatory framework that such removal necessarily implicates. This framework increases demolition costs and slows the removal process.").)

36. Finally, with respect to labor initiatives, the Disclosure Statement merely indicates that "reductions in costs associated with represented and unrepresented workers will be necessary," identifying general opportunities to reduce costs. (Disclosure Statement 135.) The City should provide detailed, current descriptions of the City's proposals and progress in this regard, including, but not limited to (i) what the City has accomplished in terms of renegotiating labor agreements and achieving other cost savings; (ii) the City's proposal for achieving the items not yet completed in the preceding clause; (iii) how the City intends to retain authority to unilaterally implement these changes pursuant to the Emergency Manager powers if labor negotiations remain incomplete as of the Effective Date; and (iv) a quantification of the improvement from changes in labor agreements and work rules that has been included in the Financial Projections (as defined in ¶ 37 below).

### c. Exhibits I and J To The Disclosure Statement Must Be Updated

37.     Attached as Exhibits I and J to the Disclosure Statement are the City's Ten-Year Plan of Adjustment Restructuring and Reinvestment Initiatives (the "Ten-Year Plan") and the Ten-Year Financial Projections (the "Ten-Year Projections" and together with the Ten-Year Plan, the "Financial Projections"). The Financial Projections contain the following issues that need to be remedied to provide a more accurate assessment of the City's financial health going forward.

38.     The Financial Projections do not define which City funds are included in the projections.  The Financial Projections consolidate reporting for certain governmental funds and enterprise funds, and as a result, comparison to historical comprehensive annual financial reports (the "CAFR") is impossible.  For example, the Debt Service Fund (Governmental Funds) is consolidated with no disclosure that actual results are segregated into a separate governmental fund.  The projection for Detroit Department of Transportation ("DDOT") (Enterprise Fund) is inconsistently presented.  The Ten-Year Plan presents DDOT as a single line item called "DDOT Subsidy"; however, the Ten-Year Plan reflects the impact of restructuring initiatives as a department with adjustments being reflected on various line items including revenue, labor costs, etc.  The inconsistent treatment makes it difficult for creditors to assess the reasonableness of the Financial Projections compared to historical results.  The Coleman A. Young Airport (the

30

"Airport") projections are reported inconsistently in the same manner as DDOT. The Financial Projections fail to disclose that other City funds are excluded, which would help creditors assess the projections in relation to the historical CAFR. Missing funds include, (i) Automobile Parking Fund (Enterprise), (ii) Special Revenue Funds (Governmental), and (iii) Capital Project Funds (Governmental).

39.     Historical financial information included with the Ten-Year Plan should be reconciled to the City's CAFR.  Failing such reconciliation, creditors will be unable to consider the proposed Ten-Year Plan in the context of historical financial results in order to form a view on the Financial Projections.

40.     The Financial Projections are for only 10 years.  Creditors will need to see longer, 30 to 40-year projections to understand the impact of the City's Plan. Other cities in chapter 9 have included 30 to 40-year projections to allow creditors to assess potential long-term recoveries.  *See, e.g.*, *In re City of Stockton, CA*, Modified Disclosure Statement with Respect to First Amended Plan for the Adjustment of Debts of city of Stockton, California (November 15, 2013), Case No. 12-32118 (Bankr. E.D. Cal. Nov. 21, 2013) [Doc. No. 1215] at 97 ("The Financial Plan projects revenues and expenditures over a 30-year period"); *In re Jefferson County, Alabama*, Exhibit 9 to Disclosure Statement Regarding Chapter 9 Plan of Adjustment for Jefferson County, Alabama (Dated July 29, 2013), Case

No. 11-05736 (Bankr. N.D. Ala. August 8, 2013) [Doc. No. 1977] (40-year projections).

41.     The Financial Projections either exclude or inadequately describe key assumptions and must be updated to remedy the following issues with the current disclosures:  (i) there is no explanation of the contingency line item, which totals $97.5 million over the 10 year projection period; (ii) there is no discussion of projections for key metrics and service levels such as crime rate, fire incidents, population, etc.; (iii) there is no footnote associated with potential impact of COPs Litigation, and no estimate of the impact of such litigation or how it may improve or decrease creditor recoveries; (iv) the DDOT subsidy line item fails to discuss DDOT restructuring and additional services to be provided; and (v) no schedule has been provided for contributions to non-enterprise funds.

### d.     Other Miscellaneous Disclosures Related To City Operations

42.     With respect to the Financial Projections and the discussion of the Coleman A. Young Airport (the "Airport"), the City should disclose (i) that the Ten-Year Plan calls for an annual $700,000 subsidy from the City's general fund; (ii) the amount of grants the City may have to repay in the event of a termination of Airport operations, and the extent to which such grant-repayment claim would constitute a prepetition claim; and (iii) the 10-year cost savings that would be available if the Airport were closed and sold.

43.     With respect to the 36th District Court, the City should amend the Disclosure Statement to (i) provide greater clarity on expectations on improvements in revenues and expenditures during the Ten-Year Plan; and (ii) provide examples of the positive impact on the general fund from improvements in collection rates of fines and improvements in operational efficiencies.

**4.     The Disclosure Statement Fails To Describe Certain Material Risk Factors**

44.     In the Disclosure Statement's discussion of risk factors (Disclosure Statement 59-63), the City should include (i) disclosure that the proposed Plan treatment of the DWSD Bonds, the Unlimited Tax General Obligation Bonds, and other current City obligations may eliminate or severely diminish the City's access to the public debt markets for many years; (ii) a discussion of potential issues related to, and the impact of, the City's inability to hire and retain employees; (iii) a quantification of the impact related to the potential failure of the City to implement the DIA Settlement; (iv) as an addition to the section titled "Non-Confirmation of the Plan" (Disclosure Statement 60), a discussion of the Bankruptcy Code's requirement that the Plan comply with state law;[16] and (v) elaboration on the City's acknowledgement that holders of new securities may

---

[16] This discussion should include the City's analysis of the terms of the instruments to be issued under the Plan and how each complies with state law.

2748755.1

encounter "limited market acceptance of City credit," (Disclosure Statement 62) including any analysis conducted regarding market acceptance. *In re Cardinal Congregate I*, 121 B.R. at 767 ("A disclosure statement should likewise contain all material information relating to the risks posed to creditors").

### E.    Additional Missing Documentation And Terms

45.    Finally, in addition to the changes requested above, the City should amend the Disclosure Statement to provide the principal terms and/or definitive documentation listed in Exhibit 1 to this Objection.

## <u>CONCLUSION</u>

46.    The inclusion of the additional information identified in this Objection is necessary for the City to satisfy its burden that the Disclosure Statement contain adequate information for purposes of section 1125 of the Bankruptcy Code. Unless and until the Disclosure Statement is amended to include the additional information identified herein, the Disclosure Statement should not be approved and distributed to creditors.

Dated:  April 7, 2014        **JAFFE RAITT HEUER & WEISS, P.C.**


By:   /s/ Paul R. Hage
Louis P. Rochkind (P24121)
Paul R. Hage (P70460)
27777 Franklin Road, Suite 2500
Southfield, MI 48034-8214
Telephone: (248) 351-3000
lrochkind@jaffelaw.com
phage@jaffelaw.com

 -and-

**SIDLEY AUSTIN LLP**

Guy S. Neal
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8041
gneal@sidley.com

Jeffrey E. Bjork
Gabriel MacConaill
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone:  (213) 896-6000
jbjork@sidley.com
gmacconaill@sidley.com

*Counsel for National Public Finance Guarantee
Corp.*

## [EXHIBITS]

**Exhibit 1**        List of Missing Documentation and Terms

## Exhibit 1 – List of Missing Documentation and Terms

- DIA Settlement Documents.

- Schedule of DIA Assets.

- Exit Facility.

- Form of GRS Hybrid Pension Plan.

- New B Notes Documents.

- The New DWSD Bond Documents.

- The New Existing Rate DWSD Bond Documents.

- The New GLWA Existing Rate Bond Documents.

- The New GLWA Bond Documents.

- The New GLWA Revolving Bond Documents.

- Form of PFRS Hybrid Pension Plan.

- Plan COP Settlement Documents.

- Plan UTGO Note.

- State Contribution Agreement.

- Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits.

- Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits.

- Schedule of Postpetition Collective Bargaining Agreements.

- Executory Contracts and Unexpired Leases to be Rejected.

- Retained Causes of Action.

Exhibit 1-1