## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |
|  | ) | **Re: Docket No. 3382** |

## OBJECTION TO APPROVAL OF THE AMENDED DISCLOSURE STATEMENT WITH RESPECT TO AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

# TABLE OF CONTENTS

Page

I. Introduction .................................................................................................. 1

II. Standard for Approval of Amended Disclosure Statement ................................ 3

III. The Amended Disclosure Statement Provides Inadequate and Misleading Disclosure as to Value Offered General Creditors ....................................................................... 4

IV. The Amended Disclosure Statement Provides Inadequate and Misleading Disclosure as to Pension Claims and Value Offered to Employee Creditors .......................................... 6

    A. Flaws in the City's UAAL Assumptions Are Not Disclosed. ................................ 7

    B. The City's UAAL Calculation Includes Future Benefits – Which Should Not Be Part of the Claims ......................................................................................... 8

    C. Recoveries on Pension Claims Are Subject to Undisclosed Risks. ....................... 9

    D. The Disclosure Statement Fails to Address Mitigation of OPEB Claims. ........... 10

V. The Amended Disclosure Statement Fails to Address Whether the Amended Plan Is in the Best Interests of Creditors ......................................................................................... 11

VI. The Amended Disclosure Statement Provides Inadequate Information Concerning the Value of the City's Assets and Potential Settlements Related to Those Assets ............... 12

    A. The City's Art Collection and the DIA Settlement ............................................. 12

    B. City-Owned Real Property and Blight Initiatives. .............................................. 15

    C. The DWSD Transaction ................................................................................. 16

    D. City-Owned Parking Facilities ........................................................................ 17

VII. The Amended Disclosure Statement Provides Inadequate Information Concerning Operational Improvements and the Transition of Lighting Work to PLA ...................... 17

VIII. The Amended Disclosure Statement Provides Inadequate Information Regarding the Scope of Releases and Exit Financing .......................................................................... 18

    A. The Debtors' Amended Disclosure Statement Contains Inadequate Information Regarding the Amended Plan Releases. ............................................................ 18

    B. Exit Facility .................................................................................................. 19

IX. The Amended Disclosure Statement Is Incomplete by Its Own Terms and Therefore Inadequate ..................................................................................................... 20

X. Reservation of Rights .................................................................................. 20

XI. Conclusion ................................................................................................. 21

The creditors and parties in interest identified in footnote 1 (the "Objectors")[1] submit this objection (the "Objection") to the Motion of the City of Detroit for Approval of the Proposed Disclosure Statement [Dkt. No. 2713] filed by the City of Detroit, Michigan (the "City" or the "Debtor") seeking entry of an order approving the proposed Amended Disclosure Statement with Respect to Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. No. 3382] (the "Amended Disclosure Statement").[2]   In support of this Objection, the Objectors state the following:

## I.   Introduction

1.   Creditors are being asked to decide whether to accept or reject the City's Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. No. 3380] (the "Amended Plan") and determine whether to object to the Amended Plan based on an Amended Disclosure Statement that is incomplete and inadequate under Section 1125(b).  In particular, and without limitation:

- The Amended Plan offers Objectors and other "General Creditors"[3] distributions consisting almost entirely of unsecured New B Notes.  The Amended Disclosure Statement contains no information as to the true value of these notes.  This

---

[1] The creditors and parties in interest submitting this objection are: Hypothekenbank Frankfurt AG; Hypothekenbank Frankfurt International S.A.; Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.; Deutsche Bank AG, London; Dexia Crédit Local; Dexia Holdings, Inc.; and FMS Wertmanagement AöR.  In compliance with this Court's Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Amended Plan of Adjustment [Dkt. No. 2937], on or before March 14, 2014, each of the Objectors advised counsel to the City in writing of the additional information they believed should be included in the Amended Disclosure Statement.

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Amended Disclosure Statement and Amended Plan.  All references to "Section" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.  All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, as presently in effect.

[3] We use "General Creditors" to refer to holders of unsecured claims in Class 7 (Limited Tax General Obligation Bond Claims), Class 9 (COP Claims), Class 13 (Downtown Development Authority Claims) and Class 14 (Other Claims).

renders the Disclosure Statement inadequate and misleading as to the distribution that will be received by Objectors and other General Creditors.

- General Creditors cannot decide whether to vote to accept or reject the Amended Plan and whether to object to the Amended Plan when the Amended Disclosure Statement gives them inadequate and misleading information regarding the value of their proposed distributions.
- The City overstates the size of pension claims, resulting in inadequate and misleading disclosure of cents-per-dollar-of-claim offered to retirees in Classes 10 and 11.

- The City proffers inadequate and misleading disclosure of cash flow and asset value available to creditors generally, misleading creditors into voting for distributions that are less than otherwise required under the law.

2.      General creditors cannot decide whether to vote to accept or reject the Amended Plan or object to the Amended Plan when the Amended Disclosure Statement gives them inadequate and misleading information on these issues. The City is not entitled to obtain votes from classes with such an inadequate and misleading disclosure statement.

3.      Complete and easily comprehensible disclosures are particularly important in this case where there are so many individual unsecured creditors. In many chapter 11 cases, the Disclosure Statement represents a negotiated document that takes into account settlements and agreements between the debtor and various creditor constituencies, where each party knows and understands *in advance of the filing of the Disclosure Statement* what its treatment will be.

4.      That is not true in this case, where there are many individual creditors, including in Classes 7 (Limited Tax General Obligation Bond Claims), 9 (COP Claims), and 14 (Other Unsecured Claims) who do not have counsel or financial advisors to help them understand the treatment they will receive under a plan in order to vote or whose counsel or financial advisors have not been involved in the case. Even the Objectors, who have been deeply involved in the case with their own attorneys and financial advisors and who have done their best to understand

the City's Amended Disclosure Statement and the treatment that they and other creditors will receive under the Amended Plan, are left with questions about what they are being offered.

## II.      Standard for Approval of Amended Disclosure Statement

5.      Pursuant to Section 1125 of the Bankruptcy Code, the Amended Disclosure Statement may not be approved unless the bankruptcy court determines that it contains "adequate information." 11 U.S.C. § 1125(a)-(b). "Adequate information" is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable [ ] a hypothetical investor [typical of holders of claims or interests] of the relevant class to make an informed judgment about the Amended Plan.

11 U.S.C. § 1125(a)(1). The purpose of the Amended Disclosure Statement is "to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan." *In re County of Orange*, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997) (internal citations omitted). Adequate information is required even if all parties are subject to cram down because without adequate disclosure "the opportunity for parties to appear and effectively express a dissenting voice would be drastically diminished . . . ." *In re Jeppson*, 66 B.R. 269, 297 (Bankr. D. Utah 1986).

6.      With particular relevance to this case, Section 1125 requires a complete description of the City's available assets and their value, the anticipated future cash flows of the City, and the accounting and valuation methods used to produce the financial information in the Amended Disclosure Statement (including, in this case, estimated pension claims). *See In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988).

### III.   The Amended Disclosure Statement Provides Inadequate and Misleading Disclosure as to Value Offered General Creditors

7.     A disclosure statement must explain and value recoveries to be provided to creditors, and failure to do so renders the Amended Disclosure Statement inadequate. *In re Prudential Energy Co.*, 58 B.R. 857, 868 (Bankr. S.D.N.Y. 1986) (disclosure inadequate where statement failed to identify "the value of the stock that is to be distributed"); *In re Polytherm Indus., Inc.*, 33 B.R. 823, 830 (Bankr. W.D. Wis. 1983) (disclosure statement inadequate where it failed to provide a "present value analyses of proposed payments to creditors").

8.     First, the Amended Disclosure Statement makes no effort to tell COPs holders what they will receive under the Amended Plan.  The Amended Disclosure Statement states that the Estimated Percentage Recovery of COP Claims in Class 9 is "unknown."  <u>Amended Disclosure Statement</u> at 22.  This disclosure is both inadequate and misleading.

9.     If the COP Claims are allowed in full, they will receive their "Pro Rata Unsecured Share" of New B Notes on the same basis as LTGO Claims in Class 7, OPEB Claims in Class 12, Downtown Development Authority Claims in Class 13 and Other Unsecured Claims in Class 14.  The Amended Disclosure Statement should so state, and it should state a range of estimated recoveries for claims in Class 7, 12, 13 and 14, ranging from allowance of COP Claims at 100%, to settlement of all COP Claims at 40%, to zero allowance of COP Claims.

10.     The Amended Plan offers each COPs holder the option to settle its corresponding COP Claims at 40% of principal amount, but the Amended Disclosure Statement fails to disclose what the estimated recovery of a settling COPs holder would be.  The City cannot offer, in good faith, to settle COP Claims if it is not prepared to tell settling COPs holders what they would recover if they elected to accept the settlement offered in the Amended Plan.

4

11.     The Amended Disclosure Statement estimates that General Creditors other than those holding COP Claims are offered 15% on their claims through the receipt of $650,000,000 principal amount of new 30-year unsecured New B Notes bearing interest at 4% and paying no principal for ten years. Objectors submit that the 15% estimate is inaccurate for several reasons.

12.     First, assuming that the New B Notes have the same value in the hands of all holders, and that a 4% interest rate results in the notes being properly valued at par, $650 million results in a 15% recovery only if allowed unsecured claims in Classes 7, 9, 12, 13, and 14 total $4,333,333,333. That total appears to be mathematically impossible.[4]

13.     Second, a 4% interest rate on the New B Notes would not result in the notes trading at par. The City's own secured sewer bonds, which amortize over time, trade at approximately 100% of their principal amounts with a current (tax exempt) yield approximating 5%. If **_secured 5%_** (tax exempt) sewer & water bonds have a value at 100% of principal amount, there is no way that **_unsecured 4%_** New B Notes (with no amortization for 10 years) will be valued at par.

14.     Third, although all General Creditors receive the same New B Notes, the 4% interest on New B Notes issued to Class 7 (Limited Tax General Obligation Bond Claims), Class

---

[4] If COP Claims are allowed at zero, the estimated claim amounts for other General Unsecured Creditors are as follows:

| | |
|---|---|
| Class 7 (LTGOs): | $ 163,543,187 |
| Class 12 (OPEB): | $3,184,900,000 |
| Class 13 (Downtown) | $ 33,600,000 |
| **Total:** | **$3,382,043,187** |

As noted, a 15% distribution based on $650,000,000 in New B Notes requires a claims pool of $4,333,333,333, requiring Other Unsecured Claims (estimated: "Unknown") of almost $1 billion. The math does not work.

If COP Claims are added to the claim pool, then General Claims total $4,822,043,187 plus the "unknown" amount of "Other Unsecured Claims." Distributing $650,000,000 in New B Notes would provide a nominal recovery of 13.4% if "Other Unsecured Claims" were zero; any amount of "Other Unsecured Claims" drives the estimated recovery down, further away from the overstated estimated 15% nominal distribution. Again, the math does not work.

13 (Downtown Development Authority Claims) and Class 14 (Other Unsecured Claims) will be ***tax exempt***. The 4% interest on New B Notes issued to Class 9 (COP Claims) and Class 12 (OPEB Claims) will be ***taxable***.[5] Thus the New B Notes issued to Objectors and other Class 9 creditors will be worth less than New B Notes issued to creditors in any other class. The Amended Disclosure Statement's depiction of all New B Notes as having the same value is false and misleading.

## IV. The Amended Disclosure Statement Provides Inadequate and Misleading Disclosure as to Pension Claims and Value Offered to Employee Creditors

15.     The Objectors and other General Creditors cannot vote on what they are getting under the Amended Plan or decide whether to object to the Amended Plan without knowing what creditors in Class 10 (PFRS Pension Claims), Class 11 (GRS Pension Claims), and Class 12 (OPEB Claims) (collectively, "Employee Creditors") are getting under the Amended Plan – and the justification, if any, for the difference in treatment. There is no way for Objectors and other General Creditors to reliably compare their recovery to Employee Creditors' recovery because the Amended Disclosure Statement contains inadequate and misleading information about the size of the Employee Creditors' claims and the value the City proposes to distribute on account of Employee Creditors' claims.

16.     The Amended Disclosure Statement estimates that the aggregate allowed amount of Class 10 (PFRS Pension Claims) is $1,588,000,000, and the aggregate allowed amount of Class 11 (GRS Pension Claims) is $2,299,000,000. Amended Disclosure Statement at 23-24. Recoveries are estimated to be between 31-49% for PFRS Pension Claims and 36-45% for GRS Pension Claims.

---

[5] The Internal Revenue Code prohibits the use of tax exempt securities to finance taxable investments. *See* 26 U.S.C. § 103(c) and regulations adopted thereunder.

17.     These estimated recoveries are misleading because the GRS and PFRS Pension Claims are inflated.  As further discussed below, the principal causes of the inflation are the use of artificially low discount rates that are not commonly used among public pension actuaries to calculate pension liabilities and the inclusion of liabilities for future, as yet unearned, pension benefits in the calculation of Allowed Pension Claims.  Additionally, the Amended Disclosure Statement fails to provide enough information regarding calculation of the OPEB Claims to allow creditors to determine whether those claims are also artificially inflated.

18.     Finally, the Amended Disclosure Statement fails to address adequately (i) the possibility that, as a result of the City's attempt to have the Service Contracts declared invalid, the pension systems may be forced to disgorge the approximately $1.4 billion deposited there in connection with the COPs transaction, and (ii) the impact such disgorgement would have on PFRS and GRS Pension Claims recoveries.

### A.     Flaws in the City's UAAL Assumptions Are Not Disclosed.

19.     The Amended Disclosure Statement estimates of PFRS Pension Claims and GRS Pension Claims are based on the unfunded actuarially accrued liability ("UAAL") as calculated by the City for each of the funds, assuming rates of return on fund assets of 6.5% for PFRS and 6.25% for GRS.  Amended Disclosure Statement at 23−24.  The Allowed Pension Claims are almost $3 billion higher than the UAAL calculated by the actuary for the pension systems, using rates of return of 7.9% for GRS and 8.0% for PFRS.[6]

20.     By the City's own admission, the City's assumed rates of return are "lower than most jurisdictions," Amended Disclosure Statement at 11, but the City nowhere provides any justification for the selection of these rates.  In fact, the Objectors believe that the City's assumed

---

[6] As the Court found in its Eligibility Decision, "the two pension plans and the City disagree about the level of underfunding in the plans." Opinion Regarding Eligibility at 9 (Dec. 5, 2013) [Dkt. No. 1945].

rates of return are virtually unprecedented and have rarely been used by the City's own actuary, Milliman, Inc., in pension calculations for other municipalities. The Amended Disclosure Statement should disclose the range and frequency of rates of return used by the City's own actuary, the UAAL that would result from the use of rates in that spectrum, and why the City believes these abnormally low rates of return are justified in this specific case.

### B. The City's UAAL Calculation Includes Future Benefits – Which Should Not Be Part of the Claims.

21. The City calculates the UAAL on the "entry age actuarial cost method." *See, e.g.*, The Police and Fire Ret. Sys. of the City of Detroit, *71st Annual Actuarial Valuation* (June 30, 2012) at 32, *available at* http://www.pfrsdetroit.org/Files/download/June%2030%20 2012%20Police%20and%20Fire%20Actuarial%20Valuation.pdf. The entry age actuarial cost method considers the actuarial present value of the *projected* benefits of each individual between that individual's entry age and his or her assumed exit age.[7] It takes into account assumptions about each active employee's future pay increases and future employment, thus speculating on benefits that *may* be earned in the future, after the date of estimation.

22. Because the City equates Allowed Pension Claims with the UAAL, the result is that the City's Allowed Pension Claims amount includes unaccrued future benefits, such as future pay increases and future employment.

23. This is improper. There is no claim for such future, unaccrued benefits; the Emergency Manager could have eliminated them without resorting to Chapter 9.

---

[7] GASB defines entry age actuarial cost method as "[a] method under which the actuarial present value of the projected benefits of each individual included in an actuarial valuation is allocated on a level basis over the earnings or service of the individual between entry age and assumed exit age(s)." Actuarial Standards Board, <u>Definitions from ASOPs and ACGs of the ASB</u> (2014), *available at* http://www.actuarialstandardsboard.org/pdf/definitions_Jan2014.pdf.

24.     Moreover, even if the future benefits were properly part of Allowed Pension Claims, they are being satisfied by new "hybrid pension plans" called the GRS Hybrid Pension Formula and the PFRS Hybrid Pension Formula.  <u>Amended Disclosure Statement</u> at 13.

25.     At a minimum, the Amended Disclosure Statement should disclose what portion of the amount of Allowed Pension Claims is attributable to projected, as opposed to accrued, benefit, as any such amount is subject to dispute, and a disclosure statement "should inform the reader what the undisputed claims are, what the disputed claims are, what effect, if any, there will be on the distribution if disputed claims are or are not allowed, and when will distribution be made."  *In re Ferretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991).  Moreover, the Amended Disclosure Statement contains no information on the total value promised by the two hybrid pension plans or the percentage of alleged claims for future benefits satisfied thereby, and these should be provided as well.[8]

26.     In short, the City should not seek votes from General Creditors (who are purportedly offered 15%) by a misleading comparison to recoveries on pension claims of 31%-49% that are actually much higher.

C.      **Recoveries on Pension Claims Are Subject to Undisclosed Risks.**

27.     The City has commenced an adversary proceeding seeking to invalidate the Service Contracts related to the COPs.  In response, certain holders of COPs have filed papers seeking (a) to intervene in the adversary proceeding, and (b) to file a third party complaint against the PFRS and GRS seeking to recover approximately $1.4 billion in identifiable proceeds from the COPs transaction in the event the City prevails on its claims.  In the event that the COPs

---

[8] Pursuant to the Court ordered procedures for suggesting information to be included in the Disclosure Statement, Objectors specifically asked the City to include – among other requests –  the value of the hybrid pension plans and the amount of pension claims satisfied thereby.  The City has not done so.

holders' third party claim is successful, the UAAL and the amount of Allowed Pension Claims would be materially affected.

28.     The Amended Disclosure Statement should address the risk that, if the City is successful in its litigation to invalidate the Service Contracts, the Funding Trusts (as established under the COPs transaction), the COPs holders, and/or the insurers of the COPs may have claims against PFRS and GRS to disgorge the proceeds received in connection with the COPs transaction. The current passing reference to this claim (without any discussion as to the amount at stake or the claims asserted) renders the disclosure statement inadequate. <u>Amended Disclosure Statement</u> at 115. The Amended Disclosure Statement should also estimate the underfunding of PFRS and GRS, in the event that they are required to disgorge the proceeds received in connection with the COPs transaction, as well as the estimated percentage recoveries (including supporting information on how the City calculated such recoveries and how the City would fund such recoveries) for all unsecured claims in classes 7 through 13 assuming that such disgorgement action is successful.

**D.      The Disclosure Statement Fails to Address Mitigation of OPEB Claims.**

29.     The Amended Disclosure Statement also fails to explain the basis for the City's calculation of OPEB claims, valued at $3,184,900,000. In particular, the Amended Disclosure Statement does not address whether the City's analysis accounts for recovery available to retirees through the implementation of the Affordable Care Act and the City's agreement to provide monthly stipends to certain retirees.

30.     The City's first draft of the Disclosure Statement made clear that Allowed GRS Claims and Allowed PFRS Claims would be reduced to "reflect mitigation of damages resulting from the projected value of, as applicable, (A) federal governmental subsidies toward the payment of health benefit premiums provided under the Patient Protection and Affordable Care

Act or (B) federal governmental health care plans." Disclosure Statement with Respect to Plan for the Adjustment of Debts of the City of Detroit at 30, 31 (Feb. 21, 2014) [Dkt. No. 2709].

31. These provisions, and any reference to the accompanying exhibits regarding this mitigation, have been removed from the Amended Disclosure Statement. The Amended Disclosure Statement fails to address whether the City plans to take mitigation of OPEB Claims into account when calculating the final amount of the claim.

32. The Objectors believe that the City must properly take into account this reduction in claim amounts. Not allowing the additional subsidies and stipends to reduce the amount of the OPEB Claims inflates the size of OPEB Claims. The Amended Disclosure Statement should disclose the range of values that it calculates for this reduction in claims.

## V. The Amended Disclosure Statement Fails to Address Whether the Amended Plan Is in the Best Interests of Creditors.

33. The Amended Disclosure Statement should also provide information necessary for creditors to evaluate whether the Amended Plan satisfies the best interests of creditors test including: (a) the estimated percentage recoveries, along with backup information detailing how the City calculated such recovery estimates, for all Unsecured Claims, assuming the City's chapter 9 case were to be dismissed and creditors were left to pursue their state law remedies; (b) the estimated percentage recoveries, along with backup information detailing how the City calculated such recovery estimates, for all Unsecured Claims, assuming that the City cannot continue to collect the *ad valorem* tax related to its Unlimited Tax General Obligation Bond debt, or that the City can use such tax only to fund recoveries for holders of Unlimited Tax General Obligation Bonds; and (c) the estimated percentage recoveries, along with backup information detailing how the City calculated such recovery estimates, for all Unsecured Claims, assuming

the City is obligated to use general tax revenues collected within the City's charter, statutory or constitutional limitations to service the Limited Tax General Obligation Bonds.

## VI. The Amended Disclosure Statement Provides Inadequate Information Concerning the Value of the City's Assets and Potential Settlements Related to Those Assets

34.     Courts have consistently held that a description of assets and their value is an essential element of adequate disclosure.  *See, e.g.*, *In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985) ("A description of available assets and their value is a vital element of necessary disclosure").  This is because "[a] plan is necessarily predicated on knowledge of the assets and liabilities being dealt with."  S. Rep. 95-989, at 121 (1978).

35.     The Amended Disclosure Statement provides inadequate and misleading disclosure of asset values available to creditors generally, misleading creditors into voting for distributions that are less than otherwise required under the law.  In addition, the Amended Plan requires creditors to evaluate potential settlements related to assets without providing creditors with necessary information to understand the value of the assets and evaluate the fairness of the settlements.

### A.     The City's Art Collection and the DIA Settlement.

36.     Detroit owns in excess of 65,000 works of art that are collected and displayed or stored in the City-owned Detroit Institute of Arts and off-site storage facilities (the "Collection"), which the Amended Disclosure Statement touts as one of the top six art collections in the United States.  Amended Disclosure Statement  at 74.   Monetization of the Collection is a potentially significant source of recovery for creditors and the value of the Collection is critical to determining whether the Amended Plan satisfies the best interest of creditors.  General Creditors cannot be required to determine how to vote on the Amended Plan and whether to object thereto when the Amended Disclosure Statement fails to provide the value of the City's art collection

and provides inadequate information concerning the DIA Settlement, including among other things the City's position on whether the Collection is monetizable for creditor recoveries or the issues that the settlement purports to settle.

37.     After commencing this case, the City retained Christie's to appraise only a subset of those works – art the City identified as having been purchased, entirely or in part, with City funds.  As a result, of the over 65,000 works in the Collection, Christie's considered only 2,773 works (4.3%) of the Collection and completed a full appraisal for only 1,741 works (2.7%) of the Collection.  Amended Disclosure Statement at 74, 127−28.  Christie's concluded that the limited subset of the Collection it appraised had a value between $454 million and $867 million.  Amended Disclosure Statement at 127−28.  This is an extraordinary range of value – where the top end is nearly double the bottom end of the range.

38.     Given the limited scope of Christie's assignment, the City clearly believes that only a very small portion of the Collection is available for creditor recoveries, but nowhere does the Amended Disclosure Statement address the merits of the City's position.  It simply mentions that the Michigan Attorney General issued an opinion on June 13, 2013 that the Collection is held in charitable trust and says that "[i]t is anticipated that these positions may be disputed by parties in interest in the City's chapter 9 case."  Amended Disclosure Statement at 74.  If the City does not believe that creditors are entitled to the art, it must explain why in the Amended Disclosure Statement.

39.     Previously in the case, the City represented to this Court that the reason the City asked Christie's to appraise such an extremely limited number of works in the Collection is that some number of works in the Collection may be subject to restrictions imposed by donors that

prohibit or limit the ability of the City to use or monetize the same.  Specifically, at a hearing conducted by this Court on January 22, 2014, counsel to the City explained this issue as follows:

> As to the rest of it, there's a big reason not to look at all of it, and that is that the rest of it came via gifts.  When art museums get gifts, they frequently get − we have an analogy in law school.  We talk about a bundle of sticks being property, and each artwork can be viewed as a bundle of sticks.  When the art museum gets art from donors, very frequently they don't get all the sticks.  They get the art subject to limitations, and if the limitations and restrictions aren't complied with, the art goes back to the donor or someplace else.

Exhibit B, Hr'g Tr. 12:15-24 (Jan. 22, 2014).  This is opaque: The Amended Disclosure Statement should explicitly disclose the instructions given by the City to limit the scope of the appraisal or the analysis of value and the basis for such instructions.

40.     Notwithstanding the above, the Amended Disclosure Statement does not even mention the issue of restrictions resulting from gifts, and provides no information as to what, if any, efforts the City has undertaken to determine which works of art in the Collection actually are subject to such restrictions or the value of such works of art.

41.     Furthermore, to "settle" claims surrounding the Collection, the Amended Disclosure Statement describes a settlement without providing creditors with information to understand the value the City has placed on various aspects of the settlement.  The settlement includes $365 million to be paid by Foundations over a period of 20 years, $100 million to be raised by the DIA Corp. over 20 years, and a potential $350 million contribution from the State with respect to pension funding.  It is unclear what portion, if any, of the $350 million in funds the City hopes to obtain from the State constitutes consideration for the DIA Settlement and what portion constitutes consideration for releases for claims retirees or the City may have directly against the State.  *Compare* Amended Disclosure Statement at 128 (discussing Governor's announcement to pledge up to $350 million in state funds in support of DIA Settlement) *with*

Amended Disclosure Statement at 47−48 (discussing contributions to be made by DIA Funding Parties (which term includes only the Foundations and DIA Corp. and does not include the State)), *and* Amended Plan at 21 (defining State Contribution Agreement as "the definitive documentation to be executed in connection with the comprehensive settlement agreement regarding Pension Claims").

42.     Moreover, the Amended Disclosure Statement: (a) lists only some of the conditions precedent to the Foundations' commitment, Amended Disclosure Statement at 47 ("The Foundations' participation in the DIA Settlement is conditioned upon, among other things, the following . . . .") (emphasis added); (b) provides no information about the status of satisfying those conditions precedent; (c) provides no information about the current status of the $350 million contribution from the State; (d) provides no information concerning the risks associated with the respective commitments by the State, Foundations, and DIA Corp.; and (e) provides no analysis of the claims allegedly being settled by the DIA Settlement.

43.     An additional major omission from the Amended Disclosure Statement is the lack of any discussion of a security interest or other enforcement mechanism in the DIA Settlement that would allow the City to recover the Collection or any part thereof, in the event that the DIA or the Foundations fail to pay the settlement payments.  While creditors receive a reduced distribution under the Amended Plan, the Collection is transferred from the City to DIA Corp. and expressly made subject to a charitable trust.  The risk of default (and the moral hazard to encourage a default) should be disclosed.

**B.     City-Owned Real Property and Blight Initiatives.**

44.     The substantial real property owned by the City is a potentially significant source of recovery for creditors, and the value of that property is critical to evaluating whether the Amended Plan satisfies the best interests of creditors test.   Nevertheless, the Amended

Disclosure Statement provides only cursory information about the value of the substantial real property owned by the City.

45.     The Amended Disclosure Statement indicates that the City owns 60,000 parcels of vacant land and approximately 7,800 vacant structures within the City limits.  Amended Disclosure Statement at 75.  In addition, the Amended Disclosure Statement indicates that the City intends to spend $520.3 million over the next six fiscal years to remediate residential blight (the "Blight Initiative").  Amended Disclosure Statement at 130−31.  It is unclear whether the City will obtain ownership of property that it does not currently own but on which the City intends to remediate blight in connection with the Blight Initiative.

46.     The Amended Disclosure Statement also is devoid of information about any efforts the City has made to sell or otherwise monetize the real property as well as information about the City's intended plan with respect to such property.

### C.     The DWSD Transaction.

47.     The DWSD is a potentially significant source of recovery for creditors, and the value of DWSD is critical to evaluating whether the Amended Plan satisfies the best interests of creditors test.  Despite the negotiations that have been reported in the press concerning the potential creation of a GLWA and the transfer or lease of DWSD assets to the GLWA, the Amended Disclosure Statement provides virtually no information from which creditors could value the DWSD, any potential transaction to monetize the DWSD, the status of negotiations concerning the creation of GLWA, or the viability and value that might be obtainable from alternative transactions in the event that the efforts to create the GLWA fail.  The value of an alternative transaction is particularly relevant in light of press reports indicating that the surrounding counties have not approved the GLWA and may never do so.  As the Amended Disclosure Statement currently stands, the only disclosure is a vague statement that the City

might enter into a DWSD Transaction if such transaction would enable "the City to make larger, more rapid or more certain distributions to at least some of its creditors as compared to the distributions specified in the Plan and described in this Disclosure Statement." <u>Amended Disclosure Statement</u> at 121.

       **D.**     <u>**City-Owned Parking Facilities.**</u>

48.     Although the City owns numerous parking facilities throughout the City, the Amended Disclosure Statement does not attempt to value the facilities and provides no information about what efforts, if any, the City has made to monetize its parking facilities other than the fact that the City has retained an unnamed "parking specialist" to conduct due diligence and produce a report. The Amended Disclosure Statement should be amended to include:

(a)     The value of City-owned parking facilities and the basis for the value asserted.

(b)     The identity of any parking specialist retained by the City and the status of all report(s) being prepared by any parking specialist.

(c)     Whether any efforts have been made to enter into a transaction to monetize the City-owned parking facilities and, if so, a description of those efforts and the status of the same.

(d)     The anticipated use of proceeds of any transaction intended to monetize the City-owned parking facilities.

(e)     An explanation of how such a transaction would affect creditor recoveries.

(f)     An explanation of whether and how the City's existing projections account for proceeds from such a transaction.

**VII.**     **The Amended Disclosure Statement Provides Inadequate Information Concerning Operational Improvements and the Transition of Lighting Work to PLA**

49.     Operational and service improvements by the City may affect recoveries by creditors, particularly creditors who are reliant on such improvements. For example, if the City continues to operate in an inefficient manner and is unwilling to adopt operational and service

improvements that would make the City function better, the City's lack of effort may depress recoveries to creditors. As such, it is important for the Amended Disclosure Statement to explain what operational improvements the City has considered, adopted, and rejected, as well as their effect.

50.     As to operational improvements, the Amended Disclosure Statement should be amended to include the following:

>     (a)     All efforts by the City to improve operational efficiency and realize cost savings from improvements in operational efficiency.
>
>     (b)     The likely cost savings from such improvements in operational efficiency.
>
>     (c)     An explanation of whether and how the City's existing projections account for improvements in operational efficiency.
>
>     (d)     An explanation as to whether and to what extent reform of the City's Charter is required to improve operational efficiency.

51.     On December 6, 2013, this Court entered an Order (I) Authorizing the Debtor to Enter into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Other Related Relief [Dkt. No. 1955] (the "PLA Order"). The Amended Disclosure Statement provides no information about the status of work to the lighting system since entry of the PLA Order or any benefits resulting from the same since entry of the PLA Order. Amended Disclosure Statement at 126. The Amended Disclosure Statement should provide all of that information concerning the PLA.

**VIII.    The Amended Disclosure Statement Provides Inadequate Information Regarding the Scope of Releases and Exit Financing**

>    **A.     The Debtors' Amended Disclosure Statement Contains Inadequate Information Regarding the Amended Plan Releases.**

52.     The Amended Disclosure Statement should disclose with particularity what individuals and entities are being released, exculpated or indemnified by the Amended Plan, by a

vote in favor of the Amended Plan or by the order confirming the Amended Plan. As the Amended Plan now stands, it releases, exculpates or indemnifies on a non-consensual basis State and City officials including officials who are not currently employed by (or participants in the governance of) the City or State and against whom creditors may have claims, and attorneys, advisors, professionals and even underwriters, including those whose advice or actions may have contributed to the City's insolvency or the inadequate funding of the pension funds, or caused direct damage to the holders of COPs.

53.     In particular, and without limitation, the release, exculpation or indemnity provisions could include PFRS and GRS, as well as their members past and present.  If the City wishes to release, indemnify or exculpate such individuals, or cause its creditors to do so, the Amended Disclosure Statement should explicitly disclose that these individuals will be covered and should explain how the non-consensual third party releases meet the standard that the Sixth Circuit applies to non-consensual third party releases.

54.     Additionally, the Amended Plan purports to release the State in exchange for the State Contribution.  In conjunction with this release, the Amended Disclosure Statement should provide an explanation of the nature of the issues and claims against the State, an examination of the strengths and weaknesses of the issues and claims to be resolved, and why the City believes the proposed resolution is reasonable and in the best interests of creditors.

**B.**     **Exit Facility.**

55.     The Amended Disclosure Statement reveals that the City intends to seek an Exit Facility in the amount of $300 million but provides virtually no other information about the potential Exit Facility or the effect on recoveries under the Amended Plan if the City is unable to obtain an Exit Facility.  Amended Disclosure Statement 49, 60.  The Amended Disclosure

Statement should be amended to include information concerning the material terms of the Exit Facility and the status of the City's efforts to obtain an Exit Facility.

## IX. The Amended Disclosure Statement Is Incomplete by Its Own Terms and Therefore Inadequate

56.     The Amended Plan and Amended Disclosure Statement frequently refer creditors to exhibits that are not included with the Amended Disclosure Statement as filed for vital information regarding their recovery.  Exhibit A contains a complete list of the exhibits and documents that the City references in, and purports to attach to, the Amended Disclosure Statement and Amended Plan that are absent from the City's filings.  In many instances, the Amended Disclosure Statement does not even attempt to describe the substance of the documents and instead directs the reader to the missing document itself.

57.     For example, the Amended Plan describes the annual contributions that will be made to PFRS and GRS.  According to the Amended Plan, the source for these contributions, which are purportedly identified in Exhibit II.B.3.t.ii.A and Exhibit II.B.3.u.ii.A, will be the DIA Proceeds.  Yet the schedules of payments are not actually attached to the City's filings. The absence of these schedules makes it impossible to reconcile actuarial calculations.

58.     The omission of these documents renders the Amended Disclosure Statement incomplete and inadequate.

## X. Reservation of Rights

59.     Objectors reserve the right, among other things, to (i) amend or supplement this objection in the event that the City amends the Amended Disclosure Statement or Amended Plan, (ii) join in any objection to the Amended Disclosure Statement filed by any other creditor or party in interest, to the extent such objection is not inconsistent with the arguments set forth herein; (iii) raise any additional objections to the Amended Disclosure Statement not

incorporated herein; and (iv) raise the arguments made herein and additional arguments in connection with the confirmation of the Amended Plan.

**XI.**   **Conclusion**

60.    The Amended Disclosure Statement, as filed, simply does not tell creditors what they need to know.  Its disclosures are confusing, inadequate, and, in some instances, profoundly misleading.  Accordingly, Objectors submit that the Amended Disclosure Statement does not contain "adequate information" within the meaning of Section 1125(b), and approval of the Amended Disclosure Statement should be denied.

Dated:  April 7, 2014.

Respectfully submitted,

/S/Deborah L. Fish
Deborah L Fish
E-mail:  dfish@allardfishpc.com
ALLARD & FISH, P.C.
2600 Buhl Building
535 Griswold
Detroit, MI 48226
Tel.:  313/309-3171

Thomas Moers Mayer
E-mail:  tmayer@kramerlevin.com
Jonathan M. Wagner
E-mail:  jwagner@kramerlevin.com
KRAMER LEVIN NAFTALIS &
  FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Tel:  212/715-9169

*Counsel for Dexia Crédit Local and Dexia Holdings, Inc.*

/S/Howard S. Sher
Howard S. Sher (P38337)
E-mail: howard@jacobweingarten.com
JACOB & WEINGARTEN, P.C.
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, MI 48084
Tel: (248) 649-1200
Fax: (248) 649-2920

Vincent J. Marriott, III
E-mail: marriott@ballardspahr.com
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500
Fax: (215) 864-8999

Matthew G. Summers
E-mail: summersm@ballardspahr.com
BALLARD SPAHR LLP
919 North Market Street, 11th Floor
Wilmington, DE 19801
Tel: (302) 252-4428
Fax: (410) 361-8930

*Counsel for Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.*

/S/Rich L. Frimmer          

Rick L. Frimmer
E-mail:  rfrimmer@schiffhardin.com
J. Mark Fisher
E-mail:  mfisher@schiffhardin.com
Jeffery D. Eaton
E-Mail:  jeaton@schiffhardin.com
SCHIFF HARDIN LLP
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
Tel:  312/258-5500

*Counsel for FMS Wertmanagement AöR*

z:\13\079\plds\obj.to amended discl. stmt..doc


/S/Kenneth E. Noble         

Kenneth E. Noble
E-mail:  Kenneth.noble@kattenlaw.com
John J. Ramirez
Email:  john.ramirez@kattenlaw.com
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Tel:  212/715-9393

*Counsel for Deutsche Bank AG, London*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |
|  | ) | **Re: Docket No. 3382** |

## <u>CERTIFICATION OF SERVICE</u>

I, Regina Drouillard, hereby certify that on April 7, 2014, I electronically filed the following:

- Objection to Approval of the Amended Disclosure Statement with Respect to amended Plan for the Adjustment of Debts of the City of Detroit.

with the Clerk of the Court using the ECF and I hereby certify that the Court's ECF system has served all registered users.

ALLARD & FISH, P.C.

/S/Regina Drouillard
535 Griswold
2600 Buhl Building
Detroit MI 48226
(313) 961-6141

Dated: April 7, 2014
z:\13\079\plds\obj.to amended discl. stmt..doc

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |
|  | ) | **Re: Docket No. 3382** |

## EXHIBIT LIST

| Exhibit | Description |
|---|---|
| A | List of the exhibits and documents that the City references in, and purports to attach to, the Amended Disclosure Statement and Amended Plan that are absent from the City's filings |
| B | Hearing Transcript of Jan. 22, 2014 |

# EXHIBIT A

## Amended Plan and Amended Disclosure Statement Missing Documents List

### Amended Plan

| MISSING EXHIBITS | |
|---|---|
| **Exhibit** | **Document** |
| I.A.80 | Form of DIA Settlement Documents |
| I.A.127 | Principal Terms of Exit Facility |
| I.A.148.a | Form of GRS Hybrid Pension Plan |
| I.A.172 | Form of New B Notes Documents |
| I.A.173 | Form of New DWSD Bond Documents |
| I.A.177 | Form of New Existing Rate GLWA Bond Documents |
| I.A.180 | Form of New GLWA Bond Documents |
| I.A.182 | Form of New GLWA Revolving Bond Documents |
| I.A.202.a | Form of PFRS Hybrid Pension Plan |
| I.A.208 | Form of Plan COP Settlement Documents |
| I.A.210 | Principal Terms of Plan UTGO Notes |
| I.A.211 | Form of Plan UTGO Note |
| I.A.255 | State Contribution Agreement |
| II.B.3.t.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| II.B.3.u.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to be Rejected |
| Exhibit III.D.2 | Retained Causes of Action |

| DOCUMENTS REFERENCED AND NOT ATTACHED | |
|---|---|
| **Document** | **Location/Referenced** |
| DIA Settlement Documents | Art.I (80) at 7; Art.III (A)(8) at 38. |
| Downtown Development Authority Loans Agreement | Art.I (93) at 7 |
| DWSD Class A Sewer Documents | Art.I (98) at 8 |
| DWSD Class A Water Documents | Art.I (101) at 8 |
| DWSD Class B Sewer Documents | Art.I (104) at 8 |
| DWSD Class B Water Documents | Art.I (107) at 8 |
| DWSD Revolving Bond Documents | Art.I (109) at 9 |
| DWSD Revolving Sewer Bond Documents | Art.I (112) at 9 |
| DWSD Revolving Water Bond Documents | Art.I (115) at 9 |
| General Obligation Bond Documents | Art.I (142) at 11 |
| HUD Installment Note Documents | Art.I (154) at 13 |
| Limited Tax General Obligation Bond Documents | Art.I (163) at 13 |
| New DWSD Bond Documents | Art.I (173) at 14; Art.IV (A)(1)(c) at 42 |
| New Existing Rate DWSD Bond Documents | Art.I (175) at 14; Art.IV (A)(1)(c) at 43 |
| New Existing Rate GLWA Bond Documents | Art.I (177) at 14; Art.IV (A)(2)(a) at 43 |
| New GLWA Bond Documents | Art.I (180) at 14 Art.IV (A)(2)(a) at 43 |
| New GLWA Revolving Bond Documents | Art.I (182) at 15; Art.IV (A)(2)(a) at 43 |
| Parking Bond Documents | Art.I (193) at 15 |
| Plan COP Settlement Documents | Art.I (208) at 17 |
| Plan UTGO Notes Documents | Art.I (211) at 17; Art.IV (B) at 43 |
| Secured GO Series 2010 Bond Documents | Art.I (234) at 19 |
| Secured GO Series 2010(A) Bond Documents | Art.I (237) at 20 |
| Secured GO Series 2012(A)(2) Bond Documents | Art.I (240) at 20 |
| Secured GO Series 2012(A2-B) Bond Documents | Art.I (243) at 20 |
| Secured GO Series 2012(B) Bond Documents | Art.I (246) at 20 |
| Secured GO Series 2012(B2) Bond Documents | Art.I (249) at 20-21 |
| Postpetition Financing Agreement | Art.I (213) at 18; Art.II(A)(1)(b) at 23 |

| DOCUMENTS REFERENCED AND NOT ATTACHED | |
|---|---|
| **Document** | **Location/Referenced** |
| DWSD Class A Water Documents | Art.II (B)(Treatment of Class 1A) at 16 |
| DWSD Class B Water Documents | Art.II (B)(Treatment of Class 1B) at 16 |
| DWSD Class A Sewer Documents | Art.II (B)(Treatment of Class 1C) at 17 |
| DWSD Class B Sewer Documents | Art.II (B)(Treatment of Class 1D) at 17 |
| DWSD Revolving Sewer Bond Documents | Art.II (B)(Treatment of Class 1E) at 18 |
| DWSD Revolving Water Bond Documents | Art.II (B)(Treatment of Class 1F) at 18 |
| Secured GO Series 2010 Bond Documents | Art.II (B)(Treatment of Class 2A) at 18 |
| Secured GO Series 2010(A) Bond Documents | Art.II (B)(Treatment of Class 2B) at 18 |
| Secured GO Series 2012(A)(2) Bond Documents | Art.II (B)(Treatment of Class 2C) at 19 |
| Secured GO Series 2012(A2-B) Bond Documents | Art.II (B)(Treatment of Class 2D) at 19 |
| Secured GO Series 2012(B) Bond Documents | Art.II (B)(Treatment of Class 2E) at 19 |
| Secured GO Series 2012(B2) Bond Documents | Art.II (B)(Treatment of Class 2F) at 19 |
| HUD Installment Note Documents | Art.II (B)(Treatment of Class 4) at 20; VII (B)(2)(c) at 79 |
| COP Swap Documents | Art.II (B)(Treatment of Class 5) at 20 |
| Parking Bond Documents | Art.II (B)(Treatment of Class 6) at 20 |
| Limited Tax General Obligation Documents | Art.II (B)(Treatment of Class 7) at 20 |
| Unlimited Tax General Obligation Bond Documents | Art.II (B)(Treatment of Class 8) at 21 |
| DIA Settlement Documents | Art.II (B)(Treatment of Class 10) at 23; III(D)(1) at 39 |
| Definitive documentation governing the New B Notes | Art.IV (A)(1) at 44 |
| Definitive documentation governing the New DWSD Bonds | Art.IV (B)(1)(c) at 44 |
| Definitive documentation governing the New Existing Rate DWSD Bonds | Art.IV (B)(1)(d) at 45 |
| Definitive documentation governing the New GLWA Bonds | Art.IV (B)(2)(a) at 45 |
| Definitive documentation governing the New Existing Rate GLWA Bonds | Art.IV (B)(2)(b) at 46 |
| Definitive documentation governing the New GLWA Revolving Bonds | Art.IV (B)(2)(c) at 46 |
| Consent Agreement | Art.VII (D)(1)(c) at 101 |
| Bond Purchase Agreements | Art.VIII (G) at 116 |
| Energy Services Delivery Agreement | Art.VIII (K)(3) at 126 |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .      Docket No. 13-53846
        MICHIGAN,                 .
                                  .      Detroit, Michigan
                                  .      January 22, 2014
                     Debtor.      .      10:00 a.m.
. . . . . . . . . . . . . . .

MOTION OF CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO
SECTION 105(a) OF THE BANKRUPTCY CODE APPOINTING AND
DIRECTING THE DEBTOR TO COOPERATE WITH A COMMITTEE OF
CREDITORS AND INTERESTED PERSONS TO ASSESS THE ART
COLLECTION OF THE DETROIT INSTITUTE OF ARTS BASED ON
ARMS-LENGTH MARKET TRANSACTIONS TO ESTABLISH A
BENCHMARK VALUATION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Jones Day
                         By:  BRUCE BENNETT
                         555 South Flower Street, Fiftieth Floor
                         Los Angeles, CA  90071-2452
                         (213) 243-2382

For Financial           Weil, Gotshal & Manges, LLP
Guaranty Insurance      By:  ALFREDO R. PEREZ
Company:                700 Louisiana Street, Suite 1600
                        Houston, TX  77002
                        (713) 546-5040

For Erste               Ballard Spahr, LLP
Europaische             By:  VINCENT J. MARRIOTT, III
Pfandbrief-und          1735 Market Street, 51st Floor
Kommunalkreditbank      Philadelphia, PA  19103-7599
Aktiengesellschaft      (215) 864-8236
in Luxemburg, S.A.:

For Syncora             Kirkland & Ellis, LLP
Holdings, Ltd.,         By:  RYAN BLAINE BENNETT
Syncora Guarantee,           WILLIAM E. ARNAULT
Inc., and Syncora       300 North LaSalle
Capital Assurance,      Chicago, IL  60654
Inc.:                   (312) 862-3062

**EXHIBIT B**

APPEARANCES (continued):

For the Official       Dentons
Committee of           By:  SAM J. ALBERTS
Retirees:              1301 K. Street, NW
                       Suite 600, East Tower
                       Washington, DC  20005-3364
                       (202) 408-7004


Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1 done it in, I think, the absolute most responsible way that
2 doesn't infringe on the city's operating their government
3 because it doesn't.
4         THE COURT:  Thank you.
5         MR. PEREZ:  Thank you.
6         MR. BRUCE BENNETT:  I do very briefly want to talk
7 about the art, but first I want to respond to some of the
8 things we've just heard.  First of all, to the extent that
9 the motion now seeks information so that creditors -- certain
10 creditors as a group want to inform themselves about art, I'm
11 not quite sure why we're here for the appointment of an
12 official committee.  I will say this, that the city, although
13 it is not actually the repository of data relating to the DIA
14 or the city collection -- that's largely with what I call the
15 DIA Corp., which is the entity that manages the museum -- we
16 will cooperate with information requests that people have
17 with respect to the art and with respect to issues relating
18 to the art, period, end of story.
19         THE COURT:  I have to interrupt you and ask you to
20 place your appearance on the record.
21         MR. BRUCE BENNETT:  I'm sorry, your Honor.  Bruce
22 Bennett of Jones Day on behalf of the city, so -- and now
23 let's talk a little bit about what people should be looking
24 at if they want to understand this and how big a job it
25 really is.  First of all, the assertion was made that this is

1  a very hard asset to deal with, particularly hard asset to

2  deal with.  In some ways it's unusual.  That is to be sure.

3  But I think we've learned a few things -- the city has

4  learned a few things, and those creditors that have discussed

5  it with us know we've learned a few things as a result of the

6  work we've done.  First thing is is that the best way into

7  starting to deal with the art is actually books.  There are

8  two of them.  They were both available on Amazon.  One is

9  sold out.  The other one is still there.  And they're both

10  guides to the museum.  One of them covers, I think, the six

11  or 800 most prominent works.  The other one covers, I think,

12  1,200 prominent works, including -- and it'll become

13  important in a second -- some information as to providence,

14  where the museum got the individual items.

15          The other thing that we learned -- and I think the

16  Christie's report, which is criticized only as to its scope

17  in the papers, but the Christie's report taught us something

18  that I think art professionals also knew and I didn't

19  adequately appreciate that the -- that value in a collection

20  like this is confined to relatively few numbers of pieces.

21  And I think in the Christie's universe, upwards of 80 percent

22  of the value was covered -- was basically 75 works, something

23  like that, rough numbers, but that's the order of magnitude.

24  It's very, very concentrated.  So if we're interested in the

25  abstract question -- and I agree for much of the reasons that

1   your Honor hinted at that it may well be an abstract question
2   as to what the value of works of art are if the city really
3   had marketable title, could sell them free and clear, and if
4   it was appropriate to do so, all of those issues being rather
5   complex, it turns out, this isn't hard. It's actually
6   relatively easy. It's expensive to get people to pay
7   attention to it, and it might be hard in the first instance
8   to narrow down the universe you really want to look at, but
9   at the abstract question of -- that I just posed, which is,
10  you know, art, be able to sell free and clear of other
11  interests and appropriate to do so, these numbers are
12  accessible, and there's no difference of view that the art in
13  the art museum -- in the DIA is valuable.
14          On cooperation, I think the DIA has evidenced at
15  least to us the willingness to work with people who are
16  prepared to work discreetly, not interfere with the museum's
17  mission, to inspect works. The city made a decision in
18  conjunction with Christie's not to take works off and subject
19  them to physical detailed examination, look at the back, you
20  know, do anything that could conceivably be invasive, and we
21  were comfortable with that, and Christie's was comfortable
22  that it didn't interfere with the project. I'm reasonably
23  sure any creditor group that wants to go through the same
24  process will get similar levels of cooperation. It might
25  involve showing up at the museum at hours when it's not open.

1  That's not a very big inconvenience.  Okay.  So that's that.

2        Second area which is important and, frankly, wasn't

3  mentioned in any of the papers but I think wisely mentioned

4  now, which is which art -- we talked about the fact that

5  value is pretty concentrated.  They talk in their motion

6  about the fact that the Christie's appraisal looked at a

7  relatively small part of the art, five percent of total items

8  corresponding with those which were purchased using city

9  funds.  What about the rest of it?  Well, we said in our

10  papers and it's true that the -- that value is actually

11  highly concentrated in the city-acquired portion.  There are

12  all kinds of very interesting historical reasons for that, by

13  the way, but I don't think that's within the scope of today's

14  hearing.  It turns out to be true, and so that's one reason

15  to look there.  As to the rest of it, there's a big reason

16  not to look at all of it, and that is is that the rest of it

17  came via gifts.  When art museums get gifts, they frequently

18  get -- we have an analogy in law school.  We talk about a

19  bundle of sticks being property, and each artwork can be

20  viewed as a bundle of sticks.  When the art museum gets art

21  from donors, very frequently they don't get all the sticks.

22  They get the art subject to limitations, and if the

23  limitations and restrictions aren't complied with, the art

24  goes back to the donor or someplace else.  There's actually

25  many, many variations on that theme, so it's not always quite