**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____
                                          )
In re                                     )     Case No. 13-53846
                                          )
CITY OF DETROIT, MICHIGAN,                 )     In Proceedings Under
                                          )     Chapter 9
Debtor.                                   )
_____   )     Hon. Steven W. Rhodes

**OBJECTION OF AMBAC ASSURANCE CORPORATION TO AMENDED**
**DISCLOSURE STATEMENT WITH RESPECT TO AMENDED PLAN OF**
**ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ...........................................................................................2

    A.    The City's Chapter 9 Filing....................................................2

    B.    Ambac's Claims and Proposed Plan Treatment...................3

OBJECTION ................................................................................................5

ARGUMENT ................................................................................................5

    A.    Applicable Law .......................................................................5

    B.    The Disclosures Concerning Creditor Recoveries Are Vague And Incomplete ........................................................8

    C.    The Terms of Key Settlements Underlying the Plan Are Not Adequately Described In the Amended Disclosure Statement ..........11

        (i)    The DIA Settlement .................................................11

        (ii)    The Plan COP Settlement ........................................14

    D.    The Amended Disclosure Statement Does Not Adequately Disclose Risks ........................................................15

    E.    The Value and Availability for Creditors of the City's Assets Are Not Adequately Discussed Or Disclosed ...................18

    F.    The Amended Disclosure Statement Does Not Contain Adequate Information Regarding the City's Expenses or the Proposed Exit Facility ........................................................22

    G.    The City's Description of the Confirmation Test is Incorrect or Inadequate ........................................................23

    H.    The Factual Assertions And Statements Of The City Are Unsupported ........................................................26

CONCLUSION .............................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Fano v. Newport Heights Irr. Dist.*,
114 F.2d 563 (9th Cir. 1940) ...................................................................25, 26

*In re Am. Capital Equip.*,
688 F.3d 145 (3d Cir. 2012) .................................................................7

*In re Barnwell Cnty. Hosp.*,
471 B.R. 849 (Bankr. D.S.C. 2012)........................................................24

*In re Cardinal Congregate I*,
121 B.R. 760 (Bankr. S.D. Ohio 1990) ........................................................8, 16

*In re City of Colorado Springs Spring Creek Gen. Improvement Dist.*,
177 B.R. 684 (Bank. D. Co. 1995) ........................................................17, 19, 22

*In re City of Stockton, Cal.*,
486 B.R. 194 (Bankr. E.D. Cal. 2013) ................................................................25

*In re Ferretti*,
128 B.R. 16 (Bankr. D.N.H. 1991)......................................................................6

*In re Kehn Ranch, Inc.*,
41 B.R. 832 (Bankr. S.D. 1984) ........................................................................8

*In re Ligon*,
50 B.R. 127 (Bankr. M.D. Tenn. 1985)........................................................19

*In re Malek*,
35 B.R. 443 (Bankr. E.D. Mich. 1983).................................................................6

*In re Metrocraft Publ'g Servs., Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) ........................................................7, 9, 10

*In re Monnier Bros.*,
755 F.2d 1336 (8th Cir. 1985) ........................................................................5

*In re Mount Carbon Metro. Dist.*,
242 B.R. 18 (Bankr. D. Colo. 1999)................................................................25

*Kelley v. Everglades Drainage Dist.*,
  319 U.S. 415 (1943).................................................................25, 26

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
  337 F.3d 314 (3d Cir. 2003) ...............................................................20

*Matter of 183 Lorraine St. Assocs.*,
  198 B.R. 16 (E.D.N.Y. 1996) . Bankruptcy.........................................5

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
  81 F.3d 355 (3d Cir. 1996) ...................................................................7

*Tenn-Fla Partners v. First Union Nat'l Bank of Fla.*,
  229 B.R. 720 (W.D. Tenn. 1999) .........................................................5

*Westland Oil Dev. Corp. v. Mcorp Mgmt. Solutions, Inc.*,
  157 B.R. 100 (S.D. Tex. 1993) .............................................................7

## FEDERAL STATUTES

11 U.S.C. § 1125..............................................................................passim

11 U.S.C. § 901 ......................................................................................5

11 U.S.C. § 904..............................................................................25, 26

11 U.S.C. § 943(b)(7)............................................................................23

## OTHER STATUTES

Mich. Comp. Laws § 141.2103.......................................................16, 17

Mich. Comp. Laws § 141.2303................................................................17

## RULES

Bankruptcy Rule 9019 ...............................................................11, 12, 26

Ambac Assurance Corporation ("Ambac"), a creditor and party in interest in the above-captioned case, objects (the "Objection") to the Amended Disclosure Statement with Respect to Amended Plan of Adjustment of Debts of the City of Detroit (the "Amended Disclosure Statement" or "Am. Discl. Stmt.").[1] In support of its Objection, Ambac respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      The Amended Disclosure Statement is materially deficient in numerous respects, to the point where it fails to satisfy the "adequate information" requirements of Bankruptcy Code § 1125. Several significant exhibits are missing, despite being referred to in the Amended Disclosure Statement or the Plan. Important explanatory information is omitted. The Amended Disclosure Statement's description of creditor recoveries is bereft of critical details, such that creditors lack information necessary to making an informed judgment about how to vote. And some of the key terms of important settlements and the securities to be issued – on which the Plan is purportedly built – are not included, making it impossible for creditors to evaluate their reasonableness and their impact on the Plan and recoveries to creditors.

2.      But the deficiencies do not stop there. The Amended Disclosure Statement's list of the risks that the Plan will not be confirmed is missing several

---

[1] Unless otherwise defined in this Objection, all capitalized terms shall have the meaning ascribed to them in the Amended Disclosure Statement.

significant points.  The discussion of the value and availability for creditors of the

City's assets lacks essential details, as does the discussion of the City's cost

containment efforts.  And, compounding the import of these deficiencies, the

City's description of the legal requirements for plan confirmation is inaccurate and

misleading.  For all of these reasons, as detailed below, the Amended Disclosure

Statement fails to meet the Bankruptcy Code's requirements and should not be

approved.

## BACKGROUND

A.      **The City's Chapter 9 Filing**

3.      On July 18, 2013 (the "Petition Date"), the City of Detroit, Michigan

(the "City" or the "Debtor") filed its petition commencing this case under chapter 9

of the Bankruptcy Code.

4.      On February 21, 2014, the City filed its Plan for Adjustment of Debts

of the City of Detroit [ECF No. 2708] and an initial disclosure statement [ECF No.

2709] (the "Disclosure Statement").  Thereafter, the Court entered a scheduling

order [ECF No. 2937] (the "Scheduling Order"), which required, among other

things, that parties advise counsel to the City of any additional information that

should be included in the Disclosure Statement by March 14, 2014.

5.      On March 14, 2014, Ambac delivered a letter to the City identifying

the additional information that should be included in the Disclosure Statement in

2

order for the City to satisfy its burden under Bankruptcy Code § 1125. The City responded to Ambac's letter on March 28, 2014, but declined to provide much of the information requested.

6.     On March 31, 2014, the City filed its Amended Plan for Adjustment of the Debts of the City of Detroit [ECF No. 3380] (the "Plan") and the Amended Disclosure Statement [ECF No. 3382]. The Amended Disclosure Statement also does not include much of the information addressed in Ambac's letter of March 14, 2014, and accordingly, Ambac files this Objection.

**B.     Ambac's Claims and Proposed Plan Treatment**

7.     In 2004 and 2005, pursuant to resolutions adopted by the City Counsel (the "Resolutions") and Sale Orders of the Finance Director of the City (the "Sale Orders"), the City issued certain unlimited tax general obligation bonds of the City (the "Unlimited GO Bonds") and limited tax general obligation bonds of the City (the "Limited GO Bonds," together with the Unlimited GO Bonds, the "GO Bonds").

8.     Ambac issued Financial Guaranty Insurance Policies (the "Policies," and together with the Resolutions and the Sale Orders, the "Bond Documents"), insuring certain of the City's payment obligations under the GO Bonds pursuant to the terms of the Policies. Ambac is the assignee and the subrogee of all of the right, title, and interest of the holders of the Bonds (the "Bondholders") to the

3

extent it has made payments under the Policies. In addition, pursuant to the Sale Orders, upon the occurrence and continuance of an event of default under the Bonds, Ambac is entitled to control and direct the enforcement of all rights and remedies granted to the Bondholders under the Bond Documents, including all rights with respect to any proposed plan of adjustment, and is entitled to exercise the voting rights with respect to the GO Bonds.

9. Ambac timely filed fourteen (14) proofs of claim [Claim Nos. 1050, 1060, 1076, 1083, 1089, 1106, 1110, 1118, 1119, 1121, 1122, 1134, 1147 and 1149] (the "Ambac Claims") asserting claims against the City for the full amount of principal and interest due under the Bond Documents, amounts due Ambac for payments pursuant to the Policies, and contractual reimbursements due for charges, fees, costs, losses, liabilities and expenses incurred by Ambac in connection with its Policies. Under the proposed Plan, the Ambac Claims are classified in Classes 7 and 8.

10. The City proposes to satisfy the Ambac Claims with respect to the Limited GO Bonds in Class 7 by distributing, *inter alia*, an "Unsecured Pro Rata Share of New B Notes." Am. Discl. Stmt. at 20. The City also proposes to satisfy certain of the COP Claims (Class 9), OPEB Claims (Class 12), Downtown Development Authority Claims (Class 13) and Other Unsecured Claims (Class 14) in the same manner, *i.e.*, with an "Unsecured Pro Rata Share of New B Notes." *Id*.

4

at 22 and 25-26. The City proposes to satisfy the Ambac Claims with respect to the Unlimited GO Bonds in Class 8 by distributing a "Pro Rata Share of Plan UTGO Notes." *Id*. at 21. The Amended Disclosure Statement estimates the recovery for creditors holding GO Bonds – Classes 7 and 8 – at 15%. *Id*. at 20-21.

## OBJECTION

11.      Section 1125 of the Bankruptcy Code, made applicable to this proceeding by Bankruptcy Code § 901, requires that the City demonstrate, and the Court find, that the Amended Disclosure Statement contains adequate information. As discussed below, the City cannot satisfy its burden because the Amended Disclosure Statement is far from adequate. It is missing material information that is necessary for creditors to analyze the proposed Plan and make informed decisions as to how to vote. Accordingly, the Amended Disclosure Statement should not be approved.

## ARGUMENT

**A.      Applicable Law**

12.      The primary purpose of a disclosure statement is to give creditors the information necessary for them to decide whether or not to accept a proposed plan. *See In re Monnier Bros*., 755 F.2d 1336, 1342 (8th Cir. 1985); *Tenn-Fla Partners v. First Union Nat'l Bank of Fla.*, 229 B.R. 720, 733 (W.D. Tenn. 1999), *aff'd*, 226 F.3d 746 (6th Cir. 2000); *Matter of 183 Lorraine St. Assocs*., 198 B.R. 16, 28

(E.D.N.Y. 1996) ("The purpose of the disclosure statement is to classify claims into groups and to enable these groups of creditors to be fully informed when voting whether or not to accept a proposed plan.").  Bankruptcy Code § 1125(b) provides that an acceptance or rejection of a plan of reorganization or adjustment may not be solicited until after a disclosure statement approved by the Bankruptcy Court as containing "adequate information" has been prepared and distributed to creditors.  Adequate information is defined as:

> Information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records . . . that would enable
> such a hypothetical investor of the relevant class to make an informed
> judgment about the plan.

11 U.S.C. § 1125(a)(1).  To satisfy the "adequate information" requirement of Bankruptcy Code § 1125, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  A disclosure statement should only be approved if it provides "information sufficient to allow parties voting on the plan the opportunity to arrive at an independent and informed judgment." *In re Malek*, 35 B.R. 443, 444-45 (Bankr. E.D. Mich. 1983).

13.    Although the type and amount of information required to be contained in a disclosure statement varies from case to case, Bankruptcy Code § 1125 is

biased toward more disclosure rather than less. *See, e.g., Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (stating that "[b]ecause creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated"). Where, as here, a disclosure statement fails to provide information material to the proffered plan, courts will deny approval of the disclosure statement. *See, e.g., Westland Oil Dev. Corp. v. Mcorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (because "[d]isclosure is the 'pivotal' concept in chapter 11 reorganization," court denied approval of a disclosure statement that failed to disclose properly the existence of certain pre-petition causes of action (internal citations omitted)); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 569-71 (Bankr. N.D. Ga. 1984) (denying approval of disclosure statement where information was omitted relating to the value of the debtor's machinery, fixtures and equipment, the amount of unsecured claims, the ability to collect accounts receivable, and the estimated return to creditors).[2]

---

[2] Although there are numerous deficiencies in the Amended Disclosure Statement, Ambac highlights in this Objection only those issues Ambac believes to be most important, and has not attempted to be exhaustive. Further, pursuant to the Court's directive in the Scheduling Order, Ambac will not discuss issues that may be considered "confirmation issues" notwithstanding several issues raised by the Amended Disclosure Statement and the Plan that appear to make the Plan patently unconfirmable. *See, e.g., In re Am. Capital Equip.*, 688 F.3d 145, 154 (3d Cir.

7

**B.    The Disclosures Concerning Creditor Recoveries Are Vague And Incomplete**

14.    Essential to the ability of any disclosure statement to enable informed votes by the creditors is adequate information regarding estimated creditor recoveries and the treatment of their claims.  Creditors are also entitled to be fully apprised of the recovery and treatment to be afforded other classes of creditors, especially where, as here, recovery by one class that shares in the New B Notes will affect the recoveries of all other classes proposed to receive the same notes.  In addition, a number of confirmation requirements turn on the relative treatment of creditor classes, including the absolute priority rule and the prohibition on unfair discrimination.  The Amended Disclosure Statement is entirely deficient in meeting these requirements.

15.    As an initial matter, many basic facts are missing.  For example, the estimated aggregate amount of claims in Classes 9 (COP Claims), 14 (Other Unsecured Claims), 15 (Convenience Claims), and 16 (Subordinated Claims) is described as "To Be Determined" or "Unknown."  Am. Discl. Stmt. at 22-26.

2012) (a court should "not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable because it does not comply with [confirmation requirements]" (quoting *In re Kehn Ranch, Inc*., 41 B.R. 832, 832-33 (Bankr. S.D. 1984)); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (a disclosure statement will not be approved where it describes a plan that is so "fatally flawed that confirmation is impossible."). Ambac reserves its right to raise, at the appropriate time, any and all objections to confirmation of the proposed Plan or any other plan of adjustment proposed by the City.

8

16.     Equally troubling is the lack of explanation for the claim amounts and
recovery percentages that *are* disclosed.  The asserted recovery percentage for
Class 7 – Limited GO Bonds – is particularly problematic.  The recovery chart in
the Amended Disclosure Statement estimates a recovery of 15%.  Am. Discl. Stmt.
at 20.  That estimate is purportedly based on the distribution of "Unsecured Pro
Rata Shares of New B Notes" to the holders of roughly $163.5 million of Limited
GO Bonds.  *Id*.  But the terms and provisions of the proffered distribution are so
vague as to make it impossible for any holder of Limited GO Bonds to evaluate the
validity of the City's estimate.  The New B Notes are proposed to be issued not
only to the creditors in Class 7, but also to creditors in Classes 9, and 12, 13 and
14.  But as noted above, the City claims it lacks an estimate of the amount of
claims in Classes 9 and 14.  And as the aggregate amount of the New B Notes is
fixed regardless of the amount of Allowed Claims on account of which they are
distributed, the recoveries to creditors in Classes 7, 9, 12, 13 and 14 are directly
and materially driven by the amount of Allowed Claims in Classes 9 and 14.
Either the City is aware of the amount of Class 9 and 14 claims and is choosing not
to disclose it, or its 15% estimated recovery for Class 7 is pure speculation.  In
either case, it is impossible for the creditors in Class 7 to even guess at the portion
of these securities to which their class may be entitled, and thus, equally
impossible to evaluate the validity of the City's estimate of a 15% recovery.

9

17.    The situation is equally bad for creditors in Class 8, who are to receive a "Pro Rata share of Plan UTGO Notes."  Am. Discl. Stmt. at 21.  Here again, the City estimates the Class 8 recovery at 15%, *id*., but there is virtually no information provided with which Class 8 creditors can evaluate this estimate.  The Amended Disclosure Statement states only that the maturities of the Plan UTGO Notes shall be no longer than the maturities of the existing Unlimited GO Bonds, and that the "Plan UTGO Notes shall contain such other terms as will result in each Holder of an Allowed Unlimited Tax General Obligation Bond Claim receiving a payment stream the present value of which is equal to approximately 15% of such Holder's Allowed Unlimited Tax General Obligation Bond Claim as of the Effective Date."  *Id*.  All other terms are omitted, and the exhibits (Exhibits I.A.210 and I.A.211) that might illuminate the facts will not be filed until five business days before the confirmation hearing, well after all Plan objections and votes are due.  Am. Discl. Stmt. at 7.  Thus, there is no information at all as to the principal amount of the Plan UTGO Notes, the interest rate that will be provided, how the interest rate will be determined, the discount rate the City intends to use to calculate present value, whether the City's obligation under the Plan UTGO Notes is secured or unsecured, or the amortization schedule for the notes.  This information is the minimum necessary for a creditor to evaluate the true value of

the proposed recovery, and without it, a Class 8 creditor simply cannot assess the proposed Plan.

18.     Finally, the Amended Disclosure Statement fails to advise creditors that actual recoveries could vary substantially from the estimates in the Amended Disclosure Statement.  In addition, creditors would be better served if estimated recoveries were stated as a range rather than as a fixed (and unsupported) percentage, especially where, as here, the City is taking the position that the amount of certain claims sharing in the New B Notes is unknown.

**C.     The Terms of Key Settlements Underlying the Plan Are Not Adequately Described In the Amended Disclosure Statement**

19.     The Plan is premised on the consummation of a number of settlements that the City believes will "inure to the benefit of the City's creditors and residents."  Am. Discl. Stmt. at 8.  But the Amended Disclosure Statement fails to describe many of the relevant terms of those settlements, and is entirely silent as to the City's ability to satisfy the requirements of Bankruptcy Rule 9019 with respect to any of them.  Without this information, no creditor can make a reasonable determination as to whether to vote to accept or reject the proposed Plan.  Two examples follow:

**(i)     The DIA Settlement**

20.     As the City itself makes clear, a cornerstone of the proposed Plan is the DIA Settlement.  Am. Discl. Stmt. at 8-9 ("The Plan . . . assume[s] the

existence and the implementation of the DIA Settlement . . . .").  Pursuant to this proposed settlement, one of the City's most valuable assets – the artwork housed at the Detroit Institute of Art ("DIA") – will be protected from the general claims of creditors in exchange for cash pledges to a single creditor – the Retirement Systems – totaling approximately $466 million.  Am. Discl. Stmt. at 47.  This sum is to be comprised of a pledge of "at least" $366 million by certain Foundations and an "irrevocable commitment" by the DIA Corp. to raise "at least" $100 million from its donors.  *Id*.  In addition, the Foundations' pledge is contingent on, *inter alia*, the agreement of the State of Michigan to provide $350 million in additional funding to the Retirement Systems.  *Id*. at 47.  All of these amounts are to be paid over a period of 20 years.  *Id*. at 11.

21.     Under the proposed Plan, these monies will be the sole contributions to the Retirement Systems over the next ten years.  *Id*.  The City intends to make no contributions until after June 30, 2023.  *Id*.  Thus, the Amended Disclosure Statement states that if the DIA Settlement does not occur or the State money is not received, "then the recoveries on account of all Unsecured Claims, including Pension Claims, will be materially diminished."  *Id*.

22.     Despite the avowed importance of the DIA Settlement, the discussion of its provisions and terms is woefully inadequate.  No information has been provided, for instance, as to the DIA Corp.'s history of fundraising, to permit a

creditor to evaluate the actual value of its "irrevocable commitment" to raise $100

million over the next 20 years.  Likewise, there is no discussion in the Amended

Disclosure Statement regarding the need for – or likelihood of passage of –

legislation authorizing the State to contribute $350 million to the Retirement

Systems, without which the DIA Settlement fails under its own terms.  And the

Amended Disclosure Statement is silent as to what use will be made of excess

funds in the event the Foundations and the DIA Corp. together raise more than

$466 million.  Other fundamental details are also missing.  The Amended

Disclosure Statement does not explain, for example, how the payment

commitments of the Foundations and the DIA Corp. will be enforced, particularly

in view of the fact that the settlement contemplates that ownership of the art will be

irrevocably transferred to the DIA Corp. on the Effective Date, and will,

accordingly, no longer be reachable by the City or its creditors.

     23.    More fundamentally, the Amended Disclosure Statement includes no

discussion or justification for the DIA Settlement.  It includes, for example, no

discussion concerning the total value of the art involved in the settlement; whether

the Settlement includes all of the artwork owned by the City, and if not, what the

value and planned disposition is of the remaining art; the legal issues surrounding

the ownership of the art and the City's assessment of its likelihood of prevailing on

those issues; or what other efforts were made to market the art or obtain other

resolutions to these issues. Likewise, the Amended Disclosure Statement does not disclose the basis on which the City determined that all of the consideration received for the art would go to a single creditor, the Retirement Systems, nor the value of the claims the Retirement Systems will release in exchange.

24.     Finally, as noted above, the Amended Disclosure Statement states explicitly that if the DIA Settlement does not occur or the State money is not received, "then the recoveries on account of all Unsecured Claims, including Pension Claims, will be materially diminished to the lower level of recoveries set forth in the Plan for Classes 10 and 11." Am. Discl. Stmt. at 11. However, the Amended Disclosure Statement includes no discussion or information sufficient for a creditor to evaluate the likelihood that the DIA Settlement will not occur or that the State money will not be received, nor does it explain how or why these matters would have a negative effect on the recoveries on account of Unsecured Claims other than Pension Claims. This information is critical to a fair and informed vote.

**(ii)     <u>The Plan COP Settlement</u>**

25.     If and to the extent that COP Claims (Class 9) become Allowed Claims, holders of COP Claims will be entitled to elect to participate in the Plan COP Settlement. And whether or not the holder of a COP Claim elects to participate in the Plan COP Settlement will apparently determine the share of the New B Notes the holders will receive. Settling COP Claims holders will share in

14

the New B Notes based on an Allowed Claim at 40% of the face amount of their claims. Those who do not settle will apparently either get nothing (if the City prevails in the COP Litigation), or share in the New B Notes at 100% of the face amount of their claims (if they prevail in the COP Litigation). The election will thus affect all creditors slated to receive a *pro rata* share of the New B Notes, including not only the electing COP Claim holders, but also all other COP Claim holders as well as all of the creditors in Classes 7, 12, 13 and 14.

26.     Despite these very significant consequences, the Disclosure Statement is missing information essential to evaluating this aspect of the Plan. As noted above, the Disclosure Statement includes *no* estimate of the potential amount of the allowed COP Claims. There is no discussion of the likelihood that the City will prevail in the COP Litigation, or any estimate as to how many of the COP Claims holders may accept the COP Settlement, and thus there is insufficient information available to creditors in other classes sharing in the New B Notes with which to evaluate what their *pro rata* share might be. This information is critical to an informed vote by creditors in all of the affected classes.

**D.     The Amended Disclosure Statement Does Not Adequately Disclose Risks**

27.     A particularly important portion of any disclosure statement is the section describing risks. Where the risks to creditors are not adequately disclosed, creditors are not in a position to make a full and fair evaluation of the plan and how

they should vote.  *See*, *e.g*., *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) ("disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization . . . [and] should likewise contain all material information relating to the risks posed to creditors . . . under the proposed plan." (citations omitted)).  The Amended Disclosure Statement omits a discussion of several material risks, without which the disclosure is manifestly inadequate.

28.    First, the City proposes to issue new securities in connection with the proposed Plan, but fails to disclose the risk that Michigan law does not authorize the issuance of these instruments, that such legislation may not be enacted, or that the City may be unable to obtain necessary approval for their issuance. Specifically, Act 34, which exclusively governs municipal borrowing, restricts debt instruments (other than revenue bonds) that can be issued by the City to "municipal securities."  *See* Mich. Comp. Laws §§ 141.2301, 141.2103(l).[3] Municipal securities must be payable from identified sources of revenue, Mich. Comp. Laws § 141.2103(r), expressly limited to *ad valorem* property taxes, special assessments, a pledge of full faith and credit, or other sources of revenue expressly

---

[3]  As detailed in Ambac's Objection to the Swap Motion [ECF No. 348], ¶¶ 28-36 and Ambac's Supplemental Objection [ECF No. 2354], ¶¶ 15-16, Act 34 occupies the field with respect to municipal borrowing.  Accordingly, notwithstanding City's broad powers under the Home Rule City Act, debt instruments other than revenue bonds may be issued only pursuant to the express provisions of Act 34.

contemplated by Act 34 and not relevant here. *See* Mich. Comp. Laws

§ 141.2103(l). The debt instruments to be issued under the Plan, at least as they

are described in the Amended Disclosure Statement, do not meet these criteria.

The City should be required to disclose these facts and reasonably apprise its

creditors of the risk that legislation will be needed to enable the issuance of the

notes contemplated by the plan, the likelihood of the enactment of such legislation,

and the impact on the Plan or creditors' ability to enforce these instruments in the

event the legislation is not enacted. Moreover, municipal securities may only be

issued if the Department of Treasury finds that the municipality meets strict

financial requirements. *See* Mich. Comp. Laws §§ 141.2303(3), (7). The

Amended Disclosure Statement discloses neither the facts sufficient to evaluate

whether these requirements are met nor the risks that the Department of Treasury

may withhold approval. If such disclosures are not made, the Amended Disclosure

Statement should not be approved. *See In re City of Colorado Springs Spring

Creek Gen. Improvement Dist.*, 177 B.R. 684, 689 (Bank. D. Co. 1995) (denying

approval of disclosure statement in part because of failure to discuss potential

inability to comply with relevant state and federal laws upon emergence).

29.     Second, while the Amended Disclosure Statement makes clear that the

Plan is contingent on the DIA Settlement, it does not discuss the risk of potential

legal challenges to that settlement. Nor does it disclose the risk that certain aspects

of the interrelated PFRS and GRS Settlements may be held illegal, *e.g*., the Plan-mandated use of specific actuarial assumptions, or the risk that the City's future pension funding obligations could be substantially more than projected if the assets of the PFRS or the GRS underperform, or if the actuarial assumptions used to calculate the contribution requirements are otherwise incorrect.

30.     Finally, the City does not disclose the risk that, in view of the proposed treatment of the GO Bonds, the City's ability to access the public debt markets may be substantially limited, if not eliminated altogether, for decades to come.[4]

**E.     The Value and Availability for Creditors of the City's Assets Are Not Adequately Discussed Or Disclosed**

31.     The Amended Disclosure Statement does not fully inform creditors of City assets that may and should be monetized in order to maximize creditor recovery.  In addition, although the proposed Plan appears to rely in part on monetization or utilization of revenue generated by certain of the City's assets, the Amended Disclosure Statement fails to provide adequate information regarding the value of these assets or the revenue that may be generated from them.  The omission of this information is fatal to the Amended Disclosure Statement's

---

[4] With regard to the GO Bonds, the City also affirmatively misstates the scope of the LTGO Litigation.  That litigation is limited to the determination of GO bondholders' property rights in certain funds designated for the repayment of GO Bonds.  It does not allege that "all other Unsecured Claims are subordinated to the Limited Tax General Obligation Bond debts."  *See* Am. Discl. Stmt. at 79.

approval. *See In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985) ("A description of available assets and their value is a vital element of necessary disclosure"); *see also Colorado Springs*, 177 B.R. at 689 (disclosure statement cannot be approved where it fails to discuss potential impact of any decrease in assessed value of District's property).

32. Generally, the Amended Disclosure Statement lacks any discussion of City assets that may be sold to satisfy the claims of creditors, their estimated value, and to whose benefit the proceeds of any sales will inure.[5] More specifically, the value of City-owned land, buildings such as the Veteran's Memorial Building, and revenue generated by the potential monetization of the Automobile Parking Fund are discussed only superficially (Am. Discl. Stmt. at 129); the City does not disclose how it will monetize these assets, the risks associated with the disposition of these assets, or the use that will be made of the proceeds if and when the assets are sold. For example, the City states it is currently negotiating a sale of the Veterans' Memorial Building. *See* Am. Discl. Stmt. at 129. Yet, there is no information relating to the appraisal of the building, the City's marketing efforts

---

[5] In this regard, the Amended Disclosure Statement discusses the City's plans to spend some $1.5 billion in revitalization efforts, including demolition of blighted structures that diminish the value of City-owned land, but nowhere discusses whether and to what extent these efforts will increase the value of City-owned land, and if so, how the Plan proposes to utilize that increased value for the benefit of creditors.

for the building, potential alternate transactions, or who will benefit from the sale if it occurs.

33.     Similarly, under the proposed Plan, the City seeks to retain numerous undisclosed causes of action. *See* Plan, Art. III.D.2; Am. Discl. Stmt. at 40.  But neither those causes of action nor their estimated merits are identified, leaving creditors merely to speculate as to the potential value of these assets.  To provide but one example, the City does not specify whether these causes of action include claims against the persons and entities that benefited from the egregious fiduciary malfeasance with respect to the Retirement Systems discussed at page 82-83 of the Amended Disclosure Statement, whether it intends to pursue claims against these malfeasors, or how much it might expect to recover as a result.  Nor is there any disclosure as to whose benefit any recoveries obtained will flow.  This information is required.  *See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321-322 (3d Cir. 2003) (disclosure statement did not contain adequate information when it failed to describe causes of action that could generate significant value for the estate).

34.     In yet another example, the Amended Disclosure Statement describes briefly a potentially significant transaction with respect to its water and sewer operations, but provides very limited specifics regarding the transaction.  The City states that it "*may* enter into a transaction (a "DWSD Transaction") that will

include the formation of a new Great Lakes Water and Sewer Authority. . . . [but that it] will enter into a DWSD Transaction *only if* it enables the City to make larger, more rapid or more certain distributions to at least some of its creditors . . . ." *See* Am. Discl. Stmt. at 121 (emphasis added). However, the City provides few specifics as to the terms of the transaction, the costs the City would incur or save, or, importantly, the amount recoveries to select creditors would increase should the transaction be consummated. Without this additional information, it is impossible for creditors to determine if the proposed transaction is reasonable or in their best interests.

35. The discussion of other potential revenue sources is also severely lacking. For example, the Amended Disclosure Statement refers to federal grants at page 71, but does not explain them, discuss the possibility that they may be increased in the future, or state whether the City is taking steps in an effort to increase them. Likewise, the Amended Disclosure Statement notes three requirements affecting state revenue sharing, but does not explain whether the City has met those requirements or expects to do so in the future. The Amended Disclosure Statement further reveals that bus fares are lower than comparable bus systems by 30% on average, but does not explain why they have not been raised, and it also includes no discussion of any analysis or research conducted by or on behalf of the City as to raising taxes or user fees to provide additional revenue for

21

the payment of creditors. More generally, the Amended Disclosure Statement states (at page 71) that the Emergency Manager has determined that the City cannot gain additional revenue through the imposition of increased rates or additional taxes on City residents, but provides no information whatsoever to support or explain this statement. Without additional information regarding recoveries that might be achieved from the City's assets and other revenue sources, creditors cannot make informed decisions about whether to accept or reject the Plan.

**F.     The Amended Disclosure Statement Does Not Contain Adequate Information Regarding the City's Expenses or the Proposed Exit Facility**

36.     Material information regarding the City's expenses, and efforts to reduce them, is also missing from the Amended Disclosure Statement. For example, the Amended Disclosure Statement refers to restrictive work rules and the City's intention to change them, but includes no information regarding the projected savings to be achieved in doing so, or how those savings will be used to benefit creditors.

37.     In addition, the City provides no estimate of administrative claims to be paid under the proposed Plan, which alone is sufficient ground to deny approval of the Amended Disclosure Statement. *See Colorado Springs*, 177 B.R. at 689 (denying approval of a disclosure statement due to failure to identify and quantify

administrative expenses).  Without this information, it is impossible for creditors to make an independent assessment of whether the City's recovery percentages and proposed treatments are reasonable and accurate, and whether creditors should vote to accept the proposed Plan.

38.     Further, the Amended Disclosure Statement refers at page 49 to an Exit Facility, but includes no details regarding its amount, terms, or purpose.  A second reference, at page 60, describes the amount of the Exit Facility as $300 million, but again, provides no details regarding the terms of the purpose of the financing.  Information about a matter of this magnitude and importance must be included.[6]

**G.     The City's Description of the Confirmation Test is Incorrect or Inadequate**

39.     The Amended Disclosure Statement's discussion of the legal requirements for confirmation of the proposed Plan, Am. Discl. Stmt. at 56-59, is so incorrect or inadequate as to be misleading.  Unless it is corrected and expanded, the Amended Disclosure Statement should not be approved.

40.     Although the Amended Disclosure Statement includes a description of the "best interest of creditors" test required by Bankruptcy Code § 943(b)(7), the

---

[6] The failure to disclose the parameters of the Exit Facility are particularly egregious in light of the fact that the lender has been identified for more than five months.  *See* [Dkt. 1520] at 1, n.1 (where the City represents that it is committed to using Barclays as the exclusive placement agent with respect to the Exit Facility).

description is at best incomplete, and at worst downright misleading.  Virtually the sole accurate statement regarding this confirmation standard is the City's description of the "best interest" test as requiring the City to demonstrate that confirmation of the Plan would leave the City's creditors in a better position than would dismissal of the case.  Am. Discl. Stmt. at 57-58.  The City fails to acknowledge, however, that the test also requires the City to establish that the proposed Plan "affords all creditors the potential for the greatest economic return from Debtor's assets."  *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012) (a plan pursuant to which the debtor maximizes value of its assets and obtains a fair price for them for distribution to creditors, "albeit over time," is in the best interest of creditors).  Nor does the City disclose the converse bright-line rule that a "plan that makes little or no effort to repay creditors over a reasonable period of time may not be in the best interests of creditors."  6 Collier on Bankruptcy, ¶ 943.03[7][a] (16th ed. 2013) (citing *Fano v. Newport Heights Irr. Dist.*, 114 F.2d 563, 565-566 (9th Cir. 1940)).

41.     The City also obscures the heavy evidentiary burden it is required to meet to show that the recovery provided to the creditor body meets the confirmation standard:

> In order that a court may determine the fairness of the total amount of cash or securities offered to creditors by the plan, the court must have before it data which will permit a reasonable, and hence an informed,

24

estimate of the probable future revenues available for the satisfaction of creditors. . . .

Appropriate facts which might have been considered . . . are the revenues which have in the past been received from each source of taxation, the present assessed value of property subject to each tax, the tax rates currently prescribed, the probable effect on future revenues of a revision in the tax structure adopted in 1941, the extent of past tax delinquencies, and any general economic conditions of the District which may reasonably be expected to affect the percentage of future delinquencies.

*Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 419-21 (1943). Also absent

from the Disclosure Statement is any disclosure that the best interest of creditors

test is not satisfied if the City retains too much value for itself at the cost of making

reasonable payments to its creditors. *See Fano*, 114 F.2d at 565-66 (a plan is not in

the best interest of creditors where the debt expended significant resources on

major improvements at the expense of being able to repay the bondholders).

Chapter 9 case law is clear that creditor recovery must be maximized so long as it

does not leave the City with insufficient resources to "provide future public

services at the level necessary to its viability as a municipality." *In re Mount*

*Carbon Metro. Dist.*, 242 B.R. 18, 34-35 (Bankr. D. Colo. 1999) (emphasis added).

42. Perhaps most misleading is the City's assertion that the scope of the

"best interest of creditors" test is somehow limited by Bankruptcy Code § 904. *See*

Am. Discl. Stmt. at 57. This is simply wrong. *See, e.g., In re City of Stockton,*

*Cal.*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013) (due to the limitations in § 904, a

municipal debtor need not submit settlements for approval pursuant to Bankruptcy Rule 9019, but the "day of reckoning" will come at the plan confirmation hearing where objections can nevertheless be raised). The Chapter 9 case law makes clear, generally, that in evaluating a proposed plan of adjustment, the Bankruptcy Court must be free to determine that the municipality's planned expenditures do not unreasonably interfere with its ability to repay its creditors, *see*, *e.g.*, *Kelley*, 319 U.S. at 419-421; *Fano*, 114 F.2d at 565-566, and this is so notwithstanding the limitations imposed by § 904.

**H.     The Factual Assertions And Statements Of The City Are Unsupported**

43.     Finally, the City makes numerous factual assertions in the Amended Disclosure Statement that are unsupported by any citation to documents or authoritative source material. Without this support, creditors are unable to evaluate the legitimacy of the City's assertions, and thus, cannot make an informed decision as to how to vote on the Plan. The following are examples of factual assertions that lack supporting citations (other than documents created by the City itself in connection with this case):

- The charts and accompanying text on pages 87-90 of the Amended Disclosure Statement, purporting to show declines in revenue, income taxes, state shared revenue, and employment

- The paragraph at the bottom of page 90 discussing "Comparative Tax Burden"

26

- The statement on page 92 that "The City estimates that it has been able to realize more than $200 million in annual savings."

- The statement on page 92 that "No major U.S. City had a lower credit rating than Detroit."

- The statement on page 95 that "The total of functioning streetlights per square mile in the City generally was less than half that of comparable national municipalities."

- The statements on page 98 that bus fares are lower than comparable bus transit systems by approximately 30% on average, that bus transfers are offered at significantly reduced rates, and that DDOT's maintenance operations are "highly inefficient (58% less efficient) as compared with similar bus transit systems."

- The statements on page 99 that the cost to the City to process payroll is $62 per check, more than 4 times the "general average of $15 per paycheck, and almost 3.5 times the average of $18 per paycheck for other public sector organizations."

Without back-up for these statements, or the ability to review and analyze the back-up, creditors are left with no means to verify the statements and whether these facts do, in fact, support a vote in favor of confirmation.

## <u>CONCLUSION</u>

44. For all of the reasons described above, the Amended Disclosure Statement should not be approved.

27

Dated: April 7, 2014                    Respectfully Submitted,

**ARENT FOX LLP**
By: /s/ Carol Connor Cohen
Carol Connor Cohen
Caroline Turner English
1717 K Street, NW
Washington, DC  20036-5342
(202) 857-6054
Email:  Carol.Cohen@arentfox.com

David L. Dubrow
Mark A. Angelov
1675 Broadway
New York, NY 10019
(212) 484-3900

– and –

**SCHAFER AND WEINER, PLLC**
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340
Email:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*