FILED

2014 APR -7 P 2: 01

U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

In the matter of:

CITY OF DETROIT, MICHIGAN

_____/Debtor

Case No. 13-53846-swr

Chapter 9

Hon. STEVEN W. RHODES

## OBJECTION TO CITY OF DETROIT'S AMENDED DISCLOSURE STATEMENT [DOCKET 3382] AND CONCURRENCE WITH CERTAIN OBJECTIONS

The undersigned, as a retired City of Detroit employee (police department), has been deemed a creditor (Class 10) in this matter. It is my understanding that the City has submitted the information contained in the disclosure statement in its effort to provide the greatest and earliest possible recoveries to the City's creditors while providing adequate police and fire protection to its residents and enabling the City to maintain streets, and to create an environment in which its residents can prosper. Although the document contains more details than the previously filed version it is still in an inchoate stage of development. With the submission of this objection and concurrence with certain other objectors, it is my desire to assist the Court and the City to understand what issues exist in the disclosure statement that are unclear and require modification to provide a known, measurable basis for cost evaluation and comparison. Should there not be any modifications to the current disclosure statement, as are being sought in this

objection, the undersigned shall be placed in a position to cast a ballot in the near future based on inadequate information.

Following are my objections:

## OBJECTIONS TO THE PROPOSED TREATMENT OF CLAIMS

A. <u>Modification/Elimination of OPEBs (health care, dental, vision plans, and death benefits) as of March 1, 2014 through December 31, 2013.</u>  Absent any court order or hearing and before this creditor could examine the plan to modify these benefit changes, the City unilaterally imposed significant changes to OPEBs that affected the undersigned as of March 1, 2014, with the elimination of health care, dental and vision plans.  In lieu of the elimination of the plans, the City has begun providing a stipend of $125.00 each month through December 31, 2014. The disclosure statement does not provide adequate information related to a cost analysis for this change to determine if an objection may be warranted.  This lack of information leaves the undersigned in a position where he is unable to quantify what the underlying costs are that impact my personal budget. In addition, although the Official Committee of Retirees entered into a settlement agreement with the city on this issue, details of which have only disclosed with the filing of the disclosure statement on March 31, 2014.  It would seem reasonable that the imposition of this modification should not be imposed absent an opportunity for the undersigned to vote on the issue and subsequent approval from the Court.

B. <u>OPEB - Terms Omitted Related to this Creditor.</u> The undersigned retired under the terms

of the City Employment Terms (CET)[1] for the DPCOA in June 2013. The CET states:

> Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees shall have the same hospitalization and medical insurance plan options and contribution structure as active employees and will also be subject to such changes as may be determined by the Employer.

The City has not provided any information in the disclosure statement regarding the financial comparison of what is being offered to this creditor going forward as opposed to what is part of the labor agreement that I retired under. The City was paying 80% of the health care premiums while 20% was being paid by the undersigned. Accordingly, the City should be required to include adequate data in the disclosure statement in order for this creditor to make an informed decision.

C.  Health Insurance Plan- City's Claim that it pays 90% of plan Premium for DPOA members. The City's Disclosure Statement states on Page 84 that:

> For DPD and DFD employees, the health care coverage began when (i) the retiree reached the date he/she would have completed 25 years of creditable service or (ii) for DPOA and DFFA member, the retiree would have completed 20 years of creditable service (effective March 8, 2007). The City paid up to 90 percent of health care coverage for the retiree and any eligible spouse. Spouses (widows or widowers) of Straight Life Option retirees who retired prior to July 1, 1987 received hospitalization coverage, as did dependents. Dental and vision coverage were also provided for retirees, spouses and dependents.

---

[1] See Exhibit A - Detroit Police Command Officers Association (DPCOA) CET provisions for OPEBs. The terms that were imposed are a result of the Financial Stability Agreement (FSA) that was entered into between the City of Detroit and the State of Michigan in April 2012. The FSA's Annex D contained specific guidelines for labor agreements.

However, the City failed to include the provisions of the City Employment Terms for DPOA members that was imposed in 2012, which is substantially different than what is contained in the Disclosure Statement. The CET[2] states that:

> Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees shall have the same hospitalization and medical insurance plan options and contribution structure as active employees and will also be subject to such changes as may be determined by the Employer.

D. Proposed Voluntary Employee Beneficiary Association (VEBA) effective January 1, 2015. In addition to the objection contained in item C. above, the content in the disclosure statement does not provide a adequate information for this creditor related to a cost analysis to determine if an objection may be warranted. Without adequate information, the undersigned is unable to quantify what the underlying costs will be that will impact my personal budget with the implementation of the VEBA.

E. OPEBs - City's Failure to Include Current Costs and Projected Savings for members of the Detroit Police Lieutenants and Sergeants (DPLSA) and members of the Detroit Police Command Officer Association (DPCOA). The City's Disclosure Statement fails to include any information as it relates to its current costs and its projected costs for bargaining unit members of the DPLSA and the DPCOA as it relates to OPEBs.

F. Valuation Method for the PFRS pension plan. The significant discrepancy concerning the issue of the PFRS pension plan's funding status (whether it is significantly underfunded, as described by the City, or that it is nearly fully funded as described by the Police and

---

[2] See Exhibit B - Article 20 of the DPOA/City of Detroit CET.

Fire Retirement System) is one area of concern for this creditor. By utilizing unconventional valuation methods as it relates to the retirement system the City is placing this creditor, and others similarly situated, in a position to endure a substantial benefit reduction. The City admits it is using a valuation method that is not the norm.[3] Due to this glaring issue that continues to exist, there is not adequate information in the Disclosure Statement for the undersigned to make an informed decision regarding this position by the City.

G. <u>City's Assertion that a 6.5% Investment Rate of Return is a Trend.</u>  The City intends on using a pension investment rate of return of 6.5% and it's reasoning is that "The City's use of these revised investment return assumptions, however, is consistent with the trend by governmental entities to reduce pension investment return assumptions…"[4] The undersigned has reviewed numerous assessments of pension plans and it appears that the use of such a low assumption rate is not a trend. There is no data contained in the Disclosure Statement in relation to the City's assertion that this revised assumption rate of return is in fact a trend among pension systems; accordingly, the undersigned does not have adequate information to make an information decision on this matter.

H. <u>City's Lack of Contributions to the PFRS pension plan.</u>   On page 9, the disclosure statement states "The City will continue to retain the responsibility to fund all amounts necessary to provide the adjusted (reduced) pension benefits to its employees and retirees

---

[3] Pages 10 and 11: "The City's use of these revised investment return assumptions …although lower than most jurisdictions – nonetheless align with the unique financial inability of the City to weather unanticipated pension investment loss."

[4] Page 10 of the Disclosure Statement.

who will have accrued benefits in either of the GRS or PFRS pension plans as of the Effective Date, although the City's contributions will be fixed during the period ending June 30, 2023." However, this information is later clarified in the document to indicate that the City will in fact contribute nothing to the PFRS pension plan for the period ending June 30, 2023 and that any funding during that period shall be provided via the DIA settlement and the State of Michigan. On Page 11, the City states: *"There is no funding available to the pension funds from the City's General Fund through June 30, 2023.* Instead, any excess cash not required for City operations in this time frame will be utilized for reinvestment in City services and payments to the Holders of Allowed Unsecured Claims in Classes 7, 9, 12, 13 and 14." There is not adequate information in the Disclosure Statement for the undersigned to make an informed decision regarding this position by the City.

I. <u>Prohibition to Restore Pension Reduction/COLA Over the Next 10 Years.</u> The City has projected that the PFRS pension plan will not be adequately funded to provide restored pension claims and/or the COLA through at least June 30, 2023 and prohibits any such restoration during that 10 year period. This prohibition seems arbitrary since projections are nothing more than predictions which may or may not be accurate. Accordingly, by placing an arbitrary 10 year prohibition on any potential pension benefit restoration is unreasonable and unjust. One must consider that it is possible that sometime within that 10 year time frame that the PFRS pension plan will reach an adequate funding level that would allow for the restoration of any such benefit reductions. There is not adequate information in the Disclosure Statement for the undersigned to make an informed

decision regarding this position by the City.

J. <u>Combining of Creditor Classes 10 and 11 for Voting Purposes.</u> For purposes of creating the various classes, the City's retirees were classified as either Class 10 (Police/Fire) or Class 11 (General - non uniformed). This seems reasonable with the exception that for the purposes of voting both classes are required to overwhelmingly vote to agree with the plan in order for the DIA's and State's contribution funding to be provided. The basis for the combining these two classes with very different potential pension reductions and financial circumstances, e.g., no social security credits earned by police/firefighters, is not clear. It would seem more logical to separate the two classes. There is not adequate information in the Disclosure Statement for the undersigned to make an informed decision regarding this position by the City.

K. <u>Mischaracterization of the Police Department's Response Times.</u> On Page 93, in Section VII.C.7.a.i., with the titles/subtitles "Inadequate Municipal Services" "Detroit Police Department" "Administrative Obstacles" of the Disclosure Statement it states:

> The DPD's many administrative challenges have contributed to its widely publicized operational difficulties. As of the Petition Date, the DPD's average response time during 2013 for top priority emergency calls was 58 minutes (the national average police response time was 11 minutes).

This depiction of a very high response time is continued on page 131:

> As discussed in Section VII.C.7.a, **the DPD has been plagued in recent years with debilitating problems including** (i) obsolete information technology; (ii) poor performance, **as evidenced by high response times**... (emphasis added in bold)

However, this information is disputed by Chief of Police James E. Craig, who on January 9, 2014 issued a report titled "Plan of Action, Strategic Restructuring, Creating Excellence in Policing."[5]    On Page 28, under Item 7 titled "Redefine Priority One Calls" (Exhibit C) the report contains the following statement:

> Issue: The DPD has been penalizing itself in the way that it counts Priority 1 calls. The widespread report that DPD requires 58 minutes on average to respond to crimes-in-progress calls is incorrect.  DPD classifies so many calls as Priority 1 that, in 2012, 42 percent of DPD runs were classified as Priority 1, compared with just 10 percent in New York City, which applies the Priority 1 classification only to crimes in progress.

Additionally, on Page 5 of the report it states that "the consulting firms Conway MacKenzie, Inc., and The Bratton Group, LLC[6] assisted Chief Craig and his command staff in developing this Strategic Plan of Action."  Before confirmation, this portion of the report should be revised to reflect the findings of Chief Craig and the City's consultants.


L. <u>Detroit Police Department's Secondary Employment Program.</u> On Page 93, in Section VII.C.7.a.iii. under the titles/subtitles "Inadequate Municipal Services" "Detroit Police Department" "High Crime Rate" of the Disclosure Statement it states:

> It has been reported that in recent years certain business owners have taken the extraordinary step of hiring off-duty police officers and renting police cruisers to patrol sections of the City underserved by the DPD. Orr Declaration, at ¶ 32.

---

[5] See Exhibit C. The entire report is located here: http://www.detroitmi.gov/Portals/0/docs/police/DPD%20Plan%20of%20Action/DPD%202014%20Plan%20of%20Action.pdf

[6] The Bratton Group at the time was led by William Bratton, an internationally recognized law enforcement professional who is now the New York City Police Commissioner for the 2nd time and who had also previously served as the Chief of Police in Los Angeles, CA, in his extensive career The Bratton Group utilized law enforcement professionals with subject matter expertise when analyzing the DPD.

However, this information is in conflict with the above cited report issued by Chief of Police James E. Craig (Exhibit D). On pages 35 and 36 of the report it states:

> Market Secondary Employment to Businesses and Streamline the Process. Issue: Many opportunities exist for a Secondary Employment Program for sworn members of the Detroit Police Department. Secondary Employment has not been adequately promoted by the DPD and has not received enough attention from the City and the DPD under past administrations. Having uniformed police officers working these details-under guidelines regarding what type of details are permissible-increases police presence in high traffic areas at no cost to our City.

> Action Plan: DPD will begin marketing secondary employment availability to businesses. DPD will develop guidelines for use of officers, their powers and acceptable venues for assignment. Consider establishing enforcement (not mandate) for certain entities to use secondary employment as safety mechanism, including clubs, construction/road closures, gas stations, etc. DPD will evaluate options to streamline the entire secondary employment process.

> Time Frame: By calendar year Q1 2014

It appears that the efforts of Chief Craig to encourage private businesses to utilize the Secondary Employment Program and the City's consultants is being somewhat sabotaged by the content of the Disclosure Statement and the Declaration made by Emergency Manager Kevyn Orr. Before confirmation, this portion of the report should be revised to reflect the findings of Chief Craig and the City's consultants.

M. <u>DPD's Fleet Replacement Plan.</u> In IX.2.a. of the Disclosure Statement, it states:

> The City intends to make the following investments in DPD over the next 10 years: $129.3 million to initiate and maintain a fleet vehicle replacement program on a three-year cycle.

The need to replace police vehicles is an important issue. However, the City appears to have determined to allocate a significant amount of money to this effort although there does not appear to have been a comprehensive assessment of the DPD's vehicle fleet.

The report issued by Chief Craig indicated that he would need to conduct a comprehensive analysis of the police fleet and determine the need to replace the fleet. From Pages 59 and 60 of the above cited report issued by Chief of Police James E. Craig (Exhibit E):

> Establish Vehicle Fleet Replacement Cycle. Issue: The bulk of the DPD's vehicle fleet is past its useful life and lacks necessary IT infrastructure. DPD will need to undertake a fleet requirements analysis to determine how many vehicles are actually needed-both marked and unmarked and develop a replacement policy.

> Action Plan 1: Perform a full inventory, including indicating how each vehicle is used and to whom assigned. Phase 2: The DPD will begin to purchase and replace one-third of its fleet on an annual basis. Funds are available and have been identified within the Emergency Manager's restructuring dollars allocated to DPD.

> Time Frame: Phase 1: By calendar Q1 2014

> Phase 2: Begin by calendar year Q2 2014

Based on the Disclosure Statement and the report by Chief Craig, it appears that the City determined the costs for replacing DPD vehicles before the comprehensive fleet analysis and replacement policy was developed. If Chief Craig's department did in fact complete an analysis of the fleet as described and it is, or is not, consistent with the current text in the Disclosure Statement, then that information should be included.

N. Clarification Regarding Salary and Wage Information. In Section XI.A.1.b. of the Disclosure Statement, it states:

> Salaries and Wages. The Projections assume a 10% wage reduction for uniformed employees beginning in Fiscal Year 2014 for contracts expiring during Fiscal Year 2013. Headcount is assumed to increase beginning in Fiscal Year 2015 to allow for improved levels of services to City residents. Wage inflation of 2.0% has been assumed beginning in

Fiscal Year 2015. A 5% wage increase is assumed for uniformed employees beginning in Fiscal Year 2020.

The language contained above lacks clarity. It seems to indicate that current uniform employees will receive a 2% wage inflation salary increase; however, since the terms "beginning in Fiscal Year 2015" are used, it is not clear if that projection for the wage inflation is only for one year or whether it is for additional years as well.

O.  Concurrence With Certain Objectors.  The undersigned concurs with the content of the following objections:

| Docket No. | Name |
|---|---|
| 3447 | David Sole |
| 3390 | John Quinn |
| 3485 | Jamie Fields |

Date: April 7, 2014

Jeffrey S. Romeo

email: JeffreyRomeo@gmail.com

# EXHIBIT A

of department business, including travel between home and work locations. Additionally, stops within reason while traveling between home and work is allowed; also management reserves the right to determine which employees can be allowed unrestricted use of the department vehicles. This privilege shall not be abused and those assigned to department vehicles with to and from or unrestrictive privileges shall not travel a distance outside the City that exceeds a mandate specified by the Chief of Police.

D.      Offices and desks shall not be opened for inspection except in the presence of the member or a representative designated by him/her for that purpose. If the member or representative refuses to be present, the Department shall have the right to inspect the office or desk after notification to the member's commanding officer of the refusal.

E.      Lump Sum for Banked Time:

Whenever a member leaves employment with the City, such employee will be paid for all banked time, other than sick time, in a lump sum payment at his/her rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. Payment shall be made pursuant to the City's schedule for that payment.

## 36.      DEFERRED COMPENSATION

Members of the bargaining unit may participate in the Deferred Compensation Plan and direct deposit programs offered by the City, i.e. Hartford Fund, Vanguard, and Aetna.

Effective with the Act 312 Award in MERC Case No. D07 K-1456, dated January 15, 2010, members who, upon retirement, receive lump sum payouts from sick leave and/or other banks, will be allowed to have a portion of that payout, up to the maximum amount permitted by the Internal Revenue Service, paid into the 457 accounts.


## 37.      MEDICAL, DENTAL, AND OPTICAL HEALTH CARE

**MEDICAL**

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a hospitalization and medical insurance plan in accordance with the plan design approved by the Employer, subject to the Health Care Policy promulgated by the City. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees shall have the same hospitalization and medical insurance plan options and contribution structure as active employees and will also be subject to such changes as may be determined by the Employer. Non-duty disability retirees are *not eligible for hospitalization-medical or prescription drug insurance coverage.*

31

# EXHIBIT B

A.  A member shall be considered off the payroll and ineligible for this allowance if he has retired, resigned or has been discharged with an effective date before July 1st of the fiscal year payment is to be made.

B.  Members discharged and suspended without pay who have pending appeal of the discharge shall not receive payment of the uniform cleaning allowance unless and until the discharge is overturned at an appellate level at which time they shall be made whole.

C.  Members on extended AWOL or ANP status on July 1st of the fiscal year payment is to be made will not receive the uniform cleaning allowance unless they return to active regular duty during the fiscal year at which time they will receive full payment.

D.  Members on an unpaid leave of absence on July 1st of the fiscal year will not be entitled to payment for the uniform cleaning allowance until the next fiscal year.

## 20. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE

### MEDICAL

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a hospitalization and medical insurance plan in accordance with the plan design approved by the Employer, subject to the Health Care Policy promulgated by the City. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees shall have the same hospitalization and medical insurance plan options and contribution structure as active employees and will also be subject to such changes as may be determined by the Employer. Non-duty disability retirees are not eligible for hospitalization-medical or prescription drug insurance coverage.

### DENTAL

The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a dental plan in accordance with the plan design approved by the City, subject to the Health Care Policy promulgated by the City. Such plan is attached for reference purposes only, as Exhibit I, and not incorporated herein. The Employer reserves the right to make changes in contribution structure, plan design, providers, coverage, dental networks, deductibles, co-pays and other provisions of its insurance programs. Employee contributions shall be at least twenty per cent (20%) of the illustrative rate or premium, whichever is applicable. Regular retirees are not eligible for dental insurance coverage.

### OPTICAL

The City shall provide for all active employees and their dependents, and duty disability retirees and

# EXHIBIT C



# Plan of Action
## Strategic Restructuring
## Creating Excellence in Policing

# Detroit Police Department
### James E. Craig
#### Chief of Police

### January 9, 2014

**Issue:** The allocation of police officers per precinct has not always been in line with calls for service and crime incidents. Precinct staffing levels should be balanced routinely to take account of changing calls for service crime patterns.

**Recent Actions:** Based on calls for service and data-driven analysis, every precinct has been reviewed to rebalance staffing levels. DPD personnel have been reassigned to balance precincts based on calls for service and changing crime patterns. Every six months, the staffing plan will be revisited and modified based on the most recent available relevant data.

---

### 5. Open Precincts 24 Hours a Day / 7 Days a Week

**Issue:** DPD implemented a plan (Virtual Precincts) to close precincts and districts to the public after 4 p.m. This plan was an effort to place more officers on patrol, but was not well received by either the rank and file or the public. The plan ignored a key component of policing which is the community need and desire to have access to precincts at all times.

**Recent Actions:** All police stations are now open to the public 24 hours a day, 7 days a week.

---

### 6. Transfer Traffic Officers to Precincts

**Issue:** Centralized Traffic Unit officers could be better utilized in the precinct commands.

**Recent Actions:** DPD has reassigned a portion of the officers currently assigned to the centralized Traffic Enforcement Unit as traffic officers in each of the precincts. These officers will be deployed strategically on the morning and evening shifts in one-officer cars in traffic control locations, accident-prone locations, and crime-prone locations. These officers might also be available to answer Priority 3 calls in the event of a backlog. The remaining traffic officers are being retained in the centralized Special Operations Division to conduct accident investigations and to help manage special events.

---

### 7. Redefine Priority One Calls

**Issue:** The DPD has been penalizing itself in the way that it counts Priority 1 calls. The widespread report that DPD requires 58 minutes on average to respond to crimes-in-progress calls is incorrect. DPD classifies so many calls as Priority 1 that, in 2012, 42 percent of DPD runs were classified as Priority 1, compared with just 10 percent in New York City, which applies the Priority 1 classification only to crimes in progress.

**Recent Actions:** Priority 1 calls have been preliminarily adjusted. A "Call-Back Desk" has been established to address non-priority runs, in which an officer can intervene by telephone or handle be an immediate response absent the need for a patrol unit. This will further contribute to the improvement in response time.


**police**

# EXHIBIT D

**Action Plan:** Most major cities charge for these services, and DPD will explore charging event organizers for the costs incurred to provide traffic control services as a result of major events. The DPD will also explore offering secondary employment, funded by event organizers, to off-duty police officers to work special-event traffic control.

**Manager Responsible:** Commander of Downtown/Midtown Services Bureau

**Time Frame:** By 1st Quarter of 2014

---

2.      **Controlling Traffic Control In and Around Events**

**Issue:** Traffic flow in and around major events is a significant challenge for DPD. Most major cities have the capability to redirect traffic flow along major corridors. DPD has limited control over traffic flow. Some traffic signals are controlled by the City and others by the State, and coordination is necessary to bring all traffic signals into synchronization to push traffic northbound out of the City after a major event.

**Action Plan:** The City will coordinate with the Public Lighting Department (PLD), the Michigan Department of Transportation (MDOT), City traffic engineers in the Department of Public Works (DPW), and Wayne County to restructure traffic control processes. A plan will be devised to station personnel in various emergency operations centers to communicate on a unified system to synchronize traffic control signals for efficient traffic egress.

**Manager Responsible:** Commander of Downtown/Midtown Services Bureau

**Time Frame:** By 1st Quarter of 2014

---

## Secondary Employment

Ordinance 103.5 authorizes the establishment of a Secondary Employment Program for sworn members of the Detroit Police Department. The Secondary Employment Program allows businesses or other organizations to employ off-duty police officers at events for security or in other circumstances where the services of a sworn police officer may be required.

---

1.      **Market Secondary Employment to Businesses and Streamline the Process**

**Issue:** Many opportunities exist for secondary employment within the City of Detroit. Secondary Employment has not been adequately promoted by the DPD and has not received enough attention from the City and DPD under past administrations. Having uniformed police officers working these details—under guidelines regarding what type of details are permissible—increases police presence in high traffic areas at no cost to our City.

**Action Plan:** DPD will begin marketing secondary employment availability to businesses. DPD will develop guidelines for use of officers, their powers and acceptable venues for assignment. Consider


**police**

establishing enforcement (not mandate) for certain entities to use secondary employment as safety mechanism, including clubs, construction/road closures, gas stations, etc. DPD will evaluate options to streamline the entire secondary employment process.

**Manager Responsible:** Commander of Downtown Services

**Time Frame:** By calendar year Q1 2014

2. **Streamline Secondary Employment Process**

**Issue:** As previously structured, the Secondary Employment process has been cumbersome for businesses seeking to employ off-duty police officers. Clients currently are instructed to issue W2s to each employee, which can be unmanageable and may discourage new clientele.

**Action Plan:** The application process will be made easier for clients to complete. DPD will review options to employ a staffing firm to manage the process with less paperwork.

**Manager Responsible:** Commander of Downtown/Midtown Services Bureau & Legal Advisor

**Time Frame:** By 1st Quarter of 2014

3. **Seek Increase in Below-Market Secondary Employment Fees**

**Issue:** A business or organization requesting the assignment of police officers through the Secondary Employment Program is required to pay the police officers directly at a rate consistent with the city ordinance which $25 per hour for Police Officers; $35 per hour for Sergeants; and $45 per hour for Lieutenants. The secondary employer must also pay an hourly administrative service fee of $2 to the Detroit Police Department.

**Action Plan:** DPD will perform a fee study to determine what additional dollars may be available. In conjunction, DPD will coordinate with City Council to obtain approval to increase fees charged for services provided.

**Manager Responsible:** Commander of Downtown/Midtown Services Bureau & Legal Advisor

**Time Frame:** By calendar year Q1 2014


detroit
police

# EXHIBIT E

citizens. A blanket purchase agreement would make this a critical vendor because the supplies are needed to run the operation.

**Manager Responsible:** Captain of Resource Management

**Time Frame:** By 1st Quarter of 2014

4.    **Liquor License Decoys**

Liquor License is a liaison between the Detroit Police Department, Detroit City Council and the Michigan Liquor Control Commission. Its responsibility is to investigate all liquor transactions within the City of Detroit. Inspections (including undercover operations) are conducted to ensure the licensed locations are in compliance with Detroit City Code and Michigan Liquor Control Commission rules and regulation

**Issue:** Fifty-five percent of all license fees and other fees (renewals, fines, inspections) related to the liquor license are returned to the City of Detroit. The decoys used in the undercover operation are students from area schools. The decoys are trained in the inspection procedures and in court testimony. All of this is done without any compensation for the decoys.

**Action Plan:** Liquor License will continue to conduct compliance inspections. Create a stipend account for the decoys from the State's returnable fees to increase the decoy pool to address the growing number of minors buying alcohol complaints. The State of Michigan pays their decoys an hourly rate, however DPD is only able to provide fringe benefits such as lunch compensation. The Department will also develop a strategy of utilizing imprest cash funds to support this initiative.

**Manager Responsible:** Captain of Resource Management

**Time Frame:** By 2nd Quarter of 2014

## Fleet Management

The DPD operates with an extremely old fleet of 1,360 vehicles. Most DPD police cruisers lack necessary information technology for modern police work. A majority of the DPD fleet is from 2007 or earlier and has reached more than two times the standard three-year replacement age for police vehicles. The Department currently has 460 marked scout vehicles, of which 304 are of 2007-vintage or older, equating to 66 percent of fleet. Operating with an aged fleet dramatically drives up maintenance costs. Currently the department has 189 vehicles that cannot be deployed in the field due to disrepair. Only 170 of the 460 marked scout vehicles have working in-car video systems, and even these systems are now obsolete and should be replaced immediately.

1.    **Establish Vehicle Fleet Replacement Cycle**

**Issue:** The bulk of DPD's vehicle fleet is past its useful life and lacks necessary IT infrastructure. DPD will need to undertake a fleet requirements analysis to determine how many vehicles are actually needed—both marked and unmarked and develop a replacement policy.


**police**

**Action Plan: Phase 1:** Perform a full vehicle inventory, including indicating how each vehicle is used and to whom assigned. **Phase 2:** The DPD will begin to purchase and replace one-third of its fleet on an annual basis. Funds are available and have been identified within the Emergency Manager's restructuring dollars allocated to DPD.

**Manager Responsible:** Captain of Resource Management

Time Frame:     Phase 1: By calendar year Q1 2014
                     Phase 2: Begin by calendar year Q2 2014

---

## 2.     Rejection of Car Leases

**Issue:** DPD has had approximately 100 leased vehicles, and all of these leases should be evaluated for termination. Some of these leased vehicles have been held for approximately nine years, resulting in DPD has paying for the value of the leased vehicles many times over. DPD believes it has too many outstanding and unnecessary lease agreements.

**Recent Actions:** DPD has evaluated all DPD vehicle leases and determined which to terminate. DPD plans to reject and return the bulk of their leased vehicles. Twenty of the leased vehicles have already been returned and the Department is no longer making payment on the vehicles with expired leases.

---

## 3.     Evaluate Privatizing Vehicle Maintenance

**Issue:** The General Services Department (GSD) provides fleet maintenance and repair services to the DPD. Because of low funding levels, GSD maintenance service is inadequate, resulting in deficient vehicle availability, which affects DPD operations. In addition, and also because of low funding levels, GSD performs little to no preventative maintenance on the DPD fleet driving up total cost of ownership and further eroding vehicle availability. GSD lacks quality repair equipment.

**Action Plan:** The city is currently evaluating privatizing fleet maintenance to enhance service levels to all departments. Improved maintenance would increase DPD vehicle availability dramatically.

**Manager Responsible:** Captain of Resource Management

**Time Frame:** By calendar year Q1 2014

---

## 4.     Improve Uniform Patrol Accountability for Vehicle Maintenance

**Issue:** Personnel are required to check vehicle oil levels, tire pressure, and general maintenance of vehicles prior to beginning their shifts. In many instances, personnel are not performing these required checks, resulting in many vehicles malfunctioning.

**Recent Actions:** Command staff has directed supervisory staff – i.e. Lieutenants and Sergeants – to


**police**