UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                  .
                                   .          Detroit, Michigan
                                   .          April 3, 2014
                   Debtor.         .          9:00 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. MOTION TO APPROVE COMPROMISE UNDER RULE 9019
(#2802); MOTION OF DEBTOR FOR ENTRY OF AN ORDER, PURSUANT
TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT
AGREEMENT AND GRANTING RELATED RELIEF FILED BY
DEBTOR IN POSSESSION CITY OF DETROIT, MICHIGAN (#2806)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  CORINNE BALL
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-7844

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For the Official       Dentons US, LLP
Committee of           By:  CAROLE NEVILLE
Retirees:              1221 Avenue of the Americas, 25th Floor
                       New York, NY  10020-1089
                       (312) 632-8390

For FMS:               Schiff Hardin, LLP
Wertmanagement:        By:  RICK FRIMMER
                       233 South Wacker Drive, Suite 6699
                       Chicago, IL  60606-6473
                       (312) 258-5511

APPEARANCES (continued):

```
For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  STEPHEN HACKNEY
Syncora Guarantee         WILLIAM ARNAULT
Inc., and Syncora    300 North LaSalle
Capital Assurance,   Chicago, IL  60654
Inc.:                (312) 862-3062

For Bank of          Davis Polk & Wardwell, LLP
America:             By:  MARSHALL S. HUEBNER
                     450 Lexington Avenue
                     New York, NY  10017
                     (212) 450-4099

For David Sole:      Jerome D. Goldberg, PLLC
                     By:  JEROME D. GOLDBERG
                     2921 East Jefferson, Suite 205
                     Detroit, MI  48207
                     (313) 393-6001

For UBS AG:          Paul, Weiss, Rifkind, Wharton &
                        Garrison, LLP
                     By:  DANIEL KRAMER
                     1285 Avenue of the Americas
                     New York, NY  10019-6064
                     (212) 373-3020

For Wilmington       Drinker, Biddle & Reath, LLP
Trust:               By:  KRISTIN GOING
                     1177 Avenue of the Americas, 41st Floor
                     New York, NY  10036
                     (202) 230-4177


Court Recorder:      Kristel Trionfi
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE COURT:  Let's place appearances on the record,

2    please.

3          MR. HERTZBERG:  Your Honor, Robert Hertzberg on

4    behalf of the City of Detroit from Pepper Hamilton along with

5    my partner, Deb Kovsky.

6          MS. BALL:  Good morning, your Honor.  Corinne Ball

7    of Jones Day on behalf of the city.

8          MR. HUEBNER:  Good morning, your Honor.  Marshall

9    Huebner of Davis Polk & Wardwell on behalf of Bank of

10   America.

11         MR. HACKNEY:  Good morning, your Honor.  Stephen

12   Hackney and Bill Arnault from Kirkland & Ellis on behalf of

13   Syncora.

14         MR. MARRIOTT:  Good morning, your Honor.  Vince

15   Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

16         MS. NEVILLE:  Good morning, your Honor.  Carole

17   Neville from Dentons on behalf of the Retiree Committee.

18         MR. GOLDBERG:  Good morning, your Honor.  Jerome

19   Goldberg on behalf of interested party, David Sole.

20         MR. FRIMMER:  Good morning, your Honor.  Rick

21   Frimmer on behalf of FMS Wertmanagement.

22         MR. KRAMER:  Good morning, your Honor.  Dan Kramer,

23   Paul, Weiss, for UBS AG.

24         MS. GOING:  Good morning, your Honor.  Kristin

25   Going, Drinker, Biddle & Reath, on behalf of Wilmington

1  Trust, NA, a successor contract administrator and successor
2  trustee.
3       THE COURT:  Any others?  Okay.  The Court has
4  previously stated that the city shall have two hours for its
5  presentation here, and objecting parties shall have three and
6  a half hours.  And I also promised counsel for UBS and
7  Merrill Lynch 30 minutes.  Mr. Hertzberg.
8       MR. HERTZBERG:  Good morning, your Honor.  Not to be
9  counted against my 30 minutes or my two hours, we have been
10  able to clear out what I'll call some of the underbrush, some
11  of the objections that have been filed.  All parties are
12  still moving forward with objections, but some of the issues
13  that they raised in some of their formal pleadings have now
14  been resolved, and we've worked on a blackline order to deal
15  with those issues.  So what I'd like to do is walk the Court
16  through it, and I'm going to ask Mr. Huebner if I stumble on
17  some of them because he worked on most of the clearing of the
18  objections and assisted in that process, so --
19       THE COURT:  Okay.
20       MR. HERTZBERG:  -- if I get to a point on some of
21  them, I'm going to ask Mr. Huebner to come up and assist me.
22  On the Retirement Systems or the retirement funds represented
23  by Mr. Gordon, the Retirement Systems have withdrawn their
24  objection.  They've asked for language stating that the city
25  would not accelerate the payoff of the swap counterparties

1    prior to the effective date of the plan.  We've added new

2    language to paragraph 16 to deal with that.  They were also

3    concerned, and we've amended paragraph 10 to make it clear

4    that the distribution amount of 85 million, the proposed

5    settlement amount, is as of January 1st, 2014.

6           U.S. Bank, who's the custodian over the swaps, has

7    been fully resolved.  UBS was concerned about the order

8    affecting its rights to certain fees and expenses as

9    custodian.  We added language to paragraph 14 to protect the

10   custodian's right to obtain its fees and expenses and liens,

11   if any.

12          Retiree Committee, as I indicated, they're still

13   objecting, but we've narrowed the issues.  The Retiree

14   Committee was concerned about paragraph 1 of the order

15   overriding changes made to the order to address objections.

16   We've modified paragraph 1 to clarify that the objections are

17   overruled except to the extent set forth in the order.  The

18   committee was also concerned about the settlement preventing

19   parties from making arguments about impairment

20   classification, vote designation, and other issues related to

21   confirmation.  We've added language to paragraph 41 as a

22   broad reservation of rights that the settlement does not

23   prejudice these issues.  I believe that fully resolves at

24   least their impairment-related objections.

25          The COPs, certificates of participation group, the

1    COPs were concerned that the injunction against the service

2    corps would prohibit service corporations and/or the funding

3    trust from seeking payment on the COPs.  Even though this

4    issue was untimely raised and that this Court struck the

5    supplemental brief, we've decided to deal with it anyways,

6    and we've added language to paragraph 20 clarifying that the

7    injunction does not prohibit the service corporations or the

8    funding trust from seeking payment on the COPs or the city

9    defending itself with respect to it.

10        They were also concerned about that the bar order

11    could apply to direct claims against the swap counterparties.

12    We've modified paragraph 34 to clarify that the bar order

13    does not apply to claims that are not for noncontractual

14    indemnity or contribution, and Mr. Huebner has something to

15    add in regard to that.

16        MR. HUEBNER:  Good morning, your Honor.  As we said

17    in our papers, we believe that the bar order from the

18    beginning was designed on the Greektown model and by its

19    terms only applied to those things, so this was just a

20    clarification as part of getting us over the last little

21    hump.  They asked that we also state on the record, in

22    addition to having it both affirmatively and negatively in

23    the text of the order, that this does not bar any direct

24    claims that parties may have.  By its terms, it bars

25    contribution and indemnity claims, and without that entire

1   number of objections is resolved.

2           THE COURT:  Thank you, sir.

3           MR. HERTZBERG:  I believe that fully resolves the

4   COP holders' issues related to the bar order and the service

5   injunction.  They still have other objections, though.  FGIC,

6   who I know is in the courtroom today through Mr. Perez, FGIC

7   did not object, but they reached out to us to say they were

8   concerned about the carveout regarding what is not released

9   in the settlement that it could be read to argue that other

10  parties' COPs claims are released pursuant to their request,

11  and an agreement has been reached.  We have modified

12  paragraph 33 to clarify that it is not so.  And we have

13  had -- in regard to Syncora, we've had some discussion with

14  Syncora, including sharing new language regarding the service

15  corporations in conjunction with them.  We think we've moved

16  towards resolving some of those issues, but we don't have a

17  formal objection removal at this point.  We're going to work

18  on it still, your Honor.  And that's it in regard to the

19  underbrush.

20          THE COURT:  All right.  Let me just ask if anyone

21  would like to say anything about what Mr. Hertzberg stated on

22  the record.  No?  All right.  Yes, sir.

23          MR. HACKNEY:  I was just wondering if we could get

24  copies of that just so that we have it with us.  Doesn't have

25  to happen right now.

1          MR. HERTZBERG:  Sure.

2          THE COURT:  Okay.

3                        OPENING STATEMENT

4          MR. HERTZBERG:  Your Honor, I'm going to just give a

5   brief opening statement.  I want to kind of set the stage

6   with the Court of where we're going today and how I see

7   things progressing.  The city is asking the Court to approve

8   what I consider a pretty straightforward settlement between

9   the city and the swap banks.  I understand the Court's

10  concern that it raised at prior hearings.  This is our third

11  attempt, but I think we've reached a settlement that this

12  Court will accept at this point.

13         The city, under the terms of the settlement, will

14  pay 85 million on a claim of approximately $280 million.

15  That's a net savings of over $200 million to the city.

16  There's also a provision that if we cannot pay off -- because

17  we're paying $4.2 million a month until October, and if we go

18  effective in October and are not able to resolve -- or to

19  take them out with post-petition -- or on the effective date

20  with financing, we'll have the ability to stretch it out for

21  another 180 days, and this is a major hurdle that we were

22  able to negotiate.  The parties will be granting releases to

23  each other.  There's other miscellaneous provisions such as a

24  bar order injunction, which the Court will hear about

25  throughout the day.

1          The city and Mr. Orr, as emergency manager, clearly

2     heard the Court's ruling after the last attempt to settle the

3     swaps litigation when the Court made it clear on January 16th

4     its opinion as to the strengths and weaknesses of the causes

5     of action of the city and how the city had proceeded

6     previously.  With the help of the Court through that ruling,

7     we were able to reach a settlement, and we believe the

8     settlement is in the best interest of the city, and Mr. Orr

9     will so testify.

10          Some parties are objecting and arguing that the lien

11     should not remain in place to support the $85 million

12     settlement because the Court felt there was a strong case to

13     avoid the lien.  We heard what the Court said in its ruling,

14     but remember this is a settlement.  This is not litigation.

15     This is a settlement.  It allows for a potential payment of

16     this for an additional 180 days after the effective date.

17     Questionable liens are settled every single day in every

18     Bankruptcy Court throughout the nation, and in those

19     settlements when there's questions as to the validity of

20     liens, they're settled in the reduced amount usually, and the

21     parties retain their lien to support the settlement.  This is

22     not anything unusual.  This takes place every day in every

23     single Bankruptcy Court in the United States.  Remember, this

24     claim is being reduced by $200 million.  The 85 million is

25     supported by a lien, and that's proper in the situation.

 1          Even though we've resolved a lot of the issues
 2    related to bar order, injunction, et cetera, impairment, I
 3    believe the Court is still going to be trying four cases
 4    today because I saw what happened at the depositions, and the
 5    four cases that are going to be tried are the following.
 6    One, you have Syncora, who's taken a pretty schizophrenic
 7    view in this case.  First time we tried to settle it, they
 8    were given a full release and didn't have to pay anything on
 9    their insurance, and they objected.  This time they're not
10    getting a release, and they objected again.  I don't
11    understand why and what's going on.  First time, full
12    release.  They object.  This time they object again when
13    they're not given a release.  They're going to be trying the
14    case -- the first case they're going to be trying before the
15    Court is the issue of the insurance obligation, and they're
16    going to try and make points with our witnesses totally
17    unrelated to what we're doing in regard to their insurance
18    obligations, and then they're going to try the enforceability
19    of the insurance with the bank and their alleged consent
20    rights.  Deja vu on that.  We've heard about that broken
21    record now for about six months.  We had the New York
22    litigation that was removed and brought over to this
23    Bankruptcy Court that they dismissed that dealt with consent
24    rights.  We have it in another lawsuit that's pending.  But
25    I'd suggest to the Court this settlement is not -- or does

1   not rely upon in any way their consent rights.  They can go

2   fight if they want.  We believe the bank has a strong case,

3   but that's a different issue.  They can go fight with the

4   bank in some other jurisdiction on those consent rights.

5   We're not asking the Court to make a ruling on it, but

6   they're going to try and get this Court to make -- or to put

7   in evidence and try and attempt to get the Court to rule on

8   it.

9           Second trial, COP holders.  They're unhappy with the

10  secured lien.  They have also been sued, as we know, or are

11  participating in what we call the COPs litigation that was

12  started on January 31st.  They're concerned about that.

13  Those issues they're going to try and blend in, I believe,

14  into this trial today to get a foothold into that litigation

15  and the defense in that litigation.  Several of them are

16  trying to intervene as we speak.

17          Third trial that's going on, retirees.  Even though

18  most of them -- but we haven't gotten all of them to withdraw

19  their objection to the settlement -- are still going to try

20  and get issues and bring out testimony regarding impairment

21  classification because they're going to try and set this up

22  for plan confirmation because that's what they did at the

23  deposition.  That's the third trial.

24          The fourth trial is the actual trial that is before

25  the Court today; that is, whether 85 million meets the Bard

1    factors.  And we're going to -- we've already heard testimony
2    on the probable success of the litigation in the prior
3    hearing, which the record has been allowed in by this Court
4    in regard to Mr. Orr's opinion, in regard to this Court's
5    ruling or findings in regard to that attempt at settlement.
6    Factor two on the <u>Bard</u> factors on collectibility is not an
7    issue today.  The Court found it wasn't before.  It still
8    isn't.  Mr. Orr has and will again testify to the complexity,
9    the cost of the litigation, and this Court has already made
10   favorable findings in regard to those issues, and I believe
11   it's the law of the case.

12          Fourth, paramount interest and proper deference to
13   the reasonable views of the parties.  The only party that has
14   objected formally to the $85 million settlement amount is Mr.
15   Sole.  That's the only one that specifically states in their
16   objection that they're objecting to the amount that is being
17   paid on the swap settlement.  I'd suggest to the Court that
18   the amount is reasonable.  The Court, on January 16th, when
19   it denied the prior settlement, told us to come up with a
20   rational settlement, told us to go forward and still
21   negotiate a settlement.  Based upon that, Mr. Orr will
22   testify before this Court today that he heard the Court, and
23   he immediately told his attorney start negotiating.  And for
24   a 48-day period, because, remember, the motion to compromise,
25   9019 motion, was filed, I believe, on March 3rd,

1    approximately 47 or 48 days later, it was a long tough

2    negotiations with the banks, but we resolved in an amount and

3    with the provisions that we believe are in the best interest

4    of the city.

5            We have two witnesses today, Mr. Malhotra, who is an

6    expert witness, who will testify as an expert.  I attempted

7    to get stipulations from the party as to him testifying as an

8    expert because he's going to testify on financial analysis

9    exactly like he did at the last hearing, updated charts.  I'd

10   suggest to the Court that no party can object to him

11   appearing as an expert, and I'd refer the Court to Richard v.

12   Ray, 76 Fed. Appx. 669, a Sixth Circuit 2003 case.  Under the

13   law of the case doctrine, a court is ordinarily precluded

14   from reexamining an issue previously decided by the same

15   court.  You've already said and found that he was an expert

16   in financial analysis and could testify to that.  That's what

17   he's going to do today.  It's the law of the case.  We don't

18   have to lay the foundation again and ask the Court to approve

19   him as an expert.  I'd also refer the Court to In re. City of

20   Frankenmuth, 2013 U.S. App., Sixth Circuit, also citing the

21   Supreme Court opinion of Arizona v. California at 460 U.S.

22   605, 1983, and I quote, "when a court decides upon a rule of

23   law, that decision should continue to govern the same issues

24   in subsequent stages in the same case," so I'm going to ask

25   the Court two things when we get to Mr. Malhotra, who will be

1   the first witness, that I don't have to go through the 20

2   questions of qualifying him as an expert because you've

3   already qualified him as an expert in financial analysis, and

4   as to his documents, if he testifies that he followed the

5   same procedures that he already testified to on the record,

6   that the Court not make me walk through 20 questions of

7   laying a foundation if he testifies to that under the law of

8   the case.  Thank you, your Honor.

9         MR. HACKNEY:  Good morning, your Honor.  Stephen

10   Hackney on behalf of Syncora.  I had not intended to do an

11   opening statement.  I've prepared with Mr. Arnault some short

12   cross-examinations, we think, and I have prepared a closing

13   argument deck, and I hope to reserve my time for that.

14         THE COURT:  Okay.  Anyone else?  Yes, sir.

15                 OPENING STATEMENT

16         MR. MARRIOTT:  Your Honor, Vince Marriott, EEPK and

17   affiliates.  Just briefly, Mr. Hertzberg tried to frame the

18   issue as we're now settling for 85 million of what we

19   originally were going to settle for over 200 million, then

20   for 165 million, and now we've got that number down to 85 as

21   though the 85 is being plugged into the same deal as the

22   other two numbers.  It's not being plugged into the same deal

23   as the other two numbers.  This deal is materially different,

24   and one way in which it's materially different is that it is

25   not at all clear at this point what claim is being settled

1  because a review of the -- the last time around what was

2  being settled was the termination amount that would be due to

3  the swap counterparties upon an optional termination at the

4  direction of the city.  This time around, the swaps aren't

5  being terminated, and, indeed, there's nothing in the

6  agreement that requires the swap counterparties to ever

7  terminate, although it does reserve their right to do so.  So

8  it can't be that the termination amount is being settled, so

9  it can't be that we're looking at a $200 million savings over

10  the last time around because the last time around it was one

11  claim being settled.  This time around it's not entirely

12  clear what claim is, in fact, being settled.  So the city

13  needs to be able to support $85 million as a settlement of a

14  claim that needs to be identified.

15        The second point I wanted to make was Mr. Hertzberg

16  described the COPs objective as litigating in advance certain

17  issues relevant to the invalidity case filed in January.  As

18  I hope I made clear yesterday, our intention is exactly the

19  opposite, and to not bring into this litigation issues

20  relevant to the validity or invalidity of the COPs

21  transactions, we will be focused exclusively in our objection

22  on whether or not this is a reasonable settlement of a lien

23  which we believe was cut off by 552(a) of the Bankruptcy

24  Code.  Thank you.

25                OPENING STATEMENT

1           MR. GOLDBERG:  Jerome Goldberg on behalf of

2     interested party, David Sole.  I'll just be very brief, but I

3     think in framing the case, I think it's -- as Mr. Hertzberg

4     said, the decisions that were made by this Court on January

5     16th did set the law of the case on many of the issues that

6     are in front of the Court.  And one of those decisions and

7     holdings of the Court was that there was a reasonable

8     likelihood that the city could prevail in an action to

9     invalidate the swaps pursuant to Public Act 34 and that if

10    the city prevailed in that action, it would not just

11    terminate -- not just owe nothing on the termination fees,

12    but it would recover $300 million that have already been

13    paid.  So the one thing I will say in framing the discussion,

14    I think it's important to -- I believe in some ways the

15    city's position is misstating the holding -- what we're

16    talking about here.  It isn't a question of 85 million

17    instead of 270 million in termination fees.  It's the city

18    paying 85 million when it could potentially recover 300

19    million and be out from under the 270 million.  And I do

20    think that's an important consideration in viewing this, that

21    it isn't just a question of a reduction in the termination

22    fee, but it's a question of the city giving up $300 million

23    and instead paying over $85 million, and I think that's the

24    real accurate way to view this in light of the Court's

25    holdings on January 16th, which, as Mr. Hertzberg said, are

1    the law of this case.  Thank you.

2                        OPENING STATEMENT

3            MS. NEVILLE:  Carole Neville on behalf of the

4    Retiree Committee.  Your Honor, we don't intend to try the

5    case on the plan support agreement, on the impairment claim

6    or the designation.  We have reserved our rights on that

7    issue, and we intend to deal with it at confirmation if

8    necessary.  But we are still concerned about the request of

9    the city to ask the Court to bless a lien on the casino

10   revenue, which, according to the Michigan gaming statute, is

11   an improper grant, so that's the remaining objection that the

12   committee has.

13           THE COURT:  Thank you.  Any others?  Sir.

14           MR. HACKNEY:  I just have a pretrial matter, so --

15           MR. HERTZBERG:  Mr. Hackney indicated he has a

16   pretrial matter, and I said, fine, go ahead, if the Court --

17           MR. HACKNEY:  I didn't mean to interrupt Mr.

18   Huebner.

19           MR. HERTZBERG:  Oh, I didn't know he was coming up.

20           THE COURT:  Okay.

21                        OPENING STATEMENT

22           MR. HUEBNER:  Your Honor, just 90 seconds because I

23   think it might be helpful in framing the rest of the day just

24   to take 90 seconds or so on a couple of the things that

25   you've heard so far.  Let me begin, if I may, your Honor,

1    with Mr. Sole's point and just to point out that that, in

2    fact, is not what your Honor said, and it's actually quite

3    important that we be precise.  And I have the transcript with

4    me if helpful.  Your Honor, in fact, said that any clawback

5    claims were very substantially more challenging, and there

6    was the implication made that your Honor ruled both that

7    there was a reasonable likelihood of success on invalidation

8    and on clawback, and that, in fact, is not correct.  Your

9    Honor had different things to say about those two points.

10   And with all due respect, at the last hearing, your Honor,

11   one of the reasons that we took -- and we very much

12   appreciated the Court's courtesy in allowing us to file a 60-

13   page brief -- was to actually lay out the many arguments that

14   we hope never to have to make because we've settled, but

15   suffice it to say we think there is a lot to say about the

16   claims we would have even if there was invalidation under PA

17   34, things that were, in fact, not fully argued and briefed

18   before the Court in the last settlement context.

19            With respect to Mr. Marriott's point, your Honor,

20   this is undoubtedly a somewhat more complicated settlement

21   agreement, and we understand that, and that's because,

22   frankly, there are other parties that are liable to us as

23   well, which is why it is more complicated, but let me be very

24   clear.  We never heard in all the calls we had that there was

25   any confusion about what the city was getting and what was

1   being settled, so this is rather a surprise to me, but let me

2   be very clear because the agreement is clear and the order is

3   clear.  All of the debtor's obligations against the swap

4   counterparties arising out of the swaps are forever settled

5   as long as we get this $85 million that we agree to have paid

6   over a long period of time.  It's crystal clear.  So the

7   notion that we're not really sure what's being settled or

8   what the estate is getting, I'm not sure where that comes

9   from because there are provisions in the term sheet, there

10  are provisions in the settlement agreement, and there are

11  provisions in the order, and the debtors were very clear and

12  precise in knowing that they could never again have claims

13  from the swap counterparties on these swaps as long as the

14  deal went through.

15          In terms of the liens, your Honor -- and, again, I

16  think we'll probably talk about this more at closing, I

17  guess -- Mr. Hertzberg's opening point, which is that when

18  liens are challenged, this is what you do.  You say I'm going

19  to avoid your lien, and I'm going to get rid of your claim,

20  and you settle, and very frequently -- and we have many, many

21  examples, including from this Court, that we will put up at

22  closing.  You agree to a reduced claim -- in this case, an

23  extremely painfully reduced claim -- in exchange for it.  But

24  more importantly, your Honor, had we been -- had the city had

25  the resources to pay us this week, next week, next month, we

1  wouldn't need the lien.  The whole point is that part of what

2  the city negotiated so hard for in the settlement was they

3  might need a long period to pay us off, and if the plan is

4  extended, that T plus 180 goes even longer.  And it was

5  precisely because we're being paid in little tiny pieces over

6  a long period of time that we negotiated for keeping

7  collateral protection with respect to that payment stream, so

8  it's that simple.  It was part of an accommodation to the

9  city that began with we can't pay you immediately.  We can

10 only pay you at plan time.  Actually, we may not even be able

11 to pay you at plan time.  We might need a further extension.

12 And because of that, we said, well, we'll take the discount.

13 We'll agree to the numbers.  We'll agree to the stretch-out.

14 Interest doesn't begin till October, but we have to be

15 protected on the remaining amount that we have agreed to be

16 paid.  So, again, there will be plenty more to say at

17 closing, your Honor, but I just thought that, you know,

18 hearing our vision of the framing issues might be helpful as

19 we begin to proceed through the evidence.  Thank you.

20        MR. HACKNEY:  Your Honor, can I offer a suggestion I

21 think may be conducive to the trial today, which is you have

22 ruled that the prior hearing on the other motion is in

23 evidence, and I've heard your ruling, but can we also clarify

24 that the objections that were raised to that evidence or

25 to -- the objections relating to the prior hearing are also

1  preserved?  Then we don't have to reiterate them, and we can
2  limit the objections to whatever is new today.
3          THE COURT:  Any objection to that, Mr. Hertzberg?
4          MR. HERTZBERG:  No, your Honor.
5          THE COURT:  That's fine.
6          MR. HACKNEY:  Thank you.
7          MR. HERTZBERG:  We'll get the first witness.
8          THE COURT:  Okay.
9          MR. HERTZBERG:  Your Honor, do you mind if I turn
10 this and face the witness?
11         THE COURT:  No, I do not.
12          GAURAV MALHOTRA, DEBTOR'S WITNESS, SWORN
13         THE COURT:  Thank you.  You may sit down.
14         MR. HERTZBERG:  One other preliminary matter, your
15 Honor.  We have numbered -- we have four exhibits today.
16 That's it.  We have picked up the numbering where we left off
17 in the prior hearing since the record is in, and we've done
18 it that way.  I believe the first one, 140-something.  I'll
19 get to it, but that's how we've set the numbering system if
20 that's all right.
21         THE COURT:  Good idea.  Thank you.
22         MR. HERTZBERG:  Okay.
23                        DIRECT EXAMINATION
24 BY MR. HERTZBERG:
25 Q   State your name, please.

1  A    Gaurav Malhotra.

2  Q    Where are you employed?

3  A    Ernst & Young.

4  Q    Have you testified before this Court on other matters?

5  A    Yes, I have.

6  Q    And on how many occasions, approximately?

7  A    Two.

8  Q    And did you testify at the prior hearing on the attempt

9  to settle the swaps litigation?

10 A    Yes, I did.

11 Q    Did you have an opportunity to review the term sheet that

12 the city entered into with the swap counterparties?

13 A    Yes.

14 Q    Did you also review the settlement agreement?

15 A    Yes.

16 Q    Do you have an understanding as to the economic terms of

17 the settlement?

18 A    Yes.

19 Q    Could you explain it to me, please?

20 A    The city is going to settle the swap liability for about

21 $85 million.

22 Q    Have you or anyone on your team been asked on occasion to

23 provide the city with the swap termination liability amount?

24 A    We have asked third-party providers, yes.

25 Q    And you have provided that information to the city?

1    A    That's right.

2    Q    Was your team asked to provide that information as of

3    February 3rd, 2014?

4    A    Yes.

5    Q    And what was the approximate amount of the swap

6    termination liability as of that date?

7              MR. MARRIOTT:  Objection, your Honor.  Relevance.

8    The settlement agreement is quite clear that the swaps are

9    not being terminated as part of this agreement, so the

10   termination amount is not relevant.

11             MR. HERTZBERG:  It's clearly relevant, your Honor.

12   In the prior record that's in the court, there was testimony

13   as to the default of the city on the swaps, the ability of

14   the swap parties to terminate, what the approximate amount

15   was, and the settlement amount on the termination liability.

16             MR. MARRIOTT:  Your Honor, they may have the ability

17   to terminate, and the last agreement, in fact, contemplated

18   termination, but this agreement does not.

19             THE COURT:  The relevance is arguable.  The

20   objection is overruled.  Go ahead.

21   BY MR. HERTZBERG:

22   Q    Do you know the approximate amount as of February 3rd?

23   A    It was about 272 million.

24   Q    Was that as of April 1st?

25   A    That is the latest amount that I recall, so it's --

1  Q   Okay.

2  A   -- the most recent amount that I recall.

3  Q   Was it a higher amount as of February 3rd?

4  A   It would be a higher amount previously, yes.

5  Q   Okay.  Are you familiar with what's called the liquidity

6  event that appears in connection with the settlement

7  agreement?

8  A   Yes.

9  Q   Can you explain that?

10  A   A liquidity event will be -- will occur if the city

11  cannot raise enough financing at exit to repay the swap

12  liability that exists at that point in time.

13  Q   In connection with the pending motion, were you asked to

14  perform certain financial analysis?

15  A   Yes.

16  Q   And what were you asked to perform?

17  A   We were asked to look at three different sets of cash

18  flow assumptions and to provide an illustrative chart as to

19  what they said for fiscal year '14 and fiscal year '15.

20          MR. HERTZBERG:  Can we put 143 up, please?  We have

21  copies for everyone.  For the Court's information, we

22  provided copies of all of our exhibits to the objectors

23  several days ago, some of them as early back as eight days

24  ago.

25          THE COURT:  Thank you.

1          MR. HERTZBERG:  And the exhibits that Mr. Malhotra

2     will be testifying about were provided eight days ago to all

3     the objectors.

4     BY MR. HERTZBERG:

5     Q    In preparing these, were you -- how many scenarios were

6     you requested to prepare?

7     A    Three.

8     Q    In preparing those scenarios, did you presume

9     particular -- any particular effective date for the plan of

10    reorganization?

11    A    October of 2014, yes.

12         THE COURT:  Excuse me, Mr. Hertzberg.  The clipping

13    we're getting I think results because the microphone is too

14    close to you.  Can you angle it and move it a bit further?

15         MR. HERTZBERG:  Try that, your Honor.

16         THE COURT:  Okay.

17    BY MR. HERTZBERG:

18    Q    I'm going to show you, up on the board is Exhibit 143.

19    Do you recognize that exhibit?

20    A    Yes.

21    Q    And have you seen it before?

22    A    Yes.

23    Q    And did you prepare that exhibit?

24    A    Yes.

25    Q    And what information did you use in preparing that

1  exhibit?

2  A   We used the cash flow -- the historical cash flow data

3  that we had for the city as well as assumptions for the

4  forecast under three different scenarios.

5       MR. HERTZBERG:  Could you put up the next page,

6  please?

7  BY MR. HERTZBERG:

8  Q   What is that document?

9  A   That is a projection of the cash flow available to the

10  city over the next -- through June of 2015 under the three

11  different scenarios.

12  Q   Did you prepare any backup documentation to that exhibit?

13  A   Yes.

14       MR. HERTZBERG:  Could you put up 144, please?

15  BY MR. HERTZBERG:

16  Q   I'm going to show you proposed Exhibit 144 and ask you if

17  you recognize that exhibit.

18  A   Yes.

19  Q   And what is that exhibit?

20  A   It's the exhibit that shows the cash flows of the city

21  through June 2015 under the first set of assumptions that we

22  were provided.

23  Q   And attached to that exhibit, if you could thumb through

24  it, please, is numerous different scenarios.  Ask you if you

25  recognize those.

1  A   Yes, I recognize this exhibit.

2  Q   Okay.

3  A   It's different assumptions that go with the different --

4  Q   There's scenario two.  You recognize that?

5  A   Yes.

6  Q   And how does that relate to Exhibit 143?

7  A   Compared to the first scenario that you just had shown up

8  there, scenario two assumes that a liquidity event does

9  occur.

10 Q   And does that document support your chart on 143?

11 A   Yes, it does.

12 Q   Okay.

13        MR. HERTZBERG:  And if you could go to scenario

14 three, please.

15 BY MR. HERTZBERG:

16 Q   Do you recognize this?

17 A   Yes.

18 Q   And what is this?

19 A   This is scenario three, which shows if the cash flows

20 available to the city under the scenario that there's no swap

21 settlement and all of the casino monies are trapped and the

22 city does not make its swap interest payments.

23 Q   And does this relate to Exhibit 143?

24 A   Yes.

25 Q   And is this the backup information for it?

1  A    It is.

2  Q    You previously testified as to the standard and accepted

3  methodology that financial analysts follow in performing

4  work.  Do you recall that testimony in December of 2013?

5  A    Yes, I do.

6  Q    You also testified about the steps that you took in

7  preparing cash flow forecasts that were admitted at the prior

8  hearing; correct?

9  A    Yes.

10 Q    Did you use the same methodology to prepare these

11 exhibits?

12 A    Yes.

13      MR. HERTZBERG:  Your Honor, I'd move to admit

14 Exhibit 143 and 144.

15      THE COURT:  Any objections?

16      MR. ARNAULT:  Your Honor, we object to the

17 admissibility of these exhibits, but we have a line of

18 questioning on cross that we think will better explore why we

19 think they're inadmissible, so if it's possible to reserve

20 judgment on that issue until we have an opportunity on cross

21 to explore the admissibility of the exhibits, we would

22 request that.

23      THE COURT:  Any objection to that?

24      MR. HERTZBERG:  Yes, your Honor.  It's proper.  I'd

25 move to admit the exhibits.  They haven't stated an objection

1 to the admission of the exhibits. I'd ask that a proper

2 foundation has been laid and that the Court admit the

3 exhibits. And they can cross-examine the witnesses about the

4 reliability or any other issues related to the exhibits, but

5 there is no basis not to admit it at this time.

6 THE COURT: The Court will admit the documents into

7 evidence at this time. If later evidence establishes grounds

8 for reconsideration, I will certainly consider that at that

9 time.

10 (City's Exhibits 143 and 144 received at 9:38 a.m.)

11 MR. GOLDBERG: Your Honor, can I just make one short

12 point? I notice the cover page --

13 THE COURT: In order for you to be on the record,

14 you need to be by a microphone.

15 MR. GOLDBERG: I apologize. Jerome Goldberg on

16 behalf of David Sole. I just noticed that the cover page to

17 448 says March 17th, 2013, and I'm wondering what that -- it

18 confused me when I saw the date, and I just wanted to raise

19 that for the record. My instinct is it meant 2014 instead of

20 two -- it says 2013, and it probably should have said 2014,

21 and just for the record --

22 THE COURT: Is that right, sir?

23 THE WITNESS: That is correct.

24 THE COURT: Thank you.

25 BY MR. HERTZBERG:

1  Q   Let's go to Exhibit 143, please, the second page of it.

2  In this exhibit, you indicate that there are five key

3  assumptions.  Can you explain the assumptions, please?

4  A   Sure.  The five key assumptions that are consistent in

5  all three scenarios are that these cash balances are shown

6  net of the estimated property tax-related distributions owed

7  to the other entities.  They also assume that the retiree

8  healthcare was transitioned to the new structure effective

9  March 1.  They assume $20 million of escrow proceeds are

10  drawn in July of 2014, but the remaining amounts in escrow

11  are not reflected here.

12  Q   Let's stop there for a second.  Explain what the $20

13  million of escrow proceeds that are drawn means and what the

14  fund is exactly.

15  A   That's related to the monies that are subject to an

16  agreement between the state and the city with respect to the

17  proceeds that -- with respect to the proceeds that were in

18  there as a part of the last bond offering the city had done

19  in 2012, so of the monies that are in there, the city is

20  forecasting to draw $20 million off it, and the remainder

21  continues to be held in escrow.

22  Q   Can you continue on with assumption number four, please?

23  A   Assumption four is that the balances do not include any

24  changes in compensation other than the two percent per year

25  wage increase for the employees, uniform and nonuniform,

1  starting fiscal year 2015.

2  Q   And what is the fifth key assumption in your chart?

3  A   That assumption is that these cash flows assume that the

4  net reinvestment expenditures of 119 million and 281 million

5  in fiscal year 2014 and 2015 are included in here.

6  Q   What do you mean by "net reinvestment expenditure"?

7  A   The net reinvestment expenditures have expenses but have

8  also corresponding revenue increases, so that's the net

9  reinvestment expenditure, but these are the expenses that the

10 city is projecting to reinvest in the city to get the

11 revitalization plan going.

12 Q   You've done three scenarios; correct?

13 A   Yes.

14 Q   Let's start with scenario number one.  Explain to me what

15 scenario number one is, please.

16 A   Scenario one was where the swaps were getting settled,

17 and the swap balance was paid in October of 2014.  And

18 there's $300 million of exit financing that is raised in

19 2014, October of 2014.

20 Q   When you say the swaps being settled, swaps being settled

21 in what amount?

22 A   In aggregate, 85 million, although the amount outstanding

23 in October of 2014 was somewhere about $46 million.

24 Q   And why was that number reduced to about $46 million?

25 A   Because we have assumed that the city continues to make

1   its monthly set-aside payments on the swap, so starting

2   January of 2014 all the way until the October time frame, the

3   city is continuing to make its monthly payments.

4   Q    And how much are the monthly payments?

5   A    Approximately $4 million a month.

6   Q    And it provides, you said, under scenario one for 300

7   million of exit financing.  What happens with the remaining

8   40 or $45 million balance on the swaps under scenario one?

9   A    In this scenario, assuming a $300 million financing, the

10  40, $45 million is paid off at that time in October.

11  Q    Under this scenario, does the city have access -- or full

12  access to its casino revenues under your scenario number one?

13  A    Yes.

14  Q    And how much are the casino revenues annually?

15  A    About $170 million.

16          THE COURT:  Excuse me.  I'm sorry, sir.  How much?

17          THE WITNESS:  About $170 million annually.

18  BY MR. HERTZBERG:

19  Q    And you talk about exit financing.  Please explain what

20  exit financing is.

21  A    It is the financing that the city raises at the time of

22  emergence from bankruptcy, part of which -- part of which

23  would be used to repay the $120 million quality of life loan,

24  and the remainder would be used to fund its ongoing working

25  capital and reinvestment needs.

1  Q    Scenario number one is reflected in which color line,

2  please, if you can take the highlighted portion down?

3  A    The dark blue line.

4  Q    Is it the top line?

5  A    Yes.  It's the top dark blue line, yes.

6  Q    What does this show in terms of the city's cash position

7  under scenario one assumptions?

8  A    Under the assumptions in here, it shows that the city has

9  adequate liquidity throughout the June 2015 time frame.

10  Q    And that is to pay what amount?  The 4.2 million per

11  month?

12  A    Yes.  On the first line, assuming that the city is paying

13  out the entire $45 million at October of 2014 after borrowing

14  the money, it does have adequate liquidity.

15  Q    Okay.  Let's turn to scenario number two now.  What is

16  scenario number two in your chart?

17  A    In scenario number two we assumed a liquidity event in

18  October of 2014, and so the swap balance that was due at that

19  point in time was paid in April of 2015 or after a 180-day

20  extension.  $120 million of exit financing was still obtained

21  in October of 2014, but the balance, $180 million, was not

22  obtained until April of 2015.

23  Q    So does this scenario assume that the swaps balance in

24  October of approximately $45 million is not paid out?

25  A    That is correct.

1  Q   And it's paid out over 180 days?

2  A   It's paid off over 180 days, yes.

3  Q   And then what happens after the 180 days?

4  A   At the end of 180 days, we have assumed that the city has

5  access to new financing, and the swap outstanding balance as

6  of then, which is about $23 million, is paid off then.

7  Q   Are you aware if an interest rate goes into effect if a

8  liquidity event occurs?

9  A   Yes.

10  Q   And what is that interest rate?

11  A   It's one and a half percent over the financing that the

12  city would have at that point in time.

13  Q   Is that part of your scenario number two?

14  A   Yes.

15  Q   Which color line is scenario number two?

16  A   The light blue line.

17  Q   During the 180-day period, assuming a liquidity event,

18  what does your analysis show in regard to the ability of the

19  city to continue making the $4.2 million monthly payment?

20  A   It shows that the liquidity -- the city is tight on

21  liquidity during this time frame but does not drop below zero

22  and can go ahead and make these payments.

23  Q   Let's turn to scenario number three now, please.  What is

24  scenario number three?

25  A   Scenario three is if there is no swap settlement, if all

1  of the casino revenues are trapped, the swap payments are not

2  made, there are increased litigation costs, and all of the

3  exit financing is not available, at least at that point in

4  time.

5  Q   You remember being deposed in my office on Monday of this

6  week?

7  A   Yes.

8  Q   And you remember testifying as to this -- the contents of

9  this exhibit?

10  A   Yes.

11  Q   After the deposition, did you discover a typo in your

12  exhibit?

13  A   Yes.

14  Q   Can you explain that to the Court, please?

15  A   Instead of -- under scenario three, instead of $300

16  million of exit financing, this sheet should have said 230

17  million of exit financing.

18  Q   Does that in any way change any of your projections on

19  this exhibit?

20  A   No.

21  Q   On scenario number three, you say the casino revenue is

22  trapped.  Do you assume that all of the revenue is trapped?

23  A   Yes.

24  Q   You say that litigation costs are included in that

25  analysis; is that correct?

1  A   That is correct.

2  Q   Explain what the litigation costs are and how you came

3  about determining that amount.

4  A   That is the amount related to the potential litigation

5  with the swap counterparties, and the estimate was given to

6  us by counsel.

7  Q   And which counsel was that?

8  A   It was your team.

9  Q   Thank you.  So in scenario number three, now that you've

10 made the correction to it for the typo, does that reflect the

11 impact of the $230 million exit financing?

12 A   Yes.

13 Q   How did you come up with the $230 million exit financing

14 number?

15 A   We used the assumption that it was the original 300

16 million less the amount that would not have to be paid to the

17 swap counterparties in the context of the settlement.

18 Q   In the context of litigation, the city would continue to

19 have to make the 4.2 million -- is that what you assumed --

20 or would not have to make it?

21 A   No.  The city would not have to make it, but, however,

22 the city has still made payments from January through March,

23 and so we -- which was roughly about $15 million, so what we

24 assumed is the city was not going to pay the entire $85

25 million settlement.  Fifteen of it was already paid, so we

1  reduced the $300 million financing facility by 70 million to

2  just try to keep the scenarios comparable to each other.

3  Q   Under scenario number three, is some portion of the $230

4  million used to pay off the quality of life loan?

5  A   Yes.

6  Q   And what amount is that?

7  A   120 million.

8  Q   Is the remaining $110 million under scenario three new

9  money that the city could use for operating expenses under

10  your scenario?

11  A   Yes.

12  Q   If the city could not obtain the 120 -- 110 million of

13  the exit financing, would it be a better cash position for

14  the city, or would it be a substantially worse cash position?

15  A   Substantially worse.

16  Q   How did you calculate the net impact on the city's cash

17  of the casino revenues being trapped?

18  A   We removed from the forecast all casino revenues as well

19  as -- which approximate about 170 million on an annualized

20  basis, and we also correspondingly removed any swap interest

21  payments that were in the forecast.  Then we added -- layered

22  in the increased litigation costs.

23  Q   Let's look at scenario number three.  Which line is it on

24  your graph here?

25  A   The red line.

1  Q    And what does the red line show on your scenario number
2  three in regard to the cash flow of the city?
3  A    It shows that under these assumptions and if the full 230
4  million is available, the city is still likely to run out of
5  cash in the February 2015 time frame.
6  Q    And what would be the approximate amount of the cash
7  shortfall?
8  A    It's approximately 150 million under these assumptions.
9              MR. HERTZBERG:  I have no further questions, your
10 Honor.
11             THE COURT:  Let's put that one back up for just one
12 brief question, please.  Why does the blue line for scenario
13 one begin in September of '14, the dark blue line?
14             THE WITNESS:  I think it's -- the way the financing
15 comes in is that's where it shows as going up by October of
16 2014, your Honor.  Is that your question?
17             THE COURT:  I'm just asking why scenario one -- the
18 blue line for scenario one begins in September of '14.
19             THE WITNESS:  Oh, I'm sorry.  It's the same as
20 scenario two, so during those first nine months there is no
21 difference between scenario one and scenario two.
22             THE COURT:  Okay.  Thank you.  Cross-exam.
23                       CROSS-EXAMINATION
24 BY MR. ARNAULT:
25 Q    Good morning, Mr. Malhotra.  How are you?

1  A   Good morning.  Thank you.

2  Q   My name is Bill Arnault, and I represent Syncora.  It's

3  nice to see you again.  So I'd like to begin -- and I know we

4  did this last time, so I'll try and be as efficient as

5  possible, but if you look at City Exhibit 144 --

6           MR. ARNAULT:  Could we pull that up, please?

7  BY MR. ARNAULT:

8  Q   And so in connection with this trial, you prepared three

9  cash flow forecasts; correct?

10  A   Yes.

11  Q   And this is one of the cash flow forecasts; right?

12  A   That is correct.

13  Q   And then City Exhibit 143, which was the -- that shows

14  the three scenarios, that exhibit is based upon these three

15  cash flow forecasts; correct?

16  A   Yes.

17  Q   And I won't run through each of the cash flow forecasts,

18  but if you take a look at the front page here, each of the

19  cash flow forecasts contains all these disclaimers; isn't

20  that right?

21  A   Yes.

22  Q   And if you look at the top, this exhibit, like all the

23  other cash flow forecasts, states "tentative and preliminary

24  draft subject to material modification"; correct?

25  A   Yes.

1 Q   It also says -- if you go down, it says that it's a work

2 in progress -- work in process -- sorry -- subject to

3 material change; is that right?

4 A   That is correct.

5 Q   And then if you go down, the first line in red says that,

6 "The information contained herein has not been independently

7 verified and is subject to material change based on

8 continuing review.  Accordingly, the information contained

9 herein is not intended to be and should not be relied upon by

10 any third party or as legal, auditing, or accounting advice."

11 Did I read that correctly?

12 A   Yes, you did.

13 Q   And then if you go down to the next paragraph in red, the

14 second sentence says, "With respect to prospective financial

15 information relative to the Client, Ernst & Young did not

16 examine, compile, or apply agreed upon procedures to such

17 information in accordance with attestation standards

18 established by the AICPA and E&Y expresses no assurance of

19 any kind on the information presented."  Did I read that

20 correctly?

21 A   You did, yes.

22 Q   And then if you go down to the last sentence in the

23 second paragraph in red, it says that, "E&Y takes no

24 responsibility for the achievement of forecasted results.

25 Accordingly, reliance on this report is prohibited by any

1   third party as the projected financial information contained

2   herein is subject to material change and may not reflect

3   actual results."  Did I read that correctly?

4   A    Yes.

5   Q    And, finally, the last sentence in red, "Many of the

6   numbers set forth herein are estimates or based on

7   assumptions which are subject to change.  Such changes may be

8   materially -- maybe be material and could materially affect

9   the calculation of other amounts reflected herein."  Did I

10  read that correctly?

11  A    Yes.

12  Q    And this disclaimer is the same for all three scenarios;

13  correct?

14  A    Yes.

15  Q    Now, on direct you testified about certain cash flow

16  forecasts that you had prepared for the city; right?

17  A    Yes.

18  Q    And when we're talking about these cash flow forecasts,

19  it's fair to say that the cash flow forecasts actually built

20  off ten-year projections that you had prepared for the city;

21  right?

22  A    It's a combination.

23  Q    And you utilized the same assumptions in the ten-year

24  projections that you utilized in your cash flow forecasts;

25  isn't that right?

1   A    Yeah.  Like I said, it's a combination.  Sometimes on

2   short-term forecasts you have to look at recent trends and

3   anomalies that impact the timing versus when you look at ten-

4   year projections you have to make some broader assumptions on

5   the time frame in the outer years, so it's a combination,

6   but --

7   Q    But they are essentially the same assumptions in the cash

8   flow forecasts and the ten-year projections; correct?

9   A    They are generally the same, yes.

10  Q    And until your work with the City of Detroit, you had

11  never done ten-year projections for another municipality;

12  isn't that right?

13  A    That is correct.

14  Q    Now, when you actually began building your ten-year

15  projections for the city, the first thing that your team did

16  was to look at the historical information that was available;

17  correct?

18         MR. HERTZBERG:  Your Honor, I'm going to object

19  based upon relevancy, and, further, there's no exhibit

20  supporting the questions.  He's asking about a ten-year

21  projection.  There's nothing in evidence.

22         THE COURT:  No.  The objection is overruled.  You

23  may proceed.

24  BY MR. ARNAULT:

25  Q    Do you want me to repeat the question, Mr. Malhotra?

1    A    Yes, please.  Thank you.

2    Q    Now, when you actually began building the ten-year

3    projections for the city, the first thing that your team did

4    was to look at the historical information that was available;

5    isn't that right?

6    A    Yes.

7    Q    And the information that your team looked at included

8    national historical economic data; right?

9    A    For actuals, it was more related to the historical

10   records of the city.

11   Q    But your team also looked at national historical economic

12   data; isn't that right?

13   A    From a forecast standpoint, yes.

14   Q    And your team also looked at Michigan and Detroit

15   historical economic data; isn't that right?

16   A    That is right.  For the long-term projections, we did.

17   Q    But it wasn't you personally who looked at Michigan and

18   Detroit historical economic data; right?

19   A    It was members of my team, yes.

20   Q    But it wasn't you personally who looked at that data;

21   correct?

22   A    No.  I did not look at all of the underlying data

23   personally.  That is correct.

24   Q    And it wasn't you personally who looked at the national

25   historical economic data; correct?

1   A    That is generally correct, yes.

2   Q    And, in fact, you don't know specifically what types of

3   data your team looked at when it comes to national historical

4   economic data; correct?

5   A    For the long-term projections, they are a series of data

6   sets that we used that were looked at.  I just make the point

7   that when you start looking at projections five and ten years

8   and twenty and thirty years out, we have to look at a lot of

9   variables compared to projections that we are looking at over

10  the next twelve to eighteen months.

11  Q    But you can't specifically tell me what data your team

12  looked at, can you?

13  A    For what time frame?

14  Q    For the national historical economic data.

15  A    For what time frame?

16  Q    For the ten-year projections.

17  A    For the ten-year projections, we would have looked at

18  components -- I know some of them, but, yes, I don't know all

19  of the data sets right now.

20  Q    And you also don't know specifically where your team got

21  the economic data that you looked at; correct?

22           MR. HERTZBERG:  Objection.  Mischaracterized his

23  testimony.  He said he's aware of some of the data.  He's now

24  saying -- questioned him saying you're not aware of any.

25  Mischaracterized the witness' testimony.

1  BY MR. ARNAULT:

2  Q   Actually, the question was you don't know where

3  specifically your team got the data; isn't that right?

4  A   I know some of the data sets.  I probably don't recall

5  all, yes.

6  Q   And you also don't specifically know what time period

7  your team was looking at for the historical economic data

8  that it was analyzing; correct?

9  A   I know some of them, probably not all.

10 Q   And you didn't meet with any other economic experts from

11 business, forecasting, or the public sector; right?

12 A   We have economic experts on our team.

13 Q   But you didn't meet with any other outside economic

14 experts from business, forecasting, or the public sector;

15 right?

16 A   From a long-term standpoint, I don't recall meeting

17 somebody, yes.

18 Q   Right.  You relied on your internal team; right?

19 A   That is correct.

20 Q   And you don't know if your internal team met with any

21 outside experts from business, forecasting, or the public

22 sector; right?

23 A   I think they had several conversations with the team at

24 the State of Michigan, and so I know that they did meet with

25 them.

1   Q   But you don't know if they met with any other outside

2   experts?

3   A   I do not know specifically of it as of now.

4   Q   And your team also looked at national assumptions with

5   respect to inflation; isn't that right?

6   A   Yes.

7   Q   And you received the inflation data from your internal

8   economist; isn't that right?

9   A   Yeah.  It was that and looking at even other publications

10  that are out there in the public domain.  Again, you have to

11  put this in the context of whether we are looking for the

12  first one to two years or five to ten years or really twenty

13  to thirty years.

14  Q   But isn't it true that you don't -- you personally don't

15  know the source of the economic data for inflation?  Isn't

16  that correct?

17  A   It's probably -- we looked at multiple factors.  I cannot

18  recall right now which specific subset we have used.

19  Q   But you relied upon the data that your economist

20  provided; correct?

21           MR. HERTZBERG:  Your Honor, I'm going to object to

22  this line of questioning.  It's way beyond the scope of the

23  direct examination, and cross should be limited to crossing

24  the witness on the scope of the direct.

25           THE COURT:  No.  I can see that it's going to the

1  witness' credibility.  The objection is overruled.  Please

2  proceed.

3  BY MR. ARNAULT:

4  Q   And then as part of your work, you did not independently

5  assess the inflation data that your team provided to you in

6  connection with the ten-year projections; correct?

7  A   I spent time with my team to understand where the data

8  was pulled from, yes.

9  Q   Right, but you didn't independently assess it, did you?

10 A   No, I did not independently assess it.

11 Q   Now, if we drill down a little bit deeper into the

12 specific revenue line items that form part of your ten-year

13 projections, one of those line items would be property taxes;

14 correct?

15 A   Yes.

16 Q   And you would agree with me that property taxes are a

17 significant component of your ten-year forecast; isn't that

18 right?

19 A   Yes, they are.

20 Q   And your team created a specific model that it used to

21 forecast property tax revenues; isn't that right?

22 A   That's right.

23 Q   But you personally weren't the one who created this

24 model; right?

25 A   I did not do the Excel modeling on that property tax

1  module if I would -- yeah, I would say that, yes.

2  Q    Right.  But you relied upon this model; right?

3  A    Yeah.  I relied upon the model and discussions with my

4  team members, yes.

5  Q    And you didn't independently assess all the assumptions

6  that went into that property tax model, did you?

7  A    I looked at all of the assumptions that went in that.

8  When you say "independently assess," what I did is reviewed

9  the assumptions that were in there and based on the

10 information that I had from a historical perspective tried to

11 ascertain whether they were reasonable, but I generally

12 relied upon the information that was provided by my team.

13 Q    Well, okay.  You do understand at a general level that

14 the forecast of property tax revenues would begin with an

15 assessment of -- or a forecast of taxable assessed values;

16 isn't that right?

17 A    That's right.

18 Q    But if I wanted to know exactly how E&Y determined what

19 taxable values would be in the future, that's not something

20 that you would know; correct?

21 A    I would know the process that we went through, and a lot

22 of it was really a discussion with the assessor's office as

23 well because the city's assessor's office for at least fiscal

24 year '14 and '15 has a pretty robust process of trying to

25 ascertain what those assessed values would be.  Once you

1   start going beyond fiscal year '16, '17, '18, there are other
2   factors that have to be overlaid as well, but I would say on
3   the short term information for property taxes, a lot of that
4   was provided by the city's assessor's office and the new
5   assessors.
6   Q   So you wouldn't know exactly how E&Y determined what
7   taxable values would be looking out to the future; isn't that
8   right?
9   A   I know most of the variables that are in there, so, in
10  terms of your question of exactly how every number has been
11  developed in there, I can go back to my notes and my
12  assumptions and kind of relay the assumptions that have been
13  put in there.
14  Q   But that's something that you relied on your team for;
15  correct?
16  A   I relied on that data to be pulled together by my team,
17  yes.
18  Q   So if I want to know how far back in time your team
19  looked when trying to determine taxable value, that's not
20  something you would know; correct?
21  A   That's not something I'd know right now, but I can go
22  back and get that data from my notes.
23  Q   And, in fact, you couldn't tell me right now -- you don't
24  even have a general idea as to how far back in time your team
25  looked when it was trying to determine taxable value;

1   correct?

2   A    No.  I think that we --

3   Q    Now, earlier on direct you testified about the

4   professional fees that would go into scenario three.  Do you

5   remember that testimony?

6   A    Yes.

7   Q    And you testified that you received this number from your

8   counsel; correct?

9   A    That is correct.

10  Q    And that number was approximately $1.2 million per month;

11  isn't that right?

12  A    That sounds about right, yes.

13  Q    And this -- these professional fees, this was solely for

14  the swaps litigation; isn't that correct?

15  A    That's correct.

16  Q    So this would be incremental to any professional fees

17  that the city would spend on the COPs invalidity lawsuit;

18  isn't that right?

19  A    I don't know about that.  This was the estimate that was

20  given to us by counsel.

21  Q    And you didn't independently assess the estimate that

22  counsel provided to you, did you?

23  A    No, I did not.

24          MR. ARNAULT:  No further questions, Mr. Malhotra.

25  At this time, your Honor, we would object to the city's

1  attempt to offer Mr. Malhotra as an expert witness and

2  provide the opinions that he provided during direct.  Under

3  Federal Rule of Evidence 702, a witness who is qualified as

4  an expert may testify only if the testimony is the product of

5  reliable principles and methods and the expert has reasonably

6  applied the principles and methods that affects the case.  In

7  this case, as we saw on cross, Mr. Malhotra doesn't know

8  exactly what assumptions or data went into some of the

9  assumptions that formed the forecast and scenario that he's

10  relying upon today.  In addition, when we asked the city for

11  his reliance materials and the data that he based these

12  exhibits on, the city refused to produce that information, so

13  it's impossible here today to test whether or not the

14  opinions that he's providing are reliable and based on

15  reliable data, so we would object to the admissibility of his

16  opinions as well as the exhibits that were previously

17  admitted.

18        MR. HERTZBERG:  Your Honor, I asked counsel to

19  produce any discovery requests that he made either formally

20  on the record as required of serving either interrogatories

21  or notices to produce.  None were ever submitted to our

22  office, so I'd suggest to the Court when he tells you that

23  documents weren't produced, they didn't follow the rules as

24  usual.

25        Second, in regard to the expert, as I already

1   indicated, he's qualified to give expert testimony on

2   financial analysis.  This Court has previously qualified him

3   as an expert in the exact same area.  It's the law of the

4   case.  I've cited two cases to the Court.  As to the

5   reliability of the information or his testimony, expert

6   witnesses are allowed to testify as to hearsay.  This witness

7   is allowed to testify as to hearsay information as an expert,

8   and that information is provided by his staff under his

9   control.  He can testify to that.  There's no prohibition

10  against that.

11        THE COURT:  Is it your representation to the Court

12  that the city did not refuse to provide the documentation

13  that counsel just referred to?

14        MR. HERTZBERG:  That there was no formal discovery

15  request made, and we filed all --

16        THE COURT:  Exactly answer my question, Mr.

17  Hertzberg.

18        MR. HERTZBERG:  Well, this Court held a hearing on

19  discovery.  There was a discovery request made by the

20  Retirees' Committee.

21        THE COURT:  I want an answer to my question.

22        MR. HERTZBERG:  The question is they sent a letter.

23  We didn't comply with their letter.  There was not formal

24  discovery.  And also there is nothing before this Court today

25  that he testified on direct in regard to ten-year

1   projections, so this whole thing about state or the real

2   estate taxes and what he went through is irrelevant to what's

3   before the Court.  We are not required to comply with every

4   letter we get requesting information.  They could have simply

5   filed a notice to produce documents.

6          THE COURT:  That's an overbroad statement, Mr.

7   Hertzberg.  I think you --

8          MR. HERTZBERG:  One second, your Honor.  As I

9   understand it, they were given projections that were later

10  filed with the disclosure statement, so they had the

11  projections.

12         THE COURT:  It's an overbroad statement to say that

13  you are not required to provide documentation unless it's in

14  the context of a formal discovery request.  If a witness has

15  relied on documentation in preparing his or her testimony and

16  counsel wants to see it, aren't you required to provide it?

17         MR. HERTZBERG:  I assume we could provide it, your

18  Honor.  We're not required, but the most important thing and

19  the step the Court is leaving out is that we're not relying

20  on ten-year projections.  We've provided the supporting

21  documentation that's Exhibit 144 eight days prior to the

22  hearing.  Were we required to do that?  Absolutely not.  We

23  produced it in advance to allow them to cross-examine the

24  witness today and at his deposition, so the Court asking me

25  whether we were required to produce documentation that don't

1   relate to any exhibits that we presented today, the answer

2   is, no, we are not required to produce that, your Honor.

3           THE COURT:  Well, but I understood the witness to

4   say even during direct examination that there were

5   assumptions made regarding property tax receipts.  Is that

6   right?

7           MR. HERTZBERG:  That's right, your Honor.  And

8   Exhibit 144 has all the assumptions on property tax.  If you

9   would like, I can walk the witness through the assumptions on

10  property tax on Exhibit 144 and how it relates to Exhibit

11  143, but as to a ten-year projection, I don't remember

12  putting one up.

13          THE COURT:  All right.  Forget the ten-year

14  projection for a moment.  Assume you're right about that.

15  What did you provide regarding property tax information for

16  the assumptions that the witness did rely upon here?

17          MR. HERTZBERG:  Exhibit 144, the analysis.

18          THE COURT:  Show me.

19          MR. HERTZBERG:  Could you put up Exhibit 144?  Can I

20  question the witness on it?

21          THE COURT:  Sure.

22          MR. HERTZBERG:  Thank you, your Honor.

23                      VOIR DIRE EXAMINATION

24  BY MR. HERTZBERG:

25  Q    Do you need written copies of your exhibits -- would that

1    be helpful -- to point us --

2    A    No.  I can see what's on the screen.

3    Q    Okay.  Does your analysis in Exhibit 144, scenario one,

4    two, and three, include property taxes?

5    A    Yes.

6    Q    On what line item does it appear?  Is it on page 2 here

7    of scenario one?

8    A    It is on page 2 of scenario one.  The gross property tax

9    collections are reflected in the first line, and then there

10   are distributions that are made from the property taxes under

11   the operating disbursement section, the lines labeled

12   "distributions," and then there is the accumulated property

13   tax distributions that have not been made to the taxing

14   authorities, which is in the line right above "cash net of

15   distributions."

16   Q    Could you please circle that line?  The line right above

17   what, Mr. Malhotra?

18   A    The cash net of distributions.  And --

19   Q    You --

20   A    Sorry.  And the --

21   Q    Go ahead.

22   A    And the distributions under the operating disbursements

23   line, the three distributions.  It's under distributions, not

24   payroll.

25   Q    Is that it, Mr. Malhotra?

1    A    That is correct.

2    Q    You testified as to your team gathering information.

3    A    Yes.

4    Q    Walk us through who your team is and what their expertise

5    are.

6    A    We have several senior managers, managers and other

7    partners actually working on this case.  When it comes to on

8    the property taxes collection piece, the city receives the

9    property taxes, which are the receipts shown in the first

10   line item, as lump sum gross tax receipts.  The city then

11   goes through a process of using an equalizer report trying to

12   determine of the property taxes that came in during that

13   first line, how much of that money has to be distributed to

14   the other taxing authorities.  Some of those amounts are

15   distributed on a timely manner, and some of them are not,

16   which also makes the remaining balance to the accumulated

17   property tax distributions a number that we continue to

18   monitor to say what previous or old amounts are due to the

19   other taxing authorities.  The city has already gone

20   through -- we also compare every month and every three months

21   what the property taxes are looking like compared to the same

22   time frame --

23              THE COURT:  I have to cut this off.  He's going way

24   beyond the scope of your question, and we need to do this in

25   question and answer format.  The question simply was --

1          MR. HERTZBERG:  Who's on your team?

2          THE COURT:  -- who's on your team, and what's their

3     expertise?

4     BY MR. HERTZBERG:

5     Q    Do you have an economist on your team?

6     A    We do.

7     Q    And who is that individual?

8     A    Bob Kline.

9     Q    And what's his expertise?

10    A    Bob is an expert in forecasting tax collections and tax

11    revenues for state and local governments in the public

12    sector.

13    Q    Did you rely on his information in preparing this

14    exhibit?

15    A    For the time period '14 and '15 it would have been very

16    limited.

17    Q    Would have been what?

18    A    Would have been limited.

19    Q    Okay.  This exhibit only goes out approximately 18

20    months; correct?

21    A    Yes.

22    Q    In making these conclusions and in Exhibit 143 that's

23    been previously admitted, did you rely on your ten-year

24    projections after 2015?

25    A    There's no projections beyond fiscal year 2015 in here.

1  Q   Okay.  You were deposed in my office on Monday of this

2  week; correct?

3  A   Yes.

4  Q   Did anyone, including Syncora's counsel, ask you anything

5  about property taxes during your deposition, if you remember?

6  A   Yes.

7  Q   And what did they ask you?

8  A   There were questions about long-term economic trends and

9  from what other sources of data we would have relied upon to

10 come up with our long-term assumptions.

11 Q   After you testified or during when you testified, at any

12 point in time, did they say they would like to see the

13 supporting documentation produced?

14 A   I don't recall.  They did ask for the professional fees.

15 I thought somebody did, but I don't recall specifically on

16 property taxes right now.

17 Q   Besides the professional fees, do you remember them

18 asking for anything?

19 A   Not that I can recall right now.

20 Q   Okay.

21         MR. HERTZBERG:  That's it, your Honor.

22         THE COURT:  In the line there near the top that's

23 been circled, property taxes, is that what it says?

24         THE WITNESS:  Yes.

25         THE COURT:  The first little more than half of the

1  page is shaded there.  Would that be the historical

2  information?

3            THE WITNESS:  That is correct, your Honor.

4            THE COURT:  And then after that where it's not

5  shaded, that would be like projections or forecasts?

6            THE WITNESS:  That is correct, your Honor.

7            THE COURT:  Okay.  So on this particular sheet,

8  there are a couple of line -- a couple of entries for

9  property taxes for March of '14 and June of '14; right?

10            THE WITNESS:  That is correct, your Honor.

11            THE COURT:  Okay.  Where did those numbers come

12  from?

13            THE WITNESS:  They would have come from an estimate

14  that our team would have done based on looking at what

15  property taxes have already come in for the summer and winter

16  months, which is predominantly most of it, and in the -- in

17  June of 2014, when Wayne County does a bond deal for

18  delinquent taxes, what the amount the city would have gotten,

19  so we would have looked at, your Honor, the historical

20  information really, seen what would have come in, and then

21  estimated what portion of the Wayne County money would be due

22  to the city.

23            THE COURT:  Um-hmm.  And is there a sheet like this

24  for 2015?

25            THE WITNESS:  Yes, your Honor.

 1          THE COURT:  Is that the page we have just flipped
 2   to, sir?
 3          THE WITNESS:  Yes, your --
 4          THE COURT:  Is that the page we've just flipped to?
 5          THE WITNESS:  Yes, your Honor.
 6          THE COURT:  Okay.  So just for the record, what page
 7   number of the exhibit is it?  I can't quite read that at the
 8   bottom there.  Page 3, according to our tech person.  Is that
 9   right?
10          THE WITNESS:  Yes, your Honor.
11          THE COURT:  Okay.  Thank you.  Okay.  And so here on
12   this page there are entries for July of '14 through June of
13   '15 for property taxes each month; right?
14          THE WITNESS:  That is correct, your Honor.
15          THE COURT:  And same question.  Where did these
16   entries come from?  I misspoke.  There are entries for all of
17   the months except April of '15 and May of '15; is that
18   correct?
19          THE WITNESS:  Yes, your Honor.
20          THE COURT:  All right.  So where did these entries
21   come from?
22          THE WITNESS:  These numbers would have come from --
23   we would have looked at the distribution of property taxes
24   collected over the last two years.  We would have then had an
25   estimate or developed an estimate in connection with our team

 1   and really also the city's assessor's office in which we

 2   spent considerable time for this time frame and then spread

 3   by month the same similar allocation of monthly property tax

 4   collections as have happened in the last year or two, so we

 5   would have come up with what the overall reduction in the

 6   assessed value would be predominantly for this time frame

 7   based on what the assessor's office has given us and then

 8   spread that number, though, on a monthly basis based on

 9   historical performance.

10           THE COURT:  And in doing that analysis that you've

11   just described to me for both this page and the other page,

12   what documents would your team have relied upon?

13           THE WITNESS:  For the first part in terms of what

14   the assessed values would be, it would have been

15   predominantly information from the assessor's office in terms

16   of what they were estimating the tax roll to be for this

17   forthcoming year would be the primary document.  In addition,

18   we would have been relying on bank statements for the prior

19   periods to ascertain how the actual cash would have come --

20   or has been coming in to estimate what the forecasted cash

21   receipts would be.

22           MR. HUEBNER:  Your Honor, may I be heard for one

23   moment?

24           THE COURT:  One second.  Anything further, sir?

25           MR. ARNAULT:  Just very briefly, your Honor.  I just

1   wanted to point out that the numbers in this exhibit are

2   really the output or the expert opinion.  The underlying

3   assumptions, the model, what went into calculating these

4   numbers was never provided.  I just want to make that clear

5   that the underlying data here we were never provided.

6           THE COURT:  Well, but hang on.  That's a slightly

7   different complaint than you had lodged previously.  The

8   previous complaint was you had asked for the underlying

9   documents and you hadn't gotten them.

10          MR. ARNAULT:  That's right, the reliance materials.

11          THE COURT:  I tried to isolate what documents were,

12  and what I heard was bank statements and assessment

13  information from Wayne County.

14          MR. ARNAULT:  In addition, I also believe that there

15  was a model that E&Y created that related to property tax

16  revenues that Mr. Malhotra talked about during cross, which I

17  believe would show all the assumptions and --

18          THE COURT:  Is that -- oh, all right.  So you

19  include that within the documents you had requested?

20          MR. ARNAULT:  Well, yeah, the reliance materials,

21  your Honor.

22          THE COURT:  All right.

23          MR. ARNAULT:  Thank you.

24          THE COURT:  So this model that you talked about, is

25  that just -- is it anything more than a formula in an Excel

1    spreadsheet?  What is it?  Where does it come from?

2              THE WITNESS:  The model would just be -- would be an

3    Excel spreadsheet that would be a compilation of various

4    different inputs.  For instance, your Honor, on property

5    taxes -- and this is, again, probably --

6              THE COURT:  I'm just asking where it appears.

7              THE WITNESS:  In an Excel spreadsheet, your Honor.

8    Sorry.

9              THE COURT:  All right.  Anything further, sir?

10             MR. ARNAULT:  No, your Honor.

11             THE COURT:  Did you want to be heard, Mr. Huebner?

12             MR. HUEBNER:  Just for a moment.  I guess, your

13   Honor, I suffer from the defect of not being a real

14   litigator, but just to be clear, the Malhotra materials that

15   are these exhibits I believe were produced, as promised by

16   the debtors, approximately eight days ago.  We are not aware

17   of any request for back materials made.  There was a

18   deposition on Monday that we attended earlier.

19             THE COURT:  I'm sorry.  I have to cut you off.

20   That's a different answer than Mr. Hertzberg gave me.

21             MR. HUEBNER:  No, no.  No, your Honor.

22             THE COURT:  The answer he gave me was, yeah, he got

23   a request, but since it wasn't formal, he ignored it.

24             MR. HUEBNER:  Your Honor, here's my question.  I

25   understand -- and, remember, we're different parties, so I

1  don't see everything he sees.  At the deposition there was
2  no --
3          THE COURT:  All right.  When you said, "We are not
4  aware of any request" --
5          MR. HUEBNER:  I mean --
6          THE COURT:  -- you were talking about you, not
7  Mr. -- not Mr. Hertzberg.
8          MR. HUEBNER:  Most definitely, your Honor.
9          THE COURT:  Okay.  Fair enough.
10          MR. HUEBNER:  Most definitely, your Honor.  And the
11  reason it matters is because we attended the deposition, and
12  we listened hard.
13          THE COURT:  Well, but that request wouldn't have
14  been presented to you.  They're not your documents.
15          MR. HUEBNER:  Your Honor, I agree.  I'm trying to
16  make actually just one small point.  They actually did
17  request additional documentation at the deposition, and that
18  was only about the professional fees.  I'm not even sure this
19  request that they say they sent -- was it about these precise
20  exhibits and when was it sent?  Was it about the plan
21  projections more generally and they're trying to shoehorn it
22  into an attack on these exhibits?  You would think that the
23  parties to this litigation, which is a very discrete 9019
24  hearing, would have been included and served.  I'd actually
25  like to see when and where they actually requested this

1    because I'm not sure they requested timely backup for this

2    testimony for this hearing.  There's certainly no indication

3    that they didn't --

4            THE COURT:  But understand this is a different

5    statement than Mr. Hertzberg is giving me.  He doesn't deny

6    that he got the request.  He says it wasn't formal, so he had

7    ignore -- he ignored it.

8            MR. HUEBNER:  Right, and having had --

9            THE COURT:  All right.  Have a seat.  Have a seat.

10           MR. HERTZBERG:  Your Honor, I want to read for you

11   the deposition transcript of Mr. Malhotra regarding issues of

12   the property taxes asked by Mr. Arnault.

13           THE COURT:  Before you do that --

14           MR. HERTZBERG:  Okay.

15           THE COURT:  -- when and in what circumstance did you

16   make this request that you say you -- the city ignored or

17   didn't comply with?

18           MR. HACKNEY:  Your Honor, I can respond to that

19   since I wrote the letter.

20           THE COURT:  You have a letter?

21           MR. HACKNEY:  I don't have it with me.  I will tell

22   you --

23           MR. HUEBNER:  Could I see the letter?

24           MR. HACKNEY:  Can I tell you while --

25           THE COURT:  Hold on.

1          MR. HACKNEY:  Yeah.

2          THE COURT:  I accept at face value that you are not

3    familiar with litigation process.  We take turns.

4          MR. HUEBNER:  Yes, your Honor.

5          THE COURT:  We do things orderly.  We don't

6    interrupt each other.

7          MR. HUEBNER:  I apologize, your Honor.

8          THE COURT:  Okay.

9          MR. HUEBNER:  It won't happen again.

10          MR. HACKNEY:  I was wondering if I could tell you

11    what happened with the letter and then propose a way forward

12    to try to address -- because there are important issues here,

13    and there's some --

14          THE COURT:  When was the letter sent?

15          MR. HACKNEY:  I don't remember the day.

16          THE COURT:  Approximately.

17          MR. HACKNEY:  So I think --

18          THE COURT:  Before or after the deposition?

19          MR. HACKNEY:  Oh, it was before the deposition.

20          THE COURT:  Before.  How long before?

21          MR. HACKNEY:  It was --

22          THE COURT:  Two days?  A week?  A month?

23          MR. HACKNEY:  It was sent in the week prior to the

24    deposition.

25          THE COURT:  In the week prior to the deposition.

1          MR. HACKNEY:  Your Honor, just so you understand the
2    theory here, in contested matters, you must move for leave to
3    conduct discovery and make a good cause showing, and we had
4    previously done that on the prior forbearance agreement
5    hearing.  And I made a decision that I wasn't going to like
6    reiterate that motion just to preserve it in front of you
7    because I thought that there wasn't necessarily a rationale
8    that you would rule differently.  I did, however, send a
9    letter to Mr. Hertzberg that said these four things are
10   things that I'd like that you produce to us so that we can
11   see them.  They are the reliance materials, the documents
12   exchanged by the parties in the negotiation of the agreement,
13   so on and so forth.  Mr. Ellman took a different tack.  He
14   just served discovery, and with respect to Mr. Ellman, I
15   think it's technically improper to do that.  My goal was just
16   to get the information so that we could review it and
17   understand the witness' testimony.  I have a suggestion for
18   you if I could offer it.
19          THE COURT:  Um-hmm.  Yeah.  Go ahead.
20          MR. HACKNEY:  The reason this is so sensitive, your
21   Honor, is all of this stuff that relates to projections, cash
22   flow, growth of the city, contraction of the city, so on and
23   so forth, that's like a big ticket issue for plan
24   confirmation and feasibility.  The issue here is a lot more
25   limited.  They just want to show really that first chart that

1    shows if you don't trap cash and you do financing at this

2    time and you do this at this time that this line is up here,

3    this line is down here, and this line is down here.  Let's

4    just have him do that.  That's within his expertise.  That's

5    something that he, as an accountant, is qualified to do.

6            Where it gets more -- a little nerve-racking for a

7    creditor is when the judge is starting to qualify as an

8    expert and accept into expert testimony these long-term

9    projections that are based on a much more complicated set of

10   assumptions and underlying information that have not been

11   produced and have not been subject to the rigors of analysis

12   in Daubert, so I feel like that's a good middle way to

13   address the evidentiary goal they have here without

14   prejudicing people for down the road in terms of the big

15   issues of these forecasts.  That's my suggestion,

16   respectfully.

17           MR. HERTZBERG:  I'd like to respond.  Couple things.

18   One, these aren't long-term projections.  These go out

19   approximately 18 months.  Second of all, I know they got a

20   copy of the letter on their iPad behind me.  I'm not sure of

21   the date.  If my -- I'm starting to remember it a little bit

22   better now.  I believe -- and I'd have to see the letter, but

23   my memory is that they served this prior to us turning over

24   the exhibits, which were eight days ago, so the letter, if

25   I'm not mistaken, came long before that, and they've got it

1    on the iPad.  They can tell you the date right now if they
2    want to.  What I did is I wrote a letter or Ms. Kovsky wrote
3    a letter to Mr. Hackney saying we'd produce a couple of them,
4    but we're not producing the other stuff.  Mr. Hackney chose
5    not to -- and I repeat -- not to come before the Court and
6    say they're refusing to produce it.  He had ample opportunity
7    to come before the Court.  We're not required to comply with
8    every discovery request served upon us if we don't think it's
9    required to be produced.  We produced part of the discovery
10   request on an informal discovery request.  We told him we
11   would not produce the others.  He never came before the
12   Court.  There is no rule that this Court can cite to me that
13   requires me to comply with informal discovery and especially
14   I did produce some of them.  I told him that I wouldn't
15   produce others.  He chose not to come to the Court.  He chose
16   to play the game of trapping the witness today and making the
17   argument.  If he was really concerned about having this
18   information -- and I mean really concerned about it -- he
19   would have come before this Court last week just like the
20   Retiree Committee.  When they wanted information, we told
21   them they couldn't have it.  They came before this Court.  We
22   had a hearing.  The Court decided, not Bob Hertzberg, not Mr.
23   Hackney, but the Court decided who would be entitled to those
24   documents and what had to be produced and what didn't have to
25   be produced.  To show up at this hearing today and play this

1    trick in front of the Court that, "Whoa, we didn't get our
2    information we requested.  Forgot to tell you we produced
3    some of it" -- he forgot to give you the date of what the
4    letter is.  He didn't give you the letter either.  I'd
5    suggest that the Court deny their objection.  This witness is
6    able to testify.  He's already been determined to be an
7    expert.  It's the law of the case.  He can rely on any
8    hearsay information as an expert that he wants to, and the
9    case law is clear on that.  Thank you.
10          THE COURT:  All right.  The Court will, to the
11   extent there's an objection before it, overrule the
12   objection, but the Court will order the city to provide all
13   of the documentation that the witness and his team relied
14   upon in preparing this exhibit.  Any further cross-
15   examination of the witness?  How much time do you need to
16   turn that over, Mr. Hertzberg?
17          MR. HERTZBERG:  Could I confer with the witness for
18   a second, walk up there, your Honor?
19          THE COURT:  Let's do that during a break --
20          MR. HERTZBERG:  Okay.
21          THE COURT:  -- and you can answer me then.
22          MR. HERTZBERG:  Then I'll report back to the Court.
23                      CROSS-EXAMINATION
24   BY MR. FRIMMER:
25   Q   Good morning, Mr. Malhotra.  How are you?

1 A   Good.  Thank you.

2 Q   I'm Rick Frimmer from Schiff Hardin in Chicago, and I

3 represent FMS Wertmanagement.  We've met before, have we not?

4 A   Yes, yes.

5 Q   In fact, I took your deposition.  Was it last November?

6 A   I think so.

7 Q   The first one.

8 A   Yes.

9 Q   Correct.  Okay.

10        MR. FRIMMER:  I just have a few questions, your

11 Honor.  Can we put back -- is it 113?

12        THE COURT:  143?

13        MR. FRIMMER:  143.  Sorry, your Honor.

14        THE COURT:  144.

15        MR. FRIMMER:  Well, why don't we put 144 back on

16 first?  I just have one question on it.

17 BY MR. FRIMMER:

18 Q   Can we turn to page 3, please?

19 A   Yes, that's the page.

20 Q   Just to clarify something, Mr. Malhotra, does the tax

21 assessor's office in Detroit actually have tax assessment

22 projections for the following year?

23 A   They have a sense of, yes, what --

24 Q   A sense.  Do they actually have the numbers?

25 A   Well, it's an iterative process.  They do have what the

1  current year's tax roll, of course, is, and they also have a

2  projection with respect to where the assessor's office feels

3  that the properties are being overvalued, and so those need

4  to get adjusted downwards, so, yes, they do have details

5  based on what the forecasted reduction would be for the

6  forthcoming tax roll.

7  Q    And would it only be for the next year?

8  A    I think they actually go beyond the next year.  It is a

9  long-term process, but it also involves other variables in

10  terms of new properties coming on board versus just what's

11  happening with the existing assessed values.  It also has to

12  take into consideration sales estimates, so my understanding

13  is, yes, it is also based on longer term impacts.

14  Q    When do the tax bills actually go out?

15  A    The tax bills go out twice a year, once for the summer

16  months.  I think that's in the May-June time frame and for

17  the winter months is, I think, in the November time frame.  I

18  don't know exact dates.

19  Q    But they're based upon estimates at this point?

20  A    No.  The ones that have gone out are based on what the

21  tax roll already is adjusted for the ones going out -- the

22  ones that we have basically shown in the forecast would be

23  fairly close to what the information they have as of now, but

24  it's a --

25  Q    I'm just curious just -- so for the forecast part as

1  opposed to the actual part, for what year do the taxes

2  relate?

3          THE COURT:  I'm sorry.  I didn't understand that

4  question.  Could you rephrase it?

5  BY MR. FRIMMER:

6  Q   Let's just go back.  The year for which taxes are

7  assessed is the year starting when?  Is it a January 1st or a

8  July 1st year --

9  A   It's July --

10  Q   -- or something other than that?

11  A   It's July 1st.

12  Q   July 1st.  So the actual numbers are based on bills that

13  went out in 2013; correct?

14  A   Sir, if you go back to page 2, the results that -- the

15  bills that are going out in June -- that will go out in June

16  or May-June time frame will be for the tax amounts due this

17  current July and August.  That's the way it works.

18  Q   Well, the year starting in July; right?

19  A   Yeah.  It's going to be for what the tax roll says as of

20  now.  That's right.

21  Q   And so for the following year starting, those tax bills

22  haven't gone out yet?

23  A   That is my understanding.  I mean it is all an iterative

24  process every -- the tax assessor's office is continuously

25  updating that roll, and right -- but they actually have to

1 draw a line in the sand before when they send out the

2 property taxes due for that particular year.

3 Q   But those will be firmed up at some point in the future.

4 We don't really know what those are yet; correct?

5 A   Will they be final at some point?  They are only final

6 when they're printed.  I would say that's my answer.

7 Q   Okay.  Can we go back to 143?  I'm referring you to

8 scenario three for a minute.  At what point in scenario three

9 did you assume that the litigation that you've put in costs

10 for ends?

11 A   It was put in for the entire period.  It did not --

12 through June 2015.

13 Q   So this scenario starts -- let's just make an imaginary

14 line in April 2014, and you've concluded the forecast in June

15 2015, and it assumes that the litigation is still pending at

16 that time?

17 A   That was the assumption, yes.

18 Q   So let's draw an imaginary line in October '14.  You were

19 asked to assume, am I correct, that the plan effective date

20 would occur in October 2014?

21 A   That is correct.

22 Q   And can you look at the chart and tell me in October 2014

23 what the cash position of the city would be in all three

24 scenarios?

25 A   Under the scenario one it would be roughly 175 million

1    assuming the city has closed on $300 million of financing.

2    Q   230 million?  Am I correct?

3    A   No.  I meant $300 million of financing in scenario one.

4    Q   I asked -- I'm talking about -- okay.  Okay.  Now I

5    understand.  Go ahead, please.

6    A   In scenario two at October of 2014 that number looks like

7    closer to 75 million assuming the city has only closed at

8    that point of time at the $120 million of financing.  And

9    scenario three in October 2014 would -- number would be

10    slightly higher, maybe about $80 million, assuming the city

11    has closed on $230 million of financing.

12    Q   And just to be clear, that 230 million that you were

13    talking about doesn't include anything for any portion of the

14    swap settlement?

15    A   That is correct.

16    Q   So is it correct to say that in your projection in all

17    three scenarios that as of the proposed -- or what you've

18    been told to assume is the plan effective date, that the city

19    would have positive cash flow in all three scenarios?

20    A   Under those assumptions, yes.

21    Q   Were you asked to do any other scenarios other than these

22    three?

23    A   No.

24    Q   So you weren't asked to do a scenario in which the city

25    prevailed in the litigation earlier and was found -- and the

1  swap counterparties were found to have no effective lien?

2  A   I do not recall having a scenario like that.

3  Q   And was it your testimony on direct that it is your

4  understanding that the only obligation of the city under the

5  proposed settlement agreement is to pay $85 million?

6         THE COURT:  I'm sorry.  Would you repeat the

7  question?  Unfortunately --

8         MR. FRIMMER:  I'm getting -- talking too --

9         THE COURT:  -- you're getting too close to the mike,

10 so part of it clipped out.

11 BY MR. FRIMMER:

12 Q   Is it your understanding from -- is it my understanding

13 from your direct testimony that you were told to assume that

14 the only obligation of the city under the proposed settlement

15 agreement would be to pay $85 million to the swap

16 counterparties?

17 A   Yes.  That was the assumption, and whether it was that or

18 the liquidity event, those were the two main scenarios.

19 Q   Were you told or do you know of any scenario under which

20 the swap counterparties could terminate the settlement

21 agreement midway through, tomorrow, next year, or whatever,

22 before the 85 million were paid and be owed a termination

23 payment?

24 A   I do not.  I do not recall.

25 Q   But you were not told to assume that?

1   A    No, we were not.

2   Q    If that were the case, would your projections change?

3   A    Could you repeat the assumptions again, please?

4   Q    If there were a scenario under the settlement agreement

5   where the swap counterparties could terminate the agreement

6   before the $85 million was paid and thereupon claim an

7   additional claim for a termination payment, would your

8   projections change?

9           MR. HERTZBERG:  Objection, your Honor.  He hasn't

10  given him what the termination payment would be.

11  BY MR. FRIMMER:

12  Q    Assume one dollar, one million dollars, two hundred

13  million dollars.  Would it change?

14  A    I'd like to think about that for a moment.

15  Q    Take your time.

16  A    It would -- it depends actually on each scenario, so

17  maybe if you can talk about one specific scenario it will

18  make probably my answers a lot easier.

19  Q    Simple question.  If it turns out that they owed more

20  money under the settlement agreement, would your projections

21  change?

22          MR. HERTZBERG:  Objection, your Honor.  He hasn't

23  indicated under which scenario.  The witness has already

24  indicated he needs to know which scenario.

25  BY MR. FRIMMER:

1  Q   Let's take scenario three.

2  A   Okay.

3  Q   No.  Let's not take scenario three.  Scenario three

4  assumes that you don't make any swap payments.  Let's take

5  scenario one.  You assume in scenario one that the entire

6  balance of what's due under the swap -- in the swap

7  settlement is paid in October 2014; correct?

8  A   That is correct.

9  Q   What if there were a termination payment due prior to

10  October of 2014?  What would be the consequence of that?

11  A   It would depend whether the overall termination event

12  payment was in excess of what the 85 million that we have

13  assumed here is or not.

14  Q   Did you testify earlier as to what the termination

15  payment would be today if they terminated?  Did I understand

16  Mr. Hertzberg asked you that question?

17  A   Yes.  I believe the swap settlement is $85 million.

18  Q   No, no.  The question was what would be the termination

19  payment due as of a few days ago, whenever you calculated it?

20  I think you testified to this on direct.  Do you remember?

21  A   Which was about $270 million.

22  Q   So if there's a $270 million termination payment and the

23  swap settlement agreement only provides for the payment of

24  $85 million, would there be a change in your projections?

25  A   Yes.

1        MR. FRIMMER:  Thank you.  I have no further

2   questions, your Honor.

3        THE COURT:  Any other cross-examination of the

4   witness?

5        MS. NEVILLE:  Just briefly.

6                    CROSS-EXAMINATION

7   BY MS. NEVILLE:

8   Q   Good morning.  I'm Carole Neville.  I represent the

9   Retirement System.  And I've never deposed you; is that true?

10  A    That is true.

11  Q   Mr. Malhotra, you testified that the casino revenue is

12  $170 million a year; is that correct?

13  A    That is correct.

14  Q   Is that -- does that figure represent all of the casino

15  revenue, or is it just a part that the city has unrestricted

16  or relatively unrestricted access to?

17  A    It's generally most of the -- all of the casino revenue

18  taxes that come in.

19  Q   Isn't it true that some part of it is dedicated to the

20  school aid fund?

21  A    Not that I can recall right now.

22  Q   You're not aware that the Michigan statute dedicates 45

23  percent of the revenue to the school aid fund?

24        MR. HERTZBERG:  Objection.  Calls for a legal

25  conclusion.

1          THE COURT:  If the witness knows the answer, he can
2    say so.
3          THE WITNESS:  I do not.  I can say that the 175
4    million is -- a hundred to -- 170 to 175 million is
5    consistent with the collections that the city has been
6    receiving for years from the casino taxes.
7    BY MS. NEVILLE:
8    Q   I understand.  So do you know whether this settlement
9    includes a lien on the full $170 million?  Is that the
10   proposal?
11         MR. HERTZBERG:  Objection.  Calls for a legal
12   conclusion.
13         THE COURT:  Again, if the witness knows, he can say
14   so.
15         THE WITNESS:  I do not know.
16         MS. NEVILLE:  Okay.  Thank you.  I have no further
17   questions.
18         THE COURT:  But just to be clear on this point, to
19   your knowledge, is the -- does the city take any portion of
20   this $170 million annual revenue from this source to pay into
21   a school aid fund?
22         THE WITNESS:  No, your Honor.  These --
23         THE COURT:  No.  All right.  Go ahead, sir.
24         MR. GOLDBERG:  Is it possible for me to have Exhibit
25   143 put up?  Thank you.

1    CROSS-EXAMINATION

2    BY MR. GOLDBERG:

3    Q    I want to look at scenario -- have you look at scenario

4    three if I may.  Would it be correct to say scenario three

5    assumes that all the casino revenue is trapped?  Is that

6    correct?

7    A    That is correct, starting April 2014.

8    Q    So from April 14th to June 15th we'd be talking about 200

9    million or so being trapped?

10   A    That sounds about right.

11   Q    Okay.  If there was an injunction against the trapping of

12   the revenue or for some reason they could not trap that

13   revenue, the graph would be completely different, would it

14   not?

15   A    As long as the city had access to it, yes.

16   Q    Okay.  And if the city had access to it, it would be I

17   guess you'd call in the black.  It wouldn't be below the

18   line.  It would be above the line; correct?

19   A    If --

20         MR. HERTZBERG:  Objection, your Honor.  He hasn't

21   said under which scenario.

22         MR. GOLDBERG:  Under scenario three.

23         MR. HERTZBERG:  Okay.

24         THE WITNESS:  If all of the casino revenue that is

25   currently assumed to be trapped is made available to the city

1   and the swap payments are not made and the city has access to
2   the 230 million --
3            THE COURT:  Hold on a second.  That's not the
4   question counsel is asking you.
5   BY MR. GOLDBERG:
6   Q   My question was that if the casino revenues were not
7   trapped, it would be above the line between negative and
8   positive cash flow?
9   A   Yes, as long as the city had access to the money.
10  Q   Okay.  And I had another question.  It says litigation
11  costs incurred.  Now, there was testimony that professional
12  fees were 1.2 million.  Is that what you factored into this
13  per month?  Is that what you factored into this graph as far
14  as litigation costs?
15  A   Yes.
16  Q   And when did that begin, sir?
17  A   In April.
18  Q   April?
19  A   Of 2014.
20  Q   Okay.  And I think this has been asked, but there's no --
21  you have not created any scenario where the city recovered
22  some of these swap payments that were made?
23  A   Swap payments made as of when?
24  Q   Swap -- as of 2008.
25  A   No.

1    Q    And you have not created a scenario where there's no

2    termination fee, where there's a zero termination fee as

3    opposed to 85 million settlement?  I'm not trying to trick

4    you.  I'm just -- these are the only scenarios you created.

5    That's correct?

6    A    That's correct.

7    Q    These are the only ones you were directed to create;

8    correct?

9    A    Yes.

10    Q    Okay.

11            MR. GOLDBERG:  Can we put up 144 for just a minute,

12    please?  That's the page I want.

13    BY MR. GOLDBERG:

14    Q    On this page, under "operating disbursements" there's a

15    line five lines down.  I think it says "distributions, tax

16    authorities."

17    A    Yes.

18    Q    Does that include chargebacks to Wayne County on property

19    taxes?

20    A    No.

21    Q    Where are chargebacks for Wayne County reflected?

22    A    So if you look at the first line under the property taxes

23    receipts --

24    Q    Yes.

25    A    -- and you look at the month of June of 2014, the

1  chargebacks for the year are netted out from any monies that
2  would be coming from Wayne County, so generally we don't even
3  see that money coming through. The chargebacks -- the net of
4  the chargebacks amount is what is made available to the city
5  in June of every year.
6  Q   Just to be clear, when I'm talking about chargebacks, I'm
7  talking about money that the city has to pay back to Wayne
8  County based on Wayne County's -- the net on what Wayne
9  County sells properties for being less than the taxes they
10 pay to the city.  Are you aware of that?
11 A   That's what I presumed you meant.
12 Q   Okay.  So that's -- so June -- for June 2014 what would
13 be the amount of the chargebacks?
14 A   I don't recall right now.
15 Q   If the CAFR reflected about 82 million for 2012, would
16 that be fairly consistent with what the amount would be for
17 this year?
18 A   No, because there's also prior periods, and there's
19 liability that is a three-year rolling liability, so every
20 year there's a look-back for about three years in terms of
21 what those chargebacks are, so I would have to go back and
22 look at what that amount is.
23 Q   I don't want to belabor this point too much, but isn't
24 the chargeback paid each year, though?  Is the chargeback
25 paid each year?

1    A    Yes.

2    Q    Okay.  I just had one other question.  For 2014 it's the

3    line in the -- under "operating disbursements" above subtotal

4    operating disbursements -- it appears that the total for

5    professional fees is 82.2 million?

6    A    That's what it says.

7    Q    Okay.  And on the next page --

8            MR. GOLDBERG:  Could we put up the next page?

9    BY MR. GOLDBERG:

10   Q    It shows professional fees stop as of November of 2014.

11   A    That is correct.

12   Q    And why would they stop as of 2014?

13   A    The city would be out of bankruptcy, and that is the

14   reason that we have stopped professional fees.

15   Q    So any of the lawyers and consultants that are part of

16   the bankruptcy would no longer be paid?

17   A    That would be the assumption.

18           MR. GOLDBERG:  Thank you.  No further questions.

19   Thank you.

20           THE COURT:  Any other cross-examination?  Redirect?

21           MR. HERTZBERG:  No, your Honor.  I'd ask to dismiss

22   the witness.

23           THE COURT:  All right.  You are excused, sir.  Thank

24   you very much for your testimony today.

25           (Witness excused at 10:54 a.m.)

1          THE COURT:  We'll take a recess now for 15 minutes

2    until 10:10 true time, not that clock time.

3          THE CLERK:  All rise.

4          THE COURT:  I'm sorry.  11:10.

5          MR. HERTZBERG:  11:10.

6          THE COURT:  Thank you.

7          THE CLERK:  Court is in recess.

8       (Recess at 10:54 a.m., until 11:10 a.m.)

9          THE CLERK:  All rise.  Court is in session.  Please

10   be seated.

11         MR. HERTZBERG:  Your Honor, I have conferred with

12   Mr. Malhotra.  If the Court -- I'm trying to clarify whether

13   the Court is just asking for the backup supporting

14   documentation for the real estate taxes.  If so, we can have

15   those by Monday into Syncora's hands.

16         THE COURT:  Was there anything more you wanted?

17         MR. ARNAULT:  Yeah.  We were hoping to get the

18   underlying assumptions that went into the -- all the

19   assumptions that went into the ten-year projections.

20         THE COURT:  I think counsel is entitled to that.

21   How much time do you need for that?

22         MR. HERTZBERG:  Mr. Malhotra is here.  He's

23   indicated it's going to take about a month to gather all the

24   payroll records.  I can have him come up and explain what

25   those documents are, but you're talking about all the city

1   documents.  You're also talking about issues that are really
2   plan confirmation issues that they're doing discovery on
3   here.  You're asking him to give every supporting document.
4           THE COURT:  No, no, no.  The documents that he and
5   his team relied upon in creating these two exhibits.
6           MR. HERTZBERG:  Oh, on these exhibits?
7           THE COURT:  These two exhibits.
8           MR. HERTZBERG:  The 14 months.
9           THE COURT:  The ones that were admitted into
10  evidence.
11          MR. HERTZBERG:  The 14 months.  Let me check with
12  him.  Mr. Malhotra has indicated it will take two weeks to
13  get all the supporting documentation for all the assumptions
14  for Exhibit 144.
15          THE COURT:  All right.  Thank you.
16          MR. HERTZBERG:  Thank you.  Your Honor, I'm going to
17  move -- I don't think there's any controversy on Exhibit 145
18  and 146 that we're going to present.  One is the settlement
19  agreement that's been filed with the Court.  The other is the
20  privilege log.  I don't know if anyone has a problem with
21  that.
22          THE COURT:  Any objections to those two?  All right.
23  They are admitted.
24      (City's Exhibits 145 and 146 received at 11:12 a.m.)
25          MR. HERTZBERG:  Your Honor, we're going to get

1    Mr. Orr, who's next door.

2            THE COURT:  All right.

3            MR. HERTZBERG:  Does the Court have the clock time

4    on where we're at here?

5            THE COURT:  You have 85 minutes left.

6            MR. HERTZBERG:  Okay.

7                KEVYN ORR, DEBTOR'S WITNESS, SWORN

8            THE COURT:  All right.  Please sit down.  And you

9    may begin when you're ready.

10                        DIRECT EXAMINATION

11   BY MR. HERTZBERG:

12   Q    Mr. Orr, I put some fresh water up there for you if you

13   need it.

14   A    Thank you, Mr. Hertzberg.

15   Q    Could you state your name, please, for the record?

16   A    Kevyn D. Orr.

17   Q    And what is your position with the City of Detroit?

18   A    I am the emergency manager for the City of Detroit.

19   Q    And when did you become the emergency manager?

20   A    I became the emergency manager under one statute on March

21   25th, 2013, and under 436 on March 28th, 2013.

22   Q    Do you recall testifying at a trial on the assumption of

23   what we call the FOTA, the forbearance and optional

24   termination agreement, regarding potential claims against the

25   swap parties?

1  A   Yes, I do.

2  Q   At the time, you made an estimate as to what you believed

3  the likelihood of success on the merits would be for the

4  city.  Do you remember that?

5  A   Yes, I do.

6  Q   And what was that testimony?

7  A   I believe my testimony was that it was 50/50.

8  Q   Have you done an assessment now of the likelihood of the

9  city's success?

10  A   Yes.

11  Q   And what have you done to do that analysis?

12  A   I reviewed the transcript of that hearing, looked at some

13  memos, had discussions with my attorneys.

14  Q   Did you look at the transcript regarding Judge Rhodes'

15  assessment on January 16th?

16  A   Yes, I did.

17  Q   And what was your understanding of that assessment?

18  A   My understanding was that the judge admonished us that he

19  believed there was a reasonable likelihood of success on some

20  claims.

21  Q   After the Court denied the assumption of the FOTA,

22  forbearance and optional termination agreement, what did you

23  do?

24  A   That day?

25  Q   Yes.

1  A    I instructed my counsel to go back and begin negotiating

2  with the counterparties.

3  Q    When you say your counsel, who are you referring to?

4  A    I'm referring to you, Mr. Hertzberg, Ms. Debbie Kovsky-

5  Apap, and Corinne Ball.

6  Q    And that was on January 16th of this year?

7  A    I believe so.

8  Q    And why did you instruct your counsel to go do that?

9  A    I continued to believe that resolving the swap agreement

10  was in the best interest of the city and thought that given

11  the denial of the second proposal as well as the Court's

12  admonition that the parties should go back and attempt to

13  resolve it, that that was our instruction, and we should do

14  that as soon as possible.

15  Q    Did you instruct your counsel, specifically Pepper

16  Hamilton, to do anything on your behalf regarding a potential

17  lawsuit?

18  A    Yes.

19  Q    What did you instruct Pepper Hamilton to do?

20  A    Told our counsel to get a lawsuit prepared that we had

21  discussed and been working on and all the attendant papers

22  ready to go.

23  Q    Did Pepper Hamilton do that?

24  A    Yes.

25  Q    Did you ever meet with Pepper Hamilton to go over any

1 lawsuits or any other documents related to a potential

2 lawsuit?

3 A    Yes.

4 Q    And when was that?

5 A    That was on January 30th, which I believe was a Thursday.

6 Q    And who did you meet with?

7 A    I met with you, and I met with Ms. Kovsky-Apap.

8 Q    And what did you review at that meeting without going

9 into discussions you might have had with myself or my

10 partner, Ms. Kovsky?

11 A    Okay.  There was a complaint.  There was a motion for an

12 injunction.  There was a brief that accompanied the motion.

13 There was a new city ordinance.  There was an EM order to

14 effectuate the city ordinance.  There were letters revoking

15 the letters of instruction to the casinos.  There may have

16 been a few other documents.  Those --

17 Q    Was there an affidavit for you to sign, too?

18 A    There was an affidavit, my affidavit, that I signed.

19 Q    And how many counts do you remember were in there, if you

20 can?

21 A    There were 17 counts.

22 Q    What were the type of counts that you --

23 A    Void ab initio, breach of fiduciary duty, unjust

24 enrichment, superior knowledge, fraud, misrepresentation,

25 injunction, contribution, a number of claims, different

1  claims smacking of those theories.

2  Q   Was that more or less related to what you heard the judge

3  rule on January 16th?

4  A   Yes.

5  Q   You said you saw those documents; that you met with

6  myself and Ms. Kovsky from my office; correct?

7  A   Yes.

8  Q   Did you actually sign those documents?

9  A   Yes.

10  Q   So you signed your affidavit and the other documents

11  related to the lawsuit?

12  A   Yes.  I signed my affidavit, the EM order.  I don't know

13  if I had to sign the ordinance, but any documents -- we met

14  in my office, and any documents that needed to be signed, I

15  signed.

16  Q   Were you intending on filing that lawsuit?

17  A   Yes.

18  Q   And why didn't you?

19  A   Well, actually, I believe the following day --

20  Q   Would that be January 31st?

21  A   That was January 31st.  I believe it was a Friday.  We

22  had thought about filing the lawsuit earlier, but I believe I

23  was counseled that the forbearance and optional termination

24  agreement was still active, so we had to wait until it

25  expired, I believe, on the 31st, and on the 31st I think I

1  instructed you to get prepared to file the lawsuit by 5 p.m.

2  that day.

3  Q   Let's talk about Friday, January 31st.

4  A   Okay.

5  Q   Did you file any other lawsuits on behalf of the city?

6  A   Yes.

7  Q   And what lawsuit?

8  A   We filed the litigation on the COPs.

9  Q   When you say "COPs," you mean certificates of

10  participation?

11  A   Yes, the lawsuit against -- related to the certificates

12  of participation.

13  Q   So you testified just now that you were prepared and

14  instructed your attorneys to go forward and file the lawsuit

15  on that Friday; correct?

16  A   Yes, by 5 p.m. that day.

17  Q   And why wasn't it filed?

18  A   We had been in continual discussions with the swap

19  counterparties, and without discussing exactly what I said

20  with my counsel, my thinking was that if we didn't get an

21  indication that they were willing to make movement that would

22  make sense for yet another settlement attempt, that we should

23  sue them.

24  Q   Did they come back to you -- were you advised that they

25  had requested a period of time on a standstill?

1  A   Yes.

2  Q   And what period of time?

3  A   They came back and asked for a 30-day standstill.

4  Q   What was your response to that?

5  A   No, not unless we see some serious movement in terms of

6  the number, that $165 million termination number, termination

7  fee number.

8  Q   On or about that day --

9  A   Yes.

10 Q   -- did you get -- did you get an offer, a dollar amount

11 from the swap banks?

12 A   Yeah.  I think I was traveling that afternoon, so I

13 thought we had filed the lawsuit.  And when I called in -- I

14 think it was around six o'clock or so -- I was told that we

15 got a number back.

16 Q   And who did you talk to?

17 A   I talked to my counsel.  There was a conference call with

18 all of you.

19 Q   And what number were you told the swap banks had offered?

20 A   I think it was 120.

21 Q   And what was your response to that?

22 A   That wasn't going to be enough and that we needed to go

23 back to them and let them know that we needed to have some

24 serious discussions and that I needed to hear to hold off

25 from filing the litigation that there was a number lower than

1  a hundred.

2  Q    When you say "a hundred," lower than a hundred million?

3  A    Yes, lower than a hundred million.

4  Q    And was it -- what was your understanding as to the

5  approximate amount of the termination?

6  A    I think at that time it was approximately $288 million.

7  Q    You didn't go back to the swap counterparties and say

8  we'll do a walkaway at zero, did you?

9  A    No.

10  Q    Why not?

11  A    It was my understanding that that was not going to be

12  acceptable in the terms of a settlement and that, based upon

13  discussions we had, they had a floor, a figure, and -- but I

14  did need to hear that they were going to be below a hundred

15  million dollars.

16  Q    Did you weigh the causes of action and potential defenses

17  in making your decision?

18  A    Yeah.

19  Q    Without going into attorney-client privilege --

20  A    Okay.

21  Q    -- did you discuss the strengths of the litigation and

22  the potential weaknesses of the city's litigation with your

23  counsel?

24  A    Yes.

25  Q    On one time, many times, several times?

1    A    No.  We had discussions starting that afternoon on the

2    16th when the prior settlement was denied.  We've had

3    continual discussions throughout January.  We had discussions

4    on Friday.  We had discussions on -- we had conference calls

5    on Saturday, the following Sunday, the following week.  We

6    had continual discussions.

7    Q    And you said you began the negotiation process on January

8    16th after the hearing?

9    A    Yes.

10   Q    Okay.  You just testified that you said, "File the suit

11   unless you get a number under a hundred million."  Is that a

12   correct characterization of your testimony?

13   A    Yeah.  I generally said, "File the suit unless we

14   hear" -- I think I said on Friday, "Let's file the litigation

15   unless we hear they're willing to make serious movement."

16   They came back at 120.  I thought that was enough to hold off

17   another day, but I think we went back to them either that

18   afternoon or Saturday and said, "You got to be below a

19   hundred to be serious."

20   Q    Did they come back with a number?

21   A    Yeah, they did.

22   Q    And what was that number?

23   A    I think they said they were willing to talk about a

24   number below a hundred.  I don't remember if they gave us a

25   specific number.

1   Q   Eventually, shortly thereafter, you agreed upon a number;

2   is that correct?

3   A   Yes.

4   Q   And what was that number?

5   A   My range was 75 to 80.  They came back and said they'd do

6   85 but give us a credit for the two $4.2 million payments

7   that had been paid in January and February, so the net number

8   was 76.6.

9   Q   And did you accept that number?

10   A   Yes.

11   Q   What were the factors you took into consideration in

12   agreeing to that number?

13   A   The fact that it was a steep discount from where we had

14   been, the potential cost of litigation if we could not agree

15   to a deal, the fact that we would not have to finance that

16   number with post-petition financing, that we might well be

17   able to pay it off because conceptually we were talking about

18   continuing to make the monthly $4.2 million payments, the

19   fact that I needed to get a resolution of this issue because

20   if we went -- took it to confirmation, I might have to fund a

21   litigation reserve on some fairly skinny assumptions of what

22   cash we would have in the plan, in a plan of adjustment, the

23   fact that they were going to give us terms without interest,

24   but we'd be making regular payments and get credit for them,

25   a number of different factors, that this was a steeper

1  discount than we'd ever gotten, and it was getting close to

2  the range of potential recovery by unsecured creditors in the

3  20- to 30-percent range for their interest, which was as a

4  secured party.

5  Q   Give me a little more details on what you mean by

6  creating a reserve in the plan of restructuring.

7  A   It is not uncommon in plans -- well, plans of

8  reorganization but here a plan of adjustment that if you have

9  potential litigation, that you have to reserve both for the

10  cost and the potential recovery by the plaintiffs in the

11  litigation so that your feasibility of projections takes into

12  account the fact that you have to deal with this potential

13  claim recovery.

14  Q   Did you factor in loss of the possible use of the casino

15  revenues for a period of time?

16  A   Yes, yeah.

17  Q   Did that concern you?

18  A   That always concerns me.

19  Q   Why is that?

20  A   Casino revenue is 17, 18 percent of our revenue.  It's

21  one of the four largest sources of revenue for the city.  The

22  city cannot afford to lose 17 to 18 percent of its revenue

23  for any period of time.  We had to just be very careful.

24  Q   If you lost use of that casino revenue for a period of

25  time, let's say hypothetically 12 months, 18 months, would

1  that have any impact on the quality of life, as you see it,

2  in the City of Detroit?

3  A   I think it would, yeah.

4  Q   In what way?

5  A   We're trying to at the same time do this restructuring

6  trying to get to operational reform, some of which are

7  underway.  We're buying new police cars.  We have an order

8  out for new fire trucks.  We're hanging lights.  We want to

9  take down some blighted buildings.  We're trying to

10  restructure our technology infrastructure.  There are a

11  number of operational initiatives that are going on in the

12  city right now.  Without that revenue, we'd have to make some

13  pretty stark choices.

14  Q   Did you look at whether it would be short, long,

15  protracted litigation, appeals, et cetera, in making your

16  decision?

17  A   Oh, yeah.

18  Q   And what did you consider in that regard?

19  A   The counterparties made it pretty clear that they would

20  fight pretty hard and long if we had to go to a litigation

21  route.

22  Q   Did you think it would be expensive for the city to fund

23  attorneys and other professionals needed?

24  A   Yes.

25  Q   Would it be a nominal amount, a large amount?

1   A    You know, nominal amounts to us are, you know, a thousand

2   bucks.  I mean anything that strays from our operational

3   funds could be risky, so it was going to be significant.

4   Q    Were you involved in face-to-face negotiations with any

5   of the swap counterparty businesspeople?

6   A    No.  Well --

7   Q    Who did the --

8   A    We had one face-to-face meeting on the 16th when I was in

9   this box.

10  Q    Okay.

11  A    Okay.

12  Q    When they came up to the witness box to talk to you?

13  A    When they came up to the witness box and --

14  Q    Understood.

15  A    Yeah.

16  Q    Other than that, how were the -- explain to the Court how

17  the negotiations worked.

18  A    My counsel were instructed to file the litigation, then

19  to seek negotiation that weekend to get to a number, and then

20  there was anticipation that we were going to get a definitive

21  term sheet, if not agreements, within the next week or so and

22  to have continual negotiations with the counterparties and

23  their counsel.

24  Q    Were you in touch with your attorneys that you described

25  as myself, Ms. Ball, and Ms. Kovsky on a regular basis or

1  just once in awhile or --

2  A   No.  We either had e-mails or conference calls with you

3  three plus others on the team, others on the litigation team,

4  other on the restructuring team, essentially daily, sometimes

5  many times daily.

6  Q   Were you kept apprised of the status of the negotiations?

7  A   Yeah.  I bugged you guys a lot.

8  Q   Okay.  Eventually you reached an agreement, didn't you,

9  at 85 million?

10  A   Yes.

11  Q   How long did the whole negotiation of all the terms and

12  conditions of the settlement agreement take, approximately?

13  A   We reached an agreement on a number, I believe, either

14  that weekend or the following Monday, but it was pretty

15  quick.  But the negotiations themselves on the documents and

16  additional terms went on for about 45 days, I believe, from

17  the end of the hearing until -- I think the motion was filed

18  on the -- March 2nd, whenever the motion was filed, the day

19  before the motion was filed, something like that.

20          MR. HERTZBERG:  Could you put up on the screen,

21  please, Laurie, 145?

22  BY MR. HERTZBERG:

23  Q   Have you seen this document before?

24  A   Can I scroll through it to the end just --

25          MR. HERTZBERG:  Can you scroll that for him, please?

1    Here, I have a hard copy if I could approach the witness,

2    your Honor.

3            THE COURT:  Yes, sir.

4            THE WITNESS:  Thank you.  Yes, I believe so.

5    BY MR. HERTZBERG:

6    Q    And what is that document?

7    A    This is the settlement and plan support agreement.

8    Q    And that was given to you by who?

9    A    By my counsel.

10   Q    And did you review that agreement?

11   A    Yes.

12   Q    Did you approve it?

13   A    Yes.

14           MR. HERTZBERG:  Your Honor, that's already been

15   admitted into evidence.

16           THE COURT:  Yes, sir.

17   BY MR. HERTZBERG:

18   Q    Can you please summarize the terms of the settlement

19   besides -- you've already indicated it's $85 million.

20   A    Yes.

21   Q    Going back as of payments of January 1st; correct?

22   A    Yes.

23   Q    What were some of the other terms and conditions?

24   A    $85 million less the payments -- monthly payments that we

25   make of approximately 4.2 million including the two that were

1    made beginning in January.  We continue to make those

2    payments for the duration of the agreement.  We get a credit

3    for those payments against the balance -- original balance of

4    4.2.  In consideration for those payments, the parties

5    agree -- I believe use their best efforts either for us not

6    to attempt to sue, interfere with those payments and for them

7    to make sure that our casino revenue is not trapped.  I

8    believe that at the end of those payments the parties agree

9    to execute mutual general releases for each others' behalf,

10   that during that time there are other provisions regarding

11   our ability to pay off the balance due of approximately --

12   Q   Let me ask you about that.

13   A   Okay.

14   Q   Have you set a target date for going effective with the

15   plan?

16   A   Yes.

17   Q   And what date is that?

18   A   October 15.

19   Q   And that's the date you're hoping to get the city out of

20   bankruptcy; correct?

21   A   Well, we're hoping, October 15, 2014.

22   Q   Okay.  You're paying 4.2 million a month to the swap

23   parties.  That's part of the settlement if the Court approves

24   it; correct?

25   A   Yes.

1  Q    What happens if you get to the October 15th date and you

2  can't get financing to take out the remaining approximate 40

3  to $45 million balance?  What happens under the agreement as

4  you understand it?

5  A    Well, if we have a plan, I think we get another period of

6  time, 180 days or so, to find financing to either take them

7  out, if we can't pay them out in cash, on October 15th.

8  Q    Is that what's referred to in the term sheet as a

9  liquidity event?

10  A    Yes.

11  Q    Is there -- do you have any understanding as to whether

12  there's any additional requirements if you extend under the

13  liquidity event for 180 days?

14  A    Yes.

15  Q    And what are those?

16  A    Well, we pay the 4.2 according to the terms of the

17  underlying collateral agreement.  If after October 15th we

18  can't, there's an interest provision that kicks in, 1.5

19  percent or so, I believe.  If we don't have a plan, I believe

20  there's an interest provision that's indexed to the post-

21  petition financing.  I think there's also a fee provision in

22  there of one percent or so.

23  Q    And you said there's a fee provision.

24  A    Right.

25  Q    What does the one percent equal, approximately:

1    A    $402,000.

2    Q    And was that put in place by the banks in order to get

3    the 180-day extension?

4    A    Yes.  I believe so, yeah.

5    Q    Do you have an understanding of where the banks started

6    on that fee?

7    A    There were many discussions about where that fee was,

8    some of them very high.

9    Q    Okay.  Under the settlement agreement and plan support

10   agreement that's on the monitor in front of you, do you have

11   an understanding as to whether the swap counterparties are

12   required to vote in favor of the plan?

13   A    Yes.

14   Q    What's your understanding?

15   A    There is a plan support provision.  They are required to

16   vote in favor of the plan.

17   Q    Did you require that?

18   A    Yeah, we did.

19   Q    Why did you?

20   A    You know, we're not going to settle a case and then have

21   the parties come back in and try to undermine our ability to

22   get confirmation, get out of bankruptcy.  I mean that's part

23   of the settlement, so it should be global to give all effect

24   to the entire settlement.

25   Q    I'm now going to turn to and ask you some questions

1  regarding other provisions that are part of the settlement

2  agreement.

3  A    Um-hmm.

4  Q    Let's start with the COPs releases, the certificates of

5  participation.

6  A    Um-hmm, yes.

7  Q    Do you have an understanding of the role of the swap

8  counterparties in the COPs transaction?

9  A    Yes.

10  Q    And what is that?

11  A    They were the underwriters for the certificates of

12  participation transaction.

13  Q    Is the city releasing the swap counterparties from claims

14  relating to the COPs transaction?

15  A    Yes.

16  Q    Did you do any analysis before you agreed to that

17  release?

18  A    Yes.

19  Q    What is it that you did?

20  A    I had a conversation with my counsel about the potential

21  claims that we might have against the counterparties -- swap

22  counterparties related to the COPs litigation and instructed

23  them to do an analysis -- instructed you to do an analysis of

24  the strengths and weaknesses of those claims.

25  Q    When you say "you," you mean me, Robert Hertzberg; right?

1  A    Yes, my attorneys.

2  Q    And did we prepare a memo for you?

3  A    Yes, you did.

4  Q    Without going into any details of the memo, did the memo

5  cover the requests that you had made in regard to the

6  analysis?

7  A    Yes.

8  Q    Did you ever talk to me about that memo?

9  A    Yes.  We had several conversations over a weekend in the

10  middle of February.

11  Q    Based upon your review of the memo and discussions with

12  me, what decision did you make in regard to the requested

13  release of the swap counterparties on the COPs litigation?

14  A    I decided to agree to it.

15  Q    Let's turn to the bar order now if we could, please.

16  A    Um-hmm.

17  Q    Are you aware that the settlement agreement provides for

18  a limited bar order?

19  A    Yes.

20  Q    Can you briefly describe to the Court your basic

21  knowledge of the limited bar order?

22  A    My understanding is that the bar order is in place to --

23  limited bar order to prohibit claims against third parties,

24  against the counterparties, related -- I think it's -- I

25  think it's solely related to claims for noncontractual

1   indemnification and contribution.

2   Q   Why did you agree to that?

3   A   To give effect to the settlement so that what we settle

4   here some other third party can't hold them liable for there.

5   There were discussions that that would be a fair provision so

6   that they're not exposed twice.

7   Q   Did this have a negative or a positive economic impact on

8   the city?

9   A   No.

10  Q   Was it neutral?

11  A   Yeah.  It was more or less neutral.  There's a mechanism

12  where they get a credit for any judgment that's entered

13  against a credit on the other side, so, as far as we're

14  concerned, fine.

15  Q   What happens to direct claims by third parties against

16  the swap counterparties?  Do you know?

17  A   Yes.  Nothing.

18  Q   Let's turn to the service corporations injunction.

19  A   Yeah.

20  Q   Are you aware that the city is seeking an injunction

21  against the service corporations as part of the settlement?

22  A   Yes.

23  Q   What is your understanding of that injunction?

24  A   My understanding of that injunction is so that the

25  service corporations, here again, whoever they are, can't

1  attempt to file claims related to this settlement so that,

2  here again, our counterparties are exposed doubly.

3  Q    You were deposed in my office on Monday; correct?

4  A    Yes.

5  Q    And you were deposed by the objectors that are sitting

6  here today?

7  A    Yes.

8  Q    And one of them, which I don't remember which, but one of

9  them -- did they ask you about whether the swaps were

10  terminated?

11  A    Yeah, I believe they did.

12  Q    And what was your testimony at that time?

13  A    I think I said that they were.

14  Q    And is that your understanding when you reviewed it

15  later?

16  A    No.  What I should have said is that as far as I'm

17  concerned, they're terminated with regard to the city, but

18  they continue to exist in whatever form they exist for other

19  parties.

20  Q    When you mean terminated as to the city, explain what you

21  mean.

22  A    Our liability is terminated under the swaps once we do

23  the payment.

24  Q    So it's your understanding, even if the swaps remain open

25  for whatever reason --

1    A    Right.

2    Q    -- the city has no responsibility after it pays the 85

3    million?

4    A    Yes.

5    Q    Based upon all the terms that you've now gone through and

6    the negotiations and hearing from Judge Rhodes on January

7    16th as to his opinion on the litigation, do you think that

8    this settlement is in the best interest of the City of

9    Detroit?

10   A    Yes, I do.

11            MR. HERTZBERG:  Thank you.  Your Honor, I have no

12   further questions.

13            THE COURT:  All right.  Cross-examination, please.

14            MR. HACKNEY:  Your Honor, may I approach the witness

15   and the bench?

16            THE COURT:  Yes.

17            THE WITNESS:  Thank you, Mr. Hackney.

18            MR. HACKNEY:  Your Honor, may I proceed?

19            THE COURT:  Yes, please.

20                        CROSS-EXAMINATION

21   BY MR. HACKNEY:

22   Q    Good morning, Mr. Orr.  Good to see you again.

23   A    Good morning, Mr. Hackney.

24   Q    My name is Steve Hackney, as you know.  We've met several

25   times before, had the pleasure of doing some depositions

1  together.  I represent Syncora in these proceedings.

2  A   I wouldn't call it a pleasure, but it's nice to see you

3  again.  Okay?

4  Q   No offense is ever taken.

5  A   Okay.

6  Q   So, Mr. Orr, your understanding is that the swap

7  counterparties have the right to enforce remedies with

8  respect to whatever liens they hold; isn't that correct?

9  A   Yes.

10  Q   And you are aware that the settlement agreement -- that

11  in that settlement agreement the swap counterparties

12  represent to you, the city, that they have the authority to

13  enter into the settlement agreement; isn't that correct?

14  A   Yes.

15  Q   And the city is relying on that representation; isn't

16  that correct?

17  A   Yes.

18  Q   Now, you presume that your counsel has taken steps to

19  investigate that representation; correct?

20  A   Yes.

21  Q   And, in fact, you would not enter into this agreement if

22  the swap counterparties didn't have authority, would you?

23  A   I think that's true.

24  Q   That's because if the swap counterparties didn't have the

25  authority to enter into the agreement, the agreement might

1   not be enforceable; right?

2   A   That's probably true.

3   Q   Now, you're aware of something called the contract

4   administration agreement; isn't that correct?

5   A   Generally, yes.

6   Q   Let me direct your attention to that document.  It's in

7   evidence as City Exhibit 130.  It is at Tab 2 of the binder

8   in front of you.  Do you have that, sir?

9   A   Yes, I do.

10  Q   And we're going to look at a couple definitions that are

11  going to be important to a provision that we're going to

12  read, but you should look on page -- numerical page 1 of this

13  agreement.  Okay?  And it's numerical page 1 of the contract

14  administration agreement.  Okay?  And I want to direct your

15  attention to the definition of capital C, Collateral.  Do you

16  see that up near the top?  It's, I think, the top first

17  definition.  Do you have the right page there, Mr. Orr?

18  A   I have page 1, and --

19  Q   Article 1 definitions, section 1.1, and then you see

20  capital C, Collateral.  Can we blow that up?

21  A   Can you point it -- can you point it out to me?

22  Q   Absolutely.  It's there.  Do you see capital C,

23  Collateral?

24  A   Collateral, yes, sir.

25  Q   And just so that we have good communication, do you have

1   the right exhibit in your binder?

2   A   I have the June 12, 2006, contract administration

3   agreement 2006 for Detroit Retirement System Funding Trust,

4   2006.  The following terms --

5           THE COURT:  The answer is "yes."

6           THE WITNESS:  I think so.

7           MR. HACKNEY:  Okay.  I just want to make sure that

8   I'm not confusing the witness.

9           THE WITNESS:  Okay.  No.  That's fine.

10  BY MR. HACKNEY:

11  Q   Now, do you see that the definition of capital C,

12  Collateral, means the funding trust receivable collateral,

13  the hedge payables collateral, and the hedge receivables

14  collateral.  Do you see that?

15  A   Yes.

16  Q   Now, take a look down at the bottom of the page at the

17  definition of hedge payables collateral.  Okay?

18  A   Yes.

19  Q   Do you see this is -- this is one of the elements of the

20  definition of collateral that we just read.  Do you recall

21  that?

22  A   Yes.

23  Q   Yeah.  So we're now getting a definition from within a

24  definition.  It says hedge payables collateral means the

25  amounts payable by the city under the service contracts in

1   respect of hedge payables and all rights and interests with

2   respect thereto granted by Article 9 of the UCC, including

3   rights to proceeds and rights of enforcement.  Did I read

4   that correctly?

5   A    Yes.

6   Q    Now, are you familiar with Section 9.2 of the contract

7   administration agreement?

8   A    Not particularly.

9   Q    Okay.  That's not something that a rings a bell in your

10  head?

11  A    Not right now, no.

12  Q    Okay.  Could you turn to that for me?  It's on page 30.

13  Do you have that in front of you, sir, at --

14  A    Yes.

15  Q    -- Section 9.2 on page 30?

16  A    Yes, Mr. Hackney.

17  Q    It's a relatively long section.  If you'll bear with me,

18  I didn't want to try and excerpt it, but the payoff part of

19  it is at the end, so --

20  A    Okay.

21  Q    This is entitled "Independent Actions by the Parties,"

22  and it says, "Except as otherwise provided in Article 6 or

23  Article 8, nothing contained in this Agreement shall prohibit

24  any Hedge Counterparty, the Funding Trust or any

25  Certificateholders from exercising any rights, remedies or

1    options it may have hereunder or under any Service Contract

2    or at law or in equity, including, instituting legal action

3    against the City, the Contract Administrator, any Corporation

4    or any other party hereto to obtain a judgment or other legal

5    process in respect of such Contract Payment, but any funds

6    received from the City, the Contract Administrator, any

7    Corporation or any other party hereto in connection with any

8    recovery therefrom shall be subject to the terms of the

9    Service Contract Priority Sections of the respective Service

10   Contract" -- and then this is the part that I want to focus

11   on -- "provided that, any action to enforce remedies with

12   respect to capital C, Collateral may be taken only by the

13   applicable Insurer, or if such Insurer is in default under

14   its Credit Insurance, a party that has a Creditor Lien on

15   such Collateral."  Did I read that correctly?

16          MR. HERTZBERG:  Your Honor, objection.  Relevancy.

17   As I told the Court at the outset in my opening argument,

18   that Syncora would try to try their case in regard to

19   coverage of insurance today.  I think this is beyond the

20   scope of direct.  It's an issue that's not before the Court

21   on whether there's insurance coverage or not, and the Court

22   should hold that this line of questioning is not relevant.

23          THE COURT:  Sir.

24          MR. HACKNEY:  So this is from the contract

25   administration agreement, which is specifically integrated

1 | into the collateral agreement and is speaking to enforcement
2 | remedies and the question of authority that Mr. Orr has said
3 | he relied upon and is assuming that they have authority to
4 | enter into. This is going to be a big part of closing
5 | argument. I'd propose to reserve for argument the argument,
6 | but it's clearly relevant.
7 | MR. HERTZBERG: Your Honor, the city is not even a
8 | party to this agreement --
9 | MR. HACKNEY: The city is --
10 | THE HERTZBERG: -- so he's asking the witness about
11 | a document the city isn't even a party to.
12 | MR. HACKNEY: Yeah. The swap counterparties are a
13 | party to this document as well as the Retirement System
14 | Funding Trust, the -- both service corporations and what was
15 | then U.S. National Bank as the contract administrator, your
16 | Honor.
17 | THE COURT: The relevance of this is reasonably
18 | arguable. The Court will overrule the objection. You may
19 | proceed.
20 | BY MR. HACKNEY:
21 | Q   Well, just to be clear, your understanding in entering
22 | into this agreement is that it is the swap counterparties
23 | that have the right to enforce remedies; isn't that correct?
24 | A   It's my understanding that the swap counterparties have
25 | the ability to enter into the settlement agreement.

1  Q   Mr. Orr, I'd like to ask you some questions about the

2  service corporations.  You understand that there are two

3  service corporations which are named the General Retirement

4  Systems Service Corporation and the Detroit Police and Fire

5  Retirement System Service Corporation?

6  A   Yes.

7  Q   And the service corporations are legally separate from

8  the city; isn't that correct?

9  A   That's --

10       MR. HERTZBERG:  Objection.  Calls for a legal

11 conclusion as to whether they are separate or part of the

12 city, and it's an issue pending in the COPs litigation.

13       THE COURT:  Are you asking the witness his position

14 on that question?

15       MR. HACKNEY:  I was asking him his understanding.

16 It relates to his powers as to PA 436.  This is actually a

17 colloquy that he and I had had previously in his prior

18 deposition when we were --

19       THE COURT:  You may answer in regard to your

20 understanding or your position on that question, sir.

21       THE WITNESS:  My position, your Honor, is that that

22 is under litigation as to whether or not they're legally

23 separate or they're a sham.

24 BY MR. HACKNEY:

25 Q   That certainly is, but your understanding back when I

1  took your deposition in August of last year was that they

2  were legally separate from the city; correct?  I mean I

3  can -- I'm happy to --

4  A   Yeah.  I don't want to waste time.  My understanding was

5  that -- back then that they were, but I didn't really have

6  any -- I think we had that discussion, Mr. Hackney.  I said I

7  really didn't understand how they operated.

8          THE COURT:  The question was in August when your

9  deposition was taken --

10         THE WITNESS:  Okay.

11         THE COURT:  -- was that your position --

12         THE WITNESS:  I don't recall.

13         THE COURT:  -- that they were separate?

14         THE WITNESS:  I don't recall, your Honor.

15         THE COURT:  He doesn't recall.

16 BY MR. HACKNEY:

17 Q   Well, you know what?  We'll let the record speak for

18 itself and continue moving along.  Your testimony, though, is

19 that you do not control the service corporations; isn't that

20 correct?

21 A   Yes, I believe so.

22 Q   And you have no firsthand knowledge regarding the

23 activities of the service corporations?

24 A   That's correct.

25 Q   Now, at least two of the service corporation directors

1  are also city employees; isn't that right?

2  A   Yes.

3  Q   And those folks are currently Mr. Naglick and Mr.

4  Hollowell; correct?

5  A   That's correct.

6  Q   And Mr. Naglick is the budget director, and Mr. Hollowell

7  is the corporation counsel; isn't that correct?

8  A   That is true.

9  Q   Now, since those two men have been appointed to their

10 position, you have had numerous conversations with both of

11 them; isn't that correct?

12 A   Yes.

13 Q   But in all of those conversations, the subject of the

14 service corporations has literally never come up; isn't that

15 correct?

16 A   That is correct.

17 Q   And you are aware that with respect to the prior

18 settlement agreement, the service corporations were at least

19 signatories to that agreement; isn't that correct?

20 A   I believe so.

21 Q   And your understanding at that time was that someone had

22 engaged in good faith negotiations with the service

23 corporations; correct?

24 A   To the best of my knowledge.

25 Q   But now the service corporations are not parties to the

1  instant settlement; isn't that correct?

2  A   Yes.

3  Q   I'd like to direct your attention to the third tab in

4  your binder, Mr. Orr, which is an e-mail chain, and this is

5  an e-mail chain back and forth between your attorneys at the

6  city and the attorneys for the swap counterparties, and you

7  actually have to go into kind of the middle of this e-mail to

8  get to the part of the chain that I want to ask you about.

9          MR. HERTZBERG:  Your Honor, I'm going to object to

10  any questions asked unless a proper foundation is laid for

11  the exhibit.

12          MR. HACKNEY:  Well, I haven't asked --

13          THE COURT:  Is it in evidence?

14          MR. HACKNEY:  It is not in evidence, your Honor.

15          THE COURT:  All right.

16  BY MR. HACKNEY:

17  Q   So the one I want you to look at, Mr. Orr, is dated

18  February 9th, 2014, and it is from Mr. Smith to Ms. Ball and

19  Mr. Hertzberg.  Okay?  And you can find it on -- page 4 and 5

20  is where it spans over.

21  A   Yes, Mr. Hackney.

22  Q   Do you see that?

23  A   I see it.

24  Q   Okay.  So Mr. Smith says, "Corinne and Bob" --

25          THE COURT:  Hold on.

1          MR. HERTZBERG:  Objection, your Honor.

2          THE COURT:  Hold on.  You can't --

3          MR. HERTZBERG:  He hasn't laid a foundation for the

4     document.

5          THE COURT:  You can't ask the witness about the

6     contents of a document before it's admitted into evidence.

7          MR. HACKNEY:  I am -- this witness has not seen this

8     e-mail, but I am asking him about the concept that is

9     elucidated by Mr. Smith.  I will not be asking him to confirm

10    that Mr. Smith did or did not say this, that e-mail -- that

11    this e-mail was or was not sent.  I am just asking him about

12    a statement that's made in the e-mail that I will not seek to

13    introduce into evidence.  It informs the next question that I

14    ask him about, decisions that he did or did not make that he

15    does have personal knowledge of.

16         MR. HERTZBERG:  Your Honor, one, the document is

17    hearsay.  Two, this witness has never seen it.  Three, he's

18    not laid a foundation because he did not lay a foundation for

19    the exhibit, and, four, if he wants to ask about something

20    regarding Mr. Smith, he's already acknowledged, counsel, that

21    the witness has never seen the exhibit.  He is not using it

22    to refresh the witness' memory.  The exhibit should be pulled

23    from the witness.  He can ask his question.  And then if he

24    wants to use it for some other purpose or can lay a

25    foundation somehow, then it can come in, but to ask the

1   witness about information and asking the witness to read an

2   exhibit that counsel acknowledges he's never seen before and

3   is clearly hearsay --

4           MR. HACKNEY:  I'm not going to ask the witness a

5   question about this document.  I am --

6           THE COURT:  Then what's the point?

7           MR. HACKNEY:  The point is to inform questions that

8   I am going to ask him about certain decisions that were made.

9           THE COURT:  Well, let me just ask you to get to

10  those questions.  It really is not proper to ask the witness

11  a question --

12          MR. HACKNEY:  Let me --

13          THE COURT:  -- about or relating to a document he's

14  never seen.

15          MR. HACKNEY:  Okay.

16  BY MR. HACKNEY:

17  Q   Mr. Orr --

18  A   Yes.

19  Q   -- were you aware that the swap counterparties' attorneys

20  had communicated to the city that they had questions about

21  the impact on the structure that was being caused by the

22  decision to omit the service corporations?

23  A   I don't think so.

24  Q   So no one from your legal team ever told you that the

25  swap counterparties had reached out to the city and said,

1    "This term sheet we're drafting is getting much more

2    complicated without the service corporations.  Would you

3    please reconsider your decision that they cannot be part of

4    the agreement?"

5            MR. HERTZBERG:  Objection, your Honor.  He's trying

6    to get into attorney-client privilege.

7            MR. HACKNEY:  Well, in fairness, we heard a lot of

8    testimony where he wasn't involved in direct negotiations,

9    but he testified downstream of the counsel.

10           THE COURT:  I'll permit this one.  Please answer the

11   question.

12           THE WITNESS:  Okay.

13   BY MR. HACKNEY:

14   Q   Yeah.  I know.  That's my fault.  I always ask the long

15   ones.  So did you -- did you ever -- did they ever tell you,

16   "Hey, the swap counterparties, they're concerned about the

17   absence of the service corporations from the new settlement.

18   They're asking us --

19   A   Okay.

20   Q   -- will we reconsider our decision to omit the service

21   corps from this deal"?  Did they ever tell you that?

22           MR. HUEBNER:  Your Honor, I object.  He's

23   mischaracterizing a document that's not even in evidence and

24   saying what he says is not what they said -- they never said.

25           MR. HACKNEY:  My first preference was to use the

1    document.  Now I'm asking him questions about what he was

2    told.

3            THE COURT:  Cross-examination questions are actually

4    allowed to mischaracterize evidence.

5            MR. HUEBNER:  Then I have no objection.

6            THE COURT:  There's no prohibition against that.

7            MR. HACKNEY:  We'll find out how bad I was doing on

8    redirect.

9            THE WITNESS:  Mr. Hackney, I think I remember your

10   question, and my answer would be they may have, but I don't

11   recall.

12   BY MR. HACKNEY:

13   Q   Okay.  This is what I want to get to, that we can agree

14   that with respect to the negotiations of the settlement

15   agreement, someone made the decision not to include the

16   service corporations; isn't that correct?

17   A   I think that's fair.

18   Q   But whoever that someone was, it wasn't you; correct?

19   A   I honestly don't recall.  It may have been visited with

20   me, and I may have approved it, but I just don't recall.

21   Q   Okay.  Well, let me direct you to the smaller deposition

22   transcript that's in front of you at page 82.

23           MR. HACKNEY:  You know what, your Honor?  We'll move

24   on.  We have a dep exhibit with no page numbers on it, so --

25           THE COURT:  Oops.

1          MR. HACKNEY:  Oops.

2    BY MR. HACKNEY:

3    Q    Now, you are aware that the service corporations depend

4    on the city to make the payments of their various obligations

5    under both the COPs and the swaps; isn't that correct?

6    A    I think that's true.

7    Q    And they do not have independent sources of income; isn't

8    that correct?

9    A    Not that I know of.

10   Q    The service corporations have not agreed to release any

11   liens they hold under the collateral agreement; isn't that

12   correct?

13   A    I don't know.

14   Q    Under the approved order, you understand that all liens

15   are released in the event that the swap counterparties are

16   paid the settlement amounts under the settlement agreement;

17   isn't that correct?

18   A    Yes.

19   Q    And that will free up the revenue -- the casino revenues

20   to be used by the city; correct?

21   A    Yes.

22   Q    But you're not able to explain how freeing up the casino

23   revenues for the city benefits the service corporations;

24   isn't that correct?

25   A    I don't know anything -- no, I don't.

1  Q   I'd like to direct your attention to Section 12.4 of the

2  settlement agreement, which is on page 18, Tab 1, of the

3  binder.  Do you have Section 12.4 in front of you of the

4  settlement agreement?

5  A   Yes, Mr. Hackney, I do.

6  Q   Now, do you see that Section 12.4 says "complete

7  agreement interpretation," and it says --

8  A   Yes.

9  Q   -- sorry -- "This agreement and the approval order

10  constitute the complete agreement among the parties with

11  respect to the subject matter hereof and supersedes all prior

12  agreements, oral or written, among the parties with respect

13  thereto"?  Do you see that language?

14  A   Yes.

15  Q   You agree that the swaps and the collateral agreement are

16  part of the subject matter of this settlement agreement;

17  isn't that correct?

18  A   I believe so.

19  Q   Mr. Orr, as you sit here today, isn't it true that you

20  don't know if the collateral agreement is still an operative

21  agreement; isn't that correct?

22  A   I don't know.

23  Q   And you don't know if the collateral agreement is legal;

24  isn't that correct?

25          MR. HERTZBERG:  Objection.  Calls for a legal

1   conclusion.

2           THE COURT:  Overruled.  Please tell us your position

3   or understanding on that question.

4           THE WITNESS:  Under the settlement agreement, we

5   make payments pursuant to the terms of the collateral

6   agreement.

7   BY MR. HACKNEY:

8   Q   You don't know whether there are any conflicts between

9   the collateral agreement and the settlement agreement; isn't

10  that correct?

11  A   No.

12  Q   If there is a conflict between the collateral agreement

13  and the settlement agreement, you don't know which one

14  governs; correct?

15  A   I'd have to consult with counsel.

16  Q   Yeah, that's right.  Answering the question would require

17  you to understand the nature of the conflict and would

18  require you to be able to consult with your counsel, isn't

19  that right --

20  A   Yeah.

21  Q   -- on the question of which agreement governed; right?

22  A   Well, just -- yes.

23  Q   And you don't recall whether you have taken advice on

24  that subject prior to today; isn't that correct?

25  A   That's correct.

1   Q   You don't know whether the city and the swap
2   counterparties have agreed to terminate the collateral
3   agreement in the proposed settlement; isn't that correct?
4   A   I don't recall, yes.
5   Q   And you don't know whether you would enter into this
6   agreement if the collateral agreement were to live on as a
7   vital contract enforced according to its terms; isn't that
8   correct?
9   A   I don't know.
10  Q   You also don't know if there are any conflicts between
11  the terms of the settlement agreement and the service
12  contracts that the city has with the service corps; isn't
13  that correct?
14  A   I think that's fair.
15  Q   And you can't recall whether you have taken any advice on
16  that subject either; isn't that right?
17  A   I don't recall.
18  Q   You also don't know whether the swap counterparties have
19  made a contractual promise in the settlement agreement to
20  release their liens if they are paid the settlement amount;
21  isn't that correct?
22  A   I think there's an obligation on the settlement agreement
23  for them to release their liens, but I don't know the
24  specific provision.
25  Q   And remember we had a colloquy on this, and I was

1  distinguishing between the parties agreeing to have the judge

2  release the liens and the parties actually making commitments

3  to one another, promises to one another.  Do you remember?

4  A   I remember that.  Yeah, I do.

5  Q   And you don't know whether the swap counterparties have

6  actually agreed to release the liens?

7  A   No.  I think that was in the discussion about I'd have to

8  talk with counsel.

9  Q   Okay.  Now, you understand that the -- oh, well, a couple

10  other questions.  We talked about the fact that the service

11  corporations aren't a party, haven't agreed to anything under

12  the settlement agreement, but it's also true that the city

13  isn't purporting to release the liens of the service

14  corporation on their behalf under the settlement agreement;

15  correct?

16  A   I think we have to talk to counsel, but I think that was

17  right.

18  Q   Okay.  Now, you understand that the settlement agreement

19  contains a bar order; isn't that right?

20  A   Yes.

21  Q   And that bar order bars third parties from filing claims

22  for contractual contribution -- noncontractual contribution

23  and indemnity against the swap counterparties.  Do you

24  remember that testimony?

25  A   Yes.

1  Q   And that provision is found at 8.4 of the agreement in

2  case you want to refer to it.  I had not intended to have you

3  read it.  It's relatively long and --

4  A   Okay.

5  Q   -- from my perspective, complicated.

6  A   If that's the right provision --

7  Q   Yeah.

8  A   -- I believe it is.

9  Q   If you'd like to, that's where it is.

10 A   No.  I believe it is.

11 Q   But do you remember you and I talked about this, and the

12 fact is that you're not able to provide a specific example of

13 a lawsuit that would be barred by the bar order; isn't that

14 correct?

15 A   Yes.  We said that was speculation.

16 Q   You're also aware that there is an injunction against the

17 service corporations contained in the settlement agreement;

18 correct?

19 A   Yes.

20 Q   But you don't know whether that injunction bars the

21 service corporations from suing the city under the service

22 contracts; correct?

23 A   That's correct.

24 Q   Now, there is an exculpation provision in this agreement;

25 isn't that correct?

1  A   Yes.

2  Q   And I can direct you to the specific provision, but I'll

3  just describe generally that it provides that if any creditor

4  of the city is exculpated for acts and omissions in

5  connection with the bankruptcy case, then any plan the city

6  proposes must also exculpate the swap counterparties to the

7  same extent; is that correct?

8  A   I believe that's generally it, yes.

9  Q   Ring a bell?  It's a most favored nation exculpation

10 provision?

11 A   Yes.

12 Q   Yeah.  I'm stealing your phrase now.  Okay.  So, but we

13 talked about this as well, and you were not able to offer to

14 me, at least, a practical explanation of how this would

15 work --

16 A   Yes.

17 Q   -- at least -- that's fair; right?

18 A   Yes, that is.

19 Q   Let's say as part of the grand bargain that we've read

20 about in the newspapers that the state is given exculpation

21 from any claims based on its acts or omissions in connection

22 with the bankruptcy.  Is it your understanding that because

23 the state was entitled to that exculpation, that that would

24 now require you to grant the swap counterparties the same

25 exculpation or risk being in breach of this agreement?

1  A   I don't know.

2          MR. HACKNEY:  Your Honor, I have no further

3  questions.  Thank you for your time, Mr. Orr.  Good to see

4  you again.

5          THE WITNESS:  Good to see you again, Mr. Hackney.

6          THE COURT:  Further cross-examination.

7                    CROSS-EXAMINATION

8  BY MR. MARRIOTT:

9  Q   Good afternoon, Mr. Orr.

10 A   Good afternoon, Mr. Marriott.

11 Q   For the record, Vince Marriott representing EEPK and

12 affiliates.

13 A   We've met before.

14 Q   We have.  In fact, when people ask me now what I do for a

15 living, I say I cross-examine Kevyn Orr.

16 A   You and a lot of other people apparently.

17 Q   I know that I share that job with others.

18 A   Yeah.

19         MR. HERTZBERG:  He needs to get a new living.

20         THE WITNESS:  So do I.

21         THE COURT:  New life.

22 BY MR. MARRIOTT:

23 Q   I will be brief.

24 A   Okay.

25 Q   I do want to address a little bit what the settlement

1  agreement is settling because I think it's important in terms

2  of analyzing the 85 million.

3  A    Um-hmm.

4  Q    Now, I'm correct, am I not, that the claim that was being

5  settled in connection with the initial forbearance agreement,

6  the one that approval of was denied in January, was to be a

7  termination amount that was payable under a termination that

8  was contemplated as part of that agreement; correct?

9  A    Yes.  A termination fee is part of the forbearance and

10  optional termination agreement.

11  Q    Right.

12  A    Right.

13  Q    I mean, but it was contemplated as part of that agreement

14  that the swap agreements would actually, in fact, be

15  terminated; correct?

16  A    I believe so.

17  Q    Okay.  Now, this agreement, the new settlement

18  agreement -- I'm sorry.

19          MR. MARRIOTT:  Which city exhibit is it?

20          MR. HERTZBERG:  145.

21          MR. MARRIOTT:  145?  Could we just bring it up?  I

22  don't know who's got -- who's master of the --

23  BY MR. MARRIOTT:

24  Q    City Exhibit 145, the new settlement agreement,

25  specifically provides that the swap agreements are not

1   terminated by virtue of the settlement agreement; correct?

2   A   Yes.

3   Q   And I'm correct, am I not, that the agreement does not at

4   any time require that the swap agreements be terminated;

5   correct?

6   A   I believe that's true.

7   Q   So that, in fact, there might never arise a claim for a

8   termination payment under the swap agreement as contemplated

9   by the new settlement agreement; correct?

10   A   I don't know.

11   Q   Well, let me -- is there a provision in the settlement

12   agreement that requires the termination of the swaps at any

13   time?

14   A   No.

15   Q   Okay.  So the $85 million, although characterized as a

16   settlement of a 280-some-odd-million dollar termination

17   claim, in fact, as we sit here today, there is no such claim;

18   correct?

19   A   I think there's an obligation, yes.

20   Q   Well, there would be an obligation to pay a termination

21   claim depending upon interest rates --

22   A   Right.

23   Q   -- if they were -- the swaps were terminated, but this

24   agreement does not terminate them; correct?

25   A   Yes.

1  Q   Yes, it does -- yes, that's correct?

2  A   That is correct.

3  Q   Okay.

4  A   Um-hmm.

5  Q   So what presently existing claims of the swap

6  counterparties are settled by this agreement for the payment

7  of $85 million?

8  A   All liability of the city with regard to the swap

9  obligations and the forbearance and optional termination

10 agreement.

11 Q   And did you quantify the claims you've just described as

12 being settled in the absence of a settlement?  Did you

13 quantify what that amount would be?

14 A   Yeah.

15 Q   And what number did you quantify them at?

16 A   $288 million.

17 Q   Well, my understanding is the $288 million relates to the

18 termination payment that would have been payable at the time

19 the settlement agreement amount was agreed to except that

20 there is no such claim because the swap agreements haven't

21 been terminated, so my question to you is $288 million

22 relates to a claim that doesn't exist, so what is your

23 quantification of the claims that do exist that are being

24 settled?

25 A   I think a claim for $288 million does exist.

1  Q   And why do you think it exists if the swaps haven't been

2  terminated and might never be?

3  A   Well, we're trying to forestall the termination of the

4  swaps so that obligation doesn't arise, but I think we have

5  the risk of owing $288 million.

6  Q   Well, but I mean you have a lot of risks, and --

7  A   Yes, we do.

8  Q   -- the risk of owing $288 million is dependent upon

9  interest rates, and two years from now maybe that number is

10 different, low, or gone; right?

11         MR. HERTZBERG:  Objection.  Argumentative, your

12 Honor.

13         THE COURT:  The objection is sustained.

14 BY MR. HACKNEY:

15 Q   You indicated in your prior testimony that -- as well as

16 your testimony in connection with the second forbearance

17 agreement that you had placed a percentage likelihood of

18 success on the various potential claims to invalidate either

19 the liens or the claims under the swap agreements at 50/50?

20 A   Yes.

21 Q   And you indicated that you -- I believe in response to

22 questions asked of you of direct, you indicated that you had

23 reevaluated your prospects for success on those claims in

24 light of some of the judge's comments from the bench in

25 connection with disapproving the last agreement; correct?

1  A    Absolutely.  I heard exactly what the judge said.

2  Q    Did you, as part of that reanalysis, come up with

3  different percentages with respect to your prospects for

4  success?

5  A    No.  I didn't determine any specific whole number.

6  Q    Since you didn't come up with a percentage, a revised

7  percentage, how did you determine that 85 million -- putting

8  aside for the moment how you would have quantified -- how you

9  quantified the claims that you're settling, how did you

10  determine that 85 million was the right number?

11  A    As we said, we wanted to get below a hundred million just

12  as an indication that they were serious about settling, which

13  was almost a shift from where we started.  The number -- my

14  target number was a combination of having at least 200

15  million off because I thought that was a significant sum of

16  money based upon what we were potentially exposed to but also

17  getting closer to the unsecured percentage recovery for even

18  a secured claim, so the range of 20 to 30 percent was roughly

19  what we were targeting.

20  Q    So you ultimately based the $85 million on some

21  comparison to the percentage -- well, the nominal percentage

22  recoveries of unsecured creditors?

23  A    Yes.  Just as an index, yes.

24  Q    All right.  Now, you understand that your latest plan

25  nominally projects that unsecured creditors will receive 15

1  cents on the dollar; correct?

2  A   Yes.

3  Q   And not in cash but in notes over a long period of time?

4  A   Yes.

5  Q   But you're planning on paying the swap counterparties

6  what I believe you describe as roughly 30 percent, so twice

7  what unsecured creditors are getting?

8  A   If that's what the math works out to be, yes.

9  Q   Okay.  And in cash, not in a note; right?

10 A   Payment over time with an ultimate cash payment

11 contemplated, yes.

12 Q   Right.

13        MR. MARRIOTT:  Judge, can I ask quickly -- I'm

14 sorry -- where we are in time?

15        THE COURT:  Approximately 120 minutes.  If you need

16 it more specifically to the minute, it'll take me a minute.

17        MR. MARRIOTT:  No, no.  That's all I needed to know.

18 I've got nothing else.

19        THE WITNESS:  Thank you, Mr. Marriott.

20        THE COURT:  Any further cross-examination of the

21 witness?

22                    CROSS-EXAMINATION

23 BY MR. FRIMMER:

24 Q   Good morning, Mr. Orr.  How are you?

25 A   Good morning.  How are you?

1  Q    I'm Rick Frimmer from Schiff Hardin.  I represent FMS

2  Wertmanagement, one of the COPs holders.

3  A    Yes, sir.

4  Q    I don't -- I think we met before, but we actually haven't

5  spoken.

6  A    We have, yes.

7  Q    I have just a few questions for you.

8  A    Um-hmm.

9  Q    You testified on direct that you had this meeting on or

10  around January 30th or 31st with your counsel and that you

11  reviewed the proposed complaint that had no less than 17

12  counts on it.

13  A    Yes.

14  Q    Was there any point that you asked your counsel, "Why do

15  we need to do all of that?  Why can't we just go for the ones

16  that Judge Rhodes told us we have a reasonable likelihood of

17  success on?"

18          MR. HERTZBERG:  Objection.

19          MR. FRIMMER:  I didn't ask for what his counsel --

20          MR. HERTZBERG:  Attorney-client privilege.

21          MR. FRIMMER:  I didn't ask for what his -- sorry.

22  Go ahead.

23          MR. HERTZBERG:  He's asking him about his

24  discussions with -- whether he had discussions with counsel

25  on an issue.  What he discussed with me or any of his other

1   attorneys is clearly attorney-client privilege.

2           MR. FRIMMER:  Your Honor, I didn't ask him what he

3   discussed with counsel.  I asked him why he didn't ask

4   counsel why they didn't do it.

5           THE COURT:  What's the relevance of that?

6           MR. FRIMMER:  The relevance?

7           THE COURT:  What's the relevance of that question?

8           MR. FRIMMER:  Well, the relevance is that from the

9   testimony of the prior witness, there's an assumption that

10  the litigation would proceed for a very long time, and it

11  firms -- and forms the basis for part of Mr. Orr's decision,

12  so I'm simply asking whether there was a shorter route.

13          THE COURT:  You can ask that question, but this

14  question is not relevant.

15  BY MR. FRIMMER:

16  Q   Was there a process by which you could have litigated the

17  claims or a portion of the claims in a way that would have

18  resolved them more quickly?

19  A   There may have been, but we -- I can't -- there may have

20  been, but I don't know.

21  Q   You didn't think of it?

22  A   No.  We thought if there's a way to be more efficient,

23  but I don't know if that would have resulted in shorter

24  litigation.

25  Q   Okay.

1        MR. FRIMMER:  Can we put back up the -- I don't --
2   I'm forgetting the number of the exhibit that is the
3   settlement agreement, please.
4        MR. HERTZBERG:  145.
5        MR. FRIMMER:  Thank you.  145.
6   BY MR. FRIMMER:
7   Q   Mr. Orr, your direct testimony is that you understand
8   that if the settlement agreement is approved, that the city
9   will owe the swap counterparties $85 million.
10  A   85 million gross, a net reduction for the payments
11  already made.
12  Q   Okay.  Under the settlement agreement, do the swap
13  counterparties preserve the right to terminate the swaps?
14  A   Yeah, I believe so.
15  Q   Okay.  And does the settlement agreement prohibit them in
16  any way from asserting a termination payment on that
17  termination?
18  A   I mean subject to the terms of the agreement and us
19  making the payments as they become due on a regular basis
20  under this agreement, yes.
21  Q   Do you know where in the settlement agreement it says
22  that?
23  A   I think it says as long as we continue to make the
24  payments, that the parties will forbear from exercising any
25  rights.

1   Q   Can you point that out to me?

2   A   I can read through the entire agreement.

3   Q   Okay.  Well, let me point you to Section 4.2(d), which is

4  on page 9.  Can we turn to page 9?

5   A   Um-hmm.

6   Q   Do you see 4.2(d)?

7   A   Yes.

8   Q   So 4.2 -- I'll help you read it or you can read it --

9   A   Okay.

10   Q   -- as we do this.  4.2(d) says the parties agree that if

11  any swap agreement is terminated, the payments due from the

12  city to the swap counterparties -- I'm going to use the

13  acronyms instead of the definitions --

14   A   Um-hmm.

15   Q   -- as provided in 4.1(a) -- those are the monthly and

16  quarterly payments --

17   A   Um-hmm.

18   Q   -- will be applied to amounts payable by the city to the

19  swap counterparties under the collateral agreement.  And the

20  next phrase is and any payment of the net amount -- the net

21  amount you recall being the difference between the 85 million

22  and what has been paid to that date -- shall be deemed a

23  prepayment of any amounts that become due under the

24  collateral agreement.  Doesn't that indicate that there might

25  be or could be under this agreement some further payments

1    due?

2          MR. HERTZBERG:  Objection.  Calls for a legal

3    conclusion.

4          THE COURT:  Again, you can testify as to your

5    understanding.

6          THE WITNESS:  Yeah.  I don't believe so.

7    BY MR. FRIMMER:

8    Q   You don't think that the swap counterparties the day

9    following the approval order can elect to terminate the

10   agreement and assert a termination payment?

11   A   I don't know.  I'd have to consult with my counsel.

12         MR. FRIMMER:  Okay.  I have no further questions,

13   your Honor.

14                      CROSS-EXAMINATION

15   BY MS. NEVILLE:

16   Q   Good afternoon, Mr. Orr.  My name is Carole Neville.

17   A   Good afternoon, Ms. Neville.

18   Q   I represent the Retiree Committee.

19   A   I'm well-aware of it.

20   Q   But I've ever cross-examined you or deposed you; isn't

21   that correct?

22   A   Not to the best of my knowledge.

23   Q   Right.  Well, this is a first.

24   A   Um-hmm.

25   Q   Are you familiar with the Michigan Gaming Control and

1  Revenue Act, Mr. Orr?

2  A   Generally, yes.

3  Q   Are you aware of any restrictions on the use of the

4  casino revenue under that act?

5  A   I'm aware that there have been arguments made that there

6  may be restrictions under the act.

7  Q   And have you ever -- have you ever looked at the

8  restrictions in the statute?

9  A   I believe in conjunction with my counsel, yes.

10  Q   Does the term "quality of life" ring a bell about what

11  those restrictions might be?

12  A   Yes.  I think there's some itemized list for services,

13  quality of life, patrolmen, things like that.

14  Q   And is it your understanding that the settlement

15  agreement requires the city to either pledge or continue a

16  pledge on the casino revenue in favor of the swap

17  counterparties?

18  A   I believe so.

19  Q   Can you explain to me how you would reconcile those

20  restrictions under the Michigan Gaming Act with the pledge of

21  the casino revenue --

22          MR. HERTZBERG:  Objection.

23          MS. NEVILLE:  -- under the settlement agreement?

24          MR. HERTZBERG:  Objection.  Calls for a legal

25  conclusion, your Honor.

1      MS. NEVILLE:  Well, I'd like --

2      THE COURT:  Overruled.  Please answer.

3      THE WITNESS:  No, not without consulting with my

4  attorney.

5      MS. NEVILLE:  Thank you.  I have no further

6  questions.

7                        CROSS-EXAMINATION

8  BY MR. GOLDBERG:

9  Q   Good afternoon, Mr. Orr.

10 A   Good afternoon, Mr. Goldberg.

11 Q   How you doing?

12 A   I'm well.  How are you?

13 Q   Good.  Couple questions, sir.  First of all, it is your

14 understanding, am I not correct, that under Judge Rhodes'

15 opinion of January 16th he held that there was a reasonable

16 likelihood that the city would prevail in an action to

17 invalidate the swaps pursuant to PA 34; is that correct?

18 A   I believe so.

19 Q   And that if the city succeeded in that action, it could

20 potentially recover the $300 million that had already been

21 paid on the swaps between 2008 and 2013?

22      MR. HERTZBERG:  Objection, your Honor.  That

23 mischaracterizes what you said on the record.  You've never

24 said that.

25      MR. GOLDBERG:  Well, we can go through the record.

1    I have the record.  I have the transcript right there.

2          THE COURT:  Just answer the question to the best of

3    your ability.

4          THE WITNESS:  Yeah.  I don't recall that.

5    BY MR. GOLDBERG:

6    Q   You do not recall that Judge Rhodes ruled that there was

7    a potential to recover the $300 million that had been paid on

8    the swaps?

9    A   I don't recall.

10   Q   Okay.  $300 million would do a lot to help the city out;

11   correct?

12   A   Yes.

13   Q   So when you weighed -- just so I'm clear, when you

14   weighed the efficacy of this new agreement, you didn't

15   balance the potential of recovering $300 million against

16   paying the banks 85 million?

17   A   I took it into consideration.

18   Q   You did take that into consideration?

19   A   Yes.

20   Q   Okay.  And what was the basis for your taking that into

21   consideration?

22   A   To try to understand what potential recoveries might be

23   through extended litigation over a long period of time versus

24   the city's need to make reinvestment projections and

25   investments in lights, police, firemen, all the things the

1  city needs -- has needed for some time.

2  Q    Okay.  Of course, $300 million would go a long way to

3  providing services to the people of the city, would it not?

4  A    If it were in cash today, yes.

5  Q    Okay.  When you recommended the approval of the first

6  forbearance agreement that would pay the swap -- sorry --

7  that would pay the swap counterparties $230 million, you

8  thought that was a good deal, did you not?

9  A    Yes.

10  Q    And when you recommended the approval of the second

11  agreement that would pay the swap counterparties 165 million,

12  you thought that was a good deal as well, did you not?

13  A    Yes.

14  Q    You testified that as of January 30th there'd already

15  been a complaint prepared and a request for preliminary

16  injunction prepared by your attorneys?

17  A    Yes.

18  Q    And so I'm trying to understand what -- we had testimony

19  from Mr. Malhotra that the litigation cost would be projected

20  at $1.2 million a month over the next 14 months, but you were

21  actually testifying that the -- a good part of that

22  litigation had already been prepared in terms at least of a

23  complaint and preliminary injunction request; is that

24  correct?

25            MR. HERTZBERG:  Objection.  One, he hasn't

1  established a foundation that Mr. Orr knows that number that

2  Mr. Malhotra put in, and, second of all, he's

3  mischaracterizing the testimony that was put in.  Mr. Orr

4  never testified that all the -- the majority of the legal

5  work had already been done.

6           MR. GOLDBERG:  Okay.  Well, I can clarify that.

7  BY MR. GOLDBERG:

8  Q   What was your -- what was your thoughts -- in evaluating

9  the efficacy of this settlement, what were -- in your mind,

10  what was the cost of litigation going to be?

11  A   It was significant.  Could be millions of dollars a

12  month.

13  Q   Okay.  And just so we are clear, you did testify that

14  already a complaint had been prepared, and a motion for

15  preliminary injunction had been prepared; is that correct?

16           MR. HERTZBERG:  Your Honor, objection.  Asked and

17  answered three times.

18           THE COURT:  We'll permit it one more time.

19           MR. GOLDBERG:  Yes.

20           THE WITNESS:  Yes.

21           MR. GOLDBERG:  Okay.  Thank you.

22           THE COURT:  I need you to do me a favor.  Take the

23  tip of that microphone and turn it down about two or three

24  inches.

25           MR. GOLDBERG:  No problem.

1       THE COURT:  There you go.

2       MR. GOLDBERG:  There we go.

3       THE COURT:  Good.

4       MR. GOLDBERG:  Thank you very much, your Honor.

5  BY MR. GOLDBERG:

6  Q   Your testimony was that the -- if the city could not pay

7  off this 85 million deal within -- I believe it was first a

8  hundred days, that interest would begin accruing on it; is

9  that correct?

10 A   No.  At the end of the payment period by October 15th the

11 figure should be 40 to 45 million --

12 Q   Okay.

13 A   -- dollars, and if we're not, we have $30 to -- 30

14 days -- wish we had $30 -- 30 days to pay that off, and if

15 not interest will begin accruing, and we'll have another 180

16 days to pay off the balance or finance it.

17 Q   And just so I'm clear, the interest that would begin

18 accruing was equivalent to the post-petitioning financing

19 plus 1.5 percent plus another one-percent fee?

20 A   Yeah, I believe so.

21 Q   And is it fair to say that that amount would be

22 approximately ten percent in interest?

23 A   I don't know.

24       MR. HERTZBERG:  Objection.  He's mischaracterized

25 the witness' testimony.

1      MR. GOLDBERG:  He hasn't testified.  I just asked

2  him is it fair to --

3      THE COURT:  It's a question.  Please answer it.

4      MR. GOLDBERG:  It's a question.

5      THE WITNESS:  I don't know.

6  BY MR. GOLDBERG:

7  Q  Okay.  Fine.  In the previous hearing, you testified that

8  you'd had contact with the feds and specifically with the SEC

9  concerning the efficacy of litigation around the swaps; is

10  that correct?

11  A  I testified I contacted the SEC.  I think I said -- yes,

12  I think I said generally a potential for investigation, yes.

13  Q  Did you have any subsequent discussions with them after

14  Judge Rhodes' opinion on January 16?

15  A  No.

16  Q  Are you aware that in February of this year that there

17  was a -- the Justice Department filed a lawsuit against UBS

18  and Bank of America for LIBOR fraud?

19  A  Yes.

20  Q  Were you aware that that lawsuit was about to be filed

21  prior to it being filed?

22  A  I don't think so.

23  Q  One last point, sir.  You testified that one of the

24  issues you were concerned about was that you didn't want to

25  have a settlement that could then be challenged again during

1  the confirmation hearing to be impaired during the

2  confirmation hearing.  Is that a correct characterization of

3  your testimony?

4  A   Yes, sir.

5  Q   You would have had the option to not bring the settlement

6  to the Court, but it would have been subject to challenge

7  during the confirmation hearing; is that correct?

8  A   I'm not quite sure I understand your question.

9  Q   Okay.  I'm just saying, I guess, another way what you

10  already said, that --

11  A   Okay.

12  Q   -- had the settlement not have been approved -- if you

13  didn't bring the settlement for approval, it would be subject

14  to challenge during the confirmation process?

15  A   The settlement or the termination fee?

16  Q   Well, the settlement, the $85 million settlement with the

17  banks.

18  A   If we hadn't brought it to the Court for approval, the

19  settlement would be subject to challenge?

20  Q   Yes.

21  A   I guess, yeah.

22  Q   Is it your understanding that by bringing it to the Court

23  now, you take it out of challenge at the -- during the

24  confirmation process?

25  A   I don't know.  I'd have to consult with my attorneys.

1     MR. GOLDBERG:  That's fine.  I have no further

2  questions.

3          THE WITNESS:  Um-hmm.

4          THE COURT:  Any further cross-examination of the

5  witness?  Any redirect?

6          MR. HERTZBERG:  I'll be very brief because I know

7  we're getting near the lunch hour.

8                    REDIRECT EXAMINATION

9  BY MR. HERTZBERG:

10 Q   What's your understanding of what happens after you pay

11 the $85 million?

12 A   Our liability is terminated with regard to the swap

13 termination fee and any claims by the counterparties.

14 Q   I believe --

15 A   The city's liability.

16 Q   I believe it was Mr. Marriott who asked you what you were

17 settling.  Do you remember that?

18 A   Yeah, I think so.

19 Q   If you didn't have a settlement agreement with the swap

20 counterparties, are you aware of any action they could take

21 against the city?

22 A   Yes.

23 Q   What's your understanding of that?

24 A   They could claim a termination fee and trap the casino

25 revenue and put the city into pretty bad shape.

1  Q   Are you aware that the city was in default of the swap

2  agreement?

3  A   We've been in default for a long time.  I'm an event of

4  default, so, yes.

5  Q   So if they exercised on the default, what's your

6  understanding what would happen?

7  A   The casino revenue would be trapped.  We'd have an

8  obligation to pay the then termination fee in cash.  Without

9  the casino revenue, there'd be pretty bad circumstances in

10  the city.

11  Q   Would you have to pay a termination fee?

12  A   Yes.

13  Q   How much, approximately, as of today?

14  A   It varies.  Today it's 270-some-odd-million dollars, 71,

15  72.  It varies.

16  Q   And what is your understanding in regard to the swap

17  remaining open and not being terminated after you pay the 85

18  million?

19  A   It has no relevance to us in the city.  Our obligations

20  are terminated with regard to the swap.  What happens after

21  there is not our concern.

22  Q   At the time that you agreed to the settlement, you had a

23  plan of -- a plan pending before the Court, correct, for the

24  city's restructuring --

25  A   Yeah.

1  Q   -- plan of adjustment?

2  A   Yes.

3  Q   That plan that was pending at that point in time when you

4  agreed to the settlement provided for a payment to unsecured

5  creditors; correct?

6  A   Yes.

7  Q   And what was the percentage that that plan provided for?

8  A   It was approximately 20 percent.

9  Q   And it's been amended now?

10 A   Yes.

11 Q   Okay.  Mr. Goldberg asked you about the interest rate

12 during what we call the liquidity event.

13 A   Right.

14 Q   Remember that?

15 A   Yes.

16 Q   And he said that you would pay the post-petition

17 financing rate; correct?

18 A   Right.

19 Q   Plus 1.5 percent above that?

20 A   Right.

21 Q   And then he said plus one percent above that for ten

22 percent.  Does that additional one percent go on top of that?

23 A   No.

24 Q   What is that additional one percent?

25 A   That's a fee.  That's a one-time fee.

1          MR. GOLDBERG:  Objection.  It mischaracterizes the

2     question.  The question -- the ten percent is what has been

3     called for.  He's trying --

4          THE COURT:  Mr. Goldberg, it's a perfectly

5     legitimate question.  The objection is overruled.

6     BY MR. HERTZBERG:

7     Q    And when you say a one-percent fee, is that the extension

8     fee for the 180 days?

9     A    Yes.  It's $402,000, approximately.

10         MR. HERTZBERG:  No further questions, your Honor.

11         THE COURT:  All right.  Any further cross-

12    examination of the witness?  All right.  Stand by, and I'll

13    give you your remaining times.  I have 54 minutes for the

14    city remaining and 96 minutes left for the objecting parties.

15    We'll be in recess until two o'clock.

16         MR. HERTZBERG:  The witness is excused, your Honor?

17         THE COURT:  Oh, yes.  You are excused.

18         THE WITNESS:  Thank you, your Honor.  Good to see

19    you again.

20        (Witness excused at 12:31 p.m.)

21        (Recess at 12:31 p.m., until 2:00 p.m.)

22         THE CLERK:  All rise.  Please be seated.  Court is

23    now in session.  Recalling Case 13-53846, City of Detroit,

24    Michigan.

25         MR. HERTZBERG:  Your Honor, Robert Hertzberg, City

1   of Detroit. I'm just going to talk for two minutes, and then

2   I'm going to turn the podium over to my colleague. What I

3   wanted to address with the Court is what I'll call the Paul

4   Harvey moment, and now the rest of the story. I want to

5   address that whole thing now that I've been able to spend a

6   few minutes and gather the facts on what happened in

7   discovery. And this is really a story of ambush that's taken

8   place here, and let me walk the Court through the facts.

9           On March 13th, I received a letter from counsel for

10   Syncora requesting a series of approximately four documents.

11   On March 14th we e-mailed, through my partner, Ms. Kovsky, a

12   letter, which I'm willing to share with the Court if it wants

13   to see it, responding to each of the requests and saying we

14   will -- that we have no duty under 7026-3 to produce any

15   documents. However, we will produce some of them that are

16   nonprivileged, and we sent them to them, but others we would

17   not because we're not required to under discovery. That's

18   March 14th.

19           March 18th the Retiree Committee files a document

20   request. We file an emergency motion to quash. The Court

21   holds a hearing on March 20th on our motion and finds that

22   six out of, I think, eleven requests do not have to be

23   produced, so they did a formal one, and they followed the

24   rules. Even though discovery is not required under 9019,

25   they filed it on a -- served a formal discovery request. We

1  responded.  We asked the Court for a hearing.  The Court
2  granted the hearing, and a decision was made on what we had
3  to produce and what we didn't.  And after the Court required
4  that, we produced what we had to.
5      3-31, another 11 days after the hearing before you
6  on the Retiree Committee's request, we hold a deposition of
7  Mr. Malhotra in our office.  At no point in time was there
8  ever a request made for production of these documents that
9  are in question now.  Never on the record did they once
10  mention it.
11      Next, Syncora files a motion to adjourn the trial,
12  listed several grounds.  Not once in the motion to adjourn
13  the trial did they say, "We need an adjournment because they
14  didn't produce documents that we requested," never appeared
15  in the motion.  If I was unhappy about some documentation not
16  appearing that I thought I was entitled to through valid
17  discovery, which is a whole different question, but I thought
18  I was entitled to and I'm moving to adjourn on three or four
19  grounds that they set forth in their motion, I would have
20  surely mentioned to the Court that, "And, by the way, we
21  asked for documents.  They won't even give us documents."
22  They didn't mention it once to the Court.
23      April 2nd we hold a hearing before the Court on
24  their motion to adjourn.  Did they ever once mention to you
25  that they want an adjournment because the debtor, city, was

1   not giving them documents? No, they didn't. It's all an

2   ambush. That's all that really happened here. They wanted

3   to make some points, so they figured they'd try and ambush

4   the city on this. They should have come to the Court

5   immediately three weeks ago and said, "Your Honor, we asked

6   for documents. They won't give it to us. Order them," and

7   then we could have responded why we didn't want to produce

8   them and why they weren't relevant. So there's always

9   another story. We have the letters if the Court wants to see

10   them. If not, that's my argument. And, as I like to say,

11   I'm going to the bullpen for the closer now, Ms. Ball.

12          THE COURT: Okay.

13          MR. HACKNEY: Your Honor, can I respond briefly?

14          THE COURT: Sure.

15          MR. HACKNEY: I'm sorry for all the sideshows. I do

16   want to get to the argument, but at some point it's tough to

17   stand by. And I guess what I want to say is that I'm

18   impressed that I managed to ambush someone by asking them for

19   something that they refused to give me. Our view on this has

20   been that they're the ones that have the burden with respect

21   to being the propounder of the expert testimony, and so

22   that's our view. And my approach to this has been to ask

23   them for the reliance materials, and I will note without any

24   tone just for the record that on the prior swap agreement

25   there were also Mr. Malhotra and others testifying. We were

 1  not granted discovery in that case, and I just didn't have a

 2  reason to see that there would be a different result here if

 3  I brought that same motion again, so I made an informal

 4  request to them saying I would like to see these materials.

 5  They didn't.  Nothing about that interchange between us

 6  changes the evidentiary obligations on the party propounding

 7  evidence.  That's our point.  And so when we come into these

 8  proceedings and they want to introduce expert testimony that

 9  goes to detailed projections and so on and so forth relating

10  to the city, our point is, as the party that's got the

11  burden, you have to establish that the assumptions are

12  reasonable and that the underlying data is known to the

13  expert and has been reasonable, and that is all that we did

14  here.  I'm not sure how that turns into an ambush of them

15  when I sent the letter well over three weeks ago and they

16  knew that I wanted this information for the purposes of

17  deposing Mr. Malhotra.  That's all I have to say.

18          THE COURT:  All right.  Thank you.

19          MR. HERTZBERG:  I'd like to just briefly --

20          THE COURT:  No.

21          MR. HERTZBERG:  -- comment.

22          THE COURT:  We're done.

23          MR. HERTZBERG:  Okay.

24          THE COURT:  Ms. Ball.

25                    CLOSING ARGUMENT

1          MS. BALL:  Good afternoon, your Honor.  Corinne Ball

2    on behalf of the city.  Laurie, could you advance the next

3    one?  Your Honor, we are here on what I hope is the end of

4    what's been a fairly long road.  We've moved from 75/25 to

5    30/70 thanks in no small part, if not large part, to this

6    Court's ruling and another intervening fact, your Honor,

7    which is also noticed on this timeline, which is the

8    commencement of the COPs adversary on the 31st in which the

9    city sued the service corps.  But the city, although it has

10   sued the service corps on many of the claims that were

11   foreshadowed that we would during the hearings before you in

12   January, it did materially change the city's position from

13   what had been the prior FOTA, and I would suggest to your

14   Honor that that change -- we have taken a different tack, and

15   it does go in large part to explaining why the service corps

16   are not parties here.  And I would be happy, as I go through

17   my argument, to answer whatever questions you might have on

18   that, your Honor.  As you know, we did serve the service

19   corps with the motion, and we did alert their attorneys as

20   soon as we were advised of their attorneys, but yet since

21   your ruling, the city now has a settlement which it believes

22   respects your prior ruling and merits your approval.  Since

23   your ruling, we have tried to answer the questions that you

24   raised, and, in fact, your Honor, we believe we've met our

25   burden under 9019.  The city has demonstrated, we believe,

1  that allowing a secured claim for 85 million satisfied the

2  <u>Bard</u>'s test.  But I thought it might be useful, your Honor --

3  and I have extra copies with me, and I'm not sure if your

4  Honor has them, of the order that was described by

5  Mr. Hertzberg this morning and Mr. Huebner with the changes

6  that were made in response to some of the issues raised by

7  the parties because they do go to some of the questions

8  raised particularly by Mr. Frimmer.  May I approach?

9          THE COURT:  Sure.  Easy.

10         MS. BALL:  And, your Honor, if we could take a

11  detour to City Exhibit 145, Mr. Frimmer raised a question

12  about leaving the swaps open, and he directed everyone's

13  attention to Section 4.2(d), which is on page 10 of City's

14  Exhibit 145.  Whoops, not on this one.  One page earlier,

15  4.2(d).  Your Honor, he neglected -- looking at the section

16  that's at the top of the page, I'd like to draw your

17  attention to 4.2(e) -- 4.1(e), which eliminates absolutely

18  any concern that the city would ever be liable for any

19  termination value and clearly limits the city's liability to

20  its monthly and quarterly payments.

21         Now, in fairness, Mr. Frimmer was not the only

22  person who had concerns on that issue.  Mr. Gordon did, too.

23  And since it was crystal clear as far as the city was

24  concerned that we pay the 85 million and that's it, Mr.

25  Gordon also asked us to add a provision to the order in

1   paragraph 16, your Honor, where the hypothetical situation

2   outlined by Mr. Frimmer could never happen.  In fact,

3   pursuant -- if the order were entered as proposed, your

4   Honor, only those quarterly payments could be made prior to

5   the effective date, and, pursuant to the order, on the

6   effective date all other claims against the city are

7   released.  So I at least wanted to answer that one question.

8   I understand Mr. Frimmer was not the only person who was

9   confused.  Mr. Gordon was as well.  And we modified the order

10  to make that very clear.

11          THE COURT:  And I'm sorry.  Where is that

12  modification?

13          MS. BALL:  Your Honor, this blackline is like --

14  paragraph 16 of this order, which is not blacklined, was

15  inserted at the request of the Retiree Systems so that there

16  is no way the secured claims can be paid other than their

17  quarterly payment without regard to what else they might do

18  to the service corps and that we will have no liability other

19  than our liability for the 85 million.

20          With that, your Honor, I'd like to go on.  If we

21  could go back to slide three, I think, your Honor, Mr. Orr

22  testified to the robust efforts and continuing efforts he had

23  after the motivation that was, frankly, supplied -- we go to

24  the next slide -- by -- the next slide even -- your Honor's

25  ruling.  Your Honor did not rule on the merits, but you

1  certainly addressed the <u>Bard</u> factor, the probabilities of

2  success on the merit -- on the litigation, and I think

3  everyone has referred to that.  But you also admonished all

4  of us that settlement of the swaps is better than litigation,

5  and, we, in fact -- the city did, in fact, take that to

6  heart.

7          As previously reported, the issues have been

8  narrowed to essentially the following question, which is

9  should the Court approve a settlement of a disputed secured

10 claim for 30 percent of its alleged amount when settlement

11 avoids complex litigation and it serves the interest as we'll

12 get on to the creditors and the residents.  If your Honor

13 will go forward, I think we made the case that 70 percent is

14 a good deal under these circumstances given the other

15 benefits that the city obtains.

16          So if we could move on, I don't think there's any

17 doubt -- and there has been evidence in the record of the

18 complex issues, the determination to follow an appellate

19 process, and the substantial fees and expenses that would be

20 incurred.  In avoiding all that, if we move on to the

21 benefits, the city has gotten a number of them.  While I

22 would like to characterize them generally as certainty,

23 stabilization of its cash flows, and, your Honor, momentum

24 towards a plan and emergence from this case, the specific

25 benefits on the ability to pay over time -- there's no more

 1   borrowing during the case, no more incremental borrowing.

 2   We've gotten -- in addition to that, we will get upon the

 3   payment of 85 million unfettered access to casino revenues,

 4   and in the interim we will also have access to the casino

 5   revenues above the amounts necessary to pay the 4.2 a month.

 6   And as Mr. Orr testified, your Honor, it's another critical

 7   benefit given that we are at the plan stage.  It did

 8   eliminate the need to create what could have been a very

 9   large secured claim reserve in the context of a disputed

10   secured claim under a plan.

11        Your Honor, we think in doing that and in

12   stabilizing the city -- and it was obvious from

13   Mr. Malhotra's testimony -- the city is going forward.  The

14   numbers were pretty impressive.  The amount of money it

15   intends to spend in each of the next two years on its

16   reinvestment -- actually, it was only an 18-month period.

17   The remainder of this fiscal year, your Honor, 119 million,

18   and all of next year, 281 million.  But if we were to move

19   ahead, your Honor, and even go forward, what you've heard

20   this morning is this fundamental question, which is on all

21   these facts and circumstances with the benefits that the city

22   will derive from this certainty of maintaining, in essence,

23   your Honor, the status quo until the effective date of the

24   plan and having every one of those status quo payments

25   applied to reduce the 85 million, although we think that's

1    the focus of the inquiry, there are several -- this question
2    has been restated several ways this morning.  In fact, I
3    think, your Honor, it's been asked can the Court validate a
4    disputed claim.  That's one question that was raised by at
5    least two of the objectors.  The second question are are the
6    swap banks the proper party to settle the secured claim or,
7    alternatively, I think Mr. Hackney was alluding to aren't the
8    service corps a necessary or missing link, and are the
9    consent issues, but I think the issue is the swap banks --
10   are the swap banks the right parties to do the settlement
11   with and empowered to release the liens.  The third question,
12   I think, that has been raised is does the settlement
13   appropriately benefit the city without impermissibly
14   depriving third parties of their claims and their rights to
15   sue perhaps each other, perhaps in another forum.

16         Your Honor, we are extremely comfortable and believe
17   that the record and the briefs filed herein should make the
18   Court comfortable that the answer to all three of those
19   questions is overwhelmingly yes.  I think, your Honor, we've
20   seen the benefits, and we can move through that.  I think
21   we've also seen the need for stability, which Mr. Orr
22   reaffirmed this morning, moving ahead.  We have been
23   successful, your Honor, and, in fact, have amended the order
24   that you have to deal with some of these new arguments.
25   While we are trying to -- we are foreclosing challenges to

1  the fundamental elements of the settlement, the 85 million,

2  by seeking your approval now, we are, by agreement,

3  postponing impairment classification and plan support issues

4  and, your Honor, provisions to that effect have been put into

5  the order and worked through with the Retiree Committee, and

6  your Honor would find them in paragraph 41.

7         The next two arguments, your Honor, I would like to

8  deal with, but if your Honor would like to take a minute and

9  look at paragraph 41, those are the issues that have been

10  specifically reserved for the objectors in the context of

11  confirmation.

12         THE COURT:  Okay.  One second, please.  Okay.

13         MS. BALL:  Okay.  So, your Honor, if we could skip

14  through to slide, if you would, Laurie, the next one, I think

15  we can go through this, your Honor.  This issue is reserved

16  on slide 13.  This is an issue the COP holders continue to

17  press, and they press it in the sense of saying if the swap

18  counterparties have a disputed claim, they really should be

19  treated as an unsecured creditor.  We disagree with that.  We

20  think that Bankruptcy Courts routinely settle disputed

21  claims.  In fact, your Honor has done it with a mechanic's

22  lien in the Collins & Aikman case, and, in fact, we will and

23  have cited several cases that do the same thing.  The

24  compromise doesn't result in unfair discrimination.  The swap

25  claims are disputed, but they're disputed secured claims.

1  And, your Honor, ever since June 14th, the proposal made by

2  the city to all of its creditors, the swap banks have been in

3  a separate class.  And in every plan draft through mediation

4  and to date they have been in a separate class, so

5  recognizing everyone has reserved on that, your Honor, let me

6  get on to the aspect of unfair discrimination that's before

7  you today, which is the COPs are arguing that the swap claims

8  are unmatured and unliquidated because the swaps are left

9  open.

10  Your Honor, I wanted to bring to your attention two

11  things.  I think the record is clear if we didn't have the

12  agreement -- Laurie, if you'd move ahead -- that the swap

13  banks would have the right to seek the termination value, but

14  what I think is somewhat interesting, and the agreement deals

15  with it, the swap banks have filed proofs of claim.  And,

16  your Honor, the proofs of claim seek the termination value,

17  which is nothing more than the present value of all interest

18  payments over the life of the swap as estimated by the

19  various markets, so in any given day, we know what our

20  obligations are, and they're measurable, so certainly with

21  the Bankruptcy Court's experience in estimating unmatured or

22  unliquidated claims, this would not be very difficult, and we

23  really don't understand this objection at all.  This amount

24  is ascertainable, and there is no doubt that absent a

25  compromise it would, in fact, come to pass.  And I would

1  point out, your Honor, that under the settlement agreement in
2  Section 8.3, the banks have agreed to withdraw all their
3  proofs of claim in addition to the releases that are set
4  forth in the order.

5         Your Honor, on the consent rights, I think it's very
6  important and I think there's some cases that Syncora has
7  repeatedly cited to your Honor, SportsStuff, others, but
8  what's really clear here -- and the banks have authorized
9  me -- the swap counterparty banks have authorized me to
10  represent to the Court the reason -- the reason why the swaps
11  were left open, your Honor, but the door was closed totally
12  on the city's liability for anything having to do with the
13  swaps to the swap counterparties, it's not for the city's
14  benefit.  It was something that the banks wanted because they
15  have a continuing dispute with Syncora, and that is an
16  undercurrent that I think we heard much about this morning.
17  And I'm sure my colleagues in the swap counterparties, should
18  your Honor have questions, would be happy to answer them, but
19  there should be no doubt that the door on the city's
20  liability for the swaps is closed.  It is absolutely closed.
21  There is a release.  And even if there were to be a
22  termination, the city would not have liability.  So, your
23  Honor, I don't think -- we do not believe that the Court has
24  to determine the consent rights, and I'd like to share with
25  you why and why that is the case.  As I mentioned briefly

 1    already, the Bankruptcy Court has the authority to compromise

 2    disputed liens.  Your Honor, in fact, has done it in Collins

 3    & Aikman.  It was done in the Homestead case in Newton

 4    County, another lien that didn't comply with state law.  It

 5    was also done in In re. Hooper and ultimately affirmed at the

 6    Ninth Circuit.  So in terms of this matter being addressed to

 7    your discretion and not your authority, your Honor, I think

 8    the cases are clear.  You have the authority to compromise

 9    disputed liens as secured claims.

10         The other thing -- the missing link question, we

11    should spend maybe just a little time on that one, your

12    Honor, because I use the missing link, and I really don't

13    mean to be tongue-in-cheek with the Court, but that's -- not

14    having the service corps, is that really a problem?  I think

15    not, your Honor, and I want to walk you through why we think

16    that's not a problem, and we think your Honor should be

17    comfortable it's not a problem.

18         THE COURT:  Hold onto that one for a second because

19    I have a question for you regarding the lien issue --

20         MS. BALL:  Yes, sir.

21         THE COURT:  -- if you're done with that piece of it.

22    Is there a difference in the settlement context where we are

23    now between compromising a lien where the issue is the UCC1

24    wasn't filed in the right place or it didn't identify the

25    goods or it didn't identify the debtor accurately enough all

 1 | on the one hand compared to, on the other hand, a lien that
 2 | isn't valid because state law prohibits it?
 3 |         MS. BALL:  Your Honor, I think that under the
 4 | avoidance powers -- and particularly I'm thinking about
 5 | Section 544 -- you can bring a cause of action under state
 6 | law.  One, I don't think there has been a determination on
 7 | the merits yet as to the validity of the lien.  Your Honor
 8 | did rule on the --
 9 |         THE COURT:  Precisely, but what I'm --
10 |         MS. BALL:  -- probability of success.
11 |         THE COURT:  But what I'm hearing the objecting
12 | creditors say is that before this settlement can be approved,
13 | because the settlement involves the Court in blessing this
14 | lien, the Court has to find that that's legal under state
15 | law.
16 |         MS. BALL:  I think, your Honor, that what the
17 | settlement agreement is asking you to do -- and I do want to
18 | return to how absolutely terrible transactions can be under
19 | the avoiding powers to avoid a lien, to avoid liens that were
20 | given for nothing, to avoid liens that were given to
21 | insiders, to avoid transactions that clearly -- and that
22 | clearly did not conform with state law, and yet they can be
23 | compromised with a lien of a lesser amount.  I think what
24 | this settlement agreement is saying is right now, your Honor,
25 | we have a lockbox system, and everything is running through

1   this lockbox.

2          THE COURT:  Um-hmm.

3          MS. BALL:  And getting the release of those funds --

4   and you know it happens monthly in cycles -- is critical to

5   the city.  There would have to be -- something would have to

6   be done and a determination would have to be made on the

7   merits to alter that.  What the settlement agreement is, in

8   essence, asking the Court to do is to continue that lockbox

9   arrangement uninterrupted until the banks receive 85 million

10  and spare us both the cost and expense of litigating that

11  issue.

12         THE COURT:  Well, I certainly agree with you that

13  mechanically that's what this settlement does, but legally it

14  raises the lien from the status of arguably invalid to valid.

15         MS. BALL:  Your Honor, it does so in the -- through

16  the vehicle of a compromise where the lien is for a fraction

17  of what it would otherwise be asserted for plus costs, plus

18  whatever else the banks might --

19         THE COURT:  Right.

20         MS. BALL:  -- deem to be secured, at a fraction of

21  that cost and spares us that expense.  And I think we're all

22  through the settlement consciously avoiding a ruling on the

23  merits as to whether or not the liens were invalid in the

24  first place, but no doubt -- no doubt that those claims that

25  we had and we are compromising here are undoubtedly the

1   reason why the liens are now asserted for only 85 million

2   and, in fact, as we stand here today, 70 million, closer to

3   70.

4          THE COURT:  Well, let's just pin this little piece

5   of the analysis down.  Is the city contending that this use

6   of the gaming revenues -- well, is the city asking for the

7   Court to find or conclude that this use of the gaming

8   revenues is consistent with the Michigan Gaming Act?

9          MS. BALL:  Your Honor, we are not asking for a

10  specific finding of conformity to the Michigan Gaming Act.

11  We are asking, your Honor, that this pledge system be

12  continued and that the liens be recognized through that

13  pledge system to the extent of 85 million, but there is no

14  finding regarding the Michigan Gaming Act in the proposed

15  order.

16         Your Honor, this would not have been an issue -- and

17  I think this is something -- a point that Mr. Orr tried to

18  make, and perhaps it was lost.  Originally, to avoid this

19  issue, had we been able to borrow money and pay off the

20  amounts due the swap counterparties, this issue wouldn't

21  exist.  We have had to bargain very hard to get the ability

22  such that all monthly payments that we make from January 14,

23  which we think, your Honor, reasonable people might think

24  maintaining the status quo might be the likely outcome during

25  litigation, in any event, certainly not the only one, but to

1 get that time and to have all those payments applied and yet

2 again to be able to get the city out of bankruptcy on the

3 effective date and still be able to get another six months

4 under this settlement to pay this 85 million, yes, the banks

5 are looking for liens that will withstand scrutiny and

6 challenge and any future challenge. We are asking you to bar

7 any future challenge, to find that these liens for that

8 amount are unassailable in your case. That is part of the

9 order, your Honor, and part of that is what it took to get

10 the ability to pay this 85 million over time and maintain the

11 status quo on the casino revenues but at the same time have

12 each one of those payments, your Honor, reduce it such that

13 by the hoped for effective date of October, we think we'll be

14 down in the low to mid-40s in terms of what's owed. That

15 stretch-out, your Honor, in the vernacular, did underscore

16 the bank's desire and need to be protected rather than

17 litigate now the issue to a conclusion, your Honor, that we

18 are compromising and trying to avoid by paying what we think

19 is not an unlikely outcome even during litigation,

20 maintaining the pledge. Had we been able to pay them off

21 right away, your Honor, this issue would not be there. The

22 city does not have those resources available to it.

23 　　　　Your Honor, I would urge you to also think about the

24 avoiding powers and how often we have tried. We have avoided

25 liens and settled fraudulent conveyance actions. And,

1  frankly, your Honor, I don't see this as a failure to conform

2  to state law mechanic liens. You seem to think there's a

3  spectrum, and perhaps there is, but I don't think the law has

4  said that there is such a spectrum, at least not today. We

5  have not found such a case.

6       Your Honor, what's interesting is the liens are on

7  property of the estate. It's exclusively within your

8  jurisdiction, your Honor. You clearly have the authority

9  over that. But I did kind of -- if we might move on, I did

10  want to address the missing link point that Mr. Hackney tried

11  to raise. Your Honor, I have put on the screen Section 11.2

12  of the collateral agreement, which was Exhibit 11 admitted

13  into evidence in the prior hearings. I wanted to pause here

14  just for a minute. And, your Honor, the parallel cases to

15  this, which I'll get to, are on page 24 of our reply brief.

16  But what this says is that the remedies associated with the

17  claim, which is the service corporation pledge that Mr.

18  Hackney described to you earlier this morning, the service

19  corps security interest, and the city pledge -- in other

20  words, the collateral for the banks is the claim that the

21  service corps have against the city as well as the casino

22  revenues. And what 11.2 says, your Honor, is that it is the

23  banks that have the ability to exercise all the rights and

24  remedies of a secured party in respect to both those pledges,

25  so, your Honor, I don't think we're missing a link. At least

by contract it's clearly the right outcome, and, in fact,
Michigan law in its adoption of Article 9, which is Michigan
Comp. Law Section 440.967(c), has the same provision in
enforcing remedies against an account debtor.  So this is not
new, and, in fact, on page 24 of our brief your Honor might
be interested that some cases, including the Second Circuit,
which I know is not binding on your Honor, in a case <u>Talmadge</u>
versus <u>United States Shipping Board Emergency Fleet</u>, Learned
Hand went further.  He said the assignee of the collateral,
the assignee of the claim and the collateral has the
exclusive right to settle and eliminate the claim, so, your
Honor, we are quite comfortable, and we urge that the Court
should also be quite comfortable in saying that the banks --
the swap banks are, in fact, the right party to release the
liens, to release the city, and to settle these claims.

          I think that Syncora, of all people, if we go to the
next slide, certainly should be stopped a bit, your Honor.
They have made several appearances before you where they have
taken the position that they are -- in fact, by way of
subrogation, enjoy the security pledged to the swap banks, so
I don't think they can -- in fact, they filed a secured proof
of claim.  They've also asserted in their objection to the
financing that your Honor approved earlier this week,
yesterday, that they referred to the current liens of the
swap counterparties on the casino tax revenues.  They're all

1    over the map here, your Honor, but I think the right answer

2    is the one that the contract and the law suggests, which are

3    that all remedies reside with the swap counterparties, and

4    they have the power to do this.  We are certainly

5    comfortable.  We think Syncora in other contexts was totally

6    comfortable about that lien and that this attempt at erecting

7    the hurdle of the missing link really should fail.

8          We also think, moving on, your Honor, that Syncora

9    really has no consent rights as a consequence of the matters

10   that we just went through.  In terms of the operation of the

11   settlement agreement -- and I think we've briefed that issue

12   before, your Honor, and we talked about it with you before --

13   we now have a few more cases on the same topic -- that a

14   promise to forbear is not an amendment.  It's not a

15   modification.  It's part of these remedies.   And it's very

16   clear -- and I've cited New York cases, your Honor, because

17   the collateral agreement is subject to New York law, and it's

18   clear that that's how New York would look at it as not being

19   an amendment.  And your Honor may recall that Syncora and the

20   insurers, for that matter -- FGIC is another -- are only

21   mentioned once in the collateral agreement, and that's if

22   there's an amendment they have a consent right.  They're not

23   mentioned in any other context.

24          And if we were to move ahead, your Honor, we are --

25   this is a little bit more of our prior discussion.  We really

1 are continuing the lockbox. That's what we're asking to do.

2 We're not asking to change the irrevocable instructions or

3 anything else until the 85 million is paid.

4   Syncora clearly doesn't have the right to vote the

5 swap counterparties' claims. They never asserted they do.

6 While it's very interesting, your Honor, we are going largely

7 to an arrangement that happened in 2009, which the swap

8 counterparties and the city were both parties to, and that's

9 what we're settling are the liens granted in that context.

10 Syncora resorts to the contract administration agreement,

11 which the city is not a party to. Your Honor, it's an inter-

12 creditor agreement. It's an agreement among the creditors as

13 to how they should behave and how they should divide up

14 various and sundry payments and rights against the city.

15 And, in fact, nothing is stopping Syncora from challenging

16 the banks in another context in another forum. We are just

17 eliminating the lien on the casino revenues and the city's

18 liabilities for anything having to do with this swap.

19   Your Honor, I thought it might be useful -- and I

20 really would defer to whether or not you have questions.

21 Other changes were made to the order which in some respects,

22 although they were made in cooperation trying to work through

23 the concerns of certain of the COP holders, Syncora has still

24 raised concerns about them, so if we could go on, your Honor,

25 perhaps we should be talking just a bit about the bar order

1  and the judgment reduction.  I would say the objectors have

2  not identified any harm, but if your Honor would just turn to

3  paragraph 20 of the proposed order, we have an injunction and

4  a bar order.  Paragraph 20, your Honor can see at the back,

5  the latter part of that in the bar -- this is the injunction

6  against the service corps, but look to the proviso at the

7  back, your Honor.  This was really about the service corps

8  suing on the claims that are being released by the city

9  against the swap counterparties, but no one wanted to be

10 confused that it hurt the COPs holders in pressing their

11 claims through the service corp or directly against the city,

12 and we never intended to stop the COP holders.  That's a

13 separate litigation.  It's ongoing.  So we did add the

14 proviso at the end, your Honor, and some of the definitions

15 might ring a familiar note.  They happen to be the same

16 definitions Mr. Hackney was so concerned about earlier this

17 morning.  Your Honor may recall its funding trust

18 receivables, those rights, which does not include the hedge

19 payables, which are collateral for the banks, are clearly

20 preserved, and we did try to make it absolutely clear, so we

21 don't think that we harm them.  In fact, your Honor, we had

22 the guidance of the Sixth Circuit this summer in Greektown,

23 and if your Honor were to look at the scope and the wording

24 of our bar order, we were very careful to track the guidance

25 of the Sixth Circuit as to what is the appropriate scope of a

1  bar order, and is it really limited.  And I think, as we

2  pointed out and as Mr. Orr testified, it really is limited to

3  situations where either the city or the service corp are

4  plaintiffs, doesn't apply in any other circumstance.  It does

5  not apply to direct claims, and it does compensate defendants

6  to the extent that they do have noncontractual indemnity and

7  contribution claims.  While they're barred from bringing

8  them, your Honor, the bar order affects a reduction of the

9  plaintiff's claim pro rata in the amount of the award.  The

10 intent and the design of this bar order is, "A," to effect

11 the release of just the swap counterparties and their

12 collateral, and, "B," to leave the third-party defendants

13 insofar as their claims for noncontractual contribution and

14 indemnity economically neutral.  I think Mr. Orr meant to say

15 the third parties would be economically neutral.  The city

16 obviously is bargaining for its release, so when its claim is

17 reduced, it has no further concern.

18        Your Honor, with that, although we could illustrate

19 the bar order, I think perhaps it's not necessary unless you

20 have questions.

21        THE COURT:  No, thanks.

22        MS. BALL:  All right.  Your Honor, with that I'd

23 like to reserve the remainder of my time.

24        THE COURT:  Okay.  Let me figure that out for you.

25 Stand by.

1          MS. BALL:  Thank you.

2          MR. HACKNEY:  Good afternoon.

3          THE COURT:  One second.  Ms. Ball, 16 minutes

4     remaining.

5          MS. BALL:  Thank you.

6          THE COURT:  Go ahead, sir.

7          MR. HACKNEY:  Good afternoon, your Honor.  The other

8     creditors have been kind enough to let me go first.  I

9     promised them I wouldn't take more than 45 minutes, hopefully

10    between 30 and 45, and I've prepared a deck to --

11         THE COURT:  Okay.

12         MR. HACKNEY:  -- keep me on schedule, I hope, so --

13         THE COURT:  Okay.

14         MR. HACKNEY:  -- which is a problem, I know.  And if

15    I could approach, your Honor, I was going to leave you with a

16    hard copy of it even though we will also have it up on the

17    screen.

18         THE COURT:  I appreciate that.

19         MR. HACKNEY:  Thank you.

20         THE COURT:  And, Ms. Ball, if I could get a copy of

21    yours, too, that would be helpful.

22         MS. BALL:  Of course, your Honor.  May I approach?

23         THE COURT:  Yes.  And you may proceed.

24                        CLOSING ARGUMENT

25         MR. HACKNEY:  Thanks very much, your Honor.  Your

Honor, I think you can see from our briefs and our
presentation today that we think that there is an important
structural problem at the heart of the transaction, and we
believe the structural problem is prohibitive to the
transaction such that we do not believe the transaction
achieves what it purports to achieve, and, thus, as a result,
you have to sort of take all of the potential benefits of the
transaction that Mr. Orr testified to and that Ms. Ball
alluded to and put them off to one side in terms of is this a
good deal for the city because although that's alluring and
of certain interest to the judge who's overseeing the City of
Detroit bankruptcy, the threshold question is does this work
legally, does it achieve the goals that yield the perceived
economic benefits.

In the course of my presentation today, I'd like to
talk about four things if we could.  I would like to talk
about why they're trying to do what they're trying to do with
your order.  I'd like to talk about -- I'd like to talk about
what they're trying to do with your order.  Then I'd like to
talk about why they're trying to do that.  I would then like
to address their arguments as to why they believe it works,
and I'd like to show you that we believe it doesn't work and
it's only going to lead to more confusion and morass.  And
then I'd like to -- at the end of this, I'd like to talk
about the implications of all of this for Syncora, for my

1    client, in terms of both the impairment of its rights and the

2    economic prejudice it'll suffer.

3          Your Honor, our view is that the city and the swap

4    counterparties are attempting to do via court order what they

5    cannot achieve contractually between themselves, and that is

6    why when you look at the approved order, you will see what we

7    believe to be extraordinary relief that is not based upon the

8    contractual agreements by the parties themselves.  And the

9    best answer -- the best example of this is the approval

10   order's treatment of the liens attached to the gaming

11   revenue.  I'm going to return later to the question of

12   authority because that's an extremely important one, but you

13   must at least note that it's somewhat odd that there is no

14   promise in the settlement agreement where the swap

15   counterparties say if you pay me "X," not only will I release

16   my lien -- my claims, but I will release my liens.  The

17   language is very, very carefully drafted, which is what they

18   have agreed between themselves, is that your approval order

19   will release all liens.  So you have a -- the use of the

20   passive voice.  You have no direct agreement by the parties

21   in question, and you have the approval order releasing the

22   liens.

23          You have a second aspect of this, which is unusual,

24   which is it's your order which is reaching out and grabbing

25   the service corporations and binding them to the agreement as

1   if they were the city by way of the service corp injunction.

2          Last, you have the broad injunction that's entered

3   against all third parties anywhere with respect to their

4   claims for noncontractual indemnity and contribution against

5   the swap counterparties.  You have significant pieces of this

6   order that are touching the rights of nonparties to the

7   agreement or that are not based on explicit contractual

8   promises in the agreement, and I'd like to talk about why

9   that's the case.  I'd like to start with what I perceive to

10  be structural problem number one, which is that there are

11  significant contractual limitations on both the city and the

12  swap counterparties that are having an impact on where

13  they're trying to go.  If you look at the contractual

14  agreements here, you will see that, for example, the swap

15  agreement bars the swap counterparties from waiving,

16  amending, or modifying any rights that they have under the

17  swap or under the collateral agreement.

18          And I'd like to respond to something that was said

19  earlier, which is this has been described as our well-worn

20  consent objection, but it's actually not at all related to

21  the prior objection we had in the earlier settlement hearing.

22  That was about who gets to decide when the swap is

23  terminated, and that was highly contentious between us back

24  and forth.  The idea that the swap counterparties cannot

25  amend, waive, or modify rights under the collateral agreement

1   under the swap is not subject to debate.  And if you look

2   through their papers, you will not see them contending that

3   they are allowed to.  They do not dispute that.  You will see

4   that the collateral agreement itself also requires Syncora's

5   consent to amendment, so it's not just the swap agreement

6   reaching out to limit the collateral agreement.  The

7   collateral agreement itself requires Syncora's consent to

8   amendments and only terminates upon payment in full of the

9   service corps' obligations under the swap for obvious

10  reasons.  If you're the insurer, you want to make sure the

11  obligor is paid off before the liens go away.  In addition,

12  the service contracts and the contract administration

13  agreement cannot be amended without the consent of Syncora,

14  so -- and I should also mention obviously what we're going to

15  talk about in more detail later, which are the enforcement

16  mechanisms in the contract administration agreement that give

17  to Syncora the right to control enforcement remedies, but let

18  me stop for a second and say these provisions that lock up

19  the agreements and make sure that you can't change them

20  without Syncora's consent are elementary when you think about

21  it because, of course, Syncora and FGIC from the start of the

22  transaction were both the COP insurer and the swap insurer.

23  They stood astride this transaction, and it's common -- I'm

24  sure you've seen in many mezzanine financings or other types

25  of situations where there is some sort of default or distress

later, the party that usually put into the controls is the
party that has the economic exposure. They are the best
incentivized to decide how to do things like compromise.
This is problem number one. This is the contractual
framework that is limiting the swap counterparties' ability
and the city's ability by extension to get to where they want
to get to with respect to the liens.

Now, structural problem number two that has arisen
since the first agreement is the service corporations. I
will talk more about this later, but the elemental facts are
not in dispute. The service corporations were a party to the
prior settlement. Since then, the city has alleged in the
invalidity case that they are shams, and the service corps
are not a party to this settlement agreement. And we've
agreed that there won't be any testimony with respect to
whether they are or not shams. We decided that yesterday.
But you can see also that the omission of the service
corporations creates material structuring problems because
they are in the stream of payments from the city and in the
stream of liens from the city, and they have not agreed to
release any liens that they hold. And they also have not
agreed to be bound by the settlement agreement as if they
were the city, so you have two different types of structuring
problems. So look at the way they attempt to use the order
to plug the gap. So on the left side you have the problem,

1    which is the -- what I'll describe as the general problem

2    that they're -- the swap counterparties are prohibited from

3    releasing their collateral agreement liens by the swap

4    agreement, and they're also not entitled to enforce them

5    under the contract administration agreement, so the solution

6    is you have -- you agree to have Judge Rhodes order the

7    release of the liens in the approval order.  And we talked

8    about the passive voice that they use in the approval order.

9    That's a giveaway that something is going on there.

10        The next problem is that the service corporations

11   are not a party to the settlement agreement.  You want to

12   treat them as if they were a shell corporation because of

13   your other interests in the COP invalidity case if you're the

14   city, but you still need them as part of your structure, so

15   you have Judge Rhodes enter an injunction against the service

16   corporation binding them as if they were a party to the

17   agreement.  That's obviously not something that they can

18   agree to on behalf of the service corporation.

19        You also have the swap counterparties' desire for

20   protection from third-party lawsuits, and, as a result, they

21   then write into this thing, this injunction, with respect to

22   the third-party claims.  That's the so-called bar order.

23   I'll address that at the end.  I just have some very brief

24   comments on the bar order.  That's not my main issue today,

25   but I do have some comments at the end on that.

1    So I've told you what we think they're trying to do
2    via the approved order, and I've told you why we think that
3    they're trying to do it the way we're doing it.  I'd like to
4    now respond to their arguments that this does, in fact, all
5    work legally.  And so the first argument they make is they
6    say the swap counterparties control enforcement remedies
7    relating to the hedge payables, and the right to enforce
8    carries with it the right to settle, and that's that simple.
9    That's the argument on who has the authority to compromise.

10   The second thing they say is, well, don't worry
11   because the settlement agreement and approval order do not
12   modify your rights under the swap agreement, the collateral
13   agreement, the contract administration agreement, and I would
14   say the argument has evolved to the point where they've put a
15   reservation of rights in there and they're saying, "See,
16   whatever rights that you have, you will still have the right
17   to, for example, sue the swap counterparties.  If all of this
18   does, in fact, impair your rights, we, the city and the swap
19   counterparties, don't agree that it does," so they're saying,
20   no, it doesn't modify, waive, or amend rights under any of
21   the other parts of the transaction structure.  And then last
22   they say -- with respect to the service corporations, they
23   say the service corporation injunction is appropriate because
24   the service corporations have acquiesced in the motion.

25   So let me turn to the first argument because the

 1   first argument with respect to the question of who gets to

 2   compromise, who has the power to -- the right to enforce with

 3   which the swap counterparties argue comes the right to

 4   compromise.  Now, in their briefs, what you'll see is an

 5   argument that's based solely on the UCC.  Okay.  And so they

 6   basically say under the UCC where you're the assignee of a

 7   lien, you have the right to enforce the lien, and then you

 8   also have the right to settle the lien.  The problem here,

 9   your Honor, is that what they're asking you to do is to bury

10   yourself in the law books and pretend that the UCC is the

11   sole source of law relating to the parties' authority here,

12   and that is not the case.  The problem is that Section 1302

13   of the Michigan UCC provides that all of the UCC are just off

14   the rack rules for parties to take and can be varied by the

15   agreement of the parties to the transaction in question so

16   long as the specific section of the UCC doesn't prohibit you

17   from doing so, so you can vary the off the rack rules of the

18   UCC by contract unless a specific provision of the UCC says

19   that you cannot.  And Article 9, which governs secured

20   transactions, that article does not provide that the

21   enforcement of a security interest is one of those types of

22   rights that cannot be altered by contract.  So the operative

23   question is not what does the UCC provide, which is the

24   argument they make.  The operative question is what do the

25   parties' contracts provide with respect to the enforcement of

1   remedies.

2          Now, when you look at it from this perspective, this

3   is where I think you start to see the city and the swap

4   counterparties encountering serious problems.  And you'll

5   note that though I crossed Mr. Orr on Section 9.2, which I'm

6   going to get to in a moment, of the contract administration

7   agreement, there was virtually no attempt to argue or respond

8   to the merits of that line of questioning, so let's take a

9   look here.  You have the city -- there's no dispute that they

10  pledged the gaming revenues to secure the city's obligation

11  under the 2006 service contracts to make the service payments

12  relating to the swap agreements to the service corporations.

13  Those obligations are called the hedge payables, and you

14  heard Ms. Ball refer to those again during her closing

15  statement.  Now, the service corporations assigned their

16  right to the hedge payables to the swap counterparties under

17  the contract administration agreement.  And when that

18  assignment happened, it becomes called the hedge payables

19  collateral, so you have the chain of the hedge payables

20  turning into the hedge payables collateral.

21         Now, let's stop for a moment and note that the hedge

22  payables collateral, a phrase that we're going to come back

23  to in a moment, is very broad.  It extends to all rights and

24  interests with respect thereto, and it includes the right to

25  proceeds and the rights of enforcement.  Now, the one thing

1   that Ms. Ball did say during her closing about the contract
2   administration agreement is she said, "Oh, well, the city is
3   not a party to the contract administration agreement."  Now,
4   response number one to that is but the swap counterparties
5   emphatically are, and point number two to that is that under
6   Section 2(k) of the service contracts, the city specifically
7   acknowledged that the service payments it would be making
8   under the service contracts would be administered in
9   accordance with the contract administration agreement.

10          Remember, your Honor, that you have kind of a galaxy
11  of different contracts that are all related to each other
12  here.  The service contracts are in a contract with just the
13  city, for example, or the service contracts are in a contract
14  with just the swap counterparties.  That's the swap.  The
15  contract administration agreement is the meta-agreement that
16  sits on top of the structure and explains how it all works
17  together, and if you pick that document up, you'll see that
18  Article 6, Article 8, and Article 9 are extensive on the
19  subject of who gets to decide who has the power to enforce
20  remedies.  That's why it's so important when you take a look
21  at Section 9.2 of the contract administration agreement and
22  you realize, as Mr. Orr did, which is that it provides the
23  swap insurer with the exclusive right to enforce remedies
24  with respect to the hedge payments collateral.  And remember
25  those are the ultimate payment obligations that are secured

1  by the gaming revenue, so this is an enormous problem for the

2  swap counterparties and the city's UCC argument that they

3  have the right to enforce remedies and, thus, the compromise

4  because the unambiguous contract administration agreement,

5  which was explicitly incorporated into the collateral

6  agreement, says it's the swap insurer who has the exclusive

7  right to enforce remedies.  By the way, your Honor, that's

8  not the only provision that talks about the enforcement of

9  remedies.  You can see other provisions in the agreement that

10 are saying to you that even if the swap counterparties had

11 the right to enforce remedies, they separated off from that

12 the right to settle them because, first of all, the potential

13 for a disjuncture between the economic incentives of the swap

14 insurer and the swap counterparty, but you can see it in, for

15 example, the collateral agreement, which bars the swap

16 counterparties from waiving, amending, or modifying their

17 rights under the collateral agreement.  It's a way of saying

18 even if you accept Ms. Ball's argument that they have the

19 right to enforcement, which I don't think you can do in light

20 of Section 9.2, you still run into the problem that the

21 parties have not established that they have the right to

22 compromise where the swap counterparties have promised away

23 their ability to waive rights under the collateral agreement.

24         Now, these two provisions here, which are more --

25 are obviously more specific, are of a piece with a broader

provision, which is one you've heard of before, which is
Section 6.9.22, and this is a provision in the contract
administration agreement which gives the swap insurers the
right to control all actions of the swap counterparties, but,
your Honor, as with every other right you'll see, it's only
so long as the swap insurer is not in default of its swap
insurance.  So that powerful right to control all of their
conduct, the right to be the exclusive enforcer of any
remedies, that disappears if the swap insurer is in default
of its swap insurance because, of course, that may evaporate
their economic incentive to do the best job with respect to
the obligation in question, so these things all fit entirely
together.  And you remember this is a -- this is a very
important issue because Mr. Orr has testified that he would
not have entered into this agreement if the swap
counterparties lacked the authority.  What we've heard from
counsel today is that, well, they're comfortable with it and
that they think that it's all going to be fine, but there has
been no substantive response to our points on Section 9.2 and
no real effort to explain why it is that this enforcement
mechanism that lays over this entire agreement should be --
should not be enforced according to its terms.

        Now, I'd like to pivot to the second point that they
make, which is the second point they make is that there is no
harm to Syncora.  And if I could stop for a moment, how much

1    time have I used?

2            THE COURT:  I can tell you.  What was that?

3            MR. HACKNEY:  Okay.

4            THE COURT:  You have used 18 minutes.

5            MR. HACKNEY:  Okay.  Perhaps if someone could tell

6    me in 12 minutes just so I can make sure I don't go over.

7    I'm very mindful of my fellow creditors, your Honor, and also

8    my own tendency to hog up all the air.  So the significant

9    transactional rights that Syncora has under the transaction

10   documents are important to remind ourselves of.  I know we

11   went through this at the beginning, but I'd like to do this

12   before we pivot to the analysis of SportsStuff.  So you have

13   the right under Section 8(b), as modified by part 5.4 of the

14   swap agreement, to consent to waivers, modifications, or

15   amendments.  Remember, this is not a well-worn argument.

16   This is an undisputed right that Syncora has, the exclusive

17   right to control enforcement remedies relating to the hedge

18   payables under Section 9.2 of the contract admin agreement,

19   the right to control all the actions of the swap

20   counterparties under Section 6.9.2, and obviously the right

21   to see the collateral agreement continue according to its own

22   terms under both the amendment and termination provisions

23   therein.  So these are very significant contractual rights

24   that relate to maintaining the very structure that we're

25   talking about compromising.

1          Now, we have quoted SportsStuff at length, I think,

2    to the Court.  Probably the Court is tired of hearing about

3    SportsStuff, but part of the reason that we have quoted it to

4    you is because we think that it's particularly germane.

5    SportsStuff was a situation where the debtor and its insurer

6    tried to compromise despite the fact that there were

7    additional insurers, and so this is one of those examples

8    where you have the problem of the multilateral contract but

9    two parties want to engage in a bilateral agreement.  The

10   problem is that the agreement impaired the rights of the

11   additional insurers because it no longer allowed them to sue

12   the insurer nor could they also sue the estate to get the

13   proceeds they would have been entitled to under their defense

14   cost provision.  And what the Eighth Circuit Bankruptcy

15   Appellate Court said there was -- I think it is important in

16   two respects.  One of them is is it said that the rights of

17   the additional insurers are not property of the estate and

18   are outside the authority of the Bankruptcy Court, so this is

19   an important issue as well when it comes to trying to enter

20   this approved order because it will go to whether or not the

21   goals were achieved of actually releasing the casino revenues

22   and so on and so forth and yielding the economic benefits.

23   But what it also said is that where it impaired the third-

24   party creditors' rights -- it wasn't just a question of, you

25   know, prejudice, and we talked about this at the last

1  hearing, the idea that you can -- well, can you just look at

2  the prejudice to that party and weigh the benefits to

3  everybody else, and if there's enough benefit to the estate,

4  well, if you impair a few legal rights along the way, that's

5  not the end of the world.  And what the Court there said was,

6  no, it didn't do an analysis where it said this is so great

7  for the estate, if a few third-party rights get broken in the

8  process, so be it.  It said, no, you're not entitled to

9  engage in this transaction, in this settlement.

10         So what I'd like to do is I'd like to make a point

11  that sometimes gets lost a little bit, which is -- but it's

12  just obvious, which is that this settlement does incredible

13  violence to Syncora's rights as they currently stand.  It

14  finds that the swap counterparties have the authority to

15  enforce remedies that are possessed by Syncora.  You make

16  that finding.  It finds that the liens were previously

17  granted for the exclusive benefit of UBS and MLCS even though

18  Syncora is clearly a third-party beneficiary of these

19  agreements and is entitled to see them enforced, and it's

20  somebody that has potential subrogation rights down the road.

21  It discharges the swap counterparties' right to proceed

22  against the city, so not only does it give them the

23  enforcement remedies, it cuts off Syncora from ever

24  proceeding against the city on those remedies, and in the

25  process -- and this is the most important part from Syncora's

1  standpoint -- it releases all of the liens on the pledged
2  property.

3       Let me just stop for a moment and say I understand
4  that, you know, from the standpoint of the citizens of the
5  people of Detroit or from the standpoint of Kevyn Orr or
6  other people that these liens are kind of this toxic thing.
7  I think you talked about at the last hearing the fact that,
8  you know, you didn't want the city to have to make decisions
9  with a gun to its head anymore and that that was part of what
10  bankruptcy is about, but the fact of the matter is that these
11  liens were granted back in 2009.  They were granted at a time
12  when the city's financial condition had deteriorated since
13  the time of 2005, and part of the grand bargain that was
14  struck was to allow the city to continue on in exchange for
15  the pledge of the liens.  So even though the liens are a
16  sensitive issue and they're kind of like this radioactive
17  concept, the fact of the matter is they're unbelievably
18  important to my client's rights under the agreement because,
19  of course, as Mr. Orr said, the service corps don't have any
20  other way to pay under the swap.  So as you annihilate the
21  liens, you terminate the irrevocable instructions, and there
22  are certain other findings here.  You have a meteoric impact
23  on the structure that redowns to the detriment of Syncora.
24  So I do not believe that the swap counterparties can say,
25  well, Syncora doesn't need to worry because there's a

1   reservation of rights, so it can just bring lawsuits against

2   us if we've, in fact, violated its rights.  Syncora will not

3   be in the same position after this settlement is approved, if

4   you do approve it, that it is now because of the violence

5   that will be done to the structure.

6        Let me talk briefly about the service corps, your

7   Honor, and hit a couple other points before I thank you and

8   pass the podium.  The approval order releases the service

9   corporations' liens on the gaming revenue.  We've talked

10  about that.  It also effectively binds them to the agreement

11  by way of the injunction.  As the swap counterparties said,

12  no service corp injunction, no settlement, so this is an

13  important issue.  It goes to the question of authority.

14        The argument here is that they have acquiesced in

15  the settlement motion, but, your Honor, I think you should

16  reject that for three reasons.  The first is I do not believe

17  that the docket -- that the record establishes that the

18  service corporations have received effective notice.  We had

19  a colloquy on this subject yesterday, and Mr. Hertzberg

20  talked about the fact that they had served Lewis & Munday at

21  the service corps, and that surprised us a little bit because

22  we had been looking for that service ever since they started

23  to make the acquiescence argument, so we went back to the

24  docket, as Mr. Hertzberg said we should have done, and we did

25  find that they served the service corps, but it was unusual

1  the way it was done.  The service corps were not served with

2  the motion until March 12th.  They were served by FedEx.

3  They did not receive the motion.  And by the way, they only

4  received the motion and the notice of motion and the things

5  that went with it on March 13th if it was delivered by FedEx.

6  The certificate of service identifying those actions itself

7  was then not filed for six days after the 12th until March

8  18th, after all of the parties in this case had had to file

9  their objections.  The reason I think the record is

10  insufficient on the question of notice to the service

11  corporations is because if you look at the notice of motion,

12  what it tells you is you have 24 days to respond to this, and

13  if you don't, you know, your rights may be harmed by the

14  Bankruptcy Court.  There is a footnote that says, by the way,

15  we've moved to expedite the schedule, and so if the judge

16  enters a different schedule, you may have a different time to

17  respond.  At the time they were sending this to the service

18  corporations, you had already granted the order shortening

19  the time, but we do not see any evidence that that order was

20  ever served on the service corporations, so we question their

21  notice.

22        Let me put that aside.  We do not believe that there

23  are legal grounds for the Court on this record to find

24  acquiescence by the service corporations for two reasons.

25  First of all, the city's employees should not be permitted to

create acquiescence by the service corporations.  We talked
about with Mr. Orr the city's seeming ability to turn the
service corporations on and off when it needs them with
respect to the settlement agreements, and what I would say is
the somewhat curious testimony that he's dealing with the
corporate counsel and the budget director over and over and
over and over, and he never says, "What's going on with the
service corps?  What do you guys do?  How is this all going
to get played out?"  He just says, "I don't know."  I think
it would be inequitable for the city to be able to say we're
having you impose extraordinary relief on the service
corporations, but don't worry about it.  They've decided to
go along.  They've acquiesced in the motion.  I think that it
just doesn't have the right feel to it, your Honor.  It
doesn't have quite the right smell to it.  But I would add
also that remember that there are numerous third-party
beneficiaries of the service corps' rights under the service
contracts, both under the service contracts and under the
contracts of administration, including Syncora, including
Wilmington Trust as the funding trustee and contract
administrator, that have filed objections and said, "Hey,
wait a second.  There's something going on here that's not
appropriate," and we believe that adequately should preserve
the rights of the service corporations.

        I will say briefly on the next slide, your Honor, I

1  think it follows from what we talked about earlier that we
2  think the plan support agreement also violates Syncora's
3  right to control all actions of the swap counterparties, its
4  exclusive right to control enforcement remedies with respect
5  to these hedge payables that are being compromised, and is
6  now taking that away and giving it to the swap
7  counterparties, so we don't think that's appropriate.
8         I'd like to give you briefly, your Honor, our
9  position on the -- both the bar order and the service corp
10 injunction.  I've already talked about the service corp
11 injunction as it applies to them.  My basic take on these
12 injunctions is that I don't think it's proper for them to
13 come into court with these injunctions that then put the onus
14 on us to try and figure out like, well, how is the injunction
15 something that could hurt me, and then you give them a
16 carveout, and then they say, okay, I'll write in that
17 carveout, I'll write in that carveout, I'll write in that
18 carveout, but if you're not smart enough to think of all the
19 multitudinous ways that this could all come around given the
20 complexity, then later on it's, ha, ha, you -- the onus was
21 on you, Syncora, to think of how this injunction could hurt
22 you, and since you weren't smart enough to think of it, you
23 are barred by it.  I don't think that's the way injunctions
24 work.  I think that the Dow Corning factors are clear that
25 injunctions are extraordinary things because, of course, they

1  are this process of reaching out and touching people that

2  aren't parties to the settlement agreement.  And the

3  Greektown argument is particularly unavailing, your Honor,

4  because what the Greektown court was dealing with was the

5  unique situation where it was a post-confirmation settlement.

6  So the reason the Greektown court said we don't find Dow

7  Corning very helpful was because they were saying I can't

8  very well apply the Dow Corning factors, which are ones you

9  must comply with with an eye towards confirmation, in the

10 post-confirmation context.  It wasn't some sweeping

11 repudiation of Dow Corning which stood for the idea that

12 injunctions are very sensitive things.

13         Your Honor, let me close with just two more thoughts

14 for you, and then I'll pass the mike, and I appreciate your

15 patience, your Honor.  The implications for Syncora on this

16 transaction are very significant because in the process of

17 unsecuring the insured obligation that we insure, that the

18 swap counterparties contend we insure -- and I think that you

19 can see the way that this may play out is that the swap

20 counterparties will collect payments through the end of the

21 bankruptcy, so they will, say, get another 20 million bucks.

22 And these will modestly reduce Syncora's liability under the

23 provisions of the settlement agreement, if approved, because

24 the swap counterparties can't come back to us for those

25 settlement payments because they're not allowed to create a

secured claim.  It's all designed to make sure Syncora never
gets to exercise rights while the bankruptcy is pending.
Then the bankruptcy ends.  Then the swap counterparties will
get paid the delta on the 77, which is around, say, 50
million bucks, 55 million bucks.  Now, what's key is that
that's not something that's going to be credited against the
swap, so the swap lives on, and they will contend Syncora's
insurance lives on.  So what they will then do is they will
then not terminate the swap, and they will argue that Syncora
is on the hook for the entirety of the remainder of the swap
payments, whatever that will be in August.  And you have to
make some projection for interest rates, but let's -- it's a
huge number.  It's 200 and some million dollars.  Okay.  I
think that not only is there potential for a windfall by the
swap counterparties who are going to get more than they're
owed under the swap in the form of that 55 million they'll
get right after the bankruptcy ends if Syncora pays on its
insurance, and we've raised our concerns about that, but it
also in the process harms Syncora by unsecuring that very
insured obligation.

        Your Honor, the swap and the contract administration
agreement and the collateral agreement, these are
multilateral structures.  They require resolutions that are
multilateral.  And this has been our point for a long time
with the city.  What we have been saying to the city is

1  you're negotiating with the wrong party.  But still and all,

2  we are also being responsive to the arguments of the Court,

3  the findings of the Court at the last hearing, and I -- my

4  client has been attempting to surrender, to get out of the

5  way of this deal.  We have not said to them, nope, we want to

6  assert our arguments about -- with respect to the global

7  nature of the agreement, the potential interactions between

8  the collateral agreement and the COPs and the questions over

9  who gets to call the timing of the termination.  We haven't.

10 We have said you win.  We will step aside.  You can have the

11 enforcement remedies.  Okay.  You can decide what you want to

12 liquidate the collateral at.  Release us from our insurance,

13 and you can go along.  You can even have your plan support

14 agreement.  The problem is now they're the ones that don't

15 want to let us go, and so we are back to this very

16 uncommercial situation where they now -- because they want to

17 keep Syncora on the hook and they want to go after Syncora,

18 they are creating all sorts of legal and structural problems

19 for you and for the city, I believe, that are going to create

20 more problems than they solve.  For that reason, your Honor,

21 we don't believe that the city gets the benefits it thinks

22 out of this agreement, and we would request that our

23 objection be sustained.  Your Honor, thanks very much for

24 your time.

25         THE COURT:  Actually, I think we'll take our 15-

1  minute recess now.  It's 3:15, so we'll reconvene at 3:30.

2          THE CLERK:  All rise.  Court is in recess.

3      (Recess at 3:15 p.m., until 3:30 p.m.)

4          THE CLERK:  All rise.  Court is back in session.

5  Please be seated.

6          MS. NEVILLE:  Your Honor, we switched in --

7          THE COURT:  Okay.

8          MS. NEVILLE:  -- during the recess.

9          THE COURT:  Sure.

10                  CLOSING ARGUMENT

11         MS. NEVILLE:  Carole Neville for the Retiree

12  Committee.  Your Honor, as you know, we had two concerns.

13  One was on the plan support agreement, and we have agreed to

14  reserve our rights with respect to an actual cramdown using

15  the swap class as the impaired consenting class or consenting

16  impaired class, but even though we're reserving our rights,

17  your Honor should know that it is -- this agreement is still

18  being used right now as a threat for all the parties to move

19  to settlement because if we don't, we'll be crammed down by

20  an $85 million claim.

21         Our second concern was that the city is asking the

22  Court to bless a pledge of the casino revenue in violation of

23  Michigan law.  I mean your Honor asked that question of Ms.

24  Ball, and I'm still struggling to figure out what her answer

25  is because, as I read --

1          THE COURT:  It was it's a settlement.

2          MS. NEVILLE:  Pardon me?

3          THE COURT:  The answer was it's a settlement.

4          MS. NEVILLE:  I know, but it's a settlement that

5    asks you to approve something that's in direct violation of

6    state law, and Ms. Ball did not say that the agreement and

7    the order expressly is an order that this is a valid

8    perfected enforceable lien not subject to challenge.  I just

9    don't see how it fits in anyplace under the Michigan gaming

10   statute that would allow you to grant such a lien.

11         I think, first of all, what it does is it gives the

12   swap parties -- and I hate to call them that -- the banks a

13   direct lien on the casino revenue where I'm not quite sure if

14   you count the service corps whether they actually had a

15   direct lien.  It does give them that.  And then it gives them

16   a valid perfected binding lien, and it's in the order.  It's

17   in the settlement agreement.  It's not subject to challenge,

18   and I don't think that Ms. Ball can show you a case where a

19   court has been allowed to approve a lien in violation of

20   state law because it's a settlement.  It just doesn't -- it

21   doesn't make sense to me.  And, in fact --

22         THE COURT:  Well, let me ask this question of you in

23   that regard.  It's the standing question.  What is the

24   standing of the debtor's unsecured creditors to challenge on

25   any grounds the creditors' liens under, for example, Section

1    544?  There's two issues there.  The first is Section 544

2    limits its standing to the debtor or a trustee if there is

3    one, and then there's the whole issue of the comprehensive

4    enforcement scheme with the Michigan Gaming Commission,

5    which, if I recall correctly, blessed this lien originally.

6              MS. NEVILLE:  Yes, your Honor, it did.

7              THE COURT:  So what's the answer to the standing

8    question?

9              MS. NEVILLE:  Your Honor, we're not in the posture

10   of a 544 case right now, and, in fact, this agreement is

11   almost the cornerstone of a plan, so I assume you're asking

12   me what is the standing of the Retiree Committee to come in

13   and say --

14             THE COURT:  Any unsecured creditor, yeah.

15             MS. NEVILLE:  -- or any unsecured creditor to say

16   that this is a violation of Michigan law, but it's putting

17   the Court in this position of blessing something now afresh

18   which we have -- almost since the beginning of this case

19   every party here has come in and challenged and raised before

20   your Honor, so I understand that maybe I don't have standing,

21   but you can't put the blinders on, I don't think, to the

22   question of whether or not this -- what you're being asked to

23   do comports with Michigan law.  I went back, and I reread in

24   the last couple of days the pleadings that have been filed in

25   this case for eight months, and there is not -- there is not

1  a single time when this issue --

2      THE COURT:  Well, but Ms. Ball says there are plenty

3  of cases where, for example, a Bankruptcy Court blesses a

4  reduced lien when the secured creditor -- secured creditor's

5  lien is illegal because it was, I don't know, filed in the

6  wrong place, so I asked, you know, is there a material

7  difference between that and this.

8      MS. NEVILLE:  I think --

9      THE COURT:  What is the difference?  How do you

10 articulate --

11     MS. NEVILLE:  How do you articulate it?

12     THE COURT:  -- any difference that results in a

13 different outcome?

14     MS. NEVILLE:  I guess I would say that the question

15 of where a lien is perfected and the litigation solving that

16 is the resolution of a technical issue involving lien

17 placement in the first place, and I guess you could say that

18 there are compromises there.  This is a statute that says

19 here are eight uses for casino revenue.  By the way, I did

20 learn that the 45 percent goes directly to the state, and

21 it's not an issue here.

22     THE COURT:  Okay.

23     MS. NEVILLE:  This is saying you can use this money

24 for eight purposes and eight purposes only and now, Judge,

25 use it for nine.  That's what's happening here, and I just --

1  I don't see where -- how you can do that.  I know it's hard

2  to articulate what the differences are.  This seems to be a

3  direct violation of state law that's not related to lien

4  perfection and lien creation, et cetera, as the compromises

5  Ms. Ball is pointing to are.

6          THE COURT:  Okay.

7          MS. NEVILLE:  That's the best I can do with that.

8          THE COURT:  Okay.

9          MS. NEVILLE:  And for that reason, we ask that you

10 either don't approve this agreement or strike the language

11 that orders that it's valid, a binding and perfected lien.  I

12 don't know that the banks would go along with that agreement,

13 but that's the solution, as far as I can see.

14         MR. FRIMMER:  Good afternoon, your Honor.  Before I

15 start, is it an imposition to ask how much time we have left?

16         THE COURT:  No.  Okay.  Fifty-four minutes.

17         MR. FRIMMER:  How much?  Fifty-four, was it?

18         THE COURT:  Fifty-four.

19                   CLOSING ARGUMENT

20         MR. FRIMMER:  Thank you, your Honor.  I'm Rick

21 Frimmer from Schiff Hardin.  As I said earlier today, I

22 represent FMS Wertmanagement, which is one of the COPs

23 holders.  And I'm speaking today for the group of us who

24 filed -- who joined in the objection.

25         Your Honor, no matter how characterized, I want to

 1   make clear that the objection that we filed is a very narrow
 2   one.  It's solely based upon the fact that the swap
 3   counterparties simply do not have a secured claim.  And this
 4   is the third time they've tried to muster up one.  We think
 5   it's about time that it's decided that, in fact, they just
 6   don't have a secured claim.  And to be more clear about it,
 7   we are not challenging -- in fact, we support the validity of
 8   all of the documents that were executed in connection with
 9   the swaps, the service agreements, the swap agreements, the
10   collateral agreement, that were executed in 2005, 6, and 9.
11   Those are not an issue for us.  We think that they have a
12   valid claim, which claim should be respected, and -- but
13   there's nothing to settle on that point, so I'm just making
14   clear that we're not arguing about the nature of their
15   documents.  We're solely arguing about the nature of their
16   claim.
17           By the way, I feel a little low tech today because,
18   having looked at the wonderful presentations of the persons
19   who precede me, normally I'm pretty good with the tech stuff,
20   but --
21           THE COURT:  Something tells me you'll be fine.
22           MR. FRIMMER:  Pardon me?
23           THE COURT:  Something tells me you'll do fine.
24           MR. FRIMMER:  Thanks, your Honor.  First, since I
25   assume you're going to ask me the same question that you

1   asked Ms. Neville, I'm going to turn your attention to
2   Section 502(a), your Honor, which I think permits in the case
3   of any claim that's filed -- and this is certainly a claim;
4   they're purporting to settle a claim -- that any party in
5   interest can object, so, in effect, we're objecting to a
6   claim that would have been -- that, in fact, has been filed.
7   I think that Ms. Ball already in her statement showed that
8   the swap counterparties, in fact, filed a proof of claim
9   here, and so this is really settling that claim. So I think
10  there is standing, so I just wanted to mention it.
11          As you, your Honor, noted in the bench order that
12  you issued in January, under the standards applicable to
13  settlements, the Court needs to make an independent
14  determination of the standards and the likelihood of success
15  on the merits. One of the things that you noted pretty
16  carefully in your January 16th order was that solely on the
17  issue of compliance with the Bankruptcy Code -- and I'm
18  referring now only to Sections 552(a), 928, and 902 -- that
19  there was a reasonable likelihood that the city would succeed
20  on the merits. And the only disagreement that we have with
21  you -- and it's a fairly good disagreement -- is that we
22  think it's a virtual certainty that they would have succeeded
23  on the merits, a certainty, not just a reasonable likelihood
24  but a certainty. And it's been a year since the forbearance
25  agreement was penned by the city. I think we all know that

 1   they started negotiations sometime in the early part of 2013.

 2   Here we are almost a year later.  This is the third attempt

 3   at it.  The arguments were made, as you know, and commented

 4   on the last time around, so I'm -- I just want to sort of

 5   punctuate some of the things that were said last time, some

 6   observations that we made in our papers and talk about some

 7   of the observations that were made in the counterparties'

 8   papers.

 9          So one would have thought after you denied that

10   settlement earlier this year that the city would have waited

11   for the swap counterparties to do something.  They had

12   neither threatened to terminate the agreement -- in fact,

13   they hadn't terminated the agreement.  They still haven't

14   terminated the agreement.  And there are a number of things

15   the city could have done other than, as Mr. Orr testified,

16   jumped almost immediately after they left the courtroom into

17   negotiations.  One thing they could have particularly done

18   is --

19          THE COURT:  Well, I assume they did that because I

20   suggested it.

21          MR. FRIMMER:  Yes.  Well, and that was a good thing.

22   That was a very good thing.  But I'm trying to point out that

23   one of the things that they could have done was to look at

24   the narrower range of claims that you suggested probably

25   would be the ones that they would look at and not undertake

1   this entire effort to go through and prepare, you know, 17
2   counts, most of which would have to do with complex factual
3   issues that might actually take, as Mr. Malhotra pointed out,
4   what he was told to do, which is to extrapolate this over an
5   infinite period of time.  He used a period of well over a
6   year, but -- and at a cost of a million two or whatever it
7   was he was told a month.  In fact, on the issue that we're
8   talking about, I think -- and I'm not clear that you actually
9   put it in the record, but I think it's pretty clear that this
10  issue could have been settled basically on summary judgment.
11  There was no facts in dispute.  It completely turns on the
12  law.  It would have been a quick, simple, and easy task for
13  the city to simply file a declaratory judgment action.

14          THE COURT:  Except for appeals.

15          MR. FRIMMER:  Well, but it wouldn't have -- it
16  wouldn't have taken a year to even get a trial order, so just
17  to say that on this issue here we are a year later, the swap
18  counterparties still haven't terminated the agreement, and
19  due to the fact that the city has been fairly unabashed about
20  the linkage between the approval and the impairment issue, we
21  think it's time that this actually was decided.

22          And I know Ms. Ball made a point of saying that
23  there is now language in the order which preserves the
24  impairment issue, but that is simply going to be the narrow
25  issue of whether or not that class can be used for a

1  cramdown. By that time, the 85 million has been approved
2  presumably, and it's nonrecoverable. And I think, as the
3  testimony showed, the recovery rate for the swap
4  counterparties will be double what the city is offering in
5  the plan for all of the other unsecured creditors. So it's
6  really important to determine once and for all whether or not
7  this is a valid secured claim for the same reasons, by the
8  way, that Ms. Neville pointed out that it's important to
9  determine whether or not they had the right to create a lien
10 in the first place. The two arguments are different, though,
11 completely different.

12       Now, I anticipated that you might ask me if I decide
13 after actually looking at this on the merits more closely
14 than I did in January or going back to my notes from January,
15 what if I decide that, in fact, they do have a secured claim?
16 Wouldn't the city be obligated to pay 200-plus million
17 dollars? The answer to that is, well, just look over at Ms.
18 Neville. There's still going to be the question of whether
19 or not the Gaming Act issue would apply, and if that
20 occurred, it would be a very good reason for the city to
21 settle. So, on the one hand, if they have an unsecured
22 claim, the Gaming Act issues are moot. On the other hand, if
23 they have a secured claim under the Bankruptcy Code -- I'm
24 just saying if they pass muster under these provisions,
25 there's still the question of whether or not the Gaming Act

1 applies and whether or not they can attach under state law

2 the lien to the gaming revenues.  So this is -- they're

3 not -- they're mutually exclusive issues, and they're related

4 to each other.

5    So now over to the merits.  As I said, I think the

6 facts were -- are undisputed, and the law is pretty clear.

7 Section 552(a), as you know, prohibits a secured claim on

8 after-acquired collateral, and the gaming tax receipts

9 certainly aren't.  They're receivables just like any other

10 type of receivable.  They just happen to be taxes.  And, by

11 the way, I heard something earlier about somehow maybe the

12 developer payments may be different, but on the question of

13 if they come in after the petition date, I don't think it

14 matters what the character was unless they were earned prior

15 to the petition date, so let's just -- and they're minor

16 anyway, so let's just -- with your permission, I'm just going

17 to focus on the gaming tax revenues.  So, as we know, the

18 interplay is that in a Chapter 9 the only exception that

19 would be available to 552(a) is 928.  928 uses the concept of

20 special revenues.  We go back to 902, and we look down, and

21 we try to find out, well, what are we talking about here.  It

22 was adequately briefed before.  I know your Honor read it,

23 considered it carefully, but the only subsection of 902 that

24 could have applied was (b), which talks about special excise

25 taxes.  We went -- it was briefed pretty carefully, and if

1  you remember some PowerPoints, which I haven't given you
2  today, were put on the board, which showed the meaning or the
3  reason why Congress used the word "special" in the context of
4  that, but the most important thing was that you heard from
5  Mr. Gordon and others, I think, that the legislative history
6  of 902 and 928, which were put in the Code at the same time,
7  1988, were pretty clear that the object of these two
8  provisions was simply to give confidence to the finance
9  industry that if financing -- we'll call them bonds for this
10 purpose -- were issued to finance projects, that the
11 revenues -- these types of revenues pledged for that
12 financing would be respected in a subsequent bankruptcy
13 proceeding because, if not, the bond industry would never
14 invest in these bonds.  You wouldn't get investors, and, you
15 know -- so the -- so without belaboring the point, we can
16 cite you back to pages 11 -- 8 through 11, rather, of our
17 objection papers, and you can take a look at the material
18 that was given to you before.  We also would note that the
19 legislative history behind this was cited with approval, you
20 know, in the Orange County case a number of years ago and
21 recently in Las Vegas Monorail.
22          What I wanted to address, your Honor, is not this
23 clear law, but it was a point you made in your order when you
24 surmised that somehow Section 560 might actually require the
25 payment, in any event, and I think you just said, you know,

 1  so what does it matter.  We tried to address that in our
 2  papers, your Honor, for your comfort that Section 560 really
 3  doesn't apply here.  By the way, we note also that the city
 4  disagreed with the statement, the surmising, if you will,
 5  that you made, and we do, too.  560 doesn't apply for a
 6  number of reasons, as we pointed out, but I want to go
 7  through them with you just very quickly.  First of all, here
 8  the swap agreements, as we know, were between the service
 9  corporations and the swap counterparties, so 560 really
10  doesn't reach them at all.  Secondly -- and this is the point
11  I think that Ms. Ball perhaps didn't pick up in our papers --
12  was that we were simply saying to you if they did apply -- we
13  don't agree that it does apply, but if 560 applied, that it
14  is not a mandate to pay anything except to the extent that
15  there were netting amounts.  The concept was really that it
16  was sort of the same -- a corollary to 553, a setoff type
17  provision where if I owe you money and you owe me money, we
18  can net the two out.  What it doesn't touch is what happens
19  at the end of the day when money is owed to one party.  The
20  netting doesn't wipe out the liability.  Here there's no
21  question of netting.  The city owes the swap companies these
22  monthly payments.  There's no dispute about that.  The only
23  question is what character they have, but under the
24  agreements, at least, they would owe them these payments.
25  There's no amount owed to the swap counterparties from the

 1   city.  Netting just doesn't apply here.  It wasn't intended
 2   for that.
 3          The third point I would make is, for your comfort,
 4   that 560 only applies by its terms when a swap is terminated,
 5   accelerated, or liquidated.  They've never done that.  There
 6   has been no termination, no acceleration.  In fact, you
 7   learned today that under the settlement agreement the swap
 8   agreements continued, continue unaffected except until the
 9   city reaches the $85 million milestone under the settlement
10   agreement, so they haven't taken any action to trigger 560
11   even if it would apply.
12          Fourth, you'll note that Section 560, even if there
13   were a termination yesterday or the day before, says nothing
14   about what the character of the claims are, which is really
15   to the point that you were making.  It doesn't say that
16   they're secured or unsecured.  In fact, Congress didn't even
17   use the word "payment" in Section 560, so there's nothing.
18   The only possible thing that they -- you know, that 560 would
19   cover is in the term "liquidate," which I think the city --
20   the counterparties' papers spent a fair amount of time
21   looking at, which really had to do with liquidation of
22   collateral, but they -- but that's a rabbit in a hat, your
23   Honor, because we're saying here they have no collateral or
24   at least that the collateral isn't -- that they have no
25   secured collateral, that there is no collateral.  And so I

1  point out that if Congress wanted to create in 560 an

2  automatic right to a payment, not in the context of netting

3  out claims of equal parties, they would have said so or they

4  could have provided, for example, that the payment

5  constituted a post-petition administrative expense.  They did

6  not do that.  And they could have amended 902 to include

7  payments under swaps in other provisions, and they didn't do

8  that either, so I don't think we can read anything into 560

9  about whether or not either, "A," the payment is required in

10  all events, any payment is required, anything other than the

11  payment is to be determined, which I think if you look at 562

12  will tell you that, since it goes back to 560, how one

13  computes the payments.  And here we had testimony from way

14  back that there was a methodology in the swap agreements for

15  using what was called, I think, the Mid-Market method for

16  computing that, so I just wanted to give you comfort on this

17  because you raised it in your January 16th order that 560 is

18  really not an issue here.

19          Also, I would note that although there was some

20  argument by the swap counterparties about the application of

21  other -- of what exactly 902(2)(B) means when it says

22  "special excise taxes," their argument was, well, your Honor,

23  forget the legislative history.  There's nothing in 902(2)(B)

24  connecting special excise taxes with financing.  I would

25  point out, your Honor, that that just flies in the face of

1   the legislative history.  Each of the five categories of
2   revenues under 902 still have to be connected with the
3   financing, and we can get there pretty easily because if you
4   looked at 902(d), 902(d) is even broader than 902(2)(B).
5   902(d) says any other revenues or receipts derived from
6   particular functions of the debtor, whether or not the debtor
7   has any other functions.  That would open up the kitchen sink
8   for everything, and clearly that's not what Congress could
9   have intended, so I just wanted to point those things out.
10          The other argument that I saw for the first time
11  really in the counterparties' papers was this notion that
12  somehow ordinance 0509 created a statutory lien, and I don't
13  even want to spend a lot of time on this, your Honor, but
14  there's nothing.  I have ordinance 0509 right here.  We can
15  look back at it.  The word "lien" only appears once in the
16  entire ordinance.  It's in the definition of permitted lien,
17  which has nothing to do with this.  Statutory lien, as you
18  know, is defined in Section 101(53) of the Bankruptcy Act as
19  meaning a lien arising solely by force of a statute on the
20  particular circumstances but does not include a security
21  interest, and it continues.  Clearly, all that the ordinance
22  did was approve a collateral agreement, which says in it, as
23  all security agreements do, that the secured party is granted
24  a security interest in and a lien on the collateral, and
25  that's the sole -- that is the sole use of the word "lien."

 1   There's no statute in Michigan, by the way, automatically
 2   creating a lien on the gaming revenues.  If it were, Ms.
 3   Neville wouldn't be here arguing about it.
 4          I would point out to you that the Orange County
 5   case, which they cite, had nothing to do with that.  In
 6   Orange County the lien was, in fact, created by a statute
 7   that had nothing to do with the transaction.  I covered the
 8   point about the use of the word "liquidation" before.  It
 9   simply doesn't mean what the swap counterparties say it is.
10          We raised another point, which is just -- again,
11   just for your Honor's information, that the Lehman case
12   pointed out that in order to avoid sort of gilding a lily on
13   560 that a swap counterparty has to act promptly in order to
14   trigger its rights, and, you know, we said -- here we are a
15   year later, and they still haven't terminated.  Even if 560
16   did apply -- I'm couching all of this by saying we don't
17   think it applies -- in the swap counterparties' papers, they
18   noted that they were under a forbearance because of the
19   forbearance agreement.  Well, that forbearance -- I would
20   just point out that that forbearance ended January 31st, your
21   Honor.  There's really nothing in the current agreement about
22   forbearance.  They still haven't terminated.  So these were
23   just multiple reasons why I would like to give you comfort
24   that 560 really doesn't apply here.
25          So I'd like to conclude, your Honor, just by saying

1    that we don't think there's a really a question about the

2    Bankruptcy Code application here, and just as it's critical

3    to consider Ms. Neville's thoughts about the application of

4    the Michigan Gaming Act, you know, one can't simply parse out

5    a claim and just say we'll treat it as a -- you know, we'll

6    treat it as a 40-percent secured claim.  Either it is or it

7    isn't under the Bankruptcy Code, and as your Honor pointed

8    out, there's a difference between filing a UCC in the wrong

9    place thinking that you can perfect by perfection, et cetera.

10           THE COURT:  Let's separate out the Michigan Gaming

11    Control Act issue for a moment --

12           MR. FRIMMER:  Sure.

13           THE COURT:  -- for this question.  Would the

14    Bankruptcy Code prohibit the Court from approving the

15    compromise of an unsecured claim when that compromise

16    involves giving that creditor a security interest?

17           MR. FRIMMER:  I don't know how you would do that,

18    your Honor.

19           THE COURT:  Why not?

20           MR. FRIMMER:  I don't know how you can --

21           THE COURT:  I mean in the end isn't the answer to

22    that question if it's in the best interest of the estate

23    because, for example, the amount of the claim was brought

24    substantially down to the benefit of the other creditors,

25    that's a reasonable thing to do in the circumstances,

1   isn't --

2        MR. FRIMMER:  I wish I could find a section of the

3   Bankruptcy Code that says that.  I'm not being glib, your

4   Honor.

5        THE COURT:  Well, it's a fair question.  No.  I

6   don't take it glib.  But isn't the answer the debtor can do

7   with its property what it wants subject to the business

8   judgment test of Section 363?

9        MR. FRIMMER:  Well, if that were the case, your

10  Honor, they could anoint all unsecured claims to be secured

11  claims.

12       THE COURT:  If that were a reasonable compromise of

13  them --

14       MR. FRIMMER:  Your Honor, they really have --

15       THE COURT:  If you want a secured claim --

16       MR. FRIMMER:  Sorry.

17       THE COURT:  -- tell them you'll take 20 percent.

18       MR. FRIMMER:  Well, actually, they're getting 30

19  percent, your Honor.

20       THE COURT:  Tell them you'll take 30 percent.

21       MR. FRIMMER:  Well, we'll -- that is to be

22  continued.

23       THE COURT:  Okay.  But I need an answer to that

24  question.  Setting aside the Gaming Control issue --

25       MR. FRIMMER:  I would respond by saying that in this

1   case, your Honor, if that were the case, the best interests

2   of estate are for them to award, if you will, to approve an

3   unsecured claim of 288 million included in with the other

4   unsecured creditors, and they will get the recovery that they

5   get. I mean it's really gilding the lily to say that we want

6   them to get more than everybody else, and so we'll fashion --

7   and, again, I'm not -- believe me, I'm not being glib -- so

8   we'll back-door remedy to try to get them there and say that

9   it's in the best interest of the estate. I think that puts

10   the rabbit in the hat because we would argue that the best

11   interest of the estate are to treat similar claims similarly

12   and to deal with them front on and for all the parties that

13   have similar claims to either try to come to a resolution of

14   the plan with the debtor or take their chances at a

15   confirmation hearing. But to separate out one, I think we'll

16   have a run. I think the GOs, the COPs, everybody is going to

17   be running at the debtor's doorstep tomorrow if you'd like to

18   do that, and we'll all try to negotiate, "A," a better deal

19   for Mr. Huebner and his clients and a better deal for us.

20   And, again, I'm not being glib, your Honor. I'm just making

21   an observation. I'm fairly well through if you are with me.

22           THE COURT: Um-hmm.

23           MR. FRIMMER: To the extent that there's a minute or

24   two left after my colleagues finish, I'd like to have the

25   permission to come back. I just want to clarify something

1    about something Ms. Ball pointed out about our collective

2    confusion about Section 4.1(e) of the collateral agreement.

3                THE COURT:  Why don't you just do that now?

4                MR. FRIMMER:  Well, I hesitate to take time up for

5    my colleagues --

6                THE COURT:  All right.  If you'd like to reserve

7    that, that's fine with me.

8                MR. FRIMMER:  -- out of respect.  Okay.  Thank you,

9    your Honor.

10               MS. GOING:  Good afternoon, your Honor.  Kristin

11   Going.

12               THE COURT:  Good afternoon.  And by my count there

13   are 30 minutes left on the objecting parties' side.

14                            CLOSING ARGUMENT

15               MS. GOING:  Thank you, your Honor.  I shouldn't take

16   that long.  Your Honor, Kristin Going, Drinker Biddle -- I'm

17   sorry -- on behalf of the contract administrator and the

18   trustee for the COPs.  And, your Honor, just -- I want to

19   address your hypothetical question that you just posed about

20   whether or not a debtor can grant a lien for an unsecured

21   creditor in a settlement in a bankruptcy, the hypothetical,

22   and under that example, you're right, sure, in a settlement,

23   but in a vacuum, that's fine.  And I think even if you had a

24   debtor that had a piece of unincumbered property, they could

25   grant a lien to an unsecured creditor on that unincumbered

property. It wouldn't affect anyone else. Grant them a
lien. That's a settlement. But in what the debtors are
trying to do here is essentially the equivalent of granting
an unsecured creditor a first perfected priming lien that
eviscerates rights of other parties and in my hypothetical
here would be, you know, impacting a first lienholder who's
not even a party to the settlement. And so that's where I
wanted to begin because I'm here today because the order that
you've been asked to enter fundamentally impacts third-party
rights, and they're the third-party contractual rights. And
I wanted to just point out to your Honor -- and I apologize.
I'm not high tech either, but I do have a transcript cite
from your August 2nd, 2013, hearing on the assumption of the
forbearance agreement. And at that hearing -- it's page 124,
lines 12 through 18 -- parties raised concerns about this
Court making judicial findings and judicial declarations that
would foreclose the rights of third parties, and they raised
those in response to seeing the proposed order. And your
Honor responded, and this is the quote, "If that's your
concern, I will assure you at the outset that my decision
will be nothing more than to approve the decision of the city
to assume the contract and enter into the settlement or
disapprove it." And so, your Honor, I just wanted to start
at that point because this new settlement agreement and, in
particular, the order does fundamentally impact third-party

1    rights.  And I want to build on what Mr. Hackney was

2    discussing, and it's Section 9.2 of the contract

3    administration agreement, because the -- in 9.2 it's not just

4    the insurers that have rights.  In addition, it's the funding

5    trust that has the right to exercise remedies or options

6    hereunder under any service contract or at law and equity,

7    including instituting legal action against the city, the

8    contract administrator, any corporation, or any other party

9    hereto to obtain a judgment or other legal process in respect

10   of such contract payment.  And so, your Honor, as the

11   trustee, you know, we have the same rights, although, you

12   know, we can't enforce the remedies in the final proviso that

13   Syncora was asserting.

14        I also want to go to Section 2.3 of the contract

15   administration agreement, which provides that, "Each

16   Corporation" -- and this is the service corporations --

17   "hereby also appoints the Contract Administrator as its agent

18   and attorney-in-fact to enforce such Corporation's rights and

19   remedies under the Stated Hedges," and the stated hedges are

20   the swaps, "including the collection of Hedge Receivables

21   from the Specified Hedge Counterparties under the respective

22   Stated Hedges, and to take all such actions and exercise such

23   rights and remedies as the respective Corporation is or may

24   become entitled to exercise under the particular Stated Hedge

25   and otherwise at law or in equity."  And, your Honor, I am

1  merely pointing out that we have these contractual rights,

2  and they're stated in the documents.  And it creates

3  fundamental problems with regard to the settlement and the

4  provisions in the order.  And, you know, I hear the city when

5  they say that they're not a party to the collateral

6  agreement, but they are a party to --

7      THE COURT:  In the contract administration

8  agreement?

9      MS. GOING:  Sorry, yeah, the contract administration

10  agreement.  But they are a party to the service contracts,

11  and Article 3 of the service contract states that each of the

12  corporation and the city represent and warrant, as set forth

13  in this article, for the mutual benefit of each other and for

14  the benefit of the funding trust and the holders from time to

15  time of the certificates -- and the representations then go

16  on to say that the corporation is a nonprofit corporation

17  duly incorporated, and it goes through the reps and

18  warranties, so, again, your Honor, when I look at these

19  provisions and then I look at the specific provisions of the

20  order and specifically paragraphs 20 and 22 -- and this is

21  the -- I believe this is the current order.  Paragraph 20

22  provides, "Ordered that the Service Corporations are hereby

23  barred from commencing any litigation or taking any other

24  action that the Service Corporations would not have been able

25  to commence or take if the Service Corporations were a party

1  to the Agreement and obligated to the same extent as the City

2  under the Agreement, including making or pursuing any

3  Released Claim," so, your Honor, I mean that goes directly to

4  the rights under the various contracts.  And then paragraph

5  22 of the order provides that subject to 10.5 of the

6  agreement, "the City shall not commence or prosecute any

7  litigation or directly or indirectly cause either Service

8  Corporation or any other person to or support either Service

9  Corporation or any other person in commencing or prosecuting

10 any litigation against UBS, MLCS or any of their affiliates

11 or any of their respective officers or directors," et cetera.

12 And, your Honor, I can't even, you know, begin to articulate

13 each and every instance in which this would impact our rights

14 vis-a-vis the service contract, the contract administration

15 agreement.  I'm pointing out these provisions because you

16 could see the interrelations, but as I stand here today, I

17 will posit that there are numerous instances that we would be

18 directly impacted in the event that this order was entered.

19        And then finally I -- you know, I think it's -- if

20 you contrast those provisions and my concerns against

21 paragraph 24 of the order, which specifically provides that

22 nothing in this order or agreement shall be deemed to alter

23 or modify any right that the custodian may have then to

24 compensation reimbursement, indemnity under the collateral

25 agreement, so the idea that, you know, we have the custodian

1    who's being protected and preserved within this order, and,

2    in fact, there's no protections or provisions for the

3    contract administrator or the trustee, and it's just

4    implicating our third-party rights.

5          And, now, your Honor, to go back to the questions

6    that were raised about the lien, again, I just want to direct

7    your attention to --

8          THE COURT:  Hold on.  Before we go there, I have a

9    question for you about your third-party rights argument --

10         MS. GOING:  Um-hmm.

11         THE COURT:  -- a hypothetical question.  What would

12    your client's remedies be -- rights and remedies be if the

13    swap counterparties and the city had entered into this

14    agreement -- this very agreement outside of bankruptcy?

15         MS. GOING:  We would -- they would be breach of

16    contract claims against all the various entities.

17         THE COURT:  Um-hmm.  And is there anything about

18    this agreement that precludes those claims at this point?

19         MS. GOING:  Yes.

20         THE COURT:  What is that?

21         MS. GOING:  Paragraph 20 -- the two paragraphs that

22    I just read, 20 and 22.

23         THE COURT:  I don't quite see that.  Can you show

24    me?  I see 20 as a bar against the service corporations, but

25    you don't represent them; right?  And 22 impacts the city's

1    rights or the city indirectly through the -- or the service

2    corporations indirectly by the city.  Help me out here.

3            MS. GOING:  Well, your Honor, there are

4    circumstances in which we are the agent and attorney-in-fact

5    for the service corporations in a hypothetical situation.

6            THE COURT:  Does the "provided further" language

7    that was recently added help you, the second "provided

8    further" language of 20?

9            MS. GOING:  Provided further for Aetna, yeah.

10           THE COURT:  "Nothing herein shall prohibit the

11   funding trust," et cetera.

12           MS. GOING:  As I stand here right now, I can't

13   entirely be sure because of Section 2.3.1 of the contract

14   administration agreement.

15           THE COURT:  All right.  Thank you.

16           MS. GOING:  Now, turning to paragraph 11 of the

17   order and going back, your Honor, pursuant to the specific

18   language of the order, this is requiring you to find that the

19   liens are valid and perfected.  And, again, your Honor, I

20   would say that outside of anyone else's rights being

21   impacted, the debtor would certainly have the right to put a

22   lien on property, but here there's a specific finding.  They

23   are asking you to find that these liens, the liens in

24   question here, are valid and enforceable.

25           And lastly, your Honor, just with regard to the

1  business judgment testimony that we heard today, we heard
2  from Mr. Orr that the city obtained this settlement without
3  filing a lawsuit, that they agreed on a dollar amount, and
4  then they spent over a month negotiating the terms.  And the
5  terms of this settlement are radically different than the
6  previous settlement that they sought to enter into, and the
7  current settlement provides for extraordinary protections and
8  injunctions for the swap counterparties.  And these
9  injunctions and the bar order were not in the previous
10 settlement, and the city received, according to Mr. Orr's
11 testimony, no consideration for these extraordinary
12 protections.  And I think in a typical bankruptcy case, you
13 would expect that there would be some consideration given for
14 the protections that are being provided to the swap
15 counterparties in this order and for the benefit of the city
16 agreeing to these extraordinary provisions.  And here Mr. Orr
17 testified that they agreed on a dollar amount and then they
18 spent a month negotiating the terms, so the dollar amount
19 didn't change, so the swap counterparties received all these
20 protections and the city did not receive any consideration
21 for them.
22         And then finally, your Honor, I would just say that
23 rather than putting this -- by putting this on as a stand-
24 alone motion rather than bringing it as part of the plan
25 process, I think the city is putting this Court's

1  jurisdiction over plan confirmation in jeopardy because if
2  your Honor enters this order and a party appeals it, then
3  there's a question as to whether or not this Court retains
4  jurisdiction over issues that are integrally related to that
5  appeal, and this order has a lot of details in it regarding
6  the plan and plan confirmation.  Thank you.
7                      CLOSING ARGUMENT
8           MR. GOLDBERG:  Good afternoon, your Honor.  Jerome
9  Goldberg on behalf of interested party, David Sole.  Your
10 Honor, when the Court rejected the second bad deal regarding
11 the swaps that the city brought to it for approval, the Court
12 held, "In its eligibility opinion, the Court found that the
13 city had entered into a series of bad deals to solve its
14 financial problems.  The law says that when the city filed
15 this bankruptcy, that must stop.  It also says that this
16 Court must be the one to stop it, if necessary.  It is
17 necessary here."
18          I would submit that that was a very important ruling
19 to the people of Detroit because what it said to the people
20 of Detroit and especially to the pensioners who are facing
21 tremendous cuts in their pensions, not just in benefits but
22 in healthcare, annuities, that they could feel the confidence
23 that they would get a fair hearing in a courtroom.  And we
24 all know in the world we live in there's a tendency to not
25 have that confidence and feeling.  And I think it was a very

1  important ruling for the Court.  I think the fact that we've

2  seen so many objections being filed by grassroots people -- I

3  know it's probably a problem for the Court -- it says that

4  people have confidence that this Court will give them a

5  hearing, and I think that's a very, very important thing not

6  just for this bankruptcy but for the city to move forward.

7  And as a resident of the city and my client being a resident,

8  that's very important.

9       We submit that this new deal being brought by the

10  city is another bad deal, and our submission is based on the

11  Court's rulings on January 16th, the Court's holdings on

12  January 16th, which, as Mr. Hertzberg said, are the law of

13  the case even though there's been a slight tendency to

14  misrepresent them during the course of this proceeding.

15       On that day, the -- in discussing the various

16  claims, the Court said, "In the absence" -- on transcript

17  page 15, "In the absence of the settlement, the city might

18  also pursue a potential claim challenging the underlying swap

19  agreements themselves.  The city argues that the swaps

20  themselves are invalid because the city did not comply with

21  the Revised Municipal Finance Act called Act 34, MCL

22  141.2108."  The Court went on, transcript page 17, "The

23  city's challenge to invalidate the swap agreements has

24  potentially very advantageous consequences for the city.  If

25  successful, not only would the city be released from any

1    obligations to the swap counterparties, but the city might
2    also recover the allowed $300 million that it has already
3    paid the swap counterparties."

4          Then on page -- on transcript 18 and 19 where the
5    Court listed its holdings, the Court first said, "the city is
6    reasonably likely to succeed on its challenge to the
7    collateral agreement under the Gaming Act and the Bankruptcy
8    Code.  The Court further concludes that the city is
9    reasonably likely to succeed on its challenge to the swap
10   agreement under PA 34.  As to the city's other potential
11   claims," which I advanced on behalf of my client, "while they
12   are certainly not frivolous, the likelihood of success is
13   less apparent on the record after the Court -- before the
14   Court at this time."  So very clearly the Court's holding on
15   January 16th is that the city was reasonably likely to
16   succeed in invalidating the swap agreements under Public Act
17   34 and under the MCL stated.  And in so doing, it would have
18   the potential to recover the $300 million not just to stop
19   the termination payments but to recover the $300 million that
20   had already been paid to the swap counterparties from the
21   years 2008 to 2013.

22          It's based on that holding that we submit to this
23   Court that the presentation of this agreement as a
24   presentation where the swap counterparties are settling for
25   31 percent, 30 percent of what they are entitled to really is

1    a misrepresentation.  The real claim here is a claim that the
2    city has against the swap counter -- a potential claim that
3    is for $588 million, the three -- to recover the 300 million
4    that's already been paid and to terminate a $288 million
5    termination -- potential termination amount.  And what the
6    banks are receiving really in reality is they're receiving
7    $385 million, the 300 million they've already gotten on top
8    of the 85 million that they will be paid, and that payout is
9    more like a 67-percent payout to the banks, not a 30-percent
10   payout.  I think to approach it otherwise is to misrepresent
11   what the Court held.
12            And I was struck today that when I asked Mr. Orr
13   about this, he wasn't clear.  He wasn't clear that based on
14   the Court's ruling there was a potential claim to recover the
15   300 million and that even Mr. Hertzberg, who is one of the
16   negotiators for the city, if I'm not mistaken, got up and
17   objected when I characterized it that way.  But I think the
18   transcript is clear, and it's problematic to me that the head
19   person of the city, the person where the buck stops,
20   Emergency Manager Orr, didn't have clarity on what he was
21   negotiating from; that the strength of his negotiating
22   position wasn't somewhere between zero and 288 million, it
23   was between -- it was to demand 300 million back from the
24   banks, and we'll go from that perspective.  And it's on that
25   basis that I believe this settlement is not in the best

1   interest, that it's not a whole lot better than the previous
2   settlements that have been taken to this Court, which
3   essentially reward the banks with millions of dollars on
4   claims that are questionable and, in fact, are so
5   questionable that this Court held that if they were to be
6   challenged, that there would be a reasonable likelihood of
7   success that they could be successfully challenged and the
8   funds could be disgorged.
9           Coming at a time when retirees are taking huge
10  cuts -- and we know the 34 percent is not really
11  representative of the full cut because it includes healthcare
12  cuts, annuity cuts, elimination of cost of living, that the
13  real cut ends up approaching 50 to 60 percent.  How can this
14  be palatable to a retiree to see that the city is turning
15  over $85 million to the bank at the precise moment when if it
16  would go after the banks, it has the potential to recover
17  money from these banks, not pay them?  And I believe that's
18  the consideration.  And whether or not -- and while I
19  understand that all the equitable claims would be much more
20  difficult in litigation, still the -- equity plays a role in
21  this courtroom, and based on the legal claim that the Court
22  has already enunciated as a strong claim with a high
23  likelihood of success, when you combine that with the
24  equities of the situation, I think we can get a better deal.
25  I think this $85 million is not in the best interest of the

 1  people of the city, not in the best interest of the block of
 2  creditors that in some ways are the creditors that have put
 3  the most into the city, and stand in many ways to lose the
 4  most, the retirees.  I don't see in any way that this Court
 5  can okay this settlement any more than it okayed the
 6  settlement -- than it disallowed the settlement -- the prior
 7  settlements.  I really believe that's the critical issue to
 8  be viewed right now.

 9          And I won't go on and on, but that is really what we
10  feel.  I mean I think it has to be said when we talk about
11  equities, the banks -- you know, just since this settlement
12  has been announced, the Justice Department launched a lawsuit
13  against UBS and Bank of America, the two swap counterparties,
14  for LIBOR fraud.  And, of course, LIBOR was the index that
15  was the basis for the swaps.  That settlement -- the lawsuit
16  was filed in February.  I have a cite to it in my objection,
17  the case number.  A leader of the municipal derivative
18  department from Bank of America was jailed in February.  I'm
19  not saying that person was directly involved in this case
20  here, but it's symptomatic of what was the problem with the
21  swaps, and it wasn't a particular administration.  It was
22  part of the overall crisis that was brought on by the banks
23  through fraudulent practices.

24          And so I just will conclude that based on the
25  holdings of this Court, which I thought were very strong

holdings, very in some ways courageous holdings in this day
and age, but also legally expedient correct holdings, that
there's a reasonable likelihood that the city could succeed
in its claims to invalidate the swaps and also -- let me just
end with one other point with regard to that.  What the Court
did hold is that the cost of that -- while the cost of a
broader attack on the equitable claims that I advanced would
be prohibitive perhaps, the cost of filing a complaint, which
already was filed before this deal was cut, filing a motion
for preliminary injunction, which already was prepared before
this deal was cut, and then a summary judgment motion would
not be very prohibitive, as the Court ruled, especially in
light of the potential recovery to the city, the dollars to
be recovered.  And certainly I think the figure that we heard
today from Mr. Malhotra of $1.2 million does not really meet
the kind of legal process that we're talking about for a
complaint, motion for summary disposition, and -- a motion
for summary judgment, and a preliminary injunction.  So on
that basis, again, I would ask the Court to, once again,
reject this agreement.  I think we need better.  I think the
people of Detroit are entitled to better.  I think rewarding
the banks with what amounts to 67 percent on a claim is not
reasonable.  It doesn't meet the test according to -- as
articulated by this Court, and I would ask the Court to
reject this agreement.

1          THE COURT:  Thank you, sir.

2          MR. GOLDBERG:  Thank you.

3          THE COURT:  Three minutes left on the objectors'

4   side.  Any takers?

5          MR. HUEBNER:  Your Honor, I didn't make your list

6   last time, but my team advises me that they believe I have

7   24-1/2 minutes left.  I don't know if that matches the

8   Court's records.

9          THE COURT:  I didn't quite hear what you said, sir.

10         MR. HUEBNER:  I'm sorry.  My team advised that I

11  have 24-1/2 minutes of our 30 minutes left.  You didn't list

12  me at the break, so I wasn't sure if that matched your

13  records or not.

14         THE COURT:  Actually, I was a little more generous.

15  I've got 26 for you.

16         MR. HUEBNER:  We'll take it.  Thank you, your Honor.

17                    CLOSING ARGUMENT

18         MR. HUEBNER:  Your Honor, I'm actually going to try

19  to be relatively surgical.  You know, I'm in a difficult

20  structural position because the debtors are in the middle,

21  and they're not here to validate our liens, claims, and

22  positions whereas many of the objectors obviously are here

23  arguing that we deserve much less, and so we sort of stand

24  alone, as we did at the last hearing in many ways, arguing

25  that, you know, we deserve more and that this is a very

1  reasonable settlement and a very deep concession, but let me

2  be very surgical in how I make those points, your Honor,

3  despite the fact that there are several dozen things that

4  arguably do need to be responded to.

5      One, let me just make it easier for the Court.  It

6  is absolutely clear under the documents that if the agreement

7  is approved, the $85 million payment stream is all the city

8  pays to us, period.  We don't even have a termination right

9  under the settlement agreement at all unless the order is

10  reversed on appeal.  We can't terminate.  We can't go back to

11  the swaps.  We can't assert the rest of the termination

12  payment.  It's just not there.  Ms. Ball covered that, but I

13  thought that it would be further helpful to your Honor to

14  hear it directly from the swaps counterparties that exactly

15  as you heard in the briefing and on the debtor's side, it's

16  85 and done.  Your Honor, there are also various paragraphs

17  of the --

18      THE COURT:  So under the agreement, Syncora and

19  others don't have any further liability to you?

20      MR. HUEBNER:  I'll address Syncora's issues in a few

21  moments, your Honor.  Whether other parties have liability to

22  us is a very live issue, but that does not impact the estate

23  for reasons I will describe in great detail in a few minutes.

24  The first point is from the perspective of the swap

25  counterparties, we have no further claims, and we are the

1  sole lienholder, and the liens on the casino revenues are

2  released when the 85 is paid.  And that's clear in 4.1(e),

3  and it's clear in paragraphs 14 and 20 of the proposed order.

4          Shall I proceed?  Thank you, your Honor.  Number

5  two, your Honor, we heard a little bit of argument rather

6  surprisingly that maybe we just have no claims at all because

7  we haven't actually terminated the swaps, and, therefore,

8  we're just not a creditor somehow and nothing is being

9  settled.  Just to be very clear, that's really not our view.

10  It's not the debtor's view.  We have proofs of claim on file,

11  and as Ms. Ball correctly said, the termination value, which

12  is a calculation under the contract, is nothing other than

13  the present value, which the Bankruptcy Code, in fact,

14  requires in any event for long-lived claims of what we are

15  owed and would otherwise be paid by the city's side.  We

16  withdraw and release our claims.  We have no further claims.

17  We pursue nothing further, and all the city's obligations to

18  us under the swaps go away.

19          Your Honor, number three, we heard some conversation

20  for awhile about the liens point, and obviously your Honor is

21  very sensitive to it for understandable reasons because at

22  the last hearing there was a fair amount of seemingly

23  convincing argument from people opposing the prior settlement

24  about the invalidity of the liens under Michigan law.  Your

25  Honor, it is absolutely true and it's fully respected that

1  you preliminarily ruled the debtors were likely to succeed on

2  this, but what there has not been is a ruling after a hearing

3  where the people on the other side litigated it resulting in

4  a judicial finding that the liens are invalid.  And so,

5  candidly, I think that's a complete answer to many of the

6  concerns you've heard because, frankly, the oral argument

7  said given that the liens are invalid, you can't enter this

8  order or you shouldn't.  Given that the liens were stopped by

9  552, they just don't exist anymore, and you shouldn't be

10  validating them.

11        I'll talk in a minute about the fact that I disagree

12  with that, but we have to pause first on the huge factual

13  assumption that those arguments make, which is the liens are

14  gone and you're sort of granting new ones.  That's exactly

15  what's disputed.  That's exactly what's being settled.  And

16  the analogy to the fact that this happens every day I wanted

17  to take up directly because, your Honor, Collins & Aikman

18  ironically was a Michigan statutory attack on a lien where

19  someone alleged under the Michigan Mold Act the lien never

20  came into being under state law.  It did not exist.  And the

21  settlement was reduce your claim, we'll give you partially a

22  secured claim, partially an unsecured claim.  Here we're

23  taking partially a secured claim, and the rest is just gone.

24  So I do think that even if one were to agree conceptually

25  that somehow a lien being void ab initio under state law as

1 opposed to fact patterns of avoidability, they're arguably

2 much worse and, if anything, I think actually may be a

3 fortiori the other way. Actual intent to hinder, delay, and

4 defraud creditors. The debtors attack a lien saying the

5 former CEO defrauded us, and this lien was actual fraud. And

6 there are settlements, and there can be, that say despite a

7 544 attack or a 548 attack that allege that the liens are

8 morally horrible and avoidable, you can settle them with a

9 reduced claim and secured treatment for the reduced claim.

10 There are a litany of cases, your Honor, that are cited in

11 our papers. I have, frankly, a much longer list, but I don't

12 think --

13          THE COURT: Well, but once the Court approves that

14 lien -- reduced lien, there's nothing that anyone can go back

15 to in state law and say that lien is not legal.

16          MR. HUEBNER: Your Honor that --

17          THE COURT: But in this case, there is.

18          MR. HUEBNER: Well, your Honor, but that's the

19 nature of every settlement of a disputed lien. I could have

20 said "X" and avoided your lien and paid you less, but since

21 you'll give me 30, 40, 50 percent off, we'll put that to bed.

22 And, your Honor, not only is this true in every fraudulent

23 transfer attack where a, you know, blanket lien secured bank

24 group comes in and says, "We have a lien on all the assets,"

25 and the committee says, "No, you don't" --

1        THE COURT:  What's the arguable grounds that this

2   lien is legal?

3        MR. HUEBNER:  So, your Honor, that actually is laid

4   out at some length in our papers.  As your Honor noted,

5   contemporaneously --

6        THE COURT:  Give me the three-sentence executive

7   summary.

8        MR. HUEBNER:  Sure.  The City of Detroit and its

9   inside and outside counsel and officials of the Gaming

10  Commission --

11       THE COURT:  That's an estoppel argument.  I want the

12  argument that reads the law to say the city can do this.

13       MR. HUEBNER:  Right.  So the answer, your Honor, I

14  think that was made in the papers is that the quality of life

15  prong and the avoided damage and harm to the city constituted

16  a legitimate basis for the granting of the lien, which is

17  why -- remember, they came to us in 2009 and said, "Please

18  don't terminate."

19       THE COURT:  That's estoppel language.

20       MR. HUEBNER:  Understood, your Honor.

21       THE COURT:  You know, I'm asking you under the law.

22       MR. HUEBNER:  Your Honor, I think fundamentally

23  that's the argument.  The argument under the Michigan Gaming

24  Act is that, but I think that, frankly, the equitable context

25  is a little bit relevant.

1          THE COURT:  I don't mean to deny it's relevant, but

2     that wasn't my question.

3          MR. HUEBNER:  Fair enough, your Honor.  So the other

4     thing you asked about was, well, what if they were unsecured?

5     Does it ever happen that you settle, you got a great deal

6     from someone that has rights, claims, et cetera, against you?

7          THE COURT:  Somebody wants to give you something

8     there.

9          MR. HUEBNER:  Yeah.  Your Honor, I think this is

10    essentially what I said, that under --

11         THE COURT:  Excellent.

12         MR. HUEBNER:  -- 432.212(3)(a)(v) and (vi) it's an

13    improvement of quality of life.  And then the second argument

14    is that the sixth subprong is relief to taxpayers of one or

15    more taxes.  This is before fended future tax because had we

16    had the termination payment, which, by the way, was $400

17    million in 2009, there would have been obviously terrifying

18    tax increases in order to potentially satisfy the obligation.

19         Your Honor, but back to the other paradigm because I

20    think as long as any one of these works, I think there's an

21    argument that it makes sense.  It happens all the time.

22    There are plans done every day where unsecured creditors as

23    their distribution get secured notes.  That's the deal.

24         THE COURT:  I agree with that a hundred percent, and

25    the issue there is is the settlement in the best interest,

 1  but that argument by itself doesn't deal with the legality of

 2  the lien issue.

 3          MR. HUEBNER:  Correct, your Honor.  And, look, I

 4  can't do better than --

 5          THE COURT:  Okay.

 6          MR. HUEBNER:  -- 15 fraudulent transfer cases where

 7  debtors say your liens are illegal, your liens are avoidable,

 8  your liens were actual fraud.  Many times the courts bring

 9  people back into chambers and say, "You guys better be

10  willing to tolerate a" --

11          THE COURT:  Right, but the lien that's given then

12  in settlement is not even arguably an illegal lien.  It's a

13  lien that the debtor has the legal capacity to give.

14          MR. HUEBNER:  I think what is really done is that

15  the potential to challenge the existing lien is forever

16  retired, and that's actually what's most important to us,

17  your Honor, because we're being paid --

18          THE COURT:  Ah, let me ask you about that.  It may

19  be --

20          MR. HUEBNER:  The answer is yes.  We'll delete

21  Romanette i.

22          THE COURT:  Let me ask the question first.  That's

23  usually how we do things.  If I read the order and the

24  settlement correctly, it is not just that the city is

25  agreeing not to challenge this lien up to 85 million, it is

1    the Court is finding that it is valid, binding, blah, blah,

2    blah.

3            MR. HUEBNER:  Yes.  That's Romanette i, your Honor.

4            THE COURT:  You know, to some that may be splitting

5    hairs, but it feels very different and that that difference

6    is big.

7            MR. HUEBNER:  Right.  So let me help, your Honor,

8    and I'm happy to report I intuited correctly.  We only still

9    need the liens because one of the actually entirely pro-city

10   results of the next 46 days was that we potentially get paid

11   over a long period of time, and we're just concerned that we

12   really get paid.  That's all this is for.  If it would be

13   very helpful to the Court to delete paragraph 11, Romanette

14   i, in its entirety, which is the language that I, frankly,

15   think everyone has pause on, although, candidly, we do

16   genuinely believe it's appropriate and it's typical when the

17   terms of disputed liens are settled, and merely go with what

18   is still very powerful, make no mistake about it, Romanette

19   ii of paragraph 11, that no party can challenge them but that

20   a finding is not, in fact, being made that they are and shall

21   continue to be valid, that's good enough for us.  And I speak

22   both for B of A and UBS.  We just want credits comfort, your

23   Honor, that by taking this very, very substantial haircut on

24   what we believe to be secured claims and agreeing to have

25   them paid over time we're actually going to get paid.  And if

1  that mechanic would give the Court the comfort on this point,

2  we're happy to concede it for the Court's pleasure.

3       THE COURT: Would you repeat what you said a moment

4  ago about why you decided you needed the security interest?

5       MR. HUEBNER: Yes, your Honor. The agreement with

6  the debtors allows them to stretch this out over a period

7  that, in fact, is not known in duration because if their plan

8  emergence --

9       THE COURT: It may extend post-confirmation.

10       MR. HUEBNER: Well, first of all, confirmation could

11  be delayed, so when they say 180 plus confirmation, we've all

12  been assuming it's October 15th, but the one thing I know

13  about this case is that a lot of people don't like a lot of

14  the schedules that are set and think that there are a lot of

15  complicated issues they need to talk about for a long time.

16       THE COURT: I like my schedule.

17       MR. HUEBNER: You didn't hear us objecting. We

18  haven't objected to anything, your Honor. We're like --

19  we're the best friend here. So we just don't know what the

20  time period is; right? And so the answer is because of that,

21  looking to this collateral pool to know that irrespective of

22  other things that happen we have a guaranteed source of

23  payment for the city for --

24       THE COURT: All right. But here's my question given

25  that that was your argument to me as to why you need the

1 security interest.  How do we deal -- or how do you deal with

2 Section 943(b)(4)?

3          MR. HUEBNER:  Of which document, your Honor?

4          THE COURT:  The Bankruptcy Code.

5          MR. HUEBNER:  Okay.

6          THE COURT:  I'm sorry.  I should have said that,

7 which requires, as a condition of confirmation, that the

8 debtor is not prohibited by law from taking any action

9 necessary to carry out the plan.

10          MR. HUEBNER:  Your Honor, I just --

11          THE COURT:  Doesn't that require -- if this dispute

12 were in the plan, wouldn't the Court be required by this

13 provision to find that this is a legal lien, and if the

14 answer to that question is "yes," why should the answer be

15 any different in this context?

16          MR. HUEBNER:  Your Honor, I apologize.

17          THE COURT:  Okay.

18          MR. HUEBNER:  I hadn't heard this before, so I --

19          THE COURT:  That's okay.

20          MR. HUEBNER:  -- didn't know where -- there are a

21 lot of section numbers we're about to talk about.

22          THE COURT:  Okay.

23          MR. HUEBNER:  Your Honor, I think the answer is,

24 respectfully, I don't think it's a problem.  I think if we

25 take out Romanette i and it merely is a statement that it

1 cannot be challenged, I don't think there's any remaining

2 argument that that is somehow unlawful.  The fact that

3 someone has agreed to put away a gun with -- and I apologize

4 for the martial analogy -- to put away any potential

5 disabling weapon as to a counterparty's rights cannot be

6 viewed --

7          THE COURT:  Fataling argument.  Thank you.

8          MR. HUEBNER:  -- as per se -- as per se illegal.

9          THE COURT:  What paragraph are you referring to,

10 sir?

11          MR. HUEBNER:  In the order?

12          THE COURT:  Yes.

13          MR. HUEBNER:  Your Honor, I think that the troubling

14 paragraph is paragraph 11.

15          THE COURT:  11.  Okay.

16          MR. HUEBNER:  And I think Romanette i is where

17 everybody's focus has been, which is, your Honor, how can you

18 validate these liens that we believe you believe are

19 unlawful.  And, again, we've given you a litany of reasons

20 why we think it's entirely appropriate, but if we take it

21 out, I would like to respectfully suggest that it goes all

22 the way and beyond towards alleviating the concerns.

23          Your Honor, the next thing, I guess, it's probably

24 time to address is Syncora.  Unlike the other objectors, who

25 are basically saying you should have cut a better deal for

 1    various reasons -- we love your claims, but your liens are

 2    bad; we hate your claims; we hate your claims and you owe

 3    us -- those are all ultimately business judgment attacks, but

 4    Syncora's attack, which I have to say was extraordinarily

 5    well-presented -- and I really give kudos to Mr. Hackney --

 6    is essentially that you cannot approve it even if you really

 7    want to and you think it's great for the city.  Your Honor,

 8    Syncora's attack --

 9              THE COURT:  Well, in fairness, that was the thrust

10    of the argument made by counsel for the contract

11    administrator as well.  She's still here.

12              MR. HUEBNER:  That's correct, but I will deal with

13    it firstly with respect to Syncora and then address the

14    contract administrator.  Your Honor, it's not today's issue,

15    and let me explain why.  The governing law, which we cite at

16    length in our brief, is actually quite clear, and I'm

17    delighted to talk about SportsStuff and, more importantly,

18    its progeny that are, in fact, on point.  There are no

19    findings in here about Syncora's rights limiting them from

20    pursuing any party that they want to.  Their basic view is,

21    if I can summarize, we're not allowed to do the settlement

22    without their consent, so we've reached their rights.  We

23    very strong --

24              THE COURT:  Oh, no.  I think it's much more

25    substantive than that.

1    MR. HUEBNER:  Your Honor, I'll get to the provisions

2  of the contracts --

3    THE COURT:  All right.

4    MR. HUEBNER:  -- in a minute, but, most

5  importantly -- you can read the order as many times as anyone

6  wants to -- the injunction provisions against the

7  counterparties who are in Syncora's shoes are nowhere to be

8  found.  What happened in SportsStuff was the debtor said to

9  the insurer --

10    THE COURT:  Well, but what I heard Mr. Hackney say

11  was his client insured a secured creditor who is now giving

12  up on a big amount of that security.

13    MR. HUEBNER:  Um-hmm --

14    THE COURT:  -- putting it, Syncora, at risk.

15    MR. HUEBNER:  Sure.  And let me address it head-on

16  because I think it's a great characterization.

17    THE COURT:  You know, so let's begin with the answer

18  to this question.  If this settlement is approved, does your

19  client maintain a claim against Syncora?

20    MR. HUEBNER:  Absolutely, your Honor, and let me

21  explain why.  Syncora did not insure a secured creditor, and

22  this is exactly what they didn't quite get accurate in their

23  very impressive deck.  In 2005 and 2006, your Honor, these

24  swaps were unsecured.  That is when the contract

25  administration agreement, of which they are so fond, was

1 executed, and it gave specific collateral as to which they

2 had rights.  The city, by the way, is not a party to that,

3 and so that's a dispute between us about what it means, and

4 someday a court is going to resolve that dispute.  In 2009

5 they were downgraded, and the city defaulted.  We had a right

6 to terminate, and the people came to us and said, "Please

7 don't.  We want to give you collateral."  This is the

8 critical point.  The 2009 grant of collateral in the

9 collateral agreement was a brand new grant that is not

10 covered by the CAA.  They're not a party to it.  They're not

11 even named in it as a third-party beneficiary.  They appear

12 exactly one time in the contract that governs the city's

13 pledge of collateral to us.  That one time is a written

14 amendment to this document is not valid unless signed by

15 parties, including them.  They don't appear in the remedy

16 section.  They don't appear anywhere else.  And lest you

17 think this is merely a matter of contract interpretation,

18 your Honor, we went on for about two and a half pages in our

19 brief with governing case law in exactly this fact pattern

20 where a counterparty said, "Well, let me put the document up

21 on the screen.  There it is.  You can't amend this without my

22 consent."  I litigated this up to the Second Circuit in Delta

23 where this exact argument was made, and in that and so many

24 other cases, the Court said stop, especially when you're in

25 bankruptcy, but even if you're not, settling claims and

1    rights and remedies is simply not an amendment.  It's not

2    what the provision governs.  If there was a 6.9.2 right that

3    they would have deserved -- and they didn't deserve it

4    because they were on the hook in 2009, as was the city -- and

5    the counterparties said we'll roll and not trigger this 400

6    million if we get and we control this new grant of collateral

7    to know that someday we will be paid even if we're not doing

8    it now.  And moreover, your Honor, there's an amazing absence

9    of law except, I respectfully and humbly assert, in our brief

10   because there's a lot of law in our brief about the fact that

11   later contracts trump earlier contracts and that specific

12   things govern over general things.  And their interpretation

13   of 692, which, by the way, is not incorporated by reference

14   into the contract administration -- into the collateral

15   agreement -- that's just not correct -- is that it sort of

16   overrides everything, and we can't do anything without their

17   consent unless they're in default, including, by the way,

18   things that are triggered by their own downgrade, so the

19   provision doesn't even make sense the way they're

20   interpreting it, but that's the critical argument.  And, your

21   Honor, this is exactly what the SportsStuff progeny say,

22   which is if a third-party creditor has a dispute about

23   whether or not a settlement between the debtor and one party

24   affect or limit its rights, as long as it's not enjoined from

25   pursuing them by the order, it's not the Bankruptcy Court's

1    showstopper. <u>SportsStuff</u> was the opposite. If we put in a

2    provision that said Syncora is forever enjoined from making

3    these allegations, I lose. I sit down. But let me tell you

4    what's really going on because the story line is actually

5    helpful, the 2006-2009 story line, and the Syncora story

6    line.

7         Your Honor, Syncora has been very thoughtful in its

8    conduct because we've asked them, "Are you still on the hook?

9    Are you our insurer?" and they won't answer. And they

10   certainly say lots of things like, "Probably not," "Maybe

11   not," "Definitely not." So we have no choice but to go

12   settle with --

13         MR. HACKNEY: Your Honor, I would object to this as

14   argument based on evidence that's not in the record.

15         THE COURT: I agree.

16         MR. HUEBNER: Your Honor, I would note that in their

17   brief -- and I was going to get to this in a minute, so this

18   is very ironic. In their brief right now on this matter,

19   they are the ones that actually said we offer to commute the

20   liability at zero and the swap counterparties --

21         THE COURT: Well, you can certainly talk about

22   what's in the brief, but you can't talk about what happened

23   when you went to them unless that's in the evidence in the

24   case.

25         MR. HUEBNER: Okay, your Honor, so let me rely on

 1   their brief because I think it's enough to tell the story.

 2           THE COURT:  All right.

 3           MR. HUEBNER:  What they're basically saying is --

 4   let me use an analogy, if I may, to tort law just for a

 5   second.  So we're the third-party, and someone injured us,

 6   and we have a claim.  And our insurer says we're not going to

 7   tell you whether we're going to cover you or not, but you

 8   better not try to settle with the tortfeasor.  And the only

 9   way I'm going to allow it is if you agree that I have no

10   liability, and if you let me totally off the hook and I never

11   have to pay a penny, then I won't object to your settlement.

12   But if you try to reserve a claim against me, I'm going to

13   try to keep you from getting zero from everybody until you

14   blink.  We have a lot of case law on that in our brief also,

15   your Honor, and so it's not new at all.  In fact, the last

16   four pages of our brief we argue and provide case law that

17   Syncora's actions as an insurer, which really, as you know,

18   your Honor, they're a huge COPs holder, so that's kind of

19   also what's really going on here -- our breach -- in breach

20   of their policy to us, and we are mitigating our damages

21   against the underlying obligor.  So, your Honor, I think

22   there are many, many reasons, and there's going to be a lot

23   to say someday about the insurers, but the important point

24   for this Court is that we don't believe today is that day.

25   And that's exactly what the settlement does.  We reserve all

1 of our claims against our insurer because we are out $200

2 million on swaps that we believe were both insured and

3 secured. We've settled with one of the two parties, and we

4 have remaining claims against the others.

5 THE COURT: You have a minute.

6 MR. HUEBNER: Your Honor, with respect to some of

7 the other arguments, I guess with a minute left, in

8 particular, I'm going to have to rely on my papers, but let

9 me just say this. Most of the arguments other than Syncora's

10 basically boil down to it's clear that we win. The debtors

11 should have gotten a better deal. The only evidence in this

12 proceeding is that the debtors got a great deal from Mr. Orr

13 and that they got 70 percent off of a secured claim and peace

14 on a critical set of revenue streams. Your Honor, even if

15 you accept at face value half of the objectors -- and that's

16 why debtors make these decisions because each objector wants

17 something else because of their own position, so let me just

18 pick one for a minute. Your Honor, their claims are

19 phenomenal, but their liens are terrible, so they should only

20 get 15 cents, not 30. Well, first of all, that's exactly

21 what business judgment and fiduciary duties are for, but just

22 take that for a minute to show how reasonable the settlement

23 is. We should have gotten 15, according to one objector. We

24 got 30. We thought we should have gotten a hundred. That

25 means there was an 85-cent spread. We only got one-sixth of

1   what our secured claim otherwise would have gotten us, so the

2   debtors actually got a monumental discount in reflection of

3   the fact that they view themselves in part -- in no small

4   part empowered by your Honor's views to avoid our liens.

5   This is an extremely reasonable settlement.  As you heard at

6   the very beginning of the hearing, which should not go

7   unnoticed, we worked very, very hard to resolve everything we

8   could.  With respect to the trustee's arguments, which you

9   asked me to come back to, that's exactly what the proviso

10  that your Honor pointed out is for.  It was actually a

11  surprise to me, having stayed up till very, very late working

12  with all the COPs holders' objectors for whom they are the

13  trustee and getting e-mails back saying, "We are resolved.

14  This addresses our concern," to have their trustee, who is

15  like the only person I didn't even know who was still in the

16  game, show up and say, "Wait.  We object."  The holders

17  themselves, who had been very zealous and active

18  representatives, agreed that this solved the problem on the

19  COPs.  Anything we heard that we could address we did.  We

20  strongly urge that the deal be approved.

21          THE COURT:  Thank you.  And we have 16 minutes left

22  for the city, please.

23                      REBUTTAL ARGUMENT

24          MS. BALL:  Thank you, your Honor.  I'd like to first

25  go to Mr. Goldberg's point.  I would remind the Court that

1    Mr. Orr did make it clear that he understood the Court's
2    direction -- go see who can settle; settle will be better --
3    and that he also understood in the settlement context going
4    for a mutual walk-away was not going to work, so I do think
5    we have evidence that he was aware of it, it was discussed,
6    and it was not at all ignored.

7            Your Honor, I would only echo the contract
8    construction that Mr. Huebner has tried to, once again,
9    remind us.  We have a deal that's almost ten years old,
10   unsecured deal, 2005, 2006.  Then these horrible events of
11   2009, which tortured virtually every city and most
12   homeowners, came about, and there was this patched-up deal in
13   2009, and that was the collateral agreement.  The
14   beneficiaries were the city and Syncora, and your Honor may
15   recall because we've been through it in August and again in
16   November and again in December, Syncora waived.  They signed
17   a waiver and consent to everything in that collateral
18   agreement.  And, your Honor, that contract that he said we
19   weren't arguing was exactly what I had up on the screen,
20   11.2, all the remedies will belong to the counterparties.
21   And as if that's not enough, this contract that they clearly
22   consented to because they benefitted also empowers the
23   counterparties to terminate the agreement.  It's the
24   counterparties' notice that ends the lien and agreement.
25   They consented to that.  They're in the hands of the

1  counterparties, and the contract is, in that respect, totally

2  consistent with the UCC that we cited as well as the cases

3  regarding bank law.

4        The other argument that I found very strange, your

5  Honor, is how is it that Syncora has standing to assert an

6  objection to an injunction against someone else.  I'm not

7  sure they have it.  I know your Honor raised standing in a

8  different context, in the context really of who can bring an

9  avoiding action to void this lien.  But I would submit, your

10 Honor, they have absolutely no standing, and, in fact, we do

11 know that Mr. Hertzberg represented to the Court that as soon

12 as they were aware of Butzel Long, they also sent this motion

13 as counsel for the service corps to Butzel Long.  So we would

14 challenge their standing to raise any objection on behalf of

15 the service corp.

16        Finally, your Honor, and I could go through how this

17 bar order is extremely narrow.  It just tries to effect this

18 release, and it only affects the situation where the

19 plaintiff is the city or the service corp, and it's the

20 third-party claim against the swap counterparties for

21 contractual indemnity, not contractual indemnity

22 contribution, very narrow and only would affect the

23 settlement.  And, in fact, that third-party defendant is made

24 whole because the city's claim is reduced by whatever, by

25 whatever the contribution share would be, so they're neutral.

1  So I do think it is very narrow.  It is not a broad third-

2  party injunction.

3          Finally, your Honor, on the void, voidability, I

4  could echo again what I believe to be the case and, which,

5  unfortunately we will have again in this case, your Honor.

6  If, in fact, something that was void under state law, be it a

7  claim under PA 34 or a lien under 436, it can't be the law,

8  your Honor, that you cannot compromise an action in some way,

9  and if that way may be never bringing an avoidance action,

10  then certainly we should be able to do that because, as you

11  know, your Honor may know from our plan we have every

12  intention, although we believe the COPs holders are not

13  creditors of the city and their claims are void and we

14  started a lawsuit to that effect, even in our plan, your

15  Honor, we've invited a settlement of what is a void claim, in

16  our view.  So I would urge the Court to be circumspect that

17  it really can't be the law if something is void under state

18  law that you're not empowered to assist the city in doing

19  something that's in the best interest of the city and its

20  residents to go forward.  And on that point -- and really I

21  do go back to Mr. Goldberg's point because he again and again

22  reaches out to you to make sure that we've all thought this

23  through, and one of the things that Mr. Orr reminded us was

24  when you had all these meetings, that the reasonable baseline

25  is, even if I had filed the motion that Mr. Goldberg rightly

1   recalled was prepared, not filed but prepared, that there was

2   still a substantial probability that there would be payments

3   throughout the duration of this litigation withheld into an

4   escrow somewhere, perhaps the status quo could be worse, not

5   available to the city.  We're talking about 17 percent of its

6   revenues.  One of the very attractive things to the city

7   about this settlement was it in ways mimics what would have

8   happened if we had litigated.  It's seeing money that's set

9   aside, but you know what?  Your Honor, it's going to resolve

10  the claim.  It's going to resolve the claim, so the city is

11  deprived of it as it would be while it was litigating,

12  although it might later get it back if it won.  It's going

13  towards a much reduced claim.  So, your Honor, the business

14  judgment I would suggest, your Honor, was carefully

15  considered, and it was the welfare of the city and assuring

16  it of access to a stable stream of cash that motivated the

17  settlement.

18          Finally, your Honor, to the extent exculpation was

19  an issue, your Honor, the banks are only seeking exculpation

20  if creditors are exculpated, and that all remains to be done.

21  And I have no doubt that they will be flexible, and I'm sure

22  they would volunteer that now so that we could remove that

23  issue.  Other than that, your Honor, if you have any

24  questions, I would be happy to try to answer them.

25          THE COURT:  No.  Thank you.  All right.  The Court

1  will take this matter under advisement.  I would like to give

2  you a decision a week from tomorrow on April 11th at 10 a.m.

3  in Judge Friedman's courtroom.  Any objections?  All right.

4  I will see you all then.

5           THE CLERK:  All rise.

6      (Proceedings concluded at 5:01 p.m.)

INDEX

                                                        Page

Opening Statement by Mr. Hertzberg                       8
Opening Statement by Mr. Marriott                       14
Opening Statement by Mr. Goldberg                       15
Opening Statement by Ms. Neville                        17
Opening Statement by Mr. Huebner                        17

WITNESSES:            Direct    Cross    Redirect   Voir Dire

Gaurav Malhotra         21    38/70/79/81                54
Kevyn Orr               88    110/132/138    152
                              143/145

Closing Argument by Ms. Ball                           159
Closing Argument by Mr. Hackney                        180
Closing Argument by Ms. Neville                        204
Closing Argument by Mr. Frimmer                        208
Closing Argument by Ms. Going                          224
Closing Argument by Mr. Goldberg                       232
Closing Argument by Mr. Huebner                        239
Rebuttal Argument by Ms. Ball                          258

EXHIBITS:                                        Received

City's Exhibit 143                                  29
City's Exhibit 144                                  29
City's Exhibit 145                                  87
City's Exhibit 146                                  87

     I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    April 9, 2014
_____          _____
Lois Garrett