# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| | ) |

### EEPK, FMS, WILMINGTON TRUST, AND FGIC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO THE CITY OF DETROIT IN CONNECTION WITH THE PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

_____

Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. (collectively "EEPK"), FMS Wertmanagement AöR ("FMS"), Wilmington Trust, National Association, as Successor Contract Administrator ("Wilmington Trust"), and Financial Guaranty Insurance Company ("FGIC"), by their undersigned attorneys and pursuant to Rule 34 of the Federal Rules of Civil Procedure, made applicable to this matter by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the *Third Amended Order Establishing Procedures, Deadline and Hearing Dates Relating to the Debtor's Plan of Adjustment* (together with any amendments thereto, the "Scheduling Order") [D.I. 3632], request that the City of Detroit, Michigan (the "City") produce for inspection, examination, and copying the Documents (defined below) set forth in the following requests. Production should be made on a rolling basis at the offices of Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103, Schiff Hardin, LLP, 233 S. Wacker Drive, Suite 6600, Chicago, Illinois 60606, Drinker Biddle & Reath LLP, 1177 Avenue of the Americas, 41st Floor, New York, New York 10036-2714, and Weil, Gotshal & Manges LLP, 700 Louisiana

1

Street, Suite 1600, Houston, Texas 77002, with such production to be completed in compliance with the deadlines imposed by the Bankruptcy Rules and the Scheduling Order.

## INSTRUCTIONS

A.     Production shall be made as the records are kept in the usual course of business, or shall be organized and labeled to correspond with the categories of this request.

B.     If any Documents (defined below) are not available for production because they have been misplaced, discarded, or destroyed, identify which Documents cannot be produced for these reasons, and state fully in writing the reasons that the Documents are unavailable.

C.     If any Document cannot be produced in full, it shall be produced to the maximum extent possible and the City shall specify in writing the reasons for its inability to produce the remainder.

D.     If any Documents are available but are not produced because of an objection, including an objection based on privilege, identify such Documents with particularity as to date, subject matter and the nature of the objection or privilege claim.

E.     If Documents called for are not available to you because they are in the custody or in control of a third person, identify such Documents and the third person in whose possession or control said Documents are to be found.

F.     Produce original Documents whenever such Documents are available to you.

G.     Produce all Documents that the City has produced (or in the future produces) to any creditor or party in interest other than EEPK, FMS, Wilmington Trust, or FGIC in response to a discovery request propounded in connection with the Plan.

H.     Produce all Documents available by virtue of being in possession of your attorneys or other agents.

2

I.        In accordance with Fed. R. Bankr. P. 7026, where a claim of privilege is asserted in objecting to any Document request or part thereof, and production is not provided on the basis of such assertion:

       1.      In asserting the privilege, the responding party shall, in the objection, identify with specificity, the nature of the privilege that is being claimed;

       2.      The following information should be provided in the objection, if known or reasonably available, unless divulging such information would cause disclosure of the allegedly privileged information: (a) the type of Document; (b) the general subject matter of the Document; (c) the date of the Document; and (d) such other information as is sufficient to identify the Document, including, where appropriate, the author, addressee, custodian, and any other recipient of the Document, and, where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

J.        The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "All" means "any and all."  "Any" means "any and all."  "Including" means "including but not limited to."  "And" and "or" encompasses both "and" and "or."  Words in the masculine, feminine or neuter shall include each of the other genders. The terms "all" and "each" shall be construed as all and each.

K.        These requests to produce shall be deemed to be continuing, and any additional Documents relating in any way to these requests to produce or your original responses that are acquired subsequent to the date of responding to these requests, up to and including the time of trial, shall be furnished to EEPK, FMS, Wilmington Trust, and FGIC promptly after such Documents are acquired as supplemental responses to these requests to produce.

3

## **DEFINITIONS**

As used in these requests, the meanings ascribed to the following terms are to be interpreted in accordance with the below definitions.

1.      All terms not otherwise defined herein shall have the meanings given to them in the Plan and Disclosure Statement.

2.      The term "Accounts Receivable" means amounts owed by any individual or entity to the City.

3.      The term "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

4.      The term "Blight Initiative" means the $520.3 million that the City intends to spend to remediate residential blight within the City as described in section IV.J.5 of the Disclosure Statement.

5.      The term "Collection" means the collection of over approximately 65,000 works of art displayed or stored at the Detroit Institute of Arts museum located at 5200 Woodward Avenue, Detroit, Michigan 48202 and on-site and off-site storage facilities.

6.      The term "Communication" means the transmittal of information by any means.

7.      The term "City" means the City of Detroit, Michigan, the Emergency Manager, the Office of the Emergency Manager, the City Council and the Mayor, as well as any past or present divisions, departments, officials, trustees, agents, affiliates, employees, attorneys, advisors, professionals, representatives and advisors of the foregoing, and all other persons acting or purporting to act on their behalf.

8.      The term "City Owned Parking Facilities" means the parking lots, parking garages, and other parking facilities owned by the City.

9.      The term "City Owned Real Property" means all real property owned by the City,

4

including, without limitation, the 60,000 parcels of vacant land and 7,800 vacant structures described in Section VII.A.5 of the Disclosure Statement.

10. The term "Collections Management Policy" means the current Detroit Institute of Arts Collection Management Policy and all amendments or modifications thereto.

11. "Concerning" means relating to, referring to, describing, evidencing, reflecting, embodying, or constituting.

12. The term "DIA Corp." means The Detroit Institute of Arts, a nonprofit corporation organized under the laws of the State of Michigan.

13. The term "Disclosure Statement" means the *Amended Disclosure Statement with Respect to Plan for the Adjustment of Debts of the City of Detroit* [D.I. 3382], as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto.

14. The term "DMA" means the Detroit Museum of Arts.

15. The term "Documents" and "Document" have the same full meaning as in Rule 34 of the Federal Rules of Civil Procedure and Rule 7034 of the Federal Rules of Bankruptcy Procedure and includes the original, any draft (whether disseminated or not) and any copy, regardless of origin or location, of any correspondence, letter, memorandum, electronic mail (e-mail), statement, summary, outline, contract, agreement, book, pamphlet, periodical, telegram, telecopy, telefax, wire, cable, record, study, report, schedule, diary, desk calendar, organizer, appointment book, photograph, reproduction, map, survey, drawing, chart, model, index, tape, data sheet or data processing card, data compilation, computerized information, data base or disk (including without limitation hard, soft, floppy, or compact), invoice, purchase order, ledger, journal, check (front and back), check stub, note, bond, assignment, transfer, account statement, tax report, tax schedule, financial statement, workpaper, business form, timesheet, log, inventory,

5

print-out, computer tape and notes of meetings, conferences, conversations or telephone conversations and any and all other written, printed, telecopied, telefaxed, transcribed, punched, taped, stored, filmed and graphic matter, however produced or reproduced, and specifically includes any preliminary note, outline, or draft of any of the foregoing in your custody, possession, or control.

16. The term "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 and any successor emergency manager.

17. The term "Expert Order" means the Order Regarding the Solicitation of Applications to Serve as the Court's Expert Witness on the Issue of Feasibility entered by the United States Bankruptcy Court for the Eastern District of Michigan – Southern Division on April 2, 2014 [D.I. 3610].

18. The term "Founders Society" means the Detroit Museum of Arts Founders' Society and all successors in interest thereto.

19. The term "Major Works" means works of art in the Collection that are estimated to have an individual value of $1 million or more, for insurance purposes or otherwise, and regardless of whether such works were purchased with City, Founder's Society, or other donor money, or donated or bequeathed in-kind.

20. The term "Museum" means the City-owned museum known as the Detroit Institute of Arts.

21. The term "1997 Operating Agreement" means Operating Agreement for the Detroit Institute of Arts between the City and the DIA Corp. (formerly known as the Founders Society or the Founders Society Detroit Institute of Arts), City Contract No. 77009, initially

6

approved on or about November 26, 1997, together with all exhibits, schedules, supplements, amendments, and modifications thereto.

22.     The term "person" means any natural person, business, or legal or governmental entity or association.

23.     The term "Petition Date" refers to July 18, 2013, the date on which the City filed a petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan

24.     The term "PLA" means the Public Lighting Authority created by the City on or about February 5, 2013.

25.     The term "Plan" means the *Amended Plan for the Adjustment of Debts of the City of Detroit* [D.I. 3380], as amended, supplemented, or modified from time to time, including any exhibits thereto and the Plan Supplement, which is incorporated by reference and made part of the Plan.

26.     The term "Plan Supplement" refers to documents or exhibits that are part of or referenced in the Plan but that the City intends to file after approval of the Disclosure Statement but before the commencement of the hearing on confirmation of the Plan.

27.     "You" or "Your" means the parties to whom this request is directed, and shall include anyone acting on behalf of those parties, over whom the parties have control, or which is, or may be subrogated to the parties' interests, including, without limitation, any officer, agent, servant, employee, attorney, insurance company, investigator, independent adjusting company, or other person or entity.

DMEAST#18745736v.3

# REQUESTS

## A.     General

1.     All Documents described, referenced, or relied upon by you in your responses to EEPK, FMS, Wilmington Trust, and FGIC's First Set of Interrogatories to the City.

2.     All Documents that the City has produced (or in the future produces) to any creditor or party in interest other than EEPK, FMS, Wilmington Trust, and  FGIC in response to a discovery request propounded in connection with the Plan by such other creditor or party in interest, including:

> a.     *Official Committee of Retiree's First Set of Requests to the Debtor for the Production of Documents* dated April 10, 2014 [D.I. 3941];
>
> b.     *Water and Sewer Trustee and Ad Hoc Bondholder Committee's Second Request for Production of Documents to Debtor* dated April 8, 2014 [D.I. 3916];
>
> c.     *Water and Sewer Trustee and Ad Hoc Bondholder Committee's First Request for Production of Documents to Debtor* dated April 3, 2014 [D.I. 3766];
>
> d.     *Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s First Request for the Production of Documents to the City of Detroit* dated March 28, 2014 [D.I. 3314]; and
>
> e.     *Ambac Assurance Corporation's First Request for Documents to the Debtor* dated March 18, 2014 [D.I. 3057].

3.     All Documents that you intend to introduce into evidence at the confirmation hearing or at any other hearing related or ancillary to confirmation of the Plan.

4.     All Documents and all drafts of Documents referenced as exhibits to the Disclosure Statement or the Plan.

5.     All Documents and all drafts of Documents that are to be included in any Plan Supplement.

8

## B. General Communications With Elected Officials

6. All Documents evidencing Communications from January 1, 2013, to present, by, between, or among the City and any elected official of the State of Michigan or any representative or staff of any elected official of the State of Michigan, concerning any of the following: (a) the Disclosure Statement, the Plan, or the Plan Supplement, (b) the Collection or the DIA Settlement, (c) the City Owned Real Property or Blight Initiative, (d) the DWSD or any transaction related thereto, (e) improving the collection of Accounts Receivable, (f) the City Owned Parking Facilities, (g) the Pension Claims, the OPEB Claims, or the State Contribution Agreement, (h) the Plan COP Settlement, (i) the potential or estimated recoveries of each Class of Unsecured Claims; (j) operational improvements made or that could be made by the City, or (k) the Exit Facility.

## C. Factual and Expert Witness Documents

7. All Documents concerning compensation to be paid to each witness the City expects or intends to call to testify as an expert in connection with Plan confirmation, including, without limitation, Documents evidencing Communication between the City and such witness concerning such compensation.

8. All Documents concerning facts or data supplied by the City to any witness the City expects or intends to call to testify as an expert in connection with Plan confirmation and upon which the expert relied in forming the opinions to be expressed, including, without limitation, Documents evidencing Communication between the City and such witness concerning facts or data so supplied.

9. All Documents concerning Communications between the City and any witness the City expects or intends to call to testify as an expert in connection with Plan confirmation

9

concerning assumptions provided to any witness the City expects or intends to call to testify as an expert and upon which assumptions such witness relied in forming the opinions to be expressed.

10.     All Documents that have been provided to, reviewed by, or prepared by or for any expert witness the City expects or intends to call to testify in connection with confirmation of the Plan.

11.     All Documents concerning compensation to be paid to each witness appointed by the Court pursuant to the Expert Order to testify as an expert in connection with Plan confirmation, including, without limitation, Documents evidencing Communication between the City and such witness concerning such compensation.

12.     All Documents concerning facts or data supplied by the City to any witness appointed by the Court pursuant to the Expert Order to testify as an expert in connection with Plan confirmation.

13.     All Documents concerning Communications between the City and any witness appointed by the Court pursuant to the Expert Order to testify as an expert in connection with Plan confirmation concerning assumptions provided to any such witness.

14.     All Documents that have been provided to, reviewed by, or prepared by or for any expert witness appointed by the Court pursuant to the Expert Order.

15.     The current resume or *curriculum vitae* for each person the City expects or intends to call to testify as an expert in connection with Plan confirmation.

16.     The current resume or *curriculum vitae* for each person the City expects or intends to call as a fact witness in connection with Plan confirmation.

17.     All Documents concerning Communications between the City and any fact

witness that may testify on behalf of the City at the Plan confirmation hearing.

D.     **General Elements of Plan Confirmation**

18.     All Documents and Communications concerning the City's ability to satisfy its burden under section 1129(a) of the Bankruptcy Code, as incorporated into chapter 9 of the Bankruptcy Code.

19.     All Documents and Communications concerning the City's ability to satisfy its burden that the Plan is "fair and equitable" and does not "discriminate unfairly" under section 1129(b) of the Bankruptcy Code, as incorporated into chapter 9 of the Bankruptcy Code.

20.     All Documents and Communications concerning the City's ability to satisfy its burden under section 943(b) of the Bankruptcy Code.

21.     All Documents and Communications concerning the City's justification for treating GRS Pension Claims and PFRS Pension Claims differently than other Unsecured Claims.

22.     All Documents and Communications concerning the City's ability to satisfy its burden that the Plan is in the "best interest of creditors" within the meaning of section 943(b)(7) of the Bankruptcy Code.

23.     All Documents and Communications concerning the City's ability to satisfy its burden that the Plan is feasible within the meaning of section 943(b)(7) of the Bankruptcy Code.

24.     All Documents and Communications concerning whether the City is prohibited by law from taking any action necessary to carry out the Plan within the meaning of section 943(b)(4) of the Bankruptcy Code.

25.     All Documents and Communications regarding the City's potential sources of recovery for creditors.

**E.** **Assets and Settlements**

26.    All Documents and Communications concerning which assets of the City are necessary for essential government services.

**1.** **Detroit Institute of Arts**

27.    All Documents and Communications concerning those works of art in the Collection that may have been given an estimated value (or range of values) by the City or DIA Corp., for insurance purposes or otherwise, of $1 million or more.

28.    All Documents concerning information pertaining to the Collection, including, without limitation, artist, medium, accession date, credit and provenance.

29.    All Documents and Communications evidencing the conveyance(s) of the assets of the DMA to the City, pursuant to Michigan Public Act 67 of 1919 and section 7(c) of the Detroit City Charter of 1918, including, without limitation, all contracts, deeds, City Council minutes, and Art Commission records effecting, authorizing, ratifying, and/or describing such conveyance(s).

30.    All Documents and Communications concerning the City's ownership interest in, and any restrictions on the transfer of, the Collection or any part of the Collection, including, without limitation, the part of the Collection that has not been appraised by Christie's.

31.    All Documents and Communications concerning any restrictions placed by donor(s) on the Founder's Society, the DIA Corp., the City or the Museum with respect to the use, display, reproduction, sale, transfer, or disposition of the Major Works that became part of the Collection as the result of a donation, gift, or bequest.

32.    All Documents and Communications concerning restrictions placed by the Founder's Society or the DIA Corp. on the City or the Museum with respect to each of the Major

Works transferred to the City or the Museum by either the Founder's Society or the Museum.

33.    The "bill of sale for all of the art collection of the Detroit Museum of Arts" that is described in the Report by Councilman Nagel at 1783, *Journal of the Common Council*, 18 November 1919, and which the Controller for the City of Detroit "filed . . . for record," as described in the Report by the Controller at 1885, *Journal of the Common Council*, 16 December 1919.

34.    The Minutes from the Detroit Museum of Art's Board of Trustees meeting, dated September 12, 1919.

35.    All Documents and Communications concerning the DIA Settlement.

36.    All Documents and Communications concerning (a) the potential monetization of the artwork held at the DIA other than pursuant to the DIA Settlement (including, without limitation, offers to purchase or finance or lease or expressions of interest in purchasing or financing or leasing the artwork), (b) the potential or estimated revenue from such monetization, and (c) the reasons why such monetization has not been pursued by the City.

37.    All Documents and Communications concerning the status of the DIA Settlement, including, without limitation, the status of (a) the Foundations' commitments, (b) the commitment by DIA Corp., (c) the City's efforts to obtain all necessary approvals, and (d) efforts to satisfy all conditions precedent to the Foundations' commitments, including the affirmation by County authorities of certain existing funding obligations with respect to DIA Corp and the approval of the DIA Settlement by the Attorney General for the State.

38.    All Documents and Communications concerning the risks associated with the execution of effectiveness of the DIA Settlement.

39.    All Documents and Communications concerning the claims and issues to be

resolved pursuant to the DIA Settlement.

40.     All Documents and Communications concerning the strengths and weaknesses of the issues to be resolved pursuant to the DIA Settlement.

41.     All Documents and Communications concerning the City's assessment of why the DIA Settlement is reasonable.

42.     All Documents and Communications concerning the projected recoveries for each Class of Unsecured Claims, assuming the DIA Settlement does not become effective.

43.     All Documents and Communications concerning the treatment of the Collection if the DIA Settlement is not consummated.

44.     All Documents and Communications concerning the present value of the DIA Settlement Proceeds.

45.     The 1997 Operating Agreement.

46.     All Documents and Communications concerning the operational relationship between the City and DIA Corp. concerning the Museum or the Collection.

47.     All Documents and Communications concerning the operational relationship between the City and the Founder's Society concerning the Museum or the Collection.

48.     The annually prepared financial statements, whether audited or unaudited, for the DIA Corp.

49.     The Collections Management Policy.

50.     Each and every City, federal and state tax return filed by DIA Corp. from 1997 to present.

51.     All inventories compiled and/or received by the City's Arts Commission, including any inventories compiled pursuant to section F(2)(4) of the 1997 Operating

14

Agreement.

52. All Documents concerning the Collection constituting part of each and every tax return filed by the City.

53. All Documents and Communications concerning the value of the Collection or any part thereof, including the following:

      a.      any and all insurance policies (including documentation of applicable coverage limits) currently held by the City, DMA, or DIA Corp. in connection the Collection (or any part thereof), including, without limitation, any and all insurance policies obtained by DIA Corp. pursuant to sections F(15)(a) and (b) of the 1997 Operating Agreement; and

      b.      all Documents and Communications concerning work performed on behalf of the City or DIA Corp. by Christie's, including the basis for the scope of Christie's appraisal of the Collection.

54. All Documents and Communications concerning the registration of any object or work of art in the Collection as being held in charitable trust.

55. All Documents and Communications evidencing the DIA Settlement, including, without limitation, the documents to be attached to the Plan as Exhibit I.A.80.

56. All Documents and Communications concerning restrictions or limitations on the use, display, reproduction, sale, transfer, or disposition of each and every of object or work that is a part of the Collection as the result of a donation, gift, bequest, or otherwise, including, without limitation, restrictions or limitations on the use or disposition of each object or work that is part of the Collection imposed by the donor(s) or that otherwise exist.

57. All Documents concerning Communications between the City and anyone in the Michigan Attorney General's office concerning the Collection, the DIA Settlement, the Foundation Commitments, or the State Contribution.

58. All Documents and Communications concerning any valuation of the Museum Assets listed on Exhibit A to Exhibit I.A.79 of the Plan.

15

59.     All Documents and Communications concerning audience, participation and/or visitor logs or surveys relating to the DIA.

60.     All Documents and Communications concerning attendance at the DIA.

61.     All Documents and Communications concerning membership of the DIA Corp.

62.     All insurance policies relating to the Collection from 1997 to present.

**2.     State Contribution Agreement**

63.     All Documents and Communications concerning the State Contribution Agreement.

64.     All Documents and Communications concerning the State Settlement Benefit Amount.

65.     All Documents and Communications concerning any approvals by any branch of the government of the State of Michigan required for the State Contribution Agreement to become effective, including the status of and any risks associated with obtaining such approvals.

66.     All Documents and Communications concerning the status of, and any risks associated with, the fulfillment of any of the conditions to effectiveness of the State Contribution Agreement.

67.     All Documents and Communications concerning the estimated percentage recoveries to each Class of Unsecured Claims, assuming the State Contribution Agreement does not become effective and/or the full amount of the State Contribution is not received.

68.     All Documents and Communications concerning the present value of the State Contribution Amount.

69.     All Documents and Communications concerning the claims against the State and State Related Entities that will be released pursuant to Section III.D.7.b of the Plan if the State

16

Contribution Agreement is consummated.

**3.** **Accounts Receivable**

70.     All Documents and Communications concerning the Accounts Receivable, including, without limitation, (a) the category, (b) nature, (c) the amount of such accounts receivable, and (d) the collectability of such accounts receivable.

71.     All Documents and Communications concerning the status of the City's efforts to improve collection on the Accounts Receivable.

72.     All Documents and Communications concerning any contracts between the City and all collection agencies concerning the collection of Accounts Receivable.

73.     All Documents and Communications concerning the value or collectability of the Accounts Receivable.

**4.** **DWSD**

74.     All Documents and Communications concerning the DWSD Transaction, the GWLA, or any potential privatization of all or part of the DWSD.

75.     All Documents evidencing Communications concerning the DWSD Transaction, the GWLA, or any potential privatization of all or part of the DWSD including, without limitation, communications between the City and (i) any representative of Wayne, Oakland, or Macomb counties, or (ii) any person solicited to provide proposals and/or bids to the City.

76.     All Documents and Communications concerning all proposals and analyses related to restructuring DWSD, including, without limitation, costs of such restructuring and the actual or projected resulting savings or value to be realized by the City from such restructuring.

77.     The feasibility report, together with any exhibits and other documents attached thereto, prepared by the Foster Group relating to the DWSD.

78.     The Conway MacKenzie Business Plan, together with any exhibits or other documents attached thereto.

79.     The OHM Advisors Capital Plan, together with any exhibits or other documents attached thereto.

80.     All system assessments, projections, and/or capital plans prepared by third parties (other than the Conway MacKenzie Business Plan, OHM Advisors Capital Plan, and the Foster Group Feasibility Report) concerning the DWSD.

81.     All Documents and Communications concerning a rate agreement between the City and the DWSD.

82.     All Documents and Communications concerning the operational structure of the DWSD, including, without limitation, all documents concerning the management, corporate governance, and/or outsourcing proposals for the DWSD.

83.     All Documents and Communications concerning the authority and ability of the DWSD to prefund its allocable share of the GRS UAAL to the GRS.

84.     All Documents and Communications concerning any necessary approvals for the DWSD to prefund its allocable share of the GRS UAAL to the GRS.

85.     All Documents and Communications concerning the estimated percentage recoveries for each Class of Unsecured Claims, assuming no amounts are received on an accelerated basis from DWSD for its portion of the GRS UAAL.

86.     All Documents and Communications concerning accounts receivable owed to the DWSD, including, without limitation, (a) the category, (b) nature, (c) the amount of such accounts receivable, and (d) the collectability of such accounts receivable.

87.     All Documents and Communications concerning any contracts between the

18

DWSD and collection agencies concerning the collection of accounts receivable owed to DWSD.

88. All documents concerning the value or collectability of the accounts receivable owed to DWSD.

### 5. City-Owned Land and Blight Initiative

89. All Documents and Communications concerning the City's efforts to enter into a transaction or series of transactions to monetize the City-owned land referenced in section III.A.5(b) of the Disclosure Statement.

90. All Documents and Communications concerning the City's strategy for treating the City-owned land referenced in section VII.A.5(b) of the Disclosure Statement, including with respect to any proceeds thereof.

91. All Documents and Communications prepared by Ernst & Young LLP concerning the City-owned land referenced in section VII.A.5(b) of the Disclosure Statement.

92. All Documents and Communications concerning the value of the City-owned land.

93. All Documents and Communications from January 1, 2013, concerning the City's efforts and/or strategy for removing blight.

94. The budget for the Blight Initiative.

95. All Documents and Communications concerning potential funding sources for the Blight Initiative.

96. All Documents and Communications analyzing the potential impact, if any, of the Blight Initiative upon the City and its revitalization efforts.

97. All Documents and Communications analyzing alternatives to the Blight Initiative.

19

**6.** **Parking**

98.     All Documents and Communications concerning all reports, including drafts, being prepared by any parking specialist on behalf of the City, as referenced on page 71, section VII.A.3.b.(iii) in the Disclosure Statement.

99.     All Documents and Communications concerning the City's efforts to enter into a transaction or series of transactions to monetize the City-owned parking facilities.

**7.** **Miscellaneous City-Owned Property**

100.     All Documents and Communications concerning the valuation and/or monetization of City-owned assets valued at or more than $1 million, including, without limitation, (a) artwork owned or held in the DIA, (b) Detroit-Windsor Tunnel, (c) the Veterans' Memorial Building, (d) City-owned parking facilities, (e) Coleman Young Airport, (f) Joe Louis Arena, (g) Belle Isle, and (h) City-owned land referenced in section VII.A.5(b) of the Disclosure Statement.

**F.** **Revenue Projections**

101.     All Documents and Communications concerning the development and formulation of the City's Projections attached as Exhibits I and J to the Disclosure Statement, including, without limitation, the assumptions underlying the Projections, and the anticipated or potential impact on the Projections with respect to any changes made to these assumptions.

102.     All Documents and Communications concerning the historical tax revenues and chargebacks from Wayne County from 2000 to present.

103.     All Documents and Communications concerning any research or analysis conducted by or for the City related to its ability (or inability) to raise additional revenue through (a) increases of existing taxes, assessments, or user fees; (b) the levying of new taxes,

20

assessments, or user fees; or (c) otherwise.

104.    The Assessing Division Corrective Action Plan, including all drafts and exhibits thereto.

105.    All Documents and Communications concerning the calculations and/or determinations of growth rates relevant to the income tax revenue projections included in the most recent Ten-Year Summary of Restructuring Initiatives, including, without limitation, all documents and communications supporting any assumptions included in the Ten-Year Summary as to:  (a) the City's population growth; (b) employment in the City and its allocation between residents and non-residents; and (c) average wage assumptions.

106.    All Documents and Communications concerning the calculations and/or determinations of growth rates relevant to the property tax revenue projections included in the most recent Ten-Year Summary of Restructuring Initiatives, including, without limitation, all documents and communications supporting any assumptions included in the Ten-Year Summary with respect to property tax revenues.

107.    All Documents and Communications concerning all research and/or analysis conducted by or for the City related to the impact of future development and/or tax revenue due to the Blight Initiative.

108.    All Documents and Communications concerning the calculations and/or determinations of growth rates relevant to the wagering tax revenue projections included in the most recent Ten-Year Summary of Restructuring Initiatives, including, without limitation, all documents and communications supporting any assumptions included in the Ten-Year Summary with respect to wagering tax revenues.

109.    All Documents and Communications concerning the calculations and/or

21

determinations of growth rates relevant to the state revenue sharing projections included in the most recent Ten-Year Summary of Restructuring Initiatives, including, without limitation, all documents and communications supporting any assumptions included in the Ten-Year Summary with respect to state revenue sharing.

110.    All Documents and Communications concerning the calculations and/or assumptions made by the City with respect to the "General Funds" included in the most recent Ten-Year Summary of Restructuring Initiatives, including, without limitation, all Documents and Communications supporting any assumptions included in the Ten-Year Summary as to Enterprise Fund payments for POC Debt service, and Grant Revenue.

111.    All Documents and Communications concerning the likelihood of implementation of the Restructuring Initiatives in the Ten-Year Plan.

112.    All Documents and Communications concerning the development of the Ten-Year Plan.

113.    All Documents and Communications that support or refute the City's projection that the population will continue to decline through 2020.

114.    All Documents and Communications concerning the City's efforts to form Business Improvement Districts to generate revenue for, among other things, blight reduction, public safety, capital improvements, and/or "quality of life" issues.

115.    All Documents and Communications that support or refute the City's growth assumptions from 2015 through 2023.

116.    All Documents and Communications that support or refute the City's growth assumptions with respect to the casinos and wagering revenues.

117.    All Documents and Communications constituting the Property Assessment

22

Valuation as of December 31, 2013.

118. All Documents and Communications concerning the City's efforts to address the material weaknesses cited in the 2012 auditor's management letter regarding internal controls for financial and accounting operations.

**G.** **Claim Treatment, Recovery, & Value**

119. All Documents and Communications concerning the City's estimate of the aggregate allowed amount of, and the recoveries on, the COP Claims and the basis for those estimates.

120. All Documents and Communications constituting the Plan COP Settlement Documents.

121. All Documents and Communications concerning the Plan COP Settlement Documents.

122. All Documents and Communications concerning the City's estimate of the aggregate allowed amount of, and recoveries on, Other Unsecured Claims, and the basis for such estimate.

123. All Documents and Communications concerning the City's estimate of the aggregate allowed amount of, and recoveries on, the GRS Pension Claims, and the basis for such estimate.

124. All Documents and Communications concerning the City's estimate of the aggregate allowed amount of, and recoveries on, the PFRS Pension Claims, and the basis for such estimate.

125. All Documents and Communications that support or refute the basis for the City providing a higher percentage of recovery to holders of GRS Pension Claims and PFRS Pension

DMEAST#18745736v.3

Claim than to other holders of Unsecured Claims including holders of COP Claims.

126. All Documents and Communications concerning the City's decision to provide holders of GRS Pension Claims and PFRS Pension Claims recoveries in the form of Cash and to provide other holders of Unsecured Claims recoveries in the form of notes.

127. All Documents and Communications concerning the City's decision to provide proceeds from the DIA Settlement solely to holders of PFRS Pension Claims and GRS Pension Claims.

128. All Documents and Communications concerning the City's decision to provide proceeds from the State Contribution Agreement solely to holders of PFRS Pension Claims and GRS Pension Claims.

129. All Documents and Communications concerning the basis of the classification and treatment of claims held by the Downtown Development Authority.

130. All Documents and Communications concerning all research and/or analysis conducted by or for the City related to the validity, enforceability, or potential impairment of the claims held by the Downtown Development Authority against the City.

131. All Documents and Communications concerning the City's calculations of the estimated percentage recoveries for each Class of Unsecured Claims.

132. The Plan of Adjustment – 40 year projections, dated 03/30/2014 (the "**40 Year Projections**").

133. All Documents and Communications concerning the 40-Year Projections, including without limitation all prior and subsequent drafts thereof, and all documents and communications concerning the assumptions made by the City in formulating the 40 Year Projections, including with respect to appropriate discount rates for calculating projected

24

recoveries under the Plan.

134.    All Documents and Communications concerning the City's analysis of the estimated percentage recoveries for each Class of Unsecured Claims, assuming the City's chapter 9 case is dismissed and creditors are left to pursue their state law remedies.

**H.    The Value of the Notes**

135.    All Documents and Communications concerning the City's valuation of the New B Notes.

136.    All Documents and Communications concerning the present value of the New B Notes, including the discount rate used in connection with calculating such value.

**I.    PLA Status**

137.    All Documents and Communications concerning the status of the transition of the operation and maintenance of the City's public lighting system to the PLA or PLA's efforts to construct and improve the public street lighting system, including, without limitation, the City's current estimate of the number of street lights that currently are not functioning.

**J.    Operational Improvements**

138.    All Documents and Communications concerning the City's efforts to improve operational efficiency and realize cost savings from improvements in operational efficiency.

139.    All Documents and Communications concerning any research and/or analysis prepared by or for the City related to efforts to reduce the City's labor costs from January 1, 2009 to the present, whether implemented, considered, or proposed.

**K.    Pension Claims/OPEB Claims**

140.    All Documents and Communications concerning the City's annual contributions to the PFRS and GRS pension plans from 2004 to present.

141.    All Documents and Communications concerning the City's projected annual contributions to the PFRS and GRS for retirement benefits following confirmation of the Plan through December 31, 2034, based on the actuarial assumptions used by the PFRS and GRS, respectively, before the Petition Date.

142.    All Documents and Communications concerning the City's projected annual contributions to the PFRS and GRS for retirement benefits following confirmation of the Plan through December 31, 2034, based on the actuarial assumptions used by the City in formulating the Plan.

143.    All Documents and Communications concerning the GRS Hybrid Pension Formula and the PFRS Hybrid Pension Formula, including, without limitation, (a) documents and communications that reflect the analysis conducted to derive those formulas, and (b) the figures and results such formulas may yield.

144.    All Documents and Communications concerning the sources of funding for the City's projected annual contributions to the PFRS and GRS pursuant to the Plan, assuming the DIA Settlement does not occur and/or the full amount of the DIA Settlement proceeds or the State Contribution is not received.

145.    All Documents and Communications concerning the calculation of the OPEB Claims (both PFRS and GRS) reflected in the Disclosure Statement, the Plan, and any Plan Supplement, including, without limitation, the underlying assumptions and methods used in the calculations.

146.    All Documents and Communications reflecting the total amount of OPEB Claims (both PFRS and GRS) paid or projected to be paid from the Petition Date to the Effective Date.

147.    All disability audits for PFRS and GRS.

DMEAST#18745736v.3

148.    All Documents and Communications concerning the basis for using a 6.25% discount rate for GRS, and a 6.50% discount rate for PFRS, including, without limitation, all assumptions made by the City in formulating these discount rates, and any other information supporting or refuting such rates.

149.    All Documents and Communications that support or refute the City's decision to classify OPEB allowable to active employees as a claim.

150.    The experience analysis covering the period July 1, 2002 through July 30, 2007 referenced in the GRS Actuarial Report of June 30, 2011.

151.    The most recent experience study for each of GRS and PFRS.

152.    All Documents and Communications concerning the GRS Accrued Liability Fund, including all Documents and Communications concerning (a) the balance of such fund from inception to date, (b) withdrawals from such fund, and (c) how the amounts in such fund factor into recoveries under the Plan.

153.    All Documents and Communications concerning the PFRS Accrued Liability Fund, including all documents and communications concerning (a) the balance of such fund from inception to date, (b) withdrawals from such fund, and (c) how the amounts in such fund factor into recoveries under the Plan.

154.    All Documents and Communications exchanged with Milliman, Inc., from January 1, 2010 to present.

155.    All Documents prepared by Milliman, Inc., from January 1, 2010 to present.

156.    All actuarial reports for each of GRS and PFRS from January 1, 2010 to present.

157.    The Report of Joseph Esuchanko dated March 8, 2011, including all exhibits and attachments thereto.

DMEAST#18745736v.3

158.    All Documents and Communications concerning and related to a potential successful claim against the GRS and the PFRS to disgorge the proceeds received in connection with the 2005 and 2006 COPs transactions.

159.    All Documents and Communications concerning the estimated UAAL for the GRS and the PFRS, assuming the GRS and the PFRS are required to disgorge any or all proceeds received in connection with the 2005 and 2006 COPs transactions.

160.    All Documents and Communications concerning the estimated percentage recoveries for each Class of Unsecured Claims, assuming the GRS and the PFRS are required to disgorge any or all proceeds received in connection with the 2005 and 2006 COPs transactions.

161.    All Documents and Communications concerning how the City fund the UAAL of the GRS and the PRFS in the event the GRS and the PFRS are required to disgorge any or all of the proceeds received in connection with the 2005 and 2006 COPs transactions.

**L.    Releases and Exculpation**

162.    All Documents and Communications concerning any claim that is subject to a release or exculpation in the Plan, including, without limitation, any claim held by the City or any creditors holding Pension Claims against the State of Michigan with respect to the State of Michigan's obligations concerning funding of any of the Pension Claims.

163.    All Documents and Communications concerning the potential liability to the City of any person or entity that would be entitled to a release or exculpation as proposed by the Plan.

**M.    Exit Facility**

164.    All Documents and Communications concerning the terms of the Exit Facility, including, without limitation, (a) the status of the City's efforts to obtain an Exit Facility, (b) the principal amount of financing sought, (c) the interest rate the City has requested, (d) the assets

that the City proposes to have serve as collateral for the Exit Facility, (e) the maturity date, and (f) the intended use of the proceeds of the Exit Facility.

165.     All Documents and Communications concerning any attempts by the City to obtain the Exit Facility, including, without limitations, (a) all documents and communications reflecting any requests for proposals ("RFPs") sent to financial institutions and other indications of interest by potential lenders, (b) proposed security packages, (c) the terms of the proposals received in response to the RFPs, (d) comparisons of the proposals, and (e) negotiations with financial institutions.

**N.     Governance**

166.     All Documents and Communications concerning any restrictions or limitations on, or oversight of, the management and operations of the City after its emergence from Chapter 9.

167.     All Documents and Communications concerning and related to the completion of Kevyn Orr's 18-month term as emergency manager pursuant to Public Act 436.

168.     All Documents and Communications concerning and related to whether the City's mayor and/or the City Council will be required to implement the Plan and the City's budget, including the Restructuring and Reinvestment Initiatives attached to the Disclosure Statement as Exhibit I.

**O.     Plan Development**

169.     All Documents and Communications concerning the City's negotiations with creditors over the terms of the Plan.

170.     All Documents and Communications concerning compromises the City reached with creditors over the terms of the Plan.

Dated:  April 11, 2014.                          Respectfully submitted,

*/s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER
 & PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
Tel:  (248) 642-0333
Fax:  (248) 642-0856
Email:  EJEssad@wwrplaw.com
Email:  mrjames@wwrplaw.com

and

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Tel:  (713) 546-5000
Fax:  (713) 224-9511
Email:  alfredo.perez@weil.com

*Attorneys for Financial Guaranty*
*Insurance Company*

*/s/ Matthew G. Summers*
Matthew G. Summers, Esquire
Ballard Spahr LLP
919 North Market Street, 11th Floor
Wilmington, Delaware 19801
Tel:  (302)  252-4428
Fax:  (302)  252-4466
E-mail: summersm@ballardspahr.com

Howard S. Sher, Esquire (P38337)
Jacob & Weingarten, P.C.
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan 48084
Tel:  (248) 649-1200
Fax:  (248) 649-2920
E-mail:howard@jacobweingarten.com

and

Vincent J. Marriott, III, Esquire
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Tel:  (215)  864-8236
Fax: (215)  864-9762
E-mail:marriott@ballardspahr.com

*Attorneys for Hypothekenbank Frankfurt AG,*
*Hypothekenbank Frankfurt International S.A.,*
*Erste Europäische Pfandbrief- und*
*Kommunalkreditbank Aktiengesellschaft in*
*Luxemburg S.A.*

/s/ Rick L. Frimmer
Rick L. Frimmer
J. Mark Fisher
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois  60606
Telephone:  (312) 258-5600
Facsimile:  (312) 258-5600
E-mail:  rfrimmer@schiffhardin.com
E-mail:  mfisher@schiffhardin.com
E-mail:  mott@schiffhardin.com

*Attorneys for FMS Wertmanagement AöR*

/s/ Heath D. Rosenblat
Kristin K. Going
Heath D. Rosenblat
Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone: (212) 248-3140
Facsimile:  (212) 248-3141
E-mail: Kristin.Going@dbr.com
E-mail: Heath.Rosenblat@dbr.com

*Counsel for Wilmington Trust, National Association, as Successor Contract Administrator*

31

## CERTIFICATE OF SERVICE

I, Matthew G. Summers, state that on April 11, 2014, I filed a copy of the foregoing First Request for Production of Documents using the Court's ECF system and I hereby certify that the Court's ECF system has served counsel to the City and all registered users that have appeared in the above-captioned case. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

/s/ Matthew G. Summers
Matthew G. Summers
E-mail: summersm@ballardspahr.com

32