## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | |
| | Chapter 9 |
| City of Detroit, Michigan, | Case No. 13-53846 |
| | Hon. Steven W. Rhodes |
| Debtor. | |

## REQUESTS BY THE RETIREE ASSOCIATION PARTIES TO THE DEBTOR CITY OF DETROIT, MICHIGAN FOR THE PRODUCTION OF DOCUMENTS

Pursuant to Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure and this Court's Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment, the Retired Detroit Police & Fire Fighters Association ("RDPFFA"), Donald Taylor, individually, and as President of the RDPFFA, and the Detroit Retired City Employees Association ("DRCEA") and Shirley V. Lightsey, individually, and as President of the DRCEA (collectively "Retiree Association Parties"), through their counsel, Lippitt O'Keefe Gornbein, PLLC and Silverman & Morris, P.L.L.C., hereby requests that the Debtor City of Detroit, Michigan ("City" or "Debtor") produce the documents requested below for inspection and copying at the offices of Lippitt O'Keefe Gornbein, PLLC, on or before April 25, 2014.

## DEFINITIONS

1. The term "Amended Disclosure Statement" means the "Amended Disclosure Statement with Respect to Amended Plan for the Adjustment of Debts of the City of Detroit," Dkt. No. 3382, filed on March 31, 2014.

2. The term "Amended Plan" or "Plan" means the Amended Plan for Adjustment of Debts of the City of Detroit, dated March 31, 2014 [Dkt. No. 3380], including all Exhibits and supplements thereto, and all modifications and amendments thereto.

3. The term "Bankruptcy Case" means In re City of Detroit, Michigan, Case No. 13-53846 (Bankr. E.D. Mich. 2013).

4. The term "City" or "Debtor" means the City of Detroit, Michigan.

5. The term "communication(s)" includes every manner of transmitting or receiving facts, information, opinion, or thoughts from one person to another person, whether orally, by documents, writing, electronic mail, or copy thereof, and to words transmitted by telephone, radio, or any method of voice recording.

6. The term "concerning" shall mean referring to, describing, evidencing, pertaining to, consisting of, constituting, reflecting, relating to, or in any way logically or factually connected with the mattered discussed.

7. The term "Debtor's Fact Witness List" means Debtor's April 8, 2014 filing, "City's List of Fact Witnesses Related to the Proposed Plan for the Adjustment of Debts," Doc. 3918.

8. The term "DPD" means the Detroit Police Department.

9. The term "DPD Plan of Action" means the January 9, 2014 Detroit Police Department Plan of Action.

10. The term "DIA" has the meaning ascribed to it in the Plan.

11. The term "DIA Settlement" has the meaning ascribed to it in the Plan.

12. The term "document" shall be used in the broadest sense and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any other mechanical process, or written or produced by hand, and whether sent or received or neither, and further includes all manner and medium of information recordation, storage, transmission, or retrieval, including, but not limited to (a) typing, handwriting, printing, or any other form of writing or marking on paper or other material; (b) tape recordings, microfilms, microfiche, and photocopies; and (c) any electronic, magnetic, or electromagnetic means of information storage and/or retrieval, including, but not limited to, electronic mail and responsive attachments, optical storage media, computer memory chips, computer tapes, hard disks, compact discs, floppy disks, and any other storage medium used in connection with electronic data processing (together

with the programming instructions and all other material necessary to understand or to use such tapes, disks, or other storage materials) obtained by detection devices, and including preliminary drafts of or marginal notes appearing on any document, however denominated or described.

13. The term "DWSD" shall have the meaning ascribed to it in the Plan.

14. The term "Emergency Manager" means the office of Kevyn D. Orr, Emergency Manager for the City pursuant to Public Act 436 of 2012.

15. The term "Foundations" shall have the meaning ascribed to it in the Plan.

16. The term "Mayor's Office" means the office of the Mayor of the City of Detroit, Michigan, including but not limited to the Mayor, the members of his administration, and supporting employees and staff members. The term is to be interpreted to include the mayoralties of both the Hon. Dave Bing, during his term as Mayor, and the Hon. Mike Duggan, during his term as Mayor.

17. The term "Orr" means Kevyn D. Orr, Emergency Manager for the City, identified as a witness on Debtor's Fact List.

18. The word "person" means any natural or artificial person, including business entities and other legal entities.

19. The term "Plan" or "Amended Plan" means the Amended Plan for Adjustment of Debts of the City of Detroit, dated March 31, 2014 [Dkt. No. 3380],

including all Exhibits and supplements thereto, and all modifications and amendments thereto.

20. The terms "regarding," "related to," or "relating to" shall mean directly or indirectly supporting, evidencing, describing, mentioning, referring to, contradicting, comprising or concerning.

21. The term "State" means the State of Michigan.

22. The term "Testimony Topics" means the specific testimony topics listed as to each individual identified in Debtor's Fact Witness List and any additional topics that Debtor decides to pursue or may pursue with Witnesses and/or Orr.

23. The term "Witnesses" means all of those individuals listed on Debtor's Fact Witness List except Orr.

24. Unless otherwise defined herein, capitalized terms have the meaning ascribed in the Plan.

25. Especially as used in the descriptions of specific topics below, the meaning of terms should be interpreted so as to be consistent with their use in the description of Testimony Topics in Debtor's Fact Witness List.

## INSTRUCTIONS

1. The terms "and" and "or" and "and/or" shall be construed conjunctively or disjunctively as necessary to make each particular request inclusive rather than exclusive.

2. The use of the word "including" shall be construed to mean "without limitation."

3. Reference to the singular in any of these requests shall also include a reference to the plural, and reference to the plural shall include a reference to the singular.

4. These requests encompass all documents in the City's possession, custody, or control, whether or not such documents were prepared by or for the City. Where documents in the City's possession, custody, or control are requested or inquired of, such request or inquiry includes documents in the possession, custody, or control of each of the City's employees, agents, accountants, attorneys, auditors, representatives, consultants, advisors, all other persons from which the City could obtain documents. The duty to produce documents shall not be limited or affected by the fact that the same document is available through another source.

5. The documents requested herein shall be produced as they are kept in the usual course of business or shall be organized and labeled according to the number of the document request. Electronically stored documents are to be produced in native file format. Documents that Debtor does not possess electronically are to be produced in either a .pdf or .tiff format and in a manner which reflects (a) document breaks; (b) physical boundaries such as boxes, folders, tabs, etc.; and (c) the document custodian.

6. Each document is to be produced with all non-identical copies and drafts thereof in their entirety without abbreviation or redaction (other than for a claim of privilege consistent with the Instructions herein). To the extent documents are kept or available in electronic format, such documents should be produced in their native and original electronic format.

7. If any document cannot be produced in full, it shall be produced to the maximum extent possible and the City shall specify in writing the reasons for their inability to produce the remainder.

8. If the City contends that no documents exist relating to all or part of a request, the City shall state this contention and respond as fully as possible to all parts of the request for which documents exist.

9. In the event that the City asserts any form of objection or privilege as a ground for not answering a document production request or any part of a request, please set forth the legal grounds and facts upon which the objection or privilege is based. If the objection relates to only part of the document production request, the balance of the document production request should be answered in full. With respect to any document which is withheld on a claim of privilege, the City shall provide, at the time its responses are due hereunder, a statement setting forth as to each such document the following information:

   a.     the name(s) of the sender(s) of the document;

b.     the name(s) of the author(s) of the document;

c.     the name(s) of the person(s) to whom the document or copies were sent;

d.     the date of the document;

e.     a brief description of the nature and subject matter of the document; and

f.     the nature of the privilege or the authority which is claimed to give rise to it.

10. If any documents requested have been destroyed, lost, mislaid, or are otherwise missing, please so state, specifying for each document or thing:

a.     the type of document;

b.     a description of the nature and contents of the document;

c.     the identity of the author;

d.     the circumstances under which it ceased to exist, was lost, mislaid, or otherwise missing;

e.     the identity of all person(s) having knowledge of the circumstances under which it ceased to exist, was lost, mislaid or otherwise missing; and

f.     the identity of all person(s) who had knowledge of the contents.

11. Should you obtain any other documents or information which would supplement or modify the documents or information supplied by you in

response to this request, you are directed, pursuant to Federal Rule of Civil Procedure 26(e), to give timely notice of such documents and information and to furnish the additional documents or information to the Committee without delay.

12.Unless stated otherwise, the time period applicable to the documents called for is from January 1, 2012 through the date of the document requests, subject to the City's ongoing obligation to supplement these responses under the applicable rules.

## REQUESTS

1.    With respect to the Witnesses and Orr, all documents, including communications, authored or prepared by any, some, or all of them regarding their respective Testimony Topics.

2.    With respect to the Witnesses, all communications with any, some, or all witnesses regarding their respective Testimony Topics.

3.    With respect to the Witnesses, all documents provided to any, some, or all of them regarding their respective Testimony Topics.

4.    With respect to the Witnesses and Orr, all documents reviewed by, shown to, or provided to them in preparation for their testimony.

5.     With respect to the Witnesses and Orr, all documents Debtor plans to or may introduce into evidence or show the witness or Court during the course of their testimony.

6.     All memoranda or communications prepared by an employee, agent, officer, or representative of Debtor or the Emergency Manager regarding any of the Testimony Topics.

7.     All memoranda or communications prepared by an employee, agent, officer, or representative of Debtor or the Emergency Manager regarding whether the Plan was or was not proposed in good faith.

8.     All memoranda or communications prepared by an employee, agent, officer, or representative of Debtor or the Emergency Manager regarding the City's historical, current, and future ability to provide adequate levels of municipal services, including but not limited to police and fire services.

9.     All reports, memoranda and/or other documents created in 2012 or thereafter concerning the need, or lack thereof, for additional police officers, police vehicles, modernized police vehicles, or police resources generally.

10.     All documents, reports, memorandum and data underlying the Detroit Police Department January 9, 2014 Plan of Action and/or relied upon in preparation of the Plan of Action.

11.    All communications with, or communications by, Chief of Police James Craig concerning the January 9, 2014 Plan of Action.

12.    Any and all reports prepared since January 1, 2013 related to evaluations and/or recommendations of the DPD's vehicle fleet. This includes any such reports and recommendations prepared by DPD members, any city consultants, including The Bratton Group, LLC, and Conway MacKenzie.  This request specifically includes but is not limited to:

    a.  The DPD's Vehicle Fleet Replacement Policy which was to be completed by the captain of Resource Management according to the DPD's Plan of Action;

    b.  The DPD's report documenting its comprehensive fleet analysis to determine how many police vehicles are needed, which was scheduled to be completed by the captain of Resource Management according to the DPD's Plan of Action;

    c.  Any reports prepared by the DPD, or its consultants, that provides a cost analysis for replacement of DPD vehicles;

    d.  Any reports prepared by the DPD, or its consultants, that provides a basis for the city to propose a funding level of $129.3 million to initiate and maintain a fleet vehicle replacement program on a three-year cycle in its Amended Plan;

e. Any reports that provide the basis for the following statement from Page 60 in the DPD's Plan of Action: "The DPD will begin to purchase and replace one-third of its fleet on an annual basis. Funds are available and have been identified within the Emergency Manager's restructuring dollars allocated to DPD."

13. Any and all reports prepared since January 1, 2013 related to evaluations and/or recommendations of DPD response times. This includes any such reports and recommendations prepared by DPD members, any city consultants, including The Bratton Group, LLC, and Conway MacKenzie. Any reports and/or recommendations that include the following information are to be produced in response to this request:

a. All law enforcement "best practices" that were reviewed by the DPD to determine that a change was needed of its policy relative to response times;

b. Categories of priorities that are used by the DPD;

c. Response times goals for the DPD, e.g., the number of minutes desired for each category;

d. Comparison of DPD response times and related policies with other agencies;

e. DPD policy and/or Standard Operating Procedure regarding police response times prior to Chief Craig being appointed as the chief of police and any modified policies/SOPS regarding response times that were changed since Chief Craig has served as the chief of police;

f. The method that the DPD utilized to calculate police response times in 2013 prior to Chief James Craig being appointed to the position of chief of police;

g. The method that the DPD utilizes to calculate police response times since Chief James Craig was appointed to the position of chief of police in July 2013.

14.     Any and all reports prepared since January 1, 2013 related to evaluations and/or recommendations of the DPD's personnel. This includes any such reports and recommendations prepared by DPD members, any city consultants, including The Bratton Group, LLC, and Conway MacKenzie and specifically includes but is not limited to:

a. police officer deployment;

b. reorganization of the DPD entities;

c. command officer staffing;

d. civilianization;

e. timekeeping personnel;

f. Any reports prepared by the DPD or its consultants that determined how many additional civilian the DPD should hire.

15. All reports, memoranda and/or other documents created in 2012 or thereafter concerning the need, or lack thereof, for additional fire fighters, fire fighting vehicles or fire fighting resources generally.

16. All memoranda or communications prepared by an employee, agent, officer, or representative of Debtor or the Emergency Manager regarding whether the Plan does or does not discriminate unfairly.

17. All memoranda or communications prepared since the filing of the City's bankruptcy petition by an employee, agent, officer, or representative of the Debtor, the City or the Emergency Manager, or sent or given to any of the them, regarding funds that might be available to the City or any of its creditors from the State of Michigan, any Michigan State agency, the federal government or a federal agency.

18. All assessments or analyses of potential funds that might be available for the City or any of its creditors from the State of Michigan, any Michigan State agency, the federal government or a federal agency

19. All memoranda or communications prepared by an employee, agent, officer, or representative of Debtor or the Emergency Manager regarding Christie's evaluation of and report regarding the DIA and/or its assets and/or holdings.

20.     All communications to or from Christie's, or any entity or individual working with or for Christie's, about the DIA, the DIA artwork, and/or Christie's evaluation and/or appraisal of the DIA art.

21.     All documents provided to or from Christie's, or any entity or individual working with or for Christie's, in connection with its evaluation and/or appraisal of the DIA art, including any draft reports, appraisals or evaluations. All communications with any entity or individual other than Christie's about the performance of a potential appraisal of the DIA art.

22.     All documents and communications concerning the potential maximization of the value of the DIA art, including the potential sale of any of that art.

23.     All memoranda and communications prepared by an employee, agent, officer, or representative of Debtor or the Emergency Manager regarding the DIA Settlement.

24.     The two consultant reviews of the City's property tax collections systems that are mentioned on page 138 of the Amended Disclosure Statement.

25.     Communications with the two consultants who prepared the consultant reviews mentioned on page 138 of the Amended Disclosure Statement.

26.     All documents setting forth, discussing and/or mentioning the City's expected, predicted or projected population growth at any time in the next 30 years.

27.     All documents setting forth, discussing and/or mentioning the City's expected, predicted or projected growth in available jobs at any time in the next 20 years.

28.     All communications with the Mayor's Office regarding: (a) any third party funding (other than debt funding) in excess of $5 million in the aggregate under a single program or from a single source actually or potentially available to the City, including but not limited to state, federal or private grants, aid or contributions, (b) all such funding that has been applied for or received by the City, and (c) all such funding that the City plans to apply for in the future.

29.     All communications with the Mayor's Office, the Mayor or anyone working with or for the Mayor regarding State reductions in funding for the City.

30.     All communications between the Mayor's Office, the Mayor or anyone working with or for the Mayor and any Member of the United States Congress, the United States President, or their offices, assistants, representatives or agents.

31.     All communications between the Mayor's Office, the Mayor or anyone working with or for the Mayor and any representative of Macomb, Oakland, or Wayne Counties regarding the DWSD.

32.     All communications between the Mayor's Office, the Mayor or anyone working with or for the Mayor and any policy institute, research institute, or think tank concerning the Bankruptcy case.

33.     All communications between the Mayor's Office, the Mayor or anyone working with or for the Mayor and the Foundations concerning the Plan, the DIA Settlement or their contributions to the Plan.

34.     All communications between the Mayor's Office, the Mayor or anyone working with or for the Mayor and the DIA, the members of the DIA board, members of the DIA's administration, and DIA employees, concerning the Plan, the DIA Settlement or the DIA's or Foundations' contributions to the Plan.

35.     All documents describing the expected scope of work of the Department of Neighborhoods, the Department of Public Lighting, and the Detroit Land Bank.

36.     All documents describing, and communications concerning, the future personnel hiring goals of the City.

37.     All surveys of blighted and abandoned structures, and all plans to remove blight, including but not limited to, any survey in which Dan Gilbert participated in the preparation.

38.     All documents and communications describing or concerning the Mayor's job creation plans.

39. All documents and communications describing or concerning the Mayor's parks initiative.

40. All documents and communications describing or concerning the Mayor's plan to organize a City-owned automotive insurance plan or company.

41. All documents and communications describing or concerning the Mayor's plan to sue landlords of blighted buildings, and/or pursue delinquent taxes from them.

42. All documents and communications describing or concerning any plans, proposals or offers by any entities to remove blight in the City.

43. All documents explaining, discussing or describing any actual or potential transaction involving a sale or lease of substantially all assets operated by DWSD to another entity, including but not limited to (a) data, notes, or analyses by hired consultants related to investigation of a privatization or other sale of DWSD assets to a private operator, and (b) any term sheets, memorandums of understanding or similar documents, whether in draft or final form, between the City and any prospective operator.

44. All documents explaining, discussing, describing, showing or analyzing, in the event of any transaction described in Request No. 43 above: (a) the transfer and amount of GRS pension assets associated with DWSD employees and retirees to another entity, (b) the assumption and amount of liabilities

associated with such a transfer of assets, and (c) the value to be paid to retirees on account of GRS Claims (as defined in the Amended Plan), including OPEB Claims.

45.     All correspondence with private operators regarding the negotiation of a transaction described in Request No. 43, including but not limited to correspondence showing or reflecting the value or amount of assumed liabilities, deferred capital expenditures, rates charged to DWSD customers, operating maintenance budget or value of DWSD assets (whether individually or in the aggregate).

46.     All documents relating to the "Indicative Interest Rates" for DWSD Bonds (as defined in Section I.A.95 of the Amended Plan) as set forth in Exhibit I.A.150 of the Plan, including but not limited to documents relating to the calculation of such rates and the assumptions underlying such calculation.

47.     All correspondence and documents, including drafts, minutes, notes, relating to the City's understanding (or lack thereof) of how a DWSD Transaction would enable the City to make "larger, more rapid or more certain distributions to at least some of its creditors" as referenced in Section VIII.K of the Amended Disclosure Statement.

48.     All documents showing or reflecting whether (a) any of the DWSD Bonds or the DWSD Revolving Bonds (as defined in Section I.A.108 of the Amended Plan) have call protection provisions, (b) there is an original issue

premium in connection with any of the DWSD Bonds or DWSD Revolving Bonds, (c) there is any right to payment in connection with any such call protection or original issue premium, (d) any requests or demands on the City to compensate holders of DWSD Bonds or DWSD Revolving Bonds on account of call protection or original issue premium, and (e) any analysis or position of the City with regard to call protection provisions or original issue premium.

49.    All proposals submitted to the City in response to the City's request for information as to the potential public-private partnership for the operation and management of the DWSD as referenced in Section VIII.K.1.b of the Amended Disclosure Statement.

50.    All documents reflecting or showing the City's analysis or evaluation of a potential public-private partnership for the operation and management of the DWSD as referenced in Section VIII.K.1.b of the Amended Disclosure Statement, including any analysis of proposals submitted to the City in response to the City's request for information.

51.    All documents reflecting, showing or discussing the calculations underlying the schedules set forth on Exhibit L to the Amended Disclosure Statement, including but not limited to the calculation of pension payments from DWSD to the GRS from 2014 to 2023.

52.     All documents identified in the City's answers to the Interrogatories served by the Retiree Association Parties.

Respectfully submitted,

**LIPPITT O'KEEFE GORNBEIN, PLLC**

By:     /s/ Ryan C. Plecha
        Brian D. O'Keefe (P39603)
        Ryan C. Plecha (P71957)
Attorneys for Retiree Association Parties
370 East Maple Road, 3rd Floor
Birmingham, Michigan 48009
Tel: (248) 646-8292;  Fax:  (248) 646-8375
bokeefe@lippittokeefe.com
rplecha@lippittokeefe.com

**SILVERMAN & MORRIS, P.L.L.C.**
Thomas R. Morris (P39141)
Karin F. Avery (P45364)
Co-counsel for Retiree Association Parties
30500 Northwestern Hwy., Suite 200
Farmington Hills, Michigan 48334
Tel: (248) 539-1330;  Fax:  (248) 539-1355
morris@silvermanmorris.com
avery@silvermanmorris.com

Dated: April 11, 2014