UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
        MICHIGAN,             .
                              .      Detroit, Michigan
                              .      April 11, 2014
                  Debtor.     .      10:00 a.m.
. . . . . . . . . . . . . . . .


        BENCH OPINION RE. (2806) CORRECTED MOTION TO APPROVE
        COMPROMISE/MOTION OF DEBTOR FOR ENTRY OF AN ORDER,
      PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND
      BANKRUPTCY RULE 9019, APPROVING A SETTLEMENT AND PLAN
          SUPPORT AGREEMENT AND GRANTING RELATED RELIEF
             BEFORE THE HONORABLE STEVEN W. RHODES
             UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  CORINNE BALL
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-7844

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For the Official       Dentons US, LLP
Committee of           By:  CAROLE NEVILLE
Retirees:              1221 Avenue of the Americas, 25th Floor
                       New York, NY  10020-1089
                       (312) 632-8390

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP<br>By:  STEPHEN HACKNEY<br>        RYAN BLAINE BENNETT<br>300 North LaSalle<br>Chicago, IL  60654<br>(312) 862-3062 |
| For David Sole: | Jerome D. Goldberg, PLLC<br>By:  JEROME D. GOLDBERG<br>2921 East Jefferson, Suite 205<br>Detroit, MI  48207<br>(313) 393-6001 |
| For UBS AG: | Bingham McCutchen, LLP<br>By:  JARED R. CLARK<br>399 Park Avenue<br>New York, NY  10022-4689<br>(212) 705-7770 |
| For Bank of America: | Davis Polk & Wardwell, LLP<br>By:  ELLIOT MOSKOWITZ<br>450 Lexington Avenue<br>New York, NY  10017<br>(212) 450-4241 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3      THE COURT:  Good morning.  Appearances, please.

4      MR. HERTZBERG:  Good morning, your Honor.  Robert

5  Hertzberg, Pepper Hamilton, on behalf of the City of Detroit.

6      MS. BALL:  Good morning, your Honor.  Corinne Ball

7  of Jones Day on behalf of the City of Detroit.

8      MR. HACKNEY:  Your Honor, good morning.  Stephen

9  Hackney and Ryan Bennett on behalf of Syncora.

10      MS. NEVILLE:  Good morning, your Honor.  Carole

11  Neville from the Retiree Committee.

12      MR. MARRIOTT:  Good morning, your Honor.  Vince

13  Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

14      MR. GOLDBERG:  Good morning, your Honor.  Jerome

15  Goldberg on behalf of interested party, David Sole.

16      MR. CLARK:  Good morning, your Honor.  Jared Clark,

17  Bingham McCutchen, UBS AG.

18      MR. MOSKOWITZ:  Good morning, your Honor.  Elliot

19  Moskowitz from the law firm of Davis Polk & Wardwell

20  representing Bank of America.

21      THE COURT:  Before the Court is the city's motion to

22  approve its settlement of the claims asserted by creditors

23  Merrill Lynch and UBS.  UBS and Merrill Lynch's predecessor

24  in interest, SBS Financial Products Company, were the parties

25  to swaps contracts that were associated with the city's 2005

1   and 2006 transactions which involved its issuances of $1.5

2   billion dollars worth of certificates of participation.

3   These certificates of participation were issued by the city

4   to assist with its unfunded liabilities of its two pension

5   plans at that time.

6           This is the third settlement that these parties

7   reached.  The first was for $230 million.  The second was for

8   $165 million.  On January 16 of this year, following the

9   evidentiary hearing on the city's request for approval of the

10  second settlement, the Court rejected that settlement finding

11  that under the standards adopted in the Sixth Circuit's

12  decision in Bard, the settlement amount was too high given

13  the strengths and weaknesses of the parties' claims,

14  counterclaims, and defenses.  The Court did, however,

15  strongly encourage the parties to continue their

16  negotiations, which they did, eventually reaching the

17  settlement that is now before the Court for approval.  This

18  current settlement obligates the city to pay $85 million,

19  which is about a 70-percent discount in its termination fee

20  obligation of about $288 million to the swaps counterparties.

21          The record before the Court consists of the evidence

22  submitted at the prior hearing and at the hearing held last

23  week in connection with this motion.  The Court's detailed

24  findings of fact and conclusions of law from the previous

25  hearing are, to the extent pertinent, adopted for purposes of

1  resolving this motion, and the Court will not restate those

2  findings and conclusions here.  The record reflects no

3  grounds to reconsider any of those findings or conclusions.

4          The Court will now review in some detail the primary

5  features of the present settlement.  The city agrees to grant

6  the swap counterparties an allowed secured claim in the

7  amount of $42.5 million each secured by the city's casino

8  revenue.  The total settlement is, therefore, $85 million.

9  During the pendency of the agreement, the city will not

10  commence or prosecute any litigation against the swap

11  counterparties.  If either of the service corporations or any

12  other person commences such litigation, the city will

13  cooperate with and support the defense of the litigation by

14  the swap counterparty defendant.  The city also will not

15  grant any other liens to be senior or in pari passu with

16  these liens on the casino revenue.  Either when the

17  settlement amount is paid -- excuse me.  When the settlement

18  amount is paid, the city will automatically release its

19  claims against the swap counterparties.  If the service

20  corporations or any other entity are collapsed into the city,

21  any claim that the entity might have against the swap

22  counterparties will also be released.  The city will not

23  propose a plan that treats the swap counterparties less

24  favorably than as provided in the settlement agreement.

25          As a defense against any claim, the city retains the

1 right to argue the invalidity of any transaction document
2 defined as including the collateral agreement, the swap
3 insurance policies, the 2006 transactions, the city pledges,
4 the service corporation security interest, the service
5 corporation pledge, the authorizing ordinance, the definitive
6 documents, and the settlement transaction as long as the city
7 is not seeking affirmative recovery from the swap
8 counterparties. Upon the payment of $85 million, the liens
9 on the pledged property will be released, and the swap
10 counterparties will withdraw their proofs of claim. So long
11 as the city is not in breach of the settlement agreement, the
12 swap counterparties will not attempt to trap the casino
13 revenue from the city, and if the custodian tries to trap the
14 casino revenue, the swap counterparties will use their best
15 efforts to help fix -- to help the city fix the problem.
16 Once the settlement is paid, the swap counterparties
17 agree to the same release of claims against the city as the
18 city agrees to release against the swap counterparties. The
19 agreement excludes the release of claims by the swap
20 counterparties against the service corporations to the extent
21 the service corporations are not collapsed into the city.
22 The swap counterparties agree to vote in favor of the city's
23 plan as long as it treats their claims no less favorably than
24 those claims are treated in the agreement. The swap
25 counterparties retain their right to terminate the swap

1  agreement; however, they will not be able to hold the city

2  liable for any termination fee.  The swap counterparties

3  retain all rights, claims, and remedies related to the swap

4  agreements or to the swap insurance parties against any

5  person that is not a party to the settlement agreement,

6  including claims against the service corporations, Syncora,

7  or FGIC, so long as the claim does not result in the swap

8  insurer receiving an allowed secured claim for reimbursement

9  or subrogation against the city.  The swap counterparties

10  retain the right to intervene in the COPs litigation.  The

11  settlement agreement bars the service corporations from,

12  quote, "commencing any litigation or taking any other action

13  that the service corporations would not have been able to

14  commence or take if the service corporations were a party to

15  the agreement and obligated to the same extent as the city

16  under the agreement," close quote.  So the service

17  corporations are barred from making any claims against the

18  swap counterparties relating to any of the underlying

19  transaction documents.

20       The settlement agreement contains a bar order and

21  judgment reduction provision for claims by third parties.

22  This provision bars all parties from asserting any claim for

23  noncontractual indemnity or contribution against any swap

24  counterparty.  However, if a court determines that a

25  barred -- that barred claims exist that would give rise to

1  liability of any swap counterparty to a barred person but for

2  the barred order -- the bar order, the barred person shall be

3  entitled to judgment reduction provisions set forth in the

4  order.

5          The city will pay off the $85 million in monthly

6  installments of approximately $4.2 million into the existing

7  lockbox structure.  These are the monthly holdback payments.

8  The custodian will release the funds to the swap

9  counterparties quarterly.  These are the quarterly payments.

10 The city's payments are payable without interest until

11 October 15th, 2014.  After that date, the city's payments

12 will begin to bear interest at the same rate as post-petition

13 financing plus 1.5 percent plus a 1-percent deferral fee.  On

14 the effective date of the city's plan, which may or may not

15 be before October 15th, 2014, the city does plan to pay off

16 the balance of the $85 million to the swap counterparties

17 with exit financing.  If the city is unable to obtain exit

18 financing, this is a liquidity event.  The city will then

19 have 180 days following the effective date of the plan to pay

20 the balance in full.  The city agrees to use the first

21 dollars after the post-petition facility is paid off of any

22 net proceeds of any financing or refinancing consummated in

23 the plan that is either supported by the full faith and

24 credit of the city or payable from general funds of the city

25 to pay off the balance.

1        That is a summary of the settlement agreement that

2    is before the Court.  The city contends that this settlement

3    is a reasonable settlement of the claims of UBS and Merrill

4    Lynch given the strengths and weakness of the parties'

5    claims, counterclaims, and defenses, as the Court detailed in

6    its previous ruling.  It is, of course, supported also by UBS

7    and Merrill Lynch.

8        The city contends that the benefits of the

9    settlement include the following.  First, the settlement

10    amount is reduced and the payments are extended, and because

11    of that, the city no longer needs post-petition financing to

12    settle its obligations under the swap contracts.  Second, the

13    swap counterparties will release their claims against the

14    city and vote in favor of its plan of adjustment.  Third, the

15    city will have greater certainty regarding its cash flows and

16    liquidity.  Fourth, the city will have continued access to

17    its casino revenues, which is a stable source of significant

18    revenues for city operations.  Fifth, it will simplify future

19    financing efforts.  Sixth, it facilitates settlements with

20    other creditors by providing an impaired accepting class as

21    required by 11 U.S.C., Section 1129(a)(10).  And, seventh, it

22    avoids protracted and expensive litigation that will impair

23    its ability to reorganize efficiently.

24        The Court concludes that the record fully supports

25    the city's view of these benefits.  Accordingly, the Court

1    finds that these benefits are real and substantial and

2    justify granting the motion.

3          The Court will now address whether the settlement

4    must, nevertheless, be rejected for one of the other reasons

5    advanced by the objecting parties.  These objections

6    generally do not go to the economic reasonableness of the

7    settlement but whether the structure of the settlement is

8    legally permissible.  The record reflects several objections

9    to the settlement that have been resolved with additions to

10   the proposed order approving the settlement.  However,

11   several creditors maintain objections to the settlement on

12   the following grounds.  First, one party, David Sole,

13   contends that the amount of the settlement is still too high

14   in light of the potential recovery that the city could have

15   against UBS and Merrill Lynch on its counterclaims against

16   them.  Second, Syncora contends that the settlement cannot be

17   approved as a matter of law because it unlawfully impairs its

18   contract rights.  Third, the objectors contend that the

19   settlement cannot be approved because the city's grant of a

20   lien in its gaming revenues to UBS and Merrill Lynch is

21   unlawful under state law.  Fourth, the objectors contend that

22   the settlement cannot be approved because it impairs the

23   rights of the two service corporations even though they were

24   not parties to this settlement.

25          The Court concludes that each of the outstanding

1  objections to the settlement lack merit, and, accordingly,

2  the motion to approve the settlement should be granted.

3  Specifically, the Court finds that the amount of the

4  settlement is reasonable and quite fairly compromises the

5  parties' various claims, counterclaims, and defenses, all of

6  which were previously reviewed by this Court.  While it is

7  true, as Mr. Sole asserts, that there is a possibility that

8  the city could recover substantial amounts from the swap

9  counterparties, perhaps as much as 300 to $400 million, the

10  Court had previously found that the likelihood of that

11  outcome was uncertain.  Indeed, the record was and now

12  remains such that the Court cannot find that there is a

13  reasonable likelihood of success on these counterclaims.  In

14  any event, the Court further previously found that it was

15  certain that any such litigation would be expensive and,

16  considering appeals, would take years.  Nothing in the

17  hearing last week -- in the record of the hearing last week

18  undermines that finding.  In these circumstances, therefore,

19  the Court finds that despite that possible favorable outcome

20  for the city, the settlement amount of $85 is entirely

21  reasonable and fairly compromises all of the claims between

22  the parties.

23        Syncora contends that the settlement impermissibly

24  impairs its rights.  It relies on In re. SportsStuff, 430

25  B.R. 170, Bankruptcy Appellate Panel, Eighth Circuit, 2012.

1  In that case, the proposed settlement would have improperly

2  imposed an injunction precluding nonsettling parties from

3  enforcing their rights against insurers.  However, the Court

4  concludes that nothing in this settlement agreement here

5  enjoins or otherwise prevents Syncora from pursuing any

6  rights that it may have.  Further, the bar order provision in

7  this settlement agreement is limited to preventing potential

8  defendants in suits brought by the city from asserting claims

9  for contribution or indemnification against the swap

10  counterparties.  Such defendants are not prejudiced, however,

11  because any recovery from the city against them would be

12  reduced accordingly.  In In re. Greektown Holdings, LLC, 728

13  F.3d 567, 579, Sixth Circuit, 2013, the Court specifically

14  approved of this very kind of limited bar order.  The Court

15  stated, quote, "when the scope of a bar order is limited to

16  claims for contribution or indemnity, the court can

17  compensate the non-settling defendants for the loss of those

18  claims by reducing any future judgment against them," close

19  quote.

20         Syncora also contends that Section 6.9.2(2) of the

21  2006 contract administration agreement gives it the right to

22  control all actions of the swap counterparties.  Syncora

23  asserts that the provision in the settlement agreement

24  requiring the swap counterparties to vote in favor of the

25  plan interferes with that right.  Section 6.9.2 of the

1   contract administration agreement provides, quote,

2   "Notwithstanding any other provision hereof, any Insurer not

3   then in default under its Credit Insurance shall, (1) be

4   treated as the Holder of all Outstanding Certificates equal

5   to the principal amount of Certificates insured by it for the

6   purposes of actions permitted to be taken by

7   Certificateholders under this title and for the purpose of

8   giving all other consents, directions and waivers that the

9   Certificateholders may give; and (2) control all action that

10  may be taken by any Specified Hedge Counterparty that is the

11  beneficiary of such Credit Insurance, including for purposes

12  of actions permitted to be taken by such Specified Hedge

13  Counterparty under this Agreement and for the purposes of

14  giving all other directions, consents and waivers that such

15  Hedge Counterparty may give," close quote.  The Court

16  concludes that this provision does not give Syncora the right

17  to control the votes of the swap counterparties on the city's

18  plan of adjustment.  Further, to the extent that Syncora

19  concludes that the swap counterparties are in violation of

20  the contract administration agreement, nothing in the

21  settlement agreement impairs Syncora's right to assert a

22  breach of contract claim.

23          Syncora contends that the settlement agreement

24  operates as an impermissible termination or amendment of the

25  2009 collateral agreement without its consent.  The Court

1   must reject this argument also.  First, the settlement
2   agreement does not terminate the collateral agreement either
3   expressly or by implication, and the parties to the
4   settlement agreement do not contend that the collateral
5   agreement is terminated.  Further, the requirements for
6   termination in Section 14.4 have not been satisfied.  Second,
7   the Court concludes that the settlement agreement also does
8   not operate as an amendment in contravention of Syncora's
9   rights under Section 14.5.  The settlement agreement is a
10  compromise of claims, not an amendment to an existing
11  agreement.  In In re. Residential Capital, LLC, 497 B.R. 720,
12  748, Bankruptcy, Southern District of New York, 2003, the
13  Court noted that a settlement agreement is not an amendment
14  to an underlying agreement but a resolution of a claim.
15  Finally, nothing suggests that Syncora is a third-party
16  beneficiary of the collateral agreement or that it has any
17  rights arising from it except as the agreement specifically
18  provides.  For these reasons, the Court overrules these
19  objections to the settlement that Syncora asserted.
20          Both the Official Committee of Retirees and Syncora
21  objected to the proposed settlement agreement on the grounds
22  that the service corporations are not parties to the
23  agreement.  The proposed settlement contemplates a release of
24  the lien on casino revenues once the $85 million is paid to
25  the swap counterparties.  In the collateral agreement dated

1   June 15, 2009, the swap counterparties were not granted the

2   lien directly from the city.  Rather, they hold the lien by

3   way of a pledge from the city to the service corporations and

4   from the service corporations to the swap counterparties.

5   The objectors assert that as a result, the proposed

6   settlement cannot be approved without the service

7   corporations.  Here it must be noted again that Syncora was

8   not a party to the collateral agreement, although it did

9   consent to it.  The record reflects that on March 12, 2014,

10  the service corporations were served with the present motion

11  to approve the settlement.  See Docket Number 3061.  Neither

12  of the service corporations, however, filed an objection to

13  the motion.  Therefore, by implication, at least, they

14  acquiesce in the motion.

15          The Court concludes that this objection should be

16  overruled.  The city granted a lien on the casino revenues

17  directly to the service corporations, and the service

18  corporations immediately granted all of their interest in

19  those revenues to the swap counterparties.  Pursuant to the

20  express terms of the collateral agreement, the counterparties

21  have an interest in casino revenues and a right to compromise

22  that interest.  The collateral agreement is fairly

23  straightforward.  Under Section 4.1, the city granted the

24  service corporations a security interest in the revenues to

25  secure the city's payment obligations to the service

1    corporations.  Under Section 4.2, the service corporations
2    then granted the swap counterparties a security interest in
3    their right to payment from the city and in the casino
4    revenue.  Under Section 11 of the collateral agreement, the
5    swap counterparties' remedies include the exercise of all
6    rights and remedies otherwise available to the service
7    corporations as secured parties under the city pledge.  This
8    ostensibly gives the counterparties the ability to exercise
9    any rights which the service corporations have under the
10   collateral agreement, including the right to enter into a
11   reasonable settlement with the city.  The objectors do not
12   contend that this two-step pledge, per se, is legally invalid
13   nor do they explain why, if the service corporations have the
14   legal capacity to discharge the lien pursuant to the rights
15   and powers granted to them by the city's pledge, that same
16   legal capacity to discharge the lien did not pass to the swap
17   counterparties pursuant to the service corporations' pledge.
18   Further, the terms of the contract are consistent with the
19   Michigan Uniform Commercial Code, which recognizes that when
20   a party pledges a right to payment, the collateral securing
21   that right to payment follows.  MCL, Section 440.9203(7),
22   provides, quote, "The attachment of a security interest in a
23   right to payment or performance secured by a security
24   interest or other lien on personal or real property is also
25   an attachment of a security interest in the security

1  interest, mortgage or other lien," close quote.  When a right

2  to payment is pledged, therefore, the pledgee has the right

3  to enforce that right to payment upon default, including the

4  enforcement of accompanying liens.

5       MCLA, Section 440.9607, provides, quote, "(1) If so

6  agreed, and in any event after default, a secured party may

7  do 1 or more of the following:  (a) Notify an account debtor

8  or other person obligated on collateral to make payment or

9  otherwise render performance to or for the benefit of the

10  secured party; (c) Enforce the obligations of an account

11  debtor or other person obligated on the collateral and

12  exercise the rights of the debtor with respect to the

13  obligation of the account debtor or other person obligated on

14  collateral to make payment or otherwise render performance to

15  the debtor, and with respect to any property that secures the

16  obligations of the account debtor or any other person

17  obligated on the collateral," close quote.  In addition,

18  comment nine to MCLA, Section 440.9607, also notes that the

19  secured party's collection and enforcement rights include the

20  right to settle and compromise claims against the account

21  debtor.

22       Because the swap counterparties' interest in the

23  casino revenue is co-extensive with the interest of the

24  service corporations that were granted by the city and

25  because the service corporations have not objected to the

1    settlement, the Court concludes that the failure to include
2    the service corporations in this proposed settlement does not
3    preclude its approval.

4         The remaining objections relate to what the Court
5    will refer to as the collateral structure for the settlement
6    agreement.  The objecting parties, primarily the Retirement
7    Systems, the Retiree Committee, the retiree association
8    parties, and the COPs holders, assert that the settlement
9    agreement cannot be approved because it provides, in effect,
10   for the swap counterparties to be treated as secured parties
11   under the city's plan of adjustment.  Indeed, paragraph 10 of
12   the proposed order approving the settlement provides, quote,
13   "Ordered that each of UBS and MLCS are hereby granted an
14   allowed claim (collectively, the 'Secured Claims') against
15   the City secured by liens on the Pledged Property (the
16   'Liens'), which, solely for purposes of distributions from
17   the City, shall be deemed to be in the aggregate amount --
18   aggregate principal amount of $42,500,000 for each of UBS and
19   MLCS," close quote.

20        The objecting parties assert that because this Court
21   found that the city is reasonably likely to succeed on its
22   challenges to the collateral agreement under the Michigan
23   Gaming Control Act, the swap counterparties should be treated
24   as unsecured creditors in the city's plan of adjustment.
25   Some of the objectors also argue that the settlement

1   agreement cannot be approved because the pledge of the casino
2   revenue under the collateral agreement is illegal and that
3   the Court cannot rule on this motion without first resolving
4   the question of whether the pledge is legal.  Stated another
5   way, the objectors argue that by approving the settlement
6   agreement, which allows the pledge of casino revenue to
7   continue until the $85 million settlement amount is fully
8   paid off, the Court is giving its approval to a potentially
9   illegal security interest.

10          The Court concludes that neither objection has
11  merit.  It is beyond serious dispute -- it is beyond serious
12  dispute that when a creditor asserts a secured claim against
13  a debtor and the debtor or other parties dispute the validity
14  of the lien, the parties can agree not to challenge the
15  validity of the disputed lien in exchange for the creditors'
16  agreement to accept a lesser payment on its secured claim.
17  Such an agreement is, of course, subject to the Bankruptcy
18  Court's approval under Rule 9019 standards and the
19  requirements of the Bankruptcy Code.  For example, in In re.
20  Hooper, 2012 WL 603766, Ninth Circuit, Bankruptcy Appellate
21  Panel, February 14, 2012, the Ninth Circuit Bankruptcy
22  Appellate Panel affirmed the Bankruptcy Court's approval of a
23  settlement in which a lender accepted a reduced claim against
24  the estate to settle an adversary proceeding in which the
25  trustee alleged that the lender held an invalid deed of

1    trust.

2         In <u>Six West Retail Acquisition, Inc.</u> v. <u>Loews</u>

3    <u>Cineplex</u>, 286 B.R. 239, Southern District of New York, 2002,

4    the District Court affirmed the Bankruptcy Court's approval

5    of a settlement in which the unsecured creditors' committee

6    agreed not to seek avoidance of certain liens and mortgages

7    granted to creditors as part of a pre-petition restructuring

8    in exchange for the new investors' agreement to commit $45

9    million for distribution to unsecured creditors.

10         Another example is this Court's own decision in <u>In</u>

11   <u>re. Collins & Aikman</u>, Case Number 05-55927, which this Court

12   presided over in 2005 and 2006.  There a creditor, Huron Mold

13   & Tools, alleged that it had a first priority statutory lien

14   in the debtor's molds pursuant to the Michigan Mold Lien Act.

15   Huron Mold & Tools asserted a secured claim in the amount of

16   approximately $1.4 million.  The debtor disputed the validity

17   of the mold liens.  However, rather than litigating the

18   liens, the debtor agreed to allow Huron Mold a secured claim

19   in the amount of $350,000.  In exchange, Huron agreed to

20   waive, release, and discharge all of its alleged liens on the

21   debtor's molds.

22         The compromise submitted for the Court's approval

23   here today in this case is indistinguishable from these

24   examples.  The swap counterparties have asserted claims

25   against the city for the present value of the remaining life

1  of the swap agreement.  As the city explained at the hearing,

2  this amount varies depending on prevailing interest rates,

3  but it is estimated in the hundreds of millions of dollars.

4  Alternatively, the swap counterparties could terminate the

5  swap agreement because the city has long been in default.

6  They could then file a claim for this termination fee

7  estimated, as noted, to be in the hundreds of millions of

8  dollars.  Either way, the swap counterparties have taken the

9  arguable position that their claims are secured by the casino

10 revenue.  The city disputes the validity of the swap

11 counterparties' alleged security interest in the casino

12 revenue, but, much like the debtor in Collins & Aikman, the

13 city seeks to resolve its potential liability under the swap

14 agreement and to relieve itself of the alleged liens on the

15 casino revenue without having to litigate the issues by

16 allowing a substantially reduced secured claim.  As the city

17 argues, nothing in law requires the city to litigate the

18 validity of the lien.  Rather, the law allows the settlement

19 and compromise of such an issue as long as the settlement is

20 fair and reasonable in the circumstances.  Indeed, as this

21 Court previously noted, the law prefers compromise to

22 litigation.

23      Now, our case here is slightly more complicated than

24 Collins & Aikman because the agreement that gave rise to the

25 disputed lien, the 2009 collateral agreement, is a separate

agreement from the swap agreement, which is the agreement
that gave rise to the swap counterparties' actual claim
against the city in this bankruptcy case.  The objectors have
taken the position that the city could secure a release of
liens by court -- by a court order declaring the liens
invalid rendering the swap counterparties' claims unsecured.
However, this position ignores the very real risk of a court
finding that the city's obligations to the swap
counterparties cannot be impaired due to the safe harbors for
swap agreements in the Bankruptcy Code.  See In re. Iridium
Operating, LLC, 478 F.3d 452, Second Circuit, 2007.  In that
case, the Court affirmed the Bankruptcy Court's approval of a
settlement of disputed liens where avoiding the liens
involved an expensive and complex lawsuit which, even if
ultimately successful, offered little reward and
acknowledging that the liens held out promise for all
creditors.

     Here the Court pauses to make an important point.
The major purpose and the ultimate affect of the settlement
agreement is that the disputed liens on the casino revenues
will be released.  Indeed, assuming an effective date of
October 15th, 2014, the settlement agreement is quite likely
to be the fastest, surest, and least costly way for the city
to achieve that goal.  The city places great importance on
that goal in achieving its reorganization, and the record

1   supports that judgment.

2          For purposes of the collateral structure objections

3   then, the only significant difference between the <u>Collins &</u>

4   <u>Aikman</u> settlement and the one before the Court today is that

5   in <u>Collins & Aikman</u> settlement agreement provided that Huron

6   Mold would receive the $350,000 lump sum payment within three

7   days of the Court's approval of the settlement at which point

8   the secured claim would be deemed fully paid and satisfied.

9   The mold releases -- the mold liens would be released and

10  discharged.  Here, of course, the city seeks to pay the swap

11  counterparties over time, but the settlement agreement on the

12  liens and the release of the liens is essentially the same.

13  Once the $85 million settlement amount is paid, the liens

14  will be released.

15         Thus, the only question remains is whether the delay

16  in the release of the liens until the $85 million is paid

17  means, as the objectors contends, that the Court cannot

18  approve this settlement.  Stated another way, the issue is

19  whether the delayed discharge of the disputed liens amounts

20  to an approval by this Court of the disputed liens.  The

21  Court finds that the answer to this issue is no for several

22  reasons.  First, as confirmed at the April 3rd hearing, the

23  city is not seeking a finding that the disputed liens conform

24  to the requirements of the Michigan Gaming Control and

25  Revenue Act.  At the hearing, the swap counterparties agreed

1   to remove the language from the proposed order approving the

2   settlement which provides that the liens are and shall

3   continue to be valid, binding, perfected, and enforceable.

4   The proposed order does foreclose any challenges to the

5   liens, but the need for any such challenge is obviated by the

6   settlement agreement itself, which provides for the discharge

7   of the liens upon payment of the reduced settlement amount.

8           Second, the Court accepts and finds reasonable the

9   swap counterparties' need for the lien to ensure that the

10  city fulfills its obligations under the settlement agreement.

11  The city does not have the resources to pay the full

12  settlement amount now.  If the city sought a loan to pay the

13  settlement, as it did in the last attempt to settle with the

14  swap counterparties, the collateral structure objections

15  raised here would be clearly baseless because the liens

16  granted in the collateral agreement would be discharged

17  immediately as in Collins & Aikman.  And it is likely that

18  the repayment terms of the settlement would provide a better

19  deal than -- for the city than any loan would.  In the

20  settlement, the city gets credit for payments already made

21  this year.  Also, the interest rate does not -- the interest

22  does not begin to accrue until after plan confirmation, and

23  the city is not required to incumber any new property or to

24  pay commitment fees, which, as we know, can be substantial.

25  The city is not required to incumber any new property or to

1  pay any such commitment fees.  The preservation of the status
2  quo in the settlement agreement until the settlement amount
3  is paid and the disputed liens are released is, thus, a
4  substantial net gain for the city, its residents, and its
5  creditors.  Given the facts of the case and the troubling
6  history between the city and the swap counterparties, the
7  Court finds that the settlement structure is reasonable and
8  that the settlement structure warrants the Court's approval
9  of the settlement agreement.
10        Finally, it has been argued that the plan support
11  provision of the settlement agreement is somehow unfair in
12  that it creates an impaired accepting class as required for
13  confirmation of the city's plan on a cramdown basis under
14  Section -- excuse me -- under 11 U.S.C., Section 1129(a)(10),
15  and that the city can use this to its advantage in
16  negotiating with other creditors.  To some extent, this is a
17  plan confirmation issue.  Nevertheless, the Court will now
18  comment that there is nothing unusual or unfair about this.
19  It is not inconsistent with either the language or the spirit
20  of the Bankruptcy Code.  To the contrary, Chapters 9 and 11
21  are explicitly designed to promote negotiation, settlement,
22  and compromise, and Section 1129(a)(10) of the Bankruptcy
23  Code does precisely that, and there's no reason to believe
24  that this section should have any different purpose or effect
25  in Chapter 9.

1    The impact of this is that, subject to the other
2    requirements of Chapters 9 and 11, the city's plan of
3    adjustment may well now be eligible for confirmation on a
4    cramdown basis without any further agreement by creditors.
5    Indeed, this prospect was enhanced earlier this week when the
6    city announced its settlement with certain unlimited tax
7    general obligation bondholders.  The message is that now is
8    the time to negotiate, not on the eve of the confirmation
9    hearing in July, nor even in June or in May but now.  The
10   Court, once again, urges the city, the retirement parties,
11   and the other creditors in the case to follow the example
12   that the city, UBS, Merrill Lynch, and the UTGO parties have
13   set with their settlements, with the settlement here approved
14   today and that the city and the UTGO bondholders set with
15   their settlement.

16   The Court specifically commends the parties and
17   their attorneys involved in the swap settlement approved here
18   today.  They could easily have been discouraged by this
19   Court's rejection of the last settlement and hardened their
20   positions into full-blown litigation.  Instead, they chose to
21   reengage.  This was plainly a challenging negotiations --
22   negotiation, but they persisted, and in doing so, they
23   demonstrated the very spirit of cooperation and compromise
24   that the Court urges upon all of the parties in negotiating
25   the remaining unsettled claims.

1          The Court feels compelled to make one further
2     comment about the parties' conduct of this case.  It is
3     apparent that each of the parties here is waging an
4     orchestrated public relations campaign in an effort to
5     advance their positions.  Indeed, we saw evidence of this
6     again just yesterday.  The Court calls upon the parties and
7     their attorneys and their leadership to give serious
8     consideration to whether this is really in their best
9     interests or, on the other hand, whether it is actually
10    counterproductive to the ultimate resolution of this case.
11    This bankruptcy case is not about who wins in the court of
12    public opinion.  This case is about the application of the
13    Bankruptcy Code to the city's bankruptcy case, and it's about
14    enhancing both the city's future and creditor recoveries by
15    using the most efficient and effective avenue available.  In
16    that -- in this case, that avenue is certainly not a public
17    relations campaign, nor is it a litigation campaign for years
18    at great expense.  That avenue is a campaign of all-out good
19    faith mediation and negotiation as demonstrated by the
20    parties to the swap settlement and the UTGO settlement.
21         Motivated by absolutely nothing more than a fervent
22    commitment to public service, Chief Judge Rosen and his team
23    have embraced this Court's call to assist the parties in
24    resolving the complex issues in this case.  They have done so
25    with unprecedented dedication, enthusiasm, energy,

1   creativity, and resourcefulness and all despite the fact that

2   each of them otherwise have full-time jobs.  The mediation

3   team remains committed to the mediation process, and the

4   Court urges the parties with unsettled claims to take full

5   advantage of that opportunity and to leave the alternative of

6   litigation with its attendant extraordinary expense and delay

7   to an absolutely last resort.

8         Finally, to complete the record, to the extent that

9   the Court has not addressed any objections to the settlement

10  that the parties have asserted, the Court concludes that

11  these objections do not warrant discussion, and they are

12  overruled.

13        The motion to approve the settlement is granted.

14  The city may submit an order.  Anything further at this time?

15        MR. HERTZBERG:  No.  Thank you, your Honor.

16        THE COURT:  All right.  We'll be in recess.

17        THE CLERK:  All rise.  Court is adjourned.

18     (Proceedings concluded at 10:44 a.m.)

INDEX

WITNESSES:

    None

EXHIBITS:

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                 April 12, 2014
_____       _____
Lois Garrett