# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                                          Chapter 9
City of Detroit, Michigan,                                      Case No. 13-53846
       Debtor.                                              Hon. Steven W. Rhodes
_____/

### Notice Regarding Interviews of Expert Witness Applicants

Notice is given that the following individuals who have submitted applications to serve as an expert witness on the issue of the feasibility of the City's plan of adjustment will be interviewed on April 18, 2014 at the times indicated below in Room 100 of the Theodore Levin U. S. Courthouse, 231 W. Lafayette Blvd. in Detroit, Michigan:

| | |
|---|---|
| Dean Kaplan<br>The PFM Group | 9:00 a.m. |
| Richard Ravitch | 10:00 a.m. |
| Peter J. Hammer | 11:00 a.m. |
| William A. Brandt, Jr.<br>Development Specialists, Inc. | 1:30 p.m. |
| Martha Kopacz<br>Phoenix Management Services LLC | 2:30 p.m. |

A copy of the application submitted by each of these applicants is attached to this notice.

The Court has selected the following two attorneys who were nominated by the creditor parties to participate in the interview process:

Guy S. Neal (Financial Nominee)

Barbara A. Patek (Labor Nominee)

One attorney for the City may also participate in the interviews.

Signed on April 14, 2014

                                  /s/ Steven Rhodes
                                  Steven Rhodes
                                  United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                    Chapter 9
City of Detroit, Michigan,                                Case No. 13-53846
      Debtor.                                   Hon. Steven W. Rhodes
_____/


      Pursuant to the Order of the Court signed April 2, 2014 Richard Ravitch, founder and

principal of the to-be-formed Ravitch Group, LLC, a not-for-profit Delaware limited liability

company (the "Company" and the "Applicant"), respectfully submits this Application to serve as

an expert witness on the issue of the feasibility of the City of Detroit's plan of adjustment (the

"Plan") in the above captioned matter.  The other principals of the Company are: Carol

O'Cleireacain, Ph.D., Edward Grebow, and Peter J. Kiernan, Esq.  I have interacted with these

individuals on matters of finance and government for forty years of my professional career.  The

endeavor to prepare a comprehensive report to the court on the feasibility of the Plan will be a

collegial, collaborative effort of the Company involving the unique blend of skills and

substantive experience of all of the principals.  Supported by these principals, I submit that I am

fully qualified to serve as the expert witness.

### A.    Municipal Finance, Budgeting and Financial Planning

      As more fully described in the biographical statements of myself and the principals which

are attached as Exhibits A-D, I have very broad experience in municipal finance, government

budgeting, and financial planning.

### 1.    Municipal Finance

In respect of public finance, as Chair of the New York State Urban Development Corporation, member of the Board of the New York State Municipal Assistance Corporation, and as Chair of the New York State Metropolitan Transportation Authority I was responsible for the issuance of more than $14 billion of municipal debt. In 2014 dollar values, that volume would be substantially higher.

I was centrally involved in the resolution of the well documented New York City Fiscal Crisis of the mid 1970's (the "Fiscal Crisis") when New York City was insolvent and twice prepared petitions for a Chapter 9 filing which, if filed, would have been the largest municipal bankruptcy in the United States. As a representative of the Governor, I negotiated with New York City's primary underwriters, union and business leaders, and federal government officials during the darkest hours of the Fiscal Crisis. I helped devise the New York State Municipal Assistance Corporation ("MAC") which used dedicated New York City sales tax revenues to back MAC revenue bonds and provide a special purpose financing vehicle and oversight mechanism to benefit New York City. I also participated in negotiations with the administration of President Gerald Ford which resulted in the Seasonal Loan Act, whereby the Federal Government provided short term financing for New York City operations. Equally important, I assisted with the requirement that New York City adopt a Four Year Financial Plan, which was to be closely monitored and modified quarterly by the legislatively created New York State Emergency Financial Control Board (the "EFCB"). New York City's elaborate Financial Plan is not unlike Detroit's plan of adjustment.

As Chair of the New York State Urban Development Corporation ("UDC"), which, when I became chair, had defaulted on moral obligation debt, I designed a rescue plan which included the creation of the New York State Project Finance Agency ("PFA") which issued credit worthy

2

bonds backed by UDC's federal housing subsidies. The PFA became the model of the subsequently formed MAC.

In 1979, I was appointed Chairman and CEO of the Metropolitan Transportation Authority ("MTA"), New York's regional urban and suburban transportation system. MTA's responsibilities include operation of the New York City subways and buses, the Long Island Railroad and MetroNorth commuter lines, and the Triborough Bridge and Tunnel Authority serving a population of about 25 million in 10 counties. I completely reorganized the MTA and its functions. I developed a long term capital plan and budget for a system wide upgrading of operating equipment, roadbed and signal capabilities, and I designed the financing plan for such improvements. In connection with these plans, I obtained authorizing legislation from the Congress and the New York State legislature to enable the issuance of tax exempt bonds secured by fare box revenues and the use of safe harbor leasing designed to lower equipment and financing costs to the MTA. The annual operating budget of the MTA in those years was in excess of $3 billion and its five year capital budget was in excess of $14 billion.

With respect to the municipal finance experience of the Company's principals, Peter J. Kiernan was appointed as Counsel to the Deputy Mayor for Finance during the New York City Fiscal Crisis. (The position of Deputy Mayor for Finance was created in response to the Fiscal Crisis). Mr. Kiernan served on the Mayor's Fiscal Crisis Management Team and as the Mayor's liaison to the EFCB and also to the U.S. Treasury in respect of the Seasonal Loan Program. Mr. Kiernan participated in the formulation, implementation and modification of the city's Financial Plan. From 1978-1980 Mr. Kiernan served as Chief Counsel to the New York State Senate Democrats as the Fiscal Crisis continued and he served as the Senate's statutory representative to the EFCB. Mr. Kiernan was Counsel to the Governor (David Paterson) from 2008 to 2010 when

3

New York State was in the grip of the Great Recession and faced an unprecedentedly severe revenue crisis that, like New York City during the Fiscal Crisis, also required enormous retrenchment. As Counsel to the Governor, Mr. Kiernan participated in every major state budget decision and negotiation, and, previously, as Chief Counsel to the New York State Senate Democratic Conference, he was the Senate Democrats' primary budget negotiator.

Carol O'Cleireacain, Ph.D. has more than thirty years of experience conducting and directing municipal budget and revenue analyses. She served as the Finance Commissioner of the City of New York, responsible for the country's largest municipal revenues, including the administrating, collecting and forecasting of the City's real property tax. She also administered the City's Treasury, which jointly with the City's Comptroller tracks the City's cash flow. Subsequently, she also served as the Director of the Mayor's Office of Management and Budget, which produced for the country's fourth largest government an annual expense budget of about $31 billion and a capital budget of $50 billion as well as a four year financial plan for both. She also served as Deputy Treasurer of the State of New Jersey in which capacity she directed New Jersey's public finance team.

Dr. O'Cleireacain has taught Public Finance at numerous universities. She has published widely on local government public finance, including her Brookings Institution study, "The Orphaned Capital", which addresses the troubled finances of the District of Columbia.

Over his 40-year career as a CEO and investment banker, Edward Grebow has been involved in restructuring and restoring to financial health numerous troubled organizations. He has extensive experience with budgeting, public and private debt and equity offerings, pension plans and operations.

4

In recent years, Mr. Grebow has worked with the FDIC and the Office of the Comptroller of the Currency on the resolution of troubled banks.

Mr. Grebow, along with several major banks and private equity firms, was a leading participant in the successful refinancing of Sallie Mae, America's largest student lender when it faced liquidity difficulties in 2007.

Mr. Grebow has extensive budgeting and planning experience having also been a senior officer of global industrial companies including CBS Inc. and Sony Corporation.

As CEO of Amalgamated Bank Mr. Grebow caused the Bank to structure and provide innovative, emergency financing to the city of Scranton, PA in 2012 and 2013 helping the city to avoid collapse.

2.    Budgeting

My governmental career includes other significant budgeting experience. My role in the New York City Fiscal Crisis of the 1970's was inextricably connected to the effort to balance the New York City budget in accordance with Generally Accepted Accounting Principles ("GAAP"). As Lieutenant Governor of New York, I was charged by Governor Paterson to improve the state budgeting process. With the assistance of Dr. O'Cleireacain, I produced a series of reports and a comprehensive plan to balance the state budget in accordance with GAAP. (The plan was not enacted into law.) As the court may be aware, government budgets generally are prepared and monitored on a cash basis.

Immediately after my tenure as Lieutenant Governor, along with Paul Volcker, the former Chair of the Federal Reserve Bank, I formed the **State Budget Crisis Task Force** (the

5

"Task Force") which focused on the structural budget issues of the states. The Task Force produced two national reports and six state specific reports presenting in-depth analyses of the major budget and fiscal problems confronting the states. The Task Force also convened several "National Dialogues" chaired by myself and Mr. Volcker that featured issue specific experts. Dr. O'Cleireacain and Mr. Kiernan served as senior consultants to the Task Force.

As exemplified by the Task Force and my numerous speaking appearances and interviews, the budget and fiscal problems of the states and the nation's cities has been the central focus of my professional life in the last four years.

3. <u>Financial Planning</u>

The Task Force explored best practices of government financial planning. The bedrock of government financial planning is the selection of proper, testable assumptions, thorough revenue forecast analyses (including sensitivity analyses), sound financial management and reporting systems, the ability to understand data and, importantly, the temperment to separate the crucial from the irritating in fiscal policy and financial management decision making. The principals of the Company are trained quantitative analysts with the judgment and practical experience required to understand the import of assembled data. As a career banker and financial manager, Mr. Grebow will supervise the assemblance and detailed analyses of all relevant financial data. He will retain quantitative analysts to make and explore the necessary inquiries.

B. **Opinion, Judgement and Objectivity**

I represent that I am willing and able by virtue of informed experience, capacity and training to exercise fair, unbiased and independent judgment in the assignment.

6

I am confident that I can give an opinion that is based on broad examination of the requisite facts and data that is the product of applied, tested principles and methods to the particular facts of the plan of adjustment.

I also represent that with the assistance of the principals identified in this Application (including certain quantitative analysts to be retained as necessary), I can prepare a thorough, detailed, sophisticated, properly annotated and sourced Report, and that I can provide testimony in deposition and at trial that, as with the Report, will be concise, succinct and understandable in respect of all matters relevant to the feasibility of the Plan and the reasonableness of Detroit's revenue and expense assumptions.

I further represent that I and the Company have the resources, time, ability, and wherewithal to accomplish the assignment within the schedule proscribed by the Court.

C.    **Disinterested**

I have no disqualifying connections or conflicts of interest with any party in interest. The Applicant is willing to forego any retention or engagement that might result in a conflict of interest in this case.

D.    **Fees/Pro Bono**

I will serve Pro Bono. My colleagues will be compensated in accordance with the proposed budget attached as Exhibit E.

The Company will be fully compliant with the requirements of 11 U.S.C. Section 330 in seeking approval of fees. All fees and expenses of the Company will be subject to a cap and to

the extent the time required to carry out the assignment in the best professional manner exceeds the value of the cap, the excess time will be provided pro bono.

E.     **Prior Retentions as Expert Witness**

I have not served as a retained expert witness.

Neither I nor the Company has had any current or past formal connections with the City of Detroit or the State of Michigan.

### Conclusion

Applicant submits that it has the requisite experience, capacity and judgment to opine in informed and learned fashion as to the feasibility of the Plan. Applicant's experience is drawn from dealing with challenging, daunting government financial problems on a large scale.

Respectfully Submitted,

Richard Ravitch

April 8, 2014

8

# EXHIBIT A

# RICHARD RAVITCH

**Home Address:**
1115 Fifth Avenue, Apt 14B
New York, New York 10128
(212) 831-9363

**Office Address:**
610 Fifth Avenue-Suite 420
New York, New York 10020
(212) 218-7880

**PERSONAL**
Richard Ravitch was born on July 7, 1933.  Mr. Ravitch is a Phi Beta Kappa
graduate of Columbia College and received his LLB from Yale University School of Law.  He is a member
of the Bar of the State of New York and of the Supreme Court of the United States.

Mr. Ravitch resides in the Borough of Manhattan in New York City.

**CURRENT AFFILIATIONS:**

| | |
|---|---|
| GENERAL PARTNER | Waterside Plaza |
| TRUSTEESHIPS | Trustee of Mount Sinai Medical Center |
| MEMBERSHIPS | The Century Club |
| | Council on Foreign Relations |
| BOARD OF DIRECTORS | Build America Mutual |

**FORMER AFFILIATIONS:**

| | |
|---|---|
| Co-Chairman | Millennial Housing Commission |
| Chairmanships | Chairman of the Board of Trustees of |
| |    Corporation for Supportive Housing |
| | The Bowery Savings Bank |
| | NYC Charter Revision Commission |
| | NYMTA (Metropolitan Transportation |
| |    Authority) |
| | NYS Urban Development Corporation |
| | NYS Economic Development Board |
| | HRH Construction Corporation |
| | NY Citizens Budget Commission |
| General Partner | The Blackstone Group |

1

| | |
|---|---|
| President | Dalton School - Board of Trustees |
| | Citizens Housing & Planning Council of NY |
| | Jewish Community Relations Council of NY |
| | Player Relations Committee-Major League |
| |   Baseball |
| | |
| Trustee | The Kaiser Family Foundation |
| | Teachers College of Columbia University |
| | WNET-Channel 13 |
| | Central Synagogue |
| | A. Philip Randolph Institute |
| | |
| Director | American Stock Exchange - |
| |   Board of Directors |
| | Olympia & York Companies, U.S.A. |
| | Addington Resources, Inc. |
| | Coro Foundation |
| | Citizens Union of the City of New York |
| | Recruitment & Training Program |
| | ULLICO |
| | |
| U.S. Delegate | United Nations Conference on Building, |
| |   Housing and Planning |
| | |
| Fellow | Kennedy School of Government at |
| |   Harvard University |
| | |
| Lecturer | Adjunct Columbia University School of Law |
| | U.S. Information Agency-Japan/Germany/ |
| |   Yugoslavia/Hungary |
| | |
| Member | NYS Council on Fiscal & Economic |
| |   Problems |
| Member | U.S. Commission on Urban Problems |
| |   (1966-68) |

## AWARDS AND CITATIONS

| | |
|---|---|
| 1986 | UJA Annual Award-Banking and Finance |
| |   Division |
| 1986 | Citizens Budget Commission-High Civic |
| |   Service |
| 1983 | Robert Moses Special Achievement Award |
| 1982 | American Public Transit Association |
| |   Individual of the Year Award |
| 1976 | Fiorello H. LaGuardia |
| 1976 | NYU Urban Leadership Award |
| 1976 | Jewish Guild for the Blind-Man of the Year |
| 1976 | Citizens Housing & Planning Council of |
| |   New York |
| 1976 | ASCE Construction Achievement Award |
| 1976 | AIA Award of Merit |

2

## Richard Ravitch

Richard Ravitch is a lawyer/businessman/public official who has been engaged in both private and public business for more than 50 years. He began his career in the construction business as a principal of the HRH Construction Corporation. There he was responsible, among other things, for supervising the development, financing and construction of over 45,000 units of affordable housing in New York, Washington, DC, Puerto Rico and other locations. In 1975, he was appointed by Governor Hugh Carey to serve as Chairman of the New York State Urban Development Corporation ("UDC"), a "moral obligation" financing and development agency with 30,000 dwelling units under construction, which had become insolvent and faced the first municipal bankruptcy since the 1930's. Mr. Ravitch designed the first municipal bailout plan. As part of this plan, Mr. Ravitch created the New York State Project Finance Agency ("PFA") as a new special purpose financing agency. PFA then issued credit-worthy revenue bonds secured by UDC's Federal subsidy payments. The proceeds from the sale of these bonds, initially to the New York Clearing House banks, together with state appropriations at levels less than would otherwise have been required to eliminate defaults, were sufficient to meet UDC's construction financing obligations and restore the State's fiscal credibility.

Later in 1975 and during the following year Mr. Ravitch assisted New York City and State officials in resolving the City's defaults. In this connection, Mr. Ravitch negotiated long term Federal guaranty arrangements with President Ford's administration and acted as an intermediary between the City and the leadership of the municipal unions and their pension funds in negotiating labor's contribution to the overall resolution. As part of such resolution and bailout of the City's default, the State created MAC or the Municipal Assistance Corporation as a new special purpose financing agency based on the PFA model.

In 1979, Mr. Ravitch was appointed Chairman and CEO of the Metropolitan Transportation Authority ("MTA"), New York's regional urban and suburban transportation system. MTA's responsibilities include operation of the New York City subways and buses, the Long Island Railroad and MetroNorth commuter lines, and the Triborough Bridge and Tunnel Authority. Mr. Ravitch completely reorganized the MTA and its functions. His restructuring changes and innovations included recruiting operating officials from the private sector with experience in marketing as well as management and operations. He developed a long term capital plan and budget for a system wide upgrading of operating equipment, roadbed and signal capabilities, and he designed the financing plan for such improvements. In connection with these plans, Mr. Ravitch obtained authorizing legislation from the Congress and the New York State legislature to enable the issuance of tax exempt bonds secured by fare box revenues and the use of safe harbor leasing designed to lower equipment and financing costs to the MTA. Another innovation involved his obtaining changes in State laws to enable more efficient procurement. Mr. Ravitch worked with the leadership of MTA's several unions on a continuing and mostly harmonious basis to implement the restructuring plans and to obtain labor's cooperation in contributing to operating efficiencies.

For his work at the MTA, Mr. Ravitch was awarded the American Public Transit Association's Individual of the Year Award in 1982.

Following his MTA service, Mr. Ravitch led an effort to recapitalize The Bowery Savings Bank, once the nation's largest mutual savings bank, involving his arranging for its acquisition from FDIC by an investor group and his serving as Chairman and CEO. Subsequently, Mr. Ravitch was retained by the owners of the Major League Baseball clubs to serve as President of the Player Relations Committee to advise them on the creation of a revenue sharing plan and proposal to the players. He also serves as principal partner in Ravitch Rice & Company LLC with Donald S. Rice, a lawyer and business partner who has assisted him in prior undertakings including the UDC and Bowery bailouts.

Mr. Ravitch was the first Chairman of the Corporation for Supportive Housing. He helped create the organization and served as Chairman for almost ten years.

In 1999, Congress created the Millennial Housing Commission to examine the federal government's role in meeting the nation's growing affordable housing challenges. Mr. Ravitch was appointed to serve as Co-Chair of the Commission which led a diverse group of 22 housing experts in an intensive 17 month process to rethink America's affordable housing policy. The Commission presented its report to Congress in May, 2002. The report recommended a series of initiatives to create new housing tools, reform several current programs and streamline existing programs.

In 2008, at the request of Governor Paterson , Mr. Ravitch chaired a commission that designed a plan to finance the MTA.

Mr. Ravitch recently served as Lieutenant Governor of the State of New York.

Mr. Ravitch recently co-chaired the State Budget Crisis Task Force with former chairman of the Federal Reserve, Paul A. Volcker.

4

# EXHIBIT B

# CAROL O'CLEIREACAIN, Ph.D.

315 West 106th Street, Apt 5B ▪ New York ▪ New York 10025
*Tel* 212-866-7663 ▪ *Fax* 212-866-6526 ▪ coc315@gmail.com

*Senior public sector financial executive: demonstrated experience in the oversight of financial and budget operations in large organizations; skilled in building and motivating a team in a changing environment; adept at operating at the interface of the private and public sectors.*

**EDUCATION:**
**PhD, Economics,** London School of Economics, 1977
**MA, Economics,** University of Michigan, 1970
**BA, Economics,** with distinction, University of Michigan, 1968

**PRESENT POSITIONS:**
**Economic & Management Consultant, 1994-**

**PREVIOUS POSITIONS:**
**The Brookings Institution, Washington DC, 1996-2012 (except for 2006)**
   **Senior Fellow (non-resident),** Metropolitan Policy Program, **1997-2005; 2007-2012**
   **Visiting Fellow,** Economic Studies, **1996-1997**
   (Directed DC Revenue Project, authored *The Orphaned Capital*.)

**Task Force on the State Budget Crisis** (Paul A. Volcker & Richard Ravitch, Chairs), 2011-2012
   **Senior consultant**

**Senior Fellow, Nelson A. Rockefeller Institute of Government, SUNY, 2010.**

**Deputy State Treasurer, State of New Jersey, 2006**
Leadership role in daily management of New Jersey State government. Member Gov. Corzine's Cabinet.

- **Management oversight responsibilities for the Treasury**, a department of 11 divisions and 3,700 employees, tasked with the generation and collection of revenues, distribution of appropriations funding State government operations, asset management, and the administration of statewide support services, including employee pension and health benefits.
  - Restored strong ethical standards, including an improved oversight and management process throughout Treasury.
  - Acted as a change-agent to bring together a management team across the Treasury functions most directly related to the State's operations – OMB, taxation, revenue, finance, pensions, investment and employee benefits.
- **Acting Director of the Division of Taxation**, exercising all powers related to State tax collection and the design and implementation of state tax policy for FY2007.
- **Directed the public finance team** issuing and refinancing state and state-related debt, including performance of due diligence, selection of the Senior Managing Underwriters on all negotiated bond underwritings for the State and its independent Authorities, and managed the historic TTFA borrowing and all credit market borrowings in 2006.
- Member of Budget Reform Advisory Committee constructing Governor's FY2007 financial plan to eliminate a budget deficit exceeding $4.5 billion.

**Economic & Management Consultant, 1994 -- (except 2006)**
Services ranged from in-house **consultation,** to **studies and publications,** to **expert testimony;** clients spanned **public, private and non-profit** sectors. For example:

- Federally imposed control board [DCFRA] running the District of Columbia (1997-2001): oversight of budget and fiscal management.
- Office of the Mayor & City Administrator, District of Columbia (2004-05): design and implementation of a capital planning and budgeting process, with supporting data and timelines.
- Empire Blue Cross/Blue Shield (2000-2004): member of team advising the CEO before, during and after the IPO.
- NY Building Congress (2003-2004): created first-ever accounting of total spending, by all levels of government, on public infrastructure in the City of New York.
- Numerous studies of NY's economy and fiscal health for various non-profit clients (1999-2005).

**NYC Government, David N. Dinkins, Mayor (1990-1993)**
**Director, Mayor's Office of Management & Budget, 1993**
**Top City financial executive,** responsible for the annual $31 billion **expense budget&$50 billion multi-year capital plan,** reporting directly to the Mayor & First Deputy Mayor.

- Issued and re-financed City debt, including related due-diligence, negotiations with rating agencies, underwriters and major lenders.
- Managed fiscal relations with NYS Financial Control Board, NYS & NYC Comptrollers, City Council, and NYS Budget Office and Legislature.
- Produced quarterly budget up-date and revised financial plan.

**Commissioner, NYC Department of Finance, 1990-93**

- **Management & administration of 23 taxes,** raising $17 billion in **revenue,** with 2,500 employees, including the **assessment of** America's largest **property** tax base, approaching one million properties.
- Directed the **Treasury,** with a cash flow of $30 billion and daily balances of $250 million.
- **Chaired Banking Commission,** awarding banking contracts.
- **Directed City pension policy and chaired Trustee Boards** and Proxy Committees of the two largest retirement systems (NYCERS and TRS), with assets in excess of $35 billion.
- Senior member of **Mayor's budget cabinet.**

*Accomplishments:*

- Managed a major downsizing – reduced staff by 25% over 3 years – while raising enforcement and audit revenues by two-thirds.
- Designed progressive tax and fee increases, including the dedicated funding for the Safe City-Safe Streets expansion of on-street police protection.
- Generated four-fold increase in revenue from tax appeals by clearing a backlog, creating productivity targets and focusing legal staff on revenue targets.
- Increased pension fund performance, as Chair of the NYC Teachers Retirement System, by leading a seven-person board to diversify $20B portfolio into equities. The board, which reflected employees and two different employers, had resisted this for more than forty years.
- Instilled transparency, accountability and a sense of customer service.

**Assistant to Executive Director & Chief Economist, District Council 37, AFSCME (1976-1990)**
- Built an in-house policy and budget analysis function for Ex. Director Victor Gotbaum.
- Represented the Director and union on various public bodies and in numerous public forums.
- Key advisor within management team during leadership transition.

*ACADEMIC APPOINTMENTS:*
**Professor (adjunct):** Milano Graduate School for Management & Urban Policy, New School 2007/8, 2004/5, 2000/1. Barnard College, Columbia Univ. 1997-99. **Assoc. Prof. (adjunct):** Wagner Graduate School of Public Service, NYU & Milano, New School 1987/8. **Senior Research Assoc.** CUNY Grad Center, Bildner Center, 1983-97. **Asst. Prof. (adjunct):** Columbia Univ. 1982/3. **Lecturer:** New School 1977-79. Sarah Lawrence College 1976/7 & 1979/80. Manhattanville College 1976/7. Univ. London (Goldsmiths' College) 1971-77. Univ. Reading (UK) 1971/2. **Research Officer:** Univ. London (LSE) 1972-74. **Teaching Fellow:** Univ. Michigan 1968-71.

*DIRECTORSHIPS:*
*Corporate:* **Trillium Asset Management Corporation, Boston MA, 1996-2011.**
> [Executive Committee (Chair), Social Investing Committee]
>   **Spectrum Pharmaceuticals, Inc., Irvine CA, 1996-2004**
>> [Audit Committee (Chair); Placement Committee (Chair); Special Functions Committee]
>>   **ACME Metals Inc., Riverdale IL,** (Audit, Finance and Nominating Committees), **1994-96**

*Non-Profit:* **FoodChange, New York City, 2004-07** (Merged with Food Bank July 1, 2007.)

*SELECTED PRIOR ASSOCIATIONS:*
*Financial Management & Public Policy:*
NYS Comptroller Thomas Di Napoli's Management Review Commission, 2007
National Academy of Sciences, NRC Board on Infrastructure Comm. on Public Investment, 2001-04
Governmental Accounting Standards Board, Post Employment Benefits Task Force, 2000-04
President Clinton's Commission to Study Capital Budgeting, 1997-99
U.S. National Civil Aviation Review Commission (Mineta Commission), 1997
Grand Central Partnership BID (Director & Finance Committee), 1995-2001
Times Square BID (Director, Audit & Finance Committees), 1995-2001
NYC Comptroller, Economic Advisory Committee, 1997-2000
NYC Independent Budget Office, Advisory Committee, 1995-99. Vice Chair, 1998-99.
*Health:*
NY Governor's Panel of Economists setting inflation trend for hospital reimbursements, 1978-89.
*Labor:*
Century Foundation Task Force on the Future of Unions, Member & Executive Director, 1997-98.
*International:*
CUNY Bildner Center & ITAM (Mexico City), Co-Chair, 21st Century City Project, 1992-97.

*SELECTED AWARDS AND HONORS:*
Woodrow Wilson Visiting Fellows Program, 1986-95. Japan Society Leadership Fellow, 1984-85.
Aspen Institute, Moderator, 1984; Fellow, 1983. Univ. Michigan, various fellowships, 1968-71.

*MEDIA EXPERIENCE:*
Accomplished public speaker. Testimony before the US Congress and executive agencies, NYS Legislature, NYS PERB fact-finding and arbitration panels, NY and Washington DC City Councils. Extensive network TV, radio and print interviews, including editorial boards, in the US, EU, Mexico, Brazil, Australia and Japan. Op-eds include the *New York Times, Financial Times, Washington Post,*

**SELECTED PUBLICATIONS:**
***State & Local Government Finance:***
*Report of the State Budget Crisis Task Force.* July 2012. Member.
Author of *State Reports on New York & Virginia*, December 2012.
http://www.statebudgetcrisis.org/wpcms/report-1/
http://www.statebudgetcrisis.org/wpcms/wp-content/images/NY-Report.pdf
http://www.statebudgetcrisis.org/wpcms/wp-content/images/2012-11-26_Virginia_Report_Final.pdf

***State & Local Government Finance: New York State***
*Hidden in Plain Sight: New York's Unbalanced Budgets.* The Rockefeller Institute, SUNY.
December 2010. http://www.rockinst.org/pdf/budgetary_balance_ny/2010-12-20-
Hidden_in_Plain_Sight.pdf

*Health Insurance Cost Sharing: New York State's Model for Localities.* The Rockefeller Institute,
SUNY. November 2010. http://www.rockinst.org/pdf/budgetary_balance_ny/2010-11-08-
Health_Insurance_Cost.pdf

***State & Local Government Finance: Washington DC***
*Cleaner Rivers for the National Capital Region: Sharing the Cost.* Brookings Metropolitan Policy
Program, Policy Brief, May 2012.

*The District of Columbia Capital Budget Process: A Three Part Study*, with Alice M. Rivlin & Mary
Filardo. (Prepared for the Office of the Mayor and City Administrator, Washington DC.) Brookings
Greater Washington Research Program, 2005. http://www.brook.edu/metro/gwrp/washington.htm

*A Sound Fiscal Footing for the Nation's Capital: A Federal Responsibility,* with Alice M. Rivlin.
Brookings Research Brief, October 2002.

*Envisioning a Future Washington,* with Alice M. Rivlin. Brookings Research Brief, June 2001.

*Bolstering D.C.'s Fragile Fiscal Recovery.* Brookings Policy Brief, No. 36, October 1998.

*The Orphaned Capital: Adopting the Right Revenues for the District of Columbia.* Brookings. 1997.
[The book's summary published as: *The Orphaned Capital: A Revenue Plan for the District of
Columbia.* Brookings Policy Brief, No. 11, January 1997.]

"The Nation's Capital in Crisis," General Session: The Fiscal Status of Cities, *Proceedings of 89th
Annual Conference on Taxation (Boston 11/96).* WDC: National Tax Association. 1997.

***State & Local Government Finance: New York City***
*How to Save New York City's Infrastructure: Dedicate Revenues.* NY Building Foundation. 2013.

*Public Infrastructure Dividends: The Benefits of Capital Investments in New York City.* NY Building
Foundation. 2011.

*The Capital Question: Financing New York City's Future Infrastructure.* NY Bldg. Congress. 2004.

"The Private Economy and the Public Budget of New York City," in Margaret E. Crahan & Alberto
Vourvoulias-Bush (eds.), *The City and the World: New York City in the Global Context* (NY: Council
on Foreign Relations, 1997), Chapter 4.

"Reflections on Managing the Budget Office During Rapid Downsizing." *Journal of Policy Analysis and Management,* Winter 1997, pp.137-141.

"The NYC Budget Situation, 1994," in C.P. Figueroa, J.W. Wilke, J.A. Alejandre (eds.) *Mexico and the Americas, VII PROFMEX-ANNUIES Conf. Proceedings* (Mexico: Annuies, 1996), pp.479-90.

"Historical Review of the New York City Structural Balance Debate," in *Structural Balance and the NYC Financial Plan: An Intellectual History 1990-1993* (NY: NY Law School, 1994), pp.1-16.

"A Case Study in Fiscal Federalism: New York City and New York State," *Fordham Urban Law Journal*, Vol.XIX, No.3, 1992, pp.727-745.

"Cities' Role in the Metropolitan Economy and the Federal Structure," in Henry G. Cisneros (ed.) *Interwoven Destinies: Cities and the Nation* (NY: W.W. Norton & Co., 1993), Chapter 7.

"The New Federalism: From Revenue Sharing to Deficit Sharing," *Dissent* Spring 1991.

### Public Finance:
"The US Industrial Policy Debate," *CUNY-Bildner Center for Western Hemisphere Studies Policy Paper*, No.15, July 1984.

"The Domestic Context of US Economic Policy," *CUNY-Bildner Center for Western Hemisphere Studies Policy Paper*, No.4, Sept. 1983.

Prop.13's Attack on the Public Sector: Labor View," with V. Gotbaum, *City Almanac:* 13-6 1979.

### Corporate Governance:
"A Holistic Approach to Institutional Investor Behavior," *Corporate Governance Advisor*, Vol.1, No.7 (1993), pp. 30-43.

"Zero-Based Compensation Design from the Institutional Investor's Point of View," *Corporate Governance Today and Tomorrow: The Thoughts of Seven Leading Players* (Investor Responsibility Research Center, 1992), pp.85-96.

"Pension Funds and Social Investment," *Dissent* Winter 1991, pp. 12-14. Also in P. Kinder, S. Lydenberg, and A. Domini (eds.) *The Social Investment Almanac* (NY: Henry Holt & Co., 1992).

"Toward a Democratic Control of Capital: The Use of Pension Funds," in N. Lieber (ed.) *Eurosocialism and America: An International Exchange* (Temple Univ. Press, 1982).

### Labor Markets:
"Statement of Task Force Members…," *What's Next for Organized Labor: Report of the Century Foundation Task Force on the Future of Unions.* (Century Foundation Press, 1999), pp. 36-48.

"Hospital Workers and the Health Care Crisis," *Journal of Public Health Policy*, Vol.10 No.2, 1989.

"Visions for the 1990s: Labor Market Issues and Policies," with V. Gotbaum, *Visions for the 1990s* (Economic Policy Council, UNA-USA, 1988).

"Women and the Future of the Labor Movement," *Social Policy*, Jan. 1986.

"Bailing Water in the 'Flagship of American Cities': Municipal Workers Ten Years After the Fiscal Crisis," *City Almanac*, Vol. 18, No.3 (1985).

"Le travail flexible: les facteurs d'inquietude," in P. Dommergues, G. Groux, and J. Mason (eds.), *Les Syndicates Francais et Americains face aux Mutations Technologiques* (Paris: Editions Anthropos, 1984).

*Women in the Public Services*, with S. Attenborough & G. Nyberg (PSI: 1984).

"NY's Municipal Negotiations," *City Almanac*, Vol. 16, No.2 (1982).

"Compensation of Municipal Workers in Large Cities: The New York City Perspective," with M. McCormick & E. Dickson, *City Almanac*, Vol. 15, No.1 (1980).

"Activity Rates of Married Women in England and Wales, 1971," with E.S. Lightman, *Applied Economics*, Vol. 10 No. 3 (1978).

"Labour Market Trends in London & the Southeast," *Urban Studies*, Vol.11 (10/74).

# EXHIBIT C

**Edward Grebow**

Mr. Grebow is a Managing Director of Morgan Joseph TriArtisan where he advises financial services companies, not for profit organizations and corporations involved in restructurings. Mr. Grebow re-joined Morgan Joseph TriArtisan in November 2013 after serving as President and CEO of Amalgamated Bank. In 2012, while CEO of Amalgamated Bank, Mr. Grebow led the successful effort to refinance the City of Scranton PA, which was facing default. Prior to joining Amalgamated, Mr. Grebow was a Managing Director of J.C. Flowers & Co, a leading private equity firm focused on the financial services sector. Mr. Grebow was retained by J.C. Flowers & Co in May 2007 to run its $25 billion acquisition of Sallie Mae. Until June 2006, Mr. Grebow served as President of the ULLICO Inc. family of companies, including the $6 billion Union Labor Life Insurance Company. As President of ULLICO, Mr. Grebow successfully developed and implemented a business plan for ULLICO which recapitalized the Company, restored its financial strength rating and rebuilt its unique position as the financial services company for labor unions and their affiliated pension plans. In 2002 and 2003, Mr. Grebow served as President of the Metropolitan Television Alliance (MTVA), a consortium Of 11 New York Metropolitan Area Broadcasters seeking to rebuild the TV and Emergency services transmission tower destroyed atop The World Trade Center on September 11, 2001. Prior to joining MTVA, Mr. Grebow was Deputy President of Sony Electronics, Inc., and President of Sony's Broadcast and Professional Company. Mr. Grebow joined Sony from Chyron Corporation, a leading maker of broadcast graphics, routing and automation systems, where he was President and Chief Executive Officer. Prior to joining Chyron, Mr. Grebow spent seven years with CBS, Inc. as Executive Vice President in charge of Operations. Prior to joining CBS, Mr. Grebow spent more than 15 years in financial services management positions including Vice President at JP Morgan & Co. Inc., President of JP Morgan Leasefunding Corp. and Chief Operating Officer and EVP of The Bowery Savings Bank. Mr. Grebow was part of the group that purchased the Bowery from the FDIC in 1985 and restored it to financial health.


Mr. Grebow serves as Director and Chairman of the Audit Committee of Diamond Offshore Drilling, Inc. (NYSE:DO), He also serves as a Trustee of Thirteen/WNET, of the International Association of Firefighters Foundation and of the Laborers International Union Charitable Fund. He has also served on the Board of Trustees of The George Washington University, the Theatre Development Fund, Flowers National Bank and Panavision Inc. He was appointed by Governor Mario Cuomo to the New York State Hospital Review and Planning Council.

# EXHIBIT D

**Peter Kiernan**

Peter J. Kiernan holds law (J.D.) and business (MBA) degrees from Cornell University and a degree in government (MPA) from Harvard University.

During the New York City Fiscal Crisis Mr. Kiernan was appointed Counsel to the Deputy Mayor for Finance and served on the Mayor's Fiscal Crisis Management Team. He authored the Shinn Commission Pension Reform legislation which completely restructured New York City's five actuarially funded pension systems.

In 2008 Mr. Kiernan was appointed Counsel to the Governor. As Counsel he managed the Governor's legislative program, directed the state's relations with its Indian nations, and participated in all major budget decisions of the state. He managed the promulgation of the new TIER V Pension Plan in 2009.

As a Trustee of the Citizens Budget Commission Mr. Kiernan co-authored reports on public authority finance and infrastructure finance. As Chair of the New York City Bar Association New York City Affairs Committee, Mr. Kiernan authored a lengthy report on the financing of the Hudson Yards Redevelopment Area. In 2014, with economist Don Boyd, Mr. Kiernan authored "Strengthening the Security of Public Sector Defined Benefit Plans" published by the Nelson A. Rockefeller Institute of Government.

From 1994 – 2001 he was Chief Executive Officer of Watermark Associates, Inc., a Mexican owned waterfront development entity. He also was Chair of the Brooklyn Sports Foundation and raised $70 million of capital funding.

Mr. Kiernan is Chair of the New York State Law Revision Commission.

# EXHIBIT E

**Proposed Budget**

| | |
|---|---:|
| Evaluation | $ 325,575 |
| Report Preparation | 278,350 |
| Deposition & Testimony | 346,500 |
| | 916,425 |
| Extimated Expenses | 48,750 |
| TOTAL | $ 965,175 |

Principals at $750/hr.

Analyst(s) at $150/hr.



Detroit Project Timeline

- April 18 Project Start
- Research complete May 19
- Report Due June 2
- Depositions Begin June 5
- Depositions End June 30
- Hearing Date July 16-31

Timeline axis: 14-Apr, 28-Apr, 12-May, 26-May, 9-Jun, 23-Jun, 7-Jul, 21-Jul, 4-Aug

**The PFM Group**

Public Financial Management, Inc.
PFM Asset Management, LLC
PFM Advisors

Two Logan Square
Suite 1600
18th & Arch Streets
Philadelphia, PA
19103-2770

April 9, 2014

The Honorable Steven W. Rhodes
United States Bankruptcy Court
Eastern District of Michigan
Southern Division

<div align="center">

Re: Case No. 13-53846
In re: City of Detroit, Michigan, Debtor
**Order Regarding the Solicitation of Applications to Serve as the Court's Expert Witness on
the Issue of Feasibility**

</div>

Honorable Judge Rhodes:

I am writing on behalf of Public Financial Management, Inc. (PFM) to apply to serve as the
Court's Expert Witness on the Issue of Feasibility of the City of Detroit's plan of adjustment.

As I will outline in the application below, I – along with other members of my team – meet and
exceed all of the qualifications set forth in the Court's order:

- PFM has strong qualifications in municipal finance, budgeting and planning and can
  provide an opinion regarding the feasibility of the City's plan of adjustment and the
  reasonableness of the assumptions that underlie the City's cash flow forecasts and
  projections. PFM has deep expertise in -- and understanding of -- local government
  budgets, particularly budgeting and multi-year financial planning for economically and
  fiscally-distressed cities. Members of our team have been involved in some of the most
  significant municipal turnaround efforts in the United States over the last two decades,
  including the financial renaissance of Philadelphia and Pittsburgh, and have advised
  Chapter 9 governments such as the City of Vallejo and Jefferson County.

- PFM and its professionals are able to deliver an opinion that is based on sufficient facts
  and data and is the product of reliable principles and methods and the application of those
  principles and methods to the facts of the case. It is what we do every day in our work
  with cities around the country.

- PFM can exercise fair, unbiased and independent judgment in the assignment –
  independence and integrity are at the core of the firm's mission.

- Our team has years of practical experience in working with distressed cities as former
  officials and hands-on advisors. We have more than just an academic or professional trade
  group view of municipal finance – we have been in the trenches as municipal finance
  officials and appointed financial overseers, and understand the real world dimensions of
  what is feasible and what is not in achieving sustainable recovery.

<div align="center">1</div>

- Given our career-long commitments to excellence in local government, we also see this opportunity to contribute to the City's future in an independent, constructive, and practical role to be extraordinarily important and personally meaningful.

- Our team is fully prepared to develop a report and provide testimony in deposition and at trial that will be concise and understandable in addressing the sophisticated and complex matters related to the feasibility of the plan of adjustment and to the reasonableness of the City's assumptions regarding its revenues, expenses and plan payments. PFM recognizes that budgets and municipal finance are more than just numbers, and regularly works with local governments to explain the underlying issues and assumptions in a city's finances to larger audiences of varying stakeholders.

- PFM has the resources and capacity to accomplish the assignment within the schedule adopted by the Court for the hearing on confirmation of the City's plan. With more than 500 employees in the firm and more than 25 professionals in our Management & Budget Consulting practice alone, PFM stands ready to meet the Court's schedule.

- We have no disqualifying connections or conflicts of interest with any party in interest and we are willing to forego any prospective retention or engagement that might result in a conflict of interest in the case, subject to clarification of parameters with the Court during the interview and selection process.

### Statement Disclosing Why the Applicant is Interested in the Appointment

PFM is the nation's leading financial advisor to public entities. The firm has been the nation's number one ranked financial advisor since 1998, having advised on over 780 financings totaling over $46 billion 2013 alone. Founded in 1975, PFM has 33 offices nationally and 85 partners with specialties in the areas of financial advisory, investment management, investment consulting and management and budget consulting. PFM is well-respected for providing public sector clients with highly professional, client-focused advisory services free of conflicts. Our focus is on independence, integrity and initiative.

As a firm, we work with state and local governments across the nation on a daily basis. We understand the unique and significant challenges that Detroit and other economically and fiscally distressed municipalities face. Within PFM, the Management & Budget Consulting practice, within which I lead our firm's turnaround services, has a specific focus on working with public agencies to achieve economic and fiscal sustainability. While we have academic credentials and belong to professional associations, we are fundamentally practitioners who understand public sector budgets and finance from working for cities, counties and other governmental agencies prior to entering consulting and now advising public entities day to day.

For more than a decade, I and other members of the practice have led engagements working with cities such as Pittsburgh, Cleveland, Youngstown, New Orleans, Memphis, Miami, and Baltimore to restore economic and financial sustainability. Prior to joining PFM, I also served as Budget

Director for the City of Philadelphia. These are all cities – like Detroit – that have seen years of depopulation, depletion of tax base and deterioration of local finances. We have regularly been appointed or approved by states in our role as fiscal overseers. Most recently, a consortium led by our team has been selected by the U.S. Department of Housing & Urban Development to manage the National Resource Network, a federal effort to build capacity in financially-challenged cities nationwide.

We have also worked in Vallejo, California and Jefferson County, Alabama and understand the factors that lead local governments to seek relief under Chapter 9.

Through this experience, we have learned the important lesson so often overlooked by experts who opine on financial and efficiency issues in cities in fiscal distress: while fiscal stability and balanced budgets are essential to the long term economic sustainability of a city, cities require more than just a balanced budget to thrive and prosper.

We seek this appointment because we believe that individually and as a firm we would offer unique expertise and qualifications to the Court as it assesses the feasibility of the City's plan of adjustment.

More than that, we seek this appointment because we believe in the importance and viability of Detroit and cities like Detroit. I, along with other members of the team that would support me, have not only worked with cities -- we have worked for cities, serving in lead finance roles in Philadelphia, Austin, Memphis, Chattanooga and elsewhere. We are former senior local government officials who understand that the restructuring and turnaround of a city is vastly different than a similar activity in the private sector. We understand that the people of Detroit – now and for the long-term – are the ultimate stakeholders.

## Qualifications in Municipal Finance and Budgeting and Municipal Planning

*Prior Experience and Qualifications of the Expert Witness and Members of the Expert Team*

PFM proposes a highly-qualified and experienced team to support the Court in its review of the plan of adjustment. PFM's expert witness and key support team members have served as Budget Director and/or Finance Director in cities including Philadelphia, Austin, Memphis, and Chattanooga. They have been financial overseers for Pittsburgh, Miami, Gary, Reading and other jurisdictions, producing acclaimed workout plans for multiple jurisdictions. Members of the team have worked in other roles with Chapter 9 governments like Vallejo and Jefferson County, and have helped scores of cities to avoid reaching such levels of financial distress. Finally, PFM has been selected by the federal government to help lead the National Resource Network, a team of experts to assist the nation's most economically challenged cities in turnarounds: a member of the Expert Team is the Executive Director of this effort and PFM leads the team's work on financial and operational issues.

As a result of these diverse experiences, PFM understands how cities can recover from financial crisis, and how to evaluate a long-term recovery plan.

To staff the feasibility review of the plan of adjustment, PFM proposes a team led by Managing Director Dean Kaplan and supported by other senior PFM professionals. Mr. Kaplan will serve as the Expert Witness to the Court and direct the overall team. He will be assisted by David Eichenthal and Michael Nadol, also partners in PFM's Management & Budget Consulting practice. They will draw on the subject matter expertise of numerous colleagues. Short biographies of key proposed PFM team members follow, including brief descriptions of their proposed role in this engagement; longer résumés are included in Appendix C.

**Dean Kaplan** will serve as the Expert Witness to the Court. He is a Managing Director with PFM's Management & Budget Consulting practice, where he concentrates on restoring the finances of distressed cities and counties. At PFM since 2000, he has worked on multi-year planning, budgeting and budget oversight, and operations improvement efforts for cities, counties and special districts around the United States. His clients at PFM have included Austin, Texas; Baltimore, Maryland; Cleveland, Ohio; Aurora, Colorado; and the Commonwealth of Pennsylvania's Department of Community & Economic Development.

The Commonwealth of Pennsylvania has appointed Mr. Kaplan recovery plan coordinator for the cities of Pittsburgh, Reading and New Castle, which are in the state's distressed municipalities program, and which have experienced improved finances under PFM-led state oversight. Mr. Kaplan has also developed multi-year financial plans for other financially stressed governments, including Cleveland, Ohio, Gary, Indiana and (under Pennsylvania's Early Intervention Program) Luzerne County and the cities of Allentown, Easton, York, and Wilkes-Barre. In 2010, he led PFM's work in support of Cuyahoga County, Ohio, in its transition to a new form of government. He currently directs PFM's team to support Pennsylvania's Department of Education in addressing issues in the state's four school districts designated as financially distressed. In addition, he serves on the governing board of the National Resource Network.

Mr. Kaplan joined PFM after a year at the University of Birmingham in the United Kingdom as an Atlantic Fellow. Before being awarded the fellowship, Mr. Kaplan was Budget Director for the City/County of Philadelphia, where he was appointed by Mayor to lead development and implementation of $4.5 billion annual operating budget for the nation's fifth-largest City. As Budget Director he managed spending for all City agencies, boards and commissions, resulting in a record level of fund balance while City was emerging from fiscal distress and operating under state oversight.

His professional experience also includes service as Deputy Commissioner/CFO of the Philadelphia Water Department, a large regional water, sewer and storm water utility with significant customer base outside the City limits. He also worked for Philadelphia's Streets Department (sanitation, highways, and other services), and as Legislative Director for a U.S. Representative.

Mr. Kaplan holds a Master in Public Administration degree from the John F. Kennedy School of Government at Harvard University and a Bachelor of Arts degree with honors from Haverford College. He has also attended the London School of Economics & Political Science and has

taught at the Fels Center of Government at the University of Pennsylvania. Mr. Kaplan has served as an evaluator for the Ford Foundation's Innovations in American Government Awards, and as a member of various state government commissions.

**David Eichenthal** will provide senior support to the Expert Witness, complete analysis of a variety of general agencies, and help manage the project team. A Managing Director at PFM, Mr. Eichenthal has completed multi-year financial plan development, fiscal sustainability, distressed municipality recovery, program evaluation, operational efficiency and budget engagements in Youngstown, Ohio; Memphis, Tennessee; New Orleans, Louisiana; Jefferson County, Alabama; Mobile County, Alabama; Cuyahoga County, Ohio; Shelby County, Tennessee; and Montgomery County, Pennsylvania. He currently serves as the Executive Director of the Strong Cities Strong Communities National Resource Network – funded with $10 million in initial support from the federal government in 2013 and designed to provide comprehensive fiscal and economic technical assistance to economically challenged local governments.

Earlier, Mr. Eichenthal was President and CEO of the Ochs Center for Metropolitan Studies and Chief Finance Officer and Director of Performance Review for the City of Chattanooga, Tennessee. He has also served as Chief of Staff in the Office of the Public Advocate in New York City, and held numerous other public oversight positions in that government. Mr. Eichenthal holds a J.D. from the New York University School of Law and a B.A. from the University of Chicago. He is the co-author of *The Art of the Watchdog: Fighting Fraud, Waste, Abuse and Corruption in Government* (SUNY Excelsior Press, 2014).

**Michael Nadol** will be a member of the Expert Team primarily responsible for analysis of labor and workforce aspects of the plan of adjustment. Along with Mr. Kaplan, he will also cover any water and wastewater utility issues. A Managing Director at PFM and a member of the firm's Executive Committee, Mr. Nadol leads client projects including multi-year financial plan development, fiscal sustainability, distressed municipality recovery, program evaluation, workforce analysis, and budget engagements. Recently he completed the widely-praised Ten Year Financial Plan for the City of Baltimore, and he advises many of the nation's largest public employers in collective bargaining and the development of sustainable retiree benefit programs.

Prior to joining PFM, Mr. Nadol served in positions including Director of Finance, Deputy Mayor for Finance, and Director of Labor Negotiations for the City of Philadelphia during a period of recovery from financial distress. In addition, as Deputy Commissioner for the Philadelphia Water Department, he oversaw both finances and human resources for one of the nation's largest environmental utilities. He holds a Masters of Governmental Administration from the University of Pennsylvania, where he is an adjunct faculty member, and a B.A. from Yale University. He is also an appointed adviser to the Government Finance Officers Association Committee on Governmental Budgeting and Fiscal Policy.

Assisting Mr. Nadol will be **Vijay Kapoor**, a Director at PFM in the workforce group of the firm's Management & Budget Consulting practice. In addition to general workforce support, he will focus on pension and other post-employment benefits matters and analysis of broad efficiency initiatives. Mr. Kapoor helps governments of all sizes with their most pressing workforce issues

5

by finding ways to address pension and retiree health liabilities and providing economic and strategic support for public sector collective bargaining and interest arbitration. In 2013, Mr. Kapoor mediated a comprehensive consensus agreement among the City of Lexington, Kentucky, and its police and fire unions to address an underfunded pension fund. He also recently mediated another pension consensus agreement with the City of Chattanooga, Tennessee and its police and fire employees and retirees.

Previously, Mr. Kapoor served in state government in positions including Executive Director of the Commonwealth of Pennsylvania's Office of Management and Productivity, and practiced as a labor and employment attorney, where he specialized in public sector labor relations matters.

**Virginia Rutledge** will act as a Consultant to the Expert Team, focusing on financial operations, energy/lighting/utility issues, and support services. She recently retired as a Director in PFM's Orlando, Florida office, and works part-time to assist MBC and PFM's financial advisory practices. While at PFM, Rutledge served as financial advisor to the Financial Oversight Board for the City of Miami, and was part of the teams that developed financial strategies and recommendations for Fulton and DeKalb counties in Georgia; Shelby County, Tennessee; Pittsburgh, Pennsylvania; Reading Pennsylvania; and New Orleans, Louisiana.

Prior to joining PFM, Ms. Rutledge served as Finance Director for both the cities of Memphis, Tennessee and Austin, Texas. She also was Vice President and Chief Financial Officer for the Orlando Utilities Commission and Chief Financial Officer for the Massachusetts Municipal Wholesale Electric Company, a public power agency. Ms. Rutledge is past president of the Government Finance Officers Association of the United States and Canada (GFOA).

**Gordon Mann** will be a member of the Expert Team supporting general governmental analysis. He is a Senior Managing Consultant and project manager in PFM's Management & Budget Consulting practice, focusing on financial, operational and strategic analysis for municipal governments. Mr. Mann is particularly active in the practice's work with Pennsylvania municipalities that are subject to State oversight under the Commonwealth's Municipalities Financial Recovery Act. He is an experienced manager of multi-disciplinary teams analyzing municipal financial distress and recovery plans.

**Daniel Kozloff** will be a resource for the Expert Team. He is a Managing Director who leads PFM's Quantitative Strategies Group, a dedicated group of professionals who provide primary technical, new product, transactional, and modeling expertise for PFM's clients. He also serves as financial advisor to a number of large, complex public sector clients of the firm. In reviewing the plan of adjustment, Mr. Kozloff will direct necessary debt-related financial analysis and manage subject matter expert resources from other PFM practices.

PFM's Management & Budget Consulting practice has additional staff senior and junior staff who specialize in various aspects of municipal government ranging from public safety to public works. In order to thoroughly and efficiently review the plan of adjustment, the managers listed above will be supported by these other PFM professionals.

Other Expert Team members will be drawn on an as-needed basis from PFM's other practices to address particular items in the plan of adjustment. For example, the firm maintains a national practice to advise governments on public-private partnership (P3) transactions, including sale or long-term lease of assets. The firm has expertise in the full range of municipal bond market transactions, and maintains an active market pricing analysis group and swaps advising and monitoring service.

*Past Experience of PFM and the Management & Budget Consulting Practice*

Beginning with PFM's work on Philadelphia's successful turnaround plan from "junk bond" status in the early 1990s, and continuing through today, PFM's Management & Budget Consulting group has helped to set the standard for public sector financial planning in order to achieve sustainable budget health.

Over the past two decades, PFM has been involved with some of the most significant and successful government turnaround efforts in the country. We have served as state-appointed fiscal recovery coordinators, advised state control boards and emergency financial managers, and worked directly for cities and counties in bankruptcy or under state oversight.

A sample of our prior engagements include:

**Philadelphia, Pennsylvania:** In 1991, facing a $225 million deficit, the City of Philadelphia's credit was downgraded to "junk bond" levels and the City was placed under state oversight pursuant to the terms of a new state law. PFM was engaged by the City in 1992 to assist in analyzing the City's financial situation and developing hundreds of initiatives to restore fiscal health. That research and the resulting initiatives were summarized in writing in the first Five-Year Financial Plan required under the oversight law's provisions. Execution of the initiatives set forth in the initial Plan produced an operating surplus by FY1994, a $295 million surplus within the decade, and multiple credit rating increases – launching Philadelphia's recovery from fiscal distress. That Plan and its subsequent annual editions have set the standard for industry analysts, government officials and academics alike in restructuring municipal operations. Fitch Ratings has described Philadelphia's multi-year plan as a model "that can be emulated by local governments, large and small."

**Washington, DC:** During the mid-1990s, when the District of Columbia was under the supervision of a financial control board, PFM led the development of two annual budgets and multi-year financial plans to help restore fiscal stability to the District. This engagement was uniquely complicated. In addition to both an immediate deficit and longer-term, structural challenges parallel to those faced by many urban governments, Washington's operating budget and ability to levy taxes are subject to Congressional approval. Within this context, PFM's analysis of the city's largest departments resulted in a plan to eliminate the District's operating deficit by generating $463 million in savings. The resulting budget and multi-year plan were adopted as a blueprint for repairing the District government; when implemented, the plan helped to balance the City's revenues and expenditures much earlier than planned. In the following years, recurring

surpluses eliminated the District's structural deficit and supported a period of economic revitalization.

**Miami, Florida:** In the late 1990s, PFM was retained by the Executive Office of the Governor of the State of Florida to advise the State and its appointed Financial Oversight Board regarding a financial emergency encountered by the City of Miami.  PFM reviewed and evaluated the City's recovery plans, and helped to develop new statutes and policies to strengthen financial management practices and integrity going forward.  These approaches helped to achieve budget stability for nearly a decade, but new fiscal strain emerged in 2010 following the collapse of the South Florida housing market.  Facing a renewed budget deficit, the City of Miami declared financial urgency under a special provision of Florida state law that allowed the City to reopen its labor contracts off-cycle in order to negotiate changes that would result in budget relief. To support this process, the City Manager assembled a team of internal and external experts with experience in financial analysis, labor relations, health benefits, and employee retirement programs. As part of this team, PFM helped the City to develop and quantify a set of adopted compensation adjustments estimated to generate $77 million in savings, avoiding a severe budget deficit for FY2011.

**Pittsburgh, Pennsylvania:** In 2003, Pittsburgh laid off 446 employees, including nearly 100 police officers.  Along with credit rating downgrades to speculative levels, an independent financial audit even questioned the City's ability to continue as a going concern.  In response, the Commonwealth of Pennsylvania designated the City as "distressed" and placed it under state oversight pursuant to the terms of Act 47.  Shortly thereafter, the Commonwealth appointed PFM and the law firm Eckert Seamans to be the City's Recovery Plan Coordinator and to draft a multi-year turnaround plan.  After consultation with numerous stakeholders including City officials, labor union leaders, the business community, and the public (through a series of public meetings), PFM developed a comprehensive multi-year plan to restore Pittsburgh's financial health.

PFM's plan was based on a multi-year budget model that projects the City's revenues and expenditures absent corrective action, and included more than 200 specific deficit-closing recommendations.  Passed by City Council and signed by the Mayor, the plan provided a comprehensive strategy to restructure City services, improve regional cooperation, control workforce costs, modify tax policy, and strengthen financial management.  Using the plan as a guide, the City has since regained an investment-grade credit rating and turned persistent annual budget shortfalls into recurring positive operating results.  As a Pittsburgh Post-Gazette editorial noted in 2009, "Pittsburgh was on the brink of bankruptcy in 2004 when…City Council adopted the first state-mandated five-year plan. Without the changes it required, Pittsburgh would have a $103 million deficit instead of a $53 million surplus today."

In addition to drafting and winning City approval of the financial Recovery Plans in 2004 and 2009, PFM and Eckert have worked with the City to develop a robust quarterly financial reporting system and to monitor City implementation of Plan provisions.  In particular, the City has completed two rounds of bargaining with its nine unions under the terms of the Recovery Plans, with the police and fire unions reaching negotiated settlements with the City in 2009 for the first time in decades.  The City has also been required to increase annual contributions to its severely

unfunded pension plan, set up a trust fund for retiree health and legal benefits, and adopted a new approach to planning for and expending capital funds.

In 2012, PFM and Eckert recommended that the City exit Act 47 oversight. However, at the request of a newly-elected Mayor, the Commonwealth of Pennsylvania recently announced that it would keep the City in oversight status for one additional cycle to track additional progress on legacy costs reforms enacted under PFM's Recovery Plan.

**New Orleans, Louisiana:** The legacy of Hurricanes Katrina and Rita will affect the City of New Orleans for years to come. Despite sharp reductions in City staffing, New Orleans is working actively to rebuild both public and private institutions. At the same time, City leaders are committed to creating improved systems, not simply replacing the structures in place before the storms.

Since 2007, PFM has supported the City with improvements to budgeting and financial management, with our work focused around Budgeting for Outcomes – a Government Finance Officers Association (GFOA) recommended best practice. As New Orleans Mayor Mitch Landrieu explained in his 2010 budget address, "New Orleans will no longer budget based simply on the previous year's numbers. Instead, we will start each year with an open mind, see what has worked, cut what has not, reorganize and make smart investments." To assist in that effort, PFM has facilitated and guided City leadership through a rigorous, seven-step process to: determine how much funding is available; establish prioritized goals for results; allocate resources toward results; conduct analyses to develop offers that demonstrate results; rank budget programs; identify performance measures; and monitor performance. In conjunction with PFM's support, the City was awarded the GFOA Distinguished Budget Award for the 2008 budget, the first time it won the honor in approximately 25 years, and has done so subsequently for the succeeding budgets.

In addition to its direct support of the City on budgetary issues, PFM has also conducted a series of analyses identifying opportunities for improvements in efficiency and effectiveness in the City's criminal justice system, Fire Department, Information Technology and other City departments.

**Cleveland, Ohio:** PFM was retained by the City of Cleveland to complete a management and efficiency study in 2009. The City faced a budget gap of over $50 million for 2010, and sought a broad menu of ideas to eliminate the shortfall. PFM identified over 175 potential expenditure reductions and revenue enhancements valued at $81.6 million in 2010 and almost $700 million over five years. Initiatives covered reorganization, modification and elimination of selected services, identification of new revenues and better collection of existing revenues, and workforce changes. In his 2010 State of the City address, Mayor Frank Jackson stated that "These measures, along with employee-approved furlough days and reductions in employee benefits and minimal layoffs, helped balance the 2010 budget."

**Commonwealth of Pennsylvania Early Intervention Program:** In 2004, Pennsylvania enacted an Early Intervention Program (EIP) to assist local governments with state matching grants to support long-range planning with goals of improving budget stability and preventing financial

distress.  Under this program, based on the approach PFM and the City of Philadelphia pioneered in the 1990s (see above), PFM has been selected to work with the cities of Allentown, Easton, Wilkes-Barre, and York, and the Counties of Luzerne, Cumberland, Columbia and Montour.  To support these engagements, PFM has developed a projection model that identifies the structural budget relationship between recurring revenues and recurring spending for each local government.  This enables PFM to help communities identify their annual operating budget surplus or deficit for each of those years, and to quantify options for expenditure reduction, revenue enhancement, and economic development.  PFM's Early Intervention Plan engagements have helped the participants to weather difficult economic times, while focusing on maintaining long-term fiscal and economic viability.

**Memphis and Shelby County, Tennessee:** In the City of Memphis, more than one-quarter of all residents are living in poverty.  As of January 2014, Shelby County's 8.6 percent unemployment rate was higher than the national and state rates and higher than unemployment in Tennessee's three next most populous counties.  In nearby Fayette and Tipton counties in Tennessee and in the Arkansas portion of the metropolitan area, unemployment was near or greater than 10 percent.

Both the City and County government have recognized that in order to achieve an economic turnaround, they need to start with basic fiscal and operational challenges.

In 2013, Shelby County commissioned PFM to identify a series of options for ensuring long term fiscal sustainability.  In response to the PFM recommendations for efficiency, the County announced a timeline for implementation of recommendations ranging from changes in employee benefits to improvements in procurement to reforms in operations of the County jail and Head Start programs.

In 2012, PFM began work with the City of Memphis to develop a multi-year financial plan for the City.  The result was a detailed analysis of City budget gaps for the next five years – largely driven by pension costs – and recommendations to close gaps through new revenue and increased operational efficiency.  In January 2014, Memphis Mayor AC Wharton went to the City Council with the first year of PFM-designed initiatives to overcome a $100 million plus budget gap in FY 2015.

**Gary, Indiana:** In 2008, the State of Indiana passed legislation enacting stringent new caps on property tax rates. The City of Gary and its affiliated units – the water, sewer and storm water utilities, the transit system and its airport – petitioned the State for relief from these caps. Although partial relief was granted, the State required that Gary retain a fiscal monitor as a condition of this receipt. The fiscal monitor would be tasked with developing a plan to ensure that Gary's spending aligned with revenues.

After a competitive process, in the summer of 2009 PFM was recommended by the City and approved by the State of Indiana's Distressed Unit Appeals Board (DUAB) to serve as Gary's fiscal monitor. Working with the State, the City and affiliated units of government, PFM met with a broad array of stakeholders, including elected officials and City managers, union leaders, regional agencies, and citizens (through a public meeting).  PFM developed a multi-year budget projection

for all City departments, and also drafted initiatives that would permit Gary to continue its operation of core services, eliminate non-essential functions while transferring other functions to Lake County and other governmental units. PFM developed parallel plans for the City's waste-water and storm water utilities, public transit corporation, and airport. PFM presented its plans to the DUAB in January 2010.

After reviewing the PFM plan, the Northwest Indiana Times wrote that "The report from Gary's fiscal monitor confirmed what many have been saying for years. Gary must live within its means, which means changing expectations of what government should provide its citizens…The report's recommendations should be studied carefully but quickly by the city officials and residents alike, then implemented with due haste to bring the city's spending under control." In April 2010, the DUAB granted relief to the City of Gary.

**Reading, Pennsylvania:** The City of Reading has significant financial challenges because of its high concentration of poverty and high unemployment relative to the rest of Berks County and Pennsylvania. According to U.S. Census data, Reading had the highest poverty rate among cities with at least 65,000 residents in 2010 and the second highest in 2012. Those socio-economic trends, combined with the City government's reliance on short-term responses to a multi-million structural deficit and an impending cash crunch led the Mayor to petition the Commonwealth for "distressed" status and state oversight under Pennsylvania's Act 47 in late 2009.

PFM was retained in January 2010 by the Commonwealth of Pennsylvania's Department of Community & Economic Development to serve as Act 47 Coordinator for the City of Reading. Over a period of six months, PFM analyzed the City's finances, met with numerous stakeholders from elected officials to non-profit leaders to union officials, and developed a multi-year budget model that projected a series of continuing deficits if no corrective action was taken. PFM engaged in an intensive community outreach process to inform residents, business owners and commuter employees about the City's financial challenges, with particular efforts to engage Reading's fast-growing Latino population that now comprises a majority of City residents.

In May 2010, PFM proposed a comprehensive plan for the City, which was then modified to include an alternative revenue package after consultation with City Council and the Administration. The resulting plan included approximately 150 initiatives to improve efficiency and balance the City's budget over a multi-year period. Major strategies included:

- Revising service provision, including restructuring the City's Fire Department and transferring tax collection to the County and private firms.
- Controlling workforce costs, including moderating wage growth and sharing the responsibility for fast-rising benefits expenditures.
- Bringing the City into compliance with legal, financial and fiduciary standards, including full payment of pension obligations and repayment of long-term interfund borrowing.
- Updating the City's economic development and housing strategies to integrate them more fully with State programs and County plans.

PFM's Act 47 Recovery Plan for Reading was approved by a unanimous vote of City Council in June 2010 and signed into law by the Mayor. Since that time, PFM has worked closely with the City and the State to implement the Plan's recommendations. Major accomplishments include:

- Strengthening the City's internal financial management and reporting capacity. The City produces regular cash flow reports and budget-to-actual projections; has an active audit committee for responding to its external auditor's findings; and discusses multi-year financial projections during its annual budget deliberations.
- Negotiating new collective bargaining agreements with its non-uniformed labor unions and receiving positive arbitration awards for its police and fire unions that moderate wage growth, increase employee cost sharing for health insurance, and establish more affordable salary and pension benefit packages for new hires.
- Successfully transitioned property tax collection to the County and earned income tax collection to a private County wide tax collector, and engaged external support for collecting delinquent non-tax revenues.

By implementing the Recovery Plan and its own initiatives, the City was able to end its reliance on interfund borrowing to temporarily fund core municipal services, come current on its annual contributions to the employee pension fund and address the cash crunch it faced in 2010. The City's preliminary year-end report for 2013 showed a positive operating result, ending a long string of years with negative results in its General Fund. However, externally-driven developments – including an adverse state court decision which may force the City to absorb millions of dollars of costs currently covered by fee revenue – mean that the City may stay in oversight for some time to come. PFM is currently beginning to develop a revised Recovery Plan for the City, taking its progress and more recent challenges into account.

### Proposed Fees to Be Charged and a Proposed Budget of Fees and Expenses

PFM proposes hourly rates as listed below. Fees for support staff are included in the hourly rates for professionals.

| | |
|---|---|
| Managing Director | $550.00 |
| Director | $450.00 |
| Senior Managing Consultant | $375.00 |
| Senior Analyst | $280.00 |
| Analyst | $275.00 |

Virginia Rutledge's hourly rate as a Consultant will be $450 per hour.

PFM's hourly rates are inclusive of all services provided. PFM will not charge the court separately for out-of-pocket expenses incurred, including travel, meals, lodging telephone, mail, and other ordinary cost and any actual extraordinary cost for graphics, printing, data processing and computer time which are incurred by PFM. PFM will make regular reports to the Court on the number of hours incurred as the project progresses.

PFM is willing and able to comply with the requirements of 11 U.S.C. Sec. 330 in seeking approval of fees.

## Disclosure of Prior Experience as an Expert Witness

The following table summarizes the experience of the Expert and members of the Expert Team as expert witnesses:

| Name of Witness | Title of the Case | Court | Attorney | Subject Matter |
|---|---|---|---|---|
| David Eichenthal | State, ex rel v. Kobly | Supreme Court of Ohio | Martin Hume and Anthony Farris | Expert in municipal budgeting and operations and budget of Youngstown City government |
| David Eichenthal | Jones v. Gusman | U.S. District Court, Eastern District of Louisiana | Harry Rosenberg and Sharonda Williams | Budgetary implications of the implementation of the consent decree related to the Orleans Parish Prison |
| Michael Nadol | Cherry v. Mayor and City Council of Baltimore | U.S. District Court, Northern District of Maryland | George Nilson, Matthew Nayden; James Ulwick, Kevin Arthur, and Jean Lewis | Expert in municipal budgeting |

## Disclosure of Prior Retentions of the Applicant and PFM

Appendix A contains a disclosure of all government clients – or clients acting on behalf of governmental entities -- that have retained PFM's Management & Budget Consulting practice since 2009 and the subject matter of the engagement. Since 2009, The PFM Group has engaged in approximately 13,000 specific projects – almost all with government clients – in its Financial Advisory, Asset Management and Management & Budget Consulting practices. Upon request, PFM will provide any detailed information required to comply with any additional disclosure requirements of the Court. As required by the Court, PFM is willing to forego any prospective retention or engagement that might result in a conflict of interest in the case, subject to clarification of parameters with the Court during the interview and selection process.

Appendix B represents my good faith effort and the good faith effort of the firm to fully disclose any present or past connections of the applicant or the applicant's Firm with the City of Detroit and any of its creditors or with other professionals representing them or with the State of Michigan. We have asked all PFM professionals that have engaged in any activity in the State of Michigan to disclose such activity. Appendix B is a summary of that disclosure.

Given that I understand that there are more than 170,000 creditors to the City, it is possible that PFM has had additional prior connections. In addition, as an active consultant to local

governments around the country, PFM regularly competes for business and talks to governments about potential consulting engagements. As a result, PFM has explored the potential of consulting to the City of Detroit and certain creditor groups during the pre- and post-bankruptcy period. PFM has not been selected to perform any of these potential assignments and does not believe that it has a conflict of any type as a result of such prior conversations.

## Conclusion

We would welcome the opportunity to assist the Court. Per the Court's order, members of the PFM team would available for an interview in Detroit on April 18. If you have any questions, please feel free to contact me by phone or email as shown below.

Sincerely,

Dean Kaplan
Managing Director

Public Financial Management
Two Logan Square, Suite 1600
Philadelphia, PA 19103
kapland@pfm.com
215 557 1487

14

**APPENDIX A**

| Client | Project (and Government Entity when Not Identified as Client) |
|---|---|
| Albany, NY, City of | Management Audit |
| Albany, NY, City of | Albany Nonprofit Revenue Report |
| Allentown, PA, City of | 2010 Early Intervention Program |
| Allentown, PA, City of | Rank Differential Arbitration |
| Allentown, PA, City of | 2011 Fire Act 111 Arbitration |
| Allentown, PA, City of | 2013 Multi-Year Plan Update |
| Anne Arundel County, MD | Labor/Economic Consulting |
| Anne Arundel County, MD | 2011 Labor Economic Services |
| Anne Arundel County, MD | 2012 Labor Arbitration |
| Anne Arundel County, MD | Police New Pay Schedule Analysis |
| Anne Arundel County, MD | Detention Lt. Comp. Analysis |
| ARUP Inc | Long Island Regional Planning Council, NY - Sustainability Project |
| Austin, Texas, City of | Refuse Collection Fee Analysis |
| Austin, Texas, City of | 2010 Fee Study - One Stop |
| Austin, Texas, City of | Billboard Fee Study |
| Austin, Texas, City of | 2013 Public Safety  Labor |
| Austin, Texas, City of | 2013 Fee Study Update |
| Ballard Spahr LLP | Subcontract - SEPTA, PA  - Fact Finding Analysis |
| Baltimore County, MD | 2009 Bargaining Support |
| Baltimore, MD, City of | Retiree Benefits Analysis |
| Baltimore, MD, City of | 10-year Financial Plan |
| Baltimore, MD, City of | Financial Plan Implementation Support |
| Bethlehem PA. City of | 2011 Police & Fire Act 111 |
| Bethlehem PA. City of | Multi-Year Plan |
| Bloomsburg PA, Town of | 2010 Police Act III Arbitration |
| Bloomsburg PA, Town of | 2011 Police Interest Arbitration |
| Boise, Idaho, City of | Non-tax revenue analysis |
| Bonneville Research | State of Utah - Department of Alcohol Control |
| Booz Allen Hamilton | FEMA Task Force Implementation |
| Bradley Arant Boult LLP | Jefferson County, AL - Expert Assistance in Chapter 9 |
| Bristol, PA , Township of | 2013 Police Interest Arbitration |
| Broward County, Florida | 2012-13 Solid Waste Consulting |
| Bucks County, PA | 2013 Ranger Arbitration |
| Camden County New Jersey | 2013 Correction Officers |
| Camden County, NJ | 2013 Interest Arbitration |
| Camden, NJ, City of | 2011 Arbitration Support |
| Camden, NJ, City of | 2012 Arbitration Support |

| | |
|---|---|
| Camden, NJ, City of | 2012 Police Superiors Arbitration |
| Camden, NJ, City of | Firefighters Remand Arbitration |
| Casey Family Programs | Philadelphia Department of Human Services - Improving Outcomes for Children |
| Casey Family Programs | Philadelphia Department of Human Services - Improving Outcomes for Children (2013) |
| Casey Family Programs | Los Angeles County - Child Welfare |
| Chambersburg, PA, Boro of | 2012 Fire Arbitration |
| Chattanooga, Tenn. City of | 2013 Budgeting for Outcomes |
| Chattanooga, Tenn. City of | Pension Consulting |
| Chattanooga, Tenn. City of | 2014 Budget for Outcomes |
| Cheltenham PA, Township of | Retiree Benefits |
| Cherry Hill, NJ | 2009 Retainer - Fire Department |
| Cherry Hill, NJ | 2010 Retainer - Fire Department |
| Cherry Hill, NJ | 2011 Retainer - Fire Department |
| Chester PA, City of | 2012 Police Arbitration |
| Chicago, IL, City of | Police & Fire Workforce Costing |
| Cincinnati, OH, City of | Income Tax Collection |
| Cleveland, OH, City of | Comprehensive Management and Efficiency Study |
| Cleveland, OH, City of | Utilities Management and Efficiency |
| Cleveland, OH, City of | Fee Study |
| Coatesville, PA, City of | Fire Act 111 Arbitration |
| Collegeville Trappe Joint Public Works Department, PA | Workforce Analysis |
| Colorado Springs, COL, City of | Long Term Sustainability Plan |
| Columbia County, PA | Columbia Montour Early Intervention Plan |
| Commonwealth of Virginia | Alcoholic Beverage Control system analysis |
| Coral Springs FL, City of | Management & Budget Consulting |
| Coventry RI, Town of | 2013 Police Interest Arbitration |
| Cumberland County, PA | 2013 Early Intervention Plan |
| Cuyahoga County, Ohio | County Government Restructuring |
| Cuyahoga County, Ohio | County Government Transition |
| Cuyahoga County, Ohio | Regional Jail Assessment |
| Dauphin County, PA | 2010 Youth Detention Center |
| Dauphin County, PA | 2011 Labor Arbitration |
| DeKalb County, GA | Assistance to Finance Department |
| Delaware, State of | 2010 Interest Arbitration |
| Delaware, State of | Medicaid Program Review |
| Delaware, State of | Delaware Port ILA Arbitration |
| Delaware, State of | Compensation Comm Support |
| Delaware, State of | 2014 Port ILA Arbitration |

16

| Detroit Public Schools, MI | FY2009 Fiscal Recovery |
|---|---|
| Detroit Public Schools, MI | Emergency Management Plan |
| Doral, FL, City of | Budget & Forecasting  Model |
| Doylestown , PA, Township of | 2011 Police Act 111 Arbitration |
| East Orange, NJ, City of | Labor Contract Analysis |
| East Orange, NJ, City of | 2012 Police & Fire Arbitration |
| Edwards Aquifer Authority, TX | Financial Planning Model |
| Enterprise Community Partners | U.S. Department of Housing and Urban Development - National Resource Network |
| Exeter, PA, Township of | 2013 Act 111 Arbitration |
| Fisher and Phillips LLC | City of Boston - Labor Economics |
| Forks Twp., PA | 2013 Police Interest Arbitration |
| Ft. Worth, TX, City of | Firefighter Comp Analysis |
| Gary, Indiana, City of | Fiscal Monitor |
| Georgia State of | ARRA Database |
| Hawaii State of | Tax Structure Review |
| Hollywood, FL, City of | Financial Consulting |
| Illinois State Toll Authority | Transition Management Study |
| Jackson, MS, City of | Multi-Year Plan |
| Kansas City, MO, City of | FY2010-11 Budget Support |
| Kramon & Graham P.A. | City of Baltimore - Expert Witness |
| Lancaster, PA,  City of | 2010 Police Act 111 |
| Lancaster, PA,  City of | 2012 Fire Arbitration |
| Lexington Fayette Co. KY | Pension Task Force |
| Long Island Regional Planning Council, NY | CEDS Application Support |
| Lower Swatara Twp., PA | 2012 Police Arbitration |
| Luzerne County, PA | Early Intervention Program Phase 2 Development |
| Luzerne County, PA | Early Intervention Program Phase 2 Implementation |
| Luzerne County, PA | Early Intervention Program Implementation 2010 |
| MAC Consulting Services | FEMA - Task Force Support |
| Maryland, State of | Department of Transportation - Workforce Analysis |
| Maryland-National Capital Park Police | Salary Survey |
| Maryland-National Capital Park Police | Salary Survey Phase II |
| Maryland-National Capital Park Police | Compensation Analysis |
| Maryland-National Capital Park Police | Classification & Compensation Study |
| Maryland-National Capital Park Police | Salary Survey Update |
| Memphis Tenn. City of | Multi Year Strategic Plan |
| Memphis Tenn. City of | Citizen Engagement Phase of Multi-Year Strategic Plan |
| Metropolitan Transportation Authority, NY | 2009 TWU Arbitration |
| Metropolitan Transportation Authority, NY | Railroad Comp. Analysis |

| | |
|---|---|
| Metropolitan Transportation Authority, NY | LIRR Comp. Analysis |
| Miami, FL, City of | Financial and Workforce Consulting |
| Miami, FL, City of | Non-Tax Revenue Analysis |
| Miami, FL, City of | Five Year Budget Model |
| Miami, FL, City of | Labor Negotiation Analytics |
| Miami, FL, City of | Finance Department Business Plan |
| Minneapolis Special SD #1, MN | Financial Planning |
| Minnesota, State of | ARRA Financial Oversight |
| Mobile County, Alabama | Budget Forecast & Analysis |
| Mobile County, Alabama | Criminal Justice Council |
| Montgomery County, MD | Labor and Economic Consulting |
| Montgomery County, Penn. | Operational Profile |
| Mount Juliet, Tennessee, City of | Fire Service Assessment |
| Nassau BOCES, NY | Transportation Bid Support |
| Nassau BOCES, NY | Analytical Administrative Support |
| Nassau County, NY | School Shared Services |
| Nassau County, NY | Budget & Workforce Consulting |
| Nassau County, NY | Labor Cost Analysis |
| Nazareth, PA, Borough of | 2013 Act 111 Arbitration |
| Nebraska, State of | Strategic Planning |
| Nebraska, State of | State Building Division Policy |
| Nebraska, State of | Department of Administrative Services |
| Nebraska, State of | Management and Privatization |
| Nebraska, State of | Workforce Investment Act Reporting Phase I |
| Nebraska, State of | Workforce Investment Act Reporting Phase 2 |
| New Castle Co, Delaware | Police Arbitration Suppt. |
| New Castle Co., Delaware | Revenue Inventory |
| New Castle Co., Delaware | Financial Analysis |
| New Haven, CT, City of | 2013 Capital Reconciliat. |
| New Jersey, State of | Sandy Grant Administration |
| New Orleans Redevelopment Authority | Financial System Support |
| New Orleans Redevelopment Authority | Financial System Support Phase II |
| New Orleans, LA, City of | Pension Review |
| New Orleans, LA, City of | 2009 Project Set-up |
| New Orleans, LA, City of | Health Dept. Anaylsis |
| New Orleans, LA, City of | EMS/First Responder |
| New Orleans, LA, City of | Revenue Projection |
| New Orleans, LA, City of | ERP Assessment |
| New Orleans, LA, City of | Health Care Claims Audit |

| | |
|---|---|
| New Orleans, LA, City of | Parks/Parkway Review |
| New Orleans, LA, City of | ARRA |
| New Orleans, LA, City of | Budgeting for Outcomes |
| New Orleans, LA, City of | SPCA Review |
| New Orleans, LA, City of | Best Practices Review |
| New Orleans, LA, City of | Fee Study |
| New Orleans, LA, City of | Mayoral Transition |
| New Orleans, LA, City of | Disaster Response\Recover |
| New Orleans, LA, City of | Budgeting for Outcomes |
| New Orleans, LA, City of | ERP Financing Analysis |
| New Orleans, LA, City of | Performance Government |
| New Orleans, LA, City of | Best Practices-Pension |
| New Orleans, LA, City of | Best Practices -Pedicabs & Taxis |
| New Orleans, LA, City of | 2011 ERP Support |
| New Orleans, LA, City of | Budgeting for Outcomes |
| New Orleans, LA, City of | Business Plan Support |
| New Orleans, LA, City of | Airport Financing Analysis |
| New Orleans, LA, City of | Pension Investment Review |
| New Orleans, LA, City of | Fire Dept. Assessment |
| New Orleans, LA, City of | Public Works Audit |
| New Orleans, LA, City of | Permit Process Redesign |
| New Orleans, LA, City of | Payroll/HR Cost Analysis |
| New Orleans, LA, City of | Best Practice Research |
| New Orleans, LA, City of | Budgeting for Outcomes |
| New Orleans, LA, City of | Enhancing Revenue Collection |
| New Orleans, LA, City of | Criminal Justice Operations |
| New Orleans, LA, City of | Budget Model |
| New Orleans, LA, City of | IT Statement of Work |
| New Orleans, LA, City of | HR/Payroll Project Management |
| New Orleans, LA, City of | Criminal Justice Operations |
| New Orleans, LA, City of | Orleans Parish Prison and Sheriff |
| New Orleans, LA, City of | Fire Dept. Transition |
| New Orleans, LA, City of | OPP Litigation Support |
| New Orleans, LA, City of | Budget Support |
| New Orleans, LA, City of | Consent Decree Implementation |
| New York City Housing Authority, NY | Case Management |
| New York, NY, City of | Office of Labor Relations - UFT/NYSNA Fact - Finding |
| New York, State of | Budget Strategic Planning |
| New York, State of | Aqueduct Analysis |

19

| | |
|---|---|
| New York, State of | Hurricane Sandy Assessment |
| New York, State of | COReSTAT |
| Newark, Delaware, City of | Police Arbitration Support |
| Newark, NJ, City of | FY2009 Budget Development |
| Northampton Twp., PA | 2012 Police Interest Arbitration |
| Oakland, CA, City of | Strategic Planning |
| Ocean County, NJ | 2011 Labor Negotiations |
| Ocean County, NJ | 2012 Labor Arbitration |
| Ohio, State of | Valuation Model |
| Oklahoma City, OK, City of | EMSA (emergency services) Trust Analysis |
| Ontelaunee Twp Municipal Authority, PA | Forensic Audit Overview |
| Oregon, State of | DAS Budget Facilitation |
| Oregon, State of | Workforce System Redesign |
| Oskaloosa, Iowa, City of | Joint Services Study |
| Palmer Township, PA | 2011 Police Act 111 Arbitration |
| Palo Alto Calif., City of | Arbitration Support |
| Parkesburg, PA, Borough of | 2013 Police Act 111 Arbitration |
| Pennsylvania Convention Center | Contracting Assistance |
| Pennsylvania Economy League | Scranton Act 47 |
| Pennsylvania Economy League | Parking Study |
| Pennsylvania, Commonwealth of | Act 47 Coordinator - New Castle, PA |
| Pennsylvania, Commonwealth of | Public Utilities Commission Restructuring Study |
| Pennsylvania, Commonwealth of | Act 47 Plan - 2009 - Dept. of Community and Economic Development - Pittsburgh |
| Pennsylvania, Commonwealth of | Act 47 Plan - 2010 - Dept. of Community and Economic Development - Pittsburgh |
| Pennsylvania, Commonwealth of | Act 47 Plan - 2011- Dept. of Community and Economic Development - Pittsburgh |
| Pennsylvania, Commonwealth of | Act 47 Plan - 2012 - Dept. of Community and Economic Development - Pittsburgh |
| Pennsylvania, Commonwealth of | Act 47 Plan Development - City of Reading |
| Pennsylvania, Commonwealth of | Act 47 Implementation - City of Reading |
| Pennsylvania, Commonwealth of | Act 47 Plan Year 2 - City of Reading |
| Pennsylvania, Commonwealth of | 2012 Act 47 - City of Reading |
| Pennsylvania, Commonwealth of | 2013 Act 47 - City of Reading |
| Pennsylvania, Commonwealth of | 2014 Act 47 - City of Reading |
| Pennsylvania, Commonwealth of | Child welfare fiscal/administrative improvements |
| Pennsylvania, Commonwealth of | Labor and Economic Consulting |
| Pennsylvania, Commonwealth of | Title IV-E Administrative Claims Improvements |
| Pennsylvania, Commonwealth of | School district governance analysis |
| Pennsylvania, Commonwealth of | General budget and policy consulting |

| | |
|---|---|
| Pennsylvania, Commonwealth of | Title IV-E Administrative Claims Improvements |
| Pennsylvania, Commonwealth of | Child welfare needs based budget development |
| Pennsylvania, Commonwealth of | Title IV-E rate-setting analysis |
| Pennsylvania, Commonwealth of | Child welfare fiscal/administrative improvements |
| Pennsylvania, Commonwealth of | General budget and policy consulting |
| Pennsylvania, Commonwealth of | Title IV-E Administrative Claims Improvements |
| Pennsylvania, Commonwealth of | Financial Review of Cyber Charters FY 10 |
| Pennsylvania, Commonwealth of | Financial Review of Cyber Charters FY 11 |
| Pennsylvania, Commonwealth of | Child welfare fiscal/administrative improvements |
| Pennsylvania, Commonwealth of | General budget and policy consulting |
| Pennsylvania, Commonwealth of | Labor and Economic Consulting - Capital Police |
| Pennsylvania, Commonwealth of | Labor and Economic Consulting - Park Police |
| Pennsylvania, Commonwealth of | Labor and Economic Consulting - Corrections |
| Pennsylvania, Commonwealth of | Liquor Control Board |
| Pennsylvania, Commonwealth of | Child welfare fiscal/administrative improvements |
| Pennsylvania, Commonwealth of | Financial Review of Cyber Charters FY 2012 |
| Pennsylvania, Commonwealth of | Educational Finance Analytics |
| Pennsylvania, Commonwealth of | General budget and policy consulting |
| Pennsylvania, Commonwealth of | Labor and Economic Consulting - State Police Arbitration |
| Pennsylvania, Commonwealth of | Labor and Economic Consulting - Capital and Game Police |
| Pennsylvania, Commonwealth of | Revenue Department Process Improvement |
| Pennsylvania, Commonwealth of | Child welfare fiscal/administrative improvements |
| Pennsylvania, Commonwealth of | Fiscal Recovery Support - Chester Upland School District |
| Pennsylvania, Commonwealth of | Fiscal Recovery Support - Chester Upland School District |
| Pennsylvania, Commonwealth of | Labor and Economic Consulting |
| Pennsylvania, Commonwealth of | Child welfare fiscal/administrative improvements |
| Pennsylvania, Commonwealth of | Fiscal Recovery Support -  School Districts |
| Pennsylvania, Commonwealth of | Financial Review of Cyber Charters FY 2013 |
| Pennsylvania, Commonwealth of | Liquor Control Board analysis |
| Pennsylvania, Commonwealth of | Fiscal Recovery Support -  School Districts |
| Pennsylvania, Commonwealth of | Financial Review of Cyber Charters FY 2014 |
| Pennsylvania, Commonwealth of | PA Convention Center Authority Management Analysis |
| Pennsylvania Convention Center | Performance Audit |
| Perry County, PA | Prison Guard Labor Arbitration |
| Philadelphia Redevelopment Authority | Financial Systems Analysis |
| Philadelphia School Reform Commission, PA | Benchmarking Analysis |
| Philadelphia School Reform Commission, PA | Strategic Planning Model |
| Philadelphia School Reform Commission, PA | Strategic Plan Costing |
| Philadelphia School Reform Commission, PA | FY 2010-14 Five Year Plan |

| | |
|---|---|
| Philadelphia School Reform Commission, PA | Custodial Analysis |
| Philadelphia School Reform Commission, PA | 2013 5 Year Plan & Labor Analysis |
| Philadelphia, City of | 2009 Interest Arbitration |
| Philadelphia, City of | DHS IV-E Rate Review |
| Philadelphia, City of | Department of Human Services IV-E Waiver Application |
| Philadelphia, City of | Labor Arbitration |
| Philadelphia, City of | Dept of Human Services Improving Outcomes for Children - analytics |
| Phoenixville, PA, Borough | 2011 Police Interest Arbitration |
| Pocono Mountain Regional Police, PA | Budget Model |
| Portsmouth, RI, Town of | 2013 Police Arbitration |
| Pottsville, PA, City of | 2012 Police Arbitration |
| Prince George's Co., MD | Police Negotiation Support |
| Proskauer Rose LLP | City of New York - Civil Service Reform |
| Puget Sound Regional Council, WA | Economic Impact Analysis |
| Rockland County, New York | Budget Analysis |
| San Antonio, TX, City of | Car Sharing Study |
| San Antonio, TX, City of | Car Sharing RFP Support |
| San Jose, CA, City of | Firefighter Arbitration |
| San Jose, CA, City of | Financial Analysis |
| Santa Rosa, CA., City of | Retirement System Analysis |
| Santa Rosa, Cal., City of | Long Term Financial Plan |
| Scituate RI, Town of | 2013 Police Arbitration |
| Shelby County, Tennessee | Efficiency Study |
| Springettsbury Twp. , PA | Labor and Economic Analysis |
| Springettsbury Twp. , PA | 2012 Police Interest Arbitration |
| Springfield Twp DelCo, PA | 2011 Police Interest Arbitration |
| St. Johns County, Florida | Mosquito Control District Operational Assessment |
| St. Louis Public S.D., MO | Multi-Year Plan |
| Stockton, Calif, City of | Economic Analysis |
| Stroud Area Police Dept. | 2010 Police Negotiations |
| Tennessee, State of | Strategic Consulting |
| Tennessee, State of | Study of Budgeted Costs |
| Tennessee, State of | Debt Management |
| Tennessee, State of | Retirement System Analysis |
| Towamencin Twp., PA | 2012 Police Arbitration |
| Tredyffrin Twp., PA | Economic Analysis Service |
| TriMet, Oregon | Bargaining & Arbitration Support |
| University of Maine | Labor Arbitration |
| Upper Merion Twp., PA | 2013 Workforce Comp Analysis |

| | |
|---|---|
| Upper Providence Twp. PA | Police Negotiations Analysis |
| Upper Saucon Twp. PA | 2011 Police Interest Arb. |
| US General Services Administration | Federal Shuttle Bus Program Analysis |
| Vallejo, Calif., City of | Arbitration Support |
| Vallejo, Calif., City of | 2013 Police Arbitration |
| Vermont, State of | Liquor System Performance  Audit |
| Virginia, Commonwealth of | Department of Behavioral Health - Fiscal Assessment |
| Virginia, Commonwealth of | Department of Behavioral Health - Model Development |
| Warren County, New Jersey | Corrections Officers Arbitration |
| Warwick Township, PA | 2012 Police Interest Arbitration |
| Washington Metropolitan Area Transit Authority | Capital Program Assessment |
| Washington Metropolitan Area Transit Authority | Strategic Plan |
| Washington Metropolitan Area Transit Authority | Budget Model |
| West Lampeter Twp. , PA | 2012 Police Arbitration |
| West Pottsgrove Twp., PA | Labor Negotiations & Arbitration |
| Whitpain Twp., PA | 2013 Police Arbitration |
| Wilmington, DE, City of | Parks/Recreation Review |
| Wilmington, DE, City of | Police Shift Analysis |
| Wilmington, DE, City of | Arbitration Support 2012 |
| Wisconsin, State of | Retirement Fund Analysis |
| Xenia Rural Water District, IA | Strategic Consulting |
| York Area Fire & Rescue, PA | Cost Sharing Analysis |
| York Area Fire & Rescue, PA | 2013 Labor Arbitration |
| York County, Pennsylvania | 2012 Youth Detention Arbitration |
| York, PA., City of | 2008 Budget Model Update |
| York, PA., City of | 2009 Budget Model Update |
| York, PA., City of | 2011 EIP Update |
| York, PA., City of | 2012 Fire Arbitration |
| York, PA., City of | 2013 Backpay Analysis |
| Youngstown, Ohio, City of | Multi-Year Financial Plan |
| Youngstown, Ohio, City of | Police Association Factfinding |

## APPENDIX B

Public Financial Management's Ann Arbor office has a history of working with financial advisory clients throughout the State of Michigan, including:

### Great Lakes Water Authority Counties (Oakland, Macomb & Wayne)

In March 2014, PFM presented to members of Oakland, Macomb, & Wayne Counties and their representatives/attorneys regarding potential assistance to them in the analysis of the acquisition of the Detroit Water and Sewer System. As a follow up, PFM submitted a proposal to members of Oakland, Macomb & Wayne Counties related to the analysis of acquisition of the Detroit Water and Sewer system.

### Detroit Public Schools

PFM is the Financial Advisor to the Detroit Public Schools. In 2009, PFM provided support to the Emergency Manager for the Detroit Public School (listed in Appendix A). In 2010 and 2011, PFM provided advice to the Detroit Public Schools on an energy management plan.

### State of Michigan, Department of Transportation

PFM has served as financial advisor to the Department for approximately 30 years.

### State of Michigan Finance Authority
PFM works with numerous Michigan municipalities seeking water/sewer funding from the Authority's various revolving fund programs

### State of Michigan Tobacco Settlement Finance Authority

PFM served as financial advisor to the Authority on its 2006 and 2007 financings. PFM Asset Management served as advisor to the Authority in 2012 and 2013 in connection with the negotiation and crystallization of the Authority's bankruptcy claims resulting from the default of Lehman Brothers Holdings, Inc. and Lehman Brothers Special Financing, Inc. under the Authority's forward delivery agreement.

### Wayne County

PFM has been retained by Wayne County Treasurer to assist with the issuance of approximately $200 million of Delinquent Tax Anticipation Notes. The proceeds of the notes will provide the City of Detroit and other taxing jurisdictions within Wayne County reimbursement for certain delinquent real property taxes in order to assist in their cash flow needs.

### Wayne County Airport Authority (Detroit Metropolitan Airport)

PFM has served as the Airport Authority's the municipal financial advisor since 2011.

PFM Asset Management LLC ("PFMAM") also has an established presence in Michigan, with local investment professionals based in Ann Arbor. It manages over $790 million in assets for Michigan clients through the Michigan Liquid Asset Fund Plus ("MILAF+") and a number of separately managed accounts.   As of September 2013, MILAF+ had approximately 475 public sector customers.  Its board also included officials from eight Michigan school districts.

PFM Funds (the "Fund") offers no-load money market mutual funds for institutional investors. The investment funds seek to provide shareholders with safety of principal, liquidity and a market rate of return by investing in high quality, short-term money market instruments.   The funds have been specifically designed to meet the special cash management and bond proceeds investment needs of public sector investors such as municipalities, other governmental agencies and political subdivisions. They are also suitable for institutions such as corporations, universities, hospitals and not-for-profit organizations that are looking for conservative investment vehicles.  Michael Flanagan, Michigan State Superintendent of Education, serves as a member of the Board of Trustees of the PFM Funds.

Given the fact that PFM serves as financial advisor to almost 200 Michigan municipal entities, and has working relationships with most municipal bond and finance attorneys within the State of Michigan and many nationally, PFM has working relationships with some of the law firms currently engaged by the City of Detroit and its creditors.  In Michigan, our professionals have worked extensively with Miller Canfield, and team members have also worked with Ballard Spahr nationally.  It is likely that other similar working relationships exist, within the context of our role as an independent advisor actively serving public sector clients.

## APPENDIX C

**Dean Kaplan** will serve as the Expert Witness to the Court.

## PROFESSIONAL EXPERIENCE

**PUBLIC FINANCIAL MANAGEMENT, INC.**
**Managing Director (Partner), 2005-Present**
**Senior Managing Consultant, 2000-2005**

*Advising public and non-profit institutions on diverse issues ranging from performance measurement to multi-year financial planning. Working with clients including the cities of Pittsburgh, Pennsylvania, Cleveland, Ohio; Austin, Texas; Aurora, Colorado; Philadelphia, Pennsylvania and the counties of Nassau (New York); Cuyahoga (Ohio); and Wake (North Carolina).*

- Appointed by the Commonwealth of Pennsylvania to serve as financial overseer for the cities of Pittsburgh, Reading and New Castle, bringing all three cities from the brink of financial collapse to annually balanced budgets.
- Chosen by Pennsylvania Department of Education to develop and monitor financial recovery plans for school districts in the Commonwealth's financially-distressed schools program.
- Member of the Board of the National Resource Network, the U.S. Department of Housing & Urban Development's effort build capacity in cities as part of the White House's Strong Cities Strong Communities initiative.
- Developed multi-year financial plans for Gary, Indiana; Allentown, Easton, York and Wilkes-Barre, Pennsylvania; completed revenue analyses for Baltimore, Maryland; New Castle County, Delaware; support PFM projects in New Orleans, Louisiana; Sacramento, California.
- Completed revenue trend and option evaluations, shared services and budget improvement analysis for various cities, counties and special districts. Executed studies on municipal and district services including housing/community development, libraries, solid waste, fleet, custodial and drinking water.

**FOREIGN AND COMMONWEALTH OFFICE, UNITED KINGDOM**
**Atlantic Fellow in Public Policy, 1999-2000**

*Selected by the British Government to conduct research on local government performance management and share results with policymakers in the United States and the United Kingdom. Extensive travel in England, Scotland, Wales and Northern Ireland to view key aspects of local government service efforts, including use of performance indicators, citizen and stakeholder consultation strategies, and adoption of the Blair Government's Best Value program.*

- Served on Improvement & Development Agency peer review team for Lancaster City Council, joining senior British local government officials to evaluate City performance.
- Organized first-ever visit of Atlantic Fellows with US Ambassador to the United Kingdom and senior American diplomats at the US Embassy.

- Lectured regularly at host institution, Institute of Local Government Studies, School of Public Policy, University of Birmingham.

## CITY OF PHILADELPHIA, PENNSYLVANIA
### Budget Director, 1996-1999

*Appointed by Mayor to lead development and implementation of $4.5 billion annual operating budget for the nation's fifth-largest City.*

- Managed spending for all City agencies, boards and commissions, resulting in three consecutive increases in fund balance.  Record surplus levels achieved while City was emerging from fiscal distress and operating under state oversight.
- Drafted, proposed and secured enactment of three successive operating and capital budgets, including oversight of City Council appearances by all agency heads.
- Supervised preparation of key fiscal monitoring documents, including quarterly managers' reports required by state oversight board, and establishment and monitoring of service level goals and performance measures for all City departments.

### Deputy Commissioner/Chief Financial Officer, Philadelphia Water Department, 1992-1996

*As CFO and head of policy planning, worked to restore fiscal health to publicly-owned drinking water, wastewater and storm water utility with $375 million in annual revenue.  Directed accounts payable/receivable, budget, procurement, accounting, payroll, internal audit, and rate-setting divisions.*

- Implemented strategy to restore Department's creditworthiness, ultimately resulting in the largest municipal bond sale in Pennsylvania history and the Department's first borrowing from the Commonwealth of Pennsylvania's environmental infrastructure capital fund.
- Drafted and negotiated regulations for new rate-setting process, directed successful application for rate increase, and supervised resulting management review of Department.  Conceived of City's first ratemaking effort to directly involve the public, convening a citizen panel to reallocate storm water costs.  Initiated utility strategic planning effort.
- Sponsored case study for water industry's first-ever utility process benchmarking project, under auspices of American Water Works Association Research Foundation.
- Led workgroup for Mayor's citywide strategic planning process.  Reviewer for Mayor's New Urban Agenda.  Steering committee member for Procurement Department strategic plan.

### Government Affairs Manager, Philadelphia Streets Department, 1991-1992

*Analyzed and evaluated alternatives for new City solid waste disposal contracts.*

- Coordinated efforts to secure City Council approval of selected regional option for solid waste disposal, saving $200 million over seven years.

**Government Affairs Manager, Philadelphia Water Department, 1987-1990**

*Originated intergovernmental affairs program for large metropolitan utility, evaluating federal and state legislative and regulatory initiatives under key environmental statutes, interpreting government actions for Department's executive staff and participating in related strategy development, decision-making and follow-up.*

- Represented Department before local, state, regional and federal agencies and legislatures. Served as Department delegate to professional associations; planned and directed first intraregional symposium for local government managers in southeastern Pennsylvania.

**U.S. REPRESENTATIVE BOB EDGAR, WASHINGTON, DC and PENNSYLVANIA**
**Legislative Director, 1984-1987**
**Legislative Assistant, 1982-1984**

*Supervised Congressman's legislative staff and operations, devising and implementing legislative strategy and managing Congressman's Public Works & Transportation Committee responsibilities. Focused on environmental and infrastructure issues, including mass transit, capital budgeting, Clean Water Act amendments, and water resources.*

- Organized successful House floor amendment to Superfund toxic waste legislation to add chronic toxic chemicals to list of substances covered by federal right-to-know legislation.
- Staffed successful House floor amendment to delete 31 unauthorized water projects from supplemental spending bill.

## EDUCATION

**Harvard University, Master in Public Administration, 1991**
**John F. Kennedy School of Government**
Coursework at Kennedy School, Massachusetts Institute of Technology and Harvard's Graduate School of Design. Planning Committee, 1991 Kennedy School MC/MPA 5th, 10th and 15th reunions (Treasurer, 10th reunion).

**Haverford College, Bachelor of Arts, 1982**
*Phi Beta Kappa*, honors in political science, Kurzman Prize for creative work in political science, Miller Award for political involvement, Magill-Rhoads Scholar, Scott Paper Award.

**London School of Economics & Political Science, University of London, 1980-1981**
Studies in government, sociology and international relations.

## RELATED EXPERIENCE

Co-Chair, Symposium on Municipal Distress, Recovery & Financial Sustainability, The Bond Buyer, 2012, 2013, 2014.

Member, Municipalities Financial Recovery Act Task Force, Local Government Commission, Commonwealth of Pennsylvania, 2013.

Coordinator, Financial Sustainability Work Group, Governor's Sustainable Water Infrastructure Task Force, Commonwealth of Pennsylvania, 2009.

Co-chair, Purchasing & Budget Committee, Philadelphia 2000 (non-profit formed to prepare successful bid to bring 2000 Republican national political convention to Philadelphia), 1998 to1999.

Instructor, Fels Center of Government, University of Pennsylvania (graduate public policy program awarding Master in Government Affairs degree), 1994, 1995.

Member, American Water Works Association Research Foundation Project Advisory Committee for "Water Utility Benchmarking and Customer Satisfaction Measurements," 1996 to 2000.

Evaluator, Innovations in State & Local Government Awards, Ford Foundation/Taubman Center for State & Local Government (Harvard University), 1991, 1993, 1994.


## SELECTED PUBLICATIONS AND PRESENTATIONS

"It's High Time to End Bankrupt Policies and Save Bankrupt Localities." The Bond Buyer, March 19, 2013.

Management Innovation in U.S. Public Water & Wastewater Systems (editor, with Seidenstat, Hakim and Nadol). John Wiley & Sons, Hoboken, New Jersey, 2005.

"Lions and Tigers and Mayors, Oh My! Should the UK Fear American-Style Mayors?" Local Governance, Volume 25, Number 3, Autumn 1999.

"Management Review: A Results-Oriented Alternative to a Traditional Management Audit." Presented at the American Water Works Association annual conference, June 1996.

"A Public Utility's View of Privatization." Presented at the first United States Conference of Mayors' first Urban Water Institute Development Training Seminar, March 1996.

"Meeting the Needs of Low-Income Water Customers." Delivered at the Association of Metropolitan Water Agencies' annual meeting, October 1988.

"A Capital Way of Budgeting." The Philadelphia Inquirer, December 25, 1986 op-ed page (with Ralph Gildehaus).

**David Eichenthal** will be a member of the Expert Team:

<u>**PROFESSIONAL EXPERIENCE**</u>

**PUBLIC FINANCIAL MANAGEMENT, INC., CHATTANOOGA, TN**
**Managing Director and Shareholder, 2014-Present**
**Director, 2011 - 2014**

- Lead and support client projects, including multi-year financial plan development, fiscal sustainability, distressed municipality recovery, program evaluation, operational efficiency and budget engagements in Youngstown, Ohio; Memphis, Tennessee; New Orleans, Louisiana; Jefferson County, Alabama; Mobile County, Alabama; Cuyahoga County, Ohio; Shelby County, Tennessee; and Montgomery County, Pennsylvania.
- Executive Director of the Strong Cities Strong Communities National Resource Network -- funded with $10 million in initial support from the federal government in 2013 and designed to provide comprehensive fiscal and economic technical assistance to economically challenged local governments.

**OCHS CENTER FOR METROPOLITAN STUDIES, INC., CHATTANOOGA, TN.**
**President and CEO, 2005 - 2011**

- Led non-profit policy research institute working with local governments, foundations and non-profit organizations in the Southeast and across the nation.
- Nonresident Senior Fellow with the Brookings Institution Metropolitan Policy Program

**CITY OF CHATTANOOGA, TENNESSEE**
**City Finance Officer, 2003 – 2005**
**Director of Performance Review, 2002 – 2005**

- Oversaw the development of the city's $150 million budget, implementation of one of the nation's first 311 systems, creation of a citywide performance management initiative and managed a department of 175 full time employees.
- Chaired the Downtown Redevelopment Corporation, the Regional Interagency Council on Homelessness and the General Pension Plan Board of Directors.

30

**CITY OF NEW YORK, NEW YORK**
**Chief of Staff, Office of the Public Advocate, 1998 – 2001**
**Counselor and Chief of Policy, Office of the Public Advocate, 1996 - 1998**
**Assistant Inspector General, New York School Construction Authority, 1994 – 1995**
**Assistant Advocate for Research and Investigation, Office of the Public Advocate, 1994**
**Assistant Deputy Comptroller for Policy and Counsel for Special Projects, 1990 – 1993**
**Representative of the New York City Comptroller on the Board of Estimate, 1990**
- Public Advocate's representative to the Audit Committee of the City of New York
- Appointed by the Speaker of the New York State Assembly to the New York State Procurement Council

**PROSECUTING ATTORNEYS RESEARCH COUNCIL, NEW YORK, NY**
**Program Director, 1988-1989**

**URBAN RESESEARCH CENTER, NEW YORK UNIVERSITY, NEW YORK, NY**
**Assistant Research Scientist, 1986-1988**

**NEW YORK STATE LEGISLATURE, BROOKLYN, NY**
**Research Director, 1986-1988**

## EDUCATION

**New York University School of Law, New York, New York       1988**
**J.D.**
Marden Fellow, Center for Research in Crime and Justice
Staff Member, Annual Survey of American Law

**University of Chicago, Chicago Illinois       1984**
**Bachelor of Arts in Public Policy Studies**
*Cum Laude*
Harry S Truman Scholar, State of New York

## RELATED EXPERIENCE

- *Senior Fellow*, New York University School of Law, Center for Research in Crime and Justice, 2012 – Present

- *Adjunct Assistant Professor*, University of Tennessee at Chattanooga, Graduate Program in Public Administration: Performance Measurement (Fall 2005), American Government (Fall 2005 and Spring 2006), Crime and Public Policy (Spring 2006), Urban Political Economy (Spring 2008)

- *Adjunct Assistant Professor*, Georgia State University: Urban Political Economy (Spring 2007, Fall 2007)

- *Adjunct Assistant Professor of Public Administration*, Baruch College School of Public Affairs (Winter 2000): Oversight and Investigation

- *Adjunct Assistant Professor of Public Administration*, Robert F. Wagner School of Public Service, New York University (Spring 1997): Public Policy Analysis and Evaluation

- Member, Tennessee Leadership Council, Trust for Public Land, 2012 – Present

- Member, Board of Directors, unifiED, 2014

- Former Board Member, Executive Committee member and Treasurer, Center for Employment Opportunities, 2003 – 2011

- Former Board Member, RiverCity Company, Chattanooga, Tennessee

- Former Board Member, New York State Common Cause

- Admitted to Practice Law in the States of New York and Tennessee (inactive)

## SELECT PUBLICATIONS AND PRESENTATIONS

Daniel Feldman and David Eichenthal, *The Art of the Watchdog: Fighting Fraud, Waste, Abuse and Corruption in Government*, SUNY Press, January 2014

"Can Washington Prevent the Next Detroit?," *The Bond Buyer*, January 22, 2014

"What About the Public as Voter and Taxpayer?," *Public Administration Review*, Vol. 73, Issue 6, 2013

"The Budget Case for Criminal Justice Reform," *Government Finance Review*, April 2012

"Considering How to Measure the Impact of 311/CRM Technology," *Public Management*, April 2012

David Eichenthal and Cory Fleming, "Process Improvement, No Problem: 311/CRM Data Can Reengineer Local Service Delivery," *Public Management,* December 2011

"Doing Well by Doing Good: Can Corruption Prevention and Government Efficiency Strategies Help Turn Around Declining Cities?," *Government, Law and Policy Journal*, Vol. 13, No.2, Winter 2011

"211/311: Is There a Case for Consolidation or Collaboration?," *Public Management,* August 2010

"Metropolitan Tennessee," Ochs Center for Metropolitan Studies, January 2010

"Place Matters: Chattanooga, Hamilton County Should Think Regionally," *Chattanooga Times Free Press,* January 24, 2009

David Eichenthal and Tracy Windeknecht, "Chattanooga, Tennessee: A Restoring Prosperity Case Study," Brookings Institution, September 2008

"Using 311 Data to Measure Performance and Manage City Finances," *Government Finance Review*, August 2008

Bob Corker and David Eichenthal, "Applying Innovations in Midsized Cities: 311 and Chattanooga's Results" in *Innovations in E-Government: The Thoughts of Governors and Mayors*, Rowman and Littlefield, 2005

"Don't Raise Taxes, Make them Fairer," *New York Daily News*, March 6, 2002

David Eichenthal and L. Blatchford, "Prison Crime in New York State," *Prison Journal*, December 1997

David Eichenthal and James Jacobs, "Enforcing the Criminal Law in State Prisons," *Justice Quarterly*, September 1991

"Changing Styles and Strategies of the Mayor" in *Urban Politics: New York Style*, M.E. Sharpe, Inc., 1990

"The Other Elected Officials" in *Urban Politics: New York Style*, M.E. Sharpe, Inc., 1990

"Voting Rights, Political Gerrymandering and Proportional Representation," *Annual Survey of American Law*, 1987, Issue 1


Mr. Eichenthal has presented at the White House Convening on Strong Cities Strong Communities; the convening of grantees of the Sustainable Communities Initiative; and annual conferences of ICMA, the Government Finance Officers Association, the Association of Government Accountants and the annual Governing magazine conference. He was also the principal guest speaker at a St. George's House, Windsor Castle Consultation on implementation of 311 in the United Kingdom.

**Michael Nadol** will be a member of the Expert Team:


## PROFESSIONAL EXPERIENCE

**PUBLIC FINANCIAL MANAGEMENT, INC., PHILADELPHIA, PA**
**Managing Director and Shareholder, 2002-Present**
**Senior Managing Consultant, 2000-2002**

- National practice leader for the firm's Management & Budget consulting services. Direct team of over 25 professionals advising federal agencies, state and local governments, public authorities, and nonprofit institutions.
- Lead and support client projects, including multi-year financial plan development, fiscal sustainability, distressed municipality recovery, program evaluation, workforce analysis, and budget engagements.
- Expert witness in public employee interest arbitration proceedings for state and local governments nationally regarding fiscal and economic trends and compensation comparability. Delivered arbitration testimony in California, Delaware, Maine, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, and Oregon, and before the Florida labor relations board. Testified before Presidential Emergency Board 244 on behalf of the New York Metropolitan Transportation Agency (2013). Testified in U.S. District Court for the District of Maryland (Northern Division) on behalf of the City of Baltimore as an expert in municipal budgeting, Robert F. Cherry, et al. vs. Mayor and City Council of Baltimore City, et al., Civil Action 1:10-cv-01447-MJG.
- Invited speaker regarding public sector finance and budget issues at sessions including the Governor's Task Force on Local Government Services and Fiscal Stability for the State of Michigan and national and regional industry conferences.
- Member of the firm's Executive Committee.


**CITY OF PHILADELPHIA, PHILADELPHIA, PA**
**Director of Finance (1999-2000), Deputy Mayor for Finance (1999), Deputy Water Commissioner (1996-1999), Chair of the Labor Relations Task Force (1993-1996), Assistant Deputy Mayor (1992-1996)**

- As Director of Finance, served as chief financial officer for a city-county government with a $2.6 billion General Fund budget.
- As Deputy Water Commissioner, oversaw all financial management, human resources, and policy initiatives for a $400 million, 2,200 employee water, wastewater, and storm water utility.
- As Chair of the Labor Relations Task Force, coordinated all labor relations activities across City government, and directed 1996 round of collective bargaining with municipal employee unions representing over 22,000 employees.

- As Deputy Mayor for Finance and Assistant Deputy Mayor, supported multi-year financial plan development and implementation oversight, and multiple management and productivity initiatives.

**GREATER PHILADELPHIA URBAN AFFAIRS COALITION, PHILADELPHIA, PA**
**Consultant, 1991**

Conducted research and planning for a regional civic engagement initiative.

**SOUTH SHORE HOUSING DEVELOPMENT CORPORATION, KINGSTON, MA**
**Housing Services Coordinator, 1987-1990**

Developed a court-based mediation service, and managed housing services programs.

## EDUCATION

**University of Pennsylvania, Philadelphia, PA    1993**
**Masters of Governmental Administration**
Stephen B. Sweeney Scholar

**Yale University, New Haven, CT    1986**
**Bachelor of Arts in Political Science**
*Summa Cum Laude*, Distinction in the Major

## RELATED EXPERIENCE

**University of Pennsylvania, Fels Institute of Government, Philadelphia, PA**
**1997 – Present**
Adjunct Faculty, masters-level public administration program

**Committee of Seventy, Philadelphia, PA        2005 – Present**
Board of Directors (2005- Present), Treasurer (2005-2008)

**Commonwealth of Pennsylvania Task Force on School Cost Reduction    2006-2007**
Appointed by the Governor, Selected as Chair by Task Force Members

## SELECT PRESENTATIONS AND PUBLICATIONS

*"Managing Public-Sector Retiree Health-Care Benefits under the Affordable Care Act," Government Finance Review,* Co-author, with Adam Benson and Jim Link, anticipated April 2014 (Government Finance Officers Association)

"Bringing Numbers to the Table; What Finance Officers Need to Know About Collective Bargaining" Government Finance Review, Co-author, with Vijay Kapoor, August 2011 (Government Finance Officers Association)

35

*Management Innovation in U.S. Public Water and Wastewater Systems,* Co-editor, with Paul Seidenstat, Dean Kaplan, and Simon Hakim, 2005 (John Wiley & Sons)

*America's Water and Wastewater Industries,* Co-editor, with Paul Seidenstat and Simon Hakim, 2000 (Public Utilities Reports)

## MEMBERSHIPS

Government Finance Officers Association
American Water Works Association
    National Standard Development Committee, Business Practices for Operations and Management (2005-2008)

**Virginia Rutledge** will act as a Consultant to the Expert Team. She recently retired as a Director in PFM's Orlando, Florida office, and works part-time to support MBC and financial advisory practices. While at PFM, Rutledge served as financial advisor to the Financial Oversight Board for the City of Miami, and was part of the teams that developed financial strategies and recommendations for Fulton and DeKalb counties in Georgia; Shelby County, Tennessee; Pittsburgh, Pennsylvania; Reading Pennsylvania; and New Orleans, Louisiana. She also developed capital process strategies for Long Beach, California and Hillsborough County, Florida.

Prior to joining PFM, Ms. Rutledge served as Vice President and Chief Financial Officer for the Orlando Utilities Commission (OUC). In that capacity, she was responsible for all financial matters of the Commission, including debt management, capital and operating budgets, financial planning, investments, information systems, and risk management. Prior to joining OUC she served as Chief Financial Officer for the Massachusetts Municipal Wholesale Electric Company (MMWEC), a public power agency. While at MMWEC, she managed MMWEC's reentry into the financial markets following one of the longest suspended bond rating in municipal bond history-- over four years.

Ms. Rutledge also served as Finance Director for both the cities of Memphis, Tennessee and Austin, Texas. Her responsibilities included debt and investment management, capital and operating budgets, purchasing, accounting, and pensions. In addition to her career as a finance professional, Ms. Rutledge is past president of the Government Finance Officers Association (GFOA). She served on the Committee on Debt and Fiscal Policy and chaired GFOA's Economic Development Task Force. She is also a member of the American Public Power Association. She was a recipient of APPA's Kramer-Preston Personal Service Award for her efforts on behalf of public power.

Ms. Rutledge received her BA (with honors) in math and statistics and MA in Economics, public finance specialization, from the University of Florida.

**Vijay Kapoor** will be a member of the Expert Team. He is the Director of PFM's Workforce group in the firm's Management & Budget Consulting practice. He helps governments of all sizes with their most pressing workforce issues by finding ways to address pension and retiree health liabilities and providing economic and strategic support for public sector collective bargaining and interest arbitration.

Mr. Kapoor has spent his entire professional career working on governmental and public sector workforce issues. Prior to joining PFM, he founded a company that provided operational and workforce consulting services to state and local governments. Previously, Mr. Kapoor served in state government in positions including Executive Director of the Commonwealth of Pennsylvania's Office of Management and Productivity where he led enterprise-wide and agency-specific cost savings projects towards the goal of reaching $1.5 billion in annual savings. Mr. Kapoor also previously practiced as a labor and employment attorney, where he specialized in public sector labor relations matters.

In 2013, Mr. Kapoor mediated a comprehensive consensus agreement among the City of Lexington, KY and its police and fire unions to address an underfunded pension fund. He and his team worked with the parties to define the scope of the problem, benchmarked the current benefit levels, and identified possible paths to sustainability. The final agreement included changing the pension COLA for current and future retirees, maintaining a defined benefit pension plan for existing employees and new hires, and increasing financial contributions by the City. The agreement was featured in The Bond Buyer ("A New Path to Reform of Pensions." The Bond Buyer. January 31, 2013) and Governing Magazine ("Pension Reform Success Stories." Governing Magazine. April 1, 2013). He also recently mediated another pension consensus agreement with the City of Chattanooga, TN and its police and fire employees and retirees.

Mr. Kapoor is a frequent speaker on pension and retiree benefit issues. Recent presentations include:

- "Municipal Finance Basics for Arbitrators." American Arbitration Association. Philadelphia, Pennsylvania. October 11, 2013

- "Pension Reform: Doing it Right." Government Finance Officers Association 107th Annual Conference. San Francisco, California. June 4, 2013

- "Local Pension Reform." Bond Buyer 2nd Annual Symposium on Distressed Municipalities. Providence, Rhode Island. March 18, 2013

- "Addressing Unfunded Retiree Benefit Liabilities." Association of Public Treasurers of the U.S. and Canada 47th Annual Conference. Williamsburg, Virginia. August 15, 2012

Mr. Kapoor has also published articles on public sector collective bargaining including:

- "Bringing Numbers to the Table: What Finance Officers Need to Know About Collective Bargaining," *Government Finance Review* (August 2011)

38

- "Public Sector Labor Relations: Why it Should Matter to the Public and Academia", *5 U. Pa. J. Lab. & Emp. 401* (2003)

Mr. Kapoor graduated from the University of Chicago with degrees in economics and public policy studies (with honors) and received his J.D. from the University of Pennsylvania Law School, where he received the labor law prize. He also received a certificate in Business and Public Policy from the Wharton School of the University of Pennsylvania. He has been certified as a Senior Professional in Human Resources (SPHR) since 2008.

**Gordon Mann** will be a member of the Expert Team. He is a Senior Managing Consultant and project manager in PFM's Management & Budget Consulting practice, focusing on financial, operational and strategic analysis for municipal governments.

Mr. Mann is particularly active in the practice's work with Pennsylvania municipalities that are subject to State oversight under the Commonwealth's Municipalities Financial Recovery Act. He is the day-to-day manager for the firm's engagement as the state-appointed recovery coordinator for the cities of Reading and New Castle and is a senior member of the oversight team for the City of Pittsburgh.

Mr. Mann has worked extensively to help Pennsylvania municipalities develop multi-year plans, which are multi-faceted strategies to overcome the operational and financial challenges that push municipal governments' budgets out of balance. Through these engagements, he has worked on improvements for public safety, public works and finance functions, in addition to broader challenges related to workforce management and revenue collection.

Mr. Mann has also led multi-year planning engagements for the City of York; the School District of the City of York; and Cumberland County, Pennsylvania, as well as Nassau County, New York and Wake County, North Carolina and Gary, Indiana.

Mr. Mann has been a regular speaker at annual seminars and conferences held by the Pennsylvania League of Municipalities and the Pennsylvania Government Finance Officers Association, and he led a session on multi-year planning at a one-day training event for Emergency Financial Managers in Michigan. He is also a member of the Pennsylvania GFOA-Communications Committee.

Earlier in his career, Mr. Mann served as Deputy Director of Public Affairs for a New York State Senator, handling media relations, communications and public affairs responsibilities for the Senate Mental Health and Developmental Disabilities Chair. In addition, he was the project manager for a multi-million dollar renovation to a regional arena and a district wide reading program.

Mr. Mann holds a Masters degree in Government Administration from the University of Pennsylvania's Fels Institute of Government, and a Bachelor of Arts degree in Political Science from Trinity College, Hartford, Connecticut, Phi Beta Kappa.

**Daniel Kozloff** will be a resource for the Expert Team. He is a Managing Director who leads PFM's Quantitative Strategies Group, a dedicated group of professionals who provide primary technical, new product, transactional, and modeling expertise for PFM's clients. The Quantitative Strategies Group is also responsible for the preservation and development of the proprietary analytical tools used throughout PFM's various business practices.

Additionally, as Manager of the Quantitative Strategies Group, Mr. Kozloff oversees PFM's firm-wide training program, which includes comprehensive sessions for new hires, current employees, lateral hires, and clients. He also leads and manages PFM's Research Group, which provides a centralized source of data, information and research for PFM's national Financial Advisory practice.

After joining PFM in 1999, Mr. Kozloff worked in multiple areas of public finance, including transactional support, technical and quantitative analysis, and strategic consulting. He has provided transactional support on refunding and new money issues, as well as derivative products analysis for such clients as the State of Connecticut, the State of Michigan, the State of Ohio, the State of New York, Nassau County, New York, and the Commonwealth of Pennsylvania. Mr. Kozloff has also been involved in the comprehensive restructuring of the Commonwealth of Pennsylvania's Public Education Funding System as well as statewide tax reform to supplement the Commonwealth's Education Funding. As day-to-day project manager of the Commonwealth of Pennsylvania's General Obligation financial advisory practice, Daniel has advised the Commonwealth on approximately $11 billion of debt issuance, including new money and refunding, long- and short-term, and tax-exempt and taxable (BAB) bonds.

Mr. Kozloff also provides primary quantitative support and analysis to PFM's Tobacco Securitization Group, PFM's OPEB Group, PFM's State-level Unemployment Compensation solutions, and supports quantitative aspects of PFM's financial advisory service with New York City. In addition to his work with State-level issuers, he serves as financial advisor to numerous Philadelphia area governments, authorities and institutions, including Lower Merion Township, Montgomery County, Girard Estate and College, The Waste System Authority of Eastern Montgomery County, York County Solid Waste Authority, and Pennsylvania State University.

Mr. Kozloff has a Bachelor of Arts degree in Political Science from the University of Pennsylvania.

April 9, 2014

Dear Judge Steven Rhodes,

A number of people that care about the future of the City forwarded to me your "Order Regarding the Solicitation of Applications to Serve as the Court's Expert Witness on the Issue of Feasibility (April 2, 2014)" and asked me to consider submitting an application.

You are seeking someone qualified in 1) municipal finance and budgeting to provide an opinion regarding the feasibility of the City's plan of adjustment and 2) municipal planning to provide an opinion regarding the reasonableness of the assumptions that underlie the City's cash flow forecasts and projections. These are important, narrow sets of expertise that are critical to your inquiry.

I am a professor of law at Wayne State University Law School and Director of the Damon J. Keith Center for Civil Rights. I have a Ph.D. in economics as well as a law degree from the University of Michigan. I developed and teach new courses at Wayne Law on *Reimagining Development in Detroit: Institutions, Law & Society* and *Race, Law & Social Change in Southeast Michigan*. My two most recent books are *Change and Continuity at the World Bank: Reforming Paradoxes of Economic Development* (Edward Elgar) (2013) and *Crusader for Justice: Federal Judge Damon J. Keith* (with Trevor W. Coleman) (Wayne State University Press) (2013). I examine questions of economic development as well as issues of race in America through the lens of complex adaptive systems and institutional economics.

One of the central themes of *Change and Continuity at the World Bank* is the power of particular academic disciplines, like economics, to both generate powerful insights, as well as to obscure basic understandings. The fact that the World Bank is run by Ph.D. economics empowers it do so some things and prevents it from doing others. On balance, these epistemic constrains have prevented the World Bank from realizing its potential and from truly catalyzing economic and social development around the world. The book calls for a richer interdisciplinary approach to development, as well as an approach that is more empirically grounded in what works in practice.

A workable Plan of Adjustment must meet the economic needs of the City of Detroit, while creating a healthy and sustainable social environment that enriches the lives of our citizens. In managing this Chapter 9 proceeding, you are undertaking a Herculean task. You rightfully seek expertise in municipal finance, budgeting and planning to assess both the feasibility of the City's Plan of Adjustment as well as the reasonableness of the City's cash flow forecasts and projections.

I maintain a keen awareness of what I know and what I do not know. I have frankly told people that I do not have the background in municipal finance that the court is looking for to guide the purely technical parts of its assessment. I caution, however, that people who have such specialized training may lack the ability to assess the feasibility of the Plan of Adjustment and the reasonableness of the City's financial assumptions from a broader perspective of what is needed to make the Plan of Adjustment work for the citizens of Detroit. Creating a viable city requires much more than balancing revenue and expenses in a narrow accounting framework.

I have substantial background and experience in assessing complicated economic/fiscal processes as applied to equally complicated social settings. The extensive work I have done in formulating a competition policy in domestic health care markets is documented in the attached c.v. I have done additional work on problems of international public health and economic development, including examining World Bank experiments to contract out health services in Cambodia.

For the past four years, since assuming the directorship of the Keith Center, most of my attention has been focused on Detroit and Southeast Michigan. I am no stranger to sorting through elaborate budgeting and fiscal reports. I have worked through state and local financing of education in writing about the Detroit Public Schools. See Peter J. Hammer, *The Fate of the Detroit Public Schools: Governance, Finance and Competition*, 13 Journal of Law in Society 111 (2011). I am in the process of writing an evaluation and critique of the *Detroit Future City: Detroit Strategic Framework Plan* (December 2012). I know what is happening in the city and understand the complex interplay of the underlying social, political and economic forces. Most recently, I was part of the team organizing and sponsoring the conference *Detroit Bankruptcy & Beyond: Organizing for Change in Distressed Cities* (April 7-8, 2014) at The Keith Center for Civil Rights (program attracted). Few people are in a better position to examine the feasibility of the fiscal and budgetary dimensions of City's Plan of Adjustment as it would impact the future lives of our citizens and communities.

I spend most of my time teaching, researching, writing and engaging in public service. I have done very little expert consulting or testifying. I engage in expert work only when I feel I have something valuable to contribute and it serves a broader social purpose. I have presented formal testimony in legal proceedings on only two occasions. In 1999, I testified in the capital murder case of Ohio v. Omar Jastrow (99AP931) as an expert on Khmer Rouge policies towards families and adolescents. The defendant, a Cambodian refugee was accused of killing another Cambodian refugee, who he alleged to believe was a former member of the Khmer Rouge. I have done academic and human rights work in Cambodia for over 20 years and testified to the kinds of experiences Mr. Jastrow would have experienced as an adolescent growing up during the Khmer Rouge period.

In 2008, I was the lead witness on behalf of the City Council of Detroit in the Governor's Removal Proceeding against Mayor Kwame Kilpatrick. I appeared as an expert in economics

and contract law. I was asked to evaluate and interpret various settlement and confidentiality agreement entered into by the mayor and to express my opinion as an economist as to whether the conduct was in the public interest. I accepted no fee for my work.

I have presented expert testimony in legislative and administrative proceedings. In 2002, I testified before a Joint Department of Justice and Federal Trade Commission Health Care and Competition Law and Policy Taskforce on the topic of *An Empirical Perspective on Health Care Competition Policy*. The following year I appeared before the same body to testify as to *Competition Policy: Building (Successfully) on Market Failure*. In 2009, I appeared before the Michigan House Judiciary Committee to present *Discrimination Threatens Michigan's Future Economic Growth*, testifying in favor of extending state civil rights protection to cover sexual orientation.

In 2010, I was retained as an expert by the Research and Analysis Division of the Detroit City Council to evaluate the contractual status of the Greater Detroit Resource Recovery Facility, which operates the large waste to energy incinerator. I presented testimony as to my findings at a closed session of the City Council. This was another large, complicated legal problem intertwined with layers of financing and re-financing agreements.

In the past, I have done expert economic consulting in private antitrust matters. I have done no outside consulting since becoming Director of the Damon J. Keith Center for Civil Rights.

If retained by the Court, I would be able to give an opinion that is based on sufficient facts and data and that is the product of reliable principles and methods and the application of those principles and methods to the facts of the case. I would be able to exercise fair, unbiased and independent judgment in the assignment. I would prepare an appropriately concise and understandable report and testify in court and in deposition as to its contents.

I would accept whatever standard fee as would be determined by the Court in such matters. I would do most of the work myself, supplementing my efforts with the consultation of other academics and experts with subject matter expertise at Wayne State and throughout the country as appropriate and with appropriate student research assistants.

The "why" in this case is simple. This is an important case, the resolution of which will determine the quality of life and the prospective presence or absence of opportunity for the residents of Detroit. While these are partly financial problems they are not solely financial problems. A feasible Plan of Adjustment based on reasonable forecasts and projections must be assessed in light of the City's history of still unhealed racial conflict and the City's position within a fractured and segregated regional economy. The feasibility of the Plan of Adjustment is an economic question embedded in a deeper social context with complementary and competing systems of education, housing, health care and commerce. While a narrow expertise in

3

municipal finance and planning is a necessary component, such expertise alone is not sufficient for a comprehensive economic assessment of the feasibility of the City's proposed plan.

Sincerely,

Peter J. Hammer

Attachments:
      Hammer c.v.
      Detroit Bankruptcy & Beyond: Organizing for Change in Distressed Cities (April 7-8, 2014).

## PETER JOSEPH HAMMER

Wayne State University Law School
471 W. Palmer, Detroit, MI 48202
(313) 577-0830 (phone)
(313) 577-2620 (fax)
phammer@wayne.edu

Wayne State University Law School
471 W. Palmer, Detroit, MI 48202
(313) 577-0830 (phone)
(313) 577-2620 (fax)
phammer@wayne.edu

### EDUCATION

**University of Michigan**, Ann Arbor, Michigan
    J.D. *magna cum laude*, May 1990
    Ph.D. (Economics), May 1993
        Dissertation: *Mergers, Market Power & Competition: An Economic and Legal Evaluation of Hospital Mergers*

**Gonzaga University**, Spokane, Washington
    B.S. (Mathematics), B.A. (Economics), B.A. (Speech Communications)
    *summa cum laude*, with honors, May 1986

### EMPLOYMENT

**Wayne State University Law School**, Detroit, Michigan
*Director, Damon J. Keith Center for Civil Rights*, August 2009 to present
*Professor of Law,* August 2005 to Present
*Associate Professor of Law*, August 2003-August 2005
    Courses:   Race, Law & Social Change in Southeast Michigan; Reimagining Development in Detroit: Institutions, Law & Society; Health Care Quality, Licensing & Liability; Health Care Organization & Finance; Health Policy: The Firm, the Market & the Law; International Organizations & Public Health; Contract Law

**University of Michigan School of Public Health**, Ann Arbor, Michigan
*Adjunct Professor, Department of Health Management & Policy*
August 2003 to 2008

**University of Michigan Law School**, Ann Arbor, Michigan
*Assistant Professor of Law*, May 1995 to June 2003
    Courses: Federal Antitrust Law; Health Law & Policy; Contract Law; Law & Economics; Cambodian Law & Development

**University of Toledo College of Law**, Toledo, Ohio
*Distinguished Visiting Professor of Law*, Fall 2002

**O'Melveny & Myers**, Los Angeles, California
*Litigation Associate – Practice Areas: Antitrust, Health Care, Expert Economic Testimony*
April 1993 to May 1995

Peter J. Hammer
Page 2

**Judge Alfred T. Goodwin, United States Court of Appeals for the Ninth Circuit**
*Judicial Law Clerk*
September 1991 to September 1992

<u>HONORS, AWARDS & GRANTS</u>
**Center for Khmer Studies, Rockefeller Program for Capacity Building in Higher Education, Visiting Professor**
> *Cambodia at the Margins: Minority Groups and Borderlines*
> Phnom Penh, Cambodia (February- August 2007)

**Center for Khmer Studies, CAORC (Council of American Overseas Research Centers), Senior Research Fellow**
> *Interfacing Local & Global: Cambodian Institutions and International Aid Initiatives*
> Phnom Penh, Cambodia (2007-09)

**Center for Khmer Studies, Luce Senior Research Fellow**
> *The Role of Social Institutions in Cambodian Economic Development*
> Siem Reap, Cambodia (Summer 2005)

**Robert Wood Johnson Foundation Health Policy Investigator Award**
> *Competing on Quality of Care: Comparing Antitrust Law to Market Reality*
> (Co-Principal Investigator with William M. Sage) (1999-2000)

<u>PUBLICATIONS & WORKS IN PROGRESS</u>

*Law Review Articles*
*Health (R)evolution: (Quality = Learning) + (Ethics = Justice)*, 10 IND. HEALTH L. REV. 415 (2013).

*Global Health Initiatives and Health System Development: The Historic Quest for Positive Synergies,* 9 IND. HEALTH L. REV. 567 (2012) (with Charla M. Burill).

*Governance: Structuring our Future*, 13 JOURNAL OF LAW IN SOCIETY 3 (2011).

*The Fate of the Detroit Public Schools: Governance, Finance and Competition*, 13 JOURNAL OF LAW IN SOCIETY 111 (2011).

*Diagnosing America's Healthcare Ills: Analysis Beyond Epithet,* 15 J. LAW & MED. 337 (2011).

*Complex Adaptive Systems: The Narrow Horizons of Malpractice Reform,* 14 J. LAW & MED. 477 (2010).

*The Architecture of Health Care Markets: Economic Sociology and Antitrust Law*, 7 HOUS. J. HEALTH L & POLICY 229 (2007).

*The Trials of Tenofovir: Mediating the Ethics of Third-World Research*, 4 U. SANTA CLARA J. INT'L. (2006); 9 U. TECH. SYDNEY L. REV. 184 (2005) (with Tammy Sue Lundstrom).

*Medical Code Blue or Blue Light Special: Where is the Market for Indigent Care?*, 6 JOURNAL OF LAW IN SOCIETY 82 (2005).

*Monopsony as an Agency and Regulatory Problem in Health Care*, 71 ANTITRUST L. J. 949 (2004) (with William M. Sage).

*A Copernican View of Health Care Antitrust*, 65 LAW & CONTEMP. PROBS. 241 (Special Issue: Is the Health Care Revolution Over?, Clark C. Havighurst, ed.) (2002) (with William M. Sage).

*Antitrust, Health Care Quality, and the Courts,* 102 COLUM. L. REV. 545 (2002) (with William M. Sage).

*How Doctors Became Distributors: A Fabled Story of Vertical Relations*, (AALS Antitrust Law Section, Guilds at the Millennium: Antitrust and the Professions) 14 LOY. CONSUMER L. REP. 411 (2002).

*Antitrust Beyond Competition: Market Failures, Total Welfare and the Challenge of Intra-Market Second Best Tradeoffs*, 98 MICH. L. REV. 849 (2000).

*Questioning Traditional Antitrust Presumptions: Price and Non-Price Competition in Hospital Markets*, (Symposium Issue, What's the Prognosis: Managed Care in the Next Century), 32 MICH. J. L. REF. 727 (1999).

*Competing on Quality of Care: The Need to Develop a Competition Policy for Health Care Markets*, (Symposium Issue, What's the Prognosis: Managed Care in the Next Century), 32 MICH. J. L. REF. 1069 (1999) (with William M. Sage).

*Free Speech and the Acid Bath: An Evaluation and Critique of Judge Richard Posner's Economic Interpretation of the First Amendment,* 87 MICH. L. REV. 499 (1988).

### Peer Reviewed (Refereed) Journals
*Shadows of Ideological Empiricism: Reconsidering an Asian Development Bank Health Policy Experiment in Cambodia* (work in progress).

*Experiments, Ethics and Epistemology in the Construction of International Health Policy: Knowledge and Vulnerability in Cambodia's Indigenous Communities* (work in progress).

*The Chinese in Cambodia: Economic and Political Inclusion and Exclusion in the Post-Independence Era,* INTERNATIONAL REVIEW OF MODERN SOCIOLOGY (forthcoming 2014)

*Contracting Illness: Reassessing International Donor-Initiated Health Service Experiments in Cambodia's Indigenous Periphery*, 21 SOUTHEAST ASIAN RESEARCH 457 (2013)

*Competition and Quality as Dynamic Processes in the Balkans of American Health Care,* 31 J. HEALTH POLITICS, POLICY & LAW 473 (Special Issue, Evaluation of DOJ/FTC Report Improving Health Care: A Dose of Competition Peter D. Jacobson and David A. Hyman, eds.) (2006).

*Slaying Dragons: Malpractice Beyond Myth,* Review of The Medical Malpractice Myth by Tom Baker, 25(1) HEALTH AFFAIRS 289 (January/February 2006).

*Critical Issues in Hospital Antitrust Law*, 22(6) HEALTH AFFAIRS 88 (November/December 2003) (with William M. Sage).

*Institutional Economics for Health Policy?,* Review of The Economic Dynamics of Environmental Law by David M. Driesen, 22(2) HEALTH AFFAIRS 277 (March/April 2003).

*The Pricing of Essential Aids Drugs: Markets, Politics and Public Health*, 5(4) J. INT'L ECON. LAW 883 (Special Issue: International Trade Law and Public Health, Gregg Bloche, ed..) (2002).

*Introduction: "Why Arrow? Why Now?* 26(5) J. HEALTH POLITICS, POLICY & LAW 835 (Special Issue, Kenneth Arrow and the Changing Economics of Health Care, Peter J. Hammer, Deborah Haas-Wilson, and William M. Sage, eds.) (2001).

*Arrow's Analysis of Social Institutions: Entering the Marketplace with Giving Hands?* 26(5) J. HEALTH POLITICS, POLICY & LAW 1011 (Special Issue, Kenneth Arrow and the Changing Economics of Health Care, Peter J. Hammer, Deborah Haas-Wilson, and William M. Sage, eds.) (2001).

*Pegram v. Herdrich: On Peritonitis, Preemption and the Elusive Goal of Managed Care Accountability,* 26(4) J. HEALTH POLITICS, POLICY & LAW 767 (2001).

### Books, Book Chapters and Monographs
CRUSADER FOR JUSTICE: FEDERAL JUDGE DAMON J. KEITH (Peter J. Hammer, ed., with Trevor W. Coleman) (Wayne State University Press) (2013)

CHANGE AND CONTINUITY AT THE WORLD BANK: REFORMING PARADOXES OF ECONOMIC DEVELOPMENT (Edward Elgar) (2013).

*International Law, Governance and Global Children's Health,* in TEXTBOOK OF PEDIATRIC GLOBAL HEALTH (Deepak Kamat, ed.) (American Academy of Pediatrics) (2012).

*International Law, Public Health and Addiction,* in PRINCIPLES OF ADDICTION AND THE LAW (Norman S. Miller, ed.) (American Psychiatric Association) (Elsevier) (2010).

*Introduction: Living on the Margins: Minorities and Borderlines in Cambodia and Southeast Asia* in LIVING ON THE MARGINS: MINORITIES AND BORDERLINES IN CAMBODIA AND SOUTHEAST ASIA (Peter J. Hammer, ed.) (Center for Khmer Studies) (2009).

*Development as Tragedy: The Asian Development Bank and Indigenous Peoples in Cambodia,* in LIVING ON THE MARGINS: MINORITIES AND BORDERLINES IN CAMBODIA AND SOUTHEAST ASIA (Peter J. Hammer, ed.) (Center for Khmer Studies) (2009).

*The Elusive Face of Cambodian Justice*, in AWAITING JUSTICE: ESSAYS ON ACCOUNTABILITY IN CAMBODIA (Beth Van Shaack, ed.) (Mellon Press) (2005).

UNCERTAIN TIMES: KENNETH ARROW AND THE CHANGING ECONOMICS OF HEALTH CARE, (Peter J. Hammer, Deborah Haas-Wilson, Mark Petersen and William M. Sage, eds.) (Duke University Press) (2003).

*Medical Antitrust Reform: Arrow, Coase and the Changing Structure of the Firm,* in THE PRIVATIZATION OF HEALTH CARE REFORM, at 113 (Gregg Bloche, ed.) (Oxford University Press) (2002).

*Health Care Quality and Antitrust Law: Lessons from the Cases,* in 2002 HEALTH LAW HANDBOOK at 549 (Alice G. Gosfield, ed) (West Group) (2002) (with William Sage).

*Assisted Suicide and the Challenge of Individually Determined Collective Rationality*, in LAW AT THE END OF LIFE: THE SUPREME COURT AND ASSISTED SUICIDE, (Carl Schneider, ed.) (University of Michigan Press) (2000).

*Price and Quality Competition in Health Care Markets: The Comparative Institutional Case Against an Antitrust Exemption for Medical Self-Regulation*, in ACHIEVING QUALITY IN MANAGED CARE: THE ROLE OF LAW, 123-53 (John D. Blum, ed.) (Health Law Section ABA) (June 1997).

Peter J. Hammer
Page 6

## PRESENTATIONS, TESTIMONY & WORKSHOPS

**Center for Khmer Studies Lecture Series**
Center for Khmer Studies, Siem Reap, Cambodia, July 2013
> Presentation: *Contracting Illness: Reassessing International Donor-Initiated Health Service Experiments in Cambodia's Indigenous Periphery*

**Journal of Law in Society Symposium**
Wayne State University Law School, Detroit, Michigan March 2013
> Presentation: *Debunking the Post-Racial Myth: The Profiling of Detroit's Most Vulnerable Populations*

**Michigan In Transition: The Restructuring of Governance through Corporatization and Privatization**
Wayne State University Law School, Detroit, Michigan March 2012
> Presentation: *Michigan In Transition: The Restructuring of Governance through Corporatization and Privatization*

**Imagining the Next Quarter Century of Health Law**
Robert H. McKinney School of Law, Indiana University, Indianapolis, Indiana, February 2012
> Presentation: *Health (R)evolution: (Quality = Learning) + (Ethics = Justice)*

**American Society of Law Medicine & Ethics, Health Law Teacher's Conference**
Loyola University, Chicago, Illinois, June 2011
> Presentation: *Experiments, Ethics and Epistemology in the Construction of International Health Policy: Knowledge and Vulnerability in Cambodia's Indigenous Communities*

**Civil Rights and American Arabs: 10 Years after 9/11**
National Arab American Journalist Association, Dearborn, Michigan, May 2011
> Presentation: *America as Idea and Ideal in the Struggle for Arab American Civil Rights*

**Perspectives on Socialized Medicine in the US**
Michigan State University Law School, Lansing, Michigan, February 2011
> Presentation: *Diagnosing America's Health Care Ills: Analysis Beyond Epithet*

**American Society of Law Medicine & Ethics, Health Law Teacher's Conference**
University of Texas, Austin, Texas, June 2010
> Presentation: *Global Health Initiatives and Health System Development: Past Imperfect, Future Tense*

**What's On The Horizon For Michigan Medical Malpractice?**
Michigan State University Law School, Lansing, Michigan, February 2010
Presentation: *Complex Adaptive Systems: The Narrow Horizons of Malpractice Reform*

**The Special Tribunal for Cambodia and the Future of International Criminal Law**
Wayne State University Law School, Detroit, Michigan, January 2010
Presentation: *The Elusive Face of Cambodian Justice*

**Michigan Medical Marijuana Symposium**
Wayne State University Law School, Detroit, Michigan, October 2010
Presentation: *Public health, Regulations, Social Movements and Social Change*

**Faculty Symposium**
University of Florida Law School, Tallahassee, Florida, September 2010
Presentation: *Reforming Paradoxes: Modeling Change and Continuity at the World Bank*

**Rethinking Patient Safety: An Interdisciplinary Symposium**
Wayne State University Law School, Detroit, Michigan, May 2009
Co-organizer and Moderator: *Interdisciplinary evaluation and assessment of the problem of patient safety*

**Alternative Dispute Resolution in Health Care**
Michigan State University College of Law, Lansing, Michigan, April 2009
Presentation: *Malpractice, ADR and Health Care Quality: Failures in Public and Private Ordering*

**Michigan State Bar Health Care and Antitrust Law Joint Meeting**
Novi, Michigan, May 2008
Presentation: *The Architecture of Health Care Markets: Economic Sociology and Antitrust Law*

**Mainland Southeast Asia at its Margins: Minority Groups and Borders**
Center for Khmer Studies, Siem Reap, Cambodia, March 2008
Presentation: *Development as Tragedy: The ADB and Indigenous Peoples in Cambodia*

**Central States Law School Association Annual Meeting**
Wayne State University, October 27, 2007
Presentation: *Reforming Paradoxes at the World Bank: Institutions, Participation and Ideological Empiricism*

**Program for Continuing Training for Judges and Prosecutors**
Royal School of Magistracy, Phnom Penh, Cambodia, March 2007
Presentation: *Introduction to New Judicial Code of Ethics*

**Local Practice and Trans-National Dynamics in Mainland Southeast Asian Religions: Historical and Contemporary Patterns**
Center for Khmer Studies, Siem Reap, Cambodia, February 2007
> Presentation: *Buddhism and Development: The GTZ Wat-Based, Self-Help Initiative*

**American Society of Law Medicine & Ethics, Health Law Teacher's Conference**
University of Maryland Law School, Baltimore, MD June 2006
> Presentation: *Competition and Quality as Dynamic Processes in the Balkans of American Health Care*

**Manufacturers' Immunity: The FDA Compliance Defense**
Ave Maria Law School, Ann Arbor, MI, March 2006
> Commentary on Daniel E. Troy's "State-Level Protections for Good-Faith Pharmaceutical Manufacturing."

**Center for Law, Ethics & Health**
University of Michigan School of Public Health, December 2005
> Presentation: *Antitrust & Health Care Quality: Building a Competition Policy*

**Dean Martin Barr Lecture on Health Policy**
2nd Anniversary Celebration of the Dedication of the New Building
> Eugene Applebaum College of Pharmacy and Health Services
> Wayne State University, Detroit, Michigan, October 2004
> Presentation: *Keeping Health Care Affordable: International Pricing of Pharmaceuticals*

**Faces of Health Care Disparities**
American Medical Student Association Conference, Detroit, Michigan, October 2004
> Presentation: *Economic & Legal Barriers to Health Care Access*

**Innovations in Laboratory Science Symposium**
> Eugene Applebaum College of Pharmacy and Health Services
> Wayne State University, Detroit, Michigan, May 2004
> Presentation: *Volunteerism   in Health Care*

**Medicaid, Medicines and Malpractice: Issues in State Health Care Policy**
Ohio State University Moritz College of Law, Columbus Ohio, April 2004
> Presentation: *Beyond Malpractice: Cultivating Health Care Quality in the Twenty-First Century*

**Biotechnology and Social Justice Workshop**
Santa Clara University Law School, Santa Clara, CA, September 2003
> Presentation: *The Pricing of Essential Aids Drugs: Markets, Politics and Public Health*

**The Policy Project Cambodia**
Phnom Penh, Cambodia, July 2003
> Workshop Participant: *Cambodian HIV/AIDS and Human Rights Audit*

**American Society of Law Medicine & Ethics, Health Law Teacher's Conference**
Widener University School of Law, Wilmington, DE, June 2003
> Presentation: *Monopsony as an Agency and Regulatory Problem in Health Care*

**Invitational Meeting, Provider Competition and Quality: Latest Findings and Implications for Next Generation of Research**
Agency for Health Care Research & Quality (AHRQ) and Federal Trade Commission, Washington, DC, May 2003
> Discussant: *Physician Competition and Quality*

**DOJ/FTC Joint Hearings on Health Care Competition Law and Policy**
Washington D.C., February 2003
> Presentation: *Competition Policy: Building (Successfully) on Market Failure*

**DOJ/FTC Health Care and Competition Law and Policy Workshop**
Washington D.C., September 2002
> Presentation: *An Empirical Perspective on Health Care Competition Policy*

**Seton Hall Faculty Colloquium**
Seton Hall University Law School, Newark, NJ, September 2002
> Presentation: *The Pricing of Essential Aids Drugs: Markets, Politics and Public Health*

**Annual Meetings of the Academy for Health Services Research & Health Policy (AHSRHP)**
Washington, D.C., June 2002
> Panelist: *Beyond the Patient's Bill of Rights: The Law & Politics of Managed Care*

**American Society of Law Medicine & Ethics, Health Law Teacher's Conference**
Indiana University School of Law, Indianapolis Indiana, June 2002
> Presentation: *The Private Side of Patient Protection: Integrating Market and Nonmarket Responses*

**AALS Antitrust Law Section, Guilds at the Millennium: Antitrust and the Professions**
New Orleans, Louisiana, January 2002
> Presentation: *The Quiet Revolution: How Doctors Became Distributors*

**Is the Health Care Revolution Over?**
Symposium for Special Issue of Law & Contemporary Problems
Duke University Law School, Durham, North Carolina, November 2001
> Presentation: *A Copernican View of Health Care Antitrust*

**Vanderbilt Legal Theory Workshop**
Vanderbilt University Law School, Nashville, Tennessee, October 2001
> Presentation: *Antitrust, Health Care Quality, and the Courts*

**Annual Meeting of the Robert Wood Johnson Foundation Investigator Awards Program in Health Policy Research**
Peach Tree Conference Center, Atlanta, Georgia, October 2001
> Plenary Session on Completed Work
> Presentation: *Kenneth Arrow and the Changing Economics of Health Care*

**American Society of Law Medicine & Ethics, Health Law Teacher's Conference**
Boston University School of Law, Boston, Massachusetts, June 2001
> Presentation: *Antitrust, Health Care Quality, and the Courts*

**Health Policy Research Seminar Series**
RWJ Foundation Scholars in Health Policy Research Program
University of Michigan School of Public Health, March 2001
> Presentation: *Antitrust, Health Care Quality and the Courts*

**FTC & DOJ Joint Antitrust Health Care Task Force, Brown Bag Program**
United States Department of Justice, Washington, D.C., November 2000
> Presentation: *How Antitrust Courts Have Addressed Quality and Non-Price Concerns in Health Care Cases*

**Sixth Annual Health Care Antitrust Forum**
Northwestern University School of Law, Chicago, Illinois, November 2000
> Presentation: *Health Care Quality, Antitrust, and the Federal Courts*

**Net Impact Faculty Case Competition**
University of Michigan School of Business, Ann Arbor, Michigan, November 2000
> Panelist: *The Role of Pharmaceutical Companies in Providing Affordable Aids Medications to those in Need in Africa*

**Annual Meeting of the Robert Wood Johnson Foundation Investigator Awards Program in Health Policy Research**
Historic Inns of Annapolis, Annapolis, Maryland, October 2000
> Panelist in Plenary Session: *Competition in the Health Care Market*

**American Society of Law Medicine & Ethics, Health Law Teacher's Conference**
Case Western Reserve University School of Law, Cleveland, Ohio, June 2000
>    Presentation: *Developing a Competition Policy: Judicial Treatment of Non-Price Competition in Antitrust Cases*

**Annual Meeting of the Robert Wood Johnson Foundation Investigator Awards Program in Health Policy Research**
The Inns at Mill Falls, Meredith, New Hampshire, October 1999
>    Presentation: *Competing on Quality of Care: Comparing Antitrust Law to Market Reality*

**Annual Meetings of the American Law & Economics Association**
Yale University Law School, New Haven Connecticut, May 1999
>    Presentation: *Testing the Limits of Antitrust: Intra-Market Second Best Tradeoffs*

**What's the Prognosis: Managed Care in the Next Century**
Symposium for the University of Michigan Journal of Law Reform
University of Michigan Law School, Ann Arbor, Michigan, October 1998
>    Presentation: *Competing on Quality in Managed Care: A Research Agenda*

**Courting Death: An Evaluation of Glucksberg and Quill**
Symposium on Assisted Suicide
University of Michigan Law School, Ann Arbor, Michigan, November 1997
>    Presentation: *Assisted Suicide and the Challenge of Individually Determined Collective Rationality*

**Trends in Health Law**
O'Melveny & Myers, Newport Beach, CA, and New York, NY, June 1997
>    Presentation: *Antitrust in a Brave New World: Public and Private Responses in Contested Health Care Markets*

**Achieving Quality in Managed Care: The Role of Law**
Loyola University Chicago Institute for Health Law, November 1996
>    Presentation: *Price and Quality Competition in Health Care Markets*

**The Privatization of Health Care Reform**
Georgetown Law Center, Washington, D.C., May 1995
>    Presentation: *Arrow, Coase and the Changing Structure of the Firm in Emerging Health Care Markets*

## OTHER PRESENTATIONS, SYMPOSIA & TESTIMONY

### Michigan House Judiciary Committee
Lansing, Michigan, August 2009
> Testimony: *Discrimination Threatens Michigan's Future Economic Growth* (advocating extending state civil rights protection to cover sexual orientation)

### In the Matter of John Doe's Application for Deferred Action
Philadelphia, Pennsylvania, April 2009
> Affidavit as Expert Witness: *Compare and contrast quality of care for HIV/AIDS in Cambodia and the United States*

### Governor's Removal Proceeding against Mayor Kwame Kilpatrick
Detroit, Michigan, September 2008
> Expert Witness for Detroit City Council: *Evaluate and Interpret the meaning of the Mayor's Settlement and Confidentiality Agreement*

### State of Ohio v. Omar Jastrow
Columbus, Ohio, June 1999
> Expert witness in capital murder case: *History of the Khmer Rouge, fate of the Khmer Rouge, and Khmer Rouge policies towards families and children*

## PROFESSIONAL & SERVICE AFFILIATIONS
### Member Board of Directors of the ACLU of Michigan
September 2013 - Present

### Member Detroit-Wayne County Health Authority Population Health Council
January 2012 - present

### Member Advisory Board of the Arab American Anti-Discrimination Committee
August 2011 - present

### Chair of the Board, Life & Hope Association
*An NGO founded and run by the Buddhist Monks at Wat Damnak, Siem Reap, Cambodia, dedicated to improving the lives of orphans and vulnerable children.*
Member of the Board June 2005-present, Chair January 2009-present

### Member Steering Committee Michigan Round Table Housing Project Partnership
*Project seeking to establish a Truth and Reconciliation Commission to examine history of housing discrimination in Southeast Michigan*
2009-2011

**Member, Ethics Advisory Committee, Michigan Department of Community Health**
*Allocation of Scarce Medical Resources During Emergencies*
2008-2010

**Founder & Director, Program for Cambodian Law & Development**
*A program committed to the interdisciplinary study of the role of law & development in Cambodian society*
University of Michigan Law School, Ann Arbor, Michigan
September 1996 - May 2003

**Member and Past President, Advisory Council, Legal Aid of Cambodia**
*A non-governmental organization committed to establishing the rule of law through the provision of direct legal services to Cambodia's poor*
Phnom Penh, Cambodia, President of the Advisory Council (1996-1998), Member of Advisory Council (1995-2000)

**Co-Chair, RWJ Foundation Cluster Group on the Changing Role of Competition**
Robert Wood Johnson Foundation Health Policy Investigator Award Program
Organized working groups culminating in publication Special Issue of the JOURNAL OF HEALTH POLITICS, POLICY & LAW, *Kenneth Arrow and the Changing Economics of Health Care*
June 1999 - October 2001

**Vice-Chair, Southeast Asian Law Committee**
International Law Section of the American Bar Association
September 1997 to September 1998

**Member, Human Subject Subcommittee**
Institutional Review Board, VA Hospital
Ann Arbor, Michigan
July 1995 to July 1997

HOME       MATERIAL      CONFERENCE SCHEDULE       NOTES FROM THE CONFERENCE

CONTACT      SPEAKERS      LODGING      REGISTRATION

# DETROIT BANKRUPTCY & BEYOND

## Organizing for Change in Distressed Cities

## Detroit Bankruptcy & Beyond

## Organizing for Change in Distressed Cities

**Monday, 07 April - Tuesday, 08 April 2014**
**@ Keith Center for Civil Rights,**
**Wayne State University, Detroit, MI**

All sessions are held in Wayne State's Law School Building (Barris Lounge & Partrich Auditorium/Atrium)
Lunch will be in McGregor Building

Wayne Law : 471 West Palmer Street, Detroit, MI 48202

We are excited to announce that Heaster Wheeler will be the master of ceremonies for the conference!

## Monday, 07 April

| | | |
|---|---|---|
| 3:00-5:00p | Concurrent Pre-conference Convening I I<br>*Bankruptcy 101* | |
| | Partrich Auditorium | |
| 3:00-5:00p | Concurrent Pre-conference Convening II I<br>*Strategies & Community Action* | |
| | Barris Lounge | |
| 5:30-6:00p | Registration | |
| | Partrich Atrium | |
| 6:00-7:30p | Opening Keynote Addresses by *Thomas Sugrue &<br>Rip Rapson* | |
| | Discussant I *john powell* | |
| | Partrich Auditorium | |
| 7:30-8:30p | Welcome Reception | |
| | Partrich Atrium | |

## Tuesday, 08 April

All Tuesday events in Partrich Auditorium except Lunch

| | |
|---|---|
| 8:30-9:00a | Registration |
| 9:00-10:30a | Keynote Address by Carol O'Cleireacain |
| | Discussant I *Wallace Turbeville* |
| 10:30-noon | Panel 1 & Discussion I Detroit: Historical Roots &<br>Current Effects |
| | Panelists: *Michelle Anderson, Gregory Eason,<br>Debra Taylor, & June Manning Thomas* |
| | Discussant I *Freda Sampson* |

Knowing where we have been is essential to knowing where we are going. The first panel focuses on Detroit's finances and the historical roots of its bankruptcy. Discussions will include how structuralized racialization and racism impacted Detroit's trajectory toward fiscal disaster, and how the city's historical roots must inform its strategies for moving through and beyond bankruptcy. Our discussion will be practical and inclusive, highlighting how pensions, housing, state funding, and regional isolation impact the city. We will consider what can be learned from communities outside Detroit, as well as from Detroit citizens who are struggling with the real consequences of the City's financial distress.

| | |
|---|---|
| noon-1:30p | Lunch and Address by *Angela Glover Blackwell* |

McGregor Building

**1:30-3:15p**  **Panel 2 & Discussion | Distressed Cities: A National Perspective**

Panelists: *Jim Carr, Chris Fox, Renaye Manley, & Stuart Rossman*

Discussant | *Brandon Jessup*

Detroit is not the only city experiencing bankruptcy and municipal distress. It is also important to look at this issue from a broader perspective. The second panel considers the housing system & economic crisis as a starting point for exploring interactions between the housing crisis and municipal distress. Discussions will consider why and how the housing crisis and the economic crisis impact a city finances. We will think about how cities can organize for different outcomes, discuss what expectations can and should be placed on particular institutions, and the intersection of pension reform with these issues. We ask "How should communities move forward in addressing the connection between foreclosures and municipal distress?" The panelists provide their insights and we follow with group

13-53846-tjt    Doc 4068    Filed 04/14/14    Entered 04/14/14 15:26:01    Page 89 of 322

conversation.

| | |
|---|---|
| 3:15-4:00p | Keynote Address by Ronald Sims |
| **4:00-5:30p** | **Panel 3 & Discussion | Working Within & Through Municipal Distress** |

Panelists: *Saqib Bhatti, Steve Dubb, Shea Howell, Robert Johnson, & Joe Recchie*

Discussant | *Rev. Curenton, M.DIV.*

Finally, we discuss ways communities can move forward and through city financial distress to create inclusive and equitable outcomes. The third panel considers what interventions are available to distressed communities for changing and influencing outcomes. Discussions will focus on how distressed cities can respond to bankruptcy and financial distress with specific interventions. Our discussion will include strategies and mechanisms for realizing such interventions. We will consider the roles of planners and developers and how they should work with and assist various groups in developing just and equitable plans. We will ask how to move forward in Detroit and beyond, combining information and ideas from the other panels.

**5:30-6:30p**    **Closing Discussion**

facilitated by *Ponsella Hardaway, Peter Hammer , & john powell*

*Header image by* REUTERS/ Rebecca Cook

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

                                    Chapter 9

City of Detroit, Michigan                  Case No. 13-53846
       Debtor.                         Hon. Steven W. Rhodes

_____/

**APPLICATION OF WILLIAM A. BRANDT, JR. TO SERVE AS THE
COURT'S EXPERT WITNESS ON THE ISSUE OF FEASIBILITY PURSUANT TO
THIS COURT'S APRIL 2, 2014 ORDER REGARDING THE SOLICITATION OF
APPLICATIONS TO SERVE AS THE COURT'S EXPERT WITNESS ON THE ISSUE
OF FEASIBILIITY**

## I.    INTRODUCTION.

On April 2, 2014, this Court entered its *Order Regarding the Solicitation of Applications to Serve as the Court's Expert Witness on the Issue of Feasibility* (DE #3610)("Order"). The Court's Order set forth the qualifications sought by the Court in one or more experts on the issues of feasibility of the City of Detroit's Amended Plan of Adjustment, detailed the information to be submitted by applicants, and ordered that applications be submitted by April 9, 2014.

This Application of William A. Brandt, Jr. to Serve as the Court's Expert Witness on the Issue of Feasibility Pursuant to this Court's April 2, 2014 Order Regarding the Solicitation of Applications to Serve as the Court's Expert Witness on the Issue of Feasibility is submitted in response to and comports with the requirements of this Court's April 2, 2014 Order.

William A. Brandt, Jr., through this Application and its Attachments, submits that he:

    a.  Has outstanding qualifications in municipal finance and budgeting to provide an opinion regarding the feasibility of the City's plan of adjustment;

    b.  Has outstanding qualifications in municipal planning to provide an opinion regarding the reasonableness of the assumptions that underlie the City's cash flow forecasts and projections;

    c.  Is able to give an opinion that is based on sufficient facts or data and that is the product of reliable principles and methods and the application of those principles and methods to the facts of the case;

    d.  Is willing and able to exercise fair, unbiased and independent judgment in the assignment;

    e.  Can prepare a report and provide testimony in deposition and at trial, both of which are concise and understandable in addressing the sophisticated and complex matters related to the feasibility of the plan of adjustment and to the reasonableness of the City's assumptions regarding its revenues, expenses and plan payments;

    f.  Has the resources and ability to accomplish the assignment within the schedule adopted by the Court for the hearing on confirmation of the City's plan;

g. Has no disqualifying connections or conflicts of interest with any party in interest;

h. Is willing to forego any retention or engagement that might result in a conflict of interest in this case; and

i. Is willing and able to comply with the requirements of 11 U.S.C. §330 in seeking approval of fees.

William A. Brandt, Jr., as part of this Application and as required by this Court's Order, submits and incorporates, as if fully set forth herein, the following attachments:

a. A disclosure of the applicant's qualifications as an expert witness on the feasibility issue in this case, including the applicant's education and training; experience (especially with municipal budgeting, forecasts and projections, as well as the assumptions that underlie them); professional licenses and certifications; professional association memberships and honors; professional speeches, lectures and presentations; and professional publications (and attaching the most pertinent publications); **See Exhibit 1 – Page 10 of file**

b. A disclosure of all prior retentions in which the applicant testified as an expert witness either in deposition or at a trial or hearing, including the title of the case, the court in which the case was pending, the attorney who retained the applicant and the subject matter of the testimony; **See Exhibit 2 – Page 51 of file**

c. A disclosure of all prior retentions of the applicant or the applicant's firm by any governmental unit, including the identity of the governmental unit and the subject matter of the retention;  **See Exhibit 3 – Page 55 of file**

d. A disclosure of all prior retentions of the applicant or the applicant's firm where the retention related to the retaining party's connections with a governmental unit, including the identity of the person or entity, the governmental unit and the subject matter of the retention; **See Exhibit 4 – Page 60 of file**

e. A disclosure of all present or past connections of the applicant or the applicant's firm with the City of Detroit and any of its creditors that have been receiving notice ("Noticed Creditors") or with other professionals representing them, or with the State of Michigan; **See Exhibit 5 – Page 64 of file**

f. A disclosure of the proposed staffing of the assignment by other members of the applicant's firm; **See Exhibit 6 – Page 79 of file**

g. A disclosure of the proposed fees to be charged and a proposed budget of fees and expenses; **See Exhibit 7 – Page 131**

and

h. A statement disclosing why the applicant is interested in the appointment. See Below and **Exhibit 8 – Page 133**

Based upon this Application and its Attachments, William A. Brandt, Jr. submits that he is competent and qualified to be appointed as this Court's Expert Witness on the feasibility of the City of Detroit's Amended Plan of Adjustment as required by this Court's April 2, 2014 Order.

## II.  <u>OVERVIEW OF WILLIAM A. BRANDT, JR. DEVELOPMENT SPECIALIST, INC. AND DSI CIVIC FINANCIAL RESTRUCTURING, LLC..</u>

William A. Brandt, Jr. has been in the business of workout, turnaround and insolvency consulting for more than thirty years and is widely recognized as one of the foremost practitioners in the field.

Mr. Brandt is the President and Chief Executive Officer of Development Specialists, Inc. ("DSI"), a firm specializing in the provision of management, consulting, and turnaround assistance to troubled or reorganizing enterprises. DSI is recognized as a leading provider of management consulting and financial advisory services, including turnaround consulting, financial restructuring, litigation support and forensic accounting. DSI's clients include business owners, private equity investors, corporate boards, financial institutions, secured lenders, bondholders and unsecured creditors. For almost 40 years, DSI has been guided by a single objective: maximizing value for all stakeholders. With our highly skilled and diverse team of professionals, offices throughout the United States and an affiliate office in Europe, and an unparalleled range of experience, DSI not only achieves that objective, but has also built a solid reputation as an industry leader in restructurings and reorganizations.

Mr. Brandt is also the President and Chief Executive Officer of DSI Civic Financial Restructuring, LLC ("DSI Civic"), a registered affiliate of DSI, a firm specializing in providing financial consultancy assistance to governmental entities who may be in or trending towards financial distress. DSI Civic is a leading provider of management and financial services, including turnaround consulting, accounting and treasury operations, review of internal auditing procedures, and financial and organizational restructuring. DSI Civic's clients have included state and local governments.

In response to the growing demand in the public sector for services which had traditionally been applicable only to private industry, DSI Civic was developed with the specific goal of providing municipalities and other governmental entities with sound financial consulting and organizational restructuring services by developing a team of uniquely qualified individuals with a broad range of expertise in both public and private sector financial restructuring services.

Furthermore, our team includes highly experienced banking professionals and experts in the bond markets, including: the current Chairman of a major bonding authority, a former CFO of the City of Chicago, a State agency executive who led the consolidation of five agencies, a former CEO of a major bonding authority, a former Chief Operating Officer of a state government, former partners in a public accounting firm with more than 75 public sector clients, and a nationally recognized public sector financial advisor. Our team also includes a former Special Assistant U.S. Attorney (Southern District of New York), Assistant State Attorney General, Assistant District Attorney, and elected Mayor of a municipality; CFOs, as well as commercial and investment bankers.

Members of the DSI Civic team have consulted and advised with virtually all levels of municipal and state governments. Members of our professional staff have served state and local governments as financial advisors, technology consultants, auditors, privatization project managers and process reengineering consultants, among other capacities. Members of the DSI Civic team have in depth experience in governmental accounting systems, budget preparation, analysis and forecasting, auditing standards, operations management and labor management.

Mr. Brandt and DSI have been involved with some of the more celebrated financial restructuring cases in the nation's history, including, but not limited to, Mercury Finance Company, Southeast

Banking Corporation, Malden Mills, the Keck, Mahin & Cate law firm, the Courdert Brothers law firm, the Ohio "Coin Fund" scandal, the Bernie Ebbers Settlement Trust, the Dreier LLP law firm matter, and the Dewey law firm matter.

Mr. Brandt and DSI Civic have been engaged to provide financial consulting and assistance to the Commonwealth of Pennsylvania as Co-Restructuring Directors for the City of Altoona, Pennsylvania, pursuant to Pennsylvania's Act 47 and the City of Lauderdale Lakes when the City declared a financial emergency pursuant to Section 218.503, Florida Statutes.

DSI and DSI Civic maintain offices throughout the United States and have an affiliate office in London, England.

Mr. Brandt has significant experience serving as a fiduciary to financially and operationally troubled entities. Mr. Brandt and the other members of DSI have been appointed as Chapter 11 and Chapter 7 bankruptcy trustees and examiners, and held other fiduciary responsibilities, in over 8,000 cases in the United States and abroad.

## III. INSOLVENCY LEADERSHIP

Mr. Brandt has advised Congress on matters of insolvency and bankruptcy policy, and in that capacity was the principal author of the amendment to the Bankruptcy Code permitting the election of Trustees in Chapter 11 cases. He was also involved in drafting several amendments to the Bankruptcy Code enacted into law in April 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which substantially rewrote the nation's bankruptcy laws. During the Clinton administration, he served as a member of the President's National Finance Board as well as serving as a delegate from the State of Florida to the 1996 Democratic National Convention. During that decade as well, and upon the invitation of both business and political leaders in the People's Republic of China, Mr. Brandt worked with various public policy, law and banking leaders in that country on approaches to the reorganization and restructuring of some of China's state-owned industries. In 2000, he served as a member of the Democratic Party's National Convention Platform Committee. In 2002, he served on the Illinois Gubernatorial Transition Team as well as on the State of California's Business Delegation dispatched to Cuba to discuss politics, business and trade. In 2008, Mr. Brandt served as a delegate from the State of Illinois to the Democratic National Convention.

Mr. Brandt is honored to have been selected to serve as one of the members of the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11. In addition, Mr. Brandt has served several terms as a member of the Board of Directors of the American Bankruptcy Institute, as well as also serving several terms on the Advisory Board for that organization's *Law Review*. He served for almost 20 years as a member of the private Panel of Trustees for the United States Bankruptcy Court for the Northern District of Illinois and briefly served as a member of the same panel for the Bankruptcy Court in the Southern District of Florida in the late 1980s. He is a member of the Executive Committee of the Bankruptcy Section of the Commercial Law League of America and serves on their National Government Affairs Committee. Mr. Brandt is a member of the Board of Advisors for the American Bankruptcy Institute's Bankruptcy Battleground West seminar held annually in Los Angeles and is also currently serving his third consecutive three-year term as a member of the Board of Directors of

the San Francisco Bay Area Bankruptcy Forum.  In addition to the Commercial Law League of America and the American Bankruptcy Institute, he holds memberships in the National Association of Bankruptcy Trustees, the International Council of Shopping Centers and the Urban Land Institute.

By Gubernatorial appointment, Mr. Brandt is serving his third consecutive term as Chairman of the Illinois Finance Authority ("IFA"), having been first appointed in 2007 and then reappointed in 2010 and 2012.  The IFA is one of the nation's largest self-financed entities principally engaged in issuing taxable and tax-exempt bonds, making loans, capital for businesses, non-profit organizations and local government and  fosters economic development, creating and retaining jobs, and improving quality of life for Illinois residents. IFA conduit financing programs have spanned every county and helped capitalize thousands of projects, assisting farmers and agri-businesses, business and industry, school districts and higher education institutions, healthcare facilities, cultural and social entities, and local governments develop, upgrade, expand, and sustain their operations and services.

The Governor has also appointed Mr. Brandt to the Illinois Broadband Deployment Council, which works to ensure that advanced telecommunications services are available to all the citizens of Illinois.  He serves as a member of the National Advisory Council for the Institute of Governmental Studies at the University of California at Berkeley, while also serving as a member of the Board of Trustees of Loyola University Chicago, and is a life trustee of Fenwick High School in Oak Park, Illinois.  Additionally, he was also featured in *What Happened*, a documentary film humorously chronicling the dot-com "bust," which premiered at the New York City Film Festival.

## IV.  PROFESSIONAL TEAM

The team of professionals from DSI and DSI Civic which will support William A. Brandt, Jr. in fulfilling his duties and responsibilities while serving in the role as Expert Witness, includes several former senior executives who were directly involved in municipal and state government, and who have also had long careers in the accounting and consulting professions, serving more than 75 governmental units.  Their executive experience includes Chairmanship of a State Finance Authority, Mayor of a City, Chief Executive Officer of several large urban school systems, Chief Operating Officer of a state government, Budget Director of a large city and state government, Chief Financial Officer of a large city, trustee of several municipal pension funds, among other positions.  Most of these positions involved engaging with governments which were in significant financial stress (or alternatively, facing significant financial challenges) during their tenure and accordingly involved significant restructuring and turnaround initiatives.

Among the diverse set of municipal governments served by members of our team (many of which have experienced significant financial stress and population loss not unlike Detroit) include the cities of Chicago, Pittsburg, San Francisco, Decatur and Springfield; Allegheny and DuPage Counties; the Philadelphia, Bridgeport, Chicago and New Orleans urban school districts;

as well as several state governments, in a variety of capacities, including Kentucky, Indiana, Illinois, Ohio, Pennsylvania and New York.

An overview of the proposed team to assist Mr. Brandt is as follows:

| Individual | Relevant Experience |
|---|---|
| William A. Brandt, Jr. | President and CEO of Development Specialists, Inc. and DSI Civic |
| | Managing Member of DSI Civic Financial Restructuring, LLC |
| | Current Chairman of the Illinois Finance Authority (3 terms) |
| | Board of Trustees, Loyola University Chicago, Illinois |
| | National Advisory Council, Berkeley University Institute of Governmental Studies |
| | Member of the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11 |
| Geoffrey L. Berman | Senior Vice President Development Specialists, Inc. |
| | Former President of American Bankruptcy Institute |
| | Ex Officio Member of the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11 |
| R. Brian Calvert | Senior Vice President Development Specialists, Inc. |
| | Member of VALCON Advisory Board |
| Steven L. Victor | Senior Vice President Development Specialists, Inc. |
| | Senior Consultant, DSI Civic Financial Restructuring, LLC |
| | Former Act 47 Plan Co-Coordinator for the City of Altoona, Pennsylvania |
| | Qualified Emergency Financial Manager (EFM) in the State of Michigan |
| Robert Weiss | General Counsel of Development Specialists, Inc. |
| | Former Senior Partner at Honigman Miller Schwartz and Cohn LLP |
| Paul G. Vallas | Senior Consultant, DSI Civic Financial Restructuring, LLC |
| | Former Superintendent, Bridgeport, Connecticut Public Schools |
| | Former Superintendent, Recovery School District of Louisiana, New Orleans, LA |
| | Former Chief Executive Officer, The Philadelphia School District, Philadelphia, Pennsylvania |
| | Former Chief Executive Officer, Chicago Public Schools |
| | Former Budget Director, City of Chicago, Illinois |
| | Former Executive Director, Economic and Fiscal Commission, State of Illinois |

| | |
|---|---|
| **John Filan** | Adjunct Professor of Government, Illinois Institute of Technology (IIT), Stuart School of Business |
| | Former Senior Consultant, Development Specialists, Inc.; Former Senior Vice President - DSI Civic Financial Restructuring, LLC; current Independent Contractor |
| | Former Act 47 Plan Co-Coordinator for the City of Altoona, Pennsylvania |
| | Former Chairman of the Comptroller's Municipal Accounting Advisory Board |
| | Former Chief Operating Officer of State of Illinois |
| | Former Chief Executive Officer of Illinois Finance Authority |
| | Former Director of Office of Management and Budget |
| | Former Managing Partner Regional CPA/Consulting firm |
| **Daniel J. Stermer** | Vice President - DSI Civic/Consultant - DSI |
| | Mayor of City of Weston, Florida |
| | Member – Broward County Planning Council |
| | Former Chair – Broward Metropolitan Planning Organization (4 terms) |
| | Former Assistant Attorney General, State of Florida |
| | Former Special Assistant United States Attorney, Southern District of New York |
| **Ronald D. Picur** | DSI Civic Financial Restructuring, LLC – independent consultant |
| | Fiscal Policy Advisor, Governor's Office of Management and Budget, State of Illinois |
| | Former Comptroller and Chief Fiscal Officer, City of Chicago, Illinois |
| | Former Partner Regional CPA/Consulting Firm |
| | Professor and Head - Department of Accounting, Professor of Finance, and Director of Center for Governmental Accounting Research & Education, University of Illinois at Chicago |
| | Pension Fund Trustee, Chicago Laborers, Municipal Employees, and Firemens' Annuity & Benefit Funds |
| **William G. Brandt** | Research Analyst, Development Specialists, Inc. |

## V.   STATEMENT OF INTEREST

My response to the question regarding why I'm interested in this appointment is simple.  Alone among practitioners in the restructuring and insolvency industry, I have maintained a parallel career in the arena of public policy, public finance and electoral politics at both the state and federal levels throughout the entirety of my 40-year business career.  A further merging of these

twin vocations took place almost seven years ago when I was asked by the Governor of Illinois to apply my restructuring, public policy and public finance skills and agree to serve as the Chair of the then-troubled Illinois Finance Authority ("IFA"). The IFA is one of the nation's largest state-sponsored entities principally engaged in the issuing of taxable and tax-exempt bonds, as well as making loans and capital available for investment in businesses, nonprofit organizations and local governments throughout the state. The primary mission of the IFA is the twin goals of economic development and job creation.

Following my appointment by the Governor and unanimous confirmation by the Illinois Senate, I set about, as the newly-appointed Chair of the IFA, to focus on one particular public policy passion that has long captivated me: the reshaping, remaking and revitalization of a portion of the nation's "Rust Belt." My goal was to aid in steering, through the multistate bonding authority granted to me by the statute, not only the economy of Illinois but, to any extent possible, the economies of other adjoining north-central Great Lakes states. My goal was to achieve a better and more stable economic mixture of older industries from the manufacturing era as well as new businesses from the growing service and information sectors of the economy.

I also discovered that under the enabling legislation that created the IFA, the power to supervise and oversee all Illinois municipal and governmental restructurings and rehabilitation was vested in both myself, as the Chair of the IFA, as well as the Authority's Executive Director. As a consequence of this duty, responsibility and obligation, long before the current rash of municipal and governmental restructurings became the topic of current debate I had begun to wrestle with and speak about the seemingly intractable issues surrounding the present dilemmas confronting today's municipal and governmental units. A prime example of this was my role in the supervision and ultimately successful rehabilitation of the City of East St. Louis, Illinois, one of the first major efforts at municipal rehabilitation I addressed as Chair of the IFA. This city had been under state supervision in conjunction with its restructuring efforts since the mid-1990s. I made it my personal goal to, in the span of a few short years, complete East St. Louis's rehabilitation, put the city back on stable economic footing and then get it out from under the supervision and oversight of the IFA, allowing it once again to take its rightful place among the cities and towns within the state who could chart their own course and destiny.

My experience with the supervision and oversight of distressed municipal and governmental entities, beyond generating a substantial volume of speaking and writing invitations and requests, also led me to form DSI Civic, a specifically dedicated affiliate of our firm's well-known corporate restructuring practice. DSI Civic's primary focus is the counseling of and provision of services to units of government in connection with their efforts at restructuring and rehabilitation. This new entity is now well-established in the industry and has attracted to its cause some of the strongest talent available in the municipal and governmental public finance and restructuring arena. These ladies and gentlemen have a broad array of municipal and governmental public finance and public policy experience, and have counseled governmental entities from Florida to California to Pennsylvania, as well as Louisiana, Connecticut, Kentucky and Indiana, on the intricacies and possibilities of differing paths toward public sector restructuring and rehabilitation.

So I view the opportunity to serve the Court as its Expert Witness in this matter on the Issue of Feasibility as a simple and natural extension of the efforts in which both I and the team at DSI Civic have been engaged over the past seven years: that of trying to apply our special skills and hard-won experience to the analysis and rejuvenation of the former great manufacturing cities that border the Great Lakes.  Given that, my interest in this assignment goes beyond just the simple task of continuing to provide restructuring advice to governmental units, and crosses over to the cause in which I've been engaged for these last many years, the rebirth and renewal of America's former Rust Belt cities, allowing them to position themselves to be competitive in the global economy for the coming century.

# EXHIBIT 1

# ITEM 5(A)

**WILLIAM A. BRANDT, JR.**

**I.**     **OVERVIEW**

William A. Brandt, Jr. has been in the business of workout, turnaround and insolvency consulting for more than thirty years and is widely recognized as one of the foremost practitioners in the field.

Mr. Brandt is the President and Chief Executive Officer of Development Specialists, Inc. ("DSI"), a firm specializing in the provision of management, consulting, and turnaround assistance to troubled or reorganizing enterprises.  DSI is recognized as a leading provider of management consulting and financial advisory services, including turnaround consulting, financial restructuring, litigation support and forensic accounting.  DSI's clients include business owners, private equity investors, corporate boards, financial institutions, secured lenders, bondholders and unsecured creditors.  For almost 40 years, DSI has been guided by a single objective: maximizing value for all stakeholders. With our highly skilled and diverse team of professionals, offices throughout the United States and an affiliate office in Europe, and an unparalleled range of experience, DSI not only achieves that objective, but has also built a solid reputation as an industry leader in restructurings and reorganizations.

Mr. Brandt is also the President and Chief Executive Officer of DSI Civic Financial Restructuring, LLC ("DSI Civic"), a registered affiliate of DSI, a firm specializing in providing financial consultancy assistance to governmental entities which may be in or are trending towards financial distress.  DSI Civic is a leading provider of management and financial services, including turnaround consulting, accounting and treasury operations, review of internal auditing procedures, and financial and organizational restructuring. DSI Civic's clients have included both state and local governments.

In response to the growing demand in the public sector for services which had traditionally been applicable only to private industry, Mr. Brandt developed DSI Civic with the specific goal of providing municipalities and other governmental entities with sound financial consulting and organizational restructuring services by developing a team of uniquely qualified individuals with a broad range of expertise in both public and private sector financial restructuring services.

Furthermore, our team includes highly experienced banking professionals and experts in the bond markets, including: the current Chairman of a major bonding authority, a former CFO of the City of Chicago, a CEO of a water and sewer utility, a State agency executive who led the consolidation of five agencies, a former CEO of a major bonding authority, a former Chief Operating Officer of a state government, former partners in a public accounting firm with more than 100 public sector clients, and a nationally recognized public sector financial advisor and underwriter.  Our team also includes a former Special Assistant U.S. Attorney (Southern District of New York), Assistant State Attorney General, Assistant District Attorney, and elected Mayor of a municipality; CFOs, as well as commercial and investment bankers.

Members of the DSI Civic team have consulted and advised with virtually all levels of local and state governments.  Members of our professional staff have served state and local governments as financial advisors, technology consultants, auditors, privatization project managers and

process reengineering consultants, among other capacities. Members of the DSI Civic team have in-depth experience in governmental accounting systems, auditing standards, operations management and labor management.

Mr. Brandt and DSI have been involved with some of the more celebrated financial restructuring cases in the nation's history, including, but not limited to, Mercury Finance Company, Southeast Banking Corporation, Malden Mills, the Keck, Mahin & Cate law firm, the Courdert Brothers law firm, the Ohio "Coin Fund" scandal, the Bernie Ebbers Settlement Trust, the Dreier LLP law firm matter, and the Dewey law firm matter.

Mr. Brandt and DSI Civic have been engaged to provide financial consulting and assistance to the City of Altoona, Pennsylvania, pursuant to Pennsylvania's Act 47 and the City of Lauderdale Lakes when the City declared a financial emergency pursuant to Section 218.503, Florida Statutes.

DSI and DSI Civic maintain offices throughout the United States and have an affiliate office in London, England.

Mr. Brandt has significant experience serving as a fiduciary to financially and operationally troubled entities. Mr. Brandt and the other members of DSI have been appointed as Chapter 11 and Chapter 7 bankruptcy trustees and examiners, and held other fiduciary responsibilities, in over 8,000 cases in the United States and abroad.

## II.   **INSOLVENCY LEADERSHIP**

Mr. Brandt has advised Congress on matters of insolvency and bankruptcy policy, and in that capacity was the principal author of the amendment to the Bankruptcy Code permitting the election of Trustees in Chapter 11 cases. He was also involved in drafting several amendments to the Bankruptcy Code enacted into law in April 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which substantially rewrote the nation's bankruptcy laws. During the Clinton administration, he served as a member of the President's National Finance Board as well as serving as a delegate from the State of Florida to the 1996 Democratic National Convention. During that decade as well, and upon the invitation of both business and political leaders in the People's Republic of China, Mr. Brandt worked with various public policy, law and banking leaders in that country on approaches to the reorganization and restructuring of some of China's state-owned industries. In 2000, he served as a member of the Democratic Party's National Convention Platform Committee. In 2002, he served on the Illinois Gubernatorial Transition Team as well as on the State of California's Business Delegation dispatched to Cuba to discuss politics, business and trade. In 2008, Mr. Brandt served as a delegate from the State of Illinois to the Democratic National Convention.

Mr. Brandt is honored to have been selected to serve as one of the members of the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11. In addition, Mr. Brandt has served several terms as a member of the Board of Directors of the American Bankruptcy Institute, as well as also serving several terms on the Advisory Board for that organization's *Law Review*. He served for almost 20 years as a member of the private Panel of Trustees for the United States Bankruptcy Court for the Northern District of Illinois and briefly served as a

member of the same panel for the Bankruptcy Court in the Southern District of Florida in the late 1980s. He is a member of the Executive Committee of the Bankruptcy Section of the Commercial Law League of America and serves on their National Government Affairs Committee. Mr. Brandt is a member of the Board of Advisors for the American Bankruptcy Institute's Bankruptcy Battleground West seminar held annually in Los Angeles and is also currently serving his third consecutive three-year term as a member of the Board of Directors of the San Francisco Bay Area Bankruptcy Forum. In addition to the Commercial Law League of America and the American Bankruptcy Institute, he holds memberships in the National Association of Bankruptcy Trustees, the International Council of Shopping Centers and the Urban Land Institute.

By Gubernatorial appointment, Mr. Brandt is serving his third consecutive term as Chairman of the Illinois Finance Authority ("IFA"), having been first appointed in 2007 and then reappointed in 2010 and 2012. The IFA is one of the nation's largest self-financed entities principally engaged in issuing taxable and tax-exempt bonds, making loans, capital for businesses, non-profit organizations and local government and fosters economic development, creating and retaining jobs, and improving quality of life for Illinois residents. IFA conduit financing programs have spanned every county and helped capitalize thousands of projects, assisting farmers and agri-businesses, business and industry, school districts and higher education institutions, healthcare facilities, cultural and social entities, and local governments develop, upgrade, expand, and sustain their operations and services.

The Governor has also appointed Mr. Brandt to the Illinois Broadband Deployment Council, which works to ensure that advanced telecommunications services are available to all the citizens of Illinois. He serves as a member of the National Advisory Council for the Institute of Governmental Studies at the University of California at Berkeley, while also serving as a member of the Board of Trustees of Loyola University Chicago, and is a life trustee of Fenwick High School in Oak Park, Illinois. Additionally, he was also featured in *What Happened*, a documentary film humorously chronicling the dot-com "bust," which premiered at the New York City Film Festival.

## III.   PUBLICATIONS AND SPEAKING ENGAGEMENTS

Mr. Brandt has written for publications that span a broad spectrum of thought, ranging from *Maclean's*, Canada's Weekly Newsmagazine, to *Directors & Boards*, *Corporate Board Magazine*, the *Florida Real Estate Journal*, and the *American Bankruptcy Institute's Law Review*, published in conjunction with St. John's University School of Law. He is the co-author of the "Due Diligence" chapter in the 2nd edition of *Bankruptcy Business Acquisitions* published by the American Bankruptcy Institute. He is a frequent lecturer and speaker on topics of corporate restructuring, bankruptcy and related public policy issues and regularly appears on CNN, CNBC, CNNfn, Bloomberg, and Canada's BNN, as well as the CBS Radio and National Public Radio networks. He has been profiled and interviewed in a wide array of periodicals including, among others, *The Wall Street Journal*, *The New York Times*, *The International Herald Tribune*, *Business Week*, *The Miami Herald*, *The Chicago Tribune*, *The Boston Globe*, *Billboard Magazine* and *Bank Bailout Litigation News*.

His biography appears in a number of reference works including *Who's Who in America*, *Who's Who in Finance and Industry*, and *Who's Who in American Law*. For well more than a dozen years, his firm, Development Specialists, Inc., has been rated as one of the outstanding turnaround firms in the world by the publication *Turnarounds & Workouts*. Mr. Brandt has also been routinely listed in the K & A Restructuring Register, an annual roster of the country's top 100 restructuring advisors. He received his B.A. from St. Louis University and his M.A. from the University of Chicago, where he also completed further post-graduate work toward a doctoral degree.

## PROFESSIONAL HISTORY

1976 – Present - President and Chief Executive Officer of Development Specialists, Inc.

1977    Commentator, business/political affairs, CBS Radio (WBBM-AM), Chicago, Illinois

1975 – 1976    Melaniphy & Associates, Inc. [management/urban affairs and economic development consulting firm], Chicago, Illinois

1972 – 1974    Assistant to the President, Pyro Mining Co. [coal], Chicago, Illinois


## EDUCATION

B.A. (with honors) in Sociology/Urban Affairs from St. Louis University (St. Louis, Missouri), 1971

M.A. in Sociology, University of Chicago (Chicago, Illinois), 1972

ABD (All-but-Dissertation) in Sociology, University of Chicago (Chicago, Illinois)
    (Course work, special field exams, and language requirements completed in 1974)


## AWARDS AND FELLOWSHIPS

Alpha Sigma Nu, the National Jesuit Honor Fraternity
    (elected to at St. Louis University, 1971)

The La Verne Noyes Scholarship for Graduate training
    (University of Chicago, 1971 through 1974)

Woodrow Wilson Scholarship Nominee
    (St. Louis University, 1971)

Ford Foundation Research and Training Grant in Demography
    (University of Chicago, Population Research Center, 1971-1972)
Visiting Research Associate, Harvard University

(Department of Government, 1972)

Former part-time member of the faculties of both the College of DuPage (Glen Ellyn, Illinois) and Thornton Community College (South Holland, Illinois)

Former Advisory Board Member, "Social Welfare, Social Planning & Social Development: An International Database."  Sponsored by Sociological Abstracts, Inc., San Diego, California

## PROFESSIONAL MEMBERSHIPS

American Bankruptcy Institute
(Member of Chapter 11 Reform Commission, Co-Commissioner of Labor and Benefits Advisory Committee, Co-Commissioner of Administrative Claims Advisory Committee; Member of Board of Advisors for ABI's annual Bankruptcy Battleground West seminar; former Member of Board of Directors)
California Receivers Forum
Central Florida Bankruptcy Law Association
Commercial Law League of America
(Former Member of the Bankruptcy Section Executive Council, the National Governmental Affairs Committee, and the NCBJ Planning Committee)
International Association of Restructuring, Insolvency and Bankruptcy Professionals (INSOL International)
International Council of Shopping Centers
Midwest Sociological Association
National Association of Bankruptcy Trustees
South Florida Bankruptcy Bar Association
San Francisco Bay Area Bankruptcy Forum
    (Member of Board of Directors, 2003-2006, 2006-2009, and 2009-2012)
Urban Land Institute

## OTHER MEMBERSHIPS

National Advisory Council, Institute of Governmental Studies, University of California, Berkeley
Board of Trustees, Loyola University Chicago
Former Member, Board of Directors, Future Music, Inc., San Francisco (2006-2009)
Governing Member of the Chicago Symphony Orchestra's Orchestral Association
Former Governing Member of the Sustaining Fellows at the Art Institute of Chicago
Life Trustee on Board of Trustees of Fenwick High School, Oak Park, Illinois
Michigan Shores Club, Wilmette, Illinois
Professional Association of SCUBA Diving Instructors
Union League of Chicago
Life Member of Zoological Society of Florida for the Miami Metrozoo

# EXPERT WITNESS APPOINTMENTS/SELECT FIDUCIARY MATTERS

Over the last 40 years, Mr. Brandt has testified and/or been disposed as part of his responsibility as Chapter 11 Trustee, Chapter 7 Trustee and as financial advisor and as an expert in litigation matters. Given the sheer number of matters in which Mr. Brandt and his staff have been engaged it would simply be too burdensome to list each and every case and each and every matter in which deposition and testimony provided. Mr. Brandt and his staff often provide testimony as either consulting witness or as expert. As a fiduciary in many of his cases, Mr. Brandt is often asked to testify as to matters related to his case including sales, refinancing and plans of reorganization. To the extent the case demand, Mr. Brandt has testified on behalf of and in support many plans or reorganization.

As listed below, Mr. Brandt has been retained solely as a testify expert in several cases. As the circumstances dictate Mr. Brandt has also been appointed as Receiver, Examiner and Examiner with Expanded Powers. Given that these positions are also extraordinary remedies in which the Court or Judge has found the need for independent analysis or review, the Applicant has included a list of such cases for further consideration.

## AS EXPERT WITNESS

- ➢ Official Committee of Administrative Claimants on Behalf of LTV Steel Company, Inc. v. Bricker, et al., Case No. 05CV2158, Northern District of Ohio, Eastern Division
- ➢ Western Asbestos Company, Case No. 02-46284-T, Northern District of California, Oakland Division
- ➢ Western MacArthur Co., Case No. 02-46285-T, Northern District of California, Oakland Division
- ➢ MacArthur Co., Case No. 02-46286-T, Northern District of California, Oakland Division

## AS EXAMINER

- ➢ Abbott Products, Inc., Case No. 82B16496, Northern District of Illinois, Eastern Division
- ➢ A. Marcus Company d/b/a Rockford Tool and Hillside Tool and Equipment Warehouse, Case No. 85B01545, Northern District of Illinois Eastern Division
- ➢ T.M. Products, Co., Case No. 85-01072-BKC-AJC, Southern District of Florida
- ➢ Virtual Network Services Corporation, Case No. 86B14849, Northern District of Illinois, Eastern Division
- ➢ Phoenix, Inc., Case No. 87B03234, Northern District of Illinois, Eastern Division
- ➢ Antonio Del Grosso, Case No. 89B06606, Northern District of Illinois, Eastern Division
- ➢ Jana Broadcasting, Co., Inc., Case No. 84B04012, Northern District of Illinois, Eastern Division
  (**Examiner with Expanded Powers**)
- ➢ Sheffield Industries, Inc., Case No. 93-10224-BKC-SMW, Southern District of Florida
  (**Ponzi-type Investment Securities Scheme**)
- ➢ Newcare Mass Nursing, Inc., Case No. 99-44160-HJB, District of Massachusetts

(**Examiner with Expanded Powers**)
- Newcare Health Corporation, Case No. 99-44161-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare Hospital Corporation, Case No. 99-44170-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Memorial Nursing Center, Case No. 99-44168-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Cimmerron Health Care, Inc., Case No. 99-44167-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare Nursing Corporation, Case No. 99-44169-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare Texas Nursing, Inc., Case No. 99-44180-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare Management Corp., Case No. 99-44162-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare Converse Management, Inc., Case No. 99-44175-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare Shepherd Management, Inc., Case No. 99-44179-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare, Inc., Case No. 99-44178-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Whigham Health & Rehab, Inc., Case No. 99-44172-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare Retirement Corporation, Case No. 99-44163-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Newcare Hospital Management Corp., Case No. 99-44176-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Ft. Valley Nursing Center, Inc., Case No. 99-44171-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Windward Nursing Center, Inc., Case No. 99-44173-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Rest a While Nursing Home, Inc., Case No. 99-44166-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Wakulla Acquisition, Inc., Case No. 99-44181-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Wakulla Manor, Inc., Case No. 99-44174-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Emory Nursing, Inc., Case No. 99-44164-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)
- Tyler Park Place, Inc., Case No. 99-44165-HJB, District of Massachusetts
  (**Examiner with Expanded Powers**)

## AS FEDERAL OR STATE COURT APPOINTED RECEIVER

- Chadwick Miller, Inc., District of Arizona, Phoenix Division
- CHL Mortgage, Case. No. C 04-02174, California Contra Costa County, Martinez Division
- Delta Cablevision, Case No. C 92-0096, District of Massachusetts, Eastern Division
- Charles Phillip Elliot, Southern District of Florida
- Haight Street Ventures, Case No. RG 03088748, California Alameda County, Oakland Division
- Mann Industries, Case No. Chancery 10448, Virginia, District of Williamsburg
- MDS Associates, Case No. 92-82-Civ-T21C, Middle District of Florida, Tampa Division
- Oregon Garden Products, Oregon State Court
- Reiner v. Rowen, Case No. BC 199675, California, Los Angeles County, Central Divison
- TMC Marketing d/b/a Millionaires Club, Southern District of Florida, Fort Lauderdale Division
- Union Bank v. Nissum, Case Nos. CV 042640 and CV 042652, California, Marin County
- Westholme Partners New Jersey, New Jersey State Court
- Westholme Partners Illinois, Illinois State Court
- Westholme Partners Florida, Florida State Court

## POLITICAL, LEGISLATIVE & CIVIC ENDEAVORS

**2012:**
- Chair, Illinois Finance Authority (2-year Gubernatorial re-appointment)
- Member, Illinois Broadband Deployment Council (Gubernatorial re-appointment)

**2011-2012:**
- National Campaign Finance Chairman for Congressional candidate (Ill. 8th Cong. Dist.) Tammy Duckworth

**2010:**
- Chair, Illinois Finance Authority (2-year Gubernatorial re-appointment)
- Member, Illinois Broadband Deployment Council (Gubernatorial appointment)

**2009:**
- National Campaign Finance Co-Chair for Congressional candidate (Ill. 5th Cong. Dist.) Mike Quigley

**2008:**
- Chair, Illinois Finance Authority (2-year Gubernatorial appointment)
- Member, Loyola University Board of Trustees
- Delegate from the State of Illinois to the 2008 Democratic National Convention, August 25th – 28th, Denver, Colorado

**2006:**
- Member, National Advisory Council for the University of California at Berkeley's Institute of Governmental Studies
- National Campaign Finance Chairman for Congressional candidate (Ill. 6th Cong. Dist.) Tammy Duckworth

**2005:**
- Named as Replacement Manager by the State of Ohio to administer two rare coin funds which received $50 million in investments from the State of Ohio's Bureau of Workers' Compensation

**2002:**
- Member, Illinois Gubernatorial Transition Team
- Member, State of California's Business Delegation to Cuba, December $6^{th} - 11^{th}$, promoting business, trade and friendship

**2000:**
- Platform Committee Member for the 2000 Democratic National Convention, August $14^{th} - 17^{th}$, Los Angeles, California

**1996:**
- National Finance Board Member, Clinton/Gore 1996 Presidential Campaign
- Vice-Chair, City of Chicago's "Chicago '96" Host Committee for the 1996 Democratic National Convention
- Delegate from the State of Florida to the 1996 Democratic National Convention, August $26^{th} - 29^{th}$, Chicago, Illinois

**1994:**
- Author of the provision within the Bankruptcy Reform Act of 1994 permitting the Election of Chapter 11 Trustees, thereafter included as Section 1104(b) of the United States Bankruptcy Code

**1988 – 1989:**
- Member, Panel of Chapter 7 Trustees for the United States Bankruptcy Court for the Southern District of Florida

**1983 – 2000:**
- Member, Panel of Chapter 7 Trustees for the United States Bankruptcy Court for the Northern District of Illinois

## LECTURES, SPEAKING ENGAGEMENTS & OTHER PANEL DISCUSSIONS

Mr. Brandt has delivered several hundred speeches and lectures on a broad range of topics dealing with the bankruptcy, reorganization and insolvency process, and, as well, has been interviewed on bankruptcy and reorganization issues by the Wall Street Journal, Chicago Tribune, Miami Herald, St. Petersburg Times, Florida Times Union, Business Week, New England Business, Miami Today, Successful Restructurings, and Crain's Chicago Business, among others. A few of Mr. Brandt's more notable presentations include:

**2014:**
**May 20: Cleveland, Ohio.** Luncheon Keynote Speaker, William J. O'Neill Great Lakes Regional Bankruptcy Institute, sponsored by Cleveland Bar Association.

**April 15: Newton, Massachusetts.** Guest Lecturer, Boston College School of Law, Professor Ingrid Hillinger's Business Bankruptcy Course.

**April 12: Napa, California.** Panel Member, Northern District of California Judicial Conference. Topic: "Cities in Distress: Is Chapter 9 the Best Vehicle for Saving Cities and Providing Needed Governmental Services?"

**January 30: New York, New York.** Panel Member, NYIC & AIRA Joint Annual Bankruptcy & Restructuring Event. Topic: "Special Bankruptcy Cases."

**2013:**
**December 6: New York, New York.** Roundtable Participant, Institutional Investor Educational Foundation Global Shareholder Activism Conference. Topic: "Detroit: Is It a Show Coming to Your Town?"

**October 9: Boston, Massachusetts.** Panel Member, International Bar Association Annual Conference; Insolvency, Restructuring and Creditors' Rights Section presentation. Topic: "The Debtor in the Mirror: The Insolvency of Law Firms."

**October 4: Birmingham, Alabama.** Panel Member, 24th Annual Bankruptcy Law Seminar presented by the Cumberland School of Law, Samford University. Topic: "Bankruptcy and Law Firm Economics: Lessons for Practitioners from the Recent Law Firm Liquidation and Reorganization Cases."

**September 26: Santa Barbara, California.** Keynote Speaker, Opal Financial Group Investment Trends Summit. Topic: "Municipal Bonds in an Era of Growing Municipal Distress: What is the Real Exposure?"

**July 16: Chicago, Illinois.** Panel Member, Bloomberg Businessweek Chicago Thought Leadership Breakfast. Topic: "Global Risk Management and Foreign Direct Investment – Partners in Growth."

**July 13: Newport, Rhode Island.** Panel Member, American Bankruptcy Institute's Northeast Bankruptcy Conference. Topic: "The Cause and Effect of Municipal Insolvency and the Limits of Chapter 9."

**June 6: Chicago, Illinois.** Panel Member, American Institute of Restructuring Advisors' Annual Bankruptcy and Restructuring Conference. Topic: "Where is the Industry Going?"

**June 5: New York, New York.** Participant, Institutional Investor Educational Foundation New York Bankruptcy Litigation Roundtable.

**April 11: Webinar.** Co-Presenter in Beard Group Webinar on Municipal and Corporate Pensions. Topic: Municipal Pensions.

**April 3: Chicago, Illinois.** Presentation to University of Chicago Law School Corporate Lab. Topic: General Health of the Legal Profession.

**March 22: Los Angeles, California.** Panel Member, American Bankruptcy Institute's Bankruptcy Battleground West conference. Topic: "Law Firm Insolvencies from Finley to Dewey: What Have We Learned?"

**2012:**
**November 28: Chicago, Illinois.** Panel Member, meeting of the Chicago Bar Association Bankruptcy Committee. Topic: The ABI Chapter 11 Reform Commission.

**November 26: New York, New York.** Panel Member, Renaissance American Management and Beard Group's 18th Annual Distressed Investing Conference. Topic: "Municipal Debt Restructuring."

**November 9: Austin, Texas.** Panel Member, University of Texas School of Law's 31st Annual Jay Westbrook Bankruptcy Conference. Topic: Law firm insolvencies.

**October 27: San Diego, California.** Contestant in "Bankruptcy Bingo," National Conference of Bankruptcy Judges. Topic: Recent case law.

**October 26: San Diego, California.** Panel Member, National Conference of Bankruptcy Judges/American Bankruptcy Institute Joint Roundtable. Topic: Developments in fiduciary law.

**August 16: Cincinnati, Ohio.** Panel Member, Midwest Regional Bankruptcy Seminar. Topic: "Litigation Trusts."

**August 16: Cincinnati, Ohio.** Speaker, Midwest Regional Bankruptcy Seminar. Topic: "American Municipalities on the Brink: A Current Discussion of the Situation and Relevance of Chapter 9."

**June 15: Chicago, Illinois.** Speaker, meeting of The Participating Group. Topics: municipal insolvency and the related defaults of municipal bonds; law firm insolvencies; and current politics.

**June 7: Chicago, Illinois.** Panel Member, Bloomberg State & Municipal Finance Conference. Topic: "Illinois: Treading Water."

**April 26: Newton, Massachusetts.** Guest Lecturer, Boston College School of Law, Professor Ingrid Hillinger's Business Bankruptcy Course.

**March 1: San Francisco, California.** Organizer, Bay Area Bankruptcy Forum March Meeting. Topic: "A Civilized, Diplomatic Discussion about Venue: Pending Venue Legislation & Its Possible Impact."

**February 13: Austin, Texas.** Panel Member, Bond Buyer 16th Annual Texas Public Finance Conference. Topic: "The Politics of Restructuring."

**January 27: Philadelphia, Pennsylvania.**  Panel Member, Stevens & Lee Griffin and DSI Civic's Conference on Financial Stress in Governments: The Issues, Challenges & Politics of Moving Forward.  Topic: "The Politics of Restructuring."

**January 27: Philadelphia, Pennsylvania.**  Moderator, Stevens & Lee Griffin and DSI Civic's Conference on Financial Stress in Governments: The Issues, Challenges & Politics of Moving Forward.  Topic: "Lessons Learned from Act 47: A Report from the Front."

**January 24: New York, New York.**  Panel Member, New York TMA Altman Luncheon. Topic: "The Corporate & Sovereign Credit Market Outlook for 2012."


**2011:**
**November 28: New York, New York.**  Panel Member, Renaissance American Management and Beard Group's 18th Annual Distressed Investing Conference.  Topic: "Sovereign and US Municipal Debt Restructuring Roundtable."

**November 18: Austin, Texas.**  Speaker, University of Texas School of Law's 30th Annual Jay Westbrook Bankruptcy Conference.  Topic: "Municipalities in Distress."

**November 14: New York, New York.**  Panel Member, Association of Insolvency & Restructuring Advisors New York's Advanced Plan of Reorganization Conference. Topic: "The Emerging Economic Outlook."

**November 8: Chicago, Illinois.**  Speaker, University of Chicago Business School Alumni's CEO Roundtable.  Topic: "What the State is Doing to Promote Economic Development and How to Participate."

**November 1: Dubai, UAE.**  Panel Member, International Bar Association Annual Conference; Insolvency, Restructuring and Creditors' Rights Section presentation. Topic: "Buying and Selling Distressed Commercial Real Estate Assets – Issues Relating to Hotels, Office Buildings and Other Commercial Properties."

**October 3: Tempe, Arizona.**  Panel Member, National Food and HBC Manufacturers Credit Group's Conference. Topic: "Bankruptcy Best Practices."

**September 15: Carlsbad, California.** Panel Member, The Bond Buyer's California Public Finance Conference.  Topic: "The Politics of Restructuring."

**September 9: Las Vegas, Nevada.**  Panel Member, American Bankruptcy Institute's Southwest Conference.  Topic: "The Economic Outlook: Are We In an Economic Bathtub?"

**August 16: Chicago, Illinois.**  Speaker, NACM's North American Paper & Plastics Industry Credit Group Conference.  Topic: "Current Economic Trends and the Impact of These Trends on Business."

**July 25: Chicago, Illinois.** Panel Member, Civic Federation and Governmental Research Association's GRA Policy Conference. Topic: "Is the Municipal Bankruptcy Threat Real? The Multi-Billion Dollar Question."

**June 16: Chicago, Illinois.** Panel Member, Global M&A Network's Distressed M&A Intelligence Forum. Topic: "Budgets, Municipal Debt and Restructurings."

**May 17: Cleveland Ohio.** Luncheon Keynote Speaker, William J. O'Neill Great Lakes Regional Bankruptcy Institute, sponsored by Cleveland Bar Association. Topic: "Legislative Developments in Congress and the State Legislatures."

**May 17: Cleveland, Ohio.** Panel Member, William J. O'Neill Great Lakes Regional Bankruptcy Institute, sponsored by Cleveland Bar Association. Topic: "Broken Promises: Municipal Bankruptcies."

**May 16: Cincinnati, Ohio.** Speaker, TACR Members' Breakfast. Topic: "Where is the Restructuring Business Headed?

**May 6: New York , New York.** Panel Member, American Bankruptcy Institute's New York Bankruptcy Conference. Topic: "Municipal and Other State Agency Restructurings."

**April 1: National Harbor, Maryland.** Panel Member, American Bankruptcy Institute's Annual Spring Meeting. Topic: "Where Will the Work Be?"

**March 22: New York City, New York:** Panel Member, Bloomberg State & Municipal Finance Briefing. Topic: "Going Private, Raising Cash & Selling off Public Assets."

**March 7: Palm Beach, Florida.** Moderator, M&A Advisors 5th Annual Turnaround Awards and Distressed Investing Summit. Topic: "Municipal Government Restructuring."

**February 24: Las Vegas, Nevada.** Roundtable Member, American Bankruptcy Institute's VALCON 2011 Conference. Topic: "Navigating Municipal Restructurings: The New Frontier."


**2010:**
**November 18: New York, New York.** Panel Member, National Association of Insurance Commissioners' hearing on bond ratings. Topic: "Municipal Insolvencies and Bonds."

**November 11: San Francisco, California.** Speaker, CalCPA 2010 Bankruptcy Conference. Topic: "Major Trends in Bankruptcy."

**October 1: Las Vegas, Nevada.** Panel Member, State Capital Group's 2010 Annual Meeting. Topic: "Prepackaged Bankruptcy Proceedings."

**September 20: Chicago, Illinois.** Panel Member, American College of Bankruptcy's 7th Circuit Education Program. Topic: "Municipal Bankruptcies and Chapter 9 of the Bankruptcy Code."

**September 13: New York, New York.**  Panel Member, Distressed Debt Conference.  Topic: "Acquiring Assets out of Bankruptcy."

**June 12: San Diego, California.**  Panel Member, Association of Insolvency and Restructuring Advisors' 26th Annual National Conference.  Topic: "Fiduciary Duties for Officers and Directors of Troubled Companies."

**May 14: Chicago, Illinois.**  Speaker, US Law Firm Group's Bankruptcy and Creditors' Rights Group Spring Meeting.  Topic: "Receiverships."

**May 13: Cleveland, Ohio.**  Speaker, William J. O'Neill Great Lakes Regional Bankruptcy Institute, sponsored by Cleveland Bar Association.  Topic: "The Legislative Response."

**May 12: Cleveland, Ohio.**  Speaker, William J. O'Neill Great Lakes Regional Bankruptcy Institute, sponsored by Cleveland Bar Association.  Topic: "The Future of Chapter 11."

**April 30: National Harbor, Maryland.**  Panel Moderator, American Bankruptcy Institute's Annual Spring Meeting.  Topic: "Dealing with the Varied Role of the Government in Bankruptcy: Creditor, Lender, U.S.
Trustee, PBGC, FDIC, SEC, IRS."

**April 28: Newton, Massachusetts.**  Guest Lecturer, Boston College School of Law, Professor Ingrid Hillinger's Business Bankruptcy Course.

**April 24: Denver, Colorado.**  Panel Member, American Bar Association's Business Law Section Spring Meeting.  Topic: "Legislative Attempts to Heal an Ailing Healthcare System – Take 2 Aspirin and Call Us."

**April 7: San Francisco, California.**  Panel Member, Bay Area Bankruptcy Forum April Meeting.  Topic: "Strategic Considerations: Bankruptcy or Non-bankruptcy Remedies."

**February 20: Miami Beach, Florida.**  Panel Member, American College of Bankruptcy's 7th and 11th Circuit Winter Retreat Weekend.  Topic: "The Life of Death of Chapter 11."

**2009:**
**December 9: Chicago, Illinois.**  Panel Member, Chicago Bar Association's Hon. Robert E. Ginsberg CLE Series on Bankruptcy: Bankruptcy Sales and Automotive Supplier Cases.  Topic: "Not Your Father's Sale:: Cutting Edge Issues in Bankruptcy Sales – Section 363 Sales Labor and Employment Issues."

**November 11: Washington, D.C.**  Panel Member, American Bankruptcy Institute's Legislative Symposium: Chapter 11 at the Crossroads: Does Reorganization Need Reform? A Symposium on the Past, Present and Future of U.S. Corporate Restructuring.  Topic: "The 1978 Code

Reconsidered: Strengths, Weaknesses and the Impact of Amendments to the Original Vision of U.S. Restructuring."

**November 6: Los Angeles, California.**  Speaker, CalCPA Education Foundation's Bankruptcy Conference.  Topic: "Turnaround Consulting and Restructuring."

**November 5: Chicago, Illinois.**  Speaker, Renaissance American Management & Beard Group's Tenth Annual Healthcare Transactions Conference.  Topic: "The State of the Healthcare Bond Market."

**October 23: Chicago, Illinois.**  Speaker, Law Seminars International One-Day Seminar on Wind and Solar Project Development and Permitting.  Topic: "State Efforts to Support Renewables."

**October 19: Las Vegas, Nevada**.  Panel Member, CLLA's The Honorable Frank W. Kroger 24th Annual Current Developments in Hot & Emerging Areas program, being held at the National Conference of Bankruptcy Judges.  Topic: "A Phoenix Rising: The Rebirth of Chapter 11."

**September 23: Chicago, Illinois.**  Speaker, National Association of Health and Educational Facilities Financing Spring Conference.  Topic: "Welcome and Opening Remarks."

**August 18: Law Seminars International Telebriefing.**  Panel Member.  Topic: "S.B. 1906: Financing Renewable Energy Projects in Illinois – Practical Implications of the New Law."

**June 8: Chicago, Illinois.**  Speaker, Renaissance American Management & Beard Group's Tenth Annual Conference on Corporate Reorganizations, CLE Ethics Hour.

**May 5: Chicago, Illinois.**  Speaker, InsideCounsel Annual SuperConference.  Topic: "When Bad Things Happen to Good Companies: A Bankruptcy and Restructuring Roadmap for the General Counsel."

**April 28: Cleveland, Ohio.**  Speaker, William J. O'Neill Great Lakes Regional Bankruptcy Institute, sponsored by Cleveland Bar Association.  Topic: "Recent Failures of Financial Institutions."

**April 28: Cleveland, Ohio.**  Speaker, William J. O'Neill Great Lakes Regional Bankruptcy Institute, sponsored by Cleveland Bar Association.  Topic: "What's New on the Hill?: Legislative Efforts to Address the Ongoing Crisis."

**April 21: San Francisco, California.**  Panel Member, Bay Area Bankruptcy Forum April Meeting.  Topic: "Deepening Insolvency."

**April 2: National Harbor, Maryland.**  Panel Moderator for Plenary Panel, American Bankruptcy Institute's Annual Spring Meeting.  Topic: "The Government-Managed Economy: Is Anything Working?"

**2008:**

**November 21: Newton, Massachusetts.** Guest Lecturer, Boston College School of Law, Professor Ingrid Hillinger's Business Bankruptcy Course.

**November 14: New York, New York.** Speaker, Commercial Law League of America's 88th New York Meeting. Topic: "Understanding Receiverships."

**September 15: Chicago, Illinois.** Panel Member, Information Management Network's Managing, Redeveloping & Acquiring Distressed Retail and Shopping Center Real Estate Symposium. Topic: "Turnaround Strategies: Repurposing; Retenanting; Refurbishing."

**June 19: Chicago, Illinois.** Speaker, Renaissance American Management & Beard Group's Ninth Annual Conference on Corporate Reorganizations, CLE Ethics Hour.

**April 17: Newton, Massachusetts.** Guest Lecturer, Boston College School of Law, Professor Ingrid Hillinger's Business Bankruptcy Course.

**March 12: Chicago, Illinois.** Panel Member, Schiff Hardin Teach-In. Topic: "363 Sales."

**2007:**

**November 19: Cincinnati, Ohio.** Speaker, Tri-state Association for Corporate Renewal luncheon meeting. Topic: "Public Sector Failure, Private Sector Skills: The State of Ohio Coin Scandal."

**November 9: New York City, New York.** Mock Trial Witness, Commercial Law League of America's 87th New York Meeting. Topic: "Bankruptcy Rule 2019 and Multiple Creditor Representation: The Perils of Non-Disclosure."

**October 12: Rolling Meadows, Illinois.** Speaker, National Association of Credit Management (NACM) Midwest Conference. Topic: "Where Is the Insolvency Business Going in the New Century?"

**May 18 – May 20: Napa Valley, California.** Educational Program Co-Chair, California Bankruptcy Forum.

**April 27: Chicago, Illinois.** Speaker, Arnstein & Lehr Spring Partners Meeting. Topic: "Current Market Trends and Their Impact on Clients."

**April 27: Cleveland, Ohio.** Panel Member, William J. O'Neill Great Lakes Regional Bankruptcy Institute, sponsored by Cleveland Bar Association. Topic: "Alternatives to Bankruptcy: Workouts, Receiverships, Assignments for the Benefit of Creditors, Foreclosures, Deeds in Lieu: What's In Your Wallet?"

**April 26: Newton, Massachusetts.** Guest Lecturer, Boston College School of Law, Professor Ingrid Hillinger's Business Bankruptcy Course. Topic: "New Developments."

**April 13: Washington, D.C.**  Panel Moderator for Plenary Panel, American Bankruptcy Institute's Annual Spring Meeting.  Topic: "And Now for Something Completely Different?: A Roundtable on Bankruptcy, Labor and Credit Issues and the New Congress."

**February 16: Amelia Island, Florida.**  Panel Member, American Bar Association Section of Litigation's Committee on Corporate Counsel Seminar.  Topic: "Deepening Insolvency – Contours of a New Tort."


**2006:**
**December 4: New York, New York.**  Featured Speaker, meeting of Edwards Angell Palmer Dodge Insurance and Reinsurance Department.

**September 8: Las Vegas, Nevada.**  Panel Member, American Bankruptcy Institute's Southwest Bankruptcy Conference and associated Complex Financial Restructuring Program.  Topic: "Where Will the Business Come From?"

**June 22: Chicago, Illinois.**  Panel Moderator, Renaissance American Management & Beard Group's Ninth Annual Conference on Corporate Reorganizations, CLE Ethics Hour.

**April 28: Chicago, Illinois.**  Panel Member, Commercial Law League of America Midwest Region's 76th Chicago Meeting.  Topic: "A Lesson on the ABCs (Assignments for the Benefit of Creditors): A Discussion on How They Work and Why They Are a Better Alternative to Chapter 11."

**April 21: Washington, D.C.**  Panel Member, American Bankruptcy Institute's Annual Spring Meeting plenary session.  Topic: "Can the Problems Facing U.S. Manufacturers be Fixed?"

**April 7: Boston, Massachusetts.**  Panel Member, American College of Bankruptcy First Circuit Fellows Educational Program.  Topic: "Reorganizations: Then and Now."

**March 10: Los Angeles, California.**  Panel Member, American Bankruptcy Institute's Bankruptcy Battleground West conference.  Topic: "The New Face of American Reorganization and Restructuring."

**February 4: Honolulu, Hawaii.**  Panel Moderator, DSI's 2006 Mid-Winter Aloha Weekend conference.  Topic: "Second Annual Review of the Present Status and Future Prospects for the Restructuring Industry."

**February 3: Honolulu, Hawaii.**  Speaker, Hawaii State Bar Association Bankruptcy Law Section's Chapter 11 Seminar.  Topic: "Chapter 11 Bankruptcy Reform."

**January 28: Ft. Lauderdale, Florida.**  Panel Member, TAGLAW Southeast Regional Meeting. Topic: "Doing Business with Restructuring Professionals."

**2005:**

**November 18: San Francisco, California.** Panel Member, Meeting of the Northern California Chapter of the Turnaround Management Association. Topic: "Bankruptcy Abuse and Reform Act of 2005."

**September 29: San Francisco, California.** Panel Member, Association of Insolvency and Restructuring Advisors' 2005 West Coast Corporate Restructuring Conference: Current Trends and Issues Facing Corporate Restructuring Professionals. Topic: "Real Estate Industry Analysis."

**August 12: Cincinnati, Ohio.** Panel Member, Midwest Regional Bankruptcy Seminar. Topic: "Asset Protection Trusts."

**August 12: Cincinnati, Ohio.** Panel Member, Midwest Regional Bankruptcy Seminar. Topic: "Deepening Insolvency & Changing Fiduciary Responsibilities."

**August 11: Cincinnati, Ohio.** Panel Member, Midwest Regional Bankruptcy Seminar. Topic: "Cross Border Insolvency Proceedings."

**July 15 and 16: Brewster, Massachusetts.** Speaker, American Bankruptcy Institute's Northeast Bankruptcy Conference. Topic: "The Business of Workouts & Reorganizations."

**June 24: Chicago, Illinois.** Panel Moderator, Renaissance American Management & Beard Group's Eighth Annual Conference on Corporate Reorganizations, CLE Ethics Hour. Topic: "Effects of the New Bankruptcy Code on Corporate Governance."

**May 11: American Bankruptcy Institute National Telephonic Audioconference.** Panel Moderator, Best of ABI Bankruptcy Battleground West 2005. Topic: "Deepening Insolvency Issues."

**May 10: San Francisco, California.** Panel Member, Bar Association of San Francisco Commercial Law and Bankruptcy Section's seminar. Topic: "The Bankruptcy Reform Act: How We Got it and What We Are Doing With It."

**April 7: Chicago, Illinois.** Luncheon Speaker, DePaul University College of Law Business and Commercial Law Journal Symposium in conjunction with the Commercial Law League of America Midwest Region's 75th Chicago Meeting. Topic: "New Industry Developments."

**April 5: New York, New York.** Panel Member, The Deal's Private Equity Symposium. Topic: "Financing Outlook: The Two-Edge Sword of Cheap Debt."

**March 4: Los Angeles, California.** Panel Moderator, American Bankruptcy Institute's Bankruptcy Battleground West conference. Topic: "Deepening Insolvency Issues."

**February 5: Honolulu, Hawaii.**  Panel Moderator, DSI's 2005 Mid-Winter Aloha Weekend conference.  Topic: "The Changing Nature of the Insolvency Business and the International Restructuring Paradigm: Where is the Industry Headed?"


**2004:**

**December 10: Cleveland, Ohio.**  Speaker, Cleveland Bar Association Bankruptcy and Commercial Law Section's Alternatives to Bankruptcy Seminar.  Topic: "Assignments for the Benefit of Creditors: What Are They? Where Are They in Use? Do They Work? Current Legislative Initiatives."

**December 10: Cleveland, Ohio.**  Luncheon Speaker, Cleveland Bar Association Bankruptcy and Commercial Law Section's Alternatives to Bankruptcy Seminar.  Topic: "The Changing Nature Of The Insolvency Arena: It Ain't Just About Bankruptcy Court Anymore – And Wait'll You See What We're Going To Do With Insurance Insolvencies."

**December 3: Scottsdale, Arizona.**  Panel Member, American Bankruptcy Institute's Winter Leadership Conference.  Topic: "The Third Way: Federal Receivership as a Creditor Option."

**November 16: New York, New York.**  Panel Member, American Conference Institute's conference on Legal and Strategic Guide to Insurance Insolvency: Overcoming Business, Legal and Regulatory Hurdles.  Topic: "Revising the Insolvency Process."

**September 20:  New York, New York.**  Panel Member, American Bankruptcy Institute's Investment Banking & Restructuring Conference.  Topic: "What is Going on Out There: Analysis of the current environment and when and why the next distress cycle will occur."

**June 25: Kauai, Hawaii.**  Panel Member, American Bankruptcy Institute's Hawaii Bankruptcy Workshop.  Topic: "Developments in Corporate Bankruptcy after Enron and Worldcom."

**June 4:  Toronto, Canada.**  Dinner Speaker, Annual Retreat hosted by the Ontario Bar Association Insolvency Committee, the Commercial List User's Committee and the Ontario Association of Insolvency and Restructuring Professionals.  Topic: "Lessons for Canadian Restructuring and Turnaround Professionals."

**April 15:  Chicago, Illinois.**  Luncheon Speaker, DePaul University College of Law Business and Commercial Law Journal Symposium on Emerging Trends in Commercial Law: Surviving Tomorrow's Challenges, in conjunction with the Commercial Law League of America Midwest Region's 74th Chicago Meeting.  Topic: "Challenges of the New Insolvency Paradigm."

**March 5:  Los Angeles, California.**  Panel Member, American Bankruptcy Institute's Bankruptcy Battleground West conference.  Topic: "New Developments."

**February 26:  Tampa, Florida.**  Speaker, Florida Bar Business Section's Conference on Alternatives to Bankruptcy.  Topic: "Receiverships – Real Estate, Corporate, Governmental/Federal Receiverships."

**February 26: Tampa, Florida.** Panel Member, Florida Bar Business Law Section's Conference on Alternatives to Bankruptcy. Topic: "Comparison of Strategies and Hypothetical Problem Analysis."

**January 30: Princeton, New Jersey.** Speaker, Eastern District of Pennsylvania Bankruptcy Conference's Fifteenth Annual Forum. Topic: "Remarks on the Changing Nature of the International Insolvency Business."


**2003:**
**September 10: Cincinnati, Ohio.** Speaker, Meeting of the Greater Cincinnati Chamber of Commerce's Association for Corporate Growth. Topic: "Fun & Games: Sarbanes-Oxley and Restructuring."

**September 8: Boston, Massachusetts.** Panel Member, LexisNexis Corporate Governance Symposium. Topic: "Bankruptcy Issues."

**August 22: Cincinnati, Ohio.** Panel Member, Midwest Regional Bankruptcy Seminar. Topic: "Creditor Remedies: Alternatives and Strategies."

**August 21: Cincinnati, Ohio.** Panel Member, Midwest Regional Bankruptcy Seminar. Topic: "The Role of the Financial Advisor."

**June 27: New York, New York.** Guest Lecturer, Building Turnarounds that Last course at Columbia Business School. Topic: "The Role of the CRO, the Engagement Letter and Other Corporate Governance Issues."

**June 19: Chicago, Illinois.** Panel Member, the Renaissance American Management & Beard Group's Sixth Annual Conference on Corporate Reorganizations, Ethics/Corporate Governance Panel.

**June 3: San Francisco, California.** Speaker, Meeting of the Bay Area Bankruptcy Forum. Topic: "The Sarbanes-Oxley Act and the Role of the SEC in Public Company Bankruptcies."

**May 23: San Antonio, Texas.** Speaker, Advanced Business Bankruptcy Conference for the State Bar of Texas. Topic: "Workouts: Some Thoughts on Their Changing Nature."

**May 16: Rancho Los Palmos, California.** Panel Moderator, California Bankruptcy Forum's Sarbanes-Oxley Panel. Topic: "Thou Shalt Not Steal, Lie or Covet."

**April 8: San Francisco, California.** Keynote Luncheon Speaker, Meeting of the Bar Association of San Francisco's Bankruptcy and Commercial Law Section. Topic: "The Changing Nature Of Our Business: Are You Comfortable With Where We're Going And Can You See The Destination?"

**April 5:  Los Angeles, California.**  Panel Member, American Bar Association's Business Law Section  Mid Year Spring Meeting, Business Bankruptcy Committee Program.  Topic: "Anatomy of a Workout."

**March 7:  Beverly Hills, California.**  Panel Member, American Bankruptcy Institute's Eleventh Annual Bankruptcy Battleground West.  Topic: "Sarbanes-Oxley Act Issues."

**February 27:  New York, New York.**  Panel Member, First Annual Turnaround Management & Corporate Restructuring Summit, presented by Institutional Investor Seminars.  Topic: "Efficiencies of Turnarounds."

**February 19:  New York, New York.**  Speaker, Strategic Research Institute's Second Annual Corporate Restructuring and High Yield Debt Conference: Crisis at Maturity.  Topic: "Case Study: A Status Report on Leading Asbestos Cases."

**February 18: New York, New York.**  Panel Moderator, Strategic Research Institute's Second Annual Corporate Restructuring and High Yield Debt Conference: Crisis at Maturity.  Topic: "Preserving Value: Strategic Communications as a Tool for Business Recovery."

**February 6:  Las Vegas, Nevada.**  Speaker, Conference on Valuation of Assets in Bankruptcy, presented by the William S. Boyd School of Law, University of Nevada, Las Vegas.  Topic: "Valuation at the Confirmation Hearing."

**January 31 and February 1:  Denver, Colorado.**  Panel Member, American Bankruptcy Institute's Eighth Annual Rocky Mountain Bankruptcy Conference. Topic: "Director and Officer Issues: New Theories of Liability."

**January 8: Tampa, Florida.**  Panel Member, International Council of Shopping Centers' 2003 Florida Retail Leasing Symposium. Topic: "Current Bankruptcy Issues Affecting Retail Tenants."


**2002:**
**December 4:  Chicago, Illinois.**  Panel Member, Strategic Research Institute's Fourth Annual Distressed Debt Investing Forum.  Topic: "An Overview of the Next Wave of Bankruptcies."

**November 22:  Nashville, Tennessee.**  Panel Member, Mid-South Commercial Law Institute's 23rd Annual Seminar: Workouts, Mediation and Recent Developments.  Topic: "Anatomy of a Workout."

**October 29:  Miami, Florida.**  Speaker, Meeting of the Bankruptcy Bar Association of the Southern District of Florida.  Topic: " Prospective Bankruptcy Legislation and Current Trends in the Business."

**October 25:  Colorado Springs, Colorado.**  Panel Member, Turnaround Management Association's Annual Conference.  Topic: "Corporate Governance Issues in a Turnaround."

**October 3: Chicago, Illinois.** Keynote Speaker, Commercial Law League's Opening Breakfast at the 76th Annual Meeting of the National Conference of Bankruptcy Judges. Topic: "Political Ramifications Behind the Bankruptcy Legislation and Why It Did or Did Not Become Law."

**September 13 and 15: Las Vegas, Nevada.** Panel Member, American Bankruptcy Institute's Tenth Annual Southwest Bankruptcy Conference. Topic: "Spotting the Downward Spiral."

**July 12 and 13: Cape Cod, Massachusetts.** Panel Member, American Bankruptcy Institute's Ninth Annual Northeast Bankruptcy Conference. Topic: "Workouts, Then and Now."

**June 21: Chicago, Illinois.** Speaker, the Renaissance American Management & Beard Group's Fifth Annual Conference on Corporate Reorganizations. Topic: "Corporate Governance Issues."

**May 14: Chicago, Illinois.** Speaker, University of Chicago Graduate School of Business CEO Roundtable. Topic: "Managing Turnarounds."

**May 6: Chicago, Illinois.** Panel Member, Seventh Circuit Bar Association's Annual Meeting. Topic: "Hot and Emerging Topics."

**April 19: Washington, D.C.** Panel Member, American Bankruptcy Institute's Annual Spring Meeting. Topic: "Controlling Costs in Chapter 11: The Latest on Fees and the Use of Fee Auditors."

**April 10: San Francisco, California.** Panel Member, Meeting of the Bay Area Bankruptcy Forum. Topic: "What Professionals and Management Want and What They Can Get."

**March 13: Cincinnati, Ohio.** Speaker, Meeting of the Cincinnati Association for Corporate Growth. Topic: "The Changing Model of Reorganizations and Restructurings in This Challenging Time."

**March 8: Los Angeles, California.** Panel Member, American Bankruptcy Institute's Tenth Annual Bankruptcy Battleground West. Topic: "Directors and Officers in the Legal Crosshairs: Exploring the Apparent Continuing Evolution of Both Responsibility and Culpability."

**January 25: New York, New York.** Panel Member, Strategic Research Institute's Conference on Corporate Restructuring and High Yield Debt: Crisis at Maturity. Topic: "Asset Sales."

**2001:**
**December 19: Miami, Florida.** Panel Member, Meeting of the Association for Corporate Growth, South Florida Chapter, Miami-Dade Subchapter. Topic: "The Trials and Tribulations of a Troubled Company."

**December 5: Atlanta, Georgia.** Panel Member, Meeting of the United States Trustees. Topic: "The Financial Market and Trends Affecting Chapter 11."

**December 4:  Chicago, Illinois.**  Speaker, SHALVA's 15th Anniversary Unity Dinner.  Topic: "Miracles."

**November 15:  Dallas, Texas.**  Speaker, Joint Meeting of the Turnaround Management Association and the in the Current Economic Climate – A 'Big Picture' Review."

**October 23:  Cambridge, Massachusetts.**  Panel Member, Harvard University's John F. Kennedy School of Government Institute of Politics.  Topic: "Money and Politics."

**June 29 and July 1:  Maui, Hawaii.**  Panel Member, American Bankruptcy Institute's Hawaii Bankruptcy Workshop.  Topic: "Workouts: Looking for Firm Footing on the Slippery Slope."

**May 18:  Monterey, California.**  Panel Member, California Bankruptcy Forum's 13th Annual Conference.  Topic: "Recent Developments."

**April 20:  Washington, D.C.**  Panel Member, American Bankruptcy Institute's Annual Spring Meeting.  Topic: "The Unthinkable?  Professional Service Firm Bankruptcies – Risks and Prospects."

**April 17:  Chicago, Illinois.**  Speaker, Meeting of the Association for Corporate Growth, Chicago Chapter. Topic: "Views from a Turnaround Professional on Changing Opportunities in a Changing Economy."

**April 3:  Cambridge, Massachusetts.**  Panel Member, Harvard University Business School's Turnaround Symposium.  Topic: "Leading the Turnaround."

**January 8 and 9:  Beijing, People's Republic of China.**  Panel Member, Conference on Business Reorganization and Commercial Bank Assets Preservation, presented by a consortium of Chinese banks.  Topic: "The Workout Specialist's Role in the Reorganization Process."


**2000:**
**December 7:  Cleveland, Ohio.**  Speaker, Cleveland Bar Association's 2000 William J. O'Neill Bankruptcy Institute.

**December 1:  Scottsdale, Arizona.**  Panel Member, American Bankruptcy Institute's Winter Leadership Conference.  Topic: "Claims Trading: Has It Changed the World of Bankruptcy Forever?"

**November 5:  Baltimore, Maryland.**  Panel Member, Turnaround Management Association's Annual Conference.  Topic: "Fiduciary Responsibilities of Professionals in Insolvencies."

**October 18:  Boston, Massachusetts.**  Panel Member, Meeting of the American Bar Association Business Law Section, Committee on Business Bankruptcy, Subcommittee on

Trustees and Examiners, in conjunction with the 74th Annual Meeting of the National Conference of Bankruptcy Judges. Topic: "Contested Elections of Chapter 11 Trustees."

**September 22 and 23: Las Vegas, Nevada.** Panel Member, American Bankruptcy Institute's Eighth Annual Southwest Bankruptcy Conference. Topic: "Lender's Perspective on Pre- and Post-Petition Workouts."

**July 15: Newport, Rhode Island.** Panel Member, Mock Trial in the American Bankruptcy Institute's Seventh Annual Northeast Bankruptcy Conference. Topic: "Motion to Appoint Trustee."

**June 21: San Antonio, Texas.** Panel Member, United States Trustee Program's Tri-Regional Seminar for Regions 5, 6 and 7. Topic: "Venue Issues."

**June 8: Miami, Florida.** Panel Member, Florida Receivers Forum Seminar. Topic: "Florida Receiverships: Making Order Out of Chaos."

**May 16: New York, New York.** Panel Member, American Conference Institute's D&O Liability Conference. Topic: "Going Broke: Director and Officer Responsibility and Risk During Bankruptcy."

**April 29: Washington, D.C.** Panel Member, American Bankruptcy Institute's Annual Spring Meeting. Topic: "Use of Turnaround Consultants in Workout/Underperforming Situations."

**April 11: San Francisco, California.** Speaker, Meeting of the Commercial Law and Bankruptcy Section of the Bar Association of San Francisco. Topic: "Responding to the Coming Trends."

**April 4: Cleveland, Ohio.** Speaker, Meeting of the Northern Ohio Chapter of Robert Morris Associates. Topic: "Turnaround Management."

**March 3: Scottsdale, Arizona.** Keynote Speaker, Commercial Law League of America's 1st Annual Winter Conference. Topic: "Deciphering the Coming Trends, Restructurings, Turnarounds and Workouts Looming on the Horizon."

**January 13: Evansville, Indiana.** Speaker, Meeting of the River Valley Chapter of Robert Morris Associates.

**January 12: Chicago, Illinois.** Panel Member, Young Lawyers Section of the Chicago Bar Association's Seminar on Bankruptcy: Accounting and Turnaround Management. Topic: "How to Identify Operational and Financial Problems and Their Solutions."

**1999:**
**December 14: Chicago, Illinois.** Speaker, Meeting of the Chicago Bar Association's Bankruptcy & Reorganization Committee. Topic: "Election of Trustees in Bankruptcy Cases."

**November 18: Cincinnati, Ohio.** Speaker, Meeting of the Greater Cincinnati/Northern Kentucky Chapter of Robert Morris Associations. Topic: "New Perspectives on Credit Evaluations and Decisions in Real Time: Responding to the Imperatives of Decision Making in the Changing Workout and Restructuring Industry."

**November 9: Dallas, Texas.** Panel Member on two separate panels for Patton Bogg's Seminar on Preparing for the Next Economic Downturn. Topic: "Warning Signs on the Horizon (or Whatever Goes Up Eventually Comes Down)" and "Benefiting from Downturn Opportunities – Methods for Taking Advantage of the Next Downturn."

**October 21: Boston, Massachusetts.** Keynote Speaker, Massachusetts Continuing Legal Education Bankruptcy Conference. Topic: "Restructurings, Turnarounds and Bankruptcies in the New Millennium: Are We All Going to Have to Get Real Jobs?"

**October 4: New Orleans, Louisiana.** Speaker, Robert Morris Associates' Annual Conference of Lending and Credit Risk Management. Topic: "Timing the Wave: Responding to the Rapid Evolution in the Nature of Workouts and Restructurings."

**September 28: Chicago, Illinois.** Panel Member, the Renaissance American Management & Beard Group's Second Annual Conference on Corporate Reorganizations. Topic: "Case Study: Mercury Finance."

**September 15: Buffalo, New York.** Panel Member, Joint meeting of the Upstate New York Turnaround Management Association and the Buffalo Chapter of Robert Morris Associates. Topic: "Use of Turnaround Consultants in Workout/Underperforming Situations."

**June 8: Chicago, Illinois.** Speaker, Meeting of the Chicago Bar Association's Bankruptcy & Reorganization Committee. Topic: "Bill Brandt, Live and Unplugged."

**May 7: Cincinnati, Ohio.** Speaker, Ohio Valley Chapter of Robert Morris Associates' Spring Meeting. Topic: "Issues with Troubled Companies."

**April 26: San Francisco, California.** Panel Member, Renaissance American Management & Beard Group's Bankruptcy Sales and Acquisitions Conference. Topic: "The CLE Ethics Hour: Avoiding Conflicts/Avoiding Suits for Disgorgement."

**April 21: Chicago, Illinois.** Panel Member, Association of Legal Administrators' 28th Annual Educational Conference and Exposition. Topic: "Law Firm Management Techniques: How to Keep Your Firm Out of Trouble."

**April 16: Washington, D.C.** Panel Member, American Bankruptcy Institute's Annual Spring Meeting. Topic: "Up Close with Top Crisis Managers: Remarks on the Changing Nature of Corporate Restructurings and Turnarounds."

**March 19: Los Angeles, California.** Panel Member, American Bankruptcy Institute's Seventh Annual Bankruptcy Battleground West. Topic: "Thoughts on the Practical Realities of Administering Cases where Federal Communication Licenses are an Issue."

**February 2: Columbus, Ohio.** Speaker, Central Ohio Chapter of Robert Morris Associates' Winter Program. Topic: "Issues with Troubled Companies."


**1998:**

**November 9: Las Vegas, Nevada.** Panel Member, Second Annual Subprime Consumer Finance, Asset-Based Securitization & Servicing Forum Conference. Topic: "Succeeding in an Increasingly Competitive Subprime Market: The Strategy Roundtable for a Successful '99 and Beyond."

**October 17: Williams Island, Florida.** Speaker, Berger Davis & Sugerman's Annual Law Firm Planning Retreat. Topic: "Enhancing Client Services."

**September 18 and 19: Santa Fe, New Mexico.** Panel Member, American Bankruptcy Institute's Sixth Annual Southwest Bankruptcy Conference. Topic: "Financial Issues in Chapter 11 Cases."

**September 15: New York, New York.** Panel Member, International Business Communications' Sixth Annual Conference on Distressed Securities. Topic: "Bankruptcy Business Acquisition Strategies.

**September 9: Chicago, Illinois.** Speaker, Meeting of the National Investor Relations Institute, Chicago Chapter. Topic: "A Presentation on Companies That Have Experienced Financial Difficulties."

**June 12: Chicago, Illinois.** Keynote Speaker, National Automotive Finance Association's Annual Non-Prime Auto Lending Conference. Topic: "Coming Back from the Covenant Violation: A Blueprint for Corporate Turnaround Situations and Growing with Restrictive Debt Financing."

**June 11: Chicago, Illinois.** Keynote Speaker, Renaissance American Conferences & Beard Group's First Annual Conference on Corporate Reorganizations. Topic: "Avoiding Pitfalls in Successful Turnarounds and Workouts.

**April 6: Chicago, Illinois.** Panel Member, Institute for International Research's Conference on Auto Financing in the Age of Consolidation. Topic: "Working Our Way Back to Financial Health."

**March 20: Los Angeles, California.** Panel Member, American Bankruptcy Institute's Sixth Annual Bankruptcy Battleground West. Topic: "Remembering Who the Client Is – Effective Representation of Business Debtor Clients."

**January 30: Scottsdale, Arizona.** Panel Member, Association of Insolvency Accountants' "Rightsizing Conference." Topic: "The Mercury Finance Story: This is More Like a Barge than a Cabin Cruiser – You Can't Turn It on a Dime."


**1997:**
**October 28: Chicago, Illinois.** Speaker, Meeting of the Chicago Chapter of Robert Morris Associates. Topic: "This Year's Turnaround Situations."

**October 21: Boston, Massachusetts.** Speaker, Meeting of the Turnaround Management Association of New England. Topic: "Thoughts on the Convergence (or Collision) of Bankruptcy and Non-Bankruptcy Law from the Workout/Turnaround Perspective."

**October 17: Philadelphia, Pennsylvania.** Panel Member, American Bar Association Business Law Section, Committee on Business Bankruptcy, Subcommittee on Bankruptcy's Meeting on Aspects of Business Transactions, in conjunction with the 71st Annual Meeting of the National Conference of Bankruptcy Judges. Topic: "And Now for Something Slightly Different: Federal Receiverships as an Alternative to Bankruptcy Proceedings."

**May 16: Washington, D.C.** Panel Member, American Bankruptcy Institute's Annual Spring Meeting. Topic: "Keep it Quiet and Cheap: The Fine Art of Out-of-Court Workouts and Liquidations."

**April 26: Victoria, Canada.** Speaker, Vancouver/Seattle Insolvency Group's Sixth Annual Conference. Topic: ""Current Developments and Hot Trends in the Bankruptcy Biz."

**April 8: Chicago, Illinois.** Panel Member, Meeting of the Chicago Bar Association Bankruptcy and Reorganization Committee. Topic: "Future of Bankruptcy."

**March 21: Los Angeles, California.** Panel Member, American Bankruptcy Institute's Fifth Annual Bankruptcy Battleground West. Topic: "Winning the Battle for Ownership: Claims Trading and Corporate Governance Issues."

**February 20: Dayton, Ohio.** Speaker, Robert Morris Association Regional Seminar. Topic: "Review of the Current Bankruptcy Scene and Related Legislative Developments."

**January 28: Tampa, Florida.** Panel Member, Meeting of the Tampa Bay Bankruptcy Bar Association. Topic: "Asset Sales in Bankruptcy."


**1996:**
**December 5 and 6: Cleveland, Ohio.** Speaker, Cleveland Bar Association's 1996 William J. O'Neill Bankruptcy Institute. Topic: "Some Thoughts on the Convergence (or Collision) of Bankruptcy and Non-Bankruptcy Law from the Workout/Turnaround Perspective."

**August 9:   Harbor Springs, Michigan.**   Panel Member, Eighth Annual Federal Bar Association's Bankruptcy Section Seminar.   Topic: "Keeping the Ship Afloat – Duties and Responsibilities of Debtors-In-Possession, Creditors' Committees and their Counsel After Filing and Before Chapter 11 Plan Confirmation."

**May 2:   Columbus, Ohio.**   Panel Member, Columbus Bar Association's Bankruptcy Law Institute.   Topic: "Pre-Packaged Plans and Distresses Sales."

**March 7:   Cleveland, Ohio.**   Speaker, Meeting of the Cleveland Chapter of the Turnaround Management Association.   Topic:   "Where Does Responsibility/Liability Stop for Accountants, Attorneys and Turnaround Professionals?"

**February 8 through 10:   Denver, Colorado.**   Panel Member, American Bankruptcy Institute's First Annual Rocky Mountain Bankruptcy Conference.   Topic: "A Review of Asset Sale Mechanisms for the Resolution of Insolvencies Outside Bankruptcy Court."

**January 19:   Phoenix, Arizona.**   Panel Member, Twelfth Annual Conference of the Association of Insolvency Accountants.   Topic:   "I Was Thinkin' Along Those Lines Anyhow, or How the Specter of Bankruptcy Proceedings Caused Me to Embrace the Consensual Workout Process."

**January 18:   Phoenix, Arizona.**   Panel Member, American Bankruptcy Institute's Bankruptcy Reform Study Project, presented to the Twelfth Annual Conference of the Association of Insolvency Accountants.   Topic: "How Consensual Workouts are Shaped by Business Bankruptcy."


**1995:**
**October 31:   New Orleans, Louisiana.**   Panel Member, National Conference of Bankruptcy Judges, Use and Disposition of Property Subcommittee.   Topic: "Trustee Elections: Organized Mayhem Under the New Amendments?   Politics, Campaigning, Disqualification.   A Practical Guide into the Fray."

**September 14 and 15:   Cincinnati, Ohio.**   Panel Member on two separate panels, 1995 Annual Midwest Regional Bankruptcy Seminar.   Topics: "Some Thoughts on the Dilemmas of Retention Facing Non-Lawyers and Non-Accounting Professionals," and "Democratizing Chapter 11's: The Election of Trustees Under the Reform Act."

**September 13:   San Antonio, Texas.**   Speaker, "Reimer Week 1995."   Topic: "Better, Faster Results in Workouts and Liquidations."

**August 5:   La Jolla, California.**   Speaker, Annual Summer Meeting of the Dental Manufacturers of America, Inc.

**July 20 through 23:   North Falmouth, Massachusetts.**   Speaker, American Bankruptcy Institute's 1995 Northeast Bankruptcy Conference.   Topic: "Financial Restructuring."

**June 1:  Orlando, Florida.**  Speaker, National Association of Credit Management's National Annual Convention.  Topic: "Selecting a Chapter 11 Trustee: Actual Cases Tell the Story."

**May 5:  Washington, D.C.**  Panel Member, Annual American Bankruptcy Institute's Spring Meeting, Special Program on the Bankruptcy Review Commission's Agenda.  Topic: "Emphasis Being on 'Facilitator.' "

**March 25:  San Antonio, Texas.**  Panel Member, American Bar Association Business Law Section's Spring Meeting, Chapter 11 Bankruptcy Courts Subcommittee.  Topic: "The Bankruptcy Court System in 1995: Is It in Need of Major Reform or Minor Refinements? A View from the Bench, the United States Trustee's Office, and a Bankruptcy Business Consultant."

**March 6:  Crystal City, Virginia.**  Speaker, National Association of Credit Managers' Legislative and Critical Issues Conference.  Topic: "Tips for Selecting a Trustee."

**March 3:  Tucson, Arizona.**  Panel Member, American Bar Association, Insurance Coverage Litigation Committee, Insolvency Subcommittee's Annual Meeting.  Topic: "Special Issues Involving Bankrupt Insureds in Insurance Coverage Litigation."

**February 21:  Los Angeles, California.**  Panel Member, Turnaround Management Association Southwest Chapter's February 1995 Program.  Topic: "So You Wanna Be A Trustee – Creditors Elections of Chapter 11 Trustees under the Bankruptcy Reform Act of 1994."

**February 15:  Miami, Florida.**  Speaker, South Florida Secured Lenders Group.


**1994:**
**December 14: Chicago, Illinois.**  Speaker, Meeting of the Chicago Bar Association's Financial Institutions Committee.

**October 5:  Oak Brook, Illinois.**  Speaker, Annual Meeting of the Illinois Bankers Association.  Topic: "Committee Lending Practices: Closing and Enforcing the Loan."

**September 30:  Cincinnati, Ohio.**  Panel Member, 1994 Annual Midwest Regional Bankruptcy Seminar.  Topic: "Commercial Bankruptcy: Chapter 11 Operations – Operation of the Business and Crisis Management."

**September 28:  Charlotte, North Carolina.**  Speaker, Meeting of the Carolinas Chapter of the Turnaround Management Association.

**August 13:  Paradise Island, Nassau.**  Keynote Address, Dental Manufacturers of American 62nd Annual Summer Meeting.  Topic:  "The Impact of Pending Healthcare Legislation on Bankruptcies in the Healthcare Field."

**May 26:  Chicago, Illinois.**  Panel Member, Joint Meeting of the American Bar Association and the Chicago Chapter of the Federal Bar Association.  Topic: "Critical Issues in Chapter 11 Bankruptcies – Keeping Control: Pre-Petition Planning."

**May 25:  Chicago, Illinois.**  Meeting of the Chicago Bar Association's Real Property Law Committee.  Topic: "What if the Builder of Your Client's New Home Files Bankruptcy."

**May 4:  Chicago, Illinois.**  Speaker, Chicago Bar Association Seminar.  Topic: "New Construction: Residential Real Estate Contracts – What if the Builder Goes Bankrupt?"

**April 29:  Washington, D.C.**  Moderator and Discussion Leader, 1994 Annual Spring Meeting of the American Bankruptcy Institute, Symposium on the Role of Government in Bankruptcy.

**April 28:  Washington, D.C.**  Panel Member, American Bankruptcy Institute's Law Review Roundtable Discussion.  Topic: "What Constitutes a Success in Chapter 11?"

**April 26:  Miami, Florida.**  Speaker, Monthly meeting of the Economic Society of South Florida.

**April 14:  Miami, Florida.**  Speaker, South Florida Regional Resource Development Grantsmanship Program Seminar.  Topic: "Relationships Between Community Development and Resource Development."

**April 8:  Chicago, Illinois.**  Speaker, 64th Annual Meeting of the Commercial Law League of America's Midwestern District Regional Members' Association.  Topic: "It's *More* Than the Economy, Stupid: The Challenge of Bankruptcy Reform."

**March 1:  Chicago, Illinois.**  Speaker, Chicago Bar Association's Young Lawyers Section, Bankruptcy Committee.  Topic: "Workouts Outside of the Bankruptcy Court."

**February 25:  St. Louis, Missouri.**  Keynote Speaker, Washington University Interdisciplinary Conference on Bankruptcy and Insolvency Theory.  Topic: "It's *More* than the Economy, Stupid: Lessons Learned in the Turnaround Business About Social Costs, Public Interests, and the Challenge of Bankruptcy Reform."

**February 22:  St. Louis, Missouri.**  Speaker, Saint Louis University Law School's Monthly Corporate Roundtable Luncheon.


**1993:**
**November 3:  East Lansing, Michigan.**  Speaker, Robert Morris Associates 1993 National Fall Study Conference.

**October 21:  Chicago, Illinois.**  Panel Member, Executive Enterprise, Inc.'s 14th Workouts and Insolvencies Conference  Topic: "Early Warning Signs."

**June 3:  San Francisco, California.**  Panel Member, Executive Enterprise, Inc.'s Real Estate Workouts and Insolvencies Conference.  Topic: "Trends and Recent Developments: Reviewing Alternative Solution Vehicles."

**May 20:  Chicago, Illinois.**  Panel Member, Executive Enterprise, Inc.'s Real Estate Workouts and Insolvencies Conference.  Topic: "Trends and Recent Developments: Reviewing Alternative Solution Vehicles."

**May 13:  New York, New York.**  Panel Member, Executive Enterprise, Inc.'s Real Estate Workouts and Insolvencies Conference.  Topic: "Trends and Recent Developments: Reviewing Alternative Solution Vehicles."

**May 7:  Columbus, Ohio.**  Speaker, 1993 Columbus Bar Association's Bankruptcy Law Institute.  Topic: "Alternatives to Bankruptcy."

**April 22:  Chicago, Illinois.**  Speaker, Banking Law Institute and Bank Lending Institute Program.  Topic: "Workouts and Bankruptcy: Recognizing and Dealing with Loan Defaults in a Consensual Manner."

**March 18:  Grand Rapids, Michigan.**  Speaker, Meeting of the Federal Bar Association of Western Michigan, Bankruptcy Section Steering Committee.

**1992:**

**December 8:  Rosemont, Illinois.**  Speaker, Illinois Certified Public Accountants Society and Foundation's 1992 ABC Fall Forum Bankruptcy Conference.  Topic: "Alternatives to Bankruptcy: Bulk Sale Transfers, Assignments for the Benefit of Creditors, State Court Receiverships, Federal Equity Receivers, Compositions of Creditors, and Acquisitions of Troubles Companies."

**October 29:  Chicago, Illinois.**  Speaker, Banking Law Institute and Bank Lending Institute Program.  Topic: "Workouts and Bankruptcy: Recognizing and Dealing with Loan Defaults in a Consensual Manner."

**October 22:  Chicago, Illinois.**  Speaker, Associated Accounting Firms International's 24th Annual Tax Seminar.  Topic: "Bankruptcy and Debt Restructuring."

**September 25:  Cincinnati, Ohio.**  Panel Member, 1992 Annual Midwest Regional Bankruptcy Seminar.  Topic: "Staying Alive: The Art of Insolvency Practice and Business/Asset Valuation and/or Transfer Outside the Friendly Confines of the Bankruptcy Court."

**July 9:  Indianapolis, Indiana.**  Speaker, Indiana Continuing Legal Education Forum.  Topic: "The Trustee's Administration in the Out-of-Court Bankruptcy."

**June 25:  Quebec City, Canada.**  Speaker, 1992 Annual Convention of the Florida Institute of Certified Public Accountants.  Topic: "Alternative Dispute Resolution: Mediation."

**April 3:  Cincinnati, Ohio.**  Speaker, Northern Kentucky Bar Association and Chase College of Law Joint Seminar on Business in the Sour Economy.  Topic: "Negotiating Accounts Payable and the Bank – The Workout."

**March 4:  Naples, Florida.**  Speaker, National Association of Printers & Lithographers' Top Management Conference.  Topic: "Turning Around a Troubled Company: The Need for Turnaround Management."


**1991:**
**November 18:  Chicago, Illinois.**  Speaker, Monthly Meeting of the North Side Bankers Association.  Topic: "Management of Troubled Businesses."

**November 7:  New York, New York.**  Panel Member, Infocast Incorporated's Seminar on Resolving the Non-Performing Loan.  Topic: "Evaluating the Workout Situation: Business Issues and Options."

**November 4:  Chicago, Illinois.**  Panel Member, Infocast Incorporated's Seminar on Resolving the Non-Performing Loan.  Topic: "Evaluating the Workout Situation: Business Issues and Options."

**October 20 through 23:  Palm Desert, California.**  Speaker, Certified Public Accountants Associates, Inc.'s 1991 Annual Meeting.  Topic: "Bankruptcy and Debt Restructuring."

**October 17:  Los Angeles, California.**  Panel Member, Infocast Incorporated's Seminar on Resolving the Non-Performing Loan.  Topic: "Evaluating the Workout Situation: Business Issues and Options."

**August 8 and 9:  Cincinnati, Ohio.**  Speaker, 1991 Annual Midwest Regional Bankruptcy Seminar.  Topic: "Evaluating the Workout Situation: Crisis Management."

**June 14:  Chicago, Illinois.**  Speaker, Meeting of the Turnaround Management Association, Chicago/Midwest Chapter.  Topic: "Alternatives to the Bankruptcy Court."

**April 20: Miami, Florida.**  Speaker, Florida Institute of Certified Public Accountants' Annual Pot-Tax Season Sunshine Seminar.  Topic: "Analyzing Workout, Bankruptcy and Insolvency Situations" Issues, Strategies and Options."

**January 29:  Portland, Maine.**  Speaker, Industrial Energy Consumer Group's Sixth Annual Conference.  Topic: "Energy and Other Issues Affecting Maine's Ability to Compete."

**1990:**

**November 30: Tampa, Florida.** Speaker, Tampa Bay Bankruptcy Bar Association Meeting. Topic: "Managing the Workout."

**November 29: Los Angeles, California.** Panel Member, Infocast Incorporated's Seminar on Resolving the Non-Performing Loan. Topic: "Evaluating the Workout Situation: Business Issues and Options."

**November 15: Chicago, Illinois.** Panel Member, Infocast Incorporated's Seminar on Resolving the Non-Performing Loan. Topic: "Evaluating the Workout Situation: Business Issues and Options."

**November 13: New York, New York.** Panel Member, Infocast Incorporated's Seminar on Resolving the Non-Performing Loan. Topic: "Evaluating the Workout Situation: Business Issues and Options."

**September 27: Chicago, Illinois.** Panel Member, First National Bank of Chicago's Asset Management Department Professional Enhancement Day. Topic: "Know the Player: A Case Study."

**September 10 and 11: Las Vegas, Nevada.** Speaker, Certified Public Accountants Associates, Inc.'s 1990 Law Firms Seminar. Topic: "A Practical Guide to Bankruptcy & Insolvency."

**September 6: Orlando, Florida.** Speaker, Florida Institute of Certified public Accountants' 1990 Annual Accounting Show. Topic: "The Certified Public Accountant's Role in Litigation Support Services During Bankruptcy."

**June 4: Boston, Massachusetts.** Speaker, Infocast Incorporated's Seminar on Resolving the Non-Performing Loan. Topic: "Evaluating the Workout Situation: Business Issues and Options."

**April 11 through 14:** Chicago, Illinois. Speaker, 1990 Midwest Sociological Meeting, Law and Society Session. Topic: "Bankruptcy: The Road to Salvation? Myth and Reality."

**March 14: Boston, Massachusetts.** Panel Member, Sixth Annual New England Bankruptcy Law Conference '90. Topic: "Changing Debtor – Creditor Balance."

**March 1: Chicago, Illinois.** Speaker, Jenner & Block Law Firm's Periodic Transaction Group Seminar. Topic: "Workouts and Reorganizations in the Era of Failing LBOs."

**1989:**

**December 8: Palm Beach, Florida.** Speaker, American Institute of Certified Public Accountants' 1989 Conference on the Certified Public Accountant's Role in Litigation Support Services. Topic: "Bankruptcy."

**October 27:  Chicago, Illinois.**  Speaker, American Institute of Certified Public Accountants' 1989 Conference on the Certified Public Accountant's Role in Litigation Support Services. Topic: "Bankruptcy."

**October 6:  Chicago, Illinois.**  Speaker, Illinois Certified Public Accountants Foundation's 1989 Show on Midwest Accounting & Business Management.  Topic: "Bankruptcy and Assignments."

**July 11: Boston, Massachusetts.**  Speaker, American Institute of Certified Public Accountants' 1989 Conference on the Certified Public Accountant's Role in Litigation Support Services. Topic: "Bankruptcy."

**May 12:  San Francisco, California.**  Speaker, American Institute of Certified Public Accountants' 1989 Conference on the Certified Public Accountant's Role in Litigation Support Services.  Topic: "Bankruptcy."

**1988:**
**November 4:  Columbus, Ohio.**  Speaker, Ohio State University College of Law's Conference on the Case Study of an Acquisition and Working Capital Loan.  Topic: "Addressing the Issue of Management – The Control and/or Consultant Agenda."

**August 18:  Chicago, Illinois.**  Speaker, 1988 Midwest Accounting Show.  Topic: "Bankruptcies & Insolvencies: A Practical Guide."

**1987:**
**April 30:  Chicago, Illinois.**  Speaker, Joint ABC Forum Meeting on Bankruptcy: Disaster or Opportunity, presented by the Illinois Certified Public Accountants Society, the Chicago Chapter of Robert Morris Associates, and the Chicago-Midwest Credit Management Association.  Topic: "Chapter 11 and Its Alternatives for the Crippled Company."

**1984:**
**September 25:  Chicago, Illinois.**  Dinner speaker, Chicago Chapter of Robert Morris Associates.  Topic: "It's Still a Loan after Chapter 11."

**1982:**
**April 9:  Des Moines, Iowa.**  Panel Member, Midwest Sociological Society's 46th Annual Meeting.  Topic: "The Sociological Job Market."

**1981:**
**April 10:  Louisville, Kentucky.**  Speaker, Southern Sociological Society's 1981 Annual Meeting.  Topic: "Sociology for Whom?"

**April 9:  Minneapolis, Minnesota.**  Speaker, Midwest Sociological Society's 1981 Annual Convention, Law and Social Change session.  Topic: "Easin' On Down the Road: Some Social Aspects of the Continuing Evolution of the Bankruptcy Act."

**1980:**

**October 25:   Chicago, Illinois.**   Speaker, Illinois Sociological Association's 1990 Annual Meeting, Law and Social Change.   Topic: "Being Busted and Knowing It: Bankruptcy and the Redefinition of the 'Business' Self."

**1979:**

**October 27:   Springfield, Illinois.**   Panel Member, Illinois Sociological Association's 1979 Annual Meeting.   Topic: "Law and Society."

**1978:**

**October 28:   Chicago, Illinois.**   Panel Member, Illinois Sociological Association's 1978 Annual Meeting.   Topic: "Law and Society."

**August 18:   Uppsala, Sweden.**   Speaker, International Sociological Association's IX World Congress of Sociology, Urban Residential Patterns: Collective Planning and Individual Response session.   Topic: "Community Resurgence Through Economic Revitalization."

**August 14:   Uppsala, Sweden.**   Speaker, International Sociological Association's IX World Congress of Sociology, Planners, Managers and Entrepreneurs session.   Topic: "The Sociologist as Planner, Manager and Entrepreneur."

**1977:**

**October 28:   Charleston, Illinois.**   Speaker, Illinois Sociological Association's 1977 Annual Meeting, Coming Decentralization of Urban Areas – Issues, Problems and Prospects session. Topic: "How Are You Going to Keep Them Down in the City After They've Seen the Farm: The Movement Toward Urban Decentralization."

**October 28:   Charleston, Illinois.**   Participant, Illinois Sociological Association's 1977 Annual Meeting Presidential Plenary Session.   Topic: "Some Examples of Current Sociology at the University of Chicago."

**1976:**

**October 22:   Chicago, Illinois.**   Panel Member, Illinois Sociological Association's 1976 Annual Meeting.   Topic: "The Community College: Who Attends the Community College and Why."

**1974:**

**August 20:   Toronto, Canada.**   Speaker, International Sociological Association's VIII World Congress of Sociological, Internal Migration: Industrial and Post-Industrial Societies session. Topic: "Migration and the American New Town:  An Analysis of Patterns of In-Migration to New Communities."

**April 5: Omaha, Nebraska.** Speaker, Midwest Sociological Society's 38th Annual Meeting, Demography, Migration & Labor Force Issues session. Topic: "Labor Force Participation in New Communities: A Proposed Approach to New Techniques of Management."

# PUBLICATIONS

Co-authored with James A. Chatz and Catherine E. Vance. "Distressed Real Estate: Can Possible Tax Advantages Be As Simple As ABC?" *UrbanLand* 68, no. 7 (July 2009).

"A Man for All Seasons: Bill Brandt." Receivership Professional Profile in the California Receivers Forum *Receivership News,* Issue 25 (Summer 2007): 13-15.

Co-authored with R. Brian Calvert, Clare Pierce and Catherine E. Vance. "Due Diligence." In *Bankruptcy Business Acquisitions*, 2nd ed., edited by Richard Tilton, 15-1 – 15-44. Alexandria, VA: American Bankruptcy Institute, 2006.

Co-authored with Catherine E. Vance. "Deepening Insolvency and the United Kingdom's Wrongful Trading Statute: A Comparative Discussion." *Debt³* 21, no. 2 (March/April 2006): 22-24.

Co-authored with Catherine E. Vance. "A Proposed Response to International Insurance Insolvencies." Financier Worldwide Supplements' *Global Restructuring & Insolvency Review -- Overcoming Corporate Crisis: Turnaround Management & Corporate Renewal*, 2004, 27-28.

Co-authored with Catherine E. Vance. "Managing the Future of Insurance Insolvency." Institutional Investors Journals' *Turnaround Management—A Guide to Corporate Restructuring*, Spring 2004, 118-123.

"Remember When – Recollections of a Time When Aggressive Accounting, Special Purpose Vehicles, Asset-Light Companies and Executive Stock Options Were Positive Attributes." Transcript of Roundtable Discussion moderated by Mr. Robin Phelan, reported in *American Bankruptcy Institute Law Review* 11, no. 1 (Spring 2003): 1-46.

"Landlords Should Exhibit Flexibility, Avoid Bankruptcy Court Headaches." *Florida Real Estate Journal* 11, no. 1 (16-30 April 2003): 20-21.

"A View from the Turnaround Trench." *Directors & Boards*, Summer 2002, 86-88.

"Six Things to Do if You Hear from a Whistle-Blower." *Corporate Board Member* 5, no. 4 (May/June 2002): 10.

"The Zone of Insolvency: Four Rules for Living for Directors and Officers." Institutional Investors Journals' *Turnaround Management – A Guide to Corporate Restructuring*, Spring 2002, 111-114.

"What Constitutes a Success in Chapter 11?" Transcript of Roundtable Discussion moderated by the Hon. Leif M. Clark, reported in *American Bankruptcy Institute Law Review* 2, no. 2 (Winter 1994): 229-267.

Review of *The Ungovernable City: The Politics of Urban Problems and Policy Making*, by Douglas Yates. *Contemporary Sociology* 8, no. 2 (March 1979).

"A Neighborly View of Separatism: Either Way There's Something in it for the U.S." *Maclean's, Canada's Weekly Newsmagazine* 91, no. 12 (12 June 1978).
Review of *New Towns and the Suburban Dream: Ideology and Utopia in Planning and Development*, by Irving Lewis Allen. *The American Journal of Sociology* 5, no. 1 (November/December 1977).

Review of *Energy and Social Change*, by James O'Toole and the University of Southern California Center for Futures Research. *The American Journal of Sociology* 4, no. 6 (September/October 1977).

Review of *Suburbanization and the City (Conservation of Human Resources Series: Columbia University)*, by Thomas Stanback, Jr., and Richard V. Knight. *The American Journal of Sociology* 4, no. 3 (March/April 1977).

Review of *The Structure of Urban Reform: Community Decision Organizations in Stability and Change*, by Roland L. Warren, Stephen M. Rose and Ann F. Bergunder. *The American Journal of Sociology* 3, no. 10 (September 1976).

"Migration and the New Town: An Analysis of Patterns of In-Migration to New Communities." In *Internal Migration: The New World and the Third World*, ed. Anthony H. Richmond and Daniel Kubat, 284-315. London: Sage Publications, 1976.

Review of *Mergers: Motives, Effects, Policies*, by Peter O. Steiner. The *American Journal of Sociology* 5, no. 4 (May 1976).

Review of *Easter Hill Village: Some Social Implications of Design*, by Clare C. Cooper. *The American Journal of Sociology* 3, no. 2 (November/December 1975).

Review of *The Great American Blow-Up: Puffery in Advertising and Selling*, by Ivan L. Preston. *The American Journal of Sociology* 2, no. 9 (August 1975).

Review of *Innovation in New Communities*, by Brown Miller, Neil J. Pinner, and William S. Saslow. *The American Journal of Sociology* 80, no. 3 (November 1974).

## LISTINGS

Who's Who in America, 51st Edition, 1997.
Who's Who in America, 52nd Edition, 1998.
Who's Who in America, 53rd Edition, 1999.
Who's Who in America, 54th Edition, 2000.
Who's Who in America, 55th Edition, 2001.
Who's Who in America, 56th Edition, 2002.
Who's Who in America, 57th Edition, 2003.
Who's Who in America, 58th Edition, 2004.
Who's Who in America, 59th Edition, 2005.
Who's Who in America, 60th Edition, 2006.
Who's Who in America, 61st Edition, 2007.
Who's Who in America, 62nd Edition, 2008.
Who's Who in America, 63rd Edition, 2009.
Who's Who in America, 64th Edition, 2010.
Who's Who in America, 65th Edition, 2011.
Who's Who in America, 66th Edition, 2012.
Who's Who in America, 67th Edition, 2013.
Who's Who in America, 66th Edition, 2014.

K&A Restructuring Register, 2001 Edition. [Annual roster of the country's top 100 restructuring advisors.]
K&A Restructuring Register, 2002 Edition.
K&A Restructuring Register, 2003 Edition.
K&A Restructuring Register, 2004 Edition.

Who's Who in Finance and Industry, 23rd Edition, 1983-84.
Who's Who in Finance and Industry, 24th Edition, 1985-86.
Who's Who in Finance and Industry, 25th Edition, 1987-88.
Who's Who in Finance and Industry, 26th Edition, 1989-90.
Who's Who in Finance and Industry, 27th Edition, 1992-93.
Who's Who in Finance and Industry, 28th Edition, 1994-95.
Who's Who in Finance and Industry, 29th Edition, 1996-97.
Who's Who in Finance and Industry, 30th Edition, 1998-99.
Who's Who in Finance and Industry, 31st Edition, 2000-01.
Who's Who in Finance and Industry, 32nd Edition, 2001-02.
Who's Who in Finance and Industry, 33rd Edition, 2002-03.
Who's Who in Finance and Business, 34th Edition, 2004-05.
Who's Who in Finance and Business, 35th Edition, 2006-07.

Who's Who in the World, 7th Edition, 1984-85.
Who's Who in the World, 8th Edition, 1987-88.
Who's Who in the World, 9th Edition, 1989-90.
Who's Who in the World, 10th Edition, 1991-92.
Who's Who in the World, 11th Edition, 1993-94.

Who's Who in the World, 12th Edition, 1995-96.
Who's Who in the World, 13th Edition, 1996.
Who's Who in the World, 14th Edition, 1997.
Who's Who in the World, 15th Edition, 1998.
Who's Who in the World, 16th Edition, 1999.
Who's Who in the World, 17th Edition, 2000.
Who's Who in the World, 18th Edition, 2001.
Who's Who in the World, 19th Edition, 2002.
Who's Who in the World, 20th Edition, 2003.
Who's Who in the World, 21st Edition, 2004.
Who's Who in the World, 22nd Edition, 2005.
Who's Who in the World, 23rd Edition, 2006.
Who's Who in the World, 24th Edition, 2007.
Who's Who in the World, 25th Edition, 2008.
Who's Who in the World, 26th Edition, 2009.
Who's Who in the World, 27th Edition, 2010.
Who's Who in the World, 28th Edition, 2011.
Who's Who in the World, 29th Edition, 2012.
Who's Who in the World, 30th Edition, 2013.
Who's Who in the World, 31st Edition, 2014.

Who's Who of Emerging Leaders in America, 1st Edition, 1987-88.
Who's Who of Emerging Leaders in America, 2nd Edition, 1989-90.
Who's Who of Emerging Leaders in America, 3rd Edition, 1991-92.
Who's Who of Emerging Leaders in America, 4th Edition, 1993-94.

Who's Who in the Midwest, 17th Edition, 1980-81.
Who's Who in the Midwest, 18th Edition, 1982-83.
Who's Who in the Midwest, 19th Edition, 1984-85.
Who's Who in the Midwest, 20th Edition, 1986-87.
Who's Who in the Midwest, 21st Edition, 1988-89.
Who's Who in the Midwest, 22nd Edition, 1990-91.
Who's Who in the Midwest, 23rd Edition, 1992-93.
Who's Who in the Midwest, 24th Edition, 1994-95.
Who's Who in the Midwest, 25th Edition, 1996-97.
Who's Who in the Midwest, 26th Edition, 1998-99.
Who's Who in the Midwest, 27th Edition, 2000-01.
Who's Who in the Midwest, 28th Edition, 2002.
Who's Who in the Midwest, 29th Edition, 2003.
Who's Who in the Midwest, 30th Edition, 2004.
Who's Who in the Midwest, 31st Edition, 2005.
Who's Who in the Midwest, 32nd Edition, 2006.
Who's Who in the Midwest, 33rd Edition, 2007.

Who's Who in the South and Southwest, 24th Edition, 1995-96.
Who's Who in the South and Southwest, 25th Edition, 1997-98.

Who's Who in the South and Southwest, 26th Edition, 1999-2000.
Who's Who in the South and Southwest, 29th Edition, 2003.

Who's Who in American Law, 10th Edition, 1998-99.
Who's Who in American Law, 11th Edition, 2000-01.
Who's Who in American Law, 12th Edition, 2002-03.
Who's Who in American Law, 13th Edition, 2003-04.
Who's Who in American Law, 14th Edition, 2005-06.
Who's Who in American Law, 15th Edition, 2007-08.
Who's Who in American Law, 16th Edition, 2009-10.
Who's Who in American Law, 17th Edition, 2011-12.
Who's Who in American Law, 18th Edition, 2014-15.

## MOTION PICTURE AND FILM APPEARANCES

**2002:**
**February 7: New York, New York.**  Sutton 1 Theatre on East 57th Street.  Mr. Brandt was featured in the documentary film, *What Happened*, which premiered at the New York International Independent Film and Video Festival.  The film humorously depicted the rise and fall of the "dot-coms."

# EXHIBIT 2

# ITEM 5(B)

**ITEM 5(B) –** A disclosure of all prior retentions in which the applicant testified as an expert witness either in deposition or at a trial or hearing, including the title of the case, the court in which the case was pending, the attorney who retained the applicant and the subject matter of the testimony.

Over the last 40 years, Mr. Brandt has testified and/or been disposed as part of his responsibility as Chapter 11 Trustee, Chapter 7 Trustee and as financial advisor and as an expert in litigation matters. Given the sheer number of matters in which Mr. Brandt and his staff have been engaged it would simply be too burdensome to list each and every case and each and every matter in which deposition and testimony provided. Mr. Brandt and his staff often provide testimony as either consulting witness or as expert. As a fiduciary in many of his cases, Mr. Brandt is often asked to testify as to matters related to his case including sales, refinancing and plans of reorganization. To the extent the case demand, Mr. Brandt has testified on behalf of and in support many plans or reorganization.

As listed below, Mr. Brandt has been retained solely as a testify expert in several cases. As the circumstances dictate Mr. Brandt has also been appointed as Receiver, Examiner and Examiner with Expanded Powers. Given that these positions are also extraordinary remedies in which the Court or Judge has found the need for independent analysis or review, the Applicant has included a list of such cases for further consideration.

## AS EXPERT WITNESS

> ➢ Official Committee of Administrative Claimants on Behalf of LTV Steel Company, Inc. v. Bricker, et al., Case No. 05CV2158, Northern District of Ohio, Eastern Division
> ➢ Western Asbestos Company, Case No. 02-46284-T, Northern District of California, Oakland Division
> ➢ Western MacArthur Co., Case No. 02-46285-T, Northern District of California, Oakland Division
> ➢ MacArthur Co., Case No. 02-46286-T, Northern District of California, Oakland Division

## AS EXAMINER

> ➢ Abbott Products, Inc., Case No. 82B16496, Northern District of Illinois, Eastern Division
> ➢ A. Marcus Company d/b/a Rockford Tool and Hillside Tool and Equipment Warehouse, Case No. 85B01545, Northern District of Illinois Eastern Division
> ➢ T.M. Products, Co., Case No. 85-01072-BKC-AJC, Southern District of Florida
> ➢ Virtual Network Services Corporation, Case No. 86B14849, Northern District of Illinois, Eastern Division
> ➢ Phoenix, Inc., Case No. 87B03234, Northern District of Illinois, Eastern Division
> ➢ Antonio Del Grosso, Case No. 89B06606, Northern District of Illinois, Eastern Division
> ➢ Jana Broadcasting, Co., Inc., Case No. 84B04012, Northern District of Illinois, Eastern Division
> **(Examiner with Expanded Powers)**

- Sheffield Industries, Inc., Case No. 93-10224-BKC-SMW, Southern District of Florida (**Ponzi-type Investment Securities Scheme**)
- Newcare Mass Nursing, Inc., Case No. 99-44160-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Health Corporation, Case No. 99-44161-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Hospital Corporation, Case No. 99-44170-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Memorial Nursing Center, Case No. 99-44168-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Cimmerron Health Care, Inc., Case No. 99-44167-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Nursing Corporation, Case No. 99-44169-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Texas Nursing, Inc., Case No. 99-44180-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Management Corp., Case No. 99-44162-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Converse Management, Inc., Case No. 99-44175-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Shepherd Management, Inc., Case No. 99-44179-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare, Inc., Case No. 99-44178-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Whigham Health & Rehab, Inc., Case No. 99-44172-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Retirement Corporation, Case No. 99-44163-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Newcare Hospital Management Corp., Case No. 99-44176-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Ft. Valley Nursing Center, Inc., Case No. 99-44171-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Windward Nursing Center, Inc., Case No. 99-44173-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Rest a While Nursing Home, Inc., Case No. 99-44166-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Wakulla Acquisition, Inc., Case No. 99-44181-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Wakulla Manor, Inc., Case No. 99-44174-HJB, District of Massachusetts (**Examiner with Expanded Powers**)
- Emory Nursing, Inc., Case No. 99-44164-HJB, District of Massachusetts (**Examiner with Expanded Powers**)

➢ Tyler Park Place, Inc., Case No. 99-44165-HJB, District of Massachusetts
(**Examiner with Expanded Powers**)


## AS FEDERAL OR STATE COURT APPOINTED RECEIVER

➢ Chadwick Miller, Inc., District of Arizona, Phoenix Division
➢ CHL Mortgage, Case. No. C 04-02174, California Contra Costa County, Martinez Division
➢ Delta Cablevision, Case No. C 92-0096, District of Massachusetts, Eastern Division
➢ Charles Phillip Elliot, Southern District of Florida
➢ Haight Street Ventures, Case No. RG 03088748, California Alameda County, Oakland Division
➢ Mann Industries, Case No. Chancery 10448, Virginia, District of Williamsburg
➢ MDS Associates, Case No. 92-82-Civ-T21C, Middle District of Florida, Tampa Division
➢ Oregon Garden Products, Oregon State Court
➢ Reiner v. Rowen, Case No. BC 199675, California, Los Angeles County, Central Divison
➢ TMC Marketing d/b/a Millionaires Club, Southern District of Florida, Fort Lauderdale Division
➢ Union Bank v. Nissum, Case Nos. CV 042640 and CV 042652, California, Marin County
➢ Westholme Partners New Jersey, New Jersey State Court
➢ Westholme Partners Illinois, Illinois State Court
➢ Westholme Partners Florida, Florida State Court

# EXHIBIT 3

# ITEM 5(C)

**ITEM 5(C) -** A disclosure of all prior retentions of the applicant or the applicant's firm by any governmental unit, including the identity of the governmental unit and the subject matter of the retention.

- **City of Altoona, Pennsylvania** – Retained by Law Firm Stevens & Lee, LLC to serve as Co-Restructuring Coordinator on behalf of the Commonwealth of Pennsylvania's Department of Community and Economic Development.
- **City of Lauderdale Lakes, Florida** – Retained by the City Manager and approved by the City Commission.
- **State of New York, Bernard Ebbers Asset Trust** – Retained by Law Firm Katten Muchin Rosenman LLP the acting counsel for MCI/Verizon. DSI was subsequently named Trustee of the Ebbers Asset Trust by the Comptroller of the State of New York.
- **City of San Francisco, California** – Retained by the San Francisco City Attorney's Office to evaluate the City's claim against Pacific Gas & Electric Company.
- **State of Ohio, Capital Coin Fund I & II** – Retained by Special Counsel to the Ohio Attorney General and Ohio Bureau of Workers' Compensation and was designated Replacement Manager of Capital Coin Fund I and Capital Coin Fund II.
- **Roseland Community Hospital** –Retained on a pro bono basis by the Illinois Finance Authority (IFA) on behalf of the State of Illinois to oversee the Hospital's restructuring.
- **Sales Agent for Venture Portfolio** – Retained on a pro bono basis by the Illinois Finance Authority (IFA) to sell a Venture Portfolio held by the IFA, on behalf of the State of Illinois.
- **State of Michigan** – Selected by the Michigan Department of Treasury to a prequalified list of vendors to provide Restructuring and Transformational Services for potential municipal restructuring engagements
- **City of Buena Park, California** – Appointed to the City's Advisory Committee regarding their ongoing investments and participation under the proposed Bankruptcy Plan for Orange County, California.

1. **City of Altoona, Pennsylvania** – Having grown around the railroad industry, the city is currently working to recover from industrial decline and urban decentralization experienced in recent decades. DSI Civic was retained by the Pennsylvania Department of Community and Economic Development (DCED) and served as Co-Restructuring Coordinator on behalf of the commonwealth for the City of Altoona, PA and was co-leader of a team which prepared both a comprehensive operational and financial assessment, as well as a (city and court adopted) recovery plan for the city. This was followed by a third phase which implemented first ever multi-period budgetary reporting and cash-flow forecasting; selected training of city personnel; and initiation of a city-wide IT assessment.

Pennsylvania's Act 47 directs state government to provide oversight and formal partnership with municipalities experiencing financial distress to ensure that citizens continue to receive

necessary and vital services. Under Act 47 the Commonwealth appointed DSI Civic (and a law firm) as Co–Recovery Plan Coordinators for Altoona, PA. In this capacity, DSI Civic worked closely with city officials, employees, bargaining units and city departments to review operations, fiscal management, tax collection, revenue enhancements, collective bargaining agreements, operational infrastructure and financial budgeting in order to prepare a comprehensive restructuring plan aimed at creating a sustainable five-year financial plan. One of the key issues was to identify and address the declining population / tax base (especially given the large share of tax-exempt properties, which included many universities and hospitals).

The Recovery plan included over 43 initiatives focused on fiscal management, tax revenue and collections, collective bargaining, benefits, service delivery, shared services/intergovernmental cooperation and economic/community development.

2.      **City of Lauderdale Lakes, FL** – The City of Lauderdale Lakes is in Broward County, Florida. The City of Lauderdale Lakes was incorporated in June 1961, and was originally popular as a retirement area for Northeasterners, notably New Yorkers according to media reports. Many communities in Florida have experienced major losses in property tax revenues as a result of the severe reduction in property values since the 2007 recession. Lauderdale Lakes' property tax revenues have declined each year since 2007, and include a large percentage of non-paying parcels. When new City administration was selected in 2011, the City was significantly in debt to the County for public safety services and to the community redevelopment agency for loans received, and was behind on many payments to vendors. DSI Civic was retained to assist the City with an immediate budget solvency plan, cash-flow projections and, in particular, development of a five-year recovery plan to restore Lauderdale Lakes to financial health. The DSI Civic team assigned to this task consisted of John Filan, Ron Picur, Daniel Stermer, Steve Victor and Matthew Farnsworth. With their guidance, the City has taken steps to reduce operating costs (including compensation, benefits and workforce) and implement operational changes (including merging services with adjoining communities), and has identified assets for potential monetization. DSI Civic also participated in meetings with other governments and groups to discuss the cash flow schedules we had assisted in developing and vetted, as part of the County agreeing to continue providing (on a monthly basis) public safety and fire protection, while an overall financial recovery plan was being developed for presentation to the City officials, the County and other stakeholders. This entailed intense contact and presentation to elected officials and other stakeholders in the community. As a result of these actions, the City entered into a formal agreement that provides for the aggregate balance of all unpaid bills to be repaid over a five year period.

3.      **State of New York, Bernard Ebbers Asset Trust** – DSI was named as Trustee of the Ebbers Asset Trust by the Comptroller of the State of New York and MCI/Verizon. The trust became the vehicle used to wind down and dispose of all of Bernie Ebbers' personal holdings, including a number of operating businesses as well as a significant amount of real estate and other assets. This asset had a gross value in excess of $1 billion and included equity interests in

timberlands, a trucking company, sawmills, a marina, large agri-business enterprises and various other forms of real estate investments. In addition to having to negotiate with Mr. Ebbers in connection with the disposition of virtually all of these assets, this DSI engagement included sales of these businesses as well as sales of minority interests in other businesses, the refinancing of some ongoing interests, the disposition of other wholly owned assets, as well as claims negotiations, claims reconciliation and claims settlements.

4.    **City of San Francisco, CA –** DSI was hired by the San Francisco City Attorney's Office to evaluate the city's claim against Pacific Gas & Electric for damages associated with a major power blackout and enter into a major price and vendor contract negotiation with the City's major utility.  DSI reviewed and analyzed the claims, and designed the methodology and verified calculations to support the claims, which were then submitted to PG&E. In addition to claim analysis and valuation, DSI successfully negotiated a settlement of the city's claim returning a major reimbursement to the City.

5.    **State of Ohio, Capital Coin Fund I & II –** DSI was designated Replacement Management by the Ohio Attorney General and the Ohio Bureau of Workers' Compensation ("BWC") to wind down Capital Coin Fund I and Capital Coin Fund II and to recover $50 million invested in the coin funds on behalf of BWC. The BWC appointed DSI to manage the two troubled coin funds, which had been operated by Ohio coin dealer Thomas W. Noe and were the center of several major investigations by state and federal authorities, ultimately leading to more than 22 individuals pleading guilty to various felonies and misdemeanors. DSI analyzed the investments of assets and constructed a plan to ensure the highest recovery and net return to the State. DSI also investigated all potential causes of action and then supervised the resultant litigation stemming from Mr. Noe's misappropriation and mismanagement of the funds. As a result of these efforts, DSI was able to return to the State the entire $50 million investment, plus additional sums to defray the cost of the investigation and collection efforts.

6.    **Roseland Community Hospital –** DSI was retained by the Illinois Finance Authority, at the behest of the State of Illinois, to oversee the restructuring and reorganization of the financially distressed Hospital located on Chicago's Southside.  DSI undertook this engagement on a pro bono basis.

7.    **Venture Portfolio Sales Agent –** Steven L. Victor of DSI was retained on a pro bono basis by the Illinois Finance Authority (IFA) to sell a Venture Portfolio held by the IFA, on behalf of the State of Illinois.

8.    **State of Michigan, Department of Treasury –** DSI Civic was selected by the Michigan Department of Treasury to serve on a prequalified list of vendors for potential engagements related to Municipal Restructuring and Transformational Services.  At this time, DSI Civic's services have not been retained by the State to assist in any specific engagements.

9. **City of Buena Park, CA** – Geoffrey L. Berman of DSI was appointed to the City's Advisory Committee regarding their ongoing investments and participation under the bankruptcy plan proposed by the County of Orange, California.

# EXHIBIT 4
# ITEM 5(D)

**ITEM 5(D) -** A disclosure of all prior retentions of the applicant or the applicant's firm where the retention related to the retaining party's connection with a governmental unit, including the identity of the person or entity, the governmental unit and the subject matter of the retention.

- **City of Altoona, Pennsylvania** – Retained by Law Firm Stevens & Lee, LLC to serve as Co-Restructuring Coordinator on behalf of the Commonwealth of Pennsylvania's Department of Community and Economic Development.
- **City of Lauderdale Lakes, Florida** – Retained by the City Manager and approved by the City Commission
- **State of New York, Bernard Ebbers Asset Trust** – Retained by Law Firm Katten Muchin Rosenman LLP the acting counsel for MCI/Verizon. DSI was subsequently named Trustee of the Ebbers Asset Trust by the Comptroller of the State of New York.
- **City of San Francisco, California** – Retained by the San Francisco City Attorney's Office to evaluate the City's claim against Pacific Gas & Electric Company.
- **State of Ohio, Capital Coin Fund I & II** – Retained by Special Counsel to the Ohio Attorney General and Ohio Bureau of Workers' Compensation and was designated Replacement Manager of Capital Coin Fund I and Capital Coin Fund II.
- **Roseland Community Hospital** –Retained on a pro bono basis by the Illinois Finance Authority (IFA) on behalf of the State of Illinois to oversee the Hospital's restructuring.
- **Sales Agent for Venture Portfolio** – Retained on a pro bono basis by the Illinois Finance Authority (IFA) to sell a Venture Portfolio held by the IFA, on behalf of the State of Illinois.

1.      **City of Altoona, PA** – Having grown around the railroad industry, the city is currently working to recover from industrial decline and urban decentralization experienced in recent decades. DSI Civic was retained by the Pennsylvania Department of Community and Economic Development (DCED) and served as Co-Restructuring Coordinator on behalf of the commonwealth for the City of Altoona, PA and was co-leader of a team which prepared both a comprehensive operational and financial assessment, as well as a (city and court adopted) recovery plan for the city. This was followed by a third phase which implemented first ever multi-period budgetary reporting and cash-flow forecasting; selected training of city personnel; and initiation of a city-wide IT assessment.

Pennsylvania's Act 47 directs state government to provide oversight and formal partnership with municipalities experiencing financial distress to ensure that citizens continue to receive necessary and vital services. Under Act 47 the Commonwealth appointed DSI Civic (and a law firm) as Co–Recovery Plan Coordinators for Altoona, PA. In this capacity, DSI Civic worked closely with city officials, employees, bargaining units and city departments to review operations, fiscal management, tax collection, revenue enhancements, collective bargaining agreements, operational infrastructure and financial budgeting in order to prepare a comprehensive restructuring plan aimed at creating a sustainable five-year financial plan. One of

the key issues was to identify and address the declining population / tax base (especially given the large share of tax-exempt properties, which included many universities and hospitals).

The Recovery plan included over 43 initiatives focused on fiscal management, tax revenue and collections, collective bargaining, benefits, service delivery, shared services/intergovernmental cooperation and economic/community development.

2.     **City of Lauderdale Lakes, FL –** The City of Lauderdale Lakes is in Broward County, Florida. The City of Lauderdale Lakes was incorporated in June 1961, and was originally popular as a retirement area for Northeasterners, notably New Yorkers according to media reports.  Many communities in Florida have experienced major losses in property tax revenues as a result of the severe reduction in property values since the 2007 recession. Lauderdale Lakes' property tax revenues have declined each year since 2007, and include a large percentage of non-paying parcels. When a new City Administration was selected in 2011, the City was significantly in debt to the County for public safety services and to the community redevelopment agency for loans received, and was behind on many payments to vendors. DSI Civic was retained to assist the City with an immediate budget solvency plan, cash-flow projections and, in particular, development of a five-year recovery plan to restore Lauderdale Lakes to financial health. The DSI Civic team assigned to this task consisted of John Filan, Ron Picur, Daniel Stermer, Steve Victor and Matthew Farnsworth. With their guidance, the City has taken steps to reduce operating costs (including compensation, benefits and workforce) and implement operational changes (including merging services with adjoining communities), and has identified assets for potential monetization. DSI Civic also participated in meetings with other governments and groups to discuss the cash flow schedules we had assisted in developing and vetted, as part of the County agreeing to continue providing (on a monthly basis) public safety and fire protection, while an overall financial recovery plan was being developed for presentation to the City officials, the County and other stakeholders.  This entailed intense contact and presentation to elected officials and other stakeholders in the community.  As a result of these actions, the City executed a formal agreement that provides for the aggregate balance of all unpaid bills to be repaid over a five year period.

3.     **State of New York, Bernard Ebbers Asset Trust –** DSI was named as Trustee of the Ebbers Asset Trust by the Comptroller of the State of New York and MCI/Verizon. The trust became the vehicle used to wind down and dispose of all of Bernie Ebbers' personal holdings, including a number of operating businesses as well as a significant amount of real estate and other assets. This asset had a gross value in excess of $1 billion and included equity interests in timberlands, a trucking company, sawmills, a marina, large agri-business enterprises and various other forms of real estate investments. In addition to having to negotiate with Mr. Ebbers in connection with the disposition of virtually all of these assets, this DSI engagement included sales of these businesses as well as sales of minority interests in other businesses, the refinancing of some ongoing interests, the disposition of other wholly owned assets, as well as claims negotiations, claims reconciliation and claims settlements.

4.      **City of San Francisco, CA** – DSI was hired by the San Francisco City Attorney's Office to evaluate the city's claim against Pacific Gas & Electric for damages associated with a major power blackout and enter into a major price and vendor contract negotiation with the City's major utility.  DSI reviewed and analyzed the claims, and designed the methodology and verified calculations to support the claims, which were then submitted to PG&E. In addition to claim analysis and valuation, DSI successfully negotiated a settlement of the city's claim returning a major reimbursement to the City.

5.      **State of Ohio, Capital Coin Fund I & II** – DSI was designated Replacement Management by the Ohio Attorney General and the Ohio Bureau of Workers' Compensation ("BWC") to wind down Capital Coin Fund I and Capital Coin Fund II and to recover $50 million invested in the coin funds on behalf of BWC. The BWC appointed DSI to manage the two troubled coin funds, which had been operated by Ohio coin dealer Thomas W. Noe and were the center of several major investigations by state and federal authorities, ultimately leading to more than 22 individuals pleading guilty to various felonies and misdemeanors. DSI analyzed the investments of assets and constructed a plan to ensure the highest recovery and net return to the State. DSI also investigated all potential causes of action and then supervised the resultant litigation stemming from Mr. Noe's misappropriation and mismanagement of the funds. As a result of these efforts, DSI was able to return to the State the entire $50 million investment, plus additional sums to defray the cost of the investigation and collection efforts.

6.      **Roseland Community Hospital** – DSI was retained by the Illinois Finance Authority, at the behest of the State of Illinois, to oversee the restructuring and reorganization of the financially distressed Hospital located on Chicago's Southside.  DSI undertook this engagement on a pro bono basis.

7.      **Venture Portfolio Sales Agent** – DSI was retained on a pro bono basis by the Illinois Finance Authority (IFA) to sell a Venture Portfolio held by the IFA, on behalf of the State of Illinois.

# EXHIBIT 5
# ITEM 5(E)

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

City of Detroit, Michigan,

              Debtor.

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

**STATEMENT OF WILLIAM A. BRANDT, JR. IN SUPPORT OF THE**
**APPLICATION FOR ORDER, PURSUANT TO SECTIONS 327 OF**
**THE BANKRUPTCY CODE, AUTHORIZING THE EMPLOYMENT OF**
**DEVELOPMENT SPECIALISTS, INC., AS THE COURT'S EXPERT WITNESS**
**PURSUANT TO ITS APRIL 2, 2014 ORDER REGARDING THE SOLICITION OF**
**APPLICATIONS TO SERVE AS THE COURT'S EXPERT WITNESS ON THE ISSUE**
**OF FEASIBILITY**

William A. Brandt, Jr. states the following:

      1.      I submit this Statement in support of Development Specialists, Inc.'s ("DSI")

Application for Order, pursuant to Sections 327 of the Bankruptcy Code, Authorizing the

Employment of Development Specialists, Inc. as the Court's Expert Witness Pursuant to its

April 2, 2014 Order Regarding the Solicitation of Applications to Serve as the Court's Expert

Witness on the Issue of Feasibility (the "Application").  I have personal knowledge of all of the

matters set forth herein and, if called as a witness, would testify competently thereto.

      2.      I am the President of Development Specialists, Inc. ("DSI")[1], one of the nation's

oldest and most respected financial restructuring, consulting and management firms, with

offices in New York, Chicago and a number of other major American cities, as well as an office

in London.  The firm was founded in 1976, and my involvement with it and its predecessor

---

[1] Development Specialists, Inc. ("DSI") is an active Illinois corporation that provides financial restructuring, consulting and management firms.  DSI Civic Financial Restructuring, LLC ("DSI Civic") is a Delaware limited liability company that is authorized to and does transact business in Illinois and specializes in government restructuring and reorganization, government debt restructuring and finance, forensic auditing and negotiations. DSI and DSI Civic are affiliated and related, yet separate, entities who share certain personnel and resources as necessary.

practice dates to 1974. DSI routinely operates, manages, and consults "troubled businesses" on behalf of lending institutions as well as other secured parties, bondholders, shareholder committees, court-approved fiduciaries, and business owners. The firm is experienced in all aspects of insolvency and bankruptcy consulting, and regularly serves as consultants to debtors in both Chapter 7 and Chapter 11 proceedings, as well as in other fiduciary capacities such as Chapter 11 Trustee, Chapter 7 Trustee, Court-Appointed Examiner, Post-Confirmation Trustee, Federal Equity and state court receiver. Consultants from DSI have been involved in over 4,000 cases throughout the United States, Puerto Rico, the Virgin Islands, Canada and Europe.

3.      In connection with my employment with DSI, I have personally served, since 1981, in over 8,000 matters as a Chapter 11 Trustee, a Chapter 7 Trustee, an Examiner, or in similar fiduciary capacities in bankruptcy courts and in other courts in proceedings throughout the United States and Canada, as well as abroad. For more than 20 years, I served as a member of the private Panel of Trustees for the United States Bankruptcy Court for the Northern District of Illinois, as well as briefly serving as a member of the corresponding private Panel of Trustees for the Bankruptcy Court for the Southern District of Florida in the late 1980s. I believe that DSI is well qualified to serve as the Court's Expert on the issue of the feasibility of the City of Detroit's ("City" and/or "Detroit") Amended Plan of Adjustment of the City of Detroit, as may be further amended, in this case.

4.      The Court's April 2, 2014 Order, particularly Paragraph 5(e), requests "A disclosure of all present or past connections of the applicant or the applicant's firm with the City of Detroit and any of its creditors or with other professionals presenting them, or with the State of Michigan." In connection with the preparation of this Statement, DSI's professionals have conducted a review of their contacts with the Debtor, those of its creditors that receive notice in this matter ("Noticed Creditors"), other parties-in-interest (as reasonably known to

3

DSI) or their respective attorneys, that receive notice in this matter, and the State of Michigan, except as disclosed in this Affidavit. The list of the parties reviewed in annexed hereto as "Schedule 1." DSI's review, completed under my supervision, consists of a query of the Schedule 1 parties within an internal computer database containing names of individuals and entities that are present or recent former clients of DSI. In addition, the review further included querying all DSI's professionals relative to the same parties referenced above.

5. After a review of records maintained by DSI and responses from DSI's professionals, to the best of my knowledge, information, and belief, and insofar as I have been able to ascertain after reasonable inquiry, DSI does have or has had relationships with certain Schedule 1 parties. The list of Schedule 1 parties with whom DSI had or has relationships is annexed hereto as Schedule 2. Except as stated herein, DSI's relationships to these parties are in matters unrelated to these proceedings and are noted for disclosure and presented on Schedule 2 to this Affidavit. To the best of my knowledge, no services have been provided to these entities that involve their rights in this proceeding, nor does DSI's involvement in this matter compromise its ability to continue such services. DSI is willing to forego any retention or engagement that might result in a conflict of interest in this case.

6. Based on the results of the relationship search conducted to date as described above, DSI appears to have no connection with the Debtors, theNoticed Creditors, other parties-in-interest (as reasonably known to DSI) or their respective attorneys, except as disclosed in the this Affidavit. No one involved in this case or in DSI's business generally has any connection to the United States Trustee for the Eastern District of Michigan (the "U.S. Trustee") or any person employed in the Office of the U.S. Trustee in this District as relates to this matter.

7. Because of the nature of the insolvency business and its structure, relationships

<div align="center">4</div>

between DSI and many of the professional firms that may be involved in this matter, as well as many of this case's creditors, may have existed in past years and may exist in the future. Any such contacts or relationships do not relate to this bankruptcy case and thus do not create any conflicts with respect to DSI's appointment as the Court's Expert on the issue of the feasibility of the City of Detroit's ("City" and/or "Detroit") Amended Plan of Adjustment of the City of Detroit in this case. Also, DSI has performed in the past, and may perform in the future, consulting services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings. In addition, DSI has in the past, may currently and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to the Debtors and these cases. It should be noted that these relationships include involvement in a number of professional organizations, including the American Bankruptcy Institute, where I currently serve on the Commission to Study the Reform of Chapter 11 (the "Commission"). A member of DSI currently is the Chairman of the Board of the ABI and also an ex-officio member of the Commission.

8.     DSI is not a "creditor" of the Debtor within the meaning of United States Bankruptcy Code section 101(10). Further, to the best of my knowledge, information, and belief, except as disclosed herein, DSI is a "Disinterested Person," as that term is defined in Section 101(14) of the United States Bankruptcy Code. To the extent that any disclosure herein requires modification upon DSI's further analysis or as additional creditor information becomes available to DSI, DSI will file one or more supplemental declarations with the Court.

9.     Subject to the Court's approval, DSI will charge for its services on an hourly basis in accordance with its ordinary and customary hourly rates in effect on the date services are rendered. These rates are adjusted as of January 1st of each year to reflect advancing

experience, capabilities, and seniority of our professionals as well as general economic factors. In the ordinary course, DSI maintains general, daily records of time and any actual and necessary expenses incurred in connection with the rendering of services.

10.    DSI understands and will accept compensation and reimbursement of expenses in accordance with and subject to the Court's approval, Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and Orders of the Court. DSI has not shared or entered into any agreements to share: (a) any compensation that it may be awarded for its services on behalf of the Court, except as set forth herein; or (b) any compensation another person or party has received or may receive in connection with this case.

11.    No promises have been received by DSI, or any principals or agents of DSI, as to payment or compensation in connection with this case.


DATED:        Chicago, Illinois
              April 9, 2014


                                    _____ /S/ _____
                                    William A. Brandt, Jr.
                                    Development Specialists, Inc.
                                    70 W. Madison Street
                                    Suite 2300
                                    Chicago, Illinois  60602

6

# Schedule 1

## LISTING OF PARTIES REVIEWED

I.      Debtor(s)

      The City of Detroit

II.     Noticed Creditor(s)

     1983 Claimants
     36th District Court for the State of Michigan
     Ad Hoc Bondholder Committee
     Ad Hoc COPs Holders
     Advisacare Health Care Solutions, Inc.
     Amalgamated Transit Unions Local 26
     Ambac Assurance Corporation
     Assured Guaranty Municipal Corp
     Berkshire Hathaway Assurance Corporation
     Black Rock Financial Management, Inc.
     Blue Cross Blue Shield of Michigan
     Blue Care Network of Michigan
     Brooks Wilkins Sharkey & Turco PLLC
     Brown Rehabilitation Management, Inc.
     Center for Community Justice and Advocacy
     CitiMortgage, Inc.
     Citizens United Against Corrupt Government
     City of Detroit Water and Sewerage Department
     City of Detroit, Michigan
     Clifford Properties, Inc.
     Committee of Unsecured Creditors
     DEPFA Bank PLC
     Leland Prince DTE Energy Co
     Dentons US LLP
     Detroit Branch NAACP
     Detroit Entertainment LLC
     Detroit Fire Fighters Association, I.A.F.F. Local 344
     Detroit Housing Commission
     Detroit Institute of Arts
     Detroit Police Command Officers Association
     Detroit Police Lieutenants and Sergeants Association
     Detroit Police Officers Association

Detroit Retired City Employees Association
Detroit Windsor Tunnel LLC
Deutsche Bank Securities Inc.
Dexia Credit Local
Dexia Holdings, Inc.
Downtown Development Authority
Eaton Vance Management
Enjoi Transportation LLC
Erste Europaische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in
    Luxemburg SA
EverBank
Everhome Mortgage Company
FMS Wertmangagement
Federal National Mortgage Association
Fidelity Management & Research Company
Fifth Third Mortgage Company
Financial Guaranty Insurance Company
Fountain Court Consumer Housing Cooperative
Gabriel Roeder Smith & Company
General Motors LLC
General Retirement System of the City of Detroit
Genuine Parts Company
Get Back Up, Inc.
Godfrey & Kahn SC
Greektown Casino LLC
HP Enterprise Services LLC
HRT Enterprises
Hercules & Hercules Inc.
Housing is a Human Right Coalition
Hyde Park Co-Operative et al.
Hypothekenbank Frankfurt AG
Hypothkenbank Frankfurt International SA
IBM Corporation
IBM Credit LLC
Individual Creditor
International Association of Fire Fighters AFL-CIO CLC
International Business Machines Credit LLC
International Outdoor Inc.
International Union of Operating Engineers Local 324
International Union, United Automobile, Aerospace and Agricultural
Implement Workers of America
Jackie's Transport Inc.
Jeff BV-SFH LLC

8

Joliet Town Houses Cooperative Association
Kondaur Capital Corporation
Lafayette Town Houses Inc.
LaSalle Town Houses Cooperative Association
Caralyce M. Lassner
Lazard Freres & Co LLC
MGM Grand Detroit LLC
Maddin Hauser Wartell Roth & Heller, PC
Mario's Restaurant, Inc.
McAlpine PC
Merrill Lynch Capital Services Inc.
Michigan Auto Recovery Service Inc.
Michigan Bell Telephone Company dba AT&T Michigan
Michigan Council 25 of the American Federation of State, County & Municipal
        Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
Michigan Council 25 of the American Federation of State, County & Municipal
        Employees, AFL-CIO
Michigan Property Tax Relief LLC
Michigan State Conference NAACP
Michigan Inc.
National Public Finance Guarantee Corporation
New England Fertilizer Company
Nicolet Town Houses Cooperative Association
Norddeutsche Landesbank Luxembourg SA
Nuveen Asset Management
Oakland County, Michigan
Official Committee of Retirees
P.P.T.A., Inc.
Police and Fire Retirement System of the City of Detroit
Public Lighting Authority
Retired Detroit Police Members Association
Retired Detroit Police and Fire Fighters Association
Service Employees International Union Local 517M
Sprint Communications Company LP
St. James Cooperative
St. Martins Cooperative
State of Michigan
State of Michigan, Department of Attorney General
Syncora Capital Assurance Inc.
Syncora Guarantee Inc.
Syncora Holdings Ltd
T&T Management, Inc.
T-Mobile USA Inc.

9

The Bank of New York Mellon
The Chair of Saint Peter
The Kales Grand Circus Park LLC
Treasurer, City of Detroit
U.S. Bank NA
U.S. Bank National Association
UBS AG
US Health & Life Insurance Company
United States Nuclear Regulatory Commission
Upright Wrecking & Demolition LLC
Wade Trim Associates Inc.
Waste Management Inc. et al.
Wilmington Trust Company, National Association

III.    Professionals

Jones Day
Miller, Canfield, Paddock, and Stone P.L.C.
Pepper Hamilton LLP
Roman Law PLC
Barnes & Thornberg, LLP
Mintz Levin
Allard Fish PC.
Rhoades Mckeee, LLP
Cousenslaw.com
Arent Fox LLP
Schaefer & Weiner PLLC
Chadbourne & Park LLP
Dykema
Garan Lucow Miller PC
Debevoise & Plimpton
Plunkett Cooney Law firm
McDonald Hopkins
Kramer Levin Naftalis & Frankel
Steinberg Shapiro & Clark
Carson Fischer  PLC
Dib & Fagan PC
Bodman PLC
Raymond Guzall III PC
Foley & Mansfield
Loevy & Loevy
Dawda, Mann, Mulcahy & Sadler,
Vanessa G. Fluker Law

Schneiderman & Sherman PC
Paterson Law
Kilpatrick & Associates PC
Honigman Miller Schwart and Cohn LLP
Financial Law Group
Morrison & Foerster LLP
Strading Yocca Carlson & Rauth, PC
Schiff Hardin
DTE Energy
Demorest Law Firm PLLC
Nabih H. Ayad & Associates, P.C
Eman Teicher Zucker & Freedman PC
Silverman & Morris PLLC
Sheldon S. Toll PLLC
Katten Muchin Rosenman LLP
Andrew J. Gerdes PLC
Gudeman & Associates PC
Jacob & Weingarten
Ballard Spahr LLP
Orlans Associates PC
Jamie Scott Fields Attorney at Law
Trott & Trott PC
Williams Williams Rattner Plunkett
Shaw Fishman
Cohen Weiss Simon LLP
Pentiuk Couvreur & Kobijak PC
Stevenson & Bullock PLC
Morgan & Meyers PLC
Arnold & Porter LLP
Barack Ferrazzano Kirschbaum & Nagelberg LLP
Jonathan B. Frank PC
Godfrey & Kahn SC
Saschs Waldman PC
ACLU of Michigan
Maxwell Dunn PLC
Thornbladh Legal Group PLLC
Woodley & McGillvary
International Union, UAW
Osipov Bigelman PC
Lassner Law
Lippit O'Keefe PLLC
Dickinson Wright PLLC
Maddin Hauser Wartell Roth & Heller PC

McGuigan Law PLLC
McAlpine PC
Warner Norcross & Judd LLP
Cadwalader Wickersham & Taft LLC
Davis Polk & Wardwell LLP
Lowenstein Sandler LLP
Dean & Fulkerson PC
Sidley Austin LLP
Jaffe
Kerr Russell and Weber PLC
Law Offices of A. Stephen Ramadan PLC
Dentons
Brooks Wilkins Sharkey & Turco PLLC
Goodman & Hurwitz PC
B.O.C. Law Group PC
Allen Law Group PC
Resnick & Moss PC
Strobl & Sharp PC
Schneider Miller PC
Kirkland & Ellis LLP
Quinn Emanuel Urquhart & Sullivan LLP
Wolfson Bolton PLLC
Norton Rose Fulbright
Seyburn & Associates PLC
Foster Swift Collins & Smith PC
Waller Lansden Dortch & Davis LLP
McDermott Will & Emery
Gold Lange & Majoros PC
Couzens, Lansky, Fealk, Ellis, Roeder, & Lazar, P.C
Ziulkowski & Associates PLC


IV.    Other

    United States Trustee's Office - Detroit
    Barclays Capital
    United Automobile Workers

# Schedule 2

# ADDITIONAL DISCLOSURES RELATED TO PARTIES[2]

I.      Debtor(s)

        None.


II.     Noticed Creditor(s)

        **State of Michigan**
        DSI and/or its affiliate DSI Civic to submit a proposal to the State of Michigan in
        response to RFP/RFQ No. 271B430000007 as relates to "Restructuring and
        Transformational Services (Financial Review and Accounting, Benefits
        Management, Labor Management and Restructuring Option – Pre-Qualification –
        Department of Treasury and was appointed to be a prequalified list of vendors
        capable of providing municipal restructuring services in Michigan, to assist
        potentially distressed municipalities.

        **Deutsche Bank Securities Inc.**
        DSI has been involved and/or may be involved in one or more unrelated matters
        with Deutsche Bank Securities Inc. over the years.

        **Fifth Third Mortgage Company**
        DSI has been involved and/or may be involved in one or more unrelated matters
        with Fifth Third Bank over the years.

        **General Motors LLC**
        A member of DSI was formally employed by GMACCF, a subsidiary of GM.
        Further DSI's General Counsel was a member of General Motor's legal staff and
        represented General Motors after separating from General Motors.


III.    Professionals

        **Jones Day**
        DSI has been involved and/or may be involved in one or more unrelated matters
        with Jones Day over the years.

---

[2] DSI and its affiliate DSI Civic did communicate with the Debtor and various Noticed Creditors at the commencement of this proceeding relative to potential engagement on behalf of and/or to assist the Debtor and/or one or more specific Noticed Creditors. No retention(s) resulted from the communications.

13

**Pepper Hamilton LLP**

DSI has been involved and/or may be involved in one or more unrelated matters with Pepper Hamilton LLP over the years.

**Arent Fox**

DSI has been involved and/or may be involved in one or more unrelated matters with Arent Fox over the years.

**EverBank/Everhome Mortgage Company**

DSI has been involved and/or may be involved in one or more unrelated matters with EverBank/Everhome Mortgage Company over the years.

**Honigman Miller Schwart and Cohn LLP**

DSI has been involved and/or may be involved in one or more unrelated matters with Honigman Miller Schwartz and Cohn LLP over the years.

Moreover, a member of DSI was formally with Honigman Miller Schwartz and Cohn LLP

**Mintz Levin**

DSI has been involved and/or may be involved in one or more unrelated matters with Mintz Levin over the years.

**Allard Fish PC**

DSI has been involved and/or may be involved in one or more unrelated matters with Allard Fish PC over the years.

**Morrison Foerster LLP**

DSI has been involved and/or may be involved in one or more unrelated matters with Morrison Foerster LLP Schwartz and Cohn LLP over the years.

**Shaw Fishman**

DSI has been involved and/or may be involved in one or more unrelated matters with Shaw Fishman over the years.

**Norton Rose Fulbright**

DSI has been involved and/or may be involved in one or more unrelated matters with Norton Rose Fulbright Company over the years.

**Arnold and Porter**

DSI has been involved and/or may be involved in one or more unrelated matters with Arnold and Porter over the years.

**Kirkland & Ellis**

DSI has been involved and/or may be involved in one or more unrelated matters with Kirkland & Ellis over the years.

**Sidley Austin**

DSI has been involved and/or may be involved in one or more unrelated matters with Sidley Austin over the years.

**Ballard Spahr LLP**

DSI has been involved and/or may be involved in one or more unrelated matters with Ballard Spahr LLP over the years.

IV.   Other

**Barclays Capital**

A member of DSI was formally with Barclays Capital.

**United Automobile Workers**

DSI has been involved and/or may be involved in one or more unrelated matters with the United Automobile Workers over the years.

15

# EXHIBIT 6

# ITEM 5(F)

**ITEM 5(F) – Staffing Disclosure:**   A disclosure of the proposed staffing of the assignment by other members of the applicant's firm.

The team of professionals which will support William A. Brandt, Jr. in fulfilling his duties and responsibilities while serving in the role as Expert Witness, includes several former senior executives who were directly involved in municipal and state government, and who have also had long careers in the accounting and consulting professions, serving more than 75 governmental units.   Their executive experience includes Chairmanship of a State Finance Authority, Mayor of a City, Chief Executive Officer of several large urban school systems, Chief Operating Officer of a state government, Budget Director of a large city and state government, Chief Financial Officer of a large city, among other positions.   Most of these positions involved engaging with governments which were in significant financial stress (or alternatively, facing significant financial challenges) during their tenure and accordingly involved significant restructuring and turnaround initiatives.

Included among the diverse set of municipal governments served by members of our team (many of which have experienced significant financial stress and population loss not unlike Detroit) are the cities of Chicago, Pittsburg, San Francisco, Decatur and Springfield; Allegheny and DuPage Counties; the Philadelphia, Bridgeport, Chicago and New Orleans urban school districts; as well as several state governments, in a variety of capacities, including Kentucky, Indiana, Illinois, Ohio, Pennsylvania and New York.

The following table contains an overview of the team's most applicable experience:

| Individual | Relevant Experience | Page |
|---|---|---|
| William A. Brandt, Jr. | President and CEO of Development Specialists, Inc. and DSI Civic | See Exhibit 1 |
| | Managing Member of DSI Civic Financial Restructuring, LLC | |
| | Current Chairman of the Illinois Finance Authority (3 terms) | |
| | Board of Trustees, Loyola University Chicago, Illinois | |
| | National Advisory Council, Berkeley University Institute of Governmental Studies | |
| | Member of the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11 | |
| Geoffrey L. Berman | Senior Vice President Development Specialists, Inc. | Page 5 |
| | Former President of American Bankruptcy Institute | |
| | Ex Officio Member of the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11 | |
| R. Brian Calvert | Senior Vice President Development Specialists, Inc. | Page 10 |
| | Member of VALCON Advisory Board | |
| Steven L. Victor | Senior Vice President Development Specialists, Inc. | Page 14 |
| | Senior Consultant, DSI Civic Financial Restructuring, LLC | |
| | Former Act 47 Plan Co-Coordinator for the City of Altoona, Pennsylvania | |
| | Qualified Emergency Financial Manager (EFM) in the State of Michigan | |
| Robert Weiss | General Counsel of Development Specialists, Inc. | Page 20 |
| | Former Senior Partner at Honigman Miller Schwartz and Cohn LLP | |
| Paul G. Vallas | Senior Consultant, DSI Civic Financial Restructuring, LLC | Page 23 |
| | Former Superintendent, Bridgeport, Connecticut Public Schools | |
| | Former Superintendent, Recovery School District of Louisiana, New Orleans, LA | |
| | Former Chief Executive Officer, The Philadelphia School District, Philadelphia, Pennsylvania | |
| | Former Chief Executive Officer, Chicago Public Schools | |
| | Former Budget Director, City of Chicago, Illinois | |
| | Former Executive Director, Economic and Fiscal Commission, State of Illinois | |

3

| | | |
|---|---|---|
| **John Filan** | Adjunct Professor of Government, Illinois Institute of Technology (IIT), Stuart School of Business | Page 33 |
| | Former Senior Consultant, Development Specialists, Inc; Former Vice President, DSI Civic Financial Restructuring LLC; current independent contractor | |
| | Former Act 47 Plan Co-Coordinator for the City of Altoona, Pennsylvania | |
| | Former Chairman of the Comptroller's Municipal Accounting Advisory Board | |
| | Former Chief Operating Officer of State of Illinois | |
| | Former Chief Executive Officer of Illinois Finance Authority | |
| | Former Director of Office of Management and Budget | |
| | Former Managing Partner Regional CPA/Consulting firm | |
| **Daniel J. Stermer** | Vice President DSI Civic | Page 38 |
| | Mayor of City of Weston, Florida | |
| | Member – Broward County Planning Council | |
| | Former Chair – Broward Metropolitan Planning Organization (4 terms) | |
| | Former Assistant Attorney General, State of Florida | |
| | Former Special Assistant United States Attorney, Southern District of New York | |
| **Ron Picur** | DSI Civic Financial Restructuring, LLC – independent consultant | Page 44 |
| | Fiscal Policy Advisor, Governor's Office of Management and Budget, State of Illinois | |
| | Former Comptroller and Chief Fiscal Officer, City of Chicago, Illinois | |
| | Former Partner Regional CPA/Consulting Firm | |
| | Professor and Head - Department of Accounting, Professor of Finance, and Director of the Center for Governmental Accounting Research & Education, University of Illinois at Chicago | |
| | Pension Fund Trustee, Chicago Laborers, Municipal Employees, and Firemens' Annuity & Benefit Funds | |
| **William G. Brandt** | Research Analyst, Development Specialists, Inc. | Page 51 |

More detailed accounts of each team member's complete professional experience are described in the following section.

4

## GEOFFREY L. BERMAN

GEOFF BERMAN, Vice-President of DSI, joined DSI in 1997 and is located in our Los Angeles office. Prior to joining DSI, Mr. Berman was with Credit Managers Association of California for 11 years, where he was the Manager of the Adjustment Bureau and a member of the Association's senior management.

Mr. Berman is a former President of the American Bankruptcy Institute, Alexandria, VA. Mr. Berman currently serves as an Ex Officio member of the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11. He previously served as ABI's Vice President of Publications, with oversight of the ABI Journal and other publication projects and a member of ABI's Executive and Management Committees. He chaired the Task Force on General Assignments, and wrote the ABI manual on general assignments, "The ABCs of ABCs," which is now in its second edition. He also served as contributing editor and co-Executive Editor to the American Bankruptcy Institute Journal and has authored a law review article published in the ABI Law Review.

Mr. Berman brings over 35 years of experience in the extension of secured and unsecured credit and the liquidation of numerous businesses. He has expertise in all types of insolvency case administrations with a specialty in the area of general assignments for the benefit of creditors (in various businesses and industries including wholesale seafood, retail auto parts, various manufacturing concerns, wholesale nursery operations, and high tech companies) and liquidating and creditor trusts under Chapter 11 Plans of Reorganization. Mr. Berman, a certified mediator, is on the Bankruptcy Mediation Panel for the Central District of California as well as the Register of Mediators for the District of Delaware, and he has served as a Federal Court Receiver.

Mr. Berman currently serves as Trustee of the USACM Liquidating Trust, the post-confirmation estate for USA Commercial Mortgage in Las Vegas, Nevada. In that capacity, Mr. Berman is responsible for prosecuting causes of action against the principals and professionals in an effort to recover millions of dollars for the benefit of thousands of direct lenders to the company. He is also the post-confirmation trustee for the Syntax Brillian Corp. Liquidation and Lender Trusts, as established by the confirmed plan in these District of Delaware cases.

Mr. Berman has also been responsible for the administration of numerous other post-confirmation estates, including the Sizzler Restaurants International, Inc. Creditor Trust, WATTSHealth Foundation Creditor Trust (resulting from a state court conservatorship) and Horizon Natural Resources Liquidating Trust and Vista Hospital Systems. Mr. Berman has also administered the liquidation of numerous businesses through general assignments, including Howard and Phil's Western Wear, Granny Goose Foods, Inc., FHC Medical Group, Inc., Franklin Press, LLC, Medical Selfcare, Inc., Avian Farms, Inc. and Avian Farms (USA) Inc. and a number of high-tech/dot.com companies including Red Herring Communications, Inc. and

Broadband Interactive Group, Inc. In addition, Mr. Berman has served as Examiner and Federal Court Receiver.

Mr. Berman has previous experience with Union Bank (of California) and Mitsui Manufacturers Bank. He graduated with honors from the University of the Pacific, Stockton, California in 1975 with a degree in business administration (accounting and finance) and wrote an Undergraduate Honors Thesis in Finance. He also has a Juris Doctor from Southwestern University School of Law, Los Angeles, California. He is also member of the Los Angeles, Orange County and Bay Area Bankruptcy Forums and the Association of Insolvency Accountants, and is a frequent lecturer on bankruptcy and insolvency subjects.

*NOTABLE ASSIGNMENTS INCLUDE:*

- Trustee of the USA Commercial Mortgage Liquidating Trust, arising out of the largest bankruptcy in Nevada history.
- Trustee of the HNR Liquidating Trust.
- Trustee for the Syntax Brillian Corporation Lender and Liquidation Trusts.
- Overseeing DSI's role as Liquidating Trustee for the Appalachian Fuels Creditor Trust.
- Post-Confirmation Plan Administrator and sole remaining officer of Vista Hospital Systems.
- Trustee of the Sizzler Restaurants International Creditor Trust.
- Trustee of the WATTSHealth Foundation Creditor Trust.
- Oversight of hundreds of general assignments, including the largest general assignment in Maine history (Avian Farms, Inc.), Howard and Phil's Western Wear, Granny Goose Foods, Inc., FHC Medical Group, Inc., Franklin Press, LLC, Medical Selfcare, Inc. and Tmax Gear, LLC.
- Examiner – Mark and Mary Ellen Leggio.
- Federal Equity Receiver

*EDUCATION*

- University of the Pacific, Stockton, CA 1975
    - o BA – Business Administration (Accounting, Finance), Undergraduate
    - o Honors Thesis, Finance
- Southwestern University School of Law, Los Angeles, CA 1985
    - o Juris Doctorate

*EMPLOYMENT*

- Development Specialists, Inc., Los Angeles, CA 1997 – Present
- Credit Managers Association of California, Burbank, CA 1986 – 1997
- Mitsui Manufacturers Bank, Los Angeles, CA 1982-1986
- Credit Managers Association of California, Los Angeles, CA 1980 – 1982
- Union Bank (of California), Los Angeles, CA 1975 – 1980

6

*PROFESSIONAL ORGANIZATIONS*

- Organization: American Bankruptcy Institute
  - Number of Years: 20
  - President, 2011-2012
  - Member of the Board of Directors, 2002 - Present;
  - Vice President – Publications and Executive Committee (2007-2010)
  - Member of the Management Committee 2010-Present
- Organization: Association of Insolvency and Restructuring Advisors
  - Number of Years: 12
- Organization: Los Angeles Bankruptcy Forum, Orange County and Bay Area Bankruptcy Forum (California Bankruptcy Forum)
  - Number of Years: 31
- Organization: Commercial Law League of America
  - Number of Years: 6

*PUBLICATIONS*

- Co-Author, Creditors' Committee Manual (American Bankruptcy Institute Unsecured Trade Creditors Committee) (1994 and later editions)
- Editor: ABI Preference Handbook (2002)
- Author, General Assignments for the Benefit of Creditors, A Practical Guide, (American Bankruptcy Institute 2000)
- Editor, Mediation Manual (American Bankruptcy Institute 2004) Author, General Assignments for the Benefit of Creditors, the ABCs of ABCs (American Bankruptcy Institute 2006)
- Contributing Editor, Last-Line-Column, ABI Journal (2000 - 2006) Co-Executive Editor, ABI Journal (2005-2007)
- Strategic Alternatives for Distressed Businesses, West Publishing (2008, 2010); Executive Editor, contributor of chapters on General Assignments for the Benefit of creditors and on application of Assignments under California Law
- ABI Law Review Symposium, Model Rules for General Assignments for the Benefit of Creditors: The Genesis of Change, American Bankruptcy Institute Law Review, Spring 2009 (Co- author with Catherine Vance)

*ARTICLES INCLUDING*

- State Law Preference Actions: Still Alive After Sherwood Partners v. Lycos (co-author), Web posted and Copyright © December 1, 2007, American Bankruptcy Institute.
- Priority of U.S. Government Claims in Non-Bankruptcy Proceedings: The Application of 31 U.S.C.§3713, Web posted and Copyright © February 1, 2005, American Bankruptcy Institute and the American Bankruptcy Institute Journal

7

- Do "Insured vs. Insured" Exclusions Apply to Assignees in Assignments for the Benefit of Creditors? (co-author), Web posted and Copyright © February 1, 2004, American Bankruptcy Institute
- When is Contemporaneous (as in Exchange) Not Contemporaneous? Web posted and Copyright © May 1, 2002, American Bankruptcy Institute
- The Receivership Alternative"—A Response (co-author), Web posted and Copyright © August 1, 2001, American Bankruptcy Institute.
- Landlords Use Letters of Credit to Bypass the Claim Cap of §502(b) (6) (co-author), Web posted and Copyright © December 1, 2001, American Bankruptcy Institute.
- Use of the "Blanket" Security Interest for Trade Creditors in Out- of-Court Workouts, 24 CAL. BANKR. J. 297, 298 (1997)
- Common Law Assignments For the Benefit of Creditors, The Reemergence of the Non-Bankruptcy Law Alternative, 21 Cal Bankr. J. 357 (1993)

*SPEAKING ENGAGEMENTS (SINCE 2004 - SELECTED):*

- National Conference of Bankruptcy Judges 85th Annual Conference, Non- Bankruptcy Alternatives including Assignments for the benefit of creditors, Tampa, FL October 14, 2011
- American Bankruptcy Institute's 19th Annual Southwest Bankruptcy Conference, Moderator for the Judges' Panel, Las Vegas, NV, September 10, 2011\
- 35th Annual Judge Alexander Paskay – Stetson University Seminar on Bankruptcy Law and Practice, ABC vs. Chapter 11: The Use of Assignments for the Benefit of Creditors as an Alternative to Chapter 11 Cases, Tampa, FL, March 2011
- American Bankruptcy Institute 16th Annual Rocky Mountain Bankruptcy Conference, Ponzi Schemers and Their Modern Day Pursuers, Denver, CO, January 2011
- Professional Education Broadcast Network telephone seminar "Alternatives for Financially Distressed Mid-Size Businesses", January 2011
- American Bankruptcy Institute 3rd Hawai'i Bankruptcy Conference, "Real Estate Bankruptcy Cases", Kona, HI, August 2010
- Lorman Education Services, Eau Claire, WI, teleseminar, "Assignments for the Benefit of Creditors: What You Need to Know", January 2010
- American Bankruptcy Institute 17th Annual Southwest Bankruptcy Conference, "Bankruptcy Alternatives: Receiverships, Foreclosures and Workouts: In Search of a Better Way", Incline Village, NV, September 2009
- California Bankruptcy Forum Conference, "Surviving the First Weeks of a Turnaround", Coronado, CA May 2009
- National Attorneys General Training & Research Institute, "Follow The Money", Austin, TX, March 2009
- National Association of Attorneys' General, Seattle, WA, September 2008 (Bankruptcy Alternatives)

- American Bankruptcy Institute, Annual Spring Meeting, Washington, DC, April 2008 (Liquidation and Litigation Trusts: Formation, Management, Jurisdictional and Other Issues)
- Connecticut Bar Association, Bankruptcy and Insolvency Section, New Haven, CT, March 2008 (Non-bankruptcy alternatives including General Assignments)
- Financial Lawyers Conference, Los Angeles, CA, January 2008 (Non- bankruptcy Alternatives for Distressed Healthcare Entities)
- American Bankruptcy Institute, Winter Leadership Conference, Rancho Mirage, CA, December 2006 (Thinking Outside the Bankruptcy Box: Non-bankruptcy Options for Entities and Individuals after BAPCPA)
- American Bankruptcy Institute, Southeast Conference, Kiawah Island, SC, July 2005 (Is There Another Way? Assignments for the Benefit of Creditors, Receiverships and Other Alternatives to Bankruptcy)
- American Bankruptcy Institute, Annual Spring Meeting, Washington, DC, April 2005 (Post Confirmation Quagmire: Limits on Liquidating Trusts, Plan Modifications and Amendments and Practical Business Issues)

*OTHER*

- Member, Bankruptcy Mediation Panel, U.S. Bankruptcy Court, Central District of California, 1995 – Present
- Member, Registrar of Mediators, U.S. Bankruptcy Court, District of Delaware, 2003 – Present

## R. BRIAN CALVERT

BRIAN CALVERT is a vice president at Development Specialists, Inc. ("DSI") with over 25 years' experience encompassing strategic planning, operations, corporate finance, valuation, mergers and acquisitions, and complex financial restructurings. DSI is a management consulting firm offering financial advisory services to companies and has offices across the United States. Mr. Calvert has performed engagements in connection with acquisitions, divestitures, partial investments on minority and majority bases, joint ventures, settlement agreements, plan confirmation matters and determining the value impact of various strategic operating and financing decisions. He has significant international experience, has performed analyses over a broad range of industries and markets and has provided expert testimony in solvency and valuation matters. Mr. Calvert has written about off-balance sheet financing techniques and lectured extensively at various graduate schools of business in the areas of finance and creating shareholder value.

Prior to joining the firm, Mr. Calvert was with L.E.K. Consulting, a global management consulting firm specializing in corporate strategy. Mr. Calvert was primarily involved in the Executive Education Practice where he assisted companies in implementing value-based management techniques and employing sound corporate finance analysis to improve their decision-making process. He also assisted commercial banks and other financial advisors in using corporate finance analysis to understand their clients' strategies and their value creation potential, and to structure capital market solutions that addressed key client needs.

In 1997, Mr. Calvert joined the Office Products Group of General Binding Corporation ("GBC") as Vice President of Business Development. In that capacity he was responsible for all acquisitions, divestitures, and joint ventures on a worldwide basis. Additionally, Mr. Calvert led acquisition integration initiatives that included the rationalization of product lines, distribution channels, manufacturing and warehousing facilities, as well as certain personnel. Mr. Calvert was responsible for developing the Office Product Group's North American Strategic Plan and he had operating responsibility for the Group's troubled Australian operations.

Prior to joining GBC, Mr. Calvert was a Manager in the Financial and Economic Advisory Consulting Services Group of Arthur Andersen LLP. Mr. Calvert assisted clients in a variety of merger and acquisition engagements that included transaction structuring, valuation, and negotiation. Further, Mr. Calvert assisted clients in developing appropriate capital structures and in raising financing.

Before joining Arthur Andersen, Mr. Calvert was a Relationship Manager for National Bank of Detroit, providing senior debt financing to Fortune 500 and middle market companies.

Mr. Calvert has significant international experience, including an expatriate assignment in Brussels, Belgium. He has performed transaction-oriented assignments in the following

countries: Australia, The Netherlands, Belgium, New Zealand, Canada, Portugal, Denmark, Sweden, Egypt, Switzerland, France, United Kingdom, Germany, and the United States.

Mr. Calvert serves on the Advisory Board of VALCON, an annual conference that focuses on valuation issues in the context of restructurings, reorganizations and distressed sales. He has served on the board of directors of private companies in the office products manufacturing industry and the commercial printing industry as well as on the board of directors of the Lookingglass Theatre Company in Chicago. Mr. Calvert is a member of the American Bankruptcy Institute.

Mr. Calvert has been a guest lecturer and instructor at various executive education programs such as the Arthur Andersen-sponsored Korean M&A School and Business Valuation School. He has served on the faculty of the Merger Week program offered by the J.L. Kellogg Graduate School of Management at Northwestern University. Mr. Calvert has been an instructor at the American Institute of Banking and authored "The Application and Effects of In-Substance Defeasance" in The Journal of Commercial Lending and co-authored the "Due Diligence" chapter in Bankruptcy Business Acquisitions, 2d Edition, American Bankruptcy Institute 2006. He is has recently written a paper, "Company Specific Risk Premiums: Update on the Scholarly Evidence" with Professor David C. Smith of the McIntire School of Commerce at the University of Virginia.

Mr. Calvert received a Master of Business Administration from the University of Chicago's Graduate School of Business with specializations in Finance and Marketing. He also holds a Bachelor's Degree in Policy and Administration from Indiana University.

*LECTURES & PRESENTATIONS*

- California Bankruptcy Forum, 25th Annual Insolvency Conference, San Diego, California, May 17, 2013, Panelist: Wall Street: Effective Use of Financial Consultants and Experts in Chapter 11
- Commercial Law League of America, Chicago, Illinois, April 11, 2013, Panelist: Use of Turnaround Professionals in Fraudulent Conveyances and Other Avoidance Actions
- VALCON 2013, Las Vegas, Nevada, February 20, 2013, Presentation: (Expert) Report Preparation in the Context of Daubert
- VALCON 2012, Las Vegas, Nevada, February 22, 2012, Presentation: Managing Post Confirmation Issues
- VALCON 2011, Las Vegas, Nevada, February 23, 2011, Presentation: Application of Discounts and Premiums
- University of Virginia McIntire School of Commerce, Charlottesville, Virginia , February 7, 2011, Lecturer: Cost of Capital (AMCV Case Study)
- National Conference of Bankruptcy Judges (NCBJ), New Orleans, Louisiana, October 15, 2010, Presentation/Panelist: Valuing Assets in the Current Market

- VALCON 2010, Las Vegas, Nevada, February 24, 2010, Presentation: Equity Risk Premium and Small Business Risk Adjustments
- John Marshall Law School, Chicago, Illinois, Bankruptcy and Insolvency Laws Affecting Real Estate, October 22, 2009 and October 21, 2008, Lecturer: Fundamentals of Real Estate Valuation
- United States Law Firm Group, Louisville, Kentucky, October 24, 2008, Presentation: What's New in the Restructuring World (This Week)
- Bay Area Bar Association, San Francisco, California, May 13, 2008, Presentation: Trimmed Hedge Funds: How They Might Behave Differently Given Present Market Conditions
- University of Missouri School of Law, Columbia, Missouri, April 11, 2008, Lecturer: Principles of Corporate Valuation and Working with the Expert Witness
- Chicago Bar Association, Chicago, Illinois, November 6, 2007, Lecturer: Avoiding Pitfalls and Bad Opinions: Tips for Working with Experts
- National City Bank, Cleveland, Ohio, October 5, 2006, Lecturer: Collateral Concerns in an Overheated Market
- Commercial Law League of America, Chicago, Illinois, April 10, 2005, Panelist/Valuation Expert: Litigation Strategies and Evidence Presentation
- Columbia University Graduate School of Business, June 27, 2003, Lecturer: Building Turnarounds That Last
- University of Nevada, Las Vegas, William S. Boyd School of Law, Conference on Valuation of Distressed Assets, February 6-7, 2003, Presentation: Valuation at the Confirmation Hearing
- Scotia Capital, Toronto, Ontario, Corporate Banking Group, May 13-17, 2002, Instructor: Topic – Applied Corporate Finance
- SunTrust, Atlanta, Georgia, Corporate Banking Division, March 25-28, 2002, Instructor: Topic - Corporate Finance for Private Companies
- Northwestern University, Kellogg Graduate School of Management, November 11-16, 2001, May 20-May 25, 2001, Faculty - Merger Week: Creating Value Through Strategic Acquisitions and Alliances
- Société Générale, May 23, 2001, Instructor: Topic – Using Discounted Cash Flow

*RECENT EXPERT WITNESS ENGAGEMENTS*

In re: Western Asbestos Company, Western MacArthur Co. and MacArthur Co. (2003)

- Case Nos. 02-46284-T, 02-46285-T and 02-46286-T of the United States Bankruptcy Court for the Northern District of California, Oakland Division.

In re: American Classic Voyages Co., et al (2006)

- Case No. 01-10954 (KJC)

- Chapter 11 (Jointly Administered)
- Adversary Proceeding No. 03-56998 (KJC) of the United States Bankruptcy
- Court for the District of Delaware

<u>In re: Philip Grossman, M.D. and Steven Jay Price, M.D. v. Baptist Hospital of Miami, Inc. (2009)</u>

- Case No. 92-25419 CA 22 of the Circuit Court of the 11th Judicial Circuit in and for Dade County, Florida

<u>In re: Gecker v. Goldman, Sachs & Company (2009)</u>

- Case No. 07 B 06720 Adversary Proceeding No. 08 A218 of the United States
- Bankruptcy Court for the Northern District of Illinois

<u>In re: Nycal Offshore Development Corporation v. The United States (2010)</u>

- Case No. 05-249C (Senior Judge Bruggink)
- United States Court of Federal Claims

<u>In re: Post Street, LLC, a Delaware limited liability company (2011)</u>

- Case No. 11-32255 of the United States Bankruptcy Court for the Northern
- District of California, San Francisco Division

<u>In re: E-Gold Limited et al. v. Rodriguez , O'Donnell, Ross Fuerst, Gonzalez & Williams, et al. (2012)</u>

- Case No. 10-36624 CA 11 in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida

**STEVEN L. VICTOR**

STEVEN VICTOR has been a member of the professional staff of Development Specialists, Inc. ("DSI"), since 1988. While with DSI, Mr. Victor has had the opportunity to assist financially distressed entities and municipalities to work out of difficult financial situations. Mr. Victor has been with the Firm for 25 years.

In April 2011 Mr. Victor completed the Best Practices in Local Government Fiscal Management Training Program offered by Michigan State University and is a qualified Emergency Financial Manager (EFM) in the State of Michigan.

On the commercial side, Mr. Victor has administered, consulted with and/or managed both public and private organizations spanning a broad spectrum of industries. These engagements include operations and management consulting, refinancing and sale transactions and fiduciary services for formal insolvency matters and out-of-court restructuring engagements. In addition, Mr. Victor has been appointed as CEO, CFO CRO, Trustee and Administrator in a variety of circumstances including Chapter 7 Bankruptcy and Chapter 11 Bankruptcy.

As a result of the instability of the technology sector, Mr. Victor has spent a significant amount of time involved with workout situations and bankruptcies in the telecommunications and dot-com arenas. His engagements have spanned these industries, handling such areas as broadband capacity, co-location facilities, DSL providers, equipment manufacturers, retail services and telecom accounts receivable factoring.

Mr. Victor has also been appointed as a consultant for financially distressed municipalities. In those matters, Mr. Victor works closely with the elected officials, city managers and oversight committees to review debt structure, revenue and expense items. These efforts are done in concert with, and with the assistance of the existing community leadership. This approach allows DSI Civic to provide expertise and critical independent analysis to municipalities on both financial and operational issues. The ability to bring independent verification to the process leads to easier negotiations with lenders, public workers, and public unions and other state and local officials. Much of this analysis is done in order to assist the community leaders, managers and city councils identify expense cuts and revenue opportunities. In the course of these matters, Mr. Victor has also worked extensively with unions and retirees on contracts, benefits, termination and grievances.

Mr. Victor has had an opportunity to work with investigatory agencies in numerous matters involving fraud. On other occasions, Mr. Victor has been appointed as a fiduciary to manage the affairs or wind down of assets seized by the government in State and Federal receivership matters. Recently, Mr. Victor was appointed by the office of the Attorney General and the board of directors of a not for profit hospital that was purchased by a for profit entity. Mr. Victor served as CEO to wind down all of the open affairs of the hospital system and through this process, fund a newly created foundation that was created by the parties as part of a Consent

14

Order entered to approve this sale. Mr. Victor's role and his efficient wind down of the hospital allowed for the transfer of over $50 million to the new foundation. These funds and the foundation were then tasked with providing valuable and much needed health care services to the community, a particularly important issue with the loss of the not for profit hospital.

Mr. Victor's strengths include operations, management, financial analysis, budgeting, business valuations, marketing services, and resource management. His areas of expertise include telecommunications, manufacturing, real-estate, healthcare and financial services.

Mr. Victor received a Bachelor of Science degree in investment banking and real estate from the University of Illinois and a Master's degree in Business Administration from the University of Southern California.

*PROFESSIONAL QUALIFICATIONS*

Professional Fiduciary with more than 25 years' experience successfully administering and managing both public and private companies involved in high-stakes Chapter 11 and Chapter 7 bankruptcies, workouts and out-of-court liquidation proceedings. Consultant to financially-distressed businesses plus experience restructuring and reorganizing distressed municipalities.

*FIDUCIARY EXPERIENCE*

Key strengths include operations, management, financial analysis, budgeting, business valuations, marketing services and resource management. Industry expertise includes telecommunications, technology, healthcare, oil and gas, real estate and financial services.

Directed the sale of numerous debtors, including their assets, stock and/or related interests. Items sold have varied from business units and site locations to individual pieces of machinery and equipment. Managed the sale of such diverse interests as:

- Oil refineries
- Commercial real estate entities
- Steel mills
- Health care
- Mortgage brokers and portfolios
- Candy manufacturers
- Plastic injection molders
- Chemical companies
- Propane distributors

*PUBLIC COMPANY EXPERIENCE*

Significant involvement in the sale of public sector companies including the following: Rouge Steel Company, Colo.com, Pacific Gateway Exchange, Inc., Calumet Industries, Inc. and Renaissance Cosmetics, Inc.

*SERVICES PROVIDED*

Chief Financial Officer, Chief Operating Officer and Chief Restructuring Officer:

- Publicly-traded recreational vehicle manufacturer
- Not-for-profit hospital system
- Publicly-traded specialty petroleum refinery
- Three mortgage servicing companies
- International multi-debtor food diverter that was involved in South Florida's largest Ponzi fraud scheme

Provided interim management services for:

- One of the largest 7-11 franchisees in the country
- Largest manufacturer and distributor of nail polishes and artificial fingernails

Provided consulting services for:

- Numerous telecommunications-related entities
- Myriad of dot-coms
- Several printing companies
- Residential home manufacturer
- Bank
- Luxury resort
- Various contractors and retailers

*GOVERNMENT FINANCIAL RESTRUCTURING*

Through DSI Civic, a DSI affiliate provided financial advice and restructuring services to various government bodies that faced financial stress. Appointed Co Act 47 Recovery Plan Coordinator for the City of Altoona, Pennsylvania and Financial Advisor for the City of Lauderdale Lakes, FL.

*EDUCATION*

- B.S. in Investment Banking and Real Estate, UNIVERSITY OF ILLINOIS
- M.A. Business Administration, UNIVERSITY OF SOUTH CALIFORNIA
- Certificate of Completion, Emergency management training program: "Best Practices in Local Government Fiscal Management", MICHIGAN STATE UNIVERSITY

16

*BOARDS/OFFICER ROLES*

- Board Chair & Restructuring Officer, Rouge Steel Company
- Director & CEO, Victory Wind-Down Company
- Independent Director, FCL Graphics, Inc.
- Independent Director, Coso Geothermal

*COMMUNITY INVOLVEMENT*

- Chairman, Development Committee, Director and Treasurer
- Respiratory Health Association of Metropolitan Chicago, 2007-present
- Director, Executive Committee Member, Gala Co-Chair
- American Lung Association of Metropolitan Chicago, 2003-2007
- Member of Director Circle, Steppenwolf Theater, 2004-2013
- Member of Circle of Champions, Midtown Education Foundation
- Member, American Israel Public Affairs Committee (AIPAC) and its Illinois Executive Council

*PROFESSIONAL AFFILIATIONS/MEMBERSHIPS*

- American Bankruptcy Institute
- Commercial Law League of America
- California Bankruptcy Forum
- Turnaround Management Association

*SPEAKING ENGAGEMENTS*

California's Fiscal Crisis

- Sponsored by UC Berkeley Institute of Governmental Studies (IGS), Co – Producer
- Prospects for Deficit Reduction and Pension Reform in the Golden State
- September 2012

Florida State Firefighter Convention, International Association of Fire Fighters – IAFF

- Designing and Implementing Sustainable Pension Programs, June 2012

Financial Stress in Governments, Wharton School of the University of Pennsylvania

- Hosted by Fels Institute of Government
- Moderator and panelist:   Chapter 9: Hero or Goat?
- January 2012

17

The Third Annual National Municipal Bond Summit

- Panel:  Is Bankruptcy an Option
- March 30 - April 1, 2011 • Miami Beach, FL, The Fontainebleau

Licensing Executive Society, 2006 Annual Meeting

- Panel: Key Terms, Success Factors and Pitfalls in Negotiating Your Financings
- September 2006

American Bankruptcy Institute Spring Meeting

- Summary of the Bankruptcy Abuse Prevention and Consumer Protection Act
- May 2005

American Bankruptcy Institute, 2004 Workouts, Restructuring and M&A Transactions

- Alternatives:  The Dealmaker's Perspective
- Chapter 11 Financing Issues: The Current Economic Climate
- September 2004

*ARTICLES*

Institutional Investor, Tips from the Trenches

- Turnaround Managements: A Guide to Corporate Restructuring and Renewal
- Spring 2003

*BACKGROUND, ACHIEVEMENTS:*

- Financial Advisor for the City of Lauderdale Lakes
- Plan Administrator Trustee for Jillian's Entertainment Holdings, Inc.
- Chapter 11 Trustee for Kobra Properties and affiliated entities.
- Chief Restructuring Officer of Orion Refining Corporation and Rouge Industries, Inc.
- Chief Financial Officer of Summit Plastic Solutions, Contemporary Industries Corporation and Premium Sales, Inc.
- Chief Operating Officer of Calumet Industries, Commonwealth Mortgage Company and Great Lakes Telecommunications.
- Principal Advisor in numerous telecom cases, including Pacific Gateway Exchange, Network One and Blue Star Communications.
- Directed DSI actions related to Commonwealth Mortgage.
- Assumed post-bankruptcy/receivership role as Chief Financial Officer for an international multi-debtor food diverter that had been involved in southern Florida's largest Ponzi fraud scheme.

18

- Assumed operating responsibility and/or Chief Financial Officer functions for a publicly-traded recreational vehicle manufacturer, a publicly-traded specialty petroleum product refinery and a mortgage servicing company.
- Provided interim management services to one of the largest 7-11 franchisees in the country and to the market's largest manufacturer and distributor of artificial nails and nail polishes.
- Served in a consulting role for a residential home manufacturer, a bank, a luxury resort, various general contractors, retailers and printing and health care companies.
- President of MGF Acquisition Corporation in the Eurolife matter.

*CHRONOLOGY SUMMARY:*

- 1988 – Present Senior Vice President of Development Specialists, Inc.
- 2012 – Altoona, Pennsylvania
- 2011 – Lauderdale Lakes
- 2009 – Chapter 11 Trustee for Kobra Properties and affiliated entities.
- 2004 – Plan Administrator Trustee for Jillian's Entertainment Holdings, Inc.
- 2004 – Chief Restructuring Officer and Chairman of the Board of Rouge Industries, Inc.
- 2003 – Chief Restructuring Officer of Orion Refining Corporation.
- 2001 – Principal Advisor in numerous telecom and dot-com cases, including Blue Star

Communications
- 2001 – Principal Advisor in numerous telecom and dot-com cases, including Colo.com.
- 2000 – Principal Advisor in numerous telecom and dot-com cases, including Pacific Gateway

Exchange
- 1999 – President of MGF Acquisition Corporation in the Eurolife matter.
- 1998 – Chief Financial Officer of Contemporary Industries Corporation.
- 1997 – Principal Advisor in numerous telecom and dot-com cases, including Network One.
- 1997 – Chief Financial Officer of Summit Plastic Solutions.
- 1996 – Chief Operating Officer of Great Lakes Telecommunications.
- 1993 – Chief Financial Officer of Premium Sales, Inc.
- 1991 – Directed DSI actions related to Commonwealth Mortgage.
- 1991 – Chief Operating Officer of Commonwealth Mortgage Company.
- 1990 – Chief Operating Officer of Calumet Industries.
- 1988 – Master of Business Administration, University of Southern California
- 1986 – Bachelor of Science, University of Illinois

# ROBERT WEISS

ROBERT WEISS assumed the role of General Counsel of Development Specialists, Inc. ("DSI"), effective July 2012. While headquartered in DSI's New York and Chicago offices, Mr. Weiss is responsible for DSI's legal affairs throughout the country.

Before joining DSI, Mr. Weiss was a Senior Partner at the law firm of Honigman Miller Schwartz and Cohn, where he headed the firm's Commercial, Restructuring and Bankruptcy practice. A significant portion of Mr. Weiss' practice while at Honigman consisted of the representation of automotive OEMs and Tier I and II suppliers regarding financially troubled, single source, critical component suppliers.

During the course of his 30-year tenure at Honigman, Mr. Weiss led the firm's engagement in a number of major restructuring/bankruptcy matters, including the firm's assignment as one of three counsels for the debtor in the General Motors Corporation Chapter 11 bankruptcy proceedings. Prior to joining Honigman, Mr. Weiss was a member of the General Motors Corporation legal staff. Upon graduating law school, Mr. Weiss practiced briefly as a litigator in private practice in Cleveland before joining the General Motors corporation legal staff.

Mr. Weiss holds a Bachelor's degree from Yeshiva College and was awarded a J.D. with Honors from Case Western Reserve University School of Law, where he was appointed to the Order of the Coif. He is a member of the state bars of Michigan and Illinois, respectively.

*EMPLOYMENT*

Commercial Law, Bankruptcy and Reorganization Department Chair, Partner

Honigman Miller Schwartz and Cohn LLP

June 1982 – July 2012 (30 years 2 months)Detroit, MI

Emphasis of practice is the representation of varied business interests in commercial law matters, with special emphasis in the automotive sector.

The depth and breadth of his experience in the commercial business context includes representing manufacturing companies in complex commercial transactions (both within the United States and cross border) and structuring and negotiating complex commercial supply contracts over the past twenty-five years.

Was the firm's liaison partner with General Motors Corporation and led the Honigman team in its representation of GM and its affiliates throughout North America and, in particular, regarding supply chain issues and transactions.

Repeated inclusion in The Best Lawyers in America reference volume evidences Mr. Weiss' reputation among his peers.

Recognized by Chambers USA: America's Leading Lawyers for Business, 2009-2011, as one of America's leading business lawyers in the Banking and Financing field in Michigan.

Member of International Insolvency Institute

Recognized in DBusiness as a Top Lawyer for 2010 and 2011

**General Motors**

**Staff Attorney, Law Department**

General Motors

1977 – 1982 (4 years) Greater Detroit Area

*ORGANIZATIONS*

- State Bar of Michigan
- State Bar of Illinois
- Yeshiva College Board of Overseers
  - o Member of board
  - o January 2012 – Present
- Young Israel of Southfield Board of Trustees
  - o Member of board
  - o May 2013 – Present

*HONORS & AWARDS*

- Chambers USA America's Leading Lawyers, 2009-2011
  - o Chambers
  - o Recognized as one of America's leading business lawyers in the Banking and Financing field in Michigan.
  - o In 2010,the Chambers Guide states, "Robert Weiss has carved out an impressive niche advising the automotive industry on commercial law. Clients are effusive in their praise: "His advice is clear, well-reasoned and demonstrates a comprehensive grasp of the automotive industry."
- The Best Lawyers in America, 1995-2011
  - o Named 2010 Detroit Bankruptcy and Creditor-Debtor Rights Lawyer of the Year
- Michigan Super Lawyers, 2007-2011
- DBusiness Top Lawyers, 2010 and 2011
- Lawdragon, recognized as a finalist in 2010

*EDUCATION*

- Case Western Reserve University
  - o J.D., law
  - o 1972 – 1975
- Yeshiva University
  - o B.A.

## PAUL G. VALLAS

PAUL G. VALLAS joined DSI Civic in 2014, bringing considerable government experience and expertise to the group's national distressed governmental and municipal practice. Mr. Vallas is known within the education community as a turnaround expert. He has a history of reforming and rebuilding school districts in the wake of both natural and manmade disasters. In late 2011, he completed a four-year tenure as superintendent of the Recovery School District of Louisiana ("RSD"), where he played a critical leadership role in building the public school system in the wake of hurricane Katrina, and in developing a statewide school intervention system to help turn around failing schools across that state. In addition to other projects, he is now engaged in turnaround in the largest school system in Connecticut, as Superintendent of the Bridgeport Public Schools, where high school graduation rates and other indicators lag far below national averages, and do not approach national or state standards.

In New Orleans, in the aftermath of hurricane Katrina, he led the creation of the nation's first 100 percent school choice district. New Orleans parents can now select any of that city's public schools school for their children, and all school principals can recruit, and retain teachers and staff based solely on performance. As leader of the RSD, he also presided over the creation of the nation's first majority charter school district, and helped the Katrina-devastated school system secure the largest FEMA settlement for any school district in the nation's history. As a result of his stewardship, test scores have improved in every grade, in every year, at growth rates that far exceed those of the statewide average. Graduation rates have also improved every year, with New Orleans' 2012 four-year cohort graduation rate at nearly 80 percent, up from just 56 percent when he assumed responsibility for the district in 2007. This means that for the first time ever, 80 percent of New Orleans high school students are graduating on time after four years of high school. These improvements come in a district in which an excess of 80 percent of the children live below the poverty level and 90 percent are minorities. He also implemented the largest school construction program in the State of Louisiana history, and one of the largest ever in the nation.

Mr. Vallas' success in New Orleans followed his similar successes in two other troubled districts: Chicago (1995-2001) and Philadelphia (2002-2007). In both districts test scores improved every year at rates that exceeded statewide test score growth, budget deficits were eliminated and historic school construction programs were implemented. For example, in Chicago Mr. Vallas initiated reforms that saw improved reading scores every year and math scores in all but one year. Concurrently he eliminating a projected $1.25 billion budget gap, and upon his departure, left the district fiscally healthy, with more than $300 million in reserves. At the same time, he conceived and implemented the nation's largest school construction program ever at that time, in the amount of $3 billion. That program resulted in 76 new schools and the renovation of more than 350 others, in just six years.

In Philadelphia, the curriculum and instruction program Mr. Vallas designed and implemented, which remains intact today, produced a nationally unprecedented ten-years of test score growth, including the tripling of math scores and doubling of reading scores. The past decade of test score and graduation growth in Philadelphia has been among the nation's greatest for large urban school districts, when compared to state testing averages. Mr. Vallas also eliminated a large budget deficit in Philadelphia, while overseeing that district's largest school construction program ever, at more than $1.7 billion.

Mr. Vallas' success in turning around some of the largest and most troubled U.S. school districts brought him to international attention and resulted in his recruitment to help other countries rebuild and strengthen their school systems.

In 2010, concurrent with his responsibilities in New Orleans, Mr. Vallas was appointed to two international projects. In the first, he was asked to serve as a lead education consultant to the Government of Haiti ("GOH") in the wake of the January 2010 earthquake, under the auspices of the Inter-American Development Bank. In that capacity, he has worked directly with the Ministry of Education, as it strives to create a publicly a subsidized school system that will make education accessible to all of Haiti's children, including the thousands of Haitian children who have never attended school or who are currently not in school. The plan also includes the development of a national curriculum, quality professional development for Haiti's teaching workforce and the building of new schools engineered to withstand earthquakes and hurricanes. The plan has been adopted by the GOH and approved by the international donor community.

The second project came at the invitation of the Government of Chile, which asked Mr. Vallas to assume responsibility for turning around and improving test scores in 1,100 of Chile's lowest performing schools. Based on this invitation, and his work in Haiti, Mr. Vallas formed The Vallas Group, Inc. He has recruited a world class team of educational experts with specific expertise in all functional areas of education, including curriculum and instruction, teacher training and re-training, student and teacher assessments and interventions, and organizational and finance management.

Under Mr. Vallas' leadership in Santiago, enormous institutional changes were achieved, while at the same time the test scores and school leadership in the designated schools improved. Students are now provided with quality curriculum supplements and interventions, with their learning progress assessed by benchmark testing for the first time, to ensure that struggling students are provided with the extra support they need to learn. Additionally, The Vallas Group developed a model for recruiting and training more than 100 Chilean "School Improvement Teams" to assess individual school deficiencies and to develop corresponding corrective action plans. As part of the project, these teams used the Vallas model to recruit and train a school leadership team at each of the 1,100 schools. Those teams then provided support and training to the teachers in the schools, while assisting principals with implementing their corrective action plans.

Mr. Vallas' wide-ranging experience has led him to believe that any school system,

whether a domestic district or an international nationwide system, can be reformed in spite of natural or manmade disaster, troubled finances, poorly trained teachers or political and community disunity. The key to his continued success is an unwavering focus on what he has termed "The Five Essential Practices." These are: (1) ensuring that schools have superior standardized curriculum and instruction; (2) ensuring that schools are provided with comprehensive interventions to turn around failing schools, to support teachers and to help struggling students; (3) ensuring that a strategy is in place to create local school leadership teams and then using those teams to drive instruction and to facilitate year-round, site-based professional development and mentoring for teachers; (4) ensuring that school systems are organized around the critical functional areas of education, while decentralizing and streamlining the central office into a school support agency, with the resulting cost savings going directly into the classroom; and (5) ensuring that the system is effectively collecting, aggregating and sharing student performance and school data to facilitate timely provision of the appropriate interventions. Mr. Vallas requires that districts under his control implement The Five Essential Practices with fidelity, and the results have shown the wisdom of this approach in every district and/or system he has reformed.

In addition to his understanding of academics and the educational process, Mr. Vallas is known for his budgetary and organizational abilities. He teaches schools how to leverage their resources to finance needed reforms. He is also a firm believer in partnering with outside entities such as non-for-profits, NGOs, public and private universities and commercial organizations to encourage the flow of resources into the schools he oversees. His skill at developing funding resources where few existed before is based on his experience outside of the education sector.

Prior to Mr. Vallas' work in the education sector, he served as the Director of the City of Chicago's Office of Budget and Management, during which time he turned around city finances and secured bond rating upgrades, while concurrently financing the City's largest investment in infrastructure repairs and the largest expansion of public safety services in the City's history. Mr. Vallas also served as the City's Revenue Director, where he reformed the City's scandal- ridden Tax and Fee Collection Agency, while at the same time recording revenue increases. He has also held a number of prominent positions in Illinois state government, including Executive Director of the Illinois Economic and Fiscal Commission, principal policy advisor to the President of the Illinois State Senate and primary staff person assigned to both the Elementary and Secondary Education and Appropriations Legislative committees and the Illinois Senate Revenue Committee. In those positions he enjoyed considerable success in both public policy and finance, including being the architect of the nation's most successful tax amnesty program at that time, and which is now used as a model in other states.

One of Mr. Vallas' proudest achievements was the opportunity to serve 13 years in the Illinois National Guard, including three as a military instructor at the Officer Candidates School at Camp

Lincoln, Illinois. He has three sons, two who are currently serving in the military, including his oldest son who recently returned from active duty in Afghanistan as a combat medic attached to the 1st Marine Division.

*EDUCATION*

➢ Western Illinois University, Macomb, IL M.S., 1980; B.S., 1976

*PROFESSIONAL EXPERIENCE*

2014    DSI Civic Financial Restructuring, LLC

Senior Consultant

2012-2014      BRIDGEPORT PUBLIC SCHOOLS, Bridgeport, CT

Superintendent

- Recruited in December 2011 by the Connecticut Board of Education and Commissioner of Education to assist with the development of a state-operated "Turnaround District.
- Assigned to lead the management of recovery from crisis in the state's largest school district, where two-thirds of the schools were failing and the administration was facing massive teacher layoffs, school closures, increased class sizes and programmatic cuts as a result of a serious budget deficit.
- Tasked with developing and implementing a strategy, within the first five weeks, to close a 2010-2011 school-year structural budget deficit which was in excess of five- percent of the annual budget.
- Developed and implemented a comprehensive five-year financial plan. Balanced two consecutive budgets with no borrowing. Secured capital funding to reconstruct three schools and expand two elementary schools to include 7th and 8th grade.
- Developed and implemented a comprehensive, long-term, district-wide academic reform and improvement plan. Replaced 10-year old textbooks district-wide with all new language arts, math and science books. Upgraded lacking technology with smart boards and desktops for all teachers, and laptops for all high school students.
- Opened five new high schools, three inter-district science academies and one inter- district military/first responder academy.
- Established tuition-free dual enrollment and early college programs with all area higher education institutions open to eligible high school seniors.

2007-2011     RECOVERY SCHOOL DISTRICT OF LOUISIANA, New Orleans, LA
Superintendent

- Responsible for developing, implementing, and managing reform measures within the Recovery School District of Louisiana ("RSD"), the state operated school turnaround district responsible for reforming most public schools in post-hurricane Katrina New Orleans.
- Opened 22 schools and hired 500 teachers in 90 days to serve waves of students returning to New Orleans after the storm.
- Created the district that has experienced the most dramatic improvement in test scores in the nation. The gains relative to the state of Louisiana from the RSD schools alone in consecutive years were four-to-seven times the rate of the state growth, depending on the grade and subject.
- Reduced the achievement gap between African-American students in New Orleans and the state by 75%, as African-American students experienced a 17-point growth between 2007 and 2011
- Launched extended school day and extended school year program to provide students with 34% more instructional time on task than required by the state.
- Implemented reforms that created the nation's first 100% parental choice district, with all schools public, non-selective and non-profit. Gave parents the choice to choose their child's school based on quality, and gave school leaders the authority to select and promote staff based on qualifications and ability.
- Led an unprecedented school construction program that will – for the first time ever – put every public school child in New Orleans in a state of the art building.
- Secured more than $1.8 billion in FEMA and CDBG funds and negotiated a final settlement that will cover the full cost of the School Facilities Master Plan to rebuild all New Orleans public schools post-Katrina.
- Launched comprehensive restructuring of the district's high schools, supported by a nearly $6.4 million grant from the Walton Family Foundation.
- Implemented Response to Intervention (RtI) model, a three-tiered approach to ensuring the academic success of all students.
- Dramatically decreased spending on school security by almost 80%, shifting those funds to classroom instruction, while simultaneously significantly improving school climate and safety.
- Developed network of transitional and alternative schools, including transitional schools for 8th graders who are over-aged, underachieving and academically behind.
- Dramatically improved student data collection resulting in improved teacher instructional decisions and lesson planning.

Chief Executive Officer

- Responsible for developing, implementing, and managing reform measures within the School District of Philadelphia.
- Managed an operating budget in excess of $2.2 billion.
- Instituted long term financial planning, resulting in $200 million being shifted into classrooms and a structurally balanced budget for three consecutive years. More than 70% of the District's budget now directly supports classrooms.
- Implemented a data driven instructional management system in 2002, which has resulted in nine consecutive years of improved student test scores across all income and racial groups in reading (more than doubled) and math (almost tripled).
- Expanded early child programs by more than by 40% while simultaneously overhauling the quality of the programs offered.
- Standardized the curriculum and instructional models in grades pre-K through 12, and distributed all new textbooks and curriculum materials in all cores subjects to all students. The District's curriculum and academic benchmarking system is now considered second to none, driving the largest test score increases among major urban districts nationally.
- Established a teacher recruitment and retention program that increased teacher applicants threefold and resulted in fewer than a dozen teacher vacancies in an 11,000 teacher system in the 2005-2006 academic year. Raised teacher retention rates to nearly 94% and the number of fully certified teachers to more than 92%.
- Overhauled teacher professional development programs and instituted 100 hours of teacher training per year.  In addition, left a district where all teachers have access to coaches and specialized staff to support instruction in the classroom.
- Created and implemented one of the largest Extended Day and Extended Year (summer school) programs in the nation to help struggling students, as well as to offer opportunities for academic enrichment.
- Provided advanced placement and honors programs in every high school, resulting in a four-fold increase in the number of students in AP classes. Put the District on track to offer Extended Day accelerated programs by 2006-2007 and, by 2008, to house accelerated day academies in more than half of all District elementary schools.
- Phased out middle schools and created a K-8 and a 9-12 system, including the opening of 27 new small high schools. As a result, the average high school population will drop from 1,700 students to less than 800, and half will have fewer than 500 students by 2008.
- Created unprecedented school choice for parents through creation of 27 small high schools, which included more magnet and specialized schools, and gaining the approval of 60 charter schools. Additionally, increased parental and community involvement in the schools.

- Implemented and enforced one of the nation's tougher discipline policies, which included expulsion to alternative schools. In 2005-2006 serious incidents decreased by 14.4% from the previous year, including a 33% decline in "moral offenses."
- Instituted the most ambitious capital program in District history with a $1.7 billion capital plan designed to build new school and modernize existing schools.

1995-2001    THE CHICAGO PUBLIC SCHOOLS, Chicago, IL Chief Executive Officer

- Responsible for the development, implementation, oversight and management of education reform measures within the Chicago Public Schools.
- Managed an operating budget in excess of $4 billion annually.
- Hand-picked as CEO by former-Chicago Mayor Richard J. Daley to successfully implement and execute city control over Chicago Schools while working with state legislature, city council, teachers' union and business community to reform the schools.
- Initiated broad educational and operational reforms to reverse persistent failure in the schools. Some key achievements include: (1) developed and implemented after school and summer school programs that served more than 150,000 students; (2) eliminated, within the first two years, a projected four-year shortfall of $1.3 billion and balanced the system's budget each year thereafter; (3) restored financial credibility and earned thirteen bond rating upgrades by three bond agencies within a six-year period; (4) left the school system in 2001 with a $330 million budget reserve; and (5) implemented an unprecedented capital improvement program which saw 76 new buildings were erected and more than 350 existing buildings rehabilitated, thereby creating classrooms more conducive to teaching and learning.
- Iowa Test of Basic Skills scores increased nearly 14%; reading scores increased for six consecutive years, math scores increased 5 out of 6 years.
- Streamlined the system's administration by eliminating 1,700 duplicative non-teaching positions and replacing ineffective operations with privately managed services in the areas of real estate and property management, construction and repair, custodial and food services.
- Increased school accountability by ending social promotion in the face of community and political pressure.
- Personally led contract negotiation teams with the teachers union. Successfully negotiated two 4-year teacher contracts. Never had a strike or had a contract go to arbitration.

1990-2001    THE CITY OF CHICAGO, Chicago, IL

1993-1995    Budget Director, City of Chicago, IL

- Closed the City's $125 million budget gap and received the first unanimous city council vote for passage of a city budget in more than 40 years. Developed budgets that allowed the City to: (1) finance the largest capital improvement program in Chicago history which, among other items, provided for the repaving of 70% city streets; (2) establish the City's first

comprehensive affordable housing program; and (3) within a three-year period, hire an additional 1,500 police officers and built new police and fire stations.

- Structurally balanced the City's budget for three consecutive years.
- Increased the City's bond rating.

1990-1993     Revenue Director, City of Chicago, IL

- Achieved an increase in the City's bond rating.
- City revenues progressively increased each year and programs were initiated that effectively reformed the City's license and tax codes. Specific accomplishments include implementation of: (1) parking enforcement program that practically doubled Chicago's parking ticket collections; (2) an impoundment program for vehicles used in crimes; and (3) an information-sharing program with the Illinois Department of
- Revenue that assisted state tax investigations.
- Rewrote the City's tax and fee ordinances, generating record revenue increases from many of the revamped ordinances.
- Reformed the Department's audit functions to generate record collectibles from account settlements.

1980-1990     THE STATE OF ILLINOIS, Springfield, IL

1985-1990     Economic and Fiscal Commission, State of Illinois

Executive Director

- Responsible for reviewing and analyzing legislation and for assessing the legislative impact on state finances and state and local taxes as well as economic development.
- Named "The Best State Agency" the by Illinois Times.

1983-1985     Illinois State Senate

Senior Policy Advisor

- Served as policy advisor to Senate President Phillip Rock.
- Served as principal advisor to the Senate Revenue Committee and the Senate Elementary and Secondary Education and Appropriations committees.
- Played a critical role in all major education and financial initiatives during the period.

1980-1983     Illinois State Senate

Policy Advisor

- Architect of the most successful tax amnesty program in the nation's history at the time.

1980-1993     Illinois National Guard

Retired Infantry Captain; Thirteen Year's Service

- Service included three years as an instructor at Camp Lincoln Military Academy, Springfield, Illinois.

*INTERNATIONAL CONSULTING*

2010-2013     INTER AMERICAN DEVELOPMENT BANK, Washington, D.C.

Lead Education Consultant, Haiti

- Recruited to advise the Haitian Presidential Commission on Education, in post-earthquake-Haiti.
- Lead consultant to the Government of Haiti ("GOH") on the development of its plan to rebuild schools after the January 12, 2010 earthquake, and to create and implement the Country's first publicly subsidized education system, ("Plan Operationnel de Refondation du Systeme Educatif") and the National Pact for Education ("Un Pacte National pour l'Education"), including a financial management system, a standardized curriculum and instructional system, human capital pipeline and a facilities authority, and a university partnership office, among other aspects of a system.
- Developed a viable financial plan for operationalizing the reform initiative.
- Achieved approval of the plan by President Renee Preval and the Interim Haiti
- Recovery Commission on October 6, 2010.
- Work to implement the plan is currently ongoing under the administration of
- President Michel Martelly and Minister of Education Vanneur Pierre.
- Member of the Board of Directors, JP/HRO (Human Rights Organization).

2010-2011     INTER AMERICAN DEVELOPMENT BANK, Washington, D.C.

Lead Education Consultant, Chile

- Recruited by the government of Chile to advise on post-earthquake educational rebuilding strategies, and on the general condition of its educational system.
- Prepared a report assessing the strengths and weaknesses of Chile's educational system with recommendations for reform measures for grades K-12.
- Invited by the Government of Chile to work within the Ministry of Education to develop a series of comprehensive curriculum and instructional reforms to improve student academic performance in more than 1,100 of the country's lowest achieving schools.
- Recruited and managed a team of 15 educational experts to assist the Ministry with developing and implementing the reforms.
- Developed an overarching reform plan entitled "Apoyo de Compartido" including:

31

- development of a standardized curriculum; establishment of a system of value-added benchmark assessments; selection and development of academic intervention and supports; development of a local school leadership team model for the 1,100 schools in the program; and development of an organizational structure and training program for the creation of more than 100 school improvement teams.
- Work product included: production of training manuals, creation of school, principal and teacher assessments, conducted training sessions and developed a comprehensive school improvement model.

**JOHN FILAN**

JOHN FILAN is an Adjunct Professor of Government at the Illinois Institute of Technology (IIT), Stuart School of Business, was a Senior Consultant, Development Specialists, Inc., and was a Vice President with DSI Civic Financial Restructuring LLC, with concentrations in both the public and nonprofit sectors. Prior to joining DSI, Mr. Filan held several positions in state government, most recently as CEO of the Illinois Finance Authority. He has also been Chief Operating Officer (management operations, economic development, infrastructure and business regulation) and, prior to 2007, Director of the Office of Management and Budget.

In addition to his government service, for 25 years Mr. Filan led and became Managing Partner of FPT&W, Ltd., a regional accounting and consulting firm (one of Crain's Top 25), where he was also the head of its consulting practice prior to becoming the Managing Partner. The firm had an extensive public sector practice with more than 75 state and local government clients throughout the Midwest and Eastern United States. The practice subsequently merged with Crowe Horwath & Co. in 2005. Mr. Filan began his career with Price Waterhouse & Co. and later with IBM Corp.

Mr. Filan has served on the boards of the Civic Federation, the Chicago Board of Education, the Comptroller's Municipal Accounting Advisory Board (as Chair) and the Illinois Development Finance Authority, among other organizations. He also serves on the boards of Casa Central Social Services, the Chicago Sisters Cities - Galway, Ireland Council, and is active in Concern Worldwide, and also serves as a high school basketball official.

Mr. Filan has been an adjunct professor at the University of Illinois, City Colleges of Chicago and St. Xavier University. He has been a guest speaker at the City Club of Chicago, the Taxpayer's Federation, various Chambers of Commerce, the Government Finance Officers Association, the Bond Buyer and other conferences, as well as Northwestern University's Public Policy School and the National Conference of Actuaries, among other organizations and recently published an article on municipal financial stress for the Journal of Corporate Renewal of the Turnaround Management Association. He also has been a guest or panel member on many broadcast and cable news and public interest shows.

Mr. Filan has an MBA degree (Economics and Finance) from the University of Chicago, a B.S. degree (Accounting) from St. Joseph's College and continued post-graduate work in cross-cultural studies and economics at the University of Illinois and Northwestern University.

*CHRONOLOGY SUMMARY:*

- January, 2011 to 2013 – DSI Civic
- November, 2009 to January, 2011 – Consultant to Civic Committee of the Commercial Club of Chicago
- February, 2003 to October, 2009 – State of Illinois (COO and other positions)

- February, 1977 to January, 2003 – FPT&W, Ltd. – Partner (Head of Consulting Division) and Managing Partner


*PROFESSIONAL EXPERIENCE:*

- January 2011 to 2013       Vice President of DSI Civic
  - Direct the firm's national public sector consulting division through eight U.S. and international offices including marketing , promotion, media relations and interviews, conference sponsorship, conference design and joint venture partnerships in the state and local government sector
  - Responsible for project supervision, client communications and negotiations
  - Recruitment of subject matter experts for technical components of restructuring projects (e.g., infrastructure; housing; public safety; etc.)
- Dec 2009 to 2010 Independent Consultant
  - Provided strategic and financial advisory services to civic and social service organizations regarding government policies, revenues, programs and budgetary outlook
- October 2008 to November 2009 Chief Executive Officer (and Board Advisor) to ILLINOIS FINANCE AUTHORITY (IFA)
  - Directed the State's independent bonding and venture capital authority for economic development with particular emphasis on the energy, health care, agricultural and educational sectors
  - Statewide authority has a combination of conduit, moral obligation and full-faith-and-credit debt issuance authority with an outstanding debt portfolio of approximately $25 billion
  - Developed strategic direction for cooperative intergovernmental and private equity funding to expand and attract business development
  - Architect of a unique $3 billion state guaranteed loan program for renewable energy, energy efficiency and clean coal projects. Guarantees will match U. S. Department of Energy competitive loan programs. Organized and led unified Illinois Energy Team including five state universities, Argonne National Laboratory, Illinois EPA and other state agencies to determine the environmental, technical and economic viability of energy projects
- January 2007 to October 2008 Chief Operating Officer to STATE OF ILLINOIS
  - Directed the State's general economic programs including: business development, trade and investment, workforce development, infrastructure, tax policy, business regulation, environmental regulation, and higher education. Entailed oversight of the approximately 20 related state agencies that operate the above referenced programs
  - Responsible for the state's infrastructure budget for transportation, education, environment, state facilities and other capital development programs which had an outstanding debt portfolio of approximately $22 billion

34

- February 2003 to December 2006 Director, Office of Management and Budget to STATE OF ILLINOIS
  - Dec 2006 Directed preparation of the state's $45 billion operating and $10 billion capital budgets, as well as oversight of the performance measurement systems for 40 state agencies
  - Maintained the State's AA bond rating by reducing the historic accumulated deficit and increasing the pension funding ratio from 48% to 62%. Restructured 65 agencies into 46, consolidated administrative functions, reduced pension benefits for new employees and permanently reduced headcount by more than 20% which resulted in an absolute reduction in government operations spending for each of four consecutive years. These reductions facilitated expansion of children's and women's health care, early childhood education and increases in P through 12 education funding
  - Conceived and managed the consolidation of seven independent development and bonding authorities for industrial development, renewable energy, education and cultural facilities, health care, agricultural development and local government capital assistance into a single statewide bonding authority. Consolidation enabled a cohesive and focused economic development catalyst in partnership with the State's economic and regulatory programs
  - Led the consolidation of the internal audit functions for more than 50 executive branch agencies into one agency - the Illinois Office of Internal Audit (IOIA) and the chaired the first statewide
  - Internal Audit Committee. The IOIA is responsible for financial, compliance; program evaluation, investigative and special audits as assigned by the Committee, and in turn works closely with the Inspector General's office
  - Directed implementation of the state's first Shared Service Centers. Restructured 15 state agencies into two shared service centers providing accounting, budgetary, human resources, procurement and other administrative services to the departments. Also, merged four regularity agencies into one department
- 1998 to 2002 Managing Partner to FPT&W, LTD. (since merged with Crowe Horvath & Co.)
  - Co-founder of regional accounting and consulting firm (Crain's Top 25). Managed the firm's overall operations and professional services for government, higher education, non-government organizations and privately held businesses
- 1977 to 2002 Head of Consulting Practice and New Business Development to FPT&W, LTD. Representative consulting projects include:
  - Coordination of Rating Agency and Media Presentations
  - Project Management for Technology Systems
  - Tax Policy and Program Analysis for Legislative Committees
  - Establishing Fee Policies for Government Services and Programs
  - Market and Feasibility Studies

- o National Study of Centralized Technology Services
- o Requirements Analysis and Restructuring of Long-Term Debt
- o Reviewing Tax Alternatives for Diversification of Investment Portfolio
- o Restructuring of Service Delivery to provide ³One-Stop Shopping´
- o Reengineering Purchasing, Contracting and Human Resource Procedures
- o Restructuring Reporting, Scheduling and Field Procedures
- o Management of Vendor Selection and Contract Negotiations

Representative clients regarding the above projects include:
- City of Pittsburgh, Pennsylvania
- Allegheny County, Pennsylvania
- Chicago Transit Authority
- Chicago Park District
- Indiana Auditor's Office
- City of Decatur, Illinois
- City of Springfield, Illinois
- City of Evanston, Illinois
- DuPage County, Illinois
- Illinois Comptroller's Office
- Illinois State Treasurer

*OTHER PREVIOUS PROFESSIONAL EXPERIENCE:*
- Previously served as a member of the Chicago Board of Education as well as the Board of the Civic
- Federation and the Illinois Development Finance Authority.
- Early professional experience includes progressive positions with Price Waterhouse & Co. and IBM Corporation

*EDUCATION*:
- University of Chicago
- Chicago, Illinois
- Masters of Business Administration (MBA) ± Economics and Finance
- University of Illinois
- Chicago, Illinois
- Post Graduate Studies ± Economics and Cross Cultural Studies
- Northwestern University
- Evanston, Illinois
- Post Graduate Studies ± Economics and Cross Cultural Studies
- St. Joseph's College
- Rensselaer, Indiana

- Bachelor of Science (B.S.) ± Accounting

*PROFESSIONAL AND CIVIC INVOLVEMENT (Current/Former Memberships):*

Community Leadership/Board of Directors

- Chicago Area Campfire Boys and Girls
- Citizens Council on Public Aid (Medicaid)
- University of Chicago Club of Metropolitan Chicago
- Chicago Board of Education
- Comptroller's Municipal Accounting Advisory Board-Former Chair
- Circuit Court Clerks Audit Guidelines Committee
- Center for Government Accounting and Research
- The Civic Federation
- Illinois Development Finance Authority
- Wisdom Bridge Theater
- Casa Central Social Services Corporation
- Concern Worldwide, USA

Higher Education - Adjunct Professor or Guest Lecturer

- City Colleges of Chicago
- St. Xavier's College, Chicago
- University of Illinois at Chicago
- Northwestern University
- University of Chicago

Community Involvement

- City of Chicago Sister Cities – Galway Council
- Mercy Home for Boys and Girls
- Chicago Area Technical Assistance Providers
- Chicago Public Schools Principal For A Day Program
- Archdiocese of Chicago - Lend a Shoulder Program
- Illinois High School Association Basketball Official

# DANIEL J. STERMER

DANIEL J. STERMER joined DSI in 2009, bringing with him more than 20 years of private and public sector experience. Mr. Stermer has been appointed as fiduciary by both state and federal courts to liquidate a variety of businesses. In addition, he has acted as advisor to others appointed as the fiduciary, where he has managed the day-to-day operations of receiverships, assignment and other estates, coordinated and assisted the estates' legal, accounting and other professionals, investigated the estates' interest in or ownership of assets, and managed the recovery and disposition of those assets. He has also coordinated claims processes and analysis and consulted and strategized with clients regarding potential and ongoing governmental investigations and prosecutions.

Mr. Stermer currently serves as Mayor of the City of Weston (Florida), being elected without opposition in November 2012.  Since his election in 2012, Mr. Stermer has been appointed to the Broward County Planning Council, selected to serve as Vice Chair of the Broward League of Cities Ethics Task Force, selected to serve on an Ad Hoc Affordable Housing Committee comprised of representatives from Broward County, the Broward County Planning Council, and the Broward League of Cities, and selected to continue to serve on the Oversight Committee for the Implementation of the Interlocal Agreement for Public School Facility Planning.

Mr. Stermer previously served as a Commissioner for the City of Weston (Florida) from 2002 through 2010, leaving office due to term limits.  Mr. Stermer served on and was elected Chair of the Broward Metropolitan Planning Organization for four terms, rose to become the First Vice President of the Broward League of Cities, served as Chairperson of the Broward League of Cities Sustainability Committee for three years, and served on the Oversight Committee for the Implementation of the Interlocal Agreement for Public School Facility Planning, Broward County, Florida.  During Mr. Stermer's terms in office, the City of Weston achieved a Triple A rating from Standard and Poor's and Moody's, consistently had the lowest ad valorem tax rate in Broward County, and maintained reserves in excess of $50MM.

Mr. Stermer led the DSI Civic team engaged by a Florida municipal government which was in severe financial distress.  DSI Civic provided a strategic and operational review, financial assessments, and recommendations regarding restructuring public safety services and asset financing, as well as a review and renegotiation of existing debt obligations, and is currently preparing a multi-year financial recovery/action plan.

Before joining the private sector, Mr. Stermer served in the Economic Crimes Litigation Unit of the Florida Attorney General's Department of Legal Affairs, where he commenced and participated in all facets of civil enforcement pre-complaint investigations and litigation, including bankruptcy litigation, related to Florida's Deceptive and Unfair Trade Practices Act and Racketeering Influenced Corrupt Organizations Act, from the inception of investigation through trial. While with the Office of the Bronx County, New York, District Attorney's office,

Mr. Stermer served as Special Assistant United States Attorney in the Organized Crime Unit and as Assistant District Attorney in a federally-funded task force prosecuting high-volume narcotics trafficking and related violent crime.

Among his fiduciary appointments, Mr. Stermer is the Receiver for the Hess Kennedy Receivership Estate; a matter commenced by the Florida Attorney General's Office against a number of entities who were supposed to provide debt settlement and debt consolidation services to over 90,000 consumers across the country but did not. As Receiver, Mr. Stermer has obtained in excess of $150 million in debt forgiveness for consumers, trade line deletions for more than 15,000 consumers, and has conducted an extensive claims procedure including more than 20,000 submitted claims providing distributions of over 30.5% to Approved Claimants.

Mr. Stermer received his Juris Doctor degree in 1988 from Touro College, Jacob D. Fuchsberg Law Center and his Bachelor of Arts from State University of New York at Binghamton in 1984. As an adjunct professor at St. Thomas University School of Law, Mr. Stermer regularly teaches "Receivership Practice and the Inter-Relationships between the Legal, Accounting, and Business Worlds" and his professional and community involvement includes his participation in local bar associations and the Florida Fiduciary Forum.

*PROFESSIONAL EXPERIENCE*

DEVELOPMENT SPECIALISTS, INC., 2009 – Present, Consultant

Appointed by Federal and State Courts as fiduciary to liquidate a variety of businesses and as trustee. Assist and manage Court-appointed fiduciary, including, but not limited to, receivers, trustees, and assignees for the benefit of creditors, in carrying out all aspects of their duties and responsibilities. Areas of responsibility include, but are not limited to: day to day operation of receivership/trusteeship/assignment; coordinate and assist professionals of receiver/trustee/assignee, including but not limited to legal counsel, accountants, and other professionals; investigate and determine what assets are estate property; recovery and disposition of assets of the estate; and coordinate claims process, including but not limited to, creation of process and analysis of claims. Consult and strategize with clients with regard to potential/ongoing governmental investigations/prosecutions.

LEWIS B. FREEMAN & PARTNERS, INC., 2000 – 2009, Principal

Appointed by Federal and State Courts as fiduciary to liquidate a variety of businesses and as trustee. Assist and manage Court-appointed fiduciary, including, but not limited to, receivers, trustees, and assignees for the benefit of creditors, in carrying out all aspects of their duties and responsibilities. Areas of responsibility include, but are not limited to: day to day operation of receivership/trusteeship/assignment; coordinate and assist professionals of receiver/trustee/assignee, including but not limited to legal counsel, accountants, and other professionals; investigate and determine what assets are estate property; recovery and disposition

of assets of the estate; and coordinate claims process, including but not limited to, creation of process and analysis of claims. Consult and strategize with clients with regard to potential/ongoing governmental investigations/prosecutions.

OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS, STATE OF FLORIDA, 1996 – 2000, Assistant Attorney General

Economic Crimes Litigation Unit

Commence and participate in all facets of civil enforcement pre-complaint investigations and litigation related to Florida's Deceptive and Unfair Trade Practices Act and Racketeering Influenced Corrupt Organizations Act, from inception of investigation through trial; coordinate, participate, and work with federal/state/local law enforcement actions and prosecutions; commence and participate in litigation in the United States Bankruptcy Court for the Southern District of Florida.

OFFICE OF THE BRONX COUNTY DISTRICT ATTORNEY, 1988 -1996, Special Assistant United States Attorney - Southern District of New York

Organized Crime Unit

Cross-designated for a federal/state investigation/prosecution that has resulted in thirteen pleas of guilty and two convictions after trial; initiated original state prosecution.

Assistant District Attorney

Major Case Narcotics Investigation Unit/Housing Task Force/Narcotics Bureau/Appeals Bureau

Selected to serve in federally funded task force prosecuting high volume narcotics trafficking and related violent crime, including homicide, occurring in public housing projects; authorize and draft search warrants; debriefed confidential informants; and investigated street gangs.

Participated in all facets of extensive litigation, from pretrial motions and hearings to felony judge and jury trials; including sale of narcotics to undercover police officers and possession of guns and drugs; voir dire, witness examination, expert witness testimony, and summations; presentation of cases to the Grand Jury; conducted extensive plea bargaining with judges and attorneys; and handling of multiple cases simultaneously in an effective, expeditious manner.

Researched, briefed and argued in excess of twenty-five cases before Appellate Division, First Department; litigated federal habeas corpus petitions in the Southern District of New York; litigated post-judgment motions, extradition and rendition proceedings, Article 78 petitions and mental competency law, during which witnesses were often presented.

*EDUCATION*

Juris Doctor       1988

Touro College, Jacob D. Fuchsberg Law Center - Huntington, New York

Bachelor of Arts       1984

State University of New York at Binghamton - Binghamton, New York

*CERTIFICATIONS AND LICENSES*

| | | |
|---|---|---|
| Federal: | Southern District of New York | 1989 |
| | Eastern District of New York | 1989 |
| State: | New York | 1989 |
| | Florida | 1995 |

*ELECTED OFFICE*
City of Weston

Mayor

- ➢ November 2012 – November 2016 – Elected Unopposed
- ➢ Appointed to serve on Broward County Planning Council
- ➢ Appointed to serve at Vice Chair – Broward League of Cities Ethics Task Force
- ➢ Appointed to serve on Ad Hoc Committee regarding Affordable Housing comprised of representatives from Board of County Commissioners, Broward County Planning Council, and Broward League of Cities

City of Weston, Commissioner

- ➢ September 2002 – November 2010 – Term Limited Out of Office
- ➢ First Elected in 2002 Special Election and Re-Elected in 2003 and 2006 (unopposed)
- ➢ Elected Chair of Broward Metropolitan Planning Organization – 2007/2008 – 2008/2009 – 2009/2010 – 2010/2011
- ➢ Elected Vice Chair of Broward Metropolitan Planning Organization – 2005/2006 and 2006/2007
- ➢ Designated to serve as Weston's representative to the Metropolitan Planning Organization
- ➢ Elected First Vice President of the Broward League of Cities – 2010/2011
- ➢ Elected Second Vice President of the Broward League of Cities – 2009/2010
- ➢ Elected Secretary of the Broward League of Cities – 2008/2009

41

- ➢ Appointed Chairperson of the Broward League of Cities Sustainability Committee 2007/2008 - 2008/2009 – 2009/2010
- ➢ Appointed Chairperson of the Broward League of Cities Transportation Committee 2006/2007
- ➢ Designated to serve as Weston's representative on the Broward League of Cities Board of Directors
- ➢ Appointed to serve on The Oversight Committee for the Implementation of the Interlocal Agreement for Public School Facility Planning, Broward County, Florida
- ➢ Member of the Broward League of Cities Growth Management Committee

*MEMBERSHIP AND COMMUNITY INVOLVEMENT*

- ➢ Adjunct Professor – St. Thomas University School of Law (Fall 2006, Fall 2007, Fall 2009)
  - o Receivership Practice and the Inter-Relationships Between the Legal, Accounting, and Business Worlds
- ➢ General Counsel – Weston Business Chamber/Greater Fort Lauderdale Chamber of Commerce
- ➢ President – Broward Professional Alliance (2006/2007)
- ➢ Personnel Vice President – B'Nai Aviv (2002 – 2004)
- ➢ American Bankruptcy Institute
- ➢ Broward County Bar Association
- ➢ Bankruptcy Bar Association of the Southern District of Florida
- ➢ Central Florida Bankruptcy Law Association
- ➢ Tampa Bay Bankruptcy Bar Association
- ➢ Northern District of Florida Bankruptcy Bar Association
- ➢ B'Nai Brith Justice Unit
- ➢ Program Chair - Florida Receivers Forum (2006 – 2009)
- ➢ Executive Committee/Steering Committee – Florida Fiduciary Forum (2009 – Present)
- ➢ Member - The Florida Bar, Business Law Section, Bankruptcy/UCC Committee – Receivership Study Group (2010 - Present)
- ➢ Member – The Florida Bar, Business Law Section, Bankruptcy/UCC Committee – Assignment for the Benefit of Creditors Study Group (2010 – Present)
- ➢ Member – The Florida Bar, Business Law Section, Bankruptcy/UCC Committee – Municipal Financial Distress Study Group (2013)

*AWARDS AND RECOGNITION*

- ➢ 2014 South Florida Legal Guide – Tope CPAs and Financial Professionals
- ➢ 2013 South Florida Legal Guide – Top CPAs and Financial Professionals
- ➢ 2012 South Florida Legal Guide – Top CPAs and Financial Professionals
- ➢ 2009 Daily Business Review – Most Effective Lawyers: South Florida
- ➢ Broward League of Cities - President's Award – 2006/2007

- ➢ B'Nai Aviv – President's Award – 2004
- ➢ Broward County Young Democrats – Trailblazer of the Year Award - 2003
- ➢ United States Department of Justice – Drug Enforcement Administration – Certificate of Appreciation – 1995

*SPEAKING ENGAGEMENTS*

- Office of the Attorney General – State of Florida – July 2013, Consumer Protection Summer Conference, Receivership Panel
- Turnaround Management Association – May 2013, Government Budgets and Related Issues
- Florida State Firefighter Convention, International Association of Fire Fighters – IAFF, Designing and Implementing Sustainable Pension Programs, June 2012
- Office of the Attorney General – State of Florida – June 2012, Economic Crimes Litigation Unit Summer Conference, Injunction/Asset Freeze/Receivership Panel
- The 4th National Municipal Bond Summit – March 2012, The Politics of Restructuring
- Financial Stress in Governments, Wharton School of the University of Pennsylvania, Hosted by Fels Institute of Government, Basics of Restructuring: What a Restructured Government Might Look Like, January 2012
- The Florida Bar – Business Law Section – Bankruptcy/UCC Committee - August 2010, Hot Topics in Assignment for the Benefit of Creditors Since the 2007 Amendments

*FIDUCIARY MATTER AND OTHER HIGHLIGHTS*

Mr. Stermer currently serves as Receiver for the Hess Kennedy Receivership Estate, a matter commenced by the Florida Attorney General's Office alleging deceptive and unfair trade practice act violations against a number of debt settlement and debt consolidation entities which failed to provide services as promised to more than 90,000 consumer clients nationwide. As Receiver, Mr. Stermer has obtained in excess of $150 million in debt forgiveness for consumers, tradeline deletions for more than 15,000 consumers, and has conducted an extensive claims procedure including more than 20,000 submitted claims, resulting in a $0.305-per-Approved-Claimant distribution.

Mr. Stermer also currently serves as Assignee for the benefit of creditors, in state court liquidation proceedings, of Global Bullion Exchange, LLC, and an affiliated entity that were involved in a Ponzi scheme involving the sale of precious metals and coins to consumers across the country. The United States Attorney's Office prosecuted the principal of Global, resulting in a term of incarceration of 151 months in addition to entry of a restitution order in excess of $17.4 million.

## RONALD D. PICUR

RONALD D. PICUR is an independent consultant with DSI Civic. He has a long career in government accounting and finance, and is a nationally recognized expert in property tax systems, debt management, pension funding analysis, and has extensive experience in multi-year budget forecasting. Mr. Picur's career includes partnership in a leading regional accounting and consulting firm with over one hundred public sector clients (including many counties and cities). Mr. Picur was also the Comptroller and Chief Fiscal Officer for the City of Chicago from 1985-1989. Throughout his career Mr. Picur has been a Professor of Accounting and Professor of Finance at the University of Illinois at Chicago and served for a number of years as the Department Head as well as Director of the Center for Governmental Accounting Research and Education.

Recent representative projects have included budgetary and debt management services to the State of Illinois Governor's Office of Management and Budget (GOMB); budgetary and pension disclosure services to the Securities and Exchange Commission (SEC); and multi-year forecasting for the State of Illinois, the City of Chicago, the Chicago Public Schools, the Chicago Park District, and the cities of Lauderdale Lakes, Florida and Altoona, Pennsylvania.

Mr. Picur is a recognized expert and has worked extensively in the following areas:

- Debt Management as a financial structuring advisor for over $40 billion of government debt issuance.
- Rating Agency Communications including extensive presentations to all major agencies as well as investors.
- Multi-Year Financial Forecasting with emphasis in recognizing how to measure variability of specific revenues and expenditures.
- Budget Monitoring & Control Systems for many state and local governments.
- Cash Flow Analysis as a necessary part of cash management during downturns in revenue.
- Pension Funding including liability forecasting, funding gaps, pension benefit restructuring, and contribution analysis.
- Capital Budgeting System including infrastructure assessment and debt affordability determination.
- Performance Measurement and Performance Budgeting based on service outcomes and peer comparisons.

Mr. Picur holds a B.S.B.A degree in Accounting, an M.S. degree in Accounting and Information Systems and has a Ph.D. degree in Accounting and a minor Systems Analysis all from Northwestern University. He is a CPA and Certified Government Finance Manager (CGFM).

Mr. Picur has served as a National Technical Advisor to the Government Finance Officers Association's (GOFA) national committees on Budgeting & Management and Debt Management, as well as a member of the Governmental Accounting Standards Board's (GASB)

Task Force on Economic Condition Reporting, and Measurement Focus/Basis of Accounting Financial Reporting Issues (which ultimately led to GASB 34). Mr. Picur has also been a member of the American Accounting Association, the Association of Government Accountants, and the Art Institute of Chicago and has authored or co-authored more than thirty academic research and professional publications.

PROFESSIONAL POSITIONS & BACKGROUND

- FISCAL POLICY ADVISOR, State Of Illinois, Governor's Office of Management & Budget (GOMB): 2003-present
- Debt Management: Provided fiscal advisory services on over $26 billion in State of Illinois debt including Pension Obligation Bonds (taxable), General Obligation Bonds and Notes, Build Illinois Bonds; developed Debt Management and SWAP Policies; prepared financial information sections and cash flows in official statements; served as State of Illinois representative on international "Road Show" presentations for the $10 billion Pension Obligation Bond; advised on development of a Debt Affordability Model; advised on replacement of Lehman Brothers as swap counterparty; conducted due diligence reviews on various debt issuances; and participated in pricing calls and issuer deliberations.
- Securities & Exchange Commission Inquiry: Assisted in preparation of the State's response to the SEC's non-public inquiry regarding communications by the State relating to the financial effects of statutory pension reforms on Illinois public pensions, including potential savings or reductions in State contributions to the Illinois public pensions.
- Rating Agency Communications: Developed strategies, plans, materials and formal presentations to communicate the State's overall fiscal position to rating agencies including participation in formal meetings and ongoing communications; serve in an ongoing communications role for the State with all three agencies.
- Multi-Year Financial Forecasts:  Prepared multi-year forecasts and various sensitivity analyses including impact of alternate policy options to address potential deficits.
- FY2004-FY2015 Operating and Capital Budgets: Strategized and coordinated preparation of key budget documents including conceptualization and design of significantly revised Operating and Capital Budgets that subsequently received the GFOA's Distinguished Budget Award (the first time in the State's history); participation in budget deliberations and negotiations with all caucuses of Illinois General Assembly; designed and implemented a Budget Tracking System used in budget negotiations; prepared various budget summaries including tables, graphs and charts for media communications.
- Pension Funds: Assisted in communications, meetings and hearings of the Governor's Pension Commission regarding pension abuses within Illinois PERS and potential revisions that resulted in a series of benefit reforms embodied in PA94-4; prepared summary tables, graphical illustrations and narrative discussions of pension reforms for communication to media, legislators and rating agencies; Developing alternate scenarios and options for revisions of benefits to current annuitants and employees.

45

- Budgetary & Financial Reporting: Designed and structured a Budget Reporting Systems (reflecting both cash and budget bases) as well as development of Quarterly Financial Reports for public disclosure purposes; prepared financial reports to the National Association of State Budget Officials (NASBO) and the National Council of State Legislatures (NCSL).
- Budget Monitoring & Control Systems: Conceptualized and implemented the Revenue Tracking, Expense Monitoring and Variance Analysis reporting systems, as well as reserve and allotment procedures.
- Revenue Forecasting & Monitoring: Developed a semi-monthly revenue tracking system to monitor performance versus budget; Serve as advisor and member of the Governor's Commission of Economic Advisors (CEA) charged with providing advice and counsel on revenue forecast incorporated in the Governor's introduced budget.
- Governmental Accounting: Advised on accounting treatment and Comprehensive Annual Financial Report (CAFR) presentations regarding alternate GAAP accounting choices – for revenue and expenditure recognition – including preparation of policy papers and pro forma financial reports.
- Fiscal Communications & Presentations: Participated in editorial board meetings, rating agency presentations, legislative committee hearings and newspaper background briefings; provided technical support to Press Office and media communications for the Governor's Office of Management and Budget.
- Specialized Analyses: Conducted Gross Receipts Tax (GRT) analyses, Tax burden & equity analyses, Cash Flow analyses for G.O. Notes, and pension funding alternate scenarios.
- Gaming Analyses: Reviewed and analyzed alternate scenarios for expansion of gaming at existing and new facilities within Illinois including testing sensitivity of results to key assumptions; reviewing and vetting of "Racino" proposals; participated in various negotiating sessions with industry representatives.
- Special State Funds Database and Analyses: Conceptualized and designed a database and financial reporting system (including an administrative charge-back sub-system) used for budgeting, monitoring and cash flow analysis for approximately 600 special revenue, trust and agency funds utilized by the State.
- Illinois Department of Transportation Capital Budgeting System: Structured a budgeting and reporting system to integrate IDOT's multi-year capital plan with cash flow data to facilitate debt issuance planning.
- Illinois Department of Transportation – Public Transportation Division: Analyzed proposed budget and increased fare proposal for the CTA; conducted sensitivity analyses and projections of fuel costs given changes in crude oil market prices; drafted Op Ed pieces for Governor's Office.
- Due Diligence of Illinois State Tollway Financing Plan: Vetted feasibility and traffic studies, plan of finance, multi-year forecasts encompassing traffic, revenue and expense projections, sensitivity analyses, debt financing and rating agency presentations.
- Due Diligence and Financial Analyses For State Agencies: ISAC, IHFA and IFA.

- Strategic Planning and Performance Measurement: Assisted in structuring overall program, process and performance measures for Governor's Office encompassing all state agencies.
- Performance Budgeting and Budgeting for Outcomes: Assisted in design of a performance-based budgeting system and incorporating BFO in the annual operating budget.

PRESIDENT, Fiscal Advising, Consulting & Strategizing, Inc. (FACS, Inc.): 2003 to present

Consulting Expert & Expert Witness:
- Securities & Exchange Commission: Regarding Official Statement financial disclosures by states and state agencies for: (a) Project budgeting, accounting and completion status disclosure in the matter of the SEC vs. the Massachusetts Turnpike Authority (the "Big Dig"), and (b) Pension funding status and offering statement disclosures in the matter of the SEC vs. the State of New Jersey. Participated in a Continuing Education program to SEC's Municipal Securities and Public Pension Unit speaking on "Pension Overview & Offering Statement Disclosures."
  - o DLA Piper: Regarding competency, accuracy and compliance with professional standards for outsourced services encompassing budgeting, accounting and financial reporting.
  - o Mayer Brown: Regarding TIF-district allocations and accounting charges.
  - o Goodkind Labaton Rudoff & Sucharow, LLP: Regarding accounting practices, materiality thresholds, compliance with Accounting Series Releases, and net asset valuation reporting by a publicly traded mutual fund in its prospectus.

Workouts for Financially-Distressed Municipalities:

- Lauderdale Lakes, Florida: Reviewed and assessed multiple financial factors that resulted in the city declaring a "financial emergency" under Florida's Local Government Entity – Financial Emergency Act; Developed multi-year projections of revenues, expenditures, cash and accounts payable which was incorporated into the city's Financial Action Plan, subsequently approved by the Florida Inspector General, as required by the Act; Supported review of the Plan by the Broward County Auditor General leading to a work-out of unpaid liabilities for public safety services provided by the County, which triggered the "financial emergency" declaration.
- Altoona, Pennsylvania: Reviewed and assessed multiple financial factors leading to the city declaring "financial distress" under Pennsylvania's Act 47: "Municipal Financial Recovery Act" as a member of the Act 47 Coordinator Team; Incorporated same into the Recovery Plan which was subsequently accepted by the state's Department of Commerce and Economic Development and the Altoona City Council; Developed multi-year financial forecasts of revenues and expenditures and prepared budgetary, pension funding, revenue enhancement, cash flow and other recommendations.

Interim Budget Reporting and Monitoring for the Chicago Public Schools

- Director of the Office of Management & Budget: Conceptual design and implementation of a monthly budget reporting system including year-to-date variance analyses (actual vs. budget), as well as monthly projections of financial results for the remainder of the fiscal year to provide monitoring information for Senior Management and the Board.

Budget Analyses and Revenue Forecasts for Chicago Transit Authority

- Chairman of the Board's Office: Analyses, comments and options regarding operating and capital budgets prepared by President's Finance Department; Develop volume estimates and revenue projections (to subsidize regional public transportation) for conversion of Chicagoland expressway lanes into toll lanes including congestion pricing.

PARTNER, FPT&W, Ltd (now Crowe Horwath): 1991-2003

- Responsibilities: Practice area encompassed financial advisory and debt management; long-term financial planning including multi-year forecasting; operating, capital and performance budgeting; cash and treasury management; enterprise resource planning systems selection and installation; and GASB 34 services.
- FA Services: Chicago Park District, the Chicago Public Schools and DuPage County as well as to a series of Illinois municipalities. These FA engagements represented in excess of $1.5 billion in various forms of debt instruments encompassing GO bonds, Limited obligation bonds, alternate revenue bonds, revenue bonds, TIF bonds, tax anticipation warrants, and variable rate debt including SWAP's and Auction Rate Notes. Picur also served as project manager and prepared a Fiscal and Economic Indicator Report for Cook County that was targeted to rating agencies and the investment community. That report subsequently received the Achievement Award from the National Association of County Officials (NACO).

COMPTROLLER AND CHIEF FISCAL OFFICER, City of Chicago: 1985 to 1989.

- Responsibilities: Debt management; preparation of the Comprehensive Annual Financial Report; receipt and disbursement of all City funds; coordination of external financial and compliance audits; and overall management of the public finance, real estate, risk and benefits management, and internal audit functions.
- Debt Management: $4 billion in debt issuances encompassing a broad scope of obligation types, financing instruments (including variable rate demand notes and bonds as well as associated liquidity instruments) and funding purposes. The bond ratings of the City were increased by both major agencies reflecting in part such financial improvements as a multi-year Fiscal and Economic Indicator Report, interim financial statements, and accounting policy and control directives.
- Taxpayers' Advocate Office: Established in 1986, the Office counseled more than 10,000 homeowners and conducted workshops throughout Chicago.
- Pension Fund Trustee: Chicago Laborers, Municipal Employees, and Firemens' Annuity & Benefit Funds. Led a movement toward incorporating various "good government" provisions

48

into the State Pension Code, including requirements for formal adoption of annual budgets and independent audits.

*PROFESSOR EMERITUS OF ACCOUNTING, University of Illinois at Chicago: 1978-2006*

- Professor of Accounting
- Professor of Finance
- Head, Department of Accounting
- Interim Head, Department of Finance
- Director, The Center for Governmental Accounting Research and Education (CGARE)

*OTHER PROFESSIONAL POSITIONS:*

- Fiscal Consultant, Office of Budget and Management of Chicago, 1985-1987
- Assistant Professor of Accountancy, University of Illinois at Urbana-Champaign, 1973-1977
- Research Consultant and Project Director, American Hospital Association, 1972-1973
- Instructor and Lecturer, Northwestern University, 1969-1973

*ACADEMIC BACKGROUND*

- Ph.D. degree from Northwestern University, 1973, major in Accounting and a minor in Systems Analysis
- M.S. degree from Northwestern University, 1971, major in Accounting and Information Systems
- B.S.B.A. degree from Northwestern University, 1968, major in Accounting
- CPA certificate from Illinois, 1978
- Certified Governmental Finance Manager (CGFM), 1998

*PROFESSIONAL ASSOCIATIONS*

- Advisor, Government Finance Officers Association: National Committee on Governmental Debt & Fiscal Policy, 2001-2007
- Advisor, Government Finance Officers Association:  National Committee on Budgeting & Management, 1994-2000
- Technical Advisor, Government Finance Officers Association:  Debt Management (1999) and Budgeting (2000) Exams, both components of the GFOA's Certified Public Finance Officers Program.
- Member, Governmental Accounting Standards Board's Task Force on Economic Condition Reporting, 2002-2003
- Member, Governmental Accounting Standards Board's Service Efforts and Accomplishments Advisory Board , 1987-1992

- Member, Governmental Accounting Standards Board's Advisory Group on Measurement Focus/Basis of Accounting Financial Reporting Issues (which ultimately led to GASB 34), 1988-1989
- Member, Illinois State Comptroller's Local Government Advisory Board, 1991-1994
- Other Memberships and Professional Positions Held: The American Accounting Association, the Association of Government Accountants, the Illinois Certified Public Accountants Society, the Financial Executives Institute, the Art Institute of Chicago (Trustee)

**WILLIAM G. BRANDT**

WILLIAM G. BRANDT joined DSI in March of 2012. During his tenure he has been directly involved in project management and objective analysis for numerous engagements in both the public and nonprofit sectors. Additionally, he has provided support, in the areas of both operations and finance, to ongoing DSI and DSI Civic engagements including Municipal Financial Recovery Plans, Chapter 11 reorganizations, Chapter 7 liquidations and Assignments for the Benefit of Creditors.

Mr. Brandt has earned a Master's in Human Resource Management from Loyola University Chicago and is currently enrolled in the school's MBA program with an expected graduation date of May, 2014.

*CHRONOLOGY SUMMARY*
- March 2012 to Present – Research Analysts, Development Specialists, Inc.
- 2014 – Master of Business Administration, Loyola University Chicago
- 2012 – Master of Science in Human Resource Management, Loyola University Chicago
- 2010 – Communications Coordinator, Illinois Gov. Pat Quinn's Gubernatorial Campaign
- 2010 – Press/Communications Intern, William J. Clinton Foundation
- 2009 – Bachelor of Arts, University of San Francisco

*EDUCATION*

- Loyola University Chicago, Chicago, IL, Master of Business Administration, 2014
- Loyola University Chicago, Chicago, IL, Master of Science in Human Resources 2012
- University of San Francisco, San Francisco, CA, Bachelor of Arts & Sciences, 2009

*PROFESSIONAL EXPERIENCE*

2012 – Present Development Specialists, Inc., Chicago, Illinois
Research Analyst

- Researched potential engagement opportunities and drafted client proposals and responses to RFPs/RFQs
- Supported consultants and forensic accountants in performing in-depth analysis of client's financial statements and various internal documents
- Assisted in the writing, editing, and submission of consultative reports for financially distressed municipalities
- Researched and distributed information on current and potential clients, including analysis of comprehensive annual financial reports, ongoing media coverage, and demographic and statistical information
- Monitored project invoices from consultants and contractors for budgetary planning purposes

2010 Quinn for Illinois, Gubernatorial Campaign, Chicago, IL
Communications Coordinator

- Served as a member of the Governor's advance team for public events, interviews, and public appearances
- Complied daily reports monitoring press coverage of the Illinois gubernatorial election and Quinn campaign
- Assisted in the writing, editing, and releasing of essential campaign communication materials such as press releases, constituent correspondence, candidate questionnaires, and official statements
- Compiled and distributed opposition research reports to campaign staff
- Orchestrated campaign events by coordinating logistics, issuing press credentials, and controlling media access
- Contacted various media outlets to respond to campaign coverage and arrange interviews with the Governor

2010 The William J. Clinton Foundation, New York, NY

Press/Communications Intern

- Compiled daily news clips to be distributed to the former President and entire Clinton Foundation staff
- Served as the Foundation's first point of contact for media requests, official statements, interviews, and information
- Researched relevant materials from online databases, in-print media sources, and official studies to support staff in informing the writing, editing, and releasing of press releases, media advisories, official statements, talking points, and speeches
- Assisted in preparing event and travel briefings for the former President's speaking engagements and international trips

# EXHIBIT 7

# ITEM 5(G)

**ITEM 5(G)** - A disclosure of the proposed fees to be charged and a proposed budget of fees and expenses.

| Staff Member | Budgeted Hours | Hourly rate | | Total Estimated Fees |
|---|---|---|---|---|
| William A. Brandt, Jr. | 350.00 | $ | 675 | $ 236,250 |
| Geoffrey L. Berman | 30.00 | $ | 560 | $ 16,800 |
| Robert Weiss | 20.00 | $ | 610 | $ 12,200 |
| John Filan [**] | 600.00 | $ | 435 | $ 261,000 |
| Paul Vallas | 200.00 | $ | 435 | $ 87,000 |
| Steven L. Victor | 350.00 | $ | 570 | $ 199,500 |
| Daniel J. Stermer | 280.00 | $ | 435 | $ 121,800 |
| R. Brian Calvert | 200.00 | $ | 570 | $ 114,000 |
| Ronald D. Picur [**] | 380.00 | $ | 410 | $ 155,800 |
| Subject Matter Experts [***] | 380.00 | $ | 325 | $ 123,500 |
| William G. Brandt | 700.00 | $ | 95 | $ 66,500 |
| Consultants | 740.00 | $ | 275 | $ 203,500 |
| **Total** | **4,230.00** | | | **$ 1,597,850** |

| Expenses | |
|---|---|
| Air | $ 80,000.00 |
| Local Transportation | $ - |
| Hotel & Lodging | $ 90,000.00 |
| Meals | $ 20,000.00 |
| Misc. | $ - |
| **Total Expenses** | **$ 190,000.00** |

| The hourly rate ranges for other DSI Civic Consultants are as follows: | |
|---|---|
| Senior Consultants: | $425 - $625/hour |
| Consultants | $175 - $325/hour |

[**]Over the course of its operations, DSI Civic has routinely retained a number of consultants as independent contractors, now including John Filan and Ronald D. Picur.

[***] In the course of DSI Civic engagements, it is common to retain subject matter experts ("SME") that may assist DSI Civic with expertise in such areas as: public safety, public works, and actuarial analysis.

# EXHIBIT 8

# ITEM 5(H)

My response to the question regarding why I'm interested in this appointment is simple. Alone among practitioners in the restructuring and insolvency industry, I have maintained a parallel career in the arena of public policy, public finance and electoral politics at both the state and federal levels throughout the entirety of my 40-year business career. A further merging of these twin vocations took place almost seven years ago when I was asked by the Governor of Illinois to apply my restructuring, public policy and public finance skills and agree to serve as the Chair of the then-troubled Illinois Finance Authority ("IFA"). The IFA is one of the nation's largest state-sponsored entities principally engaged in the issuing of taxable and tax-exempt bonds, as well as making loans and capital available for investment in businesses, nonprofit organizations and local governments throughout the state. The primary mission of the IFA is the twin goals of economic development and job creation.

Following my appointment by the Governor and unanimous confirmation by the Illinois Senate, I set about, as the newly-appointed Chair of the IFA, to focus on one particular public policy passion that has long captivated me: the reshaping, remaking and revitalization of a portion of the nation's "Rust Belt." My goal was to aid in steering, through the multistate bonding authority granted to me by the statute, not only the economy of Illinois but, to any extent possible, the economies of other adjoining north-central Great Lakes states. My goal was to achieve a better and more stable economic mixture of older industries from the manufacturing era as well as new businesses from the growing service and information sectors of the economy.

I also discovered that under the enabling legislation that created the IFA, the power to supervise and oversee all Illinois municipal and governmental restructurings and rehabilitation was vested in both myself, as the Chair of the IFA, as well as the Authority's Executive Director. As a consequence of this duty, responsibility and obligation, long before the current rash of municipal and governmental restructurings became the topic of current debate I had begun to wrestle with and speak about the seemingly intractable issues surrounding the present dilemmas confronting today's municipal and governmental units. A prime example of this was my role in the supervision and ultimately successful rehabilitation of the City of East St. Louis, Illinois, one of the first major efforts at municipal rehabilitation I addressed as Chair of the IFA. This city had been under state supervision in conjunction with its restructuring efforts since the mid-1990s. I made it my personal goal to, in the span of a few short years, complete East St. Louis's rehabilitation, put the city back on stable economic footing and then get it out from under the supervision and oversight of the IFA, allowing it once again to take its rightful place among the cities and towns within the state who could chart their own course and destiny.

My experience with the supervision and oversight of distressed municipal and governmental entities, beyond generating a substantial volume of speaking and writing invitations and requests, also led me to form DSI Civic, a specifically dedicated affiliate of our firm's well-known corporate restructuring practice. DSI Civic's primary focus is the counseling of and provision of services to units of government in connection with their efforts at restructuring and rehabilitation. This new entity is now well-established in the industry and has attracted to its cause some of the strongest talent available in the municipal and governmental public finance and restructuring arena. These ladies and gentlemen have a broad array of municipal and governmental public finance and public policy experience, and have counseled governmental entities from Florida to California to Pennsylvania, as well as Louisiana, Connecticut, Kentucky

and Indiana, on the intricacies and possibilities of differing paths toward public sector restructuring and rehabilitation.

So I view the opportunity to serve the Court as its Expert Witness in this matter on the Issue of Feasibility as a simple and natural extension of the efforts in which both I and the team at DSI Civic have been engaged over the past seven years: that of trying to apply our special skills and hard-won experience to the analysis and rejuvenation of the former great manufacturing cities that border the Great Lakes. Given that, my interest in this assignment goes beyond just the simple task of continuing to provide restructuring advice to governmental units, and crosses over to the cause in which I've been engaged for these last many years, the rebirth and renewal of America's former Rust Belt cities, allowing them to position themselves to be competitive in the global economy for the coming century.



**PHOENIX** PROVEN. RESULTS.®

Qualifications of Martha E. M. Kopacz and a team of professionals from Phoenix Management Services LLC

# Proposal to Serve as the Court's Expert Witness on the Issue of Feasibility in the Detroit Chapter 9 Matter

# Table of Contents

Table of Contents

I.   Transmittal Letter

II.  Expert's Resume and Qualifications

III. Expert's Team Resumes and Qualifications

IV.  Governmental Experience and Case Examples

V.   Proposed Approach and Fees

Appendices

A. Index of Responses to Requirements Contained in Order re: the Solicitation of Applications

B. Phoenix Management Services LLC

C. Expert Witness Engagements and Testimony Experience

D. Additional Required Disclosures

E. Expert's Publications and Work Product Examples

1



# Section I

# Transmittal Letter



# Transmittal Letter

April 9, 2014

Hon. Steven W. Rhodes
United States Bankruptcy Court
Eastern District of Michigan – Southern Division
211 W. Fort Street, Suite 1800
Detroit, MI 48226



**Martha E. M. Kopacz**
**Phoenix Management Services**
Ten Post Office Square
Suite 605N
Boston, MA 02109

Re: Application to Serve as the Court's Expert Witness on the Issue of Feasibility in the Detroit Chapter 9 Matter.

Dear Judge Rhodes,

I am pleased to submit my qualifications, and those of my team, for your consideration to serve as the Court's Expert Witness on the Issue of Feasibility. I am available by phone (617-840-9155) or email (mkopacz@phoenixmanagement.com) to answer any questions you or your colleagues may have. I sincerely hope to be able to meet with you and the City's and creditors' representatives on April 18, 2014.

Proposal Overview

I have structured my Proposal to comply with the requirements as outlined in the Court's Order dated April 2, 2014 and have included additional information that may be helpful in the evaluation process. Attached as Appendix A is an "index" which shows the location in this Proposal of my response to each requirement in the Order.

Sections II and III of the Proposal address my qualifications and that of the team I have assembled. The team is comprised of professionals from my firm, Phoenix Management Services, LLC ("Phoenix")[1], and with whom I have worked extensively in the past. Section IV lists our team's prior governmental retentions. Section V outlines our approach and fee structure. Appendix C lists my prior expert witness engagements and testimony experience. Appendix D includes required disclosures not addressed elsewhere in the Proposal. Appendix E includes samples of work product - client deliverables and thought leadership - that demonstrate my ability to address and communicate sophisticated and complex issues of municipal planning, budgeting and finance in a concise and straight forward manner.

_____

(1) Background information regarding Phoenix is provided in Appendix B.



# Transmittal Letter (cont.)

## Approach Overview

In order to formulate an opinion on the feasibility of the Plan of Adjustment[2], I believe that my engagement would include the following activities, at a minimum:

- Review the methodology used to develop the Ten-Year Plan for the City of Detroit ("Ten-Year Plan"), as well as the data and information used as a foundation for the forecasts
- Identify and analyze baseline and critical assumptions
  - Baseline assumptions being the hundreds of individual assumptions contained in the Ten-Year Plan that are predicated on consistent historical results or contractual relationships
  - Critical assumptions being those assumptions, which if not achieved in amount or timing, could cause the Ten-Year Plan to fail to meet the payments required in the Plan of Adjustment. Critical assumptions may relate to:
    - Revenue assumptions
    - Cost assumptions
    - Reinvestment/restructuring assumptions
- Assess the achievability of the change initiatives – revenue generating, cost cutting and reinvestment/restructuring – in the amounts and time frame forecasted based on execution risk at the managerial and operational level
- Prepare sensitivity analyses of the Ten-Year Plan based on analyses of the assumptions and the execution risk

Based upon my review of publically available information, including fee requests, I believe that the City's professionals should have a great deal of data and information readily available which would expedite my assessment of the methodology and many of the assumptions made in the City's Ten-Year Plan. Provided this is the case, I am suggesting a core team of four full time equivalent professionals for approximately 8 to 10 weeks, inclusive of report and testimony preparation, to complete the assignment. After the first week, I would be able to provide a detailed budget covering the necessary tasks and the staffing required to complete them. If circumstances require additional resources, they can be added promptly. Similarly, if I have overestimated the resources needed, the team can be reduced.

(2) Based upon my reading of the Court's Order, I do not believe that my opinion in this matter is intended to cover the "reasonableness" of the proposed payments to any specific class of creditors. Rather, my opinion would be limited to the likelihood that the City of Detroit can generate sufficient cash flow over the ten year period to make the payments, in total, as anticipated in the Plan of Adjustment.



# Transmittal Letter (cont.)

<u>Independence</u>

I am not connected to this case, the City of Detroit or the State of Michigan personally or professionally. My team members are similarly free of connections which we believe will be immensely helpful in providing the services requested. None of us is retained by any party involved in this proceeding, as identified on the General Service List, on any other matter, nor we do we have connections that would impair our ability to exercise fair, unbiased and independent judgment on this assignment. In addition, we are willing to forego any engagement that may result in a conflict of interest in this case and will comply with the requirements of 11 U.S.C. Section 330 when seeking approval of fees.

<u>Interest in the Appointment</u>

Phoenix has been engaged by municipal clients since the 1990's and I have been serving public sector interests since the 2000's. Bob Childree, the Senior Advisor on my team, was the Comptroller of the State of Alabama for over 20 years, a pioneer in the development of accounting standards for governmental entities and the Snodgrass Award recipient in 2010, the highest honor awarded by the Association of Government Accountants. As such, our collective commitment to serving public clients is longstanding and we would be honored to serve the Court in this most important matter. Below are my reasons for seeking this appointment which are shared by my team.

First, it is vitally important that the City of Detroit, its residents and stakeholders emerge from the chapter 9 process with confidence in the Plan of Adjustment and a reasonable expectation that the commitments made therein will be met. The Ten-Year Plan, upon which I would opine, should be the basis for that reliance and I welcome the opportunity to contribute to the process of revitalizing the City.



# Transmittal Letter (cont.)

<u>Interest in the Appointment (cont'd)</u>

Second, having been involved in the restructuring profession for over 30 years, I see an enormous opportunity to improve our cities, states and public interests by applying some of the techniques we have used to return private sector organizations to fiscal health and stability. For example, long range planning for municipalities is in its infancy but once adopted, will provide the information public leaders need for better decision making. Soon, government accounting principles will require the reporting of "off-balance sheet" obligations similar to the requirements for corporations. Improving government financial reporting so that it is consistent across entities and understandable will allow stakeholders to have a shared view of the entity's financial condition. Furthermore, formal restructuring undertakings are creating a forum to solve complex and multi-generational issues amongst residents, the municipal workforce, elected officials and capital providers. This appointment would allow my team and me to make a contribution to the continued development of our profession, as it begins to address public sector challenges in earnest.

Lastly, there may be an opportunity to improve the forecasts and projections that my team will be reviewing, analyzing, and upon which I will opine. Collectively, my team has 140 years' experience both preparing and analyzing forecasts, for public sector and private sector clients. Because developing reasonable and achievable projections is part "art" and part "science", it may be possible to bring our expertise to the assignment in a manner that could enhance the overall achievability of the Ten-Year Plan.

Thank you for the opportunity to present my, and my team's, qualifications to serve as the Court's Expert Witness on the Issue of Feasibility in this most important matter. Should you find client references helpful, please let me know and I will be happy to provide them. I am reachable at your convenience to answer any questions you may have.

Sincerely,

*/s/ Marti Kopacz*

Martha E. M. Kopacz
Senior Managing Director
Phoenix Management Services, LLC



6

# Section II

# Expert's Resume and Qualifications

7

# Marti Kopacz, CMA, CIRA



**Martha (Marti) E. M. Kopacz**
**Senior Managing Director**
**Mobile (617) 840-9155**
**mkopacz@phoenixmanagement.com**

Ms. Kopacz has over 30 years' experience assisting stakeholders in analyzing business operations and reorganization possibilities. She has led or participated in over 100 consulting and restructuring engagements representing companies, debtors, investors, creditor committees, banks and Chapter 11 Trustees. Ms. Kopacz has advised in a broad range of industries including not for profit and public sector, retail, leisure and entertainment, technology and professional services. She was one of the first financial advisors to apply turnaround principles to public sector and not for profit organizations. She has served as an Interim President, Chief Restructuring Officer, Chapter 11 Trustee, Collateral Trustee, and Examiner.

**General Experience**

Ms. Kopacz has prepared dozens of financial projections for clients and reviewed and critiqued dozens more, prepared by others. She has previously testified as to the appropriateness of forecasting methodology, the assumptions upon which forecasts are based and the likelihood of an organization to meet its forecast. She has a deep understanding of the importance of developing assumptions based upon a thorough analysis of relevant data, including historical and prospective information as well as third party, independent information. Ms. Kopacz understands the nuanced area of municipal budgeting. Because municipal entities lack a "standard" in budgeting, forecasting and accounting, great variations occur in the manner in which public entities report financial results and develop forecasts. As such, preparing and evaluating projections for municipalities requires strong business acumen and deep appreciation for the challenges inherent in the forecasting methodology and limitations presented by available information.



8

# Marti Kopacz, CMA, CIRA (cont.)

**Relevant Engagements**

Ms. Kopacz advised the **Nassau County Interim Finance Authority (NIFA)**, a New York state control board, in their oversight role. In early 2011, NIFA imposed a control period for Nassau County based on a substantial budget deficit. Nassau County has experienced financial difficulties for over a decade despite an annual budget that approaches $3 billion. The structural deficit for 2012 was estimated at $300 million. Ms. Kopacz advised NIFA on the financial requirements underpinning the control period, the nature and size of the likely budget deficit and the reasonableness of the County's forecasts. In addition, Ms. Kopacz and her team conducted an in depth review of the business operations of the County and developed over $300 million of suggested cost reductions and operational improvements, which if implemented would restore Nassau County to a balanced budget in the next few years.

Ms. Kopacz served as Financial Advisor in a multi-party representation of seven of the country's largest **Municipal Transit Authorities** in an out-of-court renegotiation of their advertising contracts with a New York based outdoor media company. She advised her transit authority clients on the viability of the company's business plan and played an active role in the advertising contract negotiations with the company. Ms. Kopacz represented her clients in the restructuring of more than $200 million of senior and junior debt with the bank group and private equity sponsor.

Serving in the capacity of the Chief Restructuring Officer and Interim President, Ms. Kopacz designed, led and executed the out-of-court restructuring of the **Legal Aid Society**. At the time, the Society was a 135 year old charity with approximately $150 million in revenue serving the legal needs of the needy in New York City, funded largely by the State of New York and New York City. Accomplishments included: reducing a $20 million operating deficit to better than break even; negotiating workforce reductions, compensation and benefit modifications with the UAW (lawyers' union) and the SEIU 1199 (social workers and paralegals' union) representing approximately three-fourths of the Society's 1400 employees; restructuring pension obligations; consolidating real estate, third party suppliers and infrastructure; and restructuring over $65 million of balance sheet and long term obligations with dozens of creditors and stakeholders, all of which returned the organization to solvency. In addition, Ms. Kopacz led the Society's first ever Strategic Business Planning effort, managed day-to-day operations in conjunction with the Attorney-in-Chief, and received the Society's Pro Bono service awards for 2004 and 2005.



# Marti Kopacz, CMA, CIRA (cont.)

**Relevant Engagements (cont.)**

Ms. Kopacz represented **The Educational Resources Institute, Inc. (TERI)**, a large not for profit organization providing college access to underprivileged and underserved populations. TERI's for profit subsidiary was the largest guarantor of private student loans in the country when the securitization market for student loans evaporated. The extensively negotiated plan of reorganization preserved the not for profit mission and return collateral to the original lenders.

**Prior Experience**

Prior to joining Phoenix Management, Ms. Kopacz founded Brant Point Advisors, a boutique advisory firm. Previously, Ms. Kopacz co-founded and co-lead the U.S. Corporate Advisory and Restructuring Services practice at Grant Thornton LLP and lead the group's public sector initiatives. Earlier in her career she was a Managing Director with Alvarez & Marsal, focused on public sector and not for profit clients, and a Principal with PricewaterhouseCoopers LLP until the practice was sold to FTI Consulting, as which time she was a Senior Managing Director.

**Education & Certifications**

Masters of Business Administration in Finance and Investments – Kelley School of Business – Indiana University
Bachelor of Science in Marketing – Kelley School of Business - Indiana University
Certified Management Accountant
Certified Insolvency and Restructuring Advisor

**Affiliations**

American College of Bankruptcy – Fellow – Twelfth Class
Turnaround Management Association
American Bankruptcy Institute
International Women's Insolvency and Restructuring Confederation
Association of Insolvency and Restructuring Advisors and the Institute of Management Accountants.

10



# Marti Kopacz, CMA, CIRA (cont.)

**Civic Engagement**

Boston 2024 Organizing Committee – Board Member

Legal Aid Society of New York – Board of Advisors

Kelley School of Business - Indiana University – Dean's Council

Graduate School of Business, Sunkyunkwan University – Dean's Council

Inly School – former Board of Trustees

**Speaking Engagements and Publications**

"**Municipal Insolvency and Bankruptcy Part 1: Introduction, Overview and Key Issues**" – Rhode Island Bar Association Annual Meeting, June 2012

"**Municipal Bankruptcy**" – Association of Insolvency and Restructuring Advisors Webinar, February 2012

"**The Municipal Restructuring under Chapter 9: Legitimate Option or Scare Tactic?**" – American Bankruptcy Institute Winter Leadership Conference, La Quinta, CA, December 2011

"**Municipal Insolvencies: Is This the Next Wave?**" – Turnaround Management Association Northeast Chapter, Boston, MA, November 2011

"**Leadership and Political Will – Fixing States' and Cities' Fiscal Woes**" – Heyman Center Series: America's Fiscal Crisis – Depression, Recession or Recovery, Cardozo School of Law, New York, New York, October 2011

"**Today's Problems in Municipal Finance – Should Chapter 9 be Extended to States?**" – Commercial Finance Association Advocacy Conference, Washington, DC, September 2011



# Marti Kopacz, CMA, CIRA (cont.)

**Speaking Engagements and Publications (cont.)**

**"Turnaround "Apps" for the Public Sector"** – Grant Thornton white paper, July 2011

**"Chapter 9 Update"** – American Bankruptcy Institute Northeast Conference, Newport, RI, July 2011

**"Turnarounds in the Public Sector"** – Kellogg Turnaround Management Conference, Chicago, IL, May 2011

**"Too Big to Fail or Too Big to Bail (Out):  a Discussion of the Pros and Cons of Bankruptcy for States"** – Grant Thornton white paper, March 2011

**"That was Then, This is Now:  Financing Your Business in the Current Environment"** – Proskauer  Grant Thornton Seminar, New York, New York, October 2010

**"Navigating Your Portfolio Through Turbulent Waters - Facing The Reality of Being Over Leveraged - And Practical Strategies for Restructuring in Zero Gravity"** – Association for Corporate Growth Intergrowth Conference, Miami, May 2010

**"Who Has $$ and What Are They Buying?"** – Caribbean Insolvency Symposium, Grand Cayman, CI, February 2009

**"Gaining Support from All of Your Constituencies"** – American Bankruptcy Institute Northeast Conference, Brewster, MA, July 2008

Previous Dates – Guest Lecturer at Harvard Business School, Massachusetts Institute of Technology, Bentley College, Northeastern University, Pennsylvania State University and Indiana University concerning various corporate recovery topics. Panelist or Moderator at industry conferences hosted by Turnaround Management Association, American Bankruptcy Institute, Massachusetts Continuing Legal Education, National Credit Managers Association, Food Manufacturers Association, Barclays Bank, among others.

12



# Section III

## Expert's Team Resumes and Qualifications

13



# Robert L. Childree



**Robert L. Childree**
**Senior Advisor**
**Mobile (334) 324-4481**
**rchildree@phoenixmanagement.com**

Mr. Childree has over thirty five years' experience in financial management and governmental accounting systems and will serve as Senior Advisor to Ms. Kopacz and the Phoenix team on a contract basis.

Mr. Childree has specific expertise in the area of financial management systems for state governments including accounting, budgeting, procurement, payroll, human resources, financial analysis and financial reporting. Mr. Childree developed and wrote fiscal and accounting policy for the State of Alabama. He has developed and taught financial management courses to the fiscal staff of the State of Alabama and has spoken frequently regarding governmental financial reporting to various organizations across the country.

**Relevant Experience**

**Grant Thornton** (2009 – 2014)
Mr. Childree was a Director in Grant Thornton's State and Local Government practice. During his tenure at Grant Thornton, Mr. Childree provided governmental accounting and municipal financial management expertise during the firm's engagement with the Nassau County Interim Finance Authority (NIFA). Mr. Childree provided extensive guidance and direction regarding GASB 60, the correct accounting treatment for various County transactions, as well as how and when to recognize revenue under GAAP for governmental entities. In the Jefferson County, Alabama engagement, Mr. Childree provided consulting services to one of the County's general obligation creditors during the chapter 9 proceeding.

14



# Robert L. Childree (cont.)

**Relevant Experience (cont.)**

**State of Alabama - *State Comptroller (May 1987-April 2009)***

For over 20 years, appointed by governors from both political parties, Mr. Childree served as the chief financial officer of the State. His responsibilities covered cash management, financial planning, capital expenditures, long and short term borrowing, and overseeing State aid to municipalities, among other matters. During his term as Comptroller, Mr. Childree directed the development and implementation of the State of Alabama's Financial Resource Management System, a fully integrated financial system (ERP) which encompassed the procurement function, payroll and personnel functions, departmental budgeting and accounting systems and the State's Central Accounting System. In conjunction with this project, the Comptroller wrote new fiscal and accounting policy which complied with Generally Accepted Accounting Principles for Governments. In addition, the internal control system for the state comptroller function was reviewed and modified to insure that the new system functioned as intended within the risk tolerances established. As part of this initiative, Mr. Childree directed the development of the extensive training required for the State's fiscal staff. As a result of the successful development and implementation of the State's new Financial Resource Management System, the State of Alabama issued its first Comprehensive Annual Financial Report (CAFR) and subsequently received seventeen consecutive Unqualified Audit Opinions. Additionally, the State of Alabama has obtained the GFOA Certificate of Achievement for Excellence in Financial Reporting for the last nine fiscal years.

**Education**

Mr. Childree earned his B.S., Commerce and Business Administration/Accounting from the University of Alabama, Tuscaloosa, Alabama.

15



# Robert L. Childree (cont.)

**Affiliations**

National Association of State Auditors, Comptrollers and Treasurers (NASACT – Past President)
National Association of State Comptrollers (NASC – Past President)
Association of Government Accountants (AGA, Financial Management Standards Board, Past President Montgomery Chapter)
Board of Directors, Auburn Montgomery Center for Government
Board of Directors, Auburn Montgomery School of Business
Board of Directors, Alabama Training Institute

**Honors/Awards**

2006 - Excellence in Leadership Award – Association of Government Accountants (AGA)
2008 - National President's Award recognizing outstanding chairmanship of AGA's Financial Management Standards Board
2010 – William R Snodgrass Distinguished Leadership Award – Association of Government Accountants (AGA)

**Publications**

**"Overcoming Adversity"**, 21st Century Government Essays on Leadership, August 2001, National Association of State Auditors, Comptrollers and Treasurers
**"Leaders are Made"**, Leadership Secrets of Government Financial Officials, July 2005, National Association of State Auditors, Comptrollers, and Treasurers



# Brian Gleason



**Brian F. Gleason**
**Senior Managing Director and Shareholder**
**Mobile  (610) 659-8118**
**bgleason@phoenixmanagement.com**

Mr. Gleason is a Senior Managing Director and Shareholder at Phoenix, and has managed or participated in more than 100 engagements since joining the firm. Mr. Gleason has led numerous Phoenix projects in both the private and public sectors. His specific areas of expertise include: executive management, financial management, operational structures, complex negotiations, financial modeling, budgeting, strategic planning, organizational process design, and pricing and sensitivity modeling. Mr. Gleason has held interim management positions in a variety of industries, in both public and private companies. Mr. Gleason's interim management roles have included serving as CEO, CFO, COO and CRO. He has assisted companies in sourcing capital and has advised on merger and acquisition transactions. In addition, Mr. Gleason has provided expert testimony in numerous financial and turnaround management matters.

**Relevant Engagement Experience**

SEPTA Business Audit
SEPTA Purchasing Department Restructuring
SEPTA Workers Comp Department Audit
City of Camden Fire Department
City of Wilmington L&I Department Review
City of Wilmington Business Audit
Delaware County PA, Prison Privatization Review
Delaware County, PA, Judicial Review
New Castle County, DE- Tom Gordon – County Executive Transition Planning Team
New Castle County  DE, multiple budget assessments
New Castle County DE, Department of Community Development and Housing
Delaware River Port Authority - Easy Pass Implementation and Toll Process Audit
Marple-Newtown, PA School District – Business Audit and Budget Review



# Brian Gleason (cont.)

**Prior Experience**

Mr. Gleason joined Phoenix after a corporate career including managing a team of financial and operational analysts focusing on organizational process improvement and financial performance. In order to reposition a $200 million division of a national financial services provider, he lead a four-year project which included strategic dispositions, process outsourcing agreements, and product repositioning and redesign.

**Education/Affiliations**

Mr. Gleason is a graduate of Drexel University, with degrees in both Finance and Marketing. While attending Drexel, Mr. Gleason was the first student appointed to sit as a voting member of a committee of the University's Board of Trustees.

He is active in a variety of local and national professional and charitable organizations. Mr. Gleason has delivered educational lectures on a variety of topics regarding restructuring, business finance and management.

18



# Albert Mink



**Albert Mink, CPA, CTP, CFE**
**Managing Director**
**Mobile (908) 239-3131**
**amink@phoenixmanagement.com**

Mr. Mink is a senior financial executive and an expert in managing companies experiencing explosive growth, in need of a turnaround, or reorganization through bankruptcy. A CPA, MBA, CTP and CFE, Mr. Mink has a strong background in accounting and financial management, operations analysis, mergers and acquisitions, recapitalizations, bankruptcies, information technologies and fraud investigations.

Mr. Mink has been with Phoenix Management since 1990 and has been engaged as an interim Chief Financial Officer or Chief Restructuring Officer for public and private sector companies. Mr. Mink has prepared fraud assessments, implemented anti-fraud measures, conducted fraud investigations and provided litigation support and expert testimony in both criminal and civil fraud cases.

**Relevant Experience**

Mr. Mink was an integral member of the Phoenix team that provided interim management to the **Philadelphia Gas Works** (PGW), a large gas utility serving the greater Philadelphia area. In the capacity of Interim CFO, he was responsible for directing the activities of the Accounting, Budget, Treasury, and Risk Management departments, and guiding the company as it struggled to meet its financial debt covenants during a critical year-long reorganization. His responsibilities as interim CFO included: managing cash flow, monitoring operating results, monthly presentations to the Mayor and City Council on operating results and status of cost cutting initiatives, supervising the preparation of the annual operating budget and providing testimony to the Gas Commission during public hearing.

19



# Albert Mink (cont.)

**Prior Experience**

Prior to joining Phoenix, Mr. Mink held management level positions in Fortune 500 companies, including American Airlines and City Investing, a $15 billion publicly held diversified conglomerate. He started his career with Price Waterhouse and Co.

**Education/Affiliations**

Mr. Mink is an active New Jersey CPA, a Certified Turnaround Professional (CTP), and a Certified Fraud Examiner (CFE), Mr. Mink holds an MBA in Finance from Seton Hall University and an Advanced Certificate in Information Technologies Management from NYU. Mr. Mink is a member in good standing with the AICPA, Certified Turnaround Management Association and the Association of Certified Fraud Examiners.



# Kevin Barr



**Kevin Barr, CFA**
**Associate**
**Mobile (484) 678-5953; Office (484) 841-6801**
**kbarr@phoenixmanagement.com**

Kevin Barr is a financial advisory services professional with significant experience providing turnaround and capital advisory services to clients. As a registered representative, Mr. Barr additionally supports Phoenix Capital's investment banking clients, where he works on a wide range of transactions including mergers and acquisitions, plans of reorganization, financial restructurings, and capital raises.

**Relevant Experience – Financial Modeling & Analysis**

- Conducts complex financial modeling; valuation analysis; merger consequences; accretion/dilution; restructuring analysis; financial forecasting; liquidation/wind-down analysis; assessment of solvency
- Responsible for building highly detailed, integrated and dynamic financial models as a basis of analysis
- Works with client representatives to develop short and long term financial projections, including developing supporting assumptions
- Performs in-depth financial statement analysis for clients, prospects, and acquisition targets
- Provides significant credit analysis for both asset-based and cash-flow lending scenarios
- Evaluates cash flow, working capital, and dynamic capital structure alternatives

**Prior Experience**

Prior to joining Phoenix, Mr. Barr was an Investment Analyst at Applied Card Systems, a family office with over $1 billion in assets and an Analyst with JB Investments Fund, LP, a distressed long-short hedge fund.

**Education/Affiliations**

Mr. Barr has a B.S. in Economics from the Wharton School at the University of Pennsylvania with a concentration in Finance. Mr. Barr was awarded the Chartered Financial Analyst (CFA) designation in 2013, successfully completing the CFA program in three years. Mr. Barr holds the Series 79 License through FINRA.



# Section IV

# Governmental Experience and Case Examples



# Governmental Experience*

| Engagement | Retained By | Subject Manner |
|---|---|---|
| Camden, NJ Fire Department | City of Camden | Business Assessment |
| Chester County, PA | Chester County, PA | Interim Management of Department of Emergency Services |
| City of Wilmington, Delaware | City of Wilmington | Business Assessment |
| City of Wilmington, Delaware | City of Wilmington | Business Audit |
| Community Transit of Delaware County | Community Transit of Delaware County Board of Directors | Business Assessment |
| Delaware County, PA | Delaware County, PA | Assessment of Court System |
| Delaware County, PA | Delaware County, PA | Prison Privatization Review |
| Delaware River Port Authority | Delaware River Port Authority Board of Directors | Assessment of Toll Collection Process and EZ Pass Implementation |
| Jefferson County | BayernLB | Chapter 9 Advisory Services for GO Bondholder |
| Marple Newtown (PA) School District | Marple Newtown School Board | Assessment of Operations |
| Nassau County, New York | Nassau County Interim Finance Authority | Comprehensive Business Review |
| New Castle County, Delaware | Office of the County Executive | Budget Assessments |
| New Castle County, Delaware | Office of the County Executive | Community Development of Housing Review |
| New Castle County, Delaware | Office of the County Executive | County Executive - Transition Planning Team |
| Philadelphia Gas Works (PGW) | City of Philadelphia | Assumed 5 Senior Management Positions |
| Smithsonian Institute | Smithsonian Board of Directors | Assessment of Business Ventures Unit |
| Southeast Pennsylvania Transportation Authority (SEPTA) | SEPTA Board of Directors | Business Audit |
| Southeast Pennsylvania Transportation Authority (SEPTA) | SEPTA Board of Directors | Purchasing Department Restructuring |
| Southeast Pennsylvania Transportation Authority (SEPTA) | SEPTA Board of Directors | Workers Compensation Audit |
| Southwest Delaware County Municipal Authority | Southwest Delaware County Municipal Authority | Business Assessment |
| State of Delaware | The State of Delaware | Assessment of Family Court Case Load Management |

* Includes experience of the team members.



# City of Wilmington, Delaware

- Engaged to identify ways to improve service to constituents
- Assessment focused on the following departments
  - Public Works
  - Parks and Recreation
  - Planning
  - Real Estate and Housing
  - Finance
  - Mayor's Office
  - Licenses and Inspections
- Recommendations consolidated disparate functions and improved coordination with the County



24

# Nassau County, New York

- Comprehensive review of the County's FY 2011 budget and associated deficit
- Assessment focused on
  - Operational review of all departments and meetings with key staff
  - Financial and budgetary review by department
  - Necessity of County functions and organizational structure
- Generated recommendations to reduce costs and/or improve operations
  - Each recommendation included implementation timelines
  - Identified $250-$320MM in cost savings opportunities
  - Performed sensitivity analysis to provide a range of possible cost savings varying in amount and time frame



# New Castle County, Delaware

- Provided baseline assessment of County's financial condition
- Extrapolation trends highlighted potential $100 million shortfall over 4 years
- Assessment focused on
  - Growth rate in personnel
  - Growth in non-personnel expenses
  - Increasing selected non-tax revenue sources
- Subsequent Operating Audits performed
  - Sheriff's Department
  - County Assessment Division
  - Community Development and Housing



26

# Philadelphia Gas Works (PGW)

- Assumed 5 senior management positions
  - Chief Executive Officer
  - Chief Operating Officer
  - Chief Financial Officer
  - Head of Customer Affairs
  - Head of Strategic Planning
- PGWs challenges included
  - Complicated political and regulatory situation
  - Deteriorating bond ratings
  - Senior management vacancies
- Selected accomplishments
  - Reinvigorated collection efforts – dramatically reducing accounts receivable
  - Introduced early retirement program – reducing workforce by 25%
  - Accelerated installation of automatic meter reading devices
  - Reduced back-log of service and turn-on calls
  - Evaluated, recommended and implemented numerous outsourcing initiatives
  - Introduced stronger internal controls
  - Improved cash flow by $50+ million, nearly doubling prior year

27



# Southeast Pennsylvania Transportation Authority (SEPTA)

- Engaged to perform comprehensive business review of 20 functional areas
- SEPTA's challenges included
  - Downward pressure from subsidies
  - Reduced ridership
  - Inefficient overhead
  - Labor costs and work rule requirements
- Assessment included 135+ implementable recommendations
- Follow-on implementation
  - Establishing productivity standards and work order based information system for bus maintenance operations
  - Purchasing and contracting functions
  - Improved services and reduced costs for workers compensation program



# Section V

## Proposed Project Plan and Fees

29



# Proposed Approach

- Understand the framework and methodology used to prepare the Ten-Year Plan including reliance on historical information
  - Conduct interviews of key personnel and financial advisors
  - Review documentation used to develop the forecasts
  - Review other third party information to independently verify assumptions
- Perform a detailed analysis of the Plan's financial and cash flow forecasts to determine baseline and critical assumptions
- Critique and analyze critical assumptions – those that have significant dollar and/or timing impact and, if not achieved, could decrease or postpone cash flow significantly
  - Revenue and/or cash receipts
  - Cost cutting initiatives
  - Reinvestment initiatives and capital spending
  - Interest rate variations
  - Provisions for contingencies

30



## Proposed Approach (cont.)

- Evaluate the execution risks associated with the Ten-Year Plan
  - Availability of financial and human capital
  - Reasonableness of timing assumptions
  - Reasonableness of dollar impact (cost or benefit)
  - Adequacy of contingencies
- Perform sensitivity analysis related to the forecast and critical assumptions, as appropriate, to better assess the achievability of the projections
- Form an opinion as to the feasibility of the Ten-Year Plan, as presented
- Prepare a written report supporting the opinion including additional information that facilitates communication and understanding by stakeholders of the likelihood of Plan success and the potential risks associated with Plan execution

31



# Proposed Staffing and Fees

- Core Team Hourly Rates
  - Marti Kopacz          $595
  - Bob Childree          $500
  - Brian Gleason         $550
  - Al Mink               $450
  - Kevin Barr            $275

- Additional Resources
  - Senior Managing Directors    $550
  - Managing Directors           $450
  - Directors                    $350
  - Associates                   $275
  - Analysts                     $200

- Expenses will be billed at actual cost and may approximate 10% to 20% of the fees incurred

- Consistent with several other professionals in this matter, fees will be discounted 10% from the above hourly rates



32

# Appendix A

**Index of Responses to Requirements Contained in Order re: the Solicitation of Applications**

33



| | Expert Witness Qualifications | Proposal Location |
|---|---|---|
| 1 | Has outstanding qualifications in municipal finance and budgeting to provide an opinion regarding the feasibility of the City's plan of adjustment. | * See pages 7-28<br>* See Appendix E |
| 2 | Has outstanding qualifications in municipal planning to provide an opinion regarding the reasonableness of the assumptions that underlie the City's cash flow forecasts and projections. | * See pages 7-28<br>* See Appendix E |
| 3 | Is able to give an opinion that is based on sufficient facts or data and that is the product of reliable principles and methods and the application of those principles and methods to the facts of the case. | * See pages 7-28<br>* See Appendix E |
| 4 | Is willing and able to exercise fair, unbiased and independent judgment in the assignment. | * See page 5<br>* See Appendix D |
| 5 | Can prepare a report and provide testimony in deposition and at trial, both of which are concise and understandable in addressing the sophisticated and complex matters related to the feasibility of the plan of adjustment and to the reasonableness of the City's assumptions regarding its | * See pages 7-28<br>* See Appendix C<br>* See Appendix E |
| 6 | Has the resources and ability to accomplish the assignment within the schedule adopted by the Court for the hearing on confirmation of the City's plan. | * See pages 7-21<br>*See page 32 |
| 7 | Has no disqualifying connections or conflicts of interest with any party in interest. | * See page 5<br>* See Appendix D |
| 8 | Is willing to forego any retention or engagement that might result in a conflict of interest in this case. | * See page 5 |
| 9 | Is willing and able to comply with the requirements of 11 U.S.C. § 330 in seeking approval of fees. | * See page 5 |



# Index of Responses to Requirements (cont.)

| | Application Requirements | Proposal Location |
|---|---|---|
| 1 | A disclosure of the applicant's qualifications as an expert witness on the feasibility issue in this case, including the applicant's education and training; experience; professional licenses and certifications; professional association memberships and honors; professional speeches, lectures and presentations; and professional publications. | * See pages 7-28<br>* See Appendix C<br>* See Appendix E |
| 2 | A disclosure of all prior retentions in which the applicant testified as an expert witness either in deposition or at a trial or hearing, including the title of the case, the court in which the case was pending, the attorney who retained the applicant and the subject matter of the testimony. | * See Appendix C |
| 3 | A disclosure of all prior retentions of the applicant or the applicant's firm by any governmental unit, including the identity of the governmental unit and the subject matter of the retention. | * See page 23 |
| 4 | A disclosure of all prior retentions of the applicant or the applicant's firm where the retention related to the retaining party's connections with a governmental unit, including the identity of the person or entity, the governmental unit and the subject matter of the retention. | * See Appendix D |
| 5 | A disclosure of all present or past connections of the applicant or the applicant's firm with the City of Detroit and any of its creditors or with other professionals representing them, or with the State of Michigan. | * See page 5<br>* See Appendix D |
| 6 | A disclosure of the proposed staffing of the assignment by other members of the applicant's firm. | * See page 4<br>* See pages 13-21 |
| 7 | A disclosure of the proposed fees to be charged and a proposed budget of fees and expenses. | * See pages 29-32 |
| 8 | A statement disclosing why the applicant is interested in the appointment. | * See pages 5-6 |



# Appendix B

## Phoenix Management Services, LLC

36



# Phoenix Management Services LLC

Phoenix is an operationally focused advisory firm, providing turnaround and interim management, investment banking and transaction advisory services to a broad spectrum of industries and ownership structures, including family-held, private equity sponsored, non-profit and municipal clients.



Since 1985, we have completed more than 1,100 assignments nationwide in a wide variety of complex situations, often with constituents with disparate views.



# Phoenix Management Services LLC

**Phoenix Management Services**® provides detailed operationally focused turnaround and interim management, operational restructuring, financial advisory and transaction advisory services.

- Founded in 1985, currently with 7 principals and 30+ professionals
- Principals total and average years of turnaround experience are 136 and 20+ respectively
- Average tenure of professionals is 11 years with Phoenix and 17 years in practice
- Middle market focus with a broad array of industry specialization
- More than 1,100 client engagements throughout the US and Canada

**Phoenix Capital Resources**® is the firm's investment banking subsidiary, a fully licensed broker dealer providing middle market focused special situations investment banking services relating to mergers and acquisitions, complex restructurings, refinancings and capital raise transactions.



# Appendix C

## Expert Witness Engagements and Testimony Experience

39



# Expert Witness Engagements and Testimony Experience

- 2013 – Sears, Roebuck & Co. v. 69th Street Retail Mall, L.P., et al
  - Court of Common Pleas; Delaware County, PA
  - Landlord/tenant dispute
  - Retained by 69th Street Retail Mall, L.P., et al through Francis P. Devine, III of Pepper Hamilton LLP
  - Expert report filed re: store closing decision by Sears; no testimony provided

- 2001/2 – In re General Cinemas Corp. (approx. date)
  - U.S. Bankruptcy Court - Delaware
  - Dispute with U.S. Trustee regarding obligation to pay quarterly fees for entities in chapter 7
  - Retained as Financial Advisor by debtor
  - Court testimony re: operating practices of debtor and maintenance of books and records

- 1997 – In re Healthco International, Inc.
  - U.S. Bankruptcy Court - Massachusetts
  - Fraudulent conveyance litigation regarding a leveraged buy out transaction brought by Wm. Brandt, Trustee v. Hicks, Muse & Co., et al
  - Retained by Lazard Freres & Co., LLC and Coopers & Lybrand, LLP through Thomas G. Rafferty of Cravath, Swaine & Moore LLP
  - Expert report and deposition testimony re: reasonableness of the projections supporting the transaction, the forecasting methodology and the adequacy of the underlying assumptions; financial condition and solvency of the debtor



40

# Expert Witness Engagements and Testimony Experience (cont.)

- 1996 – In re Lykes Bros. Steamship Co., Inc.
  - U.S. Bankruptcy Court – Middle District of Florida
  - Motion filed by lenders to convert the case to chapter 7
  - Retained as Chief Restructuring Officer and Financial Advisor to Debtor
  - Court testimony re: debtor's financial position and business plans

- 1991 – In re Tennessee Hotel Associates, L.P. (approx. date)
  - U.S. Bankruptcy Court – Tennessee
  - Litigation regarding reasonable value of use and occupancy
  - Retained by lender through Whitton E. Norris of Mintz, Levin et al
  - Expert report and trial testimony re: valuation issues

- 1983/4 – In re Belknap Hardware, Inc. (various dates)
  - U. S. Bankruptcy Court – Kentucky
  - Preference recovery actions
  - Retained as bankruptcy accountant by unsecured creditors committee
  - Numerous court testimonies re: debtor's solvency and individual transactions



# Appendix D

## Additional Required Disclosures

42



# Disclosure 5.d.

Ms. Kopacz and Phoenix do not believe that either of them has been retained by a client where the nature of the retention related to the client's connections with a governmental unit. We have never been retained to lobby or otherwise influence a governmental unit or elected officials on behalf of a client.

However, in the normal course of our retention by clients, in an advisory or interim management role, we often interact with governmental units who are customers, suppliers or regulators of our clients. For example, when Ms. Kopacz served as Interim President and Chief Restructuring Officer for the Legal Aid Society in New York City, a large portion of the Society's annual budget was provided by New York State and the City of New York subject to legislative action. Similarly, as Chief Restructuring Officer of Lykes Bros. Steamship, Ms. Kopacz worked extensively with branches of the Armed Services, who were substantial customers and account debtors to the company, to expedite and advance payments for the shipment of goods. Likewise, for many of Phoenix's prior governmental or quasi governmental clients, all, or a significant portion, of their funding was provided by some governmental agency.

Ms. Kopacz and Phoenix do not believe this type of interaction on behalf of clients raises questions of inappropriate connections with governmental units. Please call Ms. Kopacz if further explanation is desired.

43



# Disclosure 5.e.

Ms. Kopacz was formerly a managing principal in Grant Thornton LLP. During her tenure there, Robert Childree worked with her on the Nassau County matter as did Michael Imber, now a Senior Director at Alvarez & Marsal, who is involved in the Detroit matter on behalf of COP holders. Mr. Imber was one of fifteen partners that reported to Ms. Kopacz at Grant Thornton. He co-authored two white papers with Ms. Kopacz and worked with her on engagements involving public sector clients, including Nassau County. Ms. Kopacz was also employed at Alvarez & Marsal from January 2004 through March 2006. Ms. Kopacz was formerly a principal with PricewaterhouseCoopers and a Senior Managing Director with FTI Consulting, both of whom may be involved in this matter.

In general, Ms. Kopacz and Phoenix have cordial, professional relationships with many of the professionals and/or their firms involved in this case. In the past, we may have shared clients with some of these professionals, represented adversarial clients or participated in matters with multiple stakeholders and worked for different clients. Rarely is Ms. Kopacz or Phoenix hired directly by another professional for that professional's benefit. Recently, Ms. Kopacz was hired by Mr. Devine, a litigation partner in Pepper Hamilton's Philadelphia office as an expert witness on behalf of his client. Mr. Gleason was hired as an expert by Greenberg Traurig on behalf of one of their clients. Occasionally, Phoenix is hired directly by a bank or lender and is currently retained by Wells Fargo, who may or may not have an interest in this case. Regardless, none of these retentions are in any way related to the Detroit chapter 9 matter or the State of Michigan. In addition, no client provides Phoenix with more than 5% of its revenue.

44



# Appendix E

## Expert's Publications and Work Product Examples

*Provided for convenience as these documents are available in the public domain*

45





# Fiscal Sustainability Initiative

September 9, 2011

Grant Thornton

© 2011 Grant Thornton | September 9, 2011

As of September 9, 2011

Board of Directors
Nassau County Interim Finance Authority
170 Old Country Road
Mineola, NY 11501

Gentlemen:

Enclosed is Grant Thornton's report for your consideration and review. Our independent recommendations are based on the field work and analysis we undertook between mid June and early September, as well as a significant amount of professional judgment. Our work product is exclusively our own and in no way was influenced by parties, including NIFA, that may have a stake in the outcome of this report. Our findings were prepared on a "best efforts" basis. Please recognize that, in some cases, data and time constraints limited the depth of our analysis and range of guidance we could provide on implementation.

The fiscal challenges facing Nassau County are considerable. We acknowledge that embracing these recommendations will be difficult for many constituencies in the short-term but if adopted now, we firmly believe that fiscal sustainability can be achieved in the long-term. Thank you for the opportunity to serve you. Please feel free to call with any questions or comments you may have as you review this.

Very truly yours,

Martha E. M. Kopacz
Managing Principal

© 2011 Grant Thornton  |  September 9, 2011

# Disclaimer

- This report is part of an oral presentation and cannot be interpreted without the oral commentary

- This report is intended for internal use by the Nassau County Interim Finance Authority (NIFA) and should not be distributed to third parties without our approval

- This report and the analysis, as well as the recommendations contained herein, do not constitute an audit of Nassau County's finances or financial statements

- Our review, analysis, and findings rely upon information provided by Nassau County; the information was accepted "as is" and we made no attempt to audit or verify its veracity or accuracy

© 2011 Grant Thornton | September 9, 2011

# Scope and Limitations

- Grant Thornton LLP was retained by NIFA on June 8, 2011 to "review Nassau County departmental operations and recommend operational, structural and financial initiatives that will yield financial savings for the County, and providing other related advisory services on an as-needed basis." This engagement commenced on June 16, 2011.

- As of September 8, 2011, we have issued 127 information requests to various Nassau County departments. The majority of our information requests have been answered. The Appendix of this report contains:

  – A list of information requests that are still open

  – List of standard questions used in our interviews

- Between June 28, 2011 and August 24, 2011, we conducted 70 interviews with Nassau County employees representing 40 departments.

  – The level of cooperation by the department heads and their staff has been very good with a few exceptions. Due to the poor response to our information requests by the Parks, Recreation, and Museums department, our recommendations are unfortunately, very limited.

  – We were unable to obtain interviews with the following:

    ☐ Michael Kilbride – Veterans Services

    ☐ Peter Schmitt – Legislative Majority Leader

    ☐ William Muller – Clerk of the Legislature

- Nassau County operations occur in a decentralized fashion and individual departments have a great deal of control over their activities. As such, the level of information available from one department can vary greatly from another. Throughout our field work and analyses, we have accepted information as the departments could provide and attempted to refrain from asking that new data or information be created solely for our use.

- Certain Nassau County activities were outside the scope of this report:

  – Capital budget

  – Sewer and Storm Water District

  – Nassau Health Care Corporation

  – Nassau Community College

© 2011 Grant Thornton | September 9, 2011

4

# Approach

The following describes Grant Thornton's approach to our review of Nassau County:

- **Meetings with County departments:** Grant Thornton interviewed key staff and leadership in most departments to understand the scope of each department's functions, management practices, resources and performance. The general questions we posed to each department are contained in the Appendix.

- **Budgetary review:** Grant Thornton reviewed management reports, performance metrics, actual financial results and projected financial data provided by the County. We reviewed and analyzed information prepared by the Comptroller, the Office of Management and Budget and the Office of Legislative Budget Review.

- **Review of County functions and activities:** Where possible, Grant Thornton identified the cost, revenue, and funding sources involved in delivering County services and programs by department.

- **Generated recommendations to reduce costs and/or improve operations:** Based upon the functions and activities of each department as we understood them, Grant Thornton developed opportunities based upon a matrix of considerations:

  - Mandate - Is the service mandated by New York State law and/or Nassau County charter? Non-mandated activities or mandated but unfunded activities were considered to be opportunities for service consolidation or elimination. Our assessment of mandates was not a legal review, rather we reviewed this information in a business context. Annotations regarding whether a function is mandated or not, are directionally correct but do not represent a legal determination.

  - Cost recovery – Does the service or activity present recovery opportunities? Do existing fees cover the cost of service provision? Is there an opportunity to charge a user fee or increase existing user fees?

  - Operational efficiency - Is the service or activity performed in a cost-efficient manner? Is it provided elsewhere in the County more efficiently? Is the activity undertaken in multiple departments?

  - Strategic sourcing – Do other public or private entities provide the service or activity? Where there are other potential public and private providers of the service, would outsourcing, public partnerships, or managed competition create reduced costs for the County?

© 2011 Grant Thornton  |  September 9, 2011

5

# Approach

- Within the framework above, recommendations were developed for each department. These recommendations were grouped into two categories:
  - Quantified cost saving recommendations, with savings based upon specific current costs, ranges of precedent savings, or other objective metrics; and
  - Unquantified operational improvement opportunities

- For each recommendation, implementation timelines as well as potential collective bargaining agreement and legislative impacts have been identified.

- A slightly different approach was used in quantifying cost reductions in departments led by independently elected officials. In some cases, we make specific recommendations, but in all cases, we recommend the County official reduce total spending by 15%. This allows the County official discretion in managing his/her department's activities in the most cost effective manner.

- Recommendations are based upon good business sense, not how easy or difficult they may be to achieve.

© 2011 Grant Thornton | September 9, 2011

6

# Table of Contents

| Section | Page |
|---|---|
| 1. Executive Summary | 10 |
| 2. Departmental Review | 32 |
| A. Administration | |
|    i. Board of Elections | 34 |
|    ii. Civil Service | 38 |
|    iii. Constituent Affairs | 42 |
|    iv. County Clerk | 46 |
|    v. County Executive | 50 |
|    vi. Human Resources | 54 |
|    vii. Information Technology | 58 |
|    viii. Labor Relations/Department of Labor | 67 |
|    ix. Public Administrator | 69 |
|    x. Records Management | 72 |
| B. Finance | |
|    i. Assessment | 75 |
|    ii. Assessment Review Commission | 77 |
|    iii. Comptroller | 83 |
|    iv. Office of Management and Budget | 89 |
|    v. Purchasing | 93 |
|    vi. Treasurer | 97 |

© 2011 Grant Thornton | September 9, 2011

# Table of Contents

| Section | Page |
|---|---|
| C. Health and Human Services | |
| i. Behavioral Health | 100 |
| iii. CASA | 106 |
| iv. Consumer Affairs | 110 |
| v. Health | 115 |
| vi. Housing and Community Development | 120 |
| vii. Human Rights | 122 |
| viii. Minority Affairs | 125 |
| ix. Physically Challenged | 129 |
| x. Senior Citizens | 133 |
| xi. Social Services | 137 |
| xii. Veteran Services | 144 |
| xiii. Youth Board | 148 |
| D. Infrastructure | |
| i. Parks, Recreation, and Museums | 153 |
| ii. Public Works | 157 |
| iii. Real Estate | 202 |
| E. Legal | |
| i. County Attorney | 211 |
| ii. District Attorney | 214 |
| iii. Legislature | 218 |

© 2011 Grant Thornton | September 9, 2011

# Table of Contents

| Section | Page |
|---|---|
| iv. Medical Examiner | 222 |
| F. Public Safety | |
| i. Emergency Management | 226 |
| ii. Fire | 232 |
| iii. Police | 242 |
| iv. Probation | 264 |
| v. Sheriff and Correctional Center | 268 |
| vi. Traffic and Parking Violations | 277 |
| G. All Departments | |
| i. Departmental Reviews | 279 |
| 3. Appendices | |
| A. Current Open Information Requests | 282 |
| B. Standard Interview Questions for All Departments | 286 |
| C. Necessary Legislation | 288 |
| D. Recommended Investments | 289 |
| E. Recommendations for Audits and Investigations | 290 |
| F. Information Technology | 291 |
| G. Purchasing | 300 |
| H. Public Works | 309 |
| I. Sheriff | 310 |
| J. Summary of Expected Grants for FY 2011 | 313 |
| K. Employees Hired After Freeze – Full-Time and Part-Time | 318 |
| L. Employees Hired After Freeze – Seasonal Employees | 328 |

© 2011 Grant Thornton | September 9, 2011

9



1. Executive Summary
2. Departmental Review
3. Appendix

Section 1

Executive Summary



Grant Thornton

© 2011 Grant Thornton | September 9, 2011

# Preamble

- Nassau County faces extraordinary fiscal challenges over the next several years. The size and dimensions of the forecasted budget deficits will require the best efforts of the County's elected leaders, management and employees to prioritize the essential missions of County government that best serve the interests of its citizens.

- Nassau County is not alone among municipal governments in the United States. Indeed, many counties, cities, and even states are facing similar issues and difficulties. Politics often become the common obstacle to solving these issues, leading to a stalemate of opposing constituencies and a fiscal problem that only grows worse over time. This report does not proffer any political viewpoints.

- The purpose of this report is to offer a wide range of options and ideas that will help Nassau County prioritize services and programs, minimize or eliminate waste, inefficiencies and redundancies, and afford greater flexibility in the delivery of government services.

- Nassau County has a unique opportunity to make hard decisions, craft reasoned compromises, overcome its fiscal problems and become a positive example for other communities in New York and across the United States. Nassau County can *choose* financial sustainability.

© 2011 Grant Thornton | September 9, 2011

13-53846-tjt    Doc 4068    Filed 04/14/14    Entered 04/14/14 15:26:01    Page 282 of 322



## Nassau County:

## "As Is"



Grant Thornton

© 2011 Grant Thornton  |  September 9, 2011

# Estimated Deficit for FY 2011

| ($ in millions) | 2011 Adopted Budget | 2011 Projected Actual | Variance |
|---|---|---|---|
| **Revenues** | | | |
| Fines & Forfeitures | | | |
| Red Light Cameras | $ 61.7 | $ 24.5 | $ (37.2) |
| Other Traffic & Parking | 27.9 | 19.9 | (8.0) |
| Other Fines & Forfeitures | 6.0 | 4.5 | (1.5) |
| Rents & Recoveries | | | |
| Sale of Mitchel Field Rent | 36.0 | 6.0 | (30.0) |
| Sale of Property | 25.0 | 9.0 | (16.0) |
| Other Rents & Recoveries | 21.6 | 21.5 | (0.1) |
| Departmental Revenue | | | |
| Ambulance Fees | 29.2 | 20.2 | (9.0) |
| Parks Revenue | 22.8 | 19.5 | (3.3) |
| Other Departmental Revenue | 72.2 | 71.8 | (0.4) |
| Sales Tax | 1,023.4 | 1,013.4 | (10.0) |
| State Aid (excluding L.I.E. Ticket Surcharge) | 216.6 | 208.0 | (8.6) |
| L.I.E. Ticket Surcharge | 5.0 | - | (5.0) |
| Investment Income | 7.4 | 2.1 | (5.3) |
| Capital Backcharges | 12.6 | 9.0 | (3.6) |
| OTB Revenues | 6.5 | 3.9 | (2.6) |
| Property Tax | 800.4 | 801.9 | 1.5 |
| Revenue Designated for the retirement of debt | 6.0 | 10.3 | 4.3 |
| Other | 871.6 | 872.0 | 0.4 |
| **Total Revenue** | $ 3,251.9 | $ 3,117.5 | $ (134.4) |

Source: Nassau County Comptroller's Report on the County's Financial Condition for the First Six Months of Fiscal Year 2011.

© 2011 Grant Thornton | September 9, 2011

# Estimated Deficit for FY 2011

| ($ in millions) | 2011 Adopted Budget | | 2011 Projected Actual | | Variance | |
|---|---|---|---|---|---|---|
| **Expenses** | | | | | | |
| Property Tax Refunds | $ | - | $ | 70.0 | $ | (70.0) |
| Payroll and Fringe Benefits (excluding Overtime below) | | 1,197.2 | | 1,218.9 | | (21.7) |
| Overtime (Police Department and Correctional Center) | | 59.2 | | 78.2 | | (19.0) |
| NIFA Expense | | 1.4 | | 3.4 | | (2.0) |
| Other | | 1,269.2 | | 1,268.8 | | 0.4 |
| Early Intervention / Special Education | | 171.3 | | 169.5 | | 1.8 |
| Debt service | | 355.5 | | 338.6 | | 16.9 |
| Contractual Expense | | 127.8 | | 109.8 | | 18.0 |
| Contingencies | | 70.3 | | - | | 70.3 |
| **Total Expense** | **$** | **3,251.9** | **$** | **3,257.2** | **$** | **5.3** |
| | | | | | | |
| **Estimated Budget Risk excluding Potential Opportunities** | | | | | | (139.7) |
| Additional One-Time Costs | | | | | | (28.4) |
| | | | | | | |
| **Anticipated Structured Deficit** | | | | | **$** | **(168.1)** |

Source: Nassau County Comptroller's Report on the County's Financial Condition for the First Six Months of Fiscal Year 2011.

© 2011 Grant Thornton | September 9, 2011



Nassau County:

Cost Reduction Framework



Grant Thornton

© 2011 Grant Thornton | September 9, 2011

# Decision Making Framework for Cost Reductions

**Catalyst for Cost Reduction Analysis:**

- On January 26, 2011, NIFA declared a "control event" on the determination of an expected $176 million deficit in the Fiscal Year 2011 Budget
- Nassau County currently forecasts the Fiscal Year 2011 deficit to be $168 million
- From the outset of this engagement, Grant Thornton set a goal to identify at least $200 million of cost reduction opportunities
- The framework for our approach should be considered in the context of the departmental reviews that follow in this report

**Strategy Assessment:**

- "Must have" vs. "nice to have"?
- Is this a core competency? Is Nassau County good at providing?
- Are there alternatives to Nassau County as the provider?

**"Must Haves":**

- What aspects of function/department are core and critical?
- What aspects are ancillary – support oriented?
- What aspects of function/department can be changed?
- What aspects of function/department are mandated and by whom?
- Is there a "volume" dimension to this function (i.e. can do more or less by choice)?
- Define who, how, and what for existing function
- Is there redundancy, inefficiency, and/or unnecessary work?

**"Nice to Haves":**

- Can benefits be defined and quantified?
- Can costs be reduced to a point of "break even" or better?
- Are users willing to pay? Is it legal to charge users?
- Are there alternative service providers? At reduced or no cost to Nassau County?
- What is the business case for continuing to provide these services?

© 2011 Grant Thornton | September 9, 2011

13-53846-tjt    Doc 4068    Filed 04/14/14    Entered 04/14/14 15:26:01    Page 287 of 322

# Concepts and Approaches to Cost Reductions

| POTENTIAL SAVINGS | PRO | CON |
|---|---|---|
| Same percentage reduction across all departments | Easiest for leadership | Ignores importance and relevance of department activities and services |
| Business process improvements (i.e. technology substitutes for people; consolidation of similar functions) | Generates long term, lasting effects | Implementation can be slow; internal negotiations can lead to sub-optimization |
| Eliminate a program/service | Simplifies and focuses remaining efforts | Loss of function/benefit |
| Reduce scope of a program/service | Maintains partial function | May have unmet needs |

© 2011 Grant Thornton | September 9, 2011

We believe the budget deficit for 2011 will approach $200 million. The two areas most readily available for reduction are personnel costs and non-employee expenses.

# How Can Nassau County Achieve $200 Million in Cost Reductions?

## Employee Headcount



| Budgeted Salaries & Fringe Benefits | $ 1,048,889,421 | = | $ 124,719 | **Average Total Compensation per Employee for FY '11** |
| Budgeted Employee Headcount | 8,410 | | | |

| Average Total Compensation per Employee for FY '11 | | $ | 124,719 |
| Employee Headcount Reductions | | x | 1,596 |
| **Total Reduction in Expenses** | | | $199,052,023 |

| Employee Reductions | 1,596 | = 19.0% | **Reduction in Employee Headcount** |
| Total Current Employee Headcount | 8,410 | | |

## Expense Reductions



| Non-Employee Expenses | $ 1,477,988,994 |
| Less: Direct Assistance | (610,198,941) |
| Less: Debt Service | (355,461,424) |
| Expenses Eligible for Reductions | $ 512,328,629 |

| Total Reduction in Expenses | $ 199,052,023 | = 38.9% | **Decrease in Expenses** |
| Total Expense Items to be Reduced | $ 512,328,629 | | |

**The solution will likely include reductions in both categories.**



© 2011 Grant Thornton | September 9, 2011

# FY 2011 Adopted Budget Revenues and Expenses*



## Expenses



## Revenues

*Major Funds
Source: Nassau County 2011 Adopted Budget

© 2011 Grant Thornton | September 9, 2011

19



# Nassau County:
## Recommendations



Grant Thornton

© 2011 Grant Thornton | September 9, 2011

# Summary of Findings and Recommendations

- This report identifies at least $251 million to $319 million of cost savings opportunities
  - Most savings can be achieved in the short to mid-term range, which we define as immediate to twelve months
  - To achieve savings in the required time frame, decisions must be made now and implementation plans developed in the next 60 days
- In general, we recommend the elimination or significant reduction of services which are non-essential and/or not cost reimbursed
  - Several departments that are mandated only by the Nassau County Charter provide services that are provided by State and local agencies and not for profits; we recommend these departments be consolidated and streamlined to remove redundancies
  - Some recommendations will require enabling legislative action or changes to legislation at the State and County level
  - Some recommendations will have an impact on collective bargaining agreements ("CBAs") and will require negotiations with the unions
- Departments that are led by separately elected officials must share the burden for reducing costs and enhancing operations; so as not to interfere with their independent status, we recommend a 15% across-the-board reduction in expenses for these departments
- We have made numerous recommendations for operational improvements throughout the County to *simplify* activities and more narrowly *focus* the County's services to those that are essential
- Nassau County requires new and continued investment in areas that are critical to its future success:
  - Two significant initiatives, the ERP implementation and strategic sourcing program, currently lack the necessary leadership to produce the savings possible; we recommend senior level staff hiring to assure successful conclusion of these projects
  - The potential cost for these recommended investments is $900,000
- The County's current organizational structure creates too large a span of control for the County Executive and Chief Deputy County Executive; strategic leadership and management at the departmental level are not sufficient to ensure successful execution of the business process changes we recommend:
  - Selective hiring of one or more additional Deputy County Executives
  - Reorganization of departments with related functions under accountable Deputy County Executives
  - The potential cost for this recommended investment is $300,000
- Nassau County's CBAs provide for an unsustainable level of compensation and benefits; as such, we recommend:
  - Instituting across the board contributions by employees for health and retirement benefits
  - Instituting across the board reductions to paid leave
- The level of compensation and benefits in the public safety CBA's has caused us to recommend service cuts in non-mandated departments that provide valuable services and are often well managed

© 2011 Grant Thornton  |  September 9, 2011

# Recommendations for Cost Savings

| KEY | |
|---|---|
| Short-Term: 0-6 months | NC: Nassau County Charter |
| Mid-Term: 6-12 months | NYS: New York State Law |
| Long-Term: Beyond 12 months | |

| | DEPARTMENT | RECOMMENDATION | AGGREGATE COST SAVINGS Total High $319,416,000 HIGH | Total Low $251,510,000 LO | NOTES TO POTENTIAL SAVINGS | IMPLEMENTATION TIMELINE | CBA IMPACT | LEGISLATION REQUIREMENT |
|---|---|---|---|---|---|---|---|---|
| | | | POTENTIAL SAVINGS | | | | | |
| 1 | All Departments | Institute an employee and retiree contribution to benefits in the range of 7-12% on a cost base of $400M | $ 48,000,000 | $ 28,000,000 | | Short-Term | Yes | Maybe |
| 2 | Police | Schedule shifts in accordance with crime patterns and best practices regarding productivity -Reduce staffing and maintain crime levels by basing shifts on need -Use 8 and 10 hour shifts as appropriate to respond to crime | $ 40,300,000 | $ 40,300,000 | | Mid-Term | Yes | No |
| 3 | All Departments | Reduce paid personnel absences by 7-14 days. Note: CSEA employees are entitled to approximately 44 days (excluding holidays) and Public Safety employees approximately 61 days annually | $ 34,600,000 | $ 17,300,000 | | Mid-Term | Yes | No |
| 4 | All Departments | Continue NIFA imposed wage freeze | $ 34,000,000 | $ 34,000,000 | | Mid-Term | No | No |
| 5 | Comptroller | Implement ERP | $ 30,000,000 | $ 25,000,000 | | Long-Term | No | No |
| 6 | Purchasing | Implement strategic sourcing program | $ 25,000,000 | $ 15,000,000 | | Mid-Term | No | No |
| 7 | Police | Redraw post and precinct maps, based on crime and demographics. As part of this, reduce precincts by at least two | $ 15,000,000 | $ 11,355,000 | | Mid-Term | Yes | No |
| 8 | Police | Eliminate non-mandated, non-cost-reimbursable activities: Crossing guard services | $ 9,222,000 | $ 9,222,000 | | Short-Term | Yes | No |
| 9 | Police | Eliminate non-mandated, non-cost-reimbursable activities: Marine patrol and rescue services | $ 7,519,000 | $ 7,519,000 | | Short-Term | Yes | No |
| 10 | Police | Reduce light roll call overtime | $ 7,400,000 | $ 7,400,000 | | Mid-Term | Yes | No |
| 11 | Purchasing | Select the best procurement practice for the size of the procurement | $ 5,200,000 | $ 4,200,000 | | Immediate | No | No |
| 12 | Police | Civilianize one position in each of the eight precincts | $ 5,000,000 | $ 3,250,000 | | Mid-Term | Yes | No |
| 13 | District Attorney | Reduce spending by 15% | $ 4,800,000 | $ 3,800,000 | | Short-Term | No | No |
| 14 | Police | Eliminate excess overtime payment by reverting to 261-day work year rather than current 232-day work year | $ 4,456,000 | $ 4,456,000 | | Mid-Term | Yes | No |
| 15 | All Departments | Eliminate $600 per employee education stipend | $ 4,000,000 | $ 4,000,000 | | Mid-Term | Yes | No |
| 16 | Police | Change shift schedules to minimize overtime due to hold over | $ 4,000,000 | $ 4,000,000 | | Mid-Term | Yes | No |
| 17 | Youth Board | Reduce discretionary funding | $ 3,000,000 | $ 2,000,000 | | Short-Term | No | Yes- NC |
| 18 | Police | Eliminate non-mandated, non-cost-reimbursable activities: Helicopter patrol and rescue services | $ 2,658,000 | $ 2,658,000 | | Short-Term | Yes | No |
| 19 | Parks, Recreation, and | Close museum properties | $ 2,500,000 | $ 1,500,000 | | Short-Term | Yes | No |
| 20 | Police | Hire a recruit class to be assigned to the Chief of Patrol to provide flexible manning | $ 2,084,000 | $ 2,084,000 | | Mid-Term | Yes | No |
| 21 | Board of Elections | Reduce funding for special elections until required by law | $ 2,000,000 | $ 1,000,000 | | Short-Term | No | No |
| 22 | Civil Service | Establish a fee schedule to charge non-Nassau County customers for placement services | $ 2,000,000 | $ - | | Mid-Term | No | Maybe |
| 23 | Constituent Affairs | Reduce department by 50%; transfer printing and graphics to Shared Services | $ 2,000,000 | $ 2,000,000 | | Short-Term | No | No |
| 24 | Information Technology | Reduce outsourcing of IT application development positions to outside contractors | $ 2,000,000 | $ 1,500,000 | | Short-Term | Yes | No |
| 25 | Police | Eliminate non-cost-reimbursable overtime for special events | $ 2,000,000 | $ 2,000,000 | | Short-Term | Yes | No |

© 2011 Grant Thornton | September 9, 2011

# Recommendations for Cost Savings

**KEY**
Short-Term: 0-6 months | NC: Nassau County Charter
Mid-Term: 6-12 months | NYS: New York State Law
Long-Term: Beyond 12 months

**AGGREGATE COST SAVINGS**
Total High $319,416,000 | Total Low $251,510,000

| | | POTENTIAL SAVINGS | | NOTES TO POTENTIAL SAVINGS | IMPLEMENTATION TIMELINE | CBA IMPACT | LEGISLATION REQUIREMENT |
|---|---|---|---|---|---|---|---|
| DEPARTMENT | RECOMMENDATION | HIGH | LO | | | | |
| 26 Police | Reduce positions paid for by Nassau County, currently 18, to do the work of the unions by half | $ 1,972,000 | $ 1,972,000 | | Mid-Term | Yes | No |
| 27 Police | Eliminate non-mandated, non-cost-reimbursable activities: Mounted patrol services | $ 1,506,000 | $ 1,506,000 | | Short-Term | Yes | No |
| 28 Veterans Services | Consolidate referral services into Constituent Services | $ 1,500,000 | $ 1,000,000 | | Short-Term | No | Yes - NC/NYS |
| 29 Legislature | Reduce spending by 15% | $ 1,250,000 | $ 1,250,000 | | Short-Term | No | Yes- NC |
| 30 Comptroller | Reduce spending by 15% | $ 1,200,000 | $ 1,200,000 | | Short-Term | Yes | No |
| 31 DPW - Operations | Contract with an ESCO to implement an energy efficiency program for County buildings to reduce energy costs | $ 1,045,000 | $ 645,000 | | Mid-Term | No | No |
| 32 Fire Commission | Identify lowest cost provider for EMT training | $ 1,000,000 | $ 1,000,000 | | Mid-Term | No | No |
| 33 Information Technology | Combine functions, integrate IT, and reduce overhead and shadow IT costs by 7-9 positions | $ 1,000,000 | $ 700,000 | | Mid-Term | No | No |
| 34 County Clerk | Reduce spending by 15% | $ 900,000 | $ 900,000 | | Short-Term | No | No |
| 35 Sheriff | Eliminate the "four-hour rule" allowing those on 207c to use four hours of a shift for therapy or doctor visits | $ 800,000 | $ 800,000 | | Mid-Term | Yes | No |
| 36 Board of Elections | Reduce personnel costs by 15% for full-time employees | $ 750,000 | $ 750,000 | | Immediate | No | No |
| 37 Comptroller – Payroll | Enforce INTIME system or similar system as the only time-keeping system acceptable for all departments | $ 750,000 | $ 500,000 | | Short-Term | Yes | No |
| 38 Purchasing | Centralize purchasing function and eliminate shadow function | $ 600,000 | $ 150,000 | | Mid-Term | No | No |
| 39 Parks, Recreation, and Museums | Undertake strategic sourcing/managed competition for parks maintenance services | $ 562,000 | $ 374,000 | | Mid-Term | Yes | No |
| 40 Minority Affairs | Consolidate function in Consumer Affairs, Constituent Services, and County Attorney | $ 500,000 | $ 500,000 | | Short-Term | No | Yes- NC |
| 41 Physically Challenged | Transfer services in County Clerk | $ 500,000 | $ 500,000 | | Short-Term | No | No |
| 42 DPW - Operations | Reduce non specialized vehicle fleet by 250 vehicles | $ 470,000 | $ 470,000 | | Short-Term | No | No |
| 43 Police | Reduce the number of hours provided for union excusals by half | $ 439,000 | $ 439,000 | | Short-Term | Yes | No |
| 44 County Executive | Reduce personnel costs by 15% | $ 425,000 | $ 425,000 | | Immediate | No | No |
| 45 Sheriff | Change the threshold for sick leave abusers from 9 instances of 1 day or longer to 6 instances | $ 400,000 | $ 400,000 | | Mid-Term | Yes | No |
| 46 CASA | Consolidate referral services into Constituent Services | $ 300,000 | $ 300,000 | | Short-Term | No | Yes- NC |
| 47 DPW - Administration | Consolidate budget management, accounts receivable/payable, and permitting, and eliminate 4 positions | $ 286,000 | $ 286,000 | | Short-Term | Yes | No |
| 48 Police | Outsource maintenance of the 20 Police boats | $ 262,000 | $ 262,000 | | Short-Term | Yes | No |
| 49 Comptroller – Payroll | Eliminate paper payroll checks; require all employees to receive Direct Deposit | $ 250,000 | $ 250,000 | | Short-Term | Yes | No |
| 50 Consumer Affairs | Eliminate discretionary spending on outreach and advocacy programs | $ 250,000 | $ 150,000 | | Short-Term | No | No |

© 2011 Grant Thornton | September 9, 2011

# Recommendations for Cost Savings

**KEY**
Short-Term: 0-6 months
Mid-Term: 6-12 months
Long-Term: Beyond 12 months

NC: Nassau County Charter
NYS: New York State Law

| | AGGREGATE COST SAVINGS | Total High $319,416,000 | Total Low $251,510,000 |
|---|---|---|---|

| | DEPARTMENT | RECOMMENDATION | POTENTIAL SAVINGS HIGH | POTENTIAL SAVINGS LO | NOTES TO POTENTIAL SAVINGS | IMPLEMENTATION TIMELINE | CBA IMPACT | LEGISLATION REQUIREMENT |
|---|---|---|---|---|---|---|---|---|
| 51 | DPW - Operations | Undertake strategic sourcing/managed competition for janitorial services | $ 225,000 | $ 150,000 | | Mid-Term | Yes | No |
| 52 | DPW - Operations | Undertake strategic sourcing/managed competition for building maintenance services | $ 219,000 | $ 146,000 | | Mid-Term | Yes | No |
| 53 | DPW - Engineering | Eliminate traffic safety board if additional grant funding is not available beyond September 30, 2011 | $ 211,000 | $ 211,000 | | Short-Term | No | No |
| 54 | DPW - Engineering | Undertake managed competition/ strategic sourcing for material testing laboratory services | $ 192,000 | $ 96,000 | | Mid-Term | Yes | No |
| 55 | DPW - Operations | Reduce the number of "take home" vehicles only to staff on call 24/7 | $ 141,000 | $ 62,500 | | Mid-Term | Yes | No |
| 56 | DPW - Engineering | Employ structural engineer for emergency situations | $ 139,000 | $ 119,000 | TBD | Short-Term | No | No |
| 57 | Comptroller - Payroll | Reduce number of transactions in supplemental payroll runs | $ 100,000 | $ 50,000 | | Mid-Term | Yes | No |
| 58 | Information Technology | Utilize a contract management system to track raises, special raises, deferral payments, and due dates | $ 100,000 | $ 50,000 | | Long-Term | No | No |
| 59 | Information Technology | Eliminate duplicate and unused software licenses, and pursue virtual licenses, where warranted | $ 100,000 | $ 50,000 | | Mid-Term | No | No |
| 60 | OMB | Develop standardized budget and management reports eliminating one position for ad hoc reporting | $ 100,000 | $ 100,000 | | Short-Term | No | No |
| 61 | Human Rights | Eliminate discretionary funding for celebrations and jobs development programs | $ 75,000 | $ 75,000 | | Short-Term | No | No |
| 62 | DPW - Operations | Standardize the fleet to reduce the cost of fleet maintenance and parts | $ 61,000 | $ 30,500 | | Mid-Term | No | No |
| 63 | Comptroller | Integrate benefits records system and NUHRS eliminates dual data entry | $ 50,000 | $ 50,000 | | Short-Term | No | No |
| 64 | DPW - Planning | Eliminate film and television promotion function | $ 47,000 | $ 47,000 | | Short-Term | No | No |
| 65 | Behavioral Health | Eliminate discretionary funded programs in excess of revenue available for Red Light Camera fund and allocated for Behavioral Health activities | $ - | $ - | TBD | Short-Term | No | Yes - NC |
| 66 | DPW - Operations | Implement a managed competition for vehicle fleet maintenance and ownership for non public safety vehicles | $ - | $ - | Currently unquantifiable | Mid-Term | Yes | No |
| 67 | Police | Renegotiate the police contract in its entirety | $ - | $ - | TBD | Mid-Term | Yes | No |
| 68 | Police | Review the benefits that have been granted through piecemeal negotiations and interest arbitration awards to bring the total benefits package in line with its 1995 status and those of comparable police departments | $ - | $ - | TBD | Mid-Term | Yes | No |
| 69 | Senior Citizens | Eliminate discretionary funded programs in excess of revenues available from Red Light Camera and allocated for Senior Citizens activities | $ - | $ - | TBD | Short-Term | No | Yes - NC |
| 70 | Sheriff | Use the Balcerak standard for 207c injury determinations | $ - | $ - | Tangible but | Long-Term | Yes | Yes - NYS |
| 71 | Sheriff | Eliminate award of non-salary benefits during 207c leave | $ - | $ - | TBD | Mid-Term | Yes | No |
| 72 | Sheriff | Adjust the cycle on which overtime is calculated, moving from the current standard of any hours over the standard shift to the limit of what is permitted under Section 7(k) of the FLSA | $ - | $ - | TBD | Mid-Term | Yes | No |

© 2011 Grant Thornton | September 9, 2011

# Recommendations for Operational Improvements

KEY
Short-Term: 0-6 months
Mid-Term: 6-12 months
Long-Term: Beyond 12 months

NC: Nassau County Charter
NYS: New York State Law

| | CLUSTER | DEPARTMENT | RECOMMENDATION | IMPLEMENTATION TIMELINE | CBA IMPACT | LEGISLATION REQUIREMENT |
|---|---|---|---|---|---|---|
| 1 | Administration | Civil Service | Modify and reduce the number of job descriptions to reflect current jobs and reduce out-of-title work as a result of outdated job descriptions | Short-Term | Yes | No |
| 2 | Administration | Constituent Affairs | Rename "Constituent Services" and consolidate referral functions of CASA, Minority Affairs, Veterans Services, and the Legislature | Immediate | No | Yes |
| 3 | Administration | County Clerk | Identify Opportunities to use technology to streamline processes | Mid-Term | Maybe | No |
| 4 | Administration | County Clerk | Assume responsibility for issuance of handicap parking permits | Short-Term | No | No |
| 5 | Administration | County Clerk | Work with Real Estate to improve physical work space | Short-Term | No | No |
| 6 | Administration | County Executive | Reorganize structure management along functional responsibilities; selectively hire additional Deputy County Executives | Short-Term | No | No |
| 7 | Administration | Human Resources | Create a structured approval process flow for Position Request Forms (PRF) | Mid-Term | No | No |
| 8 | Administration | Human Resources | Move payroll and benefits functions from Comptroller and Information Technology into Human Resources under a Shared Services model | Immediate | No | No |
| 9 | Administration | Information Technology | Increase IT investment and develop a strategic IT plan | Mid-Term | No | No |
| 10 | Administration | Information Technology | Increase level of self service | Mid-Term | Yes | No |
| 11 | Administration | Information Technology | Recruitment in APIDS, Civil Service Roster System, NUHRS system – interface systems; effect integration with new ERP system, up-front cost and long-term savings | Long-Term | No | No |
| 12 | Administration | Information Technology | Adopt new approach to completion of ERP implementation | Short-Term | No | No |
| 13 | Finance | Assessment | Eliminate the "county guarantee" on tax refunds | Long-Term | No | Yes - NYS |
| 14 | Finance | Assessment | Establish a margin of error for assessment grievances below which a taxpayer would be prohibited from filing a grievance (10-15%) | Long-Term | No | Yes - NYS |
| 15 | Finance | Assessment Review Commission | Fully implement and utilize the "ADAPT" system to integrate tax assessment information | Mid-Term | No | No |
| 16 | Finance | Comptroller | Conduct succession planning to mitigate knowledge loss expected from near-term retirements; identify replacement personnel and establish defined cross-over period to facilitate knowledge | Short-Term | No | No |
| 17 | Finance | Comptroller | Begin processing payroll on a one pay period lag | Mid-Term | Yes | No |
| 18 | Finance | Comptroller | Investigate VEEB contract | Short-Term | No | No |
| 19 | Finance | Comptroller | Conduct a dependents eligibility audit for health insurance | Short-Term | No | No |
| 20 | Finance | Comptroller | Transfer payroll and benefits administration to Human Resources as part of Shared Services | Short-Term | No | No |
| 21 | Finance | Comptroller | Conduct physical payroll audit | Immediate | No | No |
| 22 | Finance | OMB | Strengthen performance measures for all County departments by monitoring task specific, performance metrics | Long-Term | No | No |
| 23 | Finance | OMB | Identify and implement improvements to grants management processes | Long-Term | No | No |
| 24 | Finance | OMB | Consolidate all of a department's activities (revenues and expenses) regardless of how they are funded for budgeting and reporting purposes and operational analysis | Short-Term | No | No |
| 25 | Finance | Purchasing | Evaluate procurement process performance and reallocate resources to problem areas | Long-Term | No | No |

© 2011 Grant Thornton | September 9, 2011

25

# Recommendations for Operational Improvements

KEY
**Short-Term:** 0-6 months
**Mid-Term:** 6-12 months
**Long-Term:** Beyond 12 months

**NC:** Nassau County Charter
**NYS:** New York State Law

| | CLUSTER | DEPARTMENT | RECOMMENDATION | IMPLEMENTATION TIMELINE | CBA IMPACT | LEGISLATION REQUIREMENT |
|---|---|---|---|---|---|---|
| 26 | Finance | Purchasing | Conduct a workforce assessment to include succession planning and training | Immediate | No | No |
| 27 | Finance | Purchasing/Comptroller | Strengthen oversight by the Comptroller's office. Structure review to address larger and more complex procurement. Use audit procedures to test smaller items | Mid-Term | No | No |
| 28 | Health and Human Services | Behavioral Health | Programmatic review to ensure maximizing grants and cost reimbursements | Short-Term | No | Yes - NC |
| 29 | Health and Human Services | Behavioral Health | Review and optimize third party providers | Short-Term | No | Yes - NC |
| 30 | Health and Human Services | CASA, Minority Affairs, Veterans Services | Prepare transition plan that will encompass transferring referral services to Constituent Services | Immediate | No | No |
| 31 | Health and Human Services | Human Rights | Explore consolidation with County Attorney's office | Short-Term | No | Maybe |
| 32 | Health and Human Services | Senior Citizens | Programmatic review to ensure maximizing grants and cost reimbursements | Short-Term | No | Yes - NC |
| 33 | Health and Human Services | Senior Citizens | Review and optimize third party providers | Short-Term | No | Yes - NC |
| 34 | Health and Human Services | Social Services, Health & OEM | Better coordinate emergency preparedness services from the three department to reduce duplicative services | Mid-Term | No | No |
| 35 | Infrastructure | DPW - Administration | Activity Based Costing study to ascertain true cost of providing services in support of re-pricing fees for all permits and licenses to ensure complete recapture of related cost | Short-Term | No | No |
| 36 | Infrastructure | DPW - Administration | Review and re-design County capital planning process to mitigate the labor and time intensive procedures currently in place | Short-Term | No | No |
| 37 | Infrastructure | DPW - Administration | Evaluate potential for consolidating accounts payable and accounts receivable management within a shared service function | Short-Term | No | No |
| 38 | Infrastructure | DPW - Administration | Review and re-design County capital planning process to mitigate labor and time intensive procedures currently in place | Short-Term | No | No |
| 39 | Infrastructure | DPW - Administration | Evaluate the potential for consolidating accounts payable and accounts receivable management within a shared service function | Short-Term | No | No |
| 40 | Infrastructure | DPW - Administration | Undertake a fee study to ascertain the true cost of providing services in support of all fees | Short-Term | No | No |
| 41 | Infrastructure | DPW - Engineering | Implement Assetworks system | Mid-Term | No | No |
| 42 | Infrastructure | DPW - Engineering | Introduce formal checklist for union input into contracting to reduce grievance claims | Short-Term | No | No |
| 43 | Infrastructure | DPW - Engineering | Obtain Comptroller approval of contracts prior to invoicing | Mid-Term | No | No |
| 44 | Infrastructure | DPW - Engineering | Formalize weighting of criteria in contracting proposal evaluation | Short-Term | No | No |
| 45 | Infrastructure | DPW - Operations | Design and establish service level agreements for DPW with its client County departments that clearly identify roles and responsibilities, service request procedures, required response times, escalation processes and possess measurable and time bound objectives | Short-Term | No | No |
| 46 | Infrastructure | DPW - Operations | Implement a policy limiting the use of County vehicles for personal use.  Implement GPS trackers in all | Short-Term | No | No |
| 47 | Infrastructure | DPW - Operations | Re-establish five day shift patterns for Fleet Maintenance staff to reduce garage down time and improve service efficiency | Mid-Term | Yes | No |
| 48 | Infrastructure | DPW - Operations | Accelerate County building consolidation program, reducing building maintenance and utilities costs | Short-Term | No | No |
| 49 | Infrastructure | DPW - Planning | Study to determine appropriate size and composition of vehicle fleet with goal of substantial reduction in fleet size | Short-Term | No | No |
| 50 | Infrastructure | DPW - Planning | Consolidate grants management responsibilities, currently in Administration and Planning functions to eliminate duplication | Short-Term | No | No |

© 2011 Grant Thornton | September 9, 2011

# Recommendations for Operational Improvements

**KEY**
Short-Term: 0-6 months
Mid-Term: 6-12 months
Long-Term: Beyond 12 months

NC: Nassau County Charter
NYS: New York State Law

| | CLUSTER | DEPARTMENT | RECOMMENDATION | IMPLEMENTATION TIMELINE | CBA IMPACT | LEGISLATION REQUIREMENT |
|---|---|---|---|---|---|---|
| 51 | Infrastructure | Real Estate | Develop a multi-year plan detailing the building consolidation programs (developed with DPW), disposal and open space acquisition | Mid-Term | No | No |
| 52 | Infrastructure | Real Estate | Evaluate whether real estate encroachment fines and penalties can be levied and managed using County Attorney staff, generating additional penalty fee income | Mid-Term | No | No |
| 53 | Infrastructure | Real Estate | Evaluate potential for consolidating Real Estate into the Department of Public Works to maximize efficiency of shared administrative services | Mid-Term | No | No |
| 54 | Legal | County Attorney | Work with Real Estate to improve physical work space | Short-Term | No | No |
| 55 | Legal | Legislature | Consolidate referral activities into Constituent Services | Short-Term | No | No |
| 56 | Public Safety | Fire Commission | - Re-design workflow process for fire plan review and inspection, including full activity based costing for fee pricing<br>- Re-design staffing protocols to match job description with appropriate skill set, including better distinctions for civilianization of positions<br>- Evaluate opportunities to consolidate and streamline communication center operations among Police, Fire, and Volunteer Fire departments | Short-Term | | |
| 57 | Public Safety | Fire Commission | Conduct a full cost study for each of the following: plan review and inspection and emergency light tests; ensuring that service delivery is fully cost neutral | Short-Term | No | No |
| 58 | Public Safety | Fire Commission | Right size staff by position/classification and job duty | Mid-Term | Yes | No |
| 59 | Public Safety | Police | Review fleet management activities to determine the most efficient manner for County-wide service delivery | Short-Term | Yes | No |
| 60 | Public Safety | Police | Review information technology activities to determine the most efficient way to deliver | Short-Term | Yes | No |
| 61 | Public Safety | Police | Review the delivery methods for fire and police communications centers to determine if improving the synergistic relationship could create better service or cost reduction | Short-Term | Yes | No |
| 62 | Public Safety | Police | Review the job duties of all police officers that are non-patrol positions to increase civilianization and civilianize any positions that don't require "peace officer" status | Mid-Term | Yes | No |
| 63 | Public Safety | Sheriff | Conduct an efficiency study to determine whether there are opportunities to improve the detainee-to-staff ratios for the Correction Center | Immediate | Yes | No |

# Cost Savings Recommendations
## High Scenario



© 2011 Grant Thornton  |  September 9, 2011

# Cost Savings Recommendations
## High Scenario Implementation Time and CBA Impact/Legislation Required

**Implementation Timeline for Recommendations**



Immediate, $6,375,000

Short-Term, $96,684,000

Long-Term, $30,100,000

Mid-Term, $186,257,000

**CBA Impact for Recommendations**

CBA Impact "Yes", $200,043,000

CBA Impact "No", $119,373,000

**Legislation Requirement for Recommendations**

Legislation Requirement "Yes - NC/NYS", $1,500,000

Legislation Requirement "Yes - NC", $5,050,000

Legislation Requirement "Maybe", $50,000,000

Legislation Requirement "No", $262,866,000

© 2011 Grant Thornton | September 9, 2011

# Current Nassau County Organizational Chart



**Key**

| Administration | Infrastructure |
| Finance | Legal |
| Human Services | Public Safety |

**COUNTY EXECUTIVE**

- Deputy County Executive
  - Management & Budget
    - IT — Ed Eisenstein
  - Treasurer
- Deputy County Executive/IDA
  - Senior Policy Advisor
    - Constituent Affairs
    - Health
    - Minority Communications
    - Probation
    - Press Office
    - Director of Governmental Research
- Counsel to the County Executive
  - TPVA
- Chief Deputy County Executive
  - Planning & Public Works
  - Labor Relations
  - Purchasing
  - Sheriffs Department
  - CASA
  - Housing & Community Development
  - Human Resources/EEO Officer
  - Civil Service
  - Real Estate
  - Parks, Recreation & Museums
  - Assessment
  - Assessment Review Commission
- Police
- County Attorney
- Emergency Management
- Fire Commission
- Director of Government Services
  - Veterans Services
  - Human Rights
  - Social Services
  - Consumer Affairs
- Human Services
  - Senior Citizens
  - Mental Health Chemical Dependency & Developmental Disabilities
  - Physically Challenged
  - Youth Board
- Deputy County Executive/DBE Officer/Minority Affairs

IDA (For Communication Purposes Only)

- District Attorney
- Legislature
- County Clerk
- Comptroller

© 2011 Grant Thornton | September 9, 2011

# Proposed Nassau County Organizational Chart

**Key**

| | |
|---|---|
| Administration | Infrastructure |
| Finance | Legal |
| Human Services | Public Safety |
| ~~Consolidated Department~~ | Development |

**COUNTY EXECUTIVE**

Press Secretary to the County Executive

Counsel to the County Executive

**Deputy County Executive of Public Safety & Legal**
- Human Rights
- Medical Examiner
- Traffic & Parking Violations
- County Attorney
- Commissioner of Police
- Probation
- Sheriff
- Fire Marshal
- Emergency Management

**Deputy County Executive of Heath & Human Services**
- Social Services
- Health
- Constituent Services
- Community Development / Housing
- ~~Veterans Services~~
- Human Services
- ~~Constituent Affairs~~
- Youth Board
- ~~Minority Affairs~~
- Behavioral Health
- CASA
- Senior Citizen Affairs
- ~~Physically Challenged~~

**Deputy County Executive of Finance & Administration**
- Consumer Affairs
- Assessment
- Public Administrator
- Assessment Review Commission
- Shared Services
- Board of Elections
- Labor Relations
- Civil Service Commission
- HR/ Investigations
- OMB
- Information Technology
- Purchasing
- Printing & Graphics
- Treasurer

**Deputy County Executive of Infrastructure & Development**
- Courts
- Real Estate
- Public Works
- Parks & Recreation
- ~~Government Research~~
- ~~Minority Communication~~
- Economic Development / IDA

County Clerk

Comptroller

District Attorney

Legislature

Legislative Budgetary Review

© 2011 Grant Thornton  |  September 9, 2011



**A discussion of the pros and cons of bankruptcy for states** February 2011

# Too big to fail *or* too big to bail (out)



The debate about whether states should be given an option to file for bankruptcy is gaining momentum, not only in Washington but also with interested parties throughout the country. Bankruptcy professionals and municipal finance investment bankers have weighed in, as have politicians of both parties, and surprisingly, not necessarily along traditional party lines. This article attempts to outline the many pros and cons of the issue and suggests a framework for continuing the debate in a way that leads to a reasoned opinion.

| Pro | Con |
| --- | --- |
| Proven process to bring constituencies together; creates framework | Poses challenges to states' sovereignty and law-making process |
| Forces long-term solutions to structural imbalance | Destabilizes municipal finance markets |
| Avoids defaults and disruptions | General disruption to financial markets |
| Transparency | Reputational and political risk to elected officials |
| Avoids federal bailout | Negative effect on business and economic development |
| Restructures pension and other long-term obligations | DIP and exit financing possibly problematic |
| Restructures collective bargaining agreements | Administrative burden and costs |
| Benefits from the sheer "threat" of filing | Anti-union outcomes |

Bankruptcy proceedings in the United States are available to people and legal entities who need to restructure their debts and/or operations. Bankruptcy becomes an option when the situation becomes so severe that it is impossible to pay bills when they are due, or the amount of liabilities and obligations dwarfs the available assets and resources. Individuals, companies and some municipalities (called "debtors") can seek shelter and the time to work out alternatives by subjecting themselves to the jurisdiction of the Bankruptcy Court. Through this process, the obligations of the debtors are eliminated or modified such that the debtors can obtain a "fresh start."



**Too big to fail: The con argument**

We're going to start on the con side of the debate because it is the easier to understand for those not intimately familiar with the bankruptcy process. First among the arguments is that states are sovereign entities and submitting to the federal jurisdiction of the Bankruptcy Code is a problem. The original 1934 municipal bankruptcy legislation establishing Chapter 9 was declared unconstitutional in 1936 as a violation of federalism, noting that the states themselves were responsible for the fiscal affairs of their municipalities[1]. Ultimately, legislation was passed in 1937 and revised in 1942 and 1978 to further clarify the parameters of municipal bankruptcy. But in each subsequent revision, the focus remained on state sovereignty. Legislation required that states grant their municipalities authority to file for bankruptcy protection either via a broad, standing authorization or on a case-by-case specific authority.

Possibly of greater concern is the challenge to harmonize the state's law-making process and the bankruptcy law. Clearly, bankruptcy law often intersects with other laws — be they labor, insurance, maritime or even canon — and bankruptcy judges and constituencies find a way to reconcile the federal bankruptcy statutes with these other bodies of law. Federal legislation authorizing state-level bankruptcy will likely create a whole host of political issues such as "home rule" questions and the need to repeal state constitutional prohibitions against seeking bankruptcy protection. All this could distract elected officials from making the hard decisions that deal directly with their state's fiscal distress.

Another argument against permitting state bankruptcies is the potential effect on the municipal finance market. No doubt, the rating agencies would have to add an item to the checklists and evaluate the likelihood of bankruptcy. But don't they do that now in the context of assessing the likelihood of default? The bigger issue here is that a state's ability to issue debt — apparently without limit — may come to an end, temporarily. It is probable that the cost of borrowing will increase[2] both for capital projects, which is unfortunate, and for operating expenses or working capital, which is not. It would be interesting to count how many corporations have failed to adapt to competitive changes in the last several years because they could simply borrow more money at attractive rates.

1 Ashton v. Cameron Water Improvement District No. 1 (1936), U.S. Supreme Court.

2 Only about half of the states allow access to Chapter 9 to municipalities within their jurisdictions. An interesting study would be to assess the ratings differentials of bond issues in states with, and in states without, the ability to file the bankruptcy.

3 We note that the number of insured new municipal bond issues dropped by 50 percent between 2009 and 2010 and that the pricing for the insurance has more than doubled.

The potential market disruption from a state bankruptcy could be far more catastrophic to global markets than many may care to recognize. The table below shows how the gross domestic product (GDP) of eight troubled U.S. states compares with major country GDPs. If the markets turned and roiled when Greece or Ireland became distressed, imagine how the world would react if California or Illinois suddenly sought protection under new bankruptcy legislation.

A small but important point: a state bankruptcy filing could negatively affect the reputation and political future of the state's elected officials. In fact, many of the problems a bankruptcy would strive to fix are the result of elected officials putting reelection ahead of their managerial responsibilities. Enough said.

The short- and long-term impact of a state's filing on business and economic development, and the ripple effect on companies that rely on states for a significant portion of their revenue, is concerning. Domestic and international businesses looking to expand in the United States often put states in competition with one another for their investment dollars. It is likely that a state in bankruptcy would have a difficult time attracting new investments and/or closing deals in process. Further, middle-market companies that sell to states and are financed by asset-based lenders may not be able to borrow based on their government receivables. An outright rejection by a large customer — in this case, the state — could create an unanticipated cascade of liquidity concerns in the private sector.

| 2009 GDP (in millions) | |
| --- | --- |
| Japan | $5,068,996 |
| China | 4,985,461 |
| Germany | 3,330,032 |
| France | 2,649,390 |
| United Kingdom | 2,174,530 |
| Italy | 2,112,780 |
| **California** | 1,891,363 |
| Spain | 1,460,250 |
| Russian Federation | 1,231,893 |
| **Texas** | 1,144,695 |
| **New York** | 1,093,219 |
| Netherlands | 792,128 |
| **Florida** | 737,038 |
| **Illinois** | 630,398 |
| **Pennsylvania** | 554,774 |
| **New Jersey** | 482,967 |
| Greece | 329,924 |
| Denmark | 309,596 |
| Finland | 237,989 |
| Portugal | 232,874 |
| **Connecticut** | 227,405 |
| Ireland | 227,193 |

A big hurdle for a state would be financing during a bankruptcy. In the corporate world we have financing such as debtor-in-possession (DIP) financing. DIP financing provides necessary liquidity to the debtor during the bankruptcy proceeding and is often turned into permanent financing, known as exit financing, as part of a plan of reorganization. The lenders that provide this financing are sophisticated and the market is competitive. Also, there are limits to this established financing method, as was the case with General Motors when the federal government became the DIP financier. The states' equivalent of working capital financing is revenue anticipation notes (RANs) and tax anticipation notes (TANs). It is not clear that this type of financing would continue to be available even at increased pricing, during a state's bankruptcy proceeding.

Some have commented on the cost associated with a public sector bankruptcy. Fingers are pointed to Vallejo, California, as an example of a costly bankruptcy. But readers should look to the valuable solutions delivered in terms of reduced costs and future obligations in exchange for the price of the professionals. More troubling than the sheer cost of the proceeding is the administrative burden on government employees and the potential number of constituencies that will need volumes of information from, and access to, a small number of knowledgeable employees. Another concern is the bankruptcy tradition which requires the debtor to pay for the legal and advisory bills of some of the participants in the bankruptcy proceeding. Given the size and the complexity of a state bankruptcy, a different approach to who pays for what may make sense.

A significant concern is the very "anti-union" feel of a state bankruptcy law and process. Existing Chapter 9 provisions have a lower threshold for voiding union contracts, compared with those of Chapter 11. Moreover, public sector employee unions are some of the largest contributors to the campaigns of elected officials. This creates quite a conundrum: use the power of the Bankruptcy Code to solve the long-term structural issues with some of these burdensome contracts or part ways forever with a large campaign contributor.

Now that you're convinced that bankruptcy for states is a nonstarter and that the debate should be relegated to academic circles or the local pub, let us outline why giving states the ability to engage in a court-supervised formal proceeding could be a good thing.

---

4. Orange County, Calif., was the largest municipal Chapter 9, lasting some 18 months. Within three years of emerging from bankruptcy, 100 percent of the principal was repaid, no taxes were raised, and new bond issues were investment-grade.

2

### Too big to fail: The pro argument

In today's corporate world, bankruptcy is a well-developed and highly beneficial process that brings many constituencies to resolve difficult problems. The Bankruptcy Code and years of practice have created a framework by which all the players participate. Currently, there is no forum to force any constituency to the negotiating table to work out a state's long-term structural deficits. In the current environment, parties in interest can simply wait it out until they go the route of Prichard, Alabama, which has literally run out of money to pay its retirees. For years, Prichard officials warned that the trade-off between providing ongoing services or funding the pension promises it made to employees would mean that eventually the pension fund would be unable to keep those promises. Most states are in precisely the same situation, but with slightly longer time frames in which to solve the dilemma.

The bankruptcy process has been successful in fixing "bad companies" and "bad balance sheets." What bankruptcy practitioners mean by this is that bankruptcy can be used to fix the operations of a business and/or the balance sheet of a company. In the parlance of the public sector, this would equate to an ability to live within the current means, matching current revenue and expenses through a reassessment of core competencies and services and garden-variety cost cutting. The analogy to the corporate balance sheet is a state's long-term structural imbalance that manifests in unfunded pensions, ever-increasing operating expenses not offset by increases in revenues, and infrastructure projects that will not generate enough revenue to pay off their bonds.

Another argument in favor of a controlled restructuring for states is that it would avoid the chaos that could ensue from a default — no state has defaulted since Arkansas in 1933. This is not to minimize the complexity of restructuring the debt, particularly in light of the hundreds, and even thousands, of bond issues. It is rather to compare the benefits of an orderly process with the costs of helter-skelter, one-off deals addressing only the pressing issues of the moment. A judicially supervised process would be preferable for long-term holders, including widows and orphans, although bond traders may feel otherwise.



One of the greatest benefits of a formal restructuring is the transparency that a court-supervised process would invoke. The role of the court to oversee negotiations, cajole parties to resolve differences, approve out-of-the-ordinary transactions, provide a forum for any constituency to be heard, supervise the professionals and monitor progress is a great benefit to the stakeholders. It is the transparency, or threatened transparency, of the courtroom that often drives the negotiations toward a consensual resolution. "Pain sharing" is a term that is often used in the context of a bankruptcy. The oversight of the judge, coupled with the public nature of the process, does yield negotiated resolutions in which all the constituencies bear pain — and gain.

Avoiding the federal government's bailout of a state is a key reason to allow a state to reorganize in a bankruptcy proceeding. Who is to say that saving California is more important than saving, say, Rhode Island or Arizona? Clearly, California dwarfs these states in size and economic output, but does anyone in Washington really want to pick and choose who gets bailed out? Whether you think the recent bailouts of the financial industry or the automakers were beneficial or not, few would argue that this is an optimal use of our federal government's time and money.

Pensions provided by states — or any other municipality, for that matter — do not have a safety net such as that provided by the Pension Benefit Guaranty Corporation (PBGC) to private companies. The magnitude of the underfunded pensions due government employees is astonishing.



This is caused, in part, by overgenerous benefits that were negotiated between unions and government leaders seeking favor with important voting blocks. Taxpayers who have experienced a loss of retirement benefits in the private sector or watched their 401(k)s shrink dramatically are suffering from "pension envy" of their public sector counterparts. If pensions are unquestionably overgenerous and represent an unsustainable burden on future generations, then a rational, economic approach to restructuring is warranted. Restructuring those obligations, however, is virtually impossible today. A better approach would be to use the bankruptcy process to revise the "promises" and ensure that promises are kept in a way that doesn't unduly burden future constituencies. Some have suggested that a PBGC-type approach needs to be developed for government pensions. This is a noble idea, but alone is not sufficient to resolve the multifaceted problems facing our state governments. These problems would benefit from broader restructuring activities.

In regards to the "anti-union" sentiment discussed above, some readers will see the ability to force common sense contracts onto public employee unions as a major plus of a bankruptcy. For the most part, most government employees are diligent and hardworking and not paid exorbitantly for the work they do. However, widespread abuses of the "system" are prevalent and condoned because of ridiculous contract provisions, agreed to by elected officials attempting to curry favor. Bankruptcy could make needed contract changes easier to achieve.

Most importantly, the existence of a bankruptcy law for states will likely cause states and the constituencies with which they work and do business to put forth more effort to resolve these very thorny issues. Because no politician at the state level wants to manage the administrative process that distracts from governance, the mere enactment of bankruptcy legislation could result in positive actions by states and constituencies.

## A framework for continuing the debate and reaching resolution

Nothing would be worse than for Congress to rush to pass a "bad" state bankruptcy bill. As we've demonstrated, this is a complex topic with plenty of room for partisan and bipartisan debate. However, the states' situation is not getting better. We suggest that a task force composed of knowledgeable bankruptcy professionals, bipartisan representatives of elected officials at congressional and state levels, organized labor, municipal finance bankers, former bankruptcy judges and influential businesspeople be formed with a fixed timetable to deliver a recommendation on the issue.

Although professionals knowledgeable about successful and unsuccessful Chapter 9s should be involved in the work of the task force, bankruptcy for states need not necessarily take the form of Chapter 9. Also, new legislation could address only certain issues faced by states, say, only long-term obligations or only current operating deficits, leaving others to the options currently available. Technical issues such as the automatic stay, absolute priority rule and qualifications for bankruptcy court protection do not necessarily need to follow the current Code. Our point is that fresh thinking would be welcome as the task force members sort through the pros and cons of state bankruptcy legislation.

In closing, there are those who argue that the tools already exist for states to fix their problems: cut spending and raise taxes. Others believe that this argument is nonsense until elected officials develop motivations beyond rejection and have the will to act on them. Regardless of your point of view on this issue, maintaining the status quo and avoiding hard decisions will lead to fiscal disaster at the expense of the next generation.

**For more information, please contact:**

**Martha E. M. Kopacz**
Managing Principal
Corporate Advisory & Restructuring Services
T 212.54.9730 (New York office)
T 617.848.5010 (Boston office)
E Marti.Kopacz@us.gt.com

**Michael E. Imber**
Principal
Corporate Advisory & Restructuring Services
T 212.542.9780
E Michael.Imber@us.gt.com

# Offices of Grant Thornton LLP

**National Office**
175 West Jackson Boulevard
Chicago, IL 60604
312.856.0200

**Arizona**
Phoenix
602.474.3400

**California**
Irvine
949.553.1600
Los Angeles
213.627.1717
Sacramento
916.449.3991
San Diego
858.704.8000
San Francisco
415.986.3900
San Jose
408.275.9000
Woodland Hills
818.936.5100

**Colorado**
Denver
303.813.4000

**Florida**
Fort Lauderdale
954.768.9900
Miami
305.341.8040
Orlando
407.481.5100
Tampa
813.229.7201

**Georgia**
Atlanta
404.330.2000

**Illinois**
Chicago
312.856.0200
Oakbrook Terrace
630.873.2500

**Kansas**
Wichita
316.265.3231

**Maryland**
Baltimore
410.685.4000

**Massachusetts**
Boston
617.723.7900

**Michigan**
Detroit
248.262.1950

**Minnesota**
Minneapolis
612.332.0001

**Missouri**
Kansas City
816.412.2400
St. Louis
314.735.2200

**Nevada**
Reno
775.786.1520

**New Jersey**
Edison
732.516.5500

**New York**
Long Island
631.249.6001
Downtown
212.422.1000
Midtown
212.599.0100

**North Carolina**
Charlotte
704.632.3500
Greensboro
336.271.3900
Raleigh
919.881.2700

**Ohio**
Cincinnati
513.762.5000
Cleveland
216.771.1400

**Oklahoma**
Oklahoma City
405.218.2800
Tulsa
918.877.0800

**Oregon**
Portland
503.222.3562

**Pennsylvania**
Philadelphia
215.561.4200

**South Carolina**
Columbia
803.231.3100

**Texas**
Austin
512.391.6821
Dallas
214.561.2300
Houston
832.476.3600
San Antonio
210.881.1800

**Utah**
Salt Lake City
801.415.1000

**Virginia**
Alexandria
703.837.4400
McLean
703.847.7500

**Washington**
Seattle
206.623.1121

**Washington, D.C.**
Washington, D.C.
202.296.7800

**Wisconsin**
Appleton
920.968.6700
Milwaukee
414.289.8200

**Washington National Tax Office**
1900 M Street, NW, Suite 300
Washington, D.C. 20036
202.296.7800

## About Grant Thornton

The people in the independent firms of Grant Thornton International Ltd provide personalized attention and the highest quality service to public and private clients in more than 100 countries. Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd, one of the six global audit, tax and advisory organizations. Grant Thornton International Ltd and its member firms are not a worldwide partnership, as each member firm is a separate and distinct legal entity.

Content in this publication is not intended to answer specific questions or suggest suitability of action in a particular case. For additional information on the issues discussed, consult a Grant Thornton client service partner.



Turnaround "apps" for the public sector


Grant Thornton

**Contents**

2 The platforms

3 Strategy platform

5 Operations platform

8 Finance platform

10 Leadership platform

11 Conclusion

From Westport to Winnetka to Walnut Creek, from cafés to cornfields to oil rigs, all over America we see people with their heads bent over iPads, iPods, iPhones, BlackBerrys, Droids and all manner of electronic communication devices, seeking answers to problems, finding information or enjoying some entertainment. All are seeking the "super app" that solves their problems or meets their needs.

Government leaders, too, are looking for solutions: they need the turnaround solutions that will restore fiscal stability, stimulate growth and solve government problems. To this end, we would like to offer some turnaround "apps" — proven winners in the corporate world — that can be applied in the public sector with relative ease. The corporate world already has what the public sector is looking for.

# The platforms

All of our turnaround "apps" need to run on one of the four platforms[1] listed below. Together, these platforms create a strategic framework for executing turnarounds in the public sector.

- ● Strategy
- ● Operations
- ● Finance
- ● Leadership

In the world of corporate turnarounds, every restructuring project is unique, even those within the same industry. And by their very nature, restructuring activities must be objective and analytical — in other words, apolitical. However, to be successful, an appreciation of the political landscape is required. All of this also holds true for cities, counties, schools and other government units. Each government unit has a unique set of circumstances, though its essential business of executing public policy remains the same. Throw in diverse political situations, and each public sector restructuring will also be unique.



While acknowledging that every restructuring project is unique and must be approached with a fresh perspective, restructuring professionals draw upon past experiences and interpret them in ways relevant to the current situation. There is also an accepted ordering of the restructuring steps that should not be ignored. Leadership must come first, followed by a clear strategy. Operational improvement and financial stability can be orchestrated together or separately, as the situation warrants. Although leadership is the first component, it is discussed last, after the reader has had the chance to become familiar with restructuring concepts.

It is important to emphasize that there is neither a shortcut to success nor a silver bullet solution. Focusing just on operational improvement will not result in a sustainable solution. Likewise, the strongest leader cannot be successful without sound execution of the other three components.

1 James B. Shein, author of *Reversing the Slide: A Strategic Guide to Turnarounds and Corporate Renewal*, identified the "turnaround tripod" of strategy, operations and finance. Leadership has been added as another essential component to complete our list of platforms for the public sector.

# Strategy platform

Every private enterprise has a mission, too, has a mission, which is often defined in local charters and constitutions. Current leadership interprets the mission, and public policy embodies the prioritization and execution. Public policy is the strategy of government but government units need to adopt corporate-like strategic planning in order to allocate scarce resources and manage constituents' expectations most effectively.

**Strategy app #1: Determining core services**

Defining government's core services is at the heart of any municipal restructuring effort. For example, all municipalities share a common concern for public safety that is reflected in the strength of their police and fire departments. One or several school districts often claim a major portion of the local budget but the quality of the educational program will vary with the allocation of budget dollars, demographic mix of the students and the capability of the teachers. Infrastructure in the form of roads, bridges and buildings, along with related maintenance, is generally in the exclusive purview of the government unit. The degree to which other services such as health care, sanitation, environmental management and business regulation should be prioritized is usually subject to debate and prevailing political sentiment.

But must cities provide swimming pools and golf courses? Is it necessary to operate a day care center for the elderly or preschool children? Such services are often available in a community from private for-profit or nongovernmental not-for-profit organizations. In general, government units need to engage in a strategic assessment that includes a decision framework for prioritizing its activities. The first question to be answered is this: What should be included in the government's service offering?

The question can be answered after determining if the service is mandated by either law or public policy. If yes, the follow-up question is: What level or type of service is required? A government must protect the safety of the public; what about providing security for a local music festival? Is it necessary for the police to be called every time the fire department is summoned to a private residence? The answer to the first question might seem simple, but the answer to the follow-up question presents some challenges. Governments pride themselves on their contributions to the quality of their residents' lives. The more parks, the more summer programs, the cleaner the streets, some would say, the better. But is it absolutely necessary to operate community colleges or programs for veterans? As prioritization becomes less clear, the debate can turn political over public policy concerning "must-have" versus "want-to-have" programs.

**Strategy app #2: Core competencies and priorities**

Having identified the strategic activities of the government unit, the next question that needs to be answered is: What are the government's core competencies? In other words, what activities does this government unit perform that are unique to the community, cannot be easily imitated or deliver value that is best in class? In the private sector, turnaround specialists evaluate business units based on profitability and return on investments. The equivalent in the public sector is performance metrics that evaluate how effectively the program serves its purpose. In the category of "must-have" programs such as police, fire protection and schools, the departments' effectiveness can be evaluated in terms of crime rates, protection against property damage, student performance and any number of other logical, empirical metrics.



How do these departments compare with those found in other communities? Is there a private sector alternative that can serve as a benchmark? There is an order to the analysis and economic logic in addressing the inefficiencies of the "must-have" programs that should be part of a government's core competency before addressing the "want-to-have" programs.

"Want-to-have" programs can vary from community to community and should not be assumed to be luxurious extravagances. It is often in these programs that public sector providers operate as best in class. For example, consider a city-sponsored health clinic: What is the annual cost of delivering the program? How many patients has it seen? How many jobs does it provide in the community? Has the general health index increased? Has absenteeism at work or in the schools declined as a result? What are the opportunity costs of not providing the program? What are the health care alternatives within the same and neighboring communities for the citizens who use the clinic? The evaluation of government's competency in managing this and any other program relies on benchmarking its performance against private sector alternatives and/or comparable programs in other cities.

Services that are nonessential but enriching for the community can provide an opportunity for a government to perform like a business. This is where "profit" can enter the public sector picture. Government entities should not be precluded from earning profits on their activities and creating benefits for their constituencies. For example, if the recreation department can generate enough revenue to cover its expenses from user fees, it may be able to offer summer programs to disadvantaged youth at little or no cost.

As with any strong business, the "must-have" programs should be analyzed and restructured in a way that maximizes their efficacy. The "want-to-have" programs often generate political conflict that can lead to systemic breakdown and inefficiency. Experts recognize that the trouble with evaluating disparate "want-to-have" programs is that there are rarely common criteria around which to measure performance or value. The metrics for a health care clinic are not comparable to those used in evaluating the parks and recreation department that manages parade permits. The number of citizens served may be the most readily identified metric. This "for the greater good" approach, however, can easily overrun the needs of underserved populations. And in the world of performance metrics, the measure of our humanity may be the ability to afford social programs that help just a few. The tragedy is when government's inefficiency precludes the ability to deliver an important, albeit uneconomic, humanitarian program.

# Operations platform

Operational improvement is the next step in restructuring. It addresses those activities the organization has determined are core to its purpose and support its strategy. Operational improvement can encompass many elements. This paper focuses on only three: scope of service, organizational design and process design. These three elements are analyzed in terms of the cost side of the restructuring equation. Note, however, that there can be operational improvements that will enhance revenue.

At this stage of the restructuring process, the adviser needs to be well armed with information and analysis. Benchmarking comparable communities in the state, region and nation can reveal extraordinary opportunities for restructuring government units. Moreover, efficiency ratios of full-time employees to units of service provided suggest areas for consolidation and reduction. There will always be a debate about the true value of the services of public employees, and their dedication to serving the community is respected. But when does a six-figure salary for an animal control officer or lifeguard make sense? Ultimately, the goal is to reduce costs by eliminating activities or changing how the work is performed in a manner that maintains or even enhances the delivery of the services.

## Operations app #1: Scope of service

What are the fundamental tasks of the given program or service? A police force is charged with providing public safety, a broad vision of service encompassing activities that range from crime prevention and law enforcement to neighborhood patrols and community outreach. Over time, it is easy for a department's scope of services to be expanded beyond its original scope, creating an unintended economic burden. For example, the Department of Homeland Security has recently turned to local police and county sheriff departments to assist in addressing illegal immigration. In the Secure Communities program, local law enforcement shares fingerprints of arrested persons with U.S. Immigration and Customs Enforcement authorities. If a match is found, deportation is facilitated. This mandate creates a new funding requirement for the local police departments because they must dedicate resources to the newly established programs. The cost and benefit of such an effort need to be considered against the mission or scope of the local department and the needs of the community. Often, it will be possible for the government unit to stay true to its mission while reducing the scope of its services and the variety of its activities.

## Operations app #2: Organizational design

The organization of employees can have an enormous impact on the economic efficiency of a government unit. The scope of service app described above has a direct bearing on the organizational design of any government unit. Form follows function. And, as form follows function, expense follows form: labor expenses are often among the largest, if not the largest, component of any government budget. Currently, many cash-strapped governments are providing services beyond their ability to fund these services on a sustainable basis. Elected officials and government managers have been and continue to be forced to reduce services and rightsize their organizations. An organizational design that was crafted 20 years ago may no longer match the entity's scope and mission.

The organizational chart of a government unit may reveal many layers of middle management. In the private sector, such vertical structures create hierarchies that often lead to inefficient allocations of work and resources, as well as poor communication. Selectively removing some middle management — delayering — flattens the organizational structure and pushes decision-making downward, improving morale and substantially reducing expenses. Stronger communication and efficiency from the top to the bottom of the organization are the ultimate results. If delayering is done within the strategic framework, the results will be enhanced service delivery for less cost.

The police department of Raleigh, N.C., has undertaken a major restructuring effort in recent years to address new crime-fighting priorities in the community. The organizational design has been reoriented to focus on gangs, youth crimes, and drug offenses. The department added a Youth and Family Services Unit that deploys juvenile officers to proactively work with families to address gang issues and prevent school dropout. In the experience of restructuring professionals, almost any business thrives with a flatter organization structure. Decision-making is simplified, creating a sense of empowerment and effectiveness. By decentralizing the decision-making process in their department, the Raleigh police force is able to provide

officers with the credibility needed to fulfill their mission in the community. Obviously, such decentralization must be balanced for all of the tasks at hand while recognizing a hierarchy is still required for rapid decision-making in emergency situations.

Another common technique used in rightsizing activities is the "paintbrush" approach: managers determine how much needs to be cut from the expense line as a percentage of total costs, and they instruct subordinates to cut 10 percent, 20 percent or 30 percent as they see fit. Often, the decisions as to which expenses (i.e. headcount) to reduce is done without adherence to a common strategy and standardized decision criteria. Because of this, unintended consequences can compromise the unit's mission and create an adverse ripple effect throughout the organization. This approach is easiest for management but ignores the importance and relevance of different activities. We do not recommend this type of approach because the long-term damage can be great.

**Operations app #3: Process design**

The organizational design of a government unit will dictate who performs what tasks. Process design considers how the task is performed. Expense savings may be achieved by streamlining and consolidating processes. This may include developing technology solutions to replace labor-intensive activities, combining similar tasks from across the organization into a central services function, and outsourcing to third parties. Improvements that come about from these types of changes provide the organization with more flexibility to control costs and improve service delivery over the long term. This is commonly known as "business process reengineering". Done well, the benefits are long term and long lasting. The challenges are that implementation can be slow and internal compromises reached during negotiations among the affected parties can lead to suboptimization of the project.

This is particularly relevant in governments with a history of collective bargaining contracts that evolved to include complex work rule requirements. These work rules may not be aligned with the organization's current needs or capabilities. Antiquated or redundant job classifications such as "book mender," "spray painter," "spray paint sprayer," and "spray painter helper" may provide opportunities to simplify the operations. In the current and prospective economic environment, a balanced approach to determining service delivery, and the corresponding costs, will require flexibility by all segments of the labor force, including those covered by collective bargaining agreements.

Sharing services with neighboring local municipalities has recently become favored in the redesign of government. Communities have combined emergency dispatch services, reduced redundancy in local police and fire services in adjacent towns, and formed buying cooperatives. Further, cities, counties and states should consider partnering with the private sector including nonprofits and charities, in cases where both private and public sectors provide similar services. This is a particularly powerful approach to social service offerings such as youth programs, immigrant services and safety net programs for the most needy.

It may even mean that outsourcing to a third party provides a better service for less cost. Outsourcing is an approach that has come in and out of vogue over many years. It is not a panacea and often requires strong management to ensure that the third-party contractor delivers on the promise. In fact, even redesigning the outsourcing process — the bidding procedures for such public contracts — can yield savings by increasing competitiveness for selection.

In private sector restructuring, administrative and internal tasks are areas ripe for business process reengineering. Often, conscientious employees perform tasks simply because they always have. One company kept so many different logs to keep track of business activities that they had someone whose job it was to check all 14 logs on a daily basis. When all log-keeping was stopped for a week, it quickly became apparent that one or two of the logs were important and the rest were busywork. Taking the approach of just stopping an activity for a short period of time will quickly reveal its relevance and importance. These situations are particularly evident in organizations whose business has been relatively static over time, including some government units. Clearly, a county cannot stop plowing the snow during a blizzard, but it can stop many back-office and administrative tasks for a brief period to determine if they are truly necessary.

Operational improvement decisions must be based on data and analysis, and be applied in a bi-partisan manner. The effect on individuals, citizens and the government entity itself can be significant. Tough choices can be justified only when the reasoning is sound and beyond reproach. As noted earlier, analytical preparation is critical. In both the private sector and the public sector, most people will reach the same decision if they are provided with the same facts and analysis, that is, a single set of data must be available to all stakeholders and leaders of the restructuring process must provide all parties with the same analysis. While this may sound obvious, it is not the standard by which all restructurings occur.

# Finance platform

It is financial distress that leads most organizations to the doorstep of the restructuring expert. Today, governmental organizations are suffering from two types of financial distress that are common among private sector enterprises: expenses greater than revenues and excessive future commitments.

A structural imbalance between revenues and expenditures in the general fund is the governmental equivalent of unprofitable operations in the private sector. As elected officials became euphoric over the increase in revenue in good economic times, they undertook an expansion of services along with generous increases in compensation and benefits for employees. Providing more parks and summer programs for children, building beautiful performing arts centers, adding police and firefighters, and refurbishing government offices are all worthy expenditures when cash is available. So is saving for a rainy day and paying off debt. The latter received short shrift in many municipalities in past years, so that when economic disaster hit, there was no cushion. Even those municipalities that had the foresight and discipline to save did not expect the impact of the Great Recession to last as long as it has. Now governments are faced with a cost base that exceeds their revenue potential at least in the near and medium terms.

Some states and municipalities have statutory requirements for a balanced budget, which should prohibit the behavior outlined above. But the requirements are generally not as well defined, and as a result, certain states and municipalities have found ways to fund current operating losses with long-term debt. In short, when there is little motivation to balance operating revenues and expenses, and capital markets encourage borrowing, public officials may postpone or avoid making difficult decisions. The public finance market has provided the equivalent of the home equity line of credit to many municipalities such that governments units can easily borrow to cover budget imbalances.

## Finance app #1: Long-term financial planning

Distressed businesses often lack long-term financial plans. The discipline to look three to five years into the future forces management to incorporate strategic plans and create goals that serve the interests of their shareholders. Government is no different. The idea of budgeting for complex government services from the local level all the way to the state and federal levels without regard for the long-term is anathema to the turnaround professional.

The Government Finance Officers Association recently wrote about building a financially resilient government through long-term financial planning[2] and referenced Jamais Cascio, a senior fellow at the Institute for Ethics and Emerging Technologies, who identifies the following eight essential characteristics of any resilient system:

- Diversity – Avoid a single point of failure or reliance on a single solution
- Redundancy – Have more than one path of escape
- Decentralization – Centralized systems look strong until they fail catastrophically
- Transparency – Share plans and preparations, and listen when flaws are pointed out
- Collaboration – Work together to become stronger
- Failing gracefully – Failure happens
- Flexibility – Be ready to change when plans fail, do not count on stability
- Foresight – Think and prepare

This approach is a tool that municipalities can use as they undertake strategic planning in concert with long-term financial planning. The following characteristics are particularly resonant when looking at public sector turnaround activities.

² http://gfoa.org/downloads/financiallyresilientgovernment_whitepaper.pdf

**Transparency** – A challenge with public finance is the lack of transparency and readily understandable financial reporting. Even sophisticated readers of financial information struggle to make heads or tails out of the reports generated by our government units. The timeliness of the information is often lacking — some reports appear many months after the actual results. Prospective financial information is even more challenging than the historical. Governments should institute clear and consistent information based on generally accepted accounting principles.

**Foresight** – The very concept of long-term planning begs government leaders to think beyond the election cycle and anticipate economic challenges and crises. Developing contingency plans and establishing real, tangible cash reserves are important.

## Finance app #2: Cash flow planning

Jim Gentry, professor emeritus of finance at the University of Illinois at Urbana-Champaign, once said that liquidity is like beer at a fraternity party: when you are out of liquidity, the party is over.

Understanding liquidity in the context of government operations is important to ensuring that essential activities can occur without interruption. Some government units make an attempt at cash flow forecasting, but limit its use to evaluating the need for short-term borrowing – revenue and tax anticipation notes in particular. However, the private sector uses cash forecasts as a "dashboard" to monitor performance, even if the business is not distressed, via a tool called the "13-week rolling cash forecast". Successful businesses evaluate their forecasts against actual results to understand whether variances were based on timing or permanent differences. This discipline of evaluation creates a continuous feedback loop that enhances management's ability to forecast and minimize variance. How can this be applied in the public sector?

For most governments, 13 weeks is an insufficient time frame. Biannual tax payments, large lag periods associated with federal or state funding, and union contracts with annual lump-sum payments require a longer forecasting horizon. Ideally, a rolling 12-month forecast is better. Governments need to develop a heightened sense of importance around working capital management. In the private sector, businesses have long known that it is important to balance accounts receivable collections with accounts payable expenditures. Ideally, businesses want to collect their receivables as quickly as possible and pay their bills at the latest date acceptable. Many public sector organizations existed for years without ever having to worry about having enough cash in the bank account to pay bills. This scenario has changed as cities and states have begun to spend more than they take in, making cash flow forecasting more important. Neglecting working capital management exacerbates cash flow problems and diminishes the fun at the party.



# Leadership platform

Successful turnarounds occur only when there is strong leadership that possesses a few definitive characteristics: courage, unwavering commitment to achieve the most good for the most constituencies, credibility, decisiveness, tolerance and the ability to persuade. These characteristics are those ideally found in leaders we elect to public office. The difference is that many public office leaders may have never faced the kind of fiscal crisis that can rattle even the best corporate executives. Further, elected officials are not required to have any training or experience in business or finance, two critical ingredients for a well-functioning public sector.

**Leadership app #1: Turnaround coach**

In private sector turnarounds, an "outsider" with no stake in the outcome of the restructuring other than to create stability and return the business to profitability is often brought in. A Chief Restructuring Officer can restore credibility to management and give confidence to boards of directors and outside constituencies like banks and shareholders. But an elected or appointed government unit leader cannot simply cede authority to an outsider. But he or she may do well to hire an "auxiliary authority" in the form of a turnaround adviser who can rise above political considerations and stay focused on strategy, operations and finance. Professionals who have been in the trenches in crisis situations can help develop options that may not have been previously considered. Outside advisers can also ensure that the fact gathering and data analysis, so important in reaching agreement on the restructuring activities, is done in a way that avoids political tinkering.

**Leadership app #2: Pain sharing**

For restructurings to be successful, all stakeholders must buy in to the need for the restructuring. They must see themselves as part of the problem, and part of the solution. Strong leadership is often needed to help the constituencies see that they play both roles. Reaching consensus can be difficult and normally requires each party, sometimes to varying degrees, to agree to concessions for the sake of the greater good. In the private sector this normally translates into a company that maximizes profit or value. In the public sector, this concept is more ephemeral. Accepting such resolutions and compromises is called "sharing the pain." In the private sector, where there is a broad history of restructurings, this concept is well understood as an expectation by parties in interest at the onset of a restructuring. The public sector, by contrast, is not always incented to "share pain." Sometimes it is more politically expedient to defer pain or mask it or ignore it. But if the goal is to effect lasting, permanent change in a troubled situation — such as a current or future budget deficit — the strategic approach to prioritizing programs and services, coupled with the reasoned negotiation, can yield a successful outcome.

# Conclusion

The complexities of governing and the economic crises facing leaders today will require new approaches and challenge even the best politicians. But the expectation that new problems can be solved by continuing to repeat the standard operating practices of the past will only yield frustration and a result that the turnaround cannot be effected.

The turnaround community's experience in fixing troubled businesses for more than three decades has yielded lessons that have direct application for governments. The platform fundamentals of strategy, operations, finance and leadership provide a reasoned and structured framework to tackling crises as well as instituting necessary long-term changes.



**Martha E. M. Kopacz**
Managing Principal
Corporate Advisory & Restructuring Services
Grant Thornton LLP
T 212.542.9730
T 617.848.5010
E Marti.Kopacz@us.gt.com

**Michael E. Imber**
Principal
Corporate Advisory & Restructuring Services
Grant Thornton LLP
T 212.542.9780
E Michael.Imber@us.gt.com

**Christopher R. Jadro**
Manager
Corporate Advisory & Restructuring Services
Grant Thornton LLP
T 212.542.9595
E Chris.Jadro@us.gt.com



© Grant Thornton LLP
All rights reserved
U.S. member firm of Grant Thornton International Ltd

Content in this publication is not intended to answer specific questions or suggest suitability of action in a particular case. For additional information on the issues discussed, consult a Grant Thornton client service partner.

**National Office**
175 W. Jackson Blvd., 20th Floor
Chicago, IL 60604-2687
312.856.0200

**Washington National Tax Office**
1250 Connecticut Ave. NW, Suite 400
Washington, DC 20036-3531
202.296.7800

| | | |
|---|---|---|
| **Arizona** | | |
| Phoenix | 602.474.3400 | |
| **California** | | |
| Los Angeles | 213.627.1717 | |
| Irvine | 949.553.1600 | |
| San Diego | 858.704.8000 | |
| San Francisco | 415.986.3900 | |
| San Jose | 408.275.9000 | |
| Woodland Hills | 818.936.5100 | |
| **Colorado** | | |
| Denver | 303.813.4000 | |
| **Florida** | | |
| Fort Lauderdale | 954.768.9900 | |
| Miami | 305.341.8040 | |
| Orlando | 407.481.5100 | |
| Tampa | 813.229.7201 | |
| **Georgia** | | |
| Atlanta | 404.330.2000 | |
| **Illinois** | | |
| Chicago | 312.856.0200 | |
| Oakbrook Terrace | 630.873.2500 | |
| Schaumburg | 847.884.0123 | |
| **Kansas** | | |
| Wichita | 316.265.3231 | |
| **Maryland** | | |
| Baltimore | 410.685.4000 | |
| **Massachusetts** | | |
| Boston | 617.723.7900 | |
| **Michigan** | | |
| Detroit | 248.262.1950 | |
| **Minnesota** | | |
| Minneapolis | 612.332.0001 | |
| **Missouri** | | |
| Kansas City | 816.412.2400 | |
| St. Louis | 314.735.2200 | |

| | | |
|---|---|---|
| **Nevada** | | |
| Reno | 775.786.1520 | |
| **New Jersey** | | |
| Edison | 732.516.5500 | |
| **New York** | | |
| Albany | 518.427.5197 | |
| Long Island | 631.249.6001 | |
| Downtown | 212.422.1000 | |
| Midtown | 212.599.0100 | |
| **North Carolina** | | |
| Charlotte | 704.632.3500 | |
| Raleigh | 919.881.2700 | |
| **Ohio** | | |
| Cincinnati | 513.762.5000 | |
| Cleveland | 216.771.1400 | |
| **Oklahoma** | | |
| Oklahoma City | 405.218.2800 | |
| Tulsa | 918.877.0800 | |
| **Oregon** | | |
| Portland | 503.222.3562 | |
| **Pennsylvania** | | |
| Harrisburg | 717.265.8600 | |
| Philadelphia | 215.561.4200 | |
| **South Carolina** | | |
| Columbia | 803.231.3100 | |
| **Texas** | | |
| Austin | 512.391.6821 | |
| Dallas | 214.561.2300 | |
| Houston | 832.476.3600 | |
| San Antonio | 210.881.1800 | |
| **Utah** | | |
| Salt Lake City | 801.415.1000 | |
| **Virginia** | | |
| Alexandria | 703.837.4400 | |
| McLean | 703.847.7500 | |
| **Washington** | | |
| Seattle | 206.623.1121 | |
| **Washington, D.C.** | | |
| Washington, D.C. | 202.296.7800 | |
| **Wisconsin** | | |
| Appleton | 920.968.6700 | |
| Milwaukee | 414.289.8200 | |