amendment to disclosure
objection to disclosure
statement

FILED

2014 APR 14 P 4: 08

U.S. BANKRUPTCY COURT
E.D. MICHIGAN DETROIT

Dear Judge Rhodes,

I wish to include the citizens of Detroiters as a class eligible to vote on the Restructuring Plan, since the actions taken by the local government under the emergency manager have lessened our ability as a city to bring in revenue (new arena deal Concessions Management Agreement new Joe Louis Arena Lease, and the selling off of our garbage trucks and privatized collection how do we control future expenditures when Rizzo & Advanced Disposal own the trucks. The Emergency Manager could put a shorter time span on all the tax abatements downtown require alternatives to demolition by renovating basements for homeless to occupancy to save our housing people resources for future people that can homestead, instead of demolishing hard wood floor houses to

13-53846-tjt   Doc 4194   Filed 04/14/14   Entered 04/18/14 16:59:29   Page 1 of 38

maybe someday ~~be may~~ replaced by concrete slab housing, where ~~ppl~~ people cannot survive easily without power, ( which could even happen to hi income in the future.) Take care of Detroit for the people, many who are poor now, and the people from outside that need housing opportunity will come. (has many) The state of mi. proposed Detroit ~~for~~ poor. ~~Stater~~ legislation for Nuisance Abatement would allow the government to padlock any building, house or apt. where someone(s) were caught illegally dealg drugs, etc. Section 8 bldgs. near Wayne State & Downtown could be closed and changed to market rate housing. Currently no new section 8 is available now inside the city so people would be forced to move to wherever they could find sec 8 housing like in Taylor, Mi. where "crime" is going up, property values are declining & I was told it looks like ~~our state~~ ~~corrupt~~. This is the new Detroit

like the idea. I have heard ~~that~~ second hand that the engineers, etc. say the current director wouldn't qualify for a single job in the H₂O dept. Saulius Simeolinis ~~(was)~~ head of chemist union and others like him should be part of the decision making for the H₂O dept. ↑working in the H₂O dept?

### Pensions:

pensions and vesting was used to attract and retain good loyal employees. A playleader (part time) ~~told~~ me he was told last year he would qualify for $200+ a month & this year he was told $0, because he has 17 part time years that don't add up to 10 years vesting rights. Is it fair to not allow vesting when the rules are changed in the middle of the game? Also Pensions & wages are broken out of a total benefit package and wages were reduced to accommodate them during contract negotiations.

I was told (I haven't finished reading disclosure & plan) that cost of living is being removed (& what if we have high inflation again and the market & cost of living go way up?)... Its the reverse of the swap agreement for the retirees. And what is the pension to be put in an _irrevocable_ trust that can never be changed & controlled by some new thieves, maybe Ellich & Anthony Soave, and the bridge owner, and Dan Gilbert, inc.; so that they will have money to invest in their own projects.

My hypothesis is that the general fund was "robbed" by illegitimate realestate ventures that were expected to go bankrupt and could then be picked up for pennies on the dollar. So the general fund was "forced" to borrow (more than it needed) 1.4 billion v/s 800 million) while the annuity were

Future Plan — no future in Detroit *for you* if you dont have money & connections, & especially if youre African American and low income..... institutional racism, and as WSU Law professor Hammer stated, "the Detroit Future City Plan does not mention the word "race"...in its big fat slick plan.

Let the citizens of Detroit vote too!

#3) I missed the 2 day conference on bankruptcy at WSU, but included the papers that were circulated by people who went. I was particularly pleased pleased with the proposal for the pensioners to get part of the $H_2O$ dept since if people have a direct interest, they are more likely to see that it works to everyones advantage I had suggested to the pension board once when I stopped by their Wednesday meeting that they invest in the $H_2O$ dept., in lieu of so much in realestate or the market. I still

Stadium Center
Events Center Copy of that
Master of Development Agreement required p 6, 15

DDA says no such doc. exits

default on lease —

reg in lease — if in default — send notice
— 60 days to correct it —

condition of effectiveness.

scam — airport

$ 19 mil
33 mil land to city fr. DDA

notes
from talking
with friend
John Laure

Friday —

Notice of meet & conference

growing with bonuses.
If anything only adjust the annuities, not the general fund.

_Linda J Daniels_

4/14/14

Stadium
Events Center copy of that

Master of Development Agreement    required    p 6, 15

DDA says no such doc. exits

default on lease –

reg in lease – if in default – send notice

– 60 days to correct it –

condition of effectiveness.

scam – airport

$ 19 mil
33 mil land to city fr. DDA

Friday →

Notice of meet & conference

notes
from talking
with forward
John Laure

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

The Detroit-owned water system spans 1,079 square miles servicing residential, commercial, governmental, institutional, and industrial customers within the city of Detroit and over 125 communities including Wayne, Oakland, Macomb, St. Clair, Genesee, Washtenaw and Monroe Counties. Detroit provides water for about 40% of the state of Michigan. The sewer infrastructure is just as expansive, including 3,433 miles of sewer lines covering 946 square miles, and serving Detroit and 76 neighboring communities. Detroit services 35% of Michigan's sewage needs. For decades, the Detroit water and sewer infrastructure, like Detroit itself, has served as a lifeline to surrounding communities and the state as a whole.

The water and sewer utility has been estimated to be worth $1.9 billion over 40 years to the city. And at current rates, the water and sewer utilities have underline operating margins of 22% and 20%, respectively. While they carry outstanding debt totaling $5.74 billion, together they have brought a 20% return at about $550 million annually.

### How to Make your Crown Jewel Shine

It is likely that the utility was omitted from the last readjustment plan due to its political sensitivity. Because of the regional reach of the utilities, any restructuring comes with political sensitivities. Detroit's suburbs have made it clear that they want as little as possible to do with Detroit's debt. However, the reality is, the suburban communities contributed to Detroit's debt over the past 50 years and will benefit from its recovery-- or suffer from its continued stagnation. That being said, the water and sewer utility is a valuable service and asset that Detroit owns, and policymakers are not ignorant of that fact. Kevyn Orr is currently looking at two strategies to capitalize on this asset and help pay down Detroit's debt. Both come with a stipulation of rate increases being capped at 4% each year, and both face opposition. The two strategies are:

1. Privatize the utility by either selling or leasing the system and its management to a private firm.

   On March 27 the city of Detroit released a Request for Information (RFI) that will last until April 7, 2014. Orr has asked that interested parties express their interest in one day (by March 28) and develop and submit a proposal in one week for the purchase and/or management of the system. The proposal must make considerations for the city to retire the outstanding debt over the course of its tenure. According to the RFI, should a plan and firm be chosen, the decisions and final commitments will occur in August 2014.

2. Sell the utility to a newly formed regional Great Lakes Water Authority.

   Orr has been attempting to create a Great Lakes Water Authority composed of Detroit and surrounding municipalities. This Authority will take on the debt servicing and revenue of the utility, including reissuing municipal bonds. The Authority will likely pay Detroit for the continued

3

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

management of the utility. Suburban politicians have shown strong opposition to this proposal thus far as any voluntary suburban contribution to Detroit's recovery has been met with serious political backlash.

A third option exists and should be seriously considered. It addresses the need to pay down the city's debt, it allows the cost of recovery to be shared equally by a region that benefited equally from Detroit's success (and in some cases has benefited disproportionally from its failures), and it addresses the need to fulfill commitments made to public servants— past, present, and future.

The city should consider a third option.

3. Pay Pensioner Debt with Utility Asset

Detroit should use the bankruptcy court to break its utility contracts with its surrounding municipalities.. When starting new contracts with its customers (municipalities), Detroit should transfer ownership of the utility to an entity benefiting pensioners, thereby satisfying Detroit's unfunded liability debt with an asset. Finally, pensioners should raise utility rates in accordance to national trends on all water and sewer services to pay down the outstanding debt and fund future pensions.



**Building a Foundation on Solid Ground**

The scale of Detroit's bankruptcy is unprecedented, and recovery necessitates the development of unprecedented approaches. Businesses use assets to pay down debt, and there are examples in Michigan of companies using assets to pay unfunded pension liabilities. For instance, Chrysler used stock to pay its debt to unions during its bankruptcy restructuring. Recently, Fiat purchased the union's share of that stock, giving the union the cash they needed to restore pensions.

4

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

Michigan Governor Rick Snyder recently commented, "The State's focus is on protecting and minimizing the impact on retirees, especially those on fixed, limited incomes, restoring and improving essential services for all 700,000 Detroit residents and building a foundation for the city's long-term financial stability and economic growth." This recommendation fulfills those goals. By transferring ownership of the utility asset to the pensioners, the city can satisfy its debt to its workers. By providing pensioners means for long-term revenue, the city secures funding for pensions. By restoring confidence in pensions and retiree benefits, the city not only secures a future for Detroit public servants, but it also fortifies its future workforce and frees up public funds that can be used on other important public services. By funding this solution with infrastructure that services a region regardless of property value, race, religion, socio-economic class, school district, or political affiliation, the entire region can support its own recovery in an egalitarian and fair manner.

5

## Behind Detroit's Bankruptcy: a Recent Timeline
For more information and updates see: www.beyondbankruptcy.info

*Speramus Meliora; Resurget Cineribus* (We hope for better days; it shall rise from the ashes)
– Detroit motto

"The restructuring and rebirth of Detroit will not be delivered by a state-imposed emergency manager, nor through Chapter 9 bankruptcy proceedings, foundation contributions, closed door deals, or other devious and misleading corporate schemes. Detroit's rebirth will be the result of the people's unrelenting demand for democratic self-governance, equal access to and management of the natural and economic resources of the city." – Detroiters Resisting Emergency Management

**1950:** Detroit is America's fourth-largest city, with 1.85 million residents.

**1992 – July:** Moody's downgrades Detroit's debt rating to junk status.

**2005-2006:** Under Mayor Kwame Kilpatrick, **Detroit enters into a deal with investment banks UBS AG and Merrill Lynch Capital Services (a Bank of America entity) to issue more than $1.4 billion in "Certificates of Participation" (COPs) to raise money for unfunded public pensions.** As reported by Demos, this deal included a series of swap transactions that included hugely risky termination provisions that, in certain circumstances, could force Detroit to make large, immediate payments on this debt and allow the deal's bank counterparties to "grab a stream of tax revenues representing about 20 percent of Detroit's meager cash resources until the termination payment was fully paid." According to the Detroit Free Press, currently, the deal costs Detroit "nearly $50 million a year, or about 5% of its annual operating budget."

**2008:** President Bush gives GM and Chrysler a provisional $17.4 billion bailout.

**2009:** GM and Chrysler declare bankruptcy.

**2010:** Detroit's population is reported by the U.S. Census Bureau at 713, 777, a 25% drop since the 2000 Census and the lowest level in 100 years. At this time, Detroit's finances are premised on a minimum tax base of 750,000 people. Additionally, according to Demos, by 2010 the number of employed Detroit residents has fallen by 53% since 2000, with half of this job loss occurring in 2008 as a result of the Great Recession.

**2011– March: The Michigan Legislature passes its first emergency manager law, Public Act 4, which allows the Governor discretionary power to intervene in the governance of any city, town, village or school district facing "financial emergency."** Whereas Public Act 72, passed in 1990, allowed for the appointment of "emergency *financial* managers," Public Act 4 confers sweeping powers on a state-appointed "emergency manager" with a broader mandate. Detroit's Sugar Law Center reports the State of Michigan's own analysis of Public Act 4 identified the bill before its passage as "anti-democratic" for "allow[ing] the emergency managers too much power and control over local units of government." Wayne State University Professor Jocelyn Benson testifies to Michigan Legislature's House Judiciary Committee on the "significant evidence" showing that Public Act 4 "has a disproportionate impact on the state's Black and Latino population," since the appointment of emergency managers to lead cities in fiscal distress risks disenfranchising more than half of the state's African-American voters, by preventing their votes in local elections.

**2011 – June: Governor Snyder signs the FY2011-2012 state budget, which includes a radical overhaul of statutory revenue sharing regimes between the state government and Michigan municipalities** that traditionally delivered between $200-$300 million in annual funds to Detroit. As a result, in FY2012 Detroit's share of state revenue sharing funds declined by $67 million, $43 million more than it would have without legislative action.

**2011 – December: State Treasurer Andy Dillon orders financial review of Detroit and announces the city in "probable financial stress."**

**2012 – January:** Dillon tells Detroit Mayor Dave Bing he must submit a financial plan by February in order to prevent the Governor from appointing an emergency manager.

**2012 – March:** Moody's downgrades Detroit's tax debt, and a state review team declares that Detroit is in a "severe financial emergency."

**2012 – April:** Governor Rick Snyder and Mayor Bing sign a consent agreement approved by Detroit's City Council to authorize the city's financial restructuring.

**2012 – November:** Voters repeal Public Act 4.

**2012 – December: The Michigan Legislature passes and Governor Snyder signs Public Act 436, a 'new' emergency manager bill with substantially similar effects to Public Act 4 that cannot be repealed by referendum.** Public Act 436 allows a local government or school district four options once the state declares a 'financial emergency': mediation, a consent agreement, a state-appointed emergency manager, or filing for Chapter 9 bankruptcy. However, under Public Act 436, as under Public Act 4, an emergency manager still has the ability to reject and terminate collective bargaining agreements, to strip local officials of duty and pay, and to sell off assets of a local government or school district. According to the Sugar Law Center, under 436 the emergency manager also has the power to "enact local law by decree (literally) and to disregard existing local law as contained in municipal charters and ordinances."

**2013 – February:** A state review team recommends state intervention in Detroit, alleging the city is in "operational dysfunction," has failed to restructure its debt and has "no satisfactory plan" to resolve its financial problems.

**2013 – March 25: Governor Snyder declares Detroit is facing a financial emergency and appoints Kevyn Orr as Detroit emergency manager,** granting Orr the power to recommend to Gov. Snyder that Detroit be allowed to file for Chapter 9 bankruptcy. Jones Day, the law firm where Orr was previously a partner, is almost immediately hired to represent Detroit in its bankruptcy proceedings.

**2013 – March 27:** Detroit's Sugar Law Center, the Michigan & Detroit Chapter of the National Lawyers Guild, the Center for Constitutional Rights and others file suit in the U.S. District Court, Eastern District of Michigan challenging Public Act 436 as violating citizens' constitutional rights.

**2013 – May 13:** Kevyn Orr releases his first report as emergency manager, a financial and operating plan submitted to the state Treasury Department, which identifies Detroit as "insolvent" and claims the city has effectively exhausted its ability to borrow money. The report identifies "the City's net cash position" at "negative $162 million as of April 26, 2013," when "the City had actual cash on hand of $64 million but had current obligations of $226 million to other funds and entities in the form of loans, property tax distributions, and deferred pension contributions and other payments." This same day, **the NAACP files suit to repeal Public Law 436 as "unconstitutional, invalid and unenforceable,"** with disparate impacts on Michigan voters of color.

**2013 – June 14:** Orr announces Detroit will stop making payments on some of its $18.5 billion in debt, and releases a plan to restructure Detroit's finances. The plan highlights the city's dire financial straights, macroeconomic challenges facing the city, and a litany of institutional and governance issues compounding Detroit's financial problems.

**2013 – July 17: Detroit's two pension funds, the General Retirement System and the Police and Fire Retirement System of the City of Detroit, file suit in Ingham County against emergency manager Kevyn Orr and Governor Rick Snyder to prevent the authorization of a Detroit bankruptcy,** alleging that a Chapter 9 filing would deprive retired public employees of their state constitutional right to access pension funds.

**2013 – July 18:** Orr files for Chapter 9 bankruptcy on behalf of Detroit, in U.S. District Court.

**2013 – July 19:** In Ingham County Circuit Court, Judge Rosemary Aquilina rules that Detroit's bankruptcy filing violates the Michigan constitution. This same day, U.S. Bankruptcy Judge Steven Rhodes is assigned to Detroit's bankruptcy case.

**2013 – July 23:** In response to a motion filed by emergency manager Orr—represented by attorneys from Jones Day—Judge Rhodes freezes all litigation pending against the city, Orr and Governor Snyder in federal court during Detroit's bankruptcy process. He also stays several lawsuits challenging Public Act 436 in state court. "My order enhances the likelihood of Chapter 9 reorganization, speeds the bankruptcy case and cuts costs to taxpayers," Rhodes said. Curt Guyette of the ACLU comments that as a result of Judge Rhodes' action, "lawsuits that could conceivably result in Orr and other EMs around the state losing their power were put on ice as a direct result of actions taken by Orr, who could, in fact, actually be found to be an illegitimate actor in all this if PA 436 were, in fact, judged to be unconstitutional."

**2013 – August 5:** Emergency manager Orr announces the city has contracted with Christie's, the international auction house, to assess the value of the collections of the Detroit Institute of Arts, much of which was originally purchased by the City of Detroit.

**2013 – August 22:** A nine-member committee of Detroit public employee retirees is appointed to represent more than 23,500 workers in Detroit's bankruptcy case.

**2013 – October 11:** Orr signs an Executive Order to negotiate a settlement between Detroit and UBS AG and Bank of America, parties to the toxic COP swap deals signed with the city under Mayor Kwame Kilpatrick, offering the banks 75% on the dollar to settle the city's obligations. Detroit's City Council almost immediately rejects this settlement, and a spokesman for Detroit's Moratorium Now calls it a "sweetheart deal" for the banks and advocates that the swaps, "potentially fraudulent instruments within the bankruptcy," should simply be liquidated.

**2013 – December 3: Judge Rhodes rules that Detroit is eligible to file for Chapter 9 bankruptcy, dismissing challenges to the Public Act 436 (the emergency manager law) and ruling that pensions are not protected by the state constitution.**

**2013 – December 30:** Detroit's bankruptcy mediation team recommends the approval of a $165 million renegotiated settlement between Detroit and UBS AG and Bank of America to resolve the city's contested COP swap debt obligations. This same day, by an Executive Order taking effect December 31, emergency manager Orr freezes the pensions of city workers within the membership of the General Retirement Fund, which covers over 5,500 active city workers and approximately 12,000 pensioners. The order bars the accrual of new payments to the accounts of current employees, eliminates cost-of-living increases, and closes pensions to new employees.

**2014 – January 1:** Mike Duggan takes offices as the 75th Mayor of Detroit.

**2014 – January 6:** In response to public criticism, Orr backs off from his December order freezing pensions, but reserves the right to enforce the order if mediation with pensioners fails.

**2014 – January 13:** Nine private foundations, including the Ford Foundation, the Kresge Foundation, and others, pledge $330 million toward Detroit's bankruptcy settlement to shore up pension funds and help save the Detroit Institute of Arts' collection from liquidation. They are later joined by the W.K. Kellog Foundation, which has pledged an additional $40 million toward this effort.

**2014 – January 16:** Judge Rhodes rejects Detroit's renegotiated $165 million settlement with UBS AG and Bank of America, calling the settlement "too high a price" for Detroit to pay and castigating the deal as the result of "hasty decisions."

**2014 January 31:** While still attempting a renegotiation with UBS AG and Bank of America over Detroit's pension COPs, **emergency manager Orr files suit asking Judge Rhodes to issue a judgment invalidating the COPs and swap deals altogether**, stating: "This deal was bad for the city from its onset despite reassurances it would adequately resolve the city's pension issues… we have tried without success, to negotiate a resolution to this dispute and to allow the city and its taxpayers to move forward and unwind these illegal transactions."

**2014 – February 21:** Detroit files its plan of adjustment and disclosure statement in federal bankruptcy court, which anticipates cutting retired worker pensions by up to 30 percent and reducing payments to unsecured bondholders by up to 80 percent.

**2014 – February 24:** A coalition of 38 Detroit organizations working with Detroiters Resisting

Emergency Management present a *People's Plan for Restructuring toward a Sustainable Detroit*, which states that "Detroit's rebirth will be the result of the people's unrelenting demand for democratic self-governance, equal access to and management of the natural and economic resources of the city."

**2014 – March 4:** Detroit announces its third proposed settlement with UBS AG and Bank of America to pay off their swap deal, this time for $85 million, which would offer the banks 30 cents on the dollar (and unsecured creditors 20 cents on the dollar) to eliminate Detroit's obligations.

**2014 – April 2:** Judge Rhodes approves a $120 million "quality of life" loan from Barclay's to Detroit to facilitate the city's provision of critical public services. Originally, emergency manager Orr sought a $300 million loan to pay off the city's swap deals, but both the city and Judge Rhodes emphasize that the purpose of the approved $120 million loan is service delivery. According to the Detroit Free Press, the city plans to expend these funds on public safety (anticipating $36.2 million for the Detroit Police Department and $25.4 million for the Detroit Fire Department), blight removal ($35.6 million), and general services and parks maintenance ($24.8 million).

**2017 – April 7:** Emergency manager Orr releases a request for proposals for potential operators of Detroit Water and Sewage Disposal Systems for the Detroit Water and Sewage Department (DWSD). DWSD serves 40% of Michigan residents, including 125 suburban communities. As reported by Detroit Free Press, while the water and sewer systems both had operating margins of over 20% in 2012, they are in need of vast infrastructure improvements. Detroit's City Council would need to approve any proposal to privatize the management of DWSD.

**2014 – April 11:** Judge Rhodes will rule on Detroit's third, $85 million proposed settlement with UBS AG and Bank of America over swaps brokered by former Mayor Kwame Kilpatrick now costing Detroit $50 million annually.

**2014 – April 17:** Hearing scheduled in front of Judge Rhodes on Detroit's bankruptcy disclosure statement.

**2014 – April 18:** Open court interviews of candidates to serve as an impartial expert witness on municipal finance scheduled in front of Judge Rhodes. According to the Detroit Free Press, the court is seeking this witness to help "evaluate the feasibility of Detroit's bankruptcy restructuring plan."

**General Sources:** *Detroit Free Press, Detroit News, Reuters, NY Times, The Economist,* Michigan Radio, Demos

to make huge cuts from our schools to pay for tax give-aways. Now, 55 school districts[1] across the state are grappling with budget deficits and school closures. Michigan's schools are facing teacher layoffs, increased class sizes, and cuts in music, art, and sports programs. We need to use our state budget to invest in the future, creating high-quality schools so we all benefit.

## Higher Education

A college degree is considered to be a necessity for economic prosperity in today's economy, yet there are many barriers to higher education in Michigan. Rapidly rising costs for college, coupled with state cuts for need-based scholarships present difficulty for many individuals to pay for school. Over the past decade, tuition rates at Michigan's public universities have doubled, while state support for higher education funding has been cut by $350 million.[2] State support for community colleges has also remained stagnant, while enrollments have increased by approximately 50%.[3]

## Communities

Our communities are the heartbeat of our state; we raise our families within them and rely on state support for the parks our children play in, the libraries we use and the public safety we depend upon. Over the past decade our elected leaders have cut state revenue sharing to our communities by $6 billion, or approximately 30%.[4] This means that our public parks, trails, and sidewalks are unable to be maintained in many areas, libraries are closing their doors, and police and fire departments are facing cuts, which leave our homes and streets vulnerable to crime and fire.

## Human Services

As state spending overall decreases across the state, human services programs are left to fight over a piece of our shrinking budget pie. The need for services such as homeless shelters and food banks are higher than ever as our state struggles to make a full comeback from the economic recession, and as less money is appropriated to support these services, shelters are at capacity and the shelves of local food banks remain empty. As hardworking families struggle to make ends meet in a state that has been on the leading edge of economic decline in our country, they must rely on human services to help, thus we must invest in the safety net programs in our state to help families get by in times of need.

## Transportation, Roads and Bridges

As the weather in Michigan turns cold each winter, we are greeted with pothole season. We rely on our roads to get us to work, school, and to do our daily errands. We cannot safely get from one place to the other on crumbling infra-structure. Those who do not have a reliable vehicle must travel on foot, bicycle, or use our state's underdeveloped public transportation system. Because our transportation infrastructure is so important to our daily lives, Lansing should invest in maintaining our roads and bridges, while also developing reliable and safe public transit.



Source: House Fiscal Agency, September 2013
Calculations by Michigan League for Public Policy with BLS Inflation Calculator.

---

[1]Pat Sorenson, *The Path to Prosperity: Ten Steps Michigan Must Take to Strengthen Its Economy*, Michigan League for Public Policy, November 2013.
[2]Ibid.
[3]Ibid.
[4]Ibid.



www.PrioritiesMichigan.org

February 2014

Priorities Michigan is a civic engagement and education project aimed at changing the conversation around the state budget and promoting needed investment in public goods. For too long, Michigan's budget conversation has been limited to committee rooms and legislative chambers in Lansing. Decisions are made at the State Capitol, while the negative impacts of those decisions are felt in neighborhoods and schools in every corner of our state. Priorities Michigan aims to put a face on our state's misplaced priorities by helping community partners tell their stories through traditional and new media.

The priorities of politicians in Lansing are out-of-touch with the needs of Michigan's families. We need to stay focused on our family's and state's future by investing in high quality schools that prepare today's students to be tomorrow's leaders and strong communities where our children will want to stay and raise their own families. We're dedicated to building a better Michigan by investing in education, and making the tax system fair in our state.

## A Decade of Disinvestment

Elected leaders in Lansing are making the wrong budget choices, and have been for the past decade. Bad policy decisions have taken our state in the wrong direction and have stripped our communities of needed resources.

Billions of dollars in tax giveaways were given to big businesses with no accountability and no evidence of job creation. Failed tax cuts were paid for by defunding our schools and communities -- handing the bill for these cuts to middle class families and seniors. Our current system is set up to allow two-thirds of Michigan businesses to pay no income tax. Without everyone paying their fair share our communities suffer.

Michigan needs to chart a new course toward shared prosperity. Investing in strong communities, public safety, infrastructure and high-quality schools will lead to a better future for all.



Source: House Fiscal Agency, September 2013
Calculations by Michigan League for Public Policy with BLS Inflation Calculator.

## K-12 Education

High quality public schools are the foundation for economic development in Michigan, ensuring a well-educated workforce and economic opportunity for the state's residents. However, policymakers in Lansing chose



Source: House Fiscal Agency, September 2013
Calculations by Michigan League for Public Policy with BLS Inflation Calculator.

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

## Introduction

In 2013, Detroit, Michigan made history. The city, reeling from a national economic recession and drowning in debt, filed with the courts for bankruptcy. Kevyn Orr was named Emergency Manager, and the city has been working on a debt restructure plan since. Detroit is not the first city to file for bankruptcy, and unfortunately, it likely won't be the last. It is, however, the largest city to do so, and how it handles its $18 billion debt will be used as a standard for policymakers for the foreseeable future.

One sustainable and equitable solution is hiding in plain sight. Detroit should transfer ownership of its water and sewer utilities to an entity benefiting pensioners. Utility revenue would pay down debt and fund future pensions.

As is often the case with public finances, Detroit's debt is massive and complex. Over 100,000 creditors have lent Detroit money, including banks, bondholders, and city employees. About $6 billion of that debt is in unfunded pension liabilities, post-employment



health care for city workers, $6 billion of the debt is owed to unsecured creditors that have purchased municipal bonds (such as banks), and $6 billion of that debt is in utility bonds. Detroit's current Plan of Adjustment calls for repaying secured bondholders 100% of what they are owed and repaying unsecured bondholders, including pensioners, about 20%.

While a fair restructuring of the debt requires all creditors to be treated equally, it is an unfortunate fact of bankruptcy that not all lenders will be fully repaid. Over 20,000 citizens risk losing the pension and benefits they earned. Hurting city workers hurts Detroit and halts recovery. Detroit must attract talent and residents to its urban areas. Furthermore, by favoring banks and Wall Street over its own residents, Detroit could set a troubling trajectory for future public finance decisions. We have faith in the policymakers and creditors of Detroit and believe they ultimately have the best interest of the city in mind.

1

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

We are proposing a restructuring idea for consideration. This restructure allows Detroit to capitalize on, arguably, its most valuable asset, its water and sewer utility, in order to protect the livelihoods of its former and present workers and build a sustainable future for the city. **Our recommendation is that the city transfers ownership of its water and sewer utility over to pensioners and allows the utility revenue to pay down pension debt and pay for future pension funding.**

## The Pension

Much of Detroit's $18 billion debt is owed to its own workers. Like many cities, Detroit borrowed from their pension funds to pay other debts, and now those workers might not see their loan repaid. About 32,000 people are currently receiving pension checks as repayment for the time spent in public service for the city of Detroit. About 24,000 of those are retired workers, many living on fixed incomes and depending on the pensions and benefits promised to survive. Debt restructuring is still under negotiations, but at the time of this writing, the plan proposed cutting repayment by 26% for general city workers (unless they vote against the restructure, then it's 34%) and by 6% (or 14% if they vote against) to pensions of uniformed city workers, such as police and firefighters. These retired workers would receive about 20-30% of their original healthcare benefits. Along with these cuts to monthly payouts, retirees will no longer receive cost-of-living adjustments, leading to cuts to overall pensions.

Not surprisingly, the Detroit community opposes the draconian cuts. A spokesman for Detroit's police and fire pension board expressed his disappointment in this current offer and his hope for an equitable solution, stating, "We believe the city of Detroit can afford much better treatment of its pension beneficiaries who dedicated years of their lives in service of them. We believe there are reasonable and viable options that could negate the need for pension cuts." Transferring ownership of Detroit's water and sewer utility is a viable and fair approach to honoring the city's pension obligations.

## Detroit's Crown Jewel

Noticeably missing from Orr's most recent proposed plan of adjustment is any mention of Detroit's water and sewer utility. However, it is safe to say investors haven't missed the value of the utility infrastructure. As unsexy as water and sewers might be, it hasn't stopped Wall Street from practically salivating over Detroit's systems. Even after filing for Chapter 9, Detroit's utility debt assets have been called a "solid credit" by investor analysts, and water and sewer bonds were called "the single best value in the entire bond market." The city-owned water and sewer utilities might not be the most glamorous public service, but they are the most stable, and quite possibly one of the most valuable. In this case, they might very well be an answer to Detroit's debt problem.

2

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

The Detroit-owned water system spans 1,079 square miles servicing residential,
commercial, governmental, institutional, and industrial customers within the city of
Detroit and over 125 communities including Wayne, Oakland, Macomb, St. Clair,
Genesee, Washtenaw and Monroe Counties. Detroit provides water for about 40% of the
state of Michigan. The sewer infrastructure is just as expansive, including 3,433 miles of
sewer lines covering 946 square miles, and serving Detroit and 76 neighboring
communities. Detroit services 35% of Michigan's sewage needs. For decades, the Detroit
water and sewer infrastructure, like Detroit itself, has served as a lifeline to surrounding
communities and the state as a whole.

The water and sewer utility has been estimated to be worth $1.9 billion over 40 years to
the city. And at current rates, the water and sewer utilities have operating margins of 22%
and 20%, respectively. While they carry outstanding debt totaling $5.74 billion, together
they have brought a 20% return at about $550 million annually.

## How to Make your Crown Jewel Shine

It is likely that the utility was omitted from the last readjustment plan due to its political
sensitivity. Because of the regional reach of the utilities, any restructuring comes with
political sensitivities. Detroit's suburbs have made it clear that they want as little as
possible to do with Detroit's debt. However, the reality is, the suburban communities
contributed to Detroit's debt over the past 50 years and will benefit from its recovery-- or
suffer from its continued stagnation. That being said, the water and sewer utility is a
valuable service and asset that Detroit owns, and policymakers are not ignorant of that
fact. Kevyn Orr is currently looking at two strategies to capitalize on this asset and help
pay down Detroit's debt. Both come with a stipulation of rate increases being capped at
4% each year, and both face opposition. The two strategies are:

1. Privatize the utility by either selling or leasing the system and its management to a
   private firm.
   > On March 27 the city of Detroit released a Request for Information (RFI)
   > that will last until April 7, 2014. Orr has asked that interested parties
   > express their interest in one day (by March 28) and develop and submit a
   > proposal in one week for the purchase and/or management of the system.
   > The proposal must make considerations for the city to retire the
   > outstanding debt over the course of its tenure. According to the RFI,
   > should a plan and firm be chosen, the decisions and final commitments
   > will occur in August 2014.

2. Sell the utility to a newly formed regional Great Lakes Water Authority.
   > Orr has been attempting to create a Great Lakes Water Authority
   > composed of Detroit and surrounding municipalities. This Authority will
   > take on the debt servicing and revenue of the utility, including reissuing
   > municipal bonds. The Authority will likely pay Detroit for the continued

3

management of the utility. Suburban politicians have shown strong opposition to this proposal thus far as any voluntary suburban contribution to Detroit's recovery has been met with serious political backlash.

A third option exists and should be seriously considered. It addresses the need to pay down the city's debt, it allows the cost of recovery to be shared equally by a region that benefited equally from Detroit's success (and in some cases has benefited disproportionally from its failures), and it addresses the need to fulfill commitments made to public servants— past, present, and future.

The city should consider a third option.

3. Pay Pensioner Debt with Utility Asset

Detroit should use the bankruptcy court to break its utility contracts with its surrounding municipalities.. When starting new contracts with its customers (municipalities), Detroit should transfer ownership of the utility to an entity benefiting pensioners, thereby satisfying Detroit's unfunded liability debt with an asset. Finally, pensioners should raise utility rates in accordance to national trends on all water and sewer services to pay down the outstanding debt and fund future pensions.



## Building a Foundation on Solid Ground

The scale of Detroit's bankruptcy is unprecedented, and recovery necessitates the development of unprecedented approaches. Businesses use assets to pay down debt, and there are examples in Michigan of companies using assets to pay unfunded pension liabilities. For instance, Chrysler used stock to pay its debt to unions during its bankruptcy restructuring. Recently, Fiat purchased the union's share of that stock, giving the union the cash they needed to restore pensions.

4

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

Michigan Governor Rick Snyder recently commented, "The State's focus is on protecting and minimizing the impact on retirees, especially those on fixed, limited incomes, restoring and improving essential services for all 700,000 Detroit residents and building a foundation for the city's long-term financial stability and economic growth." This recommendation fulfills those goals. By transferring ownership of the utility asset to the pensioners, the city can satisfy its debt to its workers. By providing pensioners means for long-term revenue, the city secures funding for pensions. By restoring confidence in pensions and retiree benefits, the city not only secures a future for Detroit public servants, but it also fortifies its future workforce and frees up public funds that can be used on other important public services. By funding this solution with infrastructure that services a region regardless of property value, race, religion, socio-economic class, school district, or political affiliation, the entire region can support its own recovery in an egalitarian and fair manner.

5



the inaugural project of Beyond Bankruptcy

# Detroit Bankruptcy & Beyond
07-08 April 2014

Keith Center for Civil Rights, Wayne State University School of Law

Haas Institute for a Fair & Inclusive Society   MOSES   Keith Center for Civil Rights
Wayne County Health Authority

The inaugural project of Beyond Bankruptcy: Building Power & Resilience

We welcome you to Detroit: Bankruptcy & Beyond. This conference serves as the beginning of an ongoing project designed to create strategies and paths for building community power and resilience during periods of financial distress. The welcome to this conference is also an invitation to continue with the project Beyond Bankruptcy: Building Power & Resilience.

We are pleased to launch this project by gathering together in Detroit, home to the leaders of this project's founders. Detroit's financial struggles have become a touchstone that should draw attention to municipal distress in cities across the United States. Similarly, the community energy, creativity, and alternative solutions developed in Detroit can serve as a catalyst for projects in other distressed cities. We intend to use this moment to create a new sense of inclusivity and equity, while building community power and resilience for city residents.

The racial and wealth dynamics in distressed cities are clear. Strategies for change must be informed by and rooted in their complex histories. Multiple institutions and structures are implicated, and must change to realize equitable community outcomes. New forms of city structures and institutions must be given careful attention as communities proceed in planning a path *forward and through* bankruptcy which truly benefits all residents. This conference and project intend to promote these new forms of municipal engagement.

We welcome you to join us in this Beyond Bankruptcy project.

> Haas Institute for a Fair & Inclusive Society at UC Berkeley
> Damon J. Keith Center for Civil Rights at Wayne State University Law School
> Metropolitan Organizing Strategy Enabling Strength (MOSES)
> Wayne County Health Authority

We also thank additional organizations for their early support in the project through sponsoring this conference. We are especially pleased Detroit Health Partners will join this collaboration and the work ahead.

Visit the project website at
**www.beyondbankruptcy.info**

2

## Monday, March 7

- all events in Partrich Atrium & Auditorium -

| | |
|---|---|
| 5:30 - 6:00p | Registration |
| 6:00 - 7:30p | Opening Keynote Addresses<br>Rip Rapson & Thomas Sugrue |
| 7:30 - 8:30p | Welcome Reception & Book Signing |

## Tuesday, March 8

- all events in Partrich Atrium & Auditorium -
- lunch in the McGregor Building -

| | |
|---|---|
| 8:30 - 9:00a | Registration |
| 9:00 - 10:30a | Opening Keynote Address<br>Carol O'Cleireacain with Wallace Turbeville |
| 10:30 - noon | Panel 1 & Discussion<br>Detroit: Historical Roots & Current Effects of Bankruptcy |
| noon - 1:30p | Lunch & Keynote Address<br>Angela Glover Blackwell |
| 1:30 - 3:15p | Panel 2 & Discussion<br>Distressed Cities: A National Perspective |
| 3:15 - 4:00p | Keynote Address<br>Ronald Sims |
| 4:00 - 5:30p | Panel 3 & Discussion<br>Working Within & Through Municipal Distress |
| 5:30 - 6:30p | Closing Discussion |

3

# The Detroit Bankruptcy

Wallace C. Turbeville, Senior Fellow
Demos: An Equal Say and an Equal Chance for All
Published November 2013

The City of Detroit's bankruptcy was driven by a severe decline in revenues (and, importantly, not an increase in obligations to fund pensions). Depopulation and long-term unemployment caused Detroit's property and income tax revenues to plummet. The state of Michigan exacerbated the problems by slashing revenue it shared with the city. The city's overall expenses have declined over the last five years, although its financial expenses have increased. In addition, Wall Street sold risky financial instruments to the city, which now threaten the resolution of this crisis. To return Detroit to long-term fiscal health, the city must increase revenue and extract itself from the financial transactions that threaten to drain its budget even further.

## A. THE SHORTFALL

Detroit's emergency manager, Kevyn Orr, asserts that the city is bankrupt because it has $18 billion in long-term debt. However, that figure is irrelevant to analysis of Detroit's insolvency and bankruptcy filing, highly inflated and, in large part, simply inaccurate. In reality, the city needs to address its cash flow shortfall, which the emergency manager pegs at only $198 million, although that number too may be inflated because it is based on extraordinarily aggressive assumptions of the contributions the city needs to make to its pension funds.

### I. Cash flow crisis.

In a corporate bankruptcy, the judge takes stock of a company's total assets and liabilities because the company can be liquidated and all its assets sold to pay down its debts. However, municipal bankruptcies are inherently different because they do not contemplate the liquidation of a city. Municipal bankruptcies are about cash flow--a city's ability to match revenue against expenses so that it can pay its bills. Under Chapter 9 of the United States Bankruptcy Code, a municipality is eligible to file bankruptcy when it is unable to pay its debts as they come due.

This means that Detroit is bankrupt not because of its outstanding debt, but because it is no longer bringing in enough revenue to cover its immediate expenses. According to the city's bankruptcy filing, the emergency manager projects a $198 million annual cash flow shortfall for fiscal year (FY) 2014 (though, as explained below, the portion of this amount that is related to pension fund contributions is an estimate that requires deeper analysis). To get out of bankruptcy, the city needs to address this annual shortfall—whether it is $198 million or a smaller number—not its total outstanding long-term debt.

### II. Total outstanding debt.

Not only is the $18 billion outstanding debt figure irrelevant to Detroit's bankruptcy, it is also misleading and inflated. There are several reasons, including the following examples:

- The emergency manager includes $5.8 billion of the Water and Sewerage Department's debt as a liability of the city, even though the Water and Sewerage Department serves more than 3 million people all across southeastern Michigan, an area far larger than just the city of Detroit, which has just 714,000 residents. This debt is not a liability of the city's general fund; and, even if it were, only a fraction of it would allocable to the city.

- The emergency manager's assertion that the city's pension funds have a $3.5 billion shortfall is an estimate, very different from the certain liability of a financial debt, based on calculations that use extreme assumptions that depart from most cities' and states' general practice.

To pinpoint the causes of Detroit's bankruptcy, it is necessary to identify the reasons for the city's cash flow shortfall, which are best understood through an analysis of the city's revenue and expenses.

## B. REVENUE

Detroit has been in a state of decline for several decades. The city's population has fallen from a high mark of nearly 2 million residents in 1950 to just 714,000 in 2010. This long-term decline has also taken a toll on the city's revenue base, causing both property and income tax revenues to shrink as homeowners and jobs have left the city. Altogether, Detroit's revenues have decreased by more than 20 percent since FY 2008, declining by $237.7 million.

### I. Tax revenue.

Because of the Great Recession, this gradual decline in revenue became a massive leak. Detroit was hit particularly hard by both the foreclosure and unemployment crises. The number of employed Detroit residents fell by 53 percent from 2000 through 2012, but half of that decline occurred in a single year, 2008, as the recession took hold.

During the recession, property values declined substantially, eating into the city's property tax base. The recession has cut deeply into

key property and income tax revenue and fee revenue from utilities owned and operated by the city.

II. State revenue sharing.

The state of Michigan has exacerbated Detroit's revenue crisis by slashing $67 million in state revenue sharing with the city. About $24 million dollars of these cuts were due to revenues shared pursuant to the Michigan State Constitution, allocated among cities and towns based on population. Detroit's allocation was reduced because of population loss in the 2010 census. However, the remaining $42.8 million (64 percent of the total state cuts) were due to statutory revenue sharing and were at the discretion of the state Legislature. By cutting revenue sharing with the city, the state effectively reduced its own budget challenges on the backs of the taxpayers of Detroit (and other cities). These cuts account for nearly a third of the city's revenue losses between FY 2011 and FY 2013, coming on the heels of the revenue losses from the Great Recession and tipping the city into the cash flow crisis that it is now experiencing. Furthermore, the Legislature placed strict limits on the city's ability to raise revenue itself to offset these losses.

III. Corporate subsidies.

The city has provided significant tax subsidies to a large number of enterprises as incentives to engage in development projects in downtown Detroit. In some years, the city handed out as much as $20 million to private interests. To the extent that the development would have occurred without these tax subsidies, or with less subsidies, the program was a burden on city revenues at a time when it was particularly damaging. In any event, the subsidies that have not yet been received should be treated as obligations of the city, in the same category as debt service and funding of future employee benefits, subject to readjustment to help resolve the cash flow crisis to the extent revenue is not increased to cover the demands on cash.

## C. EXPENSES

Contrary to widely held belief, Detroit does not have a spending problem. Since the onset of the Great Recession, the city's total expenses have actually decreased by $356.3 million, driven by a 38 percent reduction ($419.1 million in absolute terms) in operating expenses, although its financial expenses have gone up.

I. Operating expenses.

Between FY 2008 and FY 2013, the city drastically cut operating expenses by $419.1 million. This was accomplished in large part by laying off more than 2,350 workers, cutting worker pay, and reducing future healthcare and future benefit accruals for workers. The city reduced salary expenses by 30 percent between FY 2008 and FY 2013. Total operating expenses have been reduced by nearly 38 percent during that same time.

II. Legacy expenses.

The city's "legacy expenses" increased by $62.8 million between FY 2008 and FY 2013. These legacy expenses include the city's debt service and financial expenses as well estimates of its future liability for healthcare and pension benefits it pays to retirees. A close look at the city's legacy expenses reveals that this $62.8 million increase was driven heavily by the city's complex financial deals, not retiree benefits.

The city's financial expenses increased by $38.5 million between FY 2008 and FY 2013, accounting for more than 60 percent of the total increase in legacy expenses. The city's pension contribution expenses remained relatively flat, rising only $2 million during this time. The city's contribution might have been larger if it had had more money, but increases in the actual contributions it did make did not contribute materially to the cash flow crisis. The city's healthcare contribution expenses increased by $24.3 million. This constitutes an increase of 3.25 percent, per year, which is less than the nationwide annual increase in healthcare costs of 4 percent.

The city's pension contributions in particular did not play a role in pushing it into bankruptcy because they did not contribute materially to the increase in the city's legacy expenses that added to the cash flow shortfall. While the city's healthcare contributions did increase, this was largely because of rising healthcare costs nationally, not because the city's benefits were too generous. In fact, a comparative analysis of Detroit's retiree benefits shows that its pension and healthcare benefits are in line with those of other comparable cities.

III. Financial deals.

Detroit's financial expenses have increased significantly, and that is a direct result of the complex financial deals Wall Street banks urged on the city over the last several years, even though its precarious cash flow position meant these deals posed a great threat to the city. The biggest contributing factor to the increase in Detroit's legacy expenses is a series of complex deals it entered into in 2005 and 2006 to assume $1.6 billion in debt. Instead of issuing plain vanilla general obligation bonds, the city financed the debt using certificates of participation (COPs), which is a financial structure that municipalities often use to get around debt restrictions. Eight hundred million dollars of these COPs carried a variable interest rate, which the city synthetically converted to a fixed rate using interest rate swaps.

These swaps carried hidden risks, and these risks increased after the Federal Reserve drove down interest rates to near zero in response to the financial crisis. The deals included provisions that would allow the banks to terminate the swaps under specified conditions and collect termination payments, which would entitle the banks to immediate payment of all projected future value of the swaps to the

5

bank counterparties. Such conditions included a credit rating downgrade of the city to a level below "investment grade," appointment of an emergency manager to run the city and failure of the city to make timely payments. Projected future value balloons in low, short-term rate conditions. This is because the difference between the fixed swap payments made by the city and the floating swap payments projected to be paid by the banks increases. Because all of these events have occurred, the banks are now demanding upwards of $250-350 million in swap termination payments.

These swap deals were particularly ill-suited for a city like Detroit, which had been hovering on the edge of a credit rating downgrade for years. Because the risk of a credit downgrade below "investment grade" was so great, the likelihood of a termination was imprudently high. The banks and insurance companies were in a far better position to understand the magnitude of these risks and they had at least an ethical duty to forbear from providing the swaps under such precarious circumstances. The law recognizes special duties that sophisticated financial institutions owe to special entities like cities in providing complex financial products. A strong case can be made that the banks that sold these swaps may have breached their ethical, and possibly legal, obligations to the city in executing these deals.

## D. CONCLUSION

Detroit's bankruptcy is, at its core, a cash flow problem caused by its inability to bring in enough revenue to pay its bills. While emergency manager Kevyn Orr has focused on cutting retiree benefits and reducing the city's long-term liabilities to address the crisis, an analysis of the city's finances reveals that his efforts are inappropriate and, in important ways, not rooted in fact. Detroit's bankruptcy was primarily caused by a severe decline in revenue and exacerbated by complicated Wall Street deals that put its ability to pay its expenses at greater risk. To address the city's cash flow shortfall and get it out of bankruptcy, the emergency manager should focus on increasing revenue and extricating the city from these toxic financial deals. Here are some recommendations for doing that:

- The emergency manager, ideally in collaboration with the state, needs to increase revenue by $198 million annually to bridge Detroit's budget gap until structural programs can be put in place and the city can benefit from increased general economic improvement. This includes enlisting state involvement on an emergency basis and restoring discretionary state revenue sharing to pre-crisis levels. The shortfall amount can be reduced as FY 2014 proceeds by factors such as improved collection of unpaid taxes (which has yielded modest results to date).

- The emergency manager should drop his proposal to move city workers to a defined contribution pension plan and abrogate vested pension benefits. The city's pension fund contributions did not cause the crisis. Reducing benefits runs counter to the long-term goal of structurally improving city services. Moreover, converting to a defined contribution plan at just the moment when new active employees will be added as services are improved (a goal of the emergency manager) would adversely affect the financial dynamics of the pension fund for existing retirees and other beneficiaries who have already vested under the defined benefit system. Over time, the new active employees will rebalance a fund that is currently top-heavy with retirees and will improve the long-term investment horizon of the plan, to the benefit of city cash flow. The emergency manager should drop any plans to privatize or otherwise monetize the Water and Sewerage Department, since the asserted benefits of such a plan are not likely to be realized and, even if they were, would have no net effect on the current cash flow crisis. The sale price of the system or components represents an investment by a buyer that must be repaid by system revenues, the same as bonds issued against those revenues. If the sale price is applied to retire existing bonds, the effects balance out. If they are not used to retire bonds, it is just like issuing new debt, which presumably the system could do without selling off parts of itself. The plan calls for an annual payment to the city, but this payment is from user fee revenues net of operational expenses and debt service (and return on equity investment if true privatization is used), a financial structure that is parallel to the current system.

- The emergency manager's plan to pay the swap termination fees outside of the bankruptcy process should be abandoned. The bank counterparties should be made to bear the consequences of the original swap transaction, and they should be pushed to forego their projected profit (the measure of the termination payment), given the large profits they have already earned as a result of the unusually low interest rates that resulted from the financial crash. The emergency manager should also press for prorated rebates on the premiums for insurance on the swaps. And, if necessary, the state should be enlisted to guarantee the city's swaps to avoid payment of termination fees. The termination fees will become smaller as interest rates rise over time, which they are likely to do.

- The emergency manager should negotiate directly with the holders of the pension financing certificates of participation, apart from other unsecured creditors. The circumstances of the COPs issue are unique. Unless these circumstances are shown to have benign explanations that are not currently available generally to the public, the leverage that the emergency manager has over this negotiation is high.

- The emergency manager should reclaim tax subsidies and other expenditures to incentivize investment in the downtown area. These tax subsidies should be treated similarly to the city's other financial obligations. The residents of Detroit have already suffered as a result of the crisis, as have the public employees. The recipients of tax expenditures should share in the sacrifice as well.

Once Detroit gets through this immediate crisis, the city's elected officials, hopefully working collaboratively with the state Legislature and the governor, can turn their attention to post-crisis, structural programs that would grow the city's tax base and allow it to return to prosperity over time.

6

# The New Minimal Cities

Michelle Wilde Anderson

The Yale Law Journal (2014) v. 123 p. 1118-1227

excerpted with permission of the author

ABSTRACT: Between 2007 and 2013, twenty-eight urban municipalities declared bankruptcy or entered a state receivership to manage fiscal insolvency. To cut costs and divert revenues to debt payments, these cities have taken dramatic austerity measures—an unwitting experiment with a shrinking public sector in cities hollowed by household poverty and physical deterioration. Eventually, these cuts raise a question that looms as large for insolvency law as it does on city streets: Is there a point where the city should no longer cut public services and sell public assets, even in the face of unmet obligations to creditors? If so, what is that point?

This Article looks closely at our insolvent cities—their residents, their physical and social conditions, their debts, their governments. It explores, as a descriptive matter, local adaptations to fiscal crisis. It surfaces, as a legal matter, the latent question that mayors, governors, state and local legislatures, bankruptcy judges, and state-appointed receivers must decide: What share of city revenues can a city preserve for its current residents? Unlike creditors, who have contracts and legal judgments to quantify a city's obligations to them, residents have no monetized claim to draw on city revenues. Insolvency law itself provides no guidance on this challenging issue—it simply assumes some level of ongoing spending to preserve "health and welfare," a concept that raises more questions than it answers. This Article explores residents' interests, mapping out heuristics for decisionmakers and the public to use in thinking about essential public spending in the context of cities at risk of default on debt.

## Introduction

Unable to meet obligations to creditors while also keeping government services in operation, the City of Detroit entered a state receivership on March 14, 2013 and filed for bankruptcy on July 18. That makes Detroit the twenty-eighth city to declare municipal bankruptcy or to enter a receivership for fiscal crisis since late 2008, a window of time that has seen five of the six largest municipal bankruptcies in American history. In a long-term transformation of local finance that has accelerated in the recent recession, these cities and others are engaging in slash-and-burn budgeting to address falling revenues, rising expenses, and mounting debt. In San Bernardino, the third California city to declare bankruptcy in the recent recession, the City Attorney followed another round of deep cuts to the police department with solemn advice to residents: "Lock your doors and load your guns." Such an announcement would be unsurprising to the residents of Cleveland and East Cleveland in Ohio, Flint and Inkster in Michigan, and other cities beset by rising crime and police layoffs, where 911 can rarely dispatch an officer for a call reporting a nonviolent crime, such as car theft, drug dealing, or prostitution. Camden, New Jersey had over 2,100 incidents of homicide, forcible rape, robbery, or aggravated assault in 2011—an average of roughly one violent crime every four hours in a city of approximately 77,000 people, only slightly larger than suburban Palo Alto, California. Yet in January 2011, Camden cut its police force in half and eliminated its homicide and narcotics units.

Where police departments are understaffed, other public services are unstaffed. Cities in California, Pennsylvania, New York, Michigan, Ohio, and elsewhere have terminated thirty to fifty percent of their employees. Following Vallejo, California's bankruptcy, the city's 2011-2012 budget explained that in addition to cutting forty-five percent of all public safety staff, "[a]ll funding for youth, library, arts, elderly, needy, education, and recreation programs, projects and positions previously provided by the General Fund were completely eliminated." Decisions to scale government back in this way are distinct from contracting out for services; these cities are not purchasing private substitutes for public services. This is privatization in its purest form—government service shedding, on the unfunded hope that private or charitable alternatives will arise. Yet such cuts amplify the longstanding trend of outsourcing service provision to other public agencies (like counties) and private contractors, because the city government itself has fewer responsibilities, less authority, and a smaller staff.

Cities undertaking austerity measures also shed their property—public assets like parks, pools, and government office buildings. In Benton Harbor, Michigan, a city commission and a state receiver transferred possession of twenty-two acres of the city's pristine lakeshore and dunes to a private golf course in exchange for critically needed annual income, even though the scattered, inland replacement parcels given to the city as substitute open space required industrial decontamination and the installation of exposure barriers prior to public use. In Newark, New Jersey, Mayor Cory Booker sold sixteen city buildings in active public use, including the city's historic police and fire headquarters and Newark Symphony Hall, in a deal that plugged most of an $80 million deficit in the 2010 budget but will ultimately cost the city $125 million to lease back the buildings over the next twenty years.

Local government is shrinking in these and other struggling cities. Years, if not decades, of budget cuts and asset sales have left little beyond a strippeddown version of core service functions like irregular police and fire protection, rudimentary sanitation, and water supply. School districts continue to manage education (albeit with budget woes of their own), but the city government itself is no longer pursuing a vision beyond public safety in true emergencies. How low can these cuts go? While laws provide an entitlement to a public education, and we have long struggled to interpret what constitutes a legally adequate education, there is little to nothing to indicate

7

what other services the local public sector must provide. Beyond education, is there some minimum level of public services and public space needed to achieve neighborhood safety and habitability?

This is a humanitarian question, but it is also a doctrinal challenge. A system of state and federal laws governs cities that cannot pay their bills, and decisionmakers in this system (including mayors, governors, federal bankruptcy judges, and creditors) must determine whether a city's finances require outside intervention, such as a state receivership or federal bankruptcy protection, and if so, how to budget for the city going forward. Decisionmakers must evaluate, in essence, whether a city could cut still more deeply into spending on current residents to pay off creditors, or whether it is creditors, rather than residents, who have to bear the next round of cuts.

Standards for local public services must necessarily inform this balancing of interests between creditors and current residents. Creditors such as bondholders, retired public employees, contractors, and tort plaintiffs have contracts and legal judgments that quantify a city's obligations to them. Residents, by contrast, have no such legal instruments with which to monetize their share of a city's revenues. They have no concrete legal entitlements to police and fire protection, no regulations governing emergency response times, no enforceable right to water and water infrastructure, and no mandate for sanitary services like solid waste or wastewater disposal. Municipal bank-ruptcy and receivership laws articulate a duty to protect "basic public safety" and minimum services "consistent with public health and safety," but these laws lack guidance as to what those broad concepts mean as a practical matter. How long should a caller to 911 wait for a fire truck or an ambulance? Is there some point when a city's violent crime rate tells us that the city needs more police officers, if not gang prevention efforts, afterschool programs for juveniles, and victim support programs? Is there a specific density at which neighborhoods are "entitled" to access a public water system? Where to set the floor under public service cuts is a critical legal issue in public insolvencies, but we are asking decisionmakers to reason through it alone, and we have failed to pay attention to their answers.

In this fog of opaque, discretionary reasoning, a curious political reality is nonetheless visible. In the context of municipal insolvency, everyone (liberal, conservative, and libertarian alike) assumes that residents have some claim to share in a city's present and future revenues. When it comes to public fiscal crisis, everyone seems to agree that it is in the best interests of both creditors and society for a city to continue to provide for the "basic health and safety" of its residents—if not because they are simply people, then simply because they are the city's taxpayers, the ones who can make creditors whole over the long run without a bailout. Everyone seems to agree, that is, with no public deliberation (let alone agreement) as to what those minimum levels of public services should be. This Article frames and advises that early stage deliberation.

My goal is not to assert that residents' interests are the only ones urgently at stake in a bankruptcy. "Creditors" is a monolithic word that stands in for thousands of individuals as well as institutions. Among them are retirees who worked for decades in insolvent cities plagued by poverty, crime, and, in some cases, demoralizing working conditions. From the point of view of individual retirees, most pension commitments are not extravagant: the average annual police pension in Detroit, for example, is $30,000 a year, and general city workers (like librarians or sanitation workers) receive about $18,000 a year. If these payments fall through, there may be nothing except poverty programs to fall back on, because many of these retirees, including most former fire and law enforcement employees, are excluded by law from Social Security. The 10.8 million people (amounting to 64% of full-time civilian public employees nationwide) who work full-time for a local government are stricken with dread as they watch these insolvencies. What they see of the fate of public pensions, which are a form of deferred compensation, will affect the competitiveness of public sector jobs and thus the quality of local public services.

The word "creditor" also stands for investors who lent these cities money in good faith, believing loans to municipalities to be one of the most stable, predictable assets available in American financial markets. When a city defaults on its obligations to bondholders, it creates risk in municipal bond markets that may drive up borrowing costs for other cities in the future. Like it or not, the national economy is exposed to these risks. The American municipal bond market includes one million outstanding municipal bonds with a total aggregate principal of more than $3.7 trillion. A cascade of municipalities (beyond the twenty-eight cities to date) that paid less than the con-tracted price for debt would reverberate in the national economy. Individual investors' exposure to any given municipal insolvency is likely to be proportionately minor as compared to that city's retirees' exposure, but default on municipal bonds nonetheless distributes individualized losses to investors, both large and small, most of whom had expressed little taste for (and perhaps tolerance of) risk.

I thus stand on the foundation that creditor perspectives on municipal insolvency are compelling from both a humanistic perspective and a policy one. I leave the full articulation of those perspectives, however, to other work where they are being widely and ably explored. Instead, I focus here on residents' position in the struggle toward the "least bad" compromise that is the nature of insolvency.

This story of residents' interests must surely begin with a look at who lives in insolvent cities. Part I provides a comprehensive list of all twenty-eight cities with at least 15,000 residents that have declared bankruptcy or entered a formal state receivership for municipal insolvency during the five years following September 2008. Tables of data about these cities lay out their demographics, poverty rates, population change over time, median home values, crime rates, and other metrics.

Two commonalities are noticeable immediately in all these cities: their poverty rates are high and rising, while their populations are

8

shrunken and shrinking. Poverty means less revenue despite growing expenses—more crime and fires, more children unprepared for school, and deeper needs for drug treatment, afterschool care, and homeless shelters. We might assume that population loss would bring down expenses to offset some rising costs (fewer people cost less to service, right?), but in fact, steep population loss is also dramatically bad for budgets. Cities that formerly had large populations consumed more extensive city services in the past, leaving a disproportionate pension and capital debt overhang. Spatially, such cities' service territories are as large as they ever were, but the density of service consumers is down, resulting in costly inefficiencies. And people and businesses rarely clean up their mess when they exit a city, leaving behind vacant structures likely to be dilapidated or obsolete, if not sullied by contamination and waste. Those structures impose costs much deeper than the aesthetics of dereliction. It has been said that in shrinking cities, demolitions may be the major public works of the twenty-first century. Firemen are kept busy and endangered: When arson becomes entertainment, a city's decay is as desperate as it is ordinary.

Whatever the service demands of an impoverished shrinking city might be, in a time of state and federal deficits and redistributive intolerance, local fiscal crisis means that city governments must get smaller. What are these cities doing to shrink their governments? After introducing insolvent cities as well as insolvency law in Part I, including an overview of the main legal systems that apply to cities at risk of insolvency, Part II looks at the changes underway in insolvent cities. I consider these adaptations according to a three-part framework that describes the main purposes of local government spending, namely: to provide services (including economic development), to maintain land and equipment for public use, and to regulate for public safety. Because there is very little that insolvent cities can do to increase revenues, cities are cutting services, selling assets, and reconsidering their land-use regulations. This Part explores the nature of the transformative changes underway along each of these dimensions.

The result of these budget contractions is, as discussed in Part III, a generation of urban, high-poverty governments focused on little more than the control of fire and violent crime. These are our new minimal cities. I call them "new" because we have seen minimal local government before. Wealthy suburbs have experimented with a thin local public sector focused primarily on land-use and public safety, including police, fire, sanitation, and land-use control, often via contracts with counties and private contractors. The term "minimal cities" was coined by political scientist Gary Miller in 1981 to describe such places, where local government borders and land-use policies are organized to keep property taxes low and minimize the range of local public services. Beyond the fact that government spending is limited, however, the new minimal cities identified in this Article look nothing like Miller's original minimal cities. Indeed, minimal government in wealthy areas is predicated on excluding the heterogeneous service needs associated with the residents and uses that inhabit our new minimal cities. This reflects an implicit bargain, or at least assumption, that residents who require more public services will live elsewhere. A councilmember of the prosperous, suburban city of Costa Mesa, California revealed candidly that the best way to keep service costs low and revenues high is to filter out residents who might commit crimes—for instance, by catering only to residents with a college degree. In a state where only 30% of people over twenty-five years old meet that criterion, where would the non-college-educated persons of the state live? The bankrupt city of San Bernardino (about an hour's drive from Costa Mesa) might be one option, because the new minimal cities are not exclusive—cheaper land provides homes for people with weak buying power, including low-wage workers.

I take up the major normative questions for public law that emerge from the transformation of poor cities into minimal cities, including the question of essential minimum services. Joining the officials who are now struggling to figure out how to maintain basic health and safety, this Part works through the question of minimum standards for basic services by mapping out heuristics for bankruptcy judges, state receivers, state legislators, and the public to use in thinking about the shape of minimum standards. I draw ideas from social contract theory, economic efficiency, human rights and humanitarian exigency, property rights, anti-poverty policy, and land-use planning to assemble a set of normative approaches and sources of law that help reason through residents' claims to city revenues.

Part IV, in conclusion, asks what it means for local governments to get smaller and do so responsibly. I try to look holistically and pragmatically at how to restructure local government finance and power in light of fiscal stress and concentrated poverty. If we must shrink the local public sector, that change should be intentionally created and internally consistent, not simply government weakness borne of disorganized decay. Like the land-use strategies of the "shrinking cities movement," which work to restructure the way land is organized and used in post-industrial cities coping with substantial population losses, the concept of shrinking governance that I develop here recognizes that some cities are not on an inevitable, upward growth trajectory. Shrinking governance shifts focus from the context of land use and spatial organization to the broader governance context.

This Article explores what happens when inclusive and exclusive cities are both minimal cities, when a government model from suburban life ends up in populous cities with concentrated poverty. I grieve the conditions in our high-poverty shrinking cities. Yet this Article is neither an obituary nor a lament. It is forward-facing and functionalist. Local governments need ways to build, shrink, and, if desired, rebuild government responsibly and flexibly across economic cycles. They need tools to manage decline that go beyond the passive, injurious strategies of atrophy and attrition. Instead of extending long-running research and debate about why cities reach the point when they can't pay their bills—a "whodunit" of urban fiscal crisis—cities need work on what to do about it.

The fact that the broader American economy is thawing does not spell an end to the difficult questions the recession has surfaced. Every city identified in this study has been struggling with deindustrialization for decades, and their pre-recession fiscal prospects

9

were dim. Widening inequality among individuals has imprinted itself in space, and these cities lie within the lowest strata of cities ranked by property values, crime rates, and educational outcomes. In addition, the housing market recession that began in 2006 means that this particular recession will continue to impact local budgets for years. For reasons explained herein, cities' property tax revenues will lag any recovery of the local housing market by years, if not decades. This is ominous news for local budgets, because property taxes remain the single largest source of local revenues.

For purposes of this current piece, I stand in the current moment—along with the residents and local leaders who live in these cities—to think through the contraction of the local public sector. When cities face the compound threat of poverty, population loss, and fiscal crisis, what should they do? The imperative for research on these questions was captured by author and journalist Charlie LeDuff: "You better look at Detroit, because that's what happens when you run out of money." Needless to say, running out of money is a phenomenon not limited to cities. It is becoming business as usual for many higher-level governments, from sequestration in Washington, D.C. to serious deliberation about state bankruptcy. So too is it the current state of affairs for many school districts today, which lost 300,000 teachers between 2008 and 2011, resulting in changes like this one: in Texas in 2011, no less than 7,000 schools received waivers from the state's maximum class size limits for grades K-4. A minimal state may thus come to describe the trajectory of the public sector, beyond city hall.

This Article explores, as a descriptive matter, the austerity experiment underway in American cities that have gone broke. It surfaces, as a legal matter, the latent question of minimum standards in the system of laws governing cities in crisis. And it investigates, as a normative project, sources of guidance to help fiscal overseers determine the point beyond which it should be legally, or at least politically, unacceptable to cut local public services and sell assets. In so doing, it is wrestling with two challenging issues for legal theory. First is the question of habitability for neighborhoods: Is habitability a scalable concept that ascends past individual dwellings and out into the collective space of neighborhoods and cities? How low can shared services go before we should consider a neighborhood uninhabitable? And second: What does urban life require of public life? What are the essential collective services that we will guarantee regardless of consumer buying power or access to private charity? Posing this question in terms of cities offers a smaller setting in which to explore the age-old debate about what we want from the public sector—what taxpayers expect for themselves, and what they are willing to guarantee for others.



## Cities in Bankruptcy & Receivership   (9/1/08 - 9/30/13 w/ >15,000 population)

| Prichard | AL | Hamtramck | MI | New Castle | PA |
|----------|----|-----------|----|------------|-----|
| Atwater | CA | Inkster | MI | Pittsburgh | PA |
| San Bernardino | CA | Pontiac | MI | Reading | PA |
| Stockton | CA | Camden | NJ | Scranton | PA |
| Vallejo | CA | East Cleveland | OH | Central Falls | RI |
| East St. Louis | IL | Garfield Height | OH | East Providence | RI |
| Gary | IN | Mansfield | OH | | |
| Springfield | MA | Altoona | PA | | |
| Allen Park | MI | Chester | PA | | |
| Detroit | MI | Harrisburg | PA | | |
| Flint | MI | Johnstown | PA | | |

**Haas Institute for a Fair and Inclusive Society at UC Berkeley**
The Haas Institute for a Fair and Inclusive Society at UC Berkeley brings together researchers, stakeholders, policymakers, and communicators to identify and challenge the barriers to an inclusive, just, and sustainable society and to create transformative change. The Institute serves as a national hub of a vibrant network of researchers and community partners and will take a leadership role in translating, communicating, and facilitating research, policy, and strategic engagement. The Haas Institute advances research and policy related to marginalized people while essentially touching all who benefit from a truly diverse, fair, and inclusive society.


**Damon J. Keith Center for Civil Rights at Wayne State University Law School**
The Honorable Damon J. Keith is a living embodiment of the principles represented in the United States Constitution – he has courageously defended the Constitution while championing the cause of civil rights. Judge Keith has sought to ensure that "equal justice under law" is reality for people of color, women, and all who have been victims of discrimination. The Damon J. Keith Center for Civil Rights memorializes the work of Judge Keith, civil rights icon and one of our country's leading jurists. The Keith Center is also a leading source for the legal history of the Civil Rights Movement and the historic accomplishments of African American lawyers and judges. The Keith Center is further dedicated to research and community outreach addressing modern challenges to civil rights and racial justice.


**Metropolitan Organizing Strategy Enabling Strength (MOSES)**
MOSES, a group of diverse congregations, organizes communities, develops leaders and builds relationships to advocate for social justice in metro Detroit.

# Regional Reconciliation: The Road Not Taken

*For a century, the Detroit metropolitan area has been on a path towards greater jurisdictional division, creating the segregated region we inhabit today. It did not have to be. Despite our present crisis, it is not too late for us to choose a different path, emphasizing collective unity and responsibility above the manmade boundaries that divide us.*

### 1910: Ford begins the industrial exodus from Detroit



Less than a decade after opening shop in Detroit, Henry Ford shifts automobile production out of the city to a new plant in the village of Highland Park, which he incorporates as its own city to avoid annexation — and taxation – by Detroit.

### 1926: Detroit city limits reach their current extent



As development cascades outwards along major roads and streetcar lines, the City of Detroit grows too – until 1926. That year, the city completed its last major annexation, of the majority portion of old Redford Township. It is now surrounded by incorporated municipalities on nearly all sides.

### 1940s: U.S. sponsors factories outside city limits



The U.S. government funds the Detroit automakers to build a constellation of new war plants, but these are located outside the borders of the city. Ford's Willow Run plant, the "world's largest room," built with federal funds to produce B-24 Liberator bombers, is located just over the Wayne County border in rural Washtenaw County to avoid Wayne County taxes.

### 1950: Mayor cancels public housing in all-white areas

Mayor Albert Cobo is elected on a promise to cancel racially integrated public housing projects in the all-white outlying areas of Detroit, thwarting possibilities for residential desegregation, as the city demolishes black neighborhoods for "urban renewal."



### 1963: Detroit explores suburban annexation



City planning officials under Mayor Jerome Cavanagh explore the option of annexing the fast-growing suburbs of Warren and Livonia to compensate for a deteriorating city tax base, but the proposal wins little support outside Detroit.

### 1967: Internal combustion

As suburban development and automation drain jobs from the central city, and neighborhoods continue to deteriorate, anger among young, black Detroiters reaches boiling point. A police raid touches off five days of rioting. White Detroiters flee the city in record numbers, and some suburban police departments respond by training residents in target practice.



*(Continued on reverse side)*



MO✺SES

Metropolitan Organizing Strategy Enabling Strength, an affiliate of the Gamaliel Foundation
220 Bagley Street, Suite 212, Detroit, MI 48226 ▪ Phone: 313-962-5290 ▪ Fax: 313-262-6619 ▪ Web: www.mosesmi.org

### 1972: Public housing defeated in suburbs



Former Michigan Governor George Romney, now U.S. Secretary of Housing and Urban Development, attempts to use the Fair Housing Act to force metro Detroit suburbs, including Warren, to accept racially integrated public housing as a condition of receiving federal housing funds. He is rebuffed by local residents, elected officials and President Nixon. The same year, Alabama Governor George Wallace ("segregation now, segregation tomorrow, segregation forever") capitalizes on white fear to win Michigan's Democratic presidential primary.

### 1973: Coleman Young elected Mayor

As white flight leaves Detroit with a black majority, Coleman A. Young is elected Mayor. In his inaugural speech, he states: "What is good for the black people of this city is good for the white people of this city. What is good for the suburbs is good for the central city. It is clear that we have a commonality of interests." However, suburban residents interpret his order for criminals to "hit Eight Mile Road" as a threat to the Oakland and Macomb County suburbs.



### 1974: Regional government proposal stillborn

The Metropolitan Fund produces a proposal, *The Regionalist Papers*, for an elected regional government to replace the Southeast Michigan Council of Governments (SEMCOG). It wins few supporters in the city or in the suburbs.

### 1974: Busing across city limits banned



In *Milliken v. Bradley*, the Supreme Court bars inter-district busing of students for racial desegregation, stating that the concentration of black students inside Detroit is the consequence of "unknown and perhaps unknowable factors." Justice Marshall decries the decision as an "emasculation" of *Brown v. Board*. Anti-busing lawyer L. Brooks Patterson follows the example of Wallace and Nixon, building a political base and a career on the issue in Pontiac and suburban Oakland County.



### 1980: Suburban secession proposal symbolizes growing divide

State Representative Thomas Brown introduces a bill in the State Legislature to permit non-Detroit municipalities to secede from Wayne County and form the independent county of Suburbia. The proposal is not approved, but symbolizes the central city's increasing isolation.

*House unit passes bill to split county*

### 1989: Regional public transit rebuffed

After suburban leaders oppose plans for a regional rapid transit system, and the City determines not to entrust its bus system to an unsympathetic region, the Southeastern Michigan Transportation Authority is reorganized without the city of Detroit as the Suburban Metropolitan Authority for Regional Transportation.

**1997: MOSES is founded** as an interfaith, multiracial city-suburb coalition for the common good of the region.

**"In the short run, it may seem to be the easier course to allow our great metropolitan areas to be divided up each into two cities -- one white, the other black -- but it is a course, I predict, our people will ultimately regret."**
- **Justice Thurgood Marshall, dissent in *Milliken v. Bradley*, 1974**



Metropolitan Organizing Strategy Enabling Strength, an affiliate of the Gamaliel Foundation
220 Bagley Street, Suite 212, Detroit, MI 48226 ▪ Phone: 313-962-5290 ▪ Fax: 313-262-6619 ▪ Web: www.mosesmi.org

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

## Introduction

In 2013, Detroit, Michigan made history. The city, reeling from a national economic recession and drowning in debt, filed with the courts for bankruptcy. Kevyn Orr was named Emergency Manager, and the city has been working on a debt restructure plan since. Detroit is not the first city to file for bankruptcy, and unfortunately, it likely won't be the last. It is, however, the largest city to do so, and how it handles its $18 billion debt will be used as a standard for policymakers for the foreseeable future.

One sustainable and equitable solution is hiding in plain sight. Detroit should transfer ownership of its water and sewer utilities to an entity benefiting pensioners. Utility revenue would pay down debt and fund future pensions.

As is often the case with public finances, Detroit's debt is massive and complex. Over 100,000 creditors have lent Detroit money, including banks, bondholders, and city employees. About $6 billion of that debt is in unfunded pension liabilities, post-employment



**$18 billion total Detroit debt**

**$6.4 billion obligations backed by enterprise revenue**
**$5.7-6.4b health care for retirees**
**$3.5b underfunded pension liabilities**
**$1.43b bonds issued to fund pensions**
**$650.7m unsecured general obligation debt**
**$479.3m secured general obligation debt**
**$343.6m owed to banks**
**$300m other liabilities**

praxia PARTNERS

health care for city workers, $6 billion of the debt is owed to unsecured creditors that have purchased municipal bonds (such as banks), and $6 billion of that debt is in utility bonds. Detroit's current Plan of Adjustment calls for repaying secured bondholders 100% of what they are owed and repaying unsecured bondholders, including pensioners, about 20%.

While a fair restructuring of the debt requires all creditors to be treated equally, it is an unfortunate fact of bankruptcy that not all lenders will be fully repaid. Over 20,000 citizens risk losing the pension and benefits they earned. Hurting city workers hurts Detroit and halts recovery. Detroit must attract talent and residents to its urban areas. Furthermore, by favoring banks and Wall Street over its own residents, Detroit could set a troubling trajectory for future public finance decisions. We have faith in the policymakers and creditors of Detroit and believe they ultimately have the best interest of the city in mind.

1

**Paying Public Servants with Public Services:**
The Transfer of utilities to Pensioners to satisfy Debt in Detroit
*Praxia Partners*
*Joseph Recchie, CEO*

We are proposing a restructuring idea for consideration. This restructure allows Detroit to capitalize on, arguably, its most valuable asset, its water and sewer utility, in order to protect the livelihoods of its former and present workers and build a sustainable future for the city. **Our recommendation is that the city transfers ownership of its water and sewer utility over to pensioners and allows the utility revenue to pay down pension debt and pay for future pension funding.**

## The Pension

Much of Detroit's $18 billion debt is owed to its own workers. Like many cities, Detroit borrowed from their pension funds to pay other debts, and now those workers might not see their loan repaid. About 32,000 people are currently receiving pension checks as repayment for the time spent in public service for the city of Detroit. About 24,000 of those are retired workers, many living on fixed incomes and depending on the pensions and benefits promised to survive. Debt restructuring is still under negotiations, but at the time of this writing, the plan proposed cutting repayment by 26% for general city workers (unless they vote against the restructure, then it's 34%) and by 6% (or 14% if they vote against) to pensions of uniformed city workers, such as police and firefighters. These retired workers would receive about 20-30% of their original healthcare benefits. Along with these cuts to monthly payouts, retirees will no longer receive cost-of-living adjustments, leading to cuts to overall pensions.

Not surprisingly, the Detroit community opposes the draconian cuts. A spokesman for Detroit's police and fire pension board expressed his disappointment in this current offer and his hope for an equitable solution, stating, "We believe the city of Detroit can afford much better treatment of its pension beneficiaries who dedicated years of their lives in service of them. We believe there are reasonable and viable options that could negate the need for pension cuts." Transferring ownership of Detroit's water and sewer utility is a viable and fair approach to honoring the city's pension obligations.

## Detroit's Crown Jewel

Noticeably missing from Orr's most recent proposed plan of adjustment is any mention of Detroit's water and sewer utility. However, it is safe to say investors haven't missed the value of the utility infrastructure. As unsexy as water and sewers might be, it hasn't stopped Wall Street from practically salivating over Detroit's systems. Even after filing for Chapter 9, Detroit's utility debt assets have been called a "solid credit" by investor analysts, and water and sewer bonds were called "the single best value in the entire bond market." The city-owned water and sewer utilities might not be the most glamorous public service, but they are the most stable, and quite possibly one of the most valuable. In this case, they might very well be an answer to Detroit's debt problem.

2