UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                             .        Detroit, Michigan
                             .        April 17, 2014
                Debtor.      .        9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. (3945) WAYNE COUNTY'S MOTION UNDER
11 U.S.C. 105(d)(1) FOR A STATUS CONFERENCE ON, AND
APPOINTMENT OF A FACILITATIVE MEDIATOR WITH RESPECT TO,
ISSUES RELATED TO THE FUTURE OF THE DETROIT WATER AND
SEWERAGE DEPARTMENT; (3943) CORRECTED MOTION OF THE CITY
OF DETROIT FOR ENTRY OF AN ORDER ESTABLISHING
SUPPLEMENTAL PROCEDURES FOR SOLICITATION AND
TABULATION OF VOTES TO ACCEPT OR REJECT PLAN OF
ADJUSTMENT WITH RESPECT TO PENSION AND OPEB CLAIMS;
(3954) JOINT MOTION TO AMEND THE SOLICITATION
PROCEDURES ORDER; (3632) HEARING ON ANY UNRESOLVED
OBJECTIONS TO THE DISCLOSURE STATEMENT (RE. THIRD
AMENDED ORDER ESTABLISHING PROCEDURES, DEADLINES AND
HEARING DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT);
(3632) INITIAL STATUS CONFERENCE ON PLAN (RE. THIRD
AMENDED ORDER ESTABLISHING PROCEDURES, DEADLINES AND
HEARING DATES RELATING TO THE DEBTOR'S PLAN
OF ADJUSTMENT)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street, Fiftieth Floor
                       Los Angeles, CA  90071
                       (213) 243-2382

                       Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Jones Day
                       By:  DAVID HEIMAN
                       North Point, 901 Lakeside Avenue
                       Cleveland, OH  44114
                       (216) 586-7175

APPEARANCES (continued):

                        Jones Day
                        By:  THOMAS CULLEN, JR.
                        51 Louisiana Avenue, N.W.
                        Washington, D.C.  20001-2113
                        (202) 879-3924

                        Pepper Hamilton, LLP
                        By:  ROBERT S. HERTZBERG
                        4000 Town Center, Suite 1800
                        Southfield, MI  48075-1505
                        (248) 359-7333

                        Miller, Canfield, Paddock & Stone, PLC
                        By:  JONATHAN S. GREEN
                        150 West Jefferson, Suite 2500
                        Detroit, MI  48226
                        (313) 495-7997

For Creditor           Rights First Law
April Clarty:          By:  STEPHANIE FAKIH
                        2000 Town Center, #1780
                        Southfield, MI  48075
                        (248) 237-7944

For County of          Dechert, LLP
Macomb, Michigan:      By:  ALLAN S. BRILLIANT
                        1095 Avenue of the Americas
                        New York, NY  10036
                        (212) 698-3600

For Wayne County:      Butzel Long, PC
                        By:  MAX J. NEWMAN
                        Stoneridge West
                        41000 Woodward Avenue
                        Bloomfield Hills, MI  48304
                        (248) 258-2907

For Oakland            Carson Fischer, PLC
County, Michigan:      By:  JOSEPH M. FISCHER
                             ROBERT A. WEISBERG
                        4111 Andover Road, West - 2nd Floor
                        Bloomfield Hills, MI  48302-1924
                        (248) 644-4840

For the Official       Dentons US, LLP
Committee of           By:  CAROLE NEVILLE
Retirees:              1221 Avenue of the Americas, 25th Floor
                        New York, NY  10020-1089
                        (312) 632-8390

APPEARANCES (continued):

| | |
|---|---|
| For the Official Committee of Retirees: | Dentons, LLP<br>By:  SAM J. ALBERTS<br>1301 K Street, East Tower<br>Washington, DC  20005-3364<br>(202) 408-7004 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Zucker & Freedman, P.C.<br>By:  BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>330 West 42nd Street<br>New York, NY  10036-6976<br>(212) 356-0227 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  SHANNON L. DEEBY<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5889 |
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, 3rd Floor<br>Birmingham, MI  48009<br>(248) 723-6263 |
| For AFSCME: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |

APPEARANCES (continued):

<pre>
For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  ALFREDO R. PEREZ
Company:               700 Louisiana Avenue, Suite 1600
                       Houston, TX  77002
                       (713) 546-5040

For Assured            Chadbourne & Parke, LLP
Guaranty Municipal     By:  SAMUEL S. KOHN
Corp.:                 30 Rockefeller Plaza
                       New York, NY  10112
                       (212) 408-1060

For Berkshire          Garan Lucow Miller, PC
Hathaway Assurance     By:  THOMAS P. CHRISTY
Corporation:           1111 West Long Lake Road, Suite 300
                       Troy, MI  48098
                       (248) 641-7600

For Syncora            Kirkland & Ellis, LLP
Holdings, Ltd.,        By:  STEPHEN HACKNEY
Syncora Guarantee           RYAN BLAINE BENNETT
Inc., and Syncora      300 North LaSalle
Capital Assurance,     Chicago, IL  60654
Inc.:                  (312) 862-3062

For Ambac              Arent Fox, LLP
Assurance              By:  CAROL CONNOR COHEN
Corporation:           1717 K Street, NW
                       Washington, DC  20036-5342
                       (202) 857-6054

For Wilmington         Drinker Biddle & Reath, LLP
Trust Company,         By:  HEATH ROSENBLAT
N.A.:                  1177 Avenue of the Americas, 41st Floor
                       New York, NY  10036-2714
                       (212) 248-3248

For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For Ad Hoc Water       Kramer Levin Naftalis & Frankel, LLP
and Sewer              By:  GREGORY HOROWITZ
Bondholders:           1177 Avenue of the Americas
                       New York, NY  10036
                       (212) 715-9571
</pre>

APPEARANCES (continued):

```
For Retired Detroit      Strobl & Sharp, PC
Police Members           By:  LYNN M. BRIMER
Association:             300 East Long Lake Road, Suite 200
                         Bloomfield Hills, MI  48304-2376
                         (248) 205-2722


For U.S. Bank as         Waller Lansden Dortch & Davis, LLP
Trustee for Water        By:  DAVID E. LEMKE
and Sewer Bonds:         Nashville City Center
                         511 Union Street, Suite 2700
                         Nashville, TN  37219
                         (615) 850-8655


For Three Bond-          Mintz, Levin, Cohn, Ferris, Glovsky and
Holders of DWSD            Popeo, PC
Ad Hoc Water and         By:  WILLIAM KANNEL
Sewer Bondholder         One Financial Center
Committee:               Boston, MA  02111
                         (617) 348-1665


For National             Sidley Austin, LLP
Public Finance           By:  JEFFREY E. BJORK
Guarantee Corp.:         555 West Fifth Street, Suite 4000
                         Los Angeles, CA  90013
                         (213) 896-6037


For the State of         Dickinson Wright, PLLC
Michigan:                By:  STEVEN G. HOWELL
                         500 Woodward Avenue, Suite 4000
                         Detroit, MI  48226-3425
                         (313) 223-3033



Court Recorder:          Letrice Calloway
                         United States Bankruptcy Court
                         211 West Fort Street
                         21st Floor
                         Detroit, MI  48226-3211
                         (313) 234-0068


Transcribed By:          Lois Garrett
                         1290 West Barnes Road
                         Leslie, MI  49251
                         (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1     THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3     THE COURT:  Excuse me.  Good morning, everyone.  I'd

4  like to begin with the motion for mediation and then the

5  corrected motion for entry of an order establishing

6  supplemental procedures for solicitation and tabulation of

7  votes regarding pension and OPEB claims and then the motion

8  to amend the solicitation procedures filed by Assured and

9  others, then the hearing on the disclosure statement and then

10  the status conference.  Okay.  So let's begin with the motion

11  for mediation.  Anybody here on that?

12     MS. FAKIH:  Good morning, your Honor.  Stephanie

13  Fakih.  For the record, the spelling is F-a-k-i-h.  I'm here

14  appearing on behalf of Ms. April Clarty.  Your Honor, I was

15  just retained in this matter, and so I haven't been in touch

16  with anybody regarding mediation for this case.

17     THE COURT:  Who do you represent?

18     MS. FAKIH:  Ms. April Clarty.  She's sitting in the

19  back of the courtroom.

20     THE COURT:  Did you file a paper?

21     MS. FAKIH:  I did not, your Honor.

22     THE COURT:  Who else is here, please?  Mr. Fischer?

23     MR. FISCHER:  I misunderstood, your Honor.  When you

24  said the motion for mediation, I thought you were referring

25  to the motion that was filed by Wayne County.

1          THE COURT:  That's the motion.

2          MR. FISCHER:  Then I'm here on behalf of Oakland

3  County, your Honor, and good morning.  We have filed papers.

4          MS. FAKIH:  Your Honor, just for clarification, this

5  is Case Number 13-53846?

6          THE COURT:  Yes, City of Detroit.

7          MS. FAKIH:  That's correct.  And my client, April

8  Clarty, is the creditor on this case I'm bringing.

9          THE COURT:  She's one of the creditors?

10          MS. FAKIH:  That's right, your Honor.

11          THE COURT:  Does she have an interest in whether

12  Wayne County mediates the Detroit Water System with Wayne and

13  Oakland County?

14          MS. FAKIH:  No, your Honor, I don't believe that she

15  does, which is why I --

16          THE COURT:  All right.  That's what's before the

17  Court now.

18          MS. FAKIH:  I'm kind of confused.

19          THE COURT:  Okay.

20          MS. FAKIH:  Okay.  Thank you.

21          THE COURT:  All right.

22          MR. GREEN:  Good morning, your Honor.  Jonathan

23  Green from Miller Canfield.  I'm told that Mr. Newman, who

24  filed the motion, is still waiting to get through security.

25          THE COURT:  All right.  Mr. Fischer is here.  Are

1   you here on this matter, sir?

2         MR. BRILLIANT: Yes, your Honor. Allan Brilliant on

3   behalf of Macomb County by and through its county agency, the

4   Macomb County Public Works Commissioner. Mr. John Schapka,

5   who's the interim and maybe early, you know, today, you know,

6   the permanent corporation counsel for Macomb County, had

7   intended to appear on this matter himself. He had filed the

8   response, and I understood that he would be here by nine

9   o'clock, but apparently when your Honor asked for

10   appearances, he wasn't here, but I am here on behalf of

11   Macomb if Mr. Schapka doesn't get here.

12         THE COURT: Are you prepared to proceed on behalf of

13   your client?

14         MR. BRILLIANT: I have had conversations with him,

15   your Honor, and if, your Honor -- if he doesn't get here

16   before you start this hearing, yes, I can participate on

17   behalf of Macomb.

18         THE COURT: Well, all right. Let me just ask you

19   then to state your client's position regarding this matter.

20         MR. BRILLIANT: Your Honor, you know, we filed a

21   response, you know. As your Honor knows, there has been, you

22   know, to date, you know, negotiations with respect to the

23   creation of a water authority. The negotiations have not

24   borne fruit. A lot of people have put a lot of time and

25   effort into them. At this point in time, given the positions

1   that the city had taken in the negotiations, which are

2   outlined in the Oakland, you know -- you know, response, and

3   also given, you know, the city's response that they didn't --

4   they believe that the negotiations had -- you know, had, you

5   know, run their terms, and also, your Honor, in light of the

6   fact that they have now -- you know, taking the potential

7   creation of a water authority, you know, out of the

8   documentation, our sense is that it may just be a waste of

9   time and effort at this point to have mediation.  Of course,

10  if your Honor, you know, thinks that the parties should get

11  together and continue to, you know, negotiate, we would do

12  that and continue to do that in good faith with the hope of

13  reaching a resolution, but there has been a significant

14  amount of negotiation for a long period of time.  To date it

15  hasn't borne fruit, and we're just very concerned that it

16  would just be a waste of resources to, you know, continue to

17  do that at this point.

18          THE COURT:  I see that Mr. Newman has arrived.  Mr.

19  Newman, we are hearing your motion.  Would you like to be

20  heard?

21          MR. NEWMAN:  I would, your Honor.  Thank you very

22  much.

23          THE COURT:  I will give you a moment to take your

24  coat off.

25          MR. NEWMAN:  Thank you, your Honor.  I apologize.

1  The security line was a little longer than I anticipated.

2  Max Newman of Butzel Long on behalf of Wayne County and its

3  chief executive, Robert Ficano.  We're here today on our

4  motion to request mediation on issues related to the Detroit

5  Water and Sewerage Department and specifically the

6  negotiations and provisions in the plan related to the future

7  of the DWSD.

8        The issue is a critical one.  It's the future of

9  water and the sewage system for four million people around

10  the Metro Detroit area.  It's a question of who has control

11  over the system, whether it will be a public or private

12  system, whether it will be a city system, or whether it will

13  be a regional system.  We want to stress as part of this that

14  the system is a quality of life issue.  It's not just a cash

15  source, but it's actually critical to everyone who's around

16  the region.  Reasonable prices and -- are a bulwark against

17  poverty, and the service is obviously necessary for the

18  health and welfare of everybody in Wayne County, my client,

19  but Oakland and Macomb Counties as well, including the city

20  residents.

21        Unlike some others, we believe that the bankruptcy

22  will definitely -- or could definitely have a material impact

23  on the system.  We think that now is the time for the parties

24  to negotiate as part of the bankruptcy.  We face real

25  concerns in part of the plan of adjustment, and we would

1    prefer negotiation over litigation.  And obviously we have a

2    number of partners who have to participate in that with us.

3            The Court on the hearing on Monday was quoted in the

4    newspaper as urging all parties to take advantage of the

5    mediation system and urging all parties to negotiate as part

6    of that.  As they quoted you as saying anyway, the message is

7    that now is the time to negotiate, that this is not the time

8    for a public relations campaign; rather, negotiating in

9    public is counterproductive; rather, it is the time to

10   negotiate with the city in confidential mediation sessions.

11   And that is, in fact, exactly what we are asking for.

12           There have been several objections that were filed

13   to the motion, and I'm characterizing them as objections.

14   They were responses.  And each one of them says -- said

15   essentially in one form or another we're very frustrated with

16   the status of the negotiations.  Perhaps we think that they

17   may have run their course already, but we're willing to

18   mediate if the Court thinks it's appropriate.  We, too, are

19   frustrated with the status of the negotiations.  We never

20   would have asked for mediation if we weren't frustrated.

21           We have somewhat of an insider's view of the

22   negotiations, and I certainly have a view of the Court's

23   mediation process and the history of it.  And, quite frankly,

24   I've seen issues that were at more of an impasse or that I

25   felt were less likely to be resolved through mediation

1  succeed, you know, despite themselves and despite the initial
2  beliefs of the parties going in.  Therefore, we do have
3  confidence in the process.  We do have confidence in Chief
4  Judge Rosen, and we want to negotiate more.  We want
5  mediation to work.

6        So for the reasons set forth in the motion, we
7  believe now is the time.  The plan is pending.  I know an
8  amended plan was filed as recently as last night.  I know
9  that the case has deadlines a few months out, but in a case
10 of this magnitude and of this size, those are reasonably
11 short deadlines, and so we believe that now is the time to
12 get started.  The issues are complex.  This issue has been
13 before the courts for some 30 years or more, and if we're
14 going to resolve it, we genuinely need a little bit of time,
15 and we need to start that process now.  So with that, if the
16 Court has any questions, I'm prepared to answer them.
17 Otherwise -- oh, one thing I did want to mention my client
18 handed to me as we were walking in, the Southeastern Oakland
19 County Water Authority passed a resolution on the 9th, so
20 earlier, I guess, last week, consisting of the City of
21 Berkley, Beverly Hills, Bingham Farms, Birmingham, Clawson,
22 Huntington Woods, Lathrup Village, Pleasant Ridge, Royal Oak,
23 Southfield, and Southfield Township supporting further
24 negotiations and supporting the idea of a regional water
25 authority emerging from this bankruptcy, so we are not alone

1   in asking for further negotiations, and we do believe that

2   this is in the best interest both of this case, of the

3   county, of its residents, and of the other counties as well

4   and the city.

5          THE COURT:  Thank you.  Mr. Fischer.

6          MR. FISCHER:  Good morning again, your Honor.

7   Joseph Fischer of Carson Fischer together with Robert

8   Weisberg here on behalf of Oakland County.  Your Honor, as

9   just a short introduction, I want to make sure I start with

10  the -- what I believe to be always the view of the Court, and

11  that is parties should act in good faith to try to reach an

12  understanding and agreement with regard to any issues that

13  can be avoided in the form of litigation or undue delay and

14  expense.  I want to assure the Court that Oakland County has

15  been committed to that.

16         THE COURT:  Excuse me one second, sir.

17         MR. FISCHER:  Yes, sir.

18         THE COURT:  Can I help you?  I don't know our

19  controls, sir.  Can you help me?

20         MR. FISCHER:  I hope I didn't cause this, your

21  Honor.

22         THE COURT:  Okay.  Go ahead, sir.  Thank you.

23         MR. FISCHER:  I assume, your Honor, that I don't

24  have to repeat my opening comments again.

25         THE COURT:  No.  Go ahead.

1       MR. FISCHER:  Thank you, your Honor.  First of all,

2  with regard to trying to respond to Wayne County's motion, I

3  want to assure the Court that with regard to the assertion

4  that we're at the angry letter stage, we are not.  At least

5  that is Oakland County's position.  We do agree that the

6  Detroit Water and Sewer Department is a very important

7  component of the plan of adjustment, and, as your Honor

8  knows, last -- well, I shouldn't say yesterday evening but

9  very late in the day the second amended disclosure statement

10 and the second amended plan of adjustment was filed, and it

11 leaves questions to be answered with regard to the Detroit

12 Water and Sewer Department.  However, nobody is going to

13 argue about the fact that it provides vital services to

14 millions of residents in southeastern Michigan.  And Oakland

15 County is a critical customer of the department.  Its

16 revenues are obviously essential, and Oakland County is open

17 to the possibility of a reasonable solution to forming a

18 regional authority, but there are conditions precedent to

19 that, your Honor, respectfully.  Whatever resolution has to

20 protect all of the rate payers.  It has to be able to insure

21 that there is the maintenance of operations.  It has to

22 insure --

23       THE COURT:  Is this the beginning of the

24 negotiations?

25       MR. FISCHER:  I beg your pardon?

1    THE COURT:  Is this the beginning of the

2  negotiations?

3    MR. FISCHER:  Are you used to me, your Honor?  Most

4  apologetically, I've been asked to please place the

5  statements on the record, and I would ask your Honor's

6  indulgence.

7    THE COURT:  I don't intend to prevent you.  I just

8  want the record to be clear what you're doing.

9    MR. FISCHER:  There are many attorneys in the

10  courtroom this morning that aren't familiar with me, but I

11  think your Honor is.  Suffice it to say we want to be able to

12  insure that the operations are maintained to insure

13  sufficient and efficient and economical services to all the

14  customers of the Detroit Water and Sewer Department.

15  Certainly, at least as far as the perspective of Oakland

16  County is concerned, that the revenues must be kept in the

17  system to pay for the critical upkeep and rehabilitation that

18  is required.  They should not be allowed to be leaked out.

19  They shouldn't be diverted in a manner that is not prescribed

20  either legally or practically.

21      To date, the city, at least as far as Oakland County

22  is concerned, has failed and refused to negotiate in good

23  faith.  They've held back critical documents and information.

24  They barred the access, as far as the county is concerned, to

25  Detroit Water and Sewer Department officials.  Unfortunately,

1   your Honor, we've gotten to the point where we had

2   communicated to us the take it or leave it approach.  That

3   doesn't work, your Honor.

4            Oakland County respectfully cannot and will not make

5   critical billions of dollars decisions that would impact

6   millions of residents without the opportunity to perform, as

7   your Honor would expect, comprehensive and professional due

8   diligence.  Our concern is simply the following, your Honor.

9   If we go the mediation route, we are concerned that the city

10  will never provide the level of support and information in

11  order for the county to make rational and well-informed

12  decisions.  The city has said --

13           THE COURT:  Doesn't it strike you that if this

14  motion is granted, Judge Rosen will be in a position to

15  assure you that you get -- to assure your client that your

16  client gets all of the information that it needs to negotiate

17  this matter?

18           MR. FISCHER:  Short response, your Honor, is your

19  characterization of Judge Rosen.  There is nobody with more

20  fervor that would attack the mediation process and instruct

21  the parties to cooperate and to have transparency as a

22  denominator, so certainly both my experience in front of

23  Judge Rosen and in direct response to your question is yes

24  affirmatively.

25           THE COURT:  All right.

1          MR. FISCHER:  But with all that said, if we don't

2   get these meaningful disclosures, we're not going to be able

3   to make material progress, and that's why Oakland County

4   respectfully, your Honor, filed the response that they did.

5          THE COURT:  What I hear when you say that --

6          MR. FISCHER:  Yes, sir.

7          THE COURT:  What I hear when you say that is that if

8   you do get meaningful disclosures, you can make meaningful

9   progress.

10         MR. FISCHER:  One would hope so, your Honor.  I

11  think the denominator also is pertinent --

12         THE COURT:  Mediation is all about hope, isn't it?

13         MR. FISCHER:  It certainly is, your Honor.  That's

14  the position of Oakland County.

15         THE COURT:  All right.

16         MR. FISCHER:  Thank you.

17         THE COURT:  What's the city's position, please?

18         MS. LENNOX:  Good morning, your Honor.  For the

19  record, Heather Lennox of Jones Day on behalf of the city.

20  Your Honor, the city agrees that a regional water and sewer

21  authority would be a benefit not only to the city but to the

22  region, and that's why the city proactively reached out to

23  the three counties last fall to begin these discussions.  We

24  would be happy to reignite the discussions with the

25  assistance of a mediator if this Court believes that it's

1  appropriate and the parties are willing to participate in

2  good faith.

3      We certainly disagree with many of the

4  characterizations in Macomb and Oakland County's pleadings

5  and with a lot of what Mr. Fischer just said.  We have

6  provided all the information we have, reams of it.  We have

7  met at all times in good faith and frequently.  We intend to

8  continue in good faith should your Honor order mediation, and

9  we stand ready to participate constructively if your Honor

10  believes it's appropriate.

11      THE COURT:  Thank you.  All right.  The Court is

12  going to grant the motion and order the city, Wayne, Oakland,

13  and Macomb Counties to mediate the issue of creating a

14  regional water authority.  Several considerations motivate

15  the granting of this motion.  The first is a sense,

16  unrebutted in the record here, that the creation of a

17  regional water authority is not only in the best interest of

18  the city but also in the best interest of all of the

19  customers of the city's Water Department.  The customers of

20  the Water Department, since we're talking about a

21  governmental function here, ought to have the opportunity to

22  participate in the governance of that water authority and the

23  governance of the delivery of water services, and that can

24  only be done through a regional authority.

25      I also have a sense that this bankruptcy offers a

1    unique opportunity for the creation of that regional
2    authority and that if we do not take advantage of this unique
3    opportunity, the opportunity will, in all likelihood, be lost
4    forever, so for those reasons the motion is granted, and I
5    will prepare an appropriate order.

6           And let's turn our attention to the next matter,
7    which is the city's motion regarding soliciting votes with
8    respect to pension and OPEB claims.

9           MS. LENNOX:  Again, good morning, your Honor.  We
10   have -- this motion has certainly been long-expected, and, as
11   you can see by the -- how much paper is into it, it's been
12   the work of a lot of -- an enormous amount of effort among a
13   lot of different parties.

14          THE COURT:  Excuse me one second while the courtroom
15   calms down a little bit.  And you may proceed.

16          MS. LENNOX:  Thank you, your Honor.  The purpose of
17   the motion, of course, is to set forth some special
18   procedures and notices for solicitation and balloting for
19   pension and OPEB classes in our plan.  As I mentioned, your
20   Honor, and as we set forth in the motion, it has been a very
21   collaborative process for over more than a month among the
22   city, the Retiree Committee, the two Retirement Systems,
23   counsel for the four safety unions, counsel for AFSCME, and
24   counsel for the two largest retiree associations, one for
25   police and fire and one for general retirees.  I would like

1  to thank them for their participation and for their

2  commentary and for their helpful suggestions, and I think we

3  have a process that even going through the balloting process

4  will require continued cooperation, and I think the parties

5  are operating in the best spirit to try to make things as

6  understandable for these constituents as we can.

7          It is very tough to make what are very complicated

8  and sometimes arcane concepts about pensions and retiree

9  healthcare benefits simple or easy.  We've tried to do that.

10  We've tried to make the plain language statements for each of

11  the classes read like a pamphlet a person would get to make

12  benefit choices when they have choices to make.  We have also

13  provided examples for how the pension concepts would work

14  because these are very complicated concepts, and the

15  agreements that we reached with some parties on pension,

16  which are reflected in the plan that we filed yesterday and

17  then were reflected in the amended documents that we filed

18  for solicitation last night, they're complicated, and so we

19  thought that the examples might also help people understand

20  how that might work for their particular situation.

21          The ballots are equally important for these

22  constituents, so for the balloting, for retirees we've left

23  blanks for numbers that either the retirees' actuary or the

24  city's actuary, depending on the ballot class, will calculate

25  for each individual and fill in, so these will be customized

1    ballots for each of the retirees or each of the classes.

2         For the active persons on pension, they're not

3    drawing a pension yet, so we don't know what their pension

4    is, and it could change based on ages, years of service, and

5    salary and that sort of thing.  So what we did for the active

6    ballots, we've provided a step-by-step calculation similar to

7    kind of an IRS form where they're filling out kind of an easy

8    form taxes to use.  They can use these steps to predict how

9    their future pensions could be affected by what the plan

10   does.  Fortunately, the two Retirement Systems actually have

11   those calculators on their websites both in Word form and in

12   an actual on-line calculator form.  We simply copied those

13   instructions into the plan -- into the attachments to the

14   ballots, not the plan, your Honor, provided within the ballot

15   itself kind of a step-by-step process to do it, and we also

16   provided the websites for people to go on line, and they can

17   read that for themselves, or they can perform the on-line

18   calculation for themselves.

19        The other issue with respect to how the plan will

20   affect pensions is, of course, cost of living adjustments,

21   and there was a lot of discussion among the parties about how

22   to explain that concept and how it might work to a retiree or

23   an active person who's being asked to vote on the plan.  And

24   with the help of the Retirees' Committee actuaries, we put

25   together some charts, which are attached to the forms of

1    ballots that we filed last night, and it sort of shows a

2    person how COLA can affect what their pension might be over

3    time.  We hope that's helpful and illustrative information

4    for the people that are being asked to make decisions.

5            Those are the most important things we're asking for

6    in this motion, your Honor.  We're also asking for some

7    ancillary things that any solicitation motion would ask for,

8    things like a record date of March 1st.  It's a fairly

9    complicated matter actually, your Honor, to cull the data

10   from the systems, from the Retirement Systems and from the

11   city systems, so we tried to pick the last easy cutoff date,

12   which is the beginning of the month, that we're pretty

13   confident we could get accurate data for as the record date.

14   And I believe the parties are in agreement about that.

15           We also proposed special tabulation rules.  Again,

16   we're not asking them to calculate their own claims.  We will

17   do that for them.  So those kinds of things are reflected in

18   the tabulation rules that we propose.  And we also have

19   agreed among the parties to claim amounts for purposes of

20   voting only.  Again, the actuaries have gotten together.

21   They've been working very collaboratively, the actuaries for

22   the Retirement Systems, for the city, and for the Retiree

23   Committee, and so we have generally agreed-upon methodologies

24   and things, so that has allowed us to come to things like an

25   agreed-upon claim number for voting purposes, and that is

1   reflected in what we filed last night as well.

2          I certainly don't propose to go through this chapter

3   and verse, your Honor.  I know that you've read it.  I know

4   that we filed blacklines.  So I think at this time I would

5   ask if your Honor has any questions or any concerns or any

6   things that you would like to see changed with what we

7   propose to do.

8          THE COURT:  No.  I'm generally satisfied subject to

9   any remarks by others here.

10         MS. LENNOX:  Okay.  Thank you, your Honor.

11         THE COURT:  Would anyone like to be heard regarding

12  this matter?

13         MS. NEVILLE:  Yes, your Honor.  Carole Neville on

14  behalf of the Retiree Committee.  Your Honor, we did work

15  very long and hard on a special disclosure section for the

16  retirees.  It turned out to be 29 pages long, and we divided

17  it in half, so each of PFRS and GRS gets 15 pages.  There's

18  still problems with it, and, in particular, I'm curious about

19  what Ms. Lennox said because I'm looking at the retiree

20  ballot, and it has a worksheet on it.  Yes.  We took your

21  Honor's admonition that creditors want to know what they're

22  getting and when they're getting it very seriously, so we had

23  a space for the calculation of the claim and a methodology

24  for doing it.  We had a space for what your existing pension

25  would be with cuts, with the DIA contribution and the state

1    contribution and what your pension would be without it.  I'm

2    looking at the ballot right now, and it has worksheets for

3    the retirees.  May I show it, Ms. --

4              MS. LENNOX:  I have it.

5              MS. NEVILLE:  The calculations?  Okay.  The

6    worksheet then would be filled in, but it doesn't --

7              THE COURT:  Right, yes.  She said that.

8              MS. NEVILLE:  -- actually say that.  Okay.

9              THE COURT:  Okay.

10             MS. NEVILLE:  One of the things that -- the plan has

11   changed substantially since the last filing, and last night

12   before I got the -- before they filed the amended, I just

13   highlighted all the changes that need to be made.  And we

14   haven't had a chance to look at how those numbers play out,

15   but I mean you can see, your Honor, that there are pages and

16   pages of examples, all of which change now because the

17   investment assumption has changed and other things have

18   changed.  The amount of the cuts have changed.  One of my

19   colleagues found a number of inconsistencies between the plan

20   and the ballots.  We need to really straighten that out

21   before these get sent out.

22             But the critical thing, I think, is -- well, there

23   are two major missing things.  One, the ballot on OPEB and

24   the notice on OPEB provides absolutely no information about

25   what retirees' healthcare will be going forward.  What the

1  plan, the notice, and the ballots say is that the city will

2  create two VEBAs.  The VEBAs will get funded with some amount

3  of note, and the trustees will give you some amount of

4  benefits over some period of time, but we're not telling you

5  what it is or what you'll get or when you'll get it.  And on

6  just the basic standard of tell creditors what they're going

7  to get and when they're going to get it, it doesn't meet the

8  standard for OPEB.

9          On the pension side, we have a real issue with ASF.

10  If you have heard the press reports, you will know that

11  people are viewing the GRS treatment as a four-and-a-half-

12  percent cut and elimination of COLA.  There is a very

13  substantial recoupment program in the plan now involving the

14  ASF, which your Honor once ruled in In re. Dunn was property

15  of the pensioner.  The plan proposes to take the 20 percent

16  of the highest balance of each of 75 percent of the

17  pensioners from them and put it back into the defined benefit

18  plan.  There really isn't clear disclosure about that.

19  Nobody has valued it, nobody understands it, and it

20  significantly reduces people's pensions.  The ballot says

21  we're going to tell you what the number is or the number is

22  going to be based on a chart.  The chart isn't there.  I know

23  that the city has those numbers, but they're not supplying it

24  now to pensioners.  It can be quite substantial to the bus

25  driver who spent 30 years putting money into the ASF account.

1        So there are two very serious flaws in the notice

2    and in the -- and the ballots on the retiree notice, and we'd

3    like to have those clarified before they're approved.

4        THE COURT:  Thank you.  Would anyone else like to be

5    heard?

6        MS. PATEK:  Good morning, your Honor.  Barbara

7    Patek, Erman, Teicher, Zucker & Freedman, on behalf of the

8    Detroit Public Safety Unions.  We got the amended materials

9    late last night, and we have been in communication with the

10   city both last night and this morning.  And, as a general

11   matter, I agree with the characterizations that the group of

12   retiree and actives have worked very hard to try to come up

13   with something understandable.  We are fine with the record

14   date of March 1st.  We've agreed in the manner in which our

15   voting claim amounts will be determined.  We have two issues

16   which I think will be resolved, but I just want them on the

17   record.  And the first is there is an explanation of the

18   release that is going to be given, and as that language is in

19   both the notice and the disclosure statement, which you'll

20   hear about later, it is broad enough to suggest to active

21   employees that they may be giving up certain future

22   employment rights.  In my preliminary communications with

23   Ms. Lennox last evening and this morning, it sounds like

24   conceptually the city agrees that that's not what's intended,

25   and we're going to address that issue, but it does have to be

1   addressed.

2         The second major issue is, like COLA, the active

3   employees who have fully supported the efforts to see the

4   retirees' benefits returned, as has happened over the last

5   week or so, are affected in a different way by the cuts, and

6   that is by their -- as of June 30th, whatever they've accrued

7   in the old plan is going to be frozen, and they're

8   negotiating and hopefully will get to agreement, but at this

9   point we're still in mediation, on a new pension formula that

10  will be less generous.  And we've asked for some explanation

11  of that.  There's a placeholder in place.  Ms. Lennox informs

12  me the calculation is not complete.  I don't want to bore the

13  Court with exactly what it means because I'm not sure I

14  understand it, but it's similar to COLA, and we also want

15  some brief plain language explanation.

16        And then the only other thing -- and this was -- I

17  think has just got lost in the translation -- is on page 8 in

18  the first full line there are, in fact, five labor unions

19  who've appealed this Court's ruling, and it says two, so

20  that's a very minor clerical point that I'm sure we can

21  address, and those are the comments of the public safety

22  unions.  Thank you.

23        MS. CECCOTTI:  Good morning, your Honor.  Babette

24  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  I'm not

25  sure whether this goes here or in the disclosure piece, but

1  since the motion does concern the plain language insert, I'd
2  like to just note for the Court that we have a discrete issue
3  that we have been talking to the city about concerning the
4  disclosures with respect to the participation by employees
5  and retirees of the Detroit Library Commission in the GRS,
6  and we have asked for some additional disclosures in the main
7  document, which you may hear about later, but we have asked
8  the city to include a notification in the plain language
9  insert as well just to make sure that those folks who are
10 getting these packages have an explanation as to why they're
11 getting it.  I haven't written the language yet.  Ms. Lennox
12 I think agrees in concept, and I'm going to try and pen it
13 while we're still here, but I just wanted to let the Court
14 know that we anticipate hopefully a short excerpt in addition
15 to what you have before you.
16         THE COURT:  Thank you.
17         MS. DEEBY:  Good morning, your Honor.  Shannon Deeby
18 for the Detroit Retirement Systems.  Our comments will be
19 very brief.  Our issues with the plain language inserts is
20 that despite the best efforts of all of the parties, they are
21 still too long and too complicated.  We would ask for
22 additional time to continue to work with the city to make
23 them more succinct and easier to understand.
24         THE COURT:  How much time?
25         MS. DEEBY:  As they were just again subsequently

 1 modified last night, I think that we would be able to

 2 continue to work and try to do it in the next two days

 3 hopefully.  Particularly defective with both the releases and

 4 the -- I'm sorry -- with both the inserts and the ballots are

 5 the explanations related to the releases.  Under the plan,

 6 the state and other third parties will be given releases by

 7 any retiree or employee that accepts the plan even if the

 8 state does not pay the state contribution due to a cramdown.

 9 And if the Classes 10 and 11 vote to accept the plan, anyone

10 who votes against the plan is still bound.  And while we

11 recognize that these are <u>Dow</u> issues and the legality of that

12 can be addressed at plan confirmation, the ballots and the

13 plain language inserts should disclose more clearly both the

14 breadth of the release, the expense of the release, and

15 exactly what is being given up.

16         We would suggest modified language to the ballots

17 for the box language.  On pages 5 and 6 of the ballots as

18 well, we would expand the description of the releases to

19 include the language that's in Footnote 3 of the Class 10

20 ballot and Footnote 6 of the Class 11 plain language insert

21 where the breadth of the release relating to releasing of

22 claims and liabilities under PA 436 and any statute that

23 replaces it would be moved into the ballot so that people

24 understand exactly what is being released and what claims are

25 being affected by those releases.

1        And then in addition, minor issues would be that the

2    ballots currently contain parentheticals that just say hard

3    freeze without any explanation.  I'm sorry.  The inserts

4    contain that.  The ballots have blanks with respect to that

5    explanation.  They need to be completed.  And then we think

6    the COLA charts are confusing and would need to be either

7    supplemented with some kind of bar chart of a line graph just

8    so that people understand the effects.

9        THE COURT:  So you want all that additional

10   information but fewer pages?

11       MS. DEEBY:  Understood with the difficulties, your

12   Honor.

13       THE COURT:  Anyone else?

14       MR. PLECHA:  Good morning, your Honor.  Ryan Plecha,

15   Lippitt O'Keefe Gornbein, on behalf of the retiree

16   association parties.  Just to go a little bit further from

17   the comments of Ms. Deeby, we would like the ballot to be

18   clear whether the "yes" vote is conditional on anything

19   happening relative to the plan, whether it be confirmation,

20   acceptance of the class, or whether the money comes in, so we

21   would like that expressly stated in the ballot.

22       On a more mundane note, we do request that the city

23   remove the request for Social Security numbers as it's

24   currently stated as optional.  This puts retirees at a high

25   risk for identity fraud, which they're already more

1   vulnerable to in the first place.  Thank you, your Honor.

2          THE COURT:  Thank you.  Ms. Lennox, let me ask you

3   before you respond to any of these particulars whether you

4   think there would be value in continuing this motion until 11

5   o'clock on Monday to give you one further opportunity to

6   attempt to work out these issues with the various counsel.

7          MS. LENNOX:  Happy to do that, your Honor.  In fact,

8   a lot of the issues have been outstanding for a couple of

9   weeks, and I haven't received comments back, so if people are

10  prepared to give me comments now, I'm happy to take them.

11         THE COURT:  All right.  I'm going to order that

12  then.  We will adjourn this motion until 11 o'clock on

13  Monday.  Not sure what the courtroom will be.  We'll have to

14  make an announcement regarding that.

15         Having said that, however, a couple of things I want

16  to -- I want to focus on.  One is do we really need Social

17  Security numbers?

18         MS. LENNOX:  You know, your Honor, I'm happy to --

19         THE COURT:  I'm concerned about it.

20         MS. LENNOX:  I'm happy to remove them.  My only

21  concern is it's a quality check between how we're going to

22  populate the ballot and who's returning it, but if your Honor

23  feels strongly -- remember, these ballots are not going to be

24  made public, so -- but if your Honor feels strongly about

25  that, we are happy to remove it.  We are not looking to cause

1    problems for folks.

2              THE COURT:  All right.  Let me ask you to --

3              MS. LEVINE:  Your Honor, one of the things that we

4    might be able to do -- just apologize -- is match the last

5    four numbers the way, you know, like lawyers identify

6    themselves, and that way you don't have identity theft

7    consideration.

8              THE COURT:  Oh, okay.  See if you can work out some

9    quality check that doesn't require a disclosure of the full

10   number then.

11             MS. LENNOX:  Certainly, your Honor.  Happy to do

12   that.

13             THE COURT:  It struck me that several of the

14   comments that want additional information in the ballot turn

15   the ballot into a kind of mini disclosure statement.

16             MS. LENNOX:  Which is the purpose of the plain

17   language notice.

18             THE COURT:  Right.  So I can't say that I'm in favor

19   of that.

20             MS. LENNOX:  Okay.

21             THE COURT:  If you work out language that everyone

22   agrees to regarding a ballot, okay, but it seems to me that

23   the best ballot is one that is as clean as possible.

24             MS. LENNOX:  Agree, your Honor.

25             THE COURT:  Beyond that, I will see you and whoever

1　still has objections unresolved at 11 o'clock on Monday on

2　this matter.

3　　　　　MS. LENNOX:  Thank you, your Honor.

4　　　　　THE COURT:  Courtroom to be announced.  And in that

5　regard, I will -- I hope that you will use the opportunity

6　that's presented here today to continue your discussions.

7　　　　　MS. LENNOX:  We will, your Honor.

8　　　　　THE COURT:  Okay.  Let's turn our attention then to

9　the motion to amend the solicitation procedures order filed

10　by Assured and others.

11　　　　　MR. KOHN:  Good morning, your Honor.  Samuel Kohn of

12　Chadbourne & Parke on behalf of Assured Guaranty and

13　Municipal Corp.  First of all, your Honor, on behalf of the

14　movants, we really appreciate your Honor's scheduling of the

15　motion on short notice so that this issue coincides with the

16　disclosure statement and the ballots as we believe that this

17　is an issue that needs to be clarified in the disclosure

18　statement and particularly in the ballots so voters don't get

19　confused about what's going to happen.

20　　　　　Your Honor, I'm first going to say that the plan

21　objection death trap is different -- is described -- if your

22　Honor takes a look at it, it's different than the city's

23　peace offering.

24　　　　　THE COURT:  Let's push the pause button here and see

25　if you can think of a different word.

1       MR. KOHN:  Okay.  The coercive effect upon creditors

2  to make decisions pre-confirmation, and particularly this

3  relates to the city's argument that this is a plan objection.

4  A plan typically gets confirmed, and there's a confirmation

5  order.  And Section 944(a) says that a confirmed plan is

6  binding on creditors and debtors -- and the debtor.  What the

7  city is trying to do by inserting a provision in a plan is to

8  bind -- effectively bind creditors pre-confirmation.  So

9  while they may say that this is a plan issue, it's really,

10  your Honor -- if your Honor approves the ballots and approves

11  the disclosure statement the way it is, your Honor is binding

12  the creditors from making their choice, from objecting, the

13  fundamental right to object to the plan.  That is a coercive

14  effect on their voting.  The trustee is going to speak a

15  little bit more about the mechanics of why it doesn't work

16  and how -- what decisions the voter has to make.  For

17  instance, I'll just give you one example.  I don't want to --

18  but the trustee is going to deal with it, but one example is

19  this.  Here is a creditor, gets a ballot, sees the language

20  on the ballot, whether they're going to make an election or

21  not, and then they think for a second, should I object or

22  should I not object.  Wait a second.  The class has to

23  accept, so wait a minute.  Okay.  So if the class has to

24  accept, that means I won't know whether the class accepts

25  until after the voting deadline.  So the class has to accept.

1   I may not -- if I don't vote for the plan, my election won't

2   count because the ballot will be -- as the ballot is written

3   now, that ballot will not count at all, so if I vote "yes" or

4   vote "no," well, it doesn't make a difference because the

5   class -- it depends on the class voting, and then I have to

6   wait until after the voting deadline to see whether my

7   election is going to be effective, that I'm going to get the

8   new existing rates, the higher rates.  So what happens is is

9   that they will -- if they want to, they can participate in

10  discovery during May and June.  They can file an objection

11  May 1st or they can or they cannot file an objection May 1st.

12  And they participate in discovery.  They file supplemental

13  objections.  And then they have to see whether their

14  objection -- whether their election is going -- they're going

15  to get the higher rate.  And so, therefore, this is all a

16  question of pre-confirmation.  It's not a question of a

17  confirmed plan.  It's a question of what's pre-confirmation.

18          Now, here's another thing.  If, in fact, it turns

19  out that the class does not accept but they elected and they

20  were forced not to object, they get the lower rate at the end

21  of the day because the class didn't accept.  And, therefore,

22  if the class didn't accept and they made the election and

23  they were forced not to object even though 1128(b) says a

24  party in interest may object without exception -- I don't see

25  any exceptions there -- they may object, but they were

1   prevented from objection, and they're going to get the lower

2   rate at the end of the day. That is totally coercive, but

3   the trustee is going to speak more about individual creditors

4   and their decision about that. But it's very interesting

5   that of all the research and all the cases and even the cases

6   that the city cites, there are no cases -- there's only one

7   case that actually talks about the coercive effect of not

8   being able to object to a plan, and that's a Chapter 9 case,

9   and that's <u>Mount Carbon</u>. It was a standing case, and what

10   happened was that the debtor decided at the last minute that

11   this recalcitrant creditor was a counterparty to an executory

12   contract, and the plan provided that they'll assume the

13   contract. Okay. Then the debtor goes and says can't object,

14   you're not impaired. Guess what? The court says, no, you

15   may not be able to object to the treatment of your claim, but

16   you can object to feasibility. You can object to good faith.

17   You can object to best interest. You can object to fair and

18   equitable, to cramdown. Those are the kind of objections you

19   can always object to. Even the cases that say, okay, if

20   you're unimpaired, you can't object, none of them actually --

21   very few of them -- most of the cases say you can object on

22   all other grounds, and so we've looked at <u>Zenith</u>, and we've

23   looked at the <u>Drexel</u> case that the city cited. In both of

24   those cases, first of all, they were voting issues and not

25   objection -- not saying you can't -- notwithstanding 1128(b),

you can't object. That's not what they said. They said
that -- here was the choice that the Zenith creditors got and
the Drexel creditors got. They're totally out of the money.
They got zero distributions. They're very down in the
pecking order. So what happens is the plan said, you know
what, I don't want to fight about this. I'll give you a
little bit of -- a little bit of a distribution, so here's
their choice in Zenith and in Drexel. The choice was either
you're deemed rejected under 1126(g) because you're not going
to get any distribution or I'll give you a couple of dollars,
and you can vote for the plan. So it's not a coercive --
there's no coercion there. I have a choice between zero
distribution and getting a couple of dollars and voting for
the plan. In both of those cases, you know, some people say
that -- and the city says that MCorp and Mount Carbon and
Allegheny and all those cases are different -- are the same
as Drexel and Zenith, but they're not because Zenith -- first
of all, Zenith -- the city says that they're all confirmation
cases. If you look closely at Zenith, it was a pre-pack, so,
yes, it was a confirmation, but it was also a disclosure
statement case as well because in a pre-pack we all know the
Court was deciding whether the disclosure statement was
proper then as well. But barring that aside, it is not -- it
is not at all analogous in Zenith because there was no --
there was no coercion, and it's not an objection. It's not a

 1   violation of 1128(b).  It's a question of voting, and it's a
 2   question of being out of the money and then getting some sort
 3   of -- I don't want to use the word "gift," but some
 4   additional distribution.

 5            And here's one of the most important things.  And by
 6   the way, this issue of pre-confirmation plan provisions, a
 7   debtor could put anything in a plan and say, "Oh, it's a plan
 8   provision.  We have to deal with it at confirmation, not
 9   now."  Well, guess what?  There's impairment cases that are
10   decided at the disclosure statement case -- stage.  There are
11   classification cases that are decided earlier than the plan
12   stage.  There's also individual cases where we're not talking
13   about -- of course, your Honor issued an order, and we're not
14   talking about that the plan is totally patently
15   unconfirmable.  We're not discussing that.  We're talking
16   about a specific provision, one provision.  And there is a
17   case, Bennett Paper Corp., out of Missouri, Eastern District
18   of Missouri, 68 B.R. 508, 1986, where the Court at the
19   disclosure statement stage said, "Hey, you know, you were
20   going to grant a release to the parent guarantor, and guess
21   what?  I don't know -- I don't think it's going to pass
22   muster, and it's not proper to include that provision in a
23   disclosure statement because it's going to mislead creditors
24   that the provision is going to be valid."  That's what the
25   Court said in Bennett Paper.

1          And one of the most important things I just wanted
2   to say is that the coercion not to object to the treatment --
3   and the trustee is going to go more into it; I hope I don't
4   steal all their thunder -- is there are hundreds of CUSIPs.
5   That means there are hundreds of classes.  One creditor in
6   one CUSIP out of the hundreds, if they check off to elect on
7   the new existing rate, they forego the right to object on any
8   other basis for any other claim that they have.  If they have
9   a claim in a different category or in a different class or
10  some other claim, they also forego the right to object to
11  feasibility, and this is what was so important for your
12  Honor.  And tomorrow we're going to be here several hours
13  looking at the feasibility issue, and Mount Carbon actually
14  articulates the issue of having an adversarial process to
15  determine some of these big confirmation issues as so
16  important that the debtor's gerrymandering of their -- of
17  this counterparty's treatment is improper and can't be used
18  for them not to object to such important issues.

19          I know there's others that want to talk more about
20  it.  If your Honor has any questions, I'd be happy to answer
21  them right now.

22          THE COURT:  Thank you, sir.

23          MR. KOHN:  Thank you.  Thank you, your Honor.

24          MR. CHRISTY:  Good morning, your Honor.  Tom
25  Christy, Garan Lucow Miller, on behalf of Berkshire Hathaway,

1   the co-movants.  For the most part, we concur in everything

2   that Assured said.  Just two points.  First of all, Detroit's

3   response contained a point unique to Berkshire Hathaway.

4   Their Footnote 3 said that it's moot as to Berkshire Hathaway

5   because of certain language we requested in our objection to

6   the disclosure plan in paragraph 33 of that objection.  They

7   said that bears on this motion and essentially makes it moot

8   as to us.  We have agreed to withdraw the offending sentence

9   from paragraph 33 of our objection so that that argument no

10  longer applies.

11          But getting back to the big picture and just adding

12  to what Assured said, I think there's an important

13  distinction to be made between a voting trap -- and I'll

14  avoid the word "death" -- there's an important distinction to

15  be used between a voting trap and a plan objection trap.

16  When you vote on a plan, you can vote on a plan for any

17  reason you want.  It's capricious.  I don't like the plan for

18  my own reasons.  That's it.  It's one thing to say you can

19  include a provision in the plan to give up that capricious

20  right.  It's another thing when it comes to objection to the

21  plan, which is going to be based on the objective standards

22  in, for example, 943 in Chapter 9 or the provisions of 1129

23  which apply.  You're not saving the Court any litigation.

24  You're going to have to make your own independent

25  determination of whether the plan meets those standards.  And

1    essentially you're -- this isn't inducing a creditor to give

2    up their capricious right.  This is causing the creditor --

3    it's trying to suppress the creditor from giving the Court

4    information that may help the Court make its determination

5    that this plan doesn't meet the standards.  And I think for

6    policy reasons, you don't want to encourage suppressing

7    people bringing to your attention this may not meet the

8    standards of 943 or 1129.  And I think that's -- furthermore,

9    if you look at the language of the two statutes, if you

10   compare 1126 to 1128 -- I mean 1128, your Honor, is one of

11   the simplest statutes in the entire Code.  1128(b) is only 11

12   words.  "A party in interest may object to confirmation of a

13   plan."  There no exceptions there.  That's completely unlike

14   voting.  If you look at 1126, there are plenty of cases where

15   Congress has provided that a creditor loses its right to

16   vote, you know, for example, because it's not impaired or

17   whatever.  I mean Congress understood there's certain cases

18   where we don't want a party being capricious.  1128 is

19   absolute for precisely the reason that we want to make sure

20   that the Court has all the attention -- all the information

21   brought to its attention that it will need to make its

22   determination.  Thank you.

23          THE COURT:  Thank you, sir.

24          MR. LEMKE:  Good morning, your Honor.  David Lemke

25   of the Waller Lansden firm.  I'm here on behalf of the U.S.

1    Bank, which is the trustee for the water and sewer

2    bondholders.  And, your Honor, so when I'm speaking up here

3    today, I am really trying to speak on behalf of all of the

4    multiple bondholders that we have in this case, and I think

5    we've pointed out in the past that there are 377 CUSIPs,

6    which means there are 377 classes of bondholders, voting

7    classes of bondholders under the plan.  There are thousands

8    of bondholders within those 377 CUSIPs, maybe tens of

9    thousands.  There are a lot.  It's safe to say that most of

10   the bondholders are not in this room nor do they have counsel

11   in this room and that most of them probably do not have

12   counsel at all, and so they need to understand, among other

13   things, exactly what the plan is proposing and what they are

14   voting on.

15        If you look at the cases that have allowed these

16   types of elections -- and I won't use the term you don't

17   like, but these types of elections, you vote in favor of the

18   plan, you get one thing, which is maybe better than what the

19   debtor has to give you if you don't vote in favor of it and

20   the debtor can cram you down.  And those are generally

21   allowed because they appear to be encouraging parties to vote

22   in favor of the plan and avoid a confirmation fight, but this

23   election doesn't do that.  It does not design to encourage

24   favorable voting on the plan.  In fact, it chills the voting,

25   and here's why.  You have to make the election whether you

vote "yes" or "no," so you're a dissenting holder who says,
"I do not like the plan. I don't want to vote in favor of
it, and I'm voting no. And I'm now I'm forced to make yet
another election, and the purpose of that election is simply
to make me decide as a dissenting holder whether or not I
want to waive these important rights that are given to me
under the Bankruptcy Code, which counsel has previously
argued about, and be heard by the Court and present evidence
to the Court on whether or not the plan should or should not
be confirmed on a dissenting class, or I can vote to take
potentially more favorable treatment if the plan gets
confirmed but only if the plan gets confirmed and it turns
out the rest of my class has accepted the plan so that the
class accepts. So I'm a holder who ends up in a situation
where I have voted no. I don't like the plan. I'm going to
end up with a cramdown interest rate if the plan gets
confirmed and my class dissented, but I may have waived the
right to be heard before your Honor on why the plan should
not be confirmed," and that that is -- that is far and away
more coercive in terms of these types of elections than
you'll see in the cases that have approved them in the past.

What makes this election even more onerous is that
the way the debtor has set it up, if I'm a holder and I
have -- and I hold multiple CUSIPs or maybe I'm a holder and
I not only hold water sewer bonds but I hold GO bonds or I

have another claim, if I make the election in one of those
CUSIPs, I waive my ability to be heard on any of my other
claims in the case, so this also has the impact of causing a
waiver that is far more than just a waiver in connection with
the particular class that I may be voting in, and that is
certainly well beyond any of these types of provisions that
you will see have been approved in any of the prior cases.

So the city here is not really attempting to come up
with a consensual plan with this election. In fact, the
city, I think, by making this election, it is probably
causing holders due to, first of all, confusion as to exactly
what it means and when they get to make it and what happens
if they make it and whether the plan is confirmed or not
confirmed, I think it will probably result in most of the
holders who at least do not have the resources to engage
counsel and try to explain this to them to not vote at all,
and that is taking away the voting franchise in its entirety.

Now, that works to the debtor's favor because you
only count the votes that actually -- or the only ballots
that are voted, so they're hoping that some of the holders
may vote "yes" and they'll make the election but that the
opposition to the plan will not vote at all or if they'll
vote no, they have this dilemma they don't understand and it
just makes sense that, well, "I'm going to vote no. I might
as well elect the higher interest rate in case the plan gets

1    confirmed," but that's not really the impact that it has on

2    the holder making the election.

3         The other thing that this is going to do, as I

4    mentioned, is there's already 377 CUSIPs.  You could have a

5    situation where each of those CUSIPs now has to be divided in

6    half, and you'll end up with whatever double that number is,

7    674, and the reason that could happen is you could have a

8    class that accepts the plan, but within that class you could

9    have holders who either voted "yes" and for whatever reason

10   elected the cramdown interest rate -- and there may be a

11   valid reason for doing that; I don't know -- or you can have

12   a holder who voted "no" and also elected the cramdown rate

13   because they wanted to preserve their right to object.  And

14   so when that class gets approved or the plan gets confirmed,

15   you will now have disparate treatment of the same creditors

16   in one class, which is clearly what is prohibited and what

17   the Code is trying to prevent when it requires similar

18   treatment of creditors in the same class.  You will now

19   actually have two different treatments for these holders that

20   end up in the same class if that works out.  Now, you

21   won't -- if the class doesn't accept and the debtor has to go

22   to a cramdown route, then everybody, whether they voted in

23   favor of the plan or not or whether they made an election to

24   have the existing rate or not, will not get any of that.

25   They will end up getting the cramdown rate.

1          So, your Honor, for all of these reasons, we would

2     ask that the -- that this election actually be stricken from

3     the plan as currently drafted in terms of it requiring or

4     causing a waiver of the right to object, and we agree -- I

5     agree with counsel before me that it is a disclosure

6     statement issue or at least should be resolved at this stage

7     because if it goes out in the plan and it goes out in the

8     ballot, in essence, the debtor has won because the holders

9     will not know whether or not that waiver is going to be

10    struck down by the Court at the confirmation hearing, and

11    they'll have to make their decision and make their election

12    without actually fully knowing or even understanding how this

13    is all going to play out at confirmation, so it is something

14    we're asking the Court to make a ruling on prior to the

15    approval of the disclosure statement going out so it's very

16    clear to the holders what exactly is going to occur to them

17    based on the election.  Thank you, your Honor.

18          THE COURT:  Thank you.

19          MR. KANNEL:  Good morning, your Honor.  William

20    Kannel.  I represent three of the bondholders of the DWSD ad

21    hoc water and sewer bondholder committee, so the important

22    point there is I represent bondholders, and I'm in the room.

23    And I can tell you that we do not like this -- I'll try and

24    not use the word my colleague, Mr. Kohn, called, but this

25    sort of if you elect you can't object feature.  So there are

1 approximately 377 CUSIPs, as Mr. Lemke said.  I represent

2 three clients who between them own about 700 million of the

3 water and sewer bonds.  They have an average of 28 CUSIPs

4 each.  They are not going to, given the way the current plan

5 is drafted, waive their right to object to the plan, so, as a

6 result, this box to elect the existing rate, which is only

7 effective if the class also votes, is going to cause them to

8 vote against the plan and not make the election.  And I

9 assume that would be the case for every other bondholder --

10 water and sewer bondholder who finds the case objectionable.

11 So to me the most pernicious feature is even if there is one

12 CUSIP where this might be attractive, it becomes unattractive

13 because of the nature in which it causes you to waive your

14 right to object across all the CUSIPs and all the classes.

15 Thank you, your Honor.

16            THE COURT:  Thank you, sir.

17            MR. PEREZ:  Good morning, your Honor.  Alfredo Perez

18 on behalf of FGIC.  Your Honor, I just want to make sure the

19 Court understands the breadth of this election.  We insure

20 about $500 million of DWSD bonds.  If we assert our control

21 rights and vote in favor, we would lose all our objections on

22 the COPs, so it's not just across all the DWSD bonds but any

23 other plan objection.

24            THE COURT:  Thank you.  Anyone else in favor of the

25 motion?  And who for the city, please?

1          MR. BRUCE BENNETT:  Good morning, your Honor.  Bruce
2    Bennett of Jones Day on behalf of the city.  I think there's
3    a lot of points I have to cover, but I want to start with the
4    most simple and most basic.  I'll probably end in the same
5    place.

6          Anyone who wants to object to the plan shouldn't be
7    making the election, period, end of story.  What's going on
8    here?  Clearly the -- what we referred to as the peace
9    offering intentionally choosing the, you know, language of
10   what we're trying to do here, which is make deals, obviously
11   the peace offering is attractive and people want it, and
12   people want to be able to elect it, but they want to elect it
13   without consequences.  And when Mr. Kannel spoke, he revealed
14   another thing that we clearly know is out there, which is
15   that whenever you have to work with 330 CUSIPs -- and we
16   didn't want to do it that way, but as a result of discussions
17   with the creditors, we did break them into each one in its
18   own class -- we determined a kind of rule that we're applying
19   across the board.  And some people like the treatment in some
20   places, and they don't like the treatment in other places.
21   And quite frankly, it is, in fact, the city's intent to force
22   people to look at the deal as a whole and to say, "Do I like
23   it or do I not?" as opposed to saying, "Gee, you got this one
24   a little bit high, so I'm picking on that one, but I'm going
25   to fight about a whole bunch of others."  And so we

1  understand that it would be far easier for holders if we

2  deleted the peace treaty and just left the peace offering,

3  allowed people to pick it where they liked it and to come

4  into court and fight and create a big confirmation battle if

5  there were other parts that they did not.  We think the

6  peace -- we think the peace offering is so attractive at the

7  end of the day economically to a bondholder because it gives

8  it the right to retain a higher interest rate --

9        THE COURT:  Well, but do they get the peace

10 offering --

11       MR. BRUCE BENNETT:  If the --

12       THE COURT:  -- just because they elect it?

13       MR. BRUCE BENNETT:  If the class accepts the plan,

14 they get the peace offering.

15       THE COURT:  So the answer is no.

16       MR. BRUCE BENNETT:  They might or might not, and --

17       THE COURT:  Isn't that the problem?

18       MR. BRUCE BENNETT:  Well, if that's the only

19 problem, I can fix that, but if the class --

20       THE COURT:  How would you fix it?

21       MR. BRUCE BENNETT:  If we can basically say that the

22 promise not to object only applies if the election actually

23 becomes available, so we can tie that to class acceptance.

24 And if it turns out that a party has opted in and the rest of

25 the class disagreed with them, which I think is unlikely

1  because this is kind of a math problem that I suspect
2  everyone who does it is going to come out the same way, but
3  in the unlikely event that someone chooses to make the
4  election in a class where everyone else in the class
5  disagrees with them and, therefore, rejects and doesn't want
6  the election, then to the extent they waive the right as a
7  result of that election, we'll give them back their right.  I
8  can accept that amendment.  No one suggested it before this
9  hearing, but I am prepared to address that issue.
10       And, in fact, I want to say something else, your
11  Honor, that this is a group we have not made a deal with.
12  We're trying to have some negotiations.  It's been very fits
13  and starts and difficult, and this door is still open.  We
14  are -- if there is a -- if there are ways to make this easier
15  while preserving the city's desire to get through
16  confirmation hopefully without any battles at the end of the
17  day, that's what we would like to do.  But on this point,
18  the -- this is -- first of all, assertions that this is too
19  complex and that anyone would be confused, frankly, are out
20  of place.  We have had a disclosure statement process where
21  these provisions have been in for awhile.  They're not brand
22  new.  Everyone had an opportunity to object to our proposed
23  changes with respect to the disclosure on these questions.
24  And to the best of my recollection, after a five-hour phone
25  call and a whole bunch of opportunities for people to provide

1    changes in the disclosure, there were none addressed to this
2    particular question at all.  It turns out when we get to the
3    disclosure statement hearing, your Honor is going to hear
4    that we're going to need some more time to do a bunch of
5    different things.  If there are suggestions for additional
6    language or different language or if anyone thinks this
7    really is confusing, which I don't think anyone really thinks
8    it's confusing, we ought to see a multitude of changes, and
9    we'll, of course, adopt them because it is not at all in the
10   interest of the city to have this be confusing in any way.
11   But to the bottom line of the legal issue, first legal issue,
12   is this a confirmation issue or a plan solicitation issue.
13   It's a confirmation issue.  What we are doing is we're making
14   an offer in the plan.  We're making an offer.  No one has to
15   accept it.  And their assertion is the inclusion of this
16   offer in the plan renders the plan unconfirmable.  That's
17   what the assertion has to be.  And that's, frankly, a
18   confirmation issue.  And we say point blank in our papers if
19   there are people who are looking at this option -- remember,
20   the whole reason we have this debate is people are looking at
21   the option and they like it.  They think there's good money
22   in it for them to pick it versus the basic treatment that's
23   proposed in the plan, and they're looking at it, and, yes,
24   there's a consequence.  There's a peace treaty aspect to it
25   that if you want the peace offering, you're going to have to

1    take the peace treaty, and you're not going to be fighting

2    with the city anymore about anything.  And if it's hard for

3    you, maybe you should really think hard before you decide to

4    take the election, but there's no confusion about what the

5    consequence of the election is, and there's the right to say,

6    no, I'm not going to elect.  And there's also the other

7    option, which is between now and then to talk about it.

8            So, number one, it's a confirmation issue.  Number

9    two, very important part of this hearing -- I tried to make

10   this point in the papers -- everyone wants us to propose the

11   choice.  Everyone agrees that this is a sensible settlement

12   and that it's okay to make it contingent on acceptance of the

13   plan.  That's the trap problem.  The trap problem is the fact

14   that the election -- the availability of the election is

15   contingent upon acceptance of the class, and cases say that's

16   okay, and they admit the cases say that's okay.  This entire

17   fight is about the election is good, but they wish it was

18   better.  That's what the fight is about.  So we don't think

19   there's any legal issue.  We think it's a perfectly

20   appropriate use of tools that other Bankruptcy Courts have

21   proposed over and over again.  We fully understand that the

22   option could be better if it didn't have the peace treaty

23   element.  We fully understand that some people might choose

24   to not make the election as a result of the existence of this

25   provision, and, frankly, your Honor, no matter what people

1   say while standing at the podium today, we don't actually

2   know what they're going to do because we have in this

3   situation something that I call the tender offer problem.

4   And I call it the tender offer problem because in our laws if

5   you make a tender offer, you have to leave it open for a

6   certain period of time.  You can't say tender stopped

7   tomorrow.  You have to say tender stopped after a certain

8   number of days.  I think it's 20 business days.  And the

9   reality is is that if you go to a holder of stock -- and

10  let's say you propose ten dollars, and you go to a holder of

11  stock, and you say, "Are you going to accept my tender offer

12  on day one?" they're going to say, "No.  I want 11."  And,

13  frankly, if you have that conversation on day two or day

14  three or day four or day five or day six all the way up to

15  day nineteen, the answer is going to be, "I want 11 or I want

16  12."  It's not going to be ten is okay.  On the deadline you

17  find out whether ten was okay.  And I think that's the

18  problem we have here.  So it's very easy for Mr. Kannel today

19  to say, "I got 28 average CUSIPs, and I'm going to hate it as

20  to one of them, so we're going to say no," but when the

21  traders sit down and get out their calculators and figure out

22  what the election is worth with respect to their average of

23  28 CUSIPs, we hope -- and, in fact, the people represented by

24  Mr. Kannel are very, very smart and very, very careful --

25  that they're going to run the numbers for all 28 CUSIPs, and

1    they're going to decide whether it's net good or net bad.

2    And the reality is it's going to be net good.

3           So we think your Honor should not change the

4    solicitation procedures.  It may or may not turn out that

5    we'll have an objection actually filed at confirmation that

6    this was an inappropriate choice.  Remember, it's not

7    inappropriate that there is a choice.  No one says that.

8    It's that the choice was constructed inappropriately.  We may

9    have to deal with it then, but much will happen between now

10   and then, and we're hoping to have a broadly consensual plan

11   that involves many people making what is a very beneficial

12   election.  If you have any questions, your Honor, I'm happy

13   to answer.

14          THE COURT:  No.  Thank you, sir.  Replies, please.

15          MR. KOHN:  Thank you.  Again, for the record, Samuel

16   Kohn of Chadbourne & Parke, on behalf of Assured Guaranty

17   Municipal Corp.  Your Honor, I just want to make two quick

18   points.  Number one is that, first of all, with respect to

19   the city's new peace offering trap, whatever, that what I

20   heard Mr. Bennett say is that if they don't get the higher

21   treatment at the end of the day because the class didn't

22   accept, they will waive their issue of objection, so how does

23   that work?  They still won't know when their -- they have

24   to -- the deadline is June 30th; right?  When the class

25   accepts, it's still a coercive and chilling effect on voting

1 for the plan, so that's the first thing.  I just don't

2 understand how this new peace offering helps anything because

3 they're saying retroactively now I could go ahead -- is the

4 plan going to be extended into August that they're now going

5 to have an opportunity to object when they know that they

6 have the lower rate?  So maybe that's what should happen.

7 Maybe after June 30th when these voters find out that they're

8 going to get the lower rate and now the city is saying, okay,

9 now you can object, we should give them an opportunity to

10 object, discovery, and do everything and push out the plan

11 till September.  That's the only way that's going to work.

12    But the second thing that -- point that I just

13 wanted to make is this.  The city and Mr. Bennett keeps on

14 talking about that we like the election.  A little just quick

15 history about this issue.  This plan objection death trap --

16 sorry -- issue came about after we negotiated -- carefully

17 negotiated, if your Honor would recall, the solicitation

18 order, procedures order.  And at the time we carefully -- we

19 asked the -- we asked the city give us your form of ballot

20 because the solicitation procedures order approves a form of

21 ballot, so paragraph 7 of the solicitation procedures order

22 was carefully negotiated to say that the form of ballot will

23 be considered at the disclosure statement hearing, okay,

24 because we didn't know.  And then afterwards they come in

25 and -- the city came in and inserted this plan objection trap

1  issue, so -- and so then the city files a motion on August --

2  I'm sorry -- on April 3rd to approve the form of ballots --

3  or April 2nd or April -- April 2nd and actually schedules the

4  hearing for a disclosure statement hearing, which was then

5  April 14th or thereabouts.  And then your Honor asked the

6  city for a form of order.  We called the city that day, and

7  we asked them, "We have these issues with the ballots.  We

8  have some minor modification issues, which hopefully we'll be

9  able to stip to at the end of the day, but we'd like to talk

10  to you about the ballots."  Then your Honor asked them, we

11  understand, for the form of order, but they didn't tell your

12  Honor that we are clamoring and calling them about this

13  ballot issue.  And then your Honor entered the order

14  approving the form of ballots, so -- and then we got -- we

15  had at least four conversations about these issues.  In the

16  very first conversation about the ballot issues, it was

17  universal.  Whoever was on the call, whoever is represented

18  here, asked the city to remove the election for all the

19  reasons we're talking about today, and they refused.  So it's

20  disingenuous for Mr. Bennett to say we like the election.  We

21  asked them to remove the election, and we never stopped

22  asking them.  Thank you.

23       MR. LEMKE:  Your Honor, David Lemke again on behalf

24  of U.S. Bank.  I will say I didn't fully understand the

25  revised peace offering either, but I think I do now that Mr.

 1   Kohn got up here.  And I would say that if they want to -- if
 2   the city is really interested in this -- having this type of
 3   an election and they're trying to encourage holders to vote
 4   "yes," then it's a simple election.  If you vote "yes" and
 5   your class accepts, you get the better treatment.  If your
 6   class does not accept, you don't get the better treatment.
 7   And then the holder -- that's a simple election.  That is an
 8   election that the holders -- all the holders can understand,
 9   not just the holders that might have traders, but the holders
10   who don't -- aren't part of a large institution, either a
11   small business or individual.  Some of these holders may be
12   the same retirees that were also concerned about making sure
13   they understand what's going to happen with their retirement.
14           We have made suggestions to the debtor.  In fact,
15   Mr. Bennett is correct.  We all sat through about a five-hour
16   call and went through all of the various issues.  We drafted
17   very specific language that we asked them to put into the
18   plan that at least explained the election.  I mean we weren't
19   agreeing to the election.  We were saying but if it's going
20   to be in there, please try to explain it this way.  And it
21   was rejected, and, you know, we're happy to have another
22   conversation with counsel about that and intend to if your
23   Honor says that the election can remain so that at least it
24   is more clear, but we are certainly trying to make it so that
25   everybody will understand.  What this election really does is

1  all it does is gives the debtor two bites at not having a

2  contested confirmation.  One is people vote in favor of the

3  plan, the class accepts, they don't have to cram down.  The

4  other is the voters vote no against the plan because they

5  don't like it, but they make this election, and they waive

6  the right to object, so even though the debtors have to cram

7  down on that class, there will be nobody there to actually

8  oppose the cramdown, and it will be just a one-sided, if you

9  will, lopsided hearing in favor of the debtor after all the

10 holders have, unfortunately, waived their objections perhaps

11 without even understanding what they've done.  And they have

12 done that across CUSIPs, across holdings, and with respect to

13 the entire claim if they have multiple claim levels.  That's

14 all I have, your Honor.  Thank you.

15         MR. BJORK:  Yes, your Honor.  Jeff Bjork from Sidley

16 Austin on behalf of National Public Finance Guarantee.  We

17 joined in the motion, and most of the points were covered in

18 the opening, but I want to address on rebuttal two of the

19 points that Mr. Bennett raised.  First of all, he says that

20 this is a confirmation issue.  Stripping folks through an

21 election of their due process rights to object to

22 confirmation is an issue for today.  It's not an issue for

23 confirmation.  That's number one.  Number two, he says that

24 everyone agrees this is a sensible solution that offering a

25 choice between having your call protection stripped and

having your interest rate reset based upon some curve that
they'll prove up at trial is a comprehensive solution that
everyone supports. You're going to be faced with first
impression issues if this plan goes forward on this
particular issue in terms of whether the debtor at the end of
the day can cram down on special revenue debt in a solvent
system. That's the issue that's going to be before the
Court. And the idea that right now the debtor can, through
voting, disenfranchise voters, take away their right to
object by saying that you have a choice between having this
impairment or that impairment is -- it really rings hollow,
your Honor, and we ask that you strike it. I agree with Mr.
Lemke's suggestion that there may be a way to address it
where you have a typical incentive built in the plan. If you
elect for a different form of treatment as a class, you can
get that treatment. But I'm aware of no precedent in which
the election could be tied to stripping a right to object on
any and all other grounds with respect to the plan. Thank
you, your Honor.

THE COURT: Anyone else? All right. The Court will
take this matter under advisement and give you a decision on
this at the same time as I adjourned the other matter, 11
o'clock on Monday. I am advised now that we can have this
courtroom on Monday, so we will convene here. In the
meantime, I encourage counsel to continue to talk to see if

1  you can come to some resolution of this.  If you can't, I

2  will give you my decision at that time.

3       Let's take our morning break now, and then we'll

4  begin with the disclosure statement hearing.  We'll

5  reconvene, please, at 10:45.

6       THE CLERK:  All rise.  Court is adjourned.

7     (Recess at 10:26 a.m., until 10:45 a.m.)

8       THE CLERK:  All rise.  Court is in session.  Please

9  be seated.  Recalling Case Number 13-53846, City of Detroit,

10 Michigan.

11      THE COURT:  All right.  Let's begin our hearing on

12 the disclosure statement.

13      MR. HEIMAN:  Good morning, your Honor.  David

14 Heiman, Jones Day, for the city.  I'm actually very pleased

15 to be standing before you today because, at least in our

16 view, this is a very important, a very critical day for

17 hopefully what we view as the beginning of the last stage of

18 this case.  And I want to say at the outset it will not come

19 as any surprise to your Honor that we've been engaged in

20 around-the-clock discussions, negotiations, and the like on

21 the very complex issues that challenge us all.  And I want to

22 say at the outset that -- maybe to some people's surprise, I

23 want to acknowledge the wonderful cooperation, both

24 quantitatively and qualitatively, we've received from

25 virtually all parties in the last couple weeks, particularly

1   the last week or so with around-the-clock discussions.  So

2   what I would like to do, with your indulgence, your Honor, is

3   to, as a prelude to Mr. Bennett's opening -- and I will only

4   take a couple of minutes of his time, but just as a quick

5   prelude, I thought it would be helpful to give you a brief

6   status report not in lieu of the status conference by any

7   stretch -- that would be obviously more specific as to issues

8   presented -- but a status report on where we are in the plan

9   of adjustment efforts, which obviously are directly related

10   to the disclosure.

11       So the news is good, your Honor, and I'm very

12   pleased to say that.  We have made, in our view, very

13   significant progress.  Again, it's been in around-the-clock

14   discussions with very important parties in the case and with

15   everybody working day and night, and that is the reason why

16   we were late.  We missed our own target on the filing of the

17   amended documents that were received yesterday, I think, at

18   five o'clock or filed yesterday at five o'clock.

19       We are the first ones to acknowledge that that's not

20   a lot of time for everybody to review the significant changes

21   in the documents, and so what I hope -- in addition to

22   dealing with the adequacy of the information that we can deal

23   with today, I hope that Mr. Bennett will be able to present

24   to you some ideas about how to deal with the shortness of

25   time that we did provide and what we might do next, and he's

1  already, in fact, alluded to some additional changes,

2  completion of blanks and things that we still need to do, so

3  I want to say at the outset we understand that we still have

4  work to do on the disclosure statement, and at least to us

5  that's not a surprise, particularly where we've made so much

6  progress so that even though we may not be on schedule to the

7  hour or to the day, the delay has been worth it for what we

8  hope will be a more efficient confirmation process.

9       I would like to thank the mediators in particular

10  who have been instrumental in helping us get to this point.

11  I could go into a lot of detail about that.  Judge Rosen has

12  been tireless, and his whole team has been helpful, tireless,

13  and unbelievably committed to this process and to the City of

14  Detroit.  So we are very grateful to them and, again, to all

15  parties who have sort of laid down their swords somewhat and

16  have began to talk about the real business of the case, to

17  try to get the City of Detroit into an early exit from this

18  bankruptcy.

19       So with that I will just touch upon where I think we

20  are with some of the parties on progress made.  I want to be

21  especially careful here, and I think all the parties are

22  represented by counsel.  I do not want to overstate the

23  progress.  I do not want to put anybody into a position where

24  they feel that they have to come up and say, "No, we didn't

25  agree to that," or, "We didn't agree to that."  I do believe,

1   however, that you will find -- I hope you will find the

2   disclosure hearing today a much less contentious one because

3   of it.  So if I may, I will just touch upon the areas that we

4   have some agreement or near agreement.

5           MS. LEVINE:  Your Honor, before counsel proceeds, we

6   would just object to the extent we're going to go into

7   anything that would go into or touch upon confidential

8   mediation sessions.

9           THE COURT:  I'm sure Mr. Heiman will be very

10  sensitive to that.  Yes?

11          MR. HEIMAN:  Absolutely.  I'm not going to discuss

12  the substance of any deals or discussions.  In fact, the

13  media seems to be ahead of me on some of that, so whatever

14  was confidential in mediation was presented to me through the

15  media, so, anyway, obviously the swap claims were settled

16  with your Court's ruling last week, so that's a big plus,

17  finally, we can say, and we're pleased that we have that now

18  in tow.

19          We also have an agreement with the UTGO monoline

20  insurers that is a very important resolution for us.

21  Obviously it's subject to the Court's approval and

22  confirmation.  It is the subject of a term sheet that was

23  attached to the amended documents, and it's subject to a

24  formal agreement, a draft of which I've been carrying around

25  in my briefcase for the last several days, so we need to get

1  to that.  So we're not dragging our feet on anything there.

2  It's just the timing of it, so we can, I think, report very

3  definitively that we do have an agreement there.

4          On the pension matters --

5          THE COURT:  Give me one second, sir.  One second.

6  Chris -- Mr. Heiman, I want to see you and Ms. Levine at the

7  side of the bench, please.

8      (Sidebar conference at 10:54 a.m.)

9          THE COURT:  You may proceed, sir.

10          MR. HEIMAN:  Thank you, your Honor.  On the very

11  important pension matters, first, with respect to PFRS, we

12  have an agreement with the police and fire retirees

13  association.  That agreement is subject to refinement on

14  language and the like, a straggling issue or two, but I

15  believe we do have an agreement, very important agreement

16  with them.

17          With respect to the PFRS system, it is my

18  understanding that the trustees are considering our proposed

19  treatment as we speak, if not have already considered, so

20  we're hopeful on that front.

21          On the GRS system, we have the approval of the

22  trustees, I believe, from yesterday.  I think they issued a

23  press release.  Again, we are still working on some issues,

24  and I don't want to minimize the amount of work that needs to

25  be done, but we have a core agreement with them.  Again, it's

1  reflected in the plan, and if I didn't say that with respect

2  to PFRS, our deal there is reflected in the amended

3  documents.

4          Finally, we have had very -- again, I have to be

5  careful about how I characterize this.  We've had very

6  serious discussions with the Retirees' Committee and have

7  made very good progress, and we hope to continue those

8  discussions.  In our hope, we'll work very hard to try to

9  conclude those discussions prior to the filing of the next

10  amended plan of adjustment.

11          And that is it.  If you have any questions, I'll be

12  happy to answer them.

13          THE COURT:  Thank you, sir.

14          MR. HEIMAN:  Thank you.

15          MR. BRUCE BENNETT:  Your Honor, I'll try to be as

16  brief as possible.  As Mr. Heiman indicated, there's been

17  some moving pieces over the past several days, and this is

18  reflected in the revised disclosure statement that was filed

19  yesterday evening.  Those who spent much of the night

20  reviewing the disclosure statement no doubt noticed that

21  there are blanks, and the more perceptive among them may even

22  notice that there are some numbers in the existing draft that

23  probably need to be revised in light of the agreements that

24  were reached.  This is true.  And so what I think the -- and,

25  in addition, the one other thing I will say is that we are

1    also optimistic that in the next several days we may be in a

2    position to announce further agreements and, of course, make

3    changes to the plan to implement those agreements.

4         When we originally set up the schedule -- when your

5    Honor originally set up the schedule for the hearing today

6    and the events that follows, the contemplation was that we

7    would accept your Honor's rulings on the disclosure statement

8    today and churn them over the weekend to create a clean

9    document on Monday, and that was contemplating that we really

10   were at a place when we would be ready to mail something

11   roughly ten days after Monday.  What I would propose, in

12   light of where we are, instead is today resolve all of the

13   objections to the existing disclosure statement that we

14   possibly can.  Your rulings will be implemented obviously

15   into the form of the disclosure statement.  But I would

16   prefer -- and if your Honor can accommodate us -- that we

17   postpone filing a revised disclosure statement until Friday,

18   the 25th.  That will give us additional time to do a couple

19   things we didn't contemplate.  One, refine and more clearly

20   set forth the settlements that have been reached.  More

21   significantly even than that, to update numbers and to insert

22   some numbers that are admittedly missing as a result --

23   changes as a result of the settlements that were reached.

24        And then because it will certainly be true that in

25   the version that is filed and circulated on Friday there will

 1  be information that will be new, that won't just be the

 2  implementation of the Court's orders, we think it might be

 3  wise to schedule another date, and we're thinking about the

 4  30th, which is the -- which is the following Wednesday, but

 5  that was more or less pulled out of the air.  It could be

 6  Tuesday.  It could be Thursday.  And the effect of that, your

 7  Honor, on the rest of the calendar is to going all the way

 8  through --

 9          THE COURT:  What would happen on the 30th?

10          MR. BRUCE BENNETT:  Pardon?

11          THE COURT:  What would happen on the 30th?

12          MR. BRUCE BENNETT:  It would be a hearing date that

13  if there was -- that with respect to the new matter

14  introduced, not the preexisting disclosure, not your Honor's

15  orders with respect to the preexisting disclosure, but to the

16  extent there were new settlements that get put in or to the

17  extent new numbers are put in and the existing settlements

18  are more clearly defined, people would have an opportunity to

19  comment, make suggestions on the additions to the disclosure

20  statement.

21          It is possible, your Honor, that that could be an

22  opportunity for a hearing as opposed to an actual hearing if

23  your Honor wanted to take a shot at making it optional.  If

24  there were any business to be conducted, then people would

25  actually appear.  We could probably do that.  The effect of

1 this would be assuming that at that stage we get an order
2 entered that day somehow, that we're in a position to make
3 any changes that are needed because they will hopefully be
4 small, we can minimize the disruption to the rest of the
5 schedule to be a 11- or 12-day shift really depending upon
6 whether a weekend is implicated. And I've prepared a list of
7 the dates that would change or that would have to change.
8 Others could change, but the dates that would have to change
9 in light of this, using Docket Number 3632, which is your
10 order entered on April 2nd, 2014. And I guess I can give
11 people the dates now, and they can think about them, and
12 maybe we can come back to them later. And, again, none of
13 these are -- have to be the particular day set in stone, and
14 obviously your availability, your Honor, is most important,
15 but we tried to figure out how this would ripple through
16 under the schedule that you had set forth. And so the date
17 in paragraph 8 that's April 21 would become 25. There'd be a
18 new paragraph 8(a) for another hearing, which would be April
19 30th or an opportunity for a hearing on April 30th. The May
20 1 deadline for mailing would be May 12, and that's in
21 paragraph 11. Turning to page 3, the June 30th voting
22 deadline would become July 11th. Paragraph 17, the July 11th
23 deadline for submissions would be July 22nd. Mr. Gordon
24 pointed out accurately last night that there is something
25 else due on July 11th that is in the procedures -- it turns

1   out it's in the procedures order.  It's not here.  But we
2   would have the same date change, which is the ballot
3   tabulation would also be due on July 22nd, and so perhaps
4   we'd have a (d) added to that paragraph so it would be clear.
5   On paragraph 18, the July 14th final pretrial conference
6   would be then July 23rd or 24th or thereabouts.  Then the
7   confirmation hearing would begin a day or two -- or, again,
8   at your Honor's convenience, after the final pretrial
9   conference.  So on your additional dates that are necessary,
10  we'd be able to pick up the July 28 to 31 and August 1.
11  Hopefully we'll have enough agreements that maybe that'll be
12  enough, but, in any event, I think that would -- if your
13  Honor is inclined to give us the additional time to generate
14  a new disclosure statement and to perhaps capture some
15  additional agreements and give us to the 25th to file
16  something, that's the impact on the overall schedule as best
17  we can work it out preserving -- the most critical things
18  that you have to preserve are the amount of time to get the
19  mailing out because of how many pieces of mail we're talking
20  about, the number of days to vote, and the number of days for
21  the ballot tabulation agent to tabulate.  Those are the
22  periods that can't be shrunk very much.
23          Okay.  Very few comments in the way of introduction
24  because I think we should get to the objections right away.
25  Before I forget, in the break, Mr. Lemke and I revisited the

1    language that he proposed, and we accepted it word for word,

2    so the issues with respect to confusion with respect to the

3    election are -- hopefully are resolved now.

4         With respect to the filing last night, I think it is

5    true that the extent of blacklining in a lot of ways

6    overstates the changes, and so I've picked out basically six

7    or seven places where if your Honor would like me to, I can

8    take you through some of the kind of what looks like really

9    big changes and explain to you what they really are and what

10   they really implement, and --

11        THE COURT:  Okay.

12        MR. BRUCE BENNETT:  And I think this will help

13   because it will put in perspective what otherwise looks more

14   significant than I think it really is.  And for purposes of

15   reference, I'm going to use the blackline version that is

16   filed because I suspect that's what most people use, but I'll

17   try to give the section headings so that people can get to

18   the clean versions if that's what they're working off of.

19        The first place I would go to is page 12.  It's in a

20   filing -- it's page 219 of 408 because the blackline also

21   included the plan blackline in one bundle.  And this is a --

22   this begins a very long section of blacklining, and it is

23   basically the substitution of the simpler language insert or

24   simpler language version of description of changes that

25   affect retirees.  And so what you effectively have at this

1  point in the disclosure statement is pages -- again, using

2  the blackline version and using the disclosure statement page

3  numbers, pages 12 through -- it goes on quite a ways -- 12

4  through 27 inclusive is the disclosure material -- summary

5  disclosure materials directed to retirees.  And then the

6  provisions that come after that are really disclosure

7  materials directed to bondholders and other creditors, and

8  they're both in the same document.  As we've indicated, the

9  disclosure materials directed to retirees will be also in a

10 separate flier, and they will be the same, so it won't matter

11 which version someone picks up.  That's the reason for that

12 big clunk of blacklining -- big chunk of blacklining.

13         On page 28 there's additional very significant

14 chunks of blacklining relating to DWSD debt, and here again

15 it looks like there are more -- a lot of changes, but there,

16 in fact, are really few.  Change number one, there is no

17 longer any provision for a possible what was called GLWA,

18 Great Lakes Water Authority, transaction, which, in

19 connection with your Honor's commencement of mediation on

20 that topic, doesn't mean it can't come back, but we've kept

21 the language, but the -- at the point where we are today, we

22 thought that that was a relatively low probability

23 contingency and created more complexity than it was worth, so

24 we took it away.

25         The second change that we made is is that once upon

1  a time we thought we were dealing with basically four main

2  classes of DWSD debt, sewer, senior and -- first lien and

3  second; water, first lien and second.  As a result of

4  discussions with holders and many different things that

5  happened, we went to a structure where each CUSIP was a

6  separate class, so we have the 336 or 337 classes.  And since

7  they're all separate, there's no real reason to keep the

8  1(a), 1(b), 1(c), and 1(d) separate, so those four, 1(a),

9  (b), (c), and (d), have been collapsed just into 1(a).  It's

10  not a substantive change.  There's still many, many classes,

11  but for purposes of the document, that became much simpler,

12  and so that change is there.

13       There was an additional change that was also

14  mentioned in the papers we filed in connection with the peace

15  treaty/peace offering, which is that we've added call

16  protection as part of the proposal for the basic treatment,

17  the primary treatment, irrespective of if no -- if you don't

18  make the election, the interest rates that are on the

19  schedule will be protected by call protection for a period of

20  up to five years.  If the actual maturity of debt is shorter,

21  it's a shorter period, but that's the only change.  DWSD --

22  there's lots of black ink, but that's the only change to the

23  treatment in the DWSD class.

24       The next big clump of heavy redlining is related.

25  It's the actual classification discussion relating to DWSD,

1  which starts on page 43 of the blackline version of the

2  disclosure statement.  It implements exactly the changes that

3  I have just discussed.  It does nothing more.

4       And then there is a big clump of changes on page

5  6 -- beginning on page 63 of the blackline disclosure

6  statement.  All of these deletions relate to the elimination

7  of the GLWA, the authority alternative.  Again, it's all

8  sitting in a word processor someplace, so if the mediation

9  generates a different result, we will be ready for it.

10       And I think that's it in terms of the large clumps.

11  I wanted to emphasize, if it wasn't already obvious, that

12  there's some things that haven't changed at all.  There have

13  been no changes whatsoever to the COPs treatment.  There have

14  been no changes whatsoever to the LTGO treatment.  Obviously

15  I don't think Mr. Heiman mentioned it, but UTGO there's a

16  settlement that's in the plan.  That's another area where

17  documentation I think has yet to be completely finalized.

18       THE COURT:  He did mention that.

19       MR. BRUCE BENNETT:  Okay.  The OPEB treatment has

20  not changed.  The other general unsecured treatment has not

21  changed, and so while there have been a lot of changes that

22  have been done to implement certain things, that hasn't

23  changed.

24       Oh, I forgot one set of -- one set of heavy markup,

25  which is, of course, the changes to the pension treatments,

1    which relate to the things that Mr. Heiman was talking about.

2         I will say one other thing, which is that we did

3    have what I really regard as a very constructive session both

4    with the -- what I'd call the professional objectors, meaning

5    the persons represented by counsel who prepared objections,

6    and the people who are not represented by counsel.  I think

7    we spent a total of roughly eight and a half hours on the

8    phone, I think, in both sessions.  I think people worked hard

9    to get the disclosure right, and there was very, very limited

10   conflict over what the plan should actually say.  We worked

11   very hard to make those sessions as organized as possible by

12   asking people to give us markups of the parts of the

13   disclosure statement they wanted to change with exactly what

14   changes they wanted, and virtually everybody came through and

15   provided comments in that form.  I don't want to single them

16   out because there may have been one or two others, but

17   Syncora was one of the very few who refused, and so when they

18   indicated to the Court that they were last, yes, they were

19   last.  They were last because we thought that we should work

20   very carefully through the proposed markups that were

21   prepared by people who actually did the work to make the meet

22   and confer session as productive as it possibly could be.

23        The good news is at the end of the call when it was

24   Syncora's turn, at least they told us then that we had --

25   that as a result of others' comments, we had covered most of

1   their issues, so I think we definitely exerted our very, very

2   best efforts to minimize what your Honor will have to hear

3   today.  We clearly took away homework from those calls.  We

4   had the responsibility to put some of the agreements into

5   writing.  We tried our best.  If we have to make adjustments,

6   of course, we're absolutely going to do that.

7           I will say one last thing, and it's -- I think it's

8   an echo of a comment your Honor made, which is that this is a

9   pretty big document.  And it is clearly the case that you can

10   always ask for more disclosure.  There's always something

11   else to say.  We very clearly at the -- at the hearing when

12   we launched this, we said to people, "If you've got any ideas

13   for deletions, please let us know."  None were offered, and

14   so we continue to have that problem.  We regret its length,

15   but I think that we think that this is what -- this is --

16   does contain the material information that is necessary under

17   the circumstances.  So with that I'll --

18           THE COURT:  So nobody objected on the grounds that

19   it's too long?

20           MR. BRUCE BENNETT:  Not yet.  We'll see what happens

21   today.

22           THE COURT:  That it's too burdensome?

23           MR. BRUCE BENNETT:  Not yet.

24           THE COURT:  Can I file that objection?

25           MR. BRUCE BENNETT:  Yes, you can, even though the

1   deadline has passed.  Thank you, your Honor.

2          MR. HEIMAN:  Your Honor, with apologies,

3   apparently -- and with apologies particularly to the police

4   and fire retirees' association, apparently I inadvertently

5   omitted the very important agreement that we reached with

6   them that has been approved, so I want to correct the record

7   on that.  Thank you.

8          THE COURT:  Thank you.  All right.  I want to begin

9   then with the objections, and, as I indicated in my notice

10   from yesterday, we will allow five minutes for each in the

11   order in which they were filed.  First to file was Creditor

12   Ben McKenzie.  Is he here or anyone representing him?  Next

13   would be John P. Quinn.  Next would be Constance Mary

14   Phillips.  Next would be Jean Vortkamp.

15          MS. PHILLIPS:  Good morning, your Honor, and

16   everyone in the court.

17          THE COURT:  Good morning.  What is your name,

18   please?

19          MS. PHILLIPS:  Constance Mary Phillips.

20          THE COURT:  Okay.  Could you do me a favor and pull

21   that microphone just down a bit?

22          MS. PHILLIPS:  Is this better for you --

23          THE COURT:  Yes, yes.

24          MS. PHILLIPS:  -- and everyone else?

25          THE COURT:  Yes.

1          MS. PHILLIPS:  Okay.

2          THE COURT:  Now, ma'am, I want to be sure you

3     understand that this is your opportunity to object to the

4     disclosure statement, not to the plan itself.

5          MS. PHILLIPS:  Not to the plan of adjustment?

6          THE COURT:  Right.

7          MS. PHILLIPS:  Oh, yes.  I wrote an extensive

8     objection to the plan of adjustment, so I understand that.

9          THE COURT:  Yeah.  And I do plan to give you and

10    others like you who filed objections to the plan an

11    opportunity to be heard at a later time.

12         MS. PHILLIPS:  Okay.

13         THE COURT:  So this is only about the disclosure

14    statement.

15         MS. PHILLIPS:  May I ask one question, your Honor?

16         THE COURT:  Yes.

17         MS. PHILLIPS:  I was invited to participate in a

18    meet and confer call --

19         THE COURT:  Yes.

20         MS. PHILLIPS:  -- on Friday, April 11th --

21         THE COURT:  Yes.

22         MS. PHILLIPS:  -- which was also about the

23    disclosure statement.

24         THE COURT:  Yes.

25         MS. PHILLIPS:  My primary objection was addressed

1  then at that time as well.

2  THE COURT:  It was?

3  MS. PHILLIPS:  Okay.  But they didn't do a synthesis

4  of that conference call.  I did ask that question of them.

5  That was with Jones Day legal firm.

6  THE COURT:  Yes.

7  MS. PHILLIPS:  But my objection to the disclosure

8  statement was in regard to the time frame of ten to twenty

9  years of recipients, retirees like myself and others, to be

10  able to receive retiree benefits.  I was very, very concerned

11  about that because I've worked in this community in human

12  services for a number of years, over 30 years, and the

13  longevity rates --

14  THE COURT:  Where did you work?

15  MS. PHILLIPS:  Pardon?

16  THE COURT:  Where did you work?

17  MS. PHILLIPS:  I worked for the Detroit Wayne County

18  Area Agency on Aging.  I worked for United Community

19  Services, and I worked for the City of Detroit's Department

20  of Health and Human Services and Housing, so I have a fairly

21  good working knowledge of the population base that exists in

22  the City of Detroit.  We have approximately one-third of the

23  population who are over 55, and people are living up until

24  their late 70s and 80s, so if someone retires in their 60s or

25  late 50s, a ten-year time frame for recipients of -- to

1  receive retirement benefits is insufficient.  I retired at
2  62.
3          THE COURT:  But let me ask you how does this impact
4  the disclosure statement as opposed to the plan?
5          MS. PHILLIPS:  Well, I wanted to know how are people
6  going to get paid?  How are people going to receive their
7  benefits?  And the cutoff is ten years at the beginning,
8  twenty years at the maximum.  So if people live beyond those
9  points in times, they will not have pensions.  That to me is
10 an affect on the disclosure statement.
11         THE COURT:  Okay.
12         MS. PHILLIPS:  Monetarily speaking.  It's a
13 financial aspect.
14         THE COURT:  Thank you.
15         MS. PHILLIPS:  That's what I was concerned about,
16 and I'm still concerned about it.
17         THE COURT:  Okay.  And I will ask the city to
18 respond.
19         MS. PHILLIPS:  Okay.  Am I finished?
20         THE COURT:  If there's something more you'd like to
21 object to --
22         MS. PHILLIPS:  That was the main thing that I
23 objected to.
24         THE COURT:  That was the main thing?  Okay.  You're
25 all set then.

 1          MS. PHILLIPS:  I'll put some additional remarks
 2    together for April 28th regarding the issue of people
 3    receiving pensions if they are at the poverty level, federal
 4    poverty levels --
 5          THE COURT:  Okay.
 6          MS. PHILLIPS:  -- because that's really a very
 7    significant issue --
 8          THE COURT:  Okay.
 9          MS. PHILLIPS:  -- and my concern.
10          THE COURT:  Thank you very much, ma'am.
11          MS. PHILLIPS:  Thank you for your time, your Honor.
12          THE COURT:  Ma'am, you've been very articulate.  The
13    next objection to be heard is from Dennis Taubitz.  Sir.
14          MR. TAUBITZ:  Good morning, your Honor.  May it
15    please the Court, Dennis Taubitz.  I guess the first
16    objection is the lack of due process in the second amended
17    disclosure statement being filed apparently sometime
18    yesterday.  I don't believe people would have had adequate
19    opportunity to review it and make that many meaningful
20    comments today, so I would request that we be given
21    additional time to respond to the second amended disclosure
22    statement.
23          It's my understanding that the purpose of the
24    disclosure statement is to inform the individual creditors so
25    they can cast an informed vote, and I don't believe the

1  disclosure statement does that for a number of reasons.  One,

2  counsel for the city claimed that no deletions were presented

3  in the meet and confer.  That's untrue.  I presented one.  I

4  asked that all reference to the Retiree Committee

5  representing all retirees be deleted because they don't.

6  They only represent the retirees that affirmatively consent

7  to be represented by them, not everyone.  Some of them --

8  some of the retirees have appeared before your Honor on their

9  own and, therefore, are not represented by the Retiree

10 Committee.

11         I asked in the disclosure statement that there be a

12 further discussion of the assets and value of the assets.  In

13 order for the creditors to make an informed vote, they need

14 to know exactly what they're giving up.  What they're giving

15 up in this disclosure statement or plan is their right to

16 proceed against assets that the city may have.

17         And I would again ask the Court to reconsider the

18 statement by counsel for the debtor that the deadline to file

19 objections has passed.  I believe that is very unfair as they

20 just filed the second amended disclosure statement yesterday.

21 I believe that we should have more time to file objections.

22 Thank you.

23         THE COURT:  Thank you, sir.  Next we have an

24 objection by Jamie S. Fields.  No response.  An objection by

25 Michael Shane.  No response.  Next we have an objection by

1  AFSCME.

2       MS. LEVINE:  Good afternoon, your Honor.  Sharon

3  Levine, Lowenstein Sandler, for AFSCME Council 25 and our

4  Retiree Subchapter 98.  Your Honor, we rely on the papers and

5  the comments of others and want to limit our comments just to

6  one major disclosure issue that we have concern about.  In

7  the amended plan the debtors have included revised treatment

8  in Classes 10 and 11 with regard to pension recipients.  And

9  particularly with regard to the GRS pension recipients, who

10  are our constituents, it appears that if you vote "yes," you

11  may be getting treatment substantially improved over the

12  treatment that was originally provided by the debtors, up to

13  perhaps four-and-a-half-percent cuts as opposed to perhaps in

14  excess of 34-percent cuts.  The problem that we have is the

15  way the -- is the way the disclosure statement and plan work

16  now, people in that class elect to vote "yes" thinking that

17  they're voting for four and a half or whatever the new

18  treatment is, and even if the majority of that class votes

19  "yes" and even if this Court -- the debtor comes forward and

20  confirms this plan, it's still possible that the scope of the

21  releases will not be sufficient for the state to provide the

22  financing.  In addition to that, the document with regard to

23  which the state is supposed to provide the financing is not

24  yet attached to the disclosure statement, so what we have is

25  a situation where people are being asked to vote in favor of

1    a treatment, arguably substantially improved over the

2    treatment that they originally thought they were going to be

3    confronted with, but they don't really know that they're

4    going to get it.  And if they vote "yes" and certain other

5    levers don't fall into place, they have actually voted "yes"

6    for the in excess of 34-percent cuts, so we're now confronted

7    with a situation where somebody is saying to themselves,

8    "Well, do I take the chance and shoot hoping that I'm going

9    to hit my foot instead of my head, or do I vote 'no' and know

10   that I've hit my head?"  And you're in a situation, Judge,

11   where we know -- we've studied what happened pre-petition,

12   and your Honor actually found that the city, the state, the

13   players here acted in bad faith in those negotiations.  For

14   those of us that have participated in the mediation process,

15   it's been a very difficult process to get to the point where

16   we are today, so you're -- and you're asking those very

17   people who've been involved in the pre-petition negotiations

18   and in this post-petition process to take the leap of faith

19   that when we get to confirmation, if they do vote "yes," that

20   the state, without promising today that it's going to commit

21   that financing, will commit that financing and will provide

22   for the better treatment that these people are now trying to

23   vote for.  We would respectfully submit that the appropriate

24   disclosure here would be that, yes, if you vote "yes" and if

25   this class votes "yes" that there will be the appropriate

1  release provided to the state and that that is the only lever

2  that has to drop for the governor and the legislature to

3  appropriate this financing, and there can't be a decision at

4  the end of the process that suddenly says the rules have

5  changed because you have people with that uncertainty who are

6  going to be confronted with voting not potentially for a

7  better result for themselves and the city but voting their

8  frustration and their anger because they will believe that

9  this is not the first time they would have been lied to.  And

10  we respectfully submit that we can solve that problem now.

11  Thank you.

12         THE COURT:  Do you have specific language?

13         MS. LEVINE:  Well, your Honor, I don't know if it's

14  just language or we have to really get the parties to

15  actually say that we can put that language in the disclosure

16  statement.  If I'm hearing that the state is firmly

17  committing today that the only condition to the financing is

18  a release, then I would ask that your Honor decide whether or

19  not you'd be willing to say if, in fact, these classes vote

20  "yes," we will grant the release that's required, and we

21  would also ask the state to say that with that language and

22  with a "yes" vote, the funds are here today committed, so if

23  you do vote "yes," confused retiree, you're actually getting

24  the better treatment.  You're not, in essence, voting "yes"

25  for in excess of a 34-percent cut.

1          THE COURT:  Thank you.

2          MS. LEVINE:  Thank you.

3          THE COURT:  Next is an objection by FGIC.

4          MR. PEREZ:  Good morning, your Honor.  Alfredo

5    Perez.  Your Honor, number one, we really have significant

6    due process concerns about how this whole process is being

7    handled, and I'm not here to argue each and every one of our

8    objections, but I will point out, your Honor, that as it

9    relates to the DIA settlement, we requested information as

10   you would have in a 9019.  The only information that was

11   added was this is a risk factor, but there was no information

12   that we're compromising these claims, here are the issues,

13   here's what we've looked at.  There's nothing like that, your

14   Honor.  So perhaps with the new plan, there will be more

15   information, but at this point we really do have very

16   significant due process concerns about how it's being

17   handled.  Thank you.

18          THE COURT:  All right.  Thank you.  Next is an

19   objection jointly by Creditors T&T Management, HRT

20   Enterprises, and the John W. and Vivian M. Denis Trust.

21   Anyone here on that?  No response.  Next is an objection by

22   Oakland County.

23          MR. WEISBERG:  Thank you, your Honor.  Robert

24   Weisberg on behalf of Oakland County.  Your Honor, in light

25   of some of the rulings that the Court made today specifically

1  relative to the issue of mediation of the Great Lakes Water

2  Authority, we feel that that process will afford Oakland

3  County the necessary vehicle to get information that it

4  thinks it needs in order to evaluate both the plan and the

5  opportunity for the authority.  Candidly, we don't think that

6  there has been included within the disclosure statement at

7  present sufficient information for Oakland County to address

8  the plan as a whole, to address its treatment under the plan

9  if there is to be a treatment.  We've been told, although it

10  has not been 100-percent confirmed, that in the event that

11  there is no authority, that the contracts with Oakland County

12  and the DWSD will be assumed.  We don't see any schedule

13  indicating that that isn't the case, so we're at the moment

14  assuming that that is the case, and if that is the case, then

15  we may have issues with respect to assumption, but we don't

16  have issues with respect to being a creditor because we

17  arguably won't be a creditor unless there's ultimately a

18  rejection.  So at this point, we are prepared to allow the

19  mediation process to go forward to avail ourselves of

20  hopefully what will be free and open disclosure with respect

21  to information in connection with that process, and in so

22  getting that information, we won't need to have the

23  information that we might otherwise require to be included

24  within the disclosure statement.

25              There are other objections that we raised within the

1   papers that we filed that have been alluded to as being plan
2   confirmation issues as opposed to disclosure statement
3   issues, and with respect to those, we'll defer to the plan
4   confirmation process, so in that regard I think at least for
5   the moment our issues have been resolved.
6           THE COURT:  Thank you, sir.  Next, please, objection
7   of Berkshire Hathaway Assurance.
8           MR. CHRISTY:  Good morning again, your Honor.  Tom
9   Christy, Garan Lucow Miller, on behalf of Berkshire Hathaway.
10  Your Honor, I'm not going to regurgitate our original
11  objection.  That said, as you know, the latest version of the
12  disclosure statement was filed at five o'clock last night.
13  And I'm not here to criticize Jones Day or anyone else.  We
14  all understand this is an enormous undertaking.  That said,
15  the compromise I'm hearing from them, if I understood it
16  correctly, is if you have new objections to the new stuff,
17  you can file it by April -- for this hearing on April 25th.
18  The problem we found trying to go through this last night --
19  and our lead counsel in New York had three attorneys looking
20  at this from five o'clock into the late hours of the night
21  last night -- we're looking at this -- we're trying to get
22  numbers out of this, and we're trying to figure out what
23  numbers are there.  I still -- having spent those resources
24  as well as we could in the limited time available, we still
25  cannot figure -- come to the conclusion, hey, do we have

1  sufficient data or not.  There's simply not enough time.  I

2  don't want it to be construed that, okay, it's an old

3  objection because you made that objection before.  I mean if

4  we find there's still insufficient data, we should still be

5  able to raise that at this proposed new hearing on April 25th

6  or whenever that should happen.  That said, I think the rest

7  of our objections are pretty self-explanatory, and we hope

8  that the Court will allow further explanation if necessary.

9  Thank you.

10      THE COURT:  Next, please, objections by the Detroit

11 public safety unions.

12      MS. PATEK:  Good morning, your Honor.  Again,

13 Barbara Patek for the Detroit Fire Fighters Association, the

14 Detroit Police Officers Association, the Detroit Police

15 Lieutenants and Sergeants Association, and the Detroit Police

16 Command Officers Association, who represent the approximately

17 3,200 men and women who provide police and fire services to

18 the City of Detroit, its residents, businesses, and visitors.

19 We did file some objections, and of all the creditors that

20 the city has in this case, we are perhaps more than any other

21 appreciative of the city's severe financial distress and its

22 service delivery insolvency because our members live it every

23 day.  We are -- we realize with respect to the pension issues

24 this is a fluid process, and many of our objections related

25 to that.  And we are also appreciative of the extraordinary

 1   efforts being made by others doing the heavy lifting on this
 2   issue, including the Retirees' Committee, some of the larger
 3   unions, and the city itself and, of course, the mediators.
 4   However, we have, as mentioned on the solicitation, two
 5   primary objections, and I believe they will be addressed, but
 6   I want for the record to have them.  And the first has to do
 7   with the disclosures with respect to, in spite of the reports
 8   of the very good result with respect to police and fire,
 9   pensions on accrued benefits.  Because of the hard freeze,
10   our members need to understand that effect, and I have been
11   provided preliminarily with Ms. Lennox with some information
12   that's going to be included today, but I think that although
13   we have representation on the Retiree Committee, we have
14   supported the Retiree Committee's efforts, and in addition to
15   the service provided the city, these workers are -- these
16   police and fire fighters are also helping by virtue of that
17   hard freeze to help the retirees get to where they are, and I
18   think those disclosures will be addressed.

19        The second has to do with the release issue, and
20   precisely because we are taking somewhat larger cuts, I could
21   not possibly say it as articulately as Ms. Levine said, so I
22   would echo that objection.  And then the second part of that
23   is the scope of the release because there is information in
24   the release.  Some of it has to do with what's in the plan,
25   but truly even in the disclosures and the notices the public

1  safety unions came into this bankruptcy with all of their

2  bargaining rights stripped away by Public Act 436.  They have

3  been working very hard with the city in the mediation process

4  and are continuing to work in that regard.  What we need in

5  the disclosure statement is -- and at some level it may

6  depend on how things come out in terms of mediation, but even

7  if there isn't a deal reached with the public safety unions,

8  it needs to be made clear that these individuals are not

9  waiving, releasing, or discharging their rights going forward

10  either under the Michigan Constitution, the Public Employee

11  Relations Act, or Act 312.  So those are our primary

12  objections.  Thank you, your Honor.

13        THE COURT:  Thank you.  Next are objections by

14  Macomb County, please.

15        MR. BRILLIANT:  Good afternoon, your Honor.  For the

16  record, Allan Brilliant from Dechert, LLP, on behalf of the

17  County of Macomb, a Michigan constitutional corporation by

18  and through its county agency, the Macomb County Public Works

19  Commissioner.  Your Honor, we filed our objection to the

20  disclosure statement, participated in the meet and confer.

21  We are very mindful of your Honor's order that this was to be

22  just disclosure objections and not to be plan confirmation

23  objections, all of which, you know, we have, you know,

24  reserved for the confirmation hearing.  Like Oakland, you

25  know, we also believe the disclosure statement, you know,

1  does not provide sufficient information not just for, you

2  know, customers.  Macomb is, in addition to one of the

3  largest, you know, customers of Department of Water and

4  Sewage, but, in addition to that, is a creditor, you know,

5  has a claim for at least $26 million for overcharges which

6  were in litigation at the time of the commencement of the

7  Chapter 9 case.  But the information that's contained in the

8  disclosure statement, your Honor, just doesn't provide

9  sufficient information with respect to what is going on under

10  the plan as it relates to DWSD.  The debtor's response to

11  everything was, well, you know, everyone seems to -- not

12  just, you know, Oakland and Macomb, but some of the water

13  bondholders had indicated, you know, there were problems with

14  all these different options, you know, that it was confusing.

15  There wasn't enough information about the possibility of a

16  water authority or a private, you know, partnership, and

17  the -- you know, the city's response to that is, well, we'll

18  just take out everything with respect to the Great Lakes

19  Water Authority, and somehow, you know, that clears

20  everything up, but it doesn't, your Honor.  There's several

21  things, you know, that are lacking.  First, just as an aside,

22  you know, one of the, you know, issues that hasn't been

23  filled in is in the document, and obviously we need to see

24  this track through -- appropriately through the disclosure

25  statement into the projections, you know, and otherwise is

1    how much money it is that they're proposing that DWSD will

2    prefund into the Retirement System.  You know, effectively,

3    your Honor, what the plan does -- and there's very little

4    disclosure about it other than in various places, and in

5    connection with the objections, it was just one paragraph

6    added as a risk factor, but what the plan does is it requires

7    DWSD to prefund its pension obligations in some dollar

8    amount.  In the previous disclosure statement, that was $675

9    million.  We understand, based upon, you know, the new, you

10   know, projections, you know, from the actuaries, which, you

11   know, are changed throughout the document, but there's a

12   blank here, you know.  For this number it's going to be, you

13   know, significantly, you know, less than that, somewhere in

14   the range of $500 million, and that's going to be paid, you

15   know, early over the next ten years.  And supposedly there

16   will be a schedule, but there isn't one attached, that will

17   explain, you know, the schedule for paying it early.  It's

18   not all going to be paid on day one or in the tenth year but

19   over some kind of schedule, but there's no information on

20   that.  What we had requested, your Honor, and I think is

21   necessary for there to be adequate information is some

22   discussion as to why DWSD, you know, should be required to

23   prefund its obligations and what the risks are for DWSD in

24   doing that, you know, whether this has been approved by

25   various parties and what the reason for it is.  And the only

1    response from the debtor with respect to that request was to

2    add a provision in the risk factors that some parties think

3    that prefunding, you know, the amounts of money is too high,

4    and, therefore, if that doesn't happen, there may not be as

5    much money around for the pensions.

6         THE COURT:  I want to put you to that one.  Not to

7    set off the mediation that I just ordered on the wrong foot,

8    but I have to wonder aloud whether any explanation that the

9    city would give in response to your "why" question you would

10   ever think is an adequate disclosure.

11        MR. BRILLIANT:  Well, your Honor, whether it would

12   be adequate would depend on what they say.  All they say at

13   this point is they don't believe it's unlawful.

14        THE COURT:  What would you find to be adequate?

15        MR. BRILLIANT:  What the justification is for it,

16   why the amount was chosen.

17        THE COURT:  What you will say is, "That's not an

18   adequate disclosure.  That's not an adequate reason."

19        MR. BRILLIANT:  But, your Honor, what we have now is

20   no reason, so you're right, your Honor.  It may be that what

21   they would say would still not be satisfactory to us, but at

22   least the disclosure statement would say something.  It would

23   say -- it could say that the city believes that, you know --

24   you know, why the department should do this, whether it's

25   been discussed with, you know, the management, what effect,

1  you know, it's going to have on, you know -- you know, sewage

2  and water rates on a go forward basis, you know, for the

3  customers.  It says nothing with respect to that, your Honor.

4          THE COURT:  All right.

5          MR. BRILLIANT:  You know, in addition to that, your

6  Honor, we touched on it a little bit, you know.  There's

7  obviously the prefunding aspects of it, and then there's also

8  language in the plan in the implementation section, which is

9  duped into the disclosure statement, about how rates will be

10 set on a go forward basis.  And we had asked the -- and

11 basically what they say for a minimum of five years they

12 will, you know, continue to, you know, deal with the fiscal

13 2015 rate protocols, and then the city is going to come up

14 with the possibility of a rate stabilization, you know,

15 program for retail customers.  We asked them to explain what

16 that means rather than just say that.  Just, you know, duping

17 the language out of the plan, you know, what does that mean,

18 and what does that mean for wholesale customers, you know, in

19 terms of rates.  And, you know, the debtors to date haven't,

20 you know, added anything with respect to that.

21          So, your Honor, I think, you know, our -- you

22 know -- you know, clearly, you know, we don't know what's

23 going to happen in terms of a private partnership, you know.

24 You know, one of the things that we had asked was that, given

25 the possibility here that there -- that it may infringe upon

1  the city charter or state laws, we had asked that they

2  disclose, you know, whether or not they would need to have,

3  you know, a referendum to have the voters approve this; if

4  they were to create a franchise or do something else, whether

5  or not they would seek to, you know, assume or assign the

6  contracts to any private partnerships.  Instead, they just

7  put in the language that they added to the disclosure

8  statement just about their schedule under the theory that

9  they don't know enough about, you know, what it might bring

10  in order to disclose any more.  And our concern was not

11  necessarily trying to disclose what they're going to do

12  because we recognize they just don't know, you know, haven't

13  gotten the proposals yet, but just making sure that, to the

14  extent that it required, you know, a referendum or compliance

15  with state law required any other, you know, regulatory

16  approvals, that they would get those prior to the --

17        THE COURT:  You want the city to disclose that it

18  will comply with the law in connection with any private

19  transaction?

20        MR. BRILLIANT:  Well, we had added -- your Honor, we

21  had proposed --

22        THE COURT:  Can't we presume that?

23        MR. BRILLIANT:  But we had added just -- they have

24  listed, your Honor, under the Bankruptcy Code some of the 943

25  requirements, and we had asked that they just include a

1　reference to any electoral approvals or other regulatory

2　approvals, you know, required.  That's all we had, your

3　Honor.

4　　　　　　THE COURT:  Okay.

5　　　　　　MR. BRILLIANT:  Thank you.

6　　　　　　THE COURT:  Next would be objections from Assured

7　Guaranty, please.

8　　　　　　MR. KOHN:  Thank you, your Honor.  For the record,

9　Samuel Kohn for Assured Guaranty Municipal Corp.  Your Honor,

10　there's one issue that I hope doesn't go into the five

11　minutes.  It's what Mr. Bennett was talking about, which is

12　the amended solicitation order.  Paragraph 9(i) of the

13　solicitation procedures order provides that if the voting

14　deadline moves, the voting dispute resolution deadlines move

15　as well, the first brief and second -- all right, your Honor.

16　Thank you.

17　　　　　　Getting to the disclosure statement, it was very

18　helpful for your Honor to actually schedule that meet and

19　confer for the city and for the creditors.  We spent six

20　hours going through a lot of the issues.  There are only a

21　few remaining issues from Assured which -- but they are

22　really important, and it goes toward your Honor's discussion

23　with counsel for the county before relating to the

24　prefunding.  For two months we had a number.  I know

25　Mr. Bennett said that there's a blank.

1       THE COURT:  You're talking about the prefunding

2  retirement?

3       MR. KOHN:  Right.  Now, one of the problems is --

4  that we asked is that it's nowhere in the DWSD treatment, but

5  what it does -- it's only buried in GRS, in the GRS

6  treatment.  It's not -- there's no description for voters who

7  are looking at the DWS treatment and saying your fully

8  secured special revenues will be impaired and will be primed

9  by an additional prefunding when the documents provide that

10  the operating and maintenance expenses that can only prime

11  you are next month's current expenses.  So you'll hear a lot

12  about that in the plan objection, but there's no discussion

13  about it in the DWS section, DWSD section.  That's number

14  one.  Second of all, on the meet and confer Mr. Bennett said

15  we'll be very happy to see that the number is below 550 or

16  thereabouts, but now there's a blank.  We don't know if it's

17  going to be 775 or 675.  It's not just a matter of filling in

18  a blank, and we hope we'll have an opportunity to respond

19  when that blank gets filled in, but we want to alert your

20  Honor to the importance of what that priming is and what that

21  does to the special revenues.  It actually impairs -- there's

22  a waterfall.  Affix the waterfall onto the docs, and if they

23  put additional funding -- they say that it's operating and

24  maintenance, begs the question, fight about it on the plan --

25       THE COURT:  Do you have language?

1     MR. KOHN:  I would love to have language to say that

2  it will --

3          THE COURT:  Do you have language?

4          MR. KOHN:  Well, here's the --

5          THE COURT:  Do you have language?

6          MR. KOHN:  Your Honor, let me respond to that.  My

7  language would be take the ten years amount that --

8          THE COURT:  No, no, no.  I'm not talking about

9  language that negotiates their plan.

10         MR. KOHN:  No, no, no.  I don't --

11         THE COURT:  I'm talking about language that you want

12  in the DWS section to explain what the plan presently does.

13         MR. KOHN:  Oh, sure.  I could provide language.

14  That's the -- the amount of the impairment of your bonds will

15  be X.  I could provide that.  That's not a problem.  It's

16  what's buried in GRS that really has to just -- it's a lift

17  and cut --

18         THE COURT:  Um-hmm.

19         MR. KOHN:  -- into the DWSD and to say, you know,

20  your bonds are going to be impaired by this amount, but one

21  thing.  What the issue is -- and this is what we've asked

22  for, and this is what your Honor's question was.  It's not a

23  question of whether it's inadequate information.  The

24  question is we do not know the extent of our impairment, and

25  here's why we don't know.  We used to know that it was 675

1   less what we used to have.  Now we don't know the cut number,
2   but guess what?  We don't even know what we used to have.
3   The city never disclosed to us the actual historical
4   information for the last five years of what the DWSD spent
5   on -- contributed to the pension pursuant to the docs, to the
6   old water and sewer docs.  We've asked for that, and they
7   said, well, maybe we'll give it to you, maybe we won't, but
8   they didn't.

9           THE COURT:  Well, are you asking for that in the
10   disclosure statement?

11          MR. KOHN:  Yes, yes.  I'm asking for historical data
12   specifically of the funding and how much -- and also the
13   amount of the UAAL liability and also the historical
14   information of how much was contributed to the pension funds
15   for DWSD workers.  We've never received it.  So that's one
16   big point.  And by the way, even though there's blanks in the
17   disclosure statement, the Schedules K and L still equal up to
18   675 so that the exhibits need to be revised as well.

19          The second issue is the privatization that we talked
20   about.  Your Honor, it's very interesting to have a plan
21   provision or something in the disclosure statement that
22   there's going to be a privatization potential deal, but they
23   don't know who's it with.  They don't know what form it will
24   take.  They don't know when it will close, and they don't
25   know how it's going to affect creditors.  If they don't know

1   how it's going to affect creditors, how do we?  Our

2   recommendation is to just take it out.  Just don't talk about

3   it.  If it happens, they'll have to deal with it under 1127

4   somehow but not now.  It's just confusing.  It's meaningless.

5   If they don't know how it's going to affect us, how are we

6   going to make an informed judgment how it's going to affect

7   voters?

8          The third issue is this is -- we've asked for this,

9   and they said no.  They have this RFI, a new issuance under

10   the DWSD, that's going to water down our collateral.  It's

11   going to be pari passu to us.  And there's no mention at all

12   because they're saying they may not even have to come to your

13   Honor to ask approval for it, which we will object to, of

14   course, when they file a notice, but, anyway, so the other

15   two things is we asked for the methodology on the rate

16   setting chart.  We think that voters should understand

17   whether the figures are grounded in reality or whether

18   they're just thin air to get to a certain result to be able

19   to have savings for the city.  If it's reality and it's

20   grounded in reality, please tell us the methodology.  We

21   asked them to provide a value for the core protection.  Well,

22   they could say it's zero.  They could now say it's zero, and

23   they don't have to reverse us.  They don't have to tell us

24   about it.

25          The one thing -- the last thing, and I'm going to

1    get off, is Mr. Bennett talked about the UTGO settlement.

2    We're a party to that, and we hope we'll have an opportunity

3    to look at that.  The description so far we don't think

4    actually does it.  Thank you, your Honor.

5              THE COURT:  Thank you.  Next, please, is Syncora.

6              MR. RYAN BENNETT:  Good morning, Judge.  Ryan

7    Bennett of Kirkland & Ellis on behalf of Syncora.  While we

8    rest predominantly on our papers and the statements of

9    others, we do believe the manner in which the disclosure

10   statement has been handled presents some significant due

11   process concerns and attempts to short-circuit the

12   protections afforded to parties under the Bankruptcy Code.

13   We anticipated that we would end up in this spot when we

14   filed our first motion to adjourn the disclosure statement

15   hearing several weeks ago, and, unfortunately, we were

16   correct.  At that hearing, counsel for the city indicated

17   that the information that was missing, the documents, the

18   agreements, would be filed in bundles and not held until the

19   last day before the hearing before it would be filed, and,

20   however, here we are.  Instead of receiving the 28 days'

21   requisite notice to review the documents, we received less

22   than 28 hours.

23             Judge, if the Court does adopt the city's proposed

24   revised timeline, we ask that the information that

25   Mr. Bennett referred to as new also include the information

1  that was filed last night and that at this proposed hearing

2  of April 30th that the parties be allowed to take issue with

3  that information to the extent they have issues.  That's it,

4  your Honor.  Thank you.

5           THE COURT:  Okay.  Next is Ambac, please, Ambac

6  Assurance.

7           MS. CONNOR COHEN:  Good morning, your Honor.  Carol

8  Connor Cohen from Arent Fox on behalf of Ambac Assurance

9  Corporation.  I just have a couple of very quick matters to

10 raise, and mostly it's just a matter of confirming.  We had a

11 number of issues that we raised in our objection to the

12 disclosure statement.  A few of those were addressed in this

13 amended disclosure statement that was filed last night.  A

14 number of them the city disputes.  I'm not going to -- we'll

15 rest on our papers on those.  There was one very important

16 one that's left open that I do want to mention briefly, and

17 that is, as the Court noted, it's important that creditors

18 know what they're going to get, and we don't because of the

19 blanks in the current version.  We have -- Ambac insures the

20 LTGO bonds, Class 7.  Right now the recovery is listed as

21 blank for -- we know we're going to get some pro rata share

22 of the so-called new B bonds, B notes, but we're in a pool

23 with three other groups, the OPEB or now I guess the retiree

24 health VEBAs, the other general unsecureds, and the COPs or

25 at least those COPs holders who elect to enter into the COPs

1    settlement.  There's no amount estimated -- it's a blank --

2    for how many that might be.  The city hasn't even given us an

3    assumption about how many of those in dollars might elect

4    that treatment, and there's also no number right now for the

5    OPEB number, so we don't know what the denominator is for

6    this fixed sum note to be divided.  I assume that if the

7    Court adopts Mr. Bennett's proposal that we will be able to

8    raise issues at the next hearing if there are not -- if

9    there's not adequate disclosure so that we can figure out how

10   much we're going to get from what is filed next week, but I

11   just want to confirm that that is still an open issue for us.

12   Thank you, your Honor.

13            THE COURT:  Thank you.  Next is Wilmington Trust,

14   please.

15            MR. ROSENBLAT:  Good morning, your Honor.  This is

16   Heath Rosenblat on behalf of Wilmington Trust National

17   Association as successor contract administrator and successor

18   trustee.

19            THE COURT:  Stand by one second, please, sir.

20            MR. MARRIOTT:  Your Honor, Vince Marriott on behalf

21   of EEPK and certain other COPs holders.  I believe Wilmington

22   Trust joined in our objection, which was filed first.  It

23   might make more sense for me to go before Wilmington Trust.

24            THE COURT:  Is that all right with you, sir?

25            MR. ROSENBLAT:  That's exactly where I was going to

1   go with this, your Honor.  Thank you.

2         MR. MARRIOTT:  Your Honor, once again, Vince

3   Marriott, Ballard Spahr, representing EEPK and speaking on

4   behalf of an objection filed by EEPK, its affiliates,

5   Deutsche Bank, Dexia, and FMS Wertmanagement.  I guess I'm

6   one of the professional objectors that Mr. Bennett referred

7   to.  I'd rather he had put an "and" between the words, a

8   professional and an objector.  I choose not to think of

9   myself as a professional objector.

10        THE COURT:  There's so many comeback lines for that

11   one.

12        MR. MARRIOTT:  Your Honor, I appreciate that you're

13   restraining yourself.

14        THE COURT:  It's so hard.

15        MR. MARRIOTT:  I want to join in what I view as the

16   due process problems that have been raised by scheduling

17   here.  It would appear that what Mr. Bennett is proposing,

18   that we proceed with a hearing on objections to that portion

19   of the disclosure statement that haven't changed and defer

20   objections to the portions of the disclosure statement that

21   have or will change.  It's an organic document.  I'm not sure

22   it is fair to ask of creditors to proceed in that fashion

23   when the document really has to be evaluated as a whole.  I

24   have no problem obviously with pushing another hearing on the

25   disclosure statement till April 30th.  I resist the notion

 1  that the objections that can be presented at that hearing
 2  will be pigeonholed and constrained rather than as to the
 3  disclosure statement as a final organic document as it then
 4  exists on that date.  I think that's the appropriate way to
 5  proceed and not this sort of serial nature.

 6          That said, we had a number of objections raised in
 7  our papers that were repeated by others, including such
 8  things as indicating plan contingencies and what the effect
 9  on distributions would be if those contingencies didn't occur
10  but the plan was still confirmed.  Again, I had a few hours
11  to read this.  It didn't appear to me that those sorts of
12  issues were raised.  We raised issues about asset valuations.
13  I'm confident that those issues were not addressed.  I think
14  the city takes the position that they're not obliged to value
15  their assets for purposes of disclosure.

16          Our lead objection was that the disclosure statement
17  did not provide adequate information to -- for creditors to
18  determine either what they were getting or what others were
19  getting, which is equally important for voting on the plan.
20  Ms. Cohen indicated that there were denominator issues
21  associated with that calculation.  There were also numerator
22  issues associated with that calculation because these new B
23  notes have a nominal face amount of X, but that nominal face
24  amount of X is based upon interest rates which we, for
25  example, believe are not market and that if you were to

1  discount that note to what it would, in fact, trade at in the

2  market, the 650 would be significantly less.  There are

3  blanks in the latest --

4         THE COURT:  So is there language in regard to that

5  that you would like to see in the disclosure statement?

6         MR. MARRIOTT:  We would like to see language in the

7  disclosure statement, your Honor, that indicates what -- I

8  mean the debtor at the moment has blanks for what

9  distribution percentages will be.  Presumably when those

10 blanks --

11        THE COURT:  That was not my question.

12        MR. MARRIOTT:  No, no.  I'm going to answer your

13 question.  Presumably when those blanks are filled in, they

14 will reflect the debtor's assessment of the value of that B

15 note.

16        THE COURT:  Um-hmm.

17        MR. MARRIOTT:  I'm assuming for the sake of argument

18 that they will value the B note at par and then do -- in

19 other words, they will view the numerator as fixed and that

20 that percentage will shift depending upon their ultimate

21 calculation of the denominator.  We believe that proper

22 disclosure would indicate that there are creditors who will

23 actually have to hold and trade these notes that believe that

24 they should be valued at significantly less than face, and we

25 believe that that -- our views on that should be in the

 1  disclosure statement, yes.

 2          THE COURT:  Okay.  So I ask again, do you have

 3  language that you want included?

 4          MR. MARRIOTT:  Yes, I do.  We can provide the debtor

 5  with specific language we would like to include on --

 6          THE COURT:  All right.  So what --

 7          MR. MARRIOTT:  -- the issue of the value of

 8  distributions.

 9          THE COURT:  Okay.  So what I'll ask of the debtor,

10  be forewarned, is whether the debtor has any objection to

11  including your language with the statement that this is

12  language that your client, EEPK, has requested to be included

13  in the disclosure statement.

14          MR. MARRIOTT:  Thank you.  And with that -- oh, one

15  other thing not disclosure statement related, scheduling

16  related.

17          THE COURT:  Okay.

18          MR. MARRIOTT:  We have no objection to moving the

19  bookends of the schedule, but our view is -- and I don't know

20  that the debtor will have any issue with this -- dates within

21  those bookends should roll as well.  I mean it was an awfully

22  tight schedule, particularly at the discovery, and adding ten

23  or twelve days to the discovery schedule would improve the

24  process.  And if the bookends are moving, there's no reason

25  not to move those other dates.

1      THE COURT:  Right.  Okay.  And does Wilmington Trust

2  wish to add anything?

3      MR. ROSENBLAT:  We do, your Honor.  Heath Rosenblat

4  again of Drinker Biddle on behalf of Wilmington Trust

5  National Association.  More specifically to what we filed --

6  and, again, obviously we echo the due process concerns that

7  the other objectors have raised, but the disclosure statement

8  specifically talks about the COPs claims in principal

9  obligation only, and we had suggested language to city's

10  counsel that kind of dovetailed with the proof of claims that

11  we filed in connection with the COPs claims that lays out

12  that there are other fees, costs, charges, expenses that need

13  to be added to the obligation, not just -- it can't be

14  represented in principal outstanding amount only.  And that

15  was in paragraph 3 of our limited objection.  Thank you, your

16  Honor.

17      THE COURT:  Okay.  We do have nine or ten more of

18  these objections plus the city's response, so we're not going

19  to be able to conclude before lunch, in any event, so I'm

20  going to take lunch -- take our lunch break now, and we'll

21  reconvene at 1:30.

22      Before we break, however, I want to -- I want to

23  forewarn counsel for the city about an issue that I wish to

24  address with them during the status conference that will

25  follow our hearing on the disclosure statement, and that

1  issue is sort of broadly and generally what the plan provides

2  for supervision regarding the implementation of the plan

3  assuming it's confirmed, what the plan provides for that

4  supervision, who is going to be responsible for it, what

5  reporting obligations that responsible person might or should

6  have to the Court regarding implementation.  And with that I

7  will see you at 1:30.

8          THE CLERK:  All rise.  Court is in recess.

9      (Recess at 12:03 p.m., until 1:38 p.m.)

10          THE CLERK:  All rise.  Court is in session.  Please

11  be seated.  Recalling Case Number 13-53846, City of Detroit,

12  Michigan.

13          THE COURT:  All right.  Stand by while I try to

14  figure out who's next here.  Okay.  I think our next

15  objection will be from the ad hoc committee of DWS

16  bondholders, please.

17          MR. HOROWITZ:  Good afternoon, your Honor.  Gregory

18  Horowitz from Kramer Levin on behalf of the ad hoc water and

19  sewer bondholders.  Your Honor, we've joined in the water and

20  sewer bond trustee's objections, and Mr. Lemke will be

21  speaking to those, I think, in a few minutes.  We wrote

22  separately to highlight the problem in the disclosure

23  statement as it was -- as it then existed and the plan as it

24  then existed that it had alternative treatments of the water

25  and sewer bonds depending on whether a GLWA transaction was

1 entered into or I think what we've -- what some people have
2 been referring to as the stand-alone approach was being
3 employed, and we wanted to highlight the problem that you
4 can't ask the bondholders to vote without having any good
5 idea of what they're -- what treatment they've voting on.
6 That issue has been largely addressed to date, I guess, by
7 the withdrawal of the GWLA -- the GLWA transaction from the
8 plan and the removal of the discussion in the disclosure
9 statement. There's still an issue, which Mr. Kohn addressed,
10 I believe, with regard to the disclosure statement discussing
11 the city's exploration of a public-private transaction and
12 the possibility that some undefined transaction will be
13 entered into. In our view, it's clear that the plan, as
14 currently in place and as currently addressed by the
15 disclosure statement, is for a stand-alone treatment of the
16 bonds, and it's also clear, we believe, that if the GLWA
17 transaction is revisited or if some public-private
18 transaction is actually consummated or pursued, that would be
19 a material event that would require supplemental disclosure
20 and, to the extent that it impacts on creditor recoveries,
21 could well also require resolicitation, but that's not before
22 us today. Even the plan as currently stated in the
23 disclosure statement, as a number of people have pointed out,
24 has large gaps with regard to material relevant information
25 about the treatment of the bonds and particularly the priming

1 pension payments that are -- that the city proposes to place

2 in front of us. I trust and hope that at least a large

3 portion of that -- those gaps is going to be addressed by

4 next Friday when a supplemental disclosure statement is -- an

5 amended disclosure statement is filed. It's possible, I

6 guess, by that time that there's also new information about

7 the GLWA or a public-private transaction. Regardless of what

8 happens, your Honor, it's clear that we don't know what plan

9 we're being asked to consider at the moment. And with regard

10 to the scheduling order and the proposed changes that

11 Mr. Bennett addressed with regard --

12         THE COURT: What do you mean by that, you don't know

13 what plan you're being asked to consider?

14         MR. HOROWITZ: Well, I should say -- I'm sorry. Not

15 the plan. We don't have the information about our proposed

16 treatment. We don't know how much in --

17         THE COURT: That's a different question.

18         MR. HOROWITZ: -- proposed payments is being

19 layered -- how much in payments is proposed be layered ahead

20 of us, so with regard to the proposed changes to the

21 scheduling order that Mr. Bennett discussed this morning, if

22 a disclosure statement at the earliest is not going to be

23 approved until April 30th and May 1st is currently the

24 deadline for parties other than individual bondholders and

25 retirees to file objections, that doesn't make sense, your

1   Honor, and to the extent that the dates in paragraph 11 of

2   the third amended scheduling order, Docket Number 3632 -- and

3   Mr. Bennett said that 11(a) should be pushed off to May 12th.

4   All of the other dates in there, 11(b) and 11(c), should,

5   likewise, be pushed off.  I'm sure that there's an awful lot

6   of other rejiggering in the schedule that should be done to

7   take advantage of the additional time, but at the very least

8   the objection deadlines have to be pushed off.

9           THE COURT:  Okay.  Thank you, sir.

10          MR. HOROWITZ:  Thank you, your Honor.

11          THE COURT:  Next are the objections of the Retired

12  Detroit Police Members Association.

13          MS. BRIMER:  Good afternoon, your Honor.  Lynn M.

14  Brimer appearing on behalf of the Retired Detroit Police

15  Members Association.  Your Honor, we stand on the objection

16  as it was filed, and for brevity and in order to avoid

17  repeating issues that have been raised by other parties, I

18  would like to point out that many of our objections were also

19  raised and have been brought up this morning by other

20  parties.  We are aware that there has been a settlement

21  reached with the other association, the Retired Detroit

22  Police and Fire Fighters Association.  I do not believe all

23  of those terms have been disclosed.  And until those terms

24  have all been disclosed, it's impossible for us to evaluate

25  the impact of that settlement on the treatment of the

1   police -- I only represent police -- the police in the plan.

2   I am optimistic and believe that all of those terms will be

3   finalized and disclosed in the next document that is filed,

4   and that issue should be resolved.

5          The other issue that I'm concerned about that has

6   not yet been fully addressed is the disclosure of the terms

7   of the state contribution agreement and the DIA settlement

8   agreement.  The disclosure statement specifically states with

9   respect to both of those that there are conditions to

10  those -- the funding and to the execution of the DIA

11  settlement agreement.  With respect to both, the disclosure

12  statement states -- for example, states, "Payment of the

13  state contribution is conditioned upon," and then, "among

14  other things."  I think it's important that the -- all of

15  those things -- there's a litany of conditions, but it must

16  be clear that all of the conditions are either disclosed or

17  the settlement agreement is disclosed in order for the

18  retirees to fully evaluate the risk.  And I understand it's a

19  risk, and it may be a confirmation issue whether or not

20  they'll accept that risk, but they need to understand what

21  all those risks are.

22         In addition, I would like to reiterate the comments

23  made with respect to the Class B note, and it's very unclear.

24  And, again, I believe that the next document that's filed may

25  resolve that, but the VEBAs for both the GRS and the PFRS are

1  predicated on their share of the Class B note.  And as the

2  document stands today, it's impossible for the retirees to

3  determine what share of the Class B note will be contributed

4  to each of those respective VEBAs.  Thank you, your Honor.

5          THE COURT:  Next are the objections of the water and

6  sewer bond trustee, please.

7          MR. LEMKE:  Your Honor, David Lemke again on behalf

8  of U.S. Bank as trustee for the water and sewer bonds.  Your

9  Honor, we would start off -- echo the requests of prior

10  parties asking that if your Honor does extend the deadlines,

11  all of them get moved, so I won't belabor that.

12          In addition, we do also agree with the arguments and

13  the requests made by Assured and by Berkshire and also by --

14  I think it was Macomb County with respect to the UAAL.  As

15  your Honor understands, that is a significant issue for the

16  holders to understand exactly how that proposed accelerated

17  payment impacts the operations of the system and how it may

18  increase or shift a likelihood of nonpayment going forward to

19  the water-sewer bonds by layering on some additional

20  obligations that aren't otherwise in there right now, so we

21  do want to understand how they're coming up with the amount

22  that they are intending to allocate to the GR -- I mean --

23  I'm sorry -- to the DWSD.  We would like to understand the

24  historical payments that were made and think that all should

25  be in the disclosure statement.  You know, we have -- as

1 somebody pointed out, one of the exhibits still uses the $675

2 million number. We believe that's dropping to 550, and it is

3 a blank right now on the disclosure statement. Of course,

4 the GRS audit came out fairly recently, and it has $375

5 million as the amount attributable to DWSD for the UAAL, so

6 we would like an explanation of the reasons or if that is not

7 the number proposed, why. Why is that different?

8 The same thing that Macomb County mentioned as well

9 with respect to the rates, we certainly would like to

10 understand what the statement in the disclosure statement

11 means with respect to what they plan to do with rates

12 because, as your Honor knows, their ability to pay any and

13 all of the payments coming out of the department, whether

14 it's debt service, capital expenditures, operating, depends

15 on revenues, which clearly depend on rates, so we need to

16 understand what's going to happen with the rates going

17 forward.

18 The next item we have is that the plan says that

19 they're going to be proposing or be filing supplemental

20 disclosures that will include the new DWSD bond documents,

21 and we don't have those yet, and we haven't had a chance to

22 look at them yet. So under the disclosure statement and

23 plan, it currently provides that there will be basically no

24 changes to the bonds other than -- and they're critical, but

25 other than the interest rate may change, the call protections

1    may go away, and then there will be this UAAL pay-over that
2    may not be part of the existing situation, but it suggests in
3    the plan and disclosure statement that nothing else will
4    change with respect to any of the other terms of the bond
5    documents, and we accept that comment at face value.  That's
6    exactly right.  That would be the only changes made, period,
7    to any of the new documents.  But we need to reserve our
8    right to object if and when we finally see these new
9    documents and if, in fact, there are changes that are in
10   there that aren't -- weren't already contemplated or already
11   disclosed in the disclosure statement, your Honor.
12            THE COURT:  Okay.
13            MR. LEMKE:  We also have a similar issue to -- I
14   can't remember if it was Oakland or Macomb, but their request
15   that there be some disclosure with respect to the compliance
16   with Michigan law.  Now, in our case it is compliance with
17   Michigan law with respect to these new bonds that will come
18   out if the plan is confirmed, the replacement bonds.  And I
19   think it is critical for us and for our bondholders to
20   understand what are the state law requirements and, as a
21   result, could be impediments to those bonds being issued.
22   For example, if the city does, in fact, have to submit these
23   new issue to the 45-day referendum period -- and, in fact,
24   somebody -- 15,000 citizens ask for a vote on the new issue,
25   and then that vote is -- votes down the new issue, what

1   happens?  And there's no explanation in the disclosure

2   statement.  And it is a -- it is a risk factor, but it is

3   also something the bondholders should understand is a -- if

4   it is a possibility, it is a possibility, and what's going to

5   be the effect if that occurs.

6        We also would like an explanation from the debtor in

7   the disclosure statement on the methodology -- methodology --

8   I'm sorry -- that they used for doing the interest rate reset

9   chart.  There is a -- as your Honor knows, there's a schedule

10  attached that has all of the CUSIPs, and then the debtor has

11  proposed interest rate -- new interest rates that will be

12  attributed to each of those new CUSIPs if the plan is

13  confirmed and if they cram down or if somebody were to elect

14  the cramdown rate, and there is no explanation on how that

15  curve -- what was derived, and, you know, you can't just put

16  in a -- just sort of a standard -- you take an A-rated series

17  and run that curve.  It doesn't come out exactly the same, so

18  we feel like it is important for the holders to understand

19  what the methodology was that went into that rate when

20  they're voting on the plan.

21       We have -- we also have -- and this is sort of just

22  a -- I think a fairly minor matter, but -- and maybe this

23  gets cleaned up between now and the next hearing, but the

24  debtor did make -- and we appreciate it -- made some changes

25  to the disclosure statement that we requested, but those --

1  many of those same changes didn't get brought over to the

2  plan.  And it is important that if not all of them but

3  certainly some of them find their way over to the plan since

4  the plan will ultimately be the controlling document, and we

5  need to make sure that those provisions are in there.  And I

6  think that is all I have for right now, your Honor.

7  Appreciate it.

8          THE COURT:  Thank you.  Next we have objections from

9  the retiree association parties.

10         MR. PLECHA:  Good afternoon, your Honor.  Ryan

11  Plecha, Lippitt O'Keefe Gornbein, on behalf of the retiree

12  association parties.

13         As far as my comments relative to the Retired

14  Detroit Police and Fire Fighters Association, I would just

15  want to state that we want to confirm that the upcoming

16  disclosure statement and plan will, in fact, include accurate

17  and adequate disclosure of the deal that we have in

18  principle.  That remains subject to some details being worked

19  out.

20         As far as the Retired Detroit -- or the Detroit

21  Retired City Employees Association, we rely on our papers as

22  well as stating a few objections for the record.  One is we

23  have a real concern that there's no legal basis in the

24  disclosure statement for the recoupment of ASF funds.  Also,

25  the scope of the release as well as whether a "yes" vote has

1  an unconditional release regardless of whether the plan is
2  confirmed, money comes in or the class accepts the treatment.

3         Also, as it relates to the received by deadline, I
4  think retirees should be made aware that it could take up to
5  a week for mailing.  I know that seems like a mundane detail,
6  but since it's only based on ballots that are actually cast
7  and accepted, I think retirees should be made aware that it
8  could take up to a week for their ballots to get to
9  California.  That's all, your Honor.

10         THE COURT:  Thank you, sir.  Next we have objections
11  from Heidi Peterson.  Is she here or anyone representing her?
12  No response.  The Official Committee of Retirees objection,
13  please.

14         MS. NEVILLE:  Good afternoon, your Honor.  Carole
15  Neville on behalf of the Official Committee of Retirees.
16  First, another scheduling issue.  We would like your Honor to
17  extend our time to work on the special disclosure for the
18  retirees so it coincides with the full disclosure statement
19  because when we change a number in the plan, it affects the
20  descriptions that we put in the retiree supplement, and we're
21  continually scrambling to adjust those numbers.  So if we
22  could -- if Ms. Lennox and the rest of us could work together
23  on the plan and disclosure statement and on the special
24  disclosure, it would be very helpful.

25         With that said, it's coming late in the day.  I can

1  just turn around and say what she said and what she said.  We

2  care very deeply about the DWSD funding because it is the

3  sole source of funding pretty much for the General Retirement

4  System pensioners, so any disclosure that is made about the

5  historical funding and about how much is being allocated in

6  this accelerated funding is of great concern to the retirees.

7  The number seems to be dropping.  We haven't gotten an

8  explanation for that.  And it results in increased cuts for

9  the retirees.

10          We also care very much about the Plan B note.  We

11  share in the pool with the COPs and the LTGOs.  We believe

12  that the note is at a below market rate of interest, and

13  we're not sure what part of it we get.  The calculation of

14  the OPEB claim is a big issue still.  There are different

15  interest rates one might use to calculate that claim, and it

16  changes the amount of the claim.  That has not yet been

17  resolved.  And the other part of it is something I mentioned

18  this morning.  Once the VEBAs get this note, it isn't clear

19  what benefits the trustees are going to be asked to provide.

20  If it is a ten-year VEBA, the retirees may get the benefits

21  or better benefits than they're getting now, which are

22  greatly reduced, your Honor, as you well know.  If it's a 20-

23  year VEBA, their benefits could slip way down.  And if it's a

24  30-year VEBA to coincide with the pensions, there could be

25  virtually no benefits provided, so it's really important to

1  get some sense of what the VEBA mandate is going to be, and

2  we don't have that yet.  The plan, disclosure statement, and

3  notice just says you'll get whatever the trustees say you're

4  going to get, and I don't know how the retirees can vote on

5  that issue.

6           So those are the things that are the "me, toos"

7  basically but from the other side, from the retirees' side.

8  I'd like to turn now to some of the things that came up in

9  the plan and disclosure statement that were filed last night.

10  Ms. Levine talked about one of the conditions, and there are

11  many conditions.  One of them includes that the confirmation

12  order be a final order so that any appeal that is pending on

13  September 30th could jeopardize the state contribution, and

14  that's something retirees should know up front if that's

15  really going to be a condition of receiving it.

16           But even more important -- it's funny because I

17  actually gave some language to Mr. Bennett, and he dutifully

18  put it in, and now I'm going to object to it.  I said that

19  the city should be up front about what cuts would be made if

20  the classes vote against the plan, and he said cuts will be

21  made if you vote against the plan.  Well, what happened in

22  this version is that the cuts became very serious.

23  Originally, the plan provided that the cuts would basically

24  take away the money that was contributed by the state and by

25  the DIA funders.  Now the cuts are greater.  So, in other

1  words, the contribution is figured out at $810 million, not

2  present value, but the value over 20 years of contributions.

3  The cuts now, if the PFRS or the GRS vote against the plan,

4  are a billion one, so, in other words, they're taking away

5  more than the contribution.  They're taking away serious

6  funding from the plans.

7          In addition, these cuts fall much heavier on the

8  GRS.  If the GRS and the PFRS vote against the plan or one of

9  them do, then the GRS will be cut by $700 million.  The PFRS

10  only lose their COLA.  So on one side you have no cuts to

11  pension and COLA, and on the other side you have a 29-percent

12  cut in benefits plus COLA.  So what we need to have is

13  disclosure up front that a vote against the plan for --

14  particularly for GRS is a loss basically of 50 percent of the

15  pensions.

16          The second thing that I want to focus on, which I

17  started talking about this morning, is ASF.  I don't think

18  anybody understands what's happening with ASF.  I don't think

19  Ms. Levine actually even figured out how it plays into the

20  cuts for GRS.  You have a four-percent cut in benefits.  You

21  lose COLA, which is either valued at 13 percent or 14.5

22  percent, depending on how you look at it, and I don't want to

23  get into that.  On top of that, people who contributed to ASF

24  accounts between 2003 and 2013 will lose from their pensions

25  20 percent of the highest amount of their ASF account.  That

1  could be huge for somebody.  If you had a big ASF account and

2  you lose 20 percent of it, you could lose quite a lot of

3  money.  If you had a small account, it could be nothing.  And

4  if you were lucky enough to retire before 2002 and take your

5  money -- or 2003, then you wouldn't have any cut at all.  So

6  there's not any disclosure about how this ASF really works

7  and how it will affect individuals.

8      THE COURT:  Again, I ask do you have language that

9  you'd like included?

10     MS. NEVILLE:  Yes.  We will work with Mr. Bennett,

11 and I really appreciate the fact that he's willing to extend

12 our time for a week to add this because it's really -- it has

13 been developing.  The formula has been developing over the

14 last week.  But I think that what we had asked to put in was

15 the legal basis for this ASF recoupment because it is

16 property of the retiree, and the plan is just taking it away

17 without any litigation, without any reference to the defenses

18 that there are, and we will add language about that.

19     In addition, the justification for this ASF

20 recoupment is the malfeasance of the Retirement System and

21 the board.  And there's not any discussion about any claims

22 that are being released on that side, and this -- in this

23 plan we got the list of released actions, and there was

24 nothing on it about that.  We're concerned that if there are

25 claims and they're not disclosed, they would be released

1　pursuant to Sixth Circuit law, so -- and those are things

2　that I can work out with Mr. Bennett. I'm sure he will be

3　happy to do that.

4　　　　The third issue I have is about the interest rate.

5　This is another thing he was kind enough to put in that I

6　disagreed with his analysis of the interest rate or the

7　city's disagreement, but I think it's important for people to

8　understand that the interest rate on which the assets are

9　valued, the investment rate, is an extremely important thing.

10　Each point -- each percentage point is worth a billion

11　dollars in value, and so when you say you're going to have an

12　investment rate of return fixed at 6.75 and the average of

13　all public pensions is 7.75, you're talking about a billion

14　dollar swing, so we would put in language -- a little bit

15　more language describing the effect of the interest rate.

16　　　　It also may determine how the fiduciaries invest

17　because if you set an investment target, that's the target

18　fiduciaries aim for, so if you're aiming for 7.75, you may

19　have a more vibrant portfolio than you might if you're having

20　a more conservative interest rate.

21　　　　THE COURT: Vibrant, of course, means risky.

22　　　　MS. NEVILLE: Risky, yeah. I know, but, in fact,

23　the pension plans have been doing very well with a very mixed

24　portfolio, and 7.75 is not a particularly high rate. Let's

25　see. I think I have pretty much hit all of the main points.

1  It's OPEB, the notes, ASF, and this new in terrorem, I don't
2  know which part of the body you're aiming -- we're aiming to
3  shoot ourselves in.

4      THE COURT:  I have an issue that I need for you and
5  your colleagues and the committee to think about.  As
6  settlements are being achieved and agreements reached in
7  regard to the treatment of retirement claims, I think it's
8  entirely appropriate to think about at what point the Retiree
9  Committee should declare victory and go home.  Have you
10 thought about that?

11     MS. NEVILLE:  Yes, your Honor, we have.  You know,
12 there's still very many open issues, in particular in OPEB,
13 and we are the really -- the only people who are involved in
14 the OPEB discussion.  There are a number of other issues that
15 are still open.  We're not here to be obstructionists.  We're
16 here to find a good resolution.  There is a real disparity in
17 the treatment between GRS and PFRS.  We'd like to narrow that
18 gap, we'd like to find a good solution for OPEB, and then
19 we'll go home.

20     THE COURT:  All right.

21     MS. NEVILLE:  Thank you, your Honor.

22     THE COURT:  Next we have objections of the Detroit
23 Retirement Systems.

24     MS. DEEBY:  Good afternoon, your Honor.  Shannon
25 Deeby of Clark Hill for the Detroit Retirement Systems.

1   We'll be brief.  As we discussed this morning in connection
2   with the retiree and OPEB solicitation motion, the Systems
3   are very concerned about disclosures related to the releases,
4   the plan injunctions, and the exculpations.  We're also
5   concerned about the uncertainties surrounding the settlement
6   and the risk factors, all of which should be adequately
7   disclosed and which we hope to address in our discussions
8   with the city, our ongoing discussions with respect to the
9   plain language inserts.

10          The only other issue that I would raise, Mr. Bennett
11  requested with respect to the voting tabulation deadline that
12  it be moved to July 22nd, I believe.  There's currently a
13  slight inconsistency between the solicitation procedures
14  order, which sets that deadline for filing the tabulation
15  summary on July 11, and the third amended plan scheduling
16  order, which allows parties to file supplemental plan
17  objections on July 7th based on either discovery or the
18  results of the voting tabulation, so to the extent that you
19  would be moving the voting tabulation date, obviously all the
20  other dates would need to move, but we would request that the
21  plan objection supplementation deadline be moved so that it
22  is after the city files the voting tabulations.  That's all.
23  Thank you, your Honor.

24          THE COURT:  Our final objection is that of Jeffrey
25  S. Romeo.  Is he here or anyone on his behalf?  No?

1          MS. CECCOTTI:  Our objection should show on your

2    list as Docket 3877.  No?

3          THE COURT:  I'm sorry.

4          MS. CECCOTTI:  I believe our objection should show

5    on the docket as Number 3877.

6          THE COURT:  You are correct, and my --

7          MR. BJORK:  As well, your Honor, the National

8    objection.

9          THE COURT:  You are both correct, and I apologize to

10    both of you.

11          MR. BJORK:  Did Bruce Bennett have something to do

12    with it?  I'm just assuming.

13          THE COURT:  I assure you that the answer to that is

14    no.  Ms. Ceccotti, my apologies to you.  You may proceed.

15          MS. CECCOTTI:  And it'll be very brief.  We also

16    stated some concerns about the scope of the release, and

17    you've heard that from many parties.  And I understand now

18    that there is an effort to try to work some of those matters

19    out, and we will work ourselves into that process so that we

20    can see how --

21          THE COURT:  Okay.

22          MS. CECCOTTI:  -- much of this can be clarified.  I

23    think the only other matter, just to update from this

24    morning, we did talk about the Detroit Library issue.  I have

25    given Ms. Lennox some language, so hopefully that's --

1          THE COURT:  Okay.

2          MS. CECCOTTI:  -- on the way to being resolved as

3    well.  Thanks.

4          MR. BJORK:  Your Honor, Jeff Bjork for National.

5    Our objections have been covered.  The one point that we will

6    be willing to work with the debtor on in terms of language

7    goes to the pension acceleration, the language around that.

8    I thought Mr. Lemke identified the various issues that we

9    think should go in the disclosure statement, so we'll work

10   with the city on that.

11         THE COURT:  All right.  Thank you.  Is there anyone

12   else that I've overlooked?  All right.  Mr. Bennett, would

13   you like to proceed, or do you need a few minutes -- more

14   minutes to --

15         MR. BRUCE BENNETT:  Your Honor, I'm ready to go, but

16   if you want to take a break right now, that's okay with me.

17         THE COURT:  No.  If you're ready, I'm ready.  Let's

18   do it then.

19         MR. BRUCE BENNETT:  Let me just get to the top, and

20   I'm going to organize kind of in the order we went, and I'll

21   pick up a number of the objections as we go so it'll be

22   shorter when we get to other people.

23         THE COURT:  What I'm most interested in hearing from

24   you is what disclosures have been requested that the city

25   objects to including in the disclosure plan -- in the

1  disclosure statement, although to the extent that you agree

2  to any of the requested disclosures and want to put that on

3  the record, that's fine, too.

4      MR. BRUCE BENNETT:  Okay.  We will try to be as

5  constructive as we possibly can.  Okay.  The first -- I mean

6  the first big topic -- and it was raised by many people --

7  relates to the grand bargain or what I'll call comprehensive

8  settlement relating to the DIA, and a couple of different

9  points were made in respect to that that I can remember.  If

10 I come upon more later in my notes, I will cover them, but

11 one recurring theme was is that there was inadequate

12 disclosure of values.  Our response to that, your Honor --

13 and, of course, this was discussed at the meet and confer --

14 is that we have disclosed the values that the city has

15 obtained.  The city has not -- we admit that we have not

16 received a valuation of all 60-plus thousand items; that we

17 took a look at the -- at a sample of roughly 35 or 36 or

18 3,700 items that were purchased with city funds, and we

19 believe that that represents a disproportionate part of the

20 value of the collection, but there is no more to disclose.

21 And we don't think it's a defect in the disclosure statement

22 that we did not go out and get the particular kind of

23 valuation that other creditors would like.

24      I can report that there is -- there has been very

25 significant discovery requests relating to the art, and I'm

1  under the impression that a deal on discovery has either been

2  made or is extraordinarily close, so there will be

3  disclosure.  So if other people want to do more valuation

4  work in advance of the confirmation hearing, that's fine, but

5  we think that our disclosure statement submission is

6  adequate.

7         The second point that was raised in a couple places

8  relative to the art was the disclosure relating to this --

9         THE COURT:  Before we go to point number two, would

10  you object to a disclosure in the disclosure statement of the

11  four -- I don't want to call them offers because they weren't

12  really offers -- four statements of interest that various

13  parties made regarding the art that were included in the most

14  recent motion that the Court received relating to the art?

15         MR. BRUCE BENNETT:  Your Honor, I wouldn't object,

16  but I have very -- I have significant reservations, and the

17  reservations are as follows.  We know nothing -- or we know

18  very little -- we know a little about the process that

19  resulted in those indications of interest.  We do know they

20  are nonbinding and, notwithstanding nonbinding, are,

21  nevertheless, significantly conditioned.  And so

22  ordinarily -- at least I think the fair majority of cases

23  would discount those as indications of true value rather

24  considerably in light of their own limitations, so I

25  suppose --

1          THE COURT:  And I don't --

2          MR. BRUCE BENNETT:  -- that that would --

3          THE COURT:  And I don't make the suggestion in the

4   context of a dispute as to your value but only in the context

5   of something that has happened in the course of the case.

6          MR. BRUCE BENNETT:  We can do that.  I think we

7   should -- I think what I would propose to do is have a

8   paragraph reciting the existence of the motion, that in the

9   motion there were made representations concerning these

10  nonbinding indications of interest that are, nevertheless,

11  conditional and probably put a few more qualifying words not

12  because I'm concerned, your Honor, that your Honor or very

13  many people in this courtroom would be misled.  I don't think

14  that they would be, but this is going to have a very broad

15  dissemination of a document, and there's a great tendency in

16  our society for people to focus on a number and kind of

17  ignore the qualifications related to it.  So why don't we

18  put -- why don't we put in a section of events during the

19  Chapter 9 case, you know, properly indicating its source, its

20  context, and its limitations?

21          THE COURT:  Thank you.

22          MR. BRUCE BENNETT:  And I think that will resolve

23  the problem.  With respect to the suggestion by FGIC that in

24  addition to the information that is already in the disclosure

25  statement relating to what I've referred to in this courtroom

1  before as the problem of how many sticks in the bundle does
2  the city really own, the restrictions that may exist
3  restricting dispositions of art, restricting use of proceeds
4  from dispositions of art, whether, as a collection -- on the
5  collection as a whole or pieces of the collection pursuant to
6  particular donor restricted instruments, we've said that.
7  We've said that's out there.  What was requested by FGIC
8  is -- and others is more, and what they have requested
9  essentially is two things, a brief on, you know, what the
10 city thinks the law is in connection with this and how the
11 city actually came out with respect to those legal issues in
12 making the settlement.  And while I believe that those are
13 appropriate briefing questions -- and I know that your Honor
14 will expect briefing on this subject in connection with
15 confirmation -- I don't think they're appropriate disclosure
16 statement topics.  I think, number one, it would be just our
17 argument, and I will also tell your Honor that when we end --
18 when we finish, it's going to say something to the effect of
19 this is a godforsaken mess, and that's why we're settling it,
20 and so it would expand the disclosure statement with a lot of
21 technical legal argument that, quite frankly, very few people
22 will be interested in.  Those who are interested in it will
23 get it because it will clearly be a subject of briefing in
24 advance of plan confirmation.  So we think what we've done --
25 we've certainly put the facts in.  We've said -- the facts

1    are there.  The contentions are there.  There's a risk factor

2    that explains the possibility that it would not be approved.

3    We think that's adequate disclosure for purposes of the

4    disclosure statement.

5         With respect to Oakland and their objections or -- I

6    think they said they'll work it out in another forum.  I

7    think it's appropriate to advise the Court that Oakland is

8    only a party to an executory contract that is going to be

9    assumed under the plan, and so I'm not sure that they have

10   standing or even that we should be concerned about disclosure

11   needs that they may have.  It's, I think, in a different

12   context.

13        THE COURT:  So the plan specifically provides for

14   the assumption of the contract?

15        MR. BRUCE BENNETT:  The plan provides for the

16   assumption of all contracts except those scheduled.  I don't

17   know that that schedule has been completed, but I am prepared

18   to tell your Honor that Oakland, Macomb's, and Wayne

19   County's -- the DWSD contracts are not being rejected, so

20   they will be assumed.

21        I think the -- and if I skip a topic, your Honor,

22   things I need to address -- the next one, again, raised by

23   many, many people, at least on my list, is the disclosure

24   that remains in the disclosure statement concerning the

25   city's search for some form of public-private partnership,

1  and, again, this was a subject discussed extensively during

2  the meet and confer proceeding here.  The city actually

3  disclosed what it regards as the truth, open paren one, until

4  this morning, and your Honor ordered mediation, and I suppose

5  that that will go into the disclosure statement someplace.

6  The city believed that an authority deal, a GLWA deal was, in

7  fact, dead and would not be consummated within the time frame

8  relevant for this process.  The city does not have the same

9  views with respect to a public-private partnership-type

10 structure, and so we then had to wrestle with given that

11 there is a genuine view that that is a possibility within the

12 time frame that we're talking about between now and

13 confirmation of a plan, we then had to decide what is it that

14 we can disclose that would be truthful and helpful but not

15 misleading, and we think we did that.  Here again, we have

16 nonbinding, highly conditional indications of interest, and

17 so we thought that here -- and they were also not apples to

18 oranges completely comparable, so we thought here disclosure

19 of the particulars of those indications of interest would not

20 be helpful either to creditors or to the marketing process

21 that is ongoing right now, but we did say we are exploring

22 this, which is 100-percent true, and we did set out the

23 timeline so that people would know what we -- how we thought

24 this process would develop as we stand here today.  It would

25 not be fully truthful to strike that.  I don't understand why

1  people want to strike as much disclosure as we can make about

2  this.  I think people should understand that this is in the

3  works.

4          Now, as to assertions about what is the significance

5  of this going forward to the plan, there is a very wide

6  range.  One of those -- one of the possibilities is nothing

7  whatsoever.  There are some of the private -- public-private

8  partnership-type structures which are management-type

9  arrangements, which would not change the DWSD debt.  They

10 would not change the distributions.  They would not change

11 anything that would be in the plan.  There are admittedly

12 other kinds of potential public-private partnership

13 transactions that might require adjustments to the plan, and

14 I think our answer to that is as soon as we get there,

15 everyone is going to find out about it.  If something has to

16 happen -- well, first of all, if something economically

17 interesting enough to cause us to change something under the

18 plan, number one, it's going to be beneficial, not harmful.

19 Otherwise we wouldn't do it.  And, number two, there will be

20 appropriate notice, appropriate amendments, and appropriate

21 disclosure.  We're just not there yet, but as soon as we do

22 get there, we will make those steps if they are required, and

23 so the only qualification to -- one of the people up here

24 said, "Well, if they did this, all kinds of things would be

25 required."  My response to that is, yes, they might be, but

1    it's very important to remember they might not.  So I think

2    under the circumstances as they actually are, the disclosure

3    and the disclosure statement is both -- is not only adequate,

4    it's complete to the extent that we can disclose things that

5    are meaningful and not, in and of themselves, potentially

6    misleading.

7         The second major DWSD issue regards the so-called

8    prefunding question.  First, let me confirm on the record

9    that it is -- as I said on the meet and confer call, although

10   I'm going to make it even better for people, the number is

11   not 675.  It's going down.  On the conference call I said the

12   number would be 550 or less.  I am here today to say that the

13   number will be 500 million or less, and so the number is

14   trending down.

15        What is the number?  I think I'm going to cover many

16   different things together here, and then we'll unpack them.

17   One objector asked for the past five years of actual

18   contributions by DWSD to the GRS pension fund.  We believe we

19   have that information.  We are going to include it.  I don't

20   know how meaningful it is.  One of the reasons I don't know

21   how meaningful it is to anyone is that it may well be the

22   case -- and I'll even say it is probably likely the case --

23   that to the same extent that the city wasn't adequately

24   paying as it goes making contributions to the pension plan on

25   account of general funds, it probably wasn't paying as it

1   goes with respect to the DWSD deposits either.  That will be

2   looked at.

3        The significance of that is that you've heard a lot

4   of people come up here and say, well, all of a sudden this is

5   the city putting more money ahead of bondholders under -- and

6   I don't know that they necessarily identified it this way,

7   but it is under the operation and maintenance carveout from

8   the liens and from the distribution mechanisms under the DWSD

9   bonds.  And so a situation that we might have historically is

10  that not enough was paid out and that there may have been

11  more room or the ability to pay more, and for whatever

12  reasons DWSD didn't pay a hundred percent of the then current

13  benefit load as people were performing services.

14       Going forward, we can make an estimate -- I don't

15  think we have a final one, and the number keeps moving

16  around -- of the extent of -- in a very rough sense, DWSD's

17  share of the underfunding in the existing pension plans

18  without giving any consideration to any modifications that

19  might occur as a result of settlements or what's going on in

20  the plan.  That's going to be a number.  The number that

21  we're talking about, however, for the accelerated

22  contribution is, in fact, the estimate of the DWSD share of

23  the underfunded portion after the benefit adjustments under

24  the plan are made.  So a point that we've made --

25       THE COURT:  Does the disclosure statement say that?

1      MR. BRUCE BENNETT:  The disclosure statement does

2  not say that.  We can put that into the disclosure statement,

3  that sentence.  My suspicion is that sentence might turn into

4  a paragraph by the time the actuaries are through with it,

5  but that is a number that will be based upon many

6  assumptions, which people will have debates about and which

7  I'm sure people have already had debates about.  The point --

8      THE COURT:  It's important to disclose those

9  assumptions, too.

10      MR. BRUCE BENNETT:  Exactly.  That's what I said.  A

11  sentence may well turn into a paragraph.  The other point I

12  want to make though, and the reason why I go through this so

13  that everybody understands -- and this is not new to many

14  people behind me but may be new to your Honor -- is that this

15  number, the number -- the DWSD share of underfunding based

16  upon after the modifications is a smaller number than the

17  DWSD number that would exist in the event that none of

18  this -- no modifications occurred.  Accordingly, while in

19  some sense accelerated, the net number viewed over time we

20  viewed properly is smaller, and DWSD as a credit is improving

21  as a result of this.  And it's entire --

22      THE COURT:  Why is the word "accelerated" used?

23      MR. BRUCE BENNETT:  Pardon?

24      THE COURT:  Why is the word "accelerated" used?

25      MR. BRUCE BENNETT:  Because it's -- I suppose --

1          THE COURT:  It feels like more of a catch-up than

2    an --

3          MR. BRUCE BENNETT:  I was going to get there.

4          THE COURT:  -- a past liability than an acceleration

5    of a future liability.

6          MR. BRUCE BENNETT:  It is a -- it is potentially a

7    combination of both, so you're right.  To call it an

8    acceleration is to apply a conclusion that may not

9    necessarily be warranted.  It is -- and to us it is an

10   appropriate -- and here's another important part -- legally

11   appropriate method of capturing a DWSD contribution in

12   respect of existing unfunded portion whether that unfunded

13   portion arised as -- arose as a result of historical under-

14   contributions or whether the underfunding arose from

15   something else like annuity savings or other kinds of things.

16         THE COURT:  Well, if the adjective "accelerated" is

17   not an accurate adjective, please don't use it.

18         MR. BRUCE BENNETT:  Okay.  We will neutrally --

19         THE COURT:  Find another one or don't use one.

20         MR. BRUCE BENNETT:  We will neutrally

21   characterize -- "accelerated" is a word that's been in the

22   room, but we will neutrally characterize the number.  Okay.

23   So, number one, we will disclose the number.  I don't think

24   there's any further -- and we will disclose a -- we will

25   qualify what the number is, what the calculation represents.

1    We will state that in some way with appropriate

2    qualifications.  If there really is a need for us to put the

3    number in the disclosure statement, not the plan, relating to

4    the DWSD section, I have no problem with that, but it doesn't

5    seem like anyone has really had difficulty finding it, but we

6    can do that.

7               THE COURT:  Do it anyway.

8               MR. BRUCE BENNETT:  Okay.  So we will put it in two

9    places.

10              THE COURT:  Yes.

11              MR. BRUCE BENNETT:  But I don't think we're going to

12   go further and discuss the pros and cons and details.  We've

13   said in the risk factor -- we added the risk factor in

14   response to some of this dialogue that we understand that --

15   I don't remember the exact words -- that people may object to

16   this and that it will be -- and it may well be determined

17   that it's not appropriate.  If it's not appropriate, a lot of

18   things in the plan has to change.  Okay.  The rate

19   stabilization -- did your Honor have any more questions

20   before I move off of that one?  Okay.

21              With respect to rate stabilization plan -- that's

22   the retail rate stabilization plan -- that actually hasn't

23   been developed yet, so there is nothing to disclose.  I think

24   the topics --

25              THE COURT:  Well, you can disclose what the purpose

1  of it is that the city is contemplating --

2          MR. BRUCE BENNETT:  Okay.  I think it's focused --

3          THE COURT:  -- at the same time you disclose that

4  the plan itself has not been developed.

5          MR. BRUCE BENNETT:  Okay.  I think it's focused on

6  low income customers, but I will --

7          THE COURT:  Whatever it is.

8          MR. BRUCE BENNETT:  I'll get a sentence.  Okay.  I

9  think I said -- but just as great as clarity as possible, any

10  public-private partnership that the city decides to do, of

11  course, has to comply with applicable law.  We don't think

12  that we need to disclose that.  It's the truth.

13          THE COURT:  Well, but I think the -- I think the

14  issue there was a little more subtle.  What I heard was

15  whether this or some rate adjustments associated with it

16  require compliance by law with certain conditions, including

17  perhaps referendum, should that be disclosed as a risk

18  factor.

19          MR. BRUCE BENNETT:  Okay.  The referendum point

20  deals with newly issued debt under the plan.  It doesn't deal

21  with this particular question.

22          THE COURT:  Okay.

23          MR. BRUCE BENNETT:  But I don't have a problem with

24  a general risk factor that says that there are many

25  transactions contemplated in the plan which will have to

1    comply with state law and that if any don't, material

2    revisions might be necessary.  That would be --

3              THE COURT:  All right.

4              MR. BRUCE BENNETT:  I think it goes without saying,

5    but I think we can say that nevertheless.  It is clearly our

6    intent to comply with state law where it's applicable.

7              I think with respect to Assured's objections, I've

8    covered them all.  The five years of history will be the

9    actual payments, not our estimate of what they should be paid

10   because that's much more complicated, and it will also not be

11   our estimates of what the UAAL was or the underfunded --

12             THE COURT:  Right.

13             MR. BRUCE BENNETT:  -- portion in all five years.

14   That's a bit more complex for this.  Also, we do not have --

15   we did not -- well, we actually do have calculations about

16   the value of elimination of the call protection, which is, of

17   course, the option that we were talking -- we have the rate

18   reduction is the primary approach because that's, of course,

19   what 1129 contemplates as a direct way to deal with

20   overmarket debt.  The elimination of call protection we view

21   as an economically not quite as good but pretty equivalent to

22   the city because it gives it the opportunity to go into the

23   market and achieve the result that it would have to achieve

24   in the courtroom.  We have numbers about what the difference

25   is or, you know, what we think would happen if there -- but,

1   once again, they are projections.  They are filled with

2   assumptions.  We don't think they're meaningful, and,

3   frankly, they have nothing to do with the question.  The only

4   part of that part of the plan that we intend to seek cramdown

5   on is with respect to the basic 1129(b) treatment of

6   oversecured debt, and we had -- do not plan -- the option is

7   totally voluntary.  No person is going to be forced to take

8   it, so we feel no obligation to disclose what the city thinks

9   it might achieve in terms of savings as a result of the call

10  protection election.  I think everyone should make their own

11  calculations and decide what choices they want to make, so we

12  would not --

13          THE COURT:  Hold on there.  If a bondholder does not

14  make the election --

15          MR. BRUCE BENNETT:  Um-hmm.

16          THE COURT:  -- is the interest rate the contract

17  rate?

18          MR. BRUCE BENNETT:  No.  If the bondholder doesn't

19  make the election, it's that curve, which I'm going to get to

20  the background of the curve.  It's the list of rates on the

21  exhibit, which is the city's estimate of what the correct

22  market rate would be so that under 1129(b) the discounted

23  value of payments --

24          THE COURT:  Okay.  But is there a disclosure of how

25  the city determined those market rates?

1    MR. BRUCE BENNETT:  There isn't, your Honor.  It's a

2  proposal, and we know we have to defend that they are market

3  against the different kinds of curves that you can make from

4  literally hundreds of credits.  And I understand that the

5  objectors say that they can't figure out exactly what curve

6  we used, and I don't think we used someone else's curve.  I

7  think there was an effort to very carefully figure out what

8  the credit of the city's DWSD department would look like

9  after reorganization and stabilization, which is, of course,

10  what the cases look to.  They didn't pick single A --

11    THE COURT:  I think they're entitled to two or three

12  or four sentences describing the methodology as to how those

13  market rates were arrived at.

14    MR. BRUCE BENNETT:  Okay.  Would it be adequate if

15  we said it's based generally on and gave a list of factors

16  that said it was -- you know, that it was certain A-rated --

17  it's really somewhere between A's and BBB's, and I don't know

18  that we would -- that I can get further than that.

19    THE COURT:  Yes.

20    MR. BRUCE BENNETT:  I would -- okay.  So that's what

21  we'll do.  We'll give you a list of the factors that were

22  consulted in preparing the chart.

23    THE COURT:  Unless there was a more specific formula

24  that was used.

25    MR. BRUCE BENNETT:  There wasn't.  It's not -- it

1  wasn't a formula.

2         THE COURT:  All right.

3         MR. BRUCE BENNETT:  I don't think it was a formula.

4  And once again, we set forth the numbers.  I mean the target

5  is there.  Everyone can look at the number, make their own

6  evaluation that -- if they think it's market rate.  If they

7  don't, they're going to come and say it's something

8  different.

9         THE COURT: All right.

10        MR. BRUCE BENNETT:  I really don't know that we're

11 going to add to anyone else's analysis, but we'll add a

12 little background.  Okay.  Syncora.  I think here, in light

13 of the fact that -- I think the debtor has a continuing

14 feeling that the Syncora objection to the disclosure

15 statement and the process is wholly intended to create

16 another issue for appeal, and the reason I get this feeling

17 is because at least in this part of the case --

18        THE COURT:  I'm going to -- I'm going to cut you

19 off --

20        MR. BRUCE BENNETT:  Okay.

21        THE COURT:  -- because I'm not interested in that.

22 I'm just interested in what are their objections and what is

23 your response to their objections to the disclosure

24 statement.

25        MR. BRUCE BENNETT:  Well, the fact of the matter is,

1  your Honor, when your Honor goes back and reads their
2  papers -- and I urge you to do so -- you will find that they
3  are incredibly qualitative.  And what Syncora has never done
4  has been to propose a single markup or additional paragraph
5  or a series of sentences with blanks where they really don't
6  need -- know something and they want to fill in.  They have
7  continued to repeat the same very generalized list of more
8  about this, more about that, more about this, more about
9  that, without actually, unlike many other people, coming
10  to -- grappling with the real issue of what do we do with
11  this disclosure statement and which language do we need to
12  change.  And Mr. Bennett preceded me and said that they want
13  still more opportunities between now and the 30th to make
14  additional objections, and I would ask, your Honor, if you
15  want to make sure that we have a really solid record as to
16  what happened here is, at least in the case of Syncora --
17  mostly everyone else has volunteered -- to ask Syncora to --
18  basically this time I want inserts, I want markups, whether
19  they be filed with the court so that it's crystal clear what
20  they've done or they just send them to me and that --
21  because, frankly, I'd like to get these problems resolved.  I
22  would like to make every disclosure Syncora really wants in a
23  way that gets to the end and we can say, yes, we got to all
24  of them as opposed to they've got these generalized concerns
25  that we manage never to satisfy notwithstanding how many

 1  hours are applied to them, and so that's what I would have

 2  with respect to Syncora.  I have no specific suggestions as

 3  to how to resolve their problems because I've got really no

 4  specifics about exactly what those problems are grounded in

 5  the document that we have proposed.

 6       With respect to Ambac's objections, there are no

 7  blanks in the treatment for Ambac or any other creditor that

 8  is getting B notes.  What there are is a blank in the section

 9  where we estimate what the value of the distribution is.  And

10  the -- a couple of things.  When Ambac stood up, they

11  correctly stated that B notes are shared effectively pro rata

12  among four separate -- what are now four separate classes.  I

13  will say now that we're absolutely aware of the fact that

14  those four classes share exactly the same thing, and we are

15  very seriously thinking about collapsing them into one class

16  so that this is -- so the plan gets simpler, you know, one

17  step further, and we say explicitly what is already

18  effectively said in the plan document itself, and we'll

19  figure that out sometime in the next week.

20       There is, as there is in many cases involving a pot

21  plan -- and this is kind of a pot plan with respect to the B

22  notes -- issues with respect to the size of the claims that

23  go against it.  This is actually not an issue so much with

24  the Ambac claim.  It is, of course, an issue with the COPs.

25  Your Honor heard that there continues to be controversy

1   concerning the appropriate calculation of the allowable

2   amount of the OPEB claim.  I'd like to think and hope that

3   we're making progress on that and that we will have a number

4   that we're prepared to support.  And, of course, there is

5   some variability with respect to other unsecureds.  This is

6   unavoidable.  It is dealt with in many cases.  It will be

7   dealt with in the forthcoming amendment to the disclosure

8   statement by some form of range, range of recoveries based

9   upon assumptions that we will spell out in footnotes for

10  where the low is and where the high is.

11          As to putting on a value, it is no secret to, again,

12  any person in the room that when we value the B notes for

13  other purposes, it's a five-percent interest rate that we

14  assume to be at par, which meant that we assume the

15  appropriate rate was five percent.  It is well within the

16  capabilities of everyone who will participate in B notes to

17  apply a different discount rate if they think a discount --

18  different discount rate is appropriate.  I don't think we

19  have a view as to exactly what discount rate will be

20  applicable, and, of course, it'll vary over time, hopefully

21  getting smaller as the city recovers, but I think we're

22  providing absolutely adequate information and, when I add the

23  range, more than adequate information concerning that kind of

24  recovery commensurate with what is seen in many other

25  bankruptcy cases.

1   THE COURT:  Does the disclosure statement say or

2 would you agree that it should say what you just told me,

3 that the city believes that at five percent the notes are

4 valued at par?

5   MR. BRUCE BENNETT:  Oh, at five percent is just a

6 syllogism.  They are par.  We would definitely say that.  If

7 the discount rate is equal to the interest rate, they're

8 valued at par.  We have no problem saying it.  It's also

9 always true.

10   With EEPK, same issue.  We've had a due process

11 objection from them going on.  I think we may have -- I think

12 I may have covered everything.  We discussed asset value.  We

13 discussed the B note.  We can add a risk factor with respect

14 to the B note that says it may not trade at par, and I think

15 that would be a good thing to do under the circumstances with

16 respect to the EEPK definitions.

17   We've talked -- with respect to the DWS ad hoc

18 committee, we've talked about the public-private

19 partnerships.  We've talked about the so-called priming

20 amount issue.  So I think we've got that.  I think we've

21 covered all of those.

22   With respect to the police associations, that

23 settlements be -- that the settlement be -- with one group of

24 police associations that haven't yet joined onto the

25 settlement, they've asked that the settlement be fully

1    disclosed.  Frankly, I think that particular settlement is

2    all there.

3            There were several people who talked about the

4    state -- the disclosure of the state contribution agreement.

5    It's actually an exhibit to the plan.  I wrote it down at one

6    point, but I've lost the reference.  If anyone is having

7    trouble finding it, please see me after the session.  It's

8    actually in there.

9            With respect to the conditions to the DIA/foundation

10   agreement, that's still at a term sheet stage.  There's ample

11   disclosure of that in the disclosure statement.  I don't

12   think there's an issue there.  We've covered the B note.

13           DWSD trustee, we've talked about the -- again, one

14   of their big issues was the up to 500 million in the

15   contribution amount.  They are correct that the actual form

16   of the DWSD bonds are a plan supplement item as they are in

17   mostly every Chapter 11 case I've ever -- or Chapter 9 case

18   actually that I've ever been involved in, so they will be

19   done before the voting deadline.  And, of course, if they

20   don't comply with the requirements imposed on them by the

21   plan, we expect to hear about it.  We'll deal with it then.

22           THE COURT:  When do you expect those to be

23   available?

24           MR. BRUCE BENNETT:  I think the schedule was ten

25   days before the voting deadline.  Is that what we said or --

1  ten days before the voting deadline for the remaining plan

2  supplement documents.  It was the DWSD trustee that raised

3  the issue of the 45-day referendum.  I think the most we can

4  do about that -- I think we don't think that applies, but I

5  think we'll create a risk factor that indicates what's the

6  appropriate section number and that if it's a problem, we'll

7  deal with it then or that it could create a big problem.

8       We covered the brief additional disclosure

9  concerning where the reset chart -- the derivation of the

10  reset chart.  And as to conforming changes between the

11  disclosure statement and the plan, I would definitely like to

12  hear about it if we didn't conform something that has to be

13  conformed, but, of course, there are some things in the

14  disclosure statement that are not in the plan, but we'll work

15  that out for sure sometime during the next week.

16       With respect to the Retiree Committee's comments, we

17  have no problem and, I think, frankly contemplated advancing

18  their date to object to and comment on changes that would

19  impact the special retiree supplement as well as the

20  disclosure statement in chief.

21       The VEBA benefits.  This is raised by many people in

22  the papers.  We think an attractive part of the VEBA is that

23  the trustees of the VEBA are -- which are employee-selected

24  in large part -- that the trustees of the VEBA decide what

25  they want to do, what they should do with the resources that

1  the VEBA has.  And we understand those resources are going to

2  be limited, and they're going to be hard choices.  If there

3  are very specific priorities, guidelines that someone feels

4  strongly about, I'm not sure that it's a good idea to tie the

5  hands of the VEBA trustees.  They're going to have a hard

6  enough job as it is, but if the difference between a

7  settlement and a fight over the VEBA is somebody describing

8  to us sensible terms somehow generally relating to benefits,

9  I suppose we would absolutely consider them.  I'm not sure we

10  have any, so there's nothing to disclose on our side.  If

11  there are other people who have things, they should get in

12  touch in with me and get in touch with me very soon.

13         It was accurate -- is accurate that although the

14  plan condition -- the plan provides that as a matter of the

15  city's view of the plan effective date, our limitation is is

16  that there be a confirmation order that is entered and that

17  order is not stayed, so we -- the city would absolutely be

18  prepared to consummate over a pending appeal so long as the

19  confirmation order is not stayed.  We'll obviously look at

20  what is actually filed and make a final decision then.  It's

21  not a, you know, absolutely final thing, but that's, I think,

22  our bias.

23         The state has a different view, and so their

24  agreement has a more restrictive condition.  I think it's

25  disclosed because people figured it out.  I mean I suppose we

1 can have one sentence at the end of the -- at the --

2 somewhere near the disclosure of the conditions to the

3 effective date that the plan itself imposes and indicate that

4 there are conditions to other agreements that would be

5 effective upon an effective date that might also have to be

6 satisfied that might be different, and that's about all I

7 think we would need to do --

8         THE COURT:  Okay.

9         MR. BRUCE BENNETT:  -- and I think we could cover

10 that base.  Then the Retiree Committee said why does the

11 number -- the benefit loss go to 1.1 billion if the grand

12 bargain, which is 800-plus million, doesn't happen.  There

13 are two very easy responses to this, and, again, we can add

14 one sentence on each, but these are two fairly complicated

15 areas, and these sentences could turn into a page, so I'm

16 inclined not to do it at all.  One is that funding doesn't

17 equal benefits because, remember, inside of these beasts

18 there's an investment return, and so that's part of it.

19 They're not actually the same number.  They don't -- you

20 know, a funding amount at a particular year doesn't equal a

21 benefit in a future year.  The second is is that the -- one

22 of the reasons why the DWSD payment note -- I didn't say

23 accelerated or decelerated -- payment is we believe a fully

24 lawful approach is that DWSD by making that payment becomes

25 relieved of further contribution obligations as long as

1   certain things don't change, and so the reality is the only

2   circumstances where you can say that that's true is

3   circumstances where the other money comes in as well because

4   other money -- the DWSD money comes in in the first ten years

5   as opposed to, you know, ten years plus some time, and other

6   monies come in over a 20-year period of time.  And so part of

7   the -- I don't -- I never looked at the exact calculation,

8   and I've never seen a bridge between the contribution amount

9   and the 1.1 billion, but a part of it could well be that you

10   can't do some of the things that you're doing at DWSD if you

11   don't have the grand bargain either.  The bottom line is I

12   think, though, the most important disclosure point is is that

13   the -- trying to tie the 860 to the 1.1 billion, they don't

14   tie because they're not supposed to.  And I think that's the

15   most direct answer to the concern, and I would like to leave

16   it at that.  By the way, in our documents we don't tie them,

17   and we don't say that they do tie.  We just present what we

18   believe are the appropriate calculated numbers.  Annuity

19   savings.

20          THE COURT:  I'd like you to give me two sentences

21   summarizing what you just said in the disclosure statement.

22          MR. BRUCE BENNETT:  Okay.  We'll try.

23          THE COURT:  Short sentences.

24          MR. BRUCE BENNETT:  We'll try.  Annuity savings.

25   This is, of course, a new provision of the plan, and there is

1  a tremendous amount of disclosure regarding annuity savings
2  and regarding what happened in annuity savings in the pre-
3  petition events and the discussion of the pension funds and
4  why they're underfunded, and we know people hate recounting
5  this story.  The problem, of course, with the annuity savings
6  plans is that the benefits paid or the interest rates paid on
7  these contributions that were made bore no relationship to
8  and always either equalled or exceeded but were never worse
9  than the projections and actual results that the city
10  actually achieved, so they got more than they should have
11  gotten in a lot of years that were okay years for the city.
12  They got returns when there were losses.  All kinds of things
13  happened in annuity savings that ultimately caused a funding
14  deficit to increase.  We say that very clearly.  That is the
15  basis for undoing it.  It was, in the city's view, an unfair
16  and illegal diversion of pension fund assets.  The reason for
17  having an ASF term in the plan is because by remedying 20
18  percent plus or minus of the over-credits reduces the need to
19  reduce benefits.  It's one of the reasons why the good news
20  of shrinking the size of absolute cuts based on current
21  benefits was possible is because of the -- of what I'll call
22  the ASF reallocation.
23          THE COURT:  How much is it?
24          MR. BRUCE BENNETT:  The 20 percent that's being
25  reallocated is $239 million.

1          THE COURT:  How was 20 percent determined?

2          MR. BRUCE BENNETT:  It's the product of

3    negotiations, your Honor.  I don't think that there was a --

4    I don't know --

5          THE COURT:  Negotiations between who?

6          MR. BRUCE BENNETT:  Excuse me, your Honor.  Your

7    Honor, I think the best answer for that for the time being is

8    retiree representatives in mediation.  Yes, there's a lot of

9    money in this category.

10         THE COURT:  Is that amount of money disclosed in the

11   disclosure statement?

12         MR. BRUCE BENNETT:  I don't think the 239 is

13   separately disclosed, but I have no problem with disclosing

14   it.  The overall amount of --

15         THE COURT:  The methodology by which that number or

16   the percentage was arrived at, is that disclosed?

17         MR. BRUCE BENNETT:  No.  It was the -- that it's 20

18   percent I think is disclosed.  All of the numbers relating to

19   annuity savings and the damage it did to funding -- again,

20   city estimates -- they are all in the disclosure statement.

21         THE COURT:  No.  My question wasn't precise enough.

22   Is the fact that this number, this 20 percent, was the result

23   of a negotiation disclosed?

24         MR. BRUCE BENNETT:  Not explicitly.  It's implicit.

25   I have no problem explicitly disclosing that it was a result

1  of the negotiation.

2          THE COURT:  And among whom?

3          MR. BRUCE BENNETT:  Probably not today, but --

4          THE COURT:  Well, I don't need to know now, but it

5  needs to be in the disclosure statement.

6          MR. BRUCE BENNETT:  Okay.  Okay.  With the

7  Retirement Systems, I don't actually remember a lot of

8  comments from them previously, and today their comments were

9  also very qualitative and, frankly, therefore, unhelpful in

10 terms of grinding out a disclosure statement that would be

11 appropriate for solicitation.  I would invite them, if they

12 do have -- like Syncora, if they have a specific problem that

13 they want us to address, could they please mark up the

14 relevant pages of the disclosure statement or give us

15 proposed language?

16          As to the UAW, I want to say something out of

17 school.  I think the UAW gets the reward for quality of

18 comments made to the disclosure statement.  I know I shocked

19 their lawyer and everyone else on the phone when I said we're

20 accepting all of it.  I think we did, so -- but she didn't

21 object to the ones that I accepted, so --

22          MS. CECCOTTI:  I have one more.  I'm waiting

23 patiently.

24          MR. BRUCE BENNETT:  Next time I'm going to accept

25 with the express condition that there are no more, but I

1   didn't do that before.  So, in any event, I think I've

2   covered all of them.  I think I've covered all of the topics.

3   I don't think there are major changes; that we can easily get

4   them in before Friday.

5           THE COURT:  Stand by while I see if I have any more

6   questions for you.

7           MR. BRUCE BENNETT:  Okay.  I'll deal with that.

8           THE COURT:  Something further, sir?

9           MR. BRUCE BENNETT:  Yes.  Disclosures relating to

10  the $150 million DWSD bond issue that your Honor may not have

11  picked up yet.  There is a need -- there's a capital project

12  ongoing and a need for funding at DWSD -- actually, it's on

13  the sewer side -- that they have to raise some money by July

14  1st of this year.  We will be coming to you with a motion or

15  at the very minimum a pleading giving people an opportunity

16  to object -- we can't imagine what the objections will be,

17  but maybe there will be some -- to do a small -- roughly $150

18  million sewer offering, senior first lien debt, for this

19  purpose during the bankruptcy case under Bankruptcy Code

20  Section 364.  It's not a plan term in any way.  I don't

21  remember -- and I'm going to look to Mr. Wilson of whether we

22  mentioned it in the disclosure statement that we're doing

23  it -- yeah.  I think we mentioned we were doing it, but I

24  think that's about all we think we need to do.  It has

25  nothing to do with the plan.  That debt will be -- sail

1    straight through confirmation.  It will actually have a
2    maturity longer than confirmation, so we regard that as
3    completely distinct.  It's happening, but it's not part of
4    the plan.  I'm sorry I missed it.  Okay.  I have -- unless
5    your Honor has more points --
6                THE COURT:  No.
7                MR. BRUCE BENNETT:  There were some comments made
8    about dates.  Let me, again, try to help.  With respect to
9    the multiple dates in the -- when there's the same deadline
10   for A, B, C, it's actually in two places.  It's paragraph 11
11   of your Honor -- the former May 1 deadline that would become
12   a May 12 deadline, the June 30 deadline that will become a
13   July 11th deadline, and the July 11th deadline that will
14   become a July 22nd deadline, we meant them to apply to all
15   the different numbers -- all the letters even if I did not
16   mention them.  And also picking up the tabulation date,
17   lining that one up with July 11th I think is --
18               THE COURT:  I wonder if I could just ask you to
19   submit to the Court through the order processing program a
20   proposed third amended -- Chris is saying no.  Chris?  Excuse
21   me one second.
22               MR. BRUCE BENNETT:  I think it's fourth is what
23   you're being told.
24               THE COURT:  Okay.  A fourth amended order
25   establishing deadlines and procedures.

1           MR. BRUCE BENNETT:  Okay.  And I'll put the ones

2     where I have a couple of options in brackets.  Let me just

3     say one other thing about these.  I mentioned the deadlines

4     that had to move.  There are other deadlines that I admitted

5     could move.  I think comments out in the hall -- there were

6     people who wanted to move discovery uniformly the same period

7     of time.  The city actually has a different view.  The April

8     25th deadline for complying with timely written discovery

9     requests, which those we assume will be the responses, not

10    all the documents, and the April 26th date on which

11    depositions may commence, the city believes they should stay

12    exactly where they are.  With respect to the times to

13    complete the depositions and expert depositions, there the

14    city is flexible to moving those dates for the ten or eleven

15    days, and so in our markup that's what I will implement, but,

16    your Honor, it is clear that some parties would want

17    extensions of paragraphs 9 and 10 as well.  We just wouldn't

18    propose that.  So we will get that to you no later than the

19    close of business tomorrow.

20          THE COURT:  In your proposed order, let me ask you

21    to put in brackets your proposed date and objecting

22    creditors' proposed dates for any dates that you disagree on.

23          MR. BRUCE BENNETT:  Okay.  I will do that.

24          THE COURT:  All right.  Anything further?  It is.

25    All right.  It's obviously not for the Court at this stage to

1  give final approval to a disclosure statement since we are

2  advised that there will be an amended disclosure statement

3  here filed soon.  Nevertheless, it is appropriate for the

4  Court to rule on the adequacy of what is in the disclosure

5  statement with the understanding that following disclosure

6  statements or subsequent disclosure statements will disclose

7  not less than what's in the present disclosure statement but

8  more.  With that understanding, the Court will overrule the

9  objections to the disclosure statement that have been filed

10  except to the extent that the city has agreed to make

11  additions and except to the extent that the Court has asked

12  the city to make more disclosures and it has agreed.  And so

13  I think we have made substantial progress today, and I hope

14  and expect that with the next round, as it has been outlined

15  here today, we can have final approval of the disclosure

16  statement that will accompany the city's solicitation.

17          Let's turn our attention then to the status

18  conference.

19          MS. CECCOTTI:  Your Honor, I wonder if I might just

20  ask the Court for a couple of clarifications regarding the

21  colloquy regarding the dates.

22          THE COURT:  Oh, okay.

23          MS. CECCOTTI:  First --

24          THE COURT:  Let me ask you to stand at the

25  lectern --

1          MS. CECCOTTI:  Of course.

2          THE COURT:  -- for record purposes.

3          MS. CECCOTTI:  Of course.  I'm sorry.  I think there

4    was a suggestion made by Ms. Neville to align the dates for

5    comments regarding the main -- the new main document and the

6    newly filed plain insert and other solicitations.  If your

7    Honor is inclined to accept that, would we still need the

8    21st -- the hearing for the 21st at 11?  It seems if your

9    Honor is inclined to go along with that, we would not need

10   that date for that purpose.

11         THE COURT:  I don't know.  Do you have a view on

12   this?

13         MR. BRUCE BENNETT:  Your Honor, if you push that

14   back to coincide with the 30th, it wouldn't be a problem for

15   us at all.

16         MS. CECCOTTI:  Okay.

17         MR. BRUCE BENNETT:  Your ruling and that.

18         THE COURT:  Okay.

19         MR. BRUCE BENNETT:  We can wait on both.

20         MS. CECCOTTI:  It makes -- yeah.  It seems to make a

21   lot of sense.  And, second, I just wasn't clear on

22   Mr. Bennett's comment on the April 25th deadline to comply

23   with written discovery requests.  Are you saying you would --

24   your proposed new schedule would leave that date?

25         MR. BRUCE BENNETT:  Yes.

1          MS. CECCOTTI:  Okay.  We would -- we agree with some
2     of the other parties that at least a short extension --
3          THE COURT:  Okay.
4          MS. CECCOTTI:  -- would be appropriate.
5          THE COURT:  Make your suggestion to Mr. Bennett, and
6     he will include it as an alternative date in this, and I'll
7     make a decision.
8          MS. CECCOTTI:  Thank you very much.
9          MR. HERTZBERG:  Your Honor, Robert Hertzberg, Pepper
10    Hamilton.  I was going to wait until the status conference,
11    but since you're moving the dates now, we have a request in
12    regard to the witness list we filed.  You're moving a date
13    under 11(c) and giving an additional couple weeks.  We need
14    to amend our witness list.  We have three witnesses that we
15    did not have the ability to disclose at the time that the
16    deadline came up, and we're asking permission to amend our
17    witness list.
18         THE COURT:  Can you do that today or tomorrow?
19         MR. HERTZBERG:  As to two of them we absolutely can.
20    As to one witness, the one witness is waiting on his board's
21    approval as to whether he can be a witness at the hearing,
22    and we might need until early next week to add that third
23    witness.
24         THE COURT:  All right.  Add the two you can today or
25    tomorrow --

1          MR. HERTZBERG:  Tomorrow, your Honor.

2          THE COURT:  -- and by Wednesday of next week for the

3     third.

4          MR. HERTZBERG:  Thank you.

5          THE COURT:  Ma'am.

6          MS. CONNOR COHEN:  Thank you, your Honor.  Carol

7     Cohen for Ambac Assurance Corporation.  While we're talking

8     about the schedule, I wanted to ask for the Court's

9     clarification or maybe even to add another date to the

10    schedule.  Right now the date for designation of experts is

11    May 30th and the production of expert reports.  The schedule

12    doesn't have a separate date for disclosing rebuttal experts

13    and proposing rebuttal expert reports.  Since the city has

14    the burden on confirmation, we anticipate that once the city

15    has designated its experts for confirmation on some of the

16    tests that we may have rebuttal, and we weren't quite sure

17    where that should come in the process.  We wanted to suggest

18    perhaps a date be set separately.

19         THE COURT:  Any thoughts on this, Mr. Bennett, Mr.

20    Hertzberg?

21         MR. BRUCE BENNETT:  Fifteen days later would work

22    for us.

23         MS. CONNOR COHEN:  Twenty-one?

24         MR. BRUCE BENNETT:  Pardon?  No.  Fifteen, so --

25         THE COURT:  All right.  Let me ask you all to --

1    MR. BRUCE BENNETT: We'll talk.

2    THE COURT: -- confer regarding this and see what

3    you can work out.

4    MR. BRUCE BENNETT: We'll work on something.

5    THE COURT: All right. Let's turn our attention to

6    the status conference regarding plan confirmation. A lot of

7    what I was going to cover we have already covered by

8    shuffling our dates around. I guess for me there's the one

9    open issue that I raised earlier. Beyond that, I would

10   invite anyone who is willing, given the present state of

11   settlements and assuming there are no material changes to

12   that between now and confirmation, how many days of hearings

13   might be required. And I would be perfectly understanding if

14   no one is willing to make such an estimate in public.

15   Anybody? No. All right. Well, I'm going to keep asking you

16   this. Is there anything that any of you would like to bring

17   up in regard to our preparations for confirmation?

18   MR. HOWELL: I would, your Honor.

19   THE COURT: Yes, sir.

20   MR. HOWELL: Good afternoon, your Honor. Stephen G.

21   Howell, Dickinson Wright, special assistant attorney general,

22   representing the State of Michigan. We just want to discuss

23   briefly discovery. We have a subpoena and a request to

24   produce and an interrogatory or interrogatories that have

25   been served, and we have been attempting to negotiate and

1   narrow the scope.  The scope is extremely broad right now,

2   and so far what we have determined is --

3          THE COURT:  You're talking about parties that have

4   subpoenaed or made interrogatories to --

5          MR. HOWELL:  To the State of Michigan.

6          THE COURT:  -- the state or state representatives?

7          MR. HOWELL:  Yes.  Yes, your Honor.  There's been a

8   subpoena served on the governor, and there have been requests

9   to produce and an interrogatory served on the state.  And so

10  far as we've tried to narrow these down, we have determined

11  we've got hundreds of custodians.  And the last time we did

12  this, which was much narrower, we had 500,000 documents.  We

13  are now, we're told, over two million that our predictive

14  efforts have identified.  So we are trying to work with

15  Syncora to narrow the scope of the requests that we've had.

16  We're going to try to have some discussions as well with the

17  Retiree Committee, but some of the discussions such as all

18  documents relating to funding received by the city from the

19  State of Michigan for the -- for any purpose from the time

20  January 1, 2005, to the present is -- we're trying to narrow

21  that.  It's extremely broad, extremely difficult to respond

22  to.  We've started rolling out some information on revenue

23  sharing that they've asked for, and that's led to questions

24  such as sales tax information back to 1980, which we do not

25  keep records back that far, so -- but we've had some very

1 productive discussions with Syncora, and we're going to
2 continue those. And we've had some today, and given the
3 schedule, we're going to continue those hopefully tomorrow or
4 the next day. But up until this point, the difficulty we're
5 going to have is the 25th is going to be a very difficult, if
6 not impossible date for us to meet on these, but we want to
7 start rolling out what we're getting and what we're finding
8 and producing it, but we would like to ask if it could be
9 accommodated that to the extent that information is needed
10 for state witness depositions, which the city has identified,
11 state witnesses or others, that we ask if those could be
12 scheduled toward the end of the discovery period so that as
13 we roll this out -- and then the period past the 25th it'll
14 take will depend on how successful we are at narrowing, but
15 we have started. We started immediately on putting that
16 together. We have this morning filed a response and some
17 objections, but notwithstanding that, we've communicated to
18 Syncora, and we will communicate and by this appearance
19 communicate to the Retiree Committee that some of those same
20 issues will come up, but we will continue to try to work very
21 actively to narrow it, identify it, and get produced what we
22 can as quickly as we can, your Honor, so that's --

23        THE COURT: Thank you for that. I appreciate your
24 efforts very much.

25        MR. HACKNEY: Your Honor, good afternoon. Stephen

1  Hackney on behalf of Syncora.  I was hoping that I could

2  respond briefly to Mr. Howell's comments and also give you

3  something in the way of a small update on some things and

4  then point out one concern I have.

5          THE COURT:  Sure.

6          MR. HACKNEY:  I do want to thank Mr. Howell and Mr.

7  Flancher and also Mr. Schneider at the State of Michigan.  We

8  have been working together to try and resolve the subpoena,

9  and it broke down a little bit this week.  And I saw them

10  today and said I really would like to find a way to resolve

11  this in a way that balances the state's concerns with our

12  need for information.  I don't want to front-run the

13  objection too much.  I haven't read it yet because I've been

14  here in court today, but it does relate to an important

15  issue, which is state revenue sharing is both important from

16  a historical standpoint in terms of it relates in some part

17  to why the city became in the condition it came in, but it's

18  also going to be important to feasibility going forward,

19  and --

20          THE COURT:  So are you saying that there has been an

21  objection to the subpoena?

22          MR. HACKNEY:  There was an objection filed today,

23  and I told them --

24          THE COURT:  There was.

25          MR. HACKNEY:  -- I want to keep working to resolve

1  it without having to have motion practice before you, but I

2  just wanted -- I wanted you to know that it's on an important

3  issue.  When you're looking at the future of --

4       THE COURT:  Okay.  Well, if you can't resolve it and

5  if you file a motion to compel and request expedited

6  consideration, I will certainly grant that.

7       MR. HACKNEY:  I appreciate that, your Honor, and I

8  have some thoughts for you of that on the end.  I just

9  want --

10      THE COURT:  And, by the way, that's an offer to

11  anyone.  I don't want to encourage motions to compel.  I want

12  you to try to resolve issues among yourselves, but if you

13  need me, I want to be available on an expedited basis because

14  even with this little bit of slippage in our confirmation

15  hearing, it's going to come upon us very soon.

16      MR. HACKNEY:  Yeah.  I appreciate that because I

17  understand what you're trying to do with the schedule.  We've

18  previously given you our thoughts on what the schedule should

19  be.  We accept that those were rejected and the Court imposed

20  the schedule that it wanted to achieve, but we will need to

21  work closely with you to try to resolve things quickly to

22  keep to the schedule.

23           I wanted to tell you separately just in the way of

24  an update that I have also been working with counsel

25  representing the DIA, and I do -- I'm led to believe, based

1　on a conversation with him today, that we may have reached an

2　agreed way forward on the subpoena that we sent to them.  And

3　he and I are --

4　　　　THE COURT:  Excellent.

5　　　　MR. HACKNEY:  -- going to document that.  The last

6　subpoena that I have out there is to Christie's, and I had

7　hoped to speak to them this week, and I still intend to try

8　and achieve a similar outcome.

9　　　　THE COURT:  Thank you.

10　　　　MR. HACKNEY:  Your Honor, there's a big issue in the

11　middle of the schedule that I think that we should talk about

12　now rather than waiting, and it's -- there is an intimate

13　connection between the April 25th date, which is what -- in

14　your order says written discovery shall be completed, and we

15　should talk about what that means exactly because Mr. Bennett

16　actually alluded to that, Mr. Bruce Bennett.  But it's

17　important because after April 30th, right around there -- I'm

18　sorry -- April 25th, on April 26th you can start taking

19　depositions, and that runs through May 30th, and then you

20　disclose --

21　　　　THE COURT:  Right.

22　　　　MR. HACKNEY:  -- your expert reports.  Now, you

23　don't always have to have all the documents to take the

24　depositions, and you can sometimes say, look, you know, these

25　deponents I don't have to wait for document production, so

1    maybe we can try to get them out of the way, and we will

2    absolutely do that.  And I want to represent here to the city

3    that we're here to be smart about whether deps have to wait

4    for docs.  Practically speaking, though, there are some

5    witnesses where you really need to get the document

6    production done before you take their deposition because

7    otherwise there's just such a huge risk that they will be

8    redeposed, and it becomes more inefficient to do it that way.

9              THE COURT:  Right.

10             MR. HACKNEY:  So why is this important?  April 25 to

11   May 30, that's a relatively tight deadline when you have 27,

12   now 30 witnesses from the city, potentially 30(b)(6) topics,

13   on and on, so it has to really work perfectly.  And we're

14   also talking about a potentially relatively large sum of

15   information the city will have to produce.  They've been

16   subjected to very wide-ranging requests, as you might expect,

17   given what goes into proving feasibility when it comes to a

18   municipality as large as Detroit, so they've received broad

19   discovery requests.  They've actually also issued broad

20   discovery requests to a lot of the objectors.  So in a world

21   where even if everyone sort of did comply and actually make

22   these perfect productions and there weren't discovery

23   disputes about, well, what's appropriate and what's the scope

24   of discovery, on and on, even if that world happened, it

25   would still be -- you would be really going to get all the

1  deps done.  You'd have to process that information, work it

2  into your dep outlines to question the witnesses about it and

3  get it all done by May 30.  Separately, though, we heard from

4  the city today somewhat reasonably, I'll say, which is

5  they're assuming April 25th is not the date by which they

6  have complete discovery.  It's the date by which they'll give

7  us their objections and we'll start to talk about scope and

8  production and so on and so forth.  I'm just projecting to

9  you today that I think that there might be some utility to

10  building additional time into the period after April 25th to

11  do one of two things.  The first would be to allow a period

12  for -- the first would be to allow additional time for people

13  to just comply with the document request, point one, but the

14  second would be to allow for a period for expedited

15  resolution of discovery disputes.  So what we could do is we

16  could say April 25 is when your -- I took from your order

17  that you're supposed to be completed, meaning fully produced,

18  but to the extent people aren't --

19          THE COURT:  That is what I meant.

20          MR. HACKNEY:  That's what I thought, but I'm

21  sympathetic to what Mr. Bennett said because the city has

22  gotten a lot of requests, and it would be difficult to comply

23  with all those requests in two weeks, and that's a fact.

24          My idea for your consideration was -- and I am not

25  trying to reargue my prior proposal, but I'm also trying to

1  be realistic about putting on a good trial for you at the end

2  of this.  And what you might consider, your Honor, is if

3  people are not going to fully comply by April 25th either

4  because they've lodged an objection that they don't know

5  won't be sustained or for whatever reason or because they

6  can't physically get the documents out, you know, maybe order

7  a meeting and confer by all parties on Monday, April 28, and

8  set a conference today for Tuesday, April 29, and thrash out

9  the discovery then as quickly as possible and call balls and

10  strikes and then get people to commit when are they going to

11  complete the production because if we don't thrash that out

12  early, I think we're set up for kind of a halting uncertain

13  path forward through the deps.  And remember that the experts

14  are often waiting on the information or the deps to render

15  their opinions, so I'm not trying to create issues.

16       THE COURT:  How about if we just have a hearing on

17  all objections to all productions of documents on Saturday,

18  April 26th?

19       MR. HACKNEY:  That works.  Well, that works.  I mean

20  the only thing that you might consider is that sometimes

21  people are able to work things out once they've seen each

22  other's objections, horse trading and the like.  I mean I've

23  been able to work out subpoenas with the DIA, and I think

24  many people thought that would be a very controversial

25  subpoena.  I haven't yet with the state, but I hope to.  I

1  mean if you work together in these discovery contexts, you

2  can --

3          THE COURT:  All right.  So you can work together

4  over the weekend, and we can have a hearing on the 28th?

5          MR. HACKNEY:  That's fine.  That's fine.  But I did

6  want to -- I just wanted to flag it now because there are

7  experts --

8          THE COURT:  I appreciate that.

9          MR. HACKNEY:  -- out there working, and --

10         THE COURT:  I appreciate that because --

11         MR. HACKNEY:  Okay.

12         THE COURT:  -- you know, you all are much closer to,

13  you know, the on-the-ground challenges as to getting from

14  here to there than I am, and I appreciate that.

15         MR. HACKNEY:  Absolutely.  And that's all I have for

16  today, your Honor.

17         THE COURT:  Mr. Howell has been so eager.  I'm going

18  to let him go next again.

19         MR. HOWELL:  Fine with me, your Honor.  I appreciate

20  that.  Just a couple things.  One, I just wanted to say we've

21  started producing revenue sharing information, so --

22         THE COURT:  I heard you say that.

23         MR. HOWELL:  -- we started doing that.  Pushing the

24  state witnesses back to the end, I was doing that because the

25  order is for June 16 to be the deadline to complete all

1   nonexpert witness depositions, so I was not playing against a

2   May 30 but a June 16 and asking to push back, and we are

3   going -- we are not going to be able to comply with the

4   subpoena from Syncora in front of us presently by the 25th.

5   We're going to do as much as we can before then and keep

6   rolling, and we're going to hope to narrow it down such that

7   we can define it a whole lot better, but that's our goal,

8   your Honor, and thank you for indulging me.

9         THE COURT:  All right.

10        MR. ALBERTS:  Your Honor, I think we all want to

11   keep this on a very fast track.  And as you know, as Mr.

12   Heiman --

13        THE COURT:  You should put your appearance on the

14   record.

15        MR. ALBERTS:  -- has said, we're going to be -- I'm

16   sorry.  Sam Alberts on behalf of the Official Retiree

17   Committee.  And as Mr. Heiman indicated, we will be talking

18   this week, and maybe we will be able to resolve our

19   differences.  Hopefully we will.  But there have been some

20   things that have been included in this plan that took us a

21   little bit off guard and by surprise, and what we would like

22   is the opportunity to supplement our request to the city in

23   very short order for them to provide the documents and answer

24   some questions about it.  I think that is fair given the due

25   process concerns, your Honor, and maybe all of it will become

1    moot, but at the present time it is not.  We would like that

2    opportunity.  We would be very brief in our views.

3              THE COURT:  Like what?

4              MR. ALBERTS:  Like what?  Like, for example, how

5    they have calculated the restoration amounts with respect to

6    retirement -- retirees, which was something that was not in a

7    fashion that we had been discussing with them, such as the

8    ASF issue that has come up, such as some issues concerning

9    the new settlement regarding OPEB and dual trustees, things

10   that we would like to figure out because they have an effect

11   on how we make a recommendation to our members and how we

12   assess the various issues.  So we would like to get them out

13   there.  We would -- we hope we could get them resolved very

14   quickly, but we want to have that opportunity, so if the

15   Court would indulge us and give us, say, until Monday to get

16   them out --

17             THE COURT:  You're going to want new documents every

18   time the city has a new settlement.

19             MR. ALBERTS:  Well, we would like the documents

20   regarding the settlement, and we've asked for them

21   informally.  In fact, we have other requests that we have

22   asked for informally for months now that we haven't gotten.

23   Now, that has been in our prior requests, so hopefully we'll

24   get them now.

25             THE COURT:  All right.  But that's a different

1    question.

2         MR. ALBERTS:  That is a different issue, but this

3    new plan has new aspects to it, and we think that it is fair

4    for us to understand some issues regarding it.

5         THE COURT:  I asked you, "Like what?" and I only got

6    a vague and general answer.

7         MR. ALBERTS:  Well, your Honor, part of the

8    problem --

9         THE COURT:  Identify a specific document you want.

10        MR. ALBERTS:  Part of the problem, your Honor --

11        THE COURT:  Pick one.

12        MR. ALBERTS:  -- is -- well, we would like the

13   settlement agreements that have just been reached.  That

14   would be one that we would like to get.  We would like to

15   understand their calculations regarding the new DWSD.

16        THE COURT:  I asked you to identify a document.

17        MR. ALBERTS:  Part of the problem is, your Honor, we

18   don't know what the document is called.  We know where it

19   might originate from, but we don't know what it is called, so

20   we would also have interrogatory questions about it.  So,

21   your Honor, part of our problem is we received the disclosure

22   statement and plan very late.

23        THE COURT:  You understand that by this logic we

24   will never get to confirmation.

25        MR. ALBERTS:  Your Honor, I think that the city

1  by -- they could have filed this plan two days ago or three

2  days ago.  They chose to file it when they did.  We would

3  like to assess this plan in comparison to what we served by

4  the deadlines.  There are new issues that have been raised.

5         THE COURT:  If you want relief from a deadline that

6  I have set, I'm going to ask you to file a motion for relief.

7         MR. ALBERTS:  Okay.  Thank you, your Honor.

8         THE COURT:  Anybody else have anything to raise?

9         MS. CECCOTTI:  Apologize, your Honor, but my simple

10  request to move the April 25th written discovery deadline

11  got -- I don't know where that is now in the colloquy that

12  just happened with Syncora, so I was going to propose to

13  Mr. Bennett moving that deadline a week.  I don't know now

14  where that is with --

15         THE COURT:  I thought it was resolved by you telling

16  Mr. Bennett what date you wanted, and he would put both in

17  the proposed order, and I would choose one or one in between.

18         MS. CECCOTTI:  Okay.  And just to clarify, by

19  written -- it might influence how much time I have to ask

20  for.

21         THE COURT:  Right.

22         MS. CECCOTTI:  You're including in that the

23  documents as opposed --

24         THE COURT:  Yes.

25         MS. CECCOTTI:  Okay.  That will factor into my date

1  to Mr. Bennett.  Thank you.

2          THE COURT:  And if anyone needs more time than that

3  deadline to actually produce the documents, I expect either a

4  stipulation to that effect or a motion to extend that

5  deadline for that purpose.

6          MR. HERTZBERG:  Your Honor, Robert Hertzberg.  I

7  just want to clarify a point, and I think Mr. Howell did.

8  Mr. Hackney might have been confused.  The May 30th date is

9  the date to name experts.  Depositions are to be completed of

10  nonexpert witnesses by June 16th, so --

11          THE COURT:  Okay.

12          MR. HERTZBERG:  -- it's not the May 30th.

13          THE COURT:  Okay.  Ms. Lennox, something you would

14  like to say?

15          MS. LENNOX:  No.  I just wanted to answer your

16  inquiry, your Honor.

17          THE COURT:  Okay.  Yes.  Now is the time.  Now is

18  the time.  Thank you.

19          MS. LENNOX:  I figured I'd let the scheduling issues

20  go first, but, your Honor --

21          THE COURT:  But excuse me for just one moment.  I'm

22  sorry.  Go ahead.

23          MS. LENNOX:  Thank you, your Honor.  I believe you

24  had asked the city about what our thoughts were about

25  supervision regarding plan implementation after confirmation

1    and the effective date, and that is something that both the
2    city and the state have been giving a lot of thought to in
3    recent times.  And it generated a particular provision in the
4    plan, which is at page 56 of the blackline that we filed
5    yesterday.  It's Section IV-O of the plan, and it's entitled
6    "Post-Effective Date Governance."  And basically what we have
7    now, your Honor, is under the current state law, PA 436, we
8    do currently have a financial advisory board in place, and it
9    was in place pre-petition.

10             THE COURT:  And remind me who that consists of and
11    who appoints them.

12             MS. LENNOX:  I believe -- I don't have the names
13    of -- I cannot recall the names off the top of my head, your
14    Honor, but they're --

15             THE COURT:  But what positions are they?  There's
16    the treasurer; right?

17             MS. LENNOX:  Right.  And they're very well-respected
18    financial-type professionals in the community.  I believe --
19    I'm forgetting the chair's name right now, but they are
20    appointed by the state representatives under PA 436.  That is
21    in place.  That was in place pre-petition.  It exists now.

22             Under PA 436, the governor can also appoint a
23    transition advisory board at the end of this case to continue
24    that kind of work.  However, there has been an interest at
25    the state and the city level to have a post-Chapter 9

1   governance model akin to something like the New York

2   Municipal Assistance Corporation that was put in place at the

3   end of New York's crisis in the '70s, so they're looking at a

4   model akin to that.  That may require some legislative

5   changes, so we've put a concept of this kind of oversight in

6   the plan.  And that is the new provision that we've added,

7   but the details are still being developed.  If it requires

8   legislation, the legislative -- the legislature will break, I

9   believe, for their summer break sometime toward mid- to end

10  of May, so the legislature, if it needs to act on this, if

11  there's legislative action required, it will happen prior to

12  the voting deadline, which was prior -- it was June 30th in

13  your Honor's prior order, and it may be extended according to

14  what we've been talking about today.

15        So those details and further details about that,

16  your Honor, should that happen, will be forthcoming.  We have

17  recognized it in the plan, and we have put the concept in the

18  plan that there will be something like that.  We are also

19  perfectly happy to include continuing reporting requirements

20  to this Court and retention of jurisdiction for this Court to

21  oversee plan implementation as well.

22        THE COURT:  Okay.  Well, I appreciate as much

23  thought as you have put into this.  Clearly it needs to be

24  clarified further --

25        MS. LENNOX:  Yes, your Honor.

1          THE COURT:  -- and executed further.

2          MS. LENNOX:  Yes, your Honor.

3          THE COURT:  And without discouraging any of those

4    efforts, all of which you and -- or the city and the state

5    are obviously empowered and free to pursue, I think that in

6    addition to all of that, we have to think about what the

7    appropriate role is for the Bankruptcy Court to monitor

8    implementation of the plan post-confirmation assuming there

9    is an order of confirmation.

10          MS. LENNOX:  Um-hmm.

11          THE COURT:  My thoughts on that subject are also in

12   the formative stage.  It strikes me as efficient to have one

13   person who is responsible for reporting to the Court

14   regarding the implementation or lack of implementation of the

15   city's obligations under the plan --

16          MS. LENNOX:  Um-hmm.

17          THE COURT:  -- on a fairly frequent but regular

18   basis.

19          MS. LENNOX:  Certainly, your Honor.

20          THE COURT:  Who that is or how that person gets

21   appointed we can talk about.  I think I did read recently in

22   Chapter 9 that the case remains open until administration is

23   concluded.

24          MS. LENNOX:  I believe that's true, your Honor.

25          THE COURT:  And it's obviously in everyone's best

1   interest, city and creditors, for any implementation issues

2   or challenges or failures to be flagged and dealt with

3   promptly.

4           In that regard, I want to turn the page slightly

5   here and ask you if on your witness list for confirmation are

6   the mayor or any members of the city council?

7           MS. LENNOX:  I believe the mayor is on our witness

8   list, your Honor.

9           THE COURT:  Okay.  So I can provide notice now that

10  it will be very hard to find feasibility unless the mayor

11  and, in his judgment, the city council fully supports the

12  plan and the city's commitments under the plan and the city's

13  means of implementing the plan; right?

14          MS. LENNOX:  Understood, your Honor, yeah.

15          THE COURT:  Does that make sense?

16          MS. LENNOX:  Yes.  And we have been briefing the

17  mayor on this process regularly.

18          THE COURT:  We absolutely do not want to get to a

19  place where we have a plan that's confirmed that obligates

20  the city to make certain payments, and Mr. Orr is no longer

21  in office, and who's ever running the city at that point in

22  time doesn't support the plan.

23          MS. LENNOX:  Understood, your Honor.  That makes

24  sense.

25          THE COURT:  So you might think about supplementing

1  your witness list.  I don't know exactly what the structure

2  of city government is and what the relationship is between

3  the city council and the mayor, but you might want to

4  supplement your witness list with one or more members of the

5  council itself to further support and meet your burden of

6  proof on the issue of feasibility.

7          MS. LENNOX:  We'll take that into consideration,

8  your Honor.

9          THE COURT:  And at some point we can talk about

10  whether this individual who is responsible to the Court and

11  the creditors to report on implementation issues should be a

12  neutral person; that is to say, someone who is not an

13  employee of the city.  I don't know about that one.  We

14  should talk about that one.

15         MS. LENNOX:  Thank you, your Honor.

16         THE COURT:  Okay.  Sir.

17         MR. CULLEN:  Thomas Cullen of Jones Day for the

18  city.  One point about tomorrow.  I've conferred with the

19  other two counsel who are going to participate in the

20  discussion with the proposed experts.

21         THE COURT:  Um-hmm.

22         MR. CULLEN:  And we have a common set of questions

23  for the Court that might help us with this.

24         THE COURT:  Okay.  Go for it.

25         MR. CULLEN:  One, first is whether the Court plans

1  to take the lead in the questioning and have us follow up or

2  whether the Court would like us to start and then the Court

3  will chime in as the Court desires.

4          THE COURT:  Yeah.  I thought I would --

5          MR. CULLEN:  Which would you rather do?

6          THE COURT:  I thought I would go first and let you

7  all bat clean-up.

8          MR. CULLEN:  That's fine, your Honor.  Do you have

9  a -- do we have a concept of how we're dividing up the hour,

10  not to press the Court?

11          THE COURT:  I thought I would take as much of the

12  hour as I liked and left the rest for you.

13          MR. CULLEN:  Seems eminently fair, your Honor.

14          THE COURT:  But -- thank you.  I agree.  No, but I'm

15  usually efficient in these matters.

16          MR. CULLEN:  Okay.  I appreciate it, your Honor.

17  You can see how it plays into our preparation, though.

18          THE COURT:  Right, of course, absolutely.

19          MR. CULLEN:  Great.  Thank you very much.

20          THE COURT:  That's it?

21          MR. CULLEN:  That's all I have.

22          THE COURT:  Oh, that was easy.  Ms. Patek.

23          MS. PATEK:  Your Honor, again, Barbara Patek on

24  behalf of the public safety unions.  I want to go back just

25  for a minute to this idea of this new legislation and the

1   Court's suggestion about a single person -- neutral person,
2   because there is one issue -- and it's premature because we
3   don't have an agreement with the city, but if the public
4   safety unions can get to an agreement, you know, we want to
5   make sure it's an enforceable agreement that they go back to
6   ordinary course because it's -- there has been a lot of
7   anxiety, so if there is going to be legislation and there's
8   discussion about what form that should take and given the
9   history of what we heard in the eligibility trial, we just
10  would very much like to be included in that discussion.
11  That's probably more appropriately the labor people than me,
12  but I'm putting it out there for the record.  And we do want
13  to make it clear that it's our hope that if we do get to an
14  agreement and there is a confirmed plan, that we are moving
15  forward not in a receivership and not with an emergency
16  manager as the city has, you know, posited from the first day
17  of this case.

18           THE COURT:  Is there anything else that anyone would
19  like to bring up at this time?  I do think that having this
20  status conference regarding confirmation has been helpful.  I
21  think I will plug into whatever schedule you all submit to me
22  one or two or perhaps even three more of these as we get
23  closer to July.  And if there is nothing further, we will be
24  in recess.  Oh, by the way, one more thing.  Tomorrow
25  morning.  I don't want tomorrow morning's interviews of these

1   witnesses to be a session of court.  It's not.  It's just us

2   interviewing my potential witness.  So at the same time, I do

3   want it all to be on the record, so, you know, I may or may

4   not come out here wearing a robe, so don't be surprised.  We

5   will put the witness -- or we will put the applicant in the

6   witness box, again, just for convenience of recording, and I

7   will ask you to do your questioning from the lectern, again,

8   not because it's court -- it's not -- only because we want it

9   on the record and it to be as clean a record as we can make

10  it.  All right.  All right.  We'll be in recess.

11          THE CLERK:  All rise.  Court is adjourned.

12      (Proceedings concluded at 3:36 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    April 21, 2014
_____          _____
Lois Garrett