UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .       Docket No. 13-53846
        MICHIGAN,               .
                                .       Detroit, Michigan
                                .       April 18, 2014
                    Debtor.     .       2:34 p.m.
. . . . . . . . . . . . . . .


        HEARING RE. INTERVIEW OF EXPERT APPLICANT
            (INTERVIEW OF MARTHA E.M. KOPACZ)
        BEFORE THE HONORABLE STEVEN W. RHODES
          UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:         Jones Day
                        By:  THOMAS CULLEN, JR.
                        51 Louisiana Avenue, N.W.
                        Washington, D.C.  20001-2113
                        (202) 879-3924

For the Detroit        Erman, Teicher, Zucker &
Fire Fighters             Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police         400 Galleria Officentre, Suite 444
Officers Associa-      Southfield, MI 48034
tion and the           (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

For National           Sidley Austin, LLP
Public Finance         By:  GUY NEAL
Guarantee Corp.:       1501 K Street, N.W.
                       Washington, DC  20005
                       (202) 736-8041

Court Recorder: Kristel Trionfi
 United States Bankruptcy Court
 211 West Fort Street
 21st Floor
 Detroit, MI  48226-3211
 (313) 234-0068

Transcribed By: Lois Garrett
 1290 West Barnes Road
 Leslie, MI  49251
 (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE COURT:  So let me begin by thanking you for your

2  application and for coming here today.  I appreciate it very,

3  very much.  Our proceeding here will be that I will ask some

4  questions first, and then some attorneys volunteered to help

5  me with questions as well.  Okay.  So let's begin with this.

6  What about this appointment interests you?

7    MS. KOPACZ:  I'm interested at two levels.  I am

8  interested in serving the Court in what is a very unique and

9  independent role.  Having been in restructuring for a long,

10  long time, always having a client that had a desired outcome

11  and trying to do the best for that client, admittedly trying

12  to do the best for the estate or whatever the case was, but

13  this is a unique role in which not only don't I have a client

14  that has a preexisting perspective, but I can't have a

15  preexisting perspective.  I have to have complete

16  independence, complete lack of prejudices, lack of

17  perspectives coming into it because it is about the

18  independence.  It is about being able to assess something in

19  a way that is really based on facts analysis and not a

20  presupposed outcome, so at a personal level, it is unique,

21  and I think that that is what interests me.

22    There's also something about just doing a good turn,

23  doing what's right in a very complicated situation.  Detroit

24  is -- it could be Boston where I'm from.  It could be

25  Baltimore.  It could be any number of cities.  And if this

1   city and the constituencies here get it right, it's going to

2   lay a nice foundation for other cities, other municipalities

3   to get things right going forward, so I think the ability to

4   serve is another thing.

5         And then, quite frankly, I do believe -- and I've

6   written on this.  I've been working in this field for a long

7   time.  I think there is an awful lot that our public sector

8   organizations can learn, if you will, from what we have been

9   doing for many years on the corporate side in terms of how to

10   improve outcomes for a variety of constituencies, so I think

11   there's a giving back that's part of this to our profession.

12         THE COURT:  And what is your understanding of what

13   the assignment is, of what I'm looking for?

14         MS. KOPACZ:  Can I tell you what I think it's not?

15         THE COURT:  Sure.

16         MS. KOPACZ:  Let me tell you what I think it's not,

17   and then I'll tell you what I think it is.  It is not about

18   redoing a year-plus worth of work that the city has done,

19   that all the professionals have done.  It's not about redoing

20   that.  Okay.  It's not about coming in here and being an

21   architect for whatever the recovery for Detroit is.  Okay.

22   It's not about having an opinion as to whether or not classes

23   of creditors are treated appropriately.  It's not about, if

24   you will, how the pie gets cut.  It's about is there going to

25   be a pie to cut up at the end of the day, so it's all about

the assumptions, the projections.  Are they reasonable?  Is

the city going to be able to deliver the essential services

that it needs to deliver and have the cash available to it to

meet the obligations that they're going to commit to as part

of the plan of adjustment?  So I think it's really

straightforward.  I think it's relatively narrow.  It's not

easy.  I don't want to -- I don't want you to think that I

think it's easy because I don't think it's easy, but it's

about are the projections and the assumptions not overly

optimistic, not overly pessimistic, and does this plan have a

robustness to it in terms of can the city execute it such

that the stakeholders have some faith that they're actually

going to get the payments that are being committed to.  So,

like I said, I don't think it's about sorting out all the

deals that have already been cut.  I don't see that as my job

at all.

THE COURT:  And what expertise and qualifications

would you and your firm bring to that task as you have

defined it?

MS. KOPACZ:  There are -- put it into three

categories.  First is the experience, second would be the --

I would call the savvy, and third would be the independence.

THE COURT:  I'm sorry.  I have to interrupt.

MS. KOPACZ:  Yeah.

THE COURT:  I have been summoned to a telephone call

1  with Chief Judge Rosen.  Would you all mind if we took five

2  minutes for me to do that?

3           MS. KOPACZ:  No.

4           THE COURT:  You can chat among yourselves, and I'm

5  going to go do that.

6      (Recess at 2:40 p.m., until 2:48 p.m.)

7           THE COURT:  My apologies.

8           MS. KOPACZ:  No worries.

9           THE COURT:  Okay.  Where were we?

10          MS. KOPACZ:  We were talking about qualifications,

11 capabilities, experience.  As I thought about this with my

12 team -- and with me today is Bob Childree and Brian Gleason.

13          THE COURT:  Wave.

14          MS. KOPACZ:  Wave.

15          THE COURT:  Okay.

16          MS. KOPACZ:  They're back there; right.  And

17 obviously if anybody wants to ask them questions, they're

18 here for a reason, so with that said, when I looked at the

19 experience, it really falls into three categories.  One, I

20 would say more technical experience, and I put in that

21 category -- I think we've got the right blend of experiences

22 and skills.  We have deep expertise in public sector, in

23 municipal finance, accounting.  Bob is the former comptroller

24 of the State of Alabama.  He's got all of the government

25 accounting awards.  He's been on the GASB board.  So he's got

1   all that technical accounting expertise because, as everyone

2   in this case now knows, government accounting is not like

3   what we're used to with generally accepted accounting

4   principles, and it's very different.  We also bring a lot of

5   experience from the world of restructuring, turnaround,

6   bankruptcy.

7           At the end, the Detroit Chapter 9 is about change.

8   It's a giant change project for the city, and having sat in

9   that seat both in the public sector and the private sector, I

10  and my team understand that in addition to being about the

11  math, which is what the projections and the assumptions are

12  about, it's about can you execute it.  So at the end of the

13  day, if you're going to make a lot of investment, if you're

14  going to change the way you do business, and that's going to

15  have a positive effect on the cash flow of the city, you've

16  got to be able to execute on those plans.  And I think having

17  led those kinds of projects for our clients over the years --

18  Brian has been involved with our work in Pennsylvania, with

19  SEPTA, with Philadelphia Gas, in terms of really being in the

20  seat of the executives running those projects, so there's

21  that experience.  And then we've got all the hands-on sort of

22  experience of having prepared projections, evaluated

23  projections, again, appreciate that it's an art as much as it

24  is a science.  So there's a whole technical set of expertise.

25  I don't think any one of those capabilities necessarily

1  should trump any of the others, so understanding the
2  environment, understanding the municipal set, it is not like
3  commercial restructuring.  It is different.  Understanding
4  projections and how that works and both to use it to your
5  advantage as well as to use it as a reasonable basis for
6  confirming a plan, so there's the expertise.
7       Then the next thing is really -- I put into the
8  category of savvy.  At the end of the day, this project has
9  to be done quickly and has to be done efficiently.  There's a
10  fixed amount of time.  So you've got to know the questions to
11  ask.  You've got to know how to listen to the answers.  I
12  will tell you I'm not going to be bamboozled.  No one on my
13  team is going to be bamboozled.  We're not going to get
14  railroaded by any party into any sort of perspective.  We
15  come here without any sort of prejudices, have read --
16  obviously read the plan, looked at those sorts of things,
17  have read a lot of the press and the ABI headlines and that
18  sort of thing, but we're not -- we don't have any
19  preconceived notions on behalf of any of the constituencies.
20       One of the other things that I think we've thought
21  about and tried to show in our proposal was we have an
22  approach.  We have a perspective on how we're going to spend
23  the time that it takes to get to me forming my opinion, so
24  we -- maybe the day first you learn where we're going and who
25  we're going to meet with, but in the -- arguably the eight

1    weeks or so, eight to ten weeks that we have to complete
2    this, I've got at least in my mind a pretty clear approach as
3    to how we're going to get from here to there.  And we won't
4    get -- we won't get going down a rabbit hole or wrapped up
5    in, you know, things that aren't part of the really big
6    picture.

7              And then the last component of the capabilities goes
8    to our independence.  I'm not involved personally or
9    professionally in anything in the City of Detroit or the
10   State of Michigan.  We are not -- we've never pursued any
11   other representation in this case of any other party.
12   Clearly we have never -- we've never lobbied government.
13   We've never tried to effectuate public policy.  We're not
14   politically motivated.  Our business is not dependent on
15   rendering services to public sector entities at the federal,
16   state, or municipal level.  I, through my career in Phoenix
17   as a firm, have been very clear about its role in public
18   sector restructuring over the years, and that is if there is
19   an opportunity to do something for the greater good, that is
20   an opportunity we'll seek, but we don't underwrite bonds.  We
21   don't -- you know, we're not a municipal advisor.  And the
22   level of independence that we bring I think actually makes
23   the job and the role of the expert much easier.  I don't have
24   to see any of these constituencies at the supermarket.

25             THE COURT:  You mentioned just a moment ago and your

1  application reflects that governments have no generally

2  accepted standards for budgeting or other financial matters.

3            MS. KOPACZ:  Correct.

4            THE COURT:  What challenges would that create for

5  you in this assignment?

6            MS. KOPACZ:  It doesn't create challenges except if

7  you don't understand that there aren't standards.  Okay.  So,

8  for example, oftentimes you will see borrowings reflected as

9  revenues.  Okay.  Borrowings aren't revenues.  They aren't.

10  And you wouldn't even think about that in a commercial

11  setting.  Okay.  However, when you look at governmental

12  financial statements, oftentimes municipalities and

13  governmental entities show borrowings as revenue, so it's

14  only a problem if you don't understand or you think that

15  there are or should be standards that relate to governmental

16  accounting that aren't there.

17            THE COURT:  Your application discloses an article --

18  not an article, an appearance at the ABI Winter Leadership

19  Conference in La Quinta in December of 2011.

20            MS. KOPACZ:  Um-hmm.

21            THE COURT:  "The Municipal Restructuring Under

22  Chapter 9:  Legitimate Option or Scare Tactic?"  What would

23  be the two-sentence executive summary of your presentation as

24  part of that panel?

25            MS. KOPACZ:  Oh, boy.  Two sentences.  Chapter 9, as

1    she's typing -- Chapter 9 is not something to be considered

2    lightly.  Is it a scare tactic?  Possibly.  Okay.  For a

3    municipality that really is overwhelmed by its liabilities,

4    it could be a very viable option.

5           THE COURT:  Same question.  An appearance before the

6    Turnaround Management Association in Boston in November of

7    2011 called "Municipal Insolvencies:  Is This the Next Wave?"

8           MS. KOPACZ:  Yes.  That was -- I remember.  Okay.

9    We talked -- that was on the -- following the Central Falls

10    case in Rhode Island.  Obviously got a lot of press in New

11    England.  And I think by many people's accounts, mine

12    clearly, I think that Central Falls is a Chapter 9 that

13    worked, is working right now.  And if Chapter 9 is as

14    successful on a larger scale as it was for a town that is

15    about ten square miles with a, you know, eight-figure budget,

16    yes, it could be a wonderful tool to restore some financial

17    stability to some of our struggling municipalities.

18           THE COURT:  On pages 30 and 31 of your application,

19    you have a proposed approach that's fairly detailed.

20           MS. KOPACZ:  Yes.

21           THE COURT:  And I appreciated the opportunity to

22    read that very much.  My question is pretty simple.  Is there

23    anything about that proposed approach that, in the meantime,

24    you've thought about modifying or changing in any way?

25           MS. KOPACZ:  I don't think modifying.  Again, I

1  don't think I would add any large categories of tasks or
2  whatever.  I think we have talked about the timing, and,
3  again, working back from the June 30th date by which all
4  expert depositions have to be completed, what would --
5          THE COURT:  Maybe sliding a little bit in the
6  meantime.
7          MS. KOPACZ:  Well, but I don't know that; right?
8  I've got to assume you said June 30th; right?
9          THE COURT:  Right.
10         MS. KOPACZ:  So let's say for purposes of this
11 discussion that the Court makes a selection next week on its
12 expert.  The first two weeks are what I would kind of call my
13 listening tour, and that is -- that would entail meeting with
14 the advisors to all of the key constituencies and
15 understanding the work that's been done to develop the
16 projections that underlie the plan, okay, because, as I said,
17 there's not enough time nor is it appropriate to redo the
18 work, and I think there's a lot of work that's been done.
19 I've been through the fee apps that have been filed, and I
20 know that there are lots of things that particularly the city
21 and the city's advisors have done that should be very, very
22 helpful in reviewing the projections and that, so I think
23 that first couple of weeks really understanding what
24 information is available, coming to a understanding of how
25 complete the work is.  Maybe if there's some additional

1  things that need to be done, I would not be shy about asking

2  somebody to go and get some data if I thought it was

3  necessary.

4  Then we would move into a period of probably -- I've

5  assumed the next four weeks where we separate out the real

6  critical assumptions and do a very deep dive on the support

7  for that, the basis for that, how sensitive they are to

8  change, how missing those projections would impact the city's

9  ability to meets its obligations under the plan.  And then

10  that would give another two weeks at the end of that time to

11  actually write the report because by the time we get through

12  the deep dive on the analysis, my opinion is going to be

13  done.  Now it's a question of how do you write it and how do

14  you talk about it.  And then that would still leave a week

15  for depositions.  So I think, again, it's -- there's nothing

16  here that I would change.  It's just I've put ten weeks --

17  eight to ten weeks on two pages.

18  THE COURT:  Have you testified as an expert witness?

19  MS. KOPACZ:  I have.  I have.

20  THE COURT:  How many times and in what kinds of

21  contexts?

22  MS. KOPACZ:  I tried to differentiate in my proposal

23  the times that I've been hired as an expert versus the times

24  I testified in a matter in which I've been hired as a

25  professional, so hired as an expert, I was recently hired in

1    a retail matter between a landlord and Sears, and I was hired

2    as an expert in that case.  I was hired as an expert in the

3    Healthco matter, which was a fascinating case, Worcester --

4    actually the trial was in District Court in Massachusetts.

5    It was one of the first cases that tested the theory that a

6    leveraged buyout transaction was, in and of itself, a

7    fraudulent conveyance.  Judge Queenan was the judge at the

8    time, and I can tell you, Judge, just always thought that

9    every leveraged buyout was a fraudulent conveyance, and the

10   Healthco matter -- actually, I think one of the other

11   applicants was the trustee in that case.  I was hired by

12   Lazard Freres and Coopers, who were part of the -- obviously

13   the investment advising team that did that transaction with

14   Hicks, Muse, and the case was tried for four weeks and took

15   the jury about five hours to decide.  And my job in that case

16   was to go back in time and look at the projections that

17   Hicks, Muse, Lazard, Coopers developed for the leveraged

18   buyout of Healthco and make an assessment as to whether or

19   not they were reasonable at the time they were made, so it

20   wasn't about the fact that, guess what, it didn't work

21   several years later.  It was were the projections and the

22   assumptions reasonable when they were made back in the early

23   '90s as opposed to when the company failed in the late '90s.

24          And I did a very early in my career case on --

25   testimony in Tennessee on the reasonable value of the use and

1  occupancy of a hotel.

2          Other than that, I have testified on cases that I've

3  been involved in either as a financial advisor or a chief

4  restructuring officer on things like a motion to convert and

5  that sort of stuff, but I wasn't hired to be an expert, so --

6          THE COURT:  All right.  Let me turn the interview

7  over to the attorneys.  Who's up?

8          MR. NEAL:  Good afternoon, Ms. Kopacz.  How are you?

9          MS. KOPACZ:  I'm well.  Thank you.

10         MR. NEAL:  My name is Guy Neal.  I'm an attorney at

11  Sidley Austin representing a bond insurance company,

12  National --

13         MS. KOPACZ:  Okay.

14         MR. NEAL:  -- Public Finance Guarantee.  First,

15  thank you for your application.  Thank you for your time.

16         MS. KOPACZ:  Not at all.

17         MR. NEAL:  Thank you for you and your team coming

18  here this Friday afternoon.  Let me ask you generally about

19  your background in corporate restructurings and then

20  municipal restructurings and how that may have evolved over

21  the years --

22         MS. KOPACZ:  Um-hmm.

23         MR. NEAL:  -- in terms of the percentage of your

24  time that you devote in corporate matters versus municipal

25  matters.

1          MS. KOPACZ:  Over my 30-year career?

2          MR. NEAL:  Why don't we just limit it.  The past ten

3    years.

4          MS. KOPACZ:  It's more than 30, but I don't want to

5    admit that.  Okay?

6          MR. NEAL:  Fair enough.

7          MS. KOPACZ:  I don't want to admit that.

8          MR. NEAL:  We went through that earlier today.

9    Maybe we could just focus on the past five or ten years.  I

10   mean --

11         MS. KOPACZ:  Five or -- yes.

12         MR. NEAL:  Many of us became Chapter 9 experts in

13   the past two or three years.

14         MS. KOPACZ:  Okay.

15         MR. NEAL:  So you may have more years than --

16         MS. KOPACZ:  Yeah.

17         MR. NEAL:  -- most of us in this courtroom.

18         MS. KOPACZ:  I actually got very interested -- I

19   refer to it as my mid-life crisis.  I got very interested in

20   using my experience and using the power of the corporate

21   restructuring process in a way that delivered greater good,

22   and this started back towards the end of our

23   PricewaterhouseCoopers and FTI days.

24         MR. NEAL:  Um-hmm.

25         MS. KOPACZ:  And I had always on a pro bono basis

 1   done some like not for profit things when that failed, but I
 2   got involved with the Archdiocese of Boston, and I realized
 3   that there were skills that our profession could bring to
 4   these very unique sorts of organizations that really would
 5   benefit so much more than, you know, with all due respect, a
 6   bond guarantor or a bank or, you know, a retiree; right?  It
 7   could do greater good.  I was in the running to be the
 8   interim superintendent for the St. Louis Public School
 9   District shortly after that.  And the only other group that
10   was out there focused on this area was Alvarez, and when I
11   lost to Alvarez & Marsal for the St. Louis job, I actually
12   got a call from Alvarez -- from a headhunter for Alvarez and
13   said, "We've been hired -- we've been hired by Alvarez to
14   hire you because you're the only other person out there that
15   really wants to work in public sector."  And so I joined
16   Alvarez for a couple of years, and we did work in school
17   systems and around.  And what I realized at the end of the
18   day was there was not a -- there wasn't a business model that
19   fit me in the public sector, all right, in part because I'm a
20   real -- I'm very apolitical, and I don't -- I really don't
21   care Democrat, Republican.  I don't care about that stuff.  I
22   care about doing things in an efficient, effective way so
23   that you've got stability because what public sector does for
24   us nobody else can do, and so that was -- I was at Alvarez
25   from '04 to '06.  Then I started the Grant Thornton practice,

1  and everybody kept saying, "Well, don't you want to do public

2  sector?"  And I said, "You know what?  Public sector needs --

3  there is so much need for the skills of the restructuring

4  professional in public sector, but there's no demand."  Okay.

5  So if there's no demand for your services, no matter how much

6  you think they're important and they could be beneficial, if

7  nobody wants to do the kinds of things you're suggesting,

8  then there's no business there.  There's no reason to do it;

9  right?  Back and then after a couple of years, there became

10  some opportunities in the Nassau County Interim Finance

11  Authority, which is the control board that's been overseeing

12  Nassau County for a number of years, was reaching kind of a

13  tipping point with what was going on in Nassau County, and

14  knew a couple of people on that board, and they reached out.

15  And we went through a competitive proposal, but I and my

16  colleagues -- Bob Childree was with me at Grant Thornton at

17  the time, and so we did a multi-year representation for

18  Nassau County.  And during that time at Grant Thornton, I did

19  some work with about seven municipal transit authorities.

20          MR. NEAL:  Um-hmm.

21          MS. KOPACZ:  And prior to that, when I was at

22  Alvarez, I worked with Legal Aid, which is a nonprofit, but

23  it's a quasi-government entity because about 130 million of

24  our 150 million was government funding, so, yes, we are a not

25  for profit -- we were a not for profit, but that sort of

1  thing.  So I've been around the space, if you will, for 12

2  years maybe.

3            MR. NEAL:  And in terms of distressed municipalities

4  that have engaged you, which --

5            MS. KOPACZ:  Zero.

6            MR. NEAL:  But in fairness, I mean you've done a

7  very nice job providing your recent experience with

8  Wilmington, Nassau County, and New Castle, Delaware.

9            MS. KOPACZ:  Yeah.

10           MR. NEAL:  Were those not in the distressed arena?

11 How would you characterize --

12           MS. KOPACZ:  Okay.

13           MR. NEAL:  Okay.

14           MS. KOPACZ:  We have to separate Marti from --

15           MR. NEAL:  Let's do that.

16           MS. KOPACZ:  -- Phoenix.  Okay.  Brian Gleason, my

17 partner at Phoenix --

18           MR. NEAL:  Yes.

19           MS. KOPACZ:  Right.  I joined Phoenix -- back

20 there -- in September of this year.  Okay.  Brian and the

21 other partners at Phoenix were engaged on behalf of those

22 municipalities, so you want --

23           MR. NEAL:  Oh, no.  I'm just -- you know, it's just

24 helpful --

25           MS. KOPACZ:  Okay.

1          MR. NEAL:  -- to know among --

2          MS. KOPACZ:  Right.

3          MR. NEAL:  -- your team members that you certainly

4     have the skill set, but it's through your partners.

5          MS. KOPACZ:  Right.  My skills are -- as I

6     described, there's Phoenix --

7          MR. NEAL:  Yes.

8          MS. KOPACZ:  -- and there's a group of partners and

9     professionals at Phoenix that have been involved in

10    Pennsylvania and Delaware in different sorts of contexts, and

11    then Bob obviously was involved with me at Grant Thornton,

12    but, more importantly, he was in Alabama for a number of

13    years.

14         MR. NEAL:  And would you characterize those as

15    distressed municipal entities, distressed --

16         MS. KOPACZ:  Yes.

17         MR. NEAL:  -- municipalities?

18         MS. KOPACZ:  Yes, yes.

19         MR. NEAL:  Okay.  Have you had an opportunity in

20    preparing for the interview today to look at the latest or a

21    version of the plan of adjustment and the disclosure

22    statement?

23         MS. KOPACZ:  I have looked at the disclosure

24    statement, the one that got filed on the 16th --

25         MR. NEAL:  Okay.

1    MS. KOPACZ:  -- and the redline version of that as

2    well, although I can tell you I hadn't -- I had just started

3    the prior plan when the new plan got filed, so I quickly

4    stopped reading that one.

5         MR. NEAL:  Have you had an opportunity to look at

6    the ten-year restructuring and reinvestment program?

7         MS. KOPACZ:  Yeah.

8         MR. NEAL:  Then there are also a set of ten-year

9    forecasts.

10        MS. KOPACZ:  Yes.

11        MR. NEAL:  Do you have any preliminary thoughts,

12   nonbinding thoughts or reaction --

13        MS. KOPACZ:  No.  And I will be honest with you.

14   I'm a little bit frustrated with the way those are laid out

15   because there's a lot of projections in that, but I'm just

16   not facile enough yet with the plan and the document to

17   really figure out how it all fits together.  I can see the

18   billion five --

19        MR. NEAL:  Yes.

20        MS. KOPACZ:  -- in the reinvestment initiatives.

21   Okay.  I can see what the cash flows look like with the

22   legacy obligations in place, so I know that -- i.e., absent

23   the restructuring, this is what the cash flow is going to

24   look like.  Okay.  What I haven't seen -- and I can't --

25   like, again, I'm sure it's there.  I just haven't been able

1 to synthesize it -- is what's the big picture, how does it

2 all work out with the deals that have been cut to date.

3          MR. NEAL:  What does feasibility mean to you in the

4 municipal context, and if it differs from the corporate

5 context, I'd welcome your views on that?

6          MS. KOPACZ:  I actually asked some lawyer friends of

7 mine to help me find the opinions on Chapter 9 feasibility,

8 and they found me one.  Okay.  And they found me one.  I

9 think the similarities on feasibility are the entity must

10 generate cash if it's going to pay the obligations it's

11 committed to.  So when we restructure a corporate entity,

12 right, if the business plan can't generate profit and cash,

13 then the confirmation plan is going to fail because you

14 just -- you're not going to have the cash to pay -- make the

15 payments to the creditors that you said you were going to do,

16 so in the Chapter 9 context, we don't have to make profit,

17 per se, but we've got to deliver essential services.  And I

18 don't, quite frankly, right now understand whether those

19 services are -- can be generated without a structural deficit

20 or if there is a structural deficit involved.  Again, like I

21 said, I just -- there's not -- I'm not deep enough into the

22 data to tell you.  Okay.  But at the end of the day, revenues

23 less whatever the costs are to deliver the essential services

24 have to leave a remainder of cash to make all the payments

25 that are committed to in the plan.  Okay.  So that what's

1  feasible, and there's both a math or an arithmetic piece of

2  it, so at the end of the day if -- maybe the simplest way to

3  think about it is one of the assumptions will be that we're

4  gong to collect our tax revenues better.  Okay.  So we're not

5  going to let people not pay their taxes.  So we can say that

6  we're going to improve collections to 98 percent of what's

7  due.  Okay.  So 98 percent is an assumption.  Okay.  But

8  there's a bigger number of what you take the 98 percent of,

9  so you got to get both of those sorts of things right, and

10  that's what I call math.  Okay.  And you can say, all right,

11  if we've made the assumption that we're going to collect 98

12  percent of the revenues, maybe that's not realistic.  Maybe

13  the better number is 82.  So that's where people differ on

14  what's reasonable.

15       Then there's the other piece that says, okay, let's

16  say we've got the right number, and it is 95 percent of

17  whatever that bigger number is.  The next question is can we

18  actually do it.  Are the people in place, are the systems in

19  place, are the procedures in place that will change the way

20  the city collects its revenues from when it used to collect

21  70 percent.  So there's the math piece, and then there's the

22  execution piece.  And that's what I tried to refer to in the

23  proposal and the work plan as we've got to do the math, make

24  sure the math was right, make sure the formulation is

25  correct, make sure the basis is there for the assumptions,

1 but at the end of the day, there are so many things changing

2 that you've really got to look at the execution and are the

3 people in place. I mean I just wrote an article for the <u>ABI</u>

4 <u>Journal</u> which was a bit of being on a soapbox about how

5 people in my business tend to go in as restructuring advisors

6 and, you know, CROs and CEOs and all that sort of stuff, and

7 we worry about getting all the liabilities and the assets and

8 the operations fixed, and we don't pay enough attention to

9 who we're leaving behind to make sure it happens.

10      MR. NEAL: Have you or any of your team members

11 written or spoken or provided any sort of testimony about the

12 City of Detroit?

13      MS. KOPACZ: No.

14      MR. NEAL: Have you or any of your team members been

15 involved in state or local budgeting?

16      MS. KOPACZ: Mr. Childree has for 20-some years.

17      MR. NEAL: And same question as it relates to

18 assessing forecasts, budget forecasts and projections.

19      MS. KOPACZ: Yes. I've been involved with --

20 obviously with my work with Nassau County. Okay. Brian and

21 the other professionals at Phoenix have done that in probably

22 a dozen or more cases that we listed in the proposal. And

23 Bob did that both for the State of Alabama as well as for all

24 of the municipalities that the state was responsible for.

25      MR. NEAL: And my last question -- others may have

25

1    questions of you.  I'm sure they will.

2            MS. KOPACZ:  Yeah.

3            MR. NEAL:  Your experience with defined benefit

4    plans, particularly at the municipal -- excuse me -- the

5    municipal level?

6            MS. KOPACZ:  Municipal level only with -- in looking

7    at those as they related to Nassau County, and then the

8    other -- the one where I was really involved with defined

9    benefit plans was when I was running the Legal Aid Society in

10   New York City.  We actually -- that was a defined benefit

11   plan, covered -- our lawyers were unionized by the UAW, and

12   our social workers were unionized by the SEIU.  And then we

13   had obviously another pension plan for our nonunionized

14   labor.  And we had to ultimately freeze all of those plans

15   and redo them over time, so I've got a general familiarity

16   with that.  I am not expert in it.

17           MR. NEAL:  Very good.  I want to thank you for your

18   time.

19           MS. KOPACZ:  Thank you.

20           MS. PATEK:  Good afternoon.  My name is Barbara

21   Patek, and I represent the Detroit police and fire unions in

22   the case.  I want to ask you a couple questions, first of

23   all, about you mentioned your -- excuse me -- your

24   independence.

25           MS. KOPACZ:  Um-hmm.

 1          MS. PATEK:  Do you know -- and I'm raising -- do you

 2     know any of the parties in the case, their counsel?

 3          MS. KOPACZ:  I know -- do I know any of the parties

 4     in the case?  In terms of --

 5          MS. PATEK:  Or professionals.  And I guess I'm

 6     raising it because it came up -- and I don't know if you're

 7     aware of this or not, but Lazard is -- has been retained as a

 8     professional by the Retiree Committee, for example.  Were

 9     you -- and you --

10          MS. KOPACZ:  Yeah.  I mean I don't have any

11     professional connection with Lazard.  I don't -- and, again,

12     they were a client as an expert witness in the late '90s

13     maybe of mine, yeah.

14          MS. PATEK:  In terms of municipal experience and

15     assessing feasibility and as you're looking at the numbers

16     and do we have the money and does the math work, do you see

17     any role in a setting as complex and as large as Detroit for

18     an assessment of the political will to accomplish certain

19     things that have been forecast?

20          MS. KOPACZ:  Do I see it as my role?

21          MS. PATEK:  Well, let's start with your role.

22          MS. KOPACZ:  I don't think so.  Okay.

23          MS. PATEK:  Do you see it as someone's role?

24          MS. KOPACZ:  Huh?

25          MS. PATEK:  Do you see it as someone's role?

1       MS. KOPACZ:  It goes to the point I made earlier.

2  The Chapter 9 process could be completed and successful.

3  Okay.  But if there is no governance and structure at the end

4  of that, then easily, right, everything could change, and so

5  I think there's -- at some point in time, somebody has to

6  assess -- and I think maybe Judge Rhodes' role is, you know,

7  is there going to be a control mechanism and a governance

8  mechanism coming out of this Chapter 9 that really insures

9  that the commitments that are made during this process are

10  going to be honored going forward, so I honestly -- I

11  don't -- I'm not sure I can answer the political will.  I'm

12  sorry.  I just don't think I can.

13       MS. PATEK:  No.  It's a fair answer.  And I want

14  to -- you made a comment about essential services, and, you

15  know, we put together -- and in this case it would be the

16  city puts together and you assess, and let's assume we get to

17  the end of the road, and you come in and you look at the

18  math, and you say this is feasible.  You also mentioned a

19  piece of that about who we are leaving behind, and I take it

20  part of that has to do with the ability of the city to

21  implement the plan; correct?

22       MS. KOPACZ:  Correct.

23       MS. PATEK:  And then what about when you're talking

24  about who we are leaving behind, I guess I'm asking you --

25       MS. KOPACZ:  What does that mean?

1          MS. PATEK:  Yes.

2          MS. KOPACZ:  Okay.  And it does go to this whole --

3    this execution risk.  Okay.  So let's take urban blight.

4    Okay.  I saw it coming in from the airport yesterday.  All

5    right.  I mean it is heartbreaking.  It really is.  Okay.

6    When you look at the investment to get rid of urban blight,

7    there's a large chunk of money coming in the next fiscal year

8    from grants.  Okay.  There's also -- and there's like 50

9    million or something coming from grants, and then there's an

10   offset of 20 million of extra costs associated with using

11   that grant money, so that says at the end of the day you got

12   an incremental 30 million that you're going to use.  Okay.

13   My question on feasibility, if you will, around that is if

14   you think you're getting $50 million worth of grant money in

15   fiscal '15, you probably already need to know you have that

16   basing on how the grant cycle works.  Okay.  I don't know

17   what's imbedded in the out years for other kinds of grants.

18   Okay.  So it's is there somebody in the city who's making

19   sure that that really important project of blight elimination

20   is in place.  Is there project management?  You know, I read

21   all about the different regulatory hurdles, you know.  Is

22   there somebody out there navigating that environment so that

23   you actually could spend the hundred million dollars to get

24   rid of it to bring the people back?  Okay.  So it's really

25   about the human capital that exists in the city because the

 1   emergency manager is going to be gone.  The advisors are
 2   going to be gone.  All of that extra manpower and all of that
 3   urgency that's brought on by the bankruptcy is going to be
 4   gone.  So will there be people, systems, processes in place
 5   that will be already beginning to implement the things that
 6   are in the plan?  Did that --
 7            MS. PATEK:  Yeah.  I think --
 8            MS. KOPACZ:  Okay.
 9            MS. PATEK:  I think that answers my question.  And
10   along the same lines, you talked about assumptions about
11   grants, that if you know -- or you're counting on certain
12   money coming in, whether it's property tax revenue or income
13   tax or a chunk of money, whether it's the federal government,
14   the state government, or some outside regional authority, in
15   order to be sure that the plan is going to be able to go
16   forward, you really need to know that that money is there.
17   Is that --
18            MS. KOPACZ:  Right.
19            MS. PATEK:  That's part of your --
20            MS. KOPACZ:  You know, HUD funds are notoriously a
21   problem like that.  Okay.  I mean it just -- my experience
22   is, you know, funding from the federal government can
23   sometimes -- you think it would be a real steady source of
24   cash.  Sometimes it's not, you know, and so you just -- we'd
25   want to look at all those sorts of things.

1    MS. PATEK:  Okay.  I think that's all I have.

2    MS. KOPACZ:  Okay.

3    MR. CULLEN:  Good afternoon, Ms. Kopacz.

4    MS. KOPACZ:  Good afternoon.

5    MR. CULLEN:  Thomas Cullen of Jones Day for the

6  city.

7    MS. KOPACZ:  Nice to meet you.

8    MR. CULLEN:  I'll be very brief.  On page 30 and 31

9  of your proposed approach --

10    MS. KOPACZ:  Um-hmm.

11    MR. CULLEN:  I'll ask you a practical question.  You

12  list a number of steps, interviews, assessments.  When you're

13  doing this initial investigation and during your listening

14  period, are there anything that you could identify for us

15  concretely as red flags or good signs as you were delving

16  into this telling you you have a -- you're working with a

17  good process, you're working with a bad process?

18    MS. KOPACZ:  Let me think about that.  I would think

19  that a bad sign would be if I would sit down with the city

20  budget officials and the advisors that have been working with

21  them to develop the projections and they can't provide us

22  with the basis for those; in other words, so why are we --

23  why do we make an assumption that tax revenue will drop for a

24  number of years and then it's going to increase; right?  I

25  would expect an answer to that question; right?  And if I

1  didn't get an answer to that question, I would be concerned.

2       MR. CULLEN:  Um-hmm.

3       MS. KOPACZ:  Okay.  Good signs.  I would hope --

4  since the Court entered its order about hiring an expert, I

5  would expect a lot of the professionals in this case to have

6  already been preparing packages of information for me if I

7  were the expert.  I would be doing that.  If I were advising

8  the city, if I were advising a creditor's constituency, and I

9  knew that there was this independent third person coming in

10  that was going to be looking under all the covers, I would be

11  preparing a summary and a packaging of information for this

12  person to educate them and get them up to speed quickly.

13  That would be a very good sign for me because I can do the

14  information request, which would be pages and pages, but the

15  better way to go about it, I think, given the time frame, is

16  to sit down, ask people what they've done, what do they have,

17  and then let's figure out if there are things that are

18  missing.

19       MR. CULLEN:  In terms of the attributes of a good

20  plan, I take it you say that there should be, just to pick

21  something out, provisions for contingencies.

22       MS. KOPACZ:  Um-hmm.

23       MR. CULLEN:  Do you have in mind a rule of thumb or

24  a safety cushion, if you will, for the relationship between

25  the projected revenue and the projected demands on the

1    revenue?

2           MS. KOPACZ:  I don't.

3           MR. CULLEN:  Do others?  Is that an approach that

4    others take?

5           MS. KOPACZ:  I don't know.  Mr. Childree probably

6    has a rule of thumb for, you know, what he liked to run the

7    State of Alabama with in terms of a cushion.  I can tell you

8    when I've -- when I'm serving in an executive function as a

9    chief restructuring officer or interim president or something

10   like that, I like to make sure that I've got a couple of

11   payrolls in the bank.  Okay.  So, you know, I think it's -- I

12   don't have a notion, but I think we would be able to come up

13   with a perspective on that.

14          MR. CULLEN:  Similarly, with respect to a burden of

15   legacy costs as a proportion of revenue, do you have an idea

16   of where we should aim at, where we should try to get to in

17   the plan?

18          MS. KOPACZ:  I don't.  I don't.

19          MR. CULLEN:  That's all I have, your Honor.

20          THE COURT:  Your application did not actually

21   include a budget for your fees.  Can you give us a reasonable

22   estimate?

23          MS. KOPACZ:  I looked at it a couple of different

24   ways, and I -- again, I look at this as a level of effort

25   engagement, so it feels to me, given the task at hand, given

1    the time frame, right, that it's kind of four to five full-

2    time equivalents.  And I'm making the assumption that there's

3    a lot of information out there and I'm not going to have to

4    pull hens' teeth to get it.  Okay.

5           THE COURT:  I'm here to help you with that.

6           MS. KOPACZ:  Thank you.  Thank you.  Right; right.

7    And I came up with an estimate -- and, again, I think the

8    workweek per person is probably 40 to 60 hours a week over

9    this time, and based on our fee schedule with the ten-percent

10   reduction in fees, it's somewhere between about 800,000 and a

11   million two.  And like I said, I would be happy with you and

12   everyone else to -- after we've been here a week or so and

13   after we've embarked on that listening tour a little bit, I

14   just -- I intuitively know I'm going to know where I need to

15   put resources and how I need to staff it, and, quite frankly,

16   you know, we might get lucky, and we might not need that.  I

17   don't think we need an army of ants, so, you know, if I would

18   think that I needed staffing more than that, I'd be happy to

19   discuss it and explain it, but, again, I just don't feel like

20   putting -- you know, doubling the resources is necessarily

21   going to double the value of my opinion, so that's what I

22   said.  I do think it's -- I think it's close to seven

23   figures.

24          THE COURT:  Okay.  That's it then.

25          MS. KOPACZ:  That's it?

1          THE COURT:  Yep.

2          MS. KOPACZ:  Thank you.

3          THE COURT:  Thank you very much.

4          MS. KOPACZ:  I wanted to thank you all.  I'm really

5   honored and humbled, and I would be very honored and humbled

6   to serve.  Thank you.

7       (Proceedings concluded at 3:33 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    April 23, 2014
_____             _____
Lois Garrett