## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora")
submit this motion (the "Motion to Compel") to compel the production of
documents from the State of Michigan. In support of its motion, Syncora
respectfully states as follows:

### BACKGROUND

1. Pursuant to this Court's Third Amended Order Establishing
Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of
Adjustment [Doc. No. 3632][1], on March 28, 2014, Syncora filed with the Court
subpoenas it planned to serve on certain parties, including the State of Michigan
(the "State"), pursuant to Federal Rule of Civil Procedure 45(a)(4) [Doc No. 3315].
(Ex. 6-A.) On April 7, 2014, the subpoena directed to the State of Michigan was
served on a representative at the Attorney General's office.

---

[1] This Order has since been amended and replaced with the Fourth Amended Order Establishing Procedures,
Dates, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Doc. No. 4202].

2.    The subpoena contained six document requests, including the following request at issue in this Motion to Compel ("Request No. 1"):

> 1.    All documents and communications relating to Attorney General's Opinion No. 7272.

Attorney General's Opinion No. 7272 (the "Opinion") is a legal opinion document that was issued by the Attorney General of the State of Michigan, Bill Schuette, on June 13, 2013 in response to a legislative request. The Opinion includes the Attorney General's conclusions regarding the art collection held in the Detroit Institute of Arts ("DIA")[2], including the conclusion that certain of the art in the DIA is held in charitable trust by the City of Detroit and, accordingly, no piece of the collection may be sold, transferred, or otherwise disposed of. (*See* Ex. 6-B.)

3.    From April 8 until April 18, 2014, counsel for Syncora and counsel for the State and Attorney General spoke telephonically and via email to discuss and resolve certain issues raised by Syncora's six document requests. Because of an ethical wall erected between the Attorney General and the State of Michigan, Syncora's requests were divided into two groups. Though the State filed an objection to Syncora's requests on April 17, 2014 [Doc. No. 4146], Syncora agreed

---

[2]    The non-profit entity "Detroit Institute of Arts" has also conducted business as the Detroit Institute of Arts Founders Society and the Founders Society. Any references to the Founder's Society in documents referenced in this Motion, such as the Operating Agreement, are also references to the non-profit entity the Detroit Institute of Arts.

to narrow certain of its requests and the State agreed to produce documents responsive to these narrowed requests.[3]

4.    On April 21, 2014, counsel for Attorney General Bill Schuette sent counsel for Syncora the Attorney General's responses to objections to Request No. 1, with attachments, attached herein as Exhibit 6-B ("<u>AG Objection</u>").    The Attorney General agreed to produce three documents: the Opinion, the Request for Attorney General Opinion from Senate Majority Leader Randy Richardville, and the Common Interest Agreement between the Attorney General and the Detroit Institute of Arts (the "<u>Common Interest Agreement</u>").    The AG Objection stated that "Any other responsive documents are privileged."    (AG Objection ¶ 3.) Among the allegedly privileged documents are "eleven communications" between the Attorney General and counsel for the DIA.    (*Id.* at ¶ 6.)

5.    Counsel for the Attorney General agreed to produce a privilege log related to the communications with the DIA and produced the log on April 25, 2014.    (Ex. 6-C.)    The privilege log contains 13 entries describing communications occurring between counsel for the Attorney General and the DIA's attorneys. According to the privilege log, these communications began on April 12, 2013 and

---

[3]    Counsel for Syncora wishes to specifically thank Steven Flancher, Matthew Schneider, Dawn R. Copley , Steven G. Howell, Margaret Nelson, Jeanmarie Miller, Eric Jamison, and Mark Donnelly for their assistance in these matters.

ended on June 13, 2013, the date the Attorney General's opinion was issued. Multiple of the entries describe attachments of memoranda or other information.

6.     Syncora now moves to compel the production of documents responsive to its Request No. 1.

## JURISDICTION

7.     The Court has jurisdiction over this matter pursuant to 38 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

8.     Syncora respectfully requests that the court enter an order compelling the State of Michigan to produce the documents requested by Syncora in Request No. 1 of Syncora's subpoena.

## ARGUMENT

### I.     The Attorney General Must Produce Documents Responsive to Syncora's Request No. 1

9.     The Attorney General must produce the documents requested by Syncora for three principal reasons.  *First*, the Common Interest Agreement was signed by the parties months after the communications occurred, which militates against a finding that the common interest agreement applies to these communications.  *Second*, the common interest privilege claimed by the Attorney General for his communications with the the DIA is not applicable because the

DIA acts as an agent of the City, and the Attorney General, the City, and the DIA do not share a common legal interest with respect to the artwork in the DIA. This is so notwithstanding the existence of a written common interest agreement between the Attorney General and the DIA. *Third*, the common interest privilege does not and cannot protect underlying non-privileged information provided in connection with privileged communications, and thus notwithstanding the application of any privileges, non-privileged attachments exchanged between the Attorney General and the DIA must be produced in response to Syncora's Request No. 1.

### A. The Common Interest Agreement Does Not Apply to Communications Between the Attorney General and the DIA

10.     Counsel for the DIA began communicating with the Attorney General's office regarding the artwork in the DIA well before the Attorney General issued his Opinion on June 13, 2013. (*See* AG Privilege Log, Ex. 6-C.) In fact, these communications began <u>approximately two months</u> prior to Senate Majority Leader Randy Richardville's June 11, 2013 request for an opinion regarding the art collection. (*See* Letter from Randy Richardville, Ex. 6-B.) As the Attorney General's privilege log reveals, in the two months leading up to Senator Richardville's request, counsel for the DIA and the Attorney General's office frequently corresponded. During that time, counsel for the DIA provided the

Attorney General with purportedly privileged information on a number of subjects relating to the DIA and the art. Such communications included the following:

- On April 12, 2013 an attorney for the DIA sent the Attorney General a letter containing the "Honigman opinion regarding DIA art."
- On May 24, 2013, an attorney for the DIA forwarded three documents to attorneys for the Attorney General, including "Honigman-prepared work product."
- On May 29, 2013, an attorney for the DIA forwarded "five attachments regarding ethics of art deaccession" to counsel for the Attorney General.
- On June 1, 2013 an attorney for the DIA forwarded a "DIA memo regarding the legal and practical constraints of selling the collection" to counsel for the Attorney General.
- On June 12, 2013, an attorney for the DIA forwarded "12 attachments regarding purpose of the museum over the years" to an attorney for the Attorney General.

(AG Privilege Log, Ex. 6-C.)

11. After counsel for the DIA and the Attorney General had been communicating and exchanging information regarding the DIA art and the legal and practical constraints of selling the art for several months, Senator Richardville requested the Attorney General's opinion regarding the art. Then, just two days after Senator Richardville's June 11, 2013 request, the Attorney General issued his Opinion. (*See* Opinion, Ex. 6-B.) Counsel for the Attorney General has stated that no additional responsive communications between the DIA and Attorney General exist following the final entry on the privilege log for June 13, 2013. However,

this is hard to imagine given that the DIA artwork and the Attorney General's position remained relevant to the ongoing proceedings in the Bankruptcy Court.

12.    Approximately six months after the Attorney General issued his Opinion, the DIA and the Attorney General signed the Common Interest Agreement on December 2 and December 4, 2013.   (*See* Common Interest Agreement, Ex. 6-B.)   However, the fact that communications between the Attorney General and counsel for the DIA all occurred prior to the signing of a Common Interest Agreement in December 2013 show that a common legal interest did not exist at the time of the Attorney General's communications.  *See Prowess, Inc. v. Raysearch Labs.* AB, CIV. WDQ-11-1357, 2013 WL 509021 (D. Md. Feb. 11, 2013) ("Prowess's assertion of the common interest privilege is deficient for several reasons. First, the "common interest agreement" was not executed until November 29, 2012. . . . Accordingly, all of the conversations at issue took place well before any common interest agreement existed.").

13.    The AG Objection does not contain an assertion that a common interest agreement, written or otherwise, existed prior in time to the one attached to the AG Objection, which was signed in December 2013.  Though paragraph K of the Common Interest Agreement purports to cover communications prior to the execution of the Common Interest Agreement, this bare assertion is not a sufficient basis to find that there was a common interest at the time the communications

7

occurred.  *See Prowess, Inc. v. Raysearch Labs.* AB, CIV. WDQ-11-1357, 2013 WL 509021 (D. Md. Feb. 11, 2013).

14.    Because the Common Interest Agreement was not executed until after the communications requested in Request No. 1, it does not apply to protect the communications from disclosure.  The Attorney General must produce these communications because, as will be explained below, there is not a common legal interest between the Attorney General and the DIA.

### B. There is No Common Interest Between the Attorney General and the DIA

#### (i)    Legal Standard

15.    The "common interest" privilege protects otherwise privileged communications from disclosure if the communicating parties have "an identical legal interest with respect to the subject matter of the communication."  *Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 347-48 (N.D. Ohio 1999) (internal quotation omitted).  *See also Cozzens v. City of Lincoln Park,* 08-11778, 2009 WL 2242396 (E.D. Mich. July 24, 2009) ("In order to be considered a "common interest" within the meaning of the common interest doctrine, the interest must be . . . a "legal" interest as perhaps contrasted to a mere business interest.").  The common interest privilege is construed narrowly.  *Cigna Ins. Co. v. Cooper Tires & Rubber, Inc.*, 3:99CV7397, 2001 WL 640703 (N.D. Ohio May 24, 2001) ("[T]he

8

"common interest" extension of the privilege should be construed narrowly, rather than expansively.")

16.     In *Reed v. Baxter,* 134 F.3d 351, 357 (6th Cir.1998), the Sixth Circuit considered whether the common interest doctrine applied when counsel for a city met with two city employees regarding employment decisions the city employees had made.  *Id.*  The meeting was also attended by city council members.  *Id.* Raising the issue on its own, the court found that the attendance of the city council members waived any privilege covering communications during the meeting, and that the common interest doctrine would not protect any such communications. The reason the court declined to apply the common interest doctrine was the disparity of interest between the city councilmembers and the city employees: it was only the city employees that were legally responsible for the actions resulting in the employment-related litigation at issue.  *Id.*  Though the council members were obviously part of the city's organizational structure, they nevertheless lacked the requisite "interest" in the litigation necessary to afford the protection of the common interest doctrine to communications with them.

17.     For the reasons articulated below, here, as in *Reed*, the Attorney General and DIA have disparate legal interests and communications between them cannot be protected by the common interest doctrine.

9

### (ii) The City and Attorney General Do Not Have a Common Legal Interest

18.     Here, as in *Reed v. Baxter*, the Attorney General and the DIA, acting as agent for the City, have disparate legal interests with respect to the artworks in the DIA.  This is evidenced, for example, by multiple public statements by City spokespersons regarding the status of the art that directly contradict the Attorney General's Opinion.  *See, e.g.* Randy Kennedy, *Fate of Detroit's Art Hangs in the Balance*, N.Y. Times, December 3, 2013 ("Mr. Orr, in his presentation to the newspaper, added, referring to the art: "Let's be clear. That's a city asset."); Mark Stryker and John Gallagher, *DIA's art collection could face sell-off to satisfy Detroit's creditors*, Detroit Free Press, May 24, 2013 (quoting City spokesperson Bill Nowling as saying "But [the art] is an asset of the city to a certain degree. We've got a responsibility under the act to rationalize that asset, to make sure we understand what's it's [sic] worth.").  *See also* Khalil AlHajal, *Detroit EM Kevyn Orr: Millionaires wanted to buy DIA works, turn Belle Isle into gated community* Mlive.com, March 24, 2014 (quoting Kevyn Orr as saying that, without an agreement regarding the DIA artworks, "I was going to be having a yard sale of DIA art.").

19.     Similarly, the City's attempt to enter into a transaction (the "DIA Settlement") to transfer the art to the DIA in exchange for certain contributions in connection with the the so-called "Grand Bargain" depends on its view, contrary to

the Attorney General, that it may dispose of and transfer the City's assets in view of satisfaction of its debts and obligations. (Debtor's Second Amended Plan of Adjustment IV(F)1–3, Doc. No. 4140.) This is in direct contrast to the Attorney General's view that the art may not be "transferred." (Opinion p 13.)

20. There is no common interest between the Attorney General and the DIA and City because they do not share a common interest with respect to the subject matter of the Attorney General's opinion; in fact, they plainly disagree about the legal status of the artwork in the DIA. As in *Reed*, where the lack of relevance or involvement in a litigation on the subject matter of the communications prevented the invocation of the common interest doctrine, the fact that the Attorney General and the DIA are entities that express similar interests is not enough to protect their communications. Because only <u>the City</u> is the party with title to the assets that would be involved in potential litigation regarding the legal status of its assets, and because the City has publicly expressed views contrary to those expressed by the Attorney General, the Attorney General and the City do not have sufficiently common legal interests to protect their communications or the communications of their agents under the common interest doctrine. *See Reed v. Baxter,* 134 F.3d 351 (6th Cir.1998).

### (iii)    The DIA is an Agent of the City

21.    The DIA is a contractor of the City, and the City specifically engaged and retained the DIA Corporation (referred to as the "Society" in the Operating Agreement) to manage and operate all aspects of the DIA.  A party may be both a contractor and an agent of a principal.  *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 219 (6th Cir. 1992) (citing the Restatement (Second) of Agency for the proposition that "a person may be both an independent contractor and an agent.") Under Michigan law, to establish an agency relationship, it must be shown that the principal controls specific conduct of the alleged agent with respect to the matters entrusted to him.   *St. Clair Intermediate Sch. Dist.t v. Intermediate Educ. Ass'n/Michigan Educ. Ass'n*, 458 Mich. 540, 558, 581 N.W.2d 707, 716 (1998) (finding an agency relationship existed between a Michigan entity and a nonprofit corporation it created to administer insurance benefits pursuant to an agreement).

22.    The DIA is an agent of the City because, among other reasons, the Operating Agreement provides that the DIA must perform specific acts at the City's request and control by and through the Arts Commission, to which the DIA must report and from which it must seek approvals.   (*See* 1997 Operating Agreement, Ex. 6-D.)  The DIA is <u>specifically directed</u>, for instance, that it may not encumber or cloud the title of the works in the art collection.  (*Id.* at § F.7.) The DIA is also required to seek the Commission's approval for various of the

12

museum's policies and to report to the Commission on, for example, any emergent matters. (*See, e.g., id.* at p 24.)

23.    As an agent of the City, the DIA's legal interest with respect to the status of the artworks in the DIA is identical to the City, which holds legal title to the art collection. The DIA, because it may not encumber or cloud the City's title to the works in the art collection, (*see* Operating Agreement § F.7), therefore also cannot hold a common interest with the Attorney General with regard to the status of the art collection. Because the City has disparate interests from the Attorney General with respect to the art, the common interest privilege does not protect their communications.

24.    The existence of a written common interest agreement is not alone enough to articulate a common interest sufficient to invoke the protections of the common interest doctrine. *See Prowess, Inc. v. Raysearch Labs*. AB, CIV. WDQ-11-1357, 2013 WL 509021 (D. Md. Feb. 11, 2013) (denying the existence of a common interest and noting that a signed common interest agreement "does not explain how [certain parties to the common interest agreement] could be affected by this litigation, and it does not explain the scope of the alleged common interest."). As in *Prowess*, the DIA and the Attorney General cannot articulate the DIA's legal interest because the art in question in the Attorney General's opinion is a City asset that the DIA manages pursuant to an Operating Agreement. The

13

Common Interest Agreement merely states that the parties sign the agreement regarding "potential litigation involving protecting the art collection of the Detroit Institute of Arts." (Common Interest Agreement p 1.) The Common Interest Agreement does not specifically articulate how the Attorney General and DIA share a common legal interest, particularly in light of the legal disagreements between the Attorney General and the City, for whom the DIA acts as an agent. Instead, it merely memorializes the parties' desire to prevent their communications from being disclosed.

### C. Even If It Applies to the Communications, the Common Interest Privilege Does Not Shield Underlying Information

25.    The common interest privilege, like all privileges, does not protect <u>all</u> information from disclosure.    *UltiMed, Inc. v. Becton, Dickinson & Co.*, CIV. 062266(DSD/JJG), 2008 WL 4849034 (D. Minn. Nov. 6, 2008) ("Similar to the attorney-client privilege, a "joint-defense" or "common-interest" privilege protects confidential communications made by the client or his lawyer to a lawyer representing another in a matter of common interest. . . . These privileges, however, do not prevent disclosure of factual information.") *citing Upjohn Co. v. United States,* 449 U.S. 383, 396 (1981).  *See also Dow Chem. Co. v. Reinhard*, 07-12012-BC, 2008 WL 2245007 (E.D. Mich. May 30, 2008) ("Attorney-client privilege protects communications for the purpose of obtaining legal advice. It does not protect communications of facts by the attorney to the client.").

14

26.     Thus, even if the common interest privilege (or any other privilege) applied to documents responsive to Syncora's Request No. 1, the non-privileged information underlying the communications as attachments would not automatically be privileged. *See, e.g. Flagstar Bank v. Fed. Ins. Co.*, 05-CV-70950-DT, 2006 WL 6651780 (E.D. Mich. Aug. 21, 2006) (finding a communication privileged, but ordering the production of attachments because "the attachments . . . relate to the underlying factual investigation and contain no legal advice or opinions. The attachments are not privileged."); *Leonen v. Johns-Manville,* 135 F.R.D. 94, 98 (D.N.J. 1990) ("Where a privileged document has attachments, each attachment must individually satisfy the criteria for falling within the privilege. Merely attaching something to a privileged document will not, by itself, make the attachment privileged."); *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 918 F. Supp. 491, 511 (D.N.H. 1996) ("Attachments which do not, by their content, fall within the realm of the privilege cannot become privileged by merely attaching them to a communication with the attorney.").

27.     The AG Objection states that the Attorney General "objects to producing eleven communications (some of which include attached documents) between the Attorney General and counsel for the Detroit Institute of Arts, which are protected by a Common Interest Agreement between the Attorney General and the Detroit Institute of Arts." (AG Objection ¶ 6.) The Privilege Log provide by

the Attorney General suggests that there may be at least 24 attachments to the communications between counsel for the Attorney General and counsel for the DIA. (*See* AG Privilege Log, Ex. 6-C.) These attachments are not listed separately, nor is their status as privileged justified independently from the communication to which they are attached. For example, on June 12, 2013, counsel for the DIA sent counsel for the Attorney General "12 attachments regarding purpose of the museum over the years." (AG Privilege Log, Ex. 6-C.) There is no indication that these attachments were legal advice, attorney work-product, or otherwise confidential. Similarly, on May 28, 2013, counsel for the DIA forwarded the Attorney General's counsel "five attachments regarding ethics of art deaccession." (*Id.*) Again, there is no indication that these documents are themselves privileged. The fact that the attachments accompany potentially privileged communications does not shield them from production if they are not independently privileged. *See, e.g., Flagstar Bank v. Fed. Ins. Co.*, 05-CV-70950-DT, 2006 WL 6651780 (E.D. Mich. Aug. 21, 2006). As such, any attachments to these communications should be produced.

WHEREFORE, for the foregoing reasons, Syncora respectfully requests that this Court enter an order compelling the production of documents by the Attorney General for the State of Michigan.

Dated:  April 25, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*