# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession***<br>**City of Detroit, Michigan**<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, MI 48226<br>WAYNE–MI<br>Tax ID / EIN: 38–6004606 | represented by | **Bruce Bennett**<br>555 S. Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213) 489–3939<br>Email: bbennett@jonesday.com |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237–3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114

(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

*U.S. Trustee*
**Daniel M. McDermott**                represented by   **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769

Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Creditor Committee*<br>**Committee of Unsecured Creditors**<br>*TERMINATED: 03/03/2014* | represented by | **Brett Howard Miller**<br>1290 Avenue of the Americas<br>40th Floor<br>New York, NY 10104<br>(212) 468–8051<br>Email: bmiller@mofo.com,whildbold@mofo.com<br>*TERMINATED: 03/03/2014* |
| | | **Geoffrey T. Pavlic**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033–2518<br>(248) 352–4700<br>Fax : (248) 352–4488<br>Email: pavlic@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| | | **Mark H. Shapiro**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033–2518<br>(248) 352–4700<br>Fax : (248) 352–4488<br>Email: shapiro@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| *Creditor Committee*<br>**Charlene Hearn**<br>PO Box 6612<br>Detroit, MI 48206 | | |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364<br>(202) 408–7004<br>Email: sam.alberts@dentons.com |
| | | **Paula A. Hall**<br>401 S. Old Woodward Ave.<br>Suite 400<br>Birmingham, MI 48009<br>(248) 971–1800<br>Email: hall@bwst–law.com |
| | | **Claude D. Montgomery**<br>620 Fifth Avenue<br>New York, NY 10020<br>(212) 632–8390<br>Email: claude.montgomery@dentons.com,docketny@dentons.com |
| | | **Carole Neville**<br>1221 Avenue of the Americas<br>25th Floor<br>New York, NY 10020<br>(212) 768–6889<br>Email: carole.neville@dentons.com |
| | | **Matthew Wilkins**<br>401 S. Old Woodward Ave. |

Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: wilkins@bwst–law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 08/02/2013 | | 285 | Expedited Transcript Order Form of Hearing 8/2/2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Bennett, Ryan) (Entered: 08/02/2013) |
| 08/27/2013 | | 661 | Expedited Transcript Order Form of Hearing August 21, 2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Bennett, Ryan) (Entered: 08/27/2013) |
| 08/29/2013 | | 687 | Expedited Transcript Order Form of Hearing August 28, 2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Bennett, Ryan) (Entered: 08/29/2013) |
| 09/18/2013 | | 935 | Motion *The Objectors' Motion in Limine to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor–In–Possession Financing Efforts* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (Attachments: # 1 Index – Summary of Attachments # 2 Exhibit 1 – Proposed Order # 3 Exhibit 2 – Notice # 4 Exhibit 3 – Brief [Not Required] # 5 Exhibit 4 – Certificate of Service [To be Filed] # 6 Exhibit 5 – Affidavits [Not Applicable] # 7 Exhibit 6–A – Excerpts of Deposition of Kenneth Buckfire # 8 Exhibit 6–B – Excerpts of Deposition of Kevyn D. Orr) (Hackney, Stephen) (Entered: 09/18/2013) |
| 09/19/2013 | | 954 | Motion *The Objectors' Motion to Admit Certain Deposition Testimony of Kevyn Orr and Kenneth Buckfire* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (Attachments: # 1 Index – Summary of Exhibits # 2 Exhibit 1 – Proposed Order # 3 Exhibit 2 – Notice # 4 Exhibit 3 – Brief [Not Required] # 5 Exhibit 4 – Certificate of Service [To be Filed] # 6 Exhibit 5 – Affidavit [N/A] # 7 Exhibit 6–A – Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr # 8 Exhibit 6–B – Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire # 9 Exhibit 6–C – Excerpts From Deposition of Kevyn Orr # 10 Exhibit 6–D – Excerpts From Deposition of Kenneth Buckfire) (Hackney, Stephen) (Entered: 09/19/2013) |
| 10/23/2013 | | 1342 | Motion for 2004 Examination *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy Procedure 2004* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc., Syncora Holdings Ltd. (Attachments: # 1 Exhibit 1 – Proposed Order # 2 Exhibit 2 – Notice # 3 Exhibit 3 – Brief [Not Required] # 4 Exhibit 4 – Certificate of Service [To be Filed] # 5 Exhibit 5 – Affidavits [Not Applicable] # 6 Exhibit 6 – Documentary Exhibits [Not Applicable]) (Bennett, Ryan) (Entered: 10/23/2013) |
| 10/24/2013 | | 1367 | Amended Notice and Opportunity to Respond/Object; Filed by Interested Parties Syncora Capital Assurance Inc., Syncora |

| | | | |
|---|---|---|---|
| | | | Guarantee Inc. (RE: related document(s)<u>1342</u> Motion for Examination (2004)). Response due by 11/7/2013. (Bennett, Ryan) (Entered: 10/24/2013) |
| 10/25/2013 | | <u>1396</u> | Notice of Filing by Detroit City Council of Resolution Regarding The Emergency Manager's Post–Petition Financing Proposal (ckata) (Entered: 10/25/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name **Syncora Guarantee & Syncora Capital Assurance**

Firm **Kirkland & Ellis LLP**

Address **300 N. LaSalle**

City, State, Zip **Chicago, IL 60654**

Phone **312.862.3200**

Email **dustin.paige@kirkland.com**

**Case/Debtor Name:** **City of Detroit, MI**

**Case Number:** **13-53846**

**Chapter:** **9**

**Hearing Judge** **Hon. Steven Rhodes**

◉ **Bankruptcy**   ○ **Adversary**

○ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 08/02/2013   **Time of Hearing:** 10:00 AM **Title of Hearing:** Hearing re Detroit Bankruptcy

Please specify portion of hearing requested: ◉ **Original/Unredacted**   ○ **Redacted**   ○ **Copy** (2nd Party)

◉ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: _____

---

**Type of Request:**

○ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

◉ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com

**Signature of Ordering Party:**

Dustin Paige   Date: 8/2/13

By signing, I certify that I will pay all charges upon completion of the transcript request.

FOR COURT USE ONLY

Transcript To Be Prepared By

Date   By

Order Received:

Transcript Ordered

Transcript Received

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name  **Syncora Guarantee & Syncora Capital Assurance**

Firm  **Kirkland & Ellis LLP**

Address  **300 N. LaSalle**

City, State, Zip  **Chicago, IL 60654**

Phone  **312.862.3200**

Email  **dustin.paige@kirkland.com**

**Case/Debtor Name:** **City of Detroit, MI**

**Case Number:**  **13-53846**

**Chapter:**  **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

◉ **Bankruptcy**  ◯ **Adversary**

◯ **Appeal**  **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 08/21/2013  **Time of Hearing:** 10, 3:00  **Title of Hearing:** Hearing re Detroit Bankruptcy

Please specify portion of hearing requested:  ◉ **Original/Unredacted**  ◯ **Redacted**  ◯ **Copy** (2nd Party)

◉ Entire Hearing  ◯ Ruling/Opinion of Judge  ◯ Testimony of Witness  ◯ Other

Special Instructions: _____

---

**Type of Request:**

◯ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25 per page (14 calendar days)

◉ Expedited Transcript - $4.85 per page (7 working days)

◯ CD - $30; FTR Gold format - You must download the free
FTR Record Player™ onto your computer from
www.ftrgold.com

**Signature of Ordering Party:**

_Dustin Paige_  Date: **8/26/2013**

By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

Date  By

Order Received:

Transcript Ordered

Transcript Received

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

---

**Order Party: Name, Address and Telephone Number**

Name  Syncora Guarantee & Syncora Capital Assurance

Firm  Kirkland & Ellis LLP

Address  300 N. LaSalle

City, State, Zip  Chicago, IL 60654

Phone  312.862.3200

Email  dustin.paige@kirkland.com

**Case/Debtor Name:** City of Detroit, MI

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** Hon. Steven Rhodes

⦿ Bankruptcy    ◯ Adversary

◯ Appeal    Appeal No: _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

Date of Hearing: 08/28/2013    Time of Hearing: 10:00 AM  Title of Hearing: Hearing re Detroit Bankruptcy

Please specify portion of hearing requested:  ⦿ Original/Unredacted  ◯ Redacted    ◯ Copy (2nd Party)

⦿ Entire Hearing    ◯ Ruling/Opinion of Judge    ◯ Testimony of Witness    ◯ Other

Special Instructions: _____

---

**Type of Request:**

◯ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25 per page (14 calendar days)

⦿ Expedited Transcript - $4.85 per page (7 working days)

◯ CD - $30; FTR Gold format - You must download the free
FTR Record Player™ onto your computer from
www.ftrgold.com

FOR COURT USE ONLY

Transcript To Be Prepared By

                                        Date         By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

_Dustin Paige_    Date: 8/29/2013

By signing, I certify that I will pay all charges upon completion
of the transcript request.

13-53846-tit  Doc 13467  Filed 04/29/14  Entered 08/29/14 22:00:29  Page 9 of 253
13-53846-swr  Doc 687  Filed 08/29/13  Entered 08/29/13 13:10:29  Page 9 of 253

8

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) **Expedited Consideration** |
|  | ) **Requested** |

## THE OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

### Preliminary Statement

By this motion, the Objectors[1] seek to preclude the introduction of evidence and argument by the debtor, the City of Detroit (the "City"), regarding the City's post hoc rationalization for the Forbearance Agreement, i.e., that it needed to cut a deal with the Swap Counterparties in order to free up the casino revenues as collateral for post-petition debtor-in-possession ("DIP") financing.   The City's

---

[1]   This motion is joined by Syncora Capital Assurance and Syncora Guarantee Inc. ("Syncora"), Erste Europäische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., DEPFA Bank PLC, Retiree Association Parties, Retired Detroit Police Members Association, Ambac Assurance Corporation, National Public Finance Guarantee Corporation, Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and the Official Committee of Retirees.

motion and supporting exhibits never referenced this purported justification.[2] Instead, it surfaced for the very first time during the depositions of the City's representatives. Still, while the City's witnesses testified that the ability to collateralize the casino revenue for DIP financing was a driving factor and a business justification for the Forbearance Agreement, they refused to provide information regarding the request for proposals or the anticipated DIP loan collateral package on the grounds that such information was "commercially sensitive." The Objectors anticipate that the City will argue that its need for collateralization of the casinos revenues in order to obtain post-petition financing supports its exercise of business judgment and the fairness and equity of the settlement purportedly effectuated by the Forbearance Agreement. Because the City has refused to provide any information regarding its efforts to secure DIP financing, it should be precluded from offering any evidence at the hearing of its new-found theory that the need for casino revenue collateralization justified the Forbearance Agreement.

---

[2] This motion relates to the September 23, 2013 hearing on the *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant [to] Rule 9019, and (III) Granting Related Relief* (the "Assumption Motion") [Docket No. 17].

2

13-53846-tjt   Doc 4315-1   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 10 of
13-53846-swr   Doc 955-1   Filed 09/18/13   Entered 09/18/13 18:53:06   Page 2 of 13
253

10

## Background

**I.    Collateralization of the Casino Revenue Is a Post Hoc Justification for the Forbearance Agreement.**

Neither the City's motion to approve the Forbearance Agreement nor any of its supporting exhibits cite collateralization of the casino revenue as a business reason supporting this settlement.  The City's motion cited three reasons why the Forbearance Agreement purportedly constituted a sound exercise of business judgment and was fair and equitable:  (1) it would allow the City access to cash flow; (2) it provides a workable unwind of the swap obligations; and (3) it avoids litigation with the swap counterparties.  (*See* Assumption Motion ¶ 41.)  These three reasons were discussed in the City's moving papers at length.  Nowhere in its papers does the City discuss DIP financing or the need to offer a lien on casino revenues as part of the DIP collateral package.  This purported justification was raised for the very first time during the depositions of the City's witnesses, Emergency Manager Kevyn Orr and the lead negotiator of the Forbearance Agreement, Kenneth Buckfire.  Notably, these depositions occurred just after the City had issued a request for DIP financing proposals to more than thirty parties. (Buckfire Dep. 73:9-11.)

**II.    The City and Its Representatives Have Barred Inquiry into Key Aspects of the DIP Financing.**

While Mr. Buckfire and Mr. Orr suddenly testified that the Forbearance Agreement was necessary so that the City could offer collateralization of the

3

casino revenues in a DIP loan, the City's counsel blocked the Objectors from inquiring into details regarding the collateral package being offered as part of the City's DIP financing. Over 15 times throughout these depositions, it was claimed that this information could not be disclosed because it was "commercially sensitive."[3]

Mr. Buckfire would not, for instance, discuss the covenants in the term sheet, the collateral package (aside from the casino revenues), or the parties potentially involved in the financing.

> MR. SUMMERS: What covenants, if any, are included in the RFP as being acceptable or not acceptable?
>
> MR. BUCKFIRE: I'm not going to discuss that. It's commercially sensitive.

(Buckfire Dep. 73:24-74:2)

> MR. CULLEN: . . . So, we're not going to answer questions about individual parties, we're not going to answer questions about the strategy of negotiating with those parties . . . You can go through those general items, but the actual strategy, the terms of arrangements with individual parties I'm not going to have him go into now.

(Buckfire Dep 72:7-22.)

Mr. Buckfire also refused to answer any questions about the collateral package being offered as part of the DIP financing on the basis of the claim that this information was commercially sensitive.

---

[3] The City never sought a protective order with respect to this information; it merely directed its witnesses to refuse to answer the Objectors' questions.

4

13-53846-tjt  Doc 4315-1  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 12 of 18
13-53846-swr  Doc 995  Filed 09/18/13  Entered 09/18/13 18:53:06  Page 4 of 13
253

12

MR. SUMMERS: What other [in addition to a lien on casino revenues] collateral is the City offering to secure the DIP financing loan?

MR. BUCKFIRE: I'm not going to answer that question.

(Buckfire Dep. 74:12-14.)

MR. SUMMERS: Is the City offering art work as collateral?

MR. BUCKFIRE: I'm not going to discuss the terms of the term sheet, sorry.

(Buckfire Dep. 75:2-4.)

Specifically, Mr. Buckfire would not discuss at all whether the City had considered alternate sources of funding from the State of Michigan or federal government, continuing to claim that this is commercially sensitive information.

MR. SUMMERS: Has the City looked into possible sources of funding from the State of Michigan?[4]

MR. BUCKFIRE: I'm not going to discuss that.

MR. SUMMERS: Has the City looked into possible sources of funding from the federal government?

MR. BUCKFIRE: I'm not going to discuss that either.

MR. SUMMERS: On what basis?

MR. BUCKFIRE: Commercially sensitive information.

---

[4]   Mr. Orr stated in his deposition that, though the information regarding aid from the State of Michigan and the Federal Government was commercially sensitive, he understood that neither liquidity nor credit enhancement would be provided by the State of Michigan or the Federal Government in connection with the DIP financing.  (Orr Dep 207:6-21.)  He did not provide specifics and admitted that Mr. Buckfire is leading the DIP financing process for the City.  (Orr Dep 201:10-17.)  Mr. Buckfire, as noted above, refused to answer the relevant questions.

13-53846-tjt   Doc 4315-1   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 13 of
253
13-53846-swr   Doc 935   Filed 09/18/13   Entered 09/18/13 16:53:06   Page 13 of 15        13

(Buckfire Dep. 107:12-19.)

> MR. HACKNEY: And why aren't you going to tell me about [alternate sources of funding from the State or federal government]?
>
> MR. BUCKFIRE: It's commercially sensitive information,

(Buckfire Dep. 162:20-163:2.)

Mr. Buckfire also declined to provide specifics about the operation of the collateral package being offered in connection with the DIP financing, even though he had stated the DIP would be in part collateralized with casino revenues:

> MR. HACKNEY: As the banker who is leading the DIP, what's your understanding of the role the casino revenues will play in the collateral package offered in connection with the DIP?
>
> MR. BUCKFIRE: They will be part of the collateral package.
>
> MR. HACKNEY: So, they will be part, and when you say they, do you mean a specific period of time of the casino revenues or do you mean casino revenues projecting into the future?
>
> MR. BUCKFIRE: It's commercially sensitive so I'm going to decline to answer it.

(Buckfire Dep. 142:19-143:4.)

Finally, the City's counsel also invoked commercial sensitivity in Mr. Orr's deposition:

> MR. HACKNEY: Is the -- is the City considering pledging art as collateral?

13-53846-tjt   Doc 4311   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 14 of
13-53846-swr   Doc 985-1   Filed 09/18/13   Entered 09/18/13 18:53:06   Page 6 of 13   14
253

> MR. SHUMAKER: Again, I'm going to get into now the -- this is a very commercially sensitive subject.
>
> MR. HACKNEY: I'm just asking the questions. You guys got to decide --
>
> MR. SHUMAKER: I'm just stating my objection, and the fact of the matter is, as was stated yesterday with -- with Mr. Buckfire, is that when we get into the -- as you said, the RFP, the DIP RFP process is just started. We're not going to go into strategy or what the terms are or what the specifics are, because we do not believe that this is something that would be down to the City's benefit.

(Orr Dep. 209:21-210:10.)

Thus, the City blocked from discovery all of the Objectors' inquiry into the content of the DIP financing collateral package, while at the same time contending that the collateral package was one of the reasons that justified entering into the Forbearance Agreement.

## **Argument**

I.    **The City Will Provide Evidence Regarding the Fairness and Equity of the Forbearance Agreement and the City's Use of Business Judgment in Entering the Forbearance Agreement.**

In order to approve a settlement under Rule 9019 of the Bankruptcy Code, a court must determine that the settlement is fair and equitable. *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988) *citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). The City has the burden to establish that a settlement is fair and equitable. *See In re Hallet,* 33 B.R. 564, 565 (Bankr. D. Me. 1983). In meeting that burden, the City

must provide the court with a factual basis for concluding that the settlement is fair and equitable. *Reynolds* 861 F.2d 469, 473 (6th Cit. 1988).

A debtor's decision to assume or reject a contract under section 365 of the Bankruptcy Code is reviewed under the "business judgment" standard. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The business judgment standard "presupposes that the estate will assume a contract only where doing so will be to its economic advantage . . . ." *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008). To satisfy this standard, "[t]he act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is . . . beneficial to the estate." *In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 672 (S.D.N.Y. 2012) (quoting *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.*), 208 F.3d 498, 505 (5th Cir. 2000).).

The Objectors anticipate that, in representing to the Court that the Forbearance Agreement is fair and equitable under Rule 9019 and a sound exercise of business judgment under section 365, the City will now attempt to argue that a sound business reason that justifies approval of the Forbearance Agreement is that it will allow for the casino revenues to be collateralized, which is necessary in order to obtain the post-petition DIP financing it seeks. (Orr Dep. 213:9-15.) However, as explained below, the City should not be permitted to make this newly

8

discovered argument because it has blocked the Objectors' inquiry into key features of the DIP financing and its collateral package.

**II.** **To the Extent the City seeks to Support Its Argument In Favor of Approving the Forbearance Agreement By Reference to Its Need For Casino Revenues in Connection With the DIP Loan, It Should be Precluded from Doing So Because It Has Blocked the Objectors' Inquiry into the Issue.**

A party is not permitted to withhold information during discovery and then introduce it at trial to support its claims. *See, e.g., In re Lott*, 139 F. App'x 658, 660 (6th Cir. 2005) ("[L]itigants cannot hide behind the privilege if they are relying upon privileged communications to make their case. 'The attorney-client privilege cannot at once be used as a shield and a sword.'") *quoting United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991). If a party intends to rely on information as evidence at trial, it is required to permit discovery of that information or waive its use at trial. *See, e.g., Arista Records LLC v. Lime Grp. LLC*, 06 CV 5936 KMW, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) ("[A] party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; failure to do so constitutes a waiver of the advice-of-counsel defense . . . ."); *see also Trouble v. Wet Seal, Inc.,* 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) ("[Defendant] waived any available advice of counsel defense by objecting . . . to [Plaintiff's] discovery requests . . . .").

9

13-53846-tjt Doc 4345-1 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 17 of 18
13-53846-swr Doc 385-1 Filed 09/18/13 Entered 09/18/13 18:53:06 Page 17 of 18    17
253

Thus, where a litigant prevents an adversary's inquiry regarding facts relevant to the claims at issue, he should not be permitted to introduce evidence of those facts at trial. *See In re Residential Capital, LLC*, 491 B.R. 63, 72 (Bankr. S.D.N.Y. 2013); *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 (S.D.N.Y. 2000) aff'd, 4 F. App'x 81 (2d Cir. 2001) ("Having blocked his adversary from conducting discovery on this issue, he will not now be heard to advance reliance on counsel."). In *In re Residential Capital*, a debtor sought court approval of a settlement with certain parties under Rule 9019. *Id.* In the discovery phase leading up to the hearing on its 9019 motion, the debtor claimed privilege throughout its document productions and depositions. *Id.* In deposition, the debtor's CEO was instructed by counsel not to reveal the basis for any of the decisions to enter the settlement in question. *Id.* Objectors to the settlement argued that the debtor should be precluded from introducing the evidence because the debtor had blocked access to the information throughout the discovery period. *Id.* The court agreed, and ruled that "A court should exclude any testimony or evidentiary presentations by the Defendants at trial if that same testimony or evidence was withheld from Plaintiffs during discovery . . . ." *Id.* at 69.

Here, it is bad enough that this purported rationale supporting the Forbearance Agreement was never even mentioned in the City's moving papers. But the fact that the City then proffered the rationale, while denying any discovery

on it whatsoever, is wholly improper. To the extent the City seeks to justify its decision to enter into the Forbearance Agreement by reference to its need for collateralization of the casino revenues, it should not be permitted do so by relying on the casino revenues' use in the DIP loan's collateral package. The City should not be permitted to block all inquiry by the Objectors into the nature of the DIP loan's collateral and terms while, at the same time, advancing an argument in favor of the Forbearance Agreement that depends on this feature of the DIP loan's collateral package. Specifically, because the Objectors have not been given an opportunity to examine whether the City is using other sources of collateral and how much, relative to the casino revenues, might be available to the City from other sources, the Objectors would be unfairly prejudiced if evidence and arguments regarding the City's need for casino revenues in connection with the DIP loan were introduced at the hearing. The Objectors cannot adduce information regarding funding and collateral alternatives from any source other than the City. The City should therefore be precluded from introducing any evidence regarding the City's need for collateralization of casino revenues in connection with its DIP financing efforts.

## Conclusion

For the foregoing reasons, the Objectors respectfully request that this Court preclude the City from introducing evidence and argument concerning City's need

for collateralization of the casino revenues in connection with its DIP financing efforts as a business justification for the Forbearance Agreement and enter an order substantially similar to that attached herein as Exhibit 1.

Dated:  September 18, 2013

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

By: _/s/ Vincent J. Marriott, III_____
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan  48084

Telephone:  (248) 649-1200
Facsimile:  (248) 649-2920
E-mail:  howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**
1735 Market Street, 51st Flr.
Philadelphia, PA  19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware  19801
Telephone:  (302) 252-4428
Facsimile:  (410) 361-8930
E-mail:  summersm@ballardspahr.com

*Attorneys for Erste Europaische Pfandbriefund
Kommunalkreditbank Aktiengesellschaft in
Luxemburg S.A.*

By: /s/ Karen V. Newbury
Rick L. Frimmer
Karen V. Newbury
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Telephone:  (312) 258-5600
Facsimile:  (312) 258-5600
E-mail:  rfrimmer@schiffhardin.com
E-mail:  knewbury@schiffhardin.com
E-mail:  mott@schiffhardin.com

13

*Attorneys for DEPFA Bank PLC*

By: /s/ Thomas R. Morris
Thomas R. Morris
Karin F. Avery
**SILVERMAN & MORRIS, P.L.L.C.**
30500 Northwestern Highway, Suite 200
Farmington Hills, Michigan 48334
Telephone: (248) 539-1330
Facsimile: (248) 539-1355
E-mail: morris@silvermanmorris.com
E-mail: avery@silvermanmorris.com

-and-

**LIPPITT O'KEEFE, PLLC**
Brian D. O'Keefe
Ryan C. Plecha
370 East Maple Road, 3rd Floor
Birmingham, Michigan 48009
Telephone: (248); 646-8292
Facsimile: (248) 646-8375
E-mail: bokeefe@lippittokeefe.com
E-mail: rplecha@lippittokeefe.com

*Attorneys for Retiree Association Parties*

By: /s/Meredith E. Taunt
Lynn M. Brimer (P43291)
Meredith E. Taunt (P69698)
Mallory A. Field (P75289)
**STROBL & SHARP, P.C.**
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

14

*Attorneys for Retired Detroit Police Members*
*Association*

By: /s/ Caroline Turner English
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC 20036-5342
Telephone: (202) 857-6054
E-mail: Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY 10019
Telephone: (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI 48304
Telephone: (248) 540-3340
E-mail: bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By: /s/ Guy S. Neal
Eric D. Novetsky
Louis P. Rochkind
**JAFFE, RAITT, HEUER & WEISS, P.C.**
2777 Franklin Road, Suite 2500
Southfield, MI 48034

15

Telephone:  (248) 351-3000
Facsimile:  (248) 351-3082
E-mail:  enovetsky@jaffelaw.com

-and-

Jeffrey E. Bjork
**SIDLEY AUSTIN LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
E-mail:  jbjork@sidley.com

-and-

**SIDLEY AUSTIN LLP**
Guy S. Neal
1501 K Street, N.W.
Washington, DC  20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
E-mail:  gneal@sidley.com

*Attorneys for National Public Finance Guarantee Corporation*

By:  */s/ Lawrence A. Larose*
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY  100166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
E-mail:  llarose@winston.com
E-mail:  skohn@winston.com
E-mail:  chardman@winston.com

16

-and-

Sarah T. Foss, Esq.
**WINSTON & STRAWN LLP**
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Telephone: (713) 651-2600
Facsimile: (713) 651-2700
E-mail: sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

By: */s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
E-mail: EJEssad@wwrplaw.com
E-mail: mrjames@wwrplaw.com

-and-

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
E-mail: Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance Company*

By: */s/Robert D. Gordon*
Robert D. Gordon

17

Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI  48009
Telephone:  (248) 988-5882
Facsimile:  (248) 988-2502
E-mail:  rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System*
*of the City of Detroit and the General Retirement*
*System of the City of Detroit*

By: */s/ Carole Neville*
Carole Neville
Claude Montgomery
DENTONS
1221 Avenue of the Americas
New York, New York  10020-1089
D +1 212 768 6700
F +1 212 768 6800
carole.neville@dentons.com
claude.montgomery@dentons.com

*Counsel to the Official Committee of Retirees*

18

## Summary of Attachments

Exhibit 1 - Proposed Order

Exhibit 2 - Notice

Exhibit 3 - Brief [Not Required]

Exhibit 4 - Certificate of Service [To be Filed]

Exhibit 5 - Affidavits [Not Applicable]

Exhibit 6-A - Excerpts of Deposition of Kenneth Buckfire

Exhibit 6-B - Excerpts of Deposition of Kevyn D. Orr

**<u>Exhibit 1</u>**

**Proposed Order**

13-58846-swr   Doc 4811-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 28 of 5
13-58846-swr   Doc 935-2   Filed 09/20/13   Entered 09/20/13 18:00:08   Page 1 of 5
253

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER GRANTING THE OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

This matter having come before the Court on the motion of the Objectors for the entry of an order precluding the City of Detroit from offering evidence regarding the City's need to obtain casino revenues in connection with its debtor-in-possession financing efforts, the Court having reviewed the Objectors' motion; and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT:**

1.     The Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection With Its Debtor-In-Possession Financing Efforts is GRANTED.

2.     The Debtor, the City of Detroit, is precluded from introducing evidence regarding the City's need to obtain casino revenues in connection with its debtor-in-possession financing at the hearing on the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief.

3.    The joining Objectors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

4.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

_____
STEVEN W. RHODES
United States Bankruptcy Judge

2

13-53846-swr   Doc 4811-2   Filed 04/29/14   Entered 04/29/14 22:00:06   Page 30 of 3
253
13-53846-swr   Doc 4811-1   Filed 04/29/14   Entered 04/29/14 18:09:08   Page 30 of 3   30

**<u>Exhibit 2</u>**

**Notice of Motion and Opportunity to Object**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|                              |   |                           |
|------------------------------|---|---------------------------|
|                              | ) |                           |
| In re                        | ) | Chapter 9                 |
|                              | ) |                           |
| CITY OF DETROIT, MICHIGAN,   | ) | Case No. 13-53846         |
|                              | ) |                           |
| Debtor.                      | ) | Hon. Steven W. Rhodes     |
|                              | ) |                           |

---

## NOTICE OF THE OBJECTORS'
## MOTION *IN LIMINE* TO PRECLUDE DEBTOR
## FROM OFFERING EVIDENCE REGARDING THE CITY'S
## NEED TO OBTAIN CASINO REVENUES IN CONNECTION
## WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

---

**PLEASE TAKE NOTICE** that on September 18, 2013, the Objectors, filed its *Motion* in *Limine to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-In-Possession Financing Efforts* (the "Motion *in Limine*") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to preclude the introduction of evidence and argument by the debtor, the City of Detroit (the "City"), regarding the need for the City to obtain access to casino revenues in connection with its efforts to secure post-petition debtor-in-possession financing.

**PLEASE TAKE FURTHER NOTICE** that **your rights may be affected by the relief sought in the Motion *in Limine*. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Objectors Motion *in Limine*, or you want the Bankruptcy Court to consider your views on the Motion *in Limine*, by **October 3, 2013 at 4:00 p.m. (EDT)** you or your attorney must:[1]

---

[1]   Concurrently herewith, the Objectors are seeking expedited consideration and shortened notice of the Motion *in Limine*. If the Court grants such expedited consideration and shortened notice, the Objectors will file and serve notice of the new response deadline. The Motion *in Limine*. If the Court grants such expedited consideration and shortened notice, the Objector will file and serve notice of the new response deadline.

27923097_4.DOC

13-53846-swr   Doc 43843-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 32 of
13-53846-swr   Doc 936-1   Filed 09/18/13   Entered 09/18/13 18:58:06   Page 2 of 10
253                                                                                         32

1.   File with the court a written response to the Motion *in Limine*, explaining your position explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:   (248) 646-5070
Facsimile:    (248) 646-5075

2.   If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion *in Limine* and you will be served with a notice of the date, time and location of the hearing.

    **PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion in Limine and may enter an order granting such relief.**

---

[2]    A response must comply with F. R. Civ. P. 8(b), (c) and (e).

27923097_4.DOC
13-53846-swr   Doc 4351   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 33 of
253
13-53846-swr   Doc 535-1   Filed 09/19/13   Entered 09/19/13 18:58:06   Page 33 of   33

Dated: September 18, 2013

KIRKLAND & ELLIS LLP

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

    - and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*

By: _/s/ Vincent J. Marriott, III_____
Howard S. Sher
JACOB & WEINGARTEN, P.C.
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan 48084
Telephone: (248) 649-1200
Facsimile: (248) 649-2920
E-mail: howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
BALLARD SPAHR LLP

27923097_4.DOC
13-53846-swr    Doc 43541   Filed 04/29/14   Entered 04/29/14 12:00:03   Page 34 of 10
13-53846-swr    Doc 53541   Filed 09/18/13   Entered 09/18/13 18:58:06   Page 34 of
253                                                                              34

1735 Market Street, 51st Flr.
Philadelphia, PA  19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware  19801
Telephone:  (302) 252-4428
Facsimile:  (410) 361-8930
E-mail:  summersm@ballardspahr.com

*Attorneys for Erste Europaische Pfandbriefund
Kommunalkreditbank Aktiengesellschaft in
Luxemburg S.A.*

By: */s/ Karen V. Newbury*
Rick L. Frimmer
Karen V. Newbury
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Telephone:  (312) 258-5600
Facsimile:  (312) 258-5600
E-mail:  rfrimmer@schiffhardin.com
E-mail:  knewbury@schiffhardin.com
E-mail:  mott@schiffhardin.com

*Attorneys for DEPFA Bank PLC*

By: */s/ Thomas R. Morris*
Thomas R. Morris
Karin F. Avery
**SILVERMAN & MORRIS, P.L.L.C.**
30500 Northwestern Highway, Suite 200

4

Farmington Hills, Michigan 48334
Telephone:  (248) 539-1330
Facsimile:  (248) 539-1355
E-mail:  morris@silvermanmorris.com
E-mail:  avery@silvermanmorris.com

-and-

**LIPPITT O'KEEFE, PLLC**
Brian D. O'Keefe
Ryan C. Plecha
370 East Maple Road, 3rd Floor
Birmingham, Michigan  48009
Telephone:  (248); 646-8292
Facsimile:  (248) 646-8375
E-mail:  bokeefe@lippittokeefe.com
E-mail:  rplecha@lippittokeefe.com

*Attorneys for Retiree Association Parties*

By: _/s/Meredith E. Taunt_____
Lynn M. Brimer (P43291)
Meredith E. Taunt (P69698)
Mallory A. Field (P75289)
**STROBL & SHARP, P.C.**
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304-2376
Telephone:  (248) 540-2300
Facsimile:  (248) 645-2690
lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

*Attorneys for Retired Detroit Police Members*
*Association*

By: _/s/ Caroline Turner English_____
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**

1717 K Street, NW
Washington, DC  20036-5342
Telephone:  (202) 857-6054
E-mail:  Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY  10019
Telephone:  (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By:  */s/ Guy S. Neal*_____
Eric D. Novetsky
Louis P. Rochkind
**JAFFE, RAITT, HEUER & WEISS, P.C.**
2777 Franklin Road, Suite 2500
Southfield, MI  48034
Telephone:  (248) 351-3000
Facsimile:  (248) 351-3082
E-mail:  enovetsky@jaffelaw.com

-and-

Jeffrey E. Bjork
**SIDLEY AUSTIN LLP**

6

555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
E-mail: jbjork@sidley.com

-and-

**SIDLEY AUSTIN LLP**
Guy S. Neal
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
E-mail: gneal@sidley.com

*Attorneys for National Public Finance Guarantee Corporation*


By: */s/ Lawrence A. Larose*
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 100166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
E-mail: llarose@winston.com
E-mail: skohn@winston.com
E-mail: chardman@winston.com

-and-

Sarah T. Foss, Esq.
**WINSTON & STRAWN LLP**
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Telephone: (713) 651-2600

7

Facsimile:  (713) 651-2700
E-mail:   sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

By: */s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI  48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
E-mail:   EJEssad@wwrplaw.com
E-mail:   mrjames@wwrplaw.com

-and-

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
E-mail:   Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance
Company*

By:  /s/Robert D. Gordon
Robert D. Gordon
Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI  48009
Telephone:  (248) 988-5882
Facsimile:  (248) 988-2502
E-mail:  rgordon@clarkhill.com

8

*Counsel to the Police and Fire Retirement System
of the City of Detroit and the General Retirement
System of the City of Detroit*

By: /s/ Carole Neville
Carole Neville
Claude Montgomery
DENTONS
1221 Avenue of the Americas
New York, New York 10020-1089
D +1 212 768 6700
F +1 212 768 6800
carole.neville@dentons.com
claude.montgomery@dentons.com

*Counsel to the Official Committee of Retirees*

9

27923097_4.DOC
13-53846-swr   Doc 4314-1   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 10 of 10
13-53846-swr   Doc 935-1   Filed 09/18/13   Entered 09/18/13 16:59:06   Page 40 of
253                                                                              40

**Exhibit 3**

**None [Brief Not Required]**

**Exhibit 4**

**None [Separate Certificate of Service to be Filed]**

13-58846-swr Doc 4811-5 Filed 05/29/14 Entered 05/29/14 22:00:08 Page 42 of
253
13-58846-swr Doc 4311-5 Filed 05/29/14 Entered 05/29/14 18:09:03 Page 1 of 1    42

**Exhibit 5**

**None**

13-58846-siw   Doc 4011-4   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 43 of
13-58846-swr   Doc 935-6   Filed 05/28/14   Entered 05/28/14 13:00:08   Page 43 of 1   43
253

# Exhibit 6A
## Excerpts of Deposition of Kenneth Buckfire

Page 69

1  A.  I would recommend it.
2      BY MR. SUMMERS:
3  Q.  Okay.
4      MR. SUMMERS: Let's mark that for follow-up
5  after the deposition.
6      BY MR. SUMMERS:
7  Q.  You testified that as of the last analysis your
8  understanding is the estimated amount of the
9  termination payment that would be due is roughly three
10  hundred million dollars, is that correct?
11  A.  Well, it clearly moves around as the interest rate
12  curve moves around.  I think the most recent number is
13  somewhere reaching 275 and 300 million dollars.
14  That's before the application of the applicable
15  discount that we had provided for in the termination
16  agreement.
17  Q.  And that last analysis, when was that performed?
18  A.  A few days ago.
19  Q.  How does the City plan to get the cash necessary to
20  make the termination payment?
21      MR. CULLEN: Objection.  Foundation.  Form.
22      BY MR. SUMMERS:
23  Q.  Does the City have a plan at this point for how it
24  will obtain the cash necessary to pay the termination
25  payment?

Page 70

1      MR. CULLEN: Objection, foundation, form,
2  but you can address the question.
3  A.  Yes, the City has a plan.
4      BY MR. SUMMERS:
5  Q.  And what is that plan?
6  A.  The City intends to secure a debtor in possession
7  financing of sufficient proceeds to fund the
8  termination payment as well as provide sufficient cash
9  for the City to execute on its reinvestment program
10  during the bankruptcy.
11  Q.  And what is -- what actions, if any, has the City
12  taken toward obtaining debtor in possession financing?
13  A.  We have contacted a large universe of potentially
14  interested investors, many of whom have signed
15  nondisclosure agreements, NDAs, pursuant to which they
16  have received the request for proposal, the RFP which
17  went out yesterday.
18  Q.  And is Miller Buckfire leading the effort to obtain
19  debtor in possession financing?
20  A.  Yes.
21  Q.  And when you say a large universe of potential
22  investors, do you know approximately how many have
23  been talked to?
24  A.  At the moment it's in excess of 30.
25  Q.  And how many have -- how many have signed

Page 71

1  nondisclosure agreements?
2  A.  That's the universe I'm discussing, approximately 30
3  or more.
4  Q.  So, everybody you've talked to signed?
5  A.  No, some people didn't want to participate.  I can't
6  tell you how many we called.  I can tell you how many
7  we sent NDAs to which have been returned to us, it's
8  in excess of 30.
9  Q.  Are some of the people or some of the potential
10  sources of financing that Miller Buckfire have spoken
11  to said no, we're not interested?
12  A.  Yes.
13  Q.  And approximately how many have said no?
14  A.  Hasn't been that many, maybe ten.  Would your client
15  like one?
16  Q.  And do you know who those ten entities are that have
17  said they are not interested?
18  A.  I do, yes.
19  Q.  And who are they?
20  A.  I'm not going to tell you that.
21  Q.  On what basis?
22  A.  It's commercially sensitive information.
23      MR. CULLEN: Counsel, maybe it will help,
24  and I don't know whether you want this on the record
25  or not, but the position we are going to take with

Page 72

1  respect to this is that this is a competitive process
2  and the best result in that process is achieved by us
3  being able to negotiate with the individual parties
4  who are out there, and not to litigate the negotiating
5  strategy before we have something to bring back to the
6  court to approve.
7      So, we're not going to answer questions
8  about individual parties, we're not going to answer
9  questions about the strategy of negotiating with those
10  parties and we're not at liberty to give out the
11  information with respect to the people who responded
12  to the NDAs because they understandably don't want to
13  be shopped, don't want to take up a lot of your time.
14  We can fight this through a lot of objections and so
15  forth, and if we want to fight about that at some
16  later time, perfectly fine.
17      You can ask about his general strategy on
18  this, you can ask about the basis for his confidence
19  or nonconfidence in it.  You can go through those
20  general items, but the actual strategy, the terms of
21  arrangements with individual parties I'm not going to
22  have him go into now.  Hopefully by the time we get to
23  the hearing, we'll have an agreement that you will be
24  on a --
25      MR. SUMMERS: Let's go -- I think let's

1 go -- move through the questions and see how we do.
2    MR. CULLEN: Okay.
3    MR. SUMMERS: I understand the City's
4 position on it.
5    MR. CULLEN: Okay.
6 BY MR. SUMMERS:
7 Q. You said an RFP went out yesterday?
8 A. Correct.
9 Q. Approximately how many people was the RPF sent to
10 yesterday?
11 A. The 30 plus people who signed the NDA.
12 Q. How much debtor-in-possession financing does the City
13 hope to obtain?
14 A. Three hundred fifty million dollars, up to three
15 hundred fifty million dollars.
16 Q. And does the City have a goal on the interest rate?
17 A. The lowest possible interest rate.
18 Q. Does the RFP attempt to define what that lowest
19 possible interest rate is?
20 A. No.
21 Q. Does it define whether the interest rate needs to be
22 fixed or variable?
23 A. No.
24 Q. What covenants, if any, are included in the RFP as
25 being acceptable or not acceptable?

1 A. I'm not going to discuss that. It's commercially
2 sensitive.
3 Q. How long of maturity on the DIP financing is the City
4 looking to obtain?
5 A. Through the pendency of the end of the case.
6 Q. And is the City offering a lien on casino revenues in
7 connection with the DIP financing?
8 A. In part.
9 Q. I assume the City does not expect to obtain unsecured
10 financing?
11 A. I would take it if it was offered.
12 Q. No doubt. What other collateral is the City offering
13 to secure the DIP financing loan?
14 A. I'm not going to answer that question.
15 Q. Does the RFP define what collateral would be
16 available?
17 A. Yes, it does.
18 Q. And that's been sent out to potential investors?
19 A. Who have signed nondisclosure agreements.
20 Q. If somebody new came and said I would be interested in
21 providing DIP financing, you would have them sign an
22 NDA and then provide them the RFP?
23 A. If they wanted to make an unsolicited proposal without
24 the benefit of the RPF, we would be happy to accept
25 it. Are you suggesting your client is interested in

1 is submitting a proposal?
2 Q. Is the City offering art work as collateral?
3 A. I'm not going to discuss the terms of the term sheet,
4 sorry.
5 Q. Well, we kind of picked and choose what terms in the
6 RFP we are discussing and not discussing.
7    MR. CULLEN: We have in the attempt to
8 accommodate your desire for information and to
9 maintain control of the integrity of this process
10 which we believe is best negotiated as a negotiation
11 and not a litigation.
12    MR. SUMMERS: I guess I struggle with
13 understanding why the collateral that's offered in the
14 RPF that's been sent out when we know the interest
15 rate, the amount of the financing the debtor seeks,
16 why that puts the City at a competitive disadvantage.
17    MR. CULLEN: We didn't say the interest
18 rate.
19    MR. SUMMERS: The lowest possible.
20    MR. CULLEN: This is the beginning of a
21 negotiation. It's the beginning of a negotiation that
22 isn't at an end yet, that hasn't had any response to
23 the RFPs yet, it's an initial offer, and that's what
24 it is, and he's discussing it as such and willing to
25 testify about it as such, but I'm not going to read

1 the terms of the RFP in the newspaper and our bidders
2 are not going to read the terms of the RFP in the
3 newspaper because that would hamper the process and
4 hamper our ability to get best value.
5    MR. SUMMERS: But we already have in the
6 record that the casino revenues are part of the
7 collateral that's being offered, so, what's wrong with
8 finding out what the rest of the collateral that's
9 being offered?
10    MR. CULLEN: Not going to argue with you,
11 Counsel. I'm telling you what the position is. I've
12 tried to be accommodating. It's as far as I am going
13 to go.
14 BY MR. SUMMERS
15 Q. Has the City had discussions with the State of
16 Michigan about providing financing?
17 A. I'm not going to discuss that.
18 Q. What is the City's view about what has to happen in
19 order to be able to obtain debtor-in-possession
20 financing -- let me put a finer point.
21    Are there certain events that the City
22 believes has to happen in the case for it to be able
23 to realistically obtain debtor-in-possession
24 financing?
25 A. Yes, there are events in the case.

**1** all of the gaming revenues until that claim has been
**2** fully satisfied.
**3**     Now, simple math will tell you if we have
**4** 170 million of gaming revenues and we have a three
**5** hundred million dollar termination payment and we have
**6** an implied interest rate on that termination payment
**7** it will probably take somewhere between two and three
**8** years to pay it off in full.
**9** Q.  That presumes that the lien held by the Swap
**10** counterparties against the casino revenues is a valid
**11** and enforceable lien, correct?
**12** A.  That's what the agreement specifies.
**13** Q.  Well --
**14** A.  The 2009 agreement specifies.
**15** Q.  Right, but --
**16** A.  That's the agreement the City is bound by if the
**17** forbearance agreement is not approved.
**18** Q.  Unless there's a litigation claim that exists that
**19** might invalidate the liens?
**20** A.  In which case who knows what the Swap counterparties
**21** might do and what we might have access to in terms of
**22** gaming revenue.
**23** Q.  So, the legal analysis is important to informing --
**24** A.  Any risk the City is being asked to take that doesn't
**25** have access to gaming revenues is an unacceptable risk

**1** A.  Yes, by the end of October 2013.
**2** Q.  What is the City's intention with respect to analyzing
**3** the appraisal and making a determination as to the art
**4** work once it receives the appraisal?
**5**     MR. CULLEN: Objection.  Foundation.  Form.
**6** A.  I can't even speculate as to what we'll do until we
**7** have some facts as to what value we're dealing with.
**8** That's why they were retained.
**9**     BY MR. SUMMERS:
**10** Q.  Has the City considered selling or leasing Belle Isle?
**11** A.  Not to my knowledge.
**12** Q.  Has the City looked into possible sources of funding
**13** from the State of Michigan?
**14** A.  I'm not going to discuss that.
**15** Q.  Has the City looked into possible sources of funding
**16** from the federal government?
**17** A.  I'm not going to discuss that either.
**18** Q.  On what basis?
**19** A.  Commercially sensitive information.
**20**     MR. SUMMERS: I'm going to propose we take
**21** maybe -- why don't we stop the tape for a minute.
**22**     VIDEO TECHNICIAN: The time is 12:18 p.m.
**23** we are off the record.
**24**     (Recess taken at 12:18 p.m.)
**25**     (Back on the record at 1:21 p.m.)

**1** from the point of view of the City's ability to
**2** rehabilitate itself.
**3** Q.  Have you evaluated noncore assets as a source of funds
**4** for the City?
**5**     MR. CULLEN: Objection.  Foundation.  Form.
**6** A.  Yes.
**7**     BY MR. SUMMERS:
**8** Q.  And what evaluation have you performed?
**9** A.  As we've identified in the June 14th plan we did
**10** identify for the benefit of the public and the
**11** creditors all potential noncore assets that might have
**12** value that could be used pursuant to the plan of
**13** adjustment.
**14** Q.  And on August 5th you announced the City had hired
**15** Christie's to appraise the collection at the Detroit
**16** Institute of Art, correct?
**17** A.  I didn't announce that.
**18** Q.  The City announced it.
**19** A.  The City announced it.
**20** Q.  That they hired Christie's, correct?  Do you have an
**21** understanding of the approximate value of the City's
**22** art collection?
**23** A.  No.
**24** Q.  Do you have an understanding as to when the City
**25** expects to receive the appraisal from Christie's?

**1**     VIDEO TECHNICIAN: We are back on the
**2** record at 1:21 p.m.  This marks the beginning of tape
**3** number three.
**4**     EXAMINATION
**5**     BY MR. HACKNEY:
**6** Q.  Mr. Buckfire, good afternoon.  My name is Steve
**7** Hackney.  I'm an attorney at Kirkland & Ellis, and I
**8** represent Syncora Capital Assurance and Syncora
**9** Guaranty.  Nice to meet you.
**10** A.  Likewise.
**11** Q.  I think we had a brief conversation which you
**12** suggested there might have been something you'd like
**13** to correct with respect to a name from the morning's
**14** testimony.
**15** A.  Yes, thank you, Mr. Hackney.  I incorrectly identified
**16** the attorney from Cadwalader who was present at the
**17** June 4th meeting.  His correct name is Larry
**18** Stromfeld, S T R O M F E L D.  That's his correct name
**19** and that's who attended the meeting.
**20** Q.  If you think of any other corrections, don't hesitate
**21** to stop me and let me know and we'll give you an
**22** opportunity to make them.
**23** A.  Thank you.
**24** Q.  So, I've been listening to your testimony.  It's not
**25** my intention to re-ask you all the questions that were

1 would have demanded Syncora made good on its Swap
2 insurance and let Syncora try and stick around and
3 collect the casino revenues, correct?
4     MR. CULLEN: Objection. Foundation. Form.
5 Calls for speculation.
6 **A. It wasn't an issue for the City.**
7     **BY MR. HACKNEY:**
8 Q. I'm asking whether you thought that was a possibility
9 back at the time you were negotiating the forbearance
10 agreement?
11 **A. It wasn't an issue for the City. Had no impact on the**
12 **City's access to cash.**
13 Q. But if Syncora was a party that might come in in lieu
14 of the Swap counterparties, didn't you want to find
15 out whether you might be able to cut a better deal
16 with Syncora?
17     MR. CULLEN: Objection. Foundation. Form.
18 Calls for speculation.
19 **A. I can't speculate to that.**
20     **BY MR. HACKNEY:**
21 Q. All you can say is that you never did, correct?
22 **A. Correct.**
23 Q. And in fact between June 29th when you spoke to
24 Mr. Snyder and today, there have never been
25 substantive negotiations between the City and Syncora

1 to your knowledge, isn't that correct?
2 **A. Not on this, no.**
3 Q. I wanted to clarify something that you said about the
4 DIP earlier and it was mainly that -- you used the
5 phrase I didn't understand with respect to the casino
6 revenues, you said -- you either said that the casino
7 revenues would be a part of the collateral package or
8 that part of the casino revenues would be in the
9 collateral package, and I wanted to clarify that.
10     MR. CULLEN: Objection. Foundation. Form.
11 I don't think he said either.
12 **A. I didn't.**
13     **BY MR. HACKNEY:**
14 Q. Oh, okay. Well, I thought for sure you had said one
15 of those two, but let me understand what you
16 anticipate -- this is subject to counsel's concern,
17 but I think there has been testimony about the casino
18 revenues as part of the collateral package.
19     As the banker who is leading the DIP,
20 what's your understanding of the role the casino
21 revenues will play in the collateral package offered
22 in connection with the DIP?
23 **A. They will be part of the collateral package.**
24 Q. So, they will be part, and when you say they, do you
25 mean a specific period of time of the casino revenues

1 or do you mean casino revenues projecting into the
2 future?
3 **A. It's commercially sensitive so I'm going to decline to**
4 **answer it.**
5     MR. HACKNEY: Okay. I'll just reserve on
6 that. I obviously don't think there's a bunch of
7 value we have going back and forth. I understand your
8 position about this. On some of the other ones, we
9 may come to those briefly and talk about it, but I get
10 the DIP one.
11     **BY MR. HACKNEY:**
12 Q. You agree that the goal of the forbearance agreement
13 is to get the collateral agreement to terminate so
14 that the City can get access to the casino revenues,
15 correct?
16     MR. CULLEN: Objection. Foundation. Form.
17 **A. That is one of the goals.**
18     **BY MR. HACKNEY:**
19 Q. That is one of the goals. And isn't it true that your
20 current expectation is that you need the postpetition
21 financing, the DIP loan to close in order to be able
22 to exercise the option under the forbearance
23 agreement, correct?
24 **A. Correct.**
25 Q. And there was testimony on that today because you

1 don't have the money otherwise, right, Mr. Buckfire?
2 **A. That is part of the collateral package, yes.**
3 Q. I'm talking about the use of proceeds of the DIP just
4 so we're clear. Part of the use of proceeds of the
5 DIP will be to exercise the option under the
6 forbearance agreement, correct?
7 **A. Correct.**
8 Q. You understand that you won't have unfettered access
9 to the casino revenues until you exercise the option
10 that leads to the termination of a Swap in the
11 collateral agreement, correct?
12 **A. Yes.**
13 Q. Isn't this a bit circular?
14 **A. Regrettably.**
15 Q. How did you factor that consideration into the
16 determination as to whether to engage in the
17 forbearance agreement?
18 **A. Well, this is why the Swap collateral agreement is**
19 **such a problem for the City. Unless we can eliminate**
20 **the collateral and regain control over gaming revenues**
21 **without risk of loss because of defaults that would**
22 **trap it, we need to rationalize and clean this up in**
23 **order to put the City on a sound financial basis.**
24 Q. So, there are two parts -- there are -- there may be
25 many parts but two of the important parts of the

Min-U-Script®
Bienenstock Court Reporting & Video
(36) Pages 141 - 144

13-53846-tjt Doc 4311 Filed 04/29/14 Entered 04/29/14 23:00:03 Page 5 of 6
13-53846-swr Doc 913-248 Filed 09/19/13 Entered 09/19/13 18:39:03 Page 5 of 6
253
48

Page 161

1   City's plan is are the investments that Mr. Orr wants
2   to make, right?
3 **A. Right.**
4   Q.   And the cost reductions he wants to make, right?
5 **A. And the increase in staffing levels across services to**
6   **provide higher level services to the City.**
7   Q.   But that's in the reinvestment, right?
8 **A. No, it's actually hard to break out that way because a**
9   **lot of it is actually in the salaries line and the HR**
10  **lines.**
11       **So, you have to go back to the numbers and**
12  **ask me a lot of those questions.**
13  Q.   The proposed investments that he wants to make, that
14  he proposes to make that I'm so ruthlessly omitting,
15  they are in this document, right?
16 **A. Not in this projection.**
17  Q.   They're not in this projection, but they are in this
18  proposal?
19 **A. That's right.**
20  Q.   He laid them all out in gory detail?
21 **A. Yes, he did.**
22  Q.   He also lays out a number of cost cutting initiatives,
23  isn't that correct?
24 **A. Yes, he does.**
25  Q.   And one of his goals is also to make the City more

Page 162

1   efficient, correct?
2 **A. Yes.**
3   Q.   At the same time he also wants to make it operate
4   better, correct?
5 **A. Correct.**
6   Q.   Those two things from a net operating standpoint work
7   in tension with one another, right?
8 **A. They do over time, but you have to consider the**
9   **timetable and when these things are done.**
10  Q.   I want to ask you a question about state and federal
11  aid but I don't want to mix it up into the DIP which I
12  understand -- which I took to mean earlier was one of
13  the sensitivities there.  I want to go back to June 4,
14  2011.
15       Prior to June 4, 2011 had you undertaken
16  any effort to evaluate whether there was either state
17  aid or federal aid that you could use in lieu of
18  having to negotiate this deal with the Swap
19  counterparties?
20 **A. We are assuming there is no aid available to the City.**
21  Q.   You were assuming that there was none, but had you
22  undertaken an effort to determine whether there could
23  be some?
24 **A. I've already testified that I'm not going to discuss**
25  **that.**

Page 163

1 **Q. And why aren't you going to tell me about that?**
2 **A. It's commercially sensitive information.**
3   Q.   Why?
4 **A. That's my answer.**
5   Q.   Well, I can understand why if you are seeking estate
6   guarantee of a DIP or other things today, I get that,
7   and I'm not going to ask you about that, but I am
8   going to say that I think I deserve an answer on what
9   happened prior to June 4 in terms of finding
10  alternative ways to address the City's liquidity
11  crisis because after all what's been presented to us
12  was if we didn't do this deal, the City would die, and
13  I do think we are entitled to ask well, what had you
14  tried to do with other actors, so, can we get over it
15  or --
16       MR. CULLEN: You could certainly ask if he
17  had received any assurance of the availability of any
18  other funding from any other source during that time
19  period.
20       MR. HACKNEY: Well, I do appreciate that
21  but I often tend to ask my own questions.    Let me
22  try and ask it in a way that hopefully serves your
23  concerns.
24       BY MR. HACKNEY:
25  Q.   And let me first ask you, Mr. Buckfire, had your firm,

Page 164

1   you or your firm undertaken any analysis of this
2   question?  You don't have to tell me what it was.
3   Let's go in stages.
4        Had you analyzed the problem?
5 **A. Yes, we did.**
6   Q.   You had analyzed the problem.  And is it your
7   testimony that divulging the results of that analysis
8   would be commercially sensitive?
9 **A. Yes.**
10  Q.   Is part of the reason for that because of the way any
11  potential aid from the City or from the state or the
12  feds might interplay with the DIP process, is it the
13  way they knit up, is that the problem?
14 **A. Yes.**
15  Q.   All right.
16       MR. HACKNEY: Let me suggest a short break.
17  I think that it may be time for me to pass the baton.
18       MR. CULLEN: Okay.
19       VIDEO TECHNICIAN: The time is 2:19 p.m.
20  This marks the end of tape number three.  We are off
21  the record.
22       (Recess taken at 2:19 p.m.)
23       (Back on the record at 2:30 p.m.)
24       VIDEO TECHNICIAN: We are back on the
25  record at 2:30 p.m.  This marks the beginning of tape

**Exhibit 6B**

**Excerpts of Deposition of Kevyn D. Orr**

1 Q. Your view of those legacy expenditures in the
2 bankruptcy is that they are unsecured claims, correct?
3 A. Yes. Many of them are, yes. There are some
4 expenditures that are secured with regard to the water
5 department and parking and some miscellaneous, but the
6 roughly 11 and a half, 12 billion dollars that we put
7 out there we view as unsecured.
8 Q. So let's go back to sourcing this termination payment.
9 A. Yes.
10 Q. It was my understanding of his testimony that
11 Mr. Buckfire who, by the way, is the individual tasked
12 with obtaining the City's post petition financing,
13 correct?
14 A. Yes.
15 Q. And is presumably the individual that's most
16 knowledgeable about that effort?
17 A. Yes.
18 Q. It was -- I'll represent to you that his testimony was
19 that the proceeds for the optional termination payment
20 would likely come from the post -- the proceeds of the
21 post petition financing?
22 A. Yes.
23     MR. JURGENS: Objection to form.
24     BY MR. HACKNEY:
25 Q. Is that also your understanding?

1 A. Yes.
2 Q. Okay. Now, isn't it also true that the City hopes to
3 pledge the casino revenues as part of the collateral
4 package for the post petition financing?
5     MR. SHUMAKER: I'm going to object here.
6 We're getting into an area where it is incredibly
7 commercially sensitive as to what sort of post
8 petition financing that the City is seeking.
9     MR. HACKNEY: Let me not be rude. I will
10 tell you I'm just going to ask him questions that
11 Buckfire asked yesterday -- answered. So I'm not
12 going to try and play the whole thing, but there were
13 absolutely areas where Buckfire answered. I think
14 there were a lot of other people in the room that were
15 there. I think any of your colleagues --
16     MR. SHUMAKER: Okay, that's fine.
17     MR. HACKNEY: Any of your colleagues.
18     MR. SHUMAKER: I just want to caution you.
19     MR. HACKNEY: I understand. I understand
20 the sensitivity. There were absolutely areas, though,
21 that Buckfire talked about. This was one of them. I
22 mean can I get an Amen or --
23     (Consensus Amen.)
24 A. Okay.
25     BY MR. HACKNEY:

1 Q. Okay. So I think there -- if I'm not mistaken, your
2 father was an amen minister.
3 A. Great grandfather, grandfather and father.
4 Q. So maybe --
5 A. Yeah, took me back to -- over in the corner with the
6 deacons, yeah, took me back.
7 Q. Okay. I won't compare myself to your father,
8 grandfather and great grandfather, but I can aspire.
9 A. Yeah.
10 Q. So I do want to talk about -- this is important.
11 Okay. This is -- isn't it true that one aspect of the
12 DIP -- I'm not going to get into the others -- is that
13 the casino revenues will be pledged or anticipated to
14 be pledged as collateral for the post petition
15 financing?
16 A. Let me say this. That is certainly under
17 consideration.
18 Q. Okay. Now, isn't it also true, though, that the
19 casino revenues have not currently been freed up on a
20 permanent basis because the City has not currently
21 exercised the option, correct?
22 A. The certainty that we hope to get out of the
23 forbearance agreement has not been approved yet,
24 correct.
25 Q. Well, even if it is approved by the Court, you still

1 won't have exercised the option.
2 A. That is true with regard to the optional termination
3 payment.
4 Q. Right.
5 A. Yes.
6 Q. And you need to exercise the option to terminate the
7 hedge, right?
8 A. Yes.
9 Q. You need to terminate the hedge to terminate the
10 collateral agreement.
11 A. I think that's --
12     MR. SHUMAKER: Object to form, to the
13 extent calls for a legal conclusion.
14 A. Yeah, without getting into legal conclusions --
15     COURT REPORTER: I'm sorry. This is --
16     BY MR. HACKNEY:
17 Q. You think it's a fair characterization that you need
18 to get the hedge terminated to get the collateral
19 agreement terminated?
20 A. Yes.
21 Q. And the good part for the City, if those things
22 happen, is that now you have unchanneled access to the
23 casino revenues going into the future?
24 A. Yes, as we've said today, that certainty is one of the
25 motivations to enter into the agreement.

Page 205

1 Q. But do you also understand that you can't currently
2 pledge the casino revenues to a post petition lender
3 in a -- prior to having exercised the option under the
4 forbearance agreement?
5 A. Well, let's be careful without drawing legal
6 conclusions. You can always enter into agreements
7 that have contingencies attached to them and the
8 parties will wait for those contingencies to occur.
9 That certainly has happened with a number of different
10 negotiations, not just in this case, but happens all
11 the time.
12 Q. That's fair that you absolutely -- you make a pledge
13 that's contingent on something else. But isn't it
14 true that, as a general matter, post petition lenders
15 typically like to make sure that they have clean
16 collateral before they make a loan that's secured by
17 that collateral?
18     MR. SHUMAKER: Objection, calls for
19 speculation.
20 A. I think that's generally a fair characterization;
21 however, there have been cases that I've been involved
22 with outside of this one where post petition lenders
23 have been willing to make pledges or commitments
24 subject to certain contingencies.
25     BY MR. HACKNEY:

Page 206

1 Q. Isn't it your expectation today, though -- is it -- is
2 it your expectation today that any post petition
3 lender will want clear -- a clear lien on the casino
4 revenues before it's willing to lend? Is that your
5 current expectation?
6 A. Well, my current expectation is it might well want
7 clear lien before it's willing to fund. I would think
8 in many of the bankruptcy cases that I've been
9 involved in, post petition lenders, for instance, are
10 willing to make commitments subject to the Court
11 approving their super priority liens, and then once
12 that approval is granted, they fund the loan, so
13 that's fairly common.
14 Q. I'm going to confirm for the record that conversations
15 with the State of Michigan about providing DIP
16 financing or with the federal government about
17 providing DIP financing are still questions that you
18 will refuse to answer on the grounds of commercial
19 sensitivity?
20     MR. SHUMAKER: I think you can ask Mr. Orr
21 those questions. I don't want to -- I don't want to
22 categorically exclude you from doing that.
23     BY MR. HACKNEY:
24 Q. Are they commercially sensitive?
25 A. They are commercially sensitive, but I don't want to

Page 207

1 mislead you. It is my assumption that, while they're
2 commercially sensitive, that's not going to be
3 forthcoming.
4 Q. Oh, really?
5 A. Yes.
6 Q. So just to tie it up, you tried to get a -- whether
7 it's credit enhancement or liquidity from the State
8 and the Feds, and your expectation is that you won't
9 be able to?
10 A. My understanding at the State level is that there's
11 certain prohibitions of the State law on the ability
12 of the State to lend to the City, and at the Federal
13 level my understanding is that it's not going to be
14 forthcoming, direct aid.
15 Q. Interesting. And what about credit enhancement by the
16 State?
17 A. Here again, it's highly commercially insensitive --
18 sensitive. I don't want to say anything that
19 forecloses it, but we -- let me answer it this way.
20 We are operating on the assumption that that will not
21 come -- be forthcoming.
22 Q. The casino revenues are about 170 million dollars a
23 year; isn't that correct?
24 A. Yeah, 170, 180 somewhere in there.
25 Q. Yeah. In fact, that -- it's interesting because the

Page 208

1 DIP proceeds you're seeking are up to 350; is that
2 correct?
3 A. Here again, those are commercially sensitive, but I
4 think that's fair. Yes, I think that's fair.
5 Q. Okay. And that's the equivalent of two years' worth
6 of casino revenues, correct?
7 A. Yes.
8 Q. Okay. And that's something that you think you may be
9 able to get without having to pledge a clear lien on
10 the casino revenues, right?
11 A. No. What I'm trying to say is you can certainly enter
12 into commitments. I'm drawing commitments different
13 from funding. You can certainly have a lender which
14 is quite common in bankruptcy cases to make a
15 commitment subject to approval of its security
16 interest or priorities to actually fund.
17 Q. Okay.
18 A. So that can occur.
19 Q. So the fact that that can occur means that there can
20 be uncertainty in connection with the casino revenues
21 and it won't hamstring your DIP process, correct?
22 A. Yeah, it's not so much -- well, to a degree what
23 you're saying is correct. It's not so much
24 uncertainty with casino revenues because that's math.
25 It may be some uncertainty with regard to the ability

52

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

|                              |   |                              |
|------------------------------|---|------------------------------|
| In re                        | ) | Chapter 9                    |
|                              | ) |                              |
| CITY OF DETROIT, MICHIGAN,   | ) | Case No. 13-53846            |
|                              | ) |                              |
| Debtor.                      | ) | Hon. Steven W. Rhodes        |
|                              | ) |                              |
|                              | ) | **Expedited Consideration**  |
|                              | ) | **Requested**                |

## THE OBJECTORS' MOTION TO ADMIT CERTAIN DEPOSITION TESTIMONY OF KEVYN ORR AND KENNETH BUCKFIRE

The Objectors[1] hereby move this court pursuant to Federal Rules of Civil Procedure 26 and 32(a), made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7026 and 7032, for entry of the proposed order attached hereto as Exhibit 1 admitting the deposition testimony identified in Exhibit 6-A and Exhibit 6-B[2] for purposes of the upcoming evidentiary hearing relating to the *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that*

---

[1] This motion is joined by Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora"), Erste Europäische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., DEPFA Bank PLC, Ambac Assurance Corporation, National Public Finance Guarantee Corporation, Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and the Official Committee of Retirees.

[2] In an effort to minimize the number of motions submitted to the Court, all of the deposition designations submitted by the undersigned objectors are contained in Exhibits 6-A and 6-B.

13-53846-swr Doc 4354-1 Filed 04/29/14 Entered 04/29/14 21:00:23 Page 58 of 22
13-53846-swr Doc 954 Filed 09/13/13 Entered 09/13/13 19:13:00 Page 1 of 12
253

53

*Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief*, dated July 18, 2013 [Docket No. 17] (the "<u>Assumption Motion</u>").  In support thereof, the Objectors state as follows:

## <u>JURISDICTION</u>

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## <u>LEGAL STANDARD</u>

2.    Federal Rule of Civil Procedure 32(a)(1) provides that, "[a]t a hearing or trial, all or part of a deposition may be used against a party on these conditions: (A) the party was present or represented at the taking of the deposition or had reasonable notice of it; (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and (C) the use is allowed by Rule 32(a)(2) through (8)."  FED. R. CIV. P. 32(a)(1).

3.    Under Federal Rule of Civil Procedure 32(a)(3), "[a]n adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)."  FED. R. CIV. P. 32(a)(3).

4.    In the Sixth Circuit, a "managing agent" for purposes of Rule 32(a)(3) is any person who possesses the following authority and attributes:

  a. Acts with superior authority and is invested with general powers to exercise his judgment and discretion in dealing with his principal's affairs (as distinguished from a common employee, who does only what he is told to do; has no discretion about what he can or cannot do; and is responsible to an immediate superior who has control over his acts);

  b. Can be depended upon to carry out his principal's directions to give testimony at the demand of a party engaged in litigation with his principals; and

  c. Can be expected to identify himself with the interests of his principal rather than those of the other party.

*In re Air Crash at Lexington, Kentucky, August 27, 2006*, 71 Fed. R. Serv. 3d 313, 2008 WL 2954971, at *4 (E.D. Ky. Jul. 30, 2008) (*citing Brandon v. Art Centre Hospital (Osteopathic)*, 366 F.2d 369, 372 (6th Cir. 1966)).

## <u>RELIEF REQUESTED AND BASIS FOR RELIEF</u>

5.    In this case, the Objectors are submitting the deposition testimony of Kevyn Orr and Kenneth Buckfire, both of whom qualify as managing agents for purposes of Rule 32(a)(3).  The deposition testimony that the Objectors intend to submit is attached hereto as <u>Exhibits 6-A and 6-B</u>.

6.    The deposition testimony of Kevyn Orr satisfies the standards of Federal Rule 32.  First, Mr. Orr was represented at his deposition by Jones Day. Second, the Objectors intend to use Mr. Orr's deposition testimony to the extent it

would be admissible under the Federal Rules of Evidence if Mr. Orr were present and testifying (*i.e.*, as party admissions under Federal Rule of Evidence 801(2)(d)). Third, Mr. Orr was one of the City's "managing agents" at the time of his deposition on August 30, 2013.

7. At that time, Mr. Orr was emergency manager of the City of Detroit. (Exhibit 6-C, Orr Dep. Excerpts 83:13-20; *Declaration of Kevyn D. Orr in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 11] ("Orr Declaration") ¶ 1.)  As emergency manager, Mr. Orr acted for, and in the place and stead of, the City's elected mayor and city council, and exercised authority over nearly all aspects of the City's government and management, including, but not limited to, budgeting, operations, financial affairs, contracts, appropriations, collective bargaining, and the use, sale and lease of assets.  (Orr Declaration ¶ 2.)

8. Given the broad scope of Mr. Orr's authority, Mr. Orr acts, as set out in *In re Air Crash*, "with superior authority and is invested with general powers to exercise his judgment and discretion in dealing with [the City's] affairs." Accordingly, he qualifies as a managing agent for purposes of Federal Rule 32(a)(3).

9. The deposition testimony of Kenneth Buckfire also satisfies the standards of Federal Rule 32.  First, Mr. Buckfire was represented at his deposition

4

13-53846-tjr  Doc 4354-1  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 56 of 12
13-53846-swr  Doc 954  Filed 09/13/13  Entered 09/13/13 13:13:00  Page 4 of 11
253
56

by Jones Day.  Second, the Objectors intend to use Mr. Buckfire's deposition testimony to the extent it would be admissible under the Federal Rules of Evidence if Mr. Buckfire were present and testifying (*i.e.*, as party admissions under Federal Rule of Evidence 801(2)(d)).  Third, Mr. Buckfire was one of the City's "managing agents" at the time of his deposition on August 30, 2013.

10.    At that time, Mr. Buckfire was the co-founder and co-president of Miller Buckfire & Company, which was the company engaged by the City as its investment banker.  (Exhibit 6-D, Buckfire Dep. Excerpts 11:14-20.)  As part of this engagement, "Mr. Buckfire was the lead negotiator for the City on the business terms of what became the forbearance agreement."  (Exhibit 6-C, Orr Dep. Excerpts 15:25-16:4.)  As lead negotiator, Mr. Orr "directed Mr. Buckfire to do whatever needed to be done to get the agreement in principle resolved and signed." (*Id.* at 76:13-15.)  To accomplish this task, Mr. Orr "authorized Mr. Buckfire to negotiate the best possible deal he could with the Swap counterparties."  (*Id.* at 36:25-37:4.)

11.    Accordingly, Mr. Buckfire qualifies as a managing agent under Federal Rule 32.  To begin, Mr. Buckfire had the authority to exercise his judgment and discretion to negotiate the best possible terms with the Swap Counterparties.  *See In re Air Crash*, 2008 WL 2954971, at *4 (stating that a managing agent is a person who "is invested with general powers to exercise his

5

13-53846-tjt  Doc 4354-1  Filed 09/15/14  Entered 09/15/14 19:10:00  Page 57 of 12
13-53846-swr  Doc 954-1  Filed 09/29/14  Entered 09/29/14 21:00:23  Page 57 of 253    57

judgment and discretion in dealing with his principal's affairs . . . ."). And, after Mr. Buckfire had negotiated each of the terms of the Forbearance Agreement, he was the one who instructed Mr. Orr that the City should take the deal Mr. Buckfire had negotiated. (Exhibit 6-C, Orr Dep. Excerpts 37:5-9.) In addition, Mr. Buckfire's appearance at his deposition and the upcoming evidentiary hearing demonstrate that he satisfies the other two factors set out in *In re Air Crash* — namely, that he can (a) be depended upon to carry out the City's direction to provide testimony and (b) be expected to identify himself with the interests of the City as opposed to the Objectors.

12. Finally, it should be noted that, in addition to the fact that the depositions of Messrs. Orr and Buckfire are independently admissible, granting this Motion will permit counsel to focus their cross-examinations on the most salient points, which will help to streamline the hearing on the Assumption Motion.

13. In filing this motion, the Objectors reserve their right to designate additional deposition testimony based on the evidence introduced at the hearing, consistent with any Orders of the Court regarding post-hearing submissions.

*[Remainder of this page intentionally left blank.]*

6

13-53846-tjt  Doc 354-1  Filed 09/15/13  Entered 09/15/13 19:18:00  Page 6 of 12
13-53846-swr  Doc 4354-1  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 58 of
253

58

WHEREFORE, the Objectors request that this Court grant the relief requested in

this motion and enter an order consistent with the proposed order

attached as Exhibit 1.[3]

Dated:  September 19, 2013   Respectfully submitted,

            **KIRKLAND & ELLIS LLP**

            By: */s/ Stephen C. Hackney*
            James H.M. Sprayregen, P.C.
            Ryan Blaine Bennett
            Stephen C. Hackney
            KIRKLAND & ELLIS LLP
            300 North LaSalle
            Chicago, Illinois 60654
            Telephone:   (312) 862-2000
            Facsimile:    (312) 862-2200

              - and -

            Stephen M. Gross
            David A. Agay
            Joshua Gadharf

---

[3] In accordance with Local Rule 9014-1, on September 18, 2013, William Arnault, counsel for Syncora, conferred telephonically with Gregory Shumaker, counsel for the City, and sought concurrence regarding the issues the Objectors intended to raise in this motion.  Mr. Shumaker refused to concur in the Objectors' motion.

7

13-53846-tjt  Doc 4354-1  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 59 of 12
13-53846-swr  Doc 954  Filed 09/19/13  Entered 09/19/13 19:13:03  Page 7 of 11
253
  59

MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*

By: */s/ Vincent J. Marriott, III*
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan 48084
Telephone: (248) 649-1200
Facsimile: (248) 649-2920
E-mail: howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**
1735 Market Street, 51st Flr.
Philadelphia, PA 19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware 19801
Telephone: (302) 252-4428
Facsimile: (410) 361-8930
E-mail: summersm@ballardspahr.com

*Attorneys for Erste Europaische Pfandbriefund*

8

13-53846-tjt   Doc 4354-1   Filed 04/29/14   Entered 04/29/14 21:00:23   Page 60 of 22
13-53846-swr   Doc 954   Filed 09/19/13   Entered 09/19/13 19:19:00   Page 60 of 253

253

60

*Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.*

By: /s/ Karen V. Newbury
Rick L. Frimmer
Karen V. Newbury
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
Telephone: (312) 258-5600
Facsimile: (312) 258-5600
E-mail: rfrimmer@schiffhardin.com
E-mail: knewbury@schiffhardin.com
E-mail: mott@schiffhardin.com

*Attorneys for DEPFA Bank PLC*

By: /s/ Caroline Turner English
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC 20036-5342
Telephone: (202) 857-6054
E-mail: Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY 10019
Telephone: (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)

9

Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By:  */s/ Guy S. Neal*_____
Eric D. Novetsky
Louis P. Rochkind
**JAFFE, RAITT, HEUER & WEISS, P.C.**
2777 Franklin Road, Suite 2500
Southfield, MI  48034
Telephone:  (248) 351-3000
Facsimile:  (248) 351-3082
E-mail:  enovetsky@jaffelaw.com

-and-

Jeffrey E. Bjork
**SIDLEY AUSTIN LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
E-mail:  jbjork@sidley.com

-and-

**SIDLEY AUSTIN LLP**
Guy S. Neal
1501 K Street, N.W.
Washington, DC  20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
E-mail:  gneal@sidley.com

*Attorneys for National Public Finance Guarantee*
*Corporation*

10

By: */s/ Lawrence A. Larose*
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 100166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
E-mail: llarose@winston.com
E-mail: skohn@winston.com
E-mail: chardman@winston.com

-and-

Sarah T. Foss, Esq.
**WINSTON & STRAWN LLP**
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Telephone: (713) 651-2600
Facsimile: (713) 651-2700
E-mail: sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

By: */s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
E-mail: EJEssad@wwrplaw.com
E-mail: mrjames@wwrplaw.com

-and-

11

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
E-mail: Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance
Company*

By: */s/Robert D. Gordon*
Robert D. Gordon
Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
E-mail: rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System
of the City of Detroit and the General Retirement
System of the City of Detroit*

By: */s/ Carole Neville*
Carole Neville
Claude Montgomery
DENTONS
1221 Avenue of the Americas
New York, New York 10020-1089
D +1 212 768 6700
F +1 212 768 6800
carole.neville@dentons.com
claude.montgomery@dentons.com

*Counsel to the Official Committee of Retirees*

**<u>Summary of Exhibits</u>**

Exhibit 1 - Proposed Order

Exhibit 2 - Notice

Exhibit 3 - Brief [Not Required]

Exhibit 4 - Certificate of Service [To be Filed]

Exhibit 5 - Affidavit [N/A]

Exhibit 6-A - Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

Exhibit 6-B - Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

Exhibit 6-C - Excerpts From Deposition of Kevyn Orr

Exhibit 6-D - Excerpts From Deposition of Kenneth Buckfire

**Exhibit 1**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|                                  |     |                          |
|----------------------------------|-----|--------------------------|
|                                  | )   |                          |
| In re                            | )   | Chapter 9                |
|                                  | )   |                          |
| CITY OF DETROIT, MICHIGAN,       | )   | Case No. 13-53846        |
|                                  | )   |                          |
|                      Debtor.     | )   | Hon. Steven W. Rhodes    |
|                                  | )   |                          |

## ORDER GRANTING THE OBJECTORS' MOTION TO ADMIT CERTAIN DEPOSITION TESTIMONY OF KEVYN ORR AND KENNETH BUCKFIRE

This matter coming before the Court on the motion of the Objectors for the entry of an order admitting the deposition testimony identified in Exhibit 6-A and Exhibit 6-B to *The Objectors' Motion to Admit Certain Deposition Testimony of Kevyn Orr and Kenneth Buckfire*; the Court having reviewed the Objectors' motion; and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Objectors' motion is GRANTED.

2.    The deposition testimony identified in Exhibit 6-A and Exhibit 6-B to the Objectors' motion is admitted.

3.    The joining Objectors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

4.	The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.	The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

## Exhibit 2

**Notice of Motion and Opportunity to Object**

13-58846-tjr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 20:00:03   Page 69 of 0
13-58846-swr   Doc 954-3   Filed 04/29/14   Entered 04/29/14 19:18:06   Page 19 of 0
253
69

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| | ) |
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## NOTICE OF THE OBJECTORS' MOTION TO ADMIT CERTAIN DEPOSITION TESTIMONY OF KEVYN ORR AND KENNETH BUCKFIRE

**PLEASE TAKE NOTICE** that on September 19, 2013, the Objectors, filed *The Objectors' Motion to Admit Certain Deposition Testimony of Kevyn Orr and Kenneth Buckfire* (the "Motion") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to admit certain deposition testimony of Kevyn Orr and Kenneth Buckfire.

**PLEASE TAKE FURTHER NOTICE** that **your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Objectors' Motion or you want the Bankruptcy Court to consider your views on the Motion, by **October 4, 2013 at 4:00 p.m. (EDT)** you or your attorney must:[1]

1. File with the court a written response to the Motion. explaining your position explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.

---

[1] Concurrently herewith, the Objectors are seeking expedited consideration and shortened notice of the Motion. If the Court grants such expedited consideration and shortened notice, the Objectors will file and serve notice of the new response deadline.

[2] A response must comply with F. R. Civ. P. 8(b), (c) and (e).

Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:     (248) 646-5070
Facsimile:     (248) 646-5075

2.    If an objection or response is timely filed and served, the clerk will schedule a hearing on
the Motion and you will be served with a notice of the date, time and location of the
hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these
steps, the court may decide that you do not oppose the relief sought in the Motion and may
enter an order granting such relief.**

*[Remainder of this page intentionally left blank]*

2

Dated:  September 19, 2013

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

By: _/s/ Vincent J. Marriott, III_____
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan  48084
Telephone:  (248) 649-1200
Facsimile:  (248) 649-2920
E-mail:  howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**

1735 Market Street, 51st Flr.
Philadelphia, PA  19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware  19801
Telephone:  (302) 252-4428
Facsimile:  (410) 361-8930
E-mail:  summersm@ballardspahr.com

*Attorneys for Erste Europaische Pfandbriefund
Kommunalkreditbank Aktiengesellschaft in
Luxemburg S.A.*

By: */s/ Karen V. Newbury*
Rick L. Frimmer
Karen V. Newbury
Michael W. Ott
SCHIFF HARDIN, LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Telephone:  (312) 258-5600
Facsimile:  (312) 258-5600
E-mail:  rfrimmer@schiffhardin.com
E-mail:  knewbury@schiffhardin.com
E-mail:  mott@schiffhardin.com

*Attorneys for DEPFA Bank PLC*

By: */s/ Caroline Turner English*
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW

4

Washington, DC  20036-5342
Telephone:  (202) 857-6054
E-mail:  Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY  10019
Telephone:  (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By:  */s/ Guy S. Neal*
Eric D. Novetsky
Louis P. Rochkind
**JAFFE, RAITT, HEUER & WEISS, P.C.**
2777 Franklin Road, Suite 2500
Southfield, MI  48034
Telephone:  (248) 351-3000
Facsimile:  (248) 351-3082
E-mail:  enovetsky@jaffelaw.com

-and-

Jeffrey E. Bjork
**SIDLEY AUSTIN LLP**
555 West Fifth Street, Suite 4000

5

Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
E-mail: jbjork@sidley.com

-and-

**SIDLEY AUSTIN LLP**
Guy S. Neal
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
E-mail: gneal@sidley.com

*Attorneys for National Public Finance Guarantee*
*Corporation*

By: */s/ Lawrence A. Larose*
Lawrence A. Larose, Esq.
Samuel S. Kohn, Esq.
Carrie V. Hardman, Esq.
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 100166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
E-mail: llarose@winston.com
E-mail: skohn@winston.com
E-mail: chardman@winston.com

-and-

Sarah T. Foss, Esq.
**WINSTON & STRAWN LLP**
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Telephone: (713) 651-2600
Facsimile: (713) 651-2700

6

E-mail:  sfoss@winston.com

*Attorneys for Assured Guaranty Municipal Corp.*

By:  */s/ Mark R. James*
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI  48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
E-mail:  EJEssad@wwrplaw.com
E-mail:  mrjames@wwrplaw.com

-and-

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
E-mail:  Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance
Company*

By:  */s/Robert D. Gordon*
Robert D. Gordon
Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI  48009
Telephone:  (248) 988-5882
Facsimile:  (248) 988-2502
E-mail:  rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System*

of the City of Detroit and the General Retirement
System of the City of Detroit

By: */s/ Carole Neville*
Carole Neville
Claude Montgomery
DENTONS
1221 Avenue of the Americas
New York, New York 10020-1089
D +1 212 768 6700
F +1 212 768 6800
carole.neville@dentons.com
claude.montgomery@dentons.com

*Counsel to the Official Committee of Retirees*

8

K&E 27927073.1
13-53846-swr   Doc 4814-1   Filed 05/29/14   Entered 05/29/14 20:00:03   Page 7 of 8
13-53846-swr   Doc 954-3   Filed 09/20/13   Entered 09/20/13 19:10:08   Page 7 of 9
253

77

**Exhibit 3**

**None [Brief Not Required]**

**Exhibit 4**

**None [Separate Certificate of Service to be Filed]**

**Exhibit 5**

**None**

# Exhibit 6A

**Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr**

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**
```
10:24   Q.   Mr. Orr, good morning.
   25   A.   Good morning.
```

**Designation:**
```
11:13   Q.   If I ask a question that isn't clear, will you ask me
   14        to rephrase it?
   15   A.   Yes.
   16   Q.   And if I ask a question and you answer it, I'm going
   17        to assume that you understood it; is that fair?
   18   A.   Yes.
   19   Q.   Mr. Orr, in the course of negotiating and executing
   20        the forbearance agreement, did you receive legal
   21        advice?
   22   A.   Yes.  The forbearance and the optional payment
   23        agreement?
   24   Q.   That's right.
   25   A.   And we'll refer to that as forbearance agreement going
12: 1        forward?
    2   Q.   I was going to call it that because it's shorter, if
    3        that's okay.
    4   A.   Sure.  That's fine.
    5   Q.   But you're right.  That's what I mean.
    6   A.   Yes.  Yes, I did receive legal advice.
    7   Q.   And did you receive legal advice from the City's law
    8        department on the subject?
    9   A.   I don't recall.  I don't think so.
   10   Q.   Did you receive legal advice from Jones Day on the
   11        subject?
   12   A.   Yes, among others.
   13   Q.   And I take it that you relied on the legal advice you
   14        received in making the decision to execute the
   15        forbearance agreement?
   16   A.   Legal advice and business advice from our consultants,
   17        yes.
   18   Q.   Who were the others that you obtained legal advice
   19        from?
   20   A.   May have obtained legal advice from our local counsel.
   21   Q.   Ah, yes.
   22   A.   And in fact I said I don't recall if I obtained any
   23        legal advice from the corporation counsel's office.  I
   24        just don't recall, so I'm not going to speculate.
   25   Q.   Three possible.  You know you got legal advice from
13: 1        Jones Day.
    2   A.   Absolutely.
    3   Q.   You may have or did from local counsel.
    4   A.   Yes.
    5   Q.   And you can't recall whether you did from the City's
    6        law department.
    7   A.   Yes.
    8   Q.   Are you waiving the attorney-client privilege in
    9        connection with the motion to assume the forbearance
```

13-53846-tjt   Doc 4314-1   Filed 04/29/14   Entered 04/29/14 12:00:23   Page 82 of 1
13-53846-swr   Doc 5547-1   Filed 09/19/13   Entered 09/19/13 19:18:00   Page 82 of 1
253

82

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
10          agreement?
11                  MR. SHUMAKER:  Objection, could call for
12          the revelation of attorney-client communication.
13                  You can answer the question, but yes or no.
14    A.    No.
15    BY MR. HACKNEY:
16    Q.    If I ask you questions regarding the legal advice
17          rendered to you in connection with the forbearance
18          agreement's negotiation or execution, you will refuse
19          to answer those questions on the grounds of the
20          attorney-client privilege; is that correct?
21                  MR. SHUMAKER:  If you're asking what the
22          advice is, certainly.  The communications between
23          counsel and what he was -- what he was advised on,
24          certainly.
25                  THE WITNESS:  Right.
14: 1    BY MR. HACKNEY:
2    Q.    Okay.  That's correct?
3    A.    Yes.  That is correct.
4    Q.    So if I ask you what your view is on the likelihood
5          that the City's Swap and validity arguments will
6          prevail, you will assert the attorney-client
7          privilege; is that correct?
8    A.    Yes, more than likely.
9    Q.    If I ask you your view on the likelihood that the
10          pledge of the gaming revenues under the Michigan
11          Gaming Act is an invalid pledge, you'll assert the
12          attorney-client privilege, correct?
13    A.    Yes, more than likely.
14    Q.    If I ask you questions regarding the likelihood that
15          the City would prevail on a claim or defense against
16          the Swap counterparties, you'll assert the
17          attorney-client privilege, correct?
18    A.    Yes, more than likely.
19    Q.    And I guess I gotta clarify.  When you say more than
20          likely, I mean are you asserting the privilege with
21          respect to those types of questions?  I'm trying to
22          save having to --
23    A.    Sure.
24                  MR. SHUMAKER:  Let me state for the record
25          you can ask questions as to whether those -- those
15: 1    factors were considered by Mr. Orr, but obviously if
2          you're going to ask what he was -- what he was advised
3          by counsel, then I'm going to instruct him not to
4          answer.
5    A.    When I say more than likely, that's -- that's exactly
6          the distinction that I'm trying to make.  Did I have
7          discussions with my counsel?  Yes.  Did those
8          discussions take into consideration some of those
9          factors?  Yes.  Am I going to tell you what those
10          discussions were and what, if any, conclusions were
11          made?  No.
12    BY MR. HACKNEY:
13    Q.    Okay.  Fair enough.
14                  On July 15, 2013, the City entered into
15          what we're going to call the forbearance agreement
```

Page 2 of 70

13-53846-tjt   Doc 4314-1   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 2 of 70
13-53846-swr   Doc 954-7   Filed 09/19/13   Entered 09/19/13 19:18:00   Page 33 of 71          83

253

```
16        with the Swap counterparties and the service
17        corporations; is that correct?
18    A.  Yes.
```

**Designation:**
```
15:25    Q.  Well, let me -- let me ask it a different way, which
16: 1        is isn't it true that Mr. Buckfire was the lead
    2        negotiator for the City on the business terms of what
    3        became the forbearance agreement?
    4    A.  Yes.
    5    Q.  And Mr. Buckfire has testified that the negotiations
    6        in earnest regarding what became the forbearance
    7        agreement were conducted between June 4th and
    8        June 11th of 2013?
    9    A.  I don't recall those specific dates, but I think
   10        that's the right time frame.  Let me -- let me try to
   11        be as clear as I can so we can move on.  We began
   12        talking, discussing ways with my advisors, without
   13        discussing what we discussed, to provide the City with
   14        liquidity almost immediately upon my appointment.  The
   15        negotiations that you're referring to I believe did
   16        occur within that time frame.
```

**Designation:**
```
16:23    Q.  And as he was the lead negotiator, he's probably the
   24        guy who would know, right?
   25    A.  Sure, absolutely.
```

**Designation:**
```
18:14    Q.  If Mr. Buckfire testified there was an agreement in
   15        principle by June 11th of 2013, does that sound
   16        correct to you?
   17    A.  Yes, the second -- yes.  Yes, it does.
```

**Designation:**
```
20:11    Q.  Would you agree that, notwithstanding your involvement
   12        in these calls with the Swap counterparties, it's
   13        still fair to characterize Mr. Buckfire --
   14    A.  Yes.
   15    Q.  -- as the lead negotiator for the City?
   16    A.  Yes.
```

**Designation:**
```
20:17    Q.  Using Mr. Buckfire's recollection of June 4th as kind
   18        of the kickoff of these negotiations which you don't
   19        have a basis to --
   20    A.  No.
   21    Q.  -- contradict --
   22    A.  Not at all.
   23    Q.  -- I'd like to kind of level set where you were at
   24        going in to June 4th.  Okay?
```

Page 3 of 70

13-53846-tjt  Doc 4314-1  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 84 of 1
13-53846-swr  Doc 3547  Filed 09/19/13  Entered 09/19/13 19:18:00  Page 4 of 1
253

84

```
     25                    Your assumption prior to June 4th was that
21: 1          the Swap counterparties could unilaterally --
     2          unilaterally terminate the Swap, correct?
     4    A.   Well, my understanding was the City -- there were a
     5          series of events which put the City in default.  The
     6          consent agreement prior to my appointment, the consent
     7          agreement, the declaration of a financial emergency,
     8          my appointment was an event of default.  My
     9          understanding was that due to those multiple events of
    10          default, the counterparties had the ability to
    11          exercise their rights and deprive the City of much
    12          needed casino revenue.
    14    Q.   We'll get to the casino revenue in a moment which is
    15          something that's trapped under -- potentially trapped
    16          under the collateral agreement, right?
    17    A.   Right.
    18    Q.   I want to talk about the Swap agreement which can lead
    19          to a large termination payment --
    20    A.   Yes.
    21    Q.   -- that the service corporations might owe.
    22    A.   Yes.
    23    Q.   And you understand the distinction between those two
    24          documents --
    25    A.   Yes.
22: 1    Q.   -- right?
     2    A.   Um-hm.
     3    Q.   And your assumptions prior to the June 4th meeting
     4          were that as a result of these events of default under
     5          the Swap that occurred, some of them, prior to your
     6          appointment --
     7    A.   Yes.
     8    Q.   -- that the Swap counterparties could unilaterally
     9          terminate the Swap and demand a sizable payment from
    10          the service corporations, correct?
    12    A.   Yeah, my assumption was, my understanding was that,
    13          yes, they could terminate and demand a sizable
    14          payment, whether from the service corporations or
    15          eventually from the City.  It would hit our bottom
    16          line, yes.
    18    Q.   That's right because it ripples --
    19    A.   Yes.
    20    Q.   -- through the service corporations to the City by the
    21          service agreements, right?
    22    A.   Yeah.
    24    A.   If that is in fact the process, yes.
23: 1    Q.   Now, another one of your assumptions prior to June 4
     2          was that the Swap counterparties could also
     3          unilaterally trap cash under the collateral agreement,
     4          right?
     7    A.   My understanding was that the Swap counterparties
     8          could instruct the custodian to exercise their rights
     9          to trap cash.
    11    Q.   And that was one of the rights that they had as you
    12          were going into the negotiations with them, correct?
    15    A.   My understanding -- yes.  My understanding was that
    16          they had that right.
```

Page 4 of 70

13-53846-tjt  Doc 4314-1  Filed 04/29/14  Entered 04/29/14 22:00:03  Page 4 of 71
13-53846-swr  Doc 5547  Filed 09/19/13  Entered 09/19/13 15:18:06  Page 85 of
253                                                                          85

```
18   Q.   That's why you were negotiating with them, right?
19   A.   My -- we were negotiating with them to make sure that
20        the City had access to the revenue that it needed
21        quite badly and that the City would not suffer the
22        imposition of a fairly significant termination
23        payment.
24   Q.   Now, another one of your assumptions prior to June 4
25        was that no other party could stop the Swap
24: 1       counterparties from either terminating the Swaps or
 2        trapping cash, correct?
 4   A.   Yeah, my assumption was -- or, rather, my
 5        understanding was that the Swap counterparties had
 6        certain rights and that they had the ability to
 7        exercise those rights and remedies.  Whether another
 8        party could, quote-unquote, stop them could depend on
 9        a number of different factors.
```

**Designation:**
```
25:10  Q.   Okay.  Now, I want to also get a level set on your
 11        objectives going into the negotiations, and I
 12        understand that when I say you, I mean the City,
 13        Mr. Buckfire, there are multiple parts --
 14   A.   My -- my team --
 15   Q.   That's right.
 16   A.   -- consultants.
```

**Designation:**
```
26: 8  Q.   Now, I'd like to ask about your objectives as you go
 9        into the negotiation.  Okay?
 10   A.   Um-hm.
 11   Q.   You understand that when you go into a negotiation
 12        it's important to have an understanding of both the
 13        financial realities that your party is -- is facing as
 14        well as the legal realities that your party's facing,
 15        correct?
 16   A.   Yes.
 17   Q.   That informs the negotiation, right?
 18   A.   In making an informed decision, I would say you want
 19        to have an understanding of those factors.
 20   Q.   And you also want to understand what your counterparty
 21        in the negotiation needs and wants are as well as
 22        their potential legal rights, right?
 23   A.   What your counterparty negotiations perceived needs
 24        and rights are.
 25   Q.   That's right.  That's right.
27: 1            Now, I'm going to ask about the City's
 2        objectives in entering into the negotiations.  Okay?
 3        Objective one of the City was to get the
 4        counterparties to waive their cash trap at least on an
 5        interim basis to allow the City access to casino
 6        revenues, correct?
 7   A.   I don't know if I would characterize it as objective
 8        one.  It wasn't as if we were trying to prioritize one
 9        objective over the other.  It was an objective to make
```

Page 5 of 70

13-53846-tjr   Doc 4314-1   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 86 of 71
13-53846-swr   Doc 9547   Filed 09/19/15   Entered 09/19/15 19:18:00   Page 86 of 71

253

86

```
10        sure that the cash did not get trapped.
11   Q.   Okay.  So that was one of the objectives.
12   A.   Yes.
13   Q.   A second objective was that you wanted to modify the
14        Swap to get a discount on the termination amount,
15        correct?
16   A.   Yes.  That was certainly an objective, yes.
17   Q.   Okay.
21   Q.   And the third was that you wanted to obtain an option
22        about when you could direct the termination of the
23        Swap, correct?
28: 1 A.  Here again, I understand your characterization.  I'm
2         going to say that that -- that is a fair
3         characterization without trying to quantify as one
4         objective is more important than the others, and let
5         me explain my answer.
```

**Designation:**

```
28:25 Q.  And I don't mean to order them, but -- so I won't
29: 1     focus on it.  I just gave you them in an --
2     A.  Sure.
3     Q.  -- order.
4     A.  Right.
5     Q.  But those were three objectives of your negotiations,
6         correct?
7     A.  I think it's fair to say that.
8     Q.  And you achieved those three objectives in the
9         forbearance agreement, correct?
10    A.  We believe so.
```

**Designation:**

```
32: 7 Q.  So did Mr. Buckfire have authorization to make a
8         formal proposal in the first meeting?
9     A.  Yes.
10    Q.  And to your knowledge did he make one?
11    A.  I believe so.
12    Q.  What was the proposal?
13    A.  I don't remember what the exact number was, but I
14        believe the concepts were consistent throughout.
```

**Designation:**

```
33: 5 Q.  And do you remember whether they countered?
6     A.  I don't remember specifically.  I believe they may
7         have.
8     Q.  Okay.  Do you know the terms of their counter?
9     A.  Generally in the same concept I said.  If you're
10        looking for a number, for instance, we said 50 percent
11        and they came back with 98.  I don't recall those
12        specifics.
13    Q.  So you can't give me the bid and the ask --
14    A.  Yeah.
15    Q.  -- on what the Swap would be modified as far as the
16        termination?
```

Page 6 of 70

13-53846-tjr   Doc 4314-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 7 of 71
13-53846-swr   Doc 3547-1   Filed 04/29/13   Entered 04/29/13 19:18:00   Page 88 of 1
253                                                                              87

```
             17   A.   Yes, that's correct.
```

**Designation:**
```
     33:21   Q.   Did the City enter into a nondisclosure agreement in
        22        connection with these negotiations?
        23   A.   Yes, I believe so.
        24   Q.   With the Swap counterparties?
        25   A.   Yes.
```

**Designation:**
```
     35:18   Q.   Is it fair to say that if I ask you for the specific
        19        ebb and flow of the negotiations between the Swap
        20        counterparties in terms of the precise business
        21        deal --
        22   A.   Right.
        23   Q.   -- you would have to defer to Mr. Buckfire's
        24        recollection because he was more intimately involved?
        25   A.   That's fair.  Because Ken was -- Ken would have the
     36: 1        direct meetings and then call me back.  We'd go back
         2        and forth, and I didn't keep notes and I didn't keep a
         3        calendar, so --
```

**Designation:**
```
     36:20   Q.   Mr. Orr, I want to clear something up.  Maybe I've
        21        been saying it the wrong way.  I've been using the
        22        term "marching orders" with the respect to the way
        23        that you and Mr. Buckfire operated.
        24   A.   Right.
        25   Q.   And is a better way to say it that you authorized
     37: 1        Mr. Buckfire to negotiate the best possible deal he
         2        could with the Swap counterparties and that's what he
         3        did?
         4   A.   That's a fair characterization, sure.
         5   Q.   And at some point did he come out of a meeting and
         6        say, Mr. Orr, this is the best deal that I'm able to
         7        get out of these Swap counterparties and it's my
         8        advice that we take it?
         9   A.   Yes.
        10   Q.   And was that on or about June 11th, 2013, which is the
        11        date he recalls the agreement in principle being
        12        reached?
        13   A.   Yes.
```

**Designation:**
```
     37:16   Q.   And what was the agreement in principle that was
        17        reached as you understood it?
        18   A.   The agreement was essentially that in exchange for a
        19        reduced optional termination payment -- we'll just
        20        call it the payment under the forbearance agreement --
        21        the Swap counterparties would agree not to trap the
        22        cash, they would agree to release their liens, and
        23        also release their claims, I believe, against your
        24        client, Syncora, and we would have access to that cash
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
    25              going forward provided we made the discounted payment
38: 1              at some point in the future.  I believe at that point
    2              it was in the next 60, 90 days.
    3     Q.       Isn't the -- wasn't the agreement in principle that
    4              you'd have an option to direct the termination of the
    5              Swap?
```

**Designation:**

```
38: 8     A.       Yeah.  I believe the way it works is we would have an
    9              option to request the counterparties exercise their
    10             rights at a discounted level.
```

**Designation:**

```
38:12     Q.       And I'm not asking about the forbearance agreement.
    13             I'm asking about the agreement in principle.
    14     A.       Yeah, I think those were the general confines of the
    15             agreement in principle.
    16     Q.       Okay.  Now, you did not invite anyone else to the
    17             negotiations with the Swap counterparties; isn't that
    18             correct?
    19     A.       I did not invite anyone else.  I don't know if Ken
    20             invited anyone else or anyone else on my behalf
    21             invited anyone else.
    22     Q.       And you did not direct anyone such as Mr. Buckfire or
    23             others to invite any other parties into the
    24             negotiation, correct?
    25     A.       Correct.
39: 1     Q.       And you did not invite Syncora to participate in these
    2              negotiations, correct?
    3     A.       Correct.
    4     Q.       And you did not inform Syncora of the existence of
    5              these negotiations, correct?
    6     A.       The reason I'm hesitating is at some point clearly
    7              Syncora became aware, so I don't know how they were
    8              informed, but I did not do it, correct.
    9     Q.       You didn't do it.
    10    A.       Correct.
    11    Q.       And you did not invite FGIC to attend these
    12             negotiations, correct?
    13    A.       I believe that's correct.
    14    Q.       And you didn't direct anyone acting on your behalf to
    15             invite FGIC, correct?
    16    A.       Correct.
    17    Q.       Nor did you inform FGIC of the existence of these
    18             negotiations, correct?
    19    A.       Me personally, no.
    20    Q.       You didn't invite U.S. Bank as trustee to the funding
    21             trust or as custodian or contract administrator to
    22             attend any negotiations, correct?
    23    A.       Me personally, no.
    24    Q.       And you didn't direct anyone else acting on your
    25             behalf to do so, correct?
```

Page 8 of 70

13-53846-tjt   Doc 4314-1   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 8 of 70
13-53846-swr   Doc 9547   Filed 09/29/14   Entered 09/29/14 19:18:06   Page 89 of 71

253                                                                    89

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**
```
40: 1   A.   Correct.
```


**Designation:**
```
40:24   Q.   At any time prior to June 11th, did the Swap
    25        counterparties send a notice of a default under the
41: 1        Swap?
     2   A.   I don't recall, but I don't think so.
     3   Q.   At any time prior to June 11th, did the Swap
     4        counterparties designate an early termination date?
     5   A.   I don't recall, but I don't think so.
     6   Q.   Did they ever threaten to?
     7   A.   They didn't threaten me.
     8   Q.   They never threatened you personally.
     9   A.   Right.
    10   Q.   Did they threaten other people who reported the
    11        threats to you?
    12   A.   Not that I know of.
    13   Q.   At any time during these negotiations, did the Swap
    14        counterparties designate an optional early
    15        termination?
    16   A.   Not that I know of.
    17   Q.   Did they ever threaten to do that?
    18   A.   Not me.
    19   Q.   And did they ever threaten anyone else who reported
    20        the threat to you?
    21   A.   Not to my knowledge, no.
    22   Q.   At any time during these negotiations, did the Swap
    23        counterparties contend that the City was in breach of
    24        the collateral agreement?
    25   A.   Which collateral agreement are you talking about?
42: 1   Q.   The collateral agreement with respect to the casino
     2        revenues.
     3   A.   The 2009 agreement?
     4   Q.   Yes.
     5   A.   Okay.  Not that I recall.
     6   Q.   In fact, the City was endeavoring to make the monthly
     7        Swap payments into the holdback account throughout
     8        this period, correct?
     9   A.   Yes.  They were being paid in the ordinary course.
    10   Q.   And to the best of your knowledge, the City has
    11        complied with all of its obligations under the
    12        collateral agreement vis-à-vis the Swap
    13        counterparties.
    14   A.   No.
    15   Q.   That's not correct?
    16   A.   No, I mean I think we were -- as I said previously
    17        today, we were in default.
    18   Q.   Of the collateral agreement?
    19   A.   Right.  You mean in terms of making the payments due
    20        under the agreement?
    21   Q.   Well, the collateral agreement I know so -- the
    22        collateral agreement and the Swap are -- they are two
    23        different agreements --
    24   A.   Yes.
```

```
     25   Q.   -- that certainly relate to one another.
 43: 1   A.   Right.
      2   Q.   I'll say that.
      3   A.   Okay.
      4   Q.   I've talked about events of default under the Swap
      5        that could lead to the big termination payment.
      6   A.   Right.
      7   Q.   We talked about that earlier, right?
      8   A.   Right.
      9   Q.   I'm talking specifically now about whether there were
     10        events of default under the collateral agreement.  Had
     11        you breached any of the provisions of the collateral
     12        agreement?
     15   A.   Yeah.  That's why I'm being a little -- a little
     16        careful here.  There may be conduct under the Swaps
     17        that could be conceivably a breach under collateral
     18        agreement.  I don't know what they are, so I'm being
     19        hesitant.  But to get to your question, were we making
     20        the payments due under the Swaps?  Yes.
     22   Q.   What was -- what was the conduct under the Swap that
     23        might be --
     24   A.   I'm not sure.
     25   Q.   As you sit here today, are you aware of any breaches
 44: 1        of the collateral agreement by the City?
      4   A.   None from my perspective, but there might be.  What I
      5        don't want to do is sit here today and try to draw a
      6        conclusion as to what might be a breach of the
      7        collateral agreement vis-a-vis the Swap agreement.
      8        I'm trying to answer your question that we were making
      9        the payments that were due.
     11   Q.   Yeah, I appreciate that.  I mean, I guess your answer
     12        is there may be breaches of the collateral agreement,
     13        there may not be, you don't know.
     14   A.   I don't know, that's right.
     15   Q.   Now, this June 11th agreement in principle that we
     16        were talking about earlier --
     17   A.   Right.
     18   Q.   -- was there a term sheet?
     19   A.   No.  To the best of my recollection, I did not see a
     20        term sheet at that time.
     21   Q.   And just to be clear, do you know whether there was a
     22        term sheet that you just didn't see?
     23   A.   Yeah.  There might have been a term sheet that I
     24        didn't see.  I think Ken and I and some of the other
     25        attorneys at Jones Day, Corinne, David Heiman and
 45: 1        others would have a -- I'm trying to relay to you a
      2        sense that we'd have calls, but sometimes I don't
      3        recall seeing a specific term sheet at that time.
```

**Designation:**
```
 45:18   Q.   Do you remember whether there was a term sheet?
     19   A.   There eventually was a term sheet.  I just don't
     20        remember whether or not it was on June 11th.
     21   Q.   That's fine.  So do you think it went agreement in
     22        principle, non-binding term sheet, and then
```

```
23        negotiation of definitive documents?
24    A.  Yes.
```

**Designation:**
```
46: 6  Q.  And so at some point you did see a non-binding term
    7       sheet that embodied the agreement in principle
    8       Mr. Buckfire had negotiated, correct?
    9  A.  Yes.  Oh, yes.
```

**Designation:**
```
46:18  Q.  And the term sheet was consistent with the agreement
   19       in principle that we discussed earlier that
   20       Mr. Buckfire negotiated?
   21  A.  Yes.  It had obviously, as terms do, have more
   22       information, but it was consistent.
   23  Q.  So between July 11 -- I'm sorry.
   24             Between June 11th --
   25  A.  Okay.
47: 1  Q.  -- and July 15th, which is the execution date of the
    2       forbearance agreement --
    3  A.  Yes.
    4  Q.  -- you pivot from negotiating this agreement in
    5       principle that Mr. Buckfire has struck to now
    6       documenting it, correct?
    7  A.  Yes.
    8  Q.  Now, Mr. Buckfire has testified that those -- that
    9       those negotiations proceeded without interruption from
   10       June 11th to Ju -- July 15th.  Is that consistent with
   11       your recollection?
   12  A.  The negotiations continued.  I think there were other
   13       events related to the agreement, some of them by your
   14       client in that time frame, but yes, we continued
   15       negotiating.
   16  Q.  Okay.  And there were no serious interruptions in
   17       those negotiations, correct?
   19  A.  There was an agreement reached.  I'm going to take
   20       your time frame, June 11th.  Ken and I had a
   21       discussion about the amount.  It was somewhere south
   22       of 25 percent.  I believe in the same second week I
   23       said we can't do this deal for less than a 25 percent
   24       discount.  I believe the negotiations broke down, then
   25       the next day they came back without changing the
48: 1       framework of the agreement, just the number changed,
    2       the discount went up, and then I believe that -- yes,
    3       I believe negotiations continued continually
    4       throughout that time.
```

**Designation:**
```
48:17  Q.  Were there any serious interruptions in the
   18       negotiations between June 11 and July 15?
   19             MR. SHUMAKER:  Same objection.
   20  A.  You keep saying serious, and to the best of my
   21       knowledge there were no material or significant
   22       interruptions.  I don't want to try to characterize
```

Page 11 of 70

13-53846-tjt    Doc 4811    Filed 09/18/14    Entered 09/18/14 18:00:03    Page 11 of 71
13-53846-swr    Doc 9447    Filed 09/18/14    Entered 09/18/14 19:19:08    Page 12 of 71    92

253

```
23        what serious means.  I think negotiations continued
24        unabated.
```

**Designation:**
```
65:11  Q.  During the course of your negotiations back to the
   12      agreement in principle of what became the forbearance
   13      agreement, did you ever solicit the views of any of
   14      the other monoline insurers, such as Ambac or Assured
   15      or National about what they thought the City should
   16      do?
   17  A.  Not that I recall.
   18  Q.  Did you ever solicit the views of any COP holders
   19      about what they thought the City should do with
   20      respect to the --
   21  A.  I didn't solicit their views, no.
   22  Q.  Did you direct anyone acting on your behalf to solicit
   23      the views of any of those parties?
   24  A.  Not that I recall.
   25  Q.  Isn't it true that getting the forbearance agreement
66: 1      was a life or death issue for the City of Detroit?
    2  A.  Yes, getting the forbearance agreement was very
    3      important to the City of Detroit.
    4  Q.  Is it a life or death issue?
    6  A.  When you say life or death, you know, here again I'm
    7      trying to be responsive, but I want (sic) to
    8      characterize it.  The City needs the casino revenue
    9      badly.  It was cash poor at that time.  It would have
   10      facilitated without access, and it continues to be
   11      relatively cash poor without access.  It could have
   12      facilitated a cash crisis.  Life or death suggests to
   13      me it was critical and it might have been life or
   14      death, but what it does mean is that we could not have
   15      made the investment and cannot make the investment
   16      that is so crucial for the City.
   18  Q.  In fact, isn't it your position that without access to
   19      the casino revenues that people in the City of Detroit
   20      may die?
   21  A.  Yes.
```

**Designation:**
```
71: 3  Q.  Given the importance of this issue, I assume that you
    4      had made requests from the State of Michigan to
    5      provide the City with liquidity prior to June 4th;
    6      isn't that correct?
    7  A.  Sir, you can assume whatever you want.  The reality is
    8      under my contract I have an obligation to report and
    9      coordinate with the State.  We had had discussions, I
   10      believe, with the State about potential liquidity, and
   11      we were told that that would be unavailable.
   12  Q.  And you conveyed to the State the seriousness of the
   13      City's situation, correct?
   14  A.  I don't think I had to convey to the State the
   15      seriousness of the City's situation.  I think the
   16      State's well aware.
```

Page 12 of 70

13-53846-twj   Doc 4947   Filed 04/09/14   Entered 04/09/14 32:00:03   Page 12 of 70
13-53846-swr   Doc 9547   Filed 09/19/14   Entered 09/19/14 19:19:03   Page 93 of 71   93

253

```
17   Q.   So the State understood that getting liquidity was a
18        life or death issue for the City of Detroit, correct?
21   A.   Whatever the State understood, what I'm trying to tell
22        you is I conveyed to them what our needs are.
24   Q.   You conveyed the extreme seriousness of the situation
25        to the State, correct?
72: 1 A.  As I said, I don't think I had to convey it to the
2         State.  The State had just been through almost two
3         years of determining a financial emergency existed.
4    Q.   And the State did not provide the City with any
5         liquidity prior to June 4th, correct?
6    A.   No.
7    Q.   I am correct that they didn't?
10   A.   You are correct, they did not.
```

**Designation:**

```
72:25 Q.  And the City owns a fine art collection; isn't that
73: 1     correct?
2    A.   The City owns the Detroit Institute of Arts in its
3         collection.
4    Q.   And did you attempt to value the art collection with
5         an eye towards selling pieces of the art collection to
6         relieve the City's life or death liquidity crisis?
8    A.   Prior to June 14th?
10   Q.   Prior to June 11th, which is the date of the agreement
11        in principle.
12   A.   No.  We've entered into an agreement with Sotheby's to
13        begin that process now, not related to relieving the
14        liquidity crisis, just as a matter of prudence to
15        determine the value of assets.
16   Q.   Your expectation is that the -- that the City's art
17        collection is very valuable; isn't that correct?
18   A.   I've been told that, yes.
19   Q.   Isn't it possible it may be worth billions of dollars?
20   A.   That would be speculation.  I've been told it is
21        valuable.
22   Q.   Could it be worth hundreds of millions of dollars?
23   A.   That would be speculation.  I've been told that it's
24        valuable.
25   Q.   Okay.  So as of June 4th, you didn't know whether or
74: 1     not the City might have billions of dollars of art
2         sitting in its art institute; is that your testimony?
3    A.   No.  My testimony is that I understand it as valuable.
4         The exact value of it is to be determined.
5    Q.   And you made no effort to sell any of that art prior
6         to engaging in the negotiations with the Swap
7         counterparties, correct?
8    A.   No.  That's true.
9    Q.   What about federal aid?  Did you attempt -- did you
10        attempt to obtain federal aid prior to the June 4
11        commencement of negotiations with the Swap
12        counterparties?
13   A.   I don't know if it was prior to or around that time.
14        It may have been.  We may have sought federal aid
15        prior to that.
```

Page 13 of 70

13-53846-swr   Doc 4911   Filed 04/09/14   Entered 04/09/14 02:00:03   Page 13 of 70
13-53846-swr   Doc 9944   Filed 09/19/14   Entered 09/19/14 19:19:03   Page 94 of 71
253                                                                        94

```
16   Q.   And you conveyed the seriousness of the situation to
17        whomever you spoke to at the federal government?
18   A.   Yes, I believe the federal government was aware of the
19        seriousness of the situation.
20   Q.   And the federal government was also unwilling to
21        provide aid to the City of Detroit; is that your
22        testimony?
23   A.   Yes, direct aid.
24   Q.   Let me ask you some questions about the service
25        corporations.  The service corporations are two
75: 1     entities that have long names that I'll only say to
2         you if you want -- really want me to.
3    A.   We'll stipulate I know what you mean by the service
4         corporations.
5    Q.   And there are two of them?
6    A.   There are two.
7    Q.   Okay.
8    A.   Police and Fire General Services.
9    Q.   There you go.  So you already know them and you said
10        the names.  So the two service corporations are
11        parties to the forbearance agreement, correct?
12   A.   Yes.
13   Q.   And Mr. Buckfire testified yesterday, I'll represent
14        to you, that his understanding is that you directed
15        the service corporations to execute the forbearance
16        agreement and they did so; is that correct?
17   A.   No.
18   Q.   Okay.  Were there arms' length negotiations with the
19        service corporations?
20   A.   To the best of my knowledge, there was.
21   Q.   And who led those?
22   A.   I'm not quite sure.  I know that -- in response to
23        your question, I did not direct a service corporation.
24        They were organized by the City.  And they are managed
25        by City employees, but I had no direct -- I gave no
76: 1     direct instruction to either of the service
2         corporations.
3    Q.   Okay.  So my question was about negotiations with the
4         service corporations.
5    A.   Right.
6    Q.   Who conducted the arms' length negotiations with the
7         service corporations on behalf of the City?
8    A.   I'm not sure.
9    Q.   Well, you know it wasn't you?
10   A.   Yes, it wasn't me.
11   Q.   And did you ever direct Mr. Buckfire to engage in
12        direct negotiations with the service corporations?
13   A.   No.  I directed Mr. Buckfire to do whatever needed to
14        get done to get the agreement in principle resolved
15        and signed.  That's what I did, but I did -- said
16        nothing specific.  Just to be responsive to your
17        question, said oh, go talk to the service
18        corporations, there was nothing that specific.
19   Q.   So to the extent there was a negotiation that needed
20        to be had, it was his job to go have it?
21   A.   It was his or someone else on my -- on my
```

Page 14 of 70

13-53846-swr   Doc 4871   Filed 04/09/14   Entered 04/09/14 02:00:03   Page 14 of 70
13-53846-swr   Doc 9544   Filed 09/18/14   Entered 09/18/14 19:19:03   Page 95 of 253

253                                                                              95

```
     22          reorganization team's job, yeah, sure.
     23    Q.    Well, did you direct anyone else on your team to go
     24          negotiate with the service corporations?
     25    A.    No.  Once we reached an agreement in principle, I
77:  1          directed my team to more or less go forth and get it
      2          documented and get it done.
      3    Q.    And the service corporations are legally separate from
      4          the City, correct?
      5    A.    Yes, they are.
      6    Q.    Your powers as emergency financial manager do not
      7          extend to the service corporations, correct?
      8    A.    I haven't examined that question, so I can't answer
      9          you yes or no.
     10    Q.    Can you direct their actions under PA 436?
     11    A.    I'm not sure.
     12    Q.    Do you have any firsthand knowledge that the service
     13          corporations engaged in arms' length negotiations with
     14          the Swap counterparties?
     15    A.    No.
     16    Q.    If they had, do you think that's something you would
     17          have likely heard about?
     20    A.    I may have.  As emergency manager, there are a number
     21          of things that occur, as you might imagine, on a daily
     22          basis that I may or may not hear of.  I might have.
     24    Q.    As you sit here today, though, can you recall hearing
     25          that there were ongoing negotiations between the
78:  1          service corporations and the Swap counterparties?
      2    A.    No.
```

**Designation:**

```
78:13    Q.    I was just asking whether -- you understand that the
     14          service corporations have service contracts with the
     15          City?
     16    A.    Yes.
     17    Q.    And you understand that the City has hedge-related
     18          payments that it has to make to the service
     19          corporations --
     20    A.    Yes.
     21    Q.    -- that they then can use to make to the Swap
     22          counterparties under the Swap?
     23    A.    Yes.
```

**Designation:**

```
79:  2    Q.    Do you understand that the collateral agreement
      3          secures the City's obligation to the service
      4          corporations and the service corporations' obligation
      5          to the Swap counterparties?
      6    A.    That's the legal conclusion.  It might.  That's -- I'm
      7          going to stay away from relaying my understanding
      8          because, frankly, I haven't -- I'm going to be
      9          careful, frankly.  It might.
     10    Q.    Okay.  You don't know as you sit here today?
     11    A.    I have an impression of something along those lines,
     12          yes.
```

```
13   Q.   And what is it?
14   A.   That it does -- it may well secure it.  It's just that
15        it's a legal conclusion that I don't want to make.
```

**Designation:**
```
80: 1   Q.   Now, if the City's able to perform under the
 2           forbearance agreement and exercises the option, the
 3           effect of this is that the hedge will be terminated,
 4           correct?
```

**Designation:**
```
80: 7   A.   I believe there will no longer be a need for the
 8           hedge, yes.
```

**Designation:**
```
80:10   Q.   And the collateral agreement will also be terminated
11           in that event, correct?
12      A.   If we -- if the City performs?
13      Q.   Right.
14      A.   Yes.
15      Q.   And that will free up the casino revenues to be used
16           by the City, correct?
17      A.   Yes.
18      Q.   Okay.  How does that benefit the service corporations?
19      A.   I don't know if it does or doesn't.  I know it
20           benefits the City.
21      Q.   Can you think of a way that it benefits the service
22           corporations as you sit here today?
23      A.   No.  That would be speculation.
24      Q.   And you understand that the service corporations
25           depend on the City to make the payments of their
```

**Designation:**
```
81: 1        various obligations both under the COPs and the Swap?
 2      A.   I believe that's true.
 3      Q.   They don't have any independent sources of income?
 4      A.   To the best of my knowledge, they do not.
 5      Q.   And your view today is that the City of Detroit is
 6           insolvent, correct?
 7      A.   Yes, yes.
 8      Q.   And fair to assume that by extension the service
 9           corporations are also insolvent, too?
```

**Designation:**
```
81:12   A.   I don't know if that's true or not.
```

**Designation:**
```
81:14   Q.   Now, isn't it true that the composition of the service
15           corporations' boards of directors includes three City
16           officers and at least one City Council member?
```

Page 16 of 70

13-53846-tjt   Doc 4941   Filed 09/19/14   Entered 09/19/14 13:00:03   Page 17 of 71
13-53846-swr   Doc 9447   Filed 09/18/13   Entered 09/18/13 13:19:03   Page 17 of 71   97

253

```
17   A.   Yes.  I think I said before there are City employees
18        and City representatives on the boards.
19   Q.   And in fact the person who signed the forbearance
20        agreement on behalf of the service corporations was
21        the president of both service corporations, correct?
22   A.   Yes, I believe so.
23   Q.   And her name is Cheryl Johnson, right?
24   A.   Yes.
25   Q.   And she is also the City's finance director, correct?
82: 1 A.   Yes.
 2   Q.   Okay.  Portia Roberson --
 3   A.   Um-hm.
 4   Q.   -- is the City's corporation counsel, right?
 5   A.   Yes.
 6   Q.   And she's also on the board of both service
 7        corporations, correct?
 8   A.   To the best of my knowledge, that's true.
 9   Q.   Do you know who made the decision at the service
10        corporations to enter into the forbearance agreement?
11   A.   I do not.
12   Q.   Did you have any conversations with either Ms. Johnson
13        or Ms. Roberson about the service corporations
14        entering into the forbearance agreement?
15   A.   No.
16   Q.   Isn't it true that the policy of the City is to
17        indemnify the service corporation directors for
18        actions they take in their capacity as City employees?
19   A.   I don't know that.
20   Q.   You don't know if that's the policy of the City?
21   A.   I do not.  I know the City has an indemnification
22        policy.  I don't know if it applies to the service
23        corporations.
24   Q.   Okay, but does it apply to the City employees?
25   A.   It applies to City employees acting within their
83: 1        course and scope of their employment as employees of
 2        the City.
 3   Q.   Okay.  So as you sit here today, you can't say that
 4        that indemnification policy would extend to City
 5        employee actions taken in their capacity as service
 6        corporations --
 7   A.   Correct.
```

**Designation:**

```
83:13 Q.   As emergency financial manager, you control the salary
14        of all City employees; isn't that correct?
15   A.   As emergency manager.
16   Q.   As emergency manager, right.
17   A.   Right.
```

**Designation:**

```
84: 3 Q.   Okay.  And you have the power to reduce those City
 4        employee salaries to zero if you choose, correct?
 5   A.   I think I do, yes.
 6   Q.   And you have done that on at least one prior occasion,
 7        I believe, correct?
```

Page 17 of 70

13-53846-swr    Doc 4941-71    Filed 04/02/14    Entered 04/02/14 22:00:03    Page 17 of 71
13-53846-swr    Doc 994-47    Filed 09/13/13    Entered 09/13/13 13:19:03    Page 18 of 71    98
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
 8   A.   Yes, I did do that.
```

**Designation:**
```
85: 8   Q.   Okay.  But if I ask you to express the City's view on
     9        the legal merits of the insurers' contention that they
    10        have the right to consent, you'll decline to answer
    11        those questions because it tends to reveal the
    12        attorney-client privilege.
    13             MR. SHUMAKER:  That's right and also calls
    14        for a legal conclusion, yes.
    15             MR. HACKNEY:  But you'll -- I want to save
    16        a big string of questions, so if I want to ask him
    17        what are the pros and cons of the argument, who's
    18        likely to win, how will it all come out --
    19   BY MR. HACKNEY:
    20   Q.   You won't answer those questions on the grounds of
    21        the -- because it would tend to reveal attorney-client
    22        advice, correct?
    23             MR. SHUMAKER:  Well, I don't want to
    24        prevent you from asking any questions and I don't --
    25        but if he has an understanding independent of advice
86: 1        he's given -- but clearly to the extent it's going to
     2        reveal attorney-client communication, I will tell him
     3        not to answer.
     4             MR. HACKNEY:  Okay.  I'll ask him that.
     5   BY MR. HACKNEY:
     6   Q.   Does the City concur in the insurers' view?
     7             MR. SHUMAKER:  Objection, calls for a legal
     8        conclusion and could ask for attorney-client
     9        communications.
    10             MR. HACKNEY:  Are you instructing him not
    11        to answer?
    12             MR. SHUMAKER:  To the extent that the
    13        question goes to that, yes.
    14   A.   Maybe I can help out in this line of questioning.
    15        Any -- I have not acted as an attorney on this job for
    16        the aforementioned reasons, so any opinion that I
    17        would express on behalf of the City in this regard
    18        would be solely as a result of communications with
    19        counsel and discussions.
    20   BY MR. HACKNEY:
    21   Q.   That was my expectation.  So if I ask you if the City
    22        concurred, that's going to get into what your lawyer
    23        thinks.
    24   A.   That's exactly right.
    25   Q.   So you -- you will assert the privilege.
87: 1   A.   I will assert the privilege.
     2   Q.   And if I ask you what are the arguments for and
     3        against this point, you'll assert the privilege.
     4   A.   I will assert the privilege, but I am aware there are
     5        a number of objections that have been filed in the
     6        case that have addressed those issues and none of them
     7        have caused me any surprise.
     8   Q.   If I said that the City -- if I asked you what the
     9        City's view is on -- well, let me take a step back.
```

Page 18 of 70

13-53846-swr   Doc 4971   Filed 09/19/14   Entered 09/19/14 19:19:03   Page 99 of 71
13-53846-swr   Doc 4971   Filed 09/19/14   Entered 09/19/13 19:19:03   Page 99 of 71   99
253

```
10              Do you agree that the insurers can block an
11      early termination of the Swap, that this would be
12      important to assessing whether the City was in danger
13      of owing a termination payment?
14              MR. SHUMAKER:  Objection, calls for a legal
15      conclusion.
16  A.  Yes, same thing.  I'd only have a response to that
17      based upon discussions I've had with counsel.
18  BY MR. HACKNEY:
19  Q.  Do you agree that the insurers can block a
20      termination, that it would make sense to negotiate
21      with the insurers to determine whether you can secure
22      their agreement not to consent to any termination?
24              MR. SHUMAKER:  Same objection.
25  A.  Same response.  It would only be based upon
88: 1       discussions I've had with counsel.
 2  BY MR. HACKNEY:
 3  Q.  Are you aware that the insurers contend that they have
 4      the right to control all actions that may be taken by
 5      the Swap counterparties in connection with the -- with
 6      the Swaps?
 7  A.  I am aware of that, yes.
 8  Q.  When did you first develop that awareness?
 9  A.  During some course of the correspondence that occurred
10      during this time frame that we previously discussed
11      today.
12  Q.  And have you taken steps to evaluate whether the City
13      concurs with the insurers' construction of the
14      operative documents on this point?
15  A.  Have we taken steps?  Yes.
16  Q.  Yeah.  And what is the City's position?
17              MR. SHUMAKER:  Objection, calls for the
18      provision of attorney-client communications, and I
19      will instruct him not to answer.
20  BY MR. HACKNEY:
21  Q.  Yeah, I'm just going -- I'm making a record here.
22      Okay?  I don't want to have -- I tried to --
23  A.  I'm with you.  I'm with you.
24  Q.  And if I ask you what the arguments are on both sides
25      of this point, you'll also refuse to answer on the
89: 1       grounds of the privilege.
 2  A.  Here again, there are objections in the case that make
 3      some of those arguments, but I will not specifically
 4      answer.
 5  Q.  Because of the privilege.
 6  A.  Because of the attorney-client privilege and it calls
 7      for a legal conclusion.
 8  Q.  And if I ask you who had the better side of the
 9      argument, you would say the same thing?
10  A.  Same thing.
11              MR. SHUMAKER:  Same objection, same
12      instruction.
13  A.  I would say the same thing.  I would say the same
14      thing.
15  BY MR. HACKNEY:
16  Q.  Do you agree that the insurers can control all actions
```

Page 19 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 100 of 1
13-53846-swr   Doc 4654-7   Filed 04/19/13   Entered 04/19/13 19:10:03   Page 20 of 71   100
253

```
17        of the Swap counterparties in connection with the
18        Swaps, that this would be important in terms of
19        assessing whether the City should negotiate with the
20        insurers?
23                You can answer to the extent you have an
24        understanding.
25    A.  It's also a little speculative because it's a
90: 1     hypothetical.  If then is usually a hypothetical, so I
 2        would -- for the same reasons as we discussed before,
 3        I would say that to the extent it calls for a legal
 4        conclusion, I'll refuse to answer.
 5                I would say as a rational person, if you
 6        were put in a corner, then you might want to consider
 7        your alternatives, including negotiations.
 9    Q.  With the insurers?
10    A.  With whoever, yes, whoever's --
11    Q.  I mean it's just a simple point.  We have five minutes
12        left.  I'm going to milk them.
13    A.  Okay.
14    Q.  But it's a simple point, which is if the insurers can
15        potentially direct, like a marionette, the actions of
16        the Swap counterparties, and I understand --
17    A.  Right.
18    Q.  -- that you're not agreeing with that --
19    A.  Right.
20    Q.  -- okay, but if they can --
21    A.  Um-hm.
22    Q.  -- they're a potential party that you can go negotiate
23        with to play off against the Swap counterparties,
24        correct?
91: 2  A.  Yeah, here again, I mean if that happened, possibly,
 3        but that's a speculative question, so I'm going stay
 4        away from it.
 6    Q.  It is speculation, but it's logical --
 7    A.  As I said in my answer, a rational person would make
 8        that --
 9    Q.  Yeah.
10    A.  If you were put in a corner, you'd have to find some
11        way out, and negotiation might be one of those
12        sources, but to the extent your question is also
13        speculation, I'm going to defer from answering.
14    Q.  Do you agree that the insurers are entitled to control
15        all of the actions of the Swap counterparties; it
16        raises the risk that the deal negotiated in the
17        forbearance agreement may be for naught?
20    A.  Yeah, here again, maybe not.
22    Q.  Those are things you haven't -- you haven't considered
23        prior to today, fair statement?
24    A.  That's a fair statement.
25    Q.  Okay.  Have you ever heard the phrase "play both ends
92: 1     against the middle"?
 2    A.  Oh, have I ever heard the phrase?
 3    Q.  Yes.
 4    A.  Yes.
 5    Q.  You're a bankruptcy lawyer, right?
 6    A.  Yes.
```

Page 20 of 70

13-53846-tjt  Doc 4814-1  Filed 04/29/14  Entered 04/29/14 22:00:03  Page 20 of 71
13-53846-swr  Doc 4564-7  Filed 05/13/13  Entered 05/13/13 19:19:03  Page 21 of 71
253
101

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
    7   Q.   You were, I should say.
    8   A.   I was.
    9   Q.   And that's one of the time-honored tricks of
   10        bankruptcy negotiation, right, is to play parties off
   11        against one another to try and get the best deal?
   12   A.   I'm not going to call it a trick.
   13   Q.   Tools.
   14   A.   Tools, tactics.  You know, there -- lawyer, as a
   15        negotiator, getting a yes, discussing a number of
   16        different alternatives.
   17   Q.   And one of them is playing off both ends against the
   18        middle?
   19   A.   Could be.  People do that all -- outside of legal
   20        issues, they do that in negotiation.
   21   Q.   Isn't it true that prior to July 17 the City never
   22        engaged in substantive negotiations with Syncora?
   23   A.   I don't know if that's true.  You said July 17th?
   24   Q.   Yeah.  That's the date of the execution of the
   25        forbearance agreement.
93: 1   A.   Right.  I don't know if that's true.  I believe there
    2        were discussions that may have been, but you
    3        characterize it as substantive negotiations, so I
    4        don't know if that's true.
    5   Q.   You certainly didn't participate in any substantive
    6        negotiations with Syncora, correct?
    7   A.   Well, I -- you know, you say negotiations.  I know
    8        there were a series of letters going back and forth
    9        and I know that there was a letter -- I just don't
   10        recall when I sent it -- to Mr. LeBlanc that said if
   11        you want to have serious negotiations, then let's have
   12        a discussion, but let's stop sending these letters
   13        back and forth.
   14   Q.   But isn't it your position that there were no serious
   15        negotiations with Syncora because Syncora would not
   16        make a proposal?
   17   A.   I believe in one of those letters I expressed that
   18        concern, yes.
   19   Q.   And to your knowledge Syncora never made a proposal to
   20        the City of Detroit prior to July 17th, correct?
   21   A.   Yeah, I believe there was a discussion -- well, there
   22        was discussion about an exchange of NDAs, and Syncora
   23        said they wanted to make a proposal, but they first
   24        wanted to see the proposal from the Swap
   25        counterparties, and I believe in one of my letters to
94: 1        Mr. LeBlanc, I said well, the parties need to sign a
    2        NDA, and my understanding was Syncora declined to do
    3        that.
```

**Designation:**
```
94:17   Q.   Mr. Orr, I kind of want to cut through this with
   18        Syncora.  I understand that there were letters back
   19        and forth between you and Syncora.
   20   A.   Yes.
   21   Q.   But I just want to make clear for the record that
   22        there were not substantive negotiations of the type
```

Page 21 of 70
13-53846-tjt  Doc 4544-1  Filed 04/29/14  Entered 04/29/14 22:00:03  Page 21 of 1
13-53846-swr  Doc 4544-1  Filed 04/29/13  Entered 04/29/13 19:10:03  Page 22 of 1  102
253

```
      23           that you engaged in with the Swap counterparties with
      24           Syncora about an alternative proposal to the
      25           forbearance agreement prior to its execution on
  95:  1           July 17th, correct?
       2    A.     I believe -- July 17th?
       3    Q.     (Nods head).
       4    A.     I believe that's true.  As I said, I think there was
       5           some discussion about a potential offer from Syncora,
       6           but I believe that got caught up in the NDA issue and
       7           that went away, so yes, I believe that's true.
       8    Q.     And your recollection in the NDA issue is that the
       9           City wanted an NDA, but Syncora wouldn't sign it?
      10    A.     My recollection -- no.  My recollection was the City
      11           needed an NDA because we were asking all parties --
      12           nondisclosure agreement, we were asking all parties to
      13           sign them.  There was some discussion -- I put in a
      14           letter, I seem to recall, that Syncora sign one, but I
      15           don't want to speculate or mischaracterize.  There
      16           were some discussion about a NDA before Syncora would
      17           show us their proposal and something about they wanted
      18           to see the Swap counterparties' proposal before
      19           signing an NDA first or something along those lines.
      20    Q.     You're not aware of any situation where the City
      21           refused to sign an NDA with Syncora, correct?
      22    A.     No, not that I'm aware of.
      23    Q.     In fact, it was the City that wanted an NDA with
      24           Syncora?
      25    A.     Yes.  I believe that's true.
  96:  1    Q.     And it's also true that you did not engage in
       2           substantive negotiations with FGIC about an
       3           alternative to the forbearance agreement prior to
       4           July 17th, correct?
       5    A.     Yeah, with regard to the issue of substantive, I'll --
       6           I'll, you know, caution that I'm not -- I'm not
       7           necessarily characterizing, but to the best of my
       8           knowledge, that's a fair characterization.
       9    Q.     You didn't make a proposal about an alternative to
      10           FIGC and FIGC didn't make one to you.
      11    A.     Yes, to the best of my knowledge, that's true.
      12    Q.     And that's also true with respect to Syncora, correct?
      13    A.     Yes, that's true.
```

**Designation:**

```
  97:23    Q.     Okay.  It's true, isn't it, that as of the date of the
      24           execution of the forbearance agreement, your office
      25           had received multiple calls from Claude LeBlanc at
  98:  1           Syncora, correct?
       2    A.     I'm not aware of that.  There may have been multiple
       3           calls, but I'm not aware -- I received no calls.
       4    Q.     Okay.  So you don't -- I take it your secretary --
       5    A.     My office may have.  Yeah, my secretary may have, but
       6           I didn't.
       7    Q.     So you don't know whether he called you or not?
       8    A.     If you're representing to me that he did, I have no
       9           reason to believe that that's untrue.
      10    Q.     Okay.  And I take it you have never called personally
```

Page 22 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 22 of 70
13-53846-swr   Doc 4934-7   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 23 of 71   103

253

```
 11        Mr. LeBlanc --
 12   A.   No.
 13   Q.   -- isn't that correct?
 14   A.   No, I don't think so.
 15   Q.   So you didn't return those calls if they were made?
 16   A.   No.
 17   Q.   I just want -- I guess I -- the City has entered into
 18        numerous nondisclosure agreements --
 19   A.   Right.
 20   Q.   -- in these cases, correct?
 21   A.   Yes.
 22   Q.   I mean has it entered into hundreds?
 23   A.   I don't know.  I don't -- I don't operate the data
 24        room or any others, but I suspect there's certainly
 25        many.
99: 1 Q.   We can say that there are lots.
  2   A.   There are lots.
  3   Q.   Okay.
  4   A.   Okay.
  5   Q.   And there's no reason you can think of today that the
  6        City wouldn't enter into one with Syncora.
  7   A.   No.
  8   Q.   Were you aware that Syncora wanted a nondisclosure
  9        agreement so that it could make a proposal that would
 10        be an alternative to the Swap counterparties?
 11   A.   As I said, I believe I have a letter that discusses
 12        the NDA issue, but it was caught up in something
 13        related to Syncora -- as I understood it, Syncora
 14        wanting to see the Swap counterparty proposal first
 15        prior to entering an NDA.
 16   Q.   Did you ever hear that Syncora had gotten over that
 17        issue and was now willing to just make a proposal to
 18        the City?
 19   A.   No.
 20   Q.   So no one ever told you that?
 21   A.   No, I don't recall ever hearing that.
 22   Q.   Okay.  Would that have been significant to you if you
 23        heard that?
```

**Designation:**

```
100: 1 A.   Yeah.  Here again, it depends upon what point in time,
  2        if we were already bound by the definitive term sheet
  3        and then -- or the agreement, I believe the
  4        forbearance agreement has an obligation we cooperate
  5        with Swap counterparties, so it wouldn't have mat --
  6        no, it would not have mattered at that time, so it
  7        depends on when that would have occurred.
```

**Designation:**

```
100:15 Q.   Isn't it true that the City's decision to enter into
 16        the forbearance agreement was made by you, in your
 17        role as emergency manager?
 18   A.   Yes, after consultation with my -- with my employees,
 19        staff and consultants, yes.
```

Page 23 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 104 of 1
13-53846-swr   Doc 4984-7   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 24 of 1   104
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
20   Q.   And when did you make that decision?
21   A.   To enter into the actual agreement?
22   Q.   Yes.
23   A.   The day I signed it.
24   Q.   July 15th, 2013?
25   A.   I believe so, yes.
```

**Designation:**
```
102: 7   Q.   Any legal memoranda from Jones Day that you considered
       8        in making this decision?
       9   A.   Yes, probably.
      10   Q.   Okay.  Written legal memoranda that you reviewed?
      11   A.   Yeah, including e-mails.  Yeah.
      12   Q.   Now, did you take time to familiarize -- to
      13        familiarize yourself with any of the legal documents
      14        relating to the COPs Swap structure in connection with
      15        your decision to execute the forbearance agreement?
      16   A.   I relied -- I may have seen them, but I relied upon
      17        consultation with my counsel and investment bankers.
      18   Q.   The documents I'm referring to are -- can we agree
      19        they're relatively complicated legal documents?
      20   A.   Yeah, I'd say they're not simple documents.  It's not
      21        a -- you know, an auto purchase contract, yeah.
      22   Q.   Right.  So can I fairly characterize that -- that you
      23        may have looked at the documents, but you didn't
      24        attempt to master -- master them in terms of their
      25        legal ins and outs?
103: 1   A.   Yeah.  That's a --
```

**Designation:**
```
103: 3   A.   That's a fair characterization.  As I said, I'm trying
       4        to stay away from acting as an attorney in this job.
```

**Designation:**
```
103: 8   Q.   So you relied on your advisors to explain to you how
       9        the COP Swap agreements worked?
      10   A.   Yes.
      11   Q.   And you also relied on them to explain to you how the
      12        COP Swap agreements worked in conjunction with the
      13        forbearance agreement that you were about to execute?
```

**Designation:**
```
103:15   A.   Yes.
```

**Designation:**
```
103:17   Q.   So what is the relationship between the forbearance
      18        agreement and the COPs Swap structure?
      19   A.   Well, my understanding is that the forbearance
      20        agreement is related to the Swaps structure, but that
      21        the COPs structure is unrelated.
```

Page 24 of 70

13-53846-swr   Doc 4814-1   Filed 09/29/14   Entered 09/29/14 22:00:03   Page 25 of 71
13-53846-swr   Doc 4584-7   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 25 of 71
253                                                                        105

```
22   Q.   Okay.  So the forbearance agreement is part of the
23        same subject matter as the collateral agreement and
24        the Swaps agreement, but not the COPs part of the
25        structure?
104: 1   A.   That's my understanding.
2   Q.   Okay.  In your legal career, have you come across the
3        concept of the idea that two different contracts can
4        be part of one integrated transaction?
5   A.   Sure.  Yes.
6   Q.   You're familiar with that as an idea?
7   A.   Oh, yeah, sure.
8   Q.   Okay.  What do you understand that to mean?
```

**Designation:**
```
104:10  A.   There are a number of ways that two different
11        documents were -- may refer to the other, as simple as
12        attachments, exhibits, the master -- the master
13        service agreement on a loan, for instance.  There are
14        a number of ways that one document can relate to
15        another as explicitly expressed and intended.
```

**Designation:**
```
104:23  Q.   You understand the idea that two different contracts
24        can form part of one larger agreement?
25   A.   Oh, sure.  Yeah.
105: 1   Q.   Is the forbearance agreement part of an integrated
2        transaction with the amended Swap agreements?
```

**Designation:**
```
105: 5   A.   Yeah, I'm going to stay away from characterizing it as
6        an integrated transaction.  That may have legal
7        consequence.  I know they are related.
```

**Designation:**
```
106:23  Q.   So I guess are you saying that you can't reveal
24        attorney-client communications or are you saying that
25        you just don't know the answer to this particular
107: 1        legal question?
2   A.   I'm saying I can't reveal attorney-client
3        communications, and based upon the characterization, I
4        have formed no independent decision outside of
5        discussions with my attorney as to whether or not
6        they're integrated.
```

**Designation:**
```
107:24  Q.   Isn't it -- I'd like to shift and ask you a question
25        about the service agreements between the City and the
108: 1        service corporations.
2   A.   Okay.
3   Q.   Isn't it true that the City is in default of its
4        obligations under the service agreements because it
```

Page 25 of 70

13-53846-twr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 25 of 71
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 26 of 71   106
253

```
   5          missed the --
   6     A.   June 14th payment?
   7     Q.   That's right.
   8     A.   We're in default.
   9     Q.   Okay.  And isn't it also true that the City is not
  10          proposing to cure those defaults in connection with
  11          the assumption of the forbearance agreement?
  12     A.   I believe that's true.
  13     Q.   And you would agree that the City is not going to
  14          provide assurances that it will perform with the
  15          service agreements in the future, correct, as part of
  16          the assumption motion?
  17     A.   I'm going to be careful here because we're -- we're
  18          trying to have discussions about what we're going to
  19          do with regard to the proposal, so I don't want to say
  20          now something that may or may not occur in the future,
  21          but there is no present intent -- in response to your
  22          question, no present intent to do that.
  23     Q.   You certainly haven't represented that you will as
  24          part of the assumption motion?
  25     A.   Yes.
109: 1  Q.   We talked about this earlier.  I don't want to reask
   2          the question, but I want to tie it up in connection
   3          with the assumption motion, which is, there are also
   4          events of default existing under the Swaps.
   5     A.   Yes.
   6     Q.   Those are the cause of all the problems, right?
   7     A.   Yes.
   8     Q.   The City is not proposing to cure those defaults in
   9          connection with the assumption agreement, correct?
  10     A.   I'm going to be careful with the characterization of a
  11          cure because, as you know, and -- I have formed no
  12          independent decision as to whether or not that
  13          nomenclature's true.  What I will say is that pursuant
  14          to the forbearance agreement we are attempting to
  15          resolve any and all defaults that may have occurred
  16          under the collateral agreement.
  17     Q.   Under -- and I was asking about the Swaps.
  18     A.   And the Swaps.
  19     Q.   And the Swaps.
  20               So the forbearance agreement is an effort
  21          to resolve any defaults that exist under the
  22          collateral agreement and amended Swaps?
  23     A.   Yes.
  24     Q.   Okay.  And in your view it does that?
  25     A.   Yes.
110: 1  Q.   Okay.
   2     A.   Yes.
   3     Q.   So I'll say it this way.  In your assumption motion,
   4          isn't it true the City doesn't promise to cure any
   5          defaults under the collateral agreement or the Swap
   6          agreement; isn't it that correct?
   7     A.   Here again, and I'm not trying to be evasive.  I
   8          just -- you know, there are concepts of cure in the
   9          bankruptcy code, for instance, with regard to the
  10          assumptions of contracts so on and so forth, and I
```

Page 26 of 70

13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 26 of 70
13-53846-swr   Doc 954-7   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 27 of 71

253

107

```
11        want to make sure that I don't testify as to a legal
12        conclusion.  So what I will say is we are trying -- by
13        the assumption agreement and forbearance agreement, we
14        are trying to resolve all defaults under those
15        documents, both the collateral agreement and the
16        Swaps.
17    Q.  Okay.  And how does it achieve that resolution?
18    A.  Well, the documents speaks for itself, but generally
19        speaking, it imposes obligations upon us to perform a
20        certain ways within certain time frames with regard to
21        the potential termination payment.  It therefore gives
22        us a discount for that payment.  It releases the
23        casino revenue and imposes obligations, and this is my
24        language, upon the Swap counterparties not to trap
25        that revenue upon performance of certain obligations,
111: 1    in addition, obligates those parties to release liens
2         and potential claims as a result of the transaction.
```

**Designation:**

```
114:21   Q.  So let me go back.  I guess my question is, like, do
22        you have a view on whether that big time cash trapping
23        is supposed to happen automatically under the
24        collateral agreement?
25    A.  My understanding is that it does not happen
115: 1    automatically.
2     Q.  Okay.  And is that based on conversations you've had
3         with counsel?
4     A.  Yes.
5     Q.  And if I ask you for the pros and cons of that
6         argument as to who's likely to win and how the City
7         came to its view, you would refuse to answer those
8         questions on the basis of the attorney-client
9         privilege, correct?
10    A.  Yes, sir.
```

**Designation:**

```
116: 4   Q.  The discount that you obtained through the
5         negotiations that Mr. Buckfire led --
6     A.  Right.
7     Q.  -- is a discount to the so-called early termination of
8         the Swap.
9     A.  Yes.
10    Q.  Correct?
11    A.  Yes.
12    Q.  So if you just read the Swap agreement, it would -- it
13        implies a termination value, correct?
```

**Designation:**

```
116:17   Q.  It implies an early termination value?
19    A.  We'll use a nomenclature.  It implies a value for
20        termination fee that I understand represents the loss
21        expectation of the counterparties.
```

**Designation:**

Page 27 of 70
13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 28 of 71
13-53846-swr   Doc 4547   Filed 04/29/13   Entered 04/29/13 19:19:03   Page 28 of 71
253                                                                    108

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
116:23   Q.   That's exactly right.
    24             And the discount you negotiated in the
    25         forbearance agreement is a discount to that amount in
117: 1         the Swap?
```

**Designation:**

```
117: 4   A.   It is a discount to that, yes.  It is a discount to
     5         that expected amount.
```

**Designation:**

```
117: 7   Q.   Yeah.  It is a discount to what would otherwise be
     8         owing under the Swap in the absence of the forbearance
     9         agreement if the Swap counterparties designated an
    10         early termination.
    11   A.   I believe that's correct.
```

**Designation:**

```
117:14   Q.   Okay.  Now, you know that there's a different concept
    15         which is an optional early termination under the Swap,
    16         correct?
    17   A.   Um-hm.
```

**Designation:**

```
118: 2   Q.   Under the Swap --
     3   A.   Right.
     4   Q.   -- there is a different type of termination that's
     5         called an optional early termination.  Are you aware
     6         of that?
     7   A.   I am aware of that.
     8   Q.   Okay.  That's one where the insured -- the Swap
     9         counterparties contend that they can terminate the
    10         Swap and walk away with no payment.
    11   A.   Any understanding I would have about what the Swap
    12         counterparties can do would be based upon
    13         consultations with counsel, but suffice it to say I
    14         have heard of that concept.
    15   Q.   Okay.  So if I ask you about the pros and cons of that
    16         argument and who would likely to win, you would assert
    17         the attorney-client privilege; is that correct?
    18             MR. SHUMAKER:  We would.
    19   A.   Yes.
```

**Designation:**

```
118:21   Q.   Okay.  But I do want to say that you understand that
    22         the Swap counterparties are substantially in the money
    23         under prevailing interest rates, correct?
    24   A.   There is a lot of money that the City's going to owe,
    25         yes.
```

Page 28 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 109 of 1
13-53846-swr   Doc 4834-7   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 29 of 71    109
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**
```
119: 9   Q.   Yeah.  So what I mean is if the Swap was terminated
     10        today --
     11   A.   Right.
     12   Q.   -- it's the service corporations that would owe money
     13        to the Swap counterparties, not the Swap
     14        counterparties that would owe money to the service
     15        corporations.
```

**Designation:**
```
119:19   A.   Yeah.
```

**Designation:**
```
119:21   Q.   That's what I mean by in the money.
     22   A.   Yeah, I -- I think that's true.
     23   Q.   Okay.  I mean that's -- I'm not trying to be flip, but
     24        that is the reason that you negotiated the discount?
     25   A.   That's the mechanism, yes.  Yeah.
120: 1   Q.   Okay.  I want to make an obvious point, which is the
      2        Swap counterparties have never come to the City and
      3        said hey, we're going to exercise that optional early
      4        termination rights that has us walking away and being
      5        paid nothing, correct?
```

**Designation:**
```
120: 8   A.   To the best of my knowledge, I've never heard that.
```

**Designation:**
```
120:13   Q.   Let me -- if you had heard them threaten that, it
     14        would have made Mr. Buckfire's negotiation a lot
     15        easier.
     16   A.   I think it would have made the entire situation a lot
     17        easier, but I've never heard that.
     18   Q.   They've never offered to walk away without any
     19        payment.
     20   A.   I've never heard them offer to walk away without a
     21        payment.
     22   Q.   Okay.  Too bad.
     23   A.   I'm more than willing to accept that offer.
     24   Q.   I was going to say we're all open, right?
     25   A.   Right.
121: 1   Q.   I want to go back to the forbearance agreement.  We
      2        were talking about the things that it does in terms of
      3        providing access to casino revenues, allowing for an
      4        unwind of the Swap.  These were my descriptions of
      5        it --
      6   A.   Right.
      7   Q.   -- candidly, from your motion --
      8   A.   Right.
      9   Q.   -- but we were talking generally about these things.
     10        The valuable consideration that the City gets under
```

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 30 of 71
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 30 of 71   110
253

```
11          the forbearance agreement are all things that it can
12          exercise without any consent from any other party,
13          correct?
17     A.   That's my understanding of the way it works, yeah.
19     Q.   Do you agree that the effect of the forbearance
20          agreement, if the option is exercised, is to modify
21          the amount of the termination payment owed under the
22          Swaps down to whatever percentage is applicable as of
23          that date?
122: 2  A.  If you're talking about the forbearance agreement and
3           the formula that's involved for the percentage change
4           depending upon -- as linked to time, as well as the
5           requirement that we get approval of the agreement at a
6           certain time period, yes, that's true.
8      Q.   Okay.  I mean the effect of the forbearance agreement
9           is that instead of owing what the City would owe under
10          the Swap, which is the hundred percent of the
11          termination value, it now owes -- only owes the
12          discounted amount?
13     A.   Yes.
14     Q.   So the effect is that it modifies that provision in
15          the Swap in a way that's favorable for the City?
17     A.   That's a fair characterization.
20     Q.   Now, the forbearance agreement, another part of it,
21          that it allows the City to direct the Swap
22          counterparties to terminate the Swap, correct?
123: 4  A.  Yeah, the --
8      A.   Yeah, the mechanism is such that it's not our
9           termination, that it's the parties -- it's the
10          counterparties' termination.
12     Q.   That's right.  It's their termination right, but the
13          City gets to direct them to exercise it.
14     A.   Correct.
15     Q.   Okay.  Is that a right that the City currently
16          possesses under any of the other agreements to the
17          best of your knowledge?
18     A.   To the best of my knowledge, no.
19     Q.   That's a right it obtained as a result of the
20          forbearance agreement, correct?
21     A.   Correct.
22     Q.   And the City's able to exercise that right to direct
23          the actions of the Swap counterparties without the
24          consent of any third party, correct?
25     A.   To the best of my knowledge, that's true.
```

**Designation:**

```
125:14 Q.   Okay.  So -- but you -- you can't give me your
15          understanding of how Syncora's alleged rights under
16          the contract administration agreement interact with
17          the City's alleged rights under the forbearance
18          agreement.
19     A.   I can't do that without implicating conversations I've
20          had with my counsel.
21     Q.   And just for the record, you won't?
22     A.   And I won't.
```

Page 30 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 31 of 71
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 31 of 71   111
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
23   Q.   That's right.
24   A.   And I won't, yes.
```

**Designation:**
```
126:18   Q.   I want to go back to the subject of cash trapping
   19        really quick because we had just moments ago talked
   20        about whether it worked automatically --
   21   A.   Right.
   22   Q.   -- or whether it worked upon notice.
   23   A.   Right.
   24   Q.   But prior to the forbearance agreement, it was your
   25        view that the Swap counterparties had the right to
127: 1        direct U.S. Bank to trap the casino revenues; isn't
    2        that correct?
    3   A.   I think if there were events of default, and here they
    4        are, yes.
    5   Q.   Yeah.  That was a driver of the negotiation --
    6   A.   Yes.
    7   Q.   -- correct?
    8   A.   Certainly is, yes.
    9   Q.   And your understanding is that as part of the
   10        forbearance agreement during the -- during the --
   11        during the forbearance period, the Swap counterparties
   12        have temporarily relinquished that right to direct
   13        cash trapping so long as the optional termination
   14        period is pending.
   15   A.   Yes, they are forebearing from exercising their right.
   16   Q.   Okay.  Now, you understand that cash passes through
   17        the general receipts subaccount on a monthly basis.
   18        We talked about that earlier.
   19   A.   Right.
   20   Q.   It's trapped until a certain point and then the City
   21        makes the holdback account, and when they get --
   22        become equal, there's a discharge of payment to the
   23        City from the general receipts subaccount, and then
   24        for the remainder of the month, the City gets access
   25        to the casino revenues, correct?
128: 1   A.   Yes.  My understanding is about $500,000 a day are
    2        paid into those accounts and the mechanism is very
    3        similar to what you said --
    4   Q.   Okay.
    5   A.   -- how it operates.
    6   Q.   Can we agree that the way the forbearance agreement
    7        works is that certainly between July 17th and now and
    8        from now to whenever the forbearance, the option is
    9        either exercised or expires, there's going to be cash
   10        that passes through this account, already passed
   11        through the account, that goes to the City?
   12   A.   Yes.  There should be.
   13   Q.   If the option expires without the City's exercise of
   14        the option, isn't it true that under the forbearance
   15        agreement, the City has no obligation to put that cash
   16        back into the -- into the general receipts subaccount?
   19   A.   I --
   21   Q.   Just asking for your understanding of how the
```

Page 31 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 31 of 71
13-53846-swr   Doc 4547   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 32 of 71   112
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
      22          agreement works.
      23    A.    Sure.  And my understanding of how the agreement
      24          works, without having it in front of me and consulting
      25          counsel, is the parties revert back to the status quo
129:  1          ante as where they were, and I do not recall that
       2          there's an obligation for remittor (sic) --
       3    Q.    Yeah.
       4    A.    -- of monies that were paid during the forbearance
       5          period.
       6    Q.    And the agreement does speak for itself.  I'm just
       7          asking for your understanding of the agreement.
       8    A.    That's my understanding.
       9    Q.    I have read the agreement, and my reading of
      10          Section 1.2(c) of the agreement is that when the
      11          option expires without being exercised, that it's just
      12          as you said, everyone is restored to the status quo
      13          ante, but the City doesn't have to put the money it
      14          received back in the -- in the interim back into the
      15          account.
      16    A.    Right, which is status quo because we would have
      17          received that money in any event.
      18    Q.    Okay.  But what I just said is also your
      19          understanding?
      20    A.    Yes.
```

**Designation:**

```
130:  8    Q.    Let me hand you this forbearance agreement.
       9    A.    Okay.
      10    Q.    I've marked it as Orr Exhibit 2.
      11    A.    Okay.
      12                  MARKED FOR IDENTIFICATION:
      13                  DEPOSITION EXHIBIT 2
      14                  10:48 a.m.
      15    A.    Okay.
      16    BY MR. HACKNEY:
      17    Q.    Do you have it in front of you?
      18    A.    Yes.
      19    Q.    And is that, to the best of your knowledge, a true and
      20          accurate copy of the forbearance agreement?
      21    A.    Yes, it appears to be.
      22    Q.    Now, if you look at the -- on page 2 of the second
      23          full recital?
      24    A.    Uh-hm.
      25    Q.    You'll see that it says, "Whereas, pursuant to the
131:  1          terms of each Swap agreement, it is the view of the
       2          Swap counterparties that one or more events of default
       3          and/or additional termination events has occurred,
       4          with the service corporations" -- "with the service
       5          corporation as the defaulting party or sole affected
       6          party, and therefore each of SBS and UBS has the right
       7          to designate an early termination date for the related
       8          Swap agreements."
       9                  Do you see that?
      10    A.    Yes, I do.
      11    Q.    I have a long set of questions here that I would like
```

page 113

Page 32 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 32 of 71
13-53846-swr   Doc 4547   Filed 09/15/13   Entered 09/15/13 19:10:03   Page 33 of 1   113
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
12        to collapse if I could, which is, this just says it's
13        the view of the Swap counterparties.  The fact of the
14        matter is it's also the City's view that there are
15        termination events and events of default existing
16        under the Swap.
17   A.   Yes, I think that's fair.
18   Q.   And that as a result of those termination and events
19        of default in the absence of this agreement, the Swap
20        counterparties would have the right to designate an
21        early termination date.
22   A.   Yes.
23   Q.   If I asked you to catalog all of the termination
24        events and events of default under the Swap, would you
25        be able to do that?
132: 1 A. No, I wouldn't, not without a consulting client and a
2         long compendium of events that occurred before I was
3         appointed.
4    Q.   You do know some of them offhand.
5    A.   Sure, like the consent agreement, the declaration of
6         financial emergency, the appointment of the financial
7         advisory board, the failure to make some of the --
8         there are a bunch of them, but I couldn't catalog them
9         all.
10   Q.   Yeah.  Your appointment?
11   A.   My appointment.  I'm an event of default.
12   Q.   You are -- you are an embodiment of default.
13   A.   I'm an embodiment of default.
14   Q.   So at some point we will have to cure you.
15   A.   You will have to talk to my wife about that.
16   Q.   Okay.  The -- okay.  So that is helpful.  I was going
17        to go through some of these things, but it doesn't
18        sound like there's an actual dispute between the City
19        and the Swap counterparties on this point, correct?
20   A.   No.
```

**Designation:**

```
134: 4 Q. Is it fair to say that if I ask you to describe to me
5         what potential events of default or termination events
6         where the Swap counterparties were the sole affected
7         party or the defaulting party --
8    A.   Right.
9    Q.   -- you would decline to answer those questions on the
10        basis of the attorney-client privilege?
11             MR. SHUMAKER:  To the extent they would
12        reveal those communications, of course.
13             MR. HACKNEY:  Well, I mean --
14   A.   Yes, I would.
15   BY MR. HACKNEY:
16   Q.   Okay.  Even if I ask you about your understanding of
17        the position, your position is that you don't have one
18        independent of your legal advisors.
19   A.   I -- on this question, I don't have one independent of
20        my legal advisors.
21   Q.   So I can't ask you what your understanding is --
22   A.   Right.
23   Q.   -- because it will necessarily reveal the legal advice
```

```
        24          you got.
        25    A.    I'm trying to see if there's a way I can answer your
  135: 1          question without implicating discussions.  No.  It
         2          might -- it might implicate some discussions I had
         3          with counsel.
         4    Q.    Okay.  Mr. Orr, is the forbearance agreement a
         5          settlement?
         8    A.    Let me say this.  I'm aware that the motion pending in
         9          front of the Court is both for -- we call in
        10          bankruptcy, what I used to call in bankruptcy, both an
        11          assumption of an agreement and a ^ 9019 settlement.
        13    Q.    So it's been held out by the City as a settlement,
        14          correct?
        15    A.    Yeah.  I think there's a debate as to whether or not
        16          you need to seek settlement approval in a Chapter 9
        17          case, but we are.
        18    Q.    Okay.  Does the forbearance agreement settle any
        19          claims on a final basis?
        20    A.    I think it does.
        21    Q.    Isn't it true, though, that if the City doesn't
        22          exercise the option, everyone goes back to the status
        23          quo ante?
        24    A.    Yes.  That's the contingency, yes.
        25    Q.    Okay.  So if that were to happen, everyone's claims
  136: 1          would still be in play.
         2    A.    I'm going to be careful with the word claims, but
         3          everyone would revert back to the status quo ante.
         4    Q.    Okay.  So whatever claims they had at the status quo
         5          ante they'd have again?
         6    A.    Yeah, whatever claims -- technically, whatever claims,
         7          colloquially, whatever they had would, revert back to
         8          the status quo ante.
         9    Q.    Can we agree that in that eventuality no claims of any
        10          of the parties of the forbearance agreement would have
        11          been finally resolved by the forbearance agreement?
        12    A.    To the best of my knowledge, yes.
        13    Q.    Now, put aside the threat of declaring an early
        14          termination under the Swap --
        15    A.    Right.
        16    Q.    -- which we've discussed extensively today as a right
        17          the Swap counterparties have under the Swap --
        18    A.    Okay.
        19    Q.    -- put that aside.  Have you evaluated, separate and
        20          apart from that, whether there are other tort or
        21          contract claims that the Swap counterparties may have
        22          against the City?
        23    A.    I think there were discussions, but, here again, those
        24          would be wrapped up in attorney-client communications.
        25    Q.    So if I asked you to reveal the assessment of whether
  137: 1          there were other claims that the Swap counterparties
         2          have against the City, you would decline to answer
         3          those questions on the grounds of attorney-client
         4          privilege?
         5    A.    I think I would have to.  I do recall discussions, but
         6          I think I'd have to decline on the basis of
         7          attorney-client privilege.
```

Page 34 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 34 of 70
13-53846-swr   Doc 4547   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 35 of 71   115

253

```
 8   Q.   Have the Swap counterparties threatened to bring any
 9        claims against the City?
10   A.   Well, here again, being careful with the word claims,
11        you mean unrelated to the defaults such as tort
12        claims?
13   Q.   I guess I would say the Swap agreement is one you
14        understand that's between the Swap counterparties and
15        the service corporations.
16   A.   Right.
17   Q.   Okay.  So I'm trying to put that in a box for now.
18   A.   Right.
19   Q.   And we've talked about that extensively.
20   A.   Right.
21   Q.   So other than any claims they may have against the
22        service corporations --
23   A.   Right.
24   Q.   -- that could absolutely have implications for the
25        City, but other than that, have the Swap
138: 1    counterparties threatened to bring any other claims
 2        directly against the City?
 3   A.   None that I'm aware of.
 4   Q.   I may have asked you this earlier, but I just -- I
 5        want to make sure that I didn't miss it and so if it's
 6        asked and answered I apologize, but did the City
 7        evaluate whether it is in breach of the collateral
 8        agreement?
 9   A.   Did we evaluate it?
10   Q.   Yeah.
11   A.   Yes, I and my consultants evaluated it.
12   Q.   Is this one where if I asked you the results of those
13        evaluations you'd decline to answer?
14   A.   Yes.
```

**Designation:**

```
138:20   Q.   Now, have the service corporations threatened to bring
21            any claims against the City?
22       A.   None that I'm aware of.
23       Q.   And have you undertaken an assessment of the
24            likelihood of the service corporations to the extent
25            they were to assert claims against the City?
139: 1   A.   No.  I don't recall doing that.
 2       Q.   So you haven't assessed that?
 3       A.   Not me independently, no.
 4       Q.   Okay.  And it's not something you took into account as
 5            part of this agreement?
 6       A.   No.  We -- there was a discussion about the interest
 7            of all the parties.  I, independently, did not
 8            handicap whether the service corporations might bring
 9            a claim against the City.  I think there were
10            discussions about it.  Many of those discussions would
11            have been caught up in the general discussions that I
12            was having with counsel and my other advisors.
13       Q.   And you wouldn't be able to discuss them?
14       A.   No.
15       Q.   But the service corporations' claims against the City,
16            those are not resolved by the forbearance agreement,
```

Page 35 of 70

13-53846-swr   Doc 4814-1   Filed 09/29/14   Entered 04/29/13 22:00:03   Page 35 of 70
13-53846-swr   Doc 4864-7   Filed 09/29/14   Entered 09/29/13 19:19:03   Page 36 of 71   116

253

```
          17            correct?
          18    A.      If they have any.  I don't think they are.
          19    Q.      Let me cut to it.  Is it fair to say you haven't given
          20            this any real consideration?
          21    A.      Yeah.  We -- it is fair to say that it was -- there
          22            was no real deep consideration of it.  We did consider
          23            it.
          24    Q.      Now, as the City evaluated whether it has claims
          25            against the Swap counterparties --
    140:  1    A.      Um-hm.
           2    Q.      -- okay?
           3    A.      Um-hm.
           4    Q.      And if I ask you to tell me what claims you have, will
           5            you tell me them or will you assert the privilege?
           6                    MR. SHUMAKER:  I would instruct the witness
           7            that may implicate attorney-client communications.
           8    A.      I would have no independent knowledge of what claims
           9            may have other than discussions I've had with counsel
          10            so I wouldn't answer.
          11    BY MR. HACKNEY:
          12    Q.      Okay.  If I ask you what's the likelihood that you'll
          13            win on the claims?
          14    A.      Same answer.
          15    Q.      You would follow the advice --
          16    A.      Yeah.
          17    Q.      -- and assert the privilege?
          18    A.      Yeah.
```

**Designation:**

```
    140:24   Q.      Well, let me ask you -- let me ask you just a -- sort
          25           of this is your understanding of the forbearance
    141:  1           agreement.
           2   A.      Right.
           3   Q.      What claims are you asking the Court to approve the
           4           settlement of?
           5   A.      In claims that might be had by the parties vis-à-vis
           6           each other.
           7   Q.      So any and all claims that they have under the Swaps
           8           or the collateral agreement or the service contracts
           9           or any other contracts --
          10   A.      Yes.
          11   Q.      -- those claims are being resolved by the forbearance
          12           agreement?
          13   A.      To the best of my knowledge, that is true.
          14   Q.      Okay.  And the result of the forbearance agreement is
          15           that the City will be able to perform under the
          16           forbearance agreement without being subject to any
          17           liability to any third party?
          18   A.      That is my understanding.
          19   Q.      And so will the Swap counterparties, correct?
          20   A.      That is my understanding.
          21   Q.      It will give you what I'll call a clean closing?
          22   A.      As I said earlier this week, it will bring us to
          23           closure and certainty, yes.  Earlier today.
          24   Q.      That is also one of the values of this agreement to
```

Page 36 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 37 of 71
13-53846-swr   Doc 955-7   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 37 of 71   117
253

```
      25          both and you the Swap counterparties, you the City?
142: 1   A.   Right.
       2   Q.   Which is that it absolves you for any liability in
       3          connection with the relevant agreements?
       6   Q.   As a result of performance under the forbearance
       7          agreement, correct?
      10   A.   My understanding is that it provides us with closure
      11          and finality regarding any claims and relationships
      12          that the parties have.
      14   Q.   Okay.  And there's no trailing liability?
      15   A.   That is correct.
      16   Q.   And just for the record, if I asked to you assess the
      17          likelihood of success of all of the different claims
      18          that are being resolved by the forbearance agreement,
      19          you would assert the attorney-client privilege and
      20          refuse to answer?
      21   A.   That is correct.  I have made no independent
      22          assessment outside of any conversation I would have
      23          had with counsel and my advisors.
```

**Designation:**

```
144:10   Q.   But I guess I'm saying are you seriously unaware as to
      11          whether there's a release in the forbearance
      12          agreement?
      13   A.   Seriously or not, I think the forbearance agreement
      14          resolved all claims between the parties.  Sitting here
      15          today without examining it, I'm not aware as to
      16          whether or not it specifically has a release.
      17   Q.   Okay.  So the -- whether it's in the forbearance
      18          agreement or in the effect of its approval, it
      19          operates as a release for everyone involved?
      20   A.   Yeah.  The reality is -- when you asked me the
      21          question before as to whether or not it has a release,
      22          the reality is that to the extent you asked -- I
      23          believe in the motion you asked for assumptions and
      24          9019 settlement that the order might well contain a
      25          release so -- I wasn't trying to be truculent with
145: 1          you.  I'm just saying that, yes, the effect of the
       2          approval of the agreement should have that impact.
       3   Q.   I'm not going to try to go claim by claim because your
       4          understanding is it releases all claims of the Swap
       5          counterparties, the service corporations, and the City
       6          against one another?
       7   A.   Yes.
       8   Q.   Now, the Swap insurers, as part of the forbearance
       9          agreement, they get a release of their insurance
      10          obligations under the Swap in the event the City
      11          directs an optional termination, correct?
      12   A.   Yes, I believe that's true.
      13   Q.   And this was one of the things that the City has
      14          touted, which is to say, hey, Swap insurers, pipe down
      15          this is good for you, right?
```

**Designation:**

```
145:17   A.   Yeah, without characterizing, you know, the colloquial
```

Page 37 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 37 of 71
13-53846-swr   Doc 965-4   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 38 of 71   118
253

```
    18          characterization, yes, we think that's a benefit.
```

**Designation:**
```
145:20  Q.    That's a concept that you've argued in your papers --
    21  A.    Yes.
    22  Q.    -- as to why the Swap insurers should be happy?
    23  A.    Yes.
    24  Q.    Now, do you understand you -- you have argued that
    25        this is a benefit to the Swap insurers under the
146: 1        forbearance agreement, correct?
     2  A.    Yes, I believe so.
```

**Designation:**
```
146:24  Q.    Okay.  As a layperson person, do you have a view one
    25        way as to whether Syncora is a third party beneficiary
147: 1        under the agreement?
     2  A.    As a layperson, I really haven't examined it.
     3  Q.    So don't know one way or the other?
     4  A.    Don't know one way or the other.
     5  Q.    Do you have a view as to whether Syncora or FGIC, for
     6        that matter, can sue to enforce the agreement?
     7  A.    I don't have one way or the other.
     8  Q.    They may have, they may not have?
     9  A.    Yeah.  I'd probably weigh on the side of they don't,
    10        but I -- I don't have a view one way or the other.
    11  Q.    And have you considered the possibility that if they
    12        don't have the right to sue to enforce the agreement,
    13        that they also would not have the right to sue to
    14        enforce the release that's in the agreement?
```

**Designation:**
```
147:16  A.    They might or they might --
```

**Designation:**
```
147:19  A.    They might or they might not.
```

**Designation:**
```
148: 8  Q.    And so if the insurer can't enforce the agreement to
     9        take advantage of the release, that's the insurer's
    10        problem, correct?
    11  A.    Well, without characterizing whether or not it's their
    12        problem or so, my fiduciary duty runs to the City in
    13        its interest; it does not necessarily run to Syncora.
    14  Q.    Yeah.  Can we agree that you certainly didn't
    15        negotiate into the agreement any specific provision
    16        granting the insurers the right to sue to enforce that
    17        provision?
    18  A.    I made no instruction to my team to negotiate such a
    19        provision.
```

Page 38 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 39 of 71
13-53846-swr   Doc 4547   Filed 04/29/13   Entered 04/29/13 19:19:03   Page 31 of 71   119
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

```
151: 6   Q.   If I ask you about the specifics of the conversations
      7        you had about whether the automatic stay applied and
      8        the likelihood that it would or wouldn't, you'll
      9        decline to answer those questions on the basis of the
     10        attorney-client privilege, correct?
     11   A.   Yes, again, today I would have to do that.
```

**Designation:**

```
153:14   Q.   Your counsel rendered advice to you about the
     15        likelihood, the pros and cons of the arguments, and
     16        you're not at liberty to provide that advice to us
     17        because it would invade the attorney-client privilege?
     18   A.   Yes, I believe that's correct.
```

**Designation:**

```
154:18   Q.   If the automatic stay applied, it might get access to
     19        the casino revenue during the whole bankruptcy,
     20        correct?
     21   A.   It might.
     22   Q.   Yeah.  We're talking about different things that you
     23        consider as you're analyzing your options, right?
     24   A.   Yeah, correct.
     25   Q.   And this is -- this is a potentially important one
155: 1        because you might be able to get longer access to cash
      2        from the automatic stay than you were getting from the
      3        forbearance agreement, correct?
      4   A.   Here again, that's a contingent it might, but that has
      5        to be drawn up also in discussion of potential risk
      6        that Safe Harbor provision would allow the
      7        counterparties to exercise their rights and therefore
      8        obviate any benefits the City could receive from the
      9        automatic stay.
```

**Designation:**

```
155:12   Q.   So just to be clear, if I ask you about the specific
     13        ins and outs of all those potential arguments,
     14        likelihoods of success and so forth, you will not
     15        answer those questions on the basis of the
     16        attorney-client privilege, correct?
     17   A.   That is correct.
     18   Q.   Oh, I know.  The City recently argued in court against
     19        yours truly that the automatic stay bars the cash
     20        trapping provisions of the collateral agreement.  Are
     21        you aware of that?
     22   A.   I believe I am, yes.
```

**Designation:**

```
156: 3   Q.   Did the Swap counterparties give their consent to the
      4        City to make those arguments in court?
      5   A.   I don't know.
```

Page 39 of 70
13-53846-tir   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 40 of 71
13-53846-swr   Doc 4547   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 40 of 71
253                                                                            120

```
 6   Q.   And -- so you don't know whether they did or they
 7        didn't?
 8   A.   That is correct.
 9   Q.   You understand that as originally designed the Swaps
10        were designed to hedge against interest rate risk on
11        the floating COPs?
```

**Designation:**
```
156:15   A.   That is my understanding.
```

**Designation:**
```
156:17   Q.   And I can unpack it if you want.  I know we get into
18        the --
19   A.   That's my understanding.
20   Q.   Yeah, okay.  Let's just do basics of interest rate
21        risk, which is if the interest rates go above the
22        hedge rate, then now the Swap counterparties have to
23        pay the difference to the service corporations so that
24        they can pay the difference to the floating rate COPs,
25        correct?
```

**Designation:**
```
157: 2   A.   That is my understanding.
```

**Designation:**
```
157: 4   Q.   That's how the hedge works.
 5             Now, interest rates do not favor the City
 6        in the Swaps -- we asked that earlier.
 7   A.   Right.
```

**Designation:**
```
157: 9             But more basics of interest rate hedging,
10        so as the interest rates go up and start to approach
11        the hedge, the amount the City owes under the Swap via
12        service corporations goes down?
13   A.   That -- that is my understanding.
14   Q.   And as it crosses over the hedge line, the service
15        corporation could actually be in the money?
```

**Designation:**
```
157:17   A.   Yeah, here again, we had the discussion about in the
18        money or not, but to the extent your point is saying
19        that they would benefit more from the hedge than the
20        counterparties would, that is my understanding.
```

**Designation:**
```
157:22   Q.   When the interest rates get above the hedge line?
23   A.   (Nods head).
```

Page 40 of 70
13-53846-swr   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 41 of 71
13-53846-swr   Doc 4547   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 41 of 71   121
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

```
158: 5   Q.   When you entered into the forbearance agreement on
      6        July 15th --
      7   A.   Right.
      8   Q.   -- what steps did you take prior to that time to
      9        evaluate future interest rate moves?
     10   A.   Any discussions in those -- that regard would have
     11        been with our investment bankers and generally with
     12        our attorneys.  What I'm trying to think of is were
     13        there any discussions that I had with Miller Buckfire
     14        which would not have been confidential in that regard.
     15        I don't think that there were.  What I can say is that
     16        we evaluated the potentiality of the -- of the
     17        interest rate fluctuation as indexed to LIBOR going up
     18        or down, but I think most of those, if not all of
     19        them, were in communications with one or more of my
     20        attorneys.
     21   Q.   And when you say we evaluated the interest rate
     22        fluctuations, that would have been tasked to Miller
     23        Buckfire to do?
     24   A.   Yes, Miller Buckfire in conjunction with folks from
     25        Jones Day.  Yeah, sure.
159: 1   Q.   Okay.  No disrespect to the fine lawyers at Jones Day.
      2        I don't know if I can calculate future interest rates
      3        as a lawyer.
      4             It was in Miller Buckfire's province to do
      5        it.  They may have done it in conjunction with Jones
      6        Day?
      7   A.   Yes, yes.
      8   Q.   Okay.  And any review of forward curves or different
      9        interest rate implications currently existing in the
     10        market would have been done by Miller Buckfire?
     11   A.   Yes.
     12   Q.   And your recollection is that it was done and it was
     13        something that you considered as part of the decision
     14        entering into this agreement?
     15   A.   I believe so.
     16   Q.   You're aware, for example, that the Federal Reserve
     17        has indicated intent to scale back its monthly bond
     18        purchases?
     19   A.   I heard that.
     20   Q.   And --
     21   A.   Quantitative reasoning --
     22   Q.   Yeah.
     23   A.   Yeah.
     24   Q.   And you're aware that many people believe that that
     25        may lead interest rates to rise; isn't that right?
160: 1   A.   Yes.
      2   Q.   Okay.  Did you analyze the likelihood that the
      3        interest rates would rise or was that also tasked to
      4        Miller Buckfire?
      5   A.   I didn't do it independently.  That would have been
      6        tasked to Miller Buckfire.
      7   Q.   And if I asked what that analysis showed, I would have
      8        to ask Mr. Buckfire that?
```

Page 41 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 41 of 70
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 42 of 71   122
253

```
 9    A.    Yes, you would.
10    Q.    Okay.
11    A.    Yes, you would.
12    Q.    Let me ask you about -- in the motion to assume the
13          forbearance agreement, the City states that it has
14          examined whether there are viable actions to challenge
15          the Swap contracts.  Do you recall that?
16    A.    Yes.
17    Q.    Under what theory could the City challenge the
18          validity of the Swap contracts?
19    A.    Any theories that we discussed -- I'll give you two
20          answers.  One, many of the theories, my understanding
21          is and somebody -- I haven't read all of the
22          objections, but I've read some of them.  Some of the
23          objections in this case have discussed some of those
24          theories.
25                  Two, any theories which we would have
161: 1          examined, either independently or in the context of
  2          reviewing and handicapping the probability of success
  3          of some of the objections, would have been done with
  4          counsel.
  5    Q.    And so you'll refuse to describe both the theories and
  6          their likelihood of success because it would invade
  7          the attorney-client privilege; is that correct?
  8    A.    Yes.  Unfortunately, yes.
  9    Q.    If I asked you what likelihood of success the City
 10          attributes to an action seeking to declare the Swaps
 11          invalid, you'll decline to answer that on the
 12          attorney-client privilege?
 13    A.    Yes.
```

**Designation:**

```
161:22    Q.    In your proposal for creditors on June 14, 2013, you
   23          said that the City has identified certain issues
   24          related to the validity and/or enforceability of the
   25          COPs --
162: 1    A.    Yes.
   2    Q.    -- that may warrant further investigation.
   3    A.    Yes.
   4    Q.    Do you remember that?
   5    A.    Yes.
   6    Q.    I'm saving us from having to go through that --
   7    A.    Yeah, yeah.  No.  I remember.
   8    Q.    What issues has the City identified?
   9                  MR. SHUMAKER:  Again, I'm going to caution
  10          the witness --
  11    A.    Yeah.
  12                  MR. SHUMAKER:  -- if this is going to
  13          reveal attorney-client communications to not answer.
  14                  Subject to that, you can answer.
  15    A.    Here again, there would be no issues that -- and I
  16          hate to keep saying this.  There'd be no issues that I
  17          independently would have identified because I'm trying
  18          very hard not to act as a lawyer.  I would have only
  19          identified those issues and had discussions of them in
```

Page 42 of 70

13-53846-tir  Doc 4814-1  Filed 04/29/14  Entered 04/29/14 22:00:03  Page 42 of 71
13-53846-swr  Doc 954-7  Filed 09/19/13  Entered 09/19/13 19:10:03  Page 43 of 71    123

253

```
      20        consultations with my attorneys.  So whether there are
      21        issues such as void ab initio, fraud, any of the other
      22        issues that typically go to contracts, I would only
      23        have had those discussions with counsel, so
      24        consequently I can't speak to this.
      25   BY MR. HACKNEY:
163: 1   Q.  Okay.  And you'll assert the attorney-client privilege
      2        as a protection against describing the invalidity of
      3        the COPs analysis?
      4   A.  Yes, because I did no independent analysis.
      5   Q.  Has the City completed its investigation into this
      6        issue?
      7   A.  No.  The City's investigation into a number of things
      8        are ongoing.
      9   Q.  Okay.  And this is one of them?
     10   A.  This is one of them, yeah.
     11   Q.  Okay.  So the City hasn't reached a conclusion on this
     12        subject because it hasn't concluded its investigation
     13        into the subject, correct?
     14   A.  It -- I think that's fair, yes.
     15   Q.  And has the City considered whether the service
     16        agreements between the service corporations and the
     17        City are lawful?
     18   A.  I don't recall if we looked into that.
     19   Q.  So that's one that you --
     20   A.  I just don't recall if that was one.
     21   Q.  You may have investigated, you may have not?
     22   A.  Correct.  I don't recall that one.
     23   Q.  If you have investigated, do you know if the
     24        investigation has concluded or do you not know?
     25   A.  No.  If we had investigated or are investigating it,
164: 1        my understanding it would not have been concluded.
      2   Q.  Okay.  So much like with the COPs, generally the
      3        validity of the service contracts with the City is a
      4        subject of ongoing investigation that has not yet
      5        concluded.
      6   A.  It may be the subject of ongoing investigation which
      7        has not yet concluded.
      8   Q.  Okay.  If I asked you how either of those two
      9        investigations, the one into the COPs validity or the
     10        one into the service contracts validity, impacted your
     11        decision to enter into the forbearance agreement, you
     12        will decline to answer because it would tend to reveal
     13        attorney-client communications?
     14   A.  For all the reasons we discussed today, the -- yes, I
     15        would have to.
     16   Q.  Mr. Orr, let me ask you about under section 803 of the
     17        service contracts --
     18   A.  Yeah.
     19   Q.  -- I'm going to save us both from having to go through
     20        them --
     21   A.  Yeah.
     22   Q.  -- so I'll represent to you what it relates to and see
     23        if you've heard of it.
     24   A.  Okay.
     25   Q.  Okay?
```

Page 43 of 70

13-53846-tjt  Doc 4514-1  Filed 09/29/14  Entered 04/29/14 22:00:03  Page 44 of 71
13-53846-swr  Doc 984-7  Filed 09/19/13  Entered 09/19/13 19:10:03  Page 44 of 71   124
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
165: 1                    Under section 803 of the service contracts
      2          payments by the City to the service corporations are
      3          classified according to a waterfall.
      4   A.     Um-hm.
      5   Q.     Have you heard of this waterfall?
      6   A.     Yes.
      7   Q.     Okay.  Did you evaluate whether there were any claims
      8          that any parties to the structure might have against
      9          one another if the forbearance agreement leads to the
     10          payment of monies outside of the waterfall?
     11   A.     I assume you're alluding to prioritization or
     12          subordination in claims along those regards, and the
     13          answer:  I think there probably was, but, here again,
     14          I would -- I did not do it independently.  It would
     15          have been done by my counsel.
     16   Q.     Okay.  So you can't tell me the fruits of the analysis
     17          or the City's position on the likelihood of success on
     18          the issue because it's protected by the
     19          attorney-client --
     20   A.     That is --
     21   Q.     -- privilege?
     22   A.     -- correct.
     23   Q.     If I ask you how it impacted your decision to enter
     24          into the forbearance agreement, you'd also not be able
     25          to answer that on the basis of the attorney-client
166: 1          privilege?
      2   A.     That is correct.  In addition, that's part of the
      3          deliberative process.
      4   Q.     Have you analyzed whether or not COP holders might
      5          have claims against the Swap counterparties if the
      6          City exercises the optional termination right?
      7   A.     There -- have we analyzed it?  The answer is yes, I
      8          believe so.
      9   Q.     Okay.  What's the result of that analysis?
     10   A.     Here again, any discussion would have been caught up
     11          in discussions I would have had with my counsel in
     12          that regard, so I decline to answer the question.
```

**Designation:**
```
166:22   Q.     We've just been talking now about the COPs.  We've
     23          talked about the Swaps a lot.  I'm going to for a
     24          moment reference the 2006 COPs Swap transaction
     25          documents.
167: 1   A.     Okay.
      2   Q.     Do you know generally what I mean when I say that?
      3   A.     Yes.  The original documents by which the City
      4          borrowed money, 1.4 billion, for the unfunded
      5          actuarial liability --
```

**Designation:**
```
167: 7   A.     For the unfunded actuarial liability involve -- the
      8          organic documents.
```

**Designation:**

Page 44 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 45 of 71
13-53846-swr   Doc 4984-7   Filed 04/29/13   Entered 04/29/13 19:19:03   Page 45 of 71
253                                                                      125

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
167:10   Q.   That is exactly correct.  And, to name a few, there
    11        are the service contracts, the contract administration
    12        agreement, the trust agreement, and the master and --
    13        and amended Swap agreements, correct?
    14   A.   Yes.
    15   Q.   You've heard of all of those?
    16   A.   Yes.
    17   Q.   And there are multiple versions of them?
    18   A.   There are multiple versions of them.
    19   Q.   For example, there are two service contracts --
    20   A.   That's right.
    21   Q.   -- because there are two service corporations.
    22   A.   That's right.
    23   Q.   Now, your understanding is that some of these
    24        documents were amended in 2009 in connection with the
    25        addition of the collateral agreement to the package,
168: 1        correct?
     2   A.   Yes.  I'm going to take your meaning -- the amendment
     3        to mean that's the -- yes, the net effect of what
     4        happened in 2009.
     5   Q.   Okay.  Did you know, for example, that the service
     6        contracts were also literally amended --
     7   A.   Yes.
     8   Q.   -- as part of that?
     9   A.   Yes.  We're talking generally about all the documents
    10        without specifically going into each one.
    11   Q.   Although I did -- I did in that last one.
    12   A.   Yeah, you did, and so I'm following your lead on what
    13        we're talking about.
    14   Q.   Okay.
    15   A.   Okay.
    16   Q.   The Swaps were also themselves amended in addition to
    17        the collateral agreement being created?
    18   A.   I believe so.
```

**Designation:**
```
169: 2   Q.   I believe the City ordinance describes this as all one
     3        transaction.
     4   A.   Right.
     5   Q.   Do you have a basis to dispute it?
```

**Designation:**
```
169: 8   A.   Yeah.
```

**Designation:**
```
169:10   A.   Yeah, I have no basis to dispute it.  Yeah.
```

**Designation:**
```
169:17   Q.   You took a look at them.  You know that they all refer
    18        to one other and relate to one another.
```

Page 45 of 70

13-53846-swr   Doc 4314-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 46 of 71
13-53846-swr   Doc 4314-7   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 46 of 71
253                                                                          126

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

| | | |
|---|---|---|
| 169:22 | A. | Yeah, if -- without drawing any legal meaning to the |
| 23 | | concept that they all refer to one another, I believe |
| 24 | | that they do. |

**Designation:**

| | | |
|---|---|---|
| 170: 1 | Q. | Now, the forbearance agreement that you just signed on |
| 2 | | July 15th, that also references the 2006 transaction |
| 3 | | documents, correct? |
| 4 | A. | I believe so. |
| 5 | Q. | Okay.  In fact, doesn't it borrow certain terms from |
| 6 | | some of those documents? |
| 7 | A. | Without -- yeah, without reviewing the 2005 and 2006 |
| 8 | | documents or spending time here today reading through |
| 9 | | this agreement, I believe that's accurate. |

**Designation:**

| | | |
|---|---|---|
| 170:15 | Q. | The -- do you know that one of the things that the |
| 16 | | City agreed to do under the forbearance agreement is |
| 17 | | that during the optional termination period -- |
| 18 | A. | Right. |
| 19 | Q. | -- the City won't try to seek to invalidate any of the |
| 20 | | 2006 transaction documents? |
| 21 | A. | I believe that's true. |
| 22 | Q. | Okay.  That's one piece that's big enough that you're |
| 23 | | familiar with? |
| 24 | A. | Yeah, I believe that's true. |
| 25 | Q. | So is it fair to say that the 2006 transaction |
| 171: 1 | | documents, the collateral agreement from 2009, and the |
| 2 | | forbearance agreement are all documents that relate to |
| 3 | | the same subject matter? |
| 4 | A. | Without drawing a legal conclusion, I believe in a |
| 5 | | broad sense it's fair to say that they relate to the |
| 6 | | same subject matter, meaning the Swaps. |
| 7 | Q. | Does the forbearance agreement amend any of the |
| 8 | | provisions in the 2006 COPs or Swap transaction |
| 9 | | documents? |

**Designation:**

| | | |
|---|---|---|
| 171:12 | A. | Yeah.  I want to be very careful here.  In addition to |
| 13 | | the document speaks for itself, I don't want to draw a |
| 14 | | relationship between the COPs document, which is |
| 15 | | separate, to the Swaps document. |
| 16 | | When I said they relate broadly to the |
| 17 | | subject, to the extent COPs were money borrowed to try |
| 18 | | to fund a pension obligation, and the Swaps were in |
| 19 | | place as a hedge against the interest rate |
| 20 | | fluctuations in those documents, and the collateral |
| 21 | | agreement 2009 was a document that was meant to |
| 22 | | address defaults that had occurred in relation to the |
| 23 | | Swaps document, and this document was meant to address |

Page 46 of 70

13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 47 of 71
13-53846-swr   Doc 4514-7   Filed 09/29/13   Entered 09/29/13 19:19:03   Page 47 of 71

253

127

```
    24        the Swaps, they relate to that same subject area, but
    25        I don't want to have my testimony suggest that there's
172: 1        a legal relationship between the COPs and the Swaps
     2        document as relates to this agreement, forbearance and
     3        optional termination agreement.
```

**Designation:**

```
172: 5    Q.   So as you sit here today, is your answer that you
     6         don't know if the forbearance agreement amends any of
     7         the 2006 COPs Swap transaction documents?  It may, it
     8         may not, you don't know?
     9    A.   That is -- that is correct.  I'm not going to draw a
    10         legal conclusion.
```

**Designation:**

```
173: 8    Q.   Okay.  Is it your understanding that the 2006 COPs
     9         Swap transaction documents retain their vitality as
    10         legal agreements to the -- of the parties thereto?
    11    A.   It's my understanding that they have whatever vitality
    12         they have according to their terms.
    13    Q.   Okay.  So all the rights that all the parties to the
    14         COPs Swap transaction documents had before the
    15         forbearance agreement, they still have today?
    16    A.   No.  Here again, you're -- I just want to be careful.
    17         It seems that you're trying to conflate COPs with
    18         Swaps, and I want to be careful.
    19    Q.   Well, I want to say all of them, but if you say no,
    20         it's different on these, some rights have changed, but
    21         on these everyone's rights are preserved, that's okay.
    22    A.   Yeah, I want to be careful as far as saying what their
    23         rights are because I do believe those are legal
    24         questions, and in fact some of them are being
    25         litigated in the various piece of litigation that are
174: 1         going on.
     2    Q.   Hence this deposition?
     3    A.   Hence this deposition.  So I want to be very careful
     4         that I not give any testimony that would implicate a
     5         legal conclusion with regard to those documents.
     6    Q.   And I'm not asking for a legal conclusion.  I'm just
     7         asking for your understanding as the signatory --
     8    A.   Right.
     9    Q.   -- as to whether the COPs Swap transaction documents,
    10         whether all the parties preserved their rights under
    11         those documents, not withstanding the forbearance
    12         agreement, or whether the forbearance agreement
    13         changes the parties' rights under those documents.
    14    A.   And that's why I'm being careful because my
    15         understanding of the forbearance agreement is that it
    16         imposed upon the City, service corporations and the
    17         counterparties certain obligations to forbear.  I'm
    18         not going to draw a legal conclusion as to whether or
    19         not that amended any rights or changed any rights
    20         under the original documents.
    21    Q.   It may have, it may not have?
```

Page 47 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 47 of 71
13-53846-swr   Doc 954-7   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 48 of 71   128
253

```
22  A.  It may.  It may have not.  I'll leave that to the
23      attorneys.
24  Q.  It may constitute a waiver, it may not constitute a
25      waiver, you'll leave that to the attorneys?
175: 1  A.  I'll leave that to the attorneys.
2  Q.  At the time that you entered into the forbearance
3      agreement, were you aware that the Swap insurers had
4      the right to consent to waivers, modifications or
5      amendments of the Swap agreement and the collateral
6      agreement?
8  A.  I was aware that some of the Swap insurers had
9      asserted they had those rights.  I had drawn no
10      independent legal conclusion as to whether or not they
11      did.
13  Q.  Okay.  So you didn't know whether they were right or
14      they were wrong --
15  A.  Correct.
16  Q.  -- at the time you executed the agreement?
17  A.  I had had discussions with my attorneys about whether
18      they were right or they were wrong, but I had no
19      independent conclusions.
20  Q.  And you won't disclose the subject of your counsel's
21      communications?
22  A.  I cannot disclose that subject because that's an
23      attorney-client communication.
24  Q.  Did you evaluate when you entered into the forbearance
25      agreement, whether the act of entering into it would
176: 1      multiply the amount of litigation that the City might
2      face?
3  A.  I think it's fair to say that we considered whether it
4      might.  Any time you're in a transaction I think you
5      consider whether it might suborn litigation, yes.
6  Q.  And what were your conclusions on this subject?
7  A.  Here again, any conclusions we would have had would
8      have been in this whole air of discussions with my
9      counsel.  What I can say, without saying what my
10      conclusions specifically were of the probability that
11      it might create additional litigation, is I thought
12      that overall it was in the best interest of the City
13      to enter into agreement.
14  Q.  But you won't disclose to me your communications with
15      your counsel about whether this might multiply the
16      amount of litigation?
17  A.  That is correct.  Multiply, increase, whatever.
18  Q.  And have you -- did you evaluate whether performing
19      under the forbearance agreement, performing -- and by
20      that I mean exercising the option.
21  A.  Right.
22  Q.  Whether -- let me say it again.
23          Have you evaluated whether exercising the
24      option under the forbearance agreement might subject
25      the City to additional liability?
177: 1  A.  Here again, all of these issues regarding potential of
2      contingent claims, additional litigation, the
3      advisability of entering into the agreement,
4      considering that we were in litigation, and as I said
```

Page 48 of 70

13-53846-tjt  Doc 4814-1  Filed 04/29/14  Entered 04/29/14 22:00:03  Page 48 of 70
13-53846-swr  Doc 951-7  Filed 09/13/13  Entered 09/13/13 19:10:03  Page 49 of 71    129

253

```
      5            before there may have been litigation threats made
      6            additionally, were taken into consideration in
      7            consultation with my counsel.
      8    Q.      But you can't disclose those communications?
      9    A.      They are attorney-client communications.
```

**Designation:**
```
178: 5   Q.       Let me hand you what I've marked as Orr Exhibit 4.
```

**Designation:**
```
178:10   Q.       Do you have Orr Exhibit 4 in front of you, sir?
     11   A.       Yes, I do.
     12   Q.       So, Mr. Orr, I'll represent to you that this is the
     13            proposed order that your counsel submitted along with
     14            the motion.
```

**Designation:**
```
178:17   Q.       Do you understand that?
     18   A.       Yes.  Yes, I do.
```

**Designation:**
```
179:20            Do you understand the Swap counterparties
     21            and the City and the service corporations -- there's a
     22            provision in the forbearance agreement that talks
     23            about the fact that you need to get an order
     24            entered --
     25   A.       Sixty days.
180: 1   Q.       -- that's mutually agreeable.
      2   A.       Yes.
      3   Q.       And that was the 60-day time period.
      4   A.       Yes.
      5   Q.       And we can find the specific provision, but --
      6   A.       Yes.
      7   Q.       -- you know what I'm talking about.
      8   A.       Yes, I do.
      9   Q.       Okay.  So the form of the order is important.
     10   A.       Um-hm.
     11   Q.       Is that a yes?
     12   A.       Yes.
     13   Q.       And it's important because if the order changes
     14            materially, it might arguably give the Swap
     15            counterparties the right to declare an end to the
     16            termination period.
```

**Designation:**
```
180:19   A.       Here again, without making a legal assessment, I
     20            understand your meaning that we -- we have an
     21            obligation in the City to make sure the order is in a
     22            form that is mutually agreeable to the parties.
```

Page 49 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 49 of 71
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 50 of 71   130
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**
```
180:24   Q.   And this is it, right?
    25   A.   That is the proposed order.
181: 1   Q.   And this one, you know, is mutually agreeable to the
     2        parties.
     3   A.   I believe that it is, yes.
     4   Q.   I mean, you may not have negotiated it --
     5   A.   Correct.
     6   Q.   -- personally, but it's your expectation that people
     7        acting on your behalf then went to make sure that the
     8        proposed order was mutually agreeable to the Swap
     9        counterparties?
    10   A.   That is correct.
```

**Designation:**
```
182:19   Q.   Okay.  But if the Court enters an order that is not
    20        mutually agreeable to the City and the Swap
    21        counterparties, that could give the Swap
    22        counterparties the right to terminate the optional
    23        forbearance period?
```

**Designation:**
```
183: 1   A.   Yes.  Here again, it's speculative, in my -- but I
     2        don't anticipate that experience.  In my experience
     3        most judges are -- my experience is that many judges
     4        are very careful not to undermine the underlying
     5        agreement by the order that's entered.
```

**Designation:**
```
183: 7   Q.   So we can agree, though, that this order is an
     8        important part of the forbearance agreement, correct?
     9   A.   Yes.  I think the order is relevant to the forbearance
    10        agreement.
    13   Q.   And it's important to it?
    15   A.   I think it's a -- yes.
```

**Designation:**
```
184:11   Q.   Do you know who -- do you know whether anyone
    12        approached the service corporations to get their views
    13        on the order?
    14   A.   I do not.
    15   Q.   You certainly didn't?
    16   A.   No.
```

**Designation:**
```
187:24   Q.   Let me ask you about some of them then.  Look on the
    25        page 3 at E which is entitled Consent to Use of Casino
188: 1        Revenues.
     2   A.   Um-hm.  Um-hm.
     3   Q.   And it contains a finding that says, "Pursuant to
     4        section 1.2 of the forbearance agreement, UBS AG and
```

Page 50 of 70

13-53846-twr   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 51 of 70
13-53846-swr   Doc 4584-7   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 131 of 1
253                                                                           131

```
 5          MLCS consent to the City's use of the casino revenue
 6          as set forth in the forbearance agreement."
 7               Do you see that?
 8    A.    Yes, I do.
 9    Q.    And then it says, "The consent of the UBS AG and MLCS
10          will allow the City immediate access to its casino
11          revenue as set forth in forbearance agreement and no
12          other or further consents are required."
13               Do you see that?
14    A.    Yes, I do.
15    Q.    Okay.  Is this an important part of the proposed
16          order?
```

**Designation:**
```
188:18 A.   Well, first, the document speaks for itself.  Two --
```

**Designation:**
```
188:20 Q.   It doesn't speak for itself in terms of whether it's
21          important.
22    A.    Well, let me respond.  Two, to the extent this is an
23          order into a motion, it -- as we had discussed earlier
24          today, it's important that we have unfettered access
25          to the casino revenue; and, three, I do think this is
189: 1      a central aspect of the forbearance agreement.
```

**Designation:**
```
189:12 Q.   Take a look at paragraph G, arms' length agreement.
13          The forbearance agreement was negotiated at arms'
14          length and in good faith by all parties, and it goes
15          on to say, "UBS AG and MLCS are not insiders of the
16          City as that term is defined in bankruptcy code
17          section 10131?
18    A.    Um-hm.
19    Q.    And this is the important part I want to you focus on,
20          "The parties entry into and performance under the
21          forbearance agreement does not violate any law,
22          including the bankruptcy code, and does not give rise
23          to any claim or remedy against the parties thereto
24          except as may be expressly set forth in this order or
25          in such agreement."
190: 1           Do you see that?
 2    A.    Yes.
 3    Q.    Do you remember earlier we talked about whether if the
 4          City performed under the forbearance agreement it
 5          would be able to do so without the fear of liability
 6          to other parties?
 7    A.    Yes.
 8    Q.    And your understanding was it could do so, correct?
 9    A.    Yes.
10    Q.    And that so could the Swap counterparties, correct?
11    A.    Yes.
12    Q.    And isn't this provision one part of the basis for
13          your -- for that view?
14    A.    Well, you know, as I said, this provision draws a
```

Page 51 of 70

13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 51 of 70
13-53846-swr   Doc 954-7    Filed 09/19/13   Entered 09/19/13 19:19:03   Page 52 of 71   132
253

```
15        legal conclusion and I have not independently or as an
16        attorney done an analysis of what this provision will
17        provide, but that's my understanding, yes.
18   Q.   Are you just reading this provision for the first
19        time?
20   A.   No.  I think I -- as I said, I think I saw the order
21        attached to the motion.  I just didn't recall it
22        immediately or as terms by itself.  I was more
23        familiar with the motion because I read that in
24        conjunction with my affidavit that was attached to the
25        motion, but I think that's the effect of what this
191: 1    provision does.
2    Q.   Is this an important part of the order --
5    Q.   -- from the City's perspective?
7    A.   Yes, without giving rise to the nomenclature
8         important.  As I said before, it's important that we
9         have certainty and -- regarding the use of the casino
10        revenue, and this term certainly looks like it would
11        provide that.
13   Q.   Okay.  And not only does it provide you the certainty
14        about the casino revenue, it provides you with the
15        certainty that you will not be -- the City will not be
16        subject to any liability as a result of performing
17        under the forbearance agreement, correct?
18   A.   Yes, I believe so.
19   Q.   And it does the same thing for the Swap
20        counterparties, correct?
21   A.   Yes, I believe so.
22   Q.   Take a look at paragraph 4 on the bottom of page 4.
23   A.   Um-hm.
24   Q.   It says, "The forbearance agreement is approved in its
25        entirety.  The City is authorized to perform its
192: 1    obligations that arise from the forbearance agreement
2         pursuant to Bankruptcy Rule 9019, and any actions
3         taken heretofore in furtherance of these obligations
4         are hereby ratified."
5              Do you see that?
6    A.   Yes, I do.
7    Q.   You understand that to be a provision by which the
8         Court provides a judicial authorization to the City
9         and the Swap counterparties to perform under the
10        forbearance agreement, correct?
15   A.   My understanding --
17   A.   My understanding is that is the practical effect of
18        this provision.
20   Q.   Okay.  Is this an important part of this order?
21             MR. SHUMAKER:  Objection to form.
22   A.   I think approval of the forbearance agreement is an
23        important part of this order, yes.
25   Q.   But also the judicial authorization to perform.
193: 1   A.   Yes, I believe so.
2    Q.   Let me -- let me cut through some of these provisions,
3         which is, what the parties really want the Court to do
4         here, both the City and Swap counterparties, is to
5         tell them you are allowed to perform this forbearance
6         agreement without fear of reprisal from any third
```

Page 52 of 70

13-53846-swr   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 52 of 71
13-53846-swr   Doc 4514-7   Filed 04/29/14   Entered 04/29/13 19:10:03   Page 53 of 71   133
253

```
 7         party, correct?
10    A.   Yeah, and I also think it calls for a legal
11         conclusion, but let me see if I can answer the
12         question.  The motion sets forth what I believe are
13         the conditions necessary for approval of the
14         forbearance agreement.  This order seeks to approve
15         that motion, so to the extent it does that, yes, I
16         believe it authorizes the parties to perform and gives
17         them the authority to go forward to a motion according
18         to its terms which incorporates by definition the
19         forbearance agreement, so yeah.
21    Q.   And they can do so without fear of liability to third
22         parties.
23    A.   You know, that -- that impacts upon -- I believe that
24         may impact upon the question is not atypical in some
25         orders as far as -- as we discussed earlier today,
194: 1     releases, third party liability, exculpation, those
 2         are legal conclusions.  My understanding is that the
 3         way the order is -- is worded that, yes, it allows the
 4         parties to go forward.
 5                    COURT REPORTER:  To --
 6                    THE WITNESS:  To go forward.
 7                    MR. HACKNEY:  Without liability to third
 8         parties.
 9    BY MR. HACKNEY:
10    Q.   I think we're going over ground we've gone over
11         before.
12    A.   Yeah.  I believe that's the intent of the order, yes.
13    Q.   Okay.  So one of the benefits of the order to the City
14         and the Swap counterparties is that to the extent
15         there are third party claims -- and I know you're not
16         conceding that there are any --
17    A.   Right.
18    Q.   -- it clears them away.
19    A.   I believe that's accurate, which is one of the -- yes.
20         I believe that's accurate.
```

**Designation:**

```
197:13   Q.   The -- I want to talk about the source of proceeds for
14            any potential termination payment down the road.  This
15            is a subject I discussed with Mr. Buckfire yesterday.
16       A.   Um-hm.
```

**Designation:**

```
198:15   Q.   And I'm going to give you some notional amounts that
16            are based on comments your counsel has made in court,
17            just to try and get general agreement.
18       A.   Sure.
```

**Designation:**

```
198:19   Q.   But it's very possible that the amount of the
20            termination payment could be between 180 and 220
21            million dollars?
```

Page 53 of 70
13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 53 of 71
13-53846-swr   Doc 4514-7   Filed 04/29/13   Entered 04/29/13 19:19:03   Page 54 of 71      134
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

```
198:23   A.   I think that's fair.  We certainly hope it's on the
    24        lower end or lower of that scale, but that depends
    25        what the rates are at any given day.
```

**Designation:**

```
199: 2   Q.   Okay.  Now, let's link up the potential sizeable
     3        termination payment that the City may have to marshall
     4        if it wants to exercise the option with the City's
     5        current financial capabilities.
     6   A.   Yes.
     7   Q.   Okay.  Isn't it true that the City does not currently
     8        have enough cash on hand to be able to fund a
     9        termination payment that was in the range of 200
    10        million dollars?
    11   A.   That is true.
```

**Designation:**

```
199:15   Q.   Do you know how much cash the City has today?
    16   A.   On any given day, we fluctuate approximately in the
    17        neighborhood of I want to say 30 to 40 million
    18        dollars.  Right now that number may be a little bit
    19        higher because we just went through one of our tax
    20        collection periods in August.
```

**Designation:**

```
200: 3   Q.   Do you still project that you're going to run out of
     4        cash by the end of the year?
     5   A.   If we don't have this agreement, there's a very real
     6        chance, yes, in a steady state, we will run out of
     7        cash.
     8   Q.   And by -- what do you mean by a steady state?
     9   A.   If we don't do anything such as secure this casino
    10        revenue, if we don't go to the capital markets and
    11        borrow additional funds, which appears unlikely which
    12        the City has done every other year since 2008 to make
    13        up the difference, yes, the projections show that by
    14        December of this year, we will run out of cash.
    15   Q.   Are those the pre-bankruptcy projections?
    16   A.   Yes.  I believe so.
    17   Q.   Those are the projections that we'll get into in a
    18        moment that -- but that assumes that the City's paying
    19        its legacy expenditures on a current basis, right?
    20   A.   Yes.  As we have -- as we have represented, we intend
    21        to continue doing that throughout the year.
```

**Designation:**

```
201: 8   Q.   So let's go back to sourcing this termination payment.
     9   A.   Yes.
    10   Q.   It was my understanding of his testimony that
```

Page 54 of 70
13-53846-swr   Doc 4814-1   Filed 09/29/14   Entered 04/29/14 22:00:03   Page 55 of 1
13-53846-swr   Doc 4834-7   Filed 09/29/13   Entered 09/29/13 19:10:03   Page 55 of 1    135
253

```
11        Mr. Buckfire who, by the way, is the individual tasked
12        with obtaining the City's post petition financing,
13        correct?
14   A.   Yes.
15   Q.   And is presumably the individual that's most
16        knowledgeable about that effort?
17   A.   Yes.
18   Q.   It was -- I'll represent to you that his testimony was
19        that the proceeds for the optional termination payment
20        would likely come from the post -- the proceeds of the
21        post petition financing?
22   A.   Yes.
```

**Designation:**
```
201:25   Q.   Is that also your understanding?
202: 1   A.   Yes.
```

**Designation:**
```
203:10   Q.   So I do want to talk about -- this is important.
11        Okay.  This is -- isn't it true that one aspect of the
12        DIP -- I'm not going to get into the others -- is that
13        the casino revenues will be pledged or anticipated to
14        be pledged as collateral for the post petition
15        financing?
16   A.   Let me say this.  That is certainly under
17        consideration.
18   Q.   Okay.  Now, isn't it also true, though, that the
19        casino revenues have not currently been freed up on a
20        permanent basis because the City has not currently
21        exercised the option, correct?
22   A.   The certainty that we hope to get out of the
23        forbearance agreement has not been approved yet,
24        correct.
25   Q.   Well, even if it is approved by the Court, you still
204: 1        won't have exercised the option.
2    A.   That is true with regard to the optional termination
3         payment.
```

**Designation:**
```
204: 6   Q.   And you need to exercise the option to terminate the
7         hedge, right?
8    A.   Yes.
```

**Designation:**
```
204:17   Q.   You think it's a fair characterization that you need
18        to get the hedge terminated to get the collateral
19        agreement terminated?
20   A.   Yes.
21   Q.   And the good part for the City, if those things
22        happen, is that now you have unchanneled access to the
23        casino revenues going into the future?
24   A.   Yes, as we've said today, that certainty is one of the
25        motivations to enter into the agreement.
```

Page 55 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 55 of 71
13-53846-swr   Doc 4634-7   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 56 of 71   136
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
205: 1   Q.   But do you also understand that you can't currently
      2        pledge the casino revenues to a post petition lender
      3        in a -- prior to having exercised the option under the
      4        forbearance agreement?
      5   A.   Well, let's be careful without drawing legal
      6        conclusions.  You can always enter into agreements
      7        that have contingencies attached to them and the
      8        parties will wait for those contingencies to occur.
      9        That certainly has happened with a number of different
     10        negotiations, not just in this case, but happens all
     11        the time.
     12   Q.   That's fair that you absolutely -- you make a pledge
     13        that's contingent on something else.  But isn't it
     14        true that, as a general matter, post petition lenders
     15        typically like to make sure that they have clean
     16        collateral before they make a loan that's secured by
     17        that collateral?
```

**Designation:**
```
205:20   A.   I think that's generally a fair characterization;
     21        however, there have been cases that I've been involved
     22        with outside of this one where post petition lenders
     23        have been willing to make pledges or commitments
     24        subject to certain contingencies.
```

**Designation:**
```
206: 1   Q.   Isn't it your expectation today, though -- is it -- is
      2        it your expectation today that any post petition
      3        lender will want clear -- a clear lien on the casino
      4        revenues before it's willing to lend?  Is that your
      5        current expectation?
      6   A.   Well, my current expectation is it might well want
      7        clear lien before it's willing to fund.  I would think
      8        in many of the bankruptcy cases that I've been
      9        involved in, post petition lenders, for instance, are
     10        willing to make commitments subject to the Court
     11        approving their super priority liens, and then once
     12        that approval is granted, they fund the loan, so
     13        that's fairly common.
     14   Q.   I'm going to confirm for the record that conversations
     15        with the State of Michigan about providing DIP
     16        financing or with the federal government about
     17        providing DIP financing are still questions that you
     18        will refuse to answer on the grounds of commercial
     19        sensitivity?
```

**Designation:**
```
206:24   Q.   Are they commercially sensitive?
     25   A.   They are commercially sensitive, but I don't want to
207: 1        mislead you.  It is my assumption that, while they're
      2        commercially sensitive, that's not going to be
      3        forthcoming.
      4   Q.   Oh, really?
```

Page 56 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 56 of 70
13-53846-swr   Doc 4804-7   Filed 04/29/13   Entered 09/29/13 19:19:03   Page 57 of 71   137

253

```
 5    A.    Yes.
 6    Q.    So just to tie it up, you tried to get a -- whether
 7          it's credit enhancement or liquidity from the State
 8          and the Feds, and your expectation is that you won't
 9          be able to?
10    A.    My understanding at the State level is that there's
11          certain prohibitions of the State law on the ability
12          of the State to lend to the City, and at the Federal
13          level my understanding is that it's not going to be
14          forthcoming, direct aid.
15    Q.    Interesting.  And what about credit enhancement by the
16          State?
17    A.    Here again, it's highly commercially insensitive --
18          sensitive.  I don't want to say anything that
19          forecloses it, but we -- let me answer it this way.
20          We are operating on the assumption that that will not
21          come -- be forthcoming.
22    Q.    The casino revenues are about 170 million dollars a
23          year; isn't that correct?
24    A.    Yeah, 170, 180 somewhere in there.
25    Q.    Yeah.  In fact, that -- it's interesting because the
208: 1        DIP proceeds you're seeking are up to 350; is that
 2          correct?
 3    A.    Here again, those are commercially sensitive, but I
 4          think that's fair.  Yes, I think that's fair.
 5    Q.    Okay.  And that's the equivalent of two years' worth
 6          of casino revenues, correct?
 7    A.    Yes.
```

**Designation:**

```
209: 5    Q.    The fact of the matter is the DIP process is just
 6          getting off the ground, correct?
 7    A.    I think that's fair to say.
 8    Q.    I think it's literally in the last couple days, right?
 9    A.    I think that's fair.
10    Q.    So you don't know as you sit here today, and you
11          probably wouldn't tell me if you did --
12    A.    Right.
13    Q.    -- what the current appetite of the lenders is for
14          uncertainty around the casino revenues, correct?
15    A.    That -- that I think is part of the process.  Yeah.
16    Q.    Now, have you attempted to borrow money -- has the
17          City attempted to borrow money and secure those
18          borrowings with a lien on something other than the
19          casino revenues?
20    A.    No.
21    Q.    Is the -- is the City considering pledging art as
22          collateral?
```

**Designation:**

```
211: 2              MR. SHUMAKER:  I'm going to say that's --
 3          we're drawing a line.  We're getting into specifics,
 4          and I'm going to instruct him not to answer.
 5              MR. HACKNEY:  I -- okay.  That's just all I
 6          need to know for the record.
```

Page 57 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 57 of 71
13-53846-swr   Doc 4984-7   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 58 of 71   138
253

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

**Designation:**

| | | |
|---|---|---|
| 211:11 | Q. | The City does have other revenue streams; isn't that |
| 12 | | correct? |
| 13 | A. | Yes. |
| 14 | Q. | In fact, on an annual basis, the City's revenues are |
| 15 | | in the neighborhood of a billion to a billion 1, |
| 16 | | correct? |
| 17 | A. | Yes, I think that's fair. |
| 18 | Q. | And on an annual basis, the casino revenues are in the |
| 19 | | range of 170 to 180 million? |
| 20 | A. | Yes. |
| 21 | Q. | Roughly a little less than 20 percent of the City's |
| 22 | | annual revenues. |
| 23 | A. | 17 and a half, 18 percent. |

**Designation:**

| | | |
|---|---|---|
| 211:25 | | So have you engaged the possibility of |
| 212: 1 | | pledging other revenue streams as security for the |
| 2 | | DIP? |
| 3 | A. | This is a commercially sensitive area. In addition, |
| 4 | | there are potentially legal issues that must be |
| 5 | | resolved. Suffice it to say we have examined a number |
| 6 | | of different possibilities, looking at what options we |
| 7 | | might have given the City's various ordinary revenue |
| 8 | | streams. |
| 9 | Q. | And are there other revenue streams that could be |
| 10 | | pledged? I'm not going to ask you whether you are |
| 11 | | going to pledge them, whether you will, whether you |
| 12 | | plan to, but are there other revenue streams that |
| 13 | | could be pledged? |
| 14 | A. | There might be. There might be, but there's -- here |
| 15 | | again, there's certain legal issues regarding any |
| 16 | | revenue streams that have to be resolved. |

**Designation:**

| | | |
|---|---|---|
| 212:20 | Q. | So just in terms of level setting -- |
| 21 | A. | Right. |
| 22 | Q. | -- the casino revenues are approximately 15 million a |
| 23 | | month. |
| 24 | A. | Yes, I think that's fair. |
| 25 | Q. | Net of the Swap payment which is still made on a |
| 213: 1 | | monthly basis under the forbearance agreement -- |
| 2 | A. | Yes. |
| 3 | Q. | -- you net about 11 million? |
| 4 | A. | I think that's correct. |
| 5 | Q. | Okay. Your claim is that these revenues are necessary |
| 6 | | to the operation of the City. I think we discussed |
| 7 | | that earlier. |
| 8 | A. | Yes. |
| 9 | Q. | And in fact it's your expectation that you will use |
| 10 | | these revenues to fund the reinvestment program that |
| 11 | | you have planned with respect to the 1.25 billion |

Page 58 of 70

13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 58 of 71
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 59 of 71   139
253

```
12        dollars of reinvestment in the City over the next ten
13        years?
14   A.   Yes, that's correct.  An average of 125 million a year
15        which a big component of it is this revenue.
16   Q.   Okay.  So fair statement, you're going to take the
17        casino revenues and you're going to plow them into the
18        City, correct?
19   A.   More -- I mean, money goes into a bathtub, but yes.
20        The casino -- we don't have the casino revenue.  We
21        have no other source to make reinvestment in the City.
22   Q.   And that's what you want to do?
23   A.   Yes.
24   Q.   And so as a creditor, I'm going to make the obvious
25        point that you don't plan to take the casino revenues
214: 1        and give them to the unsecured creditors, correct?
 2   A.   I think that's generally a fair characterization.
 3   Q.   So isn't it fair that other than perhaps certainly
 4        benefitting the people of Detroit if you reinvested in
 5        the City, the creditors themselves will not see their
 6        recoveries enhanced by the fact that the City has
 7        gained access to these casino revenues, correct?
10   A.   Yeah, I'm going to be careful here because one of the
11        things we've offered in our proposal, June 14th
12        proposal, is a 2 billion dollar note that has some
13        capacity to fluctuate.  Generally speaking, your
14        statement is true, but there's another concept that
15        without this reinvestment there's a very real chance
16        that the City will have no chance to stabilize and
17        grow and the creditors will see no opportunity for any
18        benefit because the City would have an inability of --
19        continue to decline, quality of life will continue to
20        decline, revenue from other streams will continue to
21        decline, and the City's ability to satisfy its
22        obligations to the creditors will continue to decline.
23   Q.   Now, I understand that distinction, and we're talking
24        now about the proposal you've made to creditors that
25        you would give all of the unsecureds --
215: 1   A.   Yes.
 2   Q.   -- effectively a pot of 2 billion dollars of bonds.
 3   A.   Correct.
 4   Q.   And I want to distinguish between two concepts and
 5        make sure that we're on the same page because I think
 6        that we are.
 7   A.   Right.
 8   Q.   The first point is that you do agree that you're not
 9        going to take the casino revenues and put it on top of
10        the 2 billion pot to make a larger recovery for
11        creditors.
12   A.   Yes, that's fair.
13   Q.   But you are saying that there could be some value to
14        the creditors of a revitalized Detroit because that
15        Detroit will be more able to perform under the
16        2 billion dollars in bonds that you're going to give
17        them as part of your proposal?
18   A.   That's correct.
19   Q.   Okay.  Did I summarize accurately the distinction you
```

Page 59 of 70

13-53846-swr   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 60 of 71
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 60 of 71   140

253

```
20        were trying to draw there?
21    A.  Yes.  Yes.  There's a broader concept about the need
22        to revitalize the City and grow beyond just the
23        interest of the creditors.  It's also for the citizens
24        and residents and future of the City.
25    Q.  Oh, absolutely.  I understand that.
216: 1 A. But, yes, that's generally -- no direct benefit from
2         the casino revenue.
```

**Designation:**
```
216:15 Q. I understand that as a general concept, but I meant
16        have you undertaken actually any actual analysis of
17        the potential Delta 2 creditor recovery?
18    A.  Oh, from the 120 -- from the casino revenue?
19    Q.  Right.
20    A.  Yes, I believe we have.
21    Q.  And what does it show?
22    A.  Here again, that's -- it's sensitive and, in addition,
23        I believe those discussions were caught up in
24        discussions I had with counsel, so I'm going to have
25        to decline.
217: 1 Q. Those are privileged communications?
2     A.  I believe so.
3     Q.  So the analysis of how my client Syncora, as an
4         unsecured creditor, would do if the assumption motion
5         is denied versus how it will do if its granted, that's
6         something that you cannot speak to?
7     A.  Right, because it goes into the analysis, as we said
8         earlier today, what would happen if it were denied,
9         what the options would be to the City, what litigation
10        risk would happen, what would be caught up in the
11        existing litigation, all those issues.
12    Q.  Let me hand you Orr Exhibit Number 3.
```

**Designation:**
```
218:24 Q. Now, you prepared this proposal for creditors that
25        I've marked as Orr Exhibit 3 in anticipation of your
219: 1    June 14, 2013 meeting with creditors, correct?
2     A.  Yes, I and my team put this together.
```

**Designation:**
```
221: 2 Q. So let me draw your attention, if I could, to page 38
3         of this report.
4     A.  Yes.
5     Q.  Now, this is -- this is titled A Look At the Future in
6         the Absence of Restructuring Initiatives.  Do you see
7         that?
8     A.  Yes.
9     Q.  Okay.  So what this table is doing is it's saying here
10        is where the City of Detroit is headed without any
11        increases in expenditures necessary to restore City
12        services to adequate levels; without additional
13        investments by the City and services assets or
14        infrastructure; and, last, without any changes to
```

Page 60 of 70

13-53846-tjt   Doc 4814-1   Filed 09/29/14   Entered 09/29/14 22:00:03   Page 61 of 71
13-53846-swr   Doc 4547   Filed 09/29/13   Entered 09/29/13 19:10:03   Page 61 of 71

253                                                            141

```
15        legacy liabilities, correct?
16   A.   Yes, that's correct.
17   Q.   Now, we're going to talk about each of these three
18        things in a moment, but the fact of the matter is each
19        of those three things have changed during the
20        bankruptcy process in terms of what legacy liabilities
21        are getting paid or what reinvestments are being made,
22        correct?
23   A.   To some degree they have and to some degree they
24        haven't.  We are still in a steady state with, for
25        instance, salary, overtime, fringe, health benefits,
222: 1    operating expenses, with regard to secure debt
  2        service, pension contributions which remain
  3        underfunded, health benefits are still in a steady
  4        state.  We are hopefully in a steady state on a
  5        revenue side as well.
  6   Q.   I was just making --
  7   A.   But, yes.
  8   Q.   I was making a simpler point, which is, for example --
  9        we'll go into this, but like you're not paying the
 10        service payments related to the COPs during the
 11        bankruptcy?
 12   A.   I believe that's correct.
 13   Q.   Okay.  And I think you're deferring pension
 14        contributions.
 15   A.   A portion of the pension contributions.  For instance,
 16        this year I think we had an obligation of
 17        approximately 131 million dollars.  I think we paid 31
 18        million of it.
 19   Q.   Okay.  So a portion.
 20   A.   But that is the steady state.  The City regularly
 21        defers pension contributions.
 22   Q.   True, true.  We'll get into this in a moment here,
 23        but --
 24   A.   Right.
 25   Q.   -- now, the fiscal year of the City runs from June 30
223: 1    to June 30, right?
  2   A.   Yeah, July 1 to June 30.
  3   Q.   Right.  Yeah.  Okay.
  4             And the years that are listed here, it's
  5        your understanding these are the fiscal years,
  6        correct?
  7   A.   2008 to 2012 are fiscal year actuals.  2013 were
  8        preliminary forecasts, at this time forward.
  9   Q.   That's right.  This was back in June, so you had a
 10        little -- there was a stub period on June 2013?
 11   A.   Yes.
 12   Q.   When I talked to Mr. Buckfire yesterday, he indicated
 13        that it was his understanding that these years are
 14        July 1, 2013 through June 30, 2014 --
 15   A.   That's correct.
 16   Q.   -- 2014 here?
 17   A.   That is correct.
 18   Q.   Now, the forecast that the City indicates when it
 19        comes to total revenues for the fiscal year that we're
 20        currently in is about 1,082,800,000 in total revenue,
```

Page 61 of 70

13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 62 of 71
13-53846-swr   Doc 4564-7   Filed 04/29/13   Entered 04/29/13 19:19:03   Page 62 of 71
253                                                                        142

```
21      correct?
22  A.  That is correct.  That's down about 30-some-odd
23      million dollars from the prior year.
24  Q.  Right.  And if you look at the operating expenditures,
25      that shows that you anticipate 685.7 million in
224: 1     operating expenditures during that -- this fiscal year
2      that we're currently in, correct?
3  A.  That is correct.
4  Q.  Now, if you just viewed these things in isolation, you
5      are representing here a net operating surplus of just
6      under $400,000,000, correct?
7  A.  That's roughly, correct, yes.
8  Q.  Now, the -- and the operating expenditures are the
9      amount of money that you forecast needing to operate
10      the City as you found it with its current level of
11      services when you were appointed, correct?
12  A.  That is correct.
13  Q.  Okay.  So that's the point of the caveat at the top,
14      which is you have the aim of improving services in the
15      City, but when you compiled this expenditures
16      analysis, this was based on here is how we currently
17      do things in the City of Detroit, providing the level
18      of services we currently provide, and here is how much
19      it costs?
20  A.  That is correct.
21  Q.  Now, isn't it true that -- we've talked about the fact
22      that while the casino revenues fluctuate between 170
23      and 180 million, even if you took them out of this
24      forecast, you would still have a net operating surplus
25      of $227,000,000, correct?
225: 1  A.  Well --
2  Q.  Put aside --
3  A.  Yeah, put aside --
4  Q.  I understand.
5  A.  -- debt service and pension contributions, healthcare,
6      but just looking at operating expenses, that would be
7      correct.
8  Q.  And -- that's right.  I'm emphatically doing that.
9      I'm referring to --
10  A.  Right.
11  Q.  -- this line.  Okay?
12  A.  Right.
16  A.  It's in bold.  It's the 1, 2, 3, 4th line down.
18  Q.  And, I mean, can we agree it wasn't an accident that
19      whoever compiled this broke the legacy expenditures
20      down below the operating expenditures, correct?
21  A.  Yes.  I'm sure that was intentional.
22  Q.  Right.  And that's because, for example, while
23      payments to the COPs are likely very important to the
24      COP holders --
25  A.  Right.
226: 1  Q.  -- they're not something that you actually use to run
2      the City.
3  A.  Well, yes, it's not an operating expense.
4  Q.  Right.
5  A.  It's a debt service.
```

Page 62 of 70

13-53846-tjt   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 62 of 70
13-53846-swr   Doc 4547   Filed 05/12/14   Entered 05/12/14 22:00:00   Page 63 of 71
253
143

```
 6   Q.    Right.
 7               A payment to a police officer for their
 8         time or for their benefits, that is an operating
 9         expense?
10   A.    Absolutely.
11   Q.    And that's all covered in the operating expenditures.
12   A.    Yeah.  Salary over time and fringe benefits, yes.
13   Q.    Okay.  So if you follow along in my hypothetical and
14         we took out what we'll call a hundred -- we'll split
15         the difference.  We'll say it's 175,000,000.
16   A.    Sure.
17   Q.    I'll tell you in here it's projected to be 170 -- why
18         don't we use the number here.  If we took the 170 out,
19         you'll still have 227.2 million dollars to work with
20         from the standpoint of a net operating surplus,
21         correct?
22   A.    Yes, roughly $230,000,000.
```

**Designation:**

```
236: 7   Q.    I've asked you earlier about selling the art and I
 8         asked you about it as considering it as a potential
 9         backup plan to the negotiations with the Swap
10         counterparties.
11   A.    Right.
12   Q.    Do you remember that testimony?
13   A.    Yes, I do.
14   Q.    We went back and forth.
15   A.    Yes.
16   Q.    I'd like to bring it forward to the future, to the
17         present.
18   A.    Yes.
19   Q.    Which is, are you under active consideration now of
20         using the art to alleviate the liquidity crisis and to
21         do all of the things that you say you want to do in
22         this proposal?
23   A.    No.  There are no plans to use the art or any other
24         asset in particular to liquidate it to
25         relieve liquidity issues in the City.  What I have
237: 1         said when I first took this job, and continue to say,
 2         all options are on the table.  We are currently
 3         beginning the process of appraising approximately
 4         3,500 pieces of art in the City of the 66,000 that are
 5         there at the DIA, and once we go through that process,
 6         we will have to decide what, if anything, we need to
 7         do, but I have no plans to use art to relieve the
 8         liquidity crisis that the City is in now.
 9   Q.    So let me offer an observation for you to react to,
10         which is, earlier on when I was asking you questions,
11         you were telling me about the terrible things
12         happening in the City, people dying, being shot, the
13         seriousness of the problems with which you're
14         grappling.
15   A.    Yes.
16   Q.    You've also identified the assumption motion as
17         something that needs to be moved along quickly because
```

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
18          of its importance to the issues that we discussed,
19          right?
20    A.    Right.
21    Q.    Why isn't the art equally important to allowing you to
22          fix Detroit?
23    A.    I haven't said that it's not important.  What I've
24          said is there are no plans to liquidate it to address
25          those concerns.  I think it is fair to say that there
238: 1      has been much debate as to the value of art versus
2           alleviating a number of other concerns, and I've heard
3           that debate and I've listened to it, but our first
4           order of business is to assess what we're talking
5           about and then we'll decide what, if anything, we need
6           to do.
7     Q.    Isn't it fair to say that you certainly haven't put
8           the art time line, in terms of your decision-making
9           process, you haven't given it the same sort of speed
10          you've given to the forbearance agreement time line?
```

**Designation:**
```
238:12 A.   Yeah.  I think it's fair to say that in our proposal I
13          think we included roughly 15 buckets of assets, and
14          none of them have been given the same priority that we
15          deem the forbearance agreement principally because
16          we're not in default with regard to art.  We're in
17          default with regard to the Swap agreement.
18    Q.    Well, that was actually going to be my point, which
19          is, you own the art.
20    A.    Yes.
21    Q.    So you don't have to negotiate with anybody in order
22          to sell it, right?
23    A.    No, but a prudent thing to do, and we've said this
24          before, is to find out what we're talking about first,
25          and that's why we're going through an appraisal
239: 1      process.
2     Q.    Just a few more questions and I'll pass the baton.
3     A.    Sure.
4     Q.    I take it that when you were appointed as emergency
5           fin -- emergency manager, you familiarized yourself
6           with some of the prior negotiations that had gone on
7           around efforts to resolve the Swap that I believe were
8           referenced in the 2012 CAFR of the City of Detroit.
9     A.    Consolidated report, yes.
10    Q.    You at least made inquiry as to what happened last
11          year when you tried to work this out.
12    A.    Yes.
13    Q.    And it's also your understanding that the potential
14          right of the Swap counterparties to terminate the Swap
15          and demand a large termination payment goes back all
16          the way to March of 2012; isn't that correct?
17    A.    At least, yes.
18    Q.    Thinking that's consistent with your report here --
19    A.    Yes.
20    Q.    -- you say that.
21    A.    Yes.
```

Page 64 of 70

13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 64 of 70
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 65 of 71   145
253

```
22   Q.   So isn't it true that from March 2012 all the way to
23        June 4, when Mr. Buckfire went into the negotiating
24        room for the first time with the Swap counterparties,
25        during that entire time, the Swap counterparties had
240: 1    never trapped cash?
2    A.   To the best of my knowledge, that's true.
3    Q.   And they had never declared a termination event?
4    A.   To the best of my knowledge -- to the best of my
5         knowledge, that's true.
```

**Designation:**

```
248:12  Q.   Let's turn now, Mr. Orr, to the topic of the consent
13           rights or -- of FGIC and Syncora topic that you were
14           discussing with Mr. Hackney earlier.
15      A.   Yes.
16      Q.   And actually, let's focus specifically on the
17           negotiations that the City engaged in with the Swap
18           counterparties leading up to the execution of the
19           forbearance agreement.
20      A.   Okay.
21      Q.   And when you were speaking with Mr. Hackney, you
22           testified that you yourself did not invite either FGIC
23           or Syncora to those negotiations, correct?
24      A.   Yes.  To the best of my knowledge, that's true.
25      Q.   And I believe you said you also didn't suggest to
249: 1       anyone else that they should invite FGIC or Syncora to
2            those negotiations, correct?
3       A.   Yes.  I believe I testified I did not instruct anybody
4            to invite them.
5       Q.   To your knowledge, did anyone else suggest inviting
6            either FGIC or Syncora to the negotiations?
7       A.   As I testified earlier today, there were a series of
8            letters that were exchanged, and at some point there
9            was some discussion about Syncora submitting a
10           proposal.  That discussion was wrapped up into whether
11           or not it would sign a reciprocal nondisclosure
12           agreement.  To the best of my knowledge, that never
13           happened.
14      Q.   But I think we established that the letter exchanged
15           with Syncora occurred at some point after June 11th,
16           when there had been an agreement in principle on the
17           economic terms of the forbearance agreement; is that
18           correct?
19      A.   Yes.  I believe we -- we testified that June 11th we
20           reached agreement and principally documented,
21           June 14th we had the presentation for creditors, and
22           the letter I saw earlier today I think was dated
23           June 17th.
24      Q.   That's right.  So prior to June 11th, did anyone else
25           to your knowledge suggest inviting either FGIC or
250: 1       Syncora to the negotiations?
2       A.   Not to my knowledge, no.
3       Q.   And you mentioned just a minute ago that there had
4            been some discussion with Syncora or representatives
5            of Syncora about an alternative proposal to the
```

Page 65 of 70

13-53846-tjt   Doc 4851-1   Filed 09/29/14   Entered 09/29/14 22:00:03   Page 66 of 71
13-53846-swr   Doc 984-7   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 66 of 71    146
253

```
  6        forbearance agreement, and I think you said to
  7        Mr. Hackney that there had been no negotiations with
  8        FGIC about an alternative proposal; is that correct?
  9              MR. SHUMAKER:  Objection to form.
 10  A.    Yeah, it's a compound question, but I think the way I
 11        would answer it, yes, we would talk about whether or
 12        not someone had been invited.  And I think what I said
 13        is to the best of my knowledge I did not invite FGIC
 14        and I did not know if anybody else did.
```

**Designation:**
```
253:21  Q.    One of the things you -- one of the things Mr. Hackney
    22        asked you about was if in the course of the
    23        negotiation of the forbearance agreement, you had what
    24        he referred to as a plan B.  Do --
    25  A.    Right.
254: 1  Q.    -- you recall him asking that question?
     2  A.    Yes, I recall that discussion.  Yes.
     3  Q.    And you responded by saying, without specifically
     4        having a plan B, you had considered alternative to the
     5        forbearance agreement structure, correct?
     6  A.    Correct.
```

**Designation:**
```
255: 9  Q.    Did you consider capital market alternatives to the
    10        forbearance agreement?
    11  A.    We did, but to be perfectly honest with you, the City
    12        had borrowed so much money from the capital markets
    13        without the probability of being able to pay it back
    14        on any reasonable or rational time frame that that
    15        wasn't a serious consideration was taking on more
    16        debt.
    17  Q.    Okay.  So you didn't really believe that had you a
    18        what we -- what I just described as a capital market
    19        alternative to the forbearance agreement?
    20  A.    The City has no -- what I've said at the June 10th --
    21        public meeting on June 14th we were addicted to debt
    22        and we had no ability to take on additional debt.
```

**Designation:**
```
264: 7  Q.    Mr. Hackney also asked you some questions about the
     8        service corporations and about whether there were any
     9        negotiations on behalf of the City with the service.
    10        Corporations?
    11  A.    Yes.
    12  Q.    Okay.  I believe you answered that negotiating with
    13        service corporations would not have been your job.  It
    14        would have been Ken Buckfire's or someone else's job
    15        to do that.
    16  A.    Yes.  I believe that's right.
    17  Q.    Okay.  If it wasn't Ken Buckfire's job, who else's job
    18        would it have been?
    19  A.    It might have been someone else on his team or at
    20        Miller Buckfire or someone else on behalf of the other
```

Page 66 of 70

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 67 of 71
13-53846-swr   Doc 4547   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 67 of 71

253

147

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
21        counsel for the emergency manager or the City.
22   Q.   Someone else in your office you mean?
23   A.   No.  No.  Other consultants and attorneys on behalf of
24        the City.
25   Q.   Okay.  But am I correct that no one has reported to
265: 1    you that they had negotiations with the service
2         corporations; is that correct?
3    A.   Yeah, reported.  I'm going to be careful.  My
4         understanding was we had an agreement, I signed it,
5         and it was sent to the service corporations.  I
6         personally had no negotiations with them, but my
7         understanding, based upon the fact it was executed,
8         that whoever needed to procure and secure those
9         signatures did so.
10   Q.   You don't know who got those signatures from the
11        service corporations?
12   A.   No.  Sitting here today I do not.
```

**Designation:**
```
265:15           Do you -- are you assuming then that there
16        were some negotiations between the City and the
17        service corporations?
18   A.   Yeah.  Here again, I'm going to say whenever you -- as
19        I said to Mr. Hackney, whenever you talk about
20        negotiations, you know, so we don't get bogged down in
21        nomenclature, I'm assuming that something happened
22        that had the service corporations aware of the
23        agreement, that they agreed to and they signed off on
24        it.  So if those constitute negotiations, that's what
25        I'm assuming, but I'm saying to you that I had no
266: 1    independent negotiations and I don't know who did
2         that.
3    Q.   And you don't have any idea sitting here today about
4         what those negotiations would have involved, how they
5         happened, when they happened, how long they took,
6         anything like that; is that right?
7    A.   That's right.
```

**Designation:**
```
271:15   Q.   And how much do you estimate that more federal
16        assistance to be?
17   A.   I have no idea.  Whatever -- whatever we can get.  If
18        it's several millions more, if it's several hundreds
19        millions more, we're going to apply for it.
20   Q.   Do you think it's a possibility it could be hundreds
21        of millions more?
22   A.   Possibility it could be.
```

**Designation:**
```
271:23   Q.   Earlier in your testimony you were asked a lot of
24        questions about legal analyses or legal claims that
25        might have been made, and on those questions you
272: 1    claimed attorney-client privilege --
2    A.   Yes.
```

Page 67 of 70
13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 148 of
13-53846-swr   Doc 4584-7   Filed 09/13/13   Entered 09/29/13 19:19:03   Page 68 of 71     148
253

```
     3   Q.   -- and said that you didn't have an independent view
     4        that didn't come from attorney-client communications.
     5   A.   Yes.
```

**Designation:**
```
278:23   Q.   Did you make an independent assessment apart from
    24        advice of counsel as to the strengths -- strengths or
    25        weaknesses of the City's claims against the Swap
279: 1        counterparties?
     2   A.   Not without the advice of counsel, no.
```

**Designation:**
```
284: 3   Q.   Did you have any analysis done as to the cost of a
     4        litigation with the Swap counterparties?
     5   A.   No.  I don't recall if any of the documents included
     6        costs.  We -- there were discussions about the
     7        potential costs and the timing, but I don't recall if
     8        any of the documents did.
     9   Q.   Okay.  What was your best estimate as to how much a
    10        litigation with Swap counterparties would cost the
    11        City?
    12   A.   I don't -- I don't remember what the best estimates
    13        were.  They -- they ranged from --
    14             MR. SHUMAKER:  Object.  I just want to make
    15        sure you're not going to be revealing any
    16        attorney-client communications with your answer.
    17             THE WITNESS:  Okay.
    18             MR. SHUMAKER:  I'll interject that.  I'll
    19        let you answer the question as to whether that was
    20        addressed.  I don't want you to go --
    21             THE WITNESS:  Okay.
    22             MR. SHUMAKER:  -- into anything --
    23             THE WITNESS:  Okay.
    24             MR. SHUMAKER: -- beyond that.
    25   A.   It was addressed, and suffice it to say I think it's
285: 1        fair to assume that in litigation in the nature you're
     2        discussing that it could go into millions of dollars.
```

**Designation:**
```
285: 4   Q.   How about the time it would take to litigate the Swap
     5        counterparties?  Did you estimate how long it would
     6        take?
```

**Designation:**
```
285: 8   A.   Let's -- let's do it this way.  I think it's fair to
     9        say that there were discussions regarding the time for
    10        litigation and/or appeals and the costs that were
    11        involved if that tack was taken.
```

**Designation:**
```
285:13   Q.   How long did you estimate it would take to litigate
```

Page 68 of 70

13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 68 of 70
13-53846-swr   Doc 1547   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 68 of 71

253

149

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
14        with Swap counterparties?
15    A.  I'm not sure the predicate is there that I estimated
16        the length of time.
17    Q.  Okay.  If you didn't estimate the length of time,
18        that's an okay answer to give.
19    A.  Yeah.  I'm trying to be as clear as I can for you and
20        say that there were discussions, but there's nothing
21        as specific as the lodestar method of analysis which
22        you understand is time times hours billed, so on and
23        so forth.  There were discussions and there were
24        analyses about what it could be.
25    Q.  Now, I have to unpack that a little bit because you
286: 1        mentioned the lodestar analysis, one of my favorite
2        friends.  Did you have a lodestar analysis done for
3        litigation with the Swap counterparties?
4            MR. SHUMAKER:  Objection, this is getting
5        into the -- the specific communications between
6        Mr. Orr and his counsel when you start to go through
7        what -- what are the particulars of the advice that
8        was being given.  I allowed you to go forward with
9        whether he considered the length of litigation in his
10        answer, but I don't want him to go into the specifics
11        of any sort of analysis that was done by counsel.
12            With that admonition, you can answer.
13    A.  Again, without going to the specifics of discussion
14        I've had with counsel, there were discussions about
15        potential length of litigation and appeals and the
16        potential cost.  Those discussions included time that
17        may have impaired my ability to complete my obligation
18        within the time frame provided by Public Act 436, as
19        well as significant costs, litigation cost being
20        incurred by the City.
```

**Designation:**

```
286:22    Q.  Okay.  Here is my question again, because in your
23        answer you mentioned lodestar analysis, so I'm just
24        asking -- it's a yes or no question.
25    A.  Um-hm.
287: 1    Q.  Did you have a lodestar analysis performed with
2        respect to a litigation with the Swap counterparties?
3            MR. SHUMAKER:  Again, I'm going to object.
4        I believe that that question asks the -- asks Mr. Orr
5        to reveal privileged attorney-client communications
6        when you get into specific lodestar analysis.
```

**Designation:**

```
289:11    Q.  Do you recall whether you ever discussed with any of
12        the Swap counterparties the City's potential legal
13        arguments as against the Swap counterparties?
14    A.  Did I?
15    Q.  Yeah.
```

**Designation:**

Page 69 of 70
13-53846-swr   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 69 of 71
13-53846-swr   Doc 4984-7   Filed 07/19/13   Entered 07/19/13 19:19:03   Page 150 of 1
253
150

# Objectors' Designations From August 30, 2013 Deposition of Kevyn Orr

```
289:18   A.   No, I don't think I had though those discussions.  No.
    20   Q.   Did you ever debate the validity of the Swap
    21        counterparties secured position with anyone from the
    22        Swap counterparties?
    23   A.   Did I personally?
    24   Q.   Yes.
    25   A.   No.
```

**Designation:**

```
296: 6   Q.   Well, let me ask you this.  Has -- based on this
     7        document, the City's plan is to allocate a 2 billion
     8        dollar note to the unsecureds, and this plan is -- it
     9        has a line item for continuing to pay the Swaps?
    10   A.   Yes.
    11   Q.   Does the 2 billion dollar number change if the Swap
    12        payments change?
    13   A.   To the best of my knowledge, no.  I don't assume that.
```

# Exhibit 6B

**Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire**

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**
```
 9: 2   Q.   Mr. Buckfire, would you please state your name and
    3        business address for the record?
    4   A.   Kenneth Buckfire.  601 Lexington Avenue, New York, New
    5        York.
```

**Designation:**
```
11:14   Q.   Mr. Buckfire, what is your position with Miller
   15        Buckfire?
   16   A.   Co-founder and co-president of Miller
   17        Buckfire & Company.
   18   Q.   Miller Buckfire currently is employed as the financial
   19        advisor to the City of Detroit, correct?
   20   A.   As the investment banker to the City, that's correct.
```

**Designation:**
```
19:22   Q.   Now, is it fair to say that you have principal
   23        responsibility for the engagement of the City and the
   24        work that's being performed by the members of your
   25        team?
20: 1   A.   Yes.
    2   Q.   And so all the individuals we just discussed report
    3        directly to you, is that correct?
    4   A.   Yes.
```

**Designation:**
```
21:11                MR. SUMMERS:  If we could mark this as
   12        Deposition Exhibit 2, please.
```

**Designation:**
```
21:17   Q.   Mr. Buckfire, do you recognize this document?
   18   A.   I do.
   19   Q.   And it is the forbearance and optional termination
   20        agreement that was executed by Mr. Orr among others on
   21        or about July 15th, 2013, is that correct?
   22   A.   Yes.
   23   Q.   And this is the agreement that's the subject of the
   24        pending motion in the bankruptcy court which brings us
   25        here today, correct?
22: 1   A.   Yes.
    2   Q.   Okay.  And was the City's decision to enter into the
    3        forbearance agreement made by Mr. Orr?
    4   A.   Yes, it was.
```

**Designation:**
```
22:13   Q.   What role did you have in the negotiation of the
   14        forbearance agreement?
   15   A.   On behalf of the City of Detroit I had responsibility
   16        for negotiating the business terms of this agreement.
```

13-53846-swr  Doc 4654-8  Filed 04/29/14  Entered 04/29/14 20:00:00  Page 153 of 41
13-53846-swr  Doc 954-3  Filed 09/20/13  Entered 09/20/13 20:00:00  Page 153 of 253
253

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
34: 8   Q.   Is it fair -- let's draw down in detail a little bit
     9        on the June 8th meeting.  Who was -- what individuals
    10        were present at the June 8th meeting?
    11   A.   It was the same attendees as at the June 4th meeting
    12        except that Mr. Saxton and Mr. Martin did not attend.
    13   Q.   Were the service corporations present at the June 8th
    14        meeting?
    15   A.   Not to my recollection.
    16   Q.   Were the service corporations present at the June 4th
    17        meeting?
    18   A.   No.
    19   Q.   What point was information about the proposed
    20        forbearance agreement communicated to the service
    21        corporations?
    22   A.   I don't know.
    23   Q.   Do you know who was communicating with the service
    24        corporations?
    25   A.   No.
35: 1   Q.   Was anybody communicating with the service
     2        corporations?
     3   A.   I don't know.
     4   Q.   Did Mr. Orr know?
```

**Designation:**

```
35: 6   A.   I don't know.
```

**Designation:**

```
35: 8   Q.   But you never spoke with a representative of a service
     9        corporation about the forbearance agreement?
```

**Designation:**

```
35:11   A.   I already testified to that.
```

**Designation:**

```
35:25   Q.   Did the Swap counterparties ever say to the City that
36: 1        if a resolution is not reached by a certain date, they
     2        will terminate?
     3   A.   Not to my knowledge.
     4   Q.   And you said that the first defaults occurred in your
     5        view in March 2012, is that correct?
     6   A.   There was a credit rating downgrade which triggered
     7        termination event under the collateral agreement which
     8        had not been cured, and then after that the City
     9        emergency manager was appointed, that in itself was an
    10        event of default under the agreement.  So, we had
    11        several defaults.
```

Page 2 of 40

13-53846-swr   Doc 4854-8   Filed 09/29/14   Entered 09/29/14 20:00:00   Page 154 of 41
13-53846-swr   Doc 4854-8   Filed 09/29/14   Entered 09/29/14 20:00:00   Page 154 of 41
253
154

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
40: 2   Q.   Mr. Buckfire, the forbearance agreement in the City's
    3        view allows the City to direct the termination of the
    4        Swap agreements, is that correct?
    8   A.   Well, we negotiated for the right to do so if we can
    9        deliver the Swap termination payment.
   10   Q.   Is that a right that the City currently possesses
   11        under any other agreement?
   12   A.   This is the only agreement of which I'm aware.
   13   Q.   And it is the City's view that under the forbearance
   14        agreement the City is able to direct the termination
   15        of the Swap agreements without the consent of any
   16        other party, is that correct?
   21   A.   Can you repeat your question?
   22   Q.   Sure.  Under the forbearance agreement the City is
   23        able to direct the termination of the Swap agreements
   24        without the consent of any other party, is that
   25        correct?
```

**Designation:**

```
41: 3   A.   I don't know what I'm supposed to answer to.  It's our
    4        view that this is an agreement the City can perform it
    5        has rights under.
```

**Designation:**

```
44: 6   Q.   This document has been marked as Exhibit Number 3 is
    7        the proposal to creditors, executive summary of the
    8        proposal to creditors that was made on June 14th,
    9        2013, is that correct?
   10   A.   Yes.
   11   Q.   And this was prepared in connection with a meeting
   12        with creditors that was held at the Detroit Airport
   13        Westin on June 14th, 2013, is that correct?
   14   A.   That's correct.
   15   Q.   And did you participate in creating this executive
   16        summary?
   17   A.   I did.
   18   Q.   And you participated in the information that is --
   19        gathering the information that is disclosed in this
   20        executive summary, is that right?
   21   A.   Well, I reviewed drafts of it to make sure that it
   22        made sense, that it was consistent, that it was
   23        accurate, but I did not prepare the information
   24        myself.
   25   Q.   You prepared -- leave it there.  You're familiar with
45: 1        the contents of this document, correct?
    2   A.   Yes.
    3   Q.   If you turn to Page 35.  And Page 35 contains a
    4        summary of the current financial status of the City as
    5        of June 14th, 2013, is that correct?
    6   A.   No, actually this is just one way of looking at it.
    7        Page 8 and 9 are actually more relevant for the
    8        discussion we've been having today.
    9   Q.   If you stay with -- what then do you think is
```

Page 3 of 40

13-58846-sjw  Doc 4854-8  Filed 09/29/14  Entered 09/29/14 20:00:00  Page 155 of
13-58846-swr  Doc 954-8  Filed 09/29/14  Entered 09/29/14 28:00:00  Page 155 of 41    155
253

```
10        contained on Page 35?
11   A.   This is a review of the City's reported historical
12        financials.
13   Q.   If you look at the column at the very far right side
14        of the page it says prelim 2013.  Do you know what
15        that column contains?
16   A.   It contains a preliminary estimate of revenues,
17        operating expenses and legacy expenses for 2013.
18   Q.   And if you look down here line labeled total revenues
19        which indicates 1.121.9 billion dollars, is that
20        correct?
21   A.   Yes.
22   Q.   And that is the total revenue that was projected as of
23        the date this executive summary was prepared for 2013?
24   A.   Yes.
25   Q.   Now, if you go down the next subsection of Page 35 is
46: 1     labeled operating expenditures, correct?
 2   A.   Yes.
 3   Q.   And operating expenditures preliminary 2013 column
 4        indicates 692 million dollars, correct?
 5   A.   Yes.
 6   Q.   Now -- and the operating expenditures include --
 7        included in this section include the essential
 8        services that the City has to provide, is that
 9        correct?
10   A.   Yes.
11   Q.   And then when you get to the legacy expenditures, is
12        it correct that the City is not currently making debt
13        payment, debt service payments to general obligation
14        bonds, is that correct?
15   A.   Yes.
16   Q.   And the City is not -- is currently deferring payments
17        for retiree health benefits, isn't that correct?
18   A.   Yes.
19   Q.   So, without making service or making payments on the
20        legacy expenditures for 2013, is it correct to say
21        that the City would have operated at a surplus for
22        fiscal year 2013?
23   A.   Well, clearly if we're not making our fixed
24        obligations, we'd have more cash than if we did.
25   Q.   And are you currently making payments on any of the
47: 1     items that are categorized under the legacy
 2        expenditures part of Page 35?
 3   A.   Yes.
 4   Q.   What portions are you making?
 5   A.   Well, we're making payments on the POC Swaps because
 6        they are a secured obligation.  I'm not sure looking
 7        at this whether the 141 million of debt service for
 8        LTGO and UTGO incorporates payments made on the
 9        secured state revenue share bonds which we have three
10        series.  I have to go back and check, but clearly the
11        City is paying its obligations on secured, that is,
12        revenue protected debt and not paying on unsecured
13        debt.
14   Q.   And the City is not at this point making its pension
15        contributions, correct?
```

```
16   A.   Correct.
17   Q.   The City at this point is not paying the health
18        benefits for retirees, correct?
19   A.   Yes, that's correct.
20   Q.   And the City is not making principal interest payments
21        to the service corporations, correct?
22   A.   That's correct.
23   Q.   Then turn to Page 38 of the executive summary.  In
24        this document among other things or this page among
25        other things contains a preliminary forecast for
48: 1     fiscal -- for the City for fiscal year 2014, is that
2         correct?
3    A.   Yes.
4    Q.   And you see the column that's labeled 2014?
5    A.   I do.
6    Q.   The column labeled for 2014 indicates the total
7         revenues for the City for 2014 are projected to be 1
8         billion 108 -- so, it's 1 billion 82 million point  8,
9         is that correct?
10   A.   Yes, a decline from 2013.
11   Q.   And expenditures, the expenditures column indicates
12        that expenditures that the City will incur for
13        essential services will total 397.2 million dollars
14        for 2014, is that correct?
15   A.   That's the projected net operating surplus, correct.
16   Q.   Yeah, I'm sorry, it's 685.7 million in expenditures
17        for fiscal year 2014, correct?
18   A.   Yes.
19   Q.   And that results in a surplus of 397.2 million
20        dollars, correct?
21   A.   Before debt service.
22   Q.   Before debt service.  But you're not making -- the
23        City is not making a significant portion of the debt
24        service, correct, in 2014?
25   A.   That's correct.
49: 1   Q.   So, for example, the City does not actually project
2         paying pension -- making pension contributions for
3         fiscal year 2014, isn't that true?
7    A.   That's correct.
8    Q.   And the City does not currently plan to pay the health
9         benefits for retirees in fiscal year 2014, correct?
13   A.   Can you repeat the question, please?
14   Q.   The City does not currently intend to pay the line
15        item for health benefits for retirees in fiscal year
16        2014?
17   A.   That's correct.
```

**Designation:**

```
53:15   Q.   So, do you believe that the City would be out of cash
16        without access to the casino revenues?
19   Q.   As of December 2013?
20   A.   If nothing else was done, yes.
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
54: 5   Q.   Now, you've previously discussed the Swap
     6        counterparties entered the negotiations with the view
     7        that events of default had occurred under the Swap
     8        contracts, correct?
     9   A.   It was a fact.
    10   Q.   And so the City had the same view that there were
    11        events of default that had occurred under the Swap
    12        contracts prior to the bankruptcy?
    13   A.   It wasn't a view, it was a fact.  We had at least two
    14        defaults.
    15   Q.   And can you tell us what the two defaults were?
    16   A.   The ratings downgrade default which had occurred in
    17        2012 and the appointment of the emergency manager in I
    18        believe it was March of 2013.
    19   Q.   And were there any other defaults other than those two
    20        in the City's view?
    22   A.   There may well have been but those are the two that I
    23        recollect.
```

**Designation:**

```
55:15   Q.   To your knowledge had the Swap counterparties ever
    16        threatened to bring litigation claims against the
    17        City?
    18   A.   No.
    19   Q.   Has the City considered whether the Swap
    20        counterparties have claims against the City other than
    21        those arising out of the defaults under the Swap
    22        agreements?
    24   A.   I don't know.
56: 1   Q.   Has the City evaluated whether it is in breach of the
     2        collateral agreement?
    10   Q.   In your view have you engaged in any analysis of
    11        whether the City has breached the collateral
    12        agreement?
    13   A.   No.
    14   Q.   To your knowledge has anyone else associated with the
    15        City analyzed whether the City is in breach of the
    16        collateral agreement?
    17   A.   I don't know.
    22   Q.   Have the service corporations ever threatened to your
    23        knowledge claims against the City?
57: 1   A.   I don't know.
     3   Q.   Have you ever analyzed whether these service
     4        corporations may have claims against the City?
     5   A.   No.
     6   Q.   Have you analyzed whether or evaluated -- strike that.
     7        Let me start again.
     8             Have you evaluated whether the City has
     9        claims against the Swap counterparties?
    12   Q.   Has Miller Buckfire evaluated whether the City has
    13        claims against the Swap counterparties?
    14   A.   No.
    15   Q.   Has anyone else working for the City analyzed whether
    16        the City has claims against the Swap counterparties?
```

```
18   A.   No.
20   Q.   No, you don't know --
21   A.   I don't know.
22   Q.   So, Miller Buckfire performed no investigation into
23        whether the City has claims against the Swap
24        counterparties in connection with this forbearance
25        agreement, correct?
58: 2  A.   No.
```

**Designation:**
```
58:10  Q.   Do you have a view as to what claims the forbearance
11          agreement releases?
12     A.   No.  The answer was no at end of the table.  I'll
13          speak up.  I apologize.
14     Q.   Does the forbearance agreement operate to release any
15          claims that might be held against the City?
17     A.   I don't know.
```

**Designation:**
```
58:19  Q.   Do you have an understanding of how interest rate
20          movements may affect the termination payment that
21          would become due under the Swap agreements?
22     A.   Yes.
```

**Designation:**
```
58:25  Q.   And what is that understanding?
59: 1  A.   Well, as interest rates come down, the Swap
2           termination liability goes up.
3      Q.   And if interest rates go up, what happens to the Swap
4           termination liability?
5      A.   Comes down.
6      Q.   And there would come a point if interest rates
7           increased enough where the City could actually become
8           in the money on the Swaps, is that correct?
9      A.   It would except that the Swap counterparties in 2009
10          negotiated for the right to terminate the Swaps so
11          they would never actually be in a net liability
12          position against the City if that were to occur.
13     Q.   What is your basis for stating that the Swap
14          counterparties negotiated the right to terminate the
15          Swaps in 2009?
16     A.   Well, I've already testified that I reviewed the
17          collateral amendment entered into in 2009 and
18          discussed it with counsel to the City.  In their
19          review of the contract, and I can't remember exactly
20          the provision now but that was their interpretation of
21          the contract right.
22     Q.   Have you reviewed any of the other 2009 documents
23          related to the Swaps?
24     A.   No.
25     Q.   Has the City undertaken any analysis to evaluate
60: 1       future interest rate moves?
2      A.   We have reviewed the forward LIBOR curve.
```

Page 7 of 40

13-53846-swr   Doc 4814-8   Filed 04/29/14   Entered 04/29/14 23:09:00   Page 8 of 41
13-53846-swr   Doc 4814-8   Filed 04/29/14   Entered 04/29/14 23:09:00   Page 8 of 41

253

159

```
 3   Q.   And who performed that review?
 4   A.   That review was performed by Mr. Sanjay Marken, one of
 5        our associates.  M A R K E N, first name S A N J A Y.
 6   Q.   And when did he perform that review?
 7   A.   The most recent one was performed a few days ago.
 8   Q.   What did that review show?
 9   A.   It showed that the current forward LIBOR curve does
10        not show that the interest rate that's relevant to
11        this Swap would ever rise above six-and-three-quarters
12        percent which is the fixed rate on the Swap, and,
13        therefore, the market is telling us that the
14        probability of the Swap ever going in the money for
15        the benefit of the City is very low.
16   Q.   Does the analysis address whether interest rates are
17        generally rising or decreasing?
18   A.   The LIBOR curve is an observable market fact.  I'm not
19        going to speculate on when rates are going up or down.
20        They will fluctuate.
21   Q.   Have interest rates increased since the forbearance
22        agreement was executed?
23   A.   Yes.
24   Q.   And what effect has that increase on -- in interest
25        rates had on the estimated termination payment under
61: 1       the forbearance agreement?
 3   A.   Well, the assumption in June of this year when we
 4        began to negotiate with the Swap counterparties was
 5        the termination payment was around four hundred
 6        million dollars.  The rise in rates since that time
 7        and it's now almost August probably has reduced that
 8        termination payment to around three hundred million
 9        dollars or even lower.
10            So, yes, the rise in rates has resulted in
11        a reduction of the termination payment.
12   Q.   And is that analysis of the reduction to the
13        termination payment something that Miller Buckfire has
14        prepared?
16   A.   Well, there is a procedure embodied in the collateral
17        agreement that lets you determine the termination
18        payment if one is to occur.  We've simply analyzed the
19        net value of the assumed LIBOR payments and Swap
20        payments and come up with our own estimate.
22   Q.   And that analysis was performed by Mr. Marken?
23   A.   That's right.
```

**Designation:**
```
63: 3   Q.   Mr. Buckfire, did Mr. Marken perform any analysis
 4        related to the interest rates' effect on the Swaps
 5        prior to the analysis he performed a few days ago?
 6   A.   No.
```

**Designation:**
```
63:19   Q.   Did you describe what claims you would litigate
20        aggressively to the Swap counterparties?
21   A.   No.
```

```
22   Q.   Did you make any assertions to the Swap counterparties
23        concerning the validity of their liens at the June 4th
24        meeting?
25   A.   No.
64: 1 Q.  Was the potential of the City challenging the liens
 2        held by the Swap counterparties ever a matter
 3        discussed during the negotiation of the forbearance
 4        agreement?
```

**Designation:**

```
64: 7 Q.  Discussed with the Swap counterparties.
 8   A.   Yes.
 9   Q.   When was that discussed?
10   A.   It was a very hectic period.  I did really almost
11        nothing between June 4th and the 11th but try to
12        negotiate this deal.  I know at several points in my
13        conversations with the business people I let them know
14        that if there were issues with the collateral, we
15        would raise them if necessary to protect the City.
16   Q.   Did you articulate what those issues might be?
17   A.   No.
```

**Designation:**

```
65: 8 Q.  So, you never performed an analysis of the merits of
 9        those claims?
10   A.   No.
```

**Designation:**

```
65:19 Q.  Did you assert any arguments or potential litigation
20        claims other than the issues surrounding the granting
21        of the liens in your negotiations with the Swap
22        counterparties?
23   A.   No.
24   Q.   Did you articulate to the Swap counterparties why in
25        the City's view the liens may or may not be valid?
66: 1 A.  Not directly, no.
```

**Designation:**

```
69: 7 Q.  You testified that as of the last analysis your
 8        understanding is the estimated amount of the
 9        termination payment that would be due is roughly three
10        hundred million dollars, is that correct?
11   A.   Well, it clearly moves around as the interest rate
12        curve moves around.  I think the most recent number is
13        somewhere reaching 275 and 300 million dollars.
14        That's before the application of the applicable
15        discount that we had provided for in the termination
16        agreement.
17   Q.   And that last analysis, when was that performed?
18   A.   A few days ago.
```

Page 9 of 40

13-53846-swr   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 10 of 41
13-53846-swr   Doc 4854-8   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 10 of 41

253

161

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**
```
69:23   Q.   Does the City have a plan at this point for how it
   24        will obtain the cash necessary to pay the termination
   25        payment?
```

**Designation:**
```
70: 3   A.   Yes, the City has a plan.
```

**Designation:**
```
70: 5   Q.   And what is that plan?
    6   A.   The City intends to secure a debtor in possession
    7        financing of sufficient proceeds to fund the
    8        termination payment as well as provide sufficient cash
    9        for the City to execute on its reinvestment program
   10        during the bankruptcy.
```

**Designation:**
```
70:18   Q.   And is Miller Buckfire leading the effort to obtain
   19        debtor in possession financing?
   20   A.   Yes.
```

**Designation:**
```
71:16   Q.   And do you know who those ten entities are that have
   17        said they are not interested?
   18   A.   I do, yes.
   19   Q.   And who are they?
   20   A.   I'm not going to tell you that.
   21   Q.   On what basis?
   22   A.   It's commercially sensitive information.
```

**Designation:**
```
73:24   Q.   What covenants, if any, are included in the RFP as
   25        being acceptable or not acceptable?
74: 1   A.   I'm not going to discuss that.  It's commercially
    2        sensitive.
```

**Designation:**
```
74: 6   Q.   And is the City offering a lien on casino revenues in
    7        connection with the DIP financing?
    8   A.   In part.
```

**Designation:**
```
74:12   Q.   No doubt.  What other collateral is the City offering
   13        to secure the DIP financing loan?
   14   A.   I'm not going to answer that question.
```

Page 10 of 40

13-53846-swr   Doc 4814-1   Filed 09/29/14   Entered 09/29/14 22:00:03   Page 162 of

Page 10 of 40

13-53846-swr   Doc 4814-1   Filed 09/29/14   Entered 09/29/14 22:00:03   Page 162 of
13-53846-swr   Doc 4814-1   Filed 09/29/13   Entered 09/29/13 19:19:03   Page 116 of   162
253

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**
```
75: 2   Q.   Is the City offering art work as collateral?
    3   A.   I'm not going to discuss the terms of the term sheet,
    4        sorry.
```

**Designation:**
```
76:15   Q.   Has the City had discussions with the State of
   16        Michigan about providing financing?
   17   A.   I'm not going to discuss that.
```

**Designation:**
```
76:21               Are there certain events that the City
   22        believes has to happen in the case for it to be able
   23        to realistically obtain debtor-in-possession
   24        financing?
   25   A.   Yes, there are events in the case.
77: 1   Q.   And what is that deal?
```

**Designation:**
```
77: 4   A.   Well, we have to find a willing lender, that's number
    5        one.  Number two, we have to have a court order
    6        approving the form of the DIP financing, and, number
    7        three, we believe we need to have approval of the
    8        forbearance and termination agreements we get the
    9        benefit of the elimination of the collateral pledge
   10        and the benefit of the discount.
```

**Designation:**
```
77:12   Q.   Do you need a determination on eligibility as well?
   13   A.   Probably as a condition to closing but not as a
   14        condition to getting a loan commitment.
```

**Designation:**
```
79:10   Q.   And if the City obtains a debtor-in-possession
   11        financing, what's the intended use of the financing?
```

**Designation:**
```
79:14   A.   I've already answered it.
```

**Designation:**
```
79:16   Q.   Why don't you go ahead, say it again.
   17   A.   We'll use proceeds to terminate the Swaps at the
   18        discount provided for in the forbearance agreement and
   19        the balance of the DIP loan will be retained by the
   20        City as working capital and to support its
   21        reinvestment program.
   22   Q.   Are there any other intended uses to the DIP financing
   23        other than the two you just said?
```

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 11 of 41
13-53846-swr   Doc 4548   Filed 09/29/13   Entered 09/29/13 19:10:03   Page 163 of
253                                                                          163

```
        24   A.   Not that I'm aware of.
```

**Designation:**
```
 85: 6   Q.   Go back to the negotiations that occurred in 2013.
     7        Did you invite Syncora to participate in those
     8        negotiations?
     9   A.   No.
    10   Q.   Why not?
    11   A.   They weren't a party to the collateral agreement.
    12   Q.   Did you consult with Mr. Orr as to whether Syncora
    13        should be invited to the negotiations?
    14   A.   No.
    15   Q.   Did you invite Financial Guaranty Insurance Company to
    16        participate in the negotiations concerning the
    17        forbearance agreement?
    18   A.   No.
    19   Q.   Did you consult with Mr. Orr with respect to the
    20        decision whether Financial Guaranty Insurance Company
    21        should be invited to those negotiations?
    22   A.   No.
    23   Q.   So, you made that decision -- how did you come to the
    24        decision not to invite -- we'll call it FGIC?
    25   A.   It never came up.  They weren't a party to the
 86: 1        agreement.
     2   Q.   Did you invite US Bank to participate in the
     3        negotiations concerning the forbearance agreement?
     4   A.   No.
     5   Q.   Why not?
     6   A.   Not a party to the agreement.
     7   Q.   To the collateral agreement?
     8   A.   Correct.
     9   Q.   And to your knowledge no one else invited Syncora,
    10        FGIC or US Bank to participate in the negotiations on
    11        the forbearance agreement?
    12   A.   Correct.
```

**Designation:**
```
 87:11   Q.   Did you ever advise Mr. Orr that you thought Syncora
    12        should be a party to the negotiations?
    13   A.   No.
```

**Designation:**
```
 88:11   Q.   At any time during the negotiations in 2013 did the
    12        Swap counterparties send a notice of an event of
    13        default?
    14   A.   I don't recall if we ever received an official notice
    15        but we certainly were aware of the fact they could
    16        send one at any time.
    17   Q.   And at any time during the negotiations in 2013 did
    18        the Swap counterparties formally designate an early
    19        termination date?
    20   A.   No.
```

Page 12 of 40
13-53846-swr   Doc 4548   Filed 09/29/14   Entered 04/29/14 22:00:03   Page 164 of 1
13-53846-swr   Doc 4548   Filed 09/29/13   Entered 09/29/13 19:10:03   Page 15 of 41
253                                                                              164

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

| | | |
|---|---|---|
| 89: 3 | Q. | Now, you've indicated there was I guess an agreement |
| 4 | | -- is it fair to say there was an agreement at least |
| 5 | | in principle on the terms of the forbearance agreement |
| 6 | | on or before June 11th, is that correct? |
| 8 | A. | There was an economic understanding, yes. |

**Designation:**

| | | |
|---|---|---|
| 89:10 | Q. | What happened after June 11th with respect to the |
| 11 | | negotiations? |
| 12 | A. | Well, the attorneys for the City and for the Swap |
| 13 | | counterparties began to negotiate the forbearance |
| 14 | | agreement.  I was not directly involved in that |
| 15 | | because it was primarily in fact solely with respect |
| 16 | | to the nonfinancial terms of it. |
| 17 | | That took several weeks of very intensive |
| 18 | | work amongst the lawyers for all the parties to arrive |
| 19 | | at an agreement that could be executed which it turned |
| 20 | | out not before July 15th. |
| 21 | | So, it took about a month to complete the |
| 22 | | negotiations for the agreement, so -- |
| 23 | Q. | Other than attorneys working to document I guess the |
| 24 | | legal terms -- well, document the whole thing, was |
| 25 | | there anything else that caused a month, approximately |
| 90: 1 | | a month to elapse between agreement on the financial |
| 2 | | terms and execution of the forbearance agreement? |
| 3 | A. | No, it was a very, very active negotiation amongst the |
| 4 | | parties to the arrive at the final document. |

**Designation:**

| | | |
|---|---|---|
| 93: 8 | Q. | To your knowledge at no point in 2012 did the Swap |
| 9 | | counterparties send a notice of an event of default to |
| 10 | | the City? |
| 13 | A. | Not to my knowledge. |

**Designation:**

| | | |
|---|---|---|
| 94:17 | Q. | You're familiar with the Detroit General Retirement |
| 18 | | System Service Corporation and the Detroit Police and |
| 19 | | Fire Retirement System Service Corporation? |
| 20 | A. | I know they exist. |
| 21 | Q. | Do you have an understanding -- just for the record |
| 22 | | I'll refer to them as the service corporations, do you |
| 23 | | have an understanding what the service corporations |
| 24 | | are? |
| 25 | A. | Yes. |
| 95: 1 | Q. | And what is that understanding? |
| 2 | A. | They were created for the purpose of the City |
| 3 | | borrowing 1.4 billion dollars in 2005 and 2006 and |
| 4 | | making a contributions of the like amount to the |
| 5 | | pension funds. |
| 6 | Q. | Do you understand the service corporations to be |

Page 13 of 40

13-53846-tjt   Doc 4854-1   Filed 09/29/14   Entered 09/29/14 22:00:03   Page 145 of 1
13-53846-swr   Doc 4548   Filed 05/13/14   Entered 05/13/14 22:00:03   Page 165 of
253

165

```
 7        controlled by the City?
 8   A.   Yes.
 9   Q.   And do you understand the service corporations to be
10        controlled by the emergency manager?
11   A.   I assume that's the case but I don't know for a fact.
12   Q.   And the service corporations are in fact parties to
13        the forbearance agreement, correct?
14   A.   Yes, they are.
15   Q.   Who acted on behalf of the service corporations in
16        connection with the forbearance agreement?
17   A.   The City did.
18   Q.   And by the City can you identify the individuals that
19        you are referring to when you say the City?
20   A.   Mr. Orr.
21   Q.   To your knowledge did any members of the Board of
22        Directors of the service corporations consult with
23        Mr. Orr about the forbearance agreement?
24   A.   I don't know.
25   Q.   Did Mr. Orr -- let's ask it the other way.  Did
96: 1        Mr. Orr consult with any members of the Board of
 2        Directors of the service corporations in connection
 3        with the forbearance agreement?
 4   A.   I don't know.
 5   Q.   Did anyone at Miller Buckfire have any contact with
 6        anyone, any -- any member of the Board of Directors of
 7        the service corporations in connection with the
 8        negotiations?
 9   A.   I don't think so.
10   Q.   And do you know who presented the forbearance
11        agreement to the service corporations for execution?
12   A.   No.
13   Q.   Would Mr. Orr know that?
14   A.   I don't know.
15   Q.   Do you know who would know that?
16   A.   I don't know.
17   Q.   The person who signed the forbearance agreement on
18        behalf of the service corporations, a woman named
19        Cheryl Johnson, is that correct?
20   A.   Yes.
21   Q.   Do you know Miss Johnson?
22   A.   No.
23   Q.   Do you know what position Miss Johnson holds, if any,
24        on the service corporations?
25   A.   Well, the signature page indicates that she's the
97: 1        president.
 2   Q.   You've never spoken to Miss Johnson about the
 3        forbearance agreement?
 4   A.   No.
 5   Q.   Have you ever spoken with Portia Roberson about the
 6        forbearance agreement?
 7   A.   No.
 8   Q.   Do you know Miss Roberson?
 9   A.   No.
10   Q.   Has anyone from Miller Buckfire ever spoken with
11        Miss Roberson?
12   A.   I don't know.
```

Page 14 of 40

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 15 of 41
13-53846-swr   Doc 4648   Filed 09/29/13   Entered 09/29/13 19:10:03   Page 166 of
253                                                                              166

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
13   Q.   Are you aware that the insurers contend that the Swap
14        agreements cannot be terminated without their consent?
15   A.   Yes.
16   Q.   And when did you first become aware of that
17        contention?
18   A.   Well, last week in court I heard Mr. Hackney describe
19        those arguments to the judge.
20   Q.   Have you taken any steps to evaluate whether the City
21        agrees with the insurer's construction of the
22        operative documents on this point?
23   A.   No.
```

**Designation:**

```
98:25  Q.   Are you aware that the insurers contend they have the
99: 1       right to control essentially all actions to be taken
      2     by the Swap counterparties in connection with the Swap
      3     agreements?
```

**Designation:**

```
99: 5  A.   Yes, I am.
```

**Designation:**

```
99: 7  Q.   And when did you develop that awareness?
      8  A.   When I was in court last week listening to
      9        Mr. Hackney's description of those issues to the
     10        judge.
     11  Q.   And have you taken any steps to evaluate whether the
     12        City concurs with the insurer's construction of the
     13        documents on this point?
     14  A.   No.
```

**Designation:**

```
101: 8  Q.   In determining whether to enter into the settlement
      9        agreement, did the City consider whether the casino
     10        revenues constituted special revenues under the
     11        bankruptcy code?
     16  A.   No.
     18  Q.   So, you didn't consider it or you don't know?
     19  A.   I said we didn't consider it.
```

**Designation:**

```
107:10  Q.   Has the City considered selling or leasing Belle Isle?
     11  A.   Not to my knowledge.
```

**Designation:**

```
107:12  Q.   Has the City looked into possible sources of funding
     13        from the State of Michigan?
     14  A.   I'm not going to discuss that.
     15  Q.   Has the City looked into possible sources of funding
```

Page 15 of 40

13-53846-swr   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 16 of 41
13-53846-swr   Doc 4648   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 16 of 41   167

253

```
16        from the federal government?
17   A.   I'm not going to discuss that either.
18   Q.   On what basis?
19   A.   Commercially sensitive information.
```

**Designation:**
```
108: 6   Q.   Mr. Buckfire, good afternoon.  My name is Steve
     7        Hackney.  I'm an attorney at Kirkland & Ellis, and I
     8        represent Syncora Capital Assurance and Syncora
     9        Guaranty.  Nice to meet you.
    10   A.   Likewise.
```

**Designation:**
```
109: 4              So, as I understood your testimony, you
     5        were the lead negotiator for the City when it came to
     6        negotiating the business deal, is that correct?
     7   A.   Yes.
     8   Q.   Other people were going to paper the business deal in
     9        terms of the legal terms that would embody it,
    10        correct?
    11   A.   Yes.
    12   Q.   Let me ask you a question.  The kickoff of the
    13        negotiations that led to the forbearance agreement I
    14        understood you to say began on June 4th, correct?
    15   A.   Yes.
    16   Q.   Who called that meeting?
    17   A.   Counsel to Jones Day called counsel for BAML and
    18        invited them to the meeting.
    19   Q.   Fair to say that the meeting was held at the behest of
    20        the City of Detroit?
    21   A.   Yes.
    22   Q.   Did you take legal advice, you personally as the lead
    23        negotiator for the City, did you take legal advice
    24        from Jones Day in advance of the June 4 meeting?
    25   A.   Yes.
110: 1   Q.   Would you disclose to me the legal advice you obtained
     2        from them?
     3             MR. CULLEN:  I'll instruct him not to
     4        answer.
     5             MR. HACKNEY:  So, if I ask questions about
     6        the legal advice you had been given about the COPs
     7        Swap structure or various parties' rights thereunder,
     8        you would instruct the witness not to answer those
     9        questions?
    10             MR. CULLEN:  Right.
    11             MR. HACKNEY:  And I take it, Mr. Cullen,
    12        that instruction would remain true both from -- at any
    13        time?
    14             MR. CULLEN:  Right.
    15             MR. HACKNEY:  Not just with respect to the
    16        June 4 meeting?
    17             MR. CULLEN:  Precisely.
    18   BY MR. HACKNEY:
    19   Q.   Okay.  Let me ask you, Mr. Buckfire, I'm going to
```

Page 16 of 40

13-53846-tjt   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 16 of 41
13-53846-swr   Doc 4648   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 168 of
253                                                                        168

```
20        speculate, perhaps not wildly, that you've negotiated
21        a few deals in your lifetime.
22   A.   Yes.
23   Q.   Isn't it fair to say as a negotiator, you have to have
24        an understanding of the financial needs and desires of
25        your client as well as the counterparty with whom you
111: 1        are negotiating?
 2   A.   Yes.
 3   Q.   You also have to have at least some understanding of
 4        the legal framework in order to negotiate effectively,
 5        correct?
 6   A.   Yes.
 7   Q.   You don't have to go to law school, right, but you do
 8        have to understand some of the ins and outs of the
 9        various legal documents that you're negotiating over,
10        correct?
11   A.   As well as any layman can be expected to do so.
12   Q.   Now, I'd like to get a level set as to where you were
13        on June 4th, 2013 as you're going into this meeting
14        with BAML.
15   A.   And UBS.
16   Q.   And UBS.  So, they were there too?
17   A.   Yes.
18   Q.   Okay.  I want to make sure I have a level set under
19        the operating assumptions that you had in your mind as
20        you were going into the meeting to negotiate with the
21        Swap counterparties, okay?
22             One of your operating assumptions was that
23        there were termination events existing under the
24        Swaps, correct?
25   A.   There were events of default existing under the Swaps,
112: 1        the collateral agreement.
 2   Q.   Okay.  So, let's take a step back and let me be more
 3        precise.
 4   A.   Okay.
 5   Q.   So, there is a Swap agreement that the Swap
 6        counterparties are parties to with the service
 7        corporations?
 8   A.   Correct.
 9   Q.   You are aware of that?
10   A.   I am.
11   Q.   You are also aware that there is a collateral
12        agreement that is between among other parties the
13        City, the service corporations and the Swap
14        counterparties, correct?
15   A.   Yes.
16   Q.   Now, at the time you're going into the June 4 meeting,
17        one of your operating assumptions was that there were
18        termination events under the Swap that would give the
19        Swap counterparties the right to terminate?
25   A.   No, I was focused on the cash issue that would be at
113: 1        risk under the collateral agreement.
 3   Q.   And let me tie it up a little bit to see if this jogs
 4        your memory.  The collateral agreement certainly
 5        relates to the Swaps that was entered into in 2009,
 6        correct?
```

Page 17 of 40

13-53846-tjt   Doc 4814-8   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 169 of 1
13-53846-swr   Doc 4548   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 169 of 41
253                                                                      169

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
 7   A.   Correct.
 8   Q.   The collateral agreement cash trap arguably slams shut
 9        upon the occurrence of termination events or events of
10        default under the Swap, is that your understanding?
15   Q.   Okay.
16   A.   Want to try again.
17   Q.   Did you understand that the collateral agreement and
18        the cash trapping were securitizing the City's
19        obligations to the service corporations and the
20        service corporations' obligations to the Swap
21        counterparties under the Swap?
22   A.   No.
23   Q.   Did you understand that the collateral agreement what
24        it was ultimately securing was the termination payment
25        that might be made under the Swaps?
114: 2 A.   No.
 4   Q.   Did you believe that the collateral agreement had
 5        created like a new obligation by the City to pay the
 6        Swap counterparties?
 7   A.   It created a collateralized obligation to pay the Swap
 8        counterparties.
 9   Q.   Okay.  So, going back to the June 4 meeting, let me
10        put it in vernacular that I hope is more correct about
11        what you were assuming.  Okay?
12             You were assuming that there had been
13        events of default under the collateral agreement that
14        would allow the Swap counterparties to trap cash,
15        correct?
16   A.   I wasn't assuming anything.  I knew there were two
17        events of default.
18   Q.   Let me --
19   A.   But they had not been asserted by the Swap
20        counterparties but they existed.
21   Q.   Let me restate it.  As of June 4 you knew that there
22        were events of default under the collateral agreement
23        that would allow the Swap counterparties to trap cash,
24        fair statement?
25   A.   If they chose to do so, yes.
115: 1 Q.   If they chose to do so.
 2   A.   Correct.
 3   Q.   And you also -- let me make sure I get this right.
 4        You also believed that they would be able to declare
 5        termination event and potentially be paid four hundred
 6        million dollars, correct?
 7   A.   Yes.
 8   Q.   And that was also one of your operating assumptions as
 9        you're going into the negotiation, correct?
10   A.   Yes.
11   Q.   And your understanding that they could do so was that
12        they could do so unilaterally, correct?
13   A.   Correct.
14   Q.   And your understanding with both with respect to
15        declaring termination of the Swaps and getting a
16        termination payment and trapping cash was that there
17        was no other party that could direct their actions,
18        correct?
```

Page 18 of 40

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 18 of 41
13-53846-swr   Doc 4548   Filed 04/29/13   Entered 04/29/13 19:19:03   Page 170 of 1
253                                                                          170

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
19   A.   That's correct.
20   Q.   And your understanding of these operating assumptions
21        remain consistent between June 4 and June 11 when you
22        struck the agreement in principle, correct?
23   A.   Correct.
24   Q.   And in fact it remained consistent for you all the way
25        through the execution on July 15th of the forbearance
116: 1        agreement, correct?
2   A.   Correct.
3   Q.   And the forbearance agreement itself did not
4        materially change the business terms of the deal that
5        you had struck on June 11th, correct?
6   A.   No, except for the small negotiation we had around the
7        date of the first option.  It was the only material
8        business term that changed.
9   Q.   Okay.  So, there was some changes of timing in terms
10        of when the percentages stepped up?
11   A.   Yes, because the agreement took a long time to
12        negotiate.  We had originally assumed we would
13        complete a forbearance in June.  It took until July so
14        we asked for and were granted an additional month on
15        the first option payment.
16   Q.   Fair point.  Thank you for that correction.  Other
17        than that change to what I'll describe as the business
18        terms that you negotiated on June 11th, there were no
19        other material changes to the deal that you struck,
20        correct?
21   A.   No.
22   Q.   It was just legal beagles doing what they do, correct?
23   A.   I would never call them legal beagles, but yes, the
24        lawyers were doing what they were supposed to do.
25   Q.   Okay.  All right.  Now, I want to clarify at the June
117: 1        4 meeting other than saying that the City would
2        vigorously litigate attempts to trap cash, you did not
3        express the City's views on the merits of that
4        litigation, correct?
5   A.   Correct.
6   Q.   You just said we're going to fight like hell to stop
7        you from trapping cash or words to that effect?
8   A.   That's correct.
9   Q.   And you didn't say by the way here's why we are going
10        to win because we have this great argument and you're
11        going to lose, right?
12   A.   I never said that.
13   Q.   Never said words to that effect, correct?
14   A.   No.
15   Q.   Never attempted to argue the merits of why the Swap
16        counterparties wouldn't be able to trap cash, fair
17        statement?
18   A.   Correct.
19   Q.   And no one else on the City side did either, correct?
21   A.   Not to my recollection.
23   Q.   And you never attempted to argue the merits of the
24        City's case to the Swap counterparties at any time
25        between June 4 and June 11 when you reached the
118: 1        agreement in principle, correct?
```

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
 2   A.    Correct.
 3   Q.    And you never witnessed anyone else do so on behalf of
 4         the City either, correct?
 5   A.    Not that I recall.
```

**Designation:**
```
120:13 Q.    Now, at the time of the June 4 meeting you were aware
   14        that a bankruptcy filing for the City of Detroit was
   15        at least a possibility, correct?
   16  A.    Yes.
   17  Q.    Had you reached the view at that time that it was a
   18        likelihood?
   19  A.    It was a possibility.
```

**Designation:**
```
121: 4 Q.    And if I ask you at the time -- well, let me ask a
    5        general question.  I'm not asking you to disclose the
    6        subject of communication -- the communications
    7        themselves, but I want to ask whether you had taken
    8        legal advice on the subject of the automatic stay.
    9        Don't tell me what the legal advice was.
   10              Had you taken legal advice on the subject
   11        of the automatic stay at any time between June 4 and
   12        June 11?
   14  A.    Yes, I did.
   16  Q.    So, you had taken legal advice from Jones Day, is that
   17        correct?
   18  A.    Correct.
   19  Q.    But if I ask you what the advice was, you'll follow
   20        your counsel's instruction and not answer, correct?
   21  A.    Correct.
```

**Designation:**
```
122: 4 Q.    I have a broader question which is at any time prior
    5        to June 11th did you or anyone else at Miller Buckfire
    6        to your knowledge perform an analysis of what interest
    7        rates were likely to do in the future?
    8  A.    No.
    9  Q.    Did anyone study any LIBOR curves prior to June 11?
   10  A.    I don't recall.
   11  Q.    You certainly didn't?
   12  A.    I did not.
   13  Q.    Okay.  When you testified about Mr. Marken, you
   14        testified about something I think he had done a couple
   15        days ago and we're in August.  So, I'm going to ask
   16        the same question now about July 15th which is the
   17        execution date.
   18              As of the execution date of the forbearance
   19        agreement, had you or anyone else at Miller Buckfire
   20        undertaken an assessment of what interest rates were
```

Page 20 of 40

13-53846-swr   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 21 of 41
13-53846-swr   Doc 4854-8   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 21 of 41   172
253

```
21        likely to do?
22    A.  No.
```

**Designation:**

```
123: 6   Q.  You were asked a lot of questions about the service
       7       corporations.  I think we established that you don't
       8       know their directors and haven't met them, but I want
       9       to make a point clear about the negotiations which is
      10       you never engaged in arm's length negotiations with
      11       the service corporations, correct?
      12   A.  Correct.
      13   Q.  And you never witnessed anyone else do so either,
      14       correct?
      15   A.  Correct.
      16   Q.  And it's your understanding that Mr. Orr directed the
      17       service corporations to execute the agreement and they
      18       did, correct?
      19   A.  Correct.
      20   Q.  Now, you referenced a standstill agreement that was
      21       something that had been proposed by the Swap
      22       counterparties prior to June 4, 2013.
      23            Do you recall that testimony?
      24   A.  I do.
      25   Q.  Your understanding of the standstill agreement, I
124: 1       understand we are going to get it but we don't have it
       2       today so I have to tell you what I understand from
       3       your testimony.
       4            Your understanding of it was that it
       5       allowed the cash to flow out of the -- it allowed the
       6       casino revenues to flow in exchange for the City
       7       agreeing to waive arguments about the invalidity of
       8       the Swaps but was terminable at any time?
       9   A.  By the Swap counterparties.
      10   Q.  By the Swap counterparties, correct?
      11   A.  Correct.
      12   Q.  And that was unacceptable because that meant at any
      13       time they could change their mind and trap the cash,
      14       correct?
      15   A.  By those terms, yes.
      16   Q.  Now, under the forbearance agreement I understand that
      17       you're not an attorney but you are a sophisticated
      18       businessman who deals with legal documents on a
      19       regular basis, true statement?
      20   A.  Regrettably.
      21   Q.  More than he wants to?  But under the forbearance
      22       agreement isn't it true that your understanding is
      23       that the City has agreed during the forbearance period
      24       that it won't seek to declare the Swaps invalid,
      25       correct?
125: 1   A.  Correct.
       2   Q.  And during the forbearance period the Swap
       3       counterparties are allowing the cash to flow through
       4       the collateral account, right?
       5   A.  Yes.
       6   Q.  So, they waive their argument to trap the cash in
```

Page 21 of 40

13-53846-swr   Doc 4854-8   Filed 09/29/14   Entered 09/29/14 22:00:03   Page 22 of 41
13-53846-swr   Doc 4854-8   Filed 09/29/14   Entered 09/29/13 19:10:03   Page 22 of 41

253

173

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
 7        exchange for other things that they got, correct?
 8   A.   Correct.
```

**Designation:**
```
126:15  Q.   You never proposed what I'll call a smaller deal that
  16         would have attempted to maintain the status quo for
  17         some period of time without trying to achieve a
  18         potential termination of a Swap at a discount so on
  19         and so forth, true statement?
  20   A.   True.
```

**Designation:**
```
127: 6  Q.   Isn't it true that between March 12th of -- between
   7         March of 2012 and June 4th, 2013, the Swap
   8         counterparties had never terminated the Swaps,
   9         correct?
  10   A.   That's true.
  11   Q.   Despite the fact that in your view they had the right
  12         to do so, right?
  13   A.   That's correct.
  14   Q.   And during that entire time period which is 14 months
  15         they had never demanded that cash be trapped, correct?
  16   A.   No, they hadn't.
```

**Designation:**
```
129:13  Q.   Understood.  That's very helpful.  So, let me try and
  14         summarize it which is when you re-engaged in January
  15         of 2013, you were made aware of a -- of the general
  16         desire of the Swap counterparties to for lack of a
  17         better term figure out what the City and the Swap
  18         counterparties were going to do about the Swap,
  19         correct?
  20   A.   Yes.
  21   Q.   And you then held them off between that time and June
  22         4 as you tried to buy time for Ernst & Young to get
  23         its arms around the financial position of the City,
  24         correct?
  25   A.   Yes, and our other advisors.
130: 1  Q.   And your other advisors, absolutely.  And it was only
   2         after you had gotten that analysis done that you felt
   3         you were now ready to initiate a meeting with the Swap
   4         counterparties to speak meaningfully about what should
   5         be done with the Swap?
   6   A.   In the context of an overall recommendation to Mr. Orr
   7         about how to protect the City and its liquidity.
   8   Q.   And so during that time period which was from January
   9         of 2013 to June of 2013, despite these growing signs
  10         of impatience by the Swap counterparties, they still
  11         didn't trap cash, did they?
  12   A.   They were being paid in the ordinary course.  There
  13         was no economic consequence that they had to worry
  14         about.  They didn't know the financial condition of
  15         the City.  There was no economic reason for them to do
```

```
16        anything, but clearly as the condition of the City
17        became more desperate and everyone became more aware
18        of it, the risk they would do something became
19        greater.
20   Q.   I see.  So, it was the disclosure of information by
21        Mr. Orr on June 14th, was that a factor that drove you
22        to negotiate in advance of that?
23   A.   No.  Recall that his earlier disclosure was I believe
24        in April.
25   Q.   Oh, that's right.
131: 1  A.  And that was the first time that the public and the
2          capital markets really became aware of the true
3          financial condition of Detroit.
4     Q.  So, in April Mr. Orr made a disclosure that basically
5          said if I could summarize that things are not well in
6          Detroit, correct?
7     A.  That's accurate.
8     Q.  But despite that disclosure and subsequent to the
9          report in April and May, Swap counterparties didn't
10         demand cash be trapped, correct?
11    A.  Correct.
12    Q.  They didn't terminate the Swap, correct?
13    A.  Correct.
14    Q.  After June 11, after you've cut the business deal and
15         here come the lawyers to write it down, fair to say
16         that you're on the sidelines now as the lawyers work
17         out the legal language, but you're still monitoring
18         the course of the legal negotiations given the
19         importance of what's at stake?
22    A.  I was generally aware of what was going on.
24    Q.  I'm trying to get on the idea that you're not on the
25         phone with all these lawyers like directly
132: 1     participating and listening to the negotiations of the
2          forbearance agreement itself but you're keeping tabs
3          on how it's progressing and when it's hoped to be
4          executed, correct?
5     A.  Correct.
6     Q.  Put another way, you are aware of the legal
7          negotiation process as it goes along even though
8          you're not personally involved in it, correct?
9     A.  Correct.
10    Q.  And that's because this was such an important
11         agreement that you as an important advisor to the City
12         needed to be up to speed on what was going on with the
13         forbearance agreement?
14    A.  Correct, but recall that on June 11th the Swap
15         counterparties did issue a letter to US Bank
16         authorizing them to release the tranche of cash due to
17         us on June 15th and therefore we knew we had until
18         July 15th to get to the next tranche.
19              So, from a financial perspective I was
20         comfortable with where we were with the Swap
21         counterparties.
22    Q.  Because after that discharge of cash, then it goes
23         back to just slowly building up, you get it for the
24         rest of the month and then it slowly builds up in the
```

Page 23 of 40

13-53846-swr   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 24 of 41
13-53846-swr   Doc 4634   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 175 of 1

253                                                                              175

```
      25        first part of July?
133: 1   A.    Correct.
      2   Q.    So, you felt like we had some time to negotiate?
      3   A.    That's correct.
      4   Q.    Yeah.  Your understanding is that the legal
      5              negotiations of the forbearance agreement were
      6              complicated but that they proceeded uninterrupted from
      7              June 11th to July 15th, correct?
      8   A.    Correct.
      9   Q.    And if there had been a serious interruption in these
     10              negotiations, you would have likely known about this
     11              as an important advisor to the City, correct?
     12   A.    Yes.
     13   Q.    And you are aware of no serious interruption, correct?
     14   A.    No.
     15   Q.    That's not correct?
     16   A.    I'm not aware of any serious interruptions.
     17   Q.    In late June of 2013 you learned that Syncora wanted
     18              to make a proposal to the City, isn't that correct?
     19   A.    Yes.
     20   Q.    And you had a conversation with Todd Snyder on the
     21              subject of Syncora's potential proposal on Saturday,
     22              June 29th, isn't that correct?
     23   A.    That's correct.
     24   Q.    Mr. Snyder you understood is a banker at Rothschild's,
     25              correct?
134: 1   A.    Correct.
      2   Q.    And you also understood that he was representing
      3              Syncora, correct?
      4   A.    Yes.
      5   Q.    And you also understood that at the time that he was
      6              calling you, that there had been previous
      7              communications between counsel to Syncora and counsel
      8              to the City, correct?
      9   A.    I had heard about it but I wasn't aware of the
     10              specifics.
     11   Q.    Okay.  So, you knew Jones Day and Kirkland and maybe
     12              others had met and talked about something but you
     13              didn't know what it was?
     14   A.    I knew they were talking about the issues raised by
     15              Syncora.
     16   Q.    Okay.  Now, tell me -- so, in terms of Syncora's
     17              potential proposal, your first percipient knowledge of
     18              it as a witness happens on that Saturday when you have
     19              your conversation with Mr. Snyder, is that a fair
     20              statement?
     21   A.    Correct.
     22   Q.    Tell me everything you can recall about that
     23              conversation.
     24   A.    It was quite brief.  Todd told me he had been retained
     25              by Syncora and that they wanted to propose something
135: 1              that would be of benefit to the City in resolving the
      2              Swap matter.  I told him that we were always willing
      3              to listen to anything anyone had to say and I asked
      4              him to tell me what he had in mind.  He never did.
      5   Q.    Have you told me everything you can recall about that
```

Page 24 of 40

13-53846-tjt   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 25 of 41
13-53846-swr   Doc 8548   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 176 of 253

176

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
 6           conversation?
 7    A.     Yes.
 8    Q.     During that conversation didn't Mr. Snyder describe
 9           the general structure of a proposal Syncora wanted to
10           make?
11    A.     No.
12    Q.     So, if Mr. Snyder says he did, he's lying or mistaken?
13    A.     He never made a specific proposal to me.
14    Q.     I'm not saying a specific proposal, I'm saying a
15           general structure of a proposal, that's what he
16           testified to in his affidavit.
17                  Did he provide to you the general structure
18           of a proposal that Syncora wanted to make?
19    A.     Not that I recall.
20    Q.     Possible he did, possible he didn't, you just can't
21           remember?
22    A.     I can't remember.
23    Q.     Did he tell you that we'd be able to put specifics
24           into the general structure of the proposal if we could
25           execute an NDA that would allow us to learn about the
136: 1       negotiations with the Swap counterparties?
 2    A.     Yes, he did.
 3    Q.     What did you tell him in response to that?
 4    A.     I said he should send us an NDA and we'll take a look
 5           at it.
 6    Q.     And you understood that at least as he expressed to
 7           you that he wanted an NDA as a precursor in order to
 8           make a specific proposal, correct?
 9    A.     Correct.
10    Q.     Isn't it true that after that time you understood that
11           an NDA was proposed to the City, correct?
12    A.     Yes.
13    Q.     And the City refused to execute that NDA, isn't that
14           correct?
15    A.     That's correct.
```

**Designation:**
```
137:15 Q.    And that's because -- but you do remember him telling
16           you the specifics would come after we sign an NDA?
17    A.     I do.
18    Q.     Yeah.  And then your understanding is that there was a
19           problem with the NDA that you couldn't discuss the
20           proposal with the EFM?
21    A.     That's correct.
22    Q.     And that was something that the parties couldn't get
23           over?
24    A.     I asked Jones Day to go back to Kirkland Ellis and try
25           to fix the problems we had in the NDA and then I moved
138: 1       on to other issues.
 2    Q.     And your understanding was that to the extent those
 3           problems didn't get fixed it was because Kirkland
 4           Ellis was being obstinate with respect to the terms of
 5           NDA?
 6    A.     I don't know why we never resolved it.
 7    Q.     So, to this day you don't know whether or not an NDA
```

Page 25 of 40

13-53846-tjt  Doc 4815-1  Filed 04/29/14  Entered 04/29/14 22:00:03  Page 26 of 41
13-53846-swr  Doc 4648  Filed 09/19/13  Entered 09/19/13 19:19:03  Page 26 of 41
253                                                177

```
 8        could have been struck that would have allowed Syncora
 9        to make a rival proposal, correct?
10   A.   All I can tell you is that no NDA was entered into
11        because the terms were unacceptable.
12   Q.   And you don't know why one wasn't entered into
13        ultimately after that?
14   A.   I don't think we could ever resolve the issues.
15   Q.   And this was in advance of your having executed the
16        forbearance agreement, correct?
17   A.   Yes.
18   Q.   As a negotiator, don't you agree that it's nice
19        whenever you can play two parties off against each
20        other?
21   A.   I didn't have two parties, I had one party.  I had the
22        Swap counterparties.
23   Q.   And I'm not asking about in this case, I'm asking
24        about as a general principle, isn't it nice when you
25        can play two parties off against each other?
139: 1 A. Sometimes.
 2   Q.   Isn't that something that you'll do in the DIP
 3        financing which is you'll get all these offers in and
 4        then you'll make these guys compete with each other in
 5        order to drive best possible deal for the City,
 6        correct?
 7   A.   Only if you assume a level playing field which this
 8        negotiation was not.
 9   Q.   I'm just asking generally about the idea of trying to
10        drive the best deal possible through competition
11        amongst different negotiating parties.  Can be
12        valuable, right?
13   A.   Can be under the right circumstances.  This was not
14        one of them.
15   Q.   And what was wrong about the circumstances?
16   A.   Because we had only two parties to the table, the Swap
17        counterparties who had signed the collateral
18        agreement.  There was nobody else to negotiate with.
19   Q.   That's right, that's right, because your understanding
20        was that Syncora had no rights whatsoever under the
21        collateral agreement, correct?
22   A.   Correct.
23   Q.   And your understanding was they had no ability to
24        direct the actions of the Swap counterparties,
25        correct?
140: 1 A. I testified earlier that my understanding, I was
 2        advised, the only parties of interest here are the
 3        Swap counterparties.
 4   Q.   And it was also your understanding that Syncora didn't
 5        have any rights under the Swaps that would be
 6        terminated, correct?
 7   A.   Only talking about the collateral agreement.
 8   Q.   We talked about the fact that there might be a
 9        termination event for four hundred million dollars.
10        That's not under the collateral agreement, right?
11   A.   True.
12   Q.   So, we are talking about the Swaps, right?
13   A.   Yes.
```

```
14   Q.   Now, let's put aside what you've been told about who
15        the relevant parties were.  You did know that Syncora
16        was a Swap insurer, right?
17   A.   Yes.
18   Q.   And you understood as a layperson but a sophisticated
19        one that if an insurer makes a payment to the insured
20        it becomes subrogated to the rights of the insured
21        with respect to that payment, correct?
22   A.   Yes.
23   Q.   And isn't it true that if the Swap counterparties had
24        terminated, they wouldn't have waited around for two
25        years to collect the casino revenues, right, they
141: 1    would have demanded Syncora made good on its Swap
   2      insurance and let Syncora try and stick around and
   3      collect the casino revenues, correct?
   6   A. It wasn't an issue for the City.
   8   Q. I'm asking whether you thought that was a possibility
   9      back at the time you were negotiating the forbearance
  10      agreement?
  11   A. It wasn't an issue for the City.  Had no impact on the
  12      City's access to cash.
  13   Q. But if Syncora was a party that might come in in lieu
  14      of the Swap counterparties, didn't you want to find
  15      out whether you might be able to cut a better deal
  16      with Syncora?
  19   A. I can't speculate to that.
  21   Q. All you can say is that you never did, correct?
  22   A. Correct.
  23   Q. And in fact between June 29th when you spoke to
  24      Mr. Snyder and today, there have never been
  25      substantive negotiations between the City and Syncora
142: 1    to your knowledge, isn't that correct?
   2   A. Not on this, no.
```

**Designation:**
```
142:19            As the banker who is leading the DIP,
  20      what's your understanding of the role the casino
  21      revenues will play in the collateral package offered
  22      in connection with the DIP?
  23   A. They will be part of the collateral package.
  24   Q. So, they will be part, and when you say they, do you
  25      mean a specific period of time of the casino revenues
143: 1    or do you mean casino revenues projecting into the
   2      future?
   3   A. It's commercially sensitive so I'm going to decline to
   4      answer it.
```

**Designation:**
```
143:12   Q. You agree that the goal of the forbearance agreement
  13      is to get the collateral agreement to terminate so
  14      that the City can get access to the casino revenues,
  15      correct?
  17   A. That is one of the goals.
  19   Q. That is one of the goals.  And isn't it true that your
```

Page 27 of 40
13-53846-swr   Doc 4814-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 27 of 41
13-53846-swr   Doc 4845-8   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 28 of 41   179
253

```
20        current expectation is that you need the postpetition
21        financing, the DIP loan to close in order to be able
22        to exercise the option under the forbearance
23        agreement, correct?
24   A.   Correct.
25   Q.   And there was testimony on that today because you
144: 1     don't have the money otherwise, right, Mr. Buckfire?
2    A.   That is part of the collateral package, yes.
3    Q.   I'm talking about the use of proceeds of the DIP just
4         so we're clear.  Part of the use of proceeds of the
5         DIP will be to exercise the option under the
6         forbearance agreement, correct?
7    A.   Correct.
8    Q.   You understand that you won't have unfettered access
9         to the casino revenues until you exercise the option
10        that leads to the termination of a Swap in the
11        collateral agreement, correct?
12   A.   Yes.
13   Q.   Isn't this a bit circular?
14   A.   Regrettably.
15   Q.   How did you factor that consideration into the
16        determination as to whether to engage in the
17        forbearance agreement?
18   A.   Well, this is why the Swap collateral agreement is
19        such a problem for the City.  Unless we can eliminate
20        the collateral and regain control over gaming revenues
21        without risk of loss because of defaults that would
22        trap it, we need to rationalize and clean this up in
23        order to put the City on a sound financial basis.
24   Q.   So, there are two parts -- there are -- there may be
25        many parts but two of the important parts of the
145: 1     forbearance agreement are getting the Swap
2         counterparties to waive their right to trap cash and
3         then taking out the Swap at a discounted value,
4         correct?
5    A.   Well, if we take out the Swap at a discounted value
6         and we pay off the Swap, then there is no need for the
7         collateral agreement.
8    Q.   That's true but that may be something that happens
9         down the road.  So, in the interim between then it's
10        the waiver of the cash trapping rights and the
11        discounted potential value of the termination,
12        correct?
13   A.   Which is a short-term agreement.  It only goes to next
14        June.  There are termination events along the way and
15        in any case as I am aware as a sophisticated layman,
16        there is risk under the bankruptcy code that the Swap
17        counterparties could avail themselves of relief under
18        the provisions for Swaps and irrespective of the
19        automatic state, still take the money.
20   Q.   Okay.  But they've waived those rights under the
21        forbearance agreement?
22   A.   So long as the forbearance agreement exists.
23   Q.   And they waive their rights under the collateral
24        agreement to trap crash, correct?
25   A.   For now.
```

Page 28 of 40

13-53846-swr   Doc 4545-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 28 of 41
13-53846-swr   Doc 984-8    Filed 09/19/13   Entered 09/19/13 19:19:03   Page 29 of 41
253                                                                              180

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
147:12   Q.   So, I'd like to ask you about the concept of what I
      13        call a clean closing, okay, and a clean closing is one
      14        where you engage in a transaction with someone and
      15        both parties walk away from the transaction with an
      16        expectation that neither of them will have liability
      17        arising from the closing.  That's what I mean when I
      18        say a clean closing.
      19              Isn't it true that it's your understanding
      20        that it is important to the Swap counterparties that
      21        they get a clean closing with the City if the City
      22        exercises its option?
      23   A.   Yes.
```

**Designation:**

```
149:16   Q.   All right.  Do you remember we talked about -- do you
      17        remember that you talked about the concept that the
      18        Swap counterparties could walk away from the Swaps if
      19        interest rates ever look like they were going into
      20        territory that was positive for the service
      21        corporations?
      22   A.   Yes.
      23   Q.   And that was a right that you understood they had
      24        received as part of the 2009 restructuring that led to
      25        the collateral agreement, correct?
150: 1   A.   Yes.
      2   Q.   Do you understand that that's called an optional early
      3        termination?
      4   A.   Yes.
      5   Q.   And you understand that under -- when they exercise an
      6        optional early termination, the Swap counterparties
      7        take nothing from the service corporations, correct?
      8   A.   That's correct.
      9   Q.   That's the point of the walkaway which is they get to
      10        walk away but they don't get paid anything?
      11   A.   That's because the Swaps not in the money anymore.
      12   Q.   Well, even if it is or is it isn't, right?
      13   A.   Right.
      14   Q.   In fact  today the Swaps are very much in the money,
      15        correct?
      16   A.   Correct.
      17   Q.   And obviously the Swap counterparties have never
      18        threatened to exercise an optional early termination,
      19        correct?
      23   Q.   To you?
      24   A.   No.
      25   Q.   That wouldn't make sense, would it?
151: 1   A.   Not as long as you're being paid on time.
      2   Q.   And also why would you terminate a Swap on an optional
      3        early basis and be paid nothing when it is worth by
      4        your testimony approximately three hundred million
      5        dollars, correct?
      7   A.   It wouldn't be economically rational.
```

Page 29 of 40

13-53846-tjt   Doc 4814-1   Filed 09/29/14   Entered 04/29/14 22:00:03   Page 29 of 40
13-53846-tjt   Doc 4814   Filed 09/29/13   Entered 09/29/13 19:10:03   Page 30 of 41
253
181

```
 9   Q.   That would not be economically rational.  And your
10        understanding under the forbearance agreement is
11        what's happening is that in exchange for all the
12        consideration, the Swap counterparties' termination
13        rights are being discounted to somewhere between 75
14        and 82 percent, correct?
15   A.   Correct.
16   Q.   We talked a lot about cash flow forecasts earlier.
17        The cash flow forecasts that are contained in the
18        proposal that you discussed with Mr. Summers, do you
19        remember those?
20   A.   Yes, uh-huh.
21   Q.   E & Y prepared those, correct?
22   A.   Yes.
23   Q.   And you have certainly reviewed them and familiarized
24        yourself with them, correct?
25   A.   Yes.
152: 1   Q.   But you are not someone who can answer specific
 2        questions about how they were created, correct?
 3   A.   No, that's correct.
 4   Q.   If I wanted to ask about any particular line item how
 5        did they get this number, the person to ask that would
 6        be Ernst & Young?
 7   A.   Correct.
 8   Q.   I'd like to go back and talk briefly about the art and
 9        I don't want to talk about the art as part of the DIP
10        or anything like that or what you're going to do with
11        it.
12             I want to go back to June 4 and ask as of
13        June 4, had you made an assessment of the value of the
14        City's art collection?
15   A.   No.
16   Q.   Have you made even a rough approximation of its worth?
17   A.   No.
18   Q.   And why hadn't you done that?
19   A.   We're not qualified to do so.
20   Q.   Why hadn't you retained someone, gosh, back in
21        January, February that was qualified to do so to come
22        in and see whether these assets were valuable?
23   A.   We identified early on as an issue.  We got to it as
24        we could, but it was not a significant crisis for the
25        City because we were focused on cash and preserving
153: 1        cash.
 2   Q.   Well, sometimes art can be turned into cash I think,
 3        isn't that right?
 4   A.   Some people would think so.
 5   Q.   In fact there are art sales of significant amount
 6        every year in this country, isn't that right?
 7   A.   So I'm told.
 8   Q.   And you've read about them in the paper from time to
 9        time when you read the Wall Street Journal, correct?
10   A.   Yes.
11   Q.   And this is art that the City owns, right?
14   Q.   Correct?
15   A.   That's correct.
16   Q.   But you understood took no effort to see whether the
```

Page 30 of 40

13-53846-swr   Doc 4545   Filed 09/29/14   Entered 04/29/14 22:00:03   Page 31 of 41
13-53846-swr   Doc 4548   Filed 09/29/13   Entered 09/29/13 19:10:03   Page 182 of
253                                                                        182

```
17        City could obtain cash out of assets that were hanging
18        in the Detroit Art Institute as a substitute for going
19        in and engaging in this negotiation with the Swap
20        counterparties, correct?
21   A.   Correct.
22   Q.   We talked earlier about creditor recoveries and I want
23        to make sure that I understood your testimony on that
24        point.
25               You understand that Mr. Orr made a proposal
154: 1    to creditors that's called proposal for creditors back
2         in June of 2013, correct?
3    A.   Correct.
4    Q.   You helped him formulate that proposal, isn't that
5         right?
6    A.   Yes.
7    Q.   The proposal -- I'm going to summarize it but you
8         should feel free to correct me as somebody who knows
9         it better and can say it better than I, but basically
10        put the proposal suggests that unsecured creditors
11        will share in two billion dollars of bonds that are
12        issued by the City upon emergence, correct?
13   A.   Correct.
14   Q.   And the proposal assumes that the City will have
15        unfettered access to casino revenues because that's
16        what its projections show, correct?
17   A.   Yes.
18   Q.   So, even if the City has unfettered access to the
19        casino revenues, its current proposal is still that
20        the unsecured creditors will just share in this two
21        billion dollar pot, correct?
22   A.   That's correct.
23   Q.   So, is it fair to say that getting access to this
24        money will not by itself increase creditor recoveries?
25   A.   No, it's part of the base case plan that we presented
155: 1    which is the base case recovery we presented on June
2         14th.
3    Q.   Right.  So, if the court grants the motion and you get
4         access to it, that will be consistent with the base
5         case which is consistent with the two billion dollar
6         offer, right?
7    A.   Correct.
8    Q.   So, it won't go up if the court grants you the access
9         that you're assuming you'll get?
10   A.   But it will go down if the court does not.
11   Q.   That's a different question.  I'll get to that in a
12        moment.
13               It  won't go up if the court grants the
14        motion, correct?
15   A.   Correct.
16   Q.   Your argument if I understood it was that the
17        casino revenues will be used to invest in the City,
18        correct?
19   A.   Revenues of the City are fungible.  All I'm saying if
20        you don't have access to those revenues, then you
21        don't have the billion dollar plus of revenues that
22        you thought you had which is supporting not only
```

Page 31 of 40

13-53846-tjt   Doc 4845-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 31 of 41
13-53846-swr   Doc 4548   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 32 of 41   183
253

```
23        current operations but the reinvestment plan.
24   Q.   And I will say that I had understood you earlier to
25        say if you didn't have access to casino revenues, that
156: 1        City services would suffer?
2    A.   In the short-term, yes.
3    Q.   Yeah.  But it's fair to say that you're not proposing
4         to obtain the casino revenues, access to them and
5         throw them on to the pot of the two billion dollars
6         that's already being proposed to unsecured creditors,
7         correct?
11   A.   I've already testified that the access to gaming
12        revenues is part of the plan which supports the two
13        billion dollar anticipated issuance of notes.
15   Q.   And you mean that from a feasibility standpoint,
16        right?
17   A.   Yes.
18   Q.   You mean it will strengthen the City and that will
19        make the City more able to perform under the notes and
20        that will make the notes more valuable to the
21        creditors, right?
22   A.   That would be one result.
23   Q.   Let me ask you by how much will creditor recoveries go
24        down if the court declines to approve the forbearance
25        agreement?
157: 1   A.   We haven't calculated that plan yet.  It would
2         certainly be a significant reduction and it would be
3         borne primarily by the unsecured creditors as a
4         group.
5    Q.   Prior to July 15th you had not attempted a detailed
6         calculation to understand the impact to unsecured
7         creditor recoveries if the casino revenues were not
8         unfreed, correct?
9    A.   That's correct.
10   Q.   So, you don't know whether it's pennies on the dollar
11        or dimes on the dollar, correct?
12   A.   We are already at dimes on the dollar in this --
13   Q.   There's only pennies left.
14   A.   We hope there's pennies left.
15   Q.   There was some -- there was a lot of questioning
16        about the financial forecasts, and I'm not going to
17        try and reinvent the wheel, but I would ask you to go
18        back to that Page 35 that you were discussing
19        earlier.
20             Do you remember, Mr. Buckfire, being asked
21        questions about this page?
22   A.   I do.
23   Q.   And I guess I want to be clear that -- I know we're
24        coming to the end of 2013, so, we'll move to this
25        other page in a second, but at least with respect to
158: 1        2013 if you put legacy expenditures aside,
2         Ernst & Young forecast is of a substantial net
3         operating surplus in excess of four hundred million
4         dollars, correct?
5    A.   But how can you put legacy expenditures aside in 2013
6         because we were doing all this through the end of
7         June.
```

Page 32 of 40

13-53846-tjt   Doc 4814-8   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 33 of 41
13-53846-swr   Doc 4648   Filed 04/29/13   Entered 04/29/13 19:19:03   Page 33 of 41
253
184

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
 8   Q.   Fair enough.
 9   A.   So, these are the numbers.
10   Q.   Well, these are -- 2013 includes probably a full year
11        projection, so --
12   A.   Fiscal year ends June 30th.
13   Q.   Oh, so, fiscal year 2013 ends on June?
14   A.   That's correct.
15   Q.   Let's go to 38 then.
16   A.   Okay.
17   Q.   Good correction there.  We'll see if it's a big
18        difference in 2014.  So, this is the next fiscal year,
19        right?
20   A.   Correct.
21   Q.   And this is again a financial forecast prepared by
22        Ernst & Young, correct?
23   A.   Yes.
24   Q.   Now, I understand your point about the fact that this
25        doesn't reflect the different initiatives that Mr. Orr
159:1     wants to implement, okay, so let me bracket that, I
 2        heard you say that earlier, but if you hold those to
 3        one side and if you also hold legacy expenditures to
 4        one side, what the City's numbers reveals is that it
 5        has a nearly four hundred million dollar net operating
 6        surplus, correct?
 7   A.   One could look at it that way.
 8   Q.   And all of the cops and the fire department and the
 9        ambulance drivers, their payroll, that's all included
10        in these numbers, correct?
12   A.   Yes.
14   Q.   And so are their health benefits, correct?
15   A.   Yes.
16   Q.   Okay.  So, if I understood it correctly, Mr. Orr wants
17        to do a billion and a quarter of reinvestment in the
18        City over the next ten years, correct?
19   A.   That's right.
20   Q.   And that's about 125 million a year, correct?
21   A.   That's correct.
22   Q.   And, so, even if we took the 397 down by his
23        initiatives by 125 million, you'd still have
24        approximately 272 million dollars left, correct, in
25        net operating surplus?
160:1 A.  Yes.
 2   Q.   And that's even with him being able to do all the
 3        wonderful things that he wants to do for the City,
 4        right?
 5   A.   That's correct.
 6   Q.   So, we're now going to go to the area where I begin to
 7        do complex math which means adding things twice in a
 8        row where I often fall down.  But I said it was about
 9        272 and the casino revenues are only about 170 in this
10        forecast, right?
11   A.   That's correct.
12   Q.   So, even if you didn't have those and even if Mr. Orr
13        did all his improvements, you'd still have a hundred
14        million dollar net operating surplus, correct?
15   A.   No, that's actually not the case, and this is not
```

Page 33 of 40

13-53846-swr   Doc 4514-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 34 of 41
13-53846-swr   Doc 4548   Filed 05/13/14   Entered 05/13/14 19:10:03   Page 34 of 41      185
253

```
16        meant to be the City's plan, it's not the City's plan.
17        If you are proposing a different plan where the City
18        plans to liquidates itself, then yes, I guess you
19        could look at it this way.
20    Q.  I'm just referring to the preliminary forecast that
21        you all put together in this proposal and gave to us.
22    A.  This is not the City's plan and it's not the City's
23        forecast.  This is an illustration of what happens if
24        you don't do anything.
25    Q.  And the key differences between this and what the
161: 1        City's plan is are the investments that Mr. Orr wants
2         to make, right?
3     A.  Right.
4     Q.  And the cost reductions he wants to make, right?
5     A.  And the increase in staffing levels across services to
6         provide higher level services to the City.
7     Q.  But that's in the reinvestment, right?
8     A.  No, it's actually hard to break out that way because a
9         lot of it is actually in the salaries line and the HR
10        lines.
11              So, you have to go back to the numbers and
12        ask me a lot of those questions.
13    Q.  The proposed investments that he wants to make, that
14        he proposes to make that I'm so ruthlessly omitting,
15        they are in this document, right?
16    A.  Not in this projection.
17    Q.  They're not in this projection, but they are in this
18        proposal?
19    A.  That's right.
20    Q.  He laid them all out in gory detail?
21    A.  Yes, he did.
22    Q.  He also lays out a number of cost cutting initiatives,
23        isn't that correct?
24    A.  Yes, he does.
25    Q.  And one of his goals is also to make the City more
162: 1        efficient, correct?
2     A.  Yes.
3     Q.  At the same time he also wants to make it operate
4         better, correct?
5     A.  Correct.
6     Q.  Those two things from a net operating standpoint work
7         in tension with one another, right?
8     A.  They do over time, but you have to consider the
9         timetable and when these things are done.
10    Q.  I want to ask you a question about state and federal
11        aid but I don't want to mix it up into the DIP which I
12        understand -- which I took to mean earlier was one of
13        the sensitivities there.  I want to go back to June 4,
14        2011.
15              Prior to June 4, 2011 had you undertaken
16        any effort to evaluate whether there was either state
17        aid or federal aid that you could use in lieu of
18        having to negotiate this deal with the Swap
19        counterparties?
20    A.  We are assuming there is no aid available to the City.
21    Q.  You were assuming that there was none, but had you
```

Page 34 of 40

13-53846-tjt   Doc 4514-8   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 34 of 41
13-53846-tjt   Doc 4514-8   Filed 04/29/14   Entered 04/29/14 19:10:03   Page 35 of 41    186
253

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
        22          undertaken an effort to determine whether there could
        23          be some?
        24    A.    I've already testified that I'm not going to discuss
        25          that.
163: 1    Q.    And why aren't you going to tell me about that?
     2    A.    It's commercially sensitive information.
     3    Q.    Why?
     4    A.    That's my answer.
```

**Designation:**
```
163:25    Q.    And let me first ask you, Mr. Buckfire, had your firm,
164: 1          you or your firm undertaken any analysis of this
     2          question?  You don't have to tell me what it was.
     3          Let's go in stages.
     4                  Had you analyzed the problem?
     5    A.    Yes, we did.
     6    Q.    You had analyzed the problem.  And is it your
     7          testimony that divulging the results of that analysis
     8          would be commercially sensitive?
     9    A.    Yes.
    10    Q.    Is part of the reason for that because of the way any
    11          potential aid from the City or from the state or the
    12          feds might interplay with the DIP process, is it the
    13          way they knit up, is that the problem?
    14    A.    Yes.
```

**Designation:**
```
165:18    Q.    Is it your understanding that the Series 2006-B COPs
    19          were issued with a floating interest rate?
    20    A.    Yes.
    21    Q.    And is it your understanding that the Swap contracts
    22          were entered into to hedge against the interest rate
    23          risk associated with the Series 2006-B COPs?
    24    A.    Yes.
    25    Q.    And the Swap contracts accomplish this hedge by
166: 1          effectively limiting the City's payment obligations
     2          under the service contracts with respect to the Series
     3          2006-B COPs to the fixed rate that's set forth in the
     4          Swap contracts, is that correct?
     5    A.    Correct, which was amended in 2009.
     6    Q.    What was amended?
     7    A.    The original fixed rate was lower in 2006 and it was
     8          increased slightly in 2009 as part of the amendment.
     9    Q.    The Swap contracts were amended in 2009 --
    10    A.    The rate, the rate was.
    11    Q.    The rate on the Series 2006-B --
    12    A.    That's my understanding.
    13    Q.    Okay.  And with the amendment in 2009 the Swap
    14          contracts still remained in place, correct?
    15    A.    That's my understanding.
    16    Q.    And those Swap contracts are still in place today and,
    17          therefore, still hedging the interest rate risk today?
    18    A.    Except as modified by the 2009 amendment.
    19    Q.    So, do you agree that from the perspective of the City
```

```
        22          with the Swap contracts in place it's as if the
        23          Series 2006-B COPs have a fixed interest rate?
        24   A.     Yes.
        25   Q.     Have you heard of structures like this being referred
167: 1              to as a synthetic fixed rate of interest?
     2   A.         Yes.
```

**Designation:**
```
167:22   Q.     Is there any benefit to the City from having this
     23          structure with the 2006-B COPs having a floating rate
     24          hedged by the Swap contracts as opposed to merely
     25          issuing those COPs with a traditional fixed rate?
168: 2   A.     All their debt is now fixed.  I mean they are not
     3          taking any interest rate risk as a result of the Swap
     4          that was put on top of the floating rate COPs.  That
     5          is the benefit to the City.
     7   Q.     The benefit to the City from the structure is that
     8          it's a comparable interest rate risk exposure for the
     9          City?
     10  A.     They have eliminated the floating rate exposure and
     11         now they have a fixed rate on this debt similar to the
     12         rate exposure they have on the 2005 COPs which are
     13         fixed rate.  So, it's all fixed now.
```

**Designation:**
```
172:17   Q.     Did you discuss any legal arguments that the City
     18          might have had against the Swap counterparties with
     19          Mr. Orr?
     20   A.     No.
```

**Designation:**
```
174:24   Q.     You want to give a minute here for your counsel maybe
     25          to object, maybe not, what legal arguments did you
175: 1              discuss that the City might be able to raise against
     2              the Swap counterparties?
     3                      MR. CULLEN:  I'm going to object and direct
     4              him not to answer.
     5   A.         I wouldn't have answered anyway, but thank you.
```

**Designation:**
```
175:17   Q.     All right.  May I assume that any questions I ask you
     18          about what legal arguments or issues you might have
     19          discussed that the City would have had to assert
     20          against the Swap counterparties, conversations you
     21          would have had with Jones Day people your counsel is
     22          going to object and instruct you not to answer?
     23                      MR. CULLEN:  You can assume that.
```

**Designation:**
```
175:25   Q.     Slightly different question.  Did you have any
```

Page 36 of 40

13-53846-swr   Doc 4814-8   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 37 of 41
13-53846-swr   Doc 4545-8   Filed 04/29/13   Entered 04/29/13 19:10:03   Page 188 of 1
253                                                                                    188

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
176: 1      discussions with Mr. Orr regarding the probability of
     2      success on legal arguments the City could raise
     3      against the Swap counterparties?
     4  A.  Yes.
     5  Q.  When did those discussions take place?
     6  A.  During May.
     7  Q.  Can you tell me about those discussions with Mr. Orr?
     8           MR. CULLEN:  Direct him not to answer.
```

**Designation:**
```
177: 5           MS. ENGLISH:  And if I ask him to tell me
     6      about those conversations, will you direct him not to
     7      answer?
     8           MR. CULLEN:  I will indeed.
```

**Designation:**
```
177:10  Q.  Did you discuss with anyone else the probability of
     11      success that the City might have had on legal
     12      arguments against the Swap counterparties?
     13  A.  No.
     14  Q.  Were there any written documents or memos that
     15      evaluated the City's legal arguments against the Swap
     16      counterparties?
     20  A.  No.
     21  Q.  Are you aware of any written analyses that were done
     22      about the legal arguments the City might assert?
     23  A.  No.
```

**Designation:**
```
178: 6  Q.  Going into the start of the negotiations with the Swap
     7      counterparties on June 4th, did you assume that the
     8      Swap counterparties' liens were valid?
     9  A.  I did.
```

**Designation:**
```
179:12  Q.  Can you tell me what the other alternatives were that
     13      you considered?
     14  A.  Well, we considered finding another lender to fund the
     15      termination of the Swaps.  This is back in May when we
     16      knew the financial condition of the City was dire.  We
     17      did not think we could attract a lender to come in to
     18      take out the Swap termination payment at a hundred
     19      cents or even at a discount under the tight time frame
     20      that we had to work with nor did we think we could do
     21      that at a rate of interest that could ever be
     22      acceptable to the City.
     23  Q.  Let me stop you right there and ask did you try?
     24  A.  No.
```

Page 37 of 40

13-53846-swr   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 37 of 41
13-53846-swr   Doc 4854   Filed 09/19/13   Entered 09/19/13 19:19:03   Page 38 of 41
253
189

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
180:13   Q.   Prior to June 4th, did you submit a request to the
   14        state for aid on behalf of the City?
   15   A.   I'm not going to answer that question.
   16   Q.   You will not answer even whether the City made a
   17        request for state aid prior to June 4th?
   18   A.   It's commercially sensitive information.  I
   19        respectfully cannot answer that question.
   20   Q.   Was there a request for state aid that was rejected
   21        prior to June 4th?
   22   A.   I'm not going to answer that question.
   23   Q.   On what basis won't you answer whether there was one
   24        that was rejected?
   25   A.   Commercially sensitive information.
181: 1   Q.   How is it commercially sensitive?  If there was a
    2        state aid request that was rejected, how is that
    3        sensitive now?
    4   A.   You're asking me to speculate.
    5   Q.   I'm asking you why you're not answering.
    6   A.   It's commercially sensitive information.
    7   Q.   Tell me why it's commercially sensitive in your view.
    8   A.   It would have an impact on our ability to prosecute a
    9        successful DIP financing process for the City at this
   10        point.
   11   Q.   It would jeopardize your DIP financing if the public
   12        knew that a state aid request had been rejected prior
   13        to June 4th?
   14   A.   You're saying that.  I didn't say that.
   15   Q.   I'm trying to understand why you won't give us the
   16        information.
   17   A.   It's commercially sensitive.
   18   Q.   How is it commercially sensitive?
```

**Designation:**

```
181:20   A.   I'm not going to answer it.
```

**Designation:**

```
181:22   Q.   Just for kicks let's do the same line of questioning
   23        for federal aid, okay?  Was there a request made by
   24        the City for federal aid prior to June 4th?
   25   A.   I decline to answer that question.
182: 1   Q.   On what grounds do you decline to answer?
    2   A.   It's commercially sensitive information.
    3   Q.   And why do you feel it's commercially sensitive?
    4   A.   Because it would have an impact on our DIP financing
    5        process.
    6   Q.   Was there a request for federal aid that was rejected
    7        prior to June 4th?
    8   A.   I decline to answer that question.
    9   Q.   And do you decline on the exact same grounds you've
   10        just given me?
   11   A.   Yes.
```

Page 38 of 40

13-53846-swr   Doc 4514-8   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 38 of 41
13-53846-swr   Doc 4514-8   Filed 09/29/13   Entered 09/29/13 19:10:03   Page 39 of 41

253

190

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

**Designation:**

```
183:25   Q.   Did you have any substantive conversations with the
184: 1        Swap counterparties about whether or not their liens
     2        were valid other than, you know, we threaten to
     3        litigate, we threaten to defend, did you actually get
     4        into a discussion about the validity of their liens
     5        with them?
     6   A.   No, I had no other cards to play so I just kept
     7        reminding them we would be aggressive.
```

**Designation:**

```
184:12   Q.   What other unencumbered revenue streams or assets does
     13       the City have?
     14  A.   Well, we have income tax revenues, we have property
     15       tax revenues.  I'm speaking now in the Chapter 9
     16       context.  The state revenues are pledged to three
     17       series of bonds that were issued historically by the
     18       City.  So, there really is no other source of revenue
     19       that's available to the City that could be pledged or
     20       used aside from these.
     21            There are, of course, a list of noncore
     22       assets we identified on June 14th that we are
     23       evaluating for potential value but we have reached no
     24       conclusion yet as to how much is available there.
     25  Q.   I just want to make sure.  You were talking about
185: 1        state shared revenues are pledged, right, did I get
     2        that correct?
     3   A.   They are securing three different series of bonds that
     4        have a pledge of those revenues and that's already
     5        been used.
     6   Q.   So, the remaining unencumbered City assets or revenues
     7        are the noncore assets that were listed?
     8   A.   Right.
     9   Q.   Income tax and property tax?
     10  A.   Correct.
     11  Q.   Is that all?
     12  A.   Well, the gaming revenues if we can eliminate the
     13       collateral agreement.
     14  Q.   Is there any reason that the noncore assets, income
     15       tax or property tax could not be pledged as collateral
     16       to secure DIP financing?
     17  A.   They could be.
```

**Designation:**

```
185:18   Q.   You testified earlier that if the forbearance
     19       agreement was not approved, it would have dire
     20       consequences for the City, is that correct?
     21  A.   Yes.
     22  Q.   Does the City have a backup plan if the forbearance
     23       agreement is not approved?
     24  A.   Well, we're developing one now.  We are proceeding on
     25       the assumption the court will grant relief on this
186: 1        transaction and let us proceed with it and if they
     2        tell us they won't, we'll have a backup plan.
```

Page 39 of 40

13-53846-tjt   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 40 of 41
13-53846-swr   Doc 4854-8   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 40 of 41

253                                                            191

# Objectors' Designations From August 29, 2013 Deposition of Kenneth Buckfire

```
    3   Q.    What is the backup plan you're currently considering?
    4   A.    It's being developed right now.  It would be not the
    5         plan currently proposed.
```

**Designation:**
```
190:17  Q.    Okay.  Do you understand that under certain
    18        circumstances the agreement prohibits the City from
    19        taking action that's inconsistent with the position of
    20        the counterparties in litigation, for instance?
    21  A.    That's my understanding.
```

**Designation:**
```
201:18  Q.    Is it your understanding that after March 1st the City
    19        has another opportunity to challenge anything related
    20        to this agreement?
    21  A.    It's not my understanding.
    22  Q.    Okay.
    23  A.    I don't know.
    24  Q.    Okay.  Do you recognize there's a possibility then
    25        that the City could be stuck with paying a very large
202: 1        figure after the Chapter 9 plan and have no ability to
     2        challenge it if -- at some certain stage regardless of
     3        the validity of those liens?
     4  A.    That's a possibility.
     5  Q.    Okay.
```

Page 40 of 40

13-53846-swr   Doc 4854-1   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 41 of 41
13-53846-swr   Doc 4634   Filed 09/19/13   Entered 09/19/13 19:10:03   Page 41 of 41
253
192

# Exhibit 6C

**Excerpts from Deposition of Kevyn Orr**

# In The Matter Of:

*City of Detroit*

---

*Kevyn Orr*
*August 30, 2013*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File ORR_KEVYN.txt*
*Min-U-Script® with Word Index*

1              UNITED STATES BANKRUPTCY COURT

2          FOR THE EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4

5  In Re:

6

7  City OF DETROIT, MICHIGAN       Chapter 9

8                        Case No.13-53846

9          Debtor.        Hon. Steven Rhodes

10                            /

11

12

13      The Videotaped Deposition of KEVYN ORR,

14      Taken at 1114 Washington Boulevard,

15      Detroit, Michigan,

16      Commencing at 8:32 a.m.,

17      Friday, August 30, 2013,

18      Before Cindy Mendenhall, RPR, CSR-5220.

19

20

21

22

23

24

25

```
 1   BY MR. HACKNEY:
 2   Q.   Okay.  That's correct?
 3   A.   Yes.  That is correct.
 4   Q.   So if I ask you what your view is on the likelihood
 5        that the City's Swap and validity arguments will
 6        prevail, you will assert the attorney-client
 7        privilege; is that correct?
 8   A.   Yes, more than likely.
 9   Q.   If I ask you your view on the likelihood that the
10        pledge of the gaming revenues under the Michigan
11        Gaming Act is an invalid pledge, you'll assert the
12        attorney-client privilege, correct?
13   A.   Yes, more than likely.
14   Q.   If I ask you questions regarding the likelihood that
15        the City would prevail on a claim or defense against
16        the Swap counterparties, you'll assert the
17        attorney-client privilege, correct?
18   A.   Yes, more than likely.
19   Q.   And I guess I gotta clarify.  When you say more than
20        likely, I mean are you asserting the privilege with
21        respect to those types of questions?  I'm trying to
22        save having to --
23   A.   Sure.
24              MR. SHUMAKER:  Let me state for the record
25        you can ask questions as to whether those -- those
```

```
 1        factors were considered by Mr. Orr, but obviously if
 2        you're going to ask what he was -- what he was advised
 3        by counsel, then I'm going to instruct him not to
 4        answer.
 5   A.   When I say more than likely, that's -- that's exactly
 6        the distinction that I'm trying to make.  Did I have
 7        discussions with my counsel?  Yes.  Did those
 8        discussions take into consideration some of those
 9        factors?  Yes.  Am I going to tell you what those
10        discussions were and what, if any, conclusions were
11        made?  No.
12   BY MR. HACKNEY:
13   Q.   Okay.  Fair enough.
14             On July 15, 2013, the City entered into
15        what we're going to call the forbearance agreement
16        with the Swap counterparties and the service
17        corporations; is that correct?
18   A.   Yes.
19   Q.   When did negotiations around that agreement with the
20        Swap counterparties begin after your appointment?
21   A.   I think there were discussions about negotiations
22        almost immediately after my appointment.  My specific
23        knowledge -- when you say negotiations, what do you
24        mean?
25   Q.   Well, let me -- let me ask it a different way, which
```

1     is isn't it true that Mr. Buckfire was the lead

2     negotiator for the City on the business terms of what

3     became the forbearance agreement?

4  A. Yes.

5  Q. And Mr. Buckfire has testified that the negotiations

6     in earnest regarding what became the forbearance

7     agreement were conducted between June 4th and

8     June 11th of 2013?

9  A. I don't recall those specific dates, but I think

10     that's the right time frame. Let me -- let me try to

11     be as clear as I can so we can move on. We began

12     talking, discussing ways with my advisors, without

13     discussing what we discussed, to provide the City with

14     liquidity almost immediately upon my appointment. The

15     negotiations that you're referring to I believe did

16     occur within that time frame.

17  Q. Okay. So you don't have a basis as you sit here today

18     to contradict Mr. Buckfire's recollection of when the

19     key negotiations over the business terms of the

20     forbearance agreement were conducted?

21  A. No. It might be earlier, but that's the approximate

22     time frame.

23  Q. And as he was the lead negotiator, he's probably the

24     guy who would know, right?

25  A. Sure, absolutely.

1       point during the first week, but they -- they resumed.

2       My interpretation was that they broke down, and then

3       they recommenced a second week.

4  Q.   Okay.  So on -- if there -- to the extent

5       Mr. Buckfire's right that there was an in-person

6       June 8th meeting --

7  A.   Yeah.

8  Q.   -- do you remember what his -- what your marching

9       orders to him were as he went into that meeting?

10  A.   Here again, the concept of marching orders, we were

11       trying to get to an agreement generally, and I believe

12       the instructions were to continue to move towards that

13       process, whatever that was.  And so the specific

14       bid/ask that were going on throughout that time, I

15       don't -- I don't recall, but the general concept was

16       to continue to try to move to a point to get to a

17       discount number or a discount process.

18  Q.   Is it fair to say that if I ask you for the specific

19       ebb and flow of the negotiations between the Swap

20       counterparties in terms of the precise business

21       deal --

22  A.   Right.

23  Q.   -- you would have to defer to Mr. Buckfire's

24       recollection because he was more intimately involved?

25  A.   That's fair.  Because Ken was -- Ken would have the

```
 1        direct meetings and then call me back.  We'd go back

 2        and forth, and I didn't keep notes and I didn't keep a

 3        calendar, so --

 4   Q.   I asked you about nondisclosure agreements, but did

 5        the City execute any other agreements of any kind with

 6        the Swap counterparties during this period that you

 7        were negotiating the forbearance agreement?

 8   A.   No, not that I know of.

 9                    (Discussion off the record at 8:59 a.m.)

10                    (Back on the record at 8:59 a.m.)

11                    MR. HACKNEY:  No.  Problem.  Let's go off

12        the record.

13                    VIDEO TECHNICIAN:  The time is 8:59 a.m.

14        We are off the record.

15                    (Recess taken at 8:59 a.m.)

16                    (Back on the record at 9:08 a.m.)

17                    VIDEO TECHNICIAN:  We are back on the

18        record at 9:08 a.m.

19   BY MR. HACKNEY:

20   Q.   Mr. Orr, I want to clear something up.  Maybe I've

21        been saying it the wrong way.  I've been using the

22        term "marching orders" with the respect to the way

23        that you and Mr. Buckfire operated.

24   A.   Right.

25   Q.   And is a better way to say it that you authorized
```

1     Mr. Buckfire to negotiate the best possible deal he
2     could with the Swap counterparties and that's what he
3     did?
4  A.  That's a fair characterization, sure.
5  Q.  And at some point did he come out of a meeting and
6     say, Mr. Orr, this is the best deal that I'm able to
7     get out of these Swap counterparties and it's my
8     advice that we take it?
9  A.  Yes.
10 Q.  And was that on or about June 11th, 2013, which is the
11    date he recalls the agreement in principle being
12    reached?
13 A.  Yes.
14             MR. SHUMAKER:  Objection to form.
15 BY MR. HACKNEY:
16 Q.  And what was the agreement in principle that was
17    reached as you understood it?
18 A.  The agreement was essentially that in exchange for a
19    reduced optional termination payment -- we'll just
20    call it the payment under the forbearance agreement --
21    the Swap counterparties would agree not to trap the
22    cash, they would agree to release their liens, and
23    also release their claims, I believe, against your
24    client, Syncora, and we would have access to that cash
25    going forward provided we made the discounted payment

```
 1        entities that have long names that I'll only say to
 2        you if you want -- really want me to.
 3    A.  We'll stipulate I know what you mean by the service
 4        corporations.
 5    Q.  And there are two of them?
 6    A.  There are two.
 7    Q.  Okay.
 8    A.  Police and Fire General Services.
 9    Q.  There you go.  So you already know them and you said
10        the names.  So the two service corporations are
11        parties to the forbearance agreement, correct?
12    A.  Yes.
13    Q.  And Mr. Buckfire testified yesterday, I'll represent
14        to you, that his understanding is that you directed
15        the service corporations to execute the forbearance
16        agreement and they did so; is that correct?
17    A.  No.
18    Q.  Okay.  Were there arms' length negotiations with the
19        service corporations?
20    A.  To the best of my knowledge, there was.
21    Q.  And who led those?
22    A.  I'm not quite sure.  I know that -- in response to
23        your question, I did not direct a service corporation.
24        They were organized by the City.  And they are managed
25        by City employees, but I had no direct -- I gave no
```

 1      direct instruction to either of the service

 2      corporations.

 3   Q.  Okay.  So my question was about negotiations with the

 4      service corporations.

 5   A.  Right.

 6   Q.  Who conducted the arms' length negotiations with the

 7      service corporations on behalf of the City?

 8   A.  I'm not sure.

 9   Q.  Well, you know it wasn't you?

10   A.  Yes, it wasn't me.

11   Q.  And did you ever direct Mr. Buckfire to engage in

12      direct negotiations with the service corporations?

13   A.  No.  ==I directed Mr. Buckfire to do whatever needed to==

14      ==get done to get the agreement in principle resolved==

15      ==and signed.==  That's what I did, but I did -- said

16      nothing specific.  Just to be responsive to your

17      question, said oh, go talk to the service

18      corporations, there was nothing that specific.

19   Q.  So to the extent there was a negotiation that needed

20      to be had, it was his job to go have it?

21   A.  It was his or someone else on my -- on my

22      reorganization team's job, yeah, sure.

23   Q.  Well, did you direct anyone else on your team to go

24      negotiate with the service corporations?

25   A.  No.  Once we reached an agreement in principle, I

1    directed my team to more or less go forth and get it

2    documented and get it done.

3 Q.  And the service corporations are legally separate from

4    the City, correct?

5 A.  Yes, they are.

6 Q.  Your powers as emergency financial manager do not

7    extend to the service corporations, correct?

8 A.  I haven't examined that question, so I can't answer

9    you yes or no.

10 Q.  Can you direct their actions under PA 436?

11 A.  I'm not sure.

12 Q.  Do you have any firsthand knowledge that the service

13    corporations engaged in arms' length negotiations with

14    the Swap counterparties?

15 A.  No.

16 Q.  If they had, do you think that's something you would

17    have likely heard about?

18           MR. SHUMAKER:  Objection, calls for

19    speculation.

20 A.  I may have.  As emergency manager, there are a number

21    of things that occur, as you might imagine, on a daily

22    basis that I may or may not hear of.  I might have.

23 BY MR. HACKNEY:

24 Q.  As you sit here today, though, can you recall hearing

25    that there were ongoing negotiations between the

13-53846-swr  Doc 4814-1  Filed 09/29/14  Entered 09/29/14 22:00:03  Page 204 of
13-53846-swr  Doc 4854-1  Filed 09/29/14  Entered 09/29/13 19:10:03  Page 12 of 15    204
253

1    A.    Yes.

2    Q.    Okay.  Portia Roberson --

3    A.    Um-hm.

4    Q.    -- is the City's corporation counsel, right?

5    A.    Yes.

6    Q.    And she's also on the board of both service

7          corporations, correct?

8    A.    To the best of my knowledge, that's true.

9    Q.    Do you know who made the decision at the service

10         corporations to enter into the forbearance agreement?

11   A.    I do not.

12   Q.    Did you have any conversations with either Ms. Johnson

13         or Ms. Roberson about the service corporations

14         entering into the forbearance agreement?

15   A.    No.

16   Q.    Isn't it true that the policy of the City is to

17         indemnify the service corporation directors for

18         actions they take in their capacity as City employees?

19   A.    I don't know that.

20   Q.    You don't know if that's the policy of the City?

21   A.    I do not.  I know the City has an indemnification

22         policy.  I don't know if it applies to the service

23         corporations.

24   Q.    Okay, but does it apply to the City employees?

25   A.    It applies to City employees acting within their

```
 1        course and scope of their employment as employees of
 2        the City.
 3   Q.   Okay.  So as you sit here today, you can't say that
 4        that indemnification policy would extend to City
 5        employee actions taken in their capacity as service
 6        corporations --
 7   A.   Correct.
 8                    MR. SHUMAKER:  Objection, calls for a legal
 9        conclusion.
10   BY MR. HACKNEY:
11   Q.   I will -- I'm sorry.
12   A.   Okay.
13   Q.   As emergency financial manager, you control the salary
14        of all City employees; isn't that correct?
15   A.   As emergency manager.
16   Q.   As emergency manager, right.
17   A.   Right.
18   Q.   Sorry.  Is that the proper --
19   A.   It changed with Public Act 436.  Public Act 72 was EFM
20        and now I'm an EM.
21   Q.   Okay.  Got to get my lingo.
22   A.   Yeah.
23   Q.   And you do, as emergency manager, control the salary
24        of all City employees, correct?
25   A.   I have the authority to control the salary of all City
```

13-53846-swr  Doc 4814  Filed 09/29/14  Entered 09/29/14 22:00:03  Page 206 of
13-53846-swr  Doc 4549  Filed 04/29/14  Entered 04/29/14 19:10:03  Page 206 of
253

1    employees.  I have not exercised that authority for
2    all City employees.
3  Q.  Okay.  And you have the power to reduce those City
4    employee salaries to zero if you choose, correct?
5  A.  I think I do, yes.
6  Q.  And you have done that on at least one prior occasion,
7    I believe, correct?
8  A.  Yes, I did do that.
9  Q.  Okay.  Now, are you aware that the insurers, the Swap
10    insurers, like Syncora and FGIC, contend that the
11    hedges cannot be terminated without their consent
12    where there are termination events or events of
13    default?
14  A.  I have heard that.  I m -- I have no independent
15    awareness of that.
16  Q.  So when did you first hear that?
17  A.  I think it was all caught up in this time frame of
18    the -- of the discussion after the agreement in
19    principle, before the forbearance agreement was
20    reached.
21  Q.  Your best recollection is that you heard that prior to
22    the execution of the forbearance agreement?
23  A.  I believe it may have been prior to execution.
24  Q.  But you have taken -- you have taken no steps to
25    evaluate whether the City concurs with the insurers'

# Exhibit 6D

## Excerpts from Deposition of Kenneth Buckfire

# In The Matter Of:

*City of Detroit*

---

*Kenneth Buckfire*
*August 29, 2013*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File BUCKFIRE_KENNETH.txt*
*Min-U-Script® with Word Index*

```
 1              UNITED STATES BANKRUPTCY COURT

 2           FOR THE EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4

 5   In Re:

 6

 7   CITY OF DETROIT, MICHIGAN   Chapter 9

 8                              Case No.13-53846

 9           Debtor.          Hon. Steven Rhodes

10                                /

11

12

13        The Video Deposition of KENNETH BUCKFIRE,

14        Taken at 1114 Washington Boulevard,

15        Detroit, Michigan,

16        Commencing at 9:31 a.m.,

17        Thursday, August 29, 2013,

18        Before  Nora Morrissy, RMR, CRR, CSR-2642.

19

20

21

22

23

24

25
```

1       sometimes you will anticipate probably where I'm going

2       with the question or think that you anticipate, I

3       would ask that you to make the transcript clearer, I

4       will ask that you wait until I complete the question

5       before you begin your answer.

6    A.   Thank you.

7    Q.   Before you is what's been premarked as Deposition

8       Exhibit 1, and I assume you have seen this document

9       before, is that correct?

10   A.   No.

11   Q.   No.  Okay.  And it is the notice of deposition that

12       was issued that we are proceeding under today.  I'd

13       like to discuss initially with you the topics about

14       which you plan to testify at the hearing on the motion

15       to assume the forbearance and optional termination

16       agreement and prove the settlement therein.

17            Do you have in mind the topics that you

18       intend to testify at the hearing?

19   A.   Yes.

20   Q.   And can you provide those to me?

21   A.   The reason and purpose of the negotiation with the

22       Swap counterparties and the results thereof as

23       determined in the forbearance agreement itself, the

24       financial condition of the City that led us to believe

25       that this agreement was necessary to rehabilitate the

13-53846-swr  Doc 954-10  Filed 09/19/13  Entered 09/19/13 19:18:00  Page 21 of 6
253
13-53846-swr  Doc 4854-10  Filed 04/29/14  Entered 04/29/14 22:00:20  Page 211 of 6   211

1    City.  Prepared to testify to the general condition of

2    the City's financials leading up to the execution of

3    the forbearance agreement.

4  Q.  Are there any other topics that you intend to testify

5    at the hearing concerning the forbearance agreement?

6  A.  I'll testify at that point to the status of the DIP

7    form process that will provide the financing to

8    execute the City's option under the forbearance

9    agreement to retire the Swaps.

10  Q.  Are there any other topics that you have not mentioned

11    in your answers that you intend to testify about?

12  A.  I'm sure there will be other things but I can't recall

13    at this time what they might be.

14  Q.  Mr. Buckfire, what is your position with Miller

15    Buckfire?

16  A.  Co-founder and co-president of Miller

17    Buckfire & Company.

18  Q.  Miller Buckfire currently is employed as the financial

19    advisor to the City of Detroit, correct?

20  A.  As the investment banker to the City, that's correct.

21  Q.  And when was Miller Buckfire first engaged by the City

22    as investment banker?

23  A.  We were first engaged in July of 2012 for a 60-day

24    review of the City's financial condition.  We were

25    re-engaged on January 8th of this year to continue to

13-53846-swr  Doc 4854-10  Filed 04/29/13  Entered 04/29/14 22:00:20  Page 212 of 6
13-53846-swr  Doc 954-10  Filed 09/19/13  Entered 09/19/13 19:18:00  Page 54 of 6
253
212

1  advise the City on its financial condition and
2  financial alternatives.  Both were -- were hired
3  pursuant to an RFP process to which we submitted a
4  proposal.
5  Q. When you were hired in July 2012, can you describe the
6  scope of services that Miller Buckfire was engaged to
7  provide?
8  A. As I mentioned earlier, we were engaged to do a
9  general financial review of the City's financial
10  condition particularly with respect to its ability to
11  service its debt obligations.
12  Q. Were there specific tasks that you were asked to
13  perform in connection with doing a general financial
14  review of the debt obligations?
15  A. No, we were engaged to do a general financial review
16  and advise the mayor and the chief financial officer
17  as to what those financial conditions implied for the
18  City's ability to operate in the ordinary course.
19  Q. That engagement began in July 2012 is what you
20  testified to, is that correct?
21  A. Correct, and ended on August 31st.
22  Q. Very good.  I would point out that I would ask you to
23  wait until I ask the question, though.
24          Miller Buckfire was then re-engaged on
25  January 8th of 2013, is that correct?

13-53846-swr  Doc 4854-10  Filed 04/29/13  Entered 04/29/13 22:00:20  Page 63 of
253
13-53846-swr  Doc 954-10  Filed 09/19/13  Entered 09/19/13 19:18:00  Page 63 of  213

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## MOTION OF SYNCORA GUARANTEE INC.
## AND SYNCORA CAPITAL ASSURANCE INC.
## FOR AUTHORITY TO ISSUE DOCUMENT AND
## DEPOSITION SUBPOENAS TO THE DEBTOR, THE EMERGENCY
## MANAGER, AND CERTAIN OF THE DEBTOR'S ADVISORS PURSUANT
## TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively,

"Syncora") in their respective capacity as insurer and direct holder of certain of the

certificates of participation of the City of Detroit (the "City") and as insurers of the

City's swaps entered into on account of the certificates (the "Swaps"), hereby files

this motion for entry of an order (a) directing the City to produce documents

identified on Exhibit A on or before November 1, 2013, or by such other date as

the Court orders, in the manner and format in which those documents are

maintained in the City's records[1] and (b) authorizing Syncora to examine the City

on November 7, 2013, or such other date as the Court orders, regarding (i) the

---

[1] To the extent any of the documents listed on **Exhibit A** are kept or are available in electronic format, Syncora requests that the Order require such documents to be produced in native and original electronic format. Moreover, to the extent the City maintains financial records in electronic format, the Trustee requests that the Order require those files to be provided in one of the following formats: Microsoft Excel, Microsoft Access, or CSV (Comma Delimited Text).

13-53846-tjt Doc 431341 Filed 04/29/13 Entered 04/29/13 22:00:23 Page 214 of 214
13-53846-swr Doc 1341 Filed 10/29/13 Entered 10/29/13 17:00:52 Page 1 of 9
253

process the City employed to solicit, review, negotiate, and make determinations, as well as the substance of the City's negotiations, analyses, and decision making, about all proposals from third-party financing sources, including creditors of the City (collectively, the "Potential DIP Lenders"), submitted to the City for debtor in possession financing and (ii) the nature and substance of the City's communications with the City Council regarding the Barclays' DIP (as defined herein), including the City's compliance with PA 436, including as identified on Exhibit A (the "Rule 2004 Discovery"). In support of this motion, Syncora states as follows:

## **Background**

1.      On July 18, 2013, the City filed a voluntary petition for relief in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code").

2.      On July 18, 2013, the City filed its *Motion for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (III) Granting Related Relief* [Docket No. 17] (the "Settlement Motion").

2

13-53846-tjt   Doc 431   Filed 06/29/13   Entered 06/29/13 22:00:23   Page 2 of 9
13-53846-swr   Doc 1341   Filed 10/23/13   Entered 10/23/13 17:00:52   Page 215 of 253      215

3. The City solicited from Potential DIP Lenders proposals for debtor in possession financing ("DIP Proposals") that would be used in part to finance the termination of the Swaps contemplated under the Forbearance and Optional Termination Agreement in the event the Settlement Motion is granted.

4. On August 29, 2013, the City sent Syncora a request for a DIP Proposal. Contemporaneously, the City sent a request for DIP Proposals to other Potential DIP Lenders. The stated deadline for submitting DIP Proposals to the City was September 16, 2013.[2]

5. On September 7, 2013, Syncora submitted a DIP Proposal to the City's representatives. Syncora and the City discussed the proposal on September 9, 2013. The City ultimately rejected the proposal.

6. On October 3, 2013, Syncora sent a revised DIP Proposal to the City's representatives. On various occasion since October 3, 2013, Syncora has expressed to the City, through its advisors, its willingness for Syncora and the City to arrive at a beneficial DIP Proposal for the City, including one that addressed the pending litigation among Syncora and the City.

7. In various conversations between the City and Syncora, the City has stated that it received multiple DIP Proposals from Potential DIP Lenders, including from key creditors of the City. On October 7, 2013, the City and

---

[2]  NTD: Was deadline extended? If so, when did we get notice?

Barclays Capital Inc. ("Barclays") reached an agreement on the material terms of a DIP Proposal.

8.      On October 11, 2013, the City's emergency manager (the "EM") posted on the EM's website proposed order number 17 approving a DIP Proposal provided by Barclays (the "Barclays' DIP").  Attached to proposed order number 17 were certain of the terms of the Barclays' DIP.  Notably, two of the three term sheets referenced in the Barclays' DIP were not disclosed, nor were any commitment or fee letters that exist.

9.      After requesting from the City the missing term sheets and any commitment or fee letters that exist, the City turned over one of the missing term sheets but declined to provide the other requested materials.   The City subsequently indicated that no term sheet existed for the Replacement Swap Transaction referenced in the Barclays' DIP term sheet attached to proposed order number 17 despite the discussion of such a transaction therein.   Additionally, notwithstanding Syncora's additional requests to procure the missing information from the City, even on a confidential or redacted basis, the City continues to refuse to disclose the information.  To appropriately and comprehensively evaluate the terms of the Barclays' DIP, including the value it provides the City (both on a stand alone basis and in comparison to other DIP Proposals submitted to the City), its impact on Syncora's rights, and its compliance with the Bankruptcy Code, it is

necessary to examine the full terms of the Barclays' DIP, including those terms contained in ancillary documents such as additional term sheets, commitment or fee letters, and all other DIP Proposals submitted to the City.

## Jurisdiction and Notice

10.     Syncora brings this motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Rules").

11.     The Court has jurisdiction over this motion under 28 U.S.C. § 1334(b).  The motion is a core proceeding under 28 U.S.C. § 157(b)(2).

## Relief Requested

12.     Syncora seeks entry of an order, substantially in the form attached hereto as Exhibit 1, authorizing Syncora to issue document and deposition subpoenas to the Debtor, the EM, and certain of the Debtor's advisors.  This authority shall not waive the right of the Debtor or any person to object to, or move to quash, such subpoena.

## Basis for Relief Requested

13.     Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity."  Under Rule 2004, a party in interest may seek both documents and oral discovery related to "acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter

5

13-53846-tjt  Doc 1342   Filed 10/29/13   Entered 10/29/13 22:00:23   Page 21 of
13-53846-swr  Doc 1341   Filed 10/29/13   Entered 10/29/13 17:00:52   Page 8 of 9   218

which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Rule 2004(b), (c).

14. "The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Cardinal Fastener & Specialty Co., Inc.*, 2013 WL 425858, at \*5 (Bankr. N.D. Ohio Feb. 4, 2013); *see also In re Lufkin*, 255 B.R. 204, 208 (Bankr. E.D. Tenn. 2000) (finding that the purpose of Rule 2004 is to "determine the condition, extent, and location of the debtor's estate in order to maximize distribution to unsecured creditors"); *In re Almatis*, No. 10-12308, 2010 WL 4877868, at \*3 (Bankr. S.D.N.Y. Nov. 24, 2010) (noting that "the purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred"); *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008) (inquiry into any matter that may affect the administration of the estate "comfortably falls within the allowed limits under Rule 2004").

15. Unlike discovery under the Federal Rules of Civil Procedure, discovery under Rule 2004 can be used as a "pre-litigation discovery device." *In re Wilson*, No. 07-11862, 2008 WL 304672, at \*5 (Bankr. E.D. La. Feb. 6, 2009).

Further, "no contested matter or adversary proceeding need be instituted as a prerequisite to conducting an examination under this rule." *In re Almatis*, 2010 WL 4877868, at *3. Consequently, a Rule 2004 motion need not be tied to specific factual allegations at issue between parties. *In re Symington*, 209 B.R. 678, 683 (Bankr. D. Md. 1997) (Rule 2004 permits "examination of any party without the requirement of a pending adversary proceeding or contested matter").

16. The scope of a Rule 2004 examination is broader than that of discovery under the Federal Rules of Civil Procedure. *In re DeShetler*, 453 B.R. 295, 302 (Bankr. S.D. Ohio 2011) ("The scope of examination permitted pursuant to Rule 2004 is wider than that allowed under the Federal Rules of Civil Procedure and can legitimately be in the nature of a 'fishing expedition.'"). Courts have thus recognized that Rule 2004 examinations may be "extremely broad." *In re Davis*, 452 B.R. 610, 618 (Bankr. E.D. Mich. 2011).

17. The decision whether to authorize the requested discovery rests within the discretion of the bankruptcy court. *See e.g., In re Hammond*, 140 B.R. 197, 200 (Bankr. S.D. Ohio 1992).

18. Courts in other jurisdictions have approved relief similar to the relief requested in this motion for 2004 discovery of parties in a chapter 9 proceeding. *In re City of San Bernardino, Cal.*, Case No. 12-28806 (Bankr. C.D. Cal. Jan. 15,

7

13-53846-tjt  Doc 431-1  Filed 04/29/13  Entered 04/29/13 17:00:23  Page 220 of 220
13-53846-swr  Doc 1341  Filed 10/23/13  Entered 10/23/13 12:00:62  Page 220 of 253

2013); *In re Jefferson Cnty, Ala.*, Case No. 11-05736 (Bankr. N.D. Ala. Jan. 27, 2012).

19.     Syncora's requested relief is well within the scope of Rule 2004.  In light of the City's track record of negotiating deals with select parties to the detriment of creditors generally, an Syncora specifically, and the City's lack of disclosure regarding its DIP process to date, Syncora requires the requested discovery to evaluate the process by which the City solicited, reviewed, negotiated, and made determinations, as well as the substance of the City's negotiations, analyses, and decisions making, about all DIP Proposals and the nature and substance of the City's communications with the City Council regarding the Barclays' DIP, including the City's compliance with PA 436.

## Conclusion

20.     For the foregoing reasons, Syncora respectfully requests that the Court grant this motion.

[*Remainder of this page intentionally left blank*]

Dated:  October 23, 2013        /s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:    (312) 862-2200

*Attorneys for Syncora Holdings Ltd., Syncora*
*Guarantee Inc., and Syncora Capital Assurance*
*Inc.*

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
300 North LaSalle
Suite 2100
Chicago, Illinois 60654
Telephone:  (312) 280-0111
Facsimile:    (312) 280-8232

*Local Counsel to Syncora Holdings Ltd., Syncora*
*Guarantee Inc., and Syncora Capital Assurance*
*Inc.*

13-53846-tjt  Doc 1342  Filed 10/29/13   Entered 10/29/13 17:00:23   Page 223 of
253
13-53846-swr  Doc 1341  Filed 10/29/13   Entered 10/29/13 17:00:52   Page 223 of   222

# Exhibit 1

## Proposed Order

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## ORDER AUTHORIZING SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO ISSUE DOCUMENT AND DEPOSITION SUBPOENAS TO THE DEBTOR, THE EMERGENCY MANAGER, AND CERTAIN OF THE DEBTOR'S ADVISORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

Upon consideration of the motion (the "Motion")[1] of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") for entry of an order (this "Order") pursuant to rule 2004 of the Federal Rules of Bankruptcy Procedure authorizing the Rule 2004 Discovery, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and upon consideration

---

[1] Capitalized terms used but otherwise not defined herein shall have the meaning set forth in the Motion.

of the record of the Hearing and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtor, its creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.    The Motion is granted in its entirety as set forth herein.

2.    The Debtor is directed to produce those documents identified on Exhibit A on or before November ___, 2013 in the manner and format in manner and format in which those documents are maintained in the City's records.

3.    Syncora is authorized to examine the City on November ___, 2013 regarding the process the City employed to solicit, review, negotiate, and make determinations, as well as the substance of the City's negotiations, analyses, and decision making, about all DIP Proposals submitted to the City and the nature and substance of the City's communications with the City Council regarding the Barclays' DIP, including the City's compliance with PA 436.

4.    Syncora may file additional motions seeking authority to obtain discovery under Rule 2004 from other entities or individuals.

5.    This Court shall retain jurisdiction to resolve any disputes arising from or related to this Order, and to interpret, implement, and enforce the provisions of this Order.

**IT IS SO ORDERED.**

_____
STEVEN W. RHODES
United States Bankruptcy Judge

3

13-53846-swr   Doc 4342-1   Filed 04/29/14   Entered 04/29/14 22:00:33   Page 4 of 11
13-53846-tjt   Doc 4341   Filed 04/28/13   Entered 04/28/13 17:08:52   Page 226 of 253   226

# Exhibit A

## DEFINITIONS

A.    The term "City" means Detroit, Michigan.

B.    The term "EM" means the emergency manager of the City appointed pursuant to PA 436.

C.    The term "DIP Solicitation Process" means the process under taken by the City and its advisors to request and solicit proposals from Potential DIP Lenders for a DIP Loan.

D.    The term "DIP Loan" means the debtor in possession financing sought by the City through the DIP Solicitation Process.

E.    The term "DIP Negotiation" means the conversations, negotiations, and interactions with parties participating in the DIP Solicitation Process intended to lead to an acceptable proposal for a debtor in possession financing facility.

F.    The term "PA 436" means Michigan Public Act 436 of 2012.

G.    The term "PA 436 Compliance Process" means the steps taken by the City, the City's advisors, and the EM to comply with section 19(2) of PA 436, which requires the EM, before authorizing the borrowing of money, to submit the terms of the proposed borrowing of money to the governing body of the local government, which shall then have 10 days from the date of submission to approve or disapprove the borrowing.

H.    The term "Detroit Post Petition Financing Term Sheet" means the proposed term sheet circulated by the City to Potential DIP Lenders in connection with the DIP Solicitation Process.

I.    The term "Potential DIP Lender(s)" means those parties to whom the Detroit Post Petition Financing Term Sheet was circulated.

J.    The term "Document(s)" shall be interpreted in the broad and liberal sense and means written, typed, printed, recorded, graphic, or photographic matter or any other medium upon which intelligence or information can be recorded, stored, or retrieved, however produced or reproduced, of any kind and description, and whether an original, master, duplicate, or copy, including, but not limited to, paper, notes, accounts, books, journals, advertisements, catalogs, manuals, publications, correspondence, cablegrams, mailgrams, telegrams, memoranda, letters, documents, communications, including interoffice and intra-office communications, reports, studies, analyses, pamphlets, calculations, projections, contracts, charts, graphs, plans, specifications, drawings, sketches, surveys, agreements, working papers, corporate records, minutes of committee meetings, books of account, ledger books, notebooks, vouchers, bank checks, cashier's checks, receipts for cashier's check, canceled checks, check stubs, bills, receipts, invoices, delivery tickets, bills of lading, time sheets, desk calendars, appointment books, log books, diaries, diary entries, photographs, microfilm, microfiche, and

2

notes, minutes, transcriptions, or sound recordings of any conversations, negotiations, meetings, or conferences, conducted either in person or by telephone, or things similar to any of the foregoing, and all other papers, writings, or physical things containing information, including data compilations from which information can be obtained by detection devices, and including preliminary drafts of or marginal notes appearing on any document, however denominated or described.

K.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make each particular request inclusive rather than exclusive.

L.     The term "relating to" means in whole or in part and directly or indirectly relating to, pertaining to, connected with, concerning, commenting on, referring to, responding to, showing, evidencing, describing, analyzing, regarding, reflecting, or constituting.

## **INSTRUCTIONS**

1.     All documents should be produced in the manner and format in which they are kept.  Thus, to the extent any of the Documents listed below are kept or available in electronic format, such Documents should be produced in their native and original electronic format.  Moreover, to the extent financial records are maintained in electronic format, those files should be provided in one of the

3

13-53846-swr   Doc 43141   Filed 04/28/14   Entered 04/28/14 22:00:32   Page 229 of
253
13-53846-tjt   Doc 4314-1   Filed 04/28/14   Entered 04/28/14 22:00:32   Page 229 of 229

following formats: Microsoft Excel, Microsoft Access, or CSV (Comma Delimited Text).

2.      These requests encompass all documents in the Debtor's possession, custody, or control, whether or not such documents were prepared by or for the Debtors. Where documents in the Debtor's possession, custody, or control are requested or inquired of, such request or inquiry includes documents in the possession, custody, or control of each of the Debtor's employees, agents, accountants, attorneys, auditors, representatives, consultants, advisors, all other persons or entities acting or purporting to act on behalf of the Debtor, and any other persons or entities from which the Debtor could obtain documents.

3.      If the Debtor contends that no documents exist relating to all or part of a request, the Debtor shall state this contention and respond as fully as possible to all parts of the request for which documents exist.

4.      If the Debtor claims that any privilege or protection excuses production of any document or part thereof, the Debtor must expressly make such claim in writing and provide a general description of the categories of documents being withheld and the basis for doing so, sufficient in detail for Syncora to determine whether there is an adequate basis for invoking privilege or protection.

5.      In the event that any document covered hereunder has been destroyed, discarded, or lost, the Debtors shall inform the Committee of this in writing and

4

provide a general description of the categories of documents destroyed or lost and the circumstances of their destruction or loss.

6. If any document cannot be produced in full, it shall be produced to the maximum extent possible and the Debtors shall specify in writing the reasons for their inability to produce the remainder.

7. Each document is to be produced with all non-identical copies and drafts thereof in their entirety without abbreviation or redaction (other than for a claim of privilege consistent with the Instructions herein).

8. Unless stated otherwise, the time period applicable to the Documents called for is from [DATE], through the date of the document requests, subject to the Debtors' ongoing obligation to supplement responses under the applicable rules.

## MATTERS UPON WHICH TESTIMONY IS REQUIRED

Syncora requires testimony from the City's identified witness or witnesses regarding each of the topics identified in the following document requests.

A. **DIP SOLICITATION PROCESS:** The following Documents relating to the DIP Solicitation Process:

1. All Documents relating to any communication between the City, the City's advisors, the EM, or any other individual or entity regarding the need and/or purported uses for the DIP Loan.

5

2.      All Documents and communication relating to the terms of the Detroit Post Petition Financing Term Sheet that was circulated to Potential DIP Lenders.

3.      All Documents containing any opinion, study, inspection, or analysis of the necessity of the DIP Loan.

4.      All Documents relating to, supporting, or explaining any changes in the Detroit Post Petition Financing Term Sheet before it was circulated to Potential DIP Lenders.

B.      **DIP NEGOTIATION:** The following Documents relating to the DIP Negotiation:

5.      All Documents and communication relating to the terms of any DIP Proposal.

6.      All Documents and communications relating to, supporting, or explaining the City's reasoning for pursuing or not pursuing negotiations with a Potential DIP Lender, including any analysis of the perceived economic, political, or social benefits or drawbacks of any DIP Proposal.

7.      All Documents and communication relating to, supporting, or explaining any changes made to the DIP Proposals after their initial submission by the Potential DIP Lenders.

8.      All Documents and communication relating to the Barclay's DIP.

**C.     PA 436 COMPLIANCE PROCESS:   The following Documents relating to the City's compliance with PA 436 relating to the DIP Loan:**

9.     All Documents sent to the City Council relating to the Barclays' DIP.

10.     All Documents and communication between the City, its advisors, and the City Council relating to the process by which the City negotiated with Potential DIP Lenders, evaluated the DIP Proposals, and selected the Barclays' DIP.

11.     All Documents and communication between the City, its advisors, and the City Council relating to the substance of the City's negotiations, analyses, and decision making about all DIP Proposals, including the Barclays' DIP.

12.     All Documents and communication between the City, its advisors, and the City Council regarding the merits and perceived benefits of the Barclays' DIP.

## Exhibit 2

## Notice of Motion and Opportunity to Object

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| | ) | |
| In re | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

## NOTICE OF THE MOTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. FOR AUTHORITY TO ISSUE DOCUMENT AND DEPOSITION SUBPOENAS TO THE DEBTOR, THE EMERGENCY MANAGER, AND CERTAIN OF THE DEBTOR'S ADVISORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

**PLEASE TAKE NOTICE** that on October 23, 2013, Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (together "Syncora") filed the *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy Procedure 2004* (the "Rule 2004 Motion") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order authorizing Syncora to issue document and deposition subpoenas to the Debtor, the emergency manager, and certain of the Debtor's advisors to obtain additional information regarding the process and substance of soliciting, negotiating, and approving proposals for debtor in possession financing.

**PLEASE TAKE FURTHER NOTICE** that **your rights may be affected by the relief sought in the Rule 2004 Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant Syncora's Rule 2004 Motion, or you want the

Bankruptcy Court to consider your views on the Rule 2004 Motion, by **October 25, 2013 at 4:00 p.m. (EDT)** you or your attorney must:[1]

1.    File with the court a written response to the Rule 2004 Motion, explaining your position explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

---

[1]    Concurrently herewith, Syncora is seeking expedited consideration and shortened notice of the Rule 2004 Motion. If the Court grants such expedited consideration and shortened notice, Syncora will file and serve notice of the new response deadline.

[2]    A response must comply with F. R. Civ. P. 8(b), (c) and (e).

2

2.      If an objection or response is timely filed and served, the clerk will schedule a hearing on the Rule 2004 Motion and you will be served with a notice of the date, time and location of the hearing.

        **PLEASE TAKE FURTHER NOTICE** that if you or your attorney do **not take these steps, the court may decide that you do not oppose the relief sought in the Rule 2004 Motion and may enter an order granting such relief.**

KE 28279933.1

Dated:  October 23, 2013

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Ryan Blaine Bennett_
     James H.M. Sprayregen, P.C.
     Ryan Blaine Bennett
     Stephen C. Hackney
     KIRKLAND & ELLIS LLP
     300 North LaSalle
     Chicago, Illinois 60654
     Telephone:  (312) 862-2000
     Facsimile:    (312) 862-2200

       - and -

     Stephen M. Gross
     David A. Agay
     Joshua Gadharf
     MCDONALD HOPKINS PLC
     39533 Woodward Avenue
     Bloomfield Hills, MI 48304
     Telephone:  (248) 646-5070
     Facsimile:    (248) 646-5075

     _Attorneys for Syncora Guarantee Inc. and_
     _Syncora Capital Assurance Inc._

# Exhibit 3

## None [Brief Not Required]

13-58846-swr   Doc 1342-13   Filed 04/29/13   Entered 04/29/13 22:09:28   Page 239 of
253
13-58846-swr   Doc 1342-13   Filed 10/25/13   Entered 10/25/13 17:58:52   Page 39 of 1   239

**<u>Exhibit 4</u>**

**None [Separate Certificate of Service to be Filed]**

**Exhibit 5**

**Affidavits**
**[Not Applicable]**

**Exhibit 6**

**Documentary Exhibits**
**[Not Applicable]**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## AMENDED NOTICE OF THE MOTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. FOR AUTHORITY TO ISSUE DOCUMENT AND DEPOSITION SUBPOENAS TO THE DEBTOR, THE EMERGENCY MANAGER, AND CERTAIN OF THE DEBTOR'S ADVISORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

**PLEASE TAKE NOTICE** that on October 23, 2013, Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (together "Syncora") filed the *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy Procedure 2004* (the "Rule 2004 Motion") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order authorizing Syncora to issue document and deposition subpoenas to the Debtor, the emergency manager, and certain of the Debtor's advisors to obtain additional information regarding the process and substance of soliciting, negotiating, and approving proposals for debtor in possession financing.

**PLEASE TAKE FURTHER NOTICE** that **your rights may be affected by the relief sought in the Rule 2004 Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant Syncora's Rule 2004 Motion, or you want the Bankruptcy Court to consider your views on the Rule 2004 Motion, by **November 7, 2013 at 4:00 p.m. (EDT)** you or your attorney must:

1.  File with the court a written response to the Rule 2004 Motion, explaining your position explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[1]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:  (248) 646-5075

2.  If an objection or response is timely filed and served, the clerk will schedule a hearing on the Rule 2004 Motion and you will be served with a notice of the date, time and location of the hearing.

---

[1]   A response must comply with F. R. Civ. P. 8(b), (c) and (e).

2

13-53846-tjt  Doc 4313-7  Filed 04/29/14  Entered 04/29/14 16:00:13  Page 2 of
253
13-53846-swr  Doc 1467  Filed 10/29/13  Entered 10/29/13 22:00:30  Page 244 of 244

**PLEASE TAKE FURTHER NOTICE** that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Rule 2004 Motion and may enter an order granting such relief.

3

Dated:  October 24, 2013

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By:  _/s/ Ryan Blaine Bennett_
      James H.M. Sprayregen, P.C.
      Ryan Blaine Bennett
      Stephen C. Hackney
      KIRKLAND & ELLIS LLP
      300 North LaSalle
      Chicago, Illinois 60654
      Telephone:  (312) 862-2000
      Facsimile:   (312) 862-2200

        - and -

      Stephen M. Gross
      David A. Agay
      Joshua Gadharf
      MCDONALD HOPKINS PLC
      39533 Woodward Avenue
      Bloomfield Hills, MI 48304
      Telephone:  (248) 646-5070
      Facsimile:   (248) 646-5075

      _Attorneys for Syncora Guarantee Inc. and_
      _Syncora Capital Assurance Inc._

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



FILED (I)

2013 OCT 25 P 4: 01

U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

In re:

City of Detroit, Michigan,

    Debtor.

_____/

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

Notice of Filing by Detroit City Council of
Resolution Regarding The Emergency Manager's
Post-Petition Financing Proposal

    Now Comes the Detroit City Council and hereby gives notice of the adoption of the

attached Resolution Regarding The Emergency Manager's Post-Petition Financing Proposal, and

its filing with this Court.

October 25, 2013

By:  Saunteel Jenkins, President
Detroit City Council

Form C of D—16-CE

STATE OF MICHIGAN,
  City of Detroit  } ss.

## CITY CLERK'S OFFICE, DETROIT

I, *Janice M. Winfrey*, City Clerk of the City of Detroit, in said State, do hereby certify that the annexed paper is a TRUE COPY OF **RESOLUTION**

adopted (passed) by the City Council at session of

October 25, 20 13

and approved by Mayor

20

as appears from the Journal of said City Council in the office of the City Clerk of Detroit, aforesaid; that I have compared the same with the original, and the same is a correct transcript therefrom, and of the whole of such original.

In Witness Whereof, I have hereunto set my hand and affixed the corporate seal of said City, at Detroit, this 25th day of October A.D. 20 13

CITY CLERK

A RESOLUTION BY COUNCIL MEMBER _____

## RESOLUTION REGARDING THE EMERGENCY MANAGER'S
## POST PETITION FINANCING PROPOSAL

**WHEREAS**     On October 11, 2013, the Emergency Manager Kevyn Orr (EM) filed with the City Clerk for transmission to the City Council *Order No. 17 – Approval of Post-Petition Financing* for the issuance of Financial Recovery Bonds (Secured Financing) pursuant to Sec. 36a of the Home Rule City Act, 279 PA of 1909, as part of the EM's ongoing restructuring and settlement strategies being advanced through the City's Chapter 9 bankruptcy proceedings, *In Re City of Detroit*, United States Bankruptcy Court for the Eastern District of Michigan, Case No. 13-53846. More specifically, the financing from the proposed transaction would refinance the interest rate Swap Agreements at 75% to 82% of their purported value and include additional financing to provide the City of Detroit with funds to use for City service improvement projects; and

**WHEREAS**     The proposed Debtor-in-Possession Financing transaction is an extremely complex deal on a number of fronts that does not seem to be in the best interest of the City. The key terms include a maximum principal aggregate amount of $350 million dollars at a floating interest rate with a maturity date no later than two and one half years from the date of issuance, although it is quite possible that the loans would mature as early as November 2014. Essentially, if the proposed transaction is consummated the City will be taking a fixed rate loan and swapping it for a variable rate loan putting the City in the same predicament that the original Swaps were supposed to cure, and seems to primarily benefit the two Swap counterparties Bank of America and UBS; and

**WHEREAS**     It cannot be emphasized enough that this lending is of a very temporal nature; the maturity date of the loans is estimated by the Emergency Manager to be some time between November 2014 and May 2016. There is no guarantee that replacement funding will be available by this lender or any other lender when these loans mature in as little as one year placing the City into a very foreseeable default position triggering onerous default penalty provisions; and

**WHEREAS**     Miller Buckfire has indicated that the City will save approximately $35M per year in financing costs by accepting this deal; however, these savings are achieved by making interest only payments on these new loans. The City's underlying principal debt will not decrease under this proposal; rather, it is a mere stop gap measure until permanent financing is found; and

**WHEREAS**     It has been indicated that the impetus for this transaction is to ensure the continued flow of casino tax revenues to the City throughout the bankruptcy process; however, this seems to disregard Judge Rhodes' order

that essentially accomplished the same thing by providing that the casino revenue is the property of the bankruptcy estate and therefore subject to the automatic stay; and

**WHEREAS**    This Post-Petition financing appears to be an attempt to keep the Swaps out of the bankruptcy proceeding instead of challenging the Swaps counterparties' tenuous status as secured creditors. The counterparties' senior creditor status was achieved by pledging the casino wagering taxes to collateralize the underlying Swap agreements. According to MCL 432.212(2), the use of casino wagering taxes for such a pledge appears impermissible. Rather than seeking a declaration of this position by the Court, this deal would transform a soft liability into a firm liability at a time in the interest rate cycle when the Swap liability could actually start to decline; and

**WHEREAS**    Not unlike the Swap Agreements that have been universally recognized as a bad deal for the City, Barclays is requiring the City to pledge its major revenue in order to secure this transaction. The City will have to pledge not only its casino wagering tax revenue but also its income tax revenue. These are the City's two most stable general fund revenue sources. Barclays is also requiring prepayment of any asset monetization net proceeds over $10M. This would give Barclays too much power and control over the City's revenues and future and limits the City's ability to negotiate or resolve other claims in bankruptcy; and

**WHEREAS**    Municipal Market Advisors support the thought that proposed financing is more advantageous to the financiers. They indicate that the loans seem to be "a very good deal for the lender and the swap counterparties but less so for the [C]ity's unsecured creditors and its residents. The seeming lack of a tangible recovery plan that improves Detroit's revenues over the period of the loans renders us skeptical about the [C]ity's ability to repay an amount of this magnitude in a short time frame without causing additional stress to the detriment of city residents and unsecured creditors that may have their recoveries tied to the [C]ity's financial performance."[1]; and

**WHEREAS**    The default provisions within the proposed agreement are very aggressive and easily triggered. The default provisions are broad and include the following: the agreement calls for the City to remain under some level of state control, *i.e.,* emergency manager, consent agreement, or transition advisory board. Additionally, a mere assertion by any person or entity acting on behalf of or having jurisdiction over the City that any Quality of Life loan is not binding, would trigger a default; and

**WHEREAS**    The $350M Post-Petition Financing includes a Quality of Life Loan; these newly borrowed funds are proposed to be used to make certain unspecified improvements in City government. From the information provided thus far, it appears that none of the proceeds will be used to create new

---

[1] *Bond Buyer*, October 21, 2013, "Detroit Council Rejects DIP Loan"

revenue. If the City is ever to achieve a stronger financial position, strengthening revenues and revenue collection under the City's control is key. Additional revenues will improve the quality of life for citizens as it will provide funds for City services. It is difficult without additional information to determine whether the use of these funds would be prudent investments. Additionally, it would be unwise to incur more debt to facilitate the payment of costly consultants; and

**WHEREAS**  Pursuant to Sec. 19 of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, City Council had the authority to approve or disapprove this proposed transaction within ten (10) days from the date of submission by the EM, or by October 21, 2013. If Council votes to disapprove, it must submit an alternative proposal to the local emergency financial assistance loan board that would yield substantially the same financial result for the City as the EM's proposal within seven (7) days of its disapproval. If Council does not act, within the ten (10) day timeframe, the EM's proposed transaction is considered approved under the relevant statute; and

**WHEREAS**  Upon receipt of the proposal, City Council, in addition to its own individualized study of the transaction, requested its Legislative Policy Division (LPD) to review the documents related to the proposed transaction. LPD immediately consulted with the City's financial and legal consulting firms principally responsible for crafting the transactional documents on the City's behalf, Miller Buckfire and Jones Day. Since the beginning of LPD's review, numerous questions have been submitted to the consultants and although some information has been provided, a host of uncertainties and unanswered questions remain; and many of these questions simply cannot be answered adequately within the short window allotted for City Council's consideration under the aforementioned statute. Additionally, many critical issues remain unresolved until decisions by the Bankruptcy Court or other courts are made; and

**WHEREAS**  Despite Council's diligent efforts, the complexities of the proposed transaction coupled with its uniqueness (to date the single largest municipal bankruptcy filed in the United States), and the precedent setting ramifications of decisions related to this bankruptcy financing instrument, the lack of available independent subject matter experts in municipal financing arrangements of this type to properly vet the transaction, combine to make it impractical to meet the compressed statutory deadline in any competent, meaningful way; and

**WHEREAS**  In addition to not being able to properly vet the proposed transaction given the information provided, the abbreviated timeframe also constrains Council's authority to propose a reasonable or credible alternate proposal under MCL 141.1559(2); and

**WHEREAS**  Based on the foregoing information, it appears that the deal being brokered is being done in order to set a precedent for how municipal

bankruptcies work to facilitate future bankruptcies in other cities rather than to broker the best deal for the City of Detroit, thus putting the interests of lenders before the interests of the City and its residents. The goal seems to be to ensure the protection of the lenders at the detriment of all other interested parties. By settling all claims against the counterparties, the City would surrender any ability to challenge the legality of any of the actions taken regarding the original Swap Agreement, as well as any ability to challenge the City's receivership status, the counterparties' creditor status or the appropriateness of the pledging of revenues; and

**WHEREAS**      The City Council has received an alternative to the proposed Post-Petition Financing. The proposal attempted to improve upon some of the terms of the proposal proffered by the Emergency Manager. The untimely receipt of the proposal, however, does not allow City Council to obtain the expertise necessary to properly vet the alternative proposal. The seven (7) day limitation created by P.A. 436 of 2012 places an unrealistic time frame in which to solicit and consider a counteroffer to a proposal that took months to create. **NOW THEREFORE BE IT**

**RESOLVED**      That the Detroit City Council is in receipt of *Order No. 17 – Approval of Post-petition Financing* for the issuance of Financial Recovery Bonds (Secured Financing) which has triggered the provisions of Sec. 19 of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, granting City Council the authority to vote on the proposed transaction; and **BE IT FURTHER**

**RESOLVED**      If obtained, it is strongly urged that any funds from the Quality of Life Loan be used to strengthen revenues and revenue collections by improving the collection systems for income tax, property tax and the property assessment. Hardware improvements as well as staffing level increases in the Finance Department and the Law Department will send a message to non-payers that not paying what is owed is no longer an option; and **BE IT FURTHER**

**RESOLVED**      That the Detroit City Council has voted to disapprove Mr. Orr's proposed transaction and would ask that Judge Rhodes determine whether counterparties are indeed secured creditors in light of the Michigan statute that prohibits the use of wagering taxes in transactions collateralizing swap agreements and whether the instant settlement with the counterparties are in the best interest of the City in light of surrounding circumstances as discussed above; and **BE IT FINALLY**

**RESOLVED**      That a copy of this resolution be forwarded to Judge Steven Rhodes, Governor Rick Snyder, State of Michigan Department of Treasury, Emergency Manager Kevyn Orr, Municipal Loan Board and Mayor Dave Bing.

October 25, 2013