# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession***<br>**City of Detroit, Michigan**<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, MI 48226<br>WAYNE–MI<br>Tax ID / EIN: 38–6004606 | represented by | **Bruce Bennett**<br>555 S. Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213) 489–3939<br>Email: bbennett@jonesday.com |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237–3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114

(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

*U.S. Trustee*
**Daniel M. McDermott**                    represented by    **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769

Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Creditor Committee*<br>**Committee of Unsecured**<br>**Creditors**<br>*TERMINATED: 03/03/2014* | represented by | **Brett Howard Miller**<br>1290 Avenue of the Americas<br>40th Floor<br>New York, NY 10104<br>(212) 468−8051<br>Email: bmiller@mofo.com,whildbold@mofo.com<br>*TERMINATED: 03/03/2014* |
| | | **Geoffrey T. Pavlic**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033−2518<br>(248) 352−4700<br>Fax : (248) 352−4488<br>Email: pavlic@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| | | **Mark H. Shapiro**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033−2518<br>(248) 352−4700<br>Fax : (248) 352−4488<br>Email: shapiro@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| *Creditor Committee*<br>**Charlene Hearn**<br>PO Box 6612<br>Detroit, MI 48206 | | |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005−3364<br>(202) 408−7004<br>Email: sam.alberts@dentons.com |
| | | **Paula A. Hall**<br>401 S. Old Woodward Ave.<br>Suite 400<br>Birmingham, MI 48009<br>(248) 971−1800<br>Email: hall@bwst−law.com |
| | | **Claude D. Montgomery**<br>620 Fifth Avenue<br>New York, NY 10020<br>(212) 632−8390<br>Email: claude.montgomery@dentons.com,docketny@dentons.com |
| | | **Carole Neville**<br>1221 Avenue of the Americas<br>25th Floor<br>New York, NY 10020<br>(212) 768−6889<br>Email: carole.neville@dentons.com |
| | | **Matthew Wilkins**<br>401 S. Old Woodward Ave. |

Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 11/05/2013 | | 1520 | Motion to Borrow / *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post−Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* Filed by Debtor In Possession City of Detroit, Michigan (Heiman, David) (Entered: 11/05/2013) |
| 11/05/2013 | | 1521 | Motion to Seal Document (RE: related document(s)1520 Motion to Borrow). / *Debtor's Motion Pursuant to Sections 105 and 107(b) of the Bankruptcy Code for an Order Authorizing the Debtor to File Fee Letter Under Seal in Connection with the Debtor's Post−Petition Financing Motion* Filed by Debtor In Possession City of Detroit, Michigan (Heiman, David) (Entered: 11/05/2013) |
| 11/07/2013 | | 1568 | Objection to (related document(s): 1342 Motion for 2004 Examination *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and Certain of the Debtor's Advisors Pursuant to Fed) / City of Detroit's Objection to Rule 2004 Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. Filed by Debtor In Possession City of Detroit, Michigan (Heiman, David) (Entered: 11/07/2013)* |
| 11/11/2013 | | 1640 | Motion *Motion of the Objectors for Leave to Conduct Limited Discovery in Connection with Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post−Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (Attachments: #_1 Index − Summary of Attachments #_2 Exhibit 1 − Proposed Order #_3 Exhibit 2 − Notice of Motion and Opportunity to Object #_4 Exhibit 3 − None [Brief Not Required] #_5 Exhibit 4 − None [Separate Certificate of Service to be Filed] #_6 Exhibit 5 − Affidavits [Not Applicable] #_7 Exhibit 6 − Documentary Exhibits [Not Applicable]) (Hackney, Stephen) (Entered: 11/11/2013) |
| 11/12/2013 | | 1662 | Order Denying Motion of Syncora Under Rule 2004 (Related Doc #_1342). (jjm) (Entered: 11/12/2013) |
| 11/13/2013 | | 1690 | Concurrence *Joinder of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Limited Objection of Financial Guaranty Insurance Company to Debtor's Motion Pursuant to Sections 105 and 107(b) of the Bankruptcy Code for an Order Authorizing the Debtor to File Fee Letter Under Seal in Connection with the Debtor's Post−Petition Financing Motion* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (RE: related document(s)1521 Motion to Seal Document (RE: related document(s)1520 Motion to Borrow). / *Debtor's Motion Pursuant to Sections 105 and 107(b) of the Bankruptcy Code for an Order Authorizing the Debtor to File Fee Letter Under Seal in* |

| | | | |
|---|---|---|---|
| | | | *Connection with the De, <u>1686</u> Objection). (Bennett, Ryan) (Entered: 11/13/2013)* |
| 11/15/2013 | | <u>1737</u> | Transcript Order Form of Hearing November 14, 2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Bennett, Ryan) (Entered: 11/15/2013) |
| 11/15/2013 | | <u>1741</u> | Order Denying Motion to File Fee Letter Under Seal (Related Doc # <u>1521</u>). (jjm) (Entered: 11/15/2013) |
| 11/15/2013 | | <u>1743</u> | Order Regarding Motion of the Objectors For Leave to Conduct Limited Discovery in Connection with Motion of the Debtor for a Final Order (Related Doc # <u>1640</u>). (jjm) (Entered: 11/15/2013) |
| 11/18/2013 | | <u>1761</u> | Notice of Fee Letter Filed by Debtor In Possession City of Detroit, Michigan (RE: related document(s)<u>1520</u> Motion to Borrow). (Heiman, David) (Entered: 11/18/2013) |
| 11/19/2013 | | <u>1775</u> | Request for Production of Documents the City of Detroit Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Hackney, Stephen) (Entered: 11/19/2013) |

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
------------------------------------------------------x
                                            :
In re                                       :        Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                  :        Case No. 13-53846
                                            :
                        Debtor.             :        Hon. Steven W. Rhodes
                                            :
                                            :
------------------------------------------------------x
```

## COVER SHEET FOR MOTION TO USE CASH
## <u>COLLATERAL OR TO OBTAIN CREDIT</u>

      The debtor has filed a motion to obtain postpetition financing, which is attached to this Cover Sheet.  In accordance with LBR 4001-2(b) (E.D.M.), the debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | _____ Yes<br><br>__X_ No | Page ____, ¶ ____ |

| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br>___X___ No | Page ____, ¶ ____ |
|---|---|---|
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | ___X___ Yes<br><br>_____ No | Page 13, ¶ 13 |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | _____ Yes<br><br>___X___No | Page ____, ¶ ____ |
| (5) Provisions that prime any lien without that lienholder's consent. | _____ Yes<br><br>___X___ No | Page ____, ¶ ____ |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | _____ Yes<br><br>___X___ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (8) Provisions for the payment of prepetition debt. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | __X__ Yes<br><br>_____ No | Page 19, ¶28 |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | _____ Yes<br><br>___X__No | Page ____, ¶ ____ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (16) Provisions that purport to bind a subsequent trustee. | _____ Yes<br><br>___X_ No | Page ____, ¶ ____ |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | __X__ Yes<br><br>_____ No | Page 9,¶3 |

Dated: November 5, 2013

Respectfully submitted,

s/ David G Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

6

355

13-53846-swr   Doc 4310-2   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 11 of 264      11
13-53846-swr   Doc 1520   Filed 11/05/13   Entered 11/05/13 14:55:27   Page 6 of 204

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
: 
In re                            :          Chapter 9
: 
CITY OF DETROIT, MICHIGAN,     :          Case No. 13-53846
: 
               Debtor.     :          Hon. Steven W. Rhodes
: 
: 
-----------------------------------------------------x

## MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

The City of Detroit, Michigan ("Detroit" or the "City"), as debtor in

the above-captioned case, hereby moves the Court, pursuant to 11 U.S.C. §§ 105,

362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922, Rules

2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States

Bankruptcy Court for the Eastern District of Michigan (the "Local Rules"), for a

final order[1]:

---

[1]     On October 6, 2013, the City also signed an engagement letter with Barclays Capital, Inc., pursuant to which the City agreed to employ Barclays as the

13-53846-tjt    Doc 4320-2    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 12 of 26
13-53846-swr    Doc 1520    Filed 11/05/13    Entered 11/05/13 14:55:23    Page 7 of 264
355
12

(i)     Under 11 U.S.C. §§364(c)(1), (c)(2), (e) and (f) authorizing the City to (a) obtain senior secured postpetition financing on a superpriority basis and on the terms and conditions set forth in (i) the Commitment Letter dated October 6, 2013 by and among the City and Barclays Capital Inc. (the "Commitment Letter") attached hereto as Exhibit 6A, (ii) those certain Bond Purchase Agreements by and among the City and Barclays Capital Inc., as Purchaser (the "Purchaser") attached hereto as Exhibit 6B (each, a "Purchase Agreement" and together, the "Purchase Agreements"), and (iii) the Financial Recovery Bond Trust Indenture by and among the City and the indenture trustee to be named thereunder (the "Indenture") attached hereto as Exhibit 6C, in each instance, pursuant to an order substantially in the form attached hereto as Exhibit 1 (the "Proposed Order") that, if approved, would provide the City with postpetition secured financing of up to $350,000,000 (the "Postpetition Financing") and (b) perform such other and further acts as may be contemplated by, or required in connection with, the Purchase Agreements and the other financing documentation (the "Financing Documents");

(ii)    Under 11 U.S.C. §§364(c)(2) as security for the repayment of the borrowings and all other obligations arising under or in connection with the Financing Documents, authorizing the City to grant to the Purchaser automatically attached and perfected security interests in and liens upon the Collateral (as defined below) in the manner, and on the terms, described below, and as set forth in the Purchase Agreements;

(iii)   Under 11 U.S.C. §§364(c)(1), 503(b) and 507(a)(2), authorizing the City to grant super priority administrative expense claim status to the claims of the Purchaser in respect of the Postpetition Financing and the other amounts owing under the Financing Documents; and

(iv)    Under 11 U.S.C. §§362 and 922, vacating and modifying the automatic stay to the extent set forth in the Purchase Agreements and Proposed Order to the extent necessary to implement and effectuate

---

exclusive placement agent with respect to any financing the City may seek in connection with its exit from chapter 9. To the extent that the City does not use Barclays as its exclusive placement agent in connection with any exit financing, the City is obligated to pay Barclays a fee.

the terms and provisions of the Purchase Agreements and Proposed Order and in order for the Purchaser to exercise remedies thereunder.

In support of this Motion, the City has filed herewith the (i) Declaration of Charles M. Moore in Support of the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (the "Moore Declaration") attached hereto as Exhibit 5A and (ii) the Declaration of James Doak in Support of the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (the "Doak Declaration") attached hereto as Exhibit 5B. In further support of this Motion, the City respectfully represents as follows:

## Jurisdiction

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

-3-
355

13-53846-swr    Doc 4320-2  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 14 of 26
13-53846-swr    Doc 1520   Filed 11/05/13  Entered 11/05/13 14:55:27  Page 9 of 264    14

## Chapter 9 Filing and Appointment of Emergency Manager

2.  On July 18, 2013 (the "Petition Date"), the City filed a petition for relief in this Court, thereby commencing the largest chapter 9 case in history.

3.  Incorporated in 1806, Detroit is the largest city in Michigan. As of December 2012, the City had a population of less than 685,000 (down from a peak population of nearly 2 million in 1950). Over the past several decades, the City has experienced significant economic challenges that have negatively impacted employment, business conditions and the overall quality of life in the City.

4.  As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities). As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237 million.

5.  In February 2013, a state review team determined that a local government financial emergency exists in the City. Thereafter, in March 2013, Kevyn D. Orr was appointed, and now serves as, emergency manager with respect to the City (in such capacity, the "Emergency Manager") under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq.

("P.A. 436"). Under Section 18(1) of PA 436, the Emergency Manager acts exclusively on behalf of the City in this chapter 9 case. MCL § 141.1558.

## Intended Use of Proceeds of the Postpetition Financing

6.     The Postpetition Financing, totaling up to $350,000,000, will be comprised of two series of secured bonds — the "Swap Termination Bonds", and the "Quality of Life Bonds" (and together, collectively, the "Bonds" ). As will be discussed in greater detail below, the proceeds of the Swap Termination Bonds will allow the City to:

— capture a significant negotiated discount — approximately $50 million (and potentially more) — to its obligations under the Forbearance Agreement (defined in ¶8 below) with respect to any termination of the Swap Agreements (defined in ¶ 9 below); and

— eliminate its significant annual debt service obligations with respect to the Swap Agreements thus saving the City over $35 million per year in future liability.

7.     Proceeds of the Quality of Life Bonds will be used to advance certain key investment initiatives of the City, including, but not limited to, essential investments in blight removal, public safety and technology infrastructure. The City believes that its decision to obtain the Postpetition Financing is well supported by sound business judgment and should be approved.

-5-

13-53846-swj   Doc 1324-2  Filed 10/28/14  Entered 10/28/14 23:50:23  Page 16 of 264
13-53846-swj   Doc 1520  Filed 11/05/13  Entered 11/05/13 14:35:27  Page 16 of 355    16

**A.** *Repayment of Swap Obligations Under the Forbearance Agreement*

8.     Pending before this Court is a motion (the "Forbearance Agreement Approval Motion")[2] of the City for approval of the Forbearance and Option Termination Agreement (as amended, the "Forbearance Agreement"), dated as of July 15, 2013, among the City, the Emergency Manager, the Detroit General Retirement System Service Corporation ("DGRS"), the Detroit Police and Fire Retirement System Service Corporation ("PFRS" and together with DGRS, each a "Service Corporation" and collectively, the "Service Corporations"), on the one hand, and UBS AG ("UBS") and Merrill Lynch Capital Services, Inc. ("MLCS" and, together with UBS, each a "Swap Counterparty" and collectively, the "Swap Counterparties"), on the other.

9.     The Service Corporations and the Swap Counterparties are parties to certain swap transactions effectuated pursuant to ISDA Master Agreements (as applicable, the "MLCS Swap Agreements" and the "UBS Swap Agreements" and collectively, the "Swap Agreements").

10.     In connection with the Swap Agreements, the City, the Service Corporations, the Swap Counterparties and U.S. Bank, National Association (as custodian) entered into a Collateral Agreement, dated as of June 15, 2009 (the

---

[2]     Docket No. 157.

"Collateral Agreement")[3], pursuant to which the City and the Service Corporations, directly or indirectly, pledged the City's so-called "gaming revenue" as collateral to the Swap Counterparties on account of their respective obligations under, or related to, the Swap Agreements.

11. Prior to the execution of the Forbearance Agreement, the Swap Counterparties alleged that one or more events of default and/or termination events had occurred under the terms of the Swap Agreements, thus giving rise to a right of the Swap Counterparties to terminate their respective Swap Agreements under the terms thereof and to begin enforcement remedies under the Collateral Agreement, which would potentially entail, among other things, the Swap Counterparties' capturing significant gaming revenues of the City. The Swap Counterparties have argued that these enforcement actions would not have been stayed following the bankruptcy filing, pursuant to section 362(b)(17) of the Bankruptcy Code. Under the Forbearance Agreement, the Swap Counterparties have agreed to forbear from exercising these remedies in respect of the Swap Agreements and the Collateral Agreement during the Forbearance Period (as defined in the Forbearance Agreement). Additionally, as noted above, the parties have negotiated that the City's obligations under the Forbearance Agreement with respect to any early

---

[3] The Collateral Agreement is attached as Exhibit 5 to the Forbearance Agreement Approval Motion.

termination of the Swap Agreements are subject to a significant discount if the Swap Agreements are terminated by certain milestones, as set forth below.

12. Pursuant to Section 3.1(a) of the Forbearance Agreement, if approved, the City can direct UBS to exercise the right to terminate all of the transactions under all of the UBS Swap Agreements (the "UBS Termination Right"). Pursuant to Section 3.1(b) of the Forbearance Agreement, the City can direct MLCS to exercise the right to terminate all of the transactions under all of the MLCS Swap Agreements (the "MLCS Termination Right" and together with the UBS Termination Right, the "Termination Rights").

13. Pursuant to Section 3.2(a) of the Forbearance Agreement, the City is permitted to direct the exercise of the Termination Rights only once, by written notice (the "Optional Termination Notice") to MLCS and UBS on a day (the "Optional Termination Notice Date") that is at least seven (7) business days and not more than ten (10) business days prior to the proposed date of termination set forth in the Optional Termination Notice (the "Optional Termination Date"). The Optional Termination Notice must be accompanied by "evidence reasonably satisfactory to each of UBS and MLCS that the City will have funds … sufficient to pay in cash" the termination amounts in respect of the Swap Agreements on the Optional Termination Date. _See_ Forbearance Agreement § 3.2(a). On or before the second business day following the Optional Termination Date, the City is

required to pay to the Swap Counterparties in cash all amounts owing with respect to the terminated Swap Agreements (the "Optional Termination Amounts").  See Forbearance Agreement § 3.3(a).

14.    The Optional Termination Amounts will be determined by an agreed methodology among the parties and will be based on the present value of the amounts due under the Swap Agreements, as adjusted to take into account three (3) basis points of breakage costs.  See Forbearance Agreement § 3.5.  Importantly, the Forbearance Agreement contemplates that, if the City causes an Optional Termination Notice Date to occur on or before certain milestones, the Optional Termination Amount will be reduced by the "Applicable Percentage" as follows:

—    If the Optional Termination Notice Date occurs on or prior to October 31, 2013 (the "First Payment Adjustment Date"), the Optional Termination Amounts shall be reduced by 25%;

—    If the Optional Termination Notice Date occurs on or prior to November 15, 2013 (the "Second Payment Adjustment Date"), the Optional Termination Amounts shall be reduced by 23%; and

—    If the Optional Termination Notice Date occurs after the Second Payment Adjustment Date, but prior to the deadline for exercising the Termination Right, the Optional Termination Notice Amounts shall be reduced by 18%.

See Forbearance Agreement § 3.5.

15.    The City contemplates using a portion of the Postpetition Financing (the "Swap Termination Financing") to exercise the Termination Rights in connection with Swap Agreements and to fund payment of the Optional

Termination Amount as contemplated in the Forbearance Agreement. The City is prepared to move forward with the closing of the Postpetition Financing promptly upon the approval of this Motion and to issue the Optional Termination Notice.

16.     The City intends, and believes it is well positioned to, cause the exercise of the Termination Rights and thus, take advantage of an 18% reduction in the Optional Termination Amounts (and perhaps a larger reduction if there is agreement to extend the Payment Adjustment Dates). By proceeding in this manner, and securing the benefit of a reduction in the Optional Termination Amount, the City will save approximately $50 million in obligations owing with respect to the termination of the Swap Agreements, based on an estimated present market value of the Swap Agreements of approximately $290 million.

17.     Additionally, debt service obligations of the City during the term of the Postpetition Financing, assuming no events of default, are limited to interest payments only, and amount to approximately $12 million annually, which is significantly less than the nearly $50 million in annual debt service obligations that had been paid by the City in connection with the Swap Agreements, which will be eliminated in the event the Court approves the Motion and the Forbearance Agreement Approval Motion.

18.     Importantly, the Forbearance Agreement permits the City to cause the Termination Rights to be exercised only once, and in connection with the

issuance of any Optional Termination Notice, the City must demonstrate to the Swap Counterparties that it has sufficient wherewithal to fund payment of the Optional Termination Amounts. Thus, the City believes it is imperative that the Postpetition Financing be approved as soon as practicably possible, and in any event prior to the issuance of any Optional Termination Notice, to eliminate any risk that the City's ability to fund its obligations under the Forbearance Agreement could be in dispute. Moreover, the Purchaser's commitment to lend under the Post-Petition Facility expires on January 7, 2014 and there is no indication that the Purchaser's commitment would be extended beyond that date. Thus, time is of the essence with respect to the relief sought in this Motion.

**B.**   *City Reinvestment*

19.     In addition to allowing the City to unwind its position in the Swap Agreements, the Postpetition Financing derived from the Quality of Life Bonds (the "Quality of Life Financing") will empower the City to begin the critical initial steps of rebuilding itself. Detroit's woes to this point have been well documented. For years, the City has suffered from decaying City infrastructure and deteriorating City services. To date, the focus of this case has centered on the City's financial obligations, and perhaps rightfully so, as the City's more than $18 billion of debt is a truly staggering burden for a city that has lost nearly two-thirds of its population in the past half-century. Moore Dec. ¶ 7. And while there is little

question that the City must get out from underneath its staggering and unsustainable debt load, the City's true revival will be borne out, not on its balance sheet, but on its streets, and most importantly, in its neighborhoods and schools. Moore Dec. ¶7. Without significant reinvestment into the very building blocks of the City, its renaissance is not possible.

20.     Toward that end, the City intends to aggressively pursue, and devote substantial resources to, a number of key initiatives (the "Reinvestment Initiatives") to reverse these debilitating trends. Moore Dec. ¶ 8. The Reinvestment Initiatives are wide-ranging and will take years to fully accomplish, but are ultimately designed to give the City the ability to:  (a) provide improved basic, essential services to residents; (b) potentially improve recoveries for creditors; (c) maximize the collection of taxes and fees and, where appropriate, generate value from City assets; (d) attract new residents and businesses to foster growth and redevelopment; and (e) jumpstart what will be a lengthy process of reforming City government operations to improve efficiency and reduce costs, where appropriate. Moore Dec. ¶ 8. These initiatives will begin to lay the foundation for safer communities and a more efficient delivery of City services in the future. Moore Dec. ¶ 8.

21.     Accordingly, the City has proposed to spend approximately $1.25 billion over the next ten years on the Reinvestment Initiatives to remedy the

many deficiencies in the services it provides to residents and businesses. Moore Dec. ¶ 9. Given the financial need, the City has determined that it must look beyond its own coffers and rely on a multitude of sources to facilitate the Reinvestment Initiatives, including support from the state and federal governments as well as private institutions. Moore Dec. ¶ 9.

22. Consequently, the Quality of Life Financing is an appropriate, and indeed essential, tool with which to continue tackling these significant challenges. Moore Dec. ¶ 10. Although the funds sought via the Quality of Life Financing will not address all of the Reinvestment Initiatives, the Quality of Life Financing will kick-start this long-term reinvestment process at the rate of approximately $20 million per month (beginning in January 2014) of net reinvestment activity during this fiscal year. Without borrowed funds, there is a material risk that the City would have to substantially cut back or eliminate its reinvestment efforts in the near-term, and the City's ability to invest in the future would continue to be hamstrung and imperiled by the City's on-going financial constraints. Moore Dec. ¶ 10.

23. The sums borrowed in connection with the Quality of Life Financing are designed to be a manageable and responsible amount of debt load that the City can service, while at the same time making a meaningful investment into the City's infrastructure and labor requirements. Moore Dec. ¶ 11. While the

City may ultimately decide to apply the proceeds of the Quality of Life Financing to pursue an array of specific projects, at this time the City intends to prioritize and devote the proceeds of the Quality of Life Financing to three primary areas: public safety, information technology upgrades and blight removal. Moore Dec. ¶ 11.

        (i)     *Public Safety: DPD, DFD, and EMS*

24.    Levels of crime (especially violent crime) in the City are of particular concern, with the City earning the dubious distinction in 2012 of having the highest rate of violent crime of any U.S. city with a population over 200,000. Moore Dec. ¶ 12. In the face of this epidemic, the City's police department (the "DPD"), which has had five different chiefs in as many years, is currently facing operational difficulties from a sheer lack of investment over the years. Moore Dec. ¶ 12. Most fundamentally, the DPD simply lacks the personnel necessary to respond to incidents, emergency or otherwise, throughout the City, thus greatly limiting DPD's ability to engage in the kind of pro-active community policing that is necessary to curb the infestation of street gangs and other criminal elements in the City's neighborhoods. Moore Dec. ¶ 12.

25.    At the same time, short-handed DPD officers are being asked to do more with dangerously less — DPD officers lack many of the most basic tools to combat crime, such as bulletproof jackets and taser guns. Moore Dec. ¶ 13. DPD facilities are old, outdated and in disrepair. Moore Dec. ¶ 13. The DPD's

information technology hardware and software is outdated with multiple disparate systems that are not integrated, are not fully supported by maintenance contracts, and are at critical levels of disrepair, thus greatly inhibiting the ability of officers to perform basic public safety functions.  Moore Dec. ¶ 13.  Critically, the DPD operates with an extremely old fleet of police vehicles, many of which lack the necessary information technology to facilitate efficient police work.  Moore Dec. ¶ 13.  The current state of operations at DPD have gravely eroded employee morale, thus undermining the City's ability to adequately perform one of its core missions — providing basic public safety to its citizens.  Moore Dec. ¶ 13.

26.    The City has identified a number of quantifiable and qualitative objectives to greatly improve the DPD's operations, including the reduction of response times to the national average, increased case closure rates, updated fleets and facilities, modernization of information technology and refinement of the organization and related personnel structure.    Moore Dec. ¶ 14.  The City is committed to bringing DPD staffing up to levels sufficient to allow it to effectively protect the residents and businesses of the City and will use the Quality of Life Financing to support the hiring of additional officers and the civilianization of administrative functions throughout DPD.  Moore Dec. ¶ 14.  In addition, the Quality of Life Financing will support the modernization of the DPD's vehicle fleet and will be used to obtain new vehicles for the Department.  Moore Dec. ¶ 14.

Further, the City will replace DPD's outdated information technology hardware and software systems.  Moore Dec. ¶ 14.

27.    Like the DPD, the City's fire department (the "DFD") and emergency medical services division (the "EMS") are similarly hamstrung from a lack of investment over the years.  Moore Dec. ¶ 15.   The DFD has zero reserve vehicles and a mechanic to vehicle ratio of 1:39, thereby resulting in an inability to complete preventative maintenance on schedule and virtually ensuring that the City's firefighters are forced to operate shorthanded.   Moore Dec. ¶ 15.  Moreover, the DFD's fire stations are decades out of date and, in many cases, unable to effectively accommodate modern fire-fighting equipment.  Moore Dec. ¶ 15.  With respect to the EMS, during the first quarter of 2013, often only 10-14 of the City's 36 ambulances were actually in service. Moore Dec. ¶ 15.  Those vehicles, many of which have been driven over 250,000 miles, frequently succumb to mechanical difficulties and cannot be relied upon.  Moore Dec. ¶ 15.  The resulting impact of these realities on the City's ability to provide the most basic health and safety services for its residents cannot be understated.  Moore Dec. ¶ 15. Further, the risk to life and limb imposed on the City employees who must work under such conditions must be ameliorated.  Moore Dec. ¶ 15.

28.     The City has identified several initiatives to address the DFD's and EMS' aging infrastructure. Moore Dec. ¶ 16.  The City will use, among other sources of funds, the Quality of Life Financing to make substantial investments in their respective fleets, information technology systems and facilities, all of which will greatly increase the operating efficiency of both the DFD and EMS.  Moore Dec. ¶ 16.  In particular, such initiatives will include streamlining billing and collections processes, increasing charges and fees and enhancing grant identification and management and evaluating all opportunities to integrate fire-fighting and EMS functions.  Moore Dec. ¶ 16.

*(ii)     Information Technology Services (ITS)*

29.     The City's technology infrastructure is extraordinarily antiquated, with virtually no integration across departments and functions. Moore Dec. ¶ 17.  In addition to the critically needed upgrades in connection with the City's public safety functions as noted above, the City intends to enhance ITS at the City-wide level, to allow for integration between finance and operational systems.  Moore Dec. ¶ 17.

30.     The City will prioritize the selection and implementation of a new enterprise resource planning system and will begin the process of issuing a "request for proposals" and selecting a new system in 2014 and anticipates significant implementation efforts to occur that same year.   Moore Dec. ¶ 18.

Improved financial and operational reporting will permit the City both to monitor and improve its operating performance and also to improve its revenue and collection efforts. Moore Dec. ¶ 18.

*(iii) Blight*

31.    The City has physically deteriorated to a shadow of its former self and is heavily blighted, with tens of thousands of vacant lots and abandoned, dilapidated structures. Moore Dec. ¶ 19. Of the approximately 78,000 structures in the City, approximately 38,000 are considered dangerous buildings, and that number rises every day. Moore Dec. ¶ 19. The density of blight within the City not only creates sprawling waste lands that are completely devoid of any realizable economic value, but also creates significant public safety and environmental hazards and serves as a haven for criminal activity. Moore Dec. ¶ 19.

32.    The City intends to take several steps to address the large numbers of abandoned and blighted structures currently within its borders in order to stabilize and revitalize its neighborhoods and communities. Moore Dec. ¶ 20. In partnership with various public and private initiatives, including the State of Michigan, the City has renewed its efforts to implement efficient and safe demolition and clearing activities, and, ultimately, to return properties to the private tax base in order to create value going forward. Moore Dec. ¶ 20. While the City continues to investigate and determine the most effective way to

accomplish blight removal, including which geographic areas to focus its efforts on and other factors, the proceeds of the Quality of Life Financing will permit the City to directly fund demolition and other activities. Moore Dec. ¶ 20.  In addition, the City intends to support the construction of recycling centers for local demolition materials.  Moore Dec. ¶ 20.

        *(iv)    Finance*

      33.    The City's Finance Department is already engaged in a significant overhaul of several of the City's revenue generating and other operating units and processes.  Moore Dec. ¶ 21.  For instance, the City has launched a Property Tax Transformation Project in an effort to turn around the Assessment Division and significantly improve the City's ability to accurately value properties and collect tax revenue.  Moore Dec. ¶ 21.  Equally important, Finance will oversee the implementation of software solutions for income tax processing and enterprise resource planning, which initiatives will help drive revenue growth on a City-wide basis.  Moore Dec. ¶ 21.

      34.    Addressing the forgoing initiatives, along with others that have been identified by the Emergency Manager, is a critical first step in rebuilding the City.  The Quality of Life Financing, together with existing funds of the City, will kick-start that process, and enable the City to begin the long road back to viability and prosperity.

## The Postpetition Loan Proposal Solicitation Process

35.      The process for choosing the Postpetition Financing from the Purchaser was robust and subject to significant market testing.  Advisors for the City formally approached over 50 potential financing sources with experience in municipal or special credit situations, which included approximately 13 traditional lending institutions and 37 alternative financing sources.   Doak Dec. ¶ 5. Advisors for the City sent formal requests for lending proposals to approximately 40 of those potential lenders.  Doak Dec. ¶ 5.  The City received indicative term sheets from prospective lenders on September 16, 2013 (the "Proposal Deadline"). Doak Dec. ¶ 5.   Up through the Proposal Deadline, advisors for the City held numerous informational calls with potential lenders to discuss a myriad of issues related to the financing, including potential uses of capital, collateral to secure the financing, the structure of the proposed financing and many other relevant legal and structural issues.  Doak Dec. ¶ 5.

36.      On or around the Proposal Deadline, the City received 16 lending proposals (the "Lending Proposals").  Doak Dec. ¶ 6.  The City's advisors began an immediate review of each of the Lending Proposals and instituted a dialogue with those potential lenders that the City deemed to be most credible based on the pricing and structure of their Lending Proposals.  Doak Dec. ¶ 6.  By September 23, 2013, significant dialogue continued with four prospective lenders

(the "<u>Final Prospective Lenders</u>") regarding a variety of terms, structures and pricing.  Doak Dec. ¶ 6.

37.    It was the City's belief, based on extensive analysis and discussions with its advisors, that the Lending Proposals from the Final Prospective Lenders offered the best potential structures, based on pricing and certainty of closing.  Doak Dec. ¶ 7.  Of particular concern to the City, aside from the aggregate annual financing costs, was the timing under which a financing could be closed given the need to issue an Optional Termination Notice in the near-term. Doak Dec. ¶ 7.  Thus, the City gave significant weight to whether prospective lenders would be underwriting the entire financing or whether a lender's commitment would require participations or syndication prior to closing.  Doak Dec. ¶ 7.

38.    To continue the process, and as part of the next phase of securing financing for the City, the City's advisors requested that the Final Prospective Lenders submit comprehensive financing term sheets and proposed commitment letters by September 30, 2013, with a goal of having a signed commitment soon thereafter.  Doak Dec. ¶ 8.  The City's advisors worked closely with the Final Prospective Lenders and their advisors during the intervening time to resolve numerous legal and financial diligence questions as well as to discuss financing structures and closing timeframes.  Doak Dec. ¶ 8.

39.     Based on the proposed terms and conditions of the final proposals, the City and its advisors determined that the Purchaser's proposed financing terms were superior to the others in terms of overall pricing, certainty of closing and other structural aspects.   Doak Dec. ¶ 9.   Nevertheless, for the intervening week, the City's advisors engaged with certain of the Final Prospective Lenders in an effort to improve the terms of their financing proposals to maximize value for the City.  Doak Dec. ¶ 9.  Despite those efforts, the Purchaser's proposal remained the best available, prompting the Emergency Manager to execute the Commitment Letter with the Purchaser and pay 50% of the commitment fees owing under the terms thereof.   Doak Dec. ¶ 9.

40.     The City, the Purchaser and their respective advisors engaged in extensive negotiations resulting in the Financing Documents before the Court.  The Financing Documents were negotiated in good faith, without fraud or collusion and at arms' length between the parties.

### City Council and Emergency Loan Board Approval

41.     Pursuant to Section 12(u) of P.A. 436, the Emergency Manager may, subject to Section 19 of P.A. 436, "authorize the borrowing of money by" the City.  Section 19(1) of P.A. 436 provides that an emergency manager shall, prior to executing any action to borrow, submit his or her proposed action to the governing body of the local government for approval.   Section 19(1) of P.A. 436 further

provides the local governing body with 10 days from the date of submission to approve or disapprove the action proposed by the emergency manager.

42.     If the governing body of the local government disapproves the proposed action within 10 days, Section 19(2) of P.A. 436 requires the governing body of the local government, within 7 days of its disapproval, to submit to the local emergency financial assistance loan board (the "Emergency Loan Board") an alternative proposal that "would yield substantially the same financial result as the action proposed by the emergency manager."   The Emergency Loan Board then has 30 days to review both the alternative proposal submitted by the governing body of the local government, as well as the proposal submitted by the emergency manager and approve the proposal that "best serves the interest of the public." Aside and apart from the approvals required under P.A. 436, the Emergency Loan Board also must review and approve the issuance of "Financial Recovery Bonds" under section 36a of the Home Rule City Act.

43.     On October 11, 2013, the Emergency Manager issued Order No. 17 (the "EM Order"), attached hereto as Exhibit 7, generally approving the Postpetition Financing, and authorizing and directing, among other things, the City and its advisors to document, negotiate and ultimately execute the Financing Documents.  The material terms of the Postpetition Financing were attached to the EM Order as an exhibit.  The EM Order served as the submission to City Council

of the proposed Postpetition Financing and directed City Council to either approve, or disapprove the Postpetition Financing within 10 days of such submission, based on the terms attached to the EM Order. The material terms of the Postpetition Financing, along with the Emergency Order, were also hand-delivered to City Council on October 11, 2013.

44.    Following submission of the material terms of the Postpetition Financing to City Council, advisors for the City participated in two lengthy meetings (one by telephone and the other in person) with representatives for City Council, as well as City Council itself, during which the City's advisors answered numerous inquiries related to the details of the Postpetition Financing and related strategy. The City's advisors also provided responses to more than twenty follow-up questions from City Council regarding the Postpetition Financing.

45.    Nevertheless, City Council disapproved the Financing Proposal. In disapproving the Postpetition Financing, City Council failed to offer an alternative financing proposal in the time frame required by section 19(2) of P.A. 436, but instead submitted a resolution passed on October 25, 2013 to this Court urging that the Postpetition Financing be denied.[4] The City respectfully disagrees with the position of City Council with respect to the Postpetition Financing. Contemporaneously with the filing of this Motion, the City is submitting the

---

[4]    Docket No. 1396.

Postpetition Financing to the Emergency Loan Board for approval, including the pledges of Collateral set forth in the Financing Documents, pursuant to section 36a of the Home Rule City Act. If approved by the Emergency Loan Board, the City respectfully submits that no other or further consents are required under applicable Michigan law, and prior to closing, the Postpetition Financing will be fully authorized in that regard.

### Summary of the Material Terms of the Financing

46. The material terms of the Swap Termination Bonds and the Quality of Life Bonds are substantially the same, except for differences in the Collateral securing each series of Bonds, respectively. Thus, for purposes of the summary below, all material terms summarized are the same for each series of Bonds, unless specifically noted otherwise.

47. In compliance with Local Rule 4001-2(b), this Motion has been filed with a "Cover Sheet for Motion to use Cash Collateral or Obtain Financing," based on the form cover sheet located on this Court's website. Additionally, in compliance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001(a), the material terms of the Postpetition Financing are summarized as follows: [5]

Issuer:                     The City of Detroit

---

[5] The summary contained herein is for illustrative purposes only. In the event of any inconsistency between this summary and the Financing Documents, the terms of the Financing Documents shall govern.

-25-

13-53846-swr    Doc 1514-2    Filed 11/05/13    Entered 11/05/13 14:35:52    Page 36 of 355
13-53846-swr    Doc 1520    Filed 11/06/13    Entered 11/06/13 14:23:07    Page 36 of 264    36

| | |
|---|---|
| Purchaser and Sole Lead Arranger: | Barclays Capital Inc. |
| Facility Size and Use of Proceeds: | The sum of the Postpetition Financing is $350,000,000 (the "Facility Amount"). |

The Postpetition Financing will be comprised of two series of Bonds — the Swap Termination Bonds, and the Quality of Life Bonds, each of which will be governed by a Bond Purchase Agreement.

The Swap Termination Bonds shall be in an aggregate principal amount sufficient to pay the amounts required under the Forbearance Agreement to terminate the underlying swaps.

The Quality of Life Bonds shall be in an aggregate principal amount of up to $350,000,000, minus the amount of the Swap Termination Bonds. Proceeds from the issuance of the Quality of Life Bonds shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the Financing Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City

See Purchase Agreements § 1.

| | |
|---|---|
| Maturity: | The Bonds will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a confirmed plan of adjustment for the City, (c) the date on which maturity of the Bonds are accelerated pursuant to the Financing Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |

See Indenture p 6; Purchase Agreements § 1(b).

-26-
13-53846-swr    Doc 1314-2  Filed 10/22/14  Entered 10/22/14 23:00:23  Page 37 of 264
13-53846-swr    Doc 1524   Filed 11/05/13   Entered 11/05/13 14:35:27   Page 37 of
355                                                                              37

| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the Financing Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the sale of the Bonds under the Financing Documents are satisfied. |
| | |
| | See Purchase Agreements § 8. |
| | |
| Conditions Precedent to Closing Date: | Execution and delivery of the Financing Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; compliance with obligations under Commitment Letter; no competing offering, placement, arrangement or syndication of securities by City; no new materially adverse information; payment of fees and expenses; effectiveness of definitive documentation in respect of |

the Bonds reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Bonds; accuracy of representations and warranties in all material respects; termination in whole of the Swap Agreements; and absence of defaults.

In addition to the foregoing, prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act.

The Purchaser agrees, in connection with any termination of the Swap Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

<u>See</u> Purchase Agreements § 8.

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Cost of the Facility: | As set forth in the Fee Letter, including interest at 1-month LIBOR plus 250 basis points, subject to the terms of the Default Interest Rate set forth below. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. <br><br> <u>See</u> Purchase Agreements §1(b); Indenture p. 8. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Bonds in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

See Purchase Agreements §1(b); Indenture p. 8.

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Bonds (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |

See Purchase Agreements § 1(b).

| | |
|---|---|
| Optional Redemption: | The Bonds may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Bonds may occur without premium or penalty at any time upon 10 business days' prior written notice. |

See Purchase Agreements § 1(c); Indenture § 309.

| | |
|---|---|
| Mandatory Redemption: | The City shall utilize all net proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral") to redeem the Bonds on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Bonds will be due and payable in full upon the Maturity Date. |

<u>See</u> Purchase Agreements § 1(d); Indenture § 309.

| | |
|---|---|
| Quality of Life Bonds Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Quality of Life Bonds shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "<u>Pledged Wagering Tax Revenue</u>") and (b) the Asset Proceeds Collateral and (ii) a second priority lien (second only to the liens securing the Swap Termination Bonds) on the income tax revenues of the City (the "<u>Pledged Income Tax Revenue</u>", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "<u>Quality of Life Bonds Collateral</u>"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Bonds on a first-priority basis. |

The Financing Documents will require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Wagering Tax Revenue Accounts</u>"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the Financing Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Quality of Life Bonds during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

The Financing Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Income Tax Revenue Accounts</u>"), which bank accounts shall be subject to

control agreements in favor of the Purchaser, provided, however, that the Financing Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Bonds during the continuation of an Event of Default to $4 million per month, all of which shall be applied to redeem the Swap Termination Bonds until such Bonds are paid in full and thereafter, such amounts (in addition to $4 million per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Bonds. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

<u>See</u> Purchase Agreements §§ 1(f)-(j); Indenture §§ 401-402; 902.

| | |
|---|---|
| Swap Termination Bonds Collateral | The obligations owing by the City under the Post-Petition Facility with respect to the Swap Termination Bonds shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on: (i) the Asset Proceeds Collateral and (ii) income tax revenues of the City (the "<u>Pledged Income Tax Revenue</u>" and together with the Asset Proceeds Collateral, the "<u>Swap Termination Bonds Collateral</u>" and together with the Quality of Life Bonds Collateral, collectively, the "<u>Collateral</u>"). The lien on the Asset Proceeds Collateral shall also secure the Quality of Life Bonds on a pari passu basis. The Quality of Life Bonds shall be secured by a second lien on the Pledged Income Tax Revenue. |

The Financing Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Income Tax Revenue Accounts</u>"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the Financing Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to

the Swap Termination Bonds during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

See Purchase Agreements §§ 1(f)-(j); Indenture §§ 401-402; 902.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens on the Collateral granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

See Proposed Order ¶ 14.

| | |
|---|---|
| Super-Priority of Bonds: | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims.

See Proposed Order ¶ 9. |
| Events of Default: | - nonpayment of principal, interest or other amounts;

- non-performance of covenants and obligations;

- incorrectness of representations and warranties in any material respect;

- cross default in respect of a payment of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million;

- material post-petition judgments involving liability in |

-32-

13-53846-swr   Doc 1514-2   Filed 11/06/13   Entered 11/06/13 14:55:27   Page 43 of 264

an amount exceeding $25 million;

- written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any Financing Document or court order with respect thereto is invalid or otherwise not binding on the City;

- dismissal of the Bankruptcy Case;

- reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed;

- the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case;

- granting of any super-priority claim (other than as permitted under the Financing Documents);

- entry of an order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order;

- cessation of liens or super-priority claims granted in respect of the Bonds to be valid, perfected and enforceable in all respects with the priority described herein;

- failure of the Pledged Wagering Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Wagering Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times;

- failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and

- the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a

Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established.

<u>See</u> Indenture § 901.

Remedies:

Upon any Event of Default, the Purchaser may declare the principal of the Bonds to be immediately due, and following certain Events of Default, the Bonds may be payable from proceeds of the Quality of Life Bonds held by the indenture trustee under the Indenture.

Payment of accelerated principal with respect to the Swap Termination Bonds shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month from the Pledged Income Tax Revenue, plus the pro-rata proceeds of any Asset Proceeds Collateral

Payment of accelerated principal with respect to the Quality of Life Bonds shall be made by the City on a monthly basis on a level debt basis equivalent to (i) $4 million per month from the Pledged Wagering Tax Revenue, and (ii) following payment in full of the Swap Termination Bonds, $4 million per month from the Pledged Income Tax Revenue, plus the *pro rata* proceeds of any Asset Proceeds Collateral.

<u>See</u> Indenture § 902.

Prohibition of Additional Borrowings:

The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding

in respect of the Quality of Life Bonds or the Swap Termination Bonds.

See Indenture § 707.

| | |
|---|---|
| Representations, Warranties and Covenants: | The Financing Documents in respect of the Bonds contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions, which are usual and customary for transactions of this kind. |

See Purchase Agreements § 6.

| | |
|---|---|
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to any dismissal of the Bankruptcy Case and notwithstanding any order providing for dismissal, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any Financing Document or the Post-Petition Financing Order, notwithstanding the dismissal or an order providing for dismissal of the Bankruptcy Case. |

See Proposed Order ¶ 19.

| | |
|---|---|
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |

See Indenture §1108.

| | |
|---|---|
| Yield Protection, Taxes and Other Deductions: | The Financing Documents contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and |

requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed).

<u>See</u> Purchase Agreements § 1(c).

Expenses: Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City; and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreements.

<u>See</u> Purchase Agreements § 9.

Indemnification: To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the proceeds of the Bonds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit

of all such persons or entities and shall be entitled to superpriority administrative expense status.

<u>See</u> Purchase Agreements § 13.

| | |
|---|---|
| Assignment and Participation: | The Purchaser may assign all or a portion of the Bonds to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request).  In addition, the Purchaser shall be entitled to sell participations in the Bonds without the consent of the City. |

<u>See</u> Purchase Agreements § 18.

| | |
|---|---|
| Governing Law: | Michigan. |

| | |
|---|---|
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan. |

<u>See</u> Indenture § 1108.

| | |
|---|---|
| Waiver of 506(c) Rights | Upon entry of the Post-Petition Financing Order, no claims, costs or expenses incurred in the Bankruptcy Case or by the City at any time shall be charged against the Purchaser, the indenture trustee under the Indenture, the bondholders or any of their respective claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without prior written consent of the indenture trustee under the |

Indenture.

See Proposed Order ¶¶ 8, 28.

48.     Pursuant to Local Rule 4001(a), the net Pledged Wagering Tax Revenue was approximately $178,845,132 in the fiscal year 2013, and the Pledged Income Tax Revenue was approximately net $232,412,196 in the fiscal year 2013. The City believes these sums are a good faith estimate of the value of the Collateral pledged in connection with the Postpetition Financing.

### Basis for Relief

49.     Pursuant to Bankruptcy Code section 901(a), sections 362, 364(c), 364(d), 364(e), 503 and 507(a)(2), among others, are applicable in cases proceeding under chapter 9 of the Bankruptcy Code.

50.     Bankruptcy Code section 364(c), as made applicable to this case by section 901, provides that:

> If the [debtor] is unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code], the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §364(c).

51.     The statutory requirement for obtaining postpetition financing under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtor is "unable to obtain unsecured credit allowable under §503(b)(1) [of the Bankruptcy Code] as an administrative expense." <u>See</u> <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (holding that a debtor seeking secured credit under section 364(c) of the Bankruptcy Code must establish that it was unable to obtain unsecured credit under sections 364(a) or (b) of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code).

52.     To show that postpetition financing is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. <u>Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." <u>Id</u>. at 1088. Moreover, where few lenders are likely to be able and willing to extend necessary credit to the debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct an exhaustive search for financing."
In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

53.     The process for choosing the Purchaser was robust and entailed the solicitation of more than 50 prospective lenders, which resulted in 16 indicative term sheets from potentially interested parties.  Based on the discussions with these potential lenders and the eventual Purchaser, the City firmly believes that the market has been tested and that postpetition financing on an unsecured basis within the timeframe necessary, was not available.  Doak Dec. ¶ 14.  The Purchase Agreement has been negotiated at arm's-length, and the City has determined, in the exercise of its business judgment, that it is the best financing proposal available under the circumstances.

54.     Provided that its business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its business judgment.  See, e.g., Ames Dept. Stores, Inc., 115 B.R. at 40 (finding that courts have discretion under section 364 of the Bankruptcy Code to permit debtors to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not leverage the bankruptcy process and powers and (ii) the financing agreement's purpose is primarily to benefit the estate and not a party in interest); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that interim

financing was approved because it "[r]eflected sound and prudent business judgment on the part of TWA … [and was] reasonable under the circumstances and in the best interest of TWA and its creditors.").

55. As noted, proceeds of the Swap Termination Bonds will be used to fund the early termination of the Swap Agreements pursuant to the Forbearance Agreement. If the Postpetition Financing is approved, the City believes it will be in a position to close on the financing shortly thereafter and to issue an Optional Termination Notice in advance of the January 7, 2014 expiration of the Purchaser's commitment in order to take advantage of the discount on the Optional Termination Amounts under the Forbearance Agreement, if approved. Based on the estimated current present value of the obligations owing under the Swap Agreements, the City believes that terminating the Swap Agreements result in a savings of approximately $50 million to the City. This fact alone supports a finding that the Postpetition Financing is in the best interests of the City, its creditors, citizens and all other parties in interest.

56. Additionally, the annual debt service obligations of the City with respect to the Postpetition Financing is substantially lower than those under the Swap Agreements — the annual debt service obligations with respect to the Swap Agreements is approximately $50 million, compared with approximately $12 million of annual debt service obligations under the Postpetition Financing. Thus,

it can hardly be disputed that obtaining the Postpetition Financing and exercising the Termination Rights under the Forbearance Agreement as early as possible makes sound business judgment.

57.     The Quality of Life Financing is also necessary for the City's restructuring, as the proceeds will be used to fund key reinvestment initiatives critical to the City's future.  As described in detail above, as well as in the Moore Declaration, reinvesting in the infrastructure of the City is critical to beginning the long process of restoring the basic building blocks of the City that have steadily eroded over the last half century.  Based on the foregoing, the City respectfully submits that the Postpetition Financing is more than justified by sound business judgment.

58.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition.  The Financing Documents contemplate the modification of the automatic stay (to the extent applicable), to the extent necessary to permit the Purchaser to implement the terms of the Proposed Order. Stay modification provisions of this type are standard features of postpetition financing facilities, and, in the Debtor's business judgment, are reasonable under the present circumstances, particularly given the Purchaser's limited recourse against the City's assets under the Financing Documents.  Accordingly, the Debtor respectfully requests that the Court authorize the modification of the stay in

accordance with the terms set forth in the Proposed Order and the Financing Documents.

59.     Courts in this District have granted, generally, the relief sought herein in other cases.  See, e.g., In re Groeb Farms, Inc., Case No. 13-58200 (WS) (Bankr. E.D. Mich. Oct. 3, 2013) (interim order authorizing the debtor to obtain postpetition financing pending scheduling of final hearing); In re Richfield Equities, L.L.C., Case No. 12-33788 (DSO) (Bankr. E.D. Mich. Oct. 11, 2012) (final order authorizing postpetition financing); In re Noble Int'l, Ltd., Case No. 09-51720 (MBM) (Bankr. E.D. Mich. May 12, 2009) (same); In re Contech U.S., L.L.C., Case No. 09-42392 (SWR) (Bankr. E.D. Mich. April 13, 2009) (same); In re Pontiac Gen. Hosp. and Med. Ctr., Inc. d/b/a North Oakland Med. Ctr., Case No. 08-60731 (MBM) (Bankr. E.D. Mich. Sept. 23, 2008) (same);  In re Greektown Holdings, L.L.C., Case No. 08-51304 (WS) (Bankr. E.D. Mich. June 26, 2008) (same); In re Collins & Aikman Corp., Case No. 05-55927 (SWR) (Bankr. E.D. Mich. Aug. 11, 2005) (same).

## Notice

60.     Notice of this Motion has been given to the following (or their counsel, if known):  (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d);

(c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as Purchaser , (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002. The City submits that no other or further notice need be provided.

### Statement of Concurrence

61.    Local Rule 9014-1(g) provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied." Local Rule 9014-1(g). Given the number of parties and potential parties involved in this case and the lack of known opposing

parties who would be adversely impacted by the relief requested herein, it would be impracticable (and, with regard to unknown parties, impossible) for the City to affirmatively seek the concurrence of each opposing counsel interested in the relief sought herein. Accordingly, the City submits that imposing the requirements of Local Rule 9014-1(g) in this matter would be "unduly burdensome" and requests that its requirements be waived.

### No Prior Request

62. No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the City respectfully requests that this Court: (a) enter an order, substantially in the form attached hereto as <u>Exhibit 1</u>, granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

-45-

13-53846-swr    Doc 1324-2   Filed 10/29/14   Entered 10/29/14 23:00:23   Page 56 of 264
13-53846-tjt   Doc 13514   Filed 11/05/15   Entered 11/05/15 14:55:27   Page 56 of 355

56

Dated: November 5, 2013          Respectfully submitted,


                                 /s/  David G. Heiman
                                David G. Heiman (OH 0038271)
                                Heather Lennox (OH 0059649)
                                JONES DAY
                                North Point
                                901 Lakeside Avenue
                                Cleveland, Ohio  44114
                                Telephone:  (216) 586-3939
                                Facsimile:  (216) 579-0212
                                dgheiman@jonesday.com
                                hlennox@jonesday.com

                                Brad B. Erens
                                JONES DAY
                                77 West Wacker
                                Chicago, Illinois 60601
                                Telephone: (312) 782-3939
                                Facsimile: (312) 782-8585
                                bberens@jonesday.com

                                Bruce Bennett (CA 105430)
                                JONES DAY
                                555 South Flower Street
                                Fiftieth Floor
                                Los Angeles, California 90071
                                Telephone:  (213) 243-2382
                                Facsimile:  (213) 243-2539
                                bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5A | Declaration of Charles M. Moore in Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay |
| Exhibit 5B | Declaration of James Doak in Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay |
| Exhibit 6A | Commitment Letter |
| Exhibit 6B | Bond Purchase Agreements |
| Exhibit 6C | Indenture |
| Exhibit 7 | Emergency Manager Order No. 17 |

**EXHIBIT 1**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

**ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

THIS MATTER having come before the Court upon the motion (the "<u>Motion</u>") by the City of Detroit, Michigan (the "<u>City</u>"), which is a debtor in the above-captioned chapter 9 case (the "<u>Case</u>"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "<u>Bankruptcy Code</u>") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Local Rules</u>") seeking entry of an order (this "<u>Order</u>") *inter alia*:[1]

(i)   authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "<u>Post-Petition Facility</u>")

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order that are defined in Section 101 or 102 of the Bankruptcy Code have the meanings assigned to them by the Bankruptcy Code.

pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment Letter and the Fee Letter, the "Bond Documents"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)     granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)     granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life

Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond Documents;

(v)     authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)     vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)     authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 28 below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "Filed Bond Documents"), the Declarations of James Doak and Charles M. Moore in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion held on [●] , 2013 (the "Hearing"); and notice of the Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in

the best interests of the City, its creditors and all parties in interest; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      _Petition Date_.  On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case.  The order for relief in this case was entered on [  ], 2013.

B.      _Jurisdiction and Venue_.  This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      _City's Stipulations_.  The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition

4

13-53846-swr    Doc 1524    Filed 11/05/13    Entered 11/05/13 14:35:27    Page 59 of 264
13-53846-tjt    Doc 1314-2    Filed 04/29/14    Entered 04/29/14 22:50:07    Page 64 of 355

Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

        D.      *Findings Regarding the Postpetition Financing*.

        (i)      *Need for Postpetition Financing*. The City's obtaining credit pursuant to the Post-Petition Facility will enable the City to continue revitalization efforts, save tens of millions of dollars in annual debt service (in the form of scheduled swap payments) and provide for investment in the City's delivery of municipal services to its businesses and residents.

        (ii)      *No Credit Available on More Favorable Terms*. Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Post-Petition Facility. The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the Bond Documents, (2) superpriority claims and Liens and (3) the other protections set forth in the Bond Documents and this Order.

        (iii)      *Use of Proceeds of the Post-Petition Facility*. As a condition to the entry into the Bond Documents and the extension of credit under the Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the Post-Petition Facility shall be used, in each case in a manner consistent with the terms and conditions of the Bond Documents,

solely (a) with respect to the Quality of Life Bond, for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City and (b) with respect to the Swap Termination Bond, to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.     *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.     *Good Faith and Jurisdictional Matters*.

(i)     *Willingness to Provide Financing*.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond Obligation, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee

and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii) *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*. The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties. Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for valid purposes and uses, and not in violation of the Bankruptcy Code. The Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

G. *Act 436 Approval Not Required*. On October 21, 2013, in accordance with Section

7

13-53846-swr Doc 1314-2 Filed 10/23/14 Entered 10/23/14 22:50:07 Page 67 of 355
13-53846-swr Doc 1520 Filed 11/05/13 Entered 11/05/13 14:55:27 Page 92 of 264    67

19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the Post-Petition Facility. The City Council failed to offer an alternative proposal during the time period prescribed in Section 19(2) of Act 436. The City has requested approval of the Post-Petition Facility by the Emergency Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the Michigan Home Rule City Act, Public Act 279 of 1909. Because the City Council failed to offer a timely alternative proposal, approval of the Post-Petition Facility by the Board under Act 436 is not required to authorize the City to enter into the Bond Documents, which are valid and enforceable according to their terms as a result of this Order and applicable non-bankruptcy law.

H.      *Notice*.  Notice of the Hearing and the relief requested in the Motion has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have

requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      <u>Motion Approved</u>.  The Motion is granted, the Financing (as defined below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2.      <u>Objections Overruled</u>.  All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

**<u>Post-Petition Facility Authorization</u>**

3.      <u>Authorization of the Financing and Bond Documents</u>.  The Filed Bond Documents are hereby approved.  The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents.  The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents.  Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.      <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the Bond Obligations (collectively, the

9

"Financing").

5. <u>Bond Obligations</u>. The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City. Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents. The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents. No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6. <u>Liens and Collateral</u>. In order to secure the Bond Obligations, effective immediately upon entry of this Order and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "<u>Liens</u>") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross

receipts earned by each of the City's casinos (the "<u>Pledged Wagering Tax Revenue</u>") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "<u>Pledged Income Tax Revenue</u>", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "<u>Quality of Life Bond Collateral</u>"); and (II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the "<u>Swap Termination Bond Collateral</u>", and together with the Quality of Life Bond Collateral, the "<u>Collateral</u>").

7.    <u>Direction of Pledged Wagering Tax Revenue</u>.  Any entity that collects or holds Pledged Wagering Tax Revenue, shall deposit daily such Pledged Wagering Tax Revenue into the Pledged Wagering Tax Account held at the Wagering Tax Depository Bank pursuant to instructions by the City, and consistent with the terms of the Wagering Tax Account Control Agreement.

8.    <u>Lien Priority</u>.  The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral.  Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal,

modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason. The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code. No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9. <u>Superpriority Claims</u>. Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "<u>Superpriority Claim</u>") for all Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City.

10. <u>No Obligation to Extend Credit</u>. The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

11. <u>Use of Post-Petition Facility Proceeds</u>. From and after the Petition Date, the City shall use the Post-Petition Facility only for the purposes specifically set forth in this Order and the Bond Documents.

**Provisions Common to Financings**

12. <u>Amendment of the Bond Documents</u>. The City is authorized, without further

12

approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements.

13. <u>Modification of Automatic Stay</u>. The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order; and (e) authorize the City to pay, and the Indenture Trustee to retain and apply, all payments required to be made to the Indenture Trustee, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order.

14. <u>Perfection of Liens</u>. This Order shall be conclusive evidence of the validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the

13-53846-swr   Doc 1314-2   Filed 10/25/13   Entered 10/25/13 14:35:02   Page 73 of
13-53846-swr   Doc 4524   Filed 11/05/13   Entered 11/05/13 14:35:27   Page 98 of 264      73
355

Indenture Trustee and the Bondholders to the Liens and priorities granted herein. Notwithstanding the foregoing, the Purchaser, the Indenture Trustee and the Bondholders are authorized, but not required, to file and obtain, as each deems necessary in its sole discretion, such financing statements, notices of liens, control agreements and other security documents to perfect in accordance with applicable non-bankruptcy law, or take constructive control over assets, take any other action, in each case, to validate and perfect the Liens and all such financing statements, notices, control agreements and other security documents shall be deemed to have been filed or recorded as of the date of entry of this Order; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the Liens. The City is authorized and directed to execute and deliver promptly upon demand to the Purchaser or the Indenture Trustee all such financing statements, notices, control agreements and other security documents as the Purchaser or the Indenture Trustee may request. The Purchaser or the Indenture Trustee, each in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording. For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15.     Proceeds of Subsequent Financing. If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, including after the confirmation of any plan of adjustment filed in the

Case, and such facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Bond Documents and this Order.

16.    <u>Maintenance of Collateral</u>.  Until the indefeasible payment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall maintain: (a) the Collateral as required under the Bond Documents; and (b) the cash management system as required by the Bond Documents.

17.    <u>Disposition of Collateral</u>.

(a)    Except as otherwise provided for in the Bond Documents, the City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

(b)    In the event of any sale, lease or other disposition of any Collateral (a "<u>Collateral Disposition</u>"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18.    <u>Maturity Date</u>.  Upon the earliest to occur (such earliest date, the "<u>Maturity Date</u>") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

19.     <u>No Dismissal</u>.  The Bond Obligations shall be indefeasibly paid in full in cash prior

to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the

Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District

Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

20.     <u>Events of Default</u>.  The occurrence of an "Event of Default" under the Bond

Documents or any violation of the terms of this Order shall constitute an event of default under this

Order ("<u>Event of Default</u>"), unless waived in writing by the Indenture Trustee, upon consent of the

Bondholders in accordance with the Bond Documents.

21.     <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence

and during the continuation of an Event of Default, the Indenture Trustee, upon the direction of the

Bondholders in accordance with the Bond Documents, may, among other things, declare all Bond

Obligations owing under the Bond Documents to be immediately due and payable in accordance

with the terms of the Bond Documents, but without affecting any of the Liens or the Bond

Obligations (any such declaration, a "<u>Termination Declaration</u>").  The Termination Declaration

shall be given by electronic transmission as provided in the Bond Documents (the date any such

Termination Declaration is made, the "<u>Termination Declaration Date</u>").  Following the

Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be

entitled to enforce its rights and remedies under the Bond Documents without further order or

approval from this Court.

22.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay

of this Order</u>.  The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted

in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this

Order and their reliance on this Order is in good faith.  Based on the findings set forth in this Order

and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

23. <u>Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

24. <u>Proofs of Claim</u>. The Purchaser, the Indenture Trustee and the Bondholders are not

required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds. Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

25. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Post-Petition Facility.

26. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks

to use or uses such assets in a manner that is not permitted by the Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond Documents or this Order.

27. <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor or any direct, indirect or incidental beneficiary.

28. <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

29. <u>No Marshaling/Applications of Proceeds</u>.  The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other

similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

30. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

31. <u>No Waiver by Failure to Seek Relief</u>. The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

32. <u>No Waiver by Seeking Relief</u>. Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

33. <u>Binding Effect of Order</u>. Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture

Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

34. **No Modification of Order**.  Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with priority equal or superior to the Liens (except as specifically provided in the Bond Documents).  The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

35. **Order Controls**.  In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

36. **Survival**.  The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a)

confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case. Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

37.  <u>Effect of this Order</u>.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

38.  <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

**Exhibit A**
Bond Purchase Agreement
Quality of Life Bond

**<u>Exhibit B</u>**
Bond Purchase Agreement
Swap Termination Bond

**<u>Exhibit C</u>**
Indenture

# **EXHIBIT 2**

Form B20A(Official Form 20A)
12/1/10

## UNITED STATES BANKRUPTCY COURT
### Eastern District of Michigan

In re:

**CITY OF DETROIT, MICHIGAN,**

**Debtor.**

**Chapter: 9**

**Case No.: 13-53846**

**Judge: Hon. Steven W. Rhodes**

Address: 2 Woodward Avenue, Suite 1126
    Detroit, Michigan 48226

Last four digits of Social Security or
Employer's Tax Identification (EIN) No(s).(if any): 38-6004606

### NOTICE OF MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

The City of Detroit, Michigan (the "<u>City</u>") has filed papers with the Court seeking entry of an order, pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay

**<u>Your rights may be affected.</u>** **You should read these papers carefully and discuss them with your attorney, if you have one in this**

**bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the Court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, **on or by November 22, 2013**, you or your attorney must:

1.      File with the court a written response or an answer, explaining your position at:[1]

**United States Bankruptcy Court**
211 W. Fort Street, Suite 2100
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

You must also mail a copy to:

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

---

[1]    Any response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539

Brad B. Erens
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

2.        If a response or answer is timely filed and served, the Court will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.**

Dated: November 5, 2013        Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT 3

## (Intentionally Omitted)

# **EXHIBIT 4**

13-53846-swr    Doc 1314-2    Filed 10/29/14    Entered 10/29/14 23:09:23    Page 93 of 264
13-53846-tjt    Doc 4524    Filed 11/06/13    Entered 11/06/13 14:55:27    Page 98 of 355

93

## CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim and (III) Modifying Automatic Stay was filed and served via the Court's electronic case filing and noticing system on this 5th day of November, 2013.

/s/ David G. Heiman

**EXHIBIT 5A**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
------------------------------------------------------x
                                    :
In re                               :      Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          :      Case No. 13-53846
                                    :
                       Debtor.      :      Hon. Steven W. Rhodes
                                    :
                                    :
------------------------------------------------------x
```

## DECLARATION OF CHARLES M. MOORE IN SUPPORT OF MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS <u>AND (III) MODIFYING AUTOMATIC STAY</u>

I, Charles M. Moore, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a Senior Managing Director at Conway MacKenzie, Inc. ("Conway"), which currently serves as operational restructuring advisor to the City of Detroit ("Detroit" or the "City"). I have a Bachelor of Arts and a Master of Business Administration, both from Michigan State University. Before joining Conway in 2001, I was the Chief Financial Officer of a privately owned automotive supplier. Prior to that, I was a Manager in the middle market consulting practice of what was then known as Deloitte & Touche. I have approximately 19 years of extensive experience dealing with both financial and operational aspects of corporate revitalization.

2. At Conway, I provide crisis management and turnaround consulting services to under-performing entities in a variety of industries, including governmental, financial services, technology, gaming and hospitality, automotive, manufacturing, distribution, consumer products, construction and real estate.

3. I am a Certified Turnaround Professional, a Certified Public Accountant, Certified in Financial Forensics, and a member of the Turnaround Management Association, American Bankruptcy Institute, American Institute of Certified Public Accountants and Michigan Association of Certified Public Accountants. I am also a past President and a former member of the Board of

1

Directors for the Detroit Chapter of the Turnaround Management Association. Recently, I was appointed to serve on the Legislative Commission on Government Efficiency, a nine-person task force charged with identifying ways to improve the State of Michigan's operations.

4.      I, and other Conway professionals have worked closely with the City and its advisors, both prior to, and following the City's chapter 9 bankruptcy filing, to develop an extensive 10-year reinvestment plan, which is designed to inject significant sums of funds into rebuilding the City's infrastructure and to greatly enhance the services the City provides to its citizens.

5.      I submit this declaration in support the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (the "Motion").[1]  Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my discussions with City personnel and/or the City's advisors,[2] my review of relevant documents and

---

[1]    Capitalized terms used but not defined herein are ascribed the meanings given to them in the Motion.

[2]    The City has retained numerous advisors in addition to Conway in connection with its restructuring efforts, including, but not limited to:  (a) Miller Buckfire & Co. LLC, as financial advisor and investment banker; (b) Jones Day, as primary restructuring counsel; (c) Ernst & Young LLP, as financial

2

13-53846-swr    Doc 1524-2   Filed 11/05/13   Entered 11/05/13 14:35:27   Page 93 of 264
13-53846-swr    Doc 1314-2   Filed 10/28/14   Entered 10/28/14 23:00:23   Page 98 of 355

sources and/or my opinion based upon my professional experience and knowledge of the City's history, operations and financial conditions. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents and sources and/or informed opinion.

## CHALLENGES FACING THE CITY OF DETROIT

6. Since the middle of the last century, the City of Detroit's decline has been precipitous. Years of fiscal mismanagement, plummeting population rolls (coupled with the related declines in employment and revenues), decaying City infrastructure, deteriorating City services and ill-conceived borrowing at the cost of the City's deepening insolvency, has left the City today a shadow of its former self. Detroit's woes in that regard have been well documented.

7. The Quality of Life Financing will empower the City to begin the critical initial steps of rebuilding itself. To date, the focus of this case has centered on the City's financial obligations, and perhaps rightfully so, as the City's more than $18 billion of debt is a truly staggering burden for a city that has lost nearly two-thirds of its population in the past half-century. And while there is little question that the City must get out from underneath its staggering and

_____

restructuring advisor; (d) Pepper Hamilton LLP, as special litigation counsel; and (e) Miller Canfield P.L.C., as corporation and local counsel.

3

13-53846-swr   Doc 1524-2   Filed 11/05/13   Entered 11/05/13 14:35:27   Page 99 of 264
13-53846-swr   Doc 4314-2   Filed 04/29/14   Entered 04/29/14 22:50:23   Page 99 of 355

unsustainable debt load, the City's true revival will be borne out, not on its balance sheet, but on its streets, and most importantly, in its neighborhoods and schools. Without significant reinvestment into the very building blocks of the City, its renaissance is not possible.

## USE OF QUALITY OF LIFE LOAN PROCEEDS

8.     Toward that end, the City intends to aggressively pursue, and devote substantial resources to, a number of key initiatives (the "Reinvestment Initiatives") to reverse these debilitating trends.  The Reinvestment Initiatives are wide-ranging and will take years to fully accomplish, but are ultimately designed to give the City the ability to:  (a) provide improved basic, essential services to residents; (b) potentially improve recoveries for creditors; (c) maximize the collection of taxes and fees and, where appropriate, generate value from City assets; (d) attract new residents and businesses to foster growth and redevelopment; and (e) jumpstart what will be a lengthy process of reforming City government operations to improve efficiency and reduce costs, where appropriate. These initiatives will begin to lay the foundation for safer communities and a more efficient delivery of City services in the future.

9.     Accordingly, the City has proposed to spend approximately $1.25 billion over the next ten years on the Reinvestment Initiatives to remedy the many deficiencies in the services it provides to residents and businesses.  Given the

13-53846-tjt   Doc 4320-2   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 100 of 264
13-53846-swr   Doc 1520   Filed 11/05/13   Entered 11/05/13 14:55:27   Page 95 of 264   100
355

financial need, the City has determined that it must look beyond its own coffers and rely on a multitude of sources to facilitate the Reinvestment Initiatives, including support from the state and federal governments as well as private institutions.

10.     Consequently, the Quality of Life Financing is an appropriate, and indeed essential, tool with which to continue tackling these significant challenges.  Although the funds sought via the Quality of Life Financing will not address all of the Reinvestment Initiatives, the Quality of Life Financing will kick-start this long-term reinvestment process at the rate of approximately $20 million per month (beginning in January 2014) of net reinvestment activity during this fiscal year.  Without borrowed funds, there is a material risk that the City would have to substantially cut back or eliminate its reinvestment efforts in the near-term, and the City's ability to invest in the future would continue to be hamstrung and imperiled by the City's on-going financial  constraints.

11.     The sums borrowed in connection with the Quality of Life Financing are designed to be a manageable and responsible amount of debt load that the City can service, while at the same time making a meaningful investment into the City's infrastructure and labor requirements.   While the City may ultimately decide to apply the proceeds of the Quality of Life Financing to pursue an array of specific projects, at this time the City intends to prioritize and devote

5

13-53846-tjt   Doc 4320-2   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 101 of 264
13-53846-swr   Doc 1520   Filed 11/05/13   Entered 11/05/13 14:55:23   Page 96 of 264     101
355

the proceeds of the Quality of Life Financing to three primary areas: public safety, information technology upgrades and blight removal.

 *(i) Public Safety: DPD, DFD, and EMS*

 12. Levels of crime (especially violent crime) in the City are of particular concern, with the City earning the dubious distinction in 2012 of having the highest rate of violent crime of any U.S. city with a population over 200,000. In the face of this epidemic, the City's police department (the "<u>DPD</u>"), which has had five different chiefs in as many years, is currently facing operational difficulties from a sheer lack of investment over the years. Most fundamentally, the DPD simply lacks the personnel necessary to respond to incidents, emergency or otherwise, throughout the City, thus greatly limiting DPD's ability to engage in the kind of pro-active community policing that is necessary to curb the infestation of street gangs and other criminal elements in the City's neighborhoods.

 13. At the same time, short-handed DPD officers are being asked to do more with dangerously less — DPD officers lack many of the most basic tools to combat crime, such as bulletproof jackets and taser guns. DPD facilities are old, outdated and in disrepair. The DPD's information technology hardware and software is outdated with multiple disparate systems that are not integrated, are not fully supported by maintenance contracts, and are at critical levels of disrepair, thus greatly inhibiting the ability of officers to perform basic public safety

6

13-53846-tjt   Doc 4326-2  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 102 of 264
13-53846-swr   Doc 1820  Filed 11/05/13  Entered 11/05/13 14:35:23  Page 97 of 264   102
355

functions. Critically, the DPD operates with an extremely old fleet of police vehicles, many of which lack the necessary information technology to facilitate efficient police work. The current state of operations at DPD have gravely eroded employee morale, thus undermining the City's ability to adequately perform one of its core missions — providing basic public safety to its citizens.

14. The City has identified a number of quantifiable and qualitative objectives to greatly improve the DPD's operations, including the reduction of response times to the national average, increased case closure rates, updated fleets and facilities, modernization of information technology and refinement of the organization and related personnel structure. The City is committed to bringing DPD staffing up to levels sufficient to allow it to effectively protect the residents and businesses of the City and will use the Quality of Life Financing to support the hiring of additional officers and the civilianization of administrative functions throughout DPD. In addition, the Quality of Life Financing will support the modernization of the DPD's vehicle fleet and will be used to obtain new vehicles for the Department. Further, the City will replace DPD's outdated information technology hardware and software systems.

15. Like the DPD, the City's fire department (the "DFD") and emergency medical services division (the "EMS") are similarly hamstrung from a lack of investment over the years. The DFD has zero reserve vehicles and a

mechanic to vehicle ratio of 1:39, thereby resulting in an inability to complete preventative maintenance on schedule and virtually ensuring that the City's firefighters are forced to operate shorthanded.  Moreover, the DFD's fire stations are decades out of date and, in many cases, unable to effectively accommodate modern fire-fighting equipment.  With respect to the EMS, during the first quarter of 2013, often only 10-14 of the City's 36 ambulances were actually in service.  Those vehicles, many of which have been driven over 250,000 miles, frequently succumb to mechanical difficulties and cannot be relied upon.  The resulting impact of these realities on the City's ability to provide the most basic health and safety services for its residents cannot be understated.  Further, the risk to life and limb imposed on the City employees who must work under such conditions must be ameliorated.

16.    The City has identified several initiatives to address the DFD's and EMS' aging infrastructure.  The City will use, among other sources of funds, the Quality of Life Financing to make substantial investments in their respective fleets, information technology systems and facilities, all of which will greatly increase the operating efficiency of both the DFD and EMS.  In particular, such initiatives will include streamlining billing and collections processes, increasing charges and fees and enhancing grant identification and management and evaluating all opportunities to integrate fire-fighting and EMS functions.

## (ii) Information Technology Services (ITS)

17. The City's technology infrastructure is extraordinarily antiquated, with virtually no integration across departments and functions. In addition to the critically needed upgrades in connection with the City's public safety functions as noted above, the City intends to enhance ITS at the City-wide level, to allow for integration between finance and operational systems.

18. The City will prioritize the selection and implementation of a new enterprise resource planning system and will begin the process of issuing a "request for proposals" and selecting a new system in 2014 and anticipates significant implementation efforts to occur that same year. Improved financial and operational reporting will permit the City both to monitor and improve its operating performance and also to improve its revenue and collection efforts.

## (iii) Blight

19. The City has physically deteriorated to a shadow of its former self and is heavily blighted, with tens of thousands of vacant lots and abandoned, dilapidated structures. Of the approximately 78,000 structures in the City, approximately 38,000 are considered dangerous buildings, and that number rises every day. The density of blight within the City not only creates sprawling waste lands that are completely devoid of any realizable economic value, but also creates

significant public safety and environmental hazards and serves as a haven for criminal activity.

20.     The City intends to take several steps to address the large numbers of abandoned and blighted structures currently within its borders in order to stabilize and revitalize its neighborhoods and communities.  In partnership with various public and private initiatives, including the State of Michigan, the City has renewed its efforts to implement efficient and safe demolition and clearing activities, and, ultimately, to return properties to the private tax base in order to create value going forward.  While the City continues to investigate and determine the most effective way to accomplish blight removal, including which geographic areas to focus its efforts on and other factors, the proceeds of the Quality of Life Financing will permit the City to directly fund demolition and other activities.  In addition, the City intends to support the construction of recycling centers for local demolition materials.

*(iv)    Finance (Finance)*

21.     The City's Finance Department is already engaged in a significant overhaul of several of the City's revenue generating and other operating units and processes.   For instance, the City has launched a Property Tax Transformation Project in an effort to turn around the Assessment Division and significantly improve the City's ability to accurately value properties and collect

tax revenue. Equally important, Finance will oversee the implementation of software solutions for income tax processing and enterprise resource planning, which initiatives will help drive revenue growth on a City-wide basis.

22. Addressing the forgoing initiatives, along with others that have been identified by the City and Conway, is a critical first step in rebuilding the City. The Quality of Life Financing, together with existing funds of the City, will kick-start that process, and enable the City to begin the long road back to viability and prosperity. As described in detail above, reinvesting in the infrastructure of the City is critical to beginning the long process of restoring the basic building blocks of the City that have steadily eroded over the last half century. Based on the foregoing, I believe that the Postpetition Financing is both necessary and proper to support the City's restructuring efforts.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: November 5, 2013    By:   _/s/Charles M. Moore_____
                                 Charles M. Moore
                                 Senior Managing Director
                                 Conway MacKenzie, Inc.

# EXHIBIT 5B

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                                          :          Chapter 9
                                               :
CITY OF DETROIT, MICHIGAN,                     :          Case No. 13-53846
                                               :
                          Debtor.              :          Hon. Steven W. Rhodes
                                               :
                                               :
-----------------------------------------------------x

## DECLARATION OF JAMES DOAK IN SUPPORT OF MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

I, James Doak, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a Managing Director at Miller Buckfire & Co., LLC ("Miller Buckfire"), which currently serves as, among other things, investment banker to the City of Detroit ("Detroit" or the "City"), the debtor in the above-captioned chapter 9 case (the "Bankruptcy Case"). Miller Buckfire has been chiefly engaged to assist the City in connection with raising capital in connection with this Bankruptcy Case. On the date hereof, the City filed a Motion for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503,

507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (the "<u>Motion</u>")[1]. I submit this declaration in support of the Motion.

2.      I have 15 years of experience in the investment banking industry. I have been employed with Miller Buckfire and its predecessors for 13 years, 5 of which I have served as a managing director. During the course of my career, I have provided investment banking services to an array of corporations and entities in a wide variety of industries, including distribution, home goods, gaming, telecommunications, information technology, textiles and power generation and transmission. A majority of the foregoing engagements have entailed Miller Buckfire running a process to solicit financing and/or other capital in connection with the engagement. Prior to joining Miller Buckfire, I was a member of the financial restructuring group of Dresdner Kleinwort Wasserstein, which I joined in 2000. Prior to joining Dresdner Kleinwort Wasserstein, I was an investment banker at Goldman, Sachs & Co.

3.      I have a Master of Business Administration with high distinction from Harvard University Business School where I was a Baker Scholar;

---

[1]      All capitalized terms used, but not defined herein shall have the meanings ascribed to such terms in the Motion.

a Juris Doctor degree (cum laude) from Harvard University Law School; and an A.B. (magna cum laude) from Harvard University.

4.    I have been involved in all aspects of obtaining the Postpetition Financing, as described in greater detail below, including soliciting financing proposals from prospective lenders, engaging in dialogue among potential credit groups, selecting the best financing proposal for the City's needs, and negotiating the primary terms of the Purchase Agreements and the other Financing Documents. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents and/or my opinion based upon my experience and knowledge of the capital markets, recent and historical trends in the macro financial markets and the distressed lending market, and the City's operations and financial conditions. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents and/or opinion.

### The Postpetition Loan Proposal Solicitation Process

5.    The process for choosing the Postpetition Financing from the Purchaser was robust and subject to significant market testing. Advisors for the City formally approached over 50 potential financing sources with experience in municipal or special credit situations, which included approximately 13 traditional lending institutions and 37 alternative financing sources. Advisors for the City

sent formal requests for lending proposals to approximately 40 of those potential lenders. The City received indicative term sheets from prospective lenders on September 16, 2013 (the "Proposal Deadline"). Up through the Proposal Deadline, advisors for the City held numerous informational calls with potential lenders to discuss a myriad of issues related to the financing, including potential uses of capital, collateral to secure the financing, the structure of the proposed financing and many other relevant legal and structural issues.

6. On or around the Proposal Deadline, the City received 16 lending proposals (the "Lending Proposals"). The City's advisors began an immediate review of each of the Lending Proposals and instituted a dialogue with those potential lenders that the City deemed to be most credible based on the pricing and structure of their Lending Proposals. By September 23, 2013, significant dialogue continued with four prospective lenders (the "Final Prospective Lenders") regarding a variety of terms, structures and pricing.

7. It was the City's belief, based on extensive analysis and discussions with its advisors, that the Lending Proposals from the Final Prospective Lenders offered the best potential structures, based on pricing and certainty of closing. Of particular concern to the City, aside from the aggregate annual financing costs, was the timing under which a financing could be closed given the need to issue an Optional Termination Notice in the near-term. Thus, the

City gave significant weight to whether prospective lenders would be underwriting the entire financing or whether a lender's commitment would require participations or syndication prior to closing.

8.     To continue the process, and as part of the next phase of securing financing for the City, the City's advisors requested that the Final Prospective Lenders submit comprehensive financing term sheets and proposed commitment letters by September 30, 2013, with a goal of having a signed commitment soon thereafter. The City's advisors worked closely with the Final Prospective Lenders and their advisors during the intervening time to resolve numerous legal and financial diligence questions as well as to discuss financing structures and closing timeframes.

9.     Based on the proposed terms and conditions of the final proposals, the City and its advisors determined that the Purchaser's proposed financing terms were superior to the others in terms of overall pricing, certainty of closing and other structural aspects. Nevertheless, for the intervening week, the City's advisors engaged with certain of the Final Prospective Lenders in an effort to improve the terms of their financing proposals to maximize value for the City. Despite those efforts, the Purchaser's proposal remained the best available, prompting the Emergency Manager to execute the Commitment Letter with the Purchaser and pay 50% of the commitment fees owing under the terms thereof.

## Proposed Financing is in the Best Interests of the City & its Constituents

10.    I believe, based on my extensive experience in the investment banking industry, and distressed financing markets in particular, that the Postpetition Financing is the best financing available to the City under the circumstances. The pricing is particularly attractive from the City's perspective, with an effective interest rate of approximately 3.5%, an extremely favorable interest rate for an entity in bankruptcy proceedings. Although subject to market flex, I am of the belief that even if such provisions were fully exercised, the pricing on the Postpetition Financing would still be below what is typical for a postpetition bankruptcy financing.

11.    The debt service obligations of the City for the two and half year term of the Postpetition Financing, assuming no events of default, are limited to interest payments only, and amount to approximately $12 million annually, which is significantly less than the nearly $50 million in annual debt service obligations that had been paid by the City in connection with the Swap Agreements, which will be eliminated in the event the Court approves the Motion, and the Forbearance Agreement Approval Motion.

12.    Moreover, following approval of the Forbearance Agreement Approval Motion, I believe that the City is prepared to promptly issue an Optional Termination Notice, and to proceed with closing on the Postpetition Financing to

obtain a discount on the Optional Termination Amounts owing in respect of the Swap Agreements upon termination. The resulting savings to the City could approach approximately $50 million, based on an estimated present market value of the Swap Agreements of approximately $290 million.

13. Additionally, and as set forth in greater detail in the Moore Declaration, the Postpetition Financing will also be used to advance certain key investment initiatives of the City in respect of, among other things, blight removal, public safety and technology infrastructure.

14. I believe, based on the process employed by the City and its advisors in selecting the Postpetition Financing, that the market has been substantially and adequately tested. I further believe that postpetition financing on an unsecured basis within the timeframe necessary, is not available. The Purchase Agreements have been negotiated at arm's-length and I believe that the Postpetition Financing is the best financing proposal available under the circumstances.

15. I further believe that the use of the Postpetition Financing — to fund the City's obligations in respect of an early termination of the Swap Agreements pursuant to the Forbearance Agreement, and to begin critical investments in the City's infrastructure — is well supported by the City's sound business judgment, given the substantial savings the City will realize in annual

debt service obligations and the settlement discount on the Swap Agreements, as well as the key investments the City intends to make to begin the process of rebuilding its infrastructure.

16.     Based on the foregoing, I believe that the relief sought in the Motion is both necessary and appropriate to advance the City's restructuring efforts and should be approved in all respects.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on November 5, 2013

By: _/s/ James Doak_____
      James Doak
      Managing Director
      Miller Buckfire & Co., LLC

# EXHIBIT 6A

# BARCLAYS CAPITAL INC.

PERSONAL AND CONFIDENTIAL

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

## $350,000,000 Post-Petition Bond Financing—Commitment Letter

Dear Ms. Corio:

You have advised Barclays Capital Inc. ("Barclays," or the "Purchaser"), that the City of Detroit, Michigan (the "City" or "you") filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case").

Capitalized terms used but not defined herein are used with the meanings assigned to them in Exhibit A and Exhibit B attached hereto, as applicable (collectively with all exhibits attached thereto, the "Term Sheets" and, together with this letter, collectively, the "Commitment Letter"). As used herein, the term "Transactions" means, collectively, the entering into and funding of the Post-Petition Facility, the consummation of certain other transactions contemplated by the Commitment Letter and the Fee Letter (as defined below) and all other related transactions, including the payment of fees and expenses in connection therewith.

1.    **Commitments, Titles and Roles**

You hereby appoint Barclays, and Barclays hereby agrees to act, as exclusive note agent (in such capacity, the "Note Agent") for the Post-Petition Facility. You hereby appoint Barclays to act, and Barclays hereby agrees to act, as sole lead arranger, sole bookrunner and sole syndication agent (in such capacities, the "Arranger"), for the Post-Petition Facility. Each of the Arranger and the Note Agent will have the rights and authority customarily given to financial institutions in such roles. In connection with the Transactions, the Purchaser is pleased to advise you of its commitment (the "Commitment") to provide a senior secured superpriority chapter 9 debtor financing facility under section 364(c) of the Bankruptcy Code in the aggregate principal amount of up to $350,000,000, which comprises a Quality of Life Note and a Swap Termination Note on

the terms and subject to the conditions set forth in this Commitment Letter, the Term Sheets and the Fee Letter.

Our fees for services related to the Post-Petition Facility are set forth in a separate fee letter (the "Fee Letter") entered into between you, the Note Agent and the Purchaser on the date hereof. As consideration for the execution and delivery of this Commitment Letter by the Purchaser, you agree to pay or cause to be paid the fees and expenses set forth in this Commitment Letter and in the Fee Letter as and when payable in accordance with the terms hereof and thereof.

No additional agents, arrangers, bookrunners or post-petition lenders may be appointed or engaged without our written consent. It is agreed that in the event additional agents, arrangers, bookrunners or post-petition lenders are appointed or engaged, the Arranger will have primary authority for managing the syndication of the Post-Petition Facility with sole "left side" placement in any and all marketing materials or other documentation used in connection with the Post-Petition Facility. In addition, the economics allocated to Barclays shall not be less than the economics allocated to any other agent, arranger, bookrunner or post-petition lender and no agent, arranger, bookrunner or post-petition lender shall be entitled to more favorable terms and conditions than those applicable to Barclays.

## 2. Conditions Precedent

The Purchaser's commitments and the Note Agent's agreements hereunder are subject to the conditions set forth in this Section 2 and in the Term Sheets under the headings "Conditions Precedent."

The Purchaser's commitments hereunder and the Purchaser and the Note Agent's agreements to perform the services described herein are further subject to the following conditions: (i) the Purchaser and the Note Agent shall not have become aware after the date hereof of any information or other matter not previously disclosed and not otherwise publicly available to them that either of them reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the date hereof; (ii) the Purchaser's satisfaction that there is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of you; and (iii) your performance of (x) all your obligations hereunder to provide information and otherwise assist in the efforts to syndicate the Post-Petition Facility, and (y) compliance with all your obligations hereunder and under the Fee Letter to pay fees and expenses.

## 3. Syndication

The Arranger reserves the right to syndicate all or a portion of the Post-Petition Facility by assigning or selling participations in the Quality of Life Note and the Swap Termination Note (the "Notes") to a group of banks, financial institutions and other institutional lenders (together with Barclays, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). Notwithstanding the foregoing, unless otherwise agreed by you in writing, no assignment by the Purchaser of its

2

commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Notes under the Post-Petition Facility on the Closing Date in the event any assignee shall fail to do so on the Closing Date. For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date. The Arranger will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Arranger pursuant to the terms of this Commitment Letter and the Fee Letter and will determine the final commitment allocations. You hereby acknowledge and agree that the Arranger will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Arranger or the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

You agree to actively assist the Arranger until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Arranger. Such assistance shall include (a) direct contact during the syndications between you, your agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Arranger, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, (c) upon the request of the Arranger, your using commercially reasonable efforts to assist the Arranger in procuring a credit rating in respect of the Post-Petition Facility from Standard & Poor's Rating Services and Moody's Investors Service, Inc. and (d) there being no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Commitment Letter or the Fee Letter or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Post-Petition Facility shall not constitute a condition to the commitments hereunder or the purchase of the Notes on the Closing Date.

4.  **Information**

To assist the Arranger in its syndication efforts, during the Syndication Period, you agree to promptly prepare and provide to the Arranger all information with respect to you and the Transactions in form and substance satisfactory to the Arranger, including such financial information and projections as the Arranger may reasonably request in connection with the structuring, arrangement and syndication of the Post-Petition Facility. You represent, warrant and covenant that: (i) all information (other than the Projections (as defined below)) that has been or will be made available to the Arranger, the Note Agent, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Transactions is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the projections and other forward looking information (the "Projections") that have been or will be made available directly or indirectly to the Arranger, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed

3

by you to be reasonable when made and when made available to the Arranger, the Participants and their respective affiliates. You agree that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then you will promptly supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances in which statements are made. You understand that in providing services pursuant to this Commitment Letter, the Purchaser and the Note Agent may use and rely on the information and Projections without independent verification thereof.

5.    **Indemnification and Expenses**

To induce the Purchaser and the Note Agent to enter into this Commitment Letter and the Fee Letter and to proceed with the documentation of the Post-Petition Facility, you hereby agree, to the extent permitted by law, to indemnify upon demand and hold harmless the Note Agent, the Arranger, the Purchaser, each participant and their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "<u>Indemnified Person</u>") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its agents, representatives, employees, creditors or any other person or entity (whether or not the City is a party to such action, suit proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Commitment Letter, the Fee Letter, the Post-Petition Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Post-Petition Facility (whether or not the transactions contemplated hereby or by the Fee Letter are consummated), and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; <u>provided</u> that you will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any QOL Note Documents or ST Note Documents (collectively, the "<u>Note Documents</u>") are executed and delivered or any notes are purchased or extensions of credit are made under the Post-Petition Facility, you agree, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or under the Fee Letter or the administration, amendment, modification or waiver of any of the Commitment Letter, the Fee Letter, the Note Documents or the definitive documentation in respect of the Post-Petition Facility. It is further agreed that the Purchaser, the Note Agent and the Arranger shall only have liability to you with respect to the Post-Petition Facility, the Fee Letter and this Commitment Letter and not to any other person. No Indemnified Person will have any liability (whether in

4

contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Commitment Letter, the Fee Letter, the Post-Petition Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Post-Petition Facility, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Commitment Letter, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to you or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

Your indemnity and reimbursement obligations under this Section 5 will be in addition to any liability that you may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of you and the Indemnified Persons.

Neither the Purchaser, the Note Agent, the Arranger nor any other Indemnified Person will be responsible or liable on any theory of liability to you or any other person or entity for any indirect, special, punitive or consequential damages (collectively "Consequential Damages") which may be alleged or otherwise claimed as a result of or in connection with this Commitment Letter, the Fee Letter, the Post-Petition Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Post-Petition Facility. The City will not be responsible or liable on any theory of liability to any Indemnified Party or any other person or entity for any Consequential Damages which may be alleged or otherwise claimed as a result of or in connection with this Commitment Letter, the Fee Letter, the Post-Petition Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Post-Petition Facility; provided that nothing contained in this sentence shall otherwise limit your indemnity obligations to the extent set forth in this Section 5, including any Consequential Damages.

The City's obligation to indemnify or to pay any expense or other obligation set forth herein or to cause any such expense or other obligation to be paid shall be joint and several.

6.    **Assignments**

This Commitment Letter may not be assigned by you without the prior written consent of the Purchaser (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the parties hereto and the Indemnified Persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person (including your employees or creditors) other than the parties hereto (and any Indemnified Person). The Purchaser may assign its commitments and agreements hereunder, in whole or in part, to any of its affiliates or any Participant (including without limitation as provided in Section 3 above); however the Purchaser shall not be released from the portion of its commitment hereunder so assigned until after the Closing Date unless you and the Purchaser agree in writing. The Purchaser and the Note Agent reserve the right to employ the services of their respective

affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Purchaser in such manner as they and their respective affiliates may agree in their sole discretion. This Commitment Letter may not be amended or any term or provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto.

## 7. USA PATRIOT Act Notification

The Purchaser and the Note Agent notify you and your agents and representatives that, pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, supplemented or modified from time to time, the "Patriot Act") they and each Participant may be required to obtain, verify and record information that identifies you and your agents and representatives, including the name, address and tax identification number of each such person and other information that will allow the Purchaser, the Note Agent and each Participant to identify each such person in accordance with the Patriot Act and other applicable "know your customer" and anti-money laundering rules and regulations. This notice is given in accordance with the requirements of the Patriot Act and is effective for the Note Agent, the Purchaser and each Participant.

## 8. Sharing Information; Affiliate Activities; Absence of Fiduciary Relationship

Please note that this Commitment Letter, the Fee Letter and any written or oral communications provided by the Note Agent, the Purchaser, the Arranger or any of their respective affiliates in connection with the Transactions are exclusively for the information of the City and may not be disclosed by you, directly or indirectly, to any other person or entity (including, without limitation, other potential providers or arrangers of financing) or circulated or referred to publicly without the Purchaser's prior written consent except: (i) this Commitment Letter and the Fee Letter and such communications may be disclosed to your agents, representatives, officers, directors and advisors on a "need-to-know" basis to the extent you notify such persons of their obligation to keep this Commitment Letter, the Fee Letter and such communications confidential and such persons agree to hold the same in confidence, (ii) this Commitment Letter and the existence and contents hereof (but not the Fee Letter or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in syndication or marketing materials) may be disclosed in any syndication or other marketing material in connection with the Post-Petition Facility to the extent such materials are requested by the Arranger, and (iii) after providing prior written notice to the Purchaser and with appropriate redactions as reasonably requested by the Purchaser, this Commitment Letter and the Fee Letter may be disclosed to the extent required pursuant to applicable law (including any disclosures required to be made by the City to the City Council or any local emergency financial assistance loan board pursuant to Michigan P.A. 436 or Section 36a of the Michigan Home Rule Act), compulsory legal process or as required by the Bankruptcy Court; provided that you agree to take, or cause to be taken, such actions as may be necessary to prevent the Fee Letter and the provisions regarding fees payable under this Commitment Letter and any other confidential commercial information from becoming publicly available, including, without limitation, the filing of a motion or an ex parte request seeking an order authorizing you or your agents or representatives, as applicable, to file the Fee Letter under seal and seeking approval of the

6

October 4, 2013
The City of Detroit, Michigan

Bankruptcy Court to limit any such disclosure to the in camera review of the judge presiding over the Bankruptcy Case (and his or her judicial clerks). Notwithstanding any of the foregoing, with respect to any disclosures regarding the Commitment Letter or the Fee Letter to the City Council or any local emergency financial assistance loan board as may be required under Michigan P.A. 436 or Section 36a of the Michigan Home Rule Act, the City agrees to request that the City Council or local emergency financial assistance loan board keep such disclosures confidential, and the City agrees to limit such disclosures, in consultation with the Purchaser, to the minimum disclosure necessary in seeking any necessary approvals for the Transactions.

You acknowledge that Barclays and its affiliates are full service securities firms and as such may from time to time effect transactions, for their own account or the account of customers, and may at any time purchase, sell, hold or vote long or short positions and investments in securities, loans, commodities, currencies, derivative transactions (including total return swaps and credit default swaps), indebtedness, or options thereon, of you. With respect to any securities and/or financial instruments so held by Barclays, any of its affiliates or any of their respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights in its sole discretion. Barclays and its affiliates will have economic and other interests that are different from or conflict with those of the City regarding the transactions contemplated hereby, and you acknowledge and agree that Barclays has no obligation to disclose such interests to you. You further acknowledge and agree that nothing in this Commitment Letter, the Fee Letter or the nature of services provided hereunder or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between Barclays, on the one hand, and you, your agents or your representatives, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against Barclays for breach of fiduciary duty or alleged breach of fiduciary duty and agree that Barclays will have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your agents, representatives, employees or creditors. You acknowledge and agree that the Transactions (including the exercise of rights and remedies hereunder and under the Fee Letter) are arms' length commercial transactions and that Barclays is acting solely as principal and in its own best interests. You acknowledge and agree that you have consulted and are relying on your own legal, accounting, regulatory and tax advisors and other experts and advisors to the extent you have deemed appropriate to determine whether the Transactions are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby and are responsible for making your own independent investigation and appraisal of the Transactions (including, without limitation, with respect to any consents needed in connection with the transactions contemplated hereby). Any review by Barclays or its representatives of you, the Transactions, the other transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of Barclays and shall not be on behalf of you or any of your agents, representatives or creditors. In addition, you acknowledge that Barclays may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information concerning you and companies that may be the subject of the Transactions and Barclays's affiliates will be entitled to the benefits afforded to Barclays hereunder, provided that any such communication shall be subject to the Confidentiality Agreement dated September 3, 2013 between Barclays Capital Inc. and the City (the "<u>Confidentiality Agreement</u>"). You

October 4, 2013
The City of Detroit, Michigan

acknowledge and agree that Barclays does not have any obligation or liability to you or your agents or representatives with respect to the transactions contemplated hereby except those obligations or liabilities expressly set forth herein or in any other express writing executed and delivered by Barclays and you or any such agent or representative.

Consistent with Barclays's policies to hold in confidence the affairs of its customers, it will not use or disclose confidential information obtained from you by virtue of the Transactions in connection with Barclays's performance of services for any of its other customers (other than as permitted to be disclosed under this Section 8) and any such information shall remain at all times subject to the terms of the Confidentiality Agreement. Furthermore, you acknowledge that neither Barclays nor any of its affiliates have an obligation to use in connection with the Transactions, or to furnish to you, confidential information obtained or that may be obtained by Barclays from any other person.

Please note that Barclays and its affiliates do not provide tax, accounting or legal advice.

9. **Waiver of Jury Trial; Governing Law; Submission to Jurisdiction; Surviving Provisions; Miscellaneous**

ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, SUIT, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY HERETO ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO IN THIS COMMITMENT LETTER OR EITHER OF THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER IS HEREBY IRREVOCABLY WAIVED BY THE PARTIES HERETO. THIS COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) WILL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN. Each of the parties hereto hereby irrevocably and unconditionally (i) submits, for itself and its property, (a) during the pendency of the Bankruptcy Case, to the exclusive jurisdiction of the Bankruptcy Court and (b) after the Bankruptcy Case has been closed, to the non-exclusive jurisdiction of (1) the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and (2) the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan and, in each case of the foregoing, any appellate court from any such court, in any action, suit, proceeding or claim arising out of or relating to this Commitment Letter, the Fee Letter, the Transactions or the other transactions contemplated hereby or thereby, the performance of services contemplated hereunder or under the Fee Letter, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action, suit, proceeding or claim may be heard and determined in such court; provided that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (ii) waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any action, suit, proceeding or claim arising out of or relating to this Commitment Letter, the Fee Letter, the Transactions or the other transactions contemplated hereby or thereby or the performance of services

8

contemplated hereunder or under the Fee Letter in any such court, (iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of any such action, suit, proceeding or claim in any such court and (iv) agrees to commence any such action, suit, proceeding or claim in such courts, as applicable. The parties hereto agree that service of any process, summons, notice or document by registered mail addressed to you, the Note Agent or the Purchaser, as applicable, shall be effective service of process for any such action, suit, proceeding or claim brought in any such court. You agree, on behalf of yourself and your agents and representatives, that the foregoing provisions of this paragraph shall also apply to your agents and representatives to the same extent as to you, and the Arranger's obligations hereunder are being made in reliance on the foregoing.

This Commitment Letter is issued for your benefit only and no other person or entity (other than the Indemnified Persons) may rely hereon. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among you, the Note Agent and the Purchaser with respect to the Post-Petition Facility and set forth the entire understanding of the parties with respect thereto.

The provisions of Sections 3, 5, 8 and this Section 9 of this Commitment Letter will survive any termination or completion of the arrangements contemplated by this Commitment Letter or the Fee Letter, including without limitation whether or not the Note Documents are executed and delivered and whether or not the Post-Petition Facility is made available or any of the Notes under the Post-Petition Facility is purchased.

10.    **Acceptance; Termination**

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission (e.g., "pdf" or "tif") will be as effective as delivery of a manually executed counterpart hereof.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to Barclays the enclosed copy of this Commitment Letter, together, if not previously executed and delivered, with the Fee Letter on or before 5:00 p.m., New York City time, on October 11, 2013, whereupon this Commitment Letter and the Fee Letter will become binding agreements between you, the Note Agent, and the Purchaser. If not signed and returned as described in the preceding sentence by such date, this offer will terminate on such date. In the event the Closing Date has not occurred on or prior to January 7, 2014, the Commitment shall terminate on such date. In the event of a material breach by you or a failure of a condition under this Commitment Letter or the Fee Letter, then this Commitment Letter and the commitments hereunder shall automatically terminate unless the Purchaser shall, in its sole discretion, agree to an extension or waiver, as applicable.

*[The remainder of this page is intentionally left blank.]*

9

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

**BARCLAYS CAPITAL INC.**

By:_____
Name:  John Gerbino
Title:  Managing Director

Accepted and agreed to as of
the date first written above:

**THE CITY OF DETROIT, MICHIGAN**

By:_____
Name: KEVIN D. ORR
Title: EMERGENCY MANAGER

[Signature Page to Commitment Letter]

BARCLAYS CAPITAL INC., as Note Agent

By: _____
    Name: John Gerbino
    Title:  Managing Director

<u>Quality of Life Note Term Sheet</u>

<u>See Attached</u>

*Set forth below is a summary of certain key terms for the Quality of Life Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Quality of Life Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

Issuer:     The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending.

Purchaser and Sole     Barclays Capital Inc.
Lead Arranger:

Note Agent:     Barclays Capital Inc.

## 2. TYPE AND AMOUNT OF FACILITY

Type and Amount:     A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Note" or the "Note" and, together with (i) the Swap Termination Note or (ii) the Replacement Swap Transaction, as applicable (as selected by the City), the "Post-Petition Facility") in an aggregate principal amount of up to $350,000,000, minus the amount of the Swap Termination Note (as defined in the Swap Termination Note Term Sheet) or the Upfront Amount in respect of the Replacement Swap Transaction (each as defined in the Replacement Swap Transaction Term Sheet), as applicable (the "Facility Amount").

Purposes:     Proceeds from the issuance of the Quality of Life Note shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Note Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City.

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the QOL Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "<u>Maturity Date</u>"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "<u>Post-Petition Financing Order</u>"), authorizing the Post-Petition Facility, authorizing the City to enter into the QOL Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the QOL Note Documents and the issuance of the Swap Termination Note are satisfied and the Swap Termination Note shall have been issued in accordance with the terms of the ST Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Swap Termination Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| | |
|---|---|
| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Quality of Life Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax |

Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Quality of Life Note Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Note on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Note on a first-priority basis.

The QOL Note Documents will require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Quality of Life Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

The QOL Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month, all of which shall be applied to redeem the Swap Termination Note until such Note is paid in full and thereafter, such amounts (in addition to $4 million per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Note. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

| Super-Priority of | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), |

| | |
|---|---|
| Note: | the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any QOL Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any QOL Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the QOL Note Documents); entry of an order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Wagering Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Wagering Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established. |
| Remedies: | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis |

on a level debt basis equivalent to $4 million per month (or, following repayment in full of the Swap Termination Note, $8 million per month, as set forth above under the heading "Collateral"), plus the pro-rata proceeds of any Asset Proceeds Collateral.

Prohibition of
Additional
Borrowings:

The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Quality of Life Note or the Swap Termination Note.

## 5. CERTAIN OTHER PROVISIONS

Documentation:

Each in form and substance satisfactory to the Purchaser:

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of

Note terms and conditions

- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Note Collateral, including lifting of automatic stay and "good faith" finding

- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into QOL Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law

- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "QOL Note Documents".

|                         |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |
|-------------------------|-----|
| Conditions<br>Precedent: | Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the QOL Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form |

| | |
|---|---|
| Relationship: | document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| Yield Protection, Taxes and Other Deductions: | The QOL Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the QOL Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the QOL Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities |

or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase Agreement.<br><br>George E. Zobitz, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700<br>jzobitz@cravath.com |
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>AFillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and |

the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

### Swap Termination Note Term Sheet

**See Attached**

<u>City of Detroit</u>
<u>$350,000,000 Post-Petition Bond Financing</u>
<u>Summary of Indicative Terms and Conditions of Swap Termination Note</u>

*Set forth below is a summary of certain key terms for the Swap Termination Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Swap Termination Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

Issuer:

The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending.

Purchaser and Sole
Lead Arranger:

Barclays Capital Inc.

Note Agent:

Barclays Capital Inc.

## 2. TYPE AND AMOUNT OF FACILITY

Type and Amount:

A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Note" or the "Note" and, together with the Quality of Life Note, the "Post-Petition Facility") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended, the "Forbearance Agreement") to terminate the underlying swaps. The sum of the amount of the Swap Termination Note and the amount of the Quality of Life Note shall not exceed $350,000,000 (the "Facility Amount").

Purposes:

The Swap Termination Note may be used by the City to pay amounts required under the Forbearance Agreement to terminate the underlying swaps as approved by the Bankruptcy Court.

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the ST Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the ST Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the ST Note Documents and the issuance of the Quality of Life Note are satisfied and the Quality of Life Note shall have been issued in accordance with the terms of the QOL Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
|---|---|
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Quality of Life Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Swap Termination Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on: (i) the Asset Proceeds Collateral and (ii) income tax revenues of the City (the "Pledged Income Tax Revenue" and together with the Asset Proceeds Collateral, the "Swap Termination Note Collateral"). The lien on the Asset Proceeds Collateral shall also secure the Quality of Life Note on |

a pari passu basis. The Quality of Life Note shall be secured by a second lien on the Pledged Income Tax Revenue.

The ST Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the ST Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

| Super-Priority of Note: | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any ST Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any ST Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the ST Note Documents); entry of an |

order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established.

|  |  |
|---|---|
| Remedies: | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month, plus the pro-rata proceeds of any Asset Proceeds Collateral. |
| Prohibition of Additional Borrowings: | The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Swap Termination Note or the Quality of Life Note. |

## 5. CERTAIN OTHER PROVISIONS

| | |
|---|---|
| Documentation: | Each in form and substance satisfactory to the Purchaser: |

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of Note terms and conditions
- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Swap Termination Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into ST Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "ST Note Documents".

Conditions Precedent: Usual for municipal financings and Chapter 11 debtor-in-possession financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the ST Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Quality of Life Note (the "QOL Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Quality of Life Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap

Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any ST Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary Relationship: | The City acknowledges that the transactions described in this document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet.

Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |

| | |
|---|---|
| Yield Protection, Taxes and Other Deductions: | The ST Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the ST Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the ST Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities. |
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase |

Agreement.

George E. Zobitz, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
212 474 1000
F 212 474 3700
jzobitz@cravath.com

Michigan Counsel:

Ann D. Fillingham, Esq.
James P. Kiefer, Esq.
Courtney F. Kissel, Esq.
Dykema Gossett PLLC
Capitol View
201 Townsend Street, Suite 900
Lansing, MI 48933
517 374 9100
F 517 374 9191
AFillingham@dykema.com
jkiefer@dykema.com
ckissel@dykema.com

Governing Law:

Michigan.

Jurisdiction and Venue:

The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

# **EXHIBIT 6B**

**CITY OF DETROIT, MICHIGAN**

**FINANCIAL RECOVERY BONDS
SERIES 2013A (SWAP TERMINATION)**

_____

**BOND PURCHASE AGREEMENT**

_____

_____, 2013

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "<u>Purchaser</u>") offers to enter into this Bond Purchase Agreement (this "<u>Bond Purchase Agreement</u>") with City of Detroit, County of Wayne, State of Michigan (the "<u>City</u>") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City.  This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 1:00 P.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>") and that the City's bankruptcy case bears Case No. 13-53846 (the "<u>Bankruptcy Case</u>") and that an order for relief in the Bankruptcy Case was entered on _____, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1.     **Sale Purchase Price and Terms of the Bonds.**  (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____ aggregate principal amount of Financial Recovery Bonds Series 2013A (Swap Termination) (the "<u>Bonds</u>"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have

priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and over all prepetition unsecured claims against the City. The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b) The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the ST Bond Documents and (iv) _____ *[the date that is two years and six months after the Closing Date]* (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date"). Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date. Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c) As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest). Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d) As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations and on a ratable basis with the Quality of Life Bonds, from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral").

(e) The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. 2013-__ of the Local Financial Emergency Loan Board dated _____ (the "ELB Order"), and the City of

Detroit, Michigan Financial Recovery Bond Trust Indenture (the "Indenture") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $_____ (the "Purchase Price").

(f)     The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by a first priority lien on (a) the Asset Proceeds Collateral and (b) the revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et. seq. (the "Pledged Income Tax Revenue", and together with the Asset Proceeds Collateral, the "Bond Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Quality of Life Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Quality of Life Bonds on a second lien basis.

(g)     The ST Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Income Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the ST Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Bonds. Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(h)     The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the ST Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the ST Bond Documents.

(i)     Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Bonds") for the purpose of funding certain quality of life projects for the City.

2.     **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding

obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)  In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)  The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)  The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.  **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter.  Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4.  **Private Placement of Bonds; Absence of Disclosure Document.**  The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5.  **Closing.**  At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("DTC"), one registered bond in the denomination equal to the principal amount of the Bonds (the "Bond Certificate"), to be delivered to the Trustee as custodian

for DTC. Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "Closing Documents"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $_____ by wire transfer for the account of the City. The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6. **Representations of the City.** The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a) The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the ST Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ST Bond Documents.

(b) The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ST Bond Documents.

(c) The Asset Proceeds Collateral and the Pledged Income Tax Revenue may legally be pledged as collateral for the Bonds, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d) This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms. When executed and delivered, as set forth in the Post-Petition Financing Order, the ST Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)     When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the ST Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the ST Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)     All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the ST Bond Documents is in full force and effect.

(i)     The execution, delivery and performance of the terms and conditions of the ST Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the ST Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)     Except as described on Appendix __ hereto, and other than as described in the ST Bond Documents and the QOL Bond Documents and in Section 8(i) below, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)     As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have

fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.

(l) Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(m) The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the ST Bond Documents.

(n) The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the ST Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

It is further understood and agreed that the members of the City and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds. No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member, officer, attorney, agent or employee of the City in an individual capacity. No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any officer, member, agent, attorney or employee, in an individual or personal capacity.

7. **Covenants and Agreements of the City.** The City hereby covenants and agrees as follows:

(a) In the event of any payment default on the Bonds, the City agrees to cooperate with the Purchaser to deliver a Private Placement Memorandum or similar disclosure document in a timely manner if requested to do so and the City shall enter into any continuing disclosure agreement if required.

(b) The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use

or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the ST Bond Documents.

(c)     The City covenants that it will not seek to invalidate or refute the enforceability of any ST Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d)     The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or the Quality of Life Bonds or (b) is secured by a lien on any of the collateral securing the Bonds and/or the Quality of Life Bonds as long as the Bonds are outstanding under the Indenture.  The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds or the Quality of Life Bonds.

8.     **Conditions to Closing.**   The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date.  In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a)     The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b)     As of the Closing Date, (i) this Bond Purchase Agreement and the ST Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may have been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c)     The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "Commitment Date") and prior to the Closing Date: (i) the United States shall become engaged in hostilities

that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the ST Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the liens and security interests in respect of the Pledged Income Tax Revenue.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.

(g)     Evidence of the effectiveness of the definitive documents in respect of the Quality of Life Bonds (the "QOL Bond Documents") reasonably satisfactory to the Purchaser.

(h)     The satisfaction of all of the conditions precedent to the issuance of the Quality of Life Bonds set forth in the QOL Bond Documents and the simultaneous issuance of the Quality of Life Bonds.

(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may have been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.

(j)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(k)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(l)     There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(m)     The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds and the Quality of Life Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(n)     The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(o)     The Bonds and the ST Bond Documents shall contain the terms set forth in Section 1 hereof.

(p)     On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)     A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond

counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)     A State law supplemental opinion in respect of the ST Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)     A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into ST Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue;

(8)     The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue in favor of the Bonds;

(9)     The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

[(10)    A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(11)    A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(12)    A specimen Bond;

(13)    A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(14)    An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(15)    Officers' and public officials' certifications regarding the Bonds, the ST Bond Documents, the Quality of Life Bonds, the QOL Bond Documents and the Swap Agreements;

(16)    Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the ST Bond Documents (defined below);

(17)    An executed copy of the Bond Authorizing Order;

(18)    An executed copy of the Sale Order; and

(19)    Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture and each of the documents set forth in clauses (5), (6), (17) and (18) above are referred to herein as the "ST Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9.    **Fees and Expenses.**  Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City;

and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10. **Notices.** Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11. **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.** This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser). No other person shall acquire or have any right hereunder or by virtue hereof. All the representations, warranties, covenants and agreements contained in this Bond Purchase Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12. **Disclaimer of Purchaser.** It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder. The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13. **Indemnification**. To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify

upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any ST Bond Documents or QOL Bond Documents (collectively, the "Bond Documents") are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds or the Quality of Life Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds or the Quality of Life Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the ST Bond Documents, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other

person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the ST Bond Documents, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

14. **Counterparts.** This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15. **Governing Law.** This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16. **Jurisdiction**. To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17. **Waiver of Jury Trial**. Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond

Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18. **Syndication**. (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds or the Quality of Life Bonds by assigning or selling participations in the Bonds and the Quality of Life Bonds to a group of banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request). Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date. For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date. Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b) The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c) In the event that the Closing Date has occurred and the ST Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Quality of Life Bonds, the City hereby agrees, at its own expense, to take

all such action as may be required in order to effect any amendments to the Bonds and the Quality of Life Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Quality of Life Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19. **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than the projections and other forward looking information (the "Projections")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

Very truly yours,

**BARCLAYS CAPITAL INC.**


By: _____

John Gerbino
Managing Director


Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**


By: _____

<u>**Appendix A**</u>

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated _____, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the ST Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2013.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the $350,000,000 Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the $350,000,000 Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

Appendix A
Page 2

13-53846-swr   Doc 1884-2   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 67 of 264
355
13-53846-swr   Doc 1520   Filed 11/05/13   Entered 11/05/13 14:35:92   Page 66 of 171

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the ST Bond Documents, LIBOR shall at no time be less than the LIBOR Floor. If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Pledged Wagering Tax Revenue*" means taxes owing to the City in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996, MCL 432.201, et. seq. (or any replacement or successor statute).

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as ____ [Docket No.], attached hereto as Appendix __.

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Quality of Life Bonds*" shall have the meaning assigned to such term in Section 1(i) of this Bond Purchase Agreement.

"*Reserve Percentage*" means the aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Eurocurrency Liabilities" as defined in Regulation D.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the ST Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means _____.

Appendix A
Page 4

13-53846-swr   Doc 1314-2   Filed 10/25/13   Entered 10/25/13 14:23:02   Page 168 of 264
13-53846-swr   Doc 1520   Filed 11/05/13   Entered 11/05/13 14:35:27   Page 173 of 355

**CITY OF DETROIT, MICHIGAN**

**FINANCIAL RECOVERY BONDS
SERIES 2013B (QUALITY OF LIFE)**

_____

**BOND PURCHASE AGREEMENT**
_____

_____, 2013

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "Purchaser") offers to enter into this Bond Purchase Agreement (this "Bond Purchase Agreement") with City of Detroit, County of Wayne, State of Michigan (the "City") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 1:00 P.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and that the City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case") and that an order for relief in the Bankruptcy Case was entered on _____, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1.    **Sale Purchase Price and Terms of the Bonds.** (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____ aggregate principal amount of Financial Recovery Bonds Series 2013B (Quality of Life) (the "Bonds"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have

13-53846-swr   Doc 1520   Filed 11/05/13   Entered 11/05/13 14:35:02   Page 69 of 264
13-53846-swr   Doc 1314-2   Filed 10/28/14   Entered 10/28/14 22:00:23   Page 174 of
355

priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and over all prepetition unsecured claims against the City. The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b) The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the QOL Bond Documents and (iv) _____ [*the date that is two years and six months after the Closing Date*] (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date"). Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date. Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c) As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest). Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d) As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations and on a ratable basis with the Swap Termination Bonds, from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral").

(e) The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. 2013-__ of the Local Financial Emergency Loan Board dated _____ (the "ELB Order"), and the City of

-2-

Detroit, Michigan Financial Recovery Bond Trust Indenture (the "Indenture") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $_____ (the "Purchase Price").

(f) The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996, MCL 432.201, et. seq. (or any replacement or successor statute) (the "Pledged Wagering Tax Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et. seq. (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Bond Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Bonds on a first-priority basis.

(g) The QOL Bond Documents shall require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Wagering Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default (as defined in the Indenture) to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full. Subject to the terms of the Wagering Tax Control Agreements, the City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

(h) The QOL Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Income Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to redeem the Swap Termination Bonds until such Swap Termination Bonds are paid in full and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Bonds. Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(i)     The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the QOL Bond Documents.

(j)     Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Bonds") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, as amended from time to time, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other hand, to terminate the underlying swaps.

2.      **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)     In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)     The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)     The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.      **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is

unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter. Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4. **Private Placement of Bonds; Absence of Disclosure Document.** The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5. **Closing.** At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("DTC"), one registered bond in the denomination equal to the principal amount of the Bonds (the "Bond Certificate"), to be delivered to the Trustee as custodian for DTC. Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "Closing Documents"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $_____ by wire transfer for the account of the City. The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6. **Representations of the City.** The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a) The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the QOL Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate

the transactions contemplated by this Bond Purchase Agreement and the QOL Bond Documents.

(b)     The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the QOL Bond Documents.

(c)     The Asset Proceeds Collateral, the Pledged Wagering Tax Revenue and the Pledged Income Tax Revenue may legally be pledged as collateral for the Bonds and the Swap Termination Bonds, as applicable, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d)     This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms.  When executed and delivered, as set forth in the Post-Petition Financing Order, the QOL Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)     When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the QOL Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the QOL Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)     All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the QOL Bond Documents is in full force and effect.

(i)     The execution, delivery and performance of the terms and conditions of the QOL Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the QOL Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)     Except as described on Appendix __ hereto, and other than as described in the QOL Bond Documents and the ST Bond Documents and in Section 8(i) below, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)     As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.

(l)     Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(m)     The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the QOL Bond Documents.

(n)     The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the QOL Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

13-53846-swr   Doc 1314-2   Filed 11/05/13   Entered 11/05/13 14:35:02   Page 180 of 264

It is further understood and agreed that the members of the City and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds. No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member, officer, attorney, agent or employee of the City in an individual capacity. No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any officer, member, agent, attorney or employee, in an individual or personal capacity.

7. **Covenants and Agreements of the City.** The City hereby covenants and agrees as follows:

(a) In the event of any payment default on the Bonds, the City agrees to cooperate with the Purchaser to deliver a Private Placement Memorandum or similar disclosure document in a timely manner if requested to do so and the City shall enter into any continuing disclosure agreement if required.

(b) The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the QOL Bond Documents.

(c) The City covenants that it will not seek to invalidate or refute the enforceability of any QOL Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d) The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or the Swap Termination Bonds or (b) is secured by a lien on any of the collateral securing the Bonds and/or the Swap Termination Bonds as long as the Bonds are outstanding under the Indenture. The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds or the Swap Termination Bonds.

8. **Conditions to Closing.** The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date. In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a) The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b) As of the Closing Date, (i) this Bond Purchase Agreement and the QOL Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may be been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c) The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "Commitment Date") and prior to the Closing Date: (i) the United States shall become engaged in hostilities that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general

character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the QOL Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the liens and security interests in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.

(g)     Evidence of the effectiveness of the definitive documents in respect of the Swap Termination Bonds (the "ST Bond Documents") reasonably satisfactory to the Purchaser.

(h)     The satisfaction of all of the conditions precedent to the issuance of the Swap Termination Bonds set forth in the ST Bond Documents and the simultaneous issuance of the Swap Termination Bonds.

(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may be been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.

(j)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(k)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it

reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(l)　　There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(m)　　The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds and the Swap Termination Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(n)　　The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(o)　　The Bonds and the QOL Bond Documents shall contain the terms set forth in Section 1 hereof.

(p)　　On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)　　A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)　　A State law supplemental opinion in respect of the QOL Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)　　A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed

with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Wagering Tax Control Agreements and Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into QOL Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue;

(8)     The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue in favor of the Bonds;

(9)     The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

[(10)     A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(11)     A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(12)     A specimen Bond;

(13)     A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(14)     An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(15)    Officers' and public officials' certifications regarding the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the ST Bond Documents and the Swap Agreements;

(16)    Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the QOL Bond Documents (defined below);

(17)    An executed copy of the Bond Authorizing Order;

(18)    An executed copy of the Sale Order; and

(19)    Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture, this Bond Purchase Agreement and each of the documents set forth in clauses (5), (6), (17) and (18) above are referred to herein as the "QOL Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9.    **Fees and Expenses.**  Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City; and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10.    **Notices.**  Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11.    **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.**  This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser).  No other person shall acquire or have any right hereunder or by virtue hereof.   All the representations, warranties, covenants and agreements contained in this Bond Purchase

Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12. **Disclaimer of Purchaser.** It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder. The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13. **Indemnification.** To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified

13-53846-swr    Doc 1314-2    Filed 11/05/23    Entered 11/05/23 14:35:02    Page 187 of 264
13-53846-tjt    Doc 1520    Filed 04/29/14    Entered 04/29/14 23:00:23    Page 187 of 264    187

Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any QOL Bond Documents or ST Bond Documents (collectively, the "Bond Documents") are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds or the Swap Termination Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds or the Swap Termination Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

14.    **Counterparts.**   This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15.    **Governing Law.**   This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16.    **Jurisdiction**.   To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan.   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17.    **Waiver of Jury Trial**.   Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18.    **Syndication**.   (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds or the Swap Termination Bonds by assigning or selling participations in the Bonds and the Swap Termination Bonds to a group of banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).   Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date.    For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date.  Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase

-16-

Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b)     The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c)     In the event that the Closing Date has occurred and the QOL Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, the City hereby agrees, at its own expense, to take all such action as may be required in order to effect any amendments to the Bonds and the Swap Termination Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19.    **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than

the projections and other forward looking information (the "<u>Projections</u>")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

Very truly yours,

**BARCLAYS CAPITAL INC.**


By: _____

John Gerbino
Managing Director


Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**


By: _____

<u>**Appendix A**</u>

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated _____, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the QOL Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2013.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the $350,000,000 Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the $350,000,000 Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(h) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(h) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the QOL Bond Documents, LIBOR shall at no time be less than the LIBOR Floor. If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Pledged Wagering Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as _____ [Docket No.], attached hereto as Appendix __.

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Reserve Percentage*" means the aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Eurocurrency Liabilities" as defined in Regulation D.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the QOL Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Swap Termination Bonds*" shall have the meaning assigned to such term in Section 1(j) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means _____.

"*Wagering Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Wagering Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

# EXHIBIT 6C

**FINANCIAL RECOVERY BOND**

**TRUST INDENTURE**

Between

**CITY OF DETROIT**

County of Wayne, Michigan

and

[_____,]

as Trustee

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2013A**

and

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2013B**

Dated as of [_____], 2013

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND INTERPRETATION ............................................................ 2
    Section 101    Definitions ...................................................................................... 2
    Section 102    Interpretation .................................................................................. 9
ARTICLE II TERMS OF BONDS .................................................................................... 10
    Section 201    Authorization for Indenture and Bonds; Indenture to Constitute a
                 Contract ....................................................................................... 10
    Section 202    Authorization of Bonds .................................................................. 10
    Section 203    Issuance and Delivery of Bonds .................................................... 10
    Section 204    Conditions Precedent to Delivery of Bonds .................................. 10
ARTICLE III GENERAL TERMS AND PROVISIONS OF BONDS ...................................... 12
    Section 301    Designation of Bonds; Form of Bonds .......................................... 12
    Section 302    Book-Entry Only System for the Bonds ........................................ 12
    Section 303    Interchangeability of Bonds .......................................................... 13
    Section 304    Negotiability, Transfer and Bond Registry .................................... 14
    Section 305    Transfer of Bonds ......................................................................... 14
    Section 306    Regulations With Respect to Exchanges and Transfers ................ 14
    Section 307    Bonds Mutilated, Destroyed, Stolen or Lost .................................. 15
    Section 308    Cancellation and Destruction of Bonds ........................................ 15
    Section 309    Redemption .................................................................................. 15
    Section 310    Selection of Bonds to be Redeemed ............................................. 15
    Section 311    Notice of Redemption ................................................................... 16
    Section 312    Payment of Redeemed Bonds ....................................................... 16
ARTICLE IV PLEDGE OF INDENTURE; SOURCES OF PAYMENT AND SECURITY
    FOR THE BONDS ............................................................................................... 17
    Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest ........ 17
    Section 402    Creation of Liens .......................................................................... 18
ARTICLE V ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS .......... 18
    Section 501    Debt Service Fund ........................................................................ 18
    Section 502    Costs of Issuance Fund ................................................................. 19
    Section 503    Bond Proceeds Fund ..................................................................... 20
    Section 504    Amounts Remaining in Funds and Accounts ............................... 20
    Section 505    Approval of Account Control Agreements ..................................... 20
ARTICLE VI INVESTMENT OF FUNDS ........................................................................ 21
    Section 601    Permitted Investments .................................................................. 21
    Section 602    Valuation and Sale of Investments ............................................... 22
ARTICLE VII PARTICULAR COVENANTS OF THE CITY ............................................... 22
    Section 701    Payment of Bonds ........................................................................ 22
    Section 702    Power to Issue Bonds and Pledge Revenues, Funds and Other
                 Property ........................................................................................ 22
    Section 703    Maintenance of Perfected Security Interests; Further Assurances;
                 Notices of Default ........................................................................ 23

i

| | | |
|---|---|---|
| Section 704 | Tax Covenants | 23 |
| Section 705 | Compliance With Conditions Precedent | 23 |
| Section 706 | Accounts and Reports | 23 |
| Section 707 | Issuance of Additional Obligations | 23 |
| Section 708 | Wagering Tax and Income Tax Revenues and Accounts | 23 |
| Section 709 | Asset Proceeds Collateral | 24 |
| Section 710 | Contesting Enforceability | 24 |

ARTICLE VIII THE TRUSTEE ................................................................................................ 24

| | | |
|---|---|---|
| Section 801 | Powers and Duties of Trustee | 24 |
| Section 802 | Fees and Expenses of Trustee | 26 |
| Section 803 | Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale | 27 |
| Section 804 | Removal of Trustee | 27 |
| Section 805 | Appointment of and Transfer to Successor Trustee | 28 |

ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ON DEFAULT ............................ 28

| | | |
|---|---|---|
| Section 901 | Events of Default | 28 |
| Section 902 | Remedies | 30 |
| Section 903 | Waiver of Default | 31 |
| Section 904 | Possession of Bonds by Trustee Not Required | 31 |
| Section 905 | Remedies Cumulative | 32 |
| Section 906 | Knowledge by Trustee of an Event of Default | 32 |
| Section 907 | Application of Monies | 32 |

ARTICLE X SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE ....................................................................................................................... 32

| | | |
|---|---|---|
| Section 1001 | Modifications and Amendments Not Requiring Consent | 32 |
| Section 1002 | Amendments Requiring Consent | 33 |
| Section 1003 | Consent of Trustee | 34 |
| Section 1004 | General Provisions Relating to Supplemental Indentures | 34 |

ARTICLE XI MISCELLANEOUS ....................................................................................... 35

| | | |
|---|---|---|
| Section 1101 | Notices | 35 |
| Section 1102 | Termination | 35 |
| Section 1103 | Defeasance | 35 |
| Section 1104 | Severability | 36 |
| Section 1105 | Headings | 36 |
| Section 1106 | Indenture Executed in Counterparts | 36 |
| Section 1107 | Parties Interested Herein | 36 |
| Section 1108 | Jurisdiction | 36 |

| | | |
|---|---|---|
| EXHIBIT A | FORM OF SERIES 2013A BOND | A-1 |
| EXHIBIT B | FORM OF SERIES 2013B BOND | B-1 |
| EXHIBIT C | FORM OF ACCOUNT CONTROL AGREEMENT | C-1 |

ii

## FINANCIAL RECOVERY BOND TRUST INDENTURE

This Trust Indenture, dated as of [_____], 2013 (the "Indenture"), between the City of Detroit, County of Wayne, State of Michigan (the "City") and [_____, _____, _____], and its successors in trust and assignees, as trustee (the "Trustee").

## W I T N E S S E T H :

**WHEREAS**, pursuant to the Local Government Fiscal Responsibility Act, Act 436, Public Acts of Michigan, 2012 ("Act 436"), the Governor (the "Governor") of the State of Michigan (the "State") determined that a local government financial emergency exists in the City of Detroit, County of Wayne, Michigan (the "City"), and an emergency manager, as defined in Act 436, Kevyn D. Orr (the "Emergency Manager") was appointed for the City by the Governor on March 28, 2013 in accordance with Act 436; and

**WHEREAS**, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

**WHEREAS**, on October 11, 2013, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City his Order No. 17 Approval of Postpetition Financing ("Order No. 17"); and

**WHEREAS**, Order No. 17 proposes the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") to provide certain post-bankruptcy petition financing for the City upon the terms and conditions and parameters set forth in Order No. 17 and the term sheets attached thereto (the "Secured Financing"); and

**WHEREAS**, on October 21, 2013, in accordance with Section 19(1) of Act 436, the City Council of the City (the "City Council") disapproved the Secured Financing; and

**WHEREAS**, pursuant to Section 19(2) of Act 436, the City Council was afforded 7 days following its disapproval of the Secured Financing to propose an "alternative proposal that would yield substantially the same financial result as" the Secured Financing to the Emergency Financial Assistance Loan Board (the "Board"); and

**WHEREAS**, the City Council failed to offer an alternative proposal to the Board during the time period prescribed in Section 19(2) of Act 436 and as a consequence, the Emergency Manager submitted an Order to authorize the Secured Financing through the issuance of Bonds to the Board for approval and implementation of the Secured Financing by the Emergency Manager; and

**WHEREAS**, on [_____], 2013, the Bankruptcy Court issued an order [Docket No. __] authorizing the Secured Financing (the "Bankruptcy Court Order"), pursuant to which super priority liens have been established under Sections 364(c), 503 and 507(a)(2) of the Bankruptcy Code for the certain collateral securing the bonds authorized for issuance hereunder; and

**WHEREAS**, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board established pursuant to Act 243, Public Acts of Michigan, 1980, as amended; and

**WHEREAS**, on [_____], 2013, the Board issued an Order (the "Board Order") approving the issuance of the Series 2013A Bonds and the Series 2013B Bonds by the City in an aggregate principal amount not to exceed $350,000,000 and as finally determined in the Sale Order of the Emergency Manager, subject to the terms and conditions for each series of Bonds approved by the Board in the Board Order; and

**WHEREAS**, in connection with the issuance of the Bonds, the Trustee shall enter into Account Control Agreements (as hereinafter defined) with the City and the Depository Banks for purposes of perfecting the security interests granted by the City in favor of the Registered Owners of the Series 2013A Bonds and the Series 2013B Bonds in certain tax revenue and other collateral of the City described herein to secure repayment of the City's obligations owing in respect of the Bonds.

**NOW, THEREFORE, THIS TRUST INDENTURE WITNESSETH** that in order to secure the payment of the Bonds, for the benefit of the respective Registered Owners thereof and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Trustee for the benefit of the respective owners from time to time of the Bonds as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101    <u>Definitions</u>.  In addition to the terms defined in the preambles to this Indenture, and in the Bond Orders, the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"*1 Month LIBOR Rate*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("BBA LIBOR") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Calculation Agent from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a 1-Month LIBOR Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic

2



mean of all such rates; provided further, however, that, for purposes of this Indenture, the 1-Month LIBOR Rate shall at no time be less than the LIBOR Floor.  If, for any reason, such rate is not available, the term 1-Month LIBOR Rate shall mean the rate of interest per annum determined by the Calculation Agent, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the 1-Month LIBOR Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, the 1-Month LIBOR Rate shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*1-Month LIBOR Reset Date*" means the first Business Day of each calendar month.

"*Account*" means any of the trust funds and accounts created and established by, or pursuant to, this Indenture.

"*Account Control Agreements*" means, collectively the Income Tax Account Control Agreement and the Wagering Tax Account Control Agreement.

"*Act 279*" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"*Act 284*" means Act No. 284, Public Acts of Michigan, 1964, as amended, and any replacement or successor thereto.

"*Act 436*" means Act No. 436, Public Acts of Michigan, 2012.

"*Asset Proceeds Collateral*" shall mean all net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10 million, which net cash proceeds are pledged by the City hereunder, on the terms and conditions set forth hereunder, in favor of the Registered Owners of the Series 2013(A) Bonds and the Series 2013(B) Bonds.

"*Authorized Denominations*" shall mean denominations of Bonds equal to multiples of $100,000 or integral multiples of $5,000 in excess thereof.

"*Authorized Officer*" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer issued to the Trustee to act on behalf of or otherwise represent the City in any legal capacity, which such Certificate shall be delivered, if at all, in the City's sole discretion.

"*Bankruptcy Case*" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"*Bankruptcy Court Order*" has the meaning set forth in the recitals hereto.

"**Board**" has the meaning set forth in the recitals hereto.

"**Bond**" or "**Bonds**" means singularly or collectively, the Series 2013A Bonds and the Series 2013B Bonds.

"**Bondowner**", "**Owner**" or "**Registered Owner**" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry under Section 304.

"**Bond Authorizing Order**" means that Order of the Emergency Manager dated [_____,] 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"**Bond Counsel**" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"**Bond Orders**" means collectively the Bond Authorizing Order and the Sale Order.

"**Bond Proceeds Fund**" means the fund established pursuant to Section 503 hereof by the Trustee and pursuant to the Bond Orders in which, on the Date of Original Issue, the proceeds of the Bonds shall be deposited.

"**Bond Purchase Agreements**" means, collectively, that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2013 with respect to the Series 2013A Bonds and that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2013 with respect to the Series 2013B Bonds.

"**Bond Rate**" means the sum of the 1-Month LIBOR Rate and the Spread.

"**Bond Registry**" means the books for the registration of Bonds maintained by the Trustee.

"**Business Day**" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"**Calculation Agent**" means Barclays Capital Inc.

"**Certificate**" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called for by this Indenture, as the case may be.

"**City**" means the City of Detroit, County of Wayne, Michigan.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Costs of Issuance Fund**" means the fund established under Section 502 hereof for the payment of the costs of issuance of the Bonds.

"**Date of Original Issue**" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"**Debt Service Accounts**" means, collectively, the Series 2013A Debt Service Account and Series 2013B Debt Service Account.

"**Debt Service Fund**" means the Debt Service Fund established under Section 501 hereof, for the payment of principal of and interest on the Bonds.

"**Debt Service Requirement Amount**" means, as applicable, an amount equal to (i) the interest due on the Bonds on the next succeeding Interest Payment Date plus if such Interest Payment Date is also a Redemption Date, any principal and premium owing on such Redemption Date, if any, or (ii) the amount equal to the interest, premium, if any, and principal due on the Bonds on the Maturity Date plus any fees or expenses for which the Trustee is entitled to be paid from the Debt Service Fund.

"**Depository Banks**" means the Income Tax Depository Bank and the Wagering Tax Depository Bank.

"**Emergency Manager**" has the meaning set forth in the recitals hereto.

"**Event of Default**" has the meaning attributed to it in Section 901 hereof.

"**Financing Document**" means this Indenture, the Bond Purchase Agreements, the Account Control Agreements, the Series 2013A Bonds, the Series 2013B Bonds, the Bond Orders, the Bankruptcy Court Order, the Fee Letter and any other document related to the issuance, sale or delivery of the Bonds.

"**Fiscal Year**" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"**Governmental Obligations**" means non- callable (a) direct obligations of the United States of America for the full and timely payment of which the full faith and credit of the United States of America is pledged, (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any securities described in (a) or (b) issued or held in book-entry form on the books of the Department of Treasury of the United States of America or Federal Reserve Bank, and (c) securities which represent an interest in the obligations described in (a) and (b) above.

"**Income Tax Account Control Agreement**" means that certain Account Control Agreement dated as of [____], 2013 by and among the City, the Trustee, and the Income Tax

Depository Bank in favor of the Bondowners with respect to the Comerica Lockbox Account that holds the Pledged Income Tax Revenues.

"***Income Tax Depository Bank***" means Comerica Bank and any successor thereto.

"***Income Tax Revenues***" means revenues collected by the City from a levy of an excise tax on income pursuant to Act 284.

"***Indenture***" means this Trust Indenture, dated as of [_____], 2013, as supplemented and amended.

"***Interest Payment Date***" means (i) each 1-Month LIBOR Reset Date; (ii) with respect only to Bonds being redeemed, in whole or in part, the Redemption Date; and (iii) the Maturity Date.

"***Law 1***" means the Michigan Gaming Control and Revenue Act, Initiated Law 1 of the State, effective December 5, 1996, as amended, and any replacement or successor thereto.

"***LIBOR Floor***" means 1.00% per annum.

"***London Banking Day***" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"***Maturity Date***" means the earliest to occur of (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to this Indenture, and (iv) [_____,] the date that is two years and six months after the Date of Original Issue.

"***Non-Arbitrage and Tax Compliance Certificate***" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the date of issuance of the Bonds, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds.

"***Outstanding***" when used with respect to the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered pursuant to the Bond Orders and this Indenture, except:

(A)     Bonds theretofore canceled by the Trustee or delivered to such Trustee for cancellation;

(B)     Bonds for whose payment money in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the registered owners of such Bonds;

(C)     Bonds delivered to the Trustee for cancellation in connection with (i) the exchange of such Bonds for other bonds or (ii) the transfer of the registration of such Bonds;

(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the Bond Orders or otherwise pursuant to law; and

(E)     Bonds deemed paid as provided in Section 801 of the Bond Authorizing Order.

"*Payment Date*" means each Interest Payment Date, and the Maturity Date of the Bonds.

"*Permitted Investments*" means those investments specified in Article VI of this Indenture.

"*Petition Date*" has the meaning set forth in the recitals hereto.

"*Pledged Income Tax Account*" means that certain bank account established at Comerica Bank, Account No. [_____] that collects solely Income Tax Revenue.

"*Pledged Income Tax Revenues*" means the Income Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2013A Bonds and on a second priority lien basis in favor of the Registered Owners of the Series 2013B Bonds.

"*Pledged Revenues*" means, collectively, the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral.

"*Pledged Wagering Tax Account*" means that certain trust account established at U.S. Bank, Account No. [__] that collects the Wagering Tax Revenue.

"*Pledged Wagering Tax Revenues*" means the Wagering Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2013B Bonds.

"*Post Petition Date Debt*" means any payment obligation of the City first arising on or following the Petition Date.

"*Purchaser*" means Barclays Capital Inc. or any permitted party designated pursuant to the Bond Purchase Agreement, as approved by the City, which such approval shall not be unreasonably withheld.

"*Quality of Life Projects*" means those certain projects determined by the Emergency Manager in the Sale Order to be financed with the proceeds of the Series 2013B Bonds.

"*Record Date*" means the fifteenth (15th) day prior to any Interest Payment Date.

"*Redemption Date*" means the date upon which Bonds are to be called for redemption, in whole or in part, pursuant to this Indenture.

"*Redemption Price*" means, with respect to any Bond, the principal amount thereof plus the applicable premium, if any, payable upon redemption thereof.

"*Sale Order*" means that Order of the Emergency Manager dated [_____], 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"***Series 2013A Bonds***" means the City's Financial Recovery Bonds, Series 2013A.

"***Series 2013A Debt Service Account***" means the Account established within the Debt Service Fund for the benefit of the Series 2013A Bonds pursuant to Section 501 of this Indenture.

"***Series 2013B Bonds***" means the City's Financial Recovery Bonds, Series 2013B.

"***Series 2013B Debt Service Account***" means the Account established within the Debt Service Fund for the benefit of the Series 2013B Bonds pursuant to Section 501 of this Indenture.

"***Spread***" means, so long as no Event of Default has occurred and is continuing, 250 basis points, and upon the occurrence of and continuance of an Event of Default, 450 basis points.

"***State***" has the meaning set forth in the recitals hereto.

"***State Treasurer***" means the Treasurer of the State of Michigan.

"***Supplemental Indenture***" means any indenture supplemental to or amendatory of this Indenture, executed by the City and the Trustee and effective in accordance with Article X.

"***Tax-Exempt Bonds***" means those Bonds, the interest on which is excluded from gross income for federal tax purposes.

"***Trustee***" means initially, [_____, _____, _____,] as bond register, transfer agent and paying agent for the Bonds and any successor in trust or assignees pursuant to Section 803 hereof.

"***Trust Estate***" shall have the meaning set forth in Section 401 hereof.

"***Wagering Tax Account Control Agreement***" means that certain Account Control Agreement dated as of [____], 2013 by and among the City, the Trustee and the Wagering Tax Depository Bank in favor of the Bondowners with respect to the U.S. Bank Trust Account that holds the Pledged Wagering Tax Revenues.

"***Wagering Tax Depository Bank***" means U.S. Bank National Association and any successor thereto.

"***Wagering Tax Revenues***" means revenues collected by the City from taxes in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Law 1.

Section 102    Interpretation.  (A) In this Indenture, unless the context otherwise requires:

(1)    the terms "hereby", "hereof", "herein", "hereunder" and similar terms, as used in this Indenture, refer to this Indenture, and the term "heretofore" means before, and the term "hereafter" means after, the date of this Indenture;

(2)    words of the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular number mean and include the plural number and vice versa;

(3)    words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons;

(4)    any headings preceding the texts of the several Articles and Sections of this Indenture and any table of contents or marginal notes appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect;

(5)    this Indenture shall be governed by and construed in accordance with the applicable laws of the State;

(6)    references to the payment of the Bonds shall be deemed to include reference to the payment of interest thereon;

(7)    references to time shall mean the applicable local time in New York City, New York; and

(8)    references to Sections and Articles, unless otherwise indicated, refer to Sections and Articles in this Indenture.

(B)    Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than the City, the Trustee, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation thereof.  All the covenants, stipulations, promises and agreements herein contained by and on behalf of the City, shall be for the sole and exclusive benefit of the City, the Trustee, and the Owners of the Bonds.

(C)    If any one or more of the covenants or agreements provided herein on the part of the City or the Trustee to be performed should be contrary to law, then such covenant or covenants or agreement or agreements shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Indenture or of the Bonds.

## ARTICLE II

## TERMS OF BONDS

Section 201    Authorization for Indenture and Bonds; Indenture to Constitute a Contract. This Indenture and the issuance of Bonds hereunder have been duly authorized by the City and the principal amount of Bonds that may be issued hereunder is not limited except as provided herein or by law.  The City has ascertained and it is hereby determined and declared that the execution and delivery of this Indenture is necessary to carry out and effectuate the purposes of the City and that each and every covenant or agreement herein contained and made is necessary, useful or convenient in order to better secure the Bonds and is a contract or agreement necessary, useful and convenient to carry out and effectuate the purposes of the City.  In consideration of the purchase and acceptance of the Bonds by those who shall purchase and hold the same from time to time, the provisions of this Indenture, any Bond Order and any Series or Supplemental Indenture shall be deemed to be and shall constitute a contract between the City, the Trustee and the Owners from time to time of the Bonds, and such provisions are covenants and agreements with such Owners which the City hereby determines to be necessary and desirable for the security and payment thereof.  The pledge hereof, and the provisions, covenants and agreements herein set forth to be performed by the City, shall be for the equal benefit, protection and security of the Owners of any and all Bonds which shall be of equal rank without preference, priority or distinction among all Bonds, except as may otherwise be expressly set forth herein.

Section 202    Authorization of Bonds.  In order to provide sufficient funds for the purposes set forth in the Bond Orders, obligations of the City in the form of Bonds are hereby authorized to be issued from time to time hereunder in one or more series.  No Bonds shall be issued unless they are part of an issue described in the Bond Orders and until the conditions contained in this Indenture are satisfied.

Section 203    Issuance and Delivery of Bonds.  After their authorization by the City, Bonds may be executed by or on behalf of the City and delivered to the Trustee in accordance with the Bond Authorizing Order and this Indenture for authentication and, upon compliance by the City with the requirements of Section 204, the Trustee shall thereupon authenticate and deliver such Bonds to or upon the order of the City.  No Bond shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 301 of this Indenture, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Trustee by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

Section 204    Conditions Precedent to Delivery of Bonds.  The Bonds of each Series shall be authenticated and delivered upon the order of the City, but only upon the receipt by the Trustee of:

(1)    a copy of the Bond Orders authorizing each such series, executed by the City and the Trustee, which shall specify:

10

(a)     the authorized principal amount and designation of such Bonds;

(b)     the purposes for which such Bonds are issued;

(c)     the dated dates and maturity dates of each such Series of Bonds;

(d)     the interest rates, if any, of and principal amounts payable upon such Bonds (or the manner of determining such rates or amounts) and the interest payment dates, if any, and principal installment dates therefor;

(e)     the denominations of, and the manner of dating, numbering and lettering, such Bonds;

(f)     the places of payment of such Bonds or the manner of appointing and designating the same;

(g)     provisions concerning the forms of such Bonds and of the Trustee's certificate of authentication;

(h)     evidence of compliance with Act 279, including receipt of an order of the Board approving all terms and conditions of each series of the Bonds;

(i)     any other provisions deemed advisable by the City as shall not conflict with the provisions hereof; and

(j)     the Redemption Price, if any, of and the redemption terms for such Bonds.

(2)     a Bond Counsel's Opinion to the effect that (i) such Bond Order and/or Supplemental Indenture and this Indenture have been duly authorized, executed and delivered by the City and are valid and binding upon, and enforceable against, the City; and (ii) upon the execution, authentication and delivery thereof, such Bonds will have been duly and validly authorized and issued in accordance with the constitution and statutes of the State and in accordance with this Indenture with such qualifications and exceptions to such opinion as specified in the Bond Purchase Agreements; and

(3)     evidence of the receipt by the Trustee of the amount of the proceeds of such Bonds to be deposited with the Trustee pursuant to Section 503, which shall be conclusively established by the executed certificate of the Trustee so stating.

11

13-53846-swr    Doc 1314-2  Filed 10/25/14  Entered 10/29/14 23:00:23  Page 21 of 26
13-53846-swr    Doc 1520  Filed 11/05/13  Entered 11/05/13 14:35:02  Page 206 of 264
355

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

Section 301    Designation of Bonds; Form of Bonds.

(a) *Designation and Form of Bonds.* Bonds designated as "Financial Recovery Bonds, Series 2013A" and "Financial Recovery Bonds, Series 2013B" are hereby authorized to be issued pursuant to the provisions of this Indenture in the respective principal amounts of [_____ ($_____)] and [_____ ($_____)]. Both series of Bonds shall bear a Date of Original Issue of [_____, 2013.] Bonds shall be issued in fully registered form, without coupons, and in Authorized Denominations. The Bonds shall contain a recital that they are issued pursuant to the laws of the State and may have printed thereon such legend or legends as may be required to comply with any law, rule or regulation. Each Bond shall be numbered as determined by the City. The Bonds shall be substantially in the forms set forth in Exhibit A and Exhibit B, with such appropriate changes, omissions and insertions as are permitted or required by this Indenture or the Bond Authorizing Order. The Bonds shall be payable, as to principal, interest and redemption premium, if any, in lawful money of the United States of America. Principal and interest on the Bonds shall be due and payable as set forth in the form of Bonds set forth in Exhibit A and Exhibit B. Interest shall be calculated on the basis of a 360 day year for the actual number of days elapsed. The principal amount of the Bonds of each series shall be payable on the Maturity Date. The Bonds shall bear CUSIP numbers as provided by the CUSIP Service Bureau.

(b) *Payment on the Bonds.* Principal of, and premium, if any, on the Bonds are payable upon presentation and surrender thereof at the corporate trust office of the Trustee. Interest on the Bonds will be paid by check or draft drawn upon the Trustee and mailed to Owners at the registered addresses, provided that, at the written request of the Owner of at least $1,000,000 principal amount of Bonds (which request may provide that it will remain in effect with respect to each subsequent Interest Payment Date unless and until changed or revoked at any time prior to an Interest Payment Date by subsequent written notice to the Trustee), interest shall be paid by wire transfer or other method of transfer of immediately available funds acceptable to the Trustee and the City. Payment as aforesaid shall be made in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

Section 302    Book-Entry Only System for the Bonds. (a) Except as provided in Section 302(b) hereof, the ownership of the Bonds shall be registered in the Bond Registry in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the City and the Trustee shall have no responsibility or obligation to any DTC Participant or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds. Without limiting the immediately preceding sentence, the City and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the

12

payment to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any amount with respect to principal of, premium, if any, or interest on the Bonds. Notwithstanding any other provision of this Indenture to the contrary, the City and the Trustee shall be entitled to treat and consider the Person in whose name each Bond is registered in the Bond Registry as the absolute owner of such Bond for the purpose of payment of principal of, premium, if any, and interest on such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondowners, as shown in the Bond Registry as provided in this Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to satisfy and discharge the City's obligations fully with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondowner, as shown in the Bond Registry, shall receive a Bond certificate evidencing the obligation of the City to make payments of principal, premium, if any, and interest pursuant to this Indenture. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Indenture with respect to interest checks or drafts being mailed to the registered owner as of the close of business of the Record Date, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(b) In the event that the City or the Trustee determines that DTC is incapable of discharging its responsibilities described herein and in the Letter of Representations between the City and DTC (the "Letter of Representations") or that it is in the best interest of the beneficial owners of the Bonds that they be able to obtain certificated Bonds, the City or the Trustee shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Act of 1934, as amended, notify DTC and DTC Participants of the appointment of such successor securities depository and transfer one or more separate Bond certificates to DTC Participants having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered in the Bond Registry in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondowners transferring or exchanging Bonds shall designate, in accordance with the provisions of this Indenture. The Trustee shall give written notice to the City of a determination to issue certificated bonds.

(c) Notwithstanding any other provision of this Indenture to the contrary, so long as any series of the Bonds is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, in the manner provided in the Letter of Representations. The Trustee shall request in each notice sent to Cede & Co., pursuant to the terms of this Indenture, that Cede & Co. forward or cause to be forwarded such notice to the DTC Participants, but neither the Trustee nor the City shall be liable if Cede & Co. fails to honor such request.

Section 303   <u>Interchangeability of Bonds</u>. In the event that Bonds are no longer registered in the name of Cede & Co., as nominee of DTC, Bonds, upon surrender thereof at the corporate trust office of the Trustee with a written instrument of transfer satisfactory to the

Trustee, duly executed by the Owner or his duly authorized attorney, may at the option of the Owner thereof, and upon payment by such Owner of any charges which the Trustee may make as provided in Section 306, be exchanged for an equal aggregate principal amount of Bonds of the same Series and maturity bearing the same rate of interest and having the same terms of any of the authorized denominations; provided, however, that the exchange of Bonds may be restricted by the Supplemental Indenture pursuant to which such Bonds are issued.

Section 304    Negotiability, Transfer and Bond Registry.  All the Bonds issued under this Indenture shall be negotiable, subject to the provisions for registration, transfer and exchange contained in this Indenture and in the Bonds in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  So long as any of the Bonds remain Outstanding, the City shall maintain and keep, at the designated corporate trust office of the Trustee, which may be one or more banks or trust companies or national banking associations appointed by the City, books for the registration, transfer and exchange of Bonds. Upon presentation thereof for such purpose at said office, the City shall register or cause to be registered in such books, and permit to be transferred thereon, any Bonds pursuant to such reasonable regulations as it or the Trustee may prescribe. So long as any of the Bonds remain Outstanding, the City shall make all necessary provisions to permit the exchange of Bonds at the corporate trust office of the Trustee.

Section 305    Transfer of Bonds.  (A) The registration of each Bond is transferable, in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request), only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(B)    Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306    Regulations With Respect to Exchanges and Transfers.  (A) In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the City shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of this Indenture.  All Bonds surrendered in such exchanges or transfers shall be forthwith canceled by the Trustee.

14

13-53846-swr   Doc 1314-2   Filed 11/05/13   Entered 11/05/13 14:23:00   Page 214 of 214
13-53846-swr   Doc 1520-1   Filed 11/05/13   Entered 11/05/13 14:35:27   Page 204 of 264
355

(B)     For every such exchange or transfer of Bonds, the City or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, and may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or transfer, which sums shall be paid by the Bondowner requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(C)     The Trustee shall not be required (i) to issue, exchange or transfer any Bond during a period beginning on the opening of business 15 days before the giving of a notice of redemption and ending on the date of the mailing of notice of such redemption, or (ii) to transfer or exchange Bonds called or being called for redemption, except the unredeemed portion of Bonds being redeemed in part.

Section 307     <u>Bonds Mutilated, Destroyed, Stolen or Lost</u>.  If any Bond shall become mutilated, the City, at the expense of the Registered Owner of the Bond, shall execute, and the Trustee shall authenticate and deliver, a new Bond of like tenor in exchange and substitution for the mutilated Bond, upon surrender to the Trustee of the mutilated Bond.  If any Bond issued under this Indenture shall be lost, destroyed or stolen, evidence of the loss, destruction or theft may be submitted to the Trustee and, if this evidence is satisfactory to both and indemnity satisfactory to the Trustee shall be given, and if all requirements of any applicable law including Act 354, Public Acts of Michigan, 1972, as amended ("Act 354"), being sections 129.131 to 129.135, inclusive, of the Michigan Compiled Laws have been met, the City, at the expense of the owner, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Bond so lost, destroyed or stolen.  In any such Bond shall have matured or shall be about to mature, instead of issuing a substitute Bond the Trustee may pay the same without surrender thereof.

Section 308     <u>Cancellation and Destruction of Bonds</u>.  All Bonds paid or redeemed by the City, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bond, together with all Bonds purchased by the Trustee, shall thereupon be promptly cancelled.  Bonds so cancelled may at any time be cremated or otherwise destroyed by the Trustee, who shall execute a Certificate of cremation or destruction in duplicate by the signature of one of its authorized officers describing the Bonds so cremated or otherwise destroyed.  Such executed Certificate shall be filed with the City and the other executed Certificates shall be retained by the Trustee.

Section 309     <u>Redemption</u>.  The Bonds shall be subject to optional and mandatory redemption as set forth in the form of Bonds attached hereto as Exhibit A and Exhibit B.  The Bonds shall only be redeemed in Authorized Denominations.  No partial redemption of Bonds is authorized, unless as a result of such partial redemption, the remaining Outstanding Bonds of a series shall be in Authorized Denominations.

Section 310     <u>Selection of Bonds to be Redeemed</u>.  Subject to any rules and procedures of a securities depository for Bonds held in book-entry form, in the event of redemption of less than all the Outstanding Bonds of like series and maturity, the Trustee shall assign to each such Outstanding Bond a distinctive number for each minimum denomination of the principal amount

thereof so as to distinguish each such minimum denomination from each other portion of the Bonds subject to such redemption. The Trustee shall select by lot, using such method of selection as it shall deem proper in its sole discretion, from the numbers of all such Bonds then Outstanding of such maturity, as many numbers as, at the minimum denomination for each number, shall equal the principal amounts of such Bonds to be redeemed. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; but only so much of the principal amount of each such Bonds of a denomination of more than the minimum denomination shall be redeemed as shall equal the minimum denomination for each number assigned to it and so selected.  For the purposes of this Section, Bonds which have theretofore been selected by lot for redemption shall not be deemed Outstanding.

Any integral multiple of a minimum denomination may, if so specified by the provisions of a Supplemental Indenture, be utilized in connection with the partial redemption of Bonds issued pursuant to such Supplemental Indenture and such Bonds shall be subject to selection for redemption in the amount of such multiple but otherwise in accordance with this Section.

Section 311    Notice of Redemption.  When redemption of Bonds is required by this Indenture, the Trustee shall give notice, in the name of the City, of the redemption of such Bonds.  Such notice shall specify the Series and maturities of the Bonds to be redeemed, the Redemption Date and the place or places where amounts due upon such redemption will be payable and, if less than all the Bonds of any like maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the principal amount thereof to be redeemed.  Such notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof in the case of registered Bonds to be redeemed in part only, together with interest accrued to the Redemption Date, and that from and after such date interest thereon shall cease to accrue and be payable.  Such notice shall be given by first class mail or registered or certified mail, return receipt requested, not less than ten (10) business days nor more than sixty (60) days before the Redemption Date to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registry books, but failure so to mail any such notice shall not affect the validity of the proceedings for the redemption of Bonds with respect to which no such failure occurred; provided, however, that shorter periods before the Redemption Date during which notice pursuant to this Section must be given may be prescribed by a Bond Order or Supplemental Indenture as to Bonds issued pursuant to such Bond Order or Supplemental Indenture.  As directed by the City, further notice shall be given by the Trustee in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 312    Payment of Redeemed Bonds.  Notice having been given by mail in the manner provided in Section 311, the Bonds or portions thereof so called for redemption shall become due and payable on the Redemption Date so designated at the Redemption Price, plus interest accrued and unpaid to the Redemption Date, and, upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the

Redemption Price plus interest accrued and unpaid to the Redemption Date. If there shall be called for redemption less than the entire principal amount of a Bond, the City shall execute, the Trustee shall authenticate and the Trustee shall deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered at the option of the Owner, Bonds of like series and maturity in any of the authorized denominations. If, on the Redemption Date, moneys for the redemption of all the Bonds or portions thereof of any like series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been mailed as aforesaid, then, from and after the Redemption Date, interest on the Bonds or portions thereof of such series and maturities so called for redemption shall cease to accrue and become payable. If said moneys shall not be available on the Redemption Date, such Bonds or portions thereof shall continue to bear interest until paid or provided for at the same rate as they would have borne had they not been called for redemption.

## ARTICLE IV
## PLEDGE OF INDENTURE; SOURCES OF PAYMENT
## AND SECURITY FOR THE BONDS

Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest.  The City hereby grants a valid, binding, enforceable, non-avoidable, continuing postpetition security interest in, assigns, transfers, pledges, grants, conveys and hypothecates unto the Trustee and its successors and assigns, on behalf of the Bondowners, forever all of the right, title and interest of the City in all of the following described property (collectively, the "Trust Estate"):

(a)    All rights and interests of the City in the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral (collectively the "Collateral") in the following order of priority:

(i)    With respect to the Series 2013A Bonds: A first priority lien on (a) the Pledged Income Tax Revenues and (b) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2013B Bonds (items (a) and (b), collectively, the "Series 2013A Bonds Collateral").

(ii)    With respect to the 2013B Bonds: (a) A first priority lien on (i) the Pledged Wagering Tax Revenues and (ii) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2013A Bonds, and (b) a second priority lien (second only to the lien securing the Series 2013A Bonds) on the Pledged Income Tax Revenues (items (a) and (b), collectively, the "Series 2013B Bonds Collateral"); and

(b)    Amounts on deposit from time to time in the Accounts created pursuant hereto subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein.

The Bonds are also limited tax general obligations of the City, which will be payable from ad valorem taxes annually levied on all taxable property within the City, subject to applicable constitutional, statutory and charter tax rate limitations. The Bonds have been granted

super-priority claim status under Section 364(c)(1) of the Bankruptcy Code (without the need to file any proof of claim) and shall also be payable in the manner provided by the Bankruptcy Court Order.

To the fullest extent provided by applicable laws, the money and property hereby pledged shall immediately be subject to the lien of such pledge without any physical delivery thereof, without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents or the possession or control by the Trustee over any of the Trust Estate, or further act and such lien shall be valid and binding against all parties having claims in tort, contract or otherwise against the City, irrespective of whether such parties have notice of the claim.  Neither the Bond Orders authorizing the Bonds nor this Indenture nor any Supplemental Indenture need be recorded.

Section 402    Creation of Liens.  In order to effectuate the liens on the Collateral in favor of the holders of the Bonds, the City and the Trustee each hereby covenant to enter into the Account Control Agreements with the Depository Banks.

## ARTICLE V

## ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS

Section 501    Debt Service Fund.

(a) *Establishment of Debt Service Fund and Accounts.*  There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, a single trust fund designated the "Financial Recovery Bonds, Common Debt Service Fund" (hereinafter referred to as the "Debt Service Fund").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2013A – Common Debt Service Account" (hereinafter referred to as the "Series 2013A Debt Service Account").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2013B – Common Debt Service Account" (hereinafter referred to as the "Series 2013B Debt Service Account" and with the Series 2013A Debt Service Account, collectively, the "Debt Service Accounts").

(b) *Deposits to Debt Service Fund.*  Five Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for each Series of Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amounts into the Debt Service Fund, for deposit to the applicable Accounts, for the payment of amounts owing with respect to the Bonds on such Interest Payment Date. Two Business Days prior to a scheduled Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for each Series of Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amounts into the Debt Service Fund, for

deposit to the applicable Accounts, for the payment of all outstanding principal, premium, if any, and interest on the Bonds.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2013A Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2013A Bonds on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2013A Debt Service Account, an amount sufficient to make the balance of the 2013A Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2013B Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2013B Bonds on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement and deposit into the 2013B Debt Service Account, an amount sufficient to make the balance of the 2013B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date. In the event that, following the foregoing application of amounts on deposit in the Pledged Wagering Tax Account, there remains a shortfall in the 2013B Debt Service Account with respect to the Debt Service Requirement Amount owing on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2013B Debt Service Account, an amount sufficient therefrom to make the balance of the 2013B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, following the foregoing deposits, the amounts on deposit in a Debt Service Account do not equal the Debt Service Requirement Amount owing on such Interest Payment Date in respect of either or both series of Bonds, the Trustee shall withdraw funds from the Bond Proceeds Fund in an amount sufficient to make the balance in the applicable Debt Service Fund equal to the Debt Service Requirement for the applicable series of Bonds owing on such Interest Payment Date.

Asset Proceeds Collateral, if any, shall be transferred by the City within three (3) Business Days of receipt to the Trustee. The Trustee shall deposit the Asset Proceeds Collateral into the Debt Service Fund, for further pro-rata deposit into the 2013A Debt Service Account and the 2013B Debt Service Account, respectively, based on the then Outstanding amount of the Bonds in each Series for the mandatory redemption of Bonds on the next succeeding Interest Payment Date as provided in the Bonds.

(c) *Withdrawals from the Debt Service Fund.* The Trustee, in its capacity as transfer agent and paying agent for the Bonds, shall withdraw from the applicable Debt Service Account the amounts necessary to pay when due the Debt Service Requirement Amount for the Bonds on each Payment Date.

Section 502    Costs of Issuance Fund. There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial

Recovery Bonds  Costs of Issuance Fund" (the "Costs of Issuance Fund").  Upon the issuance of the Bonds, there first shall be deposited in the Costs of Issuance Fund, a portion of the proceeds of the Bonds, in an amount as necessary to pay the costs of issuance of the Bonds.  Moneys on deposit in the Costs of Issuance Fund shall be used by the Trustee to pay the costs related to the issuance of the Bonds.

Section 503    Bond Proceeds Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds, Bond Proceeds Fund" (the "Bond Proceeds Fund").  There shall be deposited into the Bond Proceeds Fund the remainder of the net proceeds of the Bonds after the deposit of amounts necessary to pay Costs of Issuance into the Costs of Issuance Fund pursuant to Section 502 hereof as specified by the Emergency Manager in the Bond Orders.

Within the Bond Proceeds Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2013A – Bond Proceeds Account" (hereinafter referred to as the "Series 2013A Bond Proceeds Account").  Moneys on deposit in the Series 2013A Bond Proceeds Account shall be used only to fund the obligations owing in respect of the termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as set forth in the Bond Orders.  Any balance remaining in such Account after such payment shall be transferred to the Series 2013B Bond Proceeds Account.

There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2013B – Bond Proceeds Account" (hereinafter referred to as the "Series 2013B Bond Proceeds Account").  Moneys on deposit in the Series 2013B Bond Proceeds Account shall be used only to pay for the Quality of Life Projects all in such amounts and for such Quality of Life Projects as specified by the Emergency Manager in the Sale Order and shall also be available, for so long as any fund remain on deposit therein, for deposit to the Debt Service Fund in accordance with Section 501(b), provided, however, that the City shall not be required to seek the Trustee's approval for Quality of Life Project expenditures and shall not be required to keep any funds on deposit in the Series 2013B Bond Proceeds Account following the date or dates on which Quality of Life Project expenditures are made.  Any balance remaining in such Account after the Maturity Date shall be deposited in the Series 2013B Debt Service Account.

Section 504    Amounts Remaining in Funds and Accounts. Any amounts remaining in any fund or account after full payment of the Bonds or provision for payment thereof shall be distributed by the Trustee to the City in accordance with Section 1102 and 1103.

Section 505    Approval of Account Control Agreements. The City shall cause to be deposited 100% of the Pledged Wagering Tax Revenues into the Pledged Wagering Tax Account, and greater than 90% of the Pledged Income Tax Revenues into the Pledged Income Tax Account, which such deposits and accounts shall be governed by the Account Control Agreements at all times. The Pledged Wagering Tax Account and the Pledged Income Tax Account constitute part of the Trust Estate; provided, however, that, subject to Sections 708(a)

13-53846-swr   Doc 1314-2   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 220 of 264

and 902(b) hereof, the City shall be authorized to use all Pledged Wagering Tax Revenues and Pledged Income Tax Revenues for any purpose permitted by law, without limitation at any time, including during an Event of Default.

# ARTICLE VI

# **INVESTMENT OF FUNDS**

Section 601    Permitted Investments.  All money held by the Trustee pursuant to this Indenture shall be invested by the Trustee in accordance with written instructions from the City in Permitted Investments for the funds of the City.  For purposes of this Article III, "Permitted Investments" shall mean and include any of the following, as may be further restricted in each Sale Order or Supplemental Indenture for the related series of Bonds:

(a) bonds, securities, and other obligations of the United States or an agency or instrumentality of the United States;

(b) certificates of deposit, savings accounts, deposit accounts, or depository receipts of a financial institution having a long term rating of not less than A2/A/A;

(c) commercial paper rated at the time of purchase within the highest classifications (A-1/P-1/F1) established by not less than 2 standard rating services and that matures not more than 90 days after the date of purchase (but in any event no later than when the funds are required);

(d) repurchase agreements consisting of instruments listed in subdivision (a);

(e) Bankers' acceptances of United States banks rated at least A2/A/A;

[(f) mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, with authority to purchase only investment vehicles that are legal for direct investment by a public corporation, however, a mutual fund is not disqualified as a permissible investment solely by reason of one of the following:

(i) the purchase of securities on a when-issued or delayed delivery basis,

(ii) the ability to lend portfolio securities as long as the mutual fund receives collateral at all times equal to at least 100% of the value of the securities loaned, or

(iii) the limited ability to borrow and pledge a like portion of the portfolio's assets for temporary or emergency purposes;

(g) obligations described in subdivisions (a) through (f) if purchased through an interlocal agreement under the Urban Cooperation Act of 1967, Act 7, Public Acts of Michigan, 1967 (Ex Sess), as amended, MCL 124.501 to 124.512;

(h) investment pools organized under the Surplus Funds Investment Pool Act, Act 367, Public Acts of Michigan, 1982, as amended, MCL 129.111 to 129.118; and

21

(i) The investment pools organized under the Local Government Investment Pool Act, Act 121, Public Acts of Michigan, 1985, MCL 129.141 to 129.150.]

Section 602    Valuation and Sale of Investments.  In computing the amount in any Account, obligations purchased as an investment of moneys therein shall be valued at their Value, as hereinafter defined, plus accrued interest in each case.  "Value" means the value of any investments calculated as follows:

(a)    as to investments the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, then in The New York Times): the average of the bid and asked prices for such investments so published on or most recently prior to the time of determination;

(b)    as to investments the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times: the average bid price at such time of determination for such investments by any two nationally recognized government securities dealers (selected by the Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service;

(c)    as to certificates of deposit and banker's acceptances: the face amount thereof, plus accrued interest, if any; and

(d)    as to any investment not specified above: the value thereof established by prior agreement between the City and the Trustee.

Except as otherwise provided herein, the Trustee shall sell, or present for redemption, any Permitted Investment whenever it shall be requested in writing by an Authorized Officer to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from any Account held by it in accordance with the terms of this Indenture.  As set forth hereunder a Permitted Investment may be credited on a pro rata basis to more than one Account and need not be sold in order to provide for the transfer of amounts from one Account to another.

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CITY

The City covenants and agrees with the Trustee and the Owners of the Bonds as follows:

Section 701    Payment of Bonds.  The City shall duly and punctually pay or cause to be paid, as herein provided, the principal or Redemption Price of every Bond and the interest, if any, thereon, at the dates and places and in the manner stated in the Bonds, according to the true intent and meaning thereof.

Section 702    Power to Issue Bonds and Pledge Revenues, Funds and Other Property. As of the date hereof, the City is duly authorized to authorize and issue the Bonds and to enter into, execute and deliver this Indenture and to pledge the assets and revenues purported to be pledged hereby in the manner and to the extent herein provided.  As of the date hereof, the assets and revenues so pledged are and will be free and clear of any pledge, lien, charge or

22

encumbrance thereon, or with respect thereto prior to the pledge created hereby, and all corporate or other action on the part of the City to that end has been and will be duly and validly taken. As of the date hereof, the Bonds and the provisions of this Indenture are and will be the valid and legally enforceable obligations of the City in accordance with their terms and terms of this Indenture. The City shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Revenues and other assets and revenues, including rights therein pledged under this Indenture, and all the rights of the Bondowners under this Indenture against all claims and demands of all persons whomsoever.

Section 703    Maintenance of Perfected Security Interests; Further Assurances; Notices of Default. At any and all times the City shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be reasonably necessary or desirable to convey, grant, pledge and perfect to the Bondowners first priority security interests in the Trust Estate. The City shall notify the Trustee immediately upon becoming aware of any Event of Default or occurrence of an event that, with the passage of time, will become an Event of Default hereunder.

Section 704    [Tax Covenants. The City shall at all times do and perform all acts and things necessary or desirable in order to assure that interest paid on Tax-Exempt Bonds shall, for the purposes of federal income taxation, be excludable from the gross income of the recipients thereof and exempt from such taxation under Section 144(b) of the Code, or any successor provisions thereto. The City shall comply with all requirements of any Non-Arbitrage and Tax Compliance Certificate delivered by the City in connection with a Series of Tax-Exempt Bonds.]

Section 705    Compliance With Conditions Precedent. Upon the date of issuance of any of the Bonds, all conditions, acts and things required by law or by this Indenture to exist, to have happened or to have been performed precedent to or in the issuance of such Bonds shall exist, have happened and have been performed, or will have happened or been performed, and such Bonds, together with all other indebtedness of the City, shall be within every debt and other limit prescribed by law.

Section 706    Accounts and Reports. The City shall keep, or cause to be kept, proper books of record and account in which complete and accurate entries shall be made of all of its transactions relating to the Bonds or the Trust, the Pledged Income Tax Account, the Pledged Wagering Tax Account, the Asset Proceeds Collateral and all Accounts established by this Indenture which shall at all reasonable times be subject to the inspection of the Trustee.

Section 707    Issuance of Additional Obligations. The City hereby covenants that as long as the Bonds are outstanding, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Collateral or that has a superior payment priority to the Bonds. The issuance of any series of bonds hereunder, other than the Bonds, shall require compliance with Section 1002 of this Indenture.

Section 708    Wagering Tax and Income Tax Revenues and Accounts. The City shall at all times:

(a)  maintain a minimum balance of no less than $5,000,000 in each of the Pledged Wagering Tax Account and Pledged Income Tax Account;

(b)  maintain Pledged Wagering Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(c)  maintain Pledged Income Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(d)  (i) take such steps as shall be reasonably necessary to levy the taxes generating the Pledged Income Tax Revenues and the Pledged Wagering Tax Revenues to the maximum extent authorized by applicable law and (ii) take such steps as shall be reasonably necessary to collect the taxes generating the Pledged Income Tax Revenues and the Pledged Wagering Tax Revenues to the maximum extent required by the City to comply with its covenants and obligations under the Financing Documents.

Section 709   Asset Proceeds Collateral.   The City shall deposit Asset Proceeds Collateral with the Trustee within three (3) Business Days of receipt thereof, for deposit in accordance with Section 501(b) hereof.  Furthermore, the City hereby covenants that as long as the Bonds are outstanding, no Asset Proceeds Collateral shall be used for any purpose other than payment of the principal of and interest on the Bonds, unless the City shall request in writing a use for such proceeds other than as set forth in this Section 709, and majority of Bondowners shall consent in writing.

Section 710   Contesting Enforceability.   The City covenants that it will not seek to invalidate or refute the enforceability of any Financing Document, notwithstanding the dismissal of the Bankruptcy Case.

## ARTICLE VIII

## THE TRUSTEE

Section 801   Powers and Duties of Trustee.

(a)   The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

(b)   In the event that any of the Bonds are issued on a tax exempt basis to finance working capital expenditures by the City, the Trustee hereby covenants, commencing [_____], 2015 and each [_____] thereafter so long as the Tax-Exempt Bonds are outstanding, to send an Authorized Officer of the City notice requesting the City to engage Bond

Counsel to provide a Continuing Exclusion Opinion (as defined in the Bond Authorizing Order). The Emergency Manager has covenanted in the Bond Orders on behalf of the City that upon receipt of such notice from the Trustee, the City shall cause Bond Counsel to provide the Continuing Exclusion Opinion as required above. The City may conclusively rely on such Continuing Exclusion Opinion in complying with the provisions therein. In the event the City fails to obtain the Continuing Exclusion Opinion, or Bond Counsel determines that the conditions necessary to provide the Continuing Exclusion Opinion for the Tax-Exempt Bonds that remain outstanding after the next succeeding Extraordinary Redemption Date (as defined in the Bond Authorizing Order) do not exist, the City shall redeem the Tax-Exempt Bonds in accordance with the provisions set forth in the Sale Order and this Indenture.

(c)     The Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Indenture, or of any supplements thereto or instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the Bonds intended to be secured hereby.

(d)     The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Indenture.

(e)     The Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(f)     As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained, the Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be found to secure the same.

(g)     The permissive right of the Trustee to do things enumerated in this Indenture, as amended, shall not be construed as a duty and the Trustee shall not be answerable for other than its [gross] negligence or willful misconduct. The immunities and exceptions from liability of the Trustee shall extend to its officers, directors, employees and agents.

(h)     The Trustee shall not be required to give any note or surety in respect to the execution of its rights and obligations hereunder.

(i)     All moneys received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Indenture, as amended, or by law. The Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(j)     The Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Indenture or to take any steps in the execution of the trusts created by this Indenture or in the enforcement of any rights and powers under this Indenture

25

until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(k)     The Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds, except for liability for its own gross negligence or willful misconduct.

(l)     The Trustee may become the holder of Bonds with the same rights it would have if it were not Trustee, and, to the extent permitted by law, may act as depositary for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or not such committee shall represent the holders of a majority in principal amount of the Bonds then outstanding.

(m)     The Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(n)     The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or in exercising any trust or power conferred upon the Trustee under this Indenture. If the Trustee receives directions from more than one such group of holders, it shall act in accordance with the direction of the holders holding the largest aggregate principal amount of the Bonds at the time outstanding, provided that such directions are consistent with this Indenture.

(o)     The Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the Bonds from its own funds; but rather the Trustee's obligations shall be limited to the performance of its duties hereunder.

(p)     Whether or not therein expressly so provided, every provision of this Indenture or related documents, including the Account Control Agreements, relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article.

(q)     The Trustee is authorized and directed by the City to enter into the Account Control Agreements.

Section 802     <u>Fees and Expenses of Trustee</u>.     (a) The Trustee shall be entitled to reasonable fees for services rendered under this Indenture, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services.  Such fees and expenses shall be payable by the City in an amount agreed to by the City and the Trustee.

(b)     If the City shall fail to make any payment required by this Section 802, the Trustee may make such payment from the Debt Service Funds, and shall be entitled to a preference therefor over any Outstanding Bonds.

26

Section 803    Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale. (a)    The Trustee and any successor Trustee may resign only upon giving 60 days' prior written notice to the City and the Bondowners.  Such resignation shall take effect only upon the appointment of a successor Trustee as described in Section 805 below and the acceptance of such appointment by the successor Trustee.  Upon appointment of a successor Trustee, the resigning Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Pledged Wagering Tax Revenues, Pledged Income Tax Revenues and Asset Proceeds Collateral, and transfer and assign its right, title and interest in the Indenture to the successor Trustee.  The successor Trustee shall meet the requirements of Section 803(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)    In case the Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (to the extent that no "Event of Default" shall have occurred and be continuing under this Indenture), be appointed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Trustee, and the successor Trustee.  In the absence of an appointment by the Bondowners, the City may appoint a successor Trustee, by an instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Trustee and the successor Trustee.  If the owners of the Bonds and the City fail to so appoint a successor Trustee, hereunder within thirty (30) days after the Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor hereunder.  Every such Trustee appointed pursuant to the provisions of this Section 803 (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $500,000,000 and having a long term rating of at least A2/A/A, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)    Any corporation or association into which the Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 803(b) hereof, shall be and become successor Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 804    Removal of Trustee.  The Trustee may be removed at any time by an instrument or concurrent instruments in writing (a) delivered to the  Trustee and the City and

13-53846-swr    Doc 1314-2 Filed 10/25/13    Entered 10/25/13 14:35:02    Page 227 of 264
355

signed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, or (b) delivered to the Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, the Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the Bonds then Outstanding. No removal of the Trustee and no appointment of a successor Trustee shall become effective until the successor Trustee has accepted its appointment in the manner provided in Section 803 hereof. Upon such removal and the payment of its fees, costs and expenses, the Trustee shall assign to the successor Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 803 hereof.

Section 805 <u>Appointment of and Transfer to Successor Trustee</u>. If the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor trustee shall be appointed by the City as soon as possible thereafter in accordance with this Article VIII.

Any successor Trustee appointed hereunder shall execute and deliver to its predecessor and the City an instrument in writing accepting such appointment and thereupon shall become fully vested with all the powers and duties under the Indenture, as amended. The Trustee, if it ceases to act as Trustee, shall execute, acknowledge and deliver such instruments of conveyance, without warranty or recourse, and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the trusts, powers and duties under the Indenture, as amended, and any property held by it under the Indenture, as amended, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.

## ARTICLE IX

## <u>EVENTS OF DEFAULT AND REMEDIES ON DEFAULT</u>

Section 901 <u>Events of Default</u>. Any one or more of the following events shall be deemed an "Event of Default" hereunder:

(a) The failure of the City to pay, when due, any interest on any or all of the Bonds on any date when such interest is due and payable;

(b) The failure of the City to pay, when due, any principal or premium, if any, of any or all Bonds, whether on the Maturity Date or redemption thereof,

(c) The City shall default in the performance or observance of any of the other covenants, agreements or conditions on its part contained in this Indenture (other than covenants otherwise specifically covered by this Section 901) and such default is not remedied within fifteen (15) days following receipt by the City of notice from the Trustee of such default;

(d) If (i) the City shall fail to make a scheduled payment in excess of $25,000,000, when due and owing, in respect of Post-Petition Date Debt (other than the obligations with

28

respect to the Bonds), or (ii) Post-Petition Date Debt in an outstanding aggregate principal amount exceeding $25,000,000 is accelerated, which results in such debt becoming immediately due and payable, and in the case of either (i) or (ii), such event is not cured within any grace period provided therefor in the applicable documents;

(e)     If material post-petition judgments, which are final and nonappealable, are rendered against the City involving liability in an aggregate amount exceeding $25,000,000 and such judgments are not paid within thirty (30) days of such judgments becoming nonappealable;

(f)     If a court of competent jurisdiction finds that any of the Financing Documents are invalid or unenforceable and such finding is not stayed pending appeal;

(g)     If there is a written assertion by the City or an Authorized Officer that any Financing Document or the Bankruptcy Court Order is invalid or otherwise not binding on the City and such written assertion is not retracted or otherwise disavowed within five (5) days of publication;

(h)     If the Bankruptcy Case is dismissed prior to the confirmation of a plan of adjustment, and the order dismissing the Bankruptcy Case is not stayed pending appeal;

(i)     The reversal or modification, by the entry of an order that is not stayed pending appeal and in a manner adverse to the Registered Owners, of the Bankruptcy Court's order dated [_____], 2013 [Docket No. __] granting the City chapter 9 bankruptcy relief;

(j)     If the City shall file, consent to, or fail to file a written opposition to a motion seeking dismissal of the Bankruptcy Case within the applicable times established by the Bankruptcy Court for filing a response to such dismissal motion;

(k)     If the Bankruptcy Court shall grant any super-priority claim pursuant to sections 364(c)(1), 503 and 507(a)(2) of the Bankruptcy Code in favor of any party other than the Registered Owners (other than as permitted under the Financing Documents);

(l)     If there is (i) entry of an order by a court of competent jurisdiction, without the prior written consent of the Registered Owners holding 51% of the Outstanding amount of the Bonds, amending, supplementing or otherwise modifying the Bankruptcy Court Order in a manner adverse to the Registered Owners, or (ii) an order of a court of competent jurisdiction reversing, vacating or staying the effectiveness of the Bankruptcy Court Order, and in either (i) or (ii), such order is not stayed pending appeal;

(m)     If the liens or super-priority claims granted in the Bankruptcy Court Order in respect of the Bonds shall cease to be valid, perfected and enforceable in all respects with the priority described herein and therein;

(n)     The failure of the City to comply with the provisions of Section 708(a) with respect to Pledged Wagering Tax Revenues and the Wagering Tax Revenue Account and such failure is not cured within two (2) Business Days;

(o)     The failure by the City to comply with the provisions of Section 708(a) with respect to Pledged Income Tax Revenues  the Income Tax Revenue Account and such failure is not cured within two (2) Business Days;

(p)     If the City ceases to be under the control of the Emergency Manager, or successor emergency manager, for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Registered Owners holding 51% of the Outstanding amount of the Bonds, or a designee or successor as consented to by the City (which consent shall not be unreasonably withheld), to ensure continued financial responsibility shall have been established pursuant to Act 436 or any successor statute; or

(q)     Any representation or warranty made by the City in this Indenture, any Financing Document or in any certificate, document, instrument, opinion or financial statement made or delivered pursuant to or in connection with this Indenture or with any of the other Financing Documents, shall prove to have been incorrect, incomplete or misleading in any material respect as of the time of such representation or warranty.

Section 902     _Remedies_.  (a)  _General_.  Upon the occurrence of an Event of Default, subject to Section 1108, the Trustee may pursue any remedy permitted by law to enforce the performance of or compliance with the provisions of this Indenture, including without limitation, the acceleration of the Bonds in accordance with Section 902(b) below.

(b)     _Acceleration._  Upon the occurrence and continuation of an Event of Default, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed, in its own name,  to protect or enforce the rights of the Trustee and the holders of the related Bonds by declaring the principal of and interest on the Bonds to be immediately due and ordering payment in the manner provided by Section 902(c)(i) and/or Section 902(c)(ii) hereof provided that interest shall continue to accrue on unpaid principal at the Default Rate until paid in full.

(c)     _Post-Maturity Debt Service_.  Upon an Event of Default, and following acceleration of the Bonds pursuant to Section 902(b):

(i)     The Trustee, on behalf of the Bondowners of the Series 2013A Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2013A Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro-rata proceeds of any Asset Proceeds Collateral, shared with the Series 2013B Bonds.

(ii)     The Trustee, on behalf of the Bondowners of the Series 2013B Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2013B Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to (i) $4,000,000 per month from the Pledged Wagering Tax Revenues and

payable from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement, and (ii) following payment in full of the Series 2013A Bonds, an additional $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro rata proceeds of any Asset Proceeds Collateral, shared with the Series 2013A Bonds;

(iii) Upon any acceleration of the Bonds following the occurrence of an Event of Default under Section 901(a), (b), (f), (g), (h), (i), (j), (k), (l), or (m), the Trustee, on behalf of the Bondowners of the Bonds, shall be entitled to apply any moneys remaining on deposit in the Bond Proceeds Fund to the Bonds;

(iv) Payment on the Bonds is not limited to the Trust Estate, and the Trustee, on behalf of the Bondowners of all of the Bonds, may be entitled to seek payment from the City, (without the need to file any proof of claim), in accordance with the Section 364(c)(1) superpriority claim status of the Bankruptcy Court Order; and

(v) The monthly payment provisions of subsections (i) and (ii) above do not modify the obligation of the City to pay the Bonds in full upon (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, or (iii) [_____], the date that is two years and six months after the Date of Original Issue.

(d)     *Enforcement.*     Upon the occurrence and continuation of an Event of Default, subject to Section 1108, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by mandamus or other suit, action or proceedings at law or in equity, to (i) enforce the rights of the Registered Owners and the Obligations of the City under this Indenture and the Financing Documents, (ii) enjoin any act or thing which may be unlawful or in violation of the rights of Registered Owners; and (iii) enforce the rights of Registered Owners in and to the Trust Estate.

(e)     *Owner Right of Action.*     If the Registered Owners holding 25% of the Outstanding amount of the Bonds shall have complied with all conditions prerequisite to the requiring of action on the part of the Trustee and said Trustee shall refuse to act, then one or more of the Owners of the Bonds shall have the right to bring any action or actions as the Trustee might have instituted for and on behalf of the Owner of all Outstanding Bonds.

Section 903     Waiver of Default.  Following an Event of Default, the Trustee shall at the direction of the Registered Owners holding 51% of the Outstanding amount of the Bonds, waive an Event of Default hereunder and annul its consequences.  No such waiver shall extend to or affect any subsequent Event of Default or shall impair any right consequent thereon.

Section 904     Possession of Bonds by Trustee Not Required.  All rights of action under this Indenture enforceable by the Trustee may be enforced by it without the possession of any of the Bonds or the production thereof at any proceedings relative thereto.  Any action instituted by

the Trustee shall be brought in its name for the benefit of all the holders of the related Bonds, subject to the provisions of this Indenture.

Section 905    Remedies Cumulative.  The rights and remedies of the Trustee and the holders of Bonds shall be cumulative, and any failure on its or their part to act shall not constitute a waiver of any right or remedy to which it or they may be entitled to hereunder or under applicable law or in equity.

Section 906    Knowledge by Trustee of an Event of Default.  The Trustee shall not be deemed to have knowledge of any Event of Default under Section 901(c) hereinabove unless and until it shall have actual knowledge thereof, or shall have received written notice thereof from any Bondowner at its address and location specifically designated for receiving notices pursuant hereto.  Except as otherwise expressed herein, the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or of any of the documents executed in connection with the Bonds, or as to the existence of an Event of Default hereunder.

Section 907    Application of Monies.  All moneys received by the Trustee and deposited in the Debt Service Fund pursuant to any right given or action taken under the provisions of this Article shall be applied first to the payment of the costs and expenses of the proceedings resulting in the collection of such moneys and expenses, liabilities, advances and charges incurred or made by the Trustee.

# ARTICLE X

# SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE

Section 1001    Modifications and Amendments Not Requiring Consent.  Any provision of this Indenture may be amended at any time by the parties hereto, without the consent of the holders of the Bonds, for any one or more of the following purposes:

(a)    To cure any ambiguity or formal defect or omission in this Indenture or in any supplemental agreement.

(b)    To grant to or confer upon the Trustee for the benefit of the holders of Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the Trustee.

(c)    To accomplish, implement or give effect to any other action which is expressly authorized or required by this Indenture.

(d)    To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the Bonds.

(e)    To appoint separate or successor trustees, paying agents or bond registrars.

(f)     To make any other change which, in the judgment of the Trustee, is not to the material prejudice of holders of the Bonds, upon the opinion of Bond Counsel or other professionals.

Within thirty (30) days after the execution of any supplement pursuant to this Section 1001, the Trustee shall cause notice thereof to be mailed, postage prepaid to all owners of Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Trustee for inspection by all such holders.  Any such supplement so executed shall be valid and binding notwithstanding any failure of the Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1002   Amendments Requiring Consent.  Any provision of this Indenture may be amended at any time by written agreement of the parties hereto, but, except as provided in this Section 1002, no such amendment made after the issuance of any Bonds shall become effective until approved in writing by the holders of a majority of the principal amount of all outstanding Bonds, other than those in the possession of the City or under its control; provided, however, no such amendment may (i) extend the maturity of the principal of or the interest on any Bonds or (ii) reduce the principal amount of any Bonds or the rate of interest thereon, or (iii) grant a privilege or priority of any Bonds over any other Bonds of the same series, or (iv) reduce the aggregate principal amount of the Bonds required for consent to such supplemental or amendatory indenture unless approved by the holders of all outstanding Bonds.  Nothing herein contained, however, shall be construed as making necessary the approval of the holders of Bonds of the execution of any supplement as authorized in Section 1001 of this Article.

If at any time the City shall request the Trustee to execute any supplement for any of the purposes of this Section 1002, the Trustee shall cause notice of the proposed supplement to be mailed, postage prepaid to all applicable owners of registered Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the proposed supplement and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by any holders of Bonds.  The Trustee shall not, however, be subject to any liability to any holder of Bonds by reason of its failure to mail the notice required by this Section 1002, and any such failure shall not affect the validity of such supplement when executed as provided in this Section.

Whenever, at any time within one year after the date of the first mailing of such notice, the City shall deliver to the Trustee an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the Bonds outstanding, which instrument or instruments shall refer to the proposed supplement described in such notice and shall specifically consent to and approve the acceptance thereof in substantially the form of the copy thereof referred to in such notice, the Trustee may, thereupon, but not

otherwise, execute such supplement, without liability or responsibility to any holder of any Bond, whether or not such holder shall have consented thereto. If the holders of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the acceptance of such supplement shall have consented to and approved the acceptance thereof as herein provided, no holder of any Bonds shall have any right to object to the acceptance of said supplement, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the acceptance thereof or to enjoin or restrain the Trustee from executing the same or from taking any action pursuant to the provisions thereof.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of Bonds outstanding shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1003  Consent of Trustee.  Prior to executing any supplement to this Indenture, the Trustee shall be entitled to receive and shall be fully protected in relying upon a certificate of the City as proof of the necessity or desirability of any such supplement provided for in Section 1001 hereof and an opinion of counsel for the City that such supplement complies with the provisions of such Section.  Such certificate shall specifically request the Trustee to enter into such supplement.  Whenever the provisions of Sections 1001 and 1002 hereof require the Trustee to include in notices to holders of Bonds a description of a proposed amendment or supplement, such description shall be provided by the City.

The Trustee may in its discretion, but shall not be obligated to, enter into any such supplement to this Indenture authorized by Section 1001 and 1002 which adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 1004  General Provisions Relating to Supplemental Indentures.  This Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article X.  Nothing contained in this Article X shall affect or limit the rights or obligations of the City to execute and deliver to the Trustee any instrument elsewhere in this Indenture provided for or permitted to be delivered to the Trustee.

A copy of every Supplemental Indenture entered into pursuant to this Indenture shall be accompanied by a Bond Counsel's Opinion stating that such Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, is valid and binding upon the parties to the Supplemental Indenture and enforceable in accordance with its terms and, in the case of Bonds the interest upon which is excludable from gross income for federal income tax purposes, stating that such Supplemental Indenture will not adversely affect the exclusion from gross income for federal income tax purposes of the interest on such Bonds.

# ARTICLE XI

## MISCELLANEOUS

Section 1101  <u>Notices</u>.  Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Indenture shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

A.  If to the City, to:  City of Detroit

Detroit, Michigan 48226
Attention: _____

B.  If to the Depository Bank, to:  _____

C.  If to the Trustee, to:  _____

The City and the Trustee may by notice given hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 1102  <u>Termination</u>. This Indenture shall terminate following delivery of written direction from the City to the Trustee to so terminate, together with written notice: (1) that all Bonds have been paid in full at maturity or defeased (and for each series of Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to defease such Bonds in accordance with the applicable defeasance requirements are on deposit with the Trustee as of the date of the City's notice), and (2) that all fees owed to the Trustee have been paid in full.  Upon termination of this Indenture, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

The Trustee shall give written notice of the termination of this Indenture to each of the other parties listed in Section 1101 hereof.

Section 1103  <u>Defeasance</u>.  Bonds of each series shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Trustee.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Registered Owners of such Bonds.  After such deposit, such

35

Bonds shall no longer be entitled to the benefits of this Indenture (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

Section 1104  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Indenture shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Indenture.

Section 1105  <u>Headings</u>.  Any headings shall be solely for convenience of reference and shall not constitute a part of the Indenture, nor shall they affect its meaning, construction or effect.

Section 1106  <u>Indenture Executed in Counterparts</u>.  This Indenture may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 1107  <u>Parties Interested Herein</u>.  Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Indenture on behalf of the City shall be for the sole and exclusive benefit of the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser.

Section 1108  <u>Jurisdiction</u>.  To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Indenture (including, without limitation, any actions by the Trustee or the Registered Owners pursuant to Section 902 hereof), or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; <u>provided</u>, <u>however</u>, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law

IN WITNESS WHEREOF, this Indenture has been signed on behalf of the City by its Emergency Manager and _____ to evidence the acceptance of the trust, has caused this Indenture to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____

    Its: Emergency Manager

_____,

as Trustee

By _____

Its: _____

37

**EXHIBIT A**

**<u>FORM OF SERIES 2013A BOND</u>**

**EXHIBIT B**

**FORM OF SERIES 2013B BOND**

**EXHIBIT C**

**FORM OF ACCOUNT CONTROL AGREEMENT**

# EXHIBIT 7



## EMERGENCY MANAGER
## CITY OF DETROIT

### ORDER No. 17

### APPROVAL OF POSTPETITION FINANCING

By the Authority Vested in the Emergency Manager
For the City of Detroit
Pursuant to Michigan Public Act 436 of 2012,
Kevyn D. Orr, the Emergency Manager,
Issues the Following Order:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager ("EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor and City Council; and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Pursuant to section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of [PA 436], including, but not limited to, orders for the timely and satisfactory implementation of a financial and operating plan" or "to take actions, or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan;" and

Section 12(1)(a) of PA 436 authorizes the EM, "notwithstanding any charter

1

provision to the contrary," to "[a]nalyze the factors and circumstances contributing to the financial emergency of the local government and initiate steps to correct the condition;" and

Section 12(1)(b) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[a]mend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended;" and

Section 12(1)(c) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[r]eceive and disburse on behalf of the local government all federal, state, and local funds earmarked for the local government. These funds may include, but are not limited to, funds for specific programs and the retirement of debt;" and

Section 12(1)(g) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[m]ake, approve, or disapprove any appropriation, contract, expenditure, or loan…;" and

Section 12(1)(u) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary" to "authorize the borrowing of money[, subject to Section 19 of PA 436,] by the local government as provided by law" (a "Proposed Transaction"); and

Section 12(1)(ee) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government. The power of the [EM] shall be superior to and supersede the power of any of the foregoing officers or entities;" and

Pursuant to section 19(1) of PA 436, the EM, before executing the Proposed Transaction, "shall submit the [Proposed Transaction] to the governing body of the local government [which] shall have 10 days from the date of submission to approve or disapprove the [Proposed Transaction]. If the governing body of the local government does not act within 10 days, the [Proposed Transaction] is considered approved by the governing body of the local government and the emergency manager may then execute the [Proposed Transaction];" and

Pursuant to Section 19(2) of PA 436, "[i]f the governing body of the local government disapproves a [Proposed Transaction] within 10 days, the governing body of the local government shall, within 7 days of its disapproval of the [Proposed Transaction], submit to the local emergency financial assistance loan board an alternative proposal that would yield substantially the same financial result as the [Proposed Transaction]. The local emergency financial assistance loan board shall have 30 days to review both the alternative proposal submitted by the governing body of the local government and the [Proposed Transaction] and to approve either the alternative proposal submitted by the governing body of the local government or the [Proposed Transaction].

2

The local emergency financial assistance loan board shall approve the proposal that best serves the interest of the public in that local government;" and

Pursuant to section 36a of the Home Rule City Act, Public Act 279 of 1909 (the "Home Rule City Act"), the City is authorized to issue on or more series of Financial Recovery Bonds; and

On July 18, 2013 (the "Petition Date"), the City filed a petition for relief pursuant to chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

In its bankruptcy case, the City filed its Motion for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (III) Granting Related Relief (the "Settlement Motion"), which motion is currently pending before the Bankruptcy Court; and

Pursuant to the Settlement Motion, the City is seeking the Bankruptcy Court's approval of the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended, the "Forbearance Agreement"), pursuant to which, if approved by the Bankruptcy Court, the City would have the option to have UBS AG and Merrill Lynch Capital Services, Inc. terminate certain swap agreements (the "Swap Agreements") with the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation at a market discount rate; and

On or around October 7, 2013, the City reached agreement on the material terms of a secured financing transaction, which such material terms are identified on the term sheets attached hereto as Exhibit A (the "Term Sheets"), with the lenders party to such Term Sheets (the "Lenders"); and

The EM believes that it is in the best interests of the City and its residents to obtain secured financing consistent with the Term Sheets ("Secured Financing") to address the objectives of PA 436, advance its chapter 9 restructuring efforts and promote the health, safety and welfare of the residents of the City consistent with the restructuring proposals set forth in the City's June 14, 2013, Proposal for Creditors; and

The EM anticipates using the Secured Financing to restructure and eliminate certain of the City's debts and fiscal obligations, including, but not limited to, the obligations of the City in connection with the Swap Agreements. The EM also expects to use the Secured Financing to advance certain key investment initiatives of the City, including,

3

but not limited to, essential investments in blight removal, public safety and technology infrastructure; and

The EM further believes that (a) it is necessary and appropriate in connection with the City's restructuring efforts, and to promote the goals of the such restructuring, to pursue the Secured Financing; (b) the City should be authorized, consistent with the terms of this Order, to negotiate, document, and execute such documents as may be necessary or appropriate to effectuate the Secured Financing and to consummate the transactions contemplated by the Term Sheets; and (c) pursuing the foregoing will directly benefit the City, its creditors, residents, and other interested parties.

**It is hereby ordered that:**

1. Notwithstanding any ordinance or resolution of the City the contrary, the Term Sheets are hereby approved in all respects in accordance with this Order. The Secured Financing shall be issued pursuant to this Order as one or more series of Financial Recovery Bonds pursuant to section 36a of the Home Rule City Act, Public Act 279 of 1909 (the "Home Rule City Act").

2. The Secured Financing shall be issued in an aggregate principal amount not to exceed $350,000,000 and is payable AND SHALL BE SECURED as provided in the Term Sheets. The Secured Financing shall have a final maturity no later than 3 years from the date of issuance. The annual interest rate on the Secured Financing shall not exceed the maximum rate permitted by law. The Secured Financing shall be sold at a price not less than 80% of the principal amount of the Secured Financing.

3. The City's Chief Financial Officer, Finance Director, financial advisors, consultants, outside legal advisors, and other officers and employees of the City as applicable (collectively, the "Authorized Parties") are hereby authorized and directed, on behalf of, and in the name of, the City, to take all actions as may be deemed advisable by such parties, under applicable law or otherwise, to authorize the Secured Financing, including any actions required under PA 436 set forth above and any actions required under the Bankruptcy Code in the City's bankruptcy case.

4. The Authorized Parties are hereby authorized to file this Order, the Term Sheets and all other documents necessary or advisable with the local emergency financial assistance loan board created under the emergency municipal loan act, 1980 P.A. 243, MCL 141.931 to 141.942 for approval pursuant to the Home Rule Act. The Authorized Parties are further authorized in connection with the Secured Financing to make determinations of useful life as needed to issue a portion of the Secured Financing as federal tax exempt.

5. The Authorized Parties are hereby authorized to negotiate, document, revise, and amend any Financing Documents (as defined below) as may be necessary or

4

appropriate to effectuate the Secured Financing and to consummate the transactions contemplated by the Term Sheets.

6. The Finance Director, or such other party as the EM may designate, is hereby authorized to execute and deliver from time to time on behalf of the City such documents, agreements, instruments, certificates, and notices as may be advisable, desirable, appropriate, or otherwise necessary in connection with and to effectuate the Secured Financing (collectively, the "Financing Documents"), each of which shall be in such form and substance as may be acceptable to the EM.

7. Notwithstanding any ordinance or resolution of the City the contrary, the entry into the Financing Documents by the City, and the City's incurrence of indebtedness thereunder shall be, and hereby are, authorized, ratified, and approved. It is determined to be a necessary public purpose for the health, safety, and welfare of the citizens of the City to enter into the Secured Financing.

8. Notwithstanding any ordinance or resolution of the City the contrary, the City may grant security interests to the Lenders as set forth in the Term Sheets to secure the City's obligations in connection with the Secured Financing. Any and all actions taken or to be taken by the City consistent with this paragraph 8 are hereby authorized, ratified, and approved.

9. Notwithstanding any ordinance or resolution of the City the contrary, the City may grant a claim in favor of the Lenders in respect of the obligations owing by the City under the Financing Documents with priority over all other postpetition claims and all prepetition unsecured claims, pursuant to 11 U.S.C. §§ 364(c), 503 and 507(a)(2), and subject to the approval of the Bankruptcy Court. Any and all actions taken or to be taken by the City consistent with this paragraph 9 are hereby authorized, ratified, and approved.

10. The City hereby appoints Barclays Capital, Inc. to serve as the City's arranger to raise the capital necessary for the City to exit from bankruptcy protection and the city is hereby authorized to pay such fees and expenses to Barclays Capital, Inc. as may be agreed by the City in exchange for such services.

11. For any portion of the Secured Financing, if it is necessary or advisable, the Authorized Parties are hereby authorized to enter into an undertaking for the benefit of the holders and beneficial owners of the Secured Financing pursuant to Rule 15c2-12 of the U.S. Securities and Exchange Commission, and the same is authorized to approve and execute such undertaking prior delivery of such financing.

12. The City hereby covenants for any debt issued pursuant to this Order as federally tax-exempt that, to the extent permitted by law, the City shall take all actions within its control necessary to maintain the exemption of the interest on the debt from general federal income taxation (as opposed to alternative minimum or other

indirect taxation) under the Internal Revenue Code of 1986 (the "Code"), including, but not limited to, actions relating to the rebate of arbitrage earnings, if applicable, and the expenditures and investment of notes proceeds and moneys deemed to be debt proceeds.

13. The City's Finance Director, Chief Financial Officer or such other party as the EM may designate, is hereby authorized and directed, from time to time and in the name and on behalf of the City to, pay any fees, costs, and expenses as may be required under the Term Sheets or as may be required under any of the Financing Documents.

14. All lawful actions previously taken by any officer, representative, or agent of the City, including financial advisors, consultants, and outside legal advisors, in the name or on behalf of the City in connection with the matters contemplated by this Order, and each of the same hereby is, adopted, ratified, confirmed, and approved in all respects.

15. Pursuant to section 19 of PA 436, the Term Sheets are hereby submitted to the City of Detroit City Council ("City Council"), and City Council is hereby instructed to review the Term Sheets for the Secured Financing, and to either approve or disapprove the Secured Financing in accordance with the Term Sheets within 10 days from the date hereof.

16. Nothing in this Order shall be interpreted as contrary to Federal law.

17. This Order is effective immediately upon the date of execution below.

18. If any component of this Order is declared illegal, unenforceable, or ineffective by a court of competent jurisdiction, such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

19. The EM may modify, amend, rescind, replace, supplement, or otherwise revise this Order at any time.

20. This Order shall be distributed to the Mayor, City Council members and all department heads.

6

Dated: October 11, 2013

By: _(signature)_

Kevyn D. Orr
Emergency Manager
City of Detroit

cc:    State of Michigan Department of Treasury
        Mayor David Bing
        Members of Detroit City Council

7

*Set forth below is a summary of certain key terms for the Quality of Life Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Quality of Life Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

| | |
|---|---|
| Issuer: | The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending. |
| Purchaser and Sole Lead Arranger: | Barclays Capital Inc. |
| Note Agent: | Barclays Capital Inc. |

## 2. TYPE AND AMOUNT OF FACILITY

| | |
|---|---|
| Type and Amount: | A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Note" or the "Note" and, together with (i) the Swap Termination Note or (ii) the Replacement Swap Transaction, as applicable (as selected by the City), the "Post-Petition Facility") in an aggregate principal amount of up to $350,000,000, minus the amount of the Swap Termination Note (as defined in the Swap Termination Note Term Sheet) or the Upfront Amount in respect of the Replacement Swap Transaction (each as defined in the Replacement Swap Transaction Term Sheet), as applicable (the "Facility Amount"). |
| Purposes: | |
| | Proceeds from the issuance of the Quality of Life Note shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Note Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City. |

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the QOL Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the QOL Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the QOL Note Documents and the issuance of the Swap Termination Note are satisfied and the Swap Termination Note shall have been issued in accordance with the terms of the ST Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Swap Termination Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| | |
|---|---|
| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Quality of Life Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax |

Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Quality of Life Note Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Note on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Note on a first-priority basis.

The QOL Note Documents will require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Quality of Life Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

The QOL Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month, all of which shall be applied to redeem the Swap Termination Note until such Note is paid in full and thereafter, such amounts (in addition to $4 million per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Note. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

Super-Priority of    Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2),

| | |
|---|---|
| Note: | the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any QOL Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any QOL Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the QOL Note Documents); entry of an order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Wagering Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Wagering Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established. |
| Remedies: | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due.  Payment of such accelerated principal shall be made by the City on a monthly basis |

on a level debt basis equivalent to $4 million per month (or, following repayment in full of the Swap Termination Note, $8 million per month, as set forth above under the heading "Collateral"), plus the pro-rata proceeds of any Asset Proceeds Collateral.

| | |
|---|---|
| Prohibition of Additional Borrowings: | The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Quality of Life Note or the Swap Termination Note. |

## 5. CERTAIN OTHER PROVISIONS

| | |
|---|---|
| Documentation: | Each in form and substance satisfactory to the Purchaser: |

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of

Note terms and conditions

- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Note Collateral, including lifting of automatic stay and "good faith" finding

- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into QOL Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law

- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "QOL Note Documents".

Conditions Precedent:    Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the QOL Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form

and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Swap Termination Note (the "ST Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Swap Termination Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any QOL Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary | The City acknowledges that the transactions described in this |

| Relationship: | document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| --- | --- |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| Yield Protection, Taxes and Other Deductions: | The QOL Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the QOL Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the QOL Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities |

or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase Agreement.<br><br>George E. Zobitz, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700<br>jzobitz@cravath.com |
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>AFillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and |

the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

*Set forth below is a summary of certain key terms for the Swap Termination Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Swap Termination Note and related documentation.*

1. PARTIES AND TRANSACTIONS

Issuer:

The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending.

Purchaser and Sole Lead Arranger:

Barclays Capital Inc.

Note Agent:

Barclays Capital Inc.

2. TYPE AND AMOUNT OF FACILITY

Type and Amount:

A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Note" or the "Note" and, together with the Quality of Life Note, the "Post-Petition Facility") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended, the "Forbearance Agreement") to terminate the underlying swaps. The sum of the amount of the Swap Termination Note and the amount of the Quality of Life Note shall not exceed $350,000,000 (the "Facility Amount").

Purposes:

The Swap Termination Note may be used by the City to pay amounts required under the Forbearance Agreement to terminate the underlying swaps as approved by the Bankruptcy Court.

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the ST Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the ST Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the ST Note Documents and the issuance of the Quality of Life Note are satisfied and the Quality of Life Note shall have been issued in accordance with the terms of the QOL Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
|---|---|
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Quality of Life Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Swap Termination Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on: (i) the Asset Proceeds Collateral and (ii) income tax revenues of the City (the "Pledged Income Tax Revenue" and together with the Asset Proceeds Collateral, the "Swap Termination Note Collateral"). The lien on the Asset Proceeds Collateral shall also secure the Quality of Life Note on |

a pari passu basis. The Quality of Life Note shall be secured by a second lien on the Pledged Income Tax Revenue.

The ST Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the ST Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

| | |
|---|---|
| Super-Priority of Note: | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any ST Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any ST Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the ST Note Documents); entry of an |

order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established.

Remedies:

Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month, plus the pro-rata proceeds of any Asset Proceeds Collateral.

Prohibition of
Additional
Borrowings:

The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Swap Termination Note or the Quality of Life Note.

## 5. CERTAIN OTHER PROVISIONS

Documentation:   Each in form and substance satisfactory to the Purchaser:

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of Note terms and conditions
- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Swap Termination Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into ST Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "ST Note Documents".

Conditions Precedent: Usual for municipal financings and Chapter 11 debtor-in-possession financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the ST Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Quality of Life Note (the "QOL Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Quality of Life Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap

Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any ST Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary Relationship: | The City acknowledges that the transactions described in this document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |

| | |
|---|---|
| Yield Protection, Taxes and Other Deductions: | The ST Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the ST Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the ST Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities. |
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase |

Agreement.

George E. Zobitz, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
212 474 1000
F 212 474 3700
jzobitz@cravath.com

| | |
|---|---|
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>AFillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan. |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | ) ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) ) Case No. 13-53846 |
| Debtor. | ) ) Hon. Steven W. Rhodes |
|  | ) ) |

## DEBTOR'S MOTION PURSUANT TO SECTIONS 105 AND 107(b) OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE DEBTOR TO FILE FEE LETTER UNDER SEAL IN CONNECTION WITH THE DEBTOR'S POST-PETITION FINANCING MOTION

The City of Detroit, Michigan, as debtor in the above-captioned case (the "City"), hereby submits this motion (this "Motion") for the entry of an order pursuant to Sections 105 and 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") substantially in the form attached hereto as Exhibit 1 (the "Proposed Order"), (a) authorizing the City to file under seal a copy of the Fee Letter dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. ("Barclays") and the City and (b) directing that the Fee Letter shall remain under seal, confidential and not be made available without the written consent of the City and Barclays or further order of this Court (after notice and hearing). In support of the Motion, the City respectfully represents and sets forth as follows:

13-53846-swr Doc 1521 Filed 11/05/13 Entered 11/05/13 14:59:33 Page 1 of 24
355
13-53846-tjt Doc 4354-2 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 270 of 274   270

## Factual Background

1.      On July 18, 2013 (the "Petition Date"), the City filed a petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

2.      Contemporaneously with the filing of this Motion, the City filed the Motion (the "Financing Motion") of the Debtor for a Final Order Pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 of the Bankruptcy Code (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay.[1]  The Financing Motion seeks, among other things, authority for the City to incur debt under the Post-Petition Facility on the terms set forth in the Financing Motion and to enter into and perform under the Financing Documents.

3.      As further described below, because the Fee Letter contains confidential commercial information regarding the potential cost to the City of the financing and commercially sensitive detail regarding how to calculate such potential cost, the disclosure of which would be harmful to both the City and to Barclays, and which the City agreed with Barclays under section 8 of the

---

[1] Terms capitalized but not defined herein shall have the meanings given to them in the Financing Motion.

CHI-1910079v3
13-53846-tjt   Doc 4314-2   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 271 of 24
13-53846-swr   Doc 1521   Filed 11/08/13   Entered 11/08/13 14:50:33   Page 2 of 24
355                                                                                    271

Commitment Letter to keep confidential, the City requests authorization to file the Fee Letter under seal.

## Jurisdiction

4.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018.

## Relief Requested

5.    The City seeks entry of the Proposed Order authorizing the City to file the Fee Letter under seal and directing that the Fee Letter shall remain under seal and confidential in accordance with its terms and the terms of the Commitment Letter (the "Commitment Letter") dated as of October 6, 2013, between Barclays and the City.

## Basis for Relief

6.    Section 105(a) of the Bankruptcy Code codifies the bankruptcy court's inherent equitable powers and empowers it to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In addition, Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders that will protect entities from any

- 3 -

CHI-1910079v3

13-53846-tjt  Doc 3115-2  Filed 11/09/14  Entered 11/09/14 22:00:53  Page 3 of 24
13-53846-swr  Doc 1521  Filed 11/05/13  Entered 11/05/13 14:59:53  Page 272 of 355    272

harm that could result from the disclosure of certain confidential information. This

section provides, in relevant part:

> On request of a party in interest, the bankruptcy
> court shall, and on the bankruptcy court's own motion,
> the bankruptcy court may

> (1)     protect any entity with respect to a trade
> secret or confidential research, development, or
> commercial information;

11 U.S.C. § 107(b).

7.     Bankruptcy Rule 9018 details the procedures by which a party in

interest may move for relief under section 107(b). It provides, "On motion, or on

its own initiative, with *or without* notice, the court may make any order which

justice requires . . . to protect the estate or any entity in respect of a trade secret or

confidential research, development, or commercial information." Fed. R. Bankr. P.

9018 (emphasis added). This provision is "designed to protect business entities

from disclosure of information that could reasonably be expected to cause the

entity commercial injury." <u>In re</u> Global Crossing, Ltd., 295 B.R. 720, 725 (Bankr.

S.D.N.Y. 2003). Accordingly, it mandates sealing information where disclosure

would unfairly benefit that entity's competitors. <u>In re</u> The Frontier Group, LLC,

256 B.R. 771 (Bankr. E.D. Tenn. 2000).

- 4 -

A.    **Section 107(b) Requires the Court to Protect Parties from Disclosure of Sensitive Commercial Information**

8.      Once the Court determines that a party in interest seeks protection of information that falls within one of the categories enumerated in section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting interested party and has no discretion to deny the application."  Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 27 (2d Cir. 1994). Courts have found that such relief should be granted if the information sought to be protected is commercial information.  See, e.g., Global Crossing, 295 B.R. at 725 (stating that the purpose of Bankruptcy Rule 9018 is to "protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury.").  Moreover, the resulting order should be broad (i.e., "any order which justice requires").  Global Crossing, 295 B.R. at 724; Bankruptcy Rule 9018.  Courts are required to provide such protections "generally where open inspection may be used as a vehicle for improper purposes."  Orion, 21 F.3d at 27. Indeed, the "authority goes not just to the protection of confidential documents, but to other confidentiality restrictions that are warranted in the interests of justice." Global Crossing, 295 B.R. 724.

- 5 -

9. Courts have also stated that commercial information need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code. Orion, 21 F.3d at 27-28 (stating that section 107(b)(1) creates an exception to the general rule that court records are open to examination by the public and that under this exception, any interested party has to show only that the information it wishes to seal is "confidential and commercial" in nature).

## B. The Fee Letter Contains "Commercial Information" That Warrants Confidential Treatment Under the Bankruptcy Code

10. The City submits that the information contained in the Fee Letter is confidential commercial information that is entitled to protection under section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 and that the City agreed under section 8 of the Commitment Letter to keep confidential. The Fee Letter specifies not only the fee that Barclays is to receive for its commitment to provide the Post-Petition Facility, but also highly sensitive pricing information for the facility, the disclosure of which likely would increase the cost of the facility to the City. As the Commitment Letter and Term Sheets describe, Barclays is permitted to syndicate the Post-Petition Facility. In order to permit such syndication, and as is common in syndicated deals, the Fee Letter provides for so-called "market flex," whereby, to a limited extent and subject to certain conditions, Barclays is entitled to, among other things, increase the interest rate on the loan to facilitate the

- 6 -

syndication.   If the terms of such "market flex" were fully disclosed, potential purchasers of the loan likely would simply demand the maximum permitted interest rate as a condition to their purchase, thereby increasing the cost of the financing to the City.

11.     The commitment fee that the City has agreed to pay also is Barclays' confidential pricing information, which the financial industry and its clients view as highly sensitive and confidential, particularly at this early stage in the financing process.  Exposing such proprietary information to the market would be detrimental to the City and to Barclays in several significant ways.  First, it would provide Barclays' direct competitors with an unfair pricing advantage in the municipal financing marketplace.  Fees paid by a borrower in connection with a financing would not typically be something that an arranger of financing would disclose to anyone.  Here, the fees payable under the Fee Letter are the product of extensive, good-faith, arm's-length negotiations. The fee and expense reimbursement provisions provided for in the Fee Letter primarily fall into three categories (i) compensation for credit risk and for Barclays' risk in underwriting the Post-Petition Facility, (ii) compensation for the large, sophisticated team of credit, financial, marketing, legal and other experts necessary to assist with the structuring and marketing of this complex, multi-tranche facility, and (iii) pricing terms which facilitate the marketing and syndication of the Post-Petition Facility.

- 7 -

Barclays is a well-established source of bankruptcy financing and the disclosure of certain of their fees and marketing strategies threatens the core of its business model and the syndication of this financing. Given the highly competitive nature of the investment banking and lending industries, it is of the utmost importance to Barclays that the details of the fee structure set forth in the Fee Letter be kept confidential so that competitors may not use the information contained therein to gain a strategic advantage in the marketplace.

12. Second, disclosure of the commitment fee would put Barclays at an unfair disadvantage in negotiations with potential participants in the Post-Petition Facility (to the ultimate detriment of the City), who would know Barclays' bottom line in payment of syndication or commitment fees to the participants. The result of such disclosure would be a likely increase in the cost of capital for the City.

13. Third, disclosure of the commercial terms in the Fee Letter may set a negative precedent and thereby discourage other financial institutions from lending to other chapter 9 debtors for fear of disclosure of their commercial fee structures and related information.

14. In summary, the Fee Letter contains confidential commercial information, and a broad publication of the Fee Letter would be materially harmful to the City and to the business of Barclays. The City therefore submits that good cause exists to authorize the City to file the Fee Letter under seal

CHI-1910079v3
13-53846-tjt   Doc 4314-2   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 27 of 24
13-53846-swr   Doc 1521   Filed 11/03/13   Entered 11/03/13 14:50:33   Page 8 of 21
355
277

15.     Bankruptcy courts have routinely granted requests to file commercial fee information, including fee amounts, percentages and pricing information, under seal. See, e.g., In re Patriot Coal Corp., et al., Case No. 12-12900, Dkt. No. 85 (Bankr. S.D.N.Y. July 16, 2012) (permitting debtor to file certain fee amounts and percentages and pricing information under seal or redacted); In re Residential Capital, LLC, et al., Case No. 12-12020, Dkt. No. 114 (Bankr. S.D.N.Y. May 18, 2012) (same); In re United Retail Group, Inc., et al., Case No. 12-10405, Dkt. No. 30 (Bankr. S.D.N.Y Feb. 1, 2012) (same); In re The Great Atlantic & Pacific Tea Co., Inc., et al., Case No. 10-24549, Dkt. No. 3184 (Bankr. S.D.N.Y. Jan. 18, 2012) (same); In re NewPage Corp., et al., Case No. 11-12804, Dkt. No. 78 (Bankr. D. Del. Sept. 8, 2011) (same); In re Harry & David Holdings, Inc., et al., Case No. 11-10884, Dkt. No. 60 (Bankr. D. Del. Mar. 29, 2011) (permitting debtor to file fee letter under seal in connection with postpetition financing); In re Tribune Co., et al., Case No. 08-13141, Dkt. No. 62 (Bankr. D. Del. Dec. 10, 2008); In re Northwest Airlines Corp., et al., Case No. 05-17930, Dkt. No. 1529 (Bankr. S.D.N.Y. Dec. 22, 2005) (permitting debtor to file term sheet and financing documents under seal); In re Adelphia Commc'n Corp., Case No. 02-41729, Dkt. No. 4260 (Bankr. S.D.N.Y. Mar. 24, 2004) (permitting debtor to file under seal fee letter, syndication letter and engagement letter relating to exit financing).

- 9 -

CHI-1910079v3

13-53846-tjt  Doc 4354-2   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 278 of
13-53846-swr   Doc 1521   Filed 11/03/13   Entered 11/03/13 14:59:33   Page 9 of 24
355
278

## Notice

16.     Notice of this Motion shall be provided to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) counsel to the Purchaser; (m) the other parties that submitted Lending Proposals; and (n) all entities that have requested notice pursuant to Bankruptcy Rule 2002.   The City submits that no other or further notice need be provided.

## Statement of Concurrence

17.     Rule 9014-1(g) of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested

- 10 -

CHI-1910079v3

13-53846-swr   Doc 4812   Filed 04/29/14   Entered 04/29/14 22:00:53   Page 10 of 24
13-53846-swr   Doc 1321   Filed 11/05/13   Entered 11/05/13 12:50:53   Page 10 of 24

355

279

on a specified date and that the concurrence was denied." Local Rule 9014-1(g).

Given the number of parties and potential parties involved in this case and the lack

of known opposing parties who would be adversely impacted by the relief

requested herein, it would be impracticable (and, with regard to unknown parties,

impossible) for the City to affirmatively seek the concurrence of each opposing

counsel interested in the relief sought herein. Accordingly, the City submits that

imposing the requirements of Local Rule 9014-1(g) in this matter would be

"unduly burdensome" and requests that its requirements be waived.

## No Prior Request

18.     No prior motion for the relief requested herein has been made to this

or any other Court.

- 11 -

WHEREFORE, for the reasons set forth herein, the City respectfully requests that the Court grant the relief requested herein and further relief as is just and proper.

Dated:  November 5, 2013                Respectfully submitted,


                                        /s/  David G. Heiman
                                        David G. Heiman (OH 0038271)
                                        Heather Lennox (OH 0059649)
                                        JONES DAY
                                        North Point
                                        901 Lakeside Avenue
                                        Cleveland, Ohio  44114
                                        Telephone:  (216) 586-3939
                                        Facsimile:  (216) 579-0212
                                        dgheiman@jonesday.com
                                        hlennox@jonesday.com

                                        Brad B. Erens
                                        JONES DAY
                                        77 West Wacker
                                        Chicago, Illinois 60601
                                        Telephone: (312) 782-3939
                                        Facsimile: (312) 782-8585
                                        bberens@jonesday.com

                                        Bruce Bennett (CA 105430)
                                        JONES DAY
                                        555 South Flower Street, Fiftieth
                                        Floor
                                        Los Angeles, California 90071
                                        Telephone: (213) 243-2382
                                        Facsimile: (213) 243-2539
                                        bbennett@jonesday.com

- 12 -

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD,
PADDOCK AND
STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY
OF DETROIT

- 13 -

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None [No Affidavits Filed Specific to This Motion] |

# EXHIBIT 1

## (Proposed Form of Order)

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## ORDER AUTHORIZING THE DEBTOR TO FILE
## FEE LETTER UNDER SEAL IN CONNECTION WITH
## THE DEBTOR'S POST-PETITION FINANCING MOTION

Upon the motion (the "Motion") of the City of Detroit, Michigan, as

debtor in the above-captioned case (the "City"), for entry of an order (this "Order")

authorizing the City to file under seal the Fee Letter dated as of October 6, 2013

(the "Fee Letter"), between Barclays Capital Inc. ("Barclays") and the City in

connection with the City's Motion (the "Financing Motion")[1] of the Debtor for a

Final Order Pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),

503, 507(a)(2), 904, 921 and 922 of the Bankruptcy Code (I) Approving Post-

Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status

and (III) Modifying Automatic Stay; and it appearing that this Court has

jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it

---

[1] Terms capitalized but not defined herein shall have the meanings given to
them in the Financing Motion.

appearing that venue of this chapter 9 case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined (i) the information contained in the Fee Letter is confidential commercial information that the City has agreed, under section 8 of the Commitment Letter, to keep confidential and (ii) that the relief provided herein is in the best interests of the City, its creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      Pursuant to Bankruptcy Code sections and 105(a) and 107(b), and Bankruptcy Rule 9018, the City is authorized to file the Fee Letter under seal.

3.      The Fee Letter shall remain under seal, confidential and not be made available without the written consent of the City and Barclays.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      This Court shall retain jurisdiction to hear and decide any dispute related to or arising from this Order.

**EXHIBIT 2**

**(Notice)**

Form B20A(Official Form 20A)
12/1/10

**UNITED STATES BANKRUPTCY COURT**
**Eastern District of Michigan**

In re:

**CITY OF DETROIT, MICHIGAN,**

              **Debtor.**

**Chapter: 9**

**Case No.: 13-53846**

**Judge:  Hon. Steven W. Rhodes**

Address:  2 Woodward Avenue, Suite 1126
          Detroit, Michigan  48226

Last four digits of Social Security or
Employer's Tax Identification (EIN) No(s).(if any):  38-6004606

**NOTICE OF DEBTOR'S MOTION PURSUANT**
**TO SECTIONS 105 AND 107(b) OF THE BANKRUPTCY CODE FOR AN**
**ORDER AUTHORIZING THE DEBTOR TO FILE FEE LETTER UNDER SEAL**
**IN CONNECTION WITH THE DEBTOR'S POST-PETITION FINANCING MOTION**

The City of Detroit, Michigan (the "City") has filed papers with the Court (the "Seal Motion") seeking entry of an order, pursuant to sections 105 and 107(b) of the Bankruptcy Code authorizing the City to file a Fee Letter under seal, in connection with the City's post-petition financing motion.

<u>**Your rights may be affected.**</u>  **You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, **on or by November 22, 2013**, you or your attorney must:[1]

1.              File with the court a written response or an answer, explaining your position at:[2]

**United States Bankruptcy Court**
211 W. Fort Street, Suite 2100
Detroit, Michigan  48226

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.  All attorneys are required to file pleadings electronically.

---

    [1] Concurrently herewith, the City is seeking expedited consideration and shortened notice of the Seal Motion. If the Court grants such expedited consideration and shortened notice, the City will file and serve notice of the new response deadline.

    [2] Any response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

You must also mail a copy to:

David G. Heiman
Heather Lennox
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114

Brad B. Erens
JONES DAY
77 West Wacker
Chicago, Illinois 60601

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226

2.        If a response or answer is timely filed and served, the Court will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

- 2 -

# **EXHIBIT 3**

## **(Intentionally Omitted)**

# **EXHIBIT 4**

**(Certificate of Service)**

## <u>CERTIFICATE OF SERVICE</u>

I, David G. Heiman, hereby certify that the foregoing Debtor's Motion Pursuant to Sections 105 and 107(b) of the Bankruptcy Code for an Order Authorizing the Debtor to File Fee Letter Under Seal in Connection with the Debtor's Post-Petition Financing Motion was filed and served via the Court's electronic case filing and noticing system on this 5th day of November, 2013.


/s/ David G. Heiman

# EXHIBIT 5

**(Intentionally Omitted)**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

-------------------------------------------------------:
                                       :

In re                               :         Chapter 9

                                  :

CITY OF DETROIT, MICHIGAN,       :         Case No. 13-53846

                                  :

                     Debtor.    :         Hon. Steven W. Rhodes

-------------------------------------------------------:

## CITY OF DETROIT'S OBJECTION TO RULE 2004
## MOTION OF SYNCORA GUARANTEE INC. AND
## SYNCORA CAPITAL ASSURANCE INC. (D.E. 1342)

     The City of Detroit, Michigan, in its capacity as the debtor in the

above-captioned chapter 9 case (the "<u>City</u>"),[1] hereby opposes the relief requested

in the above-captioned motion (the "<u>Rule 2004 Motion</u>").[2]  In support of its

Objection,[3] the City respectfully represents as follows:

---

[1]    The City also is filing this Objection on behalf of Kevyn Orr, individually
and in his official capacity as Emergency Manager of the City, since the
Rule 2004 Motion was directed at Mr. Orr as well.

[2]    On November 6, 2013, three parties filed joinders (collectively,
the "<u>Joinders</u>") to the Rule 2004 Motion:  Ambac Assurance Corporation
(D.E. 1538); National Public Finance Guarantee Corporation (D.E. 1544);
and Assured Guaranty Municipal Corp. (D.E. 1545).  To the extent the
Joinders request that the Court grant the relief requested in the Rule 2004
Motion, the City opposes the relief sought therein for the reasons set forth
below.

[3]    Capitalized terms used but not defined herein are accorded the meanings
given to them in the Rule 2004 Motion.

## PRELIMINARY STATEMENT

The City has invested significant time and energy in a process designed to identify and secure postpetition financing that will allow it to achieve a number of key objectives in this restructuring. In its latest effort to disrupt the City's reorganization efforts, however, Syncora, itself a participant in the postpetition financing process, was not content to let that process proceed. Instead, in an apparent attempt to jump the queue before the City even had the opportunity to file its motion with this Court seeking approval of such financing — yet with the full knowledge that such a motion was shortly forthcoming — Syncora sought an order permitting discovery pursuant to Rule 2004.

The City has since filed its motion seeking approval of the postpetition financing and has committed to produce — and will produce promptly — documents that generally are responsive to the requests attached to the Rule 2004 Motion, as well as to make the City's witnesses available for deposition. Accordingly, Syncora has failed to demonstrate why, under these circumstances, it should be entitled to use Rule 2004 rather than pursue discovery as part of this contested matter. Therefore, the Rule 2004 Motion should be denied.

## BACKGROUND

1.      Beginning in August 2013, the City commenced a robust process to obtain postpetition financing, which process entailed the solicitation of

more than 50 prospective lenders (including Syncora) and ultimately resulted, in early October, in an agreement with Barclays Capital, Inc. on the material terms of the postpetition financing.

2. On October 23, 2013, Syncora filed the Rule 2004 Motion. In that motion, Syncora seeks the entry of an order authorizing it to issue document and deposition subpoenas (collectively, the "2004 Requests") in order to "evaluate the process by which the City solicited, reviewed, negotiated, and made determinations, as well as the substance of the City's negotiations, analyses, and decisions making, about all DIP Proposals and the nature and substance of the City's communications with the City Council regarding the Barclays' DIP, including the City's compliance with PA 436." Rule 2004 Motion at ¶ 19.

3. On November 5, 2013, the City filed its motion for approval of postpetition financing (D.E. 1520) (the "Financing Motion"). The City at the same time also filed a motion to seal a fee letter related to that financing (D.E. 1521) (the "Seal Motion").

4. On November 5 and 6, counsel for the City reached out to counsel for Syncora to request a withdrawal of the 2004 Motion, given the filing of the Financing Motion and Seal Motion, and to discuss a discovery schedule. Counsel for the City will be discussing the matter with counsel for Syncora today to inform it that the City will produce relevant responsive documents that it

believes are properly within the scope of discovery in connection with the Financing Motion and make its witnesses in support of the Financing Motion available for deposition.[4]  As noted above, counsel for the City has requested that the Rule 2004 Motion be withdrawn, but to date Syncora has not agreed to that request.

## ARGUMENT

### *The Rule 2004 Motion is an Improper*
### *Use of Rule 2004 as a Contested Matter is Pending*

5.      Even if one assumes, for purposes of argument, that Rule 2004 applies in a chapter 9 case, Rule 2004 examinations are not without limit.  See Intercontinental Enters. Inc. v. Keller (In re Blinder, Robinson & Co., Inc.), 127 B.R. 267, 274 (D. Col. 1991) ("[T]he availability of Rule 2004 as a discovery tool is not unlimited.").

6.      In particular, it is well-settled that Rule 2004 examinations are inappropriate once the matter at issue becomes the subject of a contested matter or adversary proceeding.  In re Michalski, 449 B.R. 273, 281 n.4 (Bankr. N.D. Ohio 2011) ("Once a contested matter or adversary proceeding has been initiated, discovery under Rule 2004 is no longer appropriate."); Conley v. Central Mortgage Co. (In re Conley), 414 B.R. 157, 159 (Bankr. E.D. Mich. 2009) ("If a party

---

[4]      The City's stated intention to produce responsive documents is without prejudice to its right to assert any general and/or specific objections to the production of documents.

NYI-4551083v4

-4-

13-53846-tjt  Doc 431-2  Filed 04/29/13  Entered 04/29/13 22:00:23  Page 297 of
355
13-53846-swr  Doc 431-2  Filed 04/29/13  Entered 04/29/13 16:00:23  Page 297 of  297

requires more information *and* there is no existing adversary proceeding or contested matter, the court may order the examination of any entity on motion of any party in interest [under] F.R. Bankr.P. Rule 2004") (emphasis added); see also In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("Courts have imposed limits on the use of Rule 2004 examinations . . . under the well recognized rule that once an adversary proceeding or contested matter is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004").

7.      Here, the City filed the Financing Motion on November 5, 2013.  There is no question that the Financing Motion is a contested matter as defined by Rule 9014.   See Rule 4001(c)(1)(A) ("A motion for authority to obtain credit shall be made in accordance with Rule 9014").  It is equally clear that the 2004 Requests involve the issues and parties that are within the scope of this contested matter and at the center of the Financing Motion itself.[5]

8.      The appropriate mechanism through which to evaluate the terms of the postpetition financing is as part of the contested matter initiated upon

---

[5]      For example, the 2004 Requests seek extensive information about the "DIP Solicitation Process"— the marketing and selection process for the financing that is highlighted in the Financing Motion and that will undoubtedly be the subject of extensive evaluation in that context.  Similarly, they seek all documents and communications relating to the "Barclay's DIP" — aka the City's proposed postpetition financing facility that is the subject of the Financing Motion.  Indeed, Syncora itself admits that it is seeking information "[t]o appropriately and comprehensively evaluate the terms of the Barclays' DIP."  Rule 2004 Motion at ¶ 9.

the City's filing of the ***motion to approve that same postpetition financing***.

Permitting Syncora to discover information with respect to this topic outside of

that forum would directly circumvent the limits that have been placed on Rule

2004. Accordingly, there is no basis to permit Syncora to utilize Rule 2004, rather

than the framework provided by the Federal Rules of Civil Procedure, to conduct

discovery in connection with the Financing Motion.

***The Rule 2004 Motion is Moot***
***Because the City Has Already Agreed to Produce***
<u>***Responsive Documents and Make Witnesses Available***</u>

9.      Moreover, even if the Rule 2004 Motion were properly brought,

it is nonetheless now moot in light of the City's stated intention to voluntarily

produce responsive documents and make its witnesses available for depositions in

connection with discovery on the Financing Motion.

10.      The City currently intends to produce documents on or before

the week of November 18, 2013 and, subsequently, to produce its witnesses for

depositions at the times and locations agreed upon by the interested parties.[6] As

such, by the time the Rule 2004 Motion is heard by the Court, the City will have

substantially complied with the 2004 Requests. Accordingly, the relief sought in

the Rule 2004 Motion is moot.

---

[6]      The City also intends to seek to modify the objection deadline for the Financing Motion
in order to accommodate such discovery.

## <u>CONCLUSION</u>

For the foregoing reasons, the Rule 2004 Motion should be denied.


Dated: November 7, 2013        Respectfully submitted,

<u>/s/ David G. Heiman</u>
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Robert W. Hamilton (OH 0038889)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
JONES DAY
77 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 269-3939
Facsimile: (312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## MOTION OF THE OBJECTORS FOR LEAVE TO CONDUCT LIMITED DISCOVERY IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

The Objectors[1] submit this motion for leave to conduct limited discovery relating to the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (the "DIP Motion") pursuant to Local Rule 7026-3 of the United States Bankruptcy Court of the Eastern District of Michigan. In support of this motion, the Objectors respectfully represent as follows:

---

[1] Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora"). Ambac Assurance Corporation, and Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. (collectively "EEPK"), and David Sole, Party in Interest, join in this motion.

# BACKGROUND

1. On November 5, 2013, the City of Detroit (the "City") filed the DIP Motion, requesting approval for postpetition financing in the form of two series of secured bonds: the Swap Termination Bonds and the Quality of Life Bonds,[2] described generally as "financial recovery bonds" under Michigan law. (DIP Mot. ¶ 42.) The City intends to utilize the DIP financing proceeds to 1) terminate certain Swap Agreements pursuant to the Forbearance Agreement[3] and 2) to advance "certain key investment initiatives of the City." (DIP Mot. ¶ 6.)

2. The terms of the financing are, broadly, as follows: the sum of the financing is $350 million, with the proceeds split between bonds intended to finance the termination of certain Swap Agreements, and the balance consisting of bonds to finance certain City improvement projects. (DIP Mot. ¶ 47.) The DIP financing is projected to result in anywhere from $110 million in Quality of Life financing and $240 million in Swap Termination financing depending on the price of the Swap Termination. (DIP Mot. ¶ 16.) The interest rate is 250 basis points plus 1-month LIBOR and the purchaser, Barclays Capital Inc. ("Barclays"), will

---

[2] Capitalized terms not defined in this motion have the meanings given to them in the DIP Motion.

[3] The Forbearance Agreement is the subject of another contested matter in these Bankruptcy proceedings. Pursuant to the Court's November 7, 2013 Order, the hearing on a motion to assume the Forbearance Agreement is scheduled to occur at the same time as the hearing related to the DIP Motion. [Doc. No. 1564]. Multiple parties have filed objections to the City's motion to assume the Forbearance Agreement [Doc. No. 157].

2

13-53846-swr Doc 3143 Filed 04/29/14 Entered 04/29/14 22:00:28 Page 303 of 355

receive a first priority lien on the City's casino revenues[4] and a second priority lien on the City's income tax revenues. (*Id.*) Barclays will also purportedly receive super-priority status over administrative expenses, postpetition claims, and all prepetition unsecured claims. (*Id.*)

3. The City seeks to use the proceeds of the Swap Termination Bonds to exercise an option under the Forbearance Agreement that allows the City to terminate the Swaps. (DIP Mot. ¶ 9–11.) Though the status of the Forbearance Agreement is in question and will be addressed by this Court at a hearing on December 10, 2013, the City has stated in its DIP Motion that the City will save "approximately $50 million in obligations owing" as a result of the City's termination of the Swap Agreements pursuant to the Forbearance Agreement. (DIP Mot. ¶ 15.)

4. The City asserts that the Quality of Life Bond proceeds will be used for some, but not all, of the City's reinvestment program. (DIP Mot. ¶ 22.) The City has also stated that "the City may ultimately decide to apply the proceeds of the Quality of Life Financing to pursue an array of specific projects," but that the City's current focus includes public safety, information technology upgrades, and blight removal. (DIP Mot. ¶ 23.)

---

[4]  This lien is currently held by parties to the Swap transaction that the City seeks to terminate via the DIP financing. *See* Ex. 6 p 1 to Debtor's Mot. to Assume Forbearance Agreement [Doc. No. 157].

5.     In the course of the solicitation and negotiation of the DIP financing, the City has stated that it "formally approached over 50 potential financing sources" and eventually received 16 lending proposals. (DIP Mot. ¶ 35–36.) Of these 16, the City chose four "Final Prospective Lenders." According to the City, Barclays' proposal was the "best available." (DIP Mot. ¶ 39.)

6.     The City claims that it sought approval from the City Council and Emergency Loan Board for the DIP financing transaction. (DIP Mot. ¶ 41.) On October 25, 2013, the City Council rejected the City's proposal on October 25, 2013. (DIP Mot. ¶ 45.) The City then submitted the proposal to the Emergency Loan Board simultaneously with its submission of the DIP Motion. (*Id.*)

7.     On October 23, 2013, approximately two weeks prior to the filing of the City's DIP Motion, Syncora sought the Court's permission to seek more information about the DIP financing pursuant to Bankruptcy Rule 2004 ("2004 Motion").[5] On November 7, two days after it filed its DIP Motion, the City filed an objection to Syncora's 2004 Motion ("2004 Objection").[6]

---

[5]   *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy Procedure 2004* [Docket No. 1342].

[6]   *City of Detroit's Objection to Rule 2004 Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (D.E. 1342)* [Doc. No. 1568].

8. On November 7, 2013, this Court scheduled a hearing on the DIP Motion for December 10, 2013 [Doc. No. 1564]. Objections to the City's DIP Motion are due on November 22, 2013. (*Id.*) The Objectors intend to file objections to the City's DIP Motion.

## JURISDICTION

9. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

10. The Objectors respectfully request the entry of an order granting the Objectors leave to conduct limited discovery relating to the DIP Motion.

## BASIS FOR RELIEF

**A. The Objectors' Request for Leave to Conduct Limited Discovery Relating to the DIP Motion.**

11. Local Rule 7026-3 states that "[d]iscovery in a contested matter is permitted only upon a court order for cause shown." E.D. Mich. LBR 7026-3. The Objectors submit that, in this case, good cause exists for limited discovery surrounding the DIP Motion.

12. Courts consider the following factors to determine whether the terms of a postpetition financing transaction under section 364 of the Bankruptcy Code are appropriate: (a) whether the proposed transaction is an exercise of the debtor's

5

reasonable business judgment; (b) whether alternative financing is available on any other basis; (c) whether the proposed transaction is in the best interests of both the estate and its creditors; (d) whether any better offers, bids, or timely proposals are before the court; (e) whether the transaction is necessary, essential, and appropriate to preserve estate assets and for the continued operation of a debtor's business; (f) whether the terms of the proposed financing are fair, reasonable, and adequate given the circumstances; and (g) whether the proposed transaction was negotiated in good faith and at arm's length. *In re Farmland Industries, Inc.*, 294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003). Here, discovery is necessary in order to competently assess whether the DIP financing proposed by the City in its DIP Motion meets these requirements.

13. Syncora sought permission to investigate the terms of the DIP financing approximately two weeks in advance of the City's DIP Motion, after the proposal was made available to the City Council. In its 2004 Objection, the City suggests that Syncora improperly used Rule 2004 to "jump the queue" in seeking this information. (2004 Obj. p 2.) However, in its DIP Motion, the City states that "time is of the essence with respect to the relief sought in this Motion." (DIP Mot. ¶ 18.) Notwithstanding the City's selective approach to the importance of timing in relation to its DIP financing, discovery remains necessary with respect to

significant aspects of the DIP financing even following the City's filing of the DIP Motion.

14.    *First*, Syncora and other creditors have little information regarding the solicitation and negotiation of the DIP financing.  The City's statements in its motion and attached declarations are general and do not provide sufficient information to evaluate the propriety of the City's solicitation and negotiation process.  For example, the City states that the process it engaged in was "robust and subject to significant market testing."  (DIP Mot. ¶ 35.)  However, the City primarily recites the number of institutions it approached for financing as evidence that its process was robust.  (*Id.*)  It states that it believes that the lending proposals from the final four lenders represented the best potential structures and that the final proposal it chose was the best in terms of "overall pricing, certainty of closing and other structural aspects."  (DIP Mot. ¶ 39.)  However, the City does not provide sufficient detail regarding the other proposals to evaluate whether those proposals were superior.  As a result, further discovery is necessary to evaluate whether the process the City engaged in was reasonable, in good faith, at arm's length, and whether the alternative proposals the City entertained were inferior to the Barclays proposal.

15.    *Second*, the Objectors and other creditors have little information regarding the City and Emergency Manager's compliance with P.A. 436.  Under

P.A. 436, the City was required to seek approval from the City Council and the Emergency Loan Board before it could incur any debt. (DIP Mot. ¶ 41.) To date, the City Council has rejected the proposal and the Emergency Loan Board has not released an opinion. (DIP Mot. ¶ 41.) In the first instance, the City's authorization to borrow money depends on its meeting the requirements of P.A. 436. Moreover, compliance with this legislation is also central to the City's consideration of the best interests of its "estate," the public, and its creditors. The City's statements regarding its compliance and its steps to evaluate the requirements of P.A. 436 are thus essential to determine whether the City is eligible to receive financing. Thus, good cause exists for the Objectors to conduct discovery relating to the City's compliance with PA 436.

16.     *Third*, to date, the City has failed to provide any detailed information regarding the use of and need for the proceeds from the Quality of Life Bonds. Though the City notes that these expenditures will be part of its desire to "aggressively pursue" reinvestment initiatives in the City, the City alleges these proceeds will most likely be used to advance "investments in blight removal, public safety and technology infrastructure." (DIP Mot. ¶ 23.) However, the City concedes that it may change the use of the proceeds at any time, and does not articulate why it needs these proceeds specifically at this time. (*Id.*) Because the use of financing by the City can be approved only when it is necessary and

reasonable, the Objectors are entitled to understand exactly how the City intends to use the proceeds from the Quality of Life bonds and why these proceeds are needed. Given that the City has not yet provided that information, there is good cause for discovery on this issue.

17. Given the limited information that is currently available to the Objectors on the aforementioned issues, the Objectors request leave to seek limited discovery on topics to include the following:

(a) The DIP solicitation process;

(b) The DIP negotiation process;

(c) The process the City undertook to comply with PA 436;

(d) The uses the City contemplates for the proceeds of the sale of Quality of Life notes;

(e) All documents and communication relating to the Barclay's DIP, including but not limited to the Fee Letter, the Engagement Letter, and any other documents relating to any fees the City has agreed to pay to Barclays in connection with the DIP and/or any exit financing, and any documents made available to Barclays or other potential Bondholders via a virtual data room established in connection with the Post-Petition Facility.

The Objectors may also request depositions of:

(a) James Doak, an employee of Miller Buckfire;

(b) Charles Moore, an employee of Conway Mackenzie;

(c) A representative of Barclays;

(d) A representative of Ernst and Young;

(e) A member of the Detroit City Council;

(f) A representative of the Swap Counterparties.

## STATEMENT OF CONCURRENCE SOUGHT

18.     Local Bankruptcy Rule 9014-1 provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied."  Local Rule 9014-1(g).

19.     Counsel for Syncora sought concurrence from opposing counsel for the relief requested in this motion on November 11, 2013.  Counsel for the City agreed that the Objectors were entitled to certain discovery regarding the DIP Motion.  Specifically, counsel for the City stated that it had no objection to the scope of discovery contained in Syncora's 2004 Motion (*i.e.*, the process and negotiation surrounding the DIP Financing).  The City also stated that it would not move to quash or object to any of the Objectors' proposed depositions.

20.     However, counsel for the City stated that the City would object to any discovery relating to the City's need for, or intended use of, the DIP Financing proceeds.  According to the City's counsel, information relating to the need for and

use of the DIP Financing proceeds is irrelevant and not something that the Court can consider.

## RESERVATION OF RIGHTS

21. The Objectors file this motion without prejudice or waiver of their rights under the Bankruptcy Code.


WHEREFORE, the Objectors respectfully request that this Court (a) enter an order substantially in the form attached hereto as <u>Exhibit 1</u>, granting the relief sought herein; and (b) grant such other and further relief as the Court may deem proper.

*[Remainder of this page intentionally left blank.]*

| Dated: November 11, 2013 | /s/ Stephen C. Hackney |
|---|---|
| | James H.M. Sprayregen, P.C. |
| | Ryan Blaine Bennett |
| | Stephen C. Hackney |
| | KIRKLAND & ELLIS LLP |
| | 300 North LaSalle |
| | Chicago, Illinois 60654 |
| | Telephone: (312) 862-2000 |
| | Facsimile: (312) 862-2200 |

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

By: /s/ Carol Connor Cohen
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC 20036-5342
Telephone: (202) 857-6054
E-mail: Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY 10019
Telephone: (212) 484-3900

12

13-53846-swr Doc 1864-2 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 313 of 355
13-53846-swr Doc 1864-2 Filed 04/29/14 Entered 04/29/14 22:10:26 Page 12 of 94   313

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By:  */s/ Vincent J. Marriott, III*
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan  48084
Telephone:  (248) 649-1200
Facsimile:  (248) 649-2920
E-mail:  howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**
1735 Market Street, 51st Flr.
Philadelphia, PA  19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware  19801
Telephone:  (302) 252-4428

13

Facsimile:  (410) 361-8930
E-mail:  summersm@ballardspahr.com

*Attorneys for Hypothekenbank Frankfurt AG,*
*Hypothekenbank Frankfurt International S.A., and*
*Erste Europäische Pfandbrief- und*
*Kommunalkreditbank Aktiengesellschaft in*
*Luxemburg S.A. (collectively "EEPK")*

JEROME D. GOLDBERG, PLLC

By: /s/ *Jerome D. Goldberg*
Jerome D. Goldberg (P61678)
2921 East Jefferson, Suite 205
Detroit, MI 48207
Phone: 313-393-6001
Fax: 313-393-6007
Email: apclawyer@sbcglobal.net

*Attorney for David Sole, Party in Interest*

# SUMMARY OF ATTACHMENTS

Exhibit 1     Proposed Form of Order

Exhibit 2     Notice of Motion and Opportunity to Object

Exhibit 3     None [Brief not Required]

Exhibit 4     None [Separate Certificate of Service to be Filed]

Exhibit 5     None

Exhibit 6     None

**<u>Exhibit 1</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER GRANTING LEAVE TO CONDUCT LIMITED DISCOVERY IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

This matter coming before the Court on the motion of the Objectors[1] for leave to conduct limited discovery in connection with the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)2, 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (the "DIP Motion") and entering an order granting leave to conduct limited discovery relating to the DIP Motion; the Court having reviewed the Objectors' Motion; and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

---

[1]   Capitalized terms not otherwise defined herein have the meanings given to them in the Objectors' DIP Discovery Motion.

IT IS HEREBY ORDERED THAT:

1.      The Objectors' motion is GRANTED.

2.      Good cause exists for the Objectors to conduct limited discovery relating to the DIP Motion.  The Objectors may now commence discovery.

3.      The Objectors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**


_____

STEVEN W. RHODES
United States Bankruptcy Judge

## Exhibit 2

**Notice of Motion and Opportunity to Object**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## NOTICE OF MOTION OF THE OBJECTORS FOR LEAVE TO CONDUCT LIMITED DISCOVERY IN CONNECTION WITH MOTION OF DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

**PLEASE TAKE NOTICE** that on November 11, 2013 the Objectors filed the *Motion of the Objectors for Leave to Conduct Limited Discovery in Connection with Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)2, 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (the "DIP Discovery Motion") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to clarify the hearing date on the City of Detroit's motion seeking an order authorizing it to enter into certain transactions related to the Public Lighting Authority (the "DIP Motion") and to seek limited discovery related to the City's DIP Motion.

**PLEASE TAKE FURTHER NOTICE that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Objectors' Motion or you want the Bankruptcy

Court to consider your views on the Motion, by **November 25, 2013** you or your attorney must:[1]

File with the court a written response to the Motion. explaining your position explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

---

[1] Concurrently herewith, the Objectors are seeking expedited consideration and shortened notice of the DIP Discovery Motion. If the Court grants such expedited consideration and shortened notice, the Objectors will file and serve notice of the new response deadline.

[2] A response must comply with F. R. Civ. P. 8(b), (c) and (e).

If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

*[Remainder of this page intentionally left blank]*

Dated: November 11, 2013        Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: */s/ Stephen C. Hackney*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

      - and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:  (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*

# Exhibit 3

## None [Brief Not Required]

**Exhibit 4**

**None [Separate Certificate of Service to be Filed]**

**Exhibit 5**

**Affidavits**
**[Not Applicable]**

13-58846-swr Doc 4364-6 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 327 of
355
13-53846-swr Doc 1640-6 Filed 11/11/13 Entered 11/11/13 22:12:26 Page 327 of 327

**Exhibit 6**

**Documentary Exhibits**
**[Not Applicable]**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Chapter 9
                                                Case No. 13-53846
City of Detroit, Michigan,                      Hon. Steven W. Rhodes

    Debtor.
_____/

<u>Order Denying Motion of Syncora Under Rule 2004</u>

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. have filed a motion for authority to issue document and deposition subpoenas to the debtor, the emergency manager and certain of debtor's advisors pursuant to Federal Rule of Bankruptcy Procedure 2004 (Dkt. #1342). The debtor has filed a response in opposition to the motion. The Court concludes that it is unnecessary to hold the previously scheduled hearing on November 14, 2013. Accordingly, it is cancelled.

The Court further concludes that the motion should be denied for the reasons argued by the debtor. It is not an appropriate use of Rule 2004 to seek discovery in connection with a pending contested matter.

It is so ordered.

.

**Signed on November 12, 2013**

                            _____/s/ Steven Rhodes_____
                            **Steven Rhodes**
                            **United States Bankruptcy Judge**

13-53846-tjr  Doc 4316-2  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 329 of
13-53846-swr  Doc 1662   Filed 11/12/13  Entered 11/12/13 13:02:48  Page 1 of 1
355                                                                          329

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) |

## JOINDER OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO LIMITED OBJECTION OF FINANCIAL GUARANTY INSURANCE COMPANY TO DEBTOR'S MOTION PURSUANT TO SECTIONS 105 AND 107(b) OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE DEBTOR TO FILE FEE LETTER UNDER SEAL IN CONNECTION WITH THE DEBTOR'S POST-PETITION FINANCING MOTION

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") hereby joins (the "Joinder") the limited objection of Financial Guaranty Insurance Company dated November 13, 2013 [Docket No. 1686] (the "Limited Objection") to the *Debtor's Motion Pursuant to Sections 105 and 107(b) of the Bankruptcy Code for an Order Authorizing the Debtor to File Fee Letter Under Seal in Connection with the Debtor's Post-Petition Financing* [Docket No. 1521] (the "Motion"). In support of this Joinder, Syncora respectfully states as follows:

13-53846-tjt  Doc 4314-2  Filed 04/29/14  Entered 04/29/14 22:00:38  Page 330 of
13-53846-swr  Doc 1690  Filed 11/13/13  Entered 11/13/13 21:00:38  Page 1 of 9
355                                                                          330

1.     Syncora entered into that certain confidentiality agreement, dated as of July 9, 2013, by and between Syncora and the City[1] (the "Confidentiality Agreement").

2.     Syncora asserts the arguments set forth in the Limited Objection and incorporates those paragraphs as if fully set forth herein.

3.     On multiple occasions on October 21-23, 2013, counsel for Syncora contacted counsel for the City, via telephone and email, requesting copies of the Fee Letter and Engagement Letter.  On October 23, 2013, after counsel for Syncora informed counsel for the City that it intended to file a rule 2004 motion seeking, among other things, discovery of the Fee Letter and the Engagement Letter, counsel for the City indicated Syncora should proceed with filing its rule 2004 motion as counsel for the City continued to work to provide copies of the Fee Letter and Engagement Letter to Syncora.  The Fee Letter and Engagement Letter have yet to be disclosed to Syncora.

4.     As the Limited Objection states in more detail, disclosure of the Fee Letter and Engagement Letter to Syncora on a confidential basis poses no risk of harm to the City or the City's proposed postpetition lender and will allow Syncora to assess the relief requested in the Financing Motion.

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Limited Objection.

5. For the foregoing reasons and those set forth in the Limited Objection, Syncora respectfully requests that the Court direct the City to provide Syncora with copies of the Fee Letter and Engagement Letter, subject to the terms of the Confidentiality Agreement.

Dated: November 13, 2013

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

---

**Order Party: Name, Address and Telephone Number**

Name  Syncora Guarantee & Syncora Capital Assurance

Firm  Kirkland & Ellis LLP

Address  300 N. LaSalle

City, State, Zip  Chicago, IL 60654

Phone  312.862.3200

Email  dustin.paige@kirkland.com

**Case/Debtor Name:** City of Detroit, MI

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** Hon. Steven Rhodes

⦿ Bankruptcy   ◯ Adversary

◯ Appeal   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

Date of Hearing: 11/14/2013   Time of Hearing: 2:00 pm _11:00 am_   Title of Hearing: Hearing re Detroit Bankruptcy

Please specify portion of hearing requested: ⦿ Original/Unredacted  ◯ Redacted   ◯ Copy (2nd Party)

⦿ Entire Hearing   ◯ Ruling/Opinion of Judge   ◯ Testimony of Witness   ◯ Other

Special Instructions: _____

---

**Type of Request:**

⦿ Ordinary Transcript - $3.65 per page (30 calendar days)

◯ 14-Day Transcript - $4.25 per page (14 calendar days)

◯ Expedited Transcript - $4.85 per page (7 working days)

◯ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com



FOR COURT USE ONLY

Transcript To Be Prepared By

Date _____ By _____

Order Received:

Transcript Ordered:

Transcript Received:

**Signature of Ordering Party:**

_Dustin Paige_   Date: 11/15/2013

By signing, I certify that I will pay all charges upon completion of the transcript request.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                         Chapter 9
                                               Case No. 13-53846
City of Detroit, Michigan,                     Hon. Steven W. Rhodes

     Debtor.
_____/

<u>Order Denying Motion to File Fee Letter Under Seal</u>

For the reasons stated on the record in open Court on November 14, 2013, it is hereby ordered that the debtor's motion pursuant to Sections 105 and 107(b) of the Bankruptcy Code for an order authorizing the debtor to file fee letter under seal in connection with the debtor's post-petition financing motion (Dkt. #1521) is denied.

.

**Signed on November 15, 2013**

                              **/s/ Steven Rhodes**
                          **Steven Rhodes**
                          **United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Chapter 9
                                                Case No. 13-53846
City of Detroit, Michigan,                      Hon. Steven W. Rhodes

        Debtor.
_____/

Order Regarding Motion of the Objectors
For Leave to Conduct Limited Discovery in
Connection with Motion of the Debtor for a Final Order

        Objectors Syncora Guarantee Inc. and Syncora Capital Assurance Inc., Ambac

Assurance Corporation, Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt

International S.A., Erste Europaische Pfandbrief–und Kommunalkreditbank

Aktiengesellschaft in Luxemburg S.A., and David Sole, have filed a motion for leave to

conduct limited discovery in connection with motion of the debtor for a final order

pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2),

904, 921 and 922 (I) approving post-petition financing, (II) granting liens and providing

superpriority claim status and (III) modifying automatic stay (Dkt. #1640).  The City

opposed the motion.

        For the reasons stated on the record in open Court on November 14, 2013, it is

hereby ordered that the motion is granted in part and denied in part. The motion is

granted to the extent the City stated on the record its agreement to discovery.  The

balance of the motion is denied without prejudice to the moving parties' right to resubmit

its request for additional discovery after the Court determines the scope of the hearing on

the City's motion to incur debt (Dkt. #1520).

                                         .

**Signed on November 15, 2013**

                       /s/ Steven Rhodes

                  **Steven Rhodes**
                  **United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
:
In re                            : Chapter 9
:
CITY OF DETROIT, MICHIGAN,    : Case No. 13-53846
:
              Debtor.     : Hon. Steven W. Rhodes
:
-------------------------------------------------------x

## NOTICE OF FILING OF FEE LETTER IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

**PLEASE TAKE NOTICE THAT** the City of Detroit, Michigan ("Detroit" or the "City"), in connection with the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1),364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (Docket No. 1520), hereby files the Fee Letter dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City. A copy of the Fee Letter is attached hereto as Exhibit A.

Dated: November 18, 2013          Respectfully submitted,


/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com


Brad B. Erens (IL 6206864)
JONES DAY
77 West Wacker
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Facsimile: ( 312) 782-8585
bberens@jonesday.com


Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
bbennett@jonesday.com


ATTORNEYS FOR THE CITY

# CERTIFICATE OF SERVICE

     I, David G. Heiman, hereby certify that the foregoing Notice of Filing of Fee Letter was filed and served via the Court's electronic case filing and noticing system on this 18th day of November, 2013.


           /s/ David G. Heiman

# EXHIBIT A

BARCLAYS CAPITAL INC.

**PERSONAL AND CONFIDENTIAL**

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

$350,000,000 Post-Petition Bond Financing—Fee Letter

Dear Ms. Corio:

Reference is made to the Commitment Letter dated the date hereof (the "Commitment Letter") between the City of Detroit, Michigan (the "City" or "you") and Barclays Capital Inc. ("Barclays", "we" or "us"). Terms used but not defined in this letter agreement shall have the meanings assigned to them in the Commitment Letter (including the exhibits thereto). This Fee Letter is the "Fee Letter" referenced in the Commitment Letter. By accepting the Commitment Letter, you agree to pay (or cause to be paid) the fees set forth in this Fee Letter in accordance with the other terms and conditions set forth therein.

1.  Post-Petition Facility

As consideration for Barclays's commitment with respect to the Post-Petition Facility under the Commitment Letter and agreement under the Commitment Letter to structure, arrange and syndicate the Post-Petition Facility, you agree to pay to Barclays, solely for its own account, a commitment fee (the "Commitment Fee") equal to the sum of (a) 1.25% of the aggregate principal amount of the Quality of Life Note and (b) 1.25% of the aggregate principal amount of the Swap Termination Note; provided, however, that the aggregate Commitment Fee in respect of the Post-Petition Facility shall be no less than $750,000. The Commitment Fee shall be earned in full on the date upon which the City delivers its signed signature page to the Commitment Letter to Barclays, regardless of whether any debt is issued or whether the transactions contemplated by the Commitment Letter are consummated, and shall be due and payable to Barclays as follows: (a) 50% on the date hereof and (b) 50% on the earlier of (i) 60 days from the date hereof and (ii) the Closing Date. You acknowledge that a subsequent fee in an amount to be determined by Barclays and agreed to by you shall be required in respect of any additional facility or any amendment to the Post-Petition Facility entered into between you and Barclays (or its affiliate) that has the effect of extending the Maturity Date of the Quality of Life Note or the Swap Termination Note. Further, you acknowledge that, in the event we or our affiliates act in any other capacity with respect

13-53846-tjt  Doc 431-1  Filed 04/29/13  Entered 04/29/13 16:00:33  Page 34 of
13-53846-swr  Doc 431-1  Filed 04/29/13  Entered 04/29/13 16:00:33  Page 341 of
355                                                                              341

to the Post-Petition Facility, any fees owed to us in connection therewith that are agreed to by you shall be in addition to any fees payable to us hereunder.

The Participants' (including the Purchaser's) several commitments to provide the Post-Petition Facility are conditioned upon the payment on or prior to the Closing Date of the fees described in this Section 1 and any other fees required to be paid under the Commitment Letter, but the consummation of the Transactions is not a condition of the payment of the fees.

2.  Fees Generally; Expenses

All fees payable hereunder will be payable in U.S. dollars in immediately available funds to the Purchaser, the Arranger, the Note Agent and/or the other Participants (as applicable) for their own accounts, or as directed by them, in any such case, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes) and will not be subject to reduction by way of setoff or counterclaim. You agree that, once paid, the fees or any part thereof payable hereunder or under the Term Sheets shall not be refundable under any circumstances regardless of whether the transactions contemplated by the Commitment Letter are consummated or the Post-Petition Financing Order is entered by the Bankruptcy Court. All fees payable hereunder shall not be subject to any contingency or condition (except as expressly set forth in this Fee Letter) and shall be in addition to reimbursement of Barclays's out-of-pocket expenses (to the extent required to be reimbursed under the terms of the Commitment Letter). You agree that we may, in our sole discretion, share all or any portion of the fees payable hereunder to us with any other Participant.

3.  Market Flex

You hereby agree that the Purchaser may, after consultation with you, make any or all of the following changes, which will be approved by the Bankruptcy Court in the Post-Petition Financing Order and will require no additional authorizations or approvals, to the Post-Petition Facility (in respect of either or both of the Quality of Life Note and the Swap Termination Note, to be determined in the sole discretion of the Purchaser), at any time, and from time to time (including after the Closing Date), if the Purchaser determines, in its discretion and in consultation with you, that (i) such changes are reasonably necessary to facilitate the Successful Syndication (as defined below) of the Post-Petition Facility within 90 days after the Closing Date or (ii) a Successful Syndication on the terms set forth in the Term Sheets is unable to be achieved within 90 days after the Closing Date:

(i) the LIBOR floor may be increased by up to 1.00% per annum; and

(ii) the weighted average interest rate margins under the Post-Petition Facility (taken as a whole) may be increased by up to 2.00% per annum.

2

In the event that the Closing Date has occurred and the Note Documents have been executed and delivered prior to the Successful Syndication of the Post-Petition Facility, you hereby agree, at your own expense, to take all such action as may be required in order to effect any amendments to the Post-Petition Facility, or other changes, as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to this Section 3. You further agree to reasonably cooperate with us with regard to immaterial changes requested by potential Participants prior to the Successful Syndication of the Post-Petition Facility. The Purchaser's commitment in the Commitment Letter is subject to the agreements set forth in this Section 3, and the provisions of this Section 3 will survive the closing of the Post-Petition Facility and the execution and delivery of the Note Documents.

For purposes hereof, a "Successful Syndication" shall mean one in which the Purchaser and its affiliates are able to achieve a targeted hold level of no more than $175,000,000 of the Post-Petition Facility (taken as a whole).

4.    General

This Fee Letter shall not be assignable by you, and your rights and obligations hereunder may not be assigned or delegated, without the prior written consent of Barclays, and any attempted assignment without such consent shall be void. This Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of Barclays and you. This Fee Letter may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Fee Letter by facsimile transmission or other electronic transmission (in "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Fee Letter. This Fee Letter, the Commitment Letter and the Term Sheets are the only agreements that have been entered into among us with respect to the Post-Petition Facility and set forth the entire understanding of the parties with respect thereto. This Fee Letter, the Commitment Letter and the Term Sheets supersede all prior understandings, whether written or oral, between us with respect to the Post-Petition Facility. This Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Fee Letter and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Fee Letter and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of Michigan. Barclays may perform the duties and activities described hereunder through any of its affiliates and the provisions of Section 4 of the Commitment Letter shall apply with equal force and effect to any of such affiliates so performing any such duties or activities.

In addition, please note that neither the Purchaser nor the Arranger nor any of their respective affiliates provides tax, accounting or legal advice.

3

You agree that you will not disclose, directly or indirectly, this Fee Letter or the contents hereof other than as permitted by the Commitment Letter.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any commitment, undertaking or obligation on the part of Barclays or its affiliates to purchase any note or provide any financing in respect of the Post-Petition Facility; such an obligation shall arise only under the Commitment Letter (subject to the conditions and limitations set forth therein) if accepted in accordance with its terms.

The provisions of this Fee Letter will survive the expiration or termination (including, if applicable, in the event the Post-Petition Financing Order is not entered by the Bankruptcy Court) of the Commitment Letter (including any extensions thereof) and the funding of the Post-Petition Facility.

[The remainder of this page intentionally left blank]

Please confirm that the foregoing is our mutual understanding by signing and returning to Barclays an executed counterpart of this Fee Letter.

Very truly yours,

BARCLAYS CAPITAL INC.

By

Name: John Gerbino
Title: Managing Director

Accepted and agreed to as of
the date first written above:

THE CITY OF DETROIT, MICHIGAN

By

Name: *KEVYN D. ORR*
Title: *EMERGENCY MANAGER*

5

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## SYNCORA CAPITAL ASSURANCE INC. AND
## SYNCORA GUARANTEE INC.'S REQUEST FOR
## THE PRODUCTION OF DOCUMENTS TO THE CITY OF DETROIT

Pursuant to Local Bankruptcy Rule 7026-1, Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") files these requests for the production of documents and requests that the Debtor, the City of Detroit (the "City") produce for Syncora's inspection and copying all documents and tangible things requested below in accordance with the Definitions and Instructions set forth below at the offices of their counsel, Kirkland & Ellis LLP at 300 N. LaSalle, Chicago, IL 60654. These requests are made pursuant to this Court's November 15, 2013 Order [Doc. No. 1743]. Each of the following requests is continuing in nature, such that if the City obtains or discovers additional responsive documents and things at a later date, such documents and things are to be made available to defendant for inspection and copying.

# DEFINITIONS

A.     The term "City" means Detroit, Michigan.

B.     The term "EM" means the emergency manager of the City appointed pursuant to PA 436.

C.     The term "DIP Solicitation Process" means the process under taken by the City and its advisors to request and solicit proposals from Potential DIP Lenders for a DIP Loan.

D.     The term "DIP Loan" means the debtor in possession financing sought by the City through the DIP Solicitation Process.

E.     The term "DIP Negotiation" means the conversations, negotiations, and interactions with parties participating in the DIP Solicitation Process intended to lead to an acceptable proposal for a debtor in possession financing facility.

F.     The term "PA 436" means Michigan Public Act 436 of 2012.

G.     The term "PA 436 Compliance Process" means the steps taken by the City, the City's advisors, and the EM to comply with section 19(2) of PA 436, which requires the EM, before authorizing the borrowing of money, to submit the terms of the proposed borrowing of money to the governing body of the local government, which shall then have 10 days from the date of submission to approve or disapprove the borrowing.

H. The term "Detroit Post Petition Financing Term Sheet" means the proposed term sheet circulated by the City to Potential DIP Lenders in connection with the DIP Solicitation Process.

I. The term "Potential DIP Lender(s)" means those parties to whom the Detroit Post Petition Financing Term Sheet was circulated.

J. The term "Document(s)" shall be interpreted in the broad and liberal sense and means written, typed, printed, recorded, graphic, or photographic matter or any other medium upon which intelligence or information can be recorded, stored, or retrieved, however produced or reproduced, of any kind and description, and whether an original, master, duplicate, or copy, including, but not limited to, paper, notes, accounts, books, journals, advertisements, catalogs, manuals, publications, correspondence, cablegrams, mailgrams, telegrams, memoranda, letters, documents, communications, including interoffice and intra-office communications, reports, studies, analyses, pamphlets, calculations, projections, contracts, charts, graphs, plans, specifications, drawings, sketches, surveys, agreements, working papers, corporate records, minutes of committee meetings, books of account, ledger books, notebooks, vouchers, bank checks, cashier's checks, receipts for cashier's check, canceled checks, check stubs, bills, receipts, invoices, delivery tickets, bills of lading, time sheets, desk calendars, appointment books, log books, diaries, diary entries, photographs, microfilm, microfiche, and

notes, minutes, transcriptions, or sound recordings of any conversations, negotiations, meetings, or conferences, conducted either in person or by telephone, or things similar to any of the foregoing, and all other papers, writings, or physical things containing information, including data compilations from which information can be obtained by detection devices, and including preliminary drafts of or marginal notes appearing on any document, however denominated or described.

K.     The terms "and" and "or" shall be construed conjunctively or disjunctively as necessary to make each particular request inclusive rather than exclusive.

L.     The term "relating to" means in whole or in part and directly or indirectly relating to, pertaining to, connected with, concerning, commenting on, referring to, responding to, showing, evidencing, describing, analyzing, regarding, reflecting, or constituting.

## **INSTRUCTIONS**

1.     All documents should be produced in the manner and format in which they are kept.  Thus, to the extent any of the Documents listed below are kept or available in electronic format, such Documents should be produced in their native and original electronic format.  Moreover, to the extent financial records are maintained in electronic format, those files should be provided in one of the

following formats: Microsoft Excel, Microsoft Access, or CSV (Comma Delimited Text).

2.     These requests encompass all documents in the Debtor's possession, custody, or control, whether or not such documents were prepared by or for the Debtors. Where documents in the Debtor's possession, custody, or control are requested or inquired of, such request or inquiry includes documents in the possession, custody, or control of each of the Debtor's employees, agents, accountants, attorneys, auditors, representatives, consultants, advisors, all other persons or entities acting or purporting to act on behalf of the Debtor, and any other persons or entities from which the Debtor could obtain documents.

3.     If the Debtor contends that no documents exist relating to all or part of a request, the Debtor shall state this contention and respond as fully as possible to all parts of the request for which documents exist.

4.     If the Debtor claims that any privilege or protection excuses production of any document or part thereof, the Debtor must expressly make such claim in writing and provide a general description of the categories of documents being withheld and the basis for doing so, sufficient in detail for Syncora to determine whether there is an adequate basis for invoking privilege or protection.

5.     In the event that any document covered hereunder has been destroyed, discarded, or lost, the Debtors shall inform Syncora of this in writing and provide a

general description of the categories of documents destroyed or lost and the circumstances of their destruction or loss.

6.    If any document cannot be produced in full, it shall be produced to the maximum extent possible and the Debtors shall specify in writing the reasons for their inability to produce the remainder.

7.    Each document is to be produced with all non-identical copies and drafts thereof in their entirety without abbreviation or redaction (other than for a claim of privilege consistent with the Instructions herein).

8.    Unless stated otherwise, the time period applicable to the Documents called for is from January 2013, through the date of the document requests, subject to the Debtors' ongoing obligation to supplement responses under the applicable rules.

## DOCUMENT REQUESTS

A.    **DIP SOLICITATION PROCESS:**    The following Documents relating to the DIP Solicitation Process:

1.    All Documents relating to any communication between the City, the City's advisors, the EM, or any other individual or entity regarding the need and/or purported uses for the DIP Loan.

2.    All Documents and communication relating to the terms of the Detroit Post Petition Financing Term Sheet that was circulated to Potential DIP Lenders.

6

3. All Documents containing any opinion, study, inspection, or analysis of the necessity of the DIP Loan.

4. All Documents relating to, supporting, or explaining any changes in the Detroit Post Petition Financing Term Sheet before it was circulated to Potential DIP Lenders.

B. **DIP NEGOTIATION:** The following Documents relating to the DIP Negotiation:

5. All Documents and communication relating to the terms of any DIP Proposal.

6. All Documents and communications relating to, supporting, or explaining the City's reasoning for pursuing or not pursuing negotiations with a Potential DIP Lender, including any analysis of the perceived economic, political, or social benefits or drawbacks of any DIP Proposal.

7. All Documents and communication relating to, supporting, or explaining any changes made to the DIP Proposals after their initial submission by the Potential DIP Lenders.

8. All Documents and communication relating to the Barclay's DIP.

C. **PA 436 COMPLIANCE PROCESS: The following Documents relating to the City's compliance with PA 436 relating to the DIP Loan:**

9. All Documents sent to the City Council relating to the Barclays' DIP.

7

10.    All Documents and communication between the City, its advisors, and the City Council relating to the process by which the City negotiated with Potential DIP Lenders, evaluated the DIP Proposals, and selected the Barclays' DIP.

11.    All Documents and communication between the City, its advisors, and the City Council relating to the substance of the City's negotiations, analyses, and decision making about all DIP Proposals, including the Barclays' DIP.

12.    All Documents and communication between the City, its advisors, and the City Council regarding the merits and perceived benefits of the Barclays' DIP.

*[Remainder of this page intentionally left blank]*

8

13-53846-swr    Doc 4174-2    Filed 04/29/14    Entered 04/29/14 22:20:43    Page 8 of 10
13-53846-tjt    Doc 4317-2    Filed 04/29/14    Entered 04/29/14 22:24:43    Page 353 of 355    353
355

| | |
|---|---|
| Dated: November 19, 2013 | /s/ *Stephen C. Hackney* |

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

*Attorneys for Syncora Holdings Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance Inc.*

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
300 North LaSalle
Suite 2100
Chicago, Illinois 60654
Telephone:   (312) 280-0111
Facsimile:    (312) 280-8232

*Local Counsel to Syncora Holdings Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance Inc.*

13-53846-swr  Doc 3174-2  Filed 04/29/14  Entered 04/29/14 22:20:23  Page 354 of 10
13-53846-swr  Doc 1743  Filed 11/19/13  Entered 11/19/13 22:24:43  Page 9 of 10
355
354

## Certificate of Service

I, Stephen C. Hackney, hereby certify that on November 19, 2013, I caused the foregoing *Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Requests for the Production of Documents to the City of Detroit* to be filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter.

*/s/ Stephen C. Hackney*

Stephen C. Hackney