# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession***<br>**City of Detroit, Michigan**<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, MI 48226<br>WAYNE–MI<br>Tax ID / EIN: 38–6004606 | represented by | **Bruce Bennett**<br>555 S. Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213) 489–3939<br>Email: bbennett@jonesday.com |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237–3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114

(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

| | | |
|---|---|---|
| *U.S. Trustee*<br>**Daniel M. McDermott** | represented by | **Sean M. Cowley (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–3432<br>Email: Sean.cowley@usdoj.gov |

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769

Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Creditor Committee* **Committee of Unsecured Creditors** *TERMINATED: 03/03/2014* | represented by | **Brett Howard Miller** 1290 Avenue of the Americas 40th Floor New York, NY 10104 (212) 468–8051 Email: bmiller@mofo.com,whildbold@mofo.com *TERMINATED: 03/03/2014* |

**Geoffrey T. Pavlic**
25925 Telegraph Rd.
Suite 203
Southfield, MI 48033–2518
(248) 352–4700
Fax : (248) 352–4488
Email: pavlic@steinbergshapiro.com
*TERMINATED: 03/03/2014*

**Mark H. Shapiro**
25925 Telegraph Rd.
Suite 203
Southfield, MI 48033–2518
(248) 352–4700
Fax : (248) 352–4488
Email: shapiro@steinbergshapiro.com
*TERMINATED: 03/03/2014*

*Creditor Committee*
**Charlene Hearn**
PO Box 6612
Detroit, MI 48206

| | | |
|---|---|---|
| *Retiree Committee* **Official Committee of Retirees** | represented by | **Sam J. Alberts** 1301 K Street, NW Suite 600, East Tower Washington, DC 20005–3364 (202) 408–7004 Email: sam.alberts@dentons.com |

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.

| Filing Date | # | Docket Text |
|---|---|---|
| 11/27/2013 | 1870 | Objection to (related document(s): 1520 Motion to Borrow / *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post−Petition Financing, (II) Granting Liens and Providing) Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post−Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (Attachments: # 1 Index # 2 Exhibit A − Hr'g Tr., Nov. 14, 2013, 11:01 ET # 3 Exhibit B − Exit Engagement Letter # 4 Exhibit C − Email from Anne Marie Langan to Todd Snyder # 5 Exhibit D − Hr'g Tr., Nov. 14, 2013, 14:36 ET # 6 Exhibit E − Moody's Report # 7 Exhibit F − Funding for Detroit Announced on Sept. 27, 2013 # 8 Exhibit G − Cash Flow Variance Report June 2013 # 9 Exhibit H − Cash Flow Variance Report FY 2014 # 10 Exhibit I − Syncora Proposal # 11 Exhibit J − Hrg Tr., Oct. 15, 2013) (Bennett, Ryan) (Entered: 11/27/2013)* |
| 12/02/2013 | 1884 | Transcript Order Form of Hearing November 27, 2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Bennett, Ryan) (Entered: 12/02/2013) |
| 12/02/2013 | 1899 | Motion to Compel the Production of Privilege Log *Motion of the Objectors to Compel the Production of Privilege Log* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (Attachments: # 1 Index − Summary of Attachments # 2 Exhibit 1 − Proposed Order # 3 Exhibit 2 − Notice of Motion and Opportunity to Object # 4 Exhibit 3 − None [Brief not Required] # 5 Exhibit 4 − None [Separate Certificate of Service to be Filed] # 6 Exhibit 5 − Affidavits [Not Applicable] # 7 Exhibit 6 − Documentary Exhibits [Not Applicable]) (Hackney, Stephen) (Entered: 12/02/2013) |
| 12/09/2013 | 1980 | Exhibit List *Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Disclosure of Exhibits in Advance of the Hearing on December 17−19, 2013* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Hackney, Stephen) (Entered: 12/09/2013) |
| 12/09/2013 | 1983 | Exhibit List */ Debtor's List of Exhibits for Hearing on the City of Detroit's Assumption Motion [Dkts. 17 and 157] and Motion to Approve Post−Petition Financing [Dkt. 1520]* Filed by Debtor In Possession City of Detroit, Michigan. (Bennett, Bruce) (Entered: 12/09/2013) |
| 12/10/2013 | 2023 | Omnibus Reply to (related document(s): 1520 Motion to Borrow filed by Debtor In Possession City of Detroit, Michigan) / *Omnibus Reply of the Debtor to Objections to Debtor's Motion for Approval of Postpetition Financing* Filed by Debtor In Possession City of |

| | | | Detroit, Michigan (Heiman, David) (Entered: 12/10/2013) |
|---|---|---|---|

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) **Re: Docket No. 1520** |

## OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

Dated: November 27, 2013

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

KE 28525918

13-53846-tjt Doc 4314-0 Filed 04/29/14 Entered 04/29/14 22:00:25 Page 6 of 559
13-53846-swr Doc 1670 Filed 11/27/13 Entered 11/27/13 21:22:45 Page 1 of 52

6

# Table of Contents

                        **Page**

Preliminary Statement.................................................................1

Background...........................................................................5

Objection...........................................................................11

I.    **The Barclays DIP Does Not Meet the Standards for Approval of Postpetition Financing Under Section 364 of the Bankruptcy Code**.................................................................12

        1.    The City Did Not Exercise Sound Business Judgment When It Decided that It Needed to Borrow Money to Finance Its Reinvestment Initiatives Prior to Consideration of a Plan of Adjustment....................................17

        2.    The Barclays DIP Is Not in the Best Interests of the City or its Creditors..........................................................19

        3.    The Terms of the Barclays DIP Are Not Fair, Reasonable, and Adequate Given the Circumstances...............21

        4.    The Barclays DIP Should Not Be Approved Because Better Financing Is Available. .................................24

        5.    The DIP Motion Should be Denied, and the Parties Are Not Entitled to a Good Faith Finding under Section 364(e) of the Bankruptcy Code, Because the Barclays DIP Violates Syncora's Rights and Applicable Michigan Law..........................................................26

II.    **The City's Attempts to Hurriedly Rush Through a Series of One-Off Transactions Is an Attempt to Avoid Plan Confirmation Standards Designed to Protect Creditors**.................................32

III.    **The Court Should Engage in a Fulsome Review of the DIP Motion with a Focus on Whether the City's Relief Requested Accords with the Purposes and Policies of Chapter 9**...........................36

    A.    The DIP Motion Should Be Evaluated in Reference to the Purposes and Policies of Chapter 9.....................36

i

B.    History of Chapter 9 ................................................................37

    1.    Congress Originally Enacted Chapter 9 to Facilitate Consensual Debt Adjustment Agreements with Majority Creditor Support........................................................37

    2.    Early Constitutional Challenges Illustrate that the Controlling Purpose of Chapter 9 Is to Provide a Forum Where Distressed Cities Can Meet with Creditors Under the Necessary Control and Assistance of the Judiciary in an Effort to Effect a Mutually Advantageous Adjustment of Their Debts. ........................................................40

    3.    Early Applications of Chapter 9 Reaffirm That a Municipality's Plan of Adjustment Cannot Subsidize Public Improvement Projects at the Expense of Creditor Recoveries. ........................................................43

    4.    The 1976 and 1978 Amendments to Chapter 9 further reaffirm its first principles. ........................................................46

    5.    The 1988 Amendments to Chapter 9 Underscore How Congress Intended the Chapter 9 Process to Balance Creditors' Reasonable Expectations of Minimal Losses with a Municipality's Need to Continue Essential Public Operations. ........................................................50

C.    The City's Approach Conflicts with the Purposes and Policies Behind Chapter 9........................................................53

# Table of Authorities

**Page(s)**

**Statutes**

11 U.S.C. § 105 ........................................................................................1, 54

11 U.S.C. § 362 ........................................................................................1, 54

11 U.S.C. § 364 ...................................................................................... passim

11 U.S.C. § 364(c) ................................................................................. 11, 14

11 U.S.C. § 364(e) ....................................................................................1, 54

11 U.S.C. § 364(f) ..........................................................................................1

11 U.S.C. § 503 ........................................................................................1, 54

11 U.S.C. § 507(a) ....................................................................................1, 54

11 U.S.C. § 510(a) ................................................................................... 29, 30

11 U.S.C. § 901(a) .........................................................................................29

11 U.S.C. § 904 ............................................................................ 1, 3, 14, 54

11 U.S.C. § 921 ........................................................................................1, 54

11 U.S.C. § 922 ........................................................................................1, 54

11 U.S.C. § 928 ................................................................................. 50, 51, 52

11 U.S.C. § 943(b)(7) ....................................................................................34

2012 P.A. 436 ...................................................................................... passim

Mich. Comp. Laws Ann. § 141.1552 ..............................................................30

Mich. Comp. Laws Ann. § 141.1559 ........................................................ 30, 31

## Cases

*Ashton v. Cameron Cnty. Water Improvement Dist. No. 1*,
298 U.S. 513, 533–43 (1936) ............................................................... passim

*Bland v. Farmworker Creditors*,
308 B.R. 109, 113–14 (S.D. Ga. 2003) .................................................. 13, 24

*Fano v. Newport Heights Irrigation Dist.*,
114 F.2d 563, 566 (9th Cir. 1940) ............................................ 43, 44, 45, 51

*In re Adams Apple, Inc.*
(9th Cir. 1987) ...................................................................................27

*In re Addison Cmty. Hosp. Auth.*,
175 B.R. 646, 650 (Bankr. E.D. Mich. 1994).................................................53

*In re Ames Dep't Stores, Inc.*,
115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ............................................. 11, 15

*In re Barnwell Cnty. Hosp.*,
471 B.R. 849, 869 (Bankr. D. S.C. 2012).....................................................35

*In re Braniff Airways, Inc.*,
700 F.2d 935, 940 (5th Cir. 1983) ...............................................................32

*In re Crouse Group, Inc.*,
71 B.R. 544 (Bankr. E.D. Pa. 1987) ................................................. 14, 22, 25

*In re DB Capital Holdings, LLC*,
454 B.R. 804, 822 (Bankr. D. Colo. 2011).....................................................24

*In re Defender Drug Stores, Inc.*,
145 B.R. 312, 317–18 (B.A.P. 9th Cir. 1992) ........................................ 28, 33

*In re EDC Holding Co.*,
676 F.2d 945, 948 (7th Cir. 1982) ...............................................................27

*In re Farmland Indus., Inc.*,
294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003) ...........................................13

*In re Holly's, Inc.*,
140 B.R. 643, 668 (Bankr. W.D. Mich. 1992) ..............................................30

*In re Iridium Operating LLC*,
478 F.3d 452, 466 (2d Cir. 2007) ......................................................... 32, 34

*In re Jefferson Cnty., Ala.*,
482 B.R. 404, 439 (Bankr. N.D. Ala. 2012).......................................... 51, 52

*In re Lantana Motel*,
124 B.R. 252, 255 (Bankr. S.D. Ohio 1990) .................................................30

*In re Mosello*,
195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ..................................................20

*In re Pierce Cnty. Hous. Auth.*,
414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) .............................................34

*In re Roblin Indus., Inc.*,
52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).....................................................19

*In re Sky Valley, Inc.*,
100 B.R. 107, 115 (Bankr. N.D. Ga. 1988).....................................................14

*In re Sterling Min. Co.*,
2009 WL 2514167, at *3—5 (Bankr. D. Idaho Aug. 14, 2009) ...................13

*In re Swallen's, Inc.*,
269 B.R. 634, 638 (B.A.P. 6th Cir. 2001) ......................................................33

*In re Swedeland Dev. Grp., Inc.*,
16 F.3d 552, 564 (3d Cir. 1994) ....................................................................20

*In re Texlon Corp.*,
596 F.2d 1092, 1098–99 (2d Cir. 1979) ........................................................19

*In re Trans World Airlines, Inc.*,
163 B.R. 964 (Bankr. D. Del. 1994)...............................................................14

*Kelley v. Everglades Drainage Dist.*,
319 U.S. 415 (1943).......................................................................................45

*New York Life Ins. Co. v. Revco D.S., Inc.*,
901 F.2d 1359, 1364 (6th Cir. 1990) ............................................................26

*Official Committee of Unsecured Creditors v. Goold Electronics Corp.*,
1993 WL 408366 (N.D. Ill. Sept. 23, 1993)..................................................27

*U.S. v. Bekins*,
304 U.S. 27, 53–54 (1938) ................................................................. passim

*W. Coast Life Ins. Co. v. Merced Irrigation Dist.*,
114 F.2d 654, 678 (9th Cir. 1940) .................................................................34

## Constitutional Provisions

124 Cong. Rec. H11, 699 (daily ed. Oct. 27, 1977) (statement of Rep.
Edwards) ..........................................................................................................49

H.R. Rep. No. 100-1011 ................................................................ 50, 52, 53

H.R. Rep. No. 94-686 ................................................................... 38, 46, 47

H.R. Rep. No. 95-595 .....................................................................................48

Municipal Bankruptcy Act of 1934, Pub. L. No. 251, 48 Stat. 798 ............... passim

Municipal Bankruptcy Act of 1937, Pub. L. No. 302, 50 Stat. 653 ................. 41, 48

## Other Authorities

6 *Collier* ¶ 943.03 (16th ed.)......................................................................45

*Chapter 9 of the Bankruptcy Code: A Solution in Search of a Problem*,
27 Yale J. on Reg. 351, 362–69 (2010)..........................................................38

*Municipal Debt Adjustment and the Supreme Court*,
46 Yale L.J. 199, 199-202 (1936) .................................................................38

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this objection to the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay, dated November 5, 2013 [Dkt. No. 1520] (the "DIP Motion"). In support of its objection, Syncora respectfully states as follows:

## **Preliminary Statement**

1. The postpetition financing at issue in the DIP Motion is unprecedented in Chapter 9 both in its size and its scope. This facility has two purposes: (a) finance the payoff of the Swap Counterparties;[1] and (b) provide a downpayment on wide-ranging reinvestment initiatives designed to bring about, as the City of Detroit (the "City" or "Detroit") describes it, a "renaissance." (DIP Mot. ¶ 19.)

2. While Syncora acknowledges that the City faces real challenges, Chapter 9 is not, as the City apparently believes, intended to serve as a vehicle for financing a municipality's "renaissance" by green-lighting public spending projects without regard to how such spending affects creditors. (DIP Mot. ¶ 19)

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Motion.

(noting that "without significant reinvestment . . . [Detroit's] renaissance is not possible"). Rather, Chapter 9 is, first and foremost, a <u>debt adjustment process</u>. And the legislative history, case law, and structure of Chapter 9 each affirm, time and again, that the primary purpose of Chapter 9 is to facilitate a mutually agreeable plan of adjustment that minimizes creditor losses while simultaneously allowing for the survival of the municipality and the continued provision of necessary public services.

3.      Disregarding the purpose of, and policies behind, Chapter 9, the DIP Motion is yet another attempt by the City to hurriedly advance a complicated financial transaction that addresses plan-related issues — namely, the appropriate payouts to creditors, the City's right to grant primary liens, and the City's attempt to "kick-start" a ten-year, $1.25 billion spending campaign funded by $650 million of Chapter 9-imposed creditor losses. Yet, by asking the Court to approve a transaction that effectively implements the City's soon-to-be-filed plan of adjustment, the City threatens to short-circuit plan confirmation requirements that ensure fairness to creditors. This approach is particularly troublesome given that the City has not provided creditors with the necessary information to assess a number of significant questions, such as how it intends to value its largest assets (*e.g.*, the City's art collection) and the size of its pension and OPEB claims.

4.     While the Bankruptcy Code has many benefits for municipal debtors, those benefits come with the burden that they be employed in the best interests of creditors.  Although the City can borrow money without Court approval, here the City has asked the Court not only to authorize a section 364(c) credit transaction but also to make specific findings regarding the _need_ for such postpetition financing, the _use_ of the proceeds "to fund expenditures designed to contribute to the improvement of the quality of life in the City," and, critically, good faith for section 364(e) purposes.  (DIP Mot. Ex. 1 at ¶¶ D, F, 22.)  As a result of the City's chosen course of action, the DIP Motion at a minimum must be evaluated in reference to the requirements imposed by section 364 of the Bankruptcy Code.

5.     In an attempt to avoid the requirements of section 364, the City claims that section 904 of the Bankruptcy Code requires heavy deference to the City's "business judgment" regarding the needs of its citizenry.[2]  Contrary to the City's claims, section 904 of the Bankruptcy Code does not inoculate the City's decisions

---

[2]     Notably, the only _elected_ officials to pass judgment on the City's borrowing and spending proposals — the City Council — unanimously voted to reject the relief sought in the DIP Motion.  The City Council determined that the proposed financing "does not seem to be in the best interest of the City," "seems to primarily benefit the two Swap Counterparties," "give[s] Barclays too much power and control over the City's revenues and future and limits the City's ability to negotiate or resolve other claims in bankruptcy," and will not result in the creation of new revenue such that "it is difficult without additional information to determine the [spending] would be prudent investments." (Resolution Regarding the Emergency Manager's Post Petition Financing Proposal [Dkt. No. 1396] (the "City Council Resolution").)

13-53846-swr   Doc 1870-3   Filed 11/27/13   Entered 11/27/13 22:22:45   Page 15 of 52
13-53846-swr   Doc 4370-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 15 of 62
559                                                                          15

from any review. Instead, the Court must determine whether, among other things, the DIP Motion is: (a) a sound exercise of the City's business judgment; (b) necessary and essential for the continued operation of the City; and (c) in the best interests of the City's creditors. The DIP Motion does not satisfy any of these requirements.

6. First, the City has failed to show that the proposed borrowing is in the best interests of its creditors, many of whom are objecting. Second, the City's motion fails to establish that other monies are not available to address its short-term needs while the City and its creditors craft a mutually agreeable plan of adjustment. Nor can the City make such a showing in light of the <u>hundreds</u> of millions of dollars it has accumulated in cash since June 2013 and in recently received federal and private grant monies. Third, the City has failed to follow the statutory requirements of P.A. 436. Fourth, the DIP Motion is inextricably tied to the Assumption Motion — another hurried transaction that has garnered widespread creditor objection and should be denied in its own right.

7. Although it is possible to assess the Barclays DIP (as defined below) within the framework required by section 364, Syncora submits that, when considering a transaction that has significant plan implications (*i.e.*, the DIP Motion), the better approach is to assess the transaction in reference to confirmation standards. For instance, the Court should consider whether the City's

4

13-53846-swr   Doc 1870-3   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 16 of 62
13-53846-tjt   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 16 of 62
559

postpetition borrowing comports with the "best interests of creditors" test. To satisfy this test, the City must show, among other things, that the transaction affords all creditors the potential for the greatest economic return from its assets.

8.     Syncora therefore objects to the DIP Motion and respectfully requests that the Court either deny or defer ruling on the DIP Motion until the City better explains how the Barclays DIP fits into its proposed plan of adjustment.

## Background

9.     In June 2013, the City entered into secret negotiations with the Swap Counterparties. The result of these negotiations was the Forbearance Agreement, which purportedly provided the City with unfettered access to the casino tax revenues and the ability to unilaterally terminate the Swaps. Though the City claimed that the Forbearance Agreement was in the best interests of its creditors, its motion to assume the Forbearance Agreement [Docket No. 17] (the "Assumption Motion") generated widespread creditor hostility. In the face of this hostility, the City decided to postpone the hearing on the Assumption Motion. Consequently, the Assumption Motion — previously characterized by the City as a time-sensitive, essential step that could tolerate not even the slightest delay — has remained pending for more than four months. (Assumption Mot. Ex. 5, Affidavit of Kevyn D. Orr ¶ 22.)

5

13-53846-tjt    Doc 4374-3    Filed 04/29/14    Entered 04/29/14 22:20:23    Page 17 of 62
13-53846-swr    Doc 1870    Filed 11/27/13    Entered 11/27/13 22:22:43    Page 17 of
559

10.     Rather than reconsider the wisdom of the Forbearance Agreement, the City has instead chosen to double-down.   Beginning in September, the City solicited bids to obtain the financing necessary to exercise the early termination option in the Forbearance Agreement.   As part of the solicitation process, the City sought and obtained proposals from various lenders to secure postpetition financing.

11.     On October 11, 2013, the City announced that it had received a $350 commitment from Barclays Capital Inc. ("Barclays") for the  postpetition financing (the "Barclays DIP").   The City did not, however, procure this financing simply to terminate the Swaps.   Instead, the City went a step further and borrowed another $110 million — in addition to the approximately $240 million to terminate the Swaps (the "Swap Termination Financing") — to fund certain spending programs relating to the City's "renaissance" (the "Quality of Life Financing").   (DIP Mot. ¶¶ 14-16, 19.)   Specifically, the City intends to use the Quality of Life Financing on blight removal, public safety, and technology infrastructure.   (*Id.* ¶ 7.)   The City notes, however, that it "may ultimately decide to apply the proceeds to pursue an array of specific projects."   (*Id.* ¶ 23.)

12.     The Barclays DIP includes the following terms:

- The City will be obligated to pay the full Commitment Fee of $4.375 million even if the Barclays DIP is not approved.[3]

- The City has already engaged Barclays to provide exit financing and, if it does not, it must pay Barclays another fee.

- The City will pledge its income and wagering tax revenues as collateral, as well as proceeds from assets sales that exceed $10 million.

- The Barclays DIP has a floating interest rate with a 3.5% variable interest rate floor that is subject to a market flex provision which could result in the actual minimum interest rate being as high as 6.5%.

(*Id.* ¶ 47; Ex. B, Exit Engagement Letter § 6(c); Fee Letter [Docket No. 1761].)

13.     On the same day that the City announced the Barclays DIP, the City submitted that proposal and the emergency manager's proposed order number 17 to the City Council.  (*Id.* ¶ 43.)  As part of this submission, the City provided the City Council with certain of the terms of the Barclays DIP.  (*Id.* ¶ 43.)  The City did not, however, provide two of the term sheets referenced in the Barclays DIP, nor did it initially provide the commitment or fee letters themselves.

14.     Under P.A. 436, the City Council had ten days to review the Barclays DIP and decide whether to approve or reject that proposed transaction.  (*Id.* ¶ 41.)  To better understand this complex transaction, the City Council submitted

---

[3]    The City did not disclose in the DIP Motion that it has <u>already paid</u> half of this fee to Barclays.  (Ex. A, Hr'g Tr. 8:14-16, Nov. 14, 2013, 11:01 ET.)

numerous questions to the City's advisors. (City Council Resolution at 3.) And while the City's advisors provided "some information," the City Council was left with "a host of uncertainties and unanswered questions." (*Id*.)

15. On October 21, 2013, the City Council held a hearing to discuss the merits of the Barclays DIP. Not one of the City's legal or financial advisors deigned to appear at the hearing to answer any of the City Council's questions regarding the credit facility. Many of the City Council members also expressed concern that the Barclays DIP put the interests of the Swap Counterparties above those of the City's citizens. At the conclusion of the hearing, the City Council — the only <u>elected</u> officials to pass judgment on the City's borrowing and spending proposals — unanimously voted to reject the Barclays DIP. In its resolution, the City Council made the following findings, among others:

- "The proposed Debtor-in-Possession Financing transaction is an extremely complex deal on a number of fronts ***that does not seem to be in the best interest of the City***."

- The Barclays DIP appears to be "***putting the interests of lenders before the interests of the City and its residents***. The goal seems to be to ensure protection of the lenders at the detriment of all other interested parties."

- The Barclays DIP "seems to primarily benefit the two Swap counterparties Bank of America and UBS."

- "There is no guarantee that replacement funding will be available by this lender or any other lender when these loans mature in as little as one year ***placing the City into a very foreseeable default position*** triggering onerous default penalty provisions."

- "Not unlike the Swap Agreements that have been universally recognized as a bad deal for the City, Barclays is requiring the City to pledge its major revenue in order to secure this transaction. The City will have to pledge not only its casino wagering tax revenue but also its income tax revenue. These are the City's two most stable general fund revenue sources. Barclays is also requiring prepayment of any asset monetization net proceeds over $10M. ***This would give Barclays too much power and control over the City's revenues and future*** and limits the City's ability to negotiate or resolve other claims in bankruptcy."

- "[I]t appears that none of the proceeds [from the Quality of Life Bonds] will be used to create new revenue. If the City is ever to achieve a stronger financial position, strengthening revenues and revenue collection under the City's control is key. . . . ***It is difficult without additional information to determine whether the use of these funds would be prudent investments. Additionally, it would be unwise to incur more debt to facilitate the payment of costly consultants***."

(City Council Resolution at 1-4 (emphasis added).)

16.    After the City Council rejected the Barclays DIP, Syncora presented the City Council with an alternative proposal that contained more favorable postpetition financing terms than the Barclays DIP on October 23, 2013. Syncora and the City Council then engaged in good faith negotiations during which they exchanged several different proposals. Although the City Council believed that Syncora's alternative proposal was "clearly an improvement over Barclays,"[4] the council determined that it did not have time to fully vet Syncora's proposal and

---

[4]    Ex. C, Email from Anne Marie Langan to Todd Snyder (Oct. 25, 2013, 14:09 ET).

9

13-53846-tjt    Doc 4374-3    Filed 04/29/14    Entered 04/29/14 22:20:23    Page 21 of 62
13-53846-swr    Doc 1870    Filed 11/27/13    Entered 11/27/13 22:22:43    Page 16 of 52
559

ultimately decided not to offer an alternative proposal. Even though the City was made aware of Syncora's proposal, it did not, at any point, approach Syncora to explore this financing alternative. Given the time constraints, as well as the City Council's concerns with the Barclays DIP, the City Council implicitly offered a "no transaction" option to the emergency financial assistance loan board (the "Loan Board") as its "alternate proposal" under P.A. 436. (City Council Resolution at 4.)

17. Notwithstanding the widespread opposition to the Assumption Motion and the City Council's rejection of the Barclays DIP, the City has decided to move forward on both. In doing so, however, the City imposes important strategic limitations on its future conduct, including the following:

- The Barclays DIP encumbers previously unencumbered assets and frustrates the monetization of certain key assets (e.g., the City's art collection).

- The Barclays DIP invites yet another group of creditors to this Chapter 9 case. And these creditors will have liens and superpriority status, effectively subordinating existing creditors.

- The Barclays DIP grants liens that are actually broader than the current liens of the Swap Counterparties on the casino tax revenues.

- The Barclays DIP does not provide the City with the possibility to extend its financing. Instead, any refinancing must be part of the City's plan of adjustment.

- The City cannot dismiss the bankruptcy case because the Barclays DIP would then mature.

10

13-53846-swr Doc 4374-3 Filed 04/29/14 Entered 04/29/14 22:20:23 Page 22 of 62
13-53846-swr Doc 1874 Filed 11/27/13 Entered 11/27/13 22:22:43 Page 22 of 62
559

- The City's 3.5% variable interest rate on the Barclays DIP is subject to a market flex provision which could result in the actual minimum interest rate being as high as 6.5%.

- The Barclays DIP restricts the City's ability to access the capital markets again during this Chapter 9 case.

## Objection

18. Although the Court has discretion under section 364 of the Bankruptcy Code to authorize certain postpetition debtor credit transactions, courts have also recognized "that their discretion is not unbridled." *See* 11 U.S.C. § 364(c) (stating that the Court "<u>may</u> authorize" certain credit transactions) (emphasis added); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). In particular, the City must demonstrate that the Barclays DIP is "necessary," that the terms of the transaction are "fair, reasonable, and adequate," and that the borrowing is in the best interests of its creditors. These checks on postpetition borrowing are especially important where, as here, notwithstanding the City Council's rejection of the deal, the City has asked the Court to approve its incurrence of another $350 million of funded debt to facilitate a contested $240 million settlement payment, and $110 million of pre-plan "renaissance" spending that is unprecedented in the history of Chapter 9. To be sure, not a single case cited by the City as authority in the DIP Motion involved court approval of a credit transaction that even mildly resembles the proposed uses of the Barclays DIP proceeds.

11

13-53846-tjt   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 23 of 62
13-53846-swr   Doc 1874   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 13 of 52
559
23

19. As discussed below, the Barclays DIP does not meet the section 364 requirements because: (a) it is not a sound exercise of the City's business judgment; (b) it is not necessary, essential, or appropriate to preserve the City's assets and continue the operation of the City; (c) the proposed transaction is not in the best interests of the City's creditors (d) the terms of the Barclays DIP are not fair, reasonable, and adequate under the circumstances; (e) the City had a better offer available; (f) the City failed to comply with P.A. 436 in its interactions with the City Council; and (g) the City intends to utilize the Barclays DIP for an improper purpose.

## I. The Barclays DIP Does Not Meet the Standards for Approval of Postpetition Financing Under Section 364 of the Bankruptcy Code.

20. When evaluating whether a postpetition financing proposal satisfies section 364 of the Bankruptcy Code, courts consider the following factors:

    a.    Whether the proposed transaction is an exercise of the debtor's reasonable business judgment;

    b.    Whether alternative financing is available on any other basis;

    c.    Whether the proposed transaction is in the best interests of both the estate and its creditors;

    d.    Whether any better offers, bids, or timely proposals are before the court;

    e.    Whether the transaction is necessary, essential, and appropriate to preserve estate assets and for the continued operation of a debtor's business;

13-53846-swr    Doc 4374-3    Filed 04/29/14    Entered 04/29/14 22:20:23    Page 24 of 62
13-53846-swr    Doc 1870    Filed 11/27/13    Entered 11/27/13 22:22:43    Page 13 of 52
559    24

f.    Whether the terms of the proposed financing are fair, reasonable, and adequate given the circumstances; and

g.    Whether the proposed transaction was negotiated in good faith and at arm's length (collectively, the "Farmland Factors").

*See, e.g.*, *In re Farmland Indus., Inc.*, 294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003) (collecting cases); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (applying the Farmland Factors); *In re Sterling Min. Co.*, 2009 WL 2514167, at *3-5 (Bankr. D. Idaho Aug. 14, 2009) (same).

21.    The Farmland Factors are based on the requirement inherent in section 364 that any postpetition financing be necessary, essential, and appropriate to preserve estate assets while also allowing for the continued operation of a debtor's business.  And, while these factors are most often applied in the Chapter 11 context (*i.e.*, where a debtor obtains postpetition financing to ensure that it has sufficient liquidity to operate the business during the case), the legislative history and case law surrounding Chapter 9 also support their application to the Barclays DIP.

22.    In the DIP Motion, the City implicitly argues against the application of the Farmland Factors in favor of a much narrower standard — namely, that it need only demonstrate that the Barclays DIP was a sound exercise of its business judgment.  (DIP Mot. ¶ 54.)  However, the City's argument for such a narrow standard is belied by the very cases it relies upon in the DIP Motion.  For example, as part of the DIP Motion, the City cites *In re Crouse Group, Inc.,* 71 B.R. 544

13

13-53846-tjt   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 25 of 62
559
13-53846-swr   Doc 1870   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 25 of 62   25

(Bankr. E.D. Pa. 1987). Notably though, in that case, the court <u>rejected</u> the debtor's argument that the court should merely defer to the debtor's judgment in reviewing the proposed section 364(c) transaction. *Id*. at 550. Instead, the court held that the debtor also needed to establish that the transaction was fair, reasonable, and adequate under the circumstances, and that the credit transaction was necessary to preserve assets of the estate. *Id*. at 551. The *Crouse* court ultimately denied the proposed section 364(c) transaction. *Id*. Similarly, the City cites *In re Trans World Airlines, Inc.*, 163 B.R. 964 (Bankr. D. Del. 1994) for the proposition that the Court should defer to the City's business judgment. (DIP Mot. ¶ 54.) As a threshold matter, *Trans World Airlines* is not even a postpetition financing case. Moreover, as in *Crouse*, the *Trans World Airlines* dicta also looked beyond the debtor's business judgment and relied on the transaction at issue being in the best interests of the creditors. *Trans World Airlines*, 163 B.R. at 974.

23. Consistent with the narrow standard that the City proposes, it has also insisted that the Court may not even consider evidence regarding the City's purported need for the funds.[5] For example, during the November 14, 2013,

---

[5] Section 904 of the Bankruptcy Code does not, as the City claims, prohibit the Court's review into the uses of the Quality of Life Financing. Where, as here the City consented to the Court's review of its action, the Court may assess whether the Quality of Life Financing satisfies the best interests of creditors test that is part of section 364 of the Bankruptcy Code. Yet another case relied upon by the City, *In re Sky Valley, Inc.*, supports this proposition. *See* 100 B.R. 107, 115 (Bankr. N.D. Ga. 1988) (making an express finding that the section

14

13-53846-swr Doc 4310-3 Filed 04/29/14 Entered 04/29/14 22:22:43 Page 26 of 52
13-53846-swr Doc 1870 Filed 11/27/13 Entered 11/27/13 22:22:43 Page 26 of 52
559
26

hearing, counsel for the City stated that, "in connection with the 364 motion, [the Court] will hear and adjudicate our business judgment as to whether or not we needed to borrow the money . . . and whether or not the terms on which we want to borrow that money are reasonable and in everybody's best interest." (Ex. D, Hr'g Tr. 20:3–8, Nov. 14, 2013, 14:36 ET.) Indeed, the Court cannot possibly determine whether the City needed to borrow money unless it inquires into how that money will be used.

24. The City's proposed standard is also contradicted by the DIP Motion and its representations to the Court. For example, in the DIP Motion, the City cites *In re Ames Dept. Stores, Inc.* for the proposition that "courts have discretion under section 364 of the Bankruptcy Code to permit debtors to exercise reasonable business judgment so long as . . . the financing agreement's purpose is primarily to benefit the estate and not a party in interest." (DIP Mot. ¶ 54.) Of course, the Court can only assess the purpose of the financing agreement if it may also inquire into the use of the financing proceeds. Purpose is, in other words, inextricably tied to use.

25. Additionally, in the DIP Motion, the City provides some high-level information regarding the City's need for, and use of, the Barclays DIP proceeds.

---

364 credit transaction was "in the best interests of creditors," including unsecured and subordinated creditors).

However, if, as the City is likely to claim, the Court is not permitted to inquire into the City's use of those proceeds, then there would have been no need to explain how it intends to utilize those proceeds.

26. Thus, while it is true that there is some uncertainty surrounding exactly which standard governs the Barclays DIP — mainly because a transaction like the Barclays DIP has never been considered in the Chapter 9 context[6] — even the City concedes that the Court must nevertheless inquire into the City's need for the funds and whether the transaction meets the best interests of creditors test. Although Syncora submits that the Farmland Factors provide the proper framework to assess the Barclays DIP, even under a more limited standard that simply considers the best interests of creditors and the City's need for the borrowed funds, the DIP Motion does not satisfy the requirements under section 364 of the Bankruptcy Code.

---

[6] In its analysis of the Barclays DIP, Moody's recognizes the unprecedented nature of the City's proposed postpetition financing. (Ex. E, Moody's Report at 1 ("In the municipal sector, however, DIP financings are unprecedented. Detroit is likely the first local government to propose this type of post-petition financing structure as it continues to navigate the Chapter 9 bankruptcy process, while balancing the competing interests of operating an insolvent city and negotiating with a variety of creditors.").)

16

13-53846-swr   Doc 4174-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 28 of 52
13-53846-swr   Doc 1374   Filed 11/7/13   Entered 11/7/13 21:22:43   Page 23 of 62
559
28

**1. The City Did Not Exercise Sound Business Judgment When It Decided that It Needed to Borrow Money to Finance Its Reinvestment Initiatives Prior to Consideration of a Plan of Adjustment.**

27.     In the DIP Motion, the City claims that its "decision to obtain the Postpetition Financing is well supported by sound business judgment and should be approved." (DIP Mot. ¶ 7.) According to the City, "[w]ithout borrowed funds, there is a material risk that the City would have to substantially cut back or eliminate its reinvestment efforts *in the near-term*, and the City's ability to invest in the future would continue to be hamstrung and imperiled by the City's ongoing financial constraints." (DIP Mot. ¶ 22 (emphasis added).)

28.     As demonstrated below, however, the City does not actually need to borrow the money in the short-term to pursue substantial reinvestment initiatives. As a result, the Barclays DIP is neither necessary nor a sound exercise of business judgment.

29.     To begin, the City is set to receive more than $350 million in federal and private grants over the next two years. These grants includes: $152.6 million for demolishing blighted properties, revitalizing neighborhoods, and redeveloping Detroit; $25 million to hire 150 firefighters and purchase arson detection equipment; $1.9 million to hire new police officers; $600,000 to improve the police IT system; $155.5 million to improve transportation systems; $22.1 million to help create a 21st century Detroit; and 100 new police cars and 23 ambulances

17

13-53846-swr    Doc 4370-3    Filed 04/29/14    Entered 04/29/14 22:20:23    Page 29 of 62
559
13-53846-swr    Doc 1871    Filed 11/27/13    Entered 11/27/13 22:22:43    Page 29 of 62    29

are being donated by Downtown Detroit.  (Ex. F, Funding for Detroit Announced on Sept. 27, 2013; Ross Benes, *Detroit Welcomes New Ambulances, Police Cars Donated By Local Businesses* (Aug. 23, 2013, 2:49 PM), http://www.crainsdetroit.com/article/20130822/NEWS/130829932/.)  Significantly, much of this federal and private grant money is intended for the very reinvestment initiatives that the City has identified in its DIP Motion — blight remediation, public safety, and IT upgrades.  In short, the City already has at its disposal hundreds of millions of dollars in federal funds that are earmarked <u>specifically</u> for the purposes the City has identified as mission critical.

30.    In addition, the City has conceded that many of the reinvestment initiatives that it plans to institute are not yet ready for implementation.  With respect to blight remediation, for example, the City has noted that "it continues to investigate and determine the most effective way to accomplish blight removal, including which geographic areas to focus its efforts on and other factors . . . ." (DIP Mot. ¶ 32.)  Similarly, with respect to IT services, the City "will *begin* the process of issuing a 'request for proposals' and selecting a new system in 2014" and anticipates significant implementation efforts to occur at some unspecified time.  (DIP Mot. ¶ 30.)  Along these same lines, the City has also conceded that it "may ultimately decide to apply the proceeds of the Quality of Life Financing to pursue an array of specific projects . . . ."  (DIP Mot. ¶ 23.)  In short, the City itself

has not fully mapped out how it will use the very monies it seeks to borrow and thus refused to bind itself to spending the money in any particular fashion.

31.    Finally, upon its filing for bankruptcy (and, in the case of the COPs, before filing), the City stopped paying certain of its unsecured creditors.  As a result, the City's cash flow is better than it has been in many years.  Between June 2013 and September 2013, for example, the City's cash on hand increased from $36 million to $128.5 million.  (*Compare* Ex. G, Cash Flow Variance Report June 2013, *with* Ex. H, Cash Flow Variance Report FY 2014.)  Consequently, if the City believes that it has a present and immediate need to devote money to these reinvestment initiatives, the more prudent business decision is to invest available funds (and the aforementioned grant money) rather than plunge further into debt.

32.    In light of the above, the City cannot meet its burden of demonstrating that the Quality of Life Financing is necessary or a sound exercise of business judgment.

### 2.    The Barclays DIP Is Not in the Best Interests of the City or its Creditors.

33.    Under section 364 of the Bankruptcy Code, courts must consider whether the proposed financing is in the best interests of the City's creditors.  *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citing *In re Texlon Corp.,* 596 F.2d 1092, 1098–99 (2d Cir. 1979)).  As the City explains in the DIP Motion, it intends to utilize $110 million for the Quality of Life Financing, which

19

13-53846-tjt   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 31 of 62
13-53846-swr   Doc 1370   Filed 11/7/13   Entered 11/7/13 21:22:43   Page 29 of 62
559
31

will be utilized to "kick-start" the City's reinvestment initiatives. (DIP Mot. ¶ 22.) However, the Quality of Life Financing violates section 364 because it is not in the best interests of the City's creditors.

34.     Though the City claims that its reinvestment initiatives could "potentially improve recoveries for creditors," the City has not offered any concrete evidence that incurring additional debt for this purpose will generate any long-term upside for the City's creditors.   (DIP Mot. ¶ 20.)   In fact, the only evidence that the City offers are Mr. Moore's conclusory statements that the City's proposed ten-year, $1.25 billion reinvestment campaign will reverse downward trends in the City's fiscal and economic outlook.   (Moore Dec. ¶¶ 9–10.)   The Moore Declaration does not demonstrate how such expenditures would actually strengthen the City's tax base, reverse the flow of residents leaving the City, increase creditor recoveries, or improve the City's fiscal outlook in the long term. *Cf. In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (rejecting argument that property to be developed under postpetition loan "is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (denying motion to authorize postpetition loan to develop property because "the debtors' development scheme is beset by uncertainty and risk, and the ultimate outcome of the project is a matter of speculation based upon assumptions

which cannot be quantified or verified by objective evidence"). Moreover, the City has offered no other evidence showing how the "renaissance" spending benefits creditors in either the short- or long-term. To the contrary, the City's own financial projections show <u>no</u> increase in revenues at <u>any</u> time in the next ten years. (*Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 11] Ex. A (the "<u>Creditors Proposal</u>"), at 48.)

35. Tellingly, in its analysis of the Barclays DIP, Moody's also noted that, while "[c]orporate DIPs loans can support positive creditor outcomes . . . the impact of Detroit's plan is uncertain." (Ex. E, Moody's Report at 2.) In fact, Moody's concluded that "the ultimate creditor impact of Detroit's financing proposal, assuming it is approved at both the state and federal level, is unclear given the multitude of contingencies that remain." (*Id.*)

36. Accordingly, the City has failed to satisfy the requirement under section 364 of the Bankruptcy Code that postpetition financing be in the best interests of *both* the City and its creditors.

### 3. The Terms of the Barclays DIP Are Not Fair, Reasonable, and Adequate Given the Circumstances.

37. Another factor that courts consider in evaluating postpetition financing is whether the terms of a proposed section 364 credit transaction are fair,

21

13-53846-swr Doc 1870-3 Filed 11/27/13 Entered 11/27/13 22:22:43 Page 23 of 52
13-53846-tjt Doc 4317-3 Filed 04/29/14 Entered 04/29/14 22:20:23 Page 23 of 52
559
33

reasonable, and adequate given the circumstances. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

38.   The City is quick to point out the benefits of the Barclays DIP, but it is not as forthcoming in the DIP Motion as to the costs. Financial and transactional costs not discussed in the DIP Motion include (but are not limited to):

- A minimum 3.5% variable interest rate on the Barclays DIP that is subject to a market flex provision which could result in the actual minimum interest rate being as high as 6.5%;

- A one-time commitment fee in the amount of $4.375 million even if the Barclays DIP is not approved; and

- A minimum exit financing fee in the amount of $2.625 million even if the City refinances with an entity other than Barclays.

39.   Further, the City has assumed that the present market value of the Swaps Termination Payment is $290 million and that, by terminating the Swaps under the Forbearance Agreement at an 18% discount factor, it will achieve a $52.2 million discount. (DIP Mot. ¶ 16.) The City asserts that "this fact alone supports a finding that the Postpetition Financing is in the best interests of the City." (*Id.* ¶ 55.)

40.   Although the Barclays DIP terminates on its own terms no more than two and one-half years after the closing date, no one — the City included — anticipates that the City will actually repay the Barclays DIP in full upon maturity from its own coffers. Instead, the City has signaled its intent to refinance the

Barclays DIP upon its exit from Chapter 9, thereby assuming additional financing costs (e.g., interest payments) well into the future. (*See* Ex. B, Exit Engagement Letter.) Yet the City has not disclosed any aspect of such costs — e.g., an estimated interest rate, maturity, and collateral package for an exit facility — the absence of which obscures the true costs of the Barclays DIP.

41. Finally, in addition to the foregoing, Syncora submits that the following changes should be made to the Proposed Order:[7]

- limiting the authority for the Purchaser, Indenture Trustee, and Bondholders to file and obtain documents to perfect their liens to only those actions that are "reasonably necessary" to perfect such liens (*see* Proposed Order ¶ 14);

- providing the City with the ability to cure an Event of Default (*see* Proposed Order ¶ 20);

- removing that "approval of the Post-Petition Facility by the [Loan] Board under Act 436 is not required to authorize the City to enter into the Bond Documents" (*see* Proposed Order ¶ G);[8]

- removing the City's obligation to authorize its own advisors to cooperate with the Indenture Trustee (*see* Proposed Order ¶ 25);

- removing the limitations preventing the City from seeking additional postpetition financing that could be secured by the

---

[7] Capitalized terms used in this paragraph have the meanings ascribed to them in the Proposed Order.

[8] Approval of the Barclays DIP by the Loan Board is required under section 36a of the Home Rule City Act and section 19(2) of P.A. 436. (*See* DIP Motion ¶ 42.) To the extent the Loan Board does not approve the Barclays DIP prior to the hearing on the DIP Motion, Syncora reserves the right to object to the DIP Motion on these grounds.

Collateral or that would have a senior or equal payment priority to the Quality of Life Bond or Swap Termination Bond (*see* Proposed Order ¶ 15; Bond Purchase Agreement § 7(d));

- removing the terms "indefeasible" and "indefeasibly" from paragraphs 15, 16, 19, 34, and 36 of the Proposed Order;

- stating that any liens granted pursuant to the DIP Motion attach when the Barclays DIP transaction closes as opposed to upon entry of an order (*see* Proposed Order ¶ 6);

- clarifying that any liens granted on any property pursuant to the DIP Motion extend only as far as the City's property interest in the applicable property (e.g., only to the extent of the City's contingent rights) at issue as determined by a final non-appealable order (*see* Proposed Order ¶ 6); and

- clarifying that a finding that the DIP lenders acted in "good faith" under section 364(e) of the Bankruptcy Code (and, to be clear, they have not) protects only the validity of the debt incurred and the liens granted pursuant to the DIP, but does not prevent any other transaction from being overturned in the event the order authorizing the DIP facility is approved (*see* Proposed Order ¶¶ 22-23).

### 4. The Barclays DIP Should Not Be Approved Because Better Financing Is Available.

42.     When evaluating postpetition financing proposals, courts consider whether better alternatives are available. *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (requiring that debtor show, among other things, that there are no "better offers, bids, or timely proposals are before the court"); *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011) (same). Where better alternatives are available, courts have found that the proposed postpetition financing is not "fair, or reasonable, or adequate to the other Debtors

24

or to other creditors." *See, e.g., In re Crouse Grp., Inc.*, 71 B.R. 544, 551 (Bankr. E.D. Pa. 1987).

43.     As noted above, immediately after the City Council rejected the Barclays DIP, Syncora approached the City Council regarding an alternative proposal.  After several days of discussions, Syncora submitted a proposal that improved upon the Barclays DIP in several material respects, including the following terms:

   a.     A 20 basis point interest rate reduction, resulting in a net savings to the City of nearly $1 million per year over the term of the loan;

   b.     An option for the City to extend the termination date;

   c.     No restriction on the City's use of borrowed funds; and

   d.     No Event of Default "if the City ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement . . . shall have been established."

(Ex. I, Syncora Proposal at 2.)

44.     Although the City was made aware of this proposal, it makes no mention of it in the DIP Motion.  Nor did it, at any point, approach Syncora to explore this proposal.  Nevertheless, Syncora remains willing and able to provide the City with the funds sought under the Barclays DIP on more favorable terms.  Accordingly, given that similar postpetition financing with better terms is available, the Barclays DIP should not be approved.

13-53846-tjt   Doc 4310-3   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 37 of 62
13-53846-swr   Doc 1310   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 37 of 52
559
37

**5.** **The DIP Motion Should be Denied, and the Parties Are Not Entitled to a Good Faith Finding under Section 364(e) of the Bankruptcy Code, Because the Barclays DIP Violates Syncora's Rights and Applicable Michigan Law.**

45.     Section 364(e) of the Bankruptcy Code provides that, in the absence of a stay pending appeal, a lender is protected from the effects of a reversal or modification on appeal of an authorization to obtain credit or incur debt under section 364, or of a grant of a priority or a lien in such a financing, if the lender acted in good faith.  *E.g.*, *New York Life Ins. Co. v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 901 F.2d 1359, 1364 (6th Cir. 1990) ("[T]he proper inquiry under § 364(e) is: (1) whether the creditor attempting to challenge authorization of credit obtains a stay pending appeal; and (2) whether the postpetition lender extends credit in good faith.").

46.     Here, the parties are not entitled to the requested section 364(e) good faith finding.  In order for section 364(e) of the Bankruptcy Code to apply the Court must make an explicit finding of good faith.  *Revco D.S.*, 901 F.2d at 1366 (holding that "an implicit finding of 'good faith' in a § 364(e) context is insufficient and that 'good faith' under that section should not be presumed").  No such finding can be made because, as set forth herein, the City has not provided the Court with sufficient information to determine whether or not the funds loaned under the Barclays DIP have in fact been extended in good faith.

47.     Additionally, the parties are not entitled to a good faith finding because the funds sought will be used for improper purposes, namely the: (a) violation of Syncora's consent rights and the Waterfall (as defined below); and (b) circumvention of the requirements under section 36a of the Home Rule City Act and P.A. 436.   "Where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code, the lender is not in good faith."  *In re EDC Holding Co.*, 676 F.2d 945, 948 (7th Cir. 1982); *Official Committee of Unsecured Creditors v. Goold Electronics Corp.*, 1993 WL 408366 (N.D. Ill. Sept. 23, 1993) (same); *see also In re Adams Apple, Inc.* (9th Cir. 1987) ("A creditor fails to act in good faith if it acts for an improper purpose.").   Accordingly, both the DIP Motion and the requested good faith finding should be denied.

> ### a.     The City Seeks to Use the Barclays DIP Proceeds for an Impermissible Purpose.

48.     As more fully set out in the Assumption Objection,[9] the Forbearance Agreement cannot be approved because the City seeks to eviscerate Syncora's third-party consent rights and rights to direct the Swap Counterparties in certain

---

[9]     *Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 366] (the "Forbearance Objection").

13-53846-swr   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 39 of 62
13-53846-swr   Doc 1874   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 38 of 52
559                                                                                                          39

actions, as well as bypass a contracted-for priority payment scheme. *See, e.g.*, Assumption Objection ¶ 31; *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317–18 (B.A.P. 9th Cir. 1992) (examining the legality of a DIP enhancement fee provision and approving DIP where court was satisfied that "neither the extension order nor the enhancement fee, by themselves, enable [the lender] to control the actions of the debtor *nor prevent other parties from exercising their rights*") (emphasis added). Notably, the City fails to address in the DIP Motion any of these critical problems or, for that matter, any other problems raised in the various other objections filed in response to the Assumption Motion.

49. Additionally, the Swap Termination Payment violates the priority hierarchy set forth in section 8.03 of the Service Contracts[10] (the "Waterfall") and incorporated by section 14.14(a) of the Collateral Agreement. The Waterfall provides, in pertinent part, that payments made under the Service Contracts shall be made in the following order: interest on COPs and periodic Swap Payments; payments of COP principal; and finally, swap termination payments. (Service Contracts § 8.03.) Importantly, swap termination payments are *junior* to the payment of the outstanding principal and interest on the COPs. (*Id.*) Because the City defaulted on a $40 million June 2013 COP-related principal and interest

---

[10] Capitalized terms used in this paragraph and not otherwise defined herein have the meanings ascribed to them in the Forbearance Objection.

payment, Syncora paid approximately $23.1 million to COP holders on account of its obligations as a COP insurer. As a result, Syncora is subrogated to the rights of the COP holders on account of the June 2013 missed payment, and likewise to the enforcement of the Waterfall with respect thereto. (Service Contracts T&C § 7.03) ("An Insurer making a Credit Insurance Payment shall be subrogated to the rights of Certificateholders . . . to receive the Related Service Payment and shall be entitled to exercise all rights and remedies that the Person to which it is the subrogee would have otherwise been entitled to exercise."); (Trust Agreement T&C § 8.24) (same). Syncora is also entitled to enforce the Waterfall on account of its rights as a third-party beneficiary. (*See, e.g.*, Service Contracts T&C § 9.12 (providing that "Insurers are third party beneficiaries of the Service Contract[s]" with "the right to enforce the respective promises made in the Service Contract as if such promises were made directly to them").) Since the City has not yet cured the June 2013 missed payment, making the Swap Termination Payment now would violate Syncora's rights.[11] (Service Contracts § 9.12.)

50.     The Waterfall is also protected by section 510(a) of the Bankruptcy Code, which is incorporated into Chapter 9 by section 901(a) of the Bankruptcy

---

[11]     It should also be noted that Syncora is not just a COP insurer — it is also a COP holder. As a result, when the City missed the June 2013 payment, Syncora also lost money—money that it will not be able to recover if the City is able to evade the Waterfall.

13-53846-tjt   Doc 1870-3   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 34 of 62
13-53846-swr   Doc 4374   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 41 of
559                                                                          41

Code. Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable . . . to the same extent that such agreement is enforceable under applicable non-bankruptcy law." The Waterfall is a subordination agreement. *See, e.g.*, *In re Holly's, Inc.*, 140 B.R. 643, 668 (Bankr. W.D. Mich. 1992) (defining a subordination agreement to mean "a contract in which a creditor (the 'subordinated' or 'junior' creditor) agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor"); *In re Lantana Motel*, 124 B.R. 252, 255 (Bankr. S.D. Ohio 1990) (noting that subordination agreements provide "that subordinated creditor's right to payments will be subordinated to rights of another claimant"). The City has not demonstrated that either the Service Contracts or the Waterfall are unenforceable under state law. Therefore, the Waterfall is equally enforceable in these proceedings, and the City's proposal to violate such subordination agreement through the Barclays DIP should be denied.

> **b.** **The City Has Not Complied with Michigan Law Regarding the Issuance of Financial Recovery Bonds.**

51. In addition, the City is attempting to circumvent the requirements of the P.A. 436. Under P.A. 436, the emergency manager must submit for City Council approval any action purporting to "sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government." Mich. Comp. Laws Ann. §§ 141.1552, 141.1559. After such a

30

proposal is submitted, the City Council has 10 days from the date of submission of the proposal to approve or disapprove the action. If disapproved, the City Council must, within seven days, propose an "alternative proposal that would yield substantially the same financial result as the action proposed by the emergency manager." Mich. Comp. Laws Ann. § 141.1559.

52. On October 21, 2013, the City Council unanimously rejected the Barclays DIP. (*See* City Council Resolution.) As noted above, in its resolution, the City Council stated that "numerous questions have been submitted to the consultants and although some information has been provided, a host of uncertainties and unanswered questions remain" regarding the Barclays DIP. (*Id.* at 3.) One key piece of information that the City never provided to the City Council was the Barclays fee letter.

53. The failure of the City to provide the City Council with the Barclays fee letter had a material impact on the P.A. 436 process. To begin, it meant that the City deprived the City Council of all of the necessary information to understand and evaluate the economic terms of the Barclays DIP. In addition, the City Council could not effectively craft an "alternative proposal," as it was required to do under P.A. 436, and implicitly offered a "no transaction" proposal instead. (Motion to Seal [Docket No. 1521] ¶ 3 (noting that Fee Letter "contains confidential commercial information regarding the potential cost to the City of the

31

13-53846-tjt   Doc 4370-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 43 of 62
13-53846-swr   Doc 1870   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 43 of 52
559                                                                                        43

financing and commercially sensitive detail regarding how to calculate such potential cost").)  Indeed, because the City Council had to make a proposal that would "yield substantially the same financial result" as the emergency manager's proposal, the absence of the fee letter is in conflict with P.A. 436's requirements.

## II. The City's Attempts to Hurriedly Rush Through a Series of One-Off Transactions Is an Attempt to Avoid Plan Confirmation Standards Designed to Protect Creditors.

54.     The DIP Motion is yet another example of the City asking the Court to approve plan-like transactions outside the plan of adjustment context.  (*See also* Syncora Objection to PLA Motion [Docket No. 1557].)  The reason for this is clear:  the City realizes that it cannot meet the procedural and substantive plan confirmation requirements designed to protect creditors from precisely this kind of amorphous transaction.  The DIP Motion is just the latest iteration.

55.     The Bankruptcy Code prevents debtors from entering "into transactions that will, in effect, 'short circuit the requirements of chapter 11 for confirmation of a reorganization plan.'"  *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (citations omitted).  Such transactions often dictate the terms of a future plan of restructuring or alter creditors' rights without otherwise requiring the satisfaction of the disclosure and confirmation standards of the Bankruptcy Code.  *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).  It is well-established, however, that "a bankruptcy court cannot issue orders that

13-53846-tjt   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 34 of 62
13-53846-swr   Doc 1870   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 34 of 52
559                                                                          44

bypass the requirements of [the Bankruptcy Code], such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization." *In re Swallen's, Inc.*, 269 B.R. 634, 638 (B.A.P. 6th Cir. 2001). Although fashioned as a request for postpetition financing under section 364 of the Bankruptcy Code, the DIP Motion in reality seeks plan-like relief outside of the Chapter 9 confirmation process. *See e.g.*, *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.").

56.     As the City details in its DIP Motion, it intends to utilize the $350 million in DIP Financing to terminate the Swaps and implement its restructuring plan set forth in the Creditors Proposal. While the City does not describe exactly what the Quality of Life Financing will be used for, it does emphatically state that these funds will "kick-start" its ten-year, $1.25 billion reinvestment spending campaign. (DIP Mot. ¶¶ 21–22.) That is, before the City has even filed a plan of adjustment, it is asking the Court to approve what undoubtedly will be detailed in a "Means for Implementation of the Plan" section of the City's forthcoming plan and related disclosure statement. To "kick-start" plan components pursuant to the DIP Motion puts the cart before the horse and directly circumvents the procedural and substantive safeguards Chapter 9 affords creditors. This approach is especially

problematic because the City intends to encumber previously unencumbered assets to fund the open-ended revitalization projects to the detriment of creditor recoveries.[12]

57. At minimum, the Court should evaluate the DIP Motion through the lens of plan confirmation requirements. In *Iridium*, for example, the Second Circuit held that it was appropriate to evaluate pre-plan transactions with an eye toward confirmation standards — in that case, the absolute priority rule. 478 F.3d 452, 463-64 (2d Cir. 2007). Here, even if the City is allowed to bypass the procedural safeguards (i.e., voting and "adequate disclosure") relating to plan confirmation, the Court should nevertheless consider whether the City's proposed course of action comports with certain substantive confirmation safeguards such as the "best interests of creditors" test. 11 U.S.C. § 943(b)(7).

58. For section 943(b)(7) purposes, "[t]he 'best interest' test has been described as a 'floor requiring a reasonable effort at payment of creditors by the municipal debtor.'" *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (citations omitted); *see also W. Coast Life Ins. Co. v. Merced Irrigation Dist.*, 114 F.2d 654, 678 (9th Cir. 1940) (noting that a plan is in "the best

---

[12] As part of the plan of adjustment process, creditors will be receiving a recovery note or some other type of consideration that it paid out over time post-emergence. As a result, creditor returns will be subject to a number of risks, including the City's long-term operations and revitalization implementation.

interests of creditors," if the creditors' recovery was "all that could reasonably be expected in all the existing circumstances"). In evaluating whether a plan of adjustment meets the "best interests of creditors" requirement, bankruptcy courts consider whether "the Plan affords all creditors the potential for the greatest economic return from Debtor's assets." *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012). Here, however, the City has not yet valued its largest asset — the City's art collection — nor has it determined the size of its pension and OPEB claims. This information is necessary to any assessment of what amounts are fairly available to the City and its creditors, and consequently, whether the DIP Motion meets the "best interests" test.[13]

59. Rather than step knowingly into the void, the Court should either defer consideration until the plan confirmation stage — or import plan confirmation safeguards into its consideration under section 364 of the Bankruptcy Code.

---

[13] For these reasons, Syncora respectfully submits that certain case management protocols in respect of the plan confirmation process may be necessary to ensure that basic notions of due process are respected. Given the size, complexity, and speed of this Chapter 9 case, as well as the City's failure to make any meaningful progress in respect of the foregoing open issues, Syncora reserves the right to seek appropriate relief insofar as the parties cannot reach agreement on a schedule forward.

35

13-53846-swr Doc 4310-3 Filed 04/29/14 Entered 04/29/14 22:20:23 Page 47 of 62
13-53846-swr Doc 1370 Filed 11/7/13 Entered 11/7/13 22:22:43 Page 47 of 52
559

III. **The Court Should Engage in a Fulsome Review of the DIP Motion with a Focus on Whether the City's Relief Requested Accords with the Purposes and Policies of Chapter 9.**

A. **The DIP Motion Should Be Evaluated in Reference to the Purposes and Policies of Chapter 9.**

60.     One of the central issues in this case generally is the Court's authority to review the City's ability to allocate municipal funds to support its proposed public spending campaign.  The City has made clear its view that the Court can have only a limited role in any such determination.  According to the City, the Court has no authority to inquire into the how the City intends to use public funds or why it believes it needs them in the first instance.  (Ex. D, Hr'g Tr. 19:21-23, Nov. 14, 2013, 14:36 ET ("That does not mean that this Court will sit in review of the city's business judgment on the underlying money that is needed.").)  This narrow view, however, does not comport with the purposes and policies of Chapter 9 or, as a practical matter, with the analysis that the Court must perform when analyzing the City's proposed plan of adjustment.

61.     As described in greater detail below, since Chapter 9's inception, both Congress and courts have consistently maintained that the primary purpose of Chapter 9 is to allow a municipal debtor to continue operations while it adjusts or refinances creditor claims with a minimum (or in many cases, no) loss to its creditors.  Proposed transactions that diminish creditor recoveries thus must fairly balance creditors' reasonable expectations of minimal losses with a municipality's

13-53846-tjt   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 48 of 62
13-53846-swr   Doc 1870   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 48 of 52
559                                                    48

need to continue operations. Those transactions and plans that unfairly favor public spending to the detriment of creditor recoveries violate the purpose and policies of Chapter 9 and fail to satisfy the "fair and equitable" and "best interests of creditors" tests that are pre-conditions to emergence.

62.     Before a court can evaluate whether a proposed action comports with the standards of Chapter 9, a municipal debtor must demonstrate how it intends to treat creditors — a demonstration that, more often than not, occurs in the context of a plan confirmation proceeding. As a result, transactions, such as this one, that significantly affect creditors' recoveries must be evaluated as part of, or at least in reference to, a plan of adjustment and the history and purposes of Chapter 9.

### B.     History of Chapter 9

63.     As noted above, the purpose and policies of Chapter 9 inform the standard that the Court should employ when reviewing the DIP Motion and any plan of adjustment it proposes. Thus, given the importance of Chapter 9's purpose and policies, the following section summarizes the pertinent history of Chapter 9, highlighting the relevant legislative history and case law.

#### 1.     Congress Originally Enacted Chapter 9 to Facilitate Consensual Debt Adjustment Agreements with Majority Creditor Support.

64.     The concept of municipal bankruptcy in the United States first arose in 1934 in the midst of the Great Depression. *See generally*, *U.S. v. Bekins*, 304

13-53846-tjt   Doc 4371-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 49 of 52
13-53846-swr   Doc 1870   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 48 of 62
559
49

U.S. 27, 53–54 (1938); *Ashton v. Cameron Cnty. Water Improvement Dist. No. 1*, 298 U.S. 513, 533–43 (1936) (Cardozo, J., dissenting).[14]   During that time, municipalities were devastated by plummeting real estate values, disappearing tax receipts, and unsustainable debt service obligations.  *Ashton*, 298 U.S. at 533–34 (Cardozo, J., dissenting).   At the time, creditors of defaulting municipalities generally had no recourse except *mandamus* actions to compel the municipality to raise taxes.  *Id.* at 534.  In reality though, this remedy was "mere futility" given that tax resources were already maxed out.  *Id*.

65.   Out of options, defaulting municipalities and their creditors often entered into debt adjustment agreements.  These agreements allowed defaulting municipalities to postpone payments and avoid legal action.  *Id.*[15]  At the same time, creditors — who realized that municipalities could not pay them back in full — believed that these agreements could maximize their recoveries.  *Id*.

66.   Though this strategy was initially successful, municipalities soon encountered the "holdout" problem — namely, when a small minority of objecting

---

[14]   *See also* H.R. Rep. No. 94-686, at 541–44 (1975) (discussing the purposes and history of Chapter 9); Omer Kimhi, *Chapter 9 of the Bankruptcy Code: A Solution in Search of a Problem*, 27 Yale J. on Reg. 351, 362–69 (2010) (discussing the history of Chapter 9); George H. Dession, *Municipal Debt Adjustment and the Supreme Court,* 46 Yale L.J. 199, 199-202 (1936) (discussing the historical context of the Municipal Bankruptcy Act of 1934).

[15]   *See also* Kimhi, *supra* note 14, at 363.

creditors strategically resisted a negotiated debt readjustment agreement that had garnered majority creditor support. *See id.*[16] Holdouts were able to insist on, and sometimes even realized, payment in full. *See id.* Consequently, the majority of creditors who had been able to reach an agreement with municipalities ultimately refused to go forward with the restructuring, fearing that "to yield in one situation [would] encourage hold-outs in others."[17] As a result, debt readjustment agreements no longer became a viable restructuring solution.

67. In response, Congress enacted Chapter 9 of the Bankruptcy Act, Municipal Bankruptcy Act of 1934, Pub. L. No. 251, 48 Stat. 798 (the "1934 Municipal Bankruptcy Act"), which authorized municipalities to file for bankruptcy and, under certain conditions, bind both consenting *and* dissenting creditors to the terms of a debt adjustment agreement. *See* 1934 Municipal Bankruptcy Act § 80(d). Municipal debtors and creditors alike welcomed the adoption of a process that was designed to make creditors as close to whole as possible and enabled municipalities to continue necessary operations.

---

[16] *See also* Dession, *supra* note 14, at 203 ("The past few years yield numerous instances where settlements acceptable to an overwhelming majority were considerably delayed, if not upset completely, by relatively infinitesimal minorities.")

[17] Dession, *supra* note 14, at 203.

68.     Notably though,  the scope of Chapter 9 was deliberately narrow, and crafted such that a municipality could not invoke Chapter 9 unless a majority of its creditors had previously agreed to a debt adjustment plan.  *Id*. at § 80(a).  In practice, this required municipal debtors to demonstrate that they faced genuine holdout problems.  Where a municipality was able to demonstrate the requisite support, a plan of adjustment still required that (a) creditors holding at least 75% of the aggregate amount of indebtedness accept the plan, (b) it be "fair, equitable, and for the best interests of its creditors," (c) it not "discriminate unfairly in favor of any class of creditors," and (d) it be offered in good faith.  *Id*. at § 80(d)-(e).

> **2.     Early Constitutional Challenges Illustrate that the Controlling Purpose of Chapter 9 Is to Provide a Forum Where Distressed Cities Can Meet with Creditors Under the Necessary Control and Assistance of the Judiciary in an Effort to Effect a Mutually Advantageous Adjustment of Their Debts.**

69.     Shortly after its enactment the Supreme Court in *Ashton* struck down the Municipal Bankruptcy Act of 1934 as an unconstitutional exercise of federal control over the states in violation of the Tenth Amendment.  298 U.S. at 531.

70.     In an oft-cited dissent, Justice Cardozo examined the history and purposes underlying Chapter 9.  To begin, Justice Cardozo observed that Chapter 9 is like the rest of bankruptcy law in that it is a process to adjust the rights and obligations between a distressed debtor and its creditors.  *Id*. at 542–43 (Cardozo, J. dissenting).  He also examined the legislative history of Chapter 9 and concluded

40

13-53846-swr    Doc 4317-3    Filed 04/29/14    Entered 04/29/14 22:20:23    Page 52 of 62
13-53846-swr    Doc 1374    Filed 11/7/13    Entered 11/7/13 22:22:43    Page 52 of 62
559
52

that "[t]he controlling purpose of [Chapter 9] is to provide a forum where distressed cities . . . may meet with creditors under the necessary judicial control and assistance in an effort to effect an adjustment of their financial matters upon a plan deemed *mutually advantageous*." *Id.* at 541 (emphasis added). Significantly, while Justice Cardozo's articulations of the purpose and scope of Chapter 9 were offered in a dissent, they have been quoted approvingly by Congress, the courts, and advocates ever since.[18]

71. In an attempt to remedy the constitutional defects in the Municipal Bankruptcy Act of 1934, Congress passed the Municipal Bankruptcy Act of 1937, Pub. L. No. 302, 50 Stat. 653 (the "Municipal Bankruptcy Act of 1937"). Though this act contained material changes from its predecessor, it reaffirmed that a confirmable plan must be "fair, equitable, and for the best interests of the creditors and . . . not discriminate unfairly in favor of any creditor or class of creditors" and offered in good faith. Municipal Bankruptcy Act of 1937 § 83(e).

72. The constitutionality of the Municipal Bankruptcy Act of 1937 was immediately challenged and upheld in *Bekins*, which relied heavily on Justice

---

[18] *See, e.g.*, Ex. J, Hr'g Tr. 157:20-24, Oct. 15, 2013 (stating that Cardozo's dissent is "very, very clear thinking, elegantly written about exactly the problem we have in this courtroom today, and I think it's awfully persuasive . . . ."); *id.* at 146:7-10 ("A very careful analysis of . . . the Cardozo dissent in *Ashton* is going to provide us with the guidepost to answer a lot of the questions that may not be constitutional questions but that are ultimately resolved by those cases.").

Cardozo's dissent in *Ashton*. *U.S. v. Bekins*, 304 U.S. 27 (1938). To begin, the Court invoked Justice Cardozo's recitation that "the 'subject of bankruptcies' was nothing less than 'the subject of the relations between an insolvent or nonpaying debtor, and his creditors, extending to his and their relief.'" *Id.* at 47. The Court then quoted the same legislative record that Justice Cardozo relied upon in *Ashton*:

> [Chapter 9] gives a forum to enable those distressed taxing agencies which are capable of reorganization, to meet their creditors under necessary judicial control and guidance and free from coercion, and to affect such adjustment on a plan determined to be mutually advantageous.

*Id.* at 51.

73. Building upon Justice Cardozo's dissent, *Bekins* laid the foundation for subsequent Chapter 9 jurisprudence. Significantly, it recognized that Chapter 9 was intended to provide distressed municipalities with a forum to negotiate mutually advantageous debt adjustment agreements that would allow for the municipality to survive and repay creditors as much as reasonably could be expected under the circumstances. Just as significantly, neither *Bekins* nor Justice Cardozo's dissent contemplate that Chapter 9 should be used as a means to implement a municipality's *unilateral* "renaissance" that is funded by substantial, non-consensual cuts to creditor recoveries.

### 3. Early Applications of Chapter 9 Reaffirm That a Municipality's Plan of Adjustment Cannot Subsidize Public Improvement Projects at the Expense of Creditor Recoveries.

74.     Following *Bekins*, several distressed municipalities used Chapter 9 in an attempt to adjust their debt obligations.  The early applications of Chapter 9 are notable in that they illustrate how courts carefully balanced a municipality's need to continue essential operations with its creditors' notions of fairness and a reasonable expectation of minimal losses.

75.     For example, in *Fano v. Newport Heights Irrigation Dist.*, the court examined whether a municipality could, via a plan of adjustment, force its creditors to accept reduced recoveries and still satisfy the "fair and equitable" and "best interests of creditors" standards.  114 F.2d 563, 566 (9th Cir. 1940).  In that case, a municipal irrigation district had defaulted on interest payments to its bondholders.  *Id*. at 564.  As part of the contested plan confirmation, the municipality argued that it was unable to collect sufficient taxes and thus could not satisfy its debt service obligations.  In response, the bondholders argued that the missed interest payments resulted from the municipality's (a) failure to monetize certain assets and (b) excessive expenditures on repairs, maintenance, and construction of its irrigation system.  *Id*.  The evidence demonstrated that the municipality had not merely repaired and maintained its irrigation system, but had instead "practically rebuilt [the irrigation system] in a manner more substantial

43

13-53846-tjt   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:20:23   Page 55 of 62
13-53846-swr   Doc 1870   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 55 of 62
559
55

than the original construction" and was, as the court described it, "top-heavy and extravagant . . . of at least twice the sheer necessity of the situation." *Id*. at 565.

76.     Though recognizing that the municipality did not have sufficient funds to meet its debt service obligations, the *Fano* court found that the deficit "has been caused by the reconstruction of the [irrigation] system and the diversion of tax moneys to the payment therefor." *Id*.  Additionally, the court found that the municipality owned certain unencumbered, non-monetized assets that exceeded the amount of its indebtedness as a result of such public improvement investments, and that "it would be highly unjust to allocate their cost to the bondholders." *Id.* Based on these two pieces of the evidence — *i.e.,* the municipality's excessive revitalization project and its failure to monetize certain assets — the *Fano* court ultimately held that the municipal debtor's plan of adjustment was not fair, equitable, or in the best interest of the creditors. *Id.* at 564–66.

77.     Latching on to the court's comments surrounding the excessive refurbishing of the irrigation systems, commentators have interpreted *Fano* to stand for the proposition that a Chapter 9 plan is not fair and equitable if it provides for excessive investments in facility improvements to the detriment of creditors:

> [A Chapter 9] plan that makes little or no effort to repay creditors over
> a reasonable period of time may not be in the best interest of creditors.
> For example, a debtor that had invested heavily in improvements in its
> facilities at a time when it was unable to pay the claims of its

44

bondholders cannot rely on its cash-poor position resulting from the investment as a reason why it should pay less to bondholders, because the bondholders should not be required in effect to subsidize the improvements. Such a plan is not fair and equitable and is not in the best interest of creditors.

6 *Collier* ¶ 943.03 (16th ed.).

78. In *Kelley v. Everglades Drainage Dist.*, the Supreme Court recognized that courts have a "duty of appraising [a plan's] fairness, and of making the findings necessary to support such an appraisal." 319 U.S. 415, 418 (1943). There, bondholders appealed the confirmation of a Chapter 9 plan on grounds of unfair discrimination. The *Kelley* court observed that the ultimate determination of fairness requires factual findings by the bankruptcy court:

> In order that a court may determine the fairness of the total amount of cash or securities offered to creditors by the plan, the court must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for the satisfaction of creditors. And where, as here, different classes of creditors assert prior claims to different sources of revenue, there must be a determination of the extent to which each class is entitled to share in a particular source, and of the fairness of the allotment to each class in the light of the probable revenues to be anticipated from each source. To support such determinations, there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which the ultimate conclusion of fairness can rationally be predicated.

*Id.* at 420.

79. The *Fano* and *Kelley* courts recognized early in the history of Chapter 9 that municipal debtors carry the legal and evidentiary burden of demonstrating that plans are (a) fair and equitable, (b) in the best interests of creditors, and (c) not

45

13-53846-swr Doc 4370-3 Filed 04/29/14 Entered 04/29/14 22:22:43 Page 57 of 62
13-53846-swr Doc 1370 Filed 11/7/13 Entered 11/7/13 22:22:43 Page 57 of 62
559 57

unfairly discriminatory. In order to honor these holdings in the DIP Motion, the City must demonstrate that its proposed reinvestment spending, funded by reduced creditor recoveries, does not conflict with Chapter 9's mandate to minimize creditor losses to protect creditors from a municipal debtor's overreach; only by meeting these standards now will the City be assured that it can submit a confirmable plan.

### 4. The 1976 and 1978 Amendments to Chapter 9 further reaffirm its first principles.

80. For the next 40 years, Chapter 9 remained largely unchanged. In 1975, however, New York City experienced an economic crisis that brought about certain changes to Chapter 9. Recognizing that large municipalities could not access Chapter 9 because they could not secure support from 51% of their creditors prepetition, Congress enacted several amendments to Chapter 9 (collectively, the "1976 Amendments"). H.R. Rep. No. 94-686, at 543. When enacting these amendments, Congress explicitly stated that it intended "to follow current law as much as possible, in order that the [1976 Amendments] not be such a departure from settled principles that the changes would have an unsettling effect on other municipalities and their bondholders." *Id.* Congress also expressly reaffirmed that "the need for and the purpose of [Chapter 9] have remained unchanged in the 42 years since the first Municipal Bankruptcy Act [of 1934] was passed," quoting the same legislative history cited by Justice Cardozo in *Ashton* and the *Bekins* court:

13-53846-swr    Doc 4374-3  Filed 04/29/14  Entered 04/29/14 22:20:23  Page 58 of 62
13-53846-swr    Doc 1870  Filed 11/27/13  Entered 11/27/13 22:22:43  Page 58 of 62
559                                                                          58

> The controlling purpose of [Chapter 9] is to provide a forum where distressed cities, counties, and minor political subdivisions . . . of their own volition, free from all coercion, may meet with their creditors under the necessary judicial control and assistance in an effort to effect an adjustment of their financial matters upon a plan deemed mutually advantageous.

*Id*. (citing H.R. Rep. No. 207, 73d Cong., 1st Sess. 1 (1933)).

81.    The 1976 Amendments to Chapter 9 furthered this controlling purpose and made it more responsive to changes in municipal finance.  For example, Congress made Chapter 9 more accessible by eliminating the prepetition majority support requirement in favor of an affirmative obligation to negotiate in good faith unless such negotiations prove impracticable.    Additionally, Congress gave municipalities the opportunity to incur postpetition indebtedness with the expectation that such financing would improve creditor recoveries by ensuring that essential government services continue during the Chapter 9 case.  With respect to postpetition financing, Congress reasoned that:

> [B]y facilitating borrowing to meet current expenses, the court was actually preserving former secured creditors' collateral by preserving the business as a going entity.  Thus, there was no actual or effective taking of property prohibited by the Fifth Amendment in giving new security that would prime the former liens of secured creditors.  In the municipal context, this reasoning is similarly applicable.  While the 'business' of government will continue whether it is insolvent or not, without cash to continue to provide essential government services, the only asset available for the creditors, the municipality's tax base, may be seriously eroded by flight of the city's businesses and residents.

H.R. Rep. 94-686, at 546–47.

Congress thus gave municipalities the ability to access postpetition financing to serve the dual purposes of Chapter 9 — survival of the municipality and minimizing creditor losses.

82. In 1978, Congress rolled out additional changes to Chapter 9 (the "1978 Amendments") that were also not meant to modify its original purpose:

> Chapter 9 provides a workable procedure so that a municipality of any size that has encountered financial difficulty may work with its creditors to adjust its debts . . . Chapter 9 provides essentially for federal court protection, and supervision of a settlement between the debtor municipality and a majority of its creditors. A municipal unit cannot liquidate its assets to satisfy its creditors totally and finally. Therefore, the primary purpose of Chapter 9 is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to its creditors.

H.R. Rep. No. 95-595, at 6221 (1977).

83. The 1978 Amendments also reaffirmed Congress's commitment that a Chapter 9 plan of adjustment must be offered in good faith, fair and equitable, in the best interests of the creditors, and not unfairly discriminatory in favor of any class of creditors.[19] Congress did, however, change the circumstances under which each test would be applied. Specifically, Congress incorporated a modernized "cram down" provision of Chapter 11 into Chapter 9 which enabled municipalities to confirm a plan of adjustment over the objection of a dissenting class of impaired

---

[19] *Compare* 1934 Municipal Bankruptcy Act § 80(e), 1937 Municipal Bankruptcy Act § 83(e), *and* Pub. L. No. 94-260, § 94(b)(1), 90 Stat. 315 (1976), *with* Pub. L. No. 95-598, §§ 901(a), 943(b)(1), 1129(b)(1), 92 Stat. 2549 (1978).

48

13-53846-tjt   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:22:03   Page 50 of 52
13-53846-swr   Doc 1374   Filed 11/27/13   Entered 11/27/13 22:22:43   Page 85 of 462
559
60

creditors. Municipalities could only do so, however, if the plan was "fair and equitable" and did not "unfairly discriminate" in respect of such creditors. When describing the mutually advantageous aspects of "cram down" in the Chapter 11 context, Rep. Edwards reiterated that a plan still needed to satisfy the base-line standard of fairness:

> For both debtors and creditors, the requirements for a reorganization plan are made more flexible, and the court is given the power to confirm the plan even though some creditors do not like the plan, so long as the plan meets certain statutory criteria of fairness. This is very important. ***This way creditors get more than if the business went into straight liquidation***.

124 Cong. Rec. H11, 699 (daily ed. Oct. 27, 1977) (statement of Rep. Edwards).

84. Put slightly differently, Congress did not intend "cram down" to alter the mutually advantageous nature of a Chapter 9 restructuring. To the contrary, Congress sought to enhance creditor recoveries through cram down. Indeed, the incorporation of cram down into Chapter 9 merely reaffirms the original maxim that a recalcitrant group of minority creditors should not be able to block an otherwise consensual, mutually advantageous debt adjustment agreement.

### 5. The 1988 Amendments to Chapter 9 Underscore How Congress Intended the Chapter 9 Process to Balance Creditors' Reasonable Expectations of Minimal Losses with a Municipality's Need to Continue Essential Public Operations.

85.     In 1988, Congress enacted a series of amendments to Chapter 9 meant to balance creditors' reasonable expectations with a municipality's need to continue essential operations.[20]

86.     In relevant part, Congress added section 928 of the Bankruptcy Code. Section 928(a) affords special protection to creditors holding prepetition liens on special revenues by authorizing the continuation of such liens on postpetition special revenue. Section 928(b), however, limits the scope of section 928(a) rights by prioritizing payments of "necessary operating expenses" in connection with the project or system generating the special revenues upon which a section 928(a) lien attaches. That is, section 928 of the Bankruptcy Code protects a creditor's rights to postpetition special revenues after subtracting the amount necessary to maintain "day-to-day expenses required to keep [the special revenue project] operating for the relatively short time between the filing of the [municipality's] bankruptcy and a

---

[20]     *See* Pub. L. No. 100-597, 102 Stat 3028 (1988); H.R. Rep. No. 100-1011, at 4116 (1988) ("Concern has been voiced in recent years that some of [Chapter 9's] general bankruptcy provisions—most prominently the avoidance under section 552(a) of the Bankruptcy Code of a lien resulting from a pre-petition security interest on property acquired post-petition—are inconsistent with the principles of municipal finance, particularly with respect to public works projects financed by revenue bonds.").

final resolution of its case." *In re Jefferson Cnty., Ala.*, 482 B.R. 404, 439 (Bankr. N.D. Ala. 2012); *id.* at 437 ("From this legislative history, the following is part of the perimeter of what is contained within § 928(b)'s 'necessary operating expenses.' It includes for a given period of time those that are (1) expended to keep the system or project operating in the sense that the system or project is kept in good repair and generating the special revenues, ***not improvements or enhancement*** . . . .") (emphasis added).

87.    Section 928 is thus a microcosm of Congress's intended creditor-debtor balance in Chapter 9. Section 928(a) evidences Congress's intent to protect certain bargained-for, prepetition creditor expectations while section 928(b) represents Congress's understanding that a municipal debtor must continue to expend resources — including special revenues subject to a section 928(a) lien — necessary to (i) continue delivering essential public services <u>and</u> (ii) maintain the applicable system to facilitate the repayment of certain creditors. What remains after subtracting section 928(b) (necessary operating expenses) from section 928(a) (prepetition creditor bargain) is arguably "all that the creditors can reasonably expect under the circumstances," or that which is "fair and equitable" within the meaning of Chapter 9 plan confirmation jurisprudence. *Fano*, 114 F.2d at 565–66.

88.    The legislative history surrounding section 928 underscores how Congress intended for Chapter 9 to be a mutually beneficial process that advanced

two distinct policy objectives: minimizing or eliminating creditor losses and the continued operation of the municipal debtor. In particular, Congress viewed the 928(b) necessary operating expense carve out "important because payment of operating expenses — those necessary to keep the project or system going — must be protected so that the project or system can be maintained in good condition to **repay bondholders** (and, importantly, to provide residents of the municipality with the service the project or system is meant to deliver)." H.R. Rep. No. 100-1011, at 4122 (emphasis added); *Jefferson Cnty.*, 482 B.R. at 441 ("The standard is that which allows a project or system to be in good condition to enable it to keep 'going' to 'generate revenues to repay bondholders' and to provide the services to the system's or project's customers."). Congress believed that, once minimum necessary operating expenses are funded, municipal debtors should make creditors as close to whole as possible.

89. This framework is consistent with Chapter 9's first principles whereby a Chapter 9 debtor must abide by its dual duties of continuing essential public operations while repaying creditors as much as possible under the circumstances — not sacrificing the latter in favor of a billion-dollar revitalization campaign. *See Jefferson Cnty.*, 482 B.R. at 437 (recognizing that "improvements or enhancements" to public projects or systems do not constitute "necessary operating expenses"). Indeed, Congress understood that without section 928 of the

Bankruptcy Code, certain creditors would "ultimately receive much less than they thought to be the value"[21] of their prepetition bargain, an outcome unfair to creditors that Congress sought to remedy. *See also In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) ("The purpose of chapter 9 is to allow municipalities the opportunity to remain in existence through debt adjustment and obtain temporary relief from creditors.").

### C. The City's Approach Conflicts with the Purposes and Policies Behind Chapter 9.

90. Thus far, the City has not exhibited any desire to work within the framework established by Chapter 9 and instead appears content to rush forward with a series of one-off transactions with plan-like implications. The allure of such a strategy is clear. If, by the time the City proposes its plan of adjustment, it has already allocated the majority of possible revenue, it will be able to move forward with its $1.25 billion reinvestment without needing to allocate any money to creditor recovery. In so doing, however, the City will not be able to propose a plan of adjustment that is fair and equitable, and in the best interests of the creditors, meaning that the City may not be able to emerge from bankruptcy.

91. Obviously, the City does not believe it will be trapped in bankruptcy. Instead, its strategy is to pledge away its assets and revenue streams and <u>then</u>

---

[21] H.R. Rep. No. 100-1011, at 4118.

13-53846-tjt Doc 4374-3 Filed 04/29/14 Entered 04/29/14 22:20:23 Page 65 of 62
13-53846-swr Doc 1817-3 Filed 11/27/13 Entered 11/27/13 22:22:43 Page 65 of 62
559
65

determine what recoveries for creditors are fair by reference to what remains. In this way, fairness to creditors becomes a self-fulfilling prophecy — what is fair to creditors is what the City says is fair after it has finished spending money on itself. But Chapter 9 does not suggest that "fairness" is a subjective concept to be determined by the City, but rather an objective one to be determined by a bankruptcy court. And the Court cannot evaluate fairness without understanding how the City's actions serve the dual purposes of Chapter 9: minimizing creditor losses and continued provision of necessary public services.

## Conclusion

92.     For the foregoing reasons, Syncora respectfully respects that the Court deny the City's motion to approve postpetition financing, granting liens and providing superpriority claim status, and modifying the automatic stay pursuant to sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 of the Bankruptcy Code.

*[Remainder of this page intentionally left blank]*

Dated: November 27, 2013

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*

## Summary of Exhibits

Exhibit A - Hr'g Tr., Nov. 14, 2013, 11:01 ET

Exhibit B - Exit Engagement Letter

Exhibit C - Email from Anne Marie Langan to Todd Snyder

Exhibit D - Hr'g Tr., Nov. 14, 2013, 14:36 ET

Exhibit E - Moody's Report

Exhibit F - Funding for Detroit Announced on Sept. 27, 2013

Exhibit G - Cash Flow Variance Report June 2013

Exhibit H - Cash Flow Variance Report FY 2014

Exhibit I - Syncora Proposal

Exhibit J - Hr'g Tr., Oct. 15, 2013

**Exhibit A**

**Hr'g Tr., Nov. 14, 2013, 11:01 ET**

13-53846-swr   Doc 13741-8   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 68 of 103
13-53846-swr   Doc 1674-2   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 1 of 103   69
559

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .        Docket No. 13-53846
        MICHIGAN,              .
                               .        Detroit, Michigan
                               .        November 14, 2013
                Debtor.        .        11:01 a.m.
. . . . . . . . . . . . . . . .

    HEARING RE. DEBTOR'S MOTION PURSUANT TO SECTIONS 105
       AND 107(b) OF THE BANKRUPTCY CODE FOR AN ORDER
   AUTHORIZING THE DEBTOR TO FILE FEE LETTER UNDER SEAL IN
 CONNECTION WITH THE DEBTOR'S POST-PETITION FINANCING MOTION
           BEFORE THE HONORABLE STEVEN W. RHODES
           UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:         Jones Day
                        By:  BRAD B. ERENS
                        77 West Wacker
                        Chicago, IL  60601-1692
                        (312) 782-3939

                        Jones Day
                        By:  ROBERT W. HAMILTON
                        325 John H McConnell Blvd., Suite 600
                        Columbus, OH  43215
                        (614) 469-3939

For Financial           Williams, Williams, Rattner &
Guaranty Insurance        Plunkett, PC
Corporation:            By:  MARK R. JAMES
                        380 North Old Woodward Avenue, Suite 300
                        Birmingham, MI  48009
                        (248) 642-0333

For David Sole:         Jerome D. Goldberg, PLLC
                        By:  JEROME GOLDBERG
                        2921 East Jefferson, Suite 205
                        Detroit, MI  48207
                        (313) 393-6001

For Syncora             Kirkland & Ellis, LLP
Holdings, Ltd.,         By:  STEPHEN HACKNEY
Syncora Guarantee,      300 North LaSalle
Inc., and Syncora       Chicago, IL  60654
Capital Assurance,      (312) 862-2074
Inc.:

13-53846-swr  Doc 1874-8  Filed 04/29/14  Entered 04/29/14 22:20:23  Page 70 of 103   70
13-53846-swr  Doc 1674-3  Filed 11/27/13  Entered 11/27/13 22:22:45  Page 2 of 103
559

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retirement Systems - General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By: ROBERT D. GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI 48009<br>(248) 988-5882 |
| For National Public Finance Guarantee Corporation: | Sidley Austin, LLP<br>By: GUY S. NEAL<br>1501 K Street, N.W.<br>Washington, DC 20005<br>(202) 736-8041 |
| For Assured Guaranty Municipal Group: | Chadbourne & Parke, LLP<br>By: SAMUEL S. KOHN<br>30 Rockefeller Plaza<br>New York, NY 10112<br>(212) 408-1060 |
| For Official Committee of Retirees: | Dentons<br>By: CAROLE NEVILLE<br>1221 Avenue of the Americas<br>New York, NY 10020-1089<br>(212) 768-6889 |
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By: CAROL CONNOR COHEN<br>1717 K Street, N.W.<br>Washington, DC 20036<br>(202) 857-6054 |
| For Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By: JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>(973) 597-2538 |
| For Barclays: | Cravath, Swaine & Moore, LLP<br>By: DANIEL SLIFKIN<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>(212) 474-1438 |

13-53846-swr Doc 4304 Filed 04/29/14 Entered 04/29/14 22:20:23 Page 71 of 103
13-53846-swr Doc 1874-2 Filed 11/27/13 Entered 11/27/13 22:24:45 Page 71 of 103
559
71

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

13-53846-swr   Doc 4304-8   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 72 of 103   72
13-53846-swr   Doc 1674-2   Filed 11/27/13   Entered 11/27/13 22:22:45   Page 4 of 9
559

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Good morning.  I'd like to begin with

4  the motion to seal, please.

5    MR. ERENS:  Good morning, your Honor.  Brad Erens,

6  E-r-e-n-s, of Jones Day on behalf of the city.  Would your

7  Honor like any appearances before we start?

8    THE COURT:  That's probably a good idea.  So if

9  you're planning to address the Court regarding this motion,

10  can you put your appearance on the record now, please?

11    MR. JAMES:  Good morning, your Honor.  Mark James on

12  behalf of Financial Guaranty Insurance Company.

13    THE COURT:  Yes, sir.

14    MR. GOLDBERG:  Jerome Goldberg on behalf of

15  interested party David Sole.

16    THE COURT:  I do have to ask you to speak into a

17  microphone for me either at the table or, if it's more

18  comfortable for you, at the lectern.

19    MR. GOLDBERG:  Yes, your Honor.  Should I redo it,

20  your Honor?  Jerome Goldberg on behalf of interested party

21  David Sole.

22    THE COURT:  Thank you, sir.

23    MR. GOLDBERG:  Thank you.

24    MR. GORDON:  Good morning, your Honor.  Robert

25  Gordon of Clark Hill on behalf of the Detroit Retirement

13-53846-swit  Doc 1874-3  Filed 04/29/14  Entered 04/29/14 22:20:23  Page 73 of 103
13-53846-swr  Doc 1874-3  Filed 11/27/13  Entered 11/27/13 22:22:45  Page 73 of 103  73
559

1  Systems.

2  MR. HACKNEY:  Good morning, your Honor.  Stephen

3  Hackney on behalf of Syncora.

4  MR. NEAL:  Good morning, your Honor.  Guy Neal,

5  Sidley Austin, on behalf of National Public Finance Guarantee

6  Corporation.

7  MR. KOHN:  Good morning, your Honor.  Samuel Kohn of

8  Chadbourne & Parke on behalf of Assured Guaranty Municipal

9  Corp.

10  MS. NEVILLE:  Good morning, your Honor.  Carole

11  Neville from Dentons on behalf of the Retiree Committee.

12  MS. CONNOR COHEN:  Good morning, your Honor.  Carol

13  Connor Cohen from Arent Fox on behalf of Ambac Assurance

14  Corporation.

15  MR. SHERWOOD:  Good morning, your Honor.  Jack

16  Sherwood, Lowenstein Sandler, on behalf of AFSCME.

17  MR. HAMILTON:  And on this side of the room, your

18  Honor, Robert Hamilton of Jones Day on behalf of the City of

19  Detroit.

20  MR. SLIFKIN:  And good morning, your Honor.  Daniel

21  Slifkin of Cravath, Swaine & Moore on behalf of Barclays.

22  THE COURT:  Okay.  Go ahead, sir.

23  MR. ERENS:  All right.  This is the motion of the

24  city to file under seal a fee letter in connection with the

25  debtor's proposed post-petition financing under 107(b) of the

13-53846-swr   Doc 13751-3   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 74 of 103
13-53846-swr   Doc 1874-2   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 74 of 103
559
74

1  Bankruptcy Code and Rule 9018 as confidential commercial

2  information of both the city and of Barclays.  Barclays is,

3  again, the proposed lender under the post-petition facility.

4          Your Honor, as we indicated in the seal motion,

5  there are really two relevant parts of the fee letter.

6  There's the provision that provides for so-called market

7  flex, which is a provision that allowed Barclays in

8  syndication of the loan, which they're entitled to do, to

9  agree under limited circumstances to an increase of, among

10 other things, the interest rate on the loan, and the point of

11 sealing the fee letter is if that market flex or increased

12 interest rate were publicly disclosed, parties who might be

13 syndication parties, parties who would buy the loan in

14 syndication, would know the amount of increase that Barclays

15 could agree to and naturally would agree -- or excuse me --

16 would request the maximum amount of the increase in the

17 interest rate.  That, of course, would cause the city to pay

18 an increased interest rate under the loan if approved, so

19 that is the reason, at least from the city's perspective, we

20 would like that information to remain confidential.

21         The second part of the fee letter --

22         THE COURT:  What is that potential increase?

23         MR. ERENS:  I'm sorry.

24         THE COURT:  What is that potential increase?

25         MR. ERENS:  The amount?  That is the -- that is

1   exactly the issue that the city would like to remain

2   confidential because parties who might buy the loan right now

3   know there is some increase but don't know how much, and so

4   if you are a party thinking of participating in the loan and

5   you knew the city and Barclays could agree to an increase in

6   the amount of the interest rate of "X," let's just say, you

7   would ask for "X."

8          THE COURT:  Okay.

9          MR. ERENS:  And the city obviously has a desire to

10   keep the interest rate as low as possible.

11          The second part of the fee letter provides for the

12   commitment fee that Barclays is owed in connection with

13   arranging the loan.  For reasons set forth in the seal motion

14   and we can describe in more detail through testimony today,

15   the disclosure of that fee also potentially could have the

16   effect of increasing the cost of the loan to the city.

17   Barclays also considers that information to be proprietary

18   and, therefore, commercial -- confidential commercial

19   information that the Court should protect it from disclosure

20   pursuant to 907 -- excuse me -- 107(b) and 9018.

21          We have a variety of objections on the motion.  I

22   think it's important to note one thing, your Honor, because

23   there may be some misconception among the objectors.  The

24   city is not seeking court approval of the commitment fee.

25   Since 363 does not apply in a Chapter 9, the city has the

13-53846-swit   Doc 4364-3   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 76 of 103
13-53846-swr    Doc 16764-3   Filed 11/27/19   Entered 11/27/19 22:22:45   Page 76 of 103
559
76

 1   authority to pay the fee without court authority, and, in
 2   fact, as indicated in our underlying motion for the
 3   financing, which is up on the 10th, the city already has paid
 4   half of the fee and before that hearing will have paid the
 5   remainder of the fee.  So as your Honor takes up the post-
 6   petition financing on the 10th or thereafter, there's a
 7   question as to how relevant that fee really will be because
 8   it will have been paid and will remain paid regardless of
 9   whether your Honor approves or does not approve the
10   financing, so we thought it was important to clarify that
11   point.

12           THE COURT:  So the city is committed to pay this
13   commitment fee whether the loan is approved or not?

14           MR. ERENS:  That's correct.  And the city has paid
15   half of it and will pay the remainder prior to the hearing on
16   the financing.

17           Another point, of course, which is implicit but we
18   thought was important to mention at the beginning of the
19   hearing, the city and Barclays, of course, are more than
20   willing to share the fee letter with your Honor in camera.
21   We have not done that yet but are happy to do so today.

22           Pursuant to your court's notice, we have brought
23   witnesses for this hearing.  We have a witness from Barclays,
24   and we have a witness from the city or on behalf of the city,
25   the witness from Miller Buckfire, the city's investment

13-53846-swit   Doc 1374-2   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 77 of 103   77
13-53846-swr   Doc 1674-3   Filed 11/27/14   Entered 11/27/14 21:24:45   Page 76 of 101
559

1 banker.  So unless your Honor has more questions or comments,

2 we would propose we go directly to the direct testimony,

3 which would begin with the Barclays witness.

4      THE COURT:  Thank you.  Stand by, please.  Is there

5 any objection to going straight to testimony here?  All

6 right.  So as not to unduly extend these proceedings, I

7 wonder if I could ask all of you who object to agree upon one

8 of you to do the cross-examination.  And what we'll do is

9 we'll hear the testimony, and -- hold on.  Hold on.  What

10 we'll do is we'll hear the testimony, and then we'll take a

11 little break, and you can consult among yourselves and decide

12 who's going to do it.  Okay?  Sir.

13      MR. SLIFKIN:  May I proceed, your Honor?

14      THE COURT:  Yes.

15      MR. SLIFKIN:  Yes.  Let me reintroduce myself.  I'm

16 Daniel Slifkin of Cravath, Swaine & Moore, and I represent

17 Barclays.

18      THE COURT:  And how do you spell that, sir?

19      MR. SLIFKIN:  It's S for Sam l-i-f for Frank k-i-n,

20 first name Daniel.  And with the Court's permission, we would

21 call Mr. James Saakvitne to the stand, and I'll spell that --

22      THE COURT:  Okay.

23      MR. SLIFKIN:  -- for you, too.

24         JAMES SAAKVITNE, WITNESS, SWORN

25      THE COURT:  All right.  Please sit down.

1      MR. SLIFKIN:  May I, your Honor?

2      THE COURT:  Yes, yes.

3                      DIRECT EXAMINATION

4  BY MR. SLIFKIN:

5  Q   Could you please state your name and spell it for the

6  record?

7  A   Sure.  James Saakvitne, and that's spelled S like Sam

8  a-a-k-v-i-t-n-e.

9  Q   And do you go by Jay?

10 A   Yes.

11 Q   So, Mr. Saakvitne, by whom are you employed?

12 A   By Barclays Capital.

13 Q   And what is your position at Barclays?

14 A   I'm a managing director and head of the municipal credit

15 group.

16 Q   Can you generally describe what your experience has been

17 at Barclays in the financing area?

18 A   Sure.  So I've been at Barclays for a little over four

19 years running the municipal credit group, and we provide

20 loans, letters of credit, liquidity facilities to a range of

21 municipal and not for profit entities.  Right now the

22 portfolio is approximately $7 billion or about 70 clients.

23 Q   And is municipal financing your sole focus?

24 A   Yes.

25 Q   Prior to Barclays, did you have previous experience in

1  this area?

2  A    I did.  I was at JPMorgan for 19 years, and the last 10

3  years there I ran the municipal credit group, and while there

4  we had a portfolio of about $30 billion of likewise loans,

5  liquidity facilities, letters of credit.

6  Q    Okay.  Now, let's focus on the proposed financing for the

7  City of Detroit.  Do you have a personal involvement in that

8  transaction?

9  A    I do.

10  Q    For the benefit of the Court, could you describe

11  generally what you did on the proposed transaction?

12  A    Sure.  So I was an integral part of the financing team.

13  I was -- once we received the request from the city for

14  proposals, I was involved in structuring and pricing and

15  then, once we received the mandate, in negotiation, in

16  working closely with lawyers on documentation, so I've been

17  involved from the start from it.

18  Q    And were you involved personally in negotiations with

19  advisors for the city?

20  A    Yes.

21  Q    Now, is this, in your experience, a standard type of

22  municipal deal?

23  A    No.  It's quite unique.  It's the first ever post-

24  petition financing for a municipality.

25  Q    So what particular element is unusual, from your

1  perspective, of municipal financing?

2  A    Well, this is really effectively a hybrid between a

3  typical municipal credit deal secured by a revenue stream and

4  by a post-petition financing where suddenly you're involved

5  with other creditors, with Bankruptcy Court, this whole

6  process, that is not typical for a municipal facility.

7  Q    Did you -- do you have personal experience with respect

8  to post-petition financing?

9  A    Not prior to this transaction.

10  Q    Okay.  Did you pull in from within your colleagues at

11  Barclays people with post-petition financing experience?

12  A    Yes.  Barclays is one of the top three providers of DIP

13  financing, and we have a dedicated team, and we worked

14  closely with them.  They were very much a part of the team on

15  this transaction.

16  Q    How did Barclays become involved in this process?

17  A    Like every investment bank involved in public finance,

18  we've been following closely the situation in Detroit as it

19  unfolded.  In late August we were approached by Miller

20  Buckfire saying that they were going to -- the city was going

21  to be sending out a request for proposals for post-petition

22  financing; that we would need to sign a nondisclosure

23  agreement if we were going to receive that, so we did sign a

24  nondisclosure agreement.  We received the request for

25  proposal in early September.  We worked on it and then

1   submitted it in the middle of September.

2   Q   Okay.  Are you aware whether or not there were other

3   bids?

4   A   Well, certainly the press -- it's been talked about in

5   the press that the city went out to approximately 30 or more

6   different bidders, and then it's been in the press that

7   supposedly there were 16 submissions.

8   Q   Have you seen any of the other bids?

9   A   No.

10  Q   Did you see any of the other bids or anyone at Barclays

11  see those bids during this process?

12  A   Not at all.

13  Q   Did Barclays share its bid with any of its competitors

14  during this process?

15  A   No.

16  Q   Have you shared your bid with your competitors since the

17  city signed the agreement with Barclays?

18  A   No.

19  Q   So, again, when did the city ultimately select Barclays'

20  proposal?

21  A   Well, it was a -- it was a bit of an iterative process,

22  but the commitment letter itself was signed -- I want to say

23  on October 6th.  I may have that date off by a couple of

24  days, but -- so it was -- basically that was the --

25  Q   Okay.

1    A    -- end of September, beginning of October.

2    Q    Let me ask you a few questions about the terms of the

3    agreement.  I'm just going to ask you to answer these "yes"

4    or "no" because while the question of confidentiality is sub

5    judice, obviously we don't want to reveal anything while the

6    Court is still deciding.  So are you personally familiar with

7    the fee letter which is the subject of today's hearing?

8    A    Yes.

9    Q    Okay.  And are you familiar with the specific terms of

10   that fee letter?

11   A    Yes.

12   Q    Are you familiar with the market flex term?

13   A    Yes.

14   Q    And are you familiar with the fee term?

15   A    Yes.

16   Q    Again, do you have an understanding of how Barclays

17   calculated the fee that appears in the letter?

18   A    Yes.

19   Q    And let me just go back to a point that Mr. Erens made in

20   his opening.  Is it, in fact, your understanding that the fee

21   is payable irrespective of whether the transaction is

22   approved?

23   A    Yes.

24   Q    And has Barclay received 50 percent of that fee?

25   A    We have.

1   Q   Okay.  So now let's turn to the market flex term.  Just

2   explain generally what a market flex term is.

3   A   So market flex really came into the market, especially

4   the corporate market, in the 1990s, and the idea is that when

5   a financial institution agrees to underwrite a loan or a

6   financing where they commit early on prior to the funding

7   period but with the expectation that they're going to sell

8   and distribute it, at the time when they give their initial

9   pricing for the deal, they have an expectation for what the

10  market is going to need to buy that piece of paper on the

11  closing date whether the closing date be two weeks or four

12  weeks or six weeks and then future.  What market flex is

13  doing is it's a provision that if the underwriter needs to

14  change the terms of the deal so that they can actually

15  successfully syndicate it on or around the pricing date, it

16  gives them the ability to do that under certain parameters.

17  So, for example, if the -- if it just turns out that they've

18  misread the market or if there's been a widening in credit

19  spreads in the interim, then, therefore, they can revise the

20  market accordingly.

21  Q   And does the proposed transaction with Barclays

22  contemplate syndication?

23  A   It does.

24  Q   Okay.  And what is Barclays' current intent with respect

25  to syndication of the loan?

1    A    We do plan to syndicate a portion of the loan.

2    Q    Okay.  Now, can market flex contain more than one

3    particular provision?

4    A    Certainly.  It can be any range of terms which help

5    enable the facility to be successfully marketed, syndicated.

6    Q    And I take it that, in fact, the fee letter includes a

7    market flex provision of some type?

8    A    Yes.

9    Q    Does that specific market flex provision at issue today

10   include the possibility of the interest rate being adjusted

11   upwards?

12   A    It does.

13   Q    In your experience, Mr. Saakvitne, are the details of

14   market flex terms typically kept confidential?

15   A    Yes, they are.

16   Q    Why is that?

17   A    They're kept confidential because if the market to whom

18   we are trying to syndicate the facility or any underwriter is

19   trying to syndicate the facility is aware of them, then they

20   will demand those highest possible provisions.  It's almost

21   like if you decide you want to buy a car and you walk onto a

22   car lot, you're not going to say to the car salesman, "Gee, I

23   really like this car.  I'm willing to pay $15,000 for it, but

24   let's start at 10,000, and let's see if you'll sell it to me

25   for 10,000."  Obviously the car salesman -- you've just shown

1  your hand, and the car salesman will say, "I'm sorry.  The

2  cost -- price on that car is 15,000."  It's a very similar

3  thing.  We want to keep the provisions secret so that we can

4  get the city the lowest cost.

5  Q   Okay.  So in the ordinary course, does Barclays itself

6  seek to maintain the confidentiality of market flex terms?

7  A   Absolutely.

8  Q   Can you provide us with any examples of financings --

9  recent financings where market flex was kept confidential?

10  A   Sure.  Just -- well, particularly within the DIP area,

11  I'll just throw out a few names, which would be the Tribune;

12  New Page, which is a paper company; Patriot Coal; and then

13  ResCap, which was part of the financing vehicle for General

14  Motors.  Those were all ones where it was kept under seal,

15  kept confidential.

16  Q   Okay.  Have you sought up till this hearing to maintain

17  the confidentiality of the Detroit -- I'll call it the

18  Detroit market flex provision?

19  A   We have.  Actually, in our commitment letter, we made

20  provisions for the fee letter to remain confidential.

21  Q   So you described generally what might happen with your

22  car example if a market flex term is made public or at least

23  available to competitors, people who might be in the

24  syndicate, you know.  Do you, in fact, have that fear in the

25  case of Detroit?

1  A   Yes, yes, absolutely, especially because in this

2  situation there's no ongoing market precedent for what the

3  correct pricing should be for a municipal DIP, so, therefore,

4  it's very important for us to be able to control the

5  information to be able to get the lowest possible price for

6  the city.

7  Q   Let me turn now to the fee provision in the letter.  I

8  take it there is provision for a specific fee in the letter.

9  A   There is.

10  Q   What does that fee cover?

11  A   You know, the fee covers a number of things.  It covers

12  the risk that we are taking to -- where we're committing to

13  fund the entire $350 million.  Even if the syndication fails

14  completely, Barclays is still on the hook for the $350

15  million.  It also covers the up front work we did on

16  structuring the deal.  We're paying our bank counsel out of

17  that fee.  It covers the work we're going to do on

18  syndicating the deal, so it's -- and then it also -- some

19  portion of it -- excuse me -- would be Barclays -- a portion

20  of Barclays' profit on the overall transaction.

21  Q   In your experience, are such fees, as you've described,

22  typically kept confidential?

23  A   They are.

24  Q   Okay.  And why is that?

25  A   They're kept confidential because the banks who put

1  together syndicated deals -- typically it's part of their

2  overall business strategy and business structure as to how

3  they want to be compensated and how much they want in the up

4  front fee versus how much they want in the ongoing running

5  fee, et cetera, so it's part of the --

6        THE COURT:  I'm sorry.  How much they want in what?

7        THE WITNESS:  I'm sorry.  In the interest rate, in

8  the ongoing running fee typically, so, yes, it is -- it's

9  commercial information that we'd keep confidential.

10  BY MR. SLIFKIN:

11  Q   And in the ordinary course, does Barclays keep that

12  confidential?

13  A   We do.

14  Q   If this fee information were to be available to your

15  competitors, how would that impact your business?

16  A   Our concern is that it would put us at a competitive

17  disadvantage because now going forward our competitors can

18  say, "Ah, we know how much Barclays charges up front to

19  provide a DIP like this," whether it be a corporate DIP or a

20  municipal DIP, and that in a competitive situation -- and

21  frequently these DIP financings are competitive situations --

22  it will give our competitors a better ability to have an

23  advantage over us because they know more about the black box

24  of our pricing.

25  Q   Does Barclays get to see its competitors' fee

1   information?

2   A    No.

3   Q    You also mentioned the methodology for determining fees.

4   Is that also something that Barclays maintains

5   confidentiality on?

6   A    We do.

7   Q    Okay.  And why is that?

8   A    Again, it just comes down to the more information you

9   give about how our overall pricing works, the more possible

10  it is for a competitor to break it apart and to tease it out

11  and figure out and, therefore, give them a competitive

12  advantage against Barclays.

13  Q    Now, in some of the objections that were filed in

14  response to the motion, there was a suggestion that the, in

15  fact, municipal deals tend to be public.  Is that correct, in

16  your experience?

17  A    Well, different components of municipal deals are, and

18  that's where it's actually worth talking about sort of what

19  kind of deal is this because, you know, for a typical

20  municipal bond underwriting, the underwriting fees of the

21  underwriter would be public, but this is not a public bond

22  deal.  This is a private placement, and it's really more akin

23  to a traditional bank loan.  Yes, we chose in our bid to

24  structure it as a note instead of a loan.  That was really

25  more for booking purposes.  To give you some examples, when

1  we provide a direct purchase of a loan, we don't make -- to a

2  municipality, we don't make our fees public on that, nor do

3  our competitors on their deal.  Likewise, when I provide

4  letters of credit and liquidity facilities on municipal

5  bonds, we put the fees associated with those in a separate

6  fee letter, and that fee letter is not disclosed to the

7  public.  And this is actually important because for municipal

8  bonds the MSRB, which is the Municipal Securities Rulemaking

9  Board, has very strict requirements under G-34 as to what has

10  to be disclosed to investors, and they've come out and said,

11  yes, the bank fees do not have to be disclosed.  They're not

12  posted on the website that MSRB maintains.

13  Q   Do you have an understanding of whether fees are

14  disclosed typically in DIP financing?

15  A   I do have an understanding, and they are not typically

16  disclosed.

17  Q   Okay.  With respect to the fees in the Detroit fee

18  letter, the Detroit Barclays fee letter, in Barclays' view,

19  could disclosure of that fee have an impact on the financing

20  itself?

21  A   We think that it could.  It has the possibility -- in

22  fact, I think more than the possibility -- the probability

23  that investors, if they see the up front fee, are going to --

24  when I say "investors," I mean the people to whom we're going

25  to syndicate the loan -- will try to take a disproportional

1   share of that, and that would affect it.

2   Q   Can you explain what you -- well, let me back up for a

3   second.  Are you personally familiar with negotiating with

4   members of a syndicate?

5   A   Yes.  I've done that.

6   Q   Okay.  So explain to us how it is you think those

7   negotiations would be affected by disclosure of the fees in

8   the fee letter?

9   A   So the way that the negotiations would be affected is

10  that obviously any member of the syndicate wants to be --

11  feel that they're being treated fairly.  They want to feel as

12  though they're getting similar compensation for the risk that

13  they're taking from any other bank.  If they see our up front

14  fee, which, you know, I've talked earlier about the number of

15  different things that that provides compensation for, then

16  they can just determine, oh, well, we think that all of that

17  should be allocated towards risk and not towards deal

18  creation, administration, legal fees, et cetera, and that

19  they would put in a demand for that whole up front fee, which

20  really would not be -- it wouldn't make sense for Barclays to

21  be able to share in that way.

22  Q   Okay.  There was some suggestion in opening that

23  revealing the fee to members or potential members of the

24  syndicate could raise the cost to the city.  Do you agree

25  with that or not?

1    A    Well, I do agree because the reason for that is it really
2    ties in with the market flex, and the risk is that if the
3    syndicate members know the amount of the up front fee and if
4    they then are told that they are not a -- we're not able to
5    share that with them because it's being used to compensate us
6    in other ways, that may put more -- give them more motivation
7    to press for a higher interest rate, which would, therefore,
8    increase the likelihood that we had to kick in on the market
9    flex.  It's almost like on a mortgage where the syndicate
10   members -- it's like on a mortgage where if you get more --
11   if you get lower points up front, then you have to pay a
12   higher rate on your mortgage.
13   Q    Does Barclays intend to, you know, share all of its
14   commitment fee or all of its fees with the potential
15   syndicate members?
16   A    We wouldn't be able to share all of it because there are
17   just a number of things which that up front fee compensates
18   us for that these other syndicate people didn't do.  That
19   being said, we may or may not choose to share some of it.
20   We'll just have to see how the syndication goes.
21   Q    Would you share all of it?
22   A    No.
23   Q    How likely do you think it is that were the fee to be
24   revealed, the market flex provision would kick in and the
25   rate to the city would be higher?

1    A    I think it's definitely an increased probability.  As to

2    how likely, I'm not sure.

3    Q    Okay.  Fair enough.  When Barclays entered into the

4    agreement with the city, did you have an expectation as to

5    whether the fee would be made public?

6    A    We fully expected that it -- we certainly expected that

7    it would not be made public.

8    Q    And did you do anything -- did you do anything to protect

9    yourself in that regard?

10   A    We did actually.  We put in the commitment letter that

11   the fee letter would remain confidential and that the city

12   would take efforts to have the fee letter be under seal.

13   Q    Had you been told prior to entering into this transaction

14   that, in fact, the fee would be made public, would that have

15   affected your approach to the transaction at all?

16   A    Very much.  We actually -- it would have very much raised

17   the possibility that we would not have chosen to submit a

18   bid.  If we did choose to submit a bid, we would have almost

19   certainly increased the up front fee.

20   Q    Okay.  Now, you've told us about competitive advantages.

21   You've told us about confidentiality.  You explained the

22   potential impact on the city.  Is there anything else, in

23   your view, that -- any other impact that may result from the

24   commitment fee being made public?

25   A    I believe there is actually, and I think that it's a more

1    macro impact.  The corporate DIP financing field is certainly

2    an active one, and it's one where lenders choose to lend to

3    corporate DIP's because they -- there's a history of fees

4    being kept confidential.  This is the first muni post-

5    petition financing.  I hope very much it's the last one in a

6    long time, but if it's not, we certainly want to keep the

7    field open so that if there is a demand for future municipal

8    post-petition financings, that financial institutions will be

9    motivated to bid, and part of their motivation is knowing

10   that their fees will be confidential.

11          MR. SLIFKIN:  Thank you very much.  I have no

12   further questions at this time, your Honor.

13          THE COURT:  All right.  We'll reconvene at 11:40 for

14   cross-examination.

15          THE CLERK:  All rise.  Court is in recess.

16      (Recess at 11:31 a.m., until 11:40 a.m.)

17          THE CLERK:  All rise.  Court is in session.  Please

18   be seated.  Recalling Case Number 13-53846, City of Detroit,

19   Michigan.

20          THE COURT:  Go ahead, sir.

21          MR. SHERWOOD:  Your Honor, Jack Sherwood, for the

22   record, from Lowenstein Sandler, counsel for AFSCME, and I

23   have been asked to try to coordinate our cross-examination.

24          THE COURT:  Okay.  Thank you, sir.

25                      CROSS-EXAMINATION

13-53846-swr   Doc 1347-2   Filed 04/29/13   Entered 04/29/13 21:09:23   Page 94 of
13-53846-swr   Doc 1347-2   Filed 11/27/13   Entered 11/27/13 22:02:45   Page 94 of
558
559                                                                      94

1  BY MR. SHERWOOD:

2  Q   Mr. Saakvitne, is that right?

3  A   Yes.

4  Q   How's that?

5  A   Okay.

6  Q   Let me start by asking about some of the precedent that

7  you talked about on direct.  I think you mentioned the ResCap

8  case and Patriot Coal; correct?

9  A   Yes.  Yes, that's right.

10  Q   And those were two Chapter 11 bankruptcy situations where

11  the fee letters were kept private.  Was that your testimony?

12  A   That's correct.

13  Q   Are you aware that in both of those cases the fee letters

14  were actually filed on the docket of the bankruptcy case with

15  certain terms redacted?

16  A   I wasn't aware of that, but -- so, no, I wasn't aware of

17  that.

18  Q   Okay.  And were you also aware that in both of those

19  cases, the debtor and the DIP lender disclosed the aggregate

20  amount of fees that they were charging in connection with the

21  loan?

22  A   I'm not aware of that.

23  Q   But you are aware that in this case Barclays is not

24  willing to disclose the aggregate amount of its fees and has

25  not done so in connection with this loan?

1    A    That's correct.

2    Q    And are you aware that in the <u>ResCap</u> case before Judge

3    Glenn in the Southern District of New York that Barclays was

4    the DIP lender?

5    A    Yes, I am aware.

6    Q    And did you do any review of the Barclays order or the

7    Barclay -- I'm sorry -- the <u>ResCap</u> order or the <u>ResCap</u> docket

8    in preparation for your testimony today?

9    A    No, I did not.

10   Q    Are you also aware that in both <u>ResCap</u> and <u>Patriot</u>

11   <u>Coal</u> -- now, do you know <u>Patriot Coal</u> was a Southern District

12   of New York case, too; correct?

13   A    I wasn't involved in that, so --

14   Q    Okay.  In both of those cases --

15            THE COURT:  Wasn't venue transferred?

16            MR. SHERWOOD:  Yeah.  That was -- it was Judge --

17   but I think Judge Chapman signed the order, for the record,

18   in <u>Patriot Coal</u>.  There was a famous opinion on venue in that

19   case.

20            THE COURT:  So maybe that was after the DIP

21   financing?

22            MR. SHERWOOD:  I believe so because I -- and just

23   for the record, your Honor, both of the orders that were

24   cited with docket number in the city's brief are available

25   for public consumption.

1  BY MR. SHERWOOD:

2  Q    So in this case, Barclays is not even prepared to

3  disclose its aggregate fees; correct?

4  A    That's correct.

5  Q    And it's certainly not willing to post its fee letter on

6  the Court's docket; correct?

7  A    I believe that's correct.  We're asking that it be under

8  seal, so --

9  Q    Okay.  Are you familiar with the types of fees that were

10  charged by Barclays in the ResCap case?

11  A    No, I'm not.

12  Q    Well, in looking at those, there's reference to a

13  structuring fee, an underwriting fee, a work fee, an agency

14  fee, three types of up front fees, and collateral agency

15  fees.  Do those terms sound familiar to you?

16  A    They do.

17  Q    Now, on direct you talked about getting 50 percent of

18  your fee in this case; correct?

19  A    Paid already, yes.  That's correct.

20  Q    Okay.  You've gotten paid.  Is that the only type of fee

21  that Barclays is getting in connection with this proposed DIP

22  financing?

23  A    The up front fee?  I'm sorry.  Can you -- I don't quite

24  understand your question.  I'm sorry.

25  Q    Well, it's hard because I don't have the fee letter, so

1    I'm just trying to, you know, work off of your testimony, and

2    there was testimony about your -- you having been paid 50

3    percent of a fee.

4    A    There's only one fee of which we've received 50 percent.

5    Is that -- I hope I'm answering your question.

6    Q    Okay.  So without disclosing the terms of the fee letter,

7    are you saying that there is one fee and one fee only that is

8    payable to Barclays in connection with this proposed

9    facility, and you've received half of that?

10   A    That's correct.

11   Q    And is that the only fee that Barclays will be entitled

12   to collect during the entire course of the DIP loan?

13   A    That is correct.

14   Q    Okay.  So there's no -- so is there a difference between

15   a structuring fee and an underwriting fee?

16   A    There --

17   Q    Let me -- what's that fee called?  What are you calling

18   that fee under this deal?

19   A    We're calling that fee the commitment fee.

20   Q    Okay.

21   A    The reality is that it covers a whole number of different

22   tasks and risks, et cetera.  We chose not to subdivide it

23   into four or five separate fees.  We could have, but we just

24   kept it simple and just called it one fee.

25   Q    And in addition to that fee, is Barclays entitled to

1   reimbursement of expenses?

2   A   We are paying bank counsel fee, legal fees out of pocket,

3   out of our own pocket.

4           THE COURT:  Answer the question "yes" or "no."

5           THE WITNESS:  I'm sorry.  Can you repeat the

6   question because I just want to make sure I get it right?

7   BY MR. SHERWOOD:

8   Q   In addition to the commitment fee that we spoke of, is

9   Barclays entitled to reimbursement for its out-of-pocket fees

10  and expenses from the city?

11  A   Yes.

12  Q   Okay.  So the commitment fee that we spoke of does not

13  include reimbursement of out-of-pocket fees and expenses to

14  Barclays; correct?

15  A   Correct.

16  Q   And has a projection been done and delivered to the city

17  of what those out-of-pocket fees and -- let's just say

18  expenses will be?

19  A   No.

20  Q   And those --

21          THE COURT:  Excuse me.  I have to ask what the

22  relevance of this is to whether the fee letter itself should

23  be confidential.

24          MR. SHERWOOD:  I just wanted to get an idea of what

25  the total universe of fees that we're not knowing about might

1   be, and I think I'm pretty much -- I think I've gotten my

2   answer.

3           THE COURT:  Okay.

4   BY MR. SHERWOOD:

5   Q   You'd agree, would you not, that in determining the

6   reasonableness of a financing commitment, that the level of

7   fees being charged is relevant to that determination?

8   A   Yes.

9   Q   And that was certainly considered by the city in its

10  decision of whether or not to choose Barclays as its lender

11  in this case?

12  A   I would assume so.

13  Q   Now, I think you said on direct that in a Chapter 11

14  context, the standing operating procedure is for a DIP lender

15  to not disclose its fees?

16  A   That's my understanding.

17  Q   And that's not based on your experience, though, because

18  I think you testified that you're kind of new to the DIP

19  lending world, and your experience is in the non-bankruptcy

20  municipal finance world; is that right?

21  A   That's right.

22  Q   So that testimony is based on understandings that you got

23  from some of your colleagues at Barclays?  Is that fair to

24  say?

25  A   Yes.  That's right.

1   Q    And are you based in -- where are you based?

2   A    New York.

3   Q    Okay.  And Barclays has substantial experience lending on

4   a DIP basis in the Southern District of New York.  Is that

5   fair to say?

6   A    That's my understanding.

7   Q    Would it surprise you to learn that under the local rules

8   of the Southern District of New York that all pricing and

9   economic terms including fees, commitment fees and any other

10  fees, are required to be disclosed in any DIP financing

11  application?

12  A    That would surprise me.

13       THE COURT:  Is your representation accurate,

14  counsel?

15       MR. SHERWOOD:  Local Rule 4001-2, contents of a DIP

16  motion, added to the provisions set forth in Bankruptcy Rule

17  4001(b)(1)(B) and (c)(1)(B) and (d)(1)(B), Item 3, "pricing

18  and economic terms, including letter of credit fees,

19  commitment fees, any other fees, and the treatment of costs

20  and expenses of the lender, any agent of the lender, and

21  their respective professionals."  I just read from the local

22  rules for the Southern District of New York.

23  BY MR. SHERWOOD:

24  Q    Would you agree that the standard practice for DIP loans

25  in a Chapter 11 context outside of Chapter 9, Chapter 11

1   context, is that the DIP lender must fully disclose all of

2   its fees that it's charging in connection with a loan as part

3   of the application that it files with the Court?

4   A   That's not consistent with what I've been told by my

5   colleagues.

6   Q   Have you learned anything from your colleagues about

7   their experience in dealing with creditors' committees in

8   Chapter 11?

9   A   Yes.

10  Q   And is it your understanding that in a typical Chapter 11

11  case where there is an unsecured creditors' committee and the

12  debtor is looking to get a DIP loan, that the committee and

13  its professionals are very concerned about the fees being

14  paid by the estate in order to secure that DIP loan?

15  A   Yes.

16  Q   And in that situation, is it also commonplace for the

17  debtor to fully disclose all fees, expenses, charges, et

18  cetera, being paid by the debtor as part of that DIP

19  facility?

20          MR. SLIFKIN:  Objection, your Honor.  To whom?

21  Fully disclosed to whom?

22          MR. SHERWOOD:  To the creditors' committee.

23          THE WITNESS:  It's my understanding that Barclays

24  frequently does that for professional eyes.

25          THE COURT:  For professional what?

13-53846-tjt  Doc 4384-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 102 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 102 of
559
102

1      THE WITNESS:  I'm sorry.  Professional eyes only.

2  BY MR. SHERWOOD:

3  Q   Let me ask you about your testimony with respect to your

4  expectation that the terms of the fee letter will remain

5  confidential.  Do you remember that testimony?

6  A   Um-hmm, I do.

7  Q   Okay.  Isn't it true that the commitment letter provides

8  that the confidentiality obligation on the part of the city

9  is qualified in some respects?

10  A   Yes.  We -- yes.

11  Q   Okay.  And one of those qualifications is to the extent

12  required by applicable law.

13  A   Yes.

14  Q   And are you familiar with that language?

15  A   Um-hmm.

16  Q   And another qualifier is as required by the Bankruptcy

17  Court.  Would you agree that that's a qualifier under the

18  commitment letter?

19  A   I would.

20  Q   Okay.  And I think also in the commitment letter there is

21  an agreement by the city to limit its disclosures to the

22  minimum necessary in seeking approval of the transaction;

23  correct?

24  A   Yes.

25  Q   So that is the extent of the committee's commitment to

1    Barclays with respect to confidentiality.  It is to try to

2    limit the disclosures to the minimum necessary in seeking

3    approval of this transaction; true?

4    A    True.

5    Q    Okay.  And to the extent that the Bankruptcy Court or

6    applicable law requires the city to disclose the fee letter,

7    then they did their best, and that's okay; right?  Isn't that

8    the terms of the deal?

9    A    That's the terms of the deal.

10   Q    So to the extent that applicable law or a Bankruptcy

11   Court requires disclosure, it's not like the financing is

12   going away.

13   A    Correct.

14   Q    Fair?

15   A    Correct.

16   Q    Now, in terms of syndication, I believe the commitment

17   letter says that Barclays reserves the right to do a

18   syndication after the deal is approved.  Fair?

19   A    That's correct.

20   Q    So Barclays is not obligated to try to syndicate this

21   loan; true?

22   A    Correct.

23   Q    Now, I know you testified that it's your intention, but

24   it's certainly not Barclays' obligation.  And if the

25   syndication fails, Barclays is still committed; true?

13-53846-swr  Doc 1870-2  Filed 04/29/13  Entered 04/29/13 22:00:25  Page 104 of
104
13-53846-tjt  Doc 13870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 104 of
559

1  A    That's correct.

2  Q    In paragraph 1 of the commitment letter, Barclays is

3  described as the sole lead arranger, sole bookrunner, sole

4  syndication agent.  Those terms mean anything --

5  A    Yes.

6  Q    -- to you?  Yes?

7  A    Yes.

8  Q    What is all that?  Can you just give one sentence on what

9  a sole lead arranger is, a sole bookrunner, a sole

10  syndication agent?

11  A    Sure.  The sole lead arranger basically means we

12  structure the deal ourselves.  The sole bookrunner sort of

13  ties in with sole syndication agent meaning that we're the

14  one who will go out and find other lenders for the deal, and

15  the sole underwriter means that we're the sole entity who

16  says at the time of the commitment letter, we will write you

17  a check for $350 million regardless of whether or not we're

18  successful on the syndication.

19  Q    And all of Barclays' roles -- they don't get separate

20  fees for each role.  They're all -- all those roles are

21  satisfied by the one fee; right?

22  A    That's correct.

23  Q    Okay.  So, now, Barclays -- you were competing with, say,

24  15 other potential DIP lenders in this transaction; isn't

25  that right?

1  A   That's what the press has said, that there were a total
2  of 16 submissions.
3  Q   Okay.  So you knew when you were making your submission
4  to the city that the city was comparing your terms and
5  conditions with many others.
6  A   We expected that to be the case.
7  Q   And you expected that your fees, right, your fee letter
8  would be compared with the fee letters of these many other --
9  A   Yes.
10  Q   -- prospective lenders?  And you knew during this process
11  that the city was looking for the best terms of pricing;
12  right?
13  A   That was our expectation.
14  Q   And pricing in this context is sort of a combination of
15  interest rate and fees; right?
16  A   Yes.  That's correct.
17  Q   Is there anything else that would be included in pricing
18  of a loan of this type?
19  A   Not really in pricing.  I was just going to say there
20  could be other terms that the city might take into account.
21  Q   Nonfinancial terms.
22  A   Correct.
23  Q   Okay.  So -- but in terms of the financial terms, the key
24  ones are interest rate and fees --
25  A   Correct.  That's right.

1  Q  -- right?  So if the fees are really high but the

2  interest rate is low, that doesn't necessarily mean that, you

3  know, the pricing is good?

4  A  That's right.

5  Q  Okay.  Now, in the DIP loan application that the city

6  filed, interest is disclosed at LIBOR plus 250 basis points

7  or three and a half percent.  Are you familiar with that

8  disclosure by the city in the motion?

9  A  Yes.

10  Q  And that sounds right to you; right?

11  A  Yes.

12  Q  Now, and Barclays has committed to provide a loan at that

13  interest rate, have they not?

14  A  Subject to the market flex.

15  Q  Subject to the market flex.  Okay.  So I want to kind of

16  understand that.  Well, let me just -- in the motion the city

17  says if the market flex provisions are exercised, the pricing

18  on the DIP will still be below what is typical for a DIP

19  financing.  Do you agree with that statement?

20  A  DIP financings can be priced all over the place depending

21  on the situation, so I'm not sure by what standard they're

22  comparing that against.

23  Q  Okay.  I'm just representing to you that that was said by

24  the city's investment banker, Miller Buckfire, in paragraph

25  10 of his declaration.  I want to know whether you agree or

1  disagree with that.

2  A    It's hard to agree or disagree.

3  Q    Okay.

4  A    It's not --

5  Q    So does the -- so the market flex term of the -- is that

6  contained in the fee letter?

7  A    That's right.

8  Q    And it's nowhere else in the loan documents, to your

9  knowledge?

10  A    That's correct.

11  Q    Okay.  And this term gives Barclays the right to raise

12  the interest a little bit?

13  A    That's correct.

14  Q    And --

15        MR. SLIFKIN:  Your Honor, I just want to -- I'm sure

16  you're aware of this, but we're getting pretty close to

17  disclosing the -- asking to disclose the information that is

18  sub judice.

19        MR. SHERWOOD:  I think the Court asked that

20  question, and I understand that you're not going to give me

21  the level of flexibility --

22        THE COURT:  I permitted the question because the

23  phrase "a little bit" is so vague as to be meaningless.

24        MR. SLIFKIN:  Thank you, your Honor.

25  BY MR. SHERWOOD:

13-53846-swr  Doc 4318-2  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 108 of
108
13-53846-tjt  Doc 13870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 40 of
553

1  Q   So I guess what -- just to summarize what we can
2  understand now, you know, based on not seeing the fee letter
3  or the -- or understanding the market flex provision, at this
4  point Barclays has made a commitment to make a loan to the
5  city for -- at a rate of three and a half percent with sort
6  of this caveat that that three and a half percent might be
7  bumped up a bit if this market flex provision has to kick in.
8  Is that fair?
9  A   That's fair.
10 Q   And do you consider it confidential to -- or does the
11 market -- does the fee letter contain provisions that say
12 when the market flex provision is going to kick in?
13         MR. SLIFKIN:  Your Honor, can I ask that to be
14 answered "yes" or "no"?
15         MR. SHERWOOD:  That's all I was looking for, your
16 Honor.
17         THE WITNESS:  Yes, it does.
18 BY MR. SHERWOOD:
19 Q   Okay.  I just want to understand what the moving parts
20 are on the market flex provision, and I think -- I'm assuming
21 that it's -- you know, when it kicks in and then if it kicks
22 in, how much.  Yes?
23 A   Yes.
24 Q   Now, you'd agree that to the extent that Barclays cannot
25 syndicate this loan, Barclays is still on the hook for the

entire amount of the DIP loan.

A Yes.

Q And in terms of -- in terms of Barclays' desire to keep these terms confidential, is it fair to say that you want to do this so that you have an advantage in your negotiations with the potential parties that you're negotiating with on the syndication?

A We want to do it to give the city the lowest possible interest rate so that, therefore, it's the city's advantage relative to the parties who are negotiating. It's really between the -- it's ultimately between the city and the lenders, not between Barclays and the lenders.

Q Well, it's also in Barclays' favor because to the extent that Barclays does not have to give away some of its fees in connection with this case to someone else in the syndication, Barclays gets to keep those. It's not going to give them back to the city, is it?

A No, we won't.

Q Okay. So it is in Barclays' advantage to not have the potential syndicate lenders know what Barclays is getting in terms of the gross fee in this case; true?

A I'm not sure I do agree just because there's only a certain amount of the fee that we would be able to -- or willing to choose to give up without being fairly compensated for what we have provided to date and that, therefore,

1  anything beyond that would really -- would be more likely to

2  tie into the market flex than the interest rate.

3  Q   All right.  But let's say that I'm a prospective

4  syndicator and I'm going to buy half of this loan, and I know

5  that you have "X" amount of dollars over and above your cost

6  that you've -- you're obviously not going to give away to

7  play with.  I'm going to say give me half of that.  I mean

8  that would be my position because I know what you have in

9  terms of excess.  I know what your profit is for the

10 commitment.

11 A   Well, but you wouldn't know what our costs were out of

12 the up front fee.  It would be a random choice on your side

13 as to how much of that is appropriate for Barclays to keep

14 and how much should be shared in the syndication.  There's no

15 formula for that.

16 Q   Does the fee letter distinguish between -- does the fee

17 letter -- and you can answer this "yes" or "no," and I'll

18 give you guys a chance to object, but does the fee letter --

19 if I read the fee letter right, would I be able to determine

20 how much Barclays' actual costs were by just reading that fee

21 letter?

22 A   No.

23 Q   I think you said something about -- on direct about in

24 the municipal finance context that fees are routinely not

25 disclosed.  Is that fair to say?

1  A    Bank fees --

2  Q    Bank fees.

3  A    -- are routinely not disclosed whether it be for a loan

4  or a letter of credit enhancing municipal bonds, et cetera.

5  Q    Are fees of lenders who do business with a city or a

6  state or county -- are those fees disclosed in any contexts?

7  A    Not typically.

8  Q    Can they be learned through like Freedom of Information

9  Act?  If I went to -- filed a Freedom of Information Act

10  request, could I be able to learn how much my city or town or

11  state is paying to its lenders on bond issuances and so

12  forth?

13  A    I'm just not sure.  I don't know enough about the Freedom

14  of Information Act.

15  Q    Do you know what MSRB is?

16  A    Absolutely, yes.  I think I referenced it in my

17  testimony.

18  Q    I think you did, too.  Can you just tell me what that

19  means, what that acronym stands for?

20  A    Oh, sure.  It's the Municipal Securities Rulemaking

21  Board.

22  Q    Okay.  And is it your testimony that that board prohibits

23  the disclosure of underwriting fees?

24  A    No.  I don't think that's what I said.  I think what I

25  said was that -- first of all, was that they permit that the

 1  fees paid to banks for credit facilities do not have to be
 2  disclosed so that, therefore, on their website, which is the
 3  EMMA website, we'll post a letter of credit.  We'll post
 4  reimbursement agreement, standby bond purchase agreement, but
 5  we'll have the fees in a separate fee letter, and that is not
 6  posted.
 7  Q    Okay.  It says they don't have to be disclosed.  It
 8  doesn't mean that they're never disclosed.
 9  A    Correct.
10  Q    You also testified, I think, at the end that it was your
11  expectation that this fee letter would be kept private and
12  that had you known that the fee letter would be public, you
13  would have made the fee higher.
14  A    Um-hmm.
15  Q    Does that sound right?
16  A    That is right.
17  Q    But you gave that testimony knowing that the commitment
18  letter provides that at the end of the day, it is applicable
19  law or the bankruptcy judge that is going to decide whether
20  or not this fee letter gets disclosed; right?
21  A    That's right.
22  Q    Just one more thing going back to the discussions.  You
23  negotiated this with Miller Buckfire; right?
24  A    Um-hmm.
25  Q    During the course of --

 1   A    I'm sorry.  I'm sorry.

 2             THE COURT:  Is your answer "yes"?

 3             THE WITNESS:  Yes.  I'm sorry.

 4   BY MR. SHERWOOD:

 5   Q    During the course of your discussions with Miller

 6   Buckfire, was there any back and forth with respect to

 7   particular terms concerning the Barclays commitment?

 8   A    Yes, there were.

 9   Q    Okay.  So it wasn't as though you made a commitment and

10   that was the end of the discussion?

11   A    That's correct.

12   Q    And while you were having that back and forth with Miller

13   Buckfire, was it your understanding that Miller Buckfire was

14   talking to other potential lenders and having similar

15   conversations?

16   A    It was our assumption but not our understanding.

17   Q    And just one last question, and then I'm going to have to

18   consult with my colleagues over here to see if I'm really

19   done, but in terms of the market flex and the possibility

20   that if that kicks in the interest rate may rise, you don't

21   know for certain whether or not that market flex will kick in

22   if the fee letter is made public, do you?

23   A    We don't know for certain.

24   Q    Thank you.

25             MR. SHERWOOD:  Can I have one second, your Honor?

13-53846-tjr  Doc 4318-2  Filed 04/29/14  Entered 04/29/14 22:00:35  Page 46 of
559
13-53846-swr  Doc 3870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 46 of   114

1        THE COURT:  Yes, yes.  Take your time.

2        MR. SHERWOOD:  Let me just consult with the team

3   over here.

4        THE COURT:  Take your time.

5   BY MR. SHERWOOD:

6   Q   I'm going to ask a question, but before I do, I want --

7   this is -- this relates to the market flex and its relation

8   to the total amount of the fee being charged by Barclays

9   under the DIP loan.  And this is just a "yes" or "no"

10  question, and, you know, I'm just giving counsel a heads-up.

11  Has Barclays done an analysis which compares the percentage

12  of the market flex as compared to the total commitment fee?

13  "Yes" or "no"?

14  A   No.

15       MR. SHERWOOD:  I do have -- your Honor, before I sit

16  down, I would like to move to strike the testimony of this

17  witness as it relates to DIP financing as he's got no

18  personal knowledge or experience in this area.  He did

19  testify that it was his understanding that nondisclosure was

20  the rule in Chapter 11 DIP financings.  I think that's wrong

21  for a lot of reasons, but I also think that it's certainly

22  not something that this witness is --

23       THE COURT:  Well, does your motion to strike include

24  the testimony he gave in response to your questions, of which

25  there were several?

1      MR. SHERWOOD:  Well, I don't know which questions

2  you're talking about.  I mean I asked -- I asked --

3      THE COURT:  The questions you asked him about his

4  knowledge of DIP financing, of which there were several.

5  Does your motion include that or not?

6      MR. SHERWOOD:  Can I consult before answering that?

7      THE COURT:  Of course.

8      MR. SHERWOOD:  Your Honor, I think the consensus is

9  to withdraw the motion.  I think we've impeached the witness

10  on that issue, and --

11      THE COURT:  All right.

12      MR. SHERWOOD:  -- we'll argue that later.

13      THE COURT:  All right.

14      MR. SHERWOOD:  Thank you, sir.

15      THE COURT:  Redirect.

16      MR. SLIFKIN:  If I may stand here, I'll be very

17  brief, your Honor.

18      THE COURT:  Oh, no.  Stand at the lectern for me,

19  please.

20      MR. SLIFKIN:  Certainly.

21                    REDIRECT EXAMINATION

22  BY MR. SLIFKIN:

23  Q   You were asked on cross-examination whether you knew for

24  certain that disclosure of the fee letter would lead to the

25  triggering of the market flex.  Do you recall that?

13-53846-tjt  Doc 4384-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 48 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 48 of
558
553      116

1  A    I do.

2  Q    Okay.  And you said you don't know for certain.  Do you

3  recall that?

4  A    Correct, yes.

5  Q    Okay.  In your view, however, how likely is it that the

6  market flex would be triggered under those circumstances?

7  A    I think it's very likely just given the motivation of the

8  people -- the investors in this loan, lenders.  Their

9  motivation is to make as much money as possible.

10      MR. SLIFKIN:  Thank you very much.  I have nothing

11  further, your Honor.

12      THE COURT:  I have a question for you, sir.  Why is

13  it that the commitment fee would have been higher, as you

14  testified, if you had known in advance that the fee letter

15  would have been made public?

16      THE WITNESS:  The thinking behind that, your Honor,

17  is that recognizing that the investors to whom we syndicate

18  the loan, the other banks, et cetera, are likely to try to

19  get a piece of that once they know what it is, then we would

20  have had to price that in better in terms of putting that.

21  The other thing is -- if you don't mind my continuing for one

22  second, is that had it been -- had we known this would be

23  disclosed, we probably would have had to split the fee, you

24  know.  He mentioned, you know, the underwriting fee, the

25  admin fee, the syndication fee, et cetera, and to parse it

1   out more specifically because that would have at least put us

2   in a better position.

3          THE COURT:  Um-hmm.  Does the fee letter provide

4   for -- start over.  Do any of your agreements with the debtor

5   provide for a higher commitment fee in this case should the

6   Court deny this motion?

7          THE WITNESS:  No.  None of them do.

8          THE COURT:  Did you request of the city that your --

9   that any fee letter that is eventually agreed to be made the

10   subject of a confidentiality order before you made a bid or

11   as a condition of the bid?

12          THE WITNESS:  No, we did not.

13          THE COURT:  Did you consider doing that?

14          THE WITNESS:  No, I don't think we did.

15          THE COURT:  Are you feeling now like maybe that

16   would have been a good idea?

17          THE WITNESS:  In all honesty, I mean --

18          THE COURT:  Of course, in all honesty.

19          THE WITNESS:  In all --

20          THE COURT:  You took an oath.

21          THE WITNESS:  I'm sorry, but it's very important to

22   us to -- this may sound -- it's very important to us to be

23   there to help the city.  I don't think that even if this had

24   been made public -- I'm sorry if that sounds --

25          THE COURT:  Well, hold on.

1          THE WITNESS:  Okay.

2          THE COURT:  What's very important to you is to make

3     money.

4          THE WITNESS:  Yes, but I don't think that we

5     necessarily would have chosen to put in a provision that said

6     if the Court ruled one way that we would walk away from our

7     commitment.

8          THE COURT:  Is it fair to say that the thrust of

9     your commercial interest -- Barclays' commercial interest in

10    maintaining the confidentiality of the fee letter is that if

11    competitors see it, they will use that to their advantage in,

12    what, future deals?

13         THE WITNESS:  That's right.

14         THE COURT:  And by that you mean undercut your fee

15    structure?

16         THE WITNESS:  Yes.

17         THE COURT:  Of course, that would be good for your

18    customers, wouldn't it?

19         THE WITNESS:  They could end up with a lower cost,

20    yes.

21         THE COURT:  So heaven forbid there should be any

22    future Detroits, but if there are, making this letter public

23    would help them, wouldn't it?

24         THE WITNESS:  Not necessarily, your Honor.

25         THE COURT:  Okay.  Why not?

13-53846-tjr  Doc 13870-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 59 of
13-53846-swr  Doc 3870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 59 of   119
553

1      THE WITNESS:  Because right now the standard, as I

2  had been -- as I believed in DIP's, is that there's not

3  public disclosure of fees.  There may be disclosure to

4  committees, et cetera.  The concern is that if -- going

5  forward on a municipal DIP that if all fees are going to be

6  made public, that may put a real chill in the market and

7  disincent lenders from being willing to show their pricing

8  model.

9      THE COURT:  Um-hmm.  So much for being willing to

10  help the city, huh?  All right.  Any more questions for the

11  witness?  Sir, you may step down.  Thank you.

12      (Witness excused at 12:24 p.m.)

13      MR. HAMILTON:  Good afternoon, your Honor.  Robert

14  Hamilton of Jones Day on behalf of the City of Detroit.  We

15  have one witness to call, Mr. Doak, from Miller Buckfire.  I

16  expect his testimony to be very brief.  I would suggest we go

17  ahead and get it taken care of now.

18      THE COURT:  Yes, please.

19      MR. HAMILTON:  Call Mr. James Doak.

20          JAMES DOAK, DEBTOR'S WITNESS, SWORN

21      THE COURT:  All right.  Please sit down.

22              DIRECT EXAMINATION

23  BY MR. HAMILTON:

24  Q   Could you state your name for the record, sir?

25  A   James Leland Doak.

13-53846-tjt  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 82 of
120
13-53846-swr  Doc 1340-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 82 of
558

1    Q   Mr. Doak, where are you employed?

2    A   I am employed at Miller Buckfire & Co., a Stifel Company.

3    Q   How long have you --

4         THE COURT:  Would you spell -- I'm sorry.  Would you

5  spell your last name for us?

6         THE WITNESS:  Sure.  D-o-a-k.

7         THE COURT:  Go ahead, sir.

8  BY MR. HAMILTON:

9    Q   And how long have you been at Miller Buckfire?

10    A   I've been with Miller Buckfire and its predecessor firms

11  for about 13 years.

12    Q   And what is your current position at Miller Buckfire?

13    A   I'm a managing director at Miller Buckfire.

14    Q   And during the course of your career at Miller Buckfire,

15  what has been the nature of your work?

16    A   I represent companies and other issuers of debt as well

17  as their stakeholders around distressed financial situations

18  assisting them with a variety of investment banker-related

19  tasks, asset sales, refinancings, financings, restructurings,

20  and then also advising stakeholders and potential buyers and

21  lenders in those situations as well.

22    Q   And in the course of doing those services, have you had

23  the occasion to run a process to solicit financing and other

24  capital in restructurings?

25    A   Yes, I have.  Most situations that we become involved in

1  at some point have a solicitation process for capital.

2  Sometimes that takes the form more of a sale process, and

3  sometimes that takes a solicitation of an equity or debt

4  financing process.

5  Q   And before you joined Miller Buckfire, where did you

6  work?

7  A   Before Miller Buckfire, I -- and its predecessors, I was

8  an investment banking analyst at Goldman Sachs.

9  Q   And just briefly, did you -- where did you get your

10  educational degrees from and when?

11  A   Sure.  I have a JD from Harvard Law School in 2000.  I

12  also have a masters in business administration from Harvard

13  also granted in 2000, and my undergraduate is -- was from

14  Harvard College, an AB, and that was in 1994.

15  Q   Were you involved in the process of obtaining proposals

16  for post-petition financing for the City of Detroit here?

17  A   Yes, I was.

18  Q   What was your role in that process?

19  A   I was intimately involved in all aspects of the process

20  for my client, the City of Detroit.  Going from the starting

21  point of figuring out what the solicitation process would

22  look like, determining who the contacted parties would be,

23  contacting those parties, explaining to them the solicitation

24  process, receiving indications of interest, proceeding with

25  due diligence questions that the various parties and their

13-53846-swr  Doc 4311-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 82 of 122
13-53846-tjt  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 54 of
553

1   advisors had, receipt of proposals, a determination of which

2   parties would proceed forward in the process, creation of

3   subsequent requests for definitive proposals, receipt of

4   those proposals, and evaluation of how then we should spend

5   our time in getting to the final proposal, which was the

6   Barclays proposal.

7   Q   And were you involved in the negotiations with Barclay of

8   the financing proposal that is the subject of our underlying

9   motion here?

10   A   Yes, I was.

11   Q   Would it be fair to characterize your role as the lead

12   negotiator for the City of Detroit in connection with the

13   negotiations with Barclays?

14   A   I would say I was one of the negotiators.  I'm on the

15   finance and businessing structure side.  The city had other

16   parties involved.

17   Q   Okay.  Are you familiar with the concept that's been

18   discussed today of market flex in these type of financing

19   facilities?

20   A   Yes, I am.

21   Q   Why is the concept -- or why is the provision of market

22   flex provisions in such financing facilities important, in

23   your judgment?

24   A   Um-hmm.  Well, market flex is a critical component of a

25   proposal that comes in a fully underwritten deal that allows

 1   a would-be financing party to put the best possible terms in

 2   front of the issuer or borrower and at the same time allow

 3   the parties to allocate the risk associated with the

 4   syndication process.  If we didn't have market flex, then

 5   would-be underwriters would be forced to assume or would be

 6   pressured to assume a -- you know, worser possible scenarios

 7   in coming up with financing, and also to the extent that they

 8   assume better proposals, the parties would not know exactly

 9   how best to manipulate the process or negotiate with other

10   parties in the syndication process, so it's an important give

11   and take that gives the issuer the opportunity to achieve the

12   best possible financing while at the same time having the

13   confidence that the proceeds can be raised.

14   Q    In your experience, are market flex provisions usually

15   kept confidential?

16   A    Yes.  In -- yes.

17   Q    Why is that?

18   A    Market flex provisions and their nature, how exactly they

19   will come into effect, which particular terms they relate to,

20   noneconomic and economic, are kept confidential because it

21   allows the underwriter and the arranger as much flexibility

22   as possible to derive the lowest possible cost of financing

23   for the issuer while at the same time achieving their

24   syndication goals.  If we just posted on the billboard, you

25   know, what the terms were, then you start the dialogue with

13-53846-tjt  Doc 4318-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 124 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 56 of
559
103  124

1  would-be investors at the high part of the range rather than

2  what the announced financing would be.

3  Q   All right.  So are you familiar with the market flex

4  provisions that are contained in the fee letter in this case

5  with Barclays?

6  A   Yes, I am.

7  Q   Were you involved in negotiating those provisions?

8  A   Yes.

9  Q   If those provisions, the market flex provisions, in the

10  fee letter were disclosed to the general public in this case,

11  would that have the potential for adverse economic

12  consequences for the City of Detroit?

13  A   Yes, it would.

14  Q   Could you explain why?

15  A   It would have the potential for negative economic

16  consequences because the provisions relate to, amongst other

17  terms, the factors of the interest rate that the city will

18  have to pay as it goes forward in this financing process, and

19  if those terms are publicly announced, then Barclays will

20  have to go to market and be discussing with would-be

21  investors, you know, how much off the max they'll, you know,

22  have to be in order to achieve their syndication goals rather

23  than what would be best for the city, which is starting with

24  the announced price and determining what they need to do to

25  achieve their syndication goals.

1  Q   During the negotiations with Barclays, did Barclays take

2  a position as to whether or not the contents of the fee

3  letter should remain confidential?

4  A   Yes.

5  Q   What was their position?

6  A   Their position was that the provisions of the fee letter

7  in its entirety should remain confidential.

8  Q   During those negotiations, did the parties discuss what

9  would happen if the Bankruptcy Court were to require the

10 submission of the fee letter as part of its adjudication of

11 the financing motion?

12       MR. SHERWOOD:  Objection.  It's irrelevant.  It's

13 dealt with in the commitment letter.  There are no

14 consequences.

15       MR. HAMILTON:  Well, that's where I was going, your

16 Honor.

17       THE COURT:  All right.  You may go there.

18       THE WITNESS:  Well, we -- the commitment letter says

19 what it says, and --

20 BY MR. HAMILTON:

21 Q   What does it say that the City of Detroit is required to

22 do if the Bankruptcy Court wants to see the fee letter?

23 A   Well, we -- pursuant to the exclusions to the

24 confidentiality provisions, we would present the fee letter

25 to the Bankruptcy Court.  These provisions, in my experience,

1  are sometimes, you know, provided to a smaller set of people

2  than the entire world.

3  Q   Does the -- those provisions in the commitment letter

4  that require the fee letter to be submitted to the Court

5  confidentially, do they require the City of Detroit to file a

6  motion to have the fee letter submitted under seal?

7  A   Yes, they do.

8  Q   All right.  And has the city complied with that

9  obligation in the commitment letter?

10  A   Yes, the city has.

11         MR. HAMILTON:  I have no further questions, your

12  Honor.

13         THE COURT:  Thank you, sir.  Are you going to be

14  proceeding with the cross-examination, and would you like a

15  few minutes?

16         MR. SHERWOOD:  It's up to the Court, your Honor.  If

17  you want to get this done, I'm prepared to go forward.  If

18  you want to take a break, then --

19         THE COURT:  All right.  Let me ask you to do that

20  then.

21         MR. SHERWOOD:  Could I have a few minutes?

22                    CROSS-EXAMINATION

23  BY MR. SHERWOOD:

24  Q   Mr. Doak, is that --

25  A   Yes.

13-53846-tjr  Doc 4318-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 127 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 50 of
559
103                                                           127

1  Q   The city and Barclays will be asking the Bankruptcy Court

2  to enter an order approving this financing; is that right?

3  A   Yes.

4  Q   And as part of that order, it will ask the Court to make

5  a finding that the city and Barclays were dealing in good

6  faith and at arm's length; correct?

7  A   I haven't read the order.

8  Q   Okay.  In your experience, is it kind of important to a

9  DIP lender that it be considered a good faith lender?

10  A   Yes.

11  Q   Okay.  You were here for the prior examination, and I

12  quoted from your declaration where you said that you were of

13  the belief that even if the market flex provisions are fully

14  exercised, the pricing of this post-petition financing would

15  still be below what is typical for a post-petition bankruptcy

16  financing.  Do you remember writing that in your declaration?

17  A   Yes.

18  Q   And is that still your testimony?

19  A   Yes.

20  Q   In your work at Miller Buckfire, I assume you do work --

21  you've done a lot of DIP financings.  Do you guys normally

22  work for the borrower, the debtor?

23  A   Most often we work for the borrower.

24  Q   Okay.  And when you're analyzing potential DIP loans in a

25  Chapter 11 context, don't you have access to public

1  information that sets forth terms and conditions of DIP loans

2  in other big cases?

3  A    Yes.

4  Q    And in the performance of your duty as an investment

5  banker for the city, you routinely refer to these databases

6  to see what the marketplace is doing; correct?

7  A    Yes.

8  Q    And you'd agree, would you not, that in a typical Chapter

9  11 case, it's pretty common for the debtor to have to

10  disclose what the fees are that it's going to pay in

11  connection with its proposed DIP loan, would you not?

12  A    The economics of the loan are there's elements that are

13  frequently disclosed and there's elements that are held back,

14  held under seal, provided only to professionals.  It depends

15  on the situation.

16  Q    But you'd agree that the situations where information is

17  held back, that's the exception.  That's not the norm.

18  A    It would depend on which particular economics you're

19  talking about as in the typical -- because in the typical

20  Chapter 11 setting, the debtor needs court approval to pay

21  the commitment fee, that commitment fee is normally

22  disclosed.

23  Q    And would you agree that the standard practice in the

24  Southern District of New York, for example, is to disclose

25  all types of fees that are being paid by the debtor in

1  connection with the loan?

2  A    I don't have sufficient -- I have not sufficiently

3  reviewed Southern District, you know, recent cases to make

4  that statement.

5  Q    But generally you would counsel one of your borrowers to

6  comply with the rules of that court when it was filing an

7  application for financing in that court; right?

8  A    I'm the finance guy, not the legal guy.

9  Q    Okay.  During the course of your negotiations with

10  Barclays and the 15 other potential lenders, is it fair to

11  say that each of the other 15 potential lenders disclosed to

12  you the full terms and conditions, including fees and market

13  flex, with respect to their loans?

14  A    No.

15  Q    Okay.  How did you know what the other 15 were proposing?

16  A    The 16 total proposals that we received on our original

17  deadline arrived in a variety of formats, and some were

18  commitments for a portion of the facility.  Some were

19  commitments for the entire facility.  So some had enough

20  definition so that we could answer that question, and some

21  did not.

22  Q    Okay.  But at least some of them disclosed what the fees

23  were that they were going to charge together with the

24  interest rate?

25  A    Yes.

13-53846-tjt  Doc 43842  Filed 04/29/14  Entered 04/29/14 22:00:35  Page 132 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 82 of  130
559
130

1   Q   So you -- so I think you talked about pricing, and I

2   think we talked about pricing.  Pricing includes a

3   combination of the fee and the interest rate; correct?

4   A   In various components, and then there's other terms of

5   the financing you have to take into account, yes.

6   Q   And from your perspective, as the investment banker for

7   the city, it was important for you to know which of -- what

8   the pricing terms were with respect to this loan; correct?

9   A   Yes.

10  Q   And in your experience in Chapter 11 when you're

11  representing a borrower, isn't it commonplace for a

12  creditors' committee to investigate pricing of a DIP loan?

13  A   Yes.

14  Q   And as debtor's professional in the Chapter 11 context,

15  you give that information to the committee's counsel and its

16  financial advisors; right?

17  A   In many contexts, yes.

18  Q   In the other proposals that you considered other than

19  Barclays, did those proposals include commitment fees as well

20  as reimbursement of professional fees and expenses?

21  A   Yes.

22  Q   And did any of the other proposals provide any type of

23  estimates or caps with respect to the professional fees and

24  expenses that would be charged against the loan over and

25  above the commitment fee?

1    A    I don't recall any caps.

2    Q    In terms of the market flex, would it be possible for

3    Barclays to give up some of its commitment fee to people in

4    the syndicate or as part of the syndication -- would it be

5    possible for Barclays to give up some of its commitment fee

6    as opposed to getting someone in the syndicate to raise the

7    interest rate?

8    A    Could you try that again?  Could you --

9    Q    So if Barclays goes out to a potential financial party

10   that it wants to join the syndication and that potential

11   financial party says, "I'm not willing to do it at this

12   interest rate.  I want more money from the city," can

13   Barclays, in turn, say, "In lieu of that, I'll give you

14   some -- an up front fee"?  Is that hypothetically possible?

15   A    That is possible, yes.

16   Q    Does that happen?

17   A    Yes.  In my experience, a syndication process typically

18   has a number of different terms in play, and that's one of

19   the reasons why, you know, firms like Barclays and others are

20   great at what they do.  They are able to manage those

21   competing interests of various parties to achieve the best

22   overall results for their clients.

23   Q    And you would agree generally that in addition to the

24   objective of trying to save the city from this market flex

25   possibility on the interest, one of the objectives here in

13-53846-tjt   Doc 4318-2   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 82 of
132
13-53846-swr   Doc 1870-2   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 84 of
559

1  keeping this fee letter confidential is so that Barclays can

2  make more money; isn't that right?

3  A   Well, it's not my objective.  It's not the city's

4  objective.

5  Q   No.  I understand that.

6  A   The city's objective is to --

7  Q   But from --

8  A   -- achieve the lowest overall cost of financing.

9  Q   No, but from Barclays' perspective, it's so it can make

10  money in its negotiations with potential parties to the

11  syndication.

12        MR. HAMILTON:  Object.  Argumentative.  Wrong

13  witness.

14        THE COURT:  If the witness knows, he can testify.

15  Can you answer that question?

16        THE WITNESS:  I mean Barclays is providing this.  I

17  can't speak to what's going to happen at Barclays if they are

18  in a position where they are not achieving their syndication

19  thresholds and they are going to have to make a determination

20  as to how they are going to deploy the various provisions of

21  the flex as well as their commitment fee as well as thinking

22  about their cost of capital in determining where they want to

23  get to on selling down the commitment.

24  BY MR. SHERWOOD:

25  Q   Are you saying that Barclays can raise its commitment

1   fee?

2   A    No.

3   Q    So their commitment fee is fixed today; right?

4   A    Yes, it is.

5   Q    And the only thing that isn't fixed arguably is the

6   interest rate?

7   A    On pricing there's an -- elements of the interest rate,

8   that provision, that remain open.

9            MR. SHERWOOD:  Let me have a moment, your Honor.  I

10  think I'm --

11           THE COURT:  Yes, sir.

12           THE WITNESS:  Thank you.

13           MR. SHERWOOD:  Thank you, your Honor.

14           THE COURT:  Any redirect?

15           MR. SHERWOOD:  I have no further questions.

16           MR. HAMILTON:  No redirect, your Honor.

17           THE COURT:  Sir, you may step down.  Thank you for

18  your testimony.

19       (Witness excused at 12:47 p.m.)

20           THE COURT:  No further witnesses for the city or

21  Barclays?

22           MR. HAMILTON:  No, your Honor.  We rest on the

23  evidentiary presentation.

24           THE COURT:  Any witnesses for any of the objecting

25  parties?  Closing arguments, please.

13-53846-tjr  Doc 4318-2  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 134 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 86 of
559
134

 1          MR. HAMILTON:  Your Honor, the City of Detroit would

 2    waive a closing and reserve time for rebuttal.

 3          THE COURT:  Okay.  And for this I'll let any of the

 4    objecting parties argue.

 5                        CLOSING ARGUMENT

 6          MR. JAMES:  Good afternoon, your Honor.  Again, for

 7    the record my name is Mark James.  I'm here on behalf of --

 8    well, FGIC we call it, your Honor.  That's Financial Guaranty

 9    Insurance Company.

10          Your Honor, I know the Court has had a chance to

11    review our paper, and as you've derived from our paper, all

12    we're asking for is for the confidential disclosure of the

13    fee letter and the engagement letter to FGIC and to its

14    professionals, including counsel and its financial advisors,

15    so they can analyze the pricing contained in those documents

16    in respect to the overall proposed DIP facility.  FGIC is not

17    going to and agrees to not disclose this to its insureds, to

18    any of the parties, to the general public.  It's not going to

19    post this on its website.  It's going to keep this

20    confidential.

21          THE COURT:  Well, but what are you going to do if

22    you find grounds to object to the terms in the fee letter?

23          MR. JAMES:  Your Honor, then we would seek to file

24    our objections under seal so that those objections are not

25    known to the general public.  We will do what we can to

13-53846-tjt  Doc 4318-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 35 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 35 of  135
553

 1    protect this information that's disclosed in the letters.

 2    We'll do the same thing the city is doing right now, your

 3    Honor.  We will do what we can and what the Court allows to

 4    prevent the general dissemination of this information.

 5          Your Honor, we have asked for this obviously before

 6    the motion was heard.  We did receive a document very late

 7    last night seeking to deal with this issue, a proposed

 8    confidentiality agreement, that, frankly, was so one-sided

 9    that it made serious consideration impossible.  We received

10    this at about 11:34 last evening, your Honor.

11          I believe the Court has the ability to fashion the

12    relief that FGIC is asking for pursuant to Section 105(a) of

13    the Code, your Honor.

14          THE COURT:  What do I do --

15          MR. JAMES:  I don't --

16          THE COURT:  What do I do about what appears to be

17    plain language in Section 107(b), "the bankruptcy court shall

18    protect any entity with respect to a trade secret or

19    confidential research, development, or commercial

20    information"?

21          MR. JAMES:  Your Honor, I think that the -- just

22    limited to FGIC, your Honor, I think the relief that we're

23    seeking is not incompatible with 107(b).  That says that the

24    Court has an obligation to protect.  We're not asking for

25    wholesale general dissemination of this information.  We're

13-53846-tjt  Doc 4318-2  Filed 04/29/13  Entered 04/29/13 22:00:25  Page 38 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 38 of  136
559
552

 1   asking, as Mr. Doak had stated, for very limited disclosure

 2   to professionals, to FGIC, to its financial advisors, and to

 3   its counsel, for the sole purpose of analyzing --

 4            THE COURT:  How many such people are there?

 5            MR. JAMES:  Individuals or firms?

 6            THE COURT:  How many such people are there?

 7            MR. JAMES:  I don't know an answer to that question.

 8            THE COURT:  Well, are we talking about four people

 9   or twenty-four people or a hundred and twenty-four people?

10            MR. JAMES:  I think it's probably less than 124

11   people, your Honor.

12            THE COURT:  How many people?  Well, you get the

13   point.

14            MR. JAMES:  Yes.

15            THE COURT:  The point is the more people, the more

16   likelihood there is of breach.

17            MR. JAMES:  I understand that, your Honor.  I do.

18   And I -- you know, I can't --

19            THE COURT:  Where's the protection if there's

20   breach?

21            MR. JAMES:  Well, if the Court orders FGIC and its

22   financial advisors and its counsel not to disclose this

23   information, they'd be subject to contempt.

24            THE COURT:  Then someone is going to have to prove a

25   contempt case?

13-53846-tjt  Doc 4318-2  Filed 04/29/14  Entered 04/29/14 22:00:35  Page 137 of
559
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 69 of  137

1          MR. JAMES:  Yes.

2          THE COURT:  And, besides, the damage is done at that

3     point.

4          MR. JAMES:  I suppose that's correct, your Honor,

5     but we are dealing with professionals.  We're dealing with

6     people who deal with confidential information as a matter of

7     course.  Counsel -- both my firm, Williams, Williams, Rattner

8     & Plunkett, and the New York firm that's representing FGIC --

9     that's Weil Gotshal -- that's what we do.  We maintain the

10    confidences of our clients.  We are -- we have ethical -- as

11    you know, we have ethical obligations not to disclose

12    information.  This would be no different than protecting a

13    client's confidences, your Honor.

14         THE COURT:  Okay.

15         MR. JAMES:  Thank you, your Honor.

16                        CLOSING ARGUMENT

17         MR. GOLDBERG:  Good morning, your Honor.  Jerome

18    Goldberg.  I'm here on behalf of interested party David Sole.

19    I'll be brief, your Honor.

20         I was struck by the testimony that said that Barclay

21    is charging a fee to cover -- because of its risk-taking.  In

22    my -- and I understand that we're not here to analyze this

23    deal today, but when I looked at the deal, it was pretty

24    clear to me that ultimately the cost of this deal is going to

25    be borne by the taxpayers of the city and by the residents of

13-53846-tjt  Doc 4311-2  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 130 of
138
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 70 of
559

1  the city, which include my client and actually include
2  myself.  When I calculated it that approximately for six
3  years after bankruptcy 20 percent of income tax revenues for
4  the City of Detroit are going to be used to pay Bank of
5  America, to pay off Bank -- to pay off this loan to pay off
6  Bank of America and UBS, two banks, 20 percent of tax
7  revenues, and there's also a lien, of course, on the casino
8  tax revenues.  To me when I looked at the deal, it's the
9  people of the city that are going to be paying on this deal
10  for years to come, not just during the bankruptcy but even
11  more afterwards at a higher interest rate than was disclosed
12  today.  The idea that the people of the city are not entitled
13  to know the full terms of this deal when they're going to be
14  paying for this deal for years to come just struck me as
15  unconscionable.  It also struck me a violation of the Freedom
16  of Information Act, which applies to Michigan.  I looked at
17  the FOIA, and interestingly enough, the testimony was that
18  the confidentiality was subject to applicable law.  I looked
19  at the exemptions under FOIA, and there is no exemption for
20  fees associated with a deal like this.  The closest exemption
21  I found was 15.243(i), which covers, "A bid or proposal by a
22  person to enter into a contract or agreement, until the time
23  for the public opening of bids or proposals, or if a public
24  opening is not to be conducted, until the deadline for
25  submission of bids or proposals has expired."  Well, as they

13-53846-tjt  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 39 of
13-53846-swr  Doc 1840-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 139 of
559
139

 1   testified, the deadline for submitting the bids has expired.

 2   Under Michigan law -- under Michigan law, which favors --

 3   which covers the FOIA, which says the people shall be

 4   informed so they may participate in the democratic process,

 5   there is a duty to disclose, and under the FOIA, if it's not

 6   specifically covered by an exemption, it has to be disclosed.

 7   So the point I would say is it's the people of the city that

 8   are going to be paying for this deal.  And, again, I'm not

 9   here to debate the merits of the deal, but I have severe

10   questions about it.  It's the people that are committing our

11   tax dollars for years to come to pay off a couple of banks

12   basically with a small number -- about one-third going to

13   services, and for the people to be asked to pay off a deal

14   like this without even knowing the fees that a bank like

15   Barclays is charging seems to me unconscionable and illegal

16   under Michigan law, and I would ask you to -- and, moreover,

17   it's not going to cut the deal whatsoever.  And even the

18   market flex, the fact is they're committed to an interest

19   rate.  They're trying to get the market flex to get a

20   slightly better deal from what I heard.  They're still

21   committed to the deal.  So I would ask you to reject this.  I

22   think that it really would be an insult to the people of the

23   city to not get the full terms of this deal both because

24   we're paying for it and we're entitled to know.  Thank you.

25                          CLOSING ARGUMENT

13-53846-tjr  Doc 43103-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 140 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 42 of
559
140

1    MR. SHERWOOD:  Your Honor, I think when you talk
2  about confidential commercial information, I think you got to
3  deal with expectations.  What is the expectation of someone
4  coming into a bankruptcy case, and what is it, and what
5  should it be.  You know, any attorney who works for a
6  committee, a financial advisor, counsel for the debtor, they
7  have to disclose their rates, their hourly rates and so
8  forth.  They don't do -- they don't do that on their website.
9  They don't -- that's not public information, but when you
10 walk into a Bankruptcy Court and you make a loan, you have to
11 disclose the information, and full disclosure of fees is the
12 rule.  It's not the exception.  It is the rule.  It is the
13 rule, and I know I've cited -- in my questioning I talked
14 about the Southern District of New York, and I know that that
15 is not binding here, and your Honor can take it or leave it,
16 but they cite to all these cases in the Southern District of
17 New York, and in that district it is written into the local
18 rule that these fees -- all fees, not just non-sensitive
19 fees, all fees have to be disclosed, and that's why -- and
20 just for someone to come in and say, well, this is different
21 doesn't carry the burden, and I don't think they did it.

22     They cite to <u>ResCap</u> and <u>Patriot Coal</u>.  It's a matter
23 of public record.  Both of those cases had a lot more
24 disclosure than is projected here.  They put the fee letters
25 on the court docket.  It's part of the order that they cite

13-53846-swr  Doc 1840-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 73 of
559
13-53846-tjt  Doc 4318-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 41 of  141
553

1    to.  And they did disclose in those Chapter 11 cases the

2    aggregate amount of fees, and the city is not willing to do

3    that here.  And obviously in order for any financial party in

4    interest in a DIP financing context to analyze the bona fides

5    of that DIP financing, fees charged on the loan is a huge

6    issue because, you know, the only -- one of the main things

7    that the parties who are arguably or potentially below them

8    in the waterfall in this case want to know is what are the

9    terms and conditions of payment to the Barclays or whoever

10   that's above me, and the fees and the interest rate is

11   obviously something that anybody who is a creditor of the

12   city deserves to know.  And I think layer on top of that that

13   this is a deal with a city and the general understanding that

14   transactions with cities are a matter of public record, the

15   expectation just wasn't there, so it isn't confidential

16   commercial information because there's no way that Barclays

17   could reasonably expect it to be, and the agreement bears

18   that out because the commitment letter -- the confidentiality

19   commitment in the commitment letter at paragraph 8 has

20   qualifications, to the extent permitted by applicable law, as

21   required by the Bankruptcy Court, and the only commitment on

22   the part of the city, which they fulfilled, was to try, and

23   they tried, but to the extent your Honor or applicable law

24   requires disclosure, everything is fine.  Barclays is still

25   here.  There is the threat of the interest rate going up, but

1  even if that happens, Barclays -- or Miller Buckfire has

2  testified that it's still below the range of a DIP financing.

3  Barclays' syndication is optional.  It reserves the right to

4  syndicate, so it's not necessarily going to happen.

5       I think the common practice is full disclosure.

6  It's especially important in a case like this, and the city

7  has not made the case for confidentiality.  The city has

8  taken a very extreme view here.  On behalf of AFSCME, we

9  think that they have not made the case, and there should be

10  full disclosure like in the normal situation, but if the

11  Court -- and the Court should definitely not grant the motion

12  as submitted.  There are ways to protect confidentiality, but

13  certainly AFSCME and every financial party in interest in

14  this case deserves to analyze what this fee letter says just

15  like the city had a chance to do it and its professionals had

16  a chance to do it.  Miller Buckfire saw proposals from 16

17  different proposed lenders that had all of this information.

18  To say that the stakeholders and their representatives can't

19  see the same information is wrong.  Thank you.

20                      CLOSING ARGUMENT

21       MR. NEAL:  Good afternoon, your Honor.  Guy Neal,

22  Sidley Austin.  We filed a joint objection.  Just real brief,

23  you have National Public Finance Guarantee Corp., you have

24  Assured Guaranty Municipal Corp., and you have Ambac as well.

25  Taken together, your Honor, that's almost about $5 billion

 1  worth of municipal bonds outstanding that those three
 2  entities insure ranging from water and sewer system bonds,
 3  unlimited tax general obligation bonds, limited tax bonds,
 4  parking bonds, and the like.  I can go on, but the litany is
 5  not relevant for this purpose.

 6        Your Honor, we have a strong overarching vital
 7  economic interest in the future of the city.  Our clients
 8  will be insuring these bonds hopefully for a very long period
 9  of time, and, as such, as creditors and the public generally,
10  as you heard from Mr. Goldberg, are entitled to a transparent
11  and open process in evaluating the proposed post-petition
12  facility.  That transparency, of course, would be materially
13  disturbed should the seal motion be granted.

14        An open and transparent process necessitates full
15  disclosure concerning the terms of the facility.  I'm going
16  to focus less -- and I'll be very brief, your Honor.  I'll
17  wrap up in a couple minutes.  I'm going to focus less on the
18  market flex and more on the fees because I think, your Honor,
19  that's where your questions to the Barclays witness were
20  directed to.  Where is the disadvantage in this process in
21  the full and open disclosure of those fees?  Perhaps not a
22  breakdown, but the aggregate amount of those fees, and you
23  heard Mr. Sherwood recite the precedent in the Southern
24  District and in other cases in which the total amount of
25  those fees are disclosed.  In fact, those fee letters are, in

13-53846-tjt  Doc 4184-2  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 46 of
159
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 46 of
553                                                                        144

 1   fact, on the docket.

 2        The main interest that was advanced by Barclays is

 3   this could be a competitive disadvantage in future post-

 4   petition borrowings in the municipal bond Chapter 9 arena.

 5   Well, of course, as everyone concedes, this has never been

 6   done before, and I don't think precedent should be set that

 7   going forward in a municipal context, number one, a Chapter 9

 8   context, number two, that there should be a precedent that

 9   the total cost of this facility, the total cost of this

10   facility should be kept under wraps.

11        Next I'm going to just turn and close with the issue

12   that FGIC's counsel raised, and that is the proposed

13   confidentiality agreement, which was floated last night

14   around 11:30 for advisors' eyes only.  That doesn't work,

15   your Honor.  It also contains an indemnity provision such

16   that if my law firm signed it, we'd have to indemnify

17   Barclays.  And, in fact, your Honor, the only other time I

18   was front of you, your Honor, that was the end of August in

19   the context of the city's requirement that we had to sign an

20   indemnity to get access to the Milliman materials, and your

21   Honor quickly made it plain that that should be opened up,

22   the data room and all Milliman materials.  In the absence of

23   a strict confidentiality agreement which rather handcuffs

24   your ability to not only evaluate the information because you

25   can't turn to your financial advisors under their proposed

13-53846-tjt  Doc 1870-2  Filed 04/29/13  Entered 04/29/13 22:00:35  Page 45 of
145
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 45 of
559

1  confidentiality, but it also handcuffs your ability to use

2  that information, and we join with FGIC's counsel that to the

3  extent such information may ultimately be used, if you don't

4  open it all up, your Honor -- to the extent it will

5  ultimately be used if it's not opened up, certainly that can

6  be filed under seal.

7      So, your Honor, in closing, I think you said it

8  best.  When you talk about -- or when Barclays talks about

9  needing to keep this information or to provide for

10  flexibility, you said "a little bit" is so vague as to be

11  meaningless, your Honor, so vague as to be -- or to render

12  incapable of any effective analysis, and we do think a

13  transparent process should be strongly encouraged and should

14  be, frankly, the precedent going forward, so thank you for

15  your time.

16              CLOSING ARGUMENT

17      MR. KOHN:  Good afternoon, your Honor.  Samuel Kohn

18  of Chadbourne & Parke on behalf of Assured Guaranty Municipal

19  Corp.  We're one of the bond insurers that joined in the

20  objection with National.

21      First of all, your Honor, I would like to address

22  your Honor's question about 107(b), and it's a very good

23  question because the words "confidential commercial" --

24  "confidential research, commercial information" is -- it

25  could be considered confidential research, development, or

13-53846-tjt  Doc 4384-2  Filed 04/29/14  Entered 04/29/14 22:00:35  Page 48 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 48 of
559
153          146

 1  commercial information.  Now, the question is how

 2  confidential is it really.  Barclays is a bank.  They take

 3  risks.  They knew that there is a risk, and they priced that

 4  risk in this becoming public because if it was really

 5  confidential, they would have not -- they would have had

 6  conditions that they were not going to go forward; that it

 7  shouldn't be disclosed in any event -- in all events, but the

 8  fact that they allowed some outs and understood that --

 9  they're a bank.  They're in the business of risk.  They

10  priced their risk, and that means that pricing of that risk

11  is not confidential within the meaning of 107(b).

12  Confidential -- 107(b), the confidential commercial

13  information, means confidential, that they're really going to

14  get harmed.  This is a question of more profit for Barclays

15  or less profit for Barclays versus transparency and fairness

16  for everybody to evaluate whether the city is exercising

17  their reasonable business judgment in choosing this financing

18  and the DIP financing.  That's why it's critical.

19       Now, if it doesn't get -- if it doesn't get

20  disclosed, people -- the notice and opportunity for people to

21  object to the financing will be handicapped because we're not

22  going to know.  We're not going to know if it's reasonable or

23  fair under the standards of Section 364, and, your Honor, I

24  would -- you know, I would say that this is a Chapter 9 case,

25  of course, but 364 is included in 901.  Everything related to

13-53846-tjr  Doc 4314-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 147 of
13-53846-swr  Doc 3870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 79 of
559
147

1   64, all rules, all standards of Chapter 11 should be applied

2   in Chapter 9 because of the words that 364 is in 901, and in

3   Chapter 11 even the testimony that -- it was brought out in

4   cross-examination, of course, that in Chapter 11 this doesn't

5   happen.

6         And, your Honor, I just want to say one last thing

7   is that this is the first -- this is the first Chapter 9

8   post-petition financing.  You will be setting precedent here,

9   and people will look to your case, to Detroit, whether this

10   is -- whether 364 is included in 901 except for confidential

11   fee letters or whether the standards of Chapter 11 apply.

12   Thank you, your Honor.

13                 CLOSING ARGUMENT

14       MR. GORDON:  Good afternoon, your Honor.  Robert

15   Gordon on behalf of the Detroit Retirement Systems.  I'm

16   pleased to report to the Court that I will, due to the time,

17   just concur and join in the other closings.  I have nothing

18   further to add.  Thank you, your Honor.

19       THE COURT:  Thank you.  Anyone else on the objecting

20   side?  Rebuttal, sir.

21       MR. HAMILTON:  Thank you, your Honor.

22               REBUTTAL ARGUMENT

23       MR. HAMILTON:  Three overall points, your Honor.

24   First is a procedural matter.  We're here on a motion to file

25   the fee letter under seal with the Court.  I do not believe

 1 | we are here today on a motion for a protective order filed by
 2 | either the City of Detroit or Barclays as to what
 3 | conditions -- under what conditions we would turn over the
 4 | fee letter to objectors in discovery.  In other words, we're
 5 | not here today to present to you a dispute because we
 6 | couldn't work out a confi where everybody would be in
 7 | agreement.  Hopefully, we will be able to work out a confi.
 8 |       THE COURT:  Okay.  So what happens if the motion is
 9 | denied?
10 |       MR. HAMILTON:  Then a confi kind of becomes
11 | irrelevant because if the motion is denied, it would be
12 | publicly available.  If the motion were approved, then we
13 | have to work out the terms under which the portions of the --
14 | whatever portions of the fee letter we're going to disclose
15 | in discovery are going to be disclosed under terms of
16 | confidentiality agreements.  If we can't work it out amongst
17 | us, we may have to come back to your Honor to resolve those
18 | disputes as to what the confi should say and what it
19 | shouldn't, whether it should have an indemnity provision or
20 | whether it shouldn't, but that's not here today.  The issue
21 | today is whether the fee letter should be disclosed to the
22 | entire public in general, not to the objectors in discovery
23 | under the terms of a confi.
24 |       Second, many of the questions on cross and all of
25 | the arguments tended to merge or conflate what are two

13-53846-tjt  Doc 43843-2  Filed 04/29/14  Entered 04/29/14 22:00:35  Page 149 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 49 of
553
149

 1   distinct issues we think, at least from the City of Detroit's

 2   perspective.  The fee letter has two components.  It has the

 3   market flex provisions, and it also references the commitment

 4   fee that the City of Detroit has already agreed to pay to

 5   Barclays.  The analysis, I think, of those two provisions are

 6   different in terms of the confidentiality arguments and the

 7   public disclosure arguments that have been made.

 8          With respect to market flex, the evidence in the

 9   record is unrebutted.  It would cause -- has the potential to

10   cause substantial economic detrimental consequences to the

11   City of Detroit if the market flex provisions are made

12   publicly available to the general public because potential

13   participants in the syndication of this financing facility

14   will then demand close to or not the cap that's set forth in

15   the market flex provisions resulting in the City of Detroit

16   and, therefore, all its residents paying a much higher

17   interest rate than they would otherwise.  That is the

18   economic detriment that we are trying to avoid, and that

19   evidence is unrebutted.

20          THE COURT:  But how do you deal with the argument

21   that says democracy is inefficient?

22          MR. HAMILTON:  Your Honor, I have an argument for

23   that.  Here's how I deal with it, and I want to comment on

24   counsel's -- one of the -- the second counsel's comments

25   about FOIA.  There are no -- we have not done an exhaustive

13-53846-tjt   Doc 1870-2   Filed 04/29/14   Entered 04/29/14 22:00:35   Page 152 of
559
13-53846-swr   Doc 1840-2   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 82 of   150

1  analysis nor have we briefed it for the Court, but I think we

2  could all agree there are no provisions in Michigan's FOIA

3  that directly address this particular situation, and so if a

4  FOIA request were to be made, there might be litigation as to

5  what extent the Barclays proposal and the market flex

6  provision falls within an exception under Michigan's FOIA.

7  THE COURT:  Well, without losing sight of my

8  question to you, isn't FOIA set up such that everything is

9  disclosed except for specially -- specifically identified

10 types of information?

11 MR. HAMILTON:  That's correct, your Honor.  And what

12 I was going to make a reference to was counsel's suggestion

13 that there is an exception in FOIA for bids in an auction

14 process, and they said up until the time the bidding is

15 closed, the information is not discoverable under FOIA;

16 right?  And then once the bidding is closed, there's no

17 economic detriment to the city or to the government to

18 disclosing the information, and it's disclosed.  By analogy

19 here, once the syndication is closed, there is no economic

20 detriment to the City of Detroit if the market flex

21 provisions are revealed to the public, but until the

22 participation, the syndication of this facility is closed,

23 there is detriment to the City of Detroit, and by analogy --

24 THE COURT:  So you're arguing that the bidding that

25 FOIA refers to is the syndication bidding, not the bidding to

1   the city regarding the underlying financing?

2        MR. HAMILTON: Your Honor, I wasn't making a literal

3   argument. It was by analogy. The point is -- you made the

4   point about democracy.

5        THE COURT: Well, but FOIA doesn't work by analogy.

6   Either the information is exempted or it isn't.

7        MR. HAMILTON: That's correct, your Honor. I think

8   a legal argument could be made in the proper forum under FOIA

9   that the market flex provisions do not need to be disclosed

10   under FOIA until the syndication process is completed, and

11   certainly our argument would be, in response to your

12   question, as a matter of democracy it is in the interest of

13   the residents, of the citizens of the state -- of Detroit not

14   to disclose the market information to them until after the

15   syndication process is over because they'll get a lower

16   interest rate as a result. It's in their interest. That is

17   the same principle why you don't disclose bids to the public

18   until after the bidding is closed. That's how you reconcile

19   the democratic viewpoint that you have to disclose everything

20   to your citizens with the practical reality of it's not

21   really in their interest to know this information until after

22   the bidding is closed.

23        THE COURT: Well, but how do they participate in the

24   process unless they have all the information?

25        MR. HAMILTON: That's where confis come in. That's

1    where in a Chapter 11 --

2         THE COURT:  Where what comes in?

3         MR. HAMILTON:  That's where confidentiality

4    agreements come in.  That's where the litigants --

5         THE COURT:  Oh, confi.  Got it.

6         MR. HAMILTON:  -- the professional advisors can see

7    it.  You can get expert testimony as to whether or not the

8    market flex provisions are above market or below market or

9    are improper somehow without disclosing on the public record

10   what the cap is, and that will maximize everybody's interest.

11   It will protect the city's residents because they'll get the

12   best interest rate possible, and you'll still get the expert

13   testimony you need.  If, in fact, any of the objectors decide

14   to argue that the market flex provisions are improper

15   somehow, you can still get that expert testimony through

16   declarations under seal, through general references without

17   disclosing the actual cap figure on the record in court.

18        THE COURT:  So this foresees objections under seal,

19   a closed courtroom?

20        MR. HAMILTON:  Unlikely.  It's possible, your Honor,

21   unlikely.  I think it is unlikely that --

22        THE COURT:  Well, it's only unlikely because you

23   don't think they'll have any grounds to object to the flex

24   position.

25        MR. HAMILTON:  On the market flex provision, the

1  only testimony in the record is that it's below market even
2  with the market flex provisions.  If they want to challenge
3  that, they can, and you can do that with expert testimony
4  without disclosing the actual figure in open court.  It can
5  be done, and it's in everybody's interest to do it that way,
6  particularly the residents of Detroit, because that'll get
7  them a lower interest rate.  That's the unrebutted testimony
8  from today's hearing.

9      The second aspect of the fee letter is the
10 commitment fee as opposed to the market flex, and this is
11 largely Barclays' concern, their confidential commercial
12 information of what the commitment fee is they charge and
13 what we agreed to pay.  I would point out that the City of
14 Detroit got the approval of the State of Michigan to pay that
15 commitment fee from the treasurer's department at the State
16 of Michigan.  It is improper for any of the counsel to say
17 what the common practice here is with respect to the
18 disclosure of the commitment fee because, as the unrebutted
19 testimony is and as everybody is aware, this is the first
20 time you've ever had a post-petition financing facility in
21 Chapter 9.  364(b) does not apply in Chapter 9.  The City of
22 Detroit can go out and get unsecured financing from Barclays
23 or anybody else and pay whatever commitment fee it wants and
24 do that without even getting your Honor's approval under
25 364(b) because it doesn't apply in Chapter 9.  It's only

```
 1   because we need to -- we need to grant superpriority
 2   administrative status and liens to get the financing that we
 3   have to come to your Honor and ask for it, but to say that
 4   the normal practice in Chapter 9 is to have to disclose the
 5   commitment fees is just flat out wrong empirically,
 6   historically because it's never been done before and
 7   logically because 364(b) doesn't apply, and neither does 363.
 8   When he talk -- when counsel talks about what was happening
 9   in ResCap and in Patriot and any other Chapter 11 case,
10   you're dealing with a situation where 363 applies, and the
11   debtor is prohibited by 363 from paying a commitment fee
12   unless it first gets Bankruptcy Court approval because it's
13   out of the ordinary course of business, and so in order to
14   get Bankruptcy Court approval, you have to tell the Court
15   what you're asking the Court to approve.
16            THE COURT:  And what's the approval you're asking
17   for here?
18            MR. HAMILTON:  Granting super administrative -- the
19   need -- the necessity of granting super administrative
20   priority status and liens in order to obtain the financing we
21   need in order to fund the forbearance agreement, assuming
22   it's approved, and --
23            THE COURT:  So you're not going to ask the Court to
24   approve the interest rate?
25            MR. HAMILTON:  That will be part of the approval
```

1  process.

2          THE COURT:  So you are going to ask the Court to

3  approve the interest rate?

4          MR. HAMILTON:  Interest rate separate from

5  commitment fee, your Honor, yes.  The interest rate is part

6  of the financing.

7          THE COURT:  Well, but your own witnesses testified

8  that they are intimately interrelated.

9          MR. HAMILTON:  I believe he said in their pricing it

10 was interrelated.  Now when we come to you and ask for

11 approval, even if you disapprove the financing, we still got

12 to pay the commitment fee.  It's done.  The commitment fee

13 is --

14         THE COURT:  You don't want to hear my comment on

15 that.

16         MR. HAMILTON:  I understand your Honor's

17 frustration, and, quite frankly, the commitment fee, while

18 technically it's not relevant in that regard -- we're going

19 to pay it either way -- it is arguably, as counsel suggested,

20 relevant to the good faith finding.  If you're paying some

21 exorbitant commitment fee to Barclays, you might find this

22 was not done in good faith.

23         THE COURT:  So how do I litigate that without giving

24 it to the objecting parties?

25         MR. HAMILTON:  We can give it to the objecting

13-53846-tjr  Doc 3184-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 158 of
156
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 58 of
559

1  parties under a confi.  We just shouldn't tell the entire

2  public.  Again, today is just to file the letter under seal.

3  We aren't saying they can't get the commitment fee figures

4  under a confi under any circumstances.  That should be worked

5  out between us, Barclays, and the objectors, and we believe

6  that we've offered, I believe -- we've suggested that if

7  objectors want to share it with professionals, including

8  expert witnesses, to give testimony as to whether or not the

9  commitment fee is above or below market, that ought to be

10  able to be worked out.  What we're saying today is it should

11  not be filed on the public docket for all the reasons that

12  Mr. Saakvitne detailed on the stand.  And that's the end of

13  my argument, your Honor.

14       THE COURT:  All right.  Thank you.  Did you want to

15  speak, sir?  Go ahead.  I apologize.  Go ahead.

16       MR. SLIFKIN:  May I have a moment?  Thank you, your

17  Honor.

18                    REBUTTAL ARGUMENT

19       MR. SLIFKIN:  I'll be brief, but let me just echo

20  what counsel for the city said with respect to there being,

21  you know, all sorts of different issues being raised here

22  which actually all apply to some different motions before

23  your Honor and some motions that I believe haven't even been

24  made yet with respect to confidentiality orders.  The motion

25  here is a motion under 107(b).  The issue under the statute

 1   is whether this document contains confidential commercial

 2   information, and the issue under the statute is is that

 3   something where disclosure would cause commercial injury to

 4   an interested party, would it provide an unfair advantage to

 5   the competitors of that party.  If the answer is "yes" to

 6   those questions, then the statute says the Court shall seal

 7   it.  It is left for another day whether or not in order to

 8   facilitate your Honor's decision-making it ought to be given

 9   to objectors, other interested parties, and the position of

10   Barclays on that is that can be handled through appropriate

11   confidentiality orders and stipulations and orders.  You

12   should be aware, your Honor, that, you know, there, of

13   course, is the committee of retirees and so forth, and we

14   understand their position, but many of the people who came to

15   argue at this podium today such as FGIC, such as Syncora, and

16   I believe others have made plain in their own papers that

17   they put in competing post-petition financing bids at the

18   time Barclays did, so by their own admission they are

19   competitors of Barclays.  No one today has said we're not a

20   competitor.  No one has said we're not going to be in future

21   syndication -- future DIP situations nor have they said

22   they're not going to try and purchase some of the securities

23   in a potential syndication.

24            THE COURT:  Well, but where's the competitive harm

25   from disclosure?

13-53846-tjt  Doc 431-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 158 of
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 90 of
559
158
158

1    MR. SLIFKIN:  The competitive harm from disclosure

2  of the fee is that people will now know what Barclays' fees

3  are, what its structure is, what its methodology is, so that

4  they can --

5          THE COURT:  So it drives down the fee.

6          MR. SLIFKIN:  I'm sorry.

7          THE COURT:  So it drives down everyone's fees.

8          MR. SLIFKIN:  Potentially.  That's --

9          THE COURT:  Wouldn't your witness --

10          MR. SLIFKIN:  -- not entirely clear, your Honor.

11          THE COURT:  Wouldn't your witness testify then or

12  didn't your witness testify that that would just have the

13  effect of increasing the interest rate?

14          MR. SLIFKIN:  Potentially.  We don't know what's

15  going to happen, your Honor, but the standard is commercial

16  injury, commercial injury to Barclays, unfair competitive

17  advantage to Barclays' competitors.  That's the standard in

18  the statute.

19          THE COURT:  Right, but that would be in the next

20  case; right?  There would be no competitive injury to

21  Barclays in this case.

22          MR. SLIFKIN:  Well, that's not entirely clear, your

23  Honor.  It's still open for these people to come in and

24  propose an alternative DIP financing.

25          THE COURT:  It is?

13-53846-swr  Doc 13870-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 59 of
159
13-53846-tjt  Doc 1184-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 59 of
559

1    MR. SLIFKIN:  They can come in and do it if they

2    like.  There's nothing to prevent them.

3        THE COURT:  Except that the city wouldn't listen to

4    it.

5        MR. SLIFKIN:  I can't speak for the city.  Depends

6    what terms they offer, your Honor, but none of that matters.

7    None of that matters with respect to what the statute says.

8    The statute talks about commercial information, right, as it

9    talks about trade --

10       THE COURT:  Confidential commercial information,

11   yes.

12       MR. SLIFKIN:  -- as it talks about trade secrets and

13   so on and so forth.  It may be that there's no harm from

14   revealing a trade secret in this proceeding, but it could

15   well be harmful in some other competitive environment.  It's

16   no different here, your Honor.

17       THE COURT:  Question.  Where's the harm to Barclays

18   if this is disclosed in this case?  What I heard was

19   competitors will know what the fee structure is and will

20   underbid it in the next case.

21       MR. SLIFKIN:  Yes.

22       THE COURT:  Okay.  So Barclays will have to lower

23   its fees in the next case, but wouldn't that just have the

24   impact of increasing the interest rate in the next case to

25   make up for it?

 1          MR. SLIFKIN:  I can't say that, your Honor.  I don't
 2   know that.
 3          THE COURT:  What your witness said --
 4          MR. SLIFKIN:  Well, I'm not sure that is entirely
 5   what he said, your Honor.
 6          THE COURT:  Tell me what you think he said then.
 7          MR. SLIFKIN:  I think he said that it would chill
 8   the entire market; right?  I understand what your Honor --
 9          THE COURT:  Okay.  Okay.  It'll chill the entire
10   market.  How is that injury to Barclays?  Hurts a lot of
11   debtors in possession.  Hurts the next Detroit case, heaven
12   forbid.
13          MR. SLIFKIN:  As your Honor said quite correctly,
14   Barclays is in the business -- has for its shareholders to
15   make money.  If Barclays is impaired in making money in any
16   situation, that is a competitive injury.  It just is.
17          THE COURT:  It can't find someplace else to lend
18   $350 billion?
19          MR. SLIFKIN:  Million.
20          THE COURT:  Million.
21          MR. SLIFKIN:  Million, million, million.
22          THE COURT:  Correction accepted.
23          MR. SLIFKIN:  They're in the municipal lending
24   business, your Honor.  That's the business they're in.
25          THE COURT:  Well, but they're in lots of businesses.

1          MR. SLIFKIN:  Well, yeah, but --

2          THE COURT:  Yeah.

3          MR. SLIFKIN:  -- under that analysis, then nobody

4    ever suffers commercial injury because you could always just

5    go into a different business; right?  That I think proves too

6    much.  I think we have to take as granted as a baseline the

7    business that Barclays is in and whether this business will

8    be harmed or not.

9          THE COURT:  Where's the reasonable expectation of

10   privacy given FOIA?

11         MR. SLIFKIN:  Well, FOIA is something that I --

12   certainly Michigan FOIA is not something on which I would

13   claim any expertise.  It is by no means clear to us that FOIA

14   applies here.

15         THE COURT:  Why wouldn't it?

16         MR. SLIFKIN:  Well, I believe -- again, I haven't --

17   I'm not personally involved in this, but I understand that

18   Barclays is sending a FOIA confidentiality letter or may have

19   already done so to the city, and that issue needs to be

20   litigated, you know, in the future.  I don't think -- I don't

21   think one can -- ought to predict that ultimate analysis in

22   order to decide this motion and essentially then moot that

23   analysis like rather than have that analysis play out in the

24   appropriate forum with the appropriate, you know, ability to

25   defend yourself.

13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 64 of
558
13-53846-tjt  Doc 1184-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 162 of
162

```
 1          THE COURT:  What if the Court determines that it's
 2   reasonably clear that this is disclosable under FOIA?  Then
 3   where's the reasonable expectation --
 4          MR. SLIFKIN:  Well, you see, that's --
 5          THE COURT:  -- of confidentiality?
 6          MR. SLIFKIN:  -- what I believe the Court should not
 7   do.  I think that would be inappropriate, you know.  We
 8   know --
 9          THE COURT:  Why?
10          MR. SLIFKIN:  Why?  Because --
11          THE COURT:  Why not just read the statute and see if
12   it applies or not?
13          MR. SLIFKIN:  Because under FOIA there are certain
14   procedures and certain protections and certain submissions
15   the parties can make, and I believe that it's only
16   appropriate in the interest of due process for that to be
17   followed.
18          THE COURT:  And can you name one that might help
19   your client here other than the one that the city identified?
20          MR. SLIFKIN:  Well, as I said, you have me at a loss
21   because I haven't prepared on FOIA.  I prepared on 107(b).
22          THE COURT:  It's not me that has you at a loss,
23   counsel.
24          MR. SLIFKIN:  I'm sorry, your Honor.
25          THE COURT:  It's not me that has you at a loss.
```

1          MR. SLIFKIN:  Well, you appear to be --

2          THE COURT:  I'd like --

3          MR. SLIFKIN:  -- prejudging the FOIA issue, and I

4    don't think that's appropriate, your Honor.  I think the

5    record that is here today is the -- in these municipal

6    financings, right -- this stuff is kept confidential.  Now,

7    is it kept confidential in debtor in possession municipal

8    financings?  Well, there's no history on that, your Honor.

9    Is it kept --

10         THE COURT:  Well, you accept the proposition that

11   there's no history of that in Chapter 9 DIP financings.

12         MR. SLIFKIN:  In Chapter 9.  I was about to say that

13   in Chapter 11, you know, whatever the local rules of the

14   Southern District of New York say, we know that there are a

15   whole series of cases --

16         THE COURT:  Well, given --

17         MR. SLIFKIN:  -- where this information is filed

18   under seal.

19         THE COURT:  Given what counsel for the city has said

20   here today about the approval that's being requested under

21   Section 364 in this case, why should the rule be any

22   different here than in Chapter 11 where the approval is

23   functionally equivalent?

24         MR. SLIFKIN:  I'm not suggesting the rule should be

25   any different.  That's why we've cited a series of cases

 1  where this is sealed.  The rule is 107(b).  The rule is
 2  exactly the same.  It's 107(b).  There are numerous courts
 3  who have accepted that this is confidential information under
 4  107(b), and --
 5          THE COURT:  You interpret the Southern District of
 6  New York rules differently?
 7          MR. SLIFKIN:  No.
 8          THE COURT:  What am I missing here?
 9          MR. SLIFKIN:  That's simply the boilerplate local
10  rules.  It doesn't say we're writing out 107(b).  The
11  107(b) -- that's just like this is the presumption.  Okay.
12  That's not controversial.  We understand that's the
13  presumption.  Then you go to 107(b) and say if it's
14  confidential commercial information, which numerous courts
15  have said this is, then you go to the second part, it shall
16  be sealed, and the Second Circuit, which obviously governs
17  there, has been very clear that is mandatory.
18          THE COURT:  What one Chapter 11 case do you think is
19  the strongest case for your position here?
20          MR. SLIFKIN:  Would you allow me just to pull up
21  those papers?
22          THE COURT:  Yes, of course.
23          MR. SLIFKIN:  We would refer your Honor -- you have
24  to give me a moment because I'm getting used --
25          THE COURT:  Okay.  Take your time.

13-53846-swr  Doc 3184-2  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 165 of
13-53846-tjt  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 97 of  165
559
103

1          MR. SLIFKIN:  -- to my new glasses.

2          THE COURT:  Okay.

3          MR. SLIFKIN:  We would refer your Honor in

4  particular to <u>Re. in Tribune</u> in the District of Delaware.

5          THE COURT:  Have you got a case number on that?

6          MR. SLIFKIN:  Yes, your Honor.  It's Case Number 08-

7  13141.

8          THE COURT:  And a particular docket -- a docket --

9          MR. SLIFKIN:  Docket Entry 62.

10          THE COURT:  I'm sorry.

11          MR. SLIFKIN:  Docket Entry 62 in that case.

12          THE COURT:  62.  Okay.

13          MR. SLIFKIN:  And that's Bankruptcy Court for the

14  District of Delaware, December 10th, 2008.

15          THE COURT:  I'll have a look at that.

16          MR. SLIFKIN:  Thank you very much, your Honor.

17          THE COURT:  Thank you.  Okay.  I will take this

18  under advisement until 2:30, and we will get this matter

19  resolved at that time before we hear the one motion that is

20  left for the two o'clock call, which is the bar date motion.

21          I do want to ask counsel to cooperate with us with

22  this.  It appears that after the conclusion of last Friday's

23  eligibility hearing, there were things left in the courtroom,

24  and all of that stuff really needs to be removed from the

25  courtroom right away today because, as you know, we are just

1  guests here, and so we'd like to leave the courtroom in the

2  same condition in which it was presented to us, and so really

3  anything that is left at the conclusion of court today will

4  have to be disposed of, so please take everything out.  And

5  we'll be in recess or not --

6          MR. SHERWOOD:  Very briefly, your Honor, I just

7  wanted to politely remind the Court that there was another

8  motion on the 11 o'clock docket.

9          THE COURT:  Oh, there was.  That's right.  I forgot

10 that.  All right.  Well, let's take that up at 2:30 as well.

11 Is that all right?

12         MR. SHERWOOD:  Very well.

13         THE COURT:  And let's be sure we know what that was.

14 That's the discovery motion, yes.  All right.  So we'll do

15 that one before we do the bar motion.

16         MR. SHERWOOD:  Absolutely.

17         THE COURT:  Thank you for reminding me of that, and

18 now we will be in recess.

19         THE CLERK:  All rise.  Court is in recess.

20     (Recess at 1:33 p.m. until 2:30 p.m.)

21         THE CLERK:  Court is in session.  Please be seated.

22 Recalling Case Number 13-53846, City of Detroit, Michigan.

23         THE COURT:  The matter is before the Court on a

24 motion filed by the city for an order allowing it to file on

25 the Court's docket its fee letter from Barclays under seal

13-53846-tjr  Doc 4384-2  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 167 of
167
13-53846-swr  Doc 1870-2  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 99 of
553

1  under 11 U.S.C., Section 107(b).  That section states in

2  pertinent part, quote, "On request of a party in interest,

3  the bankruptcy court shall protect an entity with respect to

4  a trade secret or confidential research, development, or

5  commercial information," close quote.

6          In response to the motion, several objections were

7  filed.  By its plain language, the statutory -- the statute

8  is mandatory in regard to confidential commercial

9  information, and so the issue before the Court is whether

10 this fee letter is confidential commercial information.  More

11 specifically, the issue is whether it is confidential.

12         The Court concludes that when the information is in

13 the hands of a Michigan city, as here, its confidentiality is

14 controlled by law, and in Michigan that law is the Freedom of

15 Information Act.  Under that act, information in the hands of

16 a Michigan city, as here, is subject to full disclosure

17 unless it is exempt from disclosure under MCLA 15.243.  The

18 Court concludes that none of the exemptions in that section

19 apply to this fee letter, and, therefore, it is subject to

20 disclosure, and, therefore, it is not confidential.  The

21 closest subsection is -- of those that establish exemption is

22 Subsection (i), but that subsection only exempts bids or

23 proposals until the deadline for submission has expired.  In

24 this case, even if the fee letter qualifies as a bid or a

25 proposal, which seems to the Court dubious, it is, in any

1    event, clear that the time for submission has passed.  All of

2    the witnesses here testified that the city is committed to

3    its agreement with Barclays subject only to approval of the

4    Court.  Therefore, the Court concludes that this fee

5    agreement would be subject to the Michigan Freedom of

6    Information Act and, therefore, is not, as a matter of law,

7    confidential.

8            Given that this information is subject to disclosure

9    under the Michigan Freedom of Information Act, the fact that

10   Barclays for its own competitive reasons wants it to be

11   confidential or thinks that it should be or has even

12   pronounced it to be confidential is really quite irrelevant.

13   It's even irrelevant that the city may have agreed to keep it

14   confidential because there's nothing in the Freedom of

15   Information Act that exempts material that is subject to a

16   confidentiality agreement between a private party and a

17   public institution like the City of Detroit or that permits

18   enforcement of such a confidentiality agreement.

19           Now, could the State of Michigan decide that because

20   of the potential costs of the disclosure of an agreement like

21   this, the Freedom of Information Act should be amended to

22   provide for the nondisclosure and for the confidentiality of

23   these agreements?  Of course, it could, but any such

24   agreement would be subject itself -- or excuse me -- any such

25   amendment itself would be subject to the democratic process.

1   Nevertheless, at this point in time, it's clear enough that

2   there is no such exemption from Michigan's Freedom of

3   Information Act and that, therefore, this letter is not

4   confidential commercial information.  Accordingly, the motion

5   is denied.  The Court will prepare an order.

6         (Proceedings concluded at 2:36 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| James Saakvitne | 10 | 25 | 47 | |
| James Doak | 51 | 58 | | |

EXHIBITS:

None

Closing argument by Mr. James                66
Closing argument by Mr. Goldberg             69
Closing argument by Mr. Sherwood             71
Closing argument by Mr. Neal                 74
Closing argument by Mr. Kohn                 77
Closing argument by Mr. Gordon               79
Rebuttal argument by Mr. Hamilton            79
Rebuttal argument by Mr. Slifkin             88

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    November 20, 2013

_____            _____

Lois Garrett

**Exhibit B**

**Exit Engagement Letter**

<div align="center">**BARCLAYS CAPITAL INC.**</div>

**PERSONAL AND CONFIDENTIAL**

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

<div align="center">**Engagement Letter for Exit Financing**</div>

Dear Ms. Corio:

The City of Detroit, Michigan (the "**City**" or "**you**") has advised Barclays Capital, Inc. ("**Barclays**" and together with the City, the "**Engagement Parties**") that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**"). The City's bankruptcy case bears Case No. 13-53846 (the "**Bankruptcy Case**").

You have further advised us that you currently anticipate that the City will issue (or another entity will issue on behalf of the City) notes or bonds or similar securities or evidences of indebtedness, through public distribution or private placement or otherwise (the "**Exit Notes**"), pursuant to a plan of adjustment in the Bankruptcy Case or otherwise (the "**Exit Financing**"), the proceeds of which will be used to repay debt incurred during the Bankruptcy Case (including, without limitation, the Post-Petition Facility but excluding debt in respect of the Detroit Water and Sewerage Department) and, if necessary, pay other debt and claims outstanding at the time the City exits the Bankruptcy Case.

1. <u>Engagement</u>

(a)  This letter agreement (this "**Engagement Letter**") is to confirm your and our understanding with respect to our engagement in respect of the Exit Financing.

(b)  Subject to the terms and conditions of this Engagement Letter, you agree that Barclays will have the right (but not the obligation) to act as exclusive and sole bookrunner, underwriter and/or placement agent (or any similar role applicable to the specific form of Exit Financing) with respect to the Exit Financing as set forth in this Engagement Letter. Pricing in respect of the Exit Financing will reflect competitive market rates as of the time of the Exit Financing.

<div align="center">- 1 -</div>

[[3430711]]

(c) You shall have no right to appoint any other financial institution to act as bookrunner, underwriter and/or placement agent (or any similar role applicable to the specific form of Exit Financing), no other financial institution shall have any title or role, and no other financial institution shall receive any consideration, in each case, in connection with the Exit Financing, including with respect to any direct sale or other form of transaction.

(d) Barclays's advertising name will appear at the bottom center of the front page of any offering or information memorandum related to the Exit Financing. Barclays shall have the sole responsibility, subject to input from the City, to (i) establish the schedule for investor meetings, (ii) coordinate all pre-marketing activity, (iii) coordinate roadshow logistics, (iv) coordinate the final determination of the interest rate to be recommended in connection with the Exit Financing, (v) coordinate the final allocation of any commitments or notes issued in connection with the Exit Financing, (vi) if applicable, act as billing and delivery agent and (vii) if applicable, act as stabilization agent.

(e) Our engagement hereunder, and our right to act in respect of the Exit Financing, is on an exclusive basis. During the term of this Engagement Letter (which shall continue until terminated pursuant to Section 9), you and your agents and representatives will not approach, initiate, solicit or enter into any discussions or negotiations with or mandate or appoint any bank or financial institution or other person or entity to arrange or participate in any Exit Financing, including, without limitation, through the issuance, offering or sale of any debt securities (whether or not similar to the Exit Financing) to, or the incurrence of loans from, any third parties, in each case except through Barclays or its designated affiliates. Notwithstanding anything herein to the contrary, to the extent the City violates this Section 1(e), Barclays' sole and exclusive remedy is the fee provided for in Section 6(c) hereof.

(f) Notwithstanding any other provision of this Engagement Letter, you acknowledge that Barclays will not render any tax, accounting, legal or regulatory advice in connection with any Exit Financing, and you acknowledge that you will consult with and rely on your own advisors regarding those matters.

2. Cooperation

(a) In connection with the Exit Financing, the City will co-operate fully with Barclays and its counsel in connection with, and cause its agents, representatives and advisors to be reasonably available for, due diligence and drafting meetings and make available to Barclays any other documentation Barclays may reasonably request in respect of the Exit Financing, subject to applicable laws and regulations governing the provision and disclosure of such information.

(b) In anticipation of the final sale of the Exit Notes to Barclays in respect of a distribution subject to Paragraph (b) of Securities and Exchange Commission Rule 15c2-12, as amended ("**Rule 15c2-12**"), but only if Rule 15c2-12 is applicable to such offering and sale, the City shall prepare a preliminary official statement (the "**Preliminary Official Statement**"), in the form required by then-current market

- 2 -

[[3430711]]

practice and in order to comply with all securities and state laws requirements at the time of the sale date and the delivery date of the Exit Notes. The City shall, by no later than the date required by then-current market practice or securities or state law requirements (i) deliver to Barclays, in such manner as Barclays and its counsel shall reasonably request, a sufficient number of copies of the Preliminary Official Statement in "final" form as required by Paragraph (b)(1) of Rule 15c2-12. The City shall deliver, or shall cause to be delivered, to Barclays, at or prior to the delivery date of the Exit Notes, a sufficient number of copies of the final Official Statement in substantially the form of the Preliminary Official Statement with only such changes and insertions therein from the Preliminary Official Statement as shall have been approved by Barclays, to enable Barclays to comply with Rule 15c2-12. The City will not be required to provide any "10b-5 representations" with respect to the Preliminary Official Statement, but shall only be required to deem the Preliminary Official Statement final in accordance with the terms of Rule 10b-5. For the avoidance of doubt, the City shall be required to provide customary "10b-5 representations" with respect to the final Official Statement.

(c)     To the extent required by law, the City will enter into one or more agreements or other legally binding continuing disclosure obligations for the benefit of the holders of the Exit Notes, obligating the City to provide secondary market disclosure as required by Rule 15c2-12.

(d)     The City will furnish such information, will execute and deliver such instruments and documents and will take such other action in cooperation with Barclays as Barclays may reasonably request at no cost to the City to: (i) qualify the Exit Notes for offer and sale under the "Blue Sky" or other securities laws and regulations of such states and other jurisdictions of the United States of America as Barclays may (in its sole discretion) designate; (ii) determine the eligibility of the Exit Notes for investment under the laws of states and other jurisdictions as Barclays may (in its discretion upon consultation with, and agreement of the City) designate, and to provide for the continuance of such qualifications or exemptions in effect for so long as required for distribution of Exit Notes; and (iii) allow Barclays to sell the Exit Notes, each in accordance with in accordance with market practice and securities and state law at such time.

(e)     The City shall engage nationally recognized bond counsel ("**Bond Counsel**") and Bond Counsel shall provide, at closing, an opinion, reasonably acceptable to Barclays, with respect to the validity of the Exit Notes and, if applicable, the exclusion from gross income of the owners of the Exit Notes of interest payable on the Exit Notes, for federal income tax purposes and to the effect that the Exit Notes are exempt from registration under the Securities Act and the related financing documents are exempt from qualification under the Trust Indenture Act of 1939, as amended.

(f)     The City shall, to the extent required by law, properly and timely file, with the assistance of Bond Counsel, Form 8038-G with the Internal Revenue Service pursuant to Section 149(e) of the Internal Revenue Code.

- 3 -

[[3430711]]

13-53846-swr   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 21:22:45   Page 175 of 93
13-53846-swr   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 175 of 93

559

DTPPF00009768

175

(g)     The City shall, if applicable, provide a non-arbitrage certificate or tax regulatory agreement prepared by Bond Counsel, which shall set forth the facts, estimates and circumstances sufficient to satisfy the criteria which are necessary under the Internal Revenue Code, to support the opinion of Bond Counsel that the interest on the Exit Notes is excludable from gross income to the beneficial owners thereof under the Internal Revenue Code, if such Exit Notes are issued on a tax-exempt basis.

(h)     If the Exit Notes are issued on a tax-exempt basis, the City shall make all customary covenants required by Barclays with respect to the tax-exempt status of the Exit Notes, including, without limiting the foregoing, covenants to the effect that (i) the City will not take, or omit to take, any action lawful and within its power to take, which action or omission would cause interest on any Exit Note to become subject to federal income taxes, (ii) the City will not permit any of the proceeds of the Exit Notes to be used in any manner that would cause any Exit Notes to constitute a "private activity bond" within the meaning of Section 141 of the Internal Revenue Code, (iii) the City will not permit any of the proceeds of the Exit Notes or other moneys to be invested in any manner that would cause any Exit Note to constitute an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code or a "hedge bond" within the meaning of Section 149(g) of the Internal Revenue Code and (iv) the City will comply with the provisions of Section 148(f) of the Internal Revenue Code relating to the rebate of certain investment earnings at periodic intervals to the United States of America.

(i)     Documentation in respect of the Exit Financing will contain such conditions precedent, representations, warranties, events of default and other terms and conditions as may be agreed among the parties, and which are customary for transactions of this nature.

(j)     The City shall provide such additional legal opinions, instruments and other documents as Bond Counsel, Barclays or Barclays's counsel may reasonably request in order to conform to then-current market practice, or to satisfy Barclays's internal policies or to comply with all securities, tax and state laws requirements and all other laws, rules and regulations applicable to a public offering of this type.

3.      <u>Clear Market</u>

You agree that you will ensure that no mandate or authorization to arrange any Exit Financing in the capital or financial markets shall be awarded to any financial institution or group of financial institutions other than to Barclays in accordance with this Engagement Letter. Notwithstanding anything herein to the contrary, to the extent the City violates this Section 3, Barclays' sole and exclusive remedy is the fee provided for in Section 6(c) hereof.

4.      <u>No Commitment</u>

(a)     Barclays shall not be obliged by this Engagement Letter to underwrite, purchase, syndicate or place the Exit Notes or any other debt or provide any other financing. If an offering of Exit Notes is undertaken, or any other debt financing is arranged, the

- 4 -

[[3430711]]

contractual arrangements will be reflected in one or more underwriting, purchase, credit or other agreements between the City and the parties thereto (each, a "**Financing Agreement**"). You acknowledge that Barclays will have no obligation to buy or place the Exit Notes or to arrange or participate in the making of any other financing available, in each case, except upon signing of such definitive agreements.

(b)     The execution of any Financing Agreement will be subject, in the complete discretion of Barclays, to, among other things, (i) satisfactory completion of a due diligence review, (ii) the receipt of all necessary internal and external approvals (including internal commitment committee approval), (iii) market conditions which, in Barclays's judgment, are satisfactory, and (iv) compliance by the City with this Engagement Letter and such definitive agreements. Each Financing Agreement will be consistent with this Engagement Letter to the extent permitted by law and otherwise will include the final terms of the financing, including the transaction size, structure and pricing terms, as well as other reasonable and customary terms and conditions agreed to by the City, including provisions relating to indemnity, conditions precedent for the agreement to become effective and certain termination events. The provisions of this Section 4(b) shall remain effective until a Financing Agreement is executed and thereafter this Section 4(b) shall be superseded by such Financing Agreement to the extent provided for therein.

5.     Conflicts of Interest

You acknowledge that Barclays is engaged in securities trading and brokerage activities, as well as providing investment banking and financial advisory services. In the ordinary course of trading and brokerage activities and the production of research, Barclays and its affiliates may at any time hold positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt securities of entities that may be involved in the transactions contemplated hereby. You acknowledge and agree that Barclays may be prevented, by reason of law, duties of confidentiality owed to other persons, the rules of any regulatory authority or Barclays's internal controls, from using or disclosing to you any information known to Barclays in connection with this Engagement Letter or the transactions contemplated hereby. You agree, so as expressly to override any duties, obligations or restrictions which would otherwise be implied by law or regulation, that in carrying out this Engagement Letter, Barclays will not be required to have regard to or rely on any material information from other clients which is confidential which may be relevant to you or any material information obtained by Barclays while acting for another client which has interests which conflict with your interests in relation to the transactions contemplated hereby.

6.     Fees; Expenses

(a)     You agree to pay to Barclays an aggregate underwriting discount, placement fee, initial purchaser's discount or arrangement fee with respect to the Exit Financing (the "**Underwriting Spread**") equal to (i) in the event the Exit Financing receives at least one investment grade public rating from either Moody's Investors Service or Standard & Poor's, 0.50% of the aggregate principal amount of the Exit Financing and (ii)

- 5 -

[[3430711]]

otherwise, 0.75% of the aggregate principal amount of the Exit Financing, in each case to be deducted from the gross proceeds thereof.

(b)     In addition to the Underwriting Spread, whether or not an Exit Financing is completed or any financing is arranged, you shall pay all reasonable and documented out-of-pocket costs and expenses of Barclays, if any, in connection with the Exit Financing, including the reasonable fees, expenses and disbursements of legal counsel. You agree that you shall be responsible for all your own legal, accounting and other agents' or advisors' fees and costs, including all other expenses related to the transactions contemplated hereby.

(c)     In the event that you or any person on behalf of you completes an Exit Financing or any bond, note, bank, bridge or other syndicated credit or other financing in lieu of the Exit Financing (collectively, the "**Alternative Financing**") the proceeds of which are to be used in whole or in part to repay debt incurred during the Bankruptcy Case (including, without limitation, the Post-Petition Facility) and/or pay other debt and claims outstanding at the time the City exits the Bankruptcy Case, in each case, without providing Barclays the right to provide, arrange, place or underwrite such Exit Financing or Alternative Financing, then you agree, unless Barclays has terminated this Engagement Letter or breached its obligation to provide the Exit Financing on the terms set forth herein, to pay to Barclays an amount equal to 0.75% of the aggregate outstanding amount of the Post-Petition Facility immediately prior to the time the City exits the Bankruptcy Case, which payment will be made on the date of the closing of such Exit Financing or Alternative Financing from the proceeds of thereof.

(d)     To the extent applicable, all amounts payable hereunder are exclusive of value-added tax or any similar taxes ("**VAT**"). All amounts charged or required to be reimbursed hereunder will be invoiced together with VAT, where required, and such VAT shall be for your account. In addition, all such amounts shall be paid free and clear of, and without any deduction or withholding for or on account of, any current or future taxes, levies, imposts, duties, charges or other deductions or withholdings levied in any jurisdiction from or through which payment is made or where the payer is located unless such deduction or withholding is required by applicable law, in which event, you agree to pay additional amounts so that the persons entitled to such payments will receive the amount that such persons would otherwise have received but for such deduction or withholding.

7.     <u>Information</u>

(a)     You agree to use your best efforts, to the extent permitted by law, to (a) furnish or cause to be furnished to Barclays such information as Barclays may reasonably request for inclusion in any document to be used in connection with the Exit Financing (all such information so furnished being the "**Information**"), (b) provide all information to Barclays and its advisors as Barclays shall, and such advisors shall, reasonably request in connection with legal and business due diligence, and (c) furnish or cause to be furnished to Barclays all information concerning the transactions contemplated hereby and the operations and affairs of the City which is,

- 6 -

[[3430711]]

13-53846-swr   Doc 43176-3   Filed 04/29/14   Entered 04/29/14 22:00:46   Page 178 of 93
13-53846-swr   Doc 4317-3   Filed 04/27/13   Entered 04/27/13 21:22:45   Page 178 of 93
559

DTPPF00009771
178

in the opinion of Barclays, material to the proper performance under this Engagement Letter and all such further information as Barclays may reasonably request. You recognize and confirm that Barclays (a) will rely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Engagement Letter without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and (c) will not make an appraisal of any assets or liabilities of the City. You will promptly advise Barclays in writing if you become aware that any Information previously provided has become inaccurate or misleading in any material respect or is required to be updated in any material respect.

(b)  Barclays may share any Information and any other information or matters relating to you and the transactions contemplated hereby with any of their affiliates, and any such affiliate may likewise share information relating to you and the transactions contemplated hereby with Barclays, in each case, on a confidential and need-to-know basis in connection with the transactions contemplated hereby.

8.  Indemnity

(a)  You agree to indemnify and hold harmless Barclays (in each case, for itself and for each Indemnified Party) and its affiliates and their respective directors, officers, employees, agents and controlling persons (Barclays and each such person being an "**Indemnified Party**") from and against any and all losses, claims, damages, liabilities, costs and expenses whatsoever, joint or several, to which any such Indemnified Party may become subject caused by, relating to or arising out of any untrue statement or alleged untrue statement of a material fact contained in the final Official Statement, furnished or made available by you or your agents or representatives or the omission or the alleged omission to state therein a material fact necessary in order to make the statements therein not misleading, in the light of the circumstances under which they were made; provided, however, that the City will not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of or is based upon an untrue statement or omission or alleged untrue statement or omission made in the Official Statement either (a) in reliance upon and in conformity with written information supplied to the City by Barclays specifically for inclusion therein, unless the City has independent knowledge as to the truth of such written information, or (b) contained under the captions "BOOK-ENTRY ONLY SYSTEM," "TAX EXEMPTION," "RATINGS," or "UNDERWRITING" or similarly titled sections except to the extent that information under such captions was based upon information supplied by, or solely within the independent knowledge of, the City, and will reimburse each Indemnified Party to the extent permitted by law for all expenses (including counsel fees and expenses) as they are incurred by an Indemnified Party in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto and whether or not such claim, action or proceeding is initiated or brought by or on behalf of the City and whether or not the City is a party thereto. You shall not be liable to any Indemnified Party under clause (ii) of the foregoing indemnification provision to the extent that any loss, claims, damage, liability or expense which is determined by a non-

- 7 -

[[3430711]]

13-53846-swr   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 22:00:26   Page 179 of 193   DTPPF00009772
13-53846-swr   Doc 4374-3   Filed 04/29/14   Entered 04/29/14 21:22:46   Page 6 of 9
559   179

appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's willful misconduct or gross negligence. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the City or any of its agents or representatives related to or arising out of the appointment of Barclays pursuant to, or the performance by Barclays of the services contemplated by, this Engagement Letter except to the extent that a non-appealable judgment of a court of competent jurisdiction determines that any loss, claim, damage or liability has resulted from Barclays's willful misconduct or negligence, including, without limitation, any material omission or misstatement provided by Barclays provided by it to the City for inclusion into the final Official Statement. In no event shall any Indemnified Party be liable for consequential damages which may be alleged to arise out of or in connection with this Engagement Letter or the transactions contemplated hereby or relating or in any way arising from any proposed or actual use of the proceeds from the Exit Financing or any related matter.

(b)    You agree to notify Barclays promptly after becoming aware of the assertion against you or any of your agents or representatives, or after receipt of notice of the assertion against any other person, of any claim or the commencement of any such action or proceeding relating to any transaction contemplated by this Engagement Letter or its engagement hereunder.

(c)    You agree that, without Barclays's prior written consent, you will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which (i) Barclays or any other Indemnified Party is an actual or potential party to such claim, action or proceeding or (ii) indemnification could be sought under the indemnification provision of this Engagement Letter (whether or not Barclays or any other Indemnified Party is an actual or potential party to such claim, action or proceeding) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding and does not include a statement as to an admission of fault, culpability or failure to act by or on behalf of any Indemnified Party. Except as set forth above, you further agree that you have no right to settle, compromise, negotiate, consent, make any representation or do anything on behalf of Barclays in any pending or threatened claim, action or proceeding.

(d)    Neither Barclays nor any of its affiliates shall be liable hereunder for any action, failure to act or breach of this Engagement Letter by any person other than itself and nothing in this Engagement Letter or the nature of our services shall be deemed to create a fiduciary or agency relationship between Barclays or its affiliates, on the one hand, and the City or any of its agents or representatives, on the other hand. Furthermore, you agree that you will not institute, support and participate in claims in respect of this Engagement Letter brought personally against any employee, partner, servant or agent of Barclays.

- 8 -

[[3430711]]

9.  Termination

This Engagement Letter shall terminate on the closing of an Exit Financing or an Alternative Financing. This Engagement Letter may be terminated at any time by Barclays upon at least three business days' prior written notice thereof to that effect. The provisions contained herein relating to confidentiality, the payment of fees, any accrued rights and liabilities and indemnification will survive any such termination.

10. Miscellaneous

(a)  You acknowledge and agree that Barclays has been retained to act for the City to the extent provided herein.

(b)  This Engagement Letter may not be assigned by you without the prior written consent of Barclays.

(c)  You agree that this Engagement Letter including, without limitation, any advice rendered hereunder, is for your confidential use only and will not be disclosed by you to any person other than to your agents, representatives, officers, directors and advisors in connection with the Exit Financing on a confidential and "need to know" basis, except that, following your acceptance hereof, and after providing prior written notice to Barclays and with appropriate redactions as reasonably requested by Barclays, you may make such public disclosures of the terms and conditions hereof as you are required by law, court of law (including the Bankruptcy Court) or legal or regulatory process to make (including as required under Michigan P.A. 436 or Section 36a of the Michigan Home Rule City Act). You agree that you will permit Barclays to review and approve any reference to Barclays contained in any press release, filing or similar public disclosure made in connection herewith or any such press release, filing or public disclosure required to be reviewed and/or approved by Barclays under any applicable law or regulation prior to public release. You acknowledge that Barclays may, at its option, place an announcement in such newspapers and periodicals as it may choose describing its role in connection with the Exit Financing.

(d)  This Engagement Letter shall be governed by, and construed in accordance with, the laws of the State of Michigan.

(e)  This Engagement Letter is issued for your benefit only and no other person or entity (other than the Indemnified Persons) may rely hereon.

(f)  Each of the Engagement Parties hereby irrevocably and unconditionally:

(i)  submits, for itself and its property, (a) during the pendency of the Bankruptcy Case, to the exclusive jurisdiction of the Bankruptcy Court and (b) after the Bankruptcy Case has been closed, to the non-exclusive jurisdiction of (1) the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and (2) the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan and, in each case of the foregoing, any appellate court from any

- 9 -

[[3430711]]

such court, in any action, suit, proceeding or claim arising out of or relating to this Engagement Letter or the transactions contemplated hereby, the performance of services contemplated hereunder, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action, suit, proceeding or claim may be heard and determined in such court; provided that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction,

(ii) waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any action, suit, proceeding or claim arising out of or relating to this Engagement Letter, the transactions contemplated hereby or the performance of services contemplated hereunder in any such court,

(iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of any such action, suit, proceeding or claim in any such court,

(iv) agrees to commence any such action, suit, proceeding or claim in such courts, as applicable and

(v) agrees that service of any process, summons, notice or document by registered mail addressed to the City or Barclays, as applicable, shall be effective service of process for any such action, suit, proceeding or claim brought in any such court.

(g) You agree, on behalf of yourself and your agents and representatives, that the foregoing provisions of Section 10(f) above shall also apply to your agents and representatives to the same extent as to you, and Barclays's obligations hereunder are being made in reliance on the foregoing.

(h) **EACH OF THE ENGAGEMENT PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, SUIT, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY HERETO ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO IN THIS ENGAGEMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER.**

(i) If any term, provision, covenant or restriction in this Engagement Letter is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. You and Barclays shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid and enforceable provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

- 10 -

[[3430711]]

(j)   This Engagement Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this letter by facsimile transmission shall be as effective as delivery of a manually signed counterpart hereof.

*[The remainder of this page intentionally left blank]*

- 11 -

[[3430711]]

DTPPF00009776

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Barclays a duplicate copy of this Engagement Letter enclosed herewith.

Very truly yours,

BARCLAYS CAPITAL INC.

by _____

Name: John Gerbino
Title: Managing Director

Accepted and agreed to as of
the date first written above:

THE CITY OF DETROIT, MICHIGAN

By _____

Name: KEVYN D. ORR
Title: EMERGENCY MANAGER

- 12 -

[[3430711]]

**Exhibit C**

**Email from Anne Marie Langan to Todd Snyder**

| From: | Anne Marie Langan |
|---|---|
| To: | Snyder, Todd |
| Cc: | Corley, Irvin |
| Subject: | RE: Syncora Proposal |

Todd,
Council passed a resolution that explains why they voted down the Barclay's proposal and turned down Synagro's proposal.

Attached is the resolution they approved.

While your proposal was clearly an improvement over Barclay's, Council had philosophical issues with this path (DIP financing) as well as the rushed feeling that they just received it and had not had bond counsel review it. I do believe the philosophy overrode all however.
Just wondering - How long would it have taken to get a complete document? Would a complete document have included the terms plus boilerplate? or would we have had to conduct further negotiations? or would you have waited until you heard from the loan board?

Nice to have worked with you. Question - was Synagro's proposal to the EM much different than the one offered this morning?

Regards,




Anne Marie Langan
Fiscal Analyst


City of Detroit
City Council Policy Division


313.224.1078 phone


313.224.2783 fax
anne@detroitmi.gov
>>> "Snyder, Todd" <todd.snyder@rothschild.com> 10/25/2013 1:44 PM >>>


Irv and Anne Marie,


Can you give me any sense of the expected steps from here so I can report to my client?

1

DTPPF00011112

**Todd R. Snyder**

**Executive Vice Chairman of North American GFA**

**Co-Chair of the North American Debt Advisory and Restructuring Group**

**Rothschild**

Tel    +1 (212) 403-5246

e-mail   todd.snyder@rothschild.com

1251 Avenue of the Americas, 33rd Floor, New York, NY  10020, USA

**From:** Irvin Corley [mailto:irvin@detroitmi.gov]

**Sent:** Friday, October 25, 2013 9:47 AM

**To:** Snyder, Todd

**Subject:** Re: Syncora Proposal

I got it.  Thanks!  We'll keep in touch, Irv

>>> "Snyder, Todd" <todd.snyder@rothschild.com> 10/25/2013 8:32 AM >>>

Irv,

We turned it for you late last night. Pls confirm receipt

2

DTPPF00011113

Best,

Todd

Todd R. Snyder

Executive Vice Chairman of North American GFA / Co-Chair of the North American Debt Advisory and Restructuring Group

Rothschild

Tel     +1 (212) 403-5246

e-mail   todd.snyder@rothschild.com

1251 Avenue of the Americas, 33rd Floor, New York, NY 10020, USA

**From**: Irvin Corley [mailto:irvin@detroitmi.gov]

**Sent**: Thursday, October 24, 2013 08:42 PM Eastern Standard Time

**To**: Anne Marie Langan <Anne@detroitmi.gov>; Snyder, Todd

**Cc**: Lakisha Barclift <BarclifL@atwpo.ci.detroit.mi.us>; Liz Cabot <CabotL@detroitmi.gov>; David Whitaker <DavidW@detroitmi.gov>; Jerry Pokorski <Pokorski@detroitmi.gov>

3

**Subject**: Re: Syncora Proposal

One more from Irv:

No language in Events of Default section of Term Sheet document that states "the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established" as an event of default.

>>> Anne Marie Langan 10/24/2013 6:42 PM >>>

Todd,

Per our recent phone discussion, you asked us to send you in writing our items of concern:

Page 1 on the DIP Term Sheet -

Maturity - the option to extend should be clarified.

Affirmative Covenant - This should be stricken as it is unacceptable as written.

Collateral - The first bullet point on first priority lien on the art owned by Detroit should be stricken.

Mandatory Redemption - This should be stricken as it is unacceptable as written.

This is not to be construed as a counter-proposal but rather a list of items that when altered may make a proposal from Syncora/Rothschild more attractive as an alternative DIP financing proposal.

4

Please be mindful that we do not have the authority to accept or not accept any proposals or negotiate on the city's behalf.  We will quickly forward any additional offers that you would like to make to Council.


Thank you for your time and consideration,


Anne Marie Langan

Fiscal Analyst

City of Detroit

City Council Policy Division

313.224.1078 phone

313.224.2783 fax

anne@detroitmi.gov

>>> "Rakiter, Michael" <Michael.Rakiter@Rothschild.com> 10/24/2013 3:02 PM >>>

Anne Marie,

Per your discussion with Todd Snyder, please find attached the Syncora DIP term sheet proposal. Additionally, the attachment includes a comparison that highlights the primary improvements in the Syncora proposal versus the Barclays' proposal.


Best regards,

Mike


**Michael Rakiter**

**Associate**

Global Financial Advisory


**Rothschild**

Tel     +1.212.403.3788

Mobile  +1.917.371.2738

Fax     +1.212.403.5408

e-mail  michael.rakiter@rothschild.com

1251 Avenue of the Americas, 33rd Floor, New York, NY 10020, USA

Rothschild operates in the USA through Rothschild Inc.




Reso_Watson_350
mill_Revised LB...

6

DTPPF00011117

# Exhibit D

**Hr'g Tr., Nov. 14, 2013, 14:36 ET**

```
                    UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                              .        Detroit, Michigan
                              .        November 14, 2013
                  Debtor.     .        2:36 p.m.
. . . . . . . . . . . . . . . .
```

        HEARING RE. MOTION OF THE OBJECTORS FOR LEAVE TO
    CONDUCT LIMITED DISCOVERY IN CONNECTION WITH MOTION OF
     THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C.
      SEC. 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),
      503, 507(a)(2), 904, 921 and 922 (I) APPROVING POST-
     PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING
        SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING
                       AUTOMATIC STAY
           BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:       Jones Day
                      By:  BRAD B. ERENS
                      77 West Wacker
                      Chicago, IL  60601-1692
                      (312) 782-3939

                      Jones Day
                      By:  ROBERT W. HAMILTON
                      325 John H McConnell Blvd., Suite 600
                      Columbus, OH  43215
                      (614) 469-3939

For Detroit           Clark Hill, PLC
Retirement            By:  ROBERT D. GORDON
Systems - General     151 South Old Woodward, Suite 200
Retirement System     Birmingham, MI  48009
of Detroit, Police    (248) 988-5882
and Fire Retirement
System of the City
of Detroit:

For National          Sidley Austin, LLP
Public Finance        By:  GUY S. NEAL
Guarantee             1501 K Street, N.W.
Corporation:          Washington, DC  20005
                      (202) 736-8041

13-53846-swr  Doc 43170-3  Filed 04/29/14  Entered 04/29/14 22:00:26  Page 193 of 9
13-53846-swr  Doc 4370-3  Filed 04/29/14  Entered 11/27/13 21:22:45  Page 1 of 9
                                     559                                      193

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee, Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP By: STEPHEN HACKNEY 300 North LaSalle Chicago, IL 60654 (312) 862-2074 |
| For Ambac Assurance Corporation: | Arent Fox, LLP By: CAROL CONNOR COHEN 1717 K Street, N.W. Washington, DC 20036 (202) 857-6054 |
| Court Recorder: | Letrice Calloway United States Bankruptcy Court 211 West Fort Street 21st Floor Detroit, MI 48226-3211 (313) 234-0068 |
| Transcribed By: | Lois Garrett 1290 West Barnes Road Leslie, MI 49251 (517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

 1          THE COURT:  And let's move on and talk about

 2   discovery.

 3          MR. HACKNEY:  Good afternoon, your Honor.  Stephen

 4   Hackney on behalf of Syncora.

 5          THE COURT:  Yes, sir.

 6          MR. HACKNEY:  Your Honor, we're here on a motion

 7   that Syncora filed with several other parties joining that

 8   relates to discovery that we'd like to take in anticipation

 9   of the hearing on the motion for post-petition financing that

10   you spent most of the morning and afternoon discussing.

11   Before I -- I know that we're running into your next call,

12   and I will get right into the discovery itself, but I was

13   wondering if I could --

14          THE COURT:  Well, don't worry about that.  Don't

15   feel rushed.  I want to --

16          MR. HACKNEY:  Okay.  I will try.

17          THE COURT:  I want to take our time and do this

18   properly.

19          MR. HACKNEY:  I wanted to at the start, if I could,

20   your Honor, frame the importance of the DIP motion itself to

21   the case because I think its importance is significant not

22   only to this case but to other Chapter 9's that may follow,

23   and I think it's important to think about that in the context

24   of why we believe discovery is important.  As you've heard

25   today, the proposed DIP loan in question is believed to be

1    the first of its kind.  We actually -- our research indicates
2    that it's not literally the first Chapter 9 DIP loan.  Our
3    research indicates that there have been a couple small DIP
4    loans in other Chapter 9's, and there was a sizeable one that
5    was done as part of a plan, but it is the first of its kind
6    in terms of being the largest and also one I think that is
7    unabashedly about revitalization of the city in part as
8    opposed to immediate cash flow needs, so the DIP loan in this
9    case that's being proposed is significant.

10           It is significant for a second reason, and that is
11   because the proceeds of the DIP loan, the $350 million, 230
12   million about will be used to pay certain creditors outside
13   of the plan context, and the $120 million that's going to be
14   devoted to what are called quality of life initiatives, the
15   idea of a revitalization of the City of Detroit, a
16   renaissance on the street, so to speak, is also one that will
17   be happening outside the plan context, so they're coming to
18   you on an interim basis between eligibility and confirmation
19   and saying that they would like to be able to do this today.

20           The reason this is of great sensitivity and concern
21   to creditors is because if the city pledges away income
22   streams or assigns them to different parties now, it has
23   obviously an important impact on the city's ability to later
24   fairly adjust the debts of creditors like Syncora or the
25   pensioners or the others, so we perceive there to be

1 significant plan implications by some of these interim

2 motions that are being brought to the Court, and that is why

3 this is an area of great focus and concern for creditors, and

4 that informs somewhat the discovery that we've sought.

5       I believe there is some agreement with the city that

6 some discovery is appropriate, and I'd like to recite that

7 for the record and try and narrow it.  The city, as I

8 understand it, is amenable to the idea that the objectors can

9 obtain discovery into the DIP solicitation process, the DIP

10 evaluation process, and the process by which the DIP was

11 submitted to the City Council under PA 436.  It's my

12 understanding, at least, that we have general agreement that

13 that's okay and also that the city is willing for its

14 deponents, Mr. Doak and Mr. Moore, to be deposed.

15       Where there is disagreement with respect to the

16 scope of potential document requests and inquiry is on the

17 subject of the uses and the need for the quality of life

18 proceeds, and this is where I will confess I was taken a

19 little aback by our disagreement on this because the motion

20 itself is replete with references to Mr. Moore's declaration

21 but also to a discussion of all of the challenges that the

22 City of Detroit faces, for example, with respect to blight

23 remediation, the fire department, the police department, and

24 IT infrastructure.  These are some of the areas where the

25 city has said it may -- it's not obligating itself to, but it

 1   has said it may or that it intends to direct the quality of

 2   life proceeds at these subject matter areas.  We believe that

 3   discovery into --

 4          THE COURT:  Excuse me.  Why does Syncora care about

 5   what the city's priorities are in terms of quality of life

 6   spending?

 7          MR. HACKNEY:  The answer, your Honor, is because, as

 8   a creditor who, you know, expects to see a plan of adjustment

 9   at the end of the case that fairly allocates or fairly

10   adjusts its debts along with the debts of the others in the

11   case, the way the city spends its money and the impact or

12   lack of impact that has on creditor recoveries Syncora

13   believes is endemic to analyzing whether it is, for example,

14   within the business judgment, as the city has contended it is

15   and which is one of the elements under Section 364 or one of

16   the factors you'll consider, whether it's in the best

17   interest of creditors, as they have suggested that it is in

18   their papers and as the order they proposed would find, and

19   it also goes to whether --

20          THE COURT:  Do you think the city is going to ask me

21   to approve its allocation of how it's going to spend the

22   proceeds of the loan?

23          MR. HACKNEY:  I think that --

24          THE COURT:  That makes me sound like a mayor or a

25   city council.

 1          MR. HACKNEY:  Well, these -- your questions go right

 2    to the core, I think, of this matter, but also in some

 3    respects of the case, and I was -- let me respond in two

 4    respects, your Honor.

 5          THE COURT:  Well, we don't have to have an answer

 6    now, but the issue is why have discovery on all of this?

 7          MR. HACKNEY:  Yeah.  So I will answer your question,

 8    which is I know that the city -- or I believe that the city

 9    is taking the position that you're not permitted to consider

10    either the needs or the uses of the funds and that they have

11    sovereignty to administer themselves sort of thematically

12    under Section 904.

13          THE COURT:  Is that a proposition you disagree with?

14          MR. HACKNEY:  It is.  It is because, your Honor, I

15    acknowledge that under Section 904 that the city has the

16    right to administer itself without the Bankruptcy Court

17    interfering.  That's the language of Section 904.  But where

18    things change substantially is when you come to this Court

19    and ask this Court to begin to work the controls of the

20    Bankruptcy Code to the benefit of the city when they invoke

21    concepts like obtaining superpriority liens or good faith

22    assurances to be given to parties so that they're protected

23    no matter the outcome of various appeals and so on and so

24    forth.  When you come into that context, we believe you've

25    now entered -- first of all, you've put your dispute --

 1   you've consented to the idea that the Bankruptcy Court must

 2   determine whether it's appropriate, and we believe that

 3   unlike a mayor or another political leader who thinks about

 4   the needs of his citizens or her citizens in administering

 5   the body politic, a bankruptcy judge, under Chapter 9 and the

 6   history behind Chapter 9, the legislative purpose, does think

 7   in terms of fairness to creditors, that that is an essential

 8   aspect of the purpose of Chapter 9, and that the bankruptcy

 9   judge is duty bound to consider --

10          THE COURT:  The fairness of what, though?

11          MR. HACKNEY:  What's that?

12          THE COURT:  The fairness of what?

13          MR. HACKNEY:  The fairness of the proposed action in

14   terms of how it will impact creditors.  For example, we

15   believe, your Honor, if I could go back to answer your

16   question about will you have to involve yourself in assessing

17   how they propose to use the money and whether they're using

18   it in the right way, we think that, at a minimum, we should

19   be entitled to take discovery on the subject but also that

20   you should consider evidence later that there are less

21   burdensome ways, for example, for the city to improve the

22   quality of life in Detroit that may not impair creditor

23   recoveries or that may not require superpriority liens and

24   the like, that there are different ways that the money can be

25   spent so that creditors will obtain either a better return on

13-53846-swr  Doc 4317-3  Filed 04/29/14  Entered 04/29/14 22:00:26  Page 200 of 9
13-53846-tjt  Doc 4370-3  Filed 11/27/13  Entered 11/27/13 21:22:46  Page 9 of 9   200
559

1   their -- a better return on their claims.  And, for example,

2   your Honor, this is particularly appropriate when you think

3   about the concept of Section 364 and its incorporation into

4   Chapter 9, which hasn't always been part of Chapter 9, but

5   when it was incorporated, there's some of the legislative

6   history that suggests that the reason it was a good idea to

7   incorporate it into Chapter 9 was similar to the reason that

8   it is a good idea in Chapter 11, which is that post-petition

9   financing can be used to enhance the value of the estate and

10  enhance the value to creditors.  So we believe that the

11  question of how the money is being spent is germane to the

12  question of whether or not it's serving the purposes of

13  Section 364 even in the Chapter 9 context.

14          And your Court is asking -- the Court is asking

15  questions that I think are momentous ones.  I think the --

16  formulating the appropriate legal standard by which the Court

17  can determine that the interests of creditors are being

18  safeguarded whenever a municipal debtor invokes the

19  provisions of Chapter 9 that are outside Section 904 I think

20  is going to be critical and precedent setting, not only in

21  this case but also in the other cases, and I think that it is

22  inconsistent for the city, I guess, in my mind, your Honor,

23  to say that this evidence isn't relevant or that you're not

24  permitted to consider it when it dominates their motion and

25  where they are asserting that they have exercised good

13-53846-swr   Doc 4874-8   Filed 04/29/14   Entered 04/29/14 22:00:26   Page 201 of 49
13-53846-swr   Doc 4374-8   Filed 04/29/14   Entered 04/29/14 22:00:26   Page 201 of 49   201
559

 1  business judgment and that what they're going to do is in the

 2  best interest of creditors and is necessary to enhance the

 3  value of the estate and so forth, the other elements that

 4  you'll consider under Section 364.  That is why we want to

 5  obtain that discovery, and we want to test the proposition

 6  that the city is advancing that this is a good way to spend

 7  the money and, by the way, so important that it has to be

 8  done now outside of the plan context at a time where the city

 9  doesn't have some sort of cash flow emergency.  It's my

10  understanding that the city's cash coffers have actually

11  increased substantially during the bankruptcy in part because

12  it isn't -- it is not paying bond debt such as the debt held

13  by my client in part, so this isn't a situation where the

14  city is coming to you and saying we need $5 million to get us

15  through the case or to pay professionals or to literally pay

16  the police officers.  The city has more cash today than it

17  did when it started the cases.  It is about a novel and

18  distinct concept, in our view, novel in the history of

19  Chapter 9, which is that during the pendency of the case, you

20  can use the Bankruptcy Code to revitalize the city and to

21  allow for a renaissance, which is the word from the

22  declaration and from the motion.  And whether you can do that

23  outside the plan context and whether you can actually

24  subordinate creditor recoveries to the notion of

25  revitalization is, we believe, a threshold issue of critical

1   importance to the cases, and that's why we are urging the

2   Court to allow us to take discovery, to allow for a fully

3   developed record before you for whatever decision that you'll

4   make on this subject when we try it.

5           THE COURT:  What does this discovery entail

6   specifically?

7           MR. HACKNEY:  What I would think it would entail

8   is -- I understand that we haven't proffered requests yet,

9   but I've already mentioned to counsel for the city that I

10  understand we'll have to put some thought into formulating it

11  because we don't want every piece of paper that relates to

12  the fire department or the police department or to blight,

13  and it's likely burdensome for the city to go collect all of

14  that information.  What I was thinking that we would want

15  were two principal types of information.  The first type of

16  information would be information that relates to assessments

17  of how the City of Detroit can improve itself.  There have

18  been consultants obviously in this case who have been doing

19  this type of work.  There have also been other consultants,

20  it's my understanding, in the history of the City of Detroit

21  who have looked at some of these questions, and the types of

22  documents or reports, whether it's from a consultant or

23  whether it's something internal at the Detroit

24  Fire Department itself that says here are our needs, here are

25  the most important things to us that would most allow us to

 1   achieve our mission, here's the anticipated costs, those
 2   types of analytical documents I think would be of extreme
 3   importance to creditors so that they can make an assessment
 4   of whether or not the city is exercising its judgment in a
 5   way that's most appropriate or that is most efficient, and
 6   the second type of document that I could see would be
 7   documents that Mr. Orr himself considered as the decider
 8   behind the loan as he's looking out at the city he's
 9   administering and trying to decide how much money do I need
10   and what pacing and where will I put it and why, documents
11   that he considered that show how he selected the priorities
12   that he selected and documents that show what perceived
13   impact his decisions will have on the creditors in terms of
14   their recoveries to the extent these documents exist.  Those
15   are the types of documents I was thinking of when we broadly
16   described the concept of discovery into the uses and needs of
17   the quality of life note.
18          A third category of documents would be additional
19   specificity around the deployment of the capital in terms of
20   how it will be spent, the specific uses.
21          There are also some depositions that we had proposed
22   in addition to the two affiants, and the city, I think, is of
23   the view that it may object to some of those depositions.
24   There were four that we had put forward, a Barclays
25   deposition that relates to the negotiation of the DIP itself;

 1  depositions of City Council members that would be germane to
 2  discovery of the compliance with PA 436; discovery of an
 3  Ernst & Young representative, which is germane to the cash
 4  flow forecasts that have been assembled and what they say
 5  about the city's cash flow needs; and, last, depositions of
 6  the swap counterparties.  And I want to make clear for the
 7  Court in proposing the concept that we would depose the swap
 8  counterparties, it wasn't my intention that we would revisit
 9  the forbearance agreement discovery that was done previously.
10  It was my intention that we would examine them on the subject
11  of whether they're going to close on the optional termination
12  payment under a variety of circumstances because you wouldn't
13  want the city to take down $350 million in credit if it was
14  not going to be able to deploy the money in the way that it
15  was saying and pay the interest costs and so forth and not
16  being able to close.  The city has suggested that they oppose
17  the swap counterparty depositions and that they, I think,
18  needed additional information on the Ernst & Young purpose.
19          But those were the categories, and those were the
20  depositions that we propose to take, and I wanted to make
21  sure that I contextualize that within what's at stake here in
22  the motion itself.  Thank you.
23          THE COURT:  I'd like to hear from the city, please.
24          MR. HAMILTON:  Good afternoon, your Honor.  Robert
25  Hamilton of Jones Day on behalf of the City of Detroit.  When

 1    we received on October 23rd Syncora's motion for authority to

 2    take discovery under Rule 2004, while we thought the

 3    procedure was incorrect, we understood that discovery was

 4    inevitable and going to occur with respect to our at that

 5    time anticipated motion to obtain approval for the post-

 6    petition financing from Barclays, and we immediately began

 7    the process of collecting and reviewing documents for

 8    eventual production to Barclays -- I mean to Syncora and

 9    others who may decide to object to our motion for approval of

10    the financing facility.

11         We have collected and reviewed documents with

12    respect to how much financing -- external financing the city

13    will need to fund the assumption of the forbearance agreement

14    if this Court were to approve that assumption in a separate

15    hearing as well as how much external financing would be

16    needed to start the funding of the restructuring initiatives

17    that were the subject of the July 14th proposal to creditors

18    and that was the subject of extensive testimony during the

19    eligibility trial that your Honor oversaw over the last few

20    weeks.

21         We've also collected documents regarding the

22    solicitation process for potential participants in the post-

23    petition financing facilities as well as the myriad of

24    proposals that we received from various potential lenders and

25    their terms and documents regarding the exercise of the

1  city's business judgment in selecting the Barclays proposal

2  as the best one for the city.  As a result of that process,

3  we have collected and are prepared to produce tomorrow or

4  Monday over 5,000 pages of documents on each one of those

5  topics to those parties who indicate that they want to take

6  that discovery and, with respect to some of the documents,

7  agree to a protective -- or a confidentiality agreement to

8  maintain the confidentiality of some of the documents that

9  we're submitting.

10        We have also offered to Syncora to make our

11  witnesses, our two declarants, available for deposition, Mr.

12  Doak, who you heard from today, on Friday, November 22nd, in

13  New York, and on Monday, November 25th, Mr. Moore in Detroit.

14  The city consents to the discovery that I've just outlined

15  the production of all these documents on the need for

16  external financing, the process for obtaining that financing,

17  and the selection of Barclays.  We consent to the deposition

18  of those two declarants.

19        Syncora is asking for leave to take discovery on

20  other subjects that go substantially beyond the scope of what

21  we consented to, we believe on subjects that threaten to

22  impose substantial economic and logistical burdens on the

23  city on topics that we believe are not what this Court must

24  adjudicate when it hears and determines our motion for

25  approval of the post-petition financing motion.  Those

1   categories where they're going beyond what we think is the
2   legitimate scope fall under -- or there's two categories.
3   The first is relatively simple to deal with, and that's the
4   category with respect to our proposal -- or our request that
5   the Court approve our motion to assume the forbearance
6   agreement.  With respect to the motion that Syncora filed for
7   leave to take discovery, they did not list that as one of the
8   topics on which they were seeking documents, but they did
9   identify they wanted to take depositions of the swap
10  counterparties.  I did not follow entirely what counsel's
11  explanation was for why the depositions of the swap
12  counterparties is not a back door effort to take additional
13  discovery on the forbearance agreement, but I would just
14  suggest that if this Court at a separate hearing determines
15  to approve the city's assumption of the forbearance
16  agreement, the city, as -- pursuant to the terms of that
17  forbearance agreement that are detailed in our motion and in
18  the motion to assume the forbearance agreement, the city
19  would have the option to then cause the termination events
20  that would trigger our obligation to pay the $230 million --
21  $230 million -- 210 -- $210 million pursuant to that
22  forbearance agreement, so there would be, as we can see it,
23  no reason to depose in connection with the finance motion the
24  swap counterparties because the finance motion only becomes
25  material if you approve the forbearance agreement.  And if

 1    you approve the -- if you approve the forbearance agreement,
 2    what the swap counterparties say about what their intentions
 3    are are immaterial and irrelevant because at that point the
 4    city controls what happens upon seven or ten days' notice
 5    under the forbearance agreement.

 6           The bottom line is this Court has already heard and
 7    considered and decided what discovery should occur in
 8    connection with our motion to assume the forbearance
 9    agreement.  That discovery has occurred, and the hearing is
10    scheduled to occur, and it should -- it will be decided based
11    on the record that this Court already dictated should be
12    developed for that hearing, and Syncora or others should not
13    be allowed to pursue discovery on the finance motion as a way
14    to get back door discovery and supplement the record on the
15    motion to assume the forbearance agreement.

16           The more difficult argument and the more difficult
17    category is what counsel spent most of his time in his
18    argument on, and that is the request for discovery on our
19    proposed use of the quality of life -- the proceeds of the
20    quality of life bonds.  The devil in this request is
21    substantial.  While he indicates that they want to take just
22    limited document discovery, just assessments that the city
23    may have developed both at the macro level and at individual
24    department levels, the fire department, the police
25    department, and how much money they think they need for what

 1   particular improvements, documents that Mr. Orr may have

 2   considered in deciding what restructuring initiatives to

 3   approve and which ones to table, and how the money will be

 4   spent among various different departments, I can't think of

 5   what kind of evidentiary hearing counsel is contemplating

 6   that that discovery would go to other than sort of a super-

 7   tribunal in which this Court second-guesses and sits in

 8   judgments of every single governmental decision that the City

 9   of Detroit is making on how to go forward with its

10   revitalization and restructuring initiatives.  There is no

11   way that kind of hearing could be completed in one or two

12   days.

13          Essentially, I think what counsel is suggesting is

14   that Section 364 constitutes an effective repeal of Section

15   904 in a Chapter 9 case where the Bankruptcy Court does not

16   have authority or jurisdiction to interfere with a

17   municipality's governmental decisionmaking and its decisions

18   on how to use its property and revenue unless the

19   municipality decides they have to borrow some money, and if

20   the municipality decides it has to borrow some money, then

21   the Bankruptcy Court, notwithstanding 904, can sit in

22   ultimate judgment and second-guess every single spending

23   decision that the city makes on how much money to spend on

24   fire, how much money to spend on police, how much money to

25   spend on lighting, how much spending -- money to spend on

 1  roads, versus creditor recoveries.  And, in essence, they

 2  would turn the 364 --

 3          THE COURT:  Don't forget pensions.

 4          MR. HAMILTON:  Very important, pensions, maybe not

 5  sacrosanct, but very important.  And the point would be that

 6  instead of the Chapter 9 plan of adjustment process working

 7  those things out, they want to turn the 364 hearing into some

 8  macro hearing that decides how all the money that the City of

 9  Detroit should spend for the next ten years, how it should be

10  spent, what dollars should go to creditor recoveries, what

11  dollars should go to fire improvement, what dollars should go

12  to police improvement, all because we have to borrow some

13  money in order to fund some of these initiatives.  We do not

14  think that is a proper construction of either 904 or 364.  We

15  believe that when you hear the 364 motion, we have to

16  demonstrate that we exercise sound business judgment in

17  determining that we needed to borrow money in order to meet

18  our cash needs.  We will also have to demonstrate that we --

19  in order to borrow that money under 364(c)(2), we had to give

20  super administrative priority status and liens because

21  general unsecured credit was not available.  That does not

22  mean that this Court will sit in review of the city's

23  business judgment on the underlying money that is needed.

24  You do sit in judgment on whether or not forbearance

25  agreements should be approved, but that's on a separate

1  motion under 365 and a 9019 motion.  And if you decide that
2  that forbearance agreement should be approved, then we know
3  we need $210 million.   Then, in connection with the 364
4  motion, you will hear and adjudicate our business judgment as
5  to whether or not we needed to borrow the money to pay that
6  $210 million and whether or not the terms on which we want to
7  borrow that money are reasonable and in everybody's best
8  interest.  That is your call.

9          Similarly, by the same token, with respect to the
10  restructuring initiatives, the city has exercised its
11  governmental and political judgment as to how much money it
12  should invest in its restructuring initiatives over the next
13  ten years.  You do not sit in judgment and review the city's
14  exercise of its governmental and political decision-making in
15  that regard.  That's up to the city to figure out how to do
16  with the mayor, with the emergency manager, and with all the
17  constituents.  We have already presented an extensive
18  evidentiary record on how those calculations were made, what
19  the restructuring initiatives are, and how much they will
20  cost over the next ten years.  And we lay that out in our
21  motion just like we lay out all the details of the
22  forbearance agreement, but in connection to whether or not
23  you're going to approve the financing arrangement, what you
24  sit in judgment on is not our decision to spend $1.25 billion
25  over the next ten years on those restructuring initiatives

13-53846-swr    Doc 4874-8    Filed 04/29/14    Entered 04/29/14 22:00:28    Page 212 of 49
13-53846-tjt    Doc 4074-3    Filed 04/29/14    Entered 04/29/14 22:00:26    Page 212 of 249    212
559

1  because that's a governmental political decision that only

2  the City of Detroit has the authority to make.  What you sit

3  in judgment on is our business judgment that we need to

4  borrow some money to start paying for those initiatives and

5  the terms on which we want to borrow that money are

6  reasonable.  That's what you sit in judgment on, and we are

7  going to produce the documents that are relevant to that

8  inquiry, but it is not appropriate to turn the 364(c) hearing

9  into some mega trial that kind of makes moot the whole plan

10  of adjustment in which the parties ask you to decide what's

11  an appropriate use of loan proceeds and what's not.  Should

12  we use the loan proceeds to pay creditor recoveries, or

13  should we use it to pay pensions, should we pay it to use --

14  to pay for OPEB, or should we use it to pay for lighting?

15  That's not what this hearing is about, and I think it's

16  improper for them to try and seek discovery on that.

17          We are willing to make Mr. Moore and E&Y available

18  for deposition on the fact that we need to borrow money to

19  start paying -- to start funding the initiatives, the

20  restructuring initiatives, but we think it is improper for

21  them to take discovery on the underlying decision-making, the

22  political and governmental decision-making that the City of

23  Detroit has undertaken in deciding what restructuring

24  initiatives they're going to undertake and when over the next

25  ten years and how much they're going to cost.  That's not

1  appropriate for this motion.

2          THE COURT:  Thank you, sir.

3          MS. CONNOR COHEN:  Your Honor, may I also be heard

4  in support of the motion?

5          THE COURT:  Yes, ma'am.

6          MS. CONNOR COHEN:  Carol Connor Cohen, your Honor,

7  on behalf of Ambac Assurance Corporation.  Your Honor --

8          THE COURT:  But not to repeat anything.

9          MS. CONNOR COHEN:  I'm sorry.

10          THE COURT:  But not to repeat anything.

11          MS. CONNOR COHEN:  I will not repeat anything.  I

12  want to start with, though, talking about what the test is

13  under 364 because quite clearly the city has moved to have

14  your Honor make a ruling under 364(c) in this bond financing.

15  The Court will have to look at whether the debtors exercise

16  reasonable business judgment, whether --

17          THE COURT:  On what?

18          MS. CONNOR COHEN:  On -- I'm going to -- would you

19  just let me finish, and I'll get back to that?  I want to

20  come back to that.

21          THE COURT:  You're asking me not to ask you any

22  questions?

23          MS. CONNOR COHEN:  No.

24          THE COURT:  I didn't think so.

25          MS. CONNOR COHEN:  No, but actually there's a point

```
 1   I want to make --
 2              THE COURT:  Okay.
 3              MS. CONNOR COHEN:  -- here that --
 4              THE COURT:  I'll let you work into it.  That's fine.
 5              MS. CONNOR COHEN:  -- the Court has to exercise
 6   reasonable business judgment, has to evaluate whether it's in
 7   the best interest of creditors and the estate, has to look at
 8   alternative financing that might have been available, whether
 9   there are any better bids and all that kind of stuff -- we've
10   talked about that -- whether it's necessary, essential, and
11   appropriate to preserve the estate and continue operations,
12   whether the terms are fair, reasonable, and adequate, whether
13   it was negotiated in good faith and at arm's length.  Now,
14   some of those criteria are the same as in a Chapter 11, and
15   some of those criteria the debtor has said they're happy to
16   give us discovery on.  But there's two or three of these that
17   really have never been applied before on a Chapter 9, and
18   that's exactly my point, the reasonable business judgment and
19   the best interest of creditors and the estate and whether
20   it's necessary, essential, and appropriate to preserve the
21   estate and continue operations.  Those have never been
22   applied before in a Chapter 9, and part of what the Court
23   will have to do in deciding the motion before the Court will
24   be to decide what the proper criteria is, in fact.  I don't
25   believe that's what we're here for today because there is
```

1  going to be extensive briefing, I'm sure, on those questions,

2  and, you know, we will --

3          THE COURT:  Well, but some judgment about that is

4  necessary to control or decide the dispute about discovery.

5          MS. CONNOR COHEN:  Of course it is, and what we will

6  point to in discussing that issue, for example, is the

7  legislative history that was -- when 364 was first

8  incorporated into what was then the version of Chapter 9, and

9  at that time Congress said the reason they were doing it, the

10  reason they were adding this ability in for a municipality

11  was so that the municipality could maintain essential city

12  services directed to public safety and public health during

13  the reorganization proceeding, kind of a narrow purpose

14  because it was very controversial to add this provision into

15  Chapter 9.

16          Now, the question is going to become -- and we

17  don't -- this isn't a question for today again, but the

18  question is going to become at what level is the city

19  permitted to spend at the creditors' expense and still be

20  able to confirm a plan because it is pretty well settled --

21  there's tons of cases out there that when it comes time to

22  confirming a plan of adjustment, that the best interest of

23  creditors test does limit the city's ability to spend lots of

24  money on improving and glossing the current situation as

25  opposed to paying off creditors, that there's a limit to how

1   much money the city can expend at the expense of creditors.

2   We believe that same criteria should apply on the best

3   interest of creditors position here.

4           THE COURT:  Fixing the lights in the city is

5   glossing the city?

6           MS. CONNOR COHEN:  No.  And we're not talking about

7   the Lighting Authority motion right now anyway, but you're

8   right.

9           THE COURT:  All right.  Fair enough.  I'll change

10  the question.

11          MS. CONNOR COHEN:  To ask --

12          THE COURT:  Getting adequate police and fire is

13  glossing the city?

14          MS. CONNOR COHEN:  Having adequate police and fire

15  is not putting a gloss, absolutely not.  And the legislative

16  history suggests that's exactly why this provision was added

17  to Chapter 9, but how and whether you're doing it in the most

18  efficient manner or at the expense of repayment of creditors

19  is something that's in this Court's purview under this test.

20          Now, we keep hearing 904, 904, 904.  904 is not an

21  absolute.  904 says quite clearly that the debtor can consent

22  to the Court's involvement, interference, as the statute

23  says.  Here the debtor has come to the Court.  They could

24  have gone off and spent their money however they wanted.

25  They could have borrowed money if -- and spent it how they

1   wanted, but they came to your Honor and asked for an order,
2   and the reason they're coming to your Honor and asking for an
3   order is because --

4       THE COURT:  They came to the Court for an order but
5   only to approve the necessity of the borrowing, the necessity
6   of the priority and the senior liens, and to establish the
7   reasonableness of the terms.

8       MS. CONNOR COHEN:  But --

9       THE COURT:  What suggests there's any consent beyond
10  that?

11      MS. CONNOR COHEN:  Well, once you do that, when they
12  come to your Honor and asked to be able to give Barclays this
13  superpriority treatment and the like, then that has to be
14  considered consent to having the criteria under 364(c) apply,
15  which includes looking at the best interest of creditors and
16  whether they are not --

17      THE COURT:  Okay.  Can you walk me through the baby
18  steps as to why that follows because I don't exactly see it?

19      MS. CONNOR COHEN:  Well, simply coming to the Court
20  in the first instance has in other situations effectively
21  been treated as consent.  All right.  But they didn't have to
22  come to your Honor.

23      THE COURT:  I'm not sure the proponents of Stern
24  versus Marshall would a hundred percent agree with you on
25  that.

1      MS. CONNOR COHEN:  Well, I don't -- okay.  I'm going

2  to let that one pass, but --

3      THE COURT:  Well, no.  It's an important point,

4  which is the mere fact that a party comes to court can mean

5  consent to some things, but you have to be very careful in

6  measuring what the consent is.

7      MS. CONNOR COHEN:  All right.  I'll take that as a

8  given, but what the -- again, what the --

9      THE COURT:  Why I'm asking --

10      MS. CONNOR COHEN:  What the debtors --

11      THE COURT:  Why does this motion constitute consent

12  for this Court to approve, for example, how the city will

13  spend $350 million?

14      MS. CONNOR COHEN:  Because they're asking your Honor

15  to give them -- to give Barclays, this new lender who's going

16  to come in and layer on $350 million worth of new debt --

17      THE COURT:  Um-hmm.

18      MS. CONNOR COHEN:  -- over and above most of the

19  other creditors in this case --

20      THE COURT:  Um-hmm.

21      MS. CONNOR COHEN:  -- they're asking them to have

22  that superpriority status, to become a superpriority creditor

23  of the city, and part of the criteria for deciding whether

24  that's appropriate is to look at the best interest of

25  creditors, a test we believe has to be interpreted the same

 1  way as the best interest of creditors test in confirming a
 2  plan of adjustment, which, again, looks at a balance of the
 3  extent to which the city can spend at the expense of the
 4  creditors, so that does require -- now, the litany of
 5  horribles we got about the kind of trial, we don't think
 6  that's what you were looking at.
 7          THE COURT:  Is there a 943 case that says that?
 8          MS. CONNOR COHEN:  I'm not aware of a 943 case, no,
 9  but when -- what we're talking --
10          THE COURT:  You know what I'm asking.  I'm asking in
11  defining best interest of creditors in plan confirmation, is
12  there a case that gives the -- that says the Court has that
13  broad authority?
14          MS. CONNOR COHEN:  There actually was case law cited
15  in Syncora's objection to the Public Lighting Authority
16  motion that we joined in that says it's --
17          THE COURT:  I should look there?
18          MS. CONNOR COHEN:  Those cases say exactly that.
19          THE COURT:  All right.  I'll look there.  Thank you.
20  That's all right.  If it's there, you don't need to pull it
21  out again.
22          MS. CONNOR COHEN:  Sorry.
23          THE COURT:  That's all right.
24          MS. CONNOR COHEN:  I don't retain case names.
25          THE COURT:  Right.

 1          MS. CONNOR COHEN:  And I lost what I was saying.

 2          THE COURT:  Oh, I'm sorry.

 3          MS. CONNOR COHEN:  No.  It's not your fault.

 4          THE COURT:  Okay.  I won't take any then.

 5          MS. CONNOR COHEN:  Because that is a factor that has

 6  to be taken into account at plan time in that text -- in that

 7  context, then we think that's something that has to be taken

 8  into account also in applying 364 because it also

 9  incorporates a best interest of creditors component in the

10  factors, at least according to the case law, and that -- by

11  invoking the Court's jurisdiction to ask for that order, we

12  believe they have consented to having the Court look at the

13  things that have to be looked at.

14          Oh, I know what I was saying.  I was saying that the

15  hearing that we're looking for doesn't envision, you know, a

16  lengthy exposition of all of the operational details of all

17  of these various departments and so forth and so on but

18  rather a testimony about what they're going to spend it on,

19  why they need it, why they need those things, and why it has

20  to cost what they think they're asking for, and once your

21  Honor hears the testimony, then you decide does it meet this

22  criteria or not.  It's not saying this expenditure is okay

23  and this expenditure isn't.

24          THE COURT:  Where in this process do the citizens of

25  Detroit get to be heard?

```
 1        MS. CONNOR COHEN:  Well, they will be heard through
 2   their various representatives, many of whom are here, the
 3   unions, the retiree representatives.
 4        THE COURT:  There's 680-some thousand citizens.  A
 5   small percentage of them are represented by unions.
 6        MS. CONNOR COHEN:  Your Honor, I'm afraid I don't
 7   see that --
 8        THE COURT:  I guess my question is, you know, not to
 9   be flip about it, don't the citizens have a right to be heard
10   on the question of how the city will spend the proceeds of
11   this loan if it's approved, and if the answer to that
12   question is yes, isn't the mechanism for providing for that
13   right to be heard the political process, not the judicial
14   process?
15        MS. CONNOR COHEN:  Well, it is, and -- it is.
16        THE COURT:  Isn't that the end of the discussion?
17        MS. CONNOR COHEN:  And that's part of the 436
18   process.  I mean the political process is represented in this
19   situation in part by the 436 requirements, the City Council
20   and the Emergency Loan Board, for example, and for the city
21   officials who will be elected -- who have been elected and
22   who will be taking over when Mr. Orr's term is completed, but
23   with --
24        THE COURT:  Right, so why -- but doesn't that mean
25   it's a political process, not a judicial process?
```

1    MS. CONNOR COHEN:  Well, it's a judicial process to

2    the extent that your Honor has to apply the standards that

3    are in the statute and in the case law interpreting the

4    statute for providing Barclays with the superpriority status.

5    THE COURT:  Suppose the creditors' interests are

6    different from the citizens' interests?  What do I do then?

7    MS. CONNOR COHEN:  Your Honor applies the statute,

8    the statutory --

9    THE COURT:  Creditors win over the --

10   MS. CONNOR COHEN:  -- standard, which says that you

11   have to balance -- obviously the -- we don't -- none of us

12   would disagree that the city is entitled to and should spend

13   those amounts necessary to provide essential service to

14   provide public safety and health but doing so in a way and at

15   a cost that is reasonable and that doesn't do so at the

16   expense of the creditors.  Thank you, your Honor.

17   THE COURT:  All right.

18   MR. HACKNEY:  Your Honor, can I reply to Mr.

19   Hamilton?

20   THE COURT:  You can, but let me see if there are any

21   other objecting parties --

22   MR. HACKNEY:  Absolutely.

23   THE COURT:  -- who want to be heard, and then I'll

24   give you a chance.  Did you want to be heard, Mr. Gordon?

25   MR. GORDON:  Thank you, your Honor.  Robert Gordon

 1  of Clark Hill on behalf of the Detroit Retirement Systems.

 2  Thank you, your Honor.  In some respects, your Honor, I feel

 3  like I'm still trying to catch up from last week's trial to

 4  this issue, and I think it highlights what I'm seeing from

 5  over there as a chicken and egg and chicken again issue right

 6  now, which is it sounds like we're arguing objections that --

 7  legal issues that may be implicated by the motion that was

 8  filed for the DIP financing, which is supposed to be heard

 9  later, which hasn't been fully briefed yet, which may

10  determine what the total contours are of what's fair to ask

11  for in discovery.  We're arguing today to figure out what we

12  can ask for in discovery, and I'm concerned about that

13  because we haven't had a chance to fully brief this.

14  There's significant legal issues that are being discussed

15  here, but I don't think all of us have a chance to brief that

16  just yet, so I'm concerned about that.  So I'm not sure

17  whether --

18          THE COURT:  Well, I don't know what to do about

19  that.

20          MR. GORDON:  Yes.

21          THE COURT:  It is a concern, but the fact is that

22  Syncora filed this motion, and the choice was deal with it

23  now or deal with it later, and the reason why I chose now is

24  because the city says it's got to get going on this loan.

25          MR. GORDON:  Well, there seem to be a couple of

1   options here.  One, I'm just trying to think this out --

2   think this through with you before we're --

3          THE COURT:  Um-hmm.

4          MR. GORDON:  -- prejudiced in some way because I

5   would like to be able to brief this if we're really going to

6   go down this path today.  The discovery could be held in

7   abeyance while we file objections to the DIP financing and

8   claim that there's all sorts of reasonable business judgment

9   issues that the Court should be probing, and the Court could

10  then rule upon whether those are fair game or not subject to

11  discovery, but then we'll be into mid-December, and then

12  we'll be starting discovery.  The city says that's not fast

13  enough for us.  Everything has to be immediately because our

14  hair is on fire and everything else, and, you know,

15  everything has to be done like yesterday for reasons I'm not

16  exactly sure since they're accumulating cash in the meantime

17  and they're still paying payroll and so forth.  That's one

18  option.  Doesn't seem real efficient, but that's one option.

19  The other option --

20         THE COURT:  Well, hold on.

21         MR. GORDON:  Yes, sir.

22         THE COURT:  I'm sure the city is as concerned as you

23  are about the fact that the retirement contributions aren't

24  being made.

25         MR. GORDON:  I hope they're concerned about it.  I'm

1   not sure, but I hope so.  I'm sorry, your Honor.  I'm not

2   sure if I'm following --

3            THE COURT:  You missed my point.

4            MR. GORDON:  I missed your point.  I'm sorry.

5            THE COURT:  Well, your point was there's no urgency

6   here.

7            MR. GORDON:  Oh, I didn't say no urgency.  I'm just

8   trying to think of what's prudent.

9            THE COURT:  Well, your point was that there was no

10  urgency here, that we can wait till January.

11           MR. GORDON:  Not necessarily, your Honor.  The other

12  option is that we allow this discovery because it's not as --

13  certainly not as broad as what we just engaged in in the last

14  45 days in connection with eligibility, that we allow this

15  discovery, and if some of it turns out to, in your mind, not

16  be relevant, then I mean we've certainly incurred an expense.

17  There's no doubt about that.  But if the urgency is more

18  important, then so be it, but I don't think we should be

19  precluded from at least taking the discovery and being fully

20  prepared to point out things.  I think we all actually were

21  surprised at some of the things that came out in discovery

22  relative to the trial last week that -- anyway, I won't go

23  into that, but I do -- no problem.  Sorry.  So that's another

24  option is I mean, you know, if urgency is that important,

25  then the discovery seems to be fairly narrowly tailored.  We

 1   can discuss -- I haven't had a chance to really think about

 2   it.  We can discuss whether the swap participants are

 3   necessary.

 4        THE COURT:  It's hard for me to see how discovery on

 5   the subject of how the city should spend $350 million is

 6   anything but gigantic, enormous.

 7        MR. GORDON:  Yes.  I totally agree, and I think that

 8   the suggestion that 364(c) --

 9        THE COURT:  I mean because that opens up the

10   possibility that any objecting party -- and by that I mean

11   objecting to the motion -- can call its own expert or experts

12   to testify about how he or she from an urban planning

13   perspective thinks this money ought to be spent.

14        MR. GORDON:  Well --

15        THE COURT:  Wow.

16        MR. GORDON:  -- as your Honor knows, it's a

17   reasonable business judgment standard.  It's not reinventing

18   the wheel.  To suggest, as city council -- as city's counsel

19   has, that 364(c) in the context of Chapter 9 doesn't even

20   implicate reasonable business judgment -- at least that's

21   what I was hearing --

22        THE COURT:  Yeah.

23        MR. GORDON:  That seems pretty big to me.  That

24   seems a bit odd.  That kind of reads 364(c) out of Chapter 9,

25   which is not the case.

1          THE COURT:  Well, no.

2          MR. GORDON:  I don't know how you -- I don't know --

3          THE COURT:  I think the argument is you reconcile

4    364(c) with 904.

5          MR. GORDON:  And how do you do that?  I mean I

6    didn't hear anything here that could parse that and -- well

7    enough to say that we shouldn't be talking about what is

8    reasonable business judgment in terms of what you're going to

9    use this for if you're going to incumber unincumbered assets

10   that could otherwise be used in various ways and which are

11   not being proposed -- these initiatives are not being

12   proposed in the context of an overall Chapter 9 plan.

13   They're saying they need to commence these things, but

14   they're not doing it in the context of a Chapter 9 plan.

15   They're doing it outside of a plan.  I think there are

16   serious implications there.

17         THE COURT:  So you think, just to summarize, that

18   the city should go with an understaffed police department, an

19   understaffed fire department, 40 percent of lights lit, I'm

20   not sure how many tens of thousands of abandoned properties,

21   until a plan is confirmed?

22         MR. GORDON:  No, your Honor, but I'm not -- I am not

23   sure that the $150 million portion of the DIP loan has been

24   clearly identified as to what it will go for, so I think that

25   there are fair questions to be asked about that, but if it is

1   going to provide essential services, that would be a

2   different story.  And as to the $200 million portion of it,

3   of course, all subject to the arguments we've made -- that

4   all the parties have made regarding whether the swap

5   participants are even entitled to it, there needs to be some

6   analysis of whether if that part goes away, if the Court

7   determines that the swap participants are not secured

8   creditors, is the 150 million still there?  How is that

9   affected?  I don't know that we've fully analyzed that yet.

10          THE COURT:  All right.  Thank you.

11          MR. GORDON:  Thank you, your Honor.

12          THE COURT:  Before I get back to you, I want to ask

13   a question of the city because I want to give you the last

14   word.  Sir, at the lectern, please.

15          MR. HAMILTON:  Yes, sir.

16          THE COURT:  I didn't quite hear your response on the

17   request for discovery regarding compliance with PA 436.

18          MR. HAMILTON:  We have no -- we have no problem with

19   that.  They wanted to take a deposition of a City Council

20   member.  We took no position on that.  We don't represent the

21   City Council.  We would appear at the deposition if it

22   happens.

23          THE COURT:  All right.  Thank you.  Sir.

24          MR. HACKNEY:  Thank you, your Honor.  I will be

25   brief, but the stakes are very high, and I think that the

1  legal position that the city is taking is breathtaking here
2  because you heard Mr. Hamilton say that when they come to you
3  on a 364 motion and they ask you to work the controls of the
4  Bankruptcy Code to their advantage, should you deign to
5  ask -- to probe behind what they're using the money for, why
6  they believe they need it and assess whether this borrowing
7  is in the best interest of creditors, apply some of those
8  different elements you heard both counsel and I talk about,
9  that if you're to do that, now you're sitting as a super
10  tribunal almost how dare you interfere with our
11  administration.  You are now acting as a super tribunal when
12  there's no question that if they did these very plan-like
13  steps, paying $220 million to a creditor, investing in the
14  city, revitalizing the city and pushing down on the creditor
15  stack to do so, if they did that in the context of a plan,
16  there is no question that the Court would be within its
17  rights to make all of those assessments, whether it's fair
18  and equitable, whether it's in the best interest of
19  creditors, those precise elements that are designed to
20  protect creditors and make sure that the plan is fair, that
21  it does fairly adjust the debts.  The thesis here is, well,
22  why don't we just pull it forward because if we can pull it
23  forward out of the plan context, we can engage in a number of
24  these key set pieces with the Court where their position is
25  that they will come in and say, "In my judgment, it's

1  necessary, and you must defer to my judgment."  You're given

2  no opportunity to assess, and you could give away the city,

3  so to speak, in the process of improving itself because you

4  could -- Detroit's challenges are well-known, and I'm

5  sympathetic to and sensitive to your questions.  I don't mean

6  to be callous.  I understand that there are issues with the

7  lights, with 911 response times, and I understand that there

8  are real people out there today that are living with these

9  challenges, and I'm not being callous, but I do want to say

10  this.  They've been living with these challenges for a very

11  long time, and while it is important that --

12        THE COURT:  This argument does not impress me,

13  counsel.  Don't go there.

14        MR. HACKNEY:  But while it's important, it is

15  something that must be fairly balanced with the other aspects

16  of the city's --

17        THE COURT:  That's a fair point, but the fact that

18  they've been living with it for a long time --

19        MR. HACKNEY:  Agree.  Well, and --

20        THE COURT:  -- is no justification for imposing it

21  upon them for another day.

22        MR. HACKNEY:  I'm not trying to say that we should

23  make them wait for no reason at all.  I am saying that there

24  is a good reason to approach this with both the benefit of a

25  fulsome record and with caution because, your Honor, even as

1   we talk about the business judgment rule in this context, I
2   think that your rulings on what the business judgment rule
3   means in Chapter 9 are going to be questions of first
4   impression in some respects, and I think they are going to be
5   momentous rulings. I know what it means in Chapter 11. I
6   deal with that a lot, and I know the Court does as well. But
7   when you talk about the way the business judgment rule works
8   in Chapter 11, it's not clear how it translates into Chapter
9   9. For example -- and don't -- this is not intended to be
10  flip or callous, but I'm trying to map these two things very
11  precisely. Are the citizens of the city, are they like the
12  equity in a Chapter 11? That would be -- that would be --
13       THE COURT: Those analogies are so imperfect that
14  it's not even worth trying.
15       MR. HACKNEY: There are challenges there, and so I
16  actually think that when you say what the business judgment
17  rule means under 364 in the context of Chapter 9, I think
18  that ruling is going to grapple with these concepts of
19  balance, necessity, rights of the citizens vis-a-vis rights
20  of the creditors, and I -- and those are the types of issues
21  that you would grapple with, I believe, in a plan. I don't
22  believe that the city can say that you are not entitled to
23  grapple with them in the context of 364.
24       I'd like to finish with one point. I want to thank
25  you for your patience. There's one thing that doesn't make

 1  any sense to me about the city's position here today, which
 2  is they are willing to allow us to take the deposition of Mr.
 3  Moore, so he's the Conway MacKenzie consultant whose
 4  deposition is a very colorful recitation of the challenges
 5  and how they need the money to address the challenges, so
 6  it's both about needs and uses.  It doesn't square with me
 7  that they're saying, yeah, you can depose Mr. Moore because,
 8  of course, we're going to call him, and we are going to paint
 9  a picture of the City of Detroit that justifies this loan for
10  Judge Rhodes, but we won't give you discovery that relates to
11  the work and the assessments and the types of things that he
12  engaged in and reviewed and considered in order to generate
13  the declaration that we attached.  I don't see how those two
14  things fit with one another.  If the needs and the uses are
15  irrelevant, why does it dominate their motion?  Why is Mr.
16  Moore's declaration devoted entirely to it?  Why is he
17  proposed as a witness?  If those things make sense for the
18  city because they admit that they are relevant to their
19  motion, then the discovery on the uses and needs I believe
20  also would be relevant.  I agree that while we can try to
21  minimize the burden, it will be substantial discovery because
22  of what you said.  I'm not going to disagree with that, but
23  this is a big loan, and this is a big issue for the
24  creditors.  We're talking about $120 million on top of the
25  swap counterparty termination amount.

1    THE COURT:  It's a big number, but it pales in
2  comparison to the numbers I heard the city needs for its
3  revitalization program over -- I think it was ten years.
4    MR. HACKNEY:  I think that in some respects, your
5  Honor, the whole case is about that word "need," and I think
6  it's a hard question because I think that this is something
7  that's --
8    THE COURT:  Isn't "hard" just another word for
9  political?
10    MR. HACKNEY:  No.  I think in this case it's
11  emphatically going -- it is certainly also a political
12  question that people wrestle with, that certainly the city
13  wrestled with before bankruptcy under the constraints that it
14  had to operate under.  I think it is -- no matter how much we
15  struggle with the difficulty, it is a legal question, though,
16  for you because -- because necessity is something that
17  municipalities struggle with everywhere outside of
18  bankruptcy, when they come to bankruptcy and they now want to
19  confirm a plan and get out, they have to prove to you that
20  the steps that they propose to take, the recoveries that they
21  propose to offer are fair and equitable and are in the best
22  interest of creditors.  In the case of the City of Detroit
23  that has these well-documented challenges -- and I won't
24  shirk from saying that they are significant challenges -- at
25  some point doesn't Kevyn Orr just come in and say, "Why would

```
1    I ever give creditors a dollar?  I mean the needs here are
2    substantial, and I intend to invest not a billion" --
3           THE COURT:  A lot of people think that's what he
4    already said.
5           MR. HACKNEY:  I guess I would say he's come
6    relatively close to it, but I'll finish with one point, which
7    is you can see there's a logical way to back into the fact
8    that the Court must be as vigilant, we believe, in the
9    interregnum period between eligibility and closing as it is
10   in confirmation.  And the logical point is that if you put
11   the plan together that said we are going to revitalize the
12   city, improve services, speed up police officer response
13   time, protect our firemen, remediate blight, build parks, all
14   sorts of different types of things, and give the creditors
15   nothing or very little, pretend that the plan said that --
16   some people feel that the plan does say that today, but
17   pretend in this hypothetical the plan said that and it didn't
18   marshal any creditor support, it wouldn't be a confirmable
19   plan that would allow the city to exit, so you know that in
20   the backdrop of all of this, the need to have at least some
21   creditor support -- and the history of Chapter 9 indicates --
22          THE COURT:  Well, it's way premature to come to the
23   conclusion about what plan is confirmable and what isn't.
24          MR. HACKNEY:  This motion --
25          THE COURT:  There are provisions for cramdown --
```

 1          MR. HACKNEY:  There are.

 2          THE COURT:  -- in Chapter 9.

 3          MR. HACKNEY:  There are, but those provisions

 4  still --

 5          THE COURT:  A plan can be confirmed with no creditor

 6  support.

 7          MR. HACKNEY:  Well, at least an impaired assenting

 8  class I would expect even in cramdown, but understood.  You

 9  could have a small minority, but it would still have to

10  satisfy all those factors of what's fair and equitable,

11  what's in the best interest of creditors.

12          THE COURT:  True.

13          MR. HACKNEY:  Those never go away, and I think

14  that's the difference between when you come to a bankruptcy

15  judge in a Bankruptcy Court and start asking for these unique

16  aspects of the Code is that that is the perspective, and this

17  is one of the things we intend to brief for you in our

18  objection because I do want to -- it is absolutely

19  complicated and I believe reasonably a first impression.

20  We've been --

21          THE COURT:  All right.  I'm inventing a process here

22  that I think will at least go some good measure of the way

23  toward accommodating everyone's interest here because I think

24  there -- I think there is merit in the concerns that you have

25  raised and that Mr. Gordon have raised about process here, so

 1   here's the best I can come up with to try to accommodate

 2   everyone's interest here.  The first is between now and when

 3   we start the hearing to limit discovery in the ways that the

 4   city has proposed or, in the case of PA 436, not opposed, and

 5   then this will give you then an opportunity to brief more

 6   fully than we have in connection with today's hearing the

 7   issue of what is the appropriate scope of the Court's review

 8   of this motion under Section 364(c).  And then in the context

 9   of that hearing, which the Court will take so much evidence

10   as the city thinks is relevant to the motion, according to

11   its view of the scope of the Court's review, the Court will

12   then decide whether, based on its determination of the scope,

13   that the record is complete or to provide for further

14   discovery on a more expanded scope of review, so I know it's

15   a little bit more cumbersome and complex, but I think there

16   is merit in trying to make a determination of the scope of

17   review in a more fulsome way than this discovery motion has

18   allowed us to do, so that will be my order at this point in

19   time.  I will try to prepare an order that perhaps more

20   articulately sets forth what I'm trying to do here than I

21   have been able to on the record here.

22           MS. CONNOR COHEN:  Thank you, your Honor.

23           MR. NEAL:  Your Honor, just -- good afternoon again.

24   Guy Neal.  Just a question on the objection deadline.  I know

25   there's been talk potentially of having that date moved.  I

1  believe it's --

2          THE COURT:  What is the deadline now?

3          MR. NEAL:  I believe it's on the 22nd, but I thought

4  that it might be moved to the 27th.  I'm just not sure where

5  it stands today.

6          MR. ERENS:  Your Honor, the notice that the debtor

7  sent out had set the 21st as the objection deadline.  We've

8  already talked to Syncora because of the need to accommodate

9  discovery that we would move that objection deadline to the

10  27th.  The debtor then would reply on the 4th consistent with

11  the order your Honor issued in connection with the 10th, the

12  hearing on the 10th, and then we'd have the hearing on the

13  10th.

14          THE COURT:  All right.  So if that's your

15  stipulation, you may submit that, but you'll engage in

16  discovery in the meantime.  Is that the idea?

17          MR. HACKNEY:  It is.

18          THE COURT:  All right.

19          MR. HACKNEY:  Your Honor, can I ask one clarifying

20  fact?

21          THE COURT:  Sure.

22          MR. HACKNEY:  I promise not to hector you to death

23  with questions, but the one --

24          THE COURT:  Thank you.

25          MR. HACKNEY:  The one thing that I do want to

1    understand because I don't want to violate this order, which

2    is Mr. Moore's deposition, because -- can I --

3        THE COURT:  The city has offered it up.  You take --

4    you ask him whatever questions you want to ask him.

5        MR. HACKNEY:  Okay.  That's the best way because

6    then we don't have to do them twice or whatever.  I just

7    wanted to clarify that.  Thank you.

8        MR. ERENS:  Also, I should make clear, your Honor,

9    we would try, if it was okay with your Honor, to have the

10   objection deadline moved to the 27th only for parties who

11   felt they needed to participate in discovery.  If parties did

12   not think they needed to participate in discovery, we'd like

13   to get those objections so that we can start reviewing them.

14   The city will not have a long period of reply.

15       THE COURT:  Can you readily identify those parties

16   or are we going to have a dispute about which parties and

17   which category?

18       MR. ERENS:  We will certainly try, so we'll do our

19   best.

20       THE COURT:  All right.  Well, I'll trust you to try

21   to work it out.  If there are issues, you can get me on the

22   telephone.

23       MR. ERENS:  Okay.  Thank you.

24       (Hearing concluded at 3:40 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                              November 19, 2013
_____        _____
Lois Garrett

**Exhibit E**

**Moody's Report**



## SPECIAL COMMENT

 Rate this Research »

**Table of Contents:**

DETROIT'S DIP PROPOSAL DIFFERS
SUBSTANTIALLY FROM ITS CORPORATE
PREDECESSORS                        1
CORPORATE DIPS CAN SUPPORT
POSITIVE CREDITOR OUTCOMES, BUT
THE IMPACT OF DETROIT'S PLAN IS
UNCERTAIN                           2

**Analyst Contacts:**

CHICAGO                    +1.212.553.1653

Genevieve Nolan           +1.312.706.9957
*Assistant Vice President - Analyst*
genevieve.nolan@moodys.com

NEW YORK                   +1.212.553.1653

Jack Dorer                +1.212.553.1332
*Managing Director*
jack.dorer@moodys.com

Alfred Medioli            +1.212.553.4173
*Vice President/Senior Credit Officer*
alfred.medioli@moodys.com

# Detroit: DIPing its Toe into a Corporate Bankruptcy Tool

On October 11, 2013 the City of Detroit's Emergency Manager (EM) Kevyn Orr issued an order, approving a Debtor-In-Possession (DIP) financing proposal. DIP financings are commonly used in the corporate sector to inject liquidity into a bankrupt entity, with the objective of paving the way for eventual recovery. In the municipal sector, however, DIP financings are unprecedented. Detroit is likely the first local government to propose this type of post-petition financing structure as it continues to navigate the Chapter 9 bankruptcy process, while balancing the competing interests of operating an insolvent city and negotiating with a variety of creditors.

The proposed Detroit DIP financing draws from the corporate playbook with respect to most structural terms, but it differs from a typical private-sector DIP financing in important ways. Perhaps most significant is the stated use of proceeds, which highlights the difference of Detroit's insolvency, and options for recovery, from the typical bankrupt corporate. Ultimately, because of the lack of precedent in the municipal market and the key differences in Detroit's proposal, it is too early to assess the impact of the proposal on the city's finances and existing bondholders.

## Detroit's DIP financing proposal differs substantially from its corporate predecessors

The $350 million post petition financing proposed by Detroit comprises two notes that would be repaid over a 30 month maximum final maturity period, at a rate of one month LIBOR plus 250 basis point spread.

» The "Swap Termination Note", which is estimated to total $230 million, will be used to pay off outstanding swaps at approximately 75% of termination value. The pledged revenues comprise a super-priority lien on income tax revenues, up to $4 million per month in the event of a default, along with the proceeds of a sale or lease of a city asset in excess of $10 million.

» The "Quality of Life Note", generating the remaining $120 million of proceeds, will provide working capital for the city. The note's pledged revenues comprise a super-priority lien on casino gaming taxes, as well as a second lien on income tax revenues, both in amounts of up to $4 million per month in the event of a default, and the excess from asset sales over $10 million. Planned use of these proceeds is reported to include enhancement to public safety, technology infrastructure, and blight removal.

Some structural aspects of the city's proposal reflect typical corporate practice, including the super priority pledge; the short tenure for repayment; and the small size of the financing relative to outstanding debt, with the note par amount sized to 5% of the city's outstanding debt, or 2% of its liabilities inclusive of unfunded pension and OPEB costs. However, key differences remain, including the type of facility, type of asset pledged and the proposed use of proceeds, as described below.

» **Type of Facility**: Private sector DIP financings are bank lending facilities, similar to revolving lines of credit and are not bond-based. Detroit, on the other hand, is proposing a fully-funded note structure, with the expectation that proceeds from asset sales or leases in excess of $10 million will be the primary source of repayment, thereby freeing up pledged tax revenues as a source of operating cash flow upon note maturity.

» **Type of Asset Pledged**: The key assets securing a corporate DIP loan are generally tangible assets for which a market value can be reasonably estimated and the loan is normally sized to provide asset coverage substantially in excess of the new funding commitment. Detroit is proposing a stream of two cash flows, in addition to yet-to-be-realized proceeds from the sale or lease of assets. The income and wagering taxes combined are estimated to provide a healthy 2.64 times coverage. While the city has some assets that could be sold off or leased, with the proceeds used to repay the note, the assets are either tied to core operating functions, difficult to value, or some combination of the two, underscoring that a municipality is a going concern and has only limited options to turn to asset liquidation in bankruptcy as compared to a corporation. In that context, Detroit's DIP financing is more naturally secured by a pledge of certain future tax revenue collections rather than hard assets.

» **Proposed Use of Proceeds**: Detroit's proposed DIP financing plan would immediately deploy 100% of the transaction proceeds. Corporate DIPs loans are traditionally used to provide operating financing and liquidity. Accordingly, one would not normally expect to see a corporate entity draw 100% of the DIP commitment at closing. In Detroit's case, the utilization of all note proceeds highlights the city's ongoing narrow cash position that persists despite already ceasing all debt service payments on liabilities deemed unsecured by the state-appointed emergency manager, as well as deferral of the city's employer contributions to its two pension funds.

## Corporate DIPs loans can support positive creditor outcomes, but the impact of Detroit's plan is uncertain

Corporate DIP financing plans can be a credit positive by providing liquidity that facilitates continued operations, maintains the value of the franchise and potentially paves the way for eventual emergence of the firm from bankruptcy. However, the ultimate credit impact of Detroit's DIP financing proposal, assuming it is approved at both the state and federal level, is unclear given the multitude of contingencies that remain.

**First, the credit impact of the plan on the city's financial position will likely be determined by the ultimate source of repayment for the DIP notes**. Should the city successfully complete the DIP financing plan, it will terminate the outstanding swap agreement associated with the Series 2006 Certificates of Participation. As a result, it is expected that the city will no longer make payments to the counterparties, which are projected to total $50.6 million annually through 2017. Should the city ultimately repay the notes with proceeds from an asset sale or lease, then the General Fund will retain the tax revenues for general operating expenses. The city will also have gained the $120 million in Quality of Life proceeds and will have eliminated the risk of a potential termination payment. However, should the city be required to repay the note with casino and income tax revenues, then $48

2   NOVE... ...ITY  ...T  ...NT  ...TR...PT 243
13-53846-swr   Doc 4384-36   Filed 04/29/13   Entered 04/29/13 22:00:22   Page 243 of
13-53846-swr   Doc 1874-6   Filed 11/21/13   Entered 11/21/13 21:22:45   Page 3 of 5
559

million will be set aside annually from each tax revenue source until the note is paid. Ultimately, the total investments of $120 million from the Quality of Life note and the annual cash flow of $96 million to the general fund from the two tax revenue sources are not immaterial compared to the city's estimated 2013 General Fund revenues of $1.1 billion, however there is significant uncertainty related to execution of asset sales that is required for the tax revenues to be freed up.

**Second, it is unclear if the DIP financing's super priority claim on general fund tax revenues would impact existing bondholders.** While the enforceability of a super senior DIP financing for a municipality has not been tested, this pledge could result in a modest reduction of resources available to satisfy defaulted GO, GOLT and COPs bondholders, while also demonstrating a diminished willingness to honor the city's full faith and credit pledge and deterring future creditors from lending to the city. However, should the notes be repaid in full from proceeds from the sale or lease of a city asset, the plan could clear all claims on casino revenue, ultimately improving the position of general obligation and related securities bondholders over the medium term.

**Finally, Detroit's path to solvency and emergence as a financially stable city will take much longer than the 2.5 years expected period of the DIP financing.** The DIP plan may result in additional medium to long-term implications for the city's finances and debt portfolio, especially as it continues crucial negotiations with creditors in the Chapter 9 process. Should it be approved in conjunction with the current forbearance agreement with the counterparties to the city's outstanding swap agreements, the DIP financing plan would result in an unhedged variable rate position on its Series 2006 Certificates of Participation. While any near term cash flow impact is negated so long as the city continues to default on debt service payments, it is unclear as to whether the unhedged position may impact any potential settlements during negotiations with creditors. With respect to the larger negotiating process, it is not known how the completion of the DIP financing proposal could incentivize other creditors to come forth and negotiate with the city. Within the Chapter 9 process specifically, the plan may help illustrate the city's claim that it negotiated in good faith and is thus eligible to proceed under the federal restructuring framework. Finally, the city may be exposing itself to refinancing risk should it be unable to repay the notes within the stated time frame.

Rate this Research »

3        NOV...                13-53846-swr    Doc 43?4 3 6    Filed 04/29/13    Entered 04/29/14 22:00:23    Page 244 of    244
13-53846-swr    Doc 1870-6    Filed 11/27/13    Entered 11/27/13 21:22:45    Page 4 of 5
559

Report Number: 160112

| | |
|---|---|
| Authors | Production Associate |
| Genevieve Nolan | Sarah Warburton |
| Al Medioli | |

© 2013 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

**CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.**

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

For Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail clients. It would be dangerous for retail clients to make any investment decision based on MOODY'S credit rating. If in doubt you should contact your financial or other professional adviser.



**Exhibit F**

**Funding for Detroit Announced on Sept. 27, 2013**

CONFIDENTIAL INFORMATION
Daily Tribune @kirkland.com
Detroit/27.11.2013 11:55

**Funding for Detroit Announced by Federal Government on Sept. 27, 2013**

| Announcement ($mm) | Source of Funds | Use of Funds | Source: Federal / State | Source: Philanthropic / Business | Could reduce Blight Budget | Could Reduce Reinvestment | Does not reduce 10-Y Exp. | Total $ per Analysis | $ into the General Fund | Inclusion in 10-Y Plan / Additional Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| **Demolishing Blighted Properties, Revitalizing Neighborhoods and Redeveloping Detroit** | | | | | | | | | | |
| $ 65.0 | HUD Community Development Block Grant | Blight eradication, housing rehabilitation, and other community revitalization efforts | 66.2 | | | | 66.2 | 66.2 | N | Not reflected in 10-Year. Represents non-GF grants received by Planning & Development. See appendix for details |
| 52.0 | Treasury TARP Hardest Hit Fund | Blight elimination | 52.0 | | 25.6 | | 26.4 | 52.0 | N | Source of funds not accounted in 10 year plan. Could reduce $500m allocated to blight removal. Funds to go to Detroit Land Bank Authority (DLBA) for blight elimination and development in neighborhoods across the City. DLBA has partnered with Michigan Land Bank, which will do the demolition field management. See appendix for details |
| 10.2 | HUD | Affordable housing | 10.2 | | | | 10.2 | 10.2 | N | Previously identified. Not reflected in 10-Year - not related to blight. Represents non-GF grants received by Planning & Development. Used to support a wide range of affordable housing programs designed to create better housing opportunities for low- and moderate-income residents. See appendix for details |
| 10.0 | Philanthropic and Business Org. | Commercial building demolition | | 10.0 | | | 10.0 | 10.0 | N | Commercial blight removal was not included in 10-year. $500m allocated to blight removal is related to residential blight |
| - | HUD CDBG | Commercial building demolition | - | | | | - | - | N | $5.4 million announced for this program is already accounted for in CDBG line above. Commercial blight removal was not included in 10-year. $500m allocated to blight removal is related to residential blight |
| 5.0 | HUD Neighborhood Stabilization Program 3 | Commercial building demolition | 5.0 | | | | 5.0 | 5.0 | N | Commercial blight removal was not included in 10-year. $500m allocated to blight removal is related to residential blight |
| 5.0 | HUD Neighborhood Stabilization Program 2 program income from State | Commercial building demolition | 5.0 | | | | 5.0 | 5.0 | N | Commercial blight removal was not included in 10-year. $500m allocated to blight removal is related to residential blight |
| 1.5 | Ford Foundation | Detroit Land Bank Authority operating support | | 1.5 | | | 1.5 | 1.5 | N | Allocated to fund administrative costs, not demolition activities. |
| 1.1 | EPA | Environm. assessments and cleanup of Brownfield sites | | 1.1 | | | 1.1 | 1.1 | N | Environmental assessments and cleanup not included in $500 million blight removal |
| 1.0 | Ford Foundation | Invest Detroit acquisition and predevelopment of residential properties | | 1.0 | | | 1.0 | 1.0 | N | Acquisition and predevelopment activates, not blight removal, including a project on the East Riverfront |
| 0.6 | Skillman Foundation | Blight removal | | 0.6 | 0.5 | | 0.1 | 0.6 | N | $500k allocated for blight removal could reduce $500m. $100k for blight text technology, not in 10 year plan |
| 151.4 | **Category Total** | | 138.4 | 14.2 | 26.1 | - | 126.5 | 152.6 | | |
| **Improving Public Safety, Reducing Crime, and Decreasing Emergency Response Time** | | | | | | | | | | |
| 25.0 | FEMA | Hiring 150 firefighters and purchasing arson detection equipment | 25.0 | | | 22.3 | 2.7 | 25.0 | Y | SAFER grant already awarded reflected in Fire Dept. grants. New $25mm award not included in 10 year. Potential General Fund savings estimated as difference between firefighters funded by the general fund in the 10-year plan vs. latest estimate including new SAFER award. See appendix for details |
| 3.0 | DOJ | Hiring new police officers, establishing bike patrol, supporting prisoner re-entry programs, and supporting youth anti-violence | 1.9 | | | | 1.9 | 1.9 | Y | Relates to COPs grant for FY2014, 2015 and 2016. Grant $ already accounted for in 10-Y plan. ~$2m in FY2014 of COPs grants reflected in Police Department Grant Revenues line item, going away in FY2015. Additional $1.62 mm of grants per year starting in FY2014 reflected in Police Department, under Department Revenue Initiatives. See appendix for details |
| 1.3 | Skillman Foundation & other groups | Improving neighborhood safety and build community policing model with DPD | | 1.3 | | | 1.3 | 1.3 | N | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan |
| 0.6 | Skillman and Kresge Foundations | Improving police CompStat system | | 0.6 | | 0.6 | - | 0.6 | N | May reduce reinvestment IT spend |
| 29.9 | **Category Total** | | 26.9 | 1.9 | - | 22.9 | 5.9 | 28.8 | | |
| **Improving Transportation Systems for City and Regional Residents** | | | | | | | | | | |
| 100.0 | Department of Transportation | Transit grants including immediate release of $24MM to repair and rehabilitate buses and to install security cameras | 90.8 | | | | 90.8 | 90.8 | N | DDOT subsidy in 10-Year Plan and reinvestment amounts assume these funds are received. See appendix for details |
| 30.0 | Kresge Foundation | Revolving loan fund for mixed use housing along M-1 | | 30.0 | | | 30.0 | 30.0 | N | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan. See appendix for details |
| 25.0 | Department of Transportation TIGER Grant | M1 Rail/Woodward Ave. Streetcar Project | 25.0 | | | | 25.0 | 25.0 | N | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan. See appendix for details |
| 6.4 | Department of Transportation | Helping the Regional Transit Authority to implement regional bus rapid transit | 6.4 | | | | 6.4 | 6.4 | N | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan. See appendix for details |
| 3.0 | Ford Foundation | Support transit oriented development along Woodward Corridor | | 3.0 | | | 3.0 | 3.0 | N | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan |
| 0.3 | Kresge Foundation | Designing transportation system based on Detroit Future City | | 0.3 | | | 0.3 | 0.3 | N | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan |
| 164.7 | **Category Total** | | 122.4 | 33.3 | - | - | 155.5 | 155.5 | | |
| **Helping Create a 21st Century Detroit** | | | | | | | | | | |
| 15.0 | Ford, Kresge, & Knight Foundations | Cultivating Detroit entrepreneurs and small businesses | | 15.0 | | | 15.0 | 15.0 | N | |
| 5.0 | Private Funding | Classes of Revitalization Fellows | | 5.0 | | | 5.0 | 5.0 | N | |
| 1.0 | Ford Foundation | Upgrade City's grants management system | | 1.0 | | | 1.0 | 1.0 | N | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan. See appendix for details |
| 0.5 | Ford Foundation & Rock Ventures | Implement Tech Team's recommendations | | 0.5 | | | 0.5 | 0.5 | N | |
| 0.3 | Knight Foundation | Grants for enhanced training of public sector and non-profit employees | | 0.3 | | | 0.3 | 0.3 | N | |
| 0.3 | Detroit Dev. Fund & Knight Foundation | Foster early stage retail and creative businesses | | 0.3 | | | 0.3 | 0.3 | N | |
| 22.1 | **Category Total** | | - | 22.1 | - | - | 22.1 | 22.1 | | |
| $ 368.1 | **Total** | | $287.5 | $71.5 | $26.1 | $22.9 | $310.0 | $359.0 | | |

Newly identified funds coming directly to the City of Detroit

Previously identified funds, including monies already pledged, funds that are being unlocked for use, and the current year's annually anticipated appropriations

Private or public funds newly pledged for private sector initiatives or for non-Detroit governmental entities

CONFIDENTIAL INFORMATION

City of Detroit

| | Demolishing Blighted Properties, Revitalizing Neighborhoods and Redeveloping Detroit | | |
|---|---|---|---|
| | **HUD Community Development Block Grant ("CDBG")** | **Treasury TARP Hardest Hit Fund** | **U.S. Department of Housing and Urban Development ("HUD")** |
| **Amount of Grant in Announcement** | $65 million | $52 Million | $10.18 Million |
| **Actual Grant Funds Awarded** | $66.2 million | $52 Million | $10.18 Million |
| **Benefit to General Fund** | $0 | $25.6 Million | $0 |
| **Source of Funds** | U.S. Department of Housing and Urban Development | Michigan State Housing Development Authority ("MSHDA") | U.S. Department of Housing and Urban Development |
| **Purpose of Grants** | This is a multi-purpose grant with a wide range of uses including: Low to moderate income housing rehab, public facility improvements, property acquisition, and Section 108 loans. | The goal of this funding is to reduce the number of blighted structures | The goal of this grant is to expand the supply of decent, safe, sanitary, and affordable housing, with primary attention to rental housing, for very low-income and low-income families. |
| **Details of Grant Allocation** | • Planning and Development Department allocates CDBG dollars across all divisions (e.g. housing, neighborhood, development, real estate, planning, grants management, etc.). Only a small portion is allocated to demolition<br>• Below are the allocations for FY 2012/13 and FY 2013/14:<br><br>**Period** / **CDBG Allocation** / **Demolition Allocation**<br>FY 2012/13 / 33,353,509 / 2,928,995<br>FY 2013/14 / 32,877,085 / 3,310,736 | The Detroit Land Bank Authority ("DLBA") was awarded the funds to use in neighborhoods across the city of Detroit. DLBA is the implementation manager and has partnered with the Michigan Land Bank who will perform the demolition field management along with the City of Detroit Buildings Safety Engineering & Environmental Department. The grant allows for the blight removal of a maximum of 4,000 lots at a total cost per lot of $13,085.85. | The City of Detroit received a HOME Investment Partnership Program Grant ("HOME") allocation of $5.8 million in FY 2012, has a projected HOME allocation of $4.3 million in FY 2013, and also has HOME funds available from previous years. |
| **Use of the Funds** | • There are caps on how much can be spent on slum and blight activities - 70% of programming has to go for low/mod income benefit. 20% is allocated to Admin. About 10% of funds would be available to be used for blight removal<br>• The City has the following CDBG funds available. All of the grants have been allocated:<br>   2011/2012 Grants: $15,886,635<br>   2012/2013 Grants: $33,353,509<br>   2013/2014 Grants: $32,877,085<br>   **Total Grants Available: $82,117,229** | • The DLBA has identified publicly owned blighted properties in all of the target areas. The work will begin most heavily in three target areas, Grandmont Rosedale, UDM/ Marygrove and Morningside/EEV/Cornerstone, followed by aggressive strategic removal in Jefferson Chalmers, Southwest and North End. Work will be conducted in all areas simultaneously.<br>• The DLBA will be reimbursed per unit based on the unit costs estimated by the State, as follows:<br>   Demolition: $11,025<br>   Maintenance: $750<br>   Acquisition Costs: $810.85<br>   Project Management Fee: $500<br>   **Total: $13,085.85**<br>• The public lots will be acquired free and clear of property taxes.<br>• Because the HHF Grant is reimbursable, the DLBA will get a line of credit to begin the demolitions.<br>• The DLBA will acquire lots from the following sources: (a) | • The City anticipates utilizing $10.1 million of the HOME funds awarded in FY 2012 and FY 2013 for the acquisition/rehabilitation or new construction of rental properties for low and moderate income households with incomes at or below 60% of the Area Median Income. HOME funds will be used to create affordable rental housing opportunities, improve property values, preserve existing housing, and stabilize neighborhoods.<br>• The City issued a RFP in September 2013 and proposals are due November 26, 2013. Construction on rental properties is expected to start within 6 months of the initial commitment letter and completed with 18 months of initial project closing. |

1

[6.11] [Federal Funds Announced on Sep. 27 2013_115113 vDRAFT.pdf] [Page 2 of 7]

CONFIDENTIAL INFORMATION

City of Detroit                                                                                                                                *DRAFT*

| | Demolishing Blighted Properties, Revitalizing Neighborhoods and Redeveloping Detroit | | |
|---|---|---|---|
| | HUD Community Development Block Grant ("CDBG") | Treasury TARP Hardest Hit Fund | U.S. Department of Housing and Urban Development ("HUD") |
| | | Wayne County 2013 Tax Foreclosure, (b) City of Detroit, (c) Michigan Land Bank Authority ("MLBFTA"), and (d) some privately held properties.<br>• MSHDA has established an 18 month timeline beginning October 2013 for the removal of blighted structures, however the funds do not expire until late 2017. | |
| Treatment in 10-Year Plan | • CDBG dollars are not reflected in the 10-Year Plan, since they do not impact the General Fund.<br>• The 10-Year plan includes a $500 m estimate for the removal of blighted structures. The estimate was developed knowing that CDBG is a recurring grant that the City receives each year - i.e. the $500m is incremental to whatever CDBG dollars are allocated to blight removal | The plan currently accounts for the removal of 78,000 structures for $500 million. This translates to a blight removal cost of approximately $6,410 per unit. This unit amount represents the low end of the estimated range based on the assumptions that the City would take advantage of economies of scale when demolishing 78,000 structures<br>This grant allows for the removal of 4,000 structures which creates a savings of $25.6 million in the 10 year plan. (4,000 structures * $6,410 per structure). | Previously identified. Not reflected in 10-Year - not related to blight removal. Represents non-GF grants received by Planning & Development. |
| Reimbursement Grant | Yes | Yes | Yes |

2

CONFIDENTIAL INFORMATION

| | Improving Public Safety, Reducing Crime, and Decreasing Emergency Response Time | |
|---|---|---|
| | **Federal Emergency Management Agency ("FEMA")** | **Department of Justice ("DOJ")** |
| **Amount of Grant in Announcement** | $25 million | $3.0 million |
| **Actual Grant Funds Awarded** | $25 million | $1.9 million |
| **Benefit to General Fund** | $22.3 million | $0 |
| **Source of Funds** | FEMA | DOJ |
| **Purpose of Grants** | The goal of this grant is to provide funding directly to fire departments in order to help them increase the number of trained firefighters available in their communities. | The COPS Hiring Program grants provide funds directly to law enforcement agencies to hire new or previously laid off police officers. |
| **Details of Grant Allocation** | The City of Detroit has applied for a $25 million grant. FEMA Director, Brian Kamoie, indicated that the applications for the FY 2013 SAFER Grant are currently being reviewed and applicants will be notified of grant awards in November 2013. | The City currently has the following three Grants available: <br><br> Grant Year / Expiration / Original Grant <br> 2009 Grant — 12/30/2013 — 11,148,750 <br> 2011 Grant — 8/31/2014 — 5,694,725 <br> 2013 Grant — 9/30/2016 — 1,884,390 |
| **Use of the Funds** | The City plans to hire 150 new fire fighters. | The City plans to hire 10 additional police officers. |
| **Treatment in 10-Year Plan** | • The 10 year plan assumes that the Fire Department has a total of 1,228 employees covered by the General Fund by the end of FY 2014. <br> • As of September 2013, there were a total of 1,139 employees. The City expects to have a total of 1,244 employees after accounting for new hires currently in the Academy, new hires based on this grant, and the loss of employees related to prior SAFER grant expirations. Of these 1,244 employees, 150 will be SAFER funded and 1,094 will be funded through the General Fund. <br><br> Revised Plan / Firefighters / Other Employees / Total Employees <br> Current Employees — 842 / 297 / 1,139 <br> Promotion to Fire Marshal — -20 / 20 / 0 <br> New Hires in Academy — 90 / 0 / 90 <br> New SAFER Hires — 150 / 0 / 150 <br> Employee reduction do to prior SAFER expiration — -135 / 0 / -135 <br> **Total Employees — 927 / 317 / 1,244** <br><br> • The SAFER grant will reduce the number of employees funded by the General Fund by 134 (from 1,228 in the 10-Year Plan to 1,094 in the revised expectations). As a result, the SAFER grant will result in a savings of approximately $22 million (134/150 * $25 million). | • The 10 Year plan includes $2 million for the 2011 COPS Hiring Program Grant which expires in August 2014. <br> • The Plan also includes an additional $1.62 million per year of grants which would cover the 2013 COPS Hiring Grant. |
| **Reimbursement Grant** | Yes | Yes |

3

CONFIDENTIAL INFORMATION
kelly.gerbel@kirkland.com
Edition 27.11.2013 11:55

| Improving Transportation Systems for City and Regional Residents |
|---|
| Department of Transportation |

| | |
|---|---|
| **Amount of Grant in Announcement** | $100 million |
| **Actual Grant Funds Awarded** | $90.8 million |
| **Benefit to General Fund** | $0 |
| **Source of Funds** | Federal Transit Administration ("FTA") and MDOT |
| **Purpose of Grants** | The FTA has awarded the City several grants that provide Detroit with capital, operating and evaluation assistance for transportation facilities. |

**Details of Grant Allocation**

The FTA and MDOT have awarded the City of Detroit the funds below. The US Government shut down has delayed the awarding of the 5309 and 5339

| Program | Grant Details | FTA Grant | MDOT Grant | Total Grant | Type | 13c Status | Funding Year | Award Date |
|---|---|---|---|---|---|---|---|---|
| 5307 Formula Grants | Preventive Maintenance (28.9) Fac Rehab (7.5), Overhaul (12.5), SupportVeh (1.2), Shelters (.6), Security (.6), Com (.6), Dev/Planning (2.5), Misc (.2) | 43.7 | 10.9 | 54.6 | Operating Grant | Awaiting Certification | 2012/2013 | Pending |
| 5307 CMAQ Grant | Lease Payments | 3.3 | 0.8 | 4.1 | Capital Grant | | 2013 | 8/30/2013 |
| 5309 Grants | | 0.3 | 0.1 | 0.4 | Capital Grant | | 2011 | 7/15/2013 |
| 5309 Grants | Overhaul (12), Security (3), AVL (3.8), Leases (7.5), Coolidge (.7) | 21.5 | 5.4 | 26.9 | Capital Grant | Certified | 2012 | Pending |
| 5339 Grants | Bus stops/ facilities/ shelters | 2.1 | 0.5 | 2.6 | Capital Grant | Certified | 2013 | Pending |
| 5316 Grant | Job Access Grants | 0.6 | 0.6 | 1.3 | Operating Grant | | 2011 | 8/27/2013 |
| 5317 Grant | New Freedom Grants | 0.4 | 0.4 | 0.9 | Operating Grant | | 2011 | 8/26/2013 |
| **Total** | | $ 72.0 | $ 18.8 | $ 90.8 | | | | |

| | |
|---|---|
| **Use of the Funds** | The majority of the funds will be used in preventative maintenance and bus overhaul and security. Only approximately $4.5 million has been spent so far. To spend the funds DDOT must release an RFP and then hold a bid process. |
| **Treatment in 10-Year Plan** | These grants are not new, they are recurring programs that DDOT relies upon to fund its capital and maintenance programs. DDOT subsidy in 10-Year Plan and reinvestment amounts assume FTA grants continue to be received. Operating grants are reflected in 10 year plan under grant line. Capital grants are reflected in historical amounts under the grant line item, but not reflected in projections as they are assumed to have a net effect on DDOT subsidy projections |
| **Reimbursement Grant** | Yes |

[6.11] [Federal Funds Announced on Sep. 27 2013_115113 vDRAFT.pdf] [Page 5 of 7]
13-53846-swr Doc 4347 Filed 04/29/14 Entered 04/29/14 22:09:23 Page 251 of
559

CONFIDENTIAL INFORMATION

City of Detroit                                                                                                                                                  *DRAFT*

| Improving Transportation Systems for City and Regional Residents | | |
|---|---|---|
| | **Kresge Foundation** | **Department of Transportation TIGER Grant** | **Department of Transportation** |
| **Amount of Grant in Announcement** | $30 million | $25 million | $6.4 million |
| **Actual Grant Funds Awarded** | NA | $25 million | $6.4 million |
| **Benefit to General Fund** | $0 | $0 | $0 |
| **Source of Funds** | Kresge Foundation and NCB Capital Impact | Federal Transit Administration ("FTA") | US Department of Transportation |
| **Purpose of Grants** | The Kresge Foundation and NCB Capital Impact, a community development finance institution, have launched the Woodward Corridor Investment Fund ("The Fund"), a $30.25 million effort to provide capital for the redevelopment of Detroit's Woodward Corridor. | The Transportation Investment Generating Economic Recovery or TIGER Discretionary Grant program allows the U.S. Department of Transportation to invest in road, rail, transit and port projects that promise to achieve critical national objectives. | The purpose of the Regional Transit Authority ("RTA") to coordinate the activities of the existing transit agencies within its jurisdiction and secure funding to improve and enhance public transportation. |
| **Details of Grant Allocation** | The Fund will provide long-term fixed-rate loans for the development of multi-family and mixed use projects along Woodward Avenue. | • The grant will be used for Detroit's M1-Rail project to build a light rail line on Woodward Avenue in the city's downtown. <br> • The M1-Rail project is also funded by the non- profit M-1 Rail Corp which is a coalition of private businesses, foundations, and public and private institutions. The M-1 Rail Corp ("M-1") has committed more than $100 million toward construction and operation of the $137 million project. The remainder will be funded by state and local sources. M-1 will initially operate the streetcar line. | The funds were awarded to the RTA which was created in December 2012. It is comprised of the counties of Macomb, Oakland, Washtena, and Wayne. |
| **Use of the Funds** | The Fund began accepting applications on October 1, 2013 and initial loan approvals will be made before the end of 2013 for projects that will start construction before the end of 2014. | • The City of Detroit has entered into an inter-governmental agreement with MDOT to manage the $25 million grant for M-1. <br> • MDOT will draw the funds from the FTA and M-1 will spend the funds. <br> • The Department of Public Works will manage the city side. | A program has not been announced for the use of the funds. The RTA does not have permanent funding sources, so the agency may hold the funds for administrative purposes. |
| **Treatment in 10-Year Plan** | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan | Not included in 10 year baseline or reinvestment. This program would be incremental to any reinvestment amounts assumed in the plan |
| **Reimbursement Grant** | NA | Yes | |

5

[6.11] [Federal Funds Announced on Sep. 27 2013_115113 vDRAFT.pdf] [Page 6 of 7]

CONFIDENTIAL INFORMATION

| Helping Create a 21st Century Detroit (Philanthropic Grants) | | | |
|---|---|---|---|
| **Institution** | **Description** | **Amount** | **Grant Purpose** |
| Ford, Kresge, & Knight Foundations | Cultivating Detroit entrepreneurs and small businesses | $15 million | The Knight, Ford and Kresge Foundations committed a combined $15 million to the New Economy Initiative. The Group is working to transform Detroit's economy by building a network of support for entrepreneurs and small businesses. |
| Private Funding | Classes of Revitalization Fellows | $5 million | Fellows work for two-year term at a relevant Detroit organization while the program provides them with executive-style education opportunities, coaching, leadership development and the chance to work on many of the city's economic and urban development initiatives. The Ford Foundation and the Kresge Foundation have committed a combined $5 million to the program. There are currently no Revitalization Fellows placed in any City of Detroit departments. |
| Ford Foundation | Upgrade City's grants management system | $1 million | Public Consulting Group ("PCG") conducted a month-long assessment of the City's grant management capabilities. The $127K study was funded by the Ford Foundation and concluded at the end of October.  PCG has developed an implementation plan to set up a central grants management office ("GMO") to provide better oversight on grants. Their proposed plan would cost ~$1.7M and will create a transitional GMO by March 2014, with a full implementation completed by March 2015; full implementation is predicated on a system-wide ERP upgrade, which takes 9-12 months. |
| Knight Foundation & Rock Ventures | Implement Tech Team's recommendations | $0.5 million | Detroit Future City was provided $250,000 to fund the human capital necessary to put in place recommendations from a White House-led information technology team, as part of a long-term, strategic plan for a prosperous Detroit developed by city officials and the community. |
| Knight Foundation | Grants for enhanced training of public sector and non-profit employees | $0.3 million | Community Foundation for Southeast Michigan was provided $250,000 to fund fifty $5,000 capacity grants to subsidize training for public sector and nonprofit staff who are advancing the future of Detroit in areas of economic growth, land use, city systems, planning and neighborhoods (the Detroit Future City "Elements"). |
| Detroit Dev. Fund & Knight Foundation | Foster early stage retail and creative businesses | $0.3 million | Detroit Development Fund was provided $250,000 to support early stage retail and creative businesses in Detroit and furthering the organization's mission to revitalize economically distressed areas in the city. |

**Exhibit G**

**Cash Flow Variance Report June 2013**

13-58846-swr  Doc 18768  Filed 04/29/14  Entered 04/29/14 21:00:22  Page 254 of
559
13-58846-swr  Doc 18768  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 254 of 254    254

CONFIDENTIAL INFORMATION
lally.gartel@kirkland.com
Detroit/27:11:2013 11:54

# Project Piston

## Cash Flow Variance Report

## (June 2013)

Work in Process - Subject to Material Change

Information contained herein has not been independently verified and is subject to material change based on continuing review. Accordingly, the information contained herein is not intended to be and should not be relied upon by any third party or as legal, auditing, or accounting advice

The attached cash flows ("Monthly Cash Flow"), its assumptions and underlying data are the product of the Client and its management ("Management") and consist of information obtained solely from the Client. With respect to prospective financial information relative to the Client, Ernst & Young LLP ("EY") did not examine, compile or apply agreed upon procedures to such information in accordance with attestation standards established by the AICPA and EY expresses no assurance of any kind on the information presented. It is the Client's responsibility to make its own decision based on the information available to it. Management has the knowledge, experience and ability to form its own conclusions related to the Client's Monthly Cash Flow. There will usually be differences between forecasted and actual results because events and circumstances frequently do not occur as expected and those differences may be material. EY takes no responsibility for the achievement of forecasted results. Accordingly, reliance on this report is prohibited by any third party as the projected financial information contained herein is subject to material change and may not reflect actual results.

NOTE:
General Fund cash activity and the forecasts herein are based on estimated cash activity for the General Fund main operating account. In addition to General Fund cash (fund 1000), the main operating account also contains cash balances and cash activity of the Risk Management Fund, Construction Fund, Street Funds, Solid Waste Fund, General Grants, and Motor Vehicle Fund ("other funds"). While the cash balances related to these other funds are pooled with General Fund cash, the City does maintain a separate accounting of due to/from balances for each fund. Since the General Fund commonly borrows from other funds, actual cash balance in these accounts at any given point in time is higher than that which actually belongs solely to the General Fund.

13-53846-tjt Doc 13708 Filed 11/27/43 Entered 11/27/13 21:22:43 Page 2 of 5
559
[4.2.2.4] [June_2013_variance_report_(DRAFT)_V1.pdf] [Page 1 of 4]
13-53846-swr Doc 4334-3 Filed 04/29/14 Entered 04/29/14 22:09:23 Page 255 of

*$ in millions*

|  | FY 2014 |
|---|---|
| **Ending cash - Forecast (11A+1F)** | $  14.1 |
| **Ending cash - Actual** | 36.0 |
| Favorable variance | $  21.9 |

Reconciling items:

|  |  |
|---|---|
| Missed COP payment | $  39.7 |
| Escrow proceeds not drawn | (20.0) |
| Property tax receipts lower (net impact) | (9.6) |
| DDOT actual cash subsidy lower than forecast | 8.7 |
| Miscellaneous other | 3.1 |
| **Sub-total reconciling items** | **21.9** |

[4.2.2.4] [June_2013_variance_report_(DRAFT)_V1.pdf] [Page 2 of 4]

*$ in millions*

| | Forecast | Actual | | |
|---|---|---|---|---|
| | Jun-13 | Jun-13 | Variance | Comments |
| **Operating Receipts** | | | | |
| Property taxes | $ 58.0 | $ 44.6 | $ (13.4) | Actual amount lower than estimate from County; Net impact ~$10m (combine with distributions and accum prop tax accrual) |
| Income & utility taxes | 18.4 | 18.4 | (0.0) | |
| Gaming taxes | 9.2 | 5.6 | (3.5) | ~$5m held by custodian as of 6/30/2013; since cash was held by custodian, monthly swap payment ($4.2m) was not made; cash has |
| Municipal service fee to casinos | - | - | - | subsequently been released by custodian to City and June swap set-aside has been made |
| State revenue sharing | - | - | - | |
| Other receipts | 19.4 | 33.5 | 14.1 | Primarily due to inter-fund receipts for true-up of inter-agency billings coincident with fiscal year end |
| Refinancing proceeds | 20.0 | - | (20.0) | Proceeds not drawn; funds remain in escrow (see "memo" below) |
| **Total operating receipts** | **125.0** | **102.1** | **(22.9)** | |
| | | | | |
| **Operating Disbursements** | | | | |
| Payroll, taxes, & deductions | (27.2) | (27.7) | (0.5) | |
| Benefits | (16.0) | (17.1) | (1.1) | |
| Pension contributions | - | - | - | |
| Subsidy payments | (10.9) | (2.2) | 8.7 | Cash needs of DDOT lower primarily due to no risk mgmt premium, missed COP payment, and deferral of pension contributions |
| Distributions (w/o DDA increment) | (27.2) | (7.7) | 19.5 | Partially due to small prop tax collection; but majority is deferred until FY14 and captured below in "accumulated prop tax distr" accrual |
| DDA increment distributions | (5.5) | (6.2) | (0.7) | |
| Income tax refunds | (3.8) | (5.6) | (1.9) | |
| A/P and other disbursements | (32.2) | (34.9) | (2.7) | Primarily due to grant related and inter-fund disbursements (funded by favorable variance in "other receipts" above) |
| Sub-total operating disbursements | (122.8) | (101.3) | 21.4 | |
| | | | | |
| POC and debt related payments | (36.6) | 2.3 | 39.0 | Primarily due to missed COP payment ~$39.7m |
| **Total disbursements** | **(159.4)** | **(99.0)** | **60.4** | |
| | | | | |
| **Net cash flow** | **(34.4)** | **3.1** | **37.5** | |
| Cumulative net cash flow | | | | |
| | | | | |
| Beginning cash balance | 68.2 | 68.2 | - | |
| Net cash flow | (34.4) | 3.1 | 37.5 | |
| **Cash before required distributions** | **$ 33.8** | **$ 71.3** | **$ 37.5** | |
| | | | | |
| Accumulated property tax distributions | (19.7) | (35.3) | (15.6) | Higher accrual due to deferred distributions above |
| **Cash net of distributions** | **$ 14.1** | **$ 36.0** | **$ 21.9** | |
| | | | | |
| *Memo:* | | | | |
| Accumulated deferrals (estimated) | (118.7) | (118.7) | - | |
| Missed COP payment 6/14/13 | - | (39.7) | (39.7) | |
| Refunding bond proceeds in escrow | 51.7 | 71.7 | 20.0 | |
| Reimbursements owed to other funds | tbd | tbd | tbd | |

CONFIDENTIAL INFORMATION
sally.garfield@kkland.com
Detroit/27:11:2013    11:54

| $ in millions | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Preliminary |
| | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | FY 2013 |
| **Operating Receipts** | | | | | | | | | | | | | |
| Property taxes | $ 34.0 | $ 198.0 | 14.8 | 6.9 | 4.2 | 24.4 | 139.1 | 42.3 | 5.4 | 1.3 | 3.1 | 44.6 | $ 518.2 |
| Income & utility taxes | 23.1 | 25.1 | 21.5 | 25.8 | 23.6 | 21.9 | 25.4 | 23.9 | 20.4 | 30.2 | 30.8 | 18.4 | 290.1 |
| Gaming taxes | 12.4 | 15.2 | 17.2 | 12.4 | 20.8 | 11.0 | 11.5 | 19.6 | 14.4 | 12.8 | 16.5 | 5.6 | 169.5 |
| Municipal service fee to casinos | - | 7.6 | - | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | 17.4 |
| State revenue sharing | 28.5 | - | 28.7 | - | 30.9 | - | 30.4 | - | 30.6 | - | 29.7 | - | 178.9 |
| Other receipts | 26.1 | 37.8 | 26.0 | 22.5 | 26.6 | 31.7 | 16.7 | 58.0 | 25.6 | 29.3 | 41.4 | 33.5 | 375.3 |
| Refinancing proceeds | - | - | - | - | - | 10.0 | - | - | - | - | - | - | 10.0 |
| **Total operating receipts** | **124.2** | **283.8** | **108.2** | **67.5** | **110.1** | **103.1** | **225.0** | **143.9** | **96.5** | **73.6** | **121.4** | **102.1** | **1,559.3** |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (37.5) | (35.0) | (32.5) | (28.0) | (41.1) | (30.1) | (23.6) | (30.1) | (25.9) | (26.3) | (36.2) | (27.7) | (374.0) |
| Benefits | (18.3) | (21.0) | (20.4) | (16.7) | (16.2) | (19.5) | (9.7) | (15.8) | (17.7) | (4.7) | (14.9) | (17.1) | (192.1) |
| Pension contributions | - | (11.7) | (7.2) | - | (1.2) | (8.8) | (1.9) | - | - | - | - | - | (30.8) |
| Subsidy payments | (0.6) | (4.9) | (6.2) | (1.1) | - | (0.1) | (0.2) | (5.7) | (5.0) | (3.9) | (1.6) | (2.2) | (31.4) |
| Distributions (w/o DDA increment) | (0.9) | (111.6) | (45.3) | (3.4) | (4.2) | (1.5) | (8.1) | (80.7) | (66.9) | (1.9) | - | (7.7) | (332.3) |
| DDA increment distributions | - | - | - | - | - | - | (5.9) | - | - | - | - | (6.2) | (12.1) |
| Income tax refunds | (1.9) | (3.3) | (0.6) | - | (1.8) | (1.0) | (0.5) | (0.4) | (0.4) | (1.9) | (1.6) | (5.6) | (19.1) |
| A/P & other disbursements | (43.8) | (48.1) | (34.5) | (31.4) | (37.1) | (25.2) | (24.3) | (34.7) | (29.3) | (27.7) | (36.9) | (34.9) | (408.0) |
| Sub-total operating disbursements | (103.1) | (235.7) | (146.8) | (80.6) | (101.7) | (86.1) | (74.1) | (167.4) | (145.0) | (66.5) | (91.3) | (101.3) | (1,399.7) |
| POC and debt related payments | (4.2) | (5.4) | (4.9) | (9.0) | (7.9) | (14.9) | (3.1) | (8.5) | (4.8) | (32.2) | (25.6) | 2.3 | (118.1) |
| **Total disbursements** | **(107.3)** | **(241.1)** | **(151.7)** | **(89.6)** | **(109.6)** | **(101.0)** | **(77.2)** | **(175.9)** | **(149.8)** | **(98.8)** | **(116.9)** | **(99.0)** | **(1,517.9)** |
| **Net cash flow** | **16.9** | **42.6** | **(43.5)** | **(22.0)** | **0.5** | **2.1** | **147.8** | **(32.1)** | **(53.3)** | **(25.2)** | **4.6** | **3.1** | **41.5** |
| Cumulative net cash flow | 16.9 | 59.5 | 16.0 | (6.0) | (5.5) | (3.4) | 144.4 | 112.3 | 59.0 | 33.9 | 38.4 | 41.5 | |
| Beginning cash balance | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 29.8 |
| Net cash flow | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | 3.1 | 41.5 |
| **Cash before required distributions** | $ 46.7 | $ 89.3 | $ 45.8 | $ 23.8 | $ 24.3 | $ 26.4 | $ 174.2 | $ 142.1 | $ 88.8 | $ 63.7 | $ 68.2 | $ 71.3 | $ 71.3 |
| Accumulated property tax distributions | (48.1) | (77.8) | (31.8) | (32.7) | (31.2) | (47.4) | (149.3) | (89.0) | (26.4) | (25.5) | (27.9) | (35.3) | (35.3) |
| **Cash net of distributions** | $ (1.4) | $ 11.5 | $ 14.1 | $ (8.9) | $ (6.9) | $ (21.0) | $ 24.9 | $ 53.1 | $ 62.4 | $ 38.2 | $ 40.3 | 36.0 | $ 36.0 |
| *Memo:* | | | | | | | | | | | | | |
| Accumulated deferrals (estimated) | (66.2) | (56.3) | (50.9) | (52.7) | (53.2) | (46.3) | (44.2) | (53.9) | (57.7) | (61.5) | (65.8) | (118.7) | (118.7) |
| Missed COP payment 6/14/13 | - | - | - | - | - | - | - | - | - | - | - | (39.7) | (39.7) |
| Refunding bond proceeds in escrow | 28.6 | 81.7 | 81.7 | 81.7 | 81.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | |

[4.2.2.4] [June_2013_variance_report_(DRAFT)_v1.pdf] [Page 4 of 4]

# Exhibit H

## Cash Flow Variance Report FY 2014

# Project Piston

## Cash Flow Variance Report

## FY 2014 (July through September)

Work in Process - Subject to Material Change

Information contained herein has not been independently verified and is subject to material change based on continuing review. Accordingly, the information contained herein is not intended to be and should not be relied upon by any third party or as legal, auditing, or accounting advice

The attached cash flow analysis, its assumptions and underlying data are the product of the Client and its management ("Management") and consist of information obtained solely from the Client. With respect to prospective financial information relative to the Client, Ernst & Young LLP ("EY") did not examine, compile or apply agreed upon procedures to such information in accordance with attestation standards established by the AICPA and EY expresses no assurance of any kind on the information presented. It is the Client's responsibility to make its own decision based on the information available to it. Management has the knowledge, experience and ability to form its own conclusions related to the Client's cash flow analysis. There will usually be differences between forecasted and actual results because events and circumstances frequently do not occur as expected and those differences may be material. EY takes no responsibility for the achievement of forecasted results. Accordingly, reliance on this report is prohibited by any third party as the projected financial information contained herein is subject to material change and may not reflect actual results.

**NOTE:**
General Fund cash activity and the forecasts herein are based on estimated cash activity for the General Fund main operating account. In addition to General Fund cash (fund 1000), the main operating account also contains cash balances and cash activity of the Risk Management Fund, Construction Fund, Street Funds, Solid Waste Fund, General Grants, and Motor Vehicle Fund ("other funds"). While the cash balances related to these other funds are pooled with General Fund cash, the City does maintain a separate accounting of due to/from balances for each fund. Since the General Fund commonly borrows from other funds, actual cash balance in these accounts at any given point in time is higher than that which actually belongs solely to the General Fund.

13-53846-swr Doc 13469 Filed 04/29/13 Entered 04/29/13 21:02:43 Page 260 of 4
13-53846-tjt Doc 13469 CONFIDENTIAL - PRELIMINARY DRAFT - SUBJECT TO CHANGE Page 260 of
559

*$ in millions*

|  | As of |
| --- | --- |
|  | **9/27/13** |
| **Ending cash net of distributions - Forecast Restructuring Scenario (September)** | $ 102.8 |
| **Ending cash net of distributions - Actual (September)** | 128.5 |
| **Favorable variance (see components below)** | $ 25.7 |

Major variances (details on subsequent page):

| | | |
| --- | --- | --- |
| FY 2013 variance from June (see **Memo 1**) | $ (10.4) | See **Memo 1** below |
| Property tax (net impact of collections, distributions, and change in accrual) | (0.0) | |
| Income tax receipts lower (net impact) | (4.3) | Timing |
| Gaming tax receipts higher (net impact) | 9.5 | Timing - large receipt forecast in early Oct was received in Sept |
| Other receipts higher | 14.8 | Timing - $3m grants; $4m DPS catch up; $4m voided checks |
| Payroll and benefits higher | (4.4) | |
| Cash subsidy to DDOT lower | 3.8 | Timing |
| AP and professional fee payments lower | 16.7 | Timing - primarily due to vendor payment management process |
| Miscellaneous other variances / rounding | (0.0) | |
| **Sub-total major variances** | $ 25.7 | |

**Memo 1:**

| | | |
| --- | --- | --- |
| June variance actual vs. Restructuring Scenario Forecast | $ 46.4 | Ending cash June (Forecast) |
| | 36.0 | Ending cash June (Actual) |
| | $ (10.4) | |

Major variances (June):

| | |
| --- | --- |
| Escrow proceeds not drawn in June | $ (20.0) |
| DDOT subsidy not made | 8.7 |
| Miscellaneous other variances | 0.9 |
| | $ (10.4) |

CONFIDENTIAL - PRELIMINARY DRAFT - SUBJECT TO CHANGE

| $ in millions | Forecast Jul-13 | Actual Jul-13 | Forecast Aug-13 | Actual Aug-13 | Forecast Sep-13 | Actual Sep-13 | FYTD Forecast Jul-Sep | FYTD Actual Jul-Sep | Variance | Ref. |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | |
| Property taxes | $ 37.8 | $ 32.7 | $ 166.6 | $ 177.5 | $ 13.0 | $ 27.5 | $ 217.5 | $ 237.6 | $ 20.2 | **A** |
| Income & utility taxes | 28.7 | 25.8 | 22.7 | 21.8 | 22.3 | 21.0 | 73.7 | 68.6 | (5.0) | **B** |
| Gaming taxes | 14.6 | 21.2 | 14.1 | 12.7 | 8.9 | 17.5 | 37.7 | 51.4 | 13.7 | **C** |
| Municipal service fee to casinos | - | - | 7.6 | 7.3 | - | - | 7.6 | 7.3 | (0.3) | |
| State revenue sharing | 30.7 | 30.1 | - | - | 30.7 | 30.5 | 61.4 | 60.6 | (0.8) | |
| Other receipts | 26.2 | 31.8 | 24.8 | 33.7 | 24.9 | 26.5 | 76.0 | 92.0 | 16.0 | **D** |
| Financing proceeds | - | - | - | - | - | - | - | - | - | |
| **Total operating receipts** | **138.1** | **141.6** | **235.9** | **252.9** | **99.9** | **123.1** | **473.8** | **517.5** | **43.7** | |
| **Operating Disbursements** | | | | | | | | | | |
| Payroll, taxes, & deductions | (31.0) | (33.9) | (26.6) | (29.4) | (26.6) | (25.9) | (84.1) | (89.2) | (5.0) | **E** |
| Benefits | (15.5) | (13.8) | (15.5) | (14.5) | (15.5) | (17.5) | (46.4) | (45.8) | 0.6 | |
| Pension contributions | - | - | - | - | - | - | - | - | - | |
| Subsidy payments | (5.3) | (3.3) | (2.8) | (0.1) | (4.1) | (5.0) | (12.3) | (8.4) | 3.8 | **F** |
| Distributions - tax authorities | (14.8) | - | (72.4) | (83.2) | (40.0) | (20.7) | (127.2) | (103.9) | 23.3 | **G** |
| Distributions - UTGO | - | - | - | - | - | - | - | - | - | |
| Distributions - DDA increment | - | - | - | - | - | - | - | - | - | |
| Income tax refunds | (2.5) | (2.6) | (2.7) | (1.1) | (0.6) | (1.3) | (5.8) | (5.0) | 0.8 | |
| A/P and other disbursements | (41.3) | (44.2) | (42.9) | (25.0) | (34.3) | (27.7) | (118.4) | (96.9) | 21.5 | **H** |
| Professional fees | - | (2.3) | - | (1.5) | - | (1.0) | - | (4.8) | (4.8) | **I** |
| Sub-total operating disbursements | (110.4) | (100.2) | (162.9) | (154.7) | (120.9) | (99.2) | (394.2) | (354.1) | 40.1 | |
| POC and debt related payments | (7.4) | (11.6) | (4.2) | (4.2) | (7.3) | (7.3) | (18.9) | (23.2) | (4.3) | **J** |
| **Total disbursements** | **(117.7)** | **(111.8)** | **(167.1)** | **(159.0)** | **(128.3)** | **(106.5)** | **(413.1)** | **(377.2)** | **35.9** | |
| **Net cash flow** | **20.4** | **29.8** | **68.8** | **93.9** | **(28.4)** | **16.6** | **60.7** | **140.3** | **79.5** | |
| Cumulative net cash flow | | | | | | | | | | |
| Beginning cash balance | 66.1 | 71.3 | 86.4 | 101.1 | 155.2 | 195.0 | 66.1 | 71.3 | 5.2 | |
| Net cash flow | 20.4 | 29.8 | 68.8 | 93.9 | (28.4) | 16.6 | 60.7 | 140.3 | 79.5 | |
| **Cash before required distributions** | $ 86.4 | $ 101.1 | $ 155.2 | $ 195.0 | $ 126.8 | $ 211.6 | $ 126.8 | $ 211.6 | $ 84.8 | |
| Accumulated property tax distributions | (29.8) | (56.9) | (55.4) | (85.7) | (24.0) | (83.1) | (24.0) | (83.1) | (59.1) | **K** |
| **Cash net of distributions** | $ 56.6 | $ 44.3 | $ 99.8 | $ 109.4 | $ 102.8 | $ 128.5 | $ 102.8 | $ 128.5 | $ 25.7 | |
| *Memo:* | | | | | | | | | | |
| Refunding bond proceeds in escrow | 51.7 | 79.5 | 51.7 | 79.5 | 51.7 | 79.5 | 51.7 | 79.5 | 27.8 | **L** |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | |

**Footnotes:**

**A**  Actual amount higher due to timing of receipts; expected to reverse in subsequent weeks

**B**  Actual amount lower due to timing of receipts; expected to reverse in subsequent weeks

**C**  ~$5m due to cash held by custodian as of 6/30/2013 and remitted to City in July; off-set by June swap payment made in July; ~$8m related to early receipt of cash forecasted in first week of October

**D**  Primarily due to grant receipts, voided checks due to Ch9 filing, catch up payments from DPS, and unposted property and income tax collections; expected to reverse in subsequent weeks

**E**  Primarily due to delay of 10% wage cut implementation, overtime, separation payments and Federal Income tax true-up

**F**  Timing related variance based on lower working capital needs of DDOT; expected to reverse in subsequent months

**G**  Timing related variance; distributions are accrued below in "accumulated property tax distribution" line; net zero impact

**H**  Primarily due to vendor management and delays in disbursements due to bankruptcy process; expected to reverse in subsequent weeks given significant amount of invoices discovered

**I**  Professional fees were shown "below-the-line" in original forecast, but have been moved for presentational purposes

**J**  June 2013 POC swap payment not made until July; off-set by higher casino receipts above (net zero impact)

**K**  Higher accrual due to cumulative distribution payments not yet made since June and higher property tax collections

**L**  $20m was not drawn in June and currently forecast not to be drawn until Dec 2013; $7.8m was funded into account for FY14 self-insurance requirement

# Exhibit I

# Syncora Proposal

13-53846-tjt   Doc 4370-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 263 of
13-53846-swr   Doc 1876-10   Filed 11/27/13   Entered 11/27/13 20:22:45   Page 3 of 4
559   263

517211

STRICTLY PRIVILEGED PRIVATE AND CONFIDENTIAL
SUBJECT TO FRE 408
PRINTED OCTOBER 25, 2013 12:31 AM

**R** ROTHSCHILD



# DIP Term Sheet

October 25, 2013

**Strictly confidential**

DTPPF00011156

517211

STRICTLY PRIVILEGED PRIVATE AND CONFIDENTIAL
SUBJECT TO FRE 408
PRINTED OCTOBER 25, 2013 12:31 AM

# 1 DIP Term Sheet

| Key Terms | |
|---|---|
| Borrower | ▪ City of Detroit ("Detroit") |
| Lenders | ▪ Syncora Capital Assurance Inc. ("SCAI") and other lenders, designated by SCAI |
| Commitment Amount | ▪ $350 million DIP Term Loan Facility ("Term Loan") |
| Interest Rate | ▪ 1-month LIBOR + 230 basis points (cash pay). LIBOR at all times shall be deemed to be not less than 1.00% per annum |
| Maturity | ▪ Earlier of dismissal of the Bankruptcy case, confirmation of the Plan of Adjustment or 30 months, with an option to extend |
| Origination Fee | ▪ 1.25% |
| Collateral | ▪ First priority lien on the Pledged Wagering Tax Revenue<br>▪ First priority lien on the Income Tax Revenue of Detroit with creation of a trust acceptable to the Lenders |
| Mandatory Redemption | ▪ Consistent with Barclays' Proposal |

1

△ SYNCORA
Guarantee

🏛🏛 ROTHSCHILD

DTPPF00011157

13-53846-swr   Doc 4370-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 265 of 4
13-53846-swr   Doc 4370-10   Filed 11/27/13   Entered 11/27/13 29:22:45   Page 265 of 4   265
559

517211

STRICTLY PRIVILEGED PRIVATE AND CONFIDENTIAL
SUBJECT TO FRE 408
PRINTED OCTOBER 25, 2013 12:31 AM

# 2 Key benefits to Detroit

**The SCAI Proposal is superior to the Barclays' Proposal on numerous grounds:**

| Key Terms | SCAI's Proposal | Barclays' Proposal | Comments |
|---|---|---|---|
| Commitment Amount | ▪ $350 million | ▪ $350 million | ▪ Same |
| Interest Rate | ▪ 1-month LIBOR + 230 basis points (cash pay). LIBOR at all times shall be deemed to be not less than 1.00% per annum | ▪ 1-month LIBOR + 250 basis points (cash pay). LIBOR at all times shall be deemed to be not less than 1.00% per annum | ▪ SCAI's Proposal is 20 basis points lower |
| Maturity | ▪ Earlier of dismissal of the Bankruptcy case, the confirmation of the Plan of Adjustment or 30 months, with optional extension provision | ▪ Earlier of dismissal of the Bankruptcy case, confirmation of the Plan of Adjustment or 30 months | ▪ SCAI's Proposal includes an optional extension provision |
| Origination Fee | ▪ 1.25% | ▪ 1.25% | ▪ Same |
| Collateral | ▪ First priority lien on the Pledged Wagering Tax Revenue<br>▪ First priority lien on the Income Tax Revenue of Detroit with a creation of a trust acceptable to the Lenders | ▪ First priority lien on the Pledged Wagering Tax Revenue<br>▪ First priority lien on the Income Tax Revenue of Detroit<br>▪ Asset Proceeds Collateral | ▪ Same |
| Mandatory Redemption | ▪ Consistent with Barclays' Proposal | ▪ The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the note | ▪ Same |
| Use of Funds | ▪ Subject to Detroit discretion | ▪ Proceeds from the Quality of Life Note to fund expenditures designed to contribute to the improvement of the quality of life in Detroit. Proceeds from the Swap Termination Note to pay amounts required under the Forbearance Agreement to terminate the underlying swaps as approved by the Bankruptcy Court | ▪ SCAI's Proposal provides for greater flexibility |
| Events of Default | ▪ Customary Events of Default provisions | ▪ An event of default is triggered if the City ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established | ▪ SCAI's Proposal excludes such provision |

2

SYNCORA

ROTHSCHILD

**Exhibit J**

**Hr'g Tr., Oct. 15, 2013**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .       Docket No. 13-53846
        MICHIGAN,               .
                                .       Detroit, Michigan
                                .       October 15, 2013
                Debtor.         .       10:00 a.m.
. . . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9 PETITION
        BEFORE THE HONORABLE STEVEN W. RHODES
        UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:         Jones Day
                        By:  BRUCE BENNETT
                        555 South Flower Street
                        Fiftieth Floor
                        Los Angeles, CA  90071-2452
                        (213) 243-2382

For the State of        Michigan Department of Attorney General
Michigan:               By:  MARGARET A. NELSON
                        P.O. Box 30758
                        Lansing, MI  48909
                        (517) 373-1124

For AFSCME,             Lowenstein Sandler, LLP
AFL-CIO, and Sub-       By:  SHARON L. LEVINE
Chapter 98, City        65 Livingston Avenue
of Detroit              Roseland, NJ  07068
Retirees:               (973) 597-2374

For Detroit             Clark Hill, PLC
Retirement Systems-     By:  ROBERT GORDON
General Retirement      151 South Old Woodward, Suite 200
System of Detroit,      Birmingham, MI  48009
Police and Fire         (248) 988-5882
Retirement System
of the City of
Detroit:

13-53846-tjt   Doc 13840-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 268 of
13-53846-swr   Doc 1870-1   Filed 11/21/13   Entered 11/21/13 21:22:45   Page 2 of
559
198

APPEARANCES (continued):

| | |
|---|---|
| For the Official Committee of Retirees: | Dentons By:  CLAUDE D. MONTGOMERY 620 Fifth Avenue New York, NY  10020 (212) 632-8390 |
| For the Inter- national Union, UAW: | Cohen, Weiss & Simon, LLP By:  BABETTE A. CECCOTTI      PETER D. DECHIARA 330 West 42nd Street, 25th Floor New York, NY  10036-6976 (212) 356-0227 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer By:  WILLIAM WERTHEIMER 30515 Timberbrook Lane Bingham Farms, MI  48025 (248) 644-9200 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Associa- tion and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker &    Freedman, P.C. By:  BARBARA A. PATEK 400 Galleria Officentre, Suite 444 Southfield, MI  48034 (248) 827-4100 |
| Interested Party: | KRYSTAL CRITTENDON 19737 Chesterfield Detroit, MI  48221 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC By:  LYNN M. BRIMER 300 East Long Lake Road, Suite 200 Bloomfield Hills, MI  48304-2376 (248) 540-2300 |
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC By:  THOMAS R. MORRIS 30500 Northwestern Highway, Suite 200 Farmington Hills, MI  48334 (248) 539-1330 |

APPEARANCES (continued):

| | |
|---|---|
| For David Sole: | Jerome D. Goldberg, PLLC<br>By:  JEROME GOLDBERG<br>2921 East Jefferson, Suite 205<br>Detroit, MI  48207<br>(313) 393-6001 |
| For the United<br>States: | U.S. Department of Justice<br>Civil Division<br>By:  MATTHEW J. TROY<br>P.O. Box 875<br>Ben Franklin Station<br>Washington, D.C.  20044<br>(202) 514-9038 |
| For Center for<br>Community Justice<br>and Advocacy: | Vanessa G. Fluker, Esq., PLLC<br>By:  VANESSA G. FLUKER<br>2921 East Jefferson, Suite 200<br>Detroit, MI  48207<br>(313) 393-6005 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning, everybody.  I'd like to

4   take appearances from the attorneys who will be speaking here

5   today first.  Can we do that?

6          MR. BENNETT:  Thank you, your Honor.  Bruce Bennett,

7   Jones Day, on behalf of the city.

8          MS. NELSON:  Good morning, your Honor.  Assistant

9   Attorney General Margaret A. Nelson on behalf of the State of

10  Michigan.

11         MS. LEVINE:  Good morning, your Honor.  Sharon

12  Levine, Lowenstein Sandler, for AFSCME.

13         MR. GORDON:  Good morning, your Honor.  Robert

14  Gordon of Clark Hill on behalf of the Detroit Retirement

15  Systems.

16         MR. MONTGOMERY:  Good morning, your Honor.  Claude

17  Montgomery, Dentons U.S., for the Official Committee of

18  Retirees.

19         MS. CECCOTTI:  Good morning, your Honor.  Babette

20  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.

21         MR. WERTHEIMER:  Good morning, your Honor.  William

22  Wertheimer on behalf of the Flowers plaintiffs.

23         MS. PATEK:  Good morning, your Honor.  Barbara Patek

24  of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

25  Detroit Public Safety Unions.

13-53846-tjr  Doc 13870-11  Filed 04/29/14  Entered 04/29/14 20:22:45  Page 271 of  271
13-53846-swr  Doc 1870-11  Filed 11/21/13  Entered 11/21/13 21:22:45  Page 5 of
559
598

1     MS. CRITTENDON:  Good morning, your Honor.  Krystal
2  Crittendon, interested party.

3     MS. BRIMER:  Good morning, your Honor.  Lynn M.
4  Brimer appearing on behalf of the Retired Detroit Police
5  Members Association.

6     MR. MORRIS:  Good morning, your Honor.  Thomas
7  Morris of Silverman & Morris on behalf of the Retiree
8  Association parties.

9     MR. GOLDBERG:  Good morning, your Honor.  Jerome
10  Goldberg on behalf of interested party David Sole.

11     MR. TROY:  Good morning, your Honor.  Matthew Troy,
12  Department of Justice, Civil Division, on behalf of the
13  United States.  It is not my intention to speak this morning,
14  your Honor, unless you have specific questions regarding our
15  filing from Friday.

16     THE COURT:  Thank you, sir.  Mr. Gordon.

17     MR. GORDON:  Thank you, your Honor.  I just wanted
18  to provide the introduction relative to our proposed
19  allocation of the time and order of presentation here this
20  morning.  As your Honor can see from the document that was
21  filed, there are 11 objectors who wish to speak, and, of
22  course, they all have important points to make, but -- and we
23  very much appreciate the cooperation amongst all of them.  It
24  was a good and constructive process.  Not only was that easy,
25  but everyone has been very cooperative, and we've allocated

13-53846-tjt  Doc 4384-3  Filed 04/29/14  Entered 04/29/14 20:22:45  Page 272 of
13-53846-swr  Doc 1870-11  Filed 11/21/13  Entered 11/21/13 21:22:45  Page 6 of
559
198
272

1　the time accordingly to various parties to have the

2　opportunity to speak today.

3　　　　You will note, your Honor, a couple things.  One, we

4　did not allocate the full 120 minutes in the morning.

5　There's a few minutes left over.  Similarly, in the afternoon

6　there's about five minutes left over of the 90 minutes.

7　That, of course, is not intended to necessarily waive our

8　opportunity to have the full time, but we thought that would

9　build in some flexibility and some error margin as people

10　stand up and sit down to make sure that we fit within the

11　time frame.

12　　　　Also, as footnote one indicates, the presentation

13　order does not necessarily tie -- correspond discretely with

14　each of the issues as listed in your scheduling order, your

15　Honor.  There is some correlation, but various parties, as

16　the Court, I'm sure, can understand, have a number of issues

17　that they would like to address.  There will be some overlap.

18　The parties are going to try to overlap as little as

19　possible, but it was not really feasible to try to identify

20　discrete issues that each party was going to take on, so

21　instead the hope is that as each party comes to the podium,

22　they'll try to give you a little bit of a road map as to the

23　particular issues that they're going to touch upon.

24　　　　THE COURT:  Thank you, and thank you for your

25　extraordinary effort in coordinating this.  I'm sure it was a

1    challenge.  And I also want to thank all of the attorneys for

2    cooperating with Mr. Gordon and with the Court in trying to

3    organize this as best we can.  So we're going to start then

4    with AFSCME's counsel, and we're going to try to run the

5    timing mechanism for your convenience.  Kelli, have we got

6    that available?  I'm sorry.

7            MS. LEVINE:  They were teasing me that if I'm

8    nervous, it'll take 20 minutes, but if I remember to speak

9    slowly, it'll take 35.

10           THE COURT:  Okay.  So for 35 minutes you may

11   proceed.

12           MS. LEVINE:  Thank you, your Honor.  First, we

13   appreciate the opportunity.  We think these issues are

14   extremely important, and we're glad that we have the

15   opportunity to speak.  Second, as Mr. Gordon correctly noted,

16   the parties who are speaking here today have made a concerted

17   effort to divide up the time and to try not to duplicate our

18   comments, so in that regard we're reserving the right to rely

19   on the filed objections along with the other arguments of

20   other counsel simply because we won't have time to do it all

21   ourselves.

22           With that, your Honor, we started this endeavor by

23   looking at PA 436 specifically concerned, as you might

24   imagine, with the pension issues and with the fact that we

25   believe that the Michigan Constitution provides for

1  protections for vested pension benefits, and then that

2  potentially conflicted with PA 436, and, therefore, we

3  started looking at the issue of whether PA 436 was, in

4  fact -- was, in fact, unconstitutional in that it allowed a

5  Chapter 9 filing in light of the pensions -- in light of the

6  pension restriction in the Constitution.

7       In addition to that, we were looking at the

8  governor's authorization in allowing the Chapter 9 filing in

9  light of PA 436 and in light of the Michigan Constitution and

10  grappling with the issue of whether or not that authorization

11  without any contingencies caused this Chapter 9 filing to be

12  unconstitutional as applied.

13       In addition to that, we grappled with the ripeness

14  issue as to whether or not all of these issues should be

15  raised now or whether they should be raised in connection

16  with a plan of adjustment, specifically, your Honor,

17  grappling with the issue as it was presented to us by our

18  members where we have folks literally sitting at their

19  kitchen table deciding whether or not they can take medicine

20  today or do they have to start taking it every other day, do

21  they feed themselves, do they feed their children, do they

22  pay rent, so we came to this Court anxious to have some of

23  these issues decided quickly.

24       On top of that, as it turns out, involved in the

25  mediations and the other efforts with regard to the serious

13-53846-swr  Doc 1870-11  Filed 04/29/14  Entered 04/29/14 22:00:22  Page 275 of
13-53846-tjt  Doc 4184-3  Filed 04/29/14  Entered 04/29/14 21:22:45  Page 5 of
559
556  275

 1   issues that are confronting Detroit, we do think

 2   understanding your Honor's views of the rules of the game

 3   could be useful for the parties in that process, but that's

 4   really by way of introduction because what we've done, your

 5   Honor, in addition to that, is we started researching how we

 6   thought PA 436 fit in the overall scheme of Chapter 9 and, in

 7   looking at those issues, delving into whether or not Chapter

 8   9 itself was, in fact, unconstitutional, which is what we

 9   will address before your Honor this morning.  And I'd like

10   to, with the Court's permission, set the table a little bit

11   but promise to get into <u>Bekins</u> and some of the cases that are

12   cited by folks who disagree with our views later on in the

13   comments.

14        So I'd ask you, your Honor, to come back with me, if

15   you will, to elementary and high school when we first started

16   talking about what the Constitution is and what it means,

17   and, respectfully, when we go back, we remember that the

18   framers of the Constitution were fleeing an oppressive,

19   overbearing, centralized government.  So when we started

20   looking at how we framed our Constitution, we were very

21   careful to make sure that there was a federal Constitution

22   that was extremely limited only to specific rights that we

23   believed should transcend every single state in the union,

24   and we've come to call those the unalienable rights, and they

25   refer to things like freedom of speech and freedom of

 1   religion.  And under the Tenth Amendment, your Honor,
 2   everything else is reserved for the states, so specifically
 3   reserved for the states are the state municipal governments'
 4   rights to handle their own financial management.  And this is
 5   done, your Honor, not to protect the states, which would have
 6   been as suggested by the New Jersey plan, but was actually
 7   done to protect the individual citizens, as suggested by the
 8   Virginia plan, and the specific rationale behind protecting
 9   the individual citizens was in order to have accountability
10   from our government and particularly, more importantly, from
11   our local governments, which were viewed as being more
12   accessible to the citizens that they were -- that they were
13   supposed to be taking care of.  So, for example, if somebody
14   infringes on my right of free speech or my right of freedom
15   of religion, I know I point my finger to D.C., and I look at
16   the federal government, and I say to the federal government,
17   who is accountable for those federally protected rights,
18   "Make them stop," but if somebody says to me that there's an
19   inappropriate use of the power over the financial management
20   of a state municipality, of, for example, Detroit, I look to
21   my local government.  I look to my local politicians and my
22   local leaders, and I say, "I'm holding you accountable," and
23   we saw that working well very recently with the mayor of
24   Detroit -- with the prior -- apologies -- prior mayor of
25   Detroit, so this direct accountability, which is a

cornerstone of how we -- of how we run our country and how we
run this democracy, is there for a reason, and it's not there
to protect the states.  It's there to protect the citizens.
The Constitution doesn't start "We the states."  It doesn't
say, "I the general federal government."  It starts, "We the
People."  So now, as we indicated in our brief, we believe
there is what we've called this unholy alliance between the
state giving authorization to the federal government to run
this Chapter 9 process.  And what we said there, your Honor,
is that the states are, in essence, ceding the responsibility
and the accountability for their own financial management, so
by turning over under Chapter 9 to the federal government and
being able to hide behind the bankruptcy process and this
Court, we lose that accountability that's a cornerstone of
what our Constitution requires of us, and we've seen that
already.  We saw that debtor's counsel correctly noted in an
internal e-mail exchange back in January of 2013 that making
this a federal issue provides political cover, and we've seen
it in the depositions where we're talking to the EM and the
governor, and they are talking about the fact that they're
not exactly sure what's going to happen with the pensions.
The bankruptcy process takes care of that.  And we would
respectfully submit, your Honor, that we're seeing play out
in real time and real life the exact loss of accountability
that the Constitution was designed to protect, so --

1      THE COURT:  Well, but hasn't state consent been a

2   cornerstone of the Supreme Court's Tenth Amendment

3   jurisprudence?

4      MS. LEVINE:  Your Honor, we'll talk about the

5   consent in Bekins, and we don't believe that what we're

6   saying here today is inconsistent with state consent.  And if

7   your Honor will give me a little bit more leeway, we'll reach

8   that point --

9      THE COURT:  Sure.

10     MS. LEVINE:  -- because we understand the issue.  So

11  one of the comments that's being made is that in order for

12  there to be -- that the reason why we can't do it at the

13  state level, the reason why the state municipal governments

14  can't do it is because it violates the contract clause, and

15  by violating the contract clause, you can't do a plan of

16  adjustment unless you have a hundred percent consent.

17     Now, we would respectfully submit, your Honor, that

18  there's two responses to that, and they are -- and I'll admit

19  they're diametrically opposed, but under either response you

20  don't get to the place where you get to take it away from the

21  states.  Number one, if you believe, as suggested, that you

22  need a hundred percent consent at the state level because of

23  the contract clause, then we would respectfully submit that

24  the states can't cede control to the federal government and

25  then suddenly it becomes legal to do a plan of adjustment

1   without a hundred percent consent.  And, your Honor, in doing

2   that, we're actually just reading from the Constitution

3   itself.  The contract clause is in Section 10 of Article I of

4   the Constitution.  Section 10, Article I, of the Constitution

5   has three subsections, one, two, and three.  In the first

6   section, it talks about no state shall enter into treaties

7   with foreign countries, print money, and it's the contract

8   clause.  Under sections two and three, not where the contract

9   clause sits, it says, "No State shall without the consent of

10  Congress," so by the plain reading of the Constitution, if

11  "no state shall" means no state shall, then no state shall do

12  it with or without the consent of Congress, and the framers

13  clearly understood that if they wanted the states to be able

14  to do it with the consent of Congress, they could have done

15  what they did in the two other subsections and basically

16  said, okay, instead we'll do it -- we'll do it with a federal

17  municipal bankruptcy statute where the federal government

18  will consent, and, therefore, you can violate the contract

19  clause.  So our first point is under the contract clause, "no

20  state shall" means no state shall, and if we're going to be

21  intellectually honest with ourselves, that applies regardless

22  of whether or not Congress consents because it's not, as in

23  Section 10, the second and the third paragraph, "No State

24  shall without the consent of Congress."

25          THE COURT:  What Supreme Court case law supports

1  this interpretation?

2          MS. LEVINE:  Your Honor, we respectfully submit that

3  it's Ashton.

4          THE COURT:  The case that Bekins overruled?

5          MS. LEVINE:  Well, we don't believe that Bekins

6  overruled it, and if I can keep going, the alternative

7  approach -- and, frankly, the plain meaning of the statute we

8  don't believe yet -- or I'll admit we haven't found yet a

9  constitutional case that comes right out and says it is or it

10  isn't done this way, but it is the plain reading of the

11  Constitution, which we thought was --

12          THE COURT:  Okay.

13          MS. LEVINE:  -- a good place to start.  But moving

14  past that, let's assume -- and we believe the better answer

15  is that there has to be a way to adjust debts.  Then we go

16  back to where we started, your Honor, which is this is

17  absolutely a state municipal right.  What Bekins was looking

18  at -- and remember Bekins was decided in -- right in the

19  middle of the Great Depression.  Okay.  And so up until

20  the -- up until just before Bekins was decided, there was no

21  municipal federal bankruptcy law at all.  It wasn't really

22  contemplated by the framers, and I'll get into that a little

23  bit more in a minute, but what Bekins found was we now have

24  this new federal municipal bankruptcy law.  There is no state

25  counterpart, so the only option that's available to the state

1   and the only way that the state can be accountable to its

2   citizens to fix this problem if there is no other option

3   available is to then consent to the federal court stepping in

4   and doing this.  Consistent with that, your Honor, we

5   believe, is Asbury Park, and we would respectfully submit

6   that Asbury Park was decided after Bekins.  It was decided --

7   it wasn't a unanimous decision, but there was only one

8   concurrence, so there was no dissent.  It was drafted by

9   Judge Frankfurter, hardly, you know, a slouch, and it

10  specifically upheld Bekins but further found that a state --

11  in that case, New Jersey -- could correctly under its state

12  municipal authority do a plan of adjustment that did not

13  require 100 percent of consent, and in dealing with this

14  issue, it found that to be consistent with Bekins because

15  Bekins was looking at a situation where there was no state

16  alternative for the state to choose, and the state only had

17  one alternative, and it made the alternative to rely on the

18  federal statute.  And it further found -- and I'm going to

19  quote just for a moment, Judge, but in dealing with this

20  issue, the Court posed and then answered this very question.

21  "Can it be that a power that was not recognized until 1938,"

22  which is a federal municipal bankruptcy law, "when so

23  recognized, was carefully circumscribed to reserve full

24  freedom" -- that's how Bekins interprets it -- "to the States

25  has now been completely absorbed by the Federal Government -

 1   that a State which, as in the case of New Jersey, has after
 2   long study devised elaborate machinery for the autonomous
 3   regulation of problems as peculiarly local as the fiscal
 4   management of its own household, is powerless in this field?
 5   We think not." And we think that's very telling, your Honor.
 6   And by the way, Asbury Park is still good law. Like Bekins,
 7   which it is consistent with, it has not been overruled, so
 8   the -- then we were grappling with, well, why hasn't anybody
 9   looked at this issue. What happened after Asbury Park was
10   that the Bankruptcy Act incorporated a federal municipal
11   bankruptcy statute, which is a predecessor to 903, which
12   specifically includes a provision that provides, like 903,
13   that no state can enter into a plan of adjustment unless
14   there is a hundred percent consent. We find that interesting
15   that it's the federal statute. Basically, that's Article --
16   that's Chapter 9 saying Chapter 9 is constitutional, and the
17   states can't enter into an alternate separate plan of
18   adjustment with less than a hundred percent because Chapter 9
19   says so. It's a circular argument, we would submit, your
20   Honor, that can't possibly be the reason why the states can't
21   enter into a plan of adjustment, especially in light of
22   Asbury Park, with less than a hundred percent consent.
23          In addition to that, the other telling conclusion in
24   Asbury Park was when they addressed head on the issue of the
25   contract clause, they determined that the contract clause is

 1  not violated when you don't actually violate the underlying
 2  contract.  They were analogizing it to like the property
 3  rights, so while you have a contract right and that can't go
 4  away or you have a property right and that can't go away,
 5  what they were talking about in Asbury Park was what's the
 6  remedy, and the remedy in a Chapter 9 -- and we would
 7  respectfully submit the remedy in a state -- appropriate
 8  state plan of adjustment is to take what is now a valueless
 9  right -- contract right because the state municipality is
10  insolvent and create a plan of adjustment that, like in the
11  corporate bankruptcy setting, creates value for a right that
12  had no value.  We're not doing away with the contract, and a
13  lot of the cases that come after that -- for example, United
14  Trust that talks about taking away the bonds or changing the
15  bonds -- Asbury Park says you're not taking away the
16  contract, you're not taking away the bonds, you're not taking
17  away our retiree benefits.  All you're doing is you're
18  saying, "Look, there's not enough money here to pay for it.
19  We can't get it through taxation.  We need to -- we need to
20  fashion a remedy."  And that, your Honor, we would
21  respectfully submit is consistent with Bekins, with Asbury
22  Park, and with an appropriate reading of the contract clause.
23          Turning now to the bankruptcy clause, there is a --
24  there is a provision that provides for a national bankruptcy
25  statute.  How can Chapter 9 be unconstitutional if we have

1   a -- if we have a bankruptcy clause that says there's a

2   national uniform bankruptcy statute?  Number one, we're

3   directing our comments specifically at Chapter 9.  We're not

4   saying there is no statute that could be -- that could fit

5   within the parameters.  But that said, one of the things we

6   would observe about the bankruptcy clause is when the framers

7   framed the Constitution, it was inconceivable to them that

8   there would be a national municipal bankruptcy law.  To this

9   day there is no national municipal bankruptcy law in the EU.

10  And while Chapter 11 provides a very viable way to enable

11  commerce and Chapter 7 provides a very viable way for there

12  to be a fresh start -- and we've avoided debtor's prison and

13  all of the things that the framers were focused on at the

14  time -- there was no -- and there wasn't until the Great

15  Depression a national municipal bankruptcy law.

16          Second, we think there's a problem with Chapter 9

17  specifically because the requirement of the national

18  bankruptcy law is that it be uniform, so whether I'm here in

19  Detroit or in any other state or city in the country, I know

20  what the -- I know what the criteria is to be a corporate

21  debtor.  It's right in the Code.  I know what the criteria is

22  to be a Chapter 7 debtor.  It's right in the Code.  But

23  because Chapter 9 is struggling with the difference of the

24  separation of what's a federal power and what's a state

25  power -- and we respectfully submit struggling in a way that

 1  didn't work -- Chapter 9 is not a uniform statute.  There are
 2  some states that have objective standards so that everybody
 3  in their particular state has to meet a certain criteria in
 4  order to be a Chapter 9 debtor.  There are some states that
 5  don't even have the ability to be a Chapter 9 debtor, and
 6  then there are some states, like Michigan, where even though
 7  there's a statute that purports to authorize Chapter 9
 8  filings, it is completely and totally subjective with regard
 9  to who qualifies, whether they get authorization to file, and
10  whether or not there are any contingencies that are attached
11  to what they do when they're in that filing.

12          THE COURT:  Okay.  So how do you distinguish the
13  cases that uphold the nonuniformity of exemptions in Chapter
14  7?

15          MS. LEVINE:  Your Honor, one of the -- two responses
16  to that.  First of all, we understand the case law that says
17  that you can have conformity in a geographic location, so we
18  understand, for example, that if every state had an objective
19  standard the way every state has its own exemptions in
20  Chapter 7, that that could meet the criteria for uniform
21  standards, but we're saying something different.  In Chapter
22  9 we don't know that every state has a standard or that
23  they -- and if they don't have a -- and if they don't have a
24  standard for becoming a Chapter 9 debtor, there is no default
25  back to that which is provided under the Code.  In other

13-53846-swr   Doc 1870-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 286 of 286
13-53846-swr   Doc 1870-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 286 of 286
556

1  words, in Chapter 7, if I like Detroit's exemptions, I use

2  Detroit's exemptions.  If I like the federal exemptions, I

3  use the federal exemptions.  But there is no place where I

4  don't get to be a debtor or I don't get exemptions.

5       THE COURT:  Well, but still the question remains how

6  does a nonuniformity among states in authorizing or not

7  authorizing Chapter 9 or in having different standards for

8  seeking Chapter 9 protection make the federal law nonuniform?

9       MS. LEVINE:  Well, your Honor, if you take that to

10  its natural conclusion, you can say that I have a federal law

11  that basically says you can do whatever you want, but because

12  I'm saying you can do whatever you want to everybody, it's

13  uniform.  We would respectfully submit that that doesn't --

14       THE COURT:  Isn't that just about what the Chapter 7

15  exemption cases say?  Beyond that, federal law outside of

16  Chapter 9 applies state property law, generally speaking,

17  and, of course, the property law differs from state to state

18  to state.

19       MS. LEVINE:  Yes.  And that goes back to the line of

20  cases that talk about geographic, that they can be -- that

21  they can be uniform within a geographic area.  The difference

22  between all of those cases -- and then I'll let the point

23  rest because you are the Judge, and we may have to agree to

24  disagree --

25       THE COURT:  I'm just asking questions.

1    MS. LEVINE:  But the -- but we view that, as I said

2  earlier, that those exemptions, those criteria are published.

3  Okay.  So even if I know that I'm not going to follow -- that

4  if I'm going to follow state law with regard to UCC

5  priorities or if I'm going to follow state law with regard to

6  exemptions, in a specific geographic area I know exactly what

7  that is.  In the states that have the subjective test with

8  regard to whether or not to file a Chapter 9, Detroit has a

9  different standard than Lansing and has a different standard

10  than other cities, and that's the issue, and the issue -- and

11  not only that, but none of those cities know what that

12  standard is.  And I'll leave it there.

13    THE COURT:  Okay.

14    MS. LEVINE:  Your Honor, the other argument that's

15  out there is, well, doesn't the state have -- doesn't the

16  state have the ability to cede control if there's federal

17  aid.  Your Honor, we would respectfully submit that's a very

18  different situation.  If you're looking at a situation, for

19  example, like Sandy or like Katrina where the federal

20  government is saying we're going to give you money under

21  specific terms and conditions, that's different.  Nobody is

22  saying to Detroit or nobody is saying to every single Chapter

23  9 debtor if you file Chapter 9, you get "X" amount of money

24  from the United States of America, and in exchange for that,

25  you have to follow these certain rules.  There's a difference

1 between entering into a contract for money and for support
2 than ceding control just to do the plan of adjustment with no
3 financial support.

4     THE COURT: Well, but the cases in which the Supreme
5 Court has held the Tenth Amendment is violated by the federal
6 government or the federal government's legislation involve
7 what's called commandeering. Is there any of that here?

8     MS. LEVINE: Well, your Honor, we think that's -- we
9 think that is, in part, what is happening here. The
10 commandeering is they're taking away the state's right or
11 the -- to do their own financial management.

12     THE COURT: But only because the state showed up.

13     MS. LEVINE: But that's not true, and this is where
14 we go back to the Bekins --

15     THE COURT: Is there anything in Chapter 9 that
16 compelled the state to authorize the city to file this case?

17     MS. LEVINE: Yes, and this is -- and this is where
18 the argument comes. Okay. In Bekins there was no state
19 alternative at all. In Asbury Park -- so, therefore, the
20 Bekins Supreme Court made the decision that the state had no
21 choice if it wanted to adjust its debt but to come to the --
22 but to come to the federal court. In Asbury Park there was a
23 state alternative to the federal statute that was -- and that
24 was permitted by both the federal statute and the state
25 statute, so the arguments outside of the federal statute that

13-53846-swr Doc 4817-11 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 23 of 289
13-53846-swr Doc 1870-11 Filed 11/27/13 Entered 11/27/13 22:02:45 Page 23 of
558

1  said you can't go to federal -- you can't do it statewide,

2  you have to go to federal court under the commerce clause and

3  otherwise, were rejected for some of the reasons that we're

4  discussing here today.  In Chapter 9 four year -- or the

5  predecessor to Chapter 9, four years after Asbury Park, the

6  Bankruptcy Code in its municipal statute said we can adjust

7  debts at the federal level if you use the Bankruptcy Act, now

8  the Bankruptcy Code, but you, states, cannot because of how

9  we read the commerce clause only -- state municipal

10 governments cannot adjust debt except with a hundred percent

11 consent, so what the -- so what Chapter 9 says to the

12 governor is if you want to do a plan of adjustment without a

13 hundred percent consent, you must come to the federal

14 government, number one.  Number two, your Honor --

15      THE COURT:  Well, but the commandeering cases

16 address situations where the state and -- the federal

17 government imposes on the state to carry out some federal

18 program, some federal policy.  How does that work here?  So,

19 for example, in the New York case, which involved the waste,

20 right, nuclear waste or whatever, the state was forced to

21 take title to it under certain circumstances, and the Court

22 held that the state couldn't be imposed upon to do that to

23 carry out the federal policy of how to dispose of this waste.

24 How is that analogous here?

25      MS. LEVINE:  Well, your Honor, the reason why we

13-53846-swr  Doc 4317-11  Filed 04/29/14  Entered 04/29/14 22:02:45  Page 24 of 290
13-53846-tjr  Doc 1870-3  Filed 11/27/13  Entered 11/27/13 22:02:45  Page 24 of 290
558

1  believe it's analogous is because in order to do a plan of

2  adjustment, arguably there's no other way to do that without

3  using Chapter 9 unless you have a hundred percent consent,

4  and that's the commandeering.  The requirement that there be

5  a hundred percent consent unless you're the federal

6  government means that the state has no ability to do a plan

7  of adjustment unless it cedes control to the federal

8  government and to the bankruptcy process.

9       Your Honor, I'm coming up on time.  If I -- unless

10  your Honor has more questions, if I could just close briefly.

11       THE COURT:  Well, the other question I have for you

12  is what about the cases that hold that the lower courts are

13  to apply Supreme Court precedent until the Supreme Court

14  itself overrules it, and this is, of course, the Bekins case?

15       MS. LEVINE:  Well, your Honor, our -- we would

16  respectfully submit that Asbury Park was decided after

17  Bekins.  Right now where the Supreme Court sits is that

18  Bekins stands for the proposition that in the face of no

19  state alternative, which is what existed there, you can turn

20  to the federal statute.  Asbury Park stands for the

21  proposition that side by side an appropriate municipal

22  bankruptcy law and an appropriate state law, that's where the

23  state gets to choose, and if the state, as it did in Asbury

24  Park, chooses an appropriate state law that does permit for

25  the adjustment of debt, then the state is accountable to its

1  citizens.  If the state chooses the municipal law, then the

2  state is accountable to its citizens.  But either way, it's a

3  true state decision.  Consistent with both of those cases, we

4  find ourselves here in Detroit with a situation where there

5  is prohibited by Chapter 9, we believe unconstitutionally, no

6  ability to have that second state decision.

7       THE COURT:  Just so I understand, your argument is

8  that the current Chapter 9 is different enough from Bekins

9  because of its exclusivity that Bekins is not binding on this

10  Court.

11       MS. LEVINE:  Correct, and secondarily that Bekins

12  never reached the issue because regardless of whether or not

13  Bekins had an inappropriate -- the Bekins statute had an

14  inappropriate clause, the state wasn't looking to have a

15  separate -- you know, here we have PA 436 looking to try and

16  pigeonhole itself into the strictures of Chapter 9 reviewing

17  Chapter 9 as unconstitutional.

18       Your Honor, we believe your Honor is faced with a

19  difficult decision here.  We understand that Detroit is --

20  all that's happening here is difficult.  Detroit is in dire

21  financial straits, and it's not lost on any of us that the

22  decisions that you make with regard to the criteria for

23  eligibility, particularly with regard to Chapter 9, will have

24  implications for blighted cities throughout the United

25  States.  We also understand that constitutional issues are

13-53846-swr   Doc 1870-11   Filed 04/29/14   Entered 04/29/14 22:02:45   Page 26 of 292
13-53846-swr   Doc 4147-3   Filed 04/21/14   Entered 04/21/14 22:00:23   Page 292 of
559

1  difficult issues.  We heard -- you know, we've been grappling
2  since 9/11, for example, with the balancing between homeland
3  security and individual privacy rights.  We started talking
4  earlier about the First Amendment, and as a society we
5  grapple between where does First Amendment end and where does
6  a hate crime, for example, begin.  This is no less an
7  important constitutional issue because of the impact this
8  will have on state sovereignty and the ability of its
9  citizens to hold its own municipal leaders accountable.

10      Your Honor spent a long time listening to a lot of
11  individual objectors here in this courtroom talk about how
12  bad they felt things were in Detroit trying to deal with the
13  fact that their firemen were using garden hoses, you know,
14  street lights are out, all of these things, and your Honor
15  was clearly sympathetic.  And it was -- and concluded that
16  hearing, we believe correctly so, by saying that this was a
17  great day for democracy, but we would also add, your Honor,
18  that despite the fact that these things are at the forefront
19  of your mind and you want to do what's right, that doesn't
20  necessarily mean that you can do what's expedious -- what's
21  expedient.  Democracy is hard, and we would respectfully ask
22  that your Honor consider these issues with the same depth and
23  consideration that you've considered everything in this case
24  to date.  Thank you.

25      THE COURT:  Thank you.  Mr. Montgomery also for 35

1   minutes.

2           MR. MONTGOMERY:  Yes, sir.  Thank you.

3           THE COURT:  You may begin.

4           MR. MONTGOMERY:  Good morning.  Your Honor, my task

5   today is to discuss with you constitutionality as applied,

6   the standing and ripeness issue that the U.S. government has

7   posed to our constitutionality as applied to argument, and to

8   identify for you the predicate of that unconstitutionality as

9   applied, which, of course, we believe is the unconstitutional

10  behavior of Emergency Manager Orr and the governor in the

11  context of PA 436.

12          I'd like to set the stage briefly for you, your

13  Honor, on the question of standing by setting up two lines

14  of -- view of history here.  One is that in 1963 the State of

15  Michigan amended its Constitution to protect the pensions of

16  municipal workers.  Partly in reliance on that protection, a

17  small minority of the millions of people who have lived and

18  worked in the city went to work directly for the city.  Of

19  those, thousands of people who worked, about 23,000 people

20  are alive today who are retirees of the City of Detroit,

21  their beneficiaries and surviving spouses.

22          Now, those 23,000 people have been, in our view,

23  stalked by the emergency manager, who, with the blessing and

24  support of his advisors, has proposed to eliminate pensions

25  through a Chapter 9 process.  On July 16th the emergency

1   manager sought permission from the governor to file a Chapter

2   9.  On July 18 the governor, with full knowledge of the plans

3   of his emergency manager, gave unconditional permission to

4   the emergency manager to file that Chapter 9 petition.  And

5   the first overt harm has, in fact, now been announced.  On

6   October 11, the city mailed its books to the retirees

7   announcing the termination of the retiree health insurance

8   program for those same 23,000 people.

9           Now, the committee that I represent, your Honor,

10  consists of nine individuals, including retirees, deferred

11  vested, retirement eligible, surviving spouses and

12  beneficiaries, all of whom are protected by the pension

13  clause, all of whom are adversely affected by the harm that

14  was just announced by the city.  Each has or represents

15  vested accrued pension benefits, and they are participants in

16  the city's retirement health system.

17          The retiree committee consists of creditors

18  appointed by the U.S. Trustee to act in connection with the

19  case under 1102 and we think, therefore, have standing under

20  1109.  Now, the 1109 standing of being an interested party

21  may not be sufficient for either standing or ripeness on a

22  constitutionality issue, but we say to you -- we ask your

23  Honor to look at the current situation in the following

24  analogy.  When can somebody turn and defend themselves when

25  they are being threatened with harm?  We think that you don't

 1  actually have to wait until the harm has befallen you if the
 2  threat is imminent, if the threat is capable of redress by
 3  the Court, and it is identifiable.  The redress by the Court
 4  is, of course, denial of eligibility to the city.  The threat
 5  is loss of pensions as announced by the emergency manager.

 6        THE COURT:  Of course, if eligibility is denied, the
 7  city is also denied its right to deal with all of its other
 8  debts, isn't it?

 9        MR. MONTGOMERY:  Your Honor, that may be a temporary
10  delay because if your Honor holds that the current
11  authorization papers are not constitutional or if accepted,
12  despite their lack of constitutionality, the challenge to
13  Chapter 9 becomes insurmountable, we think that the
14  reasonable thing this Court could do if it were so inclined
15  would be to deny the city its eligibility for the reasons of
16  the challenge to the pension clause and then invite the city
17  to come back with either a conditional acceptance by the
18  governor or otherwise correct their manifest intent to
19  violate Article IX, Section 24.

20        THE COURT:  Well, what do I do if in Detroit two, as
21  you propose, the bondholders come in waving the state
22  contracts clause?

23        MR. MONTGOMERY:  Well, your Honor, first, we think
24  that there is a difference between Article IX, Section 24,
25  and both the federal contracts impairments clause and the

 1   state's own contracts impairment clause.  We think that can
 2   be found in two places.  First, there are extra words that
 3   can be found in Article IX, Section 24.  In its entirety,
 4   Article IX, Section 24, has a phrase that appears at the end,
 5   which says "shall not be diminished or impaired thereby," the
 6   entire phrase, if I may, your Honor, "The accrued financial
 7   benefits of each pension plan and retirement system of the
 8   state and its political subdivisions shall be a contractual
 9   obligation thereof which shall not be diminished or impaired
10   thereby," and, of course, your Honor, the second funding
11   clause, which is, "Financial benefits arising on account of
12   service rendered in each fiscal year shall be funded during
13   such year and such funding shall not be used for financing
14   unfunded accrued liabilities."  Your Honor, that is, to my
15   mind, certainly textually quite different than the state's
16   own simple contract impairment clause, and we think
17   meaningfully it's different.  What Section -- Article IX,
18   Section 24, does for -- in our view, your Honor, is tell the
19   state that no matter what you are doing, you cannot take a
20   step to adversely affect those accrued financial benefits,
21   and we cite, of course, the Seitz case, which is the judicial
22   probate case in which judges in the State of Michigan asked
23   for protection of their pensions, and the Michigan Supreme
24   Court agreed.  We think it's also consistent with the
25   Musselman case, which the Michigan Supreme Court said that,

```
 1    again, the funding of retirement benefits that were otherwise
 2    protected or protectable had to be done, and the state could
 3    not take any action to not do that.  Now, of course, that's a
 4    mandamus case in which the Court denied mandamus, but the
 5    legal proposition was squarely stated.
 6            We also think the advisory opinions that the Court
 7    entered with respect to the tax exempt nature of retirement
 8    benefits clearly show that the Michigan Supreme Court looks
 9    to see if the state is doing something to impair the actual
10    benefit.  And that particular advisory opinion dealing with
11    the tax exempt nature of retirement benefits, the Michigan
12    Supreme Court said, no, merely taxing you or removing the
13    special exemption is not an impairment of the financial
14    benefit itself, so we step back and we ask your Honor to say,
15    okay, is a plan proffered by the emergency manager with the
16    knowledge and support or blessing of the governor authorized
17    by a statute an unconstitutional series of events?  Is the
18    emergency manager's action unconstitutional, is the
19    governor's action unconstitutional, or is the statute itself?
20    Knowing that there is a judicial predilection for the
21    narrowest possible reading of major problems, we submit to
22    you that your Honor can start with the emergency manager's
23    plan.  Stop it.  No eligibility if the emergency manager's
24    plan is to be put forward.  If that isn't enough because the
25    governor authorized it, then you have to challenge the
```

1  governor.

2  THE COURT:  Let me rewind the clock here just --

3  MR. MONTGOMERY:  Sure.

4  THE COURT:  -- a couple of minutes and ask you about

5  this nonimpairment provision in the Constitution.  The

6  question we all are struggling with is what is the meaning,

7  the substantive meaning of that provision in the context of a

8  political subdivision that doesn't have the money to comply

9  with it?  What's the meaning of it?

10  MR. MONTGOMERY:  First, I think this might be a good

11  opportunity to agree with your Honor that impairment in the

12  classic sense is something the Bankruptcy Code, of course,

13  has dealt with for many years by saying the allocation of

14  assets is not all by itself impairment.  I think we -- I

15  think it's fairly well established that just because a

16  creditor gets less than a hundred cents does not mean that

17  their contract is impaired.  On the other hand --

18  THE COURT:  I thought that's exactly what it meant.

19  MR. MONTGOMERY:  That's if the state does it, but

20  that's not that the -- remember the -- it was not a taking of

21  property by the federal government to authorize the

22  Bankruptcy Code.  It was --

23  THE COURT:  Oh, if that's what you mean --

24  MR. MONTGOMERY:  Yes.

25  THE COURT:  Absolutely.

1    MR. MONTGOMERY:  Totally.

2    THE COURT:  Absolutely, sure.

3    MR. MONTGOMERY:  But it is a taking of property if

4 the emergency manager says to its retirees, "I, either by

5 virtue of a plan I put in or otherwise, am taking your right

6 to receive pension benefits in the future," which is what he

7 is proposing.  He is not merely proposing to alter the

8 funding system in violation of Article IX, Section 24.  He is

9 proposing to actually eliminate or reduce already accrued

10 financial benefits.

11    THE COURT:  Right, so what's -- how do we give

12 meaning to nonimpairment, as you propose is constitutionally

13 required, if the city doesn't have the money to pay?  What

14 does it -- what's the meaning of that requirement?

15    MR. MONTGOMERY:  Well, your Honor, I think that if

16 there is to be some allocation -- let's back up for half a

17 moment.  Let us assume for the moment that, in fact, the city

18 has proposed to utilize all of its assets to deal with it, so

19 we're not talking about a situation in which the city has

20 capacity on its balance sheet or cash flows to deal with

21 something that it just refuses to do.  We think that the

22 proper answer is not for the federal government to invite the

23 state to violate its own Constitution but to have the state

24 adjust its own laws, have the state, using its people, its

25 either constitutional ratification process or the state

1  through its legislative process create the system for

2  adjustments that Asbury Park tells us is still at least

3  viable.  Putting that aside, whether or not Asbury Park is or

4  is not still --

5      THE COURT:  Well, but hang on, Mr. Montgomery.  If

6  the pension right is as inviolate as you say it is, the

7  legislature can't adjust the pensions either.

8      MR. MONTGOMERY:  No, but it can adjust other

9  people's assets, other people's entitlements.  It can make

10  the accommodations to its Constitution that may be required.

11  It has the capacity to levy.  It has the capacity to change

12  property rights.  The state legislature has those property --

13  and the only thing we are asking this Court to consider --

14      THE COURT:  Well, let me ask this question then.

15      MR. MONTGOMERY:  Yes, sir.

16      THE COURT:  Is it your position that because of this

17  nonimpairment requirement in the Michigan Constitution, the

18  State of Michigan is a guarantor of retirees' pension rights?

19      MR. MONTGOMERY:  We have not garnered nor do we

20  propose to express a view today whether or not the state is a

21  guarantor.  What we are proposing to express a view today is

22  that no state actor can do something in violation of the

23  state Constitution and have that act be other than void ab

24  initio.  And if those acts are void ab initio, the requisite

25  authorizations either don't exist or, if this Court has the

 1   power to accept those authorizations notwithstanding their

 2   unconstitutionality under Michigan law, then your Honor is

 3   engaged not in aiding the sovereignty of the state, as

 4   suggested was required by Bekins, but you are aiding -- you

 5   are going in the direction of derogation of the sovereignty

 6   of the state.  And why do I say that?  Because you are

 7   telling the people of Michigan they can't control their own

 8   Constitution, they can't control their own legislature, they

 9   can't control their own executive officers, and we think that

10   is a pure Tenth Amendment problem.

11        You mentioned earlier in discussion with Ms. Levine

12   the commandeering issue.  It is absolutely true, as you have

13   identified, that first states must act in aid, not in

14   derogation of sovereignty.  That's the Bekins.  Under Printz

15   they can't compel a state official to do something that is

16   otherwise the subject of a federal program.  They can invite,

17   they can entice, but they can't commandeer.  That's the

18   Printz -- that's the Brady Bill decision.  And in the New

19   York versus United States case, which, again, your Honor

20   identified, you can't compel ownership of radioactive waste.

21   Again, you can create programs, you can create enticements,

22   you can create an exhaustive federal regulatory scheme that

23   keeps the states out of regulating the business, but here the

24   federal government can't, by virtue of the Tenth Amendment,

25   keep the states out of regulating the financial obligations

1   of its citizens.  It can't keep the states out of the

2   business of deciding when their elected officials can or

3   cannot do something, and it is that issue that causes the as

4   applied problem as opposed to the facial and validity issues

5   that were raised by AFSCME in the arguments of Ms. Levine.

6   We think it --

7            THE COURT:  I want to -- well, I want you to focus

8   on why the mere filing of this case resulted in an imminent

9   threat to the pension rights of the retirees of the city

10  because the filing itself didn't result in anyone's payments

11  being reduced; right?

12           MR. MONTGOMERY:  Well, I will note for you they --

13  on the healthcare side, they apparently are.

14           THE COURT:  Well, but that's not a result of the

15  Chapter 9.

16           MR. MONTGOMERY:  Well, actually, I don't think that

17  could be done under state law because these are all

18  collectively bargained -- or mostly collectively bargained,

19  and to the extent they were collectively bargained,

20  they're --

21           THE COURT:  Well, but with or without the Chapter 9,

22  Mr. Orr was free to do that or not under state law.

23           MR. MONTGOMERY:  Or not under state law.

24           THE COURT:  There's nothing about Chapter 9 that

25  impacts his decision to do that.  He hasn't asked, at least

1   as far as I know, the Court's permission to do that.

2          MR. MONTGOMERY:  No.  As far as we know, he hasn't

3   asked either.  So if I may answer the question, which, if I

4   understood it correctly, was why is the mere filing --

5          THE COURT:  An imminent injury.

6          MR. MONTGOMERY:  -- an imminent threat, first, I go

7   back to the factual predicate that I think underlays this,

8   that the mere threat of filing -- excuse me -- the mere

9   threat of a filing is not the harm all by itself, but it was

10  preceded by an announced plan, the June 14 proposal, and a

11  series of other events that the emergency manager undertook

12  and statements made, which evidenced -- evidenced -- a desire

13  to violate the state Constitution.  Now, the only way in the

14  emergency manager's own mind that he can do that is if he has

15  access to the Bankruptcy Court because he believes it will

16  trump the state constitution with respect to pension

17  protections.  Now, right or wrong, it is the -- it is the

18  threat that those pension benefits will be eliminated as part

19  of a plan, a series of steps of which have already been

20  undertaken, the most recent of which was the filing of the

21  Chapter 9 petition.  The problem we face, at least in my

22  view, your Honor, is that the world that you face today for

23  deciding whether or not the emergency manager's actions are

24  or are not constitutional under Michigan law is different in

25  the eligibility context than we think you're going to be

```
1   faced with at a plan confirmation context.  Once you're
2   inside the box of bankruptcy -- excuse me -- everyone,
3   putting aside whether -- how vigorously we will try to get
4   state law to say something different, but everyone seems to
5   suggest that the priority schemes and the allocation schemes
6   of the Bankruptcy Code preclude a contrary result that would
7   be allowable under state law.
8          THE COURT:  Oh, but you're going to fight that.
9          MR. MONTGOMERY:  But, your Honor, I've lost before,
10  and I might lose again.  The issue of --
11         THE COURT:  Well, but if you lose, it will be on
12  legal grounds.
13         MR. MONTGOMERY:  But, your Honor, it will be.  If we
14  are fighting this issue at the back end of the case and we
15  are arguing, as we will if we are required to, that
16  notwithstanding 109, that the emergency manager can't propose
17  a plan in good faith in which he violates his constitutional
18  rights for --
19         THE COURT:  Constitutional obligations, yeah.
20         MR. MONTGOMERY:  Constitutional obligations.  I
21  apologize.  For that to be a viable argument, in effect, you
22  have to rule today, your Honor, that it would be a violation
23  of his constitutional obligations because if it's not a
24  violation in the context of adhering to the Bankruptcy Code
25  provisions, which some cases say only provide with respect to
```

1  prospective obligations -- that is, a new pension plan would

2  be subject to the protections -- well, we're not talking

3  about a new pension plan, your Honor.  We're talking about

4  one that's been around for 60 or 70 years now, and we're

5  talking about a retirement plan that has people who are a

6  hundred years old.

7      THE COURT:  Suppose the plan is confirmable because

8  it results in the consent of those impaired after

9  negotiation.

10     MR. MONTGOMERY:  Your Honor, if our understanding of

11  the law is correct, it's going to be very hard for a state

12  official to agree in good faith to propose a plan that

13  impairs financial benefits without a hundred percent of the

14  retirees consenting either under 109 or under state law, and

15  so the -- in order to get to the point where a less than 100-

16  percent majority of the retirees are accepting the plan, you

17  have to have decided that state law doesn't control the

18  exercise of those rights.

19     THE COURT:  Suppose you or one of your objecting

20  colleagues decides to assert that the Michigan Constitution

21  requires the state to guarantee the federal -- the retirees'

22  pension.

23     MR. MONTGOMERY:  Well, your Honor, the -- again, you

24  are asking for advisory hypotheticals here, but --

25     THE COURT:  Well, but that's what looking at

1  ripeness is all about.

2      MR. MONTGOMERY:  The issue will be then not whether

3  or not the bankruptcy process has harmed the retirees because

4  it will have -- if the state is a guarantor or arguably a

5  guarantor, it must be sued, query whether or not that lawsuit

6  can be brought in the Bankruptcy Court or some other place,

7  and, secondly, the -- under the Sittler case, I believe,

8  there is a question of whether or not there's a cause of

9  action for damages for unconstitutional behavior.  There may

10  be a remedy, an injunction against unconstitutional behavior,

11  but the Michigan Supreme Court has not yet adopted a per se

12  rule that says if there is a violation of the state

13  Constitution --

14      THE COURT:  Suppose the state agrees that the

15  Constitution obligates it to guarantee the city's pension

16  obligations.

17      MR. MONTGOMERY:  Then the state will have remedied

18  the harm caused by the bankruptcy, your Honor, but the harm

19  was still being caused by the bankruptcy.

20      THE COURT:  What harm?

21      MR. MONTGOMERY:  The harm was the diminution of

22  pension benefits.

23      THE COURT:  Well, but if the state backs it up,

24  there's no diminution.

25      MR. MONTGOMERY:  Yeah.  If, as part of a plan of

1   arrangement, the state backstops -- you're right, your

2   Honor -- then the -- this is like a situation --

3          THE COURT:  Okay.  Okay.  If I'm right about that,

4   then why is the issue ripe now as opposed to then?

5          MR. MONTGOMERY:  This is like the landlord case, if

6   I may, your Honor, in which the -- I think it's <u>Bennett</u>

7   versus <u>City of San Jose</u>, which, if I may, your Honor, since

8   we didn't brief this issue, I can give you the cite for, but

9   as I'm looking for the citation, I believe that case stands

10  for the proposition that a landlord need not await the actual

11  failure to collect more rent than he could under the new

12  ordinance.  He's allowed to challenge the ordinance when it's

13  being passed.  All right.  We think this situation is very

14  similar to that.  We have a situation in which the emergency

15  manager has undertaken an act, has sought the aid of this

16  Court, and the question is do we have to wait for this Court

17  to, in effect, put it to us before --

18         THE COURT:  No, no.  The question isn't that.  The

19  question is do you have to wait for the emergency manager to

20  actually propose a plan that impairs pensions -- that's the

21  question -- and then object to that on constitutional

22  grounds.

23         MR. MONTGOMERY:  In the <u>Thomas More Law Center</u> case,

24  your Honor, the -- which is the commerce clause challenge to

25  minimum coverage provisions under the Affordable Care Act,

1   three and a half years in advance, the Sixth Circuit found

2   standing because notwithstanding the fact that it was a long

3   way off and many things could occur, including Congress

4   changing the law, different rules being applied, that was

5   enough because there was nothing the party asserting the

6   claim had to do in order to become injured.  Now, yes, there

7   were things that any member of the law center group could do

8   that could escape the harm, but the fact that they had to

9   undertake affirmative steps to escape the harm was enough.

10          Here the only thing we can do to escape the harm

11   which the emergency manager has announced he will undertake

12   is to escape, and the only way to escape is through the gates

13   that your Honor is standing at the door of.  You are the

14   keeper of the protection for the retirees.  You are the one

15   who can stop the emergency manager from doing what is

16   unconstitutional under Michigan law.  And apparently, by the

17   way, both the state and the city are inviting you to rule on

18   constitutionality issues, you know.  They are perfectly

19   comfortable with your going down that road, your Honor, and

20   notwithstanding our hesitancy --

21          THE COURT:  Does that make an otherwise not ripe

22   issue ripe?

23          MR. MONTGOMERY:  No, obviously not, your Honor, but

24   we do think that where there's -- where the voluntary

25   cessation by the city or the temporary cessation or the

1    temporary abandonment of its statements that, oh, we are
2    going to impair the pensions does not create a situation that
3    moots the controversy nor do we think it eliminates the
4    ripeness of the controversy because your Honor can still see
5    the identifiable harm and can still issue an order that
6    redresses that identifiable harm by telling the city it may
7    not enter the portals of your courtroom.

8         Now, your Honor, I think we have, in effect,
9    distinguished the Barnwell case, which is cited by, I
10   believe, the U.S. government, because that was an ad hoc
11   committee of citizens instead of an 1102 committee.  Here
12   we're clearly creditors.  Here 1109 grants us statutory
13   standing as parties of interest, and I think we have
14   indicated to you that the harm is factual, imminent, and you
15   are at the gates.

16        One other thing I might want to sort of identify in
17   this ripeness issue, why now as opposed to what, why later,
18   of course, your Honor is familiar with the City of Stockton
19   case, and we are not urging you to adopt that case obviously,
20   but it does suggest that once in Chapter 11, the State of
21   California couldn't decide which rules it was going to
22   follow.

23        THE COURT:  Chapter 9?

24        MR. MONTGOMERY:  Right, in Chapter 9, the same thing
25   your Honor might decide here; that is, once inside Chapter 9,

1   the city is not free to do whatever it wants to do except

2   with respect to its own property and its own future

3   governance.  That you cannot touch in any way, shape, or

4   form, but that doesn't mean that you have to approve a plan

5   that violates what your Honor thinks are the rules of the

6   road.  And it is that danger that you would be called upon to

7   make a ruling inconsistent with Michigan law at the back end

8   of the case that has us asking you at the front end of the

9   case to prevent the city from engaging in that dialogue.

10              Now, the -- I think worth making as a final, if you

11  will, point -- and, again, later this afternoon you will hear

12  a more fulsome discussion, I believe, on all of the issues

13  associated with PA 436, but I think the void ab initio issue

14  is important to our constitutionality position; that is, were

15  it not for the fact that under Michigan law an

16  unconstitutional act is considered void ab initio, we think

17  you might be able to go down the road of accepting the

18  authorization papers as having been legitimately delivered to

19  your Honor without fear of violating our view of how Chapter

20  9 would be unconstitutional as applied; that is, if Michigan

21  law did not regard unconstitutional acts as void ab initio,

22  then all you would be faced with is a remediable situation

23  rather than an absence of action or an absence of

24  authorization action.  And with respect to the void ab initio

25  cases, we have cited those in our brief, your Honor, and we

13-53846-swr  Doc 4817-3  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 314 of 311
13-53846-swr  Doc 1870-1  Filed 11/27/13  Entered 11/27/13 22:00:45  Page 45 of
558

page number

1    think that you should accept as a truism, if you will, the
2    simple words actually uttered by Attorney General Schuette in
3    his paper that the city lacks authority under Michigan law to
4    propose a plan that diminishes accrued pension rights.  It
5    similarly lacks power to consent to any proposed action that
6    would violate the Michigan Constitution.  The proposed action
7    was the petition.  The proposed action was the petition as
8    part of a plan to eliminate the pension rights induced -- the
9    emergency manager got the governor to say yes to an act that
10   was unquestionably contrary to the pension clause.  As a void
11   ab initio act, that means that the legitimacy of the filing
12   is called into question, pure question of state law for your
13   Honor to rule upon, pure question of whether or not, in fact,
14   the city has obtained valid authorization papers -- pretty
15   hard to be valid if the underlying actions are void ab
16   initio, which is the norm under Michigan law, and we think,
17   therefore, your Honor has two ways to go down the path of
18   blocking eligibility independently of the factual disputes
19   under 109.  One is to hold that it's unconstitutional, the
20   authorization was unconstitutional because it was part of a
21   scheme to eliminate the pension rights or to say even if it
22   wasn't void ab initio, the acceptance of those actions by
23   this Court raise a huge constitutional challenge under the
24   Tenth Amendment to Chapter 9 itself.  Obviously the principle
25   of limiting federal constitutionality challenges would favor

1   finding that the narrower ground would be that the emergency

2   manager couldn't have filed his papers.  And I think, your

3   Honor, just because I must, I just want to argue we are not

4   arguing -- we are not rearguing today all those issues which

5   we were in front of your Honor before several weeks ago about

6   Stern v. Marshall and whether or not the Court should do

7   that.  We are in front of you.  You have determined that you

8   have the power to decide issues of state and federal

9   constitutionality.  We are asking you to exercise that power

10  and to preclude the city's eligibility.

11          THE COURT:  So if you don't -- we have a little time

12  left.  I have some more questions for you.

13          MR. MONTGOMERY:  Sure.  Happy to engage, your Honor.

14          THE COURT:  One is sort of a procedural one.  You

15  mentioned that you didn't brief the ripeness issue.  Would

16  you like an opportunity to do that?

17          MR. MONTGOMERY:  That would be fine, your Honor.

18          THE COURT:  I'd leave it to your discretion.

19          MR. MONTGOMERY:  Yes, yes.

20          THE COURT:  How much time --

21          MR. MONTGOMERY:  We'd be happy to do that, your

22  Honor.

23          THE COURT:  How much time would you like?

24          MR. MONTGOMERY:  Give us a week, your Honor.

25          THE COURT:  Okay.  You have a --

1      MR. MONTGOMERY:  Yeah.  Give us a week.  It'll be --

2  if you don't mind, we'll submit it to you on the first day of

3  the trial.

4      THE COURT:  Okay.  I want to ask you about a couple

5  of entries in the brief that you did file.

6      MR. MONTGOMERY:  Okay.

7      THE COURT:  On page 27, you say -- and I want to

8  quote here.  This is the brief you filed at Docket Number

9  805.

10      MR. MONTGOMERY:  Yes.

11      THE COURT:  You say, "As noted by the Sixth Circuit

12  in City of Pontiac Retired Employees Association, 213 Westlaw

13  4038528 at *1-2, the Michigan legislature evidenced an

14  unconstitutional, and undemocratic purpose in crafting PA

15  436," close quote.  Similarly, on page 29 of that brief you

16  say, "The Michigan legislature, the Governor, and the

17  Emergency Manager have each made clear that abrogation of

18  municipal retirement compensation rights was the legislative

19  intent of the Act," referring to PA 436, "and is a central

20  purpose of this bankruptcy.  That intent also was recently

21  recognized by the 6th Circuit in City of Pontiac Retired

22  Employees Association," same cite at *3.  I have to say, Mr.

23  Montgomery, that I have studied that opinion by the Sixth

24  Circuit several times, and I cannot find these references.  I

25  cannot find where the Sixth Circuit addressed or even

1  suggested anything about the constitutionality of PA 436.  Am

2  I missing something or was this a mistake?

3        MR. MONTGOMERY:  Well, unless my memory fails me,

4  your Honor, I think what we're referring to is the fact that

5  the Sixth Circuit said that PA 4, which was the immediate

6  predecessor of 436, had each of those purposes, your Honor,

7  and that, therefore, by extension --

8        THE COURT:  Perhaps so, but the Court didn't say

9  anything about PA 436.

10       MR. MONTGOMERY:  Well, other than that it was

11  adopted despite the fact that the referendum had overruled PA

12  4 and that it was virtually the same but for -- I believe the

13  phrase was an add-on for --

14       THE COURT:  The Sixth Circuit did not say anything

15  about the purpose or intent of PA 436.

16       MR. MONTGOMERY:  But it did as to 4, your Honor.

17       THE COURT:  It did.

18       MR. MONTGOMERY:  And it says 4 -- 436 is the same as

19  4.  That's how we got there.  Rightly or wrongly, that is how

20  we got there, your Honor.  We say if the Sixth Circuit

21  identified a purpose of PA 4 as being the impairment of

22  pension --

23       THE COURT:  Well, since you're going to file an

24  amended brief --

25       MR. MONTGOMERY:  Yes, sir.

1          THE COURT:  -- I want you to tell me very

2   specifically where in this City of Pontiac case the Court

3   said anything or suggested anything about the

4   constitutionality of PA 436.

5          MR. MONTGOMERY:  All right.  Your Honor, we will --

6          THE COURT:  I agree with you it addressed it at

7   length with regard to PA 4 and expressed grave concerns about

8   it, but that's not the act before this Court today, so I

9   invite you to do that in your --

10          MR. MONTGOMERY:  Of course.

11          THE COURT:  -- new brief.

12          MR. MONTGOMERY:  We'll add that discussion to our

13   ripeness supplemental brief.

14          THE COURT:  All right.  Thank you.

15          MR. MONTGOMERY:  Thank you, your Honor.

16          THE COURT:  Ms. Brimer, you may proceed for ten

17   minutes, please.

18          MS. BRIMER:  Thank you, your Honor.  Lynn M. Brimer

19   appearing on behalf of the Retired Detroit Police Members

20   Association.  Your Honor, your concluding arguments or

21   discussion with Mr. Montgomery leads directly into the

22   discussion that I will have with you this morning, and that

23   has to do with the constitutionality of PA 436 under the

24   Michigan Constitution, your Honor.  And first and foremost,

25   your Honor, I'd like to point out that in our brief we

1   noted -- and we cited the <u>Schimmel</u> case -- we noted that PA

2   436 was passed in what we believe is derogation of the

3   Michigan referendum provision in Article II, Section 9, of

4   the Michigan Constitution.  It is well worth noting at the

5   outset of this discussion, your Honor, that that issue was

6   not addressed by either the city or the State of Michigan in

7   the pleadings they have filed.

8           With that, your Honor -- and I'll address that a bit

9   briefly later, your Honor.  Article I, Section 1, of the

10  Michigan Constitution specifically provides that, "All

11  political power is inherent in the people.  Government is

12  instituted for their equal benefit, security and protection."

13  Consistent with that maxim, Article II, Section 9, of the

14  Constitution specifically provides -- and it's a lengthy

15  provision, your Honor, so I'll read the relevant

16  provisions -- "The people reserve to themselves the power to

17  propose laws and to enact and reject laws, called the

18  initiative, and the power to approve or reject laws enacted

19  by the legislature, called the referendum.  The power of the

20  referendum does not extend to acts making appropriations for

21  state institutions or to meet deficiencies in state funds."

22  As has been noted, your Honor, in a handful of cases that we

23  can find that address this case, this provision of referendum

24  is so significant and vital to our Constitution that Article

25  II, Section 9, further provides that, "No law as to which the

1 power of referendum properly has been invoked shall be

2 effective thereafter unless approved by a majority of the

3 electors voting thereon at the next general election."

4 As this Court is aware, I'm sure, on November 6,

5 2012, by referendum, the people of the State of Michigan

6 rejected Public Act 4 on a vote of 52 to 48 percent. That

7 was the Local Government and School District Act --

8 Accountability Act. On December 26, Governor Snyder approved

9 Public Act 436, the Local Financial Stability and Choice Act,

10 a virtually identical law to Public Act 4.

11 In order to avoid subjecting Public Act 436 to

12 referendum, two very minor spending provisions were tacked on

13 at the back end. Section 34 of the Act provides that for the

14 fiscal year ending 9-30, 2013, $780,000 is appropriated to

15 administer the Act, in essence, to pay the salaries of the

16 emergency managers appointed thereunder, and Section 35

17 provides that $5 million is appropriated for the same time

18 frame for the professionals such as lawyers and financial

19 consultants that are engaged under the Act. The spending

20 provision was not at all a general spending provision for the

21 State of Michigan but a very limited provision relating

22 directly to the Act.

23 We have researched, your Honor, and cannot find a

24 single instance where the voters of Michigan have

25 specifically rejected a law and shortly thereafter the

1    governor passes a very similar law, if not identical, and

2    tacked on a spending provision in an effort to remove it from

3    the otherwise democratic process of the State of Michigan.

4          There are a handful of cases in Michigan that do

5    address the referendum.  In the case of Kuhn v. Department of

6    Treasury at 384 Mich. 378, 1971, the Michigan Supreme Court

7    specifically provided or held that the phrase in the preamble

8    of that -- the Income Tax Act of 1967, which provides that

9    the Act is for the purpose of meeting deficiencies in state

10    funds was not, in fact, sufficient when at the time the state

11    did not have any state deficiencies in its funding, and,

12    therefore, that provision in the preamble did not, in fact,

13    remove the Income Tax Act of 1967 from the power of

14    referendum.  Unfortunately, in that case the plaintiff had

15    not complied with the requirements for referring the matter

16    to the -- or the law to the referendum, and so the Court was

17    not able to render any further opinion regarding that

18    language and its impact on the -- whether or not that case

19    had -- that law had it been brought to referendum.  However,

20    it's instructive to this Court.  The law at issue in that

21    case had not previously been rejected on referendum, so,

22    therefore, it does have some influence in how this Court

23    should interpret how the Michigan Supreme Court may view the

24    two spending provisions tacked onto Public Act 436.  Public

25    Act 4 had, in fact, been rejected by the state through a

1  proper referendum.  The spending provisions were added on in

2  an effort to remove the case -- the law from the referendum

3  in derogation of the provision in Article II, Section 9,

4  which provides specifically that no law to which the power of

5  referendum had been properly applied shall be effective

6  thereafter unless approved by a majority of the electors

7  voting thereon at the next general election.

8       THE COURT:  Okay.  So I have this question for you

9  regarding this argument, and it's, again, a ripeness question

10  and a standing question.  How does any party have standing to

11 challenge the constitutionality of PA 436 on this ground or

12 why is it ripe until such a party has complied with all of

13 the legal requirements to have a referendum regarding that

14 put on the ballot and it being rejected because the law isn't

15 subject to a referendum because of this appropriations

16 provision?

17      MS. BRIMER:  I don't believe, your Honor, that by

18 adding on the spending provision, which on its face took

19 Public Act 436 out of the referendum provision of the

20 statute -- if that is the case, your Honor, then you have

21 read out the referendum from the Michigan Constitution.  I

22 think this is precisely the mechanism by which the

23 constitutionality of the law now should be challenged.  When

24 that law was then relied upon for purposes of the appointment

25 of an emergency manager, that is precisely, I believe, your

13-53846-swr  Doc 4817-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 320 of 320
13-53846-swr  Doc 1870-11  Filed 11/27/13  Entered 11/27/13 22:02:45  Page 54 of
559

1   Honor, how this would come to a court for review.  On its
2   face, the governor attempted to remove this from the
3   referendum.  It was removed from the referendum, but you
4   can't read that out of the law and read out of the
5   Constitution the second provision, which requires that any
6   law that has been rejected by referendum be resubmitted to
7   the electorate.

8         I see I'm running out of time, your Honor.  What I
9   would like to note, your Honor, is that while you are correct
10  that the Sixth Circuit did not specifically rule on 436 --
11  I've read that case closely several times -- 436 was not
12  before the Court, and, as you'll recall, some of the matters
13  at issue in that case were what precisely is before the Court
14  because some of the arguments had not even been preserved on
15  appeal.  However, I think the tone of the Sixth Circuit when
16  it said, "Apparently unaffected that voters had just rejected
17  Public Act 4, the Michigan Legislature enacted, and the
18  Michigan governor signed, Public Act 436.  Act 436 largely
19  reenacted the provisions of Public Act 4, the law the
20  Michigan citizens had just revoked.  In enacting 436, the
21  Michigan Legislature included a minor appropriations
22  provision, apparently" -- they didn't say "in fact," but
23  "apparently to stop Michigan voters from putting Public Act
24  436 to a referendum."  I think that gives us a tone, and I
25  also think it's noteworthy, your Honor, that despite the fact

 1  that the city noted on page 15 of Exhibit A to their

 2  consolidated response to the objections that we had raised

 3  this specific issue, it is not addressed.  It is not

 4  responded to by either the state or the city.  It stands

 5  unrefuted at this point, your Honor.

 6          THE COURT:  Thank you.

 7          MR. GOLDBERG:  Good morning, your Honor.  Jerome

 8  Goldberg appearing on behalf of interested party David Sole,

 9  who is a city retiree, as is his wife, Joyce Sole.

10          THE COURT:  And you may proceed for ten minutes,

11  sir.

12          MR. GOLDBERG:  Thank you, your Honor.  While I

13  certainly concur with many of the eloquent arguments put

14  forth by counsel prior to myself, I want to approach the

15  issue from a somewhat narrower point of view from the prism

16  of Michigan state law and specifically from the Michigan --

17  how Michigan state law views the issue of statutory

18  construction.

19          As we know, 11 U.S.C. 109 states that a local

20  municipality must be specifically authorized by state law to

21  file a Chapter 9 bankruptcy.  The phrase "authorized by law"

22  refers to the law of the state, and I cited <u>Bekins</u> for that

23  principle.  States act as gatekeepers to their municipalities

24  and access to relief under the Bankruptcy Code.

25          As we all know, the basis for the state law

1   authorizing the filing of this Chapter 9 is Public Act 436,

2   and Public Act 436 has several different provisions that I

3   think it's worth looking at to get an understanding for why

4   we believe the failure to include a contingency to bar the

5   impairment of pensions is violative of state law.  It

6   provides the emergency -- Section 1551(c) provides the

7   emergency manager with the power to carry out the

8   modification, rejection, termination, and renegotiation of

9   contracts.  Section 1552 provides the emergency manager again

10  with the power to reject, modify, or terminate, one, terms of

11  an existing contract.  Section K gives the emergency manager

12  the power to reject, modify, or terminate an existing

13  collective bargaining agreement.  Section 12 contains

14  provisions for the renegotiation of debt, and it's laid out

15  in Section 12.  But what Section 1552(m) -- Section 12(m),

16  when it deals with the question of pensions, it explicitly

17  includes within the section, within the statute, the --

18  states that the emergency manager must fully comply with

19  Article IX, Section 24, of the Michigan Constitution, which

20  is the constitutional prohibition on diminishing or impairing

21  contract.  In addition, Section 1558 states that the governor

22  may place contingencies on a local government in order to

23  proceed.

24          When you view the statute -- the authorizing statute

25  from the prism of the Michigan rules on statutory

1   construction -- and I cited the <u>Pohutski</u> case, which many --

2   is the seminal case on statutory construction in the State of

3   Michigan, <u>Pohutski</u> -- the Michigan Supreme Court in <u>Pohutski</u>

4   stated, "When parsing a statute, we presume every word is

5   used for a purpose.  As far as possible, we give effect to

6   every clause and sentence.  'The Court may not assume that

7   the Legislature inadvertently made use of one word or phrase

8   instead of another.'  Similarly, we would take care to avoid

9   a construction that renders any part of the statute

10   surplusage or nugatory."  And, in addition, Michigan courts

11   follow the doctrine of expression unius exclusion alterius,

12   the expression of one thing is the exclusion of another.

13        We would submit that in construing Public Act 436 as

14   a whole, in construing it as a whole, any -- you can't allow

15   for the filing of a Chapter 9 unless the Chapter 9 includes

16   the contingency for not impairing the pension rights under

17   Article 24.  Otherwise it would negate that section or

18   declare that section void, and that would be an express

19   violation of the Michigan Rules of Statutory Construction,

20   which the Court is bound to follow at this stage in the

21   proceeding because in the eligibility proceeding, it is state

22   law, state law that is dominant.  We believe, based on --

23        THE COURT:  But aren't there many, many, many

24   conditions that the governor could have put on the filing in

25   order to assure the emergency manager's compliance with state

1    law?

2          MR. GOLDBERG:  There are certainly different --

3          THE COURT:  Equal protection, due process of law,

4    freedom of speech.

5          MR. GOLDBERG:  But what I'm submitting, your

6    Honor --

7          THE COURT:  There are lots of constitutional rights.

8          MR. GOLDBERG:  Certainly.  But what I'm submitting

9    is we have to look at the statute as it is written.  That's

10   what the Michigan courts rule over and over again.  Those are

11   the fundamental rules of statutory construction enunciated by

12   the Michigan Supreme Court in case after case.  In this case,

13   we look at the words of the statute.  We don't read into the

14   statute.  We look at the words of the statute.  This statute

15   contains an explicit guarantee of pensions, a guarantee --

16         THE COURT:  Well, and the governor says --

17         MR. GOLDBERG:  It includes Article IX.

18         THE COURT:  The governor says the filing will comply

19   with state law, doesn't he?

20         MR. GOLDBERG:  Well, the governor may say it, but

21   the governor is not the final arbiter, your Honor.  That's

22   what the Court is for, and what we -- and the governor is not

23   above the law.

24         THE COURT:  Why isn't that a sufficient protection?

25         MR. GOLDBERG:  I'm sorry.

1    THE COURT:  Why isn't that a specific -- a

2  sufficient protection?

3    MR. GOLDBERG:  Why isn't what the governor says a --

4    THE COURT:  No.  Why isn't the fact that this Court

5  will apply state law a sufficient protection?

6    MR. GOLDBERG:  Well, we would submit, your Honor,

7  that state law at this stage of the proceeding, at the

8  authorization stage, is the determinative factor.  Once we go

9  into the -- once you make the eligibility determination, as

10  Mr. Montgomery indicated and as the case law as I've read it

11  indicates as well, that's where federal law -- there's a

12  question of federal supremacy over state law, but at this

13  stage it's state law that is determinative, and the state law

14  in this case explicitly mandates a contingency for the

15  guaranteeing of pensions.  Otherwise we've written that

16  section --

17    THE COURT:  If we're going --

18    MR. GOLDBERG:  -- out of the authorization

19  statute --

20    THE COURT:  If we're going to look at --

21    MR. GOLDBERG:  -- and that's an explicit violation

22  of statutory construction.

23    THE COURT:  If we're going to look at statutory law

24  and every word of it, how do you deal with the city's

25  argument that the word "thereby" in the constitutional

1  provision only prohibits the impairment of pensions by the
2  state or its political subdivisions; it does not prohibit the
3  impairment of pensions by a United States Bankruptcy Court?
4        MR. GOLDBERG:  That's exactly the point, your Honor.
5  That's exactly the point.  At this stage of the proceeding,
6  according to Bekins, according to Harrisburg, and according
7  to every case I've read, according to Collier's, it's state
8  law that is determinative.  That's why --
9        THE COURT:  And that's what I'm asking.
10       MR. GOLDBERG:  That's why the question --
11       THE COURT:  And that's exactly what I'm asking you
12  about.  If we're going to read every word of the statute and
13  apply every word of the statute, including the word
14  "thereby," why doesn't state law permit the Bankruptcy Court
15  to impair pensions?
16       MR. GOLDBERG:  Because the authorization statute
17  that this Court is relying upon, which it has to rely upon
18  because otherwise there would be no Chapter 9 filing, there
19  has to be a specific authorization under state law; correct?
20  I mean there are 20 -- many states don't have one.  You have
21  to rely on the state law.  That state law contains an
22  explicit clause that impair -- pensions cannot be impaired.
23  It's not just written in one place actually.  It's written in
24  two places in that statute.  Again, I'm submitting that down
25  the road, if we get past this eligibility question on this,

         1   perhaps what you said is correct.  At that point federal

         2   law -- you make the determination based on federal law, but

         3   right now you are duty bound to make that determination based

         4   on your examination of state law and by applying the state

         5   law --

         6            THE COURT:  What is the --

         7            MR. GOLDBERG:  -- principles of statutory

         8   construction.

         9            THE COURT:  What is the exact state law language in

        10   PA 436 that you rely on?

        11            MR. GOLDBERG:  I rely on the language -- here, let

        12   me find it right here.

        13            THE COURT:  Okay.

        14            MR. GOLDBERG:  "The emergency manager shall fully

        15   comply with the public employee retirement system investment

        16   act and Section 24 of Article IX of the state Constitution,

        17   and any actions taken shall be consistent with the pension's

        18   qualified status"; that he's -- this emergency manager has to

        19   abide by the constitutional impairment.

        20            THE COURT:  So my question for you remains if this

        21   Bankruptcy Court were to approve a plan -- and I want to say

        22   here I have no predisposition on this issue at all.  This is

        23   strictly hypothetical legal talk to figure out where we are.

        24   If this Court were to approve a plan that impairs pensions --

        25   again, not presuming at all that it will -- but if it did, is

1   that the city impairing pensions, or is that the Bankruptcy

2   Court impairing pensions because --

3          MR. GOLDBERG:  That would be impairing --

4          THE COURT:  -- the law prohibits the city from doing

5   it?  There's a question about whether it prohibits the

6   Bankruptcy Court from doing it.

7          MR. GOLDBERG:  That's precisely why I'm making the

8   argument, your Honor.  There is a -- there is a question as

9   to whether -- once we get past the eligibility and this Court

10  is looking at the plan, whether this Court then has the

11  authority under federal law to ignore the state law and state

12  constitutional protection.  I'm not saying it does, but

13  there's at least a question, and a lot of the case law

14  indicates that, but we're not at that stage right now.  We're

15  at the eligibility stage, and clearly at the eligibility

16  stage it's state law that predominates.  It's state law

17  that's determinative, and it's state law that this Court has

18  to look at, not federal law but state law that this Court has

19  to look at in making its determination as to whether the

20  authorization meets the muster.  And what I would submit,

21  that under state law principles, as I indicated, we look at

22  the authorization statute, we look at the plain language of

23  the statute, and we look at the Michigan rules on statutory

24  construction as a -- and there's no way to allow for a filing

25  that would not have a contingency that bars the impairment of

13-53846-swr  Doc 1870-11  Filed 04/29/14  Entered 04/29/14 22:09:23  Page 329 of 329
13-53846-swr  Doc 1870-11  Filed 11/27/13  Entered 11/27/13 22:00:45  Page 63 of
558
598

 1   pensions.  It's interesting to me you raised before to Mr.

 2   Montgomery --

 3        THE COURT:  Actually, your time has expired, so I do

 4   have to ask you to wrap up.

 5        MR. GOLDBERG:  Okay.  Well, I'll make one last

 6   point.  You raised very briefly to Mr. Montgomery why not

 7   every contract, but, as I indicated, other contracts are

 8   provided for the impairment of those contracts under the PA

 9   436.  It's the impairment of pensions that's explicitly taken

10   away from the authority of the emergency manager, and I

11   submit because of that that any authorization that doesn't

12   include a contingency barring the impairment of pensions

13   would violate Michigan state law and violate the Bankruptcy

14   Code, in essence, itself.  Thank you.

15        THE COURT:  Thank you.

16        MS. CRITTENDON:  Good morning, your Honor.  Krystal

17   Crittendon, and I want to thank the Court for giving me the

18   opportunity to speak this morning.

19        THE COURT:  Welcome, and you may proceed for five

20   minutes.

21        MS. CRITTENDON:  Thank you, your Honor.  Before the

22   Court goes any further, I would just ask that the Court step

23   back and look at the process and how we got to where we are

24   from a legal foundational standpoint, and to that end, I make

25   three objections, your Honor.

 1          First, the City of Detroit does not have a duly
 2     appointed emergency manager because there was no EM or EFM
 3     law in place at the time that appointment was made.  As the
 4     Court knows, in 2011, Public Act 4, commonly known as the
 5     Emergency Manager Act, repealed Public Act 72.  In November
 6     of 2012, the people of the State of Michigan repealed Public
 7     Act 4 by referendum.  Pursuant to Michigan law -- and this is
 8     at MCL, Michigan Compiled Law, 8.4 -- "Whenever a statute, or
 9     any part thereof shall be repealed by a subsequent statute,
10     such statute, or any part thereof, so repealed, shall not be
11     revived by the repeal of such subsequent repealing statute."
12     In short, that is saying that when PA 4 repealed Public Act
13     72 and PA 4 was then repealed by referendum, PA 72 was not
14     revived.  It did not spring back to life.
15          On March 14, 2013, a contract was purportedly
16     entered into between the State of Michigan and Kevyn Orr
17     appointing him EFM for the City of Detroit.  However -- under
18     PA 72.  However, because PA 72 was not alive at that time,
19     that appointment was not legal and is defective, and for that
20     reason, Mr. Orr is not a duly appointed emergency manager for
21     the City of Detroit.
22          The second argument, even had there been an
23     emergency manager law in place, Mr. Orr would not have been
24     an EFM at the time PA 436 came into place because his
25     contract, the contract between he and the state, was expired

1  on the day that PA 436 came into place, so he would not have

2  been grandfathered in under PA 436.

3          Finally, under Chapter 9 of the Bankruptcy Code,

4  there is no ability for there to be an involuntary

5  bankruptcy, and because the municipality would had to have

6  filed the petition, and in this case the municipality, being

7  the mayor and City Council, did not file the petition, the

8  petition filed by Mr. Orr was defective, and the filing

9  should be dismissed.

10          For those reasons -- and I see that my yellow light

11  is on -- time goes really really quickly when you have five

12  minutes, but I'd answer any questions the Court has.

13          THE COURT:  Hoe much time is left when the yellow

14  goes on, Kelli?  Do you know?

15          THE CLERK:  Three minutes.

16          THE COURT:  It's three minutes, so you only --

17          MS. CRITTENDON:  Okay.

18          THE COURT:  -- had two under green and three under

19  the yellow, so --

20          MS. CRITTENDON:  Okay.  Thank you, your Honor.

21          THE COURT:  -- you may proceed.

22          MS. CRITTENDON:  Mr. Orr's contract at Section 2.2

23  of that contract provides that his contract was effective on

24  Monday, March 25th, and terminated at midnight on Wednesday,

25  March 27th.  Midnight March 27th was a Wednesday morning at

1   12 o'clock a.m.  The new emergency manager law, PA 436, did

2   not take place -- did not become effective until Thursday,

3   March 28th.  Under 14 -- MCL 141.1572, it provides that an

4   emergency manager or emergency financial manager appointed

5   and serving under state law immediately prior to the

6   effective date of this Act shall continue under this Act as

7   an emergency manager for the local government.  Because the

8   City of Detroit was without an emergency manager or emergency

9   financial manager for one full day before the Emergency

10   Manager Act, PA 436, became effective, Mr. Orr could not

11   continue in that capacity, as used in this section, because

12   he was without a contract.

13        Finally, I would just say there are a number of

14   cases under the federal Bankruptcy Court law that talk about

15   involuntary bankruptcies.  This is akin to an involuntary

16   bankruptcy when someone other than the City of Detroit, which

17   is its mayor and City Council, filed the petition.  And for

18   those reasons, the petition was defective.  Section 109 of

19   the Bankruptcy Code talks to the authorization of the state

20   to approve a bankruptcy if filed by a municipality.  In this

21   case, that is not what happened.  It was the state

22   effectively filing the petition and approving the petition

23   being that the emergency financial manager, assuming that we

24   had one, would be an operative of the state and not an

25   operative of the City of Detroit.  Thank you, your Honor.

 1          THE COURT:  Is the contract on which you rely in the

 2     record of the case?

 3          MS. CRITTENDON:  I don't believe it is.  I do have a

 4     copy of the contract with me if the Court would like to see

 5     it.  I'm assuming that one of the parties --

 6          THE COURT:  If you'd like me to consider it, you

 7     should --

 8          MS. CRITTENDON:  I will file it.

 9          THE COURT:  -- file it.

10          MS. CRITTENDON:  I will, and I will file a brief

11     that memorializes everything that was said today.

12          THE COURT:  All right.

13          MS. CRITTENDON:  Thank you, your Honor.

14          MR. MORRIS:  Good morning, your Honor.  Thomas

15     Morris on behalf of the Retiree Association parties.  The

16     Retiree Association parties who I represent include two

17     individuals.  There was some discussion about the committee's

18     standing to raise certain objections.  The committee argued

19     those objections very ably.  We concur in those objections,

20     and that includes the concurrence of those individuals.  We

21     trust that would take care of any standing issue if there

22     were one.  And the comments that preceded us -- preceded me

23     were very ably made, so I'm just going to address a very few

24     points.

25          One is a point the Court -- a question the Court had

 1   raised about the "thereby" language in the pensions clause.

 2   It's important for the Court to note that it's the city that

 3   files any plan, the city that proposes any plan, negotiates

 4   any plan.  Chapter 9 precludes the Court from appointing a

 5   trustee, from converting the case, from interfering with the

 6   city's ability to manage its fiscal affairs.  A case cannot

 7   be filed involuntarily under Chapter 9.  As the <u>Bekins</u> court

 8   said, quoting from the legislative history on page 51, "The

 9   taxing agency itself is the only instrumentality which can

10   seek the benefits of the proposed legislation."  We think

11   it's clear that any action to impair the pensions by the city

12   would, first of all, be improper, but, second of all, it

13   would be the city's action.

14        Now, the city has taken the position that somehow

15   the pensions clause of the Michigan Constitution is

16   preempted, and we disagree with that, but the city can't have

17   it both ways.  They have a theory -- they've made a number of

18   multiple arguments, but they have a theory that once they got

19   into Bankruptcy Court -- or if they get -- are found

20   eligible, then the pensions clause is off.  Well, if that's

21   the case -- and it's not the case, but if that were the case,

22   then it would be the action of the authorization of the

23   filing and the action of the city in filing the case which

24   would be impairing the pensions.  What happens if the city is

25   found ineligible?

1    THE COURT:  Well, but that's true only if as part of

2    eligibility the Court ruled on the issue of pension rights

3    and ruled in the city's favor.

4        MR. MORRIS:  This ties in with arguments that were

5    made by other counsel, and if Public Act 436 enables the city

6    to impair the pensions, then Public Act 436 in that respect

7    is unconstitutional.  It's inconsistent with the pensions

8    clause.  Of course, the pensions clause is part of the

9    Michigan Constitution, the supreme law of our state, and the

10   Public Act 436 must comply with it.  Public Act 436, in fact,

11   gives recognition to the pension clause and acknowledges it,

12   and it even authorizes the governor to make compliance with

13   the pension clause a precondition.  However, that didn't

14   happen in this case, and that's one of the -- one of the

15   issues that has been raised by other counsel.

16       Your Honor, if the city is found to be ineligible,

17   from the standpoint of the retirees, the city will have to

18   make a choice.  It can choose to comply with the pensions

19   clause and not impair pensions, just say we're going to

20   comply with the Michigan Constitution, or it can negotiate

21   with the retirees through their associations.  That process

22   was shortcut here, and that will be one of the factual issues

23   we've raised.

24       Now, if the city goes forward with a plan that does

25   not impair pensions, one of the Court -- one of the questions

```
 1   the Court had was what happens then, what happens if the city
 2   just doesn't have the money.  Well, there's an issue of
 3   whether the state is liable.  There's the potential issue.
 4   But those are all issues apart from -- they're nonlegal
 5   issues.  The most the retirees can ask for is that the city
 6   doesn't impair the pensions.  The ultimate solution for the
 7   retirees comes elsewhere.  Will the city have -- will the
 8   state have to step in to help the city?  Will the city have
 9   to do other things to raise money?  I don't know, but those
10   are beyond our legal issues.
11        Your Honor, the city holds the key on this issue of
12   eligibility.  It can agree to comply with the Michigan
13   Constitution or it can negotiate with the retirees and reach
14   a resolution.  The proper outcome here is for the city to go
15   back -- as Section 109 intends, go back and either not impair
16   the pensions, which is our preference, or negotiate with the
17   retirees.  Thank you.
18        THE COURT:  Thank you.
19        MS. FLUKER:  Good morning, your Honor.  Vanessa
20   Fluker on behalf of Center for Community Justice and
21   Advocacy.
22        THE COURT:  Would you repeat your name for me,
23   please?
24        MS. FLUKER:  Vanessa Fluker.
25        THE COURT:  Okay.  Thank you.
```

1          MS. FLUKER:  F-l-u-k-e-r.  Your Honor, the issue I'm

2     raising today before this Court with respect to eligibility

3     is a failure of the emergency manager to comply with the

4     statutory mandates under PA 436, Section 16, which is

5     actually Section 1556.  That section specifically mandates,

6     and I quote, "an emergency manager shall," not "may," not

7     "might, "shall, on his own -- his or her own or upon the

8     advice of the local inspector if a local inspector has been

9     retained, make a determination as to whether possible

10    criminal conduct contributed to the financial situation

11    resulting in the local government's receivership status.  If

12    the emergency manager determines that there is a reason to

13    believe criminal conduct has occurred, the manager shall

14    refer the matter to the attorney general or local prosecuting

15    attorney for investigation."  There has been some extensive

16    arguments about the tenets of statutory construction, so I

17    won't go through Pohutski step by step, but we're all aware

18    that you must adhere to the plain unambiguous language of the

19    statute.

20         In this particular instance, two of the city's

21    largest creditors, UBS and Bank of America, have been found

22    convicted -- criminally convicted in UBS's case of criminal

23    conduct involving municipal bonds.  In fact, the SEC fined

24    UBS $47,207,180 in Case Number 11-2539, U.S. District Court,

25    New Jersey.  Three UBS executives were indicted and convicted

of fraud related to municipal bond rigging, and that was in
New York, Southern Division, Case Number 10-1217.  A Bank of
America executive was indicted July 19th, 2012, for bid
rigging of fraud municipal bonds.  And what's so significant
about this, in the criminal conviction with the SEC case, the
civil penancy case, it involved a Detroit bond.  This
provision cannot be ignored, and the mere fact that it's
mandatory because it indicates "shall" is very significant.
In fact, it is common knowledge at this point that the
emergency manager had knowledge of this information and did
not act on it.  In his deposition on August 30th, 2013, he
was specifically asked on these issues,

       "Are you aware of issues that have come out with
      regard to the LIBOR specifically with UBS and Bank
      of America in the setting of using the LIBOR as a
      standard?
        Answer:  I am aware.
        Question:  Are you aware that UBS has been sued
      by the Securities and Exchange Commission for
      rigging in regard to municipal bonds?
        In past years?
        There was a final judgment -- yes, in past
      years.
        Answer:  Yes.  I've heard that.  I have not read
      the final judgment.

1          Question:  Are you aware that Bank of America

2              has been investigated for potential bond rigging

3              with regard to the municipal bond market?

4          Answer:  I am aware that Bank of America has

5              been investigated.  The exact specifics of the

6              investigation I am not aware of."

7          This clearly shows that there is not just a

8    noncompliance with 1556, there's a knowing noncompliance with

9    1556.  There should have been a criminal investigation, which

10   is mandated by the statute, and, in essence, is necessary to

11   even get to the point of making a recommendation for a

12   bankruptcy.  How can you say that we need bankruptcy when you

13   don't know whether there is going to be fraud determined and

14   there may be funds that may be necessary to be paid back to

15   the city that can offset any debt, which also goes to the

16   issue of how are you saying that you're eligible for

17   bankruptcy when you really don't know what the debt is based

18   on the potentiality of fraud in these municipal bond

19   transactions, who are also standing --

20        THE COURT:  Are you saying that the emergency

21   manager, whose term in office is limited by law, was required

22   to await what could be years of litigation to determine these

23   issues and UBS's liability before filing bankruptcy?

24        MS. FLUKER:  I don't think he had to determine years

25   of litigation, but I think that it would be very evident that

1   you would look at least at the debt that you're alleging that

2   the city owes, and if there is common knowledge of such

3   information, which this is -- this is not something that you

4   have to wait years in litigation.  This has been all over the

5   news, the Internet, and everything else.  And as he admitted

6   in his deposition, he was aware of it, and that being the

7   case, that actually heightens the duty, in addition to the

8   mandatory language of Section 1556, which says "shall."

9           THE COURT:  Shall do what?

10          MS. FLUKER:  The statute specifically says the

11  emergency manager shall, on his or her own or upon the advice

12  of a local inspector, make a determination -- there had to be

13  a determination made -- whether there was criminal conduct

14  that affected the financial situation of the city.  Even if

15  he didn't know all this, say for some reason this

16  information -- I see my time is up.  I'll just complete this

17  sentence.  Say this information he had no knowledge of.

18  There was -- we just don't know about it.  He still had a

19  duty to make a determination.  Well, in my estimation,

20  there's been no criminal conduct that contributed to the

21  financial situation of the city.  This provision was not

22  complied with at all, and you cannot try to exercise one part

23  of the statute by totally ignoring and having noncompliance

24  with another.  Therefore, I would request that this Honorable

25  Court deny eligibility for the reasons set forth by all the

1   objectors.

2           THE COURT:  Thank you.

3           MS. FLUKER:  Thank you.

4           THE COURT:  Mr. Gordon, may I have your attention,

5   please?

6           MR. GORDON:  Yes, your Honor.

7           THE COURT:  Are you up next?

8           MR. GORDON:  I am.

9           THE COURT:  Okay.  Do you want to give part of your

10  argument now, or do you want to take a lunch break now and

11  then do your entire argument after lunch?  I leave it to you.

12          MR. GORDON:  If it's okay with the Court, I would

13  prefer the latter, to just start after lunch.

14          THE COURT:  Okay.  All right.  We will take our

15  lunch break now, and we will reconvene in an hour and a half,

16  so that'll be 1:20, please.  Twenty after one we'll

17  reconvene.

18          MR. GORDON:  Thank you, your Honor.

19          THE CLERK:  All rise.  Court is in recess.

20      (Recess at 11:48 a.m., until 1:20 p.m.)

21          THE CLERK:  Court is in session.  Please be seated.

22  Recalling Case Number 13-53846, City of Detroit, Michigan.

23          THE COURT:  Good afternoon, everyone.  It looks like

24  everybody is here.  Actually, Mr. Gordon, with your

25  permission, before I hear from you, I have a follow-up

1  question for one of your colleagues.

2       MR. GORDON:  By all means, your Honor.

3       THE COURT:  Ms. Brimer, would you resume the

4  lectern, please?

5       MS. BRIMER:  Should I bring something with me, your

6  Honor?

7       THE COURT:  Possibly.

8       MS. BRIMER:  I didn't know I was going to the

9  principal's office.

10       THE COURT:  No, no, no.  It's nothing like that.

11  You argued that the enactment of PA 436 violated the people's

12  referendum rights because PA 436 was so similar to PA 4.

13       MS. BRIMER:  Yes, your Honor.

14       THE COURT:  That was your argument.  Was there a

15  statutory basis for that argument, or was it just based on

16  the people's right of referendum?

17       MS. BRIMER:  It's based on the constitutional right

18  of referendum, your Honor.

19       THE COURT:  Okay.  So there's not a statute we

20  should be looking for on that.

21       MS. BRIMER:  Not that I'm aware of, your Honor.

22       THE COURT:  All right.  That was it.

23       MS. BRIMER:  Thank you, your Honor.

24       THE COURT:  That was it.  Okay.  Mr. Gordon.

25       MR. GORDON:  Thank you, your Honor.  Just to give

1   your Honor a little bit of a road map of the things that I

2   want to touch upon, if that's of help, I thought I would

3   touch upon some of the issues regarding the state law

4   consent, some of the issues that have been raised this

5   morning, then move on to a discussion of some other

6   considerations relevant to the difference between the

7   pensions clause and the contract clause, and then address the

8   issue of what would happen if the Court ruled in our favor

9   that the accrued pension benefits cannot be impaired and what

10  that means for the restructuring, and I think I can add some

11  important information there.  And then finally, if there's

12  still time, I would touch upon the collateral estoppel

13  Webster issue, which is in our papers.

14       So, your Honor, we will start with the consent

15  issues under 109(c)(2), and to be clear, in our papers, while

16  we talk -- touch upon the possibility of PA 436 being

17  unconstitutional as applied, the thrust of our papers is that

18  PA 436 needs to be read and can be read in a way that's

19  consistent with the pensions clause and so forth so that

20  there's no need to get to issues of constitutionality.

21  109(c)(2) clearly is an issue that is an issue purely of

22  state law.  It is a threshold issue.  It is an eligibility

23  issue, and we want to emphasize that it stands on its own,

24  and it can't be conflated with plan confirmation issues.

25       THE COURT:  And with apologies, I have to stop you

1   there with this question.  There seems to be a general thread
2   of assumption that whether a state has given authorization
3   under 109(c)(2) is a question of state law, as you just said.
4   I have to say that's not altogether clear to me.  It seems to
5   me there might very well be an argument that the standard as
6   to whether the state has given proper authorization is a
7   federal standard, not a state standard.  Why?  Because in
8   addressing cases in the amendment right next door to Article
9   X -- that is, Article XI -- sorry -- Amendment XI, the 11th
10  Amendment, when we talk about sovereign immunity, the issue
11  of whether a state has given its consent or its waiver of
12  sovereign immunity is a question to be determined by federal
13  law, not state law.

14          MR. GORDON:  Your Honor, in that regard, I think
15  that the Tenth Amendment is different, and it looks first to
16  respect the contours of what is reserved to the states in the
17  first instance, so here I think you have to start with
18  whether there is valid -- I think, at a minimum, the question
19  is is there valid state authorization for submitting a
20  political subdivision of the state to the jurisdiction of the
21  federal government and the federal courts.  I would at least
22  put it that way.  And so that does turn on state law, and we
23  would submit that all portions of state law need to be looked
24  to and harmonized in that regard, and that's sort of the
25  holding of Harrisburg, which we submit is instructive here

and which has not been really in any way refuted by the city.
And even the United States Attorney has stated that Congress
reserved to the state the right to regulate, and I quote,
"under what terms," end quote, its political subdivisions may
avail themselves of Chapter 9, so it really is a matter, I
believe, of state sovereignty, and it's up to the state to
determine how and when a political subdivision can avail
itself, and how it does that is in part expressed by the will
of the people, as embodied in the pension clause, and it
needs to be respected.

The response of the city and the state is on two
levels. One, first of all, it is asserted that the actions
of the governor in authorizing do not conflict with the
pensions clause because the authorization itself didn't
create any impairment and that it's unclear whether the city
will ultimately seek to impair, and if such impairment
occurs, it won't be the city or the state that has done it.
It'll be the Bankruptcy Court. Respectfully, we say that
those arguments are all unavailing. First of all, one of the
things that I think has not been made clear this morning is
some of the things that have come out in discovery. I don't
actually think these things are relevant, but I'll get to why
I think they're not relevant in a minute, but I think it's
important for the Court to know that in discovery propounded
by the Retirement Systems or conducted by the Retirement

1  Systems, the city has admitted that it was an explicit intent

2  in the restructuring plan proposed in June and in the

3  bankruptcy recommendation letter submitted on July 16th by

4  Mr. Orr that accrued pension benefits needed to be impaired.

5  The city has also admitted in admissions that its intent in

6  the Chapter 9 case is to impair and diminish accrued pension

7  benefits, so there is absolutely nothing speculative about

8  that.  The governor has also testified that he was aware that

9  accrued pension benefits may be impaired.  He also testified

10  that he understood that he could put conditions on the

11  consent and authorization and that he chose not to.  Mr. Orr

12  also testified that he could not guarantee that if a

13  consensual plan couldn't be achieved, that he would not

14  resort to cramdown provisions in order to cram down upon the

15  retirees.  So there really is nothing speculative here, and

16  for anyone to say that it is speculative is really -- I mean

17  it just is not -- it's just not factual.

18          THE COURT:  Well, but what would be the --

19          MR. GORDON:  The other thing is that --

20          THE COURT:  What would be the impact on that

21  argument if the state, under this Constitution, does have a

22  legal constitutional obligation to guarantee the pension

23  payments, an issue not yet determined?  And I don't mean to

24  suggest the outcome of that by raising this possibility.

25          MR. GORDON:  Your Honor, I mean if the -- the

1  problem is that today is the day for eligibility, and we

2  don't know that today.  If the state came forward today and

3  said that they would backstop, you know, the full accrued

4  pension benefits, that might be a different situation, but it

5  not being here today, that isn't --

6         THE COURT:  And you're not prepared to say here

7  today that you're not going to request that conclusion, are

8  you?

9         MR. GORDON:  No.  I will not say that, but that's --

10        THE COURT:  That would not be in your client's best

11  interest.

12        MR. GORDON:  Of course not.  Of course not, but that

13  has not been determined today.  The state is not coming

14  forward today.  And eligibility goes to whether this Court

15  even has jurisdiction, and what the city is asking is for the

16  Court to essentially suspend the issue of whether it even has

17  jurisdiction in order to get everybody together, and really

18  you're putting the will of the people and the protections of

19  the Michigan Constitution in jeopardy or being held in the

20  hold while the city wants to move forward with its proposals

21  and bring people to the table, and I would submit that that's

22  inappropriate.  This is an eligibility hearing, and the

23  governor's responsibility is an affirmative responsibility to

24  uphold the Constitution.  To suggest that we don't know

25  what's going to happen down the road reduces his obligation

 1   to sort of a wink and nod type of standard, and we submit
 2   that that is just inappropriate.  He is to uphold the
 3   people's will.
 4          THE COURT:  Well, he's to uphold the law.
 5          MR. GORDON:  The other thing is, your Honor, that to
 6   say that someone other than the state or the emergency
 7   manager would be the one impairing the benefits is just not
 8   correct.  As the Court well knows, the city is the one that
 9   would have to propose the plan.  The Court would not propose
10   the plan.  Essentially what is happening here would be that
11   the governor, through the authorization, is delegating
12   authority that he does not have.  He does not have the
13   authority to abrogate the state Constitution.  By authorizing
14   the emergency manager to pursue the bankruptcy -- again,
15   we're at the eligibility stage -- he cannot give authority to
16   the emergency manager that he does not have, so the question
17   becomes --
18          THE COURT:  The argument is he doesn't have the
19   authority to impair the pensions.
20          MR. GORDON:  That's correct.  If he wanted to do
21   that, he'd have to go get a constitutional amendment.
22          THE COURT:  And -- okay.
23          MR. GORDON:  So he does not have the authority to
24   delegate or to bestow upon anybody else the ability to
25   impair, so the question really is why wouldn't we put a

1  condition today saying that you can move forward in the

2  Chapter 9, but you can't impair the accrued pension benefits?

3  That to us complies with the requirements of the state

4  structure, and there has absolutely been no explanation of

5  why that wouldn't be done today.  We think that's the real

6  question is why wouldn't you -- why wouldn't the governor put

7  that condition in or why can't the Court imply that as a

8  matter of law?

9       If I may, your Honor, I'd like to move on to the

10 pensions versus contracts issue.

11      THE COURT:  Well, hold on one second.  The Sixth

12 Circuit has actually addressed -- I know you're concerned

13 about time --

14      MR. GORDON:  Okay.

15      THE COURT:  -- the issue of how to determine

16 eligibility in bankruptcy, now not in Chapter 9, but it did

17 so in Chapter 13 because there is a factual eligibility issue

18 there, has to do with debt limits, and there are times when

19 creditors say that the debtor's debts are above the debt

20 limits, and, therefore, the debtor is not eligible, so the

21 Sixth Circuit -- the case is <u>Pearson</u> if you're familiar with

22 it.  It says -- it recognizes that at the eligibility stage

23 of a bankruptcy, you don't want to go through the process of

24 fixing claims, but there is this law that sets debt limits,

25 so we have to give it some respect.  So the solution it came

1   up with in that context was we're just going to look at

2   whether the debtor in good faith asserts that its debts are

3   below the debt limit.  And for those of you who want it, it's

4   773 F.2d 751, 773 F.2d 751, a 1985 case from the Sixth

5   Circuit.  Pearson is P-e-a-r-s-o-n.  Why not apply a similar

6   standard to eligibility here?

7            MR. GORDON:  Because there's no good faith issue

8   here.  The question is very simple and can be solved today.

9   Are you going to impair pension -- accrued pension

10  obligations?  You can't.  The law says so.  So put the

11  condition on it today, and we move forward.

12           THE COURT:  So your assertion is that it wouldn't

13  even be a good faith argument by the city.

14           MR. GORDON:  Doesn't matter what their intention

15  actually is.  The condition should be applied today because

16  that is how -- that is the only way a --

17           THE COURT:  It wouldn't be a good faith --

18           MR. GORDON:  -- political subdivision can avail

19  itself --

20           THE COURT:  It wouldn't be a good faith argument for

21  the city to assert that although the Michigan Constitution

22  prohibits it from impairing pensions, it does not prohibit

23  the Bankruptcy Court from impairing pensions.  That would not

24  be a good faith argument?

25           MR. GORDON:  No, your Honor.  I think that that's

 1  something that can and should be dealt with today.  Let me
 2  give an example.  What if the only debts of the city today --
 3  as we stand here today were pension obligations?  Would you
 4  say then we should wait and see what happens?  We know what
 5  would happen.  Is it any different because there's other
 6  creditors in the room?
 7          THE COURT:  Well, do we know --
 8          MR. GORDON:  I haven't --
 9          THE COURT:  Do we know -- do we know what would
10  happen?  Do we know, for example, that there would be no
11  agreed upon negotiation?  Do we know, for example, that the
12  state won't fill in the gap?
13          MR. GORDON:  Well, let's -- I can talk about that.
14          THE COURT:  Now would be the time.
15          MR. GORDON:  If you want to talk about that, I'll
16  skip to that.  I'll skip to that since that seems to be
17  something that is troubling your Honor or at least on your
18  mind.  We have emphasized --
19          THE COURT:  A question.
20          MR. GORDON:  We have emphasized that the Retirement
21  Systems aren't saying the city can't proceed with a Chapter 9
22  case.  It simply must condition the case upon the
23  preservation of the pensions clause.  And certainly in some
24  people's minds this begs the question of whether in the event
25  the Court agreed and ruled that accrued pension benefits may

 1  not be impaired, could the city still effectively reorganize

 2  and restore itself to financial health through a bankruptcy,

 3  and while we've indicated that there is still information

 4  that we need -- and it's material information -- we continue

 5  to do so -- I believe I can stand here today and say that

 6  based upon the information that we do have, it is clear that

 7  the city can effectively reorganize even if accrued pension

 8  benefits cannot be impaired.

 9         Just some thoughts and facts for your Honor.  The

10  city talks about $18 billion in debt, but $6 billion of that

11  $18 billion is special revenues that are supported by the

12  Detroit Water and Sewer System, so now you really have $12

13  billion of debt that needs to be supported by the general

14  fund and other cash flows from the enterprise funds and so

15  forth.  Of that $12 billion of debt, roughly half, six

16  billion, is OPEB healthcare actuarially calculated.  Another

17  two billion is unsecured bond debt.  So fully two-thirds of

18  the $12 billion of debt is very much subject to restructuring

19  and compromise in bankruptcy.  Those are unsecured claims.

20  That's two-thirds of the $12 billion of debt right there.  So

21  there's a tremendous opportunity to unburden the city of the

22  debt obligations -- of these debt obligations and the demands

23  on its cash flow.

24         In addition, although not critical to this position,

25  above the line in the emergency manager's restructuring plan

proposed in June is the swap periodic payment, which is
soaking up $50 million a year in casino tax revenues.  And as
the Court knows -- and, again, I'm not going to argue it
here, but, as the Court knows, the Retirement Systems have
objected to the treatment of the swaps as secured in those
revenues both because the lien is not valid and, even if
valid, it does not reach the post-petition revenues.  Also --
and if it was determined to be an unsecured claim, then you
have a $300 million claim now that is given unsecured status
and can also be a compromise in the bankruptcy.

Also, it should be kept in mind that we're talking
about accrued benefits that need to not be impaired.  There
are obviously prospective benefits that could be impaired, so
there are a number of different ways that the city can
achieve real relief from its debts.  Obviously it spreads the
pain in different directions, but we've -- but by looking at
it, your Honor, there is absolutely an opportunity to do
something.  And when they --

THE COURT:  Isn't there also a question of fact as
to what the underfunded liability is for pensions?

MR. GORDON:  And let me get to that.  It's also
critical for the Court to understand that if the Court ruled
in our favor and said that there cannot be an impairment of
the accrued benefits, that does not mean the Retirement
Systems walk away from the table.  The Retirement Systems has

 1   said that they are committed to working with the city to be
 2   part of the solution here.  That means a number of things.
 3   The city has indicated that it needs to devote significant
 4   cash flows in the next five years, according to the proposal
 5   in June, $1.25 billion in the next five years for
 6   reinvestment in the city.  The Retirement Systems don't
 7   object to the concept and understand that the city needs to
 8   reinvest, but after that five years, that reinvestment is
 9   done.  The cash flows of the city become much larger again,
10   and they will improve at five years and the next five years
11   and the next five years.  And the Retirement Systems can be
12   flexible because the Retirement Systems issues, the pension
13   issues, are long-term issues.  They're not short-term issues.
14   So if there are cash flow issues, the Retirement Systems can
15   work with that.  The $3-1/2 billion number that's been thrown
16   out there is not an amount that is due today if the pension
17   systems are not frozen and closed.  That is an actuarial
18   calculation of what will be due over the next 30 years to
19   bring the funding level up to what it needs to be.  That's
20   not the amount that is due on a cash flow basis tomorrow or
21   the next day, so there is flexibility there.
22          Also, it should be understood that over time if the
23   economy improves or interest rates rise, and/or, the
24   underfunding level may go up or down, so there's a lot of
25   things in play there, and when you take that all together,

1   we --

2       THE COURT:  And I certainly appreciate and commend

3   your clients' willingness to work with the city, but

4   prudentially from the standpoint of ripeness apart from

5   constitutional issues, doesn't that suggest putting off until

6   plan confirmation the issue of the constitutional right?

7       MR. GORDON:  Your Honor, again, I would submit that

8   that is conflating eligibility, which is one question, with

9   what can be done under a plan.  If this Court does not have

10  jurisdiction because the authorization was not appropriate,

11  if you're putting -- what you're suggesting -- or the city is

12  suggesting is you're putting the uncertainty -- you're

13  putting at risk a state protected benefit in order to

14  leverage people to get in a room and negotiate.  And I

15  suggest, as a matter of jurisprudence, that is inappropriate.

16      I wanted to also mention, your Honor, other benefits

17  of a ruling in favor of the concept that the pension benefits

18  cannot be impaired.  It, in fact, would help the city in its

19  restructuring in other ways.  Absent a ruling on this issue

20  in favor of the nonimpairment of pension benefits, the

21  parties will struggle to negotiate in the shadows of this

22  unresolved issue.  What will happen is that the parties will

23  have to negotiate on a dual path against the backdrop of

24  still having these arguments under the pensions clause, under

25  Section 943, and so forth that are all or nothing arguments

1  that would -- if ruled on in a certain way, would come to the
2  conclusion that you can't impair us at all.  So it makes the
3  negotiations very difficult, and it also obviously -- as long
4  as that matter is not resolved or if it's not resolved in
5  favor of the pension systems, it becomes -- it makes the case
6  much more litigious and encumbers the entire process.  If the
7  Court rules in our favor -- and, again, these are just, you
8  know, some additional thoughts for the Court because I
9  understand the struggle.  If the Court rules in our favor,
10 there will be less moving parts for the city to deal with and
11 for the parties to deal with, and it makes the negotiation
12 process much more streamlined.  And if at some point in time
13 that decision were reversed and there was a decision that
14 said that the pension clause can be abrogated or impaired in
15 some fashion, having to revise the negotiations at that point
16 and spread the pain around a different way is a lot easier
17 than starting from the other end.  If you start from the end
18 that we're at now, it's very hard, again, for the parties to
19 negotiate.  And if the -- and if it's determined ultimately
20 that you can't abrogate the pension clause, then you're
21 really going back to square one, and we've lost a ton of time
22 in the negotiation process.  We submit that it's much easier
23 to negotiate against a backdrop that says that the pension
24 clause must be upheld.
25            Moreover, a ruling in our favor in that regard helps

1   the city in other ways. It calms the workforce knowing the

2   accrued and prospective accrued pension benefits will be

3   protected. This will enable the city to retain its most

4   talented personnel. In addition, the ultimate commitment of

5   funds to the Retirement Systems as opposed to financial

6   creditors benefits the city because the systems will also

7   invest in the city, as they always have done. And a majority

8   of the pensioners live within the city and pay taxes and

9   consume goods and services in the city, so the Retirement

10   Systems are an economic engine that really is part of the

11   solution for the city, so I want to address all those.

12         THE COURT: Well, but so were the bondholders and

13   the bond investors.

14         MR. GORDON: They don't live in the city, and they

15   aren't putting money back into the city, your Honor. They

16   are not part of that economic engine, and if they get paid

17   their debt service, there's no --

18         THE COURT: Hang on.

19         MR. GORDON: -- guarantee that they're going to

20   reinvest in the city.

21         THE COURT: Didn't I read in the newspaper that the

22   city just got $350 million?

23         MR. GORDON: I'm sorry.

24         THE COURT: Didn't I just read in the newspaper that

25   the city just got $350 million to help with its reinvestment?

1      MR. GORDON: No, your Honor. What we read was that

2 there's a proposal to secure unidentified assets at this

3 point but probably to encumber all sorts of assets of the

4 city in order to get $350 million of which 200 million would

5 immediately go out to pay swap participants who don't deserve

6 to get paid anything as a secured creditor, and then the

7 other 150 million is going to be used in some ways that's

8 been unidentified, so basically you're encumbering assets of

9 the city for purposes that don't benefit the city in any

10 demonstrable way at this time, so I would disagree with that

11 characterization.

12      THE COURT: Okay.

13      MR. GORDON: So, your Honor, for all those reasons,

14 I think that if the Court were to rule, again, as a pragmatic

15 matter, in favor of finding that this case should not move

16 forward without the condition that there cannot be an

17 impairment and that the pension clause must be upheld, it

18 does not mean this case comes to an end by a long -- quite

19 the opposite. In our opinion, it makes this case much more

20 manageable. It makes the negotiations easier. And it, in

21 our minds, provides a much clearer path to a consensual

22 resolution.

23      THE COURT: So you think I can find them eligible

24 and find that pensions can't be impaired? How do I do that

25 because the issue is yes or no, the city is eligible.

1    MR. GORDON:  That's correct, your Honor.  You would

2    have to -- it would be up to the city to either -- and the

3    state to either agree to -- well, there's a couple different

4    ways.

5         THE COURT:  This is the refiling scenario?

6         MR. GORDON:  You could either -- you could either

7    rule that the obligation to uphold the pension clause is

8    implied by law because otherwise you don't have valid

9    authorization, there isn't valid state authorization, or you

10   can provide the option to the state and the city to

11   explicitly confirm that process.

12        THE COURT:  Oh, I see.  So you're saying I can read

13   into the authorization the nonimpairment of pensions even

14   though the governor explicitly rejected that.

15        MR. GORDON:  The governor actually didn't.  The

16   governor testified that he didn't know whether he had to

17   uphold that, and he decided to choose not to put the

18   condition on it and leave it to the courts, which we suggest

19   is not necessarily appropriate but is --

20        THE COURT:  So he rejected the concept of

21   conditioning his authorization on nonimpairment of pensions.

22        MR. GORDON:  He did, but he also said he was

23   basically deferring to the courts as to how that should play

24   out, which is ironic because the Webster court has already

25   ruled on that issue.

1    Your Honor, I'll turn to the pensions clause, which

2  is the contracts clause, if I may.

3    THE COURT:  Sure.

4    MR. GORDON:  The concept that the pensions clause is

5  the same thing as the contracts clause just applying to

6  pensions does violence to the language of the pensions

7  clause, as has already been discussed.

8    THE COURT:  Right.

9    MR. GORDON:  I won't get into that.  Obviously we've

10  pointed out that the pensions clause is more specific and

11  that it was enacted long after the contracts clause and that

12  those things together, as a matter of the canons of

13  construction, would indicate that the pension clause must

14  mean something more and something different from the

15  contracts clause.

16    THE COURT:  Right.  So what more and what different?

17    MR. GORDON:  Well, it starts with looking at why and

18  the environment in which these things were done and looking

19  at the actual language of the two clauses.  The contracts

20  clause was adopted back when the government was being formed,

21  and it helps sort of support the structure of the government

22  as it's being developed in terms of federalism and making

23  sure that states don't impair their -- pass laws that impair

24  their own contracts or pass laws that favor their citizens

25  over other citizens.  That was the general nature of it.  And

1  it's directed, you'll note, to the legislature of the state.

2  The state shall not pass laws that will impair contracts.  So

3  that's the contracts clause.  Now you fast forward --

4       THE COURT:  That's the federal contracts clause.

5       MR. GORDON:  And the state, as well as the state

6  contracts clause.  So then you fast forward -- I don't know

7  how long -- 150 years to 1963, and you're talking about the

8  constitutional convention and the pensions clause, and what's

9  going on at that point in time?  Well, pensions are not being

10 funded.  They're underfunded across the state I'm told to the

11 tune of maybe $600 million, and guess what?  Front and center

12 is the City of Detroit that was not paying pensions for its

13 teachers' pensions funds.  So the convention decided it

14 needed to do two things.

15      THE COURT:  Well, at that point they were also not

16 being treated as contracts; right?  They were being treated

17 as gifts I think was the phraseology.

18      MR. GORDON:  As gratuities.  That's correct, your

19 Honor.  So the convention decided it needed to do two things.

20 The convention decided, first of all, to avoid municipalities

21 digging a deeper hole, they were going to put a provision in

22 the Constitution that said that local governmental units will

23 fund their current year's employer contributions in that year

24 to help avoid digging a deeper hole.  Secondly, to protect

25 the accrued and unfunded liabilities and to move away from

13-53846-swr  Doc 4170-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 363 of 362
13-53846-swr  Doc 1870-3  Filed 11/27/13  Entered 11/27/13 22:02:45  Page 96 of
558

1  the concept that they are a gratuity, the convention said
2  we're going to call it a contract but not a contract in the
3  sense of a contract but subject to the bankruptcy.  I mean
4  there was no -- there was no talk about bankruptcy, nor was
5  there any talk about the contracts clause in this regard.
6  They talked about this is going to be a contract that's in
7  the concept of a solemn binding obligation that will be paid
8  over time, so it is a contract.  There's a contractual right,
9  and it shall not be diminished or impaired, meaning it will
10 be paid over time by the state and its political
11 subdivisions.  It is absolute.  There is no -- there is no --
12 as the attorney general's papers say themselves, there is --
13 it's impermeable unlike the contracts clause, which has
14 developed over time to say otherwise.  Now, the difference is
15 in part --

16        THE COURT:  But how can the -- how can the state
17 contract -- how can the state promise that given that under
18 the federal Constitution it can't print money?

19        MR. GORDON:  It's a matter of insuring that what
20 dollars are available are devoted where they need to be
21 devoted.

22        THE COURT:  Suppose there's not enough then.

23        MR. GORDON:  I don't know the answer to that
24 question, your Honor, but that's not the issue we have here
25 today.  As I've told you, I think that there is enough money

1    here.

2           THE COURT:  It's an important issue.

3           MR. GORDON:  There is -- I'm sorry.

4           THE COURT:  It is an important issue.

5           MR. GORDON:  It's an important issue, but --

6           THE COURT:  It demonstrates that there's a

7    constitutional right there.  It is stated there, but what's

8    it worth?  What's it worth?  I mean Ms. Levine posed that

9    question.  What's it worth if the entity that has the

10   obligation doesn't have the means?

11          MR. GORDON:  First of all, I mean every situation is

12   different.

13          THE COURT:  Yeah.

14          MR. GORDON:  Does it have the means today or will it

15   have the means tomorrow, over time?  Musselman, a state

16   Supreme Court case, says, though, that the pension clause

17   cannot be abrogated in the face of financial exigency.

18   That's what it says.  If there's a need to amend the state

19   Constitution, then it needs to be amended, but it can't be

20   abrogated by one branch of the government.  The will of the

21   people has spoken.  The Constitution is a limit, and it

22   circumscribes the power of the government.  The government

23   can't say, "Gee, we've got an exigency here.  I guess we're

24   going to ignore the state Constitution."  It cannot do that.

25   The contracts clause is different, and this is the point --

1  part of the point is there are contracts and then there are
2  contracts.

3          THE COURT:  Is there any other constitutional right,
4  state or federal, that is that absolute, any other?

5          MR. GORDON:  Sure.

6          THE COURT:  And even freedom of the press has its
7  exceptions.

8          MR. GORDON:  Well, you know, if you look at even the
9  attorney general's papers, you couldn't -- the legislature
10  can't pass laws that would abrogate freedom of religion,
11  freedom of speech, things of that nature, and it puts the
12  pension clause on the same level.  It is absolute in that
13  regard.  There are contracts, and there are --

14          THE COURT:  We have laws that limit speech.  Can't
15  threaten the President; can't yell "fire" in a crowded
16  theater.  You can't commit libel.

17          MR. GORDON:  So that maybe there's some regulation
18  on the federal level, but this is a state issue.  It is an
19  issue that has been -- it is the will of the people of the
20  state.

21          THE COURT:  Even the contracts clause has its
22  limits; right?

23          MR. GORDON:  Contracts clause does.  The reason is
24  different, though.  There are contracts, and then there are
25  contracts.  And if you look at, for example, you know, some

 1   contracts fall under the contracts clause, but the pensions
 2   were determined to be different, and that's why you have a
 3   pensions clause.  That's the whole point of it.  The
 4   contracts clause recognizes that when you contract with the
 5   government, there is an inherent reserve police power to act
 6   in the public's welfare, and, therefore, to the extent
 7   necessary, in certain situations they can impair contracts.
 8   That's the contracts clause.  Then you have the pensions
 9   clause.  It doesn't say that it is subject to the contracts
10   clause.  It elevates pensions to a different level, and the
11   reason is fairly clear.  If you look at the Musselman case,
12   in particular, again, Musselman says that Michigan
13   governmental -- and I quote.  This is from 448 Mich. 503
14   where it talks about the pension clause being absolute and
15   that it -- and it recognizes that the pension clause protects
16   pensions for work performed, so I quote, "Michigan
17   governmental units do not have the option, however, of not
18   paying retirement benefits.  Unlike highway construction or
19   police protection, which a governmental unit can choose to
20   receive less of, it is impossible to receive less service
21   from the pensioner.  The pension payment is payment for work
22   already completed, or deferred compensation," end quote.
23   What's being referenced there is the complete difference --
24   the relationship between the public employer and labor is
25   different than the relationship between the public employer

1  and a bondholder.  A bondholder makes an investment.  There's

2  risk involved.  That is understood, and that risk is factored

3  into the pricing of the bond.  A laborer has -- the

4  relationship with the employer is different.  The laborer

5  works.  The employer pays.  And to the extent that part of it

6  is deferred compensation in the form of a pension, so be it,

7  but it's for -- but what the pension clause protects is

8  accrued benefits.

9         THE COURT:  Isn't there an argument that labor takes

10  risks with its employer, too?

11         MR. GORDON:  Not in the State of Michigan, your

12  Honor, and I want to emphasize that.  Michigan is only one of

13  seven or eight states in the country that has this clause.

14  This is unique to Michigan and the seven or eight other

15  states involved.

16         THE COURT:  Excuse me one second.  I want you to

17  ignore --

18         MR. GORDON:  Oh.

19         THE COURT:  No.  I want you to ignore that yellow.

20  My staff advises me that Ms. Levine didn't use seven of her

21  minutes, so I'm going to yield them to you.

22         MR. GORDON:  Thanks, Sharon.

23         THE COURT:  So reset the clock at ten.  I assume

24  that's okay with you.

25         MR. GORDON:  Yes, absolutely, your Honor.  I can't

1    even remember where we were now.  Where were we?

2           THE COURT:  Oh, I'm sorry.  I interrupted your train

3    of thought.  Well, take another minute to recollect --

4           MR. GORDON:  Oh, yes.  I think I finished that

5    point, I suppose.  It really is that, you know, some contract

6    rights are just contract rights, and other contract rights do

7    rise to the level of property rights, and that's in the

8    United States Trust Company of New York versus New Jersey,

9    the Supreme Court case, 431 U.S. 1.  In Michigan AFT Michigan

10   versus Michigan, 297 Mich. App. 597, the Court held that

11   withheld salary of public school employees constituted the

12   taking of property in violation of substantive due process

13   and the takings clause, so there are relationships,

14   contractual relationships relative to accrued benefits for

15   labor, pension obligations, that are treated as property.

16          THE COURT:  Is there a State of Michigan case that

17   holds that pension rights are property rights?

18          MR. GORDON:  Well, this relates to salary of public

19   school employees.  I don't know --

20          THE COURT:  Right.  So I was asking you about

21   pensions.

22          MR. GORDON:  About pension obligations specifically?

23   I would have to check on that, your Honor, but I believe that

24   there are pension cases in the state that talk about pension

25   rights as property, including in such a situation, as you can

13-53846-swr  Doc 4874-31  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 369 of 368
13-53846-swr  Doc 4876-11  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 302 of 368
558

 1  imagine, as divorce settlements.  There are pension

 2  obligations that become property that get part of a property

 3  settlement even, but that's just one example, but I can get

 4  you --

 5       THE COURT:  Well, we have to be careful here because

 6  a contract right is in the bundle of property rights.  Every

 7  contract is property of the parties to the contract; right?

 8       MR. GORDON:  Yes, your Honor.  I'm not sure that all

 9  contract rights rise to the level if they're abrogated of a

10  taking, but here vis-a-vis the pension --

11       THE COURT:  Right.  That's exactly the point.

12       MR. GORDON:  That's right, but the pension clause --

13       THE COURT:  So when the federal, you know,

14  Bankruptcy Court discharges creditors' contract rights

15  against debtors, which we do all day every day, we're not

16  taking the creditors' property rights even though we are

17  discharging those contracts or if we are it's not a Fifth

18  Amendment violation; right?

19       MR. GORDON:  True.  By the same token, there are

20  other property rights that are determined under state law

21  that -- cases such as <u>Butner</u> and <u>Travelers</u> respect the state

22  law property interest, and it flows through the bankruptcy.

23       THE COURT:  Right, but the point is that it has to

24  be a property right under state law over and above what would

25  be the contract right, like, for example, a security

1    interest.

2         MR. GORDON:  Or a state constitutionally protected

3    right that is impermeable we would submit, your Honor.

4         THE COURT:  Okay.

5         MR. GORDON:  It's like a nondischargeable debt, your

6    Honor, and it doesn't mean that it can't be dealt with in a

7    way that doesn't impair it but gets dealt with in a way that

8    is -- you know, provides some flexibility for the

9    reorganizing entity, but it's a nondischargeable debt.

10        THE COURT:  Well, nothing in Chapter 9 provides for

11   any nondischargeable debts, is there?

12        MR. GORDON:  I'm stating it by analogy, your Honor,

13   obviously.

14        THE COURT:  Okay.  All right.

15        MR. GORDON:  By putting the condition on that you

16   can't impair, it becomes a nondischargeable debt essentially,

17   and the state has that authority to place the appropriate

18   conditions on the filing of the bankruptcy to protect the

19   statutory structure.  And it's not just statute.  I mean this

20   is -- the difference here again, this is really unique.  It's

21   not like California or Alabama.

22        THE COURT:  Hypothetically, a state legislature

23   passes a law authorizing municipalities to file Chapter 9 so

24   long as the plan provide -- the municipality's plan provides

25   for a priority of payment, and it turns out that that

1   priority of payment legislatively required by the state
2   legislature is different from the Bankruptcy Code.  Let's
3   assume that.  Would it be your position that no municipality
4   could file Chapter 9 in that case because the state law
5   contravenes the superior -- or the supreme federal law?

6          MR. GORDON:  Well, that's an interesting question
7   because it sounds more like one of those situations where
8   once you're in bankruptcy, you have to accept the structure
9   of the Bankruptcy Code itself, and that highlights --

10         THE COURT:  That's exactly what the city is arguing
11  here.

12         MR. GORDON:  And that highlights the point here that
13  eligibility has to be dealt with at the eligibility stage and
14  that -- and to put off the question of whether you can impair
15  the pension clause leads to those vagaries of questions
16  about, "Well, now we're in bankruptcy.  Does the Bankruptcy
17  Code have vitality and in what regard?"  No.  You don't get
18  to those questions unless you have valid state authorization.
19  You don't have valid state authorization unless you've taken
20  into account what provisions need to be there to protect the
21  state Constitution and other statutes, and that's sort of
22  what Harrisburg talks about.  You may have facial authority
23  under one statute, but you got to look at the other statutes.
24  And in here in this case it's --

25         THE COURT:  So in my hypothetical you would say

1    there's no valid authorization.

2        MR. GORDON:  I would say that the state may be very

3    disappointed if it authorizes and allows the debtor into

4    bankruptcy only to find that the -- that part of the

5    protection goes away.

6        THE COURT:  It's hard for me to be concerned about

7    how the state feels.  Is it your position that there would be

8    no authorization, no proper authorization in that case?

9        MR. GORDON:  Let me understand the hypothetical

10   then.  I know time is short.  The hypothetical is that the

11   state would pass a statute that says that you can file

12   Chapter 9, but the priority of payments is going to be --

13       THE COURT:  But here are the priorities.  Here are

14   the priorities.  You got to pay bonds first, and, you know,

15   you got to pay --

16       MR. GORDON:  Perish the thought.

17       THE COURT:  Sorry?

18       MR. GORDON:  Perish the thought, but go ahead.

19       THE COURT:  Okay.  Perish the thought all you like,

20   but this is the hypo.

21       MR. GORDON:  Yes.

22       THE COURT:  You got to -- you pay the bonds first,

23   and you got to pay trades, and then you got to pay employees'

24   wages, and then you pay pensioners last, and understand,

25   everyone who's listening to this, this is strictly

1  hypothetical.  It's inconsistent with the Bankruptcy Code.

2  I'm sorry.

3          MR. GORDON:  I forgot about the overflow.  Sorry.

4          THE COURT:  Well, and this is being recorded.

5  Anyway, it's inconsistent with the Bankruptcy Code.  However,

6  whatever hypothetical you create, and the governor says, you

7  know, "We've got to comply with state law.  I'm authorizing

8  this bankruptcy, but the municipality's plan has to comply

9  with the state law that sets forth these priorities."  Is

10  that a proper authorization or not?

11          MR. GORDON:  I would say not.

12          THE COURT:  Okay.

13          MR. GORDON:  Well, it's --

14          THE COURT:  Now you're saying that when state law

15  says the priority has to be given to pensions --

16          MR. GORDON:  Well, let me back up.

17          THE COURT:  -- that's not proper if it's

18  inconsistent with the Bankruptcy Code.

19          MR. GORDON:  Actually, I would say -- no.  I would

20  say that the authorization is proper, but, again, a portion

21  of that authorization is actually going to come into conflict

22  with the Bankruptcy Code itself, so I think it's just a

23  flawed concept.  So if you had that provision in there, I --

24  you know what?  The difference is -- let me think about this.

25  I think the difference is the cases such as Vallejo and

 1    others dealt with situations where someone tried to cherry

 2    pick various provisions of the Bankruptcy Code after they got

 3    into bankruptcy.  It didn't involve the actual state

 4    authorization.  So here I think if you were presented with

 5    that, you would have two choices.  You would either have to

 6    acknowledge that state authorization as is and agree to that

 7    structure and say that will supersede the Bankruptcy Code

 8    because that's the only way the state is allowing you to get

 9    into bankruptcy, or you would have to dismiss the case.

10         THE COURT:  Which should I do?

11         MR. GORDON:  In that situation, I think you would

12    give the state the opportunity to decide, but in the first

13    instance, if the state doesn't do anything, you would have to

14    dismiss that case because you don't have the authority to

15    amend the Bankruptcy Code.

16         THE COURT:  I would have to give them the

17    opportunity to revise the authorization?

18         MR. GORDON:  That's correct, your Honor.  They'd

19    either have to amend the --

20         THE COURT:  How could --

21         MR. GORDON:  -- authorization or understand that if

22    they go into --

23         THE COURT:  How could the governor provide an

24    authorization that's inconsistent with the state statute?

25         MR. GORDON:  He couldn't.  He would either have to

13-53846-swr  Doc 4870-31  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 108 of 374
13-53846-swr  Doc 4874-31  Filed 04/29/14  Entered 04/29/14 22:22:45  Page 108 of 374
558

1  go back and --

2      THE COURT:  What's there to revise?

3      MR. GORDON:  -- change the statute -- he'd either --

4  he has two choices.

5      THE COURT:  Oh, go back and change the statute.

6      MR. GORDON:  There are two choices.  Either the

7  Court agrees to allow the case to go forward with that

8  structure because that's the only way the state will

9  authorize it and that's what 109(c)(2) talks about, or if

10 this Court for some reason believes that that is in conflict

11 with the Bankruptcy Code, then this -- I guess I don't know.

12 The state could either -- the state would have to go back and

13 amend its statute in some fashion.  I don't really know, but

14 I think that if the state --

15     THE COURT:  Or if it's constitutional, amend its

16 Constitution?

17     MR. GORDON:  Wait.  What couldn't be done is that

18 this Court could not accept the authorization and then say,

19 "I'm cherry picking.  I'm not allowing that part of the state

20 statute to stand because that is the only way that they got

21 into bankruptcy in the first place."  That's my answer, your

22 Honor.  All right.  Can I move on?

23     THE COURT:  You can.

24     MR. GORDON:  We're really out of time here probably,

25 I notice, in a minute, but I just wanted to touch upon

 1    collateral estoppel because I promised I would unless your

 2    Honor has a different --

 3              THE COURT:  No, no.  You argue what you like.

 4              MR. GORDON:  As far as collateral estoppel is

 5    concerned, your Honor, the city and the state have argued

 6    that there was not a full fair opportunity to litigate in the

 7    Webster matter.  We've addressed that in our papers.  We

 8    believe that that is not accurate.  There was full briefing.

 9    Both sides filed cross-motions for summary disposition, so

10    they addressed the merits of the matter.  The Court

11    acknowledged that there had been briefing and oral argument

12    before it entered its order.  The city and the state also

13    argued that there was no privity between the city and the

14    defendants in Webster, but on September 19th, your Honor, the

15    city argued in this court that there was a common interest

16    agreement between the city and the state and that there was

17    common interest with respect to the financial situation of

18    the city and the bankruptcy, so privity is certainly there.

19    And then finally the city and the state argued that the state

20    court doesn't have authority or jurisdiction to rule on

21    eligibility issues.  The Webster court didn't rule on

22    eligibility issues.  It doesn't mention 109(c)(2) of the

23    Bankruptcy Code.  It merely ruled on the interplay between

24    two state statutes, PA 436 and the pensions clause, and ruled

25    that those two had to be harmonized and that, therefore, any

1  authorization of a bankruptcy under PA 436 must comport with

2  the pensions clause or otherwise it was unconstitutional, so

3  it did not infringe on this Court's jurisdiction in that

4  regard.  So we think that collateral estoppel is valid and

5  applies here under the <u>Webster</u> judgment.

6      THE COURT:  Thank you.

7      MR. GORDON:  Thank you, your Honor.

8      MS. CECCOTTI:  Good afternoon, your Honor.  Babette

9  Ceccotti for the UAW.

10      THE COURT:  Good afternoon.

11      MS. CECCOTTI:  And with admittedly some trepidation,

12  I am also going to cover the authorization under state law,

13  and I think -- I guess I'd like to start with just a couple

14  of threshold comments.  First, I think the exchange that

15  you've had with Mr. Gordon and perhaps with others -- and I'm

16  sure it's not going to be limited there -- will probably lead

17  you to conclude that at least some of the issues that you've

18  slated as purely legal will -- are better served awaiting the

19  outcome of the trial.  I'm just -- you know, Mr. Gordon took

20  you through a series of numbers.  There are all kinds of

21  facts and information that are probably best developed

22  through the evidentiary record, and that may well inform your

23  Honor's views of a number of the questions that you've asked

24  here today so far, so I'll just start with that observation.

25  I'd like to just, if I might, also --

1     THE COURT:  Well, just so the record is clear -- and
2  I may have indicated this before even perhaps in writing --
3  it's certainly not the Court's intention to rule on these
4  issues before the trial, and to the extent any of the facts
5  that come out at trial bear on these, sure, they'll be taken
6  into account.

7     MS. CECCOTTI:  Thank you, your Honor.

8     THE COURT:  But I did hold out to all of you that
9  one of the purposes of today's hearing was to see whether
10  there are any genuine issues of material fact in advance of
11  the trial so that you can address those at the trial, and I
12  intend to do that.

13     MS. CECCOTTI:  Thank you, your Honor.  I guess
14  the -- let me just interject another thought into the
15  exchange that you had with Mr. Gordon on your hypothetical, a
16  couple of thoughts.  First, the -- and I will -- I'm going to
17  start and go through this in a little more organized way, but
18  I just wanted to make sure I get this point out.  It's
19  important to keep in mind that as inviolable and as absolute
20  and as definitive as those of us on the objectors' side
21  believe the pension clause is and as much as we believe that
22  it was the right of the citizens of the Michigan -- of
23  Michigan to so provide in adopting it, remember that we are
24  here in the public sector.  We are not in the private sector
25  where there is a federally regulated and federally

 1   established pension insurance system so that when plans get

 2   underfunded, when plan sponsors are overburdened, there is a

 3   system that takes over.  And I would have to say all --

 4   certainly the lion's share of the decisions that have come

 5   down on this topic arise because of the -- because of the way

 6   that that system is constructed.  There's a federal agency

 7   that provides a safety net.  You know, there are moral hazard

 8   issues.  There's a whole balancing that goes on in that

 9   system.  We don't have that here.  Michigan pensioners have

10   Article IX, Section 24.  That's it.  That's what they have.

11   So as, you know, perhaps a -- it might take a bit of a leap

12   to see that that section means what it says and really,

13   really, really means what it says, I think it's important to

14   bear in mind that that is a safety net for pensions for

15   Michigan pensioners.  Okay.

16          So, now, to try to get back a little bit towards

17   more of an organized progression here on the 109(c)(2)

18   issues, the governor, as we've been discussing, had issued

19   the letter of authorization -- the letter of authorization

20   without any contingencies, so I think it's in -- and your

21   Honor asked the question this morning -- a couple of

22   questions this morning that have to do with, you know,

23   where's the impairment and where's the harm and questions of

24   that nature, and why wasn't the governor's reference to 943

25   sufficient.  So I think what's important to do first is take

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 379 of 379
13-53846-swr   Doc 4674-31   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 119 of 379
558

1  a look at -- briefly just take a look at the authorization

2  letters.  And, again, this is without reference to any

3  testimony or anything else that you're going to hear next

4  week.  You know, just looking at the letters that were

5  attached to Mr. Orr's declaration, the July 16th

6  authorization makes quite plain in his situational

7  overview -- he says for an extended period of time, the city

8  has simply failed to make the investments required to provide

9  its residents with an adequate quality of life as limited

10  resources have been diverted elsewhere.  He says the city's

11  urgent need to address large and growing legacy liabilities

12  and other substantial debts is self-evident.  Failure to

13  address these liabilities will prevent -- excuse me --

14  prevent the city from devoting sufficient resources to

15  providing basic and essential services to its residents.

16  Indeed, significant additional resources are required to

17  improve health and safety.  And he goes on to say that the

18  city must devote a larger share of its revenues to

19  effectively providing basic essential services to current

20  residents, attract new residents and businesses to foster

21  growth and redevelopment, ultimately begin -- and ultimately

22  begin what will be a long process of rehabilitation and

23  revitalization for the city.  The city's debt and legacy

24  liabilities must be significantly reduced to permit this

25  reinvestment.  Plain as day in Mr. Orr's letter.  He

 1   incorporates his entire proposal, the -- I don't have the

 2   whole thing here.  I've just got some of it.  This is the

 3   June 14th proposal.  Goes to the governor, and the governor

 4   writes back again providing the authorization and saying in

 5   part that he's reaffirming his confidence that Mr. Orr has

 6   the right priorities when it comes to the City of Detroit.  I

 7   am reassured to see his prioritization of the needs of

 8   citizens to have improved services.  I know we share a

 9   concern for the public's -- for the public employees who gave

10   years of service to the city and now fear for their financial

11   future in retirement, and I'm confident that all of the

12   city's creditors will be treated fairly in this process.  We

13   all believe that the city's future must allow it to make the

14   investment it needs in talent and infrastructure all while

15   making only promises it can keep.  So I think it's very clear

16   from these letters -- excuse me -- as it is abundantly clear

17   from the proposal that the city is proposing to take

18   resources from what it's calling the legacy liabilities or,

19   fill in the blank, accrued pensions, and divert those

20   resources to the list that Mr. Orr has laid out here,

21   reinvestment and services and the like, so when we talk about

22   not impairing the pensions and who took what action and when

23   does the impairment happen, the governor's letter, we submit,

24   in fact, is the impairment because it has -- the governor is

25   stating that he is acknowledging Mr. Orr's priorities,

including the priorities to take money from the pensions and
use them to pay other things.  And so when the pension clause
talks about -- excuse me.  I'm sorry.  I just lost my brief.
I apologize, your Honor.  I think I -- I have it.  So when we
talk about the text of Article IX, Section 24, "The accrued
financial benefits of each pension plan and retirement system
of the state and its political subdivisions shall be a
contractual obligation thereof which shall not be diminished
or impaired thereby," and we look and we are -- we see that
among the records in the constitutional convention is the
explanation that Article IX, Section 24, quote, "requires
that accrued financial benefits of each pension plan and
retirement system of the state and its political subdivisions
be a contractual obligation which cannot be diminished or
impaired by the actions of its officials or governing body,"
the impairment occurs when the governor signs this
authorization with no contingencies.  That's when it happens.
So not impairing thereby, meaning -- means very specifically
this document, and the "this" I'm holding up here now is the
governor's consent.  Now, why is --

            THE COURT:  Oh, but this raises two questions.

            MS. CECCOTTI:  Sure.

            THE COURT:  Is there a scenario in which the city
would have the ability to meet its pension obligations in the
very long term unless it makes the kind of investments that

1　Mr. Orr and Mr. Snyder have suggested should be part of the

2　city's priorities?  That's question number one.  Question

3　number two is actually a much more important question, and

4　that is is question number one a question for now, or is it a

5　question for plan confirmation?

6　　　　MS. CECCOTTI:  It is absolutely a question for now

7　because --

8　　　　THE COURT:  What's the answer then?  How can the

9　city maximize its chance of paying its pension obligations

10　unless it makes the kind of investments that Mr. Orr and Mr.

11　Snyder are talking about?

12　　　　MS. CECCOTTI:  It may be that the investments

13　themselves or the idea for the investments is fine.  The

14　question is can it get there lawfully by taking money from

15　pensioners?  That is the question that the state Constitution

16　answers by saying no.  Now, as Mr. Gordon pointed out or as I

17　think is evident from his presentation, there's a lot of

18　numbers here, Judge.  There were numbers in Mr. Orr's

19　request, his July 16th request.  You're going to hear an

20　awful lot about those numbers and what they are and what they

21　are not, so I would suggest that the notion that we somehow

22　have already today, quote, no reasonable alternative in the

23　words of PA 436 I would suggest very much should await your

24　Honor's review of the evidence on all of that, so --

25　　　　THE COURT:  Okay.

13-53846-swr  Doc 4870-31  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 383 of 383
13-53846-swr  Doc 4870-31  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 331 of 383
558

1    MS. CECCOTTI:  I realize it's a question that has

2   been on your mind all day, but I really think unless you

3   really want us up here freelancing numbers -- and you really

4   don't -- that it is best to simply --

5        THE COURT:  I'll grant you that one.

6        MS. CECCOTTI:  Right; right.  But I guess my point

7   is the answer cannot be because the problem seems hard, we're

8   just going to try to find a way to say perhaps that this

9   language doesn't mean what it says because I think once you

10  start down that road, you run into all kinds of problems.

11  You run into the Chapter 9 dual sovereignty problems.  You

12  run into problems of who gets to decide what, right, whether

13  this Court gets to construe Article IX, 24, to, in fact, say

14  it can be invaded.  These are problems that are simply too

15  thorny -- certainly too thorny to start with, and maybe we'll

16  see where your Honor is after the evidence.

17       Okay.  So why isn't the reference to 943(b) enough,

18  and I think -- and I think you've heard it, but just to say

19  it again and hopefully crystalize it a bit, I think the

20  governor assumed in wording the letter the way that he did

21  that somehow this all gets sorted out, and I think that seems

22  to be a lot of the presumption here, and I must say I am not

23  in full company with those who say that once you cross the

24  threshold of 109(c) using state law that somehow you can

25  start, you know, running around employing federal supremacy.

13-53846-swr  Doc 4370-31  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 384 of 384
13-53846-swr  Doc 4370-31  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 384 of 384
558

1  I think that that -- we'd probably have a lot more

2  conversations about that with a lot more time with a lot more

3  specificity before we get there.  We think -- and we spent a

4  bunch of time on this in our brief, Judge, and given your

5  handling of the Addison case you probably didn't need all of

6  this, but our view is that you must look -- in order for

7  Chapter 9 to be constitutional, you have to look at all of

8  these pieces that import or give recognition to the state

9  law.  Just to take you back to another colloquy that you had

10 with Mr. Gordon and why I think maybe that the Chapter 13

11 example isn't a good fit here, 109(c) says that an entity may

12 be a debtor under Chapter 9 if and only if such entity is

13 specifically authorized to be a debtor under such chapter by

14 state law.  So while we're all here today obviously under

15 109(c) and 109(c) is in the Bankruptcy Code and so you're

16 right -- the law that must be applied is state law, and the

17 Court decides whether -- you, the Court, you, the Bankruptcy

18 Court, decide under 109(c) whether, in fact, the municipality

19 is specifically authorized to be a debtor under Chapter 9 by

20 state law or by a governmental officer empowered by state

21 law.  And so I think that that may help to distinguish the

22 Sixth Circuit case that you discussed with Mr. Gordon, but it

23 also points out that getting through the door is a state law

24 question.  903 and 904 are obvious limitations on the Court's

25 authority.  943 is a limitation on the plan.  All of these

1    things work together, and I think your Honor's opinion

2    actually in the Addison case on the motion to intervene was

3    exactly right in recognizing the limitations not only of the

4    Court's caution in addressing the questions precisely because

5    of the questions that 903 -- the issues that 903 and 904

6    import into the bankruptcy process, but another observation

7    which takes me back to the letters and the taking of the

8    money from the pensioners and putting it towards something

9    else, which is, I think, your court -- your observation in

10    that case that Chapter 9 is about debt adjustment and should

11    not be overburdened I think applies very well here, too, and

12    I think, again, when we get to the trial and the full array

13    of the plan and everything else comes out and we start

14    talking about that in the evidentiary context, I think that

15    it is at least a question as to whether or not this issue

16    that we're all talking about here is in a narrow sense debt

17    adjustment or whether it is more than debt adjustment and

18    whether that shouldn't inform the Court's caution in ensuring

19    that the state law is being adhered to.

20         And I guess -- and I don't often get to the point of

21    imploring at the podium.  It's not always pretty, but I'm

22    going to break my rule on this whole subject of where is the

23    impairment.  To me it's like a shell game.  Okay.  Under

24    which of these cups is the impairment; right?  Is the

25    impairment -- I've told you where I think the impairment is;

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 380 of 386
13-53846-swr   Doc 4870-1   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 320 of 386
559

1  right?  I don't think the Court impairs.  The debtor proposes
2  the plan.  Under Chapter 9 only the debtor can propose the
3  plan.  The debtor was supposed to have come up with something
4  that passes muster to meet the 109(c) criteria in advance of
5  getting to this point, and they --

6          THE COURT:  Well, but the proposal of a plan, the
7  filing of a plan which proposes to impair pensions doesn't
8  result in the reduction of anyone's pension check any more
9  than the filing of the case did.

10          MS. CECCOTTI:  Your Honor, I --

11          THE COURT:  That doesn't happen until the Court
12  confirms it under law.

13          MS. CECCOTTI:  And, your Honor, then why are we
14  talking about it?  Why are we talking about it?

15          THE COURT:  Answer that question.

16          MS. CECCOTTI:  If it hadn't been --

17          THE COURT:  I'm having my issues with that very
18  question.  Why are we talking about it?

19          MS. CECCOTTI:  We're talking about it because it's
20  in their proposal.  We're talking about it because it was in
21  the authorization that went to the governor.  We're talking
22  about it because the governor clearly recognized it or at
23  least recognized it sufficiently to draft the letter that he
24  did.  We're talking about it because despite weeks and weeks
25  and weeks, no one has disabused the pensioners of the notion

 1  that their pension rights are -- that they are intending to

 2  impair their pension rights.  That's why we're talking about

 3  it.  It simply does not -- here they are in Chapter 9; right?

 4  They're in Chapter 9.  They've got the benefit of the

 5  automatic stay.  They've gotten their stay against the pre-

 6  petition lawsuits.  They want to have a bar date motion.

 7  They're getting all of the -- you know, all of the features,

 8  right, of Chapter 9.  And the threshold question that has to

 9  be asked is can they be here, and the threshold question can

10  only relate to the form in which they show up on the court's

11  doorstep.  And the form in which they show up on the court's

12  doorstep is the June 14th proposal, which is abundantly clear

13  on the subject of invading -- impairing accrued pensions.

14  What else would the Court -- what else would we be dealing

15  with?  What else would your Honor be dealing with if not for

16  the fact that they evidenced their plan?

17          THE COURT:  I think the answer to that question may

18  be the governor's authorization.  He says we are here to

19  adjust the city's debts in conformity with law.

20          MS. CECCOTTI:  He says that at that end we do that,

21  but what does it mean -- what is supposed to go on before we

22  get there?  It can't be that we have a sort of quasi eligible

23  debtor going through all of the -- you know, using all of the

24  processes I just described and then we have a big

25  conflagration at the end.  I mean it just --

1          THE COURT:  Why not?

2          MS. CECCOTTI:  Chapter 9 presupposes through the

3     front door under state law, specially authorized under -- by

4     state law.  That is what 109(c) says.  It is plain as day.

5     And state law means state law, and it requires giving -- if

6     they hadn't put in this -- the pages --

7          THE COURT:  So in response to my question to Mr.

8     Gordon, you would say that if state law requires a different

9     priority scheme than the Bankruptcy Code, the municipality is

10    eligible only if the Court is willing to enforce that state

11    law priority scheme rather than the Bankruptcy Code priority

12    scheme?

13         MS. CECCOTTI:  I think that I would say that if a

14    state legislature -- we're not talking about the Constitution

15    here.  You're just talking about, in effect, the PA 436 of

16    whatever that state is.  I would say that those are the

17    terms.  We have -- we allow the states -- states have a

18    variety of authorization.  Some of them have no

19    authorization.  It is a state-by-state --

20         THE COURT:  Every bankruptcy case that has addressed

21    that question has held the other way, hasn't it?

22         MS. CECCOTTI:  Well, I don't know the answer to

23    that, your Honor.  In the Chapter 9 context?

24         THE COURT:  Yes, in the Chapter 9 context.

25         MS. CECCOTTI:  Okay.  Well, I --

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 389 of 389
13-53846-swr   Doc 1870-31   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 823 of
558
558

1       THE COURT:  Every Bankruptcy Court has held once

2   you're in the door, it's the Bankruptcy Code priorities that

3   apply, not the state law priorities --

4       MS. CECCOTTI:  Right.  Well, right.  And now we're

5   getting into the --

6       THE COURT:  -- because the state consents to the

7   Bankruptcy Code or it doesn't.

8       MS. CECCOTTI:  Well, and I would say that a state

9   that passes a law such as your Honor proposed maybe, in fact,

10  looked at those cases and said, no, we don't really want to

11  go there.  We want to -- you know, we'll let you go if it's

12  this other way.  I think the through the door -- once we're

13  in the door -- I know what Harrisburg says.  You know, I have

14  a lot of trouble with it just because I think that the

15  doctrine has not evolved in a sufficiently precise manner.

16  You don't always see what the conflict is.  You have to come

17  up with notions of what the purpose is.  Remember the ancient

18  Supreme Court cases here said bankruptcy is about discharge;

19  right?  So can states have discharge laws?  So we're way, way

20  far away from that now, so I think -- again, I think we'd

21  have to have a lot more conversations about what happens

22  through the door.  Right now we're talking about you're at

23  the door, and you're at the door, and you're presenting

24  yourself, and what you're wearing, right, is something that

25  says we are going to violate Article IX, Section 24.

 1         Just want to see if there is anything -- see if I've
 2    left anything out here that I wanted to cover.  I have some
 3    minutes here.  I guess I could barter away my minutes, Judge,
 4    or I could give them to you to barter them away.  Let me just
 5    take a quick moment here.  I think -- I mean, again, I think
 6    we're going to get to the point of duplication if I continue
 7    unless, your Honor, you'd like to ask me anything else.  I
 8    think I've hit the points I wanted to hit.

 9         THE COURT:  Okay.  Thank you.

10         MR. WERTHEIMER:  William Wertheimer, your Honor, on
11    behalf of the Flowers plaintiffs.  As I'm sure your Honor
12    will recall, although it seems like ages ago now, the Flowers
13    plaintiffs were plaintiffs in one of the state court cases
14    that preceded the bankruptcy, a state court case in which we
15    were making the claim that under state law the governor was
16    required to recognize Article IX, Section 24, if and when he
17    authorized a bankruptcy.  I'm not here to speak on bankruptcy
18    law.  When I heard the reference to Asbury Park, I thought of
19    the street in northwest Detroit.  I'm not a bankruptcy
20    lawyer.

21         THE COURT:  Okay.

22         MR. WERTHEIMER:  I just want to speak briefly on the
23    state law, which it was my understanding at the stay
24    proceedings everybody kind of understood, including the city
25    attorneys, that although our claim was being delayed, it was

 1  not being changed in terms of its nature; that is, that this

 2  Court would decide as a matter of state law whether this

 3  bankruptcy was properly authorized.  It was just that the

 4  forum was changing.

 5         And I'd just like to make three points as to that

 6  state law, three areas where I think this Court can look to

 7  what it should do in deciding what I believe is that state

 8  law issue; that is, the basic eligibility issue.  If you look

 9  at the equivalent of legislative history of Article IX,

10  Section 24 -- that is, the constitutional convention

11  record -- there is certainly references to the fact that has

12  been mentioned here today that it was meant in part to deal

13  with the fact that pensions had been considered not to be a

14  matter of contract, but the only specific reference that I

15  found in that record -- and no one has cited anything to the

16  contrary -- is the comment of Mr. Van Dusen, which I -- with

17  the Court's permission, I'll take the liberty to quote.  It's

18  not long.  "An employee who continues in the service of the

19  public employer in reliance upon the benefits which the plan

20  says he would receive would have the contractual right to

21  receive those benefits" -- he didn't stop there -- "and" --

22  he didn't say "meaning" -- he said "and," in addition -- and

23  I think this goes to what Mr. Gordon was getting at, "and

24  would have the entire assets of the employer at his disposal

25  from which to realize those benefits."  That was the

1   understanding of Mr. Van Dusen.  There's no contrary

2   understanding on the record as to what the idea was on behalf

3   of the people who were writing Article IX, Section 24.

4   That's point number one, and I think if you look at what

5   Emergency Manager Orr did in his June 14th proposal, Mr. Van

6   Dusen, were he alive to take a look at it, would say, "That's

7   not what I meant," because on June 14th what Mr. Orr proposed

8   and he continues to propose is the retirees get treated like

9   any other creditor.  He didn't say words to the effect of

10  "all the assets of the employer," so that's the first piece

11  of state law in the broad sense of the term that I think you

12  can look to.

13          The second piece is the <u>Webster</u> and the <u>Flowers</u>

14  cases and the retirement case.  And I'm not repeating

15  Mr. Gordon's argument relative to collateral estoppel or the

16  res judicata argument.  I'm simply pointing out that as --

17  excuse me -- as Mr. Gordon indicated, that case was fully

18  briefed, and a state court judge looked at the exact issue --

19  well, maybe not exact but very close to the issue that is in

20  front of you, and that state court judge, after full

21  briefing, decided that in a manner consistent with our

22  position.  And I would point out there is no contrary law

23  anywhere.  I recognize this Court -- the cases that say you

24  look to the definitive ruling from the highest state court

25  and all that, but Judge Aquilina's decision -- decisions,

 1   well-reasoned, are all that's out there.  She's a state court

 2   judge deciding this issue.  That's the second piece of state

 3   court law that, as far as I can tell, is out there.

 4           There's one other, and that is we have the state

 5   attorney general.  This isn't law, but the state attorney

 6   general enters an appearance a little late in the game.  The

 7   governor has already authorized the bankruptcy.  However, the

 8   state attorney general, as an officer of the state, as the

 9   chief legal officer of the state, tells this Court that

10   Article IX, Section 24, binds the emergency manager in

11   bankruptcy.  Now, we all know that that gets into the issue

12   of is it at the eligibility stage or the plan stage, and I --

13   that's been dealt with.  My point is simply that a state

14   officer, the attorney general of the state, saying that the

15   emergency manager in bankruptcy is bound by Article IX,

16   Section 24, is consistent and supports our position that the

17   governor, when he goes to authorize that bankruptcy, is also

18   bound by Article IX, Section 24.  And with all due respect to

19   the governor, we think it's up to this Court to hold the

20   governor to that.

21           THE COURT:  All right.  Thank you, sir.

22           MR. WERTHEIMER:  Thank you.

23           MS. PATEK:  Good afternoon, your Honor.  Barbara

24   Patek on behalf of the Detroit Police Command Officers

25   Association, the Detroit Police Lieutenants & Sergeants

1    Association, the Detroit Police Officers Association, and the

2    Detroit Fire Fighters Association defined in this case as the

3    Detroit Public Safety Unions.  As the Court is aware, these

4    are the men and women who provide the police and fire

5    protection that are essential to the survival of the city,

6    and these are exactly the essential services that Chapter 9

7    was designed to preserve and protect.

8            I want to use my time this afternoon to talk a

9    little bit about ripeness, talk very briefly about the

10   supremacy clause and the tension between the supremacy clause

11   and the Tenth Amendment, and then to try to answer some of

12   the questions that the Court has raised with some of the

13   other objectors today.

14           On the issue of ripeness and why this is a question

15   for eligibility, I think that goes to the very nature of

16   Chapter 9, which precisely because of the sovereign immunity

17   and the sovereignty of the State of Michigan, this Court, as

18   it's recognized in so many hearings, is limited in what it

19   can order the city to do.  In that respect, this -- not that

20   every bankruptcy isn't a consensual process and not that

21   every bankruptcy doesn't involve a lot of negotiating.

22   Chapter 9 is unique because it incorporates -- it's a largely

23   consensual process at some level precisely because this Court

24   cannot trump the state's sovereignty in particular

25   situations.  And in that regard, if one talks about imminent

1  harm, there is -- you know, it's in the record.  Mr. Gordon

2  alluded to the fact that the stay authorized the city to come

3  in this court for a very public purpose, and that purpose was

4  to impair the accrued vested pension rights of its public

5  servants.  That question, as the city points out in its

6  papers, no court has ever said they can't do it, and no court

7  has ever said they can.  It's an unanswered question.  We're

8  entitled to know what our rights are, and to suggest that by

9  knowing what our rights are in the door that is to knowing

10  what -- to know what the proper authority is here would

11  somehow skew the process or cause people to walk away from

12  the table I think is wrong.  This is a hard question that the

13  Court has to answer, but the Court is here to follow the law.

14  I think this is -- there is imminent harm to these

15  individuals here, and there's a second piece of that by

16  virtue of the vacuum in which there's no legal precedent on

17  this issue, and that is -- I'm just going to throw out to the

18  Court the idea that this is one of those issues where it's

19  capable of repetition but evading review.  If every time this

20  gets kicked down the road to confirmation, nobody is ever

21  going to know what their rights are when this issue comes up.

22  I submit that Michigan is a little bit unique, but I think

23  that there are plenty of reasons that this issue is ripe for

24  adjudication today.

25          I'd like to take a crack at some of the questions

1   that the Court raised. You raised the issue of what if the

2   state law requires a different scheme of priorities than is

3   authorized by the Bankruptcy Court. I think if you step out

4   of the weeds on that question and I think you look at what

5   the Code says here, the state has to give its consent to come

6   into Chapter 9. And in giving its consent, the state agrees

7   to certain provisions of Chapter 9. I think a state that

8   authorizes such a scheme simply can't give its consent to

9   come into Chapter 9. I think that's the simple answer to

10   that question.

11       THE COURT: So your answer then in that hypo would

12   be not eligible?

13       MS. PATEK: Correct. I also think -- the Court

14   asked the question and raised the 11th Amendment, and I'm

15   going to go out on a limb here on this and the question of

16   sovereign immunity because I think the answer to a lot of the

17   issues before the Court and whether or not, in fact, the city

18   can impair these rights or use the Court to impair those

19   rights is in some ways answered by the Code. Section 106 of

20   the Code addresses the sections of the Code under which the

21   state waives its sovereign immunity. 109 is not one of them,

22   and I think that makes the eligibility issue as it's framed

23   by 109 a question of state law. And the other place, if

24   we're going to jump ahead to where we'll be down the road,

25   where the state does not waive its sovereign immunity is

13-53846-tjt Doc 4870-1 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 397 of 397
13-53846-swr Doc 4870-31 Filed 11/27/13 Entered 11/27/13 21:22:45 Page 361 of
558

1  under Section 943.  We know there are some places where to

2  consent to come into this Court and get relief the state has

3  to agree to conform to the rules.  365 is one of those that

4  you've got <u>Bildisco</u>.  If you're going to come in and you look

5  at -- that's a place where the state has to agree, consent to

6  be governed by the federal rules.  The other place is the

7  automatic stay.  But when you get down the road to the plan

8  that only the city can propose, the state does not waive its

9  immunity, and that --

10       THE COURT:  I think you might be overanalyzing my

11  question about sovereign immunity.  I was only analogizing to

12  the 11th Amendment cases that hold that the issue of whether

13  sovereign immunity is waived is a federal issue, not a state

14  issue.  I didn't mean to suggest, as you appear to understand

15  here, that there is -- that there are 11th Amendment issues

16  in this case.

17       MS. PATEK:  I'm not suggesting that you are, your

18  Honor, but I'm suggesting that -- and this sort of brings us

19  back to where Ms. Levine started out this morning with this

20  concept of -- this very basic concept, and one of the things

21  that makes this case so hard and one of the things that all

22  the commentators agree makes Chapter 9 so hard is this

23  tension.  We have a federalist system.  There are rules of

24  the road that were set up by the founders.  We have a limited

25  system of federal government.  All the other powers are

1   reserved to the states and the individuals.  And there's no

2   question that wasn't done so that we could have big and

3   powerful states.  That was done by the founders so that the

4   individuals close to the ground would have their rights

5   preserved, and I think within the structure of Chapter 9 and

6   within the limits of the Tenth Amendment, that the state

7   simply cannot use Chapter 9 to impair an express

8   constitutional promise.  And I want to talk about that issue

9   for just one moment.  This pensions clause is in a very

10  unusual place.  Okay.  This is -- I think it's fair to say --

11  you talk about there is a contracts clause in the state

12  Constitution just like there's a free speech clause and there

13  are a lot of things that mirror the Bill of Rights, but, as

14  Ms. Levine told us this morning, if somebody is violating my

15  free speech rights, I'm not in state Circuit Court.  I'm

16  looking to the federal courts and the federal government to

17  protect those rights.  If you're talking about fiscal

18  management, then that's a state issue, and in this case this

19  state and the people of this state chose to enshrine that

20  right to vested accrued -- this isn't all pension benefits,

21  this isn't future benefits, just what people have already

22  earned -- in its state Constitution and say those cannot be

23  impaired.

24          The Court asked the question about what if there's

25  not enough money, which sort of brings me back to the first

1   issue I was talking about.  This Court has to rule on the

2   legal issue that's before it, and if there's not enough money

3   just like if you're in a Chapter 11 that you don't want to

4   see liquidation, that's a hard question that the creditors,

5   including the pensioners, including my clients, have to

6   answer along with the city and try to solve this problem

7   within the limits of Chapter 9 because if we don't solve the

8   problem, the only remedy is a dismissal.

9          THE COURT:  Well, I guess even that answer troubles

10  me because if the Court holds here that there is this pension

11  right that cannot be impaired and because the governor didn't

12  condition this filing on the city recognizing that right in

13  the bankruptcy, what would happen upon dismissal?  There'd be

14  this court holding that there's this unconditional absolute

15  right not to have pensions impaired.  On behalf of your

16  retirees, you couldn't negotiate that, could you?  How could

17  you?

18         MS. PATEK:  I can't negotiate that upon my retirees,

19  but I suggest to the Court there is a solution to this

20  problem, and the solution is for the city to come back again

21  and to authorize -- have the state authorize the filing

22  within the confines of the Constitution, and we move forward

23  on that basis.  I don't -- I understand that this has -- you

24  know, we talk about the elephant in the room, but the larger

25  part, the healthcare benefits, are not protected, and the

13-53846-swr  Doc 4170-11  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 403 of 400
13-53846-swr  Doc 4310-31  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 103 of 400
558

 1  city has already said effective yesterday -- and these aren't

 2  my clients, but -- we're done providing that.  It's a

 3  significant claim.  I don't want to minimize that, but I

 4  think it is something, given our constitutional structure,

 5  that has to be dealt with in the confines of these

 6  proceedings, and there are negotiations.  There's a huge

 7  consensual component to this, and that doesn't stop if the

 8  Court rules the way that we've asked to rule.

 9          I see my time is up.  I just want to wrap up very

10  quickly, and I guess I would say we came into court on the

11  first day, and we supported the city, and we've supported the

12  city in many respects throughout this.  We agree that there

13  should be the stay.  There has been the breathing space.  But

14  I think this is a hard, difficult question.  As Ms. Levine

15  said, democracy is hard.  This restructuring plan has to be

16  devised in accordance with applicable law, and the city on

17  the front end has to agree that it's going to -- it's going

18  to do so, and in the absence of that, I think they're not

19  eligible.  Thank you, your Honor.

20          THE COURT:  All right.  Thanks to each of you.

21  We'll take our afternoon break now and reconvene at 3:20, a

22  half an hour from now, for the city's arguments.

23          THE CLERK:  All rise.  Court is in recess.

24    (Recess at 2:50 p.m., until 3:20 p.m.)

25          THE CLERK:  Court is in session.  Please be seated.

 1 | Recalling Case Number 13-53846, City of Detroit, Michigan.

 2 | THE COURT:  And it looks like everyone is here.

 3 | MR. BENNETT:  Good afternoon, your Honor.

 4 | THE COURT:  Mr. Bennett, you may proceed.

 5 | MR. BENNETT:  Good afternoon, your Honor.  Bruce

 6 | Bennett of Jones Day on behalf of the city.

 7 | THE COURT:  The only thing I would ask of you, sir,

 8 | is to leave enough time before our closing time today for me

 9 | to ask some questions of Mr. Todd.  Doesn't need to be now.

10 | It can be whenever it's convenient for all of you.

11 | MR. BENNETT:  Okay.

12 | MR. TROY:  Mr. Troy, your Honor.

13 | THE COURT:  Mr. Troy.  I'm so sorry, sir.  And so I

14 | want to do that today because I'm not sure what his travel

15 | plans are.

16 | MR. BENNETT:  Okay.  Your Honor should feel free to

17 | interrupt me if you think I'm getting too close to the end.

18 | And I actually have one procedural question that I'd like to

19 | get settled, too, which really has to do with whether you're

20 | expecting or would benefit from oral argument at the

21 | beginning of the next -- opening argument at the beginning of

22 | the next phase because that's -- so I don't know if --

23 | THE COURT:  You mean tomorrow?

24 | MR. BENNETT:  No.  On the evidentiary phase

25 | beginning next week.

13-53846-swr  Doc 4874-31  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 402 of 402
13-53846-swr  Doc 4874-31  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 136 of 402
559

1    THE COURT:  Oh, well not so much oral arguments as

2  opening statements.

3       MR. BENNETT:  Opening statements is what I mean.

4       THE COURT:  Yes.

5       MR. BENNETT:  Okay.  Great.

6       THE COURT:  Yes.  I think opening statements are

7  very important.

8       MR. BENNETT:  Okay.  I want to start with some

9  general comments, some of which are designed to respond to

10  things that came up this morning and some of which I think

11  just help, I think, set the stage for what at least the city

12  believes is happening in this Chapter 9 case.  And I want to

13  start by saying that the purpose of the Chapter 9 case is to

14  adjust the city's debts, and that means all of their debts,

15  obligations evidenced by bonds, obligations under other

16  contracts, obligations to provide healthcare, and pension

17  obligations.  And so that there isn't any confusion, there's

18  been a lot of reference to statements that were made.  I

19  think the statement most cited and the one that I think is --

20  it's the same as all the other ones that have been made -- is

21  that there must be -- the statement was there must be

22  significant cuts in accrued vested benefits.  It's been cited

23  often, and it's true.

24       I want to make a couple of clarifications.  I don't

25  think anyone for the city ever said we were going to

1  eliminate pensions.  This has been about the underfunding

2  amounts.  It is the underfunding amounts that are problems.

3  I think your Honor understands that, but I think it's

4  important to remind everybody else that we've never said that

5  the objective is to eliminate pensions.  The objective is to

6  address the underfunding situation.

7       Now, why did we make that statement?  The

8  statement --

9       THE COURT:  Well, let me just put it right to you.

10  Is it your intent to propose a plan to reduce pensioners'

11  monthly checks?

12       MR. BENNETT:  To be very technical about it, what we

13  have -- what we have -- what we have noted is that it is

14  impossible for the city to fill the underfunding gap in the

15  existing pension trusts, and we have also said that likely

16  requires changing the amounts of pension benefits.  Now --

17       THE COURT:  By "changing," you mean reducing?

18       MR. BENNETT:  Reducing.  Now, I do want to -- I'm

19  going to skip a couple points and then come back.

20  Notwithstanding the fact that the Chapter 11 case has been

21  filed, it remains the city's hope that these adjustments will

22  be achieved on a consensual basis pursuant to agreements

23  reached with the holders of the obligations.  That is still

24  the objective.  And, of course, we are participating in

25  mediation that's intended to facilitate that goal, and,

1    frankly, we'll meet with anyone anyplace anytime to try to

2    achieve that goal.  And we're going to discuss at certain

3    points certain statements that have been made by others in

4    this case about this problem which may suggest that those

5    discussions are going to be particularly difficult, but I

6    want there to be absolutely no confusion about where the

7    city -- where the city stands on this.

8            And by the way, the filing doesn't say how

9    ultimately this case is going to end, whether it's going

10   to -- whether we're going to have a consensual plan, whether

11   we're going to have a nonconsensual plan, whether it'll be

12   partly a consensual plan or partly a nonconsensual plan.  And

13   although the city did make a proposal that certainly

14   contemplated cuts to the underfunding obligation and

15   ultimately to benefits that absolutely is a part of the June

16   14th proposal, it was a proposal in an out-of-court

17   negotiation, and I want to submit -- and we're going to come

18   back to this point later -- it can't possibly be

19   impermissible to ask to reduce benefits, particularly when

20   you can demonstrate a need to do so.  And so far, frankly,

21   that's what the city did pre-petition, and so far that's what

22   the city has done post-petition.  We haven't filed a plan

23   yet.  It will come soon.  And there has not been a request

24   for cramdown, so -- and I think as we get into other parts of

25   the argument -- the fact that we don't quite know what's

1  coming later may have some bearing on some of the legal

2  points that your Honor has talked about and that others have

3  talked about earlier today.

4       THE COURT:  Is it the city's position that the State

5  of Michigan does not have the obligation under the Michigan

6  Constitution to guarantee the city's underfunding?

7       MR. BENNETT:  I don't know if the city has a

8  position.  I will tell you that I have read all of the

9  materials probably more than anyone else in the city's team,

10  and I don't think the state has an obligation to guarantee

11  the pension obligations of a municipality.  I think actually

12  when you look at the --

13       THE COURT:  Isn't it in the city's best interest to

14  say that -- or to assert that the state does have that

15  obligation?

16       MR. BENNETT:  I don't know whether it is or is not

17  in the city's best interest to even take a position on that

18  point, and that's why I said I don't think the city has a

19  position on that point, but I have done a lot of the work,

20  and I think I've made up my own mind as to what I think is

21  there.  I do think it's in the city's position that if we

22  could get money from the state, we would want it, and it

23  would be a great thing, and I'm reasonably certain that that

24  sentiment has been expressed on more than one occasion.

25       THE COURT:  Well, is there any reasonable prospect

 1    that the state will comply with that request in the absence

 2    of a legal obligation -- a determined legal obligation?

 3              MR. BENNETT:  I don't know the answer to that

 4    question.  Thus far the state has been of the view that the

 5    city has to reorganize based upon its own financial

 6    resources.

 7              Okay.  The next point I wanted to touch on is the

 8    fact that there are a large array of state and federal

 9    statutes that say in all kinds of different ways that the

10    city is obligated to pay its debts.  In fact, they say that

11    the city is obligated to pay its debts in all kinds of

12    different ways.  And the city itself and the state has no --

13    and we'll get into this in much more detail -- no ability in

14    order to overcome those laws or very, very, very limited

15    ability to overcome those laws.  One important point about

16    them that didn't --

17              THE COURT:  You mean comply with those laws?

18              MR. BENNETT:  No.  To overcome them to get past them

19    if they can't pay all of their obligations.  And, again, it's

20    a situation that the city is going to prove it's in, but

21    that's for another hearing.  The point I wanted to make here

22    that I don't think was made earlier today was that a lot of

23    these priorities collide with each other in all kinds of

24    different ways.  We heard, by the way, about the all assets

25    at their disposal comment that was, I guess, from the

constitutional convention. Assuming for a second that that
is what was intended, the problem is is that the legislature
has also passed a law that describes certain debts -- the
obligation to pay certain debts as a, quote, "first budget
item," close quote. I don't remember the rest of the
sentence, but those words are there. There's also other
state statutes that don't actually grant a lien but that say
proceeds of certain things must be used in certain orders to
pay. And when you sit down and try to figure out in any
environment where you don't have enough, how do you fit all
these different things together, you run into a problem very,
very, very quickly. And these are the provisions, by the
way, that are protected by the federal contracts clause and
also by the Michigan contracts clause because many of these
provisions are in ordinances or resolutions that form part of
bond contracts, and others are in ordinances and resolutions
that form part of employment contracts. So you wind up -- if
you look at the world before you even start talking about
bankruptcy, you don't just have coherent commands, this is
how you pay and this is how you go about doing it and
everything works, you have a whole bunch of priorities that
actually don't work, and this, frankly, is --

     THE COURT: Well, but the objecting parties say all
of those contract obligations that have protection merely
under the contracts clause, federal or state, can be adjusted

     1   consistent with state and federal law, but the pension
     2   obligation under the state Constitution is inviolate.
     3         MR. BENNETT:  And we'll get to that if you'll give
     4   me a chance.  I will explain why --
     5         THE COURT:  Okay.
     6         MR. BENNETT:  -- they are, in fact, no different,
     7   but I guess my point here is that outside of bankruptcy, you
     8   have a -- you don't have coherence, and this is really to the
     9   whole point of does it really make any sense to have a rule
    10   that says if the state conditions its filing a proceeding
    11   based upon complying with its priorities, what do you even
    12   have.  And in many circumstances, you have something that is
    13   just not meaningful in the context of where there's not
    14   enough to go around.  I think that's the narrow point for the
    15   time being.  We will generalize when we get to the whole
    16   issue of how the --
    17         THE COURT:  Okay.
    18         MR. BENNETT:  -- different clauses work.  I also
    19   want to say that contrary to the papers that were filed --
    20   and I'm now referring to the UAW's papers -- the June 14th
    21   proposal didn't take broad aim at the city's workers and
    22   retirees.  It was very, very carefully drafted to try to
    23   treat as many classes of creditors the same as we possibly
    24   could denying preferences to any except in cases where we
    25   were legally compelled to provide them.  We thought and the

1  emergency manager thought that that was the best way to go

2  about the problem that confronted us, and, of course, we're

3  not under any illusion that that's going to be the last word

4  on this question.  There will be negotiations.  There will be

5  a plan filed, which I'm certain will differ from the proposal

6  that was issued on June 14th in part to respond to creditor

7  input, and it will be subjected to enormous and exacting

8  procedures by this Court before it is ever confirmed.

9        I also want to spend just a second about the point

10  that was made using some of the letters, the letters that

11  were exchanged between the emergency manager and the

12  governor.  If your Honor hasn't already, I commend you to

13  read all of them, not just the parts that were quoted.  I

14  think it's -- I think to fairly summarize the points made in

15  both letters, the city has been -- the city services, city

16  residents, the ability of the City of Detroit to be a city

17  that provides adequate services to its residents has

18  gradually been lost as a result of the constant and

19  consistent diversion of current tax revenue paid by current

20  tax revenue to legacy liabilities, including but not limited

21  to pension claims.  That is the problem.  It is not as if

22  everything is fine, let's take some money from pensioners and

23  put it to the benefit of residents to make things better.

24  The diversion already occurred.  State law has been followed.

25  Pensions have not been impaired or diminished.  A consequence

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 410 of 410
13-53846-swr   Doc 4874-11   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 410 of 559
558

1   has been that the resources available for services, that the
2   resources available for investment have, in fact, been
3   significantly impaired and significantly diminished to the
4   point that lots of the city's infrastructure is no longer
5   serviceable, thus the reference to need for investment.  It's
6   not for the new and wonderful.  It's to put back things that
7   really need to be updated and, in fact, replaced because
8   they're worn out, and it's to restore budgetary items,
9   budgets that have, in fact, been cut too great.  And I think
10  that sense -- if you read the entire document, you will see
11  that that is the historical view of the current situation.
12  Again, it will be proved next week.  And the solution is in
13  part a reinvestment program.  Again, just to be technically
14  correct, it's 1.25 billion over ten years, not over five
15  years.  Five years would be better.  I don't think anyone
16  thinks we can afford it.
17          I think the next point and the last point I'm going
18  to make by way of introduction is really to address one of
19  your Honor's questions, which is what happens if the city
20  can't adjust its debts.  I think we have to start with the
21  following.  Most business owners and residents are smart
22  enough and sophisticated enough to figure out that it's a
23  problem to be the highest -- residents of the highest taxed
24  jurisdiction in the State of Michigan where somewhere between
25  42 and 65 cents of every dollar is spent on something other

13-53846-swr   Doc 4870-31   Filed 04/29/14   Entered 04/29/14 22:00:35   Page 145 of 411
13-53846-swr   Doc 4870-31   Filed 04/29/14   Entered 04/29/14 22:00:35   Page 145 of 411
558
559

1   than services to current residents.  That is not a stable

2   situation.  That is just not going to work out well.  The

3   consequence will be continuing declines in revenue.  It may

4   be that debts of all kinds would be paid for awhile, but

5   ultimately debts of all kinds will not be paid, and no

6   provision of any Constitution will change this.  Thus, the

7   stakes are very high not just for the city but also for its

8   residents and its creditors, and I think that puts a very

9   sharp point on your Honor's question about what is a

10  constitutional provision worth when you're confronting an

11  economic crisis such as this.

12        Unless your Honor wants to hear much about it, I was

13  next going to talk about your jurisdiction to decide the

14  eligibility question, but no one else raised it on oral

15  argument, and since it wasn't raised on oral argument, I'll

16  leave it to the papers unless your Honor has any particular

17  questions with respect to that point.

18        THE COURT:  No.

19        MR. BENNETT:  And I'd like to take the same

20  prerogative that if I intentionally pass over a topic because

21  it wasn't covered today, if it's in our papers, we still care

22  about it.

23        THE COURT:  Of course.

24        MR. BENNETT:  I'm just going to try to use time

25  wisely.  So the first place I'm going to spend some time is

1  on the constitutionality of Chapter 9, and I'm going to do it
2  a little bit differently because I think, frankly, if we do a
3  really careful look at <u>Bekins</u> -- and I'm going to call it
4  <u>Bekins</u> because it's a really big company in California that
5  has -- the name is spelled B-e-k-i-n-s, and everybody calls
6  it Bekins, but I don't know what the correct pronunciation in
7  this particular case is concerned.  A very careful analysis
8  of <u>Bekins</u> -- and believe it or not, the Cardozo dissent in
9  <u>Ashton</u> is going to provide us with the guidepost to answer a
10  lot of the questions that may not be constitutional questions
11  but that ultimately are resolved by those cases.  First, I
12  have to say because it's important that it isn't this Court's
13  place to overrule <u>Bekins</u>.  <u>Bekins</u> has been the law for lots
14  of years.  And as the U.S. Attorney pointed out, it's not
15  only that <u>Bekins</u> hasn't been overruled, it's actually never
16  been challenged or questioned or otherwise suggested to be
17  worthy of reconsideration by anything that the Supreme Court
18  has done.  And, moreover, in all of the discussion that your
19  Honor heard about why <u>Bekins</u> should not be regarded as good
20  law anymore, no one actually said that the -- that Chapter 9
21  has been changed in any material way from the law that was
22  before the Court in <u>Bekins</u>, and that's because in all the
23  ways that mattered it really hasn't changed, not just -- not
24  by a little but really not at all.  However, we don't want
25  the Court to write an opinion that says, well, you feel

1 constrained not to overrule Bekins. You think it should be

2 overruled. So I'm going to spend some time talking about why

3 Bekins is absolutely right and why Asbury Park and anything

4 else didn't change anything.

5 Let me start with just a quick word on Asbury Park.

6 Even to the Supreme Court, if you read their own words,

7 Asbury Park is kind of considered an outlier. It has -- the

8 Supreme Court has never since approved a municipality's

9 modification of its own contract on the basis of emergency or

10 anything else. Every time it's been asked to, it's basically

11 talked about Asbury as being, number one, confined to its

12 facts and extraordinary situation and not reflective of a

13 broad doctrine. This same argument was made to Judge Bennett

14 in the Jefferson County case, and he commented on it. I

15 think we've cited to that case in our papers. He does an

16 even better job than I just did of explaining why Asbury is

17 an outlier. It doesn't provide much comfort to any

18 municipality thinking it's going to modify its debts without

19 the help of the Bankruptcy Code and is no good reason to

20 reconsider Bekins.

21 Now, the next thing I want to talk about is what

22 Bekins really does, and the -- a reality that you can find in

23 Bekins if you're looking really hard, but unfortunately you

24 have to look really hard, is that there were two

25 constitutional provisions at stake when the Chapter 9's

1    predecessor was subject to Supreme Court review.  One was the

2    Tenth Amendment, and some people have talked about that.  And

3    the second part was the contracts clause.  And when you read

4    Bekins, the Court kind of touches on all the different

5    features that matter but isn't particularly careful about

6    matching up which features were needed to overcome which

7    constitutional problem.  And, frankly, in there we're going

8    to find the answers to a lot of the -- a lot of the other

9    questions that come up in this case.

10        So let's start with the Tenth Amendment.  Of course,

11   the Tenth Amendment, if you quote the whole thing -- and when

12   your Honor confronted earlier, I'm not sure the first six or

13   so words were quoted, "powers not delegated to the United

14   States by the Constitution, nor prohibited by it to the

15   states are reserved to the states respectively, or to the

16   people."  For starting purposes, "powers not delegated to the

17   United States" are important words, and one of the things

18   Bekins very clearly says is uniform laws on the subject of

19   bankruptcies are delegated to the United States and that laws

20   on the subject of bankruptcies include municipal debt, and I

21   think they used "composition" as opposed to "adjustment," but

22   composition statutes.  So it's actually not a close call that

23   the -- at least as far as the Supreme Court is concerned --

24   and I think that's all that matters for this purpose is that

25   we're going to have a municipal Bankruptcy Code that at least

1    covers subjects of bankruptcy and that those are clearly

2    federal functions.  Where a Bankruptcy Code applicable to

3    municipalities --

4         THE COURT:  Well, but we know from several Supreme

5    Court cases that the mere fact that Congress legislates

6    within its authority does not necessarily by itself mean that

7    it's consistent with the Tenth Amendment.

8         MR. BENNETT:  Well, actually I think --

9         THE COURT:  Right?  You've got _Printz_ --

10        MR. BENNETT:  Well --

11        THE COURT:  -- in New York at a minimum that hold

12   that.

13        MR. BENNETT:  Well, that was the commandeering

14   point.  We'll get to commandeering.  There's no commandeering

15   in the Bankruptcy Code.

16        THE COURT:  Well, I don't mean to suggest that there

17   is, but in the laws that Congress passed that the Supreme

18   Court held unconstitutional there, they were legislating

19   within their commerce clause or other enumerated power.

20        MR. BENNETT:  Okay.  In the radioactive waste case,

21   the New York case, it was because they used means that were

22   inappropriate that offended the solvency -- excuse me --

23   offended the sovereignty of the states.  In the Bankruptcy

24   Code -- in the context of the _Bekins_ case, I think when you

25   read the case, they were worried about something different.

1    They were worried about the -- in <u>Ashton</u> the majority was

2    clearly worried about the bankruptcy parts going too far and

3    intruding on insolvent -- on sovereignty issues that weren't

4    actually close enough to the core bankruptcy problem.  That's

5    where we got the governmental and political powers type

6    exception that we have today, and so -- but I don't think

7    there is -- your Honor is correct.  If the way that the --

8    that Congress chose to legislate on the subject of

9    bankruptcies affecting municipalities was to tell state

10   courts what state courts had to do, then you would

11   conceivably have a problem, but there's nothing about the

12   Bankruptcy Court that tells -- state any things what states

13   have to do.  What the Bankruptcy Code tells courts, what it

14   tells federal courts what they should do when confronted with

15   a municipality that petitions for relief and petitions for

16   relief with proper authorization.  And so I don't think that

17   is -- that doesn't implicate the second half of the Tenth

18   Amendment.  It only implicates the first half of the Tenth

19   Amendment, and, quite frankly, it's protected by it.

20        And this is going to come up with something later.

21   When we think about the issue of priorities -- and that's a

22   word that encompasses lots of different things, and we can

23   break it down further if we need to -- priorities are at the

24   core of the subject of bankruptcy, absolutely solidly in the

25   core, so a point I want to make and we'll come back to is

1  that we're not really dealing with the part of the Bankruptcy

2  Code that gets closest to offending sovereignty.  We are

3  really dealing with -- when we talk about where pension

4  claims stand in the world and where they can be impaired, we

5  are dealing something that is core to the subject of

6  bankruptcies.  It's not at the edge of the things that made

7  the difference between the constitutionality and

8  nonconstitutionality of the Bankruptcy Code under the Tenth

9  Amendment.

10      THE COURT:  Well, I think possibly your colleagues

11  on the other side might take issue with that because they

12  analogize the pension right to a property right, which is a

13  matter of state law, at least under our present Bankruptcy

14  Code.  It probably doesn't need to be, as a matter of

15  constitutional law, but it is.

16      MR. BENNETT:  We will come later, and believe it or

17  not, it's going to be implicated in other aspects of the

18  Chapter 9 case not having anything to do with pensions to

19  where the line is between a priority and a property right.

20  When we talk later -- I'll get to it later.  I have a whole

21  section on why in this instance a pension is an unsecured

22  claim and not a property right.

23      THE COURT:  Okay.

24      MR. BENNETT:  If we -- just to take a short part

25  about it now, as I read the cases, there are some cases that

1   talk about an entitlement to money being a property right,

2   but in every single one of those cases the money was there,

3   so, for example, it was in a bank account and the balance was

4   there.  In another circumstance, you were dealing with a --

5   an entity was reducing the amount of money that was supposed

6   to be paid to an employee, but there was a hundred cent

7   dollars there, and the three percent that was going to be

8   carved out was going someplace else.  There is no

9   constitutional case that deals with a promise that there -- a

10  promise that might or might not be satisfied because there's

11  not enough money and say that kind of a promise is a property

12  right.  So I think that if you -- if we apply carefully the

13  Supreme Court cases -- and when I get to them, I'll remember

14  the citations -- we are going to find that an unsecured

15  promise where the actual sum of money can't be pointed to

16  because it's not there yet, that's not a property right and

17  never has been, and so the Fifth Amendment is not implicated

18  here.  This is absolutely a contracts clause case, and we'll

19  get to the contracts clause -- clauses in a second.

20          Okay.  So I want to -- last point with respect to

21  the Tenth Amendment, of course, Bekins says it's

22  constitutional under the Tenth Amendment.  The Bankruptcy

23  Code, in particular, its part relating to municipalities,

24  it's constitutional under the Tenth Amendment.  It finds that

25  the combination -- that apart from the fact that it's subject

to bankruptcies, it finds that the fact that the Code, then
the Act, had carefully carved out governmental and political
powers, kind of the -- that is, the relationship between a
municipality and its subjects -- it's carved that out.  It
says that is an appropriate safeguard to states retaining
sovereignty, and they say, "And, oh, by the way, there's a
consent requirement."  So those two things, the consent
requirement, the -- what I'll call the 903-904 carveout, and
the fact that the uniform laws on the subject of bankruptcies
are fair game for the federal government, those three things
are the three points that the <u>Bekins</u> court says it's okay for
Tenth Amendment purposes.

     Now, it's time to work about -- talk about the
contracts clause problem.  Your Honor is clearly familiar
with what the contracts clause problem is.  You have a
contracts clause -- and I have a cheat sheet for everyone.
I've provided my colleagues on my left with a copy during the
break.  If your Honor --

     THE COURT:  Sure.

     MR. BENNETT:  -- will, I'd like to pass up --

     THE COURT:  If you'd like me to look at it, sure.

     MR. BENNETT:  -- copies.  And here we have the three
clauses that we need to talk about, the federal contracts
clause, the state contracts clause, and the pensions clause.
As far as the <u>Bekins</u> court is concerned, it's talking only

 1   about the federal contracts clause, and where I'm going is
 2   it's not going to make any difference.  And what the
 3   Bekins -- the Bekins court doesn't think that consent of the
 4   state has anything to do with getting beyond this clause
 5   probably because it knows that there's no consent out to the
 6   contracts clause.  Instead, it finds that the reason why that
 7   the municipal bankruptcy act is constitutional is because the
 8   entity that is actually impairing or changing contracts is
 9   not the state.  It's not the municipality acting by the
10   state.  It is the court itself.  And the key quote is the
11   state invites the intervention of the federal, my word,
12   bankruptcy power to save its agency -- that's really a
13   synonym for municipality -- which the state itself is
14   powerless to rescue.  And the reason the state is powerless
15   to rescue it is because of the contracts clause.  Through its
16   cooperation with the national government, the needed relief
17   is given.  So under -- so as far as Bekins is concerned,
18   under Chapter 9 the federal government, through its courts,
19   is the pertinent actor.
20           Now, you could write this more elegantly, and it
21   wasn't in our briefs because I actually didn't find it until
22   last night, and that is Ashton.  You know, I have to
23   confess --
24           THE COURT:  That is what, sir?
25           MR. BENNETT:  Pardon?

1          THE COURT:  What did you say it was?

2          MR. BENNETT:  <u>Ashton</u>.  Until yesterday I'd never

3    read <u>Ashton</u>.  After all, everybody knew it had been overruled

4    by <u>Bekins</u>.  But I read it last night, and I got to the end,

5    and I realized there was a dissent by Cardozo.  And I read it

6    because it was by Cardozo because he writes really well.  And

7    he took this particular issue head on, and so I'm going to

8    read a lot of sentences from it.  It's on page 142.  And

9    here's what he says.  He, of course, is dissenting, so he's

10   finding the last version constitutional, and he gets to the

11   contract clause problem.  And by the way, one of the things

12   about Cardozo's dissent is that he's also much better about

13   dividing the Tenth Amendment analysis from the contracts

14   clause analysis.  He kind of does it explicitly separately.

15   And he says this.  This is about the contracts clause.  "The

16   act does not authorize the states to impair through their own

17   laws the obligation of existing contracts.  Any interference

18   by the states is remote and indirect."  I'm going to skip

19   some things, some citations and some things that aren't that

20   important, and get to something that's more important.  "If

21   contracts are impaired, the tie is cut or loosened through

22   the action of the court of bankruptcy approving a plan of

23   composition under the authority of federal law.  There, and

24   not beyond in an ascending train of antecedents" -- it's an

25   amazing sentence -- "is the cause of the impairment to which

1   the law will have regard," skipping some citations.

2   "Impairment by the central government through laws concerning

3   bankruptcies is not forbidden by the Constitution.

4   Impairment is not forbidden unless effected by the states

5   themselves.  No change in obligation results from the filing

6   of a petition by one seeking a discharge, whether a public or

7   a private corporation invokes the jurisdiction."  We're going

8   to use that sentence again when we talk about whether -- how

9   much we have to decide today.  "The court, not the

10  petitioner, is the efficient cause of the release."

11          For some reason Cardozo didn't participate in

12  Bekins.  The Bekins court, I think, said the same thing.  I

13  just think they said it a lot less clearly and a lot less

14  elegantly.

15          So I think this is very informative about the right

16  way to think about who is doing what and will become

17  important when we get to the authorization problem, which

18  we're going to be at very soon, but I want to --

19          THE COURT:  Where do you think in Bekins the

20  majority of the court or the court itself said the same

21  thing?

22          MR. BENNETT:  The words I read at the -- I'm sorry.

23  I got to find the back pages.  The words I started with,

24  the -- it's at page 54.  The state invites the intervention

25  of the federal bankruptcy power to save its agency -- means

1 municipality -- which the state itself is powerless to
2 rescue -- that's the reference to the contracts clause.
3 Through its cooperation with the national government, the
4 needed relief is given. I think the -- I think they're doing
5 exactly the same thing and just managed to do it in a lot
6 fewer words but with -- losing a teeny bit of precision in
7 the process, but it is the same thing. They are basically
8 adopting the Cardozo view of why the bankruptcy law is
9 constitutional under the contracts clause, the federal
10 contracts clause.

11      And, you know, I quoted these words, but there are
12 words before it and words after it that basically zeroes in
13 on that they're dealing with this particular issue at this
14 particular point in time. This is just as much as they say.

15      The Bekins court, of course, there's no dissenting
16 opinions. There's two judges that say they dissent for the
17 reasons expressed by the majority in Ashton. That's all they
18 do. And so that may well be one of the reasons why the court
19 was a little bit less careful. Of course, what Cardozo said
20 isn't precedent. It's just very, very clear thinking,
21 elegantly written about exactly the problem we have in this
22 courtroom today, and I think it's awfully persuasive, and I
23 think it is reflective, although certainly done better, than
24 the work that was done by the Bekins court.

25      A couple of other constitutional issues before we

 1  move on to the authority points and the different contracts

 2  clauses.  AFSCME does take the position in their papers that

 3  the contracts clause continues to constrain all municipal

 4  bankruptcies.  Of course, the federal contracts clause we

 5  know from the Supreme Court does not.  We'll talk about

 6  whether there's any difference in the state courts soon.  But

 7  why AFSCME takes that position is they know full well that if

 8  the contracts clause is easily bypassed by a municipal

 9  bankruptcy case -- and we think that it is for precisely the

10  reasoning of Judge -- Justice Cardozo -- then this is over

11  because the contracts clauses, as we're about to get to, are

12  very, very similar.  They're almost identical to each other,

13  and they're identical in all the ways that matter.  We will

14  go through it very carefully.

15          There was next the point that was made about

16  accountability.  I don't think there's any confusion about

17  accountability.  I think, again, I appeal to Cardozo's

18  language but also to Bekins on this point.  If you don't like

19  the powers that a court has in Chapter 9, write your

20  Congressman.  If you don't like the way Detroit was managed

21  so that it wound up in Chapter 9, don't let the people who

22  used to be in office be in office again in Detroit.  If you

23  don't like the emergency manager and don't think he was

24  qualified and don't like what he was doing, write the

25  governor or your state legislator.  There is no

13-53846-swr  Doc 4874-31  Filed 04/29/14  Entered 04/29/14 22:00:25  Page 459 of 425
13-53846-tjt  Doc 4310-11  Filed 11/27/13  Entered 11/27/13 21:22:45  Page 459 of 559
158

1   accountability question if you break it down in the way that
2   Cardozo broke it down.  And by the way, the other thing
3   Cardozo says and I think also <u>Bekins</u> says, there's nothing
4   wrong with asking.  You have to ask if you're going to do
5   this consensually.  The emergency manager on behalf of the
6   city had to ask the retirement funds directly, retirees more
7   indirectly, to reduce or change benefits in order to
8   accommodate the needs of current city residents and the
9   ability of the city to survive.  They could also ask the
10  Court to exercise its authority to help, too.  That doesn't
11  mean they are the one loosening the knot or cutting the knot.
12          We talked about <u>Asbury Park</u>.  Anti-commandeering
13  cases.  Again, I think -- well, the federal government's
14  brief does a much nicer job on this than I ever could in
15  pointing out that the essence of the commandeering cases are
16  the federal direction to state actors -- in this case, maybe
17  it would be state judges or the emergency manager or the
18  governor -- to do something in a particular way.  And, in
19  fact, the -- that's not what happens.  That is not the
20  structure of Chapter 9 at all.  The structure of Chapter 9 is
21  that there is certain power that is vested in this Court, and
22  that power can be used in certain ways.  Frankly, your Honor
23  can't tell the city what kind of plan to file, but your Honor
24  can say whether or not you will approve a plan that is filed,
25  so the request has to be made by the city, and the power has

1   to be exercised by your Honor.  Again, the city itself is

2   powerless to escape the contracts clause, but it does not --

3   at no point does the federal government say I have a policy

4   that I am going to ask the states or demands that the states

5   implement for me.  That doesn't happen anywhere in Chapter 9,

6   and, frankly --

7        THE COURT:  Well, but Ms. Ceccotti doesn't agree

8   with that.  What she says is Congress says if you want to

9   adjust your debts, we prescribe the priority scheme to the

10   exclusion of the state.  The state can't come in with its own

11   notion of what the priorities should be so that the division

12   of sovereignty that results violates the Tenth Amendment.

13        MR. BENNETT:  Well, first, there's a logical failure

14   there, and it has to do with Asbury Park.  The UAW starts

15   with the proposition that there is some kind of viable state

16   restructuring process that can actually work and that the

17   federal government took it away from them and made the

18   bankruptcy -- the Chapter 9 exclusive.  That isn't reality.

19   Asbury Park, as we've seen, first of all, is an unbelievably

20   exceptional case, which, by the way, the end holding is that

21   that restructuring was done for bonds and made bonds better.

22   That is the holding at the end of the day or the key facts at

23   the end of the day in Asbury Park.  Asbury Park is not and

24   never has been construed to be -- and no one cited any case

25   to your Honor showing that in the period of time before

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 427 of 427
13-53846-swr   Doc 4870-31   Filed 04/29/14   Entered 04/29/14 21:22:45   Page 161 of 427
558

1   Congress claimed the field for itself that there was any

2   viable municipal debt adjustment opportunity created by what

3   we have to call the <u>Asbury Park</u> exception to the contracts

4   clause.  And if you believe everything in the UAW's belief --

5   brief and believe their interpretation of the pensions

6   clause, it gets even worse, that even if there were -- was

7   <u>Asbury Park</u> wiggle room and then in the absence of the

8   Bankruptcy Code the pensions clause is absolute, you have

9   worse than nothing.  You have worse than the almost

10  meaningless <u>Asbury Park</u> exception.  So I don't think it's

11  coercion for the -- for Congress to say you can't do

12  something that you can't do.  And I think the prohibition on

13  competing state municipal schemes is, frankly, recognition

14  that they're not possible or workable, and, again, no one has

15  been able to show you either before or after that provision

16  of the Bankruptcy Code what this wonderful municipal scheme

17  is out there that would have been a choice.  Cardozo doesn't

18  think there's any choice.  <u>Bekins</u> doesn't think there's any

19  choice.  And that's the same court that decided <u>Ashton</u>, so

20  I -- about the same time actually or <u>Blaisdell</u> was about the

21  same time.  <u>Ashton</u> may have been later.  This is a -- I

22  think -- I don't think Congress coerced anybody.  I don't

23  think that's possible on the facts.

24          Okay.  So to summarize, we've shown that Chapter 9

25  is constitutional and that, in particular, it does not offend

 1   the contracts clause in the United States Constitution.  I
 2   think along the way we've demonstrated that the state's
 3   authorization of a municipality's resort to Chapter 9 for
 4   relief from contracts generally does not constitute a state
 5   impairment of contract because otherwise no -- not a single
 6   Chapter 9 would work.  We have also along the way noted that
 7   the filing of a petition itself doesn't constitute impairment
 8   of anything in any event and that if there is an impairment,
 9   it's by the federal Bankruptcy Court, so now let's look at
10   our contracts clause cheat sheet and try to find out whether
11   there's any difference because of the fact that there's a
12   state contracts clause or because there's a pensions clause.
13          First, with respect to the state contracts clause, I
14   don't think anyone has suggested to the Court that this is
15   any different than the federal contracts clause, and, in
16   fact, there isn't.  There's no difference, and no one
17   suggested it, so -- but, by the way, Justice Cardozo, again,
18   as -- more elegantly and more precisely but -- and the Bekins
19   court both would believe that the state contracts clause --
20   okay -- is also focused on the state.  It doesn't bind the
21   federal government.  And since the federal government is the
22   relevant actor, the state contracts clause does not impose
23   any obstacle at all to a municipality invoking Chapter 9
24   relief.
25          The only thing I want to pause to say is it couldn't

1   be otherwise because if it were otherwise -- I skipped a

2   step.  Every state -- at least every state I looked at, so

3   there may be an exception, but every state has a state

4   contracts clause.  It's not surprising.  Copied it from the

5   federal Constitution.  So if it were the case that the

6   state's contracts clause was different than the federal

7   contracts clause and that it was a barrier to invoking

8   Chapter 9 relief, then every single bondholder in every

9   single -- I should say every single lawyer for every single

10  bondholder in every prior Chapter 9 case has probably been

11  guilty of malpractice because they might have been able to

12  escape their prior Chapter 9 cases -- and there are now

13  hundreds on the books -- on this basis alone.  But, again,

14  for the reasons expressed in <u>Bekins</u> and more elegantly by

15  Judge -- Justice Cardozo, they can't.

16       So now we finally get -- we reach the pensions

17  clause also quoted in front of you, and we say, okay, is this

18  pensions clause any different than --

19       THE COURT:  But hang on.  Isn't there a difference

20  between reconciling the bankruptcy clause with the federal

21  contracts clause on the one hand and trying to reconcile how

22  a state that prohibits itself from impairing contracts with

23  taking advantage of the bankruptcy power that the federal

24  court has enabled -- or that the federal Congress has enabled

25  because of the sovereignty of the state?

1     MR. BENNETT:  No difference.  Why?  Let's remember.

2  The reason why I spent so much time talking about why was the

3  Debt Adjustment Act under the Bankruptcy Act constitutional

4  as far as the federal contracts clause was concerned -- it

5  wasn't about the language of the federal contracts clause.

6  It was because the state isn't an actor.  The federal

7  contracts clause acts only on states.  The relevant actor is

8  the federal government.  It's the Bankruptcy Court.  That was

9  the reason why there was no federal contracts clause problem

10  with the Bankruptcy Act in <u>Bekins</u>, and it was the only

11  reason -- the only part of the opinion that had to do with

12  the federal contracts clause part of the problem.  The state

13  contracts clause acts again only on the state, not on the

14  federal government.  Accordingly, if you believe -- and the

15  Supreme Court has held that the relevant actor for purposes

16  of untying or cutting the knot is the federal Bankruptcy

17  Court and not the state, then the state contracts clause

18  forms no additional barrier to the use of the Bankruptcy Code

19  than the federal contracts clause did.  They are the same,

20  and they are both not relevant for the same reason.

21     THE COURT:  And your position is that it's a matter

22  of federal law that the pertinent actor is the federal court,

23  not the state entity that's in bankruptcy?

24     MR. BENNETT:  The Supreme Court told us along the

25  way to approving the Bankruptcy Act the first -- for

1   municipalities the first time that it's --

2       THE COURT:  So even if the state law were to say

3   it's the city that's the pertinent actor, that's not relevant

4   because it's a federal law question.

5       MR. BENNETT:  Correct.  So for purposes of federal

6   law, the Supreme Court has told us it's the federal

7   Bankruptcy Court that is the relevant actor.

8       So now we get to the pensions clause, and we've got

9   to find that there's a difference.  And I think I want to

10  start here.  This is going to be somewhat repetitive of the

11  brief.  There's nothing in the pensions clause that says

12  anything like, quote, "and the state shall not authorize any

13  municipality to commence a bankruptcy case that would allow a

14  federal court to impair or diminish pension claims."  It just

15  doesn't say that.  And, of course, it is words like that that

16  the objectors are saying have to be imported into the

17  pensions clause.

18      It's hard, I think, because at the end of the day,

19  apart from the fact that the pensions clause is, quote, "more

20  specific," and it's, of course, more specific because they

21  were looking at pensions because the law in Michigan at the

22  time they were looking at the pensions clause was that

23  pensions weren't a contract.  That's the only reason it's

24  more specific.  It wasn't because -- there's no other

25  evidence for why it was more specific.  The only

13-53846-swr   Doc 4870-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 32 of
                                        598
13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:22:45   Page 160 of 432

 1  difference -- the only words that are different are the

 2  words, quote, "be diminished." Excuse me. Quote,

 3  "diminished or." That's the only difference. "Impaired" is

 4  used in all of them. "Prohibition of impairment" is used in

 5  all of them. All of them are absolute about prohibitions of

 6  impairment.

 7       And I'm going to take this in two steps. First of

 8  all, the objectors say --

 9       THE COURT: Well, but hang on. There's the next

10  sentence, which you didn't include on here, the next sentence

11  of the pension clause.

12       MR. BENNETT: Okay. The funding sentence?

13       THE COURT: Yes.

14       MR. BENNETT: Okay. Well, frankly, that's not

15  focusing on today, and it sounds like it's a --

16       THE COURT: Well, but the objectors argue that this

17  additional consideration that the Michigan Constitution gave

18  to pensions which it didn't give to contracts elevates it,

19  makes it, if not absolute, more absolute than contracts.

20       MR. BENNETT: Well, let's talk about -- I

21  specifically wanted to talk about that because --

22       THE COURT: Okay.

23       MR. BENNETT: -- first of all, why is it -- we

24  should ask ourselves question number one. Why is it that the

25  federal contracts clause and the state contracts clause

1    became less than absolutely binding?  It wasn't because of

2    the inadequacies of the language.  It was -- in fact, what

3    the courts have done is they put the word "substantial" in

4    front of the word "contract," so an insubstantial impairment

5    doesn't count, and a substantial impairment has some extra

6    hurdles that you have to go over before you can make it.  So,

7    frankly, if what they were trying to do was to tighten the

8    pensions clause and make it more distinctive -- and if they

9    went to the books because, of course, all of the cases, you

10   know, <u>Worthen</u> versus <u>Thomas</u>, <u>Home Building & Loan Association</u>

11   versus <u>Blaisdell</u>, these are like cases from the mid-'30s, so

12   they were all on the books in 1961 through 1963, so they knew

13   that, and they knew that the problem was the incorporation of

14   the substantialness concept.  So if they were really after

15   solving that problem, why didn't they just put the words

16   right before "impairment" "substantial or insubstantial

17   impairment"?  And they could have tightened it up in the way

18   that it had been loosened.  They could have prohibited

19   substantial and insubstantial impairments.  That would have

20   dealt with -- if they were trying to say we're opting the

21   pensions out of the judge-made doctrines and exceptions that

22   have burdened the federal contracts clause and the state

23   contracts clause, that's how they might do it.

24          Now, by the way, it would be irrelevant to this

25   argument because remember the pensions clause, just like the

 1  state contracts clause, just like the federal contracts
 2  clause, acts on states and municipalities.  It doesn't act on
 3  the Bankruptcy Court.  It doesn't act on the federal
 4  government.  And once again, if the right actor -- if the
 5  actor that unties the knot or cuts the knot is the federal
 6  Bankruptcy Court and the federal government and not the state
 7  and not the municipalities, as the Supreme Court says, then
 8  the pensions clause, even with the words "substantial or
 9  insubstantial" in front of it, doesn't get you all the way
10  home.  What they next needed to do in the pensions clause is
11  to say by enacting the pensions clause and giving it -- and
12  making pensions special, we now want to do something else.
13  We really want to say -- objectors thinks the Constitution --
14  that the convention -- that the conventioneers really wanted
15  to say, well, in a municipality that has material pension
16  claims, they can't resort to a federal court to seek relief.
17  That's what they really want us to find in the pensions
18  clause.  But, frankly --
19       THE COURT:  No, no.  I don't hear that at all.  What
20  I hear is you are welcome to come in that door so long as the
21  city's assets, according to Mr. Dusen, are first allocated to
22  pensions.
23       MR. BENNETT:  Well, if there was a lawyer around
24  there at the constitutional convention who was doing
25  research -- and I suspect that there was -- they should be

 1  charged with figuring out that the only way to stop the
 2  federal courts -- if there is even a way, but the only way to
 3  stop federal courts from having the power to impair contracts
 4  that maybe a state can't impair is to cut off the -- is to
 5  basically say the state cannot ever go to a federal court for
 6  a federal -- then it was called composition, you know,
 7  federal debt composition case.
 8         And the other point that your Honor should note is
 9  that -- and we say this in our papers -- during the entire
10  constitutional convention, for years before and almost
11  continuously thereafter, the State of Michigan had authorized
12  the municipalities to file Chapter 9 cases, so if they were
13  really elevating pensions in the way of taking them --
14  distancing themselves from the federal power to impair them
15  and they knew, open paren, one, that the federal debt
16  composition scheme had been determined to be constitutional
17  by the Supreme Court in part because the federal court was
18  doing the work of impairing contracts and they knew -- they
19  have to be presumed to know that Michigan had opted in and
20  had continuously all through the period -- in fact, I think
21  in our papers we say when they repealed it.  I think they
22  repealed it around 1980 when general authorization was all
23  that was necessary, so they kind of covered the entire
24  period.  No one ever said, gee, we better as hell change
25  this.  And in all of the legislative history of the

1   constitutional convention, you don't have a word about

2   bankruptcy and pensions, and the words that you do have --

3   the words that were quoted to you in the papers just filed --

4   I have to find it.  Okay.  Here's AFSCME's best quote from

5   the official record of the constitutional convention, 2

6   Official Record, page 3402.  This is a new section that

7   requires that accrued financial benefits of each pension plan

8   and retirement system of the state and its political

9   subdivisions be a contractual obligation which cannot be

10  diminished or impaired by the action of its officials or

11  governing body.  It's in AFSCME's papers, paragraph -- the

12  new ones, the supplemental papers.  Actually, those are

13  amended and restated, paragraph 19, page 11.  Same brief,

14  paragraph 142, page 71.  Pension benefits constitute, quote,

15  "deferred compensation for work performed which should not be

16  diminished by the employing unit after the service has been

17  performed," close quote.  Those are the quotes that you were

18  offered by AFSCME about the seriousness and importance of the

19  work done in the constitutional convention from 1961 to 1963,

20  this against the background where it's been the law of the

21  land, at least as far as the Supreme Court is concerned,

22  since 1930 -- I can't remember exactly.

23          THE COURT:  So is it your view that the only

24  effective way that the Michigan Constitution could have

25  provided the protection for pensions that the objectors seek

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:35   Page 437 of 437
13-53846-swr   Doc 4870-1   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 171 of
558

1   here is by the Constitution prohibiting a Chapter 9 filing?

2       MR. BENNETT:  Prohibiting authorization of a Chapter

3   9 filing or -- yes, your Honor.  That's exactly what they

4   would have had to do, and that's not the kind of thing that

5   they can do by implication.

6       I want to talk a little bit more because I think

7   there's a lot of stress that's put on the words "diminished

8   or," and there is the assertion that "diminished or" has to

9   be given some meaning, but, frankly, the only meaning it

10  could be given is to somehow expand "impaired."  I don't

11  personally think it does expand "impaired," and there's -- I

12  want to point out before moving on with a whole bunch of

13  authority to that effect that it's really dangerous for a

14  court to decide that "diminished or" added anything to

15  "impaired" because if the Court decides that "diminished or"

16  filled some gap that's related to the word "diminished and

17  impaired," then in the next case someone is going to come to

18  your Honor and say, "You know that state contracts clause?

19  There's no 'diminished' there, and 'impaired' has to mean

20  less than 'diminished or impaired' in the pensions clause."

21  So it's actually a good thing that there's law out there on

22  this subject -- we had it in our brief -- that basically says

23  that if you run into one of these problems where you've got a

24  list and you want to say that they all have an independent

25  and separate meaning, you've got to propose an independent

1   and separate meaning for the terms on the list that actually

2   solve the problem. And in this case, trying to find an extra

3   meaning for "diminished or" -- again, it's consistent with

4   its place in the sentence -- does -- creates a mess in the

5   state contracts clause in Article I, Section 10.

6          Apart from that, it turns out that when you go look

7   at the books -- and this is not in our papers because this

8   was an issue raised in the responsive papers -- is that every

9   time we found the definition of "impair" in the cases or in

10  dictionaries, it includes diminishment, which should not be

11  terribly surprising. It's a very common sense answer. But

12  if you want a list -- and you might need them in connection

13  with putting together an opinion -- you could start with the

14  Bank of Minden case, which is a Supreme Court case, 256 U.S.

15  126 at 128. Then if you want to go to the Sixth Circuit,

16  Riverview Health Institute, 601 Fed. 3d 505. Black's Law

17  Dictionary, Webster's Third, and then there's a bunch of

18  state courses -- state cases from other states that all say

19  the same thing. I could read the quotes, but I'll save the

20  time because it really is kind of a commonsensical -- a

21  common -- it's common sense that "impaired" has to include

22  "diminished." "Impaired" is much broader than "diminished,"

23  and every so often this is either a -- there's a rhetorical

24  flourish that works its way in, and this may well be what

25  that is, and that's all it can be.

1          Okay.  Moving on to the issue of whether or not the
2    authorization to file Chapter 9 is ineffective because the
3    emergency manager or the governor recognized that impairment
4    of pension benefits may be necessary.  I don't want to add
5    additional arguments to the constitutional provisions.
6    That's not the purpose of this section.  The purpose of this
7    section is to deal with the point made, I think, by only one
8    or two of the objectors that the -- that there's an
9    instruction to the emergency manager to comply with the
10   pension statute, and that should apply to the filing of a
11   Chapter 9 case as well.  I'm sure your Honor has your own
12   copy of the Local Financial Stability and Choice Act, Act
13   436, and when you look at the -- most importantly, when you
14   look at the Chapter 9 authorization section, there is no
15   instruction that the emergency manager comply with the
16   protections affecting pensions.  By the way, that may well
17   make sense.  There are a whole bunch of other provisions that
18   talk about what the emergency manager is supposed to do out
19   of court, and not surprisingly it talks about him having to
20   comply with many laws and to pay many debts and to do many
21   things.  He resorts to Chapter 9 when he can't accomplish
22   those things out of court.  And if one thought that anything
23   about the emergency manager law meant to say that the
24   emergency manager had to in Chapter 9 continue to not impair
25   pensions, you would think it would belong in the section that

1   is applicable when the emergency manager files Chapter 9.

2          In addition, I think the part that was read to your

3   Honor earlier this morning has a lead-in clause that didn't

4   make it into the record.  It reads, "If the emergency manager

5   serves as sole trustee of the local pension board, all of the

6   following should apply," and that's where the provision that

7   was located was read to you, so there is nothing in the

8   emergency manager law -- and, in fact, the structure of the

9   emergency manager law itself suggests that a lot of bets are

10  off in a Chapter 9 context that may not be -- including

11  things that the emergency manager is supposed to try to

12  accomplish if he's in an out-of-court world.

13         Next argument, failing to condition authorization on

14  nonimpairment of --

15         THE COURT:  One second.  Does that suggest that in

16  order to accomplish what Mr. Orr thinks is necessary to

17  accomplish with regard to pensions, he needs to be a trustee

18  of the plan?

19         MR. BENNETT:  No.  It's that -- no.  He has the

20  right to remove trustees of the plan for other purposes, and

21  these are these extra requirements that are imposed upon him

22  just in those circumstances that it -- I think when your

23  Honor gets a chance to look at it -- what did I do with it?

24  I had it here a second ago, so I'll give you -- let me give

25  the exact section referenced so it's easy to find.

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 175 of 441
13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 175 of 441
558

1    THE COURT:  Okay.

2    MR. BENNETT:  The part I read from is in Section

3  12(m), and it is confined to that relatively narrow

4  circumstance.

5         Okay.  First of all, on the issue of whether or not

6  the governor's failure to put conditions on authorization

7  makes the authorization invalid, we indicate in our brief

8  that we don't think that conditions on authorization could be

9  valid, that -- and as I think -- I think I got ahead of

10  myself earlier, so I don't want to take too much time in

11  covering it again now, but we're talking here about one of

12  the core subjects of bankruptcy, which is priorities, who

13  gets paid when there's not enough to go around.  If that's

14  not a core subject of bankruptcy -- not in the core versus

15  related, but if that's not the absolute center of the subject

16  of bankruptcies, I don't know what it is.  And we've cited a

17  lot of law, and your Honor has pointed out there are many

18  cases, none decided the other way, that say particularly in

19  the context of things touching on priorities and who gets

20  paid first and who gets paid second, who doesn't get paid at

21  all, that the -- that you buy the Bankruptcy Code as a whole.

22  You buy the scheme as a whole.  You don't buy parts of it.

23  And in this sense federal law is supreme because once there

24  is a proper bankruptcy case before the Court, it is the

25  federal priority scheme that applies.  It is legitimate that

1   the federal priority scheme applies because it's legislation

2   on the subject of bankruptcies, and because it's legislation

3   on the subject of bankruptcies, it is absolutely supreme,

4   period, end of story.

5          So, as to your Honor's hypothetical, if anyone walks

6   into the federal court and says, "I want federal judicial

7   relief.  I want to use that federal power to untie and cut

8   knots, but I want the ultimate distribution or really any

9   part of the distribution to be conducted in accordance with

10  my terms," whether they're found in a statute or in a state

11  Constitution, it doesn't matter.  The federal law on this

12  issue is supreme, and it's supreme over Constitutions and

13  over statutes, period, end of story.

14         It seems kind of small when done with that to point

15  out that 436 permits but doesn't require conditioning.  We

16  can imagine a whole bunch of conditions that might have been

17  very sensible and that might not offend federal jurisdiction

18  like it could have been -- there could have been suggestions

19  or requirements as to exactly how the emergency manager

20  should interact with other elected representatives or with

21  other people.  Actually, the governor does have one -- it's

22  not quite a condition.  It's a suggestion, but I think he'd

23  be offended if it wasn't followed, which is he wants Mr. Orr

24  to continue to communicate with the governor and the

25  treasurer relating to what he's doing.  So I think we can

 1   think of several things that could be -- that you could use

 2   for the PA 436 conditioning power that would be perfectly

 3   okay, but going in and saying, "Gee, as a matter of this

 4   particular state law" -- and, by the way, it's -- the

 5   governor would -- to do that, he's got to ignore the

 6   conflicts that I discussed earlier between a law that says

 7   thou shall not impair this one with another law that says

 8   you're the first money out.  It's mind-boggling what he'd

 9   have to reconcile, but the instruction would be, yeah, this

10   one we really meant and the others we didn't really mean,

11   follow that one first.  I think that that would be an invalid

12   authorization.  I think the Court would have to say that

13   authorization isn't okay for federal court purposes.  I think

14   as a prudential matter, the federal court should not get

15   involved in a case where the authorization is conditioned in

16   a way that would offend the federal scheme, but understanding

17   that there may be very extreme and difficult circumstances

18   involved, a creative federal court might want to give people

19   some time to kind of take a couple steps back and figure out

20   how to do it better.

21         THE COURT:  Let me ask about Section 943.

22         MR. BENNETT:  I need to get a case if you're going

23   to do that because I -- from the --

24         THE COURT:  This is the Bankruptcy Code.

25         MR. BENNETT:  Yeah.

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 447 of 444
13-53846-swr   Doc 4870-31   Filed 04/29/14   Entered 04/29/14 21:22:45   Page 447 of 444
598

1          THE COURT:  943(b)(4).

2          MR. BENNETT:  Right.  There's actually one case

3    that's dealt with that previously, and I think it's --

4          THE COURT:  Let me just get my question out.

5          MR. BENNETT:  Okay.

6          THE COURT:  Thank you.  So the question is what does

7    this section mean if it doesn't mean that the state can

8    dictate the priorities?

9          MR. BENNETT:  Because it says "from taking any

10   action necessary to carry out the plan," and I --

11         THE COURT:  What does that -- what does that

12   language mean?  What meaning does it have?  How does it come

13   into effect?

14         MR. BENNETT:  Okay.  I think the best way to work

15   through that is the Sanitary Improvement District Number 7

16   case, 98 B.R. 970, and this is a really fascinating case

17   because the facts gave you every conceivable issue under the

18   sun in terms of the interpretation of this section.  What

19   happened in Sanitary Improvement District is that the debtor

20   had -- you know, had claims against it.  Let's call them a

21   hundred.  I'm using representative numbers, not the actual

22   numbers.  As a result of the bankruptcy case, they issued

23   paper, and I think it was like 60.  Okay.  And the -- but the

24   paper that was 60 had in it a provision that said that if the

25   debtor paid it in full within a certain number -- within a

 1  certain number of months -- I think it was 18 months -- after

 2  the bankruptcy case is over, it only had to pay 95 cents on

 3  the dollar or something like that, and so the creditors came

 4  in, and they attacked the whole plan, pointed to a state law

 5  that says thou shall pay your bonds.  By the way, there are

 6  laws like that in Michigan, too.  And the court decides very

 7  easily that the takedown from a hundred to 60, well, that's

 8  supremacy clause bankruptcy.  You can do that notwithstanding

 9  state law.  What you can't do, though, is because state law

10  says you have to pay bonds at a hundred percent of principal,

11  you can't have the five-percent discount feature because

12  that's -- after the bankruptcy, you issued this new bond, you

13  know, with 60 being the new hundred, but you've said that you

14  can still pay that off at a discount.  That violates

15  943(b)(4).  So what this case illustrates is that this looks

16  at the obligations after they've been restructured and says

17  that the Bankruptcy Court does the restructuring.  By the

18  way, very consistent with the Cardozo and the Bekins view of

19  the world, you -- and you're finished.  The bankruptcy --

20  there's a confirmation order.  New instruments are issued.

21  Those instruments, the ones that you walk out of Bankruptcy

22  Court with, have to be instruments that you can perform in

23  accordance with state law.

24       THE COURT:  So this provision, in your view, says

25  nothing about the requirement of the plan itself or the order

1   confirming plan to comply with state law.

2           MR. BENNETT:  I don't know if there's any case that

3   says that.  There may be.  I think <u>Sanitary and Improvement</u>

4   <u>District Number 7</u> has got it right, that it does not say

5   anything about the Bankruptcy Code restructuring process.  It

6   only acts on the debt that is issued after the case is over.

7           I don't think I have to spend time on it, so I'm

8   going to skip over -- again, it's in our papers.  There's an

9   assertion in the papers that the Tenth Amendment is not

10  reserved -- that the Tenth Amendment reserves every issue

11  relating to municipal pensions to the states.  I think we've

12  dealt with that enough in the constitutional section, and I

13  don't have to deal with -- this really is the -- an argument

14  was built, constructed based upon the fact that in the case

15  of ERISA the federal government didn't make ERISA -- didn't

16  make states or municipalities applicable to ERISA, didn't

17  create the insurance program, PBGC, and the assertion is made

18  because the federal government chose not to go into those

19  areas, they must have done that because they were absolutely

20  precluded from doing so, ergo they are precluded from using

21  the bankruptcy power to modify pensions.  I think that fails

22  logically in a lot of places, but most importantly maybe to

23  start with is that it's not clear that there is no possible

24  way for the federal government to apply the ERISA statute or

25  the PBG statute to state municipalities, maybe to states but

1   not to municipalities, and -- at all, by the way, and that
2   Congress didn't may have reflected political realities at the
3   time and not actual constitutional limitations, so I think
4   the starting point of that argument just fails, and I think
5   we've seen that federal -- that a federal bankruptcy power
6   can be applied by the federal court to obligations.  Pensions
7   are clearly within the federal bankruptcy power, no dispute
8   in the private context.  There's nothing different about
9   Chapter 9 context.  And so there is no such part of the Tenth
10  Amendment that constrains this aspect of the subject of
11  bankruptcies.

12          The next point is a really important one, and I
13  could easily have started with it, and I know your Honor has
14  been concerned with it throughout, which is whether or not
15  your Honor really has to deal with the -- whether or not
16  pensions can be impaired in bankruptcy in the context of
17  authorization.  I hope it's clear to your Honor that the city
18  is perfectly comfortable with you dealing with it now or
19  perfectly comfortable with dealing with it later.  We don't
20  think that this is -- some of these things may be a little
21  bit conceptually difficult and complex, but the
22  constitutional law on the subject is really pretty clear, and
23  so we're prepared to have it decided.  We think that there's
24  only one way to decide it.  There is, though, a way for your
25  Honor to decide not to decide it, which is to find -- and the

next to the last sentence I read from Justice Cardozo in his
dissent where he says, "just the filing is not doing
anything," we say that, too.  It is starting a bankruptcy
case.  I have said at the beginning -- I mean it -- there is
nothing inevitable.  A cramdown of revisions to pension
benefits, a cramdown of a particular treatment of the
underfunded portion of the pension obligation is not
necessarily the way this case is going to end, and it's not
necessarily the next step in this case.  We just don't know.
The next -- obviously right now mediation is an important
milestone.  The next important milestone is the plan, and
since your Honor has been around the Bankruptcy Courts for a
good long time, you know that the plan that we file before
the end of this year is not likely to be the plan that we
ultimately confirm.  It would be actually a good exercise for
different people to figure which amended plan is going to be
the plan.  The bottom line is nobody really knows.  And so it
is possible to adopt Justice Cardozo's view that no change in
obligation results from the filing of a petition by one
seeking a discharge whether a public or private corporation
invokes the jurisdiction and basically say since nobody has
done anything yet, we're not going to decide anything more.
You could do that.  I will say that the -- I think that the
assertion that there is an imminence that -- an imminence of
harm represented by the filing of the Chapter 9 case that

1    requires this Court to act is, frankly, not a fair statement

2    of the law.  I think one of the more important cases is

3    Donohue.  It's been cited by objectors.  The most important

4    part -- Donohue is the Nassau County financial restructuring

5    case, and the most important part of Donohue that led the

6    Court to act I think is mentioned by the Court.  It's kind of

7    near the end of the opinion.  The Court says the law, the

8    ordinance that gave the county executive all the powers,

9    "provides expansive and seemingly limitless power to the

10   County Executive without any reasonable restraints other than

11   the procedural mechanism of an executive order."  This case

12   would be a lot simpler if all Kevyn Orr had to do to

13   reorganize the debts of Detroit was to say how he wanted to

14   do it and sign it as an order.  He doesn't think he has that

15   power.  I don't think he has that power.  No one in this room

16   thinks he has this power.  We've talked about the fact that

17   to get to a debt adjustment plan that is nonconsensually

18   confirmed, it has to be filed.  There has to be disclosure

19   statement approved.  There has to be voting.  There has to be

20   more discovery.  There has to be a confirmation hearing, and

21   there has to be an order of this Court.  That is a very

22   different procedure or array of protections than was

23   available in the Donohue case, which is, frankly, the closest

24   case to this one in terms of the kinds of things that we're

25   talking about here.  If your Honor goes through the other

1   cases that have been cited for the proposition of imminent

2   harm, you will find that in all of them there was no judicial

3   step going to occur before the harm might be inflicted.  In

4   all of --

5         THE COURT:  Let me ask that question here.  Can

6   you -- are you willing to identify here on the record or can

7   you identify here on the record any conceivable circumstance

8   in which retiree benefits, pensions won't be impaired by a

9   plan?

10         MR. BENNETT:  You know, your Honor, at this point

11   there are a number of major things that I don't know, and I

12   will say I don't know that there won't be money from outside,

13   although I tend to doubt it.  I don't know that.  I do not

14   know whether there will be -- whether certain other assets

15   will, in fact, be available to the city to address its debts,

16   and I will point out in this regard that while the objectors

17   have cited over and over and over again a pleading filed by

18   the attorney general asserting the primacy of pension claims,

19   they've all managed to have forgotten a formal opinion he's

20   given concerning the accessibility of certain assets in this

21   bankruptcy case, particularly the art, and -- but I have no

22   idea, number one, what's going to happen with that, and I

23   have no idea what the -- whether or not there will, in fact,

24   be a transaction involving the departments of water and

25   sewerage and whether those transactions will deliver material

1    dollars.  So while I'd be kidding myself and kidding the

2    Court and kidding everyone here if I said that I thought it

3    was anything but likely that there would be some impairment

4    of the underfunding claims in this case, it's not fair to ask

5    me and I don't think I could say that there's no scenario

6    where impairment will not be necessary.  I just don't think I

7    can even say that today.

8          THE COURT:  Okay.  Even with that much of a

9    disclosure here, why isn't that enough to say there's an

10    impairment here?

11          MR. BENNETT:  I'm sorry.

12          THE COURT:  Why isn't that enough to say at this

13    point in time there's an impairment?

14          MR. BENNETT:  Well --

15          THE COURT:  There's a sufficient impairment to get

16    past ripeness anyway.

17          MR. BENNETT:  You know, I don't think you can say

18    there's impairment because the Supreme Court has told us

19    there is not.  There won't be impairment, your Honor, until

20    you say so.  Is there a risk of impairment?  There's a risk

21    of impairment.  Is the risk of impairment enough to make this

22    ripe?  And the answer is is that -- I think this is the

23    answer when -- I mean the <u>Donohue</u> case is a good example, but

24    I think it ripples through all the others, which is that if a

25    court is presented with a situation where there's a risk of

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:35   Page 452 of 452
13-53846-swr   Doc 4870-11   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 186 of
598

```
 1    impairment and the impairment can occur before there's
 2    another opportunity or requirement that people show up in
 3    front of a judge, then they start thinking about whether
 4    there's interim harm, but there's not a single case that has
 5    been cited to you that says there is imminent harm in
 6    circumstances where no one is going to suffer anything until
 7    and unless a court enters an order after notice,
 8    opportunities for discovery, opportunities for hearing, and
 9    all the other protections that are available in connection
10    with a plan confirmation process in a Bankruptcy Court.  It's
11    just totally different.  The cases are dealing with a totally
12    different situation, particularly the Donohue case.
13              Do you have -- we're 20 minutes to.
14              THE COURT:  Twenty till five.
15              MR. BENNETT:  Do you want to save time for your
16    questions or --
17              THE COURT:  If you want to stop now, and we'll pick
18    it up with the government's attorney, that's fine with me,
19    and then we'll pick up the balance of your argument tomorrow.
20    Is that what you're --
21              MR. BENNETT:  I think it's a good break point.
22              THE COURT:  Okay.
23              MR. BENNETT:  I have very minor things left.
24              THE COURT:  Good.
25              MR. TROY:  Matthew Troy, your Honor, Department of
```

1    Justice, Civil Division, on behalf of the United States.  If

2    it makes any difference to your Honor or the other parties, I

3    am here for tonight and can be available tomorrow as well.

4            THE COURT:  I appreciate that, but since you're

5    here, let's have at it.

6            MR. TROY:  Fair enough.

7            THE COURT:  Well, my primary questions relate to how

8    you address the arguments here that the objecting parties

9    made in response to your brief regarding ripeness.

10           MR. TROY:  To be honest with you, your Honor, I've

11   only reviewed those very quickly because I filed the brief on

12   Friday and then went back to furlough status.  And on

13   Monday --

14           THE COURT:  That.

15           MR. TROY:  And on Monday --

16           THE COURT:  Well, would it be your preference to

17   have overnight to think about how to respond to the

18   objectors' concerns regarding ripeness?

19           MR. TROY:  Sure.  I can do that.

20           THE COURT:  Would that be your preference?

21           MR. TROY:  That would be, yeah, a more fulsome

22   discussion, I think.

23           THE COURT:  All right.  Then you are excused, and I

24   will hear from you tomorrow regarding that.  Do you want to

25   stop for the day now and pick it up tomorrow?

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 454 of 454
13-53846-swr   Doc 4874-31   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 188 of
598

 1     MR. BENNETT:  Your pleasure, your Honor.  I can keep

 2  going, but I can also stop.  I'm not going to -- I don't

 3  have -- less than 30 minutes left, in fact, significantly

 4  less than 30 minutes left.

 5     THE COURT:  Well, do you think you can finish in the

 6  20 minutes that are left before five?

 7     MR. BENNETT:  I'll try.

 8     THE COURT:  All right.  Then I would invite you to

 9  try.

10     MR. BENNETT:  Let me just get a little bit

11  reorganized.  Okay.  The next topic on my list is collateral

12  estoppel, and, your Honor, I think with respect to collateral

13  estoppel, a couple of points are worth focusing on.  First of

14  all, our very, very first point on this -- and I think it's

15  dispositive -- is that when this case was filed, this Court

16  had the most exclusive jurisdiction it ever gets about

17  anything, absolutely exclusive interest -- exclusive

18  jurisdiction under 1334(a) to decide matters in the case, and

19  eligibility is a matter in the case.  And the assertion by

20  the objectors is that the Webster court really didn't decide

21  eligibility.  The Webster court was deciding some abstract

22  issues of state law.  And, your Honor, two things.  Number

23  one, the objectors can't even say that without mentioning the

24  eligibility determination, and here I'm looking at the

25  funds -- Mr. Gordon's brief at page 32.  The Webster judgment

1   rules squarely on the constitutionality of PA 436 and the

2   governor's authorization of the emergency manager to proceed

3   under Chapter 9 in light of the pensions clause of the

4   Michigan Constitution.  There was absolutely no confusion in

5   the judge's mind or anyone around that courtroom's mind that

6   what they were trying to do was to get an early determination

7   of eligibility.  It might have succeeded, but this case was

8   actually filed first.  And by the way, although the attorney

9   general will probably have more to say about this, there was

10  no adjournment sought for purposes of filing the Chapter 9

11  case, and the transcript shows no such thing.  And they know

12  more about the circumstances than I do, and they can address

13  it tomorrow when it's their turn.

14          But there's an even more important point, which is

15  that the order that was entered by the judge purports to

16  enjoin the emergency manager directing him to have the case

17  dismissed and not file another one, so I just -- I can't

18  abide the assertion and the record does not support the

19  assertion that what happened in that court was not an effort

20  at an eligibility determination, so, number one, that was

21  within the exclusive jurisdiction of this Court.  If it was

22  within the exclusive jurisdiction of this Court, it wasn't

23  within the jurisdiction of that Court to do anything about

24  it, and, therefore, any judgment that was entered after the

25  filing for that reason alone is void.

1      Now, second point we make is that the automatic stay

2  applied as well because the entire event, even though the

3  city was not a party, was an effort to gain control over the

4  city's assets and an effort to enhance collection of the

5  debt.  Again, there can't be much dispute about that, open

6  paren, one, partly because of the way the whole proceeding

7  evolved and how everyone understood it, but more importantly,

8  here again we have the judge explicitly talking about the

9  Chapter 9 case and attempting to stop the Chapter 9 case

10  because of the perception that the Chapter 9 case might

11  impair pensions, and those kinds of acts are clearly within

12  the automatic stay.  Again, I think that the --

13      THE COURT:  Just to be clear, you're talking about

14  the automatic stay of Section 362 --

15      MR. BENNETT:  Yes.

16      THE COURT:  -- the Bankruptcy Code.

17      MR. BENNETT:  Correct, the Bankruptcy Code's

18  automatic stay, or 942.  The other half of it is in the -- is

19  in Chapter 9 as well.

20      Full and fair opportunity to litigate.  Again, I

21  would ask the Court to look at the record in that case.

22  There had been -- it is certainly true that a whole bunch of

23  briefs that were filed -- I don't think the hearing where

24  this all occurred had previously been calendared and noticed

25  to anybody.  The hearing was set on an emergency basis, and

1   someone got on the phone and called for the attorney

2   general's office because they thought it might be a good idea

3   to tell him about it about an hour before the hearing.

4   That's actually not the way things are fully and fairly

5   litigated in any courts I visit, and I don't think that when

6   your Honor ticks through the procedural elements of what

7   happened in that case in Lansing is going to be convinced

8   that there was a full and fair opportunity to litigate.

9           THE COURT:  Let me ask you just a sort of

10  administrative question regarding this.  Do we have in our

11  record here all of the pleadings and papers and dockets and

12  transcripts from that case?

13          MR. BENNETT:  I don't know if they're there yet.

14          MS. NELSON:  I believe I can answer that, your

15  Honor.  Assistant Attorney General Margaret Nelson.  It's my

16  understanding, no, those have not been submitted.  I do have

17  all of the transcripts, which I was prepared to present to

18  the Court when I make my argument, which now appears to be

19  tomorrow.  If the Court would like the submission of the

20  pleadings, we'll be happy to do that, although it's --

21          THE COURT:  Well, my understanding is that some of

22  the pleadings have been attached to various briefs, but I'm

23  just not sure if it's everything.

24          MS. NELSON:  There was only a -- there was --

25          THE COURT:  Just to --

1          MR. BENNETT:  We'll get it in.

2          THE COURT:  Yeah, exactly.  Just to be complete --

3          MS. NELSON:  Yes.

4          THE COURT:  -- let me make my request to you that

5   our record here include everything from that case, including

6   the docket.

7          MS. NELSON:  There's three cases, your Honor.

8          THE COURT:  Okay.

9          MS. NELSON:  And so -- that were filed separately --

10         THE COURT:  Well, but I think the --

11         MS. NELSON:  -- so I will submit everything --

12         THE COURT:  I think the one that's at issue here is

13  the one in which a judgment was entered.

14         MS. NELSON:  Correct.

15         THE COURT:  That's the one I need.

16         MS. NELSON:  So you want everything in the case in

17  which the judgment was entered the next day, including the

18  docket entries.

19         THE COURT:  Thank you.

20         MS. NELSON:  Would you also like the Court of

21  Appeals materials --

22         THE COURT:  Yes.

23         MS. NELSON:  -- because the Court of Appeals

24  materials were --

25         THE COURT:  Yes.

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 459 of 459
13-53846-swr   Doc 4870-31   Filed 04/27/13   Entered 04/27/13 21:22:45   Page 593 of
559

 1          MS. NELSON:  -- filed and a stay order entered

 2     thereto?

 3          THE COURT:  Just for --

 4          MS. NELSON:  <u>Webster</u>?

 5          THE COURT:  For completeness, yeah.  All right.  I

 6     have to -- I have to pause here.  I've been advised that the

 7     people in our overflow room couldn't hear this exchange, so I

 8     will just restate it for the record.  The attorney general's

 9     representative has agreed to provide to the Court in this

10     case the complete record from the <u>Webster</u> litigation not only

11     at the trial court level but at the Court of Appeals level,

12     including all pleadings and papers, transcripts, and docket

13     entries, the docket itself.  You may proceed, sir.

14          MR. BENNETT:  Okay.  Lastly, the last factor with

15     respect to collateral estoppel, your Honor, is the issue of

16     whether or not the judgment would be binding on the city in

17     any event.  Of course, the city was not a party to those

18     proceedings.  The assertion is made that the -- that there is

19     privity between the city and the state because they have a

20     common legal interest in some matters in connection with this

21     Chapter 9 case.  Frankly, I don't think those are the same

22     standard, and I think we covered that in our papers, but I

23     will say one other thing is that to the extent that there --

24     that the plaintiffs in those cases believed that the city was

25     in privity with the state with respect to those cases is an

13-53846-swr   Doc 4874-31   Filed 04/29/14   Entered 04/29/14 22:00:25   Page 460 of 460
13-53846-swr   Doc 4870-31   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 90 of
559
558

 1   additional reason why the automatic stay applied from the

 2   very beginning because if they thought that they were in a

 3   case with the state really trying to bind the city, then it

 4   is perfectly clear that they violated the automatic stay.

 5          I don't think I have any other material topics that

 6   I think we need to cover based upon the argument by others.

 7   If I've missed something or if your Honor has any questions,

 8   I'd be happy to take them.  Otherwise I'll allow the attorney

 9   general to take the floor tomorrow.

10          THE COURT:  Um-hmm.

11          MR. BENNETT:  We'll be done early.

12          THE COURT:  Okay.  Good.  We'll be in recess now

13   until 10 a.m. tomorrow morning.

14          MS. NELSON:  Your Honor, before you leave the bench,

15   may I just ask do you want those pleading -- do you want

16   everything submitted electronically?

17          THE COURT:  Yes, yes, in the record of this case.

18   Thank you.

19          THE CLERK:  All rise.  Court is adjourned.

20      (Proceedings concluded at 4:51 p.m.)

INDEX


<u>WITNESSES:</u>

     None

<u>EXHIBITS:</u>

     None


          I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    October 20, 2013
_____        _____
Lois Garrett

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

---

**Order Party: Name, Address and Telephone Number**

Name __Syncora Guarantee & Syncora Capital Assurance__

Firm __Kirkland & Ellis LLP__

Address __300 N. LaSalle__

City, State, Zip __Chicago, IL 60654__

Phone __312.862.3200__

Email __dustin.paige@kirkland.com__

**Case/Debtor Name:** City of Detroit, MI

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** _Hon. Steven Rhodes_

◉ **Bankruptcy**    ○ **Adversary**

○ **Appeal**    **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** __11/27/2013__    **Time of Hearing:** __9:00am__    **Title of Hearing:** _Hearing re Detroit Bankruptcy_

Please specify portion of hearing requested: ◉ **Original/Unredacted**   ○ **Redacted**   ○ **Copy** (2nd Party)

◉ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: _____

---

**Type of Request:**

◉ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

○ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free FTR Record Player™ onto your computer from www.ftrgold.com

**Signature of Ordering Party:**

_Dustin Paige_    Date: __12/2/13__

By signing, I certify that I will pay all charges upon completion of the transcript request.

FOR COURT USE ONLY

Transcript To Be Prepared By

Date        By

Order Received:

Transcript Ordered:

Transcript Received:

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## MOTION OF THE OBJECTORS TO COMPEL THE PRODUCTION OF PRIVILEGE LOG

The Objectors[1] submit this motion to compel the production of a privilege log by the Debtor City of Detroit (the "City") in connection with the City's document production relating to the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* [Doc. No. 1520] (the "DIP Motion") and pursuant to this Court's November 15, 2013 Order [Doc. No. 1743], Syncora's Request for the Production of

---

[1] Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora"). Ambac Assurance Corporation, the Retiree Association Parties, Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. (collectively "EEPK"), the Detroit Retired City Employees Association ("DRCEA") and the Retired Detroit Police and Fire Fighters Association ("RDPFFA") (collectively the "Retiree Associations"), the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and Financial Guaranty Insurance Company.

13-53846-swr Doc 3193 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 1 of 10
13-53846-swr Doc 1993 Filed 12/23/13 Entered 12/23/13 22:59:23 Page 1 of 10
559
464

Documents [Doc. No. 1775], and Federal Rule of Bankruptcy Procedure 7026. In support of this motion, the Objectors respectfully represent as follows:

## BACKGROUND

1. On November 5, 2013, the City of Detroit filed the DIP Motion requesting approval for postpetition financing. In connection with the DIP Motion, certain objecting parties filed a Motion for Leave to Conduct Limited Discovery (the "DIP Discovery Motion") [Doc. No. 1640]. The City opposed certain of the Objectors' requested discovery.

2. On November 14, 2013, this Court held a hearing on the DIP Discovery Motion and issued an Order granting in part the DIP Discovery Motion [Doc. No. 1743]. Consistent with this Court's Order granting in part the Objectors' DIP Discovery Motion, Syncora filed its Request for the Production of Documents ("Document Requests") with the Court pursuant to Local Bankruptcy Rule 7026-1 [Doc. No. 1775]. As part of its Document Requests, Syncora requested that, "[i]f the Debtor claims any that any privilege or protection excuses production of any document or part thereof, the Debtor must expressly make such claim in writing and provide a general description of the categories of documents being withheld and the basis for doing so, sufficient in detail for Syncora to determine whether there is an adequate basis for invoking privilege or protection." (Document Requests at 5.)

2

13-53846-tjt   Doc 4199   Filed 12/22/14   Entered 12/22/14 22:50:23   Page 465 of 10
13-53846-swr   Doc 1893   Filed 12/02/13   Entered 12/02/13 22:00:23   Page 2 of 10
559

465

3. The City produced documents to the Objectors on November 20, 2013. As part of this production, the City withheld multiple documents on privilege grounds. The City did not, however, provide a corresponding privilege log.

4. On December 2, 2013, counsel for Syncora requested that the City provide a privilege log in order to assess the City's privilege claims. In response to this request, counsel for the City stated that it had not planned to provide a privilege log. Counsel for Syncora noted that (a) it was entitled to receive such a log under the relevant Federal Rules of Bankruptcy Procedure and Federal Rules of Discovery and (b) a log was necessary, as a practical matter, to assess the City's privilege claims. The City ultimately stated that it did not intend to provide a privilege log, claiming that it had not agreed to do so and that it was not required to do so "under the rules."

5. In light of the City's refusal to comply with the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and the instructions in Syncora's Document Requests, the Objectors now seek to compel the production of a privilege log relating to the City's production of documents in connection with the DIP Motion.

3

13-53846-tjt   Doc 1899   Filed 12/02/13   Entered 12/02/13 22:59:23   Page 3 of 10
13-53846-swr   Doc 4394-3   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 466 of   466
559

## JURISDICTION

6.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

7.     The Objectors respectfully request the entry of an order substantially in the form of Exhibit 1 attached herein compelling the City to produce a privilege log or, in the alternative, finding that the City has waived privilege with respect to the documents withheld on that basis.

## BASIS FOR RELIEF

8.     Rule 26(b)(5) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7026, requires that a party claiming privilege must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  *In re Cont'l Capital Inv. Servs., Inc.*, BR 03-3370, 2011 WL 4624678 (Bankr. N.D. Ohio Sept. 30, 2011).

9.     A privilege log satisfies the requirements of Rule 26(b)(5).  *See Hoxie v. Livingston Cnty.*, CIV.A. 09-CV-10725, 2009 WL 5171845 (E.D. Mich. Dec.

4

22, 2009) *objections overruled,* 09-CV-10725, 2010 WL 457104 (E.D. Mich. Feb. 3, 2010) ("The [Defendants] must produce an adequate privilege log listing any and all documents which they withhold by claiming a privilege. . . . The [Defendants'] privilege log should contain sufficient information for the Court and Plaintiff to determine whether the withheld documents are properly subject to a privilege or protection.") (internal quotations and citations omitted).  Moreover, in the absence of a privilege log, a court may consider the privilege claimed by party waived.  *Id.*  ("The Court can reject the claim of privilege where the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege.")

10.    Although the City has withheld a number of responsive documents on privilege grounds, it has not provided any reason or basis for its privilege claims. In so doing, the City has violated Federal Rule of Civil Procedure 26(b)(5) and Federal Rule of Bankruptcy Procedure 7026.

11.    Thus, while the City is intent on moving forward with the DIP Motion in an expedited fashion — and has objected to the Objectors' attempts to obtain all of the discovery that is necessary to adequately assess the transaction at issue — it remains unwilling to comply with its most basic discovery obligations vis-à-vis the limited discovery it has agreed to provide.

12.     Accordingly, the Objectors respectfully request that the Court compel the production of a privilege log that contains sufficient information to meet the requirements of Rule 26(b)(5) or, in the alternative, reject the City's claim of privilege given the City's failure to demonstrate any basis for its claims.

## STATEMENT OF CONCURRENCE SOUGHT

13.     Local Bankruptcy Rule 9014-1 provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied." Local Rule 9014-1(g).

14.     Counsel for Syncora sought concurrence from opposing counsel for the relief requested in this motion on December 2, 2013. Counsel for the City did not agree to produce a privilege log.

## RESERVATION OF RIGHTS

15.     The Objectors file this motion without prejudice or waiver of their rights under the Bankruptcy Code.

WHEREFORE, the Objectors respectfully request that this Court (a) enter an order substantially in the form attached hereto as <u>Exhibit 1</u>, granting the relief sought herein; and (b) grant such other and further relief as the Court may deem proper.

6

13-53846-tjt   Doc 43843   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 469 of 10
13-53846-swr   Doc 1899   Filed 12/02/13   Entered 12/02/13 22:59:23   Page 6 of 10

559

469

Dated: December 2, 2013

/s/ *Stephen C. Hackney*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

By: */s/ Carol Connor Cohen*
Carol Connor Cohen
Caroline Turner English
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC 20036-5342
Telephone: (202) 857-6054
E-mail: Carol.Cohen@arentfox.com

-and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY 10019
Telephone: (212) 484-3900

7

13-53846-tjt   Doc 4193   Filed 04/22/14   Entered 04/22/14 22:00:23   Page 7 of 10
13-53846-swr   Doc 1969   Filed 12/02/13   Entered 12/02/13 22:59:23   Page 7 of 10
559
470

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI 48304
Telephone: (248) 540-3340
E-mail: bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By: */s/ Vincent J. Marriott, III*
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan 48084
Telephone: (248) 649-1200
Facsimile: (248) 649-2920
E-mail: howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**
1735 Market Street, 51st Flr.
Philadelphia, PA 19103
Phone: 215.864.8236
Fax: 215.864.9762
Email: marriott@ballardspahr.com

-and-

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware 19801
Telephone: (302) 252-4428

8

13-53846-swr Doc 4393 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 47 of 10
13-53846-tjt Doc 3193 Filed 12/02/13 Entered 12/02/13 22:59:23 Page 4 of 10
559
471

Facsimile:  (410) 361-8930
E-mail:  summersm@ballardspahr.com

*Attorneys for Hypothekenbank Frankfurt AG,*
*Hypothekenbank Frankfurt International S.A., and*
*Erste Europäische Pfandbrief- und*
*Kommunalkreditbank Aktiengesellschaft in*
*Luxemburg S.A. (collectively "EEPK")*

Thomas R. Morris
Karin F. Avery
**SILVERMAN & MORRIS, P.L.L.C.**
30500 Northwestern Highway, Suite 200
Farmington Hills, Michigan 48334
Telephone:  (248) 539-1330
Facsimile:  (248) 539-1355
E-mail:  morris@silvermanmorris.com
E-mail:  avery@silvermanmorris.com

-and-

**LIPPITT O'KEEFE, PLLC**
By: /s/ Ryan C. Plecha
Brian D. O'Keefe
Ryan C. Plecha
370 East Maple Road, 3rd Floor
Birmingham, Michigan  48009
Telephone:  (248); 646-8292
Facsimile:  (248) 646-8375
E-mail:  bokeefe@lippittokeefe.com
E-mail:  rplecha@lippittokeefe.com
*Attorneys for the Retiree Associations*

By:  */s/Robert D. Gordon*
Robert D. Gordon
Shannon L. Deeby
CLARK HILL PLC
151 South Old Woodward Avenue, Suite 200
Birmingham, MI  48009
Telephone:  (248) 988-5882

9

Facsimile:  (248) 988-2502
E-mail:  rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System
of the City of Detroit and the General Retirement
System of the City of Detroit*

By: _/s/ Mark R. James_____
Ernest J. Essad Jr.
Mark R. James
**WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.**
280 North Old Woodward Avenue, Suite 300
Birmingham, MI  48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
E-mail:  EJEssad@wwrplaw.com
E-mail:  mrjames@wwrplaw.com

-and-

Alfredo R. Pérez
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
E-mail:  Alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance
Company*

10

# SUMMARY OF ATTACHMENTS

Exhibit 1    Proposed Form of Order

Exhibit 2    Notice of Motion and Opportunity to Object

Exhibit 3    None [Brief not Required]

Exhibit 4    Certificate of Service

Exhibit 5    Affidavits [Not Applicable]

Exhibit 6    Documentary Exhibits [Not Applicable]

**<u>Exhibit 1</u>**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER GRANTING THE OBJECTORS' MOTION
## TO COMPEL THE PRODUCTION OF A PRIVILEGE LOG

This matter coming before the Court on the motion of the Objectors[1] to compel production of a privilege log in connection with the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)2, 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (the "DIP Motion") and entering an order compelling the production of a privilege log; the Court having reviewed the Objectors' Motion; and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The Objectors' motion is GRANTED.

---

[1]      Capitalized terms not otherwise defined herein have the meanings given to them in the Objectors' Motion to Compel the Production of a Privilege Log.

2.     The City must produce a privilege log setting forth the reasons for claiming privilege over any documents produced to the Objectors in connection with the DIP Motion.

3.     The Objectors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

4.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

_____

STEVEN W. RHODES
United States Bankruptcy Judge

## Exhibit 2

## Notice of Motion and Opportunity to Object

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## NOTICE OF MOTION OF THE OBJECTORS TO
## COMPEL THE PRODUCTION OF PRIVILEGE LOG

**PLEASE TAKE NOTICE** that on December 2, 2013, the Objectors filed the *Motion of the Objectors to Compel the Production of Privilege Log* (the "Motion ") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order compelling the City of Detroit (the "City") to produce a privilege log or, in the alternative, finding that the City has waived privilege with respect to the documents withheld on that basis.

**PLEASE TAKE FURTHER NOTICE that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Objectors' Motion or you want the Bankruptcy Court to consider your views on the Motion, by **December 17, 2013,** you or your attorney must:[1]

---

[1] Concurrently herewith, the Objectors are seeking expedited consideration and shortened notice of the Motion. If the Court grants such expedited consideration and shortened notice, the Objectors will file and serve notice of the new response deadline.

File with the Bankruptcy Court a written response to the Motion, explaining your position, electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:  (248) 646-5075

If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

---

[2]    A response must comply with F. R. Civ. P. 8(b), (c) and (e).

2

Dated: December 2, 2013    /s/ *Stephen C. Hackney*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

3

KE 28755652
13-58846-siw   Doc 43863   Filed 04/20/43   Entered 04/20/43 22:00:23   Page 481 of 4
13-53846-swr   Doc 1899-3   Filed 12/02/13   Entered 12/02/13 22:59:23   Page 481 of
559

# Exhibit 3

## None [Brief Not Required]

13-58846-siv   Doc 1899-4   Filed 04/20/43   Entered 04/20/43 22:09:23   Page 82 of 1
13-53846-swr   Doc 1899-4   Filed 12/02/43   Entered 12/02/43 22:09:23   Page 82 of 1
559
482

**<u>Exhibit 4</u>**

**None [Separate Certificate of Service to be Filed]**

# Exhibit 5

**Affidavits**
**[Not Applicable]**

**Exhibit 6**

**Documentary Exhibits**
**[Not Applicable]**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) |
|  | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) |
|  | ) Case No. 13-53846 |
| Debtor. | ) |
|  | ) Hon. Steven W. Rhodes |
|  | ) |

## SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC.'S DISCLOSURE OF EXHIBITS IN ADVANCE OF THE HEARING ON DECEMBER 17-19, 2013

On November 27, 2013 the Court held a hearing (the "Hearing") regarding Debtor's Motion for Entry of an Order Establishing Pre-Trial and Trial Procedures and Setting Additional Hearings and certain objections thereto (Dkt. Nos. 1821-1822). In accordance with the statements of counsel during the Hearing and by agreement of the parties, Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this disclosure of exhibits that it may use during the hearing on the City's Assumption Motion (Dkt. Nos. 17 and 157) and Motion to Approve Post-Petition Financing (Dkt. No. 1520) (the "Consolidated Hearing").

## Documents

Syncora may introduce the following documents as part of its examination of the City's witnesses or Syncora's witnesses during the Consolidated Hearing. Syncora reserves the right to use or refer to any of the City's exhibits or any of the exhibits of the other objectors.

13-53846-tjt Doc 4314-8 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 486 of
13-53846-swr Doc 1960 Filed 12/09/13 Entered 12/09/13 17:27:57 Page 1 of 9
559
486

| No. | Exhibit Description |
|-----|---------------------|
| 1 | 1992 ISDA Master Agreement Local Currency Single Jurisdiction, dated as of May 25, 2005 between UBS and the GRS Service Corporation |
| 2 | June 7, 2006 SBS and UBS ISDA Master Agreements Local Currency Single Jurisdiction and corresponding Schedules |
| 3 | June 26, 2009 SBS and UBS Amended and Restated Schedules to the 1992 ISDA Master Agreements Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 4 | Waiver and Consent of FGIC, dated June 26, 2009 (Pérez Decl. Ex. T) |
| 5 | Waiver and Consent of Syncora, dated June 26, 2009 |
| 6 | Detroit City Code § 18-16-4 |
| 7 | June 15, 2009 Collateral Agreement |
| 8 | July 15, 2013 Forbearance and Optional Termination Agreement |
| 9 | XL Capital Assurance Swap Insurance Policy Numbers CA03049E, CA03049D, CA03049C and CA03049B, dated June 12, 2006 |
| 10 | GRS Service Contract 2005 dated May 25, 2005, between the Detroit General Retirement System Service Corporation and the City |
| 11 | PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City |
| 12 | GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. G) |
| 13 | PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. H) |
| 14 | Contract Administration Agreement, dated June 12, 2006 |
| 15 | Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee |
| 16 | XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 |

2

13-53846-tjt   Doc 4310   Filed 04/29/14   Entered 04/29/14 12:00:23   Page 487 of
13-53846-swr   Doc 4310-3   Filed 04/29/14   Entered 04/29/14 12:00:23   Page 2 of
559

487

| No. | Exhibit Description |
|-----|---------------------|
| 17 | U.S. Bank Notice of Event of Default Regarding the City of Detroit, Michigan to Swap Counterparties and Ratings Agencies dated July 26, 2013 |
| 18 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2005-A and 2006-B Certificates of Participation dated July 26, 2013 |
| 19 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2006-A and 2006-B Certificates of Participation dated July 26, 2013 |
| 20 | City Ordinance No. 03-05 (Pérez Decl. Ex. A) |
| 21 | City Ordinance 04-05 (Pérez Decl. Ex. B) |
| 22 | City Ordinance No. 05-05 (Pérez Decl. Ex. C) |
| 23 | City Ordinance No. 05-09 (Pérez Decl. Ex. Q) |
| 24 | FGIC Municipal Bond New Issue Insurance Policy Number 06010249, dated June 12, 2006 (Pérez Decl. Ex. J) |
| 25 | FGIC Municipal Bond New Issue Insurance Policy Number 06010250, dated June 12, 2006 (Pérez Decl. Ex. K) |
| 26 | Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. N) |
| 27 | Revised Confirmation to the PFRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. O) |
| 28 | FGIC Swap Surety Policy Number 0602052 dated June 12, 2006 (Pérez Decl. Ex. P) |
| 29 | FGIC Swap Surety Policy Numbers 06010253, 06010254 and 06010255, dated June 12, 2006 |
| 30 | Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013 (Pérez Decl. Ex. L) |
| 31 | Project Piston Cash Flow Forecast - monthly (FY 2013, FY 2014, FY 2015), as of June 21, 2013 |

| No. | Exhibit Description |
|-----|--------------------|
| 32 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2005-A Certificates of Participation dated July 26, 2013 |
| 33 | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2006-A and 2006-B Certificates of Participation dated July 26, 2013 |
| 34 | Jones Day - Syncora NDA (Swap Proposal) dated July 10, 2013 |
| 35 | Forbearance and Optional Termination Agreement term sheet |
| 36 | Email from Cheryl Johnson to A. Neely re Status of Swap dated December 3, 2012 |
| 37 | Email from Reuters to Press Secretary re Status of Swap Contract dated November 30, 2012 |
| 38 | Joint Stipulation of Facts of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. and U.S. Bank National Association |
| 39 | Declaration of Charles Moore In Support of DIP Motion (Exhibit 5A to DIP Motion) |
| 40 | Declaration of James Doak In Support of DIP Motion (Exhibit 5B to DIP Motion) |
| 41 | Barclays Commitment Letter (Exhibit 6A to DIP Motion) |
| 42 | Bond Purchase Agreement (Exhibit 6B to DIP Motion) |
| 43 | Financial Recovery Bond Trust Indenture (Exhibit 6C to DIP Motion) |
| 44 | Emergency Manager Order No. 17 (Exhibit 7 to DIP Motion) |
| 45 | June 13, 2013 Correspondence from the City to U.S. Bank National Association ("USBNA") |
| 46 | June 17, 2013 correspondence from Syncora Capital Assurance, Inc. ("Syncora") to USBNA |
| 47 | June 24, 2013 correspondence between and among counsel to USBNA, Syncora and the City |
| 48 | June 24, 2013 correspondence from Syncora's counsel to counsel to USBNA |

| No. | Exhibit Description |
|-----|---------------------|
| 49 | June 26, 2013 correspondence from the Syncora to the City |
| 50 | July 15, 2013 correspondence from Syncora to SBS Financial Product Company, LLC ("SBS") |
| 51 | July 16, 2013 correspondence from Syncora to the City |
| 52 | January 13, 2013 City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team (Orr Declaration Ex. C) |
| 53 | March 26, 2013 Report of the Detroit Financial Review Team (Orr Declaration Ex. D) |
| 54 | April 4, 2012 Financial Stability Agreement (Orr Declaration Ex. E) |
| 55 | December 14, 2012 Preliminary Review of the City of Detroit (Orr Declaration Ex. F) |
| 56 | February 19, 2013 Report of the Detroit Financial Review Team (Orr Declaration Ex. G) |
| 57 | March 1, 2013 letter from Governor Richard Snyder to the City (Orr Declaration Ex. H) |
| 58 | Exit Engagement Letter (Exhibit B to Syncora Objection to DIP Motion) |
| 59 | Email from Anne Marie Langan to Todd Snyder (Exhibit C to Syncora Objection to DIP Motion) |
| 60 | Moody's Report (Exhibit E to Syncora Objection to DIP Motion) |
| 61 | Funding for Detroit Announced on Sept. 27, 2013 (Exhibit F to Syncora Objection to DIP Motion) |
| 62 | Cash Flow Variance Report June 2013 (Exhibit G to Syncora Objection to DIP Motion) |
| 63 | Cash Flow Variance Report FY 2014 (Exhibit H to Syncora Objection to DIP Motion) |
| 64 | Syncora Proposal (Exhibit I to Syncora Objection to DIP Motion) |

| No. | Exhibit Description |
|-----|---------------------|
| 65 | Professional Service Contract Transmittal Record (Moore Dep. Ex. 1) |
| 66 | June 14, 2013 Creditor Proposal (Moore Dep. Ex. 3) |
| 67 | Detroit Police Times No Guide to Effectiveness news article (Moore Dep. Ex. 4) |
| 68 | Detroit Police Dashboard (Moore Dep. Ex. 5) |
| 69 | City of Detroit Operational Restructuring Summary, dated November 11, 2013 (Moore Dep. Ex. 7) |
| 70 | City of Detroit Restructuring Priorities (DTPFF0012709) (Moore Dep. Ex. 8) |
| 71 | Project Piston Cash Flow Forecast -Through FY 2017 (DTPFF0020055) (Moore Dep. Ex. 9) |
| 72 | Key Operational Updates as of September 24, 2013 (DTPPF00011728) (Moore Dep. Ex. 10) |
| 73 | Request for the Amendment to the FY 2014 Budget of the City of Detroit (Moore Dep. Ex. 11) |
| 74 | Letter Dated August 26, 2013 with attached term sheets (DTPPF00016682) (Doak Dep. Ex. 2) |
| 75 | Detroit Post-Petition Financing Briefing Materials for City Council (DTPPF00012993) (Doak Dep. Ex. 3) |
| 76 | Detroit Post-Petition Financing Briefing Materials Prepared for Members of City Council (DTPPF00020039) (Doak Dep. Ex. 4) |
| 77 | Post-Petition Financing Discussion (DTPPF00020215) (Doak Dep. Ex. 5) |
| 78 | Barclays Fee Letter (Doak Dep. Ex. 12) |
| 79 | Detroit Post-Petition Financing Materials for Financial Advisory Board, dated 11/4/13 (DTPPF00001959) (Doak Dep. Ex. 14) |
| 80 | Email from Thomas Gavin to James Doak (Doak Dep. Ex. 15) |

| No. | Exhibit Description |
|-----|---------------------|
| 81 | City of Detroit Post-Petition Financing Contact List (DTPPF00016847) |
| 82 | Detroit PPF All-In Cost Analysis (DTPPF00013761) |
| 83 | 6/22/13 email from K. Buckfire (DTMI80335) |
| 84 | 7/5/13 email from Erin Smith (DTMI00107294) |
| 85 | 7/5/13 email from Bill Nowling (DTMI00111238) |
| 86 | Abernathy MacGregor Invoice (DTMI00112208) |
| 87 | Syncora and FGIC Outline of Terms and Conditions (DTPPF00000191) |
| 88 | 6/12/13 email from Andrew Dillon (DTMI00114984) |
| 89 | 6/24/13 email from Kevyn Orr (DTMI00114531) |
| 90 | 6/29/13 email from Kevyn Orr (DTMI00101514) |
| 91 | 6/24/13 email from Kevyn Orr (DTMI00115562) |
| 92 | June 14, 2013 Proposal to Creditors |
| 93 | June 14, 2013 Proposal to Creditors (Executive Summary) |
| 94 | Responses to Inquiries from City Council (DTPPF00020357) |

Syncora reserves the right to supplement this list with additional documents including, but not limited to, any documents utilized in the depositions of witnesses in connection with the Consolidated Hearing.

7

13-53846-tjt   Doc 431-3   Filed 04/29/13   Entered 04/29/13 12:00:23   Page 492 of
13-53846-swr   Doc 1963   Filed 12/09/13   Entered 12/09/13 17:27:07   Page 492 of
559

492

Dated: December 9, 2013        Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By:    */s/ Stephen C. Hackney*
       James H.M. Sprayregen, P.C.
       Ryan Blaine Bennett
       Stephen C. Hackney
       KIRKLAND & ELLIS LLP
       300 North LaSalle
       Chicago, Illinois 60654
       Telephone:   (312) 862-2000
       Facsimile:    (312) 862-2200

             - and -

       Stephen M. Gross
       David A. Agay
       Joshua Gadharf
       MCDONALD HOPKINS PLC
       39533 Woodward Avenue
       Bloomfield Hills, MI 48304
       Telephone:   (248) 646-5070
       Facsimile:    (248) 646-5075

       *Attorneys for Syncora Guarantee Inc. and*
       *Syncora Capital Assurance Inc.*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x

|                              |   |                          |
|------------------------------|---|--------------------------|
|                              | : |                          |
| In re                        | : | Chapter 9                |
|                              | : |                          |
| CITY OF DETROIT, MICHIGAN,   | : | Case No. 13-53846        |
|                              | : |                          |
| Debtor.                      | : | Hon. Steven W. Rhodes    |
|                              | : |                          |
|                              | : |                          |

-------------------------------------------------------x

## DEBTOR'S LIST OF EXHIBITS FOR HEARING ON THE CITY OF DETROIT'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]

1.    As contemplated by the proposed Scheduling Order filed by the City on December 6, 2013, and for purposes of the hearing on the City's Assumption Motion [Dkts. # 17, #157] and Motion to Approve Post-Petition Financing [Dkt. 1520] (together, the "City's Motions"), scheduled to take place on December 17, 18 and 19, 2013, the City identifies the following exhibits that it may use at the Evidentiary Hearings related to the City's Motions.

| City's Exhibit No. | Exhibit Description |
|--------------------|---------------------|
| 1. | June 7, 2006, ISDA Master Agreement between UBS AG and Detroit General Retirement System ("GRS") Service Corporation (Local Currency Single Jurisdiction), and related Schedule |
| 2. | June 7, 2006. ISDA Master Agreement between SBS Financial Products Company, LLC ("SBS") and GRS Service Corporation (Local Currency Single Jurisdiction), and related |

13-53846-swr  Doc 1983  Filed 12/09/14  Entered 12/09/14 23:09:33  Page 1 of 13
13-53846-swr  Doc 3963  Filed 04/29/14  Entered 04/29/14 18:00:33  Page 494 of
559
494

| City's Exhibit No. | Exhibit Description |
|---|---|
| | Schedule |
| 3. | March 30, 2009, Term Sheet: Summary of Terms for Settlement between SBS, Merrill Lynch Capital Services, Inc., and UBS AG (collectively, the "Counterparties), and GRS Service Corporation and the Detroit Police and Fire Retirement System ("PFRS") Service Corporation (collectively the "Service Corporations) |
| 4. | June 26, 2009, SBS and GRS Service Corporation Amended and Restated Schedules to 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 5. | June 26, 2009, UBS AG and GRS Service Corporation Amended and Restated Schedule to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 6. | June 26, 2009, Waiver and Consent of Insurer Syncora, with Exhibits |
| 7. | Detroit, Mich. Code § 18-16-4 |
| 8. | July 5, 2013, Transcript of Hearing, City of Detroit v. Syncora, No. 13-008858-CZ, 3rd Cir. Ct. Co. of Wayne (Hon. A. J. Berry, presiding) |
| 9. | July 4, 2013, Affidavit of Kevyn D. Orr, City of Detroit v. Syncora Guar. Inc., No.: 2:13-cv-12987 (E.D. Mich) |
| 10. | June 14, 2013, City of Detroit ("City") Proposal for Creditors Executive Summary |
| 11. | June 15, 2009, Collateral Agreement among the City, the Service Corporations, and U. S. Bank National.Association ("USBNA") |
| 12. | June 13, 2013, Letter from Orr to USBNA regarding Written Instructions to Custodian Under Collateral Agreement |
| 13. | June 17, 2013, Letter from LeBlanc (Syncora) to USBNA regarding Collateral Agreement dated June 15, 2009 regarding Detroit Retirement Systems with U.S. Bank as Custodian |
| 14. | June 24, 2013, Email from Bennett (Syncora) to Smith (USBNA) regarding USB – Detroit – Casino Revenue Collateral Account, forwarding June 24, 2013 email from Smith to Ball. |

| City's Exhibit No. | Exhibit Description |
|---|---|
| 15. | June 24, 2013, Letter from Bennett (Syncora) to Smith (USBNA) regarding General Receipts Subaccount under the Collateral Agreement dated June 15, 2009 |
| 16. | June 25, 2013, Letter from Orr to Syncora regarding Instructions to Custodian under Collateral Agreement |
| 17. | June 26, 2013, Letter from LeBlanc (Syncora) to the City regarding Instructions to Custodian Under Collateral Agreement |
| 18. | July 15, 2013, Forbearance and Optional Termination Agreement among the Service Corporations, the City, the Emergency Manager, UBS AG, and Merrill Lynch Capital Services, Inc. |
| 19. | July 15, 2013, Letter from Lundy (Syncora) to SBS |
| 20. | July 16, 2013, Letter from LeBlanc (Syncora) to Orr |
| 21. | July 17, 2013, Letter from Orr to LeBlanc (Syncora) regarding July 16 Letter |
| 22. | July 17, 2013, Letter from Carter (SBS) to Lundy (Syncora) |
| 23. | July 18, 2013, Declaration of Gaurav Malhotra In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration") |
| 24. | Annual Cash Flow Summary FY 2012-FY 2015; Monthly Cash Flow Forecast FY 2014 and FY 2015 – Base Case [Malhotra Declaration Ex. A] |
| 25. | Ten-Year Financial Projections [Malhotra Declaration Ex. B] |
| 26. | Legacy Expenditures (Assuming No Restructuring) [Malhotra Declaration Ex. C] |
| 27. | Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. D] |
| 28. | Schedule of water system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. E] |
| 29. | Annual Debt Service on Revenue Bonds [Malhotra Declaration Ex. F] |

| City's Exhibit No. | Exhibit Description |
|---|---|
| 30. | Schedule of COPs and Swap Contracts as of June 30, 2012 [Malhotra Declaration Ex. G] |
| 31. | Annual Debt Service on COPs and Swap Contracts [Malhotra Declaration Ex. H] |
| 32. | Schedule of UTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. I] |
| 33. | Schedule of LTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. J] |
| 34. | Annual Debt Service on General Obligation Debt & Other Liabilities [Malhotra Declaration Ex. K] |
| 35. | July 18, 2013, Declaration of Kevyn D. Orr In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration") |
| 36. | June 14, 2013, City of Detroit Proposal for Creditors [Orr Declaration Ex. A] |
| 37. | January 13, 2013, City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team [Orr Declaration Ex. C] |
| 38. | March 26, 2013, Report of the Detroit Financial Review Team [Orr Declaration Ex. D] |
| 39. | April 4, 2012, Financial Stability Agreement Between the City and the Michigan Department of Treasury [Orr Declaration Ex. E] |
| 40. | December 14, 2012, Preliminary Review of the City of Detroit [Orr Declaration Ex. F] |
| 41. | February 19, 2013, Report of the Detroit Financial Review Team; Supplemental Documentation of the Detroit Financial Review Team [Orr Declaration Ex. G] |
| 42. | March 1, 2013, Letter from Governor Snyder to Bing and the City Council [Orr Declaration Ex. H] |
| 43. | July 8, 2013, Ambac Comments on Detroit [Orr Declaration Ex. I] |
| 44. | July 16, 2013, Letter from Orr to Governor Snyder and Treasurer Dillon regarding Recommendation Pursuant to Section 18(1) of PA 436 [Orr Declaration Ex. J] |
| 45. | July 18, 2013, Letter from Governor Snyder to Orr and |

4

| City's Exhibit No. | Exhibit Description |
|---|---|
| | Treasurer Dillon regarding Authorization to Commence Chapter 9 Bankruptcy Proceeding [Orr Declaration Ex. K] |
| 46. | July 18, 2013, Emergency Manager Order No. 13 Filing of a Petition Under Chapter 9 of Title 11 of the United States Code [Orr Declaration Ex. L] |
| 47. | June 12, 2006, UBS AG Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement |
| 48. | June 12, 2006, SBS Insurance Policies for Scheduled Paymentw of GRS Service Corporation under June 7, 2006 Master Agreement |
| 49. | 2009 Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78) |
| 50. | July 31, 2013, First Amendment to Forbearance and Optional Termination Agreement |
| 51. | August 12, 2013, Second Amendment to Forbearance and Optional Termination Agreement |
| 52. | August 23, 2013, Third Amendment to Forbearance and Optional Termination Agreement |
| 53. | August 29, 2013, Fourth Amendment to Forbearance and Optional Termination Agreement |
| 54. | September 4, 2013, Fifth Amendment to Forbearance and Optional Termination Agreement |
| 55. | October 15, 2013, Letter from Orr to Treasurer Dillon enclosing Quarterly Report of the Emergency Manager Pursuant to Section 9(5) of PA 436. |
| 56. | September 3, 2013, E-mail from Doak to Gerbino regarding City of Detroit Financing, including attachments of September 3, 2013, Letter from Miller Buckfire to Gerbino, July 15, 2013, Forbearance and Optional Termination Agreement, and Undated Model "Summary of Certain Key Terms and Conditions" [DTPFF00015602- DTPFF00015638] |
| 57. | September 4, 2013, Ernst & Young, Project Piston 13-Week Cash Flow Forecast (DIP Financing Scenario) [DTPFF00002227- DTPFF00002230] |
| 58. | September 4, 2013, Ernst & Young, Project Piston Cash Flow Forecast Through FY 2017 (DIP Financing Scenario) |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | [DTPFF00014812- DTPFF00014824] |
| 59. | September 30, 2013, Ernst & Young, 13-Week Cash Flow Forecast – Restructuring Scenario (including reinvestment; DIP transaction assumed after 12/31) [DTPFF00002232] |
| 60. | October 2013, Ernst & Young, Project Piston, Comparison of DIP vs. Creditor Plan Restructuring [DTPPF00002226] |
| 61. | July 5, 2013, Response to City of Detroit Financing RFP from J.P. Morgan [DTPPF00000624-DTPPF00000633] |
| 62. | July 5, 2013, Letter from Brownstein to Corio regarding Citibank, N.A, Response to City of Detroit Financing RFP [DTPPF00000650-DTPPF00000656] |
| 63. | September 16, 2013, Goldman Sachs "Summary of Certain Key Terms and Conditions," and related documents, responding to City of Detroit Financing RFP [DTPPF00000985-DTPPF00001005] |
| 64. | September 16, 2013, Letter from Klein and Flanagan to Corio, and related documents, regarding Jefferies LLC response to City of Detroit Financing RFP [DTPPF00001011-DTPPF00001039] |
| 65. | September 2013, Deutsche Bank "City of Detroit discussion materials" responding to City of Detroit Financing RFP [DTPPF00000944-DTPPF00000958] |
| 66. | Undated, Canyon Capital Advisors LLC "Summary of Key Terms and Conditions" responding to City of Detroit Financing RFP. [DTPPF00000903-DTPPF00000907] |
| 67. | September 16, 2013, Letters from Ambac Assurance Corporation, Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation, with attached "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00000826-DTPPF00000837] |
| 68. | September 16, 2013, Letter from Marc Sole to Miller Buckfire, attaching Hudson Bay Capital Management LP "Summary of Certain Key Terms and Conditions" in response to City of Detroit Financing RFP.[DTPPF00001006-DTPPF00001010] |
| 69. | September 16, 2013, Letter from Fundamental Advisors LP to Corio, attaching "Indicative Summary of Certain Key Terms |

6

| City's Exhibit No. | Exhibit Description |
|---|---|
|  | and Conditions," responding to City of Detroit Financing RFP [DTPPF00000961-DTPPF00000980] |
| 70. | Undated, Silver Point Finance, LLC: "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP [DTPPF00001572-DTPPF00001577] |
| 71. | September 16, 2013, Letter from Gerbino to Miller Buckfire, attaching Barclay's "Summary of Indicative Terms and Conditions of Swap Termination Note," "Summary of Indicative Terms and Conditions of Quality of Life Note," "Summary of Indicative Terms and Conditions of the Replacement Swap Transaction," and "Muni Swap Confirmation," responding to City of Detroit Financing RFP [DTPPF00000856-DTPPF00000902] |
| 72. | September 16, 2013, Letter from Gubner to Miller Buckfire regarding PIMCO Distressed Credit Fund, L.P., "Letter of Intent – Proposed DIP Facility" responding to City of Detroit Financing RFP [DTPPF00001040-DTPPF00001057] |
| 73. | September 16, 2013, Letter from Kersten to Corio, attaching CarVal Investors "Proposal A" and "Proposal B," responding to City of Detroit Financing RFP. [DTPPF00000908-DTPPF00000943] |
| 74. | September 16, 2013, "Proposal for Post-Petition Financing" by Bank of America Merrill Lynch, responding to City of Detroit Financing RFP. [DTPPF00000838-DTPPF00000855] |
| 75. | September 16, 2013, Amalgamated Bank "Expression of Interest," responding to City of Detroit Financing RFP. [DTPPF00000821-DTPPF00000825] |
| 76. | September 12, 2013, Letter from Antonczak to Corio regarding Flagstar Bank's response to City of Detroit Financing RFP. [DTPPF00000959-DTPPF00000960] |
| 77. | October 8, 2013, Email from Cherner to Doak regarding Beal Bank USA's Detroit DIP Financing Indicative Term Sheet in response to City of Detroit Financing RFP. [DTPPF00013170-DTPPF00013195] |
| 78. | October 3, 2013, Syncora DIP Term Sheet regarding Syncora Capital Assurance Inc.'s ("Syncora") and Financial Guaranty Insurance Company's ("FGIC") DIP financing proposal [DTPPF00000035- DTPPF00000037] |

7

13-53846-tjt  Doc 4311-3  Filed 04/29/14  Entered 04/29/14 22:00:33  Page 500 of 559
13-53846-swr  Doc 1963  Filed 12/09/13  Entered 12/09/13 18:00:33  Page 7 of 13    500
559

| City's Exhibit No. | Exhibit Description |
|---|---|
| 79. | October 25, 2013, Syncora DIP Term Sheet regarding Syncora's DIP financing proposal [DTPPF00001578- DTPPF00001580] |
| 80. | September 2013, Syncora and FGIC's Outline of Terms and Conditions for Secured First Lien, First out DIP Loan Facility in the Amount of $350 Million [DTPPF00013640- DTPPF00013656] |
| 81. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Commitment to $350,000,000 in Post-Petition Financing.[ DTPPF00003377- DTPPF00003404] |
| 82. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Engagement Letter for Exit Financing [DTPPF00003405- DTPPF00003415] |
| 83. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Fee Letter [DTPPF00003416- DTPPF00003420] |
| 84. | September 30, 2013, Goldman Sachs' Draft Commitment Letter, including Annex A and B [DTPPF00001543- DTPPF00001567] |
| 85. | September 30, 2013, Goldman Sachs' Draft Fee Letter [DTPPF00001568- DTPPF00001571] |
| 86. | September 30, 2013, Letter from Stephens to Orr regarding Bank of America Merrill Lynch Commitment Letter with Annex A through C, and a "Proposal for Post-Petition Financing" [DTPPF00001058- DTPPF00001086] |
| 87. | October 2, 2013, Letter from Kersten to The City of Detroit regarding CarVal Investors Commitment Letter, including Exhibit A [DTPPF00011494- DTPPF00011516] |
| 88. | September 26, 2013, Miller Buckfire, "Post-Petition Financing Discussion" [DTPPF000202215- DTPPF00020225] |
| 89. | October 3, 2013, Miller Buckfire, "Draft Detroit Post-Petition Financing: Commitment Letter Summaries" [DTPPF00020226- DTPPF00020231] |
| 90. | October 7, 2013, Miller Buckfire, "Briefing Materials Prepared for Members of City Council" [DTPPF00020039- DTPPF00020071] |
| 91. | October 17, 2013, Miller Buckfire, "Briefing Material Prepared for City Council Closed Session" " |

8

13-53846-tjt  Doc 4313-3  Filed 04/29/14  Entered 04/29/14 22:00:33  Page 501 of 13
13-53846-swr  Doc 1963  Filed 12/09/13  Entered 12/09/13 18:07:33  Page 5 of 13   501
559

| City's Exhibit No. | Exhibit Description |
|---|---|
| | [DTPPF00012993- DTPPF00013024] |
| 92. | November 4, 2013, Miller Buckfire, "Briefing Materials Prepared for the Financial Advisory Board" " [DTPPF00001959- DTPPF00001968] |
| 93. | October 6, 2013, Barclay's Fee Letter fully executed by Barclay's and City  [Filed as Docket No. 1761] |
| 94. | October 6, 2013, Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City  [Filed as Docket No. 1520; Exhibit 6A] |
| 95. | 2013 Draft Financial Recovery Bonds Series 2013A (Swap Termination) Bond Purchase Agreement  [Filed as Docket No. 1520; Exhibit 6B] |
| 96. | October 8, 2013, Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing [DTPPF00001366- DTPPF00001406] |
| 97. | October 11, 2013, Letter from State Treasurer Dillon to Orr Approving Financing [DTPPF00012230-DTPPF00012233] |
| 98. | October 11, 2013, Email from Hayes to City Council attaching October 11, 2013, Letter from Orr to All City Council Members Re:  Emergency Manager's Order No. 17: Approval of Postpetition Financing; October 11, 2013 Emergency Manager Order No. 17; Undated Barclay's "Summary of Indicative Terms and Conditions of Quality of Life Loan;" and, Undated City Council Resolution Approving Post Petition Financing [DTPPF00019623-DTPPF00019655] |
| 99. | October 11, 2013, Email from Hayes to Bonsall, et al., attaching October 11, 2013, Letter  from Orr to Mayor Bing regarding Emergency Manager's Order No. 17:  Approval of Postpetition Financing; October 11, 2013 Emergency Manager Order No. 17; and, Undated Barclay's "Summary of Indicative Terms and Conditions of Quality of Life Loan" [DTPPF00019592-DTPPF00019622] |
| 100. | November 6, 2013, Letter from Bulger to Goodrich regarding City of Detroit's submission to Local Emergency Financial Assistance Loan Board |
| 101. | November 5, 2013,  Declaration of Charles M. Moore In Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364 (c)(1), 364(c)(2), 364(e), 364(f), |

9

13-53846-swr  Doc 4394-3  Filed 04/29/14  Entered 04/29/14 23:00:33  Page 50 of 13
559
13-53846-tjt  Doc 4303  Filed 04/29/14  Entered 04/29/14 18:07:16  Page 502 of  502

| City's Exhibit No. | Exhibit Description |
|---|---|
| | 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Filed as Docket No. 1520; Exhibit 5A] |
| 102. | November 5, 2013, Declaration of James Doak In Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364 (c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Filed as Docket No. 1520; Exhibit 5B] |
| 103. | November 11, 2013, City of Detroit, Operational Restructuring Summary |
| 104. | November 12, 2013, City of Detroit, Operational Restructuring Summary |
| 105. | September 27, 2013, Funding for Detroit Announced by Federal Government |
| 106. | June 21, 2013, Ernst & Young, Project Piston, Cash Flow Forecast – Monthly (FY 2013, FY 2014, FY 2015) |
| 107. | June 21, 2013, Ernst & Young, Project Piston, Cash Flow Forecast (including Restructuring Scenario) |
| 108. | September 16, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017  (DIP Financing Scenario) |
| 109. | October 3, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP) |
| 110. | September 17, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (Casino Trap; No DIP) |
| 111. | September 18, 2013, Ernst & Young, Illustrative Cash Chart |

2.     The City reserves the right to supplement its list of exhibits, as provided for in the proposed Scheduling Order.

3.     The City will exchange copies of its exhibits on counsel for any objecting parties on a mutually agreeable schedule.

4.      The City also reserves the right to utilize demonstrative exhibits at either a deposition or the Evidentiary Hearing.  The City will serve copies of any such demonstratives on counsel for any objecting party in advance of its use at a deposition or the Evidentiary Hearing.

5.      As of the date of this filing, some objectors have filed Exhibit Lists.  However, no objector has provided copies of the exhibits listed, which are necessary in light of the sometimes vague and inadequate descriptions of the listed exhibits.  Therefore, the City reserves its rights to assert objections to any exhibits identified by an objecting party after such exhibits have been both identified, and provided, to the City.

Dated: December 9, 2013          Respectfully submitted,

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 243-2382
Facsimile:    (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
Geoffrey S. Irwin
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

 - and -

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.

ATTORNEYS FOR THE CITY OF
DETROIT

12

## Certificate of Service

I, Bruce Bennett, hereby certify that the foregoing **DEBTOR'S LIST OF EXHIBITS FOR HEARING ON THE CITY OF DETROIT'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]** was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter on this 9th day of December 2013.

/s/ Bruce Bennett_____
Bruce Bennett

13-53846-swr   Doc 1983   Filed 12/09/13   Entered 12/09/13 18:07:30   Page 13 of 13
13-53846-swr   Doc 4843   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 506 of 559

506

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

---

In re

CITY OF DETROIT, MICHIGAN,

      Debtor,

---

:
:
:
:
:
:
:
:
:
:

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

## OMNIBUS REPLY OF THE DEBTOR TO OBJECTIONS TO DEBTOR'S MOTION FOR APPROVAL OF POSTPETITION FINANCING

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................1

SUMMARY OF OBJECTIONS ........................................................6

REPLY ...........................................................................................7

    A.    The Broad Review Advanced By The Objectors Is Not Justified .......7

        1.    The Quality Of Life Initiatives Are An Exercise Of The City's Political Judgment About How Best To Fulfill Its Governmental Obligations ..........................................................8

        2.    Section 904 Prohibits Efforts By Creditors To Second-Guess the City's Political Judgments.........................................9

        3.    The City's Effort To Obtain Approval Of Liens And Superpriority Claims Under Section 364(c) Is Not Consent To The Broad Review Advanced By The Objectors ...............................................................................11

    B.    Appropriate Standard of Review For the Relief Sought in the Motion ....................................................................................13

        1.    Applicability of the *Farmland* Factors ...................................13

        2.    The Financing Should be Approved Even Under *Farmland* Factors....................................................................16

            a.    The Financing is a Sound Exercise of the City's Judgment.......................................................................16

            b.    The Financing Satisfies Any Appropriate "Best Interests" Analysis ........................................................21

            c.    The Terms of Financing are Fair and Reasonable and There Were No Better Alternative Financing Options Available .........................................................28

            d.    A Section 364(e) Finding is Appropriate ......................32

    C.    Key Investments in the City Must Begin Now ...............................37

        1.    The City is Not Required to Wait Until Plan Confirmation to Begin Critical Investments..............................37

        2.    The Financing is Not a *Sub Rosa* Plan....................................39

    D.    The Super-Priority Claim Objections Are Specious ..........................41

CONCLUSION ............................................................................................42

CHI-1912664v7

# TABLE OF AUTHORITIES

<div align="right">

**Page**

</div>

CASES

Anchor Sav. Bank FSB v. Sky Valley, Inc.,
  99 B.R. 117 (N.D. Ga. 1989) ...................................................................22

Fano v. Newport Heights Irr. Dist.,
  114 F.2d 563 (9th Cir. 1940) .............................................................24, 25

In re 495 Cent. Park Ave. Corp.,
  136 B.R. 626 (Bankr. S.D.N.Y. 1992) .................................................22

In re Addison Cmty. Hosp. Auth.,
  175 B.R. 646 (Bankr. E.D. Mich. 1994) ...........................9, 10, 27, 38

In re Ames Dep't Stores, Inc.,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ...................................................15

In re Babcock & Wilcox Co.,
  250 F.3d 955 (5th Cir. 2001) .................................................................22

In re Barnwell Cnty. Hosp.,
  471 B.R. 849 (Bankr. D.S.C. 2012) .....................................................26

In re Braniff Airways, Inc.,
  25 B.R. 216 (Bankr. N.D. Tex. 1982) .................................................38

In re Braniff Airways Inc.,
  700 F.2d 935 (5th Cir. 1983) .................................................................40

In re City of Columbia Falls, Mont., Special Imp. Dists.,
  143 B.R. 750 (Bankr. D. Mont. 1992) .................................................26

In re City of Stockton,
  478 B.R. 8 (Bankr. E.D. Cal. 2012) .....................................................10

In re City of Stockton,
  486 B.R. 194 (Bankr. E.D. Cal. 2013) ...........................................10, 11

In re Connector 2000 Ass'n, Inc.,
  447 B.R. 752 (Bankr. D.S.C. 2011) .....................................................26

i

CHI-1912664v7
13-53846-tjt  Doc 4304-3  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 510 of 51
13-53846-swr  Doc 3023  Filed 12/19/13  Entered 12/19/13 16:49:32  Page 5 of 53
559
510

In re Ellingsen MacLean Oil Co., Inc.,
834 F.2d 599 (6th Cir. 1987) ...............................................................................32

In re Farmland Indus.,
294 B.R. 855 (Bankr. W.D. Mo. 2003) ……………………...……........13, 14

In re Flight Transportation Corp. Securities Litigation,
730 F.2d 1128 (8th Cir. 1984) ............................................................................40

In re Mid-State Raceway,
323 B.R. 40 (Bankr. S.D.N.Y. 2005)...................................................................15

In re Mount Carbon Metro. Dist.,
242 B.R. 18 (Bankr. D. Colo. 1999)……………………………………….23, 24

In re New York City Off-Track Betting Corp.,
434 B.R. 131 (Bankr. S.D.N.Y. 2010)................................................................12

In re Northwest Airlines Corp.,
366 B.R. 270 (Bankr. S.D.N.Y. 2007)................................................................38

In re Pan Am Corp.,
1992 WL 154200 (S.D.N.Y. June 18, 1992) ......................................................33

In re Richmond Unified Sch. Dist.,
133 B.R. 221 (Bankr. N.D. Cal. 1991) ...............................................................23

In re White Crane Trading Co., Inc.,
170 B.R. 694 (Bankr. E.D. Cal. 1994).................................................................33

In re YL W. 87th Holdings I LLC,
423 B.R. 421 (Bankr. S.D.N.Y. 2010).................................................................15

Leco Properties v. R.E. Crummer & Co.,
128 F.2d 110 (5th Cir. 1942) ........................................................................11, 12

Lorber v. Vista Irr. Dist.,
143 F.2d 628 (9th Cir. 1944) ..............................................................................24

Matter of Cajun Elec. Power Co-op., Inc.,
119 F.3d 349 (5th Cir. 1997)……........................................................................40

Matter of EDC Holding Co.,
   676 F.2d 945 (7th Cir. 1982) ..............................................................................33

Matter of Sanitary & Imp. Dist. No, 7,
   98 B.R. 970 (Bankr. D. Neb. 1989)…………………………………………....26

Moody v. James Irr. Dist.,
   114 F.2d 685 (9th Cir. 1940) .................................................................25, 26, 38

Newhouse v. Corcoran Irr. Dist.,
   114 F.2d 690 (9th Cir. 1940) ..............................................................................25

United States v. Bekins,
   304 U.S. 27 (1938)................................................................................................9

W. Coast Life Ins. Co. v. Merced Irr. Dist.,
   114 F.2d 654 (9th Cir. 1940) ..............................................................................25

## STATUTES

11 U.S.C. § 901 ......................................................................................................12

11 U.S.C. § 943(b)(7)............................................................................................ 21

Act of Apr. 8, 1976, 90 Stat. 316..........................................................................10

Bankruptcy Act § 83(c), Act of Aug. 16, 1937, 50 Stat. 657 ...................................10

§ 12(3)(a) Michigan Gaming Control and Revenue Act, M.C.L.A. 432.212…......20

§ 364 of the Bankruptcy Code ..................................................................14, 15, 38

§ 364(c) of the Bankruptcy Code……………………………………………….passim

§ 364(e) of the Bankruptcy Code..........................................................7, 32, 33 ,37

§ 904 of the Bankruptcy Code…………………………………….............passim

§ 943 of the Bankruptcy Code .......................................................................21, 25

Uniform Commercial Code......................................................................................30

## OTHER AUTHORITIES

H.R. Rep. No. 94-686, 94th ....................................................................................12

H.R. Rep. No. 595-394, 95th…………………………………………...……12

Tenth Amendment.................................................................................9

9 Collier on Bankruptcy ¶ 943.03[7][b]……………………………………..24

13-53846-swr  Doc 4303  Filed 04/29/14  Entered 04/29/14 22:00:33  Page 513 of

The City of Detroit (the "City" or the "Debtor") hereby files this omnibus reply (the "Reply") to the objections (the "Objections") filed in opposition to the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Docket No. 1520] (the "Motion").[1] In support of its Reply, the Debtor respectfully represents as follows:

## **INTRODUCTION**

1.      The Objections comprise 15 individual responses to the Motion, reaching into the hundreds of pages.[2] The Objections are directed primarily at the propriety of the Quality of Life Financing, while also taking aim at the substance of the Forbearance Agreement. While voluminous, and ostensibly raising a host of factual and legal issues, the key theme throughout the Objections rests, primarily, on the flawed legal premise that the City's citizens — for whom the City exists and operates in the first instance, and whose future is most dependent upon the outcome of this proceeding — should have little or no voice in this process.

---

[1]      Capitalized terms used but not defined herein are accorded the meanings given to them in the Motion.

[2]      The Official Committee of Retirees filed a response in support of the Financing Motion [Docket No. 1868].

CHI-1912664v7

13-53846-tjt    Doc 43043    Filed 12/20/14    Entered 12/20/14 22:00:33    Page 514 of 559
13-53846-swr    Doc 2023    Filed 12/10/13    Entered 12/10/13 16:49:33    Page 5 of 53

514

2.     If the objecting parties are correct, the City's ability to borrow pursuant to section 364(c) of the Bankruptcy Code, and to make expenditures on behalf of its citizens, would be curtailed to that which is deemed "essential" by this Court to operate the City, while every penny beyond that would go to creditor recoveries.

3.     Meanwhile, any true investment in the City would wait — lights would remain unlit, emergency calls to police and fire would go unanswered, crumbling infrastructure would continue its formidable decay, basic notions of public health, safety and welfare would go on being ignored — until a plan of adjustment is ultimately approved in this case, and, presumably, the appellate process has run its course. The City respectfully submits that Detroit's citizens can no longer be asked to wait. Any suggestion that the woefully inadequate status quo should continue any longer is simply unacceptable.

4.     Much ado has been made about the proper scope of review for the present Motion. The fact is, by any standard, the relief sought by the City is appropriate and should be approved. As set forth below, in a chapter 9 proceeding a municipal debtor is generally free to pursue its political and governmental prerogatives without interference from the judiciary. That is no different here. It is simply not the purview of this Court to rule upon the wisdom of each and every expenditure contemplated by the City with respect to the Quality of Life Financing,

which would not only place rigorous, unnecessary demands on this Court, but also clearly present an improper encroachment on the powers of a municipality reserved under section 904 of the Bankruptcy Code.

5. What is required of the Court with respect to the Motion is a finding that the City was unable to obtain credit on an unsecured basis and that the terms of the financing are fair and reasonable, the best available under the circumstances and were reached based upon good faith, arm's length negotiations. In that regard, there can be little doubt that the Quality of Life Financing is appropriate and should be approved.

6. As to need, the City's deterioration over the last half-century is well documented and need not be repeated here. Suffice it to say, however, that the City highlighted in the Motion but a few of the most pressing issues it faces in rebuilding itself. The challenges for the City going forward are extensive and will require a long-term, sustained commitment over years, costing in excess of a billion dollars to begin returning the City to a semblance of what it once was and providing its citizens with the level of services to which they are entitled. That process must begin now.

7. What also is clear, based on the representations of the City and its advisors in the Motion (and as will be presented at the hearing on the Motion), is that the Postpetition Financing was subject to significant market testing, was

heavily negotiated between the City and Barclays — at arm's length and in good faith — and is the best financing available to the City under the circumstances.

8.    Even under the exacting scrutiny proposed by the objecting parties, the City's decision to borrow the Quality of Life Financing is sound.  The City has not, by any stretch of the imagination, proposed extravagant or frivolous expenditures in connection with the Quality of Life Financing.  As this Court has already found, years of neglect and fiscal mismanagement have rendered the City "service delivery insolvent."

9.    The Quality of Life Financing is designed to be a responsible step into the long and difficult process of modernizing the City's operational processes and information technology infrastructure, making critically needed investments in the City's police and fire departments to enhance public safety and reduce crime, and to continue the City's on-going efforts to reformulate its post-apocalyptic urban landscape.  Hardly gratuitous, the Quality of Life Financing will allow the City to *begin* restoring City services to that of an ordinarily functioning metropolis, capable of providing the most basic of services to its residents so that it can retain its current population and attract new lifeblood to the City's tax rolls.

10.    In the absence of any directly applicable law, the objecting parties spin inapposite analogies to chapter 11, arguing that the recoveries to unsecured creditors should be this Court's singular focus.  In chapter 11, unsecured

creditors are typically the fulcrum constituency and the bankruptcy process in that regard is primarily designed to maximize returns for these parties. Indeed, in most chapter 11 cases, equity is out of the money entirely, and thus, the focus of chapter 11 proceedings is appropriately trained on the recoveries of unsecured creditors, a majority of the time.

11. Here, however, the City's citizens are not shareholders. They have a voice and a stake in the outcome of this case that stretches well beyond that of any creditor objecting to the Motion. The zero-sum approach suggested by the objecting parties, whereby the "best interests of creditors" should be the singular and controlling consideration for every transaction put before this Court is groundless, when the epic failure of one of the great American cities has left nearly 700,000 people to weather the City's economic storm. While creditors in this case may be perfectly sanguine about allowing the City and its residents to "tread water" while the bones are picked clean, there are far larger implications at play, and contrary to what the objecting parties would have this Court believe, the future viability of the City *does matter*.

12. As set forth in detail below, and as will be established at the hearing on the Motion, there is little question that the Quality of Life Financing is an appropriate and proper exercise of the City's judgment and should be approved.

13. With respect to the Objections directed at the Swap Termination Financing, such Objections are really aimed at the merits of the Forbearance Agreement. The City addresses these Objections in the Omnibus Reply of the City of Detroit to Objections to the Motion for Assumption and Approval of the Forbearance and Optional Termination Agreement filed contemporaneously herewith (the "Assumption Reply"). Should this Court approve the Forbearance Agreement Approval Motion, there is little question that the Swap Termination Financing is appropriate.

14. Based on the arguments below, and the evidence that will presented at the hearing on the Motion, the Objections should be overruled, and the relief in the Motion granted in all respects.

## SUMMARY OF OBJECTIONS

15. The substance of the Objections is summarized below. The Debtor is hopeful that it can resolve certain of the Objections in advance of the hearing on the Motion and the Debtor intends to file, in advance thereof, a revised proposed form of order.

16. The key issues raised in the Objections generally can be categorized as follows:[3]

---

[3] This summary is not exhaustive of all the Objections.

— Section 904 of the Bankruptcy Code does not prevent an exhaustive review by the Court of the intended uses of the Quality of Life Financing because the City has sought approval from this Court of the Postpetition Financing.

— The proper standard of review for the relief sought by the City in the Motion is set forth in the <u>Farmland</u> factors. This issue encompasses the following assertions:

  ○ The City has failed to sufficiently disclose the need for financing, how the Quality of Life Financing will be spent and on what timeframe, thus establishing the City's business judgment.

  ○ The City has failed to establish that the Postpetition Financing is necessary to provide only essential services to citizens and that the Postpetition Financing will enhance recoveries to creditors.

  ○ There is insufficient factual basis to make a finding of "good faith" pursuant to section 364(e) of the Bankruptcy Code.

— The Postpetition Financing constitutes an impermissible *sub rosa* plan of adjustment.

— Reinvestment initiatives of the kind contemplated in the Motion should be done as part of a comprehensive plan of adjustment and not on a "piece-meal basis."

— The Postpetition Financing imposes unreasonably high costs on the City.

— Super-priority claims granted pursuant to the Motion, if at all, should not "apply" to certain *ad valorem* tax revenue of the City in which certain bondholders (and bond insurers) allege they have an interest.

17. As set forth in greater detail below, the Objections are legally deficient and cannot be sustained.

## **REPLY**

### ***A.    The Broad Review Advanced By The Objectors Is Not Justified***

1. **The Quality Of Life Initiatives Are An Exercise Of The City's Political Judgment About How Best To Fulfill Its Governmental Obligations**

18.    A municipality has an overriding governmental responsibility to provide public services that promote the health, safety and welfare of its citizens. The City's inability to fulfill this governmental responsibility, however, has been well documented. For several years, the City has lacked the resources to maintain adequate police, fire, or emergency medical services. The City's work force is understaffed, its equipment is outdated and its infrastructure is crumbling. Blighted properties throughout the City are a haven for crime and a target for arsonists. The City's information technology infrastructure cannot handle the needs of a modern City. Conditions in the City have been described as deplorable. See, e.g., Opinion Regarding Eligibility, p. 107-08 [Docket No. 1945] (December 5, 2013).

19.    Through its Quality of Life spending, the City is taking an important step toward raising the public services it provides to the level its citizens deserve. As detailed in its prior filings, the City intends to use the proceeds from the proposed Postpetition Financing to, among other things, increase staffing at the Detroit Police Department to a level adequate to protect the public, transition certain administrative positions from police officers to civilians, purchase new police, fire and emergency medical vehicles, demolish dangerously blighted

structures and better integrate the City's outdated information technology systems. See Moore Decl. at ¶¶ 14, 16, 17, 20. The Quality of Life spending represents the City's considered political judgment about how best to satisfy its governmental obligation to its citizens.

### 2. Section 904 Prohibits Efforts By Creditors To Second-Guess the City's Political Judgments

20.     The objecting parties take issue with the City's exercise of its political judgment and urge a broad court review of the planned expenditures to determine whether the money is being spent as efficiently as possible for only essential government services. The objecting parties' efforts to second-guess the City's governmental decision making, however, are not justified.

21.     Section 904 of the Bankruptcy Code provides that "unless the debtor consents or the plan so provides, the court may not . . . interfere with — (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or enjoyment of any income-producing property." 11 U.S.C. § 904. This provision reflects a recognition of the special solicitude that must be given to municipal debtors within a chapter 9 case resulting from concerns of independence and sovereignty embodied in the Tenth Amendment. See United States v. Bekins, 304 U.S. 27, 50-52 (1938) (relying in part on the presence of the predecessor to section 904 in upholding the constitutionality of the municipal bankruptcy statute); In re Addison Cmty. Hosp.

Auth., 175 B.R. 646, 648 (Bankr. E.D. Mich. 1994) ("A primary distinction between chapter 11 and chapter 9 proceedings is that in the latter, the law must be sensitive to the issue of the sovereignty of the states.").

22.    Section 904 ensures that a municipal debtor is free to manage its own affairs during the bankruptcy case.  This provision, on its face, prohibits review of a municipal debtor's political judgments about how best to expend its revenues to satisfy its governmental obligations.  See Addison Hosp., 175 B.R. at 649 ("[Section 904] makes clear that the court may not interfere with the choices a municipality makes as to what services and benefits it will provide" (quoting H.R.Rep. No. 595, at 398)).  Perhaps even more tellingly, however, the history of Section 904 makes clear that this limitation is designed to avoid precisely the kind of inquiry the objecting parties now urge.

23.    Until 1976, the predecessor to section 904 required a court to determine whether spending by the debtor was "necessary for essential government purposes."  See Bankruptcy Act § 83(c), Act of Aug. 16, 1937, 50 Stat. 657.  However, that requirement was removed in the 1976 amendments to the Bankruptcy Act in order to enhance the independence of municipal debtors during the bankruptcy case.  See Act of Apr. 8, 1976, 90 Stat. 316; In re City of Stockton, 478 B.R. 8, 18 (detailing the history of section 904); In re City of Stockton, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013) (same).  The review proposed by the

objecting parties disregards this history and attempts to revive the "necessary for essential government purposes" test long ago rejected by Congress. See, e.g., Ambac Objection at 18-19 ("[T]he City has the burden . . . to show that the funding sought is to maintain essential services."); Id. at 21 ("[T]he Court will be required to determine whether the Post-Petition Financing is necessary to maintain essential services for the citizens of Detroit during the case . . . .").

### 3. The City's Effort To Obtain Approval Of Liens And Superpriority Claims Under Section 364(c) Is Not Consent To The Broad Review Advanced By The Objectors

24. Recognizing that the plain terms of section 904 prohibit the type of review they seek, certain of the objecting parties argue instead that the City's effort to obtain approval of its Motion should be interpreted as a waiver of section 904 and consent to a broad review of its Quality of Life expenditures. Such a conclusion is unjustified. It is true that a municipality provides limited consent to bankruptcy court involvement with its governmental decisions when it seeks to use the tools of the Bankruptcy Code to accomplish something it could not do without court involvement. See Stockton, 486 B.R. at 199. That consent, however, extends only so far as necessary to accomplish the proposed transaction. See id.; Leco Properties v. R.E. Crummer & Co., 128 F.2d 110, 113 (5th Cir. 1942) ("[W]hile the jurisdiction conferred by the statute depending, as it does, upon the city's volition, [it] may not be extended by the court beyond that volition . . . .");

see also H.R. Rep. No. 94-686, 94th Cong., 1st Sess, at 18 (explaining that section 904's consent requirement codifies the result of <u>Leco Properties</u>); <u>In re New York City Off-Track Betting Corp.</u>, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010) (confining the court's review to the issues to which the municipal debtor had consented).

25.    In this case, the City neither needs nor seeks court approval for its governmental decision to spend money on the Quality of Life initiatives.  <u>See</u> 11 U.S.C. § 904.  Moreover, because section 364(b) does not apply to a chapter 9 case,[4] the City also does not need or seek this Court's authorization to borrow funds to pay for these initiatives.  <u>See</u> 11 U.S.C. § 901.  Rather, the City seeks this Court's authorization only for its decision to grant liens on certain revenue streams and superpriority claim status to Barclays and this Court's finding of good faith.  It is for this limited aspect of the transaction that the City's financial transaction is subject to Court review.

---

[4]    Indeed, as noted in the legislative history to chapter 9, "if a municipality could borrow money outside of the bankruptcy court, then it should have the same authority in bankruptcy court, under the doctrine of <u>Ashton v. Cameron Water District No. 1</u>, 298 U.S. 513, 56 S. Ct. 892, 80 L. Ed. 1309 (1936) and <u>National League of Cities v. Usery</u>, 426 U.S. 833, 96 S. Ct. 2465, 49 L. Ed. 2d 245 (1976).  Only when the municipality needs special authority, such as subordination of existing liens, or special priority for the borrowed funds, will the court become involved in the authorization."  <u>See</u> H.R. Rep. No. 595, 95th Cong. 1st Sess. 394 (1977).

26. Evaluating the City's Motion thus requires a consideration of whether the City could obtain credit unencumbered or without superpriority status and that the terms of the financing are fair and reasonable, the best available under the circumstances and were reached based upon good faith, arm's length negotiations. This review does not require an assessment of the City's determination that the money is necessary to meet its obligations to its citizens or an analysis of all of the individual items on which the City is planning to spend the money. Those political and governmental decisions have been committed by section 904 solely to the discretion of the City's legally authorized decision makers. Such judgments are beyond the scope of review under section 364(c).

27. For the foregoing reasons, the City submits that a broad and intensive review of the need and use of the Quality of Life Financing is not appropriate and should not be undertaken by the Court in connection with deciding the Motion. Nevertheless, as detailed below, the City is confident that under any standard of review, the appropriateness of the Postpetition Financing is beyond any serious dispute.

## B. Appropriate Standard of Review For the Relief Sought in the Motion

### 1. Applicability of the *Farmland* Factors

28. In addition to, and in conjunction with, the objecting parties' urging of a broad scope of review of the Debtor's use of loan proceeds, the

objecting parties have also argued that the relief sought in the Motion should be judged using the factors set forth in the chapter 11 case of <u>In re Farmland Indus., Inc.</u>, which consist of the following:

— That the proposed financing is an exercise of sound business judgment;

— That no alternative financing is available on any other basis;

— That the financing is in the best interests of the estate and its creditors;

— Whether there are any better offers, bids, or timely proposals before the court;

— That the financing is necessary to preserve assets of the estate;

— That the terms of the financing are fair, reasonable, and adequate given the circumstances; and

— The financing was negotiated in good faith and at arm's length.

294 B.R. 855, 879-880 (Bankr. W.D. Mo. 2003).

29. Nevertheless, it is hardly clear that these factors apply in a chapter 9 case, as asserted by many of the objecting parties. While certain courts certainly have cited <u>Farmland</u> favorably in chapter 11, the City is not aware of a single case applying these or similar factors in a chapter 9 proceeding.[5] Moreover,

---

[5] While post-petition borrowings may be rare in chapter 9, contrary to common belief (and at least one of the Objections) a sizable post-petition borrowing has occurred before in chapter 9 in the case of <u>In re County of Orange</u>, where the debtor borrowed in excess of $400 million during its chapter 9 proceeding and used the proceeds to make distributions to certain prepetition creditors, and in particular, certain school districts.

it is not clear that bankruptcy courts in the Eastern District of Michigan apply Farmland even in the chapter 11 context.

30.     Instead, in determining whether a debtor is entitled to financing in chapter 11 under section 364(c) of the Bankruptcy Code, courts generally have articulated a three-part test, including whether:

(a)     the debtor is unable to obtain unsecured credit;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed lender

In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

31.     Moreover, courts generally defer to the debtor's business judgment in granting post-petition financing under section 364 of the Bankruptcy Code.  See In re YL W. 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); In re Mid-State Raceway, 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) (holding that "to overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent.").

32.     Nevertheless, even under the more exacting standard of the Farmland factors, the Postpetition Financing should be approved.

## 2. The Financing Should be Approved Even Under The *Farmland* Factors

### a. The Financing is a Sound Exercise of the City's Judgment

*Swap Termination Financing*

33.     There seems to be little dispute that the Swap Termination Financing is an appropriate and necessary transaction if the Forbearance Agreement is approved by this Court. While many Objections have been leveled at the Forbearance Agreement itself, that debate is reserved for the Assumption Reply. If the Forbearance Agreement is approved, the City will likely require between $200 million and $230 million in connection with the termination of the Swap Agreements. Terminating the Swap Agreements early in accordance with the Forbearance Agreement will save the City millions of dollars in almost immediately recognized savings and will significantly reduce the costs of carrying the debt associated with the Swap Agreements. There can is no credible dispute that in this circumstance the Swap Termination Financing is a sound exercise of the City's judgment.

*Quality of Life Financing*

34.     The objecting parties argue that the Quality of Life Financing is not an appropriate exercise of the City's judgment because the City (i) has sufficient resources available, without any borrowing, to make near-term investments, and (ii) does not have a sufficiently detailed plan for utilizing the

proceeds of the Quality of Life Funds. The objecting parties' arguments fail on both fronts.

35. First, the City does not have the available resources to meaningfully fund investment initiatives in the near-term. Citing recent cash-flow statements provided by the City, many of the objecting parties argue that the City has $128.5 million of net cash (which is more than the $93.5 million of cash that had been projected by the City). The objecting parties also argue that the City is "awash" in federal funding. Each of these sources of funding can be used to fund investment initiatives without any additional borrowing, so the argument goes.

36. As of December 1, 2013, the City has approximately $107 million of net operating cash and investments in the City's general fund. This balance is largely reflective of the City's collection of summer property taxes. As has historically been the case, the City's "high water" mark for net cash in its general fund is August and September — when the City collects the bulk of its property tax revenue. Cash decreases in time as the fiscal year progresses. The City's current cash balance is also a result of the fact that the City has been receiving approximately $11 million per month in wagering tax revenue for the last 6 months in connection with the Forbearance Agreement that, absent the Forbearance Agreement, may not have flowed into City coffers.

37.    The objecting parties are correct in that the City's projected spend for the fiscal year 2014 with respect to reinvestment initiatives is approximately $170 million — a sum that the City determined would provide a meaningful investment in necessary projects for the year.  To actually effectuate those projects, however, it was *assumed* that the City would have access to the Quality of Life Financing.  Because the City has yet to procure post-petition financing, the City has committed to very few reinvestment projects so as to avoid any risk of it committing to projects it could not then afford to fund.  Without access to post-petition financing, if the City sought to fund reinvestment initiatives at the rate projected for the fiscal year 2014, the City would run out of money by May, 2014.[6]

38.    As will be established at the hearing on the Motion, the City's projected cash balances are subject to significant downside risks or threats, including:

— Additional cash potentially needed to settle accounts payable invoices;

— The potential need to transfer funds currently held in the City's general fund into other special purposes accounts;

— Current litigation seeking to cause the City to segregate revenues from certain *ad valorem* taxes, resulting in an immediate loss to the general

---

[6]    Financial Guaranty Insurance Company "FGIC") seems to recognize this fact, see FGIC Objection ¶ 19, but nevertheless *still* suggests that the Postpetition Financing is unnecessary.

fund of $30 million and an annual cost of as much as $50 million in revenues on a go-forward basis; [7]

— The loss of wagering tax revenues in the amount of approximately $11 million per month if the Forbearance Agreement, and the assumption thereof, is not approved by this Court; and

— Needs in connection with any agreement to continue making OPEB payments beyond the current agreement which expires in February, 2014, at a cost of $12 to $15 million per month.

39. Thus, the reality is that the City's current cash is critically necessary to simply fund the City's operations and cannot be responsibly diverted to fund any meaningful investment in the City, even in the short-term, particularly in light of these potential down-side risks.

40. Moreover, as will also be established at the hearing on the Motion, of the $350 million of cited federal funds that supposedly may be used for City revitalization, only approximately $50 million of such funds cited by the objecting parties is not already budgeted and would act as a substitute for the City's already contemplated reinvestment spending. In any event, the City's needs with respect to reinvestment far outstrip available funds.

41. Finally, assertions that the City has "no immediate plans" for spending the proceeds of the Quality of Life Financing is also of no persuasion.

---

[7] The City vigorously denies that it has any obligation in this regard. Nevertheless, one of the objecting parties seeking to have the City segregate tax revenues is also arguing that the Quality of Life Financing is unnecessary because the City has sufficient cash on hand to fund any reinvestment initiatives. The two positions cannot be squared.

19

CHI-1912664v7

13-53846-swr   Doc 42043   Filed 04/09/13   Entered 04/09/13 22:00:03   Page 25 of 33
13-53846-swr   Doc 2023   Filed 12/16/13   Entered 12/16/13 16:49:32   Page 532 of 93   532

559

While the City continues to examine the most effective use of the funds, it is without dispute that there is no shortage of immediate and urgent needs within the City, the most pressing of which were set forth in the Motion. If that were not enough, the Proposal for Creditors presented on June 14, 2013 set forth, in extensive detail, the initiatives the City intends to embark upon in the coming years, many of which can be commenced in the very near-term.[8] Additionally, on November 11 and 12, 2013, the City and its representatives held two days of meetings with representatives of many of the objecting parties, during which it outlined the City's planned operational restructuring initiatives, and where nearly 130 pages of information was shared by the City on the very topics covered in the Motion, among many others. The City has also conducted various due diligence sessions with advisors of certain creditors and have supplemented both the Proposal for Creditors and the post-petition financing cash flows with supporting detail to give greater clarity in respect of the reinvestment initiatives.

42. To suggest that the City "has no plan" for the use of Quality of Life funds therefore is disingenuous.[9] The City's operational restructuring

---

[8] See City of Detroit Proposal for Creditors dated June 14, 2013 at pp. 9-22; 61-78.

[9] Certain objecting parties have also argued that the proposed pledge of the wagering tax revenues is not in compliance with applicable Michigan law that authorizes the levy of wagering taxes in the first instance. Section 12(3)(a) of the Michigan Gaming Control and Revenue Act, M.C.L.A 432.312, provides that the

roadmap is well laid out, has been extensively shared with creditors and parties in interest and is ready, in the near-term, for the City to pursue, at least in part, once the necessary funds become available.

> **b.** **The Financing Satisfies Any Appropriate "Best Interests" Analysis**

43.     The objecting parties have almost uniformly argued, in one form or another, that the key element in analyzing the Postpetition Financing is whether the financing is in the best interest of creditors.  The collective argument in this regard is that the City is not authorized to borrow under section 364(c) of the Bankruptcy Code unless the proceeds of the borrowing are used to fund only "essential" services that cannot otherwise be funded through tax receipts *and* the use of funds maximizes returns to creditors in some quantifiable manner.

44.     In the absence of any binding authority as support for their novel interpretation of the law, the objecting parties argue that the confirmation standards under section 943 of the Bankruptcy Code should be the benchmark, and, in particular, the requirement that a plan of adjustment be "in the best interests of creditors."  See 11 U.S.C. §943(b)(7).

---

City may use its percentage of wagering tax revenues for any number of enumerated purposes, including programs "designed to contribute to the improvement of the quality of life in the city."  That is precisely the stated use of the Quality of Life Financing proceeds and, thus, that aspect of the Postpetition Financing complies with Michigan law.

45. As an initial matter, there is <u>no</u> support for the proposition that confirmation standards are at all relevant to a court's inquiry into the merits of a post-petition borrowing under section 364(c) of the Bankruptcy Code. <u>See, e.g.,</u> <u>Anchor Sav. Bank FSB v. Sky Valley, Inc.</u>, 99 B.R. 117, 123 (N.D. Ga. 1989) ("[I]t is not necessary to test the lien proposal against the confirmation requirements of § 1129"); <u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626, 632 (Bankr. S.D.N.Y. 1992) ("The absolute priority rule is a confirmation standard which does not apply to a preconfirmation contested matter involving a debtor's request to obtain senior credit"); <u>In re Babcock & Wilcox Co.</u>, 250 F.3d 955, 960-61 (5th Cir. 2001) (same).

46. If Congress intended confirmation standards to be applied in this context, it would have clearly made that cross reference. But it did not. Instead, Congress incorporated section 364(c) into chapter 9, to be applied as written. This Court should not read into section 364(c) a standard that is simply not there.

47. Moreover, even if reference to section 943(b)(7) were appropriate to inform the inquiry here, the objecting parties badly misstate the law with respect to how courts in chapter 9 have long viewed the "best interest of creditors" requirement.

48.    Instead of expressing an absolute preference for creditors, as suggested, the best interest requirement simply requires that creditors under a plan of adjustment collectively do at least as well as they would if the chapter 9 case were dismissed.  See Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999) (stating the best interests test in a chapter 9 is "often easy to establish" but nevertheless denying confirmation because *creditors were receiving too much* under the proposed plan at the expense of the municipality's services to residents).

49.    Thus, the best interest test cannot be read to stand for the proposition that creditor recoveries are paramount to a municipality's efforts to improve infrastructure and the services it provides to its residents.  Quite to the contrary, in considering confirmation of a plan of adjustment, a court "does not attempt to balance the rights of the debtor and its creditors, but rather, [attempts] to meet the special needs of a municipal debtor."  In re Richmond Unified Sch. Dist., 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991); see also Mount Carbon Metro. Dist., 242 B.R. at 41 (holding that the purpose of chapter 9 is to adjust debts in order "to continue to provide public services.").  In that regard, chapter 9 confirmation standards are not focused solely on the "repayment of pre-petition debt," but rather are focused on the "repayment of debt in conjunction with [the] provision of continued government services."  Id. at 34-35.  In other words, safeguarding a municipal debtor's unique role with respect to its citizens is a central focus of a

chapter 9 proceeding.  Id. ("[T]here is no purpose in confirming a Chapter 9 plan if the municipality will be unable to provide future governmental services.").

50.     Thus, for example, section 943(b)(7) specifically requires that a plan be "feasible," which has been interpreted to mean that the debtor is able "to make the payments required under the plan *and still maintain its operations at the level that it selects as necessary to [the] continued viability of the municipality*."  9 Collier on Bankruptcy ¶ 943.03[7][b] (emphasis added); Mount Carbon, 242 B.R. at 37 ("The question of feasibility is whether the Plan is a suitable vehicle for the District to repay its pre-petition debts and to provide future public services.").

51.     And even the "fair and equitable" standard of section 1129(b), as applied in chapter 9, incorporates the notion that the debtor's return to viability is of first importance, requiring that the debtor provide a dissenting class of creditors no more than it "can reasonably expect in the circumstances." Lorber v. Vista Irrigation Dist., 127 F.2d 628, 639 (9th Cir. 1944).

52.     Nothing cited by the objecting parties is to the contrary.  The chief case cited by many of the objecting parties in support of their misguided standard of review is Fano v. Newport Heights Irr. Dist., 114 F.2d 563 (9th Cir. 1940), a case involving a bankrupt irrigation district.  Fano, in the first instance, arose in the context of plan confirmation, not a financing motion and should

therefore have no bearing on a motion under section 364(c) of the Bankruptcy Code.

53.     Moreover, in <u>Fano</u> the court reversed a lower court order confirming the debtor's plan after holding that the debtor was grossly solvent, had spent extravagantly prior to its bankruptcy filing to improve its infrastructure and, thus, had sufficient wherewithal to increase taxes to cover its debt service.  114 F.2d at 565-66.  As a consequence, the court held that the proposed impairment of bondholders under the debtor's plan was not appropriate.  <u>id</u>.  Thus, <u>Fano</u> stands for the uncontroversial proposition that a debtor in chapter 9 may need to access its taxing power in connection with a plan of adjustment to the extent that is possible under applicable law and the circumstances of the case.[10]

54.     More importantly, however, in no event can <u>Fano</u> be read to say — whether under section 364 *or* 943 of the Bankruptcy Code — that a city in chapter 9 is prohibited from making improvements to its infrastructure and the services it provides to citizens unless there is a quantifiable enhancement to the

---

[10]     On the same day that <u>Fano</u> was decided, the Ninth Circuit issued three other chapter IX decisions: <u>Newhouse v. Corcoran Irr. Dist.</u>, 114 F.2d 690 (9th Cir. 1940), <u>W. Coast Life Ins. Co. v. Merced Irr. Dist.</u>, 114 F.2d 654 (9th Cir. 1940) and <u>Moody v. James Irr. Dist.</u>, 114 F.2d 685 (9th Cir. 1940).  All of these decisions were authored by Circuit Judge Stephens.  In each of <u>Newhouse</u>, <u>West Coast</u> and <u>Moody</u>, the Court determined that the Districts could not increase taxes to pay creditors and affirmed the confirmation of their plans of adjustment.

recoveries of creditors.[11] <u>See, e.g.</u>, <u>In re City of Columbia Falls, Mont., Special Imp. Dists.</u>, 143 B.R. 750, 759 (Bankr. D. Mont. 1992) (stating that "[h]ad the Montana legislature sought to require municipalities to pay all of their debts in full, regardless of the cost to city services, it could have merely refused to permit municipalities to file Chapter 9 petitions …."); <u>Matter of Sanitary & Imp. Dist. No. 7</u>, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("[T]he debtor may obtain confirmation of a plan, over objection, which does not utilize all of the assets of the estate to retire its obligations."); <u>Moody v. James Irr. Dist.</u>, 114 F.2d 685, 689 (9th Cir. 1940) ("To afford the plan of payment proposed the District must be in a position to proceed as a going District and for this reason its cash in hand cannot be too greatly depleted."). Indeed, "[b]ecause the purpose of municipalities (i.e. police protection, fire protection, sewage, garbage removal, schools, hospitals) is to

---

[11] Certain of the other "confirmation" cases cited by the objecting parties also do not advance the argument that the Postpetition Financing somehow violates the "best interests" test. Instead, in those cases, the courts found that the "best interest" test was met and reinforces the proposition that the continued ability of a municipality to provide services to its residents in a chapter 9 case is of paramount concern. <u>See</u> <u>In re Connector 2000 Ass'n, Inc.</u>, 447 B.R. 752 (Bankr. D.S.C. 2011) (confirming plan and providing that best interests of creditors was served by debtor's plan); <u>In re Barnwell Cnty. Hosp.</u>, 471 B.R. 849 (Bankr. D.S.C. 2012) (confirming plan and noting that "of particular importance to the Court" was the fact that the proposed plan "preserves the availability of healthcare services to citizens and patients in the County."). <u>In re Pierce Cnty. Hous. Auth.</u>, 414 B.R. 702 (Bankr. W.D. Wash. 2009), the other case cited by the objecting parties, is also of no moment here, as that case involved the issue of whether a debtor should abandon certain assets as part of a plan.

provide essential services to residents, it is crucial that chapter 9 relief allow these entities enough flexibility to remain viable." Addison Cmty. Hosp., 175 B.R. at 648.

55. The Court has already found that as of the Petition Date, the City was "in a state of 'service delivery insolvency' … and will continue to be for the foreseeable future." See Opinion Regarding Eligibility, p. 107 [Docket No. 1945] (December 5, 2013). Indeed, the City is not providing "services at the level and quality that are required for the health, safety, and welfare of the community." id. at 108. The deterioration in the City's basic operating functions has been so complete that it can hardly be said that the City is providing even some of the most basic of City services to its nearly 700,000 residents.

56. While ostensibly recognizing the City's dire circumstances, the objecting parties nevertheless assert that this Court should give short shrift to such concerns, focusing instead solely on the interests of creditors and how the Postpetition Financing will enhance their recoveries. Such an approach is misguided and is not the law. Indeed, City residents did not assume the risk of the City's failure or insolvency. They did not agree that their access to public services, including police, fire and emergency services, would be subordinate to the repayment of the City's creditors. Nor did they agree to live with blight and darkness until the City's debts are satisfied.

57. While the City believes that its revitalization will ultimately have a positive impact on the economic interests of many of the objecting parties, the City respectfully submits that the Court must also consider the interests of the City's residents, which will be greatly served by the Postpetition Financing, and in particular, the Quality of Life Financing.

c. **The Terms of Financing are Fair and Reasonable and There Were No Better Alternative Financing Options Available**

58. As will be established at the hearing on the Motion, and which is not subject to any serious dispute, the Postpetition Financing is the product of a robust process run by Miller Buckfire, the City's investment bank, which involved the solicitation of over 50 lending institutions and resulted in more than a dozen lending proposals. These proposals were further distilled to approximately four serious contending lenders until, ultimately, Barclays emerged as the successful lender.

59. The terms of the Postpetition Financing are highly favorable to an entity in bankruptcy and were the best available among the numerous proposals the City received from prospective lenders. Indeed, Barclays' terms were thoroughly market tested and no better options materialized.

60. The interest rate is 3.5%, and, even with full market flex, is not likely to exceed 6.5%. Financings for entities in bankruptcy frequently feature

interest rates into the double digits.  The secured nature of the loan was key for purposes of keeping the cost of the loan low.  Additionally, unsecured debt has not been available to the City for years given its highly distressed circumstances, and, thus, was not effectively available to the City in this chapter 9 case, particularly with the City's eligibility subject to heavy litigation.

61.    The collateral package, far from being overreaching, as suggested by some, is quite favorable, in the sense that while the Postpetition Financing will be "secured" by a pledge of the City's wagering and income tax revenues, Barclays only has secured recourse to tax revenue limited to the payment of $4 million per month from each source of tax revenue to pay down the principal and interest owing on the bonds in due course.  See Indenture §902(c).  During that time, the City remains in control of the remainder of the pledged tax revenue, subject to a requirement that the City hold $5 million in each tax revenue deposit account.  See Commitment Letter dated October 6, 2013, Terms & Conditions §4; Indenture §708(a).  Thus, unlike most secured financings where a lender can foreclose on its collateral to repay itself promptly, it would take Barclays over three years to do so under the terms of the Postpetition Financing.

62.    With respect to Asset Proceeds Collateral, the City is not obligated to engage in any transactions to monetize any City-owned assets (even following an event of default), and Barclays' right to receive proceeds is only

triggered in connection with a large monetization transaction, which is not anticipated by the City at this time. Additionally, the super-priority claim granted to Barclays is very typical for a transaction of this type and was a common feature in all of the proposals the City received (including proposals by parties now objecting to this super-priority claim). Moreover, the Postpetition Financing does not include many of the typical "lender control" features typically seen in post-petition financings, such as case milestones and financial covenants. Thus, while many of the objecting parties stated, in conclusory fashion, that the Postpetition Financing "gives Barclays too much control" over the City, such allegations are way off the mark.

63.     What's more is that many of those objecting parties — namely, Syncora, FGIC, Ambac, Assured and National — all submitted financing proposals that were significantly *less favorable* to the City than the terms of the Postpetition Financing, while at the same time inappropriately seeking some favorable treatment for their prepetition claims. And while each of these objecting parties vigorously object to the City's proposed use of the proceeds of the Postpetition Financing, each of their respective lending proposals would have allowed the City to do precisely what these parties so loudly object to now: to pay-off the Swap Agreements and make quality of life improvements. Their Objections, accordingly, should be dismissed as disingenuous subterfuge.

64.     Syncora also argues that the City had a "better" financing option available to it than the Barclays deal based on a two-page PowerPoint presentation Syncora gave to City Council (rather than the City itself) on October 25, 2013[12] — weeks after the City had selected Barclays as its lender.

65.     Syncora's "rough outline" of a lending proposal could hardly be considered a commitment to lend.   But even if Syncora was serious about providing the City post-petition financing, the City had serious reservations about whether Syncora could be a suitable lender, given that Syncora is an insurance company, with no track record of lending (in bankruptcy or otherwise), whose parent company's stock trades at less than a dollar and whose entire publicly traded equity market cap is under $50 million.   In short, Syncora's financial wherewithal to actually follow through on any lending commitment was, and remains, very uncertain.

66.     Moreover, by the end of October, time was of the essence for the City to move forward so that funding could be obtained and put to use by the end of 2013, or the beginning of 2014 at the very latest.   The City had run a thorough and lengthy process, in which Syncora was invited to participate, and the City had chosen its preferred lender.   To the extent Syncora was serious about

---

[12]     Syncora's October 25, 2013 financing proposal was in addition to a far less favorable proposal extended to the City in early October, 2013 referenced in paragraph 63 hereof.

31

CHI-1912664v7

13-53846-swr   Doc 2023   Filed 12/10/13   Entered 12/10/13 16:40:32   Page 38 of 93
13-53846-swr   Doc 2023   Filed 12/10/13   Entered 12/10/13 16:49:32   Page 544 of 559   544

making a new and legitimate proposal to the City, it could have approached the City with a fully documented deal, as the terms of the Barclays proposal were then fully known. Given Syncora's prior self-serving financing proposals, past tactics and its exceedingly adversarial conduct to date in this case, it was clear to the City that Syncora's "financing proposal" to City Council was not serious and was likely another futile attempt to manipulate the process towards its own ends.

67. All rhetoric aside, the fact is the Postpetition Financing is the best financing available to the City at this time. It is the product of an extensive process, involving dozens of prospective lenders. The terms were heavily negotiated, in good faith and at arm's length and are fair and reasonable under the circumstances.

### d. A Section 364(e) Finding is Appropriate

68. Certain of the objecting parties have argued that the City has not proposed the financing in good faith and that a finding under section 364(e) of the Bankruptcy Code is not appropriate. The allegations in this regard take a myriad of forms — all of which fall flat.

69. The basic purpose of section 364(e) of the Bankruptcy Code is "to encourage postpetition financing by ... giving the lender priority.... [and] protect[ing] the authorization for priority on a lien from reversal or modification on appeal, as long as the order has not been stayed pending appeal and the creditor

extended credit in good faith." In re Ellingsen MacLean Oil Co., Inc., 834 F.2d 599, 603 (6th Cir. 1987). While the Bankruptcy Code fails to define the term "good faith," the Sixth Circuit has acknowledged courts look to the definition found in the Uniform Commercial Code: "Good faith means honesty in fact in the conduct or transaction concerned." id. at 604-05; see also In re Pan Am Corp., 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992) (examining whether factors such as fraud or collusion existed in determining whether a lender acted in "good faith" under section 364(e) of the Bankruptcy Code).

70.    Courts have found a lack of good faith when parties fail to disclose ulterior motives or material facts to the bankruptcy court and those motives or facts may impact a court's reasoning. In re White Crane Trading Co., Inc., 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994). A lack of "good faith" also may exist when it is "evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code." Matter of EDC Holding Co., 676 F.2d 945, 948 (7th Cir. 1982) (deciding that a lender lacked good faith with respect to a portion of its loan agreement that required the debtor to utilize $77,000 of the loan proceeds to pay the attorney's fees of an unsecured creditor group).

71.    Good faith is present in this case. The negotiations between the City and Barclays proceeded at arm's length. Moreover, the City has fully

complied with P.A. 436, contrary to certain assertions in the Objections. The transaction was made public and submitted to City Council in a timely manner and City Council was afforded the statutory period to consider and review the proposed terms.

72.     Counsel for the City fully engaged City Council during its consideration period with regard to any questions and concerns regarding the proposal. The City's cooperation included attending a closed door question and answer period with the full City Council, as well as participating in conference calls with City Council's staff. Additionally, the City shared relevant documents relating to the transaction with City Council and its staff and provided written answers to more than 20 questions from City Council regarding the transaction and other related issues.

73.     Although the Fee Letter was not provided to City Council, the commitment fee was not an element of the proposal that required City Council approval, and in any event, this has no bearing on the process at this point given that City Council did not ultimately approve the transaction (and thus, any omission of the Fee Letter could not have prejudiced the process).

74.     The ELB is also considering the City's request for approval of the transaction, and ELB approval is a condition to closing the financing.

Consequently, the City submits that prior to any closing of the transaction, the ELB will have approved the financing.

75.    Additionally, certain parties have alleged bad faith, asserting that the City failed to disclose that the commitment fee owing to Barclays had been paid, in part, before the Motion was filed.  As an initial matter, the City disclosed to the Court in the Motion that 50% of the commitment fee was paid prior to the filing of the Motion.  See Motion ¶ 39.  Moreover, the City was contractually obligated to Barclays to keep the commitment fee confidential (pending an order of this Court) and to seek permission to file the Fee Letter under seal, which the City promptly did on the same date the Motion was filed.  The existence of the commitment fee, and the early payment thereof, has never been hidden by the City.

76.    Other objecting parties have argued that the City has provided insufficient disclosure regarding the use of proceeds to give an adequate basis for the Court to find that the Postpetition Financing is proposed in good faith.  Aside from the lengthy discussion of the anticipated use of proceeds set forth in the Motion, as previously noted, the Proposal for Creditors dated June 14, 2013 contains a substantial presentation of many of the investment initiatives the City intends to undertake.  Additionally, as noted, on November 11 and 12, 2013, the City and its representatives convened all-day meetings with representatives of many of the objecting parties that disingenuously complain of a lack of

transparency on this topic. These meetings were devoted to an in-depth discussion of the City's planned operational restructuring initiatives, where nearly 130 pages of information was shared by the City on the very topics covered in the Motion, among many others.

77. Others argue more generally that the Debtor has not been transparent in this case. The City would note that the objecting parties constitute a large, disparate group of highly litigious parties. Coordinating negotiations on any particular initiative of the City on an individual basis typically is not practical. Nevertheless, the City has been communicating with its creditors collectively and in good faith, including participating in the various Court-ordered mediations, some of which are designed to tackle the issue of information sharing. The City has been engaged with most of the objecting parties — in formal mediation, and in meetings and on conference calls — on a wide variety of issues, including the plan of adjustment and the Forbearance Agreement. It will continue to do so.

78. Additionally, in connection with mediation, reams of information have been shared with the objecting parties, and the City has held numerous less formal calls and meetings with many of the objecting parties on a number of issues. Indeed, the data room arranged by the City, to which new information is being consistently added and to which many if not all of the objecting parties have access, contains literally thousands of pages of information

regarding the City's cash flows and reinvestment and restructuring plans, among many other topics.

79.     To say the City has not been transparent on its restructuring plans or any other matter at this point is just not accurate.  The City and Barclays have operated in good faith in connection with the Postpetition Financing and a finding under 364(e) is appropriate in this case.

### C.     *Key Investments in the City Must Begin Now*

#### 1.     **The City is Not Required to Wait Until Plan Confirmation to Begin Critical Investments**

80.     Delay.     That is the message from the objecting parties.  Although they claim to recognize the severe challenges facing the City and its citizens — how could they not? — they nevertheless request from this Court further delay.   As this Court has noted, there is simply "no justification for imposing [inept City services] upon [the residents] for another day."  Hearing Tr., November 14, 2013 (2:36 p.m.), p. 39, 12-21.

81.     If Congress had intended for a proposed borrowing to be conducted only as part of a plan of adjustment, it could have very easily made that restriction clear, but that is not the case.   Large transactions are frequently conducted in bankruptcy proceedings in advance of a plan of reorganization or adjustment, including financings, assets sales (including sales of substantially all of

CHI-1912664v7
37
13-53846-swr   Doc 2204-3   Filed 12/10/13   Entered 12/10/13 16:40:23   Page 450 of 93
559
13-53846-swr   Doc 2023   Filed 12/10/13   Entered 12/10/13 22:00:23   Page 550 of 93          550

a debtor's assets), litigation and claim settlements, and other restructuring initiatives.

82.     The objecting parties' argument is functionally similar to arguing that assumption or rejection of a contract should await confirmation of a plan.  Such arguments have been made in chapter 11 cases based upon the possibility that the debtor may not be able to confirm a plan.  Those arguments, however, are commonly rejected by courts because section 365 — much like section 364 — does not first require plan confirmation.  See e.g., In re Northwest Airlines Corp., 366 B.R. 270, 272 (Bankr. S.D.N.Y. 2007) (debtor rejected collective bargaining agreement prior to proposing a plan; "although the possibility always exists that a debtor's financial condition may change, neither § 1113 nor § 365 requires a debtor to wait until the end of a Chapter 11 case to move to assume or reject"); In re Braniff Airways, Inc., 25 B.R. 216, 220-221 (Bankr. N.D. Tex. 1982) (rejection of collective bargaining agreement approved prior to consideration of chapter 11 plan).

83.     There is no requirement that a municipality wait until plan confirmation to begin making key investments on behalf of its citizens.  Quite the contrary; a municipality must be in a position to provide basic services to its citizens at all times, and having cash on hand is necessary to meet those obligations.  Addison Cmty. Hosp., 175 B.R. at 648; Moody, 114 F.2d at 689

("[T]he District must be in a position to proceed as a going District, and for this reason its cash in hand cannot be too greatly depleted.").  Waiting further to make these investments will only cause the City's problems to compound and, thus, increase the cost of fixing them later.

84.     Additionally, while parties have strenuously argued that the reinvestment initiatives should only be done as part of a plan of adjustment, such a position neglects the fact that a significant portion of the Postpetition Financing will be used to fund termination of the Swap Agreements, which will need to be effectuated at this time and well in advance of confirmation of any plan of adjustment in this case.

85.     Based on the foregoing, there is no justification to find that the Postpetition Financing should be deferred to a plan of adjustment.

### 2.     The Financing is Not a *Sub Rosa* Plan

86.     Additionally, there is no basis for the allegation that the Postpetition Financing constitutes a *sub rosa* plan.  The Objections in this regard are really, in essence, objections to the Forbearance Agreement as they rest on the assertion that paying prepetition claims outside of a plan of adjustment is inappropriate.  That issue, however, will be decided in connection with the Forbearance Agreement Assumption Motion, and has little bearing on the terms of the Postpetition Financing, which contains no elements of a plan of adjustment.

Indeed, courts, historically, have taken a strict approach to the "*sub rosa*" doctrine, and have applied it only in extreme cases where the proposed transaction dictates the specific terms of a future plan.

87.    For instance, in Braniff, the seminal case on the issue, the court denied approval of a transaction that would have transferred the debtor's cash, aircraft and equipment, and terminal leases to another airline in exchange for certain consideration from the purchaser.  In re Braniff Airways Inc., 700 F.2d 935 (5th Cir. 1983).  The court found that the agreement (i) had the effect of dictating how, and to which creditors, certain valuable assets of the debtor would be distributed under a plan, (ii) required the debtor's secured creditors to vote in favor of any future reorganization plan and (iii) provided for the release of all parties against the debtor, the debtor's secured creditors and the debtor's officers and directors.  Id. at 940.

88.    Following the Braniff decision, courts have refused to find that a transaction violates the *sub rosa* principle absent extreme facts similar to those present in Braniff.  See In re Flight Transportation Corp. Securities Litigation, 730 F.2d 1128 (8th Cir. 1984) (approving settlement agreement over *sub rosa* objection by finding that there were no plan terms dictated and no rights to vote on a plan compromised); Cajun Electric Power Co-op., Inc., 119 F.3d 349, 354 (5th Cir.

1997) (giving strict interpretation of *sub rosa* standards and approving settlement agreement because none of the <u>Braniff</u> factors were present).

89.    In this case, it is clear that the key facts necessary to justify a finding that the Proposed Financing constitutes a *sub rosa* plan are not even remotely present:  terms of a plan of adjustment are not being dictated, there is no commitment by any party to vote in favor of any future plan and no assets are being distributed to creditors on account of prepetition claims that will not have been approved by this Court.  Accordingly, the Proposed Financing is not a *sub rosa* plan.

### D.    *The Super-Priority Claim Objections Are Specious*

90.    Ambac, Assured and National (the "<u>Bond Insurers</u>") each allege that Michigan law affords them, in connection with certain bonds they insure, some form of special interest in certain *ad valorem* taxes (the "<u>Taxes</u>") collected by the City.  In particular, these parties argue that the Taxes should be "carved out" of any super-priority administrative expense claim granted to Barclays under the Proposed Financing Order.  As this Court is aware, the Bond Insurers have each filed adversary complaints against the City asserting a special right to the Taxes and seeking, effectively, injunctive relief forcing the City to hold the Taxes in trust for them pending the outcome of this case.

91.     As with many of the pleadings filed before this Court by the Bond Insurers, including their adversary complaints, these parties fail to allege affirmatively one critical element to their assertions — the existence of a valid and enforceable lien in the Taxes.  If the bonds were in fact secured, then their Objections to Barclay's super-priority claim would be moot given that any administrative claim would be *unsecured* and *subordinate* to any security interests of the bondholders.

92.     But even in the absence of a lien, the Bond Insurers' Objections miss the point.  A super-priority administrative claim is not a claim *against* or *in* any particular asset, unlike a lien or a security interest.  A super-priority administrative claim is simply a claim payable from whatever assets are available for distribution to unsecured creditors, except that, the holder of such a claim has priority in recovery over all other unsecured creditors.  Thus, to the extent the Bond Insurers are correct in their presentation of the law with respect to their claims — a proposition the City vigorously disputes — then the Taxes would not be available for distribution to Barclays on account of any super-priority administrative claim.  Thus, the Bond Insurers' Objections in this regard ring hollow and should be overruled.

## **CONCLUSION**

For each of the forgoing reasons, the City submits that the Objections

should be overruled and the Motion approved in all respects.

Dated: December 10, 2013            Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
JONES DAY
77 W. Wacker Dr.
Chicago, IL 60601
Telephone:  (312) 269-3939
Facsimile:  (312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

45

13-53846-swr   Doc 2023   Filed 12/10/13   Entered 12/10/13 16:40:32   Page 52 of 53
13-53846-tjt   Doc 4214   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 558 of
559

## <u>CERTIFICATE OF SERVICE</u>

      I, David G. Heiman, hereby certify that the foregoing Omnibus Reply of the Debtor to Objections to Debtor's Motion for Approval of Postpetition Financing was filed and served via the Court's electronic case filing and noticing system on this 10th day of December, 2013.

                            /s/ David G. Heiman