**U.S. Bankruptcy Court**
**Eastern District of Michigan (Detroit)**
**Bankruptcy Petition #: 13–53846–swr**

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession*** | represented by | **Bruce Bennett** |
| **City of Detroit, Michigan** | | 555 S. Flower Street |
| 2 Woodward Avenue | | 50th Floor |
| Suite 1126 | | Los Angeles, CA 90071 |
| Detroit, MI 48226 | | (213) 489–3939 |
| WAYNE–MI | | Email: bbennett@jonesday.com |
| Tax ID / EIN: 38–6004606 | | |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237–3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114

(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

*U.S. Trustee*      represented by **Sean M. Cowley (UST)**
**Daniel M. McDermott**              United States Trustee
                                     211 West Fort Street
                                     Suite 700
                                     Detroit, MI 48226
                                     (313) 226–3432
                                     Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769

Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Creditor Committee*<br>**Committee of Unsecured**<br>**Creditors**<br>*TERMINATED: 03/03/2014* | represented by | **Brett Howard Miller**<br>1290 Avenue of the Americas<br>40th Floor<br>New York, NY 10104<br>(212) 468–8051<br>Email: bmiller@mofo.com,whildbold@mofo.com<br>*TERMINATED: 03/03/2014* |
| | | **Geoffrey T. Pavlic**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033–2518<br>(248) 352–4700<br>Fax : (248) 352–4488<br>Email: pavlic@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| | | **Mark H. Shapiro**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033–2518<br>(248) 352–4700<br>Fax : (248) 352–4488<br>Email: shapiro@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| *Creditor Committee*<br>**Charlene Hearn**<br>PO Box 6612<br>Detroit, MI 48206 | | |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364<br>(202) 408–7004<br>Email: sam.alberts@dentons.com |
| | | **Paula A. Hall**<br>401 S. Old Woodward Ave.<br>Suite 400<br>Birmingham, MI 48009<br>(248) 971–1800<br>Email: hall@bwst–law.com |
| | | **Claude D. Montgomery**<br>620 Fifth Avenue<br>New York, NY 10020<br>(212) 632–8390<br>Email: claude.montgomery@dentons.com,docketny@dentons.com |
| | | **Carole Neville**<br>1221 Avenue of the Americas<br>25th Floor<br>New York, NY 10020<br>(212) 768–6889<br>Email: carole.neville@dentons.com |
| | | **Matthew Wilkins**<br>401 S. Old Woodward Ave. |

Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/10/2013 | | 2024 | Objection to (related document(s): 954 Motion *The Objectors' Motion to Admit Certain Deposition Testimony of Kevyn Orr and Kenneth Buckfire) / Debtor's Opposition to Objectors' Motion to Admit Certain Deposition Testimony of Kevyn Orr and Kenneth Buckfire* Filed by Debtor In Possession City of Detroit, Michigan (Attachments: # 1 Index Summary of Attachments # 2 Exhibit 1 – 4 # 3 Exhibit 5 (Part 1) # 4 Exhibit 5 (Part 2) # 5 Exhibit 6) (Heiman, David) (Entered: 12/10/2013) |
| 12/10/2013 | | 2030 | Objection to (related document(s): 935 Motion *The Objectors' Motion in Limine to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor−In−Possession Financing Efforts) / Opposition of Debtor the City of Detroit, Michigan to Objectors' Motion in Limine to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor−In−Possession Financing Efforts* Filed by Debtor In Possession City of Detroit, Michigan (Heiman, David) (Entered: 12/10/2013) |
| 12/11/2013 | | 2050 | Order Denying Motions to Preclude Debtor from Offering Evidence [Dkts. #933 and #935] (Related Doc # 933), Denying Motion (Related Doc # 935). (ckata) (Entered: 12/11/2013) |
| 12/11/2013 | | 2058 | Motion to Adjourn Hearing On (related documents 17 Motion to Assume or Reject Lease or Executory Contract, 157 Amended Motion, 1520 Motion to Borrow) *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Adjourn Hearing on the Debtor's Assumption Motion [Dkts. 17 and 157] and Motion to Approve Post−Petition Financing [Dkt. 1520]* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (Attachments: # 1 Index – Summary of Exhibits # 2 Exhibit 1 – Proposed Order # 3 Exhibit 2 – Notice of Motion and Opportunity to Object # 4 Exhibit 3 – None [Brief Not Required] # 5 Exhibit 4 – None [Separate Certificate of Service to be Filed] # 6 Exhibit 5 – Affidavits [Not Applicable] # 7 Exhibit 6 – Documentary Exhibits [Not Applicable]) (Hackney, Stephen) (Entered: 12/11/2013) |
| 12/12/2013 | | 2082 | Exhibit List*Debtor's Amended List of Exhibits for Hearing on the City of Detroit's Assumption Motion [Dkts. 17 and 157] and Motion to Approve Post−Petition Financing [Dkt. 1520]* Filed by Debtor In Possession City of Detroit, Michigan. (Bennett, Bruce) (Entered: 12/12/2013) |
| 12/13/2013 | | 2120 | Exhibit List */ Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Amended Disclosure of Exhibits in Advance of the Hearing on December 17−19, 2013* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Hackney, Stephen) (Entered: 12/13/2013) |
| 12/15/2013 | | 2127 | Transcript Order Form of Hearing December 13, 2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora |

4

| | | | |
|---|---|---|---|
| | | | Guarantee Inc.. (Bennett, Ryan) (Entered: 12/15/2013) |
| 12/16/2013 | | <u>2147</u> | Exhibit List / *Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Second Amended Disclosure of Exhibits in Advance of the Hearing on December 17–19, 2013* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Hackney, Stephen) (Entered: 12/16/2013) |
| 12/16/2013 | | <u>2148</u> | Declaration / *Notice of Revised Proposed Order in Connection with Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post–Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* Filed by Debtor In Possession City of Detroit, Michigan (RE: related document(s)<u>1520</u> Motion to Borrow / *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post–Petition Financing, (II) Granting Liens and Providing). (Heiman, David) (Entered: 12/16/2013)* |
| 12/16/2013 | | <u>2177</u> | Declaration / *Second Notice of Revised Proposed Order in Connection with Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post–Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* Filed by Debtor In Possession City of Detroit, Michigan (RE: related document(s)<u>1520</u> Motion to Borrow / *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post–Petition Financing, (II) Granting Liens and Providing, <u>2148</u> Declaration). (Heiman, David) (Entered: 12/16/2013)* |
| 12/16/2013 | | <u>2186</u> | Declaration *Amended Statement Of Stipulated Facts Regarding Motion Of Debtor For Entry Of An Order (I) Authorizing The Assumption Of That Certain Forbearance And Optional Termination Agreement Pursuant To Section 365(a) Of The Bankruptcy Code, (II) Approving Such Agreement Pursuant To Rule 9019, And (III) Granting Related Relief* Filed by Debtor In Possession City of Detroit, Michigan. (Kovsky–Apap, Deborah) (Entered: 12/16/2013) |
| 12/18/2013 | | <u>2207</u> | Transcript Order Form of Hearing December 17, 2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Bennett, Ryan) (Entered: 12/18/2013) |
| 12/18/2013 | | <u>2221</u> | Transcript Order Form of Hearing December 18, 2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Bennett, Ryan) (Entered: 12/18/2013) |
| 12/27/2013 | | <u>2333</u> | Expedited Transcript Order Form of Hearing December 20, 2013, Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc.. (Bennett, Ryan) (Entered: 12/27/2013) |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
------------------------------------------------------x
                                          :
In re                                     :          Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                :          Case No. 13-53846
                                          :
                         Debtor.          :          Hon. Steven W. Rhodes
                                          :
                                          :
                                          :
------------------------------------------------------x
```

## DEBTOR'S OPPOSITION TO OBJECTORS' MOTION TO ADMIT CERTAIN DEPOSITION TESTIMONY OF KEVYN ORR AND KENNETH BUCKFIRE

The Objectors[1] move the Court to admit certain deposition testimony of Kevyn Orr and Kenneth Buckfire (Dkt #954) for purposes of the upcoming evidentiary hearing relating to the *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 465(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019,*

---

[1] The movants are: Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora"), Erste Europäische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., DEPFA Bank PLC, Ambac Assurance Corporation, National Public Finance Guarantee Corporation, Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and the Official Committee of Retirees.

*and (III) Granting Related Relief* dated July 18, 2013 (Dkt #17) ("Assumption Motion").

1.      The City opposes the Objectors' motion for the following reasons.

2.      First, the Objectors' method of dealing with what is essentially deposition designations and counter-designations (by filing a motion *in limine*) is improper and inefficient.  There will likely be multiple other parties that wish to designate deposition testimony of multiple other witnesses as part of the hearings regarding the City's Assumption Motion and Motion to Approve Post-Petition Financing (Dkt #157) ("Consolidated Hearing").  If the Court approves this motion, the result would be similar motions filed piecemeal.

3.      Second, the Court and parties already have a roadmap to deal with this issue efficiently.  During the Eligibility Trial, the parties coordinated the filing of deposition designations and counter-designations smoothly.  On the final day of the Eligibility Trial, the parties presented the Court with transcripts that indicated (via different color highlights) designations and counter-designations.

4.      Accordingly, the City respectfully requests that the Court deny Objectors' motion and instruct the parties to coordinate when and how

deposition designations and counter-designations (along with any evidentiary objections to such designations and counter-designations) will be submitted to the Court. A proposed order reflecting this approach is attached as Exhibit 1A.

5.      If the Court desires to grant the Objectors' motion, the City requests in the alternative, that the Court allow the City to counter-designate portions of Messrs. Orr and Buckfire's depositions testimony now. Attached are said deposition transcripts depicting Objectors' designations (highlighted in yellow) and City's counter-designations (highlighted in blue). Exs. 5 (Orr) and 6 (Buckfire).

6.      A proposed order reflecting the City's alternative position is attached as Exhibit 1B.

Dated:  December 10, 2013

Respectfully submitted,

 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:    (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone:  (313) 963-6420
Facsimile:    (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

*Counsel for the City of Detroit*

# SUMMARY OF ATTACHMENTS

The following documents are attached and labeled in accordance with Local Rule 9014-1(b).

| Exhibits 1A and 1B | Proposed Forms of Orders |
|---|---|
| Exhibit 2 | None [Notice Not Required] |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service [To Be Separately Filed] |
| Exhibit 5 | Deposition Transcript of Kevyn Orr from August 30, 2013 (includes Objectors' designations and City's counter-designations) |
| Exhibit 6 | Deposition Transcript of Kenneth Buckfire from August 29, 2013 (includes Objectors' designations and City's counter-designations) |

# EXHIBIT 1A – PROPOSED ORDER

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
------------------------------------------------------x
                                    :
In re                               :        Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          :        Case No. 13-53846
                                    :
                        Debtor.     :        Hon. Steven W. Rhodes
                                    :
                                    :
------------------------------------------------------x
```

## ORDER DENYING THE OBJECTORS' MOTION TO ADMIT CERTAIN DEPOSITION TESTIMONY OF KEVYN ORR AND KENNETH BUCKFIRE

This matter coming before the Court on the motion of the Objectors for the entry of an order admitting the deposition testimony identified in Exhibit 6-A and Exhibit 6-B to *The Objectors' Motion to Admit Certain Deposition Testimony of Kevyn Orr and Kenneth Buckfire*; the Court having reviewed the Objectors' motion, as well as the City's Response, IT IS HEREBY ORDERED THAT:

1. The court DENIES the Objectors' motion to admit the deposition testimony of Messrs. Orr and Buckfire designated in Exhibit 6-A and Exhibit 6-B to the Objectors' motion.

2. The parties are instructed to coordinate the filing of deposition designations and counter designations, along with any evidentiary objections to said designations and counter-designations.

3. The parties should be prepared to present their plan to the Court on the first day of the upcoming hearing regarding the City's Assumption Motion (Dkt #17) and Motion to Approve Post-Petition Financing (Dkt #157) ("Consolidated Hearing").

4. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**Signed on December __, 2013**

_____

**Steven Rhodes**
**United States Bankruptcy Judge**

# EXHIBIT 1B – PROPOSED ORDER

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-------------------------------------------------------x
                                          :
In re                                     :          Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                :          Case No. 13-53846
                                          :
                        Debtor.           :          Hon. Steven W. Rhodes
                                          :
                                          :
-------------------------------------------------------x
```

## ORDER GRANTING THE OBJECTORS' MOTION TO ADMIT CERTAIN DEPOSITION TESTIMONY OF KEVYN ORR AND KENNETH BUCKFIRE

This matter coming before the Court on the motion of the Objectors for the entry of an order admitting the deposition testimony identified in Exhibit 6-A and Exhibit 6-B to *The Objectors' Motion to Admit Certain Deposition Testimony of Kevyn Orr and Kenneth Buckfire*; the Court having reviewed the Objectors' motion, as well as the City's Response, IT IS HEREBY ORDERED THAT:

1. The court GRANTS the Objectors' motion to admit the deposition testimony of Messrs. Orr and Buckfire designated in Exhibit 6-A and Exhibit 6-B to the Objectors' motion, subject to evidentiary objections by the City.

2. The City's counter-designations of the deposition testimony of Messrs. Orr and Buckfire identified in exhibits 5 and 6 of its Opposition to the Objectors' Motion is admitted, subject to evidentiary objections by the Objectors.

3. The Objectors and City exchange any evidentiary objections to the designations and counter-designations before the upcoming hearing regarding the City's Assumption Motion (Dkt #17) and Motion to Approve Post-Petition Financing (Dkt #157) ("Consolidated Hearing").

4. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**Signed on December __, 2013**

_____

**Steven Rhodes**
**United States Bankruptcy Judge**

## **EXHIBIT 2**

### *None [Notice of Motion and Opportunity to Object Not Required]*

# EXHIBIT 3

*None [Brief Not Required]*

# EXHIBIT 4

***Certificate of Service [To Be Separately Filed]***

## EXHIBIT 5

*Deposition Transcript of Kevyn Orr from August 30, 2013*

*(Objectors' designations highlighted in yellow;*
*City's counter-designations highlighted in blue)*

# In The Matter Of:

*City of Detroit*

---

*Kevyn Orr*
*August 30, 2013*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File ORR_KEVYN.txt*
*Min-U-Script® with Word Index*

**Page 1**

```
 1            UNITED STATES BANKRUPTCY COURT
 2          FOR THE EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5   In Re:
 6
 7   City of DETROIT, MICHIGAN      Chapter 9
 8                                  Case No.13-53846
 9            Debtor.              Hon. Steven Rhodes
10                                        /
11
12
13        The Videotaped Deposition of KEVYN ORR,
14        Taken at 1114 Washington Boulevard,
15        Detroit, Michigan,
16        Commencing at 8:32 a.m.,
17        Friday, August 30, 2013,
18        Before Cindy Mendenhall, RPR, CSR-5220.
19
20
21
22
23
24
25
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   GREGORY M. SHUMAKER
 4   DAN T. MOSS
 5   Jones Day
 6   51 Louisiana Avenue N.W.
 7   Washington, D.C. 20001
 8   202.879.3939
 9       Appearing on behalf of the City of Detroit.
10
11   ROBERT S. HERTZBERG
12   Pepper Hamilton LLP
13   4000 Town Center, Suite 1800
14   Southfield, Michigan 48075
15   248.359.7300
16       Appearing on behalf of the City of Detroit.
17
18   MATTHEW G. SUMMERS
19   Ballard Spahr, LLP
20   919 North Market Street, 11th floor
21   Wilmington, Delaware 19801
22   302.252.4465
23       Appearing on behalf of EEPK.
24
25
```

**Page 3**

```
 1   VINCENT J. MARRIOTT III
 2   Ballard Spahr LLP
 3   1735 Market Street
 4   51st Floor
 5   Philadelphia, Pennsylvania 19103
 6   215.665.8500
 7       Appearing on behalf of EEPK.
 8
 9   STEPHEN HACKNEY
10   LALLY GARTEL
11   Kirkland & Ellis, LLP
12   300 North LaSalle
13   Chicago, Illinois 60654
14   312.862.2157
15       Appearing on behalf of Syncora.
16
17   JENNIFER GREEN
18   FRANK GUADAGNINO
19   Clark Hill, P.L.C.
20   500 Woodward Avenue, Suite 3500
21   Detroit, Michigan 48226
22   313.965.8300
23       Appearing on behalf of Police and Fire Retirement
24       System and Police and Fire General Retirement System.
25
```

**Page 4**

```
 1   FRANK J. GUADAGNINO
 2   Clark Hill Thorp Reed
 3   One Oxford Centre
 4   301 Grant Street, 14th Floor
 5   Pittsburgh, PA 15219
 6   412.394.2329
 7       Appearing on behalf of Police and Fire Retirement
 8       System and Police and Fire General Retirement
 9       System.
10
11   KELLY DIBLASI
12   Weil, Gotshal & Manges, LLP
13   767 Fifth Avenue
14   New York, New York 10153
15   212.310.8032
16       Appearing on behalf of Financial Guaranty Insurance
17       Company.
18
19   ERNEST J. ESSAD, JR.
20   Williams, Rattner & Plunkett, P.C.
21   380 North Old Woodward, Suite 300
22   Birmingham, Michigan 48009
23   248.642.0333
24       Appearing on behalf of Financial Guaranty Insurance
25       Company.
```

Page 5

1 KAREN NEWBURY
2 RICK L. FRIMMER
3 Schiff Hardin, LLP
4 233 South Wacker Drive, Suite 6600
5 Chicago, Illinois 60606
6 312.258.5522
7     Appearing on behalf of Depfa Bank, PLC, as agent for
8     DFS WertManagement.
9
10 CAROLINE TURNER ENGLISH
11 Arent Fox, LLP
12 1717 K Street, NW
13 Washington, D.C. 20036
14 202.857.6000
15     Appearing on behalf of Ambac.
16
17 BIANCA FORDE
18 Winston & Strawn, LLP
19 200 Park Avenue
20 New York, New York 10166
21 212.294.4733
22     Appearing on behalf of Assured Municipal Guaranty
23     Corp.
24
25

Page 6

1 JASON JURGENS
2 Cadwalader, Wickersham & Taft, LLP
3 One World Financial Center
4 New York, New York 10281
5 212.504.6102
6     Appearing on behalf of Merrill Lynch Capital Services.
7
8 GUY S. NEAL
9 Sidley Austin, LLP
10 1501 K. Street, N.W.
11 Washington, D.C. 20005
12 202.736.8041
13     Appearing on behalf of National Public Finance
14     Guarantee Corp.
15
16 STEVEN WILAMOWSKY
17 Bingham McCutchen, LLP
18 399 Park Avenue
19 New York, New York 10022
20 212.705.7960
21     Appearing on behalf of UBS.
22
23
24
25

Page 7

1 CLAUDE D. MONTGOMERY
2 Dentons
3 620 Fifth Avenue
4 New York, New York 10020
5 212.632.8390
6 Appearing on behalf of Official Committee of Retirees.
7
8 JEROME D. GOLDBERG
9 Jerome D. Goldberg, PLLC
10 2921 East Jefferson, Suite 205
11 Detroit, Michigan 48207
12 313.393.6001
13 Appearing on behalf of David Sole, Party in Interest.
14
15
16     ALSO PRESENT:
17 Bailey Wellman - Video Technician
18
19
20
21
22
23
24
25

Page 8

1     TABLE OF CONTENTS
2
3 WITNESS                    PAGE
4 KEVYN ORR
5
6 EXAMINATION
7 BY MR. HACKNEY              10
8 EXAMINATION
9 BY MS. DiBLASI             241
10 EXAMINATION
11 BY MR. MARRIOTT            253
12 EXAMINATION
13 BY MS. ENGLISH             262
14 EXAMINATION
15 BY MS. GREEN               297
16 EXAMINATION
17 BY MR. GOLDBERG            311
18
19     EXHIBITS
20
21 EXHIBIT                    PAGE
22 (Exhibits 1-7, 9 attached to transcript.)
23 (Exhibits 8 and 10 retained by Mr. Goldberg.)
24
25 DEPOSITION EXHIBIT 1          53

13-53846-swr Doc 2043 Filed 04/29/13 Entered 04/29/13 17:54:32 Page 4 of 57    24

### Page 9

```
 1  DEPOSITION EXHIBIT 2       130
 2  DEPOSITION EXHIBIT 4       178
 3  DEPOSITION EXHIBIT 3       217
 4  DEPOSITION EXHIBIT 5       247
 5  DEPOSITION EXHIBIT 6       290
 6  DEPOSITION EXHIBIT 7       310
 7  DEPOSITION EXHIBIT 8       317
 8  DEPOSITION EXHIBIT 9       323
 9  DEPOSITION EXHIBIT 10      329
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 10

```
 1  Detroit, Michigan
 2  Friday, August 30, 2013
 3     8:32 a.m.
 4
 5
 6     VIDEO TECHNICIAN: We are now on the
 7  record.  This is the videotaped deposition of Kevyn
 8  Orr being taken on Friday, August 30th, 2013.  The
 9  time is now 8:32 a.m.  We are located at
10  1114 Washington Boulevard, Detroit, Michigan.  We are
11  here in the matter of In Re:  City of Detroit,
12  Michigan, case number 13-53846 in the United States
13  Bankruptcy Court of the Eastern District of Michigan.
14     My name is Bailey Wellman, video
15  technician.  Will the court reporter swear in the
16  witness.
17     KEVYN ORR,
18  was thereupon called as a witness herein, and after
19  having first been duly sworn to testify to the truth,
20  the whole truth and nothing but the truth, was
21  examined and testified as follows:
22  EXAMINATION
23  BY MR. HACKNEY:
24  Q.  Mr. Orr, good morning.
25  A.  Good morning.
```

### Page 11

```
 1  Q.  My name is Steve Hackney.  I'm an attorney at Kirkland
 2     & Ellis and I represent Syncora Capital Assurance and
 3     Syncora Guarantee.  It's Nice to meet you.
 4  A.  Nice to meet you.
 5  Q.  Could you state your name for the record?
 6  A.  Sure.  Kevyn Dwayne Orr.
 7  Q.  Mr. Orr, you understand the way a deposition works,
 8     right?
 9  A.  I think I do.
10  Q.  In fact, you have taken depositions in your career;
11     isn't that correct?
12  A.  I have.
13  Q.  If I ask a question that isn't clear, will you ask me
14     to rephrase it?
15  A.  Yes.
16  Q.  And if I ask a question and you answer it, I'm going
17     to assume that you understood it; is that fair?
18  A.  Yes.
19  Q.  Mr. Orr, in the course of negotiating and executing
20     the forbearance agreement, did you receive legal
21     advice?
22  A.  Yes.  The forbearance and the optional payment
23     agreement?
24  Q.  That's right.
25  A.  And we'll refer to that as forbearance agreement going
```

### Page 12

```
 1     forward?
 2  Q.  I was going to call it that because it's shorter, if
 3     that's okay.
 4  A.  Sure.  That's fine.
 5  Q.  But you're right.  That's what I mean.
 6  A.  Yes.  Yes, I did receive legal advice.
 7  Q.  And did you receive legal advice from the City's law
 8     department on the subject?
 9  A.  I don't recall.  I don't think so.
10  Q.  Did you receive legal advice from Jones Day on the
11     subject?
12  A.  Yes, among others.
13  Q.  And I take it that you relied on the legal advice you
14     received in making the decision to execute the
15     forbearance agreement?
16  A.  Legal advice and business advice from our consultants,
17     yes.
18  Q.  Who were the others that you obtained legal advice
19     from?
20  A.  May have obtained legal advice from our local counsel.
21  Q.  Ah, yes.
22  A.  And in fact I said I don't recall if I obtained any
23     legal advice from the corporation counsel's office.  I
24     just don't recall, so I'm not going to speculate.
25  Q.  Three possible.  You know you got legal advice from
```

Page 13

1    Jones Day.
2  A.  Absolutely.
3  Q.  You may have or did from local counsel.
4  A.  Yes.
5  Q.  And you can't recall whether you did from the City's
6    law department.
7  A.  Yes.
8  Q.  Are you waiving the attorney-client privilege in
9    connection with the motion to assume the forbearance
10   agreement?
11     MR. SHUMAKER: Objection, could call for
12   the revelation of attorney-client communication.
13     You can answer the question, but yes or no.
14  A.  No.
15     BY MR. HACKNEY:
16  Q.  If I ask you questions regarding the legal advice
17   rendered to you in connection with the forbearance
18   agreement's negotiation or execution, you will refuse
19   to answer those questions on the grounds of the
20   attorney-client privilege; is that correct?
21     MR. SHUMAKER: If you're asking what the
22   advice is, certainly.  The communications between
23   counsel and what he was -- what he was advised on,
24   certainly.
25     THE WITNESS: Right.

Page 14

1     BY MR. HACKNEY:
2  Q.  Okay.  That's correct?
3  A.  Yes.  That is correct.
4  Q.  So if I ask you what your view is on the likelihood
5    that the City's Swap and validity arguments will
6    prevail, you will assert the attorney-client
7    privilege; is that correct?
8  A.  Yes, more than likely.
9  Q.  If I ask you your view on the likelihood that the
10   pledge of the gaming revenues under the Michigan
11   Gaming Act is an invalid pledge, you'll assert the
12   attorney-client privilege, correct?
13  A.  Yes, more than likely.
14  Q.  If I ask you questions regarding the likelihood that
15   the City would prevail on a claim or defense against
16   the Swap counterparties, you'll assert the
17   attorney-client privilege, correct?
18  A.  Yes, more than likely.
19  Q.  And I guess I gotta clarify.  When you say more than
20   likely, I mean are you asserting the privilege with
21   respect to those types of questions?  I'm trying to
22   save having to --
23  A.  Sure.
24     MR. SHUMAKER: Let me state for the record
25   you can ask questions as to whether those -- those

Page 15

1    factors were considered by Mr. Orr, but obviously if
2    you're going to ask what he was -- what he was advised
3    by counsel, then I'm going to instruct him not to
4    answer.
5  A.  When I say more than likely, that's -- that's exactly
6    the distinction that I'm trying to make.  Did I have
7    discussions with my counsel?  Yes.  Did those
8    discussions take into consideration some of those
9    factors?  Yes.  Am I going to tell you what those
10   discussions were and what, if any, conclusions were
11   made?  No.
12     BY MR. HACKNEY:
13  Q.  Okay.  Fair enough.
14     On July 15, 2013, the City entered into
15   what we're going to call the forbearance agreement
16   with the Swap counterparties and the service
17   corporations; is that correct?
18  A.  Yes.
19  Q.  When did negotiations around that agreement with the
20   Swap counterparties begin after your appointment?
21  A.  I think there were discussions about negotiations
22   almost immediately after my appointment.  My specific
23   knowledge -- when you say negotiations, what do you
24   mean?
25  Q.  Well, let me -- let me ask it a different way, which

Page 16

1    is isn't it true that Mr. Buckfire was the lead
2    negotiator for the City on the business terms of what
3    became the forbearance agreement?
4  A.  Yes.
5  Q.  And Mr. Buckfire has testified that the negotiations
6    in earnest regarding what became the forbearance
7    agreement were conducted between June 4th and
8    June 11th of 2013?
9  A.  I don't recall those specific dates, but I think
10   that's the right time frame.  Let me -- let me try to
11   be as clear as I can so we can move on.  We began
12   talking, discussing ways with my advisors, without
13   discussing what we discussed, to provide the City with
14   liquidity almost immediately upon my appointment.  The
15   negotiations that you're referring to I believe did
16   occur within that time frame.
17  Q.  Okay.  So you don't have a basis as you sit here today
18   to contradict Mr. Buckfire's recollection of when the
19   key negotiations over the business terms of the
20   forbearance agreement were conducted?
21  A.  No.  It might be earlier, but that's the approximate
22   time frame.
23  Q.  And as he was the lead negotiator, he's probably the
24   guy who would know, right?
25  A.  Sure, absolutely.

**Page 17**

1 Q. Okay. And you did not participate directly in those
2 negotiations; isn't that correct?
3 A. No. No. I did participate at some point in June
4 with -- I had no face-to-face meetings, but there were
5 several phone calls with a principal on the other
6 side.
7 Q. Do you remember when those phone calls took place?
8 A. I do not remember the exact date. I believe those
9 calls took place in the first and second week of June
10 prior to the June 14th creditor's meeting.
11 Q. Okay. And what was the substance of those calls?
12 A. The nature of the proposed settlement and the amount
13 of the discount.
14 Q. And who were you talking to?
15 A. I don't remember. A Mr. Kuderic (phonetic)? There
16 was one individual, and perhaps others on a conference
17 call that Ken and I -- Ken and I had, Ken Buckfire and
18 I had. One or two conference calls the first week of
19 June and then perhaps another couple of conference
20 calls the second week of June.
21 Q. And this was prior to an agreement in principle being
22 struck?
23 A. Yes. Yes. Yes.
24 Q. Okay. And tell me what was said on these conference
25 calls if you can divide them in your mind.

**Page 18**

1 A. Generally speaking, without violating confidential
2 settlement negotiations, we were talking about the
3 amount of the discount for the optional termination
4 payment. At several points discussions broke down and
5 the parties pledged to keep the lines of communication
6 open, but felt that there may not be a settlement.
7 I actually, several times, came away
8 believing there was not going to be a settlement. I
9 think there was a -- without running on, I think a
10 weekend transpired, and then negotiations began anew
11 the second week. Those negotiations broke down a time
12 or two, and then eventually I believe an agreement in
13 principle was reached at some point that week.
14 Q. If Mr. Buckfire testified there was an agreement in
15 principle by June 11th of 2013, does that sound
16 correct to you?
17 A. Yes, the second -- yes. Yes, it does.
18 Q. Now, you prefaced your answer without divulging
19 confidential settlement communications, and I'll tell
20 you that Rule 408 doesn't actually make your
21 settlement communications privileged, and I mean from
22 discovery it may have implications for admissibility
23 at trial.
24 A. Yes.
25 Q. So I want to make sure that you're not leaving

**Page 19**

1 anything out from these conversations.
2 A. No. I'm -- I'm trying to relay to you that there
3 were -- there were some very difficult discussions the
4 first week on a series of conference calls.
5 Negotiations broke down and that first week we walked
6 away believing that the concept of the settlement
7 wasn't going to work. I came away with a very sincere
8 feeling that it wasn't going to work.
9 Those negotiations started again. It may
10 have even started over the weekend, but they started
11 the second week. They broke down again. There was a
12 conference call where we -- the parties hung up
13 without having reached an agreement. Then I believe
14 later -- the afternoon, and it may have been the
15 11th -- I said it was the second week -- there were a
16 series of calls going back and forth where the actual
17 terms of the discount and the framework for the
18 settlement was finally hammered out.
19 Q. Okay. Can you dial in with any more specificity the
20 dates that these calls took place?
21 A. Like I said, the first of -- it is consistent with my
22 memory that, yes, we started around the June 4th time
23 frame. As I said, there was a weekend. June 10th was
24 my public meeting, so June 11th is entirely reasonable
25 as the date that we finally reached an agreement.

**Page 20**

1 Q. Okay. Do you maintain a calendar that would reflect
2 any of these calls or dates?
3 A. No. Because they were very much off the cuff and ad
4 hoc and they were not -- my calendar is more of a
5 formal process where it has to go through my
6 administrative assistant and it's put in, and then I
7 either accept or deny it, and I don't have any of
8 these calls basically because it was very quick and it
9 was very dynamic and as I said, they actually broke
10 down several times.
11 Q. Would you agree that, notwithstanding your involvement
12 in these calls with the Swap counterparties, it's
13 still fair to characterize Mr. Buckfire --
14 A. Yes.
15 Q. -- as the lead negotiator for the City?
16 A. Yes.
17 Q. Using Mr. Buckfire's recollection of June 4th as kind
18 of the kickoff of these negotiations which you don't
19 have a basis to --
20 A. No.
21 Q. -- contradict --
22 A. Not at all.
23 Q. -- I'd like to kind of level set where you were at
24 going in to June 4th. Okay?
25 Your assumption prior to June 4th was that

1  the Swap counterparties could unilaterally --
2  unilaterally terminate the Swap, correct?
3     MR. SHUMAKER: Objection, form.
4  A.  Well, my understanding was the City -- there were a
5  series of events which put the City in default.  The
6  consent agreement prior to my appointment, the consent
7  agreement, the declaration of a financial emergency,
8  my appointment was an event of default.  My
9  understanding was that due to those multiple events of
10  default, the counterparties had the ability to
11  exercise their rights and deprive the City of much
12  needed casino revenue.
13     BY MR. HACKNEY:
14  Q.  We'll get to the casino revenue in a moment which is
15  something that's trapped under -- potentially trapped
16  under the collateral agreement, right?
17  A.  Right.
18  Q.  I want to talk about the Swap agreement which can lead
19  to a large termination payment --
20  A.  Yes.
21  Q.  -- that the service corporations might owe.
22  A.  Yes.
23  Q.  And you understand the distinction between those two
24  documents --
25  A.  Yes.

1  Q.  -- right?
2  A.  Um-hm.
3  Q.  And your assumptions prior to the June 4th meeting
4  were that as a result of these events of default under
5  the Swap that occurred, some of them, prior to your
6  appointment --
7  A.  Yes.
8  Q.  -- that the Swap counterparties could unilaterally
9  terminate the Swap and demand a sizable payment from
10  the service corporations, correct?
11     MR. SHUMAKER: Objection, form, foundation.
12  A.  Yeah, my assumption was, my understanding was that,
13  yes, they could terminate and demand a sizable
14  payment, whether from the service corporations or
15  eventually from the City.  It would hit our bottom
16  line, yes.
17     BY MR. HACKNEY:
18  Q.  That's right because it ripples --
19  A.  Yes.
20  Q.  -- through the service corporations to the City by the
21  service agreements, right?
22  A.  Yeah.
23     MR. SHUMAKER: Objection, form.
24  A.  If that is in fact the process, yes.
25     BY MR. HACKNEY:

1  Q.  Now, another one of your assumptions prior to June 4
2  was that the Swap counterparties could also
3  unilaterally trap cash under the collateral agreement,
4  right?
5     MR. SHUMAKER: Objection, form, calls for a
6  legal conclusion.
7  A.  My understanding was that the Swap counterparties
8  could instruct the custodian to exercise their rights
9  to trap cash.
10     BY MR. HACKNEY:
11  Q.  And that was one of the rights that they had as you
12  were going into the negotiations with them, correct?
13     MR. SHUMAKER: Objection, form, calls for a
14  legal conclusion.
15  A.  My understanding -- yes.  My understanding was that
16  they had that right.
17     BY MR. HACKNEY:
18  Q.  That's why you were negotiating with them, right?
19  A.  My -- we were negotiating with them to make sure that
20  the City had access to the revenue that it needed
21  quite badly and that the City would not suffer the
22  imposition of a fairly significant termination
23  payment.
24  Q.  Now, another one of your assumptions prior to June 4
25  was that no other party could stop the Swap

1  counterparties from either terminating the Swaps or
2  trapping cash, correct?
3     MR. SHUMAKER: Objection, form, foundation.
4  A.  Yeah, my assumption was -- or, rather, my
5  understanding was that the Swap counterparties had
6  certain rights and that they had the ability to
7  exercise those rights and remedies.  Whether another
8  party could, quote-unquote, stop them could depend on
9  a number of different factors.
10     BY MR. HACKNEY:
11  Q.  So was that something -- that was not something that
12  you had considered then as of June 4th?
13  A.  Yes.
14     MR. SHUMAKER: Objection, form.
15  A.  Yeah.  We had considered whether or not there were
16  perhaps other risks involved.  What I'm saying to you
17  is I had not, as you phrased the question, reached a
18  conclusion as to whether or not someone would have the
19  ability to stop them from exercising those rights.
20     BY MR. HACKNEY:
21  Q.  Okay.  So you considered the question, but you hadn't
22  answered, in your money mind, whether or not there was
23  a party out there that could stop the Swap
24  counterparties from acting?
25     MR. SHUMAKER: Objection, form.

Min-U-Script®          Bienenstock Court Reporting & Video          (6) Pages 21 - 24
Ph: 248.644.8888     Toll Free:  888.644.8080

13-53846-swr   Doc 4304-3   Filed 04/29/13   Entered 04/29/13 17:34:32   Page 8 of 57
13-53846-tjt   Doc 2024-3   Filed 04/29/13   Entered 04/29/13 17:03:23   Page 28 of 57     28

**Page 25**

1 A. We believe that the Swap counterparties could act. I
2 think there's a series of letters subsequently with
3 discussion with your client about their lack of
4 ability to stop the Swap counterparties from acting,
5 but I'm -- what I'm trying to relay to you is we had
6 to assess whether they were risks to that, and my
7 understanding was that they had the right to exercise
8 their remedies.
9     BY MR. HACKNEY:
10 Q. Okay. Now, I want to also get a level set on your
11 objectives going into the negotiations, and I
12 understand that when I say you, I mean the City,
13 Mr. Buckfire, there are multiple parts --
14 A. My -- my team --
15 Q. That's right.
16 A. -- consultants.
17 Q. I may be a little euphemistic, but I'll try to be
18 precise at the right times.
19 A. That's fine.
20 Q. Okay.
21     MR. SHUMAKER: Steve, if I could just
22 object. If you could just define what you mean by
23 level set, I would appreciate that.
24     MR. HACKNEY: I want to go back in time --
25     MR. SHUMAKER: Okay.

**Page 26**

1     MR. HACKNEY: -- to prior to the June 4
2 commencement of negotiations.
3     MR. SHUMAKER: Okay.
4     MR. HACKNEY: That's what I mean by level
5 set.
6     MR. SHUMAKER: Okay. Thank you.
7     BY MR. HACKNEY:
8 Q. Now, I'd like to ask about your objectives as you go
9 into the negotiation. Okay?
10 A. Um-hm.
11 Q. You understand that when you go into a negotiation
12 it's important to have an understanding of both the
13 financial realities that your party is -- is facing as
14 well as the legal realities that your party's facing,
15 correct?
16 A. Yes.
17 Q. That informs the negotiation, right?
18 A. In making an informed decision, I would say you want
19 to have an understanding of those factors.
20 Q. And you also want to understand what your counterparty
21 in the negotiation needs and wants are as well as
22 their potential legal rights, right?
23 A. What your counterparty negotiations perceived needs
24 and rights are.
25 Q. That's right. That's right.

**Page 27**

1     Now, I'm going to ask about the City's
2 objectives in entering into the negotiations. Okay?
3 Objective one of the City was to get the
4 counterparties to waive their cash trap at least on an
5 interim basis to allow the City access to casino
6 revenues, correct?
7 A. I don't know if I would characterize it as objective
8 one. It wasn't as if we were trying to prioritize one
9 objective over the other. It was an objective to make
10 sure that the cash did not get trapped.
11 Q. Okay. So that was one of the objectives.
12 A. Yes.
13 Q. A second objective was that you wanted to modify the
14 Swap to get a discount on the termination amount,
15 correct?
16 A. Yes. That was certainly an objective, yes.
17 Q. Okay.
18     MR. SHUMAKER: Objection there to the
19 extent that it calls for a legal conclusion.
20     BY MR. HACKNEY:
21 Q. And the third was that you wanted to obtain an option
22 about when you could direct the termination of the
23 Swap, correct?
24     MR. SHUMAKER: Objection, calls for a legal
25 conclusion.

**Page 28**

1 A. Here again, I understand your characterization. I'm
2 going to say that that -- that is a fair
3 characterization without trying to quantify as one
4 objective is more important than the others, and let
5 me explain my answer.
6     The City was at risk of significant
7 reduction in cash flow at that period. I think at one
8 point there were various projections that showed us
9 having as little as four or nine million dollars of
10 cash on hand in mid-June. In fact, sometime around
11 that period I heard that an employee of the City had
12 gone to cash their paycheck and the paycheck had
13 bounced. They came back in later that afternoon and
14 it cashed, but we were -- we were that precarious in
15 terms of our cash.
16     We knew we were at risk with regard to the
17 Swap agreement both for trapping casino revenue as
18 well as the termination payment. We also knew that we
19 would need to analyze what the right were -- rights
20 were and to have time to resolve that issue. So to
21 the extent your characterization of three objectives
22 encompasses those concepts, then that's a fair
23 characterization.
24     BY MR. HACKNEY:
25 Q. And I don't mean to order them, but -- so I won't

**Page 29**

1  focus on it. I just gave you them in an --
2  A. Sure.
3  A. -- order.
4  A. Right.
5  Q. But those were three objectives of your negotiations,
6  correct?
7  A. I think it's fair to say that.
8  Q. And you achieved those three objectives in the
9  forbearance agreement, correct?
10 A. We believe so.
11 Q. Tell me what you and Mr. Buckfire discussed as he's
12 going into the June 4 meeting. So what was his
13 mission?
14 A. Well, I'm trying to -- generally speaking, because
15 some of these conversations may have occurred on phone
16 calls where my attorneys were present, but generally
17 speaking, the characterization of what you just talked
18 about, getting a discount of the termination payment,
19 making sure that the casino revenue wasn't trapped,
20 getting time to find an alternative source of funding,
21 making sure that the City had sufficient cash to
22 commence some immediate reinvestment and public
23 health, safety and welfare initiatives that we were
24 focused on, all of those concepts were caught up in
25 these discussions.

**Page 30**

1  Q. Okay. So the way we described your objectives is a
2  fair way to describe the marching orders that
3  Mr. Buckfire had going in to the June 4 meeting.
4    MR. SHUMAKER: Objection to form.
5  A. Yeah, you know, marching orders -- I think that
6  Mr. Buckfire, myself, our attorneys, the consultants
7  and accountants reached a consensus.
8    BY MR. HACKNEY:
9  Q. About what the City should do?
10 A. About what the City needed to do.
11 Q. And what -- and that consensus was to try and achieve
12 the three objectives we talked about earlier.
13    MR. SHUMAKER: Objection to form.
14 A. Here again, I'll stay with the concept that, you know --
15 I understand for your purposes you're trying to
16 characterize the three objectives, but the objectives,
17 in my opinion, were quite broader. The efforts to try
18 to achieve the objectives, as you call them, were
19 necessary for some of the things, priorities the City
20 needed to do.
21    BY MR. HACKNEY:
22 Q. Did you have any conversations with anyone else in
23 advance of June 4 about the anticipated negotiations?
24 A. Oh, sure. We -- we -- my -- my team and I have
25 conversations from the time my appointment became

**Page 31**

1  effective on the 25th to date regularly, daily, sure.
2  Q. On this subject.
3  A. Oh, sure. On the subject of freeing up cash, on the
4  subject of alternatives, on the subject of relieving
5  us from our obligations under the Swaps, we -- we --
6  we have conversations regularly.
7  Q. So going -- using the June 4th date, Mr. Buckfire goes
8  into a negotiation in New York with the Swap
9  counterparties, correct?
10 A. As to the best of my knowledge -- I'll stick with
11 June 4th, because you have told me that's what Ken
12 said, and so I assume that's the date -- yes.
13 Q. And whenever the date was, there was a first meeting
14 that he took in person with the Swap counterparties,
15 correct?
16 A. Yes. To the best of my recollection, I believe it was
17 a meeting.
18 Q. What offer was he authorized to make in that meeting,
19 if any?
20 A. I don't recall if there was a specific offer in that
21 meeting. I think our discussions centered around
22 getting the best deal we could. We may have been
23 trying to even have the potential termination --
24 optional termination payment or more, so I don't think
25 we had it as strict as, you know, your marching orders

**Page 32**

1  are to say do this and go in.
2    It was to go in and have a discussion with
3  the representatives of the counterparty about what we
4  needed to get so that the City could function first
5  with cash flow, not any priority, but also to get a
6  discount over that termination payment.
7  Q. So did Mr. Buckfire have authorization to make a
8  formal proposal in the first meeting?
9  A. Yes.
10 Q. And to your knowledge did he make one?
11 A. I believe so.
12 Q. What was the proposal?
13 A. I don't remember what the exact number was, but I
14 believe the concepts were consistent throughout.
15 Q. And what were the concepts?
16 A. Same thing that we just said, to -- to try to get a
17 discount over the termination payment, to try to make
18 sure that the cash wasn't trapped, make sure we had
19 some time to find a way to pay even the discounted
20 amount.
21 Q. Did Mr. Buckfire report back to you after the June 4th
22 meeting about what had transpired?
23 A. Yes.
24 Q. What did he tell you transpired?
25 A. Had a discussion. I don't have notes, but my general

Page 33

1 recollection is had a discussion with the
2 counterparties, discussed a range of alternatives, our
3 first overture was rejected, but we would have further
4 discussions.
5 Q. And do you remember whether they countered?
6 A. I don't remember specifically. I believe they may
7 have.
8 Q. Okay. Do you know the terms of their counter?
9 A. Generally in the same concept I said. If you're
10 looking for a number, for instance, we said 50 percent
11 and they came back with 98. I don't recall those
12 specifics.
13 Q. So you can't give me the bid and the ask --
14 A. Yeah.
15 Q. -- on what the Swap would be modified as far as the
16 termination?
17 A. Yes, that's correct.
18 (Discussion off the record at 8:56 a.m.)
19 (Back on the record at 8:56 a.m.)
20 BY MR. HACKNEY:
21 Q. Did the City enter into a nondisclosure agreement in
22 connection with these negotiations?
23 A. Yes, I believe so.
24 Q. With the Swap counterparties?
25 A. Yes.

Page 34

1 MR. HACKNEY: I think we would ask to see
2 if that could be produced. I know that there's not
3 formal written discovery, but the Court has also
4 indicated that all documents relating to the debtors
5 are effectively discoverable in bankruptcy, so I'd ask
6 that you consider that and we can address it later.
7 MR. SHUMAKER: We'll look into it.
8 BY MR. HACKNEY:
9 Q. Now the -- I know that -- I've established already
10 that you -- you don't have an independent recollection
11 of the specific dates any of this occurred. I'm
12 making representations to you as an officer who was
13 here yesterday.
14 A. Right.
15 Q. So subject to my representations being accurate,
16 Mr. Buckfire's recollection was that the next meeting
17 in person with the Swap counterparties was June 8th.
18 A. That's sou -- as I said, there was a first week and
19 there was a second week and that sounds about
20 accurate. I believe June 8th may have been a weekend,
21 so as I said before some of these discussions may have
22 occurred over the weekend.
23 Q. Okay. So discussions had not broken down at this
24 point, correct?
25 A. No. They may have. I think they broke down at some

Page 35

1 point during the first week, but they -- they resumed.
2 My interpretation was that they broke down, and then
3 they recommenced a second week.
4 Q. Okay. So on -- if there -- to the extent
5 Mr. Buckfire's right that there was an in-person
6 June 8th meeting --
7 A. Yeah.
8 Q. -- do you remember what his -- what your marching
9 orders to him were as he went into that meeting?
10 A. Here again, the concept of marching orders, we were
11 trying to get to an agreement generally, and I believe
12 the instructions were to continue to move towards that
13 process, whatever that was. And so the specific
14 bid/ask that were going on throughout that time, I
15 don't -- I don't recall, but the general concept was
16 to continue to try to move to a point to get to a
17 discount number or a discount process.
18 Q. Is it fair to say that if I ask you for the specific
19 ebb and flow of the negotiations between the Swap
20 counterparties in terms of the precise business
21 deal --
22 A. Right.
23 Q. -- you would have to defer to Mr. Buckfire's
24 recollection because he was more intimately involved?
25 A. That's fair. Because Ken was -- Ken would have the

Page 36

1 direct meetings and then call me back. We'd go back
2 and forth, and I didn't keep notes and I didn't keep a
3 calendar, so --
4 Q. I asked you about nondisclosure agreements, but did
5 the City execute any other agreements of any kind with
6 the Swap counterparties during this period that you
7 were negotiating the forbearance agreement?
8 A. No, not that I know of.
9 (Discussion off the record at 8:59 a.m.)
10 (Back on the record at 8:59 a.m.)
11 MR. HACKNEY: No. Problem. Let's go off
12 the record.
13 VIDEO TECHNICIAN: The time is 8:59 a.m.
14 We are off the record.
15 (Recess taken at 8:59 a.m.)
16 (Back on the record at 9:08 a.m.)
17 VIDEO TECHNICIAN: We are back on the
18 record at 9:08 a.m.
19 BY MR. HACKNEY:
20 Q. Mr. Orr, I want to clear something up. Maybe I've
21 been saying it the wrong way. I've been using the
22 term "marching orders" with the respect to the way
23 that you and Mr. Buckfire operated.
24 A. Right.
25 Q. And is a better way to say it that you authorized

1 Mr. Buckfire to negotiate the best possible deal he
2 could with the Swap counterparties and that's what he
3 did?
4 A. That's a fair characterization, sure.
5 Q. And at some point did he come out of a meeting and
6 say, Mr. Orr, this is the best deal that I'm able to
7 get out of these Swap counterparties and it's my
8 advice that we take it?
9 A. Yes.
10 Q. And was that on or about June 11th, 2013, which is the
11 date he recalls the agreement in principle being
12 reached?
13 A. Yes.
14 MR. SHUMAKER: Objection to form.
15 BY MR. HACKNEY:
16 Q. And what was the agreement in principle that was
17 reached as you understood it?
18 A. The agreement was essentially that in exchange for a
19 reduced optional termination payment -- we'll just
20 call it the payment under the forbearance agreement --
21 the Swap counterparties would agree not to trap the
22 cash, they would agree to release their liens, and
23 also release their claims, I believe, against your
24 client, Syncora, and we would have access to that cash
25 going forward provided we made the discounted payment

1 at some point in the future. I believe at that point
2 it was in the next 60, 90 days.
3 Q. Isn't the -- wasn't the agreement in principle that
4 you'd have an option to direct the termination of the
5 Swap?
6 MR. SHUMAKER: Objection, calls for a legal
7 conclusion.
8 A. Yeah. I believe the way it works is we would have an
9 option to request the counterparties exercise their
10 rights at a discounted level.
11 BY MR. HACKNEY:
12 Q. And I'm not asking about the forbearance agreement.
13 I'm asking about the agreement in principle.
14 A. Yeah, I think those were the general confines of the
15 agreement in principle.
16 Q. Okay. Now, you did not invite anyone else to the
17 negotiations with the Swap counterparties; isn't that
18 correct?
19 A. I did not invite anyone else. I don't know if Ken
20 invited anyone else or anyone else on my behalf
21 invited anyone else.
22 Q. And you did not direct anyone such as Mr. Buckfire or
23 others to invite any other parties into the
24 negotiation, correct?
25 A. Correct.

1 Q. And you did not invite Syncora to participate in these
2 negotiations, correct?
3 A. Correct.
4 Q. And you did not inform Syncora of the existence of
5 these negotiations, correct?
6 A. The reason I'm hesitating is at some point clearly
7 Syncora became aware, so I don't know how they were
8 informed, but I did not do it, correct.
9 Q. You didn't do it.
10 A. Correct.
11 Q. And you did not invite FGIC to attend these
12 negotiations, correct?
13 A. I believe that's correct.
14 Q. And you didn't direct anyone acting on your behalf to
15 invite FGIC, correct?
16 A. Correct.
17 Q. Nor did you inform FGIC of the existence of these
18 negotiations, correct?
19 A. Me personally, no.
20 Q. You didn't invite U.S. Bank as trustee to the funding
21 trust or as custodian or contract administrator to
22 attend any negotiations, correct?
23 A. Me personally, no.
24 Q. And you didn't direct anyone else acting on your
25 behalf to do so, correct?

1 A. Correct.
2 Q. Now, why didn't you invite Syncora into these
3 negotiations with the Swap counterparties?
4 A. After consultations with my, you know, team, we didn't
5 think Syncora had any right to be involved in the
6 negotiations.
7 Q. And that's because Syncora had no rights under the
8 relevant documents?
9 A. That was my understanding, yes.
10 Q. Now, at any time during these negotiations -- and by
11 these negotiations, I mean through the June 11th
12 agreement in principle.
13 A. Um-hm.
14 Q. Okay? I understand that there are legal negotiations
15 of the scrivening of the document --
16 A. Sure.
17 Q. -- between June 11 and July 15. I going to ask you
18 about them, but when I say these negotiations, I'm
19 talking about the ones that we're talking about right
20 now --
21 A. Um-hm.
22 Q. -- that led to the agreement in principle.
23 A. Okay.
24 Q. At any time prior to June 11th, did the Swap
25 counterparties send a notice of a default under the

1 Swap?
2 A. I don't recall, but I don't think so.
3 Q. At any time prior to June 11th, did the Swap
4 counterparties designate an early termination date?
5 A. I don't recall, but I don't think so.
6 Q. Did they ever threaten to?
7 A. They didn't threaten me.
8 Q. They never threatened you personally.
9 A. Right.
10 Q. Did they threaten other people who reported the
11 threats to you?
12 A. Not that I know of.
13 Q. At any time during these negotiations, did the Swap
14 counterparties designate an optional early
15 termination?
16 A. Not that I know of.
17 Q. Did they ever threaten to do that?
18 A. Not me.
19 Q. And did they ever threaten anyone else who reported
20 the threat to you?
21 A. Not to my knowledge, no.
22 Q. At any time during these negotiations, did the Swap
23 counterparties contend that the City was in breach of
24 the collateral agreement?
25 A. Which collateral agreement are you talking about?

1 Q. The collateral agreement with respect to the casino
2 revenues.
3 A. The 2009 agreement?
4 Q. Yes.
5 A. Okay. Not that I recall.
6 Q. In fact, the City was endeavoring to make the monthly
7 Swap payments into the holdback account throughout
8 this period, correct?
9 A. Yes. They were being paid in the ordinary course.
10 Q. And to the best of your knowledge, the City has
11 complied with all of its obligations under the
12 collateral agreement vis-à-vis the Swap
13 counterparties.
14 A. No.
15 Q. That's not correct?
16 A. No, I mean I think we were -- as I said previously
17 today, we were in default.
18 Q. Of the collateral agreement?
19 A. Right. You mean in terms of making the payments due
20 under the agreement?
21 Q. Well, the collateral agreement I know so -- the
22 collateral agreement and the Swap are -- they are two
23 different agreements --
24 A. Yes.
25 Q. -- that certainly relate to one another.

1 A. Right.
2 Q. I'll say that.
3 A. Okay.
4 Q. I've talked about events of default under the Swap
5 that could lead to the big termination payment.
6 A. Right.
7 Q. We talked about that earlier, right?
8 A. Right.
9 Q. I'm talking specifically now about whether there were
10 events of default under the collateral agreement. Had
11 you breached any of the provisions of the collateral
12 agreement?
13    MR. SHUMAKER: Objection, calls for a legal
14 conclusion.
15 A. Yeah. That's why I'm being a little -- a little
16 careful here. There may be conduct under the Swaps
17 that could be conceivably a breach under collateral
18 agreement. I don't know what they are, so I'm being
19 hesitant. But to get to your question, were we making
20 the payments due under the Swaps? Yes.
21    BY MR. HACKNEY:
22 Q. What was -- what was the conduct under the Swap that
23 might be --
24 A. I'm not sure.
25 Q. As you sit here today, are you aware of any breaches

1 of the collateral agreement by the City?
2    MR. SHUMAKER: Objection, calls for a legal
3 conclusion.
4 A. None from my perspective, but there might be. What I
5 don't want to do is sit here today and try to draw a
6 conclusion as to what might be a breach of the
7 collateral agreement vis-a-vis the Swap agreement.
8 I'm trying to answer your question that we were making
9 the payments that were due.
10    BY MR. HACKNEY:
11 Q. Yeah, I appreciate that. I mean, I guess your answer
12 is there may be breaches of the collateral agreement,
13 there may not be, you don't know.
14 A. I don't know, that's right.
15 Q. Now, this June 11th agreement in principle that we
16 were talking about earlier --
17 A. Right.
18 Q. -- was there a term sheet?
19 A. No. To the best of my recollection, I did not see a
20 term sheet at that time.
21 Q. And just to be clear, do you know whether there was a
22 term sheet that you just didn't see?
23 A. Yeah. There might have been a term sheet that I
24 didn't see. I think Ken and I and some of the other
25 attorneys at Jones Day, Corinne, David Heiman and

Page 45

1 others would have a -- I'm trying to relay to you a
2 sense that we'd have calls, but sometimes I don't
3 recall seeing a specific term sheet at that time.
4 Q. I'm going to distinguish this from when you get into
5 the definitive document negotiation that's going to
6 become the forbearance agreement.
7 A. Right.
8 Q. You're familiar with the idea that sometimes parties
9 hash out a non-binding term sheet --
10 A. Yes.
11 Q. -- to get an understanding on the business terms, and
12 then they progress from the term sheet to the
13 definitive document. You're familiar with that
14 concept.
15 A. Yes.
16 Q. So I want to put the definitive documents over here.
17 A. Okay.
18 Q. Do you remember whether there was a term sheet?
19 A. There eventually was a term sheet. I just don't
20 remember whether or not it was on June 11th.
21 Q. That's fine. So do you think it went agreement in
22 principle, non-binding term sheet, and then
23 negotiation of definitive documents?
24 A. Yes.
25     MR. SHUMAKER: You're talking about in

Page 46

1 time?
2     MR. HACKNEY: Yes.
3     MR. SHUMAKER: Chronologically?
4     MR. HACKNEY: Yes.
5 BY MR. HACKNEY:
6 Q. And so at some point you did see a non-binding term
7 sheet that embodied the agreement in principle
8 Mr. Buckfire had negotiated, correct?
9 A. Yes. Oh, yes.
10 Q. Okay.
11     MR. HACKNEY: Is that something that the
12 City's willing to produce?
13     MR. SHUMAKER: We'll look into it. I
14 don't -- I don't see that one as being an issue.
15     MR. HACKNEY: Okay.
16     MR. SHUMAKER: To the extent we have it.
17 BY MR. HACKNEY:
18 Q. And the term sheet was consistent with the agreement
19 in principle that we discussed earlier that
20 Mr. Buckfire negotiated?
21 A. Yes. It had obviously, as terms do, have more
22 information, but it was consistent.
23 Q. So between July 11 -- I'm sorry.
24     Between June 11th --
25 A. Okay.

Page 47

1 Q. -- and July 15th, which is the execution date of the
2 forbearance agreement --
3 A. Yes.
4 Q. -- you pivot from negotiating this agreement in
5 principle that Mr. Buckfire has struck to now
6 documenting it, correct?
7 A. Yes.
8 Q. Now, Mr. Buckfire has testified that those -- that
9 those negotiations proceeded without interruption from
10 June 11th to Ju -- July 15th. Is that consistent with
11 your recollection?
12 A. The negotiations continued. I think there were other
13 events related to the agreement, some of them by your
14 client in that time frame, but yes, we continued
15 negotiating.
16 Q. Okay. And there were no serious interruptions in
17 those negotiations, correct?
18     MR. SHUMAKER: Objection to form.
19 A. There was an agreement reached. I'm going to take
20 your time frame, June 11th. Ken and I had a
21 discussion about the amount. It was somewhere south
22 of 25 percent. I believe in the same second week I
23 said we can't do this deal for less than a 25 percent
24 discount. I believe the negotiations broke down, then
25 the next day they came back without changing the

Page 48

1 framework of the agreement, just the number changed,
2 the discount went up, and then I believe that -- yes,
3 I believe negotiations continued continually
4 throughout that time.
5 BY MR. HACKNEY:
6 Q. And they -- they continued from June 11 to July 15
7 without serious interruption, correct?
8     MR. SHUMAKER: Objection to form.
9 A. Yeah, here again, your characterization of serious
10 interruption and to July 15th, I don't want to testify
11 to your characterization. What I can say is it was my
12 understanding that negotiations continued from that
13 second week of June to that date, if that's the date
14 that you're relaying to me based upon Mr. Buckfire's
15 testimony.
16 BY MR. HACKNEY:
17 Q. Were there any serious interruptions in the
18 negotiations between June 11 and July 15?
19     MR. SHUMAKER: Same objection.
20 A. You keep saying serious, and to the best of my
21 knowledge there were no material or significant
22 interruptions. I don't want to try to characterize
23 what serious means. I think negotiations continued
24 unabated.
25 BY MR. HACKNEY:

Page 49

1 Q. There were little -- there may have been points of
2 contention between the parties, but they continued
3 steadily from June 11 to July 15, true statement?
4 A. Here again, I believe June 14th was the creditor's
5 meeting, and I don't have a document to refresh my
6 recollection in front of me, but I believe your client
7 sent a letter at some point during that time which I
8 think had an impact on negotiations, so I'm being
9 careful with the concept that they continued without
10 serious interruption because I think there may have
11 been interruptions.
12 Q. So there may have been a serious interruption in the
13 negotiations.
14 A. Yeah. I just don't remember the time frame. I mean
15 you probably recall there were a series of letters
16 between Mr. LeBlanc and your client at first to the
17 custodian and then to me and then I wrote back to him.
18 I'm just not recalling the specific dates of these
19 letters, but I believe they were during this time.
20 Q. And those caused a serious interruption in the
21 negotiations, right?
22 A. Here again, you say -- you say serious, and I'm saying
23 it caused an interruption. There was -- there were --
24 I recall there were letters that I was sending back
25 and forth, and so whether or not it was serious, I

Page 50

1 believe they're interruptions, if this is the time
2 frame I'm thinking of. If they came after the
3 June 14th date and it was July 17th, for instance,
4 that's when that -- those events occurred.
5 Q. Okay.
6 A. I just don't recall the times.
7 Q. I'll represent to you, and I'm going to show it to you
8 in a moment, but Syncora's letter was June 17th.
9 A. Okay. Then that -- yeah, then that -- that caused
10 some disruption.
11 Q. It caused some disruption, but did it cause a serious
12 interruption in the negotiations?
13 A. Yeah, because the benefit that we -- we were supposed
14 to get which was -- actually as I recall, your client
15 sent a letter to UBS. UBS expressed some concern.
16 The negotiations that we were going through were
17 impacted by those concerns and, here again, recalling
18 off the top of my head, there were discussions then.
19 Mr. LeBlanc sent me a letter, I sent him one, I think
20 he sent me another one, I think we exchanged two or
21 three letters, and those all had an impact on the
22 negotiations, yes.
23 Q. Did they stall the negotiations?
24 A. To some degree I believe they did.
25 Q. And did you inform Mr. Buckfire that these important

Page 51

1 negotiations had been stalled by Syncora?
2 A. Well, I think there were discussions about Syncora's
3 behavior that was reflected in my letters.
4 Q. That wasn't my question. My question was did you tell
5 Mr. Buckfire that there had been -- that the
6 negotiations had been stalled as a result -- as a
7 resort of Syncora's conduct?
8 A. Sir, that's your phrase, "stalled." What I said was I
9 think they did have an impact on the negotiations
10 because there were communications going back and
11 forth, I think we discussed them, and I think I sent a
12 series of letters back and forth to your client as a
13 consequence of that behavior.
14 Q. You wouldn't use the -- you wouldn't use the word
15 stalled to describe the negotiations impact --
16 Syncora's impact on the negotiations, correct?
17 A. Yeah, I'm not going to use any adjectives --
18 specifically what I said is they had an impact.
19 Q. But you can't say that they stalled?
20 A. I don't know if they did or they didn't. I said they
21 had an impact.
22 Q. Okay. And did you inform Mr. Buckfire that there had
23 been a serious interruption in the negotiations with
24 the Swap counterparties?
25     MR. SHUMAKER: Objection, asked and

Page 52

1 answered.
2 A. Yeah, here again, I don't think I had to inform him.
3 We were all of the opinion that after announcing, I
4 believe -- after reaching, rather, we thought was
5 agreement in principle, I believe that following
6 Monday, if it's the 17th, your client sent a letter
7 and interjected itself into this process and --
8     BY MR. HACKNEY:
9 Q. So Mr. --
10 A. -- that had an impact.
11 Q. Sorry to interrupt you.
12 A. You're okay.
13 Q. Mr. Buckfire was well aware of the serious
14 interruption in the negotiation process, correct?
15     MR. SHUMAKER: Objection, foundation, form.
16 A. Here again, you keep saying serious interruption. I
17 said it had an impact. Whether or not that stopped us
18 from having discussions with the Swap counterparties
19 and going forward, it certainly had an impact on the
20 process.
21     BY MR. HACKNEY:
22 Q. It didn't stop the process, though, did it?
23 A. I had an impact on it. We were -- we were trying to
24 continue going forward in figuring out what your
25 client's intent was and whether or not it should have

Page 53

1  an impact on the Swap counterparties or the custodian.
2  Q.  But did you inform Mr. Buckfire that Syncora's
3  letter -- Mr. Buckfire, the lead negotiator of the
4  business terms of the deal, that Syncora's letter had
5  disrupted the negotiations of this important
6  agreement?
7  A.  I don't know if I --
8     MR. SHUMAKER: Objection, form.
9  A.  I don't know if I had to inform Mr. Buckfire.  He saw
10  the letters that were going back and forth and I'm
11  sure he was aware that they had an impact on what we
12  were trying to achieve.
13     MR. HACKNEY: Let me hand you a document
14  I've marked for purposes of identification as Orr
15  Exhibit 1.
16     MARKED FOR IDENTIFICATION:
17     DEPOSITION EXHIBIT 1
18     9:24 a.m.
19  BY MR. HACKNEY:
20  Q.  Is this a copy of Syncora's June 17th, 2013 letter?
21  A.  Um-hm.
22     Okay.  I've read the letter.
23  Q.  Have you had a chance to read it?
24  A.  Yes.
25  Q.  First question, are there any statements you consider

Page 54

1  to be false in this letter?
2  A.  I think there was a discussion that some of the
3  statements regarding the cross-default provision --
4  this is -- this is what I understood of this letter
5  after -- without going into specific discussions with
6  my attorneys, that I had with my attorneys, that my
7  understanding is Syncora was attempting to tell U.S.
8  Bank, as custodian, that the default on the COP
9  payment on June 14 constituted some form of a
10  cross-default and therefore it impacted the settlement
11  we were teaching -- attempting to reach under the Swap
12  agreement.
13     We did not believe that those two events
14  had a relationship in that position it appeared
15  Syncora was taking, trying to tell U.S. Bank not to
16  release any of the casino revenue to us, was
17  appropriate.
18  Q.  Other than the letter characterizing the missed
19  payment as a cross-default, other than the sentence,
20  are there any other sentences in this letter that you
21  think are false?
22  A.  Well, the first paragraph is an introductory
23  paragraph, so I don't think that's relevant.  The
24  second paragraph -- the last paragraph is someone
25  reserving their rights, and that's fine.  Generally

Page 55

1  the tenor, without parsing through the entire letter,
2  we believed that the tenor of the letter was
3  inappropriate.
4  Q.  But there were -- are there any other statements that
5  were false in this letter other than the sentence you
6  identified on the cross-default?
7     MR. SHUMAKER: I want you to go through it
8  sentence by sentence.
9  A.  We write in reference to the General Receipts
10  Subaccount under the cap --
11     COURT REPORTER: I'm sorry.
12  A.  Okay.  The first sentence of the first paragraph is a
13  reference in it, so I don't believe that would fall
14  into whether or not it's true or false.  It's what
15  they purport to be writing to.  I suppose someone
16  could take an interpretation that to the extent
17  they're trying to reference the cross
18  collateralization is false, but I'm not trying to be
19  insincere, so I'm just going to go through the letter.
20     The second sentence of the first paragraph
21  is a general business nomenclature, so that's a throw
22  away.  June 14th service corporations failed to -- the
23  first sentence of the second paragraph I believe we
24  did fail to make the June 14th payment.
25     BY MR. HACKNEY:

Page 56

1  Q.  The second sentence we've discussed.
2  A.  Which is the substantive sentence I believe is -- is
3  the one that we had issues with, we felt was
4  inappropriate.
5     The third paragraph, first sentence, I
6  don't know whether that was false or not because I
7  wasn't privileged to -- privy to that conversation.
8  The second sentence is a request of the third
9  paragraph.  That consent is required for any release,
10  I think that was another -- the last sentence of the
11  third paragraph I think we had a problem with that,
12  and as I said before, the final paragraph sentence I
13  don't think is germane to discussion that we're
14  having.  It's a standard business sentence.
15  Q.  And the last sentence of the third paragraph you had a
16  problem with because you don't think Syncora has
17  consent rights, correct?
18  A.  Yes, that's correct, yeah.
19  Q.  Now, how did this letter disrupt negotiations with the
20  Swap counterparties?
21  A.  Well, my -- my understanding is it raised concerns as
22  far as what Syncora thought their rights were and what
23  they were going to do.  I think people have to
24  understand this was a very sensitive and urgent
25  situation.  As I said before, the week before we had

Page 57

1  checks bounce, we were running about four or nine
2  million dollars, we needed urgent access to the -- to
3  the revenue, and I think it caused all parties to take
4  a step back.
5  Q.  And how long did they step back?
6  A.  I don't -- to be perfectly honest with you, I don't --
7  I don't really recall.  I remember, as I said before,
8  after this letter there were a series of letters that
9  went back and forth, and I recall that there was some
10  concern by the counterparties as to their potential
11  exposure based upon Syncora's behavior and whether or
12  not they would be free to give us access to the casino
13  revenue.
14  Q.  They were concerned that Syncora might be right,
15  correct?
16  A.  No.  That's your characterization.  I think my general
17  understanding was that everyone felt Syncora was quite
18  wrong.
19  Q.  Didn't you just say that they were worried about their
20  exposure?
21  A.  Well, their exposure in terms of -- not that they were
22  right, their exposure in terms of potential litigation
23  and having to parse through a position which they
24  thought was unfounded.
25  Q.  So they were worried about having to engage in a

Page 58

1  litigation with Syncora over a frivolous legal
2  position that Syncora was taking?
3      MR. SHUMAKER: Objection to form.
4      BY MR. HACKNEY:
5  Q.  That's your understanding?
6  A.  Well, no.  You're characterizing it as frivolous.  I
7  think any prudent business people when they receive
8  letters like this, if they don't believe they are well
9  founded are certainly justified in being concerned
10  about potential litigation.
11  Q.  Were there any out-of-the-ordinary emergencies in the
12  City of Detroit on July 5th that demanded your
13  attention?
14  A.  There are always out-of-the-ordinary emergencies in
15  the City of Detroit.
16  Q.  What were the ones on July 5th?
17  A.  I don't -- I don't remember the ones on July 5th, but
18  I'm sure you can check.  We can -- you know, you can
19  check the press reports as far as -- so there are
20  shootings daily, there are fires, there are unfunded
21  mandates within the City.
22  Q.  Anything that stands out in your mind?
23  A.  There are always -- there are always emergencies.
24  Nothing that stands out in my mind, but on any given
25  weekend, we get 30 shootings a weekend.

Page 59

1  Q.  Was there anything that you can recall today that
2  happened on July 5th that was so urgent it couldn't
3  wait six hours?
4  A.  Every -- every day -- let me be clear about this, so
5  we can just get by it.  Every day that the City does
6  not make reinvestment in the City that has tons of
7  thousands of abandoned structures, that has four of
8  the most dangerous neighborhoods in the country, that
9  has police cars with over 250,000 miles on them, that
10  has police officers I believe during this time, one of
11  whom got shot in the head by a perpetrator that nine
12  cars had surrounded and remains in the hospital today,
13  every day that this City does not make reinvestment is
14  a dangerous day.
15  Q.  Were there any negotiations scheduled for July 5th,
16  2013, the day after July 4?
17  A.  I don't -- I don't recall.  If there's something you
18  can refresh my recollection.  I believe there was --
19  there was something on July 5th.  I'm just not
20  recalling what it was.
21  Q.  Did this letter cause the negotiations to cease
22  between June 17th and when you're able to obtain the
23  TRO on July 5th?
24  A.  I wouldn't say whether it caused them to cease.  As I
25  said before, it had an impact and it was disruptive.

Page 60

1  Q.  Okay.  So it had an impact, but it didn't cause them
2  to stop, correct?
3  A.  To some degree the parties -- you know, to some degree
4  my recollection is -- here again, understanding that
5  I'm the client and I'm relying on my team, my
6  understanding was it had an impact and it was
7  disruptive.
8  Q.  Did negotiations stop between June 17th and July 5th?
9  A.  I don't know if they completely stopped because your
10  characterization of negotiations could include
11  discussions about what to do with Syncora's
12  interruption.
13  Q.  So the answer to my question is no, they did not stop?
14  A.  No.  The answer to your question is just what I said.
15  The characterization of the interruption could include
16  this letter.
17  Q.  Okay.  But it's a simple question, and you were the
18  person that was involved for the City in making the
19  ultimate decision.  Did the negotiations of the
20  forbearance agreement's final terms stop between
21  June 17th and July 5th when you're able to get a TRO?
22      MR. SHUMAKER: Objection, asked and
23  answered.
24  A.  Sir, I'm going to stick with my answer.  It was
25  disruptive and it was -- had an impact.

Page 61

1    BY MR. HACKNEY:
2    Q.  Can you answer the question as to whether they
3    stopped?
4    A.  Your characterization --
5        MR. SHUMAKER: Objection, asked and
6    answered.
7    A.  On any given day they may have. I'm going to stick
8    with my answer.
9        BY MR. HACKNEY:
10   Q.  Were there any negotiations with the Swap
11   counterparties between June 17th and July 5th?
12   A.  There probably were.
13   Q.  After Syncora -- let me -- let me stop.
14   So after you obtained the TRO, did that
15   facilitate the resumption of the negotiations?
16   A.  When did we obtain the TRO?
17   Q.  July 5th.
18   A.  That was the event I was talking about. I think it
19   certainly facilitated the parties continuing to
20   discuss, yes.
21   Q.  It didn't resolve any of Syncora's rights, correct?
22   A.  Well, we didn't -- we didn't --
23       MR. SHUMAKER: Objection to the extent it
24   calls for a legal conclusion.
25   A.  We didn't think Syncora had rights in this regard, but

Page 62

1    my understanding of the TRO was to cause Syncora to
2    cease and desist from its behavior.
3        BY MR. HACKNEY:
4    Q.  But you understand that whatever Syncora's rights were
5    before the TRO, they were after the TRO. The TRO
6    doesn't resolve Syncora's rights. It's just an
7    interim measure. You understand that as a lawyer,
8    right?
9    A.  Well --
10       MR. SHUMAKER: Same objection, form.
11   A.  And let's get by this, sir. Yes, I am an attorney,
12   but I do not have a license in the state of Michigan
13   and I'm not practicing law now nor do I have
14   malpractice insurance, so I think it's fair for me to
15   act as a -- act as a client, a business person, and
16   not draw a legal conclusion as far as what your
17   client's rights are.
18       BY MR. HACKNEY:
19   Q.  And the TRO was very important because it stopped
20   Syncora from doing what it was doing, correct?
21   A.  Yes. My understanding is it did, sure.
22   Q.  And that was critical, right?
23   A.  I thought it was appropriate, yes.
24   Q.  And then you were willing to dissolve the TRO one week
25   later, correct?

Page 63

1    A.  I don't recall if it was one week later or not. I
2    believe it was dissolved a week or so ago. I don't
3    recall whether or not we were willing to resolve it
4    one week later -- dissolve it one week later.
5    Q.  If I told you that your counsel represented to me on
6    July 12th, one week after the TRO was entered, that
7    you were willing to dissolve the TRO, do you have a
8    basis to contradict that?
9        MR. SHUMAKER: Objection, form, foundation.
10   A.  Yeah, if my counsel was telling you that in the
11   context of potential settlement negotiations, I'm --
12   I'm a little hesitant to characterize what he said,
13   but I have no basis -- if my counsel represented that
14   to you, I have no basis to object to that.
15       BY MR. HACKNEY:
16   Q.  And if they represented it in pleadings to the Court,
17   you don't have a basis to dispute that either?
18   A.  No.
19   Q.  Okay. So this critical TRO that you had obtained,
20   your counsel was willing to dissolve ten days after it
21   was entered, correct?
22       MR. SHUMAKER: Objection. Counsel, this is
23   discovery about the assumption motion, correct? I
24   mean this is not discovery for the City's lawsuit
25   against Syncora.

Page 64

1        MR. HACKNEY: Syncora -- Syncora's alleged
2    conduct is included in Mr. Orr's affidavit. It's
3    described in the assumption motion. I mean, come on,
4    this is right up Main Street.
5    A.  Well, sir, I understand you're trying to get me to
6    characterize what we were doing for purposes in the
7    litigation. If you want to stick to the facts as far
8    as what happened, I'm happy to talk to you about
9    those, but you asked me a question before as to
10   whether or not I would have any reason to object on
11   what my counsel represented to you and I said no.
12       BY MR. HACKNEY:
13   Q.  If Syncora's letter represented such a threat to the
14   City, why were you willing to dissolve the TRO that
15   stopped the impact of Syncora's letter?
16       MR. SHUMAKER: Objection, form, foundation.
17   A.  Here again, there. There -- part of your question is
18   calling for a little bit of speculation. Clearly, you
19   were having discussions with my counsel potentially
20   about what could be done to resolve this issue. Your
21   question may not include the context of all of those
22   discussions.
23       BY MR. HACKNEY:
24   Q.  I'm referring to statements you made in pleadings.
25   A.  Well, I'm trying to respond to your question. There

Page 65

1  may be other reasons why they made those
2  representations.  What I will say to you is what I
3  said before.  If my counsel represented to you that we
4  were willing to dissolve it, I have no reason to
5  contradict that.
6  Q.  And they would have done that at your behest, right?
7      MR. SHUMAKER:  Objection, form, foundation.
8  A.  They -- we would have the -- they would have had the
9  authority to do that, yeah.
10 BY MR. HACKNEY:
11 Q.  During the course of your negotiations back to the
12 agreement in principle of what became the forbearance
13 agreement, did you ever solicit the views of any of
14 the other monoline insurers, such as Ambac or Assured
15 or National about what they thought the City should
16 do?
17 A.  Not that I recall.
18 Q.  Did you ever solicit the views of any COP holders
19 about what they thought the City should do with
20 respect to the --
21 A.  I didn't solicit their views, no.
22 Q.  Did you direct anyone acting on your behalf to solicit
23 the views of any of those parties?
24 A.  Not that I recall.
25 Q.  Isn't it true that getting the forbearance agreement

Page 66

1  was a life or death issue for the City of Detroit?
2  A.  Yes, getting the forbearance agreement was very
3  important to the City of Detroit.
4  Q.  Is it a life or death issue?
5      MR. SHUMAKER:  Object to form.
6  A.  When you say life or death, you know, here again I'm
7  trying to be responsive, but I want (sic) to
8  characterize it.  The City needs the casino revenue
9  badly.  It was cash poor at that time.  It would have
10 facilitated without access, and it continues to be
11 relatively cash poor without access.  It could have
12 facilitated a cash crisis.  Life or death suggests to
13 me it was critical and it might have been life or
14 death, but what it does mean is that we could not have
15 made the investment and cannot make the investment
16 that is so crucial for the City.
17 BY MR. HACKNEY:
18 Q.  In fact, isn't it your position that without access to
19 the casino revenues that people in the City of Detroit
20 may die?
21 A.  Yes.
22 Q.  Okay.
23 A.  People -- you know, you may think of that as
24 hyperbole, but this is a City where between car
25 jackings, crime -- just last week, there was a woman

Page 67

1  who had a gun pointed at her three times in her front
2  yard by people who were stripping a car in front of
3  her -- that's a very serious threat in the City, and I
4  don't want anyone to undermine the concept that this
5  revenue is necessary to make this City a safer place.
6  Q.  So it's fair to say that when it comes to the City's
7  access to casino revenues, lives of the people of the
8  City of Detroit are at stake?
9  A.  Lives of the people of the City of Detroit are at
10 stake every day.
11 Q.  I know that's true.  I'm aware of the fact people that
12 live and die, but I'm asking with respect to access to
13 the casino revenues.  Access to the casino revenues is
14 something that lives are at stake regarding, correct?
15 A.  Health, safety and welfare of the citizens are crucial
16 and this casino revenue allows us to enhance that.
17 Q.  And lives are at stake, right?
18 A.  Health, safety and welfare of the City is crucial and
19 this casino revenue allows us to enhance that.
20 Q.  Can you agree with me that lives are at stake?
21     MR. SHUMAKER:  Objection, asked and
22 answered.
23 A.  I've answered the question.
24     BY MR. HACKNEY:
25 Q.  That's not something you can agree with?

Page 68

1  A.  I told you, lives are at stake in the City every day.
2  Q.  Are they at stake with respect to access to the --
3  A.  Every day --
4  Q.  -- casino revenues?
5  A.  Lives are at stake, every day that we don't have access
6  to casino revenue, we cannot make the necessary
7  reinvestment in this City to provide for the health,
8  safety and welfare of the citizens, and that's a true
9  statement.
10 Q.  If I said that lives are at stake with respect to the
11 casino revenues, can you agree with that statement?
12     MR. SHUMAKER:  Objection, asked and
13 answered.
14 A.  I've answered your question.
15     BY MR. HACKNEY:
16 Q.  Can you -- can you agree with my statement?
17 A.  I've answered your question.
18 Q.  I disagree that you've answered my question.  We'll
19 take the objection up at the -- with the Court, but
20 are lives at stake with respect to access to the
21 casino revenues?
22 A.  I've answered your question.
23     (Whereupon Rick Frimmer left the
24     deposition at 9:41 a.m.)
25     MR. HACKNEY:  Well, we're going to have to

Page 69

1 take a motion to compel then on this one, Greg. I've
2 not gotten an answer to that question.
3     MR. SHUMAKER: I disagree.
4     BY MR. HACKNEY:
5 Q.   We can agree that access to the casino revenues was an
6 issue of extreme importance to the City, right?
7 A.   Yes.
8 Q.   There was no guarantee going into the negotiations
9 with the Swap counterparts that they were going to
10 grant you that access, correct?
11 A.   That is true.
12 Q.   Given the importance of this issue, what was your
13 backup plan?
14 A.   We had discussed a number of alternatives, but quite
15 frankly, there were none that made any sense.
16 Q.   So what -- so you had no backup plan?
17 A.   No. Sir, this City had reduced FTEs by over
18 20 percent before I got here. The police department
19 had lost hundreds, I believe, before I got here under
20 the point -- this year, from January 1, we've lost in
21 excess of 300 employees.
22     Even if you did an analysis of the City of
23 $40,000, the salary per FTE, and the City benefits
24 account for 108 percent of FTE, so let's say 80,000
25 times 300 lost employees. That's only 24 million

Page 70

1 dollars. So even if we reduced the City -- tried to
2 reduce it by more employees beyond the roughly 9,700
3 that we have, you wouldn't have a way to stem the loss
4 of almost 132 to 180 million dollars in casino
5 revenue. So when you say what other alternatives we
6 had, this was a crucial component of any plan that we
7 would have.
8 Q.   Do you have any --
9 A.   This is the third largest source of income for the
10 City.
11 Q.   And I -- I have a limited time with you today,
12 Mr. Orr, and I'd appreciate it if you answered my
13 questions directly to the extent you're able.
14     Did you have a backup plan if you couldn't
15 get the Swap counterparties to waive their cash
16 trapping rights?
17 A.   We discussed alternatives. When you say plan, that
18 suggests to me that we were going to say we were going
19 to do this if we can't do that. We had discussed
20 alternatives.
21 Q.   But you can't say that you had a plan?
22 A.   No. This was crucial.
23 Q.   And if Mr. Buckfire testified that you'd just started
24 developing your backup plan recently, do you have a
25 basis to contradict that?

Page 71

1 A.   No. That's what I was just saying. We had discussed
2 alternatives, but this was crucial.
3 Q.   Given the importance of this issue, I assume that you
4 had made requests from the State of Michigan to
5 provide the City with liquidity prior to June 4th;
6 isn't that correct?
7 A.   Sir, you can assume whatever you want. The reality is
8 under my contract I have an obligation to report and
9 coordinate with the State. We had had discussions, I
10 believe, with the State about potential liquidity, and
11 we were told that that would be unavailable.
12 Q.   And you conveyed to the State the seriousness of the
13 City's situation, correct?
14 A.   I don't think I had to convey to the State the
15 seriousness of the City's situation. I think the
16 State's well aware.
17 Q.   So the State understood that getting liquidity was a
18 life or death issue for the City of Detroit, correct?
19     MR. SHUMAKER: Objection, form, foundation,
20 calls for speculation.
21 A.   Whatever the State understood, what I'm trying to tell
22 you is I conveyed to them what our needs are.
23     BY MR. HACKNEY:
24 Q.   You conveyed the extreme seriousness of the situation
25 to the State, correct?

Page 72

1 A.   As I said, I don't think I had to convey it to the
2 State. The State had just been through almost two
3 years of determining a financial emergency existed.
4 Q.   And the State did not provide the City with any
5 liquidity prior to June 4th, correct?
6 A.   No.
7 Q.   I am correct that they didn't?
8     (Whereupon Jerome Goldberg entered the
9     deposition at 9:44 a.m.)
10 A.   You are correct, they did not.
11     BY MR. HACKNEY:
12 Q.   Now, given that seriousness of the liquidity crisis
13 and the life or death issues that were facing the
14 City, I assume you also evaluated the value of the
15 City's non-core assets for possible sale, correct?
16     MR. SHUMAKER: Object to the form,
17 mischaracterizes his testimony.
18 A.   Is that a compound question?
19     I think in our June 14 proposal and the run
20 up to the June 14 proposal, we had listed in our
21 proposal for creditors a number of assets of the City,
22 and we had also said that we were in the process of
23 evaluating what to do.
24     BY MR. HACKNEY:
25 Q.   And the City owns a fine art collection; isn't that

**Page 73**

1  correct?

2  A.  The City owns the Detroit Institute of Arts in its

3  collection.

4  Q.  And did you attempt to value the art collection with

5  an eye towards selling pieces of the art collection to

6  relieve the City's life or death liquidity crisis?

7      MR. SHUMAKER: Object to the form.

8  A.  Prior to June 14th?

9      BY MR. HACKNEY:

10  Q.  Prior to June 11th, which is the date of the agreement

11  in principle.

12  A.  No.  We've entered into an agreement with Sotheby's to

13  begin that process now, not related to relieving the

14  liquidity crisis, just as a matter of prudence to

15  determine the value of assets.

16  Q.  Your expectation is that the -- that the City's art

17  collection is very valuable; isn't that correct?

18  A.  I've been told that, yes.

19  Q.  Isn't it possible it may be worth billions of dollars?

20  A.  That would be speculation.  I've been told it is

21  valuable.

22  Q.  Could it be worth hundreds of millions of dollars?

23  A.  That would be speculation.  I've been told that it's

24  valuable.

25  Q.  Okay.  So as of June 4th, you didn't know whether or

**Page 74**

1  not the City might have billions of dollars of art

2  sitting in its art institute; is that your testimony?

3  A.  No.  My testimony is that I understand it as valuable.

4  The exact value of it is to be determined.

5  Q.  And you made no effort to sell any of that art prior

6  to engaging in the negotiations with the Swap

7  counterparties, correct?

8  A.  No.  That's true.

9  Q.  What about federal aid?  Did you attempt -- did you

10  attempt to obtain federal aid prior to the June 4

11  commencement of negotiations with the Swap

12  counterparties?

13  A.  I don't know if it was prior to or around that time.

14  It may have been.  We may have sought federal aid

15  prior to that.

16  Q.  And you conveyed the seriousness of the situation to

17  whomever you spoke to at the federal government?

18  A.  Yes, I believe the federal government was aware of the

19  seriousness of the situation.

20  Q.  And the federal government was also unwilling to

21  provide aid to the City of Detroit; is that your

22  testimony?

23  A.  Yes, direct aid.

24  Q.  Let me ask you some questions about the service

25  corporations.  The service corporations are two

**Page 75**

1  entities that have long names that I'll only say to

2  you if you want -- really want me to.

3  A.  We'll stipulate I know what you mean by the service

4  corporations.

5  Q.  And there are two of them?

6  A.  There are two.

7  Q.  Okay.

8  A.  Police and Fire General Services.

9  Q.  There you go.  So you already know them and you said

10  the names.  So the two service corporations are

11  parties to the forbearance agreement, correct?

12  A.  Yes.

13  Q.  And Mr. Buckfire testified yesterday, I'll represent

14  to you, that his understanding is that you directed

15  the service corporations to execute the forbearance

16  agreement and they did so; is that correct?

17  A.  No.

18  Q.  Okay.  Were there arms' length negotiations with the

19  service corporations?

20  A.  To the best of my knowledge, there was.

21  Q.  And who led those?

22  A.  I'm not quite sure.  I know that -- in response to

23  your question, I did not direct a service corporation.

24  They were organized by the City.  And they are managed

25  by City employees, but I had no direct -- I gave no

**Page 76**

1  direct instruction to either of the service

2  corporations.

3  Q.  Okay.  So my question was about negotiations with the

4  service corporations.

5  A.  Right.

6  Q.  Who conducted the arms' length negotiations with the

7  service corporations on behalf of the City?

8  A.  I'm not sure.

9  Q.  Well, you know it wasn't you?

10  A.  Yes, it wasn't me.

11  Q.  And did you ever direct Mr. Buckfire to engage in

12  direct negotiations with the service corporations?

13  A.  No.  I directed Mr. Buckfire to do whatever needed to

14  get done to get the agreement in principle resolved

15  and signed.  That's what I did, but I did -- said

16  nothing specific.  Just to be responsive to your

17  question, said oh, go talk to the service

18  corporations, there was nothing that specific.

19  Q.  So to the extent there was a negotiation that needed

20  to be had, it was his job to go have it?

21  A.  It was his or someone else on my -- on my

22  reorganization team's job, yeah, sure.

23  Q.  Well, did you direct anyone else on your team to go

24  negotiate with the service corporations?

25  A.  No.  Once we reached an agreement in principle, I

1  directed my team to more or less go forth and get it
2  documented and get it done.
3  Q.  And the service corporations are legally separate from
4  the City, correct?
5  A.  Yes, they are.
6  Q.  Your powers as emergency financial manager do not
7  extend to the service corporations, correct?
8  A.  I haven't examined that question, so I can't answer
9  you yes or no.
10  Q.  Can you direct their actions under PA 436?
11  A.  I'm not sure.
12  Q.  Do you have any firsthand knowledge that the service
13  corporations engaged in arms' length negotiations with
14  the Swap counterparties?
15  A.  No.
16  Q.  If they had, do you think that's something you would
17  have likely heard about?
18      MR. SHUMAKER: Objection, calls for
19  speculation.
20  A.  I may have.  As emergency manager, there are a number
21  of things that occur, as you might imagine, on a daily
22  basis that I may or may not hear of.  I might have.
23      BY MR. HACKNEY:
24  Q.  As you sit here today, though, can you recall hearing
25  that there were ongoing negotiations between the

1  service corporations and the Swap counterparties?
2  A.  No.
3  Q.  Isn't it true that the City's obligation to the
4  service corporations under the service contracts with
5  respect to hedge-related payments were secured by
6  the collateral agreement?
7      MR. SHUMAKER: Objection, calls for a legal
8  conclusion, foundation.
9      If you understand it, you can answer it.
10  A.  I'm trying not to draw a legal conclusion.  Repeat
11  your question; let me see if I can answer it.
12      BY MR. HACKNEY:
13  Q.  I was just asking whether -- you understand that the
14  service corporations have service contracts with the
15  City?
16  A.  Yes.
17  Q.  And you understand that the City has hedge-related
18  payments that it has to make to the service
19  corporations --
20  A.  Yes.
21  Q.  -- that they then can use to make to the Swap
22  counterparties under the Swap?
23  A.  Yes.
24      MR. SHUMAKER: Objection, calls for a legal
25  conclusion.

1      BY MR. HACKNEY:
2  Q.  Do you understand that the collateral agreement
3  secures the City's obligation to the service
4  corporations and the service corporations' obligation
5  to the Swap counterparties?
6  A.  That's the legal conclusion.  It might.  That's -- I'm
7  going to stay away from relaying my understanding
8  because, frankly, I haven't -- I'm going to be
9  careful, frankly.  It might.
10  Q.  Okay.  You don't know as you sit here today?
11  A.  I have an impression of something along those lines,
12  yes.
13  Q.  And what is it?
14  A.  That it does -- it may well secure it.  It's just that
15  it's a legal conclusion that I don't want to make.
16  Q.  Okay.
17  A.  Okay.
18  Q.  Isn't it fair to say, though, that the collateral
19  agreement's existence meant that the service
20  corporations could rely on the City to make its
21  quarterly Swap-related interest payments?
22  A.  Yeah, my understanding is that the casino revenue
23  comes in daily.  It's put into an account.  Monthly
24  there are payments that are put into the custodial
25  account and those payments are disbursed orally.

1  Q.  Now, if the City's able to perform under the
2  forbearance agreement and exercises the option, the
3  effect of this is that the hedge will be terminated,
4  correct?
5      MR. SHUMAKER: Object to the form, calls
6  for a legal conclusion.
7  A.  I believe there will no longer be a need for the
8  hedge, yes.
9      BY MR. HACKNEY:
10  Q.  And the collateral agreement will also be terminated
11  in that event, correct?
12  A.  If we -- if the City performs?
13  Q.  Right.
14  A.  Yes.
15  Q.  And that will free up the casino revenues to be used
16  by the City, correct?
17  A.  Yes.
18  Q.  Okay.  How does that benefit the service corporations?
19  A.  I don't know if it does or doesn't.  I know it
20  benefits the City.
21  Q.  Can you think of a way that it benefits the service
22  corporations as you sit here today?
23  A.  No.  That would be speculation.
24  Q.  And you understand that the service corporations
25  depend on the City to make the payments of their

Page 81

1  various obligations both under the COPs and the Swap?
2  A.  I believe that's true.
3  Q.  They don't have any independent sources of income?
4  A.  To the best of my knowledge, they do not.
5  Q.  And your view today is that the City of Detroit is
6  insolvent, correct?
7  A.  Yes, yes.
8  Q.  And fair to assume that by extension the service
9  corporations are also insolvent, too?
10    MR. SHUMAKER:  Objection, calls for
11  speculation.
12  A.  I don't know if that's true or not.
13    BY MR. HACKNEY:
14  Q.  Now, isn't it true that the composition of the service
15  corporations' boards of directors includes three City
16  officers and at least one City Council member?
17  A.  Yes.  I think I said before there are City employees
18  and City representatives on the boards.
19  Q.  And in fact the person who signed the forbearance
20  agreement on behalf of the service corporations was
21  the president of both service corporations, correct?
22  A.  Yes, I believe so.
23  Q.  And her name is Cheryl Johnson, right?
24  A.  Yes.
25  Q.  And she is also the City's finance director, correct?

Page 82

1  A.  Yes.
2  Q.  Okay.  Portia Roberson --
3  A.  Um-hm.
4  Q.  -- is the City's corporation counsel, right?
5  A.  Yes.
6  Q.  And she's also on the board of both service
7  corporations, correct?
8  A.  To the best of my knowledge, that's true.
9  Q.  Do you know who made the decision at the service
10  corporations to enter into the forbearance agreement?
11  A.  I do not.
12  Q.  Did you have any conversations with either Ms. Johnson
13  or Ms. Roberson about the service corporations
14  entering into the forbearance agreement?
15  A.  No.
16  Q.  Isn't it true that the policy of the City is to
17  indemnify the service corporation directors for
18  actions they take in their capacity as City employees?
19  A.  I don't know that.
20  Q.  You don't know if that's the policy of the City?
21  A.  I do not.  I know the City has an indemnification
22  policy.  I don't know if it applies to the service
23  corporations.
24  Q.  Okay, but does it apply to the City employees?
25  A.  It applies to City employees acting within their

Page 83

1  course and scope of their employment as employees of
2  the City.
3  Q.  Okay.  So as you sit here today, you can't say that
4  that indemnification policy would extend to City
5  employee actions taken in their capacity as service
6  corporations --
7  A.  Correct.
8    MR. SHUMAKER:  Objection, calls for a legal
9  conclusion.
10    BY MR. HACKNEY:
11  Q.  I will -- I'm sorry.
12  A.  Okay.
13  Q.  As emergency financial manager, you control the salary
14  of all City employees; isn't that correct?
15  A.  As emergency manager.
16  Q.  As emergency manager, right.
17  A.  Right.
18  Q.  Sorry.  Is that the proper --
19  A.  It changed with Public Act 436.  Public Act 72 was EFM
20  and now I'm an EM.
21  Q.  Okay.  Got to get my lingo.
22  A.  Yeah.
23  Q.  And you do, as emergency manager, control the salary
24  of all City employees, correct?
25  A.  I have the authority to control the salary of all City

Page 84

1  employees.  I have not exercised that authority for
2  all City employees.
3  Q.  Okay.  And you have the power to reduce those City
4  employee salaries to zero if you choose, correct?
5  A.  I think I do, yes.
6  Q.  And you have done that on at least one prior occasion,
7  I believe, correct?
8  A.  Yes, I did do that.
9  Q.  Okay.  Now, are you aware that the insurers, the Swap
10  insurers, like Syncora and FGIC, contend that the
11  hedges cannot be terminated without their consent
12  where there are termination events or events of
13  default?
14  A.  I have heard that.  I'm -- I have no independent
15  awareness of that.
16  Q.  So when did you first hear that?
17  A.  I think it was all caught up in this time frame of
18  the -- of the discussion after the agreement in
19  principle, before the forbearance agreement was
20  reached.
21  Q.  Your best recollection is that you heard that prior to
22  the execution of the forbearance agreement?
23  A.  I believe it may have been prior to execution.
24  Q.  But you have taken -- you have taken no steps to
25  evaluate whether the City concurs with the insurers'

Page 85

1 construction on this point?
2 A. No. I don't think that's exactly true. I think there
3 were -- as I said before, there were a series of
4 letters and discussions that went on from the second
5 week of June throughout some point in July where I
6 believe there may have been discussions in that
7 regard, validity of that point.
8 Q. Okay. But if I ask you to express the City's view on
9 the legal merits of the insurers' contention that they
10 have the right to consent, you'll decline to answer
11 those questions because it tends to reveal the
12 attorney-client privilege.
13 MR. SHUMAKER: That's right and also calls
14 for a legal conclusion, yes.
15 MR. HACKNEY: But you'll -- I want to save
16 a big string of questions, so if I want to ask him
17 what are the pros and cons of the argument, who's
18 likely to win, how will it all come out --
19 BY MR. HACKNEY:
20 Q. You won't answer those questions on the grounds of
21 the -- because it would tend to reveal attorney-client
22 advice, correct?
23 MR. SHUMAKER: Well, I don't want to
24 prevent you from asking any questions and I don't --
25 but if he has an understanding independent of advice

Page 86

1 he's given -- but clearly to the extent it's going to
2 reveal attorney-client communication, I will tell him
3 not to answer.
4 MR. HACKNEY: Okay. I'll ask him that.
5 BY MR. HACKNEY:
6 Q. Does the City concur in the insurers' view?
7 MR. SHUMAKER: Objection, calls for a legal
8 conclusion and could ask for attorney-client
9 communications.
10 MR. HACKNEY: Are you instructing him not
11 to answer?
12 MR. SHUMAKER: To the extent that the
13 question goes to that, yes.
14 A. Maybe I can help out in this line of questioning.
15 Any -- I have not acted as an attorney on this job for
16 the aforementioned reasons, so any opinion that I
17 would express on behalf of the City in this regard
18 would be solely as a result of communications with
19 counsel and discussions.
20 BY MR. HACKNEY:
21 Q. That was my expectation. So if I ask you if the City
22 concurred, that's going to get into what your lawyer
23 thinks.
24 A. That's exactly right.
25 Q. So you -- you will assert the privilege.

Page 87

1 A. I will assert the privilege.
2 Q. And if I ask you what are the arguments for and
3 against this point, you'll assert the privilege.
4 A. I will assert the privilege, but I am aware there are
5 a number of objections that have been filed in the
6 case that have addressed those issues and none of them
7 have caused me any surprise.
8 Q. If I said that the City -- if I asked you what the
9 City's view is on -- well, let me take a step back.
10 Do you agree that the insurers can block an
11 early termination of the Swap, that this would be
12 important to assessing whether the City was in danger
13 of owing a termination payment?
14 MR. SHUMAKER: Objection, calls for a legal
15 conclusion.
16 A. Yes, same thing. I'd only have a response to that
17 based upon discussions I've had with counsel.
18 BY MR. HACKNEY:
19 Q. Do you agree that the insurers can block a
20 termination, that it would make sense to negotiate
21 with the insurers to determine whether you can secure
22 their agreement not to consent to any termination?
23 MR. JURGENS: Objection, form.
24 MR. SHUMAKER: Same objection.
25 A. Same response. It would only be based upon

Page 88

1 discussions I've had with counsel.
2 BY MR. HACKNEY:
3 Q. Are you aware that the insurers contend that they have
4 the right to control all actions that may be taken by
5 the Swap counterparties in connection with the -- with
6 the Swaps?
7 A. I am aware of that, yes.
8 Q. When did you first develop that awareness?
9 A. During some course of the correspondence that occurred
10 during this time frame that we previously discussed
11 today.
12 Q. And have you taken steps to evaluate whether the City
13 concurs with the insurers' construction of the
14 operative documents on this point?
15 A. Have we taken steps? Yes.
16 Q. Yeah. And what is the City's position?
17 MR. SHUMAKER: Objection, calls for the
18 provision of attorney-client communications, and I
19 will instruct him not to answer.
20 BY MR. HACKNEY:
21 Q. Yeah, I'm just going -- I'm making a record here.
22 Okay? I don't want to have -- I tried to --
23 A. I'm with you. I'm with you.
24 Q. And if I ask you what the arguments are on both sides
25 of this point, you'll also refuse to answer on the

Page 89

1 grounds of the privilege.
2 A. Here again, there are objections in the case that make
3 some of those arguments, but I will not specifically
4 answer.
5 Q. Because of the privilege.
6 A. Because of the attorney-client privilege and it calls
7 for a legal conclusion.
8 Q. And if I ask you who had the better side of the
9 argument, you would say the same thing?
10 A. Same thing.
11 MR. SHUMAKER: Same objection, same
12 instruction.
13 A. I would say the same thing. I would say the same
14 thing.
15 BY MR. HACKNEY:
16 Q. Do you agree that the insurers can control all actions
17 of the Swap counterparties in connection with the
18 Swaps, that this would be important in terms of
19 assessing whether the City should negotiate with the
20 insurers?
21 MR. SHUMAKER: Objection, foundation, calls
22 for a legal conclusion.
23 You can answer to the extent you have an
24 understanding.
25 A. It's also a little speculative because it's a

Page 90

1 hypothetical. If then is usually a hypothetical, so I
2 would -- for the same reasons as we discussed before,
3 I would say that to the extent it calls for a legal
4 conclusion, I'll refuse to answer.
5 I would say as a rational person, if you
6 were put in a corner, then you might want to consider
7 your alternatives, including negotiations.
8 BY MR. HACKNEY:
9 Q. With the insurers?
10 A. With whoever, yes, whoever's --
11 Q. I mean it's just a simple point. We have five minutes
12 left. I'm going to milk them.
13 A. Okay.
14 Q. But it's a simple point, which is if the insurers can
15 potentially direct, like a marionette, the actions of
16 the Swap counterparties, and I understand --
17 A. Right.
18 Q. -- that you're not agreeing with that --
19 A. Right.
20 Q. -- okay, but if they can --
21 A. Um-hm.
22 Q. -- they're a potential party that you can go negotiate
23 with to play off against the Swap counterparties,
24 correct?
25 MR. SHUMAKER: Objection, calls for

Page 91

1 speculation.
2 A. Yeah, here again, I mean if that happened, possibly,
3 but that's a speculative question, so I'm going stay
4 away from it.
5 BY MR. HACKNEY:
6 Q. It is speculation, but it's logical --
7 A. As I said in my answer, a rational person would make
8 that --
9 Q. Yeah.
10 A. If you were put in a corner, you'd have to find some
11 way out, and negotiation might be one of those
12 sources, but to the extent your question is also
13 speculation, I'm going to defer from answering.
14 Q. Do you agree that the insurers are entitled to control
15 all of the actions of the Swap counterparties; it
16 raises the risk that the deal negotiated in the
17 forbearance agreement may be for naught?
18 MR. SHUMAKER: Objection, calls for
19 speculation.
20 A. Yeah, here again, maybe not.
21 Q. Those are things you haven't -- you haven't considered
22 prior to today, fair statement?
23 A. That's a fair statement.
24 Q. Okay. Have you ever heard the phrase "play both ends
25

Page 92

1 against the middle"?
2 A. Oh, have I ever heard the phrase?
3 Q. Yes.
4 A. Yes.
5 Q. You're a bankruptcy lawyer, right?
6 A. Yes.
7 Q. You were, I should say.
8 A. I was.
9 Q. And that's one of the time-honored tricks of
10 bankruptcy negotiation, right, is to play parties off
11 against one another to try and get the best deal?
12 A. I'm not going to call it a trick.
13 Q. Tools.
14 A. Tools, tactics. You know, there -- lawyer, as a
15 negotiator, getting a yes, discussing a number of
16 different alternatives.
17 Q. And one of them is playing off both ends against the
18 middle?
19 A. Could be. People do that all -- outside of legal
20 issues, they do that in negotiation.
21 Q. Isn't it true that prior to July 17 the City never
22 engaged in substantive negotiations with Syncora?
23 A. I don't know if that's true. You said July 17th?
24 Q. Yeah. That's the date of the execution of the
25 forbearance agreement.

1  A.  Right.  I don't know if that's true.  I believe there
2  were discussions that may have been, but you
3  characterize it as substantive negotiations, so I
4  don't know if that's true.
5  Q.  You certainly didn't participate in any substantive
6  negotiations with Syncora, correct?
7  A.  Well, I -- you know, you say negotiations.  I know
8  there were a series of letters going back and forth
9  and I know that there was a letter -- I just don't
10  recall when I sent it -- to Mr. LeBlanc that said if
11  you want to have serious negotiations, then let's have
12  a discussion, but let's stop sending these letters
13  back and forth.
14  Q.  But isn't it your position that there were no serious
15  negotiations with Syncora because Syncora would not
16  make a proposal?
17  A.  I believe in one of those letters I expressed that
18  concern, yes.
19  Q.  And to your knowledge Syncora never made a proposal to
20  the City of Detroit prior to July 17th, correct?
21  A.  Yeah, I believe there was a discussion -- well, there
22  was discussion about an exchange of NDAs, and Syncora
23  said they wanted to make a proposal, but they first
24  wanted to see the proposal from the Swap
25  counterparties, and I believe in one of my letters to

1  Mr. LeBlanc, I said well, the parties need to sign a
2  NDA, and my understanding was Syncora declined to do
3  that.
4  MR. HACKNEY:  Let's actually take a break
5  right now in light of the videotape and maybe we can
6  use it as a chance to stretch our legs and use the
7  restroom.
8  VIDEO TECHNICIAN:  The time is 10:04 a.m.
9  This marks the end of tape number 1.  We are off the
10  record.
11  (Recess taken at 10:04 a.m.)
12  (Back on the record at 10:14 a.m.)
13  VIDEO TECHNICIAN:  We are back on the
14  record at 10:14 a.m.  This marks the beginning of tape
15  number 2.
16  BY MR. HACKNEY:
17  Q.  Mr. Orr, I kind of want to cut through this with
18  Syncora.  I understand that there were letters back
19  and forth between you and Syncora.
20  A.  Yes.
21  Q.  But I just want to make clear for the record that
22  there were not substantive negotiations of the type
23  that you engaged in with the Swap counterparties with
24  Syncora about an alternative proposal to the
25  forbearance agreement prior to its execution on

1  July 17th, correct?
2  A.  I believe -- July 17th?
3  Q.  (Nods head).
4  A.  I believe that's true.  As I said, I think there was
5  some discussion about a potential offer from Syncora,
6  but I believe that got caught up in the NDA issue and
7  that went away, so yes, I believe that's true.
8  Q.  And your recollection in the NDA issue is that the
9  City wanted an NDA, but Syncora wouldn't sign it?
10  A.  My recollection -- no.  My recollection was the City
11  needed an NDA because we were asking all parties --
12  nondisclosure agreement, we were asking all parties to
13  sign them.  There was some discussion -- I put in a
14  letter, I seem to recall, that Syncora sign one, but I
15  don't want to speculate or mischaracterize.  There
16  were some discussion about a NDA before Syncora would
17  show us their proposal and something about they wanted
18  to see the Swap counterparties' proposal before
19  signing an NDA first or something along those lines.
20  Q.  You're not aware of any situation where the City
21  refused to sign an NDA with Syncora, correct?
22  A.  No, not that I'm aware of.
23  Q.  In fact, it was the City that wanted an NDA with
24  Syncora?
25  A.  Yes.  I believe that's true.

1  Q.  And it's also true that you did not engage in
2  substantive negotiations with FGIC about an
3  alternative to the forbearance agreement prior to
4  July 17th, correct?
5  A.  Yeah, with regard to the issue of substantive, I'll --
6  I'll, you know, caution that I'm not -- I'm not
7  necessarily characterizing, but to the best of my
8  knowledge, that's a fair characterization.
9  Q.  You didn't make a proposal about an alternative to
10  FIGC and FIGC didn't make one to you.
11  A.  Yes, to the best of my knowledge, that's true.
12  Q.  And that's also true with respect to Syncora, correct?
13  A.  Yes, that's true.
14  Q.  Now, I think you've testified previously that no
15  proposal was forthcoming from Syncora in connection
16  with the TRO proceedings.
17  A.  Okay.
18  Q.  I'll just represent that to you --
19  A.  Okay.
20  Q.  -- as a way of --
21  A.  Yeah.  In one of my affidavits --
22  Q.  That's right.
23  A.  -- or something, yeah.
24  Q.  Were you aware that Mr. Buckfire had had a
25  conversation with Todd Snyder of Syncora?

Page 97

1  A.  As I said, there were -- you know, during this --
2  there were many conversations that were going back and
3  forth and I wasn't necessarily aware of all of them.
4  I knew they were -- they were going back and forth,
5  but it is -- if that's true, it wouldn't surprise me.
6  Q.  So you don't remember it as you sit here today?
7  A.  No, I do not.
8  Q.  Okay.  Because this was in the -- this was in the
9  period of where the cash was being trapped.
10  A.  Right.  But, sir, here again, there were so many -- so
11  many discussions going back and forth about so many
12  things.  I mean in this period we were dealing with
13  the June 10th meeting, the June 14th creditor's
14  presentation, trying to do the Swap settlement, the
15  run up to my quarterly report.  There were just --
16  there were a lot of conversations about a lot of
17  things.  I simply don't remember.
18  Q.  Okay.  And I take it you don't recall that Mr. --
19  whether Mr. Buckfire told you that Syncora had
20  described to him the general structure of a proposal
21  it wanted to make?
22  A.  He may have.  I just don't recall it.
23  Q.  Okay.  It's true, isn't it, that as of the date of the
24  execution of the forbearance agreement, your office
25  had received multiple calls from Claude LeBlanc at

Page 98

1  Syncora, correct?
2  A.  I'm not aware of that.  There may have been multiple
3  calls, but I'm not aware -- I received no calls.
4  Q.  Okay.  So you don't -- I take it your secretary --
5  A.  My office may have.  Yeah, my secretary may have, but
6  I didn't.
7  Q.  So you don't know whether he called you or not?
8  A.  If you're representing to me that he did, I have no
9  reason to believe that that's untrue.
10  Q.  Okay.  And I take it you have never called personally
11  Mr. LeBlanc --
12  A.  No.
13  Q.  -- isn't that correct?
14  A.  No, I don't think so.
15  Q.  So you didn't return those calls if they were made?
16  A.  No.
17  Q.  I just want -- I guess I -- the City has entered into
18  numerous nondisclosure agreements --
19  A.  Right.
20  Q.  -- in these cases, correct?
21  A.  Yes.
22  Q.  I mean has it entered into hundreds?
23  A.  I don't know.  I don't -- I don't operate the data
24  room or any others, but I suspect there's certainly
25  many.

Page 99

1  Q.  We can say that there are lots.
2  A.  There are lots.
3  Q.  Okay.
4  A.  Okay.
5  Q.  And there's no reason you can think of today that the
6  City wouldn't enter into one with Syncora.
7  A.  No.
8  Q.  Were you aware that Syncora wanted a nondisclosure
9  agreement so that it could make a proposal that would
10  be an alternative to the Swap counterparties?
11  A.  As I said, I believe I have a letter that discusses
12  the NDA issue, but it was caught up in something
13  related to Syncora -- as I understood it, Syncora
14  wanting to see the Swap counterparty proposal first
15  prior to entering an NDA.
16  Q.  Did you ever hear that Syncora had gotten over that
17  issue and was now willing to just make a proposal to
18  the City?
19  A.  No.
20  Q.  So no one ever told you that?
21  A.  No, I don't recall ever hearing that.
22  Q.  Okay.  Would that have been significant to you if you
23  heard that?
24      MR. SHUMAKER:  Objection, calls for
25  speculation.

Page 100

1  A.  Yeah.  Here again, it depends upon what point in time,
2  if we were already bound by the definitive term sheet
3  and then -- or the agreement, I believe the
4  forbearance agreement has an obligation we cooperate
5  with Swap counterparties, so it wouldn't have mat --
6  no, it would not have mattered at that time, so it
7  depends on when that would have occurred.
8      BY MR. HACKNEY:
9  Q.  But if it was prior to July 17th, if there were any
10  parties that were out there that thought they had a
11  good deal for the City, that would have been something
12  you wanted to know?
13  A.  We are always willing to listen to parties that think
14  they have a good deal for the City.
15  Q.  Isn't it true that the City's decision to enter into
16  the forbearance agreement was made by you, in your
17  role as emergency manager?
18  A.  Yes, after consultation with my -- with my employees,
19  staff and consultants, yes.
20  Q.  And when did you make that decision?
21  A.  To enter into the actual agreement?
22  Q.  Yes.
23  A.  The day I signed it.
24  Q.  July 15th, 2013?
25  A.  I believe so, yes.

Page 101

1 Q. And what advisors did you rely upon in making this
2 decision?
3 A. My attorneys, Mill -- my investment banker, Miller
4 Buckfire; our accountants, Ernst & Young; virtually --
5 virtually -- Conway McKenzie, our operational advisor,
6 virtually all of them.
7 Q. All of your third party advisors?
8 A. Yes, yes.
9 Q. And anyone else that you relied upon in making the
10 decision?
11 A. Oh, probably members of my immediate staff such as my
12 senior advisor, chief of staff, but less so. More of
13 my outside third party advisors.
14 Q. What documents did you rely upon in making the
15 decision, if any?
16 A. We looked at a number of -- term sheet, the actual
17 draft of the forbearance agreement. There may have
18 been some e-mails. I just recall a lot of telephone
19 calls. There may have been some forecast, cash
20 forecast, and actuals, and some of the public reports
21 I had issued regarding our cash position.
22 Q. Any other documents you can remember considering as
23 part of this decision to enter into the forbearance
24 agreement?
25 A. There may have been correspondence. As I said, there

Page 102

1 were letters that were exchanged between Mr. LeBlanc
2 and myself, and others, the letter you showed me
3 today. I'm just trying to capture the universe of
4 what would have been included, but any -- any and all
5 documents related to this that I would have seen would
6 probably fall under that characterization.
7 Q. Any legal memoranda from Jones Day that you considered
8 in making this decision?
9 A. Yes, probably.
10 Q. Okay. Written legal memoranda that you reviewed?
11 A. Yeah, including e-mails. Yeah.
12 Q. Now, did you take time to familiarize -- to
13 familiarize yourself with any of the legal documents
14 relating to the COPs Swap structure in connection with
15 your decision to execute the forbearance agreement?
16 A. I relied -- I may have seen them, but I relied upon
17 consultation with my counsel and investment bankers.
18 Q. The documents I'm referring to are -- can we agree
19 they're relatively complicated legal documents?
20 A. Yeah, I'd say they're not simple documents. It's not
21 a -- you know, an auto purchase contract, yeah.
22 Q. Right. So can I fairly characterize that -- that you
23 may have looked at the documents, but you didn't
24 attempt to master -- master them in terms of their
25 legal ins and outs?

Page 103

1 A. Yeah. That's a --
2 MR. SHUMAKER: Object to form.
3 A. That's a fair characterization. As I said, I'm trying
4 to stay away from acting as an attorney in this job.
5 BY MR. HACKNEY:
6 Q. Okay.
7 A. For a number of reasons.
8 Q. So you relied on your advisors to explain to you how
9 the COP Swap agreements worked?
10 A. Yes.
11 Q. And you also relied on them to explain to you how the
12 COP Swap agreements worked in conjunction with the
13 forbearance agreement that you were about to execute?
14 MR. JURGENS: Object to form.
15 A. Yes.
16 BY MR. HACKNEY:
17 Q. So what is the relationship between the forbearance
18 agreement and the COPs Swap structure?
19 A. Well, my understanding is that the forbearance
20 agreement is related to the Swaps structure, but that
21 the COPs structure is unrelated.
22 Q. Okay. So the forbearance agreement is part of the
23 same subject matter as the collateral agreement and
24 the Swaps agreement, but not the COPs part of the
25 structure?

Page 104

1 A. That's my understanding.
2 Q. Okay. In your legal career, have you come across the
3 concept of the idea that two different contracts can
4 be part of one integrated transaction?
5 A. Sure. Yes.
6 Q. You're familiar with that as an idea?
7 A. Oh, yeah, sure.
8 Q. Okay. What do you understand that to mean?
9 MR. SHUMAKER: Objection, form.
10 A. There are a number of ways that two different
11 documents were -- may refer to the other, as simple as
12 attachments, exhibits, the master -- the master
13 service agreement on a loan, for instance. There are
14 a number of ways that one document can relate to
15 another as explicitly expressed and intended.
16 BY MR. HACKNEY:
17 Q. Yeah, and I know this is a -- you know, we're not
18 talking about was the stoplight red or green here, but
19 you are also a lawyer with a relatively --
20 A. I was.
21 Q. -- sophisticated clientele and experience?
22 A. Well --
23 Q. You understand the idea that two different contracts
24 can form part of one larger agreement?
25 A. Oh, sure. Yeah.

Page 105

1  Q.  Is the forbearance agreement part of an integrated
2  transaction with the amended Swap agreements?
3     MR. SHUMAKER: Objection, calls for a legal
4  conclusion.
5  A.  Yeah, I'm going to stay away from characterizing it as
6  an integrated transaction.  That may have legal
7  consequence.  I know they are related.
8     BY MR. HACKNEY:
9  Q.  Okay.  They are related, but you can't answer today
10  whether they're part of an integrated transaction as
11  the person who executed it on behalf of the City?
12  A.  Yeah.
13     MR. SHUMAKER: Same objection.
14  A.  Yeah, because -- because of legal implications of
15  using that nomenclature.
16     BY MR. HACKNEY:
17  Q.  Okay.  So it may be, it may not be, you just don't
18  know?
19  A.  Precisely.  I'll rely on the attorneys to characterize
20  that.
21  Q.  Is the forbearance agreement part of an integrated
22  transaction with the collateral agreement?
23     MR. SHUMAKER: Same objection.
24  A.  Same answer.  I'll rely on the attorneys to
25  characterize it as integrated.  I know I signed the

Page 106

1  forbearance agreement.
2     BY MR. HACKNEY:
3  Q.  You did?
4  A.  Yes.
5  Q.  So it may be, it may not be, you don't know?
6  A.  Correct.
7  Q.  And did you consider any of those questions when you
8  entered into the forbearance agreement?
9  A.  We may have had some discussions.  The question such
10  as whether they're integrated or supersede or are
11  related may have been discussed.
12  Q.  But as you sit here today, you can't answer my
13  question about whether it is integrated into other
14  agreements or not?
15  A.  True.  I'm going to re -- because of the possible
16  legal implications of anything I say, I'm going to
17  rely on our counsel.
18  Q.  Okay.  Well, I guess there are legal implications of
19  all of the testimony that you give today --
20  A.  Yeah.
21  Q.  -- both good and bad.
22  A.  Right.
23  Q.  So I guess are you saying that you can't reveal
24  attorney-client communications or are you saying that
25  you just don't know the answer to this particular

Page 107

1  legal question?
2  A.  I'm saying I can't reveal attorney-client
3  communications, and based upon the characterization, I
4  have formed no independent decision outside of
5  discussions with my attorney as to whether or not
6  they're integrated.
7  Q.  Okay.  Let me ask you the reverse question, which is,
8  is the forbearance agreement a separate agreement from
9  the collateral agreement?
10  A.  Is it a separate agreement?
11  Q.  Yeah.
12  A.  I believe it's related to it, but yeah, it was a
13  separate agreement, sure.  It wasn't entered into
14  contemporaneously.
15  Q.  Meaning one that does not form part of a common
16  agreement with the collateral agreement?
17  A.  Here again, you're using a characterization as common
18  agreement or integrated.  I'm going to stay away
19  because those may have legal connotations.  What I
20  know is the forbearance agreement was entered into in
21  2009, and the collateral agreement attempts to resolve
22  issues of default that are raised by the forbearance
23  agreement and also including obligations of the City.
24  Q.  Isn't it -- I'd like to shift and ask you a question
25  about the service agreements between the City and the

Page 108

1  service corporations.
2  A.  Okay.
3  Q.  Isn't it true that the City is in default of its
4  obligations under the service agreements because it
5  missed the --
6  A.  June 14th payment?
7  Q.  That's right.
8  A.  We're in default.
9  Q.  Okay.  And isn't it also true that the City is not
10  proposing to cure those defaults in connection with
11  the assumption of the forbearance agreement?
12  A.  I believe that's true.
13  Q.  And you would agree that the City is not going to
14  provide assurances that it will perform with the
15  service agreements in the future, correct, as part of
16  the assumption motion?
17  A.  I'm going to be careful here because we're -- we're
18  trying to have discussions about what we're going to
19  do with regard to the proposal, so I don't want to say
20  now something that may or may not occur in the future,
21  but there is no present intent -- in response to your
22  question, no present intent to do that.
23  Q.  You certainly haven't represented that you will as
24  part of the assumption motion?
25  A.  Yes.

Page 109

1 Q. We talked about this earlier. I don't want to reask
2 the question, but I want to tie it up in connection
3 with the assumption motion, which is, there are also
4 events of default existing under the Swaps.
5 A. Yes.
6 Q. Those are the cause of all the problems, right?
7 A. Yes.
8 Q. The City is not proposing to cure those defaults in
9 connection with the assumption agreement, correct?
10 A. I'm going to be careful with the characterization of a
11 cure because, as you know, and -- I have formed no
12 independent decision as to whether or not that
13 nomenclature's true. What I will say is that pursuant
14 to the forbearance agreement we are attempting to
15 resolve any and all defaults that may have occurred
16 under the collateral agreement.
17 Q. Under -- and I was asking about the Swaps.
18 A. And the Swaps.
19 Q. And the Swaps.
20    So the forbearance agreement is an effort
21 to resolve any defaults that exist under the
22 collateral agreement and amended Swaps?
23 A. Yes.
24 Q. Okay. And in your view it does that?
25 A. Yes.

Page 110

1 Q. Okay.
2 A. Yes.
3 Q. So I'll say it this way. In your assumption motion,
4 isn't it true the City doesn't promise to cure any
5 defaults under the collateral agreement or the Swap
6 agreement; isn't it that correct?
7 A. Here again, and I'm not trying to be evasive. I
8 just -- you know, there are concepts of cure in the
9 bankruptcy code, for instance, with regard to the
10 assumptions of contracts so on and so forth, and I
11 want to make sure that I don't testify as to a legal
12 conclusion. So what I will say is we are trying -- by
13 the assumption agreement and forbearance agreement, we
14 are trying to resolve all defaults under those
15 documents, both the collateral agreement and the
16 Swaps.
17 Q. Okay. And how does it achieve that resolution?
18 A. Well, the documents speaks for itself, but generally
19 speaking, it imposes obligations upon us to perform a
20 certain ways within certain time frames with regard to
21 the potential termination payment. It therefore gives
22 us a discount for that payment. It releases the
23 casino revenue and imposes obligations, and this is my
24 language, upon the Swap counterparties not to trap
25 that revenue upon performance of certain obligations,

Page 111

1 in addition, obligates those parties to release liens
2 and potential claims as a result of the transaction.
3 Q. Okay. So the practical impact of it -- put aside the
4 legal beagle words.
5 A. Right.
6 Q. The practical impact of it is during the optional
7 termination period, the Swap counterparties waive
8 whatever rights they have under the Swaps and the
9 collateral agreement to either demand cash or to
10 terminate the Swap?
11 A. Yeah, here --
12    MR. JURGENS: Object to form.
13    MR. SHUMAKER: Objection, calls for legal
14 conclusion and form.
15 A. Here again, I'm going to stay away from whether or not
16 they waive. What it says is forbearance, and my
17 understanding is that they forebear from exercising
18 any of those rights during the operative terms of the
19 agreement.
20    BY MR. HACKNEY:
21 Q. We talked about the benefits of the forbearance
22 agreement before. I'm going to try and summarize your
23 prior testimony to try and move us along, but you
24 should listen to my summary and see if I'm correct.
25 A. Okay.

Page 112

1 Q. But the benefits of the forbearance agreement are
2 access to the casino revenues during the option
3 period, a workable unwind of the Swaps, and a
4 discounted termination payment?
5 A. And a release of liens and potential claims against
6 the insured, yes.
7 Q. Correct. Those are kind of some of the key elements
8 of the forbearance agreement.
9 A. Yes.
10 Q. I want to start with the casino gaming revenues.
11 A. Um-hm.
12 Q. How does the forbearance agreement provide the City
13 with better access to gaming revenues than it has
14 right now?
15 A. Well, as -- I think as we discussed earlier today,
16 there's always the risk that because there are events
17 of default under the Swaps, that those revenues
18 could -- that default could be declared and those
19 revenues could be trapped, so it removes that level of
20 uncertainty, which is crucial for the City. Cash is
21 critical for the City.
22    So once you remove that level of
23 uncertainty and the City has certainty, as we've seen
24 in some of our proposals that we made for creditors,
25 the City can then reasonably count on having access to

**Page 113**

1  that cash in terms of going forward.

2  Q.  Now, if the collateral agreement operates the trapped

3  cash automatically upon an event of default under the

4  Swap --

5  A.  Um-hm.

6  Q.  -- is there anything in the forbearance agreement that

7  alters that mechanism?

8  MR. SHUMAKER: Objection, calls for legal

9  conclusion.

10  A.  Yeah, here again, your conclusion if it acts to trap

11  automatically, I don't know if I would characterize it

12  that way. I know that the agreements work that money

13  comes in on a daily basis. That money is put into I

14  think one account. At the end of each month, some

15  portion of that money is sent out to another account,

16  and every quarter that money is disbursed. I'm not

17  going to characterize as to whether or not it would --

18  it would change that mechanism automatically.

19  BY MR. HACKNEY:

20  Q.  Okay. You can't say if it does or it doesn't?

21  A.  Correct.

22  Q.  And can you say here today whether the collateral

23  agreement operates automatically or does not?

24  A.  The collateral agreement, it's my understanding, using

25  your words automatically, operates to trap cash, but

**Page 114**

1  maybe not in the way that is detrimental to the City.

2  It has two accounts, a subrecipient holding account --

3  COURT REPORTER: Subrecipient?

4  THE WITNESS: Subrecipient.

5  A.  -- two accounts, an initial general account and then a

6  subrecipient account. We'll just call them that.

7  Those monies come in -- so when you use

8  automatic, those monies come in daily, but they're

9  disbursed according to the terms, and have been

10  disbursed according to their terms.

11  Q.  I'm not talking about interim trapping that --

12  A.  Right.

13  Q.  -- happens in the first part of the month until the

14  whole bank account builds up.

15  A.  Right.

16  Q.  I'm talking about what I'll call big time cash

17  trapping upon an event of default --

18  A.  Right.

19  Q.  -- or termination event.

20  A.  Right.

21  Q.  So let me go back. I guess my question is, like, do

22  you have a view on whether that big time cash trapping

23  is supposed to happen automatically under the

24  collateral agreement?

25  A.  My understanding is that it does not happen

**Page 115**

1  automatically.

2  Q.  Okay. And is that based on conversations you've had

3  with counsel?

4  A.  Yes.

5  Q.  And if I ask you for the pros and cons of that

6  argument as to who's likely to win and how the City

7  came to its view, you would refuse to answer those

8  questions on the basis of the attorney-client

9  privilege, correct?

10  A.  Yes, sir.

11  Q.  Now, you also mentioned that the forbearance

12  agreement -- or we talked about the idea that the

13  forbearance agreement provides for a workable unwind

14  of the Swap, correct?

15  A.  Right.

16  MR. JURGENS: Objection to form.

17  BY MR. HACKNEY:

18  Q.  How does it do that?

19  A.  Well, my understanding, as I said before, in the

20  forbearance agreement, the parties agree to certain --

21  certain events that we will pay -- meaning the City --

22  will pay a discount, an optional termination payment

23  or cause that payment to be made; that in

24  consideration for that payment, the parties to the

25  agreement will release any claims they have to

**Page 116**

1  trapping the casino revenue; and, here again, the

2  parties will release their liens and any potential

3  claims they have against the insured.

4  Q.  The discount that you obtained through the

5  negotiations that Mr. Buckfire led --

6  A.  Right.

7  Q.  -- is a discount to the so-called early termination of

8  the Swap.

9  A.  Yes.

10  Q.  Correct?

11  A.  Yes.

12  Q.  So if you just read the Swap agreement, it would -- it

13  implies a termination value, correct?

14  MR. JURGENS: Objection, form.

15  MR. SHUMAKER: Objection, Calls for --

16  BY MR. HACKNEY:

17  Q.  It implies an early termination value?

18  MR. JURGENS: Objection to form.

19  A.  We'll use a nomenclature. It implies a value for

20  termination fee that I understand represents the loss

21  expectation of the counterparties.

22  BY MR. HACKNEY:

23  Q.  That's exactly right.

24  And the discount you negotiated in the

25  forbearance agreement is a discount to that amount in

1 the Swap?

2      MR. JURGENS: Objection to form.

3      MR. SHUMAKER: Objection to form.

4 A.  It is a discount to that, yes.  It is a discount to

5 that expected amount.

6 BY MR. HACKNEY:

7 Q.  Yeah.  It is a discount to what would otherwise be

8 owing under the Swap in the absence of the forbearance

9 agreement if the Swap counterparties designated an

10 early termination.

11 A.  I believe that's correct.

12      MR. JURGENS: Objection to form.

13 BY MR. HACKNEY:

14 Q.  Okay.  Now, you know that there's a different concept

15 which is an optional early termination under the Swap,

16 correct?

17 A.  Um-hm.

18 Q.  Is that correct?

19 A.  Well, the way the agreement is worded, forbearance and

20 optional termination --

21 Q.  I'm not talking about the forbearance agreement.

22 A.  Okay.

23 Q.  I'm sorry if that wasn't clear --

24 A.  Oh.

25 Q.  -- and I don't mean to interrupt you.

1 A.  Okay.

2 Q.  Under the Swap --

3 A.  Right.

4 Q.  -- there is a different type of termination that's

5 called an optional early termination.  Are you aware

6 of that?

7 A.  I am aware of that.

8 Q.  Okay.  That's one where the insured -- the Swap

9 counterparties contend that they can terminate the

10 Swap and walk away with no payment.

11 A.  Any understanding I would have about what the Swap

12 counterparties can do would be based upon

13 consultations with counsel, but suffice it to say I

14 have heard of that concept.

15 Q.  Okay.  So if I ask you about the pros and cons of that

16 argument and who would likely to win, you would assert

17 the attorney-client privilege; is that correct?

18      MR. SHUMAKER: We would.

19 A.  Yes.

20 BY MR. HACKNEY:

21 Q.  Okay.  But I do want to say that you understand that

22 the Swap counterparties are substantially in the money

23 under prevailing interest rates, correct?

24 A.  There is a lot of money that the City's going to owe,

25 yes.

1 Q.  I'm just talking about with respect to the Swap.

2 Interest rates are favorable for the Swap

3 counterparties.

4 A.  On -- and I'm going to be careful here because on any

5 given day interest rates might swing and be favorable

6 to us based upon what we might owe, but generally

7 speaking, if you're saying -- what do you mean by in

8 the money?

9 Q.  Yeah.  So what I mean is if the Swap was terminated

10 today --

11 A.  Right.

12 Q.  -- it's the service corporations that would owe money

13 to the Swap counterparties, not the Swap

14 counterparties that would owe money to the service

15 corporations.

16      MR. JURGENS: Objection.

17      MR. SHUMAKER: To be clear, the Swap

18 counterparties are UBS and Merrill Lynch.

19 A.  Yeah.

20 BY MR. HACKNEY:

21 Q.  That's what I mean by in the money.

22 A.  Yeah, I -- I think that's true.

23 Q.  Okay.  I mean that's -- I'm not trying to be flip, but

24 that is the reason that you negotiated the discount?

25 A.  That's the mechanism, yes.  Yeah.

1 Q.  Okay.  I want to make an obvious point, which is the

2 Swap counterparties have never come to the City and

3 said hey, we're going to exercise that optional early

4 termination rights that has us walking away and being

5 paid nothing, correct?

6      MR. JURGENS: Form.

7      MR. SHUMAKER: Objection form, too.

8 A.  To the best of my knowledge, I've never heard that.

9 BY MR. HACKNEY:

10 Q.  Obviously if they had, you would have been --

11      COURT REPORTER: I'm sorry.

12 BY MR. HACKNEY:

13 Q.  Let me -- if you had heard them threaten that, it

14 would have made Mr. Buckfire's negotiation a lot

15 easier.

16 A.  I think it would have made the entire situation a lot

17 easier, but I've never heard that.

18 Q.  They've never offered to walk away without any

19 payment.

20 A.  I've never heard them offer to walk away without a

21 payment.

22 Q.  Okay.  Too bad.

23 A.  I'm more than willing to accept that offer.

24 Q.  I was going to say we're all open, right?

25 A.  Right.

**Page 121**

1 Q. I want to go back to the forbearance agreement. We
2 were talking about the things that it does in terms of
3 providing access to casino revenues, allowing for an
4 unwind of the Swap. These were my descriptions of
5 it --
6 A. Right.
7 Q. -- candidly, from your motion --
8 A. Right.
9 Q. -- but we were talking generally about these things.
10 The valuable consideration that the City gets under
11 the forbearance agreement are all things that it can
12 exercise without any consent from any other party,
13 correct?
14     MR. SHUMAKER: Objection, calls for a legal
15 conclusion.
16     You can answer.
17 A. That's my understanding of the way it works, yeah.
18     BY MR. HACKNEY:
19 Q. Do you agree that the effect of the forbearance
20 agreement, if the option is exercised, is to modify
21 the amount of the termination payment owed under the
22 Swaps down to whatever percentage is applicable as of
23 that date?
24     MR. JURGENS: Objection to form.
25     MR. SHUMAKER: Objection, form, calls for a

**Page 122**

1 legal conclusion.
2 A. If you're talking about the forbearance agreement and
3 the formula that's involved for the percentage change
4 depending upon -- as linked to time, as well as the
5 requirement that we get approval of the agreement at a
6 certain time period, yes, that's true.
7     BY MR. HACKNEY:
8 Q. Okay. I mean the effect of the forbearance agreement
9 is that instead of owing what the City would owe under
10 the Swap, which is the hundred percent of the
11 termination value, it now owes -- only owes the
12 discounted amount?
13 A. Yes.
14 Q. So the effect is that it modifies that provision in
15 the Swap in a way that's favorable for the City?
16     MR. JURGENS: Objection to form.
17 A. That's a fair characterization.
18     THE WITNESS: Sorry.
19     BY MR. HACKNEY:
20 Q. Now, the forbearance agreement, another part of it,
21 that it allows the City to direct the Swap
22 counterparties to terminate the Swap, correct?
23     MR. SHUMAKER: Objection, calls for a legal
24 conclusion.
25     MR. JURGENS: Objection.

**Page 123**

1     MR. HACKNEY: I understand you want to
2 preserve objections. This is the individual who
3 signed the agreement --
4 A. Yeah, the --
5     MR. HACKNEY: -- so I'm asking him for his
6 understanding.
7     MR. SHUMAKER: Okay. That's fine.
8 A. Yeah, the mechanism is such that it's not our
9 termination, it's the parties -- it's the
10 counterparties' termination.
11     BY MR. HACKNEY:
12 Q. That's right. It's their termination right, but the
13 City gets to direct them to exercise it.
14 A. Correct.
15 Q. Okay. Is that a right that the City currently
16 possesses under any of the other agreements to the
17 best of your knowledge?
18 A. To the best of my knowledge, no.
19 Q. That's a right it obtained as a result of the
20 forbearance agreement, correct?
21 A. Correct.
22 Q. And the City's able to exercise that right to direct
23 the actions of the Swap counterparties without the
24 consent of any third party, correct?
25 A. To the best of my knowledge, that's true.

**Page 124**

1 Q. Now, if Syncora has the right to control all actions
2 of the Swap counterparties under the contract
3 administration agreement, your position is that the
4 forbearance agreement overrides that provision in the
5 contract administration agreement; is that correct?
6     MR. SHUMAKER: Objection, calls for
7 speculation.
8 A. I think it calls for speculation and it also
9 essentially implies a legal analysis. I will defer to
10 my counsel as to what our position would be. What I
11 do know is that forbearance agreement gives us certain
12 rights.
13     BY MR. HACKNEY:
14 Q. Okay. What if I said that when it comes to the
15 interaction between Syncora's alleged control rights
16 under the contract administration agreement and the
17 City's alleged control right under the forbearance and
18 optional termination agreement, you would refuse to
19 answer those questions on the grounds that it would
20 get into attorney-client advice that you've received
21 from your counsel, correct?
22 A. That is correct.
23     MR. SHUMAKER: It most likely would,
24 depending upon how you phrased the question.
25     MR. HACKNEY: I'm asking.

Page 125

1  A.  Yeah, no.  These issues I have discussed with my
2  counsel.  We have discussed pros and cons as I said
3  earlier today, and as you notice, although I'm not an
4  attorney here, I've practiced before, none of this
5  surprises me.  Some of these issues are expressed in
6  the objections.  It's just that I want to be very
7  careful about relaying to you any of my perceptions
8  about these issues based upon discussions I've had
9  with counsel.
10     Suffice it to say we think that I have the
11  right -- the City has the right under forbearance
12  agreement to exercise its rights under that agreement.
13     BY MR. HACKNEY:
14  Q.  Okay.  So -- but you -- you can't give me your
15  understanding of how Syncora's alleged rights under
16  the contract administration agreement interact with
17  the City's alleged rights under the forbearance
18  agreement.
19  A.  I can't do that without implicating conversations I've
20  had with my counsel.
21  Q.  And just for the record, you won't?
22  A.  And I won't.
23  Q.  That's right.
24  A.  And I won't, yes.
25  Q.  What are the downsides of the forbearance agreement to

Page 126

1  the City?
2  A.  From my perspective?
3  Q.  Yeah.
4  A.  None.
5  Q.  So this agreement that Mr. Buckfire negotiated is one
6  of those happy agreements.  It's all upside and no
7  downside.
8  A.  It's not happy.  I mean, I'm not going to characterize
9  it as happy.  There's a significant sum of money that
10  the City has got to pay, but it does remove a certain
11  amount of uncertainty and allows the City to be able
12  to plan to make the reinvestment that's crucial for it
13  to go forward.  So I wouldn't characterize it as happy
14  by any means, but it's an obligation that the City
15  entered into a long time ago -- several years ago --
16  that we have to resolve so we can have unfettered
17  access to the casino revenue.
18  Q.  I want to go back to the subject of cash trapping
19  really quick because we had just moments ago talked
20  about whether it worked automatically --
21  A.  Right.
22  Q.  -- or whether it worked upon notice.
23  A.  Right.
24  Q.  But prior to the forbearance agreement, it was your
25  view that the Swap counterparties had the right to

Page 127

1  direct U.S. Bank to trap the casino revenues; isn't
2  that correct?
3  A.  I think if there were events of default, and here they
4  are, yes.
5  Q.  Yeah.  That was a driver of the negotiation --
6  A.  Yes.
7  Q.  -- correct?
8  A.  Certainly is, yes.
9  Q.  And your understanding is that as part of the
10  forbearance agreement during the -- during the --
11  during the forbearance period, the Swap counterparties
12  have temporarily relinquished that right to direct
13  cash trapping so long as the optional termination
14  period is pending.
15  A.  Yes, they are forebearing from exercising their right.
16  Q.  Okay.  Now, you understand that cash passes through
17  the general receipts subaccount on a monthly basis.
18  We talked about that earlier.
19  A.  Right.
20  Q.  It's trapped until a certain point and then the City
21  makes the holdback account, and when they get --
22  become equal, there's a discharge of payment to the
23  City from the general receipts subaccount, and then
24  for the remainder of the month, the City gets access
25  to the casino revenues, correct?

Page 128

1  A.  Yes.  My understanding is about $500,000 a day are
2  paid into those accounts and the mechanism is very
3  similar to what you said --
4  Q.  Okay.
5  A.  -- how it operates.
6  Q.  Can we agree that the way the forbearance agreement
7  works is that certainly between July 17th and now and
8  from now to whenever the forbearance, the option is
9  either exercised or expires, there's going to be cash
10  that passes through this account, already passed
11  through the account, that goes to the City?
12  A.  Yes.  There should be.
13  Q.  If the option expires without the City's exercise of
14  the option, isn't it true that under the forbearance
15  agreement, the City has no obligation to put that cash
16  back into the -- into the general receipts subaccount?
17     MR. SHUMAKER:  Objection, calls for a legal
18  conclusion.
19  A.  I --
20     BY MR. HACKNEY:
21  Q.  Just asking for your understanding of how the
22  agreement works.
23  A.  Sure.  And my understanding of how the agreement
24  works, without having it in front of me and consulting
25  counsel, is the parties revert back to the status quo

Page 129

1 ante as where they were, and I do not recall that
2 there's an obligation for remittor (sic) --
3 Q. Yeah.
4 A. -- of monies that were paid during the forbearance
5 period.
6 Q. And the agreement does speak for itself. I'm just
7 asking for your understanding of the agreement.
8 A. That's my understanding.
9 Q. I have read the agreement, and my reading of
10 Section 1.2(c) of the agreement is that when the
11 option expires without being exercised, that it's just
12 as you said, everyone is restored to the status quo
13 ante, but the City doesn't have to put the money it
14 received back in the -- in the interim back into the
15 account.
16 A. Right, which is status quo because we would have
17 received that money in any event.
18 Q. Okay. But what I just said is also your
19 understanding?
20 A. Yes.
21 Q. Can we agree that -- we talked about waiver and
22 forbearance and they are two different concepts, but
23 can we agree that the Swap counterparties have
24 certainly waived their right to obtain the cash that
25 passes through the account during the option period?

Page 130

1     MR. SHUMAKER: Objection, calls for a legal
2 conclusion.
3     MR. JURGENS: Objection to form.
4 A. I'm going to stay away from characterizing what
5 consequences are if we don't exercise the option under
6 the agreement.
7     BY MR. HACKNEY:
8 Q. Let me hand you this forbearance agreement.
9 A. Okay.
10 Q. I've marked it as Orr Exhibit 2.
11 A. Okay.
12     MARKED FOR IDENTIFICATION:
13     DEPOSITION EXHIBIT 2
14     10:48 a.m.
15 A. Okay.
16     BY MR. HACKNEY:
17 Q. Do you have it in front of you?
18 A. Yes.
19 Q. And is that, to the best of your knowledge, a true and
20 accurate copy of the forbearance agreement?
21 A. Yes, it appears to be.
22 Q. Now, if you look at the -- on page 2 of the second
23 full recital?
24 A. Uh-hm.
25 Q. You'll see that it says, "Whereas, pursuant to the

Page 131

1 terms of each Swap agreement, it is the view of the
2 Swap counterparties that one or more events of default
3 and/or additional termination events has occurred,
4 with the service corporations" -- "with the service
5 corporation as the defaulting party or sole affected
6 party, and therefore each of SBS and UBS has the right
7 to designate an early termination date for the related
8 Swap agreements."
9     Do you see that?
10 A. Yes, I do.
11 Q. I have a long set of questions here that I would like
12 to collapse if I could, which is, this just says it's
13 the view of the Swap counterparties. The fact of the
14 matter is it's also the City's view that there are
15 termination events and events of default existing
16 under the Swap.
17 A. Yes, I think that's fair.
18 Q. And that as a result of those termination and events
19 of default in the absence of this agreement, the Swap
20 counterparties would have the right to designate an
21 early termination date.
22 A. Yes.
23 Q. If I asked you to catalog all of the termination
24 events and events of default under the Swap, would you
25 be able to do that?

Page 132

1 A. No, I wouldn't, not without a consulting client and a
2 long compendium of events that occurred before I was
3 appointed.
4 Q. You do know some of them offhand.
5 A. Sure, like the consent agreement, the declaration of
6 financial emergency, the appointment of the financial
7 advisory board, the failure to make some of the --
8 there are a bunch of them, but I couldn't catalog them
9 all.
10 Q. Yeah. Your appointment?
11 A. My appointment. I'm an event of default.
12 Q. You are -- you are an embodiment of default.
13 A. I'm an embodiment of default.
14 Q. So at some point we will have to cure you.
15 A. You will have to talk to my wife about that.
16 Q. Okay. The -- okay. So that is helpful. I was going
17 to go through some of these things, but it doesn't
18 sound like there's an actual dispute between the City
19 and the Swap counterparties on this point, correct?
20 A. No.
21 Q. Now, I want to ask you a different question, though.
22 A. Sure.
23 Q. This is different from what I was just asking, so --
24 A. Okay.
25 Q. As of July 17th, had you evaluated where there were

## Page 133

1 any termination events where the Swap counterparty was
2 the sole affected party?
3     MR. SHUMAKER: Objection, calls for a legal
4 conclusion.
5 A. Yeah.
6     BY MR. HACKNEY:
7 Q. I'm not asking for the advice. I'm asking had you
8 evaluated that.
9 A. We had evaluated a number of issues and suffice it to
10 say that was probably one of them.
11 Q. You can't remember whether it was or it wasn't?
12 A. I can't remember if --
13 Q. Pretty technical question?
14 A. Yeah. As I said before, I'm not trying to be evasive.
15 It's just that the conversations I have with my
16 counsel, investment banker, you know, on a daily
17 basis, are -- there are days when there are dozens.
18 Q. Now, if I asked you whether you had evaluated whether
19 there were any events of default under the Swap where
20 the Swap counterparties were the defaulting party --
21 A. Sure.
22 Q. -- can you answer that question?
23 A. Whether I personally or whether it had been done on
24 the payoff of the team?
25 Q. Either.

## Page 134

1 A. I personally don't recall doing that. I do recall
2 that members of the team and I may have had those
3 discussions, yes.
4 Q. Is it fair to say that if I ask you to describe to me
5 what potential events of default or termination events
6 where the Swap counterparties were the sole affected
7 party or the defaulting party --
8 A. Right.
9 Q. -- you would decline to answer those questions on the
10 basis of the attorney-client privilege?
11     MR. SHUMAKER: To the extent they would
12 reveal those communications, of course.
13     MR. HACKNEY: Well, I mean --
14 A. Yes, I would.
15     BY MR. HACKNEY:
16 Q. Okay. Even if I ask you about your understanding of
17 the position, your position is that you don't have one
18 independent of your legal advisors.
19 A. I -- on this question, I don't have one independent of
20 my legal advisors.
21 Q. So I can't ask you what your understanding is --
22 A. Right.
23 Q. -- because it will necessarily reveal the legal advice
24 you got.
25 A. I'm trying to see if there's a way I can answer your

## Page 135

1 question without implicating discussions. No. It
2 might -- it might implicate some discussions I had
3 with counsel.
4 Q. Okay. Mr. Orr, is the forbearance agreement a
5 settlement?
6     MR. SHUMAKER: Objection, calls for a legal
7 conclusion.
8 A. Let me say this. I'm aware that the motion pending in
9 front of the Court is both for -- we call in
10 bankruptcy, what I used to call in bankruptcy, both an
11 assumption of an agreement and a ^ 9019 settlement.
12     BY MR. HACKNEY:
13 Q. So it's been held out by the City as a settlement,
14 correct?
15 A. Yeah. I think there's a debate as to whether or not
16 you need to seek settlement approval in a Chapter 9
17 case, but we are.
18 Q. Okay. Does the forbearance agreement settle any
19 claims on a final basis?
20 A. I think it does.
21 Q. Isn't it true, though, that if the City doesn't
22 exercise the option, everyone goes back to the status
23 quo ante?
24 A. Yes. That's the contingency, yes.
25 Q. Okay. So if that were to happen, everyone's claims

## Page 136

1 would still be in play.
2 A. I'm going to be careful with the word claims, but
3 everyone would revert back to the status quo ante.
4 Q. Okay. So whatever claims they had at the status quo
5 ante they'd have again?
6 A. Yeah, whatever claims -- technically, whatever claims,
7 colloquially, whatever they had would, revert back to
8 the status quo ante.
9 Q. Can we agree that in that eventuality no claims of any
10 of the parties of the forbearance agreement would have
11 been finally resolved by the forbearance agreement?
12 A. To the best of my knowledge, yes.
13 Q. Now, put aside the threat of declaring an early
14 termination under the Swap --
15 A. Right.
16 Q. -- which we've discussed extensively today as a right
17 the Swap counterparties have under the Swap --
18 A. Okay.
19 Q. -- put that aside. Have you evaluated, separate and
20 apart from that, whether there are other tort or
21 contract claims that the Swap counterparties may have
22 against the City?
23 A. I think there were discussions, but, here again, those
24 would be wrapped up in attorney-client communications.
25 Q. So if I asked you to reveal the assessment of whether

1  there were other claims that the Swap counterparties
2  have against the City, you would decline to answer
3  those questions on the grounds of attorney-client
4  privilege?
5  A.  I think I would have to.  I do recall discussions, but
6  I think I'd have to decline on the basis of
7  attorney-client privilege.
8  Q.  Have the Swap counterparties threatened to bring any
9  claims against the City?
10  A.  Well, here again, being careful with the word claims,
11  you mean unrelated to the defaults such as tort
12  claims?
13  Q.  I guess I would say the Swap agreement is one you
14  understand that's between the Swap counterparties and
15  the service corporations.
16  A.  Right.
17  Q.  Okay.  So I'm trying to put that in a box for now.
18  A.  Right.
19  Q.  And we've talked about that extensively.
20  A.  Right.
21  Q.  So other than any claims they may have against the
22  service corporations --
23  A.  Right.
24  Q.  -- that could absolutely have implications for the
25  City, but other than that, have the Swap

1  counterparties threatened to bring any other claims
2  directly against the City?
3  A.  None that I'm aware of.
4  Q.  I may have asked you this earlier, but I just -- I
5  want to make sure that I didn't miss it and so if it's
6  asked and answered I apologize, but did the City
7  evaluate whether it is in breach of the collateral
8  agreement?
9  A.  Did we evaluate it?
10  Q.  Yeah.
11  A.  Yes, I and my consultants evaluated it.
12  Q.  Is this one where if I asked you the results of those
13  evaluations you'd decline to answer?
14  A.  Yes.
15  Q.  It is true that prior to the forbearance agreement,
16  the only direct contractual agreement under which both
17  the City and the Swap counterparties had signed was
18  the collateral agreement, correct?
19  A.  To the best of my knowledge, that's correct.
20  Q.  Now, have the service corporations threatened to bring
21  any claims against the City?
22  A.  None that I'm aware of.
23  Q.  And have you undertaken an assessment of the
24  likelihood of the service corporations to the extent
25  they were to assert claims against the City?

1  A.  No.  I don't recall doing that.
2  Q.  So you haven't assessed that?
3  A.  Not me independently, no.
4  Q.  Okay.  And it's not something you took into account as
5  part of this agreement?
6  A.  No.  We -- there was a discussion about the interest
7  of all the parties.  I, independently, did not
8  handicap whether the service corporations might bring
9  a claim against the City.  I think there were
10  discussions about it.  Many of those discussions would
11  have been caught up in the general discussions that I
12  was having with counsel and my other advisors.
13  Q.  And you wouldn't be able to discuss them?
14  A.  No.
15  Q.  But the service corporations' claims against the City,
16  those are not resolved by the forbearance agreement,
17  correct?
18  A.  If they have any.  I don't think they are.
19  Q.  Let me cut to it.  Is it fair to say you haven't given
20  this any real consideration?
21  A.  Yeah.  We -- it is fair to say that it was -- there
22  was no real deep consideration of it.  We did consider
23  it.
24  Q.  Now, as the City evaluated whether it has claims
25  against the Swap counterparties --

1  A.  Um-hm.
2  Q.  -- okay?
3  A.  Um-hm.
4  Q.  And if I ask you to tell me what claims you have, will
5  you tell me them or will you assert the privilege?
6  MR. SHUMAKER:  I would instruct the witness
7  that may implicate attorney-client communications.
8  A.  I would have no independent knowledge of what claims
9  may have other than discussions I've had with counsel
10  so I wouldn't answer.
11  BY MR. HACKNEY:
12  Q.  Okay.  If I ask you what's the likelihood that you'll
13  win on the claims?
14  A.  Same answer.
15  Q.  You would follow the advice --
16  A.  Yeah.
17  Q.  -- and assert the privilege?
18  A.  Yeah.
19  Q.  Okay.
20  A.  In my prior life, as an attorney, likely would be a
21  hundred percent.
22  Q.  Okay.
23  A.  But I can't say that.
24  Q.  Well, let me ask you -- let me ask you just a -- sort
25  of this is your understanding of the forbearance