Page 141

1  agreement.
2  A.  Right.
3  Q.  What claims are you asking the Court to approve the
4  settlement of?
5  A.  In claims that might be had by the parties vis-à-vis
6  each other.
7  Q.  So any and all claims that they have under the Swaps
8  or the collateral agreement or the service contracts
9  or any other contracts --
10  A.  Yes.
11  Q.  -- those claims are being resolved by the forbearance
12  agreement?
13  A.  To the best of my knowledge, that is true.
14  Q.  Okay.  And the result of the forbearance agreement is
15  that the City will be able to perform under the
16  forbearance agreement without being subject to any
17  liability to any third party?
18  A.  That is my understanding.
19  Q.  And so will the Swap counterparties, correct?
20  A.  That is my understanding.
21  Q.  It will give you what I'll call a clean closing?
22  A.  As I said earlier this week, it will bring us to
23  closure and certainty, yes.  Earlier today.
24  Q.  That is also one of the values of this agreement to
25  both and you the Swap counterparties, you the City?

Page 142

1  A.  Right.
2  Q.  Which is that it absolves you for any liability in
3  connection with the relevant agreements?
4  MR. SHUMAKER: Objection to form.
5  BY MR. HACKNEY:
6  Q.  As a result of performance under the forbearance
7  agreement, correct?
8  MR. SHUMAKER: Objection calls for
9  speculation.
10  A.  My understanding is that it provides us with closure
11  and finality regarding any claims and relationships
12  that the parties have.
13  BY MR. HACKNEY:
14  Q.  Okay.  And there's no trailing liability?
15  A.  That is correct.
16  Q.  And just for the record, if I asked to you assess the
17  likelihood of success of all of the different claims
18  that are being resolved by the forbearance agreement,
19  you would assert the attorney-client privilege and
20  refuse to answer?
21  A.  That is correct.  I have made no independent
22  assessment outside of any conversation I would have
23  had with counsel and my advisors.
24  Q.  Now, Mr. Orr, I'm going to speculate you may have
25  negotiated a settlement or two in your life as a

Page 143

1  lawyer.
2  A.  That's a fair statement.
3  Q.  And isn't it also fair -- I will tell you I have as
4  well, but --
5  A.  Right.
6  Q.  Isn't it common that settlement agreements typically
7  involve releases of liability by the parties against
8  one another?
9  A.  It is not uncommon for there to be releases in
10  settlement agreements.
11  Q.  And I will tell you I actually was racking my brain to
12  see whether I ever entered into a settlement agreement
13  that didn't have a release.  I couldn't think of one.
14  Have you ever entered into a settlement agreement that
15  didn't have a release?
16  A.  Yes.
17  Q.  Okay.  You have?
18  A.  Yes, I have.
19  Q.  Okay.  Do you know whether the forbearance agreement
20  contains a release of claims by the parties against
21  one another?
22  MR. SHUMAKER: Objection, calls for legal
23  conclusion.
24  You can answer.
25  A.  Okay.  I'd have to read through it and consult with my

Page 144

1  counsel to make sure.  I know the agreement speaks for
2  itself.
3  BY MR. HACKNEY:
4  Q.  It does, but as you sit here today, I take it you
5  reviewed the forbearance agreement in connection with
6  the preparation for your deposition?
7  A.  Maybe not as in depth as you might think.
8  Q.  Okay.  I know you have a lot on your plate.
9  A.  I have a lot on my plate.
10  Q.  But I guess I'm saying are you seriously unaware as to
11  whether there's a release in the forbearance
12  agreement?
13  A.  Seriously or not, I think the forbearance agreement
14  resolved all claims between the parties.  Sitting here
15  today without examining it, I'm not aware as to
16  whether or not it specifically has a release.
17  Q.  Okay.  So the -- whether it's in the forbearance
18  agreement or in the effect of its approval, it
19  operates as a release for everyone involved?
20  A.  Yeah.  The reality is -- when you asked me the
21  question before as to whether or not it has a release,
22  the reality is that to the extent you asked -- I
23  believe in the motion you asked for assumptions and
24  9019 settlement that the order might well contain a
25  release so -- I wasn't trying to be truculent with

Page 145

1 you. I'm just saying that, yes, the effect of the
2 approval of the agreement should have that impact.
3 Q. I'm not going to try to go claim by claim because your
4 understanding is it releases all claims of the Swap
5 counterparties, the service corporations, and the City
6 against one another?
7 A. Yes.
8 Q. Now, the Swap insurers, as part of the forbearance
9 agreement, they get a release of their insurance
10 obligations under the Swap in the event the City
11 directs an optional termination, correct?
12 A. Yes, I believe that's true.
13 Q. And this was one of the things that the City has
14 touted, which is to say, hey, Swap insurers, pipe down
15 this is good for you, right?
16 MR. SHUMAKER: Objection to form.
17 A. Yeah, without characterizing, you know, the colloquial
18 characterization, yes, we think that's a benefit.
19 BY MR. HACKNEY:
20 Q. That's a concept that you've argued in your papers --
21 A. Yes.
22 Q. -- as to why the Swap insurers should be happy?
23 A. Yes.
24 Q. Now, do you understand you -- you have argued that
25 this is a benefit to the Swap insurers under the

Page 146

1 forbearance agreement, correct?
2 A. Yes, I believe so.
3 Q. Are the swap insurers third party beneficiaries as you
4 understand it as the signatories to the agreement --
5 of the agreement?
6 MR. SHUMAKER: Objection, calls for a legal
7 conclusion.
8 A. Here, I'm not acting as a lawyer as I understand it.
9 I'll have to decline from answering whether or not
10 they're third party beneficiaries. As you know,
11 they're intended beneficiaries, incidental
12 beneficiaries. A lot of these questions are questions
13 of fact, so that would draw me into a legal analysis
14 and I'll stay away from that.
15 BY MR. HACKNEY:
16 Q. Let me -- let me -- let me -- what I'll do then is
17 I'll ask you your understanding as a layperson --
18 A. Okay.
19 Q. -- because you are -- you can say that you're acting
20 as a layperson --
21 A. I am.
22 Q. -- so to speak.
23 A. Yes.
24 Q. Okay. As a layperson person, do you have a view one
25 way as to whether Syncora is a third party beneficiary

Page 147

1 under the agreement?
2 A. As a layperson, I really haven't examined it.
3 Q. So don't know one way or the other?
4 A. Don't know one way or the other.
5 Q. Do you have a view as to whether Syncora or FGIC, for
6 that matter, can sue to enforce the agreement?
7 A. I don't have one way or the other.
8 Q. They may have, they may not have?
9 A. Yeah. I'd probably weigh on the side of they don't,
10 but I -- I don't have a view one way or the other.
11 Q. And have you considered the possibility that if they
12 don't have the right to sue to enforce the agreement,
13 that they also would not have the right to sue to
14 enforce the release that's in the agreement?
15 MR. SHUMAKER: Objection --
16 A. They might or they might --
17 MR. SHUMAKER: -- calls for a legal
18 conclusion.
19 A. They might or they might not.
20 BY MR. HACKNEY:
21 Q. And let's be frank. That's not your concern, right?
22 A. Well, to be honest with you, you know, without getting
23 into whether or not there may be equitable rights,
24 estoppel, third party intended, unintended beneficiary
25 rights, things along those lines, what I do know --

Page 148

1 incidental benefits -- what I do know is the
2 agreement, and what we've said is it provides a
3 benefit to the insured.
4 Q. That's right, but you obviously don't represent the
5 insured, you represent the City?
6 A. I am employed by the governor on behalf of the City,
7 that is correct.
8 Q. And so if the insurer can't enforce the agreement to
9 take advantage of the release, that's the insurer's
10 problem, correct?
11 A. Well, without characterizing whether or not it's their
12 problem or so, my fiduciary duty runs to the City in
13 its interest; it does not necessarily run to Syncora.
14 Q. Yeah. Can we agree that you certainly didn't
15 negotiate into the agreement any specific provision
16 granting the insurers the right to sue to enforce that
17 provision?
18 A. I made no instruction to my team to negotiate such a
19 provision.
20 Q. In entering into the forbearance agreement, did you
21 consider whether or not the automatic stay would apply
22 to cash trapping if the City filed for bankruptcy?
23 MR. SHUMAKER: Objection, calls for a legal
24 conclusion.
25 A. Without getting -- here again, there were discussions

Page 149

1 because, quite frankly, at the time we were in
2 negotiating this agreement in June, we were hoping
3 that this agreement and its announcement was for other
4 creditors to -- and other stakeholders, including the
5 labor side, to come in and negotiate additional
6 agreements. So we may have had discussion about what
7 the impact, if we filed bankruptcy, would have been,
8 but, frankly, at this time we were hoping we were
9 going to get a round of agreements in place.
10   BY MR. HACKNEY:
11 Q.   You knew that as of July 15th, when you executed the
12 forbearance agreement, that bankruptcy was possible?
13 A.   Oh, sure. We knew it was possible, yeah.
14 Q.   Fair to say that by July 15th, given all the work that
15 was going on, you were of the view that it was likely?
16 A.   No, not really. We had been sued -- the governor and
17 the treasurer had been sued a few weeks before that.
18 The following week I believe one union had joined in
19 that suit and the Monday of the week after that, the
20 governor and I were sued, and I believe July -- I
21 don't have a calendar. I believe July 15th was that
22 Monday.
23 Q.   It was.
24 A.   Yes. So we signed this agreement and, frankly, even
25 at that time, because there was a whole lot of things

Page 150

1 going on, there was litigation, there were stays in
2 place, there were appeals to the state court, it
3 certainly was possible and we were with doing
4 contingency planning given the paper, but we have not
5 made any determination at that point as to whether or
6 not, excuse me, we were going to file.
7 Q.   It was certainly possible enough that it behooved you
8 to analyze whether the automatic stay might be a way
9 to get access to the casino revenues, correct?
10 A.   Yeah, I don't recall whether or not we did it then or
11 before or just during that week, but -- but we --
12 there was some discussion about the impact of the
13 automatic stay, yes.
14 Q.   So is it possible that you did not evaluate the
15 applicability of the automatic stay in the event of a
16 bankruptcy prior to executing the forbearance
17 agreement?
18   MR. SHUMAKER: Objection --
19 A.   No.
20   MR. SHUMAKER: -- asked and answered.
21 A.   No. What I said is at some point during that time or
22 even prior we had to have those discussions.
23   BY MR. HACKNEY:
24 Q.   You may have had them in advance of July 15th, you may
25 not have, you just can't remember?

Page 151

1 A.   No. I -- let's be clear. I think we had them before.
2 I think we had them around that time because in that
3 week, when I was sued that Monday, there were
4 discussions about what they may be and we were signing
5 this agreement at the time.
6 Q.   If I ask you about the specifics of the conversations
7 you had about whether the automatic stay applied and
8 the likelihood that it would or wouldn't, you'll
9 decline to answer those questions on the basis of the
10 attorney-client privilege, correct?
11 A.   Yes, again, today I would have to do that.
12 Q.   The one thing I will say that we can agree on, though,
13 is that if the automatic stay did bar cash trapping,
14 that would be valuable to the City because at least
15 during the pendency of the bankruptcy it would then
16 have access to the casino revenues, correct?
17 A.   Well, it's -- here again, it's a hypothetical and
18 contingent question, but I take your meaning, and what
19 I would say is I think certainly one of the benefits
20 of the automatic stay is that you maintain the status
21 quo and access to cash. There are also provisions
22 however in the bankruptcy code -- I'm not acting as an
23 attorney, but I am aware -- of Safe Harbor provisions
24 related to certain financial instruments and you have
25 to factor that in as well.

Page 152

1 Q.   And those are?
2   COURT REPORTER: Can you please slow down?
3   THE WITNESS: I'm sorry.
4   BY MR. HACKNEY:
5 Q.   Those are risk factors that might make the automatic
6 stay not applicable?
7 A.   That's correct.
8   MR. SHUMAKER: Objection, calls for a legal
9 conclusion.
10 A.   I was informed without telling specific --
11   BY MR. HACKNEY:
12 Q.   Right.
13 A.   -- conversations that those are issues you have to
14 take into consideration.
15 Q.   And so let me try and collapse this if I can. If I
16 ask you about whether the casino revenues are special
17 revenues being applied to indebtedness, you will
18 refuse to answer?
19   MR. SHUMAKER: You can ask him whether he
20 considered them, but in terms of likelihood of success
21 or communication between --
22   BY MR. HACKNEY:
23 Q.   I'll do it that way.
24 Did you consider whether there were special
25 revenues that were accepted from the automatic stay

Page 153

1  under 922(d)?
2  A. We considered all of these issues including the
3  interaction 922(d) with 362 and I considered them in
4  the context with my counsel.
5  Q. Okay. You considered whether 362(b)(17) exception for
6  Swap collateral applied?
7  A. Yes.
8  Q. Did you consider whether the collateral account --
9  rather, the gaming revenues were even property of the
10  estate at all?
11  A. Yes.
12  Q. So you considered all those questions.
13  A. Um-hm.
14  Q. Your counsel rendered advice to you about the
15  likelihood, the pros and cons of the arguments, and
16  you're not at liberty to provide that advice to us
17  because it would invade the attorney-client privilege?
18  A. Yes, I believe that's correct.
19  Q. But I do want to get -- I do want to just get your
20  agreement that the question is important to at least
21  one of the benefits of the forbearance agreement which
22  was the interim access to cash during the optional
23  termination period.
24  A. I think the question is relevant.
25  Q. Yeah.

Page 154

1  A. Yes.
2  Q. In fact the optional termination period, it could end
3  as soon as on September 16th; at the latest it goes to
4  June 30, 2014, right?
5  A. Correct.
6     MR. SHUMAKER: Objection, document speaks
7  for itself.
8  A. Yeah, the document --
9     BY MR. HACKNEY:
10  Q. Whatever it says --
11  A. Yeah.
12  Q. -- that's your understanding?
13  A. Yes.
14  Q. So that -- the forbearance agreement -- let's put it
15  this way, Mr. Orr. The forbearance agreement gets you
16  access to cash during the optional termination period.
17  A. Yes, I believe that's true.
18  Q. If the automatic stay applied, it might get access to
19  the casino revenue during the whole bankruptcy,
20  correct?
21  A. It might.
22  Q. Yeah. We're talking about different things that you
23  consider as you're analyzing your options, right?
24  A. Yeah, correct.
25  Q. And this is -- this is a potentially important one

Page 155

1  because you might be able to get longer access to cash
2  from the automatic stay than you were getting from the
3  forbearance agreement, correct?
4  A. Here again, that's a contingent it might, but that has
5  to be drawn up also in discussion of potential risk
6  that Safe Harbor provision would allow the
7  counterparties to exercise their rights and therefore
8  obviate any benefits the City could receive from the
9  automatic stay.
10  Q. That's right.
11  A. So we considered all of those.
12  Q. So just to be clear, if I ask you about the specific
13  ins and outs of all those potential arguments,
14  likelihoods of success and so forth, you will not
15  answer those questions on the basis of the
16  attorney-client privilege, correct?
17  A. That is correct.
18  Q. Oh, I know. The City recently argued in court against
19  yours truly that the automatic stay bars the cash
20  trapping provisions of the collateral agreement. Are
21  you aware of that?
22  A. I believe I am, yes.
23  Q. Yeah. In fact, I think that your spokesman,
24  Mr. Nowling, may have made statements in the press
25  about the impact of the judge's rulings. Are you

Page 156

1  familiar with those statements?
2  A. I am.
3  Q. Did the Swap counterparties give their consent to the
4  City to make those arguments in court?
5  A. I don't know.
6  Q. And -- so you don't know whether they did or they
7  didn't?
8  A. That is correct.
9  Q. You understand that as originally designed the Swaps
10  were designed to hedge against interest rate risk on
11  the floating COPs?
12     MR. SHUMAKER: Objection, calls for a legal
13  conclusion.
14     MR. JURGENS: Objection to form as well.
15  A. That is my understanding.
16     BY MR. HACKNEY:
17  Q. And I can unpack it if you want. I know we get into
18  the --
19  A. That's my understanding.
20  Q. Yeah, okay. Let's just do basics of interest rate
21  risk, which is if the interest rates go above the
22  hedge rate, then now the Swap counterparties have to
23  pay the difference to the service corporations so that
24  they can pay the difference to the floating rate COPs,
25  correct?

Page 157

1    MR. SHUMAKER: Objection, form.
2 A.  That is my understanding.
3    BY MR. HACKNEY:
4 Q.  That's how the hedge works.
5    Now, interest rates do not favor the City
6 in the Swaps -- we asked that earlier.
7 A.  Right.
8 Q.  I will strike that.
9    But more basics of interest rate hedging,
10 so as the interest rates go up and start to approach
11 the hedge, the amount the City owes under the Swap via
12 service corporations goes down?
13 A.  That -- that is my understanding.
14 Q.  And as it crosses over the hedge line, the service
15 corporation could actually be in the money?
16    MR. JURGENS: Objection to form.
17 A.  Yeah, here again, we had the discussion about in the
18 money or not, but to the extent your point is saying
19 that they would benefit more from the hedge than the
20 counterparties would, that is my understanding.
21    BY MR. HACKNEY:
22 Q.  When the interest rates get above the hedge line?
23 A.  (Nods head).
24 Q.  That's right.
25    Okay.  Now, when you were entering into the

Page 158

1 forbearance agreement on July 17th, what steps did you
2 take personally to evaluate future -- I'm sorry.  I
3 misspoke, didn't I?
4 A.  Yeah.
5 Q.  When you entered into the forbearance agreement on
6 July 15th --
7 A.  Right.
8 Q.  -- what steps did you take prior to that time to
9 evaluate future interest rate moves?
10 A.  Any discussions in those -- that regard would have
11 been with our investment bankers and generally with
12 our attorneys.  What I'm trying to think of is were
13 there any discussions that I had with Miller Buckfire
14 which would not have been confidential in that regard.
15 I don't think that there were.  What I can say is that
16 we evaluated the potentiality of the -- of the
17 interest rate fluctuation as indexed to LIBOR going up
18 or down, but I think most of those, if not all of
19 them, were in communications with one or more of my
20 attorneys.
21 Q.  And when you say we evaluated the interest rate
22 fluctuations, that would have been tasked to Miller
23 Buckfire to do?
24 A.  Yes, Miller Buckfire in conjunction with folks from
25 Jones Day.  Yeah, sure.

Page 159

1 Q.  Okay.  No disrespect to the fine lawyers at Jones Day.
2 I don't know if I can calculate future interest rates
3 as a lawyer.
4    It was in Miller Buckfire's province to do
5 it.  They may have done it in conjunction with Jones
6 Day?
7 A.  Yes, yes.
8 Q.  Okay.  And any review of forward curves or different
9 interest rate implications currently existing in the
10 market would have been done by Miller Buckfire?
11 A.  Yes.
12 Q.  And your recollection is that it was done and it was
13 something that you considered as part of the decision
14 entering into this agreement?
15 A.  I believe so.
16 Q.  You're aware, for example, that the Federal Reserve
17 has indicated intent to scale back its monthly bond
18 purchases?
19 A.  I heard that.
20 Q.  And --
21 A.  Quantitative reasoning --
22 Q.  Yeah.
23 A.  Yeah.
24 Q.  And you're aware that many people believe that that
25 may lead interest rates to rise; isn't that right?

Page 160

1 A.  Yes.
2 Q.  Okay.  Did you analyze the likelihood that the
3 interest rates would rise or was that also tasked to
4 Miller Buckfire?
5 A.  I didn't do it independently.  That would have been
6 tasked to Miller Buckfire.
7 Q.  And if I asked what that analysis showed, I would have
8 to ask Mr. Buckfire that?
9 A.  Yes, you would.
10 Q.  Okay.
11 A.  Yes, you would.
12 Q.  Let me ask you about -- in the motion to assume the
13 forbearance agreement, the City states that it has
14 examined whether there are viable actions to challenge
15 the Swap contracts.  Do you recall that?
16 A.  Yes.
17 Q.  Under what theory could the City challenge the
18 validity of the Swap contracts?
19 A.  Any theories that we discussed -- I'll give you two
20 answers.  One, many of the theories, my understanding
21 is and somebody -- I haven't read all of the
22 objections, but I've read some of them.  Some of the
23 objections in this case have discussed some of those
24 theories.
25    Two, any theories which we would have

1 examined, either independently or in the context of
2 reviewing and handicapping the probability of success
3 of some of the objections, would have been done with
4 counsel.
5 Q. And so you'll refuse to describe both the theories and
6 their likelihood of success because it would invade
7 the attorney-client privilege; is that correct?
8 A. Yes. Unfortunately, yes.
9 Q. If I asked you what likelihood of success the City
10 attributes to an action seeking to declare the Swaps
11 invalid, you'll decline to answer that on the
12 attorney-client privilege?
13 A. Yes.
14 Q. Can we agree that if the Swaps are not valid, it
15 wouldn't make sense for you to enter into the
16 forbearance agreement?
17 A. No, not necessarily. There may be other prudential
18 reasons that the City might want to be bring closure
19 and certainty is access to its cash flow irrespective
20 of the probability that the Swaps are valid or not
21 valid.
22 Q. In your proposal for creditors on June 14, 2013, you
23 said that the City has identified certain issues
24 related to the validity and/or enforceability of the
25 COPs --

1 A. Yes.
2 Q. -- that may warrant further investigation.
3 A. Yes.
4 Q. Do you remember that?
5 A. Yes.
6 Q. I'm saving us from having to go through that --
7 A. Yeah, yeah. No. I remember.
8 Q. What issues has the City identified?
9 MR. SHUMAKER: Again, I'm going to caution
10 the witness --
11 A. Yeah.
12 MR. SHUMAKER: -- if this is going to
13 reveal attorney-client communications to not answer.
14 Subject to that, you can answer.
15 A. Here again, there would be no issues that -- and I
16 hate to keep saying this. There'd be no issues that I
17 independently would have identified because I'm trying
18 very hard not to act as a lawyer. I would have only
19 identified those issues and had discussions of them in
20 consultations with my attorneys. So whether there are
21 issues such as void ab initio, fraud, any of the other
22 issues that typically go to contracts, I would only
23 have had those discussions with counsel, so
24 consequently I can't speak to this.
25 BY MR. HACKNEY:

1 Q. Okay. And you'll assert the attorney-client privilege
2 as a protection against describing the invalidity of
3 the COPs analysis?
4 A. Yes, because I did no independent analysis.
5 Q. Has the City completed its investigation into this
6 issue?
7 A. No. The City's investigation into a number of things
8 are ongoing.
9 Q. Okay. And this is one of them?
10 A. This is one of them, yeah.
11 Q. Okay. So the City hasn't reached a conclusion on this
12 subject because it hasn't concluded its investigation
13 into the subject, correct?
14 A. It -- I think that's fair, yes.
15 Q. And has the City considered whether the service
16 agreements between the service corporations and the
17 City are lawful?
18 A. I don't recall if we looked into that.
19 Q. So that's one that you --
20 A. I just don't recall if that was one.
21 Q. You may have investigated, you may have not?
22 A. Correct. I don't recall that one.
23 Q. If you have investigated, do you know if the
24 investigation has concluded or do you not know?
25 A. No. If we had investigated or are investigating it,

1 my understanding it would not have been concluded.
2 Q. Okay. So much like with the COPs, generally the
3 validity of the service contracts with the City is a
4 subject of ongoing investigation that has not yet
5 concluded?
6 A. It may be the subject of ongoing investigation which
7 has not yet concluded.
8 Q. Okay. If I asked you how either of those two
9 investigations, the one into the COPs validity or the
10 one into the service contracts validity, impacted your
11 decision to enter into the forbearance agreement, you
12 will decline to answer because it would tend to reveal
13 attorney-client communications?
14 A. For all the reasons we discussed today, the -- yes, I
15 would have to.
16 Q. Mr. Orr, let me ask you about under section 803 of the
17 service contracts --
18 A. Yeah.
19 Q. -- I'm going to save us both from having to go through
20 them --
21 A. Yeah.
22 Q. -- so I'll represent to you what it relates to and see
23 if you've heard of it.
24 A. Okay.
25 Q. Okay?

1  Under section 803 of the service contracts
2  payments by the City to the service corporations are
3  classified according to a waterfall.
4  A.  Um-hm.
5  Q.  Have you heard of this waterfall?
6  A.  Yes.
7  Q.  Okay.  Did you evaluate whether there were any claims
8  that any parties to the structure might have against
9  one another if the forbearance agreement leads to the
10 payment of monies outside of the waterfall?
11 A.  I assume you're alluding to prioritization or
12 subordination in claims along those regards, and the
13 answer:  I think there probably was, but, here again,
14 I would -- I did not do it independently.  It would
15 have been done by my counsel.
16 Q.  Okay.  So you can't tell me the fruits of the analysis
17 or the City's position on the likelihood of success on
18 the issue because it's protected by the
19 attorney-client --
20 A.  That is --
21 Q.  -- privilege?
22 A.  -- correct.
23 Q.  If I ask you how it impacted your decision to enter
24 into the forbearance agreement, you'd also not be able
25 to answer that on the basis of the attorney-client

1  privilege?
2  A.  That is correct.  In addition, that's part of the
3  deliberative process.
4  Q.  Have you analyzed whether or not COP holders might
5  have claims against the Swap counterparties if the
6  City exercises the optional termination right?
7  A.  There -- have we analyzed it?  The answer is yes, I
8  believe so.
9  Q.  Okay.  What's the result of that analysis?
10 A.  Here again, any discussion would have been caught up
11 in discussions I would have had with my counsel in
12 that regard, so I decline to answer the question.
13 Q.  Okay.  Have you analyzed whether those potential
14 claims may have an impact on whether the Swap
15 counterparties go forward with the optional
16 termination amount -- optional termination?
17 A.  I don't recall if we did that specific analysis.  I --
18 I think that was probably caught up in the whole
19 universe of analyses of potential claims, pros and
20 cons analyses, but I don't recall that one
21 specifically.
22 Q.  We've just been talking now about the COPs.  We've
23 talked about the Swaps a lot.  I'm going to for a
24 moment reference the 2006 COPs Swap transaction
25 documents.

1  A.  Okay.
2  Q.  Do you know generally what I mean when I say that?
3  A.  Yes.  The original documents by which the City
4  borrowed money, 1.4 billion, for the unfunded
5  actuarial liability --
6  COURT REPORTER:  For the --
7  A.  For the unfunded actuarial liability involve -- the
8  organic documents.
9  BY MR. HACKNEY:
10 Q.  That is exactly correct.  And, to name a few, there
11 are the service contracts, the contract administration
12 agreement, the trust agreement, and the master and --
13 and amended Swap agreements, correct?
14 A.  Yes.
15 Q.  You've heard of all of those?
16 A.  Yes.
17 Q.  And there are multiple versions of them?
18 A.  There are multiple versions of them.
19 Q.  For example, there are two service contracts --
20 A.  That's right.
21 Q.  -- because there are two service corporations.
22 A.  That's right.
23 Q.  Now, your understanding is that some of these
24 documents were amended in 2009 in connection with the
25 addition of the collateral agreement to the package,

1  correct?
2  A.  Yes.  I'm going to take your meaning -- the amendment
3  to mean that's the -- yes, the net effect of what
4  happened in 2009.
5  Q.  Okay.  Did you know, for example, that the service
6  contracts were also literally amended --
7  A.  Yes.
8  Q.  -- as part of that?
9  A.  Yes.  We're talking generally about all the documents
10 without specifically going into each one.
11 Q.  Although I did -- I did in that last one.
12 A.  Yeah, you did, and so I'm following your lead on what
13 we're talking about.
14 Q.  Okay.
15 A.  Okay.
16 Q.  The Swaps were also themselves amended in addition to
17 the collateral agreement being created?
18 A.  I believe so.
19 Q.  Now, you're aware that these contracts that form the
20 2006 COPs Swap transaction documents were contracts
21 that were entered into the same day back in 2006?  I
22 know you weren't there.
23 A.  Yeah, I wasn't there, and I have seen them.  I just
24 don't recall sitting here today if they're the same
25 day.  If you're representing to me that is a fact, I

**Page 169**

1  have no reason to believe otherwise.

2  Q.  I believe the City ordinance describes this as all one

3  transaction.

4  A.  Right.

5  Q.  Do you have a basis to dispute it?

6  MR. SHUMAKER: Objection, calls for

7  speculation --

8  A.  Yeah.

9  MR. SHUMAKER: -- foundation.

10  A.  Yeah, I have no basis to dispute it.  Yeah.

11  BY MR. HACKNEY:

12  Q.  You also know -- I know that you haven't familiarized

13  yourself with the documents.

14  A.  Right.

15  Q.  We talked about that earlier.

16  A.  Right.

17  Q.  You took a look at them.  You know that they all refer

18  to one other and relate to one another.

19  MR. SHUMAKER: Objection to the extent it

20  calls for a legal conclusion.

21  MR. JURGENS: Object to form.

22  A.  Yeah, if -- without drawing any legal meaning to the

23  concept that they all refer to one another, I believe

24  that they do.

25  BY MR. HACKNEY:

**Page 170**

1  Q.  Now, the forbearance agreement that you just signed on

2  July 15th, that also references the 2006 transaction

3  documents, correct?

4  A.  I believe so.

5  Q.  Okay.  In fact, doesn't it borrow certain terms from

6  some of those documents?

7  A.  Without -- yeah, without reviewing the 2005 and 2006

8  documents or spending time here today reading through

9  this agreement, I believe that's accurate.

10  Q.  Okay.  I will represent to you that I have reviewed it

11  and that it does --

12  A.  Right.

13  Q.  -- but I take your answer.

14  A.  Right.

15  Q.  The -- do you know that one of the things that the

16  City agreed to do under the forbearance agreement is

17  that during the optional termination period --

18  A.  Right.

19  Q.  -- the City won't try to seek to invalidate any of the

20  2006 transaction documents?

21  A.  I believe that's true.

22  Q.  Okay.  That's one piece that's big enough that you're

23  familiar with?

24  A.  Yeah, I believe that's true.

25  Q.  So is it fair to say that the 2006 transaction

**Page 171**

1  documents, the collateral agreement from 2009, and the

2  forbearance agreement are all documents that relate to

3  the same subject matter?

4  A.  Without drawing a legal conclusion, I believe in a

5  broad sense it's fair to say that they relate to the

6  same subject matter, meaning the Swaps.

7  Q.  Does the forbearance agreement amend any of the

8  provisions in the 2006 COPs or Swap transaction

9  documents?

10  MR. SHUMAKER: Objection, document speaks

11  for itself.

12  A.  I want to be very careful here.  In addition to

13  the document speaks for itself, I don't want to draw a

14  relationship between the COPs document, which is

15  separate, to the Swaps document.

16  When I said they relate broadly to the

17  subject, to the extent COPs were money borrowed to try

18  to fund a pension obligation, and the Swaps were in

19  place as a hedge against the interest rate

20  fluctuations in those documents, and the collateral

21  agreement 2009 was a document that was meant to

22  address defaults that had occurred in relation to the

23  Swaps document, and this document was meant to address

24  the Swaps, they relate to that same subject area, but

25  I don't want to have my testimony suggest that there's

**Page 172**

1  a legal relationship between the COPs and the Swaps

2  document as relates to this agreement, forbearance and

3  optional termination agreement.

4  BY MR. HACKNEY:

5  Q.  So as you sit here today, is your answer that you

6  don't know if the forbearance agreement amends any of

7  the 2006 COPs Swap transaction documents?  It may, it

8  may not, you don't know?

9  A.  That is -- that is correct.  I'm not going to draw a

10  legal conclusion.

11  Q.  Yeah, and I'm not going to try to drive you to one.

12  A.  Okay.

13  Q.  I am asking questions as in your role as a layperson

14  who did execute the document.

15  A.  Right.

16  Q.  I understand the lawyers are going to do what they do,

17  okay, but there is an aspect of this where it's --

18  your understanding as the guy who signs on it --

19  A.  Right.

20  Q.  -- can also be relevant?

21  A.  That's right.  My understanding is what this agreement

22  does -- it's a forbearance agreement, and to the

23  extent it has a provision in it that reverts back to

24  the status quo ante if -- if the deal's not done, I

25  don't want to draw any legal conclusion if there's an

1 amendment that exists after that process.
2 Q. Okay.
3 A. That's why I'm being hesitant.
4 Q. So you just don't know one way or the other as you sit
5 here today the impact the forbearance agreement has on
6 the other agreements?
7 A. With regard to an amendment, that's correct.
8 Q. Okay. Is it your understanding that the 2006 COPs
9 Swap transaction documents retain their vitality as
10 legal agreements to the -- of the parties thereto?
11 A. It's my understanding that they have whatever vitality
12 they have according to their terms.
13 Q. Okay. So all the rights that all the parties to the
14 COPs Swap transaction documents had before the
15 forbearance agreement, they still have today?
16 A. No. Here again, you're -- I just want to be careful.
17 It seems that you're trying to conflate COPs with
18 Swaps, and I want to be careful.
19 Q. Well, I want to say all of them, but if you say no,
20 it's different on these, some rights have changed, but
21 on these everyone's rights are preserved, that's okay.
22 A. Yeah, I want to be careful as far as saying what their
23 rights are because I do believe those are legal
24 questions, and in fact some of them are being
25 litigated in the various piece of litigation that are

1 going on.
2 Q. Hence this deposition?
3 A. Hence this deposition. So I want to be very careful
4 that I not give any testimony that would implicate a
5 legal conclusion with regard to those documents.
6 Q. And I'm not asking for a legal conclusion. I'm just
7 asking for your understanding as the signatory --
8 A. Right.
9 Q. -- as to whether the COPs Swap transaction documents,
10 whether all the parties preserved their rights under
11 those documents, not withstanding the forbearance
12 agreement, or whether the forbearance agreement
13 changes the parties' rights under those documents.
14 A. And that's why I'm being careful because my
15 understanding of the forbearance agreement is that it
16 imposed upon the City, service corporations and the
17 counterparties certain obligations to forebear. I'm
18 not going to draw a legal conclusion as to whether or
19 not that amended any rights or changed any rights
20 under the original documents.
21 Q. It may have, it may not have?
22 A. It may. It may have not. I'll leave that to the
23 attorneys.
24 Q. It may constitute a waiver, it may not constitute a
25 waiver, you'll leave that to the attorneys.

1 A. I'll leave that to the attorneys.
2 Q. At the time that you entered into the forbearance
3 agreement, were you aware that the Swap insurers had
4 the right to consent to waivers, modifications or
5 amendments of the Swap agreement and the collateral
6 agreement?
7 MR. JURGENS: Objection to form.
8 A. I was aware that some of the Swap insurers had
9 asserted they had those rights. I had drawn no
10 independent legal conclusion as to whether or not they
11 did.
12 BY MR. HACKNEY:
13 Q. Okay. So you didn't know whether they were right or
14 they were wrong --
15 A. Correct.
16 Q. -- at the time you executed the agreement?
17 A. I had had discussions with my attorneys about whether
18 they were right or they were wrong, but I had no
19 independent conclusions.
20 Q. And you won't disclose the subject of your counsel's
21 communications?
22 A. I cannot disclose that subject because that's an
23 attorney-client communication.
24 Q. Did you evaluate when you entered into the forbearance
25 agreement, whether the act of entering into it would

1 multiply the amount of litigation that the City might
2 face?
3 A. I think it's fair to say that we considered whether it
4 might. Any time you're in a transaction I think you
5 consider whether it might suborn litigation, yes.
6 Q. And what were your conclusions on this subject?
7 A. Here again, any conclusions we would have had would
8 have been in this whole air of discussions with my
9 counsel. What I can say, without saying what my
10 conclusions specifically were of the probability that
11 it might create additional litigation, is I thought
12 that overall it was in the best interest of the City
13 to enter into agreement.
14 Q. But you won't disclose to me your communications with
15 your counsel about whether this might multiply the
16 amount of litigation?
17 A. That is correct. Multiply, increase, whatever.
18 Q. And have you -- did you evaluate whether performing
19 under the forbearance agreement, performing -- and by
20 that I mean exercising the option.
21 A. Right.
22 Q. Whether -- let me say it again.
23 Have you evaluated whether exercising the
24 option under the forbearance agreement might subject
25 the City to additional liability?

Page 177

1  A.  Here again, all of these issues regarding potential of
2  contingent claims, additional litigation, the
3  advisability of entering into the agreement,
4  considering that we were in litigation, and as I said
5  before there may have been litigation threats made
6  additionally, were taken into consideration in
7  consultation with my counsel.
8  Q.  But you can't disclose those communications?
9  A.  They are attorney-client communications.
10  Q.  All right.  Let me ask you some questions about the
11  proposed order which I've marked.
12  A.  Okay.
13      MR. HACKNEY:  You know what?  We've got a
14  five-minute tape coming up and maybe since we're about
15  to move to a new section, I'll propose a restroom
16  break.
17      THE WITNESS:  Okay.  That's fine.
18      VIDEO TECHNICIAN:  The time is 11:35 a.m.
19  This marks the end of tape number 2.  We are off the
20  record.
21      (Recess taken at 11:35 a.m.)
22      (Back on the record at 11:51 a.m.)
23      VIDEO TECHNICIAN:  We are back on the
24  record at 11:51 a.m.  This marks the beginning of tape
25  number 3.

Page 178

1      MARKED FOR IDENTIFICATION:
2      DEPOSITION EXHIBIT 4
3      11:51 a.m.
4  BY MR. HACKNEY:
5  Q.  Let me hand you what I've marked as Orr Exhibit 4.
6      MR. SHUMAKER:  Are we going out of order?
7      MR. HACKNEY:  Yes.  These were pre-marked
8  and I must have dropped an exhibit here or there.
9  BY MR. HACKNEY:
10  Q.  Do you have Orr Exhibit 4 in front of you, sir?
11  A.  Yes, I do.
12  Q.  So, Mr. Orr, I'll represent to you that this is the
13  proposed order that your counsel submitted along with
14  the motion.
15      MR. HACKNEY:  Oh, sorry.
16  BY MR. HACKNEY:
17  Q.  Do you understand that?
18  A.  Yes.  Yes, I do.
19  Q.  Did you review this order prior to its being submitted
20  along with the motion?
21  A.  I don't think I did.
22  Q.  Okay.  Let me tell you that this order is actually of
23  some importance to the forbearance agreement.
24  A.  Um-hm.
25  Q.  And that's because if you don't get an order that is

Page 179

1  in a form that's satisfactory --
2  A.  Yes.
3  Q.  -- to the Swap counterparties --
4  A.  I understand.
5  Q.  Yeah.
6  A.  I need to be clear.  Obviously I've reviewed and read
7  and signed the forbearance agreement.  I reviewed the
8  motion.  I just don't recall whether or not I reviewed
9  the order.
10  Q.  Okay.
11  A.  I may have because it was probably attached to the
12  motion.  I just don't have an independent recollection
13  of it.
14  Q.  Let's try and make sure we understand the potential
15  significance of the order --
16  A.  Sure.
17  Q.  -- and then we're going to go through it --
18  A.  Sure.
19  Q.  -- even though you haven't read it.
20      Do you understand the Swap counterparties
21  and the City and the service corporations -- there's a
22  provision in the forbearance agreement that talks
23  about the fact that you need to get an order
24  entered --
25  A.  Sixty days.

Page 180

1  Q.  -- that's mutually agreeable.
2  A.  Yes.
3  Q.  And that was the 60-day time period.
4  A.  Yes.
5  Q.  And we can find the specific provision, but --
6  A.  Yes.
7  Q.  -- you know what I'm talking about.
8  A.  Yes, I do.
9  Q.  Okay.  So the form of the order is important.
10  A.  Um-hm.
11  Q.  Is that a yes?
12  A.  Yes.
13  Q.  And it's important because if the order changes
14  materially, it might arguably give the Swap
15  counterparties the right to declare an end to the
16  termination period.
17      MR. SHUMAKER:  Objection to the form, calls
18  for a legal conclusion.
19  A.  Here again, without making a legal assessment, I
20  understand your meaning that we -- we have an
21  obligation in the City to make sure the order is in a
22  form that is mutually agreeable to the parties.
23  BY MR. HACKNEY:
24  Q.  And this is it, right?
25  A.  That is the proposed order.

**Page 181**

1  Q.  And this one, you know, is mutually agreeable to the
2  parties.
3  A.  I believe that it is, yes.
4  Q.  I mean, you may not have negotiated it --
5  A.  Correct.
6  Q.  -- personally, but it's your expectation that people
7  acting on your behalf then went to make sure that the
8  proposed order was mutually agreeable to the Swap
9  counterparties.
10  A.  That is correct.
11  Q.  Okay.  Now, if the Court -- you understand that in
12  bankruptcy sometimes the Court enters an order that's
13  different from the one that was proposed.
14  A.  Yes.  I think the judge has done that on many
15  occasions in this case.
16  Q.  Yes.  And so you understand the judge is the one who
17  ultimately decides what the order says.
18  A.  The judge wears the robe.
19  Q.  That's right.  Now, the judge, it's possible he may
20  materially change some of the provisions of this
21  order.  Do you understand that?
22  A.  Yes.  It is possible that the judge may change the
23  order.
24  Q.  And I'm not going to ask you to commit to a position
25  as to whether you would lose your rights, but it at

**Page 182**

1  least raises the risk that if there's a material
2  change to the proposed order, the Swap counterparties
3  might be able to say that's not the order that we
4  mutually negotiated in advance of the motion so in my
5  view you haven't obtained the mutually negotiated
6  order.
7  MR. SHUMAKER: Objection, form, foundation.
8  BY MR. HACKNEY:
9  Q.  That's a risk?
10  MR. SHUMAKER: Sorry.  Objection to form,
11  foundation, calls for speculation.
12  A.  Yeah.  It is somewhat speculative, and I'd have to say
13  that risk has to be mitigated by the fact that I would
14  hope and anticipate that any proposed revisions to the
15  order would be discussed with the Court under the
16  guise of the obligations that the parties have to
17  reach a mutually agreeable order.
18  BY MR. HACKNEY:
19  Q.  Okay.  But if the Court enters an order that is not
20  mutually agreeable to the City and the Swap
21  counterparties, that could give the Swap
22  counterparties the right to terminate the optional
23  forbearance period?
24  MR. SHUMAKER: Objection, calls for
25  speculation.

**Page 183**

1  A.  Yes.  Here again, it's speculative, in my -- but I
2  don't anticipate that experience.  In my experience
3  most judges are -- my experience is that many judges
4  are very careful not to undermine the underlying
5  agreement by the order that's entered.
6  BY MR. HACKNEY:
7  Q.  So we can agree, though, that this order is an
8  important part of the forbearance agreement, correct?
9  A.  Yes.  I think the order is relevant to the forbearance
10  agreement.
11  MR. JURGENS: Objection, form.
12  BY MR. HACKNEY:
13  Q.  And it's important to it?
14  MR. SHUMAKER: Objection to form.
15  A.  I think it's a -- yes.
16  BY MR. HACKNEY:
17  Q.  Let me ask you about some of the specific provisions
18  in the order.
19  A.  Okay.
20  Q.  Let me just say real quick, do you know who negotiated
21  this order with the Swap counterparties?
22  MR. JURGENS: Objection, form.
23  A.  I assume it was my counsel.  I don't know who in
24  particular.
25  BY MR. HACKNEY:

**Page 184**

1  Q.  Did you -- but did -- did you approve the form of this
2  order before it was submitted for the City?
3  A.  As I said, I looked at the motion and the order was
4  probably attached to the motion.  I just don't
5  remember looking at the order specifically.  What I
6  remember is, after we reached the agreement in
7  principle and signed the forbearance agreement, having
8  discussions without speaking to them, my counsel,
9  okay, was -- let's document the agreement and get the
10  motion filed.
11  Q.  Do you know who -- do you know whether anyone
12  approached the service corporations to get their views
13  on the order?
14  A.  I do not.
15  Q.  You certainly didn't?
16  A.  No.
17  Q.  And let me just tie this up for a record because I was
18  asking it colloquially, but it's under section 1.3(j)
19  of the forbearance agreement.  The City needs to
20  obtain a final and non-appealable order on its motion
21  before September 16th, 2013 or else the Swap
22  counterparties have the right to terminate the
23  forbearance agreement; isn't that correct?
24  A.  Yeah.
25  MR. SHUMAKER: Objection to the summary.

Page 185

1 A. Yeah. The agreement speaks for itself and there are
2 other provisions in there, but the net effect is that
3 you have to do -- obtain the order within 60 days
4 and --
5 BY MR. HACKNEY:
6 Q. Yeah.
7 A. -- I believe that's -- if you represent that's the
8 correct date, then I have no reason to disagree.
9 Q. And there are actually two elements to this here. One
10 of them is that, whatever the order says, it has to be
11 final and unappealable by September 16, correct?
12 MR. SHUMAKER: Objection, document speaks
13 for itself.
14 A. I'll have to rely on the documents speaking to itself
15 because without going through the whole -- I do recall
16 that there was an obligation that the order be a final
17 order. I don't recall specifically the -- the
18 unappealable aspect of it. I do -- I do see in J that
19 there's a 60-day provision going forward.
20 BY MR. HACKNEY:
21 Q. And do you see it says final and unappealable in J?
22 A. I'm sorry, I'm looking through it.
23 Q. No, that's okay. You what, the court order
24 definition?
25 A. Yeah. It doesn't say it in J as defined in 2.1(d),

Page 186

1 and that's what I was looking. Unfortunately I -- I
2 remembered it was in 2. It's D. It's 2.1(d).
3 Q. And you --
4 A. It says obtain entry of a final and unappealable
5 order, yeah.
6 Q. Are you aware that that's actually not possible as we
7 stand here today under the rules of the bankruptcy
8 code?
9 MR. SHUMAKER: Objection, calls for
10 speculation and a legal conclusion.
11 A. Yeah, here again, since I'm not acting as an attorney,
12 I'm going to defer from asking (sic) that question. I
13 do understand that there are time frames involved
14 under the bankruptcy code and under the rules as to
15 whether or not they can occur.
16 BY MR. HACKNEY:
17 Q. So you don't know whether or not it's -- it's
18 potentially impossible for the City to comply with
19 this --
20 A. Yeah, I would --
21 MR. SHUMAKER: Same objection.
22 A. I would not opine as to whether or not it's possible.
23 BY MR. HACKNEY:
24 Q. Have you or your representatives had any
25 communications with the Swap counterparties regarding

Page 187

1 whether they will extend that 60-day deadline we were
2 just discussing?
3 A. I have not had any discussions. I am unaware as to
4 whether or not any of my representatives have.
5 Q. You haven't directed them to have any, correct?
6 A. No, not directly.
7 Q. It's correct that you have not directed them?
8 A. It is correct -- it is correct that I have not
9 directed them, but generally, just so we have an
10 understanding here, once the forbearance agreement was
11 reached, my counsel and representatives have all the
12 authority necessary to do what's required to get the
13 order entered.
14 Q. Okay. Well, let me ask it this way, which is, there
15 are a number of provisions that are in this order that
16 I -- I guess I'm maybe having the sense that you're
17 not intimately familiar with as you sit here today; is
18 that correct?
19 A. Yes, I know generally what the provisions of the order
20 are. I know that the motion speaks to both the
21 assumption and the 9019 agreement and their different
22 principles, but the specific inner workings of the
23 order, I will defer to my counsel on those.
24 Q. Let me ask you about some of them then. Look on the
25 page 3 at E which is entitled Consent to Use of Casino

Page 188

1 Revenues.
2 A. Um-hm. Um-hm.
3 Q. And it contains a finding that says, "Pursuant to
4 section 1.2 of the forbearance agreement, UBS AG and
5 MLCS consent to the City's use of the casino revenue
6 as set forth in the forbearance agreement."
7 Do you see that?
8 A. Yes, I do.
9 Q. And then it says, "The consent of the UBS AG and MLCS
10 will allow the City immediate access to its casino
11 revenue as set forth in forbearance agreement and no
12 other or further consents are required."
13 Do you see that?
14 A. Yes, I do.
15 Q. Okay. Is this an important part of the proposed
16 order?
17 MR. SHUMAKER: Objection to form.
18 A. Well, first, the document speaks for itself. Two --
19 BY MR. HACKNEY:
20 Q. It doesn't speak for itself in terms of whether it's
21 important.
22 A. Well, let me respond. Two, to the extent this is an
23 order into a motion, it -- as we had discussed earlier
24 today, it's important that we have unfettered access
25 to the casino revenue; and, three, I do think this is

1 a central aspect of the forbearance agreement.
2 Q. Okay. If the Court refuses to grant the relief
3 specified here, will the Swap counterparties have the
4 right to terminate the forbearance agreement in your
5 view?
6 MR. SHUMAKER: Objection, calls for a legal
7 conclusion.
8 You can answer.
9 A. Yeah, they'll have whatever rights they have under the
10 forbearance agreement which might include termination.
11 BY MR. HACKNEY:
12 Q. Take a look at paragraph G, arms' length agreement.
13 The forbearance agreement was negotiated at arms'
14 length and in good faith by all parties, and it goes
15 on to say, "UBS AG and MLCS are not insiders of the
16 City as that term is defined in bankruptcy code
17 section 10131?
18 A. Um-hm.
19 Q. And this is the important part I want to you focus on,
20 "The parties entry into and performance under the
21 forbearance agreement does not violate any law,
22 including the bankruptcy code, and does not give rise
23 to any claim or remedy against the parties thereto
24 except as may be expressly set forth in this order or
25 in such agreement."

1 Do you see that?
2 A. Yes.
3 Q. Do you remember earlier we talked about whether if the
4 City performed under the forbearance agreement it
5 would be able to do so without the fear of liability
6 to other parties?
7 A. Yes.
8 Q. And your understanding was it could do so, correct?
9 A. Yes.
10 Q. And that so could the Swap counterparties, correct?
11 A. Yes.
12 Q. And isn't this provision one part of the basis for
13 your -- for that view?
14 A. Well, you know, as I said, this provision draws a
15 legal conclusion and I have not independently or as an
16 attorney done an analysis of what this provision will
17 provide, but that's my understanding, yes.
18 Q. Are you just reading this provision for the first
19 time?
20 A. No. I think I -- as I said, I think I saw the order
21 attached to the motion. I just didn't recall it
22 immediately or as terms by itself. I was more
23 familiar with the motion because I read that in
24 conjunction with my affidavit that was attached to the
25 motion, but I think that's the effect of what this

1 provision does.
2 Q. Is this an important part of the order --
3 MR. SHUMAKER: Objection.
4 BY MR. HACKNEY:
5 Q. -- from the City's perspective?
6 MR. SHUMAKER: Objection, form.
7 A. Yes, without giving rise to the nomenclature
8 important. As I said before, it's important that we
9 have certainty and -- regarding the use of the casino
10 revenue, and this term certainly looks like it would
11 provide that.
12 BY MR. HACKNEY:
13 Q. Okay. And not only does it provide you the certainty
14 about the casino revenue, it provides you with the
15 certainty that you will not be -- the City will not be
16 subject to any liability as a result of performing
17 under the forbearance agreement, correct?
18 A. Yes, I believe so.
19 Q. And it does the same thing for the Swap
20 counterparties, correct?
21 A. Yes, I believe so.
22 Q. Take a look at paragraph 4 on the bottom of page 4.
23 A. Um-hm.
24 Q. It says, "The forbearance agreement is approved in its
25 entirety. The City is authorized to perform its

1 obligations that arise from the forbearance agreement
2 pursuant to Bankruptcy Rule 9019, and any actions
3 taken heretofore in furtherance of these obligations
4 are hereby ratified."
5 Do you see that?
6 A. Yes, I do.
7 Q. You understand that to be a provision by which the
8 Court provides a judicial authorization to the City
9 and the Swap counterparties to perform under the
10 forbearance agreement, correct?
11 MR. SHUMAKER: Objection, calls for a legal
12 conclusion.
13 MR. HACKNEY: I'm just asking for his
14 assumption.
15 A. My understanding --
16 MR. SHUMAKER: Just to make that clear.
17 A. My understanding is that is the practical effect of
18 this provision.
19 BY MR. HACKNEY:
20 Q. Okay. Is this an important part of this order?
21 MR. SHUMAKER: Objection to form.
22 A. I think approval of the forbearance agreement is an
23 important part of this order, yes.
24 BY MR. HACKNEY:
25 Q. But also the judicial authorization to perform.

Page 193

1  A.  Yes, I believe so.
2  Q.  Let me -- let me cut through some of these provisions,
3  which is, what the parties really want the Court to do
4  here, both the City and Swap counterparties, is to
5  tell them you are allowed to perform this forbearance
6  agreement without fear of reprisal from any third
7  party, correct?
8      MR. JURGENS: Objection to form.
9      MR. SHUMAKER: Objection to form.
10  A.  Yeah, and I also think it calls for a legal
11  conclusion, but let me see if I can answer the
12  question.  The motion sets forth what I believe are
13  the conditions necessary for approval of the
14  forbearance agreement.  This order seeks to approve
15  that motion, so to the extent it does that, yes, I
16  believe it authorizes the parties to perform and gives
17  them the authority to go forward to a motion according
18  to its terms which incorporates by definition the
19  forbearance agreement, so yeah.
20     BY MR. HACKNEY:
21  Q.  And they can do so without fear of liability to third
22  parties.
23  A.  You know, that -- that impacts upon -- I believe that
24  may impact upon the question is not atypical in some
25  orders as far as -- as we discussed earlier today,

Page 194

1  releases, third party liability, exculpation, those
2  are legal conclusions.  My understanding is that the
3  way the order is -- is worded that, yes, it allows the
4  parties to go forward.
5      COURT REPORTER: To --
6      THE WITNESS: To go forward.
7      MR. HACKNEY: Without liability to third
8  parties.
9      BY MR. HACKNEY:
10  Q.  I think we're going over ground we've gone over
11  before.
12  A.  Yeah.  I believe that's the intent of the order, yes.
13  Q.  Okay.  So one of the benefits of the order to the City
14  and the Swap counterparties is that to the extent
15  there are third party claims -- and I know you're not
16  conceding that there are any --
17  A.  Right.
18  Q.  -- it clears them away.
19  A.  I believe that's accurate, which is one of the -- yes.
20  I believe that's accurate.
21  Q.  And I take it the City is not willing to agree to an
22  order which ensures the protection of third party
23  claims?
24     MR. SHUMAKER: Calls for speculation,
25  objection.

Page 195

1  A.  Yeah, that's -- you know, there are so many -- there
2  are -- there's a possibility there may be conditions
3  under which the City could agree, so I don't want to
4  be misleading in saying that there are no
5  circumstances when -- but generally speaking, this
6  order, the motion and forbearance agreement, are the
7  expectations of the parties.
8  Q.  Are you aware of the possibility that if third party
9  claims are preserved, that that could be a
10  sufficiently material change in this order for the
11  Swap counterparties to be able to terminate?
12  A.  It might be.
13  Q.  Have you had any conversations with them about that
14  subject?
15  A.  I have not personally had any conversations with them
16  about that subject.
17  Q.  Have you directed folks that report to you to do so,
18  either advisors or personal --
19  A.  As I've said earlier, I've given the authority to my
20  counsel and team to have all discussions that are
21  necessary to address any contingencies that could
22  arise, and they may well have had those discussions.
23  I'm just not aware of any with specificity.
24  Q.  Okay.  But you gave a general direction.
25  A.  Right.

Page 196

1  Q.  You didn't give someone a specific direction to hey,
2  go find out what the Swap counterparties think if
3  third party rights are preserved, what are they going
4  to do, do we have a problem?  You never gave that
5  specific direction.
6  A.  No, I didn't, and let's -- you know, let's make sure
7  we're clear on this.  As I said, once we reached the
8  agreement, you know, my direction was okay, let's get
9  it done and let's document and do whatever's necessary
10  to do that, so I did not give a specific direction in
11  that regard.
12  Q.  Let me ask you real quickly.  One of the other
13  benefits of the forbearance agreement to the City is
14  that it resolves litigation that the City's currently
15  in with Syncora, correct?
16  A.  I would like to think so.  To the extent it draws a
17  legal conclusion, I'd have to defer to my counsel, but
18  I like to think it does that, yes.
19  Q.  So you think that the Court's order that we're looking
20  at here will actually moot pending litigations
21  involving the City and Syncora?
22  A.  Perhaps not.  For instance, and I haven't -- you know,
23  I haven't drawn a legal conclusion on this, but there
24  may be claims by the City against Syncora that survive
25  this order.  I just don't know.

Page 197

1 Q. Okay. As the City's litigation against Syncora stands
2 currently, will the Court's order moot out that
3 litigation?
4 A. I don't know.
5    MR. SHUMAKER: Objection, calls for a legal
6 conclusion.
7 A. Yeah, I was going to say I don't know. That -- that
8 calls for a legal conclusion and I have not
9 independently done that analysis.
10    BY MR. HACKNEY:
11 Q. Okay. So it may, it may not, you don't know?
12 A. It may, it may not. I don't know.
13 Q. The -- I want to talk about the source of proceeds for
14 any potential termination payment down the road. This
15 is a subject I discussed with Mr. Buckfire yesterday.
16 A. Um-hm.
17 Q. The optional termination amount fluctuates over time
18 and is ultimately pegged on the day that you exercise
19 the option; isn't that correct?
20 A. Yes, I believe that's correct.
21    MR. JURGENS: Objection to form.
22    BY MR. HACKNEY:
23 Q. So when we talk about these amounts, Mr. Orr, it's a
24 little bit difficult because we don't -- I can't tell
25 you you're going to have X amount of money to exercise

Page 198

1 it, but you understand that there is a distinct
2 possibility that the amount of the optional
3 termination payment will be a very sizable sum.
4    MR. JURGENS: Objection to form.
5 A. I think that it's fair to say that although the
6 interest rates may fluctuate, they are not going to
7 fluctuate so greatly that it will reduce the
8 probability that that will be a sizable sum. You're
9 not going to go from zero points or two points to
10 36 percent at the Fed discount window.
11 Q. Hopefully not or something's horrible happened.
12 A. Yeah, or we're all in trouble, yeah. So you may
13 fluctuate, but the range of fluctuation is generally
14 within a fairly finite bandwidth, we hope.
15 Q. And I'm going to give you some notional amounts that
16 are based on comments your counsel has made in court,
17 just to try and get general agreement.
18 A. Sure.
19 Q. But it's very possible that the amount of the
20 termination payment could be between 180 and 220
21 million dollars?
22    MR. JURGENS: Objection to form.
23 A. I think that's fair. We certainly hope it's on the
24 lower end or lower of that scale, but that depends
25 what the rates are at any given day.

Page 199

1    BY MR. HACKNEY:
2 Q. Okay. Now, let's link up the potential sizeable
3 termination payment that the City may have to marshall
4 if it wants to exercise the option with the City's
5 current financial capabilities.
6 A. Yes.
7 Q. Okay. Isn't it true that the City does not currently
8 have enough cash on hand to be able to fund a
9 termination payment that was in the range of 200
10 million dollars?
11 A. That is true.
12 Q. That's part of the problem that you're working
13 on as emergency manager, right?
14 A. That is certainly true.
15 Q. Do you know how much cash the City has today?
16 A. On any given day, we fluctuate approximately in the
17 neighborhood of I want to say 30 to 40 million
18 dollars. Right now that number may be a little bit
19 higher because we just went through one of our tax
20 collection periods in August.
21 Q. I'm going to guess and ask you do you stay in almost
22 daily contact with your -- with your cash flow
23 forecast?
24 A. Almost daily, yeah.
25 Q. Yeah. That's probably an important aspect of running

Page 200

1 the City.
2 A. It's an important aspect of the City.
3 Q. Do you still project that you're going to run out of
4 cash by the end of the year?
5 A. If we don't have this agreement, there's a very real
6 chance, yes, in a steady state, we will run out of
7 cash.
8 Q. And by -- what do you mean by a steady state?
9 A. If we don't do anything such as secure this casino
10 revenue, if we don't go to the capital markets and
11 borrow additional funds, which appears unlikely which
12 the City has done every other year since 2008 to make
13 up the difference, yes, the projections show that by
14 December of this year, we will run out of cash.
15 Q. Are those the pre-bankruptcy projections?
16 A. Yes. I believe so.
17 Q. Those are the projections that we'll get into in a
18 moment that -- but that assumes that the City's paying
19 its legacy expenditures on a current basis, right?
20 A. Yes. As we have -- as we have represented, we intend
21 to continue doing that throughout the year.
22 Q. The legacy expenditures?
23 A. Well, certainly with regard to healthcare and other
24 employees, if we get this agreement, that may change
25 our risk for the termination payment.

13-53846-swr  Doc 2045  Filed 04/22/13  Entered 04/22/13 22:04:52  Page 15 of 38    72

Page 201

1 Q. Your view of those legacy expenditures in the
2 bankruptcy is that they are unsecured claims, correct?
3 A. Yes. Many of them are, yes. There are some
4 expenditures that are secured with regard to the water
5 department and parking and some miscellaneous, but the
6 roughly 11 and a half, 12 billion dollars that we put
7 out there we view as unsecured.
8 Q. So let's go back to sourcing this termination payment.
9 A. Yes.
10 Q. It was my understanding of his testimony that
11 Mr. Buckfire who, by the way, is the individual tasked
12 with obtaining the City's post petition financing,
13 correct?
14 A. Yes.
15 Q. And is presumably the individual that's most
16 knowledgeable about that effort?
17 A. Yes.
18 Q. It was -- I'll represent to you that his testimony was
19 that the proceeds for the optional termination payment
20 would likely come from the post -- the proceeds of the
21 post petition financing, correct?
22 A. Yes.
23     MR. JURGENS: Objection to form.
24     BY MR. HACKNEY:
25 Q. Is that also your understanding?

Page 202

1 A. Yes.
2 Q. Okay. Now, isn't it also true that the City hopes to
3 pledge the casino revenues as part of the collateral
4 package for the post petition financing?
5     MR. SHUMAKER: I'm going to object here.
6 We're getting into an area where it is incredibly
7 commercially sensitive as to what sort of post
8 petition financing that the City is seeking.
9     MR. HACKNEY: Let me not be rude. I will
10 tell you I'm just going to ask him questions that
11 Buckfire asked yesterday -- answered. So I'm not
12 going to try and play the whole thing, but there were
13 absolutely areas where Buckfire answered. I think
14 there were a lot of other people in the room that were
15 there. I think any of your colleagues --
16     MR. SHUMAKER: Okay, that's fine.
17     MR. HACKNEY: Any of your colleagues.
18     MR. SHUMAKER: I just want to caution you.
19     MR. HACKNEY: I understand. I understand
20 the sensitivity. There were absolutely areas, though,
21 that Buckfire talked about. This was one of them. I
22 mean can I get an Amen or --
23     (Consensus Amen.)
24 A. Okay.
25     BY MR. HACKNEY:

Page 203

1 Q. Okay. So I think there -- if I'm not mistaken, your
2 father was an amen minister.
3 A. Great grandfather, grandfather and father.
4 Q. So maybe --
5 A. Yeah, took me back to -- over in the corner with the
6 deacons, yeah, took me back.
7 Q. Okay. I won't compare myself to your father,
8 grandfather and great grandfather, but I can aspire.
9 A. Yeah.
10 Q. So I do want to talk about -- this is important.
11 Okay. This is -- isn't it true that one aspect of the
12 DIP -- I'm not going to get into the others -- is that
13 the casino revenues will be pledged or anticipated to
14 be pledged as collateral for the post petition
15 financing?
16 A. Let me say this. That is certainly under
17 consideration.
18 Q. Okay. Now, isn't it also true, though, that the
19 casino revenues have not currently been freed up on a
20 permanent basis because the City has not currently
21 exercised the option, correct?
22 A. The certainty that we hope to get out of the
23 forbearance agreement has not been approved yet,
24 correct.
25 Q. Well, even if it is approved by the Court, you still

Page 204

1 won't have exercised the option.
2 A. That is true with regard to the optional termination
3 payment.
4 Q. Right.
5 A. Yes.
6 Q. And you need to exercise the option to terminate the
7 hedge, right?
8 A. Yes.
9 Q. You need to terminate the hedge to terminate the
10 collateral agreement.
11 A. I think that's --
12     MR. SHUMAKER: Object to form, to the
13 extent calls for a legal conclusion.
14 A. Yeah, without getting into legal conclusions --
15     COURT REPORTER: I'm sorry. This is --
16     BY MR. HACKNEY:
17 Q. You think it's a fair characterization that you need
18 to get the hedge terminated to get the collateral
19 agreement terminated?
20 A. Yes.
21 Q. And the good part for the City, if those things
22 happen, is that now you have unchanneled access to the
23 casino revenues going into the future?
24 A. Yes, as we've said today, that certainty is one of the
25 motivations to enter into the agreement.

Page 205

1  Q.  But do you also understand that you can't currently
2  pledge the casino revenues to a post petition lender
3  in a -- prior to having exercised the option under the
4  forbearance agreement?
5  A.  Well, let's be careful without drawing legal
6  conclusions.  You can always enter into agreements
7  that have contingencies attached to them and the
8  parties will wait for those contingencies to occur.
9  That certainly has happened with a number of different
10 negotiations, not just in this case, but happens all
11 the time.
12 Q.  That's fair that you absolutely -- you make a pledge
13 that's contingent on something else.  But isn't it
14 true that, as a general matter, post petition lenders
15 typically like to make sure that they have clean
16 collateral before they make a loan that's secured by
17 that collateral?
18     MR. SHUMAKER: Objection, calls for
19 speculation.
20 A.  I think that's generally a fair characterization;
21 however, there have been cases that I've been involved
22 with outside of this one where post petition lenders
23 have been willing to make pledges or commitments
24 subject to certain contingencies.
25     BY MR. HACKNEY:

Page 206

1  Q.  Isn't it your expectation today, though -- is it -- is
2  it your expectation today that any post petition
3  lender will want clear -- a clear lien on the casino
4  revenues before it's willing to lend?  Is that your
5  current expectation?
6  A.  Well, my current expectation is it might well want
7  clear lien before it's willing to fund.  I would think
8  in many of the bankruptcy cases that I've been
9  involved in, post petition lenders, for instance, are
10 willing to make commitments subject to the Court
11 approving their super priority liens, and then once
12 that approval is granted, they fund the loan, so
13 that's fairly common.
14 Q.  I'm going to confirm for the record that conversations
15 with the State of Michigan about providing DIP
16 financing or with the federal government about
17 providing DIP financing are still questions that you
18 will refuse to answer on the grounds of commercial
19 sensitivity?
20     MR. SHUMAKER: I think you can ask Mr. Orr
21 those questions.  I don't want to -- I don't want to
22 categorically exclude you from doing that.
23     BY MR. HACKNEY:
24 Q.  Are they commercially sensitive?
25 A.  They are commercially sensitive, but I don't want to

Page 207

1  mislead you.  It is my assumption that, while they're
2  commercially sensitive, that's not going to be
3  forthcoming.
4  Q.  Oh, really?
5  A.  Yes.
6  Q.  So just to tie it up, you tried to get a -- whether
7  it's credit enhancement or liquidity from the State
8  and the Feds, and your expectation is that you won't
9  be able to?
10 A.  My understanding at the State level is that there's
11 certain prohibitions of the State law on the ability
12 of the State to lend to the City, and at the Federal
13 level my understanding is that it's not going to be
14 forthcoming, direct aid.
15 Q.  Interesting.  And what about credit enhancement by the
16 State?
17 A.  Here again, it's highly commercially insensitive --
18 sensitive.  I don't want to say anything that
19 forecloses it, but we -- let me answer it this way.
20 We are operating on the assumption that that will not
21 come -- be forthcoming.
22 Q.  The casino revenues are about 170 million dollars a
23 year; isn't that correct?
24 A.  Yeah, 170, 180 somewhere in there.
25 Q.  Yeah.  In fact, that -- it's interesting because the

Page 208

1  DIP proceeds you're seeking are up to 350; is that
2  correct?
3  A.  Here again, those are commercially sensitive, but I
4  think that's fair.  Yes, I think that's fair.
5  Q.  Okay.  And that's the equivalent of two years' worth
6  of casino revenues, correct?
7  A.  Yes.
8  Q.  Okay.  And that's something that you think you may be
9  able to get without having to pledge a clear lien on
10 the casino revenues, right?
11 A.  No.  What I'm trying to say is you can certainly enter
12 into commitments.  I'm drawing commitments different
13 from funding.  You can certainly have a lender which
14 is quite common in bankruptcy cases to make a
15 commitment subject to approval of its security
16 interest or priorities to actually fund.
17 Q.  Okay.
18 A.  So that can occur.
19 Q.  So the fact that that can occur means that there can
20 be uncertainty in connection with the casino revenues
21 and it won't hamstring your DIP process, correct?
22 A.  Yeah, it's not so much -- well, to a degree what
23 you're saying is correct.  It's not so much
24 uncertainty with casino revenues because that's math.
25 It may be some uncertainty with regard to the ability

1 of the City to pledge those revenues to pay off any
2 post petition lending, and, here again, a lender might
3 well be willing to enter into an agreement subject to
4 having that insecurity removed to fund that --
5 Q. The fact of the matter is the DIP process is just
6 getting off the ground, correct?
7 A. I think that's fair to say.
8 Q. I think it's literally in the last couple days, right?
9 A. I think that's fair.
10 Q. So you don't know as you sit here today, and you
11 probably wouldn't tell me if you did --
12 A. Right.
13 Q. -- what the current appetite of the lenders is for
14 uncertainty around the casino revenues, correct?
15 A. That -- that I think is part of the process. Yeah.
16 Q. Now, have you attempted to borrow money -- has the
17 City attempted to borrow money and secure those
18 borrowings with a lien on something other than the
19 casino revenues?
20 A. No.
21 Q. Is the -- is the City considering pledging art as
22 collateral?
23 MR. SHUMAKER: Again, I'm going to get into
24 now the -- this is a very commercially sensitive
25 subject.

1 MR. HACKNEY: I'm just asking the
2 questions. You guys got to decide --
3 MR. SHUMAKER: I'm just stating my
4 objection, and the fact of the matter is, as was
5 stated yesterday with -- with Mr. Buckfire, is that
6 when we get into the -- as you said, the RFP, the DIP
7 RFP process is just started. We're not going to go
8 into strategy or what the terms are or what the
9 specifics are, because we do not believe that this is
10 something that would be down to the City's benefit.
11 If it's negotiated, gets public, and bidders' --
12 MR. HACKNEY: Sure.
13 MR. SHUMAKER: -- identities are revealed
14 and all these things --
15 MR. HACKNEY: I don't mean to be rude, and
16 I totally respect the speech. I'm just interested in
17 time, and for me the upshot is are you going to let
18 him answer or not?
19 MR. SHUMAKER: Well, if will you repeat the
20 question, I'll tell you.
21 MR. HACKNEY: I can't remember the question
22 anymore.
23 A. Have you considered --
24 MR. HACKNEY: Are you going to pledge the
25 art --

1 A. Yeah.
2 MR. SHUMAKER: I'm going to say that's --
3 we're drawing a line. We're getting into specifics,
4 and I'm going to instruct him not to answer.
5 MR. HACKNEY: I -- okay. That's just all I
6 need to know for the record.
7 BY MR. HACKNEY:
8 Q. Okay. Now, I want to talk about revenue streams other
9 than casino revenues.
10 A. Right.
11 Q. The City does have other revenue streams; isn't that
12 correct?
13 A. Yes.
14 Q. In fact, on an annual basis, the City's revenues are
15 in the neighborhood of a billion to a billion 1,
16 correct?
17 A. Yes, I think that's fair.
18 Q. And on an annual basis, the casino revenues are in the
19 range of 170 to 180 million?
20 A. Yes.
21 Q. Roughly a little less than 20 percent of the City's
22 annual revenues.
23 A. 17 and a half, 18 percent.
24 Q. Now, there's somebody who studied. Okay.
25 So have you engaged the possibility of

1 pledging other revenue streams as security for the
2 DIP?
3 A. This is a commercially sensitive area. In addition,
4 there are potentially legal issues that must be
5 resolved. Suffice it to say we have examined a number
6 of different possibilities, looking at what options we
7 might have given the City's various ordinary revenue
8 streams.
9 Q. And are there other revenue streams that could be
10 pledged? I'm not going to ask you whether you are
11 going to pledge them, whether you will, whether you
12 plan to, but are there other revenue streams that
13 could be pledged?
14 A. There might be. There might be, but there's -- here
15 again, there's certain legal issues regarding any
16 revenue streams that have to be resolved.
17 Q. Let me ask you about the -- the use of the casino
18 revenues if you're able to obtain them.
19 A. Right.
20 Q. So just in terms of level setting --
21 A. Right.
22 Q. -- the casino revenues are approximately 15 million a
23 month.
24 A. Yes, I think that's fair.
25 Q. Net of the Swap payment which is still made on a

1 monthly basis under the forbearance agreement --
2 A.   Yes.
3 Q.   -- you net about 11 million?
4 A.   I think that's correct.
5 Q.   Okay.  Your claim is that these revenues are necessary
6 to the operation of the City.  I think we discussed
7 that earlier.
8 A.   Yes.
9 Q.   And in fact it's your expectation that you will use
10 these revenues to fund the reinvestment program that
11 you have planned with respect to the 1.25 billion
12 dollars of reinvestment in the City over the next ten
13 years?
14 A.   Yes, that's correct.  An average of 125 million a year
15 which a big component of it is this revenue.
16 Q.   Okay.  So fair statement, you're going to take the
17 casino revenues and you're going to plow them into the
18 City, correct?
19 A.   More -- I mean, money goes into a bathtub, but yes.
20 The casino -- we don't have the casino revenue.  We
21 have no other source to make reinvestment in the City.
22 Q.   And that's what you want to do?
23 A.   Yes.
24 Q.   And so as a creditor, I'm going to make the obvious
25 point that you don't plan to take the casino revenues

1 and give them to the unsecured creditors, correct?
2 A.   I think that's generally a fair characterization.
3 Q.   So isn't it fair that other than perhaps certainly
4 benefitting the people of Detroit if you reinvest in
5 the City, the creditors themselves will not see their
6 recoveries enhanced by the fact that the City has
7 gained access to these casino revenues, correct?
8        MR. SHUMAKER:  Objection, calls for
9 speculation.
10 A.   Yeah, I'm going to be careful here because one of the
11 things we've offered in our proposal, June 14th
12 proposal, is a 2 billion dollar note that has some
13 capacity to fluctuate.  Generally speaking, your
14 statement is true, but there's another concept that
15 without this reinvestment there's a very real chance
16 that the City will have no chance to stabilize and
17 grow and the creditors will see no opportunity for any
18 benefit because the City would have an inability of --
19 continue to decline, quality of life will continue to
20 decline, revenue from other streams will continue to
21 decline, and the City's ability to satisfy its
22 obligations to the creditors will continue to decline.
23 Q.   Now, I understand that distinction, and we're talking
24 now about the proposal you've made to creditors that
25 you would give all of the unsecureds --

1 A.   Yes.
2 Q.   -- effectively a pot of 2 billion dollars of bonds.
3 A.   Correct.
4 Q.   And I want to distinguish between two concepts and
5 make sure that we're on the same page because I think
6 that we are.
7 A.   Right.
8 Q.   The first point is that you do agree that you're not
9 going to take the casino revenues and put it on top of
10 the 2 billion pot to make a larger recovery for
11 creditors.
12 A.   Yes, that's fair.
13 Q.   But you are saying that there could be some value to
14 the creditors of a revitalized Detroit because that
15 Detroit will be more able to perform under the
16 2 billion dollars in bonds that you're going to give
17 them as part of your proposal?
18 A.   That's correct.
19 Q.   Okay.  Did I summarize accurately the distinction you
20 were trying to draw there?
21 A.   Yes.  Yes.  There's a broader concept about the need
22 to revitalize the City and grow beyond just the
23 interest of the creditors.  It's also for the citizens
24 and residents and future of the City.
25 Q.   Oh, absolutely.  I understand that.

1 A.   But, yes, that's generally -- no direct benefit from
2 the casino revenue.
3 Q.   Consistent with what we've just discussed then, you
4 haven't undertaken an analysis to show how much
5 creditor -- unsecured creditor recoveries will be
6 enhanced if the forbearance agreement is approved,
7 because you intend to use the money to reinvest in the
8 City.
9 A.   No.  I'm not sure that's true.  I mean, that's why I
10 was saying before, part of it is enhancing the
11 stability of the City and its ability to meet or
12 actually to provide for that 2 billion dollar note.
13 It depends on large part on the ability to stabilize
14 the City.
15 Q.   I understand that as a general concept, but I meant
16 have you undertaken actually any actual analysis of
17 the potential Delta 2 creditor recovery?
18 A.   Oh, from the 120 -- from the casino revenue?
19 Q.   Right.
20 A.   Yes, I believe we have.
21 Q.   And what does it show?
22 A.   Here again, that's -- it's sensitive and, in addition,
23 I believe those discussions were caught up in
24 discussions I had with counsel, so I'm going to have
25 to decline.

Page 217

1  Q.  Those are privileged communications?
2  A.  I believe so.
3  Q.  So the analysis of how my client Syncora, as an
4  unsecured creditor, would do if the assumption motion
5  is denied versus how it will do if its granted, that's
6  something that you cannot speak to?
7  A.  Right, because it goes into the analysis, as we said
8  earlier today, what would happen if it were denied,
9  what the options would be to the City, what litigation
10  risk would happen, what would be caught up in the
11  existing litigation, all those issues.
12  Q.  Let me hand you Orr Exhibit Number 3.
13      MARKED FOR IDENTIFICATION:
14      DEPOSITION EXHIBIT 3
15      12:30 p.m.
16      BY MR. HACKNEY:
17  Q.  It's even in color.  One large view for you.  I don't
18  mean that di --
19  A.  Okay.
20  Q.  Sorry.
21  A.  I know you didn't.  Okay.
22  Q.  Yeah, okay.  Cringeworthy, awkward.  I apologize.
23      THE WITNESS: Can we go off the record for
24  a second?
25      MR. HACKNEY: Yeah.

Page 218

1      VIDEO TECHNICIAN: The time is 12:30 p.m.
2  (Discussion off the record at 12:30 p.m.)
3  (Back on the record at 12:31 p.m.)
4      VIDEO TECHNICIAN: We are back on the
5  record the time is 12:32 p.m.
6      BY MR. HACKNEY:
7  Q.  Mr. Orr, I am going to play it by the book --
8  A.  Okay.
9  Q.  -- from here on out, just to be safe.
10  A.  Sure.
11  Q.  And to the extent any of that was on the record, I do
12  want to offer a fulsome apology.  That was an
13  inadvertent reference.
14  A.  No apology necessary.  To the extent anybody thinks
15  there was an apology necessary, it's not.
16  Q.  Okay.  Well, I appreciate that.  Very gracious of you.
17      So in the motion to assume the forbearance
18  agreement, the City makes the claim that the City is
19  currently in a liquidity crisis; isn't that correct?
20  A.  Yes.
21  Q.  And that's something that you obviously agree with,
22  right?
23  A.  Yes.
24  Q.  Now, you prepared this proposal for creditors that
25  I've marked as Orr Exhibit 3 in anticipation of your

Page 219

1  June 14, 2013 meeting with creditors, correct?
2  A.  Yes, I and my team put this together.
3  Q.  And the best of your knowledge, this is a --
4  A.  True and correct copy.
5  Q.  -- true and correct copy?
6  A.  Yes.  I have no reason to believe this is not a true
7  and correct copy, in color.
8  Q.  Great.  Please don't --
9  A.  Okay.  This is --
10  Q.  And obviously -- we haven't talked about this, but
11  Ernst & Young was retained to -- by the City to
12  undertake efforts to understand the City's cash flow
13  forecast, among other things, correct?
14  A.  Yes, in addition -- yes.
15  Q.  And I know that you're involved in all aspects of the
16  City's operation as emergency manager, but isn't it
17  true that Ernst & Young is the entity responsible for
18  preparing the City's cash flow forecasts?
19  A.  Yes.  I am not an account; they are.  Yes.
20  Q.  Okay.  So while I'm certain that you have reviewed
21  their work product --
22  A.  Yes.
23  Q.  -- when it comes to actually compiling the forecast
24  itself, if I wanted to ask about how was this number
25  arrived at or this projection, I would have to ask

Page 220

1  Ernst & Young.
2  A.  You would -- yes, they'd be the best evidence of how
3  that was done.
4  Q.  Okay.  You might have knowledge about one number here
5  one number there because someone specifically
6  discussed it with you, but you don't have
7  comprehensive knowledge of how all the numbers in the
8  cash flow forecast were arrived at.
9  A.  No.  Usually the process is the financial advisor and
10  the -- Ernst & Young, for instance, would do the deep
11  dive and then present me with a report and analyses,
12  but they would have the in-depth knowledge.
13  Q.  Fair enough.  Fair enough.
14      You see their work product and you go over
15  with it with them.  You're not the one that compiles
16  their work product.
17  A.  That is correct.
18  Q.  Obviously, in compiling this report, you, Ernst &
19  Young, your other advisors endeavored to be as
20  accurate as you could in assembling the information
21  contained in this report?
22  A.  Yes.
23  Q.  And that also would apply to forecasts that you were
24  making.  You tried to be as accurate as possible about
25  making forecasts.

1 A. Yes.

2 Q. So let me draw your attention, if I could, to page 38
3 of this report.

4 A. Yes.

5 Q. Now, this is -- this is titled A Look At the Future in
6 the Absence of Restructuring Initiatives. Do you see
7 that?

8 A. Yes.

9 Q. Okay. So what this table is doing is it's saying here
10 is where the City of Detroit is headed without any
11 increases in expenditures necessary to restore City
12 services to adequate levels; without additional
13 investments by the City and services assets or
14 infrastructure; and, last, without any changes to
15 legacy liabilities, correct?

16 A. Yes, that's correct.

17 Q. Now, we're going to talk about each of these three
18 things in a moment, but the fact of the matter is each
19 of those three things have changed during the
20 bankruptcy process in terms of what legacy liabilities
21 are getting paid or what reinvestments are being made,
22 correct?

23 A. To some degree they have and to some degree they
24 haven't. We are still in a steady state with, for
25 instance, salary, overtime, fringe, health benefits,

1 operating expenses, with regard to secure debt
2 service, pension contributions which remain
3 underfunded, health benefits are still in a steady
4 state. We are hopefully in a steady state on a
5 revenue side as well.

6 Q. I was just making --

7 A. But, yes.

8 Q. I was making a simpler point, which is, for example --
9 we'll go into this, but like you're not paying the
10 service payments related to the COPs during the
11 bankruptcy?

12 A. I believe that's correct.

13 Q. Okay. And I think you're deferring pension
14 contributions.

15 A. A portion of the pension contributions. For instance,
16 this year I think we had an obligation of
17 approximately 131 million dollars. I think we paid 31
18 million of it.

19 Q. Okay. So a portion.

20 A. But that is the steady state. The City regularly
21 defers pension contributions.

22 Q. True, true. We'll get into this in a moment here,
23 but --

24 A. Right.

25 Q. -- now, the fiscal year of the City runs from June 30

1 to June 30, right?

2 A. Yeah, July 1 to June 30.

3 Q. Right. Yeah. Okay.

4 And the years that are listed here, it's
5 your understanding these are the fiscal years,
6 correct?

7 A. 2008 to 2012 are fiscal year actuals. 2013 were
8 preliminary forecasts, at this time forward.

9 Q. That's right. This was back in June, so you had a
10 little -- there was a stub period on June 2013?

11 A. Yes.

12 Q. When I talked to Mr. Buckfire yesterday, he indicated
13 that it was his understanding that these years are
14 July 1, 2013 through June 30, 2014 --

15 A. That's correct.

16 Q. -- 2014 here?

17 A. That is correct.

18 Q. Now, the forecast that the City indicates when it
19 comes to total revenues for the fiscal year that we're
20 currently in is about 1,082,800,000 in total revenue,
21 correct?

22 A. That is correct. That's down about 30-some-odd
23 million dollars from the prior year.

24 Q. Right. And if you look at the operating expenditures,
25 that shows that you anticipate 685.7 million in

1 operating expenditures during that -- this fiscal year
2 that we're currently in, correct?

3 A. That is correct.

4 Q. Now, if you just viewed these things in isolation, you
5 are representing here a net operating surplus of just
6 under $400,000,000, correct?

7 A. That's roughly, correct, yes.

8 Q. Now, the -- and the operating expenditures are the
9 amount of money that you forecast needing to operate
10 the City as you found it with its current level of
11 services when you were appointed, correct?

12 A. That is correct.

13 Q. Okay. So that's the point of the caveat at the top,
14 which is you have the aim of improving services in the
15 City, but when you compiled this expenditures
16 analysis, this was based on here is how we currently
17 do things in the City of Detroit, providing the level
18 of services we currently provide, and here is how much
19 it costs?

20 A. That is correct.

21 Q. Now, isn't it true that -- we've talked about the fact
22 that while the casino revenues fluctuate between 170
23 and 180 million, even if you took them out of this
24 forecast, you would still have a net operating surplus
25 of $227,000,000, correct?

## Page 225

1 A. Well --
2 Q. Put aside --
3 A. Yeah, put aside --
4 Q. I understand.
5 A. -- debt service and pension contributions, healthcare,
6 but just looking at operating expenses, that would be
7 correct.
8 Q. And -- that's right. I'm emphatically doing that.
9 I'm referring to --
10 A. Right.
11 Q. -- this line. Okay?
12 A. Right.
13 MR. SHUMAKER: Which line, Steve?
14 MR. HACKNEY: The line that says net
15 operating surplus.
16 A. It's in bold. It's the 1, 2, 3, 4th line down.
17 BY MR. HACKNEY:
18 Q. And, I mean, can we agree it wasn't an accident that
19 whoever compiled this broke the legacy expenditures
20 down below the operating expenditures, correct?
21 A. Yes. I'm sure that was intentional.
22 Q. Right. And that's because, for example, while
23 payments to the COPs are likely very important to the
24 COP holders --
25 A. Right.

## Page 226

1 Q. -- they're not something that you actually use to run
2 the City.
3 A. Well, yes, it's not an operating expense.
4 Q. Right.
5 A. It's a debt service.
6 Q. Right.
7 A payment to a police officer for their
8 time or for their benefits, that is an operating
9 expense?
10 A. Absolutely.
11 Q. And that's all covered in the operating expenditures.
12 A. Yeah. Salary over time and fringe benefits, yes.
13 Q. Okay. So if you follow along in my hypothetical and
14 we took out what we'll call a hundred -- we'll split
15 the difference. We'll say it's 175,000,000.
16 A. Sure.
17 Q. I'll tell you in here it's projected to be 170 -- why
18 don't we use the number here. If we took the 170 out,
19 you'll still have 227.2 million dollars to work with
20 from the standpoint of a net operating surplus,
21 correct?
22 A. Yes, roughly $230,000,000.
23 Q. Okay. Your reinvestment plan I believe calls for a
24 billion and a quarter over ten years and it's commonly
25 described as being about $125,000,000 a year.

## Page 227

1 A. Yes. There's one caveat to that. It is front end
2 loaded that almost 500,000,000 of that will be spent
3 in the first six years going forward, but that's the
4 average over ten years.
5 Q. Okay. So if -- there's some element of lumpiness to
6 it.
7 A. Yes.
8 Q. It was 500,000,000 over the first --
9 A. Over the first six years.
10 Q. Oh, so that's less than 125 a year.
11 A. No, it's more. It's 500,000,000 over the first six
12 years -- I believe it's on page 47 -- maybe on page 47
13 or 48. If you look on page 47, not to go out of
14 sign -- but if you look at the second to the last bold
15 line, it says reinvestment in the City. Starting in
16 2014 you'll see, for instance, the total reinvestment
17 in the City will be $188.5 million dollars.
18 Q. I'm sorry, I blanked on you. What page are you on?
19 A. Oh, I'm sorry. Page 47, the second to the last bold
20 line, you will see that in the first year of the
21 preliminary forecast -- this is in a steady state, so
22 we're comparing steady state to steady state --
23 without any adjustments that that reinvestment
24 expense, total reinvestment in the City will be 188.5
25 million dollars and --

## Page 228

1 Q. Oh, I see it. Okay.
2 A. Third line up from the bottom.
3 But if you wanted to average it, it would
4 be 125 over ten years.
5 Q. Oh, I see. And it drops off quite a bit in --
6 A. Right. After the six years, it drops off to $32.8
7 million.
8 Q. And if I recall, what I had said to you earlier is
9 that even if we take out the casino revenues, you will
10 have $227,000,000 in net operating surplus to work
11 with. That's where we were before we broke.
12 A. Right. Operating, but that still does not adjust for
13 other expenditures, legacy expenditures we call them.
14 Q. That's true. All of which -- the large majority of
15 which are unsecured claims in the bankruptcy, correct?
16 A. Well, if you look on page -- go back to page 38 where
17 it says net operating surplus, you'll see the first
18 line below net operating surplus is debt service and a
19 portion of that one -- portion of that 141.4 for year
20 2013 or 135.9 for year 2014 is secured debt service.
21 Q. Some portion of the gold bonds is secure?
22 A. Some portion is secured, roughly -- roughly
23 30,000,000.
24 Q. That's a very appropriate caveat. I will say with
25 that caveat and with the caveat of the Swaps, the

1 remainder of the claims under legacy expenditures are
2 ones that you consider unsecure.
3 A. Yes. That's how we treated them in our proposal.
4 Q. And by the way, even with respect to the Swaps, I've
5 been giving you full credit for the 170 of the casino
6 revenues, but you actually have to not -- you have to
7 net the swap payments out against it, at least until
8 you exercise the --
9 A. Yes. Yes, that's correct.
10 Q. So with respect to the 188, we can agree that the 227
11 net operating surplus you have, as a matter of math
12 and subject to your qualifications about certain
13 secured legacy obligations, is larger than 188?
14 A. Yes. The surplus is assuming that we make no pension
15 contributions, we do not service -- you have to back
16 out of that -- you call it 227. I call it 230. You
17 have to back out of there approximately $30,000,000 in
18 debt service under the LTGO and UTGO --
19     COURT REPORTER: I'm sorry, under the?
20     THE WITNESS: I'm sorry.
21 A. Under the LTGO and UTGO cat -- the bonds category debt
22 service, so that would leave you with a net of roughly
23 200,000,000, and then if you look on the 2014 column,
24 you would see that if -- if some portion of pension
25 contributions were made and some portion of healthcare

1 benefits were made, that would essentially wipe out
2 the 200,000,000, and that's not dealing with the COPs
3 or the Swaps payment.
4 Q. It is however your expectation that substantial
5 portions of retiree health and benefits will be
6 deferred at a minimum?
7 A. They essentially have to be because we won't have the
8 money.
9 Q. That's right. And also pension contributions,
10 substantial parts of those are being deferred at a
11 minimum?
12 A. This year we deferred some and we are anticipating
13 deferring more, and again -- but that creates a
14 deferred pension obligation. There are two things
15 that's missing from this analysis. One is we have a
16 general operating deficit going forth this year, about
17 $387,000,000, for which there's no provision made in
18 the cash flow analysis, and we have an aggregate
19 deferred pension contribution number close to
20 200,000,000.
21     So while I under -- take your point that if
22 you were to take out from 1.1 billion, deduct the
23 roughly 700 million in operating expenses, would leave
24 you with a net of 400 million, if you were to back out
25 the 170 million or so in wagering expenditures, you

1 get the 230. If you take out the 30 million in
2 secured bonds, you'd have 200 million, there's so much
3 significant debt that it's not adjusted, we wouldn't
4 have that 200 million.
5 Q. Let me ask you about something I read in the
6 newspapers.
7 A. Okay.
8 Q. So I want to ask whether it's true or not. Isn't it
9 true that two days before the City filed for
10 bankruptcy you held a meeting with community leaders?
11 A. I had a public meeting with the public as well as
12 community leaders. The --
13 Q. Did you have a closed door meeting with community
14 leaders two days before --
15 A. I'm sorry.
16 Q. -- the bankruptcy?
17 A. Let me correct that. I'm sorry. I was thinking
18 about -- we're looking at this document, so I was
19 thinking about the meeting with creditors.
20     The bankruptcy was July 18th.
21 Q. Yes.
22 A. I believe I did have a meeting with leaders roughly
23 July 16th, is it?
24 Q. And was it a closed door meeting?
25 A. I don't recall, but it may been.

1 Q. Now, it's been reported in the press that during that
2 meeting one of the things that you said to these
3 community leaders was that the first thing to be done
4 to help the City with the City's bankruptcy was to,
5 "Deal with these Huns on Wall Street."
6     Did you say that, Mr. Orr?
7 A. I may have said that.
8 Q. Okay.
9 A. Some people make misstatements, as witnessed today.
10 So I may well have said that.
11 Q. I will -- I will suggest to you, earlier, and I want
12 to reiterate that was truly unintentional.
13 A. Steve, as I said, some people may make misstatements,
14 and as I said today it happens.
15     I may have said that.
16 Q. When you said that about the Huns of Wall Street, I
17 take it wasn't like a slip of the tongue. Did you
18 mean to say hey, the first thing I mean to do is deal
19 with the Huns of Wall Street?
20 A. No. Let me explain that. What I meant to say by that
21 is look, we've got to deal with adjusting our debt to
22 the creditors as well as our obligations to the
23 laborers, and I used -- I used I think the
24 nomenclature Huns. It was probably too colloquial,
25 too slip of the tongue.

## Page 233

1  I wasn't meaning to impugn anyone's
2  character. That was an allusion to a statement that
3  I've seen used before, you've got to keep the Huns out
4  of the portals, and that's all I meant.
5  Q.  When you talk about the Huns of Wall Street, you mean
6  banks, bond holders, bond insurers, Swap insurers,
7  Swap counterparties, etcetera, correct?
8  A.  Whatever's on Wall Street, yes.
9  Q.  Yeah.
10  A.  Largely speaking.
11  Q.  You mean the clients of the folks in this room, in the
12  main?
13  A.  Well, some of whom were my ex-clients, who probably
14  will no longer be, but yeah.
15  Q.  I understand. But wouldn't you agree, Mr. Orr, that
16  while the last, you know -- going back to 2006, when
17  they had that COPs transaction, I know that it's been
18  a challenging time in Detroit, but the Huns of Wall
19  Street were some of the people that kept the City's
20  lights on by providing credit to the City?
21  A.  Let me say this, and I'm not going to use the word Hun
22  anymore.
23  Q.  Okay.
24  A.  I've since learned to be very careful with my words.
25  The capital markets have assisted the City in many,

## Page 234

1  many ways over the years, and as I said before earlier
2  today, in addition to providing funding in 2008, 2010,
3  2012 when the City was in very dire straits, so I do
4  not mean to impugn in any way the help that the
5  capital markets have provided to the Cities -- to the
6  City.
7  What I do mean to say is given the dire
8  straights that the City is in, and the fact that under
9  any set of circumstances, it can no longer afford to
10  pay this debt, there has to be adjustment of this
11  debt, particularly the unsecured debt portion, and
12  that's both for the capital market community,
13  including banks, private equity, as well as for the
14  obligations we owe to our labor counterparts,
15  including health and pension funds.
16  Q.  In fact, bond holders, the so-called COP holders, as
17  part of the 2006 transaction, they contributed a
18  billion four that ultimately went into the pension
19  funds, correct?
20  A.  I believe that was the number, yes.
21  Q.  And if that hadn't happened back then, all things
22  being equal you'd have an even larger unfunded pension
23  liability than you currently do, right?
24  A.  Well, I'm going to be careful about what would have
25  happened because it may have -- you know, it's

## Page 235

1  speculative as far as what happened. In fact, before
2  I took this job, I read several articles that advised
3  the City to file bankruptcy in 2005. So I'm going to
4  be careful about what would have happened if the City
5  had not received that 1.4, because at that time, my
6  understanding -- I wasn't here, but from what I read
7  that was to supposed to secure the unfunded portion of
8  the pension liability at that time, and it didn't work
9  out so well, but there was provision of credit to the
10  City.
11  Q.  In your mind, when you made the statement, were you
12  trying to convey to people that you view the
13  pensioners' claims or the retirees' claims or the
14  current employees' claims for pension benefits or --
15  or health benefits as more important than the claims
16  of unsecured creditors like Wall Street participants
17  such as my client?
18  A.  No. I was not trying to make any value judgments
19  about the claims. What we had done -- here again, as
20  I said, it was a colloquialism that I made in a closed
21  door meeting, but I was not trying to convey to anyone
22  that we were treating any class of creditors --
23  unsecured creditors differently than the others. As
24  provided for in our proposal, we were treating them
25  all equally.

## Page 236

1  Q.  We're coming up on the one o'clock hour, which is
2  almost the end of my time, and I think I'm going to
3  just ask you a couple questions to tie up and then --
4  A.  Sure.
5  Q.  -- I'll allow you to go get a well-deserved lunch.
6  A.  Thank you.
7  Q.  I've asked you earlier about selling the art and I
8  asked you about it as considering it as a potential
9  backup plan to the negotiations with the Swap
10  counterparties.
11  A.  Right.
12  Q.  Do you remember that testimony?
13  A.  Yes, I do.
14  Q.  We went back and forth.
15  A.  Yes.
16  Q.  I'd like to bring it forward to the future, to the
17  present.
18  A.  Yes.
19  Q.  Which is, are you under active consideration now of
20  using the art to alleviate the liquidity crisis and to
21  do all of the things that you say you want to do in
22  this proposal?
23  A.  No. There are no plans to use the art or any other
24  asset in particular to liquidate it to
25  relieve liquidity issues in the City. What I have

Page 237

1  said when I first took this job, and continue to say,
2  all options are on the table. We are currently
3  beginning the process of appraising approximately
4  3,500 pieces of art in the City of the 66,000 that are
5  there at the DIA, and once we go through that process,
6  we will have to decide what, if anything, we need to
7  do, but I have no plans to use art to relieve the
8  liquidity crisis that the City is now in.
9  Q.  So let me offer an observation for you to react to,
10  which is, earlier on when I was asking you questions,
11  you were telling me about the terrible things
12  happening in the City, people dying, being shot, the
13  seriousness of the problems with which you're
14  grappling.
15  A.  Yes.
16  Q.  You've also identified the assumption motion as
17  something that needs to be moved along quickly because
18  of its importance to the issues that we discussed,
19  right?
20  A.  Right.
21  Q.  Why isn't the art equally important to allowing you to
22  fix Detroit?
23  A.  I haven't said that it's not important. What I've
24  said is there are no plans to liquidate it to address
25  those concerns. I think it is fair to say that there

Page 238

1  has been much debate as to the value of art versus
2  alleviating a number of other concerns, and I've heard
3  that debate and I've listened to it, but our first
4  order of business is to assess what we're talking
5  about and then we'll decide what, if anything, we need
6  to do.
7  Q.  Isn't it fair to say that you certainly haven't put
8  the art time line, in terms of your decision-making
9  process, you haven't given it the same sort of speed
10  you've given to the forbearance agreement time line?
11  MR. SHUMAKER:  Object to the form.
12  A.  Yeah. I think it's fair to say that in our proposal I
13  think we included roughly 15 buckets of assets, and
14  none of them have been given the same priority that we
15  deem the forbearance agreement principally because
16  we're not in default with regard to art. We're in
17  default with regard to the Swap agreement.
18  Q.  Well, that was actually going to be my point, which
19  is, you own the art.
20  A.  Yes.
21  Q.  So you don't have to negotiate with anybody in order
22  to sell it, right?
23  A.  No, but a prudent thing to do, and we've said this
24  before, is to find out what we're talking about first,
25  and that's why we're going through an appraisal

Page 239

1  process.
2  Q.  Just a few more questions and I'll pass the baton.
3  A.  Sure.
4  Q.  I take it that when you were appointed as emergency
5  fin -- emergency manager, you familiarized yourself
6  with some of the prior negotiations that had gone on
7  around efforts to resolve the Swap that I believe were
8  referenced in the 2012 CAFR of the City of Detroit.
9  A.  Consolidated report, yes.
10  Q.  You at least made inquiry as to what happened last
11  year when you tried to work this out.
12  A.  Yes.
13  Q.  And it's also your understanding that the potential
14  right of the Swap counterparties to terminate the Swap
15  and demand a large termination payment goes back all
16  the way to March of 2012; isn't that correct?
17  A.  At least, yes.
18  Q.  Thinking that's consistent with your report here --
19  A.  Yes.
20  Q.  -- you say that.
21  A.  Yes.
22  Q.  So isn't it true that from March 2012 all the way to
23  June 4, when Mr. Buckfire went into the negotiating
24  room for the first time with the Swap counterparties,
25  during that entire time, the Swap counterparties had

Page 240

1  never trapped cash?
2  A.  To the best of my knowledge, that's true.
3  Q.  And they had never declared a termination event?
4  A.  To the best of my knowledge -- to the best of my
5  knowledge, that's true.
6  MR. HACKNEY:  Mr. Orr, I'd like to thank
7  you for your time. We have -- as I mentioned, we have
8  divided up our examination. There are a number of
9  different objectors here. I have attempted to
10  coordinate some of the common subjects so that we
11  could have --
12  THE WITNESS:  Sure.
13  MR. HACKNEY:  -- one 4-hour period that we
14  have come nearly to the end of, and I'm going to pass
15  the baton to my other objectors. I may review my
16  notes to see if I have follow-up.
17  THE WITNESS:  Sure.
18  MR. HACKNEY:  And so I'll reserve my time
19  technically, but I want to get out of the way of the
20  other folks so they can start asking questions. And
21  consistent with what we discussed earlier, I thought
22  we might take a short lunch break.
23  THE WITNESS:  Sure.
24  MR. HACKNEY:  Off the record.
25  VIDEO TECHNICIAN:  The time is 12:57 p.m.

**Page 241**

1  this marks the end of tape Number 3. We are off the
2  record.
3      (Recess taken at 12:57 p.m.)
4      (Back on the record at 1:48 p.m.)
5      VIDEO TECHNICIAN: We are back on the
6  record at 1:49 p.m. This marks the beginning of tape
7  number 4.
8      EXAMINATION
9      BY MS. DiBLASI:
10 Q.  Good afternoon, Mr. Orr. My name is Kelly DiBlasi.
11 I'm an attorney at Weil, Gotshal & Manges. We
12 represent Financial Guaranty Insurance Company, which
13 people generally refer to as FGIC.
14 A.  FGIC.
15 Q.  As I go through my questions with you this afternoon,
16 if you could please assume that the same ground rules
17 that Mr. Hackney discussed with you earlier today
18 still apply.
19 A.  Yes.
20 Q.  You spoke to Mr. Hackney earlier today about the Swap
21 contract and the fact that they hedge against the
22 interest rate risks that's associated with the series
23 2006-B COPs, correct?
24 A.  Yes.
25 Q.  And what is your understanding of how this hedge is

**Page 242**

1  accomplished?
2  A.  As we discussed earlier today, depending upon the
3  interest rate fluctuations, they're supposed to
4  convert the fix rate that was in the original
5  documents -- variable rates some people say -- to a
6  fixed rate based upon whether interest rates go up or
7  down. And since the parties have essentially bet
8  against each other, depending upon which way the rates
9  go, one party may owe an obligation to the other.
10 Q.  So based on that understanding that you just
11 articulated, is it fair to say that from the City's
12 perspective, it's as if the series 2006-B COPs have a
13 fixed rate of interest?
14 A.  That was the intent. That's my understanding.
15 Q.  Have you ever heard of a structure like this being
16 referred to as creating a synthetic fixed rate of
17 interest?
18 A.  Yes. I may have heard that. There are
19 other phrase -- I think I've read that somewhere.
20 Q.  Prior to executing the forbearance agreement, did you
21 do anything to inform yourself about the structure of
22 the COPs and the Swap contracts and in particular why
23 they were structured the way that they were?
24 A.  If I can address your question in two ways, yes, I did
25 something to inform myself about the structure, and

**Page 243**

1  yes, I did some -- I had some discussions and analyses
2  about why they are structured the way they are.
3  Depending upon how far back your question is asking
4  about that analyses, it may or may not be true.
5  Q.  So -- so let's in particular go back to 2005 --
6  A.  Right.
7  Q.  -- which is really when the structure initially was
8  put in place, correct?
9  A.  Yes, I believe so.
10 Q.  And what is your understanding as to why in 2005 the
11 transaction was structured so that the COPs -- the
12 series 2005-B COPs had a variable interest rate hedged
13 with the Swap contracts?
14     MR. SHUMAKER: Objection to form,
15 foundation.
16 A.  Yeah. Let me say I only know what I've read, and it
17 seemed to say that that was the nature of the
18 transaction based upon the certificates of
19 participation to lend the City ultimately the 1.4
20 billion dollars, and that I don't know the intent of
21 why they did not at that point provide for a fixed
22 rate, but I know that the Swap contract was entered
23 into the hedge against the variable rate that was in
24 the original document.
25     BY MS. DiBLASI:

**Page 244**

1  Q.  Would you answer the same if I asked you as to why it
2  was structured that way in 2006?
3  A.  Yes.
4      MR. SHUMAKER: Same objection.
5  A.  Yes. I don't know the intent behind the parties at
6  that time.
7      BY MS. DiBLASI:
8  Q.  Do you know who designed the structure either in 2005
9  or 2006?
10 A.  Other than the parties that appear on the documents,
11 no, I do not know who designed the structure. I don't
12 know if it was their counsel or the principals. No, I
13 don't know.
14 Q.  Is there any benefit to the City from having
15 the 2000 -- series 2006-B COPs have a floating rate of
16 interest hedged by the Swap contract as opposed to
17 just issuing them with a fixed rate of interest?
18 A.  I don't -- as I just said, I don't know what the
19 parties were thinking back in 2005 and 2006, as
20 opposed to -- as to why they wanted that structure,
21 and so any statement I would have would either be a
22 derivative based on what I read or speculative on what
23 I think was going on in the capital markets at that
24 time.
25 Q.  Understood. Today can you -- are you aware of any

## Page 245

1  benefit from that structure that I described?

2  A.  Well, the -- yes.

3  Q.  What benefits are you aware of?

4  A.  The benefit currently is, given the debt that was

5  taken out and the Swap contract, the interest rates

6  could actually make the optional termination payment

7  decrease.

8  Q.  Are there any other benefits that you're aware of?

9  A.  Not principally, no.

10  Q.  Would the City have had to pay higher interest rates

11  if the COPs were issued with fixed rates?

12  A.  I don't know.

13  Q.  Would the City have agreed to a structure where the

14  2006-B COPs were issued with a floating interest rate

15  without having a Swap contract in place?

16  A.  I don't know.

17  Q.  And you're aware of the fact that FGIC and Syncora

18  each insured portions of the payment of principal and

19  interest to the series 2006-B COPs, correct?

20  A.  That is my understanding.

21  Q.  Are you aware of any benefit to FGIC and Syncora as

22  insurers of these variable rate certificates to having

23  the interest rate hedge in place?

24  MR. SHUMAKER: Objection to form.

25  A.  None, other than the fact that they might be able to

## Page 246

1  benefit based upon interest rate fluctuations, but not

2  aware of any other benefit or what the intent of the

3  parties were.

4  BY MS. DiBLASI:

5  Q.  Are you aware of any harm or risk that FGIC or Syncora

6  might insure if the Swap contracts are terminated?

7  A.  I think there are some risks that they insured as a

8  basis of an insurer, yes.

9  Q.  What risk might that be?

10  A.  There -- in terms of the Swaps?  There may be some

11  risk that a claim could be made to the extent payments

12  weren't made.

13  Q.  And would there be any risk to FGIC and Syncora with

14  respect to the insurance policies on the COPs

15  themselves if the Swap contracts are terminated?

16  MR. SHUMAKER: Objection, calls for

17  speculation.

18  A.  Yeah.  I mean, you say there may be, but I'm -- I'm

19  not aware of any specific certain risks, no.

20  BY MS. DiBLASI:

21  Q.  Are you aware of the fact that FGIC and Syncora -- and

22  I think you alluded to this just a minute ago -- that

23  FGIC and Syncora also insured the obligations to the

24  Swap counterparties under the Swap contracts, correct?

25  A.  Yes.

## Page 247

1  Q.  Are you aware that when FGIC issued the policies in

2  2006 insuring the Swap contracts, FGIC did not charge

3  a premium in addition to the premium charged for the

4  2006 COPs policy?

5  A.  No.

6  MR. SHUMAKER: Objection, form, foundation.

7  A.  Yeah.  No.

8  MARKED FOR IDENTIFICATION:

9  DEPOSITION EXHIBIT 5

10  1:56 p.m.

11  BY MS. DiBLASI:

12  Q.  Mr. Orr, I'm going to hand you what I've marked as Orr

13  Exhibit 5.

14  A.  Yes.

15  Q.  The documentation is entitled Presentation to FGIC.

16  It's dated April 26, 2005.  If you'd please take a

17  moment to look at it and tell me when you've had an

18  opportunity to do so.

19  A.  Okay.

20  Q.  Mr. Orr, have you seen this Exhibit Number 5 before?

21  A.  I may have, but I don't recall doing so.

22  Q.  What is your sense for what this document is?

23  A.  I think the document speaks for itself, but it seems

24  to be a SlideDeck regarding -- Presentation to FGIC is

25  what it's titled regarding the series 2005

## Page 248

1  certificates of participation.

2  Q.  In looking at it, does that refresh your recollection

3  of whether you may have seen it before?

4  A.  No.

5  Q.  Does it appear to you that this presentation was

6  prepared by the City of Detroit?

7  MR. SHUMAKER: Objection, foundation.

8  A.  No.  I can't say that.  It has the City of Detroit

9  logo.  It's a green giant on it, but that doesn't mean

10  it was prepared by the City of Detroit.

11  BY MS. DiBLASI:

12  Q.  Let's turn now, Mr. Orr, to the topic of the consent

13  rights or -- of FGIC and Syncora topic that you were

14  discussing with Mr. Hackney earlier.

15  A.  Yes.

16  Q.  And actually, let's focus specifically on the

17  negotiations that the City engaged in with the Swap

18  counterparties leading up to the execution of the

19  forbearance agreement.

20  A.  Okay.

21  Q.  And when you were speaking with Mr. Hackney, you

22  testified that you yourself did not invite either FGIC

23  or Syncora to those negotiations, correct?

24  A.  Yes.  To the best of my knowledge, that's true.

25  Q.  And I believe you said you also didn't suggest to

Page 249

1 anyone else that they should invite FGIC or Syncora to
2 those negotiations, correct?
3 A. Yes. I believe I testified I did not instruct anybody
4 to invite them.
5 Q. To your knowledge, did anyone else suggest inviting
6 either FGIC or Syncora to the negotiations?
7 A. As I testified earlier today, there were a series of
8 letters that were exchanged, and at some point there
9 was some discussion about Syncora submitting a
10 proposal. That discussion was wrapped up into whether
11 or not it would sign a reciprocal nondisclosure
12 agreement. To the best of my knowledge, that never
13 happened.
14 Q. But I think we established that the letter exchanged
15 with Syncora occurred at some point after June 11th,
16 when there had been an agreement in principle on the
17 economic terms of the forbearance agreement; is that
18 correct?
19 A. Yes. I believe we -- we testified that June 11th we
20 reached agreement and principally documented,
21 June 14th we had the presentation for creditors, and
22 the letter I saw earlier today I think was dated
23 June 17th.
24 Q. That's right. So prior to June 11th, did anyone else
25 to your knowledge suggest inviting either FGIC or

Page 250

1 Syncora to the negotiations?
2 A. Not to my knowledge, no.
3 Q. And you mentioned just a minute ago that there had
4 been some discussion with Syncora or representatives
5 of Syncora about an alternative proposal to the
6 forbearance agreement, and I think you said to
7 Mr. Hackney that there had been no negotiations with
8 FGIC about an alternative proposal; is that correct?
9 MR. SHUMAKER: Objection to form.
10 A. Yeah, it's a compound question, but I think the way I
11 would answer it, yes, we would talk about whether or
12 not someone had been invited. And I think what I said
13 is to the best of my knowledge I did not invite FGIC
14 and I did not know if anybody else did.
15 BY MS. DiBLASI:
16 Q. To your knowledge, was there any negotiations by the
17 City with FGIC about the forbearance agreement prior
18 to the City executing the forbearance agreement?
19 A. There may have been. I seem to recall one of our
20 attorneys -- you used the word negotiation and, here
21 again, as I said earlier today, without getting caught
22 up in the nomenclature, I don't want to characterize
23 what was going on, but I think there was -- I remember
24 hearing something about some discussions with FGIC,
25 but I don't recall who. Whether or not there were

Page 251

1 negotiations would have to be determined.
2 Q. So I think you said you -- you thought maybe it was
3 someone from your -- Jones Day who had initiated or
4 who had participated in -- in this discussion?
5 A. Yes. I believe someone on the finance side at Jones
6 Day, yes. They may have. I seem to recall some
7 discussion about they had had discussions with FGIC.
8 Q. Do you have any recollection as to when that took
9 place?
10 A. I do not. It may be prior to the July -- June 11th
11 agreement in principle after, but I don't have a
12 specific recollection.
13 Q. When you were speaking with Mr. Hackney about the
14 negotiations with the Swap counterparties that you
15 personally took part in, I believe you said that you
16 had participated in a number of conference calls; is
17 that correct?
18 A. Yes.
19 Q. Was FGIC or a representative of FGIC on any of those
20 conference calls?
21 A. No. The conference calls I was referring were
22 conference calls between me and my attorneys. There
23 were conference calls that I had with Mr. Buckfire and
24 a principal on behalf of Syncora, but to the best of
25 my knowledge, there weren't FGIC representatives on

Page 252

1 those calls.
2 Q. So you were not on any conference calls with the Swap
3 counterparties negotiating the terms of the
4 forbearance agreement?
5 A. Yes. Yeah, I -- let me correct myself.
6 Q. Sure.
7 A. I said -- I just said Syncora. I think I meant the
8 Swap counterparties.
9 Q. Okay.
10 A. There were no conference calls. There were letters
11 with Syncora, not conference calls with Syncora.
12 Q. Just so I'm clear in my understanding, did you
13 participate in conference calls with the Swap
14 counterparties negotiating the terms of the
15 forbearance agreement?
16 A. Yes.
17 Q. Was FGIC or a representative of FGIC on any of those
18 conference calls?
19 A. No. To the best of my knowledge, no.
20 MS. DiBLASI: Thank you for your time,
21 Mr. Orr. That's all I have.
22 THE WITNESS: Sure. Thank you very much,
23 Mrs. DiBlasi.
24 MR. HACKNEY: I was worried that I missed a
25 pretty significant area of inquiry there.

Page 253

1    THE WITNESS: I was looking at this letter
2  and Syncora popped into my head, so that's -- long
3  day.
4    EXAMINATION
5    BY MR. MARRIOTT:
6  Q.  Good afternoon, Mr. Orr.
7  A.  Good afternoon.
8  Q.  I'm Vince Marriott. I'm with Ballard Spahr, and I
9  represent a holder of 152 million dollars in the 2006
10  COPs. We refer to it by agreement as EEPK, and I hope
11  we can stipulate that I will have to pronounce the
12  entire name for you.
13    MR. SHUMAKER: Stipulated.
14  A.  Mr. Marriott, we will stipulate as such.
15    BY MR. MARRIOTT:
16  Q.  Ironically enough it's German.
17  A.  We wouldn't try.
18  Q.  Mr. Hackney was very comprehensive and I don't have a
19  lot.
20  A.  Okay. Yes, he was.
21  Q.  One of the things you -- one of the things Mr. Hackney
22  asked you about was if in the course of the
23  negotiation of the forbearance agreement, you had what
24  he referred to as a plan B. Do --
25  A.  Right.

Page 254

1  Q.  -- you recall him asking that question?
2  A.  Yes, I recall that discussion. Yes.
3  Q.  And you responded by saying, without specifically
4  having a plan B, you had considered alternative to the
5  forbearance agreement structure, correct?
6  A.  Correct.
7  Q.  Can you tell me what alternatives to the forbearance
8  agreement you considered at the time?
9  A.  Without getting into the discussions with my counsel
10  or with commercially sensitive information with the
11  investment banker and/or both, the alternatives
12  generally centered on the need for reinvestment in the
13  City and what we would do if we could not secure the
14  funds to have that reinvestment and what kind of
15  reinvestment proposal, if any, we could put together.
16  Q.  And are you able to articulate more specifically
17  whether you consider -- or what specifically
18  considered as alternative source of the funding for
19  reinvestment?
20  A.  I think as I said with Mr. Hackney just before the
21  break, I have said fairly consistently since I've been
22  here that everything's on the table, but we had not
23  specifically looked at liquidation of any particular
24  bucket of assets in relation to this. All we had
25  considered was if we could not secure the critical

Page 255

1  need for the casino revenue, which was urgent and
2  critical and would not in our opinion at that point be
3  able to make a reinvestment of the City, what would
4  the City look like going forward.
5  Q.  Let me ask you the question this way. Did you
6  consider what I'll describe -- and if you want me to
7  be more specific I can try to be.
8  A.  Um-hm.
9  Q.  Did you consider capital market alternatives to the
10  forbearance agreement?
11  A.  We did, but to be perfectly honest with you, the City
12  had borrowed so much money from the capital markets
13  without the probability of being able to pay it back
14  on any reasonable or rational time frame that that
15  wasn't a serious consideration was taking on more
16  debt.
17  Q.  Okay. So you didn't really believe that had you a
18  what we -- what I just described as a capital market
19  alternative to the forbearance agreement?
20  A.  The City has no -- what I've said at the June 10th --
21  public meeting on June 14th we were addicted to debt
22  and we had no ability to take on additional debt.
23  Q.  Okay. All right. And this may re-plow some ground
24  and I apologize to the extent it does, but in the
25  context of your negotiation of the forbearance

Page 256

1  agreement, and by yours I mean the City's --
2  A.  Yes.
3  Q.  -- it was with the understanding that the Swap
4  counterparties asserted a lien in the casino revenues,
5  right?
6  A.  Yes.
7  Q.  Would the City have entered into the forbearance
8  agreement with the Swap counterparties if they did not
9  assert a lien in the casino revenues?
10    MR. SHUMAKER: Objection, calls for
11  speculation.
12  A.  Yeah. I was going to say that's a hypothetical, and
13  it would depend on a number of different issues, so
14  I'm not quite sure I can answer you. All I can say is
15  that our need for that cash was so significant that we
16  might well have considered anything.
17    BY MR. MARRIOTT:
18  Q.  All right. Let me ask the question this way then. Is
19  it fair to say that the optional termination amount of
20  pay will be paid by the City to obtain clear title to
21  the casino revenues?
22    MR. JURGENS: Objection to form.
23    MR. SHUMAKER: Objection, form and calls
24  for legal conclusion.
25  A.  Without getting into the concept of title, what I will

Page 257

1    say, and what I've said today, is the forbearance
2    agreement is designed to remove uncertainty with
3    regard to the City's access to the casino revenue
4    which is essential.
5        BY MR. MARRIOTT:
6    Q.  All right.  Let me ask the question this way.  Is it
7    your understanding that the Swap counterparties will
8    no longer assert a lien in the casino revenues if paid
9    the optional termination amount?
10       MR. JURGENS: Objection --
11   A.  Yes.
12       MR. JURGENS: -- to form.
13   A.  It's my understanding that it's going to resolve all
14   those issues, and as I said earlier today, including a
15   release of liens to the extent they have any.
16       BY MR. MARRIOTT:
17   Q.  Okay.  Now, I understand your description of the
18   City's current operational needs --
19   A.  Right.
20   Q.  -- for access to the casino revenues.
21   A.  Yes.
22   Q.  If those casino revenues were otherwise available to
23   the City, for current operation's purposes, would
24   removal of the lien be necessary -- or removal of the
25   asserted lien be necessary?

Page 258

1        MR. SHUMAKER: Objection, calls for
2    speculation.
3    A.  Yeah, this again is a hypothetical question, but I
4    believe you may be alluding to the discussion I had
5    with Mr. Hackney regarding whether the stay would
6    provide us unfettered access, and I think what I said
7    there is that's something we'll have to examine, but
8    the whole concept of the forbearance agreement is to
9    deal with removing any uncertainty regarding our
10   access to the casino revenues so that we could put in
11   place a reinvestment plan.
12       BY MR. MARRIOTT:
13   Q.  Okay.  I wasn't clear, I don't think --
14   A.  Okay.
15   Q.  -- in what I'm trying to get at.
16   A.  Sure.
17   Q.  I'm not asking you whether or not there was an
18   alternative to releasing -- I'm just asking whether
19   you believe there was a legitimate alternative to
20   release of the lien to get access to those funds.
21       What I'm asking you is that assuming you
22   had access to those funds on some basis, without the
23   need to release the lien --
24   A.  Um-hm.
25   Q.  -- is a release of the lien today --

Page 259

1    A.  Um-hm.
2    Q.  -- necessary for the City to currently operate?
3    A.  To currently operate?
4    Q.  Yes.
5        MR. SHUMAKER: Object to the hypothetical.
6        Go ahead.
7    A.  If you're drawing a distinction between currently
8    operating and the reinvestment plan that we have, what
9    I would say is we are currently operating in the
10   status quo.  So the answer to your question would be
11   to the extent the Swap counterparties have a lien
12   interest in the casino revenue, it would not be
13   necessary because that's where we are now.
14       BY MR. MARRIOTT:
15   Q.  Okay.  And so what do you view release of the lien as
16   necessary to?
17   A.  The release of the lien is essential so that the City
18   has certainty in terms of going forward so that we can
19   plan, as is required both under Chapter 9, but more
20   importantly, in my perspective, under Chapter -- under
21   Public Act 436.
22       436 imposes an obligation on me within
23   18 months to come up with a plan to put the City on a
24   sustainable footing going forward before the
25   expiration of my term, and even if you could come up

Page 260

1    with a plan without release of those liens, that would
2    leave some uncertainty and would be, in my opinion, a
3    violation of my duty as emergency manager to provide
4    that certainty for the City to move forward in a
5    sustainable fashion.
6    Q.  Okay.  So and if I'm paraphrasing your answer
7    incorrectly --
8    A.  Right.
9    Q.  -- tell me.
10       Release of the lien is necessary to a
11   viable exit strategy from the Chapter 9 proceeding?
12   A.  That's part of it.  Not just the Chapter 9 proceeding.
13   As I said, I think what's missing in some of the
14   discussion is the fact that I have an independent duty
15   under Public Act 436 to put the City on a sustainable
16   footing.  That is my obligation.  And leaving liens in
17   place in a City that has defaulted, as we discussed
18   earlier today, under multiple different factors would
19   be irresponsible.
20   Q.  One of the other things that Mr. Hackney and you
21   discussed was whether or not the Swaps and the COPs
22   and the insurance associated with the Swaps and the
23   cops --
24   A.  Right.
25   Q.  -- were what Mr. Hackney described as an integrated

**Page 261**

1 transaction.

2 A. Um-hm.

3 Q. Do you recall that discussion?

4 A. Yes, I do recall that discussion.

5 Q. Your counsel in a hearing on August 21st -- and I'll

6 represent this to you --

7 A. Okay.

8 Q. -- whether you're aware of it or not. It described

9 the 2009 transaction with respect to the COPs and the

10 Swaps as severing the tie --

11 A. Um-hm.

12 Q. -- Between the COPs and the Swaps. Do you have an

13 understanding of what that means?

14     MR. SHUMAKER: Objection to form.

15 A. I have not consulted with my counsel regarding what

16 was meant by that statement, so I'm going to qualify

17 my answer by saying to the extent it calls for a legal

18 conclusion or an analysis, that this is my

19 understanding in a layman's sense.

20     But what I think -- and your question began

21 with the concept of the insurance for the COPs and

22 Swaps, so I also want to say my understanding there

23 may be different insurance obligations related to the

24 COPs that in our view are unrelated to the obligations

25 under the Swaps. I don't want to conflate the two.

**Page 262**

1     And further, anything I can say in that

2 regard, because I have not talked to my counsel, would

3 be speculative as far as what they meant. Okay? But

4 what my understanding is, is that that would relieve

5 us under the agreement, forbearance agreement, of any

6 of the obligations that are necessary under the Swaps.

7 I sincerely don't know what that statement means with

8 regard to the COPs.

9     BY MR. MARRIOTT: That's all I have. Thank

10 you.

11     THE WITNESS: Thank you, sir.

12     EXAMINATION

13     BY MS. ENGLISH:

14 Q. Hi, there.

15 A. Hi. How are you?

16 Q. Good. How are you?

17 A. I am well. Thank you.

18 Q. I'm Caroline English.

19 A. Hi, Caroline.

20 Q. We met before in the Chrysler case and I don't know if

21 you recall.

22 A. Oh, you know --

23 Q. We can talk later. It's all right.

24 A. Yeah. We will talk later. I was going to say I

25 recognized you over there.

**Page 263**

1 Q. Yeah. So I'm from Arent Fox?

2 A. Okay.

3 Q. And this time I reco -- I represent Ambac.

4 A. Okay.

5 Q. Okay?

6 A. Okay.

7 Q. I'm going to apologize in advance in advance if I jump

8 around a little bit or seem to jump around because I'm

9 going to try to plug some holes from your earlier four

10 and a half hours of testimony that you've given

11 already.

12 A. Thank you.

13 Q. Okay. Same rules apply, right?

14 A. Yes.

15 Q. Okay. This is a small question. Earlier in response

16 to Mr. Hackney, his questioning, he asked you a

17 question about the collateral agreement and your

18 response was which collateral agreement.

19 A. Um-hm.

20 Q. I want to make sure. Is there any other collateral

21 agreement other than the 2009 collateral agreement

22 we've spoken about?

23 A. No. I just think that was earlier on in my deposition

24 by Mr. Hackney, and I just wanted to make sure we were

25 being specific about the terms. I wasn't meaning to

**Page 264**

1 allude to another collateral agreement.

2 Q. That's fine. I just wanted to make sure I --

3 A. Sure.

4 Q. -- didn't miss a large transactional document here.

5 Okay?

6 A. Sure.

7 Q. Mr. Hackney also asked you some questions about the

8 service corporations and about whether there were any

9 negotiations on behalf of the City with the service.

10 Corporations?

11 A. Yes.

12 Q. Okay. I believe you answered that negotiating with

13 service corporations would not have been your job. It

14 would have been Ken Buckfire's or someone else's job

15 to do that.

16 A. Yes. I believe that's right.

17 Q. Okay. If it wasn't Ken Buckfire's job, who else's job

18 would it have been?

19 A. It might have been someone else on his team or at

20 Miller Buckfire or someone else on behalf of the other

21 counsel for the emergency manager or the City.

22 Q. Someone else in your office you mean?

23 A. No. No. Other consultants and attorneys on behalf of

24 the City.

25 Q. Okay. But am I correct that no one has reported to

## Page 265

1 you that they had negotiations with the service
2 corporations; is that correct?
3 A. Yeah, reported. I'm going to be careful. My
4 understanding was we had an agreement, I signed it,
5 and it was sent to the service corporations. I
6 personally had no negotiations with them, but my
7 understanding, based upon the fact it was executed,
8 that whoever needed to procure and secure those
9 signatures did so.
10 Q. You don't know who got those signatures from the
11 service corporations?
12 A. No. Sitting here today I do not.
13 Q. You also testified earlier -- Mr. Hackney's helping me
14 out here.
15 Do you -- are you assuming then that there
16 were some negotiations between the City and the
17 service corporations?
18 A. Yeah. Here again, I'm going to say whenever you -- as
19 I said to Mr. Hackney, whenever you talk about
20 negotiations, you know, so we don't get bogged down in
21 nomenclature, I'm assuming that something happened
22 that had the service corporations aware of the
23 agreement, that they agreed to and they signed off on
24 it. So if those constitute negotiations, that's what
25 I'm assuming, but I'm saying to you that I had no

## Page 266

1 independent negotiations and I don't know who did
2 that.
3 Q. And you don't have any idea sitting here today about
4 what those negotiations would have involved, how they
5 happened, when they happened, how long they took,
6 anything like that; is that right?
7 A. That's right.
8 Q. You testified earlier about state aid and federal aid,
9 the possibilities of getting aid from other government
10 sources.
11 A. Yes.
12 Q. With respect to state aid, when did the City make a
13 request of any kind to the State for aid?
14 MR. SHUMAKER: Objection, foundation.
15 A. Assuming the predicate that some request was made,
16 which I don't think is true, what became clear from
17 various discussions with the State was that this was a
18 hole that the City had dug for itself and it needed to
19 find its way out of it on its own.
20 I think at some point we were also informed
21 that there are State prohibitions against the State
22 lending money to the City, either state ordinances --
23 State statutes or constitutional prohibitions, so that
24 would not have been a possibility in any event.
25 BY MS. ENGLISH:

## Page 267

1 Q. Let me back you up to the start of your answer, which
2 was that my predicate you did not believe to be true.
3 A. Yes.
4 Q. So let me ask you a question. To your knowledge was
5 any request of any kind ever made to the State for
6 aid?
7 A. Here's -- I'm not trying to be evasive, but here's the
8 issue I'm having with your question. It's not so much
9 if there was ever a request. As I said earlier today,
10 I have regular discussions with the governor and other
11 officers on behalf of the State, and it became clear
12 to us in terms of whether or not it was made -- a
13 request seems to suggest that we asked the State for
14 money and they said no, and what I'm saying to you is
15 we had a discussion that even if that was an
16 alternative in some fashion, me or a representatives
17 on my behalf -- I don't remember -- that the State
18 couldn't do that in any event, so I'm not sure there
19 was a request made. What I'm trying to say is that it
20 became clear that that was not an option.
21 Q. In other words, it became clear to you that making any
22 such requests would have been futile.
23 A. Yeah, I'm staying away from request. It just became
24 clear that the State couldn't do that, yes, one way or
25 the other.

## Page 268

1 Q. All right. I have the same questions about federal
2 aid, and let me start again with the predicate. Was a
3 request ever made of any kind for federal government
4 aid?
5 A. Not by me. Not for -- well, let me correct that. Not
6 for direct federal government aid in the terms of
7 either a loan or a grant, meaning money. I did have a
8 meeting with Senator Levin where he informed me and
9 actually gave me a list of a number of different grant
10 programs, ordinary grant programs, that are available
11 to the City, as well as other cities, by which we
12 could apply for additional grants and we're reviewing
13 those now.
14 So I want to be clear when people say
15 federal aid, it became clear to us that no one was
16 going to give us, for lack of a better word -- people
17 use the word bailout, which I don't like -- but a
18 direct grant of money, but there are other programs
19 that the City can apply for to get federal assistance.
20 Q. Okay. With respect to the federal grant programs you
21 just mentioned, at this point in time, have any
22 applications been submitted for any of these grant
23 programs?
24 A. At this point in time, there may -- there may be. We
25 received that a couple weeks ago and I know two things

Page 269

1 as has been reported. We're currently doing an
2 analysis of our grants administration and application
3 process to make it better, and I think we're also
4 reviewing it for making specific grant requests, I
5 think some specifically related to public safety.
6 So I don't know if -- sitting here today if
7 actual documents have been submitted, but I know we
8 are mining the federal programs with an eye toward
9 making applications and some have been made or some
10 are near to being made.
11 Q. Are there specific grants you're targeting in this
12 application process?
13 A. That's handled by the folks in the City bureaucracy
14 and consultants, so I -- as I said, health, safety and
15 welfare, meaning police, fire, EMT, City grants
16 meaning blight, HUD grants and others, yes, but
17 sitting here today, I don't know which specific ones
18 have been submitted.
19 Q. And who was handling that process?
20 A. Ultimately, in my office, it would be a combination of
21 the existing -- hopefully in the City as well --
22 existing grant procurers, you know, whether they're at
23 different departments in planning and development,
24 police and fire. It would be at that level, at a line
25 level, would be applying for grants.

Page 270

1 Q. Is that going to happen under your supervision?
2 A. I certainly hope so, yes.
3 Q. Do you have any idea of how much money in grant
4 programs might be available to the City?
5 A. Well, the City has already applied for somewhere in the
6 neighborhood of 300 million in 71 programs. We have
7 been told that none of those 71 programs are in
8 compliance. Some of those programs we're receiving
9 technical assistance from HUD --
10 COURT REPORTER: I need you to slow down.
11 THE WITNESS: I'm sorry.
12 A. Some of those programs we're receiving technical
13 assistance, for instance, from HUD, and our intent is
14 to get our grants administration and application
15 process more up to date and streamlined so we can
16 apply for as many grants as we can possibly get our
17 hands on.
18 BY MS. ENGLISH:
19 Q. Okay. You confused me there for a minute because
20 you've said you've got a bunch of grant applications
21 already in with respect to programs that are
22 noncompliant, but I thought you said earlier you don't
23 have any grant applications in.
24 A. No, no, no.
25 Q. Okay.

Page 271

1 A. You asked me if there were any new ones going in.
2 Q. Okay.
3 A. We -- the City has received, in past years and
4 currently, almost 300 million dollars in federal
5 grants.
6 Q. Okay.
7 A. Okay. We hoped -- and they're being administered
8 through 71 different programs in the City. I think
9 that's been publicly discussed before. We hope to
10 apply for even more grants. So I can be clear, what
11 we are trying to do is to get some assistance so that
12 we can get better at this process, this administration
13 application process, so we would be eligible for more
14 federal assistance that's already existing.
15 Q. And how much do you estimate that more federal
16 assistance to be?
17 A. I have no idea. Whatever -- whatever we can get. If
18 it's several millions more, if it's several hundreds
19 millions more, we're going to apply for it.
20 Q. Do you think it's a possibility it could be hundreds
21 of millions more?
22 A. Possibility it could be.
23 Q. Earlier in your testimony you were asked a lot of
24 questions about legal analyses or legal claims that
25 might have been made, and on those questions you

Page 272

1 claimed attorney-client privilege --
2 A. Yes.
3 Q. -- and said that you didn't have an independent view
4 that didn't come from attorney-client communications.
5 A. Yes.
6 Q. Okay. I want to ask, without divulging what the
7 advice was of your counsel, can you just list for me
8 what the topics were on which you got advice, or would
9 you claim the privilege as to just the topics as well?
10 A. Maybe I can do it this way. I think I've said before
11 that in this case, for instance, your client has filed
12 an objection.
13 Q. Yes, it has.
14 A. And in this case many objections have been filed and
15 many of the topics listed in those objections, and I
16 think I said with Mr. Hackney, whether it was
17 subordination, prioritization, equitable estoppel,
18 tort, invalidation of liens ab initio, whatever they
19 were, none of those analyses or claims came as a
20 surprise to me and that in some fashion -- without
21 divulging what I had spoken with my counsel, in
22 some fashion issues such as those had been discussed
23 and analyzed with my counsel, attorneys and advisors.
24 Q. So, for example, if -- as you know, Ambac filed an
25 objection, and --

Page 273

1 A. Yes.

2 Q. -- one of the arguments raised was whether the Swap
3 obligations themselves were void ab initio because
4 they did not comply with Act 34.

5 A. Yes.

6 Q. You're familiar with that argument that we raised?

7 A. Yeah.

8 Q. Can you -- and again without asking -- I'm not asking
9 you to divulge what the advice was or what the
10 analysis was you got from your counsel, but can you
11 tell me what issues, just by naming the topics, you
12 sought advice on with respect to that argument?

13 MR. SHUMAKER: Well, the seeking of advice
14 somewhat implicates communications. If you were to
15 look at topics perhaps as to whether he regarding your
16 objection whether he -- they were raised, without
17 going into the communications, I think he could
18 respond to that.

19 BY MS. ENGLISH:

20 Q. That's exactly what I'm asking.

21 A. Okay. Well, for instance, whether or not arguments
22 such as that would erase the obligation in toto or
23 subordinate it to a lower level, whether or not an
24 obligation like that would raise defenses on behalf of
25 the obligor of equitable estoppel to the City, whether

Page 274

1 or not there are facts surrounding those documents and
2 liens that would equitably raise issues as far as
3 their validity beyond void ab initio, whether or not
4 the law in the district and the circuit supported a
5 clean remedy that could be easily obtained, and
6 whether or not it would be expensive and extensive
7 litigation and appeals over a period of time, things
8 such as those were discussed and examined.

9 Q. When you say whether there were equitable issues, what
10 do you mean by that?

11 A. Here again, without going into discussion, any of the
12 concern -- equity is -- implicates action such as
13 clean hands. Whether there were issues surrounding
14 the City's conduct and issues along those lines, that
15 would be factually intensive and lead to, for
16 instance, increased litigation costs which I think is
17 mentioned in our motion or some of the papers we
18 filed, things along those lines, general equitable
19 concerns.

20 Q. When you just listed for me the types of concerns and
21 topics you were exploring with counsel, you didn't
22 mention Act 34.

23 A. Well, as I said, I said for instance. I didn't mean
24 for it to be an exhaustive list, and that's why
25 without sitting here today, counsel, memos that were

Page 275

1 prepared, analyses, I can't give you a compendium or
2 an exhaustive list of things that were considered, so
3 I don't want to leave you with the misimpression that
4 somehow the analysis wasn't complete or we didn't
5 consider more issues than the one I did. We did.
6 Those are just the ones that came, sitting here
7 today -- you asked me a question -- off the top of my
8 head that I remembered for instance.

9 Q. Did you have legal analysis done on whether the Swaps
10 transactions complied with Act 34?

11 A. As I said, without getting into discussions with my
12 counsel, a whole panoply of issues, some of which are
13 contained in the objections filed, including those
14 filed by your client, were examined.

15 Q. Okay. Now can you answer my question? Did you have
16 legal analysis done on whether the Swap transactions
17 complied with Act 34?

18 A. As I said --

19 MR. SHUMAKER: Objection, asked and
20 answered.

21 A. As I said --

22 MR. SHUMAKER: If you want to share with
23 him the argument, that might help.

24 A. There are a whole panoply of issues, some of them
25 contained in the objections such as the one filed by

Page 276

1 your client which were examined and reviewed.

2 BY MS. ENGLISH:

3 Q. Was Act 34 one of them?

4 A. More than likely, yes.

5 Q. More than likely? You don't know?

6 A. No. Sitting here today, I just said to you, for
7 instance, that many of the issues, without being a
8 compendium or being exhaustive, were examined. Act 34
9 was probably one of them. I did not mean for my
10 testimony to be exhaustive because I don't have the
11 analyses or the benefit of discussing them with my
12 client prior to your question today.

13 Q. I do understand the answers that you're giving me.
14 They're just not quite answers to the questions I'm
15 asking.

16 A. Okay.

17 Q. So let me -- in your answer right now when I was
18 trying to hone in on was Act 34 --

19 A. Um-hm.

20 Q. -- examined, right?

21 A. Yes.

22 Q. You said probably.

23 A. Yes.

24 Q. So you're not sure?

25 A. No. I said --

1    MR. SHUMAKER: Objection, asked and
2 answered.
3 A.   I'll say it again.  Probably means that it was, but I
4 don't want my answer to represent to you that it was a
5 compendium.  If you want to keep asking me about Act
6 34, that's fine, but I said more likely than not it
7 was examined.  I -- just sitting here right now, I
8 don't have an independent recollection of all the
9 things we examined.  Act 34 was more than likely one
10 of them.
11    BY MS. ENGLISH:
12 Q.   Okay.  But sitting here today you don't have an
13 independent recollection for sure that Act 34 was
14 looked at; is that correct?
15 A.   I just said --
16    MR. SHUMAKER: Objection, asked and
17 answered.
18 A.   I just said it's more likely than not.
19    BY MS. ENGLISH:
20 Q.   Sitting here today do you have a recollection as to
21 whether there was legal analysis done as to the
22 validity of the pledge of casino revenues under the
23 gaming act?
24 A.   I thought you just asked -- well, suffice it to say I
25 believe so.

1 Q.   You believe so?
2 A.   Yes.
3 Q.   Are you sure?
4 A.   I believe so.
5 Q.   Are you sure?
6 A.   I believe so.
7    MR. SHUMAKER: Objection, asked and
8 answered.
9    BY MS. ENGLISH:
10 Q.   Do you recall seeing a legal analysis or memo that was
11 prepared with respect to the validity of the pledge of
12 casino revenues under the gaming act?
13 A.   Ms. English, I see -- I see a lot of memos.  As I said
14 before this line of questioning, it's more likely than
15 not that I did, but sitting here today, in an effort
16 to be accurate, I don't specifically recall all of the
17 issues we examined.  More likely than not, it included
18 Act 34, it included validity of liens.
19    COURT REPORTER: It included validity --
20    THE WITNESS: Validity of liens.
21    COURT REPORTER: Thank you.
22    BY MS. ENGLISH:
23 Q.   Did you make an independent assessment apart from
24 advice of counsel as to the strengths -- strengths or
25 weaknesses of the City's claims against the Swap

1 counterparties?
2 A.   Not without the advice of counsel, no.
3 Q.   Why didn't the City just sue the Swap counterparties
4 and then negotiate from there?
5 A.   You know, one of the things that we have, both in
6 bankruptcy and in Public Act 436, is that in the
7 deliberative process the emergency manager has
8 discretion to make decisions, business judgment
9 decisions, within that discretion, irrespective of
10 third parties, the decisions as to how that should
11 have occurred.
12    We made a decision in consultation with
13 counsel that this was the best way to proceed.
14 Commencing litigation might well have created a
15 cascade of other events such as the very event we are
16 trying to avoid which is trapping the casino revenue
17 for time and a number of months and/or years which
18 would have made the probability of me completing my
19 mission within the time frame of the statute
20 difficult.
21 Q.   If the City couldn't get a deal such as the
22 forbearance agreement, was the City prepared to sue
23 the Swap counterparties then?
24    MR. SHUMAKER: Objection to the extent that
25 question is asking for attorney-client privileged

1 communication.  I'll object.
2    If you have some independent understanding,
3 you can answer.
4 A.   Mrs. English, I'll say this.  Without getting into
5 communications with my counsel, we examined all
6 alternatives, and as I said earlier with Mr. Hackney,
7 including potential litigation.
8    BY MS. ENGLISH:
9 Q.   If you hadn't gotten a deal, were you prepared to sue
10 them then?
11    MR. SHUMAKER: Objection, calls for
12 speculation.
13 A.   Yeah, I was going to say.  I don't know.  We'd have to
14 examine the situation on the ground at that time.
15    BY MS. ENGLISH:
16 Q.   Okay.  Let me ask you this.  If the forbearance
17 agreement is not approved by the bankruptcy court,
18 will the City then sue the Swap counterparties?
19    MR. SHUMAKER: Objection, calls for
20 speculation.
21 A.   Here again, it's a different version of the prior
22 question which it calls me to speculate as to what we
23 would do if the Court does not approve the agreement.
24    BY MS. ENGLISH:
25 Q.   If there were to be litigation with the Swap

Page 281

1 counterparties, do you have some sense as to what
2 claims might be asserted against the Swap
3 counterparties?
4 MR. SHUMAKER: Objection, asked and
5 answered.
6 A. Yeah, as we said before, those are discussions that
7 I've had with my counsel. I would consult with them
8 as to our possible -- I can't tell you in direct
9 response to your question and this line of questioning
10 what we would do. What I can tell you is that we
11 would engage in a process of examining what our
12 alternatives were and try to make an informed and
13 reasonable decision based upon the information we had
14 at that time.
15 BY MS. ENGLISH:
16 Q. Okay. So sitting here today you are not able to tell
17 me even a single claim that the City might assert
18 against the Swap counterparties?
19 A. There are a number of claims that the City might
20 assert. As I said earlier today, some of them might
21 be framed in some of the objections. Whether or not
22 we would ultimately assert those, depends upon a
23 number of different factors that we would have to
24 examine at that point.
25 Q. Well, in the forbearance agreement, the City is giving

Page 282

1 up the right to assert claims against the Swap
2 counterparties, correct?
3 A. If the forbearance agreement is approved and we
4 ultimately execute on the agreement, then yes, the
5 parties would forebear and would not sue each other.
6 Q. Right. So all I'm asking is give me one example of
7 one claim you're giving up in the forbearance
8 agreement.
9 A. I suppose any of the claims that have been implicated
10 in some of the objections that have been filed and, as
11 I said earlier today, some of those claims which is
12 the ones we discussed a few minutes ago, such as
13 estoppel, ab initio and those others.
14 Q. Did any of your legal counsel ever prepare a memo or a
15 written analysis for the City that outlined a
16 litigation strategy against the Swap counterparties?
17 I'm not asking what would have been in it, if there
18 was one. I just want to know if there was any written
19 analysis ever prepared that outlined a litigation
20 strategy.
21 A. Well, without, here again, drawing into the
22 nomenclature of a litigation strategy, because that
23 can mean a number of different things, including up --
24 up to and through attaching a proposed complaint, for
25 instance, without getting into the nomenclature, I

Page 283

1 would say that, as I said before this afternoon, there
2 was analysis of the potential claims, strengths and
3 weaknesses and options available to the City.
4 Those -- some of those were prepared in writing, yes.
5 Q. You just mentioned a draft complaint. Was there ever
6 a draft complaint prepared?
7 MR. SHUMAKER: I think you mischaracterized
8 what he said. That's my objection.
9 A. Yeah, as I said, some of those types of things could
10 include a draft complaint. I don't recall seeing a
11 draft complaint.
12 BY MS. ENGLISH:
13 Q. Do you recall seeing a memo that outlined strengths
14 and weaknesses of claims that could be asserted in a
15 complaint?
16 A. As I said before, I think there were memorandum and
17 advice that was given regarding the various claims,
18 defenses and alternatives available to the City which
19 could have included a memorandum of the nature you're
20 talking about.
21 Q. It could have included it --
22 A. It could.
23 Q. -- but you're not sure whether it did or not?
24 A. Sitting here today I don't specifically remember all
25 the memos that would fit the description that you're

Page 284

1 making. There were memos discussing the various
2 strengths and weaknesses of the positions.
3 Q. Did you have any analysis done as to the cost of a
4 litigation with the Swap counterparties?
5 A. No. I don't recall if any of the documents included
6 costs. We -- there were discussions about the
7 potential costs and the timing, but I don't recall if
8 any of the documents did.
9 Q. Okay. What was your best estimate as to how much a
10 litigation with Swap counterparties would cost the
11 City?
12 A. I don't -- I don't remember what the best estimates
13 were. They -- they ranged from --
14 MR. SHUMAKER: Object. I just want to make
15 sure you're not going to be revealing any
16 attorney-client communications with your answer.
17 THE WITNESS: Okay.
18 MR. SHUMAKER: I'll interject that. I'll
19 let you answer the question as to whether that was
20 addressed. I don't want you to go --
21 THE WITNESS: Okay.
22 MR. SHUMAKER: -- into anything --
23 THE WITNESS: Okay.
24 MR. SHUMAKER: -- beyond that.
25 A. It was addressed, and suffice it to say I think it's

Page 285

1 fair to assume that in litigation in the nature you're
2 discussing that it could go into millions of dollars.
3 BY MS. ENGLISH:
4 Q. How about the time it would take to litigate the Swap
5 counterparties? Did you estimate how long it would
6 take?
7 MR. SHUMAKER: Same admonition.
8 A. Let's -- let's do it this way. I think it's fair to
9 say that there were discussions regarding the time for
10 litigation and/or appeals and the costs that were
11 involved if that tack was taken.
12 BY MS. ENGLISH:
13 Q. How long did you estimate it would take to litigate
14 with Swap counterparties?
15 A. I'm not sure the predicate is there that I estimated
16 the length of time.
17 Q. Okay. If you didn't estimate the length of time,
18 that's an okay answer to give.
19 A. Yeah. I'm trying to be as clear as I can for you and
20 say that there were discussions, but there's nothing
21 as specific as the lodestar method of analysis which
22 you understand is time times hours billed, so on and
23 so forth. There were discussions and there were
24 analyses about what it could be.
25 Q. Now, I have to unpack that a little bit because you

Page 286

1 mentioned the lodestar analysis, one of my favorite
2 friends. Did you have a lodestar analysis done for
3 litigation with the Swap counterparties?
4 MR. SHUMAKER: Objection, this is getting
5 into the -- the specific communications between
6 Mr. Orr and his counsel when you start to go through
7 what -- what are the particulars of the advice that
8 was being given. I allowed you to go forward with
9 whether he considered the length of litigation in his
10 answer, but I don't want him to go into the specifics
11 of any sort of analysis that was done by counsel.
12 With that admonition, you can answer.
13 A. Again, without going to the specifics of discussion
14 I've had with counsel, there were discussions about
15 potential length of litigation and appeals and the
16 potential cost. Those discussions included time that
17 may have impaired my ability to complete my obligation
18 within the time frame provided by Public Act 436, as
19 well as significant costs, litigation cost being
20 incurred by the City.
21 BY MS. ENGLISH:
22 Q. Okay. Here is my question again, because in your
23 answer you mentioned lodestar analysis, so I'm just
24 asking -- it's a yes or no question.
25 A. Um-hm.

Page 287

1 Q. Did you have a lodestar analysis performed with
2 respect to a litigation with the Swap counterparties?
3 MR. SHUMAKER: Again, I'm going to object.
4 I believe that that question asks the -- asks Mr. Orr
5 to reveal privileged attorney-client communications
6 when you get into specific lodestar analysis.
7 BY MS. ENGLISH:
8 Q. I don't want the analysis. I just want to know
9 whether had you one done because you mentioned it.
10 A. I did mention it, but, here again, I think my response
11 was that there was an analysis that was done. I'm not
12 sure. I don't recall if it was as specific as the
13 type of lodestar analysis to give you an example, and
14 without going into conversation between me and my
15 counsel, I say again, we did an analysis and had
16 discussions regarding potential claims and defenses
17 that could be asserted, the potential length of time
18 it would take and the significant cost that might be
19 incurred by the City.
20 Q. I'm going to move on.
21 A. Okay. Sure.
22 Q. Did the City obtain approval from the Michigan
23 Department of Treasury for the COPs or the Swap
24 obligations, do you know?
25 A. You mean initially?

Page 288

1 Q. Yeah.
2 A. I don't know. Well, wait a minute. Wait a minute.
3 I recall seeing a letter some time ago on
4 official Michigan State letterhead -- well, I recall
5 seeing a letter. It may have been some form related
6 to the COPs. I just don't remember specifically, but
7 I do recall seeing a letter on Michigan letterhead
8 related to the transaction.
9 Q. Okay. So I'm going to put in a request to your
10 counsel.
11 MS. ENGLISH: If there is an approval or a
12 letter from the Michigan Department of Treasury with
13 respect to the COPs or the Swaps, we'd like to request
14 a copy of that.
15 MR. SHUMAKER: We'll look into it.
16 MS. ENGLISH: Thanks.
17 BY MS. ENGLISH:
18 Q. Here's another one I don't know if you know the answer
19 to this.
20 A. Right.
21 Q. Do you know if the City approved the offering circular
22 that went out with respect to the COPs?
23 A. I do not.
24 Q. You mentioned earlier that you were on conference
25 calls with Ken Buckfire and the principals of the Swap

## Page 289

1 counterparties?

2 A. Yes.

3 Q. Did you -- on any of those calls, did you ever take

4 the position that the Swaps were invalid or void?

5 A. I don't recall if we had any discussions of that

6 nature on any of those calls.

7 Q. Do you recall whether you ever took the position that

8 the liens were invalid or not secured?

9 A. Likewise, I don't recall if we had discussions of that

10 nature on those calls.

11 Q. Do you recall whether you ever discussed with any of

12 the Swap counterparties the City's potential legal

13 arguments as against the Swap counterparties?

14 A. Did I?

15 Q. Yeah.

16 (Whereupon Robert Hertzberg left the

17 deposition at 2:49 p.m.)

18 A. No, I don't think I had though those discussions. No.

19 BY MS. ENGLISH:

20 Q. Did you ever debate the validity of the Swap

21 counterparties secured position with anyone from the

22 Swap counterparties?

23 A. Did I personally?

24 Q. Yes.

25 A. No.

## Page 290

1 Q. I want to show you a document you're very familiar

2 with.

3 A. Um-hm.

4 Q. So what exhibit are we up to now? Exhibit 6?

5 A. Yeah.

6 Q. Orr 6?

7 A. Yes.

8 MS. ENGLISH: Lally, can you pass me my

9 binder?

10 MARKED FOR IDENTIFICATION:

11 DEPOSITION EXHIBIT 6

12 2:50 p.m.

13 BY MS. ENGLISH:

14 Q. Okay. You recognize this document, don't you,

15 Mr. Orr?

16 A. Yes. I assume it's an accurate representation of my

17 June 14th proposal to creditors.

18 Q. Okay. And this is a document that you put together

19 largely, with help I'm sure, but you were responsible

20 for putting this together, right?

21 A. This is a document that I and my team put together.

22 Q. Okay. I'd like you to turn to pages 97 and 98 of the

23 document.

24 A. Yes.

25 Q. Okay. These are -- there's two forecast tables here

## Page 291

1 which is really just one table on two pages, right?

2 A. Right.

3 Q. And --

4 A. Well, let me make sure. Yes.

5 Q. You know what, so there's ECF numbers at the bottom --

6 A. Yes.

7 Q. -- but there's also numbers in the -- that were part

8 of the original document and it's the original numbers

9 that I'm looking for, page 97 and 98.

10 A. Okay.

11 Q. On the top it says restructuring scenario.

12 A. Okay. I'm sorry, I was looking at the electronic case

13 number. -

14 Q. Yeah, my bad.

15 A. 97 and 98. Here we go. Okay.

16 Q. Okay. Now, if I understand this table that spans

17 pages 97 and 98 correctly, this is the City's

18 restructuring proposal, if you will; is that correct?

19 A. Yes.

20 (Whereupon Robert Hertzberg entered the

21 deposition at 2:51 p.m.)

22 BY MS. ENGLISH:

23 Q. Okay. And if we just look down say the column for

24 2014, we've got total revenues, net operating surplus,

25 readjustment expenses. And then if you go to page 98,

## Page 292

1 we get down to a list of secured claims of the City.

2 A. Yes.

3 Q. Okay.

4 (Whereupon Kelly DiBlasi left the

5 deposition at 2:52 p.m.)

6 BY MS. ENGLISH:

7 Q. And there's a line item there for POC Swaps. Do you

8 see that?

9 A. Yes.

10 Q. And that line item is actually the Swaps we're talking

11 about today that you proposed to settle through the

12 forbearance agreement, correct?

13 A. Yes.

14 Q. Okay. And that line item, if you go right straight

15 across, shows roughly 50 million dollars a year being

16 paid; is that right?

17 A. Yes.

18 Q. So this restructuring proposal, if I'm reading this

19 correctly, is assuming that the City is going to

20 continue to pay its monthly Swap payments; is that

21 correct?

22 A. Yes. I think there's a footnote there at the top that

23 says -- at the bottom, it says, "Assumes continued

24 payments as scheduled. Treatment to be determined."

25 Q. Okay. So this restructuring proposal then -- well,