1  let me stay with this for just one more minute.
2  A. Um-hm.
3  Q. Then fur -- further down you've got an estimate of
4  total unsecured claims of the City, about 11 and a
5  half billion dollars, correct?
6  A. Yes.
7  Q. All right. Now, flip to page 106. I'm sorry, 105.
8  There again, we've got secured -- a section on secured
9  payments, and we're showing the City's still making
10 the Swap payments, correct?
11 A. Um-hm.
12 Q. All right. And then we flip to 107. We've got your
13 proposal for the 2 billion dollar note that's going to
14 go to pay unsecured.
15 A. Yes.
16 Q. Have I read all that correctly?
17 A. Yes. I think --
18 Q. Okay.
19 A. -- the document speaks for itself.
20 Q. So if I've understood this correctly, then your -- the
21 City's restructuring proposal is based on the notion
22 that the Swaps payments will continue, correct?
23 A. Yes, for some period of time.
24 Q. And in fact, this proposal does not show the -- any
25 effect of the forbearance agreement or indicate the

1  forbearance agreement coming into play here at all,
2  correct?
3  A. That is correct.
4  Q. All right. So if I were to tell you that Mr. Buckfire
5  yesterday testified that the City's restructuring plan
6  was based on an assumption that the forbearance
7  agreement was approved, that would be incorrect,
8  correct?
9  A. No, not necessarily. I think the footnote at 1,
10 "assumes payments as scheduled. Treatment to be
11 determined," suggests that we're going to assume it.
12 I think what you're trying to say is based upon these
13 numbers, that at some point they should be taking
14 (sic) out because we would assume that the payments
15 would cease to the Swap counterparties, is what I
16 think you're saying.
17    I think what Mr. Buckfire was saying is
18 that at some point, based upon these notes, whether
19 it's this data or others -- I don't know what he was
20 saying, but my interpretation would be based upon
21 estimated unsecured claims that they would be -- and I
22 don't -- I don't want to mischaracterize his testimony
23 and I don't know the context in which it was taken, so
24 I don't want to misstate my understanding of what his
25 testimony was.

1     But when you look at the note on page 107,
2  that -- the 2 billion dollar note -- that assumes that
3  the Swaps are -- the forbearance agreement is going to
4  include that all this unsecured debt is somehow paid
5  out of this note. Now, I understand what you're
6  trying to say is that the cash flow forecast here
7  doesn't take into account the Swap payment. I don't
8  know what he was saying in that regard.
9  Q. Well, I guess all I'm trying to figure out is --
10 the -- the 2 billion dollar note that's in your
11 plan --
12 A. Yes.
13 Q. -- as evidenced in this document, seems to me to be
14 based on continuing to pay the Swap payments because
15 that's what's listed here, both on page 105 and on
16 page 98.
17 A. Right.
18 Q. Are you telling me that that's not correct, that the 2
19 billion dollars was formulated based on the assumption
20 that you'd get the forbearance agreement?
21 A. What I'm telling you is that at the time this report
22 went out -- well, I'm telling you two things. One, at
23 the time this report went out, we did not have the
24 forbearance agreement, but we were having discussions
25 about it; and, two, what I'm telling you it's probably

1  the best thing to do is ask Mr. Buckfire what he meant
2  by his testimony 'cause -- rather than trying to use
3  me to somehow contradict his testimony regarding the
4  Swap payment cash flow that's shown at page 98, you
5  should ask him what he meant.
6  Q. Well, let me ask you this. Has -- based on this
7  document, the City's plan is to allocate a 2 billion
8  dollar note to the unsecureds, and this plan is -- it
9  has a line item for continuing to pay the Swaps?
10 A. Yes.
11 Q. Does the 2 billion dollar number change if the Swap
12 payments change?
13 A. To the best of my knowledge, no. I don't assume that.
14    MS. ENGLISH: I don't think I have anything
15 else.
16 A. Okay.
17    MS. ENGLISH: Thank you for your patience.
18    THE WITNESS: No, thank you. Sure.
19    MR. SHUMAKER: Take a quick five-minute
20 break and then we'll switch.
21    VIDEO TECHNICIAN: Okay. The time is
22 2:57 p.m. This marks the end of tape number 4. We
23 are off the record.
24    (Recess taken at 2:57 p.m.)
25    (Back on the record at 3:06 p.m.)

Page 297

1    VIDEO TECHNICIAN: We are back on the
2 record at 3:06 p.m. This marks the beginning of tape
3 number 5.
4    EXAMINATION
5    BY MS. GREEN:
6 Q.  Good afternoon, Mr. Orr.
7 A.  Good afternoon.
8 Q.  I'm Jennifer Green.
9 A.  Hi, Jennifer.
10 Q.  I'm from Clark Hill and I represent the Police and
11 Fire Retirement System and the General Retirement
12 System.
13 A.  Um-hm.
14 Q.  If I refer to the 2009 collateral agreement -- we've
15 been doing it all day, but it has not yet been marked
16 as an exhibit -- you know what I'm referring to,
17 though, correct?
18 A.  Yes.
19 Q.  It's attached as Exhibit B to your assumption motion?
20 A.  Yes.
21 Q.  You know, are you familiar with the attachments to the
22 collateral agreement?
23 A.  Yes. I'm somewhat familiar with them, yes.
24 Q.  I have an extra copy here.
25 A.  Okay.

Page 298

1 Q.  I will give them to you if you want to follow along.
2 A.  Okay.
3 Q.  If you can flip to page 186. At the bottom it's
4 listed. It's the first yellow tab.
5    (Sneezing.)
6    THE WITNESS: Bless you. Gesundheit.
7    BY MS. GREEN:
8 Q.  Do you recognize that letter?
9 A.  I've seen it before, but obviously I have no
10 contemporaneous recollection when it was written.
11 Q.  And that's the letter from the City to the Motor City
12 Casino, correct?
13 A.  Yes.
14 Q.  It's dated June 23rd, 2009?
15 A.  Yes.
16 Q.  It's attached to the collateral agreement?
17 A.  Yes.
18 Q.  If I can direct your attention to paragraphs 4 and
19 5 --
20 A.  Um-hm.
21 Q.  -- that letter appears to instruct the casino, the
22 Motor City Casino, to direct certain payments to U.S.
23 Bank?
24 A.  Yes. Paragraph 4 seems to mention payment
25 instructions and paragraph 5 seems to discuss who they

Page 299

1 are to be made to.
2 Q.  Okay. Then the following letter appears to be a
3 written receipt from the Motor City Casino back to the
4 City simply acknowledging receipt of the instructional
5 letter?
6 A.  Well, I -- the following letter is a June 23rd, 2009
7 letter from the City of Detroit back to Greektown
8 Casino.
9 Q.  Is it a letter acknowledging that they received, I'm
10 sorry, the instructional letter?
11    MR. SHUMAKER: What page are you on,
12 Counsel?
13    MS. GREEN: It's the page he was --
14    THE WITNESS: 190 of 247?
15    MS. GREEN: Um-hm.
16 A.  Yeah, what it -- the document speaks for itself, but
17 your first letter at page 186 is from Motor City
18 Casino appearing to go -- it's from the City of
19 Detroit to Motor City Casino; the second letter is
20 from the City of Detroit to Greektown Casino.
21    BY MS. GREEN:
22 Q.  Is that 191?
23 A.  That's 191.
24 Q.  Okay.
25 A.  Okay. 191.

Page 300

1 Q.  Okay.
2 A.  Okay.
3 Q.  And so that's another instructional letter, correct,
4 kind of doing the same thing, just laying out that
5 certain payments are supposed to be made?
6    MR. SHUMAKER: Just for clarification, when
7 you say that, are you talking about the irrevocable
8 instructions on page 191 through 193?
9    MS. GREEN: Yes, exactly what he's looking
10 at right now.
11 A.  Okay. So I -- in order to expedite this, I assume you
12 will represent to me the letters are essentially
13 similar and the first one was to Motor City and the
14 second was to Greektown Casino.
15    BY MS. GREEN:
16 Q.  Exactly.
17 A.  Is that correct?
18    Yes.
19 Q.  And if you keep going there's another one I believe to
20 MGM.
21 A.  I would assume there's a similar letter from Norma
22 White, following up with a receipt, following up with
23 a similar -- what appears to have been -- maybe have
24 been a cover letter, and then there's a
25 June 23rd, 2009 letter to MGM Grand.

Page 301

1  Q.  So you'd agree with me, there's a series of
2  instructional letters from the City to the casinos,
3  and then each of those are followed by a letter from
4  the casino back to the City acknowledging receipt.
5  I'm just summarizing what you just said.
6  A.  Yes.  I don't -- I don't mean to be difficult.  I
7  don't know if this receipt regarding irrevocable
8  instructions was a letter or was attached to the
9  document, but there appear to be those that are
10  comparable to the three letters you discussed from
11  each of the hotels back to Norma White.
12  Q.  Okay.  Earlier when you were being examined by
13  Ms. English, you referenced that you relied on a
14  formal approval letter from the Michigan Gaming
15  Control Board?
16      MR. SHUMAKER: Objection, mischaracterizes
17  his testimony.
18  A.  Yeah, my testimony was I thought I had seen a letter
19  from the -- from the State on State letterhead which
20  might have qualified for the question of Ms. English
21  as to whether or not I'd seen anything approving the
22  agreement.
23      BY MS. GREEN:
24  Q.  Okay.
25  A.  Okay.

Page 302

1  Q.  From the State of Michigan or from the Michigan Gaming
2  Control Board?
3  A.  I thought from the -- I think I said on State
4  letterhead.  I don't recall if I said Michigan Gaming
5  Control Board, but I said State I believe.
6  Q.  Okay.  What was your understanding of this approval
7  letter?
8  A.  Well, you call it an approval letter.
9  Q.  I was using your language, I thought.
10  A.  Yeah, I said -- what I said was -- the question was
11  had you seen an approval letter, and what I said I
12  don't know.  I said at first, no.  I said wait a
13  minute.  I seem to have recalled seeing a letter on
14  State letterhead related to this issue, and I couldn't
15  recall whether or not it was a formal, quote, unquote,
16  approval.
17  Q.  Do you recall if you relied upon this letter in
18  evaluating the validity of the lien on the casino
19  revenue?
20  A.  I recall having seen this letter, and this I think is
21  the letter that I recall having seen.  Your question
22  is did I rely on it -- in evaluating potential claims,
23  did I personally rely on it.  My response to you is I
24  made no independent analysis, as I said to
25  Ms. English, outside of discussions that I had with

Page 303

1  counsel.
2      There were a number of analyses and
3  memoranda that were prepared regarding potential
4  strengths and weaknesses and a proposal for the deal,
5  and -- and that I recall this letter is because,
6  yes, I believe that this was one of the documents that
7  I may have reviewed in that process.
8  Q.  Do you know if anyone else on your team at the City
9  would have reviewed and analyzed this letter in
10  connection with evaluating the validity of the lien?
11  A.  I believe my -- my team, including my counsel -- I
12  don't know if they're at the City.  It may have been
13  my restructuring and outside counsel.
14  Q.  And just for the record, we're referring to a letter
15  dated June 18th, 2009.  The letterhead is from the
16  Michigan Gaming Control Board and it does say State of
17  Michigan.
18  A.  Yes, page 200 of 247.
19  Q.  If you read the first paragraph of the letter --
20  A.  Yes.
21  Q.  -- and if you need to reacquaint yourself with it now,
22  that's fine.
23  A.  I did.  Here again, these documents are legacy
24  documents that occurred in 2009, well before I was
25  here, so I've only seen them.  I have no

Page 304

1  contemporaneous recollection.
2  Q.  I understand.
3  A.  The document speak for themselves, but I'd be
4  certainly happy to read it and give you my
5  understanding.
6      Okay.  I've read the letter.
7  Q.  This letter acknowledges that the three Detroit-based
8  casinos have been directed to, quote, electronically
9  transfer a portion of the City's money that would be
10  due under the gaming act to U.S. Bank, correct?
11  A.  Yes.
12  Q.  And after that it acknowledges that there was a
13  letter, quote, advising the board that the City
14  Council of the City of Detroit has enacted an
15  ordinance and taken all related action necessary to
16  direct the three licensed Detroit casinos to make the
17  transfer to the account.
18      MR. SHUMAKER: Objection, the document
19  speaks for itself.
20  A.  Yes.
21      BY MS. GREEN:
22  Q.  Did I -- did I correctly relate the letter on the
23  record?
24  A.  Well, the document speaks for itself, but romanette II
25  says that, yes.

Page 305

1 Q. Okay. Thank you.
2 So this letter at the bottom, page -- of
3 the same page --
4 A. Right.
5 Q. -- paragraph 2 --
6 A. Yes.
7 Q. -- there is some sort of analysis as to this
8 electronic transfer, correct?
9 MR. SHUMAKER: Object to the form.
10 A. Yeah, I don't know if I'd call it an analysis, but --
11 BY MS. GREEN:
12 Q. A reference?
13 A. Yeah, the paragraph speaks for itself. The single
14 sentence paragraph speaks for itself.
15 Q. And it's referring to the transfer of the funds
16 that -- mentioned in paragraph 1, correct?
17 A. Yes.
18 Q. Okay. So fair to say this letter is really just
19 confirming that the Michigan Gaming Board received a
20 letter directing it to transfer those funds, and this
21 letter is relating to the mere transfer of those
22 funds, correct?
23 MR. SHUMAKER: Object to the form, document
24 speaks for itself.
25 A. Yeah, the document speaks for itself, and I'm -- your

Page 306

1 question seems to suggest that the prior letters we
2 looked at were to the gaming control board directing
3 them to transfer funds. As I read this letter, it
4 says that the gaming control board has seen the
5 letters, that they're giving -- advising the board of
6 certain irrevocable instructions, not instructing them
7 to do it, for certain the three licensed Detroit
8 casinos, and it goes on to speak for itself.
9 And then it says at the end, upon review of
10 this matter, I do not find --
11 COURT REPORTER: I'm sorry. You're going
12 to have to slow down.
13 THE WITNESS: Okay. I'm sorry.
14 COURT REPORTER: Speaks for itself and it
15 goes on.
16 A. Speaks for itself, and goes on to say, "Upon review of
17 this matter, I do not find any compliance issues at
18 this time, and since no goods or service are being
19 provided to the casino, no licensing is required."
20 BY MS. GREEN:
21 Q. That's a fair point. As we said before, the letter
22 was reflecting on the fact that certain instructional
23 letters had been sent --
24 A. Yes.
25 Q. -- to the casinos and signing off on that process

Page 307

1 under which certain funds would be transferred to U.S.
2 Bank.
3 A. Right. The letter, here again, speaks for itself, but
4 it appears to be the State gaming commission saying
5 there are no compliance issues and you don't need any
6 licensing.
7 Q. Well, let's do it this way. The Michigan Gaming Board
8 in this letter has not said that it has reviewed the
9 validity of the City's pledge of certain casino
10 revenues for purposes of securing its financial
11 obligations under the 2009 collateral agreement under
12 the Swap contracts, right?
13 A. Yes.
14 Q. It doesn't say that?
15 A. Yes.
16 Q. And it does not say that it hereby authorizes the City
17 to pledge the casino revenues under the Michigan
18 Gaming Act, correct?
19 A. That is correct.
20 Q. And it does not confirm the transaction or say that
21 the transaction fully complies with the Michigan
22 Gaming Act, does it?
23 A. No. The letter speaks for itself, but I don't see
24 that anywhere in the letter.
25 Q. And nowhere in this letter does it mention that the

Page 308

1 transaction is approved under section 12 of the
2 Michigan Gaming Act, right?
3 A. That is not -- that is not in the letter.
4 Q. Okay. And speaking of the lien on the casino revenue,
5 what is your understanding of how the lien on casino
6 revenue arose? It arose from the agreement that we
7 just looked at, correct?
8 MR. JURGENS: Objection to form.
9 MR. SHUMAKER: Objection to form.
10 A. My understanding is that the 2009 collateral agreement
11 was entered into to address a default under the 2005
12 and 2006 Swaps, and that as a consequence of that,
13 there were allegedly liens based upon the casino
14 revenue.
15 BY MS. GREEN:
16 Q. Okay. But was there a lien prior to the collateral
17 agreement that was entered into in 2009?
18 MR. JURGENS: Objection to form.
19 MR. SHUMAKER: Objection to foundation.
20 A. Without getting into legal conclusion as to whether or
21 not there was a lien, to the best of my knowledge, the
22 answer is no.
23 BY MS. GREEN:
24 Q. Okay. So suffice it to say that the lien would not
25 exist but for the 2009 collateral agreement that was

1 entered into, correct?
2 **MR. JURGENS:** Objection to form.
3 **MR. SHUMAKER:** Objection, form.
4 **A. Here again, as I've said a couple of times today, I'm**
5 **going to stay away from legal conclusions as to**
6 **whether or not a lien would or would not have existed.**
7 **There are equitable liens that arise ex contractu**
8 **outside of law. There are other issues, but suffice**
9 **it to say this agreement seemed to impose a lien as a**
10 **matter of equity on the casino revenue.**
11 **BY MS. GREEN:**
12 Q. Okay. You're not claiming any equitable lien?
13 **MR. JURGENS:** Objection.
14 **A. We're not claiming a lien. We've done an analysis,**
15 **and there have been several memos that have gone back**
16 **and forth from counsel analyzing a number of different**
17 **issues at law and at equity. We -- there's -- me,**
18 **personally, under our agreement, there's no -- been no**
19 **assertion of an equitable lien.**
20 **MS. GREEN:** I have nothing further then.
21 **THE WITNESS:** Sure.
22 Do you need -- you need this, don't you?
23 Is this -- did you -- excuse me. Did you mark this?
24 **MS. GREEN:** We can mark it as an exhibit.
25 I don't know that anyone has marked it yet. We can

1 mark it as Exhibit 7.
2 **MARKED FOR IDENTIFICATION:**
3 DEPOSITION EXHIBIT 7
4 3:20 p.m.
5 (Discussion off the record at 3:20 p.m.)
6 (Back on the record at 3:20 p.m.)
7 **MS. GREEN:** I thought maybe it was earlier
8 and I just didn't know.
9 **THE WITNESS:** No, I don't think it was.
10 **MS. GREEN:** It's hard to hear down there.
11 **THE WITNESS:** We talked about the
12 collateral agreement.
13 **MS. GREEN:** We did. Okay.
14 **VIDEO TECHNICIAN:** Do we need to go off the
15 record for the second or are we staying on? Are you
16 asking questions?
17 **MS. GREEN:** Oh, were we on?
18 **THE WITNESS:** We can shut up.
19 **MR. SHUMAKER:** Why don't we go off for one
20 minute to get ourselves together.
21 **VIDEO TECHNICIAN:** All right. Thank you.
22 The time is 3:20 p.m. We are off the
23 record.
24 (Recess taken at 3:20 p.m.)
25 (Whereupon Lally Gartel and Stephen Hackney

1 left the deposition at 3:21 p.m.)
2 (Back on the record at 3:22 p.m.)
3 **VIDEO TECHNICIAN:** We are back on the
4 record at 3:22 p.m.
5 **EXAMINATION**
6 **BY MR. GOLDBERG:**
7 Q. How are you doing, Mr. Orr?
8 **A. Hello, Mr. Goldberg. How are you?**
9 Q. We met before. I'm Jerome Goldberg. I represent
10 David Sole, who's an interested party, he's a retiree,
11 along with his wife, who's also a retiree.
12 **MR. GOLDBERG:** First of all, I want to just
13 go on the record and thank Kirkland & Ellis and the
14 other attorneys for their patience and their working
15 with other attorneys in this case, and especially
16 someone like me who represents a very different point
17 of view and that they were objective and fair their --
18 in accommodating all the objectives here.
19 **BY MR. GOLDBERG:**
20 Q. Let me begin by asking just a few questions just so we
21 can put some of this into perspective. I want to call
22 your attention to Exhibit 3.
23 **A. Yes. Okay.**
24 Q. On page 34 of Exhibit 3, there's a chart here that
25 references expenditures from the years 2008 to 2012?

1 **A. Yes.**
2 Q. And it indicates -- first of all, I just had a
3 question. Under the POCs, it has POC Swap GF, I
4 assume that means general fund?
5 **MR. SHUMAKER:** Counsel, I think you may be
6 pointing to a different page than the witness has in
7 front of him.
8 **BY MR. GOLDBERG:**
9 Q. It's page 34 in mine. Which one did I give you? I'm
10 talking about the June 14th, 2013.
11 **MR. SHUMAKER:** Yeah, there's an executive
12 summary and then there's a bigger one. Are you
13 looking at the bigger one?
14 **MR. GOLDBERG:** I have copies of what I'm
15 looking at.
16 **A. These are the executive summaries.**
17 **MR. GOLDBERG:** Why don't I mark these and
18 that will make it easier.
19 **THE WITNESS:** And the larger one is this
20 one.
21 **MR. SHUMAKER:** The larger one is Orr
22 Number 6. Take a look at that.
23 **MR. GOLDBERG:** Sure. Yeah, this is the one
24 I'm looking at.
25 **THE WITNESS:** That's the one, the larger

1 one.
2 BY MR. GOLDBERG:
3 Q. Okay. So Exhibit Number 6.
4 A. Okay. Mr. Goldberg, which page were you at?
5 Q. Page 34.
6 A. Of the original document?
7 Q. Yes.
8 A. Okay.
9 Q. Here we go, that chart, 34. And it's a chart that
10 says study that -- lists for fiscal years ended actual
11 expenditures for 2008 to 2012; is that correct?
12 A. Yes.
13 Q. I just want to be clear. It has under POC Swaps GF.
14 That means general fund?
15 A. Yes.
16 Q. EF, is that enterprise fund?
17 A. Enterprise fund excluding department of
18 transportation.
19 Q. And I'm trying to understand, does that mean that part
20 of the POC Swaps are paid -- a small part is paid from
21 the enterprise fund?
22 A. Yes. You'll see the corresponding numbers show for
23 those categories.
24 Q. Okay. And I totaled up the years from 2008, 2012. It
25 appears that $247.5 million was paid on for the POC

1 Swaps during those years.
2 A. I don't have that total in front of me, but I'm going
3 to take it that that's the accurate number.
4 Q. It appears that it's usually about between 45 to 50
5 million a year.
6 A. Right, if you average 5, 10, 15, 20.
7 Q. Just so we're clear, I mean, that 247 million, none of
8 that went to turn on any lights in the City of
9 Detroit, did it?
10 MR. SHUMAKER: Object to the form.
11 A. It was legacy expenditures, debt service.
12 BY MR. GOLDBERG:
13 Q. It basically went to UBS and to Bank of America. It
14 was their reward for betting correctly on a hedge bet,
15 right?
16 MR. JURGENS: Objection to form.
17 MR. SHUMAKER: Objection to form.
18 A. Yeah, I'm going to stay away from characterizing it as
19 a reward. There were payments made pursuant to
20 existing certificates of participation at that time.
21 BY MR. GOLDBERG:
22 Q. And it was based on, as we talked about before, that
23 the difference between the interest rate on the
24 floating rate Swaps -- on the floating rate COPs and
25 the fixed rate that the -- that the City was obligated

1 to pay the Swap counterparties, correct?
2 A. Yes --
3 MR. SHUMAKER: Objection to form.
4 A. -- as we discussed earlier today.
5 BY MR. GOLDBERG:
6 Q. Just so I'm clear, the -- what we're talking about
7 with the optional termination event. The exhibit --
8 the same exhibit you're referencing -- let's just get
9 this -- I want to call your attention to page 28.
10 A. Of the same exhibit?
11 Q. Same exhibit.
12 A. Okay.
13 Q. Am I correct in the -- that that reflects that as of
14 May 31, 2013, according to your proposal for
15 creditors, the negative fair value of the Swaps was
16 $343.6 million?
17 A. That's what it says. Recent valuations established
18 the negative fair value --
19 COURT REPORTER: I'm sorry. You're reading
20 way too fast.
21 THE WITNESS: I'm sorry.
22 A. Recent valuations established. The negative fair
23 value of the Swaps at approximately 343.6 million as
24 of May 31st.
25 BY MR. GOLDBERG:

1 Q. So in the optional termination policy that's part of
2 the forbearance agreement, if the City was to pay the
3 initial payment, the City would still owe 264 -- we'd
4 be paying 264 million approximately on the Swaps?
5 MR. SHUMAKER: Objection to form.
6 BY MR. GOLDBERG:
7 Q. We'd be paying 75 percent of whatever the termination
8 amount is at that point?
9 A. Well, it's 75 percent of termination amount at that
10 point, which I believe has since declined from
11 May 31st.
12 Q. Why do you say it's declined?
13 A. Because interest rates have shifted, and so at any
14 given time we'd have to value the interest rate
15 formula at the time you choose to exercise the
16 optional termination provision of the forbearance
17 agreement.
18 Q. The interest rate that we're talking about on the Swap
19 is linked to the LIBOR; isn't that correct?
20 A. Yes.
21 Q. The three-month LIBOR?
22 A. Yes. I believe so.
23 Q. I pulled the three-month LIBOR historical index. It
24 indicated that as of -- might as well as mark this as
25 an exhibit.

1   MR. GOLDBERG: Can you mark this as an
2   exhibit?
3   **MARKED FOR IDENTIFICATION:**
4   **DEPOSITION EXHIBIT 8**
5   **3:29 p.m.**
6   **BY MR. GOLDBERG:**
7   Q.   It appears that as of August of 2013, the three-month
8   LIBOR rate was .2655 percent?
9   **MR. SHUMAKER: Objection, foundation.**
10  **A.   Is there -- if you're talking about --**
11  **BY MR. GOLDBERG:**
12  Q.   Under 2013.
13  **A.   2013, a specific category in August which reads**
14  **0.26550.**
15  Q.   Right.  So it's actually gone down since July of 2013
16  according to this chart.
17  **A.   Yes.  Did I say up before?**
18  Q.   You had indicated that the interest rates -- right,
19  that the -- I mean, if it goes down, the City owes
20  more; isn't that correct?
21  **A.   Right.**
22  Q.   Just so we're clear again, that 200 -- whatever --
23  whether the figure is 247 million or 200 million, the
24  optional termination payment is not going to be -- the
25  City gets no direct benefit from that payment?

1   **MR. JURGENS: Objection.**
2   **MR. SHUMAKER: Objection to form.**
3   **A.   Well --**
4   **BY MR. HACKNEY:**
5   Q.   Let me be -- strike that question.
6        No lights get turned on from that money.
7   That's money that comes out of the City budget.
8   **MR. SHUMAKER: Same objection.**
9   **A.   Well, it's money -- yeah, I would say that it's money**
10  **that the City is obligated to pay in some fashion, but**
11  **to the extent we get a discount, the City benefits.**
12  **BY MR. GOLDBERG:**
13  Q.   I heard before the testimony, and I think it's pretty
14  obvious, that the City does not have the money on hand
15  to pay that termination amount, correct?
16  **MR. JURGENS: Objection to form.**
17  **A.   Yes, I'm told that is correct.**
18  **BY MR. GOLDBERG:**
19  Q.   And to do so it's going to have to float another bond
20  or some kind of loan?
21  **A.   Well, it would have to in some fashion derive some**
22  **funding from the capital markets, yes.**
23  Q.   Okay.  I read something, and I heard the same figures
24  floated here.  I read an article in the Detroit News
25  and I heard the same -- I wasn't able to come

1   yesterday due to an illness of my wife, but --
2   A.   Oh, I'm sorry.
3   Q.   -- they were talking about a $350 million bond of some
4   kind that is being looked into being floated, correct?
5   **A.   Here again, I want to be careful.  It's unclear**
6   **whether or not it is a bond.**
7   Q.   Okay.
8   **A.   What is clear is there's some post petition financing**
9   **proposal which are quite sensitive, but that number is**
10  **not an unreasonable number and it has been mentioned**
11  **about in the press.**
12  Q.   And is it reasonable to say that that 2 -- 350 million
13  is not going to come free to the City?
14  **A.   No.  The City will have to finance it in some fashion.**
15  Q.   I mean, I did a little research myself and looked up a
16  bond in Ann Arbor that was recently financed for
17  340 million at 4 percent which is, I would think we
18  both agree, was a good interest rate --
19  **A.   Um-hm.**
20  Q.   -- and the -- Ann Arbor would be paying 230 million in
21  interest on that bond over a 25-year period.
22  **A.   Here again, Mr. Goldberg, I want to be very careful.**
23  **Without representing or agreeing that the post**
24  **petition financing that's being discussed will take**
25  **the characteristic of a bond.**

1   Q.   No problem.  But either way, we are in agreement that
2   that financing -- we don't have -- the City does not
3   have a source for -- it doesn't have a relationship
4   with the Fed that the banks have where it gets a zero
5   qualitative easing and zero percent loans, does it?
6   **A.   The City does not -- is not a qualified financial**
7   **institution to go to the Fed discount window nor does**
8   **it have an extra several hundred million dollars in**
9   **its funds.**
10  Q.   Let me ask another question.  I want to call your
11  attention to the forbearance agreement.
12  **A.   Yes.**
13  Q.   Which exhibit is that?
14  **A.   That's Exhibit 2.**
15  Q.   Let me call your attention to page 14.
16  **A.   Yes.**
17  Q.   And it indicates under mid-market amount --
18  **A.   Yes.**
19  Q.   -- am I reading it correctly to say that the -- when
20  the optional termination goes into effect, assuming it
21  goes into effect, that the calculation on what's owed
22  on the Swap that's the basis for the termination is
23  based on the ISDA fix 3?
24  **MR. SHUMAKER: Objection to form.  The**
25  **document speaks for itself.**

1    BY MR. GOLDBERG:

2 Q.  Okay.

3 A.  Yeah, here again, the document speaks to itself and it

4    says methodology that is agreed to by the City and

5    based upon the present value as it speaks to the rest

6    of the document, yes.

7 Q.  Have you looked into the fact that there's a lot of

8    literature out now that's exposing a pretty large

9    scandal with reg -- regard to the ISDA fix that

10   involves and implicates both Bank of America and UBS?

11    MR. JURGENS: Object to form.

12 A.  Without characterizing the nature of the literature, I

13   think it's safe to say that I am aware of some issues

14   that have been discussed regarding ISDA, fixed.

15    BY MR. GOLDBERG:

16 Q.  Are you aware also of issues that have come out with

17   regard to the LIBOR, specifically with regard to UBS

18   and Bank of America in the setting of using the LIBOR

19   as a standard?

20    MR. JURGENS: Objection to form.

21 A.  I am aware that in the past years there have been some

22   questions raised regarding the LIBOR for certain

23   financial institutions, yes.

24    BY MR. GOLDBERG:

25 Q.  Has that affected your analysis of how to deal with

1    the Swap counterparties in terms of the -- the

2    forbearance agreement?

3 A.  No.

4 Q.  The fact that it's potential fraud was involved in the

5    setting of these --

6    MR. JURGENS: Objection to form.

7    MR. SHUMAKER: Objection to form.

8 A.  Mr. Goldberg, I'm going to defer from accepting the

9    characterization of potential fraud.  It is -- it is

10   as reported.

11    BY MR. GOLDBERG:

12 Q.  Okay.  That's fine.

13   Are you also aware that the -- that UBS

14   was -- let me find that.

15   Are you aware that UBS has been sued by the

16   Securities and Exchange Commission for rigging in

17   regard to municipal bonds?

18 A.  In past years?

19 Q.  That there was a final judgment -- yes, in past years.

20 A.  Yes.

21 Q.  Are you aware of the final judgment that was -- there

22   was a final judgment on a case that was filed on --

23   it's 112539 -- that -- and that one of the bonds that

24   actually was involved in that case was the Detroit

25   water and sewage bond case?

1 A.  I had heard that.  I have not read the final judgment.

2 Q.  Well, I'd be glad to pass you down a copy.

3    MR. GOLDBERG: Why don't we mark this.

4    MARKED FOR IDENTIFICATION:

5    DEPOSITION EXHIBIT 9

6    3:36 p.m.

7    BY MR. GOLDBERG:

8 Q.  Are you also aware that Bank of America has been

9    investigated for potential rigging with regard to the

10   municipal bond market?

11    MR. JURGENS: Objection to form.

12 A.  I am aware that Bank of America has been investigated.

13   The exact specifics of the investigation I am not

14   aware of.

15    BY MR. GOLDBERG:

16 Q.  In light of these investigations that deal with

17   rigging of the municipal bond market, was that taken

18   into consideration by the City in how to approach the

19   question of this forbearance agreement and potential

20   action on these Swaps?

21 A.  Perhaps you could be more specific in what way you're

22   asking whether that was taken into consideration.

23 Q.  I mean, if there, in fact, was fraud -- based on the

24   fact there's at least an indication of fraudulent

25   activity by both Bank of America and UBS within the

1    municipal bond market, has there been any

2    investigation as to whether or not that was the case

3    with -- with regard to the Swaps associated with the

4    POCs?

5    MR. JURGENS: Objection to form.

6    MR. SHUMAKER: Objection to form,

7    foundation.

8 A.  Yeah, first, it's not clear that there was fraud with

9    respect to POCs.  I think your prior question

10   concerning Bank of America concerned bonds at DWSD

11   that as my understanding are not implicated by this

12   process, meaning the forbearance agreement, but have

13   we calculated and analyzed the possibility that there

14   may be issues surrounding potential concerns in

15   connection with the Swap agreement, the answer is yes.

16    BY MR. GOLDBERG:

17 Q.  And who was -- who were those discussions with in

18   terms of whether or not to pursue that?

19 A.  I would have had discussions with my counsel.

20 Q.  When you say your counsel, who do you mean?

21 A.  My attorneys.

22 Q.  Jones Day, is that --

23 A.  Well, Jones Day.  We also have local counsel that's

24   involved that's sitting here, Pepper Hamilton, and

25   others.

1 Q. I mean, isn't Jones Day -- doesn't Jones Day represent
2 this Bank of America as one of its clients on its Web
3 site?
4 A. Yes, Jones Day does represent Bank of America.
5 Q. How could Jones Day investigate one of its own clients
6 for potential fraud?
7    MR. SHUMAKER: Objection, form.
8    MR. JURGENS: Objection, form.
9 A. I am today, Mr. Goldberg, a client of Jones Day. The
10 specific practices of Jones Day regarding its
11 investigations, I would suggest that you refer to
12 them.
13    BY MR. GOLDBERG:
14 Q. Okay. I'm just saying you utilize them --
15 A. Yes, I do.
16 Q. -- for their -- for their advice on whether or not to
17 conduct such an investigation. I'm trying to ask you
18 as your -- in your independent position as emergency
19 manager, wouldn't you think that a law firm that
20 represents the precise person you're asking to
21 investigate for fraud could not give you an
22 objective appraisal?
23 A. No.
24    MR. JURGENS: Objection to form.
25    MR. SHUMAKER: Objection to form.

1 A. No. In my experience, having worked now at three
2 different law firms, I have seen situations where law
3 firms are fully capable of investigating clients, yes.
4    BY MR. GOLDBERG:
5 Q. Are you aware that three executives of UBS were in --
6 recently jailed that -- who were involved in municipal
7 bond division were recently jailed?
8 A. I'm aware that there were prosecutions related to UBS.
9 I wasn't aware of the exact number or who they are.
10 Q. Okay. I do have -- now, I'm not privy to much on that
11 either, but I do have articles that do cite that.
12 A. Okay.
13 Q. And they cited three people who were just convicted in
14 July of this year.
15 A. Okay.
16 Q. Are you aware that Bank of -- an executive of Bank of
17 America in its municipal bond division was indicted in
18 2012?
19 A. I don't recall if I was aware of that.
20 Q. Okay. Let me just ask under -- pursuant to the Public
21 Act 436 section 13 -- section 16, aren't you mandated
22 to conduct a criminal investigation, or at least to
23 refer potential suspicion of criminal investigation to
24 the Attorney General in connection with -- if there's
25 any kind of criminal activity associated with the

1 financial crisis in Detroit?
2 A. Yes. To be clear, under 436 I have no independent
3 prosecutorial authority, but I do have the authority
4 to make criminal referrals to appropriate
5 prosecutorial authorities.
6 Q. In light of the cost to the City of the Swaps and the
7 continuing costs, which we all acknowledge will be
8 substantial even in light of the forbearance
9 agreement, have you made any referral to at least do
10 a -- conduct an investigation based on the evidence
11 that, that -- I'm not accusing them of criminal
12 activity in these activities. I have no basis for
13 doing that, but on the other hand that fact that
14 their -- some of their top executives in this area
15 have been convicted would at least lead me to want to
16 take a look at that in light of Detroit's situation.
17    MR. JURGENS: Objection to form.
18    MR. SHUMAKER: Objection, form.
19 A. Yeah, it is a run-on question, Mr. Goldberg, but let
20 me say this. We are -- we have an -- analyzed to the
21 degree and looked at everything significantly related
22 to this transaction. Any --
23    BY MR. GOLDBERG:
24 Q. Have or have not? I'm sorry.
25 A. We have. We have.

1 Q. Okay.
2 A. If there appears to be a basis for making a criminal
3 referral of any kind related to anything that falls
4 under my purview of 436, I will do that.
5 Q. But at this point nothing -- there hasn't even been a
6 request for such an investigation?
7 A. I would be careful about -- I -- I have asked -- there
8 are matters that are under investigation that may or
9 may not implicate the subject matters you're talking
10 about. I'm going to defer to speak about them
11 further.
12 Q. Okay. Are you familiar with the circumstances that
13 led to the 2005 Swap?
14 A. I'm familiar with what I've read. I wasn't here in
15 the City at the time.
16 Q. Do you know why Moody's -- not Moody's -- Fitch and
17 Standard & Poor's would have been at the table along
18 with UBS when this -- when this was discussed?
19 A. First, I don't know that they were at the table and,
20 secondly, if they were, I do not know why they would
21 have been.
22 Q. Well, I do have a photograph of them at the table
23 which I'd be glad to share with you --
24 A. Okay.
25 Q. -- from the Michigan Citizen. It was taken at that

time. Let me see if I can find that.
**MR. GOLDBERG:** Here, I can mark this.
**MARKED FOR IDENTIFICATION:**
DEPOSITION EXHIBIT 10
3:43 p.m.
**BY MR. GOLDBERG:**
Q. This is a photograph taken by the -- it was in the Michigan Citizen July 31st, 2005, it reflects a picture of Sha -- Sean Werdlow, Stephen Murphy of Standard & Poor -- Poor's, Joe Keefe -- Joe O'Keefe of Fitch, the Deputy Mayor, Anthony Adams, and the -- and the -- and -- and the representative of SBS at the table.
**MR. SHUMAKER:** Is there a question?
**BY MR. GOLDBERG:**
Q. Sure. I was asking why would Moody -- why would Standard & Poor and Fitch be at the table?
**MR. SHUMAKER:** Objection, foundation, form, document speaks for itself.
**A. Yeah, Mr. Goldberg, this purports to be a document showing some of these members at counsel table. I have no idea -- I wasn't here, and I have no idea what the discussions were and whether or not it's accurately represented to be something related to this. This document speaks for itself.**

**BY MR. GOLDBERG:**
Q. So you haven't done really any substantive investigation on what the circumstances were that -- that why -- that put the City into the pension obligations with certificates and Swap --
**MR. SHUMAKER:** Objection to form.
**BY MR. GOLDBERG:**
Q. -- when they first were initiated in 2005?
**A. Yeah, all I can say is this -- this picture appears to be what it purports to be and speaks for itself. I don't know if it's accurate or not.**
Q. Let me just ask one quick -- that I was kind of curious about, personally. It appears that there was -- the first COP and Swap was in 2005. Then they were terminated and a new one -- new COPs and Swaps were placed in 2006. Is that your understanding?
**A. I don't know if that's my understanding. I know there were -- there were two series that went on. I'm going to be careful with the question of replacing them, but let's go with your question.**
Q. Okay. I guess my curiosity is why the banks would pay a termination fee of 2.7 million, according to those documents, to the City to then have them renegotiate -- replaced?
**A. Mr. Goldberg --**

**MR. SHUMAKER:** Object to form, foundation.
**A. I wasn't here in the City at the time. I have no idea.**
**BY MR. GOLDBERG:**
Q. Okay. That's fine.
Have you approached the Securities and Exchange Commission to conduct any kind of investigation of the Swaps in light of their extensive investigations of UBS and Bank of America?
**MR. JURGENS:** Objection to form.
**A. Yeah, here again, any -- your question is have I? I think I can answer your question. I think the answer is no.**
**BY MR. GOLDBERG:**
Q. Okay. And you haven't approached them to intervene in the bankruptcy which they have a right to do as we both know under the bankruptcy code?
**A. I would hazard a guess that the Security and Exchange Commission is aware of Detroit's bankruptcy.**
Q. But you have not approached them to aid you in doing a proper investigation of the Swaps?
**A. No. I -- I think they're fully capable of determining what they should do within their mission.**
Q. Have you looked into the mortgage practices of Bank of America that -- in light of the financial crisis of

Detroit?
**MR. JURGENS:** Objection to form.
**MR. SHUMAKER:** Objection to form.
**MR. ESSAD:** Objection to relevance.
**A. I don't think my duties under 436 would specify to look into the mortgage crisis, so the answer is no.**
**BY MR. GOLDBERG:**
Q. But you would agree with me that the mortgage crisis and the subprime lending crisis is a major contributor to Detroit's financial crisis, would you not?
**MR. SHUMAKER:** Objection to form, foundation.
**A. Mr. Goldberg, I don't know if it was or wasn't.**
**BY MR. GOLDBERG:**
Q. You don't know if it was or it wasn't?
**A. No. I've -- I've heard reports that there was disproportionate mortgage foreclosures and so on and so forth, but I've made no conclusion as to whether or not that was a major contributor to Detroit's financial crisis.**
Q. I've got you. Well, let me -- let me run this --
(Whereupon Vincent Marriott and Matthew Summers left the Deposition at 3:47 p.m.)
**MS. ENGLISH:** Can we go off the record for one second, please?

Page 333

1    **VIDEO TECHNICIAN:** We are off the record.
2    The time is 3:47.
3    (Recess taken at 3:47 p.m.)
4    (Back on the record at 3:48 p.m.)
5    **VIDEO TECHNICIAN:** Back on the record at
6    3:48 p.m.
7    BY MR. GOLDBERG:
8    Q.   I'm sorry, I didn't bring that report with me.
9    So your public -- your statement to me is
10   you're not clear whether the subprime mortgage crisis
11   in Detroit was a factor in Detroit's financial crisis?
12   A.   No.  My statement --
13       **MR. SHUMAKER:** Objection to form.
14   A.   My statement to you -- I believe your question was,
15   was it a major factor, and I said I understand there
16   have been reports, allegations, and stories that there
17   was disproportionate mortgage foreclosure in the City
18   of Detroit.  I don't know if that was a major factor
19   in its financial crisis.
20   BY MR. GOLDBERG:
21   Q.   And you haven't looked into that issue independently?
22   A.   No, I've not looked into it independently.
23   Q.   Even though the banks -- the same banks that are
24   claiming all these Swaps were directly involved in the
25   subprime mortgage crisis?

Page 334

1        **MR. JURGENS:** Objection to form.
2    A.   Here again, your characterization was directly
3    involved.  My mission in this forbearance agreement is
4    look at whether or not this is in the best interest of
5    the City at the time.
6    BY MR. GOLDBERG:
7    Q.   Sure.
8    A.   It seems to be as you and I have discussed before,
9    several times now, that you have expressed concerns
10   about a broader issue regarding banks involvement with
11   the mortgage foreclosure crisis in the City of
12   Detroit.  In my opinion, that's not directly related
13   to the issue that we have at hand in the forbearance
14   agreement.
15   Q.   Let me just ask you one other question.  We've been
16   talking about alternative sources of financing.
17   You're familiar with the last CAFR?
18   A.   Yes.
19   Q.   Are you familiar with the -- what the 82 million in
20   chargebacks means in this CAFR that the City is
21   paying?
22   A.   Yes, I think I have some understanding.
23   Q.   What is your understanding of it, sir?
24   A.   That there's a certain obligation on the City to pay
25   some money out based upon an analysis of either

Page 335

1    overcharges or obligations that it has to other --
2    other organizations and entities.
3    Q.   Are you aware that chargebacks specifically deal with
4    chargebacks to the County that the County buys -- pays
5    the City for foreclosed tax -- foreclosed properties,
6    then sells them, and the City is responsible for the
7    difference between what they're sold for and what
8    the -- what originally was paid to the City?
9    A.   Yes, as I said --
10       **MR. SHUMAKER:** Objection, form, foundation.
11   A.   As I said, it's a process by which the City has
12   obligations to other organizations and entities.
13   BY MR. GOLDBERG:
14   Q.   Are you aware that the state has hundreds of -- at
15   least 200 million dollars available in the Hardest --
16   Helping Hardest Hit funds that could be used to pay
17   off delinquent property taxes?
18   A.   I've heard that representation before in terms of the
19   Hardest Hit funds.  What I am aware of is that the
20   City is entitled to get 52 million dollars of the
21   late -- latest one hundred million dollar transfer of
22   the Hardest Hit funds for blight remediation.
23   Q.   That's true.  Which affects -- affects your general
24   proposal in terms of the cost of blight, correct?
25   A.   Well, it helps us in terms of getting at the cost of

Page 336

1    blight as quickly as possible.
2    Q.   But my question was a little different on that.
3    A.   Um-hm.
4    Q.   Have you intervened with Governor Snyder who you --
5    who you're -- your appointor --
6    A.   Right.
7    Q.   -- to secure the release of these Hardest Hit funds to
8    pay off property taxes which would both stabilize
9    communities to keep people in their homes and
10   stabilize the City budget by avoiding the need to pay
11   80 million in chargebacks?
12       **MR. SHUMAKER:** Objection, foundation.
13   A.   It is not -- it is not -- it has been made clear to me
14   that it is not clear to me that, one, we'd have access
15   to those funds and that those funds can be
16   appropriately used for that purpose.
17   BY MR. GOLDBERG:
18   Q.   It's not?
19   A.   It's -- it's not clear.  That's --
20   Q.   Well, I'll send you some literature on that so you can
21   clarify that.
22   A.   Okay.
23       **MR. GOLDBERG:** Okay.  Okay.  Thank you very
24   much.
25       **THE WITNESS:** Thank you very much.

Page 337

1      **VIDEO TECHNICIAN:** All set?
2      **THE WITNESS:** All done? Okay. Thank you
3   very much.
4      **VIDEO TECHNICIAN:** This concludes today's
5   deposition. The time is 3:52 p.m. We are off the
6   record.
7      (The deposition was concluded at 3:52 p.m.
8      Signature of the witness was not requested by
9      counsel for the respective parties hereto.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 338

1                    CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN )
3                    ) SS
4   COUNTY OF OAKLAND)
5
6        I, CYNTHIA C. MENDENHALL, certify that this
7      deposition was taken before me on the date
8      hereinbefore set forth; that the foregoing questions
9      and answers were recorded by me stenographically and
10     reduced to computer transcription; that this is a
11     true, full and correct transcript of my stenographic
12     notes so taken; and that I am not related to, nor of
13     counsel to, either party nor interested in the event
14     of this cause.
15
16
17
18
19
20
21
22          CYNTHIA C. MENDENHALL, CSR 5220
23               Notary Public,
24               Oakland County, Michigan.
25   My Commission expires: April 5, 2017

# **EXHIBIT 6**

*Deposition Transcript of Kenneth Buckfire from August 29, 2013.*

*(Objectors' designations highlighted in yellow;*
*City's counter-designations highlighted in blue)*

# In The Matter Of:

*City of Detroit*

---

*Kenneth Buckfire*
*August 29, 2013*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File BUCKFIRE_KENNETH.txt*
*Min-U-Script® with Word Index*

## Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
 2          FOR THE EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4
 5   In Re:
 6
 7   CITY OF DETROIT, MICHIGAN   Chapter 9
 8                        Case No.13-53846
 9          Debtor.          Hon. Steven Rhodes
10                             /
11
12
13       The Video Deposition of KENNETH BUCKFIRE,
14       Taken at 1114 Washington Boulevard,
15       Detroit, Michigan,
16       Commencing at 9:31 a.m.,
17       Thursday, August 29, 2013,
18       Before  Nora Morrissy, RMR, CRR, CSR-2642.
19
20
21
22
23
24
25
```

## Page 2

```
 1   APPEARANCES:
 2
 3   THOMAS CULLEN, JR.
 4   BENJAMIN ROSENBLUM
 5   Jones Day
 6   51 Louisiana Avenue N.W.
 7   Washington, D.C. 20001
 8   202.879.3939
 9       Appearing on behalf of the City of Detroit.
10
11   MATTHEW G. SUMMERS
12   Ballard Spahr, LLP
13   919 North Market Street, 11th floor
14   Wilmington, Delaware 19801
15   302.252.4465
16       Appearing on behalf of EEPK.
17
18   STEPHEN HACKNEY
19   LALLY GARTEL
20   Kirkland & Ellis, LLP
21   300 North LaSalle
22   Chicago, Illinois 60654
23   312.862.2157
24       Appearing on behalf of Syncora.
25
```

## Page 3

```
 1   JENNIFER GREEN
 2   FRANK GUADAGNINO
 3   Clark Hill, P.L.C.
 4   500 Woodward Avenue, Suite 3500
 5   Detroit, Michigan  48226-3435
 6   313.965.8300
 7       Appearing on behalf of Police and Fire Retirement
 8   System and Police and Fire General Retirement System.
 9
10   KELLY DIBLASI
11   Weil, Gotshal & Manges, LLP
12   767 Fifth Avenue
13   New York, New York 10153
14   212.310.8032
15       Appearing on behalf of Financial Guaranty Insurance
16   Company.
17
18   ERNEST J. ESSAD, JR.
19   Williams, Williams, Rattner & Plunkett, P.C.
20   380 North Old Woodward, Suite 300
21   Birmingham, Michigan  48009
22   248.642.0333
23       Appearing on behalf of Financial Guaranty Insurance
24   Company.
25
```

## Page 4

```
 1   KAREN NEWBURY
 2   Schiff Hardin, LLP
 3   233 South Wacker Drive, Suite 6600
 4   Chicago, Illinois 60606
 5   312.258.5522
 6       Appearing on behalf of Depfa Bank, PLC, as agent for
 7   DFS WertManagement.
 8
 9   CAROLINE TURNER ENGLISH
10   Arent Fox, LLP
11   1717 K Street, NW
12   Washington, D.C. 20036
13   202.857.6000
14       Appearing on behalf of Ambac.
15
16   BIANCA FORDE
17   Winston & Strawn, LLP
18   200 Park Avenue
19   New York, New York 10166
20   212.294.4733
21       Appearing on behalf of Assured Municipal Guaranty
22   Corp.
23
24
25
```

## Page 5

1 JASON JURGENS
2 Cadwalader, Wickersham & Taft, LLP
3 One World Financial Center
4 New York, New York 10281
5 212.504.6102
6 Appearing on behalf of Merrill Lynch Capital Services.
7
8
9 GUY S. NEAL
10 Sidley Austin, LLP
11 1501 K. Street, N.W.
12 Washington, D.C. 20005
13 202.736.8041
14 Appearing on behalf of National Public Finance
15 Guarantee Corp.
16
17 STEVEN WILAMOWSKY
18 Bingham McCutchen, LLP
19 399 Park Avenue
20 New York, New York  10022
21 212.705.7960
22 Appearing on behalf of UBS.
23
24   **ALSO PRESENT:**
25 Bailey Wellman, Video Technician

## Page 7

1 DEPOSITION EXHIBIT 1          8
2 DEPOSITION EXHIBIT 2          21
3 DEPOSITION EXHIBIT 3          43
4 DEPOSITION EXHIBIT 4          80
5 DEPOSITION EXHIBIT 5          170
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 6

1   TABLE OF CONTENTS
2
3 Witness                              Page
4 KENNETH BUCKFIRE
5
6 **EXAMINATION**
7   **BY MR. SUMMERS:** 8
8 **EXAMINATION**
9   **BY MR. HACKNEY:** 108
10 **EXAMINATION**
11   **BY MS. DIBLASI:** 165
12 **EXAMINATION**
13   **BY MS. ENGLISH:** 171
14 **EXAMINATION**
15   **BY MS. FORDE:** 189
16 **EXAMINATION**
17   **BY MS. GREEN:** 202
18 **EXAMINATION**
19   **BY MS. NEWBURY:** 204
20
21   EXHIBITS
22
23 Exhibit                              Page
24 (Exhibits retained by counsel.)
25

## Page 8

1 Detroit, Michigan
2 Thursday, August 29, 2013
3   9:31 a.m.
4
5   **MARKED FOR IDENTIFICATION:**
6 DEPOSITION EXHIBIT 1
7   9:21 a.m.
8   **VIDEO TECHNICIAN:** We are now on the
9 record.  This is the videotaped deposition of Kenneth
10 Buckfire being taken on Thursday, August 29th, 2013.
11 The time is now 9:31 a.m.  We are located at 1114
12 Washington Boulevard, Detroit, Michigan.
13   We are here in the matter of In Re: City of
14 Detroit, Michigan case number 13-53846 in the United
15 States Bankruptcy Court, Eastern District of Michigan.
16   My name is Bailey Wellman, video
17 technician.  Will the court reporter please swear in
18 the witness.
19   KENNETH BUCKFIRE,
20 was thereupon called as a witness herein, and after
21 having first been duly sworn to testify to the truth,
22 the whole truth and nothing but the truth, was
23 examined and testified as follows:
24   **MR. SUMMERS:** Good morning.
25   **EXAMINATION**

Page 9

BY MR. SUMMERS:

1   BY MR. SUMMERS:
2   Q.   Mr. Buckfire, would you please state your name and
3   business address for the record?
4   A.   Kenneth Buckfire.  601 Lexington Avenue, New York, New
5   York.
6   Q.   For the record my name is Matthew Summers.  I'm an
7   attorney at Ballard Spahr in Wilmington, Delaware and
8   we represent the entity that's caused people a little
9   trouble with the name but we've been referring to it
10  as EEPK.
11      Mr. Buckfire, you understand the way a
12  deposition process works, correct?
13  A.   I believe so.
14  Q.   And you've been deposed on numerous occasions
15  previously, correct?
16  A.   Yes.
17  Q.   Because of that experience I just provide a few basic
18  ground rules that I will ask you to abide by today.
19  First if the question that I ask is not clear, please
20  let me know and I will attempt to rephrase it and if I
21  ask a question and you don't understand it but answer
22  it anyway, I would ask you not to do that but to ask
23  me to clarify and if you give me an answer, I will
24  assume you understood the question.
25      Second, because we are on the record and

Page 10

1   sometimes you will anticipate probably where I'm going
2   with the question or think that you anticipate, I
3   would ask that you to make the transcript clearer, I
4   will ask that you wait until I complete the question
5   before you begin your answer.
6   A.   Thank you.
7   Q.   Before you is what's been premarked as Deposition
8   Exhibit 1, and I assume you have seen this document
9   before, is that correct?
10  A.   No.
11  Q.   No.  Okay.  And it is the notice of deposition that
12  was issued that we are proceeding under today.  I'd
13  like to discuss initially with you the topics about
14  which you plan to testify at the hearing on the motion
15  to assume the forbearance and optional termination
16  agreement and prove the settlement therein.
17      Do you have in mind the topics that you
18  intend to testify at the hearing?
19  A.   Yes.
20  Q.   And can you provide those to me?
21  A.   The reason and purpose of the negotiation with the
22  Swap counterparties and the results thereof as
23  determined in the forbearance agreement itself, the
24  financial condition of the City that led us to believe
25  that this agreement was necessary to rehabilitate the

Page 11

1   City.  Prepared to testify to the general condition of
2   the City's financials leading up to the execution of
3   the forbearance agreement.
4   Q.   Are there any other topics that you intend to testify
5   at the hearing concerning the forbearance agreement?
6   A.   I'll testify at that point to the status of the DIP
7   form process that will provide the financing to
8   execute the City's option under the forbearance
9   agreement to retire the Swaps.
10  Q.   Are there any other topics that you have not mentioned
11  in your answers that you intend to testify about?
12  A.   I'm sure there will be other things but I can't recall
13  at this time what they might be.
14  Q.   Mr. Buckfire, what is your position with Miller
15  Buckfire?
16  A.   Co-founder and co-president of Miller
17  Buckfire & Company.
18  Q.   Miller Buckfire currently is employed as the financial
19  advisor to the City of Detroit, correct?
20  A.   As the investment banker to the City, that's correct.
21  Q.   And when was Miller Buckfire first engaged by the City
22  as investment banker?
23  A.   We were first engaged in July of 2012 for a 60-day
24  review of the City's financial condition.  We were
25  re-engaged on January 8th of this year to continue to

Page 12

1   advise the City on its financial condition and
2   financial alternatives.  Both were -- were hired
3   pursuant to an RFP process to which we submitted a
4   proposal.
5   Q.   When you were hired in July 2012, can you describe the
6   scope of services that Miller Buckfire was engaged to
7   provide?
8   A.   As I mentioned earlier, we were engaged to do a
9   general financial review of the City's financial
10  condition particularly with respect to its ability to
11  service its debt obligations.
12  Q.   Were there specific tasks that you were asked to
13  perform in connection with doing a general financial
14  review of the debt obligations?
15  A.   No, we were engaged to do a general financial review
16  and advise the mayor and the chief financial officer
17  as to what those financial conditions implied for the
18  City's ability to operate in the ordinary course.
19  Q.   That engagement began in July 2012 is what you
20  testified to, is that correct?
21  A.   Correct, and ended on August 31st.
22  Q.   Very good.  I would point out that I would ask you to
23  wait until I ask the question, though.
24      Miller Buckfire was then re-engaged on
25  January 8th of 2013, is that correct?

Page 13

1 **A.  Yes.**
2 Q.   Okay.  And can you give a list of the specific items
3   that you were asked or specific actions you were asked
4   to undertake for the City when you were re-engaged on
5   January 8th?
6 **A.  Well, it was a general financial advisory assignment**
7   **in some way similar to the assignment we had already**
8   **been hired for the previous year.**
9       **The scope was expanded at the mayor's**
10   **request and at the request of the CFO to review its**
11   **liquidity position in greater detail particularly**
12   **because of the continuation of the defaults the City**
13   **suffered under the Swap collateral agreement which put**
14   **the City's liquidity at risk if the Swap**
15   **counterparties were to exercise their remedies.  They**
16   **were very concerned about that and asked us to take**
17   **that into account.**
18 Q.  Were you at the time of your engagement expected to be
19   negotiating with creditors of the City?
20 **A.  Not at that time.**
21 Q.  Was there a time after January 2013 where the scope of
22   your engagement changed?
23 **A.  Yes.**
24 Q.  And at what time did the scope of engagement change?
25 **A.  Early May.**

Page 14

1 Q.  And who directed that the scope of the engagement
2   change?
3 **A.  The emergency manager, Mr. Orr.**
4 Q.  And can you explain how the scope of the engagement by
5   the City of Detroit changed?
6 **A.  Immediately after our re-retention by the City we**
7   **advised the mayor that in order to properly assess the**
8   **condition of the City and its options in order to deal**
9   **with that balance sheet, the City should engage other**
10   **professionals that could assist in developing a**
11   **reliable and long-term cash flow and financial**
12   **forecast.**
13       **Upon a recommendation E & Y, Ernst & Young,**
14   **which in working with the City in other activities for**
15   **several years was requested to begin developing that**
16   **forecast.**
17       **At the same time the City engaged the firm**
18   **of Conway MacKenzie, not at exactly that time, to**
19   **assist with operational analysis.**
20       **Ernst & Young was tasked with the**
21   **responsibility of developing a reliable short-term**
22   **cash flow forecast and a long-term ten-year forecast**
23   **that would allow us to have the evidence and the facts**
24   **on which to advise the City as to what its financial**
25   **options would be.**

Page 15

1   **That initial forecast was presented to us**
2   **and to the City I believe on May the 2nd or 3rd of**
3   **this year.  Upon receipt of that forecast it was clear**
4   **that the financial condition of the City was more dire**
5   **than I had expected and that, therefore, was**
6   **immediately necessary to begin planning for the**
7   **preservation of the City's cash flow given the**
8   **incredible risk the City was running during this year**
9   **of 2013.  And the forecast is what triggered the**
10   **expansion of the scope of our assignment.**
11 Q.  And did the scope of your assignment expand to include
12   negotiations with creditors of the City?
13 **A.  At that time it did but we did not initially engage in**
14   **negotiations with creditors at that time but it was**
15   **clearly anticipated given the results of the forecast**
16   **that attempting to achieve stability with our key**
17   **creditors and particularly Swap counterparties was**
18   **going to be a crucial element to the City's ability to**
19   **continue to operate in the ordinary course.**
20 Q.  And is it a fair statement that the scope of
21   engagement has expanded to include developing a plan
22   of adjustment for the City of Detroit?
23 **A.  Well, it did after that point, yes.**
24 Q.  And are you -- is Miller Buckfire engaged at this
25   point to work on developing or analyzing the potential

Page 16

1   for asset sales by the City?
2 **A.  Yes.**
3 Q.  And is Miller Buckfire also engaged at this point to
4   analyze financing options for the City?
5 **A.  Yes.**
6 Q.  When you were -- when Miller Buckfire was initially
7   retained in January of 2013, second time, who was
8   Miller Buckfire principally reporting to at the City?
9 **A.  Initially it was to Jack Martin, chief financial**
10   **officer, and Mayor Bing.**
11 Q.  And when Miller Buckfire was engaged in July of 2012,
12   who was Miller Buckfire principally reporting to?
13 **A.  Chris Anders (phonetic) and Mayor Bing.**
14 Q.  What is Mr. Anders position?
15 **A.  I believe he was chief of staff.**
16 Q.  Chief of staff --
17 **A.  Chief restructuring officer.**
18 Q.  Chief restructuring officer?
19 **A.  I believe that was his title.**
20 Q.  And did he work directly -- strike that.
21   Did he report directly to the mayor?
22 **A.  That's my understanding.**
23 Q.  Who in addition to you at Miller Buckfire is
24   performing services for the City?
25 **A.  Well, we have a very large team.  So, if you don't**

1 mind I'll restrict myself to the senior members --
2 Q. The senior members at Miller Buckfire?
3 A. Yes, there's a long list. Norma Corio, co-president
4 of Miller Buckfire, C O R I O; James Doak, D O A K;
5 Kevin Haggard, H A double G A R D; and Kyle Herman.
6 Q. Is anyone other than those four individuals and
7 yourself employed by Miller Buckfire and engaging or
8 providing services to the City?
9 A. Yes.
10 MR. CULLEN: Objection. He just --
11 A. I just told you.
12 BY MR. SUMMERS:
13 Q. That that is the complete list?
14 A. No, those are the senior members --
15 Q. Those are the senior members. Approximately how many
16 other persons at Miller Buckfire are working on the
17 engagement for the City, if you can just give me a
18 number?
19 A. Probably between six and eight.
20 Q. What is Mr. Herman primarily responsible for in the
21 engagement with the City?
22 A. Mr. Herman is responsible for overall management of
23 the -- what I would call the plan of adjustment
24 process and analyzing the financial forecasts,
25 determining what the implications of those forecasts

1 are for the sustainable balance sheet of the City.
2 Q. Is Mr. Herman primarily responsible for doing any
3 other work for the engagement by the City?
4 A. He's involved in almost every aspect of this
5 engagement.
6 Q. What is Mr. Haggard's principal responsibility in the
7 engagement of Miller Buckfire by the City?
8 A. He's engaged on both the financing elements and the
9 asset sale alternative evaluation elements of this
10 assignment.
11 Q. Same question for Mr. Doak, what is his principal
12 responsibility in the engagement for the City?
13 A. Overall management of the engagement.
14 Q. And what does overall -- what task does overall
15 management of the engagement include?
16 A. Everything I don't have time for.
17 Q. Can you give an example?
18 A. Discussions with potential parties to buy individual
19 assets, discussions with other consultants involved
20 with the process, discussions with potential parties
21 involving financing.
22 Q. How much of Mr. Doak's time is devoted to the
23 engagement by the City of Detroit?
24 A. Well, it's impossible to give a precise answer because
25 we don't keep time records, and the involvement

1 someone has varies from day to day and week to week.
2 I would say at the moment our team is
3 almost entirely committed to Detroit but we have other
4 assignments.
5 Q. And then the other individual that you mentioned I
6 believe was Mr. McCore, is that correct?
7 A. No, Norma Corio, she's co-president of Miller
8 Buckfire.
9 Q. And what are her responsibilities in the engagement
10 with the City?
11 A. Managing the financing process for the City.
12 Q. And by managing the financing process, does that mean
13 looking for or attempting to find DIP financing?
14 A. Yes.
15 Q. Does it involve any other tasks?
16 A. Not at the moment.
17 Q. How much of your time is devoted to the engagement by
18 the City?
19 A. It's impossible to give a precise answer. I would say
20 going back to January it's been 60 to 70 percent of my
21 time.
22 Q. Now, is it fair to say that you have principal
23 responsibility for the engagement of the City and the
24 work that's being performed by the members of your
25 team?

1 A. Yes.
2 Q. And so all the individuals we just discussed report
3 directly to you, is that correct?
4 A. Yes.
5 Q. And you at this point report directly to Mr. Orr, is
6 that correct?
7 A. Our firm is responsible to Mr. Orr for the tasks that
8 we've been hired to perform.
9 Q. How often do you speak with Mr. Orr?
10 A. On average once or twice a day.
11 Q. Has the frequency of communications with Mr. Orr
12 changed over the life of the engagement since Mr. Orr
13 was appointed?
14 A. Depending on the topic it can be more or less.
15 Q. When Miller Buckfire was engaged in 2012, what steps
16 did Miller Buckfire undertake to become familiar with
17 the City and its financial affairs?
18 A. We reviewed all publicly available financial
19 information. We did interviews with certain members
20 of the finance staff to make sure we understood the
21 financial condition of the City.
22 Q. In 2012 did you do anything else to become familiar
23 with the City and its financial status?
24 A. No.
25 Q. When Miller Buckfire was re-engaged in January 2013,

Min-U-Script® Bienenstock Court Reporting & Video (5) Pages 17 - 20
13-53846-tjt Doc 4314-6 Filed 04/30/14 Entered 04/30/14 22:00:53 Page 75 of 54
13-53846-swr Doc 2014-9 Filed 12/10/13 Entered 12/10/13 14:30:52 Page 75 of 54
456
114

1  what steps did you undertake with respect to the City,
2  its financial status and your engagement?
3  A.  As I testified earlier we recommended the City
4  immediately expand Ernst & Young's engagement to do a
5  full and thoughtful review of the City's financial
6  condition for the purpose of developing a short-term
7  cash flow forecast and a ten-year financial forecast
8  because we needed better information on which to base
9  our financial recommendations to the mayor and later
10  to the emergency manager.
11      MR. SUMMERS: If we could mark this as
12  Deposition Exhibit 2, please.
13      MARKED FOR IDENTIFICATION:
14      DEPOSITION EXHIBIT 2
15      9:48 a.m.
16  BY MR. SUMMERS:
17  Q.   Mr. Buckfire, do you recognize this document?
18  A.  I do.
19  Q.   And it is the forbearance and optional termination
20  agreement that was executed by Mr. Orr among others on
21  or about July 15th, 2013, is that correct?
22  A.  Yes.
23  Q.   And this is the agreement that's the subject of the
24  pending motion in the bankruptcy court which brings us
25  here today, correct?

1  A.  Yes.
2  Q.   Okay.  And was the City's decision to enter into the
3  forbearance agreement made by Mr. Orr?
4  A.  Yes, it was.
5  Q.   When did Mr. Orr make the decision to enter into the
6  forbearance agreement?
7  A.  On July 15, 2013.
8  Q.   So, up until July 15th, 2013 Mr. Orr was -- had not
9  made up his mind whether to execute this document?
10      MR. CULLEN: Objection.  Foundation.  Form.
11  A.  It was being negotiated.
12      BY MR. SUMMERS:
13  Q.   What role did you have in the negotiation of the
14  forbearance agreement?
15  A.  On behalf of the City of Detroit I had responsibility
16  for negotiating the business terms of this agreement.
17  Q.   And what specific tasks were included in the -- that
18  responsibility?
19  A.  Well, leading up to the decision to commence
20  negotiations, as I mentioned earlier, once we received
21  the early projections from Ernst & Young as to the
22  true condition of the City in early May, it became
23  clear to us as the City's bankers and to the other
24  financial advisors to the City that the City was
25  bearing an increasingly high level of risk that if the

1  Swap counterparties were to exercise their rights and
2  stop access to the gaming revenues going into the
3  collateral accounts, that the City's ability to
4  operate would be in severe jeopardy and it became a
5  life or death issue for the City.
6      We began therefore in early May determining
7  what our best course of action would be to protect the
8  City's access to this cash, and by the end of May it
9  became clear to the advisors including Miller Buckfire
10  that to enter into a negotiation with the Swap
11  counterparties was in the City's best interest.
12      My responsibility was to initiate those
13  discussions with the business people of the Swap
14  counterparties and try to arrange an understanding
15  with them that would ensure the City had continued
16  access to cash and that we had an overall resolution
17  of the Swap including the right to terminate it and
18  buy it out, that was advantageous to do so.
19  Q.  Did Miller Buckfire perform any analysis in connection
20  with the decision to enter into negotiations?
21      MR. CULLEN: Other than he's already
22  stated, Counsel?
23      MR. SUMMERS: I think --
24      BY MR. SUMMERS:
25  Q.  Was the analysis that you just described performed by

1  Miller Buckfire or was it performed by Ernst & Young
2  or someone else?
3      MR. CULLEN: Objection.  Foundation.  Form.
4  You can address it if you can unpack it.
5  A.  We understood the implications of their using their
6  rights to stop the cash from the City's ability to
7  operate, that we understood.
8      BY MR. SUMMERS:
9  Q.  And how did you come to understand that?
10  A.  By analyzing the projections that was produced by
11  Ernst & Young.
12  Q.  Is that the only -- were the projections produced by
13  Ernst & Young the only item you analyzed?
14      MR. CULLEN: Objection.  Foundation.  Form.
15  A.  Well, it's a cash flow issue.  The City was expected
16  to receive 175 to 185 million of year of gaming
17  revenues which had been pledged to the Swap
18  counterparties pursuant to the amendment of 2009.
19      Of that 175 million the City was obligated
20  to pay them 50 million dollars as long as they did not
21  exercise their rights.  So, we needed the other money
22  to operate the City.  If they were to block our access
23  to that cash, it would be a devastating consequence to
24  the City leading to a reduction in public services and
25  that was unacceptable.  So, that's our analysis.

## Page 25

1    BY MR. SUMMERS:
2  Q.  How was the decision made as to who would participate
3    in the negotiations about the Swap agreements and
4    access to casino revenues?
5  A.  I don't understand that question.
6  Q.  Were you involved in the decision as to the entities
7    the City would approach about negotiations?
8    MR. CULLEN:  Objection.  Foundation.  Form.
9  A.  Yes, I was.
10    BY MR. SUMMERS:
11  Q.  And how did you decide who to bring -- who you wanted
12    at the negotiating table?
13  A.  Together with counsel I made a recommendation to
14    Mr. Orr on how we should handle the negotiations.
15  Q.  And what was that recommendation?
16  A.  That as the City's investment banker together with the
17    City's lead restructuring counsel Jones Day we contact
18    the Swap counterparties, invite them to a meeting
19    which was held on June 4th at which time we also had
20    Mr. Jack Martin, CFO of the City and Mr. Tom Saxton,
21    chief deputy treasurer of the State of Michigan in
22    attendance.
23  Q.  And did you review any documents other than the
24    Ernst & Young cash flow analysis in determining what
25    advice to give Mr. Orr?

## Page 26

1    MR. CULLEN:  Objection.  Foundation.  Form.
2  A.  I read the collateral amendment that had been executed
3    by the City in 2009.
4    BY MR. SUMMERS:
5  Q.  Did you read anything else?
6  A.  No.
7  Q.  Was Mr. Orr present at the meeting on June 4th, 2013?
8  A.  No.
9  Q.  But you were present, correct?
10  A.  Yes.
11  Q.  What transpired at the June 4th meeting?
12  A.  Well, we began by explaining to the banks, Bank
13    America Merrill Lynch and UBS that the City's
14    financial condition was dire, that we were very
15    concerned about the City's ability to operate without
16    liquidity and even though they had been to that point
17    standing fast on their rights to seize the City's
18    cash, that would be in everyone's best interest to
19    arrive at a permanent solution to this problem.
20    I explained to them that we were
21    economically motivated to do so but recognizing that
22    there at least were some arguments, that their
23    position was not a strong one legally, we would expect
24    them to allow us to buy back their Swaps at a
25    significant discount.

## Page 27

1  Q.  And who communicated to the Swap counterparties that
2    the City wanted or was interested in buying back the
3    Swaps at a significant discount?
4  A.  I did.
5  Q.  Mr. Orr was aware prior to the June 4th meeting that
6    you were going to make that sort of proposal to the
7    Swap counterparties?
8  A.  He had authorized it.
9  Q.  And what was the reaction at the meeting of the Swap
10    counterparties?
11  A.  Well, they were expecting us to pay them.  They were
12    very unhappy.  It was a very tense and difficult
13    meeting.  They were -- expressed high confidence in
14    their position with respect to their collateral.  They
15    were not willing to consider at least initially any
16    arrangement in which we had the right to buy back
17    their position at a discount and they highlighted for
18    my benefit several times that we didn't even have the
19    money to do it so why did I care about the option.
20  Q.  How did you respond to that last part that the City
21    did not have the money to buy back the Swaps?
22  A.  I told them that we were highly confident that if we
23    had an enforceable termination agreement with them,
24    that I would be able to find the money.
25  Q.  Did you give them any specifics at that time as to how

## Page 28

1    you thought you would be able to obtain the money?
2  A.  No.
3  Q.  What did you have in mind at that point as to how you
4    would obtain the money to buy back the Swaps?
5  A.  Well, at the time we thought we might be able to use
6    the same gaming revenues to secure new debt which of
7    course was the basis of the collateral agreement
8    itself.  We also took notice of the fact the City had
9    other potential assets that could be pledged to raise
10    capital but we also recognized that it was meant to be
11    and is still intended to be an option so that even if
12    the City cannot take care of the Swap, we still have
13    achieved our primary objective which is preserving our
14    access to gaming revenues.
15  Q.  It's preserving access to gaming revenues until June
16    2014, is that correct?
17  A.  That's correct.
18  Q.  And if the City is unable to pay the termination,
19    discounted termination by that time --
20  A.  We'll renegotiate.  At the time we negotiated this,
21    bankruptcy was not inevitable or really contemplated
22    as an inevitable factor.  We did the best we could
23    getting the best deal we could at the time with the
24    Swap counterparties.
25    I actually originally asked until the end

1  of next year, 12-31-2014, but it was rejected.  It was
2  a very, very difficult negotiation.
3  Q.  What individuals were present at the June 4th meeting?
4  A.  Well, the business people present were Ed Curland and
5  James Nacos from Bank of America Merrill Lynch and
6  Bill Chandler from UBS.  Their counsels were there and
7  I apologize if I can't recall all their names.
8      MR. CULLEN: Lawyers tend to run together.
9      MR. JURGENS: They all appear to be the
10  same.
11     THE WITNESS: I would never say that.
12     BY MR. SUMMERS:
13  Q.  Do you recall any of the attorneys that were present?
14  A.  Larry Larose is the only one I can really recall being
15  particularly chatty.
16  Q.  Which firm is Mr. Larose at?
17  A.  Cadwalader.
18  Q.  Approximately how long did the June 4th meeting last?
19  A.  Lasted about an hour and a half.  As I said it was a
20  very difficult meeting.  They were extremely
21  aggressive toward the City.  They brought up several
22  times the fact that the City had been in default since
23  2012, that we continue to add defaults to our pile of
24  defaults, most recently the appointment of Mr. Orr as
25  an emergency manager was in and of itself a default

1  under the collateral agreement and they made it very
2  clear to me at least and to the other members
3  representing the City that their patience was wearing
4  thin, that they wanted a resolution and there were
5  many attempts to get us to sign another standstill
6  agreement beforehand from their point in view had been
7  done, made in good faith.
8      They were unhappy that the City had
9  rejected those overtures and they were putting us on
10  notice from a business point of view that patience was
11  not infinite.
12  Q.  Was there a particular individual that took the lead
13  for the Swap counterparties at the June 4th meeting?
14  A.  Mr. Curland, C U R L A N D.
15  Q.  How did you -- when the June 4th meeting concluded,
16  was there an agreement to meet again at some point?
17  A.  Not specifically, but I had to agree with Mr. Curland
18  that we would chat again in a few days to attempt to
19  find a middle ground.
20  Q.  And what in your mind when the June 4th meeting
21  concluded did you think would be the next step?
22  A.  Well, as soon as the meeting concluded, we discussed
23  amongst ourselves the appropriate next step.  One of
24  the things that made them particularly upset was our
25  original bid to terminate the Swaps was 50 cents on

1  the dollar.
2      As I mentioned earlier we had asked for a
3  forbearance period that would go through the end of
4  2014, and that we wanted to have that 50 cent option,
5  you know, really to the end of the forbearance period.
6      They viewed that as very aggressive, but I
7  spoke with Mr. Curland a few days later and at that
8  point we agreed to meet again which we did.  I believe
9  it was on the 8th, and at that meeting Bank America
10  Merrill Lynch indicated that although they were not
11  conceding at all, that their collateral position was
12  in any jeopardy, that they recognized they had a book
13  reserve issue against their Swaps, not an economic
14  loss but a book loss caused by Dodd-Frank rules that
15  led them to perhaps consider a termination payment of
16  85.
17     I viewed that as progress and in response I
18  was told, Ed, that the City was willing to move our
19  initial option payments up to 72.  He laughed at me
20  and told me that was still too low and that frankly
21  over the next couple of days and I can't recall
22  exactly when we had other meetings and other phone
23  calls where we ended up with the structure now
24  embodied in the forbearance agreement which was an
25  attempt to bridge the gap.

1      One might ask the question why did we have
2  a progressively higher option termination payment
3  scheduled built in, and the answer is we agreed that
4  we would have the benefit of the lowest possible price
5  but have the least amount of time to exercise it and
6  that they would have the benefit of their higher price
7  at the end of that period through the end of the
8  forbearance period, and that's how we ended up with a
9  price of 75, 77 and then 82.
10  Q.  How did you describe the negotiations that led to the
11  discounted termination availability ending in March of
12  2014?
13  A.  Well, as I mentioned our original request was
14  termination right at a discount through December 31 of
15  2014.  They wouldn't grant us that.
16     So, we agreed that if the final date was in
17  June, then the outside date would be March 15th which
18  happens to be the date on which they received their
19  quarterly Swap payments anyway so it was a convenience
20  factor to say March 15th or March 14th.
21     Likewise that's how we arrived at the
22  November 15th date at which the price was 77 and then
23  the inside date was the shortest one, 75.  Originally
24  we agreed to September 15th but eventually during the
25  next month because this all happened before June 11th

Page 33

1  I believe, we were able to extend that to October 31
2  which is how we got from September 15th to October 31.
3  We did not move the other dates.
4  Q.  You said all this happened before June 11th, 2013?
5  A.  Yes, the reason for that it was clear to us in early
6  June as a result of the forecasting E & Y had done
7  that the City's financial condition was frankly even
8  worse than we had feared, and, therefore, it might
9  become necessary to not make the payment to the COPs
10  bond holders on I believe it was June the 15th and
11  once that occurred, we would bear a very high risk of
12  the Swap counterparties despite their purported
13  patience with the City might have no choice but to
14  exercise their remedies, and therefore we felt
15  compelled to complete a business agreement with them
16  prior to that date in order to protect the City at all
17  costs, and the primary motivation for that, of course,
18  was the Swap counterparties needed to send a letter to
19  US Bank, I believe it was on June 11th instructing
20  them to release the City's share of gaming revenues in
21  the ordinary course and we felt imperative to have
22  that protection in hand so the City could make a
23  decision about whether or not to make the payment on
24  the COPs bonds on June 15th.
25  Q.  At any point -- well, let's stick with the time line.

Page 34

1  What's been marked as Exhibit 2, when was the first
2  time you saw a draft of this forbearance agreement?
3  A.  I believe it was after June 15th.
4  Q.  Do you recall which party to these negotiations
5  provided the initial draft of the forbearance
6  agreement?
7  A.  I don't.
8  Q.  Is it fair -- let's draw down in detail a little bit
9  on the June 8th meeting.  Who was -- what individuals
10  were present at the June 8th meeting?
11  A.  It was the same attendees as at the June 4th meeting
12  except that Mr. Saxton and Mr. Martin did not attend.
13  Q.  Were the service corporations present at the June 8th
14  meeting?
15  A.  Not to my recollection.
16  Q.  Were the service corporations present at the June 4th
17  meeting?
18  A.  No.
19  Q.  What point was information about the proposed
20  forbearance agreement communicated to the service
21  corporations?
22  A.  I don't know.
23  Q.  Do you know who was communicating with the service
24  corporations?
25  A.  No.

Page 35

1  Q.  Was anybody communicating with the service
2  corporations?
3  A.  I don't know.
4  Q.  Did Mr. Orr know?
5  MR. CULLEN: Objection.  Foundation.
6  A.  I don't know.
7  BY MR. SUMMERS:
8  Q.  But you never spoke with a representative of a service
9  corporation about the forbearance agreement?
10  MR. CULLEN: Objection.  Foundation.  Form.
11  A.  I already testified to that.
12  BY MR. SUMMERS:
13  Q.  At any point during the negotiation of the forbearance
14  agreement did the Swap counterparties threaten to
15  terminate?
16  A.  I've already testified that our June 4th meeting they
17  made it very clear that their patience was running out
18  with the City's unwillingness to sign a standstill
19  agreement in the form of which they had previously
20  been trying to get the City to sign it.  You may call
21  it a threat.  I would interpret it as a threat.  It
22  was a direct risk on the City's survival which in my
23  judgment and I advised Mr. Orr was unacceptable for
24  the City to continue to bear.
25  Q.  Did the Swap counterparties ever say to the City that

Page 36

1  if a resolution is not reached by a certain date, they
2  will terminate?
3  A.  Not to my knowledge.
4  Q.  And you said that the first defaults occurred in your
5  view in March 2012, is that correct?
6  A.  There was a credit rating downgrade which triggered
7  termination event under the collateral agreement which
8  had not been cured, and then after that the City
9  emergency manager was appointed, that in itself was an
10  event of default under the agreement.  So, we had
11  several defaults.
12  Q.  At any point from the current -- first default in
13  March 2012 until the date just prior to the time, just
14  prior to the June 4th meeting, did any of the Swap
15  counterparties threaten the City that they would
16  terminate the Swap contracts?
17  MR. CULLEN: Objection.  Foundation.
18  A.  I've already testified that they were making numerous
19  attempts to get the City to sign a standstill
20  agreement and they were letting everyone know
21  including myself that their patience was running out.
22  BY MR. SUMMERS:
23  Q.  Do you recall what specifically they said that made
24  you think their patience was running out?
25  A.  They said so.

1  Q.  What do you believe to be the benefits to the City of
2  entering into the forbearance agreement?
3  A.  Well, there are three.  Most important is continued
4  and reliable access to the City's net share of the
5  gaming revenues.  By that I mean the amount remaining
6  after paying off the fixed Swap payments.  That's a
7  critical element to the City's ability to operate in
8  the ordinary course and invest in its reinvestment
9  program.
10      Second, obviously the opportunity to
11  terminate the Swaps and eliminate this class of
12  creditors from a plan of adjustment at a discount
13  particularly since it's a secured party is of economic
14  value to the City, it saves real cash.
15      Lastly, by freeing up the gaming revenues,
16  it will give the City financing options as part of the
17  plan of adjustment that it otherwise might not have.
18  Q.  With respect to -- with respect to freeing up the
19  gaming revenues, how in your view does the forbearance
20  agreement provide the City with better access to those
21  revenues?
22  A.  Well, by the action of the collateral agreement today
23  the City receives the net revenues after paying the
24  Swap payments on a monthly basis.
25  Q.  The City -- the City today has access to the casino

1  revenues, is that correct?
2  A.  Pursuant to the forbearance agreement, yes.
3  Q.  So, the forbearance agreement has not been approved by
4  the court?
5  A.  That's correct.
6  Q.  But you believe the Swap counterparties are refraining
7  from terminating because of the forbearance agreement?
8  A.  Until the court rules, they are.
9  Q.  Under the forbearance agreement the City will have the
10  ability to direct the termination of the Swap
11  agreements, is that correct?
12      MR. JURGENS: Objection to form.
13  A.  I'm not quite sure I understand that question.
14      BY MR. SUMMERS:
15  Q.  Under the forbearance agreement the City obtains the
16  right to determine if and when the Swap contracts will
17  be terminated?
18      MR. CULLEN: Objection.  Foundation.  Form.
19      MR. HACKNEY: I'd like to put something on
20  the record which is that the Swap counterparties'
21  counsel are not parties to the deposition nor are they
22  objectors or movements to the motion and under the
23  court's order, a strict instruction of the court's
24  order I think there's a question as to whether they
25  are even supposed to be in the room.

1      So we certainly would not want to be
2  entertaining objections from the Swap counterparties.
3  I think that seems reasonable.
4      MR. JURGENS: Well, I think  we disagree
5  with that.  We didn't consider ourselves to be the
6  public as described by the court yesterday.
7      As you know the forbearance agreement that
8  is the subject of this deposition and the subject of
9  the motion is something that we are a party to or at
10  least Cadwalalder's client Merrill Lynch Capital
11  serves as a party to.  I'm happy to continue to object
12  and you can reserve on whether or not the objections
13  are appropriate at some point it's necessary, you
14  can bring that to the attention to the judge down the
15  road but at this point I don't think it makes sense
16  for us to belabor the point.
17      MR. HACKNEY: Let's go off the record for a
18  second if we could.
19      VIDEO TECHNICIAN: The time is 10:16 a.m.
20  We are off the record.
21      (Discussion held off the record at
22  10:16 a.m.)
23      (Back on the record at 10:19 a.m.)
24      VIDEO TECHNICIAN: We are back on the
25  record at 10:19 a.m.

1      BY MR. SUMMERS:
2  Q.  Mr. Buckfire, the forbearance agreement in the City's
3  view allows the City to direct the termination of the
4  Swap agreements, is that correct?
5      MR. CULLEN: Objection.  Foundation.  Form.
6      BY MR. SUMMERS:
7  Q.  You may answer.
8  A.  Well, we negotiated for the right to do so if we can
9  deliver the Swap termination payment.
10  Q.  Is that a right that the City currently possesses
11  under any other agreement?
12  A.  This is the only agreement of which I'm aware.
13  Q.  And it is the City's view that under the forbearance
14  agreement the City is able to direct the termination
15  of the Swap agreements without the consent of any
16  other party, is that correct?
17      MR. CULLEN: Objection.  Foundation.  Form.
18  Mischaracterizes his answer.
19      BY MR. SUMMERS:
20  Q.  You may answer.
21  A.  Can you repeat your question?
22  Q.  Sure.  Under the forbearance agreement the City is
23  able to direct the termination of the Swap agreements
24  without the consent of any other party, is that
25  correct?

Page 41

1    MR. CULLEN: Objection. Foundation. Form.
2  Mischaracterizes his answer.
3  A.  I don't know what I'm supposed to answer to.  It's our
4  view that this is an agreement the City can perform it
5  has rights under.
6    BY MR. SUMMERS:
7  Q.  What are the down sides of the forbearance agreement
8  to the City?
9  A.  That's catchy.  Financially, none.
10  Q.  What about other than financially are there down sides
11  to the forbearance agreement?
12  A.  Yes, it would be clearly another claim that would have
13  to be disputed in front of the judge.  It would
14  require -- could be a delay factor.  It exposes the
15  City to increased cost of litigation, uncertainties as
16  to access to cash which is a critical element of its
17  ability to survive.  Those are the financial down
18  sides.
19  Q.  The financial down sides of having entered into the
20  forbearance agreement?
21  A.  No, not having the forbearance agreement.
22  Q.  Those are the financial -- what I am asking is what
23  are the financial -- what are the down sides, if any,
24  to the City of having entered into the forbearance
25  agreement?

Page 42

1  A.  There aren't any.
2  Q.  None.  Did the City consider alternatives to the
3  forbearance agreement in paying a discounted
4  termination fee?
5  A.  We reviewed all possible alternatives and there really
6  weren't any.
7  Q.  What possible alternatives did you review?
8  A.  We reviewed novation, possibly getting some other Swap
9  party to come in and provide the same Swap to the 2006
10  COPs payments and not have a collateral contract to
11  protect it.  We did consider that, we looked at it, we
12  talked to a few people.  There was no interest
13  whatsoever in the idea.  There was no appetite on
14  anybody's part to provide unsecured credit to the City
15  at that juncture which I remind you was May of this
16  year.
17  Q.  Who did you talk to about what you described as the
18  novation?
19  A.  We talked to the state which has a lot of expertise in
20  this area.  We spoke with people inside other banks
21  who are not involved here just to get their general
22  views on how this might be done. Can't recall exactly
23  who it was but it was clear that without security
24  there was no interest in providing any kind of credit
25  to the City that would release the current Swap

Page 43

1  counterparties from their obligations.
2  Q.  In the settlement motion that the City has filed, the
3  City asserts that the City is currently in a liquidity
4  crisis, is that correct?
5  A.  Yes.
6  Q.  And you agree that the City is in a liquidity crisis,
7  correct?
8  A.  Yes.
9    MR. SUMMERS: Let me have this marked as
10  Exhibit 3.
11    MARKED FOR IDENTIFICATION:
12    DEPOSITION EXHIBIT 3
13    10:24 a.m.
14    MR. CULLEN: At one point, Counsel, just as
15  we go through these depositions are we going to mark
16  them sequentially for each witness or are we going to
17  mark them sequentially throughout?  If we don't end up
18  double tracking that will be hard.  So, I don't care
19  --
20    MR. HACKNEY: We'll do our best.
21    MR. CULLEN: Let's just for today on the
22  record let's just call these Buckfire 3 just in case
23  we go the other way because we can be cumulative if we
24  want to but it will be hard to disinter Buckfire 2, 3,
25  4, 5 and 7 if we just have them by numbers that will

Page 44

1  be the same as Orrs.
2    MR. SUMMERS: I think the reporter has been
3  marking them as Buckfire 3.
4    MR. CULLEN: All right.
5    BY MR. SUMMERS:
6  Q.  This document has been marked as Exhibit Number 3 is
7  the proposal to creditors, executive summary of the
8  proposal to creditors that was made on June 14th,
9  2013, is that correct?
10  A.  Yes.
11  Q.  And this was prepared in connection with a meeting
12  with creditors that was held at the Detroit Airport
13  Westin on June 14th, 2013, is that correct?
14  A.  That's correct.
15  Q.  And did you participate in creating this executive
16  summary?
17  A.  I did.
18  Q.  And you participated in the information that is --
19  gathering the information that is disclosed in this
20  executive summary, is that right?
21  A.  Well, I reviewed drafts of it to make sure that it
22  made sense, that it was consistent, that it was
23  accurate, but I did not prepare the information
24  myself.
25  Q.  You prepared -- leave it there.  You're familiar with

Page 45

1 the contents of this document, correct?
2 A.   Yes.
3 Q.   If you turn to Page 35.  And Page 35 contains a
4 summary of the current financial status of the City as
5 of June 14th, 2013, is that correct?
6 A.   No, actually this is just one way of looking at it.
7 Page 8 and 9 are actually more relevant for the
8 discussion we've been having today.
9 Q.   If you stay with -- what then do you think is
10 contained on Page 35?
11 A.   This is a review of the City's reported historical
12 financials.
13 Q.   If you look at the column at the very far right side
14 of the page it says prelim 2013.  Do you know what
15 that column contains?
16 A.   It contains a preliminary estimate of revenues,
17 operating expenses and legacy expenses for 2013.
18 Q.   And if you look down here line labeled total revenues
19 which indicates 1.121.9 billion dollars, is that
20 correct?
21 A.   Yes.
22 Q.   And that is the total revenue that was projected as of
23 the date this executive summary was prepared for 2013?
24 A.   Yes.
25 Q.   Now, if you go down the next subsection of Page 35 is

Page 46

1 labeled operating expenditures, correct?
2 A.   Yes.
3 Q.   And operating expenditures preliminary 2013 column
4 indicates 692 million dollars, correct?
5 A.   Yes.
6 Q.   Now -- and the operating expenditures include --
7 included in this section include the essential
8 services that the City has to provide, is that
9 correct?
10 A.   Yes.
11 Q.   And then when you get to the legacy expenditures, is
12 it correct that the City is not currently making debt
13 payment, debt service payments to general obligation
14 bonds, is that correct?
15 A.   Yes.
16 Q.   And the City is not -- is currently deferring payments
17 for retiree health benefits, isn't that correct?
18 A.   Yes.
19 Q.   So, without making service or making payments on the
20 legacy expenditures for 2013, is it correct to say
21 that the City would have operated at a surplus for
22 fiscal year 2013?
23 A.   Well, clearly if we're not making our fixed
24 obligations, we'd have more cash than if we did.
25 Q.   And are you currently making payments on any of the

Page 47

1 items that are categorized under the legacy
2 expenditures part of Page 35?
3 A.   Yes.
4 Q.   What portions are you making?
5 A.   Well, we're making payments on the POC Swaps because
6 they are a secured obligation.  I'm not sure looking
7 at this whether the 141 million of debt service for
8 LTGO and UTGO incorporates payments made on the
9 secured state revenue share bonds which we have three
10 series.  I have to go back and check, but clearly the
11 City is paying its obligations on secured, that is,
12 revenue protected debt and not paying on unsecured
13 debt.
14 Q.   And the City is not at this point making its pension
15 contributions, correct?
16 A.   Correct.
17 Q.   The City at this point is not paying the health
18 benefits for retirees, correct?
19 A.   Yes, that's correct.
20 Q.   And the City is not making principal interest payments
21 to the service corporations, correct?
22 A.   That's correct.
23 Q.   Then turn to Page 38 of the executive summary.  In
24 this document among other things or this page among
25 other things contains a preliminary forecast for

Page 48

1 fiscal -- for the City for fiscal year 2014, is that
2 correct?
3 A.   Yes.
4 Q.   And you see the column that's labeled 2014?
5 A.   I do.
6 Q.   The column labeled for 2014 indicates the total
7 revenues for the City for 2014 are projected to be 1
8 billion 108 -- so, it's 1 billion 82 million point  8,
9 is that correct?
10 A.   Yes, a decline from 2013.
11 Q.   And expenditures, the expenditures column indicates
12 that expenditures that the City will incur for
13 essential services will total 397.2 million dollars
14 for 2014, is that correct?
15 A.   That's the projected net operating surplus, correct.
16 Q.   Yeah, I'm sorry, it's 685.7 million in expenditures
17 for fiscal year 2014, correct?
18 A.   Yes.
19 Q.   And that results in a surplus of 397.2 million
20 dollars, correct?
21 A.   Before debt service.
22 Q.   Before debt service.  But you're not making -- the
23 City is not making a significant portion of the debt
24 service, correct, in 2014?
25 A.   That's correct.

Page 49

1 Q. So, for example, the City does not actually project
2 paying pension -- making pension contributions for
3 fiscal year 2014, isn't that true?
4 MR. CULLEN: Objection. Foundation. Form.
5 BY MR. SUMMERS:
6 Q. You may answer.
7 A. That's correct.
8 Q. And the City does not currently plan to pay the health
9 benefits for retirees in fiscal year 2014, correct?
10 MR. CULLEN: Objection. Foundation. Form.
11 BY MR. SUMMERS:
12 Q. You may answer.
13 A. Can you repeat the question, please?
14 Q. The City does not currently intend to pay the line
15 item for health benefits for retirees in fiscal year
16 2014?
17 A. That's correct.
18 Q. And the City does I guess intend to continue paying
19 the monthly payment to the Swaps, is that correct,
20 which is represented by the 50.6 million?
21 A. Yes, but again you have to look at the caption of this
22 page. This is not the City's plan.
23 Q. This is the City's projection, however?
24 A. This is the City's projection in the absence of the
25 reinvestment plan that the City manager has already

Page 50

1 said he is going to put in place and is putting in
2 place.
3 So, this is interesting but not relevant to
4 this discussion because it does not include as the
5 caption indicates clearly at the top the increased in
6 expenditures necessary to restore services to adequate
7 levels for the residents.
8 Q. But if you look at this -- and the revenues for fiscal
9 year 2014 include 170 million in wage earning
10 revenues, is that correct?
11 A. Yes.
12 Q. So, if the City is operating, understanding your
13 qualification, but if the City is under this
14 projection showing a 397.2 million dollar surplus, if
15 it did not have access to the casino revenues during
16 fiscal year 2014, there still would be a surplus, is
17 that correct?
18 A. But it's not the City's plan. This is academic.
19 Q. Whether it's academic or not, that's what this
20 indicates, is that correct?
21 MR. CULLEN: Objection. Foundation. Form.
22 A. Yes.
23 MR. CULLEN: And asked and answered.
24 BY MR. SUMMERS:
25 Q. And in fact if the City pays the termination fee, it's

Page 51

1 no longer going to be paying the Swaps' monthly
2 payment, correct?
3 A. Yes, but this is not the City's plan.
4 Q. If the City did not have access to casino revenues
5 from now until December 2013, does the City believe
6 there will be any point where it would run out of
7 cash?
8 A. You have to look at Page 8. It answers that question.
9 On Page 8 which is clearly presented to the creditors
10 on June the 8th -- June 14th matter, and also on Page
11 9 which forecasts out to June of '14 we clearly show
12 on a monthly basis what we believe the City's cash
13 position to be in the absence of any transaction and
14 you can see that business as usual results in the City
15 having 14 million of cash by the end of June of '13 in
16 the absence of any intermediary action and that that
17 number would not incorporate any cash being spent on
18 the reinvestment program because it hasn't started
19 yet. This indicates quite clearly the dire position
20 the City would be in if we lost access to the 170
21 million of gaming revenue because that would
22 immediately translate into a net cash loss of 160
23 million on this page alone.
24 Q. This cash flow page on Page 8 indicates or assumes the
25 City will be making certain legacy payments that it is

Page 52

1 in fact not currently making, is that correct?
2 A. Yes, it does.
3 Q. For example, it assumes that the City will make
4 pension contributions, correct?
5 A. No, I think we are assuming here we continue to defer
6 those pension contributions and that's why if you look
7 at the bottom and you see accumulated deferrals, you
8 see the number grows every month, that's the pension
9 contribution we weren't making.
10 Q. If you look at -- this assumes that the City will
11 continue to payments on general obligation bonds?
12 A. That's right. This is the status quo. In the absence
13 of any restructuring or preservation of cash plan or
14 reinvestment of the City, this will be the financial
15 condition of the City in the absence of any action.
16 Q. Right. But as a result in part of filing the Chapter
17 9 bankruptcy proceeding, there are significant legacy
18 obligations that are not being paid?
19 A. This clearly shows if you look at the far right column
20 June of '13 that trying to operate a City of this
21 scale with 14 million of cash bearing in mind that
22 that could be zero or negative on any given day
23 depending on collections made it almost impossible to
24 prudently operate the City and that was the proximate
25 reason why it became necessary to defer the payment on

1 the COPs on June 15th. And that was discussed with
2 the creditors on June 14th.
3 Q. Correct, but this analysis on Pages 8 and 9 does not
4 actually show the cash position of the City with the
5 deferral of the payments to the service corporations
6 for the pension obligation?
7 　　MR. CULLEN: Objection. Foundation. Form.
8 You can address the question.
9 A. Not this page but this shows you the condition of the
10 City.
11 　　BY MR. SUMMERS:
12 Q. Condition of the City on June 14th of prebankruptcy,
13 correct?
14 A. Correct.
15 Q. So, do you believe that the City would be out of cash
16 without access to the casino revenues?
17 　　MR. CULLEN: Objection. Foundation. Form.
18 　　BY MR. SUMMERS?
19 Q. As of December 2013?
20 A. If nothing else was done, yes.
21 Q. And has there been an analysis performed by
22 Ernst & Young as to what the cash flow from the City
23 would look like in bankruptcy without access to the
24 casino revenues?
25 A. I believe so.

1 Q. And when was that performed?
2 A. I've seen multiple iterations of forecasts produced by
3 E & Y. I can't remember when I first saw that one but
4 I've seen it.
5 Q. Now, you've previously discussed the Swap
6 counterparties entered the negotiations with the view
7 that events of default had occurred under the Swap
8 contracts, correct?
9 A. It was a fact.
10 Q. And so the City had the same view that there were
11 events of default that had occurred under the Swap
12 contracts prior to the bankruptcy?
13 A. It wasn't a view, it was a fact. We had at least two
14 defaults.
15 Q. And can you tell us what the two defaults were?
16 A. The ratings downgrade default which had occurred in
17 2012 and the appointment of the emergency manager in I
18 believe it was March of 2013.
19 Q. And were there any other defaults other than those two
20 in the City's view?
21 　　MR. CULLEN: Objection. Foundation. Form.
22 A. There may well have been but those are the two that I
23 recollect.
24 　　BY MR. SUMMERS:
25 Q. Is the forbearance agreement a compromise of claims?

1 　　MR. CULLEN: Objection. Asks for a legal
2 conclusion.
3 　　BY MR. SUMMERS:
4 Q. You may answer.
5 A. It's a compromise.
6 Q. What claims does the forbearance agreement compromise?
7 　　MR. CULLEN: Objection. Foundation. Form.
8 A. I don't know what you mean by a claim. They had an
9 agreement entered into by the City in 2009 which gave
10 them certain rights which were a direct threat to the
11 City's survival. We agreed on an economic termination
12 arrangement that was satisfactory to both the City and
13 the Swap counterparties. I call that a compromise.
14 　　BY MR. SUMMERS:
15 Q. To your knowledge had the Swap counterparties ever
16 threatened to bring litigation claims against the
17 City?
18 A. No.
19 Q. Has the City considered whether the Swap
20 counterparties have claims against the City other than
21 those arising out of the defaults under the Swap
22 agreements?
23 　　MR. CULLEN: Objection. Foundation. Form.
24 A. I don't know.
25 　　BY MR. SUMMERS:

1 Q. Has the City evaluated whether it is in breach of the
2 collateral agreement?
3 　　MR. CULLEN: Objection. Foundation. Form.
4 May call for privileged information.
5 A. Am I supposed to answer this question then with all
6 those objections?
7 　　MR. CULLEN: Why don't you try the question
8 again. Why don't you tie it to what he's done.
9 　　BY MR. SUMMERS:
10 Q. In your view have you engaged in any analysis of
11 whether the City has breached the collateral
12 agreement?
13 A. No.
14 Q. To your knowledge has anyone else associated with the
15 City analyzed whether the City is in breach of the
16 collateral agreement?
17 A. I don't know.
18 　　MR. CULLEN: I want you to know I let that
19 one go because I knew that was the answer.
20 　　THE WITNESS: You're such a mensch.
21 　　BY MR. SUMMERS:
22 Q. Have the service corporations ever threatened to your
23 knowledge claims against the City?
24 　　MR. CULLEN: Objection. Foundation. Form.
25 Asked and answered.

1 A. I don't know.
2 BY MR. SUMMERS:
3 Q. Have you ever analyzed whether these service
4 corporations may have claims against the City?
5 A. No.
6 Q. Have you analyzed whether or evaluated -- strike that.
7 Let me start again.
8 Have you evaluated whether the City has
9 claims against the Swap counterparties?
10 MR. CULLEN: Has he personally?
11 BY MR. SUMMERS:
12 Q. Has Miller Buckfire evaluated whether the City has
13 claims against the Swap counterparties?
14 A. No.
15 Q. Has anyone else working for the City analyzed whether
16 the City has claims against the Swap counterparties?
17 MR. CULLEN: Answer yes or no if you can.
18 A. No.
19 BY MR. SUMMERS:
20 Q. No, you don't know --
21 A. I don't know.
22 Q. So, Miller Buckfire performed no investigation into
23 whether the City has claims against the Swap
24 counterparties in connection with this forbearance
25 agreement, correct?

1 MR. CULLEN: Objection. Foundation. Form.
2 A. No.
3 BY MR. SUMMERS:
4 Q. The forbearance -- you testified earlier that you
5 believe the forbearance agreement is a release of
6 claims, correct?
7 MR. CULLEN: Objection. Foundation. Form.
8 I don't believe he testified to that.
9 BY MR. SUMMERS:
10 Q. Do you have a view as to what claims the forbearance
11 agreement releases?
12 A. No. The answer was no at end of the table. I'll
13 speak up. I apologize.
14 Q. Does the forbearance agreement operate to release any
15 claims that might be held against the City?
16 MR. CULLEN: Objection. Foundation. Form.
17 A. I don't know.
18 BY MR. SUMMERS:
19 Q. Do you have an understanding of how interest rate
20 movements may affect the termination payment that
21 would become due under the Swap agreements?
22 A. Yes.
23 MR. JURGENS: Objection to form.
24 BY MR. SUMMERS:
25 Q. And what is that understanding?

1 A. Well, as interest rates come down, the Swap
2 termination liability goes up.
3 Q. And if interest rates go up, what happens to the Swap
4 termination liability?
5 A. Comes down.
6 Q. And there would come a point if interest rates
7 increased enough where the City could actually become
8 in the money on the Swaps, is that correct?
9 A. It would except that the Swap counterparties in 2009
10 negotiated for the right to terminate the Swaps so
11 they would never actually be in a net liability
12 position against the City if that were to occur.
13 Q. What is your basis for stating that the Swap
14 counterparties negotiated the right to terminate the
15 Swaps in 2009?
16 A. Well, I've already testified that I reviewed the
17 collateral amendment entered into in 2009 and
18 discussed it with counsel to the City. In their
19 review of the contract, and I can't remember exactly
20 the provision now but that was their interpretation of
21 the contract right.
22 Q. Have you reviewed any of the other 2009 documents
23 related to the Swaps?
24 A. No.
25 Q. Has the City undertaken any analysis to evaluate

1 future interest rate moves?
2 A. We have reviewed the forward LIBOR curve.
3 Q. And who performed that review?
4 A. That review was performed by Mr. Sanjay Marken, one of
5 our associates. M A R K E N, first name S A N J A Y.
6 Q. And when did he perform that review?
7 A. The most recent one was performed a few days ago.
8 Q. What did that review show?
9 A. It showed that the current forward LIBOR curve does
10 not show that the interest rate that's relevant to
11 this Swap would ever rise above six-and-three-quarters
12 percent which is the fixed rate on the Swap, and,
13 therefore, the market is telling us that the
14 probability of the Swap ever going in the money for
15 the benefit of the City is very low.
16 Q. Does the analysis address whether interest rates are
17 generally rising or decreasing?
18 A. The LIBOR curve is an observable market fact. I'm not
19 going to speculate on when rates are going up or down.
20 They will fluctuate.
21 Q. Have interest rates increased since the forbearance
22 agreement was executed?
23 A. Yes.
24 Q. And what effect has that increase on -- in interest
25 rates had on the estimated termination payment under

1  the forbearance agreement?

2      MR. JURGENS: Objection.

3  A.  Well, the assumption in June of this year when we

4  began to negotiate with the Swap counterparties was

5  the termination payment was around four hundred

6  million dollars.  The rise in rates since that time

7  and it's now almost August probably has reduced that

8  termination payment to around three hundred million

9  dollars or even lower.

10     So, yes, the rise in rates has resulted in

11  a reduction of the termination payment.

12  Q.  And is that analysis of the reduction to the

13  termination payment something that Miller Buckfire has

14  prepared?

15     MR. JURGENS: Objection.

16  A.  Well, there is a procedure embodied in the collateral

17  agreement that lets you determine the termination

18  payment if one is to occur.  We've simply analyzed the

19  net value of the assumed LIBOR payments and Swap

20  payments and come up with our own estimate.

21     BY MR. SUMMERS:

22  Q.  And that analysis was performed by Mr. Marken?

23  A.  That's right.

24  Q.  If interest rates continue to rise, and the

25  termination payment that would have to be made

1  continues to decrease, that has the net effect of

2  reducing the value of the forbearance agreement to the

3  City?

4      MR. CULLEN: Objection.  Foundation.  Form.

5      BY MR. SUMMERS:

6  Q.  Do you agree?

7  A.  No.

8  Q.  And why not?

9  A.  I already testified to the three principal benefits

10  that we attempted to achieve in this forbearance

11  agreement.  The ability to terminate the Swap at a

12  discount is only one of the elements of the

13  forbearance agreement and its value to the City.

14     MR. SUMMERS: The reporter has said we have

15  about five minutes left on the tape.  Do we want to

16  take a break now and change that?

17     MR. CULLEN: Seems sensible.

18     MR. SUMMERS: I think that makes sense.

19     VIDEO TECHNICIAN: The time is 10:53 a.m.

20  This marks the end of tape number one.  We are off the

21  record.

22     (Recess taken at 10:53 a.m.)

23     (Back on the record at 11:05 a.m.)

24     VIDEO TECHNICIAN: We are back on the

25  record at 11:05 a.m.  This marks the beginning of tape

1  number two.

2      BY MR. SUMMERS:

3  Q.  Mr. Buckfire, did Mr. Marken perform any analysis

4  related to the interest rates' effect on the Swaps

5  prior to the analysis he performed a few days ago?

6  A.  No.

7  Q.  At the June 4th meeting the Swap counterparties, were

8  there specific arguments that the City articulated to

9  the Swap counterparties concerning why it would be in

10  their interest to settle?

11  A.  I made the general point to them several times that we

12  were willing to litigate aggressively to protect the

13  City's access to cash.  That any attempt by them to

14  exercise their rights and terminate our access to

15  gaming revenues would be vigorously rejected.  We

16  would marshall every argument we could to protect the

17  City's cash flow and that we would not accept any

18  action by them as a fete accompli.

19  Q.  Did you describe what claims you would litigate

20  aggressively to the Swap counterparties?

21  A.  No.

22  Q.  Did you make any assertions to the Swap counterparties

23  concerning the validity of their liens at the June 4th

24  meeting?

25  A.  No.

1  Q.  Was the potential of the City challenging the liens

2  held by the Swap counterparties ever a matter

3  discussed during the negotiation of the forbearance

4  agreement?

5      MR. CULLEN: Discussed between --

6      BY MR. SUMMERS:

7  Q.  Discussed with the Swap counterparties.

8  A.  Yes.

9  Q.  When was that discussed?

10  A.  It was a very hectic period.  I did really almost

11  nothing between June 4th and the 11th but try to

12  negotiate this deal.  I know at several points in my

13  conversations with the business people I let them know

14  that if there were issues with the collateral, we

15  would raise them if necessary to protect the City.

16  Q.  Did you articulate what those issues might be?

17  A.  No.

18  Q.  What did you understand those issues to be?

19  A.  Well, there were some concerns that the original

20  granting of the collateral was not appropriate which

21  would seem odd because in the collateral agreement

22  there's a letter attached to the Michigan Gaming

23  Control Board saying that it was fine, but I was

24  trying to cut a deal and I was looking for any

25  leverage I had over the Swap counterparties to get

1  them to a deal.

2     The reality is that if they were to

3  exercise their rights, we would have vigorously

4  litigated that and tried to get a stay of their

5  getting the cash and that was all I was concerned

6  about. I wasn't particularly concerned about the

7  merits of those claims.

8  Q. So, you never performed an analysis of the merits of

9  those claims?

10  A. No.

11  Q. Did the Swap counterparties have a reaction to your

12  assertion that you may aggressively litigate against

13  them?

14  A. Well, it got a little heated at one point and they

15  said well, if you want to litigate, we'll respond

16  aggressively as well, but let's try and avoid that

17  unnecessary expense and cut a deal which is what we

18  did.

19  Q. Did you assert any arguments or potential litigation

20  claims other than the issues surrounding the granting

21  of the liens in your negotiations with the Swap

22  counterparties?

23  A. No.

24  Q. Did you articulate to the Swap counterparties why in

25  the City's view the liens may or may not be valid?

1  A. Not directly, no.

2  Q. And did you consider asserting any other claims or

3  potential claims of the City to help you get leverage

4  in the negotiations with the Swap counterparties?

5  A. I'm not sure I understand that question.

6  Q. Other than the granting of the liens and the issues

7  surrounding them, did you consider asserting any other

8  types of claims in the negotiations to help you get

9  leverage with the Swap counterparties?

10    MR. CULLEN: Objection. Foundation. Form.

11  A. I was at all times just trying to make them understand

12  that the City would be as aggressive as possible to

13  defend its access to gaming revenues including

14  litigation whatever that turned out to be.

15  BY MR. SUMMERS:

16  Q. You met with the Swap counterparties or at least

17  negotiations on June 11th, is that correct?

18  A. No, we reached a final agreement with them on the

19  economic terms by June 11th.

20  Q. So, there was no meeting on June 11th?

21  A. Not that I recall but it's possible I'm mistaken. We

22  were very busy during that period.

23  Q. Were there any meetings with the Swap counterparties,

24  in-person meetings with the Swap counterparties other

25  than the June 4th meeting?

1  A. Yes.

2  Q. And when were those?

3  A. I believe there was one on June the 8th which I've

4  already testified to earlier and I believe we had

5  another one but I can't recall the exact date.

6  Q. Do you remember whether that other meeting was in June

7  or July?

8  A. No, they were all in June, prior to June 11th.

9  Q. Did you communicate with Mr. Orr between the June 4th

10  and June 8th meeting?

11  A. Yes.

12  Q. And what did you communicate?

13  A. The status of our negotiations.

14  Q. And what specifically did you report to him about the

15  negotiations?

16  A. What we had offered, what they had responded, what we

17  should do as our next move with respect to the Swap

18  counterparties.

19  Q. Between the June 4th and the June 8th meeting how

20  frequently were you in contact with Mr. Orr concerning

21  the forbearance agreement negotiations?

22  A. Every day. It was a matter of life or death for the

23  City.

24  Q. Multiple times a day?

25  A. Some days probably.

1  Q. And then between June 8th, the June 8th meeting and

2  reaching an agreement sometime prior to June 11th, how

3  frequently were you in contact with Mr. Orr?

4  A. Probably every day.

5  Q. Now, you testified earlier that Ernst & Young has

6  performed an analysis of the City's cash flow with

7  access to the casino revenues. Is that analysis

8  something that's been posted to the data room?

9  A. I don't know, but if you took the company's

10  projections even the ones on June 14th and simply

11  whited out the gaming revenues, you'll get the cash

12  flows. It's not hard to do.

13  Q. Miller Buckfire is in charge of what gets posted to

14  the data room, correct?

15    MR. CULLEN: Objection. Foundation. Form.

16  BY MR. SUMMERS:

17  Q. Miller Buckfire maintains the data room?

18  A. I believe so.

19  Q. So, who at Miller Buckfire would know whether the

20  Ernst & Young analysis without casino revenues has

21  been posted to the data room?

22  A. Mr. Kyle Herman.

23  Q. If something has not been posted to the data room,

24  would the City be willing to provide that to us?

25    MR. CULLEN: Don't see any reason why not.

Page 69

1    A.   I would recommend it.
2         BY MR. SUMMERS:
3    Q.   Okay.
4         MR. SUMMERS: Let's mark that for follow-up
5    after the deposition.
6         BY MR. SUMMERS:
7    Q.   You testified that as of the last analysis your
8    understanding is the estimated amount of the
9    termination payment that would be due is roughly three
10   hundred million dollars, is that correct?
11   A.   Well, it clearly moves around as the interest rate
12   curve moves around.  I think the most recent number is
13   somewhere reaching 275 and 300 million dollars.
14   That's before the application of the applicable
15   discount that we had provided for in the termination
16   agreement.
17   Q.   And that last analysis, when was that performed?
18   A.   A few days ago.
19   Q.   How does the City plan to get the cash necessary to
20   make the termination payment?
21        MR. CULLEN: Objection.  Foundation.  Form.
22        BY MR. SUMMERS:
23   Q.   Does the City have a plan at this point for how it
24   will obtain the cash necessary to pay the termination
25   payment?

Page 70

1         MR. CULLEN: Objection, foundation, form,
2    but you can address the question.
3    A.   Yes, the City has a plan.
4         BY MR. SUMMERS:
5    Q.   And what is that plan?
6    A.   The City intends to secure a debtor in possession
7    financing of sufficient proceeds to fund the
8    termination payment as well as provide sufficient cash
9    for the City to execute on its reinvestment program
10   during the bankruptcy.
11   Q.   And what is -- what actions, if any, has the City
12   taken toward obtaining debtor in possession financing?
13   A.   We have contacted a large universe of potentially
14   interested investors, many of whom have signed
15   nondisclosure agreements, NDAs, pursuant to which they
16   have received the request for proposal, the RFP which
17   went out yesterday.
18   Q.   And is Miller Buckfire leading the effort to obtain
19   debtor in possession financing?
20   A.   Yes.
21   Q.   And when you say a large universe of potential
22   investors, do you know approximately how many have
23   been talked to?
24   A.   At the moment it's in excess of 30.
25   Q.   And how many have -- how many have signed

Page 71

1    nondisclosure agreements?
2    A.   That's the universe I'm discussing, approximately 30
3    or more.
4    Q.   So, everybody you've talked to signed?
5    A.   No, some people didn't want to participate.  I can't
6    tell you how many we called.  I can tell you how many
7    we sent NDAs to which have been returned to us, it's
8    in excess of 30.
9    Q.   Are some of the people or some of the potential
10   sources of financing that Miller Buckfire have spoken
11   to said no, we're not interested?
12   A.   Yes.
13   Q.   And approximately how many have said no?
14   A.   Hasn't been that many, maybe ten.  Would your client
15   like one?
16   Q.   And do you know who those ten entities are that have
17   said they are not interested?
18   A.   I do, yes.
19   Q.   And who are they?
20   A.   I'm not going to tell you that.
21   Q.   On what basis?
22   A.   It's commercially sensitive information.
23        MR. CULLEN: Counsel, maybe it will help,
24   and I don't know whether you want this on the record
25   or not, but the position we are going to take with

Page 72

1    respect to this is that this is a competitive process
2    and the best result in that process is achieved by us
3    being able to negotiate with the individual parties
4    who are out there, and not to litigate the negotiating
5    strategy before we have something to bring back to the
6    court to approve.
7         So, we're not going to answer questions
8    about individual parties, we're not going to answer
9    questions about the strategy of negotiating with those
10   parties and we're not at liberty to give out the
11   information with respect to the people who responded
12   to the NDAs because they understandably don't want to
13   be shopped, don't want to take up a lot of your time.
14   We can fight this through a lot of objections and so
15   forth, and if we want to fight about that at some
16   later time, perfectly fine.
17        You can ask about his general strategy on
18   this, you can ask about the basis for his confidence
19   or nonconfidence in it.  You can go through those
20   general items, but the actual strategy, the terms of
21   arrangements with individual parties I'm not going to
22   have him go into now.  Hopefully by the time we get to
23   the hearing, we'll have an agreement that you will be
24   on a --
25        MR. SUMMERS: Let's go -- I think let's

Page 73

1 go -- move through the questions and see how we do.
2 MR. CULLEN: Okay.
3 MR. SUMMERS: I understand the City's
4 position on it.
5 MR. CULLEN: Okay.
6 BY MR. SUMMERS:
7 Q. You said an RFP went out yesterday?
8 A. Correct.
9 Q. Approximately how many people was the RPF sent to
10 yesterday?
11 A. The 30 plus people who signed the NDA.
12 Q. How much debtor-in-possession financing does the City
13 hope to obtain?
14 A. Three hundred fifty million dollars, up to three
15 hundred fifty million dollars.
16 Q. And does the City have a goal on the interest rate?
17 A. The lowest possible interest rate.
18 Q. Does the RFP attempt to define what that lowest
19 possible interest rate is?
20 A. No.
21 Q. Does it define whether the interest rate needs to be
22 fixed or variable?
23 A. No.
24 Q. What covenants, if any, are included in the RFP as
25 being acceptable or not acceptable?

Page 75

1 is submitting a proposal?
2 Q. Is the City offering art work as collateral?
3 A. I'm not going to discuss the terms of the term sheet,
4 sorry.
5 Q. Well, we kind of picked and choose what terms in the
6 RFP we are discussing and not discussing.
7 MR. CULLEN: We have in the attempt to
8 accommodate your desire for information and to
9 maintain control of the integrity of this process
10 which we believe is best negotiated as a negotiation
11 and not a litigation.
12 MR. SUMMERS: I guess I struggle with
13 understanding why the collateral that's offered in the
14 RPF that's been sent out when we know the interest
15 rate, the amount of the financing the debtor seeks,
16 why that puts the City at a competitive disadvantage.
17 MR. CULLEN: We didn't say the interest
18 rate.
19 MR. SUMMERS: The lowest possible.
20 MR. CULLEN: This is the beginning of a
21 negotiation. It's the beginning of a negotiation that
22 isn't at an end yet, that hasn't had any response to
23 the RFPs yet, it's an initial offer, and that's what
24 it is, and he's discussing it as such and willing to
25 testify about it as such, but I'm not going to read

Page 74

1 A. I'm not going to discuss that. It's commercially
2 sensitive.
3 Q. How long of maturity on the DIP financing is the City
4 looking to obtain?
5 A. Through the pendency of the end of the case.
6 Q. And is the City offering a lien on casino revenues in
7 connection with the DIP financing?
8 A. In part.
9 Q. I assume the City does not expect to obtain unsecured
10 financing?
11 A. I would take it if it was offered.
12 Q. No doubt. What other collateral is the City offering
13 to secure the DIP financing loan?
14 A. I'm not going to answer that question.
15 Q. Does the RFP define what collateral would be
16 available?
17 A. Yes, it does.
18 Q. And that's been sent out to potential investors?
19 A. Who have signed nondisclosure agreements.
20 Q. If somebody new came and said I would be interested in
21 providing DIP financing, you would have them sign an
22 NDA and then provide them the RFP?
23 A. If they wanted to make an unsolicited proposal without
24 the benefit of the RPF, we would be happy to accept
25 it. Are you suggesting your client is interested in

Page 76

1 the terms of the RFP in the newspaper and our bidders
2 are not going to read the terms of the RFP in the
3 newspaper because that would hamper the process and
4 hamper our ability to get best value.
5 MR. SUMMERS: But we already have in the
6 record that the casino revenues are part of the
7 collateral that's being offered, so, what's wrong with
8 finding out what the rest of the collateral that's
9 being offered?
10 MR. CULLEN: Not going to argue with you,
11 Counsel. I'm telling you what the position is. I've
12 tried to be accommodating. It's as far as I am going
13 to go.
14 BY MR. SUMMERS
15 Q. Has the City had discussions with the State of
16 Michigan about providing financing?
17 A. I'm not going to discuss that.
18 Q. What is the City's view about what has to happen in
19 order to be able to obtain debtor-in-possession
20 financing -- let me put a finer point.
21 Are there certain events that the City
22 believes has to happen in the case for it to be able
23 to realistically obtain debtor-in-possession
24 financing?
25 A. Yes, there are events in the case.

1  Q.   And what is that deal?

2     MR. CULLEN: Objection to the extent it

3  calls for a legal conclusion.

4  A.   Well, we have to find a willing lender, that's number

5  one.  Number two, we have to have a court order

6  approving the form of the DIP financing, and, number

7  three, we believe we need to have approval of the

8  forbearance and termination agreements we get the

9  benefit of the elimination of the collateral pledge

10  and the benefit of the discount.

11     BY MR. SUMMERS:

12  Q.   Do you need a determination on eligibility as well?

13  A.   Probably as a condition to closing but not as a

14  condition to getting a loan commitment.

15  Q.   And what time line does the City hope to secure

16  debtor-in-possession financing?

17  A.   Well, it's a large group of potential lenders, and,

18  therefore, we have requested preliminary indications

19  of interest by September the 6th, next Friday.  We

20  want to determine who really has a serious interest

21  and therefore encourage their ability to do due

22  diligence in a rational way because they will all have

23  due diligence requirements.

24     We simply can't handle all 30.  If they all

25  decide they want to put in proposals, we'll do the

1  best we can, but I'm assuming a smaller number when

2  they see the RFP will want to proceed to the second

3  stage which is to propose actual terms in response to

4  our RFP.  The date for that I believe is September the

5  16th.

6  Q.   Has a time line for the DIP financing because the view

7  of what the time line should be for the DIP financing

8  beyond the September 16th deadline?

9  A.   Well, we will receive I hope on the 16th multiple

10  serious indications of interest back by term sheets.

11  At that point we will look at how many we have and

12  we'll determine whether there's one that is so

13  superior to the others that we'll negotiate with that

14  party exclusively.

15     If we have a lot that are very competitive,

16  we may decide to negotiate with several of them at the

17  same time.

18     So, I don't have a clear view at this time

19  what date we'll actually select our lender, but it

20  will clearly be something we'll focus on after the

21  16th of September.  The goal will be to do it as soon

22  as possible.

23  Q.   Based on your experience in other cases do you have a

24  view as to what -- how long the selection of the

25  lender is likely to take?

1  A.   Depends on how many proposals I get back.

2  Q.   If you get 15 back, do you have a view of how long

3  it's likely to take?

4  A.   We should be so lucky.  I think that will take several

5  weeks, probably two weeks to come up with a winning

6  bid as it were.

7  Q.   And then the intent would be to as quickly as possible

8  present that to the bankruptcy court, is that correct?

9  A.   Yes.

10  Q.   And if the City obtains a debtor-in-possession

11  financing, what's the intended use of the financing?

12     MR. CULLEN: Asked and answered but you can

13  address it again.

14  A.   I've already answered it.

15     BY MR. SUMMERS:

16  Q.   Why don't you go ahead, say it again.

17  A.   We'll use proceeds to terminate the Swaps at the

18  discount provided for in the forbearance agreement and

19  the balance of the DIP loan will be retained by the

20  City as working capital and to support its

21  reinvestment program.

22  Q.   Are there any other intended uses to the DIP financing

23  other than the two you just said?

24  A.   Not that I'm aware of.

25  Q.   And the amount of the casino revenues that are

1  generated currently are is it correct that it's net

2  the City currently is about 15 million dollars?

3     MR. CULLEN: Objection.  Foundation.  Form.

4  A.   Well, there's 175 million annually of projected casino

5  gaming revenues.  That's what the City has on its

6  income statement.

7     MR. SUMMERS: Mark this as Deposition

8  Exhibit 4.

9     MARKED FOR IDENTIFICATION:

10     DEPOSITION EXHIBIT 4

11     11:31 a.m.

12     BY MR. SUMMERS:

13  Q.   What's been marked as Deposition Exhibit 4 is a copy

14  of the proposed order that the City has submitted with

15  the settlement motion, correct?

16  A.   Well, I haven't seen it before you handed it to me but

17  I'll so stipulate.

18  Q.   Was the proposed order or the form of the proposed

19  order something that was negotiated with the Swap

20  counterparties?

21     MR. CULLEN: Objection.  Foundation.

22  A.   I believe so.

23     BY MR. SUMMERS:

24  Q.   Did Miller Buckfire participate in the negotiation of

25  the proposed form of order?

**A.  No.**
Q.   Who participated in the negotiation of the proposed
form of order on behalf of the City?
    MR. CULLEN: If you know.
**A.  Counsel from Jones Day.**
    BY MR. SUMMERS:
Q.   Prior to today you've never looked at the proposed
order, is that correct?
**A.  Correct.**
Q.   Do you have a view as to the whether the proposed
order is a -- the form of proposed order is an
important term to the Swap counterparties?
    MR. CULLEN: Objection. Foundation. Form.
**A.  I just told you I haven't seen it before you handed it
to me.**
    BY MR. SUMMERS:
Q.   That's not what I asked.
**A.  Well, what did you ask?**
Q.   Do you have a view as to whether the form of the
proposed order is important to the Swap
counterparties?
    MR. CULLEN: Same objection.
**A.  No.**
    BY MR. SUMMERS:
Q.   Have the Swap counterparties ever indicated to the

City that the form of the proposed order is important?
**A.  I don't know.**
Q.   If the court refuses to enter an order in the form
that was submitted, have the Swap counterparties ever
indicated to you that they would have the right to
terminate the forbearance agreement?
    MR. CULLEN: Objection. Foundation. Form.
We've been through this, Counsel.   He hasn't seen the
document.
    MR. SUMMERS: I'm asking what, if anything,
the Swap counterparties have said to him.
    MR. CULLEN: About this document.
    MR. SUMMERS: About this document.
**A.  I've never seen it before.**
    BY MR. SUMMERS:
Q.   I know you've never seen it before.  Have they ever
told you, have the Swap counterparties ever said to
you that the form of the proposed order is an
important aspect of the settlement to them?
**A.  No.**
Q.   Do you have a view as to the effect, if any, of the
documents that were executed in 2009, collateral
agreement and others, as to the effect that that had
on the relationship, if any, between the COPs and the
Swap transaction?

    MR. CULLEN: Objection. Foundation. Form.
Asks for a legal conclusion.
**A.  No.**
    BY MR. SUMMERS:
Q.   Are you aware that on August 21 counsel for the City
suggested that the 2009 documents, quote, severed the
tie between the COPs and the Swaps?
**A.  No.**
Q.   What is your understanding of the effect of the
execution delivery of the collateral agreement in 2009
on the Swaps?
    MR. CULLEN: Objection. Foundation.
**A.  Well, economically it eliminated the benefit of the
Swaps to the point of the City because it was a net
liability to the City at that point, but the amendment
allowed the bank to terminate if it went into being an
asset for the City.**
    **So, it eliminated much of the benefit to
the City of the original Swap agreements entered into
in 2006.**
    BY MR. SUMMERS:
Q.   And, so, in your view prior to the execution of the
2009 collateral agreement the Swap counterparties did
not have the right to terminate?
    MR. CULLEN: Objection. Foundation. Form.

**A.  I didn't say that.**
    BY MR. SUMMERS:
Q.   Prior to the execution of the 2009 documents, in order
for the Swap counterparties to consent -- to
terminate, was the consent of the insurers required?
    MR. CULLEN: Objection. Foundation. Form.
Calls for -- you're asking the witness to legally
resurrect dead documents here.  I don't think it's
appropriate.
    MR. SUMMERS: Well, he's testified that he
has a view that the 2009 amendments gave the Swap
parties the right to terminate and I'm trying to
understand what the basis for that is.
**A.  If there isn't an event of default, they have the
right to terminate.**
    BY MR. SUMMERS:
Q.   What's the basis for that view?
**A.  It's in the collateral agreement.**
Q.   And is that different than what existed before the
2009 documents were executed?
**A.  I don't know.**
Q.   Did you review the 2006 documents in connection with
your engagement with the City?
**A.  Only to understand the financial terms.**
Q.   And what financial terms were you seeking to

1 understand?

2 A.   The fixed rate, the terminal amount, the -- I'm sorry.
3 The notional amount of the Swaps, the fixed rate
4 pursuant to the Swap contract and the base rate
5 calculation.

6 Q.   Go back to the negotiations that occurred in 2013.
7 Did you invite Syncora to participate in those
8 negotiations?

9 A.   No.

10 Q.   Why not?

11 A.   They weren't a party to the collateral agreement.

12 Q.   Did you consult with Mr. Orr as to whether Syncora
13 should be invited to the negotiations?

14 A.   No.

15 Q.   Did you invite Financial Guaranty Insurance Company to
16 participate in the negotiations concerning the
17 forbearance agreement?

18 A.   No.

19 Q.   Did you consult with Mr. Orr with respect to the
20 decision whether Financial Guaranty Insurance Company
21 should be invited to those negotiations?

22 A.   No.

23 Q.   So, you made that decision -- how did you come to the
24 decision not to invite -- we'll call it FGIC?

25 A.   It never came up.  They weren't a party to the

1 agreement.

2 Q.   Did you invite US Bank to participate in the
3 negotiations concerning the forbearance agreement?

4 A.   No.

5 Q.   Why not?

6 A.   Not a party to the agreement.

7 Q.   To the collateral agreement?

8 A.   Correct.

9 Q.   And to your knowledge no one else invited Syncora,
10 FGIC or US Bank to participate in the negotiations on
11 the forbearance agreement?

12 A.   Correct.

13 Q.   Did you and Mr. Orr ever discuss who should
14 participate in the negotiations?

15 A.   Yes.

16 Q.   And when did that discussion occur?

17 A.   I can't recall the exact day.  It was sometime in late
18 May when we recognized the seriousness of the
19 situation and the need to protect the City's access to
20 cash at all costs.  It was then we began to formulate
21 our negotiating position including who should attend
22 the first meeting.

23 Q.   And did you provide Mr. Orr with advice as to who
24 should attend the first meeting?

25 A.   Yes.

1 Q.   And what was your advice?

2 A.   My advice was that the discussion should be led by
3 Miller Buckfire as the City's investment banker
4 assisted by Jones Day, primary restructuring counsel
5 to the City and that and we should include the chief
6 financial officer of the City, Mr. Jack Martin, and
7 also to make sure the Swap counterparties understood
8 how seriously we were taking it, we invited the chief
9 deputy treasurer of the State of Michigan, Mr. Tom
10 Saxton.

11 Q.   Did you ever advise Mr. Orr that you thought Syncora
12 should be a party to the negotiations?

13 A.   No.

14 Q.   Did Mr. Orr prior to receiving your advice express a
15 view as to who should participate in the negotiations?

16 A.   We had a short discussion about whether or not we
17 should include the state.  It wasn't required, they're
18 not a party to it but we felt unbalanced because the
19 state's overall support for the restructuring was
20 important that including the chief deputy treasurer
21 would be a good idea, so we invited him.

22 Q.   But he did not attend, is that correct?

23 A.   He did.

24 Q.   Oh, he did attend.  Did you ever seek input from the
25 Swap counterparties as to who should be present at the

1 negotiations?

2 A.   No.

3 Q.   Did the Swap counterparties ever volunteer their view
4 as to whether there should be other parties involved
5 in the negotiations?

6 A.   Not to me.

7 Q.   Did they do so to someone else?

8 A.   I don't know.

9 Q.   Not to your knowledge?

10 A.   Not to my knowledge.

11 Q.   At any time during the negotiations in 2013 did the
12 Swap counterparties send a notice of an event of
13 default?

14 A.   I don't recall if we ever received an official notice
15 but we certainly were aware of the fact they could
16 send one at any time.

17 Q.   And at any time during the negotiations in 2013 did
18 the Swap counterparties formally designate an early
19 termination date?

20 A.   No.

21 Q.   Did the Swap counterparties at any point propose,
22 formally propose to the City a structure that would
23 not involve an early termination of the Swaps?

24      MR. JURGENS: Objection.

25      MR. CULLEN: Objection.  Foundation.  Form.

Page 89

1 A. Not after we began our discussions on June 4th, no.
2 BY MR. SUMMERS:
3 Q. Now, you've indicated there was I guess an agreement
4 -- is it fair to say there was an agreement at least
5 in principle on the terms of the forbearance agreement
6 on or before June 11th, is that correct?
7 MR. CULLEN: Objection. Foundation.
8 A. There was an economic understanding, yes.
9 BY MR. SUMMERS:
10 Q. What happened after June 11th with respect to the
11 negotiations?
12 A. Well, the attorneys for the City and for the Swap
13 counterparties began to negotiate the forbearance
14 agreement. I was not directly involved in that
15 because it was primarily in fact solely with respect
16 to the nonfinancial terms of it.
17 That took several weeks of very intensive
18 work amongst the lawyers for all the parties to arrive
19 at an agreement that could be executed which it turned
20 out not before July 15th.
21 So, it took about a month to complete the
22 negotiations for the agreement, so --
23 Q. Other than attorneys working to document I guess the
24 legal terms -- well, document the whole thing, was
25 there anything else that caused a month, approximately

Page 90

1 a month to elapse between agreement on the financial
2 terms and execution of the forbearance agreement?
3 A. No, it was a very, very active negotiation amongst the
4 parties to the arrive at the final document.
5 Q. Let's turn to the 2012 negotiations, turn to 2012. Is
6 it correct that in March 2012 the City suffered a
7 ratings downgrade with respect to its general
8 obligation bonds?
9 A. Well, that is a fact, yes.
10 Q. Okay. And that downgrade could have constituted an
11 event of default under the Swap agreements at that
12 point, correct?
13 A. Correct.
14 Q. As a result of the downgrade, did the City in 2012
15 commence any negotiations with the Swap counterparties
16 to resolve the potentially event of default?
17 MR. CULLEN: Objection. Foundation.
18 A. I believe they did but we were not involved in it, we
19 weren't retained to do so.
20 BY MR. SUMMERS:
21 Q. So, Miller Buckfire had no involvement in any
22 negotiations that happened in 2012?
23 A. That's correct, we were only engaged in July for a
24 two-month period to do a financial review.
25 Q. Have you as part of your diligence and in connection

Page 91

1 with the forbearance agreement that's ultimately been
2 executed, have you reviewed or familiarized yourself
3 with what happened during the 2012 negotiations?
4 A. Yes.
5 Q. Who participated for the City in the negotiations with
6 the Swap counterparties in 2012?
7 A. I believe it was Jack Martin, to some extent the prior
8 CFO whose name is Chris Brown. Those negotiations
9 were inconclusive.
10 Q. Was the City represented by counsel during the 2012
11 negotiations?
12 A. I'm sure they were, but I can't tell you who it was.
13 Q. Did the City have a financial advisor in connection
14 with the 2012 negotiations?
15 A. Not retained as far as I know.
16 Q. And do you know who participated in the 2012
17 negotiations for the Swap counterparties?
18 A. No.
19 Q. And do you know who the counterparties' lawyers were
20 in the 2012 negotiations?
21 A. No.
22 Q. Do you know how long the negotiations in 2012 lasted?
23 A. No.
24 Q. Do you know whether the service corporations
25 participated in the 2012 negotiations?

Page 92

1 A. I don't know.
2 Q. And at the time you were engaged the second time, what
3 was your understanding of the status of the
4 negotiations with the Swap counterparties that had
5 started in 2012?
6 A. My understanding was that they were inconclusive and
7 that they were at the moment of our retention on
8 January 8th in suspension that there were no
9 discussions ongoing.
10 Q. Do you know if the City had ever made a proposal to
11 the Swap counterparties in connection with the 2012
12 negotiations?
13 A. I don't know.
14 Q. Do you know if the Swap counterparties had ever made a
15 proposal to the City during the 2012 negotiations?
16 A. No, I testified to that earlier, they had proposed a
17 standstill agreement which would require the City to I
18 guess give up some rights or some litigation positions
19 in exchange for the Swap counterparties agreeing to
20 not exercise their remedies but that it could be
21 terminated at any time. I believe that was their
22 proposal.
23 Q. And to your knowledge is that the only proposal that
24 the Swap counterparties made?
25 A. Yes.

Page 93

1 Q. Is that proposed standstill agreement a document
2 that's available in the data room?
3 A. I don't know.
4 Q. Is that a document the City would make available if
5 it's not in the data room?
6 MR. CULLEN: No reason why not.
7 BY MR. SUMMERS:
8 Q. To your knowledge at no point in 2012 did the Swap
9 counterparties send a notice of an event of default to
10 the City?
11 MR. CULLEN: Objection. Asked and
12 answered.
13 A. Not to my knowledge.
14 BY MR. SUMMERS:
15 Q. During the June 2013 negotiations, if the Swap
16 counterparties had sent a notice of termination to the
17 City, would the City have had any way to pay the
18 termination amount?
19 MR. CULLEN: Objection. Calls for
20 speculation, but you can address it.
21 A. Well, the City had no cash. And it would have
22 potentially been a four hundred million dollar claim
23 would have had to be paid in order to retain access to
24 gaming revenues. I don't see how we could have done
25 that.

Page 94

1 BY MR. SUMMERS:
2 Q. So, did you consider it likely that they would send a
3 termination notice rather than negotiate in light of
4 the City's lack of cash to pay the termination fee?
5 A. We weren't prepared to gamble with the survival of the
6 City by taking that risk.
7 Q. And can you explain why you viewed it as a gamble for
8 the City?
9 A. To assume the City would have continued access to
10 gaming revenues in the face of increasing levels of
11 default and assuming that the Swap counterparties
12 would continue to forbear exercising their remedies
13 and depending on their good will and intentions, when
14 they have their own fiduciary duties would be an
15 unacceptable risk. I so recommended to Mr. Orr that
16 we not take that risk.
17 Q. You're familiar with the Detroit General Retirement
18 System Service Corporation and the Detroit Police and
19 Fire Retirement System Service Corporation?
20 A. I know they exist.
21 Q. Do you have an understanding -- just for the record
22 I'll refer to them as the service corporations, do you
23 have an understanding what the service corporations
24 are?
25 A. Yes.

Page 95

1 Q. And what is that understanding?
2 A. They were created for the purpose of the City
3 borrowing 1.4 billion dollars in 2005 and 2006 and
4 making a contributions of the like amount to the
5 pension funds.
6 Q. Do you understand the service corporations to be
7 controlled by the City?
8 A. Yes.
9 Q. And do you understand the service corporations to be
10 controlled by the emergency manager?
11 A. I assume that's the case but I don't know for a fact.
12 Q. And the service corporations are in fact parties to
13 the forbearance agreement, correct?
14 A. Yes, they are.
15 Q. Who acted on behalf of the service corporations in
16 connection with the forbearance agreement?
17 A. The City did.
18 Q. And by the City can you identify the individuals that
19 you are referring to when you say the City?
20 A. Mr. Orr.
21 Q. To your knowledge did any members of the Board of
22 Directors of the service corporations consult with
23 Mr. Orr about the forbearance agreement?
24 A. I don't know.
25 Q. Did Mr. Orr -- let's ask it the other way. Did

Page 96

1 Mr. Orr consult with any members of the Board of
2 Directors of the service corporations in connection
3 with the forbearance agreement?
4 A. I don't know.
5 Q. Did anyone at Miller Buckfire have any contact with
6 anyone, any -- any member of the Board of Directors of
7 the service corporations in connection with the
8 negotiations?
9 A. I don't think so.
10 Q. And do you know who presented the forbearance
11 agreement to the service corporations for execution?
12 A. No.
13 Q. Would Mr. Orr know that?
14 A. I don't know.
15 Q. Do you know who would know that?
16 A. I don't know.
17 Q. The person who signed the forbearance agreement on
18 behalf of the service corporations, a woman named
19 Cheryl Johnson, is that correct?
20 A. Yes.
21 Q. Do you know Miss Johnson?
22 A. No.
23 Q. Do you know what position Miss Johnson holds, if any,
24 on the service corporations?
25 A. Well, the signature page indicates that she's the

## Page 97

1  president.
2  Q.  You've never spoken to Miss Johnson about the
3  forbearance agreement?
4  A.  No.
5  Q.  Have you ever spoken with Portia Roberson about the
6  forbearance agreement?
7  A.  No.
8  Q.  Do you know Miss Roberson?
9  A.  No.
10  Q.  Has anyone from Miller Buckfire ever spoken with
11  Miss Roberson?
12  A.  I don't know.
13  Q.  Are you aware that the insurers contend that the Swap
14  agreements cannot be terminated without their consent?
15  A.  Yes.
16  Q.  And when did you first become aware of that
17  contention?
18  A.  Well, last week in court I heard Mr. Hackney describe
19  those arguments to the judge.
20  Q.  Have you taken any steps to evaluate whether the City
21  agrees with the insurer's construction of the
22  operative documents on this point?
23  A.  No.
24  Q.  Do you know whether the City agrees with the insurer's
25  interpretation of the operative documents on this

## Page 98

1  point?
2  A.  I don't know.  Hackney, H A C K N E Y.  That's him.
3     MR. HACKNEY: Mr. Buckfire is looking out
4  for me.
5     THE WITNESS: Only where I can.
6     BY MR. SUMMERS:
7  Q.  Do you agree that if the insurers can block a
8  termination, that this would be important for the City
9  to assess whether it is in danger -- whether it was in
10  danger in June 2013 of owing the termination payment?
11     MR. CULLEN: Objection.  Foundation.  Form.
12  A.  I'm sorry.  I don't understand the question.
13     BY MR. SUMMERS:
14  Q.  If the insurers are correct that they contend they can
15  block the termination, would that have been important
16  to assess whether the City was in real danger in June
17  2013 of owing a termination payment under the Swaps?
18     MR. JURGENS: Objection to form.
19  A.  The issue for the City primarily is maintaining
20  uninterrupted access to its gaming revenues.  Any
21  litigation by any party which would threaten that
22  access would be a very serious problem for the City of
23  Detroit.
24     BY MR. SUMMERS:
25  Q.  Are you aware that the insurers contend they have the

## Page 99

1  right to control essentially all actions to be taken
2  by the Swap counterparties in connection with the Swap
3  agreements?
4     MR. CULLEN: Objection.  Foundation.  Form.
5  A.  Yes, I am.
6     BY MR. SUMMERS:
7  Q.  And when did you develop that awareness?
8  A.  When I was in court last week listening to
9  Mr. Hackney's description of those issues to the
10  judge.
11  Q.  And have you taken any steps to evaluate whether the
12  City concurs with the insurer's construction of the
13  documents on this point?
14  A.  No.
15  Q.  Are you aware the City states in its motion to approve
16  the forbearance agreement that it is not required to
17  seek judicial approval under bankruptcy Rule 9019?
18     MR. CULLEN: Objection.  Foundation.  Form,
19  but you can address it.
20  A.  I'm not aware --
21     MR. SUMMERS:
22  Q.  I'm asking if you're aware.
23  A.  I'm not aware.
24  Q.  If the court does not approve the forbearance
25  agreement, will the City still consider the

## Page 100

1  forbearance agreement a valid contract?
2     MR. CULLEN: Objection.  Asks for a legal
3  conclusion.
4  A.  I can't answer that.  It calls for a legal conclusion.
5     BY MR. SUMMERS:
6  Q.  If the court doesn't approve the forbearance
7  agreement, will the City still attempt to perform
8  under the forbearance agreement?
9     MR. CULLEN: Objection.  Calls for
10  speculation.
11  A.  I can't answer that question.  I don't understand it.
12     BY MR. SUMMERS:
13  Q.  Have you ever discussed with Mr. Orr what the City
14  will do with respect to the Swaps if the forbearance
15  agreement is not approved?
16  A.  The financial consequences of not having the
17  forbearance agreement approved would be very dire for
18  the City of Detroit.  We could no longer count on our
19  access to gaming revenues, we would no longer be able
20  to execute on the reinvestment plan which has been
21  described to the public and to the creditors on June
22  14th.  We might be required to in fact reduce existing
23  City services in order to live within our cash
24  resources.  I'm only identifying some of the concerns
25  we would immediately have to review in order to come

Page 101

1 up with a new plan.
2 Q. That presumes that the City would not continue to view
3 the forbearance agreement as binding?
4 A. I'm only speaking to the question of access to gaming
5 revenues. If the forbearance agreement is not
6 approved and we don't have access to gaming revenues,
7 the consequences to the City are extremely serious.
8 Q. In determining whether to enter into the settlement
9 agreement, did the City consider whether the casino
10 revenues constituted special revenues under the
11 bankruptcy code?
12 MR. CULLEN: Objection. Calls for a legal
13 conclusion.
14 MR. SUMMERS: It doesn't. I'm asking
15 whether the City considered it.
16 A. No.
17 BY MR. SUMMERS:
18 Q. So, you didn't consider it or you don't know?
19 A. I said we didn't consider it.
20 Q. In entering into the forbearance agreement, did the
21 City consider whether or not the automatic stay
22 applied to prevent the casino revenue from being
23 trapped under the collateral agreement?
24 A. Well, we hoped it would, but again it's pursuant to a
25 Swap agreement and there are special provisions in the

Page 102

1 code that give Swap parties special rights.
2 Q. And, so, how was that consideration relevant to the
3 decision of the City to enter into the forbearance
4 agreement?
5 A. Well, having been involved in other situations where
6 we had Swaps and Swap counterparties, we are able to
7 take their collateral, even after a bankruptcy filing
8 was created, again it was an element of risk we were
9 not willing to accept on the City's behalf that the
10 Swap counterparties even after a bankruptcy filing
11 might be able to take advantage of those rights and
12 seize gaming revenues against their termination
13 amounts.
14 Q. In connection with the decision to enter into the
15 forbearance agreement, did the City consider whether
16 the casino revenues are property of the estate?
17 MR. CULLEN: Objection. Calls for a legal
18 conclusion.
19 A. They are property of the City.
20 BY MR. SUMMERS:
21 Q. So, the City took the view when these negotiations
22 that they are property of the estate, correct?
23 A. Yes.
24 Q. Has the City undertaken any analysis as to what impact
25 the forbearance agreement may have on unsecured

Page 103

1 creditor recoveries?
2 A. We've considered that, yes.
3 Q. And what is the City's view as to the impact of the
4 forbearance agreement on unsecured creditor
5 recoveries?
6 A. Well, the elimination of litigation risk, the
7 preservation of the City's ability to operate in the
8 ordinary course and reinvest in the City pursuant to
9 access to gaming revenues would provide the City the
10 ability to enhance its overall credit and solvency
11 which would lead in theory to a higher recovery for
12 our unsecured creditors.
13 Q. If the court refuses to approve the forbearance
14 agreement, what is your view of the impact that will
15 have on unsecured creditors?
16 A. I think it will reduce their chance of recovery to a
17 very low number.
18 Q. And why do you think that?
19 A. Because the City will not be able to execute its
20 reinvestment plan, will not be able to emerge from
21 bankruptcy on the schedule that we have promised the
22 court. We would not be able to deliver the two
23 billion dollar limited recourse participation note to
24 our unsecured creditors.
25 Q. Why do you think you will not be able to do that?

Page 104

1 A. Our June 14th plan and proposal to creditors pursuant
2 to which we proposed a two billion dollar note be
3 given out to all of our unsecured creditors assumes
4 that the City is able to execute its reinvestment
5 program over the next ten years which assumes that we
6 have access to the cash flows embodied in that plan
7 including the gaming revenues.
8 Q. It's not -- it's access to the gaming revenues to
9 grant a lien on them again?
10 A. Not necessarily. But the point is if we don't have
11 the gaming revenues because the actions of the Swap
12 counterparties, we can't even start the reinvestment
13 plan.
14 Q. The City intends, correct me if I'm wrong, but I
15 thought that the City intends to enter into DIP
16 financing and grant a lien on the casino revenues as
17 the next step after approval of the forbearance
18 agreement?
19 MR. CULLEN: Objection. Foundation.
20 Form.
21 A. If we have no forbearance agreement and we have to
22 live with the current Swap termination rights and the
23 Swap counterparties were to terminate officially and
24 require the City to pay three hundred million dollars
25 to them, by action of the agreement they would seize

Page 105

1 all of the gaming revenues until that claim has been
2 fully satisfied.
3    Now, simple math will tell you if we have
4 170 million of gaming revenues and we have a three
5 hundred million dollar termination payment and we have
6 an implied interest rate on that termination payment
7 it will probably take somewhere between two and three
8 years to pay it off in full.
9 Q. That presumes that the lien held by the Swap
10 counterparties against the casino revenues is a valid
11 and enforceable lien, correct?
12 A. That's what the agreement specifies.
13 Q. Well --
14 A. The 2009 agreement specifies.
15 Q. Right, but --
16 A. That's the agreement the City is bound by if the
17 forbearance agreement is not approved.
18 Q. Unless there's a litigation claim that exists that
19 might invalidate the liens?
20 A. In which case who knows what the Swap counterparties
21 might do and what we might have access to in terms of
22 gaming revenue.
23 Q. So, the legal analysis is important to informing --
24 A. Any risk the City is being asked to take that doesn't
25 have access to gaming revenues is an unacceptable risk

Page 106

1 from the point of view of the City's ability to
2 rehabilitate itself.
3 Q. Have you evaluated noncore assets as a source of funds
4 for the City?
5    MR. CULLEN: Objection. Foundation. Form.
6 A. Yes.
7    BY MR. SUMMERS:
8 Q. And what evaluation have you performed?
9 A. As we've identified in the June 14th plan we did
10 identify for the benefit of the public and the
11 creditors all potential noncore assets that might have
12 value that could be used pursuant to the plan of
13 adjustment.
14 Q. And on August 5th you announced the City had hired
15 Christie's to appraise the collection at the Detroit
16 Institute of Art, correct?
17 A. I didn't announce that.
18 Q. The City announced it.
19 A. The City announced it.
20 Q. That they hired Christie's, correct? Do you have an
21 understanding of the approximate value of the City's
22 art collection?
23 A. No.
24 Q. Do you have an understanding as to when the City
25 expects to receive the appraisal from Christie's?

Page 107

1 A. Yes, by the end of October 2013.
2 Q. What is the City's intention with respect to analyzing
3 the appraisal and making a determination as to the art
4 work once it receives the appraisal?
5    MR. CULLEN: Objection. Foundation. Form.
6 A. I can't even speculate as to what we'll do until we
7 have some facts as to what value we're dealing with.
8 That's why they were retained.
9    BY MR. SUMMERS:
10 Q. Has the City considered selling or leasing Belle Isle?
11 A. Not to my knowledge.
12 Q. Has the City looked into possible sources of funding
13 from the State of Michigan?
14 A. I'm not going to discuss that.
15 Q. Has the City looked into possible sources of funding
16 from the federal government?
17 A. I'm not going to discuss that either.
18 Q. On what basis?
19 A. Commercially sensitive information.
20    MR. SUMMERS: I'm going to propose we take
21 maybe -- why don't we stop the tape for a minute.
22    VIDEO TECHNICIAN: The time is 12:18 p.m.
23 we are off the record.
24    (Recess taken at 12:18 p.m.)
25    (Back on the record at 1:21 p.m.)

Page 108

1    VIDEO TECHNICIAN: We are back on the
2 record at 1:21 p.m. This marks the beginning of tape
3 number three.
4    EXAMINATION
5    BY MR. HACKNEY:
6 Q. Mr. Buckfire, good afternoon. My name is Steve
7 Hackney. I'm an attorney at Kirkland & Ellis, and I
8 represent Syncora Capital Assurance and Syncora
9 Guaranty. Nice to meet you.
10 A. Likewise.
11 Q. I think we had a brief conversation which you
12 suggested there might have been something you'd like
13 to correct with respect to a name from the morning's
14 testimony.
15 A. Yes, thank you, Mr. Hackney. I incorrectly identified
16 the attorney from Cadwalader who was present at the
17 June 4th meeting. His correct name is Larry
18 Stromfeld, S T R O M F E L D. That's his correct name
19 and that's who attended the meeting.
20 Q. If you think of any other corrections, don't hesitate
21 to stop me and let me know and we'll give you an
22 opportunity to make them.
23 A. Thank you.
24 Q. So, I've been listening to your testimony. It's not
25 my intention to re-ask you all the questions that were

Page 109

1  asked today. I am just here principally to follow up
2  on certain items and ask about certain other areas
3  that may be germane to Syncora.
4      So, as I understood your testimony, you
5  were the lead negotiator for the City when it came to
6  negotiating the business deal, is that correct?
7  A.  Yes.
8  Q.  Other people were going to paper the business deal in
9  terms of the legal terms that would embody it,
10  correct?
11  A.  Yes.
12  Q.  Let me ask you a question. The kickoff of the
13  negotiations that led to the forbearance agreement I
14  understood you to say began on June 4th, correct?
15  A.  Yes.
16  Q.  Who called that meeting?
17  A.  Counsel to Jones Day called counsel for BAML and
18  invited them to the meeting.
19  Q.  Fair to say that the meeting was held at the behest of
20  the City of Detroit?
21  A.  Yes.
22  Q.  Did you take legal advice, you personally as the lead
23  negotiator for the City, did you take legal advice
24  from Jones Day in advance of the June 4 meeting?
25  A.  Yes.

Page 110

1  Q.  Would you disclose to me the legal advice you obtained
2  from them?
3      MR. CULLEN: I'll instruct him not to
4  answer.
5      MR. HACKNEY: So, if I ask questions about
6  the legal advice you had been given about the COPs
7  Swap structure or various parties' rights thereunder,
8  you would instruct the witness not to answer those
9  questions?
10      MR. CULLEN: Right.
11      MR. HACKNEY: And I take it, Mr. Cullen,
12  that instruction would remain true both from -- at any
13  time?
14      MR. CULLEN: Right.
15      MR. HACKNEY: Not just with respect to the
16  June 4 meeting?
17      MR. CULLEN: Precisely.
18  BY MR. HACKNEY:
19  Q.  Okay. Let me ask you, Mr. Buckfire, I'm going to
20  speculate, perhaps not wildly, that you've negotiated
21  a few deals in your lifetime.
22  A.  Yes.
23  Q.  Isn't it fair to say as a negotiator, you have to have
24  an understanding of the financial needs and desires of
25  your client as well as the counterparty with whom you

Page 111

1  are negotiating?
2  A.  Yes.
3  Q.  You also have to have at least some understanding of
4  the legal framework in order to negotiate effectively,
5  correct?
6  A.  Yes.
7  Q.  You don't have to go to law school, right, but you do
8  have to understand some of the ins and outs of the
9  various legal documents that you're negotiating over,
10  correct?
11  A.  As well as any layman can be expected to do so.
12  Q.  Now, I'd like to get a level set as to where you were
13  on June 4th, 2013 as you're going into this meeting
14  with BAML.
15  A.  And UBS.
16  Q.  And UBS. So, they were there too?
17  A.  Yes.
18  Q.  Okay. I want to make sure I have a level set under
19  the operating assumptions that you had in your mind as
20  you were going into the meeting to negotiate with the
21  Swap counterparties, okay?
22      One of your operating assumptions was that
23  there were termination events existing under the
24  Swaps, correct?
25  A.  There were events of default existing under the Swaps,

Page 112

1  the collateral agreement.
2  Q.  Okay. So, let's take a step back and let me be more
3  precise.
4  A.  Okay.
5  Q.  So, there is a Swap agreement that the Swap
6  counterparties are parties to with the service
7  corporations?
8  A.  Correct.
9  Q.  You are aware of that?
10  A.  I am.
11  Q.  You are also aware that there is a collateral
12  agreement that is between among other parties the
13  City, the service corporations and the Swap
14  counterparties, correct?
15  A.  Yes.
16  Q.  Now, at the time you're going into the June 4 meeting,
17  one of your operating assumptions was that there were
18  termination events under the Swap that would give the
19  Swap counterparties the right to terminate?
20      MR. CULLEN: Objection. Foundation. I
21  think he said default events.
22      MR. HACKNEY: He said default events under
23  the collateral agreement. I'm trying to be precise
24  about --
25  A.  No, I was focused on the cash issue that would be at

1 risk under the collateral agreement.
2     BY MR. HACKNEY:
3 Q.  And let me tie it up a little bit to see if this jogs
4  your memory. The collateral agreement certainly
5  relates to the Swaps that was entered into in 2009,
6  correct?
7 A.  Correct.
8 Q.  The collateral agreement cash trap arguably slams shut
9  upon the occurrence of termination events or events of
10  default under the Swap, is that your understanding?
11     MR. CULLEN: Objection. Foundation. Form.
12  You can address the question if you understand it.
13 A.  I don't understand the question. I'm sorry.
14     BY MR. HACKNEY:
15 Q.  Okay.
16 A.  Want to try again.
17 Q.  Did you understand that the collateral agreement and
18  the cash trapping were securitizing the City's
19  obligations to the service corporations and the
20  service corporations' obligations to the Swap
21  counterparties under the Swap?
22 A.  No.
23 Q.  Did you understand that the collateral agreement what
24  it was ultimately securing was the termination payment
25  that might be made under the Swaps?

1     MR. CULLEN: Objection. Foundation. Form.
2 A.  No.
3     BY MR. HACKNEY:
4 Q.  Did you believe that the collateral agreement had
5  created like a new obligation by the City to pay the
6  Swap counterparties?
7 A.  It created a collateralized obligation to pay the Swap
8  counterparties.
9 Q.  Okay. So, going back to the June 4 meeting, let me
10  put it in vernacular that I hope is more correct about
11  what you were assuming. Okay?
12     You were assuming that there had been
13  events of default under the collateral agreement that
14  would allow the Swap counterparties to trap cash,
15  correct?
16 A.  I wasn't assuming anything. I knew there were two
17  events of default.
18 Q.  Let me --
19 A.  But they had not been asserted by the Swap
20  counterparties but they existed.
21 Q.  Let me restate it. As of June 4 you knew that there
22  were events of default under the collateral agreement
23  that would allow the Swap counterparties to trap cash,
24  fair statement?
25 A.  If they chose to do so, yes.

1 Q.  If they chose to do so.
2 A.  Correct.
3 Q.  And you also -- let me make sure I get this right.
4  You also believed that they would be able to declare
5  termination event and potentially be paid four hundred
6  million dollars, correct?
7 A.  Yes.
8 Q.  And that was also one of your operating assumptions as
9  you're going into the negotiation, correct?
10 A.  Yes.
11 Q.  And your understanding that they could do so was that
12  they could do so unilaterally, correct?
13 A.  Correct.
14 Q.  And your understanding with both with respect to
15  declaring termination of the Swaps and getting a
16  termination payment and trapping cash was that there
17  was no other party that could direct their actions,
18  correct?
19 A.  That's correct.
20 Q.  And your understanding of these operating assumptions
21  remain consistent between June 4 and June 11 when you
22  struck the agreement in principle, correct?
23 A.  Correct.
24 Q.  And in fact it remained consistent for you all the way
25  through the execution on July 15th of the forbearance

1  agreement, correct?
2 A.  Correct.
3 Q.  And the forbearance agreement itself did not
4  materially change the business terms of the deal that
5  you had struck on June 11th, correct?
6 A.  No, except for the small negotiation we had around the
7  date of the first option. It was the only material
8  business term that changed.
9 Q.  Okay. So, there was some changes of timing in terms
10  of when the percentages stepped up?
11 A.  Yes, because the agreement took a long time to
12  negotiate. We had originally assumed we would
13  complete a forbearance in June. It took until July so
14  we asked for and were granted an additional month on
15  the first option payment.
16 Q.  Fair point. Thank you for that correction. Other
17  than that change to what I'll describe as the business
18  terms that you negotiated on June 11th, there were no
19  other material changes to the deal that you struck,
20  correct?
21 A.  No.
22 Q.  It was just legal beagles doing what they do, correct?
23 A.  I would never call them legal beagles, but yes, the
24  lawyers were doing what they were supposed to do.
25 Q.  Okay. All right. Now, I want to clarify at the June

Page 117

1  4 meeting other than saying that the City would
2  vigorously litigate attempts to trap cash, you did not
3  express the City's views on the merits of that
4  litigation, correct?
5  A.  Correct.
6  Q.  You just said we're going to fight like hell to stop
7  you from trapping cash or words to that effect?
8  A.  That's correct.
9  Q.  And you didn't say by the way here's why we are going
10  to win because we have this great argument and you're
11  going to lose, right?
12  A.  I never said that.
13  Q.  Never said words to that effect, correct?
14  A.  No.
15  Q.  Never attempted to argue the merits of why the Swap
16  counterparties wouldn't be able to trap cash, fair
17  statement?
18  A.  Correct.
19  Q.  And no one else on the City side did either, correct?
20      MR. JURGENS: Objection to form.
21  A.  Not to my recollection.
22      BY MR. HACKNEY:
23  Q.  And you never attempted to argue the merits of the
24  City's case to the Swap counterparties at any time
25  between June 4 and June 11 when you reached the

Page 118

1  agreement in principle, correct?
2  A.  Correct.
3  Q.  And you never witnessed anyone else do so on behalf of
4  the City either, correct?
5  A.  Not that I recall.
6  Q.  You said that the June 4 meeting was about an hour and
7  a half long, is that right?
8  A.  Approximately.
9  Q.  How much additional time did you spend in actual
10  negotiation with the Swap counterparties between the
11  end of that June 4 meeting and the reaching agreement
12  in principle on June 11?
13  A.  It's hard to put an hour on that.  I only can tell you
14  that from the 4th until the 11th it was my exclusive
15  focus because it was a do-or-die issue for the City we
16  knew we had to get an agreement with them by the 11th
17  otherwise the consequences would be unbearable.
18      So, I would have to say that for my team
19  and myself it was a 24-hour dedication and I think for
20  the banks as well on their side it was probably
21  equally intense.
22  Q.  Absolutely understand that can understand that there
23  was a lot of work going on behind the scenes and in
24  anticipation of meetings, so on and so forth, but my
25  question is driving on, how much time you actually

Page 119

1  spent either on the phone with a Swap counterparty
2  principal or lawyer or whomever you were dealing with
3  this or in a meeting with them talking turkey about
4  the deal?
5  A.  Oh, hours.
6  Q.  Okay.  So, the first one was an hour and a half on
7  June 4.
8  A.  Introductory meeting.
9  Q.  Okay.  Let me go -- I'll go by meetings.  Okay.  How
10  long was June 8?
11  A.  That was about three hours.
12  Q.  Okay.  That was a three-hour negotiation?
13  A.  Yeah.
14  Q.  And did you meet again on June 11th?
15  A.  I think we did.
16  Q.  Okay.
17  A.  For perhaps two hours.
18  Q.  So, June 11 two hours.  And did you do any negotiating
19  over the phone in between June 4 and June 8 or June 8
20  and June 11?
21  A.  Yes.
22  Q.  And can you estimate the amount of time on the phone?
23  A.  I can't.  We were on the phone a lot.
24  Q.  Okay.  You know, I have six-and-a-half hours of
25  in-person negotiation.  Can you ballpark it in

Page 120

1  reference to that, were you doing more than that on
2  the phone?
3  A.  It was probably an equal amount.
4  Q.  Okay.
5  A.  But that was just the negotiations that I was involved
6  in.  I'm sure that counsel was having separate
7  conversations on their issues.
8  Q.  Yeah, and I'm not trying to address the -- any
9  wrangling about the legal terms that I understand was
10  not in your bailiwick.  You were the guy cutting the
11  business deal, correct?
12  A.  Right.
13  Q.  Now, at the time of the June 4 meeting you were aware
14  that a bankruptcy filing for the City of Detroit was
15  at least a possibility, correct?
16  A.  Yes.
17  Q.  Had you reached the view at that time that it was a
18  likelihood?
19  A.  It was a possibility.
20  Q.  But you can't say more than that that it was a
21  likelihood?
22  A.  No.
23  Q.  As of June 4?
24  A.  Correct.
25  Q.  And you also understood that the automatic stay is

Page 121

1 part of any bankruptcy proceeding as a restructuring
2 professional, isn't that correct?
3 A. Correct.
4 Q. And if I ask you at the time -- well, let me ask a
5 general question. I'm not asking you to disclose the
6 subject of communication -- the communications
7 themselves, but I want to ask whether you had taken
8 legal advice on the subject of the automatic stay.
9 Don't tell me what the legal advice was.
10 Had you taken legal advice on the subject
11 of the automatic stay at any time between June 4 and
12 June 11?
13 MR. CULLEN: You can answer that.
14 A. Yes, I did.
15 BY MR. HACKNEY:
16 Q. So, you had taken legal advice from Jones Day, is that
17 correct?
18 A. Correct.
19 Q. But if I ask you what the advice was, you'll follow
20 your counsel's instruction and not answer, correct?
21 A. Correct.
22 Q. You were asked questions about interest rates and
23 LIBOR and the questions I think focused on a gentleman
24 at your firm who has done some analysis whose name I
25 can't recall --

Page 122

1 A. Mr. Marken.
2 Q. Mr. Marken.
3 A. M A R K E N.
4 Q. I have a broader question which is at any time prior
5 to June 11th did you or anyone else at Miller Buckfire
6 to your knowledge perform an analysis of what interest
7 rates were likely to do in the future?
8 A. No.
9 Q. Did anyone study any LIBOR curves prior to June 11?
10 A. I don't recall.
11 Q. You certainly didn't?
12 A. I did not.
13 Q. Okay. When you testified about Mr. Marken, you
14 testified about something I think he had done a couple
15 days ago and we're in August. So, I'm going to ask
16 the same question now about July 15th which is the
17 execution date.
18 As of the execution date of the forbearance
19 agreement, had you or anyone else at Miller Buckfire
20 undertaken an assessment of what interest rates were
21 likely to do?
22 A. No.
23 Q. Prior to engaging in these negotiations between June 4
24 and June 11, did the City and the Swap counterparties
25 to your knowledge execute a nondisclosure agreement?

Page 123

1 A. I don't know.
2 Q. Is it a you definitely don't recall one being executed
3 but you don't know whether someone else might have or
4 you just can't remember?
5 A. I just don't remember.
6 Q. You were asked a lot of questions about the service
7 corporations. I think we established that you don't
8 know their directors and haven't met them, but I want
9 to make a point clear about the negotiations which is
10 you never engaged in arm's length negotiations with
11 the service corporations, correct?
12 A. Correct.
13 Q. And you never witnessed anyone else do so either,
14 correct?
15 A. Correct.
16 Q. And it's your understanding that Mr. Orr directed the
17 service corporations to execute the agreement and they
18 did, correct?
19 A. Correct.
20 Q. Now, you referenced a standstill agreement that was
21 something that had been proposed by the Swap
22 counterparties prior to June 4, 2013.
23 Do you recall that testimony?
24 A. I do.
25 Q. Your understanding of the standstill agreement, I

Page 124

1 understand we are going to get it but we don't have it
2 today so I have to tell you what I understand from
3 your testimony.
4 Your understanding of it was that it
5 allowed the cash to flow out of the -- it allowed the
6 casino revenues to flow in exchange for the City
7 agreeing to waive arguments about the invalidity of
8 the Swaps but was terminable at any time?
9 A. By the Swap counterparties.
10 Q. By the Swap counterparties, correct?
11 A. Correct.
12 Q. And that was unacceptable because that meant at any
13 time they could change their mind and trap the cash,
14 correct?
15 A. By those terms, yes.
16 Q. Now, under the forbearance agreement I understand that
17 you're not an attorney but you are a sophisticated
18 businessman who deals with legal documents on a
19 regular basis, true statement?
20 A. Regrettably.
21 Q. More than he wants to? But under the forbearance
22 agreement isn't it true that your understanding is
23 that the City has agreed during the forbearance period
24 that it won't seek to declare the Swaps invalid,
25 correct?

1  A.  Correct.
2  Q.  And during the forbearance period the Swap
3  counterparties are allowing the cash to flow through
4  the collateral account, right?
5  A.  Yes.
6  Q.  So, they waive their argument to trap the cash in
7  exchange for other things that they got, correct?
8  A.  Correct.
9  Q.  Now -- so, there are other elements of the forbearance
10  agreement, I understand that including the discount
11  and so on and so forth, but at least these two
12  elements bear some similarity to elements that were in
13  the standstill agreement, right?
14  A.  Yes.
15  Q.  The big difference is that the standstill agreement
16  which was terminable solely by the Swap counterparties
17  is different from the forbearance agreement because
18  the forbearance agreement creates a window of time for
19  the City to evaluate what it wants to do, correct?
20    MR. CULLEN:  Objection.  Foundation.  Form.
21  You can answer if you can unpack it.
22  A.  Would you -- would you mind asking me again.
23    BY MR. HACKNEY:
24  Q.  I don't mind at all.  One of the big differences about
25  the forbearance agreement that makes it acceptable to

1  you in comparison to the standstill agreement is the
2  forbearance agreement is not terminable at any time by
3  the Swap counterparties, correct?
4  A.  It's one element, yes.
5  Q.  Did you ever see whether you could attempt to cut a
6  more limited deal with the Swap counterparties that
7  was along the lines of the standstill agreement but
8  which simply extended a period of time in which the
9  City could have some assurance that the agreement
10  wouldn't be terminated?
11  A.  We considered all possibilities, but the proposal we
12  made to the banks on the 4th was the one that we made
13  because it was the one that was in the best interest
14  of the City.
15  Q.  You never proposed what I'll call a smaller deal that
16  would have attempted to maintain the status quo for
17  some period of time without trying to achieve a
18  potential termination of a Swap at a discount so on
19  and so forth, true statement?
20  A.  True.
21  Q.  Now, I know that you weren't engaged with the City at
22  every time between March 2012 and today.  I know your
23  retention was 60 days in 2012?
24  A.  It was very limited scope.
25  Q.  I take it that when you would re-engage with

1  something, you would undertake some efforts to find
2  out what had transpired while you were gone, correct?
3  A.  Correct.
4  Q.  Kind of catch up on the state of play?
5  A.  Yes.
6  Q.  Isn't it true that between March 12th of -- between
7  March of 2012 and June 4th, 2013, the Swap
8  counterparties had never terminated the Swaps,
9  correct?
10  A.  That's true.
11  Q.  Despite the fact that in your view they had the right
12  to do so, right?
13  A.  That's correct.
14  Q.  And during that entire time period which is 14 months
15  they had never demanded that cash be trapped, correct?
16  A.  No, they hadn't.
17  Q.  And your understanding of the state of play as you
18  came into the negotiations on June 4 was that the
19  prior negotiations were dormant and had been
20  unproductive, correct?
21  A.  True, but recall that the Swap counterparties were
22  through the various channels letting the City know
23  they were getting increasingly impatient.  That their
24  impatience was not permanent.  That we had had other
25  events of default that were causing them increasing

1  concern and they really wanted to sit down with us as
2  soon as possible to cut a deal.
3  Q.  Okay.  So, that's an important thing that --
4  A.  Which I did testify to in the morning.
5  Q.  I may have just missed it.  I heard you say that in
6  the meetings that they expressed their wearing
7  thinness of their patience.
8  A.  Yes.
9  Q.  I didn't understand that they had -- that they had
10  expressed that prior to June 4.
11  A.  Yes.
12  Q.  So, I may have misheard.  If I did, I apologize.
13  Can you tell me more about what precisely
14  you understood prior to when you set up the June 4
15  meeting you're downloading information from people
16  about what these Swap counterparties are saying to the
17  City, what download are you getting?
18  A.  We were re-engaged on January the 8th.  Of course we
19  did go back and bring ourselves up to speed on all the
20  relevant issues including the state of play on the
21  Swap termination issue.
22  We heard from people in the City, we heard
23  from counsel, we heard from others that they were
24  unhappy with the fact there was no deal.  They really
25  wanted to sit down with us and discuss something, and

Page 129

1  it was a very calculated risk on our part to hold them
2  off until we really knew what our true financial
3  position was, and, therefore, particularly after
4  Mr. Orr became the emergency manager in March which
5  was another event of default, we recognized we didn't
6  have a lot of time to engage with them.
7      We asked them indirectly through counsel to
8  be patient, that we recognize we would get to them
9  soon, but we didn't want to proceed on a piecemeal
10 basis with our creditors. We needed to understand the
11 true financial of the City before we decided what to
12 do.
13 Q.  Understood. That's very helpful. So, let me try and
14 summarize it which is when you re-engaged in January
15 of 2013, you were made aware of a -- of the general
16 desire of the Swap counterparties to for lack of a
17 better term figure out what the City and the Swap
18 counterparties were going to do about the Swap,
19 correct?
20 A.  Yes.
21 Q.  And you then held them off between that time and June
22 4 as you tried to buy time for Ernst & Young to get
23 its arms around the financial position of the City,
24 correct?
25 A.  Yes, and our other advisors.

Page 130

1  Q.  And your other advisors, absolutely. And it was only
2  after you had gotten that analysis done that you felt
3  you were now ready to initiate a meeting with the Swap
4  counterparties to speak meaningfully about what should
5  be done with the Swap?
6  A.  In the context of an overall recommendation to Mr. Orr
7  about how to protect the City and its liquidity.
8  Q.  And so during that time period which was from January
9  of 2013 to June of 2013, despite these growing signs
10 of impatience by the Swap counterparties, they still
11 didn't trap cash, did they?
12 A.  They were being paid in the ordinary course. There
13 was no economic consequence that they had to worry
14 about. They didn't know the financial condition of
15 the City. There was no economic reason for them to do
16 anything, but clearly as the condition of the City
17 became more desperate and everyone became more aware
18 of it, the risk they would do something became
19 greater.
20 Q.  I see. So, it was the disclosure of information by
21 Mr. Orr on June 14th, was that a factor that drove you
22 to negotiate in advance of that?
23 A.  No. Recall that his earlier disclosure was I believe
24 in April.
25 Q.  Oh, that's right.

Page 131

1  A.  And that was the first time that the public and the
2  capital markets really became aware of the true
3  financial condition of Detroit.
4  Q.  So, in April Mr. Orr made a disclosure that basically
5  said if I could summarize that things are not well in
6  Detroit, correct?
7  A.  That's accurate.
8  Q.  But despite that disclosure and subsequent to the
9  report in April and May, Swap counterparties didn't
10 demand cash be trapped, correct?
11 A.  Correct.
12 Q.  They didn't terminate the Swap, correct?
13 A.  Correct.
14 Q.  After June 11, after you've cut the business deal and
15 here come the lawyers to write it down, fair to say
16 that you're on the sidelines now as the lawyers work
17 out the legal language, but you're still monitoring
18 the course of the legal negotiations given the
19 importance of what's at stake?
20     MR. CULLEN: Objection. Foundation. Form.
21 You can address it.
22 A.  I was generally aware of what was going on.
23     BY MR. HACKNEY:
24 Q.  I'm trying to get on the idea that you're not on the
25 phone with all these lawyers like directly

Page 132

1  participating and listening to the negotiations of the
2  forbearance agreement itself but you're keeping tabs
3  on how it's progressing and when it's hoped to be
4  executed, correct?
5  A.  Correct.
6  Q.  Put another way, you are aware of the legal
7  negotiation process as it goes along even though
8  you're not personally involved in it, correct?
9  A.  Correct.
10 Q.  And that's because this was such an important
11 agreement that you as an important advisor to the City
12 needed to be up to speed on what was going on with the
13 forbearance agreement?
14 A.  Correct, but recall that on June 11th the Swap
15 counterparties did issue a letter to US Bank
16 authorizing them to release the tranche of cash due to
17 us on June 15th and therefore we knew we had until
18 July 15th to get to the next tranche.
19     So, from a financial perspective I was
20 comfortable with where we were with the Swap
21 counterparties.
22 Q.  Because after that discharge of cash, then it goes
23 back to just slowly building up, you get it for the
24 rest of the month and then it slowly builds up in the
25 first part of July?

Page 133

1  A.   Correct.
2  Q.   So, you felt like we had some time to negotiate?
3  A.   That's correct.
4  Q.   Yeah.  Your understanding is that the legal
5  negotiations of the forbearance agreement were
6  complicated but that they proceeded uninterrupted from
7  June 11th to July 15th, correct?
8  A.   Correct.
9  Q.   And if there had been a serious interruption in these
10  negotiations, you would have likely known about this
11  as an important advisor to the City, correct?
12  A.   Yes.
13  Q.   And you are aware of no serious interruption, correct?
14  A.   No.
15  Q.   That's not correct?
16  A.   I'm not aware of any serious interruptions.
17  Q.   In late June of 2013 you learned that Syncora wanted
18  to make a proposal to the City, isn't that correct?
19  A.   Yes.
20  Q.   And you had a conversation with Todd Snyder on the
21  subject of Syncora's potential proposal on Saturday,
22  June 29th, isn't that correct?
23  A.   That's correct.
24  Q.   Mr. Snyder you understood is a banker at Rothschild's,
25  correct?

Page 134

1  A.   Correct.
2  Q.   And you also understood that he was representing
3  Syncora, correct?
4  A.   Yes.
5  Q.   And you also understood that at the time that he was
6  calling you, that there had been previous
7  communications between counsel to Syncora and counsel
8  to the City, correct?
9  A.   I had heard about it but I wasn't aware of the
10  specifics.
11  Q.   Okay.  So, you knew Jones Day and Kirkland and maybe
12  others had met and talked about something but you
13  didn't know what it was?
14  A.   I knew they were talking about the issues raised by
15  Syncora.
16  Q.   Okay.  Now, tell me -- so, in terms of Syncora's
17  potential proposal, your first percipient knowledge of
18  it as a witness happens on that Saturday when you have
19  your conversation with Mr. Snyder, is that a fair
20  statement?
21  A.   Correct.
22  Q.   Tell me everything you can recall about that
23  conversation.
24  A.   It was quite brief.  Todd told me he had been retained
25  by Syncora and that they wanted to propose something

Page 135

1  that would be of benefit to the City in resolving the
2  Swap matter.  I told him that we were always willing
3  to listen to anything anyone had to say and I asked
4  him to tell me what he had in mind.  He never did.
5  Q.   Have you told me everything you can recall about that
6  conversation.
7  A.   Yes.
8  Q.   During that conversation didn't Mr. Snyder describe
9  the general structure of a proposal Syncora wanted to
10  make?
11  A.   No.
12  Q.   So, if Mr. Snyder says he did, he's lying or mistaken?
13  A.   He never made a specific proposal to me.
14  Q.   I'm not saying a specific proposal, I'm saying a
15  general structure of a proposal, that's what he
16  testified to in his affidavit.
17       Did he provide to you the general structure
18  of a proposal that Syncora wanted to make?
19  A.   Not that I recall.
20  Q.   Possible he did, possible he didn't, you just can't
21  remember?
22  A.   I can't remember.
23  Q.   Did he tell you that we'd be able to put specifics
24  into the general structure of the proposal if we could
25  execute an NDA that would allow us to learn about the

Page 136

1  negotiations with the Swap counterparties?
2  A.   Yes, he did.
3  Q.   What did you tell him in response to that?
4  A.   I said he should send us an NDA and we'll take a look
5  at it.
6  Q.   And you understood that at least as he expressed to
7  you that he wanted an NDA as a precursor in order to
8  make a specific proposal, correct?
9  A.   Correct.
10  Q.   Isn't it true that after that time you understood that
11  an NDA was proposed to the City, correct?
12  A.   Yes.
13  Q.   And the City refused to execute that NDA, isn't that
14  correct?
15  A.   That's correct.
16  Q.   Do you have information about why the City refused to
17  execute it?
18  A.   Well, as I recall the NDA was not with the City, it
19  was meant to be with Miller Buckfire and Jones Day and
20  we would not be able to disclose whatever they told us
21  to the City which made no sense, and that was the
22  reason we couldn't sign that NDA and that's why I
23  testified earlier he didn't really tell me a proposal,
24  he said I'd like to make a proposal.  He said I'll
25  tell you the proposal if you sign the NDA.  So we

1 never got a proposal.

2 Q. I want to make that clear that's subject to you saying

3 you don't remember whether he provided the general

4 outlines of the structure or not, correct?

5 A. No.

6 MR. CULLEN: Objection. Foundation. I

7 don't know what general --

8 MR. HACKNEY: Foundation?

9 MR. CULLEN: Yeah, general outline is my

10 problem.

11 A. I can't recall him telling me anything about what he

12 was going to propose and certainly wasn't specific.

13 If he had been specific, I probably would remember it.

14 BY MR. HACKNEY:

15 Q. And that's because -- but you do remember him telling

16 you the specifics would come after we sign an NDA?

17 A. I do.

18 Q. Yeah. And then your understanding is that there was a

19 problem with the NDA that you couldn't discuss the

20 proposal with the EFM?

21 A. That's correct.

22 Q. And that was something that the parties couldn't get

23 over?

24 A. I asked Jones Day to go back to Kirkland Ellis and try

25 to fix the problems we had in the NDA and then I moved

1 on to other issues.

2 Q. And your understanding was that to the extent those

3 problems didn't get fixed it was because Kirkland

4 Ellis was being obstinate with respect to the terms of

5 NDA?

6 A. I don't know why we never resolved it.

7 Q. So, to this day you don't know whether or not an NDA

8 could have been struck that would have allowed Syncora

9 to make a rival proposal, correct?

10 A. All I can tell you is that no NDA was entered into

11 because the terms were unacceptable.

12 Q. And you don't know why one wasn't entered into

13 ultimately after that?

14 A. I don't think we could ever resolve the issues.

15 Q. And this was in advance of your having executed the

16 forbearance agreement, correct?

17 A. Yes.

18 Q. As a negotiator, don't you agree that it's nice

19 whenever you can play two parties off against each

20 other?

21 A. I didn't have two parties, I had one party. I had the

22 Swap counterparties.

23 Q. And I'm not asking about in this case, I'm asking

24 about as a general principle, isn't it nice when you

25 can play two parties off against each other?

1 A. Sometimes.

2 Q. Isn't that something that you'll do in the DIP

3 financing which is you'll get all these offers in and

4 then you'll make these guys compete with each other in

5 order to drive best possible deal for the City,

6 correct?

7 A. Only if you assume a level playing field which this

8 negotiation was not.

9 Q. I'm just asking generally about the idea of trying to

10 drive the best deal possible through competition

11 amongst different negotiating parties. Can be

12 valuable, right?

13 A. Can be under the right circumstances. This was not

14 one of them.

15 Q. And what was wrong about the circumstances?

16 A. Because we had only two parties to the table, the Swap

17 counterparties who had signed the collateral

18 agreement. There was nobody else to negotiate with.

19 Q. That's right, that's right, because your understanding

20 was that Syncora had no rights whatsoever under the

21 collateral agreement, correct?

22 A. Correct.

23 Q. And your understanding was they had no ability to

24 direct the actions of the Swap counterparties,

25 correct?

1 A. I testified earlier that my understanding, I was

2 advised, the only parties of interest here are the

3 Swap counterparties.

4 Q. And it was also your understanding that Syncora didn't

5 have any rights under the Swaps that would be

6 terminated, correct?

7 A. Only talking about the collateral agreement.

8 Q. We talked about the fact that there might be a

9 termination event for four hundred million dollars.

10 That's not under the collateral agreement, right?

11 A. True.

12 Q. So, we are talking about the Swaps, right?

13 A. Yes.

14 Q. Now, let's put aside what you've been told about who

15 the relevant parties were. You did know that Syncora

16 was a Swap insurer, right?

17 A. Yes.

18 Q. And you understood as a layperson but a sophisticated

19 one that if an insurer makes a payment to the insured

20 it becomes subrogated to the rights of the insured

21 with respect to that payment, correct?

22 A. Yes.

23 Q. And isn't it true that if the Swap counterparties had

24 terminated, they wouldn't have waited around for two

25 years to collect the casino revenues, right, they

Page 141

1  would have demanded Syncora made good on its Swap
2  insurance and let Syncora try and stick around and
3  collect the casino revenues, correct?
4      MR. CULLEN: Objection. Foundation. Form.
5  Calls for speculation.
6  A.  It wasn't an issue for the City.
7      BY MR. HACKNEY:
8  Q.  I'm asking whether you thought that was a possibility
9  back at the time you were negotiating the forbearance
10 agreement?
11 A.  It wasn't an issue for the City. Had no impact on the
12 City's access to cash.
13 Q.  But if Syncora was a party that might come in in lieu
14 of the Swap counterparties, didn't you want to find
15 out whether you might be able to cut a better deal
16 with Syncora?
17     MR. CULLEN: Objection. Foundation. Form.
18 Calls for speculation.
19 A.  I can't speculate to that.
20     BY MR. HACKNEY:
21 Q.  All you can say is that you never did, correct?
22 A.  Correct.
23 Q.  And in fact between June 29th when you spoke to
24 Mr. Snyder and today, there have never been
25 substantive negotiations between the City and Syncora

Page 142

1  to your knowledge, isn't that correct?
2  A.  Not on this, no.
3  Q.  I wanted to clarify something that you said about the
4  DIP earlier and it was mainly that -- you used the
5  phrase I didn't understand with respect to the casino
6  revenues, you said -- you either said that the casino
7  revenues would be a part of the collateral package or
8  that part of the casino revenues would be in the
9  collateral package, and I wanted to clarify that.
10     MR. CULLEN: Objection. Foundation. Form.
11 I don't think he said either.
12 A.  I didn't.
13     BY MR. HACKNEY:
14 Q.  Oh, okay. Well, I thought for sure you had said one
15 of those two, but let me understand what you
16 anticipate -- this is subject to counsel's concern,
17 but I think there has been testimony about the casino
18 revenues as part of the collateral package.
19     As the banker who is leading the DIP,
20 what's your understanding of the role the casino
21 revenues will play in the collateral package offered
22 in connection with the DIP?
23 A.  They will be part of the collateral package.
24 Q.  So, they will be part, and when you say they, do you
25 mean a specific period of time of the casino revenues

Page 143

1  or do you mean casino revenues projecting into the
2  future?
3  A.  It's commercially sensitive so I'm going to decline to
4  answer it.
5      MR. HACKNEY: Okay. I'll just reserve on
6  that. I obviously don't think there's a bunch of
7  value we have going back and forth. I understand your
8  position about this. On some of the other ones, we
9  may come to those briefly and talk about it, but I get
10 the DIP one.
11     BY MR. HACKNEY:
12 Q.  You agree that the goal of the forbearance agreement
13 is to get the collateral agreement to terminate so
14 that the City can get access to the casino revenues,
15 correct?
16     MR. CULLEN: Objection. Foundation. Form.
17 A.  That is one of the goals.
18     BY MR. HACKNEY:
19 Q.  That is one of the goals. And isn't it true that your
20 current expectation is that you need the postpetition
21 financing, the DIP loan to close in order to be able
22 to exercise the option under the forbearance
23 agreement, correct?
24 A.  Correct.
25 Q.  And there was testimony on that today because you

Page 144

1  don't have the money otherwise, right, Mr. Buckfire?
2  A.  That is part of the collateral package, yes.
3  Q.  I'm talking about the use of proceeds of the DIP just
4  so we're clear. Part of the use of proceeds of the
5  DIP will be to exercise the option under the
6  forbearance agreement, correct?
7  A.  Correct.
8  Q.  You understand that you won't have unfettered access
9  to the casino revenues until you exercise the option
10 that leads to the termination of a Swap in the
11 collateral agreement, correct?
12 A.  Yes.
13 Q.  Isn't this a bit circular?
14 A.  Regrettably.
15 Q.  How did you factor that consideration into the
16 determination as to whether to engage in the
17 forbearance agreement?
18 A.  Well, this is why the Swap collateral agreement is
19 such a problem for the City. Unless we can eliminate
20 the collateral and regain control over gaming revenues
21 without risk of loss because of defaults that would
22 trap it, we need to rationalize and clean this up in
23 order to put the City on a sound financial basis.
24 Q.  So, there are two parts -- there are -- there may be
25 many parts but two of the important parts of the

## Page 145

1 forbearance agreement are getting the Swap
2 counterparties to waive their right to trap cash and
3 then taking out the Swap at a discounted value,
4 correct?
5 A. Well, if we take out the Swap at a discounted value
6 and we pay off the Swap, then there is no need for the
7 collateral agreement.
8 Q. That's true but that may be something that happens
9 down the road. So, in the interim between then it's
10 the waiver of the cash trapping rights and the
11 discounted potential value of the termination,
12 correct?
13 A. Which is a short-term agreement. It only goes to next
14 June. There are termination events along the way and
15 in any case as I am aware as a sophisticated layman,
16 there is risk under the bankruptcy code that the Swap
17 counterparties could avail themselves of relief under
18 the provisions for Swaps and irrespective of the
19 automatic state, still take the money.
20 Q. Okay. But they've waived those rights under the
21 forbearance agreement?
22 A. So long as the forbearance agreement exists.
23 Q. And they waive their rights under the collateral
24 agreement to trap crash, correct?
25 A. For now.

## Page 146

1 Q. I'd like to ask you about the court's approval of the
2 forbearance agreement. You've testified earlier that
3 if the court does not approve the forbearance
4 agreement, that will be of dire consequence to the
5 City of Detroit, correct?
6 A. If it leads to the consequence that we do not have
7 access to gaming revenues, correct.
8 Q. Okay. Now, conversely you testified earlier that if
9 the court approves the forbearance agreement, I'll say
10 this to you, you can decide whether you agree, you
11 almost testified that was synonymous with then
12 there being a closing under the option?
13 A. One is a condition that allows for the other.
14 Q. That's right. So, you understand that the court
15 granting the assumption agreement does not mean that
16 the City will exercise the option, correct?
17 A. You're assuming the Swap counterparties would allow us
18 to have one without the other.
19 Q. No, I'm actually saying the granting of the assumption
20 motion in your view is absolutely a necessary
21 precondition to the City even being able to exercise
22 the option, correct?
23 A. Yes.
24 Q. It doesn't mean that it will if the court grants the
25 assumption motion, it just means that it potentially

## Page 147

1 can?
2 A. That's correct.
3 Q. But do you also understand that if the court grants
4 the assumption motion and enters an order that's
5 significantly different from the one that's been
6 proposed, that the Swap counterparties have the
7 arguable right to terminate the forbearance period, do
8 you know that?
9 MR. CULLEN: Objection. Foundation. Form.
10 A. I don't know that.
11 BY MR. HACKNEY:
12 Q. So, I'd like to ask you about the concept of what I
13 call a clean closing, okay, and a clean closing is one
14 where you engage in a transaction with someone and
15 both parties walk away from the transaction with an
16 expectation that neither of them will have liability
17 arising from the closing. That's what I mean when I
18 say a clean closing.
19 Isn't it true that it's your understanding
20 that it is important to the Swap counterparties that
21 they get a clean closing with the City if the City
22 exercises its option?
23 A. Yes.
24 Q. And isn't it a fact that as large banks if there is
25 substantial risk that they will be sued by Syncora or

## Page 148

1 the COPs holders or FGIC or others surrounding the
2 City's exercise of the optional termination payment,
3 they may not close?
4 A. I don't know --
5 MR. CULLEN: Objection. Foundation. Form.
6 Speculation.
7 A. I don't know that.
8 BY MR. HACKNEY:
9 Q. And I'm not asking -- I should have rephrased. I'm
10 asking about your expectation of what they'll do if
11 there is substantial risk of litigation.
12 A. I think they'll honor the terms of the agreement and
13 close.
14 Q. Obviously as you sit here today I think you've had the
15 pleasure of being in court from time to time and
16 watching the festivities?
17 A. I saw you last week.
18 Q. Yes, that was an exciting time for me as I think
19 you've probably read in the newspapers.
20 Are you aware that -- I think it's safe to
21 say that you are aware now that there are parties like
22 Syncora and others that say that they will have claims
23 against the Swap counterparties because of the
24 forbearance agreement, isn't that true?
25 A. I've heard you say that.

Page 149

1  Q.   Okay.  If the court in granting its order about the
2  assumption agreement preserves those claims, do you
3  have a view as a banker as to whether the Swap
4  counterparties will close over those claims?
5     MR. CULLEN: Objection.  Foundation.  Form.
6  Asked and answered.
7  A.   No.
8     BY MR. HACKNEY:
9  Q.   You don't have a view?
10 A.   No.
11 Q.   Mr. Buckfire, you've been around a lot of deals,
12 right, nobody buys a lawsuit, right?
13    MR. CULLEN: Objection.  Foundation.
14 A.   I don't have a view on this one.
15    BY MR. HACKNEY:
16 Q.   All right.  Do you remember we talked about -- do you
17 remember that you talked about the concept that the
18 Swap counterparties could walk away from the Swaps if
19 interest rates ever look like they were going into
20 territory that was positive for the service
21 corporations?
22 A.   Yes.
23 Q.   And that was a right that you understood they had
24 received as part of the 2009 restructuring that led to
25 the collateral agreement, correct?

Page 150

1  A.   Yes.
2  Q.   Do you understand that that's called an optional early
3  termination?
4  A.   Yes.
5  Q.   And you understand that under -- when they exercise an
6  optional early termination, the Swap counterparties
7  take nothing from the service corporations, correct?
8  A.   That's correct.
9  Q.   That's the point of the walkaway which is they get to
10 walk away but they don't get paid anything?
11 A.   That's because the Swaps not in the money anymore.
12 Q.   Well, even if it is or is it isn't, right?
13 A.   Right.
14 Q.   In fact  today the Swaps are very much in the money,
15 correct?
16 A.   Correct.
17 Q.   And obviously the Swap counterparties have never
18 threatened to exercise an optional early termination,
19 correct?
20    MR. JURGENS: Objection to form.
21    MR. CULLEN: Objection to form.
22    BY MR. HACKNEY:
23 Q.   To you?
24 A.   No.
25 Q.   That wouldn't make sense, would it?

Page 151

1  A.   Not as long as you're being paid on time.
2  Q.   And also why would you terminate a Swap on an optional
3  early basis and be paid nothing when it is worth by
4  your testimony approximately three hundred million
5  dollars, correct?
6     MR. CULLEN: Objection.  Foundation.  Form.
7  A.   It wouldn't be economically rational.
8     BY MR. HACKNEY:
9  Q.   That would not be economically rational.  And your
10 understanding under the forbearance agreement is
11 what's happening is that in exchange for all the
12 consideration, the Swap counterparties' termination
13 rights are being discounted to somewhere between 75
14 and 82 percent, correct?
15 A.   Correct.
16 Q.   We talked a lot about cash flow forecasts earlier.
17 The cash flow forecasts that are contained in the
18 proposal that you discussed with Mr. Summers, do you
19 remember those?
20 A.   Yes, uh-huh.
21 Q.   E & Y prepared those, correct?
22 A.   Yes.
23 Q.   And you have certainly reviewed them and familiarized
24 yourself with them, correct?
25 A.   Yes.

Page 152

1  Q.   But you are not someone who can answer specific
2  questions about how they were created, correct?
3  A.   No, that's correct.
4  Q.   If I wanted to ask about any particular line item how
5  did they get this number, the person to ask that would
6  be Ernst & Young?
7  A.   Correct.
8  Q.   I'd like to go back and talk briefly about the art and
9  I don't want to talk about the art as part of the DIP
10 or anything like that or what you're going to do with
11 it.
12    I want to go back to June 4 and ask as of
13 June 4, had you made an assessment of the value of the
14 City's art collection?
15 A.   No.
16 Q.   Have you made even a rough approximation of its worth?
17 A.   No.
18 Q.   And why hadn't you done that?
19 A.   We're not qualified to do so.
20 Q.   Why hadn't you retained someone, gosh, back in
21 January, February that was qualified to do so to come
22 in and see whether these assets were valuable?
23 A.   We identified early on as an issue.  We got to it as
24 we could, but it was not a significant crisis for the
25 City because we were focused on cash and preserving

Page 153

cash.
Q. Well, sometimes art can be turned into cash I think, isn't that right?
A. **Some people would think so.**
Q. In fact there are art sales of significant amount every year in this country, isn't that right?
A. **So I'm told.**
Q. And you've read about them in the paper from time to time when you read the Wall Street Journal, correct?
A. **Yes.**
Q. And this is art that the City owns, right?
**MR. CULLEN:** Objection. Foundation. Form.
BY MR. HACKNEY:
Q. Correct?
A. **That's correct.**
Q. But you understood took no effort to see whether the City could obtain cash out of assets that were hanging in the Detroit Art Institute as a substitute for going in and engaging in this negotiation with the Swap counterparties, correct?
A. **Correct.**
Q. We talked earlier about creditor recoveries and I want to make sure that I understand your testimony on that point.
You understand that Mr. Orr made a proposal

Page 154

to creditors that's called proposal for creditors back in June of 2013, correct?
A. **Correct.**
Q. You helped him formulate that proposal, isn't that right?
A. **Yes.**
Q. The proposal -- I'm going to summarize it but you should feel free to correct me as somebody who knows it better and can say it better than I, but basically put the proposal suggests that unsecured creditors will share in two billion dollars of bonds that are issued by the City upon emergence, correct?
A. **Correct.**
Q. And the proposal assumes that the City will have unfettered access to casino revenues because that's what its projections show, correct?
A. **Yes.**
Q. So, even if the City has unfettered access to the casino revenues, its current proposal is still that the unsecured creditors will just share in this two billion dollar pot, correct?
A. **That's correct.**
Q. So, is it fair to say that getting access to this money will not by itself increase creditor recoveries?
A. **No, it's part of the base case plan that we presented**

Page 155

**which is the base case recovery we presented on June 14th.**
Q. Right. So, if the court grants the motion and you get access to it, that will be consistent with the base case which is consistent with the two billion dollar offer, right?
A. **Correct.**
Q. So, it won't go up if the court grants you the access that you're assuming you'll get?
A. **But it will go down if the court does not.**
Q. That's a different question. I'll get to that in a moment.
It won't go up if the court grants the motion, correct?
A. **Correct.**
Q. Your argument if I understood it was that the casino revenues will be used to invest in the City, correct?
A. **Revenues of the City are fungible. All I'm saying if you don't have access to those revenues, then you don't have the billion dollar plus of revenues that you thought you had which is supporting not only current operations but the reinvestment plan.**
Q. And I will say that I had understood you earlier to say if you didn't have access to casino revenues, that

Page 156

City services would suffer?
A. **In the short-term, yes.**
Q. Yeah. But it's fair to say that you're not proposing to obtain the casino revenues, access to them and throw them on to the pot of the two billion dollars that's already being proposed to unsecured creditors, correct?
**MR. CULLEN:** Objection. Foundation. Form.
If you can make any sense of that question, you can answer it.
A. **I've already testified that the access to gaming revenues is part of the plan which supports the two billion dollar anticipated issuance of notes.**
BY MR. HACKNEY:
Q. And you mean that from a feasibility standpoint, right?
A. **Yes.**
Q. You mean it will strengthen the City and that will make the City more able to perform under the notes and that will make the notes more valuable to the creditors, right?
A. **That would be one result.**
Q. Let me ask you by how much will creditor recoveries go down if the court declines to approve the forbearance agreement?

1  A.  We haven't calculated that plan yet.  It would
2  certainly be a significant reduction and it would be
3  borne primarily by the unsecured creditors as a
4  group.
5  Q.  Prior to July 15th you had not attempted a detailed
6  calculation to understand the impact to unsecured
7  creditor recoveries if the casino revenues were not
8  unfreed, correct?
9  A.  That's correct.
10  Q.  So, you don't know whether it's pennies on the dollar
11  or dimes on the dollar, correct?
12  A.  We are already at dimes on the dollar in this --
13  There's only pennies left.
14  A.  We hope there's pennies left.
15  Q.  There was some -- there was a lot of questioning
16  about the financial forecasts, and I'm not going to
17  try and reinvent the wheel, but I would ask you to go
18  back to that Page 35 that you were discussing
19  earlier.
20     Do you remember, Mr. Buckfire, being asked
21  questions about this page?
22  A.  I do.
23  Q.  And I guess I want to be clear that -- I know we're
24  coming to the end of 2013, so, we'll move to this
25  other page in a second, but at least with respect to

1  2013 if you put legacy expenditures aside,
2  Ernst & Young forecast is of a substantial net
3  operating surplus in excess of four hundred million
4  dollars, correct?
5  A.  But how can you put legacy expenditures aside in 2013
6  because we were doing all this through the end of
7  June.
8  Q.  Fair enough.
9  A.  So, these are the numbers.
10  Q.  Well, these are -- 2013 includes probably a full year
11  projection, so --
12  A.  Fiscal year ends June 30th.
13  Q.  Oh, so, fiscal year 2013 ends on June?
14  A.  That's correct.
15  Q.  Let's go to 38 then.
16  A.  Okay.
17  Q.  Good correction there.  We'll see if it's a big
18  difference in 2014.  So, this is the next fiscal year,
19  right?
20  A.  Correct.
21  Q.  And this is again a financial forecast prepared by
22  Ernst & Young, correct?
23  A.  Yes.
24  Q.  Now, I understand your point about the fact that this
25  doesn't reflect the different initiatives that Mr. Orr

1  wants to implement, okay, so let me bracket that, I
2  heard you say that earlier, but if you hold those to
3  one side and if you also hold legacy expenditures to
4  one side, what the City's numbers reveals is that it
5  has a nearly four hundred million dollar net operating
6  surplus, correct?
7  A.  One could look at it that way.
8  Q.  And all of the cops and the fire department and the
9  ambulance drivers, their payroll, that's all included
10  in these numbers, correct?
11  MR. CULLEN: Objection.  Foundation.  Form.
12  A.  Yes.
13  BY MR. HACKNEY:
14  Q.  And so are their health benefits, correct?
15  A.  Yes.
16  Q.  Okay.  So, if I understood it correctly, Mr. Orr wants
17  to do a billion and a quarter of reinvestment in the
18  City over the next ten years, correct?
19  A.  That's right.
20  Q.  And that's about 125 million a year, correct?
21  A.  That's correct.
22  Q.  And, so, even if we took the 397 down by his
23  initiatives by 125 million, you'd still have
24  approximately 272 million dollars left, correct, in
25  net operating surplus?

1  A.  Yes.
2  Q.  And that's even with him being able to do all the
3  wonderful things that he wants to do for the City,
4  right?
5  A.  That's correct.
6  Q.  So, we're now going to go to the area where I begin to
7  do complex math which means adding things twice in a
8  row where I often fall down.  But I said it was about
9  272 and the casino revenues are only about 170 in this
10  forecast, right?
11  A.  That's correct.
12  Q.  So, even if you didn't have those and even if Mr. Orr
13  did all his improvements, you'd still have a hundred
14  million dollar net operating surplus, correct?
15  A.  No, that's actually not the case, and this is not
16  meant to be the City's plan, it's not the City's plan.
17  If you are proposing a different plan where the City
18  plans to liquidates itself, then yes, I guess you
19  could look at it this way.
20  Q.  I'm just referring to the preliminary forecast that
21  you all put together in this proposal and gave to us.
22  A.  This is not the City's plan and it's not the City's
23  forecast.  This is an illustration of what happens if
24  you don't do anything.
25  Q.  And the key differences between this and what the

1  City's plan is are the investments that Mr. Orr wants
2  to make, right?
3  A.  Right.
4  Q.  And the cost reductions he wants to make, right?
5  A.  And the increase in staffing levels across services to
6  provide higher level services to the City.
7  Q.  But that's in the reinvestment, right?
8  A.  No, it's actually hard to break out that way because a
9  lot of it is actually in the salaries line and the HR
10  lines.
11      So, you have to go back to the numbers and
12  ask me a lot of those questions.
13  Q.  The proposed investments that he wants to make, that
14  he proposes to make that I'm so ruthlessly omitting,
15  they are in this document, right?
16  A.  Not in this projection.
17  Q.  They're not in this projection, but they are in this
18  proposal?
19  A.  That's right.
20  Q.  He laid them all out in gory detail?
21  A.  Yes, he did.
22  Q.  He also lays out a number of cost cutting initiatives,
23  isn't that correct?
24  A.  Yes, he does.
25  Q.  And one of his goals is also to make the City more

1  efficient, correct?
2  A.  Yes.
3  Q.  At the same time he also wants to make it operate
4  better, correct?
5  A.  Correct.
6  Q.  Those two things from a net operating standpoint work
7  in tension with one another, right?
8  A.  They do over time, but you have to consider the
9  timetable and when these things are done.
10  Q.  I want to ask you a question about state and federal
11  aid but I don't want to mix it up into the DIP which I
12  understand -- which I took to mean earlier was one of
13  the sensitivities there.  I want to go back to June 4,
14  2011.
15      Prior to June 4, 2011 had you undertaken
16  any effort to evaluate whether there was either state
17  aid or federal aid that you could use in lieu of
18  having to negotiate this deal with the Swap
19  counterparties?
20  A.  We are assuming there is no aid available to the City.
21  Q.  You were assuming that there was none, but had you
22  undertaken an effort to determine whether there could
23  be some?
24  A.  I've already testified that I'm not going to discuss
25  that.

1  Q.  And why aren't you going to tell me about that?
2  A.  It's commercially sensitive information.
3  Q.  Why?
4  A.  That's my answer.
5  Q.  Well, I can understand why if you are seeking estate
6  guarantee of a DIP or other things today, I get that,
7  and I'm not going to ask you about that, but I am
8  going to say that I think I deserve an answer on what
9  happened prior to June 4 in terms of finding
10  alternative ways to address the City's liquidity
11  crisis because after all what's been presented to us
12  was if we didn't do this deal, the City would die, and
13  I do think we are entitled to ask well, what had you
14  tried to do with other actors, so, can we get over it
15  or --
16      MR. CULLEN: You could certainly ask if he
17  had received any assurance of the availability of any
18  other funding from any other source during that time
19  period.
20      MR. HACKNEY: Well, I do appreciate that
21  but I often tend to ask my own questions.    Let me
22  try and ask it in a way that hopefully serves your
23  concerns.
24      BY MR. HACKNEY:
25  Q.  And let me first ask you, Mr. Buckfire, had your firm,

1  you or your firm undertaken any analysis of this
2  question?  You don't have to tell me what it was.
3  Let's go in stages.
4      Had you analyzed the problem?
5  A.  Yes, we did.
6  Q.  You had analyzed the problem.  And is it your
7  testimony that divulging the results of that analysis
8  would be commercially sensitive?
9  A.  Yes.
10  Q.  Is part of the reason for that because of the way any
11  potential aid from the City or from the state or the
12  feds might interplay with the DIP process, is it the
13  way they knit up, is that the problem?
14  A.  Yes.
15  Q.  All right.
16      MR. HACKNEY: Let me suggest a short break.
17  I think that it may be time for me to pass the baton.
18      MR. CULLEN: Okay.
19      VIDEO TECHNICIAN: The time is 2:19 p.m.
20  This marks the end of tape number three.  We are off
21  the record.
22      (Recess taken at 2:19 p.m.)
23      (Back on the record at 2:30 p.m.)
24      VIDEO TECHNICIAN: We are back on the
25  record at 2:30 p.m.  This marks the beginning of tape

Page 165

1  number four.
2  **EXAMINATION**
3  **BY MS. DIBLASI:**
4  Q.  Good afternoon, Mr. Buckfire, my name is Kelly
5  DiBlasi. I'm an attorney at Weil, Gotshal & Manges.
6  We represent Financial Guaranty Insurance Company
7  which others have referred to and I will refer to as
8  FGIC or FGIC.
9    I'm going to ask you a few questions about
10  some of the topics that have been addressed today. I
11  will do my best not to repeat any questions.
12    I would ask that you assume that the ground
13  rules that Mr. Hackney and Mr. Summers previously
14  discussed with you still apply in terms of if you
15  don't understand a question that I've asked, ask me to
16  repeat it, etcetera.
17  A.  Thank you.
18  Q.  Is it your understanding that the Series 2006-B COPs
19  were issued with a floating interest rate?
20  A.  Yes.
21  Q.  And is it your understanding that the Swap contracts
22  were entered into to hedge against the interest rate
23  risk associated with the Series 2006-B COPs?
24  A.  Yes.
25  Q.  And the Swap contracts accomplish this hedge by

Page 166

1  effectively limiting the City's payment obligations
2  under the service contracts with respect to the Series
3  2006-B COPs to the fixed rate that's set forth in the
4  Swap contracts, is that correct?
5  A.  Correct, which was amended in 2009.
6  Q.  What was amended?
7  A.  The original fixed rate was lower in 2006 and it was
8  increased slightly in 2009 as part of the amendment.
9  Q.  The Swap contracts were amended in 2009 --
10  A.  The rate, the rate was.
11  Q.  The rate on the Series 2006-B --
12  A.  That's my understanding.
13  Q.  Okay. And with the amendment in 2009 the Swap
14  contracts still remained in place, correct?
15  A.  That's my understanding.
16  Q.  And those Swap contracts are still in place today and,
17  therefore, still hedging the interest rate risk today?
18  MR. CULLEN: Objection. Foundation. Form.
19  A.  Except as modified by the 2009 amendment.
20  BY MS. DIBLASI:
21  Q.  So, do you agree that from the perspective of the City
22  with the Swap contracts in place it's as if the
23  Series 2006-B COPs have a fixed interest rate?
24  A.  Yes.
25  Q.  Have you heard of structures like this being referred

Page 167

1  to as a synthetic fixed rate of interest?
2  A.  Yes.
3  Q.  Is it fair to say that from the perspective of the
4  City, the issuance of the 2006-B COPs and the
5  execution of the Swap contracts were part of an
6  integrated transaction?
7  MR. CULLEN: Objection. Asks for a legal
8  conclusion.
9  A.  No.
10  BY MS. DIBLASI:
11  Q.  Were they executed at the same time?
12  A.  I don't know.
13  Q.  Why was the transaction structured with a Series
14  2006-B COPs having a floating interest rate hedged by
15  the Swap contracts as opposed to merely issuing the
16  2006-B COPs with a fixed rate?
17  MR. CULLEN: Objection. Foundation. Form.
18  A.  I don't know.
19  BY MS. DIBLASI:
20  Q.  Do you know who designed this structure?
21  A.  No.
22  Q.  Is there any benefit to the City from having this
23  structure with the 2006-B COPs having a floating rate
24  hedged by the Swap contracts as opposed to merely
25  issuing those COPs with a traditional fixed rate?

Page 168

1  MR. CULLEN: Objection. Foundation. Form.
2  A.  All their debt is now fixed. I mean they are not
3  taking any interest rate risk as a result of the Swap
4  that was put on top of the floating rate COPs. That
5  is the benefit to the City.
6  BY MS. DIBLASI:
7  Q.  The benefit to the City from the structure is that
8  it's a comparable interest rate risk exposure for the
9  City?
10  A.  They have eliminated the floating rate exposure and
11  now they have a fixed rate on this debt similar to the
12  rate exposure they have on the 2005 COPs which are
13  fixed rate. So, it's all fixed now.
14  Q.  So, why not just issue it with fixed to begin with?
15  MR. CULLEN: Objection. Foundation. Form.
16  A.  I don't know why they did it this way.
17  BY MS. DIBLASI:
18  Q.  Would the City have had to pay higher interest rates
19  if the COPs were all issued with fixed rates?
20  MR. CULLEN: Objection. Foundation. Form.
21  A.  It was 2006. I don't know.
22  BY MS. DIBLASI:
23  Q.  Would the City have agreed to restructure where the
24  2006-B COPs were issued with a floating rate of
25  interest without having an interest rate hedge in

Page 169

1 place?
2    **MR. CULLEN:** Objection. Foundation. Form.
3 **A. I don't know.**
4    **BY MS. DIBLASI:**
5 Q. You stated previously that the City benefits from
6 having the hedge that's created by the Swap contracts
7 in place.
8    Do you have a view as to whether FGIC and
9 Syncora who insured the Series 2006-B COPs also
10 benefit from this hedge?
11    **MR. CULLEN:** Objection. Foundation and
12 form.
13 **A. Well, the Swap was -- in general interest rate Swaps**
14 **are done for the benefit of the borrower to eliminate**
15 **exposure to higher interest rates. That's the benefit**
16 **of a Swap contract.**
17    **BY MS. DIBLASI:**
18 Q. Are you aware of the fact that FGIC and Syncora
19 insured the Series 2006-B COPs?
20 **A. Yes.**
21 Q. As insurers of those certificates, is there any
22 benefit to the payment obligations of the City with
23 respect to those certificates being hedged by the Swap
24 contracts?
25    **MR. CULLEN:** Objection. Foundation. Form.

Page 170

1 **A. Well, if there is, there is only the indirect benefit**
2 **that if you believe there was a risk at the time you**
3 **are entering into a Swap that floating rates might go**
4 **to 20 percent and that might bankrupt the City and,**
5 **therefore, could not pay the underlying debt, I**
6 **suppose it's a benefit.**
7    **BY MS. DIBLASI:**
8 Q. And are you aware of the fact that FGIC also insured
9 certain obligations to the Swap counterparties under
10 the Swap contracts?
11 **A. Yes.**
12 Q. Are you aware of the fact that when FGIC issued the
13 policies in 2006 insuring the Swap contracts, it did
14 not charge any additional premium for those policies?
15 **A. I'm not aware of that.**
16    **MS. DIBLASI:** I'd like to have this marked
17 as Exhibit 5, please.
18    **MARKED FOR IDENTIFICATION:**
19    DEPOSITION EXHIBIT 5
20    2:37 p.m.
21    **BY MS. DIBLASI:**
22 Q. So, the document that was just marked as Deposition
23 Exhibit 5 is entitled presentation to FGIC, City of
24 Detroit dated April 26th, 2005.
25    Mr. Buckfire, have you ever seen this

Page 171

1 document before?
2 **A. No.**
3 Q. Does it appear to you that this presentation was
4 prepared or given by the City?
5    **MR. CULLEN:** Objection. Foundation. Form.
6 **A. That's what it says.**
7    **BY MS. DIBLASI:**
8 Q. So, prior to today did you have any awareness of the
9 existence of this document?
10 **A. No.**
11 Q. Just going to shift gears and have one final question
12 for you, Mr. Buckfire. You testified previously that
13 Miller Buckfire distributed a request for proposal to
14 parties who may be interested in providing the City
15 with DIP financing, correct?
16 **A. Yes.**
17 Q. Is the City of Detroit in possession of a copy of that
18 request for proposal?
19 **A. Yes.**
20    **MS. DIBLASI:** I have nothing further.
21    (Discussion off the record at
22    2:39 p.m.)
23    (Back on the record at 2:39 p.m.)
24    **EXAMINATION**
25    **BY MS. ENGLISH:**

Page 172

1 Q. Hi. I'm Caroline English. We met earlier. I'm from
2 Arent Fox. I represent Ambac.
3    I am going to ask you some questions based
4 on testimony you've already given, nothing new really,
5 I just want to back up and clarify a few things and
6 ask a couple of follow-ups. So, I apologize if it
7 seems like I'm bouncing around. I'm just going
8 through my notes of what you said earlier today.
9 Okay?
10 **A. Thank you.**
11 Q. I want to start by asking you whether you discussed
12 any legal arguments that the City might have had
13 against the Swap counterparties with Mr. Orr?
14    **MR. CULLEN:** That's a yes or no question.
15 **A. Would you remind repeating it?**
16    **BY MS. ENGLISH:**
17 Q. Did you discuss any legal arguments that the City
18 might have had against the Swap counterparties with
19 Mr. Orr?
20 **A. No.**
21 Q. Did you discuss any legal arguments the City might
22 have had against the Swap counterparties with anyone
23 from Jones Day?
24 **A. Yes.**
25 Q. Who would those conversations have been with?

Page 173

1 A. Corinne Ball, B A L L, Joel Telpner, T E L P N E R,
2  Benjamin Rosenblum.
3 Q. Anyone else?
4 A. Not that I can recall.
5 Q. When would those discussions have taken place?
6 A. Probably beginning in May.
7 Q. May of 2013?
8 A. Correct.
9 Q. And Mr. Orr was not involved in those conversations?
10 A. Not to my knowledge. These are conversations I had.
11 Q. Was anyone else involved in those conversations other
12  than you and the attorneys from Jones Day?
13 A. Some of my colleagues from Miller Buckfire from time
14  to time but primarily it was myself.
15 Q. Other than Miller Buckfire representatives and Jones
16  Day representatives, was there anyone else on those
17  conversations?
18 A. No.
19 Q. Were they phone calls?
20 A. Meetings and phone calls.
21 Q. Meetings and phone calls? In-person meetings?
22 A. Yes.
23 Q. About how many meetings and phone calls were there?
24 A. With Jones Day?
25 Q. Uh-huh.

Page 174

1  MR. CULLEN: Or about this subject matter?
2  BY MS. ENGLISH:
3 Q. Yes, about legal arguments that the City could assert
4  against the Swap counterparties.
5 A. We had many conversations about this topic among
6  others. I couldn't tell you with specificity which
7  ones we did on which call.
8 Q. Well, right now I'm just asking how many conversations
9  do you think you had?
10 A. Many.
11 Q. Many? More than a dozen?
12 A. No.
13 Q. More than a half a dozen?
14 A. Somewhere around there.
15 Q. Somewhere around a half a dozen. And were they all in
16  May of 2013?
17 A. As I recollect, yes.
18 Q. As you began negotiating with the Swap counterparties
19  starting in, say -- starting with the June 4th
20  meeting, did you continue to have conversations with
21  Jones Day about legal arguments that the City could
22  raise?
23 A. No.
24 Q. You want to give a minute here for your counsel maybe
25  to object, maybe not, what legal arguments did you

Page 175

1  discuss that the City might be able to raise against
2  the Swap counterparties?
3  MR. CULLEN: I'm going to object and direct
4  him not to answer.
5 A. I wouldn't have answered anyway, but thank you.
6  MR. CULLEN: Quite all right.
7  BY MS. ENGLISH:
8 Q. Do you like that I gave you the warning --
9 A. It was very polite.
10 Q. Here it comes, right?
11 A. Big flag, now --
12  MR. CULLEN: It's after lunch, anything
13  could happen.
14  MS. ENGLISH: Can I get you some to go in
15  that coffee?
16  BY MS. ENGLISH:
17 Q. All right. May I assume that any questions I ask you
18  about what legal arguments or issues you might have
19  discussed that the City would have had to assert
20  against the Swap counterparties, conversations you
21  would have had with Jones Day people your counsel is
22  going to object and instruct you not to answer?
23  MR. CULLEN: You can assume that.
24  BY MS. ENGLISH:
25 Q. Slightly different question. Did you have any

Page 176

1  discussions with Mr. Orr regarding the probability of
2  success on legal arguments the City could raise
3  against the Swap counterparties?
4 A. Yes.
5 Q. When did those discussions take place?
6 A. During May.
7 Q. Can you tell me about those discussions with Mr. Orr?
8  MR. CULLEN: Direct him not to answer.
9  BY MS. ENGLISH:
10 Q. Okay. Did you -- how many discussions would you have
11  had about the probability of success on the City's
12  legal arguments?
13 A. A few.
14 Q. A few? Are we talking now less than a half a dozen?
15 A. A few.
16 Q. A few. Were they all in May 2013 or did they continue
17  beyond that?
18 A. It's possible they continued in June but I don't
19  recall.
20 Q. Did you have any discussions with Jones Day about the
21  probability of success of the City's legal arguments?
22  MR. CULLEN: Subject but --
23 A. Yes.
24  BY MS. ENGLISH:
25 Q. When did those discussions take place?

13-53846-swr    Doc 2014-24  Filed 12/10/13  Entered 12/10/13 22:00:23    Page 48 of 54
13-53846-swr    Doc 2014-24  Filed 12/10/13  Entered 12/10/13 22:00:23    Page 48 of 54    153
456

**Page 177**

1 A.  May.

2 Q.  How many of those discussions were there?

3 A.  Call it half a dozen.

4 Q.  Half a dozen.

5    MS. ENGLISH:  And if I ask him to tell me

6 about those conversations, will you direct him not to

7 answer?

8    MR. CULLEN:  I will indeed.

9    BY MS. ENGLISH:

10 Q.  Did you discuss with anyone else the probability of

11 success that the City might have had on legal

12 arguments against the Swap counterparties?

13 A.  No.

14 Q.  Were there any written documents or memos that

15 evaluated the City's legal arguments against the Swap

16 counterparties?

17    MR. CULLEN:  That he saw.

18    BY MS. ENGLISH:

19 Q.  Yes, that you saw.

20 A.  No.

21 Q.  Are you aware of any written analyses that were done

22 about the legal arguments the City might assert?

23 A.  No.

24 Q.  Going into the June 4th -- starting on June 4th the

25 negotiations with the Swap counterparties, did you

**Page 178**

1 assume that the Swap counterparties' liens were valid?

2    MR. CULLEN:  Objection.  Foundation.  Form.

3    BY MS. ENGLISH:

4 Q.  I'm sorry, your answer?

5 A.  Can you repeat the question?

6 Q.  Going into the start of the negotiations with the Swap

7 counterparties on June 4th, did you assume that the

8 Swap counterparties' liens were valid?

9 A.  I did.

10 Q.  Earlier in your testimony you indicated that you had

11 reviewed all possible alternatives to doing a deal

12 with the Swap counterparties, and you gave two

13 examples, one was a novation and one was getting

14 another Swap counterparty involved with no collateral.

15 Do I have that right?

16 A.  No, a novation would be another Swap party coming in

17 to assume the position of the Swap party here and if

18 one could do that and get them to do it without

19 collateral, then that would be a benefit.

20 Q.  Okay.

21 A.  That would have to mean unsecured credit.  However,

22 the last refinancings the City did were on a secured

23 basis as is public record and the City's ability to

24 access unsecured credit of any kind is effectively

25 zero and it was zero then as well.

**Page 179**

1    So, even though we considered it, we

2 realized it was impractical.

3 Q.  Okay.  So, this novation and sort of redoing this Swap

4 contract with no collateral was an option you looked

5 at but was not feasible, is that correct?

6 A.  That was our judgment, it was not feasible.

7 Q.  All right.  Now, you said you had reviewed all

8 possible alternatives.  Is that the only alternative

9 you looked at or were there others?

10 A.  Well, there were other theoretical alternatives but

11 none of them were practical.

12 Q.  Can you tell me what the other alternatives were that

13 you considered?

14 A.  Well, we considered finding another lender to fund the

15 termination of the Swaps.  This is back in May when we

16 knew the financial condition of the City was dire.  We

17 did not think we could attract a lender to come in to

18 take out the Swap termination payment at a hundred

19 cents or even at a discount under the tight time frame

20 that we had to work with nor did we think we could do

21 that at a rate of interest that could ever be

22 acceptable to the City.

23 Q.  Let me stop you right there and ask did you try?

24 A.  No.

25 Q.  Were there any other alternatives that you considered

**Page 180**

1 other than we've got now the novation idea and finding

2 another lender to fund the termination of the Swaps.

3 A.  Those are the two principal alternatives.

4 Q.  Principal alternatives.  Were there other not

5 principal alternatives but still alternatives?

6 A.  We reviewed the noncore assets of the City to

7 determine whether there was any source of ready cash

8 that we could access to use to fund the termination

9 payment.  We considered alternate source of funding,

10 for example, state and federal aid as I already

11 testified I'm not going to address.  We considered

12 everything.

13 Q.  Prior to June 4th, did you submit a request to the

14 state for aid on behalf of the City?

15 A.  I'm not going to answer that question.

16 Q.  You will not answer even whether the City made a

17 request for state aid prior to June 4th?

18 A.  It's commercially sensitive information.  I

19 respectfully cannot answer that question.

20 Q.  Was there a request for state aid that was rejected

21 prior to June 4th?

22 A.  I'm not going to answer that question.

23 Q.  On what basis won't you answer whether there was one

24 that was rejected?

25 A.  Commercially sensitive information.

## Page 181

1 Q. How is it commercially sensitive? If there was a
2 state aid request that was rejected, how is that
3 sensitive now?
4 A. You're asking me to speculate.
5 Q. I'm asking you why you're not answering.
6 A. It's commercially sensitive information.
7 Q. Tell me why it's commercially sensitive in your view.
8 A. It would have an impact on our ability to prosecute a
9 successful DIP financing process for the City at this
10 point.
11 Q. It would jeopardize your DIP financing if the public
12 knew that a state aid request had been rejected prior
13 to June 4th?
14 A. You're saying that. I didn't say that.
15 Q. I'm trying to understand why you won't give us the
16 information.
17 A. It's commercially sensitive.
18 Q. How is it commercially sensitive?
19     MR. CULLEN: Asked and answered.
20 A. I'm not going to answer it.
21     BY MS. ENGLISH:
22 Q. Just for kicks let's do the same line of questioning
23 for federal aid, okay? Was there a request made by
24 the City for federal aid prior to June 4th?
25 A. I decline to answer that question.

## Page 182

1 Q. On what grounds do you decline to answer?
2 A. It's commercially sensitive information.
3 Q. And why do you feel it's commercially sensitive?
4 A. Because it would have an impact on our DIP financing
5 process.
6 Q. Was there a request for federal aid that was rejected
7 prior to June 4th?
8 A. I decline to answer that question.
9 Q. And do you decline on the exact same grounds you've
10 just given me?
11 A. Yes.
12 Q. Earlier in your testimony, and I think this was by
13 Mr. Summers, he asked you a question did you
14 articulate to the Swap counterparties why the liens
15 may or may not have been valid, and your answer that I
16 wrote down was not directly, no.
17     Was this articulated to the Swap
18 counterparties indirectly to your knowledge?
19 A. That was a complicated question. Do you mind
20 repeating it?
21 Q. Sure, sure. As I understand your earlier testimony,
22 you said that you did not directly articulate to the
23 Swap counterparties a belief that their liens were or
24 were not valid. Was that issue indirectly
25 communicated?

## Page 183

1 A. Well, it was and what I said to the Swap
2 counterparties was in the concert of getting them to
3 the table to negotiate a discount, I told them on June
4 4th that the City would vigorously contest every
5 aspect of these transactions if they dared to
6 terminate our ability to gain access to the gaming
7 revenues, and I said even though I'm not a lawyer if I
8 were them, I would be worried about that, that's what
9 I meant by indirect.
10 Q. What was their response to that?
11 A. They told me they were very comfortable with their
12 lien and collateral position that I could not bring
13 this up again.
14 Q. And did you ever bring it up again?
15 A. Every time I talked to them.
16 Q. And was their response the same every time you brought
17 it up?
18 A. Yes, but then we were in the context of trying to
19 construct a compromise, that's where this went, but
20 they recognized that the City would vigorously defend
21 itself if they did not compromise with us. On that
22 basis --
23 Q. I didn't mean to interrupt you. Are you finished?
24 A. I'm done.
25 Q. Did you have any substantive conversations with the

## Page 184

1 Swap counterparties about whether or not their liens
2 were valid other than, you know, we threaten to
3 litigate, we threaten to defend, did you actually get
4 into a discussion about the validity of their liens
5 with them?
6 A. No, I had no other cards to play so I just kept
7 reminding them we would be aggressive.
8 Q. Okay. You've talked about the importance of having --
9 getting the wager and tax revenues unencumbered was a
10 motivation for doing this deal, correct?
11 A. Correct.
12 Q. What other unencumbered revenue streams or assets does
13 the City have?
14 A. Well, we have income tax revenues, we have property
15 tax revenues. I'm speaking now in the Chapter 9
16 context. The state revenues are pledged to three
17 series of bonds that were issued historically by the
18 City. So, there really is no other source of revenue
19 that's available to the City that could be pledged or
20 used aside from these.
21     There are, of course, a list of noncore
22 assets we identified on June 14th that we are
23 evaluating for potential value but we have reached no
24 conclusion yet as to how much is available there.
25 Q. I just want to make sure. You were talking about

Page 185

1 state shared revenues are pledged, right, did I get
2 that correct?
3 A.   They are securing three different series of bonds that
4 have a pledge of those revenues and that's already
5 been used.
6 Q.   So, the remaining unencumbered City assets or revenues
7 are the noncore assets that were listed?
8 A.   Right.
9 Q.   Income tax and property tax?
10 A.   Correct.
11 Q.   Is that all?
12 A.   Well, the gaming revenues if we can eliminate the
13 collateral agreement.
14 Q.   Is there any reason that the noncore assets, income
15 tax or property tax could not be pledged as collateral
16 to secure DIP financing?
17 A.   They could be.
18 Q.   You testified earlier that if the forbearance
19 agreement was not approved, it would have dire
20 consequences for the City, is that correct?
21 A.   Yes.
22 Q.   Does the City have a backup plan if the forbearance
23 agreement is not approved?
24 A.   Well, we're developing one now.  We are proceeding on
25 the assumption the court will grant relief on this

Page 186

1 transaction and let us proceed with it and if they
2 tell us they won't, we'll have a backup plan.
3 Q.   What is the backup plan you're currently considering?
4 A.   It's being developed right now.  It would be not the
5 plan currently proposed.
6 Q.   Are you refusing to answer my question?
7 A.   No, it's being developed.  I mean I don't want to give
8 you the answer piecemeal because it's not a simple
9 answer.  We don't have the cash resources we believe
10 we need to rehabilitate the City and we will have to
11 evaluate which elements of the reinvestment plan we'll
12 have to cancel or defer, we'll have to re-evaluate
13 whether the City can continue its current  level of
14 service as inadequate as it is or have further cuts.
15      It requires a complete rethink of the
16 City's call it operating plan for the next few years.
17 Q.   Is it correct then that the City's backup plan if the
18 forbearance agreement doesn't go through is basically
19 to cut either the re -- cut all or a portion of the
20 reinvestment program or to cut essential services?
21 A.   Well, that's the worst case scenario.  Are there
22 intermediate positions, of course.
23 Q.   What are those?
24 A.   Well, I would hope that we could renegotiate with the
25 Swap counterparties to continue having access to the

Page 187

1 net share of the gaming revenues not being used to
2 fund the Swap, that would be useful.
3      I would hope that we could find some other
4 way of permanently resolving the collateral agreement
5 to free up gaming revenues for use as part of the plan
6 of adjustment, but you asked me what our contingency
7 plan is and our contingency plan does not assume
8 anything except we have no agreement with anybody and
9 we therefore have to plan for the worst case.
10 Q.   You said one possible option here would be to go back
11 to the Swap counterparties if the forbearance
12 agreement was not approved, go back to the Swap
13 counterparties and try to renegotiate something with
14 them, right?
15 A.   Correct.
16 Q.   May I assume then that the Swap counterparties have
17 not told the City it's this deal or nothing, we won't
18 talk to you further if you don't get this?
19      MR. CULLEN: Objection.  Foundation and
20 form but you can address the question.
21 A.   We have an agreement with the Swap counterparties
22 pending approval by the court.  That's our current
23 agreement with the Swap counterparties.
24      BY MS. ENGLISH:
25 Q.   Small point of clarification.  In the morning I wrote

Page 188

1 down that you said you didn't think there was a June
2 11th meeting, you thought you just signed or agreed --
3 got the final deal on the economic terms and then in
4 the afternoon with Mr. Hackney you said you thought
5 there might have been a two-hour meeting on June 11th.
6      I just wanted to ask,  see if you can rack
7 your brain a little bit and be sure whether there was
8 or was not a meeting on June 11th.
9 A.   I believe there was a meeting on the 11th but it was a
10 short meeting.  It was not a long meeting.
11 Q.   Do you think it was a two-hour meeting?
12 A.   Two hours is fairly short.
13 Q.   Well, some people maybe, maybe not.  You said you
14 considered all possibilities for a deal with the Swap
15 counterparties, is that correct?
16 A.   We did.
17 Q.   Were there any other deal structures with the Swap
18 counterparties that you considered other than the one
19 we've got before us in the forbearance agreement?
20 A.   None that would meet all of our requirements, no.
21 Q.   What were the other deal structures that were
22 considered?
23 A.   Well, they didn't meet our requirements so, therefore,
24 we didn't propose them.  They weren't optimal for the
25 City.

Page 189

1 Q. So, this is the only real -- in your view and in the
2 City's view, this is the only realistic deal structure
3 there could be with the Swap counterparties?
4 A. If you are solving for the three objectives that the
5 City had, this is the only transaction that achieves
6 all three objectives. If you want to eliminate
7 objectives, you could have a different deal structure.
8 That is not what our mission was.
9 MS. ENGLISH: That's all I have. Thanks
10 very much.
11 MS. FORDE: Hello, Mr. Buckfire. My name
12 is Bianca Forde.
13 THE WITNESS: You're not wired up yet.
14 Now you've got to say it all again.
15 MS. FORDE: Good afternoon. My name is
16 Bianca Forde. I represent Assured Guaranty Municipal
17 Corporation. I'm an attorney at Winston & Strawn.
18 I just have a few questions for you today
19 mostly pertaining to the forbearance agreement and
20 your understanding of the termination provisions.
21 EXAMINATION
22 BY MS. FORDE:
23 Q. So, sitting here today do you have an understanding of
24 what would cause the forbearance period to end under
25 the forbearance agreement?

Page 190

1 A. Well, I have to go back and read it. I didn't pay
2 that much attention to it because I didn't draft it
3 but it would terminate obviously by June 30 or June 15
4 of 2014 if we hadn't otherwise executed our option,
5 that's one. And if you want to go to Page 4 of
6 Section 1.3 all of the forbearance period termination
7 events are listed.
8 Q. Right. Do you have an understanding of the different
9 impact on the City's rights depending on how the
10 agreement is terminated?
11 A. Not specifically, no.
12 Q. Okay. You testified earlier you don't view the
13 agreement as being a release of claims by the City, is
14 that right?
15 MR. CULLEN: Objection. Foundation. Form.
16 BY MS. FORDE:
17 Q. Okay. Do you understand that under certain
18 circumstances the agreement prohibits the City from
19 taking action that's inconsistent with the position of
20 the counterparties in litigation, for instance?
21 A. That's my understanding.
22 Q. Do you also agree that the agreement requires the City
23 to file a motion to have the agreement assumed by the
24 court in bankruptcy?
25 A. Yes.

Page 191

1 Q. Do you see a relationship between a release of claims
2 in certain instances and those provisions?
3 MR. CULLEN: Objection. Foundation. Form.
4 A. I'm not sure I can answer that question.
5 BY MS. FORDE:
6 Q. Okay. Would you agree that an agreement to release
7 claims would be a downside to the forbearance
8 agreement in relation to the City?
9 A. No, it's part of the overall transaction. The City is
10 getting very real benefits from this transaction and
11 it's making certain concessions that were value to the
12 other side.
13 Q. Sitting here today do you see there are people who
14 have arguments as to whether or not the liens in the
15 forbearance agreement are valid, is that right?
16 A. I've heard people say that.
17 Q. Okay. Would you agree that if those arguments are
18 valid and they are not made by the City, that
19 forfeiting those claims would be a down side under the
20 agreement whether or not there are up sides to the
21 agreement?
22 MR. CULLEN: Objection. Foundation and
23 form. If you can address the question.
24 A. The City is getting the benefits it bargained for as
25 part of this agreement. I think that's the way you

Page 192

1 have to look at it.
2 BY MS. FORDE:
3 Q. You mentioned earlier that forfeiting any access to
4 revenues, casino revenues under any agreement would be
5 an unacceptable risk?
6 A. Correct.
7 Q. Is there any parallel between forfeiting an argument
8 that the liens are invalid?
9 A. Well, forfeiting an argument is not a life-threatening
10 event for the City. Forfeiting cash is.
11 Q. How are they not the same thing?
12 A. As long as we have cash we're not dead. If we
13 forfeit an argument, we're still alive.
14 Q. Are you aware that under the scheduling order the
15 City's plan of Chapter 9 plan is to be filed by March
16 1st, 2014?
17 A. Yes.
18 Q. Under this forbearance agreement do you understand
19 that the City can't take a position in that plan
20 that's inconsistent with that of the counterparties?
21 MR. CULLEN: Objection. Foundation. Form.
22 A. I'm not generally aware of that, no.
23 BY MS. FORDE:
24 Q. If that were the case, would that be a downside to the
25 forbearance agreement?

1  MR. CULLEN: Do you have something to point
2  the witness at, Counsel?
3  BY MS. FORDE:
4  Q. Sure, if you could turn to Exhibit 2, the forbearance
5  agreement.
6  A. Okay. What section, Counselor?
7  Q. If you turn to Page 14, we can talk about the exercise
8  period ending.
9  A. Uh-huh.
10  Q. What in your understanding is the impact of not having
11  submitted a payment under this agreement by March
12  14th, 2014?
13  A. We have the benefit of this agreement through June
14  15th, 2014.
15  Q. What is your understanding of this provision, the
16  definition exercise period end date?
17  MR. CULLEN: I think I'm going to object.
18  It's a little hard to read him a defined term that
19  probably appears in a number of different places and
20  say what is his understanding of where else -- where
21  else it appears as a part of an active sentence.
22  I don't mean to restrict your latitude to
23  examine, Counsel, but it's a definition, it doesn't
24  have a verb attached to it yet.
25  BY MS. FORDE:

1  Q. What's your -- what is the basis for your
2  understanding that you have the benefit of the
3  agreement until June 2014?
4  A. Well, let's go back to Section 1.3. -- wrong section
5  to myself.
6  Q. Are you by any chance looking for 1.3A on Page 4?
7  A. Oh, thank you.
8  Q. So, I'm going to direct your attention now to Section
9  1.4A on Page 6 which applies if there's a termination
10  event under 1.3A amongst other provisions, is that
11  right?
12  A. Yes.
13  Q. And if you go to the end of that section, the very
14  last sentence, and I'll just read it --
15  MR. CULLEN: Is the last sentence the same
16  as the first sentence?
17  MS. FORDE: No, it's not.
18  BY MS. FORDE:
19  Q. But if we start at the bottom of Page 6 at the  end of
20  this paragraph says giving effect to Section 2 of this
21  agreement.
22  What is your understanding of that phrase,
23  giving effect to Section 2?
24  MR. CULLEN: I think you are asking a lay
25  witness to construe a legal document leading him back

1  and forth through a number of sections. I don't know
2  whether he feels -- if he has an existing
3  understanding --
4  MS. FORDE: Well, that's not really a
5  legal question. The question is what does giving
6  effect to Section 2 mean.
7  MR. CULLEN: Well, that is a legal question
8  actually --
9  MS. FORDE: I'm not asking for the effect
10  of Section 2, I'm just asking for a meaning of the
11  phrase.
12  MR. CULLEN: You can ask him for his
13  understanding if he has one. You can't --
14  MS. FORDE: Which is what I said and he
15  hasn't answered it yet, so, I'm just going to ask him
16  if he has an understanding of it.
17  MR. CULLEN: Fine.
18  A. I don't have an understanding.
19  BY MS. FORDE:
20  Q. Okay. I'm going to see if I can go through this and
21  make it a little clear. So my understanding of
22  Section 2 is that if it applies there are certain
23  restrictions on the City's ability to take positions
24  inconsistent with that of the counterparties, and I'm
25  going to tell you why I think that. If you look at

1  Section 2.1A, it basically says the City and the
2  service corporations cannot commence litigation,
3  assert any defense in litigation or essentially take
4  any action that sets aside, avoids, rejects, modifies
5  or otherwise renders invalid the forbearance
6  agreement.
7  Would you agree that if Section 2 is valid
8  and is given effect as per 1.3, then this restricts
9  the City's rights with respect to litigation and
10  taking positions inconsistent with the counterparties?
11  MR. CULLEN: Objection. Foundation. Form.
12  You may ask if you have any understanding -- answer if
13  you have any understanding.
14  A. I don't.
15  BY MS. FORDE:
16  Q. Okay. If you look at 1.4B at the very end of the
17  sentence without giving effect to Section 2, would you
18  agree with me then that that simply just means that
19  Section 2 does not apply, Section 2 would not be valid
20  if the agreement was terminated under Section 1.4B?
21  MR. CULLEN: Objection. Asking for a legal
22  conclusion.
23  A. I don't have that understanding.
24  BY MS. FORDE:
25  Q. Okay.

Page 197

1    **MR. CULLEN:** Just would note for the record
2  that I do think that A and B are each one horrendous
3  sentence.
4    **MS. FORDE:** I'd agree.
5    **THE WITNESS:** Who drafted this, I'd like to
6  know.
7    **MR. HACKNEY:** So stipulated.
8    **THE WITNESS:** They must have studied German
9  in a prior life.
10   **BY MS. FORDE:**
11 Q.  If the City cannot challenge or take a position
12 inconsistent with the counterparties under this
13 agreement, and you say this agreement applies until
14 June 2014, we can say that for purposes of my question
15 --
16 **A.  We did want a longer period of time and I encourage**
17 **you to speak with Cadwalader to get it from their**
18 **clients on our behalf.**
19 Q.  Okay,  but if the agreement is in effect we'll say at
20 least until that point and the City's Chapter 9 plan
21 is due March 2014, correct?
22 **A.  Uh-huh.**
23 Q.  Then under this agreement the City cannot take a
24 position inconsistent with the counterparties in their
25 Chapter 9 plan, is that right?

Page 198

1    **MR. CULLEN:** Objection.  Foundation.  Form.
2    **BY MS. FORDE:**
3  Q.  Do you understand the question?
4    **MR. CULLEN:** Is the question with respect
5  to the subject matter of this agreement?
6    **MS. FORDE:** Yes.
7    **MR. CULLEN:** Okay.  That's a little bit
8  different.
9  **A.  Well, we have until March 15th to retire the Swaps**
10 **pursuant to this option.**
11   **BY MS. FORDE:**
12 Q.  You have until March 15th to retire --
13 **A.  Eighty-two is the price.**
14 Q.  That's right.  So, if we get to March 15th and the
15 Swaps have not been retired, what percentage is owed
16 under this agreement to the Swap?
17 **A.  One hundred percent.**
18 Q.  And that number I think we talked about a little
19 earlier is that number, the hundred percent that would
20 be owed, do you have a dollar figure?
21 **A.  Today, what's today, the 29th of August, it's**
22 **somewhere between 275 and 300 million dollars would be**
23 **the termination value today.**
24 Q.  So, if the City can't challenge any -- take any
25 position that's inconsistent with the counterparties,

Page 199

1  the City is then left with an obligation to pay --
2  **A.  Only if they exercise their remedies and present us**
3  **with an event of default and assert a termination**
4  **payment.  But this agreement is clear that if it**
5  **expires, everybody goes back to their original**
6  **positions.**
7  Q.  That's right.  And --
8  **A.  You want to take a minute?**
9  Q.  Yeah.  Can I just have a couple minutes?
10   **MR. CULLEN:** Sure.  Off the record.
11   **VIDEO TECHNICIAN:** The time is 3:13 p.m.
12 We are off the record.
13   (Discussion held off the record at
14   3:13 p.m.)
15   (Back on the record at 3:15 p.m.)
16   **VIDEO TECHNICIAN:** Back on the record at
17   3:15 p.m.
18   **BY MS. FORDE:**
19 Q.  Mr. Buckfire, you just mentioned that if the agreement
20 terminates under certain circumstances, that the
21 parties go back to their original positions, is that
22 right?
23 **A.  That's my understanding.**
24 Q.  Okay.  Now, if you turn with me -- I'm going to try to
25 be as simplistic as possible, but it's a complicated

Page 200

1  agreement.  To Page 6 at Section 1.4 again.  And it
2  lists a series of provision under which if the
3  forbearance period comes to an end under those
4  provisions, the parties are restored to their original
5  position and in one section the parties are restored
6  to their original position giving effect to Section 2
7  and in another situation the parties are restored
8  without giving effect to Section 2.
9    Can we agree on that?
10 **A.  That's what it says.**
11 Q.  Okay.  Now, when Section 2 is in effect -- scratch
12 that.
13   You mentioned earlier it would be
14 irrational economically for the Swaps to walk away
15 from this agreement prior to June.
16 **A.  No, I didn't say that.  I said that prior to the**
17 **Chapter 9 filing in answer to the question why they**
18 **did not pursue their termination rights, recognizing**
19 **the City could not pay the termination payment that**
20 **allowing the City to continue to pay them their**
21 **quarterly payments when due was a rational decision**
22 **for them, they were not harmed by not pursuing their**
23 **rights economically.  That's what I said.**
24 Q.  If the City -- if the parties are restored to their
25 original position and Section 2 is given effect and

Page 201

1 the City is precluded from taking any position
2 inconsistent with the Swap counterparties and this
3 applies through March 1st, 2014 when the Chapter 9
4 plan is filed --
5 A. Yes.
6 Q. Is there going to be another time where the City can
7 challenge the liens as invalid once the Chapter 9 plan
8 is filed?
9   MR. CULLEN: I object to the form of the
10 question but you can answer if you can --
11   BY MS. FORDE:
12 Q. Do you see that this agreement forfeits the City's
13 right to challenge any liens after the Chapter 9 plan
14 is filed?
15 A. I don't see that.
16 Q. Can you tell me why you don't see it that way?
17 A. Well, I didn't write this agreement.
18 Q. Is it your understanding that after March 1st the City
19 has another opportunity to challenge anything related
20 to this agreement?
21 A. It's not my understanding.
22 Q. Okay.
23 A. I don't know.
24 Q. Okay. Do you recognize there's a possibility then
25 that the City could be stuck with paying a very large

Page 202

1 figure after the Chapter 9 plan and have no ability to
2 challenge it if -- at some certain stage regardless of
3 the validity of those liens?
4 A. That's a possibility.
5 Q. Okay.
6   MS. FORDE: Thank you. No further
7 questions.
8   MS. GREEN: Good afternoon, my name is
9 Jennifer Green. I just have a few questions.
10   THE WITNESS: May I ask who you represent,
11 Counsel?
12   MS. GREEN: Police and Fire Retirement
13 System and the General Retirement System.
14   THE WITNESS: And you are with what law
15 firm?
16   MS. GREEN: Clark Hill.
17   EXAMINATION
18   BY MS. GREEN:
19 Q. I had a hard time hearing down there. I may have
20 written this down wrong. I thought I heard you say
21 that you had received a letter from or the City had
22 received a letter from the Michigan Gaming Control
23 Board saying that it was okay to pledge the casino
24 funds.
25 A. Well, if you look at the original collateral

Page 203

1 agreement, I believe it was dated June 18th of 2009,
2 there is attached as an exhibit to that a letter from
3 the Michigan Gaming Control Board saying that they
4 were okay with the arrangements embodied in the
5 collateral agreement.
6 Q. Do you know the date of the letter?
7 A. I believe it was the same date as the agreement.
8 Q. My next question I believe someone may have alluded to
9 but I don't know that we got this far. You said that
10 you assumed that the liens were valid in your
11 negotiations, correct?
12 A. Yes.
13 Q. Did you also understand that the lien arose solely
14 from the collateral agreement itself?
15 A. That's my understanding.
16 Q. Okay. And as far as the lien -- look at my last page
17 of notes here -- did you discuss with anyone whether
18 pledging the casino revenue was permissible under the
19 Michigan Gaming Act or was the letter the only thing
20 that was relied upon?
21   MR. CULLEN: Objection to the extent that
22 it calls for privileged conversations, where we have
23 directed no inquiry between himself and Jones Day.
24   MS. GREEN: And that is my question so is
25 he not going to answer that?

Page 204

1   MR. CULLEN: If he can find in his memory a
2 nonprivileged conversation that affects --
3   THE WITNESS: With Jones Day, impossible.
4   MR. CULLEN: Not with Jones Day but with
5 somebody else, a nonprivileged conversation, you can
6 answer with respect to that.
7   BY MS. GREEN:
8 Q. Do you have a nonprivileged conversation that you can
9 recall regarding whether or not you discussed with
10 anyone whether pledging the casino revenue was
11 permissible under the Michigan Gaming Act?
12 A. No.
13   MS. GREEN: Thanks. That's my only
14 question. Thank you.
15   MS. NEWBURY: Good afternoon, Mr. Buckfire.
16 My name is Karen Newbury. I'm with Schiff Hardin, and
17 I represent DepfaBank as agent for DFS WertManagement.
18   THE WITNESS: Can you say that really fast
19 twice?
20   MS. NEWBURY: I said it really fast once.
21 So, that will be enough.
22   THE WITNESS: Thank you.
23   EXAMINATION
24   BY MS. NEWBURY:
25 Q. You've testified earlier today that you were the

Page 205

1  individual largely responsible for the negotiation of
2  the business terms of the forbearance agreement,
3  correct?
4  **A. Yes.**
5  Q.  So, you are familiar with and perhaps even designed
6  the optional termination provisions?
7  **A. Yes.**
8  Q.  So, if I ask you to explain to me the way that the
9  termination amount will be calculated with all the
10  accompanying definitions such as optional termination
11  notice on Page 11 of the agreement, then mid-market
12  amount and optional termination amount on Page 14, you
13  could walk me through this in plain English without
14  any trouble, right?
15  **A.  That's a bold statement.  I'll do my best.**
16  Q.  Would you please try?
17  **A.  Okay.  Well, the calculation of the termination amount**
18  **is not an easy quantitative exercise because pursuant**
19  **to the underlying agreement which is not in front of**
20  **me today so I can't refer you to it, you're supposed**
21  **to go and seek bids in the market from dealers to find**
22  **out what the value of the Swap is, and then you figure**
23  **out from that what the termination amount is.**
24      **So, it's not a simple calculation that you**
25  **can just do mathematically on Bloomberg.  You could**

Page 206

1  **get to a pretty good answer because everyone looks at**
2  **the same LIBOR curves but it is a matter of market**
3  **checking.**
4  Q.  So, it's your understanding that the optional
5  termination amount is to be determined on the optional
6  termination date which is the date that the City gives
7  notice, is that correct?
8  **A.  That's my understanding.**
9      **MS. NEWBURY:** Thank you, that's all.
10      (Discussion held off the record at
11      3:24 p.m.)
12      (Back on the record at  3:24 p.m.)
13      **MR. HACKNEY:** I think we are done.
14      **VIDEO TECHNICIAN:** This concludes today's
15  deposition.  The time is 3:24 p.m.  We are off the
16  record.
17      (The deposition was concluded at 3:24 p.m.
18      Signature of the witness was not requested by
19      counsel for the respective parties hereto.)
20
21
22
23
24
25

Page 207

1          CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3              ) SS
4  COUNTY OF WAYNE)
5
6          I, NORA MORRISSY, certify that this
7      deposition was taken before me on the date
8      hereinbefore set forth; that the foregoing questions
9      and answers were recorded by me stenographically and
10      reduced to computer transcription; that this is a
11      true, full and correct transcript of my stenographic
12      notes so taken; and that I am not related to, nor of
13      counsel to, either party nor interested in the event
14      of this cause.
15
16
17
18
19
20
21
22          NORA MORRISSY, CSR-2642
23          Notary Public,
24          Wayne, County, Michigan.
25  My Commission expires: 9-13-13

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-----------------------------------------------------x
:
In re: : Chapter 9
:
CITY OF DETROIT, MICHIGAN, : Case No. 13-53846
:
Debtor. : Hon. Steven W. Rhodes
:
:
-----------------------------------------------------x

## OPPOSITION OF DEBTOR THE CITY OF DETROIT, MICHIGAN TO OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS

Objectors[1] move to preclude the introduction of evidence and argument by

the City of Detroit, Michigan (the "City"), debtor in the above-captioned case,

regarding the City's intent to leverage Casino Revenues in connection with its

post-petition financing efforts in support of its Motion of the Debtor for Entry of

---

[1] The Objectors who have joined the Motion *In Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-in-Possession Financing Efforts are Syncora Capital Assurance and Syncora Guarantee Inc. ("Syncora"), Erste Europäische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxembourg S.A., DEPFA Bank PLC, the Retiree Association Parties, Retired Detroit Police Members Association, Ambac Assurance Corporation, National Pubic Finance Guarantee Corporation, Assured Guaranty Municipal Corporation, Financial Guaranty Insurance Company, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and the Official Committee of Retirees.

an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief (the "Assumption Motion") [Dkt. 17]. Objectors seek to preclude such evidence and argument on the grounds that (1) the ability to collateralize the Casino Revenues supposedly represents a surprising and undisclosed justification for the Forbearance and Optional Termination Agreement (the "Settlement") and (2) the City has allegedly barred inquiry into "key aspects" of the City's post-petition financing efforts.

These contentions are baseless. The City has long indicated that access to cash is critical here, and its ability to leverage the Casino Revenues for any post-petition financing it requires is an obvious use of such funds. To the extent the City kept any information confidential regarding its post-petition financing efforts – months ago when that competitive bidding process was still underway – that information was irrelevant, appropriately withheld, and, regardless, has since been provided to Objectors through post-petition financing discovery and the City's dataroom. Objectors' Motion should therefore be denied.

### Objectors' Motion

Objectors argue in their motion that, because it has blocked all inquiry by Objectors into its post-petition financing efforts and collateral package, the City

2

should be precluded from offering any evidence regarding its intent to leverage Casino Revenues in connection with post-petition financing as a business justification in support of the Settlement.

First, Objectors attempt to characterize this use of the Casino Revenues as a *post hoc* rationalization for the Settlement. Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenue in Connection with its Debtor-in-Possession Financing Efforts (the "Motion *in Limine*") [Dkt. 935] at 3. Objectors concede that the City cites and discusses at length three reasons supporting that Settlement as a sound exercise of business judgment and that it is fair and equitable – namely, (1) it allows the City access to cash flow; (2) it offers a workable unwind of the City's swap obligations; and (3) it avoids litigation with Swap Counterparties. Mot. *in Limine* at 3. Objectors assert, however, that the City's papers do not explicitly discuss post-petition financing or the City's need to leverage its Casino Revenues as part of the post-petition financing package. According to Objectors, the City's intent to leverage its Casino Revenues in support of post-petition financing arose for the first time during the depositions of Kevyn Orr, the Emergency Manager, and Kenneth Buckfire of Miller Buckfire, the lead negotiator for the Settlement.

Second, Objectors contend that the City blocked Objectors from inquiring into the City post-petition financing efforts and the planned post-petition collateral

package on the grounds that information was "commercially sensitive." Mot. *in Limine* at 3-4. Specifically, Objectors contend that the City precluded questions during the deposition of Mr. Buckfire regarding the covenants in the term sheet, the collateral package (aside from the Casino Revenues) or its operation, the identity of parties potentially involved in the financing, and whether the City had considered alternate sources of funding from the State of Michigan or federal government. Mot. *in Limine* at 4-6. Objectors further contend that the City similarly invoked a commercial sensitivity bar to certain questions during the deposition of Mr. Orr regarding elements of the City's post-petition financing efforts. Mot. *in Limine* at 6-7.

According to Objectors the City should be precluded from offering any evidence regarding its intent to collateralize the Casino Revenues in support of its post-petition financing.

<div align="center">**Argument**</div>

I.    **Objectors' Motion is Moot.**

Since Objectors filed their motion on September 18, 2013, the City has disclosed extensive information regarding its post-petition financing efforts, through its dataroom and discovery, and as a result, Objectors motion is now moot. *See Powell v. McCormack*, 395 U.S. 486, 497 (1969) (holding a matter is moot when the issues presented are no longer "live"). Mootness is found only after

<div align="center">4</div>

determining if an actual controversy between the parties exists in light of intervening circumstances. *In re Asmar, Inc.*, Case Nos. 12-15053, 12-15064, 2013 WL 628581 (E.D. Mich. 2013) (*citing Fleet Aerospace Corp. v. Holderman*, 848 F.2d 720, 723 (6th Cir. 1988)).

Objectors' motion is premised on the City's refusal to provide information in response to a few deposition questions related to its efforts to obtain post-petition financing. Specifically, Objectors sought information regarding the covenants in the post-petition financing term sheet, the potential and final collateral package, the identity of parties involved in the financing, efforts to obtain alternate sources of funding, including funding from the State of Michigan and/or the federal government, and the operation of the collateral package.

In the months since Objectors filed their motion, however, the City has provided substantial information regarding its post-petition financing efforts. On November 5, 2013, the City filed a motion seeking the Court's approval for post-petitioning which described at length the City's post-petition loan solicitation process. *See* Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superiority Claim Status and (III) Modifying Automatic Stay (the "Post-Petition Financing Motion") [Dkt. 1520]. In support of the Post-Petition Financing Motion, the City

5

included a Declaration from James Doak, which further described the post-petition financing solicitation process and provided additional details specifically requested by Objectors during the depositions of Mr. Orr and Mr. Buckfire.  Declaration of James Doak in Support of Motion of Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superiority Claim Status and (III) Modifying Automatic Stay (the "Doak Declaration") [Dkt. 1520, Ex. 5B].  Notably, Mr. Doak stated that the negotiation process involved soliciting over 50 potential financing sources, including 13 traditional lending institutions and 37 alternative financing sources.  Doak Decl. ¶ 5.  Doak further stated in his declaration that the City settled on Barclay's bid as the best financing package available under the circumstances based, in part on its pricing, which with an effective interest rate of 3.5% was extremely favorable, and debt service obligations, which, assuming no events of default, were limited to interest payments that annually amounted to nearly $38 million less than the City's current debt service obligations under the Swap Agreements.  *See* Doak Decl. ¶¶ 9-11.  The Post-Petition Financing Motion and Doak Declaration together already significantly address the information Objectors sought.

In connection with the Post-Petition Financing Motion, Syncora issued a 2004 request seeking materials related to the City's post-petition financing and the

City used that request as a guide for its document production.  *See* Motion of

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue

Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and

Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy

Procedure 2004 [Dkt. 1342].  As a result of that exercise, the City produced

approximately 20,000 pages of documents to objectors.  The City has also

continued to update its dataroom as information on its post-petition financing

becomes available and might be appropriately disclosed, including information

regarding its efforts to seek funding from the State of Michigan and the federal

government.

Moreover, Objectors have had the opportunity to depose, among others,

James Doak of Miller Buckfire, who was the City's lead negotiator in its post-

petition financing efforts.  Objectors have already, or will, depose Mr. Orr and Mr.

Buckfire this week in connection to the Post-Petition Financing Motion.  Objectors

have therefore had ample opportunity to obtain the very information at issue and

no longer have a basis for the relief which they seek.

## II.   Objectors' Motion Fails on the Merits.

Mootness aside, Objectors' motion fails on the merits.  First, leveraging the

City's revenue streams is not a new and distinct rationale for assumption of the

Settlement but, instead, a foreseeable and reasonable application of the Casino

13-53846-swr   Doc 4213-6   Filed 04/29/14   Entered 04/29/14 18:30:03   Page 73 of
456
13-53846-swr   Doc 2036   Filed 12/10/13   Entered 12/10/13 16:38:40   Page 7 of 60        168

Revenues to accomplish the City's well-articulated plans. Second, even prior to discovery on the Post-Petition Financing Motion, the City had provided Objectors with appropriate information regarding its post-petition financing efforts. The City only denied Objectors answers to a limited number of deposition questions, and the specific information sought by Objectors is not relevant to the Assumption Motion before the Court. Finally, even if the information Objectors sought were relevant, it was properly withheld at the time under the business strategy privilege, and, as noted above, has been subsequently disclosed, once it was no longer commercially sensitive.

### A. The Use of Additional Cash as Collateral for Post-Petition Financing is an Obvious Benefit from Free Access to the Casino Revenues.

Objectors miscast the City's plan to employ the Casino Revenues unencumbered by the Settlement as collateral for its post-petition financing as a separate and *post hoc* justification for assumption of the Settlement. Rather, collateralizing these cash flows is merely a natural and logical consequence of unencumbering the Casino Revenues and a means to accomplishing the City's stated objectives.

As the Objector's note, the City has cited three core reasons that the Settlement constitutes a sound exercise of business judgment and is fair and equitable, including that it "allows the City access to much needed cash flows."

Assumption Mot. ¶¶ 41-42; *see* Mot. *in Limine* at 3.  The City has consistently justified assumption of the Settlement in order to "provide [it] with crucial liquidity and cash flow going forward," on the grounds that these funds – namely the Casino Revenues – are critical not only to the City's ability to finance its operations but also to its ability to engage in crucial reinvestment that will allow it to emerge from bankruptcy.  Assumption Mot. ¶¶ 43-44; Deposition of Kenneth Buckfire ( the "Buckfire Deposition") Tr. at 37:3-9, 15-17; 155:19-23 (August 29, 2013).

First, given the cash-starved and insolvent state of the City, access to the Casino Revenues is critical to the ongoing operations of the City.  Assumption Mot. ¶ 42; Deposition of Kevyn Orr (the "Orr Deposition") Tr. at 213:5-8 (August 30, 2013); Buckfire Depos. 37:3-9.  As Mr. Orr testified, if, among other things, the City does not free the Casino Revenues, the City is projected to run out of cash by the end of the year.  Orr Depos. 200:9-14.  Further, if the Casino Revenues are trapped by the Swap Counterparties, a possible outcome if they remain encumbered, it might be necessary to reduce existing City services.  Buckfire Depos. 100:22-23.

Second, access to the Casino Revenues is crucial to enable the degree of reinvestment necessary "to improve Detroit residents' quality of life" which "is an essential touchstone of any restructuring plan."  Assumption Mot. ¶ 44; *see*

9

13-53846-swr   Doc 2030-6   Filed 12/10/13   Entered 12/10/13 16:39:40   Page 75 of
456
13-53846-tjt   Doc 4213-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 95 of
170

Buckfire Depos. 37:3-9, 15-17 ("[B]y freeing up the gaming revenues, it will give the City financing options as part of a plan of adjustment that it otherwise might not have."). As Mr. Orr has asserted, every day that the City does not begin to reinvest in itself "is a dangerous day." Orr Depos. 59:13-14. And, "every day that we don't have access to casino revenue, we cannot make the necessary reinvestment in this City to provide for the health, safety and welfare of the citizens." Orr Depos. 68:5-8.

The Casino Revenues are a necessary component to the City's reinvestment and restructuring plans. Orr Depos. 213:9-21. Without reinvestment, and access to the Casino Revenues, "there's a very real chance that the City will have no chance to stabilize and grow and the creditors will see no opportunity for any benefit because the City would . . . continue to decline, revenue from other streams would continue to decline, and the City's ability to satisfy its obligations to the creditors will continue to decline." Orr Depos. 214:14-22; Buckfire Depos. 100:19-20; 104:10-13 ("[i]f we don't have the gaming revenues . . ., we can't even start the reinvestment plan.").

Employing the Casino Revenues as collateral for post-petition financing is merely a tool to accomplish these objectives. Mr. Buckfire testified to that very point. Buckfire Depos. 70:6-10 ("The City intends to secure a debtor in possession financing of sufficient proceeds to fund the termination payment [for the

10

13-53846-swr    Doc 2050-6   Filed 12/10/13   Entered 12/10/13 18:35:40   Page 76 of
456
13-53846-tjt   Doc 4316   Filed 04/29/14   Entered 04/29/14 18:30:23   Page 76 of   171

Settlement] as well as provide sufficient cash for the City to execute on its reinvestment program during the bankruptcy."); 79:17-21 ("We'll use the proceeds to terminate the Swaps at the discount provided for in [the Settlement] and the balance of the DIP loan will be retained by the City as working capital and to support its reinvestment program.").

Objectors offer no substantive basis to preclude evidence of the City's intent to use the Casino Revenues in this fashion. Instead, Objectors' motion rests on the City's purported failure to expressly state that it planned to leverage the Casino Revenues for post-petition financing in its opening motion. Absent such an explicit statement, Objectors feign surprise to hear deposition testimony regarding the City's plans. Use of regular or fixed municipal cash flows as leverage for immediate access to funds, however, is hardly a new or novel idea. Doing so is, in fact, standard practice and might be reasonably anticipated where, as here, a city is in dire and immediate need of cash. Nowhere do Objectors explain why collateralizing the Casino Revenues is an unreasonable or unforeseeable use of such revenue streams.

In fact, the City made no secret of its intent to apply cash flows unencumbered by the Settlement for its daily operations as well as for substantial reinvestment. On June 14, 2013, Mr. Orr outlined a restructuring plan that contemplated investing $1.25 billion over the next 10 years, including $500 million

11

13-53846-swr  Doc 2050-6  Filed 12/10/13  Entered 12/10/13 18:33:40  Page 17 of 60
456
13-53846-tjt  Doc 4311  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 77 of 60   172

in the next 6 years, to address blight, increase property values, and improve the City's infrastructure and services. Assumption Mot. ¶ 22. Moreover, the Emergency Manager and the City's advisors have consistently indicated the need for that reinvestment to begin immediately. *See e.g.*, Orr Depos. 59:13-14. Objectors cannot, therefore, be surprised that the City might use the Casino Revenues, once freed, to obtain more extensive, immediate funding. Regardless, the City has articulated its need for unencumbered cash flows and the purposes for which they are required.

> **B.** **Objectors Were Provided With Appropriate Information Regarding the City's Post-Petition Financing Efforts and Were Denied Only Limited and Irrelevant Information.**

Objectors also misconstrue the extent to which they were denied discovery into the collateral package offered by the City as part of its post-petition financing and the relevance of the limited details that City witnesses would not disclose. Objectors protest that the City denied them discovery regarding the covenants in the term sheet, the collateral package (aside from the Casino Revenues) or its operation, the identity of parties potentially involved in the financing, and whether the City had considered alternate sources of funding from the State of Michigan or federal government. The City's refusals to comply with these requests were entirely justified. First, limiting a small number of deposition questions into these areas hardly constitutes wholesale preclusion. The City, in fact, provided

significant information regarding its post-petition financing plans and only withheld information that would impact the integrity of the bidding process. Second, the granular level of information regarding the City's post-petition financing sought by Objectors is not relevant to the issues before the Court.

### 1. To the Extent Objectors Inquired, the City Provided Ample Information Regarding Its Post-Petition Financing Efforts.

Objectors portray the City's refusal to divulge information regarding its post-petition financing efforts as nearly universal whereas, in fact, the City withheld only limited and specific details that were still subject to negotiation with potential investors. The City otherwise provided substantial testimony regarding its post-petition financing plans and efforts.

As an initial matter, with the exception of a few isolated questions about the collateral package and state and federal aid, to which Mr. Orr's responses mirrored those of Mr. Buckfire, Objectors asked Mr. Orr no questions regarding the City's post-petition financing efforts. Objectors, therefore, cannot now claim their inquiry was precluded. In any event, Mr. Buckfire provided sufficient testimony regarding the parameters of the City's plans and efforts.

While Mr. Buckfire did not provide testimony regarding specific covenants in the post-petition financing term sheet on the grounds that they were commercially sensitive, Buckfire Depos. 73:24-74:2, he provided testimony regarding numerous other terms. Mr. Buckfire, for instance, provided substantial

13

13-53846-swr    Doc 4391-6    Filed 12/10/13    Entered 12/10/13 18:33:40    Page 79 of 60
456
13-53846-tjt    Doc 4391-6    Filed 04/29/14    Entered 04/29/14 18:30:03    Page 79 of 60    174

testimony regarding the City's interest rate objectives – that it be the "lowest possible interest rate," and that the request for proposals did not define that possible interest rate or require whether it must be fixed or variable. Buckfire Depos. 73:16-23. He further testified that the maturity of the financing would be "the pendency of the end of the case." Buckfire Depos. 74:3-5. He also testified to the City's anticipated timeline to obtain post-petition financing. Buckfire Depos. 77:15-79:6. Objectors did not ask any other questions about the term sheet.

Although he refused to delve into commercially sensitive specifics of the collateral package, which remained subject to an active request for proposals, Mr. Buckfire provided testimony on its general parameters. For instance, he testified that the City anticipated offering a lien on the Casino Revenues, in part. Buckfire Depos. 74:6-8; 142:20-23. Mr. Buckfire only declined to provide further details as to the extent to which the Casino Revenues would be offered as collateral or other forms of collateral, such as the City's art collection, which may be negotiated with the potential investors.

Mr. Buckfire testified that the City had spoken with "in excess of 30" potential investors regarding post-petition financing, Buckfire Depos. 70:24, of whom ten already appeared to have no interest. Buckfire Depos. 71:14. Mr. Buckfire would not, however, disclose the identities of the potentially uninterested

investors.  Buckfire Depos. 71:16-22.  Objectors never asked about the identities of any interested investors.

Finally, while neither Mr. Orr nor Mr. Buckfire testified to the specifics of the City's discussions with the State of Michigan or the federal government regarding the provision of alternate sources of funding, both testified to having considered such funding.  Objectors concede that Mr. Orr stated in his deposition that, although the information was commercially sensitive, he understood that neither liquidity nor credit enhancement would be provided by the State of Michigan or the federal government in connection with post-petition financing. Mot. *in Limine* at 5, fn 4; *see* Orr Depos. 207:6-21; 201:10-17.  Although Objectors contend Mr. Buckfire refused to answer question on this topic, he, in fact testified that the City "considered, for example state and federal aid" in connection with post-petition financing, and merely declined to discuss any further specifics. Buckfire Depos. 180:9-10.  Notably, Objectors appeared to understand the sensitivities involved with disclosing that information.  Buckfire Depos. 163:5-7 ("Well, I can understand why [its commercially sensitive] if you are seeking estate guarantee of a DIP or other things today, I get that and I'm not going to ask you about that ....") (Mr. Hackney).

## 2. The Discovery Sought by Objectors Is Not Relevant to the Assumption Motion.

The specific information sought by Objectors is not relevant to the Court's consideration of the Settlement. In order to approve the Settlement, the Court must determine whether it constitutes a sound exercise of business judgment, is fair and equitable and in the best interests of the City. *See* Assumption Mot. ¶ 41.

The City has justified assumption of the Settlement on the grounds that it "allows the City to access much needed cash flows, provides for a workable unwind of its swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions." *Id.* At least in connection with the Assumption Motion, which was the motion under consideration when the depositions at issue took place, information regarding the covenants in the post-petition financing term sheet, the potential collateral package, operation of the collateral package, the parties involved in the post-petition financing, and efforts to obtain alternate sources of post-petition funding, including funding from the State of Michigan and/or the federal government is simply not relevant to the Court's consideration of the Settlement's justifications.[2] The City's need for free access to the Casino Revenues, as discussed above, extends beyond its use as collateral for post-petition financing, and has no bearing on the importance of ridding the City of its swap obligations or the associated risk of litigation.

[2] Of course, such information is relevant to the now-pending Post-Petition Financing Motion, and therefore, has been provided to Objectors.

13-53846-swr   Doc 2036-6   Filed 12/10/13   Entered 12/10/13 18:33:40   Page 82 of 50
456
13-53846-tjt   Doc 4311-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 82 of 50   177

Accordingly, while discovery may be broad, the information sought by Objectors undoubtedly falls outside the bounds of relevant evidence to the Court.

## C. Even if Relevant, the City Properly Withheld the Discovery Sought by Objectors Under the Business Strategy Privilege.

Even if the information denied to Objectors was relevant, it was appropriately withheld as commercially sensitive and protected by the business strategy privilege. Courts routinely recognize a "business strategy privilege" that, while limited in scope and duration, provides a qualified immunity to discovery similar to the attorney work product doctrine under Federal Rule of Civil Procedure Rule 26(c) that protects from disclosure "the strategic business plans, proposals, or alternatives under consideration" by a party from whom discovery is sought where disclosure "would irreparably harm and prejudice" the party. *See Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 418 (M.D.N.C. 1992); *Grand Metro. PLC v. Pillsbury Co.*, Fed. Sec. L. Rep. P. 94,096; 14 Del. J. Corp. L. 1045, 1050 (Del. Ch. Nov. 21, 1988).

While this privilege has most commonly been asserted in contests for corporate control, it is not limited to that context. *See e.g.*, *Gioia v. Texas Air Corp.*, Case No. 9500, 1988 Del. Ch. LEXIS 30 (Del. Ch. Mar. 3, 1988) (applying the privilege in a shareholder suit to preclude discovery of corporate plans to deal with possible labor strikes by its work force); *In re Heizer Corp.*, Case No. 7949, slip op. (Del. Ch. Nov. 9, 1987) (applying the privilege to preclude the disclosure

17

of ongoing negotiations with third parties in a suit by a trustee related to the disbursement of trust assets); *Dedde v. Orrox*, Case No. 6409, slip op. (Del. Ch. Apr. 8, 1981) (applying the privilege to protect a dissident shareholder from discovery in a proxy fight). The principles underlying the privilege similarly justify its application here because the privilege recognizes and protects a responding party's ongoing responsibility to manage its affairs in the best interests of its constituents even in the face of challenges to those efforts. *Parsons*, 141 F.R.D. at 418-19. In essence, the privilege seeks to balance "inconsistent yet valid interests … on the one hand, the requesting party's need for information in order to fairly prepare for trial; and on the other, the responding party's need to be able to carry out an ongoing strategy." *Id.* at 419.

In the interests of balance, the business strategy privilege is limited in scope and precludes only "information concerning options still being actively considered" where disclosure would harm the responding party's interests. *Grand Metro.*, 14 Del. J. Corp. L. at 1051. Even within that limitation, the privilege typically precludes disclosure of the categories of information sought by Objectors. *See e.g.*, *id.* at 1051-54 (precluding the identity of and subject of discussions with any potential alternate investors with "a still lively interest" and materials related to a contemplated recapitalization). Here, disclosure of the covenants in the post-petition financing term sheet, the potential collateral package, operation of the

18

13-53846-tjt    Doc 4030-6    Filed 04/09/14    Entered 04/09/14 18:30:03    Page 84 of 60
13-53846-swr    Doc 2050    Filed 12/10/13    Entered 12/10/13 18:33:43    Page 18 of 50
456                                                                          179

collateral package, the identity of parties involved in the post-petition financing, and efforts to obtain alternate sources of post-petition funding, including funding from the State of Michigan and/or the federal government, would have necessarily injured the City's post-petition financing negotiating position.

At the very least, disclosure would have revealed the City's baseline acceptable provisions to which all of its possible investors would have flocked. This result would almost certainly have ensured the City might only obtain post-petition financing on its worst possible terms. Such a result is quintessentially what the business strategy privilege is designed to prevent, and the information sought by Objectors accordingly warrants protection under the privilege. Indeed, Syncora has refused to disclosure similar information on the grounds that it is commercially sensitive and, presumably, protected by the business strategy privilege. Schwarzman Depos. 80:1-25.

Finally, while the business strategy privilege is further limited by its duration, that limitation is no longer at issue in the instant matter. "[O]nce a decision has been made," the requesting party may test its validity and inquire into its underlying basis. *Parsons*, 141 F.R.D. at 419; *see also Plaza Securities Co. v. Office*, Del. Ch., C.A. No. 8737, 1986 WL 14417 (Dec. 15, 1986). As a result, a requesting party will not be denied discovery forever. *Parsons*, 141 F.R.D. at 419 (citations omitted).

Here, as explained earlier, Objectors have not been indefinitely denied discovery into the City's post-petition financing efforts, plans, and proposed collateral package. Now that the City has completed its post-petition financing negotiations, it has provided – through discovery in connection with the Post-Petition Financing Motion and its dataroom – extensive information regarding the City's post-petition financing efforts. In particular, the City has provided Objectors with the very information they sought during discovery related to the Settlement – namely, the covenants in the post-petition financing term sheet, the potential and final collateral package, the identity of parties involved in the financing, efforts to obtain alternate sources of funding, including funding from the State of Michigan and/or the federal government, and the operation of the collateral package. Accordingly, Objectors can no longer argue that they have been prejudiced by lack of access to the information they sought during discovery related to the Settlement.

## **Conclusion**

For the foregoing reasons, the City respectfully requests that this Court deny Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-in-Possession Financing Efforts.

20

13-53846-swr   Doc 2050-6   Filed 12/10/13   Entered 12/10/13 18:33:40   Page 86 of 60
13-53846-swr   Doc 2016   Filed 04/29/14   Entered 04/29/14 18:30:23   Page 86 of 60   181
456

Dated:  December 10, 2013          Respectfully submitted,


 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center
21

13-53846-swr   Doc 2050-6   Filed 12/10/13   Entered 12/10/13 18:58:40   Page 87 of
456
13-53846-swr   Doc 4304   Filed 04/29/14   Entered 04/29/14 18:30:23   Page 27 of  182

Suite 1800
Southfield, MI 48075
Telephone:   (248) 359-7300
Facsimile:   (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone:   (313) 963-6420
Facsimile:   (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

*Counsel for the City of Detroit*

# SUMMARY OF ATTACHMENTS

| Exhibit 1 | Excerpts from the Deposition of Kevyn Orr |
|-----------|-------------------------------------------|
| Exhibit 2 | Excerpts from the Deposition of Kenneth Buckfire |

# **EXHIBIT 1**

### *Excerpts from the Deposition of Kevyn Orr*

13-53846-swr   Doc 4391-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 90 of 60
13-53846-swr   Doc 2090   Filed 12/10/13   Entered 12/10/13 13:33:40   Page 2 of 60
456
185

# In The Matter Of:

*City of Detroit*

---

*Kevyn Orr*
*August 30, 2013*

---



**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File ORR_KEVYN.txt*
*Min-U-Script® with Word Index*

13-53846-tjt   Doc 4066   Filed 04/29/14   Entered 04/29/14 18:30:03   Page 91 of
456
13-53846-swr   Doc 2050   Filed 12/10/13   Entered 12/10/13 18:33:43   Page 29 of 60   186

```
 1              UNITED STATES BANKRUPTCY COURT

 2           FOR THE EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4

 5   In Re:

 6

 7   City OF DETROIT, MICHIGAN        Chapter 9

 8                                    Case No.13-53846

 9             Debtor.          Hon. Steven Rhodes

10                                     /

11

12

13        The Videotaped Deposition of KEVYN ORR,

14        Taken at 1114 Washington Boulevard,

15        Detroit, Michigan,

16        Commencing at 8:32 a.m.,

17        Friday, August 30, 2013,

18        Before Cindy Mendenhall, RPR, CSR-5220.

19

20

21

22

23

24

25
```

1    APPEARANCES:

2

3    GREGORY M. SHUMAKER

4    DAN T. MOSS

5    Jones Day

6    51 Louisiana Avenue N.W.

7    Washington, D.C. 20001

8    202.879.3939

9         Appearing on behalf of the City of Detroit.

10

11   ROBERT S. HERTZBERG

12   Pepper Hamilton LLP

13   4000 Town Center, Suite 1800

14   Southfield, Michigan 48075

15   248.359.7300

16        Appearing on behalf of the City of Detroit.

17

18   MATTHEW G. SUMMERS

19   Ballard Spahr, LLP

20   919 North Market Street, 11th floor

21   Wilmington, Delaware 19801

22   302.252.4465

23        Appearing on behalf of EEPK.

24

25

13-53846-tjt   Doc 4310-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 93 of
13-53846-swr   Doc 2050   Filed 12/10/13   Entered 12/10/13 18:35:40   Page 93 of 60
456                                                            188

```
1    VINCENT J. MARRIOTT III

2    Ballard Spahr LLP

3    1735 Market Street

4    51st Floor

5    Philadelphia, Pennsylvania 19103

6    215.665.8500

7         Appearing on behalf of EEPK.

8

9    STEPHEN HACKNEY

10   LALLY GARTEL

11   Kirkland & Ellis, LLP

12   300 North LaSalle

13   Chicago, Illinois 60654

14   312.862.2157

15        Appearing on behalf of Syncora.

16

17   JENNIFER GREEN

18   FRANK GUADAGNINO

19   Clark Hill, P.L.C.

20   500 Woodward Avenue, Suite 3500

21   Detroit, Michigan 48226

22   313.965.8300

23        Appearing on behalf of Police and Fire Retirement

24        System and Police and Fire General Retirement System.

25
```

13-53846-tjt   Doc 4310-6   Filed 04/29/14   Entered 04/29/14 18:30:23   Page 94 of 60
13-53846-swr   Doc 2050   Filed 12/16/13   Entered 12/16/13 16:33:43   Page 29 of 60   189
456

```
 1   FRANK J. GUADAGNINO
 2   Clark Hill Thorp Reed
 3   One Oxford Centre
 4   301 Grant Street, 14th Floor
 5   Pittsburgh, PA 15219
 6   412.394.2329
 7        Appearing on behalf of Police and Fire Retirement
 8        System and Police and Fire General Retirement
 9        System.
10
11   KELLY DIBLASI
12   Weil, Gotshal & Manges, LLP
13   767 Fifth Avenue
14   New York, New York 10153
15   212.310.8032
16        Appearing on behalf of Financial Guaranty Insurance
17        Company.
18
19   ERNEST J. ESSAD, JR.
20   Williams, Williams, Rattner & Plunkett, P.C.
21   380 North Old Woodward, Suite 300
22   Birmingham, Michigan 48009
23   248.642.0333
24        Appearing on behalf of Financial Guaranty Insurance
25        Company.
```

13-53846-tjt   Doc 4311-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 95 of
13-53846-swr   Doc 2050   Filed 12/16/13   Entered 12/16/13 16:33:46   Page 29 of 60   190
456

```
 1   KAREN NEWBURY
 2   RICK L. FRIMMER
 3   Schiff Hardin, LLP
 4   233 South Wacker Drive, Suite 6600
 5   Chicago, Illinois 60606
 6   312.258.5522
 7        Appearing on behalf of Depfa Bank, PLC, as agent for
 8        DFS WertManagement.
 9
10   CAROLINE TURNER ENGLISH
11   Arent Fox, LLP
12   1717 K Street, NW
13   Washington, D.C. 20036
14   202.857.6000
15        Appearing on behalf of Ambac.
16
17   BIANCA FORDE
18   Winston & Strawn, LLP
19   200 Park Avenue
20   New York, New York 10166
21   212.294.4733
22        Appearing on behalf of Assured Municipal Guaranty
23        Corp.
24
25
```

```
 1   JASON JURGENS
 2   Cadwalader, Wickersham & Taft, LLP
 3   One World Financial Center
 4   New York, New York 10281
 5   212.504.6102
 6        Appearing on behalf of Merrill Lynch Capital Services.
 7
 8   GUY S. NEAL
 9   Sidley Austin, LLP
10   1501 K. Street, N.W.
11   Washington, D.C. 20005
12   202.736.8041
13        Appearing on behalf of National Public Finance
14        Guarantee Corp.
15
16   STEVEN WILAMOWSKY
17   Bingham McCutchen, LLP
18   399 Park Avenue
19   New York, New York 10022
20   212.705.7960
21        Appearing on behalf of UBS.
22
23
24
25
```

13-53846-tjt   Doc 2050-6   Filed 12/10/13   Entered 12/10/13 18:33:40   Page 1 of 60
13-53846-swr   Doc 4311-6   Filed 04/29/14   Entered 04/29/14 18:30:23   Page 97 of
456                                                                        192

```
 1   CLAUDE D. MONTGOMERY

 2   Dentons

 3   620 Fifth Avenue

 4   New York, New York 10020

 5   212.632.8390

 6        Appearing on behalf of Official Committee of Retirees.

 7

 8   JEROME D. GOLDBERG

 9   Jerome D. Goldberg, PLLC

10   2921 East Jefferson, Suite 205

11   Detroit, Michigan 48207

12   313.393.6001

13        Appearing on behalf of David Sole, Party in Interest.

14

15

16   ALSO PRESENT:

17   Bailey Wellman - Video Technician

18

19

20

21

22

23

24

25
```

1   Q.  Was there anything that you can recall today that

2       happened on July 5th that was so urgent it couldn't

3       wait six hours?

4   A.  Every -- every day -- let me be clear about this, so

5       we can just get by it.  Every day that the City does

6       not make reinvestment in the City that has tens of

7       thousands of abandoned structures, that has four of

8       the most dangerous neighborhoods in the country, that

9       has police cars with over 250,000 miles on them, that

10      has police officers I believe during this time, one of

11      whom got shot in the head by a perpetrator that nine

12      cars had surrounded and remains in the hospital today,

13      every day that this City does not make reinvestment is

14      a dangerous day.

15   Q.  Were there any negotiations scheduled for July 5th,

16      2013, the day after July 4?

17   A.  I don't -- I don't recall.  If there's something you

18      can refresh my recollection.  I believe there was --

19      there was something on July 5th.  I'm just not

20      recalling what it was.

21   Q.  Did this letter cause the negotiations to cease

22      between June 17th and when you're able to obtain the

23      TRO on July 5th?

24   A.  I wouldn't say whether it caused them to cease.  As I

25      said before, it had an impact and it was disruptive.

1   A.   I told you, lives are at stake in the City every day.

2   Q.   Are they at stake with respect to access to the --

3   A.   Every day --

4   Q.   -- casino revenues?

5   A.   I will say again, every day that we don't have access

6        to casino revenue, we cannot make the necessary

7        reinvestment in this City to provide for the health,

8        safety and welfare of the citizens, and that's a true

9        statement.

10  Q.   If I said that lives are at stake with respect to the

11       casino revenues, can you agree with that statement?

12                   MR. SHUMAKER:  Objection, asked and

13       answered.

14  A.   I've answered your question.

15  BY MR. HACKNEY:

16  Q.   Can you -- can you agree with my statement?

17  A.   I've answered your question.

18  Q.   I disagree that you've answered my question.  We'll

19       take the objection up at the -- with the Court, but

20       are lives at stake with respect to access to the

21       casino revenues?

22  A.   I've answered your question.

23                   (Whereupon Rick Frimmer left the

24                   deposition at 9:41 a.m.)

25                   MR. HACKNEY:  Well, we're going to have to

1      the City.

2    A.    It's an important aspect of the City.

3    Q.    Do you still project that you're going to run out of

4          cash by the end of the year?

5    A.    If we don't have this agreement, there's a very real

6          chance, yes, in a steady state, we will run out of

7          cash.

8    Q.    And by -- what do you mean by a steady state?

9    A.    If we don't do anything such as secure this casino

10         revenue, if we don't go to the capital markets and

11         borrow additional funds, which appears unlikely which

12         the City has done every other year since 2008 to make

13         up the difference, yes, the projections show that by

14         December of this year, we will run out of cash.

15   Q.    Are those the pre-bankruptcy projections?

16   A.    Yes.  I believe so.

17   Q.    Those are the projections that we'll get into in a

18         moment that -- but that assumes that the City's paying

19         its legacy expenditures on a current basis, right?

20   A.    Yes.  As we have -- as we have represented, we intend

21         to continue doing that throughout the year.

22   Q.    The legacy expenditures?

23   A.    Well, certainly with regard to healthcare and other

24         employees, if we get this agreement, that may change

25         our risk for the termination payment.

13-53846-swr   Doc 42036   Filed 04/29/14   Entered 04/29/14 22:30:03   Page 101 of 60
13-53846-swr   Doc 42036   Filed 04/29/14   Entered 04/29/14 22:30:03   Page 35 of 60
456                                                                            196

1   Q.   Your view of those legacy expenditures in the

2        bankruptcy is that they are unsecured claims, correct?

3   A.   Yes.  Many of them are, yes.  There are some

4        expenditures that are secured with regard to the water

5        department and parking and some miscellaneous, but the

6        roughly 11 and a half, 12 billion dollars that we put

7        out there we view as unsecured.

8   Q.   So let's go back to sourcing this termination payment.

9   A.   Yes.

10  Q.   It was my understanding of his testimony that

11       Mr. Buckfire who, by the way, is the individual tasked

12       with obtaining the City's post petition financing,

13       correct?

14  A.   Yes.

15  Q.   And is presumably the individual that's most

16       knowledgeable about that effort?

17  A.   Yes.

18  Q.   It was -- I'll represent to you that his testimony was

19       that the proceeds for the optional termination payment

20       would likely come from the post -- the proceeds of the

21       post petition financing?

22  A.   Yes.

23               MR. JURGENS:  Objection to form.

24  BY MR. HACKNEY:

25  Q.   Is that also your understanding?

1       mislead you.  It is my assumption that, while they're

2       commercially sensitive, that's not going to be

3       forthcoming.

4  Q.  Oh, really?

5  A.  Yes.

6  Q.  So just to tie it up, you tried to get a -- whether

7       it's credit enhancement or liquidity from the State

8       and the Feds, and your expectation is that you won't

9       be able to?

10 A.  My understanding at the State level is that there's

11      certain prohibitions of the State law on the ability

12      of the State to lend to the City, and at the Federal

13      level my understanding is that it's not going to be

14      forthcoming, direct aid.

15 Q.  Interesting.  And what about credit enhancement by the

16      State?

17 A.  Here again, it's highly commercially insensitive --

18      sensitive.  I don't want to say anything that

19      forecloses it, but we -- let me answer it this way.

20      We are operating on the assumption that that will not

21      come -- be forthcoming.

22 Q.  The casino revenues are about 170 million dollars a

23      year; isn't that correct?

24 A.  Yeah, 170, 180 somewhere in there.

25 Q.  Yeah.  In fact, that -- it's interesting because the

1      monthly basis under the forbearance agreement --
2  A.   Yes.
3  Q.   -- you net about 11 million?
4  A.   I think that's correct.
5  Q.   Okay.  Your claim is that these revenues are necessary
6       to the operation of the City.  I think we discussed
7       that earlier.
8  A.   Yes.
9  Q.   And in fact it's your expectation that you will use
10      these revenues to fund the reinvestment program that
11      you have planned with respect to the 1.25 billion
12      dollars of reinvestment in the City over the next ten
13      years?
14 A.   Yes, that's correct.  An average of 125 million a year
15      which a big component of it is this revenue.
16 Q.   Okay.  So fair statement, you're going to take the
17      casino revenues and you're going to plow them into the
18      City, correct?
19 A.   More -- I mean, money goes into a bathtub, but yes.
20      The casino -- we don't have the casino revenue.  We
21      have no other source to make reinvestment in the City.
22 Q.   And that's what you want to do?
23 A.   Yes.
24 Q.   And so as a creditor, I'm going to make the obvious
25      point that you don't plan to take the casino revenues

1  and give them to the unsecured creditors, correct?

2  A.  I think that's generally a fair characterization.

3  Q.  So isn't it fair that other than perhaps certainly

4  benefitting the people of Detroit if you reinvested in

5  the City, the creditors themselves will not see their

6  recoveries enhanced by the fact that the City has

7  gained access to these casino revenues, correct?

8  MR. SHUMAKER:  Objection, calls for

9  speculation.

10  A.  Yeah, I'm going to be careful here because one of the

11  things we've offered in our proposal, June 14th

12  proposal, is a 2 billion dollar note that has some

13  capacity to fluctuate.  Generally speaking, your

14  statement is true, but there's another concept that

15  without this reinvestment there's a very real chance

16  that the City will have no chance to stabilize and

17  grow and the creditors will see no opportunity for any

18  benefit because the City would have an inability of --

19  continue to decline, quality of life will continue to

20  decline, revenue from other streams will continue to

21  decline, and the City's ability to satisfy its

22  obligations to the creditors will continue to decline.

23  Q.  Now, I understand that distinction, and we're talking

24  now about the proposal you've made to creditors that

25  you would give all of the unsecureds --

# EXHIBIT 2

*Excerpts from the Deposition of Kenneth Buckfire*

# In The Matter Of:

*City of Detroit*

---

*Kenneth Buckfire*
*August 29, 2013*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File BUCKFIRE_KENNETH.txt*
*Min-U-Script® with Word Index*

```
 1              UNITED STATES BANKRUPTCY COURT

 2          FOR THE EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4

 5   In Re:

 6

 7   CITY OF DETROIT, MICHIGAN   Chapter 9

 8                              Case No.13-53846

 9           Debtor.            Hon. Steven Rhodes

10                                    /

11

12

13        The Video Deposition of KENNETH BUCKFIRE,

14        Taken at 1114 Washington Boulevard,

15        Detroit, Michigan,

16        Commencing at 9:31 a.m.,

17        Thursday, August 29, 2013,

18        Before  Nora Morrissy, RMR, CRR, CSR-2642.

19

20

21

22

23

24

25
```

1   APPEARANCES:

2

3   THOMAS CULLEN, JR.

4   BENJAMIN ROSENBLUM

5   Jones Day

6   51 Louisiana Avenue N.W.

7   Washington, D.C. 20001

8   202.879.3939

9       Appearing on behalf of the City of Detroit.

10

11   MATTHEW G. SUMMERS

12   Ballard Spahr, LLP

13   919 North Market Street, 11th floor

14   Wilmington, Delaware 19801

15   302.252.4465

16       Appearing on behalf of EEPK.

17

18   STEPHEN HACKNEY

19   LALLY GARTEL

20   Kirkland & Ellis, LLP

21   300 North LaSalle

22   Chicago, Illinois 60654

23   312.862.2157

24       Appearing on behalf of Syncora.

25

13-53846-swr   Doc 2306   Filed 12/10/13   Entered 12/10/13 18:36:43   Page 48 of 60
13-53846-swr   Doc 2306   Filed 04/29/14   Entered 04/29/14 22:30:23   Page 109 of
456                                                                          204

```
 1   JENNIFER GREEN

 2   FRANK GUADAGNINO

 3   Clark Hill, P.L.C.

 4   500 Woodward Avenue, Suite 3500

 5   Detroit, Michigan  48226-3435

 6   313.965.8300

 7       Appearing on behalf of Police and Fire Retirement

 8   System and Police and Fire General Retirement System.

 9

10   KELLY DIBLASI

11   Weil, Gotshal & Manges, LLP

12   767 Fifth Avenue

13   New York, New York 10153

14   212.310.8032

15       Appearing on behalf of Financial Guaranty Insurance

16   Company.

17

18   ERNEST J. ESSAD, JR.

19   Williams, Williams, Rattner & Plunkett, P.C.

20   380 North Old Woodward, Suite 300

21   Birmingham, Michigan  48009

22   248.642.0333

23       Appearing on behalf of Financial Guaranty Insurance

24   Company.

25
```

```
 1   KAREN NEWBURY
 2   Schiff Hardin, LLP
 3   233 South Wacker Drive, Suite 6600
 4   Chicago, Illinois 60606
 5   312.258.5522
 6       Appearing on behalf of Depfa Bank, PLC, as agent for
 7   DFS WertManagement.
 8
 9   CAROLINE TURNER ENGLISH
10   Arent Fox, LLP
11   1717 K Street, NW
12   Washington, D.C. 20036
13   202.857.6000
14       Appearing on behalf of Ambac.
15
16   BIANCA FORDE
17   Winston & Strawn, LLP
18   200 Park Avenue
19   New York, New York 10166
20   212.294.4733
21       Appearing on behalf of Assured Municipal Guaranty
22   Corp.
23
24
25
```

1  JASON JURGENS

2  Cadwalader, Wickersham & Taft, LLP

3  One World Financial Center

4  New York, New York 10281

5  212.504.6102

6      Appearing on behalf of Merrill Lynch Capital Services.

7

8

9  GUY S. NEAL

10  Sidley Austin, LLP

11  1501 K. Street, N.W.

12  Washington, D.C. 20005

13  202.736.8041

14      Appearing on behalf of National Public Finance

15  Guarantee Corp.

16

17  STEVEN WILAMOWSKY

18  Bingham McCutchen, LLP

19  399 Park Avenue

20  New York, New York  10022

21  212.705.7960

22      Appearing on behalf of UBS.

23

24  ALSO PRESENT:

25  Bailey Wellman, Video Technician

1   Q.    What do you believe to be the benefits to the City of

2          entering into the forbearance agreement?

3   A.    Well, there are three.  Most important is continued

4          and reliable access to the City's net share of the

5          gaming revenues.  By that I mean the amount remaining

6          after paying off the fixed Swap payments.  That's a

7          critical element to the City's ability to operate in

8          the ordinary course and invest in its reinvestment

9          program.

10          Second, obviously the opportunity to

11         terminate the Swaps and eliminate this class of

12         creditors from a plan of adjustment at a discount

13         particularly since it's a secured party is of economic

14         value to the City, it saves real cash.

15          Lastly, by freeing up the gaming revenues,

16         it will give the City financing options as part of the

17         plan of adjustment that it otherwise might not have.

18   Q.    With respect to -- with respect to freeing up the

19          gaming revenues, how in your view does the forbearance

20          agreement provide the City with better access to those

21          revenues?

22   A.    Well, by the action of the collateral agreement today

23         the City receives the net revenues after paying the

24         Swap payments on a monthly basis.

25   Q.    The City -- the City today has access to the casino

1          MR. CULLEN:  Objection, foundation, form,
2     but you can address the question.
3  A.   Yes, the City has a plan.
4  BY MR. SUMMERS:
5  Q.   And what is that plan?
6  A.   The City intends to secure a debtor in possession
7     financing of sufficient proceeds to fund the
8     termination payment as well as provide sufficient cash
9     for the City to execute on its reinvestment program
10     during the bankruptcy.
11  Q.   And what is -- what actions, if any, has the City
12     taken toward obtaining debtor in possession financing?
13  A.   We have contacted a large universe of potentially
14     interested investors, many of whom have signed
15     nondisclosure agreements, NDAs, pursuant to which they
16     have received the request for proposal, the RFP which
17     went out yesterday.
18  Q.   And is Miller Buckfire leading the effort to obtain
19     debtor in possession financing?
20  A.   Yes.
21  Q.   And when you say a large universe of potential
22     investors, do you know approximately how many have
23     been talked to?
24  A.   At the moment it's in excess of 30.
25  Q.   And how many have -- how many have signed

1    nondisclosure agreements?

2  A.  That's the universe I'm discussing, approximately 30

3      or more.

4  Q.  So, everybody you've talked to signed?

5  A.  No, some people didn't want to participate.  I can't

6      tell you how many we called.  I can tell you how many

7      we sent NDAs to which have been returned to us, it's

8      in excess of 30.

9  Q.  Are some of the people or some of the potential

10     sources of financing that Miller Buckfire have spoken

11     to said no, we're not interested?

12 A.  Yes.

13 Q.  And approximately how many have said no?

14 A.  Hasn't been that many, maybe ten.  Would your client

15     like one?

16 Q.  And do you know who those ten entities are that have

17     said they are not interested?

18 A.  I do, yes.

19 Q.  And who are they?

20 A.  I'm not going to tell you that.

21 Q.  On what basis?

22 A.  It's commercially sensitive information.

23         MR. CULLEN:  Counsel, maybe it will help,

24     and I don't know whether you want this on the record

25     or not, but the position we are going to take with

13-53846-swr   Doc 4206   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 115 of 60
13-53846-swr   Doc 2036   Filed 12/10/13   Entered 12/10/13 18:30:43   Page 49 of 60   210
456

```
 1          go -- move through the questions and see how we do.
 2                        MR. CULLEN:  Okay.
 3                        MR. SUMMERS:  I understand the City's
 4          position on it.
 5                        MR. CULLEN:  Okay.
 6    BY MR. SUMMERS:
 7    Q.    You said an RFP went out yesterday?
 8    A.    Correct.
 9    Q.    Approximately how many people was the RPF sent to
10          yesterday?
11    A.    The 30 plus people who signed the NDA.
12    Q.    How much debtor-in-possession financing does the City
13          hope to obtain?
14    A.    Three hundred fifty million dollars, up to three
15          hundred fifty million dollars.
16    Q.    And does the City have a goal on the interest rate?
17    A.    The lowest possible interest rate.
18    Q.    Does the RFP attempt to define what that lowest
19          possible interest rate is?
20    A.    No.
21    Q.    Does it define whether the interest rate needs to be
22          fixed or variable?
23    A.    No.
24    Q.    What covenants, if any, are included in the RFP as
25          being acceptable or not acceptable?
```

13-53846-swr   Doc 2036   Filed 12/10/13   Entered 12/10/13 18:30:43   Page 116 of 60
13-53846-swr   Doc 4306   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 50 of 60   211
456

```
 1   A.   I'm not going to discuss that.  It's commercially
 2        sensitive.
 3   Q.   How long of maturity on the DIP financing is the City
 4        looking to obtain?
 5   A.   Through the pendency of the end of the case.
 6   Q.   And is the City offering a lien on casino revenues in
 7        connection with the DIP financing?
 8   A.   In part.
 9   Q.   I assume the City does not expect to obtain unsecured
10        financing?
11   A.   I would take it if it was offered.
12   Q.   No doubt.  What other collateral is the City offering
13        to secure the DIP financing loan?
14   A.   I'm not going to answer that question.
15   Q.   Does the RFP define what collateral would be
16        available?
17   A.   Yes, it does.
18   Q.   And that's been sent out to potential investors?
19   A.   Who have signed nondisclosure agreements.
20   Q.   If somebody new came and said I would be interested in
21        providing DIP financing, you would have them sign an
22        NDA and then provide them the RFP?
23   A.   If they wanted to make an unsolicited proposal without
24        the benefit of the RPF, we would be happy to accept
25        it.  Are you suggesting your client is interested in
```

```
 1 || Q.   And what is that deal?
 2 ||            MR. CULLEN:  Objection to the extent it
 3 ||      calls for a legal conclusion.
 4 || A.   Well, we have to find a willing lender, that's number
 5 ||      one.  Number two, we have to have a court order
 6 ||      approving the form of the DIP financing, and, number
 7 ||      three, we believe we need to have approval of the
 8 ||      forbearance and termination agreements we get the
 9 ||      benefit of the elimination of the collateral pledge
10 ||      and the benefit of the discount.
11 || BY MR. SUMMERS:
12 || Q.   Do you need a determination on eligibility as well?
13 || A.   Probably as a condition to closing but not as a
14 ||      condition to getting a loan commitment.
15 || Q.   And what time line does the City hope to secure
16 ||      debtor-in-possession financing?
17 || A.   Well, it's a large group of potential lenders, and,
18 ||      therefore, we have requested preliminary indications
19 ||      of interest by September the 6th, next Friday.  We
20 ||      want to determine who really has a serious interest
21 ||      and therefore encourage their ability to do due
22 ||      diligence in a rational way because they will all have
23 ||      due diligence requirements.
24 ||            We simply can't handle all 30.  If they all
25 ||      decide they want to put in proposals, we'll do the
```

13-53846-swr    Doc 2036    Filed 12/10/13    Entered 12/10/13 18:30:03    Page 118 of 60
13-53846-swr    Doc 4206    Filed 04/29/14    Entered 04/29/14 22:00:03    Page 51 of 60    213
456

1     best we can, but I'm assuming a smaller number when

2     they see the RFP will want to proceed to the second

3     stage which is to propose actual terms in response to

4     our RFP.  The date for that I believe is September the

5     16th.

6  Q.  Has a time line for the DIP financing because the view

7     of what the time line should be for the DIP financing

8     beyond the September 16th deadline?

9  A.  Well, we will receive I hope on the 16th multiple

10    serious indications of interest back by term sheets.

11    At that point we will look at how many we have and

12    we'll determine whether there's one that is so

13    superior to the others that we'll negotiate with that

14    party exclusively.

15          If we have a lot that are very competitive,

16    we may decide to negotiate with several of them at the

17    same time.

18          So, I don't have a clear view at this time

19    what date we'll actually select our lender, but it

20    will clearly be something we'll focus on after the

21    16th of September.  The goal will be to do it as soon

22    as possible.

23 Q.  Based on your experience in other cases do you have a

24    view as to what -- how long the selection of the

25    lender is likely to take?

1  A.  Depends on how many proposals I get back.

2  Q.  If you get 15 back, do you have a view of how long

3      it's likely to take?

4  A.  We should be so lucky.  I think that will take several

5      weeks, probably two weeks to come up with a winning

6      bid as it were.

7  Q.  And then the intent would be to as quickly as possible

8      present that to the bankruptcy court, is that correct?

9  A.  Yes.

10  Q.  And if the City obtains a debtor-in-possession

11      financing, what's the intended use of the financing?

12              MR. CULLEN:  Asked and answered but you can

13      address it again.

14  A.  I've already answered it.

15  BY MR. SUMMERS:

16  Q.  Why don't you go ahead, say it again.

17  A.  We'll use proceeds to terminate the Swaps at the

18      discount provided for in the forbearance agreement and

19      the balance of the DIP loan will be retained by the

20      City as working capital and to support its

21      reinvestment program.

22  Q.  Are there any other intended uses to the DIP financing

23      other than the two you just said?

24  A.  Not that I'm aware of.

25  Q.  And the amount of the casino revenues that are

1     forbearance agreement a valid contract?

2              MR. CULLEN:  Objection.  Asks for a legal

3     conclusion.

4  A.   I can't answer that.  It calls for a legal conclusion.

5  BY MR. SUMMERS:

6  Q.   If the court doesn't approve the forbearance

7     agreement, will the City still attempt to perform

8     under the forbearance agreement?

9              MR. CULLEN:  Objection.  Calls for

10     speculation.

11  A.   I can't answer that question.  I don't understand it.

12  BY MR. SUMMERS:

13  Q.   Have you ever discussed with Mr. Orr what the City

14     will do with respect to the Swaps if the forbearance

15     agreement is not approved?

16  A.   The financial consequences of not having the

17     forbearance agreement approved would be very dire for

18     the City of Detroit.  We could no longer count on our

19     access to gaming revenues, we would no longer be able

20     to execute on the reinvestment plan which has been

21     described to the public and to the creditors on June

22     14th.  We might be required to in fact reduce existing

23     City services in order to live within our cash

24     resources.  I'm only identifying some of the concerns

25     we would immediately have to review in order to come

1    A.    Our June 14th plan and proposal to creditors pursuant

2           to which we proposed a two billion dollar note be

3           given out to all of our unsecured creditors assumes

4           that the City is able to execute its reinvestment

5           program over the next ten years which assumes that we

6           have access to the cash flows embodied in that plan

7           including the gaming revenues.

8    Q.    It's not -- it's access to the gaming revenues to

9           grant a lien on them again?

10    A.    Not necessarily.  But the point is if we don't have

11          the gaming revenues because the actions of the Swap

12          counterparties, we can't even start the reinvestment

13          plan.

14    Q.    The City intends, correct me if I'm wrong, but I

15          thought that the City intends to enter into DIP

16          financing and grant a lien on the casino revenues as

17          the next step after approval of the forbearance

18          agreement?

19               MR. CULLEN:  Objection.  Foundation.

20          Form.

21    A.    If we have no forbearance agreement and we have to

22          live with the current Swap termination rights and the

23          Swap counterparties were to terminate officially and

24          require the City to pay three hundred million dollars

25          to them, by action of the agreement they would seize

1       to your knowledge, isn't that correct?

2   A.  Not on this, no.

3   Q.  I wanted to clarify something that you said about the

4       DIP earlier and it was mainly that -- you used the

5       phrase I didn't understand with respect to the casino

6       revenues, you said -- you either said that the casino

7       revenues would be a part of the collateral package or

8       that part of the casino revenues would be in the

9       collateral package, and I wanted to clarify that.

10              MR. CULLEN:  Objection.  Foundation.  Form.

11      I don't think he said either.

12  A.  I didn't.

13  BY MR. HACKNEY:

14  Q.  Oh, okay.  Well, I thought for sure you had said one

15      of those two, but let me understand what you

16      anticipate -- this is subject to counsel's concern,

17      but I think there has been testimony about the casino

18      revenues as part of the collateral package.

19              As the banker who is leading the DIP,

20      what's your understanding of the role the casino

21      revenues will play in the collateral package offered

22      in connection with the DIP?

23  A.  They will be part of the collateral package.

24  Q.  So, they will be part, and when you say they, do you

25      mean a specific period of time of the casino revenues

1    which is the base case recovery we presented on June

2    14th.

3 Q.  Right.  So, if the court grants the motion and you get

4    access to it, that will be consistent with the base

5    case which is consistent with the two billion dollar

6    offer, right?

7 A.  Correct.

8 Q.  So, it won't go up if the court grants you the access

9    that you're assuming you'll get?

10 A.  But it will go down if the court does not.

11 Q.  That's a different question.  I'll get to that in a

12    moment.

13          It  won't go up if the court grants the

14    motion, correct?

15 A.  Correct.

16 Q.  Your argument if I understood it was that the

17    casino revenues will be used to invest in the City,

18    correct?

19 A.  Revenues of the City are fungible.  All I'm saying if

20    you don't have access to those revenues, then you

21    don't have the billion dollar plus of revenues that

22    you thought you had which is supporting not only

23    current operations but the reinvestment plan.

24 Q.  And I will say that I had understood you earlier to

25    say if you didn't have access to casino revenues, that

1  Q.   And why aren't you going to tell me about that?

2  A.   It's commercially sensitive information.

3  Q.   Why?

4  A.   That's my answer.

5  Q.   Well, I can understand why if you are seeking estate

6       guarantee of a DIP or other things today, I get that,

7       and I'm not going to ask you about that, but I am

8       going to say that I think I deserve an answer on what

9       happened prior to June 4 in terms of finding

10      alternative ways to address the City's liquidity

11      crisis because after all what's been presented to us

12      was if we didn't do this deal, the City would die, and

13      I do think we are entitled to ask well, what had you

14      tried to do with other actors, so, can we get over it

15      or --

16             MR. CULLEN:  You could certainly ask if he

17      had received any assurance of the availability of any

18      other funding from any other source during that time

19      period.

20             MR. HACKNEY:  Well, I do appreciate that

21      but I often tend to ask my own questions.   Let me

22      try and ask it in a way that hopefully serves your

23      concerns.

24  BY MR. HACKNEY:

25  Q.   And let me first ask you, Mr. Buckfire, had your firm,

1    other than we've got now the novation idea and finding

2    another lender to fund the termination of the Swaps.

3  A.   Those are the two principal alternatives.

4  Q.   Principal alternatives.  Were there other not

5    principal alternatives but still alternatives?

6  A.   We reviewed the noncore assets of the City to

7    determine whether there was any source of ready cash

8    that we could access to use to fund the termination

9    payment.  We considered alternate source of funding,

10   for example, state and federal aid as I already

11   testified I'm not going to address.  We considered

12   everything.

13 Q.   Prior to June 4th, did you submit a request to the

14   state for aid on behalf of the City?

15 A.   I'm not going to answer that question.

16 Q.   You will not answer even whether the City made a

17   request for state aid prior to June 4th?

18 A.   It's commercially sensitive information.  I

19   respectfully cannot answer that question.

20 Q.   Was there a request for state aid that was rejected

21   prior to June 4th?

22 A.   I'm not going to answer that question.

23 Q.   On what basis won't you answer whether there was one

24   that was rejected?

25 A.   Commercially sensitive information.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                         Chapter 9
City of Detroit, Michigan,                     Case No. 13-53846
        Debtor.                                Hon. Steven W. Rhodes
_____/

**Order Denying Motions to Preclude Debtor from Offering Evidence**
**[Dkts. #933 and #935]**

Several objectors have filed these two motions.  Upon review, the Court concludes that

no hearing is necessary to resolve these motions.  Accordingly, the hearings that are presently set

are cancelled.

The Court further concludes that the motions should be denied without prejudice, because

the issues raised in the motions are more efficiently and properly addressed within the context of

the trial itself.  Further, the Court finds no cause to consider the issues in advance of trial.

It is so ordered.

.

**Signed on December 11, 2013**

                    _____/s/ Steven Rhodes_____
                    **Steven Rhodes**
                    **United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| | ) |
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## MOTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC.  TO ADJOURN HEARING ON THE DEBTOR'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora")[1] files this motion (the "Motion") to adjourn the hearing on the *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief* (the "Assumption Motion") and *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (the "DIP Motion" and the hearing on the Assumption Motion and the DIP Motion the "Hearing") until Syncora has completed additional discovery

---

[1] Ambac Assurance Corporation, Hypothekenbank Frankfurt AG, Hypothenkenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. join in this Motion.

13-53846-swr Doc 2056 Filed 12/19/13 Entered 12/19/13 23:40:23 Page 1 of 14
456
13-53846-tjt Doc 4304-6 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 128 of 14   223

as requested herein. In support of the Motion, Syncora respectfully states as follows:

## **Background**

1. On July 18, 2013, the City of Detroit (the "City") filed the Assumption Motion, requesting approval of the July 15, 2013 Forbearance and Optional Termination Agreement (the "Forbearance Agreement") [Docket No. 17, Ex. 6]. In response, Syncora filed a motion for discovery related thereto (the "Assumption Discovery Motion") [Docket No. 142].

2. On August 2, 2013, the Court heard arguments on the Assumption Discovery Motion during which counsel for Syncora expressed concerns that an order on the Assumption Motion would contain judicial findings that could foreclose the rights of third parties, including Syncora, with respect to state law contractual disputes. (Aug. 2, 2013 Hearing, p. 124.) In response to these concerns, the Court assured counsel for Syncora that the Court's ruling on the Assumption Motion would do no more than "approve the decision of the city to assume [the Forbearance Agreement] and enter into the settlement or disapprove of it." (Id.) Further, the Court stated that if the Assumption Motion were approved, the Forbearance Agreement would be assumed 'warts and all,' implying that third-party legal rights would not be adjudicated during a hearing on the Assumption Motion.

2

13-53846-tjt   Doc 4305-6   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 129 of 224
13-53846-swr   Doc 3058   Filed 12/13/13   Entered 12/13/13 20:47:43   Page 2 of 14
456

3. Consistent with its comments regarding the Court's limited role in deciding the Assumption Motion, the Court initially denied Syncora's request for discovery. (Id. at 128.) Only after the City stated its intention to present witnesses at the hearing on the Assumption Motion was Syncora granted limited discovery thereon, consisting solely of depositions of three witnesses the City intended to present at trial. (Id. at 137.) In addition, the City produced a limited number of documents *after* the depositions, including documents the Objectors (defined below) had never seen before.

4. On November 5, 2013, the City filed the DIP Motion requesting approval for postpetition financing. In connection with the DIP Motion, certain objecting parties (the "Objectors") filed a motion for leave to conduct limited discovery (the "DIP Discovery Motion") [Docket No. 1640]. The City opposed certain of the Objectors' requested discovery.

5. On November 14, 2013, this Court held a hearing on the DIP Discovery Motion and issued an Order granting in part and denying in part the DIP Discovery Motion (the "DIP Discovery Order") [Docket No. 1743]. Recognizing that it was granting very limited discovery pursuant to the DIP Discovery Order, the Court invited the Objectors to resubmit their request for additional discovery in the future if needed.

6.      Consistent with the DIP Discovery Order, Syncora filed its *Request for the Production of Documents* ("Document Requests") with the Court pursuant to Local Bankruptcy Rule 7026-1 [Docket No. 1775].  As part of its Document Requests, Syncora requested that, "[i]f the Debtor claims that any privilege or protection excuses production of any document or part thereof, the Debtor must expressly make such claims in writing and provide a general description of the categories of documents being withheld and the basis for doing so, sufficient in detail for Syncora to determine whether there is an adequate basis for invoking privilege or protection."  (Document Requests at 5.)

7.      On November 20, 2013, the City produced documents to the Objectors.[2]  As part of this production, the City withheld multiple documents on privilege grounds.  The City did not, however, provide a corresponding privilege log.

8.      On December 2, 2013, counsel for Syncora requested that the City provide a privilege log in order to assess the City's privilege claims.  In response to this request, counsel for the City stated that it had not planned to provide a privilege log.  Counsel for Syncora noted that (a) it was entitled to receive such a log under the relevant Federal Rules of Bankruptcy Procedure and Federal Rules of Evidence and (b) a log was necessary, as a practical matter, to assess the City's

---

[2]      Significantly, the City also produced, or made available in the data room, a host of additional documents, but did so only *after* the Objectors had completed their depositions of the City's witnesses.

4

13-53846-swr  Doc 4305  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 4 of 14
13-53846-swr  Doc 3058  Filed 12/13/13  Entered 12/13/13 23:40:23  Page 131 of 14  226
456

privilege claims. The City ultimately stated that it did not intend to provide a privilege log, claiming that it had not agreed to do so and that it was not required to do so "under the rules."

9.     In light of the City's refusal to comply with the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and the instructions in Syncora's Document Requests, the Objectors filed the *Motion of the Objectors to Compel the Production of Privilege Log* (the "Motion to Compel") [Docket No. 1899]. This Court has not yet scheduled a hearing on the Motion to Compel.

### Jurisdiction

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

11.     Syncora respectfully requests the entry of an order (a) granting Syncora additional discovery on the DIP Motion and the Assumption Motion and (b) adjourning the Hearing until Syncora has had sufficient time to conduct the additional discovery.

5

13-53846-tjt   Doc 4305   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 5 of 14
13-53846-swr   Doc 2058   Filed 12/11/13   Entered 12/11/13 23:47:43   Page 5 of 14      227
456

## Basis for Relief Requested

### I. Syncora Requests Leave to Conduct Additional Discovery Relating to the DIP Motion and the Assumption Motion.

12.    Local Rule 7026-3 states that "[d]iscovery in a contested matter is permitted only upon a court order for cause shown."  E.D. Mich. LBR 7026-3. Syncora submits that, in this case, good cause exists for additional discovery on the DIP Motion and the Assumption Motion.

### II. Fulsome Discovery on the Forbearance Agreement is Proper in Light of the City's View Regarding the Scope of the Court's Review.

13.    With respect to the Assumption Motion, Syncora's request for limited discovery was initially denied in full.  Limited discovery was granted only after the City expressed its intent to present evidence at the hearing on the Assumption Motion.  In response to the City's request for an evidentiary hearing, the Court granted Syncora discovery with respect to the witnesses and the documents the City intended to offer at the Assumption Motion hearing.  (Aug. 2, 2013 Hr'g Transcript, 137).  However, that discovery was exceedingly limited.  By way of example, four of the five parties to the Forbearance Agreement (the two Swap Counterparties and the two Service Corporations) have neither been deposed nor produced documents.

14.    The Court's denial of more fulsome discovery was premised on the scope of review in which the Court anticipated it would engage with respect to the Assumption Motion.  However, the City's omnibus reply to objections to the

Assumption Motion (the "<u>Assumption Reply</u>") [Docket No. 2029] clearly sets forth the City's position that the Court has the jurisdiction to engage in a broad review of the City's request for approval of the Forbearance Agreement, including all state law claims related thereto. (Assumption Reply ¶ 8.) Specifically, the City states that the Court has authority to "consider all of the legal arguments presented by the Objectors, whether arising under state law or otherwise." (Assumption Reply ¶ 9.)

15.    If the Court adopts the position articulated by the City in its Assumption Reply regarding the appropriate scope of review of the Forbearance Agreement, the Court should allow more fulsome discovery rather than proceeding on an overly limited record that will not provide the Court with all of the information it requires for disposition of the City's Assumption Motion.

## III. The City Cannot Base its Arguments in Favor of the DIP Motion on the Necessity of DIP Financing While Simultaneously Opposing Discovery on the Necessity of Such Financing.

16.    With respect to the DIP Motion, Syncora was granted discovery only to the extent the City so agreed. (Nov. 14, 2013 Hr'g Transcript, 45.) By way of example, the Objectors have not been given the opportunity to discover the source documents and information underlying the need for, and uses of, the Quality of Life proceeds.

7

13-53846-tjt   Doc 2058   Filed 12/13/13   Entered 12/13/13 22:40:48   Page 7 of 14
13-53846-swr   Doc 3045-6   Filed 04/29/14   Entered 04/29/14 22:00:28   Page 134 of   229
456

17.    The City has indicated an intention to call witnesses and present documents that will address the many challenges of the City. (Nov. 14, 2013 Hr'g, Transcript, 15.) The declaration of Mr. Doak, who the City indicated it will call as a witness, details some of the challenges faced by the City. (DIP Motion, Ex. 5A, ¶¶ 6-7.) Additionally, the DIP Motion goes into substantial detail regarding these challenges. (DIP Motion, ¶¶ 24-34.) Despite describing the City's challenges at length in the DIP Motion and offering up witnesses to testify to those challenges, the City subsequently stated that it "neither needs nor seeks court approval for its governmental decision to spend money on the Quality of Life initiatives." (DIP Reply ¶ 25.) The City cannot base its argument in favor of the DIP Motion on the challenges facing the City and simultaneously state that the Court cannot analyze evidence of those challenges when deciding whether to approve the DIP Motion.

18.    In light of the foregoing, Syncora requests discovery on the specific needs for, and uses of, the DIP proceeds to evaluate whether the DIP financing is, in fact, necessary, reasonable, and in the best interests of creditors.

**IV. The Discovery Requested**

19.    As a result of the foregoing, Syncora renews the discovery requests set forth in its two prior discovery motions.

20.    Specifically, Syncora requests discovery on (a) the documents referred to by the emergency manager when determining whether the DIP

financing was in the best interests of creditors and necessary to enhance the value of the City, including those documents that relate to (i) assessments of how the City can improve itself, (ii) the perceived impact of the DIP financing on creditor recoveries, and (iii) specificity regarding the deployment of the proceeds of the DIP financing, and (b) the proposed specific uses of the proceeds of the DIP financing. In addition, the Syncora requests the opportunity to seek discovery from DIP lender, the Service Corporations, the City Council, and the Swap Counterparties, all of whom were integrally involved in negotiating the transactions contemplated in the DIP Motion and the Assumption Motion.

21.     Representatives of the DIP lender and Service Corporations are uniquely positioned to provide Syncora with information concerning the process by which the DIP financing was negotiated, evaluated, and approved.

22.     Similarly, the Swap Counterparties are the only parties able to provide information about their intentions regarding termination of the Swap Obligations, and potentially acceptable alternatives to the Forbearance Agreement.  Since the bulk of the DIP financing will be used to pay the Swap Counterparties under the Forbearance Agreement, this information is directly relevant to whether the full amount of the requested borrowing is necessary.

23.     Finally, discovery from the City Council is appropriate as that publicly elected body has rejected the proposed DIP financing and therefore is in a

9

13-53846-tjt  Doc 43046  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 9 of 14
13-53846-swr  Doc 2058  Filed 12/13/13  Entered 12/13/13 20:47:23  Page 136 of  231
456

unique position to testify regarding the necessity of the DIP financing and possible alternatives.

## V. Discovery is Required in Light of Restrictions Placed on Syncora's Use of Information Learned in Mediation.

24.     Additionally, the City has taken the position that none of the information disseminated to Objectors during Mediation may be used in any filings or pleadings.[3]  (Doak Dep., 11-12.)  As a result, Syncora requires additional discovery to access critical information through means other than Mediation.

## VI. The City Failed to Comply with Previously Granted Discovery on the DIP Motion.

25.     Finally, the City has failed to provide the limited discovery that has been granted to Syncora pursuant to this Court's DIP Discovery Order.  Although the City produced over 20,000 documents in conjunction with the DIP Discovery Order, the City failed to produce a privilege log or otherwise satisfy Rule 26(b)(5) of the Federal Rules of Evidence.  Further, when Syncora requested the City comply with Rule 26, the City refused to do so.  As a result, Syncora renews its prior request for this discovery.

---

[3] Although the City did not object to the use of the specific documents referenced at the deposition of Mr. Doak as it intended to make those documents public, the City reiterated its position that all other information disseminated in the context of Mediation is subject to the confidentiality provision of the Court's August 13, 2013 mediation order [Docket No. 322].

26.     Pursuant to the Court's invitation to the Objectors to resubmit their discovery requests in the future, Syncora now asserts that additional discovery is necessary in light of the previously stated facts.

## Conclusion

27.     For the foregoing reasons, Syncora respectfully requests that the Court grant this motion.

*[Remainder of this page intentionally left blank]*

13-53846-swr   Doc 2056   Filed 12/13/13   Entered 12/13/13 20:40:43   Page 11 of 14
13-53846-swr   Doc 2056   Filed 12/13/13   Entered 04/29/14 20:00:23   Page 138 of
456
233

Dated:  December 11, 2013     /s/ Stephen C. Hackney
                              James H.M. Sprayregen, P.C.
                              Ryan Blaine Bennett
                              Stephen C. Hackney
                              KIRKLAND & ELLIS LLP
                              300 North LaSalle
                              Chicago, Illinois 60654
                              Telephone:  (312) 862-2000
                              Facsimile:   (312) 862-2200

                              *Attorneys for Syncora Holdings Ltd., Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

                                    - and -

                              David A. Agay
                              Joshua Gadharf
                              **MCDONALD HOPKINS LLC**
                              300 North LaSalle
                              Suite 2100
                              Chicago, Illinois 60654
                              Telephone:  (312) 280-0111
                              Facsimile:   (312) 280-8232

                              *Local Counsel to Syncora Holdings Ltd., Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*


                              By:  /s/ Carol Connor Cohen
                              Carol Connor Cohen
                              Caroline Turner English
                              **ARENT FOX LLP**
                              1717 K Street, NW
                              Washington, DC  20036-5342
                              Telephone:  (202) 857-6054
                              E-mail:  Carol.Cohen@arentfox.com

                              -and-

David L. Dubrow
Mark A. Angelov
**ARENT FOX LLP**
1675 Broadway
New York, NY  10019
Telephone:  (212) 484-3900

-and-

SCHAFER AND WEINER, PLLC
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI  48304
Telephone:  (248) 540-3340
E-mail:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

By: _/s/ Vincent J. Marriott, III_
Howard S. Sher
**JACOB & WEINGARTEN, P.C.**
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan  48084
Telephone:  (248) 649-1200
Facsimile:  (248) 649-2920
E-mail:  howard@jacobweingarten.com

-and-

Vincent J. Marriott, III
**BALLARD SPAHR LLP**
1735 Market Street, 51st Flr.
Philadelphia, PA  19103
Phone: 215.864.8236
Fax: 215.864.9762
Email:  marriott@ballardspahr.com

-and-

13-53846-swr   Doc 4206   Filed 04/29/14   Entered 04/29/14 20:40:23   Page 140 of
456
13-53846-swr   Doc 2056   Filed 12/13/13   Entered 12/13/13 20:47:44   Page 13 of 14   235

Matthew G. Summers
**BALLARD SPAHR LLP**
919 North Market Street, 11th Floor
Wilmington, Delaware 19801
Telephone: (302) 252-4428
Facsimile: (410) 361-8930
E-mail: summersm@ballardspahr.com

*Attorneys for Hypothekenbank Frankfurt AG,
Hypothekenbank Frankfurt International S.A., and
Erste Europäische Pfandbrief- und
Kommunalkreditbank Aktiengesellschaft in
Luxemburg S.A. (collectively "EEPK")*

## <u>Summary of Exhibits</u>

Exhibit 1 - Proposed Order

Exhibit 2 - Notice of Motion and Opportunity to Object

Exhibit 3 - None [Brief Not Required]

Exhibit 4 - None [Separate Certificate of Service to be Filed]

Exhibit 5 - Affidavits [Not Applicable]

Exhibit 6 - Documentary Exhibits [Not Applicable]

**Exhibit 1**

**Proposed Order**

13-58846-siv Doc 4304-2 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 143 of
456
13-53846-swr Doc 2058-2 Filed 12/11/13 Entered 12/11/13 20:47:44 Page 3 of 8   238

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## ORDER GRANTING SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC.'S MOTION TO ADJOURN HEARING ON THE DEBTOR'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]

This matter coming before the Court on the motion of Syncora[1] to adjourn the Hearing on the *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief* (the "Assumption Motion") and *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (the "DIP Motion") and grant Syncora's previous requests for discovery on the Assumption Motion and the DIP Motion; the Court having reviewed Syncora's motion; and the Court

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth in the Motion.

13-53846-swr Doc 4305 Filed 04/29/13 Entered 04/29/13 22:00:23 Page 14 of 8
13-53846-swr Doc 2058-2 Filed 12/11/13 Entered 12/11/13 20:47:44 Page 14 of 8
456    239

having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    Syncora's motion is GRANTED.

2.    The Hearing is adjourned.

3.    Syncora's previous requests for leave to conduct discovery on the Assumption Motion and the DIP Motion are granted.

4.    Syncora is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the motion.

5.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

_____

STEVEN W. RHODES
United States Bankruptcy Judge

13-53846-swr   Doc 2058-2   Filed 12/11/13   Entered 12/11/13 20:47:44   Page 35 of 8
13-53846-swr   Doc 4304   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 145 of 240
456

## Exhibit 2

## Notice of Motion and Opportunity to Object

13-58846-siw  Doc 4304-3  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 146 of
13-58846-swr  Doc 2058-3  Filed 12/11/13  Entered 12/11/13 20:47:44  Page 16 of 21    241
456

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## NOTICE OF MOTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO ADJOURN HEARING ON THE DEBTOR'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]

**PLEASE TAKE NOTICE** that on December 11, 2013, Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (together, "Syncora") filed the *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Adjourn Hearing on the Debtor's Assumption Motion [Dkts. 17 and 157] and Motion to Approve Post-Petition Financing [Dkt. 1520]* (the "Motion ")[1] in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order (a) granting Syncora additional discovery on the DIP Motion and the Assumption Motion and (b) adjourning the hearing until Syncora has had sufficient time to conduct the additional discovery.

**PLEASE TAKE FURTHER NOTICE that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the Motion or you want the Bankruptcy Court to

---

[1] Ambac Assurance Corporation, Hypothekenbank Frankfurt AG, Hypothenkenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. join in this Motion.

consider your views on the Motion, by **December 13, 2013,** you or your attorney must:[2]

File with the Bankruptcy Court a written response to the Motion, explaining your position, electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[3]

United States Bankruptcy Court
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

---

[2]    Concurrently herewith, the Syncora is seeking expedited consideration and shortened notice of the Motion. If the Court grants such expedited consideration and shortened notice, Syncora will file and serve notice of the new response deadline.

[3]    A response must comply with F. R. Civ. P. 8(b), (c) and (e).

2

If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

Dated:  December 11, 2013

/s/ *Stephen C. Hackney*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:  (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

**Exhibit 3**

**None [Brief Not Required]**

13-58846-swr   Doc 4304   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 150 of
456
13-53846-swr   Doc 2058   Filed 12/11/13   Entered 12/11/13 20:47:44   Page 150 of 1   245

**Exhibit 4**

**None [Separate Certificate of Service to be Filed]**

# Exhibit 5

**Affidavits**
**[Not Applicable]**

**Exhibit 6**

**Documentary Exhibits**
**[Not Applicable]**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
                                           :

In re                                :           Chapter 9
                                           :

CITY OF DETROIT, MICHIGAN,     :          Case No. 13-53846
                                         :

                   Debtor.       :          Hon. Steven W. Rhodes
                                         :
                                         :
-------------------------------------------------------x

## DEBTOR'S AMENDED LIST OF EXHIBITS FOR HEARING ON THE CITY OF DETROIT'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]

1.      As contemplated by the proposed Scheduling Order filed by the City on December 6, 2013, and for purposes of the hearing on the City's Assumption Motion [Dkts. # 17, #157] and Motion to Approve Post-Petition Financing [Dkt. 1520] (together, the "City's Motions"), scheduled to take place on December 17, 18 and 19, 2013, the City identifies the following exhibits that it may use at the Evidentiary Hearings related to the City's Motions.

| City's Exhibit No. | Exhibit Description |
|---|---|
| 1. | June 7, 2006, ISDA Master Agreement between UBS AG and Detroit General Retirement System ("GRS") Service Corporation (Local Currency Single Jurisdiction), and related Schedule |
| 2. | June 7, 2006, ISDA Master Agreement between SBS Financial Products Company, LLC ("SBS") and GRS Service Corporation (Local Currency Single Jurisdiction), and related |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | Schedule |
| 3. | March 30, 2009, Term Sheet: Summary of Terms for Settlement between SBS, Merrill Lynch Capital Services, Inc., and UBS AG (collectively, the "Counterparties), and GRS Service Corporation and the Detroit Police and Fire Retirement System ("PFRS") Service Corporation (collectively the "Service Corporations) |
| 4. | June 26, 2009, SBS and GRS Service Corporation Amended and Restated Schedules to 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 5. | June 26, 2009, UBS AG and GRS Service Corporation Amended and Restated Schedule to the 1992 ISDA Master Agreement Local Currency Single Jurisdiction dated as of June 7, 2006 |
| 6. | June 26, 2009, Waiver and Consent of Insurer Syncora, with Exhibits |
| 7. | Detroit, Mich. Code § 18-16-4 |
| 8. | July 5, 2013, Transcript of Hearing, City of Detroit v. Syncora, No. 13-008858-CZ, 3rd Cir. Ct. Co. of Wayne (Hon. A. J. Berry, presiding) |
| 9. | July 4, 2013, Affidavit of Kevyn D. Orr, City of Detroit v. Syncora Guar. Inc., No. 2:13-cv-12987 (E.D. Mich) |
| 10. | June 14, 2013, City of Detroit ("City") Proposal for Creditors Executive Summary |
| 11. | June 15, 2009, Collateral Agreement among the City, the Service Corporations, and U. S. Bank National Association ("USBNA") |
| 12. | June 13, 2013, Letter from Orr to USBNA regarding Written Instructions to Custodian Under Collateral Agreement |
| 13. | June 17, 2013, Letter from LeBlanc (Syncora) to USBNA regarding Collateral Agreement dated June 15, 2009, regarding Detroit Retirement Systems with U.S. Bank as Custodian |
| 14. | June 24, 2013, Email from Bennett (Syncora) to Smith (USBNA) regarding USB – Detroit – Casino Revenue Collateral Account, forwarding June 24, 2013 email from Smith to Ball |

2

13-53846-swr Doc 4304-2 Filed 04/29/14 Entered 04/29/14 23:00:23 Page 155 of 250
13-53846-tjt Doc 2082 Filed 12/27/13 Entered 12/27/13 15:00:23 Page 2 of 13
456

| City's Exhibit No. | Exhibit Description |
|---|---|
| 15. | June 24, 2013, Letter from Bennett (Syncora) to Smith (USBNA) regarding General Receipts Subaccount under the Collateral Agreement dated June 15, 2009 |
| 16. | June 25, 2013, Letter from Orr to Syncora regarding Instructions to Custodian under Collateral Agreement |
| 17. | June 26, 2013, Letter from LeBlanc (Syncora) to the City regarding Instructions to Custodian Under Collateral Agreement |
| 18. | July 15, 2013, Forbearance and Optional Termination Agreement among the Service Corporations, the City, the Emergency Manager, UBS AG, and Merrill Lynch Capital Services, Inc. |
| 19. | July 15, 2013, Letter from Lundy (Syncora) to SBS |
| 20. | July 16, 2013, Letter from LeBlanc (Syncora) to Orr |
| 21. | July 17, 2013, Letter from Orr to LeBlanc (Syncora) regarding July 16 Letter |
| 22. | July 17, 2013, Letter from Carter (SBS) to Lundy (Syncora) |
| 23. | July 18, 2013, Declaration of Gaurav Malhotra In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration") |
| 24. | Annual Cash Flow Summary FY 2012-FY 2015; Monthly Cash Flow Forecast FY 2014 and FY 2015 – Base Case [Malhotra Declaration Ex. A] |
| 25. | Ten-Year Financial Projections [Malhotra Declaration Ex. B] |
| 26. | Legacy Expenditures (Assuming No Restructuring) [Malhotra Declaration Ex. C] |
| 27. | Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. D] |
| 28. | Schedule of water system bonds and related state revolving loans as of June 30, 2012 [Malhotra Declaration Ex. E] |
| 29. | Annual Debt Service on Revenue Bonds [Malhotra Declaration Ex. F] |

| City's Exhibit No. | Exhibit Description |
|---|---|
| 30. | Schedule of COPs and Swap Contracts as of June 30, 2012 [Malhotra Declaration Ex. G] |
| 31. | Annual Debt Service on COPs and Swap Contracts [Malhotra Declaration Ex. H] |
| 32. | Schedule of UTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. I] |
| 33. | Schedule of LTGO Bonds as of June 30, 2012 [Malhotra Declaration Ex. J] |
| 34. | Annual Debt Service on General Obligation Debt & Other Liabilities [Malhotra Declaration Ex. K] |
| 35. | July 18, 2013, Declaration of Kevyn D. Orr In Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration") |
| 36. | June 14, 2013, City of Detroit Proposal for Creditors [Orr Declaration Ex. A] |
| 37. | January 13, 2013, City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team [Orr Declaration Ex. C] |
| 38. | March 26, 2013, Report of the Detroit Financial Review Team [Orr Declaration Ex. D] |
| 39. | April 4, 2012, Financial Stability Agreement Between the City and the Michigan Department of Treasury [Orr Declaration Ex. E] |
| 40. | December 14, 2012, Preliminary Review of the City of Detroit [Orr Declaration Ex. F] |
| 41. | February 19, 2013, Report of the Detroit Financial Review Team; Supplemental Documentation of the Detroit Financial Review Team [Orr Declaration Ex. G] |
| 42. | March 1, 2013, Letter from Governor Snyder to Mayor Bing and the City Council [Orr Declaration Ex. H] |
| 43. | July 8, 2013, Ambac Comments on Detroit [Orr Declaration Ex. I] |
| 44. | July 16, 2013, Letter from Orr to Governor Snyder and Treasurer Dillon regarding Recommendation Pursuant to Section 18(1) of PA 436 [Orr Declaration Ex. J] |
| 45. | July 18, 2013, Letter from Governor Snyder to Orr and |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | Treasurer Dillon regarding Authorization to Commence Chapter 9 Bankruptcy Proceeding [Orr Declaration Ex. K] |
| 46. | July 18, 2013, Emergency Manager Order No. 13 Filing of a Petition Under Chapter 9 of Title 11 of the United States Code [Orr Declaration Ex. L] |
| 47. | June 12, 2006, UBS AG Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement |
| 48. | June 12, 2006, SBS Insurance Policies for Scheduled Payments of GRS Service Corporation under June 7, 2006 Master Agreement |
| 49. | 2009 Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78) |
| 50. | July 31, 2013, First Amendment to Forbearance and Optional Termination Agreement |
| 51. | August 12, 2013, Second Amendment to Forbearance and Optional Termination Agreement |
| 52. | August 23, 2013, Third Amendment to Forbearance and Optional Termination Agreement |
| 53. | August 29, 2013, Fourth Amendment to Forbearance and Optional Termination Agreement |
| 54. | September 4, 2013, Fifth Amendment to Forbearance and Optional Termination Agreement |
| 55. | October 15, 2013, Letter from Orr to Treasurer Dillon enclosing Quarterly Report of the Emergency Manager Pursuant to Section 9(5) of PA 436. |
| 56. | September 3, 2013, E-mail from Doak to Gerbino regarding City of Detroit Financing, including attachments of September 3, 2013, Letter from Miller Buckfire to Gerbino, July 15, 2013, Forbearance and Optional Termination Agreement, and Undated Model "Summary of Certain Key Terms and Conditions" [DTPFF00015602- DTPFF00015638] |
| 57. | September 4, 2013, Ernst & Young, Project Piston 13-Week Cash Flow Forecast (DIP Financing Scenario) [DTPFF00002227- DTPFF00002230] |
| 58. | September 4, 2013, Ernst & Young, Project Piston Cash Flow Forecast Through FY 2017 (DIP Financing Scenario) |

5

| City's Exhibit No. | Exhibit Description |
|---|---|
| | [DTPFF00014812- DTPFF00014824] |
| 59. | September 30, 2013, Ernst & Young, 13-Week Cash Flow Forecast – Restructuring Scenario (including reinvestment; DIP transaction assumed after 12/31) [DTPFF00002232] |
| 60. | October 2013, Ernst & Young, Project Piston, Comparison of DIP vs. Creditor Plan Restructuring [DTPPF00002226] |
| 61. | July 5, 2013, Response to City of Detroit Financing RFP from J.P. Morgan [DTPPF00000624-DTPPF00000633] |
| 62. | July 5, 2013, Letter from Brownstein to Corio regarding Citibank, N.A, Response to City of Detroit Financing RFP [DTPPF00000650-DTPPF00000656] |
| 63. | September 16, 2013, Goldman Sachs "Summary of Certain Key Terms and Conditions," and related documents, responding to City of Detroit Financing RFP [DTPPF00000985-DTPPF00001005] |
| 64. | September 16, 2013, Letter from Klein and Flanagan to Corio, and related documents, regarding Jefferies LLC response to City of Detroit Financing RFP [DTPPF00001011-DTPPF00001039] |
| 65. | September 2013, Deutsche Bank "City of Detroit discussion materials" responding to City of Detroit Financing RFP [DTPPF00000944-DTPPF00000958] |
| 66. | Undated, Canyon Capital Advisors LLC "Summary of Key Terms and Conditions" responding to City of Detroit Financing RFP. [DTPPF00000903-DTPPF00000907] |
| 67. | September 16, 2013, Letters from Ambac Assurance Corporation, Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation, with attached "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP  [DTPPF00000826-DTPPF00000837] |
| 68. | September 16, 2013,  Letter from Marc Sole to Miller Buckfire, attaching Hudson Bay Capital Management LP "Summary of Certain Key Terms and Conditions" in response to City of Detroit Financing RFP [DTPPF00001006-DTPPF00001010] |
| 69. | September 16, 2013, Letter from Fundamental Advisors LP to Corio, attaching "Indicative Summary of Certain Key Terms |

| City's Exhibit No. | Exhibit Description |
|---|---|
|  | and Conditions," responding to City of Detroit Financing RFP [DTPPF00000961-DTPPF00000980] |
| 70. | Undated, Silver Point Finance, LLC: "Summary of Certain Key Terms and Conditions" responding to City of Detroit Financing RFP  [DTPPF00001572-DTPPF00001577] |
| 71. | September 16, 2013, Letter from Gerbino to Miller Buckfire, attaching Barclay's "Summary of Indicative Terms and Conditions of Swap Termination Note," "Summary of Indicative Terms and Conditions of Quality of Life Note," "Summary of Indicative Terms and Conditions of the Replacement Swap Transaction," and "Muni Swap Confirmation," responding to City of Detroit Financing RFP [DTPPF00000856-DTPPF00000902] |
| 72. | September 16, 2013, Letter from Gubner to Miller Buckfire regarding PIMCO Distressed Credit Fund, L.P., "Letter of Intent – Proposed DIP Facility" responding to City of Detroit Financing RFP [DTPPF00001040-DTPPF00001057] |
| 73. | September 16, 2013, Letter from Kersten to Corio, attaching CarVal Investors "Proposal A" and "Proposal B," responding to City of Detroit Financing RFP [DTPPF00000908-DTPPF00000943] |
| 74. | September 16, 2013, "Proposal for Post-Petition Financing" by Bank of America Merrill Lynch, responding to City of Detroit Financing RFP [DTPPF00000838-DTPPF00000855] |
| 75. | September 16, 2013, Amalgamated Bank "Expression of Interest," responding to City of Detroit Financing RFP [DTPPF00000821-DTPPF00000825] |
| 76. | September 12, 2013, Letter from Antonczak to Corio regarding Flagstar Bank's response to City of Detroit Financing RFP [DTPPF00000959-DTPPF00000960] |
| 77. | October 8, 2013, Email from Cherner to Doak regarding Beal Bank USA's Detroit DIP Financing Indicative Term Sheet in response to City of Detroit Financing RFP [DTPPF00013170-DTPPF00013195] |
| 78. | October 3, 2013, Syncora DIP Term Sheet regarding Syncora Capital Assurance Inc.'s ("Syncora") and Financial Guaranty Insurance Company's ("FGIC") DIP financing proposal [DTPPF00000035- DTPPF00000037] |

| City's Exhibit No. | Exhibit Description |
|---|---|
| 79. | October 25, 2013, Syncora DIP Term Sheet regarding Syncora's DIP financing proposal [DTPPF00001578- DTPPF00001580] |
| 80. | September 2013, Syncora and FGIC's Outline of Terms and Conditions for Secured First Lien, First out DIP Loan Facility in the Amount of $350 Million [DTPPF00013640- DTPPF00013656] |
| 81. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Commitment to $350,000,000 in Post-Petition Financing.[ DTPPF00003377- DTPPF00003404] |
| 82. | September 30, 2013,  Letter from Gerbino to Corio regarding Barclay's Engagement Letter for Exit Financing [DTPPF00003405- DTPPF00003415] |
| 83. | September 30, 2013, Letter from Gerbino to Corio regarding Barclay's Fee Letter [DTPPF00003416- DTPPF00003420] |
| 84. | September 30, 2013, Goldman Sachs' Draft Commitment Letter, including Annex A and B  [DTPPF00001543- DTPPF00001567] |
| 85. | September 30, 2013, Goldman Sachs' Draft Fee Letter [DTPPF00001568- DTPPF00001571] |
| 86. | September 30, 2013,  Letter from Stephens to Orr regarding Bank of America Merrill Lynch Commitment Letter with Annex A through C, and a "Proposal for Post-Petition Financing"  [DTPPF00001058- DTPPF00001086] |
| 87. | October 2, 2013, Letter from Kersten to The City of Detroit regarding  CarVal Investors Commitment Letter, including Exhibit A  [DTPPF00011494- DTPPF00011516] |
| 88. | September 26, 2013, Miller Buckfire,  "Post-Petition Financing Discussion" [DTPPF000202215- DTPPF00020225] |
| 89. | October 3, 2013, Miller Buckfire, "Draft Detroit Post-Petition Financing:  Commitment Letter Summaries" [DTPPF00020226- DTPPF00020231] |
| 90. | October 7, 2013, Miller Buckfire, "Briefing Materials Prepared for Members of City Council" [DTPPF00020039- DTPPF00020071] |
| 91. | October 17, 2013, Miller Buckfire, "Briefing Material Prepared for City Council Closed Session" " |

| City's Exhibit No. | Exhibit Description |
|---|---|
| | [DTPPF00012993- DTPPF00013024] |
| 92. | November 4, 2013, Miller Buckfire, "Briefing Materials Prepared for the Financial Advisory Board" " [DTPPF00001959- DTPPF00001968] |
| 93. | October 6, 2013, Barclay's Fee Letter fully executed by Barclay's and City  [Filed as Docket No. 1761] |
| 94. | October 6, 2013, Barclay's Commitment Letter, including Term Sheets, fully executed by Barclays and City  [Filed as Docket No. 1520; Exhibit 6A] |
| 95. | 2013 Draft Financial Recovery Bonds Series 2013A (Swap Termination) Bond Purchase Agreement  [Filed as Docket No. 1520; Exhibit 6B] |
| 96. | October 8, 2013, Letter from Orr to Michigan State Treasurer Andy Dillon regarding Financing [DTPPF00001366-DTPPF00001406] |
| 97. | October 11, 2013, Letter from State Treasurer Dillon to Orr Approving Financing [DTPPF00012230-DTPPF00012233] |
| 98. | October 11, 2013, Email from Hayes to City Council attaching October 11, 2013, Letter from Orr to All City Council Members Re:  Emergency Manager's Order No. 17: Approval of Postpetition Financing; October 11, 2013 Emergency Manager Order No. 17; Undated Barclay's "Summary of Indicative Terms and Conditions of Quality of Life Loan;" and, Undated City Council Resolution Approving Post Petition Financing [DTPPF00019623-DTPPF00019655] |
| 99. | October 11, 2013, Email from Hayes to Bonsall, et al., attaching October 11, 2013, Letter  from Orr to Mayor Bing regarding Emergency Manager's Order No. 17:  Approval of Postpetition Financing; October 11, 2013 Emergency Manager Order No. 17; and, Undated Barclay's "Summary of Indicative Terms and Conditions of Quality of Life Loan" [DTPPF00019592-DTPPF00019622] |
| 100. | November 6, 2013, Letter from Bulger to Goodrich regarding City of Detroit's submission to Local Emergency Financial Assistance Loan Board |
| 101. | November 5, 2013,  Declaration of Charles M. Moore In Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364 (c)(1), 364(c)(2), 364(e), 364(f), |

| City's Exhibit No. | Exhibit Description |
|---|---|
|  | 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Filed as Docket No. 1520; Exhibit 5A] |
| 102. | November 5, 2013, Declaration of James Doak In Support of Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364 (c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Filed as Docket No. 1520; Exhibit 5B] |
| 103. | November 11, 2013, City of Detroit, Operational Restructuring Summary |
| 104. | November 12, 2013, City of Detroit, Operational Restructuring Summary |
| 105. | September 27, 2013, Funding for Detroit Announced by Federal Government |
| 106. | June 21, 2013, Ernst & Young, Project Piston, Cash Flow Forecast – Monthly (FY 2013, FY 2014, FY 2015) |
| 107. | June 21, 2013, Ernst & Young, Project Piston, Cash Flow Forecast (including Restructuring Scenario) |
| 108. | September 16, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) |
| 109. | October 3, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (No Casino Trap; No DIP) |
| 110. | September 17, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (Casino Trap; No DIP) |
| 111. | September 18, 2013, Ernst & Young, Illustrative Cash Chart |
| 112. | June 26, 2009, Waiver and Consent of Insurer by Financial Guaranty Insurance Company |
| 113. | March 24, 2009, Moody's Investors Service, Rating Action: Moody's downgrades FGIC to Caa3 and will withdraw ratings |
| 114. | 2013, Draft Financial Recovery Bond Trust Indenture Between City of Detroit and Trustee |
| 115. | December 9, 2013, Ernst & Young, Project Piston Cash Flow Forecast – through FY 2017 (DIP Financing Scenario) |

2.      The City reserves the right to supplement its list of exhibits, as provided for in the proposed Scheduling Order.

3.      The City will exchange copies of its exhibits on counsel for any objecting parties on a mutually agreeable schedule.

4.      The City also reserves the right to utilize demonstrative exhibits at either a deposition or the Evidentiary Hearing. The City will serve copies of any such demonstratives on counsel for any objecting party in advance of its use at a deposition or the Evidentiary Hearing.

5.      As of the date of this filing, some objectors have filed Exhibit Lists. However, only one objector has provided copies of the exhibits listed, which are necessary in light of the sometimes vague and inadequate descriptions of the listed exhibits. Therefore, the City reserves its rights to assert objections to any exhibits identified by an objecting party after such exhibits have been both identified, and provided, to the City.

6.      The City further reserves the right to introduce exhibits not listed on this Exhibit List as rebuttal or impeachment to any testimony or evidence presented by the Objectors, and to use or rely upon exhibits identified or introduced by any Objector. By reserving the right to use or rely upon exhibits identified by Objectors, the City does not waive any objections to admissibility on any grounds.

11

Dated:  December 12, 2013        Respectfully submitted,

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 243-2382
Facsimile:    (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
Geoffrey S. Irwin
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

 - and -

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.

ATTORNEYS FOR THE CITY OF
DETROIT

12

13-53846-swr   Doc 2042   Filed 12/12/13   Entered 12/12/13 22:00:23   Page 165 of
456
13-53846-swr   Doc 4304-6   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 12 of 13   260

**Certificate of Service**

I, Bruce Bennett, hereby certify that the foregoing **DEBTOR'S AMENDED LIST OF EXHIBITS FOR HEARING ON THE CITY OF DETROIT'S ASSUMPTION MOTION [DKTS. 17 AND 157] AND MOTION TO APPROVE POST-PETITION FINANCING [DKT. 1520]** was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter on this 12th day of December 2013.

/s/ Bruce Bennett_____

Bruce Bennett

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC.'S AMENDED DISCLOSURE OF EXHIBITS IN ADVANCE OF THE HEARING ON DECEMBER 17-19, 2013

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") files this amended disclosure of exhibits that it may use during the hearing on the City's Assumption Motion (Dkt. Nos. 17 and 157) and Motion to Approve Post-Petition Financing (Dkt. No. 1520) (the "Consolidated Hearing"). Syncora files this amended list in light of the Court's oral ruling on December 13, 2013 in the context of the pre-trial discussions regarding the Consolidated Hearing.

## Documents

Syncora may introduce the following documents as part of its examination of the City's witnesses or Syncora's witnesses during the Consolidated Hearing. Syncora reserves the right to use or refer to any of the City's exhibits or any of the exhibits of the other objectors. Syncora also reserves the right to re-mark any exhibits on the below list in advance of the Consolidated Hearing.

| Ex. No. | Exhibit Description |
|---------|---------------------|
| 201. | GRS Service Contract 2005 dated May 25, 2005, between the Detroit General Retirement System Service Corporation and the City |
| 202. | PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City |
| 203. | GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. G) |
| 204. | PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. H) |
| 205. | Contract Administration Agreement, dated June 12, 2006 |
| 206. | Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee |
| 207. | XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 |
| 208. | U.S. Bank Notice of Event of Default Regarding the City of Detroit, Michigan to Swap Counterparties and Ratings Agencies dated July 26, 2013 |
| 209. | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2005-A Certificates of Participation dated July 26, 2013 |
| 210. | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2006-A and 2006-B Certificates of Participation dated July 26, 2013 |
| 211. | City Ordinance No. 03-05 (Pérez Decl. Ex. A) |
| 212. | City Ordinance No. 04-05 (Pérez Decl. Ex. B) |
| 213. | City Ordinance No. 05-05 (Pérez Decl. Ex. C) |
| 214. | City Ordinance No. 05-09 (Pérez Decl. Ex. Q) |
| 215. | Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. N) |

2

13-53846-tjt  Doc 4311-20  Filed 04/29/14  Entered 04/29/14 22:00:38  Page 168 of
13-53846-swr  Doc 4311-20  Filed 04/29/14  Entered 04/29/14 12:00:33  Page 168 of
456
263

| Ex. No. | Exhibit Description |
|---------|--------------------|
| 216. | Revised Confirmation to the PFRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. O) |
| 217. | Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013 (Pérez Decl. Ex. L) |
| 218. | Jones Day - Syncora NDA (Swap Proposal) dated July 10, 2013 |
| 219. | Forbearance and Optional Termination Agreement term sheet |
| 220. | Email from Cheryl Johnson to A. Neely re Status of Swap dated December 3, 2012 |
| 221. | Email from Reuters to Press Secretary re Status of Swap Contract dated November 30, 2012 |
| 222. | Joint Stipulation of Facts of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. and U.S. Bank National Association |
| 223. | Exit Engagement Letter (Exhibit B to Syncora Objection to DIP Motion) |
| 224. | Email from Anne Marie Langan to Todd Snyder (Exhibit C to Syncora Objection to DIP Motion) |
| 225. | Moody's Report (Exhibit E to Syncora Objection to DIP Motion) |
| 226. | Cash Flow Variance Report June 2013 (Exhibit G to Syncora Objection to DIP Motion) |
| 227. | Cash Flow Variance Report FY 2014 (Exhibit H to Syncora Objection to DIP Motion) |
| 228. | Professional Service Contract Transmittal Record (Moore Dep. Ex. 1) |
| 229. | Detroit Police Times No Guide to Effectiveness news article (Moore Dep. Ex. 4) |
| 230. | Detroit Police Dashboard (Moore Dep. Ex. 5) |
| 231. | City of Detroit Restructuring Priorities (DTPFF0012709) (Moore Dep. Ex. 8) |

| Ex. No. | Exhibit Description |
|---------|---------------------|
| 232. | Project Piston Cash Flow Forecast -Through FY 2017 (DTPFF0020055) (Moore Dep. Ex. 9) |
| 233. | Key Operational Updates as of September 24, 2013 (DTPPF00011728) (Moore Dep. Ex. 10) |
| 234. | Request for the Amendment to the FY 2014 Budget of the City of Detroit (Moore Dep. Ex. 11) |
| 235. | Letter Dated August 26, 2013 with attached term sheets (DTPPF00016682) (Doak Dep. Ex. 2) |
| 236. | Email from Thomas Gavin to James Doak (Doak Dep. Ex. 15) |
| 237. | City of Detroit Post-Petition Financing Contact List (DTPPF00016847) |
| 238. | 6/22/13 email from K. Buckfire (DTMI80335) |
| 239. | 7/5/13 email from Erin Smith (DTMI00107294) |
| 240. | 7/5/13 email from Bill Nowling (DTMI00111238) |
| 241. | Abernathy MacGregor Invoice (DTMI00112208) |
| 242. | 6/12/13 email from Andrew Dillon (DTMI00114984) |
| 243. | 6/24/13 email from Kevyn Orr (DTMI00114531) |
| 244. | 6/29/13 email from Kevyn Orr (DTMI00101514 |
| 245. | 6/24/13 email from Kevyn Orr (DTMI00115562) |
| 246. | Responses to Inquiries from City Council (DTPPF00020357) |
| 247. | Transcript of 8/30/2013 Deposition of Kevyn D. Orr |
| 248. | Transcript of 8/29/2013 Deposition of Kenneth Buckfire |
| 249. | Transcript of 9/9/2013 Deposition of Gaurav Malhotra |
| 250. | Transcript of 12/4/2013 Deposition of Charles Moore |

4

| Ex. No. | Exhibit Description |
|---------|---------------------|
| 251. | Transcript of 12/5/2013 Deposition of James Doak |
| 252. | Transcript of 12/9/2013 Deposition of Kevyn D. Orr |
| 253. | Transcript of 12/10/2013 Deposition of Kenneth Buckfire |
| 254. | Transcript of 12/11/2013 Deposition of Gaurav Malhotra |
| 255. | Objectors' Proposed Designations of 8/30/2013 Deposition of Kevyn D. Orr |
| 256. | Objectors' Proposed Designations of 8/29/2013 Deposition of Kenneth Buckfire |
| 257. | Objectors' Proposed Designations of 12/4/2013 Deposition of Charles Moore |
| 258. | Objectors' Proposed Designations of 12/4/2013 Deposition of James Doak |
| 259. | Questions for Consultants on $350 DIP Financing (DTPPF00020380) |
| 260. | Transcript of 12/12/2013 Continuation of Deposition of Kevyn D. Orr |
| 261. | Transcript of 12/12/2013 Deposition of Irvin Corley |
| 262. | Transcript of 12/13/2013 Deposition of Anne Marie Langan |

Syncora reserves the right to supplement this list with additional documents including, but not limited to, any documents utilized in the depositions of witnesses in connection with the Consolidated Hearing.

5

13-53846-tjt  Doc 4321-20  Filed 04/29/14  Entered 04/29/14 12:00:33  Page 17 of
13-53846-swr  Doc 2124-6  Filed 12/13/13  Entered 12/13/13 18:00:33  Page 5 of 6
456
266

Dated:  December 13, 2013          Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By:  */s/ Stephen C. Hackney*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:    (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*

13-53846-tjt  Doc 4311-20  Filed 04/29/14   Entered 04/29/14 22:00:33   Page 172 of
456
13-53846-swr  Doc 2142-6   Filed 12/13/13   Entered 12/13/13 16:00:33   Page 6 of 6   267

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

| Order Party: Name, Address and Telephone Number | Case/Debtor Name: City of Detroit, MI |
|---|---|

**Order Party: Name, Address and Telephone Number**

Name  Syncora Guarantee & Syncora Capital Assurance

Firm  Kirkland & Ellis LLP

Address  300 N. LaSalle

City, State, Zip  Chicago, IL 60654

Phone  312.862.3200

Email  dustin.paige@kirkland.com

**Case/Debtor Name: City of Detroit, MI**

Case Number:  13-53846

Chapter:  9

Hearing Judge  Hon. Steven Rhodes

◉ Bankruptcy   ○ Adversary

○ Appeal   Appeal No: _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

Date of Hearing: 12/13/13  Time of Hearing: 10:00 am Title of Hearing: Hearing re Detroit Bankruptcy

Please specify portion of hearing requested:  ◉ Original/Unredacted  ○ Redacted  ○ Copy (2nd Party)

◉ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: _____

**Type of Request:**

○ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

◉ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free
   FTR Record Player™ onto your computer from
   www.ftrgold.com

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____

Date        By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

_Dustin Paige_ Date: 12/13/13

By signing, I certify that I will pay all charges upon completion
of the transcript request.

13-53846-swr Doc 431-26 Filed 04/28/13 Entered 04/28/13 22:00:23 Page 173 of
456
13-53846-swr Doc 2112-7 Filed 12/18/13 Entered 12/18/13 00:00:23 Page 173 of 268

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|                                        |     |                          |
| -------------------------------------- | --- | ------------------------ |
|                                        | )   |                          |
| In re                                  | )   | Chapter 9                |
|                                        | )   |                          |
| CITY OF DETROIT, MICHIGAN,             | )   | Case No. 13-53846        |
|                                        | )   |                          |
| Debtor.                                | )   | Hon. Steven W. Rhodes    |
|                                        | )   |                          |

## SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC.'S SECOND AMENDED DISCLOSURE OF EXHIBITS IN ADVANCE OF THE HEARING ON DECEMBER 17-19, 2013

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") files this second amended disclosure of exhibits that it may use during the hearing on the City's Assumption Motion (Dkt. Nos. 17 and 157) and Motion to Approve Post-Petition Financing (Dkt. No. 1520) (the "Consolidated Hearing"). Syncora files this amended list in light of the Court's oral ruling on December 13, 2013 in the context of the pre-trial discussions regarding the Consolidated Hearing.

**<u>Documents</u>**

Syncora may introduce the following documents as part of its examination of the City's witnesses or Syncora's witnesses during the Consolidated Hearing. Syncora reserves the right to use or refer to any of the City's exhibits or any of the exhibits of the other objectors. Syncora also reserves the right to re-mark any exhibits on the below list in advance of the Consolidated Hearing.

| Ex. No. | Exhibit Description |
|---------|--------------------|
| 201. | GRS Service Contract 2005 dated May 25, 2005, between the Detroit General Retirement System Service Corporation and the City |
| 202. | PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City |
| 203. | GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. G) |
| 204. | PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (Pérez Decl. Ex. H) |
| 205. | Contract Administration Agreement, dated June 12, 2006 |
| 206. | Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee |
| 207. | XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 |
| 208. | U.S. Bank Notice of Event of Default Regarding the City of Detroit, Michigan to Swap Counterparties and Ratings Agencies dated July 26, 2013 |
| 209. | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2005-A Certificates of Participation dated July 26, 2013 |
| 210. | U.S. Bank Notice of Bankruptcy Filing to Beneficial Holders of Series 2006-A and 2006-B Certificates of Participation dated July 26, 2013 |
| 211. | City Ordinance No. 03-05 (Pérez Decl. Ex. A) |
| 212. | City Ordinance No. 04-05 (Pérez Decl. Ex. B) |
| 213. | City Ordinance No. 05-05 (Pérez Decl. Ex. C) |
| 214. | City Ordinance No. 05-09 (Pérez Decl. Ex. Q) |
| 215. | Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. N) |

2

| Ex. No. | Exhibit Description |
|---------|---------------------|
| 216. | Revised Confirmation to the PFRS Service Corporation from UBS, dated June 26, 2009 (Pérez Decl. Ex. O) |
| 217. | Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013 (Pérez Decl. Ex. L) |
| 218. | Jones Day - Syncora NDA (Swap Proposal) dated July 10, 2013 |
| 219. | Forbearance and Optional Termination Agreement term sheet |
| 220. | Email from Cheryl Johnson to A. Neely re Status of Swap dated December 3, 2012 |
| 221. | Email from Reuters to Press Secretary re Status of Swap Contract dated November 30, 2012 |
| 222. | Joint Stipulation of Facts of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. and U.S. Bank National Association |
| 223. | Exit Engagement Letter (Exhibit B to Syncora Objection to DIP Motion) |
| 224. | Email from Anne Marie Langan to Todd Snyder (Exhibit C to Syncora Objection to DIP Motion) |
| 225. | Letter Dated August 26, 2013 with attached term sheets (DTPPF00016682) (Doak Dep. Ex. 2) |
| 226. | 6/22/13 email from K. Buckfire (DTMI80335) |
| 227. | 7/5/13 email from Erin Smith (DTMI00107294) |
| 228. | 7/5/13 email from Bill Nowling (DTMI00111238) |
| 229. | Abernathy MacGregor Invoice (DTMI00112208) |
| 230. | 6/12/13 email from Andrew Dillon (DTMI00114984) |
| 231. | 6/24/13 email from Kevyn Orr (DTMI00114531) |
| 232. | 6/24/13 email from Kevyn Orr (DTMI00115562) |

| Ex. No. | Exhibit Description |
|---------|---------------------|
| 233. | Responses to Inquiries from City Council (DTPPF00020357) |
| 234. | Transcript of 8/30/2013 Deposition of Kevyn D. Orr |
| 235. | Transcript of 8/29/2013 Deposition of Kenneth Buckfire |
| 236. | Transcript of 12/5/2013 Deposition of James Doak |
| 237. | Transcript of 12/9/2013 Deposition of Kevyn D. Orr |
| 238. | Transcript of 12/10/2013 Deposition of Kenneth Buckfire |
| 239. | Questions for Consultants on $350 DIP Financing (DTPPF00020380) |
| 240. | Transcript of 12/12/2013 Continuation of Deposition of Kevyn D. Orr |

Syncora reserves the right to supplement this list with additional documents including, but not limited to, any documents utilized in the depositions of witnesses in connection with the Consolidated Hearing.

4

Dated:  December 16, 2013

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By:  _/s/ Stephen C. Hackney_

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:    (248) 646-5075

_Attorneys for Syncora Guarantee Inc. and_
_Syncora Capital Assurance Inc._

13-53846-tjt  Doc 2144  Filed 12/28/13  Entered 12/28/13 12:00:23  Page 178 of
456
13-53846-swr  Doc 1147  Filed 12/18/13  Entered 12/18/13 22:09:13  Page 170 of  273

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-------------------------------------------------------x
                                     :
In re                                :  Chapter 9
                                     :
CITY OF DETROIT, MICHIGAN,           :  Case No. 13-53846
                                     :
                    Debtor.          :  Hon. Steven W. Rhodes
                                     :
-------------------------------------------------------x
```

**NOTICE OF REVISED PROPOSED ORDER IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

**PLEASE TAKE NOTICE THAT:**

1.      On November 5, 2013, the City of Detroit, Michigan  ("<u>Detroit</u>" or the "<u>City</u>") filed the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1),364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (Docket No. 1520) (the "<u>Financing Motion</u>").  Attached to the Financing Motion as <u>Exhibit 1</u> is the proposed Order granting the Financing Motion (the "<u>Proposed Order</u>").

2.      Based on comments to the Proposed Order by parties in interest and the statements of parties in interest and the Court at the pre-trial conference on

December 13, 2013, the City has made certain modifications to the Proposed

Order.  Accordingly, a revised Proposed Order (the "<u>Revised Proposed Order</u>")

with these modifications is attached hereto as <u>Exhibit A</u>.

       3.     A blackline comparing the Revised Proposed Order with the

original Proposed Order is attached hereto as <u>Exhibit B</u>.

Dated: December 16, 2013

Respectfully submitted,

/s/ David G. Heiman

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens (IL 6206864)
JONES DAY
77 West Wacker
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Facsimile: ( 312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
bbennett@jonesday.com


ATTORNEYS FOR THE CITY

-3-
13-53846-swr   Doc 2214-6   Filed 12/16/13   Entered 12/16/13 22:30:03   Page 3 of 107
13-53846-swr   Doc 4214-6   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 181 of
456                                                                              276

# CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Notice of Revised Proposed Order was filed and served via the Court's electronic case filing and noticing system on this 16th day of December, 2013.


/s/ David G. Heiman

# **EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the

13-53846-swr   Doc 4214-6   Filed 04/29/14   Entered 04/29/14 22:30:03   Page 184 of 172
13-53846-swr   Doc 2146   Filed 12/16/13   Entered 12/16/13 12:30:13   Page 6 of 17
456
279

United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Local Rules</u>") seeking entry of an order (this "<u>Order</u>") *inter alia*:[1]

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "<u>Post-Petition Facility</u>") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "<u>Bond Purchase Agreements</u>"), by and between the City and Barclays Capital Inc., as Purchaser (the "<u>Purchaser</u>"), and the Indenture substantially in the form attached hereto as Exhibit C (the "<u>Indenture</u>"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "<u>Bondholders</u>").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order that are

Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax  (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment Letter and the Fee Letter, the "<u>Bond Documents</u>"), entered into by and among, variously, the City,  the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "<u>Bond Obligations</u>") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond Documents;

(v)    authorizing the City to pay the principal, interest, fees, expenses and

defined in Section 101 or 102 of the Bankruptcy Code have the meanings assigned to

other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)  vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)  authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 28 below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "Filed Bond Documents"), the Declaration of James Doak in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "Hearing"); and notice of the Hearing having been given in accordance with

them by the Bankruptcy Code.

Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the City; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case. The order for relief in this case was entered on December 5, 2013.

B. *Jurisdiction and Venue*. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of

Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *City's Stipulations*. The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

D. *Findings Regarding the Postpetition Financing*.

(i) *No Credit Available on More Favorable Terms*. Given its

6

13-53846-tjt Doc 4314-6 Filed 04/29/14 Entered 04/29/14 23:00:23 Page 189 of 172
13-53846-swr Doc 2148 Filed 12/16/13 Entered 12/16/13 12:39:10 Page 189 of 284
456

current financial condition and financing arrangements, the City is unable to obtain

adequate financing on terms more favorable than the Post-Petition Facility. The

City has been unable to obtain unsecured credit allowable under Bankruptcy Code

Section 503(b)(1) as an administrative expense. Adequate financing on a

postpetition basis is not otherwise available without granting the Purchaser, the

Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided

herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the

Bond Documents, (2) superpriority claims and Liens and (3) the other protections set

forth in the Bond Documents and this Order.

(ii)     *Use of Proceeds of the Post-Petition Facility.*  As a condition to

the entry into the Bond Documents and the extension of credit under the

Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds

of the Post-Petition Facility shall be used, in each case in a manner consistent with

the terms and conditions of the Bond Documents, solely (a) with respect to the

Quality of Life Bond, for purposes permitted by law, including to fund expenditures

designed to contribute to the improvement of the quality of life in the City and (b)

with respect to the Swap Termination Bond, to pay amounts required under the

Forbearance and Optional Termination Agreement dated as of July 15, 2013, among

the City, the Emergency Manager of the City, the Detroit General Retirement

System Service Corporation, the Detroit Police and Fire Retirement System Service

Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.    *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.    *Good Faith and Jurisdictional Matters*.

(i)    *Willingness to Provide Financing*.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond Obligations, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee

8

13-53846-swr   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 191 of 72
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 191 of 286
456

and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii)     *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*.  The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties.  Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses

9

13-53846-swr   Doc 4314-6 Filed 04/29/14 Entered 04/29/14 23:00:03 Page 192 of 272
13-53846-swr   Doc 2146 Filed 12/16/13 Entered 12/16/13 12:39:13 Page 192 of 172   287
456

that are permitted by law, and not in violation of the Bankruptcy Code. The

Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full

protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and

this Order and shall not be affected by any reversal, modification, vacatur,

amendment, reargument or reconsideration of this Order, any order finding

jurisdiction, the order for relief or any other order.

G.     _Act 436 Approval Not Required_.  On October 21, 2013, in accordance

with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL

141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council")

disapproved the Post-Petition Facility.  The City Council failed to offer an

alternative proposal during the time period prescribed in Section 19(2) of Act 436.

The City has requested approval of the Post-Petition Facility by the Emergency

Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the

Michigan Home Rule City Act, Public Act 279 of 1909.  Because the City Council

failed to offer a timely alternative proposal, approval of the Post-Petition Facility by

the Board under Act 436 is not required to authorize the City to enter into the Bond

Documents, which are valid and enforceable according to their terms as a result of

this Order and applicable non-bankruptcy law.

H.     _Notice_.  Notice of the Hearing and the relief requested in the Motion

has been provided by overnight delivery and electronic mail or facsimile to: (a) the

trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    Motion Approved.  The Motion is granted, the Financing (as defined

11

13-53846-swr   Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 94 of 172
456
13-53846-tjt   Doc 4314   Filed 04/29/14   Entered 04/29/14 23:00:03   Page 94 of 172   289

below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2. <u>Objections Overruled</u>. All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

**Post-Petition Facility Authorization**

3. <u>Authorization of the Financing and Bond Documents</u>. The Filed Bond Documents are hereby approved. The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents. The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents. Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4. <u>Authorization to Borrow</u>. Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the

Bond Obligations (collectively, the "Financing").

5.    Bond Obligations.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents.  The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents.  No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    Liens and Collateral.  (a) In order to secure the Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to

Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "Liens") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the

14

13-53846-tw    Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:39:03   Page 197 of 272
13-53846-swr   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 197 of 292
456

"Swap Termination Bond Collateral", and together with the Quality of Life Bond Collateral, the "Collateral").

(b)     Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or of any other assets pledged to secure any of the Water/Sewer Bonds.  This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.  The terms, "Trustee," "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds.  The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.

7. <u>Direction of Pledged Wagering Tax Revenue</u>. On, and after the Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue, shall deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax Account in the name of the City held at the Wagering Tax Depository Bank pursuant to irrevocable directions (the "<u>Irrevocable Directions</u>") by the City in the form attached hereto as Exhibit D. Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "<u>Gaming Act</u>"), or their certified development agreements.

8. <u>Lien Priority</u>. The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral. Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason. The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code. No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9.    <u>Superpriority Claims</u>.  Upon the Closing Date, the Purchaser, the

Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of

the Bankruptcy Code, an allowed superpriority claim (collectively, the

"<u>Superpriority Claim</u>") for all Bond Obligations (without the need to file any proof

of claim), with priority over (i) any and all administrative expenses of the City at any

time existing or arising, of any kind or nature whatsoever, including all

administrative expenses arising under any section of the Bankruptcy Code, whether

or not such expenses or claims may become secured by a judgment lien or other

non-consensual lien, levy or attachment, (ii) all other post-petition claims against the

City, and (iii) pre-petition unsecured claims against the City.  There is litigation

pending before the Court between certain bond insurers of certain of the limited and

unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect

of ad valorem property tax revenue (the "<u>Property Tax Revenue</u>").  To the extent this

Court finds and determines (and pending such finding or determination), or

approves any settlement or confirms any plan of adjustment that provides that any

Property Tax Revenue of the City is subject to a property interest (such as a lien or

pledge) of any holders of limited or unlimited tax general obligation bonds issued by

the City or that such Property Tax Revenue is not generally available for use by the

City other than for payment of such limited or unlimited general obligation bonds

and is not available for distribution to general unsecured creditors as part of a plan of

adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

10.     No Obligation to Extend Credit.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

**Provisions Common to Financings**

11.     Amendment of the Bond Documents. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements.  Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the

13-53846-swr   Doc 4146   Filed 04/29/14   Entered 04/29/14 23:00:03   Page 201 of 72
13-53846-swr   Doc 2114-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 201 of 296
456

City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.

12.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance

with the terms of the Bond Documents, the Post-Petition Facility and this Order; and (e) authorize the City to pay, and the Indenture Trustee to retain and apply, all payments required to be made to the Indenture Trustee, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order.

13.     Perfection of Liens.  This Order shall be conclusive evidence of the validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein. Upon satisfaction of the conditions to termination  set forth in section 14.4 (a) of that certain Collateral Agreement among the City, Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association (the "Custodian") and the Other Persons Party thereto dated as of June 15, 2009 (the "Collateral Agreement"), the Collateral Agreement shall terminate and any lien, security interest or other interest in the Pledged Wagering Revenues under the Collateral Agreement shall be terminated.  The Custodian shall timely perform its obligations in connection with

the termination of the Collateral Agreement, including, without limitation, the

obligations set forth in Section 14.4 thereof and in particular, but also without

limitation, paying any and all amounts due to the City under the Collateral

Agreement and giving notice to the appropriate parties that the "Irrevocable

Instructions" (as defined in the Collateral Agreement) are terminated and no longer

of any force or effect.

14. <u>Right to Take Actions to Perfect</u>. Notwithstanding the foregoing, the

Purchaser, the Indenture Trustee and the Bondholders are authorized, but not

required, to file and obtain, as each deems necessary in its sole discretion, such

financing statements, notices of liens, control agreements and other security

documents to perfect in accordance with applicable non-bankruptcy law, or take

constructive control over assets, take any other action, in each case, to validate and

perfect the Liens and all such financing statements, notices, control agreements and

other security documents shall be deemed to have been filed or recorded as of the

date of entry of this Order; <u>provided</u>, <u>however</u>, that no such filing or recordation

shall be necessary or required in order to create or perfect the Liens. The City is

authorized and directed to execute and deliver promptly upon demand to the

Purchaser or the Indenture Trustee all such financing statements, notices, control

agreements and other security documents as the Purchaser or the Indenture Trustee

may request. The Purchaser or the Indenture Trustee, each in its discretion, may file

a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording.  For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15.    Proceeds of Subsequent Financing.  If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, including after the confirmation of any plan of adjustment filed in the Case, and such facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Bond Documents and this Order.

16.    Maintenance of Collateral.  Until the indefeasible payment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall

maintain: (a) the Collateral as required under the Bond Documents; and (b) the cash management system as required by the Bond Documents.

17.     Disposition of Collateral.

(a)     Except as otherwise provided for in the Bond Documents, the City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

(b)     In the event of any sale, lease or other disposition of any Collateral (a "Collateral Disposition"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18.     Maturity Date.  Upon the earliest to occur (such earliest date, the "Maturity Date") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

19.     No Dismissal.  The Bond Obligations shall be indefeasibly paid in full

in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

20.     Events of Default.  The occurrence of an "Event of Default" under the Bond Documents or any violation of the terms of this Order shall constitute an event of default under this Order ("Event of Default"), unless waived in writing by the Indenture Trustee, upon consent of the Bondholders in accordance with the Bond Documents.

21.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, the Indenture Trustee, upon the direction of the Bondholders in accordance with the Bond Documents, may, among other things, declare all Bond Obligations owing under the Bond Documents to be immediately due and payable in accordance with the terms of the Bond Documents, but without affecting any of the Liens or the Bond Obligations (any such declaration, a "Termination Declaration").  The Termination Declaration shall be given by electronic transmission as provided in the Bond Documents (the date any such Termination Declaration is made, the "Termination Declaration Date").  Following the Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the Bond

24

13-53846-swr   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:03   Page 207 of 272
456
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 29 of 172   302

Documents without further order or approval from this Court.

22.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith.  Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby.  Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

23.     <u>Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  In accordance with Section 921(e) of the Bankruptcy Code, in the event any

or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

24. <u>Proofs of Claim</u>. The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds. Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

26

13-53846-tjt   Doc 4314-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 209 of 172
13-53846-swr   Doc 2148   Filed 12/29/14   Entered 12/29/14 23:00:23   Page 209 of 304
456

25.    <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Bond Documents.  All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Post-Petition Facility.

26.    <u>Limitations on the Post-Petition Facility and the Collateral</u>.  The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a

27

manner that is not permitted by the Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond Documents or this Order.

27. <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor or any direct, indirect or incidental beneficiary.

28. <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the

Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

29.    <u>No Marshaling/Applications of Proceeds</u>.  The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

30.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

31.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

32.    <u>No Waiver by Seeking Relief</u>.  Neither the filing of the Motion nor

anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

33.      <u>Binding Effect of Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

34.      <u>No Modification of Order</u>.  Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture

30

13-53846-swr   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:03   Page 213 of 272
13-53846-swr   Doc 2146   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 35 of 72   308
456

Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with priority equal or superior to the Liens (except as specifically provided in the Bond Documents).  The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

35.     <u>Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

36.     <u>Survival</u>.  The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the

Case.  Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

37.    Effect of this Order.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

38.    Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

32

13-53846-tjt   Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 215 of 310
13-53846-swr   Doc 2114   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 87 of 172
456

**Exhibit A**
Bond Purchase Agreement
Swap Termination Bond

# CITY OF DETROIT, MICHIGAN

## FINANCIAL RECOVERY BONDS
## SERIES 2014A (SWAP TERMINATION)

---

### BOND PURCHASE AGREEMENT

---

_____, 2014

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "Purchaser") offers to enter into this Bond Purchase Agreement (this "Bond Purchase Agreement") with City of Detroit, County of Wayne, State of Michigan (the "City") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 1:00 P.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and that the City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case") and that an order for relief in the Bankruptcy Case was entered on December 5, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1.    **Sale Purchase Price and Terms of the Bonds.** (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____ aggregate principal amount of Financial Recovery Bonds Series 2014A (Swap Termination) (the "Bonds"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have

13-53846-tjt    Doc 4314-6    Filed 04/29/14    Entered 04/29/14 23:00:03    Page 217 of 312
13-53846-swr    Doc 2146    Filed 12/16/13    Entered 12/16/13 12:39:13    Page 33 of 172
456

priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and over all prepetition unsecured claims against the City. The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b) The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the ST Bond Documents and (iv) _____ *[the date that is two years and six months after the Closing Date]* (any such date, the "<u>Maturity Date</u>"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "<u>Reset Date</u>"). Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date. Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "<u>Default Rate</u>") from and including the date of the occurrence of such Event of Default.

(c) As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest). Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d) As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations and on a ratable basis with the Quality of Life Bonds, from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "<u>Asset Proceeds Collateral</u>").

(e) The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. 2013-__ of the Local Financial Emergency Loan Board dated _____ (the "<u>ELB Order</u>"), and the City of

Detroit, Michigan Financial Recovery Bond Trust Indenture (the "<u>Indenture</u>") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $_____ (the "<u>Purchase Price</u>").

(f)     The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by a first priority lien on (a) the Asset Proceeds Collateral and (b) the revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et. seq. (the "<u>Pledged Income Tax Revenue</u>", and together with the Asset Proceeds Collateral, the "<u>Bond Collateral</u>"). The lien on (i) the Asset Proceeds Collateral shall also secure the Quality of Life Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Quality of Life Bonds on a second lien basis.

(g)     The ST Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Income Tax Revenue Accounts</u>"), which bank accounts shall be subject to control agreements (the "<u>Income Tax Control Agreements</u>") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the ST Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Bonds. Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(h)     The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the ST Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the ST Bond Documents.

(i)     Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "<u>Quality of Life Bonds</u>") for the purpose of funding certain quality of life projects for the City.

2.     **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding

13-53846-tjt    Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:03   Page 219 of 314
13-53846-swr    Doc 4148   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 219 of 172
456

obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)   In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)   The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)   The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.    **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter.  Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4.    **Private Placement of Bonds; Absence of Disclosure Document.**  The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5.    **Closing.**  At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("<u>DTC</u>"), one registered bond in the denomination equal to the principal amount of the Bonds (the "<u>Bond Certificate</u>"), to be delivered to the Trustee as custodian

-4-

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 220 of 315
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 22 of 72
456

for DTC. Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "Closing Documents"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $_____ by wire transfer for the account of the City. The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6. **Representations of the City.** The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a) The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the ST Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ST Bond Documents.

(b) The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the ST Bond Documents.

(c) The Asset Proceeds Collateral and the Pledged Income Tax Revenue may legally be pledged as collateral for the Bonds, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d) This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms. When executed and delivered, as set forth in the Post-Petition Financing Order, the ST Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)     When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the ST Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the ST Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)     All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the ST Bond Documents is in full force and effect.

(i)     The execution, delivery and performance of the terms and conditions of the ST Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the ST Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)     Except as described on Appendix __ hereto, and other than as described in the ST Bond Documents and the QOL Bond Documents and in Section 8(i) below, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)     As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have

-6-

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 222 of 72
13-53846-swr   Doc 2148-6   Filed 12/16/13   Entered 12/16/13 12:39:16   Page 42 of 172   317
456

fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.

(l)     Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(m)     The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the ST Bond Documents.

(n)     The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the ST Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

It is further understood and agreed that the members of the City and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds.  No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member, officer, attorney, agent or employee of the City in an individual capacity.  No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any officer, member, agent, attorney or employee, in an individual or personal capacity.

7.     **Covenants and Agreements of the City.**  The City hereby covenants and agrees as follows:

(a)     In the event of any payment default on the Bonds, the City agrees to cooperate with the Purchaser to deliver a Private Placement Memorandum or similar disclosure document in a timely manner if requested to do so and the City shall enter into any continuing disclosure agreement if required.

(b)     The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use

or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the ST Bond Documents.

(c)     The City covenants that it will not seek to invalidate or refute the enforceability of any ST Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d)     The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or the Quality of Life Bonds or (b) is secured by a lien on any of the collateral securing the Bonds and/or the Quality of Life Bonds as long as the Bonds are outstanding under the Indenture.  The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds or the Quality of Life Bonds.

8.  **Conditions to Closing.**   The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date.  In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a)     The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b)     As of the Closing Date, (i) this Bond Purchase Agreement and the ST Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may have been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c)     The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "<u>Commitment Date</u>") and prior to the Closing Date: (i) the United States shall become engaged in hostilities

-8-

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:03   Page 224 of 272
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:16   Page 224 of 319
456

that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the ST Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the liens and security interests in respect of the Pledged Income Tax Revenue.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.

(g)     Evidence of the effectiveness of the definitive documents in respect of the Quality of Life Bonds (the "QOL Bond Documents") reasonably satisfactory to the Purchaser.

(h)     The satisfaction of all of the conditions precedent to the issuance of the Quality of Life Bonds set forth in the QOL Bond Documents and the simultaneous issuance of the Quality of Life Bonds.

(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may have been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.

(j)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(k)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(l)     There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(m)     The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds and the Quality of Life Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(n)     The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(o)     The Bonds and the ST Bond Documents shall contain the terms set forth in Section 1 hereof.

(p)     On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)     A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 226 of 272
13-53846-swr   Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 48 of 72   321
456

counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)     A State law supplemental opinion in respect of the ST Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)     A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into ST Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue;

(8)     The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue in favor of the Bonds;

(9)     The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

-11-

13-53846-tjt    Doc 4311-6    Filed 04/29/14    Entered 04/29/14 23:00:23    Page 227 of 322
13-53846-swr    Doc 2148    Filed 12/16/13    Entered 12/16/13 12:59:16    Page 93 of 172
456

[(10)  A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(11)  A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(12)  A specimen Bond;

(13)  A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(14)  An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(15)  Officers' and public officials' certifications regarding the Bonds, the ST Bond Documents, the Quality of Life Bonds, the QOL Bond Documents and the Swap Agreements;

(16)  Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the ST Bond Documents (defined below);

(17)  An executed copy of the Bond Authorizing Order;

(18)  An executed copy of the Sale Order; and

(19)  Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture and each of the documents set forth in clauses (5), (6), (17) and (18) above are referred to herein as the "ST Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9.  **Fees and Expenses.**  Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City;

-12-

13-53846-tjt    Doc 4314-6  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 228 of 72
13-53846-swr    Doc 2314-6  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 80 of 172   323
456

and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10. **Notices.** Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11. **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.** This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser). No other person shall acquire or have any right hereunder or by virtue hereof. All the representations, warranties, covenants and agreements contained in this Bond Purchase Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12. **Disclaimer of Purchaser.** It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder. The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13. **Indemnification**. To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify

upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any ST Bond Documents or QOL Bond Documents (collectively, the "Bond Documents") are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds or the Quality of Life Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds or the Quality of Life Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the ST Bond Documents, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other

person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the ST Bond Documents, the Quality of Life Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Quality of Life Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

14. **Counterparts.** This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15. **Governing Law.** This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16. **Jurisdiction**. To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17. **Waiver of Jury Trial**. Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond

Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18. **Syndication**. (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds or the Quality of Life Bonds by assigning or selling participations in the Bonds and the Quality of Life Bonds to a group of banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request). Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date. For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date. Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b) The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c) In the event that the Closing Date has occurred and the ST Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Quality of Life Bonds, the City hereby agrees, at its own expense, to take

all such action as may be required in order to effect any amendments to the Bonds and the Quality of Life Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Quality of Life Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

      19.    **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than the projections and other forward looking information (the "Projections")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

Very truly yours,

**BARCLAYS CAPITAL INC.**


By: _____
                 John Gerbino
                 Managing Director


Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**


By: _____

-18-

13-53846-tjt    Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 234 of 172
13-53846-swr    Doc 2148-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 86 of 172   329
456

## Appendix A

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the ST Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2014.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

13-53846-swr   Doc 2314-6   Filed 12/16/13   Entered 12/16/13 22:00:13   Page 235 of 272
13-53846-tjt   Doc 8111   Filed 10/29/14   Entered 10/29/14 23:00:23   Page 235 of
456   330

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the $350,000,000 Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the $350,000,000 Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the ST Bond Documents, LIBOR shall at no time be less than the LIBOR Floor.  If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Pledged Wagering Tax Revenue*" means taxes owing to the City in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996, MCL 432.201, et. seq. (or any replacement or successor statute).

Appendix A
Page 3

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 237 of
456
13-53846-swr   Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 63 of 72   332

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as ____ [Docket No.], attached hereto as Appendix __.

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Quality of Life Bonds*" shall have the meaning assigned to such term in Section 1(i) of this Bond Purchase Agreement.

"*Reserve Percentage*" means the aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Eurocurrency Liabilities" as defined in Regulation D.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the ST Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means UMB Bank, N.A.

Appendix A
Page 4
456
13-53846-tjt   Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:09:13   Page 60 of 172
13-53846-swr   Doc 4114-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 238 of 333

**Exhibit B**
Bond Purchase Agreement
Quality of Life Bond

**CITY OF DETROIT, MICHIGAN**

**FINANCIAL RECOVERY BONDS**
**SERIES 2014B (QUALITY OF LIFE)**

_____

**BOND PURCHASE AGREEMENT**
_____

_____, 2014

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "Purchaser") offers to enter into this Bond Purchase Agreement (this "Bond Purchase Agreement") with City of Detroit, County of Wayne, State of Michigan (the "City") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 1:00 P.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and that the City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case") and that an order for relief in the Bankruptcy Case was entered on December 5, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1. **Sale Purchase Price and Terms of the Bonds.** (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $_____ aggregate principal amount of Financial Recovery Bonds Series 2014B (Quality of Life) (the "Bonds"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 240 of 272
13-53846-swr   Doc 2314-8   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 62 of 172    335
456

priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and over all prepetition unsecured claims against the City. The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b) The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the QOL Bond Documents and (iv) _____ [*the date that is two years and six months after the Closing Date*] (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date"). Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date. Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c) As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest). Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d) As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations and on a ratable basis with the Swap Termination Bonds, from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral").

(e) The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. 2013-__ of the Local Financial Emergency Loan Board dated _____ (the "ELB Order"), and the City of

Detroit, Michigan Financial Recovery Bond Trust Indenture (the "<u>Indenture</u>") executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $_____ (the "<u>Purchase Price</u>").

(f) The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Initiated Law 1, effective December 5, 1996, MCL 432.201, et. seq. (or any replacement or successor statute) (the "<u>Pledged Wagering Tax Revenue</u>") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et. seq. (the "<u>Pledged Income Tax Revenue</u>", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "<u>Bond Collateral</u>"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Bonds on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Bonds on a first-priority basis.

(g) The QOL Bond Documents shall require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Wagering Tax Revenue Accounts</u>"), which bank accounts shall be subject to control agreements (the "<u>Wagering Tax Control Agreements</u>") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default (as defined in the Indenture) to $4,000,000 per month, all of which shall be applied to redeem the Bonds until the Bonds are paid in full. Subject to the terms of the Wagering Tax Control Agreements, the City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

(h) The QOL Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "<u>Income Tax Revenue Accounts</u>"), which bank accounts shall be subject to control agreements (the "<u>Income Tax Control Agreements</u>") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the QOL Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to redeem the Swap Termination Bonds until such Swap Termination Bonds are paid in full and thereafter, such amounts (in addition to $4,000,000 per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Bonds. Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

13-53846-tjt Doc 4314-6 Filed 04/29/14 Entered 04/29/14 23:00:33 Page 242 of 272
13-53846-swr Doc 2146 Filed 12/16/13 Entered 12/16/13 12:39:10 Page 64 of 172 337
456

(i)   The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the QOL Bond Documents.

(j)   Simultaneously with the execution of this Bond Purchase Agreement, the City and the Purchaser are entering into a bond purchase agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Bonds") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, as amended from time to time, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other hand, to terminate the underlying swaps.

2.   **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)   In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)   The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)   The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.   **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is

unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect and the City shall be obligated to pay the remaining portion of the Commitment Fee, as set forth in the Fee Letter. Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4. **Private Placement of Bonds; Absence of Disclosure Document.** The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5. **Closing.** At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("DTC"), one registered bond in the denomination equal to the principal amount of the Bonds (the "Bond Certificate"), to be delivered to the Trustee as custodian for DTC. Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "Closing Documents"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $_____ by wire transfer for the account of the City. The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6. **Representations of the City.** The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a) The City is a duly organized home rule city and political subdivision of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the QOL Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate

the transactions contemplated by this Bond Purchase Agreement and the QOL Bond Documents.

(b)     The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the QOL Bond Documents.

(c)     The Asset Proceeds Collateral, the Pledged Wagering Tax Revenue and the Pledged Income Tax Revenue may legally be pledged as collateral for the Bonds and the Swap Termination Bonds, as applicable, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d)     This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms.   When executed and delivered, as set forth in the Post-Petition Financing Order, the QOL Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)     When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the QOL Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the QOL Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)     All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the QOL Bond Documents is in full force and effect.

-6-

13-53846-swr   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 245 of 340
456
13-53846-swr   Doc 2146   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 67 of 172

(i)     The execution, delivery and performance of the terms and conditions of the QOL Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the QOL Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)     Except as described on Appendix __ hereto, and other than as described in the QOL Bond Documents and the ST Bond Documents and in Section 8(i) below, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)     As of the Closing Date, the City will have fully and legally terminated the Swap Agreements, receiving any consents required therefor, will have fully and legally terminated the Swap Collateral Agreement, receiving any consents required therefor, and will have fully and legally repealed any related Ordinances.

(l)     Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(m)     The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the QOL Bond Documents.

(n)     The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the QOL Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

It is further understood and agreed that the members of the City and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds. No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member, officer, attorney, agent or employee of the City in an individual capacity. No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any officer, member, agent, attorney or employee, in an individual or personal capacity.

7. **Covenants and Agreements of the City.** The City hereby covenants and agrees as follows:

(a) In the event of any payment default on the Bonds, the City agrees to cooperate with the Purchaser to deliver a Private Placement Memorandum or similar disclosure document in a timely manner if requested to do so and the City shall enter into any continuing disclosure agreement if required.

(b) The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the QOL Bond Documents.

(c) The City covenants that it will not seek to invalidate or refute the enforceability of any QOL Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d) The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or the Swap Termination Bonds or (b) is secured by a lien on any of the collateral securing the Bonds and/or the Swap Termination Bonds as long as the Bonds are outstanding under the Indenture. The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds or the Swap Termination Bonds.

8.  **Conditions to Closing.**  The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date.  In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a)     The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b)     As of the Closing Date, (i) this Bond Purchase Agreement and the QOL Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may have been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c)     The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "Commitment Date") and prior to the Closing Date: (i) the United States shall become engaged in hostilities that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general

-9-

character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)     The execution and delivery of the QOL Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the liens and security interests in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue.

(e)     The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     The payment of the remaining portion of the Commitment Fee, as defined in and set forth in the Fee Letter.

(g)     Evidence of the effectiveness of the definitive documents in respect of the Swap Termination Bonds (the "ST Bond Documents") reasonably satisfactory to the Purchaser.

(h)     The satisfaction of all of the conditions precedent to the issuance of the Swap Termination Bonds set forth in the ST Bond Documents and the simultaneous issuance of the Swap Termination Bonds.

(i)     Evidence of (i) the termination in whole of all existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as the same may have been amended from time to time (the "Swap Agreements") and (ii) the release of the pledge of and lien on the taxes owing to the City in respect of the gross receipts earned by each of the City's casinos previously granted in favor of the Swap Agreements, including but not limited to termination of the Collateral Agreement dated as of June 15, 2009 (the "Swap Collateral Agreement") and the amendment or repeal of the related City Ordinances.

(j)     Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(k)     The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it

-10-

13-53846-tjt   Doc 4311-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 249 of 72
13-53846-swr   Doc 2145   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 249 of 172   344
456

reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(l)     There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(m)     The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate the Bonds and the Swap Termination Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(n)     The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(o)     The Bonds and the QOL Bond Documents shall contain the terms set forth in Section 1 hereof.

(p)     On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)     A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)     A State law supplemental opinion in respect of the QOL Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)     A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City, including (i) that the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) that, subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Post-Petition Financing Order is effective to create a valid and perfected pledge of the Bond Collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed

with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion);

(4)      The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)      The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)      Executed Wagering Tax Control Agreements and Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)      Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager, whose consent is required by applicable law for the issuance of the Bonds, entry into QOL Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue;

(8)      The amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with the pledge of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue in favor of the Bonds;

(9)      The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

[(10)    A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(11)    A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(12)    A specimen Bond;

(13)    A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(14)    An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(15)    Officers' and public officials' certifications regarding the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the ST Bond Documents and the Swap Agreements;

(16)    Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the QOL Bond Documents (defined below);

(17)    An executed copy of the Bond Authorizing Order;

(18)    An executed copy of the Sale Order; and

(19)    Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture, this Bond Purchase Agreement and each of the documents set forth in clauses (5), (6), (17) and (18) above are referred to herein as the "QOL Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9.    **Fees and Expenses.**  Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City; and (B) the cost of printing and preparing the Bonds. The City shall also pay (i) the remaining portion of the Commitment Fee as defined in and set forth in the Fee Letter in accordance with the terms thereof and (ii) all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10.    **Notices.**  Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11.    **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.**  This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser).  No other person shall acquire or have any right hereunder or by virtue hereof.   All the representations, warranties, covenants and agreements contained in this Bond Purchase

Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12. **Disclaimer of Purchaser.** It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder. The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13. **Indemnification.** To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified

Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any QOL Bond Documents or ST Bond Documents (collectively, the "Bond Documents") are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds or the Swap Termination Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds or the Swap Termination Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the QOL Bond Documents, the Swap Termination Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds or the Swap Termination Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

-15-

14.     **Counterparts.**   This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15.     **Governing Law.**   This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16.     **Jurisdiction**.   To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan.   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17.     **Waiver of Jury Trial**.   Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18.     **Syndication**.   (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds or the Swap Termination Bonds by assigning or selling participations in the Bonds and the Swap Termination Bonds to a group of banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date.  For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date.  Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase

-16-

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 255 of 350
13-53846-swr   Doc 2146   Filed 12/16/13   Entered 12/16/13 12:39:16   Page 75 of 172
456

Agreement and the Fee Letter and will determine the final commitment allocations. The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b)     The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "<u>Syndication Period</u>"), in completing timely and orderly syndications satisfactory to the Purchaser. Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, and (c) upon the request of the Purchaser, the City using commercially reasonable efforts to assist the Purchaser in procuring a credit rating in respect of the Bonds from Standard & Poor's Rating Services and Moody's Investors Service, Inc. During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c)     In the event that the Closing Date has occurred and the QOL Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, the City hereby agrees, at its own expense, to take all such action as may be required in order to effect any amendments to the Bonds and the Swap Termination Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, <u>provided</u>, <u>however</u>, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter. The City further agrees to reasonably cooperate with the Purchaser with regard to immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds and the Swap Termination Bonds, <u>provided</u>, <u>however</u>, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19.     **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than

-17-

the projections and other forward looking information (the "Projections")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

Very truly yours,

**BARCLAYS CAPITAL INC.**

By: _____
                John Gerbino
                Managing Director

Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**

By: _____

## Appendix A

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the QOL Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2014.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 259 of 272
13-53846-swr   Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:16   Page 259 of 272   354
456

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the $350,000,000 Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the $350,000,000 Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(h) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(h) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

Appendix A
Page 2

13-53846-swr   Doc 4114-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 260 of 272
13-53846-swr   Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 82 of 172   355
456

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the QOL Bond Documents, LIBOR shall at no time be less than the LIBOR Floor. If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Pledged Wagering Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as ____ [Docket No.], attached hereto as Appendix __.

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*QOL Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Reserve Percentage*" means the aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Eurocurrency Liabilities" as defined in Regulation D.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the QOL Bond Documents.

"*State*" means the State of Michigan.

"*ST Bond Documents*" shall have the meaning assigned to such term in Section 8(g) of this Bond Purchase Agreement.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Swap Agreements*" shall have the meaning assigned to such term in Section 8(i) of this Bond Purchase Agreement.

"*Swap Termination Bonds*" shall have the meaning assigned to such term in Section 1(j) of this Bond Purchase Agreement.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means UMB Bank, N.A.

"*Wagering Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Wagering Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

**Exhibit C**
Indenture

**FINANCIAL RECOVERY BOND**

**TRUST INDENTURE**

Between

**CITY OF DETROIT**

County of Wayne, Michigan

and

**UMB BANK, N.A.**

as Trustee

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2014A**

and

$[_____]

**FINANCIAL RECOVERY BONDS, SERIES 2014B**

Dated as of [_____], 2014

13-53846-tjt    Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 265 of
456
13-53846-swr    Doc 2148   Filed 12/16/13   Entered 12/16/13 12:39:16   Page 87 of 172    360

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................. 2
    Section 101    Definitions ........................................................................ 2
    Section 102    Interpretation .................................................................... 9
ARTICLE II TERMS OF BONDS ......................................................................... 10
    Section 201    Authorization for Indenture and Bonds; Indenture to Constitute a
                      Contract ......................................................................... 10
    Section 202    Authorization of Bonds ....................................................... 10
    Section 203    Issuance and Delivery of Bonds ........................................... 10
    Section 204    Conditions Precedent to Delivery of Bonds ............................. 10
ARTICLE III GENERAL TERMS AND PROVISIONS OF BONDS ......................... 12
    Section 301    Designation of Bonds; Form of Bonds ................................... 12
    Section 302    Book-Entry Only System for the Bonds ................................. 12
    Section 303    Interchangeability of Bonds ................................................. 13
    Section 304    Negotiability, Transfer and Bond Registry .............................. 14
    Section 305    Transfer of Bonds ............................................................. 14
    Section 306    Regulations With Respect to Exchanges and Transfers ............ 14
    Section 307    Bonds Mutilated, Destroyed, Stolen or Lost ........................... 15
    Section 308    Cancellation and Destruction of Bonds .................................. 15
    Section 309    Redemption ..................................................................... 15
    Section 310    Selection of Bonds to be Redeemed ..................................... 15
    Section 311    Notice of Redemption ........................................................ 16
    Section 312    Payment of Redeemed Bonds .............................................. 16
ARTICLE IV PLEDGE OF INDENTURE; SOURCES OF PAYMENT AND SECURITY
    FOR THE BONDS ........................................................................... 17
    Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest ....... 17
    Section 402    Creation of Liens .............................................................. 18
ARTICLE V ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS .......... 18
    Section 501    Debt Service Fund ............................................................. 18
    Section 502    Costs of Issuance Fund ...................................................... 19
    Section 503    Bond Proceeds Fund .......................................................... 20
    Section 504    Amounts Remaining in Funds and Accounts ........................... 20
    Section 505    Approval of Account Control Agreements ............................... 20
ARTICLE VI INVESTMENT OF FUNDS .............................................................. 21
    Section 601    Permitted Investments ........................................................ 21
    Section 602    Valuation and Sale of Investments ........................................ 22
ARTICLE VII PARTICULAR COVENANTS OF THE CITY .................................... 22
    Section 701    Payment of Bonds ............................................................. 22
    Section 702    Power to Issue Bonds and Pledge Revenues, Funds and Other
                      Property ......................................................................... 22
    Section 703    Maintenance of Perfected Security Interests; Further Assurances;
                      Notices of Default ............................................................ 23

i

13-53846-tjt    Doc 4314-6  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 266 of 172
13-53846-swr    Doc 2148-6  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 66 of 172  361
456

| | | |
|---|---|---|
| Section 704 | Tax Covenants ................................................................ | 23 |
| Section 705 | Compliance With Conditions Precedent ........................... | 23 |
| Section 706 | Accounts and Reports ...................................................... | 23 |
| Section 707 | Issuance of Additional Obligations ................................. | 23 |
| Section 708 | Wagering Tax and Income Tax Revenues and Accounts ... | 24 |
| Section 709 | Asset Proceeds Collateral ................................................ | 24 |
| Section 710 | Contesting Enforceability ................................................ | 24 |

ARTICLE VIII THE TRUSTEE ..................................................................... 24

| | | |
|---|---|---|
| Section 801 | Powers and Duties of Trustee .......................................... | 24 |
| Section 802 | Fees and Expenses of Trustee .......................................... | 27 |
| Section 803 | Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale ......... | 27 |
| Section 804 | Removal of Trustee .......................................................... | 28 |
| Section 805 | Appointment of and Transfer to Successor Trustee .......... | 28 |

ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ON DEFAULT ........... 28

| | | |
|---|---|---|
| Section 901 | Events of Default ............................................................ | 28 |
| Section 902 | Remedies .......................................................................... | 30 |
| Section 903 | Waiver of Default ............................................................ | 32 |
| Section 904 | Possession of Bonds by Trustee Not Required ................. | 32 |
| Section 905 | Remedies Cumulative ...................................................... | 32 |
| Section 906 | Knowledge by Trustee of an Event of Default ................. | 32 |
| Section 907 | Application of Monies ...................................................... | 32 |

ARTICLE X SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE ....................................................................................... 32

| | | |
|---|---|---|
| Section 1001 | Modifications and Amendments Not Requiring Consent ... | 32 |
| Section 1002 | Amendments Requiring Consent ...................................... | 33 |
| Section 1003 | Consent of Trustee ........................................................... | 34 |
| Section 1004 | General Provisions Relating to Supplemental Indentures ... | 34 |

ARTICLE XI MISCELLANEOUS ................................................................. 35

| | | |
|---|---|---|
| Section 1101 | Notices ............................................................................. | 35 |
| Section 1102 | Termination ...................................................................... | 35 |
| Section 1103 | Defeasance ....................................................................... | 35 |
| Section 1104 | Severability ...................................................................... | 36 |
| Section 1105 | Headings ........................................................................... | 36 |
| Section 1106 | Indenture Executed in Counterparts ................................ | 36 |
| Section 1107 | Parties Interested Herein .................................................. | 36 |
| Section 1108 | Jurisdiction ...................................................................... | 36 |

| | | |
|---|---|---|
| EXHIBIT A | FORM OF SERIES 2014A BOND ................................... | A-1 |
| EXHIBIT B | FORM OF SERIES 2014B BOND ................................... | B-1 |
| EXHIBIT C | FORM OF ACCOUNT CONTROL AGREEMENT ......... | C-1 |

## FINANCIAL RECOVERY BOND TRUST INDENTURE

This Trust Indenture, dated as of [_____], 2014 (the "Indenture"), between the City of Detroit, County of Wayne, State of Michigan (the "City") and UMB Bank, N.A., and its successors in trust and assignees, as trustee (the "Trustee").

## W I T N E S S E T H :

**WHEREAS**, pursuant to the Local Government Fiscal Responsibility Act, Act 436, Public Acts of Michigan, 2012 ("Act 436"), the Governor (the "Governor") of the State of Michigan (the "State") determined that a local government financial emergency exists in the City of Detroit, County of Wayne, Michigan (the "City"), and an emergency manager, as defined in Act 436, Kevyn D. Orr (the "Emergency Manager") was appointed for the City by the Governor on March 28, 2013 in accordance with Act 436; and

**WHEREAS**, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

**WHEREAS**, on October 11, 2013, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City his Order No. 17 Approval of Postpetition Financing ("Order No. 17"); and

**WHEREAS**, Order No. 17 proposes the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") to provide certain post-bankruptcy petition financing for the City upon the terms and conditions and parameters set forth in Order No. 17 and the term sheets attached thereto (the "Secured Financing"); and

**WHEREAS**, on October 21, 2013, in accordance with Section 19(1) of Act 436, the City Council of the City (the "City Council") disapproved the Secured Financing; and

**WHEREAS**, pursuant to Section 19(2) of Act 436, the City Council was afforded 7 days following its disapproval of the Secured Financing to propose an "alternative proposal that would yield substantially the same financial result as" the Secured Financing to the Emergency Financial Assistance Loan Board (the "Board"); and

**WHEREAS**, the City Council failed to offer an alternative proposal to the Board during the time period prescribed in Section 19(2) of Act 436 and as a consequence, the Emergency Manager submitted an Order to authorize the Secured Financing through the issuance of Bonds to the Board for approval and implementation of the Secured Financing by the Emergency Manager; and

13-53846-tjt    Doc 4314-6  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 268 of 272
13-53846-swr    Doc 2344  Filed 12/16/13  Entered 12/16/13 12:39:10  Page 90 of 172    363
456

**WHEREAS**, on [_____], 2013, the Bankruptcy Court issued an order [Docket No. \_\_] authorizing the Secured Financing (the "Bankruptcy Court Order"), pursuant to which super priority liens have been established under Sections 364(c), 503 and 507(a)(2) of the Bankruptcy Code for the certain collateral securing the bonds authorized for issuance hereunder; and

**WHEREAS**, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board established pursuant to Act 243, Public Acts of Michigan, 1980, as amended; and

**WHEREAS**, on [_____], 2013, the Board issued an Order (the "Board Order") approving the issuance of the Series 2014A Bonds and the Series 2014B Bonds by the City in an aggregate principal amount not to exceed $350,000,000 and as finally determined in the Sale Order of the Emergency Manager, subject to the terms and conditions for each series of Bonds approved by the Board in the Board Order; and

**WHEREAS**, in connection with the issuance of the Bonds, the Trustee shall enter into Account Control Agreements (as hereinafter defined) with the City and the Depository Banks for purposes of perfecting the security interests granted by the City in favor of the Registered Owners of the Series 2014A Bonds and the Series 2014B Bonds in certain tax revenue and other collateral of the City described herein to secure repayment of the City's obligations owing in respect of the Bonds.

**NOW, THEREFORE, THIS TRUST INDENTURE WITNESSETH** that in order to secure the payment of the Bonds, for the benefit of the respective Registered Owners thereof and to secure the performance and observance of the conditions and covenants herein set forth and for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Trustee for the benefit of the respective owners from time to time of the Bonds as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101    <u>Definitions</u>.  In addition to the terms defined in the preambles to this Indenture, and in the Bond Orders, the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"*1 Month LIBOR Rate*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("BBA LIBOR") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Calculation Agent from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a 1-Month LIBOR Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic

2



mean of all such rates; provided further, however, that, for purposes of this Indenture, the 1-Month LIBOR Rate shall at no time be less than the LIBOR Floor.  If, for any reason, such rate is not available, the term 1-Month LIBOR Rate shall mean the rate of interest per annum determined by the Calculation Agent, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the 1-Month LIBOR Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, the 1-Month LIBOR Rate shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*1-Month LIBOR Reset Date*" means the first Business Day of each calendar month.

"*Account*" means any of the trust funds and accounts created and established by, or pursuant to, this Indenture.

"*Account Control Agreements*" means, collectively the Income Tax Account Control Agreement and the Wagering Tax Account Control Agreement.

"*Act 279*" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"*Act 284*" means Act No. 284, Public Acts of Michigan, 1964, as amended, and any replacement or successor thereto.

"*Act 436*" means Act No. 436, Public Acts of Michigan, 2012.

"*Asset Proceeds Collateral*" shall mean all net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10 million, which net cash proceeds are pledged by the City hereunder, on the terms and conditions set forth hereunder, in favor of the Registered Owners of the Series 2014(A) Bonds and the Series 2014(B) Bonds.

"*Authorized Denominations*" shall mean denominations of Bonds equal to multiples of $100,000 or integral multiples of $5,000 in excess thereof.

"*Authorized Officer*" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer issued to the Trustee to act on behalf of or otherwise represent the City in any legal capacity, which such Certificate shall be delivered, if at all, in the City's sole discretion.

"*Bankruptcy Case*" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"*Bankruptcy Court Order*" has the meaning set forth in the recitals hereto.

3

"**Board**" has the meaning set forth in the recitals hereto.

"**Bond**" or "**Bonds**" means singularly or collectively, the Series 2014A Bonds and the Series 2014B Bonds.

"**Bondowner**", "**Owner**" or "**Registered Owner**" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry under Section 304.

"**Bond Authorizing Order**" means that Order of the Emergency Manager dated November 5, 2013 authorizing the issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"**Bond Counsel**" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"**Bond Orders**" means collectively the Bond Authorizing Order and the Sale Order.

"**Bond Proceeds Fund**" means the fund established pursuant to Section 503 hereof by the Trustee and pursuant to the Bond Orders in which, on the Date of Original Issue, the proceeds of the Bonds shall be deposited.

"**Bond Purchase Agreements**" means, collectively, that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014A Bonds and that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014B Bonds.

"**Bond Rate**" means the sum of the 1-Month LIBOR Rate and the Spread.

"**Bond Registry**" means the books for the registration of Bonds maintained by the Trustee.

"**Business Day**" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"**Calculation Agent**" means Barclays Capital Inc.

"**Certificate**" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called for by this Indenture, as the case may be.

"**City**" means the City of Detroit, County of Wayne, Michigan.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Costs of Issuance Fund**" means the fund established under Section 502 hereof for the payment of the costs of issuance of the Bonds.

"**Date of Original Issue**" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"**Debt Service Accounts**" means, collectively, the Series 2014A Debt Service Account and Series 2014B Debt Service Account.

"**Debt Service Fund**" means the Debt Service Fund established under Section 501 hereof, for the payment of principal of and interest on the Bonds.

"**Debt Service Requirement Amount**" means, as applicable, an amount equal to (i) the interest due on the Bonds on the next succeeding Interest Payment Date <u>plus</u> if such Interest Payment Date is also a Redemption Date, any principal and premium owing on such Redemption Date, if any, or (ii) the amount equal to the interest, premium, if any, and principal due on the Bonds on the Maturity Date plus any fees or expenses for which the Trustee is entitled to be paid from the Debt Service Fund.

"**Depository Banks**" means the Income Tax Depository Bank and the Wagering Tax Depository Bank.

"**Emergency Manager**" has the meaning set forth in the recitals hereto.

"**Event of Default**" has the meaning attributed to it in Section 901 hereof.

"**Financing Document**" means this Indenture, the Bond Purchase Agreements, the Account Control Agreements, the Series 2014A Bonds, the Series 2014B Bonds, the Bond Orders, the Bankruptcy Court Order, the Fee Letter and any other document related to the issuance, sale or delivery of the Bonds.

"**Fiscal Year**" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"**Governmental Obligations**" means non- callable (a) direct obligations of the United States of America for the full and timely payment of which the full faith and credit of the United States of America is pledged, (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any securities described in (a) or (b) issued or held in book-entry form on the books of the Department of Treasury of the United States of America or Federal Reserve Bank, and (c) securities which represent an interest in the obligations described in (a) and (b) above.

"**Income Tax Account Control Agreement**" means that certain Account Control Agreement dated as of [_____], 2014 by and among the City, the Trustee, and the Income Tax

5

Depository Bank in favor of the Bondowners with respect to the Comerica Lockbox Account that holds the Pledged Income Tax Revenues.

"***Income Tax Depository Bank***" means Comerica Bank and any successor thereto.

"***Income Tax Revenues***" means revenues collected by the City from a levy of an excise tax on income pursuant to Act 284.

"***Indenture***" means this Trust Indenture, dated as of [_____], 2014, as supplemented and amended.

"***Interest Payment Date***" means (i) each 1-Month LIBOR Reset Date; (ii) with respect only to Bonds being redeemed, in whole or in part, the Redemption Date; and (iii) the Maturity Date.

"***Law 1***" means the Michigan Gaming Control and Revenue Act, Initiated Law 1 of the State, effective December 5, 1996, as amended, and any replacement or successor thereto.

"***LIBOR Floor***" means 1.00% per annum.

"***London Banking Day***" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"***Maturity Date***" means the earliest to occur of (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to this Indenture, and (iv) [_____,] the date that is two years and six months after the Date of Original Issue.

"***Non-Arbitrage and Tax Compliance Certificate***" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the date of issuance of the Bonds, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds.

"***Outstanding***" when used with respect to the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered pursuant to the Bond Orders and this Indenture, except:

(A)     Bonds theretofore canceled by the Trustee or delivered to such Trustee for cancellation;

(B)     Bonds for whose payment money in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the registered owners of such Bonds;

(C)     Bonds delivered to the Trustee for cancellation in connection with (i) the exchange of such Bonds for other bonds or (ii) the transfer of the registration of such Bonds;

6

13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 273 of
456
13-53846-swr   Doc 2314-6   Filed 12/16/13   Entered 12/16/13 12:39:13   Page 95 of 172   368

(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the Bond Orders or otherwise pursuant to law; and

(E)     Bonds deemed paid as provided in Section 801 of the Bond Authorizing Order.

"***Payment Date***" means each Interest Payment Date, and the Maturity Date of the Bonds.

"***Permitted Investments***" means those investments specified in Article VI of this Indenture.

"***Petition Date***" has the meaning set forth in the recitals hereto.

"***Pledged Income Tax Account***" means that certain bank account established at Comerica Bank, Account No. [_____] that collects solely Income Tax Revenue.

"***Pledged Income Tax Revenues***" means the Income Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014A Bonds and on a second priority lien basis in favor of the Registered Owners of the Series 2014B Bonds.

"***Pledged Revenues***" means, collectively, the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral.

"***Pledged Wagering Tax Account***" means that certain trust account established at U.S. Bank, Account No. [__] that collects the Wagering Tax Revenue.

"***Pledged Wagering Tax Revenues***" means the Wagering Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014B Bonds.

"***Post Petition Date Debt***" means any payment obligation of the City first arising on or following the Petition Date.

"***Purchaser***" means Barclays Capital Inc. or any permitted party designated pursuant to the Bond Purchase Agreement, as approved by the City, which such approval shall not be unreasonably withheld.

"***Quality of Life Projects***" means those certain projects determined by the Emergency Manager in the Sale Order to be financed with the proceeds of the Series 2014B Bonds.

"***Record Date***" means the fifteenth (15th) day prior to any Interest Payment Date.

"***Redemption Date***" means the date upon which Bonds are to be called for redemption, in whole or in part, pursuant to this Indenture.

"***Redemption Price***" means, with respect to any Bond, the principal amount thereof plus the applicable premium, if any, payable upon redemption thereof.

"***Sale Order***" means that Order of the Emergency Manager dated [_____], 2013 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the preamble above.

7

"***Series 2014A Bonds***" means the City's Financial Recovery Bonds, Series 2014A.

"***Series 2014A Debt Service Account***" means the Account established within the Debt Service Fund for the benefit of the Series 2014A Bonds pursuant to Section 501 of this Indenture.

"***Series 2014B Bonds***" means the City's Financial Recovery Bonds, Series 2014B.

"***Series 2014B Debt Service Account***" means the Account established within the Debt Service Fund for the benefit of the Series 2014B Bonds pursuant to Section 501 of this Indenture.

"***Spread***" means, so long as no Event of Default has occurred and is continuing, 250 basis points, and upon the occurrence of and continuance of an Event of Default, 450 basis points.

"***State***" has the meaning set forth in the recitals hereto.

"***State Treasurer***" means the Treasurer of the State of Michigan.

"***Supplemental Indenture***" means any indenture supplemental to or amendatory of this Indenture, executed by the City and the Trustee and effective in accordance with Article X.

"***Tax-Exempt Bonds***" means those Bonds, the interest on which is excluded from gross income for federal tax purposes.

"***Trustee***" means initially, UMB Bank, N.A., as bond register, transfer agent and paying agent for the Bonds and any successor in trust or assignees pursuant to Section 803 hereof.

"***Trust Estate***" shall have the meaning set forth in Section 401 hereof.

"***Wagering Tax Account Control Agreement***" means that certain Account Control Agreement dated as of [_____], 2014 by and among the City, the Trustee and the Wagering Tax Depository Bank in favor of the Bondowners with respect to the U.S. Bank Trust Account that holds the Pledged Wagering Tax Revenues.

"***Wagering Tax Depository Bank***" means U.S. Bank National Association and any successor thereto.

"***Wagering Tax Revenues***" means revenues collected by the City from taxes in respect of the gross receipts earned by each of the City's casinos or any replacement or successor tax, pursuant to Law 1.

Section 102    Interpretation.  (A) In this Indenture, unless the context otherwise requires:

(1)      the terms "hereby", "hereof", "herein", "hereunder" and similar terms, as used in this Indenture, refer to this Indenture, and the term "heretofore" means before, and the term "hereafter" means after, the date of this Indenture;

(2)      words of the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular number mean and include the plural number and vice versa;

(3)      words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons;

(4)      any headings preceding the texts of the several Articles and Sections of this Indenture and any table of contents or marginal notes appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect;

(5)      this Indenture shall be governed by and construed in accordance with the applicable laws of the State;

(6)      references to the payment of the Bonds shall be deemed to include reference to the payment of interest thereon;

(7)      references to time shall mean the applicable local time in New York City, New York; and

(8)      references to Sections and Articles, unless otherwise indicated, refer to Sections and Articles in this Indenture.

(B)      Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than the City, the Trustee, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation thereof.  All the covenants, stipulations, promises and agreements herein contained by and on behalf of the City, shall be for the sole and exclusive benefit of the City, the Trustee, and the Owners of the Bonds.

(C)      If any one or more of the covenants or agreements provided herein on the part of the City or the Trustee to be performed should be contrary to law, then such covenant or covenants or agreement or agreements shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Indenture or of the Bonds.

13-53846-swr    Doc 2314-6    Filed 12/16/13    Entered 12/16/13 12:39:03    Page 276 of
456
13-53846-tjt    Doc 4314-6    Filed 04/29/14    Entered 04/29/14 23:00:23    Page 93 of 172    371

**ARTICLE II**

**TERMS OF BONDS**

Section 201    Authorization for Indenture and Bonds; Indenture to Constitute a Contract. This Indenture and the issuance of Bonds hereunder have been duly authorized by the City and the principal amount of Bonds that may be issued hereunder is not limited except as provided herein or by law.  The City has ascertained and it is hereby determined and declared that the execution and delivery of this Indenture is necessary to carry out and effectuate the purposes of the City and that each and every covenant or agreement herein contained and made is necessary, useful or convenient in order to better secure the Bonds and is a contract or agreement necessary, useful and convenient to carry out and effectuate the purposes of the City.  In consideration of the purchase and acceptance of the Bonds by those who shall purchase and hold the same from time to time, the provisions of this Indenture, any Bond Order and any Series or Supplemental Indenture shall be deemed to be and shall constitute a contract between the City, the Trustee and the Owners from time to time of the Bonds, and such provisions are covenants and agreements with such Owners which the City hereby determines to be necessary and desirable for the security and payment thereof.  The pledge hereof, and the provisions, covenants and agreements herein set forth to be performed by the City, shall be for the equal benefit, protection and security of the Owners of any and all Bonds which shall be of equal rank without preference, priority or distinction among all Bonds, except as may otherwise be expressly set forth herein.

Section 202    Authorization of Bonds.  In order to provide sufficient funds for the purposes set forth in the Bond Orders, obligations of the City in the form of Bonds are hereby authorized to be issued from time to time hereunder in one or more series.  No Bonds shall be issued unless they are part of an issue described in the Bond Orders and until the conditions contained in this Indenture are satisfied.

Section 203    Issuance and Delivery of Bonds.  After their authorization by the City, Bonds may be executed by or on behalf of the City and delivered to the Trustee in accordance with the Bond Authorizing Order and this Indenture for authentication and, upon compliance by the City with the requirements of Section 204, the Trustee shall thereupon authenticate and deliver such Bonds to or upon the order of the City.  No Bond shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 301 of this Indenture, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Trustee by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

Section 204    Conditions Precedent to Delivery of Bonds.  The Bonds of each Series shall be authenticated and delivered upon the order of the City, but only upon the receipt by the Trustee of:

(1)    a copy of the Bond Orders authorizing each such series, executed by the City and the Trustee, which shall specify:

10

(a)     the authorized principal amount and designation of such Bonds;

(b)     the purposes for which such Bonds are issued;

(c)     the dated dates and maturity dates of each such Series of Bonds;

(d)     the interest rates, if any, of and principal amounts payable upon such Bonds (or the manner of determining such rates or amounts) and the interest payment dates, if any, and principal installment dates therefor;

(e)     the denominations of, and the manner of dating, numbering and lettering, such Bonds;

(f)     the places of payment of such Bonds or the manner of appointing and designating the same;

(g)     provisions concerning the forms of such Bonds and of the Trustee's certificate of authentication;

(h)     evidence of compliance with Act 279, including receipt of an order of the Board approving all terms and conditions of each series of the Bonds;

(i)     any other provisions deemed advisable by the City as shall not conflict with the provisions hereof; and

(j)     the Redemption Price, if any, of and the redemption terms for such Bonds.

(2)     a Bond Counsel's Opinion to the effect that (i) such Bond Order and/or Supplemental Indenture and this Indenture have been duly authorized, executed and delivered by the City and are valid and binding upon, and enforceable against, the City; and (ii) upon the execution, authentication and delivery thereof, such Bonds will have been duly and validly authorized and issued in accordance with the constitution and statutes of the State and in accordance with this Indenture with such qualifications and exceptions to such opinion as specified in the Bond Purchase Agreements; and

(3)     evidence of the receipt by the Trustee of the amount of the proceeds of such Bonds to be deposited with the Trustee pursuant to Section 503, which shall be conclusively established by the executed certificate of the Trustee so stating.

11

13-53846-swr    Doc 2143-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 100 of 172
456
13-53846-swr    Doc 4844-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 278 of 373

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

Section 301     Designation of Bonds; Form of Bonds.

(a) *Designation and Form of Bonds.*  Bonds designated as "Financial Recovery Bonds, Series 2014A" and "Financial Recovery Bonds, Series 2014B" are hereby authorized to be issued pursuant to the provisions of this Indenture in the respective principal amounts of [_____ ($_____)] and [_____ ($_____)].   Both series of Bonds shall bear a Date of Original Issue of [_____, 2014.] Bonds shall be issued in fully registered form, without coupons, and in Authorized Denominations.  The Bonds shall contain a recital that they are issued pursuant to the laws of the State and may have printed thereon such legend or legends as may be required to comply with any law, rule or regulation.  Each Bond shall be numbered as determined by the City.  The Bonds shall be substantially in the forms set forth in Exhibit A and Exhibit B, with such appropriate changes, omissions and insertions as are permitted or required by this Indenture or the Bond Authorizing Order.  The Bonds shall be payable, as to principal, interest and redemption premium, if any, in lawful money of the United States of America.  Principal and interest on the Bonds shall be due and payable as set forth in the form of Bonds set forth in Exhibit A and Exhibit B. Interest shall be calculated on the basis of a 360 day year for the actual number of days elapsed.  The principal amount of the Bonds of each series shall be payable on the Maturity Date.  The Bonds shall bear CUSIP numbers as provided by the CUSIP Service Bureau.

(b) *Payment on the Bonds.* Principal of, and premium, if any, on the Bonds are payable upon presentation and surrender thereof at the corporate trust office of the Trustee.  Interest on the Bonds will be paid by check or draft drawn upon the Trustee and mailed to Owners at the registered addresses, provided that, at the written request of the Owner of at least $1,000,000 principal amount of Bonds (which request may provide that it will remain in effect with respect to each subsequent Interest Payment Date unless and until changed or revoked at any time prior to an Interest Payment Date by subsequent written notice to the Trustee), interest shall be paid by wire transfer or other method of transfer of immediately available funds acceptable to the Trustee and the City.  Payment as aforesaid shall be made in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

Section 302     Book-Entry Only System for the Bonds.  (a) Except as provided in Section 302(b) hereof, the ownership of the Bonds shall be registered in the Bond Registry in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the City and the Trustee shall have no responsibility or obligation to any DTC Participant or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds.  Without limiting the immediately preceding sentence, the City and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the

payment to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any amount with respect to principal of, premium, if any, or interest on the Bonds. Notwithstanding any other provision of this Indenture to the contrary, the City and the Trustee shall be entitled to treat and consider the Person in whose name each Bond is registered in the Bond Registry as the absolute owner of such Bond for the purpose of payment of principal of, premium, if any, and interest on such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondowners, as shown in the Bond Registry as provided in this Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to satisfy and discharge the City's obligations fully with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondowner, as shown in the Bond Registry, shall receive a Bond certificate evidencing the obligation of the City to make payments of principal, premium, if any, and interest pursuant to this Indenture. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Indenture with respect to interest checks or drafts being mailed to the registered owner as of the close of business of the Record Date, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(b) In the event that the City or the Trustee determines that DTC is incapable of discharging its responsibilities described herein and in the Letter of Representations between the City and DTC (the "Letter of Representations") or that it is in the best interest of the beneficial owners of the Bonds that they be able to obtain certificated Bonds, the City or the Trustee shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Act of 1934, as amended, notify DTC and DTC Participants of the appointment of such successor securities depository and transfer one or more separate Bond certificates to DTC Participants having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered in the Bond Registry in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondowners transferring or exchanging Bonds shall designate, in accordance with the provisions of this Indenture. The Trustee shall give written notice to the City of a determination to issue certificated bonds.

(c) Notwithstanding any other provision of this Indenture to the contrary, so long as any series of the Bonds is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, in the manner provided in the Letter of Representations. The Trustee shall request in each notice sent to Cede & Co., pursuant to the terms of this Indenture, that Cede & Co. forward or cause to be forwarded such notice to the DTC Participants, but neither the Trustee nor the City shall be liable if Cede & Co. fails to honor such request.

Section 303    Interchangeability of Bonds.    In the event that Bonds are no longer registered in the name of Cede & Co., as nominee of DTC, Bonds, upon surrender thereof at the corporate trust office of the Trustee with a written instrument of transfer satisfactory to the

Trustee, duly executed by the Owner or his duly authorized attorney, may at the option of the Owner thereof, and upon payment by such Owner of any charges which the Trustee may make as provided in Section 306, be exchanged for an equal aggregate principal amount of Bonds of the same Series and maturity bearing the same rate of interest and having the same terms of any of the authorized denominations; provided, however, that the exchange of Bonds may be restricted by the Supplemental Indenture pursuant to which such Bonds are issued.

Section 304    Negotiability, Transfer and Bond Registry.  All the Bonds issued under this Indenture shall be negotiable, subject to the provisions for registration, transfer and exchange contained in this Indenture and in the Bonds in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  So long as any of the Bonds remain Outstanding, the City shall maintain and keep, at the designated corporate trust office of the Trustee, which may be one or more banks or trust companies or national banking associations appointed by the City, books for the registration, transfer and exchange of Bonds. Upon presentation thereof for such purpose at said office, the City shall register or cause to be registered in such books, and permit to be transferred thereon, any Bonds pursuant to such reasonable regulations as it or the Trustee may prescribe. So long as any of the Bonds remain Outstanding, the City shall make all necessary provisions to permit the exchange of Bonds at the corporate trust office of the Trustee.

Section 305    Transfer of Bonds.  (A) The registration of each Bond is transferable, in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request), only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(B)    Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306    Regulations With Respect to Exchanges and Transfers.  (A) In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the City shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of this Indenture.  All Bonds surrendered in such exchanges or transfers shall be forthwith canceled by the Trustee.

13-53846-swr   Doc 2344-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 283 of 376
456

(B)     For every such exchange or transfer of Bonds, the City or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, and may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or transfer, which sums shall be paid by the Bondowner requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(C)     The Trustee shall not be required (i) to issue, exchange or transfer any Bond during a period beginning on the opening of business 15 days before the giving of a notice of redemption and ending on the date of the mailing of notice of such redemption, or (ii) to transfer or exchange Bonds called or being called for redemption, except the unredeemed portion of Bonds being redeemed in part.

Section 307     <u>Bonds Mutilated, Destroyed, Stolen or Lost</u>.  If any Bond shall become mutilated, the City, at the expense of the Registered Owner of the Bond, shall execute, and the Trustee shall authenticate and deliver, a new Bond of like tenor in exchange and substitution for the mutilated Bond, upon surrender to the Trustee of the mutilated Bond.  If any Bond issued under this Indenture shall be lost, destroyed or stolen, evidence of the loss, destruction or theft may be submitted to the Trustee and, if this evidence is satisfactory to both and indemnity satisfactory to the Trustee shall be given, and if all requirements of any applicable law including Act 354, Public Acts of Michigan, 1972, as amended ("Act 354"), being sections 129.131 to 129.135, inclusive, of the Michigan Compiled Laws have been met, the City, at the expense of the owner, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Bond so lost, destroyed or stolen.  In any such Bond shall have matured or shall be about to mature, instead of issuing a substitute Bond the Trustee may pay the same without surrender thereof.

Section 308     <u>Cancellation and Destruction of Bonds</u>.  All Bonds paid or redeemed by the City, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bond, together with all Bonds purchased by the Trustee, shall thereupon be promptly cancelled.  Bonds so cancelled may at any time be cremated or otherwise destroyed by the Trustee, who shall execute a Certificate of cremation or destruction in duplicate by the signature of one of its authorized officers describing the Bonds so cremated or otherwise destroyed.  Such executed Certificate shall be filed with the City and the other executed Certificates shall be retained by the Trustee.

Section 309     <u>Redemption</u>.  The Bonds shall be subject to optional and mandatory redemption as set forth in the form of Bonds attached hereto as Exhibit A and Exhibit B.  The Bonds shall only be redeemed in Authorized Denominations.  No partial redemption of Bonds is authorized, unless as a result of such partial redemption, the remaining Outstanding Bonds of a series shall be in Authorized Denominations.

Section 310     <u>Selection of Bonds to be Redeemed</u>.  Subject to any rules and procedures of a securities depository for Bonds held in book-entry form, in the event of redemption of less than all the Outstanding Bonds of like series and maturity, the Trustee shall assign to each such Outstanding Bond a distinctive number for each minimum denomination of the principal amount

15

thereof so as to distinguish each such minimum denomination from each other portion of the Bonds subject to such redemption. The Trustee shall select by lot, using such method of selection as it shall deem proper in its sole discretion, from the numbers of all such Bonds then Outstanding of such maturity, as many numbers as, at the minimum denomination for each number, shall equal the principal amounts of such Bonds to be redeemed. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; but only so much of the principal amount of each such Bonds of a denomination of more than the minimum denomination shall be redeemed as shall equal the minimum denomination for each number assigned to it and so selected. For the purposes of this Section, Bonds which have theretofore been selected by lot for redemption shall not be deemed Outstanding.

Any integral multiple of a minimum denomination may, if so specified by the provisions of a Supplemental Indenture, be utilized in connection with the partial redemption of Bonds issued pursuant to such Supplemental Indenture and such Bonds shall be subject to selection for redemption in the amount of such multiple but otherwise in accordance with this Section.

Section 311    Notice of Redemption. When redemption of Bonds is required by this Indenture, the Trustee shall give notice, in the name of the City, of the redemption of such Bonds. Such notice shall specify the Series and maturities of the Bonds to be redeemed, the Redemption Date and the place or places where amounts due upon such redemption will be payable and, if less than all the Bonds of any like maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the principal amount thereof to be redeemed. Such notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof in the case of registered Bonds to be redeemed in part only, together with interest accrued to the Redemption Date, and that from and after such date interest thereon shall cease to accrue and be payable. Such notice shall be given by first class mail or registered or certified mail, return receipt requested, not less than ten (10) business days nor more than sixty (60) days before the Redemption Date to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registry books, but failure so to mail any such notice shall not affect the validity of the proceedings for the redemption of Bonds with respect to which no such failure occurred; provided, however, that shorter periods before the Redemption Date during which notice pursuant to this Section must be given may be prescribed by a Bond Order or Supplemental Indenture as to Bonds issued pursuant to such Bond Order or Supplemental Indenture. As directed by the City, further notice shall be given by the Trustee in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 312    Payment of Redeemed Bonds. Notice having been given by mail in the manner provided in Section 311, the Bonds or portions thereof so called for redemption shall become due and payable on the Redemption Date so designated at the Redemption Price, plus interest accrued and unpaid to the Redemption Date, and, upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the

Redemption Price plus interest accrued and unpaid to the Redemption Date. If there shall be called for redemption less than the entire principal amount of a Bond, the City shall execute, the Trustee shall authenticate and the Trustee shall deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered at the option of the Owner, Bonds of like series and maturity in any of the authorized denominations. If, on the Redemption Date, moneys for the redemption of all the Bonds or portions thereof of any like series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been mailed as aforesaid, then, from and after the Redemption Date, interest on the Bonds or portions thereof of such series and maturities so called for redemption shall cease to accrue and become payable. If said moneys shall not be available on the Redemption Date, such Bonds or portions thereof shall continue to bear interest until paid or provided for at the same rate as they would have borne had they not been called for redemption.

<div align="center">

**ARTICLE IV**
**PLEDGE OF INDENTURE; SOURCES OF PAYMENT**
**AND SECURITY FOR THE BONDS**

</div>

Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest.  The City hereby grants a valid, binding, enforceable, non-avoidable, continuing postpetition security interest in, assigns, transfers, pledges, grants, conveys and hypothecates unto the Trustee and its successors and assigns, on behalf of the Bondowners, forever all of the right, title and interest of the City in all of the following described property (collectively, the "Trust Estate"):

(a)    All rights and interests of the City in the Pledged Income Tax Revenues, the Pledged Wagering Tax Revenues and the Asset Proceeds Collateral (collectively the "Collateral") in the following order of priority:

(i)    With respect to the Series 2014A Bonds: A first priority lien on (a) the Pledged Income Tax Revenues and (b) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2014B Bonds (items (a) and (b), collectively, the "Series 2014A Bonds Collateral").

(ii)    With respect to the 2014B Bonds: (a) A first priority lien on (i) the Pledged Wagering Tax Revenues and (ii) Asset Proceeds Collateral, with the Asset Proceeds Collateral shared pari passu with the Series 2014A Bonds, and (b) a second priority lien (second only to the lien securing the Series 2014A Bonds) on the Pledged Income Tax Revenues (items (a) and (b), collectively, the "Series 2014B Bonds Collateral"); and

(b)    Amounts on deposit from time to time in the Accounts created pursuant hereto subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein.

The Bonds are also limited tax general obligations of the City, which will be payable from ad valorem taxes annually levied on all taxable property within the City, subject to applicable constitutional, statutory and charter tax rate limitations. The Bonds have been granted

17

13-53846-swr    Doc 2344-6    Filed 12/16/13    Entered 12/16/13 12:39:01    Page 106 of 172
13-53846-swr    Doc 4344-6    Filed 04/29/14    Entered 04/29/14 23:00:23    Page 284 of 379
456

super-priority claim status under Section 364(c)(1) of the Bankruptcy Code (without the need to file any proof of claim) and shall also be payable in the manner provided by the Bankruptcy Court Order.

To the fullest extent provided by applicable laws, the money and property hereby pledged shall immediately be subject to the lien of such pledge without any physical delivery thereof, without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents or the possession or control by the Trustee over any of the Trust Estate, or further act and such lien shall be valid and binding against all parties having claims in tort, contract or otherwise against the City, irrespective of whether such parties have notice of the claim. Neither the Bond Orders authorizing the Bonds nor this Indenture nor any Supplemental Indenture need be recorded.

Section 402    Creation of Liens.  In order to effectuate the liens on the Collateral in favor of the holders of the Bonds, the City and the Trustee each hereby covenant to enter into the Account Control Agreements with the Depository Banks.

## ARTICLE V

## ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS

Section 501    Debt Service Fund.

(a) *Establishment of Debt Service Fund and Accounts.*  There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, a single trust fund designated the "Financial Recovery Bonds, Common Debt Service Fund" (hereinafter referred to as the "Debt Service Fund").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014A – Common Debt Service Account" (hereinafter referred to as the "Series 2014A Debt Service Account").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014B – Common Debt Service Account" (hereinafter referred to as the "Series 2014B Debt Service Account" and with the Series 2014A Debt Service Account, collectively, the "Debt Service Accounts").

(b)  *Deposits to Debt Service Fund.*  Five Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for each Series of Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amounts into the Debt Service Fund, for deposit to the applicable Accounts, for the payment of amounts owing with respect to the Bonds on such Interest Payment Date. Two Business Days prior to a scheduled Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for each Series of Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amounts into the Debt Service Fund, for

18

deposit to the applicable Accounts, for the payment of all outstanding principal, premium, if any, and interest on the Bonds.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2014A Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2014A Bonds on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2014A Debt Service Account, an amount sufficient to make the balance of the 2014A Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the 2014B Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Series 2014B Bonds on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement and deposit into the 2014B Debt Service Account, an amount sufficient to make the balance of the 2014B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date. In the event that, following the foregoing application of amounts on deposit in the Pledged Wagering Tax Account, there remains a shortfall in the 2014B Debt Service Account with respect to the Debt Service Requirement Amount owing on such Interest Payment Date, the Trustee shall withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement and deposit into the 2014B Debt Service Account, an amount sufficient therefrom to make the balance of the 2014B Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, following the foregoing deposits, the amounts on deposit in a Debt Service Account do not equal the Debt Service Requirement Amount owing on such Interest Payment Date in respect of either or both series of Bonds, the Trustee shall withdraw funds from the Bond Proceeds Fund in an amount sufficient to make the balance in the applicable Debt Service Fund equal to the Debt Service Requirement for the applicable series of Bonds owing on such Interest Payment Date.

Asset Proceeds Collateral, if any, shall be transferred by the City within three (3) Business Days of receipt to the Trustee. The Trustee shall deposit the Asset Proceeds Collateral into the Debt Service Fund, for further pro-rata deposit into the 2014A Debt Service Account and the 2014B Debt Service Account, respectively, based on the then Outstanding amount of the Bonds in each Series for the mandatory redemption of Bonds on the next succeeding Interest Payment Date as provided in the Bonds.

(c) *Withdrawals from the Debt Service Fund.*  The Trustee, in its capacity as transfer agent and paying agent for the Bonds, shall withdraw from the applicable Debt Service Account the amounts necessary to pay when due the Debt Service Requirement Amount for the Bonds on each Payment Date.

Section 502    Costs of Issuance Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial

Recovery Bonds Costs of Issuance Fund" (the "Costs of Issuance Fund"). Upon the issuance of the Bonds, there first shall be deposited in the Costs of Issuance Fund, a portion of the proceeds of the Bonds, in an amount as necessary to pay the costs of issuance of the Bonds. Moneys on deposit in the Costs of Issuance Fund shall be used by the Trustee to pay the costs related to the issuance of the Bonds.

Section 503    Bond Proceeds Fund. There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds, Bond Proceeds Fund" (the "Bond Proceeds Fund"). There shall be deposited into the Bond Proceeds Fund the remainder of the net proceeds of the Bonds after the deposit of amounts necessary to pay Costs of Issuance into the Costs of Issuance Fund pursuant to Section 502 hereof as specified by the Emergency Manager in the Bond Orders.

Within the Bond Proceeds Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014A – Bond Proceeds Account" (hereinafter referred to as the "Series 2014A Bond Proceeds Account"). Moneys on deposit in the Series 2014A Bond Proceeds Account shall be used only to fund the obligations owing in respect of the termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and the related counterparties, as set forth in the Bond Orders. Any balance remaining in such Account after such payment shall be transferred to the Series 2014B Bond Proceeds Account.

There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014B – Bond Proceeds Account" (hereinafter referred to as the "Series 2014B Bond Proceeds Account"). Moneys on deposit in the Series 2014B Bond Proceeds Account shall be used only to pay for the Quality of Life Projects all in such amounts and for such Quality of Life Projects as specified by the Emergency Manager in the Sale Order and shall also be available, for so long as any fund remain on deposit therein, for deposit to the Debt Service Fund in accordance with Section 501(b), provided, however, that the City shall not be required to seek the Trustee's approval for Quality of Life Project expenditures and shall not be required to keep any funds on deposit in the Series 2014B Bond Proceeds Account following the date or dates on which Quality of Life Project expenditures are made. Any balance remaining in such Account after the Maturity Date shall be deposited in the Series 2014B Debt Service Account.

Section 504    Amounts Remaining in Funds and Accounts. Any amounts remaining in any fund or account after full payment of the Bonds or provision for payment thereof shall be distributed by the Trustee to the City in accordance with Section 1102 and 1103.

Section 505    Approval of Account Control Agreements. The City shall cause to be deposited 100% of the Pledged Wagering Tax Revenues into the Pledged Wagering Tax Account, and greater than 90% of the Pledged Income Tax Revenues into the Pledged Income Tax Account, which such deposits and accounts shall be governed by the Account Control Agreements at all times. The Pledged Wagering Tax Account and the Pledged Income Tax Account constitute part of the Trust Estate; provided, however, that, subject to Sections 708(a)

and 902(b) hereof, the City shall be authorized to use all Pledged Wagering Tax Revenues and Pledged Income Tax Revenues for any purpose permitted by law, without limitation at any time, including during an Event of Default.

## ARTICLE VI

## **INVESTMENT OF FUNDS**

Section 601    Permitted Investments.  All money held by the Trustee pursuant to this Indenture shall be invested by the Trustee in accordance with written instructions from the City in Permitted Investments for the funds of the City.  If the Trustee does not receive written investment direction from the City, the Trustee shall invest all money held by it as provided in subsection [(f)] hereof.  For purposes of this Article III, "Permitted Investments" shall mean and include any of the following, as may be further restricted in each Sale Order or Supplemental Indenture for the related series of Bonds:

(a) bonds, securities, and other obligations of the United States or an agency or instrumentality of the United States;

(b) certificates of deposit, savings accounts, deposit accounts, or depository receipts of a financial institution having a long term rating of not less than A2/A/A;

(c) commercial paper rated at the time of purchase within the highest classifications (A-1/P-1/F1) established by not less than 2 standard rating services and that matures not more than 90 days after the date of purchase (but in any event no later than when the funds are required);

(d) repurchase agreements consisting of instruments listed in subdivision (a);

(e) Bankers' acceptances of United States banks rated at least A2/A/A;

[(f) mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, with authority to purchase only investment vehicles that are legal for direct investment by a public corporation, however, a mutual fund is not disqualified as a permissible investment solely by reason of one of the following:

(i) the purchase of securities on a when-issued or delayed delivery basis,

(ii) the ability to lend portfolio securities as long as the mutual fund receives collateral at all times equal to at least 100% of the value of the securities loaned, or

(iii) the limited ability to borrow and pledge a like portion of the portfolio's assets for temporary or emergency purposes;

(g) obligations described in subdivisions (a) through (f) if purchased through an interlocal agreement under the Urban Cooperation Act of 1967, Act 7, Public Acts of Michigan, 1967 (Ex Sess), as amended, MCL 124.501 to 124.512;

21

(h) investment pools organized under the Surplus Funds Investment Pool Act, Act 367, Public Acts of Michigan, 1982, as amended, MCL 129.111 to 129.118; and

(i) The investment pools organized under the Local Government Investment Pool Act, Act 121, Public Acts of Michigan, 1985, MCL 129.141 to 129.150.]

Section 602    Valuation and Sale of Investments.  In computing the amount in any Account, obligations purchased as an investment of moneys therein shall be valued at their Value, as hereinafter defined, plus accrued interest in each case.  "Value" means the value of any investments calculated as follows:

(a)    as to investments the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, then in The New York Times): the average of the bid and asked prices for such investments so published on or most recently prior to the time of determination;

(b)    as to investments the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times: the average bid price at such time of determination for such investments by any two nationally recognized government securities dealers (selected by the Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service;

(c)    as to certificates of deposit and banker's acceptances: the face amount thereof, plus accrued interest, if any; and

(d)    as to any investment not specified above: the value thereof established by prior agreement between the City and the Trustee.

Except as otherwise provided herein, the Trustee shall sell, or present for redemption, any Permitted Investment whenever it shall be requested in writing by an Authorized Officer to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from any Account held by it in accordance with the terms of this Indenture.  As set forth hereunder a Permitted Investment may be credited on a pro rata basis to more than one Account and need not be sold in order to provide for the transfer of amounts from one Account to another.

**ARTICLE VII**

**PARTICULAR COVENANTS OF THE CITY**

The City covenants and agrees with the Trustee and the Owners of the Bonds as follows:

Section 701    Payment of Bonds.  The City shall duly and punctually pay or cause to be paid, as herein provided, the principal or Redemption Price of every Bond and the interest, if any, thereon, at the dates and places and in the manner stated in the Bonds, according to the true intent and meaning thereof.

Section 702    Power to Issue Bonds and Pledge Revenues, Funds and Other Property. As of the date hereof, the City is duly authorized to authorize and issue the Bonds and to enter

22

13-53846-swr    Doc 2344-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 289 of 472
13-53846-swr    Doc 4844   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 289 of 384
456

into, execute and deliver this Indenture and to pledge the assets and revenues purported to be pledged hereby in the manner and to the extent herein provided. As of the date hereof, the assets and revenues so pledged are and will be free and clear of any pledge, lien, charge or encumbrance thereon, or with respect thereto prior to the pledge created hereby, and all corporate or other action on the part of the City to that end has been and will be duly and validly taken. As of the date hereof, the Bonds and the provisions of this Indenture are and will be the valid and legally enforceable obligations of the City in accordance with their terms and terms of this Indenture. The City shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Revenues and other assets and revenues, including rights therein pledged under this Indenture, and all the rights of the Bondowners under this Indenture against all claims and demands of all persons whomsoever.

Section 703    Maintenance of Perfected Security Interests; Further Assurances; Notices of Default. At any and all times the City shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be reasonably necessary or desirable to convey, grant, pledge and perfect to the Bondowners first priority security interests in the Trust Estate. The City shall notify the Trustee immediately upon becoming aware of any Event of Default or occurrence of an event that, with the passage of time, will become an Event of Default hereunder.

Section 704    [Tax Covenants. The City shall at all times do and perform all acts and things necessary or desirable in order to assure that interest paid on Tax-Exempt Bonds shall, for the purposes of federal income taxation, be excludable from the gross income of the recipients thereof and exempt from such taxation under Section 144(b) of the Code, or any successor provisions thereto. The City shall comply with all requirements of any Non-Arbitrage and Tax Compliance Certificate delivered by the City in connection with a Series of Tax-Exempt Bonds.]

Section 705    Compliance With Conditions Precedent. Upon the date of issuance of any of the Bonds, all conditions, acts and things required by law or by this Indenture to exist, to have happened or to have been performed precedent to or in the issuance of such Bonds shall exist, have happened and have been performed, or will have happened or been performed, and such Bonds, together with all other indebtedness of the City, shall be within every debt and other limit prescribed by law.

Section 706    Accounts and Reports. The City shall keep, or cause to be kept, proper books of record and account in which complete and accurate entries shall be made of all of its transactions relating to the Bonds or the Trust, the Pledged Income Tax Account, the Pledged Wagering Tax Account, the Asset Proceeds Collateral and all Accounts established by this Indenture which shall at all reasonable times be subject to the inspection of the Trustee.

Section 707    Issuance of Additional Obligations. The City hereby covenants that as long as the Bonds are outstanding, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Collateral or that has a superior payment priority to the Bonds. The issuance of any series of bonds hereunder, other than the Bonds, shall require compliance with Section 1002 of this Indenture.

Section 708    Wagering Tax and Income Tax Revenues and Accounts.  The City shall at all times:

(a)   maintain a minimum balance of no less than $5,000,000 in each of the Pledged Wagering Tax Account and Pledged Income Tax Account;

(b)  maintain Pledged Wagering Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(c)  maintain Pledged Income Tax Revenues at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(d)  (i) take such steps as shall be reasonably necessary to levy the taxes generating the Pledged Income Tax Revenues and the Pledged Wagering Tax Revenues to the maximum extent authorized by applicable law and (ii) take such steps as shall be reasonably necessary to collect the taxes generating the Pledged Income Tax Revenues and the Pledged Wagering Tax Revenues to the maximum extent required by the City to comply with its covenants and obligations under the Financing Documents.

Section 709    Asset Proceeds Collateral.    The City shall deposit Asset Proceeds Collateral with the Trustee within three (3) Business Days of receipt thereof, for deposit in accordance with Section 501(b) hereof.  Furthermore, the City hereby covenants that as long as the Bonds are outstanding, no Asset Proceeds Collateral shall be used for any purpose other than payment of the principal of and interest on the Bonds, unless the City shall request in writing a use for such proceeds other than as set forth in this Section 709, and majority of Bondowners shall consent in writing.

Section 710    Contesting Enforceability.  The City covenants that it will not seek to invalidate or refute the enforceability of any Financing Document, notwithstanding the dismissal of the Bankruptcy Case.

# ARTICLE VIII

# THE TRUSTEE

Section 801    Powers and Duties of Trustee.

(a)     The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

(b)     In the event that any of the Bonds are issued on a tax exempt basis to finance working capital expenditures by the City, the Trustee hereby covenants, commencing [_____], 2015 and each [_____] thereafter so long as the Tax-Exempt Bonds are outstanding, to send an Authorized Officer of the City notice requesting the City to engage Bond Counsel to provide a Continuing Exclusion Opinion (as defined in the Bond Authorizing Order). The Emergency Manager has covenanted in the Bond Orders on behalf of City that upon receipt of such notice from the Trustee, the City shall cause Bond Counsel to provide the Continuing Exclusion Opinion as required above.  The City may conclusively rely on such Continuing Exclusion Opinion in complying with the provisions therein.  In the event the City fails to obtain the Continuing Exclusion Opinion, or Bond Counsel determines that the conditions necessary to provide the Continuing Exclusion Opinion for the Tax-Exempt Bonds that remain outstanding after the next succeeding Extraordinary Redemption Date (as defined in the Bond Authorizing Order) do not exist, the City shall redeem the Tax-Exempt Bonds in accordance with the provisions set forth in the Sale Order and this Indenture.

(c)     The Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Indenture, or of any supplements thereto or instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the Bonds intended to be secured hereby.

(d)     The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Indenture.

(e)     The Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(f)     As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained, the Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be found to secure the same.

(g)     The permissive right of the Trustee to do things enumerated in this Indenture, as amended, shall not be construed as a duty and the Trustee shall not be answerable for other than its [gross] negligence or willful misconduct.  The immunities and exceptions from liability of the Trustee shall extend to its officers, directors, employees and agents.

(h)     The Trustee shall not be required to give any note or surety in respect to the execution of its rights and obligations hereunder.

(i)     All moneys received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Indenture, as

amended, or by law. The Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(j)     The Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Indenture or to take any steps in the execution of the trusts created by this Indenture or in the enforcement of any rights and powers under this Indenture until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(k)     The Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds, except for liability for its own gross negligence or willful misconduct.

(l)     The Trustee may become the holder of Bonds with the same rights it would have if it were not Trustee, and, to the extent permitted by law, may act as depositary for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or not such committee shall represent the holders of a majority in principal amount of the Bonds then outstanding.

(m)     The Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(n)     The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or in exercising any trust or power conferred upon the Trustee under this Indenture. If the Trustee receives directions from more than one such group of holders, it shall act in accordance with the direction of the holders holding the largest aggregate principal amount of the Bonds at the time outstanding, provided that such directions are consistent with this Indenture.

(o)     The Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the Bonds from its own funds; but rather the Trustee's obligations shall be limited to the performance of its duties hereunder.

(p)     Whether or not therein expressly so provided, every provision of this Indenture or related documents, including the Account Control Agreements, relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article.

(q)     The Trustee is authorized and directed by the City to enter into the Account Control Agreements.

(r)     The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. If an Event of Default shall have occurred

26

and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs in exercising any rights or remedies or performing any of its duties hereunder.

Section 802    Fees and Expenses of Trustee.  (a) The Trustee shall be entitled to reasonable fees for services rendered under this Indenture, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services.  Such fees and expenses shall be payable by the City in an amount agreed to by the City and the Trustee.

(b)    If the City shall fail to make any payment required by this Section 802, the Trustee may make such payment from the Debt Service Funds, and shall be entitled to a preference therefor over any Outstanding Bonds.

Section 803    Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale.  (a)   The Trustee and any successor Trustee may resign only upon giving 60 days' prior written notice to the City and the Bondowners.  Such resignation shall take effect only upon the appointment of a successor Trustee as described in Section 805 below and the acceptance of such appointment by the successor Trustee.   Upon appointment of a successor Trustee, the resigning Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Pledged Wagering Tax Revenues, Pledged Income Tax Revenues and Asset Proceeds Collateral, and transfer and assign its right, title and interest in the Indenture to the successor Trustee.  The successor Trustee shall meet the requirements of Section 803(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)    In case the Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (to the extent that no "Event of Default" shall have occurred and be continuing under this Indenture), be appointed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Trustee, and the successor Trustee.  In the absence of an appointment by the Bondowners, the City may appoint a successor Trustee, by an instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Trustee and the successor Trustee.  If the owners of the Bonds and the City fail to so appoint a successor Trustee, hereunder within thirty (30) days after the Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor trustee.  Every such Trustee appointed pursuant to the provisions of this Section 803 (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $500,000,000 and having a long term rating of

27

at least A2/A/A, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)     Any corporation or association into which the Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 803(b) hereof, shall be and become successor Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 804     Removal of Trustee.   The Trustee may be removed at any time by an instrument or concurrent instruments in writing (a) delivered to the  Trustee and the City and signed by  the owners of a majority in aggregate principal amount of Bonds then Outstanding, or (b) delivered to the Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, the Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the Bonds then Outstanding.  No removal of the Trustee and no appointment of a successor Trustee shall become effective until the successor Trustee has accepted its appointment in the manner provided in Section 803 hereof. Upon such removal and the payment of its fees, costs and expenses, the Trustee shall assign to the successor Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 803 hereof.

Section 805     Appointment of and Transfer to Successor Trustee.   If the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor trustee shall be appointed by the City as soon as possible thereafter in accordance with this Article VIII.

Any successor Trustee appointed hereunder shall execute and deliver to its predecessor and the City an instrument in writing accepting such appointment and thereupon shall become fully vested with all the powers and duties under the Indenture, as amended.  The Trustee, if it ceases to act as Trustee, shall execute, acknowledge and deliver such instruments of conveyance, without warranty or recourse, and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the trusts, powers and duties under the Indenture, as amended, and any property held by it under the Indenture, as amended, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.

## ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES ON DEFAULT

Section 901     Events of Default.   Any one or more of the following events shall be deemed an "Event of Default" hereunder:

(a)    The failure of the City to pay, when due, any interest on any or all of the Bonds on any date when such interest is due and payable;

(b)    The failure of the City to pay, when due, any principal or premium, if any, of any or all Bonds, whether on the Maturity Date or redemption thereof,

(c)    The City shall default in the performance or observance of any of the other covenants, agreements or conditions on its part contained in this Indenture (other than covenants otherwise specifically covered by this Section 901) and such default is not remedied within fifteen (15) days following receipt by the City of notice from the Trustee of such default;

(d)    If (i) the City shall fail to make a scheduled payment in excess of $25,000,000, when due and owing, in respect of Post-Petition Date Debt (other than the obligations with respect to the Bonds), or (ii) Post-Petition Date Debt in an outstanding aggregate principal amount exceeding $25,000,000 is accelerated, which results in such debt becoming immediately due and payable, and in the case of either (i) or (ii), such event is not cured within any grace period provided therefor in the applicable documents;

(e)    If material post-petition judgments, which are final and nonappealable, are rendered against the City involving liability in an aggregate amount exceeding $25,000,000 and such judgments are not paid within thirty (30) days of such judgments becoming nonappealable;

(f)    If a court of competent jurisdiction finds that any of the Financing Documents are invalid or unenforceable and such finding is not stayed pending appeal;

(g)    If there is a written assertion by the City or an Authorized Officer that any Financing Document or the Bankruptcy Court Order is invalid or otherwise not binding on the City and such written assertion is not retracted or otherwise disavowed within five (5) days of publication;

(h)    If the Bankruptcy Case is dismissed prior to the confirmation of a plan of adjustment, and the order dismissing the Bankruptcy Case is not stayed pending appeal;

(i)    The reversal or modification, by the entry of an order that is not stayed pending appeal and in a manner adverse to the Registered Owners, of the Bankruptcy Court's order dated December 5, 2013 [Docket No. 1945] granting the City chapter 9 bankruptcy relief;

(j)    If the City shall file, consent to, or fail to file a written opposition to a motion seeking dismissal of the Bankruptcy Case within the applicable times established by the Bankruptcy Court for filing a response to such dismissal motion;

(k)    If the Bankruptcy Court shall grant any super-priority claim pursuant to sections 364(c)(1), 503 and 507(a)(2) of the Bankruptcy Code in favor of  any party other than the Registered Owners (other than as permitted under the Financing Documents);

(l)    If there is (i) entry of an order by a court of competent jurisdiction, without the prior written consent of the Registered Owners holding 51% of the Outstanding amount of the Bonds, amending, supplementing or otherwise modifying the Bankruptcy Court Order in a

29

13-53846-swr  Doc 2344-6  Filed 12/16/13  Entered 12/16/13 12:39:01  Page 296 of
13-53846-swr  Doc 4344-6  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 186 of 172  391
456

manner adverse to the Registered Owners, or (ii) an order of a court of competent jurisdiction reversing, vacating or staying the effectiveness of the Bankruptcy Court Order, and in either (i) or (ii), such order is not stayed pending appeal;

(m)     If the liens or super-priority claims granted in the Bankruptcy Court Order in respect of the Bonds shall cease to be valid, perfected and enforceable in all respects with the priority described herein and therein;

(n)     The failure of the City to comply with the provisions of Section 708(a) with respect to Pledged Wagering Tax Revenues and the Wagering Tax Revenue Account and such failure is not cured within two (2) Business Days;

(o)     The failure by the City to comply with the provisions of Section 708(a) with respect to Pledged Income Tax Revenues the Income Tax Revenue Account and such failure is not cured within two (2) Business Days;

(p)     If the City ceases to be under the control of the Emergency Manager, or successor emergency manager, for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Registered Owners holding 51% of the Outstanding amount of the Bonds, or a designee or successor as consented to by the City (which consent shall not be unreasonably withheld), to ensure continued financial responsibility shall have been established pursuant to Act 436 or any successor statute; or

(q)     Any representation or warranty made by the City in this Indenture, any Financing Document or in any certificate, document, instrument, opinion or financial statement made or delivered pursuant to or in connection with this Indenture or with any of the other Financing Documents, shall prove to have been incorrect, incomplete or misleading in any material respect as of the time of such representation or warranty.

Section 902     Remedies.  (a)  *General*.  Upon the occurrence of an Event of Default, subject to Section 1108, the Trustee may pursue any remedy permitted by law to enforce the performance of or compliance with the provisions of this Indenture, including without limitation, the acceleration of the Bonds in accordance with Section 902(b) below.

(b)     *Acceleration.*  Upon the occurrence and continuation of an Event of Default, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed, in its own name,  to protect or enforce the rights of the Trustee and the holders of the related Bonds by declaring the principal of and interest on the Bonds to be immediately due and ordering payment in the manner provided by Section 902(c)(i) and/or Section 902(c)(ii) hereof provided that interest shall continue to accrue on unpaid principal at the Default Rate until paid in full.

(c)     *Post-Maturity Debt Service*.   Upon an Event of Default, and following acceleration of the Bonds pursuant to Section 902(b):

(i)     The Trustee, on behalf of the Bondowners of the Series 2014A Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2014A Bonds on a monthly basis (such monthly payment date constituting a Redemption

30

Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro-rata proceeds of any Asset Proceeds Collateral, shared with the Series 2014B Bonds.

(ii)    The Trustee, on behalf of the Bondowners of the Series 2014B Bonds, shall be entitled to accelerated, mandatory payment of principal and interest of the Series 2014B Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to (i) $4,000,000 per month from the Pledged Wagering Tax Revenues and payable from the Pledged Wagering Tax Account in accordance with the terms of the Wagering Tax Account Control Agreement, and (ii) following payment in full of the Series 2014A Bonds, an additional $4,000,000 per month from the Pledged Income Tax Revenues and payable from the Pledged Income Tax Account in accordance with the terms of the Income Tax Account Control Agreement, plus the pro rata proceeds of any Asset Proceeds Collateral, shared with the Series 2014A Bonds;

(iii) Upon any acceleration of the Bonds following the occurrence of an Event of Default under Section 901(a), (b), (f), (g), (h), (i), (j), (k), (l), or (m), the Trustee, on behalf of the Bondowners of the Bonds, shall be entitled to apply any moneys remaining on deposit in the Bond Proceeds Fund to the Bonds;

(iv) Payment on the Bonds is not limited to the Trust Estate, and the Trustee, on behalf of the Bondowners of all of the Bonds, may be entitled to seek payment from the City, (without the need to file any proof of claim), in accordance with the Section 364(c)(1) superpriority claim status of the Bankruptcy Court Order; and

(v) The monthly payment provisions of subsections (i) and (ii) above do not modify the obligation of the City to pay the Bonds in full upon (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, or (iii) [_____], the date that is two years and six months after the Date of Original Issue.

(d)    *Enforcement.*   Upon the occurrence and continuation of an Event of Default, subject to Section 1108, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by mandamus or other suit, action or proceedings at law or in equity, to (i) enforce the rights of the Registered Owners and the Obligations of the City under this Indenture and the Financing Documents, (ii) enjoin any act or thing which may be unlawful or in violation of the rights of Registered Owners; and (iii) enforce the rights of Registered Owners in and to the Trust Estate.

(e)    *Owner Right of Action.*   If the Registered Owners holding 25% of the Outstanding amount of the Bonds shall have complied with all conditions prerequisite to the requiring of action on the part of the Trustee and said Trustee shall refuse to act, then one or more of the

Owners of the Bonds shall have the right to bring any action or actions as the Trustee might have instituted for and on behalf of the Owner of all Outstanding Bonds.

Section 903    Waiver of Default.  Following an Event of Default, the Trustee shall at the direction of the Registered Owners holding 51% of the Outstanding amount of the Bonds, waive an Event of Default hereunder and annul its consequences.  No such waiver shall extend to or affect any subsequent Event of Default or shall impair any right consequent thereon.

Section 904    Possession of Bonds by Trustee Not Required.  All rights of action under this Indenture enforceable by the Trustee may be enforced by it without the possession of any of the Bonds or the production thereof at any proceedings relative thereto.  Any action instituted by the Trustee shall be brought in its name for the benefit of all the holders of the related Bonds, subject to the provisions of this Indenture.

Section 905    Remedies Cumulative.  The rights and remedies of the Trustee and the holders of Bonds shall be cumulative, and any failure on its or their part to act shall not constitute a waiver of any right or remedy to which it or they may be entitled to hereunder or under applicable law or in equity.

Section 906    Knowledge by Trustee of an Event of Default.  The Trustee shall not be deemed to have knowledge of any Event of Default under Section 901(c) hereinabove unless and until it shall have actual knowledge thereof, or shall have received written notice thereof from any Bondowner at its address and location specifically designated for receiving notices pursuant hereto.  Except as otherwise expressed herein, the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or of any of the documents executed in connection with the Bonds, or as to the existence of an Event of Default hereunder.

Section 907    Application of Monies.  All moneys received by the Trustee and deposited in the Debt Service Fund pursuant to any right given or action taken under the provisions of this Article shall be applied first to the payment of the costs and expenses of the proceedings resulting in the collection of such moneys and expenses, liabilities, advances and charges incurred or made by the Trustee.

## ARTICLE X

## SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE

Section 1001    Modifications and Amendments Not Requiring Consent.  Any provision of this Indenture may be amended at any time by the parties hereto, without the consent of the holders of the Bonds, for any one or more of the following purposes:

(a)    To cure any ambiguity or formal defect or omission in this Indenture or in any supplemental agreement.

(b)    To grant to or confer upon the Trustee for the benefit of the holders of Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the Trustee.

32

13-53846-swr   Doc 2344-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 299 of 394
18-53846-swr   Doc 2144   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 299 of 372
456

(c)     To accomplish, implement or give effect to any other action which is expressly authorized or required by this Indenture.

(d)     To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the Bonds.

(e)     To appoint separate or successor trustees, paying agents or bond registrars.

(f)     To make any other change which, in the judgment of the Trustee, is not to the material prejudice of holders of the Bonds, upon the opinion of Bond Counsel or other professionals.

Within thirty (30) days after the execution of any supplement pursuant to this Section 1001, the Trustee shall cause notice thereof to be mailed, postage prepaid to all owners of Bonds at their addresses as they appear on the registration books. The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Trustee for inspection by all such holders. Any such supplement so executed shall be valid and binding notwithstanding any failure of the Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1002   Amendments Requiring Consent.  Any provision of this Indenture may be amended at any time by written agreement of the parties hereto, but, except as provided in this Section 1002, no such amendment made after the issuance of any Bonds shall become effective until approved in writing by the holders of a majority of the principal amount of all outstanding Bonds, other than those in the possession of the City or under its control; provided, however, no such amendment may (i) extend the maturity of the principal of or the interest on any Bonds or (ii) reduce the principal amount of any Bonds or the rate of interest thereon, or (iii) grant a privilege or priority of any Bonds over any other Bonds of the same series, or (iv) reduce the aggregate principal amount of the Bonds required for consent to such supplemental or amendatory indenture unless approved by the holders of all outstanding Bonds. Nothing herein contained, however, shall be construed as making necessary the approval of the holders of Bonds of the execution of any supplement as authorized in Section 1001 of this Article.

If at any time the City shall request the Trustee to execute any supplement for any of the purposes of this Section 1002, the Trustee shall cause notice of the proposed supplement to be mailed, postage prepaid to all applicable owners of registered Bonds at their addresses as they appear on the registration books. The notice shall briefly set forth the nature of the proposed supplement and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by any holders of Bonds. The Trustee shall not, however, be subject to any liability to any holder of Bonds by reason of its failure to mail the notice required by this

Section 1002, and any such failure shall not affect the validity of such supplement when executed as provided in this Section.

Whenever, at any time within one year after the date of the first mailing of such notice, the City shall deliver to the Trustee an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the Bonds outstanding, which instrument or instruments shall refer to the proposed supplement described in such notice and shall specifically consent to and approve the acceptance thereof in substantially the form of the copy thereof referred to in such notice, the Trustee may, thereupon, but not otherwise, execute such supplement, without liability or responsibility to any holder of any Bond, whether or not such holder shall have consented thereto. If the holders of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the acceptance of such supplement shall have consented to and approved the acceptance thereof as herein provided, no holder of any Bonds shall have any right to object to the acceptance of said supplement, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the acceptance thereof or to enjoin or restrain the Trustee from executing the same or from taking any action pursuant to the provisions thereof.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of Bonds outstanding shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1003   <u>Consent of Trustee</u>. Prior to executing any supplement to this Indenture, the Trustee shall be entitled to receive and shall be fully protected in relying upon a certificate of the City as proof of the necessity or desirability of any such supplement provided for in Section 1001 hereof and an opinion of counsel for the City that such supplement complies with the provisions of such Section. Such certificate shall specifically request the Trustee to enter into such supplement. Whenever the provisions of Sections 1001 and 1002 hereof require the Trustee to include in notices to holders of Bonds a description of a proposed amendment or supplement, such description shall be provided by the City.

The Trustee may in its discretion, but shall not be obligated to, enter into any such supplement to this Indenture authorized by Section 1001 and 1002 which adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 1004   <u>General Provisions Relating to Supplemental Indentures</u>. This Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article X. Nothing contained in this Article X shall affect or limit the rights or obligations of the City to execute and deliver to the Trustee any instrument elsewhere in this Indenture provided for or permitted to be delivered to the Trustee.

A copy of every Supplemental Indenture entered into pursuant to this Indenture shall be accompanied by a Bond Counsel's Opinion stating that such Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, is valid and binding upon the parties to the Supplemental Indenture

34

and enforceable in accordance with its terms and, in the case of Bonds the interest upon which is excludable from gross income for federal income tax purposes, stating that such Supplemental Indenture will not adversely affect the exclusion from gross income for federal income tax purposes of the interest on such Bonds.

## ARTICLE XI

## **MISCELLANEOUS**

Section 1101   Notices.   Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Indenture shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

A.  If to the City, to:                     City of Detroit

Detroit, Michigan 48226
Attention: _____

B.  If to the Depository Bank, to:        _____

C.  If to the Trustee, to:                 _____

The City and the Trustee may by notice given hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 1102   Termination. This Indenture shall terminate following delivery of written direction from the City to the Trustee to so terminate, together with written notice: (1) that all Bonds have been paid in full at maturity or defeased (and for each series of Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to defease such Bonds in accordance with the applicable defeasance requirements are on deposit with the Trustee as of the date of the City's notice), and (2) that all fees owed to the Trustee have been paid in full.  Upon termination of this Indenture, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

The Trustee shall give written notice of the termination of this Indenture to each of the other parties listed in Section 1101 hereof.

Section 1103   Defeasance.  Bonds of each series shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon,

as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Trustee. Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Registered Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Indenture (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

Section 1104  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Indenture shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Indenture.

Section 1105  <u>Headings</u>.  Any headings shall be solely for convenience of reference and shall not constitute a part of the Indenture, nor shall they affect its meaning, construction or effect.

Section 1106  <u>Indenture Executed in Counterparts</u>.  This Indenture may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 1107  <u>Parties Interested Herein</u>.  Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Indenture on behalf of the City shall be for the sole and exclusive benefit of the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser.

Section 1108  <u>Jurisdiction</u>.  To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Indenture (including, without limitation, any actions by the Trustee or the Registered Owners pursuant to Section 902 hereof), or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; <u>provided</u>, <u>however</u>, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law

IN WITNESS WHEREOF, this Indenture has been signed on behalf of the City by its Emergency Manager and UMB Bank, N.A. to evidence the acceptance of the trust, has caused this Indenture to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____

    Its:  Emergency Manager

UMB BANK, N.A.,

as Trustee

By _____

Its: _____

**EXHIBIT A**

**<u>FORM OF SERIES 2014A BOND</u>**

**EXHIBIT B**

**FORM OF SERIES 2014B BOND**

**EXHIBIT C**

**FORM OF ACCOUNT CONTROL AGREEMENT**

**Exhibit D**
Irrevocable Direections

<center>**IRREVOCABLE DIRECTIONS**</center>

<center>_____, 2014</center>

_____

_____

_____

**Re:  Wagering Tax Payments to be made to the City of Detroit (the "City")**

Ladies and Gentlemen:

Please be advised that:

1.  All payments by _____ of all taxes owing to the City of Detroit in respect of the adjusted gross receipts earned by you and payable pursuant to the City of Detroit pursuant to Detroit City Code Section 18-14-3, as amended and any replacement or successor thereto and the Michigan Gaming Control and Revenue Act, Initiated Law 1 of the State of Michigan, effective December 5, 1996, as amended, and any replacement or successor thereto, together with any interest and penalties payable thereon (collectively, the "Pledged Wagering Taxes") shall be paid to the City by wire transfer in immediately available funds for credit to the City's account at Comerica Bank (the "Bank") as follows:

_____

_____

_____

For the avoidance of doubt, Pledged Wagering Taxes include Wagering Taxes, Additional Wagering Taxes and Alternative Taxes, (all as defined in Detroit City Code Section 18-14-2) including any interest and penalties thereon and all proceeds.

2.  No change to these Instructions shall be effective for any purpose without the prior written consent of UMB Bank, N.A., as Trustee (the "Trustee") under a Financial Recovery Bond Trust Indenture between the City of Detroit and UMB Bank, N.A., as Trustee, dated _____, 2014, (the "Indenture").

3.  These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Trustee.

4.  These Instructions shall terminate upon written notice of the Bank and the Trustee that the Indenture has been terminated.

5.  These Irrevocable Directions amend, restate and replace in their entirety those certain Irrevocable Instructions given by the City of Detroit to you on June 23, 2009.

6. These Instructions are binding on you, your successors and assigns.

                                        CITY OF DETROIT


                                        _____
                                        Kevyn Orr, Emergency Manager

Acknowledged and Agreed:

[SEPARATE ACKNOWLEDGMENT BLOCK TO BE ADDED FOR EACH CASINO]

# **EXHIBIT B**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),  503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2),  904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order") *inter alia*:[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax  (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment

that are defined in Section 101 or 102 of the Bankruptcy Code have the meanings

Letter and the Fee Letter, the "Bond Documents"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond Documents;

(v)    authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees,

_____

assigned to them by the Bankruptcy Code.

the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's

attorneys, advisers, accountants, and other consultants, all to the extent provided in

and in accordance with the terms of the Bond Documents (as applicable);

(vi)   vacating and modifying the automatic stay imposed by Sections 362

and 922 of the Bankruptcy Code to the extent necessary to implement and

effectuate the terms and provisions of the Bond Documents and this Order, as

limited pursuant hereto; and

(vii)   authorizing the limitation of the City's right to assert claims to

surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code

to the extent set forth in paragraph 28 below;

The Court having considered the Motion, the Bond Documents attached to

the Motion (the "Filed Bond Documents"), the ~~Declarations~~**Declaration** of James

Doak ~~and Charles M. Moore~~ in Support of the Motion, the exhibits attached thereto

and hereto, and the evidence and arguments submitted at the hearing on the Motion

~~held~~**commencing** on [●]**December 17**, 2013 (the "Hearing"); and notice of the

Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014

and no further notice being required; and the Hearing to consider the relief

requested in the Motion having been held and concluded and all objections, if any,

thereto having been withdrawn, resolved or overruled by the Court; and it

appearing to the Court that granting the relief requested is fair and reasonable and

in the best interests of the City, ~~its creditors and all parties in interest~~; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. _Petition Date_. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case. The order for relief in this case was entered on [— ]**December 5**, 2013.

B. _Jurisdiction and Venue_. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    *City's Stipulations*.  The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

D.    *Findings Regarding the Postpetition Financing*.

(i)    ~~*Need for Postpetition Financing*.  The City's obtaining credit pursuant to the Post-Petition Facility will enable the City to continue revitalization efforts, save tens of millions of dollars in annual debt service (in the form of scheduled swap payments) and provide for investment in the City's delivery of municipal services to its businesses and residents.~~

6

(iii**i**)   *No Credit Available on More Favorable Terms*.  Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Post-Petition Facility.  The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the Bond Documents, (2) superpriority claims and Liens and (3) the other protections set forth in the Bond Documents and this Order.

(iiii**ii**)   *Use of Proceeds of the Post-Petition Facility*.  As a condition to the entry into the Bond Documents and the extension of credit under the Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the Post-Petition Facility shall be used, in each case in a manner consistent with the terms and conditions of the Bond Documents, solely (a) with respect to the Quality of Life Bond, for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City and (b) with respect to the Swap Termination Bond, to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General

Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E. *Section 506(c)*. Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F. *Good Faith and Jurisdictional Matters*.

(i) *Willingness to Provide Financing*. The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to: (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond

8

~~Obligation~~**Obligations**, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii)    *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*.  The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties.  Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express

9

13-53846-swr   Doc 4844-6   Filed 12/16/13   Entered 12/16/13 12:39:10   Page 320 of 415
13-53846-swr   Doc 2143   Filed 12/09/14   Entered 12/09/14 23:00:23   Page 320 of 472
456

reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for ~~valid~~ purposes and uses **_that are permitted by law_**, and not in violation of the Bankruptcy Code.  The Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

G.  _Act 436 Approval Not Required_.  On October 21, 2013, in accordance with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the Post-Petition Facility.  The City Council failed to offer an alternative proposal during the time period prescribed in Section 19(2) of Act 436. The City has requested approval of the Post-Petition Facility by the Emergency Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the Michigan Home Rule City Act, Public Act 279 of 1909.  Because the City Council failed to offer a timely alternative proposal, approval of the Post-Petition Facility by the Board under Act 436 is not required to authorize the City to enter into the Bond Documents, which are valid and enforceable according to their terms as a result of this Order and applicable non-bankruptcy law.

H.  _Notice_.  Notice of the Hearing and the relief requested in the Motion

10

13-53846-swr   Doc 2143-6   Filed 12/16/13   Entered 12/16/13 12:39:01   Page 321 of 416
13-53846-swr   Doc 4844   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 432 of 472
456

has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

13-53846-swr    Doc 4344-6    Filed 04/29/14    Entered 04/29/14 23:09:10    Page 322 of 417
13-53846-swr    Doc 2143    Filed 12/16/13    Entered 12/16/13 12:39:10    Page 443 of 472
456

IT IS HEREBY ORDERED that:

1.    <u>Motion Approved</u>.  The Motion is granted, the Financing (as defined below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2.    <u>Objections Overruled</u>.  All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

**<u>Post-Petition Facility Authorization</u>**

3.    <u>Authorization of the Financing and Bond Documents</u>.  The Filed Bond Documents are hereby approved.  The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents.  The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents.  Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.    <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the

Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the Bond Obligations (collectively, the "Financing").

5.      Bond Obligations.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents.  The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents.  No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      Liens and Collateral.  **(a)** In order to secure the Bond Obligations, effective ~~immediately~~ upon ~~entry of this Order~~**the Closing Date** and without the necessity of the execution, recordation of filings by the City of financing

statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "Liens") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax

Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the "<u>Swap Termination Bond Collateral</u>", and together with the Quality of Life Bond Collateral, the "<u>Collateral</u>").

**(b)      Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or of any other assets pledged to secure any of the Water/Sewer Bonds.  This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.  The terms, "Trustee,"  "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No.**

**1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds.  The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.**

7.    Direction of Pledged Wagering Tax Revenue.  ~~Any~~**On, and after the Closing Date, any** entity that collects or holds Pledged Wagering Tax Revenue, shall deposit ~~daily~~ such Pledged Wagering Tax Revenue into the Pledged Wagering Tax Account **in the name of the City** held at the Wagering Tax Depository Bank pursuant to ~~instructions by the City, and consistent with the terms of the Wagering Tax Account Control Agreement.~~**irrevocable directions (the "Irrevocable Directions") by the City in the form attached hereto as Exhibit D.  Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "Gaming Act"), or their certified development agreements.**

8.    Lien Priority.  The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral.  Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise

and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason.  The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code.  No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9.    Superpriority Claims.  Upon ~~entry of this Order~~**the Closing Date**, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "Superpriority Claim") for all Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City.  **There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the**

**one hand, and the City, on the other, in respect of ad valorem property tax revenue (the "Property Tax Revenue"). To the extent this Court finds and determines (and pending such finding or determination), or approves any settlement or confirms any plan of adjustment that provides that any Property Tax Revenue of the City is subject to a property interest (such as a lien or pledge) of any holders of limited or unlimited tax general obligation bonds issued by the City or that such Property Tax Revenue is not generally available for use by the City other than for payment of such limited or unlimited general obligation bonds and is not available for distribution to general unsecured creditors as part of a plan of adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.**

10.    <u>No Obligation to Extend Credit</u>.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

11. ~~Use of Post-Petition Facility Proceeds. From and after the Petition Date, the City shall use the Post-Petition Facility only for the purposes specifically set forth in this Order and the Bond Documents.~~

**Provisions Common to Financings**

~~12~~**11**. Amendment of the Bond Documents. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements. **Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos**

**by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.**

~~13~~**12**. Modification of Automatic Stay. The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order; and (e) authorize the City to pay, and the Indenture Trustee to retain and apply, all payments required to be made to the Indenture Trustee, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order.

~~14~~**13**. Perfection of Liens. This Order shall be conclusive evidence of the

validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein. **Upon satisfaction of the conditions to termination set forth in section 14.4 (a) of that certain Collateral Agreement among the City, Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association (the "Custodian") and the Other Persons Party thereto dated as of June 15, 2009 (the "Collateral Agreement"), the Collateral Agreement shall terminate and any lien, security interest or other interest in the Pledged Wagering Revenues under the Collateral Agreement shall be terminated. The Custodian shall timely perform its obligations in connection with the termination of the Collateral Agreement, including, without limitation, the obligations set forth in Section 14.4 thereof and in particular, but also without limitation, paying any and all amounts due to the City under the Collateral Agreement and giving notice to the appropriate parties that the "Irrevocable Instructions" (as**

**defined in the Collateral Agreement) are terminated and no longer of any force or effect.**

14. **Right to Take Actions to Perfect.** Notwithstanding the foregoing, the Purchaser, the Indenture Trustee and the Bondholders are authorized, but not required, to file and obtain, as each deems necessary in its sole discretion, such financing statements, notices of liens, control agreements and other security documents to perfect in accordance with applicable non-bankruptcy law, or take constructive control over assets, take any other action, in each case, to validate and perfect the Liens and all such financing statements, notices, control agreements and other security documents shall be deemed to have been filed or recorded as of the date of entry of this Order; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the Liens. The City is authorized and directed to execute and deliver promptly upon demand to the Purchaser or the Indenture Trustee all such financing statements, notices, control agreements and other security documents as the Purchaser or the Indenture Trustee may request. The Purchaser or the Indenture Trustee, each in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording.

22

13-53846-swr Doc 2844-6 Filed 04/29/14 Entered 04/29/14 23:00:23 Page 333 of 428
13-53846-swr Doc 2143 Filed 12/16/13 Entered 12/16/13 12:39:10 Page 53 of 72
456

For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15. <u>Proceeds of Subsequent Financing</u>.  If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, including after the confirmation of any plan of adjustment filed in the Case, and such facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Bond Documents and this Order.

16. <u>Maintenance of Collateral</u>.  Until the indefeasible payment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall maintain: (a) the Collateral as required under the Bond Documents; and (b) the cash management system as required by the Bond Documents.

17. <u>Disposition of Collateral</u>.

(a)    Except as otherwise provided for in the Bond Documents, the

City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

(b)     In the event of any sale, lease or other disposition of any Collateral (a "Collateral Disposition"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18.     Maturity Date.  Upon the earliest to occur (such earliest date, the "Maturity Date") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

19.     No Dismissal.  The Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

20.     Events of Default.  The occurrence of an "Event of Default" under the Bond Documents or any violation of the terms of this Order shall constitute an event of default under this Order ("Event of Default"), unless waived in writing by the Indenture Trustee, upon consent of the Bondholders in accordance with the Bond Documents.

21.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, the Indenture Trustee, upon the direction of the Bondholders in accordance with the Bond Documents, may, among other things, declare all Bond Obligations owing under the Bond Documents to be immediately due and payable in accordance with the terms of the Bond Documents, but without affecting any of the Liens or the Bond Obligations (any such declaration, a "Termination Declaration").  The Termination Declaration shall be given by electronic transmission as provided in the Bond Documents (the date any such Termination Declaration is made, the "Termination Declaration Date").  Following the Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the Bond Documents without further order or approval from this Court.

22.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order.  The Indenture Trustee, on behalf of the

13-53846-swr   Doc 2143-6   Filed 12/16/13   Entered 12/16/13 23:00:23   Page 336 of 431
18-53846-swr   Doc 4844-6   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 158 of 172
456

Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

23. <u>Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other

court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

24. <u>Proofs of Claim</u>. The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds. Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

25. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and

Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Post-Petition Facility.

26. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the Bond Documents; (c) objecting or challenging

in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond Documents or this Order.

27. <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor or any direct, indirect or incidental beneficiary.

28. <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective

29

13-53846-swr    Doc 2143-6    Filed 12/16/13    Entered 12/16/13 12:39:10    Page 340 of 972
13-53846-swr    Doc 4844-6    Filed 04/29/14    Entered 04/29/14 23:00:23    Page 634 of 435
456

claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

29. <u>No Marshaling/Applications of Proceeds</u>. The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

30. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

31. <u>No Waiver by Failure to Seek Relief</u>. The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

32. <u>No Waiver by Seeking Relief</u>.  Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

33. <u>Binding Effect of Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

34. <u>No Modification of Order</u>.  Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not

seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with priority equal or superior to the Liens (except as specifically provided in the Bond Documents). The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

35. <u>Order Controls</u>. In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

36. <u>Survival</u>. The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order

that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case. Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

37. Effect of this Order. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

38. Retention of Jurisdiction. The Court has and will retain jurisdiction to

enforce this Order according to its terms.

## **Exhibit A**
Bond Purchase Agreement
~~Quality of Life~~**Swap Termination** Bond

**Exhibit B**
Bond Purchase Agreement
~~Swap Termination~~**Quality of Life** Bond

**Exhibit C**
Indenture

[[NYCORP:3434754v13:3136D: 11/04/2013--11:55 AM]]

## Exhibit D
## Irrevocable Direections

[[NYCORP:3434754v13:3136D: 11/04/2013--11:55 AM]]

| Summary Report: Litera Change-Pro ML IC 6.5.0.313 Document Comparison done on 12/16/2013 11:03:07 AM | |
|---|---|
| **Style Name:** JD Blackline | |
| **Original Filename:** Financing Proposed Order - FILING VERSION 11.5.2013.doc | |
| **Original DMS:** | |
| **Modified Filename:** Financing Order (REVISED for hearing 12.16.13).doc | |
| **Modified DMS:** | |
| **Changes:** | |
| **Add** | 30 |
| ~~Delete~~ | 24 |
| ~~Move From~~ | 0 |
| <u>Move To</u> | 0 |
| **Table Insert** | 0 |
| ~~Table Delete~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 54 |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

------------------------------------------------------x
                    :

In re                       : Chapter 9
                    :

CITY OF DETROIT, MICHIGAN,   : Case No. 13-53846
                    :

             Debtor.   : Hon. Steven W. Rhodes
                    :

------------------------------------------------------x

## SECOND NOTICE OF REVISED PROPOSED ORDER IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

**PLEASE TAKE NOTICE THAT:**

1.      On November 5, 2013, the City of Detroit, Michigan  ("<u>Detroit</u>" or the "<u>City</u>") filed the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1),364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (Docket No. 1520) (the "<u>Financing Motion</u>").  Attached to the Financing Motion as <u>Exhibit 1</u> is the proposed Order granting the Financing Motion (the "<u>Proposed Order</u>").

2.      Based on comments to the Proposed Order by parties in interest and the statements of parties in interest and the Court at the pre-trial conference on

December 13, 2013, the City made certain modifications to the Proposed Order and filed a revised Proposed Order on December 16, 2013 [Docket No. 2148] (the "Revised Proposed Order").  Based on additional discussions between the City and certain parties in interest, the City has agreed to make additional revisions to the Proposed Order to resolve certain objections to the Financing Motion.

3.      Accordingly, a further revised Proposed Order (the "Second Revised Proposed Order") with these modifications is attached hereto as Exhibit A. A blackline comparing the Second Revised Proposed Order with the Revised Proposed Order is attached hereto as Exhibit B.

Dated: December 16, 2013

Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens (IL 6206864)
JONES DAY
77 West Wacker
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Facsimile: ( 312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY

-3-
13-53846-tw  Doc 4314-6  Filed 04/28/14  Entered 04/28/14 22:10:23  Page 353 of
13-53846-swr  Doc 2314-6  Filed 12/16/13  Entered 12/16/13 18:10:13  Page 353 of
456
448

## CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Second Notice of Revised Proposed Order was filed and served via the Court's electronic case filing and noticing system on this 16th day of December, 2013.

/s/ David G. Heiman

-4-

13-53846-tjt  Doc 4314-6  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 354 of 33
13-53846-swr  Doc 2174-6  Filed 12/16/13  Entered 12/16/13 18:10:13  Page 4 of 86

456

449

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.:  13-53846 |

---

### ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),  503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2),  904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the

United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order") *inter alia*:[1]

(i)    authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)   authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order that are

Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment Letter and the Fee Letter, the "Bond Documents"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond Documents;

(v)    authorizing the City to pay the principal, interest, fees, expenses and

defined in Section 101 or 102 of the Bankruptcy Code have the meanings assigned to

3

other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)    vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)   authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 30 below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "Filed Bond Documents"), the Declaration of James Doak in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "Hearing"); and notice of the Hearing having been given in accordance with

them by the Bankruptcy Code.

Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the City; and it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Petition Date*.  On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case.  The order for relief in this case was entered on December 5, 2013.

B.    *Jurisdiction and Venue*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of

Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *City's Stipulations*. The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

D. *Findings Regarding the Postpetition Financing*.

(i) *No Credit Available on More Favorable Terms*. Given its

current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Post-Petition Facility. The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the Bond Documents, (2) superpriority claims and Liens and (3) the other protections set forth in the Bond Documents and this Order.

(ii) *Use of Proceeds of the Post-Petition Facility.* As a condition to the entry into the Bond Documents and the extension of credit under the Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the Post-Petition Facility shall be used, in each case in a manner consistent with the terms and conditions of the Bond Documents, solely (a) with respect to the Quality of Life Bond, for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City and (b) with respect to the Swap Termination Bond, to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service

Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.     _Section 506(c)_.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.     _Good Faith and Jurisdictional Matters_.

(i)     _Willingness to Provide Financing_.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond Obligations, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee

and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii) *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*. The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties. Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses

that are permitted by law, and not in violation of the Bankruptcy Code. The

Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full

protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and

this Order and shall not be affected by any reversal, modification, vacatur,

amendment, reargument or reconsideration of this Order, any order finding

jurisdiction, the order for relief or any other order.

      G.    *Act 436 Approval Not Required*. On October 21, 2013, in accordance

with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL

141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council")

disapproved the Post-Petition Facility. The City Council failed to offer an

alternative proposal during the time period prescribed in Section 19(2) of Act 436.

The City has requested approval of the Post-Petition Facility by the Emergency

Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the

Michigan Home Rule City Act, Public Act 279 of 1909. Because the City Council

failed to offer a timely alternative proposal, approval of the Post-Petition Facility by

the Board under Act 436 is not required to authorize the City to enter into the Bond

Documents, which are valid and enforceable according to their terms as a result of

this Order and applicable non-bankruptcy law.

      H.    *Notice*. Notice of the Hearing and the relief requested in the Motion

has been provided by overnight delivery and electronic mail or facsimile to: (a) the

10

13-53846-swr   Doc 421-6   Filed 12/16/13   Entered 12/16/13 22:10:13   Page 365 of 460
13-53846-swr   Doc 421-76   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 136 of 93
456

trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1. <u>Motion Approved</u>. The Motion is granted, the Financing (as defined

below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2. <u>Objections Overruled</u>. All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

**Post-Petition Facility Authorization**

3. <u>Authorization of the Financing and Bond Documents</u>. The Filed Bond Documents are hereby approved. The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents. The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents. Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4. <u>Authorization to Borrow</u>. Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the

Bond Obligations (collectively, the "Financing").

5.    Bond Obligations.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order, the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents.  The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents.  No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    Liens and Collateral.  (a) In order to secure the Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to

Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "Liens") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the

"Swap Termination Bond Collateral", and together with the Quality of Life Bond Collateral, the "Collateral").

(b)     Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or of any other assets pledged to secure any of the Water/Sewer Bonds.  This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.  The terms, "Trustee," "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds.  The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.

7.     Direction of Pledged Wagering Tax Revenue.  On, and after the Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue, shall deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax Account in the name of the City held at the Wagering Tax Depository Bank pursuant to irrevocable directions (the "Irrevocable Directions") by the City in the form attached hereto as Exhibit D.  Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "Gaming Act"), or their certified development agreements.

8.     Lien Priority.  The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral.  Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason.  The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code.  No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9.     Superpriority Claims.  Upon the Closing Date, the Purchaser, the

Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of

the Bankruptcy Code, an allowed superpriority claim (collectively, the

"Superpriority Claim") for all Bond Obligations (without the need to file any proof

of claim), with priority over (i) any and all administrative expenses of the City at any

time existing or arising, of any kind or nature whatsoever, including all

administrative expenses arising under any section of the Bankruptcy Code, whether

or not such expenses or claims may become secured by a judgment lien or other

non-consensual lien, levy or attachment, (ii) all other post-petition claims against the

City, and (iii) pre-petition unsecured claims against the City.  There is litigation

pending before the Court between certain bond insurers of certain of the limited and

unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect

of ad valorem property tax revenue (the "Property Tax Revenue").  To the extent this

Court finds and determines (and pending such finding or determination), or

approves any settlement or confirms any plan of adjustment that provides that any

Property Tax Revenue of the City is subject to a property interest (such as a lien or

pledge) of any holders of limited or unlimited tax general obligation bonds issued by

the City or that such Property Tax Revenue is not generally available for use by the

City other than for payment of such limited or unlimited general obligation bonds

and is not available for distribution to general unsecured creditors as part of a plan of

adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

10.    <u>No Obligation to Extend Credit</u>.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

**<u>Provisions Common to Financings</u>**

11.    <u>Amendment of the Bond Documents</u>. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements.  Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the

City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.

12.     <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance

with the terms of the Bond Documents, the Post-Petition Facility and this Order; and

(e) authorize the City to pay, and the Indenture Trustee to retain and apply, all

payments required to be made to the Indenture Trustee, in accordance with the terms

of the Bond Documents, the Post-Petition Facility and this Order.

       13.   <u>Perfection of Liens</u>.  This Order shall be conclusive evidence of the

validity, perfection and priority of the Liens without the necessity of filing or

recording any financing statement, mortgage, notice or other instrument or

document which may otherwise be required under the law or regulation of any

jurisdiction or the taking of any other action (including entering into any deposit

account control agreement, mortgages or deeds of trust) to validate or perfect (in

accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser,

the Indenture Trustee and the Bondholders to the Liens and priorities granted herein.

Upon satisfaction of the conditions to termination  set forth in section 14.4 (a) of that

certain Collateral Agreement among the City, Detroit General Retirement System

Service Corporation, Detroit Police and Fire Retirement System Service

Corporation, U.S. Bank National Association (the "<u>Custodian</u>") and the Other

Persons Party thereto dated as of June 15, 2009 (the "<u>Collateral Agreement</u>"), the

Collateral Agreement shall terminate and any lien, security interest or other interest

in the Pledged Wagering Revenues under the Collateral Agreement shall be

terminated.  The Custodian shall timely perform its obligations in connection with

13-53846-swr   Doc 421-6   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 375 of 470
13-53846-swr   Doc 2147   Filed 12/16/13   Entered 12/16/13 18:10:03   Page 28 of 93

the termination of the Collateral Agreement, including, without limitation, the

obligations set forth in Section 14.4 thereof and in particular, but also without

limitation, paying any and all amounts due to the City under the Collateral

Agreement and giving notice to the appropriate parties that the "Irrevocable

Instructions" (as defined in the Collateral Agreement) are terminated and no longer

of any force or effect.

14. <u>Right to Take Actions to Perfect</u>.  Notwithstanding the foregoing, the

Purchaser, the Indenture Trustee and the Bondholders are authorized, but not

required, to file and obtain, as each deems necessary in its sole discretion, such

financing statements, notices of liens, control agreements and other security

documents to perfect in accordance with applicable non-bankruptcy law, or take

constructive control over assets, take any other action, in each case, to validate and

perfect the Liens and all such financing statements, notices, control agreements and

other security documents shall be deemed to have been filed or recorded as of the

date of entry of this Order; <u>provided</u>, <u>however</u>, that no such filing or recordation

shall be necessary or required in order to create or perfect the Liens.  The City is

authorized and directed to execute and deliver promptly upon demand to the

Purchaser or the Indenture Trustee all such financing statements, notices, control

agreements and other security documents as the Purchaser or the Indenture Trustee

may request.  The Purchaser or the Indenture Trustee, each in its discretion, may file

a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording. For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15. <u>Proceeds of Subsequent Financing</u>. If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, including after the confirmation of any plan of adjustment filed in the Case, and such facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Bond Documents and this Order.

16. <u>Maintenance of Collateral</u>. Until the indefeasible payment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall

22

13-53846-swr   Doc 421476   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 377 of 96
13-53846-swr   Doc 421476   Filed 12/16/13   Entered 12/16/13 18:10:13   Page 27 of 93   472
456

maintain: (a) the Collateral as required under the Bond Documents; and (b) the cash management system as required by the Bond Documents.

17. <u>Disposition of Collateral</u>.

(a)     Except as otherwise provided for in the Bond Documents, the City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

(b)     In the event of any sale, lease or other disposition of any Collateral (a "<u>Collateral Disposition</u>"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

18. <u>Reporting reinvestment/revitalization spending</u>. Within 30 days after the Closing Date, the City will produce in its electronic data site for review by creditors a revised indicative schedule of spending from the Quality of Life Financing (with monthly detail) with at least the same line items that are contained in the reinvestment spending plan dated October 10, 2013 provided by the City to creditors (a "<u>Revised Plan</u>").  Proceeds of the Quality of Life Financing will be placed in a segregated account (the "<u>Quality of Life Account</u>") that will be drawn

upon as approved, appropriated and budgeted quality of life projects are invoiced and require payment. Quality of life projects may extend beyond those listed in the Revised Plan. The City will track actual disbursements from the Quality of Life Account, and will provide, on a monthly basis, a report of actual disbursements, including a description of the disbursements. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

19. <u>Overall general fund financial condition</u>. Within 30 days after the closing of the Postpetition Financing, the City will provide in its electronic data site a revised monthly cash flow forecast through Fiscal Year 2015 (the "<u>Revised Forecast</u>") consistent with the "DIP Forecast" format previously presented by the City to creditors and potential financing providers. The City will provide in its electronic data site, on at least a quarterly basis, a report that includes actual performance (by month) against forecasted performance (by month) on the line items contained in Revised Forecast. The City will reforecast the remaining periods of the Revised Forecast, and determine whether to extend the Revised Forecast, on a quarterly basis. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

20. <u>Maturity Date</u>. Upon the earliest to occur (such earliest date, the

"Maturity Date") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the Bankruptcy Case, the Bond Obligations shall be immediately due in accordance with the terms of the Bond Documents.

21.  No Dismissal.  The Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

22.  Events of Default.  The occurrence of an "Event of Default" under the Bond Documents or any violation of the terms of this Order shall constitute an event of default under this Order ("Event of Default"), unless waived in writing by the Indenture Trustee, upon consent of the Bondholders in accordance with the Bond Documents.

23.  Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, the Indenture Trustee, upon the direction of the Bondholders in accordance with the Bond Documents, may, among other things, declare all Bond Obligations owing under the Bond Documents to be immediately due and payable in accordance with the terms of the Bond

25

13-53846-swr   Doc 421-6   Filed 04/29/13   Entered 04/29/13 22:00:23   Page 380 of 393
13-53846-swr   Doc 2141   Filed 12/16/13   Entered 12/16/13 18:10:13   Page 380 of
456                                                                              475

Documents, but without affecting any of the Liens or the Bond Obligations (any such declaration, a "Termination Declaration").  The Termination Declaration shall be given by electronic transmission as provided in the Bond Documents (the date any such Termination Declaration is made, the "Termination Declaration Date"). Following the Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the Bond Documents without further order or approval from this Court.

24.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order.  The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith.  Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby.  Any liens or claims

granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

25.     Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order.  In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code.  Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby.  Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

26.     Proofs of Claim.  The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds.  Any order entered by the Court in

relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

27. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room)

28

13-53846-swr Doc 421-6 Filed 04/29/13 Entered 04/29/13 22:00:03 Page 38 of 93
13-53846-swr Doc 421-6 Filed 04/29/13 Entered 04/29/13 22:00:03 Page 383 of 478

456

provided to Bondholders in connection with the Post-Petition Facility.

28. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Bond

Documents or this Order.

29.  <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor or any direct, indirect or incidental beneficiary.

30.  <u>Section 506(c) Claims</u>.  Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee.

31.  <u>No Marshaling/Applications of Proceeds</u>.  The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Bond Documents and this Order.

32.  <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

33.  <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

34.  <u>No Waiver by Seeking Relief</u>.  Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

35.  <u>Binding Effect of Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

31

13-53846-swr   Doc 421-6   Filed 04/29/13   Entered 04/29/13 22:10:03   Page 386 of 93
13-53846-swr   Doc 1776   Filed 12/16/13   Entered 12/16/13 18:10:03   Page 386 of 93   481
456

36.  <u>No Modification of Order</u>.  Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with priority equal or superior to the Liens (except as specifically provided in the Bond Documents).  The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

37.  <u>Order Controls</u>.  In the event of any inconsistency between the terms

and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

38.  <u>Survival</u>.  The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case.  Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "<u>Commitment Letter</u>"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond

Obligations.

39.    <u>Effect of this Order</u>.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

40.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

**Exhibit A**
Bond Purchase Agreement
Swap Termination Bond

**Exhibit B**
Bond Purchase Agreement
Quality of Life Bond

**Exhibit C**
Indenture

**Exhibit D**
Irrevocable Directions

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order") *inter alia*:[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached hereto as Exhibit A and Exhibit B (collectively, the "Bond Purchase Agreements"), by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached hereto as Exhibit C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax  (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment

that are defined in Section 101 or 102 of the Bankruptcy Code have the meanings

Letter and the Fee Letter, the "Bond Documents"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder and under the Bond Documents (collectively, and including all obligations under or with respect to the Bond Documents, the "Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below) and the Swap Termination Bond Collateral (as defined below) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of this Order and in the Bond Documents;

(v)    authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Bond Documents and the Fee Letter dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees,

assigned to them by the Bankruptcy Code.

the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Bond Documents (as applicable);

(vi)    vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Bond Documents and this Order, as limited pursuant hereto; and

(vii)   authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 28**30** below;

The Court having considered the Motion, the Bond Documents attached to the Motion (the "Filed Bond Documents"), the Declaration of James Doak in Support of the Motion, the exhibits attached thereto and hereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "Hearing"); and notice of the Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and no further notice being required; and the Hearing to consider the relief requested in the Motion having been held and concluded and all objections, if any, thereto having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the City; and it

4

13-53846-swr   Doc 2147-6   Filed 12/16/13   Entered 12/16/13 18:10:13   Page 48 of 93
13-53846-swr   Doc 2147   Filed 12/16/13   Entered 12/16/13 22:00:13   Page 398 of 456    493

further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case. The order for relief in this case was entered on December 5, 2013.

B. *Jurisdiction and Venue*. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *City's Stipulations*. The City stipulates and acknowledges that: (a)

except as granted pursuant to this Order and the Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents; (b) upon the entry of this Order, and giving effect to the Court's authority in this bankruptcy case, the City has taken or caused to be taken all actions and received all consents necessary, including under applicable non-bankruptcy law, for the approval of the Post-Petition Facility upon the terms and conditions set forth in the Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the Bond Documents, and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility and (c) the entry of this Order and the relief granted herein is at the request, and upon the consent, of the City.

      D.    *Findings Regarding the Postpetition Financing*.

      (i)    *No Credit Available on More Favorable Terms*. Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Post-Petition Facility. The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the

6

13-53846-swr   Doc 4216   Filed 04/29/14   Entered 04/29/14 12:00:13   Page 400 of 456
13-53846-swr   Doc 4217   Filed 04/29/14   Entered 04/29/14 12:10:13   Page 50 of 93   495
456

Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the Bond Documents, (2) superpriority claims and Liens and (3) the other protections set forth in the Bond Documents and this Order.

(ii) *Use of Proceeds of the Post-Petition Facility.* As a condition to the entry into the Bond Documents and the extension of credit under the Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the Post-Petition Facility shall be used, in each case in a manner consistent with the terms and conditions of the Bond Documents, solely (a) with respect to the Quality of Life Bond, for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City and (b) with respect to the Swap Termination Bond, to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.     _Section 506(c)_.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.     _Good Faith and Jurisdictional Matters_.

(i)     _Willingness to Provide Financing_.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Bond Documents subject to:  (a) the entry of this Order; (b) approval of the terms and conditions of the Post-Petition Facility and the Bond Documents; and (c) entry of findings by this Court that such financing is in the best interests of the City, that the Purchaser, the Indenture Trustee and the Bondholders are extending credit to the City pursuant to the Bond Documents in good faith, and that the Bond Obligations, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee and the Bondholders pursuant to this Order and the Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order.

(ii)     *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*.  The terms and conditions of the Post-Petition Facility and the Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code. The Post-Petition Facility was selected by the City after review of multiple proposals received during a full and fair marketing process conducted by the City and its agents and advisors. The Post-Petition Facility and the Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties.  Credit extended under the Post-Petition Facility and the Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code.  The Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order,

any order finding jurisdiction, the order for relief or any other order.

G. _Act 436 Approval Not Required_.  On October 21, 2013, in accordance with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the Post-Petition Facility.  The City Council failed to offer an alternative proposal during the time period prescribed in Section 19(2) of Act 436.  The City has requested approval of the Post-Petition Facility by the Emergency Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the Michigan Home Rule City Act, Public Act 279 of 1909.  Because the City Council failed to offer a timely alternative proposal, approval of the Post-Petition Facility by the Board under Act 436 is not required to authorize the City to enter into the Bond Documents, which are valid and enforceable according to their terms as a result of this Order and applicable non-bankruptcy law.

H. _Notice_.  Notice of the Hearing and the relief requested in the Motion has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing

certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; (p) counsel to the Greektown Casino-Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit and (s) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1. <u>Motion Approved</u>. The Motion is granted, the Financing (as defined below) is authorized and approved, to the extent and subject to the terms and conditions set forth in this Order.

2. <u>Objections Overruled</u>. All objections to the Financing to the extent not withdrawn or resolved are hereby overruled.

**Post-Petition Facility Authorization**

3.     <u>Authorization of the Financing and Bond Documents</u>.  The Filed Bond Documents are hereby approved.  The City is immediately authorized and empowered to incur and to perform the Bond Obligations in accordance with, and subject to, the terms of this Order and the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Bond Documents.  The Collateral and all proceeds thereof will be deposited and applied as required by this Order and the Bond Documents.  Upon execution and delivery, the Bond Documents shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.     <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the Bond Documents and this Order, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into the Bond Purchase Agreements and the Bond Documents and incur the Bond Obligations (collectively, the "<u>Financing</u>").

5.     <u>Bond Obligations</u>.  The Bond Documents and this Order shall evidence the validity and binding effect of the City's Bond Obligations, which Bond Obligations shall be enforceable against the City.  Upon entry of this Order,

12

13-53846-swr   Doc 4211-6   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 406 of 456
456
13-53846-swr   Doc 4211   Filed 12/16/13   Entered 12/16/13 18:10:03   Page 56 of 93   501

the Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Bond Documents. The Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Bond Documents. No obligation, payment, transfer or grant of security under the Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6.  <u>Liens and Collateral</u>.  (a) In order to secure the Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Indenture, continuing, valid, binding, enforceable, non-avoidable postpetition security interests and liens (the "<u>Liens</u>") as follows:

(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Bond Documents, on a *pari passu* basis with the holders of Swap Termination Bond, and (b) a valid, binding, continuing, enforceable, fully-perfected second priority Lien (second only to the Liens securing the Swap Termination Bond) on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, each as described in this clause (I), the "Quality of Life Bond Collateral"); and

(II) to secure the Swap Termination Bond, a valid, binding, continuing, enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the holders of Quality of Life Bond (the Pledged Income Tax Revenue and the Asset Proceeds Collateral, collectively, as described in this clause (II), the "Swap Termination Bond Collateral", and together with the Quality of Life Bond Collateral, the "Collateral").

(b)     Notwithstanding anything to the contrary in this Order, the Motion or the Bond Documents, under no circumstances shall the Collateral include revenues

14

13-53846-swr   Doc 421-6   Filed 04/29/13   Entered 04/29/13 22:00:23   Page 40 of 95
13-53846-swr   Doc 2147-6   Filed 12/16/13   Entered 12/16/13 18:10:13   Page 58 of 93
456
503

of the Systems or of any other assets pledged to secure any of the Water/Sewer Bonds. This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense that Purchaser, Indenture Trustee under the Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral. The terms, "Trustee," "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds. The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.

7.    Direction of Pledged Wagering Tax Revenue. On, and after the Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue, shall deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax

15

13-53846-swr   Doc 2147   Filed 12/16/13   Entered 12/16/13 22:00:13   Page 59 of 93
13-53846-swr   Doc 4216   Filed 04/29/14   Entered 04/29/14 22:10:03   Page 409 of
456                                                                            504

Account in the name of the City held at the Wagering Tax Depository Bank pursuant to irrevocable directions (the "Irrevocable Directions") by the City in the form attached hereto as Exhibit D. Subject to this paragraph 7, nothing in this Order is intended to modify the payment obligations of the City's casinos under the Michigan Gaming Control and Revenue Act (the "Gaming Act"), or their certified development agreements.

8. Lien Priority. The Liens shall be senior in priority and superior to any lien on or claim to any of the Collateral. Other than as set forth herein and in the Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable against the City under Sections 921(e) and 364(e) of the Bankruptcy Code notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the order for relief or any other order and notwithstanding the dismissal of the Case for any reason. The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code. No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9. Superpriority Claims. Upon the Closing Date, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1)

of the Bankruptcy Code, an allowed superpriority claim (collectively, the "Superpriority Claim") for all Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City. There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect of ad valorem property tax revenue (the "Property Tax Revenue"). To the extent this Court finds and determines (and pending such finding or determination), or approves any settlement or confirms any plan of adjustment that provides that any Property Tax Revenue of the City is subject to a property interest (such as a lien or pledge) of any holders of limited or unlimited tax general obligation bonds issued by the City or that such Property Tax Revenue is not generally available for use by the City other than for payment of such limited or unlimited general obligation bonds and is not available for distribution to general unsecured creditors as part of a plan of adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid

from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

10. <u>No Obligation to Extend Credit</u>. The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Bond Documents.

**Provisions Common to Financings**

11. <u>Amendment of the Bond Documents</u>. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements. Subject to paragraph 7 hereof, nothing in this paragraph 11 shall be construed to (i) entitle the City, without the prior written consent of each of the City's casinos, to amend, modify or supplement the Bond Documents, including without limitation the Irrevocable Directions to be given to and accepted by the City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents, including without limitation the Irrevocable Directions, in the case of either (i) or (ii), in a

way that would (a) modify the payment obligations of the City's casinos under the Gaming Act or their certified development agreements, all in the amounts, at the times and to the payees set forth therein; (b) create a lease, pledge, borrowing or loaning of money against any license, permit or authorization issued to the City's casinos by the Michigan Gaming Control Board or (c) require any amendment to, or approval under, the certified development agreements entered into by the City with each respective City casino.

12.  <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, the Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order; and (e) authorize the City to pay, and the Indenture Trustee to retain

19

13-53846-swr   Doc 421-6   Filed 12/16/13   Entered 12/16/13 12:10:03   Page 63 of 96
13-53846-swr   Doc 421-6   Filed 12/16/13   Entered 12/16/13 12:10:03   Page 413 of   508
456

and apply, all payments required to be made to the Indenture Trustee, in accordance with the terms of the Bond Documents, the Post-Petition Facility and this Order.

13.    Perfection of Liens.  This Order shall be conclusive evidence of the validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein.  Upon satisfaction of the conditions to termination  set forth in section 14.4 (a) of that certain Collateral Agreement among the City, Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association (the "Custodian") and the Other Persons Party thereto dated as of June 15, 2009 (the "Collateral Agreement"), the Collateral Agreement shall terminate and any lien, security interest or other interest in the Pledged Wagering Revenues under the Collateral Agreement shall be terminated.  The Custodian shall timely perform its obligations in connection with the termination of the Collateral Agreement,

20

13-53846-swr   Doc 421-6   Filed 04/29/13   Entered 04/29/13 22:00:03   Page 64 of 93
13-53846-swr   Doc 2217   Filed 12/16/13   Entered 12/16/13 12:10:13   Page 414 of 456
456
509

including, without limitation, the obligations set forth in Section 14.4 thereof and in particular, but also without limitation, paying any and all amounts due to the City under the Collateral Agreement and giving notice to the appropriate parties that the "Irrevocable Instructions" (as defined in the Collateral Agreement) are terminated and no longer of any force or effect.

14. <u>Right to Take Actions to Perfect</u>.  Notwithstanding the foregoing, the Purchaser, the Indenture Trustee and the Bondholders are authorized, but not required, to file and obtain, as each deems necessary in its sole discretion, such financing statements, notices of liens, control agreements and other security documents to perfect in accordance with applicable non-bankruptcy law, or take constructive control over assets, take any other action, in each case, to validate and perfect the Liens and all such financing statements, notices, control agreements and other security documents shall be deemed to have been filed or recorded as of the date of entry of this Order; <u>provided</u>, <u>however</u>, that no such filing or recordation shall be necessary or required in order to create or perfect the Liens.  The City is authorized and directed to execute and deliver promptly upon demand to the Purchaser or the Indenture Trustee all such financing statements, notices, control agreements and other security documents as the Purchaser or the Indenture Trustee may request.  The Purchaser or the Indenture Trustee, each in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording

office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and all filing offices are hereby authorized to accept such photocopy for filing and recording. For the avoidance of doubt, the automatic stay of Section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions, as applicable, referenced in this paragraph.

15. _Proceeds of Subsequent Financing_.  If the City obtains credit or incurs debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the Bond Documents at any time prior to the indefeasible repayment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, including after the confirmation of any plan of adjustment filed in the Case, and such facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Bond Documents and this Order.

16. _Maintenance of Collateral_.  Until the indefeasible payment in full of all Bond Obligations and the satisfaction of the Superpriority Claims, the City shall maintain: (a) the Collateral as required under the Bond Documents; and (b) the

22

13-53846-swr   Doc 421-6   Filed 04/29/13   Entered 04/29/13 22:00:03   Page 416 of 456
13-53846-swr   Doc 2146   Filed 12/16/13   Entered 12/16/13 18:10:13   Page 66 of 93   511

456

cash management system as required by the Bond Documents.

    17.    <u>Disposition of Collateral</u>.

    (a)    Except as otherwise provided for in the Bond Documents, the City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Bond Documents or without the prior written consent of the Indenture Trustee.

    (b)    In the event of any sale, lease or other disposition of any Collateral (a "<u>Collateral Disposition</u>"), the City shall, to the extent required by the Bond Documents, pay, or cause to be paid to, the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the Bond Documents.

    **18.**    **<u>Reporting reinvestment/revitalization spending. Within 30 days after the Closing Date, the City will produce in its electronic data site for review by creditors a revised indicative schedule of spending from the Quality of Life Financing (with monthly detail) with at least the same line items that are contained in the reinvestment spending plan dated October 10, 2013 provided by the City to creditors (a "Revised Plan"). Proceeds of the Quality of Life Financing will be placed in a segregated account (the "Quality of Life Account") that will be drawn upon as approved, appropriated and budgeted</u>**

**quality of life projects are invoiced and require payment. Quality of life projects may extend beyond those listed in the Revised Plan. The City will track actual disbursements from the Quality of Life Account, and will provide, on a monthly basis, a report of actual disbursements, including a description of the disbursements. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.**

**19. Overall general fund financial condition. Within 30 days after the closing of the Postpetition Financing, the City will provide in its electronic data site a revised monthly cash flow forecast through Fiscal Year 2015 (the "Revised Forecast") consistent with the "DIP Forecast" format previously presented by the City to creditors and potential financing providers. The City will provide in its electronic data site, on at least a quarterly basis, a report that includes actual performance (by month) against forecasted performance (by month) on the line items contained in Revised Forecast. The City will reforecast the remaining periods of the Revised Forecast, and determine whether to extend the Revised Forecast, on a quarterly basis. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.**

18**20**. Maturity Date.  Upon the earliest to occur (such earliest date, the

"Maturity Date") of (a) the date that is two years and six months after the Closing

Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c)

the acceleration of the Bonds under the Bond Documents; and (d) dismissal of the

Bankruptcy Case, the Bond Obligations shall be immediately due in accordance

with the terms of the Bond Documents.

19**21**. No Dismissal.  The Bond Obligations shall be indefeasibly paid in full

in cash prior to, and notwithstanding, any dismissal of this bankruptcy case unless

otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders,

and this Court or the United States District Court for the Eastern District of

Michigan shall retain jurisdiction to enforce this Order.

20**22**. Events of Default.  The occurrence of an "Event of Default" under the

Bond Documents or any violation of the terms of this Order shall constitute an

event of default under this Order ("Event of Default"), unless waived in writing by

the Indenture Trustee, upon consent of the Bondholders in accordance with the

Bond Documents.

21**23**. Rights and Remedies Upon Event of Default.  Immediately upon the

occurrence and during the continuation of an Event of Default, the Indenture

Trustee, upon the direction of the Bondholders in accordance with the Bond

Documents, may, among other things, declare all Bond Obligations owing under

13-53846-swr  Doc 2147  Filed 12/16/13  Entered 12/16/13 12:10:13  Page 69 of 93
13-53846-swr  Doc 2174-6  Filed 12/19/13  Entered 12/19/13 22:00:03  Page 419 of
456

the Bond Documents to be immediately due and payable in accordance with the terms of the Bond Documents, but without affecting any of the Liens or the Bond Obligations (any such declaration, a "Termination Declaration"). The Termination Declaration shall be given by electronic transmission as provided in the Bond Documents (the date any such Termination Declaration is made, the "Termination Declaration Date"). Following the Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the Bond Documents without further order or approval from this Court.

~~22~~**24**. Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order. The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or

enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

~~23~~**25**. Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order. In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

24**26**. Underline{Proofs of Claim}.  The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Bonds.  Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

25**27**. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the

extent required by the Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Bond Purchase Agreements will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Post-Petition Facility.

~~26~~**28**. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Post-Petition Facility and the Collateral may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the

Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection

to, or contesting in any manner, the order for relief; or (g) taking any action which

is contrary, in a manner that is material and adverse to the Purchaser, the Indenture

Trustee or the Bondholders, to any term or condition set forth in the Bond

Documents or this Order.

27**29**. No Third Party Rights.  Except as explicitly provided for herein, this

Order does not create any rights for the benefit of any third party, creditor or any

direct, indirect or incidental beneficiary.

28**30**. Section 506(c) Claims.  Upon entry of this Order, no claims, costs or

expenses incurred in the Case or by the City at any time shall be charged against

the Purchaser, the Indenture Trustee, the Bondholders or any of their respective

claims or against the Collateral pursuant to Section 105 or 506(c) of the

Bankruptcy Code, or otherwise, without the prior written consent of the Indenture

Trustee.

29**31**. No Marshaling/Applications of Proceeds.  The Purchaser, the

Indenture Trustee and the Bondholders shall not be subject to the equitable

doctrine of "marshaling" or any other similar doctrine with respect to any of the

Collateral and proceeds shall be received and applied pursuant to the Bond

Documents and this Order.

30**32**. Rights Preserved.  Notwithstanding anything herein to the contrary,

30

13-53846-swr   Doc 421-6   Filed 04/29/13   Entered 04/29/13 22:00:13   Page 74 of 93
13-53846-swr   Doc 2147   Filed 12/16/13   Entered 12/16/13 18:10:13   Page 424 of 519
456

the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly of the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

31**33**. <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

32**34**. <u>No Waiver by Seeking Relief</u>.  Neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Post-Petition Facility, without approval of the Court, to the extent permitted under Section 904, nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture

31

Trustee or the Bondholders of their respective rights in connection with the Bond Documents.

3335. Binding Effect of Order. Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

3436. No Modification of Order. Until and unless the Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the

Collateral with priority equal or superior to the Liens (except as specifically provided in the Bond Documents).  The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such  action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

35~~35~~**37**. <u>Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

36~~36~~**38**. <u>Survival</u>.  The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case.  Any order dismissing the Case shall provide that (A) the Superpriority Claim and Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Bond Documents until all Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Post-Petition Facility that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding

such dismissal, for the purposes of enforcing the Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Bond Documents and in the Commitment Letter dated as of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City, shall continue in the Case, following dismissal of the Case, termination of the Bond Documents, the Commitment Letter and the Post-Petition Facility and the indefeasible repayment of the Bond Obligations.

~~37~~**39**.  Effect of this Order.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

~~38~~**40**.  Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

34

13-53846-swr   Doc 2147   Filed 12/16/13   Entered 12/16/13 18:10:13   Page 74 of 93
13-53846-swr   Doc 4147   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 428 of 456
523

**Exhibit A**
Bond Purchase Agreement
Swap Termination Bond

**Exhibit B**
Bond Purchase Agreement
Quality of Life Bond

13-53846-swr   Doc 2147   Filed 12/16/13   Entered 12/16/13 18:10:10   Page 430 of
456
13-53846-tjt   Doc 4217   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 86 of 93   525

**Exhibit C**
Indenture

Exhibit D
Irrevocable ~~Direections~~ **Directions**

| Summary Report: Litera Change-Pro ML IC 6.5.0.313 Document Comparison done on 12/16/2013 4:48:46 PM | |
|---|---|
| **Style Name:** JD Blackline | |
| **Original Filename:** Financing Order (REVISED for hearing 12.16.13).doc | |
| **Original DMS:** | |
| **Modified Filename:** Financing Order (REVISED for hearing 12.16.13)(2).doc | |
| **Modified DMS:** | |
| **Changes:** | |
| **Add** | 25 |
| ~~Delete~~ | 23 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| ~~Table Delete~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 48 |

---------------------------------------------------x
                                  :

In re                           : Chapter 9
                                  :

CITY OF DETROIT, MICHIGAN,   : Case No. 13-53846
                                  :

               Debtor.     : Hon. Steven W. Rhodes
                                  :
                                  :
---------------------------------------------------x

**AMENDED STATEMENT OF STIPULATED FACTS
REGARDING MOTION OF DEBTOR FOR ENTRY OF AN
ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT
CERTAIN FORBEARANCE AND OPTIONAL TERMINATION
AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT
PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF**

For purposes of the Court's consideration of the *Motion of Debtor for Entry of an Order (i) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (ii) Approving Such Agreement Pursuant to Rule 9019, and (iii) Granting Related Relief* [Docket No. 17] filed by the City of Detroit on July 18, 2013 and corrected on July 24, 2013 [Docket No. 157] (the "Forbearance Agreement and Approval Motion"), the City of Detroit and (a) Financial Guaranty Insurance Company, (b) Syncora Guarantee Inc. and Syncora Capital Assurance Inc., (c) Ambac Assurance Corporation, (d) National Public Finance Guarantee

Corporation, (e) Assured Guaranty Municipal Corp., (f) the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, (g) Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., (h) FMS Wertmanagement Service GmbH as servicer to FMS Wertmanagement, and (i) the Retired Detroit Police & Fire Fighters Association ("RDPFFA"), Donald Taylor, individually, and as President of RDPFFA, and the Detroit Retired City Employees Association ("DRCEA") and Shirley V. Lightsey, individually, and as President of the DRCEA, submit the attached amended Joint Statement as a stipulation of facts aimed at facilitating the Court's understanding of the COPs/Swaps (each as defined below) structure. The attached amended Joint Statement is being filed solely to conform the exhibits referenced therein with the City's exhibit numbering.

The City has attempted and been unable to obtain the concurrence of the remaining objectors.


Dated: December 16, 2013          Respectfully submitted,

2

NYI-4560933v2
13-53846-tjt   Doc 4314-6   Filed 04/29/14   Entered 04/29/14 22:00:38   Page 435 of
13-53846-swr   Doc 2186   Filed 12/16/13   Entered 12/16/13 22:16:58   Page 2 of 20   530
456

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300 - Telephone
(248) 359-7700 - Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

# **EXHIBIT A**

2

## Joint Statement of Stipulated Facts

For purposes of the Court's consideration of the *Motion of Debtor for Entry of an Order (i) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (ii) Approving Such Agreement Pursuant to Rule 9019, and (iii) Granting Related Relief* [Docket No. 17] filed by the City of Detroit on July 18, 2013 and corrected on July 24, 2013 [Docket No. 157] (the "Forbearance Agreement and Approval Motion"), the parties submit this Joint Statement as a stipulation of facts aimed at facilitating the Court's understanding of the COPs/Swaps (each as defined below) structure.

## I. The Issuance of the COPs and the Service Contracts

1. In 2005, the annual reports of the boards of trustees for the two retirement systems of the City of Detroit (the "City"), the General Retirement System (the "GRS") and the Police and Fire Retirement System (the "PFRS" and, together with the GRS, the "Retirement Systems"), indicated that the pension funds of the Retirement Systems had an unfunded accrued actuarial liability ("UAAL") of approximately $1.7 billion.[1] To address this UAAL of the GRS and PFRS, pursuant to City Ordinances No. 03-05 and 04-05 (Exs. 118, 119), the City provided an alternative funding mechanism by initiating transactions that resulted in the issuance to

---

[1] As of June 30, 2004, the Annual Report of the Board of Trustees of the GRS For the Year Ended June 20, 2004 indicated that the GRS had estimated UAAL of $913,683,200 (*see* Actuarial & Statistical Section, available at http://www.rscd.org/gc_annrpt_actstats2004.pdf at 22 (Ex. 116)), and the Annual Report of the Board of Trustees of the PFRS For the Year Ended June 20, 2004 indicated that the PFRS had estimated UAAL of $782,976,693 (*see* Actuarial & Statistical Section, available at http://www.pfrsdetroit.org/images/pdf/pf_annrpt_actstats2004.pdf at 13, 17 (Ex. 117)), for a total UAAL of $1,686,659,895. Certain parties contest the accuracy of the UAAL figures reflected in these reports.

investors of approximately $1.4 billion of instruments known as certificates of participation (the "2005 COPs").[2]  *See* Ordinance No. 05-05 at § 18-5-120(d) (Ex. 122).

2.      First, the City in 2005 created two nonprofit corporations, the Detroit General Retirement System Service Corporation (the "GRS Service Corporation") and the Detroit Police and Fire Retirement System Service Corporation (the "PFRS Service Corporation" and, together with the GRS Service Corporation, the "Service Corporations") to provide certain services, including funding the UAAL of the GRS and the PFRS by facilitating the financing of the 2005 COPs.  *Id.* at § 18-5-125 (Ex. 122).  By ordinance, the Service Corporations' boards of directors must have three City officers and two Detroit City Council members.  *Id.* at § 18-5-126(a)(5) (Ex. 122).  The Service Corporations in turn created a funding trust (the "2005 Funding Trust") to issue and sell the 2005 COPs.  *Id.* at §§ 18-5-120(k), 18-5-129 (Ex. 122).  In 2005, the 2005 Funding Trust issued the 2005 COPs.  Ordinance No. 05-09 at § 18-16-2(c) (Ex. 123).

3.      In 2006, the Service Corporations established another funding trust (the "2006 Funding Trust" and, together with the 2005 Funding Trust, the "Trusts").  *Id.* at § 18-16-3(b) (Ex. 123).  Pursuant to that certain Trust Agreement, dated June 12, 2006, by and among the Service Corporations and Wilmington Trust Company National Association as Trustee (the "Trust Indenture"),[3] the 2006 Funding Trust issued two new series of certificates of participation (the "2006 COPs," and, together with the 2005 COPs, the "COPs") — one with a fixed interest rate in the original aggregate principal amount of $148,540,000 (the "Fixed-Rate COPs") and

---

[2] The 2005 COPs funded $739,793,898 of the GRS UAAL and $630,829,189 of the PFRS UAAL, for a total funding of $1,370,623,087.  *See* GRS Service Contract 2005 dated May 25, 2005 between the Detroit General Retirement System Service Corporation and the City (the "GRS Service Contract 2005") at Schedule 1 (Ex.120); PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City (the "PFRS Service Contract 2005") at Schedule 1 (Ex. 121).

[3] Wilmington Trust Company National Association is the successor trustee.  The original trustee was U.S. Bank National Association.

one with a floating interest rate in the original aggregate principal amount of $800,000,000 (the "Floating-Rate COPs").  Trust Indenture §§ 4, 6.4 (Ex. 124).  The proceeds of the 2006 COPs were used, in large part, to fund the optional redemption and cancellation of certain of the 2005 COPs.  Ordinance No. 05-09 at § 18-16-3(b)(10) (Ex. 123).  Currently there remains outstanding $480,260,000 in principal amount of certain series of the 2005 COPs.

4.      The City and the Service Corporations in 2006 arranged for insurance policies on the 2006 COPs with Financial Guaranty Insurance Company ("FGIC") and Syncora Guarantee Inc., f/k/a XL Capital Assurance (collectively, "Syncora" and, together with FGIC, the "Insurers").  (See XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 (Ex. 125), FGIC Municipal Bond New Issue Insurance Policy Number 06010249, dated June 12, 2006 (Ex. 126) and FGIC Municipal Bond New Issue Insurance Policy Number 06010250, dated June 12, 2006 (Ex. 127).  The 2006 COPs insurance policies insured against the risk that the 2006 Funding Trust might fail to make scheduled principal and interest payments on the 2006 COPs.  (Id.).[4]  Each of the policies is unconditional and irrevocable, and may not be cancelled for any reason.  (Id.).

5.      In 2005, the City and the Service Corporations entered into the GRS Service Contract 2005 (Ex. 120) and the PFRS Service Contract 2005 (Ex. 121).  In 2006, the City and

---

[4] FGIC's two insurance policies guaranteed the scheduled payment of principal and interest when due on $148,540,000 in aggregate principal amount of the 2006 Fixed-Rate COPs and $500,845,000 in aggregate principal amount of the 2006 Floating-Rate COPs, to the extent not paid by the 2006 Funding Trust.  See FGIC Municipal Bond New Issue Insurance Policy Number 06010249, dated June 12, 2006 (Ex. 126); FGIC Municipal Bond New Issue Insurance Policy Number 06010250, dated June 12, 2006 (Ex. 127).  Syncora's insurance policy guaranteed the scheduled payment of principal and interest when due on $299,155,000 in aggregate principal amount of the 2006 Floating-Rate COPs to the extent not paid by the 2006 Funding Trust.  See XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 (Ex. 125).  FGIC and Syncora issued similar insurance policies with respect to the 2005 COPs, guarantying the scheduled payment of principal and interest when due, to the extent not paid by the 2005 Funding Trust; FGIC and Syncora assert that FGIC's 2005 policy covers $450,615,000 of the $480,260,000 in principal amount of the outstanding 2005 COPs, and Syncora's 2005 policy covers the remaining $29,645,000.

-3-

the Service Corporations entered into that certain GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (the "GRS Service Contract 2006") (Ex. 128) and that certain PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (the "PFRS Service Contract 2006" (Ex. 129) and, together with the GRS Service Contract 2006, the GRS Service Contract 2005 and the PFRS Service Contract 2005, the "Service Contracts"). The Service Contracts establish and govern the City's obligation to, among other things, make payments to the Service Corporations in amounts equal to the amounts due under the COPs. The Service Corporations assigned their respective rights to receive certain payments under the Service Contracts to the Trusts, and each of the COPs evidences an individual, undivided proportionate interest in the right to receive such payments. *See* Ordinance No. 05-09 at § 18 16-2(d) and 18-16-3-(b)(2) (Ex. 123); Trust Indenture § 201 (Ex. 124). As discussed in greater detail below, Section 7.02 of each of the Service Contracts also establish the City's obligation to make payments to the Service Corporations in amounts equal to payments owed by the Service Corporations to the Swap Counterparties (defined below) under the Swap Agreements (defined below). The Service Corporations purported to grant the Swap Counterparties a security interest in and lien upon their rights to receive such amounts pursuant to Section 2.4 of the CAA (defined below). (Ex. 130). Certain parties contest the validity of this lien.

6.       The Service Contracts establish (among others) the Trusts, the Trustee, the Swap Counterparties, and the Insurers each as third-party beneficiaries of the Service Contracts (*see* Service Contracts § 9.12(a)), each with consent rights over any amendment of the Service Contracts. *Id.* at § 9.05 (Exs. 128, 129, 120, 121).

7.       On June 12, 2006, an agreement (the "Contract Administration Agreement" or "CAA") regarding the administration of the 2006 Service Contracts was entered into to govern

-4-

the relationship between the parties, and the collection of amounts due under the Service

Contracts and Swaps.  (Ex. 130).  The Service Corporations, the Swap Counterparties and

Wilmington Trust Company National Association as contract administrator (the "Contract

Administrator"),[5] are all parties to the Contract Administration Agreement.  *See* CAA Preamble,

at 1 (Ex. 130).  The Insurers are "parties in interest" to the CAA and have the right of consent

over any amendments thereto (provided they are not in default of their respective insurance

obligations), but were not signatories to the CAA.  *See id.* §§10.1, 10.2, 10.3 (Ex. 130).

## II.    Interest Rate Swaps

8.      To protect against the risk of rising interest rates on the Floating-Rate COPs, such

COPs were structured to have a "synthetic" fixed rate.  In order to avoid betting on the future

direction of interest rates, and to lock in a fixed, predictable interest cost, in 2006, the Service

Corporations entered into certain pay-fixed/receive-variable interest rate swap contracts (the

"Swap Agreements" or the "Swaps") with UBS AG ("UBS") and SBS Financial Products

Company, LLC ("SBS" and together with UBS and with Merrill Lynch Capital Services, Inc., as

credit support provider to SBS, the "Swap Counterparties").[6]  *See* Ordinance No. 05-09

at§ 18-16-3(b)(3) (Ex. 123).[7]  Certain parties contest the validity of the Swap Agreements.

---

[5] Wilmington Trust Company National Association is the successor Contract Administrator.  The original
Contract Administrator was U.S. Bank National Association.  Wilmington Trust's role as Contract
Administrator under the CAA is distinct from its role as Trustee of each of the Trusts.

[6] Merrill Lynch Capital Services ("Merrill Lynch") served as a credit support provider for SBS in
connection with the Swaps.  *See* CAA at 1 (Ex. 130).  On or about July 19, 2013, SBS assigned its rights
and obligations under the Swap Agreements to Merrill Lynch. (*See* Assignment of Swap Transactions
with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS
Service Corporation, dated July 19, 2013 (Ex. 131).

[7] *See also* GRS Service Contract 2006 at Schedule 5 and PFRS Service Contract 2006 at Schedule 5
(listing the Swap Contracts) (Exs. 128, 129); 1992 ISDA Master Agreement Local Currency Single
Jurisdiction, dated as of May 25, 2005 between UBS and the GRS Service Corporation (the "ISDA") (Ex.
132); Amended and Restated Schedule, dated as of June 26, 2009, to the ISDA between UBS and the
GRS Service Corporation (the "Amended Schedule") (Ex. 133); and Revised Confirmation to the GRS

US_ACTIVE\44383859\3\45259.0007
NYI-4560736v7

9. More specifically, pursuant to the Swap Agreements, the Service Corporations are required to make quarterly payments to the Swap Counterparties, in exchange for the Swap Counterparties' obligation to make floating-rate payments to the Service Corporations in amounts equal to the floating rate interest payments due on the Floating-Rate COPs (the "Swap Payments"). *See* Revised Confirmation (Ex. 134). In practice, if the interest rate on the Floating Rate COPs exceeds the fixed rate set forth in the Revised Confirmation, the Swap Counterparties pay the Service Corporations an amount equal to the difference between the higher floating rate and the lower fixed rate on the notional amount (*see* ISDA § 2(c) (Ex. 132)). Conversely, if the interest rate on the Floating Rate COPs falls below the fixed rate specified in the Revised Confirmation, the Service Corporations pay the Swap Counterparties the difference between the lower floating rate and the higher fixed rate on the notional amount. *See* ISDA § 2(c) (Ex. 132). Prior to 2009, the Service Corporations' sole source of funding for payments owed under the Swap Agreements was payments owed by the City under the Service Contracts. *See* 2006 Service Contracts § 7.02(b) (Exs. 128, 129, 120, 121).

10. The Swap Agreements also provide for a termination payment when a non-defaulting or affected party designates an "Early Termination Date" pursuant to Section 6 of the ISDA. ISDA § 6 (Ex. 132) An "Early Termination Date" may only be designated pursuant to Section 6 of the ISDA upon the occurrence of certain specified events, known as "Events of Default" or "Termination Events." *Id.* (Ex. 132).

---

Service Corporation from UBS, dated June 26, 2009 (the "Revised Confirmation") (Ex. 134). Each of the Swap Contracts consists of an ISDA Master Agreement, an amended and restated schedule and a revised confirmation thereto, each of which are substantially identical to the ISDA, the Amended Schedule and the Revised Confirmation attached to the Pérez Declaration. (Pérez Decl. ¶¶ 16-18). Accordingly, unless otherwise indicated, all citations in this Joint Statement to the ISDA, the Amended Schedule and the Revised Confirmation refer to identical provisions in the other Swap Agreements.

-6-

11.     In the event an Early Termination Date is designated, the Swap Agreements provide that the party that is "out of the money"[8] is obligated to pay the other party a termination payment designed to reflect the value of the swap under then-current market conditions.  *Id.* at §6(e) (Ex. 132).  The Swap Counterparties who receive the fixed rate under the Swaps are currently "in the money."  As of June 28, 2013, the City calculated that the amount the Service Corporations would owe to the Swap Counterparties (and, in turn, the City would owe the Service Corporations) upon termination of the Swap Agreements was approximately $296.5 million.  (Motion at ¶ 23.)  As of November 29, 2013, the City calculated that the amount the Service Corporations would owe to the Swap Counterparties (and, in turn, the City would owe the Service Corporations) upon termination of the Swap Agreements was approximately $277.6 million.

12.     The City, the Service Corporations and the Swap Counterparties in 2006 arranged for insurance policies with the Insurers on the Swaps.  *See, e.g.,* FGIC Swap Surety Policy Number 0602052 dated June 12, 2006 (Ex. 135).[9]  The Swaps insurance policies insure against the risk that the Service Corporations might fail to make net payments due under the Swap Agreements.  *Id.* (Ex. 135).  Specifically, the policies insure the quarterly payments owed under the Swaps as well as a certain portion of the termination payments that may be owed thereunder.

---

[8] A party is said to be "out of the money" if the then-current interest rate conditions make the swap transaction economically unfavorable to it.  Conversely, a party is "in the money" if it is on favorable side of the transaction.  For example, the party paying the floating rate will be "in the money" if the floating rate is less than the fixed rate.  In that scenario, the party paying the fixed rate obligation will be "out of the money" because it is obligated to pay more than it receives.

[9] Each of the Insurer's policies insuring payments under the Swaps is substantially identical to the FGIC Swap Surety Policy attached as Exhibit 135, except that each policy has a different cap on the amount the Insurer would owe with respect to a claim based on a termination payment owed by a Service Corporation to a Swap Counterparty under a Swap Agreement.

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v7

13. In certain circumstances (e.g., when the Insurer directs termination), there is no cap on the amount the Insurer would owe with respect to a claim based on a termination payment. In the event the Swap Counterparties terminate the Swaps, unless they release the Insurers as per the Forbearance and Optional Termination Agreement (Mot., Ex. 6), Syncora's maximum exposure is $27 million[10] and FGIC's maximum exposure is $50 million, under their respective Swap insurance policies.[11] Each of the policies is unconditional and irrevocable, and may not be cancelled for any reason. *See, e.g.*, *id.*, at 1 (Ex. 135).

14. Under the Swap Agreements, the parties agreed that the Insurers would have certain consent rights with respect to the designation of an Early Termination Date under Section 6 of the ISDA. *See* Amended and Restated Schedule, dated as of June 26, 2009, to the ISDA between SBS and the PFRS Service Corporation (the "SBS Amended Schedule") Part 5(a) (Exs. 4, 137)[12] and Amended Schedule Part 5(i) (Ex. 133). However, the City and the Swap Counterparties contend that the Insurers lose their consent rights if they fail to maintain certain credit ratings. See SBS Amended Schedule Part 5(a)(ii) (Exs. 4, 137); Amended Schedule, Part 5(i)(b) (Ex. 133). The Insurers dispute this contention. In addition, each of the Swap Agreements provides that no amendment, modification or waiver with respect to such Swap Agreement or any Credit Support Document (as defined in the Swap Agreements) will be effective unless in writing executed by each of the Swap Counterparties and the Insurers. ISDA

---

[10] *See* XL Capital Assurance Swap Insurance Policy Numbers CA03049E, CA03049D, CA03049C and CA03049B, dated June 12, 2006 at pg. 2 of the Attachment to each, definition of "Scheduled Payments" (Exs. 47, 48).

[11] *See* FGIC Swap Surety Policy Numbers 06010252, 06010253, 06010254 and 06010255, dated June 12, 2006 at pg. 2 of each, definition of "Insured Payment" (Exs. 135, 136).

[12] Although the substance of Part 5 is identical in each of the Amended Schedules, the numbering in Part 5 of the SBS Amended Schedules is different from the numbering in Part 5 of the UBS Amended Schedules. Accordingly, citations to Part 5 of the Amended Schedules will reference both the SBS Amended Schedule (Exs. 4, 137) and the Amended Schedule (Ex. 133).

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v7

§ 8(b) (Ex. 132) and SBS Amended Schedule Part 5(d) (Exs. 4, 137); Amended Schedule Part 5(iv) (Ex. 133). The City and the Swap Counterparties contend that an "Additional Termination Event" occurs if, among other things, the Swap Insurer "fails to have a claims paying ability of at least 'A-' from S&P, or a financial strength rating of at least 'A3' from Moody's. The Insurers dispute this contention. Neither of the Insurers has maintained these required credit ratings since 2009.

## III.    The 2009 Amendments and the Collateral Agreement

15.    In or around January 2009, an "Additional Termination Event" under the Swap Agreements had occurred, resulting from the 2006 COPs' debt rating being reduced below investment grade and the Insurers' ratings being reduced below certain levels, which provided the Swap Counterparties the right to designate an "Early Termination Date" for the transactions under the Swap Agreements. Ordinance No. 05-09 §§ 18-16-3(b)(8); 18-16-4(a) (Ex. 123). Given the low prevailing interest rates in 2009, a termination of the Swaps at that time on the basis of that Additional Termination Event would have resulted in a lump-sum payment owed to the Swap Counterparties of between $300 million and $400 million. *Id.* at § 18-16-4(b) (Ex. 123).

16.    To avoid a significant termination payment, the City, the Service Corporations, and the Swap Counterparties amended the Swap Agreements, and entered into a collateral agreement, dated June 15, 2009, which included a collateral pledge (the "Collateral Agreement" or "CA"). CA Preamble, at 1 (Ex. 11); Ordinance No. 05-09 at § 18-16-4(f), (g); (Ex. 123). Under the Collateral Agreement, the City and the Service Corporations agreed to a "lockbox" arrangement to effectively fund the Swap Payments. The City also purported to grant a first priority lien on and pledge of certain wagering taxes and certain developer payments

-9-

(collectively, the "Casino Revenues") as collateral to secure the City's obligation under the 2006

Service Contracts to make the service payments relating to the Swap Agreements to the Service

Corporations (the "City Pledge"). *See* CA.§§ 4.1, 4.2, 4.3 (Ex. 11). Certain parties contest the

validity of the City Pledge.[13]  The Service Corporations, in turn, purported to grant to the Swap

Counterparties a security interest in and, alternatively, a first priority lien on and pledge of, the

City Pledge. Certain parties contest the validity of this security arrangement and the status of the

Swap Counterparties as secured creditors of the Service Corporations and, through the City

Pledge, of the City. In addition, in 2009 Part 5 of each of the Amended Schedules to the Swap

Agreements was amended to add an "Optional Early Termination" provision, which is described

below. The Insurers consented to the 2009 amendments to the Swap Agreements and to the

Collateral Agreement. *See* Waiver and Consent of FGIC, dated June 26, 2009 (Ex. 112); Waiver

and Consent of Syncora, dated June 26, 2009 (Ex. 6).

17.     As party to the Collateral Agreement, the City provided irrevocable instructions

(the "Irrevocable Instructions") to three Detroit casinos that require the casinos to deposit the

Casino Revenues into a specified account (the "General Receipts Subaccount") maintained by

U.S. Bank National Association as custodian under the Collateral Agreement (the "Custodian").

CA § 3.4 (Ex. 11). At the start of each month, Casino Revenues accumulate in the General

Receipts Subaccount until the City deposits service payments in an amount equal to one-third of

the quarterly Swap Payments owed to the Swap Counterparties pursuant to the Swap Agreements

(without giving effect to netting) into a custodial account (the "Holdback Account"). *Id*. § 5 (Ex.

11). Once the City deposits funds in that amount into the Holdback Account, the Custodian then

---

[13] Prior to the execution of the Collateral Agreement on June 15, 2009, the City of Detroit passed an
ordinance pursuant to the Home Rule Act, which granted a first priority lien and pledge on (i) wagering
taxes and (ii) certain development payments to secure payments on the Swaps. (*See* Detroit, Mich., Code
§ 18-16-8 (2009)). Certain parties contest the validity of this pledge.

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v7

pays to the City the Casino Revenues deposited in the General Receipts Subaccount as well

deposits made during the remainder of the month, except as provided by section 5.4 of the CA.

*Id*. (Ex. 11). Section 5.4 of the CA provides, in part: "No payment shall be made to the City

from the General Receipts Subaccount (i) on and after the Term Period End Date or (ii) on or

after the occurrence of a Termination Event under a Hedge where the related Counterparty is not

the sole Affected Party . . . ." *Id.* § 5.4(a) (Ex. 11) [14] The (i) downgrade by Moody's of the 2006

COPs on March 20, 2012, (ii) Governor declaring a financial emergency in the City on March 1,

2013, (iii) appointment of the Emergency Manager on March 14, 2013, (iv) City's failure to pay

certain amounts due under the Service Contracts on June 14, 2013, and (v) commencement of the

chapter 9 case on July 18, 2013 each constituted a "Termination Event" for which the Service

Corporations are the sole Affected Parties (as defined in the Swap Agreements). *See* ISDA

§§ 5(b)(iii), 12 (definition of "Termination Event") (Ex. 132), Amended Schedule Part 1(i)(ii)(4),

(8), (11) (Ex. 133).[15] The City also concedes that Events of Default and/or Termination Events

exist under the Swaps. The Swap Counterparties have not taken any action to enforce Section

5.4 of the Collateral Agreement and, pursuant to the Forbearance and Optional Termination

Agreement (Mot. Ex. 6), they have agreed to forbear from doing so during the Forbearance

Period (as defined therein). The Custodian "may rely upon the written notice delivered by either

Counterparty as to the occurrence of any…event affecting the determination of the amount or

timing of payment" under Article V of the Collateral Agreement. *See* CA §5.8(a) (Ex. 11).

Furthermore, under the Collateral Agreement, the Custodian is not (i) "required to make any

---

[14] Certain parties assert that the "trapping" of the Casino Revenues occurs automatically, without further action of the Swap Counterparties.

[15] In addition, each of the events described in clauses (ii) through (v) constitutes the "Term Period End Date" under the Collateral Agreement. *See* CA §§ 1.1 (Definitions of "Term Period End Date" Qualified Hedge Event," and "Specified Additional Termination Event"), 11.6(7), (11)(12), Amended Schedule Part 4(i) (Definition of Specified Additional Termination Event"), Part 1(1)(ii)(4).

543

investigation into the existence or occurrence of any facts referred to" in the Collateral Agreement or (ii) "obligated to make any investigation into the facts or matters stated in any . . . notice" delivered in connection with the Collateral Agreement. *See* CA §§12.3(e), (f) (Ex. 11).

18.　Following the execution of the Collateral Agreement, all quarterly swap payments have been made to the Swap Counterparties. On average, approximately $15 million of Casino Revenues has been deposited by the Casinos into the General Receipts Subaccount each month. Deducting the approximately $4 million of monthly Swap payments, this provides the City, on average, with a net cash source of approximately $11 million per month to fund obligations.

19.　The Collateral Agreement provides that the City cannot take any action to divert or redirect the payment of the Casino Revenues without the consent of the Swap Counterparties. CA § 5.1 (Ex. 11). In addition to the new Optional Early Termination provision added to the Amended Schedules (discussed below), the Collateral Agreement gave the Swap Counterparties a variety of new rights the exercise of which, the Swap Counterparties contend, do not by their terms require the Insurers' consent. (*See, e.g., id.* §§ 3.4 (casino instructions), 9.2 (control over junior liens), 9.6 (changes to the Development Agreement), 10.4 (payment of alternative taxes), 11.2 (remedies as secured parties), 11.4 (City's failure to appropriate), and 12.13 (right to remove the Custodian) (Ex. 11). The Collateral Agreement and all the security interests granted to the Swap Counterparties (certain parties contest that any valid security interests were granted to the Swap Counterparties) terminate upon termination of the Swaps and each Swap Counterparty's delivery of confirmation to the Custodian of the payment in full of all obligations of the Service Corporations and the City to each Swap Counterparty under the Swaps and the Collateral Agreement. *Id.* § 14.4 (Ex. 11).

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v7

20.     Concurrently with the execution of the Collateral Agreement, the Swaps and Service Contracts were expressly amended.  The Collateral Agreement provides that it, the 2009 amendments and the Irrevocable Instructions (collectively, the "Definitive Documents"), the Swaps, the 2006 Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, contain the entire agreement of the parties.  *Id*. § 14.14 (Ex. 11).  In addition, the Collateral Agreement provides, "[a]ll of the terms and conditions of the Definitive Documents and of the Hedges [i.e., Swaps], the [2006] Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, shall remain in full force and effect."  *Id*. § 14.14(c) (Ex. 11).

21.     The Collateral Agreement defines "Insurer" as FGIC or Syncora, as the context may require, "or any successor of either of them to the insurance obligations of its predecessor with respect to the insurance of the payment obligations of a Service Corporation under a Hedge."  *Id*. § 1.1 (Ex. 11).  An "Insurer" has the right to consent to any amendment of the Collateral Agreement, but "only…to the extent the amendment affects the rights, remedies, or obligations of such Insurer." *Id*. § 14.5 (Ex. 11).  To date, the Swap Insurers have made no payments on the Swap insurance policies.

22.     At the same time they entered the Collateral Agreement, the Swap Counterparties renegotiated the schedules to the Swap Agreements (the "Amended Schedules").  Among other things, certain new provisions were added to the Swap Agreements through the Amended Schedules.  *See e.g.* Amended Schedule Part 1(i) (Ex. 133).  Specifically, eleven specific "Additional Termination Events" based on events of default or similar events were added and made applicable to Part 5(a) of the SBS Amended Schedules and Part 5(i) of the UBS Amended

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v7

Schedules.[16]  *See* Amended Schedule, Parts 1(i)(ii), 5(i) (Exs. 4, 137); SBS Amended Schedule Part 5(a) (Ex. 133).  Termination of the Swaps based upon any of these eleven new events, like other Events of Default and Termination Events under the Swap Agreements that were not amended, is subject to the purported consent rights of the Insurers.  *See* SBS Amended Schedule Part 5(a)(ii) (Exs. 4, 137); Amended Schedule Part 5(i)(b) (Ex. 133).  The City contends that the Insurers lost their right of consent pursuant to Section 5(b) of the Amended Schedules; however, the Insurers dispute this interpretation of the Swap documents.  In addition, the fixed rate owed by the Service Corporations to the Swap Counterparties under the Swap Agreements was raised from 6.256% to 6.356% for Swaps related to the GRS, and from 6.252% to 6.352% for Swaps related to the PFRS.  *See* Revised Confirmation at 2 (Ex. 134) (for Swaps related to the GRS); PFRS Revised Confirmation (Ex. 138) (for Swaps related to the PFRS).

23.     The Swap Agreements were also amended in 2009 to add an Optional Early Termination provision, which gives the Swap Counterparties the right and option to terminate the Swaps, <u>provided</u> that the Service Corporations will not owe any amount on the Swaps upon the exercise of such option (except for prior unpaid amounts).  SBS Amended Schedule Part 5(t) (Exs. 4, 137); Amended Schedule Part 5(xx) (Ex. 133).  The express terms of the Optional Early Termination provision do not require the Swap Insurer's consent.  *Id*.

24.     The Insurers provided their consent to the Collateral Agreement and the Amended Schedules by Waiver and Consent dated June 26, 2009.  *See* Waiver and Consent of FGIC, dated June 26, 2009 (Ex. 112); Waiver and Consent of Syncora, dated June 26, 2009 (Ex. 6).  The Insurers to date have not made any payments on the Swaps and therefore have no current losses

---

[16] Part 5(a) of the SBS Amended Schedules and Part 5(i) of the Amended Schedules apply only when there is a designation of an "Early Termination Date pursuant to Section 6" of the ISDA Master Agreement, which is based upon an exercise of remedies following certain specific events.  (See, e.g. SBS Amended Schedules at Part 5(a) (Exs. 4, 137); Amended Schedules at Part 5(i) (Ex. 133)).

or claim or rights of subrogation under the Swap insurance policies (although they assert they may have contingent subrogation rights). When, in June 2013, the City failed to make $39.7 million of payments owed under the Service Contracts related to payments owed on the COPs, Syncora paid the claims subsequently submitted under its COPs insurance policies. Based on the Order of Rehabilitation that was in place at the time, and the Rehabilitation Plan that went effective on August 19, 2013, FGIC has not yet made any payments on the claims submitted under its COPs insurance policies.

No party to this Stipulation objects to the admission of the following documents, and all parties to this Stipulation agree to their authenticity and admissibility:

**Exhibits**

City Exhibit 116 - Annual Report of the Board of Trustees of the GRS For the Year Ended June 20, 2004

City Exhibit 117 - Annual Report of the Board of Trustees of the PFRS For the Year Ended June 20, 2004

City Exhibit 118 - City Ordinances No. 03-05

City Exhibit 119 - City Ordinances No. 04-05

City Exhibit 120 - GRS Service Contract 2005

City Exhibit 121 - PFRS Service Contract 2005

City Exhibit 122 - Ordinance No. 05-05

City Exhibit 123 - Ordinance No. 05-09

City Exhibit 124 - Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee

City Exhibit 125 - XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006

City Exhibit 126 - FGIC Municipal Bond New Issue Insurance Policy Number 06010249, dated June 12, 2006

-15-

City Exhibit 127 - FGIC Municipal Bond New Issue Insurance Policy Number 06010250, dated June 12, 2006

City Exhibit 128 - GRS Service Contract 2006

City Exhibit 129 - PFRS Service Contract 2006

City Exhibit 130 - Contract Administration Agreement

City Exhibit 131 - Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013

City Exhibit 132 - 1992 ISDA Master Agreement Local Currency Single Jurisdiction, dated as of May 25, 2005 between UBS and the GRS Service Corporation

City Exhibit 133 - Amended and Restated Schedule, dated as of June 26, 2009, to the ISDA between UBS and the GRS Service Corporation

City Exhibit 134 - Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009

City Exhibit 135 - FGIC Swap Surety Policy Number 0602052 dated June 12, 2006

City Exhibits 47, 48 - XL Capital Assurance Swap Insurance Policy Numbers CA03049E, CA03049D, CA03049C and CA03049B, dated June 12, 2006

City Exhibit 136 - FGIC Swap Surety Policy Numbers 06010253, 06010254 and 06010255, dated June 12, 2006

City Exhibits 4, 137 - SBS Amended Schedules

City Exhibit 11 - Collateral Agreement, dated June 15, 2009

City Exhibit 112 - Waiver and Consent of FGIC, dated June 26, 2009

City Exhibit 6 - Waiver and Consent of Syncora, dated June 26, 2009

City Exhibit 138 - PFRS Revised Confirmation

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v7

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

---

**Order Party: Name, Address and Telephone Number**

Name _Syncora Guarantee & Syncora Capital Assurance_

Firm _Kirkland & Ellis LLP_

Address _300 N. LaSalle_

City, State, Zip _Chicago, IL 60654_

Phone _312.862.3200_

Email _dustin.paige@kirkland.com_

**Case/Debtor Name:** City of Detroit, MI

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** _Hon. Steven Rhodes_

⊙ **Bankruptcy**   ○ **Adversary**

○ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 12/17/13  **Time of Hearing:** 9:00am **Title of Hearing:** Hearing re Detroit Bankruptcy

Please specify portion of hearing requested:  ⊙ **Original/Unredacted**  ○ **Redacted**   ○ **Copy** (2nd Party)

⊙ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: _____

---

**Type of Request:**

⊙ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

○ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free
FTR Record Player™ onto your computer from
www.ftrgold.com

FOR COURT USE ONLY

Transcript To Be Prepared By

_____   Date   By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

_Dustin Paige_ Date: 12/17/13

By signing, I certify that I will pay all charges upon completion
of the transcript request.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

---

**Order Party: Name, Address and Telephone Number**

Name __Syncora Guarantee & Syncora Capital Assurance__

Firm __Kirkland & Ellis LLP__

Address __300 N. LaSalle__

City, State, Zip __Chicago, IL 60654__

Phone __312.862.3200__

Email __dustin.paige@kirkland.com__

**Case/Debtor Name:** City of Detroit, MI

**Case Number:** 13-53846

**Chapter:** 9

**Hearing Judge** _Hon. Steven Rhodes

⊙ **Bankruptcy** ○ **Adversary**

○ **Appeal    Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 12/18/13 **Time of Hearing:** 9:00 am **Title of Hearing:** Hearing re Detroit Bankruptcy

Please specify portion of hearing requested: ⊙ **Original/Unredacted** ○ **Redacted** ○ **Copy** (2nd Party)

⊙ Entire Hearing    ○ Ruling/Opinion of Judge    ○ Testimony of Witness    ○ Other

Special Instructions: _____

---

**Type of Request:**

⊙ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

○ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free
FTR Record Player™ onto your computer from
www.ftrgold.com

**Signature of Ordering Party:**

_Dustin Paige_ _____ Date: 12/18/13

By signing, I certify that I will pay all charges upon completion
of the transcript request.

FOR COURT USE ONLY

Transcript To Be Prepared By

Date        By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjwr Doc 43426 Filed 04/29/13 Entered 04/29/13 26:00:23 Page 455 of
13-53846-swr Doc 2221 Filed 12/18/13 Entered 12/18/13 16:00:23 Page 455 of
456
550

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

---

**Order Party: Name, Address and Telephone Number**

Name  **Syncora Guarantee & Syncora Capital Assurance**

Firm  **Kirkland & Ellis LLP**

Address  **300 N. LaSalle**

City, State, Zip  **Chicago, IL  60654**

Phone  **312-862-2000**

Email  **lally.gartel@kirkland.com**

**Case/Debtor Name:  City of Detroit, MI**

**Case Number:**       **13-53846**

**Chapter:**               **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

◉ **Bankruptcy**    ○ **Adversary**

○ **Appeal**    **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 12/20/2013   **Time of Hearing:** 10:00 am  **Title of Hearing:** Status Conf. Mtn: Assume/Fin

Please specify portion of hearing requested:  ○ **Original/Unredacted**  ○ **Redacted**  ○ **Copy** (2nd Party)

◉ Entire Hearing    ○ Ruling/Opinion of Judge    ○ Testimony of Witness    ○ Other

Special Instructions: **Status Conf. Motions to Assume Forbearance Agreement & Post-Petition Financing**

---

**Type of Request:**

○ Ordinary Transcript - $3.65 per page (30 calendar days)

○ 14-Day Transcript - $4.25 per page (14 calendar days)

◉ Expedited Transcript - $4.85 per page (7 working days)

○ CD - $30; FTR Gold format - You must download the free
FTR Record Player™ onto your computer from
www.ftrgold.com

FOR COURT USE ONLY

Transcript To Be Prepared By

_____    Date    By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

_____ Date: **12/27/2013**

By signing, I certify that I will pay all charges upon completion
of the transcript request.