# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

***Debtor In Possession***
**City of Detroit, Michigan**
2 Woodward Avenue
Suite 1126
Detroit, MI 48226
WAYNE–MI
Tax ID / EIN: 38–6004606

represented by **Bruce Bennett**
555 S. Flower Street
50th Floor
Los Angeles, CA 90071
(213) 489–3939
Email: bbennett@jonesday.com

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237–3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114

(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

*U.S. Trustee*                    represented by **Sean M. Cowley (UST)**
**Daniel M. McDermott**                          United States Trustee
                                                 211 West Fort Street
                                                 Suite 700
                                                 Detroit, MI 48226
                                                 (313) 226–3432
                                                 Email: Sean.cowley@usdoj.gov

                                                 **Richard A. Roble (UST)**
                                                 United States Trustee
                                                 211 West Fort Street
                                                 Suite 700
                                                 Detroit, MI 48226
                                                 (313) 226–6769

2

Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Creditor Committee*<br>**Committee of Unsecured Creditors**<br>*TERMINATED: 03/03/2014* | represented by | **Brett Howard Miller**<br>1290 Avenue of the Americas<br>40th Floor<br>New York, NY 10104<br>(212) 468–8051<br>Email: bmiller@mofo.com,whildbold@mofo.com<br>*TERMINATED: 03/03/2014* |
| | | **Geoffrey T. Pavlic**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033–2518<br>(248) 352–4700<br>Fax : (248) 352–4488<br>Email: pavlic@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| | | **Mark H. Shapiro**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033–2518<br>(248) 352–4700<br>Fax : (248) 352–4488<br>Email: shapiro@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| *Creditor Committee*<br>**Charlene Hearn**<br>PO Box 6612<br>Detroit, MI 48206 | | |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364<br>(202) 408–7004<br>Email: sam.alberts@dentons.com |
| | | **Paula A. Hall**<br>401 S. Old Woodward Ave.<br>Suite 400<br>Birmingham, MI 48009<br>(248) 971–1800<br>Email: hall@bwst–law.com |
| | | **Claude D. Montgomery**<br>620 Fifth Avenue<br>New York, NY 10020<br>(212) 632–8390<br>Email: claude.montgomery@dentons.com,docketny@dentons.com |
| | | **Carole Neville**<br>1221 Avenue of the Americas<br>25th Floor<br>New York, NY 10020<br>(212) 768–6889<br>Email: carole.neville@dentons.com |
| | | **Matthew Wilkins**<br>401 S. Old Woodward Ave. |

Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 03/06/2014 | | 2921 | Notice of Presentment of Order By: Debtor In Possession City of Detroit, Michigan (RE: related document(s)2511 Order on Motion to Assume/Reject, Order on Amended Motion). (Heiman, David) (Entered: 03/06/2014) |
| 03/13/2014 | | 3012 | Objection *along with Certificate of Service* Filed by Creditors Erste Europaische Pfandbrief− und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., FMS Wertmanagement, Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Wilmington Trust, National Association, Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (RE: related document(s)2921 Notice of Presentment of Order). (Sher, Howard) (Entered: 03/13/2014) |
| 03/13/2014 | | 3015 | Objection *Limited Objection of the Detroit Retirement Systems to Notice of Presentment of Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post−Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying the Automatic Stay* Filed by Creditors General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit (RE: related document(s)2921 Notice of Presentment of Order). (Gordon, Robert) (Entered: 03/13/2014) |
| 04/24/2014 | | 4249 | Expedited Transcript Order Form of Hearing 4/2/2014, Filed by Interested Party Ambac Assurance Corporation. (Angelov, Mark) (Entered: 04/24/2014) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
----------------------------------------------------x
                                            :
In re                                       :   Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                  :   Case No. 13-53846
                                            :
                     Debtor.                :   Hon. Steven W. Rhodes
                                            :
----------------------------------------------------x
```

**NOTICE OF PRESENTMENT OF FINAL ORDER PURSUANT TO 11
U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2),
904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING,
(II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

### PLEASE TAKE NOTICE THAT:

1.     On November 5, 2013, the City filed its Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Status and (III) Modifying Automatic Stay [Docket No. 1520] (the "Initial PPF Motion").  In the Initial PPF Motion, the City sought approval of $350 million in post-petition financing (the "Initial PPF Financing"), with Barclays Capital, Inc. as lender ("Barclays").

2.     The Initial PPF Financing consisted of two issuances of financial recovery bonds—

(i)     the first (the "<u>Swap Termination Financing</u>"), to finance the swap termination obligations (the "<u>Swap Termination Obligations</u>") arising in connection with certain swap agreements (the "<u>Swap Agreements</u>") that were to be settled and terminated in connection with the City's Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement (the "<u>Optional Termination Agreement</u>") Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019 and (III) Granting Related Relief [Docket No. 17] (together with a supplement filed on December 27, 2013 [Docket No. 2341], the "<u>Optional Termination Agreement Motion</u>"); and

(ii)     the second (the "<u>QOL Financing</u>"), to finance certain projects (the "<u>QOL Projects</u>") within the City to improve the quality of life in the City, as outlined in greater detail in the Initial PPF Motion.

3.     Approximately $230 million of the Initial PPF Financing was to consist of Swap Termination Financing, and would be used to fund the Swap Termination Obligations.   The remainder of the Initial PPF Financing — approximately $120 million — would consist of QOL Financing.

4.     The City proposed securing the QOL Financing by granting Barclays (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "<u>Pledged Wagering Tax Revenue</u>") and (b) Asset Proceeds Collateral[1] and (ii) a second priority lien on the income tax revenues of the City (the "<u>Pledged Income Tax Revenue</u>", and together

---

[1]     "<u>Asset Proceeds Collateral</u>" was defined in the Initial PPF Motion as "all net proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000."

with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "QOL Financing Collateral").

5.     Importantly, the counterparties under the Swap Agreements assert, as a result of a 2009 collateral agreement, a first lien on the Pledged Wagering Revenues.  Following the termination of the Swap Agreements and payment of the Optional Termination Amount, as contemplated in the Optional Termination Agreement, the swap counterparties' asserted liens in the Pledged Wagering Revenues would have been released, thus allowing the City to pledge a first lien in the Pledged Wagering Revenues to Barclays in connection with the QOL Financing.

6.     The City proposed securing the Swap Termination Financing by granting Barclays a first priority lien on: (i) Asset Proceeds Collateral (on a pari passu basis with the liens granted in connection with the QOL Financing) and (ii) Pledged Income Tax Revenue (collectively, the "Swap Termination Financing Collateral").

7.     As additional security, the obligations owing to Barclays in connection with the Initial PPF Financing were to have super-priority administrative expense status, pursuant to section 364(c) of the Bankruptcy Code, over all other postpetition claims and over all prepetition unsecured claims in the

CHI-1922513v3
-3-
13-53846-tjt   Doc 4311-8   Filed 04/30/14   Entered 04/30/14 23:00:33   Page 7 of 203
13-53846-swr  Doc 3205   Filed 03/20/14   Entered 03/20/14 23:00:33   Page 3 of 178     7

City's chapter 9 case. The other material terms of the Initial PPF Financing are outlined in the Initial PPF Motion and the exhibits attached thereto.

8. Given the inter-related nature of the Initial PPF Motion and the Optional Termination Agreement Motion, this Court held combined evidentiary hearings on both motions on December 17, 2013, December 18, 2013, January 3, 2014, and January 13, 2014. Following the proceedings on December 18, 2013, this Court ordered the parties into further mediation in connection with the Optional Termination Agreement Motion and, in particular, urged the parties to reach agreement on reduced Swap Termination Obligations under the Optional Termination Agreement.

9. Mediation sessions were held among the parties on December 23 and 24, 2013, the result of which was an agreement to reduce the Swap Termination Obligations to $165 million. As a result of this agreement, the Initial PPF Financing was also reduced, with the consent of Barclays, to a commitment of $285 million — $165 million of which would constitute Swap Termination Financing, and $120 million would remain QOL Financing.

10. On January 16, 2014, this Court denied the Optional Termination Agreement Motion [Docket No. 2511] and, as a result, also denied the Initial PPF Motion to the extent it sought approval of the Swap Termination Financing.

11.   The Court, nevertheless, approved the Initial PPF Motion insofar as it sought approval of the QOL Financing.  In so holding, the Court made the following findings with respect to the QOL Financing:

> Specifically, the Court finds that the city has established by a preponderance of the evidence that this loan is in the best interest of the city; that it needs the money; that the terms are market terms and the best available to the city; that they were negotiated in good faith; and that they were negotiated at arm's length.  Indeed, the Court finds that there was no substantial contradictory evidence on these points.

See Transcript dated January 16, 2014 at 23, 9-16.

12.   The Court's approval of the QOL Financing, however, was conditioned.  In particular, the Court found that the Michigan statute authorizing the imposition of wagering taxes on casinos operating in the State restricts the use of the Pledged Wagering Revenues to the following uses:

> (a) the hiring, training, and deployment of street patrol officers; (b) neighborhood and downtown economic development programs designed to create local jobs; (c) public safety programs such as emergency medical services, fire, department programs, and street lighting; (d) anti-gang and youth development programs; (e) other programs that are designed to contribute to the improvement of the quality of life in the city; (f) relief to the taxpayers of the city from 1 or more taxes or fee imposed by the city; (g) the costs of capital improvements; and (h) road repairs and improvements.

MICH. COMP. LAWS § 432.212(3)(a).

13.   The Court found that the Pledged Wagering Revenue could be pledged as collateral to secure a financing if the proceeds of such financing were used for one of the enumerated purposes set out in Michigan law, but the Pledged

Wagering Revenue <u>could not</u> be used, as collateral or otherwise, to finance the City's "working capital" needs. <u>See</u> Transcript dated January 16, 2014 at 26, 9-20. To ensure that proceeds of the QOL Financing are properly used for an enumerated purpose under Michigan law, the Court conditioned approval —

> [O]n a process by which the city gives 14 days' written and filed notice of its intent to use the proceeds during which interested parties can object on the grounds that the proposed use is not consistent with the Gaming Act. The Court would then schedule a prompt hearing and promptly resolve the objection. Consistent with Section 904, however, the Court will not review any aspect of the use of the proceeds other than its compliance with the Gaming Act.

<u>See</u> Transcript dated January 16, 2014 at 26-27, 21-25, 1-5.

14. Alternatively, the Court indicated that if the QOL Financing were secured by a different form of collateral that was not subject to a similar state law restriction, the foregoing notice requirements would not be applicable. <u>See</u> Transcript dated January 16, 2014 at 27, 6-12.

15. In light of the Court's ruling, the City and Barclays engaged in discussions about proceeding with only the QOL Financing. With the denial of the Optional Termination Agreement Motion, the previous structure of the QOL Financing was no longer viable because the City would not be in a position to deliver an undisputed first lien in the Pledged Wagering Revenues. Consequently, Barclays would no longer be agreeable in lending against the Pledged Wagering Tax Revenue as collateral.

16.     As a result, the City and Barclays have agreed to an amended structure for the QOL Financing (the "Amended QOL Financing").  The material terms of the Amended QOL Financing are set forth in (i) the proposed order attached hereto as Exhibit A (the "Proposed Order"), (ii) that certain Bond Purchase Agreement by and among the City and Barclays Capital Inc., as Purchaser attached hereto as Exhibit C (the "Purchase Agreement") (iii) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A. as trustee thereunder (the "Indenture") attached hereto as Exhibit D, (iv) the First Supplemental Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A. as trustee thereunder (the "Supplemental Indenture") attached hereto as Exhibit E, (v) the Deposit Account Control Agreement by and among the City, UMB Bank, N.A. and Comerica Bank (the "DACA") attached hereto as Exhibit F, and (vi) the letter agreement dated March 6, 2014 between Barclays Capital Inc. and the City (the "Letter Agreement") attached hereto as Exhibit G.  A blackline of the Proposed Order is attached hereto as Exhibit B, which shows the changes from the final form of order that was filed with the Initial PPF Motion on December 31, 2013.   The Proposed Order, the Purchase Agreement, the Indenture, and the transaction documents related thereto shall be collectively referred to herein as the "Financing Documents".

CHI-1922513v3
13-53846-swr    Doc 4314-8   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 11 of 79
13-53846-swr    Doc 2311-8   Filed 03/06/14   Entered 03/06/14 15:30:33   Page 11 of 79
203    11

17.     The key change to the structure of the financing as proposed in the Financing Documents (other than the loan amount), is the collateral securing the Amended QOL Financing, which shall consist of (i) the Pledged Income Tax Revenues (as defined in the Financing Documents), and (ii) Asset Proceeds Collateral (together, the "Collateral").  The Collateral is less than that offered by the City to Barclays in connection with the Initial PPF Financing.  Additionally, Asset Proceeds Collateral expressly excludes assets owned by the City, or assets in which the City holds an interest, which are held by the Detroit Institute of Arts. The other material terms of the Amended QOL Financing are substantially similar to those proposed in the Initial PPF Motion, except as they may be modified to reflect the reduced loan amount or the new Collateral.

18.     In ruling on the proposed grant of a lien to secure the QOL Financing and the use of loan proceeds, the Court stated:

> [A]ny offer of security for a loan under Section 364 must comply with state law unless, of course, Section 364 expressly provides otherwise. As the city points out, the Court can, under Section 364, give a senior or priming lien to existing liens which might be or would be in derogation of state law; however, nothing in Section 364 suggests that a Court can allow a municipality to use its property in violation of state law.

See Transcript dated January 16, 2014 at 27, 2-7.

Consistent with the Court's ruling, the City believes the Court can and should approve the Amended QOL Financing as not only expressly authorized by Section 364, but also consistent with and, in fact, authorized by state law.

19. Incurrence of the Amended QOL Financing indebtedness is authorized by Michigan law. Under Article 7, Section 21 of the Michigan Constitution and, subject to Article 7, Section 22 of the Michigan Constitution, Michigan law, including the Michigan Home Rule City Act, Public Act 279 of 1909 ("Act 279"), restricts the powers of cities to levy taxes and incur indebtedness. Act 279, however, expressly provides that:

> (1) Except as otherwise provided under this section, if a financial emergency exists under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, a city may issue financial recovery bonds in amounts greater than the limitations established by the city charter or this act.

> (2) Any financial recovery bonds issued under this section are subject to the terms and conditions approved by the local emergency financial assistance loan board created under the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942.

MICH. COMP. LAWS § 117.36a.

The Amended QOL Financing is being issued under Section 36a of Act 279. Before the Closing Date, the Amended QOL Financing and its terms and conditions will be approved by the Emergency Manager, submitted to City Council for consideration, and approved by the Local Emergency Financial Assistance

CHI-1922513v3
-9-
13-53846-tiit   Doc 4314-8   Filed 04/29/44   Entered 04/29/44 22:00:23   Page 13 of 279
13-53846-swr   Doc 2911   Filed 03/06/14   Entered 03/06/14 15:30:33   Page 13 of
203
13

Loan Board (the "Board"), all in accordance with applicable Michigan statute, including Act 279 and Act 436, Public Acts of Michigan 2012, as amended, MCL 141.1541, et seq. ("Act 436"). Furthermore, incurrence of the QOL Financing indebtedness is not prohibited under Michigan law. As provided above, a city is authorized to issue financial recovery bonds in amounts greater than the limits otherwise established by law. No applicable debt limitations will be exceeded or evaded by issuance of the Amended QOL Financing.

20. Use of the QOL Financing proceeds for quality of life projects, and the indirect commitment of Pledged Income Tax Revenues and Asset Proceeds Collateral for quality of life projects, is authorized by Michigan statute. Act 279 provides, in addition to the authorization of Section 36a, that:

> Each city in its charter may provide for the borrowing of money on the credit of the city and issuing bonds for the borrowing of money, for any purpose within the scope of the powers of the city.

MICH. COMP. LAWS § 117.4a(1).

All quality of life projects are within the scope of the City's powers under Michigan law. Furthermore, use of the Amended QOL Financing proceeds to fund quality of life projects, and the indirect commitment of Pledged Income Tax Revenues and Asset Proceeds Collateral to fund quality of life projects, are not

prohibited by any provision of Michigan law, including Act 436, Act 279 or the City Income Tax Act, Public Act 284 of 1964 ("Act 284").

21.     All terms and conditions of the Amended QOL Financing, including the grant of the lien on the Pledged Income Tax Revenue and the Asset Proceeds Collateral, are authorized by Michigan law.  As contemplated by Act 279, before the Closing Date, the Board will approve the Amended QOL Financing, require the City to grant a lien on the Pledged Income Tax Revenue and the Asset Proceeds Collateral, and authorize the City to execute the Financing Documents.  Under the Emergency Municipal Loan Act, Public Act 243 of 1980 ("Act 243"):

> The board has the powers necessary to carry out and effectuate the purposes and provisions of this act, and powers vested in the board under other laws of this state, including, but not limited to, all of the following powers:
>
> (h) To subject a loan to the terms and conditions the board considers necessary to ensure compliance with the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, and to ensure timely repayment of the loan…

MICH. COMP. LAWS § 141.932(2).

Before the Closing Date, the City will have received the Board's order and will have complied with any and all terms and conditions of the Board's order. Furthermore, each of the terms and conditions of the Amended QOL Financing is not prohibited by any provision of Michigan law, including Act 436, Act 279 or Act 243.

22.     The effectiveness of the Proposed Order is conditioned upon (i) the City submitting the Amended QOL Financing to the City Council of the City for review pursuant to Section 19(1) of Act 436 and (ii) approval of the Amended QOL Financing by the Board pursuant to Section 36a of Act 279.   The City anticipates that each of the foregoing conditions to the effectiveness of the Proposed Order will be satisfied in due course.

23.     Consistent with this Court's ruling on January 16, 2014, the City requests that the Court enter the Proposed Order approving the Amended QOL Financing on terms substantially similar to, or more advantageous to, the City than those set forth in the Financing Documents.   In accordance with E.D. Mich. L.R. 9021-1(a)(4), any party seeking to object to the entry of the Proposed Order shall file its objection (an "<u>Objection</u>") with the Court, and serve its Objection upon counsel for the City and Barclays within seven (7) days from the date of service of this Notice of Presentment (the ("<u>Objection Deadline</u>").   To the extent any Objections are filed with the Court by a party in interest, the Court may schedule a hearing to address such Objections at the Court's earliest available date and time. If a written Objection is not timely filed and served in the manner provided above before the Objection Deadline, the Order will be submitted by the City to the Court for entry onto the Court's docket.

Dated: March 6, 2014                    Respectfully submitted,


                                        /s/ David G. Heiman
                                        David G. Heiman (OH 0038271)
                                        Heather Lennox (OH 0059649)
                                        JONES DAY
                                        North Point
                                        901 Lakeside Avenue
                                        Cleveland, Ohio  44114
                                        Telephone:  (216) 586-3939
                                        Facsimile:  (216) 579-0212
                                        dgheiman@jonesday.com
                                        hlennox@jonesday.com

                                        Brad B. Erens (IL 6206864)
                                        JONES DAY
                                        77 West Wacker
                                        Chicago, Illinois  60601-1692
                                        Telephone:  (312) 782-3939
                                        Facsimile: ( 312) 782-8585
                                        bberens@jonesday.com

                                        Bruce Bennett (CA 105430)
                                        JONES DAY
                                        555 South Flower Street
                                        Fiftieth Floor
                                        Los Angeles, California  90071
                                        Telephone:  (213) 489-3939
                                        Facsimile:  (213) 243-2539
                                        bbennett@jonesday.com


                                        ATTORNEYS FOR THE CITY

## <u>CERTIFICATE OF SERVICE</u>

       I, David G. Heiman, hereby certify that the foregoing Notice of Presentment was filed and served via the Court's electronic case filing and noticing system on this 6th day of March, 2014.


                    /s/ David G. Heiman

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),  503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2),  904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan seeking entry of an order, *inter alia*:[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings given to

CHI-1922517v1

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $350,000,000 (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached to the Motion as Exhibit 6B, by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached to the Motion as Exhibit 6C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)     authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local Emergency Financial Assistance Loan Board Order and the documents relating to

them in the Bond Purchase Agreement (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this Order that are defined in Section 101 or 102 of the Bankruptcy Code have the meanings assigned to

the Pledged Wagering Tax and Pledged Income Tax (each as may be amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment Letter between Barclays Capital Inc. and the City dated as of October 6, 2013 (together with all amendments thereto as of the date hereof, the "Commitment Letter") and the Fee Letter between Barclays Capital Inc. and the City dated as of October 6, 2013 (together with all amendments thereto as of the date hereof, the "Fee Letter"), the "Initial Bond Documents"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the Initial Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder and under the Initial Bond Documents (collectively, and including all obligations under or with respect to the Initial Bond Documents, the "Initial Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined

them by the Bankruptcy Code.

below) on the Quality of Life Bond Collateral (as defined in the Motion) and the Swap Termination Bond Collateral (as defined in the Motion) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6 and 7 of the Order attached to the Motion at Exhibit 1 (the "Proposed Order") and in the Initial Bond Documents;

(v)     authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Initial Bond Documents and the Fee Letter, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the Initial Bond Documents (as applicable);

(vi)     vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Initial Bond Documents and the Proposed Order, as limited pursuant thereto; and

(vii)     authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 29 of the Proposed Order;

The City having revised the Motion with the consent of the Purchaser to limit the City's borrowing under the Post-Petition Facility to $285,000,000, the Purchaser

having agreed to extend the termination date under the Commitment Letter to January 31, 2014, and the amendment to the Commitment Letter having been submitted to the Court as part of the record of the Hearing (as defined below);

the Court having considered the Motion, the Initial Bond Documents attached to the Motion, the Declarations of James Doak and Charles M. Moore in Support of the Motion, the exhibits attached thereto, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "Hearing");

notice of the Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and no further notice being required;

the Hearing to consider the relief requested in the Motion having been held and concluded;

the Court having determined after the conclusion of the Hearing and by minute order that the Motion should be denied in part and granted in part with conditions as to a revised post-petition facility in an amount not to exceed $120,000,000 (the "Revised Post-Petition Facility"), to the extent set forth in this Order;

the city having filed and the Court having considered the Notice of Presentment of this Order ("Notice of Presentment"), which presented this Order as a proposed Order, described the revisions in this Order from the Proposed Order necessitated by this Court's determination and minute order and attached as Exhibits

the revised Indenture, a form of Supplemental Indenture, the revised Bond Purchase Agreement, and the revised Income Tax Control Agreement (each, a "<u>Revised</u>" document, and collectively, the "<u>Revised Bond Documents</u>");

all objections to the Motion having been withdrawn, resolved or overruled by the Court in the manner set forth in this Order;

it further appearing that granting the relief requested to the extent set forth in this Order is fair and reasonable and in the best interests of the City; and

it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and

after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, INCLUDING THE NOTICE OF PRESENTMENT, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Petition Date*.  On July 18, 2013 (the "<u>Petition Date</u>"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Court</u>")

commencing this Case. The order for relief in this case was entered on December 5, 2013.

      B.    *Jurisdiction and Venue*. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings and over the persons, entities and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

      C.    *City's Stipulations*. The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the Revised Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens and any rights of Comerica Bank in the Collateral referenced in section 2.02(c) of the DACA (defined in paragraph 7 below) that exist on the date hereof; (b) on or before the Closing Date, and giving effect to the Court's authority in this bankruptcy case, the City shall take or cause to be taken all actions, and the effectiveness of this Order is conditioned upon the City's having received, all consents necessary, including under applicable non-bankruptcy law, for the approval of the Revised Post-Petition Facility upon the terms and conditions set forth in the Revised Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities

7

CHI-1922517v1

13-53846-swr    Doc 4311-8  Filed 03/06/14  Entered 03/06/14 15:36:59  Page 26 of 79    26
13-53846-swr    Doc 2521  Filed 03/06/14  Entered 03/06/14 15:36:59  Page 26 of 179
203

set forth herein and in the Revised Bond Documents, and (c) the entry of this Order and the relief and orders granted herein is at the request, and upon the consent, of the City.

D. *Findings Regarding the Postpetition Financing*.

(i) *No Credit Available on More Favorable Terms*. Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the Revised Post-Petition Facility. The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph 7 hereof and in the Revised Bond Documents, (2) superpriority claims and Liens and (3) the other protections set forth in the Revised Bond Documents and this Order.

(ii) *Use of Proceeds of the Revised Post-Petition Facility*. As a condition to the entry into the Revised Bond Documents and the extension of credit under the Revised Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the Revised Post-Petition Facility shall be used in a manner consistent with the terms and conditions of the Revised Bond Documents, solely for purposes permitted by law, including to fund expenditures designed to contribute to

the improvement of the quality of life in the City and to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.      *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F.      *Good Faith and Jurisdictional Matters*.

(i)      *Willingness to Provide Financing*.  The Purchaser has indicated a willingness to provide financing to the City pursuant to the Revised Bond Documents subject to:  (a) the entry of this Order; (b) approval by this Court of the terms and conditions of the Revised Post-Petition Facility and the Revised Bond Documents;  (c) entry of findings by this Court that such financing is in the best interests of the City and is not prohibited by any applicable law, that the Purchaser, the Indenture Trustee and Bondholders are extending credit to the City pursuant to the Revised Bond Documents in good faith and for a proper purpose and that the Revised Post-Petition Facility and all obligations owing thereunder and under the Revised Bond Documents (collectively, and including all obligations under or with respect to the Revised Bond Documents, the "Revised Bond Obligations"),

Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee and the Bondholders pursuant to this Order and the Revised Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, of any order finding jurisdiction, of the order for relief or of any other order.

(ii)     *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*.  The terms and conditions of the Revised Post-Petition Facility and the Revised Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code.  The Revised Post-Petition Facility is the result of a full and fair marketing process conducted by the City and its agents and advisors.  The Revised Post-Petition Facility and the Revised Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties.  Credit extended under the Revised Post-Petition Facility and the Revised Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the

protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses
that are permitted by law, and not in violation of the Bankruptcy Code or of
applicable nonbankruptcy law, and the Revised Post-Petition Facility (including the
transactions contemplated by the Revised Bond Documents) is not prohibited by
applicable bankruptcy or nonbankruptcy law. The Purchaser, the Indenture Trustee
and the Bondholders therefore qualify for the full protection and benefits of Sections
364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected
by any reversal, modification, vacatur, amendment, reargument or reconsideration
of this Order, of any order finding jurisdiction, of the order for relief or of any other
order.

G.      *Act 436 Approval.*  On October 21, 2013, in accordance with Section
19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et
seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the
Post-Petition Facility.  The City Council failed to offer an alternative proposal
during the time period prescribed in Section 19(2) of Act 436.  The City has
requested and received approval of the Post-Petition Facility by the Emergency
Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the
Michigan Home Rule City Act, Public Act 279 of 1909.  The City has committed to
comply with the procedures required under Section 19(1) of Act 436 and with
Section 36a of the Michigan Home Rule City Act with respect to the Revised

11

.

Post-Petition Facility.

H.    *Notice*.  Notice of the Hearing and the relief requested in the Motion and of the Notice of Presentment has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; and (p) all entities that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      <u>Motion Approved</u>.  The Motion is granted to the extent and subject to the terms and conditions set forth in this Order.

2.      <u>Objections Overruled</u>.  All objections to the Motion and to the Revised Post-Petition Facility and the Revised Bond Documents and the Revised Bond Obligations (collectively, the "<u>Financing</u>"), to the extent not withdrawn or resolved are hereby overruled to the extent provided in this Order.

**Revised Post-Petition Facility Authorization**

3.      <u>Authorization of the Financing</u>.  Subject to the City's compliance with the procedures for authorizing the borrowing of money under Sections 12(1) and 19 of Act 436 and the approval of the Board of the Financing under Section 36a of the Michigan Home Rule City Act, the City is hereby authorized to enter into and to incur the obligations under the Financing, all of which is hereby approved, and is authorized and empowered to incur and to perform the Revised Bond Obligations in accordance with, and subject to, the terms of this Order and the Revised Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the

Revised Bond Documents and the creation and perfection of the Liens described in and provided for by this Order and the Revised Bond Documents. The Collateral and all proceeds thereof shall be deposited and applied as required by this Order and the Revised Bond Documents. Upon execution and delivery, the Revised Bond Documents and the Revised Bond Obligations shall represent valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4.  <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the Revised Bond Documents and this Order and to the City's compliance with the procedures for authorizing the borrowing of money under Sections 12(1) and 19 of Act 436 and the Board's approval of the Financing under Section 36a of the Michigan Home Rule City Act, the City is hereby authorized to issue the Revised Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into and incur the Financing.

5.  <u>Revised Bond Obligations</u>.  The Revised Bond Documents and this Order shall evidence the validity and binding effect of the City's Revised Bond Obligations, which Revised Bond Obligations shall be effective as of the Closing Date.  Upon entry of this Order, and effective as of the Closing Date, the Revised Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective Revised Bond

14

CHI-1922517v1

13-53846-swr   Doc 4311-8   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 33 of 79
13-53846-swr   Doc 2521   Filed 03/06/14   Entered 03/06/14 15:36:59   Page 33 of 179   33
203

Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective Revised Bond Documents. The Revised Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the Revised Bond Documents. No obligation, payment, transfer or grant of security under the Revised Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6. <u>Liens and Collateral</u>. (a) In order to secure the Revised Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the City is authorized to grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby granted, in accordance with the terms of the Revised Indenture, valid, binding, continuing, enforceable, non-avoidable, fully-perfected first priority liens (the "<u>Liens</u>") on (i) except for that portion of income tax revenues transferred into the budget of the City's police department at any time, to be used exclusively to retain and hire police officers, in an amount equal to the sum of 0.2% of the income tax rate levied on

resident individuals and 0.1% of the income tax rate levied on non-resident individuals for so long as bonds, obligations or other evidences of indebtedness of the City's Public Lighting Authority are outstanding and payable from taxes levied by the City under the Utility Users Tax Act, Act 100, Public Acts of Michigan, 1990, as amended, MCL 141.1151, et seq., the remaining income tax revenues of the City (the "Pledged Income Tax Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Revised Bond Documents (clauses (i) and (ii), collectively, the "Collateral"); and

(b)    Notwithstanding anything to the contrary in this Order, the Motion or the Revised Bond Documents, under no circumstances shall the Collateral include revenues of the Systems or any other assets pledged to secure any of the Water/Sewer Bonds.  This Order is without prejudice to, and does not waive, any objections the Trustee, the Holders, or the Bond Insurers may have regarding any monetization or disposition of any assets of either or both the Systems or any claim or defense (including any claim of a first priority lien on any Asset Proceeds Collateral arising from the disposition of any assets of the Systems) that the Purchaser, the Indenture Trustee under the Revised Indenture or the Bondholders may have with respect to any security interest, lien or pledge that the Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.  The terms, "Trustee,"  "Systems" and "Water/Sewer Bonds," as used in this paragraph, shall

have the same meaning as those terms have in the Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay (Docket No. 1797) filed by U.S. Bank National Association in its capacity as Trustee for the Water/Sewer Bonds. The term "Holders" shall mean the holders of the Water/Sewer Bonds. The term "Bond Insurers" shall mean the bond insurers (including, without limitation, as providers of surety bonds for any reserve fund requirements) that insure the Water/ Sewer Bonds.

7.    Lien Priority.  The Liens shall be senior in priority and superior to any pledge of, lien on or claim to any of the Collateral and shall expressly apply to any Collateral deposited at Comerica Bank pursuant to the Deposit Account Control Agreement among the City, UMB Bank, N.A., as Indenture Trustee, and Comerica Bank (the "DACA") except that, notwithstanding anything to the contrary in this Order or the Revised Bond Documents, the Liens shall be subject to the rights of Comerica Bank with respect to any Collateral deposited at Comerica Bank as provided in section 2.02(c) of the DACA.  Other than as set forth herein and in the Revised Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable, including against the City under Sections 921(e)

17

CHI-1922517v1
13-53846-swr   Doc 4311-8   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 36 of 79
13-53846-swr   Doc 2521   Filed 03/06/14   Entered 03/06/14 15:36:59   Page 35 of 179    36
203

and 364(e) of the Bankruptcy Code, notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, of any order finding jurisdiction, of the order for relief or of any other order and notwithstanding the dismissal of the Case for any reason.  The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code.  No lien or interest avoided and preserved pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

8.     <u>Superpriority Claims</u>.  Upon the Closing Date, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "<u>Superpriority Claim</u>") for all Revised Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City.  There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect of ad valorem property tax revenue (the "<u>Property Tax Revenue</u>").  To the extent this

Court finds and determines (and pending such finding or determination), or approves any settlement or confirms any plan of adjustment that provides, that any Property Tax Revenue of the City is subject to a property interest (such as a lien or pledge) of any holders of limited or unlimited tax general obligation bonds issued by the City or that such Property Tax Revenue is not generally available for use by the City other than for payment of such limited or unlimited general obligation bonds and is not available for distribution to general unsecured creditors as part of a plan of adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

9.      No Obligation to Extend Credit.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the Revised Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the Revised Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Revised Bond Documents.

**Additional Provisions**

10.      Amendment of the Revised Bond Documents. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and

deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Revised Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements or as the City may otherwise have the power to effect without further order of the Court.

11. <u>Modification of Automatic Stay</u>. The automatic stay imposed under Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including to: (a) permit the City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the Indenture Trustee and the Bondholders to request, and the City to perform, such acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may request, each in its sole discretion to assure the perfection and priority of the Liens granted herein; (c) permit the City to incur all liabilities and obligations to the Purchaser, the Indenture Trustee and the Bondholders under the Revised Bond Documents, the Revised Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance with the terms of the Revised Bond Documents, the Revised Post-Petition Facility and this Order; (e) authorize the City to pay, and the Indenture Trustee (for its own benefit and for the benefit of the Bondholders) and the Bondholders to retain and apply, all payments required to be made to the Indenture

Trustee or the Bondholders, in accordance with the terms of the Revised Bond Documents, the Revised Post-Petition Facility and this Order; and (f) authorize Comerica Bank to exercise its rights and to comply with its obligations under and as referenced in the DACA.

12.    Perfection of Liens.  This Order shall be conclusive evidence of the validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein and in the Revised Bond Documents.

13.    Right to Take Actions to Perfect.  Notwithstanding the foregoing, the Purchaser, the Indenture Trustee and the Bondholders are authorized, but not required, to file and obtain, as each deems necessary in its sole discretion, such financing statements, notices of liens, control agreements, supplemental bond documents and other security documents to perfect in accordance with applicable non-bankruptcy law, or take constructive control over assets, or take any other action, in each case, to validate and perfect the Liens, and all such financing

statements, notices, control agreements and other security documents shall be

deemed to have been filed or recorded as of the date of entry of this Order; provided,

however, that no such filing or recordation shall be necessary or required in order to

create or perfect the Liens.  The City is authorized and directed to execute and

deliver promptly upon demand to the Purchaser or the Indenture Trustee all such

financing statements, notices, control agreements and other security documents as

the Purchaser or the Indenture Trustee may request.  The Purchaser or the Indenture

Trustee, each in its discretion, may file a photocopy of this Order as a financing

statement with any filing or recording office or with any registry of deeds or similar

office, in addition to or in lieu of such financing statements, notices of lien or similar

instrument, and all filing offices are hereby authorized to accept such photocopy for

filing and recording.  For the avoidance of doubt, the automatic stay of

Section 362(a) of the Bankruptcy Code is hereby modified to the extent necessary to

permit the Purchaser, the Indenture Trustee and the Bondholders to take all actions,

as applicable, referenced in this paragraph.

14.     Proceeds of Subsequent Financing.  If the City obtains credit or incurs

debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the

Revised Bond Documents at any time prior to the indefeasible repayment in full of

all Revised Bond Obligations and the satisfaction of the Superpriority Claims,

including after the confirmation of any plan of adjustment filed in the Case, and such

facilities are secured by any Collateral, then, in addition to any remedies that may be available to the Purchaser, the Indenture Trustee and the Bondholders under the Revised Bond Documents, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Indenture Trustee, to be applied as set forth in the Revised Bond Documents and this Order.

15. <u>Maintenance of Collateral</u>. Until the indefeasible payment in full of all Revised Bond Obligations and the satisfaction of the Superpriority Claims, the City shall maintain: (a) the Collateral as required under the Revised Bond Documents; and (b) the cash management system as required by the Revised Bond Documents.

16. <u>Disposition of Collateral</u>.

(a) Except as otherwise provided for in the Revised Bond Documents or the DACA, the City shall not grant a lien on or transfer any interests in any portion of the Collateral in any way inconsistent with the Revised Bond Documents or without the prior written consent of the Indenture Trustee (or, prior to the issuance of the Bonds, the prior written consent of the Purchaser).

(b) In the event of any sale, lease or other disposition of any Collateral (a "<u>Collateral Disposition</u>"), the City shall, to the extent required by the Revised Bond Documents, pay, or cause to be paid, to the Indenture Trustee the proceeds of such Collateral Disposition for application in accordance with the Revised Bond Documents and this Order. All such proceeds of any Collateral

Disposition shall be applied in accordance with the terms and conditions of the Revised Bond Documents.

17. <u>Reporting reinvestment/revitalization spending</u>. Within 30 days after the Closing Date, the City will produce in its electronic data site for review by creditors a revised indicative schedule of spending of the proceeds of the Revised Post-Petition Facility (with monthly detail) with at least the same line items that are contained in the reinvestment spending plan dated October 10, 2013 provided by the City to creditors (a "<u>Revised Plan</u>"). Proceeds of the Revised Post-Petition Facility will be placed in a segregated account (the "<u>Quality of Life Account</u>") that will be drawn upon as approved, appropriated and budgeted reinvestment spending plan projects are invoiced and require payment. Such projects may extend beyond those listed in the Revised Plan. The City will track actual disbursements from the Quality of Life Account, and will provide, on a monthly basis, a report of actual disbursements, including a description of the disbursements. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

18. <u>Overall general fund financial condition</u>. Within 30 days after the closing of the Revised Post-Petition Facility, the City will provide in its electronic data site a revised monthly cash flow forecast through Fiscal Year 2015 (the "<u>Revised Forecast</u>") consistent with the "DIP Forecast" format previously presented

by the City to creditors and potential financing providers. The City will provide in its electronic data site, on at least a quarterly basis, a report that includes actual performance (by month) against forecasted performance (by month) on the line items contained in Revised Forecast. The City will reforecast the remaining periods of the Revised Forecast, and determine whether to extend the Revised Forecast, on a quarterly basis. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

19. <u>Maturity Date</u>. Upon the earliest to occur (such earliest date, the "<u>Maturity Date</u>") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the Revised Bond Documents; and (d) dismissal of the Bankruptcy Case, the Revised Bond Obligations shall be immediately due in accordance with the terms of the Revised Bond Documents.

20. <u>No Dismissal</u>. The Revised Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of the Case unless otherwise agreed to by the Indenture Trustee, upon the consent of all Bondholders, and this Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

21. <u>Events of Default</u>. The occurrence of an "Event of Default" under the

Revised Bond Documents or any violation of the terms of this Order shall constitute an event of default under this Order ("<u>Event of Default</u>"), unless waived in writing by the Indenture Trustee, upon consent of the Bondholders in accordance with the Revised Bond Documents (or, prior to the issuance of the Bonds, waived in writing by the Purchaser)..

22. <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default, the Indenture Trustee, on its own or upon the direction of the Bondholders in either case in accordance with the Revised Bond Documents, may, among other things, declare all Revised Bond Obligations owing under the Revised Bond Documents to be immediately due and payable in accordance with the terms of the Revised Bond Documents, but without affecting any of the Liens or the Revised Bond Obligations (any such declaration, a "<u>Termination Declaration</u>"). The Termination Declaration shall be given by electronic transmission as provided in the Revised Bond Documents (the date any such Termination Declaration is made, the "<u>Termination Declaration Date</u>"). Following the Termination Declaration Date, the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the Revised Bond Documents without further order or approval from this Court.

23. <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. The Indenture Trustee, on behalf of the

Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the Revised Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby. Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

24. <u>Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections

provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the Revised Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created by this Order. Any Liens or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

25. <u>Proofs of Claim</u>. The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the Revised Bonds. Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

26. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the Revised Bond Documents, the City shall afford representatives, agents or

employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the Revised Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the Revised Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the Revised Bond Purchase Agreement will be provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the Revised Post-Petition Facility.

27. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The Revised Post-Petition Facility and the Collateral and their proceeds may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the Revised Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on

behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Revised Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the Revised Bond Documents or this Order.

28.    No Third Party Rights.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party who is not expressly referenced in this Order, any creditor or any direct, indirect or incidental beneficiary.

29.    Section 506(c) Claims.  Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims

or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee (or, in the case of any such charges against the Purchaser or its claims, the prior written consent of the Purchaser).

30. <u>No Marshaling/Applications of Proceeds</u>. The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the Revised Bond Documents and this Order.

31. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

32. <u>No Waiver by Failure to Seek Relief</u>. The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the Revised Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the

Bondholders.

33. <u>No Waiver by Seeking Relief</u>. Except to the extent this Order (other than paragraphs 10, 17 and 18) provides otherwise, (i) neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the Revised Post-Petition Facility, without approval of the Court, (ii) nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the Revised Bond Documents.

34. <u>Binding Effect of Order</u>. Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

35. <u>No Modification of Order</u>. Until and unless the Revised Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Revised Bond Documents that

by their terms survive such discharge), the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken before or within 90 days after the issuance of the Revised Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Revised Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with priority equal or superior to the Liens (except as specifically provided in the Revised Bond Documents). The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

36.     _Order Controls_.  In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

37.  <u>Survival</u>.  The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case.  Any order dismissing the Case shall provide that (A) the Revised Bond Obligations, the Superpriority Claim and the Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the Revised Bond Documents until all Revised Bond Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Revised Post-Petition Facility or the Revised Bond Documents that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Revised Bond Obligations, Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the Revised Bond Documents and in the Commitment Letter, as amended, shall continue in the Case, following dismissal of the Case, termination of the Revised Bond Documents, the Commitment Letter and the Revised Post-Petition Facility and the indefeasible repayment of the Revised Bond Obligations. The terms of this paragraph 37 are without prejudice to and are

not intended to limit, in any way, the effect of paragraph 20 hereof.

38.    <u>Effect of this Order</u>.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  This Order shall be immediately effective upon its entry.

39.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction, including after dismissal, after the effective date of a plan of adjustment confirmed in the Case or the closing of the Case, to enforce this Order according to its terms.

35

CHI-1922517v1

13-53846-swr   Doc 4311-8 Filed 04/29/14 Entered 04/29/14 23:00:23   Page 54 of 179
13-53846-swr   Doc 2521-1 Filed 03/06/14 Entered 03/06/14 15:36:59   Page 56 of 179   54

203

# **EXHIBIT B**

CHI-1922513v1

13-53846-swr    Doc 4311-8  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 55 of 79
13-53846-swr    Doc 2521  Filed 03/06/14  Entered 03/06/14 15:36:59  Page 55 of 179

203    55

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 9 |
| | § | |
| CITY OF DETROIT, MICHIGAN, | § | Hon. Steven W. Rhodes |
| | § | |
| Debtor. | § | Case No.: 13-53846 |

---

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),  503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

THIS MATTER having come before the Court upon the motion (the "Motion") by the City of Detroit, Michigan (the "City"), which is a debtor in the above-captioned chapter 9 case (the "Case"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2),  904, 921 and 922 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") seeking entry of an order (this "Order"), *inter alia*:[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in each of the Bond Purchase Agreements**Agreement** (as defined below) and the Indenture (as defined below), as applicable. Uncapitalized terms used in this

CHI-1922517v1

13-53846-swr   Doc 2311-8   Filed 03/06/14   Entered 03/06/14 15:36:59   Page 56 of 79
13-53846-swr   Doc 4311-8   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 256 of 279
203
56

(i)     authorizing the City to obtain senior secured post-petition financing on a superpriority basis in the form of the Quality of Life Bond and the Swap Termination Bond in an aggregate principal amount of up to $~~285,000,000~~**350,000,000** (collectively, the "Post-Petition Facility") pursuant to the terms and conditions of the Bond Purchase Agreements substantially in the forms attached ~~hereto~~**to the Motion** as Exhibit ~~A and Exhibit~~**6**B ~~(collectively, the "Bond Purchase Agreements")~~, by and between the City and Barclays Capital Inc., as Purchaser (the "Purchaser"), and the Indenture substantially in the form attached ~~hereto~~**to the Motion** as Exhibit **6**C (the "Indenture"), by and between the City and the Indenture Trustee, on behalf of itself, the Purchaser and those other entities to whom the Purchaser either assigns or sells participations in the Bonds from time to time (collectively, the "Bondholders").

(ii)    authorizing the City to enter into and perform under the Bond Purchase Agreements and all other related bond documents, including the Indenture, the Bonds, the Wagering Tax Control Agreements and the Income Tax Control Agreements, the Orders Authorizing the Issuance and Sale of the Bonds, the Local Emergency Financial Assistance Loan Board Order and the documents relating to the Pledged Wagering Tax and Pledged Income Tax (each as may be

_____

Order that are defined in Section 101 or 102 of the Bankruptcy Code have the meanings assigned to them by the Bankruptcy Code.

amended, supplemented, restated, or otherwise modified from time to time, collectively, and together with the Bond Purchase Agreements, the Commitment Letter **between Barclays Capital Inc. and the City dated as of October 6, 2013 (together with all amendments thereto as of the date hereof, the "Commitment Letter")** and the Fee Letter, the " **between Barclays Capital Inc. and the City dated as of October 6, 2013 (together with all amendments thereto as of the date hereof, the "Fee Letter"), the "Initial** Bond Documents"), entered into by and among, variously, the City, the Purchaser, the Indenture Trustee, and other third parties, and to perform such other acts as may be necessary or desirable in connection with the **Initial** Bond Documents;

(iii)    granting the Post-Petition Facility and all obligations owing thereunder and under the **Initial** Bond Documents (collectively, and including all obligations under or with respect to the **Initial** Bond Documents, the "**Initial** Bond Obligations") allowed superpriority claim status under Section 364(c)(1) of the Bankruptcy Code;

(iv)    granting to the Purchaser, the Indenture Trustee and the Bondholders automatically attached and perfected security interests in and Liens (as defined below) on the Quality of Life Bond Collateral (as defined below**in the Motion**) and the Swap Termination Bond Collateral (as defined below**in the Motion**) as applicable, which Liens shall be subject to the priorities set forth in paragraphs 6

and ~~8~~**7** of ~~this~~**the** Order **attached to the Motion at Exhibit 1 (the "Proposed Order")** and in the **Initial** Bond Documents;

(v)     authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the **Initial** Bond Documents and the Fee Letter ~~dated as of October 6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City~~, including (and to the extent applicable), Purchaser's and Indenture Trustee's fees, the reasonable fees and disbursements of the Purchaser's and Indenture Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the **Initial** Bond Documents (as applicable);

(vi)     vacating and modifying the automatic stay imposed by Sections 362 and 922 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the **Initial** Bond Documents and ~~this~~**the Proposed** Order, as limited pursuant ~~hereto~~**thereto**; and

(vii)     authorizing the limitation of the City's right to assert claims to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph ~~30 below~~**29 of the Proposed Order**;

**The City having revised the Motion with the consent of the Purchaser to limit the City's borrowing under the Post-Petition Facility to $285,000,000, the Purchaser having agreed to extend the termination date under the**

**Commitment Letter to January 31, 2014, and the amendment to the Commitment Letter having been submitted to the Court as part of the record of the Hearing (as defined below);**

~~The~~**the** Court having considered the Motion, the **Initial** Bond Documents attached to the Motion ~~(the "Filed Bond Documents")~~, the ~~Declaration~~**Declarations** of James Doak **and Charles M. Moore** in Support of the Motion, the exhibits attached thereto ~~and hereto~~, and the evidence and arguments submitted at the hearing on the Motion commencing on December 17 , 2013 (the "Hearing"); ~~and~~

notice of the Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and no further notice being required; ~~and~~

the Hearing to consider the relief requested in the Motion having been held and concluded ~~and~~**:**

**the Court having determined after the conclusion of the Hearing and by minute order that the Motion should be denied in part and granted in part with conditions as to a revised post-petition facility in an amount not to exceed $120,000,000 (the "Revised Post-Petition Facility"), to the extent set forth in this Order;**

**the city having filed and the Court having considered the Notice of Presentment of this Order ("Notice of Presentment"), which presented this**

**Order as a proposed Order, described the revisions in this Order from the Proposed Order necessitated by this Court's determination and minute order and attached as Exhibits the revised Indenture, a form of Supplemental Indenture, the revised Bond Purchase Agreement, and the revised Income Tax Control Agreement (each, a "Revised" document, and collectively, the "Revised Bond Documents");**

all objections~~, if any, thereto~~ **to the Motion** having been withdrawn, resolved or overruled by the Court **in the manner set forth in this Order**; ~~and~~

it **further** appearing ~~to the Court~~ that granting the relief requested **to the extent set forth in this Order** is fair and reasonable and in the best interests of the City; and

it further appearing that the City is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code Section 503(b)(1); and

after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, **INCLUDING THE NOTICE OF PRESENTMENT,** THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF

6

LAW:

A.  *Petition Date*.  On July 18, 2013 (the "<u>Petition Date</u>"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Court</u>") commencing this Case.  The order for relief in this case was entered on December 5, 2013.

B.  *Jurisdiction and Venue*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings and over the persons<u>,</u> <u>**entities**</u> and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  *City's Stipulations*.  The City stipulates and acknowledges that: (a) except as granted pursuant to this Order and the <u>**Revised**</u> Bond Documents, as of the date of entry of this Order, the Collateral (as defined below) is not subject to any pledge, lien or security interest other than the Liens~~,~~ <u>**and**</u> any rights of Comerica Bank in the Collateral referenced in section 2.02(c) of the DACA (defined in paragraph 8~~8~~<u>7</u> below) that exist on the date hereof~~, and any liens that will be terminated as of the Closing Date as contemplated by the Bond Documents~~; (b) ~~upon~~<u>**on or before**</u> the ~~entry of this Order~~<u>**Closing Date**</u>, and giving effect to the

Court's authority in this bankruptcy case, the City ~~has taken~~**shall take** or ~~caused~~**cause** to be taken all actions**,** and **the effectiveness of this Order is conditioned upon the City's having** received**,** all consents necessary, including under applicable non-bankruptcy law, for the approval of the **Revised** Post-Petition Facility upon the terms and conditions set forth in the **Revised** Bond Documents, including the pledge of the Collateral and the perfection of the security interests therein with the priorities set forth herein and in the **Revised** Bond Documents, ~~and no further action is required for such approval or will be required as of the closing date of the Post-Petition Facility~~ and (c) the entry of this Order and the relief **and orders** granted herein is at the request, and upon the consent, of the City.

        D.    *Findings Regarding the Postpetition Financing*.

        (i)    *No Credit Available on More Favorable Terms*.  Given its current financial condition and financing arrangements, the City is unable to obtain adequate financing on terms more favorable than the **Revised** Post-Petition Facility.  The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. Adequate financing on a postpetition basis is not otherwise available without granting the Purchaser, the Indenture Trustee and the Bondholders (1) perfected Liens on (each as provided herein) the Collateral with the priorities set forth in paragraph ~~8~~**7** hereof and in the **Revised** Bond Documents, (2) superpriority claims and Liens and

(3) the other protections set forth in the **_Revised_** Bond Documents and this Order.

(ii)    *Use of Proceeds of the **_Revised_** Post-Petition Facility*.  As a condition to the entry into the **_Revised_** Bond Documents and the extension of credit under the **_Revised_** Post-Petition Facility, the Purchaser requires, and the City has agreed, that proceeds of the **_Revised_** Post-Petition Facility shall be used, in each case in a manner consistent with the terms and conditions of the **_Revised_** Bond Documents, solely (a) with respect to the Quality of Life Bond, for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City and (b) with respect to the Swap Termination Bond, to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended from time to time, the "Forbearance Agreement") to terminate the underlying swaps, and, in the case of each of clauses (a) and (b) above, to pay the fees and expenses of the Purchaser and the Indenture Trustee (to the extent applicable).

E.    *Section 506(c)*.  Upon entry of this Order, the Purchaser, the Indenture Trustee and the Bondholders are each entitled to a waiver of the provisions of

9

CHI-1922517v1

13-53846-swr    Doc 2521   Filed 03/06/14   Entered 03/06/14 15:36:59   Page 64 of 79    64

203

Section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the Purchaser, the Indenture Trustee or the Bondholders that Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to Section 364 of the Bankruptcy Code).

F. *Good Faith and Jurisdictional Matters*.

(i) *Willingness to Provide Financing*. The Purchaser has indicated a willingness to provide financing to the City pursuant to the **Revised** Bond Documents subject to: (a) the entry of this Order; (b) approval **by this Court** of the terms and conditions of the **Revised** Post-Petition Facility and the **Revised** Bond Documents; ~~and~~ (c) entry of findings by this Court that such financing is in the best interests of the City **and is not prohibited by any applicable law**, that the Purchaser, the Indenture Trustee and ~~the~~ Bondholders are extending credit to the City pursuant to the **Revised** Bond Documents in good faith~~, and that the~~ **and for a proper purpose and that the Revised Post-Petition Facility and all obligations owing thereunder and under the Revised Bond Documents (collectively, and including all obligations under or with respect to the Revised Bond Documents, the "Revised** Bond Obligations**")**, Superpriority Claim, Liens and other protections granted to the Purchaser, the Indenture Trustee and the Bondholders pursuant to this Order and the **Revised** Bond Documents will have the protections provided in Sections 364(e) and 921(e) of the Bankruptcy Code and

will not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, **of** any order finding jurisdiction, **of** the order for relief or **of** any other order.

    (ii)    *Prudent Judgment, Jurisdictional Matters and Good Faith Under Section 364(e)*.  The terms and conditions of the **Revised** Post-Petition Facility and the **Revised** Bond Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, are at the request, and with the consent, of the City and are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code.  The **Revised** Post-Petition Facility ~~was selected by the City after review of multiple proposals received during~~**is the result of** a full and fair marketing process conducted by the City and its agents and advisors.  The **Revised** Post-Petition Facility and the **Revised** Bond Documents were negotiated in good faith, without fraud or collusion and at arms' length among the parties.  Credit extended under the **Revised** Post-Petition Facility and the **Revised** Bond Documents under Section 364(c) of the Bankruptcy Code is extended in good faith within the meaning of Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, for purposes and uses that are permitted by law, and not in violation of the

Bankruptcy Code **or of applicable nonbankruptcy law, and the Revised Post-Petition Facility (including the transactions contemplated by the Revised Bond Documents) is not prohibited by applicable bankruptcy or nonbankruptcy law**. The Purchaser, the Indenture Trustee and the Bondholders therefore qualify for the full protection and benefits of Sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, **of** any order finding jurisdiction, **of** the order for relief or **of** any other order.

G.    *Act 436 Approval ~~Not Required~~*.  On October 21, 2013, in accordance with Section 19(1) of Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436"), the City Council of the City (the "City Council") disapproved the Post-Petition Facility.  The City Council failed to offer an alternative proposal during the time period prescribed in Section 19(2) of Act 436. The City has requested **and received** approval of the Post-Petition Facility by the Emergency Financial Assistance Loan Board (the "Board") pursuant to Section 36a of the Michigan Home Rule City Act, Public Act 279 of 1909.  ~~Because the~~**The** City ~~Council failed to offer a timely alternative proposal, approval of the~~**has committed to comply with the procedures required under Section 19(1) of Act 436 and with Section 36a of the Michigan Home Rule City Act with respect to the Revised** Post-Petition Facility ~~by the Board under Act 436 is not~~

~~required to authorize the City to enter into the Bond Documents, which are valid~~

~~and enforceable according to their terms as a result of this Order and applicable~~

~~non-bankruptcy law~~.

H.     _Notice_.   Notice of the Hearing and the relief requested in the Motion **and of the Notice of Presentment** has been provided by overnight delivery and electronic mail or facsimile to: (a) the trustees, transfer agents and/or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d ); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) Barclays Capital Inc., as the Purchaser; (m) Cravath, Swaine & Moore LLP, as counsel to the Purchaser; (n) Dykema, Gossett PLLC, as counsel to the Purchaser; (o) the other parties that submitted Lending Proposals; ~~(p) counsel to the Greektown Casino Hotel, (q) counsel to Motor City Casino Hotel, (r) counsel to MGM Grand Detroit~~ and (s**p**) all entities

that have requested notice pursuant to Bankruptcy Rule 2002.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    <u>Motion Approved</u>.  The Motion is granted~~, the Financing (as defined below) is authorized and approved,~~ to the extent and subject to the terms and conditions set forth in this Order.

2.    <u>Objections Overruled</u>.  All objections to the **Motion and to the Revised Post-Petition Facility and the Revised Bond Documents and the Revised Bond Obligations (collectively, the "**Financing**"),** to the extent not withdrawn or resolved are hereby overruled **to the extent provided in this Order**.

**Revised Post-Petition Facility Authorization**

3.    <u>Authorization of the Financing</u> ~~and Bond Documents.  The Filed Bond Documents are~~**.  Subject to the City's compliance with the procedures for authorizing the borrowing of money under Sections 12(1) and 19 of Act 436 and the approval of the Board of the Financing under Section 36a of the Michigan Home Rule City Act, the City is hereby authorized to enter into and to incur the obligations under the Financing, all of which is** hereby approved.~~  The City~~**, and** is ~~immediately~~ authorized and empowered to incur and to perform

14

13-53846-swr    Doc 4311-8  Filed 04/29/14  Entered 04/29/14 15:36:09  Page 69 of 79    69
203

the **Revised** Bond Obligations in accordance with, and subject to, the terms of this

Order and the **Revised** Bond Documents and to perform all acts, make, execute

and deliver all instruments and documents which may be required for the

performance by the City under the **Revised** Bond Documents and the creation and

perfection of the Liens described in and provided for by this Order and the **Revised**

Bond Documents.  The Collateral and all proceeds thereof ~~will~~**shall** be deposited

and applied as required by this Order and the **Revised** Bond Documents.  Upon

execution and delivery, the **Revised** Bond Documents **and the Revised Bond**

**Obligations** shall represent valid and binding obligations of the City, enforceable

against the City in accordance with their terms.

4.     Authorization to Borrow.  Subject to the terms and conditions set forth

in the **Revised** Bond Documents and this Order **and to the City's compliance**

**with the procedures for authorizing the borrowing of money under Sections**

**12(1) and 19 of Act 436 and the Board's approval of the Financing under**

**Section 36a of the Michigan Home Rule City Act**, the City is hereby authorized

to issue the **Revised** Bonds for purchase by the Purchaser on the Closing Date and

is hereby authorized to enter into ~~the Bond Purchase Agreements and the Bond~~

~~Documents~~ and incur the ~~Bond Obligations (collectively, the "~~Financing~~")~~.

5.     **Revised** Bond Obligations.  The **Revised** Bond Documents and this

Order shall evidence the validity and binding effect of the City's **Revised** Bond

Obligations, which **Revised** Bond Obligations shall be ~~enforceable against~~**effective as of** the ~~City~~**Closing Date**.  Upon entry of this Order, **and effective as of** the **Closing Date, the Revised** Bond Obligations will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the City to the Purchaser, the Indenture Trustee or any of the Bondholders, under the respective **Revised** Bond Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the respective **Revised** Bond Documents.  The **Revised** Bond Obligations shall be due and payable, without notice or demand, in accordance with the terms of the **Revised** Bond Documents.  No obligation, payment, transfer or grant of security under the **Revised** Bond Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Section 502(d) of the Bankruptcy Code) or be subject to any defense, reduction, setoff, recoupment or counterclaim.

6. <u>Liens and Collateral</u>.  (a) In order to secure the **Revised** Bond Obligations, effective upon the Closing Date and without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents, or the possession or control by the Purchaser, the Indenture Trustee or the Bondholders over any Collateral, pursuant to Section 364(c)(2) of the Bankruptcy Code, the City is authorized to

16

grant, and the Purchaser, the Indenture Trustee and the Bondholders are hereby

granted, in accordance with the terms of the **Revised** Indenture, ~~continuing~~, valid,

binding**, continuing**, enforceable, non-avoidable ~~postpetition security interests and~~**,**

**fully-perfected first priority** liens  (the "Liens") ~~as follows:~~**on (i) except for that**

**portion of income tax revenues transferred into the budget of the City's police**

**department at any time, to be used exclusively to retain and hire police**

**officers, in an amount equal to the sum of 0.2% of the income tax rate levied**

**on resident individuals and 0.1% of the income tax rate levied on non-resident**

**individuals for so long as bonds, obligations or other evidences of**

**indebtedness of the City's Public Lighting Authority are outstanding and**

**payable from taxes levied by the City under the Utility Users Tax Act, Act**

**100, Public Acts of Michigan, 1990, as amended, MCL 141.1151, et seq., the**

**remaining income tax revenues of the City (the "Pledged Income Tax**

**Revenue") and (ii) all Asset Proceeds Collateral, as defined in the Revised**

**Bond Documents (clauses (i) and (ii), collectively, the "Collateral"); and**

> ~~(I) to secure the Quality of Life Bond, (a) a valid, binding, continuing,~~

> ~~enforceable, fully-perfected first priority Lien on (i) taxes owing to the City~~

> ~~in respect of the gross receipts earned by each of the City's casinos (the~~

> ~~"Pledged Wagering Tax Revenue") and (ii) all Asset Proceeds Collateral, as~~

> ~~defined in the Bond Documents, on a *pari passu* basis with the holders of~~

17

13-53846-swr   Doc 4311-8   Filed 03/06/14   Entered 03/06/14 15:36:59   Page 73 of 79   72
203

~~Swap Termination Bond, and (b) a valid, binding, continuing, enforceable,~~

~~fully-perfected second priority Lien (second only to the Liens securing the~~

~~Swap Termination Bond) on the income tax revenues of the City (the~~

~~"Pledged Income Tax Revenue", and together with the Pledged Wagering~~

~~Tax Revenue and the Asset Proceeds Collateral, each as described in this~~

~~clause (I), the "Quality of Life Bond Collateral"); and~~

~~(II) to secure the Swap Termination Bond, a valid, binding, continuing,~~

~~enforceable, fully-perfected first priority Lien on (i) the Pledged Income Tax~~

~~Revenue and (ii) the Asset Proceeds Collateral on a *pari passu* basis with the~~

~~holders of Quality of Life Bond (the Pledged Income Tax Revenue and the~~

~~Asset Proceeds Collateral, collectively, as described in this clause (II), the~~

~~"Swap Termination Bond Collateral", and together with the Quality of Life~~

~~Bond Collateral, the "Collateral").~~

(b) Notwithstanding anything to the contrary in this Order, the Motion or

the **Revised** Bond Documents, under no circumstances shall the Collateral include

revenues of the Systems or any assets pledged to secure any of the

Water/Sewer Bonds.  This Order is without prejudice to, and does not waive, any

objections the Trustee, the Holders, or the Bond Insurers may have regarding any

monetization or disposition of any assets of either or both the Systems or any claim

or defense ~~that~~**(including any claim of a first priority lien on any Asset**

**Proceeds Collateral arising from the disposition of any assets of the Systems)**

**that the** Purchaser, **the** Indenture Trustee under the **Revised** Indenture or the

Bondholders may have with respect to any security interest, lien or pledge that the

Holders, the Trustee or the Bond Insurers assert in any Asset Proceeds Collateral.

The terms, "Trustee,"  "Systems" and "Water/Sewer Bonds," as used in this

paragraph, shall have the same meaning as those terms have in the Limited

Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry

of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and

Providing Super-Priority Claims Status and (III) Modifying the Automatic Stay

(Docket No. 1797) filed by U.S. Bank National Association in its capacity as

Trustee for the Water/Sewer Bonds.  The term "Holders" shall mean the holders of

the Water/Sewer Bonds.  The term "Bond Insurers" shall mean the bond insurers

(including, without limitation, as providers of surety bonds for any reserve fund

requirements) that insure the Water/ Sewer Bonds.

7.    ~~Direction of Pledged Wagering Tax Revenue.  On, and after the~~

~~Closing Date, any entity that collects or holds Pledged Wagering Tax Revenue,~~

~~shall deposit such Pledged Wagering Tax Revenue into the Pledged Wagering Tax~~

~~Account in the name of the City held at the Wagering Tax Depository Bank~~

~~pursuant to irrevocable directions (the "Irrevocable Directions") by the City in the~~

~~form attached hereto as Exhibit D.  Subject to this paragraph 7, nothing in this~~

~~Order is intended to modify the payment obligations of the City's casinos under the~~ ~~Michigan Gaming Control and Revenue Act (the "Gaming Act"), or their certified~~ ~~development agreements.~~

~~8~~**7**.     <u>Lien Priority</u>.  The Liens shall be senior in priority and superior to any **pledge of,** lien on or claim to any of the Collateral and shall expressly apply to any Collateral deposited at Comerica Bank pursuant to the Deposit Account Control ~~Agreements~~**Agreement** among the City, UMB Bank, N.A., as Indenture Trustee, and Comerica Bank (~~collectively,~~ the "<u>DACA</u>") except that, notwithstanding anything to the contrary in this Order or the **Revised** Bond Documents, the Liens shall be subject to the rights of Comerica Bank with respect to any Collateral deposited at Comerica Bank as provided in section 2.02(c) of the DACA.  Other than as set forth herein and in the **Revised** Bond Documents, the Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or otherwise and shall be valid and enforceable**,** **including** against the City under Sections 921(e) and 364(e) of the Bankruptcy Code**,** notwithstanding any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, **of** any order finding jurisdiction, **of** the order for relief or **of** any other order and notwithstanding the dismissal of the Case for any reason.  The Liens shall not be subject to Section 506(c) or 510 of the Bankruptcy Code.  No lien or interest avoided and preserved pursuant to Section

20

551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens.

9~~8~~.    <u>Superpriority Claims</u>.  Upon the Closing Date, the Purchaser, the Indenture Trustee and the Bondholders are granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim (collectively, the "<u>Superpriority Claim</u>") for all **<u>Revised</u>** Bond Obligations (without the need to file any proof of claim), with priority over (i) any and all administrative expenses of the City at any time existing or arising, of any kind or nature whatsoever, including all administrative expenses arising under any section of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, (ii) all other post-petition claims against the City, and (iii) pre-petition unsecured claims against the City.  There is litigation pending before the Court between certain bond insurers of certain of the limited and unlimited tax obligation bonds, on the one hand, and the City, on the other, in respect of ad valorem property tax revenue (the "<u>Property Tax Revenue</u>"). To the extent this Court finds and determines (and pending such finding or determination), or approves any settlement or confirms any plan of adjustment that provides~,~ that any Property Tax Revenue of the City is subject to a property interest (such as a lien or pledge) of any holders of limited or unlimited tax general obligation bonds issued by the City or that such Property Tax Revenue is not generally available for use by the City other than for payment of such limited or

21

CHI-1922517v1

13-53846-swr   Doc 4311-8 Filed 04/29/14 Entered 04/29/14 23:00:23 Page 76 of 79
13-53846-swr   Doc 2521 Filed 03/06/14 Entered 03/06/14 15:36:59 Page 77 of 179   76
203

unlimited general obligation bonds and is not available for distribution to general unsecured creditors as part of a plan of adjustment in this case, then the Superpriority Claim granted hereunder shall not, in such circumstance, be paid from the Property Tax Revenue unless and until any allowed claims arising from such limited or unlimited general obligation bonds have been satisfied in full.

~~10~~**9**.    No Obligation to Extend Credit.  The Purchaser shall have no obligation to purchase any bond, extend any credit or make any loan under the **Revised** Bond Documents unless all of the conditions precedent to the purchase of such bond or extension of such credit under the **Revised** Bond Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable **Revised** Bond Documents.

**Additional Provisions ~~Common to Financings~~**

~~11~~**10**. Amendment of the **Revised** Bond Documents. The City is authorized, without further approval of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the **Revised** Bond Documents as provided in the Fee Letter or that are solely ministerial amendments, modifications or supplements~~.  Subject to paragraph 7 hereof,~~ ~~nothing in this paragraph 11 shall be construed to (i) entitle~~ **or as** the City~~,~~ **may otherwise have the power to effect** without ~~the prior written consent of each of~~

~~the City's casinos, to amend, modify or supplement the Bond Documents,~~
~~including without limitation the Irrevocable Directions to be given to and accepted~~
~~by the City's casinos, or (ii) entitle the Trustee to enforce the Bond Documents,~~
~~including without limitation the Irrevocable Directions, in the case of either (i) or~~
~~(ii), in a way that would (a) modify the payment obligations of the City's casinos~~
~~under the Gaming Act or their certified development agreements, all in the~~
~~amounts, at the times and to the payees set forth therein; (b) create a lease, pledge,~~
~~borrowing or loaning of money against any license, permit or authorization issued~~
~~to the City's casinos by the Michigan Gaming Control Board or (c) require any~~
~~amendment to, or approval under, the certified development agreements entered~~
~~into by the City with each respective City casino.__further order of the Court.__

~~12~~**11**. <u>Modification of Automatic Stay</u>.  The automatic stay imposed under

Bankruptcy Code Sections 362(a) and 922 is hereby modified as necessary to

effectuate all of the terms and provisions of this Order, including to: (a) permit the

City to grant the Liens and the Superpriority Claims; (b) permit the Purchaser, the

Indenture Trustee and the Bondholders to request, and the City to perform, such

acts as the Purchaser, the Indenture Trustee or the Bondholders, respectively, may

request, each in its sole discretion to assure the perfection and priority of the Liens

granted herein; (c) permit the City to incur all liabilities and obligations to the

Purchaser, the Indenture Trustee and the Bondholders under the **<u>Revised</u>** Bond

Documents, the **Revised** Post-Petition Facility and this Order; (d) authorize the City to pay, and the Purchaser to retain, all payments required to be made to the Purchaser, in accordance with the terms of the **Revised** Bond Documents, the **Revised** Post-Petition Facility and this Order; (e) authorize the City to pay, and the Indenture Trustee **(for its own benefit and for the benefit of the Bondholders) and the Bondholders** to retain and apply, all payments required to be made to the Indenture Trustee **or the Bondholders**, in accordance with the terms of the **Revised** Bond Documents, the **Revised** Post-Petition Facility and this Order; and (f) authorize Comerica Bank to exercise its rights and to comply with its obligations under and as referenced in the DACA.

13**12**. <u>Perfection of Liens</u>.  This Order shall be conclusive evidence of the validity, perfection and priority of the Liens without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens or to entitle the Purchaser, the Indenture Trustee and the Bondholders to the Liens and priorities granted herein. ~~Upon satisfaction of the conditions to termination  set forth in section 14.4 (a) of that certain Collateral Agreement among the City, Detroit~~

24

CHI-1922517v1
13-53846-swr   Doc 2311-8  Filed 03/06/14  Entered 03/06/14 15:36:09  Page 79 of 179    79
203

~~General Retirement System Service Corporation, Detroit Police and Fire~~
~~Retirement System Service Corporation, U.S. Bank National Association (the~~
~~"Custodian") and the Other Persons Party thereto dated as of June 15, 2009 (the~~
~~"Collateral Agreement"), the Collateral Agreement shall terminate and any lien,~~
~~security interest or other interest in the Pledged Wagering Revenues under the~~
~~Collateral Agreement shall be terminated.  The Custodian shall timely perform its~~
~~obligations in connection with the termination of the Collateral Agreement,~~
~~including, without limitation, the obligations set forth in Section 14.4 thereof and~~
~~in particular, but also without limitation, paying any and all amounts due to the~~
~~City under the Collateral Agreement and giving notice to the appropriate parties~~
~~that the "Irrevocable Instructions" (as defined in the Collateral Agreement) are~~
~~terminated and no longer of any force or effect.~~ **and in the Revised Bond**
**Documents.**

~~14~~**13**. <u>Right to Take Actions to Perfect</u>.  Notwithstanding the foregoing, the
Purchaser, the Indenture Trustee and the Bondholders are authorized, but not
required, to file and obtain, as each deems necessary in its sole discretion, such
financing statements, notices of liens, control agreements**, supplemental bond**
**documents** and other security documents to perfect in accordance with applicable
non-bankruptcy law, or take constructive control over assets, **or** take any other
action, in each case, to validate and perfect the Liens**,** and all such financing

statements, notices, control agreements and other security documents shall be

deemed to have been filed or recorded as of the date of entry of this Order;

provided, however, that no such filing or recordation shall be necessary or required

in order to create or perfect the Liens.  The City is authorized and directed to

execute and deliver promptly upon demand to the Purchaser or the Indenture

Trustee all such financing statements, notices, control agreements and other

security documents as the Purchaser or the Indenture Trustee may request.  The

Purchaser or the Indenture Trustee, each in its discretion, may file a photocopy of

this Order as a financing statement with any filing or recording office or with any

registry of deeds or similar office, in addition to or in lieu of such financing

statements, notices of lien or similar instrument, and all filing offices are hereby

authorized to accept such photocopy for filing and recording.  For the avoidance of

doubt, the automatic stay of Section 362(a) of the Bankruptcy Code ~~shall be~~**is**

**hereby** modified to the extent necessary to permit the Purchaser, the Indenture

Trustee and the Bondholders to take all actions, as applicable, referenced in this

paragraph.

~~15~~**14**.  Proceeds of Subsequent Financing.  If the City obtains credit or incurs

debt pursuant to Bankruptcy Code Section 364(c) or 364(d) or in violation of the

**Revised** Bond Documents at any time prior to the indefeasible repayment in full of

all **Revised** Bond Obligations and the satisfaction of the Superpriority Claims,

including after the confirmation of any plan of adjustment filed in the Case, and

such facilities are secured by any Collateral, then, in addition to any remedies that

may be available to the Purchaser, the Indenture Trustee and the Bondholders

under the **Revised** Bond Documents, all the cash proceeds derived from such credit

or debt shall immediately be turned over to the Indenture Trustee, to be applied as

set forth in the **Revised** Bond Documents and this Order.

~~16~~**15**. Maintenance of Collateral.  Until the indefeasible payment in full of

all **Revised** Bond Obligations and the satisfaction of the Superpriority Claims, the

City shall maintain: (a) the Collateral as required under the **Revised** Bond

Documents; and (b) the cash management system as required by the **Revised** Bond

Documents.

~~17~~**16**. Disposition of Collateral.

(a)     Except as otherwise provided for in the **Revised** Bond

Documents or the DACA, the City shall not grant a lien on or transfer any interests

in any portion of the Collateral in any way inconsistent with the **Revised** Bond

Documents or without the prior written consent of the Indenture Trustee **(or, prior

to the issuance of the Bonds, the prior written consent of the Purchaser)**.

(b)     In the event of any sale, lease or other disposition of any

Collateral (a "Collateral Disposition"), the City shall, to the extent required by the

**Revised** Bond Documents, pay, or cause to be paid**,** to~~,~~ the Indenture Trustee the

27

CHI-1922517v1
13-53846-swr   Doc 4311-8 Filed 04/29/14   Entered 04/29/14 23:00:23   Page 83 of 179   82
13-53846-swr   Doc 2521  Filed 03/06/14   Entered 03/06/14 15:36:59   Page 83 of 179
203

proceeds of such Collateral Disposition for application in accordance with the **Revised** Bond Documents and this Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the **Revised** Bond Documents.

~~18~~**17**. <u>Reporting reinvestment/revitalization spending</u>. Within 30 days after the Closing Date, the City will produce in its electronic data site for review by creditors a revised indicative schedule of spending ~~from the Quality of Life Financing~~**of the proceeds of the Revised Post-Petition Facility** (with monthly detail) with at least the same line items that are contained in the reinvestment spending plan dated October 10, 2013 provided by the City to creditors (a "<u>Revised Plan</u>"). Proceeds of the ~~Quality of Life Financing~~**Revised Post-Petition Facility** will be placed in a segregated account (the "<u>Quality of Life Account</u>") that will be drawn upon as approved, appropriated and budgeted ~~quality of life~~**reinvestment spending plan** projects are invoiced and require payment. ~~Quality of life~~**Such** projects may extend beyond those listed in the Revised Plan. The City will track actual disbursements from the Quality of Life Account, and will provide, on a monthly basis, a report of actual disbursements, including a description of the disbursements. Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

28

~~19~~**18**. Underline{Overall general fund financial condition}. Within 30 days after the closing of the ~~Postpetition Financing~~**Revised Post-Petition Facility**, the City will provide in its electronic data site a revised monthly cash flow forecast through Fiscal Year 2015 (the "Revised Forecast") consistent with the "DIP Forecast" format previously presented by the City to creditors and potential financing providers. The City will provide in its electronic data site, on at least a quarterly basis, a report that includes actual performance (by month) against forecasted performance (by month) on the line items contained in Revised Forecast. The City will reforecast the remaining periods of the Revised Forecast, and determine whether to extend the Revised Forecast, on a quarterly basis.  Additionally, advisors to the City will provide a quarterly call for creditors and stakeholders and their financial advisors to discuss the contents of each report.

~~20~~**19**. Maturity Date.  Upon the earliest to occur (such earliest date, the "Maturity Date") of (a) the date that is two years and six months after the Closing Date; (b) the effective date of a confirmed plan of adjustment filed in the Case; (c) the acceleration of the Bonds under the **Revised** Bond Documents; and (d) dismissal of the Bankruptcy Case, the **Revised** Bond Obligations shall be immediately due in accordance with the terms of the **Revised** Bond Documents.

~~21~~**20**. No Dismissal.  The **Revised** Bond Obligations shall be indefeasibly paid in full in cash prior to, and notwithstanding, any dismissal of ~~this bankruptcy~~

29

CHI-1922517v1
13-53846-swr   Doc 4311-8  Filed 04/29/14  Entered 04/29/14 23:09:23  Page 84 of 179
13-53846-swr   Doc 2521-8  Filed 03/06/14  Entered 03/06/14 15:36:59  Page 85 of 179   84
203

casethe Case unless otherwise agreed to by the Indenture Trustee, upon the

consent of all Bondholders, and this Court or the United States District Court for

the Eastern District of Michigan shall retain jurisdiction to enforce this Order.

2221. Events of Default. The occurrence of an "Event of Default" under the

**Revised** Bond Documents or any violation of the terms of this Order shall

constitute an event of default under this Order ("Event of Default"), unless waived

in writing by the Indenture Trustee, upon consent of the Bondholders in

accordance with the **Revised** Bond Documents **(or, prior to the issuance of the**

**Bonds, waived in writing by the Purchaser).**.

2322. Rights and Remedies Upon Event of Default. Immediately upon the

occurrence and during the continuation of an Event of Default, the Indenture

Trustee, **on its own or** upon the direction of the Bondholders in **either case in**

accordance with the **Revised** Bond Documents, may, among other things, declare

all **Revised** Bond Obligations owing under the **Revised** Bond Documents to be

immediately due and payable in accordance with the terms of the **Revised** Bond

Documents, but without affecting any of the Liens or the **Revised** Bond

Obligations (any such declaration, a "Termination Declaration"). The Termination

Declaration shall be given by electronic transmission as provided in the **Revised**

Bond Documents (the date any such Termination Declaration is made, the

"Termination Declaration Date"). Following the Termination Declaration Date,

30

CHI-1922517v1

13-53846-swr    Doc 4311-8 Filed 04/29/14 Entered 04/29/14 23:00:23  Page 185 of 179
13-53846-swr    Doc 2521 Filed 03/06/14 Entered 03/06/14 15:36:59  Page 85 of 179    85

203

the Indenture Trustee, on behalf of the Bondholders, shall be entitled to enforce its rights and remedies under the **Revised** Bond Documents without further order or approval from this Court.

2423. Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order.  The Indenture Trustee, on behalf of the Bondholders, and the Purchaser have acted in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, in connection with this Order and their reliance on this Order is in good faith.  Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code. Any modification, amendment or vacatur shall not affect the validity or enforceability of the **Revised** Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created hereby.  Any liens or claims granted to the Purchaser, the Indenture Trustee or the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Order shall be governed in all respects by the original provisions of

this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

25~~24~~. Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order. In accordance with Section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed, modified, amended or vacated by this Court or any other court, the Purchaser, the Indenture Trustee and the Bondholders are entitled to the protections provided in Section 921(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity or enforceability of the **Revised** Bond Obligations or any Lien, claim (including the Superpriority Claim) or priority authorized or created ~~hereby~~**by this Order**. Any ~~liens~~**Liens** or claims granted to the Purchaser, the Indenture Trustee and the Bondholders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

26~~25~~. Proofs of Claim. The Purchaser, the Indenture Trustee and the Bondholders are not required to file proofs of claim in the Case to assert any claim in the Case against the City in respect of the **Revised** Bonds. Any order entered by the Court in relation to the establishment of a bar date in the Case shall not apply to

the Purchaser, the Indenture Trustee or the Bondholders, and each of the Purchaser, the Indenture Trustee and each Bondholder is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) a proof of claim and/or aggregate proofs of claim in the Case for any claim authorized under this Order.

2726. Rights of Access and Information. Without limiting the rights of access and information afforded the Purchaser, the Indenture Trustee and Bondholders under the **Revised** Bond Documents, the City shall afford representatives, agents or employees of the Purchaser, the Indenture Trustee or the Bondholders reasonable access to the City's books and records in accordance with the **Revised** Bond Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the City shall authorize its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the Indenture Trustee, on behalf of the Bondholders, all such information as may be reasonably requested with respect to the financial condition of the City to the extent required by the **Revised** Bond Documents. All Bondholders who have agreed to keep such information confidential on terms consistent with the **Revised** Bond Purchase Agreements**Agreement** will be

provided access by the City to all information (including via a virtual data room) provided to Bondholders in connection with the **Revised** Post-Petition Facility.

~~28~~**27**. <u>Limitations on the Post-Petition Facility and the Collateral</u>. The **Revised** Post-Petition Facility and the Collateral **and their proceeds** may not be used in connection with: (a) preventing, hindering or delaying any of the Purchaser's, the Indenture Trustee's or the Bondholders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (b) any act that seeks to use or uses such assets in a manner that is not permitted by the **Revised** Bond Documents; (c) objecting or challenging in any way any claims, Liens or Collateral held by or on behalf of any of the Purchaser, the Indenture Trustee or the Bondholders; (d) asserting, commencing or prosecuting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against any of the Purchaser, the Indenture Trustee, the Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (e) prosecuting or supporting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the **Revised** Bond Obligations, the Liens or any other rights or interests of any of the Purchaser, the Indenture Trustee or the Bondholders; (f) prosecuting or supporting an objection to, or contesting in any manner, the order for relief; or (g) taking any action which is contrary, in a manner

CHI-1922517v1

13-53846-swr    Doc 4311-8  Filed 04/29/14  Entered 04/29/14 15:36:09  Page 89 of 179    89
13-53846-swr    Doc 2521  Filed 03/06/14  Entered 03/06/14 15:36:09  Page 95 of 203
203

that is material and adverse to the Purchaser, the Indenture Trustee or the Bondholders, to any term or condition set forth in the **Revised** Bond Documents or this Order.

2928. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party who is not expressly referenced in this Order, any creditor or any direct, indirect or incidental beneficiary.

3029. <u>Section 506(c) Claims</u>. Upon entry of this Order, no claims, costs or expenses incurred in the Case or by the City at any time shall be charged against the Purchaser, the Indenture Trustee, the Bondholders or any of their respective claims or against the Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Indenture Trustee **(or, in the case of any such charges against the Purchaser or its claims, the prior written consent of the Purchaser)**.

3130. <u>No Marshaling/Applications of Proceeds</u>. The Purchaser, the Indenture Trustee and the Bondholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and proceeds shall be received and applied pursuant to the **Revised** Bond Documents and this Order.

3231. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary,

the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly ~~of,~~ the rights of the Purchaser, the Indenture Trustee or the Bondholders: (a) to seek any other or supplemental relief in respect of the City; or (b) to request modification of the automatic stay of Section 362 or 922 of the Bankruptcy Code.

~~33~~**32**. No Waiver by Failure to Seek Relief. The failure of the Purchaser, the Indenture Trustee or the Bondholders to seek relief or otherwise exercise their rights or remedies under this Order, the **Revised** Bond Documents, the Fee Letter or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Purchaser, the Indenture Trustee or the Bondholders.

~~34~~**33**. No Waiver by Seeking Relief. ~~Neither~~**Except to the extent this Order (other than paragraphs 10, 17 and 18) provides otherwise, (i) neither** the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the **Revised** Post-Petition Facility, without approval of the Court, ~~to the extent permitted under Section 904,~~**(ii)** nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any

income-producing property, other than as required in connection with the enforcement by the Purchaser, the Indenture Trustee or the Bondholders of their respective rights in connection with the **Revised** Bond Documents.

~~35~~**34**. <u>Binding Effect of Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Order shall become valid and binding upon the City, the Purchaser, the Indenture Trustee, the Bondholders, all creditors of the City, any committee appointed in the Case and all other parties in interest and their respective successors and assigns, including upon dismissal of the Case.

~~36~~**35**. <u>No Modification of Order</u>.  Until and unless the **Revised** Bond Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the **Revised** Bond Documents that by their terms survive such discharge), the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Purchaser (if such action is to be taken ~~prior to~~**before or within 90 days after** the issuance of the **Revised** Bonds) or the Indenture Trustee (if such  action is to be taken after the issuance of the **Revised** Bonds), in each case, in its sole discretion, (i) any modification, stay, vacatur or amendment to this Order or the order for relief in a manner adverse to the Purchaser, the Indenture Trustee or the Bondholders; (ii) any claim against the City (now existing or hereafter arising of any kind or nature whatsoever, including any administrative

37

CHI-1922517v1

13-53846-swr   Doc 4311-8   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 93 of 179
13-53846-swr   Doc 2521   Filed 03/06/14   Entered 03/06/14 15:36:59   Page 93 of 179     92
203

expense of the kind specified in Section 503(b), 506(c) or 507(a) of the Bankruptcy Code) equal or superior to the Superpriority Claims; or (iii) any lien on any of the Collateral with priority equal or superior to the Liens (except as specifically provided in the **Revised** Bond Documents).  The City irrevocably waives any right to seek any amendment, modification or extension of this Order without the prior written consent of the Purchaser (if such action is to be taken prior to the issuance of the Bonds) or the Indenture Trustee (if such action is to be taken after the issuance of the Bonds), in each case, in its sole discretion.

37~~36~~. <u>Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Bond Documents and this Order, the provisions of this Order shall govern and control.

38~~37~~. <u>Survival</u>.  The Superpriority Claim and Liens and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of adjustment in the Case; (b) dismissing the Case; or (c) pursuant to which this Court abstains from hearing the Case.  Any order dismissing the Case shall provide that (A) the **Revised Bond Obligations, the** Superpriority Claim and **the** Liens granted to the Purchaser, the Indenture Trustee and the Bondholders shall continue in full force and effect and shall maintain their priorities as provided in this Order and the **Revised** Bond Documents until all **Revised** Bond Obligations have been paid in full in cash (such

payment being without prejudice to any terms or provisions contained in the **Revised** Post-Petition Facility **or the Revised Bond Documents** that by their terms survive such discharge) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the **Revised Bond Obligations,** Superpriority Claim and Liens referred to in clause (A) above. The terms and provisions concerning the indemnification of the Purchaser, the Indenture Trustee and the Bondholders contained in the **Revised** Bond Documents and in the Commitment Letter ~~dated~~**,** as ~~of October 6, 2013 (the "Commitment Letter"), between Barclays Capital Inc. and the City~~**amended**, shall continue in the Case, following dismissal of the Case, termination of the **Revised** Bond Documents, the Commitment Letter and the **Revised** Post-Petition Facility and the indefeasible repayment of the **Revised** Bond Obligations. **The terms of this paragraph 37 are without prejudice to and are not intended to limit, in any way, the effect of paragraph 20 hereof.**

~~39~~**38**. Effect of this Order. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. **This Order shall be immediately effective upon its entry.**

~~40~~**39**. Retention of Jurisdiction. The Court has and will retain jurisdiction**, including after dismissal, after the effective date of a plan of adjustment confirmed in the Case or the closing of the Case,** to enforce this Order according

to its terms.

CHI-1922517v1

**Exhibit A**
Bond Purchase Agreement
Swap Termination Bond

**Exhibit B**
Bond Purchase Agreement
Quality of Life Bond

**Exhibit C**
Indenture

**Exhibit D**
Irrevocable Directions

| Summary Report: Litera Change-Pro ML IC 6.5.0.313 Document Comparison done on 3/4/2014 11:19:33 AM | |
|---|---|
| **Style Name:** JD Blackline | |
| **Original Filename:** THIRD REVISED Financing Order (REVISED for hearing 12.30.13).doc | |
| **Original DMS:** | |
| **Modified Filename:** | |
| **Modified DMS:** iw://CHI/CHI/1922517/1 | |
| **Changes:** | |
| **Add** | 290 |
| ~~Delete~~ | 142 |
| ~~Move From~~ | 0 |
| <u>Move To</u> | 0 |
| **<u>Table Insert</u>** | 0 |
| ~~Table Delete~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 432 |

# **EXHIBIT C**

CHI-1922513v1
-2-
203
13-53846-swr   Doc 4311-8 Filed 04/29/14 Entered 04/29/14 23:00:23 Page 99 of 179
13-53846-swr   Doc 2521 Filed 03/06/14 Entered 03/06/14 15:36:59 Page 95 of 97
99

# CITY OF DETROIT, MICHIGAN

## FINANCIAL RECOVERY BONDS — SERIES 2014

---

### BOND PURCHASE AGREEMENT

---

_____, 2014

City of Detroit, Michigan
2 Woodward Ave., Suite 1126
Detroit, MI 48226

The undersigned (the "Purchaser") offers to enter into this Bond Purchase Agreement (this "Bond Purchase Agreement") with City of Detroit, County of Wayne, State of Michigan (the "City") which, upon the City's acceptance hereof, will be binding upon the Purchaser and the City. This offer is made subject to written acceptance of this Bond Purchase Agreement by the City and the delivery of such acceptance to the Purchaser on or before 10:00 A.M., New York time on the date hereof and if not accepted will be subject to withdrawal by the Purchaser upon notice delivered to the City at any time prior to acceptance by the City.

The City has advised the Purchaser that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and that the City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case") and that an order for relief in the Bankruptcy Case was entered on December 5, 2013.

Capitalized terms used herein and not otherwise defined in the body of this Bond Purchase Agreement shall have the respective meanings ascribed thereto in Appendix A hereto or, if not defined herein, in the Indenture.

1. **Sale Purchase Price and Terms of the Bonds.** (a) Upon the terms and conditions and upon the basis of the City's representations and warranties hereinafter set forth, the Purchaser hereby agrees to purchase from the City, and the City hereby agrees to sell to the Purchaser, on a private placement basis, all (but not less than all) of the $120,000,000 aggregate principal amount of Financial Recovery Bonds Series 2014 (the "Bonds"), which Bonds shall constitute a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code. Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have priority over all administrative expenses in the Bankruptcy Case, over all other postpetition claims against the City and

over all prepetition unsecured claims against the City. The Bonds shall be issued in denominations of $100,000 or any integral multiple thereof.

(b) The Bonds will be dated the date of delivery thereof, will have a maturity date of the earliest of (i) the date of dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to the Bond Documents and (iv) _____ [*the date that is two years and six months after the Closing Date]* (any such date, the "Maturity Date"), and will bear interest from and including the date of delivery thereof to but excluding the Maturity Date at a per annum interest rate equal to the Bond Rate, which rate shall be reset on the first Business Day of each calendar month (each, a "Reset Date"). Interest on the Bonds shall be computed on the basis of a year of 360 days and the actual number of days elapsed and shall be payable on (i) each Reset Date, (ii) the date of redemption of the Bonds (in whole or in part) and (iii) the Maturity Date. Upon the occurrence and continuance of an Event of Default under the Indenture (including upon the failure to pay any amounts due on the Bonds), the Bonds shall bear interest at a per annum interest rate equal to the sum of the Bond Rate plus 2.00% (the "Default Rate") from and including the date of the occurrence of such Event of Default.

(c) As provided in the Indenture, the Bonds shall be subject to optional redemption, in whole or in part in Authorized Denominations, upon at least 10 Business Days' prior written notice to the holders thereof, (i) on or before the first anniversary of the Closing Date at a redemption price (plus accrued interest) equal to 100% of the principal amount of the Bonds redeemed plus a make-whole premium equal to the amount of interest on the Bonds calculated at the then current Effective Rate from and including the redemption date to and including the first anniversary of the Closing Date, and (ii) on any date after the first anniversary of the Closing Date at a redemption price equal to 100% of the principal amount of the Bonds redeemed (plus accrued interest). Notwithstanding the foregoing, the City may partially redeem the Bonds with the proceeds of any disposition or monetization of any City owned asset not required to be used to cause a mandatory redemption of the Bonds as described in Section 1(d) below without the payment of any premium.

(d) As provided in the Indenture, the Bonds shall be subject to mandatory redemption, upon at least 10 Business Days' prior written notice, in whole or in part in Authorized Denominations from the net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "Asset Proceeds Collateral"). Asset Proceeds Collateral shall not include assets owned by the City, or assets in which the City holds an interest, which, in either case, are held by the Detroit Institute of Arts.

(e) The Bonds will be as described in and shall be issued and secured under and pursuant to the Act, the EM Orders, Order of Approval No. _____ of the Local Financial Emergency Loan Board dated _____, 2014 (the "ELB Order"), and the City of Detroit, Michigan Financial Recovery Bond Trust Indenture (the "Indenture")

executed by the City and the Trustee, and will be payable as described in the Indenture. The purchase price for the Bonds will be $120,000,000 (the "Purchase Price").

(f)  The obligations of the City with respect to the Bonds shall, pursuant to the Order, the Indenture and section 364(c) of the Bankruptcy Code, be secured by a first priority lien on (i) except for the portion of income tax revenues transferred into the budget of the City's police department at any time, to be used exclusively to retain and hire police officers, in an amount equal to the sum of 0.2% of the income tax rate levied on resident individuals and 0.1% of the income tax rate levied on non-resident individuals, for so long as bonds, obligations or other evidences of indebtedness of the City's Public Lighting Authority are outstanding and payable from taxes levied by the City under the Utility Users Tax Act, Act 100, Public Acts of Michigan, 1990, as amended, MCL 141.1151, et seq., the remaining revenues collected by the City from a levy of an excise tax on income pursuant to Act No. 284, Public Acts of Michigan, 1964, as amended, MCL 141.501, et seq. (the "Pledged Income Tax Revenue") and (ii) the Asset Proceeds Collateral (together with the Pledged Income Tax Revenue, collectively, the "Bond Collateral").

(g)  The Bond Documents shall require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements (the "Income Tax Control Agreements") in favor of the Trustee on terms reasonably acceptable to the Purchaser, provided, however, that the Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default to $4,000,000 per month, all of which shall be applied to pay principal and interest on the Bonds until the Bonds are paid in full.  Subject to the terms of the Income Tax Control Agreements, the City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

(h)  The net proceeds of the Bonds will be used for the purposes permitted by law, agreed upon between the City and the Purchaser in the Bond Documents as more specifically provided in the Bond Documents.

2.  **Representations of the Purchaser.**  The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that (a) it has the full legal power and authority to execute and deliver this Bond Purchase Agreement and to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement; (b) it has duly authorized the execution and delivery of this Bond Purchase Agreement, and the performance of its obligations hereunder; and (c) when executed and delivered by the City, this Bond Purchase Agreement shall constitute a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

The Purchaser further represents and covenants as follows:

(a)   In connection with its business the Purchaser holds an extensive portfolio of investment securities.  It has experience in the municipal bond market, has knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of investment in the Bonds.  It has been provided with access by the City to information and with the opportunity to ask questions of, and receive answers from, the City concerning the terms and conditions of the Bonds and with the opportunity to obtain any additional information necessary to verify the accuracy of the information obtained.

(b)   The Purchaser acknowledges that it has performed its own investigation of the financial risks involved in purchasing the Bonds and it is not relying upon any other person to have conducted such investigation.  The Purchaser acknowledges that neither the City nor its agents have requested or will request a rating for the Bonds.

(c)   The Purchaser acknowledges and agrees that it will comply with the requirements of any applicable state or federal securities law in connection with any resale of the Bonds (or any portion thereof) by the Purchaser.

3.    **Failure to Close; Termination of Bond Purchase Agreement.**  In the event of the City's failure to deliver the Bonds on the Closing Date, or if the City is unable to satisfy the conditions of the Purchaser's obligation to purchase and accept delivery of the Bonds as set forth in this Bond Purchase Agreement or if the Purchaser's obligation with respect to the Bonds shall be terminated for any reason permitted by this Bond Purchase Agreement, this Bond Purchase Agreement shall terminate, and neither the Purchaser nor the City shall be under any further obligation hereunder, except that the obligation of the City for the payment of amounts set forth in Section 9 hereof and the obligations of the City under Section 13 hereof shall continue in full force and effect. Except as set forth in Sections 9 and 13 hereof, neither party hereto shall have any further rights against the other hereunder following such termination of this Bond Purchase Agreement.

4.    **Private Placement of Bonds; Absence of Disclosure Document.**  The City and the Purchaser each acknowledge and agree that the Bonds are being sold by the City and purchased by the Purchaser in a private placement transaction without the preparation by the City of a disclosure document relating to the Bonds.

5.    **Closing.**  At or prior to 1:00 P.M., New York time on the Closing Date, the City will cause the Bonds in typewritten or printed form, duly executed, authenticated and fully registered in the name of Cede & Co., as nominee for the Depository Trust Company ("<u>DTC</u>"), one registered bond in the denomination equal to the principal amount of the Bonds (the "<u>Bond Certificate</u>"), to be delivered to the Trustee as custodian for DTC.  Subject to the terms and conditions hereof, the City will deliver to the Purchaser at the offices of _____ the other documents and instruments to be delivered on the Closing Date pursuant to this Bond Purchase Agreement (the "<u>Closing Documents</u>"), and the Purchaser will accept delivery of the Closing Documents and pay in immediately available funds the amount of $120,000,000 by wire transfer for

the account of the City.  The Closing Documents shall be made available for inspection by the Purchaser at least one full Business Day before the Closing Date.

On the Business Day prior to the Closing Date, the City shall deliver to the Trustee, as F.A.S.T. Agent of DTC, the Bond Certificate to be held in escrow for delivery to the account of the Purchaser as provided above.

6.      **Representations of the City.**  The City represents and warrants to, and agrees with, the Purchaser that, as of the date hereof and the Closing Date:

(a)      The City is a duly organized home rule city and political subdivision  of the State, is validly existing under the Constitution and laws of the State, and has, and on the Closing Date will have, full legal right, power and authority (i) to execute and enter into contracts and agreements and such other documents or instruments to which the City is to be a party in connection with the sale and delivery of the Bonds, (ii) to execute, deliver and perform its obligations under this Bond Purchase Agreement, (iii) to execute, deliver and perform its obligations under the Bond Documents, (iv) to offer, issue, sell and deliver the Bonds to the Purchaser as provided herein and to perform its obligations with respect to the Bonds, and (v) to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the Bond Documents.

(b)      The Emergency Manager has been duly appointed pursuant to Act 436, Public Acts of Michigan, 2012, as amended, MCL 141.1541, et seq. ("Act 436") and is duly authorized, with full legal right, power and authority, to act on behalf of the City to carry out and to consummate the transactions contemplated by this Bond Purchase Agreement and the Bond Documents.

(c)      The Bond Collateral may legally be pledged as collateral for the Bonds as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order.

(d)      This Bond Purchase Agreement has been duly executed and delivered by the City, and, as authorized in the EM Orders, the ELB Order and the Post-Petition Financing Order (assuming due authorization, execution and delivery of this Bond Purchase Agreement by the Purchaser), constitutes a legal, valid and binding obligation of the City, enforceable in accordance with its respective terms.   When executed and delivered, as set forth in the Post-Petition Financing Order, the Bond Documents will be legal, valid and binding obligations of the City enforceable against the City in accordance with their terms.

(e)      When sold to the Purchaser and paid for in accordance with the terms of this Bond Purchase Agreement, the Bonds (i) will have been duly authorized, executed, authenticated, issued and delivered by the City pursuant to and for the purposes set forth in the Act and the ELB Order and (ii) will constitute valid and legally binding obligations of the City in conformity with, and entitled to the benefit and security of, the Act, the Indenture and the Bankruptcy Code.

(f)     By official action of the City prior to the acceptance hereof, the City has duly authorized and approved the performance by the City of its obligations contained in the Bonds, the Bond Documents and this Bond Purchase Agreement.

(g)     No approval, permit, consent or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made is required by the City in connection with the issuance and sale of the Bonds, or the execution or adoption and delivery by the City of, or the due performance of its obligations under, the Bonds, the Bond Documents and this Bond Purchase Agreement and all such approvals, permits, consents or authorizations so obtained are in full force and effect.

(h)     All legislation necessary to fulfill the terms and conditions of, and to carry out the transactions contemplated by, this Bond Purchase Agreement and the Bond Documents is in full force and effect.

(i)     The execution, delivery and performance of the terms and conditions of the Bond Documents and this Bond Purchase Agreement by the City, including the issue, sale and delivery of the Bonds, do not and will not (i) conflict with or constitute, on the part of the City, a breach of, or a default under, any applicable law (including, without limitation, the Constitution of the United States or the State or the Act), any ordinance, court or administrative regulation, decree, judgment, ruling or order or any agreement, indenture, mortgage, lease or other instrument to which the City is a party or by or to which it or its revenues, properties, assets or operations are bound or subject or by which it is bound in such manner as to adversely affect the validity or enforceability of the Bonds or the security interests of the Purchaser in the Bond Collateral or (ii) except as provided in the Bond Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its revenues, properties or assets.

(j)     Except as described on Appendix __ hereto, and other than as described in the Bond Documents, there are no liens or encumbrances on the items pledged pursuant to the Indenture, and the City has not entered into any contract or arrangement of any kind, and to the knowledge of the City there is no existing, pending, threatened or anticipated event or circumstance which might give rise to any such lien or encumbrance.

(k)     Any certificate or copy of any certificate signed by an authorized officer of the City and delivered to the Purchaser pursuant hereto or in connection herewith shall be deemed a representation and warranty by the City to the Purchaser as to the truth of the statements therein made with the same effect as if such representation and warranty were set forth herein.

(l)     The City has the legal authority to apply and will apply the net proceeds of the Bonds, together with other available funds, for the purposes provided in the Bond Documents.

(m)     The City is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Bond Purchase Agreement the Bonds or the Bond Documents in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

It is further understood and agreed that the members of the City Council and the agents, attorneys, or employees of the City shall not be personally liable in connection with any matter, cause or thing pertaining to the Bonds or the issuance thereof, this Agreement, or any instruments and documents executed and delivered by the City in connection with issuance of the Bonds.  No covenant or agreement contained in this Agreement shall be deemed to be the covenant or agreement of any member of City Council or officer, attorney, agent or employee of the City in an individual capacity.  No recourse shall be had for the payment of the principal of or interest on the Bonds, or for any claim based hereon or on any instruments and documents executed and delivered by the City in connection with the Bonds, against any member of City Council or officer, agent, attorney or employee, in an individual or personal capacity.

7.     **Covenants and Agreements of the City.**  The City hereby covenants and agrees as follows:

(a)     In connection with syndication of the Bonds as provided in Section 18, the City agrees to (i) cooperate with the Purchaser to deliver a Confidential Syndication Memorandum or similar disclosure document in a timely manner if requested to do so, (ii) enter into any continuing disclosure agreement if required, and (iii) execute the First Supplemental Indenture as authorized pursuant to the City's Sale Order, and (iv) provide bring-down opinions of Jones Day and Miller Canfield Paddock & Stone in the forms attached hereto.

(b)     The City irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it

will not claim any such immunity in any proceedings relating to this Bond Purchase Agreement, the Bonds or the Bond Documents.

(c) The City covenants that it will not seek to invalidate or refute the enforceability of any Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

(d) The City covenants that it will not obtain or seek to obtain any additional financing, including without limitation, any swap transaction, which (a) would have a senior or equal payment priority to the Bonds or (b) is secured by a lien on any of the Bond Collateral as long as the Bonds are outstanding under the Indenture. The City further covenants that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds.

8. **Conditions to Closing.** The Purchaser has entered into this Bond Purchase Agreement in reliance upon the representations, warranties and covenants of the City contained herein and the performance by the City of its obligations hereunder, both as of the date hereof and as of the Closing Date. In addition to any other conditions herein stated, the obligations of the Purchaser hereunder are subject to the performance by the City of its obligations to be performed hereunder and under the Closing Documents, at or prior to the Closing Date, and shall also be subject to the following conditions:

(a) The representations and warranties of the City contained herein shall be true, complete and correct as of the date hereof and on and as of the Closing Date, as if made on the Closing Date.

(b) As of the Closing Date, (i) this Bond Purchase Agreement and the Bond Documents shall be in full force and effect in the respective forms approved or adopted by the City on or prior to the date hereof and shall not have been amended, modified or supplemented, except as may have been agreed to by the Purchaser; and (ii) the City shall perform or have performed all of its obligations required under or specified in this Bond Purchase Agreement and the Indenture to be performed at or prior to the Closing Date.

(c) The Purchaser shall have the right to terminate its obligations under this Bond Purchase Agreement by notifying the City of its election to do so if, after the date on which the City executed the Commitment Letter (the "Commitment Date") and prior to the Closing Date: (i) the United States shall become engaged in hostilities that have resulted in a Congressional declaration of war or a Congressional authorization for the use of force or there shall be a national emergency or there shall have occurred any outbreak of hostilities or an act of terrorism or other national or international calamity or crisis or escalation of any thereof, the effect of which on the financial markets of the United States is, in the reasonable judgment of the Purchaser, to materially adversely affect the market for the Bonds; (ii) there shall be in force a general suspension of trading on the New York Stock Exchange or other national exchanges, or minimum or

maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction; (iii) a general banking moratorium shall have been established by Federal, New York or State authorities or a major financial crisis or material disruption in commercial banking or securities settlement, payment or clearance services shall have occurred which, in the reasonable judgment of the Purchaser, would make the marketing of securities of the general character of the Bonds generally impracticable; (iv) legislation is introduced in or enacted (or resolution passed) by the Congress or an order, decree, or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary, or proposed), press release or other form of notice issued or made by or on behalf of the Securities and Exchange Commission, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds are not exempt from registration under or other requirements of the Securities Act of 1933, as amended, or that the Indenture is not exempt from qualification under or other requirements of the Trust Indenture Act of 1939, as amended, or that the issuance or sale of obligations of the general character of the Bonds is or would be in violation of the federal securities law as amended and then in effect; or (v) there shall have occurred any material adverse change between the Commitment Date and the Closing Date in the Bond Collateral or the City's collection thereof or the sources thereof.

(d)      The execution and delivery of the Bond Documents satisfactory in form and substance to the Purchaser, including without limitation, the lien and security interests in respect of the Pledged Income Tax Revenue.

(e)      The delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(f)      Entry of the Post-Petition Financing Order, which is not stayed, vacated or reversed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date.

(g)      The Purchaser shall not have become aware of any information or other matter not previously disclosed and not otherwise publicly available to it that it reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the Commitment Date.

(h)      There is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City.

(i)      The City's (x) performance of all of its obligations under the Commitment Letter to provide information and otherwise assist in the efforts to syndicate

the Bonds, and (y) compliance with all of the City's obligations under the Commitment Letter and under the Fee Letter to pay fees and expenses.

(j)     The City shall have consented, pursuant to Bankruptcy Code section 904, to the jurisdiction, authority and power of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

(k)     The Bonds and the Bond Documents shall contain the terms set forth in Section 1 hereof.

(l)     On or prior to the Closing Date, the Purchaser shall have received each of the following documents:

(1)     A State law approving opinion relating to the Bonds in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel (with appropriate carve-outs in respect of pledge and priority), including state and federal tax treatment of Bonds, no registration of Bonds under federal securities laws and no governmental immunity under State law with respect to actions to enforce the Bonds;

(2)     A State law supplemental opinion in respect of the Bond Documents in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Miller, Canfield, Paddock and Stone, P.L.C., the City's bond counsel, including the City's right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority);

(3)     A bankruptcy opinion in the form attached hereto as Appendix __, dated the Closing Date and addressed to the Purchaser, delivered by Jones Day, counsel to the City;

(4)     The ELB Order approving the terms and conditions of the Bonds including authorization under Section 36a of the Act;

(5)     The Post-Petition Financing Order, which has been entered and is not stayed, vacated or reversed and which shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, in each instance, as of the Closing Date;

(6)     Executed Income Tax Control Agreements, in form and substance satisfactory to the Purchaser;

(7)     Ordinances, resolutions and/or orders of the appropriate governing bodies and the consent of State officers, including the Emergency Manager,

whose consent is required by applicable law for the issuance of the Bonds, entry into Bond Documents and the grant of the pledge of the Pledged Income Tax Revenue;

(8)     The written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, in accordance with applicable law;

[(9)     A Non-Arbitrage and Tax Compliance Certificate, dated the Closing Date, signed by an authorized officer of the City in a form acceptable to Bond Counsel, with respect to the compliance by the City with applicable arbitrage and other applicable requirements of the Internal Revenue Code of 1986, as amended;]

(10)    A copy of the Blanket Letter of Representations from the City to DTC, in form and substance satisfactory to the Purchaser;

(11)    A specimen Bond;

(12)    A certificate of the Trustee as to (i) its corporate capacity to act as such and (ii) the incumbency and signatures of authorized officers;

(13)    An opinion of counsel to the Trustee, in form and substance reasonably acceptable to the Purchaser, regarding the due authorization, execution and delivery of the Indenture by the Trustee and the enforceability of the Indenture against the Trustee;

(14)    Officers' and public officials' certifications regarding the Bonds and the Bond Documents;

(15)    Evidence of the City's compliance with the Financial Stability Agreement or that such compliance is not necessary to close the transactions contemplated in the Bond Documents (defined below);

(16)    An executed copy of the Bond Authorizing Order;

(17)    An executed copy of the Sale Order; and

(18)    Such additional certificates and other instruments and documents as the Purchaser may reasonably request.

The Indenture, this Bond Purchase Agreement and each of the documents set forth in clauses (5), (6), (16) and (17) above are referred to herein as the "Bond Documents".

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Bond Purchase Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Purchaser.

9. **Fees and Expenses.** Except as otherwise agreed, the Purchaser shall be under no obligation to pay, and the City shall pay, all expenses incident to the performance of the obligations of the City hereunder, including, but not limited to: (A) the fees and disbursements of any consultants, advisors or counsel retained by the City; and (B) the cost of printing and preparing the Bonds. The City shall pay all other amounts payable by the City pursuant to this Bond Purchase Agreement, including, without limiting the foregoing, all amounts payable pursuant to Sections 13, 18 and 19.

10. **Notices.** Any notice or other communication to be given to the City under this Bond Purchase Agreement shall be given by delivering the same in writing to its address set forth above with a copy to Bond Counsel, and any notice or other communication to be given to the Purchaser under this Bond Purchase Agreement shall be given by delivering the same in writing to Barclays Capital Inc., 745 Seventh Avenue, 19th Floor, New York, New York, 10019 (Attention: John Gerbino, Managing Director).

11. **No Third Party Beneficiaries; Survival of Representations, Covenants and Agreements.** This Bond Purchase Agreement is made solely for the benefit of the City and the Purchaser (including the successors or assigns of the Purchaser). No other person shall acquire or have any right hereunder or by virtue hereof. All the representations, warranties, covenants and agreements contained in this Bond Purchase Agreement shall remain operative and in full force and effect for so long as the Bonds have not been paid regardless of any investigation made by or on behalf of the Purchaser and such representations, warranties, covenants and agreements shall survive the delivery of and payment for the Bonds hereunder unless this Bond Purchase Agreement shall be terminated for the reasons described in Section 3 hereof, in which case the survival provisions contained in such paragraph shall control.

12. **Disclaimer of Purchaser.** It is expressly understood and agreed by and between the City and the Purchaser that the Purchaser is not acting as the City's selling or marketing agent hereunder. The City acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Bond Purchase Agreement is an arm's-length commercial transaction between the City and the Purchaser, (ii) in connection therewith and with the process leading to such transaction the Purchaser is acting solely as a principal and not the agent, advisor or fiduciary of the City, and in particular the Purchaser is not acting as a "municipal advisor" (as defined in section 15B of the Exchange Act), (iii) the Purchaser has not assumed an advisory or fiduciary responsibility in favor of the City with respect to the sale contemplated hereby or the process leading thereto (irrespective of whether the Purchaser has advised or is currently advising the City on other matters) or any other obligation to the City except the obligations expressly set forth in this Bond Purchase Agreement, (iv) the City has consulted with its own legal and financial advisors to the extent it has deemed appropriate, and (v) the Purchaser has a financial and other interest that differs from those of the City. The City agrees that it will not claim that the Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the City in connection with the sale, and purchase of the Bonds as contemplated hereby or the process leading thereto.

13.    **Indemnification**. To induce the Purchaser to enter into this Bond Purchase Agreement, the City hereby agrees, to the extent permitted by law, to indemnify upon demand and hold harmless the Purchaser, each of the Participants and each of their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its officers, agents, representatives, employees attorneys, creditors or any other person or entity (whether or not the City is a party to such action, suit, proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds (whether or not the transactions contemplated hereby are consummated), and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any Bond Documents are executed and delivered or any bonds are purchased or extensions of credit are made under the Bonds, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of this Bond Purchase Agreement, the Bond Documents or any other documentation in respect of the Bonds. It is also agreed that, in furtherance of Section 11 hereof, the Purchaser shall only have liability to the City with respect to the Bonds and this Bond Purchase Agreement and not to any other person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Bond Purchase Agreement, the Bonds, the Bond Documents, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Bond Purchase Agreement, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to the City or any other person or entity

for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 13 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

Neither the Purchaser nor any other Indemnified Person will be responsible or liable on any theory of liability to the City or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged or otherwise claimed as a result of or in connection with this Bond Purchase Agreement, the Bonds, the Bond Documents, the Bankruptcy Case (to the extent related to the transactions contemplated hereunder) or the transactions contemplated hereunder or any use or intended use of the proceeds of the Bonds. This indemnification shall survive the delivery of and payment for the Bonds hereunder and continue for the benefit of all such persons or entities.

14. **Counterparts.** This Bond Purchase Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

15. **Governing Law.** This Bond Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to its choice of law doctrine.

16. **Jurisdiction**. To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Bond Purchase Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court; provided, however, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

17. **Waiver of Jury Trial**. Any right to trial by jury with respect to any action, suit, proceeding, claim or counterclaim brought by or on behalf of any party hereto arising in connection with or as a result of any matter referred to in this Bond Purchase Agreement or the transactions contemplated hereunder is hereby irrevocably waived by the parties hereto.

18.     **Syndication**.  (a) The Purchaser reserves the right to syndicate all or a portion of the Bonds by assigning or selling participations in the Bonds to one or more banks, financial institutions and other institutional lenders (together with the Purchaser, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  Notwithstanding the foregoing, unless otherwise agreed by the City in writing, no assignment by the Purchaser of its commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Bonds on the Closing Date in the event any assignee shall fail to do so on the Closing Date.  For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date.  Purchaser will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Purchaser pursuant to the terms of this Bond Purchase Agreement and the Fee Letter and will determine the final commitment allocations.  The City hereby acknowledges and agrees that the Purchaser, in its capacity as the arranger of the syndication described in this Section 18, will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

(b)     The City agrees to actively assist the Purchaser until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Purchaser.  Such assistance shall include (a) direct contact during the syndications between the City and its agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, and (b) the hosting, with the Purchaser, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon.  During the Syndication Period, the City agrees that there shall be no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Bond Purchase Agreement or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds on the Closing Date.

(c)     In the event that the Closing Date has occurred and the Bond Documents have been executed and delivered prior to the Successful Syndication of the Bonds, the City hereby agrees, at its own expense, to take all such action as may be required in order to effect any amendments to the Bonds or other changes as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to the market flex provisions set forth in the Fee Letter, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.  The City further agrees to reasonably cooperate with the Purchaser with regard to

immaterial changes requested by potential participants prior to the Successful Syndication of the Bonds, provided, however, that the City's obligations hereunder shall be subject to the time limitations expressly set forth in the Fee Letter.

19. **Information**

To assist the Purchaser in its syndication efforts during the Syndication Period, the City agrees to promptly prepare and provide to the Purchaser all information with respect to the City and the transactions contemplated hereby in form and substance satisfactory to the Purchaser, including such financial information and projections as the Purchaser may reasonably request in connection with the structuring, arrangement and syndication of the Bonds. The City represents, warrants and covenants that: (i) all information (other than the projections and other forward looking information (the "Projections")) that has been or will be made available to the Purchaser, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Bonds is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available directly or indirectly to the Purchaser, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Purchaser, the Participants and their respective affiliates. The City agrees that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly, at its own expense, supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances under which statements are made. The City understands that the Purchaser may use and rely on the information and Projections without independent verification thereof.

Very truly yours,

**BARCLAYS CAPITAL INC.**

By: _____

John Gerbino
Managing Director

Accepted and agreed:

**CITY OF DETROIT, MICHIGAN**

By: _____

## Appendix A

"*Act*" means the Michigan Home Rule City Act, Public Act 279 of 1909.

"*Applicable Margin*" means 2.50%, subject to adjustment in accordance with the Fee Letter.

"*Asset Proceeds Collateral*" shall have the meaning assigned to such term in Section 1(d) of this Bond Purchase Agreement.

"*Bankruptcy Case*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Code*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bankruptcy Court*" shall have the meaning assigned to such term in the recitals to this Bond Purchase Agreement.

"*Bond Authorizing Order*" means that Order of the Emergency Manager dated _____, 2014 authorizing the issuance of the Bonds for the purposes set forth therein and described in the Bond Documents.

"*Bond Certificate*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Bond Collateral*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Bond Documents*" shall have the meaning assigned to such term in Section 8 of this Bond Purchase Agreement.

"*Bond Rate*" means the sum of LIBOR and the Applicable Margin.

"*Bonds*" shall have the meaning assigned to such term in Section 1(a) of this Bond Purchase Agreement.

"*Business Day*" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"*Closing Date*" means _____, 2014.

"*Closing Documents*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Commitment Date*" shall have the meaning assigned to such term in Section 8(c) of this Bond Purchase Agreement.

"*Commitment Letter*" means the Post-Petition Bond Financing - Commitment Letter from the Purchaser to the City, dated October 6, 2013, as may be amended from time to time.

"*Default Rate*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*DTC*" shall have the meaning assigned to such term in Section 5 of this Bond Purchase Agreement.

"*Effective Rate*" means, as of any date, the Bond Rate that is then currently in effect, unless the Bonds then currently bear interest at the Default Rate, in which case the Effective Rate with respect to such date shall be the Default Rate.

"*ELB Order*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Emergency Manager*" means the emergency manager for the City with all of the powers and duties provided in Michigan Public Act 436 of 2012.

"*EM Orders*" means, collectively, the Bond Authorizing Order and the Sale Order.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fee Letter*" means the Post-Petition Bond Financing - Fee Letter from the Purchaser to the City, dated October 6, 2013, as may be amended from time to time.

"*Financial Stability Agreement*" means that certain Financial Stability Agreement by and among the City and the Michigan Department of Treasury dated April 4, 2012, as may be amended from time to time.

"*Income Tax Control Agreements*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Income Tax Revenue Accounts*" shall have the meaning assigned to such term in Section 1(g) of this Bond Purchase Agreement.

"*Indemnified Person*" shall have the meaning assigned to such term in Section 13 of this Bond Purchase Agreement.

"*Indenture*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*LIBOR*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("*BBA LIBOR*") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Purchaser from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Bond Purchase Agreement, the Bonds and the Bond Documents, LIBOR shall at no time be less than the LIBOR Floor.  If, for any reason, such rate is not available, the term LIBOR shall mean the rate of interest per annum determined by the Purchaser, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*LIBOR Floor*" means 1.00% per annum, subject to adjustment in accordance with the Fee Letter.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Participants*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Patriot Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Pledged Income Tax Revenue*" shall have the meaning assigned to such term in Section 1(f) of this Bond Purchase Agreement.

"*Post-Petition Financing Order*" means the order of the Bankruptcy Court dated as _____, 2014 [Docket No. __], attached hereto as Appendix __.

"*Projections*" shall have the meaning assigned to such term in Section 19 of this Bond Purchase Agreement.

"*Purchase Price*" shall have the meaning assigned to such term in Section 1(e) of this Bond Purchase Agreement.

"*Reserve Percentage*" means, relative to any day of any interest period, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements (including all basic, emergency, supplemental, marginal and other reserves) and taking into account any transitional adjustments or other scheduled changes in reserve requirements) under any regulations of the Board of Governors of the Federal Reserve System (the "Board") or other governmental authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liabilities consisting of "Eurocurrency Liabilities" as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such interest period.

"*Reset Date*" shall have the meaning assigned to such term in Section 1(b) of this Bond Purchase Agreement.

"*Sale Order*" means that Order of the Emergency Manager dated _____, 2014 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the Bond Documents.

"*State*" means the State of Michigan.

"*Successful Syndication*" shall have the meaning assigned to such term in the Fee Letter.

"*Syndication Period*" shall have the meaning assigned to such term in Section 18 of this Bond Purchase Agreement.

"*Trustee*" means UMB Bank, N.A.

# **EXHIBIT D**

CHI-1922513v1

# FINANCIAL RECOVERY BOND

## TRUST INDENTURE

Between

## CITY OF DETROIT

County of Wayne, Michigan

and

## UMB BANK, N.A.

as Trustee

$120,000,000

## FINANCIAL RECOVERY BONDS, SERIES 2014

CHI-1918768v4

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND INTERPRETATION ..................................................... 2

    Section 101        Definitions.................................................................. 2

    Section 102        Interpretation ........................................................... 8

ARTICLE II        TERMS OF BONDS .............................................................................. 9

    Section 201        Authorization for Indenture and Bonds; Indenture to Constitute a Contract ....................................... 9

    Section 202        Authorization of Bonds ............................................. 9

    Section 203        Issuance and Delivery of Bonds ............................... 9

    Section 204        Conditions Precedent to Delivery of Bonds ............ 10

ARTICLE III        GENERAL TERMS AND PROVISIONS OF BONDS ............................ 11

    Section 301        Designation of Bonds; Form of Bonds .................... 11

    Section 302        Book-Entry Only System for the Bonds .................. 11

    Section 303        Interchangeability of Bonds .................................... 13

    Section 304        Negotiability, Transfer and Bond Registry .............. 13

    Section 305        Transfer of Bonds .................................................... 13

    Section 306        Regulations With Respect to Exchanges and Transfers ................... 14

    Section 307        Bonds Mutilated, Destroyed, Stolen or Lost........... 14

    Section 308        Cancellation and Destruction of Bonds ................... 14

    Section 309        Redemption .............................................................. 14

    Section 310        Selection of Bonds to be Redeemed ........................ 15

    Section 311        Notice of Redemption .............................................. 15

    Section 312        Payment of Redeemed Bonds .................................. 16

ARTICLE IV        PLEDGE OF INDENTURE; SOURCES OF PAYMENT ...................... 16

    Section 401        The Bonds; Pledge of Indenture; Grant of Security Interest ............. 16

    Section 402        Creation of Liens..................................................... 17

ARTICLE V        ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS ........................................ 17

    Section 501        Debt Service Fund.................................................... 17

    Section 502        Costs of Issuance Fund ............................................ 18

| | | |
|---|---|---|
| Section 503 | Bond Proceeds Fund | 18 |
| Section 504 | Amounts Remaining in Funds and Accounts | 19 |
| Section 505 | Approval of Account Control Agreement | 19 |
| ARTICLE VI | INVESTMENT OF FUNDS | 19 |
| Section 601 | Permitted Investments | 19 |
| Section 602 | Valuation and Sale of Investments | 20 |
| ARTICLE VII | PARTICULAR COVENANTS OF THE CITY | 21 |
| Section 701 | Payment of Bonds | 21 |
| Section 702 | Power to Issue Bonds and Pledge Revenues, Funds and Other Property | 21 |
| Section 703 | Maintenance of Perfected Security Interests; Further Assurances; Notices of Default | 21 |
| Section 704 | Tax Covenants | 21 |
| Section 705 | Compliance With Conditions Precedent | 22 |
| Section 706 | Accounts and Reports | 22 |
| Section 707 | Issuance of Additional Obligations | 22 |
| Section 708 | Income Tax Revenues and Accounts | 22 |
| Section 709 | Asset Proceeds Collateral | 22 |
| Section 710 | Contesting Enforceability | 22 |
| ARTICLE VIII | THE TRUSTEE | 23 |
| Section 801 | Powers and Duties of Trustee | 23 |
| Section 802 | Fees and Expenses of Trustee | 25 |
| Section 803 | Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale | 25 |
| Section 804 | Removal of Trustee | 26 |
| Section 805 | Appointment of and Transfer to Successor Trustee | 26 |
| ARTICLE IX | EVENTS OF DEFAULT AND REMEDIES ON DEFAULT | 26 |
| Section 901 | Events of Default | 27 |
| Section 902 | Remedies | 28 |
| Section 903 | Waiver of Default | 29 |
| Section 904 | Possession of Bonds by Trustee Not Required | 29 |
| Section 905 | Remedies Cumulative | 30 |
| Section 906 | Knowledge by Trustee of an Event of Default | 30 |

    Section 907        Application of Monies ...................................................... 30

ARTICLE X       SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE .......................................................................... 30

    Section 1001    Modifications and Amendments Not Requiring Consent ................. 30

    Section 1002    Amendments Requiring Consent .................................... 31

    Section 1003    Consent of Trustee ......................................................... 32

    Section 1004    General Provisions Relating to Supplemental Indentures ................ 32

ARTICLE XI      MISCELLANEOUS ........................................................... 33

    Section 1101    Notices .......................................................................... 33

    Section 1102    Termination ................................................................... 33

    Section 1103    Defeasance .................................................................... 33

    Section 1104    Severability .................................................................. 34

    Section 1105    Headings ...................................................................... 34

    Section 1106    Indenture Executed in Counterparts................................ 34

    Section 1107    Parties Interested Herein ............................................... 34

    Section 1108    Jurisdiction ................................................................... 34

EXHIBIT A   FORM OF SERIES 2014 BOND ..................................................... A-1
EXHIBIT B   FORM OF ACCOUNT CONTROL AGREEMENT .........................................B-1

# FINANCIAL RECOVERY BOND TRUST INDENTURE

This Trust Indenture, dated as of [_____], 2014 (the "Indenture"), between the City of Detroit, County of Wayne, State of Michigan (the "City") and UMB Bank, N.A., and its successors in trust and assignees, as trustee (the "Trustee").

## W I T N E S S E T H:

**WHEREAS**, pursuant to the Local Government Fiscal Responsibility Act, Act 436, Public Acts of Michigan, 2012 ("Act 436"), the Governor (the "Governor") of the State of Michigan (the "State") determined that a local government financial emergency exists in the City of Detroit, County of Wayne, Michigan (the "City"), and an emergency manager, as defined in Act 436, Kevyn D. Orr (the "Emergency Manager") was appointed for the City by the Governor on March 28, 2013 in accordance with Act 436; and

**WHEREAS**, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief (the "Case") pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

**WHEREAS**, on _____, 2014, pursuant to Section 12(1) and Section 19(1) of Act 436, the Emergency Manager filed with the City Council of the City the key terms and conditions of the Series 2014 Bonds (the "Secured Financing"); and

**WHEREAS**, on [_____], 2014, the Bankruptcy Court issued an order [Docket No. __] authorizing the Secured Financing (the "Bankruptcy Court Order"), pursuant to which super priority liens have been established under Sections 364(c), 503 and 507(a)(2) of the Bankruptcy Code for the certain collateral securing the bonds authorized for issuance hereunder; and

**WHEREAS**, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board established pursuant to Act 243, Public Acts of Michigan, 1980, as amended; and

**WHEREAS**, on _____, 2014, the Board issued an order (the "Board Order") approving the issuance of the Series 2014 Bonds by the City as finally determined in the Sale Order of the Emergency Manager, subject to the terms and conditions for each series of Bonds approved by the Board in the Board Order; and

**WHEREAS**, in connection with the issuance of the Bonds, the Trustee shall enter into the Account Control Agreement (as hereinafter defined) with the City and the Depository Bank.

**NOW, THEREFORE, THIS TRUST INDENTURE WITNESSETH** that in order to secure the payment of the Bonds, for the benefit of the respective Registered Owners thereof and to secure the performance and observance of the conditions and covenants herein set forth and

for other valuable consideration, the receipt of which is hereby acknowledged, the City covenants and agrees with the Trustee for the benefit of the respective owners from time to time of the Bonds as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101    Definitions.    In addition to the terms defined in the preambles to this Indenture, and in the Bond Orders, the following terms shall have, unless the context otherwise requires, the meanings herein specified:

"*1 Month LIBOR Rate*" means the per annum interest rate (rounded upward, if necessary, to the nearest 1/32 of one percent) for deposits in U.S. Dollars equal to the British Bankers' Association LIBOR (or any entity that assumes responsibility for determining such rate) ("BBA LIBOR") for a one-month period as appearing on the BBAM page of the Bloomberg Professional Service (or, if no longer published by Bloomberg, such other commercially available source providing quotations of BBA LIBOR as determined by the Calculation Agent from time to time, upon notice to the City) at approximately 11:00 A.M. (London time) two London Banking Days prior to a 1-Month LIBOR Reset Date; provided, however, if more than one BBA LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates; provided further, however, that, for purposes of this Indenture, the 1-Month LIBOR Rate shall at no time be less than the LIBOR Floor.  If, for any reason, such rate is not available, the term 1-Month LIBOR Rate shall mean the rate of interest per annum determined by the Calculation Agent, which shall at no time be less than the LIBOR Floor, to be the average per annum interest rate at which deposits in dollars are offered for a one-month period by major banks in London, England at approximately 11:00 A.M. (London time) two London Banking Days prior to the 1-Month LIBOR Reset Date.  In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits, then for any period during which such Reserve Percentage shall apply, the 1-Month LIBOR Rate shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage but in no event less than the LIBOR Floor.

"*1-Month LIBOR Reset Date*" means the first Business Day of each calendar month.

"*Account*" means any of the trust funds and accounts created and established by, or pursuant to, this Indenture.

"*Account Control Agreement*" means that certain Account Control Agreement dated as of [____], 2014 by and among the City, the Trustee, and the Depository Bank in favor of the Trustee with respect to the Pledged Income Tax Account that holds the Pledged Income Tax Revenue.

"*Act 279*" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"*Act 284*" means Act No. 284, Public Acts of Michigan, 1964, as amended, and any replacement or successor thereto.

2

"***Act 436***" means Act No. 436, Public Acts of Michigan, 2012.

"***Asset Proceeds Collateral***" shall mean all net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10 million, which net cash proceeds are pledged by the City hereunder, on the terms and conditions set forth hereunder, in favor of the Registered Owners of the Series 2014 Bonds. Asset Proceeds Collateral shall not include assets owned by the City, or assets in which the City holds an interest, which, in either case, are held by the Detroit Institute of Arts.

"***Authorized Denominations***" shall mean denominations of Bonds equal to multiples of $100,000 or integral multiples of $5,000 in excess thereof.

"***Authorized Officer***" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City or his or her designee, (ii) if the City is operating under a financing emergency pursuant to Act 436 but no Emergency Manager (or successor thereto) has been appointed, any person or entity with legal authority to act on behalf of the City or (iii) any other person authorized by a Certificate of an Authorized Officer issued to the Trustee to act on behalf of or otherwise represent the City in any legal capacity, which such Certificate shall be delivered, if at all, in the City's sole discretion.

"***Bankruptcy Case***" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"***Bankruptcy Court Order***" has the meaning set forth in the recitals hereto.

"***Board***" has the meaning set forth in the recitals hereto.

"***Bond***" or "***Bonds***" means the Series 2014 Bonds.

"***Bondowner***", "***Owner***" or "***Registered Owner***" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry under Section 304.

"***Bond Authorizing Order***" means that Order of the Emergency Manager dated _____, 2014 authorizing the issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"***Bond Counsel***" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"***Bond Orders***" means collectively the Bond Authorizing Order and the Sale Order.

3

"**Bond Proceeds Fund**" means the fund established pursuant to Section 503 hereof by the Trustee and pursuant to the Bond Orders in which, on the Date of Original Issue, the proceeds of the Bonds shall be deposited.

"**Bond Purchase Agreement**" means that certain Bond Purchase Agreement by and among the Purchaser and the City dated as of [_____], 2014 with respect to the Series 2014 Bonds.

"**Bond Rate**" means the sum of the 1-Month LIBOR Rate and the Spread.

"**Bond Registry**" means the books for the registration of Bonds maintained by the Trustee.

"**Business Day**" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Trustee or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"**Calculation Agent**" means Barclays Capital Inc.

"**Case**" has the meaning set forth in the recitals hereto.

"**Certificate**" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called for by this Indenture, as the case may be.

"**City**" means the City of Detroit, County of Wayne, Michigan.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Costs of Issuance Fund**" means the fund established under Section 502 hereof for the payment of the costs of issuance of the Bonds.

"**Date of Original Issue**" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"**Debt Service Account**" means the Account established within the Debt Service Fund for the benefit of the Series 2014 Bonds pursuant to Section 501 of this Indenture.

"**Debt Service Fund**" means the Debt Service Fund established under Section 501 hereof, for the payment of principal of and interest on the Bonds.

"**Debt Service Requirement Amount**" means, as applicable, an amount equal to (i) the interest due on the Bonds on the next succeeding Interest Payment Date plus if such Interest Payment Date is also a Redemption Date, any principal and premium owing on such Redemption

4

13-53846-swr Doc 4921-8 Filed 03/06/14 Entered 03/06/14 15:36:59 Page 129 of 179
203

Date, if any, or (ii) the amount equal to the interest, premium, if any, and principal due on the Bonds on the Maturity Date plus any fees or expenses for which the Trustee is entitled to be paid from the Debt Service Fund.

"*Depository Bank*" means Comerica Bank and any successor thereto.

"*Emergency Manager*" has the meaning set forth in the recitals hereto.

"*Event of Default*" has the meaning attributed to it in Section 901 hereof.

"*Financing Documents*" means this Indenture, the Bond Purchase Agreement, the Account Control Agreement, the Series 2014 Bonds, the Bond Orders, the Bankruptcy Court Order, the Fee Letter and any other document related to the issuance, sale or delivery of the Bonds.

"*Fiscal Year*" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"*Governmental Obligations*" means non- callable (a) direct obligations of the United States of America for the full and timely payment of which the full faith and credit of the United States of America is pledged, (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any securities described in (a) or (b) issued or held in book-entry form on the books of the Department of Treasury of the United States of America or any Federal Reserve Bank, and (c) securities which represent an interest in the obligations described in (a) and (b) above.

"*Income Tax Revenues*" means revenues collected by the City from a levy of an excise tax on income pursuant to Act 284 or pursuant to any other applicable State or local law.

"*Indenture*" means this Trust Indenture, dated as of [_____], 2014, as supplemented and amended.

"*Interest Payment Date*" means (i) each 1-Month LIBOR Reset Date; (ii) with respect only to Bonds being redeemed, in whole or in part, the Redemption Date; and (iii) the Maturity Date.

"*LIBOR Floor*" means 1.00% per annum.

"*London Banking Day*" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"*Maturity Date*" means the earliest to occur of (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, (iii) the date on which the Bonds are accelerated pursuant to this Indenture, and (iv) [_____,] the date that is two years and six months after the Date of Original Issue.

5

CHI-1918768v4

"***Non-Arbitrage and Tax Compliance Certificate***" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the date of issuance of the Bonds, regarding rebate requirements and other tax responsibilities of the City relating to the Tax-Exempt Bonds.

"***Outstanding***" when used with respect to the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered pursuant to the Bond Orders and this Indenture, except:

(A)     Bonds theretofore canceled by the Trustee or delivered to such Trustee for cancellation;

(B)     Bonds for whose payment money in the necessary amount has been theretofore irrevocably deposited with the Trustee in trust for the registered owners of such Bonds;

(C)     Bonds delivered to the Trustee for cancellation in connection with (i) the exchange of such Bonds for other bonds or (ii) the transfer of the registration of such Bonds;

(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to the Bond Orders or otherwise pursuant to law; and

(E)     Bonds deemed paid as provided in Section 801 of the Bond Authorizing Order.

"***Payment Date***" means each Interest Payment Date, and the Maturity Date of the Bonds.

"***Permitted Investments***" means those investments specified in Article VI of this Indenture.

"***Petition Date***" has the meaning set forth in the recitals hereto.

"***Pledged Income Tax Account***" means that certain bank account established at Comerica Bank, Account No. [_____] that collects solely Income Tax Revenues.

"***Pledged Income Tax Revenue***" means the Income Tax Revenues pledged on a first priority lien basis in favor of the Registered Owners of the Series 2014 Bonds. Pledged Income Tax Revenue does not include that portion of income tax revenues transferred into the budget of the City's police department at any time, to be used exclusively to retain and hire police officers, in an amount equal to the sum of 0.2% of the income tax rate levied on resident individuals and 0.1% of the income tax rate levied on non-resident individuals, for so long as bonds, obligations or other evidences of indebtedness of the City's Public Lighting Authority are outstanding and payable from taxes levied by the City under the Utility Users Tax Act, Act 100, Public Acts of Michigan, 1990, as amended, MCL 141.1151, *et seq*.

"***Post Petition Date Debt***" means any payment obligation of the City first incurred on or following the Petition Date.

6

CHI-1918768v4

13-53846-swr    Doc 4311-8   Filed 03/06/14   Entered 03/06/14 15:36:09   Page 133 of 179
13-53846-swr    Doc 2911   Filed 03/06/14   Entered 03/06/14 15:23:00   Page 133 of
203

"**Purchaser**" means Barclays Capital Inc. or any permitted party designated pursuant to the Bond Purchase Agreement, as approved by the City, which such approval shall not be unreasonably withheld.

"**Quality of Life Projects**" means those certain projects determined by the Emergency Manager in the Sale Order to be financed with the proceeds of the Series 2014 Bonds.

"**Record Date**" means the fifteenth (15th) day prior to any Interest Payment Date.

"**Redemption Date**" means the date upon which Bonds are to be called for redemption, in whole or in part, pursuant to this Indenture.

"**Redemption Price**" means, with respect to any Bond, the principal amount thereof plus the applicable premium, if any, payable upon redemption thereof.

"**Reserve Percentage**" means, relative to any day of any interest period, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) under any regulations of the Board of Governors of the Federal Reserve System (the "Board") or other governmental authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liability consisting of "Eurocurrency Liabilities," as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such interest period.

"**Sale Order**" means that Order of the Emergency Manager dated [_____], 2014 authorizing the final sale and issuance of the Bonds for the purposes set forth therein and described in the preamble above.

"**Series 2014 Bonds**" means the City's Financial Recovery Bonds, Series 2014.

"**Spread**" means, so long as no Event of Default has occurred and is continuing, 250 basis points, and upon the occurrence of and continuance of an Event of Default, 450 basis points.

"**State**" has the meaning set forth in the recitals hereto.

"**State Treasurer**" means the Treasurer of the State of Michigan.

"**Supplemental Indenture**" means any indenture supplemental to or amendatory of this Indenture, executed by the City and the Trustee and effective in accordance with Article X.

"**Tax-Exempt Bonds**" means those Bonds, the interest on which is excluded from gross income for federal tax purposes.

"**Trustee**" means initially, UMB Bank, N.A., as trustee, as bond registrar, transfer agent and paying agent for the Bonds and any successor in trust or assignees pursuant to Section 803 hereof.

7

CHI-1918768v4

"***Trust Estate***" shall have the meaning set forth in Section 401 hereof.

Section 102    Interpretation.  (A) In this Indenture, unless the context otherwise requires:

(1)    the terms "hereby", "hereof", "herein", "hereunder" and similar terms, as used in this Indenture, refer to this Indenture, and the term "heretofore" means before, and the term "hereafter" means after, the date of this Indenture;

(2)    words of the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular number mean and include the plural number and vice versa;

(3)    words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons;

(4)    any headings preceding the texts of the several Articles and Sections of this Indenture and any table of contents or marginal notes appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect;

(5)    this Indenture shall be governed by and construed in accordance with the applicable laws of the State;

(6)    references to the payment of the Bonds shall be deemed to include reference to the payment of interest thereon;

(7)    references to time shall mean the applicable local time in New York City, New York; and

(8)    references to Sections and Articles, unless otherwise indicated, refer to Sections and Articles in this Indenture.

(B)    Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than the City, the Trustee, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation thereof.  All the covenants, stipulations, promises and agreements herein contained by and on behalf of the City, shall be for the sole and exclusive benefit of the City, the Trustee, and the Owners of the Bonds.

(C)    If any one or more of the covenants or agreements provided herein on the part of the City or the Trustee to be performed should be contrary to law, then such covenant or covenants or agreement or agreements shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Indenture or of the Bonds.

8

**ARTICLE II**

**TERMS OF BONDS**

Section 201     Authorization for Indenture and Bonds; Indenture to Constitute a Contract. This Indenture and the issuance of Bonds hereunder have been duly authorized by the City and the principal amount of Bonds that may be issued hereunder is not limited except as provided herein or by law.  The City has ascertained and it is hereby determined and declared that the execution and delivery of this Indenture is necessary to carry out and effectuate the purposes of the City and that each and every covenant or agreement herein contained and made is necessary, useful or convenient in order to better secure the Bonds and is a contract or agreement necessary, useful and convenient to carry out and effectuate the purposes of the City.  In consideration of the purchase and acceptance of the Bonds by those who shall purchase and hold the same from time to time, the provisions of this Indenture, any Bond Order and any Series or Supplemental Indenture shall be deemed to be and shall constitute a contract between the City, the Trustee and the Owners from time to time of the Bonds, and such provisions are covenants and agreements with such Owners which the City hereby determines to be necessary and desirable for the security and payment thereof.  The pledge hereof, and the provisions, covenants and agreements herein set forth to be performed by the City, shall be for the equal benefit, protection and security of the Owners of any and all Bonds which shall be of equal rank without preference, priority or distinction among all Bonds, except as may otherwise be expressly set forth herein.

Section 202     Authorization of Bonds.  In order to provide sufficient funds for the purposes set forth in the Bond Orders, obligations of the City in the form of Bonds are hereby authorized to be issued from time to time hereunder in one or more series.  No Bonds shall be issued unless they are part of an issue described in the Bond Orders and until the conditions contained in this Indenture are satisfied.

Section 203     Issuance and Delivery of Bonds.  After their authorization by the City, Bonds may be executed by or on behalf of the City and delivered to the Trustee in accordance with the Bond Authorizing Order and this Indenture for authentication and, upon compliance by the City with the requirements of Section 204, the Trustee shall thereupon authenticate and deliver such Bonds to or upon the order of the City.  No Bond shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 301 of this Indenture, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Trustee by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

Section 204     Conditions Precedent to Delivery of Bonds.  The Bonds shall be authenticated and delivered upon the order of the City, but only upon the receipt by the Trustee of:

(1)     a copy of the Bond Orders authorizing each such series, executed by the City, which shall specify:

9

(a)     the authorized principal amount and designation of such Bonds;

(b)     the purposes for which such Bonds are issued;

(c)     the dated dates and maturity dates of the Bonds;

(d)     the interest rates, if any, of and principal amounts payable upon such Bonds (or the manner of determining such rates or amounts) and the interest payment dates, if any, and principal installment dates therefor;

(e)     the denominations of, and the manner of dating, numbering and lettering, such Bonds;

(f)     the places of payment of such Bonds or the manner of appointing and designating the same;

(g)     provisions concerning the forms of such Bonds and of the Trustee's certificate of authentication;

(h)     evidence of compliance with Act 279, including receipt of an order of the Board approving all terms and conditions of the Bonds;

(i)     any other provisions deemed advisable by the City as shall not conflict with the provisions hereof; and

(j)     the Redemption Price, if any, of and the redemption terms for such Bonds.

(2)     **a** Bond Counsel's Opinion to the effect that (i) such Bond Order and/or Supplemental Indenture and this Indenture have been duly authorized, executed and delivered by the City and are valid and binding upon, and enforceable against, the City; and (ii) upon the execution, authentication and delivery thereof, such Bonds will have been duly and validly authorized and issued in accordance with the constitution and statutes of the State and in accordance with this Indenture with such qualifications and exceptions to such opinion as specified in the Bond Purchase Agreements; and

(3)     evidence of the receipt by the Trustee of the amount of the proceeds of such Bonds to be deposited with the Trustee pursuant to Section 503, which shall be conclusively established by the executed certificate of the Trustee so stating.

CHI-1918768v4

**ARTICLE III**

**GENERAL TERMS AND PROVISIONS OF BONDS**

Section 301     Designation of Bonds; Form of Bonds.

(a) *Designation and Form of Bonds.*  Bonds designated as "Financial Recovery Bonds, Series 2014" are hereby authorized to be issued pursuant to the provisions of this Indenture in the principal amount of $120,000,000.   The Bonds shall bear a Date of Original Issue of _____, 2014.  The Bonds shall be issued in fully registered form, without coupons, and in Authorized Denominations.  The Bonds shall contain a recital that they are issued pursuant to the laws of the State and may have printed thereon such legend or legends as may be required to comply with any law, rule or regulation.  Each Bond shall be numbered as determined by the City.  The Bonds shall be substantially in the form set forth in Exhibit A, with such appropriate changes, omissions and insertions as are permitted or required by this Indenture or the Bond Authorizing Order.   The Bonds shall be payable, as to principal, interest and redemption premium, if any, in lawful money of the United States of America.  Principal and interest on the Bonds shall be due and payable as set forth in the form of Bond set forth in Exhibit A. Interest shall be calculated on the basis of a 360 day year for the actual number of days elapsed.  The principal amount of the Bonds of each series shall be payable on the Maturity Date.  The Bonds shall bear CUSIP numbers as provided by the CUSIP Service Bureau.

(b) *Payment on the Bonds.* Principal of, and premium, if any, on the Bonds are payable upon presentation and surrender thereof at the corporate trust office of the Trustee.  Interest on the Bonds will be paid by check or draft drawn upon the Trustee and mailed to Owners at the registered addresses, provided that, at the written request of the Owner of at least $1,000,000 principal amount of Bonds (which request may provide that it will remain in effect with respect to each subsequent Interest Payment Date unless and until changed or revoked at any time prior to an Interest Payment Date by subsequent written notice to the Trustee), interest shall be paid by wire transfer or other method of transfer of immediately available funds acceptable to the Trustee and the City.  Payment as aforesaid shall be made in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

Section 302     Book-Entry Only System for the Bonds.  (a) Except as provided in Section 302(b) hereof, the ownership of the Bonds shall be registered in the Bond Registry in the name of Cede & Co., as nominee of DTC.

With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the City and the Trustee shall have no responsibility or obligation to any DTC Participant or to any person on behalf of whom such a DTC Participant holds an interest in the Bonds.  Without limiting the immediately preceding sentence, the City and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any other Person, other than a Bondowner, as shown in the Bond Registry, of any notice with respect to the Bonds, including any notice of redemption, or (iii) the payment to any DTC Participant or any other Person, other than a Bondowner, as shown in the

11

CHI-1918768v4

Bond Registry, of any amount with respect to principal of, premium, if any, or interest on the Bonds. Notwithstanding any other provision of this Indenture to the contrary, the City and the Trustee shall be entitled to treat and consider the Person in whose name each Bond is registered in the Bond Registry as the absolute owner of such Bond for the purpose of payment of principal of, premium, if any, and interest on such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal of, premium, if any, and interest on the Bonds only to or upon the order of the respective Bondowners, as shown in the Bond Registry as provided in this Indenture, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to satisfy and discharge the City's obligations fully with respect to payment of principal of, premium, if any, and interest on the Bonds to the extent of the sum or sums so paid. No Person other than a Bondowner, as shown in the Bond Registry, shall receive a Bond certificate evidencing the obligation of the City to make payments of principal, premium, if any, and interest pursuant to this Indenture. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Indenture with respect to interest checks or drafts being mailed to the registered owner as of the close of business of the Record Date, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(b) In the event that the City or the Trustee determines that DTC is incapable of discharging its responsibilities described herein and in the Letter of Representations between the City and DTC (the "Letter of Representations") or that it is in the best interest of the beneficial owners of the Bonds that they be able to obtain certificated Bonds, the City or the Trustee shall (i) appoint a successor securities depository, qualified to act as such under Section 17(a) of the Securities Act of 1934, as amended, notify DTC and DTC Participants of the appointment of such successor securities depository and transfer one or more separate Bond certificates to DTC Participants having Bonds credited to their DTC accounts. In such event, the Bonds shall no longer be restricted to being registered in the Bond Registry in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondowners transferring or exchanging Bonds shall designate, in accordance with the provisions of this Indenture. The Trustee shall give written notice to the City of a determination to issue certificated bonds.

(c) Notwithstanding any other provision of this Indenture to the contrary, so long as any series of the Bonds is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on the Bonds and all notices with respect to such Bonds shall be made and given, respectively, in the manner provided in the Letter of Representations. The Trustee shall request in each notice sent to Cede & Co., pursuant to the terms of this Indenture, that Cede & Co. forward or cause to be forwarded such notice to the DTC Participants, but neither the Trustee nor the City shall be liable if Cede & Co. fails to honor such request.

Section 303 <u>Interchangeability of Bonds</u>. In the event that Bonds are no longer registered in the name of Cede & Co., as nominee of DTC, Bonds, upon surrender thereof at the corporate trust office of the Trustee with a written instrument of transfer satisfactory to the

12

Trustee, duly executed by the Owner or his duly authorized attorney, may at the option of the Owner thereof, and upon payment by such Owner of any charges which the Trustee may make as provided in Section 306, be exchanged for an equal aggregate principal amount of Bonds of the same Series and maturity bearing the same rate of interest and having the same terms of any of the authorized denominations; provided, however, that the exchange of Bonds may be restricted by the Supplemental Indenture pursuant to which such Bonds are issued.

Section 304    Negotiability, Transfer and Bond Registry.  All the Bonds issued under this Indenture shall be negotiable, subject to the provisions for registration, transfer and exchange contained in this Indenture and in the Bonds in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request).  So long as any of the Bonds remain Outstanding, the City shall maintain and keep, at the designated corporate trust office of the Trustee, which may be one or more banks or trust companies or national banking associations appointed by the City, books for the registration, transfer and exchange of Bonds. Upon presentation thereof for such purpose at said office, the City shall register or cause to be registered in such books, and permit to be transferred thereon, any Bonds pursuant to such reasonable regulations as it or the Trustee may prescribe. So long as any of the Bonds remain Outstanding, the City shall make all necessary provisions to permit the exchange of Bonds at the corporate trust office of the Trustee.

Section 305    Transfer of Bonds.  (A) The registration of each Bond is transferable, in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) Business Days of an assignment request), only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(B)    Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Trustee together with a written instrument of transfer satisfactory to the Trustee, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306    Regulations With Respect to Exchanges and Transfers.  (A) In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the City shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of this Indenture.  All Bonds surrendered in such exchanges or transfers shall be forthwith canceled by the Trustee.

13

(B)     For every such exchange or transfer of Bonds, the City or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, and may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or transfer, which sums shall be paid by the Bondowner requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(C)     The Trustee shall not be required (i) to issue, exchange or transfer any Bond during a period beginning on the opening of business 15 days before the giving of a notice of redemption and ending on the date of the mailing of notice of such redemption, or (ii) to transfer or exchange Bonds called or being called for redemption, except the unredeemed portion of Bonds being redeemed in part.

Section 307     Bonds Mutilated, Destroyed, Stolen or Lost.  If any Bond shall become mutilated, the City, at the expense of the Registered Owner of the Bond, shall execute, and the Trustee shall authenticate and deliver, a new Bond of like tenor in exchange and substitution for the mutilated Bond, upon surrender to the Trustee of the mutilated Bond.  If any Bond issued under this Indenture shall be lost, destroyed or stolen, evidence of the loss, destruction or theft may be submitted to the Trustee and, if this evidence is satisfactory to both and indemnity satisfactory to the Trustee shall be given, and if all requirements of any applicable law including Act 354, Public Acts of Michigan, 1972, as amended ("Act 354"), being sections 129.131 to 129.135, inclusive, of the Michigan Compiled Laws have been met, the City, at the expense of the owner, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor and bearing the statement required by Act 354, or any applicable law hereafter enacted, in lieu of and in substitution for the Bond so lost, destroyed or stolen.  If any such Bond shall have matured or shall be about to mature, instead of issuing a substitute Bond the Trustee may pay the same without surrender thereof.

Section 308     Cancellation and Destruction of Bonds.  All Bonds paid or redeemed by the City, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bond, together with all Bonds purchased by the Trustee, shall thereupon be promptly cancelled.  Bonds so cancelled may at any time be cremated or otherwise destroyed by the Trustee, who shall execute a Certificate of cremation or destruction in duplicate by the signature of one of its authorized officers describing the Bonds so cremated or otherwise destroyed.  Such executed Certificate shall be filed with the City and the other executed Certificates shall be retained by the Trustee.

Section 309     Redemption.  The Bonds shall be subject to optional and mandatory redemption as set forth in the form of Bonds attached hereto as Exhibit A.  The Bonds shall only be redeemed in Authorized Denominations.  No partial redemption of Bonds is authorized, unless as a result of such partial redemption, the remaining Outstanding Bonds of a series shall be in Authorized Denominations.

Section 310     Selection of Bonds to be Redeemed.  Subject to any rules and procedures of a securities depository for Bonds held in book-entry form, in the event of redemption of less than all the Outstanding Bonds of like series and maturity, the Trustee shall assign to each such

14

CHI-1918768v4

Outstanding Bond a distinctive number for each minimum denomination of the principal amount thereof so as to distinguish each such minimum denomination from each other portion of the Bonds subject to such redemption. The Trustee shall select by lot, using such method of selection as it shall deem proper in its sole discretion, from the numbers of all such Bonds then Outstanding of such maturity, as many numbers as, at the minimum denomination for each number, shall equal the principal amounts of such Bonds to be redeemed. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; but only so much of the principal amount of each such Bonds of a denomination of more than the minimum denomination shall be redeemed as shall equal the minimum denomination for each number assigned to it and so selected. For the purposes of this Section, Bonds which have theretofore been selected by lot for redemption shall not be deemed Outstanding.

Any integral multiple of a minimum denomination may, if so specified by the provisions of a Supplemental Indenture, be utilized in connection with the partial redemption of Bonds issued pursuant to such Supplemental Indenture and such Bonds shall be subject to selection for redemption in the amount of such multiple but otherwise in accordance with this Section.

Section 311    Notice of Redemption.  When redemption of Bonds is required by this Indenture, the Trustee shall give notice, in the name of the City, of the redemption of such Bonds.  Such notice shall specify the Series and maturities of the Bonds to be redeemed, the Redemption Date and the place or places where amounts due upon such redemption will be payable and, if less than all the Bonds of any like maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the principal amount thereof to be redeemed.  Such notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof in the case of registered Bonds to be redeemed in part only, together with interest accrued to the Redemption Date, and that from and after such date interest thereon shall cease to accrue and be payable.  Such notice shall be given by first class mail or registered or certified mail, return receipt requested, not less than ten (10) business days nor more than sixty (60) days before the Redemption Date to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registry books, but failure to mail any such notice shall not affect the validity of the proceedings for the redemption of Bonds with respect to which no such failure occurred; provided, however, that shorter periods before the Redemption Date during which notice pursuant to this Section must be given may be prescribed by a Bond Order or Supplemental Indenture as to Bonds issued pursuant to such Bond Order or Supplemental Indenture.  As directed by the City, further notice shall be given by the Trustee in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 312    Payment of Redeemed Bonds.  Notice having been given by mail in the manner provided in Section 311, the Bonds or portions thereof so called for redemption shall become due and payable on the Redemption Date so designated at the Redemption Price, plus

CHI-1918768v4

interest accrued and unpaid to the Redemption Date, and, upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the Redemption Date. If there shall be called for redemption less than the entire principal amount of a Bond, the City shall execute, the Trustee shall authenticate and the Trustee shall deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered at the option of the Owner, Bonds of like series and maturity in any of the authorized denominations. If, on the Redemption Date, moneys for the redemption of all the Bonds or portions thereof of any like series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been mailed as aforesaid, then, from and after the Redemption Date, interest on the Bonds or portions thereof of such series and maturities so called for redemption shall cease to accrue and become payable. If said moneys shall not be available on the Redemption Date, such Bonds or portions thereof shall continue to bear interest until paid or provided for at the same rate as they would have borne had they not been called for redemption.

**ARTICLE IV**
**PLEDGE OF INDENTURE; SOURCES OF PAYMENT**
**AND SECURITY FOR THE BONDS**

Section 401    The Bonds; Pledge of Indenture; Grant of Security Interest. The City hereby grants a valid, binding, enforceable, non-avoidable, continuing postpetition security interest in, assigns, transfers, pledges, grants, conveys and hypothecates unto the Trustee and its successors and assigns, on behalf of the Bondowners, forever, on a first priority lien basis, all of the right, title and interest of the City in all of the following described property (collectively, the "Trust Estate"):

(a)    All rights and interests of the City in the Pledged Income Tax Revenue and the Asset Proceeds Collateral (collectively the "Collateral").

(b)    Amounts on deposit from time to time in the Accounts created pursuant hereto subject to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein.

The Bonds are also limited tax general obligations of the City, which will be payable from ad valorem taxes annually levied on all taxable property within the City, subject to applicable constitutional, statutory and charter tax rate limitations. The Bonds have been granted super-priority claim status under Section 364(c)(1) of the Bankruptcy Code (without the need to file any proof of claim) and shall also be payable in the manner provided by the Bankruptcy Court Order.

To the fullest extent provided by applicable laws, the money and property hereby pledged shall immediately be subject to the lien of such pledge without any physical delivery thereof, without the necessity of the execution, recordation of filings by the City of financing statements, notices of liens, control agreements or other security documents or the possession or control by the Trustee over any of the Trust Estate, or further act and such lien shall be valid and binding

16

against all parties having claims in tort, contract or otherwise against the City, irrespective of whether such parties have notice of the claim. Neither the Bond Orders authorizing the Bonds nor this Indenture nor any Supplemental Indenture need be recorded.

Section 402    Creation of Liens.  In order to further implement the liens on the Collateral in favor of the holders of the Bonds, the City and the Trustee each hereby covenant to enter into the Account Control Agreement with the Depository Bank, and the Trust Estate shall include the Trustee's rights thereunder in and to the Pledged Income Tax Account.

# ARTICLE V

## ESTABLISHMENT OF FUNDS AND ACCOUNTS; FLOW OF FUNDS

Section 501    Debt Service Fund.

(a) *Establishment of Debt Service Fund and Accounts.*  There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, a single trust fund designated the "Financial Recovery Bonds, Common Debt Service Fund" (hereinafter referred to as the "Debt Service Fund").

Within the Debt Service Fund, there is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014 – Common Debt Service Account" (hereinafter referred to as the "Debt Service Account"), and within the Debt Service Account two subaccounts entitled "Scheduled Debt Service Subaccount" and "Asset Proceeds Collateral Mandatory Redemption Subaccount."

(b) *Deposits to Debt Service Fund.*  Five Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount and the Trustee shall deposit the Debt Service Requirement Amount into the Debt Service Fund, for deposit to the Scheduled Debt Service Subaccount of the Debt Service Account, for the payment of amounts owing with respect to the Bonds on such Interest Payment Date. Two Business Days prior to a scheduled Maturity Date, the City shall transfer to the Trustee the Debt Service Requirement Amount for the Outstanding Bonds and the Trustee shall deposit the Debt Service Requirement Amount into the Scheduled Debt Service Subaccount of the Debt Service Fund, for deposit to the Scheduled Debt Service Subaccount of the Debt Service Account, for the payment of all outstanding principal, premium, if any, and interest on the Bonds.

If, two Business Days prior to a scheduled Interest Payment Date other than a Maturity Date, amounts on deposit in the Scheduled Debt Service Subaccount of the Debt Service Account do not equal the Debt Service Requirement Amount owing with respect to the Bonds on such Interest Payment Date, the Trustee shall send the Depository Bank a Notice of Deficiency and Requisition under the Account Control Agreement and withdraw funds from the Pledged Income Tax Account in accordance with the terms of the Account Control Agreement and deposit into the Scheduled Debt Service Subaccount of the Debt Service Account, an amount

17

sufficient to make the balance of the Scheduled Debt Service Subaccount of the Debt Service Account equal the Debt Service Requirement Amount owing on such Interest Payment Date.

If, following the foregoing deposits, the amounts on deposit in the Scheduled Debt Service Subaccount of the Debt Service Account do not equal the Debt Service Requirement Amount owing on such Interest Payment Date in respect of the Bonds, the Trustee shall withdraw funds from the Bond Proceeds Fund in an amount sufficient to make the balance in the Scheduled Debt Service Subaccount of the Debt Service Account equal to the Debt Service Requirement for the applicable series of Bonds owing on such Interest Payment Date.

Asset Proceeds Collateral, if any, shall be transferred by the City within three (3) Business Days of receipt to the Trustee. The Trustee shall deposit the Asset Proceeds Collateral into the Debt Service Fund, for deposit into the Asset Proceeds Collateral Mandatory Redemption Subaccount of the Debt Service Account for the mandatory redemption of Bonds on the next succeeding Interest Payment Date as provided in the Bonds.

(c) *Withdrawals from the Debt Service Fund.* The Trustee, in its capacity as transfer agent and paying agent for the Bonds, shall withdraw from the Scheduled Debt Service Subaccount of the Debt Service Account the amounts necessary to pay when due the Debt Service Requirement Amount for the Bonds on each Payment Date.

Section 502    Costs of Issuance Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds  Costs of Issuance Fund" (the "Costs of Issuance Fund").  Upon the issuance of the Bonds, there first shall be deposited in the Costs of Issuance Fund, a portion of the proceeds of the Bonds, in an amount as necessary to pay the costs of issuance of the Bonds.  Moneys on deposit in the Costs of Issuance Fund shall be used by the Trustee to pay the costs related to the issuance of the Bonds.

Section 503    Bond Proceeds Fund.  There is hereby created and established with the Trustee pursuant to the Bond Orders and this Indenture, a trust fund designated the "Financial Recovery Bonds, Bond Proceeds Fund" (the "Bond Proceeds Fund").  There shall be deposited into the Bond Proceeds Fund the remainder of the net proceeds of the Bonds after the deposit of amounts necessary to pay Costs of Issuance into the Costs of Issuance Fund pursuant to Section 502 hereof as specified by the Emergency Manager in the Bond Orders.

There is hereby created and established with the Trustee, pursuant to the Bond Orders and this Indenture, an account designated the "Financial Recovery Bonds, Series 2014 – Bond Proceeds Account" (hereinafter referred to as the "Bond Proceeds Account").  Moneys on deposit in the Bond Proceeds Account shall be used only to pay for the Quality of Life Projects all in such amounts and for such Quality of Life Projects as specified by the Emergency Manager in the Sale Order and shall also be available, for so long as any funds remain on deposit therein, for deposit to the Debt Service Fund in accordance with Section 501(b), provided, however, that the City shall not be required to seek the Trustee's approval for Quality of Life Project expenditures and shall not be required to keep any funds on deposit in the Bond Proceeds Account following the date or dates on which Quality of Life Project expenditures are made.

18

Any balance remaining in such Account after the Maturity Date shall be deposited in the Series Debt Service Account.

Section 504    Amounts Remaining in Funds and Accounts. Any amounts remaining in any fund or account after full payment of the Bonds or provision for payment thereof shall be distributed by the Trustee to the City in accordance with Section 1102 and 1103.

Section 505    Approval of Account Control Agreement. The City shall cause to be deposited greater than 90% of the Pledged Income Tax Revenues into the Pledged Income Tax Account, which such deposits and account shall be governed by the Account Control Agreement at all times. The Pledged Income Tax Account constitutes part of the Trust Estate; provided, however, that, subject to Sections 708(a) and 902(c) hereof, the City shall be authorized to use all Pledged Income Tax Revenue for any purpose permitted by law, without limitation at any time, including during an Event of Default.

## ARTICLE VI

## INVESTMENT OF FUNDS

Section 601    Permitted Investments. All money held by the Trustee pursuant to this Indenture shall be invested by the Trustee in accordance with written instructions from the City in Permitted Investments for the funds of the City. If the Trustee does not receive written investment direction from the City, the Trustee shall invest all money held by it as provided in subsection (f) hereof. For purposes of this Article VI, "Permitted Investments" shall mean and include any of the following, as may be further restricted in each Sale Order or Supplemental Indenture for the related series of Bonds:

(a) bonds, securities, and other obligations of the United States or an agency or instrumentality of the United States;

(b) certificates of deposit, savings accounts, deposit accounts, or depository receipts of a financial institution having a long term rating of not less than A2/A/A;

(c) commercial paper rated at the time of purchase within the highest classifications (A-1/P-1/F1) established by not less than 2 standard rating services and that matures not more than 90 days after the date of purchase (but in any event no later than when the funds are required);

(d) repurchase agreements consisting of instruments listed in subdivision (a);

(e) Bankers' acceptances of United States banks rated at least A2/A/A;

(f) mutual funds registered under the investment company act of 1940, title I of chapter 686, 54 Stat. 789, 15 USC 80a-1 to 80a-3 and 80a-4 to 80a-64, with authority to purchase only investment vehicles that are legal for direct investment by a public corporation, however, a mutual fund is not disqualified as a permissible investment solely by reason of one of the following:

19

CHI-1918768v4

(i) the purchase of securities on a when-issued or delayed delivery basis,

(ii) the ability to lend portfolio securities as long as the mutual fund receives collateral at all times equal to at least 100% of the value of the securities loaned, or

(iii) the limited ability to borrow and pledge a like portion of the portfolio's assets for temporary or emergency purposes;

(g) obligations described in subdivisions (a) through (f) if purchased through an interlocal agreement under the Urban Cooperation Act of 1967, Act 7, Public Acts of Michigan, 1967 (Ex Sess), as amended, MCL 124.501 to 124.512;

(h) investment pools organized under the Surplus Funds Investment Pool Act, Act 367, Public Acts of Michigan, 1982, as amended, MCL 129.111 to 129.118; and

(i) The investment pools organized under the Local Government Investment Pool Act, Act 121, Public Acts of Michigan, 1985, MCL 129.141 to 129.150.

Section 602    Valuation and Sale of Investments.   In computing the amount in any Account, obligations purchased as an investment of moneys therein shall be valued at their Value, as hereinafter defined, plus accrued interest in each case.  "Value" means the value of any investments calculated as follows:

(a)    as to investments the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, then in The New York Times): the average of the bid and asked prices for such investments so published on or most recently prior to the time of determination;

(b)    as to investments the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times: the average bid price at such time of determination for such investments by any two nationally recognized government securities dealers (selected by the Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service;

(c)    as to certificates of deposit and banker's acceptances: the face amount thereof, plus accrued interest, if any; and

(d)    as to any investment not specified above: the value thereof established by prior agreement between the City and the Trustee.

Except as otherwise provided herein, the Trustee shall sell, or present for redemption, any Permitted Investment whenever it shall be requested in writing by an Authorized Officer to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from any Account held by it in accordance with the terms of this Indenture.  As set forth hereunder a Permitted Investment may be credited on a pro rata basis to more than one Account and need not be sold in order to provide for the transfer of amounts from one Account to another.

20

CHI-1918768v4

# ARTICLE VII

## PARTICULAR COVENANTS OF THE CITY

The City covenants and agrees with the Trustee and the Owners of the Bonds as follows:

Section 701    Payment of Bonds.  The City shall duly and punctually pay or cause to be paid, as herein provided, the principal or Redemption Price of every Bond and the interest, if any, thereon, at the dates and places and in the manner stated in the Bonds, according to the true intent and meaning thereof.

Section 702    Power to Issue Bonds and Pledge Revenues, Funds and Other Property. As of the date hereof, the City is duly authorized to authorize and issue the Bonds and to enter into, execute and deliver this Indenture and to pledge the assets and revenues purported to be pledged hereby in the manner and to the extent herein provided.  As of the date hereof, the assets and revenues so pledged are and will be free and clear of any pledge, lien, charge or encumbrance thereon, or with respect thereto prior to the pledge created hereby, and all corporate or other action on the part of the City to that end has been and will be duly and validly taken.  As of the date hereof, the Bonds and the provisions of this Indenture are and will be the valid and legally enforceable obligations of the City in accordance with their terms and terms of this Indenture.  The City shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Trust Estate and other assets and revenues, including rights therein pledged under this Indenture, and all the rights of the Bondowners under this Indenture against all claims and demands of all persons whomsoever.  The City shall not sell, transfer, encumber or hypothecate the Pledged Income Tax Revenue.

Section 703    Maintenance of Perfected Security Interests; Further Assurances; Notices of Default.  At any and all times the City shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be reasonably necessary or desirable to convey, grant, pledge and perfect to the Bondowners first priority security interests in the Trust Estate.  The City shall notify the Trustee immediately upon becoming aware of any Event of Default or occurrence of an event that, with the passage of time, will become an Event of Default hereunder, including, for the avoidance of doubt, any failure to comply with Section 708 hereof.

Section 704    [Tax Covenants.  The City shall at all times do and perform all acts and things necessary or desirable in order to assure that interest paid on Tax-Exempt Bonds shall, for the purposes of federal income taxation, be excludable from the gross income of the recipients thereof and exempt from such taxation under Section 103 of the Code, or any successor provisions thereto.  The City shall comply with all requirements of any Non-Arbitrage and Tax Compliance Certificate delivered by the City in connection with a Series of Tax-Exempt Bonds.]

Section 705    Compliance With Conditions Precedent.  Upon the date of issuance of any of the Bonds, all conditions, acts and things required by law or by this Indenture to exist, to have happened or to have been performed precedent to or in the issuance of such Bonds shall exist,

21

have happened and have been performed, or will have happened or been performed, and such Bonds, together with all other indebtedness of the City, shall be within every debt and other limit prescribed by law.

Section 706 <u>Accounts and Reports</u>. The City shall keep, or cause to be kept, proper books of record and account in which complete and accurate entries shall be made of all of its transactions relating to the Bonds or the Trust, the Pledged Income Tax Account, the Asset Proceeds Collateral and all Accounts established by this Indenture which shall at all reasonable times be subject to the inspection of the Trustee.

Section 707 <u>Issuance of Additional Obligations</u>. The City hereby covenants that as long as the Bonds are outstanding, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Collateral or that has a superior payment priority to the Bonds. The issuance of any series of bonds hereunder, other than the Bonds, shall require compliance with Section 1002 of this Indenture.

Section 708 <u>Income Tax Revenues and Accounts</u>. The City shall at all times:

(a) maintain a minimum balance of no less than $5,000,000 in the Pledged Income Tax Account;

(b) maintain Pledged Income Tax Revenue at a minimum level of aggregate receipts of $30,000,000 for all consecutive 3-month periods measured in complete calendar months; and

(c) (i) take such steps as shall be reasonably necessary to levy the taxes generating the Pledged Income Tax Revenue to the maximum extent authorized by applicable law and (ii) take such steps as shall be reasonably necessary to collect the taxes generating the Pledged Income Tax Revenue to the maximum extent required by the City to comply with its covenants and obligations under the Financing Documents.

Section 709 <u>Asset Proceeds Collateral</u>. The City shall deposit Asset Proceeds Collateral with the Trustee within three (3) Business Days of receipt thereof, for deposit in accordance with Section 501(b) hereof. Furthermore, the City hereby covenants that as long as the Bonds are outstanding, no Asset Proceeds Collateral shall be used for any purpose other than payment of the principal of and interest on the Bonds, unless the City shall request in writing a use for such proceeds other than as set forth in this Section 709, and majority of Bondowners shall consent in writing.

Section 710 <u>Contesting Enforceability</u>. The City covenants that it will not seek to invalidate or refute the enforceability of any Financing Document, notwithstanding the dismissal of the Bankruptcy Case.

## ARTICLE VIII

## **THE TRUSTEE**

22

CHI-1918768v4

Section 801    Powers and Duties of Trustee.

(a)    The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to act upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Trustee may act upon an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance upon such opinion of counsel.

(b)    The Trustee shall not be responsible for any recital herein, or for the validity of the execution by the City of this Indenture, or of any supplements thereto or instruments of further assurance, or for the validity or sufficiency of, or filing of documents related to the security for the Bonds intended to be secured hereby.

(c)    The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with this Indenture.

(d)    The Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.

(e)    As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the City by an authorized officer of the City as sufficient evidence of the facts therein contained, the Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be found to secure the same.

(f)    The permissive right of the Trustee to do things enumerated in this Indenture, as amended, shall not be construed as a duty and the Trustee shall not be answerable for other than its negligence or willful misconduct.  The immunities and exceptions from liability of the Trustee shall extend to its officers, directors, employees and agents.

(g)    The Trustee shall not be required to give any note or surety in respect to the execution of its rights and obligations hereunder.

(h)    All moneys received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purpose for which they were received, but need not be segregated from other funds except to the extent required by this Indenture, as amended, or by law.  The Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(i)    The Trustee shall not be under any obligation to initiate any suit or to take any remedial proceeding under this Indenture or to take any steps in the execution of the trusts

23

CHI-1918768v4

created by this Indenture or in the enforcement of any rights and powers under this Indenture until it has been indemnified to its satisfaction against any and all fees, costs and expenses and other reasonable disbursements and against all liability.

(j)     The Trustee shall have no responsibility or liability with respect to any information, statement or recital in any official statement, offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds, except for liability for its own gross negligence or willful misconduct.

(k)     The Trustee may become the holder of Bonds with the same rights it would have if it were not Trustee, and, to the extent permitted by law, may act as depositary for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of holders, whether or not such committee shall represent the holders of a majority in principal amount of the Bonds then outstanding.

(l)     The Trustee shall not be liable for any error of judgment made in good faith by any of its officers, employees, agents or representatives, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(m)     The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than twenty-five percent (25%) in aggregate principal amount of the Bonds at the time outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or in exercising any trust or power conferred upon the Trustee under this Indenture. If the Trustee receives directions from more than one such group of holders, it shall act in accordance with the direction of the holders holding the largest aggregate principal amount of the Bonds at the time outstanding, provided that such directions are consistent with this Indenture.

(n)     The Trustee has no obligation or liability to the holders for the payment of interest on, principal of or redemption premium, if any, with respect to the Bonds from its own funds; but rather the Trustee's obligations shall be limited to the performance of its duties hereunder.

(o)     Whether or not therein expressly so provided, every provision of this Indenture or related documents, including the Account Control Agreement, relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article.

(p)     The Trustee is authorized and directed by the City to enter into the Account Control Agreement.

(q)     The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. If an Event of Default shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs in exercising any rights or remedies or performing any of its duties hereunder.

CHI-1918768v4

Section 802    Fees and Expenses of Trustee.    (a) The Trustee shall be entitled to reasonable fees for services rendered under this Indenture, as amended, and shall be reimbursed for all expenses reasonably incurred in connection with such services.  Such fees and expenses shall be payable by the City in an amount agreed to by the City and the Trustee.

(b)    If the City shall fail to make any payment required by this Section 802, the Trustee may make such payment from the Debt Service Fund, and shall be entitled to a preference therefor over any Outstanding Bonds.

Section 803    Resignation; Appointment of Successor Trustee; Successor Trustee Upon Merger, Consolidation or Sale.  (a)   The Trustee and any successor Trustee may resign only upon giving 60 days' prior written notice to the City and the Bondowners.  Such resignation shall take effect only upon the appointment of a successor Trustee as described in Section 805 below and the acceptance of such appointment by the successor Trustee.  Upon appointment of a successor Trustee, the resigning Trustee shall, after payment of its fees, costs and expenses, assign all of its right, title and interest in the Pledged Income Tax Revenue and Asset Proceeds Collateral, and transfer and assign its right, title and interest in the Indenture to the successor Trustee.  The successor Trustee shall meet the requirements of Section 803(b) below and shall accept in writing its duties and responsibilities hereunder and file such acceptance with the City.

(b)    In case the Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the prior written consent of the City (to the extent that no "Event of Default" shall have occurred and be continuing under this Indenture), be appointed by the owners of a majority in aggregate principal amount of Bonds then Outstanding, by an instrument or concurrent instruments in writing signed by such owners, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the City, the retiring Trustee, and the successor Trustee.  In the absence of an appointment by the Bondowners, the City may appoint a successor Trustee, by an instrument in writing signed by an authorized officer of the City, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Trustee and the successor Trustee.  If the owners of the Bonds and the City fail to so appoint a successor Trustee, hereunder within thirty (30) days after the Trustee has given notice of its resignation, has been removed, has been dissolved, has otherwise become incapable of acting hereunder or has been taken under control by a public officer or receiver, the Trustee shall have the right to petition a court of competent jurisdiction to appoint a successor hereunder.  Every such Trustee appointed pursuant to the provisions of this Section 803 (i) shall at all times be a bank having trust powers or a trust company, (ii) shall at all times be organized and doing business under the laws of the United States of America or of any state, (iii) shall have, or be wholly owned by an entity having, a combined capital and surplus of at least $500,000,000 and having a long term rating of at least A2/A/A, (iv) shall be authorized under such laws to exercise corporate trust powers, and (v) shall be subject to supervision or examination by federal or state authority.

(c)    Any corporation or association into which the Trustee may be merged or converted or with or into which it may be consolidated, or to which it may sell or transfer its

25

corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any merger, conversion, sale, consolidation or transfer to which it is a party, provided such company shall be eligible under Section 803(b) hereof, shall be and become successor Trustee hereunder and shall be vested with all the trusts, powers, rights, obligations, duties, remedies, immunities and privileges hereunder as was its predecessor, without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

Section 804    Removal of Trustee.  The Trustee may be removed at any time by an instrument or concurrent instruments in writing (a) delivered to the  Trustee and the City and signed by  the owners of a majority in aggregate principal amount of Bonds then Outstanding, or (b) delivered to the Trustee and signed by the City; provided that if an Event of Default has occurred and is continuing hereunder, the Trustee may not be removed without the consent of the holders of a majority in aggregate principal amount of the Bonds then Outstanding.  No removal of the Trustee and no appointment of a successor Trustee shall become effective until the successor Trustee has accepted its appointment in the manner provided in Section 803 hereof.  Upon such removal and the payment of its fees, costs and expenses, the Trustee shall assign to the successor Trustee all of its right, title and interest in the Trust Estate in the same manner as provided in Section 803 hereof.

Section 805    Appointment of and Transfer to Successor Trustee.  If the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor trustee shall be appointed by the City as soon as possible thereafter in accordance with this Article VIII.

Any successor Trustee appointed hereunder shall execute and deliver to its predecessor and the City an instrument in writing accepting such appointment and thereupon shall become fully vested with all the powers and duties under the Indenture, as amended.  The Trustee, if it ceases to act as Trustee, shall execute, acknowledge and deliver such instruments of conveyance, without warranty or recourse, and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the trusts, powers and duties under the Indenture, as amended, and any property held by it under the Indenture, as amended, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.

# ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES ON DEFAULT

Section 901    Events of Default.  Any one or more of the following events shall be deemed an "Event of Default" hereunder:

(a)    The failure of the City to pay, when due, any interest on any or all of the Bonds on any date when such interest is due and payable;

26

(b)     The failure of the City to pay, when due, any principal or premium, if any, of any or all Bonds, whether on the Maturity Date or Redemption Date thereof,

(c)     The City shall default in the performance or observance of any of the other covenants, agreements or conditions on its part contained in this Indenture (other than covenants otherwise specifically covered by this Section 901) and such default is not remedied within fifteen (15) days following receipt by the City of notice from the Trustee of such default;

(d)     If (i) the City shall fail to make a scheduled payment in excess of $25,000,000, when due and owing, in respect of Post-Petition Date Debt (other than the obligations with respect to the Bonds), or (ii) Post-Petition Date Debt in an outstanding aggregate principal amount exceeding $25,000,000 is accelerated, which results in such debt becoming immediately due and payable, and in the case of either (i) or (ii), such event is not cured within any grace period provided therefor in the applicable documents;

(e)     If material post-petition judgments, which are final and nonappealable, are rendered against the City involving liability in an aggregate amount exceeding $25,000,000 and such judgments are not paid within thirty (30) days of such judgments becoming nonappealable;

(f)     If a court of competent jurisdiction finds that any of the Financing Documents are invalid or unenforceable and such finding is not stayed pending appeal;

(g)     If there is a written assertion by the City or an Authorized Officer that any Financing Document or the Bankruptcy Court Order is invalid or otherwise not binding on the City and such written assertion is not retracted or otherwise disavowed within five (5) days of publication;

(h)     If the Bankruptcy Case is dismissed prior to the confirmation of a plan of adjustment, and the order dismissing the Bankruptcy Case is not stayed pending appeal;

(i)     The reversal or modification, by the entry of an order that is not stayed pending appeal and in a manner adverse to the Registered Owners, of the Bankruptcy Court's order dated December 5, 2013 [Docket No. 1945] granting the City chapter 9 bankruptcy relief;

(j)     If the City shall file, consent to, or fail to file a written opposition to a motion seeking dismissal of the Bankruptcy Case within the applicable times established by the Bankruptcy Court for filing a response to such dismissal motion;

(k)     If the Bankruptcy Court shall grant any super-priority claim pursuant to sections 364(c)(1), 503 and 507(a)(2) of the Bankruptcy Code in favor of any party other than the Registered Owners (other than as permitted under the Financing Documents);

(l)     If there is (i) entry of an order by a court of competent jurisdiction, without the prior written consent of the Registered Owners holding 51% of the Outstanding amount of the Bonds, amending, supplementing or otherwise modifying the Bankruptcy Court Order in a manner adverse to the Registered Owners, or (ii) an order of a court of competent jurisdiction

27

reversing, vacating or staying the effectiveness of the Bankruptcy Court Order, and in either (i) or (ii), such order is not stayed pending appeal;

(m)    If the liens or super-priority claims granted in the Bankruptcy Court Order in respect of the Bonds shall cease to be valid, perfected and enforceable in all respects with the priority described herein and therein;

(n)    The failure by the City to comply with the provisions of Section 708(a) with respect to Pledged Income Tax Revenue in the Income Tax Revenue Account and such failure is not cured within two (2) Business Days;

(o)    If the City ceases to be under the control of the Emergency Manager, or successor emergency manager, for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Registered Owners holding 51% of the Outstanding amount of the Bonds, or a designee or successor as consented to by the City (which consent shall not be unreasonably withheld), to ensure continued financial responsibility shall have been established pursuant to Act 436 or any successor statute; or

(p)    Any representation or warranty made by the City in this Indenture, any Financing Document or in any certificate, document, instrument, opinion or financial statement made or delivered pursuant to or in connection with this Indenture or with any of the other Financing Documents, shall prove to have been incorrect, incomplete or misleading in any material respect as of the time of such representation or warranty.

Section 902    Remedies.  (a)  *General*.  Upon the occurrence of an Event of Default, subject to Section 1108, the Trustee may pursue any remedy permitted by law to enforce the performance of or compliance with the provisions of this Indenture, including without limitation, the acceleration of the Bonds in accordance with Section 902(b) below.

(b)    *Acceleration.*  Upon the occurrence and continuation of an Event of Default, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed, in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by declaring the principal of and interest on the Bonds to be immediately due and ordering payment in the manner provided by Section 902(c)(i) and/or Section 902(c)(ii) hereof provided that interest shall continue to accrue on unpaid principal at the Default Rate until paid in full.  Following acceleration, the Trustee shall send the Depository Bank a Notice of Control under the Account Control Agreement.

(c)    *Post-Acceleration Debt Service*.  Upon an Event of Default, and following acceleration of the Bonds pursuant to Section 902(b):

(i)    The Trustee, on behalf of the Bondowners, shall be entitled to accelerated, mandatory payment of principal and interest of the Bonds on a monthly basis (such monthly payment date constituting a Redemption Date for purposes of calculating principal and interest on the Bonds) on a level debt basis equivalent to $4,000,000 per month from the Pledged Income Tax Revenue and payable from the Pledged Income Tax

28

CHI-1918768v4

Account in accordance with the terms of the Account Control Agreement, plus the proceeds of any Asset Proceeds Collateral.

(ii) Upon any acceleration of the Bonds following the occurrence of an Event of Default under Section 901(a), (b), (f), (g), (h), (i), (j), (k), (l), or (m), the Trustee, on behalf of the Bondowners of the Bonds, shall be entitled to apply any moneys remaining on deposit in the Bond Proceeds Fund to the Bonds; and

(iii) Payment on the Bonds is not limited to the Trust Estate, and the Trustee, on behalf of the Bondowners of all of the Bonds, may be entitled to seek payment from the City, (without the need to file any proof of claim), in accordance with the Section 364(c)(1) superpriority claim status of the Bankruptcy Court Order.

(d) The monthly payment provisions of subsection (i) above do not modify the obligation of the City to pay the Bonds in full upon (i) dismissal of the Bankruptcy Case, (ii) the effective date of a confirmed plan of adjustment filed in the Bankruptcy Case, or (iii) [_____], the date that is two years and six months after the Date of Original Issue, which obligation is automatic and does not require action by the Trustee or Bondholders under Section 902(b).

(e) *Enforcement.* Upon the occurrence and continuation of an Event of Default, subject to Section 1108, the Trustee may and shall, at the direction of the Registered Owners holding 25% of the Outstanding amount of the Bonds, proceed in its own name, to protect or enforce the rights of the Trustee and the holders of the related Bonds by mandamus or other suit, action or proceedings at law or in equity, to (i) enforce the rights of the Registered Owners and the Obligations of the City under this Indenture and the Financing Documents, (ii) enjoin any act or thing which may be unlawful or in violation of the rights of Registered Owners; and (iii) enforce the rights of Registered Owners in and to the Trust Estate.

(f) *Owner Right of Action*. If the Registered Owners holding 25% of the Outstanding amount of the Bonds shall have complied with all conditions prerequisite to the requiring of action on the part of the Trustee and said Trustee shall refuse to act, then one or more of the Owners of the Bonds shall have the right to bring any action or actions as the Trustee might have instituted for and on behalf of the Owners of all Outstanding Bonds.

Section 903    Waiver of Default.  Following an Event of Default, the Trustee shall at the direction of the Registered Owners holding 51% of the Outstanding amount of the Bonds, waive an Event of Default hereunder and annul its consequences.  No such waiver shall extend to or affect any subsequent Event of Default or shall impair any right consequent thereon.

Section 904    Possession of Bonds by Trustee Not Required.  All rights of action under this Indenture enforceable by the Trustee may be enforced by it without the possession of any of the Bonds or the production thereof at any proceedings relative thereto.  Any action instituted by the Trustee shall be brought in its name for the benefit of all the holders of the related Bonds, subject to the provisions of this Indenture.

Section 905    Remedies Cumulative.  The rights and remedies of the Trustee and the holders of Bonds shall be cumulative, and any failure on its or their part to act shall not

constitute a waiver of any right or remedy to which it or they may be entitled to hereunder or under applicable law or in equity.

Section 906  Knowledge by Trustee of an Event of Default.  The Trustee shall not be deemed to have knowledge of any Event of Default under Section 901(c) hereinabove unless and until it shall have actual knowledge thereof, or shall have received written notice thereof from any Bondowner at its address and location specifically designated for receiving notices pursuant hereto.  Except as otherwise expressed herein, the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or of any of the documents executed in connection with the Bonds, or as to the existence of an Event of Default hereunder.

Section 907  Application of Monies.  All moneys received by the Trustee and deposited in the Debt Service Fund pursuant to any right given or action taken under the provisions of this Article shall be applied first to the payment of the costs and expenses of the proceedings resulting in the collection of such moneys and expenses, liabilities, advances and charges incurred or made by the Trustee.

# ARTICLE X

# SUPPLEMENTAL INDENTURES AND AMENDMENTS TO THIS INDENTURE

Section 1001  Modifications and Amendments Not Requiring Consent.  Any provision of this Indenture may be amended at any time by the parties hereto, without the consent of the holders of the Bonds, for any one or more of the following purposes:

(a)  To cure any ambiguity or formal defect or omission in this Indenture or in any supplemental agreement.

(b)  To grant to or confer upon the Trustee for the benefit of the holders of Bonds any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the Trustee.

(c)  To accomplish, implement or give effect to any other action which is expressly authorized or required by this Indenture.

(d)  To comply with the requirements of the Internal Revenue Code of 1986, as amended, applicable to the Bonds.

(e)  To appoint separate or successor trustees, paying agents or bond registrars.

(f)  To implement a change to the definitions of "LIBOR Floor" or "Spread" and such other changes in connection with any syndication of the Bonds by the Purchaser consistent with the terms of the Financing Documents.

30

(g)    To make any other change which, in the judgment of the Trustee, is not to the material prejudice of holders of the Bonds, upon the opinion of Bond Counsel or other professionals.

Within thirty (30) days after the execution of any supplement pursuant to this Section 1001, the Trustee shall cause notice thereof to be mailed, postage prepaid to all owners of Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the supplement and shall state that copies thereof are on file at the corporate trust office of the Trustee for inspection by all such holders.  Any such supplement so executed shall be valid and binding notwithstanding any failure of the Trustee to mail the notice herein required and notwithstanding any objections which may be received pursuant to any mailed notice.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be deemed to be modified and amended in accordance therewith and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1002    Amendments Requiring Consent.  Any provision of this Indenture may be amended at any time by written agreement of the parties hereto, but, except as provided in this Section 1002, no such amendment made after the issuance of any Bonds shall become effective until approved in writing by the holders of a majority of the principal amount of all outstanding Bonds, other than those in the possession of the City or under its control; provided, however, no such amendment may (i) extend the maturity of the principal of or the interest on any Bonds or (ii) reduce the principal amount of any Bonds or the rate of interest thereon, or (iii) grant a privilege or priority of any Bonds over any other Bonds of the same series, or (iv) reduce the aggregate principal amount of the Bonds required for consent to such supplemental or amendatory indenture unless approved by the holders of all outstanding Bonds.  Nothing herein contained, however, shall be construed as making necessary the approval of the holders of Bonds of the execution of any supplement as authorized in Section 1001 of this Article.

If at any time the City shall request the Trustee to execute any supplement for any of the purposes of this Section 1002, the Trustee shall cause notice of the proposed supplement to be mailed, postage prepaid to all applicable owners of registered Bonds at their addresses as they appear on the registration books.  The notice shall briefly set forth the nature of the proposed supplement and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by any holders of Bonds.  The Trustee shall not, however, be subject to any liability to any holder of Bonds by reason of its failure to mail the notice required by this Section 1002, and any such failure shall not affect the validity of such supplement when executed as provided in this Section.

Whenever, at any time within one year after the date of the first mailing of such notice, the City shall deliver to the Trustee an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the Bonds outstanding, which instrument or instruments shall refer to the proposed supplement described in such notice and shall specifically consent to and approve the acceptance thereof in substantially

31

the form of the copy thereof referred to in such notice, the Trustee may, thereupon, but not otherwise, execute such supplement, without liability or responsibility to any holder of any Bond, whether or not such holder shall have consented thereto. If the holders of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the acceptance of such supplement shall have consented to and approved the acceptance thereof as herein provided, no holder of any Bonds shall have any right to object to the acceptance of said supplement, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the acceptance thereof or to enjoin or restrain the Trustee from executing the same or from taking any action pursuant to the provisions thereof.

Upon the execution of any supplement pursuant to the provisions of this Section, this Indenture shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the City, the Trustee and all holders of Bonds outstanding shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.

Section 1003  Consent of Trustee.  Prior to executing any supplement to this Indenture, the Trustee shall be entitled to receive and shall be fully protected in relying upon a certificate of the City as proof of the necessity or desirability of any such supplement provided for in Section 1001 hereof and an opinion of counsel for the City that such supplement complies with the provisions of such Section.  Such certificate shall specifically request the Trustee to enter into such supplement.  Whenever the provisions of Sections 1001 and 1002 hereof require the Trustee to include in notices to holders of Bonds a description of a proposed amendment or supplement, such description shall be provided by the City.

The Trustee may in its discretion, but shall not be obligated to, enter into any such supplement to this Indenture authorized by Section 1001 and 1002 which adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 1004  General Provisions Relating to Supplemental Indentures.  This Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article X.  Nothing contained in this Article X shall affect or limit the rights or obligations of the City to execute and deliver to the Trustee any instrument elsewhere in this Indenture provided for or permitted to be delivered to the Trustee.

A copy of every Supplemental Indenture entered into pursuant to this Indenture shall be accompanied by a Bond Counsel's Opinion stating that such Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, is valid and binding upon the parties to the Supplemental Indenture and enforceable in accordance with its terms and, in the case of Bonds the interest upon which is excludable from gross income for federal income tax purposes, stating that such Supplemental Indenture will not adversely affect the exclusion from gross income for federal income tax purposes of the interest on such Bonds.

CHI-1918768v4

## ARTICLE XI

## MISCELLANEOUS

Section 1101    Notices.    Except as other provided, all notices, certificates, requests, complaints, demands or other communications under this Indenture shall be deemed sufficiently given when sent by first class mail or overnight mail postage prepaid, addressed as follows:

    A.  If to the City, to:           City of Detroit

                                   Detroit, Michigan 48226
                                   Attention: _____

    B.  If to the Depository Bank, to:     _____

    C.  If to the Trustee, to:         _____

The City and the Trustee may by notice given hereunder, in writing, designate any further or different addresses to which subsequent notices, certificates, requests, complaints, demands or other communications hereunder shall be sent.

Section 1102    Termination. This Indenture shall terminate following delivery of written direction from the City to the Trustee to so terminate, together with written notice: (1) that all Bonds have been paid in full at maturity or defeased (and for each series of Bonds that have been or are to be defeased prior to termination, such notice shall include written certification by an independent verification agent for the City that sufficient cash or obligations necessary to defease such Bonds in accordance with the applicable defeasance requirements are on deposit with the Trustee as of the date of the City's notice), and (2) that all fees owed to the Trustee have been paid in full.  Upon termination of this Indenture, any money remaining on deposit in the funds and accounts created and established hereunder shall be paid to the City.

The Trustee shall give written notice of the termination of this Indenture to each of the other parties listed in Section 1101 hereof.

Section 1103    Defeasance.  Bonds of each series shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Trustee.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held

for the exclusive benefit of the Registered Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Indenture (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Indenture for the benefit of such Bonds shall be discharged.

Section 1104  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Indenture shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions of the Indenture.

Section 1105  <u>Headings</u>.  Any headings shall be solely for convenience of reference and shall not constitute a part of the Indenture, nor shall they affect its meaning, construction or effect.

Section 1106  <u>Indenture Executed in Counterparts</u>.  This Indenture may be executed simultaneously in several counterparts, each of which shall be deemed an original, and such counterparts together shall and will constitute one and the same instrument.

Section 1107  <u>Parties Interested Herein</u>.  Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any person or entity, other than the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Indenture on behalf of the City shall be for the sole and exclusive benefit of the Trustee, the City, the registered owners of the Bonds and, to the extent expressly set forth herein, the Purchaser.

Section 1108  <u>Jurisdiction</u>.  To the fullest extent permitted by applicable law, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Indenture (including, without limitation, any actions by the Trustee or the Registered Owners pursuant to Section 902 hereof), or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court whether or not the Case has been dismissed; <u>provided</u>, <u>however</u>, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of the courts of the State of New York, and the United States District Court, located in the Borough of Manhattan in New York City and of the courts of the State of Michigan, and the United States District Court for the Eastern District of Michigan, located in Detroit, Michigan.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law

34

IN WITNESS WHEREOF, this Indenture has been signed on behalf of the City by its Emergency Manager and UMB Bank, N.A. to evidence the acceptance of the trust, has caused this Indenture to be executed in its behalf by its authorized officer, all as of the date first above written.

CITY OF DETROIT

By _____

     Its:  Emergency Manager

UMB BANK, N.A.,

as Trustee

By _____

Its: _____

35

CHI-1918768v4

**EXHIBIT A**

**FORM OF SERIES 2014 BOND**

A-1

CHI-1918768v4

**EXHIBIT B**

**FORM OF ACCOUNT CONTROL AGREEMENT**

B-1

# **EXHIBIT E**

**FINANCIAL RECOVERY BOND**

**FIRST SUPPLEMENTAL TRUST INDENTURE**

Between

**CITY OF DETROIT**

County of Wayne, Michigan

and

**UMB BANK, N.A.,**

as Trustee

**$120,000,000**

**FINANCIAL RECOVERY BONDS, SERIES 2014**

Dated as of [_____], 2014

This First Supplemental Indenture, dated as of _____ , 2014 is entered into by and between the CITY OF DETROIT (the "City") and UMB BANK, N.A. (the "Trustee") and is a Supplemental Indenture to the Financial Recovery Bond Trust Indenture between the City and the Trustee dated as of _____ , 2014 (the "Indenture").

# ARTICLE I
## SHORT TITLE, DEFINITIONS AND AUTHORITY

**Section 1.1    Short Title.**  This First Supplemental Indenture shall be known as and may be designated by the short title "First Supplemental Indenture" (this "Supplemental Indenture").

**Section 1.2    Definitions.**  All words and phrases defined in Article I of the Indenture shall have the same meaning in this Supplemental Indenture, except as otherwise defined herein.

**Section 1.3    Authority.**   This Supplemental Indenture is adopted pursuant to the provisions of the Act 279, Section 1001 of the Indenture, and the Bond Authorizing Order.

# ARTICLE II
## AMENDMENT OF INDENTURE

**Section 2.1    Amendment of Section 101 of the Indenture.**   The definition of "Spread" and "LIBOR Floor" contained in Section 101 of the Indenture are amended and restated in its entirety as follows:

"**Spread**" means, so long as no Event of Default has occurred and is continuing, ___ basis points, and upon the occurrence of and continuation of an Event of Default, ___ basis points.

"**LIBOR Floor**" means ___% per annum.

**Section 2.2    Additional Security.**

The City, the Trustee and Comerica Bank have previously established the Pledged Income Tax Account pursuant to the Indenture and entered into the Account Control Agreement.  Section 505 of the Indenture provides that:

The City shall cause to be deposited no greater than ___% of Pledged Income Tax Revenues into the Pledged Income Tax Account, which such deposits and account shall be governed by the Account Control Agreement at all times.  The Pledged Income Tax Account constitutes part of the Trust Estate; *provided, however*, that subject to Sections 708(a) and 902(b) hereof, the City is authorized to use all Pledged Income Tax Revenues for any purpose permitted by law, without limitation at any time, including during an Event of Default.

2

CHI-1922531v1

The Pledged Income Tax Revenues are revenues pledged for the payment of the Bonds. The Account Control Agreement constitutes an agreement between the City and a third party providing for the direct payment by the third party of revenues pledged by the City for payment of the Bonds to the Trustee.

In order to more fully implement under Michigan law the perfected liens on collateral granted by the Bankruptcy Court Order, from and after the date hereof, the City is granting additional security to the Bonds under Section 36a(7) of Act 279 insofar as a statutory lien and trust is created under Section 36a(7) on the Pledged Income Tax Account and the Pledged Income Tax Revenues in the Trust Estate, perfected under Michigan law without delivery, recording, or notice; *provided, however*, that for the avoidance of doubt, the City and the Trustee acknowledge and agree that such statutory lien and trust is only as broad as the lien of the Indenture and the Bankruptcy Court Order, and as set forth in Section 505 of the Indenture and reaffirmed here:

> The Pledged Income Tax Account constitutes part of the Trust Estate; *provided, however,* that subject to Sections 708(a) and 902(b) of the Indenture, the City is authorized to use all Pledged Income Tax Revenues for any purpose permitted by law, without limitation at any time, including during an Event of Default.

## ARTICLE III
## MISCELLANEOUS

**Section 3.1** <u>First Supplemental Indenture Construed with Indenture.</u> All of the provisions of this Supplemental Indenture shall be deemed to be and construed as part of the Indenture to the same extent as if fully set forth therein.

**Section 3.2** <u>Indenture as Supplemented to Remain in Effect</u>. Except as herein supplemented by this Supplemental Indenture, the Indenture shall remain in full force and effect.

**Section 3.3** <u>Execution in Counterparts</u>. This Supplemental Indenture may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute but one and the same instrument.

**Section 3.4** <u>Severability</u>. If any section, paragraph, clause or provision of this Supplemental Indenture shall for any reason be held to be invalid or unenforceable, the invalidity or unenforceability of such section, paragraph, clause or provision shall not affect any of the remaining provisions of this Supplemental Indenture.

3

IN WITNESS WHEREOF, the Emergency Manager of the City and the authorized officer of the Trustee have hereunto executed this First Supplemental Indenture as of the date first above written.

CITY OF DETROIT

By: _____
Its:   Emergency Manager

UMB BANK, N.A.

By: _____
Its:   Authorized Officer

CHI-1922531v1

# EXHIBIT F



# DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement (this "Agreement") is entered into as of _____, 2014, by and among the City of Detroit, County of Wayne, State of Michigan ("Customer"), UMB Bank, N.A., as Trustee under the Indenture (as defined below) ("Trustee and Secured Party") and COMERICA BANK ("Bank") with reference to the following facts:

      A.      Customer maintains the Deposit Account (as defined below) at Bank.

      B.      Pursuant to the Indenture (as defined below) Customer has granted Secured Party a security interest in the Deposit Account and all funds now or at any time hereafter held in the Deposit Account.

      C.      Secured Party, Customer and Bank have agreed to enter into this Agreement to provide for the control of the Deposit Account by Secured Party and to facilitate Secured Party's perfected security interests in the Deposit Account.

NOW, THEREFORE, in consideration of the mutual promises and covenants, contained herein the parties hereto mutually agree as follows.

## ARTICLE 1 - DEFINITIONS

**1.01**    **Definitions.**    As used in this Agreement, the following terms shall have the following meanings:

"Account Charges" means those items described in clauses (i) through (viii) of Section 2.02(c) of this Agreement.

"Banking Office" means, collectively, the locations set forth as the addresses for notice to Bank in Section 3.08 of this Agreement.

"Business Day" means any day, other than a Saturday, Sunday or any other day designated as a holiday under Federal or applicable State statute or regulation, on which Bank is open for all or substantially all of its domestic business in Michigan.

"Collected Balance" means the balance in the Deposit Account that reflects deposits, posted withdrawals and other debits, less deposited items in the process of collection and less Account Charges.

"Deposit Account" means deposit account number[s] [_____] held at Bank and including without limitation any and all other deposit account(s) of Customer established with Bank from time to time in replacement or substitution therefor.

"Indenture" means the Financial Recovery Bond Trust Indenture between the City of Detroit, County of Wayne, Michigan and UMB Bank, N.A. as Trustee, dated _____, 2014.

"Notice of Control" means written notice to Bank in the form attached hereto as Exhibit A.

"Notice of Deficiency and Requisition" means written notice to Bank in the form attached hereto as Exhibit B.

"Order" means any instruction issued by any person with respect to the disposition of any funds contained in the Deposit Account.

"Pledged Income Tax Revenues" means Pledged Income Tax Revenues, as that term is defined in the Indenture.

13-53846-swr    Doc 4311-8   Filed 04/29/14   Entered 04/29/14 15:36:09   Page 169 of 179
13-53846-swr    Doc 2911   Filed 03/06/14   Entered 03/06/14 15:28:00   Page 165 of 169
CHI-1918873v3                                                    203

"Trustee" means Trustee, as defined in the first paragraph hereof.

**1.02** **Construction.** Any reference herein to any document includes any and all alterations, amendments, extensions, modifications, renewals, or supplements thereto or thereof, as applicable. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Bank, whether under any rule of construction or otherwise. This Agreement has been reviewed by each of the parties hereto, and, to the extent applicable, their respective counsel. This Agreement shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of Customer and Secured Party.

## ARTICLE 2 - CONTROL

**2.01** **Bank Obligations and Compliance with Orders Following its Receipt of a Notice of Control.** The parties agree that within two (2) Business Days after receipt of a Notice of Control by Bank at the Banking Office, without further consent from Customer, Bank shall:

(a)     Honor an Order from Secured Party to transfer monthly (via wire transfer or other means acceptable to Bank) the required Post-Acceleration Debt Service obligations under Section 902(c) of the Indenture (Bank having no obligation to verify the amount of any such obligation or any other term of the Indenture);

(b)     Not honor any Order originated by Customer, if (i) doing so would cause the Collected Balance of the Deposit Account to be less than $5 million or (ii) Secured Party has not been paid Post-Acceleration Debt Service obligations stated in a properly presented Order of Secured Party to Bank (delivered to the Banking Office with copy to the Customer) as being due and owing under Section 902(c) of the Indenture within three (3) Business Days of the payment date set forth in such Order; and

(c)     Honor Orders originated by Customer except as provided in Section 2.01(b) hereof.

Anything contained in the foregoing to the contrary notwithstanding, Secured Party hereby agrees that before it attempts to give Bank any Orders concerning the Deposit Account, Secured Party shall deliver to the Banking Office such documentation as Bank may from time to time reasonably request to evidence the authority of those person(s) whom Secured Party may designate to give Orders, which Bank acknowledges have been provided contemporaneously with execution of this Agreement and that Bank shall be entitled to assume without further inquiry that the person(s) named in any such evidence of authority have the authority to give such Orders. Customer hereby agrees that Bank shall have no duty to notify Customer or make any inquiry whatsoever as to Secured Party's right or authority to give any such Notice of Control or any such Orders, instructions or directions. Secured Party hereby further agrees that before it attempts to give Bank any Orders concerning the Deposit Account requesting a transfer, disposition and/or delivery of funds contained in the Deposit Account by wire transfer, Secured Party shall deliver to the Banking Office such documentation as Bank may from time to time reasonably request to evidence the agreement of Secured Party to Bank's customary wire transfer terms and conditions, including without limitation Bank's Global Wire Transfer Authorization and Security Procedure Agreement and Bank's Declaration for Entering Into Wire Transfer Agreements and designation of authorized agents which Bank acknowledges have been provided contemporaneously with execution of this Agreement.

**2.02** **Priority of Lien.** Bank hereby acknowledges and agrees that:

(a)     Bank has received notice of the existence of the security interest of Secured Party in the Pledged Income Tax Revenues and the Deposit Account, and recognizes the security interest granted to Secured Party by Customer;

(b)     Said security interest shall be noted by Bank on its books and records;

(c)     All of Bank's present and future rights against the Deposit Account are subordinate to Secured Party's security interest therein and Bank waives any right of setoff with respect to the Deposit Account; provided, however, that Secured Party hereby acknowledges and agrees that nothing herein subordinates or waives, and that Bank expressly reserves, all of its present and future rights against amounts on deposit in the

Deposit Account (whether described as rights of setoff, banker's lien, security interest, chargeback or otherwise, and whether available to Bank under the law or under any other agreement between Bank and Customer concerning the Deposit Account, or otherwise) with respect to: (i) items deposited to the Deposit Account and returned unpaid, whether for insufficient funds or for any other reason, and without regard to the timeliness of return of any such items or the occurrence or timeliness of any drawee's notice of non-payment of such items; (ii) ACH entries credited to the Deposit Account and later reversed, whether for insufficient funds or for any other reason, and without regard to the timeliness of such entries' reversal; (iii) chargebacks to the Deposit Account of credit card transactions, without regard to the timeliness of such chargebacks; (iv) erroneous entries to the Deposit Account; (v) overdrafts on the Deposit Account, (vi) claims of breach of the transfer or presentment warranties made to Bank pursuant to the Code in connection with items deposited to the Deposit Account; and (vii) Bank's usual and customary charges for services rendered in connection with the Deposit Account; and

(d)　　　　Except as otherwise required by law, Bank shall not enter into any agreement with any third party relating to the Deposit Account or agree that it will comply with any Orders concerning the Deposit Account originated by any such third party without the prior written consent of Secured Party and Customer.

**2.03　　Control of Deposit Account.** At all times during the effectiveness of this Agreement, the parties agree that:

(a)　　　　Bank shall comply with Orders originated by Secured Party in accordance with Sections 2.01 and 2.09 without further consent by Customer and consequently, Secured Party has control of the Deposit Account as provided herein, which constitutes "control" under the Michigan Uniform Commercial Code;

(b)　　　　Bank shall not comply with any Orders or other instructions concerning the Deposit Account from any third party, other than an Order of the United States Bankruptcy Court for the Eastern District of Michigan in the Customer's Chapter 9 proceeding, Case No. 13-53846, without the prior written consent of Secured Party and Customer, and

(c)　　　　Except as provided in Section 2.01(b), Bank may accept and comply with Orders from Customer for the payment of any funds from the Deposit Account to Customer or any third person, or permit Customer to withdraw any funds in the Deposit Account without the specific prior written consent of Secured Party.

**2.04　　Representations, Warranties and Acknowledgments.**

(a)　　　　Bank represents and warrants to Secured Party that:

(i)　　　　the Deposit Account has been established and is maintained with Bank at the Banking Office solely in Customer's name as recited above;

(ii)　　　　Bank has no knowledge of any claim to, security interest in or lien upon the Deposit Account, except the security interests in favor of Secured Party and Bank's rights described in Section 2.02(c)(i) – (vii) hereof; and

(iii)　　　　Bank has not knowingly entered into any agreement with any third party regarding the Deposit Account or agreed that it will comply with any Orders concerning the Deposit Account originated by any such third party.

(b)　　　　Customer represents, warrants and covenants to the Bank and the Secured Party that (i) it will maintain a minimum Collected Balance of no less than $5,000,000 in the Deposit Account at all times, (ii) it will not issue any Order to the Bank contrary to the terms of the Indenture, and (iii) it will not transfer its rights or duties under this Agreement contrary to the terms of the Indenture or without the prior written consent of Bank and Secured Party. Bank is not a party to the Indenture and has no obligations thereunder.

(c)　　　　Customer and Secured Party represent and warrant to Bank that the execution, delivery, and performance of the Agreement (i) is within Customer's and Secured Party's powers, (ii) has been duly

authorized, executed and delivered by such party, and (iii) does not conflict with nor constitute a breach of any provision contained in any material agreement by which Customer or Secured Party, as applicable, is bound.

**2.05** **Agreements of Bank and Customer.** Bank and Customer agree that:

(a) Bank will provide Trustee with online read-only Internet access to Deposit Account balance information;

(b) Customer authorizes Bank to disclose to Secured Party such other information concerning the Deposit Account as Secured Party may from time to time reasonably request;

(c) Bank shall use commercially reasonable efforts to promptly notify Secured Party and Customer if any other party asserts any claim to, security or property interest in or lien upon the Deposit Account; and

(d) The Secured Party has been directed to enter into this Agreement pursuant to the Indenture.

**2.06** **Bank's Responsibility.** Anything contained in the foregoing to the contrary notwithstanding:

(a) Except for permitting a withdrawal not permitted by  Section 2.01 or 2.03, Bank shall not be liable to Secured Party for complying with Orders from Customer.

(b) This Agreement does not create any obligation of Bank except for those expressly set forth in this Agreement.  In particular, Bank need not investigate whether the Secured Party is entitled under the Indenture or Secured Party's other agreements with Customer to issue a Notice of Control or to give Orders.  In acting or performing under this Agreement, Bank may rely on any papers, documents, notices and communications it believes are given, signed or sent by the appropriate party or its authorized representative;

(c) Other than as provided in Section 2.06(a) hereof, Bank will not have any liability to Customer or Secured Party for claims, losses, liabilities or damages suffered or incurred by Customer or Secured Party as a result of or in connection with this agreement except to the extent such losses, liabilities and damages directly result from Bank's gross negligence or willful misconduct;

(d) In the event that Bank is liable to Customer or Secured Party under this Agreement, Bank's liability shall be limited to the lesser of (i) the actual direct and provable amount of money damages suffered by the claiming party, or (ii) the amount maintained in the Deposit Account immediately prior to the action that gave rise to the claim for such liability; and

(e) In no event shall Bank have any liability to Customer or Secured Party for (1) any consequential, special, punitive or exemplary damages, indirect loss or damage or any lost profits, whether or not any claim for such damages is based on tort or contract or an allegation that Bank knew or should have known the likelihood of such damages in any circumstances, (2) any failure to perform the Bank's responsibilities under this Agreement if such failure is due to strikes, lockouts or other labor disturbances, riots or civil commotions, fire or other casualty, earthquakes, floods, windstorms, lightning or other acts of God, epidemics, sabotage, insurrection, war, civil disorders, hostilities, expropriation or confiscation of properties, equipment failures or malfunctions, power failures, failures of or delays by carriers or other third parties, interference by civil or military authorities, or any other cause or condition beyond the Bank's control, (3) any act or failure to act by Customer or Secured Party, or (4) acting pursuant to a court order, subpoena, garnishment, tax levy or similar process in regard to any account or service covered by this Agreement.

**2.07    Indemnity.**

(a)    Other than as provided in Section 2.06(a) hereof, Customer and Secured Party hereby agree that Bank is released from any and all claims and liabilities to Customer and Secured Party arising from the terms of this Agreement and the compliance by Bank with the terms hereof, except to the extent that such liabilities arise directly from Bank's gross negligence or willful misconduct.

(b)    Customer shall indemnify and hold harmless Bank, its officers, directors, employees, and agents from and against any and all claims, liabilities, demands, losses, damages, costs and expenses arising out of this Agreement, except to the extent the claims, liabilities, damages or expenses are caused directly by Bank's gross negligence or willful misconduct.

(c)    Customer shall indemnify and hold harmless Secured Party, its officers, directors, employees, and agents from and against any and all claims, liabilities, demands, losses, damages, costs and expenses arising out of this Agreement, except to the extent the claims, liabilities, damages or expenses are caused directly by Secured Party's gross negligence or willful misconduct.

**2.08    Termination, Survival.**

(a)    This Agreement shall terminate:

(i)    immediately upon receipt by the Bank at the Banking Office of written notice in the form of Exhibit C attached hereto from Secured Party expressly stating that Secured Party is terminating this Agreement, and thereupon Bank's duties under this Agreement shall be terminated; and

(ii)    ninety (90) days after delivery to Secured Party and Customer of written notice from Bank stating that it is terminating this Agreement, and thereupon Bank's duties under this Agreement shall be terminated.

(b)    Sections 2.06, "Bank's Responsibility," and Section 2.07, "Indemnity," shall survive termination of this Agreement.

**2.09    Notice of Deficiency and Requisition.**  The City and the Secured Party direct the Bank to honor, within two Business Days, each Notice of Deficiency and Requisition Order received from the Secured Party.

## ARTICLE 3 -  GENERAL PROVISIONS

**3.01    Conflicts; Controlling Agreement.**  As to the matters specifically the subject of this Agreement, in the event of any conflict between this Agreement and any other agreement between Bank and Customer, the terms of this Agreement shall control.

**3.02    Final Agreement; Amendments and Waivers.**  In addition to the terms contained in this Agreement, the parties agree that the Deposit Account will be subject to the terms contained in the Bank's Business and Personal Deposit Account Contract, or such other agreement(s) in effect between Customer and Bank governing the Deposit Account ("Account Contract").  To the extent any term of the Account Contract conflicts with any term of this Agreement, the terms of this Agreement shall prevail. This Agreement and the Account Contract, together with any other document, instrument, or agreement entered into between Bank, Customer and Secured Party in connection therewith with respect to the subject matter contained therein constitutes the entire understanding among each of them with respect to the subject matter thereof.  This Agreement supersedes any and all prior oral or written agreements relating to the subject matter hereof.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the party asserted to be bound thereby, and then such amendment or waiver shall be effective only in the specific instance and specific purpose for which given.

**3.03** **Successors and Assigns.**

(a)     This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, and permitted successors and assigns of the parties.  Except as provided in this Section, a voluntary transfer of a party's rights or duties under this Agreement without the written consent of the other parties will be void.

(b)     Bank may transfer its rights and duties under this Agreement to a transferee to which, by contract or operation of law, Bank transfers substantially all of its rights and duties under the Account Contract.

(c)     Secured Party may transfer its rights and duties under this Agreement to a transferee to which, by contract or operation of law, the Secured Party transfers substantially all of its rights and duties under the Indenture or which is named as successor trustee under the Indenture.

(d)     No transfer under this Section will be binding upon a non-transferring party until the transferring party or the transferee notifies the non-transferring parties of the transfer in a writing signed by the transferee that identifies the transferee, gives the transferee's address for communications under this Agreement, and states that the transferee is a successor of the transferor or other transferee permitted under this Section and is entitled to the benefit of the transferring party's rights and has assumed all of the transferring party's duties under this Agreement.

(e)     A non-transferring party need not request proof of any transfer or that the transferee is a successor of the transferor or other transferee permitted by this Section.  If requested by a non-transferring party, however, the transferring party or the transferee will provide reasonable proof thereof.  If Bank or Secured Party, as a non-transferring party, requests such proof, then the effectiveness of the notification of transfer as to the non-transferring party will be suspended until the proof is provided.

(f)     When a transfer becomes binding on the non-transferring parties, the transferring party will not be entitled to exercise any rights, and will be relieved of its obligations, accruing under this Agreement from and after that time.  Those rights may be exercised and those obligations will be incurred by the transferee.

(g)     The provisions of subsections (d) and (e) requiring notification for a transfer to be binding on the non-transferring parties and suspending the effectiveness of the notification of transfer until reasonable proof of the transfer has been provided do not apply to Bank as the transferring party if the transfer is by operation of law and by operation of the law (i) the transferee succeeds to all or substantially all of the rights and becomes generally bound by all of the duties of Bank, including Bank's duties under this Agreement, and (ii) the Bank ceases to exist.

**3.04**     Amendments, Modifications.  This Agreement may be amended or modified only in writing signed by all parties hereto.

**3.05**     Severability of Provisions.  If any provision of this Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Agreement.

**3.06**     Section Headings.  Headings and numbers used to identify sections and paragraphs of this Agreement have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Agreement.

**3.07**     Counterparts; Facsimile Execution.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of a manually executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile also shall deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

**3.08** <u>Notices</u>. All notices, requests and demands which any party is required or may desire to give to any other party under any provision of this Agreement must be in writing (unless otherwise specifically provided) and delivered to each party at the following address:

Bank:

> Comerica Bank
> 411 W. Lafayette MC 3354
> Detroit, MI 48226
> Fax. No.: 313-222-3900
> Attn: LaJeanna Turner

And With a copy to:

> Comerica Bank
> 39200 6 Mile Road MC 7619
> Livonia, MI 48152
> Fax. No.: 734-632-4540
> Attn: Chris Georvassilis

Customer:

> City of Detroit
> Coleman A. Young Municipal Center
> 2 Woodward Ave., Suite 1200
> Detroit, MI 48226
> Attn: John Naglick,
>      Interim Treasurer and Finance Director

Secured Party:

> UMB Bank, N.A., as Indenture Trustee
> Corporate Trust Division
> 1010 Grand Boulevard, 4th Floor
> Kansas, MO 64106
> Fax. No.: (816) 860-3029
> Attn: Anthony Hawkins

or to such other address or facsimile number as any party may designate by written notice to all other parties. Each such notice, request and demand shall be deemed given or made as follows: (i) if sent by hand delivery, upon delivery; (ii) if sent by facsimile, upon receipt; and (iii) if sent by overnight courier, upon receipt; <u>provided</u>, <u>however</u>, that in any case, receipt by Bank of any Notice of Control shall not be deemed to have occurred until the Bank delivers written notification (by email or facsimile copy) confirming receipt to the Secured Party. Bank shall attempt in good faith to deliver written notification confirming receipt to the Secured Party promptly following Bank's actual receipt at the Banking Office of the Notice of Control.

**3.09** <u>Governing Law</u>. This Agreement shall be deemed to have been made in the state of Michigan and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and construed in accordance with the internal laws of the state of Michigan without regard to principles regarding the conflicts or choice of law.

**3.10** <u>WAIVER OF JURY TRIAL</u>. THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED PARTIES.

**3.11** <u>Consent to Jurisdiction</u>. During the pendency of Customer's chapter 9 bankruptcy case, the Customer, Bank and Secured Party hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Agreement, and Customer, Bank and Secured Party hereby irrevocably agree that all claims in respect of such action or proceeding

may be heard and determined in the Bankruptcy Court, <u>provided</u>, <u>however</u>, if the Bankruptcy Court does not have jurisdiction, the parties consent to the non-exclusive jurisdiction of any United States Federal Court or Michigan state court sitting in Detroit, Michigan in any action or proceeding arising out of or relating to this Agreement and Customer, Bank and Secured Party hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in any such United States Federal Court or Michigan state court.

**3.12**    <u>Only Collected Funds are to be Transferred from the Deposit Account</u>.  In no event shall Bank be obligated to transfer uncollected funds from the Deposit Account.

**3.13**    <u>Effectiveness</u>.  This Agreement shall not become effective until executed by the Bank.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date set forth in the first paragraph hereof.

CUSTOMER:                              CITY OF DETROIT

                                        By: _____
                                        Name: _____
                                        Title: _____

BANK:                                   COMERICA BANK

                                        By: _____
                                        Name: _____
                                        Title: _____

SECURED PARTY:                          UMB BANK, as Trustee

                                        By: _____
                                        Name: _____
                                        Title: _____

EXHIBIT A

[FORM OF NOTICE OF CONTROL]

[DATE]

To:      Comerica Bank
411 W. Lafayette MC 3354
Detroit, MI 48226
Fax. No.: 313-222-3900
Attn: LaJeanna Turner

And With a copy to:

Comerica Bank
39200 6 Mile Road MC 7619
Livonia, MI 48152
Fax. No.: 734-632-4540
Attn: Chris Georvassilis

Re:      Deposit Account Control Agreement for
Account No. [_____] (the "Deposit Account")

Ladies and Gentlemen:

The City of Detroit, County of Wayne, State of Michigan ("Customer") , UMB Bank, N.A., a national banking association, ("Trustee" and "Secured Party"), and Comerica Bank ("Bank") previously entered into a Deposit Account Control Agreement dated as of _____, 2014 (as amended or otherwise modified from time to time, the "Agreement"), a copy of which is attached as Exhibit A.  All capitalized terms, unless otherwise defined in this letter, shall have the meanings assigned to them in the Agreement.

Pursuant to the Agreement, the Trustee is hereby providing Notice of Control to the Bank, granting the Trustee rights in the Deposit Account in accordance with the Agreement, more specifically the Trustee instructs the Bank to:

(a)      Transfer $_____ from the Deposit Account on the ____ day of each month (or the next succeeding Business Day if such day is not a Business Day) in accordance with the following wire transfer instructions:

Bank:_____
ABA Number:_____
For Credit to Account Number:_____
Reference:_____

(b)      Not honor Orders originated by Customer if (i) so doing would cause the Collected Balance of the Deposit Account to be less than $5 million or (ii) Secured Party has not been paid Post-Acceleration Debt Service obligations stated in a properly presented Order of Secured Party to Bank (delivered to the Banking Office with a copy to the Customer) as being due and owing under Section 902(c) of the Indenture within three (3) Business Days of the payment date set forth in such Order.

Nothing in this Notice shall limit the rights of the Trustee under the Indenture including but without limitation, in accordance with Section 902(c)(iv) and Section 902(d) thereof.

13-53846-swr   Doc 4311-8   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 177 of 179
13-53846-tjt   Doc 2521   Filed 03/06/14   Entered 03/06/14 15:36:35   Page 73 of 79   177
203

Please let me know if you have any questions regarding this material.

Sincerely,

[Secured Party]

Enclosure

Acknowledged by Comerica Bank on _____, 20___, by _____

cc: [copy Customer per Section 3.08 of Agreement]

18-58846-smb    Doc 931-8   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 470 of 979
19-23649-rdd    Doc 2921-1   Filed 05/06/14   Entered 05/06/14 15:36:39   Page 478 of 179
203
178

EXHIBIT B

[FORM OF NOTICE OF DEFICIENCY AND REQUISITION]
[DATE]

To:      Comerica Bank
         411 W. Lafayette MC 3354
         Detroit, MI 48226
         Fax. No.: 313-222-3900
         Attn: LaJeanna Turner

And With a copy to:

         Comerica Bank
         39200 6 Mile Road MC 7619
         Livonia, MI 48152
         Fax. No.: 734-632-4540
         Attn: Chris Georvassilis

Re:   Notice of Deficiency and Requisition related to Deposit Account Control Agreement for
          Account No. [_____] (the "Deposit Account")

Ladies and Gentlemen:

The City of Detroit, County of Wayne, State of Michigan ("Customer") , UMB Bank, N.A., a national banking association, ("Trustee" and "Secured Party"), and Comerica Bank ("Bank") previously entered into a Deposit Account Control Agreement dated as of _____, 2014 (as amended or otherwise modified from time to time, the "Agreement"), a copy of which is attached as Exhibit A.  All capitalized terms, unless otherwise defined in this letter, shall have the meanings assigned to them in the Agreement.

The Customer has failed to make the required deposits to the Debt Service Fund under the terms of the Indenture.   Thus, pursuant to the Agreement, the Trustee is hereby providing Notice of Deficiency to the Customer and the following amount is requisitioned from the Deposit Account, to be remitted to the Trustee within two (2) Business Days hereof.

         Requisition Amount:  $_____

         In accordance with the following wire transfer instructions:

         Bank:_____
         ABA Number:_____
         For Credit to Account Number:_____
         Reference:_____

Please let me know if you have any questions regarding this material.

Sincerely,


Enclosure

EXHIBIT C

TERMINATION LETTER

[Insert Date]

Comerica Bank
411 W. Lafayette MC 3354
Detroit, MI 48226
Fax. No.: 313-222-3900
Attn: LaJeanna Turner

with a copy to:

Comerica Bank
39200 6 Mile Road MC 7619
Livonia, MI 48152
Fax. No.: 734-632-4540
Attn: Chris Georvassilis

Re: CITY OF DETROIT, [ACCOUNT NUMBER(S) LISTED IN AGREEMENT] (the "Deposit Account")

Ladies and Gentlemen:

     Comerica Bank ("Bank"), UMB Bank, N.A., as Trustee ("Secured Party") and City of Detroit, County of Wayne, State of Michigan ("Customer"), have entered into certain restricted account arrangements as set forth in the Deposit Account Control Agreement dated _____, 2014, by and among Bank, Secured Party and Customer (as amended or otherwise modified from time to time, the "Agreement") with respect to the Deposit Account. Capitalized terms used, but not otherwise defined herein, shall have the meanings given to them in the Agreement.

     Effective as of [_____] (the "Effective Date") and pursuant to Section 2.08(a)(i) of the Agreement, as of the Effective Date: (i) the Agreement is terminated and is and shall be of no further force and effect, (ii) Secured Party shall have no other or further security interest in or under the Agreement or in the Deposit Account or any amounts received therein or held or deposited therein, and (iii) the name of the Deposit Account shall be changed to omit any reference to Secured Party therein.

Sincerely,

[Insert Secured Party name]

By: _____
Name: _____
Title: _____

cc: [copy Customer per Section 3.08 of Agreement]

# **EXHIBIT G**

# BARCLAYS CAPITAL INC.

**CONFIDENTIAL**

March 6, 2014

Kevyn D. Orr, Emergency Manager
City of Detroit, Michigan
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, MI 48226

## <u>Post-Petition Bond Financing – Commitment Fee</u>

Dear Mr. Orr:

1.      Reference is made to (i) the Commitment Letter dated as of October 6, 2013, as amended, and together with all attachments thereto, (the "Commitment Letter"), (ii) the Fee Letter, dated as of October 6, 2013, as amended, and together with all attachments thereto, (the "Fee Letter"), and (iii) the Commitment Letter Extension, dated as of January 7, 2014, in each case, between the City of Detroit, Michigan (the "City") and Barclays Capital Inc. ("Barclays"). Capitalized terms not defined herein have the meanings assigned to them in the Commitment Letter. Pursuant to the Commitment Letter, in exchange for, among other financial and other accommodations, Barclays' commitment to provide post-petition financing in an amount up to $350,000,000, the City paid Barclays a commitment fee of $4,375,000 (the "Commitment Fee"), which pursuant to the terms of the Fee Letter was fully earned on October 6, 2013, and was non-refundable.

2.      Originally, the Post-Petition Facility was expected to close in December 2013. In light of recent developments, the City and Barclays now intend to consummate a financing in an amount up to $120,000,000. A significant portion of the Commitment Fee has been expended by Barclays on legal and other expenses between October 6, 2013 and today, but in light of the new lower facility amount, Barclays has agreed to refund to the City $1,000,000 of the Commitment Fee at the closing of the contemplated transaction.

3.      Moreover, notwithstanding the City's agreement pursuant to the Commitment Letter Extension to reimburse Barclays for certain legal fees in connection with potential litigation over the Post-Petition Facility, the City and Barclays agree as follows: (i) the City's obligations, if any, under the Commitment Letter Extension are terminated, (ii) the City will be responsible to Barclays for any reasonable legal fees and legal expenses incurred by Barclays after the date of this letter solely to the extent that such legal fees and legal expenses are incurred by Barclays as a result of third-party discovery or third-party litigation, in each case directed at Barclays in its capacity as lender, in connection with the City's efforts to obtain approval of the Post-Petition Facility in the bankruptcy court, and (iii) this agreement does not affect in any respect the City's obligations to Barclays, if any, for any professional fees or expenses incurred

CHI-1922664v2

after closing by Barclays in connection with the Post-Petition Facility that arise under written agreements other than the Commitment Extension Letter. Barclays hereby agrees that as of the date hereof, the City is not liable, in any respect, for any professional fees or expenses incurred to date by Barclays in connection with the Post-Petition Facility or otherwise. Finally, the parties agree that if the closing of the Post-Petition Facility has not occurred as of April 15, 2014 and not as a result of any action or inaction of Barclays, then it is the expectation of Barclays that it will not be requested to close the Post-Petition Facility unless the City reimburses it for transactional legal fees and expenses incurred after April 15, 2014 and through the date of closing; provided, however, that the City will not actually be liable for any such legal fees or expenses after April 15, 2014 unless there is a further written agreement between the parties evidencing such obligation.

As always, we are pleased to have been given the opportunity to continue to assist you in connection with this important financing.

Very truly yours,

BARCLAYS CAPITAL INC.

By: _____
    Name: James Saakvitne
    Title: Managing Director

Accepted and agreed to with respect
to paragraph 3 as of the date first written above:

**THE CITY OF DETROIT, MICHIGAN**

By: _____
    Name: Kevyn D. Orr
    Title: Emergency Manager

cc:   Brad B. Erens
     Thomas F. Saxton

CHI-1922664v2

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
| | ) **Re: Docket No. 2921** |

## OBJECTION TO THE NOTICE OF PRESENTMENT OF FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

_____

The creditors and parties in interest identified in footnote 1 (the "<u>Objectors</u>")[1] submit this objection (the "<u>Objection</u>") to the *Notice of Presentment of Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status, and (III) Modifying Automatic Stay* (the "<u>Notice</u>") [D.I. 2921].[2]  As more fully explained herein, the City seeks approval of a new loan through the Notice and, as a result, the City should be required to seek authorization of such new loan by filing a new motion, providing creditors and parties in interest with all of the material terms of the new loan and a complete set of the loan documents which the City proposes to execute and deliver, and proving through competent evidence that the

---

[1] The creditors and parties in interest submitting this objection are: Hypothekenbank Frankfurt AG; Hypothekenbank Frankfurt International S.A.; Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.; FMS Wertmanagement AoR; Syncora Guarantee Inc.; Syncora Capital Assurance Inc.; and Wilmington Trust, National Association, as Successor Contract Administrator.

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Initial Financing Motion (as hereinafter defined).  All references to "Section" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.  All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, as presently in effect.

1

new loan meets the requirements of the Bankruptcy Code. The Objectors should also be permitted to take discovery to test the City's assertions with respect to the same. The City should not be permitted to short-circuit the motion, notice, discovery, and evidentiary hearing processes mandated by the Bankruptcy Code, the Bankruptcy Rules, and due process by submitting a proposed order, supported only by a notice that fails to disclose the material terms of the new financing and only some of the new loan documents. The City should not be permitted to rely on a record developed more than two months ago, at a time the proposed loan did not exist, and with respect to a loan that had materially different terms. In support of the Objection, the Objectors respectfully state as follows:

## I. BACKGROUND

### A. The City Seeks Approval of the Initial Financing Facility.

1. On July 18, 2013, the City filed a *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019 and (III) Granting Related Relief* [D.I. 17], seeking approval of a Forbearance and Optional Termination Agreement (the "Swap Settlement Agreement") and authorization to settle various disputes with the Swap Counterparties (as corrected on July 24, 2013 [D.I. 157] and together with a supplement filed on December 27, 2013 [D.I. 2341], the "Swap Settlement Motion").

2. On November 5, 2013, the City filed a *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (the "Initial Financing Motion,"

and together with the Swap Settlement Motion, the "Contested Motions") [D.I. 1520], seeking approval of $350 million in post-petition financing (the "Initial Financing Facility") with Barclays Capital, Inc. as lender ("Barclays").

3.      The Initial Financing Facility was proposed for two purposes:  funding of the termination payment under the Swap Settlement Agreement and purportedly funding of certain proposed capital improvement projects in the City, but in fact, as the City admitted at the Combined Hearing (as hereinafter defined), the funding of general working capital (the "Original Quality of Life Facility").  (Dec. 17, 2013 Tr. at 203:1-7 & 203: 8-16 (K. Buckfire testimony stating that proceeds are really intended to provide "adequate working capital," that Barclay's financing is a "true working capital facility," and admitting that "the title of this loan as a quality of life loan is actually not the best choice of words" because it should have been called a "working capital loan…").)

4.      The Initial Financing Facility was later reduced to $285 million—$165 million for the Swap Termination Bonds and $120 million for the Original Quality of Life Facility.

**B.      The Court Denies Approval of the Swap Settlement Agreement and Swap Termination Financing.**

5.      On December 17–18, 2013, and January 3 and 13, 2014, this Court held hearings (the "Combined Hearing") on the Contested Motions.

6.      On January 16, 2014, this Court issued a bench opinion and entered minute entries denying the Swap Settlement Motion and declining to approve the Initial Financing Facility insofar as it was to be used to fund the swap termination payment.  The Court, however, conditionally approved the Initial Financing Motion to the extent it sought approval of the Original Quality of Life Facility.  Specifically, the Court's approval of the Original Quality of

3

13-53846-tjt   Doc 4304-2   Filed 04/29/14   Entered 04/29/14 16:00:43   Page 186 of 15
13-53846-swr   Doc 3012   Filed 03/13/14   Entered 03/13/14 12:07:29   Page 3 of 15
203

186

Life Facility was conditioned on the City demonstrating that any proposed use of the Original Quality of Life Facility complies with Michigan law. (Jan. 16, 2014 Tr. at 25:25–26:4.)

7.    To that end, the Court said that if the City intended to secure the Original Quality of Life Financing with gaming revenues, a process would need to be put into place to ensure that any use by the City of the proceeds of the Original Quality of Life Financing was in compliance with the Michigan Gaming Control and Revenue Act (the "Gaming Act").

> To enforce this state statutory limitation, the Court will condition this approval on a process by which the city gives 14 days' written and filed notice of its intent to use the proceeds during which interested parties can object on the grounds that the proposed use is not consistent with the Gaming Act. The Court would then schedule a prompt hearing and promptly resolve the objection. Consistent with Section 904, however, the Court will not review any aspect of the use of the proceeds other than its compliance with the Gaming Act.

(*Id.* at 26:21–27:5.) Alternatively, the Court suggested that, subject to Barclays' approval, the City could secure the Original Quality of Life Financing Facility with an alternative source of collateral that was not subject to a similar state law restriction. (*Id.* at 27:6–12.) If the City pursued that route, the Court would not impose the notice requirements noted above. (*Id.*)

8.    The Court, however, did not suggest that, if the City negotiated and sought approval of a new financing facility on materially different terms months after the hearing concluded, the City could proceed by simply providing notice of a proposed order in the event it reached a new deal with Barclays and obtain entry of that order without disclosing all of the material terms of the new loan. Nor did the Court suggest that parties-in-interest should not be afforded an opportunity to evaluate such financing facility, the process in which the City engaged to obtain such loan, and the other alternatives for financing available to the City, and, following that evaluation, present evidence, after proper discovery, to the Court as to whether the new loan meets the requirements for approval of the relief that the City seeks.

4

13-53846-tjt   Doc 4304-2   Filed 04/29/14   Entered 04/29/14 16:09:23   Page 4 of 15
13-53846-swr   Doc 4301-2   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 187 of 15

203

187

**C. The City Is Improperly Seeking Entry of a Final Order Approving a New and Materially Different Quality of Life Financing Facility.**

9.      Because this Court denied the Swap Settlement Motion, the City admits that the previous structure of the Original Quality of Life Facility is no longer viable as the City is not in a position to deliver an undisputed first lien in the gaming revenues. (Notice at ¶ 15.)

10.     As a result, the City has negotiated an entirely new financing facility with Barclays (the "New QOL Financing Facility"). (*Id.* at ¶ 16.) While the City describes the changes to the collateral package effected through the New QOL Financing Facility, the City provides no evidentiary support to meet the requirements under Section 364 of the Bankruptcy Code, including disclosing the actual amount of fees and costs associated with the New QOL Financing Facility, the interest rate of such facility, whether the New QOL Financing Facility is subject to market flex provisions (and, if so, what the terms of the market flex provisions are), and what steps, if any, the City took to determine if alternate lenders would provide funding on better terms or offer facilities that were unsecured or secured by less collateral. The City cannot implicitly rely on its investigation last August and September that led to Barclays being selected as a lender of $350 million.

11.     Six months have elapsed since the City ran that process. It provides insufficient support for the presently proposed $120 million financing and no indication of the best, or any alternative, terms that are currently available. The Notice is silent as to all of these critical aspects of the New QOL Financing Facility and makes no effort to quantify the actual cost of the New QOL Financing Facility to the City.[3]

---

[3] The only information the City provides in the Notice is that the excessive $4.35 million commitment fee that the City paid to Barclays in connection with the Initial Financing Facility has been reduced to $3.375 million. However, given the reduced size of the now proposed financing compared to the Initial Financing Facility, this commitment fee is actually an even larger percentage of the financing's principal balance, which matures *only* five months from now.

5

13-53846-swr  Doc 4304-2  Filed 04/29/14  Entered 04/29/14 16:07:23  Page 5 of 15
13-53846-tjt  Doc 3012  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 188 of
203

188

12.    Moreover, the City did not provide a blackline comparing the New QOL Financing Facility with the documents governing the Original Quality of Life Facility. Without additional information, it is impossible to divine whether the New QOL Financing Facility is on the same terms, better terms, or worse terms than the Original Quality of Life Facility. The Objectors presume that if the terms of the New QOL Financing Facility were better, the City would have heralded that fact in the Notice. However, until the City provides a blackline comparison of the financing documents, and provides a detailed explanation of the material terms of the New QOL Financing Facility, it is impossible for the Objectors, any other parties in interest, or the Court to make an informed decision whether the New QOL Financing Facility is an appropriate deal for the City and meets the requirements of the Bankruptcy Code.

13.    Finally, the City omits a schedule of quality of life expenditures and budgets. The City has provided no explanation for why it needs these funds now and no details about how it plans to use these funds. The Notice provides no justification whatsoever for the City's rush to consummate yet another ill-conceived deal that harms creditors.

## II.    OBJECTION

### A.    The City Must File a New Motion Seeking Authorization to Enter Into the New QOL Financing Facility.

14.    It is settled law that before a debtor obtains post-petition financing, notice of intent to incur such financing must be given to all creditors and parties-in-interest, and a hearing thereon must be held by the bankruptcy court. *See* 11 U.S.C. § 364(c) ("the court, *after notice and hearing*, may authorize the obtaining of credit. . . .") (emphasis supplied); 11 U.S.C. § 901(a) (making Section 364(c) applicable to chapter 9 cases).

6

13-53846-tjt   Doc 4301-2   Filed 04/29/14   Entered 04/29/14 16:00:43   Page 6 of 15
13-53846-swr   Doc 3012   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 189 of
203                                                                                                      189

15.     Here, rather than file a motion seeking this Court's approval of the new financing facility—the New QOL Financing Facility—the City simply lodged a proposed final order approving the new loan.  In an effort to justify its noncompliance with the "notice and hearing" requirement under Section 364, the City contends that the New QOL Financing Facility is consistent with this Court's ruling on January 16, 2014 and, thus, no further hearing is necessary. The City's position is wrong.

16.     After extensive briefing and hearings, this Court approved the terms of a deal that the City concedes it no longer has—*i.e.,* the Original Quality of Life Facility.

> . . . the Court finds that the city has established by a preponderance of the evidence that this loan [*i.e.,* the Initial Financing Facility] is in the best interest of the city; that it needs the money; that the terms are market terms and the best available to the city; that they were negotiated in good faith; and that they were negotiated at arm's length.  Indeed, the Court finds that there was no substantial contradictory evidence on these points.

(Jan 16, 2014 Tr. at 23:9–16.)

17.     Although the Objectors respectfully disagree with this Court's findings, there can be no dispute that this Court's ruling only pertained to the Original Quality of Life Facility under the specific terms of the Initial Financing Facility.  Indeed, until the City submits a motion seeking approval of the New QOL Financing Facility, it would be impossible for this Court to make any findings with respect to this new deal, including, among other things, the good faith of Barclays and that negotiations were at arm's length.  Simply put, this Court's January 16 ruling did not provide the City with *carte blanche* authority to lodge final orders for any "new deal" without the appropriate disclosure and review by the Court and parties-in-interest of the terms of that new deal.  The City's rationale that the new deal is purportedly consistent with the Court's January 16 ruling will not suffice to satisfy the clear requirements of Section 364(c).  The City has not simply removed the offending funding for the Swap Termination Bonds from the Initial

Financing Facility; it has entered into an entirely new agreement with potentially substantially different terms in the New QOL Financing Facility.

18.     To the extent there is any doubt that the New QOL Financing Facility is a new loan, the City's concession in the Notice that it must seek new approval of the New QOL Financing Facility from the Emergency Manager, City Council (which, under Michigan law, has the right to propose an alternative facility), and the Emergency Loan Board should be determinative.  Notice at ¶ 19.  If the New QOL Financing Facility was not a new financing facility (materially different than the one this Court approved), then obtaining such approvals under Michigan law would not be necessary.  It would be a very unusual result if the City had to go through the process for obtaining approval and authorization from these various municipal and state bodies to enter into the New QOL Financing Facility but could avoid review by creditors, other parties in interest (whose rights and claims are most directly affected), and this Court (which will actually be imposing the liens and super-priority administrative claim) simply by submitting a proposed order under a shortened notice procedure and relying on an evidentiary record developed months ago for a loan with a different collateral package and potentially with financing terms and conditions that are materially different and worse than what this Court previously approved.

19.     Because the deal conditionally approved by this Court in January 2014 no longer exists and the City is seeking approval of a new loan (one that did not exist at the time of this Court's ruling in January 2014 and one that was not the subject of any of the evidentiary record developed at that hearing), it would be improper to rely on the evidentiary record developed in connection with the Initial Financing Motion or this Court's previous ruling to justify the City's noncompliance with the "notice and hearing" requirement of Section 364.

20.     Simply put, if the City desires to enter into the New QOL Financing Facility, this Court should require the City to seek authorization by filing a new motion and offering competent evidence that the New QOL Financing Facility meets the requirements imposed by the Bankruptcy Code for approval.

**B.      The Notice Does Not Comply With Bankruptcy Rule 4001.**

21.     Bankruptcy Rule 4001(c)(1)(A) provides that a motion for approval of post-petition financing ". . . shall be accompanied by a copy of the agreement and a proposed form of order." Fed. R. Bankr. P. 4001(c)(1)(A).

22.     Here, the City failed to provide final copies of the documents that will be executed and delivered in connection with the New QOL Financing Facility. In particular, there are a number of exhibits that were not attached to the proposed financing documents. The City also failed to provide any budget detailing expenditures or forecasting funding needs for the New QOL Financing Facility. The lack of this information and the failure to comply with Bankruptcy Rule 4001(c) goes to the heart of the due process rights afforded to creditors and parties in interest before liens may be granted on tax revenues, asset proceeds, or other sources that might otherwise be sources available to make distributions to creditors and parties in interest under a plan. Moreover, the description of tax revenues and asset proceeds is vague, making it impossible to determine whether all real estate owned by the City will now be encumbered to support a loan that, by its terms, matures upon plan confirmation.

23.     As a result, the Objectors, as well as other parties in interest, have not been (and will not be) afforded an opportunity to review the final and complete loan terms.

24.     Moreover, Bankruptcy Rule 4001(c)(1)(B) requires a debtor to provide "a concise statement of the relief requested … that lists or summarizes, and sets out the location within the

9

13-53846-tjt   Doc 4301-2   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 102 of
13-53846-swr   Doc 3012   Filed 03/19/14   Entered 03/19/14 16:00:43   Page 9 of 15       192
203

relevant documents of, all material provisions of the proposed credit agreement and proposed form of order, including interest rate, maturity, events of default, liens, borrowing limits, and borrowing conditions." Fed. R. Bankr. P. 4001(c)(1)(B). Despite the basic nature of this requirement, the City makes virtually no effort to comply with it.

25. Thus, if the Notice is characterized as a motion for authorization to enter into the New QOL Financing Facility, the relief requested by the City must be denied until the City complies with all of the requirements set forth in Bankruptcy Rule 4001 and applicable local rules of this Court, and a proper evidentiary hearing is conducted to determine whether this new loan meets all of the requirements for approval by this Court.

**C. The City Continues to Pursue Ill-Advised Transactions on an Expedited Basis that Waste Parties' and this Court's Resources.[4]**

26. As discussed above, the City intends to seek Emergency Loan Board and City Council approval of the transaction, but not before presenting this proposed financing to the Court. There is no reason for this Court to waste its time and the time of creditors during the crucial plan of adjustment approval process to review an incomplete deal. (*See* Dec. 17, 2013 Tr. at 217:15-17, 218:3-4 ("[I]f there's any chance that [the Emergency Loan Board is] not going to approve [the Initial Financing Facility] and we're wasting three days of trial with really expensive lawyers … it's unfair to everyone in the courtroom …"); Dec. 18, 2013 Tr. At 7:22-23, 8:10-12 ("Why wasn't [the Emergency Loan Board approval] done before this [Initial Financing Facility] hearing? … Someone actually made the decision to potentially risk wasting the Court's time and all of the attorney fees in this case?").)

---

[4] In fact, this Court has noted on various occasions the City's hasty financial actions and decision making and there are no circumstances here with the Notice and New QOL Financing requiring (or permitting) the City's current short cut to obtaining post-petition financing.

27.     Even the urgency of post-petition financing is questionable.  While a loan last fall arguably would have enabled the Debtor to get a head start on quality of life projects prior to plan confirmation, the New QOL Financing Facility will mature in only a few months, at the time of plan confirmation.  The Court should reject the City's vague proposal to encumber asset proceeds and tax revenues that would otherwise be available to creditors under a plan of adjustment.

### III.    RESERVATION OF RIGHTS

28.     As demonstrated herein, the City's attempt to circumvent Bankruptcy Rule 4001 is improper.  Until the City complies with the "notice and hearing" requirement of Section 364, and the procedural requirements set forth in Bankruptcy Rule 4001, the Objectors should not be required to specify all of their objections to the terms of the New QOL Financing Facility in order to preserve such objections.  The Objectors reserve all their rights with respect to the Notice and the New QOL Financing Facility, including with respect to supplementing and amending this Objection and introducing evidence at any hearing for a motion seeking the approval of the New QOL Financing Facility.

### IV.    CONCLUSION

29.     For the foregoing reasons, the Objectors respectfully request that this Court not allow the City to circumvent the requirements of Bankruptcy Rule 4001, that the relief sought by the City be denied, and that this Objection be sustained.

11

13-53846-swr   Doc 4301-8   Filed 04/29/14   Entered 04/29/14 22:00:43   Page 194 of 203
13-53846-swr   Doc 3011-2   Filed 03/13/14   Entered 03/13/14 16:09:43   Page 11 of 95   194

Dated:  March 13, 2014.                    Respectfully submitted,


                                           /s/ Howard S. Sher
                                           Howard S. Sher, Esquire (P38337)
                                           Jacob & Weingarten, P.C.
                                           Somerset Place
                                           2301 W. Big Beaver Road, Suite 777
                                           Troy, Michigan 48084
                                           Tel:  (248) 649-1200
                                           Fax:  (248) 649-2920
                                           E-mail:  howard@jacobweingarten.com

                                           Vincent J. Marriott, III, Esquire
                                           Ballard Spahr LLP
                                           1735 Market Street, 51st Floor
                                           Philadelphia, Pennsylvania 19103
                                           Tel:  (215) 864-8236
                                           Fax: (215) 864-9762
                                           E-mail: marriott@ballardspahr.com

                                           -and-

                                           Matthew G. Summers, Esquire
                                           Ballard Spahr LLP
                                           919 North Market Street, 11th Floor
                                           Wilmington, Delaware 19801
                                           Tel:  (302) 252-4428
                                           Fax:  (302) 252-4466
                                           E-mail: summersm@ballardspahr.com

                                           *Attorneys for Hypothekenbank Frankfurt AG,
                                           Hypothekenbank Frankfurt International S.A., Erste
                                           Europäische Pfandbrief- und Kommunalkreditbank
                                           Aktiengesellschaft in Luxemburg S.A.*

/s/ J. Mark Fisher
Rick. L. Frimmer, Esquire
J. Mark Fisher, Esquire
Michael W. Ott, Esquire
Jeffrey D. Eaton, Esquire
Schiff Hardin LLP
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
Tel: (312) 258-5500
Fax: (312) 258-6500
E-mail:  rfrimmer@schiffhardin.com
         mfisher@schiffhardin.com
         mott@schiffhardin.com
         jeaton@schiffhardin.com

*Attorneys for FMS Wertmanagement AoR*


/s/ Stephen C. Hackney
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett, Esquire
Stephen C. Hackney, Esquire
Kikland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200

-and-

David A. Agay, Esquire
Joshua Gadharf, Esquire
McDonald Hopkins LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Tel: (248) 646-5070
Fax: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. And Syncora
Capital Assurance Inc.*

13

13-53846-swr  Doc 4311-8  Filed 04/29/14  Entered 04/29/14 22:00:43  Page 196 of
203
13-53846-swr  Doc 3012  Filed 03/13/14  Entered 03/13/14 16:00:43  Page 13 of 15      196

*/s/ Heath D. Rosenblat*
Heath D. Rosenblat, Esquire
Kristin K. Going, Esquire  (Application Pending)
Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
E-mail: Heath.Rosenblat@dbr.com
E-mail: Kristin.Going@dbr.com
Tel: (212) 248-3140
Fax:   (212) 248-3141

*Counsel for Wilmington Trust, National
Association, as Successor Contract Administrator*

## CERTIFICATE OF SERVICE

I, Lynnea Koerber, state that on March 13, 2014, I filed a copy of the foregoing Objection To The Notice Of Presentment Of Final Order Pursuant To 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(F), 503, 507(A)(2), 904, 921 And 922 (I) Approving Post-Petition Financing, (II) Granting Liens And Providing Superpriority Claim Status And (III) Modifying Automatic Stay with the Clerk of Court using the Court's ECF system and I hereby certify that the Court's ECF system has served all registered users that have appeared in the above-captioned case. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

/s/ *Lynnea Koerber*
E-mail: howard@jacobweingarten.com

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |

## LIMITED OBJECTION OF THE DETROIT RETIREMENT SYSTEMS TO NOTICE OF PRESENTMENT OF FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING THE AUTOMATIC STAY

The Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (collectively, the "Retirement Systems") object to the Notice of Presentment of Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (ii) Granting Liens and Providing Superpriority Claim Status and (III) Modifying the Automatic Stay [Dkt. No. 2921] (the "Notice"):

     1.    The Notice requests entry of the Proposed Order approving Amended QOL Financing in the principal amount of $120 million and approving the

Purchase Agreement, the Indenture, the Supplemental Indenture, the DACA, and the Letter Agreement.[1]

2.     The Notice provides, in relevant part:

> The key changes to the structure of the financing as proposed in the Financing Documents (other than the loan amount), is the collateral securing the Amended QOL Financing, which shall consist of (i) the Pledged Income Tax Revenues (as defined in the Financing Documents, and (ii) Asset Proceedings Collateral (together, the "Collateral").  The Collateral is less than that offered by the City to Barclays in connection with the Initial PPF Financing.  Additionally, Asset Proceeds Collateral expressly excludes assets owned by the City, or assets in which the City holds an interest, which are held by the Detroit Institute of Arts.  ***The other material terms of the Amended QOL Financing are substantially similar*** to those proposed in the Initial PPF Motion, except as they may be modified to reflect the reduced loan amount or the new Collateral.

Notice at ¶ 17 (*emphasis added*).

3.     Although the Notice attaches a black-line of the Proposed Order, it does not attach a black-line reflecting any changes in the Purchase Agreement, the Indenture, the Supplemental Indenture, or the DACA.  The Notice does not even attach a term sheet for the Amended QOL Financing.

4.     Without a term sheet and black-lines of these documents, at a minimum, the Retirement Systems are unable to assess whether the Amended QOL Financing is, in fact, substantially similar to that approved by the Court in its January 16, 2014 bench decision or if the Amended QOL Financing is an entirely

---

[1]  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Notice.

new credit transaction for which the City is required to obtain independent review and approval under section 364(c) of the Bankruptcy Code.

5.    Moreover, it is equally unclear whether the $120 million to be obtained from the Amended QOL Financing will be used for the same purposes as those articulated in paragraphs 23-34 of the Initial PPF Motion and the Declaration of Charles M. Moore, attached as Exhibit 5A to the Initial PPF Motion (the "QOL Initiatives").  The Amended QOL Financing should not be used, for example, to fund the proposed $85 million settlement with the swap counterparties in lieu of the QOL Initiatives (and in lieu of the swaps being paid out in accordance with the terms of the Swap settlement, if approved).

6.    The Retirement Systems respectfully request that the Court deny entry of the Proposed Order until such time as: (i) the City provides parties-in-interest with black-lines of the financing documents comparing those attached to the Notice to those attached to the Initial PPF Motion; (ii) parties-in-interest have a reasonable opportunity to evaluate whether the Amended QOL Financing is substantially similar to the QOL Financing approved by the Court in its January 16, 2014 bench decision or whether it is a new credit transaction requiring independent approval under section 364(c) of the Bankruptcy Code; and (iii) the City confirms that the proceeds of the Amended QOL Financing will be used solely for QOL Initiatives.

- 3 -

7.      The Retirement Systems expressly reserve their rights to supplement and amend this Limited Objection, and to object to the Amended QOL Financing on any alternative or additional bases, once the additional documents and information are provided and the Retirement Systems have had a reasonable opportunity to review them.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com
sdeeby@clarkhill.com

Dated:  March 13, 2014             *Counsel to the Police and Fire Retirement*
                                   *System of the City of Detroit and the General*
                                   *Retirement System of the City of Detroit*

- 4 -

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name **Ambac Assurance Corporation**

Firm **Arent Fox LLP**

Address **1675 Broadway**

City, State, Zip **New York, NY 10019**

Phone **212.484.3900**

Email **mark.angelov@arentfox.com**

**Case/Debtor Name: City of Detroit, MI**

**Case Number:** **13-53846**

**Chapter:** **9**

**Hearing Judge** Hon. Steven Rhodes

(●) **Bankruptcy** ( ) **Adversary**

( ) **Appeal** **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 04/02/2014 **Time of Hearing:** 9:00am **Title of Hearing:** DIP FINANCE ORDER ETC

Please specify portion of hearing requested: (●) **Original/Unredacted** ( ) **Redacted** ( ) **Copy** (2nd Party)

(●) Entire Hearing ( ) Ruling/Opinion of Judge ( ) Testimony of Witness ( ) Other

Special Instructions: **Please send to miranda.perkins@arentfox.com; mark.angelov@arentfox.com**

**Type of Request:**

( ) Ordinary Transcript - $3.65 per page (30 calendar days)

( ) 14-Day Transcript - $4.25 per page (14 calendar days)

(●) Expedited Transcript - $4.85 per page (7 working days)

( ) CD - $30; FTR Gold format - You must download the free
FTR Record Player™ onto your computer from
www.ftrgold.com

**Signature of Ordering Party:**

/s/ Mark Angelov                    Date: **4/24/2014**

By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
                                    Date        By

Order Received:

Transcript Ordered

Transcript Received

13-53846-tjt  Doc 4148  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 203 of
203
13-53846-swr  Doc 4148  Filed 04/29/14  Entered 04/29/14 09:00:23  Page 1 of 1    203