# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession*** | represented by | **Bruce Bennett** |
| **City of Detroit, Michigan** | | 555 S. Flower Street |
| 2 Woodward Avenue | | 50th Floor |
| Suite 1126 | | Los Angeles, CA 90071 |
| Detroit, MI 48226 | | (213) 489–3939 |
| WAYNE–MI | | Email: bbennett@jonesday.com |
| Tax ID / EIN: 38–6004606 | | |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237–3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114

(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

| | | |
|---|---|---|
| *U.S. Trustee*<br>**Daniel M. McDermott** | represented by | **Sean M. Cowley (UST)**<br>United States Trustee<br>211 West Fort Street<br>Suite 700<br>Detroit, MI 48226<br>(313) 226–3432<br>Email: Sean.cowley@usdoj.gov |

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769

Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Creditor Committee* **Committee of Unsecured Creditors** *TERMINATED: 03/03/2014* | represented by | **Brett Howard Miller** 1290 Avenue of the Americas 40th Floor New York, NY 10104 (212) 468–8051 Email: bmiller@mofo.com,whildbold@mofo.com *TERMINATED: 03/03/2014* |

**Geoffrey T. Pavlic**
25925 Telegraph Rd.
Suite 203
Southfield, MI 48033–2518
(248) 352–4700
Fax : (248) 352–4488
Email: pavlic@steinbergshapiro.com
*TERMINATED: 03/03/2014*

**Mark H. Shapiro**
25925 Telegraph Rd.
Suite 203
Southfield, MI 48033–2518
(248) 352–4700
Fax : (248) 352–4488
Email: shapiro@steinbergshapiro.com
*TERMINATED: 03/03/2014*

*Creditor Committee*
**Charlene Hearn**
PO Box 6612
Detroit, MI 48206

*Retiree Committee*
**Official Committee of Retirees**      represented by      **Sam J. Alberts**
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005–3364
(202) 408–7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 08/09/2013 | | <u>316</u> | Transcript regarding Hearing Held 08/02/13 RE: Status Conference. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 11/8/2013. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) <u>282</u> Transcript Request, <u>284</u> Transcript Request, <u>285</u> Transcript Request, <u>289</u> Transcript Request, <u>291</u> Transcript Request, <u>315</u> Transcript Request). Redaction Request Due By 08/30/2013. Redacted Transcript Submission Due By 09/6/2013. Transcript access will be restricted through 11/8/2013. (Garrett, Lois) (Entered: 08/09/2013) |
| 08/29/2013 | | <u>685</u> | Transcript regarding Hearing Held 08/21/13 RE: HEARING RE. EMERGENCY MOTION FOR CLARIFICATION OF THE JULY 25, 2013, STAY ORDER; EXPEDITED HEARING RE. NOTICE OF PENDENCY OF DEFENDANT SYNCORA GUARANTEE, INC.'S, EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND CONDUCT EXPEDITED DISCOVERY; STATUS HEARING RE. CORRECTED MOTION TO ASSUME LEASE OR EXECUTORY CONTRACT; ADVERSARY PROCEEDING 13–04942 – STATUS CONFERENCE RE. ORDER GRANTING IN PART AND DENYING IN PART DEBTOR'S EX PARTE MOTION FOR AN ORDER SHORTENING NOTICE, STAYING FURTHER BRIEFING AND SCHEDULING AN EXPEDITED HEARING WITH RESPECT TO MOTION OF DEBTOR CITY OF DETROIT TO SCHEDULE STATUS CONFERENCE, SET BRIEFING SCHEDULES AND MAINTAIN STATUS QUO. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 11/29/2013. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) <u>570</u> Transcript Request, <u>620</u> Transcript Request, <u>634</u> Transcript Request, <u>638</u> Transcript Request, <u>648</u> Transcript Request, <u>649</u> Transcript Request, <u>661</u> Transcript Request). Redaction Request Due By 09/19/2013. Redacted Transcript Submission Due By 09/26/2013. Transcript access will be restricted through 11/29/2013. (Garrett, Lois) (Entered: 08/29/2013) |
| 08/30/2013 | | <u>693</u> | Transcript regarding Hearing Held 08/28/13 RE: Opinion re. Stay Issue; Status Hearing re. Corrected Motion to Assume Lease or Executory Contract; Motion for Protective Order, Adversary Proceeding 13–04942 – Status Conference. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 11/29/2013. Until that time, |

| | | | |
|---|---|---|---|
| | | | the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 673 Transcript Request, 679 Transcript Request, 681 Transcript Request, 687 Transcript Request, 690 Transcript Request). Redaction Request Due By 09/20/2013. Redacted Transcript Submission Due By 09/27/2013. Transcript access will be restricted through 11/29/2013. (Garrett, Lois) (Entered: 08/30/2013) |
| 11/19/2013 | | 1770 | Transcript regarding Hearing Held 11/14/13 RE: 2:36 p.m. Motion of the Objectors for Leave to Conduct Limited Discovery in Connection with Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. Sec. 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post–Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 02/18/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s 1732 Transcript Request, 1737 Transcript Request, 1738 Transcript Request, 1748 Transcript Request, 1752 Transcript Request, 1754 Transcript Request). Redaction Request Due By 12/10/2013. Redacted Transcript Submission Due By 12/17/2013. Transcript access will be restricted through 02/18/2014. (Garrett, Lois) (Entered: 11/19/2013) |
| 11/28/2013 | | 1875 | Transcript regarding Hearing Held 11/27/13 RE: 11:19 a.m. – City of Detroit's Motion for Entry of an Order Establishing Pre–Trial and Trial Procedures and Setting Additional Hearings (Docket #1788). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 02/27/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 1839 Transcript Request, 1841 Transcript Request, 1843 Transcript Request, 1848 Transcript Request). Redaction Request Due By 12/19/2013. Redacted Transcript Submission Due By 12/26/2013. Transcript access will be restricted through 02/27/2014. (Garrett, Lois) (Entered: 11/28/2013) |
| 12/15/2013 | | 2132 | Transcript regarding Hearing Held 12/13/13 RE: Motion to Adjourn, Motion to Compel the Production of Privilege Log; Pretrial Conference. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 03/17/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 2100 Transcript Request, 2106 Transcript Request, 2107 Transcript Request, 2114 Transcript Request, 2117 Transcript Request, 2125 |

| | | | |
|---|---|---|---|
| | | | Transcript Request, 2127 Transcript Request). Redaction Request Due By 01/6/2014. Redacted Transcript Submission Due By 01/13/2014. Transcript access will be restricted through 03/17/2014. (Garrett, Lois) (Entered: 12/15/2013) |
| 12/20/2013 | | 2280 | Transcript regarding Hearing Held 12/18/13 RE: IN RE: MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 USC SECTIONS 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, AND 922(I) APPROVING POST–PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIMS STATUS AND (III) MODIFYING AUTOMATIC STAY (DKT #1520) MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (1) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT #17) CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019, and (III) GRANTING RELATED RELIEF (Dkt #157). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 03/21/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Deborah Kremlick at 810.635.7084. (RE: related document(s) 2215 Transcript Request). Redaction Request Due By 01/10/2014. Redacted Transcript Submission Due By 01/17/2014. Transcript access will be restricted through 03/21/2014. (Kremlick, Deborah) (Entered: 12/20/2013) |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
         MICHIGAN,               .
                                 .        Detroit, Michigan
                                 .        August 2, 2013
                    Debtor.      .        10:01 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. STATUS CONFERENCE
MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
ASSUMPTION OF THE CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019 AND (III) GRANTING RELATED RELIEF (DOCKET #17);
MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (A) DIRECTING AND
APPROVING FORM OF NOTICE OF COMMENCEMENT OF CASE AND MANNER
OF SERVICE AND PUBLICATION OF NOTICE AND (B) ESTABLISHING A
DEADLINE FOR OBJECTIONS TO ELIGIBILITY AND A SCHEDULE FOR
THEIR CONSIDERATION (DOCKET #18); MOTION OF DEBTOR FOR
ENTRY OF AN ORDER APPOINTMENT KURTZMAN CARSON CONSULTANTS,
LLC, AS CLAIMS AND NOTICING AGENT PURSUANT TO 28 U.S.C.,
SECTION 156(c), SECTION 105(a) OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULE 2002 (DOCKET #19); AND MOTION OF DEBTOR,
PURSUANT TO SECTION 1102(a)(2) OF THE BANKRUPTCY CODE FOR
ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A
COMMITTEE OF RETIRED EMPLOYEES
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  DAVID HEIMAN
                            HEATHER LENNOX
                       North Point
                       901 Lakeside Avenue
                       Cleveland, OH  44114-1190
                       (216) 586-3939

                       Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2300
                       (213) 243-2382

APPEARANCES (continued):

                          Jones Day
                          By:  GREGORY M. SHUMAKER
                          51 Louisiana Avenue, N.W.
                          Washington, DC  20001-2113
                          (202) 879-3679

For Assured               Winston & Strawn, LLP
Guaranty Municipal        By:  LAWRENCE A. LAROSE
Corp.:                    200 Park Avenue
                          New York, NY  10166-4193
                          (212) 294-3286

For AFSCME:               Lowenstein Sandler, LLP
                          By:  SHARON L. LEVINE
                          65 Livingston Avenue
                          Roseland, NJ  07068
                          (973) 597-2374

For Police and           Clark Hill, PLC
Fire Retirement          By:  ROBERT GORDON
System and               151 South Old Woodward, Suite 200
General Retirement       Birmingham, MI  48009
System of the City       (248) 988-5882
of Detroit:

For the UAW:              Cohen, Weiss & Simon, LLP
                          By:  BABETTE CECCOTTI
                          330 West 42nd Street, 25th Floor
                          New York, NY  10036
                          (212) 356-0227

For National              Sidley Austin, LLP
Public Finance            By:  JEFFREY E. BJORK
Guarantee Corp.:          555 West 5th Street
                          Los Angeles, CA  90013
                          (213) 896-6037

For Public Safety         Erman, Teicher, Miller, Zucker &
Unions:                      Freedman, PC
                          By:  BARBARA PATEK
                          400 Galleria Officentre, Suite 444
                          Southfield, MI  48034
                          (248) 827-4100

For Retired               Strobl & Sharp, PC
Detroit Police            By:  LYNN M. BRIMER
Members                   300 East Long Lake Road, Suite 200
Association:              Bloomfield Hills, MI  48304
                          (248) 540-2300

APPEARANCES (continued):

For David Sole:                  Jerome D. Goldberg, PLLC
                                 By:  JEROME GOLDBERG
                                 2921 East Jefferson, Suite 205
                                 Detroit, MI  48207
                                 (313) 393-6001

For Retired                      Silverman & Morris, PLLC
Detroit Police and               By:  THOMAS R. MORRIS
Fire Fighters                    30500 Northwestern Highway, Suite 200
Association and                  Farmington Hills, MI  48334
Detroit Retired                  (248) 539-1330
City Employees
Association:

For Syncora                      Kirkland & Ellis, LLP
Guarantee and                    By:  STEPHEN HACKNEY
Syncora Capital                  300 North LaSalle
Assurance:                       Chicago, IL  60654
                                 (312) 862-2074

For Daniel                       Office of the United States Trustee
McDermott:                       By:  MARIA GIANNIRAKIS
                                 201 Superior Avenue, Room 441
                                 Cleveland, OH  44114
                                 (216) 522-7800

For Michael                      MICHAEL J. KARWOSKI
Karwoski:                        In pro per
                                 26015 Felicity Lndg.
                                 Harrison Township, MI  48045
                                 (313) 378-7642

For Dennis                       DENNIS TAUBITZ
Taubitz:                         In pro per

For Erste                        Ballard Spahr, LLP
Europaische                      By:  VINCENT J. MARRIOTT, III
Pfandbrief-und                   1735 Market Street, 51st Floor
Kommunalkreditbank               Philadelphia, PA  19103-7599
Aktiengesellschaft               (215) 864-8236
in Luxemburg, S.A.:

For Financial                    Weil, Gotshal & Manges, LLP
Guaranty Insurance               By:  ALFREDO PEREZ
Company:                         700 Louisiana, Suite 1600
                                 Houston, TX  77002
                                 (713) 546-5040

APPEARANCES (continued):

For U.S. Bank:          McDermott, Will & Emery, LLP
                        By:  WILLIAM P. SMITH
                        227 West Monroe Street, Suite 4700
                        Chicago, IL  60606
                        (312) 372-2000


Court Recorder:         Jane Murphy
                        United States Bankruptcy Court
                        211 West Fort Street
                        21st Floor
                        Detroit, MI  48226-3211
                        (313) 234-0068

Transcribed By:         Lois Garrett
                        1290 West Barnes Road
                        Leslie, MI  49251
                        (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

3      THE COURT:  Good morning, everyone.

4      ATTORNEYS:  Good morning, your Honor (collectively).

5      THE COURT:  We are going to begin as we did the last

6   time with the admission of an attorney to the Bar of the

7   Court.  Who would like to be admitted?  Step forward, please.

8      MR. ROSSMAN:  Good morning, your Honor.  Jeff

9   Rossman.

10      THE COURT:  Mr. Rossman, are you prepared to take

11   the oath of admission to the Bar of the Court?

12      MR. ROSSMAN:  Yes, I am.

13      THE COURT:  Please raise your right hand --

14      MR. ROSSMAN:  Sorry.

15      THE COURT:  -- carefully.  Do you affirm that you

16   will conduct yourself as an attorney and counselor of this

17   Court with integrity and respect for the law, that you have

18   read and will abide by the civility principles approved by

19   the Court, and that you will support and defend the

20   Constitution and laws of the United States?

21      MR. ROSSMAN:  I do.

22      THE COURT:  Welcome, sir.

23      MR. ROSSMAN:  Thank you, your Honor.

24      THE COURT:  Before we begin our status conference

25   today, I need to remind everyone of the rules for the use of

1  cellular phones in the courthouse and the rules for those

2  listening to these proceedings through CourtCall.  District

3  Court Local Rule 83.31(f) governs the use of cellular phones

4  and other communication devices.  An attorney appearing in

5  connection with any judicial proceeding may bring a phone

6  into our federal court facility.  However, the phone cannot

7  be used at all while in a courtroom.  In other words,

8  texting, talking on the phone, recording, or taking pictures

9  of the proceedings is not permitted in the courtroom.

10  Attorneys may use cellphones in the approved attorney

11  conference room on the second floor of this building.

12       Now let me address the use of CourtCall to listen in

13  on these proceedings.  Its use is restricted to attorneys and

14  their clients who are parties in this case.  CourtCall is not

15  to be used or accessed by the media or the public.  The law

16  prohibits the simultaneous public broadcast of court

17  proceedings.  The Court expects that, as officers of the

18  court, attorneys will respect this restriction.  The Court

19  understands that this is an important and valuable service,

20  but it can only continue to make this service available if

21  this restriction is observed.  The audio recording of all

22  court hearings will be posted on the court's website very

23  shortly after the hearings are concluded and will in that way

24  be available to the media and the public without charge.

25       Okay.  So now turning to our status conference, I'm

going to shuffle the order of the agenda just a little bit.
I've decided to do the review by me of the Court's limited
role in Chapter 9 cases first, and then we'll do the items --
the rest of the items on the status conference agenda pretty
much in the order stated, and then, of course, we will
consider the motions that are on the calendar for today.

It is important for the parties and the public to
understand the very limited role that a Bankruptcy Court and
a bankruptcy judge play in a municipal bankruptcy case under
Chapter 9 of the Bankruptcy Code.  Let me first try to
describe what that role is and then discuss what that role is
not.  Primarily, the Court's role in this case is to resolve
the legal issues that the parties raise as the city moves
through this Chapter 9 process.  In general, there are two
main challenges that we can readily expect the city to face
in this case.  The first is to establish that it is eligible
for Chapter 9 relief.  If it meets that challenge, then its
next challenge is to establish that its plan to adjust its
debts meets the requirements for confirmation under Chapter 9
of the Bankruptcy Code.

Beyond those two major issues, the parties may
present other issues to the Court during the case.  These may
involve whether to approve the city's assumption or rejection
of its contracts, including its union contracts; whether to
grant creditors relief from the stay against litigation that

1  the Court and the law have imposed; whether to approve of
2  certain settlements; whether to approve of certain kinds of
3  proposed borrowings; and, finally, what dates and deadlines
4  to set as we move the case to its conclusion, whatever that
5  conclusion might be.

6         In addition, the Court sees three other roles for
7  it.  The first is to facilitate, to the greatest extent
8  possible, the consensual resolution of disputes.  To that
9  end, I have proposed a process of mediation, which I will
10 discuss with counsel later.  The second is to apply
11 procedures of judicial management in this case that will meet
12 the requirement to -- of Rule 1 of the Federal Rules of Civil
13 Procedure for the just, speedy, and inexpensive determination
14 of this case.  The circumstances of this case make that
15 requirement imperative and one that the Court intends to
16 fulfill with the highest degree of commitment, but the Court,
17 of course, cannot do this alone.  In fulfilling this
18 commitment, the Court requests input from the attorneys as
19 well as their full cooperation and, indeed, their
20 partnership.  In a few minutes, the attorneys and I will
21 discuss what dates and deadlines should be set in this case
22 so that we can meet the requirement for the just, speedy, and
23 inexpensive determination of this case.

24        The third additional role for the Court is to
25 recognize and appreciate the enormous public interest in this

case and to facilitate, to the greatest extent possible, public access to the Court's proceedings. However, there are certain restrictions that the Court must ask the public and the media to accept. Some of these restrictions are imposed by law. For example, as I said before, the law prohibits the simultaneous broadcast of federal court proceedings. Other restrictions result from security concerns, and we request your patience in our security screening process as this helps to protect all of us. Other restrictions will have to be imposed just to allow the process to function properly. For example, when and if disputes are submitted to mediation, that process must be both closed to the public and completely confidential in order for it to have any chance of success. Finally, there are simple practical limitations, so, for example, we only have so much space available in this courtroom and for overflow courtroom viewing.

Now let me address what the Court's role is not and what the Court will not do. In this Chapter 9 case, as in all others, the city's elected and appointed officials and officers remain in full control of the city and its operations. Whatever their responsibilities for running the city before the case was filed, they still are. As a result, the Court has no role to play in managing or running the city or any of the services it provides. Any compliments, complaints, suggestions, or requests regarding city services

should continue to be directed to the city.  There is nothing

the Court can do about any of those matters.  The Court does

not displace city government in any respect, and nothing in

Chapter 9 gives the Court any authority to hire, fire, or

supervise anyone in city government.  The city's officials

are not accountable to this Court for how they run the city.

There is a second way in which it is important to

understand the limited role of the Court in this case.

Chapter 9 of the Bankruptcy Code states that it is the city's

responsibility to propose and file a plan.  The Court's role

is only to determine whether the plan that the city proposes

meets the requirements of Chapter 9.  It is not the Court's

role to dictate to the city what its plan should state or

even to suggest anything about it.  That is entirely for the

city to decide after, of course, discussing and attempting to

negotiate the plan with its creditors.

Any questions about what the Court's role is or is

not?  Okay.  So let's now then move on to the next item on

our status conference agenda.  I'll ask the representatives

of the city to address the Court regarding the status of the

filing of the list of creditors under Section 924 and any

potential amendments.  Sir.

MR. HEIMAN:  Good morning, your Honor.  David Heiman

from Jones Day on behalf of the city.  I hope the microphone

is working properly after the attack on it, but what -- and

1  thank you for those comments.  They're very helpful, indeed,

2  especially about the plan process and understanding that you

3  have proposed a plan deadline -- a plan filing deadline,

4  which I will address in a few minutes.  As you have

5  suggested, I will take these one at a time.  I assume that

6  you will want to hear from others, to the extent they wish to

7  be heard.

8           THE COURT:  Yeah.  At this point I just need the

9  record to state the city's compliance with the filing of the

10 list of creditors and if you intend or foresee any amendments

11 to it.

12          MR. HEIMAN:  Well, we did, I'm happy to say, file

13 the list of creditors last night, so that's the easy part.  I

14 cannot speak really -- it's 3,500 pages, so I cannot speak to

15 whether there are amendments.  Actually, this list itself was

16 an amendment for changing of addresses and the like --

17          THE COURT:  Um-hmm.

18          MR. HEIMAN:  -- and so I hope it's complete, but we

19 may find during the course of the case that we will

20 supplement it, so I don't --

21          THE COURT:  Okay.  My only encouragement to you

22 would be that if you determine a need to amend that list, you

23 do so promptly.

24          MR. HEIMAN:  Thank you, your Honor.  We will do

25 that.

13-53846-swr    Doc 4164-9    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 17 of 139
13-53846-swr    Doc 316-9    Filed 08/09/13    Entered 08/09/13 15:58:42    Page 17 of 139    17
574

1      THE COURT:  So the next item is the disclosure by

2  the city of the status of its negotiations with creditors.

3      MR. HEIMAN:  Yes, your Honor.  That might take a few

4  more minutes than the last item.

5      THE COURT:  Um-hmm, yes.

6      MR. HEIMAN:  I'd first like to say we all know that

7  we are in a very serious situation here, so rather than drag

8  everybody through the blow-by-blow of how we got to our

9  proposal and so forth, I'd like to just refer the Court and

10  others to the Orr declaration that --

11      THE COURT:  Um-hmm.

12      MR. HEIMAN:  -- I think does that in great detail at

13  pages 52 to 73.  I would like to say that there was a

14  significant effort that went into preparing that, and that

15  was followed up by meetings, many meetings with creditors,

16  informational and issue-oriented meetings.  The proposal we

17  made, as your Honor knows, was 128 pages.  It was made public

18  on the city website for all to see, and from our standpoint

19  we feel we've done our best to basically lay open the

20  relevant aspects of the city's finances to everyone, most

21  particularly to our creditors.  In that presentation, we --

22      THE COURT:  I have to interrupt you.  I don't intend

23  this to be your opening statement on the issue of whether

24  your client has negotiated in good faith because that's an

25  eligibility issue.  What I really want to hear is what the

13-53846-swr   Doc 4364-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 18 of 19
13-53846-swr   Doc 814-3   Filed 08/09/13   Entered 08/09/13 15:58:42   Page 92 of 139     18
574

1  current status is and what negotiations, if any, have taken

2  place since the case was filed.

3          MR. HEIMAN:  Yes, your Honor.  We have had

4  discussions in the last week and have discussions even

5  scheduled today --

6          THE COURT:  Um-hmm.

7          MR. HEIMAN:  -- and next week, so discussions are

8  continuing.  However, in terms of the status of discussions,

9  it's clear that there are significant differences between the

10  city and its unsecured creditors distinguished from its

11  secured creditors.

12          THE COURT:  Um-hmm.

13          MR. HEIMAN:  Those differences are not surprising

14  based on the limited resources that the city has available,

15  so in our book -- and that's what I was getting to -- there

16  was a proposal made, so our proposal is out on the table.  I

17  don't mean this in terms of eligibility, and I certainly

18  don't want to characterize any creditor positions here.

19  That's not my objective.  What I'd like to say is of course

20  we are continuing to talk.  We will hopefully continue to

21  talk virtually every day as we get through this case or

22  attempt to get through this case, but there are significant

23  differences that we feel are going to be difficult to bridge.

24  We believe those differences, again, are based on our limited

25  resources to pay our creditors and their perspective on their

13-53846-tjt   Doc 4154-9   Filed 08/09/14   Entered 08/09/14 15:33:42   Page 19 of 139
13-53846-swr   Doc 3154   Filed 03/29/14   Entered 03/29/14 22:00:23   Page 19 of 139
574                                                                    19

 1   own positions and rights with respect to their claims, and

 2   so --

 3        THE COURT:  How would you -- how would you

 4   characterize your client's willingness to continue to try,

 5   however, to bridge those differences?

 6        MR. HEIMAN:  I would say more than a willingness,

 7   your Honor, there is a commitment not only by Kevyn Orr and

 8   other people in the city but by his team of professionals to

 9   make itself available and, in fact, pursue discussions, as I

10   say, every day of the week that we can with every

11   constituency.  And I would also like to add I don't want to

12   mislead anybody.  I believe that we've had constructive

13   discussions and -- civil and friendly, and yet when it comes

14   to the point of saying, "How do you view our proposal?" no

15   one likes it, and that's not surprising.  It requires

16   significant -- our proposal requires significant across-the-

17   board debt relief from our unsecured creditor body.  So that

18   is where we are, and if I may, I know this is another agenda

19   item, but we welcome the idea of mediation because there are

20   very serious issues here.  We have, as I say, limitations,

21   and, again, we would like to talk to creditors consistently,

22   constantly.  We have meetings scheduled even today and

23   several meetings scheduled next week, and we will continue to

24   schedule meetings, but the --

25        THE COURT:  All right.  Well, you know, I'll

13-53846-tjt   Doc 8164-9   Filed 08/09/14   Entered 08/09/14 15:52:42   Page 14 of 139
13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 20 of 139   20
574

1   certainly submit -- request your more specific comments

2   regarding mediation as well as those of others when we get to

3   that item on the agenda.

4            MR. HEIMAN:  Okay.  Thank you, your Honor.

5            THE COURT:  Let's turn our attention to the proposed

6   dates and deadlines item on the agenda, and I want to focus

7   first on the schedule for resolution of the issue of

8   eligibility.  Before we set dates and deadlines and the

9   extent of discovery, however, it would be helpful for me to

10  get whatever sense I can from the attorneys involved as to

11  what the eligibility issues will be, and so from the papers

12  that have been filed so far, I think we can safely assume

13  that there will be at least these two:  one, did the city

14  negotiate in good faith; and, two, did the governor properly

15  authorize the Chapter 9 filing in light of what is argued to

16  be the constitutional protection of pension rights.  Do you

17  or does anyone here see any other eligibility issues?

18           MR. HEIMAN:  I think, your Honor, first of all, let

19  me say that Mr. Bennett is going to address the motion that

20  requests the eligibility schedule as well as your proposed --

21           THE COURT:  Okay.

22           MR. HEIMAN:  -- deadlines, so he may have more to

23  say about this, but we believe that the statutory

24  requirements for filing are going to be at issue, and, of

25  course, we have our position on that.  And also we understand

1    the governor's authority issue, especially after the last

2    couple of weeks, so we are aware of that, but Mr. Bennett may

3    have more to say about that at the time we get to the motion.

4    Okay.

5         THE COURT:  Okay.  So let me ask any other counsel,

6    can any of you foresee any other eligibility issues?

7         MR. LAROSE:  Good morning, your Honor.  Lawrence

8    Larose representing Assured Municipal Finance Guaranty

9    Corporation, insurer of approximately $2.5 billion of various

10   series of the city's indebtedness.

11        Your Honor, with respect to authorization -- we have

12   made no decision as to objecting to eligibility, but with

13   respect to authorization, your Honor, I respectfully suggest

14   that it goes beyond the issue of pensions.

15        THE COURT:  In what sense, sir?

16        MR. LAROSE:  Compliance with the underlying Act in

17   connection with the authorization of the Chapter 9.

18        THE COURT:  Can you be more specific?

19        MR. LAROSE:  No.  As I said, your Honor, I'm not

20   prepared to make an objection today on that issue.  I just

21   need to preserve it for the record.

22        THE COURT:  Okay.

23        MR. LAROSE:  Thank you.

24        THE COURT:  Well, I don't want anyone to think that

25   they need to address me at the microphone to preserve

13-53846-swr    Doc 4164-9    Filed 08/09/13    Entered 08/09/13 15:32:00    Page 22 of 139
13-53846-swr    Doc 314-1    Filed 08/09/13    Entered 08/09/13 15:32:42    Page 96 of 139    22
574

1  anything for the record.  You will be given an opportunity to
2  object.  That will be your deadline to state your eligibility
3  objections.

4          MR. LAROSE:  Thank you, your Honor.

5          THE COURT:  So we don't need that parade.

6          MS. LEVINE:  Your Honor, I rose before, so I
7  don't -- Sharon Levine, Lowenstein Sandler.  We really were
8  concerned that there might be a limitation on some of the
9  reservations.  We gave the Court a preview in the brief in
10  support of 105, and we don't need to burden the record today.

11          THE COURT:  Okay.  All right.  Mr. Gordon.

12          MR. GORDON:  Thank you, your Honor.  Robert Gordon
13  on behalf of the Detroit Retirement Systems.  At the risk of
14  not answering the question that you just asked, I just want
15  to make sure from a procedural standpoint whether we're going
16  to be able to go back to other questions that you've asked of
17  Mr. Heiman that we might want to respond to, such as the
18  status of negotiations.  I didn't know if you wanted to hear
19  from parties after you've gone through the list or whether we
20  can weigh in on those issues for the Court at this time.

21          THE COURT:  I don't really feel the need to have
22  everyone respond to that.  What I wanted from that was what I
23  got, which was the city is willing to negotiate.

24          MR. GORDON:  And I'm certainly not here to get into
25  a polemic about it, but I wanted to make sure the Court was

13-53846-tjt   Doc 4354-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 23 of 159
13-53846-swr   Doc 3154   Filed 03/04/14   Entered 03/04/14 15:33:42   Page 17 of 139   23
574

1  aware of the status in a little more detail at the right time
2  because obviously one of the things that the Court is
3  considering is mediation, and I would like to have the
4  opportunity to at least apprise the Court of why the
5  discussions are where they are at this point with parties and
6  why perhaps mediation may not be appropriate just yet, so --
7        THE COURT:  Okay.  Let's save that for --
8        MR. GORDON:  Okay.
9        THE COURT:  -- that agenda item then.
10       MR. GORDON:  Thank you, your Honor.
11       THE COURT:  And I will want to hear from you then
12  regarding that.
13       MR. GORDON:  Thank you, your Honor.
14       THE COURT:  Any other thoughts -- go ahead, sir --
15  on what issues may arise in the context of eligibility?
16       MR. BENNETT:  I'm Bruce Bennett from Jones Day, your
17  Honor, and I have responsibility for the eligibility side of
18  this today.
19       THE COURT:  Okay.
20       MR. BENNETT:  My reading of the situation in terms
21  of where the expected objections are is the same as yours
22  from the pleadings that have been filed.  We certainly expect
23  the objection relating to the constitutionality of the
24  statute, and we certainly expect the objection relating to
25  good faith.  I'm not aware of the objection Mr. Larose is

13-53846-swr    Doc 4164-9    Filed 08/09/13    Entered 08/09/13 15:52:42    Page 18 of 139
13-53846-tjt    Doc 4164-9    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 24 of 139
574
24

1  foreshadowing.  One of the reasons for an early deadline for

2  exclusivity objections, which will hopefully be -- I think we

3  expect them to be genuine substantive objections -- is that

4  it will help every subsequent step in the process if we have

5  a clear and complete statement of what the objections are as

6  rapidly as possible.

7          THE COURT:  Okay.

8          MR. BENNETT:  On the schedule in particular, the

9  schedule is fine with us.  I can report -- I want to report

10  two things.  There were really two objections to the whole

11  scheduling process that were actually filed.  One was did we

12  really need to receive e-mail service of objections or would

13  we just take them off ECF.

14          THE COURT:  Hold on that one.  We'll get to that

15  later.

16          MR. BENNETT:  Okay.

17          THE COURT:  Right now I just want to talk about

18  dates and deadlines.

19          MR. BENNETT:  Okay.  The only comment I'll talk

20  about dates and deadlines is that we -- in private

21  discussions, there is one party that has what I think are

22  genuine special circumstances affecting their ability to

23  comply with the August 19th and 23rd dates, and under the

24  assumption that these dates stay the way they are, we've

25  reached a separate accommodation that would work for the

1  debtor and for that party, and I guess I just wanted to make

2  clear that -- or ask, your Honor, that when you did set

3  deadlines, was it possible to make those kinds of informal

4  adjustments where two sides thought they were appropriate

5  without offending the overall schedule?

6          THE COURT:  Well, the answer is most likely yes so

7  long as it doesn't result in the delay of the hearing itself.

8          MR. BENNETT:  And this one doesn't, and I think

9  that's an appropriate guideline, and we will govern ourselves

10  by that.

11          THE COURT:  Okay.  Fair enough.  If those are the

12  two primary issues -- and I recognize that there may be

13  others that parties may assert in the meantime -- I have to

14  ask with all sincerity, because you all know this case better

15  than I do, what is the need for discovery, and what is the

16  scope of the discovery that is needed?  Now, let me, before

17  you all answer that question, give you my uninformed

18  analysis, admittedly uninformed analysis.

19          On the issue of whether the governor's authorization

20  was proper, it strikes me that that is entirely a legal

21  issue, and if anyone believes otherwise, I'd obviously be

22  interested in hearing that, but I think we can all agree that

23  the governor's authorization did not include a restriction on

24  the city's ability to seek an impairment of pension rights,

25  which is the fact that raises the issue.

1    Turning to the good faith negotiation issue, I have
2 a sense -- and I could be wrong -- that anyone who might
3 object on that ground has already firsthand knowledge of what
4 the negotiations were or weren't, so, again, I would ask from
5 a totally uninformed perspective what the need for discovery
6 is.  I ask this question because if there's not a need for
7 discovery, we're going to have to think about even advancing
8 eligibility from where I have tentatively suggested it.

9    MR. BENNETT:  Your Honor, since we would concur with
10 your assessment, I'll cede the podium to others for now.

11    THE COURT:  Okay.

12    MS. CECCOTTI:  Your Honor, I didn't mean to send Mr.
13 Bennett away prematurely, but I wasn't clear exactly when you
14 wanted us --

15    THE COURT:  Now.

16    MS. CECCOTTI:  -- to rise.

17    THE COURT:  Please.

18    MS. CECCOTTI:  Okay.  Well, speaking for the UAW, I
19 think what we have in the record certainly on the
20 bankruptcy -- from the city's filings we have some, you know,
21 documents that were filed in terms of their qualification
22 statement, in terms of a memorandum of law, various
23 declarations.  I don't know that -- certainly for the UAW I
24 don't think -- I wouldn't want the Court to think that we've
25 scratched the surface in trying to unpack those and determine

1   to what extent any discovery is needed, so I would caution
2   against perhaps assuming more than the parties or at least
3   certainly we have had an opportunity to do.  We expected to
4   discuss with the Court, as we're doing today, a schedule for
5   eligibility but not in the context of -- or not informed by
6   anything other than an initial look at the papers that have
7   been filed, so while it may be true that some or more of us
8   were present at certain meetings, looking at the totality of
9   what the city has filed, I think we would really need to take
10  a harder look at that before we could say with any certainty
11  that no discovery is needed really on any of the
12  qualifications.  So I realize that that is a rather general
13  statement, but I would not want the Court to be misled in
14  thinking that we are prepared certainly today with a, you
15  know, sort of fully indexed and annotated view of the papers
16  that the city has filed and a sort of plan of how to get
17  to -- from those papers to a position that we might take let
18  alone to a litigation schedule position.

19          MS. LEVINE:  Your Honor, for the record, Sharon
20  Levine, Lowenstein Sandler.  We would concur that the extent
21  of discovery that we would need has not yet fully availed
22  itself to us, but, at a minimum, to the extent that the city
23  intends to rely on declarations to offer evidence in support
24  of eligibility, we would want to take a close look at that
25  evidence and probably seek documents and depositions with

13-53846-tjt   Doc 4154-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 28 of 139
13-53846-swr   Doc 3154   Filed 03/09/13   Entered 03/09/13 15:56:42   Page 22 of 139
574
28

1  regard to those proposed witnesses.

2      In addition to that, one of the things that's
3  probably going to come to light as we move forward in this
4  process, your Honor, is there may be a definitional issue and
5  a dispute with regard to what exactly constitutes
6  negotiations because our view is that the meetings that have
7  taken place to date have been more presentations without an
8  opportunity for give and take. And in addition to that, your
9  Honor, in reviewing the information that's in the data room,
10 there's information that we would need even to evaluate just
11 those presentations that's not yet in the data room, so if a
12 negotiation over this kind of an economic situation goes as
13 we've seen others go, the first step of the negotiation
14 process is the diligence, so, you know, we appreciate the
15 fact that the city has populated a data room. There's always
16 stuff that has to get added to it and/or created. We haven't
17 seen the soft model, if you will, of the debtor's business
18 plan. And after that then there is the dispute that you have
19 to work through with regard to what the assumptions are that
20 underlie that business plan before you can get to whether or
21 not the asks and the gives are appropriate or not
22 appropriate, and we would respectfully submit that in
23 addition to just the litigation aspect of the trial on
24 eligibility, there may be a second silo of discovery that has
25 to do with legitimate diligence requests in connection with

1  facilitating better and more meaningful negotiations or

2  exchanges of information perhaps facilitated by the mediator

3  who may be helping us with process as well as substance in

4  order to get through this process constructively.  Thank you.

5      THE COURT:  Thank you.  That is a very helpful

6  comment to make.  Everyone in this room who has been in more

7  than one bankruptcy case knows that there's very little about

8  a debtor that's irrelevant to the bankruptcy case and very

9  few requests that creditors make for information that is

10  burdensome, and I am sure the city and its counsel understand

11  that and will act accordingly.

12      MR. BJORK:  Good morning, your Honor.  Jeff Bjork

13  from Sidley Austin on behalf of National Public Finance

14  Guarantee.  National insures about 2.5 billion of the city's

15  debt obligations.  I just want to echo the comments of

16  counsel.  We have been exchanging information requests with

17  the city.  We've been in major discussions with them about

18  information we need, some of which actually goes to issues

19  that may be pertinent to eligibility, some of which goes to

20  issues that are beyond the scope of eligibility.  While those

21  discussions are continuing, what we had talked with Mr.

22  Bennett about was potentially allowing us to participate in

23  the discovery with eligibility because we think on the

24  schedule it's tight.  We support the schedule.  We also think

25  it might be the most efficient way to get the information

13-53846-tjt   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 15:38:42   Page 24 of 139
13-53846-swr   Doc 316   Filed 08/09/13   Entered 08/09/13 22:00:23   Page 30 of 139   30
574

1  that, from our perspective, will help us better understand

2  where this restructuring is going and, to your Honor's point

3  about appointing a mediator, I think better inform the

4  parties quicker on -- sooner in terms of where that mediation

5  may be going.  So just on that, what we had proposed, just

6  one change in the schedule would be that the pretrial brief

7  that you've set forth in terms of timing actually be the

8  substantive objection that would be tied to any evidence that

9  was intended to be presented at trial based upon the

10  discovery policies itself.

11         THE COURT:  I'm not sure I followed you.  What is

12  your request?

13         MR. BJORK:  My request, your Honor, would be that

14  the August 19th deadline --

15         THE COURT:  Yes.

16         MR. BJORK:  -- they have proposed that it be

17  objections tied to specific facts.  Our proposal is that we

18  could participate in the eligibility based -- eligibility

19  discovery based upon a reservation of rights to the extent we

20  think that there are issues with an objection to the extent

21  necessary based upon the facts to be determined through

22  discovery supplemented and filed as part of the pretrial

23  brief, so rather than -- so essentially, your Honor, what you

24  end up with is one objection tied to the record as opposed to

25  objection, discovery, and then a supplemental objection.

1      THE COURT:  That makes me nervous, uneasy, because

2  if I hear you right, what you're saying is you want to do

3  discovery first and then decide whether and to what extent to

4  object to eligibility?

5      MR. BJORK:  We want to make a fully informed

6  decision based upon the discovery that we determined and

7  received from the city as to whether there is any grounds to

8  object to eligibility, yes.

9      THE COURT:  That's -- sir.

10     MR. BENNETT:  We are uncomfortable as well.  I think

11  that there was a number of things said.  There's a lot of

12  information about the city that's already available, and we

13  log each and every request, and we respond to requests as we

14  can, and if there are disputes about that, we can deal with

15  it, but given that there's so much information available, it

16  kind of is hard for us to understand how it is that one would

17  not know the grounds on which they are objecting to

18  eligibility at this time.  We fully understand that facts

19  currently unknown could conceivably surface later, and we

20  would certainly not object if a fact unknown today found its

21  way into a subsequent brief, but we think the August 19th

22  deadline should require and call for an objection -- all

23  grounds stated and facts then known that support the

24  objection.  And that's the way to narrow disputes and to have

25  an economical piece of litigation going forward.  Short of

13-53846-swr    Doc 4354-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 32 of 139
13-53846-swr    Doc 3164-1   Filed 03/09/14   Entered 03/09/14 15:32:42   Page 26 of 139   32
574

 1    that, it could be a wide-ranging procedural disaster that

 2    would be ridiculously expensive and we think should be

 3    avoided.

 4         THE COURT:  I agree, counsel.  There certainly are

 5    circumstances in which the law permits amendments to

 6    pleadings.  They are limited.  They apply here, but as a

 7    general matter, the Court wants to set a firm deadline for

 8    the filing of objections to eligibility.

 9         MR. BENNETT:  Understood.  Thank you, your Honor.

10         THE COURT:  Mr. Gordon.

11         MR. GORDON:  Thank you, your Honor.  Again, Robert

12    Gordon on behalf of the Detroit Retirement Systems.  I will

13    focus just on the 109(c)(2) issue for a moment because Ms.

14    Levine already commented on the 109(c)(5) issue of good faith

15    and what have you.  As to the 109(c)(2) issue, I certainly,

16    in all candor, agree with the Court that it could appear that

17    it is strictly a legal issue.  To that end and consistent

18    with the comments I've just heard, it would seem to us -- and

19    this is something that is consistent with what we filed

20    yesterday afternoon -- that in addition to a deadline for the

21    filing of an eligibility objection, there ought to be a

22    deadline for the city to then file some kind of a response,

23    and then we could see if there is any kind of a discovery

24    issue that needs to be addressed.

25         THE COURT:  Um-hmm, um-hmm, yeah.

13-53846-tjt   Doc 4154-9   Filed 08/09/19   Entered 08/09/19 14:22:23   Page 27 of 139
13-53846-swr   Doc 3164   Filed 03/29/14   Entered 03/29/14 15:58:42   Page 27 of 139
574
33

1      MR. GORDON:  So that's my suggestion --

2      THE COURT:  I saw that you submitted that, and that

3  was not in there, not by intent.  It just didn't occur to me

4  to put that in there, so I would like to hear from the city

5  regarding that question.  Thank you.

6      MR. GORDON:  Thank you, your Honor.

7      THE COURT:  So the question is should we have a

8  deadline for the city to file a written response or a series

9  of written responses to the eligibility objections that are

10  filed?

11      MR. BENNETT:  I certainly don't have a problem

12  filing any pleading that the Court thinks would be helpful to

13  it.

14      THE COURT:  Um-hmm.

15      MR. BENNETT:  I do think it's important to note --

16  and I hope people didn't miss it in the flurry of filings --

17  that we had filed a statement of qualifications and a fairly

18  extensive --

19      THE COURT:  Um-hmm.

20      MR. BENNETT:  -- brief on the subject of eligibility

21  already --

22      THE COURT:  Um-hmm.

23      MR. BENNETT:  -- so it's not as if our position is a

24  mystery.

25      THE COURT:  Um-hmm.  All right.  I want to give

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 34 of 139
13-53846-swr   Doc 515-4   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 28 of 139   34
574

1   serious consideration to this and see how it can be worked

2   into the schedule.  Okay.  But to refocus us here, the

3   question is what about discovery on the issue of eligibility?

4         MS. PATEK:  Your Honor, Barbara Patek appearing on

5   behalf of the public safety unions.  I would echo Ms.

6   Levine's comments with respect to the definitional question

7   on negotiation.  We concur with the deadline.  We think this

8   is an aggressive and tight scheduling order as it stands now.

9   We're prepared to abide by it subject to -- you know, for

10   good cause shown, and it sounds like the debtor has already

11   acknowledged and agreed to that with one other party, so with

12   that caveat --

13         THE COURT:  Um-hmm.

14         MS. PATEK:  -- and the issue of the city's response

15   being considered, we're prepared to go forward.

16         THE COURT:  Um-hmm.  Anyone else?  Okay.

17         MR. BENNETT:  On the subject of good faith, I agree

18   with your Honor that it doesn't take a great deal of

19   exploration to figure out whether the parties did or did not

20   act in good faith, and I would, frankly, think that

21   there's --

22         THE COURT:  Well, whether the city negotiated in

23   good faith.

24         MR. BENNETT:  Well, that's true; however, if your

25   Honor reads the cases, you'll find that the emphasis quickly

1 shifts to what both sides were doing because it takes --

2         THE COURT: Fair enough, but the eligibility

3 requirement --

4         MR. BENNETT: Okay. And so --

5         THE COURT: -- is the city.

6         MR. BENNETT: -- just to lay out very briefly, Mr.

7 Heiman, I think quite properly -- I'm going to do the same

8 thing. We're very reluctant to say what our negotiating

9 partners said to us. We feel comfortable telling you

10 everything about what we said, and, frankly, much of what we

11 have said is public. It's the other side that your Honor

12 does not know about and has to find out about on some basis

13 to make an assessment.

14         THE COURT: Fair enough.

15         MR. BENNETT: And I am submitting that, in fact, if

16 you had before you what the city proposed and what the

17 responses were and were there responses in all circumstances

18 in the negotiating period that we tried hard to make

19 productive, I think you would, frankly, have all you need, so

20 I do think that in the context of parties who are going to

21 object to good faith of the city in the negotiating process,

22 you need some form of an arrangement, I think, to benefit

23 your decision-making to find out exactly what that party said

24 in response to the city's very public proposal.

25         THE COURT: Okay.

13-53846-tjt Doc 4164-9 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 36 of 139
13-53846-swr Doc 3154-9 Filed 03/09/13 Entered 03/09/13 13:34:42 Page 30 of 39   36
574

1          MR. BENNETT:  Thank you.

2          THE COURT:  Ms. Brimer.  One second, sir.  Mr.

3     Morris, I do want to hear from you, so stand by.

4          MR. MORRIS:  All right.  I was told I need to get

5     the --

6          MS. BRIMER:  Good morning, your Honor.  Lynn M.

7     Brimer appearing on the Retired Detroit Police Members

8     Association.  It is an association of approximately 240

9     retired Detroit Police Department personnel who either are

10    currently or will in the future collect pursuant to the

11    police and fire-fighters pension.

12         I raise one issue with respect to the Court's

13    deadlines and the comments this morning, and that is up later

14    this morning, your Honor, is an issue with respect to whether

15    or not a committee will be appointed to represent the

16    retirees.  And there are many issues that we have with

17    respect to that motion, but with respect to the Court's

18    deadlines, the concern I raise right now and just want to be

19    sure the Court is cognizant of this is that if there is -- if

20    the Court does determine that --

21         THE COURT:  Um-hmm.

22         MS. BRIMER:  -- it is appropriate and within the

23    authority of the Code for the trustee to appoint a committee,

24    these deadlines may be extremely aggressive because it's very

25    possible that a committee would not be constituted, and

1   counsel and what other -- whatever other professionals would

2   be required would not even be in place by this deadline, so I

3   just --

4           THE COURT:  Um-hmm.

5           MS. BRIMER:  -- would like to ensure that the Court

6   keep that in mind when evaluating the deadlines.

7           THE COURT:  Right.  I do want to be very sensitive

8   to that issue and build into our process an adequate

9   opportunity for everyone to be heard, of course.

10          MS. BRIMER:  Thank you, your Honor.

11          THE COURT:  Thank you.  Sir.  And then I'll hear Mr.

12  Morris next.

13          MR. GOLDBERG:  Okay.  I just have a brief question,

14  your Honor.  My name is Jerome Goldberg, and I'm on --

15          THE COURT:  Mr. Morris, there's a seat for you here.

16  Go ahead, sir.

17          MR. GOLDBERG:  And I represent party of interest

18  David Sole.  I just had a brief question, and I excuse the

19  Court for my own ignorance in the procedures in this matter,

20  but the deadline to serve written discovery requests for

21  August 23rd, just for my own clarification, that specifically

22  is discovery requests relative to the eligibility question;

23  is that correct?

24          THE COURT:  Yes.  All of this discovery is the

25  discovery needed for the eligibility issues that are raised

13-53846-tjt   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 14:22:00   Page 38 of 139
13-53846-swr   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 14:22:00   Page 32 of 139   38
574

1   in the objections.

2           MR. GOLDBERG:  Thank you, your Honor.

3           THE COURT:  Mr. Morris.

4           MR. MORRIS:  Your Honor, Ms. Brimer made my point.

5           THE COURT:  Oh, okay.  Then you're all set.  Would

6   anyone else like to be heard on this issue of the necessary

7   discovery?  All right.  I will take your comments under

8   advisement and issue an appropriate scheduling order.  There

9   are other deadlines.  We've been talking about deadlines

10  regarding eligibility.  I suggested that we might want to

11  have a deadline for the city to file motions to assume or

12  reject executory contracts, including collective bargaining

13  agreements.  Sir.

14          MR. HEIMAN:  Yes.  Thank you, your Honor.  I think I

15  can address that pretty quickly.  Most of our collective

16  bargaining agreements have expired, the large majority.  We

17  have six or seven still remaining in connection with the work

18  at Detroit Water and Sewer District.  It is our view at this

19  point that we will not seek -- we will not need to seek court

20  relief on those --

21          THE COURT:  Um-hmm.

22          MR. HEIMAN:  -- and we will advise you at our

23  earliest opportunity if that should change.

24          THE COURT:  Okay.  What about other kinds of

25  executory contracts, leases, et cetera, et cetera?

13-53846-tjt  Doc 4164-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 39 of 139
13-53846-swr  Doc 3164-9  Filed 08/09/13  Entered 08/09/13 15:58:42  Page 33 of 139   39
574

 1          MR. HEIMAN:  We have nothing on tap today for that

 2     in terms of deadlines.  As your Honor may know, we have a

 3     list of noncore assets that we're dealing with.  They include

 4     water and sewer and the Coleman Young Airport, et cetera, et

 5     cetera, the Institute of Art.  There is a list in our book

 6     and our -- and a description about them, and we hope on some

 7     of them, at least, to be able to bring something to your

 8     Honor that will be beneficial to the estate.  We are not

 9     anywhere near prepared to do that today, so I don't think we

10     have anything today specifically in that area.

11          There is one that comes to my mind.  There is one

12     issue right now, and I'm reluctant to raise it slightly, but

13     I feel I have to so that there's no question of the city

14     somehow waiving a right to object, but, as your Honor may

15     know, the attorney general has filed a notice of appearance

16     which was preceded and followed by public statements.

17     Without going into a lot of detail, that confuses us a bit

18     about the role the attorney general expects to take in this

19     case.  We want to try to unravel that and not come to your

20     Honor unless we have to, but that is something that we have

21     to look at, and, you know, we won't need any special

22     hearings.  I know that you have a schedule on omnibus and so

23     forth that, by the way, is perfectly fine with us, so with

24     that -- and, you know, we're talking about some post-petition

25     financing that we'd probably like to pursue, and that

13-53846-tjt   Doc 4316-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 40 of 139
13-53846-swr   Doc 313-4   Filed 08/09/13   Entered 08/09/13 15:58:42   Page 34 of 139     40
574

1   requires --

2           THE COURT:  Um-hmm.

3           MR. HEIMAN:  -- a long explanation as well, and we

4   would hope that sometime in the near term we will know when

5   we would like to --

6           THE COURT:  Um-hmm.

7           MR. HEIMAN:  -- seek your Honor's views of that,

8   but, again, we're not ready today to suggest any deadlines.

9           THE COURT:  All right.  In other kinds of

10  reorganization cases, as you well know, courts do commonly

11  set a deadline for the assumption or rejection of executory

12  contracts so that the plan confirmation process doesn't get

13  delayed when such issues are raised just before confirmation,

14  so I guess I'm willing to grant you some latitude here, but I

15  don't want to get to plan confirmation and then run into

16  issues of what contracts are going to be assumed or rejected.

17          MR. HEIMAN:  Your Honor, you raise a very good

18  point, and we have been looking at executory contracts.

19  Without belaboring the issue, it's a huge job in this city to

20  look at --

21          THE COURT:  Right.

22          MR. HEIMAN:  -- those, and at this point we have

23  nothing specific that we know of that we need to bring to

24  you, but there are -- in what I call the asset columns there

25  are some leases and arrangements and whatever that at some

13-53846-swr   Doc 4154-9   Filed 08/09/19   Entered 08/09/19 15:38:42   Page 41 of 139
13-53846-swr   Doc 4314-9   Filed 08/09/19   Entered 08/09/19 15:22:00:23   Page 33 of 139   41
574

1  point -- I am not talking about, you know, like next year --
2  at some point hopefully this year we will bring to your
3  attention if --
4          THE COURT:  All right.
5          MR. HEIMAN:  -- we think we need to.
6          THE COURT:  Well, I think you understand my concern
7  here.
8          MR. HEIMAN:  Yeah.  And I appreciate it, and we will
9  make a special effort to accelerate our evaluation of those
10 executory contracts.  Shall I go on with your agenda, your
11 Honor?
12         THE COURT:  Well, let me just ask the question of
13 really everyone in the room point blank.  I have suggested
14 these discovery deadlines, the date for a final pretrial
15 conference, and a date to begin the trial on eligibility.
16 Assuming I agree that discovery is required, and I'm inclined
17 to at this point, based on the record we have so far, does
18 anyone object to any of those dates on lines 8, 9, 10, and 11
19 of my Notice of Proposed Dates and Deadlines?
20         MR. HEIMAN:  Sorry.
21         MS. CECCOTTI:  Your Honor, once again Babette
22 Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  I'm not so
23 sure I'm rising specifically to object to those particular
24 items, but I guess with the open-endedness of -- despite the
25 efforts here today to try to outline for your Honor some

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 15:32:00   Page 42 of 139
13-53846-swr   Doc 4314-9   Filed 08/09/13   Entered 08/09/13 15:32:23   Page 36 of 159   42
574

 1    discovery issues -- and I should also point out that from our

 2    perspective, some of the discovery may extend, you know,

 3    beyond the city, so I'm wondering whether it would be helpful

 4    if the Court were to perhaps think about the discovery

 5    schedule and then perhaps build on that because there may not

 6    be enough time.  And, again, I don't think anyone here is

 7    looking to delay any of this unduly, but there's a lot here,

 8    and one of the things that I'm sure is not in anyone's

 9    interest is to have some of these issues rushed.  One doesn't

10    know what one is going to find in discovery, so I --

11         THE COURT:  Well, let me just ask you.  Are any of

12    the other discovery deadlines that I proposed here, in your

13    view, too aggressive?

14         MS. CECCOTTI:  Yes.  I think they might be too

15    aggressive.  They might be too aggressive.

16         THE COURT:  Which one or all of them?

17         MS. CECCOTTI:  Well, again, if we're looking at the

18    whole schedule as a package, the whole schedule is fairly

19    aggressive in and of itself.  In addition -- and we've

20    already had the reference made to the retiree motion -- we

21    don't know exactly how your Honor is going to view that

22    motion in the context of the schedule, and there have been

23    some suggestions that it would be worth considering this

24    schedule in the context of where your Honor ends up on the

25    retiree motion, so I wonder if it might be possible to

13-53846-swr   Doc 4314-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 37 of 139   43
13-53846-swr   Doc 3154  Filed 03/19/14  Entered 03/19/14 15:54:42  Page 37 of 139
574

1  perhaps revisit the totality of the schedule, at least the

2  block of time, after your Honor has had a chance to hear the

3  parties on the retiree motion.  It might actually inform the

4  Court rather than to try to set something now and then try to

5  shoehorn the retiree motion -- the retiree committee process,

6  assuming your Honor authorizes the motion, into a schedule

7  that your Honor is saying now it's just a scheduling

8  suggestion.

9         THE COURT:  All right.  Does anyone else want to be

10 heard on the specific dates and deadlines that I have set

11 forth here?

12        MS. PATEK:  Your Honor, I apologize.  Not specific

13 dates and deadlines, but I want -- if I may go back for a

14 moment to the 365 issue just --

15        THE COURT:  Okay.

16        MS. PATEK:  -- for the matter of preserving

17 something.  I represent the public safety unions.  Barbara

18 Patek.  One of those, the Detroit Police Officers

19 Association, to my knowledge and understanding -- and I'm not

20 up to the minute because I'm not their labor lawyer -- does

21 have a contract in place, at least as of a couple of days

22 ago, so I don't know if that perhaps with everything they

23 have on their plate was simply off the city's radar screen,

24 but we were looking -- I don't have a particular deadline to

25 propose, and I just want that noted for the record.

1          THE COURT:  Mr. Heiman.

2          MR. HEIMAN:  Your Honor, that is inconsistent with

3     our understanding.  There may be a CET, what's -- you know,

4     was something unilaterally opposed by the city, but we don't

5     view that as an executory contract, so we don't think that

6     that is correct that there is a CBA on police, fire, or

7     otherwise that is extant right now.

8          THE COURT:  I'm hearing buzzing in the loudspeaker

9     system, which most commonly means someone has their telephone

10    on.  Please check your telephones and be sure they're off for

11    me.

12         MR. HEIMAN:  I think I might have changed -- do you

13    still hear it?

14         THE COURT:  Oh, you moved the microphone, and maybe

15    that solved the problem.  Well, okay.  If that's what it

16    took, great.

17         MR. HEIMAN:  I have -- I am now on 3(b) of your

18    agenda.  Is that correct, your Honor, the plan filing date?

19         THE COURT:  Well, before we get to that, I want to

20    ask whether there are any other potential motions or

21    adversary proceedings that you or anyone else foresees that

22    we should address before we get to the issue of setting a

23    plan deadline.  Any other motions --

24         MR. HEIMAN:  Not other than what I --

25         THE COURT:  -- or adversary proceedings?

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 45 of 139
13-53846-swr   Doc 3184-9   Filed 08/09/13   Entered 08/09/13 23:58:42   Page 39 of 139     45
574

1           MR. HEIMAN:  No, your Honor, not --

2           THE COURT:  Anyone else foresee any other kinds of

3    motions or adversary proceedings that it would be helpful to

4    know about now and perhaps set a time schedule for?  Sir.

5           MR. HACKNEY:  Good morning, your Honor.  Stephen

6    Hackney on behalf of Syncora.  I wanted to rise briefly to

7    say that it is possible that there will be additional

8    adversary proceedings arising out of the COPs and swap

9    structure that I think the Court has read --

10          THE COURT:  Um-hmm.

11          MR. HACKNEY:  -- probably more than it wants to

12   about, but there is already --

13          THE COURT:  Probably.

14          MR. HACKNEY:  Probably.  Already litigation has been

15   initiated by the city against Syncora.  Syncora has also

16   initiated litigation against the swap counterparties in New

17   York.

18          THE COURT:  Um-hmm.

19          MR. HACKNEY:  I think the Court has been made aware

20   of that.

21          THE COURT:  Okay.

22          MR. HACKNEY:  And I cannot be more specific other

23   than to say that --

24          THE COURT:  Right.

25          MR. HACKNEY:  -- it's entirely possible as you're

13-53846-swr    Doc 4314-9    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 46 of 139
13-53846-swr    Doc 3184-9    Filed 03/09/13    Entered 08/09/13 53:42:23    Page 40 of 139    46
574

1  resolving -- as the various courts are resolving where this

2  can proceed, there may be additional adversaries that arise

3  out of that structure.

4       THE COURT:  Right.  Good.  Thank you for reminding

5  me of that.

6       MR. HACKNEY:  Thank you, your Honor.

7       MR. HEIMAN:  I'm sorry, your Honor.  I actually

8  appreciate that supplement because there may be some motion

9  or adversary arising out of that debt that's not with respect

10 to what's already being litigated, so --

11      THE COURT:  Okay.

12      MR. HEIMAN:  -- we don't know today.

13      THE COURT:  Well, if so, that would happen fairly

14 soon and not likely to impact the plan confirmation schedule.

15      MR. HEIMAN:  Right.

16      THE COURT:  All right.  Anyone else with any other

17 possible motions or adversary proceedings?  I have one I'd

18 like to suggest to you, although we'll address that when we

19 get to the issue of committees.  All right.

20      Let's talk about the deadline to file a plan.  I

21 suggested March 1st.

22      MR. HEIMAN:  Your Honor, we enthusiastically accept

23 that deadline.  I would only supplement that acceptance with

24 a statement of desire on the part of the city, if I may.

25      THE COURT:  Please.

13-53846-tjt   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 22:00:23   Page 47 of 139
13-53846-swr   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 15:22:42   Page 47 of 139   47
574

1          MR. HEIMAN:  And that is that we hope -- and our

2    view is that time is our enemy and that the facts are not

3    going to change no matter how long we wait, whether it's on

4    eligibility or filing of a plan, so we intend or hope to run

5    our process on parallel paths so that we can move as swiftly

6    as possible through this case, and, therefore, it is our hope

7    and desire that we will file a plan by year end, which is

8    well in advance of the deadline you have set.  Now, there are

9    a lot of issues surrounding that, but that is our own target,

10   so --

11         THE COURT:  Um-hmm.  All right.  Well, it would be

12   the Court's intention when a plan is filed to reconvene a

13   conference like this to set a schedule for litigating

14   whatever the issues are regarding that plan.

15         MR. HEIMAN:  Thank you, your Honor.

16         THE COURT:  Would anyone else like to be heard

17   regarding the deadline that the Court proposed?  All right.

18   Thank you.

19         MR. HEIMAN:  Next is item four, the mediation

20   proposal, your Honor.

21         THE COURT:  Yes.  Let's turn our attention to that.

22   Before you commence, I have a little introduction to give.

23   The Court does solicit the comments regarding its proposed

24   mediation order.  The reason that the Court provided notice

25   of its proposed mediation order is because it would like

13-53846-tjt   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 48 of 139
13-53846-swr   Doc 3154-9   Filed 03/09/13   Entered 03/09/13 15:56:42   Page 42 of 139   48
574

1   comments from you on whether this is a good idea in this case
2   or not.  First, the Court would like to hear from counsel
3   regarding the concept of mediation in this case.  Then we can
4   discuss the particulars of the order itself.  The Court does
5   strongly encourage mediation in this case in order to
6   facilitate the consensual resolution of disputes to the
7   greatest extent possible.  Bankruptcy certainly does offer
8   litigation as a means to resolve disputes, and the Court is,
9   of course, fully prepared to conduct the litigation of any
10  issue that the parties decide requires it.  However, the goal
11  of bankruptcy is almost always better served through the
12  consensual litigation of disputes.
13          What is the goal of bankruptcy?  The purpose and
14  goal of bankruptcy is to give the city a fresh start in its
15  financial life and to do so in the most expeditious and
16  efficient way possible.  That's the goal of this bankruptcy
17  and really all bankruptcies.  Everyone who practices in the
18  field of bankruptcy law understands that consensual
19  resolution will meet the goals of promoting the city's fresh
20  start better -- much better than litigation.  There are two
21  reasons for this.  The first reason is that after this
22  bankruptcy case is over, however it is resolved, many of the
23  city's creditors will continue to have long-term
24  relationships with the city.  You know who you are, the
25  unions, the bondholders, the employees, the trade creditors.

13-53846-tjt   Doc 4164-9   Filed 08/09/13   Entered 08/09/13 15:32:42   Page 43 of 139
13-53846-swr   Doc 315-9   Filed 08/29/14   Entered 08/29/14 22:00:23   Page 49 of 139   49
574

1  Settlements can stabilize and even strengthen those long-term

2  relationships.  On the other hand, litigation is not designed

3  for that purpose, and experience strongly suggests that it

4  will not have that effect.  It may even be counterproductive.

5      Why is stabilizing and enhancing those long-term

6  relationships important to the city's fresh start?  For the

7  simple reason that if these relationships are stronger and

8  more cooperative, it will help the city's recovery and

9  facilitate the city's ability to become the city that it

10  wants to be.  Strong relationships between the city and its

11  creditors should also be important to the creditors because

12  it will place the city in a better position to do more

13  business with its creditors.

14      Finally and perhaps most important of all is that

15  consensual resolution of the city's disputes with its

16  creditors is in the best interest of the citizens of the City

17  of Detroit.  Without addressing their legal rights as such,

18  the city that they deserve, a city that is strong, vibrant,

19  and responsive, is more readily achieved after a settlement

20  between the city and its creditors than after long,

21  expensive, and potentially bitter litigation.  As a result,

22  the citizens of Detroit also have an important interest in

23  the outcome of this case that is as prompt and efficient as

24  possible.  Sir.

25      MR. HEIMAN:  Thank you, your Honor.

1          THE COURT:  Hold on one second, please.  Okay.  All

2     right.  After all, I do need to ask you to turn that

3     microphone so that its head is facing directly at you.

4          MR. HEIMAN:  Is this better?

5          THE COURT:  Turn it like 90 degrees so it's right --

6     pointed right at you.  There you go.

7          MR. HEIMAN:  Okay.

8          THE COURT:  That's it.

9          MR. HEIMAN:  Sorry.

10          THE COURT:  Okay.  But, again, I'm hearing noise in

11     the loudspeakers, so please check your phones to be sure

12     they're all off.  Go ahead.

13          MR. HEIMAN:  First, the concept of mediation.

14     Obviously you articulated better than I could possibly why we

15     support mediation.  We want resolution.  We don't want

16     protracted litigation.  We want to move swiftly.  Time is our

17     enemy, as I said.  We are hopeful that a mediation process on

18     all important issues that relate to the plan or otherwise,

19     individual creditors' rights will be better served by

20     mediation, so, again, we welcome that and appreciate your

21     comments in that regard.

22          With respect to the order, which is your second

23     question, we have no desire to change any of the language

24     presented in the order as you've stated it.

25          THE COURT:  All right.  Thank you.  And I want to

13-53846-tjt   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 51 of 139
13-53846-swr   Doc 4154-9   Filed 08/09/13   Entered 08/09/13 15:32:42   Page 46 of 139     51
574

1  solicit the comments of others regarding the concept of
2  mediation and the particulars of the order.  It's probably
3  not, however, appropriate to seek your comments in this forum
4  regarding the proposed mediator, and so I am going to ask you
5  if you have any comments, either -- on either side of the
6  question about the proposed mediator, I'm going to give you a
7  seven-day opportunity to submit to my chambers sealed and
8  confidentially any such comments, and so the actual entry of
9  the mediation order will be held up for that purpose, but at
10  this point I would like to hear from others on the concept of
11  mediation and the terms of the order.

12          MS. LEVINE:  Your Honor, Sharon Levine, Lowenstein
13  Sandler, and I'm not sure because of the informal sort of
14  nature if I actually entered for whom I'm appearing, so with
15  the Court's permission, the Michigan Council 25 of the
16  American Federation of State, County, and Municipal
17  Employees, AFLCIO, and Subchapter 98, the City of Detroit
18  Retirees, which is the union's retirement group here in
19  Detroit.

20          First, we support mediation.  We support protecting
21  our constituents in every way we possibly can within the core
22  proceedings.  We had some discussion in the retiree motion
23  response about reservation of rights, and we've had some
24  conversations with the city's attorneys with regard to that
25  as well.  We don't want the fact that we do recognize the

13-53846-swr    Doc 4164-9    Filed 08/09/14    Entered 08/09/14 15:52:42    Page 46 of 159
13-53846-tjt    Doc 315-4    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 52 of 139      52
574

1    city has some serious woes here that it needs to address to

2    in any way detract from our --

3              THE COURT:  Um-hmm.

4              MS. LEVINE:  -- ability to go down dual or three

5    tracks.

6              THE COURT:  Um-hmm.

7              MS. LEVINE:  Two, with regard to the specific

8    language of the order, we would just ask for a clarification

9    with regard to decretal paragraph four, which I alluded to

10   when I approached the podium earlier.  In addition to

11   mediating the difficult substantive issues that need to get

12   done, we do seem to be having some issues which we're hoping

13   that we're working through with regard to actually getting

14   access to information and the ability to have more of a give

15   and take in the process.  And we're hoping that, to the

16   extent that there is a mediator, it's a full-service mediator

17   that can help us with process issues as well as substance

18   issues.  Thank you.

19             THE COURT:  Good point.  Thank you.

20             MR. GORDON:  Your Honor, Robert Gordon again on

21   behalf of the Detroit Retirement Systems.  Your Honor,

22   without waiver of our position that accrued pension benefits

23   can't be diminished or impaired under the Michigan

24   constitution, the systems are not simply standing pat on that

25   position but are pursuing parallel -- the parallel path of

13-53846-tjt   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 15:54:42   Page 47 of 139
13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 53 of 139    53
574

1    exploring ways in which the systems can be a part of the

2    solution.  Having said that, in the context of discussing

3    mediation, it's important that -- again, harkening back to my

4    comments from earlier, that the Court understand a little bit

5    about where the negotiations actually stand.  And this is not

6    with respect to any comments about whether those negotiations

7    meet the standard for good bid negotiations at all.

8            THE COURT:  Okay.

9            MR. GORDON:  This is about whether there's been

10   negotiations in general.  To date there have been, as has

11   been indicated, several presentational meetings with the city

12   and the emergency manager and his financial and legal

13   advisors.  There were presentations made at the airport on

14   June 14th.  There was a presentation made on June 20th

15   regarding modifications possibly to pension and healthcare

16   benefits.  There was a financial due diligence session

17   conducted in New York on -- I believe it was June 25th.

18   There were further financial due diligence sessions conducted

19   just on July 9th and 10th, roughly one week before this

20   bankruptcy was filed.  These were due diligence sessions.

21   These were sessions to gather information.  There were legal

22   and financial advisors from all the major creditor

23   constituents in a room asking questions about the cash flow

24   forecast, for example, and that really is the basis for the

25   proposal that was made by the emergency manager on June 14th.

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 54 of 139
13-53846-swr   Doc 315-4   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 48 of 139    54
574

1    Your Honor, those discussions made clear that there
2    are a number of not immaterial but very material financial
3    analyses that still need to be undertaken, and I want to make
4    it very clear.  I am not by saying this casting any criticism
5    or aspersion on anyone.  The emergency manager's team, as far
6    as I know, is working very hard, but there is information
7    that is not available at this time in the data room or
8    otherwise, and some of that I can even give you an example
9    because it's public.  The emergency manager's proposal on --
10   that was disseminated on June 14th has those cash flows
11   available, a ten-year cash flow forecast there.
12           THE COURT:  Um-hmm.
13           MR. GORDON:  The emergency manager's proposal also
14   references, for example -- and this is just one example --
15   that there may be an initiative to create a water authority.
16   And in the root cause document that was issued a couple
17   months back by the city, there was some indication that such
18   an authority may free up tens of millions of dollars in
19   revenues for the city.  Those numbers are not in the cash
20   flow forecast at this time.
21           THE COURT:  Um-hmm.
22           MR. GORDON:  And it's been readily accepted they
23   haven't, and the analysis is still ongoing as to what that
24   number should be.  That is very important because if you look
25   at the cash flow forecasts, the premise of the proposal by

13-53846-swr   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 15:56:42   Page 49 of 139
13-53846-tjt   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 55 of 139    55
574

1    the emergency manager begins by -- with the fact that,

2    according to those cash flow forecasts, there is on average

3    over the ten years about $80 million a year available for

4    payments to what are designated under his proposal as

5    unsecured creditors.  The root cause analysis talks about

6    tens of millions.  I believe it puts a range of maybe 30 to

7    $70 million on that, so you can imagine just that item alone,

8    30 to $70 million versus $80 million, these are huge numbers,

9    and it makes it difficult to sit down and have fulsome

10   negotiations when there are things that are still in flux

11   like that.  Again, it's part of the process.  This is not a

12   mom and pop convenience store situation.  There are a lot of

13   complexities, and I fully expect that the parties will engage

14   to resolve those informational issues, but they haven't

15   happened yet.

16        The Retirement Systems have also -- I feel like I'm

17   free to report to the Court -- have had discussions with

18   their actuaries to discuss different issues relative to this

19   matter.  They are very complex issues, very complex issues

20   with respect to the actuarial calculations, and we have kept

21   the city --

22        THE COURT:  This is the underfunding issue?

23        MR. GORDON:  The underfunding issues or how cash

24   flows might be permitted as they -- whatever the cash flows

25   may be, how those could permit supporting the existing

13-53846-swr    Doc 4314-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 56 of 139
13-53846-swr    Doc 3164-9  Filed 08/09/13  Entered 08/09/13 15:52:42  Page 56 of 139    56
574

benefits over time.  We have kept the city, their legal and
financial advisors apprised of our progress on that front
with a view to being able to sit down with them, and it is,
indeed, anticipated that later this month we will hopefully
be able to sit down with our financial team and our actuaries
in the same room with the emergency manager's team and his
actuaries and start to have conceptual discussions about
actuarial issues, but that is just at the beginning stage at
this point, so I wanted to be clear about that.  As a result,
it is our feeling that while mediation -- we have absolutely
no objection to the concept of mediation, we would
respectfully submit it's premature at this point.  We are
going to make formal information requests of the city in the
near future.  It's been all informal up to now because of the
out-of-court situation that we were in.

THE COURT:  Um-hmm.

MR. GORDON:  But we will be making formal requests,
and, of course, the city will need time to respond to those
requests.  And then we would expect that the parties would
engage in negotiations to narrow the issues, and we think
that process needs to play out to some extent before we end
up in mediation.  We need better information, and we need to
have had those discussions between the parties.  So it would
be our suggestion in that regard, respectfully, the Court
consider something along the lines of perhaps having a status

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 57 of 139
13-53846-swr   Doc 3164-3   Filed 08/09/13   Entered 08/09/13 23:58:42   Page 57 of 139   57
574

1  conference every 30 days to see where we are in this

2  negotiation process to gauge when mediation may be

3  appropriate.

4      Rule 1001, as the Court has referenced, talks about

5  both a just and speedy administration of the case.  Just is

6  as important as speedy is.  We want to caution against

7  expediency merely for the sake of expediency.  We all have a

8  sense of urgency.  How could we not?  But there is proceeding

9  with all due dispatch, and then there's proceeding in haste

10  and endangering parties' due process rights.

11      The sound bite that we hear that the city is broke

12  is a catchy sound bite, but -- we all understand the urgency,

13  but it is a bit of a sound bite.  The city is not paying its

14  unsecured bond debt at this time.  The city is not paying its

15  employer contributions at this time.  The city is meeting its

16  payroll obligations.  So while everything needs to move with

17  due speed -- we understand that -- again, it should not be

18  used as an excuse to move through this process faster than is

19  reasonable.

20      Your Honor, the stakes are high, and the men and

21  women of this city, current employees and retirees, deserve

22  to have their rights addressed in a careful and delicate

23  manner and not in a more --

24      THE COURT:  All right.  You make really --

25      MR. GORDON:  -- blunt fashion all in the name of

13-53846-swr    Doc 4164-9    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 58 of 139
13-53846-swr    Doc 3154    Filed 03/09/13    Entered 03/09/13 15:52:42    Page 52 of 139    58
574

1    expediency.

2           THE COURT:  You make really important comments, and

3    I thank you for them.  As I see the issue that you raise, it

4    is this.  Who is in a better position to determine when the

5    actual mediation discussions should begin, either a mediator

6    or the Court?  A mediator could meet with the parties on a

7    regular basis informally, supervise the expedited exchange of

8    information, and have potentially a better sense of when to

9    begin negotiations, or the Court, whose processes are much

10   more formal, much more public, more constrained.  I'm

11   inclined to think that the mediator is in a better position

12   to say, okay, now it's time to actually begin discussions.

13          MR. GORDON:  Your Honor, I will step back and say

14   this.  What you've just described is a much more three-

15   dimensional mediation process than perhaps I was envisioning

16   and has often been the case.

17          THE COURT:  Um-hmm.

18          MR. GORDON:  What you're describing I think could be

19   constructive.  I would not dispute that.

20          THE COURT:  Well, please understand what I'm

21   referring to here and what I envision here is entirely

22   facilitative mediation.  There's nothing that this mediator

23   will have the authority to do in terms of compelling any

24   particular outcome, so it's up to the parties to work with

25   the mediator on setting the agenda, setting the schedule, and

13-53846-swr   Doc 4154-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 59 of 139
13-53846-swr   Doc 3164-1   Filed 03/09/14   Entered 03/09/14 15:38:42   Page 58 of 139   59
574

1  working through the issues.  The ultimate deliverable is a

2  plan, assuming we get past eligibility, which I don't want to

3  assume, but for purposes of this we want to assume it, a plan

4  that has the support of enough creditors to be confirmed;

5  right?  And in that regard, there may be other disputes that

6  should better be referred to a mediation panel than to the

7  mediator who is working on debt adjustment, and I think we

8  want to keep that option open also.

9        MR. GORDON:  Thank you, your Honor, for those

10  thoughts and comments.

11        THE COURT:  Okay.

12        MR. GORDON:  Yeah.  Without revisiting my comments,

13  it is consistent also with our concerns that are expressed

14  with respect to the retiree committee that, again, the

15  process not be used in a way that --

16        THE COURT:  Right.

17        MR. GORDON:  -- allows someone in a perfunctory way

18  to move --

19        THE COURT:  Right.

20        MR. GORDON:  -- through this process and say we've

21  met the obligations, let's just go to a plan confirmation

22  hearing when the parties really haven't had a real meaningful

23  opportunity to discuss the issues.

24        THE COURT:  Right.  You've already heard me speak on

25  the subject of why a consensual resolution is better than a

1  cramdown.

2       MR. GORDON:  To that end, your Honor, the only other

3  comment I would make is that as to the proposed mediation

4  order itself --

5       THE COURT:  Yes.

6       MR. GORDON:  -- it is a little bit, I guess -- you

7  know, your Honor, I'll strike that comment.

8       THE COURT:  Okay.

9       MR. GORDON:  Based upon your comments, I'm fine.

10  Thank you.

11       THE COURT:  Well, let me just offer this opportunity

12  to you, Mr. Gordon, and really anyone.  In the seven-day

13  period that I'm going to allow for additional comments to be

14  submitted to the Court, you should also take that as an

15  opportunity to suggest any changes to the language or really

16  anything about the order that you'd like.

17       MR. GORDON:  Thank you, your Honor.

18       THE COURT:  Would anyone else like to be heard

19  regarding the proposed mediation order concept or terms?  No?

20  Sir.

21       MR. HEIMAN:  Your Honor, just two quick comments to

22  what Mr. Gordon said.  The first is that I don't intend to

23  respond today to some of his characterizations.  I don't

24  think that would advance the ball on the subject we're

25  talking about.  And the second is your Honor asked me awhile

13-53846-swr  Doc 4314-9  Filed 08/09/14  Entered 08/09/14 22:00:23  Page 61 of 139   61
13-53846-swr  Doc 3134-9  Filed 03/29/14  Entered 03/29/14 15:58:42  Page 61 of 139
574

1    ago whether the city is willing to continue to negotiate with

2    its creditors.  I think I responded that we're committed to

3    doing so, and I want to make that clear again in this

4    context.  We do not view mediation as a reason to not

5    continue our discussions.  Quite the contrary.  If mediation

6    is going to be successful at all, it's our obligation -- and

7    the burden falls on us -- we recognize this -- to move the

8    ball here with information, discussions, or what have you, so

9    we, again, endorse the mediation concept as well as the

10   language of the order.

11         THE COURT:  All right.  Thank you.  Let's move on

12   then and talk about the proposed order appointing a fee

13   examiner.  Again, I have a bit of an introduction that I'd

14   like to give you and everyone.  In considering and addressing

15   the issue of whether to appoint a fee examiner in this case,

16   the Court wants to assure everyone who might be affected by

17   such an order that it fully recognizes and accepts that

18   neither Section 330 nor Section 1104 of the Bankruptcy Code

19   applies in this Chapter 9 case.  Those are the provisions of

20   the Bankruptcy Code that judges commonly rely upon in

21   appointing fee examiners in Chapter 11 cases.

22         Likewise, the Court states on the record here that

23   it has no reason to believe that the city's professional fees

24   in this case either have been or will be either excessive or

25   otherwise improper, no reason.  Still, the Court has

13-53846-tjt   Doc 4354-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 62 of 139
13-53846-swr   Doc 3154   Filed 03/09/13   Entered 03/09/13 15:58:42   Page 56 of 139    62
574

1  concluded that it at least should suggest and discuss with
2  counsel the merits of appointing an independent fee examiner.
3  It is easy to predict in this case that there will be intense
4  media and public scrutiny of the city's professional fees.
5  Now, this is entirely natural and proper, and, frankly, the
6  Court encourages the public to remain fully informed about
7  all aspects of the case, including the professional fees that
8  the city is asked to pay.  There is, however, a blunt truth
9  that motivates the Court to make this suggestion.  It is
10 this.  If the city's professional fees and professional fee
11 expenses have been processed through an independent fee
12 examiner, then two things are more likely.  First, the city's
13 professionals will be in a much better position to justify
14 those fees to the city, and, second, the city will -- the
15 city itself will be in a much better position to justify
16 those fees to the public and to the citizens of the city.
17 Therefore, the Court sincerely hopes that the city and its
18 professionals will recognize and accept this blunt truth and
19 agree to some kind of a process for the independent review of
20 the city's professional fee expenses.  The parties and
21 counsel should understand that the Court is willing to be
22 quite flexible on the design of the process and is fully
23 prepared to collaborate with counsel on the process of fee
24 examination if we agree to it.
25            There are, of course, many possible ways to

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 63 of 139
13-53846-swr   Doc 3164   Filed 03/09/14   Entered 03/09/14 15:38:42   Page 57 of 139      63
574

 1   accomplish the goal.  The process set forth in the Court's

 2   proposed order is only one way.  Likewise, the Court is

 3   willing to be flexible regarding the process of selecting the

 4   independent fee examiner.  If we can agree in principle to

 5   the concept, then I am confident we can work out the details

 6   and identify a qualified individual.  Having said that,

 7   however, in order for the fee examiner to be truly

 8   independent, probably the selection should ultimately reside

 9   with the Court rather than with the city and its

10   professionals.

11        So, again, I'd like to solicit first comments on the

12   concept of an independent fee examiner and then regarding an

13   appropriate process.  Sir.

14        MR. HEIMAN:  Your Honor, the city accepts and

15   appreciates the concept, and we and the city and its

16   professionals are committed to working with a fee examiner,

17   whoever that may be.

18        As to the order, I had one I think very minor

19   comment, but it's consistent with your comments about

20   flexibility, which, as I understand your approach, would

21   be -- this hearing or the entry of an order would be followed

22   by a discussion between the fee examiner who you appoint and

23   us, the city and its counsel.

24        THE COURT:  Yes.

25        MR. HEIMAN:  And so if you look at the first

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 64 of 139
13-53846-swr   Doc 3164   Filed 03/09/13   Entered 03/09/13 22:00:23   Page 58 of 139   64
574

 1   sentence of paragraph 6 and less so to the first sentence of
 2   paragraph 5, there are issues in there, including rate per
 3   hour and so forth -- and that is, in my mind, going to be
 4   whatever it is, but it seems to us that that's somewhat
 5   covered by 4(c) or could be covered by 4(c) at least and that
 6   it might be better to move that to the proposed order that
 7   the fee examiner presents to your Honor.

 8            THE COURT:  Um-hmm, um-hmm, um-hmm.  Okay.

 9            MR. HEIMAN:  With that minor suggestion -- and I
10   must say it's not a big deal to us -- it's just a matter of
11   how the process is going to work -- I think I've responded to
12   your questions.

13            THE COURT:  Okay.  All right.  Any other comments on
14   either the concept of a fee examiner or the terms of the
15   proposed order or any other order?

16            MS. GIANNIRAKIS:  Good morning, your Honor.  Excuse
17   me.  Maria Giannirakis on behalf of Daniel McDermott, United
18   States Trustee.  Your Honor, I'm here on Mr. McDermott's
19   behalf to comment on the Court's suggestion that a fee
20   examiner might be appropriate in this case, and although
21   we're not asking for the relief, we are offering the Court
22   information on our experience in Chapter 11 cases, and if the
23   Court finds this useful, I'd be happy to share it with you.

24            THE COURT:  Please.

25            MS. GIANNIRAKIS:  Thank you.  We've certainly -- we

13-53846-tjt   Doc 4164-9   Filed 04/23/14   Entered 04/23/14 22:00:23   Page 65 of 139
13-53846-swr   Doc 3164-1   Filed 08/09/13   Entered 08/09/13 15:58:42   Page 59 of 139    65
574

1  certainly see the utility of a fee examiner in this case.  As
2  the Court has stated, the fee examiner could advance the
3  public interest and the public confidence by promoting
4  transparency in this highly publicized case.  The U.S.
5  Trustee has supported the use of fee examiners in complex
6  Chapter 11 cases, and this endorsement is reflected in the
7  new fee guidelines for larger Chapter 11 cases that the U.S.
8  Trustee program has recently issued.  The guidelines set
9  forth several models for the use of fee examiners and fee
10 committees and have proven effective.  Most recently they
11 have been effected in the GM and American Airlines cases.
12 The fee examiner has not only proven to be effective and
13 efficient in identifying problems such as over-staffing, but
14 they've also raised other important legal issues for the
15 Court's consideration.  Just an example, in the GM case the
16 fee examiner raised the issue of whether professionals should
17 give notice of different rate increases.  These guidelines
18 and the information and guidance that's included in them
19 might be helpful to the Court, the proposed fee examiner, and
20 the parties.  And just an example of some of the guideline
21 provisions that we think could be useful is the adoption of
22 professional budgets and benchmarking invoices to the
23 budgets, the submission by professionals of electronic
24 billing data, specific disclosure of comparable compensation
25 through the use of blended rates, the disclosure of whether

13-53846-tjt   Doc 4164-9   Filed 08/09/13   Entered 08/09/13 15:32:00   Page 66 of 139
13-53846-swr   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 15:22:23   Page 66 of 139
574
66

1   rate increase -- of whether rates increased post-filing, the

2   disclosure and calculation during the case of rate increases

3   and the effect of those increases on compensation, and the

4   consideration of standards for using co-counsel as efficiency

5   counsel.  We agree with the Court, as the Court commented,

6   about Chapter 9 different from Chapter 11 but believe that

7   some of these comments could be useful and thank the Court

8   for allowing us to share that with you.

9           THE COURT:  You're welcome, and thank you as well.

10  Any other comments?

11          MR. HEIMAN:  Your Honor, I'd just like to add one

12  thing to note that there was a quite voluminous filing by

13  Godfrey & Kahn, and I have no comment about that except that,

14  for what it's worth, we don't think General Motors and Lehman

15  are in any way comparable to our situation.  Hopefully we'll

16  have far fewer retained professionals and the like, and the

17  process will not be so complicated, but having said that --

18  and they said they would be in the courtroom.  I don't know

19  if they are and may want to speak, but having said that,

20  again, we appreciate your Honor's approach and accept it.

21          THE COURT:  Let me ask you this question.  To what

22  extent do you think your office or your client or other

23  parties should be invited to participate in the selection of

24  an examiner, or do you just want me to do it?

25          MR. HEIMAN:  That's an interesting question.

1    THE COURT:  Again, there's a range of creative ways

2  in which we could handle this.  We could do what --

3    MR. HEIMAN:  I personally --

4    THE COURT:  We could do here what we are doing in

5  the mediation context, which is just to allow you a seven-day

6  period to submit confidential sealed suggestions or comments

7  on this question.

8    MR. HEIMAN:  I must say, your Honor, I'm just going

9  to let my hair down on this one.  For me to suggest who I

10  would like to have examine my fees seems unseemly to me,

11  so --

12    THE COURT:  Okay.

13    MR. HEIMAN:  -- that's my gut reaction.  I don't --

14  you know, my colleagues may beat me up after this hearing for

15  saying that, but that's my honest reaction.  Your Honor has

16  expressed --

17    THE COURT:  I understand and accept that.

18    MR. HEIMAN:  Okay.  So with that we have -- I think

19  I've addressed this already, your Honor.  Number 6 on your

20  amended list is future conferences and hearings, and we

21  are --

22    THE COURT:  Stand by one second.  We do have --

23    MS. LEVINE:  Sorry.  Before we leave the --

24    THE COURT:  -- Ms. Levine who'd like to be heard.

25    MS. LEVINE:  Before we leave the fee examiner

13-53846-swr    Doc 4154-9    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 68 of 139
13-53846-swr    Doc 3164-9    Filed 03/09/13    Entered 03/09/13 55:42:42    Page 62 of 139    68
574

1  issue --

2      THE COURT:  Step forward, please.

3      MS. LEVINE:  Your Honor, one of the issues and one

4  of the themes you've been hearing throughout this is trying

5  to maintain the credibility of a process that's a very

6  difficult process for people to have to go through.

7      THE COURT:  Yes.

8      MS. LEVINE:  So to the extent your Honor would

9  welcome it, I believe that we would like to have a voice at

10  least in having your Honor consider some thoughts with regard

11  to the fee examiner.

12      THE COURT:  With regard to the identity of the fee

13  examiner?

14      MS. LEVINE:  The identity, yes.

15      THE COURT:  Okay.  Will it suit your purposes

16  sufficiently if I give you seven days to submit to the Court

17  confidentially and under seal whatever your comments are?

18      MS. LEVINE:  Yes.  Thank you.

19      THE COURT:  Okay.  And this is an opportunity open

20  to everyone.  Don't file anything, please.  Just submit them

21  to my chambers directly --

22      MR. HEIMAN:  And, your Honor, Mr. Bennett points

23  out --

24      THE COURT:  -- by mail or hand-delivery, whatever

25  you want to do.

1    MR. HEIMAN:  Mr. Bennett points out, as he so often

2  does, that I spoke for myself and not for the city, my

3  client, so I don't know what the city's reaction will be to

4  your invitation, and I just need to --

5    THE COURT:  Okay.

6    MR. HEIMAN:  -- make that clear.

7    THE COURT:  Fair enough.

8    MR. HEIMAN:  Thank you.  Status conferences and

9  omnibus, I think I have already said we appreciate the

10  advance notice on those, and they look good to us, and

11  nothing further to add to that unless your Honor has a

12  question about it.

13    THE COURT:  Just for notice purposes, the District

14  Court has requested that we not conduct hearings on the

15  morning of September 4th because there's another high-profile

16  matter that morning, so if we do have any hearings of any

17  kind on September 4th, they would be in the afternoon, and

18  I'll have to get back to you all on what time in the

19  afternoon.

20    MR. GORDON:  Your Honor, I believe that's actually

21  Rosh Hashanah that night, so just to be careful --

22    THE COURT:  Ah, we will have to be very careful

23  about that, too, yes.  Thank you.

24    MR. HEIMAN:  Your Honor, I --

25    THE COURT:  On the issue of omnibus hearings, I

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 70 of 139
13-53846-swr   Doc 3164   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 84 of 139     70
574

 1  suggested a motion procedure that was very different from the

 2  one that your office submitted in its motion.  You want to

 3  take that up now?

 4        MR. HEIMAN:  I would like to call on Ms. Lennox for

 5  that purpose.

 6        THE COURT:  All right.

 7        MR. HEIMAN:  Thank you, your Honor.

 8        MS. LENNOX:  Thank you, your Honor.  For the record,

 9  Heather Lennox of Jones Day.  What we had proposed in our

10  motion -- we tried to be fairly faithful to Local Rule 9014-

11  1, so I'm pleased to say that we just have a couple of

12  questions and clarifications on --

13        THE COURT:  Okay.

14        MS. LENNOX:  -- what your Honor might propose, and

15  some of them may be a little parochial or a little minor.

16  The first one that I view as perhaps a little parochial is

17  Local Bankruptcy Rule 9014-1(e) imposes a five-page limit on

18  replies for certain matters, and then the Eastern District of

19  Michigan rule has a similar blanket seven-page limit on

20  replies.  It is more than likely that as the debtor in this

21  case, the city, will be doing omnibus replies to many

22  objections, and we would ask for your Honor's consideration

23  in waiving that at least as to the city.

24        THE COURT:  Well, I'd rather deal with the issue now

25  than get a motion to waive it on a case-by-case basis.  Is

1   there a limit that we can set within reason?

2   　　　　MS. LENNOX:  I do think it depends on the issue,

3   your Honor.  I mean if we're going to do a general limit, I

4   would propose a little higher, so it might be up to 20 pages.

5   For example, replies on eligibility could be quite lengthy.

6   Replies on minor matters could be much shorter.  But I do

7   expect that there will be several objections that your Honor

8   would prefer to have one pleading from the debtor rather than

9   many.

10  　　　　THE COURT:  All right.  Well, then how about if I

11  put in the order that that is extended to 30 pages and, of

12  course, without prejudice to your right to request even more

13  in the context of a specific reply?

14  　　　　MS. LENNOX:  Thank you, your Honor.

15  　　　　THE COURT:  What else?

16  　　　　MS. LENNOX:  There was also a question on

17  clarification that we had with respect to your Honor's

18  statement on 4(a) about not conducting an evidentiary hearing

19  on a motion unless the order and notice setting the hearing

20  states otherwise, and that is simply a procedural question

21  about how your Honor would like to proceed about whether we

22  should notice that ourselves, whether we should put a request

23  for that in the motion.  How would your Honor like to address

24  that issue so the parties know how to handle it in advance?

25  　　　　THE COURT:  The more information you can provide to

13-53846-tjt   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:02:23   Page 72 of 139
13-53846-swr   Doc 3164   Filed 03/09/13   Entered 03/09/13 22:48:42   Page 86 of 139   72
574

1   me about what it will take to resolve any given motion the

2   better, so, for example, if your motion foresees that there

3   will be factual issues, it would be helpful to identify those

4   factual issues and request an evidentiary hearing.

5           MS. LENNOX:  In the motion.  Thank you.

6           THE COURT:  Right.  At that point, I can decide

7   whether it's appropriate to conduct the evidentiary hearing

8   on one of these omnibus days or not, but I have to tell you

9   that in general I don't foresee conducting evidentiary

10  hearings at all on omnibus hearing days; that instead when

11  there are issues of fact, we will identify them and set a

12  schedule for whatever discovery might be needed, whatever

13  additional briefing on any legal issues might be needed, and

14  sometimes even a final pretrial conference and then an

15  evidentiary hearing, so I like the idea of your telling me

16  when you think an evidentiary hearing will be required and if

17  it's possible that it might be an extremely brief one to do

18  it on an evidentiary hearing day -- on an omnibus hearing

19  day, but more often than not -- much more often than not, I

20  foresee it playing out in a more traditional way.  Does that

21  answer your question, or is it too vague?

22          MS. LENNOX:  That does in large main, your Honor.

23  Part of the question -- and perhaps this is a follow-up

24  question -- is related to your admonition in -- your

25  perfectly appropriate admonition in Section 1 reminding

13-53846-tjt   Doc 4364-9   Filed 08/09/14   Entered 08/09/14 15:32:02   Page 73 of 139
13-53846-swr   Doc 4364-9   Filed 08/09/14   Entered 08/09/14 15:32:02   Page 67 of 139   73
574

1  counsel that when you assert facts in a motion, you should

2  have an affidavit to support them, so I would expect that

3  there may be motions filed with affidavits that support facts

4  in the motion but maybe we don't need a whole full-blown

5  evidentiary trial on, things like that, so that --

6          THE COURT:  Among the things we discuss at the

7  initial hearing is whether there are genuine issues of

8  material fact.

9          MS. LENNOX:  Um-hmm.

10          THE COURT:  And my suggestion or request, which

11  maybe I should actually incorporate in the order, that

12  parties advise the Court about whether they believe an

13  evidentiary hearing will be required applies also to

14  responses.

15          MS. LENNOX:  Thank you, your Honor.  Two other

16  things, your Honor.  You mentioned in paragraph 2(c) that the

17  Court will let parties know at least two days in advance of

18  the hearing what matters you would actually like to take up

19  on the hearing.  I am assuming for notice purposes in advance

20  of that two days that the parties should submit a notice of

21  hearing so that people will be -- people will be on notice of

22  the hearing date that is proposed for that motion.

23          THE COURT:  My concern with that process is that it

24  has the potential for creating confusion.

25          MS. LENNOX:  Um-hmm.

1       THE COURT:  I would rather that the Court maintain

2  complete control over the process of issuing dates.  If

3  you're concerned about two days not being enough time --

4       MS. LENNOX:  That's the concern, your Honor.

5       THE COURT:  -- we can talk about how to enlarge

6  that.

7       MS. LENNOX:  That is the concern, your Honor.

8       THE COURT:  Okay.  What would you -- what would you

9  prefer then?

10      MS. LENNOX:  I would propose, if it please the

11  Court, at least five days, particularly if we're going to

12  have many matters on for one hearing.

13      THE COURT:  Okay.

14      MS. LENNOX:  And then the last point that we had was

15  one of the requests that we had suggested in our motion, and

16  that is related to motions for relief from the automatic stay

17  under Section 362.  We had suggested a procedure, and we

18  would ask the Court to consider it, that provides that if the

19  Court is not able to hold a hearing or is scheduling --

20  unwilling to hold a hearing within that 30-day period

21  referenced in Section 362(e)(1) that the stay not

22  automatically terminate until your Honor can hold a hearing.

23      THE COURT:  I saw that in there.  My problem with it

24  is I just don't think it's consistent with the requirements

25  of Section 362 itself.  I can state for the record pretty

13-53846-tjt   Doc 4316-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 75 of 139
13-53846-swr   Doc 3164-9   Filed 03/09/19   Entered 03/09/19 15:56:42   Page 89 of 139   75
574

1  categorically that it would be my intent to set every motion

2  for relief from stay -- from the stay within the 30-day time

3  period because that's what I think the law requires, and I

4  think our history with motions for relief from stay certainly

5  suggests that we have been able to do that.  I think setting

6  two motion -- or omnibus hearing days a month will permit

7  that to happen.  In the odd event that it can't happen, we

8  can select a date that isn't an omnibus hearing date.  We can

9  ask the creditor to stipulate to extend it to an omnibus

10  hearing date or, if necessary in odd circumstances, conduct a

11  hearing by telephone, so we have lots of options to comply

12  with that 30-day time period, and I'd rather do that than

13  just have an open door.

14       MS. LENNOX:  Thank you, your Honor.  That definitely

15  helps with clarification.

16       THE COURT:  Okay.

17       MS. LENNOX:  And that was all the clarifications

18  that I had.  Thank you.

19       THE COURT:  Anyone else have any comments or

20  questions or suggestions regarding the proposed motion

21  procedure?  Okay.  One more second, please.  Okay.  Are there

22  any other procedural or administrative questions, comments,

23  concerns that anyone would like to raise before we go on to

24  the motions that are set for hearing today?  No?  Okay.

25  Let's first address the motion for the order -- for the entry

1  of an order appointing Kurtzman Carson Consultants as claims

2  and noticing agent.

3  　　　　MS. LENNOX:  Thank you, your Honor.  The city has

4  filed a motion, as your Honor indicated, seeking to appoint

5  Kurtzman Carson Consultants or KCC as claims and noticing

6  agent in the city's Chapter 9 case to, among other things,

7  serve as the Court's agent to mail notices to creditors,

8  provide claims processing service, and provide computerized

9  claims database services, and we seek this relief pursuant to

10 28 U.S.C., Section 156(c).  The city has identified more than

11 a hundred potential creditors, including, among others --

12 　　　　THE COURT:  Has identified what?

13 　　　　MS. LENNOX:  More than a hundred potential

14 creditors -- oh, I'm sorry -- a hundred thousand potential

15 creditors in this case.  We've got employees, retirees --

16 　　　　THE COURT:  Just three orders of magnitude up.

17 　　　　MS. LENNOX:  Yes.  Perhaps I should have added

18 another three zeros to that.  In any event, there are quite a

19 few people that are going to require notices in this case,

20 and we think it might be burdensome on the clerk's office to

21 send those notices to all those folks.  Before selecting KCC,

22 the city did solicit bids from third-party vendors to serve

23 as the claims and noticing agent, and we selected one with

24 relevant expertise in this district and relevant expertise in

25 a Chapter 9 case since they served as the claims and noticing

1    agent in the Jefferson County case, and they were the most

2    economical proposal at the end of the day.  Again, we found

3    it important that KCC had experience working with this

4    clerk's office and this court, and they have assured us that

5    they will continue to follow the court's procedures and any

6    orders that might be entered by this Court.  There was a

7    declaration of Evan Gershbein that was attached to the

8    motion.  If your Honor has any questions of Mr. Gershbein, he

9    is in the courtroom today.  So with respect to the motion, we

10   would ask for its approval.  I don't believe, your Honor,

11   there have been any objections to it.

12           THE COURT:  Okay.  Yes.  Would you ask him to step

13   forward, please?

14           MS. LENNOX:  Yes.  Mr. Gershbein, would you

15   approach?  Would you like him to take the stand, your Honor?

16           THE COURT:  No, no, no.  Just to stand there is just

17   fine.

18           MR. GERSHBEIN:  Your Honor, Evan Gershbein.

19           THE COURT:  What is your name, sir?

20           MR. GERSHBEIN:  Sorry.  Evan Gershbein with Kurtzman

21   Carson Consultants.

22           THE COURT:  Thank you.  One second, please.  One

23   more second, please.  My clerk welcomes your participation.

24   She does, however, have a couple of details that she would

25   like to work out with you and to work them out in the context

13-53846-tjt   Doc 4314-9   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 72 of 139
574
13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:02:23   Page 78 of 139   78

1    of the order itself that the city has proposed.

2              MR. GERSHBEIN:  Okay.

3              THE COURT:  I'll just give you a heads up on them

4    and just ask you to consult with her, and then the city can

5    resubmit the proposed order to the Court.  So there are two.

6    The one is simply creating a link for the court to use to the

7    claims register that you will keep, and the other is that you

8    should work with the clerk when it actually comes time to

9    file the notice of commencement because there's a very

10   specific ECF event code that's important to use.

11             MR. GERSHBEIN:  Right.

12             THE COURT:  So these are not details I need to be

13   involved in and don't want to be involved in, and so I'll

14   just ask you to work them out with her.

15             MR. GERSHBEIN:  Absolutely, your Honor.

16             THE COURT:  All right.  That was it.  Thank you.

17   Not too tough, huh?

18             MR. GERSHBEIN:  Yeah.

19             THE COURT:  Okay.  All right.  So when that's worked

20   out, Ms. Lennox, would you just submit your proposed order

21   through the order processing program?

22             MS. LENNOX:  Thank you, your Honor.

23             THE COURT:  All right.  Let's talk next about the

24   motion for an order directing and approving the form of the

25   notice of commencement and the manner of service and

13-53846-tjt   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 79 of 139
13-53846-swr   Doc 3164   Filed 03/09/13   Entered 03/09/13 15:55:42   Page 93 of 139    79
574

1  publication.  I think that the deadline part of it we have

2  already figured out or at least are on the road to figuring

3  out.

4          MR. BENNETT:  Okay.  I think that's right, your

5  Honor.  On the notice part, as you know, notice is required

6  in accordance with the statute notwithstanding the rather

7  large notoriety the case has already attracted.  We propose

8  publishing the required notice at the required times in the

9  Detroit Free Press and the Bond Buyer.  We've received no

10  objections, no comments at all to the proposed form of

11  notice, and so if it's acceptable to your Honor, we'll get

12  started on the process using the appropriate ECF code.

13          THE COURT:  Um-hmm.  Anyone have any comments or

14  questions regarding this motion?  Two.  Okay.  Go ahead.

15          MS. PATEK:  Your Honor, just for clarification on

16  the additional paper notice -- and that is part, I believe,

17  of the notice of commencement telling people what they have

18  to serve on the city.  We did have a comment on that, and we

19  think -- we're totally comfortable with e-mail notice, but

20  given electronic filing and everything, we would --

21          THE COURT:  Um-hmm.

22          MS. PATEK:  -- prefer that from a cost and time

23  standpoint that there not be paper.

24          THE COURT:  This is a -- this is a concern I share.

25  What is the need of the city and Jones Day to be mailed paper

13-53846-swr   Doc 4154-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 80 of 139
13-53846-swr   Doc 316-4   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 74 of 139    80
574

1  copies of responses to -- or objections to eligibility in

2  this electronic age?

3         MR. BENNETT:  We have no need, your Honor, and I

4  think I tried to mention that before.  We are prepared to

5  dispense with it.

6         THE COURT:  Excellent.  Mr. Gordon.

7         MR. GORDON:  Thank you, your Honor.  Just one nit.

8  There is an identification of parties that are already

9  presumed to be on the special service list, which includes

10  creditors listed on a list of the 20 largest unsecured

11  creditors.  That would include the two retirement systems.

12  However, there is no provision for counsel for those

13  retirement systems to be on the special service list unless

14  you file a motion, and I'd really like to dispense with

15  having to file a motion.  Hopefully Mr. Bennett would agree

16  that counsel for those creditors should also be on the

17  special service list.

18         THE COURT:  Sir.

19         MR. BENNETT:  That's perfectly fine, and for anyone

20  else who wants to get on that list, if they want to contact

21  us informally, that's okay as well.

22         THE COURT:  All right.  Thank you.

23         MR. BENNETT:  Your Honor, are you going to make the

24  changes to the proposed form of order, or would you like us

25  to --

13-53846-tjt   Doc 4364-9   Filed 08/09/14   Entered 08/09/14 15:00:23   Page 81 of 139   81
13-53846-swr   Doc 3154   Filed 03/29/14   Entered 03/29/14 13:22:00   Page 76 of 139
574

1    THE COURT:  No.  I'm going to ask you to do it and,

2  again, submit it through our order processing program.  Any

3  other comments or questions regarding this matter?  All

4  right.  Please let's give counsel till the close of business

5  on Tuesday to request to be included, and then you can submit

6  your order or actually let me ask this.  Was your order

7  constructed such that it can be entered now, or do you need

8  to wait to find out the names of attorneys who want to be on

9  the special service list?

10    MR. BENNETT:  Well, I think the order encompasses

11  both the notice part, which I think can -- we can do that

12  separately.  I don't think it requires work on the order at

13  all.

14    THE COURT:  Right.  Okay.

15    MR. BENNETT:  The deadlines, though, are there.

16    THE COURT:  Right.  All right.  So I need to get

17  that order entered so that you can pick them up in the

18  notice.  All right.  Let's follow that sequence then.

19    MR. BENNETT:  Okay.

20    THE COURT:  All right.  Let's turn our attention to

21  the motion regarding the appointment of a committee of

22  retired employees.

23    MS. LENNOX:  Thank you, your Honor.  The city has

24  decided to seek relief under Section 1102(a)(2), which is

25  made applicable to Chapter 9 by Section 901.  We seek this

13-53846-tjt   Doc 4164-9   Filed 08/09/14   Entered 08/09/14 15:36:42   Page 76 of 159
13-53846-swr   Doc 3164-9   Filed 08/09/13   Entered 08/09/13 22:00:23   Page 82 of 139     82
574

1  relief to assure the adequate representation of our retiree

2  creditors during this case.  As we set forth in the motion,

3  retiree claims encompass pension benefits, which the city

4  estimates to be underfunded by about $3-1/2 billion dollars,

5  and retiree healthcare benefits, which are pay as you go and

6  actuarially amount to about $6 billion.  We have

7  approximately 23,500 former employees with vested pension

8  benefits.  We have almost 20,000 of them receiving retiree

9  healthcare.  It is a very diffuse group of individuals.

10        Many of the city's legacy obligations but not all

11 stem from old collective bargaining agreements.  The city has

12 47 bargaining units with 28 different unions, and there are

13 also four formal retiree associations which have voluntary

14 membership of which the city is aware.  There may be more.

15        As we noted in the motion prior to this case, the

16 city solicited the unions to see if they were interested in

17 representing their current retirees.  The overwhelming

18 majority said no.  I do understand from reading their

19 pleadings filed yesterday that two of the unions, AFSCME and

20 the UAW, have reversed course on this issue, but, regardless,

21 we still have many orphan retirees.  We also have

22 nonrepresented retirees, which comprise about 15 percent of

23 our retiree population.

24        Given the pressing financial crisis that the city

25 faces, the city filed this because it wants to have a clear

13-53846-tjt   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 83 of 139
13-53846-swr   Doc 316-4   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 97 of 139   83
574

authorized representative who can speak for the city's
retirees and engage in negotiations and discussions with the
city over the issues of resolving legacy obligations in this
case.  We don't have the clean guidelines, of course, that
Section 1114 provides, that the unions will represent their
members, and, again, we would have to seek a committee in any
event for the nonunion represented members.  So we have
sought relief under Section 1102(a)(2) to provide this
important group of creditors with adequate representation in
this case and to provide a body with which the city can hold
restructuring negotiations.

There are a couple of things I want to make clear.
In the papers we commented on who the city thought the
committee should represent, and we defined retirees as a
committee of former employees because we had assumed that the
unions would represent their active employees with respect to
this and other issues.  However, the city does recognize that
active employees do have an interest in retiree benefits,
particularly those who have pension rights, so the city is
not opposed to the committee having representation for active
employees that have an interest in retiree benefits as part
of this committee as the U.S. Trustee sees fit, which brings
me to a further point, your Honor.

The U.S. Trustee had contacted the city after the
motion was filed to discuss the motion and the procedures

13-53846-swr    Doc 4316-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 84 of 139
13-53846-swr    Doc 316-4   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 96 of 139    84
574

proposed.  Now, I want to be clear here.  The city did not

propose procedures to try to control the process.  The city

understands that should your Honor grant the motion, the

formation of the membership and the selection of the members

of this committee are wholly within the purview of the U.S.

Trustee.  It was simply suggested -- the city was simply

suggesting some procedures to form a logical process that

might be useful for people to consider.  However,

understanding that the appointment of the committee, should

your Honor grant the motion, is within the purview of the

U.S. Trustee, we had discussions with the U.S. Trustee, and

we have agreed to remove the suggested procedures from the

order, and I think a lot of folks had commentary about that

in their objections.  So the process to be used, should the

motion be granted, to select a fair and representative

committee will be the U.S. Trustee's own.  Yesterday, your

Honor, we did file on the docket a revised form of proposed

order with these revisions reflected that is agreed to by the

United States Trustee.  If your Honor needs a copy, I have

one with me that I can hand up.

        THE COURT:  Please.

        MS. LENNOX:  May I approach?

        THE COURT:  Please.

        MS. LENNOX:  That form of filing, your Honor, on

Exhibit A is a proposed new form of clean order to which the

13-53846-tjt   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 85 of 139
13-53846-swr   Doc 3164   Filed 03/09/13   Entered 03/09/13 15:56:42   Page 79 of 139   85
574

1 U.S. Trustee has agreed, and Exhibit B shows the blackline

2 from the original order proposed with the motion.

3     THE COURT:  All right.  Stand by one moment while I

4 look at this.  Thank you.  Go ahead.

5     MS. LENNOX:  As a final comment, your Honor, because

6 this also appeared, and there may have been some confusion --

7 and I think Mr. Heiman echoed this earlier today --

8 notwithstanding the appointment of the committee, the city

9 also plans to continue discussions with all of its creditor

10 groups with whom it's been having discussions.  This is not

11 an attempt to freeze out any party.  This is simply an

12 attempt to provide an authorized representative for folks

13 that may not have adequate representation in this case as it

14 stands today.

15     I do have responses to a lot of the objections that

16 were filed, but perhaps your Honor wants to hear the

17 objections beforehand.

18     THE COURT:  Okay.  Thank you.  And who would like to

19 be heard regarding this motion, please?

20     MS. LEVINE:  Good morning, your Honor, for another

21 minute.  Sharon Levine, Lowenstein Sandler, for Michigan

22 Council 25 of the American Federation of State, County, and

23 Municipal Employees, AFLCIO, and Subchapter 98(c) of Detroit

24 Retirees.  Your Honor, we represent the interests of between

25 40 and 50 percent of the city's retirees at about 11,943.  We

13-53846-tjt   Doc 4314-9   Filed 08/09/14   Entered 08/09/14 15:32:42   Page 86 of 139
13-53846-swr   Doc 316-4   Filed 08/09/13   Entered 08/09/13 15:22:00   Page 80 of 139   86
574

represent about 70 percent of the non-uniform union represented employees. We have 18 units of the locals that counsel was referring to. We have units in every single department in the city, including the police and fire departments.

Your Honor, I'd like to address a couple of issues raised. First and foremost, when we first started drafting this response, we drafted it like we were answering a law school exam, and we were originally going to take the position before your Honor that you can't do this kind of thing before there's an order for relief, and we have serious eligibility issues and concerns along those lines. We've had conversations with the city and are hoping that today they will affirm that all of this action, mediation, retiree committee, et cetera, is going to be taken without any prejudice to any of those rights, constitutional, substantive, technical, whatever else they are.

THE COURT: I agree.

MS. LEVINE: But regardless, the goal of our union is to work as hard as we can for all of our retiree and active members in every avenue that's available to us to work through this process. And in addition to that, we appreciate the city's comments that they recognize that a lot of the active employees have interests in their pension benefits and in their medical benefits as well, which brings me to another

13-53846-swr Doc 4164-9 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 87 of 159
13-53846-swr Doc 3154 Filed 03/09/13 Entered 03/09/13 15:53:42 Page 81 of 159
574
87

1   point, which is there's some -- there's been some concern

2   raised with regard to whether a union can actually represent

3   its retirees.

4           THE COURT:  Um-hmm.

5           MS. LEVINE:  I'd like to respond two ways.  First,

6   legally we believe that the answer -- again, looking at the

7   law school exam, that the answer is yes, that we have

8   historically under our internal workings represented our

9   retirees.  In fact, at the International level, we have a

10  designated person and a group that works with that person who

11  just deals with retiree issues, so in that regard, we would

12  fully expect to represent the retirees along with the

13  actives, especially since a lot of the issues here overlap.

14  And we've submitted the certification of -- from the union

15  specifically talking about the fact that we do provide these

16  services with regard to the retirees on a regular basis.

17          That said, your Honor, as a practical matter, in

18  handling the situation in other cases -- and while they've

19  been Chapter 11 cases under 1114 and not the unique situation

20  we find ourselves in here, we have seen the United States

21  Trustee's Office deal with this issue three separate ways:

22  (a) actually appointing the union to the retiree committee;

23  (b) appointing the retiree group affiliated with the union,

24  which we represent here, to the retiree committee; or

25  appointing individuals who are either members of the union or

1  members of the retiree committee.  And in either of those

2  three circumstances, we're committed to bringing the full

3  support of the union to the process and hopefully

4  constructively interfacing with the retiree committee's

5  professionals and working through some of these difficult

6  issues.  With that said, your Honor, we start with the

7  premise that we don't believe that there's a conflict, and we

8  don't think that your Honor needs to rule on that issue.

9          Your Honor, the other issue that we did want to

10  touch on just briefly is with regard to the timing, but we do

11  think that your Honor addressed it adequately before, but we

12  just want to state for the record that to the extent that

13  your Honor enters scheduling orders in this case, we hope

14  that they're without prejudice to come back to your Honor --

15          THE COURT:  Um-hmm.

16          MS. LEVINE:  -- in case circumstances change,

17  including after the retiree committee gets up and running and

18  its professionals get engaged.  And with that, your Honor, we

19  would just close by suggesting that we represent a large

20  number of people here.  We're very concerned about this

21  process.  It's a nice day today, but it's going to be cold

22  this winter, and they're very concerned about their pension

23  benefits, their health benefits, and moving forward

24  constructively to resolve the issues here because regardless

25  there's going to be something that has to happen in order to

13-53846-tjt   Doc 431-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 89 of 139
13-53846-swr   Doc 316-4   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 83 of 139   89
574

1   resolve these issues.  Thank you.

2           THE COURT:  Thank you.  Anyone else on this motion?

3   Ms. Brimer.  Oh, Mr. Gordon.

4           MR. GORDON:  Thank you, your Honor.  Robert Gordon

5   again on behalf of the Detroit Retirement Systems.  Since we

6   did file papers, if I could at least acknowledge the fact

7   that we did file papers on this, and there have been other

8   papers filed subsequently by a number of parties that cover

9   the same issues, so, from our perspective, the concerns have

10  been addressed, I believe, by Ms. Lennox as far as not

11  marginalizing anybody in the process and in the selection

12  process with the U.S. Trustee's Office and giving the U.S.

13  Trustee plenty of space to make their own decision.

14          The only other thing that hasn't been raised yet is

15  we suggested in our papers that there's -- if there is going

16  to be a retiree committee, it ought to be able to function

17  properly, and so there should be some provision made for

18  compensation for reasonable professional fees.  Obviously

19  that's not necessarily imbedded in the Chapter 9 context, so

20  it seems like if that is something that's desirable to the

21  city, there ought to be some provision made for that because,

22  again, Chapter 9 doesn't quite cover it very well.  Thank

23  you.

24          THE COURT:  Now Ms. Brimer.

25          MS. BRIMER:  Well, good afternoon, your Honor.  Lynn

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 90 of 139
13-53846-swr   Doc 3164   Filed 03/09/13   Entered 03/09/13 15:33:42   Page 84 of 139   90
574

1  M. Brimer appearing again on behalf of the Retired Detroit
2  Police Members Association.  Your Honor, we filed a response
3  and very limited objections to the city's motion.
4  Fundamentally we understand perhaps in the long term the need
5  for committees in order to effectively negotiate a resolution
6  of whatever disputes may arise with respect to fully funding
7  the pension rights of the city's retirees.  However, we have
8  several concerns with the motion and the proposed order as
9  it's presented.

10        First -- and I addressed this earlier, your Honor --
11  there is a concern with whether or not at this stage in this
12  proceeding there is authority for the U.S. Trustee's Office
13  to, in fact, appoint -- to go to the complete step of
14  appointing a committee.  While we believe it may be
15  appropriate, without waiving any rights to our objection to
16  eligibility for this Chapter 9 to proceed, for the U.S.
17  Trustee's Office to begin the process of attempting to select
18  and appoint the committees that should this Court determine
19  eligibility should be appropriately appointed, however,
20  appointment at this point may chill some of the existing
21  retiree associations from actively pursuing their rights with
22  respect to eligibility and may ultimately be that the
23  committees are not properly authorized under Section 1102(a),
24  which, in fact, does authorize appointment of committees
25  after an order for relief.  And if you look at at least some

of the more recent cases that have been filed, they are
instructive to the extent that in the matter of In re. The
City of Vallejo the Court, in fact, found that the
appointment was premature prior to the order of relief.  In
the matter of In re. The City of Stockton, California, the
orders were entered, you know.  Immediately after the order
for relief was entered, the Court then appointed the
committee, which would tend to indicate the procedures were
in place, and the Court acknowledged what the restrictions in
Section 1102(a) are.

With that in mind, your Honor, we still have, should
the Court determine that it is appropriate to appoint a
committee at this point and assuming -- without waiving our
rights to object to eligibility, assuming this case proceeds,
we, nonetheless, still have some concerns with some of the
issues raised in the motion.  The procedures issues may have,
in fact, been addressed by the city.  We think it is
completely inappropriate for the city not to control.  The
issue is influence.  They should not even influence the
selection process for appointing committees.

We do not believe it's appropriate for any of the
unions or any representatives of current employees to have
representation on committees that represent retirees.
Continuing wages and continuing current benefits may impact
their willingness or their participation in negotiating with

1  respect to pension distributions.

2          That raises the concern we have also with respect to

3  whether or not one committee for retirees would be

4  appropriate.  As this Court may be aware, police and fire-

5  fighters do not participate in the Social Security

6  Administration; therefore, to the extent any of their pension

7  benefits are reduced in this process, they will not have the

8  same opportunity to pursue Social Security as perhaps the

9  retirees of the general retirement system would have.  They

10  may have, therefore, very different interests in pursuing

11  negotiations and may have to negotiate a different resolution

12  of their benefits than the retirees who participate in the

13  general retirement system.

14          Then, finally, the issue that was raised by Mr.

15  Gordon is extremely important, and that is funding.  If there

16  are committees to be appointed, one or more committee, in

17  order to properly be able to negotiate and address issues

18  raised by the city, it must be funded.  All of its

19  professionals must be funded.  Legal and any accounting or

20  other actuarial type professionals that they would require

21  should be funded.  Even though I do understand that funding

22  is not required, those provisions are not incorporated into

23  Chapter 9, the fact that this Court recognizes the need for a

24  fee examiner when, in fact, the fees are not subject to this

25  Court's review under Chapter 9 is an acknowledgement that

13-53846-tjt   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 93 of 139
13-53846-swr   Doc 3314   Filed 08/09/13   Entered 08/09/13 15:58:42   Page 87 of 139   93
574

1  this Court understands that funding and the protection of the

2  public interest is of utmost importance in this case.

3  THE COURT:  My question for you is really a process

4  question.  Does the Court have the authority to give

5  direction and instruction to the U.S. Trustee in an order

6  granting a motion like this, or is the process that the U.S.

7  Trustee exercises its discretion, and then the Court, upon

8  motion, reviews that after the fact?

9  MS. BRIMER:  Well, I believe, your Honor, that,

10  frankly, our U.S. Trustee's Office has the discretion and, in

11  consultation with the various retirees and other interested

12  parties, can evaluate what the appropriate procedures would

13  be for selecting the committee.  I can -- I recognize why the

14  city filed this motion and brought it to the Court's

15  attention that it would be very important in order to

16  effectively advance negotiations that they are not

17  negotiating with multiple retirees, individual retirees;

18  however, I do believe that at this stage of the proceeding,

19  it would be appropriate for the U.S. Trustees to exercise

20  their discretion, move forward with the process for

21  selection, and then present the Court with an order for the

22  appointment of the committee.

23  THE COURT:  Okay.  Thank you.  Mr. Morris.

24  MR. MORRIS:  May it please the Court, Thomas Morris

25  of Silverman & Morris.  I'm co-counsel with Lippitt O'Keefe,

1  PLLC, representing the Retired Detroit Police and Fire

2  Fighters Association and the Detroit Retired City Employees

3  Association.  The first organization has been in existence

4  for more than 30 years, and the General Retirees Association

5  has been in existence for more than 50 years, and these two

6  organizations represent -- have as their members

7  approximately 70 percent of retirees.

8          The reason we filed the response to the motion was

9  we objected to the city's proposed involvement in the

10  selection process and also the proposed involvement of the

11  unions.  The present employees of the city, most of whom are

12  members of unions, have a very significant interest in seeing

13  that their present wages are protected and their future

14  benefits are protected, but they have a different interest

15  than do the retirees.  I take the -- we understand the

16  proposal for a retiree committee to be just that, a committee

17  of the retirees by the retirees and for the retirees, and

18  it's not -- there's a lot of interests in this case to be

19  served.  This committee should not be everything to everyone.

20  That's why we support the appointment of a committee, as I

21  said, of retirees.

22          As to whether the Court -- whether it's appropriate

23  for the Court to direct the U.S. Trustee in the details,

24  that's -- the pared down proposed order is acceptable to us

25  that leaves the details to the U.S. Trustee.  I can

13-53846-tjt   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 95 of 139
13-53846-swr   Doc 3164-1   Filed 03/09/14   Entered 03/09/14 15:56:42   Page 89 of 139   95
574

understand the Court ruling that way looking at the
separation of powers.  The reason for the U.S. Trustee's
Office being separate from the court is to separate powers.
We did submit a proposed order, which has some specific
provisions that we would like to see in the order if the
Court does prepare a more detailed order.  I agree with the
other comments that the scheduling order should allow the
retiree committee, if and when it's formed, more time.

Your Honor, the associations hope to work with the
committee and with the unions to help to reorganize the city
and reach a deal, but we do think the retirees have special
interests; that that interest has been represented by the
associations with their unique situation, having been in
existence for years representing such a high percentage of
the retirees, having gone through and prepared and adopted
by-laws, elected officers and directors, and we think all
those are important considerations for the U.S. Trustee.  We
have submitted and received from members of the associations
proxies, not legal proxies, but written recommendation that
the officers and directors of the associations be considered
as -- for membership in the committee.

THE COURT:  One second, sir.  Letrice, would you go
adjust that mike stand to see if that takes care of the
knocking that we're hearing through the loudspeaker?  All
right.  Let's try that and see if that will solve our

13-53846-swr    Doc 4164-9    Filed 08/09/14    Entered 08/09/14 15:52:42    Page 96 of 139
574
13-53846-tjt    Doc 4164-9    Filed 08/09/14    Entered 08/09/14 13:22:00    Page 96 of 139    96

1    problem, and you may continue, sir.

2         MR. MORRIS:  Yes, your Honor.  We submitted to the

3    membership documents for them to sign to recommend for the

4    inclusion in the committee officers and directors of their

5    associations.  I think it'll be more appropriate for us to

6    take that up with the U.S. Trustee, but we do have those

7    available for the Court if the Court decides to get involved

8    in the process to that detail.  Thank you.

9         THE COURT:  Thank you, sir.  Other comments?

10        MS. PATEK:  Your Honor, once again Barbara Patek

11   appearing on behalf of the public safety unions, the three

12   police unions, and the Detroit Fire Fighters Association.  We

13   did file a response and a limited objection to the city's

14   motion.  We are looking for four things, and I --

15   understanding the limitations and the role of the U.S.

16   Trustee's Office, we're looking for a seat at the table.

17   We're looking for the U.S. Trustee to control the selection

18   of the committee, and we are also looking for a mechanism for

19   this committee to be adequately funded.  Otherwise it will

20   not make it an effective process, and the two things that we

21   have suggested -- and we understand under Chapter 9 because

22   of the limitations, it would require the city's consent --

23   would be that the city consent to pay the reasonable

24   professional fees of the committee and delegate the

25   responsibility for determining the reasonableness of those

13-53846-swr    Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 97 of 139
13-53846-swr    Doc 4314-9   Filed 08/09/13   Entered 08/09/13 15:58:42   Page 91 of 139    97
574

1    fees to the fee examiner to be appointed by the Court.

2          We filed our response without prejudice to our right

3    to object to eligibility, of course, and we are not conceding

4    that the formation of such a committee would make it the sole

5    negotiator on the issues before the Court.

6          I want to address the Court's question about

7    1102(a)(2) and (4) and the order in which things should

8    happen, and it seems as though we have perhaps already leapt

9    over the obstacle of having an order for relief.  And I

10   suggest, to the extent that the Court finds that it has

11   authority, that given the -- that everyone in this courtroom

12   agrees that time is not on its side, that from the standpoint

13   of judicial economy and the efficiency of the process, that

14   the Court in this case may be in a position -- ultimately the

15   U.S. Trustee is going to select this committee, but to give

16   some direction based upon the information that is being put

17   before the Court this morning, and to that end I would like

18   to speak briefly to the circumstances of my constituents.

19   And appreciating that there -- if we were in a Chapter 11,

20   there would be specific provisions that would govern both my

21   clients' rights and the rights of the separate retirees under

22   1113 and 1114, we are in a very different circumstance in

23   this case in terms of there's nothing usual about this case,

24   but from the standpoint of collective bargaining -- and you

25   heard the city's counsel say it earlier this morning -- from

13-53846-tjt   Doc 4154-9   Filed 08/09/14   Entered 08/09/14 15:22:00   Page 92 of 139
13-53846-swr   Doc 3154   Filed 03/19/14   Entered 03/19/14 15:32:42   Page 92 of 139   98
574

their perspective, all the bargaining units, pursuant to the

Emergency Manager Act, their position is -- and I'm not

conceding this because I don't for sure know the answer to

it -- are under imposed conditions of employment or imposed

terms that have been imposed on them by the emergency

manager.  To date, the position has been first under Public

Act 4 and then later after that was repealed under 436 -- the

position of the city has been we have no obligation to

bargain with you.  We can pretty much do anything to you that

we want except modify your pension.  For that we need

Bankruptcy Court, and now here we are.  And we are a group

that -- aside from the fact that our active employees do have

vested benefits, this retiree group is obviously a rolling

group, some by choice and some not by choice, may be moved

very quickly even as this process is proceeding from active

to retiree, and the issue of these pension benefits is the

400-pound gorilla in the room.  And so for that reason, we

think -- you know, we are advocating to have a seat at this

table.  We understand the Court can't tell the trustee who to

put on the committee, but in terms of making it

representative, there are a lot of different constituencies

from the folks, as I think Ms. Brimer pointed out, who have

no Social Security -- and some of them I understand don't

even have Medicare to fall back on -- to some people who

perhaps have more luxurious pensions and a second career.

13-53846-tjt    Doc 4314-9    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 99 of 139
13-53846-swr    Doc 3164-1    Filed 03/09/13    Entered 03/09/13 15:58:42    Page 93 of 139    99
574

 1    There's a lot of different constituencies, and the goal will

 2    be to get a representative constituency, and I'm going to

 3    return to, I think, from our perspective, we want not only

 4    representation, but it's critical that this committee, if the

 5    Court is going to appoint it, be adequately funded so that

 6    there can be a real and serious conversation about how this

 7    problem can be solved.  Thank you, your Honor.

 8         MR. GOLDBERG:  Good morning, your Honor.  Jerome

 9    Goldberg.  I represent party of interest David Sole, who is a

10    retiree himself and was a former president of UAW SCATA, a

11    chemist, and whose wife also is a retiree as a bus driver.  I

12    also filed an objection in this case, and we basically cited

13    that our interpretation and our view of the plain language of

14    the statute is that this motion is premature, that 11 --

15    Section 1120 -- 1102(a) states that the trustee has the

16    authority to appoint committees after a order for relief is

17    entered, and 11 U.S.C. 921(c) provides that in a Chapter 9

18    case the Court shall order relief only after objections to

19    the eligibility issues have been resolved and the

20    determination on eligibility has been made.  That's why we

21    believe that the appointment of a retiree committee at this

22    point would be in plain violation of the law.

23         Why we feel that's so important is that the -- as

24    your Honor stated earlier, that one of the critical issues in

25    eligibility is the applicability of the state limitation

1    on -- constitutional limitations on impairing pension to this

2    case.  That's a critical question that not only affects the

3    thousands of retirees in this case, but it also will have

4    national impact.  There are 24 other states that have

5    guarantees on pension.  They're looking at what the decision

6    is going to be on that issue.  And our concern is in

7    designating a retiree committee, especially the way it was

8    initially proposed by the city, which would essentially be

9    the only spokesperson for the retiree, it could have the

10   effect of dampening the participation of all interested

11   parties who choose to participate in this critical question,

12   whether they be retiree associations, the unions, the

13   retirement boards, all of whom already have done so and whose

14   participation we fully respect, or individual retirees.

15   There needs to be the fullest participation in this critical

16   question that will have implications in Detroit and all over

17   the country.

18         THE COURT:  Why would this committee do that, or how

19   would it happen?

20         MR. GOLDBERG:  Well, just listening to the debate

21   here, we hear everyone vying for who will be on the

22   committee, but what we say -- again, we say the plain

23   language of the statute bars the formation of this committee.

24         THE COURT:  No.  I understand that, but you asserted

25   that the formation and participation of this committee in the

1  eligibility question will discourage others from asserting

2  their issues.  Why would that happen?  How would that happen?

3       MR. GOLDBERG:  Well, let me just say that in the

4  city's motion for this, the city provided that the retiree

5  committee would provide a single party to negotiate with the

6  city on behalf of retirees as a group.

7       THE COURT:  They've moved past that; right?

8       MR. GOLDBERG:  Well, it does sound like they've

9  moved past that today, and I appreciate that they've moved

10  past it today, your Honor.

11       THE COURT:  Okay.

12       MR. GOLDBERG:  But, again, I really do feel that at

13  this point it's improper.  At this point the critical

14  question is the eligibility question and the

15  constitutionality, and, in fact, what would the committee

16  even be negotiating on at this point?  To spend time debating

17  who should be on a committee when the scope of what the

18  authority is on the issue of pensions and whether there's

19  even authority in this question seems to me to be a diversion

20  from the issue of eligibility that needs to be decided first

21  under the law, and that is really the significant question in

22  front of everybody right at this moment.

23       THE COURT:  Of course, the statute says the Court

24  has the authority to order this after an order for relief is

25  entered; right?

1        MR. GOLDBERG:  Yes, it does.

2        THE COURT:  It doesn't say the Court doesn't have

3   the authority to do it before that, does it?

4        MR. GOLDBERG:  Well, I think by the language of the

5   statute, it empowers -- it states when the Court has that

6   authority, and 921 imputes that right into it, says the Court

7   shall order relief only after objections to the eligibility

8   questions have been heard.  Thank you, your Honor.

9        I just want to make one other point, too, just for a

10  point of correction to the city's motion that the city

11  indicated that the city is the only authority that -- that

12  the city has the authority to amend pensions, and just to

13  clarify, I did attach Section 4744 of the Municipal Code 2 as

14  an exhibit to our brief and which states very plainly that

15  that authority does not apply to vested pensions.  Thank you,

16  your Honor.

17       MS. CECCOTTI:  Good morning again, your Honor.

18  Babette Ceccotti, Cohen, Weiss & Simon, for the UAW.  We did

19  file a short response to the motion, and I'll touch briefly

20  on essentially three items that we've covered.

21       First, the UAW is not taking a position specifically

22  with respect to the 11 -- what I'll just call 1102 issue,

23  whether the Court should grant the motion now.  We are,

24  however -- to the extent the Court does grant the motion, we

25  want to emphasize three points, some of which have already

1  been touched on by counsel.  First, the funding issue.  We've

2  stated in our motion that the UAW, if such a committee is

3  formed, would be interested in declaring its interest in

4  serving on the committee.  Critical to the UAW's thinking in

5  that regard and decision-making would be a sense that the

6  committee is going to be able to have adequate resources to

7  adequately perform the job that the committee is being formed

8  to perform, and you've heard the other speakers.  I won't

9  belabor the point, but we do consider the funding to be very

10  critical here, funding by the city, and we have suggested in

11  our papers that the city should indicate its intention so

12  that the Court has that information before it in terms of

13  making a decision regarding granting the motion.

14        Second, on the -- we've indicated reservations of

15  rights issues as well.  Ms. Levine touched upon them.  Others

16  have as well.  And we understood the Court to be cognizant

17  and agreeing with us on that point, so I won't --

18        THE COURT:  I am and I do.

19        MS. CECCOTTI:  Thank you.  So that leaves me with

20  our third point, which is the point of adequate

21  representation, and I regret that we have -- or being the

22  U.S. Trustee thinks that we've initiated a disputed with

23  them -- it was certainly not our intent to do so.  We

24  certainly have respect for the office -- their office, and we

25  understand their role and respect the role that they play in

forming committees. However, that said, we do think that
some guidance by the Court -- if the Court, again, were
inclined to grant the motion, that some guidance just to deal
with just some very practical considerations -- and I think
you've heard some of them here today. When the city filed
its motion, as Ms. Lennox indicated, they at first proposed a
series of rather detailed procedures. The revised order that
has been submitted to the Court has deleted those procedures
with the expectation, and I think appropriately so, that the
U.S. Trustee would be designing the solicitation procedures
and the process by which it would form the committee.
However, let's take a step back and let's assume that the
city had not attached any suggested procedures. One would --
we would have had a motion to appoint a retiree committee
with a definition and, you know, perhaps some very general
definition by the city and nothing more. And without any
further guidance, the U.S. Trustee would have immediately,
I'm assuming, just based on some of the questions that have
been raised here today, have confronted a series of
questions, some of which might be just considered procedural,
but some of them would be quite basic, the scope of the
committee's purview, whether the committee should include or
can include individuals, associations, and labor unions,
questions about -- the questions that you've already heard
discussed before your Honor today about labor unions serving

13-53846-swr Doc 4314-9 Filed 04/29/14 Entered 04/29/14 23:00:23 Page 105 of 199
13-53846-swr Doc 316 Filed 08/09/13 Entered 08/09/13 15:38:42 Page 99 of 199
574
105

1   and in what capacity.  These questions we could see, as a

2   practical matter, might bog down the process to the point

3   where either the parties would be back here before your Honor

4   anyway or the U.S. Trustee, doing its best to take on those

5   issues and try to solve them just themselves, would

6   undoubtedly spur additional proceedings before your Honor

7   anyway.  So our thought was that -- and we understand

8   normally how the sequencing goes.  We've read the statement

9   submitted by the office.  We still think that 1102 does

10   contemplate a role for the Court and that in terms of -- not

11   with respect to detailing and wordsmithing procedures and not

12   with respect to dictating or directing that specific entities

13   or parties be appointed, but that, nonetheless, the

14   framework, if you will, or the table that's being set for the

15   office to perform its functions appropriately resides with

16   the Court, particularly given the array of comments that the

17   Court -- that have been filed both with respect to the legal

18   issues but also with respect to issues of composition.  We

19   state -- we have stated -- and, again, the UAW has a lot of

20   experience on creditors' committees, on general creditors'

21   committees and in the Chapter 11 context in the 1113 and 1114

22   process and outside of bankruptcy, and one of the things that

23   labor organizations do is engage with employers on complex

24   matters such as pension benefits, health benefits, retiree

25   health benefits, other types of benefits as well.  It makes

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 106 of 139
13-53846-swr   Doc 516   Filed 06/09/13   Entered 06/09/13 15:56:42   Page 100 of 139   106
574

the unions, in our view, who take on this role -- and the UAW
is another union that historically does take on this role --
particularly well-suited to a project like this and a
committee like this where their facility with being able to
engage on these matters will aid in the effective functioning
of the committee.  So we made the suggestion that we did in
our papers that the Court provide some direction on, again,
the framework and scope and eligibility, if we can put it
that way, in order to make sure that, first, the --
everyone's goal here, if your Honor grants the motion, is
that the committee be effective and be able to function
effectively with -- not only with funding but with members
who can effectively undertake the task.  This is an enormous
task, and you've already heard about the human element here.

Second, in terms of participation and scope -- and
we've made this point in our papers -- if there is a group
that feels disenfranchised -- and we think this is -- I would
put this in the heading of guidance that the Court could
provide to the U.S. Trustee in fulfilling its role here.  If
there are groups that are left out for some reason or feel
excluded, that will directly affect the credibility of the
process, and it doesn't do the Court any good or any of us
any good to have a committee like this formed, as I've said
already, that cannot effectively complete its task.  And if
you have skepticism engendered by exclusions or if some folks

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 101 of 139
13-53846-swr   Doc 3116-9   Filed 03/19/14   Entered 03/19/14 15:56:42   Page 107 of 139   107
574

 1   have -- some groups have been selected to serve and some

 2   haven't, undoubtedly that will have ramifications.  So we

 3   think that, again, with all due respect to the Office of the

 4   U.S. Trustee and with no intention at all to interfere with

 5   their proper function in conducting the solicitation and the

 6   formation, we do think that some guidance along the lines

 7   that we've set forth in our papers in here would be

 8   appropriate and is also appropriate under the statute itself

 9   without crossing -- unduly crossing any lines or

10   inappropriately crossing any lines in terms of the division

11   of labor between the Court and the U.S. Trustee's Office.

12           THE COURT:  Let me ask you this question.

13           MS. CECCOTTI:  Sure.

14           THE COURT:  I heard today a concern that a union

15   which represents by law present employees may have either an

16   actual or a potential conflict of interest in representing

17   retired employees.  How do you address that concern?

18           MS. CECCOTTI:  A couple of ways, your Honor.  First,

19   unions that -- like the UAW that are very familiar with the

20   bankruptcy process and have served, as I said, in Chapter 11

21   cases for the most part undertaking those roles, are very

22   skilled in -- not only very skilled in the substance of the

23   subject matter but in making the internal institutional

24   decisions to undertake representation of both actives and

25   retirees.  They do not see an inherent conflict in taking on

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 102 of 139
13-53846-swr   Doc 516   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 108 of 139   108
574

both -- in taking on that -- I was going to say both roles,
but it really is a continuum.  It's really viewed as a whole,
and I'm speaking now really for the UAW.  You heard Ms.
Levine speak on behalf of AFSCME.  These are decisions that
individual labor organizations make based on their own
institutional history and organization and their own
institutional functioning.  We do not think it would be
appropriate for an outsider to simply make a blanket across-
the-board station that -- statement -- excuse me -- that
simply because we have a labor organization that is
representing a unit of actives, that labor organization is,
per se, disqualified.  The first question to ask is what does
that particular union think about that -- what is the
position of that particular union?  The UAW does not see an
inherent conflict and hasn't throughout its history.  It's
been actively involved in retiree matters as -- with respect
to retiree interests, not simply actives as future retirees
but current retirees.  They have -- and that is, again, part
of their history, so I think that it is not possible really
to make a blanket statement to that effect and that each
labor organization answers that question for itself and
should be permitted to do so given its own institutional
operation and history.

            THE COURT:  Next question.

            MS. CECCOTTI:  Um-hmm.

1    THE COURT:  You have argued that the Court has the

2 authority to give the U.S. Trustee's Office guidance.

3    MS. CECCOTTI:  Yes.

4    THE COURT:  What guidance would you propose?

5    MS. CECCOTTI:  Well, I would certainly propose

6 guidance to the effect of a definition of the scope.

7    THE COURT:  Right.

8    MS. CECCOTTI:  Right.  And I thought I heard Ms.

9 Lennox -- I couldn't quite hear her too clearly, but to the

10 extent the scope or anything about the scope has changed from

11 the time the motion was filed until today, whatever that

12 is --

13    THE COURT:  The scope is an easy one.  It's actually

14 inherent in the process.

15    MS. CECCOTTI:  Understood, but I guess my point

16 would be as long as we have a clear understanding -- as long

17 as -- the United States Trustee should have a clear

18 understanding of the scope of the committee.

19    THE COURT:  Okay.

20    MS. CECCOTTI:  It's also appropriate, I think, for

21 the Court to provide guidance concerning the pool, the

22 eligible pool.  Is it okay to solicit, particularly in light

23 of what you've heard today, retiree associations,

24 individuals, and unions?  And we think the answer to that

25 should be yes, and we --

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 104 of 139
13-53846-swr   Doc 516   Filed 08/09/13   Entered 08/09/13 15:56:02   Page 104 of 139

574

110

1            THE COURT:  Okay.

2            MS. CECCOTTI:  -- think that the guidance would

3    ultimately help the U.S. Trustee devise its procedures and

4    make the process work that much more efficiently.  To the

5    extent the Court --

6            THE COURT:  So if I gave that guidance, that would

7    effectively be an authorization to the U.S. Trustee to choose

8    among those potential participants however it saw fit?

9            MS. CECCOTTI:  With one more piece of guidance, your

10   Honor, which is that -- and anything you'd like to say on

11   funding, we'd be -- by the city we'd be happy to hear that,

12   but that wasn't what I was going to say next.  What I was

13   going to say next is to the extent that -- well, not to the

14   extent.  Adequate representation is something that we do

15   think the Court should comment upon, and in this case,

16   although it seems like a lot when you say there are 47

17   bargaining units, I would doubt that there will be 47 people

18   clamoring to get on this committee, so the suggestion would

19   be that for adequate representation purposes, any group that

20   wants to participate should be permitted to participate

21   because you can't, practically speaking, for example, ask --

22   tell Unions A, B, and C, who show up ready and willing and

23   able to serve -- you can't say to them as a practical matter

24   there's too many of you; therefore, we're going to have Union

25   A represent the retirees for Unions B and C.  So we do think

13-53846-swr    Doc 4164-9    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 105 of 139
13-53846-swr    Doc 316    Filed 08/09/13    Entered 08/09/13 15:56:42    Page 111 of 139    111
574

1  that some adequate representation instruction along the lines

2  of what we've suggested here is appropriate just to avoid the

3  exclusion issue that we've suggested would be very

4  detrimental to the process, not to mention just the practical

5  implications of asking one -- with respect to the organized

6  groups, those that are organized, one group to try and

7  speak --

8         THE COURT:  Well, but isn't it appropriate for the

9  U.S. Trustee's Office to be concerned that in order for the

10  committee to actually function, it has to have a limited

11  number of people?

12         MS. CECCOTTI:  Understood, and that is certainly

13  part of their challenge.  No question about it.  We think,

14  though, that there is a point to be emphasized that while

15  there is -- there could be -- there could be a numerocity

16  issue, there is also very definitely in 1102 an adequate

17  representation issue so that in balancing those two, the

18  fundamental concept there should be adequate representation

19  and if there is an issue with respect to size, that that

20  would be something that would be taken up in the context of

21  determining adequacy of representation.

22         THE COURT:  Thank you.

23         MS. CECCOTTI:  Thank you.

24         THE COURT:  Sir.

25         MR. KARWOSKI:  Good afternoon, your Honor.  Michael

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 106 of 139
13-53846-swr   Doc 516   Filed 06/09/13   Entered 06/09/13 15:56:42   Page 106 of 139   112
574

1 Karwoski.  I'm representing myself as an attorney who worked

2 for the City of Detroit Law Department for about 15 years.  I

3 retired about a year ago.  I draw a pension from the General

4 Retirement System of the city.  I can speak to -- I'd like to

5 just address two points briefly because I know it's been a

6 long morning, and we're into the afternoon.

7          Attorneys for the city who are not in management are

8 members of Public Attorneys Association 2211, which is

9 affiliated with the UAW.  For the 15 years that I was with

10 the city and a member of that union, the union did not

11 represent the interests of retirees.  In fact, there were a

12 number of issues where the union took positions that were

13 adverse to the interests of retirees because it seemed that

14 there's a limited amount of money available in the pension

15 system, and sometimes the active -- the interests of active

16 employees are different than those of retired employees, so I

17 would suggest that in terms of the structure of the

18 committee, that there should be a distinction between

19 retirees who are drawing a pension and those who are -- and

20 employees who are -- former employees or current employees

21 who have vested interests in future retirement benefits,

22 which may be different.

23          I have not seen the list of creditors that the city

24 filed yesterday evening.  I believe, as a retiree and someone

25 drawing a pension, I'm probably on -- I'm somewhere in that

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 107 of 139
13-53846-swr   Doc 516   Filed 06/09/13   Entered 06/09/13 15:56:42   Page 107 of 139   113
574

 1    list of -- in that 3,500-page list.

 2         With respect to this motion, the city has given

 3    notice to -- on page 16, paragraph 29, it indicates the

 4    groups that it's given notice to, and I respectfully -- the

 5    last sentence is, "The city submits that no other or further

 6    notice need be provided."  I respectfully suggest that this

 7    is essentially an ex parte motion at this point because the

 8    group that has not gotten notice is the group that has the

 9    most important interest in this motion, which are the

10    retirees themselves.  The groups -- not only have they not

11    gotten notice, but the groups that did get notice have an

12    interest adverse to the retirees.  They include the largest

13    creditors, the bondholders, the insurers, the large dollar

14    interests who -- to the extent that pensioners are involved

15    in the bankruptcy process and there's a limited amount of

16    money available to satisfy creditors, the less money that is

17    allocated to retirees through the committee process or

18    otherwise, the more money there is for the larger -- for the

19    other creditors.  So the groups that have gotten notice are

20    either the groups that are adverse to the interest of

21    retirees or the unions and the associations, which the

22    discussion that we've had so far, you know, is mixed at best

23    as to whether they have legal authority to represent retirees

24    and whether, in fact, they have interests that are contrary

25    to the interests of retirees.

1      My request is that the Court order that notice of

2   this motion be sent to all of the retirees of the City of

3   Detroit, the 12,000 who are drawing pensions and the

4   approximately 12,000 employees who have either a vested

5   pension or a vested interest in health benefits.  It's a

6   large number obviously.  It's about 24,000 people, but it's

7   24,000 out of a hundred thousand creditors of the city.  And

8   as the city has said, the alleged indebtedness of the

9   retirement system, the $3.5 billion, is one of the larger

10  debts at issue in this case along with the $6 billion of pay-

11  as-you-go health benefits.

12      From the standpoint of each individual retiree whose

13  average pension is $19,000 a year or less, knowing about this

14  process and having the basics of due process, notice and an

15  opportunity to be heard, are as essential or more essential

16  to those retirees as they are to the bondholders, the

17  insurers, the credit swap counterparties, whoever they are --

18  the notice is more important to the retirees because of

19  their -- the importance of their pension to them even though

20  the dollar amount of the individual pensions is small.

21      Stockton, California, which had about 2,000

22  retirees, in the appendix or attachment to its petition

23  listed the 2,000.  They listed the individual names.  They

24  listed the addresses in care of the pension boards to avoid

25  the privacy issue, which I understand caused the city to

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 109 of 139
13-53846-swr   Doc 316   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 109 of 139   115
574

1  withdraw the list that it originally filed.  It's certainly

2  doable to do that kind of a mailing, and, in fact, my

3  understanding is that the city has proposed doing a mailing

4  of that type somewhere down the road further in the process

5  using Kurtzman Carson Consultants to do that mailing.  It's a

6  day late and a dollar short to do the mailing after the

7  motion has been granted, after the committee has been

8  appointed, after the process has run its course.  It makes

9  more sense, I believe, in terms of fundamental fairness, due

10  process, and an opportunity to be heard for the Court to

11  order the city to send the motion to the retirees through

12  Kurtzman Carson, give them a short -- in the notice to the

13  retirees give them a short turnaround time to respond to it.

14  Some will, and some won't.  The city somewhat condescendingly

15  on page 13 refers to the retirees as basically a bunch of old

16  fogies who don't know what's going on and wouldn't know what

17  to do with the notice if they got it.  I suggest that that's

18  presumptuous on the part of the --

19       THE COURT:  All right, sir.  Thank you.  Who else

20  would like to be heard?

21       MR. KARWOSKI:  Thank you, your Honor.

22       MR. TAUBITZ:  May it please the Court, Dennis

23  Taubitz appearing on behalf of myself.  I'm a retiree of the

24  City of Detroit, and I'd like to make the following comments.

25  I concur with Mr. Karwoski.  I believe that this committee,

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 116 of 189
13-53846-swr   Doc 516   Filed 08/09/13   Entered 08/09/13 15:36:42   Page 110 of 189   116
574

1    as proposed, would be a denial of the due process rights of

2    the 20,000 retirees.  I also believe it's premature.  I want

3    to assert that the retirees are not a member of a labor

4    union.  They don't pay dues to the union.  We don't have a

5    voice in the union.  The union, therefore, does not represent

6    the retirees.  Further submit that all 20,000 retirees

7    deserve a place at the table.  Thank you.

8        MS. GIANNIRAKIS:  Good afternoon, your Honor.

9    Again, Maria Giannirakis on behalf of the United -- Daniel

10   McDermott, United States Trustee.  Sorry.  Your Honor, the

11   United States Trustee does not take a position on the motion

12   here if an appointment of a committee is appropriate, but,

13   frankly, we filed a response to the UAW's -- we filed a

14   statement in response to the UAW's response that was filed

15   yesterday because what they are asking is that if the Court

16   does appoint a retiree committee, that it directs the U.S.

17   Trustee to appoint all labor organizations to that committee

18   or even some labor organizations, and I think other parties

19   have mentioned the same thing in court this morning.  This

20   relief is simply not available.  1102(a)(2) states if the

21   Court directs an additional committee to be appointed, the

22   U.S. Trustee will appoint a representative committee.

23   There's nothing that mandates the appointment of a particular

24   creditor.  If parties, after a committee is selected, deem

25   that it's inappropriate, 1104(a)(4) provides the relief that

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 117 of 189   117
13-53846-swr   Doc 316-9   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 117 of 189
574

1  they need, but that's not appropriate yet because at this

2  time there's no committee appointed, although the UAW

3  referenced that.  Frankly, 1102(a)(4) says if the committee

4  is appointed, after the appointment of the committee the

5  Court directs the U.S. Trustee to appoint, if a party deems

6  that it is not represented on the committee, then it has the

7  right to come back to the Court at that time, and then the

8  Court, if it finds that the committee is not adequately

9  represented, will direct the U.S. Trustee to change the

10  committee composition.  The request that the UAW is making is

11  not available at this time and is -- I'm sorry -- and is

12  premature if they're asking the Court to -- they're assuming

13  it's going to be a nonrepresentative committee, and that's

14  not appropriate at this time.

15         THE COURT:  If the Court grants the motion, what

16  would be the time frame for the U.S. Trustee to complete its

17  responsibilities?

18         MS. GIANNIRAKIS:  Your Honor, we have already

19  started discussions with the city and other parties.  We have

20  been working on doing this as quickly as possible if the

21  Court does grant the motion today.  In cases where there are

22  exigent circumstances, we have appointed committees almost

23  immediately, in as little as three days.  We don't anticipate

24  that'll happen here because it's a complicated case, and we

25  don't think we can quite proceed with that degree of speed,

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 118 of 139
13-53846-swr   Doc 316   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 112 of 139   118
574

1  but we will do everything in our power to appoint a committee

2  as promptly as possible and with a view towards all the

3  issues that are arising in this case.

4         THE COURT:  Thank you.

5         MS. LENNOX:  Thank you, your Honor.  I think there

6  are about half a dozen thematic objections that I'd like to

7  respond to in due course.  The first is about the motion

8  being premature.  This motion is not premature.  We do not

9  need to wait for an order for relief to be entered under

10  Section 1102(a)(2) of the Bankruptcy Code under a plain

11  reading of the statute's language.  The limiter that suggests

12  that the appointment of a committee should await the entry of

13  an order for relief is only in Section (a)(1).  If Congress

14  had wanted that limiter to apply to both Sections (1) and

15  (2), it could have placed the limiter in (a), and then it

16  would have modified both subsections.  It didn't do that, so

17  the motion from a statutory basis is perfectly proper and

18  perfectly timely.  Moreover, from a practical perspective,

19  your Honor, as many of the objectors themselves have noted,

20  the legacy issues in this case are exceedingly important and

21  complicated, and there's no reason to delay the discussions

22  of them.  In fact, discussions of them have already

23  commenced.  In fact, it would be irresponsible to delay the

24  appointment of a representative committee for those folks who

25  are not currently at the table.

1    With respect to the _Vallejo_ case that Ms. Brimer

2  pointed out, in that case, to the extent it made any

3  difference to the Court, that was not a case where the debtor

4  moved for a committee.  In fact, the debtor opposed the

5  committee in that case.  Here we are moving for the

6  committee.

7    Secondly, your Honor, with respect to notice, we do

8  state and we did in our motion and we did give notice to the

9  four retiree associations that are voluntary memberships of

10  currently retired persons that we were aware of.  In fact,

11  three of them have shown up today, and one of them claims to

12  represent 70 percent of the folks that are retired, so we do

13  think notice is appropriate.  This is a procedural process in

14  which we asked to appoint a committee to represent some

15  folks.  This is not s substantive process where we are asking

16  to compromise any claims that retirees may have, so under the

17  circumstances, we believe notice was perfectly appropriate.

18    Third -- and I've stated this before, so I'll just

19  make it clear on the record again -- we are not -- the city

20  is not participating in the selection of members of the

21  committee nor does the city intend to be involved in who the

22  committee selects as its professionals if it is appointed, so

23  we don't believe, as has been alleged in a couple of

24  pleadings, that there's any violation of Local Bankruptcy

25  Rule 2014-2 here.

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 120 of 189
13-53846-swr   Doc 516   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 114 of 189   120
574

1    Fourth, with respect to the notations and

2    reservation of rights -- and for this I would like to say

3    that the city does appreciate the thoughtful response that

4    was filed by AFSCME on this issue.  It was very constructive.

5    And we do confirm that by this motion the city is not seeking

6    to preclude a creditor or the committee itself, should it be

7    appointed, from weighing in on or objecting to any other

8    substantive issue in this case, including eligibility.  We

9    are not asking parties to waive those rights.

10    Fourth, one of the objectors has suggested there

11   should be more than one committee, and we submit there should

12   only be one committee.  The retirees in the two pension

13   systems have more in common than not.  Each has an

14   underfunded pension.  Each gets similar retiree benefits from

15   the city.  The legal issues to be addressed are substantially

16   similar, if not identical, but even if that were not the

17   case, your Honor, the whole purpose of having a committee is

18   to bring representatives of differing types of interests but

19   claims of the same legal priority together in one body to try

20   to work out a consensual plan.  You know, it's one thing for

21   a committee to negotiate with a debtor, but there are

22   differing interests on a committee.  That's the whole purpose

23   of it, and part of being on a committee is so that the

24   creditors can start working out their intercreditor issues as

25   well.  We think it's, therefore -- I mean on a normal regular

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 121 of 139
13-53846-swr   Doc 516   Filed 06/09/13   Entered 06/09/13 15:56:42   Page 115 of 139   121
574

1  official unsecured creditors' committee, you have bondholders

2  and unions and trade vendors and, you know, a host of people

3  with differing interests.  That's the whole purpose of having

4  a committee.  So we think it's perfectly appropriate and

5  intended for members with different types of views and

6  interests to sit on one committee, and we think that applies

7  here as well.

8          And then finally, your Honor, this is the punch line

9  that everybody seems to have been waiting for.  As many of

10  the objections concede, a Chapter 9 debtor is not required to

11  pay for professionals of the committee.  Nevertheless, in

12  light of the special nature of this committee that the city

13  itself has sought, it is the city's current intent to pay for

14  the reasonable fees and expenses of the retiree committee

15  professionals, one committee's professionals.  If the

16  committee is formed, the city will have to certainly discuss

17  with the committee itself what's reasonable and rational

18  under the circumstances, and like it's done with its own

19  professionals, the city is going to look to maximize

20  efficiencies and economies among the committee's

21  professionals as well as all professionals in the case.  So,

22  accordingly and as most of the objectors have noted, it

23  wouldn't be inappropriate to put that in an order.  However,

24  the city did wish to make its intentions known on the record.

25          THE COURT:  Thank you.  In a few moments, the Court

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 122 of 189
13-53846-swr   Doc 516   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 116 of 189   122
574

```
 1    will take under advisement the issue raised by this motion.
 2    There is another committee that I think we should think about
 3    here.  It would be a committee of tort claimants, tort
 4    claimants, accident claims, civil rights claims, people who
 5    have litigation pending or contemplated to be filed.  The
 6    merit of this seems to me to be as much procedural as
 7    substantive.  I think the last thing any of us wants is a
 8    flood of motions for relief from stay filed by people with
 9    lawsuits against the city to be permitted to pursue those
10    claims, and it seems to me there may be merit in the
11    appointment of a committee for the purpose of working out how
12    those will be handled.  They are quite complex because the
13    options of where those cases get resolved is quite wide;
14    right?  Under 28 U.S.C. 157(b), you know, personal injury
15    claims can be filed -- or can be tried in the District Court
16    or in the court that they were pending in, and it seems to me
17    that we ought to try to think of some way to manage that
18    potential chaos.
19             MS. LENNOX:  May I respond, your Honor?
20             THE COURT:  No.  Please think about that.  I don't
21    need a response right now, but at some point I think we need
22    to think about that issue.
23             MS. LENNOX:  Yeah.  We have thought about that on
24    many, many fronts about how to handle that.  In fact, we have
25    inquiries that have been made of us, and we do have what we
```

1  believe is a perfectly appropriate process at the right time

2  to resolve those kinds of claims that would not necessitate

3  the appointment of a committee.

4       THE COURT:  Okay.  All right.  Anybody else have

5  anything for today?

6       MS. LEVINE:  Your Honor, before you deliberate, can

7  we make one or two comments on the proposed form of order?

8       THE COURT:  Yes, please.

9       MS. LEVINE:  The order that was filed last night

10  seemed -- Sharon Levine, Lowenstein Sandler.  The order that

11  was filed last night seems to have resolved a lot of the

12  issues between the city and the U.S. Trustee, and we

13  appreciate those efforts.  Decretal paragraph one, though,

14  says the motion is granted, and we would respectfully submit,

15  as we've seen in a lot of orders in a lot of other cases, it

16  should just say the motion is granted as set forth herein

17  because then it would avoid the conflict with regard to

18  things that haven't been resolved.

19       In addition, at decretal paragraph five there's a

20  retention of jurisdiction which isn't limited with regard to

21  the reservation of rights that we've been discussing on the

22  record, so I just want clarification even if that -- unlike

23  decretal paragraph one, even if decretal paragraph five stays

24  the same, there's an understanding on the record --

25       THE COURT:  Yeah.  Well, let me just --

1     MS. LEVINE:  -- that the reservation of

2 jurisdiction --

3     THE COURT:  Let me just say broadly I do not favor

4 provisions in any order that say the Court retains

5 jurisdiction to do A, B, or C.  They are unnecessary and

6 confusing.  The law sets forth what the Court's jurisdiction

7 is, and that's what applies.

8     MS. LEVINE:  Thank you, your Honor.

9     THE COURT:  Okay.  It's now one -- something else,

10 sir?

11     MR. HACKNEY:  Sorry, your Honor.  I just -- Stephen

12 Hackney on behalf of Syncora.  I wasn't sure if you were

13 going to adjourn for the day or just for a lunch recess, but

14 there was a status conference on the motion pursuant --

15     THE COURT:  Yes.  I want to -- I want to contemplate

16 this committee issue and then come back and hear yours.  I

17 don't really want to take a lunch break, per se, because

18 that'll take altogether too long.

19     MR. HACKNEY:  Understood.

20     THE COURT:  So just give me 15 minutes to think

21 about this committee issue, come back, give a decision on

22 that, and then we'll get to the Syncora matter.

23     MR. HACKNEY:  Absolutely, your Honor.  Thank you.

24     THE COURT:  And we'll be in recess for 15 minutes,

25 please.

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 125 of 139
13-53846-swr   Doc 516-9   Filed 08/09/13   Entered 08/09/13 15:56:02   Page 125 of 139   125
574

1          THE CLERK:  All rise.  Court is in recess.

2      (Recess at 1:00 p.m., until 1:14 p.m.)

3          THE CLERK:  All rise.  Court is in session.  Please

4  be seated.  Case Number 13-53846, City of Detroit, Michigan.

5          THE COURT:  The Court concludes that it is

6  appropriate to grant the motion of the city for the

7  appointment of a committee of retired persons.  The Court

8  concludes that the objection that this motion is statutorily

9  premature should be overruled.

10          As counsel for the city has pointed out, Section

11  1102(a)(2), which is the section on which the present motion

12  is based, does not require the Court to wait until after the

13  order for relief to appoint a committee.  Accordingly, by its

14  plain language, the Court does have the authority to grant

15  this relief, and so that objection is overruled.

16          It has also been argued here that this motion is on

17  inadequate notice because most, if not all, of the individual

18  retirees were not given notice of this motion.  The Court

19  concludes that that objection as well should be overruled.

20  This is simply a procedural motion that does not affect the

21  substantive rights of retirees or any other party, for that

22  matter, and, accordingly, the Court concludes that notice was

23  adequate, and that objection is overruled.

24          The Court commends and accepts the city's offer to

25  pay the reasonable expenses of the committee and proposes

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 126 of 139
13-53846-swr   Doc 516-1   Filed 06/09/13   Entered 06/09/13 15:36:42   Page 120 of 139   126
574

1   that all such professional expenses be processed through the

2   fee examiner process.

3           Regarding the issue of scope, it is an important

4   part of the process to define the scope of the committee,

5   and, as noted a moment ago, the Court concludes that the

6   scope of the committee should be to represent the retirees of

7   the City of Detroit.  If the Court has any discretion on the

8   issue of whether to give guidance to the U.S. Trustee as to

9   the issue of adequate representation, the Court concludes in

10  this case that it would not be appropriate to exercise that

11  discretion.  The Court, rather, concludes that the issue of

12  who should serve on this committee should be left first to

13  the discretion of the U.S. Trustee, and if there are issues

14  or objections to the composition of the committee, there are

15  procedures in place under the Bankruptcy Code to address

16  that, and those issues will be addressed to the extent raised

17  in due course, so the Court will not make any statement on

18  the record at this time on this issue.

19          On the issue of adjusting the dates and deadlines

20  that we discussed earlier on in the status conference to

21  reflect the interest of the committee in participating fully

22  in the process, the Court concludes that that interest can be

23  accommodated by granting the committee a period of time after

24  it selects its attorneys to file objections to eligibility

25  and participate in the discovery as set forth in the proposed

1    dates and deadlines, so the Court will build that extra

2    leeway in for this one participant, so with that on the

3    record, the Court will grant the motion.

4         I do, however, want to address the representative of

5    the United States Trustee's office one more time.  Ma'am,

6    would you take the lectern for me?  I feel the need to take

7    one more try at pinning you down regarding how long this is

8    going to take because we have a very aggressive and tight set

9    of dates and deadlines here, and so I think it's important to

10   the process that I give your office a deadline as well.

11        MS. GIANNIRAKIS:  Your Honor, I appreciate that, and

12   I appreciate --

13        THE COURT:  How much time do you need?

14        MS. GIANNIRAKIS:  I don't have a specific answer.

15   All I can say is we will --

16        THE COURT:  If you don't give me a number, I'll make

17   one up.  And honestly, if I do it, it's going to be like

18   arbitrary and capricious and clearly erroneous.

19        MS. GIANNIRAKIS:  May I have a moment to consult --

20        THE COURT:  And none of us want that, so -- and I

21   don't know whether you're talking about three days, seven

22   days, fourteen days, twenty-one days.  I don't know what

23   you're thinking about.

24        MS. GIANNIRAKIS:  Your Honor, I don't think -- I

25   don't think it's possible to have a committee up and running

```
 1   in three days, to be honest with you.  I mean we will --
 2          THE COURT:  I wasn't asking you to.  What I'm
 3   telling you is I don't know what the right answer is.  Do you
 4   want time to consult with your colleagues?
 5          MS. GIANNIRAKIS:  I do want time to consult with my
 6   colleagues.  I do know --
 7          THE COURT:  All right.
 8          MS. GIANNIRAKIS:  I do know that we are concerned
 9   with giving parties enough time to respond --
10          THE COURT:  Um-hmm.
11          MS. GIANNIRAKIS:  -- because we are --
12          THE COURT:  Right.
13          MS. GIANNIRAKIS:  -- we do have retirees here who --
14          THE COURT:  Right.
15          MS. GIANNIRAKIS:  -- may not have all the electronic
16   methods that we all have to get information.
17          THE COURT:  Right.  Okay.  Fair enough.  So I will
18   do the status conference on the Syncora motion while you
19   consult with your colleagues, and then we'll pick this back
20   up again.
21          MS. GIANNIRAKIS:  Thank you, your Honor.
22          THE COURT:  Okay.  Let's do that.
23          MR. HACKNEY:  Good afternoon, your Honor.  Stephen
24   Hackney on behalf of Syncora.
25          THE COURT:  Here's my question for you.
```

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 129 of 139
13-53846-swr   Doc 516-9   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 123 of 139   129
574

1           MR. HACKNEY:  Yes.

2           THE COURT:  Given the very restricted role that a

3    court plays in either reviewing the decision of a debtor to

4    assume or reject a contract or the decision of a debtor to

5    settle a dispute, why do you need discovery at all?

6           MR. HACKNEY:  So you've anticipated the first part

7    of our argument, your Honor, which was why we filed the

8    statement yesterday to express concerns that we had when you

9    take the proposed order that they have submitted to you and

10   the forbearance agreement and you lay them next to the Orion

11   agreement from the Second Circuit.  We have concerns that

12   that order would entail the Court making judicial findings,

13   judicial declarations that could foreclose the rights of

14   third parties, and you see --

15          THE COURT:  Okay.  If that's your concern, I will

16   assure you at the outset that my decision will be nothing

17   more than to approve the decision of the city to assume this

18   contract and enter into the settlement or disapprove of it.

19          MR. HACKNEY:  And that assurance is very helpful I

20   would say at the outset.  I would still say, though, your

21   Honor, that this is a sizeable transaction that the city is

22   proposing to potentially assume and perform under.  Whether

23   they can perform under it is obviously a subject of dispute

24   that I'll bracket, but whether or not this is within the

25   business judgment of both the city and potentially the

13-53846-swr    Doc 4164-9    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 130 of 189
13-53846-swr    Doc 516    Filed 08/09/13    Entered 08/09/13 15:56:42    Page 124 of 189    130
574

1   service corporation that's also a party to this contract,

2   what claims exactly are being compromised, why they're being

3   compromised now, the likelihood of success, so on and so

4   forth, where the city will get the money to potentially

5   perform under this agreement if it is entitled to perform,

6   bracketing our dispute about that, these are all important

7   questions that are -- unfortunately, they are fact-intensive.

8   And while it is true that the Court must defer to the city's

9   business judgment, to the extent it applies, with a serious

10  question around whether it applies when two of the three

11  parties to the transaction appear to be city officers with

12  duties to the city, the indemnification of the service

13  corporation directors, a number of factual issues, your

14  Honor, that's why we need discovery.

15          THE COURT:  Let's assume for a minute -- let's

16  assume for a minute that for any or all or some of the

17  reasons you have identified the city cannot demonstrate that

18  it has exercised appropriate business judgment.  Isn't the

19  answer to deny the motion --

20          MR. HACKNEY:  I believe --

21          THE COURT:  -- rather than grant all this discovery?

22          MR. HACKNEY:  I believe it would be, but I need the

23  discovery in order to inquire into that because remember,

24  your Honor, at Syncora we have been excluded from these

25  negotiations, so we do not know what's happened, what

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 125 of 189
13-53846-swr   Doc 516-9   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 125 of 189   131
574

1  meetings were involved, who discussed what with whom.  And we

2  also have serious questions about the interaction of the

3  forbearance agreement with the COPs and swap structure that I

4  discussed -- that I mentioned earlier, and so there are

5  ambiguities in the way the forbearance agreement works.

6  There are questions about the necessity of the casino

7  revenues.

8          THE COURT:  Okay.

9          MR. HACKNEY:  Yeah.

10         THE COURT:  Let's focus on ambiguities.  If the

11  ambiguities are such that it's not in the best interest of

12  the city to assume this contract or if the ambiguities are

13  such that the Court cannot say that the city exercised proper

14  business judgment in proposing to assume the contract, why

15  doesn't it suit your purposes just to argue the motion should

16  be denied?

17         MR. HACKNEY:  I think that's a fair point, your

18  Honor, but it's also very possible that parol evidence may

19  inform the resolution of the ambiguity in a way that leads to

20  informing the Court's decision about whether it should --

21  whether it should deny the motion or not, whether it's within

22  the business judgment or not.  I mean, your Honor, we are

23  talking about the city is purporting to use this --

24         THE COURT:  What I'm having a hard time doing is

25  reconciling your position on the one hand that the Court in

1  its very limited role here should not make any holdings or
2  findings about what this contract means or does or how it
3  impacts third parties with your interest in discovery on
4  those very questions --

5           MR. HACKNEY:  Well, I think that --

6           THE COURT:  -- unless you have some ulterior motive
7  because of your other litigation.

8           MR. HACKNEY:  And we do not, your Honor.  We do not,
9  but we are concerned that the city is going to attempt to
10 wrap itself up in the cloak of the order and say, "Now we're
11 entitled to act consistent with this forbearance agreement,"
12 and so we do have serious --

13          THE COURT:  Well, if the motion to assume is
14 granted, it's granted with all of the words and questions
15 about the contract.  There's nothing about the assumption
16 process that improves a debtor's position vis-a-vis other
17 parties; right?  We all understand that.

18          MR. HACKNEY:  I agree, and, your Honor, you are
19 speaking to the large majority of my concerns here, and so
20 I'm trying to react on my feet.  I do appreciate it.  I also
21 appreciate that you have considered our statement already
22 given the avalanche of information that's filed every week.
23 I guess what I would say, your Honor, is that we have not had
24 very much insight into what led to the forbearance agreement.
25 There are standards under 365 and 9019 that are applicable,

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 127 of 189
13-53846-swr   Doc 316-9   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 127 of 189   133
574

1  and to the extent we do have remaining objections

2  notwithstanding the Court's emphasis of its limited role, we

3  don't believe that we can meaningfully prepare for the

4  hearing without at least some discovery into what happened.

5  THE COURT:  All right.  I don't see it, so I'm going

6  to ask you to file a response to the motion within 14 days.

7  You can argue that the information that the debtor has placed

8  on the record is not adequate information for the Court to

9  make the judgments that the city is asking the Court to make,

10 and the Court will, of course, take that very seriously,

11 but -- so what I'm proposing is a response by you within 14

12 days and a hearing on the motion at our first omnibus hearing

13 date on August 21st.  Any objection to that?

14 MR. HACKNEY:  I guess subject to our objection to

15 the fact that our request --

16 THE COURT:  Right.

17 MR. HACKNEY:  -- for discovery is overruled.

18 THE COURT:  Yeah.  Apart from that.  Sir, did you

19 want to be heard on this matter as well?

20 MR. MARRIOTT:  If I might, your Honor.

21 THE COURT:  Go ahead, sir.

22 MR. MARRIOTT:  Your Honor, Vince Marriott, Ballard

23 Spahr.  I'm embarrassed to tell you I cannot pronounce the

24 name of my client.  It's also about a paragraph --

25 THE COURT:  I'm assuming that's because it's not

13-53846-swr  Doc 4164-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 134 of 139
13-53846-swr  Doc 516-9  Filed 08/09/13  Entered 08/09/13 15:56:42  Page 123 of 129  134
574

1  English.

2      MR. MARRIOTT:  That's correct.  It's also about a

3  paragraph long.  The first two words look like Erste

4  Europaische.

5      THE COURT:  Okay.  That should be enough for our

6  purposes.  Thank you.

7      MR. MARRIOTT:  I like to refer to it as EEPK because

8  that's just easier.

9      THE COURT:  Okay.

10     MR. MARRIOTT:  We filed a preliminary objection to

11 the debtor's motion at Docket Number 246.

12     THE COURT:  I saw that.

13     MR. MARRIOTT:  And at Docket Number 246 you can see

14 the whole name.  Just a couple of additions to what Mr.

15 Hackney said.  First, the forbearance agreement, as I think

16 all of the papers indicate, isn't simply about -- or the

17 motion isn't simply about assumption of an agreement.  It's

18 also about settlement of certain potentially significant

19 claims that the estate might have against the swap parties

20 either as to the validity of the swaps, the amount that's due

21 under them, the perfection or priority of the --

22     THE COURT:  Um-hmm.

23     MR. MARRIOTT:  -- collateral interest in the casino

24 revenues, and, you know, the city in its motion basically

25 deals with those issues by saying, you know, they're

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 135 of 139
13-53846-swr   Doc 516-9   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 129 of 139   135
574

1   complicated.  They're hard.  It would take a lot of time to

2   litigate them, and we don't want to.  Nevertheless, one of

3   the justifications for the settlement is that it's $300

4   million in secured debt and, therefore, to the extent the

5   city can get out from under $300 million of secured debt so

6   that the collateralization and the amount of the claim -- all

7   of that is significantly relevant to consideration of the

8   motion.

9         When it comes to considering whether a settlement

10  agreement is fair and equitable, I think the Court's role is

11  a little more significant than passing on the business

12  judgment of the debtor in assuming or not a contract.  In

13  other words, I think the Court's involvement is a little bit

14  more, and the showing that the debtor has to make is a little

15  bit more substantial to approve a settlement than assumption

16  or rejection of a contract.  And at least in our view, your

17  Honor, the forbearance agreement is much more a settlement

18  than it is your -- what you normally would see as a contract

19  that a debtor is seeking to assume or reject.  And the fact

20  that the debtor is seeking to assume a settlement agreement,

21  although it's called a forbearance agreement, and the basis

22  upon which it is entering into that agreement impacts what

23  may be significant claims and impacts what may be significant

24  issues for unsecured creditors insofar as either the debt or

25  the swap obligations themselves --

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 136 of 139
13-53846-swr   Doc 516   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 130 of 139   136
574

1    THE COURT:  Okay.  But what I'm hearing from you is

2    the opening paragraph of your argument on August 21st.

3    MR. MARRIOTT:  Yes, but I could make that argument

4    better if I had the opportunity to do some discovery and see

5    the documents that relate to the swap agreement, see the

6    documents that relate to the 2009 collateralization and

7    amendment to the service contract.

8    THE COURT:  Is there any reason to believe that

9    these documents aren't in this data room?

10   MR. MARRIOTT:  They may be in the data room, your

11   Honor, but to get into the data room -- the problem with the

12   data room is it has a lot of things in there that at least at

13   the moment my client is not interested in seeing because the

14   data room may very well contain material nonpublic

15   information that would put my client in a position of perhaps

16   impacting its ability to trade.  We don't think any of the

17   documents that we would seek in connection with this motion

18   would be considered material nonpublic information.  I think

19   they're public record or could be available through public

20   means, so we would prefer not to have to sign an NDA to get

21   into the data room for a bunch of stuff we don't want.  We'd

22   rather make a document request for the limited things we do

23   want that wouldn't create the same issue.

24   THE COURT:  Well, all right.  I have to say I still

25   don't see it.  Whether the debtor can establish the grounds

13-53846-swr   Doc 4364-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 137 of 139
13-53846-swr   Doc 316   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 131 of 139   137
574

 1   for its motion it doesn't seem to me to depend on anything

 2   other than what they assert in their motion and what they

 3   offer in court.  Now, having said that, as a creditor in the

 4   case you're entitled to see any document you like that's

 5   related to the financial condition of the city.  I said that

 6   earlier, and I hope the city will cooperate with you in that

 7   regard, but let's hold a hearing on this on October -- I'm

 8   sorry -- August 21st.  Ms. Lennox or whomever, I should ask

 9   you if that date is acceptable to you as well.

10          MR. SHUMAKER:  It is, your Honor.  Gregory Shumaker,

11   Jones Day.

12          THE COURT:  All right.  Is 21 -- excuse me.  Is 14

13   days enough time to file a response?

14          MR. PEREZ:  My name is Alfredo Perez, and I

15   represent FGIC, which is another monoline insurer that's

16   involved in this transaction.  Fourteen days is fine if it

17   applies to everybody.  Obviously that wouldn't preclude us

18   from arguing that this matter shouldn't be heard at this

19   time, but we can --

20          THE COURT:  Right.

21          MR. PEREZ:  -- respond in 14 days.

22          THE COURT:  Okay.  All right.  That will conclude

23   that status conference.  The Court will enter a scheduling

24   order accordingly.  We don't have our U.S. Trustee

25   representatives back here yet.  Was there something you

1  wanted to say, sir?

2        MR. SHUMAKER:  Yes, sir, your Honor.  Again, Gregory

3  Shumaker, Jones Day, for the city.  Just one thing that

4  I'm -- I'm sorry.

5        THE COURT:  Go ahead, sir.

6        MR. SHUMAKER:  I'm sorry.  I'd just note that one of

7  my colleagues asked that we ask that the hearing on the 21st

8  be an evidentiary hearing as opposed to just a preliminary

9  hearing.  I know it's a formality, but I thought I should

10  raise it.

11        THE COURT:  An evidentiary hearing at which what

12  evidence would be presented?

13        MR. SHUMAKER:  Well, the evidence in support of the

14  motion.

15        THE COURT:  You mean like a witness evidence or --

16        MR. SHUMAKER:  Right, exactly.

17        THE COURT:  -- or documentary evidence?

18        MR. SHUMAKER:  That's right, your Honor.

19        THE COURT:  Who would the witnesses be?

20        MR. SHUMAKER:  Well, we're not certain of that, but

21  we're sure there will probably be witnesses, including

22  potentially the emergency manager.

23        THE COURT:  If I grant that request, does that open

24  the door to discovery by those witnesses or of those

25  witnesses?

1      MR. SHUMAKER:  Well, I believe part of our -- the

2  presentation of our evidence is going to involve oral

3  testimony from a witness, so we believe there's probably

4  adequate opportunity for cross-examination, but that is what

5  we were planning, your Honor.

6      THE COURT:  All right.  Thank you for that

7  information.  In light of that -- sir.

8      MR. SMITH:  Your Honor, my name is Bill Smith.  I'm

9  counsel -- I've learned to be precise about this -- to U.S.

10 Bank in its role as custodian of the casino revenues and as

11 trustee for the certificates of participation.  That makes us

12 a party in interest.  It's unclear whether we are a creditor.

13      The dialogue you just concluded underscores, I

14 think, a relevant factor.  This is, as has been suggested to

15 you by other parties, a complex series of transactions.  If

16 the debtor proposes --

17      THE COURT:  I remain to be convinced of that.

18      MR. SMITH:  I apologize, your Honor.  I'm sorry.

19      THE COURT:  I remain to be convinced of that.

20      MR. SMITH:  We'd be -- well, I'm not certain we

21 oppose the transaction, so I'm not sure I'm the right person

22 to convince you.  There are able and capable people who I

23 believe are going to take a yeoman's shot at trying to do

24 that.  We believe, in the event that the debtor proposes to

25 present live testimony, it is worthwhile making available to

interested parties at least the documents that surround this transaction, some of which are in the data room, some of which are not.  And so our suggestion is, to the degree that you are disposed not to grant discovery, that you at least make -- suggest to the city that it make available to any person interested in opposing the transaction the transaction documents themselves.  Past that we have no view on discovery, your Honor.

THE COURT:  All right.  Well, the city's suggestion that they are proposing evidence at this hearing does cause me to change my mind about discovery and to allow some limited discovery, so by the same August 21st deadline, the Court will ask the city to file a list of witnesses and a list of documents that it intends to offer at the hearing and to provide those documents to the city.  In the two weeks following, the Court will order the city to make available for deposition those witnesses who it intends to call.  As a result, we won't have our hearing on August 21st.  We'll have it on August 28th.  Anything further on this matter?

MR. GOLDBERG:  What does that do to the response time for the motion?

THE COURT:  I want responses within 21 days --

MR. GOLDBERG:  Twenty-one --

THE COURT:  I'm sorry -- 14 days.  Fourteen days.  Sorry.  Okay.  Let's get back to the issue of appointing a

 1  committee of retired persons.

 2        MS. GIANNIRAKIS:  Thank you, your Honor.  Thank you

 3  for allowing us the opportunity.

 4        THE COURT:  Sure.

 5        MS. GIANNIRAKIS:  I was able to consult with my

 6  client during that break, and our concern -- and I'll just

 7  voice it briefly -- is --

 8        THE COURT:  Uh-huh.

 9        MS. GIANNIRAKIS:  -- unlike when we have a list of

10  unsecured creditors, we don't have the body of people that we

11  have to -- well, I guess we do now with 3,500 pages of people

12  to solicit.  And although there are parties here that we know

13  are interested and we're going to ask them for information,

14  we don't control how quickly we get those names and that

15  information.  We are going to post the questionnaire on the

16  website as soon as it's completed, and that will be done very

17  early, and it'll be available.

18        THE COURT:  What website?

19        MS. GIANNIRAKIS:  On the U.S. Trustee's Detroit

20  website.  I don't have that address, but it's the U.S.

21  Trustee's --

22        THE COURT:  U.S. Trustee's website?

23        MS. GIANNIRAKIS:  Right.  And it'll be very --

24        THE COURT:  Do you have any objection to posting it

25  on the city's website and the court's website as well?

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 142 of 189
13-53846-swr   Doc 516-1   Filed 06/09/13   Entered 06/09/13 15:56:42   Page 136 of 189   142
574

1   MS. GIANNIRAKIS:  I'm sorry, your Honor.

2   THE COURT:  Do you have any objection to posting it

3   on the city's website and the court's website as well?

4   MS. GIANNIRAKIS:  Do not, your Honor.  As much as it

5   could be out there, we are not opposed to that.

6   THE COURT:  Okay.

7   MS. GIANNIRAKIS:  And we also know that in addition

8   to that, we're going to be doing mailings, and we're going to

9   have -- we have a body of constituents here that are probably

10  not all technologically savvy, so we want to be mindful of

11  that.

12  THE COURT:  Um-hmm.

13  MS. GIANNIRAKIS:  So with that said, your Honor, we

14  are going to endeavor to do this as quickly as possible, but

15  we believe we need at least the outline of 21 days.

16  THE COURT:  Um-hmm.  All right.

17  MS. GIANNIRAKIS:  And if we can do it sooner, we

18  will do it sooner.

19  THE COURT:  All right.  I will set that deadline for

20  you.  If there's cause to extend that, you can file a motion,

21  and the Court will, of course, give that every consideration.

22  Anything further for today, or are we done?  I just -- I want

23  to make one more statement.  Was there something you wanted

24  to say, sir?  I didn't mean to cut you off.  Okay.  Give me

25  one second.

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 143 of 189
13-53846-swr   Doc 8316   Filed 08/09/13   Entered 08/09/13 15:56:02   Page 137 of 139   143
574

1    This is quite out of the ordinary, but before we

2  conclude I do want to take a moment to thank the United

3  States District Court and its judges for very generously

4  offering us the use of their space and for adjusting their

5  schedules to allow this and future hearings.  I also want to

6  thank the clerk of the District Court, Dave Weaver, and the

7  clerk of the Bankruptcy Court, Katherine Gullo, as well as

8  their staffs for their monumental efforts in arranging and

9  setting up all of this.  It was an extraordinary challenge

10  with very short notice, and they met that challenge with

11  grace and with expertise and in the very best spirit of

12  public service.  And I'd like to break our decorum and ask

13  you to give them a round of applause.  And we are adjourned.

14    THE CLERK:  All rise.  Court is adjourned.

15    (Proceedings concluded at 1:43 p.m.)

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 144 of 189
574
13-53846-swr   Doc 516   Filed 06/09/13   Entered 06/09/13 15:56:42   Page 144 of 189   144

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                 August 9, 2013
_____     _____
Lois Garrett

13-53846-swr   Doc 4164-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 145 of 149
13-53846-swr   Doc 916-1   Filed 08/09/13   Entered 08/09/13 15:56:42   Page 139 of 139
574
145

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
        MICHIGAN,              .
                              .      Detroit, Michigan
                              .      August 21, 2013
              Debtor.          .      10:02 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. EMERGENCY MOTION FOR
CLARIFICATION OF THE JULY 25, 2013, STAY ORDER

EXPEDITED HEARING RE. NOTICE OF PENDENCY OF DEFENDANT
SYNCORA GUARANTEE, INC.'S, EMERGENCY MOTION TO DISSOLVE
THE TEMPORARY RESTRAINING ORDER AND CONDUCT
EXPEDITED DISCOVERY

STATUS HEARING RE. CORRECTED MOTION TO ASSUME LEASE OR
EXECUTORY CONTRACT

ADVERSARY PROCEEDING 13-04942 - STATUS CONFERENCE RE.
ORDER GRANTING IN PART AND DENYING IN PART DEBTOR'S
EX PARTE MOTION FOR AN ORDER SHORTENING NOTICE, STAYING
FURTHER BRIEFING AND SCHEDULING AN EXPEDITED HEARING WITH
RESPECT TO MOTION OF DEBTOR CITY OF DETROIT TO SCHEDULE
STATUS CONFERENCE, SET BRIEFING SCHEDULES AND
MAINTAIN STATUS QUO

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  DAVID G. HEIMAN
                     North Point
                     901 Lakeside Avenue
                     Cleveland, OH  44114-1190
                     (216) 586-3939

                     Jones Day
                     By:  GREGORY M. SHUMAKER
                     51 Louisiana Avenue, N.W.
                     Washington, DC  20001-2113
                     (202) 879-3679

APPEARANCES (continued):

                        Jones Day
                        By:  CORINNE BALL
                        222 East 41st Street
                        New York, NY  10017-6702
                        (212) 326-7844

For Robert Davis:      Paterson Law Office
                        By:  ANDREW A. PATERSON, JR.
                        46350 Grand River, Suite C
                        Novi, MI  48374
                        (248) 568-9712

For the State of       State of Michigan - Assistant Attorney
Michigan -                General, State Operations Division
Governor, State        By:  MICHELLE M. BRYA
Treasurer, and              JOSHUA O. BOOTH
Local Emergency        525 W. Ottawa Street
Financial              P.O. Box 30754
Assistance Loan        Lansing, MI  48909
Board in State         (517) 373-1162
Case:

For Syncora Hold-      Kirkland & Ellis, LLP
ings, Ltd., Syncora    By:  STEPHEN C. HACKNEY
Guarantee, Inc.,       300 North LaSalle
and Syncora Capital    Chicago, IL  60654
Assurance, Inc.:       (312) 862-2074

For Detroit            Honigman, Miller, Schwartz & Cohn, LLP
Entertainment, LLC-    By:  JUDY B. CALTON
Motor City Casino      660 Woodward Avenue, Suite 2290
and Greektown          Detroit, MI  48226
Casino, LLC:           (313) 465-7344

For U.S. Bank:         McDermott, Will & Emery, LLP
                        By:  NATHAN F. COCO
                        227 West Monroe Street, Suite 4700
                        Chicago, IL  60606
                        (312) 372-2000

For David Sole:        Jerome D. Goldberg, PLLC
                        By:  JEROME GOLDBERG
                        2921 East Jefferson, Suite 205
                        Detroit, MI  48207
                        (313) 393-6001

13-53846-tjt  Doc 4315-9  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 147 of
13-53846-swr  Doc 605  Filed 08/23/13  Entered 08/23/13 12:14:33  Page 2 of 107
574
147

APPEARANCES (continued):

```
                        Vanessa G. Fluker, Esq., PLLC
                        By:  VANESSA G. FLUKER
                        2921 East Jefferson, Suite 200
                        Detroit, MI  48207
                        (313) 393-6005
```

```
For Ambac Assurance   Arent Fox, LLP
Corporation:          By:  CAROLINE TURNER ENGLISH
                      1717 K Street, N.W.
                      Washington, DC  20036-5342
                      (202) 857-6178
```

```
For Financial         Weil, Gotshal & Manges, LLP
Guaranty Insurance    By:  ALFREDO R. PEREZ
Company:              700 Louisiana, Suite 1600
                      Houston, TX  77002
                      (713) 546-5040
```

```
For Detroit           Clark Hill, PLC
Retirement Systems-   By:  ROBERT GORDON
General Retirement    151 South Old Woodward, Suite 200
System of Detroit,    Birmingham, MI  48009
Police and Fire       (248) 988-5882
Retirement System
of the City of Detroit:
```

```
For Retired           Strobl & Sharp, PC
Detroit Police        By:  LYNN M. BRIMER
Members               300 East Long Lake Road, Suite 200
Association:          Bloomfield Hills, MI  48304-2376
                      (248) 540-2300
```

```
For Erste             Ballard Spahr, LLP
Europaische           By:  VINCENT J. MARRIOTT, III
Pfandbrief-und        1735 Market Street, 51st Floor
Kommunalkreditbank    Philadelphia, PA  19103-7599
Aktiengesellschaft    (215) 864-8236
in Luxemburg, S.A.:
```

```
For International     International Union, UAW
Union, UAW:           By:  MICHAEL B. NICHOLSON
                      8000 East Jefferson Avenue
                      Detroit, MI  48214
                      (313) 926-5216
```

```
For National Public   Sidley Austin, LLP
Finance Guarantee     By:  GUY S. NEAL
Corporation:          1501 K Street, N.W.
                      Washington, DC  20005
                      (202) 736-8041
```

13-53846-tjr  Doc 4314-9  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 148 of
13-53846-swr  Doc 685  Filed 08/29/13  Entered 08/29/13 12:14:39  Page 3 of 107  148
574

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

13-53846-tjt  Doc 4314-9  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 149 of
13-53846-swr  Doc 665  Filed 08/29/13  Entered 08/29/13 12:14:33  Page 4 of 107   149
574

```
 1          THE CLERK:  All rise.  Court is in session.  Please
 2   be seated.  Case Number 13-53846, City of Detroit, Michigan,
 3   and Case Number 13-04942, City of Detroit versus Syncora
 4   Guarantee, et al.
 5          THE COURT:  One second, please.  Chris.  All right.
 6   Did someone want to be sworn in?
 7          ATTORNEY:  Yes.
 8          THE COURT:  Someone would like to be admitted to the
 9   bar of the Court.  Step forward, please.
10          MR. COCO:  Good morning, your Honor.
11          THE COURT:  Good morning.  What are your names,
12   please?
13          MR. COCO:  Nathan Coco from McDermott, Will & Emery.
14          THE COURT:  Mr. Coco.
15          MR. PRICE:  Good morning, your Honor.  William Price
16   from Clark Hill.
17          THE COURT:  Mr. Price.
18          MR. GUADAGNINO:  Frank Guadagnino, Clark Hill.
19          THE COURT:  What's your last name, sir?
20          MR. GUADAGNINO:  Guadagnino.
21          THE COURT:  Welcome.  Okay.  Are the three of you
22   prepared to take the oath of admission to the Bar of the
23   Court?  Please raise your right hands.  Do you affirm that
24   you will conduct yourself as an attorney and counselor of
25   this Court with integrity and respect for the law, that you
```

13-53846-tit  Doc 43t4-9 Filed 04/29/14  Entered 04/29/14 21:00:23  Page 150 of
13-53846-swr  Doc 685  Filed 08/29/13  Entered 08/29/13 12:14:33  Page 5 of 100  150
574

 1   have read and will abide by the civility principles approved

 2   by the Court, and that you will support and defend the

 3   Constitution and laws of the United States?

 4           ATTORNEYS:  I will (collectively).

 5           THE COURT:  All right.  Welcome.  We'll take care of

 6   your paperwork for you.  You are all set.

 7           ATTORNEY:  Thank you, your Honor.

 8           THE COURT:  You're welcome.  One second, please.  My

 9   password is not working here, Chris.  All right.  Well, let's

10   start.  I want to start with the Davis matter, please.

11           MR. PATERSON:  Thank you, your Honor.  Andrew

12   Paterson on behalf of Robert Davis.

13           THE COURT:  And you may proceed, sir.

14           MR. PATERSON:  Sir, this is our motion for

15   clarification of your stay order that was entered in July and

16   addressed, as we saw it, three state lawsuits that were

17   included in the stay, although the debtor was not a party to

18   those suits, but they did involve the first or second biggest

19   liability of the debtor, the pension plans.  And the

20   definition or the identification of those cases was set forth

21   in the motion, and your order did adopt that.

22           THE COURT:  Excuse me one second, sir.  Chris, it's

23   working.  Go ahead, sir.

24           MR. PATERSON:  Since that time, your order has been

25   interposed in our state case up in Ingham County on an open

13-53846-tjt  Doc 4314-9  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 151 of
574
13-53846-swr  Doc 885  Filed 08/29/13  Entered 08/29/13 12:14:39  Page 6 of 107   151

1    meetings case.  It's also been interposed in other matters

2    that I've been involved in, and I'd like to have some

3    clarification as to the extent of that order.  I feel that

4    the state proceeding in Ingham County is an open meetings

5    case that has no impact whatsoever directly or practically on

6    the debtor's Chapter 9 protections.

7        THE COURT:  Well, let's talk about that.  What does

8    your client seek to accomplish by that lawsuit?

9        MR. PATERSON:  A declaration from the Court that the

10   Loan Board violated the Open Meetings Act in connection with

11   the appointment of Mr. Orr under Public Act 72 as the

12   emergency financial manager for the City of Detroit.

13       THE COURT:  And what does he intend to do with that

14   declaration if he obtains it?

15       MR. PATERSON:  The declaration is used in the state

16   court to guide conduct of public bodies, and I will also seek

17   an injunction that they not violate the OMA again, although

18   it's somewhat moot at this point since Public Act 72 has now

19   been repealed by the enactment of Public Act 436 of 2012

20   under which Mr. Orr currently serves and is appointed.

21       THE COURT:  Is it your representation to the Court

22   that it is not the intent of your client to use such a

23   declaration to remove Mr. Orr from office?

24       MR. PATERSON:  It is, and he did in our reply brief

25   so stipulate that we would not be appealing any such

13-53846-tjt   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 21:00:23   Page 152 of
13-53846-swr   Doc 885   Filed 08/29/13   Entered 08/29/13 12:14:39   Page 7 of 107   152
574

1  decision.  I also indicated to the Court and have brought

2  with me a copy of the transcript from our July 24 hearing

3  before Judge Collette wherein he indicated that he was not

4  going to invalidate any actions taken by the Loan Board in

5  connection with the appointment.

6         THE COURT:  Well, I appreciate that, but I want to

7  be sure you understand the very specific question I'm asking

8  you.  I get that it is not the intent of your client or of

9  the state court to invalidate any of the actions of the Loan

10 Board or any of the actions that Mr. Orr has taken from the

11 time of his appointment until whenever that judgment might be

12 entered.  I've got that.

13        MR. PATERSON:  Nor could I seek that relief, nor

14 could the Court grant that under Michigan law.

15        THE COURT:  But that's not the question I'm asking.

16 I'm asking is -- the question I'm asking is is it your

17 representation to the Court that your client will not seek to

18 use that judgment to remove Mr. Orr from office in the

19 future?

20        MR. PATERSON:  That is, in fact, our stipulation.

21        THE COURT:  So if I heard you correctly, what you

22 plan to do with this judgment is to use it to enjoin the Loan

23 Board or others from violating the Open Meetings Act in the

24 future?

25        MR. PATERSON:  That is correct.

13-53846-tjt  Doc 4314-9  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 153 of
574
13-53846-swr  Doc 885  Filed 08/23/13  Entered 08/23/13 12:14:33  Page 8 of 107   153

1          THE COURT:  And anything else?

2          MR. PATERSON:  No.  I mean the relief that I seek is

3    the declaration.  I am compelled to ask for an injunction

4    against further violations.  It's within the discretion of

5    the state court to issue or not issue that, and then I will,

6    of course, be seeking reimbursement of the attorneys' fees

7    and costs.

8          THE COURT:  All right.  So the question remaining to

9    be addressed is why shouldn't the order that the Court

10   previously entered be read to stay your suit or the suit

11   where you represent Mr. Davis?

12         MR. PATERSON:  Because none of the debtor's assets

13   or property is affected whatsoever by my suit.  My suit is

14   against state actors, not against the city.  The city is not

15   a party.  None of its departments are parties.  None of its

16   assets or property is subject to any action by the Circuit

17   Court in my OMA suit.  My OMA suit is exclusively against the

18   governor, the state treasurer, and the state Emergency

19   Financial Loan Board.

20         THE COURT:  All right.  Anything further, sir?

21         MR. PATERSON:  No.  I would just emphasize that the

22   de facto doctrine does validate all of the acts that have

23   occurred to date, in any event, and there's been no response

24   to that.  I mean that is clearly the state law.

25         THE COURT:  Thank you, sir.

1          MR. PATERSON:  Thank you.

2          THE COURT:  Who will be addressing this?  Oh, I'm

3     sorry.

4          MS. BRYA:  Good morning, your Honor.  Michelle Brya

5     and Joshua Booth.  We represent the governor, the state

6     treasurer, and the Local Emergency Financial Assistance Loan

7     Board in the state case.

8          It is our position that the scope of your order

9     extending the bankruptcy stay should include the Davis case.

10    In the debtor's motion they specifically requested that it

11    apply to actions against the governor, the treasurer, and the

12    Loan Board that directly or indirectly seek to enforce claims

13    against the city or interfere with the city's actions or

14    activities in the Chapter 9 case.  Although the order that

15    was signed by this Court specifically acknowledged the three

16    pre-petition cases, we believe that by the language of that

17    order it said that that language was included for the

18    avoidance of doubt, and it didn't in any way limit the scope

19    of your order to those three cases.

20         The defendants in the state case, the Davis versus

21    Loan Board case, are the exact same defendants that this

22    Court acknowledged in its order, the state treasurer, the

23    governor, and the Local Financial Emergency Loan Board, and

24    Davis seeks to invalidate the emergency manager, and that

25    would clearly interfere with the state's activities in the

1   Chapter 9 bankruptcy case.  Until Mr. Paterson filed his

2   reply brief, we weren't aware of his position with respect to

3   the invalidation, but clearly in his prayer for relief in the

4   state case in his second amended complaint he requests a

5   declaration that all decisions of the defendants, including

6   its votes taken at the March 14th Loan Board meeting, are

7   invalidated, and one of the decisions that they made that day

8   was the appointment of Mr. Orr, so we believe that by seeking

9   such relief, Mr. Paterson and Mr. Davis have not withdrawn

10  those claims for the invalidation of the emergency manager,

11  and, therefore, Judge Collette in the state case could still

12  order that invalidation occur and that Mr. Orr's appointment

13  be invalidated.  And we believe that that could have a

14  significant impact on the Chapter 9 proceedings, and we're

15  asking that you extend the scope of stay.

16          THE COURT:  Suppose the motion were granted with the

17  condition that prohibited that?

18          MS. BRYA:  That prohibited the ability for the state

19  court to invalidate the emergency manager?

20          THE COURT:  Precisely.

21          MS. BRYA:  That would be something that we would be

22  probably comfortable with, your Honor.  I mean certainly

23  that's the concern that we have is that if his position is

24  invalidated, then it could significantly impact the City of

25  Detroit and the state in general.

1    THE COURT:  It sounds like all Mr. Davis and his

2  counsel want here is a declaration that the Open Meetings Act

3  was violated and attorney fees.

4    MS. BRYA:  To some extent I think that that's

5  correct, your Honor, although they still have those claims in

6  their complaint, and so that relief, again, can still be

7  granted.

8    THE COURT:  But if my order of clarification limited

9  Mr. Davis to those two forms of relief, you would be

10  comfortable with that?

11    MS. BRYA:  Yes, your Honor, I believe we would.

12    THE COURT:  All right.  Thank you.

13    MS. BRYA:  Thank you, your Honor.

14    MR. HEIMAN:  Good morning, your Honor.  David

15  Heiman, Jones Day, on behalf of the city.  As a technical

16  matter, this seems more like a request for relief from stay

17  than clarification, but I'll leave that to your Honor, and I

18  don't -- it matters not to me whether we try to go through a

19  proper process or not in that respect, but I would like to

20  say that we're obviously very concerned about anything that

21  would in any way question the role or authority of the

22  executive decision-maker of the city, and I cannot imagine

23  anything that would be more disruptive to a Chapter 9 case

24  than that.  So to just respond to your proposal, if I can

25  call it that, I also have no problem with the suggestion as

13-53846-swr  Doc 4844-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 215 of 107
574
13-53846-swr  Doc 685  Filed 08/29/13  Entered 08/29/13 12:14:05  Page 12 of 107   157

```
 1    it relates to Mr. Davis and his counsel, Mr. Paterson.  I am
 2    concerned, however, about the impact of a ruling that
 3    potentially invalidates the -- for the record, invalidates
 4    the appointment of Mr. Orr not so much for the party that is
 5    making the commitment to your Honor but for the rest of the
 6    world and what they do with that, so I think we have to
 7    address that.  I have no problem with your Honor getting
 8    comfortable with whatever works here, but I just want to make
 9    sure that we have covered the waterfront in terms of not
10    being exposed to some third party coming in and saying, "Look
11    at that order," so with that --
12            THE COURT:  Is it possible -- one second, sir.  Is
13    it legally possible to give Mr. Orr and the city that kind of
14    protection?
15            MR. HEIMAN:  I would assume -- I'm not a
16    constitutional scholar, your Honor, but I would assume if
17    your Honor issues an order that makes it clear -- and what I
18    think I heard you say is your order would say that, without,
19    again, being technical, the stay will not apply to the Davis
20    lawsuit -- the pending Davis lawsuit so long as the
21    Bankruptcy Court does not move to invalidate the appointment
22    of Mr. Orr.
23            THE COURT:  Well, you said "Bankruptcy Court," but,
24    of course, you mean the Circuit Court.
25            MR. HEIMAN:  Yes.  I'm sorry.  Excuse me.  I'm
```

1    sorry.  And so --

2          THE COURT:  Well, actually my question was a little

3    more specific than that.  It was the stay would be clarified

4    to permit Mr. Davis to seek a judgment -- a declaratory

5    judgment under the Open -- that the Open Meetings Act was

6    violated, obviously not finding that.  That's not our role

7    here, but a declaratory judgment that the -- seeking a

8    declaratory judgment that the Open Meetings Act was violated

9    and attorney fees, period.

10          MR. HEIMAN:  Okay.  And if I may suggest that we add

11    to that and that no other party may use any such ruling

12    should it come to pass in any way regarding -- with respect

13    to Mr. Orr's appointment without coming back to the

14    Bankruptcy Court, I think we would be satisfied, so it's --

15    it would, in fact, be a clarification of the stay as relates

16    to Mr. Davis' lawsuit, so I would think we could do that,

17    your Honor.

18          THE COURT:  Sir.

19          MR. PATERSON:  Yes.  I think the Court should be

20    aware that the Open Meetings Act itself I think addresses Mr.

21    Heiman's concern.  Section MCL 15.273 reads, "The circuit

22    court shall not have jurisdiction to invalidate a decision of

23    a public body for a violation of this act unless an action is

24    commenced pursuant to this section within the following

25    specified period of time," and then "(a) Within 60 days after

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 159 of 107
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:55   Page 15 of 107
574
159

1　the approved minutes are made available to the public by the

2　public body."  His appointment was on March 14th.  Sixty days

3　have come and gone.  No one else can seek to invalidate the

4　appointment of Mr. Orr under Public Act 72 because the

5　Circuit Court would not have jurisdiction.

6　　　　THE COURT:  So I take it by that that you wouldn't

7　object to the additional suggestion that Mr. Heiman made

8　here.

9　　　　MR. PATERSON:  I would not.  It simply restates the

10　law, I think, of the state.

11　　　　THE COURT:  Sir.

12　　　　MR. HEIMAN:  No.  I was good.

13　　　　THE COURT:  Okay.

14　　　　MR. HEIMAN:  Thank you.

15　　　　THE COURT:  Well, in the circumstances, it appears

16　to the Court that we have an agreement as to how this motion

17　should be resolved, so, Mr. Peterson, I'm going to ask you to

18　prepare an order with the three agreed upon conditions here

19　and have it approved as to form by the Attorney General's

20　Office and counsel for the city and then submit it to the

21　Court.

22　　　　MR. PATERSON:  Will do.  Thank you, your Honor.

23　　　　THE COURT:  You're all set, sir.  All right.  Let's

24　turn our attention to the Syncora matters.  I'd like actually

25　first to address the adversary proceeding if that's okay with

1  everyone.  Who will be addressing the adversary proceeding

2  for the city?

3          MR. SHUMAKER:  I will, your Honor.  Gregory Shumaker

4  of Jones Day.

5          THE COURT:  Mr. Shumaker.

6          MR. SHUMAKER:  Yes.

7          THE COURT:  All right.  So let's review where we are

8  in the adversary proceeding and where we think we might be

9  going.  Okay?

10          MR. SHUMAKER:  Certainly.

11          THE COURT:  As best I can figure it, Syncora has a

12  motion to dismiss that's pending and fully briefed and needs

13  a hearing date.  Yes?

14          MR. SHUMAKER:  It's almost fully briefed, your

15  Honor.  There's a reply brief from --

16          THE COURT:  Reply brief, yes.

17          MR. SHUMAKER:  -- the city due I think on the 26th.

18          THE COURT:  Okay.  There is the city's motion for a

19  protective order.  What's the briefing status on that?

20          MR. SHUMAKER:  The reply brief was filed by the city

21  recently, and that was in response, if you recall, your

22  Honor, to their emergency motion to dissolve the TRO and for

23  discovery, so we responded by responding to the motion to

24  dissolve and then with a motion for protective order with

25  respect to the discovery they sought.

1　　　　THE COURT:  Right.  And so then the other motion is

2　the motion to dissolve the TRO.

3　　　　MR. SHUMAKER:  That's right, your Honor.

4　　　　THE COURT:  All right.  Well, my questions for you

5　are what is the city's position on dissolving the TRO, and I

6　ask that with the vague notion that perhaps the TRO has

7　already expired by its own terms, if not by operation of law

8　or rule, and what further relief does the city seek in this

9　adversary proceeding, in any event?

10　　　　MR. SHUMAKER:  Well, your Honor, excellent

11　questions.  The TRO, of course, by Michigan law typically

12　expires as of 14 days.  Judge Berry indicated that the TRO

13　should remain in full force and effect until the Court

14　specifies otherwise.  After that happened, the case then got

15　removed, and then it got transferred to your Honor, referred

16　to your Honor, so the TRO has been out there.  If you will,

17　we believe that one option for the Court would be under

18　Section 108(b) of the Bankruptcy Code, which allows -- when

19　an order is enforced in a nonbankruptcy proceeding and fixes

20　a period which is -- say it's 14 days -- the city filed on

21　the 13th day.  The TRO was entered on July 5th, and the city

22　filed on July 18th.  Section 108(b) provides a 60-day, if you

23　will, extension, but I can't tell you, your Honor, that I've

24　got a case on that one, but it is something.  But in the end,

25　the TRO has been out there.  We know that it is still needed,

1   which has kind of hung up the communications between the

2   parties because we know that Syncora is going to try to

3   capture or try to trap the $15 million that goes into the

4   lockbox arrangement every month, and so we have been

5   unwilling, without them agreeing to not go after the cash, to

6   agree to a dissolution.

7          THE COURT:  But it's your position that the

8   automatic stay --

9          MR. SHUMAKER:  Correct, your Honor.

10          THE COURT:  -- would prohibit that regardless.

11          MR. SHUMAKER:  I don't mean to say what I just said

12   was not relevant because I think it is, but in the end we

13   think since the city has filed that the casino revenues, if

14   you will, your Honor, the tax -- the wagering taxes, are

15   subject to the automatic stay, so the TRO may have run its

16   useful life, but we do believe that the automatic stay would

17   prohibit Syncora from taking the actions that it intends to

18   take.

19          THE COURT:  Well, is it -- just procedurally is it

20   your and your client's intent to try to keep this temporary

21   restraining order in effect, if it is in effect, pending this

22   Court's ruling on whether the stay is in effect as to this

23   property?

24          MR. SHUMAKER:  Well, your Honor, what we have asked

25   for is that the Court maintain the status quo through the

13-53846-swr   Doc 4814-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 163 of
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:55   Page 18 of 107   163
574

1  hearing on the assumption motion because the purported

2  consent rights that Syncora is asserting are also -- are

3  going to be ruled upon, if you will, in that proceeding, and,

4  therefore, we see them as very closely connected.  And what

5  we would prefer, your Honor, is either an extension of the

6  TRO or -- you know, that's why I raised the 108(b) vehicle --

7  or simply -- I don't think we're asking for the stay.  We

8  just noted the stay applies to this property or we believe

9  the stay applies to this property, and Syncora has not moved

10  to -- moved for relief from the stay.  And as a result, we

11  would --

12         THE COURT:  It contends the stay doesn't apply.

13         MR. SHUMAKER:  I'm sorry.

14         THE COURT:  It contends the stay does not apply.

15         MR. SHUMAKER:  That's correct, your Honor.  That's

16  correct, which we disagree with, and I'm more than happy to

17  address those points, your Honor, if you'd like me to, but

18  we -- and they filed a statement yesterday that went into the

19  different reasons why they believe the automatic stay does

20  not apply.

21         THE COURT:  Right.  I saw that.

22         MR. SHUMAKER:  Yeah.  Oh, your Honor, one other

23  thing I should raise is not only is the 362 stay out there,

24  but we also believe that there's a stay under Chapter 9 that

25  applies which is 922(a)(2), which would also prevent Syncora

1  from taking post-petition action against the casino revenues

2  which are taxes, and so that would be another vehicle for

3  maintaining the status quo as we believe is necessary.

4       THE COURT:  Well, if you got a court order

5  clarifying that the stay does prohibit Syncora notifying U.S.

6  Bank to trap these funds, would that obviate the need for

7  this adversary proceeding altogether?

8       MR. SHUMAKER:  I don't -- the remaining aspects of

9  the adversary proceeding would be the tort claims that the

10  city advanced in that initial complaint on July 5th, which

11  were the intentional interference with a contract,

12  intentional interference with an advantageous relationship,

13  so those torts presumably would move forward, but in terms

14  of, you know, the declaration that we sought, at least --

15       THE COURT:  Well, but has the city really suffered

16  any damages, assuming those wrongs were committed?

17       MR. SHUMAKER:  Well, I think that's something that

18  we would need to flesh out in discovery, but I think that the

19  declaratory --

20       THE COURT:  Excuse me, but really?

21       MR. SHUMAKER:  Well, your Honor, it's -- those

22  claims are still out there.

23       THE COURT:  How long -- how long --

24       MR. SHUMAKER:  We would -- we would --

25       THE COURT:  How long was the city without the funds

1   because of the trap?

2          MR. SHUMAKER:  At least a couple of weeks, your

3   Honor, since June.  It's complicated because the --

4          THE COURT:  So there may be a bit of damages from

5   that maybe.

6          MR. SHUMAKER:  There might be some damages from

7   that, correct, your Honor.

8          THE COURT:  Maybe.  All right.  So what you seek by

9   your request to maintain the status quo pending the

10  resolution of the assumption motion is the explicit or

11  implicit -- I'm not sure which -- order that the TRO

12  previously granted is still in effect.

13         MR. SHUMAKER:  That would be fine with us, your

14  Honor.

15         THE COURT:  Well, I'm asking what you're requesting.

16         MR. SHUMAKER:  Well, I --

17         THE COURT:  I'm not offering anything.  I just want

18  to know what you want here.

19         MR. SHUMAKER:  Well, what I think is -- the fact

20  that the automatic stay applies I believe would prevent

21  Syncora from doing what we believe they want to do.

22         THE COURT:  Well, if that's your position, it seems

23  to me you ought to think seriously about consenting to the

24  dismissal of the case.  Let me hear from Syncora's counsel.

25         MR. HACKNEY:  Good morning, your Honor.  Stephen

13-53846-swr   Doc 4834-9  Filed 04/29/14   Entered 04/29/14 22:00:23   Page 166 of
574
13-53846-swr   Doc 685  Filed 08/29/13   Entered 08/29/13 12:14:55   Page 21 of 107        166

1   Hackney.  It's nice to see you again.

2          THE COURT:  Mr. Hackney.

3          MR. HACKNEY:  So I think you've gone to the nub of

4   some of the issues, your Honor, because I think what is

5   really trying to happen -- what the city is really trying to

6   have happen here is I think they're uncertain as to whether

7   the stay applies, and they're hoping that they can prop up

8   the TRO as an interim measure where they sort out whether --

9          THE COURT:  I sort of asked that, and the answer was

10  no.

11         MR. HACKNEY:  And I think that to the point that if

12  they believe the stay applies, then there is certainly no

13  need for the TRO.  There will be no irreparable harm going

14  forward because the stay will prevent against that.  We have

15  been cards on the table with the Court in terms of expressing

16  our views about the stay because we didn't want to come in

17  here and get the TRO dissolved and then pop up later, so that

18  was part of the reason for the lengthy filings.

19         THE COURT:  I read what you wrote about that.

20         MR. HACKNEY:  I know you've had a lot of filings,

21  but -- we're not trying to weigh you down unnecessarily, but

22  we wanted to be transparent with you.  But I guess from my

23  standpoint, your Honor --

24         THE COURT:  Well, let's just ask the question --

25         MR. HACKNEY:  Yeah.

1        THE COURT:  -- since you are willing to be so

2   transparent.

3        MR. HACKNEY:  Yes.

4        THE COURT:  If, with the city's consent or without

5   it, the Court dissolves the TRO --

6        MR. HACKNEY:  Yeah.

7        THE COURT:  -- do you intend to notify U.S. Bank to

8   trap casino funds?

9        MR. HACKNEY:  So I think that there are two answers

10  to that question, your Honor.

11       THE COURT:  Are they both either yes or no?

12       MR. HACKNEY:  Ironically, the first one is that it's

13  important to understand about our position on the legal

14  documents that -- and this is actually very important to the

15  way the collateral agreement works is that it doesn't matter

16  whether we notice U.S. Bank to trap or not.  This is very

17  important.  So under Section 5.4(a)(3) of the collateral

18  agreement, when there is an event of default of which the

19  custodian is aware -- that's U.S. Bank -- it shall not remit

20  money to the city.  And the custodian is aware that there are

21  events of default separate and apart from Syncora's letters,

22  which were merely describing its view of the state of the

23  world, because Mr. Orr himself in his proposal to creditors

24  in his presentation on June 14th said there was, so he

25  created that state of mind in U.S. Bank.  That is what led to

1  the conversation that we believe happened, which led to our
2  confirmatory letter that under the normal automatic operation
3  of the collateral agreement cash trapping would occur, so
4  that's why I'm prefacing my question of what will Syncora do
5  because our view continues to be that it doesn't matter
6  whether we take action or not.  It's something that happens
7  automatically.  So I think the -- as to what will we do, you
8  know, I think the answer is that we've expressed our view to
9  you that we do not believe that the stay applies.  We've also
10  attempted to describe to you this machinery embodied in the
11  COP's and the swap and the different types of rights we have,
12  so we believe that we have not only enforcement rights
13  directly under the collateral agreement and the swap
14  agreement but also direction rights to the swap
15  counterparties themselves vis-a-vis their rights under the
16  collateral agreement.  And while I can't say definitively
17  today what we will do, I do want to represent to the Court
18  that we believe that we would continue to have those rights
19  notwithstanding the stay, so, in an effort to be responsive
20  to your question, I think it's something we could do, but,
21  more importantly, I think it's something that we do not have
22  to do.
23       THE COURT:  So that's a definite maybe.
24       MR. HACKNEY:  Yeah.  But, your Honor, if I could add
25  something, I mean I'm trying not to argue the merits of the

13-53846-swr   Doc 4664-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 169 of 107
13-53846-swr   Doc 665   Filed 08/29/13   Entered 08/29/13 12:14:35   Page 24 of 107
574
169

 1   dissolution motion, but I think, as you saw, we have very
 2   strong feelings about that TRO.  I mean that TRO was granted
 3   ex parte, and I won't argue the merits, but I think it's
 4   already been in place for -- since July 5th, so I think
 5   that's something on the order of 45 days.  And now the city
 6   is saying we think it should be extended another 60 days, and
 7   we don't see the merits of it under the classic test, and we
 8   also don't believe that it --

 9              THE COURT:  Well, 60 days from filing, not from now.
10              MR. HACKNEY:  Fair point.  Fair point, but -- so I
11   really think that what -- I think that we have to just be
12   candid about what's happening here, and I think this is
13   really about the auto stay.  I think it's does the automatic
14   stay apply, and you know what, Syncora, if it does, act at
15   your peril because you could be subject to sanctions if you
16   violate the automatic stay, and, city, you know, if there's a
17   question that the automatic stay doesn't apply -- for
18   example, when the city touted the assumption motion, they
19   were talking about the access to the liquidity they would
20   get.  I took that by negative implication to suggest if we
21   didn't do the forbearance agreement, there would be cash
22   trapping.  So, city, if there's questions about whether you
23   think the automatic stay applies, it's incumbent upon you to
24   file a motion to extend it, but I wanted to add one last
25   thing, your Honor.  I'll try not to go on at length, but when

1   I did the conversation with Mr. Shumaker about our motion to

2   dissolve and asked them whether they would consent, this is

3   what I understood them to say.  I understood them to say we

4   will stipulate to dissolution.  We're not putting the money

5   back, so we had a disagreement there.  But what will happen

6   then is U.S. Bank will go back to trapping cash in the

7   interim, and then I take from their papers that they

8   anticipated that they would have then filed, and so if that

9   had happened, as we believe it should have, given the

10  stipulation, then it would have been clearly on the points of

11  the automatic stay.  It would have been does the automatic

12  stay apply or does it not.  I don't think that there's

13  anything about the passage of time and the fact that the TRO

14  actually didn't get formally dissolved by Judge Zatkoff that

15  should change the essential nature of that legal question.  I

16  think that's the appropriate place to leave the parties

17  rather than having this TRO involved, which then leads to a

18  preliminary injunction hearing which requires discovery and,

19  to my mind, is not the real debate between the parties.

20          One last note, your Honor.  The motion to dismiss is

21  not fully briefed because not only do we have to get their

22  response, but I think we also are able to reply.

23          THE COURT:  Right.  Thank you.

24          MR. HACKNEY:  Thank you.

25          THE COURT:  Well, before you sit down, let me just

13-53846-swr  Doc 4354-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 171 of 107
13-53846-swr  Doc 635  Filed 08/29/13  Entered 08/29/13 12:14:35  Page 26 of 107
574
171

1   ask you procedurally whether you are willing to take on in a
2   formal context in this Court and on an expedited basis the
3   extent to which the stay applies to any of the rights you
4   think your client has in the circumstances.
5           MR. HACKNEY:  Yeah.  So if the TRO were dissolved
6   and we shifted the focus to where we think it was -- where it
7   should be, I would absolutely work with counsel and with the
8   Court to move through an expedited process of resolving the
9   status of the stay, and so if I'm right and cash is trapped
10  in the interim, it would only be the amount of cash that's
11  trapped while that issue is resolved, and we would absolutely
12  work with the Court to meet any schedule you set.  You can
13  see we've done work on it already, so --
14          THE COURT:  Yes.  You've briefed it extensively
15  already.
16          MR. HACKNEY:  Yeah.
17          THE COURT:  Ms. Calton, did you want to be heard?
18          MS. CALTON:  We're representing Defendants Detroit
19  Entertainment, LLC, which is the Motor City Casino, and
20  Greektown Casino, LLC, and I think with respect to what
21  you're discussing today, our desire is pretty easy.  We want
22  whatever order is entered to be very clear where we're
23  supposed to pay the money so that we're at no risk of ever
24  having to pay it a second time.
25          THE COURT:  Right.

1      MS. CALTON:  Okay.

2      THE COURT:  I don't think anyone could object to

3  that.  One more, sir.

4      MR. COCO:  Yes, your Honor.  Good morning again.

5  Nathan Coco on behalf of -- on behalf of U.S. Bank in its

6  capacity as custodian under the collateral agreement.  Your

7  Honor, as we noted in our response brief that was filed some

8  time ago, U.S. Bank in this capacity is simply a custodian.

9  It is not U.S. Bank's role or discretion under the agreement

10  to decide whether or not there's an event of default, and,

11  you know, there's obviously a live dispute about whether or

12  not the stay applies, whether or not the cash should be

13  trapped or must be trapped.  U.S. Bank in this dispute is

14  simply seeking clarification one way or the other.  We are

15  trying to avoid a situation much like the casinos where we're

16  subject to conflicting instructions from the city and from

17  Syncora and, you know, are forced to separately seek the

18  Court's decision-making authority on those issues, so --

19      THE COURT:  That's a bit inconsistent from what I

20  heard Mr. Hackney say.  He said you have obligations once you

21  are aware of a default.

22      MR. COCO:  And there is a dispute about whether or

23  not there is an event of default --

24      THE COURT:  All right.

25      MR. COCO:  -- as I understand it because --

13-53846-swr   Doc 4814-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 173 of 107
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:35   Page 28 of 107   173
574

 1          THE COURT:  That's a different question.

 2          MR. COCO:  -- because the swap counterparties

 3  haven't officially declared a default, but I just want to

 4  make sure the record is clear.  U.S. Bank is not taking a

 5  position that there is or is not.  It's an issue that's been

 6  presented to the Court by the parties who have an economic

 7  interest in this dispute.  We just seek clarification to make

 8  sure that we're not put in an untenable situation where we're

 9  forced to reconcile two conflicting directions.

10          THE COURT:  Fair enough, sir.  Thank you.

11          MR. COCO:  Thank you.

12          MR. SHUMAKER:  Your Honor, if I may, briefly.  Mr.

13  Hackney was talking about how the collateral agreement works.

14  Of course, your Honor realizes that Syncora, the swap

15  insurer, is not a party to the collateral agreement and not a

16  third-party beneficiary.  There's no clause in that agreement

17  nor has there been any default on the swaps payments by the

18  city.  And we fundamentally disagree on this position as to

19  whether there is automatic cash trapping of the casino

20  revenues.  Mr. Hackney referred to a conversation between Mr.

21  Orr and U.S. Bank.  U.S. Bank has filed a paper disavowing

22  Syncora's version of those events, and we strongly believe

23  that the only parties that can -- the only entities that can

24  declare an event of default are the actual parties to the

25  collateral agreement.  That would be the swap counterparties

13-53846-swr  Doc 4814-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 174 of
574
13-53846-swr  Doc 665  Filed 08/29/13  Entered 08/29/13 12:14:35  Page 29 of 107     174

1   and not Syncora.

2           THE COURT:  Well, let me ask you the same question

3   that I asked of Mr. Hackney.  Are you and your client

4   prepared to address the issue of whether the automatic stay

5   in this case acts to prohibit Syncora from enforcing any of

6   the rights that it thinks it has under whatever the

7   agreements are here?

8           MR. SHUMAKER:  Your Honor, I think we would be more

9   than happy to do that.  We believe that it would be -- the

10  burden of proof would be incumbent upon Syncora to show that

11  they were entitled to that relief, but the only other thing I

12  would share, your Honor, is that we would still ask that the

13  Court prohibit the -- Syncora from taking steps to get at the

14  city's property, the casino revenues, which are so vital to

15  the city.  I mean we're talking if they take actions vis-a-

16  vis U.S. Bank --

17          THE COURT:  Well, all right.  Fair enough.  Let me

18  just put the schedule question to the two of you.  I'm

19  available today or we have a hearing -- a regularly scheduled

20  hearing for next Wednesday.  We could do it then or some

21  other time.  What suits you?  Do you want a moment to consult

22  with your --

23          MR. SHUMAKER:  If I might.

24          THE COURT:  -- staff there?  Sir.

25          MR. SHUMAKER:  Your Honor, we would be willing to do

13-53846-swr  Doc 4814-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 175 of 107
13-53846-swr  Doc 635  Filed 08/29/13  Entered 08/29/13 12:14:59  Page 30 of 107  175
574

1   it on an expedited basis over the next week for the August

2   28th hearing if we were able to have the status quo

3   maintained in some fashion.

4         THE COURT:  Sir.

5         MR. HACKNEY:  Your Honor, I think that in late June

6   when we thought that we were negotiating an NDA with the city

7   in order to make a proposal if the --

8         THE COURT:  Negotiating what?

9         MR. HACKNEY:  Negotiating an NDA with the city.

10  That's what we thought we were doing on July 3rd.

11        THE COURT:  I'm sorry.  Negotiating what?

12        MR. HACKNEY:  A nondisclosure agreement.  I'm sorry,

13  your Honor.  Don't mean to be overly familiar.  If they had

14  asked us back then, "Hey, will you stand still while we

15  negotiate this nondisclosure agreement, see if we can work it

16  out, make a proposal?" there might have been a different

17  willingness on behalf of my client to voluntarily stand

18  still, but I think -- I'm not authorized to say that we will

19  voluntarily stand still, your Honor.  I certainly will say

20  that we're happy to show up and argue this on August 27th,

21  August 28th if that works with the Court's schedule.  My

22  personal view is this TRO, there's not a lawful basis to

23  maintain it for a variety of reasons, and I just don't think

24  that we can just use it as this interim measure.  I don't

25  think a week's worth of cash trapping is going to cripple the

```
 1    city, and so -- and by the way, if the TRO stays in place,
 2    then you have the preliminary injunction, and we have to
 3    schedule the discovery.  It's just -- I don't think it's an
 4    efficient way to proceed, but we certainly will show up and
 5    argue this next week if you'd like us to.  I'm not even
 6    sure -- I will have to say I'm not even sure when the city
 7    gets the next payment discharged from the general receipt
 8    subaccount, so I don't know if they're going to --
 9              THE COURT:  Anybody have an answer to that question?
10              MR. SHUMAKER:  I'm sorry, your Honor.  I'm sorry.  I
11    missed the question.
12              MR. HACKNEY:  He wants to know when the next release
13    is to the city.
14              THE COURT:  When is the next release from the
15    subaccount?
16              MR. SHUMAKER:  It should be on or about the 26th,
17    your Honor.
18              THE COURT:  26th of this month?
19              MR. SHUMAKER:  Yes, your Honor.
20              MR. HACKNEY:  I was hoping it was.
21              THE COURT:  So it's before next Wednesday.
22              MR. HACKNEY:  I didn't know if U.S. Bank might know
23    the precise answer to that because it builds up, and then it
24    discharges to them, and so if it wasn't even going to
25    discharge, there is more time, so --
```

13-53846-swr   Doc 4834-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 177 of 107
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:35   Page 32 of 107
574
177

 1          THE COURT:  Right.  Well, I wonder, Mr. Shumaker, if
 2     it isn't in the best interest of all concerned to reconvene
 3     later this afternoon and have argument on this question.
 4     It's certainly been briefed in various filings that the two
 5     of you have made.  I'm prepared.
 6          MR. SHUMAKER:  Your Honor, we got their papers
 7     setting forth their arguments yesterday, and --
 8          THE COURT:  Of course you did, but none of it was
 9     any surprise to you.
10          MR. SHUMAKER:  Well, in terms of their positions on
11     the automatic stay, I believe there were some things in there
12     that were brand new, and we've --
13          THE COURT:  Okay.
14          MR. SHUMAKER:  You know, I believe that if your
15     Honor believes that's the only way to do it, that's what
16     we'll -- that's what we'll do.  We would hope that there
17     would be -- because the automatic stay is in place, we
18     believe, presumptively, that we could do this on --
19          THE COURT:  My concern with your relying on the TRO
20     is twofold.  I'm not confident, as a matter of law, that it
21     is still in place.  I don't know.  Second, I'm not
22     comfortable imposing one without all of the process that
23     Rule -- I think it's 65 of the Federal Rules of Civil
24     Procedure requires, which we have not -- or you have not
25     invoked, so I think it's in the city's best interest to get

this matter resolved very promptly, and I think it's also in

Syncora's best interest, too, because, you know, there's

money coming in, and there's money going out.

MR. SHUMAKER:  And we will do it today then, your

Honor.

THE COURT:  I suppose we could reconvene tomorrow if

you think 24 hours will be necessary to help you prepare for

it, but, in the meantime, there are risks, right --

MR. SHUMAKER:  Your Honor --

THE COURT:  -- and to consult with your people and

let me know what you want to do.

MR. SHUMAKER:  This afternoon is fine, your Honor.

THE COURT:  This afternoon is fine.  Okay.  Is that

all right with you, sir?

MR. HACKNEY:  Absolutely.

THE COURT:  What time would either of you suggest?

May I suggest three?

MR. SHUMAKER:  Three o'clock?

MR. HACKNEY:  You bet.

MR. SHUMAKER:  That's great.

THE COURT:  All right.  At three o'clock we will

have an oral argument on the issue of whether the automatic

stay of either 922 or 362 stays Syncora's enforcement of any

of its rights under any of the applicable agreements.

MR. HACKNEY:  And, your Honor, did you have a view

1    on the dissolution motion and whether we should argue its

2    merits, or is the TRO going to be dissolved?

3              THE COURT:  Well, my thought there was to wait and

4    see what the outcome of the stay motion was.

5              MR. HACKNEY:  Okay.

6              THE COURT:  If the answer to that is there is no

7    stay or it's a limited stay or whatever, then the city may or

8    may not decide to pursue a TRO, and we'll have to figure out

9    how to do that.  If the answer is, yes, the stay applies,

10   then I think the city would agree to dissolve the TRO and

11   maybe even dismiss the lawsuit.  So is that okay to hold off

12   on that?

13             MR. HACKNEY:  Absolutely.  The only reason I'm

14   asking is we do technically have a status conference today on

15   the adversary that would normally involve scheduling of

16   things like the preliminary --

17             THE COURT:  Right.  So let's hold off on that.

18             MR. HACKNEY:  Understood.  Your Honor, I just want

19   to make one more technical note on the adversary -- on the

20   adversary proceeding just before we leave the podium, which

21   is it's not precisely before you, but I think one thing that

22   we'll have to do is clarify the precise nature of the Court's

23   jurisdiction.  There were competing theories of jurisdiction

24   offered to Judge Zatkoff, and Judge Zatkoff merely held that

25   he did have jurisdiction.  And I wanted to flag this with you

13-53846-swr  Doc 4804-9 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 180 of 107
13-53846-swr  Doc 665 Filed 08/29/13 Entered 08/29/13 12:14:33 Page 35 of 107  180
574

 1   as a potentially important issue to things like mandatory

 2   abstention and so forth under Section 1334.  It's not before

 3   you.  I'm merely raising it with you in the means of a status

 4   to let you know that we think that may be an issue that has

 5   to be resolved.

 6          THE COURT:  Can you be a little more specific for

 7   me?

 8          MR. HACKNEY:  I sure can.  When we removed the case,

 9   we asserted that the casino defendants had been fraudulently

10   joined, and in doing so we represented that diversity

11   jurisdiction existed that supported removal.  By the time

12   Judge Zatkoff asked for clarification of this, the bankruptcy

13   had intervened, and they filed a motion that said it doesn't

14   matter anymore whether there was removal, and maybe there was

15   diversity jurisdiction.  They hedged a bit, but they said now

16   there's related-to jurisdiction.

17          THE COURT:  Okay.

18          MR. HACKNEY:  So that's good enough for him, but I

19   think for you it will be important for you to decide whether

20   you have either or both and so on and so forth.  I'm just

21   making that point now.

22          THE COURT:  All right.

23          MR. HACKNEY:  Thank you, your Honor.

24          THE COURT:  Sir.

25          MR. GOLDBERG:  Very briefly --

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 181 of 107
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:39   Page 36 of 107   181
574

```
 1          THE COURT:  Sir.
 2          MR. GOLDBERG:  What I'm hearing is that the
 3     hearing -- the expedited hearing you're talking about is a
 4     hearing on whether the automatic stay applies to post-
 5     petition release of the casino tax dollars.  Is that correct?
 6          THE COURT:  Yes, among other things.
 7          MR. GOLDBERG:  I mean I just want to call attention
 8     that in -- I represent party of interest David Sole.  We
 9     filed an objection to the approval of the forbearance
10     agreement.  One of the central arguments in our objection,
11     which we did brief, was --
12          THE COURT:  Excuse me, sir.  Could you just state
13     your appearance on the record?
14          MR. GOLDBERG:  I apologize.  Jerome Goldberg, and
15     I'm appearing on behalf of interested party David Sole.  We
16     did file an objection to the city's motion for approval of
17     the forbearance --
18          THE COURT:  Right.
19          MR. GOLDBERG:  -- agreement, and one of the things
20     that we did brief in the objection -- and it goes to the core
21     of our objection -- is whether or not the automatic stay does
22     apply to the -- based on Section 922 and Section 928.  And we
23     would appreciate at least consideration going to the
24     arguments we raised in the brief, which we took some time to
25     raise, and --
```

13-53846-swr  Doc 4814-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 182 of
13-53846-swr  Doc 685  Filed 08/29/13  Entered 08/29/13 12:14:39  Page 37 of 107   182
574

 1          THE COURT:  Okay.  We will look at that, and if
 2     you'd like to be heard this afternoon at three o'clock,
 3     that's fine with me as well.
 4          MR. GOLDBERG:  My problem this afternoon is my wife
 5     has cancer surgery next Wednesday, and she does have an
 6     important appointment with the doctor.  I'm available
 7     tomorrow morning to be heard, but I could not be available
 8     today.
 9          THE COURT:  Right.
10          MR. GOLDBERG:  But I would appreciate this because
11     we feel it is a very -- we feel this whole issue is a major
12     issue because it deals with interest rate swaps, which we
13     briefed, and that's a -- we're talking about tons of money
14     going to these banks and for what we believe is very little
15     socially useful, but I'm not going to argue our argument
16     there, but obviously the question of whether or not the city
17     is going to have to pay the money goes to whether it's a
18     secured loan.  It goes to the status within bankruptcy, and
19     it goes to whether -- it goes to the efficacy and the
20     necessity for this forbearance agreement and any benefit to
21     the city and to the -- against the interest of other
22     creditors like my clients, who are pensioners, who will see
23     less funds available for their pensions because the money is
24     going to the banks when the money does not even have to go to
25     the banks, so I would like to be heard on this question, but

13-53846-swr   Doc 4814-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 103 of 107
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:35   Page 38 of 107   183
574

 1   I know I'm not available at three o'clock.  If there's no

 2   other way to reschedule, I appreciate the -- I would at least

 3   appreciate that my brief be considered, be looked at.  We

 4   took time doing it.  We feel there are very valid arguments

 5   on why the automatic stay does not apply -- I mean does

 6   apply -- my apology -- does apply, and, you know, if there's

 7   going to be post-briefing on it, we'd like to be involved in

 8   that as well.

 9          THE COURT:  All right, sir.  You have my commitment

10   to review that part of your briefs for this afternoon's

11   hearing.  Thank you.

12          MR. GOLDBERG:  I appreciate it.  And it's Docket

13   361.

14          THE COURT:  Oh, okay.  Thank you.  All right.  The

15   other item that's on the agenda is a status hearing on the

16   motion to assume the executory contract, the forbearance

17   agreement.  Is there anything that anyone would like to bring

18   up in that regard?

19          MR. SHUMAKER:  Yes, your Honor.  Gregory Shumaker

20   again for the record.  Your Honor, last time we met on August

21   2nd, you'll recall that Syncora had asked for a significant

22   amount of discovery relating to the assumption motion.  At

23   the end of the hearing, I had informed the Court that the

24   city planned on putting on one or two witnesses for -- at the

25   hearing, and your Honor then ordered that there be -- that

1   depositions of the debtor's witnesses and any exhibits that

2   it proposed to proffer take place.  The city did do that on

3   Friday, I believe, and designated three witnesses and put

4   forth its exhibit list and has, in fact, given copies of all

5   of those exhibits pursuant to your order.

6          Syncora has put forth a witness list of ten

7   witnesses, one of whom overlaps, and that's the emergency

8   manager.  We've got -- your Honor has set the end of next

9   week for the end of those depositions.  We were wondering,

10  your Honor, if that was what you had envisioned for the

11  hearing, that there would be multiple other witnesses.  As

12  your Honor knows, it's not supposed to be a mini trial.  We

13  want your Honor to be -- you know, have everything it needs

14  to be informed -- fully informed, but that puts into some

15  sort of question the length of the hearing perhaps.  I don't

16  know if, you know, September 9th -- if 13 witnesses can be

17  put on that day, but, in any event, we wanted to raise that

18  as a status conference and get your guidance on that and then

19  also sort of the length of the depositions.  We have 13

20  objectors on the assumption motion.  We'd ask for

21  clarification from your Honor that whatever depositions go

22  forward be limited in length and perhaps that the objectors

23  be asked to coordinate in terms of their timing so there's no

24  duplication of effort for the parties.

25          THE COURT:  What limit would you suggest?

1     MR. SHUMAKER:  Well, your Honor, you know, a lot

2  of -- I don't know exactly with regard to the Syncora

3  witnesses how long those would take.  I was hoping with

4  regard to the three witnesses that the city had put forth,

5  including the emergency manager, given all that's going on,

6  that those be depositions of a half day in length.

7     THE COURT:  Thank you, sir.

8     MR. HACKNEY:  Stephen Hackney on behalf of Syncora,

9  your Honor.  So the first thing I want to say is that the

10  order didn't require us to identify witnesses or disclose

11  documents, but we thought it would be safer to identify any

12  potential rebuttal witnesses now.

13     THE COURT:  Well, the reason for that was because

14  you didn't tell me at the last hearing that you intended to

15  call any witnesses.

16     MR. HACKNEY:  And I don't have a present intention.

17  It's not a will call list.  I mean I don't know what the

18  city's witnesses are going to say in their depositions.  I

19  have their affidavits.  I have a sense of what they're going

20  to say, but there is water under the bridge yet.  We just did

21  it earlier rather than later rather than doing a rebuttal

22  witness list after we take the depositions.  That's all we

23  did.  I don't have a present intention to call witnesses.  I

24  will say I don't fully know enough about the city's case-in-

25  chief on the assumption motion to make that decision.  That's

13-53846-swr   Doc 4814-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 186 of
574
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:55   Page 41 of 107     186

 1   a nuance decision.  I don't anticipate putting on hours of

 2   testimony from Syncora or its financial advisors.  I will

 3   tell you that four of the names on the list are the service

 4   corporation directors who are -- is a party to the

 5   forbearance agreement, so those were names that we put on the

 6   list as well as potential percipient witnesses.  And then we

 7   identified a bunch of documents as well, so I'm not -- it's

 8   not my intention to hijack your assumption hearing.  I agree

 9   with the statement that a Court can't resolve third-party

10   rights in the context of assumption or 9019, so it's within

11   the context of that guidance that the Court gave that we

12   were -- that we submitted this list.

13          THE COURT:  Are the depositions of the three city

14   witnesses scheduled?

15          MR. HACKNEY:  They aren't scheduled, your Honor.

16   Well, that's in part because I didn't want to just fire out a

17   notice and then claim all the seven hours to myself.  I've

18   been trying to coordinate and have already had communications

19   with the other objectors, some of them.  Our intention is to

20   coordinate a call tomorrow so that the depositions can be as

21   orderly as possible in terms of not having a merry-go-round

22   of attorneys asking questions.  And if we can do that, we

23   will, but the one thing I'll say, your Honor, is we won't be

24   able to get the depositions done, I doubt, with all of the

25   objectors in a half day.  I think all of the objectors means

1     that we'll need the full seven hours for sure.

2          One last point on the matter of status, your Honor.

3          THE COURT:  I don't quite get that given the

4     relatively narrow scope of the issues and the hearing.

5          MR. HACKNEY:  I guess, you know, I won't reargue our

6     last interaction with each other on this subject.  I guess I

7     will just say that this is a very complicated structure, and

8     the implications of the forbearance --

9          THE COURT:  Of course that's true, but nobody argues

10    about the structure.  The structure is what it is.  It's in

11    the documents.

12         MR. HACKNEY:  Agreed; agreed.  But I also think the

13    implications, the analysis of the structure, of the city's

14    need for cash, of the validity of various things, is a

15    factual question that I know different objectors are going to

16    want to inquire --

17         THE COURT:  All right.  But that's a different

18    question than the question of the structure.

19         MR. HACKNEY:  That's a fair point.  It's just that

20    the complexity of the structure bleeds over somewhat into the

21    factual inquiry we do need to make in terms of have they run

22    their traps properly in order to try and get this deal

23    approved because they are contending that this will lead to

24    performance, so -- and, your Honor --

25         THE COURT:  You're talking about 21 hours of

1  depositions just on the city's side in a hearing that I was

2  thinking of allocating each side three hours to try.

3        MR. HACKNEY:  With the objectors grouped as a class?

4  Well, remember, your Honor, I think that I will say part of

5  the value of the depositions happening outside of the

6  courtroom is that it streamlines the presentation before the

7  Court.  I mean cross-examination gets a lot crisper when you

8  have the time to clarify and there's not as much fumbling

9  around in the courtroom, so I'm not sure that the deposition

10  will run contrary to your desire to run a tight hearing.  I

11  think it may accentuate it.

12        THE COURT:  Thank you, sir.  Does anyone else want

13  to be heard on these issues?

14        MR. HACKNEY:  Your Honor, if I could raise --

15        THE COURT:  Oh, is there more?

16        MR. HACKNEY:  I'm sorry.

17        THE COURT:  I'm sorry.  I'm sorry.

18        MR. HACKNEY:  No.  That's okay.  I try not to go on

19  at length.  I wanted to clarify one thing.  There's been

20  these repeated references to the data room as being something

21  that they've provided to us, and I just want to confirm that

22  it is being deemed discoverable and responsive to our

23  requests.  The reason for this is important.  Everyone had to

24  sign an NDA to go into the data room meaning --

25        THE COURT:  Nondisclosure agreement.  Got it.

 1          MR. HACKNEY:  Nondisclosure agreement.  I'm going to

 2     write that on my forehead this evening so --

 3          THE COURT:  No, no, no.

 4          MR. HACKNEY:  -- I see it every time I look in --

 5          THE COURT:  You can use the letters from now on.

 6          MR. HACKNEY:  Yeah.  No.

 7          THE COURT:  I got it now.

 8          MR. HACKNEY:  I will try to be less euphemistic.

 9     I'm sorry.  Under the nondisclosure agreement, you can't

10     disclose the information from the data room in court, to

11     witnesses, et cetera, unless the city agrees with you that it

12     is discoverable by other means, in which case now it can be

13     used in court proceedings.  I think that that's happened, and

14     I just want to clarify that that's happened because that's

15     going to facilitate depositions, filing of briefs before the

16     Court, and the execution of this hearing and a bunch of other

17     ones before you.  I don't think they put any privileged

18     information in that room, so there's -- it's financial

19     information of the city, so I think it should be

20     discoverable.

21          THE COURT:  All right.  I will get around to putting

22     that question to the city.

23          MR. HACKNEY:  Thank you.

24          MS. ENGLISH:  Good morning, your Honor.  Caroline

25     English from Arent Fox.  We represent Ambac, and we filed an

1   objection.  We, like Syncora, also at this point do not
2   anticipate the need to put forth rebuttal witnesses and
3   exhibits at the September 9th hearing, but based on what we
4   hear from the city's witnesses during depositions, it's
5   possible, and so we would like to request that a schedule be
6   entered allowing us after the conclusion of those depositions
7   to disclose any rebuttal witnesses and exhibits we might like
8   to offer during the evidentiary hearing and then allow the
9   city, if necessary, to depose our witnesses as well.  I'll
10  also --

11          THE COURT:  That would require that the depositions
12  take place like tomorrow, all three at the same time.

13          MS. ENGLISH:  Well, I think we have an extra week
14  built in.  The depositions of the city witnesses are supposed
15  to conclude by August 30th, I believe, and I think the
16  trial -- or the hearing is the 9th, so we do have the week of
17  Labor Day.  We could squeeze in some extra depositions if
18  necessary.  Again, we don't anticipate that it'll be
19  necessary, but we couldn't say for sure, and we need to
20  reserve the right to call any witnesses as we see fit after
21  we depose the city's witnesses.

22          THE COURT:  All right.  Thank you.

23          MS. ENGLISH:  Thank you.

24          THE COURT:  Sir.

25          MR. PEREZ:  Good morning, your Honor.  Alfredo

13-53846-swr   Doc 4884-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 191 of
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:55   Page 46 of 107   191
574

 1  Perez.  I represent FGIC.  Your Honor, in connection with our
 2  limited objection, we did file two declarations.  One was my
 3  declaration just attaching the documents that we relied on,
 4  so I don't think that's an issue, but we did file a very
 5  short declaration for Stephen Spencer on kind of two issues,
 6  and that would be our direct testimony of him to the extent
 7  the hearing goes forward.  So I don't know if anybody wants
 8  to question him about that, but that -- you know, those two-
 9  or three-page declaration would be our direct testimony of
10  him.
11          THE COURT:  If you haven't already, perhaps you
12  could work with the city on seeing if they would be willing
13  to have that declaration be admitted in lieu of testimony.
14          MR. PEREZ:  Okay.  I will do that, your Honor.
15          THE COURT:  Would anyone else like to be heard?
16          MR. GORDON:  Good morning, your Honor.  Robert
17  Gordon of Clark Hill on behalf of the Detroit Retirement
18  Systems.  I just thought this might be the right time to echo
19  the sentiment of Mr. Goldberg.  I don't know what's going to
20  get argued in oral argument regarding the stay this
21  afternoon, but we did in our papers raise the issue of
22  whether the lien asserted by the swap participants actually
23  extends to the post-petition casino revenue, so there could
24  be an issue there relative to whether there would be a basis
25  for even arguing whether the stay applies or doesn't apply,

13-53846-swr  Doc 4844-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 192 of 207
13-53846-swr  Doc 685  Filed 08/29/13  Entered 08/29/13 12:14:35  Page 47 of 107
574
192

 1   so we just want to make sure that the Court is aware of that.

 2          THE COURT:  Thank you.

 3          MR. GORDON:  Thank you very much, your Honor.  And

 4   other than that, I echo Mr. Hackney's suggestion that all

 5   objectors would somehow in a very efficient way hopefully be

 6   able to participate in the same discovery so no one is

 7   duplicating each other.  Thank you.

 8          MS. BRIMER:  Good morning, your Honor.  Lynn M.

 9   Brimer appearing on behalf of the Retired Detroit Police

10   Members Association.  Your Honor, we filed a limited

11   objection chiefly concerned that, as the Court is aware,

12   there was a retiree committee formation meeting yesterday.

13   The committee was -- will be appointed at the request of the

14   city, and to just request that the Court ensure whatever

15   scheduling order the Court puts in place takes into

16   consideration the opportunity for committee and committee

17   counsel to address these what are going to be ultimately very

18   significant issues to the ability of the city to honor its

19   pension obligations.

20          THE COURT:  Thank you for reminding me of that.

21          MR. MARRIOTT:  Good morning, your Honor.  Vince

22   Marriott, Ballard Spahr, on behalf of EEPK.  If you remember,

23   they're the unpronounceable --

24          THE COURT:  I do.

25          MR. MARRIOTT:  I rise only to address the notion

1    that it would be half-day depositions as opposed to full-day.

2    Not all of the objections raise the same issues.  I mean

3    there is some overlap, but there's also some independent,

4    depending upon who's objecting --

5            THE COURT:  Right.

6            MR. MARRIOTT:  -- so that it is not as though a

7    single lawyer could be designated to handle all of the

8    questioning, so I think that given the lack of overlap among

9    the objections, I think a full day would be appropriate, not

10   half.  Thank you.

11           THE COURT:  Thank you, sir.

12           MR. GOLDBERG:  Your Honor, Jerome Goldberg appearing

13   again on behalf of Mr. Sole.  We also did file a declaration

14   with our objections of the declaration of David Sole based on

15   a thorough review of the swap documents based on a previous

16   FOIA we had done, and if -- we are very amenable to that

17   declaration being entered in lieu of any testimony and will

18   check with -- as you instructed the other attorneys, we could

19   check with the others.  If they want to talk to -- depose Mr.

20   Sole, we would clearly make him available.

21           THE COURT:  All right.

22           MR. GOLDBERG:  If I could maybe visit one issue, and

23   I apologize for -- I sat thinking about this.  I am available

24   tomorrow morning to be part of this argument on the automatic

25   stay, which I think is a very important argument, and if

13-53846-swr   Doc 4804-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 194 of 107
13-53846-swr   Doc 665   Filed 08/29/13   Entered 08/29/13 12:14:55   Page 49 of 107
574                                                                                    194

 1   there was any way to reschedule -- I just am absolutely not

 2   available this afternoon.  I'm pledged to -- family comes

 3   first obviously, but I could make myself available tomorrow

 4   morning or Friday for the argument on the stay if that's

 5   possible.  Thank you.

 6        THE COURT:  Well, I certainly appreciate your

 7   interest in this issue and your client's, of course, and your

 8   personal circumstances, but I think it is in the best

 9   interest of all concerned to proceed this afternoon, so

10   that's what we're going to do.

11        MR. GOLDBERG:  If I could have a representative who

12   works with me appear, that would be okay.

13        THE COURT:  Absolutely.

14        MR. GOLDBERG:  Okay.  I appreciate it.  Thank you.

15        THE COURT:  Absolutely.  Anyone else?

16        MS. CALTON:  For clarification, your Honor, will the

17   status conference in the adversary proceeding be resumed this

18   afternoon or set for some other day?

19        THE COURT:  What more did you think we needed to

20   accomplish?

21        MS. CALTON:  Well, I don't know that we need to

22   accomplish, but if there's going to discuss discovery and

23   scheduling and briefing or is it really just going to be the

24   stay argument?

25        THE COURT:  Well, you raise a good point.  It is

1   possible that if the Court holds that the stay does not apply

2   and the city wants to go ahead with the adversary and

3   including the TRO, there may be some scheduling issues

4   discussed at that time.

5           MS. CALTON:  Okay.

6           THE COURT:  Okay?  Okay.  Mr. Shumaker.

7           MR. SHUMAKER:  Yes, your Honor.

8           THE COURT:  What's your answer to Mr. Hackney's

9   question?

10          MR. SHUMAKER:  His question is -- there were

11  several, your Honor.  I'm sorry.

12          THE COURT:  Well, his question about the data room

13  being discoverable and, therefore, not subject to your NDA.

14          MR. SHUMAKER:  Right.  The reason that the NDA's

15  were necessary, your Honor, is because there's a number of

16  sensitive financial documents, projections that are in the

17  data room that the city strongly believes should not be

18  disseminated unless there's an NDA in place.  We have

19  provided the parties with all of the documents that we've --

20          THE COURT:  I have to ask you to pause there with

21  this very general question, which is in bankruptcy why isn't

22  every piece of paper not privileged discoverable by any

23  creditor?

24          MR. SHUMAKER:  Well, your Honor, I think the answer

25  is if it's -- it might be discoverable, but it would -- it's

 1  possible it would be provided to the Court under seal if

 2  there was competitively sensitive information in there

 3  that --

 4          THE COURT:  Competitively sensitive?

 5          MR. SHUMAKER:  Well, I mean sensitive financial

 6  information.

 7          THE COURT:  These days.

 8          MR. SHUMAKER:  I'm sorry, your Honor.

 9          THE COURT:  What do you mean?  What do you mean?

10  Give me an example.

11          MR. SHUMAKER:  Well, there are --

12          THE COURT:  Give me an example of a document that

13  parties can see but you don't want disseminated, whatever

14  that means.

15          MR. SHUMAKER:  Your Honor, there are cash

16  projections relating to the city's financial future.  There

17  are expert reports.

18          THE COURT:  Okay.  Stop there.  Financial

19  projections.  Why are they sensitive?

20          MR. SHUMAKER:  They have --

21          THE COURT:  Doesn't the city want every one of its

22  citizens to see what the city's financial future is projected

23  to look like?

24          MR. SHUMAKER:  Yes, your Honor, but --

25          THE COURT:  What's the problem?

13-53846-swr   Doc 4814-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 197 of
13-53846-swr   Doc 665   Filed 08/29/13   Entered 08/29/13 12:14:09   Page 52 of 107   197
574

1          MR. SHUMAKER:  There are a lot of different
2   scenarios that are played out in those projections which,
3   again, the city has believed is it would not be in its best
4   interest to be disseminated in public.
5          THE COURT:  Okay, but why not?
6          MR. SHUMAKER:  Because we believe that the --
7          THE COURT:  What would be the harm to the city's
8   interest if that happened?
9          MR. SHUMAKER:  Yes, your Honor.
10          THE COURT:  What would the harm be?
11          MR. SHUMAKER:  Your Honor, you know, it's hard to
12   imagine the different scenarios that might develop with some
13   of the information that would suggest certain things.  That's
14   why we proceeded in this fashion.
15          THE COURT:  Well, generally speaking, speculation
16   and conjecture are not the basis for confidentiality, are
17   they?
18          MR. SHUMAKER:  That's true, your Honor.
19          THE COURT:  Now, you moved on to expert reports.
20   Those are discoverable, in any event, aren't they?
21          MR. SHUMAKER:  Your Honor, I mean I guess there's
22   also a relevancy concern.  I mean a lot of this
23   information --
24          THE COURT:  This is bankruptcy.  What's not
25   relevant?  All right.  I'm going to -- I'm going to just

1    pause this inquiry now because I sense the need for it.
2    We're going to reconvene this question also at three o'clock
3    because I want you to seriously consider with your colleagues
4    and your client the extent to which confidentiality is
5    necessary and appropriate for what's in your data room, and
6    at that point you can give me a more specific answer.
7              MR. SHUMAKER:  Thank you, your Honor.
8              THE COURT:  And that'll work for you, too, Mr.
9    Hackney.
10             MR. HACKNEY:  It will.
11             THE COURT:  All right.  All right.  So what else?
12   Okay.  So I guess I need to make a decision about the length
13   of depositions.  I am persuaded that the depositions of the
14   three city witnesses should be permitted for six hours, and
15   the Court will allow that.  It is the Court's hope and
16   expectation that these depositions can be scheduled as
17   promptly as possible so that parties opposing the motion can
18   determine the extent to which they will put on rebuttal
19   testimony.  In the circumstances, the Court will order the
20   disclosure of rebuttal witnesses 24 hours after the
21   conclusion of the last of the three depositions, and then the
22   city will have an opportunity to depose them if it sees fit.
23   Having said that, it is still the Court's strong intent to
24   proceed with the hearing on the date it set.  Anything else
25   we can do between now and three o'clock?  Sir.

13-53846-swr  Doc 4814-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 199 of 107
13-53846-swr  Doc 685  Filed 08/29/13  Entered 08/29/13 12:14:59  Page 54 of 107
574
199

1      MR. NICHOLSON:  Michael Nicholson appearing for

2  International Union, UAW.  I won't be able to be here at

3  three o'clock, your Honor, because of a prior commitment, but

4  I did want to report to the Court that with respect to the

5  NDA, the nondisclosure agreement, in meetings leading up to

6  the filing, we raised the very same questions the Court

7  raised and really didn't get a satisfactory answer.  We said

8  why shouldn't retirees, our members, citizens, be allowed to

9  know what's going on, and we were told we wouldn't get

10  certain information unless we signed the NDA.  We refused to

11  do that.  We still have not signed the NDA.  I think the

12  Court's concern is very appropriate.  Thank you.

13      THE COURT:  All right.  I do have one more thing to

14  put on the agenda for three o'clock, which is the issue that

15  I raised about how much time each side should be allowed to

16  present evidence at the hearing.  I'd like for you to suggest

17  some answer to that question to me at that time.  Anything

18  else anyone have at this time?  All right.  We'll be in

19  recess until three o'clock.

20      THE CLERK:  All rise.  Court is in recess.

21    (Recess at 11:16 a.m., until 3:01 p.m.)

22      THE CLERK:  All rise.  Court is in session.  Please

23  be seated.  Recalling Case Number 13-53846, City of Detroit,

24  Michigan, and Case Number 13-04942, City of Detroit versus

25  Syncora Guarantee, Incorporated, et al.

13-53846-swr   Doc 4364-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 200 of
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:33   Page 55 of 107   200
574

1    THE COURT:  Okay.  Let's address the automatic stay

2  issue.

3    MR. SHUMAKER:  Your Honor, could I interrupt with

4  two preliminary matters if it's okay?

5    THE COURT:  Sure.

6    MR. SHUMAKER:  My colleague, Ms. Ball, is going to

7  argue the stay motion, but two things I wanted to get back to

8  your Honor on.  One of them was, in light of your Honor's

9  willingness to have this hearing so quickly this afternoon, I

10  wanted to indicate that the city is willing to dissolve the

11  TRO, so prior to the automatic stay motion being heard we

12  thought we should tell you that.

13    The second thing is with regard to the data room.  I

14  wanted to be very clear that the city very much agrees with

15  your Honor that this is -- we should be as transparent as we

16  possibly can be with regard to documents affecting the city

17  and its citizens, and what we would propose, though, as much

18  as we agree with that, there are some documents -- we talked

19  about the 70,000 or so pages that are in that data room over

20  the break, and there are certain documents that we have

21  concerns about.  There's really kind of two categories.  One

22  is documents that involve individual privacy issues.  There

23  are some documents relating to different employee salaries,

24  compensation, benefits, Social Security numbers and whatnot

25  that we would be very reluctant to have disseminated publicly

1  for obvious reasons.

2          And then, secondly, in connection with sort of some

3  of the pension assessments, the city agreed to an agreement

4  with Milliman, which is a pension actuary, and as part of the

5  city's agreement we agreed to an NDA with Milliman, so anyone

6  who has come into the data room since then can get access to

7  the Milliman documents but also has been required to sign an

8  NDA.  We're happy to talk to Milliman about that, but that

9  was the other category that we were concerned about that

10  was -- obviously had some sensitivity as well.  What we would

11  propose is that if -- if it was all right with your Honor,

12  that we go through, cull out any of those documents that we

13  have those concerns about, and approach your Honor with a

14  motion for a protective order very, very quickly.  We don't

15  think any of this stuff has any relevance to the ongoing

16  assumption motion, but if we determine that the protective

17  order motion has to be filed, to get it filed in the next day

18  or two and then come back perhaps next Wednesday, if your

19  Honor was amenable to that, to argue that if there were

20  certain documents that we thought really should remain under

21  seal and require further protection.

22          MR. HACKNEY:  That makes sense to me, your Honor.  I

23  think it switches the burden a bit.  Instead of saying it's

24  all confidential until it's not, it says it's all not

25  confidential unless it should be.

1     THE COURT:  All right.  So this will solve the issue
2  you raised initially about discoverable material.  Yes?
3     MS. CALTON:  Judy Calton for Detroit Entertainment
4  and Greektown Casino.  We've been told that my clients aren't
5  eligible for the data room; that they won't tell the criteria
6  for who is eligible for the data room, which this may be
7  great for these two parties, but it doesn't help for the rest
8  of us.  I don't know what the criteria is for who can have
9  access.
10     MR. NEAL:  If I could -- good afternoon, your Honor.
11  Guy Neal, Sidley Austin, for National Public Finance
12  Guarantee Corp.  I rise to address the Milliman issue.  The
13  city has taken the position that in order for parties in
14  interest and creditors to have access to these actuarial
15  reports and valuations of their post-employment benefits,
16  OPEB's, that you need to release Milliman.  You have to
17  execute a third-party release.  We have not executed that
18  release.  We don't believe it's appropriate that we need to
19  enter into a release in order to obtain these materials.  If
20  Mr. Shumaker's opinion --
21     THE COURT:  Of what?
22     MR. NEAL:  Excuse me.  Release of any and all claims
23  that one may have against Milliman.  I'm not saying we have
24  claims, but I'm not sure why one needs to release a party in
25  order to get access to information that may become public.

13-53846-swr   Doc 4834-9 Filed 04/29/14  Entered 04/29/14 22:00:23   Page 203 of
574
13-53846-swr   Doc 665  Filed 08/29/13  Entered 08/29/13 12:14:59   Page 203 of 107     203

 1   If it's the city's position that they're going to arrive at

 2   a -- they're going to evaluate what needs to be public and

 3   what needs not to be public by the next hearing, we're happy

 4   to work with the city on that.  If they have a stated

 5   position that they're going to hold firm to this third-party

 6   release and the parties need to sign it, I'd like to have

 7   that addressed today.

 8           MR. GORDON:  Good afternoon, your Honor.  Robert

 9   Gordon on behalf of the Detroit Retirement Systems.  I would

10   echo the comments of Mr. Neal on that point.  There already

11   have been also, just for the Court's edification, releases or

12   information provided by the city about some of those

13   Milliman, quote, unquote, reports, and I use that term

14   loosely because I don't believe they are reports.  They are

15   letters, they are analyses, but they're not actuarial

16   reports.  But, for example, there was a June 4 letter from

17   Milliman that was in that data room that was subject to these

18   confidentiality agreements, but then there's been information

19   released by the city about those reports, so there's

20   additional issues about whether things that are in that data

21   room and that might have been arguably at one time subject to

22   confidentiality are still subject to it, so I welcome having

23   that discussion at next week's hearing.  I don't think anyone

24   will be prejudiced in the interim.  Thank you.

25           MR. SHUMAKER:  And, your Honor, that is what I was

13-53846-swr  Doc 4334-9 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 204 of 107
13-53846-swr  Doc 685 Filed 08/29/13 Entered 08/29/13 12:14:05 Page 204 of 107
574
204

talking about is that the city was required to enter into
this contract with Milliman, and that's who we would like to
talk to about addressing the concerns that were just raised
about those documents.  As to the initial --

THE COURT:  Well, before we move on from that,
please ask the people with this firm that if they're not
willing to excuse what is apparently your contractual
requirement to get a release from the people who see their
work product, they need to come to court next week and talk
with me about it.

MR. SHUMAKER:  Be happy to do that, your Honor.  And
then as to access to the -- to I think it was Detroit
Entertainment, again, considering that this is the approach
that we think should be taken, they would get access like any
other objector or party.

THE COURT:  All right.  So we'll look forward to
your motion in the next day or so.  Ms. Ball.

MS. BALL:  Thank you, your Honor.  Good afternoon.
Corinne Ball on behalf of the City of Detroit.  Your Honor, I
rise to do a number of things, but I thought it might be
helpful, with the Court's indulgence, if I provided the
context in terms of the nature of the asset that we're
talking about this afternoon.  The casino tax revenues are
probably the highest quality revenue stream the city has.  It
certainly is one of the largest and we believe the most

13-53846-swr   Doc 4804-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 205 of
574
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:35   Page 60 of 107   205

```
 1   stable tax stream that the city has generating in excess of
 2   175 million a year and forecast to generate roughly that much
 3   in at least each of the next ten years.  Being able to use
 4   this valuable revenue stream is pivotal to the overall
 5   resolution of this case and the rehabilitation of the city.
 6              Another point that's been bouncing -- perhaps we
 7   could assist the Court -- are the numbers that have been
 8   discussed in connection with the swap, and your Honor may
 9   wonder why.  With these particular swaps, which are between
10   the counterparties and the service corporations, the
11   termination value, your Honor, floats inversely with interest
12   rates, so as interest rates rise, the termination value is
13   reduced so that as of now I am told the discounted price to
14   free up this revenue stream is less than 200 million and, in
15   fact, estimated at 190 million.  To date I think there has
16   been no debate in any of the three litigations involving the
17   casino revenues that if the swap obligation is discharged,
18   the lien on these revenues is released.  I also think there
19   is no debate that Syncora has not paid anything on the swaps
20   and that there are no amounts due.
21              Moreover, your Honor, absent the forbearance
22   agreement, were the swap counterparties to exercise their
23   alleged rights under Section 560 to terminate the swap, by
24   our calculation, as is reflected in Mr. Orr's affidavit,
25   Syncora's exposure is capped at $27 million.
```

 1      Your Honor, as is obvious to me but sometimes not as

 2  obvious to others given the pendency still of litigation and

 3  the fact that the city has no assurance that the settlement

 4  with the counterparties will be approved, it may, in fact,

 5  flounder or fail.  As is obvious from the 13 objections filed

 6  to date, there are key issues as to which the city is not

 7  prepared to concede any of these points today, since it

 8  doesn't know where the settlement will end up, but certain

 9  issues, your Honor, we think may be raised this afternoon,

10  and I wanted to share with you our view that we'd like to

11  make certain assumptions during our argument this afternoon.

12      Key among those issues which are being settled,

13  should the settlement and assumption motion be approved and

14  succeed, is are the casino wagering tax revenues special

15  revenues within the meaning of 9022.  There is dicta in the

16  Jefferson case cited by Syncora, and, your Honor, I know

17  there are three JeffCo decisions that have been cited

18  frequently with you.  I'm referring to the decision on the

19  receivership, which is reported at 474 B.R. 28, suggesting

20  that a revenue picture like ours it may or may not be special

21  revenues, so we are reserving that issue.

22      Obviously, your Honor, we're also not prepared to

23  concede that the swap is valid or that the pledge of the

24  revenues are valid, but having from the outset reserved on

25  those issues, we think we can still address the stay's

13-53846-swr   Doc 4814-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 207 of 207
13-53846-swr   Doc 635   Filed 08/29/13   Entered 08/29/13 12:14:35   Page 62 of 107   207
574

1   applicability to the wagering tax revenues.

2            I was impressed by Syncora's statement of yesterday

3   where for the first time they asserted that the casino tax

4   revenues, the wagering tax revenues payable by casino owners

5   to the city, are not property of the city, and for that

6   proposition -- and your Honor will have to excuse me because

7   we'll be referring to New York cases a lot this afternoon as

8   many of these documents are governed by New York law -- they

9   point to cases which there's only one common theme among the

10  escrow cases cited by Syncora in support of that proposition,

11  and the common theme is you have to go to the underlying

12  agreement, and you have to look at it and see what it says.

13  So if we go to the key agreement, which is the collateral

14  agreement, which, as your Honor knows, Syncora is not a party

15  to, the agreement has a definition of pledged property in

16  Section 1.2, which keys into the definition of revenues that

17  are pledged and ultimately to the city's tax -- wagering tax

18  revenues.  So I think that the agreement is fairly clear that

19  these revenues are property of the city, and the remedy

20  section -- and, in particular, Section 11(c) of that

21  collateral agreement -- confirms that the revenues remain

22  property of the city in these accounts and cannot be accessed

23  except with an appropriation by the city of its revenues to

24  that purpose.  So I think this agreement, were one to read

25  it, is fairly clear that these revenues are remaining

 1   property of the city.  But I think we would then turn, your

 2   Honor, beyond the agreement to the decision again by Judge

 3   Bennett in ruling on the receivership motion.  You may recall

 4   that the monolines and other warrant holders in that case

 5   sought to restore the receivership in the context of

 6   Jefferson County's Chapter 9.  Judge Bennett spent a very

 7   thoughtful opinion, and in that he concluded that the pledged

 8   revenues, even though in possession of a receiver appointed

 9   by a state court, remained property of the Chapter 9 debtor

10   and, as your Honor knows, ultimately did not restore the

11   receivership and did say that these properties are protected

12   by the stays of 362(a) and 922.  So I think we have the

13   general proposition look to the agreement as well as a very

14   specific one in Chapter 9, and that was an exceptionally

15   well-reasoned opinion.

16        I also think, your Honor, that there should be no

17   doubt that the casino tax revenues, technically wagering tax

18   revenues, are taxes within the meaning of Section 922(a)(2),

19   which has a very specific reference to taxes being protected.

20   While we're not prepared to concede, as I indicated already,

21   your Honor, that casino revenues are special revenues,

22   assuming arguendo for this afternoon that they are special

23   revenues within the meaning of Section 9022, there's still

24   two problems.  It's not clear to us that Syncora has

25   standing -- since it's not a secured party and it cannot

1    apply these revenues, that it has standing to raise or to be

2    within the protection of 922 at all.  It's not a party.

3    These properties were not pledged to them.  But more

4    importantly, if one actually looks to the words of 922,

5    literally it says that the stay does not apply to the

6    application of special revenues to the payment of

7    indebtedness.  As I think I've already shared with your

8    Honor, there are no amounts owing under the swap, and there

9    is no indebtedness remaining to be paid currently due on the

10   swaps, so we think reliance on 922(d) is misplaced for two

11   reasons.

12          And, your Honor, if I -- I thought it might be most

13   helpful if I went to 922(a)(2) first -- it's a very narrow

14   argument -- and then if your Honor would still like us to

15   argue the applicability of 362(b)(17), we're prepared to do

16   that.  I don't think there's any debate that wagering taxes

17   are taxes.

18          I also think, your Honor, that the 11th Circuit in a

19   case called In re. Patterson -- and perhaps at this point,

20   your Honor -- I have assembled a listing of the authorities

21   that I'd be using.  Would it be helpful to the Court so that

22   I don't have to keep reporting them -- I also have some for

23   Syncora.  May I approach, your Honor?

24          THE COURT:  Yes.

25          MS. BALL:  Your Honor, the 11th Circuit case named

1   In re. Patterson, the 11th Circuit has told us that a credit

2   union's action to freeze revenues constitutes a violation of

3   the stay as an act to enforce a lien.  That particular

4   passage appears at 967 Fed. 2d at 512.  We also have one of

5   your colleagues from the Southern District of Ohio in a case

6   called In re. Figgers.  In that case, the Court was

7   confronted with a refusal to release funds, which the Court

8   similarly found a violation of the stay as a prohibited

9   enforcement and collection action.  So, your Honor, I think

10  we now have freezing or refusing to release is enforcing a

11  lien, and we have taxes, so plain meaning for this

12  afternoon's purposes, the casino wagering tax revenues --

13  there should be a stay protecting them from enforcement of a

14  lien.

15          Now, what else do we know about a stay under Chapter

16  9?  Again, thanks to Judge Klein in Stockton --

17          THE COURT:  Well, the question that Syncora raises

18  is how is U.S. Bank's act in allowing the funds in the sub

19  account to accumulate rather than to turn it over to the city

20  a violation of the stay, an exercise of control --

21          MS. BALL:  Your Honor, I think --

22          THE COURT:  -- assuming it is property of the

23  debtor?

24          MS. BALL:  I think, your Honor, that's the Southern

25  District of Ohio.  That's enforcement of lien, refusing to

1   release revenues.  Similarly, your Honor, I think that
2   Syncora has somewhat overstated the Supreme Court's ruling in
3   Strumpf.  Your Honor may recall that the Supreme Court did
4   find in Strumpf that freezing revenues for a short duration
5   was not a violation of the stay, but it was really a stopgap
6   measure, if one looks at that case at 516 U.S. 19 and 20, to
7   get to the Bankruptcy Court to seek relief from the stay.

8        Your Honor, U.S. Bank has been releasing revenues
9   without a hitch until June 17th when communication started
10  from Syncora.  There were -- all of the events that were
11  alleged in Syncora's papers had all -- many had occurred
12  before then, but a custodian has a view.  I wouldn't be
13  surprised at all.  The documents only protect them if they
14  rely on the directions of the swap counterparties as the
15  secured party.  As part of the forbearance agreement, your
16  Honor may recall those swap counterparties consented to the
17  continuing release of those funds to the city.  Query, would
18  U.S. Bank ever had changed releasing revenues which it had
19  been doing since the emergency financial manager was
20  appointed in March, it had been doing for over a year when
21  there was an intervening credit rating downgrade?  It was
22  doing what the secured parties wanted it to do until a
23  communication from Syncora, and the nature of those
24  communications, your Honor, are probably beyond this
25  afternoon, but they were peppered with words like "demand

13-53846-swr  Doc 4814-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 72 of 107
13-53846-swr  Doc 685  Filed 08/29/13  Entered 08/29/13 12:14:39  Page 67 of 107    212
574

 1    that you hold."  It was not "look to your agreement."  And

 2    if, in fact, 922(a)(2) applies, if this matter of law does,

 3    and we would submit to your Honor on these facts it does,

 4    then there are no exception -- the 362(b) exceptions that are

 5    being argued by Syncora, they don't apply in Chapter 9.

 6    There has to be another basis to come to your Honor and seek

 7    relief from the stay.  362(c), (d), and (e) apply, but (b)

 8    doesn't.  So if we're in Chapter 9 stay world, I think U.S.

 9    Bank has to think about it.  I think Judge Klein and Judge

10    Bennett, both in Stockton and all three JeffCo cases, have

11    underscored that the exceptions to the automatic stay that

12    one would classically rely on, police power, 362(b), do not

13    apply, so in construing that agreement, I think -- which no

14    one has done and the custodian has zero obligation to do, a

15    fact -- that's the position it has espoused in filings in the

16    adversary proceeding now pending before your Honor, so we

17    know, your Honor, that if a Chapter 9 stay applies,

18    362(b)(17) doesn't.

19          Now, if I were to take a detour with your Honor's

20    indulgence -- bear with me because there is a critical

21    difference between 362(b) and Section 560.  The way the

22    exceptions work in the safe harbor world it appears to us --

23    it appears to me first from Judge Shannon's decision in

24    SemCrude where he actually took the lead -- he took the

25    general proposition that the automatic stay is very broad

13-53846-swr   Doc 4304-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 214 of
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:05   Page 68 of 107      213
574

 1   relying on Timbers and Midatlantic and said that exceptions

 2   really have to be construed extremely narrowly.  I think we

 3   know that from him, but he looked at the safe harbors, and I

 4   want to get back to 560.  It is relevant to the Chapter 9

 5   stay.  He looked at the safe harbors as saying it kind of

 6   works as a package, but fundamentally it's about offset

 7   netting and the termination of qualifying financial

 8   contracts.  In Judge Shannon's SemCrude case, your Honor may

 9   not be aware of the facts, but it involved what the Wall

10   Street types call a triangular setoff, which means that if

11   one of the nondebtor parties' affiliates owes an obligation,

12   they can set off -- I mean one of the debtor's affiliates

13   owes the counterparty an obligation, they can set off the

14   debtor's property.  The contract said that was totally

15   permissible.  They look to 362(b)(17), contract right, we're

16   exercising this.  Judge Shannon, who was affirmed in his

17   decision, said, no, very narrow exception.  You still have to

18   fundamentally be entitled to set off or exercise the rights

19   that you're seeking to exercise.

20        So why do I want to get back to 560?  560, 561, 559

21   are the part of the safe harbors.  If your Honor looks to the

22   language of 560, unlike the language of anything in 362,

23   including 362(o), 560, were the swap counterparties to

24   actually be terminating the swap, says right in it -- and I

25   quote, your Honor -- that they have a right to do so

13-53846-swr   Doc 4864-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 214 of
13-53846-swr   Doc 665   Filed 08/29/13   Entered 08/29/13 12:14:05   Page 69 of 107   214
574

 1   notwithstanding any provision in this title, meaning

 2   including, I would argue, 922(a)(2) if it were the swap

 3   counterparties who were, in fact, terminating the swap.  They

 4   have something they can point to.  362(b) has no such

 5   reference to notwithstanding anything else in this title.

 6   362, including 362(o), operate subject to Chapter 9.  So I

 7   think that when we think of the decisions, your Honor, that

 8   have really looked at this issue and they are, when one

 9   thinks about the qualifying financial contract decisions,

10   outside of Chapter 9, you have to start, as I said, with

11   Judge Shannon's decision in SemCrude on the triangular

12   merger.

13          Shortly after that, Judge Peck would follow again.

14   He, too, encountered very creative arguments that banks and

15   financial parties raised to say that they were arguing --

16   they were asserting a contractual right that enabled them to

17   squirt through this very narrow exception of 362(b)(17).  So

18   even if we were only operating under the automatic stay, I

19   think we have to look to Judge Peck's ruling against

20   Swedbank, and, your Honor, that's reported on the list that I

21   have given you at 433 B.R. 101, and that was affirmed.  And

22   Judge Buchwald in affirming that decision went at length

23   through the legislative history of the safe harbors, and, in

24   fact, relied on Dewsnup, the Supreme Court decision, to say

25   we have to pay attention to the fundamental principles.  If

13-53846-swr   Doc 4804-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 215 of 107
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:00   Page 215 of 107   215
574

1    this was designed for a setoff and a termination, that's the

2    only time it can be used.  So Swedbank that got the bright

3    idea that it could have had a contractual right to do more

4    than that was found to have violated the stay and directed to

5    release to Lehman the monies it was holding.

6         Shortly after that a name familiar to this Court,

7    Bank of America, would try something very similar against

8    Lehman.  They said, "Gee, we also have a contract right to

9    take your monies wherever we're holding it and apply it to

10   your debt.  And since we're involved in a swap, we should be

11   able to do that."  And, your Honor, that case was cited in

12   our statement to you of earlier this week.  And Judge Peck

13   said, "Wait a minute.  No.  You are not within the safe

14   harbor, and you shouldn't have done that.  You should have

15   come to me first and demonstrated your entitlement to relief

16   from the stay."  Failing that, he found that they had, in

17   fact, violated the stay.

18        You would then have the opportunity -- and Lehman

19   gave Judge Peck many opportunities to deal with the safe

20   harbors, your Honor.  Forgive me for reverting to New York

21   decisions so often, but he would then have to deal with

22   another triangular setoff case with UBS.  In the list of

23   authorities I've given you, your Honor, that's the Lehman

24   case that is followed with the initials UBS.  Again,

25   following Judge Shannon's lead, no, your contract may say --

1   or you can argue till you're blue in the face your contract

2   says you can do that, but that is not permitted.  That is not

3   a right that should be recognized.  It's beyond the

4   termination of a swap and going against collateral.

5          The case that probably gets the most press -- and it

6   was not reported, your Honor, so I don't know your rules

7   regarding an unreported decision.  It was a decision in the

8   transcript of Judge Peck.  In that case, a financial party

9   known as Metavante had relied on a provision in the ISDA

10  master swap.  It's very interesting.  Metavante was, in swap

11  vernacular, out of the money, which meant that Metavante

12  should have been paying monies periodically into the debtor.

13  Metavante said, "Wait a minute.  Safe harbor.  I have the

14  right -- I have the right to terminate the swap, and I

15  haven't decided whether I want to or not, but I also have a

16  contract provision which I'm exercising under 362(b)(17) that

17  says I don't have to perform if the debtor is not

18  performing."  Judge Peck had little patience -- had little

19  patience with that provision and said, "You waived your right

20  to terminate on account of the bankruptcy.  You haven't done

21  it, and you can't exercise other remedies."  That's not the

22  scope of this exception known as 362(b)(17).  It's far

23  narrower.

24         Another bank would come along shortly thereafter,

25  the Bank of New York.  And your Honor may be familiar -- and

1    I know that it did come up, I think, in Collins & Aikman
2    where there are special provision entities where there are
3    management rights, and if one were to become bankrupt, the
4    management rights would flip to the nondebtor.  Someone
5    sought to enforce such provision against Lehman.  They had a
6    swap and a financial contract, and they also had this flip
7    right.  And they literally read 362(b)(17), any contract
8    right.  Judge Peck said absolutely not.

9         It's not confined to Wall Street cases, your Honor.
10   In Calpine there was a forward contract in the energy field
11   between Calpine and Reliant Energy, and Judge Lifland was
12   confronted with Reliant Energy as a nondebtor trying to
13   exercise a right, a remedy, under its contract under 362(b).
14   Judge said, "Wait a minute.  You're not terminating this
15   forward.  That's all that's protected in the safe harbor.
16   It's not a roving commission to do what you want to a debtor
17   and withhold."

18        Your Honor, Judge Gonzales had a similar experience
19   in Enron when someone commenced a DEC action in state court
20   in reliance on a remedy in their contract, and he found that
21   that, too, was a violation of the stay.

22        But what I'm kind of concerned about -- and I
23   certainly did not mean to concede -- we're not sure since
24   we've heard conflicting statements and we certainly are not
25   conceding that Syncora has any contract rights with respect

 1    to the casino revenues and the collateral agreement.  In

 2    fact, we've heard them say they're not doing anything.  To

 3    your Honor's point earlier, they're passive.  So, your Honor,

 4    we think they can't be on all sides of this issue.  We think

 5    that the automatic stay of 362(a) has to rise to protect

 6    property of the city of this magnitude.  Your Honor, this

 7    property has substantial value.  It can support substantial

 8    leverage to resolve this case.  It should be protected by the

 9    automatic stay as a critical resource of the city, but its

10    characteristic as a tax can't be ignored either, which would

11    bring in the separate protection of Section 922(a)(2).  And,

12    your Honor, there's only one exception for that, and that's

13    in the safe harbors themselves, not the exceptions from the

14    stay, and I don't think that anyone, in light of the

15    forbearance agreement, certainly the swap counterparties, are

16    not terminating the swap.

17          Your Honor, I'd like to reserve the right to respond

18    as this was somewhat unscheduled, and we've tried to

19    anticipate the arguments that Syncora might raise.

20          THE COURT:  Thank you.

21          MR. HACKNEY:  Good afternoon, your Honor.  Stephen

22    Hackney on behalf of Syncora.  So there were a lot of cases

23    that were referenced there.  I would propose to start with

24    each of the three arguments I think that were made as to why

25    the stay should not apply, and I'd propose to start with the

fact that we contend that the property of the casino revenues
is not property of the estate.  And I thought it would be
helpful if I could walk the Court through where exactly this
property goes and how it gets to where it goes under the
collateral agreement, so there -- I don't think -- I heard
Ms. Ball say that I guess maybe they're reserving on the
question of whether it's a special revenue, but these are
excise taxes that we believe constitute special revenues that
are imposed on the activity of gaming and gaming related
activities.  They come into the hands of the casino, and then
instead of being paid to the city, as they normally would be,
the city gave irrevocable instructions to the casinos
directing them to pay the money to U.S. Bank.  And the
irrevocable instructions are interesting because they also
come with a release that says if you pay the money to U.S.
Bank, you have no further obligation.  You are released.
U.S. Bank then under the collateral agreement sets up a
number of accounts.  There's an account called the holdback
account, there's an account called the developer account, and
there's an account called the general receipt subaccount.
Put the holdback account over to this side for a moment
conceptually.  The developer account and the general receipt
subaccount are accounts that U.S. Bank itself sets up under
the collateral agreement.  They are housed at -- in New York
City, so the accounts themselves are physically outside the

1  State of Michigan.  The funds then go into the developer

2  account, and U.S. Bank at certain times then itself transfers

3  the funds from the developer account to the general receipt

4  subaccount.  They are only paid -- and the collateral account

5  uses the word "the custodian shall make payment of the funds

6  to the city upon the" -- either the city fulfilling certain

7  specific events or the nonoccurrence of other events as we

8  contend under Section 5.4, a termination event, an event of

9  default.  If those things are happening, then the custodian

10  shall not pay to the city the funds in the general receipt

11  subaccount.

12         The reason I'm going through this in such detail is

13  because the question is whether or not the casino revenues

14  are property of the estate.  I don't think it's a question as

15  to whether the debtor has an interest in them.  It certainly

16  has an interest in them, but that is not tantamount to saying

17  that it is property of the estate.  Here the --

18         THE COURT:  What's the nature of that interest that

19  you concede?

20         MR. HACKNEY:  I would -- what we have analogized it

21  to, your Honor, is a residual interest like one in an escrow

22  account.  And, in fact, I think we have made an argument in

23  our papers that the collateral agreement does create an

24  escrow account under New York law.  It has the hallmarks of

25  an escrow --

1    THE COURT:  Would you agree it's a contingent

2  interest?

3    MR. HACKNEY:  Yeah.  I think -- I would think of it

4  as residual, but I think contingent maybe is also accurate in

5  the sense that it is contingent upon a number of things

6  either coming to pass or not coming to pass before the city

7  has a right to receive the property, but we have cited the

8  cases to you that we cited --

9    THE COURT:  Well, let me ask you to pause one more

10  time --

11    MR. HACKNEY:  Oh, you bet.

12    THE COURT:  -- for what, you know, will seem like a

13  silly question, but I'm going to put it to you anyway.  If

14  it's not the debtor's property, whose is it?

15    MR. HACKNEY:  I think that the answer to that is

16  that it is property of the custodian.  The custodian has

17  title to the property.  It has control and possession over

18  the property.  There are other people that have interests in

19  the property.  The service corporations have an interest in

20  the property by operation of the city pledged to them.

21    THE COURT:  The custodian has no beneficial interest

22  in the property.

23    MR. HACKNEY:  I would have to think about that some

24  more.  The custodian is entitled to --

25    THE COURT:  There are no circumstances under which

13-53846-swr    Doc 4834-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 72 of 107
13-53846-swr    Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:39   Page 72 of 107    222
574

1  the money would ever go to the custodian for the custodian's
2  own use and benefit; right?

3          MR. HACKNEY:  I will have to duck that one, your
4  Honor, and say I'm not sure just because there are
5  circumstances where in its role as contract administrator the
6  contract administrator is allowed to pay itself some of its
7  fees.  I don't know if the custodian has similar provisions
8  that say, "Oh, by the way, before I kick the money out, I get
9  to hold back the X, Y, and Z."  I'm not saying it does.  I'm
10  just saying I'm not certain.  I can't concede it from the
11  podium, but -- so does the service corporation have an
12  interest in this property that is the property of the
13  custodian?  Yes.  Does the swap counterparty --

14          THE COURT:  All right.  Let's stop there.

15          MR. HACKNEY:  Yeah.

16          THE COURT:  Assuming for the moment that the city
17  has even a contingent interest in the money on deposit in
18  this account, isn't any attempt to exercise control over that
19  contingent interest stayed by Section 362(a)(3)?

20          MR. HACKNEY:  Yeah.  I guess I would say we don't
21  believe so, your Honor, because of the cases that we have
22  cited that say where in the context of an escrow all the
23  debtor has is a contingent interest that isn't sufficient to
24  establish that the property is property of the estate, and so
25  the stay does not apply in the first instance.  And I would

13-53846-swr   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 223 of
574
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:55   Page 83 of 107   223

1 | note that we have also cited cases to this effect.

2 | THE COURT: But what's the logic behind that? I ask

3 | that because in every other circumstance I can think of where

4 | a debtor has a contingent interest in property, that

5 | contingent interest is considered to be property of the

6 | estate protected by the automatic stay. Why would an escrow

7 | agreement be any different?

8 | MR. HACKNEY: Well, I can only say that I guess

9 | reason number one would be certainly we've cited cases

10 | suggesting that it is, but in terms of the policies behind

11 | those cases --

12 | THE COURT: Okay.

13 | MR. HACKNEY: -- I think the policies are that there

14 | is value to having certainty with respect to security that's

15 | been granted by a debtor that is no longer under its

16 | possession or control, and so you can see a situation where

17 | if the debtor -- I can see where the debtor has -- is driving

18 | its car around, but, yes, it's pledged the title to a bank

19 | there. The debtor still retains the primary possession and

20 | ownership of the property. The creditor there's interest is

21 | a security interest that they're not allowed to foreclose

22 | upon without violating the automatic stay. I understand that

23 | as an example where there are contingencies to the debtor's

24 | interest, but it's got the hallmarks of possession and

25 | control, and it's actually using the car. Where I think

 1  things change from the standpoint of the Bankruptcy Code,
 2  they certainly change from the standpoint of the cases that
 3  we've cited is where the debtor now gives the car as well to
 4  the bank that's also holding the title and saying, "Now this
 5  is property that can be held pursuant to this agreement.  I
 6  can only get it back in these certain circumstances."
 7       THE COURT:  So if under state law a creditor has a
 8  possessory security interest in property, your position would
 9  be that that creditor is not required to seek relief from the
10  stay because the stay doesn't apply?  That's an extraordinary
11  position to take.
12       MR. HACKNEY:  Where the creditor has a possessory
13  interest in --
14       THE COURT:  Possessory, yeah.  It holds possession
15  of the property as a secured creditor under state law like a
16  pawn shop or a bank that holds a CD, for example, as a
17  security interest.
18       MR. HACKNEY:  What I would say is that the escrow
19  cases we have cited I think read onto that circumstance that
20  you've identified, which is that, yes, where the maintenance
21  of the escrow, the continued operation of the escrow
22  subsequent to the bankruptcy filing does not constitute a
23  violation of the automatic stay.
24       THE COURT:  Well, but that would only be because the
25  stay doesn't apply; right?

13-53846-swr   Doc 4844-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 225 of
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:00   Page 80 of 107   225
574

 1          MR. HACKNEY:  That is correct.  I mean I'm not
 2    trying to assume the conclusion, but I'm saying the cases
 3    that we have cited were considering the question of whether
 4    or not the maintenance of the escrow violated the automatic
 5    stay because of the fact that the debtor had -- did have
 6    potentially a residual interest in the property that was in
 7    the escrow account, and what those cases said is the debtor's
 8    residual interest does not rise to the level of making the
 9    property property of the estate.  Part of the reason we're
10    analogizing to them is we do think at some point the rubber
11    has to meet the road in terms of looking at --
12          THE COURT:  Well, but there are a gazillion cases
13    that say a secured creditor who's in possession of collateral
14    must turn that over to the debtor and -- to the debtor, and
15    the creditors' relief is to ask for adequate protection,
16    right --
17          MR. HACKNEY:  Your Honor, I have to --
18          THE COURT:  -- outside of Chapter 9?
19          MR. HACKNEY:  I have to say I -- I will say, your
20    Honor, I'm not familiar with those cases as I stand here
21    today.  I prepared on the cases that were cited in the city's
22    papers.  It does seem to me, though, that to the extent those
23    cases hold that way, that the creditor has to pay the money
24    over to the debtor, they may be distinguishable from the
25    escrow context wherein the escrow is specifically designed to

 1   capture the money while different parties' potential rights

 2   are assessed, so I can only say that the cases we have cited

 3   are ones in which there's -- it's agreed that the debtor has

 4   a contingent and residual interest to the property

 5   potentially someday, but it doesn't have either possession or

 6   control of the property.  We have cited cases saying that the

 7   operation of the escrow is not outside the automatic stay.

 8          Your Honor, I would like to speak briefly, if I

 9   could, to the question of the pledged special revenues.  So I

10   don't think that there's a real debate that -- as to whether

11   these are pledged special revenues.  I understand counsel's,

12   I guess, reserved on that, but they are excise taxes.

13   There's an opinion from Orrick Herrington that was issued in

14   connection with the 2009 collateral agreements formation

15   identifying the wagering taxes as excise taxes, and Mr. Orr

16   himself in his proposal identified them as such, so I think

17   what I'd like to turn to, though, is the city's argument that

18   there's not going to be any application to indebtedness

19   because -- the fact that they're staying current on the swap.

20   And I want to address this because I think this misapprehends

21   the precise nature of the structure because the obligations

22   to make the periodic swap payments are the obligations of the

23   service corporation.  The city's obligations that are secured

24   by the city's pledge of these revenues are obligations under

25   the service contracts.  All of the city's obligations under

1  the service contracts have accelerated as a result of the

2  city's bankruptcy filing, so we disagree with the fact that

3  the city is current with respect to its obligations under the

4  service contract that the city pledged secures.  So I think

5  that argument by the city misses the mark.

6            THE COURT:  Is that acceleration legal?

7            MR. HACKNEY:  To the best of my knowledge, it is,

8  your Honor.  It's provided for in the service contracts that

9  the city signed that contain numerous opinions that were

10  rendered with them regarding the legality of those contracts.

11            THE COURT:  Is there any other indebtedness you rely

12  on?

13            MR. HACKNEY:  Well, I guess what I would say is that

14  the ultimate application of the wagering revenues to the

15  obligations of the service corporations under the swap in the

16  future would also be potential indebtedness that would

17  require the trapping now.  For example, if Mr. Orr decides

18  I'm going to stop paying the swap in light of the fact that

19  the trap is valid, then the payments will be made out of the

20  trapped funds via the -- from the city -- from the custodian

21  to the --

22            THE COURT:  Let's assume your argument is accurate

23  as far as it goes.  That is to say, the party holding the

24  lien can proceed.  How does that help you?  Why does that

25  suggest that there's no stay against Syncora because Syncora

1   does not have a lien?

2          MR. HACKNEY:  Well, first of all, the language of

3   Section 922(d) is not versed in the language of who possesses

4   the right in question, which distinguishes it from something

5   like 362(b)(17), which we'll get to in a moment, which talks

6   about swap participants, but let me answer your question

7   head-on, your Honor, and say that remember that this is an

8   integrated transaction, and so the collateral agreement not

9   only takes pains to integrate itself into the swaps

10  agreement, the services agreement, and the contract

11  administration agreement, the swaps agreement also makes

12  clear that the services contract, the collateral agreement,

13  and the contract administration agreement are all credit

14  support documents underneath the swap agreement.

15         Now, the significance of this, your Honor, is that

16  the way this structure works is that because Syncora

17  possesses the -- along with FGIC, but because the insurers

18  possess the ultimate economic exposure here to the structure,

19  the system -- the structure gives them the power to enforce

20  the various agreements and the right to direct the actions of

21  other people.  So if you look at the swaps agreement, for

22  example, Syncora is an explicit third-party beneficiary with

23  the rights to enforce the obligations underneath the swap

24  agreement, which, as I've noted, is integrated with these

25  other agreements.  Under the services contract, it's also an

```
 1   explicit third-party beneficiary with the rights of
 2   enforcement, and what is also unique is that under the
 3   contract administration agreement, it has the rights to
 4   direct the actions of the service corporation, the custodian,
 5   and the swap counterparties.  The reason for that, your
 6   Honor, is in order to remain in control of a structure that
 7   it's ultimately going to be paying people on, if you default
 8   on your insurance, you lose these control and direction
 9   rights, so you have to be staying current, which Syncora has
10   done, but the -- I'm trying to be responsive to your point,
11   which is to say they keep saying -- you know, it's like a
12   drum they're beating to say that -- what they're really
13   saying, your Honor, is Syncora is not a signatory to the
14   collateral agreement.  And you know what?  They're right.
15   Syncora is not a signatory to the collateral agreement, but
16   you should know that its consent was required to enter into
17   the collateral agreement.  It is a noticed party under the
18   collateral agreement.  There are provisions in the collateral
19   agreement that say that in order to exercise its rights under
20   the collateral agreement, it must not be in default of its
21   credit insurance that hearken back to the other provisions in
22   the services agreement and the swap and the contract
23   administration agreement that talk about not being in default
24   of your credit insurance, and so Syncora is absolutely a
25   party in interest and a third-party beneficiary with rights
```

 1    of enforcement, and that would entail the right to direct the
 2    conduct of the swap counterparties, so even if the Court
 3    decided under 922(d) it is important to me, the Court, that
 4    the party asserting 922(d)'s exemption of special revenues
 5    being applied to indebtedness have some connection to that,
 6    what I'm telling you, your Honor, is we absolutely do because
 7    that's the way these agreements are designed to work in terms
 8    of the control, the consent, and the direction rights.

 9            Your Honor, I was going to speak briefly to the
10    question of Section 362(b)(17) of the Bankruptcy Code, if I
11    may.

12            THE COURT:  Yes.

13            MR. HACKNEY:  So the key argument here, there is not
14    a suggestion, I don't believe, that the swap is not a swap,
15    that the collateral agreement isn't a security agreement
16    within the meaning of a swap agreement, which, by the way,
17    extends to agreements beyond just the swap agreement.  I
18    think the sole argument that the city is making here is that
19    Syncora is not a swap participant, and so I think I would not
20    belabor or repeat the arguments that I all just made about
21    the way Syncora is intimately connected to and has the powers
22    of different aspects of the agreements to both enforce them
23    directly and to direct other parties to do things including
24    the swap counterparties.  So from my standpoint at a
25    functional level, if you look at the language as to whether

13-53846-swr   Doc 4814-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 231 of
574
13-53846-swr   Doc 655   Filed 08/29/13   Entered 08/29/13 12:14:09   Page 86 of 107   231

 1  Syncora is a participant in the swap, it fits within the

 2  plain language not only because it has potential economic

 3  exposure to it, but also because it has rights of

 4  enforcement, and it has rights to direct the swap

 5  counterparties underneath the swap.  To me that makes it a

 6  swap participant under the plain language.

 7      There is admittedly -- there is a dearth of

 8  authority on this question.  We've researched it to say can

 9  we find a case one way or the other, and while I'll start as

10  an advocate by telling you that we found no case saying that

11  a swap insurer is not a swap participant, I'll also be candid

12  and tell you that we haven't found a case that says that a

13  swap insurer is a swap participant, so we're somewhat in a

14  case of first impression, but I wanted to offer you two

15  notes.  The first is that that Lehman case that they did cite

16  in their briefs, which is a -- I would describe as a highly

17  distinguishable case -- there was a -- Lehman involved, I

18  believe, Bank of America as attempting to use its role as a

19  custodian in one context, to grab the money and use it to set

20  off against an unrelated agreement that it believed it had

21  with Lehman, and not only was it held not to have the setoff

22  rights, which were the premise for what it was doing, it was

23  also -- certainly shouldn't be using the amounts it was

24  holding as custodian in order to try and set off its other

25  obligations, so Lehman is inapposite.  Obviously we take the

1    admonitions to be cautious with respect to the stay

2    seriously, and I'm not diminishing them, but here is what is

3    interesting about <u>Lehman</u>, I think, which is when Bank of

4    America invoked Section 362(b)(17) in <u>Lehman</u>, it was just a

5    custodian, you know. I mean, yeah, they're a signatory to a

6    swap, but are they really a participant in the swap? They're

7    not somebody that's going to benefit from the swap one way or

8    the other. And the Court in that case never said, "You're

9    not a swap participant." It said, "I will address your

10    argument on the merits as to whether Section 362(b)(17)

11    applies," and then concluded that it did not. And I think

12    that's significant because Syncora is absolutely a market

13    participant in connection with the swaps. Swap insurance is

14    a common aspect of the market, and so to ignore the practical

15    realities I think would ignore some of the purposes of the

16    safe harbor.

17         I would also note that we were able to find language

18    from <u>Collier's</u>, and this is <u>5 Collier on Bankruptcy</u> 560.031,

19    and what it said was the special protections for swap

20    agreements provided by Section 560 and other provisions of

21    the Bankruptcy Code are available to all parties to swap

22    agreements with the debtor because the swap -- the term "swap

23    participant" is broadly defined in Section 101(53C) to mean a

24    entity that, at any time before the filing of the petition,

25    has an outstanding swap agreement with the debtor, thus the

1  swap protections are generally available to all parties who

2  could benefit therefrom.  That's obviously --

3          THE COURT:  Collier cite any cases in support of

4  that?

5          MR. HACKNEY:  It does not in the provision I'm

6  reading, so take it for what it's worth, your Honor.  I

7  understand it's not the same as a Supreme Court opinion, I

8  know, but in short I think that if you take a functional look

9  at the purposes of the Safe Harbor Act, it was designed to

10  provide certainty with respect to swap participants with

11  respect to things like collateral agreements.

12          THE COURT:  How do you deal with Ms. Ball's argument

13  that under 922(b), Section 362(b) does not apply?

14          MR. HACKNEY:  Yeah.  So under 922 -- and I'm

15  sorry -- was that --

16          THE COURT:  (B).

17          MR. HACKNEY:  I want to make sure.  There was an

18  argument made under 922(a)(2) that these are the collection

19  of taxes.  Am I mis --

20          THE COURT:  Well, 922(a)(2), yes.

21          MR. HACKNEY:  And then --

22          THE COURT:  It's a stay applicable to all entities

23  of the enforcement of a lien on or arising out of taxes or

24  assessments owed to the debtor.  There's that stay.

25          MR. HACKNEY:  Yeah.

1    THE COURT:  But there's nothing that suggests that

2  (b) -- the exceptions in (b) -- 362(b) apply to that stay.

3    MR. HACKNEY:  Okay.  So at the first level, our

4  argument, your Honor, is that under Section 922(d) what

5  922(d) says, "Notwithstanding section 362 of this title and

6  subsection (a) of this section," so even if Ms. Ball were

7  correct -- and I will tell you why we don't concede that she

8  is -- they still have to run the rapids of 922(d) because it

9  specifically excepts 922(a).

10    The second thing I will tell you, your Honor, is

11  that I would say we have conducted research on this, and we

12  were, if I'm not mistaken, only able to find one case that

13  related to this provision, and it's in my iPhone, so I don't

14  have it for you because you have to turn your iPhone off in

15  the courtroom, so -- which is a good -- which is a good rule

16  because we're all too connected, but, anyway, I was reading

17  the case over lunchtime, and what my associate told me was he

18  was only able to find one case where this was invoked, and

19  the case there involved confusion or attempts to collect

20  taxes by an entity that was distinct from the debtor.  I

21  don't believe that this is currently the enforcement of a

22  lien against -- arising out of the taxes or assessments owed

23  to the debtor.  This is the natural operation of the

24  collateral agreement, the irrevocable instructions that were

25  entered into long ago, so there is no action that's being

1  taken by someone.  That's what's frustrating to the city is

2  the inaction, the refusal to transmit the monies that the

3  city has set by this -- by the dead hand of the collateral

4  agreement and the irrevocable instructions to flow directly

5  to the custodian.

6         THE COURT:  You keep tripping over that.  There's

7  lots of case law that says that Section 362 doesn't

8  distinguish much between action and inaction, and I assume

9  that case law would apply to 922 because it's the same

10  language, if not the same policy.  How do I deal with that

11  here?

12         MR. HACKNEY:  Well, I guess the -- I think the --

13  you would deal with it first by saying that it only applies

14  to property of the debtor ab initio, so you do have to get to

15  that stage.  And then second, even if the -- even if we are

16  on the subject of action versus inaction being irrelevant,

17  you also do have to find that 92 --

18         THE COURT:  What the cases say is that there are

19  many circumstances in which the inaction of a creditor

20  constitutes the exercise of control over the debtor's

21  property.

22         MR. HACKNEY:  But in those cases I'm going to

23  surmise there is a finding that it is property of the debtor,

24  and there's also --

25         THE COURT:  Right.

1        MR. HACKNEY:  So --

2        THE COURT:  Right.  It is.

3        MR. HACKNEY:  I also don't want to assume the

4   conclusion the other way against me, which is we have a

5   threshold question that says it's not property of the debtor.

6        THE COURT:  Okay.  So there's two different issues.

7   The first is is what is at stake property of the debtor.  The

8   second issue is is what the debtor is doing in relation to

9   that property an exercise of control over it.

10        MR. HACKNEY:  That's right, and that the 9 --

11        THE COURT:  What the cases say is that on the second

12   issue, the issue of exercise of control, inaction can be an

13   exercise of control.

14        MR. HACKNEY:  And I think the -- so and not to

15   forget that 922(d) is also an exception to 922 --

16        THE COURT:  Right.

17        MR. HACKNEY:  -- (a)(2), but I think -- Mr. Bennett

18   has handed me a helpful note, and hopefully I'm doing him

19   justice, but what he points out is we are not seeking to

20   interfere with the contingent interest that the city does

21   have.  It is merely that the property which is not the city's

22   property is the cash itself continue to be trapped, so that

23   is the distinction there which, again, folds back into our

24   argument that it's not property of the estate.

25        Your Honor, I have said my piece.  I think we --

```
 1              THE COURT:  All right.

 2              MR. HACKNEY:  -- may have exhausted my knowledge

 3    of --

 4              THE COURT:  Thank you.

 5              MR. HACKNEY:  -- bankruptcy law as well, so thank

 6    you very much, your Honor.

 7              THE COURT:  Anyone else briefly without duplicating

 8    what's already been said?

 9              MR. NEAL:  Yes, your Honor.  Good afternoon again.

10    Guy Neal, Sidley Austin, counsel for National Public Finance

11    Guarantee Corp.  I rise to echo or to -- to echo and to

12    underscore what Ms. Ball said about her reservations as it

13    relates to the special revenue determination, and without

14    treating this as a complete reservation of rights, which I

15    know is not something I need to do, I would encourage your

16    Honor to expressly reserve or avoid ruling on the issue of

17    whether or not these are special revenues such that they are

18    excepted from the automatic stay.

19              NPFG, among others -- I think about 12 or 13

20    others -- have filed an objection to the swap forbearance

21    motion, will be an active participant in discovery, will

22    litigate this issue on the 9th, and those threshold issues

23    that are raised -- and there are just three of them, so I

24    will be brief -- that were raised in NPFG's objection or

25    technically NPFG's joinder to Ambac's objection is that the
```

1    swap obligations are unauthorized under state law and,

2    therefore, void.  State law does not authorize the city to

3    pledge casino revenue to secure swap obligations, and, third,

4    the casino revenue does not constitute special revenue, and,

5    accordingly, the swap counterparties do not have a lien on

6    post-petition casino revenue.  I think these were the same

7    three issues that Ms. Ball appropriately reserved on.  Those

8    are issues to be -- that have been extensively briefed and

9    will be extensively argued and litigated on the 9th, so I

10   would ask your Honor in your ruling today not to foreclose

11   any argument -- or foreclose us -- excuse me -- and others

12   who, frankly, are not here in the courtroom today, including

13   Assured and Ambac this afternoon, to make these arguments on

14   the 9th.

15             THE COURT:  Thank you, sir.

16             MR. NEAL:  Thank you very much.

17             THE COURT:  Mr. Gordon, you rose.

18             MR. GORDON:  I did, your Honor, and the vagaries of

19   going second -- Mr. Neal said everything I wanted to say.

20             THE COURT:  Thank you.

21             MR. GORDON:  But just for the record, we support the

22   same position.  It was our understanding that the arguments

23   today were simply as to whether the stay had any effect on

24   Syncora as a third party not standing in the shoes of a swap

25   participant.  Those issues are really to be dealt with on the

1   9th.  Thank you, your Honor.

2       THE COURT:  Anybody else before we get back to Ms.

3   Ball?  One more, yes.

4       MS. FLUKER:  Good afternoon, your Honor.  May it

5   please the Court, Vanessa Fluker standing in for the attorney

6   of record, Jerome Goldberg, on behalf of interested party

7   David Sole.  I do concur with Ms. Ball's arguments.  I would

8   just like to highlight a couple points that I think add

9   something to that, and that is, number one, that the gravamen

10  of this whole issue is whether we have a special revenue

11  here, and I think that is significant.  Counsel for Syncora

12  made an argument about the escrow and was very eloquent, but

13  the bottom line is the escrow was created based on the

14  alleged lien that was on the revenue that came into the city

15  via the wagering taxes.  Therefore, it's incumbent to be able

16  to ascertain whether, in fact, this is a special revenue

17  which, pursuant to statute, it obviously is.  If you look not

18  only at the definition under 902, but also if you look at the

19  Michigan statute that allocates the revenue, it specifically

20  articulates purposes that the revenue could be used for,

21  including hiring, training of street patrol officers,

22  neighborhood, downtown economic developments.  It's just a

23  laundry list of things that it could be used for, so to say

24  that it was specifically earmarked for the payment of Syncora

25  as a custodian, I think that is a far stretch, particularly

1   when you have statutes incorporating this.

2         THE COURT:  Not on the list?

3         MS. FLUKER:  That is correct.  They're not on the

4   list, exactly.  Therefore, we believe that obviously the stay

5   is applicable and just based on pure statutory construction

6   in addition to the collateral agreement itself that does not

7   specifically isolate all of these funds that would make it

8   constitute a special revenue as defined by Section 902.  I do

9   concur, as I indicated, with Attorney Ball.

10        THE COURT:  Thank you very much, ma'am.  Ms. Ball.

11        MS. BALL:  Thank you, your Honor.  If I may, I rise

12   for, I think, a very short list of points, but two of them

13   are critical.  I have a picture which I think lays out what

14   Mr. Hackney tried to describe to you.  I have one for Mr.

15   Hackney as well.  May I approach, your Honor?

16        THE COURT:  Yes.

17        MS. BALL:  I think your Honor has appropriately

18   cautioned Syncora regarding the fact that secured creditors

19   remain subject to the automatic stay even if they're the IRS.

20   Your Honor may recall Whiting Pools where the IRS had seized

21   property and similarly claimed it's no longer property of the

22   debtor.  The Supreme Court has told us that's clearly not

23   true, and, in fact, as I mentioned to you earlier, Judge

24   Bennett in his assessment in Jefferson County as to whether

25   or not possession by the receiver removed revenues from the

13-53846-swr  Doc 4844-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 24 of 107
13-53846-swr  Doc 685  Filed 08/29/13  Entered 08/29/13 12:14:09  Page 96 of 107   241
574

1   estate of Jefferson County similarly concluded no.

2           But I want to get back to three things that Mr.

3   Hackney said.  On this -- this picture, your Honor, has

4   nothing to do with any agreement other than the collateral

5   agreement, and all the payments that are required to be made

6   are not made under the service contract as alleged by Mr.

7   Hackney.  As a matter of fact, there are payments that

8   casinos every day are directed to pay revenues into that

9   general receipt subaccount.  Monthly under the collateral

10  agreement the payments are made by the city under the

11  collateral agreement into the holdback account.  Once there

12  is a -- once the city makes that payment into the holdback

13  account, every day, not remote in the future, not at the end

14  of the year, every day casino revenues are released in that

15  monthly cycle, so payments -- monthly payments are made by

16  the city under the collateral agreement, never goes near the

17  service corp., the service contract.  It's a contractual

18  obligation under the collateral agreement.  Similarly, under

19  the collateral agreement, the city has the right to obtain a

20  release of its funds from the holdback from the general

21  receipts account every day until the next monthly cycle

22  begins, so the city has a contract right under the collateral

23  agreement to have monies released to it from -- its monies

24  released to it from the general receipts subaccount on a

25  daily basis every day in the month after it has made the

13-53846-swr   Doc 4844-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 242 of
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:55   Page 97 of 107   242
574

1   payment.

2           THE COURT:  What paragraph of the agreement are you

3   referring to?

4           MS. BALL:  Pardon?

5           THE COURT:  I'm sorry.  What paragraph of the

6   agreement are you --

7           MS. BALL:  Paragraph 5.2 of the collateral

8   agreement, your Honor.  And then the payments to the city

9   from the holdback account are in Section 5.5, so everything

10  works here in a closed circle under this agreement that

11  Syncora is not a party to.

12          The other point which I think goes to the

13  application of special revenues to indebtedness, again,

14  assuming arguendo that the special -- that the casino

15  revenues are special revenues, the only obligation for which

16  the casino revenues stand as collateral is the hedge payable,

17  payments under the swap, very clear in the grant of the

18  security interest under the collateral agreement that that is

19  the scope of the city pledge, and that is in Section 4.1.

20  While I know it has been -- well, I don't know.  It just

21  seems that it's been fundamental to the approach that my

22  colleagues representing Syncora have taken that this really

23  is a complex, interrelated, multiple, multi-party, everybody

24  is in the game situation, your Honor, that world changed, and

25  it changed radically in 2009.  And what changed in 2009?  And

1  I want to get to the Syncora consent.

2          What happened in 2009 was, your Honor may be aware

3  from all the papers, there was a downgrade of the city, but

4  the city wasn't the only one on its heels.  The insurers had

5  been downgraded, and there had been an insurer event under

6  the swap as well, so here everyone was facing the prospect in

7  2009 of a massive default by the city and a massive amount of

8  money due.  The city did the responsible thing.  The banks

9  kind of had everybody.  We were all on our heels, the city,

10  Syncora, FGIC.  Nobody was in tremendous shape in 2009.  I'm

11  sure it's a time that your Honor recalls well, particularly

12  in this part of the country.

13          So what happened in 2009?  We've heard a lot about

14  the banks got collateral.  Well, that's true, and I want to

15  come back to that.  Two major things happened in 2009.  We

16  focused on one.  One was the city gave the swap

17  counterparties collateral in this closed circuit agreement

18  under a document which was not only -- the insurers weren't a

19  party to it, but, your Honor, also the city was very careful.

20  Kudos to them.  In the section that my colleagues are so wont

21  to quote to your Honor, which the rest of us might refer to

22  as a merger clause, you know, Section 14, 14(a), that all

23  these other documents constitute the entire agreement of the

24  parties, it's very interesting because only three places --

25  and I would dare our colleagues to find more -- where the

13-53846-swr   Doc 4814-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 244 of
13-53846-swr   Doc 685   Filed 08/29/13   Entered 08/29/13 12:14:39   Page 99 of 107   244
574

1   word "insurer" is even mentioned in the collateral agreement,
2   and it's mentioned in the merger section.  You know what it
3   says?  This section does not apply to any rights and
4   obligations of the insurers.  The insurers had nothing to do
5   with the collateral agreement.  Why?  Because a second change
6   happened in 2009.  And, your Honor, it was very obvious
7   because the ordinance of the city in that summer of 2009 had
8   a term sheet, and the term sheet kind of highlighted it very
9   nicely.  It laid out in gory detail the fact that the city
10  was now going to pay a higher rate of interest to the banks.
11  It was going to put up collateral.  But it also provided for
12  the end of the hedge.  It severed the tie between the COP's,
13  which are the certificates of participation, insure the other
14  insurance obligation by Syncora that has nothing to do with
15  the swaps, and Syncora disagrees with that construction, but
16  it, in essence, said to the banks you get a free -- get out
17  of jail free card.  You can walk away from these swaps
18  anytime you want, and, you know, your Honor, when do you
19  think a rational financial player is going to walk away from
20  those swaps?  When they're going to be out of the money for
21  the banks.  So rather than ever have to pay a nickel, the
22  banks got the right to just wash their hands and say, "We
23  walk."  Well, that's a radical change, your Honor.  That
24  meant that the hedge could never really be a value to the
25  city.  It was never going -- to the service corps.  Excuse

1    me.  It was never going to be in the money.  That was kind of

2    a radical change, but it was consistent with the city's view

3    that we are pledging this incredible revenue stream, the last

4    big one we have, to the banks, and we want to be able to get

5    it back.  So if those swaps are terminated, we only have to

6    deal with you, and we'll get our -- we'll get our revenue

7    stream back.  But that is an immense change, your Honor, and

8    what's very interesting -- and I have copies with me should

9    your Honor want to walk through this with me.  Mr. Hertzberg,

10   perhaps you can help me.  Mr. Hackney is a hundred percent

11   correct that Syncora was asked to consent to everything that

12   happened in 2009, and I have with me, your Honor, a copy of

13   their waiver and consent.  May I approach?

14           THE COURT:  Yes.

15           MS. BALL:  Your Honor, in the third paragraph on the

16   first page of that waiver and consent --

17           THE COURT:  All right.  I'll let you describe this

18   to me briefly, but I'm going to --

19           MS. BALL:  Your Honor, suffice it to say all the

20   agreements that they consented to were appended to their

21   consent, and, in fact, Syncora did consent not once but four

22   different times because they had four different policies on

23   four different swaps to this amendment that broke the hedge,

24   that broke the --

25           THE COURT:  Okay.  So what does this have to do with

1  whether the stay is applicable --

2          MS. BALL:  Your Honor, it goes to the --

3          THE COURT:  -- in the circumstances that we're

4  talking about here?

5          MS. BALL:  Sorry.  It goes to any debt unpaid on the

6  COP's or the service are so far afield from this pledge and

7  should not be countenance in the context of suggesting that

8  922(d) is applicable here.  It is only payments under the

9  swap, and they have all been timely made.  And all the

10  payments in our contract rights to get the release of

11  revenues are under the collateral agreement, and that's a

12  right that we believe the automatic stay and the stay of

13  Chapter 9 protect.  It is not a very complicated series of

14  many other things.  The city pays every month.  Thereafter

15  every day they get their revenues, their tax revenues.  Your

16  Honor, I think there should be no doubt that it remains

17  property of the city throughout, and I think, as I said

18  earlier, the remedy section of the collateral agreement,

19  which is the only way to get remedies should they trap, also

20  provides that you have to go through all the hoops to get to

21  that property because it's city property, and you only get

22  there by appropriation.  So to suggest that it ever ceases

23  being property of the city is totally contrary to this

24  agreement, which is the agreement by which these revenues are

25  delivered to the custodian.  I can see I've worn out my

13-53846-swr   Doc 6354-9   Filed 08/29/14   Entered 08/29/14 22:00:23   Page 247 of 107
13-53846-swr   Doc 685-1   Filed 08/29/13   Entered 08/29/13 22:44:00   Page 102 of 107   247
574

1   welcome.  I'm sorry.  Thank you.

2           THE COURT:  Thank you.

3           MS. BALL:  Do you have any questions?

4           MR. HACKNEY:  Just a brief rebuttal.

5           THE COURT:  Yes, sir.

6           MR. HACKNEY:  I will resist the temptation.  I'm not

7   always good at resisting temptations, but I'm not going to

8   argue the way the structure works and our interpretation

9   because it's super technical, and I don't believe it's

10  germane here, so I'm going to just respectfully disagree with

11  Ms. Ball.

12          But I want to address the diagram because you'll

13  remember that in my argument I said that the payments under

14  the service contract which the city pledged definitely

15  secures had all accelerated so that there is a disagreement

16  with us with their contention that the city is current.

17  They're holding this diagram up to say, no, look, the amounts

18  go directly to the counterparties from the holdback account.

19  I only want to tell you that this is a very technical point,

20  but under Section 5.7(a)(1) of the collateral agreement, it

21  says "payments to the counterparties and the custodian from

22  the holdback account," and it says, "The custodian shall pay

23  to the counterparties from the holdback account at the end of

24  each quarterly period" -- so these are the three months that

25  have now stacked up -- an amount equal to all hedge periodic

13-53846-swr   Doc 4354-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 103 of 107
13-53846-swr   Doc 685   Filed 08/19/13   Entered 08/19/13 12:44:00   Page 248 of 107   248
574

1  payables, capital HPP.  Hedge periodic payables are defined

2  in the service contract as a periodic amount owing by the

3  corporation under a stated hedge, so the only reason I'm

4  making this hypertechnical point is to say that to the extent

5  these payments are made to the counterparties, they are made

6  for the ultimate benefit of the service corporation, which

7  is, of course, the party to the swap.

8          The only other limited point I wanted to make, your

9  Honor, is that in Section 14.14 where Ms. Ball said there's

10  this sort of curious reference to Syncora, it says words to

11  the effect of Syncora's rights and obligations shall be

12  unaffected by -- this section does not apply to any rights or

13  obligations of the capital line insurers.  This is the

14  integration provision of the collateral agreement.

15  Obviously, a quick reminder that the swap itself references

16  the collateral agreement, the services contracts, and the

17  contract administration agreements as credit support

18  documents, so there's integration on that end as well, but

19  more importantly, I think all this is doing is noting that

20  Syncora's insurance obligation contracts are not referenced

21  in the various documents that are part of the integration,

22  and we are not claiming that we're coming through one of our

23  insurance documents and exercising direct rights.  We are

24  claiming that we have enforcement and consent and direction

25  rights as third-party beneficiaries explicitly in the

1  agreements.  That's all I think that provision is designed to

2  do.  Thank you for your patience today, your Honor.

3         THE COURT:  All right.  The Court will take this

4  under advisement and either written -- either issue a written

5  opinion before next Wednesday or give it to you on the record

6  at that time when we reconvene on the discovery and

7  disclosure issue.

8         MR. HACKNEY:  Your Honor, if I could say --

9         THE COURT:  One thing -- sir.

10       MR. HACKNEY:  I'm sorry.  Just to the extent there

11  was any failing in my presentation today to respond to some

12  of your questions, I wanted you to know that we would be

13  happy to submit additional pleadings.  I know that you get a

14  lot of pleadings every day, but --

15       THE COURT:  Okay.

16       MR. HACKNEY:  -- there were some questions you posed

17  that if you'd like more, we'd be happy to prepare --

18       THE COURT:  In the meantime, the Court will maintain

19  the status quo, whatever that is.  At some point, in light of

20  the city's agreement to dissolve the TRO perhaps after the

21  court rules on the stay motion, the two of you can prepare an

22  order and submit it to the Court that accomplishes that.

23       There is one more matter that I want to discuss with

24  certain parties, and I'm looking at the -- what?

25       MS. CALTON:  I'm sorry.  On the order dissolving the

13-53846-swr   Doc 685-9   Filed 08/29/13   Entered 08/29/13 12:24:00   Page 105 of 107
13-53846-tjt   Doc 434-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 250 of 107   250
574

1  injunction, could they circulate it to the casino so we can

2  make sure the language protects us for making payments in the

3  interim and not be at risk to have to pay them a second time?

4          THE COURT:  Any objection to that?

5          MR. SHUMAKER:  No, your Honor.

6          MR. HACKNEY:  No.

7          MS. CALTON:  Thank you.

8          THE COURT:  You're welcome.  Okay.  So I want to

9  have a conversation with certain attorneys but not with

10  everyone, so I need a show of hands.  Who here represents

11  parties who are signatories to any of the agreements that

12  have been discussed here today?  Okay.  If your hand is not

13  raised, I'm going to ask you to leave the courtroom at this

14  time.  That includes members of the press and the public.

15  I'm going to ask you to leave the courtroom at this time if

16  you do not represent a party to one of these agreements.

17  Turn it off.  Turn it off.  We're going to turn off CourtCall

18  and the overflow courtroom communication as well.

19          (Proceedings concluded at 4:25 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                August 29, 2013
_____        _____
Lois Garrett

13-53846-tjt Doc 4354-9 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 252 of 107
13-53846-swr Doc 685 Filed 08/29/13 Entered 08/29/13 12:44:00 Page 107 of 107 252
574

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .        Docket No. 13-53846
        MICHIGAN,                 .
                                  .        Detroit, Michigan
                                  .        August 28, 2013
                 Debtor.          .        10:00 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. OPINION RE. STAY ISSUE

STATUS HEARING RE. CORRECTED MOTION TO ASSUME LEASE OR
EXECUTORY CONTRACT

MOTION FOR PROTECTIVE ORDER

ADVERSARY PROCEEDING 13-04942 - STATUS CONFERENCE

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  GREGORY M. SHUMAKER
                     51 Louisiana Avenue, N.W.
                     Washington, DC  20001-2113
                     (202) 879-3679

                     Jones Day
                     By:  CORINNE BALL
                     222 East 41st Street
                     New York, NY  10017-6702
                     (212) 326-7844

For Syncora Hold-    Kirkland & Ellis, LLP
ings, Ltd., Syncora  By:  STEPHEN C. HACKNEY
Guarantee, Inc.,     300 North LaSalle
and Syncora Capital  Chicago, IL  60654
Assurance, Inc.:     (312) 862-2074

For Detroit          Honigman, Miller, Schwartz & Cohn, LLP
Entertainment, LLC-  By:  JUDY B. CALTON
Motor City Casino    660 Woodward Avenue, Suite 2290
and Greektown        Detroit, MI  48226
Casino, LLC:         (313) 465-7344

13-53846-tjt  Doc 4343-9  Filed 04/29/14  Entered 04/29/14 22:00:53  Page 253 of
574
13-53846-swr  Doc 993  Filed 09/30/13  Entered 09/30/13 10:02:53  Page 1 of 39    253

APPEARANCES (continued):

| | |
|---|---|
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By:  CAROLINE TURNER ENGLISH<br>1717 K Street, N.W.<br>Washington, DC  20036-5342<br>(202) 857-6178 |
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP<br>By:  ALFREDO R. PEREZ<br>700 Louisiana, Suite 1600<br>Houston, TX  77002<br>(713) 546-5040 |
| For Erste Europaische Pfandbrief-und Kommunalkreditbank Aktiengesellschaft in Luxemburg, S.A.: | Ballard Spahr, LLP<br>By:  VINCENT J. MARRIOTT, III<br>1735 Market Street, 51st Floor<br>Philadelphia, PA  19103-7599<br>(215) 864-8236 |
| For FMS: | Schiff Hardin, LLP<br>By:  RICK L. FRIMMER<br>233 S. Wacker Drive, Suite 6600<br>Chicago, IL  60606<br>(312) 258-5511 |
| For Retiree Association Parties (Retired Detroit Police & Fire Fighters Association, Donald Taylor, individually and as President of the RDPFFA, the Detroit Retired City Employees Association and Shirley V. Lightsey, individually and as President of the DRCEA): | Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, 3rd Floor<br>Birmingham, MI  48009<br>(248) 723-6263 |

13-53846-tjt  Doc 4349  Filed 04/29/14  Entered 04/29/14 22:00:53  Page 25 of
13-53846-swr  Doc 3353  Filed 03/30/13  Entered 03/30/13 10:02:53  Page 2 of 39
574
254

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

13-53846-tjt  Doc 4349  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 25 of 39
13-53846-swr  Doc 3953  Filed 06/30/13  Entered 06/30/13 10:02:55  Page 3 of 39
574
255

 1         THE CLERK:  All rise.  Court is in session.  Please
 2   be seated.  Case Number 13-53846, City of Detroit, Michigan,
 3   and Case Number 13-04942, City of Detroit versus Syncora
 4   Guarantee, Incorporated, et al.
 5         THE COURT:  Okay.  I'd like to begin with
 6   administering the oath of admission to attorneys who seek
 7   admission to the Bar of the Court.  I think we have one
 8   today, Ms. Newbury.
 9         MS. NEWBURY:  Good morning, your Honor.
10         THE COURT:  Good morning.  And you are Ms. Newbury?
11         MS. NEWBURY:  Yes, I am.  Karen Newbury.
12         THE COURT:  And are you prepared to take the oath of
13   admission to the Bar of the Court?
14         MS. NEWBURY:  Yes, I am, your Honor.
15         THE COURT:  Please raise your right hand.  Do you
16   affirm that you will conduct yourself as an attorney and
17   counselor of this Court with integrity and respect for the
18   law, that you have read and will abide by the civility
19   principles approved by the Court, and that you will support
20   and defend the Constitution and laws of the United States?
21         MS. NEWBURY:  I do, your Honor.
22         THE COURT:  Welcome.
23         MS. NEWBURY:  Thank you.
24         THE COURT:  We'll take care of your paperwork for
25   you.

13-53846-tjt  Doc 4349   Filed 04/29/14   Entered 04/29/14 22:00:33   Page 256 of
13-53846-swr  Doc 3593   Filed 04/30/14   Entered 04/30/14 10:02:53   Page 4 of 9
574                                      256

1    MS. NEWBURY:  Thank you very much.

2    THE COURT:  Okay.  One moment, please.  Okay.  So in

3    terms of our order of proceeding today, I thought we would

4    start with the Court's opinion regarding the stay issue and

5    Syncora, and then we would do the status conference on the

6    Syncora adversary proceeding, and then the status conference

7    on the motion to assume and then the city's motion for a

8    protective order regarding the data room and then if there's

9    anything else anyone would like to bring up.  Is that order

10   okay with everybody?  Okay.  Perhaps so the record is clear,

11   we should just take appearances in regard to this stay issue

12   for the record.

13   MS. BALL:  Good morning, your Honor.  Corinne Ball

14   for the City of Detroit.

15   MR. HACKNEY:  Good morning, your Honor.  Nice to see

16   you again.  It's Steve Hackney on behalf of Syncora.

17   THE COURT:  All right.  Thank you.  The issue before

18   the Court is whether the casino revenues in the subaccount

19   held by U.S. Bank are property of the city protected by the

20   automatic stay.  It is the position of Syncora that these

21   casino revenues in this account held by U.S. Bank are not

22   property of the city.  In the alternative, Syncora contends

23   that either Section 362(b)(17) or Section 922(d) of the

24   Bankruptcy Code apply to provide an exception to the

25   automatic stay.  The city contends that these funds are

13-53846-tjt   Doc 4304-9   Filed 04/29/14   Entered 04/29/14 22:00:53   Page 257 of
13-53846-swr   Doc 3993   Filed 04/30/14   Entered 04/30/14 10:02:53   Page 5 of 39
574
257

1    property of the city.

2        Section 362(a)(3) of the Bankruptcy Code stays any

3    act to obtain possession of property of the estate or of

4    property from the estate or to exercise control over property

5    of the estate.  Section 902(1) makes the references in

6    362(a)(3) to property of the estate to mean property of the

7    debtor.  So the application of the stay depends on whether

8    the property is property of the city.

9        Syncora argues that the subaccount in which the

10    casino revenues are held is similar to an escrow account,

11    and, therefore, the funds in the account are not property of

12    the city.  Under New York law, apparently applicable here, an

13    escrow is defined as, quote, "a written instrument which by

14    its terms imports a legal obligation and which is deposited

15    by the grantor, promisor, or obligor and -- or against

16    thereof, with a stranger or third party to be kept by the

17    depository until the performance of a condition or the

18    happening of a certain event.  The escrow relationship is of

19    a fiduciary nature and has some characteristics of a trust,"

20    close quote.  This is from -- excuse me -- 55 New York

21    Jurisprudence 2d Escrows Section 1.  With an escrow account,

22    the, quote, "incidents of ownership remain in the person

23    depositing the property into escrow until the conditions of

24    the escrow are fulfilled," close quote, 55 New York

25    Jurisprudence 2d Escrows Section 9.  See also 99 Commercial

13-53846-tjt  Doc 4304-39  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 258 of
574
13-53846-swr  Doc 3993  Filed 09/30/13  Entered 09/30/13 10:02:53  Page 6 of 39    258

1  Street, Inc. v. Goldberg, 811 F. Supp. 900 at 906, Southern

2  District of New York, 1993.

3          Pursuant to the collateral agreement, the casino

4  deposit -- the casino deposits -- sorry -- the casinos

5  deposit the funds owed to the city into the subaccount.  For

6  the subaccount to be an escrow account, as Syncora argues,

7  the arrangement would have to be such that the casinos would

8  retain ownership of the funds; however, there is simply no

9  basis in the collateral agreement for such a finding.

10          Likewise, there is no support for Syncora's

11  alternative argument that U.S. Bank, as the custodian, owns

12  the funds.  The fact that the city is not in possession of

13  the casino revenues is of no consequence in determining

14  whether they are the city's property.  See, for example,

15  United States versus Whiting Pools, Inc., 462 U.S. 198, 103

16  Supreme Court Reporter 2309, 1983.  The Court must conclude

17  that the casino revenues are, under applicable state law,

18  property of the city.

19          Section 362(b)(17) of the Bankruptcy Code exempts

20  from the automatic stay, quote, "the exercise by a swap

21  participant or a financial participant of any contractual

22  right (as defined in section 560) under any security

23  agreement or arrangement or other credit enhancement forming

24  a part of or related to any swap agreement, or of any

25  contractual right (as defined in section 560) to offset or

13-53846-tjt  Doc 4343  Filed 04/29/14  Entered 04/29/14 22:00:33  Page 259 of
13-53846-swr  Doc 3993  Filed 04/30/14  Entered 04/30/14 10:02:53  Page 725 of 9
574
259

1　net out any termination value, payment amount, or other

2　transfer obligation arising under or in connection with 1 or

3　more such agreements, including any master agreement for such

4　agreements."

5　　　　Section 101(53C) of the Bankruptcy Code defines swap

6　participant as, quote, "an entity that, at any time before

7　the filing of the petition, has an outstanding swap agreement

8　with the debtor," close quote.

9　　　　It is Syncora's position that the swap

10　counterparties are swap participants and that Syncora has the

11　right to direct the actions of the swap counterparties under

12　the collateral agreement and that, therefore, any action

13　taken by the swap counterparties at the direction of Syncora

14　is not subject to the automatic stay.  Syncora also contends

15　that because it is a third-party beneficiary of the

16　collateral agreement, it is a swap participant.  The Court

17　concludes, however, that there is no legal support for either

18　of Syncora's arguments.  Syncora is not a swap participant as

19　that term is defined by the Bankruptcy Code, and the Court

20　concludes, therefore, that it cannot rely on Section

21　362(b)(17).  If Congress had intended to include a party like

22　Syncora within the definition of a swap participant on the

23　grounds that Syncora now asserts, Congress could readily have

24　done that with more expansive language, but it did not.

25　Instead, it limited the definition to those who have swap

13-53846-tjt  Doc 4344-9  Filed 04/29/14  Entered 04/29/14 22:00:33  Page 8 of 39
13-53846-swr  Doc 3593  Filed 09/30/13  Entered 09/30/13 10:02:53  Page 260 of
574　　260

1   agreements with the debtor, which Syncora does not.

2          Lastly, Syncora argues that Section 922(d) of the

3   Bankruptcy Code is applicable.  That section provides, quote,

4   "Notwithstanding section 362 of this title and subsection (a)

5   of this section, a petition filed under this chapter does not

6   operate as a stay of application of pledged special revenues

7   in a manner consistent with section 927 of this title to

8   payment of indebtedness secured by such revenues."  Assuming,

9   without deciding, that the funds on deposit with U.S. Bank

10  are special revenues, this section is inapplicable.  Syncora

11  does not have a lien on the revenues.  Further, the

12  accumulation of the funds in the subaccount is not the,

13  quote, "application of special pledged revenues to the

14  payment of indebtedness," close quote.  It is merely an

15  administrative act.  Therefore, there is no indebtedness to

16  Syncora here.

17         Accordingly, the Court concludes that the casino

18  revenues are protected by the automatic stay.  The Court will

19  prepare and enter an order to that effect.  This order will,

20  of course, be without prejudice to the right of any party to

21  seek relief from the stay under Section 362(d).

22         So let's turn then to the adversary proceeding.  In

23  light of this order, is the city prepared to dismiss the

24  adversary proceeding against Syncora and others?

25         MR. SHUMAKER:  Your Honor, Gregory Shumaker of Jones

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:00:53  Page 26 of 39
13-53846-swr  Doc 3933  Filed 04/30/14  Entered 04/30/14 10:02:53  Page 9 of 39
574
261

1    Day, for the record.  It's a pleasure to be here.  Your

2    Honor, the answer to your question is -- well, first is --

3    I'm not -- we obviously just heard your ruling, so a final

4    determination as to whether we might be able to dismiss the

5    case -- we would appreciate the opportunity to do that.

6    We're not sure if your Honor's ruling, however, covers all of

7    the factual findings that we would need and the declaratory

8    judgment that the city is seeking with regard to Syncora's

9    rights vis-a-vis the collateral agreement and the casino

10   revenues, and so I think that that determination remains

11   outstanding as does Syncora's lawsuit against the swap

12   counterparties in New York where they will be seeking a

13   similar -- and currently seek a similar -- not a similar

14   declaration, but a declaration of their rights -- a

15   declaratory judgment as to their rights.  We also -- so I

16   believe we still have the need to get those rights

17   adjudicated finally, all of the rights that are asserted by,

18   for example, Syncora in its motion -- its pending motion to

19   dismiss.  The New York action, too, remains out there.  It's

20   subject to a motion to transfer it to this Court.  When -- if

21   and when that action were to come here, perhaps a

22   consolidation would be appropriate, but, in any event, I'm

23   not -- I can't tell you right now, your Honor, that the city

24   is amenable to a dismissal because we --

25             THE COURT:  So if the motion to assume is denied,

13-53846-swr  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 262 of 39
13-53846-tjt  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 10 of 39    262
574

1   that would moot out those claims as well; right?

2           MR. SHUMAKER:  Well, it would depend on why your

3   Honor denied it, I presume.  There are multiple objections to

4   the assumption motion.  If it had to do with Syncora's

5   rights, I think there is some question as to whether you will

6   be making findings in that regard.  We believe that you

7   should, but we -- based upon earlier comments from your

8   Honor, that seems to still be a question as to the --

9           THE COURT:  Can you be more specific about what you

10  want declared in the adversary proceeding?

11          MR. SHUMAKER:  Well, in the adversary proceeding

12  right now, it's a little bit complicated, your Honor,

13  because, if you'll recall, the adversary proceeding was filed

14  prior to the forbearance and optional termination agreement

15  being executed.  In fact, we pursued that so that the

16  forbearance agreement could be executed -- or negotiated,

17  finalized, and executed.  So right now the TRO that we

18  discussed last week relates to the city's allegations about

19  the irreparable harm that it would suffer if the casino

20  revenues were attached.  Syncora has, in response to that

21  complaint, filed a motion to dismiss, which asserts a broader

22  set of rights to the casino revenues based not only on the

23  collateral agreement but a number of other agreements, which

24  your Honor is probably all too aware of at this point, but,

25  you know, if the city would need to amend its complaint in

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 263 of 39
13-53846-swr  Doc 693  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 12 of 39   263
574

1  order to deal with those broader issues, I'm not sure, but
2  the New York action that is still out there, your Honor, is a
3  post-forbearance agreement suit, and it may or may not come
4  here, so it's a bit complicated.  And I'm not sure that your
5  ruling is going to -- on the assumption motion is going to
6  address that adjudication of rights.
7        THE COURT:  Okay.  So presently pending in the
8  adversary are the two motions that we've been discussing, the
9  motion to dismiss and the motion for a protective order; is
10  that right?
11       MR. SHUMAKER:  That's correct, your Honor.  The
12  motion to dismiss is not yet fully briefed.  The city filed
13  its reply brief earlier this week or late last week, and then
14  the motion for protective order emanated from the discovery
15  that Syncora sought back in the beginning of July, which we
16  believe for a number of reasons was oppressive, and we should
17  not be required to go through that.
18       THE COURT:  Is it premature to set hearing dates on
19  those two motions?
20       MR. SHUMAKER:  Well, your Honor, I believe that the
21  motion to dismiss reply brief is due September 12th, and
22  certainly at that time that would be --
23       THE COURT:  Obviously --
24       MR. SHUMAKER:  -- I would think a threshold issue.
25       THE COURT:  Obviously after that.

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 26 of 39
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 12 of 39
574
264

1    MR. SHUMAKER:  Yes, your Honor, because I presume

2  you would want to adjudicate that prior to discovery

3  proceeding, if you will.

4    THE COURT:  All right.  We'll have to work with my

5  schedule and the district courtroom's availability to provide

6  you with a date.  Mr. Hackney, would you concur that after

7  September 12 we can set hearings on these two motions?

8    MR. HACKNEY:  Absolutely, your Honor.  If I could --

9  I guess I have a couple quick observations --

10    THE COURT:  Sure.

11    MR. HACKNEY:  -- that might facilitate things.  I

12  guess it seems to me that the TRO is dissolved and that

13  logically that the preliminary injunction motion would be

14  withdrawn.  Now, if I'm wrong about that, I'll --

15    THE COURT:  Well, let's inquire.

16    MR. SHUMAKER:  With the stay in place, your Honor,

17  that would be fair, yes.

18    THE COURT:  All right.  There you go.

19    MR. HACKNEY:  The protective order -- the discovery

20  we sought was principally in connection with the anticipated

21  preliminary injunction hearing that we might have.  If there

22  is no preliminary injunction hearing, I do not believe that

23  there is a need for expedited interim discovery.  I would

24  instead propose that we proceed in the normal course under a

25  Rule 26 discovery conference, so I view that as sort of

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 265 of 39
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 13 of 39
574
265

```
 1   mooting the protective order issues.  I had a --
 2            THE COURT:  Would you concur with that, sir?
 3            MR. SHUMAKER:  I would, your Honor.
 4            THE COURT:  All right.  So all we'll set for hearing
 5   is the motion to dismiss.
 6            MR. HACKNEY:  That hopefully streamlines things,
 7   your Honor.
 8            THE COURT:  Good.  Thank you.
 9            MR. HACKNEY:  I had a -- I did have a favor to ask,
10   which is we've been running relatively hard.  We are able to
11   do two things at once, but I will tell you we've been
12   relatively busy.  I was wondering if I could have an
13   extension of time of four days until September 16th to do our
14   reply brief.  The briefs in this --
15            THE COURT:  Any objections?
16            MR. SHUMAKER:  No, your Honor.
17            MR. HACKNEY:  And then we would, of course, be
18   willing to argue before -- subsequent to that time.
19            THE COURT:  All right.
20            MR. HACKNEY:  And those were all of the issues that
21   I had to discuss today.
22            THE COURT:  Okay.
23            MR. HACKNEY:  Thank you.
24            THE COURT:  Okay.  All right.  In regard to the
25   motion to assume, is there -- are there any issues or
```

13-53846-swr  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 266 of 39
13-53846-tjt  Doc 893-9  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 266 of 39
574
266

1  comments or suggestions that anyone would like to make in
2  regard to that?

3            MR. SHUMAKER:  Your Honor, there are a few scattered
4  issues.  I should apprise your Honor of this.  You may have
5  noticed that deposition notices were filed.  Mr. Buckfire's
6  deposition is scheduled for 9:30 tomorrow morning, and Mr.
7  Orr's deposition is set for Friday at 8:30.  One issue that's
8  arisen as the -- and I've been dealing with Mr. Hackney,
9  who's been the liaison for the objectors -- is consistent
10 with your Honor's guidelines or at least proposed guidelines
11 for the September 9th hearing where we -- where the
12 suggestion, I believe, your Honor, was three hours for the
13 city to put on its case and then the objectors three hours to
14 respond.  We were -- one of the things that we did was we
15 withdrew one of the proposed witnesses, Gaurav Malhotra, who
16 is with Ernst & Young, who submitted a declaration on the
17 first day.  We did that to -- because we wanted to
18 consolidate.  We know that this is not supposed to be a mini
19 trial.  Your Honor really was not looking for, I think,
20 extensive discovery and had the debtor put forward its
21 witnesses, and those depositions are the ones that are going
22 to occur.  We withdrew that.  There seems to be a developing
23 question as to whether the Court can take judicial notice of
24 Mr. Malhotra's first day declaration, which is in the record.
25 There are a few paragraphs that relate to the COP's and the

13-53846-swr  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:53  Page 267 of 39
13-53846-tjt  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 15 of 31
574                                                    267

1   swaps and the assumption motion.  I'm not -- we've had some
2   discussions earlier today just before coming into court.  If
3   your Honor is able to do that, wants to take judicial notice
4   of Mr. Malhotra's testimony, then we would continue to leave
5   him off.  If your Honor, however, believes that he needs to
6   appear as a witness and in order for that declaration to
7   get -- gain weight from the Court, which it would have if we
8   had not had discovery presumably, then I think we would have
9   to revisit the notion of Mr. Malhotra's presence on our
10  witness list.
11          THE COURT:  Well, I'm certainly willing to take
12  judicial notice of the fact that there is an affidavit there,
13  but that's not particularly pertinent.  You want me to take
14  judicial notice of the facts that he asserts in his
15  affidavit?
16          MR. SHUMAKER:  Well, as you would have, your Honor,
17  if there had not been discovery.  If you had -- if you had --
18  if you had proceeded on the papers for the assumption motion,
19  you would have considered the declaration and given it
20  whatever weight you believe necessary.  And given the --
21          THE COURT:  Well, but that's subject to the
22  opportunity of the opposing parties to question the witness.
23          MR. SHUMAKER:  I guess if you were then going -- if
24  you were going to look at the city's motion to assume and
25  then have discovery on it, but at least it was my

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 26 of 39
13-53846-swr  Doc 693  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 16 of 39
574
268

1 understanding, your Honor, that you were limiting that
2 discovery to just the debtor's witnesses that were going to
3 appear at the hearing so that the objectors would have some
4 idea of what -- how they would cross-examine the witness as
5 opposed to, you know, reopening the issue of what evidence
6 had been submitted to your Honor in connection with the
7 motion.

8 THE COURT:  Well, the Rules of Evidence apply, and
9 what he says in his affidavit is hearsay even though it's in
10 a court-filed document, so unless the parties opposing -- all
11 of them are willing to waive that hearsay objection, which I
12 would doubt, I would have to sustain any effort on your --
13 sustain an objection to any effort on your part to offer it
14 into evidence to prove the truth of any of the matters
15 asserted in it.

16 MR. SHUMAKER:  Your Honor, if that's your ruling,
17 then I would ask if we could reserve the right to put Mr.
18 Malhotra back on our witness list and schedule a deposition
19 for him.  Now, the deadline that you previously set was
20 August 30th.  I'm not certain of his availability at the
21 moment.  If that deposition moved a couple days into next
22 week, would that be all right with your Honor?

23 THE COURT:  It's fine with me so long as we can
24 stand firm with our hearing date.

25 MR. SHUMAKER:  Sure, sure.  And I presume we could

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 269 of 31
13-53846-swr  Doc 693  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 269 of 574
574
269

 1    do that.  As your Honor knows, after Mr. Orr's deposition

 2    concludes on Friday, the rebuttal witnesses will be named

 3    within 24 hours, so those will be going on at the same time.

 4              THE COURT:  Mr. Hackney.

 5              MR. HACKNEY:  Well, I guess I'll just say that I

 6    think the city made a decision about what witnesses it was

 7    going to call, and it withdrew one of them, and now it's

 8    regretting the evidential implications for the hearing, and

 9    so I guess for me it's simple, which is when they decided to

10    withdraw Mr. Malhotra, they took him off the case as someone

11    that they could call at the hearing, and now they're asking

12    you to amend the discovery schedule that they previously, I

13    think, were agreeable to because of their decision to

14    withdraw him, so I guess I don't follow the cause for it.

15    That's all I'll say, your Honor.  We'll be guided by your

16    decision.

17              THE COURT:  Well, the question the Court needs to

18    address in these circumstances is how would the city's

19    changing its mind again prejudice your presentation or the

20    presentation of others at the hearing?

21              MR. HACKNEY:  Yeah.  And I guess the answer to

22    that -- I mean I've been coordinating all these folks, and

23    we've actually been working well in concert together.  I want

24    to share credit with the other objectors.  It's been very

25    constructive.  It's not that easy.

13-53846-tjt  Doc 4314-9  Filed 04/29/14  Entered 04/29/14 22:26:23  Page 27 of 31
13-53846-swr  Doc 693  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 18 of 39
574
270

1          THE COURT:  Right.

2          MR. HACKNEY:  And so what we've been trying to do is

3    be orderly in the way we depose these witnesses so it's not

4    just this chaotic deposition, and so when Malhotra came off,

5    a lot of prep for that deposition didn't happen.  If he went

6    back on, we would want it to be sometime after the Labor Day

7    holiday so that whomever can get ready for it.  That's, I

8    guess -- I wouldn't want to try and jam it into this week.  I

9    would want it to be like on Thursday or Friday of that

10   following week just so whomever -- in light of the holiday

11   and et cetera.

12         THE COURT:  Okay.

13         MR. HACKNEY:  Sorry, your Honor.

14         THE COURT:  No.  I appreciate it and understand it.

15         MR. PEREZ:  Good morning, your Honor.  Alfredo

16   Perez.  I represent FGIC.  Two things, your Honor.  With

17   respect to how you want the evidence presented, one of the

18   things that we would like to do is to make a presentation

19   with respect to how the swaps work in connection with the

20   COP's.  And we could certainly do that through a witness, but

21   I think, since it's a matter of, you know, reading the

22   documents, if the Court would indulge just a straightforward

23   presentation, that might expedite things.  I don't think it's

24   particularly -- it would be particularly controversial, so

25   that's one thing.

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 27 of 39
13-53846-swr  Doc 893  Filed 09/30/13  Entered 09/30/13 10:02:03  Page 19 of 39   271
574

1      THE COURT:  Well, if you don't think it would be

2  controversial, what I would encourage you to do is work with

3  the city on a joint statement.

4      MR. PEREZ:  We can certainly do that, your Honor.

5  Then the other thing, your Honor, is I was tasked by the

6  various objectors to file a statement yesterday requesting

7  some additional time, and --

8      THE COURT:  I saw that.

9      MR. PEREZ:  And, your Honor, we would -- if the

10  issue were just the objectors versus the city, I think that

11  we could certainly comply -- fully comply and do a good job

12  for our clients, but there are -- as between the objectors,

13  there's really a lot of different issues, and, in fact, you

14  know, we're much more aligned with Syncora than we are with

15  anybody else since Syncora and FGIC are the only two people

16  who actually insure the swaps, so I would request additional

17  time with respect to that, your Honor.

18      THE COURT:  Six hours?

19      MR. PEREZ:  I think we could do it in six hours,

20  your Honor.

21      THE COURT:  You're dubious about even that?

22      MR. PEREZ:  Well, it depends.  Let me give you --

23  and that's why I asked the first question.

24      THE COURT:  Fully understanding that the issue here

25  is only whether to assume or reject this.  It has -- the

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:00:53  Page 27 of 31
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 20 of 39
574
272

1   issue is not who has what rights under this contract.

2          MR. PEREZ:  I understand that, your Honor, but I

3   think in order -- in order for us to do a good job of

4   presenting whether we think -- you know, basically the facts

5   so that we can argue them to the Court, I really -- we really

6   kind of do think that the Court needs to understand the

7   transaction, and it's a complicated transaction.

8          THE COURT:  Well, but you're going to come up with a

9   joint statement with the debtor on that point.

10         MR. PEREZ:  Well, we're certainly going to try.

11         THE COURT:  Let's negotiate.  Five hours, and you

12   come up with a joint statement.

13         MR. PEREZ:  We'll do that, your Honor.  Thank you.

14         THE COURT:  Anything else in regard to preparation

15   for the hearing on the motion to assume?  Sir.

16         MR. MARRIOTT:  Briefly, your Honor.  Vince Marriott,

17   Ballard Spahr, on behalf of EEPK.  I would just like to echo

18   Mr. Hackney's observation that coordinating preparation for

19   these depositions among the objectors has been a complicated

20   process, and we've been designating who's going to prepare

21   for what, and Ballard Spahr has been heavily involved in that

22   process.  When that one witness came off, it did affect the

23   preparation.  And if the witness is going back on, we really

24   do need time to sort of reload in preparing for that witness.

25         THE COURT:  Yes.  Thank you.  Let me just ask will

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 273 of 39
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 22 of 39
574
273

1  this witness be available Thursday or Friday of next week?

2         MR. SHUMAKER:  Your Honor, I don't know, but I will

3  certainly attempt to make him available then.

4         THE COURT:  Well, doesn't he pretty much have to be

5  in order for our hearing date to proceed and to --

6         MR. SHUMAKER:  Yes.  You know --

7         THE COURT:  -- give the objecting parties the time

8  they have requested?

9         MR. SHUMAKER:  So the request, your Honor, just so

10  I'm clear, is that it's on Thursday or Friday of next week.

11         THE COURT:  That's what I heard.

12         MR. SHUMAKER:  Okay.

13         THE COURT:  Okay.

14         MR. SHUMAKER:  I don't know of him being out of the

15  country or anything like that, your Honor, but I'll do

16  everything within my power to make that happen.  And I'm sure

17  the odds are extremely low that he would not be available.

18         THE COURT:  Well, I hope you understand that if he's

19  not available for deposition, it will be challenging to

20  establish that he should be called as a witness.

21         MR. SHUMAKER:  Understood, your Honor.  Understood.

22         THE COURT:  Sir.

23         MR. FRIMMER:  Good morning, your Honor.  Rick

24  Frimmer from Schiff Hardin representing FMS Wertmanagement,

25  which was incorrectly listed previously as DEPFA Bank, PLC.

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 27 of 39
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 22 of 39
574
274

1          THE COURT:  Okay.

2          MR. FRIMMER:  I almost hesitate to do this, but just

3   to remind counsel that next Thursday and Friday are the

4   Jewish holidays.  Some of us won't be available.  So whether

5   or not the witness is available does cause of a bit of a

6   monkeywrench for some of the other players, so --

7          THE COURT:  That's a problem.

8          MR. FRIMMER:  -- I just wanted the Court and the

9   counsel to be sensitive to that.

10         THE COURT:  Well, let me ask is Wednesday an

11  acceptable day, and can you all prepare in time for the

12  deposition on that date?

13         MR. FRIMMER:  As Mr. Hackney correctly noted, we've

14  been trying to work together to coordinate this.  I'm sure

15  someone will be available.  I just wanted to alert the Court

16  just to remind everybody that some portion of the populous

17  here will not be available.

18         MS. ENGLISH:  Good morning, your Honor.  Caroline

19  English from Arent Fox on behalf of Ambac.  Just to point out

20  another wrinkle, if Malhotra testifies, we need the right to

21  call a potential rebuttal witness, which is going to put more

22  time into the schedule, and right now our hearing is

23  scheduled for Monday.  Thank you, your Honor.

24         THE COURT:  I was wondering when that issue was

25  going to arise.

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 275 of 39
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 23 of 39
574
275

1          MR. HACKNEY:  Your Honor --

2          THE COURT:  Sir.

3          MR. HACKNEY:  I was wondering.  I guess I'd like to

4   stick my head in the lion's mouth, so to speak, because I

5   think the Court has been clear that you want to have this

6   hearing on September 9th, and I appreciate that.  I

7   understand what you're trying to do.  I really do.  I've been

8   in situations before where it makes sense to hold the foot on

9   the accelerator, but I did want to make an observation to the

10  Court in light of two developments.  One of them is that

11  today you held that the city is going to have at least

12  interim access to these casino revenues during its case, and,

13  second, under the forbearance agreement, what's ostensibly

14  driving the schedule and the hurry-up is the idea that if

15  they don't get a final and unappealable order by September

16  16th, which is 60 days from the commencement of the case, the

17  swap counterparties may terminate the forbearance agreement.

18  It's a fact today that they will not have a final and

19  unappealable order by September 16th.  That is already

20  established.  If the Court's order is final, it will be

21  appealable, and if it's not final and unappealable, then it

22  won't be final.  I just raise this to ask a practical

23  question about whether or not we need to strictly adhere to

24  the schedule in light of some of the challenges it's posing.

25  And I also wanted to add one thing, your Honor, that may be

13-53846-tjt   Doc 4304-9   Filed 04/29/14   Entered 04/29/14 22:06:53   Page 27 of 39
13-53846-swr   Doc 893   Filed 08/30/13   Entered 08/30/13 10:02:53   Page 24 of 31
574
276

```
 1   nearer and dearer to your heart, which is it impacts things
 2   like the mediation.  You know, I'm part of the Syncora team.
 3   I'm not going to the mediation tomorrow because I have to be
 4   in the deposition.  I know Mr. Marriott was originally
 5   planning to take the Buckfire deposition, but now he's going
 6   to the mediation.  We can do two things at once.  We can take
 7   depositions and mediate, but there is sometimes a desire to
 8   see whether a mediation can be fruitful before parties take
 9   up the time and expense of litigation, and it seems to me
10   that even a two- to three-week adjournment of the hearing may
11   solve many of the different issues that are coming up.  Just
12   a suggestion, your Honor.
13          THE COURT:  Anyone else want to say anything?
14          MR. SHUMAKER:  Your Honor, one -- excuse me -- two
15   things.  One, I've been asked to advise your Honor that a
16   retirees' committee has been formed and is, I think, in the
17   process of retaining counsel, who is here, Carole Neville of
18   Dentons, and I believe she may wish to address the Court, but
19   before she does, if I would, your Honor, if the objectors
20   would have five hours and Mr. Malhotra is on the slate for
21   the city, we'd ask this, that we be given an hour to make
22   sure that we could get his testimony because we were --
23          THE COURT:  So you want four instead of three?
24          MR. SHUMAKER:  Exactly, your Honor.  One of our
25   considerations was how can we do three witnesses in three
```

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:02:23  Page 27 of 39
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 25 of 31    277
574

     1    hours.

     2         THE COURT:  Is he available next Wednesday?

     3         MR. SHUMAKER:  I can check on a break.  I could

     4    leave right now if your Honor would --

     5         THE COURT:  All right.  I'm going to give you that

     6    opportunity and sit here while you do that.  Wait.  What?

     7    The issue is use of the telephone?

     8         MR. HERTZBERG:  He can't use it out in the hallway,

     9    your Honor, under the rules of the District Court.  He has to

    10    go downstairs.

    11         THE COURT:  I will grant you relief from that --

    12         MR. SHUMAKER:  Thank you, your Honor.  Be right

    13    back.

    14         THE COURT:  -- and instruct the security personnel

    15    to allow you to use your phone in the hallway.

    16         MR. SHUMAKER:  Thank you, your Honor.

    17         THE COURT:  Thank you, Mr. Hertzberg.

    18       (Pause at 10:37 a.m., until 10:41 a.m.)

    19         MR. HACKNEY:  Your Honor, can I propose something to

    20    the Court while we're waiting on this information?

    21         THE COURT:  Sure.

    22         MR. HACKNEY:  I understand the city's sensitivity on

    23    the subject of the schedule because under the forbearance

    24    agreement they have a best efforts obligation, best efforts

    25    to try and get this final appealable order within 60 days, so

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 278 of 39
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 26 of 39   278
574

1  I respect the fact that they need to exercise best efforts,

2  but I think the objectors in the court, we don't have that

3  obligation, and what I would propose is that we continue the

4  hearing one month and that the city vigorously oppose my

5  motion for a continuance.  And, your Honor, I think that may

6  allow for a number of things to happen that are potentially

7  conducive both to the use of your time, which is also

8  occupied by other matters, and to the coherence of the

9  presentation and to the mediation, and the city will comply

10  with its best efforts obligation to attempt to get a final

11  appealable order within 60 days, which, by the way, it

12  already cannot get, but it has used its best efforts.

13         THE COURT:  Ms. Ball.

14         MS. BALL:  Thank you, your Honor, with vigor.  Your

15  Honor, Mr. Hackney has correctly calculated the dates, so I

16  cannot contest his description of where we will find

17  ourselves should your Honor approve the settlement and the

18  assumption of the forbearance agreement.  We do also have the

19  obligation that Mr. Hackney has described as a best efforts

20  obligation.  Your Honor, we have all tried mightily, and my

21  partner, Greg, is out trying to find out if we can do a

22  deposition on Wednesday.  I certainly question whether a

23  month is necessary because, your Honor, there are other

24  economic provisions in the agreement, which Mr. Hackney may

25  not be as aware of at this point, but I'm sure by the time of

13-53846-tjt  Doc 4804-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 27 of 31
13-53846-swr  Doc 693  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 27 of 31
574
279

    1    our hearing he will be, where some of the economic benefits
    2    that we must obtain are important.  But in fairness to your
    3    Honor, our ability to obtain those economic benefits is in
    4    some respects tied to two other events, which are on a
    5    different schedule, and those two other events, your Honor,
    6    you scheduled with an order earlier this week, the
    7    eligibility hearing as well as, your Honor, any effort to
    8    obtain -- and we are working mightily -- post-petition
    9    financing.  Actually funding it will likely require a
    10   resolution of the eligibility issue.  So we have not just the
    11   parallel tracks of mediation and litigation.  We actually
    12   have the track -- if the city is going to get the benefit
    13   of -- one of the reasons why it did this, clearly one, your
    14   Honor's ruling -- we thank you; it was very important -- was
    15   getting immediate access, continuing access to casino
    16   revenues, and I certainly am grateful for your ruling and
    17   don't want to under -- in any way understate the importance
    18   of that.  So, your Honor, I really question whether or not 30
    19   days is appropriate.  I do think that if -- in fairness to
    20   the Court and in light of what you've already heard certainly
    21   from Mr. Perez on behalf of FGIC and from Ambac as well as
    22   Syncora, this is complicated, and a better presentation --
    23   the more we work out in advance of this hearing, the better
    24   off we will all be in terms of as much being stipulated facts
    25   and a very short succinct but accurate joint statement.  So

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 280 of 31
13-53846-swr  Doc 693  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 28 of 31
574
280

1   with that, your Honor, we are -- we will go forward on

2   September 9th assuming Mr. Malhotra is available on

3   Wednesday, but at my -- discharging my obligations to this

4   Court, I have to just make those three points.  That

5   condition is virtually impossible to meet through no fault.

6   Secondly, there are other -- two other deadlines out there

7   that we're mindful of for getting the economic benefit.  Your

8   Honor, I'm talking about when the discount of 75 percent

9   increases to 77, so we think a month is too long if you're

10  even considering this motion.  And, thirdly, your Honor, as

11  I've apprised you, we're going to be somewhat in a bind with

12  financing on the schedule, so a short adjournment would not

13  injure the city terribly, but obviously, your Honor, we will

14  be prepared to go forward on September 9th, if that's your

15  Honor's ruling, on the motion for continuance.  Thank you.

16          THE COURT:  Ms. Ball or Mr. Hackney, what are your

17  appearance obligations in relation to mediation?

18          MR. PEREZ:  Thursday, your Honor, is the mediation

19  with respect to the swaps, and then on the 17th is the

20  overall mediation.  And I would imagine that there would be

21  other dates set as soon as we have those dates.

22          MS. BALL:  And, your Honor, the retirees' committee

23  has asked to participate in the assumption, and they have to

24  get up to speed.

25          THE COURT:  Right.

13-53846-tjt  Doc 4804-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 281 of
13-53846-swr  Doc 693-9  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 29 of 39   281
574

1       MR. PLECHA:  If I may, your Honor, Ryan Plecha on

2  behalf of the Retiree Association Parties.  It is my

3  knowledge that counsel for the committee has been selected,

4  but it has not yet been formally retained.  But it does wish

5  to participate relative to the motion on the lease, so I did

6  just want to make that clear for the Court.

7       THE COURT:  Thank you.

8       MR. PLECHA:  Thank you.

9       THE COURT:  What is your report, sir?

10       MR. SHUMAKER:  Your Honor, I'm sorry.  As luck would

11  have it, we called his office, his cell, and e-mailed him and

12  haven't heard anything yet.  Perhaps by the time we adjourn,

13  I'll know if I can keep looking at my Blackberry.  I'm sorry.

14       THE COURT:  One more second, please.  What would be

15  the consequences to the city that would concern it if the

16  matter were adjourned to Monday and Tuesday, the 23rd and

17  24th?

18       MR. SHUMAKER:  I'm sorry, your Honor.  I was reading

19  the e-mail that says that the witness would be available on

20  Wednesday if that's -- I'm sorry -- moving the assumption

21  motion --

22       THE COURT:  23rd and 24th.

23       MS. BALL:  Your Honor, noting our objection to any

24  adjournment to be in compliance with our best efforts, we do

25  not believe that it will adversely affect any other provision

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:02:53  Page 282 of
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 30 of 39   282
574

1 of the agreement.

2          THE COURT:  Mr. Hackney.

3          MR. HACKNEY:  Your Honor, I think that that would be

4 helpful, and I would have one additional suggestion, which is

5 that I think that the way we should use this adjournment is

6 to, in addition to creating order on the litigation side, to

7 create a little bit of space to see what happens with the

8 mediation.  That would be the purpose, in my mind.  I would

9 recommend then that -- I would recommend allowing depositions

10 to complete at a time that's closer to the hearing so that we

11 all don't remain in the same litigation scrum that we're

12 currently in and have to --

13          THE COURT:  What would you suggest, sir?

14          MR. HACKNEY:  And the 23rd, your Honor -- I'm sorry.

15 I don't have my --

16          THE COURT:  23rd is a Monday, Monday and Tuesday,

17 the 23rd and 24th.

18          MR. HACKNEY:  You know what?  In bankruptcy

19 litigation a lot of times the depositions will run up a

20 little bit closer to the hearings, and I would say that I

21 would do it -- I would cut it off on the Wednesday before.

22          THE COURT:  That would be the 19th?

23          MR. HACKNEY:  Yes, sir.

24          THE COURT:  Any objection to that, Mr. Shumaker?

25          MR. SHUMAKER:  Your Honor, we have the eligibility

13-53846-tjt   Doc 4304-9 Filed 04/29/14 Entered 04/29/14 22:06:23 Page 283 of 31
13-53846-swr   Doc 893  Filed 09/30/13 Entered 09/30/13 10:02:03  Page 32 of 39   283
574

1   track going on, and the nonexpert depositions are to be

2   completed on the 23rd for that.  The witnesses are also here

3   and available tomorrow and Friday.  We would propose --

4           THE COURT:  Oh, I think you should go ahead with

5   those regardless.

6           MR. SHUMAKER:  And I think --

7           THE COURT:  They're scheduled.

8           MR. SHUMAKER:  I think that's --

9           THE COURT:  And with a third of the city's witnesses

10  next Wednesday.

11          MR. SHUMAKER:  Yes.  I think subject to what Ms.

12  Ball has already said, then that would be fine with the city.

13          THE COURT:  I'm sorry if I misunderstood you, Mr.

14  Hackney.  I thought you were talking about extending the

15  opportunity for rebuttal witnesses' depositions through the

16  19th.

17          MR. HACKNEY:  That's correct.

18          THE COURT:  All right.  Sorry.  Let's stick with the

19  schedule you have for the city's witnesses' depositions.

20  Okay.  All right.  Subject to the availability of a courtroom

21  here in this building, we will reschedule the hearing on the

22  assumption motion for the 23rd and the 24th.  The Court will

23  allow the city four hours and the objecting parties five

24  hours, and I want you to work with your best efforts to come

25  up with a joint statement on how the swaps and COP's work.

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 284 of
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:53  Page 32 of 39
574                                                               284

1    MR. SHUMAKER:  We will do that, your Honor.

2    THE COURT:  Yes.  Okay.  Let's turn our attention

3  then to the city's motion for a protective order regarding

4  the data room.

5    MR. SHUMAKER:  Your Honor, you recall our colloquy

6  last week about the data room, and consistent with my

7  representation to you, the city filed the motion for

8  protective order.  I don't believe that there are any

9  objections to it.  It has to do with the access to the data

10  room.  Two of the things that have occurred, as reflected in

11  the motion, are we have removed any requirement that the

12  objectors or others with discovery rights sign an NDA, and we

13  have also gone back to the city's pension actuary, Milliman,

14  and essentially renegotiated that contract such that they no

15  longer will require an NDA to access their materials.  The

16  only outstanding issue was, just for clarity purposes, that

17  the city would still be able to redact personally

18  identifiable information.  There's very few documents -- I

19  mean I think less than a handful -- that have Social Security

20  numbers, home addresses, and even the city's own bank account

21  number, but that's what the city seeks to do with this

22  motion.

23    THE COURT:  Anyone object to the city's redaction of

24  personally -- of personal information?  There was an

25  objection or a request really, more appropriately stated,

1   that the city waive any NDA obligations of people who have

2   already signed them and waive any releases that people

3   entered into as a condition previously of entering into this

4   room.

5           MR. SHUMAKER:  We'll, of course, do that, your

6   Honor.

7           THE COURT:  You will.  All right.  One of the papers

8   actually had proposed language, I think, to be added to the

9   order that you seek.  Did you see that language?

10          MR. SHUMAKER:  I know that came in last night.

11  Thank you.

12          THE COURT:  Well, we don't have to review it now.

13  Let me just ask you to work with --

14          MR. SHUMAKER:  Certainly.

15          THE COURT:  -- whoever filed that to see if you can

16  agree upon the language and to submit an amended order

17  through our order processing program.

18          MR. SHUMAKER:  We will do that, your Honor.

19          THE COURT:  Ms. Calton, did you want to be heard?

20          MS. CALTON:  Yes, your Honor.  Judy Calton for

21  Detroit Entertainment, LLC, which is Motor City Casino.  At

22  present the casino has to file financial information

23  regularly with the city under the Michigan Gaming Control

24  Act, and under the Act that information is confidential, and

25  it can't be subject of a Freedom of Information Act

13-53846-tjt   Doc 4804-9   Filed 04/29/14   Entered 04/29/14 22:06:23   Page 286 of 31
13-53846-swr   Doc 693   Filed 08/30/13   Entered 08/30/13 10:02:53   Page 34 of 39
574
286

1   disclosure.  As far as I can tell, that information today is

2   not in the data room.  My client is concerned that its right

3   for that information to be confidential maintains

4   confidential or at least if they're going to feel that they

5   should make it public that we have an opportunity for advance

6   knowledge and to seek a protective order.  And I feel kind

7   of -- it's not a today issue, but we need to be protected in

8   case tomorrow they decide to put it in there.

9         THE COURT:  Any thoughts on this?

10        MR. SHUMAKER:  Your Honor, we have no intention of

11   putting the financial statements that Ms. Calton talks about

12   in there.  If for some reason that would change, we would

13   endeavor to talk to counsel about that.

14        THE COURT:  That representation sufficient for you?

15        MS. CALTON:  Yes.  Thank you.

16        THE COURT:  All right.  The motion is granted with

17   the condition that the city seeks and the additional

18   condition that we've discussed here.  Please submit an order.

19   Would anyone else like to raise anything else here today?

20   All right.

21        MR. SHUMAKER:  Your Honor, if I may, one --

22        THE COURT:  Sir.

23        MR. SHUMAKER:  I'm sorry.  One issue that has arisen

24   with the depositions -- and I don't have any firsthand

25   knowledge of this, and I tread lightly given our exchange

1   last week, but apparently there has been some media inquiries

2   about attending the depositions of Mr. Buckfire and Mr. Orr.

3   I raise that because we want to avoid tomorrow or Friday some

4   sort of situation where people are trying to get into the

5   deposition room, the witnesses are prejudiced by, you know,

6   the commotion, and we're just -- we're seeking whether --

7   wondering if we could get some clarification from your Honor

8   as to the fact that hopefully --

9        THE COURT:  What's your position on whether it

10  should be allowed or not?

11       MR. SHUMAKER:  Well, the witnesses will be present

12  on September 9th for the hearing, so obviously they will be

13  present then.  If your Honor wants us to provide a transcript

14  from the deposition to the press, we could do that if need

15  be, but I really am worried about crowd control, if you will,

16  tomorrow where the deposition is going to take place.

17       THE COURT:  Mr. Hackney.

18       MR. HACKNEY:  I do share Mr. Shumaker's concerns

19  just on the subject of crowd control.  I had a suggestion for

20  your Honor, which is -- I'm not entirely certain, I'll

21  confess, about whether parties in interest in the case

22  generally that haven't objected to the motion are entitled to

23  appear at a deposition and ask questions.  I'll just tell you

24  that I just don't know the answer to that.  From an orderly

25  process --

13-53846-tjt   Doc 431-9   Filed 04/29/14   Entered 04/29/14 22:00:53   Page 288 of 39
13-53846-swr   Doc 693   Filed 08/30/13   Entered 08/30/13 10:02:03   Page 36 of 39
574
288

1        THE COURT:  The answer is no.

2        MR. HACKNEY:  Okay.  That's helpful because my

3   suggestion was that the only people that be allowed to appear

4   in person at the deposition would be parties that have

5   objected and that perhaps could --

6        THE COURT:  I agree with that.

7        MR. HACKNEY:  -- communicate with me and Mr.

8   Shumaker who they will be maybe I'll just say.

9        THE COURT:  Um-hmm.

10       MR. HACKNEY:  That will allow us to exercise some

11  crowd control over the physical room we're taking the

12  deposition in.

13       THE COURT:  Um-hmm.

14       MR. HACKNEY:  We have a conference call line that

15  we're going to set up for people that want to listen in, and

16  so that was requested by certain people that couldn't be in

17  Detroit, and separately --

18       THE COURT:  Certain attorneys representing parties

19  who have filed objections?

20       MR. HACKNEY:  Yes, for sure.  Like I said, I didn't

21  know coming to the podium today how parties in interest were

22  handled in terms of their ability to even attend.  And the

23  idea of giving a transcript after the deposition would seem

24  to address some of the public interest concerns that the

25  people of the city legitimately have --

13-53846-tjt  Doc 4304-9  Filed 04/29/14  Entered 04/29/14 22:06:23  Page 289 of
13-53846-swr  Doc 893  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 37 of 39   289
574

1          THE COURT:  Um-hmm.

2          MR. HACKNEY:  -- you know, so that would be our

3     suggestion.

4          THE COURT:  Um-hmm.  Would anyone else like to be

5     heard regarding this specific issue?

6          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

7     again on behalf of the Retiree Association Parties.  Because

8     of the new nature of the retiree committee, I would request

9     that they be allowed to attend even though they've not had

10    the opportunity to file a formal objection at this point.

11         THE COURT:  Um-hmm.  Interesting point.  Anybody

12    object to that?

13         MR. HACKNEY:  No, your Honor.

14         THE COURT:  The Court will permit that then.  All

15    right.  I do think it is appropriate to order that only

16    parties plus a representative of the retiree committee to

17    attend these depositions.  The Court will order the release

18    of the transcript of the depositions to the press upon their

19    request but that no other members -- no other parties in the

20    case or no members of the press otherwise be permitted to

21    attend these depositions.  Anything further yet?  Thank you

22    for bringing that up.  All right.  We'll be in recess then.

23         THE CLERK:  All rise.

24         MR. HACKNEY:  Thank you, your Honor.

25         THE CLERK:  Court is adjourned.

13-53846-tjt  Doc 4804-9  Filed 04/29/14  Entered 04/29/14 22:06:53  Page 290 of 31
13-53846-swr  Doc 893  Filed 09/30/13  Entered 09/30/13 10:02:03  Page 38 of 39   290
574

1     (Proceedings concluded at 11:01 a.m.)

2                         *  *  *




                        INDEX




<u>WITNESSES:</u>

      None

<u>EXHIBITS:</u>

      None



      I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.



/s/ Lois Garrett                    August 30, 2013
_____          _____

Lois Garrett

13-53846-swr  Doc 8539  Filed 08/30/13  Entered 08/30/13 10:02:03  Page 201 of 39
13-53846-tjt  Doc 4804-9  Filed 04/29/14  Entered 04/29/14 22:20:23  Page 32 of 39   291
574

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,                .
                                 .        Detroit, Michigan
                                 .        November 14, 2013
                Debtor.          .        2:36 p.m.
. . . . . . . . . . . . . . . . . .

HEARING RE. MOTION OF THE OBJECTORS FOR LEAVE TO
CONDUCT LIMITED DISCOVERY IN CONNECTION WITH MOTION OF
THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C.
SEC. 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),
503, 507(a)(2), 904, 921 and 922 (I) APPROVING POST-
PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING
AUTOMATIC STAY
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRAD B. ERENS
                     77 West Wacker
                     Chicago, IL  60601-1692
                     (312) 782-3939

                     Jones Day
                     By:  ROBERT W. HAMILTON
                     325 John H McConnell Blvd., Suite 600
                     Columbus, OH  43215
                     (614) 469-3939

For Detroit          Clark Hill, PLC
Retirement           By:  ROBERT D. GORDON
Systems - General    151 South Old Woodward, Suite 200
Retirement System    Birmingham, MI  48009
of Detroit, Police   (248) 988-5882
and Fire Retirement
System of the City
of Detroit:

For National         Sidley Austin, LLP
Public Finance       By:  GUY S. NEAL
Guarantee            1501 K Street, N.W.
Corporation:         Washington, DC  20005
                     (202) 736-8041

APPEARANCES (continued):

| | |
|---|---|
| For Syncora<br>Holdings, Ltd.,<br>Syncora Guarantee,<br>Inc., and Syncora<br>Capital Assurance,<br>Inc.: | Kirkland & Ellis, LLP<br>By: STEPHEN HACKNEY<br>300 North LaSalle<br>Chicago, IL 60654<br>(312) 862-2074 |
| For Ambac<br>Assurance<br>Corporation: | Arent Fox, LLP<br>By: CAROL CONNOR COHEN<br>1717 K Street, N.W.<br>Washington, DC 20036<br>(202) 857-6054 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI 48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI 49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1     THE COURT:  And let's move on and talk about

2   discovery.

3          MR. HACKNEY:  Good afternoon, your Honor.  Stephen

4   Hackney on behalf of Syncora.

5          THE COURT:  Yes, sir.

6          MR. HACKNEY:  Your Honor, we're here on a motion

7   that Syncora filed with several other parties joining that

8   relates to discovery that we'd like to take in anticipation

9   of the hearing on the motion for post-petition financing that

10  you spent most of the morning and afternoon discussing.

11  Before I -- I know that we're running into your next call,

12  and I will get right into the discovery itself, but I was

13  wondering if I could --

14         THE COURT:  Well, don't worry about that.  Don't

15  feel rushed.  I want to --

16         MR. HACKNEY:  Okay.  I will try.

17         THE COURT:  I want to take our time and do this

18  properly.

19         MR. HACKNEY:  I wanted to at the start, if I could,

20  your Honor, frame the importance of the DIP motion itself to

21  the case because I think its importance is significant not

22  only to this case but to other Chapter 9's that may follow,

23  and I think it's important to think about that in the context

24  of why we believe discovery is important.  As you've heard

25  today, the proposed DIP loan in question is believed to be

13-53846-tjt  Doc 4174  Filed 04/29/14  Entered 04/29/14 22:20:08  Page 294 of 448
13-53846-swr  Doc 3179  Filed 11/19/13  Entered 11/19/13 13:24:08  Page 3 of 48
574
294

 1   the first of its kind.  We actually -- our research indicates
 2   that it's not literally the first Chapter 9 DIP loan.  Our
 3   research indicates that there have been a couple small DIP
 4   loans in other Chapter 9's, and there was a sizeable one that
 5   was done as part of a plan, but it is the first of its kind
 6   in terms of being the largest and also one I think that is
 7   unabashedly about revitalization of the city in part as
 8   opposed to immediate cash flow needs, so the DIP loan in this
 9   case that's being proposed is significant.

10        It is significant for a second reason, and that is
11   because the proceeds of the DIP loan, the $350 million, 230
12   million about will be used to pay certain creditors outside
13   of the plan context, and the $120 million that's going to be
14   devoted to what are called quality of life initiatives, the
15   idea of a revitalization of the City of Detroit, a
16   renaissance on the street, so to speak, is also one that will
17   be happening outside the plan context, so they're coming to
18   you on an interim basis between eligibility and confirmation
19   and saying that they would like to be able to do this today.

20        The reason this is of great sensitivity and concern
21   to creditors is because if the city pledges away income
22   streams or assigns them to different parties now, it has
23   obviously an important impact on the city's ability to later
24   fairly adjust the debts of creditors like Syncora or the
25   pensioners or the others, so we perceive there to be

13-53846-tjr   Doc 1749   Filed 11/29/13   Entered 11/29/13 18:20:08   Page 295 of 48
13-53846-swr   Doc 1749   Filed 11/29/13   Entered 11/29/13 18:24:03   Page 4 of 48   295
574

1  significant plan implications by some of these interim

2  motions that are being brought to the Court, and that is why

3  this is an area of great focus and concern for creditors, and

4  that informs somewhat the discovery that we've sought.

5       I believe there is some agreement with the city that

6  some discovery is appropriate, and I'd like to recite that

7  for the record and try and narrow it.  The city, as I

8  understand it, is amenable to the idea that the objectors can

9  obtain discovery into the DIP solicitation process, the DIP

10  evaluation process, and the process by which the DIP was

11  submitted to the City Council under PA 436.  It's my

12  understanding, at least, that we have general agreement that

13  that's okay and also that the city is willing for its

14  deponents, Mr. Doak and Mr. Moore, to be deposed.

15       Where there is disagreement with respect to the

16  scope of potential document requests and inquiry is on the

17  subject of the uses and the need for the quality of life

18  proceeds, and this is where I will confess I was taken a

19  little aback by our disagreement on this because the motion

20  itself is replete with references to Mr. Moore's declaration

21  but also to a discussion of all of the challenges that the

22  City of Detroit faces, for example, with respect to blight

23  remediation, the fire department, the police department, and

24  IT infrastructure.  These are some of the areas where the

25  city has said it may -- it's not obligating itself to, but it

1   has said it may or that it intends to direct the quality of
2   life proceeds at these subject matter areas.  We believe that
3   discovery into --

4           THE COURT:  Excuse me.  Why does Syncora care about
5   what the city's priorities are in terms of quality of life
6   spending?

7           MR. HACKNEY:  The answer, your Honor, is because, as
8   a creditor who, you know, expects to see a plan of adjustment
9   at the end of the case that fairly allocates or fairly
10  adjusts its debts along with the debts of the others in the
11  case, the way the city spends its money and the impact or
12  lack of impact that has on creditor recoveries Syncora
13  believes is endemic to analyzing whether it is, for example,
14  within the business judgment, as the city has contended it is
15  and which is one of the elements under Section 364 or one of
16  the factors you'll consider, whether it's in the best
17  interest of creditors, as they have suggested that it is in
18  their papers and as the order they proposed would find, and
19  it also goes to whether --

20          THE COURT:  Do you think the city is going to ask me
21  to approve its allocation of how it's going to spend the
22  proceeds of the loan?

23          MR. HACKNEY:  I think that --

24          THE COURT:  That makes me sound like a mayor or a
25  city council.

         1          MR. HACKNEY:  Well, these -- your questions go right
         2   to the core, I think, of this matter, but also in some
         3   respects of the case, and I was -- let me respond in two
         4   respects, your Honor.
         5          THE COURT:  Well, we don't have to have an answer
         6   now, but the issue is why have discovery on all of this?
         7          MR. HACKNEY:  Yeah.  So I will answer your question,
         8   which is I know that the city -- or I believe that the city
         9   is taking the position that you're not permitted to consider
        10   either the needs or the uses of the funds and that they have
        11   sovereignty to administer themselves sort of thematically
        12   under Section 904.
        13          THE COURT:  Is that a proposition you disagree with?
        14          MR. HACKNEY:  It is.  It is because, your Honor, I
        15   acknowledge that under Section 904 that the city has the
        16   right to administer itself without the Bankruptcy Court
        17   interfering.  That's the language of Section 904.  But where
        18   things change substantially is when you come to this Court
        19   and ask this Court to begin to work the controls of the
        20   Bankruptcy Code to the benefit of the city when they invoke
        21   concepts like obtaining superpriority liens or good faith
        22   assurances to be given to parties so that they're protected
        23   no matter the outcome of various appeals and so on and so
        24   forth.  When you come into that context, we believe you've
        25   now entered -- first of all, you've put your dispute --

1  you've consented to the idea that the Bankruptcy Court must
2  determine whether it's appropriate, and we believe that
3  unlike a mayor or another political leader who thinks about
4  the needs of his citizens or her citizens in administering
5  the body politic, a bankruptcy judge, under Chapter 9 and the
6  history behind Chapter 9, the legislative purpose, does think
7  in terms of fairness to creditors, that that is an essential
8  aspect of the purpose of Chapter 9, and that the bankruptcy
9  judge is duty bound to consider --

10          THE COURT:  The fairness of what, though?

11          MR. HACKNEY:  What's that?

12          THE COURT:  The fairness of what?

13          MR. HACKNEY:  The fairness of the proposed action in
14  terms of how it will impact creditors.  For example, we
15  believe, your Honor, if I could go back to answer your
16  question about will you have to involve yourself in assessing
17  how they propose to use the money and whether they're using
18  it in the right way, we think that, at a minimum, we should
19  be entitled to take discovery on the subject but also that
20  you should consider evidence later that there are less
21  burdensome ways, for example, for the city to improve the
22  quality of life in Detroit that may not impair creditor
23  recoveries or that may not require superpriority liens and
24  the like, that there are different ways that the money can be
25  spent so that creditors will obtain either a better return on

1  their -- a better return on their claims.  And, for example,

2  your Honor, this is particularly appropriate when you think

3  about the concept of Section 364 and its incorporation into

4  Chapter 9, which hasn't always been part of Chapter 9, but

5  when it was incorporated, there's some of the legislative

6  history that suggests that the reason it was a good idea to

7  incorporate it into Chapter 9 was similar to the reason that

8  it is a good idea in Chapter 11, which is that post-petition

9  financing can be used to enhance the value of the estate and

10 enhance the value to creditors.  So we believe that the

11 question of how the money is being spent is germane to the

12 question of whether or not it's serving the purposes of

13 Section 364 even in the Chapter 9 context.

14       And your Court is asking -- the Court is asking

15 questions that I think are momentous ones.  I think the --

16 formulating the appropriate legal standard by which the Court

17 can determine that the interests of creditors are being

18 safeguarded whenever a municipal debtor invokes the

19 provisions of Chapter 9 that are outside Section 904 I think

20 is going to be critical and precedent setting, not only in

21 this case but also in the other cases, and I think that it is

22 inconsistent for the city, I guess, in my mind, your Honor,

23 to say that this evidence isn't relevant or that you're not

24 permitted to consider it when it dominates their motion and

25 where they are asserting that they have exercised good

 1   business judgment and that what they're going to do is in the
 2   best interest of creditors and is necessary to enhance the
 3   value of the estate and so forth, the other elements that
 4   you'll consider under Section 364.  That is why we want to
 5   obtain that discovery, and we want to test the proposition
 6   that the city is advancing that this is a good way to spend
 7   the money and, by the way, so important that it has to be
 8   done now outside of the plan context at a time where the city
 9   doesn't have some sort of cash flow emergency.  It's my
10   understanding that the city's cash coffers have actually
11   increased substantially during the bankruptcy in part because
12   it isn't -- it is not paying bond debt such as the debt held
13   by my client in part, so this isn't a situation where the
14   city is coming to you and saying we need $5 million to get us
15   through the case or to pay professionals or to literally pay
16   the police officers.  The city has more cash today than it
17   did when it started the cases.  It is about a novel and
18   distinct concept, in our view, novel in the history of
19   Chapter 9, which is that during the pendency of the case, you
20   can use the Bankruptcy Code to revitalize the city and to
21   allow for a renaissance, which is the word from the
22   declaration and from the motion.  And whether you can do that
23   outside the plan context and whether you can actually
24   subordinate creditor recoveries to the notion of
25   revitalization is, we believe, a threshold issue of critical

1   importance to the cases, and that's why we are urging the

2   Court to allow us to take discovery, to allow for a fully

3   developed record before you for whatever decision that you'll

4   make on this subject when we try it.

5           THE COURT:  What does this discovery entail

6   specifically?

7           MR. HACKNEY:  What I would think it would entail

8   is -- I understand that we haven't proffered requests yet,

9   but I've already mentioned to counsel for the city that I

10  understand we'll have to put some thought into formulating it

11  because we don't want every piece of paper that relates to

12  the fire department or the police department or to blight,

13  and it's likely burdensome for the city to go collect all of

14  that information.  What I was thinking that we would want

15  were two principal types of information.  The first type of

16  information would be information that relates to assessments

17  of how the City of Detroit can improve itself.  There have

18  been consultants obviously in this case who have been doing

19  this type of work.  There have also been other consultants,

20  it's my understanding, in the history of the City of Detroit

21  who have looked at some of these questions, and the types of

22  documents or reports, whether it's from a consultant or

23  whether it's something internal at the Detroit

24  Fire Department itself that says here are our needs, here are

25  the most important things to us that would most allow us to

achieve our mission, here's the anticipated costs, those
types of analytical documents I think would be of extreme
importance to creditors so that they can make an assessment
of whether or not the city is exercising its judgment in a
way that's most appropriate or that is most efficient, and
the second type of document that I could see would be
documents that Mr. Orr himself considered as the decider
behind the loan as he's looking out at the city he's
administering and trying to decide how much money do I need
and what pacing and where will I put it and why, documents
that he considered that show how he selected the priorities
that he selected and documents that show what perceived
impact his decisions will have on the creditors in terms of
their recoveries to the extent these documents exist.  Those
are the types of documents I was thinking of when we broadly
described the concept of discovery into the uses and needs of
the quality of life note.

        A third category of documents would be additional
specificity around the deployment of the capital in terms of
how it will be spent, the specific uses.

        There are also some depositions that we had proposed
in addition to the two affiants, and the city, I think, is of
the view that it may object to some of those depositions.
There were four that we had put forward, a Barclays
deposition that relates to the negotiation of the DIP itself;

1    depositions of City Council members that would be germane to
2    discovery of the compliance with PA 436; discovery of an
3    Ernst & Young representative, which is germane to the cash
4    flow forecasts that have been assembled and what they say
5    about the city's cash flow needs; and, last, depositions of
6    the swap counterparties.  And I want to make clear for the
7    Court in proposing the concept that we would depose the swap
8    counterparties, it wasn't my intention that we would revisit
9    the forbearance agreement discovery that was done previously.
10   It was my intention that we would examine them on the subject
11   of whether they're going to close on the optional termination
12   payment under a variety of circumstances because you wouldn't
13   want the city to take down $350 million in credit if it was
14   not going to be able to deploy the money in the way that it
15   was saying and pay the interest costs and so forth and not
16   being able to close.  The city has suggested that they oppose
17   the swap counterparty depositions and that they, I think,
18   needed additional information on the Ernst & Young purpose.

19       But those were the categories, and those were the
20   depositions that we propose to take, and I wanted to make
21   sure that I contextualize that within what's at stake here in
22   the motion itself.  Thank you.

23       THE COURT:  I'd like to hear from the city, please.

24       MR. HAMILTON:  Good afternoon, your Honor.  Robert
25   Hamilton of Jones Day on behalf of the City of Detroit.  When

 1   we received on October 23rd Syncora's motion for authority to

 2   take discovery under Rule 2004, while we thought the

 3   procedure was incorrect, we understood that discovery was

 4   inevitable and going to occur with respect to our at that

 5   time anticipated motion to obtain approval for the post-

 6   petition financing from Barclays, and we immediately began

 7   the process of collecting and reviewing documents for

 8   eventual production to Barclays -- I mean to Syncora and

 9   others who may decide to object to our motion for approval of

10   the financing facility.

11         We have collected and reviewed documents with

12   respect to how much financing -- external financing the city

13   will need to fund the assumption of the forbearance agreement

14   if this Court were to approve that assumption in a separate

15   hearing as well as how much external financing would be

16   needed to start the funding of the restructuring initiatives

17   that were the subject of the July 14th proposal to creditors

18   and that was the subject of extensive testimony during the

19   eligibility trial that your Honor oversaw over the last few

20   weeks.

21         We've also collected documents regarding the

22   solicitation process for potential participants in the post-

23   petition financing facilities as well as the myriad of

24   proposals that we received from various potential lenders and

25   their terms and documents regarding the exercise of the

1   city's business judgment in selecting the Barclays proposal

2   as the best one for the city.  As a result of that process,

3   we have collected and are prepared to produce tomorrow or

4   Monday over 5,000 pages of documents on each one of those

5   topics to those parties who indicate that they want to take

6   that discovery and, with respect to some of the documents,

7   agree to a protective -- or a confidentiality agreement to

8   maintain the confidentiality of some of the documents that

9   we're submitting.

10          We have also offered to Syncora to make our

11  witnesses, our two declarants, available for deposition, Mr.

12  Doak, who you heard from today, on Friday, November 22nd, in

13  New York, and on Monday, November 25th, Mr. Moore in Detroit.

14  The city consents to the discovery that I've just outlined

15  the production of all these documents on the need for

16  external financing, the process for obtaining that financing,

17  and the selection of Barclays.  We consent to the deposition

18  of those two declarants.

19          Syncora is asking for leave to take discovery on

20  other subjects that go substantially beyond the scope of what

21  we consented to, we believe on subjects that threaten to

22  impose substantial economic and logistical burdens on the

23  city on topics that we believe are not what this Court must

24  adjudicate when it hears and determines our motion for

25  approval of the post-petition financing motion.  Those

1   categories where they're going beyond what we think is the
2   legitimate scope fall under -- or there's two categories.
3   The first is relatively simple to deal with, and that's the
4   category with respect to our proposal -- or our request that
5   the Court approve our motion to assume the forbearance
6   agreement.  With respect to the motion that Syncora filed for
7   leave to take discovery, they did not list that as one of the
8   topics on which they were seeking documents, but they did
9   identify they wanted to take depositions of the swap
10  counterparties.  I did not follow entirely what counsel's
11  explanation was for why the depositions of the swap
12  counterparties is not a back door effort to take additional
13  discovery on the forbearance agreement, but I would just
14  suggest that if this Court at a separate hearing determines
15  to approve the city's assumption of the forbearance
16  agreement, the city, as -- pursuant to the terms of that
17  forbearance agreement that are detailed in our motion and in
18  the motion to assume the forbearance agreement, the city
19  would have the option to then cause the termination events
20  that would trigger our obligation to pay the $230 million --
21  $230 million -- 210 -- $210 million pursuant to that
22  forbearance agreement, so there would be, as we can see it,
23  no reason to depose in connection with the finance motion the
24  swap counterparties because the finance motion only becomes
25  material if you approve the forbearance agreement.  And if

1   you approve the -- if you approve the forbearance agreement,

2   what the swap counterparties say about what their intentions

3   are are immaterial and irrelevant because at that point the

4   city controls what happens upon seven or ten days' notice

5   under the forbearance agreement.

6        The bottom line is this Court has already heard and

7   considered and decided what discovery should occur in

8   connection with our motion to assume the forbearance

9   agreement.  That discovery has occurred, and the hearing is

10  scheduled to occur, and it should -- it will be decided based

11  on the record that this Court already dictated should be

12  developed for that hearing, and Syncora or others should not

13  be allowed to pursue discovery on the finance motion as a way

14  to get back door discovery and supplement the record on the

15  motion to assume the forbearance agreement.

16       The more difficult argument and the more difficult

17  category is what counsel spent most of his time in his

18  argument on, and that is the request for discovery on our

19  proposed use of the quality of life -- the proceeds of the

20  quality of life bonds.  The devil in this request is

21  substantial.  While he indicates that they want to take just

22  limited document discovery, just assessments that the city

23  may have developed both at the macro level and at individual

24  department levels, the fire department, the police

25  department, and how much money they think they need for what

 1  particular improvements, documents that Mr. Orr may have

 2  considered in deciding what restructuring initiatives to

 3  approve and which ones to table, and how the money will be

 4  spent among various different departments, I can't think of

 5  what kind of evidentiary hearing counsel is contemplating

 6  that that discovery would go to other than sort of a super-

 7  tribunal in which this Court second-guesses and sits in

 8  judgments of every single governmental decision that the City

 9  of Detroit is making on how to go forward with its

10  revitalization and restructuring initiatives.  There is no

11  way that kind of hearing could be completed in one or two

12  days.

13          Essentially, I think what counsel is suggesting is

14  that Section 364 constitutes an effective repeal of Section

15  904 in a Chapter 9 case where the Bankruptcy Court does not

16  have authority or jurisdiction to interfere with a

17  municipality's governmental decisionmaking and its decisions

18  on how to use its property and revenue unless the

19  municipality decides they have to borrow some money, and if

20  the municipality decides it has to borrow some money, then

21  the Bankruptcy Court, notwithstanding 904, can sit in

22  ultimate judgment and second-guess every single spending

23  decision that the city makes on how much money to spend on

24  fire, how much money to spend on police, how much money to

25  spend on lighting, how much spending -- money to spend on

1  roads, versus creditor recoveries.  And, in essence, they

2  would turn the 364 --

3         THE COURT:  Don't forget pensions.

4         MR. HAMILTON:  Very important, pensions, maybe not

5  sacrosanct, but very important.  And the point would be that

6  instead of the Chapter 9 plan of adjustment process working

7  those things out, they want to turn the 364 hearing into some

8  macro hearing that decides how all the money that the City of

9  Detroit should spend for the next ten years, how it should be

10  spent, what dollars should go to creditor recoveries, what

11  dollars should go to fire improvement, what dollars should go

12  to police improvement, all because we have to borrow some

13  money in order to fund some of these initiatives.  We do not

14  think that is a proper construction of either 904 or 364.  We

15  believe that when you hear the 364 motion, we have to

16  demonstrate that we exercise sound business judgment in

17  determining that we needed to borrow money in order to meet

18  our cash needs.  We will also have to demonstrate that we --

19  in order to borrow that money under 364(c)(2), we had to give

20  super administrative priority status and liens because

21  general unsecured credit was not available.  That does not

22  mean that this Court will sit in review of the city's

23  business judgment on the underlying money that is needed.

24  You do sit in judgment on whether or not forbearance

25  agreements should be approved, but that's on a separate

 1   motion under 365 and a 9019 motion.  And if you decide that

 2   that forbearance agreement should be approved, then we know

 3   we need $210 million.   Then, in connection with the 364

 4   motion, you will hear and adjudicate our business judgment as

 5   to whether or not we needed to borrow the money to pay that

 6   $210 million and whether or not the terms on which we want to

 7   borrow that money are reasonable and in everybody's best

 8   interest.  That is your call.

 9           Similarly, by the same token, with respect to the

10   restructuring initiatives, the city has exercised its

11   governmental and political judgment as to how much money it

12   should invest in its restructuring initiatives over the next

13   ten years.  You do not sit in judgment and review the city's

14   exercise of its governmental and political decision-making in

15   that regard.  That's up to the city to figure out how to do

16   with the mayor, with the emergency manager, and with all the

17   constituents.  We have already presented an extensive

18   evidentiary record on how those calculations were made, what

19   the restructuring initiatives are, and how much they will

20   cost over the next ten years.  And we lay that out in our

21   motion just like we lay out all the details of the

22   forbearance agreement, but in connection to whether or not

23   you're going to approve the financing arrangement, what you

24   sit in judgment on is not our decision to spend $1.25 billion

25   over the next ten years on those restructuring initiatives

1 because that's a governmental political decision that only

2 the City of Detroit has the authority to make.  What you sit

3 in judgment on is our business judgment that we need to

4 borrow some money to start paying for those initiatives and

5 the terms on which we want to borrow that money are

6 reasonable.  That's what you sit in judgment on, and we are

7 going to produce the documents that are relevant to that

8 inquiry, but it is not appropriate to turn the 364(c) hearing

9 into some mega trial that kind of makes moot the whole plan

10 of adjustment in which the parties ask you to decide what's

11 an appropriate use of loan proceeds and what's not.  Should

12 we use the loan proceeds to pay creditor recoveries, or

13 should we use it to pay pensions, should we pay it to use --

14 to pay for OPEB, or should we use it to pay for lighting?

15 That's not what this hearing is about, and I think it's

16 improper for them to try and seek discovery on that.

17 　　　　　We are willing to make Mr. Moore and E&Y available

18 for deposition on the fact that we need to borrow money to

19 start paying -- to start funding the initiatives, the

20 restructuring initiatives, but we think it is improper for

21 them to take discovery on the underlying decision-making, the

22 political and governmental decision-making that the City of

23 Detroit has undertaken in deciding what restructuring

24 initiatives they're going to undertake and when over the next

25 ten years and how much they're going to cost.  That's not

1  appropriate for this motion.

2          THE COURT:  Thank you, sir.

3          MS. CONNOR COHEN:  Your Honor, may I also be heard

4  in support of the motion?

5          THE COURT:  Yes, ma'am.

6          MS. CONNOR COHEN:  Carol Connor Cohen, your Honor,

7  on behalf of Ambac Assurance Corporation.  Your Honor --

8          THE COURT:  But not to repeat anything.

9          MS. CONNOR COHEN:  I'm sorry.

10         THE COURT:  But not to repeat anything.

11         MS. CONNOR COHEN:  I will not repeat anything.  I

12  want to start with, though, talking about what the test is

13  under 364 because quite clearly the city has moved to have

14  your Honor make a ruling under 364(c) in this bond financing.

15  The Court will have to look at whether the debtors exercise

16  reasonable business judgment, whether --

17         THE COURT:  On what?

18         MS. CONNOR COHEN:  On -- I'm going to -- would you

19  just let me finish, and I'll get back to that?  I want to

20  come back to that.

21         THE COURT:  You're asking me not to ask you any

22  questions?

23         MS. CONNOR COHEN:  No.

24         THE COURT:  I didn't think so.

25         MS. CONNOR COHEN:  No, but actually there's a point

1   I want to make --

2           THE COURT:  Okay.

3           MS. CONNOR COHEN:  -- here that --

4           THE COURT:  I'll let you work into it.  That's fine.

5           MS. CONNOR COHEN:  -- the Court has to exercise

6   reasonable business judgment, has to evaluate whether it's in

7   the best interest of creditors and the estate, has to look at

8   alternative financing that might have been available, whether

9   there are any better bids and all that kind of stuff -- we've

10  talked about that -- whether it's necessary, essential, and

11  appropriate to preserve the estate and continue operations,

12  whether the terms are fair, reasonable, and adequate, whether

13  it was negotiated in good faith and at arm's length.  Now,

14  some of those criteria are the same as in a Chapter 11, and

15  some of those criteria the debtor has said they're happy to

16  give us discovery on.  But there's two or three of these that

17  really have never been applied before on a Chapter 9, and

18  that's exactly my point, the reasonable business judgment and

19  the best interest of creditors and the estate and whether

20  it's necessary, essential, and appropriate to preserve the

21  estate and continue operations.  Those have never been

22  applied before in a Chapter 9, and part of what the Court

23  will have to do in deciding the motion before the Court will

24  be to decide what the proper criteria is, in fact.  I don't

25  believe that's what we're here for today because there is

1  going to be extensive briefing, I'm sure, on those questions,

2  and, you know, we will --

3          THE COURT:  Well, but some judgment about that is

4  necessary to control or decide the dispute about discovery.

5          MS. CONNOR COHEN:  Of course it is, and what we will

6  point to in discussing that issue, for example, is the

7  legislative history that was -- when 364 was first

8  incorporated into what was then the version of Chapter 9, and

9  at that time Congress said the reason they were doing it, the

10  reason they were adding this ability in for a municipality

11  was so that the municipality could maintain essential city

12  services directed to public safety and public health during

13  the reorganization proceeding, kind of a narrow purpose

14  because it was very controversial to add this provision into

15  Chapter 9.

16          Now, the question is going to become -- and we

17  don't -- this isn't a question for today again, but the

18  question is going to become at what level is the city

19  permitted to spend at the creditors' expense and still be

20  able to confirm a plan because it is pretty well settled --

21  there's tons of cases out there that when it comes time to

22  confirming a plan of adjustment, that the best interest of

23  creditors test does limit the city's ability to spend lots of

24  money on improving and glossing the current situation as

25  opposed to paying off creditors, that there's a limit to how

1   much money the city can expend at the expense of creditors.

2   We believe that same criteria should apply on the best

3   interest of creditors position here.

4           THE COURT:  Fixing the lights in the city is

5   glossing the city?

6           MS. CONNOR COHEN:  No.  And we're not talking about

7   the Lighting Authority motion right now anyway, but you're

8   right.

9           THE COURT:  All right.  Fair enough.  I'll change

10  the question.

11          MS. CONNOR COHEN:  To ask --

12          THE COURT:  Getting adequate police and fire is

13  glossing the city?

14          MS. CONNOR COHEN:  Having adequate police and fire

15  is not putting a gloss, absolutely not.  And the legislative

16  history suggests that's exactly why this provision was added

17  to Chapter 9, but how and whether you're doing it in the most

18  efficient manner or at the expense of repayment of creditors

19  is something that's in this Court's purview under this test.

20          Now, we keep hearing 904, 904, 904.  904 is not an

21  absolute.  904 says quite clearly that the debtor can consent

22  to the Court's involvement, interference, as the statute

23  says.  Here the debtor has come to the Court.  They could

24  have gone off and spent their money however they wanted.

25  They could have borrowed money if -- and spent it how they

1   wanted, but they came to your Honor and asked for an order,

2   and the reason they're coming to your Honor and asking for an

3   order is because --

4        THE COURT:  They came to the Court for an order but

5   only to approve the necessity of the borrowing, the necessity

6   of the priority and the senior liens, and to establish the

7   reasonableness of the terms.

8        MS. CONNOR COHEN:  But --

9        THE COURT:  What suggests there's any consent beyond

10  that?

11       MS. CONNOR COHEN:  Well, once you do that, when they

12  come to your Honor and asked to be able to give Barclays this

13  superpriority treatment and the like, then that has to be

14  considered consent to having the criteria under 364(c) apply,

15  which includes looking at the best interest of creditors and

16  whether they are not --

17       THE COURT:  Okay.  Can you walk me through the baby

18  steps as to why that follows because I don't exactly see it?

19       MS. CONNOR COHEN:  Well, simply coming to the Court

20  in the first instance has in other situations effectively

21  been treated as consent.  All right.  But they didn't have to

22  come to your Honor.

23       THE COURT:  I'm not sure the proponents of <u>Stern</u>

24  versus <u>Marshall</u> would a hundred percent agree with you on

25  that.

1    MS. CONNOR COHEN:  Well, I don't -- okay.  I'm going

2 to let that one pass, but --

3    THE COURT:  Well, no.  It's an important point,

4 which is the mere fact that a party comes to court can mean

5 consent to some things, but you have to be very careful in

6 measuring what the consent is.

7    MS. CONNOR COHEN:  All right.  I'll take that as a

8 given, but what the -- again, what the --

9    THE COURT:  Why I'm asking --

10    MS. CONNOR COHEN:  What the debtors --

11    THE COURT:  Why does this motion constitute consent

12 for this Court to approve, for example, how the city will

13 spend $350 million?

14    MS. CONNOR COHEN:  Because they're asking your Honor

15 to give them -- to give Barclays, this new lender who's going

16 to come in and layer on $350 million worth of new debt --

17    THE COURT:  Um-hmm.

18    MS. CONNOR COHEN:  -- over and above most of the

19 other creditors in this case --

20    THE COURT:  Um-hmm.

21    MS. CONNOR COHEN:  -- they're asking them to have

22 that superpriority status, to become a superpriority creditor

23 of the city, and part of the criteria for deciding whether

24 that's appropriate is to look at the best interest of

25 creditors, a test we believe has to be interpreted the same

 1   way as the best interest of creditors test in confirming a

 2   plan of adjustment, which, again, looks at a balance of the

 3   extent to which the city can spend at the expense of the

 4   creditors, so that does require -- now, the litany of

 5   horribles we got about the kind of trial, we don't think

 6   that's what you were looking at.

 7             THE COURT:  Is there a 943 case that says that?

 8             MS. CONNOR COHEN:  I'm not aware of a 943 case, no,

 9   but when -- what we're talking --

10             THE COURT:  You know what I'm asking.  I'm asking in

11   defining best interest of creditors in plan confirmation, is

12   there a case that gives the -- that says the Court has that

13   broad authority?

14             MS. CONNOR COHEN:  There actually was case law cited

15   in Syncora's objection to the Public Lighting Authority

16   motion that we joined in that says it's --

17             THE COURT:  I should look there?

18             MS. CONNOR COHEN:  Those cases say exactly that.

19             THE COURT:  All right.  I'll look there.  Thank you.

20   That's all right.  If it's there, you don't need to pull it

21   out again.

22             MS. CONNOR COHEN:  Sorry.

23             THE COURT:  That's all right.

24             MS. CONNOR COHEN:  I don't retain case names.

25             THE COURT:  Right.

1      MS. CONNOR COHEN:  And I lost what I was saying.

2      THE COURT:  Oh, I'm sorry.

3      MS. CONNOR COHEN:  No.  It's not your fault.

4      THE COURT:  Okay.  I won't take any then.

5      MS. CONNOR COHEN:  Because that is a factor that has

6  to be taken into account at plan time in that text -- in that

7  context, then we think that's something that has to be taken

8  into account also in applying 364 because it also

9  incorporates a best interest of creditors component in the

10 factors, at least according to the case law, and that -- by

11 invoking the Court's jurisdiction to ask for that order, we

12 believe they have consented to having the Court look at the

13 things that have to be looked at.

14      Oh, I know what I was saying.  I was saying that the

15 hearing that we're looking for doesn't envision, you know, a

16 lengthy exposition of all of the operational details of all

17 of these various departments and so forth and so on but

18 rather a testimony about what they're going to spend it on,

19 why they need it, why they need those things, and why it has

20 to cost what they think they're asking for, and once your

21 Honor hears the testimony, then you decide does it meet this

22 criteria or not.  It's not saying this expenditure is okay

23 and this expenditure isn't.

24      THE COURT:  Where in this process do the citizens of

25 Detroit get to be heard?

1     MS. CONNOR COHEN:  Well, they will be heard through

2  their various representatives, many of whom are here, the

3  unions, the retiree representatives.

4     THE COURT:  There's 680-some thousand citizens.  A

5  small percentage of them are represented by unions.

6     MS. CONNOR COHEN:  Your Honor, I'm afraid I don't

7  see that --

8     THE COURT:  I guess my question is, you know, not to

9  be flip about it, don't the citizens have a right to be heard

10  on the question of how the city will spend the proceeds of

11  this loan if it's approved, and if the answer to that

12  question is yes, isn't the mechanism for providing for that

13  right to be heard the political process, not the judicial

14  process?

15     MS. CONNOR COHEN:  Well, it is, and -- it is.

16     THE COURT:  Isn't that the end of the discussion?

17     MS. CONNOR COHEN:  And that's part of the 436

18  process.  I mean the political process is represented in this

19  situation in part by the 436 requirements, the City Council

20  and the Emergency Loan Board, for example, and for the city

21  officials who will be elected -- who have been elected and

22  who will be taking over when Mr. Orr's term is completed, but

23  with --

24     THE COURT:  Right, so why -- but doesn't that mean

25  it's a political process, not a judicial process?

1    MS. CONNOR COHEN:  Well, it's a judicial process to

2    the extent that your Honor has to apply the standards that

3    are in the statute and in the case law interpreting the

4    statute for providing Barclays with the superpriority status.

5         THE COURT:  Suppose the creditors' interests are

6    different from the citizens' interests?  What do I do then?

7         MS. CONNOR COHEN:  Your Honor applies the statute,

8    the statutory --

9         THE COURT:  Creditors win over the --

10        MS. CONNOR COHEN:  -- standard, which says that you

11   have to balance -- obviously the -- we don't -- none of us

12   would disagree that the city is entitled to and should spend

13   those amounts necessary to provide essential service to

14   provide public safety and health but doing so in a way and at

15   a cost that is reasonable and that doesn't do so at the

16   expense of the creditors.  Thank you, your Honor.

17        THE COURT:  All right.

18        MR. HACKNEY:  Your Honor, can I reply to Mr.

19   Hamilton?

20        THE COURT:  You can, but let me see if there are any

21   other objecting parties --

22        MR. HACKNEY:  Absolutely.

23        THE COURT:  -- who want to be heard, and then I'll

24   give you a chance.  Did you want to be heard, Mr. Gordon?

25        MR. GORDON:  Thank you, your Honor.  Robert Gordon

 1   of Clark Hill on behalf of the Detroit Retirement Systems.

 2   Thank you, your Honor.  In some respects, your Honor, I feel

 3   like I'm still trying to catch up from last week's trial to

 4   this issue, and I think it highlights what I'm seeing from

 5   over there as a chicken and egg and chicken again issue right

 6   now, which is it sounds like we're arguing objections that --

 7   legal issues that may be implicated by the motion that was

 8   filed for the DIP financing, which is supposed to be heard

 9   later, which hasn't been fully briefed yet, which may

10   determine what the total contours are of what's fair to ask

11   for in discovery.  We're arguing today to figure out what we

12   can ask for in discovery, and I'm concerned about that

13   because we haven't had a chance to fully brief this.

14   There's significant legal issues that are being discussed

15   here, but I don't think all of us have a chance to brief that

16   just yet, so I'm concerned about that.  So I'm not sure

17   whether --

18              THE COURT:  Well, I don't know what to do about

19   that.

20              MR. GORDON:  Yes.

21              THE COURT:  It is a concern, but the fact is that

22   Syncora filed this motion, and the choice was deal with it

23   now or deal with it later, and the reason why I chose now is

24   because the city says it's got to get going on this loan.

25              MR. GORDON:  Well, there seem to be a couple of

1  options here.  One, I'm just trying to think this out --

2  think this through with you before we're --

3          THE COURT:  Um-hmm.

4          MR. GORDON:  -- prejudiced in some way because I

5  would like to be able to brief this if we're really going to

6  go down this path today.  The discovery could be held in

7  abeyance while we file objections to the DIP financing and

8  claim that there's all sorts of reasonable business judgment

9  issues that the Court should be probing, and the Court could

10  then rule upon whether those are fair game or not subject to

11  discovery, but then we'll be into mid-December, and then

12  we'll be starting discovery.  The city says that's not fast

13  enough for us.  Everything has to be immediately because our

14  hair is on fire and everything else, and, you know,

15  everything has to be done like yesterday for reasons I'm not

16  exactly sure since they're accumulating cash in the meantime

17  and they're still paying payroll and so forth.  That's one

18  option.  Doesn't seem real efficient, but that's one option.

19  The other option --

20          THE COURT:  Well, hold on.

21          MR. GORDON:  Yes, sir.

22          THE COURT:  I'm sure the city is as concerned as you

23  are about the fact that the retirement contributions aren't

24  being made.

25          MR. GORDON:  I hope they're concerned about it.  I'm

1   not sure, but I hope so.  I'm sorry, your Honor.  I'm not

2   sure if I'm following --

3           THE COURT:  You missed my point.

4           MR. GORDON:  I missed your point.  I'm sorry.

5           THE COURT:  Well, your point was there's no urgency

6   here.

7           MR. GORDON:  Oh, I didn't say no urgency.  I'm just

8   trying to think of what's prudent.

9           THE COURT:  Well, your point was that there was no

10  urgency here, that we can wait till January.

11          MR. GORDON:  Not necessarily, your Honor.  The other

12  option is that we allow this discovery because it's not as --

13  certainly not as broad as what we just engaged in in the last

14  45 days in connection with eligibility, that we allow this

15  discovery, and if some of it turns out to, in your mind, not

16  be relevant, then I mean we've certainly incurred an expense.

17  There's no doubt about that.  But if the urgency is more

18  important, then so be it, but I don't think we should be

19  precluded from at least taking the discovery and being fully

20  prepared to point out things.  I think we all actually were

21  surprised at some of the things that came out in discovery

22  relative to the trial last week that -- anyway, I won't go

23  into that, but I do -- no problem.  Sorry.  So that's another

24  option is I mean, you know, if urgency is that important,

25  then the discovery seems to be fairly narrowly tailored.  We

1  can discuss -- I haven't had a chance to really think about

2  it.  We can discuss whether the swap participants are

3  necessary.

4       THE COURT:  It's hard for me to see how discovery on

5  the subject of how the city should spend $350 million is

6  anything but gigantic, enormous.

7       MR. GORDON:  Yes.  I totally agree, and I think that

8  the suggestion that 364(c) --

9       THE COURT:  I mean because that opens up the

10 possibility that any objecting party -- and by that I mean

11 objecting to the motion -- can call its own expert or experts

12 to testify about how he or she from an urban planning

13 perspective thinks this money ought to be spent.

14      MR. GORDON:  Well --

15      THE COURT:  Wow.

16      MR. GORDON:  -- as your Honor knows, it's a

17 reasonable business judgment standard.  It's not reinventing

18 the wheel.  To suggest, as city council -- as city's counsel

19 has, that 364(c) in the context of Chapter 9 doesn't even

20 implicate reasonable business judgment -- at least that's

21 what I was hearing --

22      THE COURT:  Yeah.

23      MR. GORDON:  That seems pretty big to me.  That

24 seems a bit odd.  That kind of reads 364(c) out of Chapter 9,

25 which is not the case.

1          THE COURT:  Well, no.

2          MR. GORDON:  I don't know how you -- I don't know --

3          THE COURT:  I think the argument is you reconcile

4     364(c) with 904.

5          MR. GORDON:  And how do you do that?  I mean I

6     didn't hear anything here that could parse that and -- well

7     enough to say that we shouldn't be talking about what is

8     reasonable business judgment in terms of what you're going to

9     use this for if you're going to incumber unincumbered assets

10    that could otherwise be used in various ways and which are

11    not being proposed -- these initiatives are not being

12    proposed in the context of an overall Chapter 9 plan.

13    They're saying they need to commence these things, but

14    they're not doing it in the context of a Chapter 9 plan.

15    They're doing it outside of a plan.  I think there are

16    serious implications there.

17         THE COURT:  So you think, just to summarize, that

18    the city should go with an understaffed police department, an

19    understaffed fire department, 40 percent of lights lit, I'm

20    not sure how many tens of thousands of abandoned properties,

21    until a plan is confirmed?

22         MR. GORDON:  No, your Honor, but I'm not -- I am not

23    sure that the $150 million portion of the DIP loan has been

24    clearly identified as to what it will go for, so I think that

25    there are fair questions to be asked about that, but if it is

1   going to provide essential services, that would be a

2   different story.  And as to the $200 million portion of it,

3   of course, all subject to the arguments we've made -- that

4   all the parties have made regarding whether the swap

5   participants are even entitled to it, there needs to be some

6   analysis of whether if that part goes away, if the Court

7   determines that the swap participants are not secured

8   creditors, is the 150 million still there?  How is that

9   affected?  I don't know that we've fully analyzed that yet.

10          THE COURT:  All right.  Thank you.

11          MR. GORDON:  Thank you, your Honor.

12          THE COURT:  Before I get back to you, I want to ask

13  a question of the city because I want to give you the last

14  word.  Sir, at the lectern, please.

15          MR. HAMILTON:  Yes, sir.

16          THE COURT:  I didn't quite hear your response on the

17  request for discovery regarding compliance with PA 436.

18          MR. HAMILTON:  We have no -- we have no problem with

19  that.  They wanted to take a deposition of a City Council

20  member.  We took no position on that.  We don't represent the

21  City Council.  We would appear at the deposition if it

22  happens.

23          THE COURT:  All right.  Thank you.  Sir.

24          MR. HACKNEY:  Thank you, your Honor.  I will be

25  brief, but the stakes are very high, and I think that the

legal position that the city is taking is breathtaking here
because you heard Mr. Hamilton say that when they come to you
on a 364 motion and they ask you to work the controls of the
Bankruptcy Code to their advantage, should you deign to
ask -- to probe behind what they're using the money for, why
they believe they need it and assess whether this borrowing
is in the best interest of creditors, apply some of those
different elements you heard both counsel and I talk about,
that if you're to do that, now you're sitting as a super
tribunal almost how dare you interfere with our
administration.  You are now acting as a super tribunal when
there's no question that if they did these very plan-like
steps, paying $220 million to a creditor, investing in the
city, revitalizing the city and pushing down on the creditor
stack to do so, if they did that in the context of a plan,
there is no question that the Court would be within its
rights to make all of those assessments, whether it's fair
and equitable, whether it's in the best interest of
creditors, those precise elements that are designed to
protect creditors and make sure that the plan is fair, that
it does fairly adjust the debts.  The thesis here is, well,
why don't we just pull it forward because if we can pull it
forward out of the plan context, we can engage in a number of
these key set pieces with the Court where their position is
that they will come in and say, "In my judgment, it's

13-53846-swr  Doc 1714-9  Filed 04/29/14  Entered 04/29/14 22:00:03  Page 38 of 46
13-53846-swr  Doc 1714-9  Filed 04/29/14  Entered 04/29/14 22:00:03  Page 329 of 46
574
329

1   necessary, and you must defer to my judgment."  You're given

2   no opportunity to assess, and you could give away the city,

3   so to speak, in the process of improving itself because you

4   could -- Detroit's challenges are well-known, and I'm

5   sympathetic to and sensitive to your questions.  I don't mean

6   to be callous.  I understand that there are issues with the

7   lights, with 911 response times, and I understand that there

8   are real people out there today that are living with these

9   challenges, and I'm not being callous, but I do want to say

10  this.  They've been living with these challenges for a very

11  long time, and while it is important that --

12          THE COURT:  This argument does not impress me,

13  counsel.  Don't go there.

14          MR. HACKNEY:  But while it's important, it is

15  something that must be fairly balanced with the other aspects

16  of the city's --

17          THE COURT:  That's a fair point, but the fact that

18  they've been living with it for a long time --

19          MR. HACKNEY:  Agree.  Well, and --

20          THE COURT:  -- is no justification for imposing it

21  upon them for another day.

22          MR. HACKNEY:  I'm not trying to say that we should

23  make them wait for no reason at all.  I am saying that there

24  is a good reason to approach this with both the benefit of a

25  fulsome record and with caution because, your Honor, even as

 1   we talk about the business judgment rule in this context, I
 2   think that your rulings on what the business judgment rule
 3   means in Chapter 9 are going to be questions of first
 4   impression in some respects, and I think they are going to be
 5   momentous rulings.  I know what it means in Chapter 11.  I
 6   deal with that a lot, and I know the Court does as well.  But
 7   when you talk about the way the business judgment rule works
 8   in Chapter 11, it's not clear how it translates into Chapter
 9   9.  For example -- and don't -- this is not intended to be
10   flip or callous, but I'm trying to map these two things very
11   precisely.  Are the citizens of the city, are they like the
12   equity in a Chapter 11?  That would be -- that would be --
13         THE COURT:  Those analogies are so imperfect that
14   it's not even worth trying.
15         MR. HACKNEY:  There are challenges there, and so I
16   actually think that when you say what the business judgment
17   rule means under 364 in the context of Chapter 9, I think
18   that ruling is going to grapple with these concepts of
19   balance, necessity, rights of the citizens vis-a-vis rights
20   of the creditors, and I -- and those are the types of issues
21   that you would grapple with, I believe, in a plan.  I don't
22   believe that the city can say that you are not entitled to
23   grapple with them in the context of 364.
24         I'd like to finish with one point.  I want to thank
25   you for your patience.  There's one thing that doesn't make

1    any sense to me about the city's position here today, which

2    is they are willing to allow us to take the deposition of Mr.

3    Moore, so he's the Conway MacKenzie consultant whose

4    deposition is a very colorful recitation of the challenges

5    and how they need the money to address the challenges, so

6    it's both about needs and uses.  It doesn't square with me

7    that they're saying, yeah, you can depose Mr. Moore because,

8    of course, we're going to call him, and we are going to paint

9    a picture of the City of Detroit that justifies this loan for

10   Judge Rhodes, but we won't give you discovery that relates to

11   the work and the assessments and the types of things that he

12   engaged in and reviewed and considered in order to generate

13   the declaration that we attached.  I don't see how those two

14   things fit with one another.  If the needs and the uses are

15   irrelevant, why does it dominate their motion?  Why is Mr.

16   Moore's declaration devoted entirely to it?  Why is he

17   proposed as a witness?  If those things make sense for the

18   city because they admit that they are relevant to their

19   motion, then the discovery on the uses and needs I believe

20   also would be relevant.  I agree that while we can try to

21   minimize the burden, it will be substantial discovery because

22   of what you said.  I'm not going to disagree with that, but

23   this is a big loan, and this is a big issue for the

24   creditors.  We're talking about $120 million on top of the

25   swap counterparty termination amount.

 1       THE COURT:  It's a big number, but it pales in

 2   comparison to the numbers I heard the city needs for its

 3   revitalization program over -- I think it was ten years.

 4       MR. HACKNEY:  I think that in some respects, your

 5   Honor, the whole case is about that word "need," and I think

 6   it's a hard question because I think that this is something

 7   that's --

 8       THE COURT:  Isn't "hard" just another word for

 9   political?

10       MR. HACKNEY:  No.  I think in this case it's

11   emphatically going -- it is certainly also a political

12   question that people wrestle with, that certainly the city

13   wrestled with before bankruptcy under the constraints that it

14   had to operate under.  I think it is -- no matter how much we

15   struggle with the difficulty, it is a legal question, though,

16   for you because -- because necessity is something that

17   municipalities struggle with everywhere outside of

18   bankruptcy, when they come to bankruptcy and they now want to

19   confirm a plan and get out, they have to prove to you that

20   the steps that they propose to take, the recoveries that they

21   propose to offer are fair and equitable and are in the best

22   interest of creditors.  In the case of the City of Detroit

23   that has these well-documented challenges -- and I won't

24   shirk from saying that they are significant challenges -- at

25   some point doesn't Kevyn Orr just come in and say, "Why would

1  I ever give creditors a dollar?  I mean the needs here are

2  substantial, and I intend to invest not a billion" --

3           THE COURT:  A lot of people think that's what he

4  already said.

5           MR. HACKNEY:  I guess I would say he's come

6  relatively close to it, but I'll finish with one point, which

7  is you can see there's a logical way to back into the fact

8  that the Court must be as vigilant, we believe, in the

9  interregnum period between eligibility and closing as it is

10  in confirmation.  And the logical point is that if you put

11  the plan together that said we are going to revitalize the

12  city, improve services, speed up police officer response

13  time, protect our firemen, remediate blight, build parks, all

14  sorts of different types of things, and give the creditors

15  nothing or very little, pretend that the plan said that --

16  some people feel that the plan does say that today, but

17  pretend in this hypothetical the plan said that and it didn't

18  marshal any creditor support, it wouldn't be a confirmable

19  plan that would allow the city to exit, so you know that in

20  the backdrop of all of this, the need to have at least some

21  creditor support -- and the history of Chapter 9 indicates --

22           THE COURT:  Well, it's way premature to come to the

23  conclusion about what plan is confirmable and what isn't.

24           MR. HACKNEY:  This motion --

25           THE COURT:  There are provisions for cramdown --

1          MR. HACKNEY:  There are.

2          THE COURT:  -- in Chapter 9.

3          MR. HACKNEY:  There are, but those provisions

4   still --

5          THE COURT:  A plan can be confirmed with no creditor

6   support.

7          MR. HACKNEY:  Well, at least an impaired assenting

8   class I would expect even in cramdown, but understood.  You

9   could have a small minority, but it would still have to

10  satisfy all those factors of what's fair and equitable,

11  what's in the best interest of creditors.

12         THE COURT:  True.

13         MR. HACKNEY:  Those never go away, and I think

14  that's the difference between when you come to a bankruptcy

15  judge in a Bankruptcy Court and start asking for these unique

16  aspects of the Code is that that is the perspective, and this

17  is one of the things we intend to brief for you in our

18  objection because I do want to -- it is absolutely

19  complicated and I believe reasonably a first impression.

20  We've been --

21         THE COURT:  All right.  I'm inventing a process here

22  that I think will at least go some good measure of the way

23  toward accommodating everyone's interest here because I think

24  there -- I think there is merit in the concerns that you have

25  raised and that Mr. Gordon have raised about process here, so

 1  here's the best I can come up with to try to accommodate
 2  everyone's interest here.  The first is between now and when
 3  we start the hearing to limit discovery in the ways that the
 4  city has proposed or, in the case of PA 436, not opposed, and
 5  then this will give you then an opportunity to brief more
 6  fully than we have in connection with today's hearing the
 7  issue of what is the appropriate scope of the Court's review
 8  of this motion under Section 364(c).  And then in the context
 9  of that hearing, which the Court will take so much evidence
10  as the city thinks is relevant to the motion, according to
11  its view of the scope of the Court's review, the Court will
12  then decide whether, based on its determination of the scope,
13  that the record is complete or to provide for further
14  discovery on a more expanded scope of review, so I know it's
15  a little bit more cumbersome and complex, but I think there
16  is merit in trying to make a determination of the scope of
17  review in a more fulsome way than this discovery motion has
18  allowed us to do, so that will be my order at this point in
19  time.  I will try to prepare an order that perhaps more
20  articulately sets forth what I'm trying to do here than I
21  have been able to on the record here.

22          MS. CONNOR COHEN:  Thank you, your Honor.

23          MR. NEAL:  Your Honor, just -- good afternoon again.
24  Guy Neal.  Just a question on the objection deadline.  I know
25  there's been talk potentially of having that date moved.  I

1  believe it's --

2         THE COURT:  What is the deadline now?

3         MR. NEAL:  I believe it's on the 22nd, but I thought

4  that it might be moved to the 27th.  I'm just not sure where

5  it stands today.

6         MR. ERENS:  Your Honor, the notice that the debtor

7  sent out had set the 21st as the objection deadline.  We've

8  already talked to Syncora because of the need to accommodate

9  discovery that we would move that objection deadline to the

10  27th.  The debtor then would reply on the 4th consistent with

11  the order your Honor issued in connection with the 10th, the

12  hearing on the 10th, and then we'd have the hearing on the

13  10th.

14         THE COURT:  All right.  So if that's your

15  stipulation, you may submit that, but you'll engage in

16  discovery in the meantime.  Is that the idea?

17         MR. HACKNEY:  It is.

18         THE COURT:  All right.

19         MR. HACKNEY:  Your Honor, can I ask one clarifying

20  fact?

21         THE COURT:  Sure.

22         MR. HACKNEY:  I promise not to hector you to death

23  with questions, but the one --

24         THE COURT:  Thank you.

25         MR. HACKNEY:  The one thing that I do want to

1   understand because I don't want to violate this order, which

2   is Mr. Moore's deposition, because -- can I --

3          THE COURT:  The city has offered it up.  You take --

4   you ask him whatever questions you want to ask him.

5          MR. HACKNEY:  Okay.  That's the best way because

6   then we don't have to do them twice or whatever.  I just

7   wanted to clarify that.  Thank you.

8          MR. ERENS:  Also, I should make clear, your Honor,

9   we would try, if it was okay with your Honor, to have the

10   objection deadline moved to the 27th only for parties who

11   felt they needed to participate in discovery.  If parties did

12   not think they needed to participate in discovery, we'd like

13   to get those objections so that we can start reviewing them.

14   The city will not have a long period of reply.

15          THE COURT:  Can you readily identify those parties

16   or are we going to have a dispute about which parties and

17   which category?

18          MR. ERENS:  We will certainly try, so we'll do our

19   best.

20          THE COURT:  All right.  Well, I'll trust you to try

21   to work it out.  If there are issues, you can get me on the

22   telephone.

23          MR. ERENS:  Okay.  Thank you.

24     (Hearing concluded at 3:40 p.m.)

INDEX


<u>WITNESSES:</u>

     None

<u>EXHIBITS:</u>

     None


          I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                         November 19, 2013
_____          _____
Lois Garrett

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .       Docket No. 13-53846
        MICHIGAN,              .
                              .       Detroit, Michigan
                              .       November 27, 2013
                Debtor.        .       11:19 a.m.
. . . . . . . . . . . . . . .

HEARING RE. CITY OF DETROIT'S MOTION FOR ENTRY OF AN
ORDER ESTABLISHING PRE-TRIAL AND TRIAL PROCEDURES AND
SETTING ADDITIONAL HEARINGS (DOCKET #1788)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:       Jones Day
                      By:  GREGORY SHUMAKER
                      51 Louisiana Avenue, N.W.
                      Washington, D.C.  20001-2113
                      (212) 879-3679

                      Miller, Canfield, Paddock & Stone, PLC
                      By:  TIMOTHY A. FUSCO
                      150 West Jefferson, Suite 2500
                      Detroit, MI  48226
                      (313) 496-8435

For Detroit           Clark Hill, PLC
Retirement            By:  ROBERT D. GORDON
Systems - General     151 South Old Woodward, Suite 200
Retirement System     Birmingham, MI  48009
of Detroit, Police    (248) 988-5882
and Fire Retirement
System of the City
of Detroit:

For Detroit           Honigman, Miller, Schwartz & Cohn, LLP
Entertainment,        By:  JUDY B. CALTON
LLC - Motor City      660 Woodward Avenue, Suite 2290
Casino and Greek-     Detroit, MI  48226
town Casino, LLC:     (313) 465-7344

13-53846-swr  Doc 13849  Filed 11/29/14  Entered 11/29/13 11:52:33  Page 340 of 41
13-53846-swr  Doc 13849  Filed 11/29/14  Entered 11/29/14 22:00:23  Page 340 of 41  340
574

APPEARANCES (continued):

For Syncora:              McDonald Hopkins, PLC
                          By:  JOSHUA A. GADHARF
                          39533 Woodward Avenue, Suite 318
                          Bloomfield Hills, MI  48304
                          (248) 593-2942

                          Quinn Emanuel Urquhart & Sullivan, LLP
                          By:  SUSHEEL KIRPALANI
                               JAKE SHIELDS
                          50 Madison Avenue, 22nd Floor
                          New York, NY  10010
                          (212) 849-7000

For Erste                 Ballard Spahr, LLP
Europaische               By:  VINCENT J. MARRIOTT, III
Pfandbrief-und            1735 Market Street, 51st Floor
Kommunalkreditbank        Philadelphia, PA  19103-7599
Aktiengesellschaft        (215) 864-8236
in Luxemburg, S.A.:

For the Swap              Warner, Nocross & Judd, LLP
Counterparties:           By:  STEPHEN B. GROW
                          900 Fifth Third Tower
                          111 Lyon Street, N.W.
                          Grand Rapids, MI  49503-2487
                          (616) 752-2158

Court Recorder:           Letrice Calloway
                          United States Bankruptcy Court
                          211 West Fort Street
                          21st Floor
                          Detroit, MI  48226-3211
                          (313) 234-0068

Transcribed By:           Lois Garrett
                          1290 West Barnes Road
                          Leslie, MI  49251
                          (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      MR. SHUMAKER:  Good morning, your Honor.  Greg
2   Shumaker of Jones Day for the City of Detroit.
3      THE COURT:  Before you proceed, did anyone ever show
4   up on the Mobley matter?
5      MR. FUSCO:  Your Honor, we reached Mr. Rose finally.
6   He apologized.  He said he just inadvertently did not see the
7   notice for today and asked -- and we have no objection to
8   moving this to the next hearing date.
9      THE COURT:  Okay.  You may submit a stipulation and
10   order that accomplishes that.
11      MR. FUSCO:  Thank you.
12      THE COURT:  All right.
13      MR. SHUMAKER:  Your Honor, to resume, the city filed
14   this motion in an effort to gain your guidance in the lead-up
15   to the upcoming hearings on what we referred to as the
16   assumption motion and the DIP or the post-petition financing
17   motion.  As your Honor knows, you set aside December 10th,
18   11th, and 12th for the hearings on those motions, and what we
19   do in our motion is to lay out a proposed schedule to try
20   to -- to order things in the lead-up.  You know, I don't
21   think there's anything surprising in what the city has
22   proposed there.  It's, if you will, in some ways a redo of
23   what we did with the eligibility motion in terms of setting a
24   date for will call and may call witnesses, exhibit lists.  We
25   would suggest simultaneously exchanging those on Friday.

 1  That's not the most convenient day on -- in the calendar, but

 2  we are --

 3        THE COURT:  It's more convenient than tomorrow.

 4        MR. SHUMAKER:  That it is, your Honor.  It is

 5  certainly that.  We thought so, so we suggested Friday.  But

 6  all of it is sort of back-engineered from the hearing dates,

 7  and, you know, we've got our will call and our may call

 8  witness list again, the exhibit list.  We talked, your Honor,

 9  with regard to the assumption motion hearing that your Honor

10  thought it would be helpful to have a joint statement of

11  facts, so we've been working -- actually, back in September

12  the city was working with the objectors on that effort, and

13  that would resume, and we presume it would also be helpful to

14  the Court to have one with regard to the DIP motion as well

15  and also have a joint exhibit list which would specify

16  obviously the exhibits that might be introduced at the

17  hearing and give the parties an opportunity to object and for

18  the Court to have something to look at and resolve matters as

19  we proceed to the hearings.

20        We also indicated that we -- in our motion we set

21  forth the witnesses that we believe will testify, and what we

22  did there gets into one of the issues that we were really

23  seeking the Court's guidance on, which is whether the Court

24  would like the -- it to be one or two hearings.  We believe

25  that for the convenience of the parties, the convenience of

13-53846-tjt  Doc 4314-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 343 of 41
13-53846-swr  Doc 1879  Filed 11/29/13  Entered 11/29/13 11:52:33  Page 4 of 41   343
574

1   the witnesses, and certainly the convenience of the Court as

2   well as the fact that the initial assumption motion hearing

3   was adjourned in part because a number of objectors had said,

4   "Hey, we can't really assess the reasonableness without

5   knowing what the financing situation is," so we see them as

6   going hand in hand, and that's why we suggested the hearing

7   would be one consolidated hearing.  We could have arguments

8   however the Court would want to set that up, but for purposes

9   of putting the witnesses on the stand, we would offer that

10  the witnesses would take the stand and testify with regard to

11  both, whatever their testimony is on the assumption motion

12  and then also with regard to the DIP motion as opposed to

13  having them step down after being cross-examined and then

14  bringing them back, so that's why we -- and we've -- the five

15  witnesses that we believe we'll be putting forth, your Honor

16  has already heard testimony from all of them, Mr. Orr,

17  Mr. Malhotra, Mr. Buckfire, Mr. Moore, and Mr. Doak.

18         Now, the declarants in support of the DIP motion

19  were Mr. Doak and Mr. Moore.  Your Honor heard a couple weeks

20  ago their testimony in connection with the motion for

21  discovery.  We also believe -- we don't believe that there

22  will be significant amounts of testimony from Mr. Orr,

23  Mr. Buckfire, or Mr. Malhotra on the DIP motion, but they did

24  play roles, and they may well get into that on the stand.

25  And we wanted to afford the objectors the -- we wanted to

1  advise them of that and then afford them the ability to have

2  what we would hope would be short depositions because they've

3  already been deposed in connection at least with the

4  assumption motion, so all of those were set up.

5       We also would like -- and I think it's only fair

6  that if the objectors are going to put forth rebuttal

7  witnesses, as they did with regard to the eligibility motion,

8  the city would like the opportunity to be able to depose

9  them, hence including a request that on Friday, which is

10  pretty close, but the -- because objections to the DIP motion

11  are due today, that they declare who their rebuttal witnesses

12  are because we need to depose them in advance of the hearing

13  ten days hence starting at the beginning of next week.  So

14  that's kind of what we were doing.

15       Now, we also -- so in terms of the scheduling, we

16  also -- one other matter that we were seeking your Honor's

17  advice on was the length of the hearing because, as your

18  Honor recalls, with regard to the assumption motion hearing,

19  it was going to be four hours for the city to put on its

20  case, five hours for the objectors.  We suggested seven and

21  eight, and, your Honor, we believe that's a doable and --

22  hopefully for both sides.

23       We've also suggested -- I think your Honor used this

24  in the November 18th hearing, and I think it would be helpful

25  if there was some way of having a lead cross-examiner of the

13-53846-swr  Doc 4314-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 345 of
574
13-53846-swr  Doc 1879  Filed 11/28/13  Entered 11/28/13 11:52:53  Page 6 of 41    345

1  witnesses if there's -- we recognize there are different

2  interests at play, but perhaps if they were to categorize

3  them by groups, but when your Honor did that with the cross-

4  examinations of Mr. Doak and Mr. Moore, it certainly went

5  more smoothly.  And because this is a summary proceeding, in

6  general, we suggest that that might be advisable as well.

7      Now, with regard to the schedule that we proposed,

8  the objectors have kind of said, you know, we don't really

9  object to what you're -- well, there are some things that

10  they object to, but in general setting some dates and

11  deadlines makes some sense, but it seems rather hurried to us

12  because there's so much that's going to have to be done in

13  the next couple of weeks, and there's an intervening holiday.

14  And they've sort of suggested some proposals.  I wanted to

15  share with your Honor the concern that the city has about

16  doing that, and not to be presumptuous, but it's actually

17  somewhat of a concern for your Honor because the city is

18  going to be asking -- as you know, we've been trying to

19  proceed as expeditiously as possible with regard to these

20  motions because we believe the forbearance agreement -- we

21  want to -- we want to implement it, of course, and we

22  obviously want to fund it as well through the DIP motion.  We

23  need orders from your Honor to do that.  As things currently

24  stand, you heard some testimony about the Barclays commitment

25  letter on the 14th and how it operates, and right now the

1  Barclays commitment expires -- to fund the DIP loan expires
2  on January 7th, 2014.  And given how the forbearance
3  agreement operates and the obviously -- the obvious need to
4  fund the forbearance agreement, we believe that it's
5  necessary to have eight business days in advance.  The
6  forbearance agreement would require the city to give notice
7  to the swap counterparties that it has the ability to pay, it
8  has received an order, and it has the financing to do what
9  it's doing, and that's a seven-day notice period -- seven-day
10  business notice -- I'm sorry -- seven-business-day notice
11  period.  If you back out from January 7th, a day upon which
12  Barclays, by the terms of the city's agreement with them,
13  could walk away from its commitment, if you back up those
14  seven business days plus one for logistics -- that's the add-
15  on -- you come to December 26th as the date that the city
16  would be asking your Honor to provide an order, which may not
17  be perhaps the most convenient -- another perhaps
18  inconvenient date on the calendar especially if, as the
19  objectors have proposed, how about we move the hearing back
20  from the 10th, 11th, and 12th to the 17th, 18th, and 19th.
21  By my count, that's a week at a tough time of year, and so
22  obviously the city wants to be reasonable and accommodate,
23  you know, all of the parties' interests as best it can, but
24  it would put a -- we worry, a burden on the Court that's
25  worrisome.  We would prefer not to do that, and that's why we

13-53846-tjt  Doc 41849  Filed 01/29/14  Entered 01/29/14 22:00:23  Page 347 of 41
13-53846-swr  Doc 1879  Filed 11/29/13  Entered 11/29/13 11:52:33  Page 347 of 41  347
574

1  think that, you know, sticking to the December 10th, 11th,

2  12th is the better way to go because it gives your Honor more

3  time to do what you need to do as opposed to issuing an order

4  from the bench at the end of the hearing or doing something

5  in those seven days.  So that's, you know, our suggestion.  I

6  could run through those dates, your Honor, and go through,

7  you know, the pros and cons, but I think your Honor gets all

8  that.  I actually have a calendar that prints it all out

9  nicely.  If your Honor would like it, I'm happy to give you

10  that.  But this -- I want to emphasize for the Court -- and I

11  know it was discussed at the hearing on the 14th -- but that

12  January 7th date is an important date because by then the

13  complete commitment fee that the city has agreed to pay in

14  order to get Barclays' commitment to fund -- to provide the

15  $350 million will have been paid.  That's over $4 million.

16  And if we don't hit that date, Barclays is able to walk away,

17  and that has obviously significant consequences, I mean,

18  because if they walk away, we don't have our DIP loan, and we

19  can't set forth -- take the steps that we think are so vital

20  to not only taking out the swaps, if you will, by way of the

21  forbearance agreement but also to get access to those quality

22  of life proceeds and implement the kinds of steps, blight,

23  addressing blight and whatnot, so that's the conundrum that

24  we currently find ourselves on, and I wanted to raise that

25  with your Honor.

13-53846-tjt   Doc 4314-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 348 of
13-53846-swr   Doc 1879   Filed 11/29/13   Entered 11/29/13 11:52:53   Page 9 of 41   348
574

 1          The other aspect of our motion, which I'll touch on,

 2     which is -- and I think I touched on most of the

 3     objectors' -- the joint objectors' -- or the objectors' joint

 4     response.  Syncora also raises -- it has its own independent

 5     objection, and, your Honor, you know, that objection -- we

 6     think it's time to deal with the Syncora -- the consent right

 7     issue.  As your Honor knows, Syncora's basis for objecting to

 8     the assumption motion is bound up in its consent rights as a

 9     swaps insurer, and that issue has come up in other contexts.

10     It has come up in connection with the lawsuit that the city

11     was forced to file back on July 5th to gain a temporary

12     restraining order in order to continue to receive the casino

13     revenues.  That obviously predates the forbearance agreement,

14     which was a couple weeks later, but Syncora's defense to its

15     actions, which -- of the city's complaint is bound up in

16     these consent rates as well as the fact that after the

17     bankruptcy was commenced, as your Honor knows, Syncora went

18     to New York state court and filed an action against the swap

19     counterparties, and that action was removed and transferred

20     to the Eastern District of Michigan, and then -- I guess it

21     was as of the beginning of last week Judge Goldsmith referred

22     it to your Honor, so now all the bouncing Syncora consent

23     right balls are in sort of one bin now in front of your

24     Honor, which we think is the appropriate spot for those balls

25     to be.  And we believe that given the fact -- I'll be shocked

1  if in Syncora's objection -- well, first of all, I'll be

2  shocked if Syncora doesn't object today to the DIP motion,

3  but I'll also be shocked if that's not bound up in the

4  consent right issue.  And because there is a pending motion

5  to dismiss in the adversary proceeding that is -- the only

6  thing that's necessary is a reply brief, which I think

7  actually may have been filed yesterday, that's fully briefed,

8  and the city has moved to intervene in that case for what we

9  think are obvious reasons.  We have put in our motion a

10  suggestion to your Honor that you hear the motion to

11  dismiss -- actually, hear our motion to intervene to allow

12  the city to get into the action and then hear the consent

13  right issue because that's going to be a way of resolving

14  these consent rights, which, your Honor, I think we believe

15  you must do in connection with Syncora's objection in any

16  event.  And so that's kind of bound up in this motion.  I

17  don't know what your Honor would like to do about the timing

18  obviously, and -- but that's why we raise it because it is --

19  at least the Syncora consent right issue is what we view very

20  much a threshold issue and could impact the progress of the

21  Court's substantial -- of the -- I'm sorry -- the hearing

22  substantially when it comes before your Honor.

23      And I just would -- one additional -- just to

24  emphasize something that's obvious to your Honor, and I hate

25  to say this, but we were -- the city very much believes that

1   your Honor should be deciding the consent right issue.  I

2   mean you are forced to get familiar with some fairly

3   complicated documentation in connection with Syncora's

4   objection.  It obviously has a clear impact on the city's

5   revenues and the city's access to an incredibly important

6   revenue stream, and, again, all the balls now are in front of

7   you, and that's why we would submit that your Honor should

8   deal with it when you can.

9          THE COURT:  Thank you, sir.

10         MR. SHUMAKER:  Thank you, your Honor.

11         MR. GORDON:  Good morning, your Honor.  Good

12  morning, your Honor.  Robert Gordon of Clark Hill on behalf

13  of the Detroit Retirement Systems.  Your Honor, I'm actually

14  here today presenting the joint response of a large group of

15  objecting parties, so I have the solemn task of speaking on

16  behalf of, in some respects, my last count was at least 14

17  parties who all signed onto this joint response that we filed

18  yesterday.

19         THE COURT:  Um-hmm.

20         MR. GORDON:  I think that the genesis of the joint

21  response was, in part, due to the parties speaking amongst

22  themselves and realizing that they had common concerns and

23  recognizing also that if we could put it all into one

24  document rather than 14 documents, it might help the Court.

25  I hope it was helpful.

1          THE COURT:  Yes.

2          MR. GORDON:  And then I suspect it was also helpful

3     to out-state counsel to task me with presenting today so they

4     might avoid traveling on the day before the holiday.  In any

5     event, I guess, your Honor, I'm a little -- I don't know if

6     the word is "dismayed," and maybe the Court is as well, that

7     we're having a contested hearing on pretrial procedures and

8     scheduling matters.  Hopefully those could usually be worked

9     out to some extent, but if I may, I'd like to describe how

10    we've gotten here today.  Your Honor, we were before this

11    Court on November 14th discussing discovery in connection

12    with the financing motion.

13         THE COURT:  Well, I'll give you a brief opportunity

14    to do this, but mostly what I'm interested in is what do I

15    have to decide, what do you disagree on, what do you want to

16    do.

17         MR. GORDON:  Yes.  I understand, your Honor.

18         THE COURT:  But go ahead.

19         MR. GORDON:  I'll be brief.  We were here on the

20    14th, and at that time there was a discussion of the timing

21    of taking the depositions of Mr. Doak and Mr. Moore and only

22    Mr. Doak and Mr. Moore.  The city did not indicate that it

23    intended to call any other witnesses for the financing motion

24    and, in fact, opposed Syncora's request to depose Mr. Orr.

25    If the city was planning to call other witnesses, one would

 1   have hoped that they would have mentioned it at that time.
 2   They did not.  They also did not mention that they desired to
 3   take the depositions of the objecting parties' witnesses at
 4   that time.  Apparently subsequently the city decided
 5   otherwise, had a change of heart, and in the intervening
 6   eight days they could have reached out to the objecting
 7   parties, but they did not.  Instead, last Friday at about
 8   three o'clock in the afternoon they simply filed a motion and
 9   asked for an expedited hearing.  The motion, your Honor, in
10   short, asks for procedures and deadlines that are illogical
11   and unworkable, and I'll get into that in one moment.  Your
12   Honor, the local rules, 9014-1, requires that a party filing
13   such a motion must seek the concurrence of parties or
14   otherwise assert that it was infeasible to do so, and the
15   section of the motion filed by the city states -- and I will
16   just quote directly from it at page 10 -- "The city sought
17   concurrence in this motion from Syncora, but such concurrence
18   was not obtained.  Given the large number of objectors and
19   potential objectors, paren, some of whom are not yet known to
20   the city, end paren, comma, it is not feasible for the city
21   to seek concurrence in this motion from all parties.
22   Accordingly, the city respectfully requests that such
23   requirement be waived as to those additional parties,
24   period," end quote.  In other words, the city didn't reach
25   out to any of the parties that appeared at the November 14th

13-53846-swr   Doc 1845   Filed 11/26/13   Entered 11/26/13 14:52:53   Page 353 of
574
13-53846-swr   Doc 1845   Filed 11/26/13   Entered 11/26/13 12:00:23   Page 353 of   353

hearing other than Syncora.  It knew of all the parties that
have objected to the swap motion, which is part of what this
pretrial procedure is all about.  That's a finite number of
parties.  It's probably less than ten.  They didn't reach out
to any of them either.

We filed our joint response as of noon yesterday,
your Honor.  It's pretty straightforward.  In the interim,
again, the city has not reached out to us to try to resolve
these matters.  We actually during the break here reached out
to counsel to try to resolve it to no avail.

Your Honor, as we've mentioned in -- described in
our response, the deadlines are just not workable.  They
are -- the city is suggesting that all witnesses, will call
and rebuttal witnesses, should be identified by this Friday
before we've done depositions, before we've been able to
fully review 20,000 documents that were produced just last
week.  We submit that that's truly impossible and prejudicial
to have to identify all witnesses, including rebuttal
witnesses, by this Friday.  The identification particularly
of rebuttal witnesses clearly has to take place after
depositions have been taken.

Mr. Shumaker says that this is the same procedure
that was used in the eligibility hearings.  I don't recall
that to be the case.  I believe that the designation of
witnesses took place after some significant and fulsome

1    deposition discovery had already been taken, so the procedure

2    here is very different and very prejudicial.

3            It also -- the city also suggests that the exhibit

4    list and the joint statement of facts and the pretrial order

5    would be submitted on December 6th, the day after the

6    completion of the deposition of Mr. Moore and before

7    depositions have been taken of Mr. Orr, Mr. Malhotra, or Mr.

8    Buckfire, who are all now indicated to be taking the stand

9    for the financing hearing.  That's simply not workable, and

10   depositions will not have been completed, so -- and that

11   doesn't even include the taking of the depositions by the

12   city of any of the objecting parties' witnesses.  So

13   apparently the city --

14           THE COURT:  Who are you going to call?

15           MR. GORDON:  I'm sorry.

16           THE COURT:  Who are you going to call?

17           MR. GORDON:  Actually, myself, your Honor, I don't

18   know that we are going to call anybody, and I haven't had a

19   chance to talk with the other parties to see who they would

20   call.  And certainly obviously we'd have to identify them

21   within a reasonable period of time and allow them to take

22   them, but I don't know who that would be, your Honor.  It may

23   be a very limited number, and I would think it would be, but

24   I don't know.

25           So, your Honor, it's simply putting the cart before

1  the horse.  They're asking us to designate things before

2  we've even had a chance to review fully 20,000 documents and

3  take certain depositions at least and see what comes out of

4  those depositions to determine what exhibits we might want,

5  whether all the documents have been produced, whether there's

6  other documents that need to be produced and so forth.

7         Having said all that, we understand that everyone

8  wants to move quickly, and we're suggesting a solution for

9  that, and that solution is -- with respect to the financing

10 motion is that the dates be moved modestly one week.  Well,

11 let me say the trial dates moved one week.  The deposition

12 deadlines that -- the city is asking for the 9th.  With the

13 addition of Mr. Orr, Mr. Buckfire, and Mr. Malhotra, and the

14 city's desire to depose anybody on the objecting parties'

15 side, that's just not going to be possible, but we're only

16 asking to move that date, we're suggesting, to December 11th,

17 two days, from December 9th to December 11th for a deposition

18 cutoff.  By December 13th we could submit a joint statement

19 of facts, designation of witnesses and exhibit lists, and,

20 your Honor, I would actually suggest -- and I don't know if

21 the Court would indulge us in this regard.  I would suggest

22 that perhaps there should actually be a pretrial conference

23 on the 13th, that Friday, because I can't imagine with things

24 moving this fast that we're going to not have some issues.

25 One of those issues, in particular, is something that I think

13-53846-swr  Doc 1817-9  Filed 04/29/14  Entered 04/29/14 12:00:53  Page 17 of 41
574
13-53846-swr  Doc 1817  Filed 11/28/13  Entered 11/28/13 11:52:57  Page 356 of  356

```
 1    is being asked for prematurely today by the city, which is to
 2    determine how much time is needed by both parties and who
 3    should be conducting the trial on behalf of the 14 or more
 4    objectors.  I think that all has to be figured out with the
 5    parties, and they need time to do that.  And I think if there
 6    was a pretrial conference, that would be an excellent
 7    opportunity to discuss those things before the trial, but
 8    today seems difficult and premature to do that.  So, your
 9    Honor, we're only asking to move the trial dates by a week
10    and to allow time for depositions.  We asked this --
11    suggested this to Mr. Shumaker, and the response was what you
12    heard, that the swap parties need an eight-day notice period
13    and that if you back that up, that gives the Court not a lot
14    of time to issue a ruling.  I would suggest that the swap
15    parties, first of all, have adjourned certain dates in the
16    forbearance agreement to allow the trial to take place
17    already and that the due process rights of the 14 objectors
18    shouldn't be held hostage by the swap parties standing on
19    ceremony needing eight days' notice of something that they
20    don't need eight days' notice of.  Yes, your Honor.
21            THE COURT:  I'd like your permission actually to
22    take a pause --
23            MR. GORDON:  Yes, sir.
24            THE COURT:  -- and suggest to you that I agree with
25    you that the trial is too rushed at this point and that we
```

 1    should go the week of the 16th.  Now, Chris says we have

 2    motions on the 16th.  What are those?

 3              MR. GORDON:  You do.  You have a number of motions.

 4              THE COURT:  A number of motions, so we may have to

 5    go like the 17th, 18th, and 19th instead of 16th, 17th, and

 6    18th.  Okay?

 7              MR. GORDON:  And that's what we have suggested.

 8              THE COURT:  So what I want to do is suspend this

 9    hearing and ask all of you to try to agree on what the

10    schedule will be between now and December 17th.  Are you

11    willing to do that?

12              MR. GORDON:  Absolutely, your Honor.

13              THE COURT:  Not willing to do that?  Ms. Calton is

14    not willing to do that.

15              MS. CALTON:  Could I just make a statement, please?

16              THE COURT:  Of course.  Step forward.

17              MS. CALTON:  Judy Calton for Greektown Casino and

18    Detroit Entertainment, which is Motor City Casino Hotel, and

19    we filed rather limited objections to the financing motion.

20    This is unique in my career.  I'm representing collateral,

21    and --

22              THE COURT:  Right.

23              MS. CALTON:  -- they're heavily regulated, and if

24    things aren't done pursuant to the regulations, they could be

25    sanctioned, fined, lose their license, which would interrupt

 1  this important income stream, and we believe that the

 2  proposed documents as drafted now put us at risk.  We're

 3  talking with the city and Barclays on changes.  I'm extremely

 4  optimistic that it will happen, but if for some reason it

 5  doesn't happen, the city has agreed we could get up and argue

 6  at the hearing without having to go through the discovery and

 7  being part of the pretrial.  I just wanted to get that on the

 8  record.  We don't care about the dates and that kind of

 9  thing.

10       THE COURT:  All right.  One more?  Who wants to just

11  comment?

12       MR. GADHARF:  Hello, Judge.  Joshua Gadharf on

13  behalf on behalf of Syncora.  The Court graciously allowed

14  the Quinn Emanuel firm, who's representing Syncora in the --

15  on their objection, to appear telephonically --

16       THE COURT:  Um-hmm.

17       MR. GADHARF:  -- so Mr. Susheel Kirpalani and Jake

18  Shields are both on the line, and I just wanted to make sure

19  that they did not want to weigh in on the matter as well.

20       THE COURT:  Thank you.

21       MR. KIRPALANI:  Thank you, your Honor.

22       THE COURT:  Is there anyone on the line who --

23       MR. KIRPALANI:  This is Susheel Kirpalani from Quinn

24  Emanuel, and I have my colleague, Jake Shields, with me.  I

25  do want to thank the Court for allowing us to appear

1  telephonically for this matter.

2        THE COURT:  Okay.

3        MR. KIRPALANI:  In the future we would, of course,

4  come and appear in person.  The issue for Syncora and for the

5  aspects of the Syncora matter that we handle for the client

6  is different than the ones that your Honor is already dealing

7  with.  Let me try to narrow down what the issue actually is.

8        THE COURT:  No.  Sir, I'm going to -- I'm going

9  to --

10        MR. KIRPALANI:  Your Honor --

11        THE COURT:  Sir, can you hear me?

12        MR. KIRPALANI:  Yes.

13        THE COURT:  Okay.  I'm going to interrupt you

14  because I'm going to ask you to participate with the

15  attorneys here in trying to work this out.  If you can't,

16  then I'll deal with it, but I want to give you the lunch hour

17  here to try to -- to try to encourage all of the attorneys to

18  work together to narrow your issues hopefully to none, but

19  whatever is left I will deal with, so let's take --

20        MR. KIRPALANI:  Thank you, your Honor.

21        THE COURT:  Let's take a lunch break now and

22  reconvene at one o'clock.

23        MR. GORDON:  Your Honor, if I may, there's the one

24  issue that we haven't really discussed, and I don't know if

25  you're folding that into our discussions or whether that's

 1  something that is better left to your Honor, is the issue of

 2  whether they should be two hearings or one hearing.  There is

 3  no doubt that there is a relationship between the swap

 4  motion, if you will, and the DIP financing motion, if you

 5  will.  They're related, but the inquiries are different, and

 6  they're --

 7          THE COURT:  My preference is to try them together.

 8          MR. GORDON:  Is it also possible in that regard

 9  because you'll see in our papers we mention the fact that

10  there are different attorneys from different -- each firm

11  that are handling those two parts -- is it possible that we

12  might have a hearing with -- on certain issues that are --

13  and then hearings on the other issues, keep them discrete, at

14  least, so that the record is clear as to which -- we'll talk

15  about it.  I understand, your Honor.

16          THE COURT:  Yeah.  And I'm willing to be very

17  flexible on that, you know, recognizing the different

18  interests that are involved, so, you know, I'll just ask you

19  all to be creative on how to solve that problem.  You can

20  figure it out.

21          MR. GORDON:  Very well.

22          THE COURT:  All right.  I'll see you at one.

23          MR. GORDON:  Thank you, your Honor.

24          THE CLERK:  All rise.  Court is in recess.

25      (Recess at 11:52 a.m. until 1:00 p.m.)

 1          THE CLERK:  Court is in session.  Please be seated.

 2   Recalling Case Number 13-53846, City of Detroit, Michigan.

 3          THE COURT:  Is everything okay with our technology,

 4   Chris?

 5          THE CLERK:  I believe --

 6          MR. SHUMAKER:  Good afternoon, your Honor.  For the

 7   record, Greg Shumaker of Jones Day for the City of Detroit.

 8   That was an excellent idea your Honor had.  During break I'm

 9   pleased to report that all of us gathered in the cozy

10   conference room and developed a calendar between now and a --

11   hearing dates of December 17th, 18th, and 19th.  I'm happy to

12   run through that, your Honor, if you'd like me to.

13          THE COURT:  Yes, please.

14          MR. SHUMAKER:  The new revised calendar starts as

15   follows, and I apologize in advance because some of this is

16   my own scribbling, and I'm doing the best I can here to

17   interpret that, but on Monday, December 2nd, the objectors

18   are going to identify their direct witnesses.  These would be

19   the witnesses that they are aware of right now who would

20   testify at the hearing or might testify at the hearing so

21   that we can get their deposition set.  There's nothing

22   occurring on the 3rd, although I'm sure there will be a lot

23   of things which are just not on my calendar.

24          On Wednesday, December 4th, the -- there will be the

25   deposition of Charles Moore here in Detroit, and the city is

 1   going to provide a draft of the joint statement of facts to

 2   the objectors on that date.  On Thursday, December 5th, there

 3   will be a deposition of James Doak.  I believe that will be

 4   in Detroit, although I'm not certain of that.  On Friday

 5   there will be a deposition of Ken Buckfire.  The parties are

 6   tabling for now the issue of the length of those depositions

 7   until we see the objections, and then we're going to see if

 8   we can come to some agreement there.

 9          On Monday, December 9th, then, your Honor --

10   December 9th, tentatively we're going to set the Orr

11   deposition on that date on the DIP motion issues.  Also at

12   that time the parties plan on submitting exhibit lists to the

13   Court on that date, and the parties will reserve the right to

14   supplement those because the depositions will not be

15   finalized on that date.  Then on Tuesday, December 10th, the

16   continue -- well, no.  I shouldn't say continued.  The

17   deposition of Mr. Malhotra would take place.  It's unclear

18   right now in which location.  On December 11th -- oh, I'm

19   sorry.  One other thing on Tuesday, the 10th.  We are

20   penciling in those days for the depositions of the direct

21   witnesses that the objectors identify on December 2nd, both

22   the 10th and on the 11th.  We have penciled in those days.

23   And then also on the 11th continuing would be the parties'

24   deadline for submitting the joint statement of facts to your

25   Honor.

1          Moving to the 12th, on that date at noon would be
2   the deadline for the objectors to provide the city with the
3   names of any rebuttal witnesses regarding things that might
4   come up during the depositions that occur, and the deposition
5   dates for those rebuttal witnesses have been tentatively set
6   aside as Friday, the 13th, and Monday, the 16th.  Then on
7   Friday, the 13th, we were going to ask your Honor if you
8   might schedule a pretrial conference as Mr. Gordon had
9   mentioned the possibility of.  If you're able to, we were
10  hoping to cover the following subjects with you then, the
11  first being whether the city believes it necessary to put
12  Mr. Orr, Mr. Malhotra, or Mr. Buckfire up as an expert,
13  discussing that with your Honor as to whether -- what your
14  Honor's expectations are in that regard.  Also, we would
15  address at that conference the issue of process for
16  examination.  Your Honor, we talked about if someone could
17  take the lead.  I think the parties will have a better idea
18  then of whether that's possible.  We would also propose the
19  following if your Honor is amenable to it.  It would be to
20  hear the motions in limine that have already been filed, and
21  in connection therewith I should have mentioned something I
22  failed to do, that the parties would agree to file their
23  responses to the motions in limine that are outstanding on
24  Tuesday, December 10th, if your Honor would be able to hear
25  those on the 13th.

1    We would also propose that if your Honor wanted to

2    do this -- I don't believe you did at the assumption -- I'm

3    sorry -- at the eligibility hearing, but the exhibit

4    objections -- it would be possible to deal with them then.

5    It might expedite things the next week, so we would propose

6    that and then also the issue of time limits on the parties'

7    cases.  That's where I suggested, your Honor, that seven

8    hours for the city and eight hours for the objectors might be

9    reasonable, but that was -- would be a possible subject for

10   then.

11       And then moving to Monday, December 16th, I

12   mentioned the rebuttal witness deposition date, if necessary.

13   Oh, I'm sorry.  One last thing.  I keep forgetting about

14   December 10th.  The reply briefs -- the city's reply brief in

15   support of the assumption motion would be due on December

16   10th as well as the city's response to the objections that we

17   will be receiving today on the DIP motion --

18       THE COURT:  Okay.

19       MR. SHUMAKER:  -- would also be on the December

20   10th.  Sorry for going out of order there.  And that would

21   leave us, your Honor, with the hearing on the 17th, 18th, and

22   19th, a consolidated hearing of both the assumption and DIP

23   motions.

24       THE COURT:  That's certainly all fine with me.  We

25   can reconvene here for your final pretrial conference

1  actually in this courtroom --

2       MR. SHUMAKER:  Okay.

3       THE COURT:  -- on the 13th.

4       MR. SHUMAKER:  Wonderful.

5       THE COURT:  We just need a time, Chris.  Any idea?

6       THE CLERK:  10 a.m.

7       THE COURT:  10 a.m.?

8       MR. SHUMAKER:  Wonderful.

9       THE COURT:  Would anyone like to -- I'm sorry.

10  Something further, sir?

11       MR. SHUMAKER:  One thing.  I mentioned all that.

12  The one thing that was excluded in my rundown were issues

13  with Syncora, so these are the non-Syncora issues.

14       MR. MARRIOTT:  Good afternoon, your Honor.  Vince

15  Marriott, EEPK.  Just one quick clarification.  As I

16  understand it, the designation of rebuttal witnesses on the

17  12th is both the debtor and the objector's, and there's a

18  deadline of noon.

19       THE COURT:  Noon on the 12th?

20       MR. MARRIOTT:  Yes, yeah.

21       THE COURT:  Yes.  I think he said that.

22       MR. MARRIOTT:  Yeah.

23       THE COURT:  Yes.

24       MR. MARRIOTT:  Yeah.  Okay.  That's it.  Other than

25  that, I think it all got in.

 1              THE COURT:  All right.  So you'll submit an order.
 2     Is that the plan?
 3              MR. SHUMAKER:  Yes, your Honor.
 4              THE COURT:  Okay.  So now what's left to resolve
 5     with regard to Syncora or anything else?
 6              MR. KIRPALANI:  Your Honor, may I be heard on the
 7     phone?
 8              MR. SHUMAKER:  Your Honor, the Syncora issue is --
 9              MR. MARRIOTT:  Sorry.  Can I just make a quick
10     request?
11              THE COURT:  Sir.
12              MR. MARRIOTT:  I have a plane to catch.  Can I -- I
13     have no dog in this fight.  May I be excused?
14              THE COURT:  Yes, sir.
15              MR. MARRIOTT:  Thank you.
16              THE COURT:  Yes.
17              MR. SHUMAKER:  The remaining issue --
18              THE COURT:  Let's just be clear.  Who is on the
19     line, please?
20              MR. KIRPALANI:  Again, your Honor, for the record,
21     it's Susheel Kirpalani from Quinn Emanuel in New York
22     representing Syncora in the New York state lawsuit that's now
23     been removed and transferred to the Eastern District of
24     Michigan and that pursuant to the automatic reference is
25     currently sitting and waiting to be docketed for further

1   proceedings or consideration before the Court.

2           THE COURT:  Thank you.

3           MR. SHUMAKER:  And, your Honor, on the -- the

4   remaining issues relating to Syncora relate to what I was

5   explaining before about the city's position on the motion to

6   intervene with regard to the adversary proceeding and the

7   almost briefed motion to dismiss.  We have discussed it with

8   Syncora's counsel at the break.  We have not been able to

9   come to agreement.  What we would propose is in our papers,

10  which would be perhaps a -- if your Honor believes a hearing

11  is necessary -- frankly, on the city's motion to intervene,

12  we're not sure that a hearing would be necessary, but if your

13  Honor believes one is, sometime next week, when would be

14  convenient to your Honor, the 4th or the 5th or --

15          THE COURT:  When did you file this motion?

16          MR. SHUMAKER:  The motion to intervene, I believe,

17  was filed November 18th.

18          THE COURT:  Has there been a response to it?

19          MR. SHUMAKER:  There has.  It is fully briefed.

20          THE COURT:  Well, it's hard for me to give you an

21  answer to that without having actually looked at the papers,

22  so let me promise to get back to you as promptly as possible

23  on that and, if a hearing is necessary, to give you as prompt

24  a hearing as possible.

25          MR. SHUMAKER:  And then the one remaining issue on

 1  behalf of the city, your Honor, was the motion -- the motion

 2  to dismiss, which right now is pending and awaits the swap

 3  counterparties' reply, and if the city were to be allowed to

 4  intervene, then the city would participate in that briefing.

 5  We were thinking that if your Honor wanted to, we could have

 6  a hearing that next week -- it would be the week of December

 7  9th -- to argue that motion, which, again, we believe would

 8  pare down the issues that would be taken up on the assumption

 9  and DIP motion hearings the next week.

10      THE COURT:  All right.  Walk me through that in

11  little baby steps because I'm not sure I quite followed it

12  from your earlier presentation.

13      MR. SHUMAKER:  Well, I'm sorry about that, your

14  Honor.  The issue is if the city is allowed to intervene --

15  I'll boil this down to its essence, which is the swap

16  counterparties, which are currently the parties in that

17  lawsuit, have filed a motion to dismiss saying that Syncora

18  does not have the consent rights that it argues that it has,

19  the same consent rights that are at issue with regard to

20  Syncora's objection to the assumption motion.  And what we

21  believe is -- as the swap counterparties believe, too, is

22  that that motion can be adjudicated by your Honor because it

23  is a matter of contract construction, contract

24  interpretation.  It's the interplay of the different swap

25  agreements and the collateral agreement and the forbearance

1   agreement, and if your Honor was to hear that -- if the city

2   were to intervene but it was to hear that the week of the

3   9th, then that would take care of a lot of -- well, the

4   Syncora objection we believe would fall to the side.

5        Now, in connection with that, we would also, I

6   think, be proposing that your Honor issue proposed findings

7   of fact and conclusions of law because that's a part of the

8   adversary proceeding, but I don't know if that answers your

9   question, your Honor.

10        MR. KIRPALANI: Your Honor, if I could try and

11   clarify --

12        THE COURT: Yes. Go ahead, sir, please.

13        MR. KIRPALANI: Thank you so much, your Honor, and,

14   again, I apologize for appearing telephonically.

15        THE COURT: That's okay.

16        MR. KIRPALANI: This is Susheel Kirpalani from Quinn

17   Emanuel on behalf of Syncora. I just want to give your Honor

18   a macro sense of the issue. In July after your Honor

19   confirmed at the city's counsel's clarification that the

20   automatic stay does not apply to the swap counterparties but

21   only to the city, we filed a lawsuit in New York state court

22   against our counterparties, the banks. Thereafter, since

23   July, really nothing has happened other than procedural ping-

24   pong. The banks sought to remove the case to federal court

25   in New York. It was there for awhile. Finally, Judge Kaplan

 1   in the Southern District decided to transfer the venue to the

 2   District Court in Michigan without deciding whether the

 3   federal court had jurisdiction over the lawsuit, which is, as

 4   counsel just mentioned, a New York state contract dispute

 5   between two nondebtor parties.

 6          Before the District Court last week we appeared and

 7   tried to address the issue of where is the right place for

 8   this dispute to be heard.  We made it clear to all the

 9   parties as well as to the District Court that, consistent

10   with what Syncora's position has been before your Honor,

11   certain issues, while they may be related to the bankruptcy,

12   are noncore to the bankruptcy, and statutorily they are

13   required to be ordered and ruled upon and adjudicated by

14   either a state court or by an Article III federal District

15   Court.  In the interest of nothing other than efficiency,

16   what we've tried to do with the city and with the banks is

17   come up with a solution where we stop the procedural ping-

18   pong, we try to do something that's efficient.  We would

19   waive our right to try to seek the matter to be heard back

20   through mandatory abstention in New York state court, and we

21   would just have the matter adjudicated once in the District

22   Court.  That was opposed, and the determination was pushed

23   back on us that Judge Rhodes needs to review the issues.

24   Your Honor, I haven't appeared before you in this matter, but

25   I've read your transcripts.  I do believe that your Honor

1  previously thought of this issue and considered it to be one

2  of the many warts that may exist that if the forbearance

3  agreement were to be assumed, it would be a contract that's

4  assumed warts and all, and whatever the rights of nondebtor

5  parties are as between each other, they'll have to duke that

6  out in the right place at the right time.

7           Nevertheless, the city and the banks have tried, as

8  your Honor just heard, to kind of railroad the process and

9  push everything to be resolved before even the city has

10  properly intervened, before even the briefing is done, before

11  the plaintiff, Syncora, has an opportunity to file a motion

12  for summary judgment, which we've been waiting to file until

13  the matter would be docketed in some court.  And we have

14  proposed in the interest of efficiency to not seek to

15  withdraw the reference, to ask your Honor to consider the

16  motions for summary judgment along with the motion to dismiss

17  so everything is done once and done properly on a proper

18  record with appropriate briefing, and then your Honor could

19  issue proposed findings and proposed conclusions of law for

20  the District Court to consider adjudication and issuing an

21  order.  That was unacceptable to the city and to the banks,

22  and we -- I want to tell your Honor that we are trying to be

23  as efficient as possible.  We've never even had a substantive

24  day in court since July on the issues of what our rights are

25  vis-a-vis the banks under a contract that was negotiated

1  seven years before this bankruptcy case, and we'll do

2  whatever your Honor pleases in terms of timing, scheduling.

3  The city has not even filed a proposed pleading in support of

4  its intervention.  Frankly, we're not sure what they could

5  possibly say that our bank defendants have not already said,

6  but I'm not trying to stand on ceremony about those issues

7  either, but we do need due process.  We do need an

8  opportunity to respond if they want to take a position with a

9  pleading, and we have the right, as we've said in other

10  proceedings, to have this matter adjudicated in an Article

11  III court or in a state court, but in the issue of -- in the

12  interest of efficiency, we're happy to have your Honor issue

13  proposed findings and conclusions of law and then have it

14  adjudicated by the District Court, and that's where we stand.

15  And in terms of the briefing, whatever works for your Honor

16  and your Honor's staff, which I'm sure is overburdened by

17  enough, we will live by.

18       MR. SHUMAKER:  Your Honor, we -- counsel's

19  proposal -- Syncora's proposal is unacceptable to the city

20  because we do not believe that the matter is noncore.  We

21  believe that it is core and that it goes to the extent of the

22  lien of the property of the debtor.  And because of that, we

23  think that your Honor can, in fact, deal with this, and so

24  that's why -- I mean if we're able to brief up the -- okay.

25  We have no idea what additional facts Syncora is going to

 1   allege because we believe this is purely an issue of contract

 2   construction, but if there's a -- you know, a summary

 3   judgment motion they're going to file in the next day or so,

 4   we could get that briefed up, and we could argue that at the

 5   first day of the hearing on the 17th because we think this

 6   issue needs to be resolved once and for all for the city's

 7   sake.

 8             MR. KIRPALANI:  Timingwise that's fine with us, your

 9   Honor.  It's an issue, again, now only of proposed findings

10   that your Honor could deliver at or, you know, after hearing

11   argument on December 17th.  We're fine with the schedule.

12   The issue had to do with where it should be finally

13   adjudicated and what our rights are under the Constitution,

14   and that's what we tried to make clear to the city and to the

15   banks.

16             MR. SHUMAKER:  Your Honor, Syncora could always

17   consent to your adjudicating this.

18             THE COURT:  Well, we can't determine the issue of

19   core versus noncore right now; right?  I don't have the

20   papers to try to figure that out, so we're going to have to

21   leave that issue open as well, and you'll have to brief it in

22   connection with some motion or another or maybe its own

23   motion.  I don't know.  The timing of these things is always

24   unfortunate, but I have to say that the process of trying to

25   get an issue as important as this one finally resolved within

13-53846-swr   Doc 1845   Filed 04/29/14   Entered 04/29/14 12:00:23   Page 37 of 41
13-53846-swr   Doc 1875   Filed 04/29/14   Entered 04/29/14 13:52:57   Page 38 of 41
574                                                                        374

1   the time frame that we have set for ourselves on approving

2   the DIP financing and the assumption motion feels very

3   rushed.  And I'm normally all for efficiency and getting

4   things done, as you all know, but this one feels a little

5   over the line, so I'm going to -- I'm going to turn you down

6   and suggest that we process this in the normal course, so

7   we'll look at the motion to intervene in the next few days,

8   early next week, and decide whether we need a hearing on

9   that, but in connection with a motion to dismiss or motions

10  for summary judgment, we'll have to handle those in the

11  normal course.

12          MR. SHUMAKER:  Okay.  Thank you, your Honor.

13          THE COURT:  All right.

14          MR. KIRPALANI:  Thank you, your Honor.

15          THE COURT:  You're welcome, and, yes, sir, you may.

16          MR. GROW:  Thank you, your Honor.  Stephen Grow,

17  Warner, Norcross & Judd.  I represent the swap

18  counterparties, your Honor.  I think there may be some

19  additional context that may be appropriate here, your Honor.

20  There is, in fact, with the exception of the counterparties'

21  reply, a fully briefed motion to dismiss that's been pending

22  for some time at the District Court level.  Our thought was

23  that certainly --

24          THE COURT:  Well, it's fully briefed unless the city

25  is permitted to intervene, in which case it's going to want

1  to brief it.  Am I right about that?

2        MR. GROW:  That's probably true, but I would expect,

3  your Honor, that our interests and arguments in that

4  respect -- with respect to the legal arguments are fairly

5  well-aligned with the city's on this point.  You know, the

6  alternative is -- and I hear counsel for Syncora making the

7  point that they ought to be entitled to file a motion for

8  summary disposition that they've had on the shelf.  They can

9  certainly do that.  The Court, in the meantime, could

10 consider the motion to dismiss, and if the Court believed

11 that there was a basis to grant the motion to dismiss, it

12 would moot out the motion for summary disposition.  And I

13 understand the due process issues.  I understand that we're

14 moving at a very -- at a lightning clip here, and -- but it

15 seems to me that would be one way for -- to recognize

16 Syncora's due process concerns and at the same time give the

17 Court an opportunity to resolve this issue before the --

18       THE COURT:  Well, fair enough, but if it's noncore,

19 which, like I say, I don't know, but if it is, nothing I do

20 would be final until a District Court reviews it anyway;

21 right?

22       MR. GROW:  Understood; understood.  It's difficult

23 because --

24       THE COURT:  So there's that built-in inefficiency or

25 at least the potential for that built-in inefficiency

1    regardless.

2         MR. GROW:  There is.  There is.  Now, I think --

3         THE COURT:  So, you know, maybe the answer is for me

4    to try to get my arms around it enough to come to some

5    preliminary conclusion on whether it's core or noncore.

6    Where are the papers?  Have they been filed with the

7    District -- with the Bankruptcy Court yet -- or you said

8    they're in limbo.  Where are they?

9         MR. GROW:  I believe the District Court case has

10   been referred to your Honor, but it hasn't been docketed yet.

11        THE COURT:  Hasn't been opened up yet?

12        MR. GROW:  Right.  So I don't know whether there's a

13   paper file in transit.  I don't know what that process is,

14   but it has not --

15        THE COURT:  I don't either.  Chris, can we try to

16   track that down at some point today?

17        THE CLERK:  We haven't received it yet.

18        THE COURT:  Oh, we haven't received it from District

19   Court yet.  Which judge did you all say it was?

20        MR. GROW:  Goldsmith.

21        THE COURT:  All right.  Maybe we'll contact their

22   chambers and see.

23        MR. GROW:  My point, your Honor, was that this is

24   not something that has been sprung on Syncora.  There have

25   been pending motions which --

 1      THE COURT:  Well, and I don't think they're

 2 contending that it was, yeah.  All right.  Well, I think we

 3 may just have to leave it open and let me get my arms further

 4 around it and come up with a schedule that makes sense for

 5 everybody.  I wish we could, you know, pin it down a little

 6 further today, but it's too far beyond my grasp at this

 7 point.

 8      MR. GROW:  Understood, your Honor.  Thank you.

 9      MR. SHUMAKER:  Your Honor, one suggestion.  If your

10 Honor was to allow the city to intervene and the issue of

11 core versus noncore could be briefed in connection with the

12 reply briefs that have to be filed in connection with that

13 motion to dismiss by the swap counterparties and obviously

14 Syncora and the city.

15      THE COURT:  When would those be due?

16      MR. SHUMAKER:  Whenever you say, your Honor.

17      THE COURT:  All right.  Let's leave that open, and

18 then we'll figure it out.

19      MR. SHUMAKER:  Thank you, your Honor.

20      THE COURT:  All right.  Are we done?  All right.

21 When can I expect the procedures order?

22      MR. SHUMAKER:  Your Honor, I was going to try to

23 circulate the draft on Monday and get it to you as quickly as

24 possible.  Would that --

25      THE COURT:  Okay.  But in the meantime, you all are

1 | going to operate as if it's in effect?  Yes?

2 |       MR. SHUMAKER:  Yes, your Honor.

3 |       THE COURT:  Okay.

4 |       MR. SHUMAKER:  Thank you, your Honor.

5 |       THE COURT:  Thank you.  We're in recess.

6 |       THE CLERK:  All rise.  Court is adjourned.

7 |     (Proceedings concluded at 1:27 p.m.)

INDEX

<u>WITNESSES:</u>

None

<u>EXHIBITS:</u>

None

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                         November 28, 2013

_____     _____
Lois Garrett

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .        Docket No. 13-53846
       MICHIGAN,                 .
                                .        Detroit, Michigan
                                .        December 13, 2013
                 Debtor.       .        10:01 a.m.
. . . . . . . . . . . . . . . .


HEARING RE. MOTION TO ADJOURN HEARING; MOTION TO COMPEL
THE PRODUCTION OF PRIVILEGE LOG; PRETRIAL CONFERENCE
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                     By:  ROBERT W. HAMILTON
                     325 John H McConnell Blvd., Suite 600
                     Columbus, OH  43215
                     (614) 469-3939

                     Jones Day
                     By:  GREGORY M. SHUMAKER
                     51 Louisiana Avenue, N.W.
                     Washington, DC  20001-2113
                     (202) 879-3679

For Syncora            Kirkland & Ellis, LLP
Guarantee and          By:  STEPHEN HACKNEY
Syncora Capital        300 North LaSalle
Assurance:             Chicago, IL  60654
                     (312) 862-2074

For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For UBS:               Bingham McCutchen, LLP
                     By:  JARED R. CLARK
                     399 Park Avenue
                     New York, NY  10022-4689
                     (212) 705-7770

APPEARANCES (continued):

For Detroit            Clark Hill, PLC
Retirement Systems-    By:  JENNIFER GREEN
General Retirement     500 Woodward, Suite 3500
System of Detroit,     Detroit, MI  48226
Police and Fire        (313) 965-8300
Retirement System
of the City of
Detroit:

For David Sole:        Jerome D. Goldberg, PLLC
                       By:  JEROME GOLDBERG
                       2921 East Jefferson, Suite 205
                       Detroit, MI  48207
                       (313) 393-6001

For FGIC:              Weil, Gotshal & Manges, LLP
                       By:  KELLY DIBLASI
                       767 5th Avenue
                       New York, NY  10153
                       (212) 310-8032

For Ad Hoc COP         Allard & Fish, PC
Holders:               By:  DEBORAH L. FISH
                       535 Griswold, Suite 2600
                       Detroit, MI  48226
                       (313) 961-6141

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

13-53846-tjt  Doc 4314-2  Filed 04/29/14  Entered 04/29/14 22:00:33  Page 282 of
13-53846-swr  Doc 2132  Filed 12/19/13  Entered 12/19/13 16:59:33  Page 2 of 66  382
574

```
 1          THE CLERK:  All rise.  Court is in session.  Please
 2    be seated.  Case Number 13-53846, City of Detroit, Michigan.
 3          THE COURT:  It appears we have an attorney swearing
 4    in for this morning.  Okay.  Would you stand at the lectern,
 5    please?  And what is your name?
 6          MS. DIBLASI:  Kelly DiBlasi
 7          THE COURT:  Okay.  Are you prepared to take the oath
 8    of admission to the Bar of the Court?
 9          MS. DIBLASI:  Yes, I am.
10          THE COURT:  Please raise your right hand.  Do you
11    affirm that you will conduct yourself as an attorney and
12    counselor of this Court with integrity and respect for the
13    law, that you have read and will abide by the civility
14    principles approved by this Court, and that you will support
15    and defend the Constitution and laws of the United States?
16          MS. DIBLASI:  I do.
17          THE COURT:  Welcome.
18          MS. DIBLASI:  Thank you.
19          THE COURT:  We'll take care of your paperwork for
20    you.  Okay.  I think we should begin with Syncora's motion to
21    adjourn.
22          MR. HACKNEY:  Good morning, your Honor.  Stephen
23    Hackney on behalf of Syncora.  Your Honor, we brought the
24    adjournment motion I would say for two broad reasons, and
25    then there are a couple discrete issues that are also
```

 1   included in the motion, but the first broad reason was that

 2   we previously had pretty significant colloquy with the Court

 3   on November 14th, I believe, with respect to the interplay

 4   between Section 364 and Section 904 as the Court is

 5   considering whether to approve the post-petition financing.

 6   And it came up in the context of our request for discovery

 7   into the needs of the city for the money, the uses of the

 8   quality of life proceeds, and how the anticipated uses will

 9   relate to the interest of the city and the interest of

10   creditors in this case, and I think the Court may recall that

11   we had -- you had relatively extensive colloquy both with me

12   and with Ms. Connor and with Mr. Gordon.  And at the

13   conclusion of that, what the Court had said was I'm not going

14   to grant the discovery today, but I invite you to return on

15   this issue at the hearing, and we can revisit it.  And part

16   of the reason we tied that up for today, your Honor, was

17   because we were having this -- we teed it up for today is

18   because we were having this pretrial conference and we

19   thought it was appropriately considered in anticipation of

20   the hearing next week.

21        Your Honor, I think, in our view, there is the issue

22   of the standard and the issue of what you are entitled to

23   consider when you're deciding whether to grant the post-

24   petition financing is a bit of a predicate issue to how the

25   hearing should flow, and it's a predicate issue to the types

13-53846-tjt   Doc 4314-2   Filed 04/29/14   Entered 04/29/14 22:00:33   Page 384 of
13-53846-swr   Doc 2132   Filed 12/19/13   Entered 12/19/13 16:50:33   Page 4 of 66
574
384

1   and the nature of the discovery that's been granted because I

2   think that the city has taken -- took in that hearing and has

3   taken the position that the Court is not entitled under

4   Section 904 to consider whether the city needs the money, how

5   it wants to use the money, and how those uses will impact the

6   interests of creditors as well as the interest of the city.

7   It has taken a narrower position, which is that the Court may

8   merely consider whether the city has sought to obtain

9   unsecured credit and, if it's unavailable, whether the

10  secured credit that it purports -- that it wants to borrow is

11  on the best terms that are available.

12          Depending on how you resolve that question I think

13  should have an impact on both whether you grant discovery to

14  the creditors of the type that we had previously requested

15  or, alteratively, whether you streamline that portion of the

16  post-petition financing hearing and say given that the city

17  has taken the position that I cannot consider these issues

18  under Section 904, the city has to have the courage of its

19  convictions and also not make a record detailing all of the

20  different challenges that the city faces and why the money

21  will be used to assuage those challenges because I think

22  there's a bit of a swinging door here, which is the city

23  wants to put on through Mr. Orr or Mr. Moore, the Conway

24  MacKenzie restructuring expert, the story of the City of

25  Detroit and the different challenges that it faces, and it

13-53846-tjt  Doc 4314-2  Filed 04/29/14  Entered 04/29/14 22:00:33  Page 385 of
13-53846-swr  Doc 2132  Filed 12/19/13  Entered 12/19/13 16:59:33  Page 5 of 66   385
574

1   wants to introduce that evidence into the record in order to
2   persuade the Court to grant it the post-petition financing,
3   but it also at the same time is saying that you're actually
4   not entitled to review their decisions on that subject and
5   that you're not -- that you ought not to grant us discovery
6   that allows us to check the work of the city and its
7   consultants in reaching the conclusions and recommendations
8   that they've reached.  So I think that is appropriately
9   addressed today, your Honor, and what I think that you had
10  said at the last hearing that we had before you was -- you
11  know, at that time I don't think we had even filed our
12  objection, so my sense of the hearing was that you were
13  saying, "My current view is that I'm not going to grant the
14  discovery, but I won't finally decide this issue and I'll
15  deny your request without prejudice to come back."  It seems
16  appropriate to us for the Court to decide the issue now
17  because if we go through the hearing and in the course of the
18  hearing the Court decides, you know, I actually -- I've
19  decided that under 364 I do need to decide if this post-
20  petition financing is in the best interest of creditors, and
21  I do need to make an assessment of how this money is going to
22  be used, whether there are alternative noneconomic ways for
23  the city to address certain short-term needs, whether there
24  are other existing cash flows that it can use, and in order
25  to -- and the potential impact on creditor recovery.  I need

to assess that.  Well, I think then we will be in the middle
of a hearing where we will not have been given discovery into
those questions in a way that allows us to develop a
sufficient record.

Alternatively, if you decide today, no, I agree with
the city, and I'm not entitled under 904 to probe behind how
the city -- how the city intends to use the money that it
wants to borrow, my review is much more limited, then I
think, alteratively, that the Court should make that ruling
but also that the city should have the courage of its
convictions and that that portion of the post-petition
financing hearing should be presented in a way that's
consistent with its legal posture.  This was the first -- and
I will tell you, your Honor, that to the extent the Court
wants to have argument on the standard under Section 364
versus 904, the individual who -- the individual attorney who
is preparing on those arguments for the hearing next week is
available and in the court today and will do a better job
than I will of getting deep into the weeds on some of the
different case law and so forth that we think informs the
standard, but we did think it was an important issue that was
worth bringing up today, and that is one of the first
motivations for our adjournment motion.

The second one, your Honor, was specific to the
forbearance agreement, and it flowed from the replies that

13-53846-swr   Doc 4314-2   Filed 04/29/14   Entered 04/29/14 22:00:33   Page 387 of
13-53846-tjt   Doc 2132   Filed 12/13/13   Entered 12/13/13 16:50:33   Page 387 of
574
387

1   were filed both by the city and by the swap counterparties

2   because in those replies, those two parties made clear that

3   they aren't just seeking assumption of the motion -- of the

4   forbearance agreement, warts and all, for what it is worth

5   subject to the third-party claims.  They are seeking the type

6   of broad relief that they outlined in the proposed order that

7   they submitted to you, and this is of concern to us because

8   you'll remember that the first time you and I had the

9   opportunity to meet one another was at a hearing back on

10  August 2nd right at the outset of the case where we had

11  sought discovery on the forbearance agreement, and the Court

12  in that hearing -- and I went back and reviewed the

13  transcript again last night -- I would say was relatively

14  clear about saying, look, let me assure you that when I

15  decide this, I decide it -- you know, it comes warts and all,

16  comes subject to all of the third-party claims that are

17  asserted by parties as a result of it, and that decision then

18  heavily informed the colloquy that you and I had about the

19  nature of discovery because you were saying, given the

20  limited role that I perform, why do you need all this

21  discovery, and you denied our initial request for --

22          THE COURT:  You're focusing on the consent issue.

23          MR. HACKNEY:  Well, I would say in terms of the

24  third-party rights, there is not only the consent issue but

25  also the argument that the swap counterparties cannot

transfer rights under the swap to third parties, that they
cannot modify or amend the swap or the collateral agreement
without consent, the fact that payments to the swap
counterparties under the forbearance agreement violate the
waterfall that's contained in the service contracts.  The
forbearance agreement implicates all of those things or it
certainly does ab initio, and then it also does when you
perform under it in connection with the DIP.  So I think that
the fact that the swap counterparties and the city are now
coming to the Court and saying, no, we want you to finally
determine these legal issues and we want the proposed order
that we submitted to you that says we can perform without
liability, no one else's consent is required -- you know,
when you and I were engaging in our dialogue back on August
2nd, the city did not at that point pop up and say, "Wait a
second, like we have a different view of what you can do
under Section 365 and Rule 9019.  We don't agree that you
have this limited role.  We think that you're going to decide
these issues."  They didn't say that, and so they actually
said, yes, limited discovery is appropriate, but now we've
come to the end, and they stick the reply brief in that says,
no, you should decide all of these issues.  So that was cause
for concern for us and was the second major motivating reason
in bringing the adjournment motion.  Now, I do want to be up
front with the Court.

13-53846-tjt  Doc 4314-2  Filed 04/29/14  Entered 04/29/14 22:00:33  Page 389 of
13-53846-swr  Doc 2132  Filed 12/19/13  Entered 12/19/13 16:50:33  Page 389 of 66
574
389

1      THE COURT:  What does that have to do with an

2  adjournment?

3      MR. HACKNEY:  Well, I guess what I would say is

4  this, which is it's similar to the concerns under Section 364

5  versus 904, which is we will not change our argument

6  regarding the nature of a 365 hearing or a 9019 hearing, but

7  if we're going to go into battle where there's a risk that

8  the Court may be deciding all of these issues, then our

9  position is if we're at risk that the Court may decide all

10  these issues, we need to depose, for example, the swap

11  counterparties.

12      THE COURT:  Why?

13      MR. HACKNEY:  Because they're all parties to this

14  transaction, and understanding --

15      THE COURT:  But aren't those issues all to be

16  determined, if at all, based on the documents?

17      MR. HACKNEY:  No, I don't think so.  I don't think

18  so.  I think that -- I don't think that you can say at this

19  point, oh, these are just pure legal questions.  I think that

20  the way that they structure these documents, the substance of

21  the transaction, their intentions in structuring the

22  documents, not only are going to be relevant to your

23  consideration, but to the extent there are ambiguities, when

24  you have different parties going at it hammer and tong like

25  this on what the documents mean, there is a real potential

1  for the need for parol evidence.

2  THE COURT: Every time that the parties disagree

3  about what a document means, there's an ambiguity that opens

4  up discovery? Is that the --

5  MR. HACKNEY: Not necessarily.

6  THE COURT: Is that the law?

7  MR. HACKNEY: Well, I think the law is that where

8  the parties have advanced reasonable interpretations of the

9  documents, multiple reasonable interpretations --

10  THE COURT: Isn't it the Court's job to interpret

11  contracts as a matter of law?

12  MR. HACKNEY: In the proper context informed by the

13  proper procedures, and both Orion and Sportstuff are cases

14  that say the limited either assumption or 9019 context is not

15  a substitute for the trial on the merits. Those are quotes.

16  And now the city is trying to say, no, it should be --

17  THE COURT: Okay. But that's a different question

18  from opening up discovery to the extent you seek it. I don't

19  know if I agree with you or not on the question of whether

20  this is the right time to decide those issues, but it's a

21  long way from that to if it is, you need more discovery.

22  MR. HACKNEY: I think that you're right that they're

23  separate questions. I agree that you might --

24  THE COURT: I'm only asking about why you need

25  discovery, and I haven't heard it yet.

13-53846-swr   Doc 4214   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 13 of 66
13-53846-swr   Doc 2132   Filed 12/16/13   Entered 12/16/13 10:59:03   Page 13 of 66   391
574

1    MR. HACKNEY:  Well, I think the circumstances

2  regarding the negotiation of the forbearance agreement and

3  what the provisions mean and why they were structured in the

4  way they were structured and whether that structuring was

5  designed, for example, to evade consent rights, those are

6  factual determinations that I think could be validly before

7  the Court.

8         THE COURT:  Suppose they were.  So what?

9         MR. HACKNEY:  That would be relevant evidence.  It

10  would be relevant --

11         THE COURT:  To what?  To how to interpret the

12  contracts?

13         MR. HACKNEY:  Absolutely.  Absolutely, your Honor.

14  I don't think that -- I think --

15         THE COURT:  You need to move on.

16         MR. HACKNEY:  Okay.  Well, your Honor, the

17  additional issues that are contained in the adjournment

18  motion are two.  One of them relates to the privilege log and

19  our request for a privilege log.

20         THE COURT:  And what's the relevance of that?

21         MR. HACKNEY:  The relevance of that is this is with

22  respect to discovery that the city did agree to produce in

23  connection with the DIP hearing.

24         THE COURT:  What's the relevance of it?

25         MR. HACKNEY:  The relevance of it is that if the

 1  information has not been validly withheld by a privilege, it
 2  may be discoverable and, thus, relevant.
 3      THE COURT:  I'll just ask one more time.  What's the
 4  relevance of the privilege log?
 5      MR. HACKNEY:  The privilege log allows --
 6      THE COURT:  Suppose you look at the privilege log
 7  and say, "Ah, that's not privileged.  We want it," I would
 8  ask what's the relevance of whatever it is you want?
 9      MR. HACKNEY:  You can't know until you see it, but
10  you know it's relevant because they agreed to produce
11  documents on this subject matter.  If it's not reasonably
12  calculated to lead to the discovery of admissible evidence,
13  then it wouldn't be on the log.
14      THE COURT:  What else?
15      MR. HACKNEY:  The last issue, your Honor, is an
16  issue that relates to the mediation, and it is an issue that
17  has some importance, I think, to this hearing, but it's also
18  just a generally more important hearing to the case that I
19  wanted to raise with the Court.  There have been
20  presentations that were made by the city's consultants that
21  existed prior to the mediation that were done under
22  confidentiality agreements, nondisclosure agreements, that
23  related to the way that you could use the information that
24  was provided in those presentations, and they relate to the
25  work that the consultants were doing.  After the mediation

1   was ordered, the mediation I would say generally has taken

2   two forms where there are --

3           THE COURT:  I don't want to hear anything about the

4   mediation.

5           MR. HACKNEY:  I'm not going to get into the

6   substance of the mediation negotiations.  I'm just

7   describing --

8           THE COURT:  Why are you telling me anything about

9   the mediation?

10          MR. HACKNEY:  Because it impacts the evidential

11   admissibility of evidence that's produced by the consultants

12   in the mediation despite the fact that the presentations that

13   are being --

14          THE COURT:  Is the city asserting -- excuse me.  Is

15   the city -- is the city offering evidence from the mediation?

16          MR. HACKNEY:  It is not, but it is also saying that

17   none of the presentations that are being made by the

18   financial advisors can be used as evidence even under seal

19   and so on and so forth.

20          THE COURT:  I agree with that.

21          MR. HACKNEY:  We wanted to raise that issue now as a

22   point of concern.

23          THE COURT:  You have a different position?

24          MR. HACKNEY:  Yeah, because the presentations by the

25   financial advisors are -- I would describe them as in the way

1  of 2004-type information.  They're not being done pursuant to

2  2004, but they are, "Hey, creditors, here's what's going on

3  with our efforts on the -- on blight or police or fire," and

4  then, yeah, separately there are negotiations, but the

5  presentations that are being made, as I understand it, are

6  the same type of presentations that were being made before

7  the mediation.

8          THE COURT:  Oh, I see what you're saying.

9          MR. HACKNEY:  So --

10          THE COURT:  Okay.  Well, all right.  We'll have a

11  discussion about that.

12          MR. HACKNEY:  The only reason it's relevant, your

13  Honor, is just because that is the basis for a lot of our

14  information about what's going on with the city, and so it

15  does interplay --

16          THE COURT:  I'm inclined to agree with you that just

17  because information was presented in a mediation doesn't mean

18  that that information is not admissible --

19          MR. HACKNEY:  And, look --

20          THE COURT:  -- if it's otherwise admissible.

21          MR. HACKNEY:  Right.  And one thing I want to --

22          THE COURT:  It doesn't get shielded from our court

23  process just because it was presented in mediation.

24          MR. HACKNEY:  Right.  And -- I agree, and I want to

25  tell you that I'm not trying to evade the other parts of the

13-53846-swr   Doc 2129   Filed 12/16/13   Entered 12/16/13 10:59:03   Page 15 of 66
13-53846-swr   Doc 2129   Filed 12/16/13   Entered 12/16/13 10:59:03   Page 15 of 66
574
395

mediation where you may want the broader protections of there
won't be any evidential admissibility because you want people
to be candid in back and forth.  I'm just saying given the
way this has gone together, can't we have like a little bit
of a switch that we flip where we say this is an FA
presentation about blight, this is a negotiation.  Okay.  And
let's flip the switch so that we can say, okay, well these
decks that they're putting forward that provide this level of
detail, that's subject to the NDA protections because that's
how it was -- the same presentation could have been made
before the mediation, and that's how it would have been
handled.  The only reason I'm raising that, your Honor, is it
came up in one of the depositions when I was using two
documents, and we ultimately got past that issue with respect
to those two documents, but the city then at that point
asserted, hey, these two documents --

THE COURT:  This may be -- this may be something we
have to deal with in the context of specific witnesses and
specific documents, but --

MR. HACKNEY:  I think that's fine.  I agree with
you, your Honor.  I just want to --

THE COURT:  If the question is did you say in
mediation A, B, and C, I don't like that --

MR. HACKNEY:  Yeah.

THE COURT:  -- but if the question is are A, B, and

1  C true, that's a different question.  There's nothing
2  objectionable about that assuming A, B, and C are otherwise
3  relevant.

4        MR. HACKNEY:  Okay.

5        THE COURT:  All right.  Anything further?

6        MR. HACKNEY:  I don't think so.  Thank you, your
7  Honor.

8        THE COURT:  Anyone else want to speak in favor of an
9  adjournment?

10        MR. MARRIOTT:  Good morning, your Honor.  At the
11  risk of being a glutton for punishment, Vince Marriott,
12  Ballard Spahr, EEPK and affiliates.  We also support
13  adjournment on the basis that Mr. Hackney has indicated.
14  Syncora has asked for it.  We believe that the production of
15  documents and the witnesses presented by the city were based
16  on the city's view of what we were entitled to based on the
17  city's view of what this Court is entitled to make a decision
18  on or not.  As and to the extent -- it's our view that this
19  Court is entitled to make a much broader inquiry and findings
20  than the city has suggested, and the discovery that has
21  proceeded to date is based on their narrow gatekeeping view
22  of what this Court is entitled to.  And if this Court does
23  not agree with that narrow view, there's more discovery that
24  we'll need.

25        As to the forbearance agreement piece, let me just

 1   make two quick observations.  One is that as and to the

 2   extent contracts are ambiguous, then I believe that parties

 3   are entitled to and the Court needs to hear parol evidence

 4   based upon intent, negotiations, and the like.

 5         And, second, your Honor, as and to the extent that

 6   the city and the swap counterparties are taking the view that

 7   third-party rights under those contracts need to be

 8   determined in the context of assumption of the forbearance

 9   agreement and as and to the extent, therefore, that such

10   assumption and settlement embodied in it will affect third-

11   party rights via those findings by this Court, then I think

12   third parties are entitled to discovery around those issues.

13         THE COURT:  Around what?

14         MR. MARRIOTT:  Around --

15         THE COURT:  I ask that because every settlement in

16   bankruptcy affects third parties.

17         MR. MARRIOTT:  Yes, and that effect has to be -- if

18   it affects third parties, your Honor, affects third-party

19   rights, has to be fair, and I think fairness goes to an

20   inquiry into, well, what do the documents actually say, what

21   was intended by the parties at the time that these documents

22   were entered into.  They are ambiguous.  There has been a

23   great deal of dispute about what various provisions in very

24   complicated documents mean.

25         THE COURT:  So you agree with the city and the swap

13-53846-swr   Doc 4214-29   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 19 of 66
13-53846-swr   Doc 2132   Filed 12/16/13   Entered 12/16/13 10:59:30   Page 18 of 66
574                                                                          398

 1   counterparties that these issues should be determined now

 2   unlike Syncora?

 3          MR. MARRIOTT:  I'm not saying I agree that it should

 4   be.  If this Court were to stick to its statement in August

 5   that third-party rights would flow through entirely

 6   unaffected, then that would be fine, and we wouldn't need any

 7   additional discovery.

 8          THE COURT:  Oh, all right.

 9          MR. MARRIOTT:  If, however, this Court adopts the

10   city, swap counterparty view that these are issues that now

11   are before it, that would require, in our view, additional

12   discovery.

13          THE COURT:  Thank you.  Anyone else want to speak in

14   favor of adjournment?  Okay.  Would the city like to be heard

15   on this matter?

16          MR. HAMILTON:  Yes, your Honor.  Good morning, your

17   Honor.  Robert Hamilton of Jones Day on behalf of the City of

18   Detroit.  If I can take the matters that were raised by

19   counsel for Syncora in reverse order, since the ones at the

20   end are the easiest to resolve, on the mediation issue that

21   Mr. Hackney raised, there is no dispute among the parties,

22   and we were able to work out what arose during the

23   deposition.  Everybody agrees, as far as I can tell, with the

24   rules and the protocol that your Honor articulated in the

25   colloquy with Mr. Hackney.  Our point at the deposition is if

13-53846-swr   Doc 2142   Filed 12/16/13   Entered 12/16/13 10:59:30   Page 399 of
574
13-53846-swr   Doc 2142   Filed 12/16/13   Entered 12/16/13 10:59:30   Page 399 of   399

1  you're going -- that we made at the deposition is if you're

2  going to whip out a document that was shared only at a

3  mediation, you ought to talk with us first to see if we have

4  a problem about that because maybe it would reveal something

5  that was confidential that we didn't want disclosed to the

6  outside world, but with the particular document that counsel

7  did whip out at the deposition, we determined that that was

8  the type of document that, as your Honor described, is

9  information that should be made public even though it was

10  initially distributed in the mediation, and we did make it

11  public and put it in the data room.  So, as far as I can

12  tell, we're engaged at this point in a purely hypothetical

13  discussion about maybe there might be some other documents

14  that were shared in the mediation that we might want to use

15  at trial, but as we're going to get to the status conference

16  later today, everybody is going to share their exhibits.

17  We're all going to decide in advance what's relevant, what

18  isn't, or if we have an objection, so we're not going to have

19  this mediation issue arise at all.  So I don't understand and

20  I certainly don't think there is any basis to adjourn the

21  hearing so that we can somehow decide in advance whether or

22  not there's additional information that was shared in

23  mediation that might be a problem at the hearing because that

24  issue is never going to arise.

25          On the privilege log, there was some ambiguity in

1   the request that we received 12 days ago from Syncora about

2   what type of privilege log they wanted, whether they wanted a

3   particular document-by-document description of every document

4   we withheld on privilege grounds or whether instead they

5   wanted some category basis of a privilege log.  When counsel

6   for Syncora contacted me about 13 days ago or 12 days ago

7   about that issue, I indicated that we did not understand your

8   Honor's ruling on November 14th to require us to prepare and

9   produce a privilege log, but we were willing to discuss it,

10  and I wanted to -- I invited him to call me to tell me

11  whether or not a general category one would be sufficient

12  given the ambiguity in his original request.  Counsel chose

13  not to take my invitation to call me and instead just filed

14  the motion to compel.

15          We are willing to do whatever the Court wants us to

16  do as regard to a privilege log.  We've been working on it

17  for the past 12 days.  And if the Court wants us to produce a

18  general category privilege log, we can do that by Monday.  If

19  you want us to produce a document-by-document description of

20  every document withheld on privilege grounds, we can do that

21  by Monday, but it's certainly no reason to adjourn the

22  hearing.  I don't think it is materially enough in this

23  context of a summary proceeding that they even need the

24  privilege log, but if your Honor believes it's sufficiently

25  material to order it, we can get it done by Monday on

1  whatever basis the Court or Syncora requests.

2  With respect to the forbearance agreement and the

3  request for additional discovery with respect to the

4  forbearance agreement and the assumption motion to assume it,

5  the City of Detroit contests Syncora counsel's suggestion

6  that our position has changed in any way from when this Court

7  already ruled on these arguments back in August.  To the

8  extent there is some -- it is certainly the position of the

9  City of Detroit consistent with how the Court articulated it

10  that to the extent the Court needs to make rulings with

11  respect to the construction of particular contract

12  provisions, it can do so as a matter of law, to the extent it

13  needs to do so, in ruling on the 9019 motion for a compromise

14  of the parties' rights underneath those contracts.  To the

15  extent the Court determines that there might be some

16  evidentiary issues involved if you were to have a full-blown

17  trial on those contracts, as we articulated, I believe, back

18  in August, in the context of a 9019 motion, you don't conduct

19  a mini-trial or an evidentiary ruling on those legal issues.

20  You consider those issues in deciding whether or not the

21  compromise is fair and equitable or is appropriate under the

22  standards for approving a 9019 compromise.

23  To the extent this Court were to determine, based on

24  the evidentiary record and arguments that are made at the

25  assumption hearing, that for whatever reason it cannot rule

13-53846-swr   Doc 2149   Filed 12/16/13   Entered 12/16/13 10:59:30   Page 22 of 66
13-53846-swr   Doc 2149   Filed 12/16/13   Entered 12/16/13 10:59:30   Page 22 of 66
402
574

1   on the merits of the 9019 motion unless it makes a factual

2   finding on a particular ambiguity and a particular document

3   and it is barred from making that finding because adequate

4   discovery hasn't happened yet, then the Court can decide at

5   that time whether it needs to allow that discovery to occur,

6   but there is no reason to adjourn this hearing now because

7   there's no reason to believe that such a necessary factual

8   finding is going to arise.

9        The bottom line is this Court already dealt with

10  this issue back in August, and nothing has changed, so

11  there's no reason two days -- two business days before the

12  hearing is about to start to adjourn it based on the issues

13  that this Court already decided back in August.

14       Now, with respect to the DIP and the 364 versus 904

15  issue that Mr. Hackney described, the City of Detroit has

16  gone to great lengths to provide discovery and an evidentiary

17  record to accommodate whatever ruling this Court makes as to

18  what the scope of -- the proper appropriate scope of review

19  is with respect to a request for 364(c) relief in a Chapter 9

20  case.  We have set forth in our reply -- in our motion and in

21  our reply brief what our views are as to what the appropriate

22  legal standards are for this Court's review of our request

23  for relief under 364(c) to get the DIP by granting

24  superpriority administrative status in certain liens.

25  However, we have done whatever we can do to accommodate any

1  ruling this Court may make that says the scope of review is

2  broader than what we've laid out in our brief, and counsel

3  for Syncora is not correct to say that we have refused to

4  provide discovery on any of the broader issues that we say in

5  our reply brief are not within the appropriate scope of

6  review under the law.  We have given all the information we

7  have on the need for borrowing this money, even though we

8  believe that, given the legislative history of the 1976-77

9  amendments to Chapter 9 with respect to 364 and the fact that

10  364(b) doesn't apply and the idea that the city should have

11  the same right to borrow unfettered by Bankruptcy Court

12  involvement in bankruptcy that it has outside of bankruptcy,

13  we believe that the need to borrow or the decision to borrow

14  money to fund city services is a decision that is committed

15  at the sole discretion of the City of Detroit and is not

16  subject to Bankruptcy Court review under both 904 and the

17  Supreme Court's decision in Bekins.

18      THE COURT:  How would you articulate in one sentence

19  what the Court's role is on your 364 motion?

20      MR. HAMILTON:  I would -- it is to the extent the

21  City of Detroit wishes to use special powers that are given

22  to it in bankruptcy that it doesn't have outside of

23  bankruptcy to borrow money, the Bankruptcy Court reviews

24  whether or not the use of those special powers is

25  appropriate.  The ability to borrow money is not a special

1   power.

2          THE COURT:  Those powers are the superpriority and

3   the administrative expense priority?

4          MR. HAMILTON:  And the finding of good faith under

5   364(e).  Those three things give --

6          THE COURT:  Is appropriate?

7          MR. HAMILTON:  Is appropriate for you to review

8   whether or not it is appropriate to allow the City of Detroit

9   to use those special powers to borrow money, and in that

10  context --

11         THE COURT:  Is appropriate?

12         MR. HAMILTON:  Well, whether the -- for instance,

13  if -- it would be -- you cannot -- we would have to convince

14  your Honor at the hearing that the City of Detroit cannot go

15  get the financing that we have determined we need without

16  offering those -- without offering the superpriority status

17  or the liens, which is typical in a 364(c) hearing anyway,

18  and we would also have to establish that the terms on which

19  we are offering those liens in super -- in a sort of super

20  administrative priority status, the terms on which we are

21  offering them are reasonable.  That would be relevant both to

22  the use of those powers and to a finding of good faith under

23  364(e), but the decision whether to borrow the money in order

24  to fund quality of life's or any city services is a

25  decision -- is a political decision that, as we've

1    articulated in the reply brief, is one we don't think is

2    within your scope of review.  However, we have provided full

3    discovery on that.  We've given them everything we have on

4    how we decided how much we needed to borrow, why we needed to

5    borrow it, and the time --

6              THE COURT:  When you say "reasonable terms," you

7    mean -- well, let me just ask.  What do you mean?

8              MR. HAMILTON:  Like whether the commitment fee,

9    interest rates are within market -- are within market --

10             THE COURT:  Market standards?

11             MR. HAMILTON:  Yeah.  We need to establish in order

12   to get a finding under 364(e) that this was the result of

13   arm's length bargaining, good faith, and the terms are

14   reasonable.

15             THE COURT:  I ask you what you mean by "reasonable"

16   because certain of the objections can be read to suggest that

17   the terms aren't reasonable given what you want to do with

18   the money.

19             MR. HAMILTON:  Right.  And the problem with that is

20   that goes into the political decision of whether you should

21   be borrowing money to fund city services, and our position,

22   as we lay out in the reply brief, is under 904 and Bekins,

23   that's not an appropriate review for this Court to do, but

24   the point I'm trying to make here is if you decide that --

25   notwithstanding our best effort to be eloquent, that you

13-53846-swr   Doc 2132   Filed 12/16/13   Entered 12/16/13 10:59:30   Page 26 of 66
574
13-53846-swr   Doc 4214-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 406 of 66   406

1   don't agree with us, we have provided full discovery to the

2   objectors on what information we have as to why we think we

3   need to borrow this money and how much.  That essentially

4   comes down to brass tacks, the cash flow projections prepared

5   by E&Y, which we've provided.

6           THE COURT:  What's the standard of review on the

7   assumption motion?

8           MR. HAMILTON:  I believe that's pretty much

9   straightforward 9019 standard, whether it falls below the

10  lowest level of reasonableness, I believe.  I don't think

11  that's a --

12          THE COURT:  Okay.

13          MR. HAMILTON:  -- novel area of law.

14          THE COURT:  How close can you pin down how much of

15  the DIP loan you're going to use to pay off the swaps?

16          MR. HAMILTON:  That will be the subject of testimony

17  at the hearing, and it is my understanding that that amount

18  fluctuates -- I don't know -- I think perhaps even on a daily

19  basis based on interest rates, so we'll give you the most

20  current estimate at the time of --

21          THE COURT:  But what is it?

22          MR. HAMILTON:  -- the assumption hearing, and

23  whatever is left over is then the quality of life proceeds.

24          THE COURT:  What's the number?

25          MR. HAMILTON:  I don't know what the current number

1  is, your Honor.

2          THE COURT:  Approximately.

3          MR. HAMILTON:  It was the subject of deposition

4  testimony.

5          THE COURT:  Approximately.  Are we talking 200

6  million or 300 million or what?

7          MR. HAMILTON:  I think it's closer to 230.

8          THE COURT:  Within $25 million, what's the number?

9          MR. HAMILTON:  230 million.

10         THE COURT:  Okay.  Is it the Court's role to

11  determine whether 230 million or whatever the number is is a

12  fair number?

13         MR. HAMILTON:  I'm not sure what you mean by -- oh,

14  in terms of the compromise?  It is the Court's role --

15         THE COURT:  In terms of the buy-out of the swaps.

16         MR. HAMILTON:  It is the -- I believe it is the

17  Court's role to determine whether or not the city's decision

18  to make that payment falls within the reasonable range of

19  possible outcomes if --

20         THE COURT:  Okay.

21         MR. HAMILTON:  -- the underlying legal issues were

22  litigated, and so fairness in that context is defined by as

23  long as it falls within the range of reasonable outcomes,

24  it's fair.  If that's what you mean by "fair," then, yes,

25  that's within your role.

 1    THE COURT:  What impact would a negative decision by
 2  this Court on that question on the assumption motion have on
 3  the DIP motion?
 4    MR. HAMILTON:  It is a condition to closing on the
 5  DIP that the parties be able to -- be able to perform under
 6  the termination -- under the forbearance agreement.  If you
 7  don't approve the forbearance agreement, there's no DIP.  It
 8  won't close.
 9    THE COURT:  Okay.
10    MR. HAMILTON:  And that was confirmed in depositions
11  last week.
12    THE COURT:  Okay.
13    MR. HAMILTON:  The only thing the city has not
14  agreed to provide in discovery is the vast multitude of
15  underlying communications that undoubtedly occurred in
16  connection with the elaborate work that Conway MacKenzie and
17  others have done in determining which restructuring
18  initiatives should be pursued, how much was needed for
19  particular restructuring initiatives, and when the money
20  should be spent and how.  We have produced the end product
21  of all that work in detail updated through the middle of
22  November.  We have allowed them to depose a full day Mr.
23  Moore on how those determinations were made, what standards
24  were used, but we haven't produced all the e-mails that may
25  have occurred between the various people at Conway MacKenzie

13-53846-swr  Doc 2132  Filed 12/16/13  Entered 12/16/13 10:59:30  Page 29 of 66
13-53846-swr  Doc 2139  Filed 12/17/13  Entered 12/17/13 22:00:23  Page 409 of
574    409

1   or the other outside consultants with the people at the city,

2   at the fire department, the police chief, the police people,

3   that they've done for the past year in determining how many

4   vests need to be bought, how many new cruisers they need,

5   what needs to be done in order to get police response times

6   down to a national average.  All those e-mail communications

7   we have not undertaken to collect and review and produce

8   because, quite frankly, the burden would be astronomical, and

9   to the extent this Court were to undertake a review of each

10  of the individual decisions that the City of Detroit has

11  undertaken over the past year to determine what restructuring

12  initiatives they want to pursue at this point, that type of

13  hearing would take weeks, if not months, and we think no

14  matter how you decide what the appropriate scope of review is

15  under 364(c), there is no scenario where you will find that

16  it is appropriate for the Bankruptcy Court to sit in judgment

17  on those individual decisions about how many cruisers the

18  City of Detroit should buy or what -- or how the police --

19  how the bulletproof vests -- how many needed to buy, those

20  type of decisions, and you don't -- they don't need to see

21  all the e-mail communications on those type of issues, but

22  everything else we've provided discovery.  We don't think

23  it's relevant, but if you decide that you need to hear it and

24  it is relevant, they've got discovery, and we've got

25  witnesses available, and you can hear the -- you can hear the

1   evidence.  We'll accommodate whatever ruling you make as to

2   what the scope is of the evidentiary record you need in order

3   to consider our request for relief under 364(c).  On that

4   basis, we don't think there's any justification for

5   adjourning a hearing that has been scheduled, that

6   everybody's been working at breakneck speed to be able to be

7   in a position to present to you starting Tuesday of next

8   week.

9           THE COURT:  Anyone else want to speak against an

10  adjournment?

11          MR. CLARK:  Your Honor, Jared Clark, Bingham

12  McCutchen, counsel to UBS.  I'll speak very briefly just on

13  one issue that counsel for Syncora raised.  Syncora has

14  argued since after the August 2nd hearing in its objection on

15  the assumption motion that an exercise of the city's option

16  under the forbearance agreement is void ab initio and of no

17  force and effect, and, therefore, your Honor need -- should

18  not approve the forbearance agreement, and this is based on

19  what I believe your Honor referred to as the consent right

20  issues.  The swap counterparties believe that your Honor can

21  and needs to look at the consent right issues as a matter of

22  contract interpretation, as indicated; however, we do not

23  believe that that supports any need for an adjournment.

24          THE COURT: All right.  Thank you.  Anyone else have

25  anything further?  All right.  The Court will take this under

13-53846-swr  Doc 4214-29  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 31 of 66
13-53846-swr  Doc 2132  Filed 12/16/13  Entered 12/16/13 10:59:33  Page 31 of 66
574
411

 1   advisement until 11 o'clock and give you a decision at that

 2   time.

 3          THE CLERK:  All rise.  Court is in recess.

 4       (Recess at 10:42 a.m. until 11:17 a.m.)

 5          THE CLERK:  All rise.  Court is in session.  Please

 6   be seated.  Recalling Case Number 13-53846, City of Detroit,

 7   Michigan.

 8          THE COURT:  Counsel are present.  I do have a

 9   question for the city before I give a ruling.

10          MR. HAMILTON:  Robert Hamilton of Jones Day on

11   behalf of the City of Detroit, your Honor.

12          THE COURT:  Of course, I said "a question," but I

13   exaggerated.  It's more than one.  Is it the city's position

14   that the issue of whether Syncora -- Syncora's consent to the

15   forbearance agreement is -- or was required is an issue that

16   the Court must determine in connection with this approval

17   motion under 9019?

18          MR. HAMILTON:  May I have a moment, your Honor, to

19   confer?  Your Honor, as we have articulated in our reply

20   brief, it is our position that the Court has to determine

21   that the contract we are trying to assume is a valid

22   contract.  In order to make the finding that the contract

23   we're asking to assume is a valid contract, you have to make

24   a determination on that issue.

25          THE COURT:  So you agree with Syncora on that?

13-53846-swr   Doc 4214-29   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 412 of
13-53846-swr   Doc 2132   Filed 12/16/13   Entered 12/16/13 10:59:03   Page 32 of 66   412
574

 1          MR. HAMILTON:  I don't -- I think we took the
 2    position that Syncora said the same thing in one of their
 3    earlier pleadings.  I'm not sure if they've been consistent
 4    in that regard, but to the extent that they take that
 5    position, we agree with them.
 6          THE COURT:  Okay.  Well, then there was just the one
 7    question.  Thank you.  All right.  The matter is before the
 8    Court on the motion of Syncora --
 9          MS. GREEN:  Your Honor, if I may, something came up
10    at the break relating to discovery.  We have a third-party
11    witness on our may call list named Thomas Gavin, and we were
12    planning to depose him Monday morning to make him available
13    for the city if they had questions for him.  The city has
14    just stated it will object to third-party discovery because
15    they had not previously agreed to third-party discovery.  I
16    just wanted to --
17          THE COURT:  What does the phrase "third-party
18    discovery" mean?
19          MS. GREEN:  That he's not a party.  He used to be a
20    financial advisor for the City of Detroit.  He no longer is
21    a -- is not currently a financial advisor for the City of
22    Detroit.
23          We wanted to depose him Monday and call him as a
24    witness at the evidentiary hearing.  I wanted to confirm with
25    the Court that that was appropriate to deal with any

13-53846-swr  Doc 2214  Filed 12/19/13  Entered 12/19/13 10:59:30  Page 33 of 66
13-53846-swr  Doc 2214-29  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 34 of 46  413
574

 1   objections.  I don't want to call him as a witness at the

 2   evidentiary hearing and have some sort of objection to him by

 3   the city.

 4        THE COURT:  Let me suggest this.  I've been advised

 5   you didn't put your appearance on the record.

 6        MS. GREEN:  I'm sorry.  Jennifer Green on behalf of

 7   the Retirement Systems for the City of Detroit.

 8        THE COURT:  Let me suggest this to you to resolve

 9   your question.  In connection with the motion to adjourn, I'm

10   going to articulate as best I can the issues as I see them,

11   and then you can consult among yourselves and see if the

12   testimony of this witness that you want to proffer would be

13   relevant given that these are the issues.

14        MS. GREEN:  Okay.  And I believe he would be

15   relevant --

16        THE COURT:  So let me ask you to stand by on that

17   one.

18        MS. GREEN:  I think he would be relevant to the

19   business judgment of the city in entering into the

20   forbearance agreement.  That's what we would be proffering

21   the witness for.  He has testimony that the swap

22   counterparties themselves had concerns about the pledge of

23   the casino revenue back in 2009.  He was a financial advisor

24   on behalf of the city, and he worked with the city during the

25   collateral agreement execution.

1          THE COURT:  Okay.  But to that I would ask you what

2    is the relevance of the fact that the swap parties had

3    concerns?

4          MS. GREEN:  To the extent that both the city and/or

5    the swap counterparties had concerns about the pledge of the

6    casino revenue and the collateral agreement itself and

7    certain objecting parties are arguing that the collateral

8    agreement is invalid or that the casino revenue pledged does

9    not survive the bankruptcy petition, if the city and the swap

10   counterparties also were aware of these potential issues, I

11   think that informs the city's business judgment in entering

12   into the forbearance agreement, your Honor.

13         THE COURT:  How, though?

14         MS. GREEN:  If there were issues that they should

15   have litigated, that is one of the arguments by some of the

16   objecting parties.

17         THE COURT:  Okay.  But we can look at that question

18   without having a witness tell us that Syncora or the swap

19   counterparties were concerned about it at the time; right?

20         MS. GREEN:  Well, I assume, your Honor, if I expect

21   an objection --

22         THE COURT:  Look, an issue is an issue whether the

23   parties knew about it at the time or not.

24         MS. GREEN:  Well, if they knew about it then and

25   they knew about it at the time that the forbearance agreement

13-53846-swr  Doc 2134  Filed 12/16/13  Entered 12/16/13 10:59:30  Page 35 of 66
13-53846-swr  Doc 4214-29  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 415 of
574                                                                        415

1   was being negotiated, it seems to me as though it's

2   questionable to enter into the forbearance agreement if you

3   knew you had very strong legal arguments that could have

4   been --

5           THE COURT:  Ah, but the strength of the legal

6   arguments doesn't depend on whether the parties were aware of

7   those legal arguments at the time, does it, or does it?

8           MS. GREEN:  I believe it does.  If you --

9           THE COURT:  Why?

10          MS. GREEN:  -- enter into a forbearance agreement

11  and the argument from some of the objecting parties is that

12  you should have litigated it rather than settle it, then to

13  me it seems as though the knowledge of the city and the swap

14  counterparties as to the strength of their legal arguments or

15  the existence of certain arguments are admissions as to the

16  strength of those arguments.

17          THE COURT:  Are what?  Admissions?

18          MS. GREEN:  Could be admissions as to the strength

19  or the existence of certain arguments that could have been

20  made or defenses that existed.

21          THE COURT:  Well, but we would evaluate the strength

22  based on the applicable law and if there's conflicts in the

23  law, et cetera, et cetera.  All right.

24          MS. GREEN:  Thank you, your Honor.

25          THE COURT:  All right.  First, on the motion to

13-53846-swr  Doc 2129  Filed 12/15/13  Entered 12/15/13 10:59:30  Page 36 of 66
13-53846-swr  Doc 2144  Filed 12/29/14  Entered 12/29/14 22:00:33  Page 416 of
574                                                                          416

 1  adjourn, this motion suggests to the Court that it's in the

 2  best interest of all concerned and to facilitate resolution

 3  of the motion itself for the Court to identify, as best it

 4  can, what the issues are for next week's hearing, so I'm

 5  going to attempt that.

 6      The motion to assume the forbearance agreement under

 7  Section 365, the city at least recognizes, and I believe

 8  other parties do as well, that it's as much a motion for

 9  approval of a settlement under Rule 9019 as it is a motion to

10  assume an executory contract.  I just do not believe that the

11  fact that this agreement was reached a few days before the

12  bankruptcy as opposed to a few days after the bankruptcy

13  should make any substantive difference in either the outcome

14  or the nature of the Court's consideration in determining the

15  outcome.

16      As a general matter, I think the parties agree that

17  when considering a motion to approve a settlement, the

18  Court's role is to determine whether that settlement is fair

19  and equitable and whether it's in the best interest of the

20  estate as a whole.  Accordingly, what is not relevant is

21  whether the settlement prejudices creditors or any particular

22  creditor because every settlement that's proposed to the

23  Court arguably prejudices one or more or even all creditors.

24  The question will remain whether the settlement is fair and

25  equitable and in the best interest of the estate.

13-53846-swr   Doc 421-29   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 37 of 66
13-53846-swr   Doc 2132   Filed 12/16/13   Entered 12/16/13 10:59:30   Page 37 of 66
574
417

1    In determining that question, the Court concludes
2  that the following factors in the context of this case are
3  significant.  The forbearance agreement is clearly an attempt
4  by the parties to it to settle and resolve on a going forward
5  basis the legal and economic issues that they faced at the
6  time, so, accordingly, the probability of success that the
7  city might have if it pursued any challenge to the rights of
8  the other parties or to its own obligations as they existed
9  at that time is a major consideration.  More on this in a
10  moment.

11    A second major consideration is the issue of
12  collection.  Now, when the claim to be compromised is a claim
13  that the debtor has against a third party, of course, it's
14  that third party's collectibility that is an issue.  On the
15  other hand, when the claim to be compromised is a third
16  party's claim against the city or the debtor more generally,
17  of course, the collectibility of the debtor is an issue.  And
18  in the context of this case, the Court concludes that that is
19  an issue to be considered in determining this motion.  At the
20  same time, the Court recognizes that on this issue of
21  collectibility it is asserted that the issue is a minimal
22  issue because of the security interests that are claimed
23  here, but if there are potential challenges to the validity
24  of those security interests, those would obviously come into
25  play in determining whether to grant this motion or not.

13-53846-swr   Doc 2142   Filed 12/16/13   Entered 12/16/13 10:59:30   Page 38 of 66
13-53846-swr   Doc 4214-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 41 of 66
574
418

1  A third consideration is the complexity of the

2  litigation, although more specifically considering the

3  complexity of the litigation is only important because it

4  bears upon the costs to the city of litigating it if there is

5  no settlement or no settlement is approved and the delay to

6  the process, which leads really to the fourth consideration,

7  which is the interest of creditors.  The issue here would be

8  what impact would granting the motion or denying the motion

9  have on the plan process, upon the city's and the public's

10 interest in the city's reconstruction and revitalization.

11  Those are the factors that the Court considers

12 important in determining whether this settlement is fair and

13 equitable and in the best interest of the city and its

14 creditors and its residents, but I want to -- I want to drop

15 a significant asterisk or footnote here.  In considering the

16 probability of success on any of the issues that are

17 compromised by this proposed settlement, it is clearly not

18 the Court's role to resolve those issues, and the Court will

19 not resolve any of those issues.

20  A motion to compromise puts its proponent in a very

21 awkward position, and you can see that awkwardness in the

22 city's papers here because at the same time it is

23 acknowledging the strengths of the other parties' positions

24 or the weaknesses of its own positions, it dare not be too

25 articulate about either side of that lest the motion be

 1   denied and it has to actually litigate those issues, so in
 2   the context of this motion, the Court is not interested in
 3   any evidence about what Jones Day or Mr. Orr or any of its
 4   employees or agents thought were the strengths or weaknesses
 5   of any challenges it might have to the other parties'
 6   positions in this matter or with regard to any of the
 7   positions that those other parties might take against the
 8   city.  The parties' papers have identified what those
 9   challenges are on both sides, and it's for the Court, with
10   the assistance of counsel, surely, to try to evaluate as best
11   it can but in a summary way the strengths and weaknesses of
12   those challenges.

13          So, for example, and acknowledging this violation of
14   the general rule against giving an advisory opinion, it would
15   be inappropriate to ask Mr. Orr what he thought the city's
16   probability of success was in asserting issue "X" not only
17   because that would plainly require him to disclose his
18   communications with his counsel that are protected, but, more
19   importantly, and with all due respect to him, the Court isn't
20   actually that interested in what his assessment of the city's
21   probability on issue "X" is.

22          Now, it appears to the Court that most of the
23   underlying disputes between the parties that this agreement
24   compromises are, frankly, issues of contract interpretation
25   that would, in the ordinary course, be resolved by the Court

13-53846-swr   Doc 4214   Filed 04/29/14   Entered 04/29/14 22:00:03   Page 420 of 66
13-53846-swr   Doc 2132   Filed 12/16/13   Entered 12/16/13 10:59:03   Page 46 of 66
574
420

1  without evidence as a matter of law.  It is certainly not the
2  law that simply because parties disagree about contract
3  interpretation, it's, therefore, ambiguous and under the
4  parol evidence rule subject to the testimony of witnesses.
5  And on this point, the Court will go one step further and
6  conclude that after reading all of the parties' briefs, the
7  Court does not identify a single issue of contract
8  interpretation as to which there is such ambiguity as would
9  permit a party to present parol evidence in support of its
10  interpretation.

11         Now, this does not mean that there is not a genuine
12  good faith dispute about the interpretation of the contract.
13  It appears to the Court there is, but that does not mean that
14  the contract is ambiguous.  There are, however, certain
15  defenses that the city might have that may turn on the
16  establishment of certain facts, so, for example, I think one
17  of the parties, perhaps Mr. Sole -- correct me if I'm
18  wrong -- asserted that the city might have an equitable
19  subordination argument here.  It would be the purpose and
20  function of this hearing not to try that case, not to call
21  witnesses in support of a claim the city has that some claim
22  or another of a given party should be equitably subordinated,
23  but still there should be some testimony by someone or some
24  evidence somewhere of what the factual predicate in a summary
25  way of such a claim might be.

1          All right.  I think that's as much as I want to say
2     about the 9019, 365 motion.

3          On the debtor in possession financing motion under
4     Section 364, the Court basically agrees with the city's
5     position that Section 904 of the Bankruptcy Code prohibits
6     any review of what the city proposes to do with the proceeds
7     of the loan and actually prohibits any review beyond the
8     narrow review that Section 364 itself requires to determine
9     the reasonableness of the terms of the borrowing given the
10    current market conditions for similar kinds of loans and the
11    other technical requirements of Section 364, including the
12    city's inability to obtain a loan on any better terms.  And,
13    of course, the Court welcomes any evidence on the issue of
14    whether the debtor in possession financing was negotiated in
15    good faith, but the city's proposed use of the proceeds is
16    not a matter for this Court's consideration next week.

17          Having concluded all of that, the Court must
18    conclude that the record fails to establish cause for any
19    adjournment.  Accordingly, it is denied.

20          Now, can we move to the final pretrial conference on
21    this?  Did you all prepare a joint pretrial statement?

22          MR. SHUMAKER:  Good morning, your Honor.  Greg
23    Shumaker of Jones Day for the City of Detroit.  Yes, your
24    Honor, we did prepare a joint statement of facts in
25    connection with the -- what we've referred to as the

1   assumption motion.  We were able to hash that out over the

2   last week or so, and I believe we filed that on Wednesday

3   night.

4            THE COURT:  Um-hmm.

5            MR. SHUMAKER:  The joint statement of facts with

6   regard to what we referred to as the PPF motion, the DIP

7   motion, is still in progress.  We're hopeful, your Honor,

8   that the parties will be able to come up with something

9   before the hearing next week.  We've sent back some -- the

10  city sent back a number of comments to the objectors, I

11  think, last night, so we are very hopeful that we'll be able

12  to achieve that, but it's still --

13           THE COURT:  Hopeful you'll be able to achieve what?

14           MR. SHUMAKER:  Well, a joint statement of facts with

15  regard to the DIP motion.

16           THE COURT:  Okay.

17           MR. SHUMAKER:  We've submitted that to your Honor.

18  The parties have agreed --

19           THE COURT:  Okay.

20           MR. SHUMAKER:  -- with regard to the assumption, the

21  forbearance agreement facts.

22           THE COURT:  Okay.  And that's all wonderful, and I

23  appreciate that all very much.  My question had more to do

24  with the more standard, you know, joint pretrial statement

25  where you state your claims, you state the defenses, you

 1   state who the witnesses will be and what the exhibits will

 2   be.

 3          MR. SHUMAKER:  Well, along those lines, the short

 4   answer, I think, your Honor, is, no, we have not been

 5   operating under the standard joint pretrial order process

 6   because we thought that it was not appropriate, but we have

 7   been working on --

 8          THE COURT:  That's okay.  We can still accomplish a

 9   lot here this morning.  Have all of the exhibit lists been

10   finalized --

11          MR. SHUMAKER:  I believe they have, your Honor.

12          THE COURT:  -- by all of the parties on both sides?

13          MR. SHUMAKER:  All of the exhibit lists have been

14   submitted to the Court.  The only reservation is that there

15   are continuing depositions.  There's one or two depositions

16   left.  The parties reserve the right to supplement, but, yes,

17   the exhibit lists have all been provided, have been filed,

18   and what we are hoping to do along the lines of a pretrial

19   order that we haven't been following, but is to come up with

20   what we've talked about with regard to the eligibility

21   hearing where we do what your Honor is I would suggest

22   proposing, which is that there would be a joint list where

23   there would be a list of the documents to which there is no

24   objection, and your Honor could rule on the admissibility of

25   those, and then a corollary with the list of exhibits to

1  which there have been objections.

2        Now, the city has provided its objections to the

3  objectors.  We're waiting and discussing with them waiting

4  for their objections to the city's exhibits, but that's

5  underway, and we also hope to have that filed hopefully

6  Monday.  Obviously there's not a lot of time, but we are

7  working on that actively.

8        THE COURT:  Okay.  All right.  Does anyone see any

9  obstacle to getting that to the Court by the close of

10  business on Monday?  All right.  But just to be, you know, as

11  technically accurate about this as we can, there was some

12  overlap in exhibits at the eligibility trial --

13        MR. SHUMAKER:  Yes, your Honor.

14        THE COURT:  -- which created a little bit of

15  confusion.  I would encourage you to try to minimize that as

16  much as possible, so if the city has offered an exhibit, I

17  would discourage other parties from including that same

18  exhibit on their lists.

19        MR. SHUMAKER:  We'll do everything we can, your

20  Honor.

21        THE COURT:  If it's an exhibit, you know, in a

22  different form or if it has, you know, attachments to it that

23  the city's doesn't have, okay, but if it's the exact same

24  pieces of paper, we don't need it twice.

25        MR. SHUMAKER:  Thank you, your Honor.

 1          THE COURT:  In terms of numbering, I like the

 2    numbering system we used last time where, you know, each

 3    party takes a range of numbers in the hundreds.

 4          MR. SHUMAKER:  Your Honor, I believe that the city

 5    had zero through a hundred, although we have more than a

 6    hundred exhibits, so we may have to hog the --

 7          THE COURT:  Yeah.

 8          MR. SHUMAKER:  -- zero to 200 range.

 9          THE COURT:  Fine.

10          MR. SHUMAKER:  But we can figure --

11          THE COURT:  Whatever you work out is fine.  I just

12    don't want parties to use the same numbers --

13          MR. SHUMAKER:  Understood, your Honor.

14          THE COURT:  -- because that's going to be confusing.

15          MR. SHUMAKER:  One outstanding issue on that is,

16    your Honor, the city has provided electronic copies of all of

17    its exhibits to the objectors.  We've asked for those in

18    return, but I think we've -- I don't know how many objectors

19    have responded.  As of yesterday, it was one, but it

20    facilitates the issue of figuring out what exhibit it is and

21    so that we can give the objections back.  I don't know if a

22    deadline is necessary, but we have had some difficulty in

23    that regard.

24          THE COURT:  Well, let me just ask.  Can you all get

25    your exhibits to the city in the electronic format that they

1  provided to you by the close of business today?  All right.

2  Hearing no objection, I'll assume that will be done.  So

3  after the hearing today, I would encourage you all to

4  collaborate together on who gets what exhibit numbers, what

5  exhibit ranges are assigned to which parties.  Okay?

6          MR. SHUMAKER:  Certainly, your Honor.

7          THE COURT:  Now, who are your witnesses?

8          MR. SHUMAKER:  The witnesses right now are the five

9  that I mentioned last time we met, your Honor, the day before

10 Thanksgiving --

11         THE COURT:  Remind me.

12         MR. SHUMAKER:  -- which was Mr. Moore from Conway

13 MacKenzie, Mr. Doak from Miller Buckfire, Mr. Malhotra from

14 Ernst & Young, Mr. Buckfire, and Mr. Orr.  Those are the

15 five.  And I think I have --

16         THE COURT:  All right.  But I want to be sure that

17 you constrain your examination of those witnesses to the

18 issues that I identified here.

19         MR. SHUMAKER:  We will do that, your Honor.

20         THE COURT:  All right.  I'd like to hear the names

21 of the witnesses that the objecting parties intend to call,

22 so let's have that, please.  Who'd like to go?

23         MR. HACKNEY:  I'm sorry.  I didn't hear.  I'm sorry.

24         THE COURT:  I'm sorry to you, sir.  My question is

25 who's -- what witnesses are the objecting parties going to

1  call?

2            MR. HACKNEY:  I'll let each speak for their --

3            THE COURT:  Yeah.

4            MR. HACKNEY:  My name is Stephen Hackney, your

5  Honor, on behalf of Syncora.  At this point, we only have a

6  may call witness.  We have not determined today that we will

7  call him, and I would propose to monitor the course of the

8  hearing and give counsel for the other side 24 hours' notice

9  or 48 hours' notice if I refine that.  I was -- refine that

10  into the intention to call for certain.  I was hoping that I

11  might ask the city to provide us with the order of the

12  witnesses by the close of business today.  It helps us

13  coordinate our preparation of cross-examination amongst

14  objectors.

15            THE COURT:  So who's your may call witness?

16            MR. HACKNEY:  It is a potential expert witness by

17  the name of Mr. Davido.

18            THE COURT:  Okay.

19            MR. HACKNEY:  Yeah.

20            THE COURT:  Who else is going to call witnesses?

21            MR. GOLDBERG:  Good morning, your Honor.  Jerome

22  Goldberg appearing on behalf of interested party David Sole.

23  Your Honor, I'd like -- I just had one question, if I may.  I

24  was a little confused on the second point in your order on

25  the issue of collectibility.  I guess maybe I should just

listen to it again, but I was a little confused.  There were

two --

THE COURT:  Well, it's not that complex.  To the

extent that whatever claims third parties have against the

city, the issue of the collectibility of the city is an issue

to be taken into account in determining the fairness of the

settlement.  Anyway --

MR. GOLDBERG:  Okay.  I understand it better now.

THE COURT:  Okay.  Who's your --

MR. GOLDBERG:  I was -- my own confusion.

THE COURT:  Who's your witness?

MR. GOLDBERG:  I intend to call, at least at this

point, Wallace C. Turbeville as basically an expert on the

first issue.  That's my -- the one witness.

THE COURT:  When you say "the first issue," you

mean --

MR. GOLDBERG:  The issue on the equitable questions

concerning the forbearance agreement itself and the DIP in

relation to the forbearance agreement.  I also do have a

recall witness that's a -- a rebuttal witness who is Sharon

McPhail.  It was one of the people involved in the -- on City

Council at the time of the hearing itself -- I just actually

ran into her two days ago -- as a potential rebuttal witness.

THE COURT:  Thank you.

MR. GOLDBERG:  Can I ask one other question, your

1    Honor?

2            THE COURT:  Sure.

3            MR. GOLDBERG:  I'm sorry for --

4            THE COURT:  That's all right.

5            MR. GOLDBERG:  -- my inexperience.  The city did

6    file a number of objections to exhibits that, you know, I

7    proffered, and will there be a hearing?  You don't intend to

8    hear those objections today or -- I was just trying to get

9    some advice on that.

10            THE COURT:  No, I don't.  You know, during the

11   course of the hearing when it comes time for your case --

12            MR. GOLDBERG:  Okay.

13            THE COURT:  -- you will proffer those exhibits in

14   the ordinary course, and if the city still objects, I'll hear

15   those objections and your response.

16            MR. GOLDBERG:  Thank you, your Honor.

17            MS. DIBLASI:  Your Honor, Kelly DiBlasi on behalf of

18   Financial Guaranty Insurance Company.  We intend to call

19   Stephen Spencer of Houlihan Lokey as a witness.

20            THE COURT:  Okay.  Thank you.

21            MS. DIBLASI:  Thank you.

22            MS. GREEN:  Jennifer Green on behalf of the

23   Retirement Systems.  We had intended as may call witnesses

24   Ann Langan and Irvin Corley of the City Council staff and

25   Thomas Gavin.  However, based upon today's ruling, we'll be

1   reassessing our may call list.

2          THE COURT:  Okay.  Any other witness names?  I do

3   want to discuss the issue of limiting time on each side for

4   presentations.

5          MR. HACKNEY:  Your Honor, I had some collected

6   thoughts I was going to offer at some point, and I just

7   wanted to make you aware of that.

8          THE COURT:  Regarding this issue or a different

9   issue?

10         MR. HACKNEY:  It relates very directly to this issue

11  and to the organization of the hearing.

12         THE COURT:  Go for it.

13         MR. HACKNEY:  Your Honor, I wanted to tell you that

14  the objectors have been working together to try to organize

15  the presentation of it for the Court so it's as coherent as

16  possible.  That's not always easy because --

17         THE COURT:  Right.

18         MR. HACKNEY:  -- the objectors don't always

19  object -- in addition to the fact that we're all different

20  firms and entities, but --

21         THE COURT:  Right.

22         MR. HACKNEY:  -- we don't always object for the same

23  reasons, but we've had some success.  We have eight hours

24  that's been allocated to our side by your order, and what we

25  have done is we had a proposal for you about how we hope to

 1   strike the allocation of time, and I was hoping I could lay

 2   that out for you in the way of suggestion as to how it may

 3   be --

 4            THE COURT:  Okay.

 5            MR. HACKNEY:  -- most efficient.  The first thing is

 6   we are going to endeavor to use a lead cross-examinationer as

 7   a way of trying to get someone to cover the main body of a

 8   witness' cross on behalf of all objectors subject to the

 9   important point that each individual objector will retain the

10   right to do discrete amounts of cleanup if they have unique

11   issues, but we hope to use a lead questioner style method of

12   cross-examination.  We hope to spend approximately -- we

13   intend not to do opening statements unless the Court really

14   wanted them.  The briefs so --

15            THE COURT:  Yeah.  I leave it optional to you.

16            MR. HACKNEY:  Our intention was not to spend our

17   time on opening statement unless you just preferred

18   otherwise.

19            THE COURT:  I don't.

20            MR. HACKNEY:  We hoped to spend approximately four

21   and three-quarters hours on our witness cross-examination

22   and/or our directs.  I will tell you that it is somewhat --

23   it's more art than science when you're trying to predict time

24   on that.  It relates to things like witness responsiveness

25   and a host of factors.

13-53846-swr  Doc 4214-29  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 432 of
13-53846-swr  Doc 2132  Filed 12/16/13  Entered 12/16/13 10:59:30  Page 52 of 66   432
574

1    THE COURT:  Of course.

2    MR. HACKNEY:  That is our going in strategy, and we

3    would then retain three and a quarter hours for closing

4    argument.

5    THE COURT:  Okay.

6    MR. HACKNEY:  We propose to have an -- what we call

7    an issue-based closing argument as opposed to a party-based

8    closing argument.  The idea is to try to avoid repetition.

9    And so I wanted to suggest to you what we had thought the

10   different mainline issues would be, although it's been

11   impacted somewhat by today, but I was going to offer them for

12   your consideration.

13   THE COURT:  I have to say in this regard, you know,

14   that how you divide this up among yourselves or what issues

15   you articulate is not something I need right now, so if you

16   want to keep this to yourselves and/or reconsider it at some

17   point, that's fine, but, you know, my main issue is in fixing

18   this time and making sure we're all on the same page

19   regarding it, and it sounds like we are.

20   MR. HACKNEY:  Yeah.  Thank you, your Honor.  I just

21   didn't want to be in a position where I was presuming to tell

22   you what we would be spending our argument time on because

23   the argument, of course, is supposed to aid you in your

24   determination, so I wanted you to have an opportunity to tell

25   me, no, I don't want argument on that, I want argument on

1  this, and so forth, but we can caucus in light of today.

2        THE COURT:  You can rest assured that if anyone is

3  arguing into a vicinity that I don't think is helpful, I will

4  let you know.

5        MR. HACKNEY:  I have personal experience with that,

6  so thank you, your Honor.

7        THE COURT:  You do.

8        MR. HACKNEY:  Your Honor --

9        THE COURT:  You asked for that.

10        MR. HACKNEY:  I did.  I did, and I take it

11  willingly.  I have a follow-up question, if I could ask you,

12  about witnesses because -- and I'll let Mr. Hamilton respond

13  to this after I do, but with respect to the views you

14  expressed on 904 versus 364, obviously notwithstanding our

15  disagreement, it's heard and understood on our part, but I

16  wanted to tell you that my interpretation of what you said to

17  me when I look at Mr. Moore's declaration -- he's the Conway

18  MacKenzie individual who he details here are the different

19  problems, here's how we're going to use the money, and here's

20  why it's going to fix them, and so on and so forth -- that

21  that would not be relevant under the standard as you

22  articulate it.  Now, I don't want overstep, but --

23        THE COURT:  That's right.

24        MR. HACKNEY:  -- do you agree?  Okay.  That's

25  helpful to me because we're in the process of preparing, so

 1  I'll caucus with Mr. Hamilton about that, but that was a
 2  point of clarification.
 3          THE COURT:  All right.
 4          MR. HACKNEY:  So I've hit all the issues that I hit,
 5  and I hope I addressed your question about how we intend to
 6  use our time and --
 7          THE COURT:  Yes.
 8          MR. HACKNEY:  -- who we intend to use it with.
 9  Thank you.
10          MR. HAMILTON:  Robert Hamilton of Jones Day on
11  behalf of the City of Detroit, your Honor.  I did have just a
12  brief moment to caucus with Mr. Hackney, and I'm not sure
13  we've worked all of this out.  With respect to witnesses that
14  both sides are going to call on the motion to approve the
15  post-petition financing, it seems, given the Court's ruling,
16  that most, if not all, of the testimony that was previewed in
17  Mr. Moore's declaration would not be necessary and, in fact,
18  would be immaterial under the standard you've articulated.
19          THE COURT:  Under the standard that you advocated.
20          MR. HAMILTON:  Under the standard that we advocated.
21  I've advocated things, and I don't always win what I
22  advocate, your Honor, so we were trying to cover all our
23  bases.  The two experts that the objectors have identified,
24  Mr. Davido and Mr. Spencer, the opinions that they proffered
25  at their depositions relate to an issue that appears to fall

1    on the irrelevant side, but if it doesn't, then Mr. Moore

2    would be relevant.

3         THE COURT:  Okay.  I have to -- I have to ask you to

4    defer your argument on this until they actually testify.

5         MR. HAMILTON:  Well, it goes to whether we're going

6    to have three witnesses here or zero on the issue of do we

7    need to borrow the money now.  If the question of do we need

8    to borrow the money now or do we have enough money without

9    borrowing to do what we want to do, if that's not within your

10   scope of review under your ruling today, then neither Mr.

11   Moore nor Mr. Spencer nor Mr. Davido are relevant, and they

12   don't need to come here next Tuesday.

13        THE COURT:  If you want me to find that it is

14   relevant that it is necessary to borrow this money now --

15   this is your motion, you know -- then that suggests all that

16   is relevant.

17        MR. HAMILTON:  Our position is you don't need to

18   find that, and we don't need to ask you to find that.  And if

19   that's the case, we would not need to call Mr. Moore, but

20   then neither would Mr. Spencer or Mr. Davido need to come.

21   And the only reason I raise it now is because it's a

22   pretrial, and we'd kind of like to know in advance whether

23   these three witnesses are going to have to be here on Tuesday

24   or not.  Our position is it's not relevant given your ruling,

25   and I have not had a full opportunity to confer with Mr.

1   Hackney other than we thought it might be appropriate to

2   raise it today to get it resolved.  That's all I had to say

3   at the moment.

4        MR. MARRIOTT:  Your Honor, Vince Marriott, EEPK.  If

5   I could just speak to the findings, I think that the city's

6   proposed order that accompanied the motion does request

7   findings on those issues.  If the city is prepared to submit

8   a revised proposed order that strips out asking for these

9   things, then I think we are in a better position to decide

10  whether we need that, but so long as the proposed order asks

11  findings on that sort of thing, you know, we're sort of

12  stuck.

13       THE COURT:  And that's why I asked the question that

14  I asked, so I think the answer is really in -- of the city's

15  own making.  If there's a finding you want me to make, you

16  better submit evidence of it, but then you open the door to

17  rebuttal evidence on it.  Otherwise I don't see the relevance

18  of the necessity of the borrowing for the 364 motion, but,

19  you know, it's your motion, so if you want me to make a

20  finding on it, it's up to you.  If you say no, then the

21  objecting parties will rely on that, and, you know, you can't

22  argue that they didn't submit any evidence.

23       MR. HAMILTON:  Your Honor, I think we are going to

24  take the position that it's irrelevant.  I think what we

25  should do is that I should just caucus with Mr. Marriott and

1   Mr. Hackney, and we should work this out by Tuesday.

2        THE COURT:  That's an excellent idea.  I have to say

3   one more thing in the interest of justice.  I wouldn't

4   normally say this, but with all due respect to Mr. Orr, I

5   need to emphasize to him through his counsel here the

6   necessity of him being responsive to the questions and with

7   the caution that if he is not, as he was not during the

8   eligibility trial, that may constitute grounds or cause to

9   extend the objecting parties' time to present their case.

10       All right.  I need to get back to the issue of the

11   privilege log, but before I do that, I want to see if there's

12   anything else we need to cover in the context of this final

13   pretrial conference.  We have several willing attorneys, so

14   we'll just race to the lectern.

15       MR. GOLDBERG:  Sorry, your Honor.  Jerome Goldberg

16   on behalf of interested party Sole.  I know I'm asking the

17   indulgence of the Court, and if I'm out of line, let me know,

18   but I have a -- honestly speaking, I'm operating in this case

19   on virtually no budget, and my expert is testifying on that

20   basis.  I was just wondering if it's possible for me to get a

21   sense of when I would need to -- and I have to fly him in

22   from New York --

23       THE COURT:  Um-hmm.

24       MR. GOLDBERG:  -- when he might be testifying.  I

25   mean I normally would not ask, but I'm not in a position to

1 even pay him as my client is not in a position to pay myself.

2     THE COURT: Remind me how much time we allocated for

3 the city. Was it seven, seven hours?

4     MR. SHUMAKER: Yes, your Honor.

5     THE COURT: Okay. So we may or may not quite get

6 through the city's case on Tuesday, right, depending on

7 recesses and whatnot, so it would either be sometime during

8 the day on Wednesday or Thursday, so I would suggest that you

9 collaborate with your fellow objecting parties' attorneys and

10 see if you can agree upon the order in which witnesses are

11 called, and that'll give you a much better sense of when your

12 witness would come up.

13     MR. GOLDBERG: Thank you very much, your Honor.

14     THE COURT: Okay. Ms. Fish, you wanted to be heard?

15     MS. FISH: Yes. I didn't know if Mr. Shumaker was

16 finished with the city's presentation. Deborah Fish from the

17 law firm of Allard & Fish on behalf of the ad hoc COP

18 holders. Similar to Mr. Goldberg, your Honor, my client

19 would only like to make a five-minute presentation at the

20 hearing. Wondering if, in fact, that could be made at the

21 beginning so that we wouldn't have to appear every day and

22 could just listen by phone.

23     THE COURT: Does anyone object to that?

24     MS. FISH: Thank you, your Honor.

25     THE COURT: All right. We will hear you first thing

13-53846-swr Doc 4214-29 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 439 of 66
13-53846-swr Doc 2132 Filed 12/16/13 Entered 12/16/13 10:59:30 Page 59 of 66
574
439

1    Tuesday morning then.  Would anyone else like to be heard in

2    the context of any joint -- of any final pretrial order

3    issues, questions?

4            MR. HACKNEY:  Your Honor, would you indulge me in

5    just one more brief colloquy on part of your ruling because I

6    think it will help us determine whether witnesses need to

7    come?

8            THE COURT:  Um-hmm.  Go ahead.

9            MR. HACKNEY:  Steve Hackney again on behalf of

10   Syncora.  You know, I'm loath always to question the Court

11   extensively, and I'll try to avoid that.

12           THE COURT:  I appreciate that.

13           MR. HACKNEY:  Your job is to rule, and our job is to

14   figure it out, but you talked about the word "need" in the

15   context of the Section 364 versus 904 context, and Mr.

16   Hamilton and you talked about that subject with respect to

17   different witnesses, and I just wanted to articulate a

18   possible distinction and make sure we understand it.

19           The first thing I could see the Court saying is if

20   Mr. Orr decides that the city needs a hundred police cars,

21   I -- as the Court, I am not going to review that decision

22   under 904.  My reading of your ruling is that's clearly what

23   you were saying on that point.  There is a second concept,

24   though, which is whether or not he should borrow the money to

25   buy the police cars or whether or not he has existing funds

1   with which to borrow the police cars, and this is a second

2   concept, which is the need to borrow.  Is that also within

3   the rubric of a decision that you will not review, which

4   is --

5           THE COURT:  It is.

6           MR. HACKNEY:  It is.  That clarifies it, and I

7   appreciate it.

8           THE COURT:  But there's an "unless" there, which I

9   asked the city about, unless they want me to find that they

10  need to borrow the money, but the city said, no, they don't

11  want me to find that even though it's apparently in --

12  someone said it's in the order that was proposed with the

13  motion and they're going to collaborate with you on all of

14  that, so --

15          MR. HACKNEY:  Thank you.

16          THE COURT:  -- if they open that issue up, go for

17  it.  If they don't want that finding, I don't think it's

18  necessary or appropriate under 364 in a Chapter 9 case.

19          MR. HACKNEY:  Thank you, your Honor.

20          MR. SHUMAKER:  One issue, your Honor, which we'd

21  appreciate some clarification on, and that is the time

22  limits.  And now that it appears that the city will have

23  seven hours and that the objectors will have eight hours to

24  present their case, does the time allotted to each side

25  include the cross-examination of the --

        1            THE COURT:  Oh, no.  That's lectern time.

        2            MR. SHUMAKER:  Okay.  Okay.  Yes.

        3            THE COURT:  Does that answer your question?

        4            MR. SHUMAKER:  Yes, that does.  That does, yes.

        5    Thank you.

        6            THE COURT:  I keep a running clock by minutes of the

        7    time each side is standing at the lectern --

        8            MR. SHUMAKER:  Thank you, your Honor.

        9            THE COURT:  -- whether it's opening, cross, direct,

        10    or closing.  On the privilege log issue, one of the

        11    consequences of my earlier statement of the issues is that as

        12    an evidentiary matter, I don't think it's relevant what any

        13    particular attorney concludes regarding the strengths or

        14    weaknesses of any of the claims or defenses are nor do I

        15    think it's relevant what any particular attorney on either

        16    side for this matter told a client were the strengths or

        17    weaknesses of any particular claim or defense.  So on the

        18    issue of the privilege log, I don't think that any attorney-

        19    client communications are particularly relevant in the first

        20    instance, so in those circumstances, I cannot conclude that

        21    the disclosure of a privilege log is necessary, so I won't

        22    require it.

        23            All right.  Anything further for today?

        24            MR. HACKNEY:  Can I be heard on that just briefly?

        25            THE COURT:  Yes.

    1            MR. HACKNEY:  The only desire for the log is to
    2     confirm that the documents that have been withheld are
    3     privileged.  If they are privileged, I'm not disputing the
    4     idea that they can withhold them under the privilege.  I'm
    5     not saying you'd put it at issue.  I'm just saying I want to
    6     check.
    7            THE COURT:  Your concern is that they have withheld
    8     documents that weren't communications between attorneys and
    9     clients?
   10            MR. HACKNEY:  Well, yes, because the way
   11     privilege --
   12            THE COURT:  That would be pretty ugly.
   13            MR. HACKNEY:  Well, no.  It's not necessarily
   14     uncommon when people are reviewing, especially a pace like
   15     this, which is you'll look at the to and from on an e-mail,
   16     and if you see an attorney, you'll just mark it, and then
   17     you -- when you do the log, then you do the hard calls and
   18     say, "Well, yeah, there was an attorney cc'd on this, but
   19     this is really Miller Buckfire to business guys talking
   20     business stuff."
   21            THE COURT:  Okay.
   22            MR. HACKNEY:  Then you produce it.  So I didn't want
   23     there to be confusion about why I want the log.  I'm not
   24     trying to say, "Oh, look at what they withheld.  This is
   25     relevant."  I'm trying to check their privilege calls.

1          THE COURT:  Any response to that?

2          MR. SHUMAKER:  Your Honor, my response would be that

3     when we produce documents, when we gather the documents from

4     the city and we review them and produce them, we do our

5     darndest to give the responsive documents as we did in

6     connection with the PPF motion, and --

7          THE COURT:  What motion?

8          MR. SHUMAKER:  I'm sorry.  The post-petition

9     financing, the DIP motion.  I forget which one we're calling

10    it.  And so, you know, we've -- we do have to go through a

11    review.  We do have a number of people who look at those

12    documents.  They operate in good faith, do the best they can.

13    It's, you know, a significant amount of work to undertake

14    just under the possibility that a document was withheld that

15    shouldn't have been.  I can't represent to your Honor that

16    that's not possible, but we do have an affirmative ongoing

17    obligation that if we uncover something that is not

18    privileged, we produce it.

19         THE COURT:  All right.  Well, I'll ask you to file

20    an affidavit then by Tuesday which describes what process you

21    used to determine which documents were privileged or to be

22    claimed as privileged and not disclosed, therefore, what

23    standards the staff used, and I want the representation of

24    who's ever affidavit this is that it is that affiant's good

25    faith belief that all of the documents withheld are subject

1  to a proper claim of attorney-client privilege.

2          MR. SHUMAKER:  Certainly will do that, your Honor.

3          THE COURT:  All right.  We'll be in recess.

4          THE CLERK:  All rise.  Court is adjourned.

5      (Proceedings concluded at 12:13 p.m.)

INDEX


<u>WITNESSES:</u>

      None

<u>EXHIBITS:</u>

      None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                      December 15, 2013
_____        _____
Lois Garrett

3  IN THE MATTER OF,            Case No. 13-53846
                                Detroit, Michigan
4  CITY OF DETROIT, MICHIGAN    December 18, 2013
   _____/  9:01 a.m.

5

6   IN RE: MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11
    USC SECTIONS 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f),
    503, 507(a)(2), 904, 921, AND 922(I) APPROVING POST-PETITION
7   FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
    CLAIMS STATUS AND (III) MODIFYING AUTOMATIC STAY (DKT #1520)
8  MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (1) AUTHORIZING THE
         ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
9    TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
    BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
10     RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT #17)
    CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
11        ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
     TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
12  BANKRUPTCY CODE (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE
         9019, and (III) GRANTING RELATED RELIEF (Dkt #157)
13          BEFORE THE HONORABLE STEVEN W. RHODES
           TRANSCRIPT ORDERED BY: STEPHEN GROW, ESQ.
14
   APPEARANCES:

15
   For the City of Detroit, MI:   CORINNE BALL, ESQ.
16                                 Jones, Day
                                   222 East 41st Street
17                                 New York, NY 10017-6702
                                   212-326-3939

18
                                   JEFFREY ELLMAN, ESQ.
19                                 Jones, Day
                                   1420 Peachtree Street, N.E.
20                                 Suite 800
                                   Atlanta, GA 30309-3053
21                                 404-521-3939

22                                 ROBERT HAMILTON, ESQ.
                                   Jones, Day
23                                 325 John H. McConnell Blvd.
                                   Suite 600
24                                 Columbus, OH 43216-5017
                                   614-469-3939
25

```
 1                                GEOFFREY IRWIN, ESQ.
                                  GEOFFREY STEWART, ESQ.
 2                                GREGORY SHUMAKER, ESQ.
                                  THOMAS CULLEN, JR., ESQ.
 3                                Jones, Day
                                  51 Louisiana Avenue, N.W.
 4                                Washington, D.C. 20001-2113
                                  202-879-3939
 5
                                  BRAD ERENS, ESQ.
 6                                Jones, Day
                                  77 West Wacker
 7                                Chicago, IL 60601-1692
                                  312-782-3939
 8
     For State of Michigan:       STEVEN HOWELL, ESQ. (P28982)
 9                                Special Assistant Attorney
                                  General
10                                Dickinson, Wright
                                  500 Woodward Avenue
11                                Suite 4000
                                  Detroit, MI  48226-3425
12                                313-223-3033

13   For Bank of America and      MARK ELLENBERG, ESQ.
     Merrill Lynch Capital        Cadwalader, Wickersham & Taft
14   Services:                    700 Sixth Street, N.W.
                                  Washington, D.C. 20001
15                                202-862-2200

16                                HOWARD HAWKINS, ESQ.
                                  Cadwalader, Wickersham & Taft
17                                One World Financial Center
                                  New York, NY 10281
18                                212-564-6000

19   For UBS AG:                  JARED CLARK, ESQ.
                                  EDWIN SMITH, ESQ.
20                                Bingham, McCutchen
                                  399 Park Avenue
21                                New York, NY 10022-4689
                                  212-705-7000
22

23

24

25
```

```
 1  For Syncora Holdings, Ltd.,    STEPHEN HACKNEY, ESQ.
    Syncora Guarantee, Inc., and   WILLIAM ARNAULT, ESQ.
 2  Syncora Capital Assurance,     RYAN BLAINE BENNETT, ESQ.
    Inc.:                          Kirkland & Ellis
 3                                 300 North LaSalle
                                   Chicago, IL 60654
 4                                 312-862-2000

 5  For the Ad Hoc COPS Holders:   DEBORAH FISH, ESQ. (P36580)
                                   Allard & Fish
 6                                 2600 Buhl Building
                                   535 Griswold
 7                                 Detroit, MI 48226
                                   313-961-6141
 8
                                   THOMAS MOERS MAYER, ESQ.
 9                                 Kramer, Levin, Naftalis &
                                   Frankel
10                                 1177 Avenue of The Americas
                                   New York, NY 10036
11                                 212-715-9100

12  For General and Police and     JENNIFER GREEN, ESQ. (P69019)
    Fire Retirement Systems:       Clark, Hill, PLC
13                                 500 S. Woodward Avenue
                                   Suite 3500
14                                 Detroit, MI 48226
                                   313-965-8300
15
    For Erste Europaische          VINCENT MARRIOTT, III, ESQ.
16  Pfandbrief and                 Ballard, Spahr
    Kommunalkreditbank             1735 Market Street
17  Aktiengesellschaft in          Philadelphia, PA 19103
    Luxemborg, S.A.:               215-665-8500
18
    For Interested Party David     JEROME GOLDBERG, ESQ. (P61678)
19  Sole:                          Jerome Goldberg, PLLC
                                   2921 East Jefferson
20                                 Suite 205
                                   Detroit, MI 48207
21                                 313-393-6001

22  For Financial Guaranty         ALFREDO PEREZ, ESQ.
    Insurance Company:             Weil, Gotshal & Manges, LLP
23                                 700 Louisiana Street
                                   Suite 1600
24                                 Houston, TX 77002
                                   214-746-7700
25
```

```
 1 │ For Ambac Assurance          CAROLINE TURNER, ENGLISH, ESQ.
   │ Corporation:                 Arent, Fox, LLP
 2 │                              1717 K Street, N.W.
   │                              Washington, D.C.  20036-5342
 3 │                              202-857-6000

 4 │ For U.S. Bank as Trustee     DAVID LEMKE, ESQ.
   │ For Water and Sewer Bonds:   Waller, Lansden, Dortch & Davis
 5 │                              Nashville City Center
   │                              511 Union Street
 6 │                              Suite 2700
   │                              Nashville, TN 37219
 7 │                              615-244-6380

 8 │ For FMS Wertmanagement:      RICK FRIMMER, ESQ.
   │                              Schiff, Hardin, LLP
 9 │                              233 South Wacker Drive
   │                              Suite 6699
10 │                              Chicago, IL 60606-6473
   │                              312-258-5500
11 │
   │ For the Detroit Retired      RYAN PLECHA, ESQ. (P71957)
12 │ City Employees Association,  Lippitt, O'Keefe
   │ Retired Detroit Police and   370 East Maple Road
13 │ Fire Fighters Association,   3rd Floor
   │ Shirley V. Lightsey, and     Birmingham, MI 48009
14 │ Donald Taylor (Retiree       248-646-8292
   │ Association Parties):
15 │
   │ Court Recorder:              Letrice Calloway
16 │
   │ Transcriber:                 Deborah L. Kremlick
17 │

18 │
   │ Proceedings recorded by electronic sound recording, transcript
19 │ produced by transcription service.

20 │

21 │

22 │

23 │

24 │

25 │
```

1                              INDEX

2  <u>WITNESSES FOR</u>          <u>Direct</u>    <u>Cross</u>
   <u>THE DEBTOR:</u>
3
   JAMES DOAK                 11       36,46,51
4  KEVYN ORR                  76

5  <u>EXHIBITS:</u>                                    <u>ID</u>   <u>ADM</u>

6  CX90    Presentation                        21   22
   CX91    Briefing Materials                  31   32
7  CX94    Commitment Letter                   26   28
   CX96    Letter                              24   24
8  CX97    Response from Treasurer Dillon      26   26

9  RSX1003 Email                               64   68
   RSX1005 Email                               65   68
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Court in Session)

2               THE CLERK:  All rise.  Court is in session.  Please

3  be seated.  Case number 13-53846, City of Detroit, Michigan.

4               THE COURT:  Good morning.  One moment, please.  Sir.

5               MR. ERENS:  Good morning, Your Honor.  Again Brad

6  Erens on behalf of the City of Detroit.

7       If it please the Court, we thought before we went on the

8  clock this morning we'd give the emergency loan board report

9  Your Honor asked for yesterday afternoon.

10              THE COURT:  Yes.

11              MR. ERENS:  Mr. Steve Howell of Dickinson, Wright is

12 here on behalf of the state and I'm going to have him give the

13 report.

14              THE COURT:  Okay.

15              MR. ERENS:  Thank you.

16              MR. HOWELL:  Good morning, Your Honor.  Steven G.

17 Howell, Dickinson, Wright appearing as Special Assistant

18 Attorney General on behalf of the state.

19      Your Honor, I understand there were questions that came

20 up yesterday and I'd like to address a couple of them that I

21 understand were raised.  One is in terms of the members of the

22 board, emergency loan board, they are Kevin Clinton, State

23 Treasurer, John Nixon, Director of the Department of

24 Technology Management and Budget, and Steve Arwood, Director

25 of Licensing and Regulatory Affairs.

1      Your Honor, there is underway an effort to get a meeting

2   scheduled.  There is 18 hours notice required under the Open

3   Meetings Act.  We hope to have that meeting scheduled by the

4   -- either on Friday afternoon, or Monday.  And that is the

5   soonest we can have it set up, Your Honor.

6           THE COURT:  What is the nature of the loan board's

7   review?

8           MR. HOWELL:  It's not real clear.  The -- the

9   requirement -- the review is under the Home Rule Cities Act,

10  not under PA436.  And it is simply a requirement that it

11  comply with the procedures and requirements of -- of the --

12  let me just read it for you if I could.

13          THE COURT:  Okay, sure.

14          MR. HOWELL:  And it's the Home Rule City Act 279,

15  Section 36(a)(2).  Any financial recovery bonds issued under

16  this section are subject to the terms and conditions approved

17  by the local emergency financial assistant loan board created

18  under the Emergency Municipal Loan Act.

19      And that is the extent of the guidance in the statute.

20  It will be presented to them.  They will ask whatever

21  questions they have and make their decision at that time.

22          THE COURT:  Why wasn't this done before this

23  hearing?

24          MR. HOWELL:  I think at the time I think their

25  thinking was that it would be presented after any revisions

1    that may come up in the course of this proceeding, in the

2    course of any negotiations, the Judge's ruling, that what we

3    would present to the emergency loan board would be that which

4    was final and concluded.  Whether that was a correct judgment

5    with the benefit of hindsight, is another question.  But that

6    was the thinking at the time that we would simply present what

7    was the final outcome as opposed to having to possibly go back

8    later if there were changes between what was approved earlier

9    and what ultimately --

10        THE COURT:  Someone actually made the decision to

11    potentially risk wasting the Court's time and all of the

12    attorney fees in this case?

13        MR. HOWELL:  That was -- that was certainly not --

14        THE COURT:  Should the loan board decide not to

15    approve whatever loan this Court approves?

16        MR. HOWELL:  That was not the intention, Your Honor.

17    The intention was not to show any disrespect to this Court.

18        THE COURT:  Well, it's not -- of course it wasn't

19    your intention, but that's the risk, right?

20        MR. HOWELL:  That is -- that is the risk.  We are

21    hopeful that will not happen, but that -- that is a risk that

22    exists, Your Honor, I can't change that.

23        THE COURT:  Well, let me just put it to you

24    directly.  Is there any reasonable likelihood that the loan

25    board would not approve the loan after this Court approves it?

1      MR. HOWELL:  Well, the question will be presented

2   and needs to be made.  That decision needs to be made in -- in

3   the meeting that is scheduled under the Open Meetings Act.

4   But I do not expect there -- we do not expect there to be an

5   issue, but that is -- that -- that decision has to be made at

6   that meeting at that time under the Open Meetings Act, Your

7   Honor.

8      THE COURT:  Well, but -- okay.  So suppose one or

9   more of the objecting parties here wish to address the loan

10  board with the same or perhaps even different issues on why

11  the loan board shouldn't accept it.  Will -- will -- will that

12  be permitted?

13     MR. HOWELL:  I suppose they -- I don't know the

14  procedure for presenting evidence at that hearing.  I don't

15  know that there is a procedure for presenting evidence.  But

16  if it is, I would -- I would expect that that board would be

17  before this Court.

18     THE COURT:  I wasn't asking about evidence, I was

19  just -- that's another question.  I was just asking about

20  whether parties are permitted to be heard on the issue of

21  whether the loan should be approved at that administrative

22  level.

23     MR. HOWELL:  It is an open -- it is an open meeting

24  under the Open Meetings Act.  So I suppose someone could come

25  in.  I -- I do not expect the members as constituted of that

1  board to disregard the Court's view of this when -- when the

2  ruling is completed.  And we are confident it will be -- be

3  approved, but we cannot say that or give any real guidance

4  prior to that meeting occurring.

5          THE COURT:  Is it your recommendation that the Court

6  proceed?

7          MR. HOWELL:  It is, Your Honor.

8          THE COURT:  Thank you, sir.

9          MR. HOWELL:  Thank you, Your Honor.

10          THE COURT:  One more moment, please.  At the

11  beginning of this case, I resolved to myself that I would

12  never have an off the record conversation with counsel because

13  the case is too public for that.

14     A circumstance, however, has arisen that has forced me to

15  reconsider that and so I want to see Ms. Ball and Ms. (sic)

16  Hackney at the side of the bench here right now.

17     (At Side Bar Off the Record at 9:09 a.m.; Resume at 9:10

18  a.m.)

19          THE COURT:  All right.  Let's proceed.

20          MR. HAMILTON:  Good morning, Your Honor.  Robert

21  Hamilton of Jones, Day on behalf of the City.  We're going to

22  continue with the direct examination of -- of James Doak.

23          THE COURT:  Sir, you are still under oath.  You may

24  be seated.

25          THE WITNESS:  Thank you.

1    (WITNESS JAMES DOAK WAS PREVIOUSLY SWORN)

2                    DIRECT EXAMINATION

3    BY MR. HAMILTON:

4    Q    Good morning, Mr. Doak.

5    A    Good morning.

6    Q    When we broke yesterday afternoon, evening we were on

7    City's Exhibit 88 which is the September 26th, 2013 financing

8    discussion dec that you testified you provided to Mr. Orr, the

9    City's CFO, and to then State Treasurer Andy Dillon.  And we

10   were on the second page of the dec which is up there on the

11   screen.

12       And I wanted to ask you, the first two columns after all

13   the names of the alternative lenders has a column that CA sent

14   and CA signed.  What does the CA refer to?

15   A    That refers to confidentiality agreement.  So the first

16   column is parties that received the confidentiality agreement

17   and then parties that returned it executed.

18   Q    And then the next column is 9-6 check in.  What is that?

19   A    For parties that received the introductory packet at the

20   -- at the commencement of the process.  We had asked them to

21   get back to us on the 6th of September to indicate whether they

22   were anticipating preparing a -- a term sheet or indication of

23   interest.

24   Q    Okay.  And then the next column has the label data room.

25   What is that?

1  A    We anticipated at the outset of the process that some of

2  the parties may ask for access to a data room and we -- this

3  column was intended to track those that -- that were admitted

4  into the data room.

5  Q    And if you go down to the -- the very bottom on that

6  column under the grand total which as I understand it combines

7  both the lenders on this page and the previous page, the

8  traditional lenders.  It has a total of eight out of 50 with

9  access to the data room, is that right?

10  A    That's correct.

11  Q    Why such a small number?

12  A    Of -- in the -- in the time frame of getting to the term

13  sheets, a number of the parties did -- did not request access

14  to the data room.  In -- they felt that they could produce the

15  term sheet without access to the data room and as a result

16  only -- only eight subsequently entered the -- the data room.

17  Q    Did they have discussions with you in -- in lieu of going

18  to the data room on other topics?

19  A    Yes, they did.  Most of our discussions with the parties

20  in advance of deliveries of the term sheet concerned

21  structuring of the -- structuring of the loan and the

22  provisions in the indicative term sheet.  Parties were less

23  concerned with the financial and operational data that was in

24  the data room that the City operated.

25  Q    Well, during those discussions with the lenders, both

1  before the 26th and after the 26th, what was the most important

2  areas of concerns that were expressed by the lenders to you?

3  A    The most -- the areas that were most frequently addressed

4  by the lenders were the state of the Chapter 9 filing and the

5  protections including collateral that the lenders would

6  receive in the -- in making the loan and how those protections

7  and collateral would be affected by various litigative

8  outcomes including the appeal of the Chapter 9 and a -- an

9  overturning of the -- the -- the Chapter -- Chapter 9 as well

10 as other issues associated with 436.

11 Q    And when you say the appeal of Chapter 9, do you mean the

12 appeal of the eligibility ruling for Chapter 9?

13 A    Yes.  The lenders were concerned that the Court's

14 decision on the eligibility of the city would be overturned in

15 the appellate process and at that point they would have a -- a

16 loan agreement that would potentially have state -- state

17 components and federal components, but the federal components

18 could be viewed as being inactive or not part of their loan

19 any longer.

20 Q    So how did the concern regarding loan structure and

21 collateral relate -- relate to the concern about the

22 possibility that the Chapter 9 eligibility ruling would be

23 reversed and this case would be dismissed?  How did those two

24 relate?

25 A    None -- none of the lenders felt comfortable in

1  proceeding forward.  None of them indicated to us that they

2  were -- were willing to proceed forward without -- and being

3  provided collateral and collateral that could be provided to

4  them under state law as well as -- as federal law.

5        MR. ARNAULT:  Objection, Your Honor.  That's

6  hearsay.

7        THE COURT:  Overruled.

8  Q    The last column on Page 2 of this dec is title -- not the

9  last column, second to last one is -- is term sheet.  What

10 does that refer to?

11 A    That refers to potential lenders who got back to us with

12 written indications of interest to participate in the

13 financing.

14 Q    Now in the -- if you look at the very bottom on that

15 column, the grand total is 15 out of 50.  Yet in the City's

16 motion and your declaration and -- and in some other testimony

17 we have indicated that we got a total of 16 term sheets, not

18 15.  Why does that say 15 but elsewhere we say 16?

19 A    Subsequent to the date of this document, CSG Investments

20 which also goes by the name Beal Bank in our process submitted

21 an indication of interest.

22 Q    And they're the one that's close to the middle of the

23 page there on the alternative lender's side, right?

24 A    That's correct.

25 Q    Okay.  All right.  So if we then go to the next page of

1  this exhibit, what does this page represent?

2  A    This page represents the comparative economics of solely

3  the -- the swap termination portion of the post-petition

4  financing amongst the various parties.

5  Q    And then the next page of the exhibit shows what?

6  A    The next page shows the same mathematics for the quality

7  of life component of the facility.

8  Q    And then Page 5 of the next page shows what?

9  A    Page 5 shows the comparative economics of the proposal --

10  proposals that we received for the entire financing and for

11  the total facility.

12  Q    Okay.  Now there's a -- there's a black bar down the

13  middle of this chart.  There's three potential lenders on the

14  left side of that -- of that black bar and there's five on the

15  right side.  What's the significance of that black bar?

16  A    At the time these were the three potential lenders that

17  we were recommending that we proceed forward with to

18  definitive commitment letters.

19  Q    The three to the left of the bar?

20  A    That's correct.

21  Q    And why -- why were you recommending proceeding with

22  those three and not with the other five?

23  A    We were recommending those three because of the -- their

24  -- all in terms of their -- their indicative term sheet,

25  including the -- the cost and other provisions as well as the

1  strength of the institutions.

2  Q   And if you'll look on the -- the -- under the Barclays

3  column, the second lender there to the left of the bar.  If

4  you go down to the -- the bottom totals on the difference from

5  lowest all in rate and difference from lowest all in expense,

6  dashes there for Barclays.  Why is that?

7  A   Because this -- this row showed sort of distance off the

8  lead.  And at this point Barclays was the lead and that they

9  were the lowest all in rate provider of financing.

10 Q   All right.  Now does this all in cost analysis reflect

11 the market flex provision that ultimately ended up in the

12 Barclays facility?

13 A   No.  No, it does not.

14 Q   Why not?

15 A   Because at -- at this time the indicative term sheet that

16 they provided us did not have a market flex provision.

17 Q   All right.  After you recommended to the -- I assume you

18 made your recommendation to Mr. Orr, the emergency manager.

19 I'm assuming the three to the left of the bar, is that right?

20 A   Yes, we did.

21 Q   All right.  After you made that recommendation, what did

22 you do?

23 A   We -- we indicated to those three institutions that we

24 would like to see from them definitive executable commitment

25 letters on -- on the lines of their indicative term sheets.

13-53846-swr  Doc 4310-9  Filed 12/29/14  Entered 12/29/14 22:00:03  Page 16 of 128  462
13-53846-swr  Doc 2350  Filed 12/26/13  Entered 12/26/13 21:20:03  Page 16 of 128
574

1   Q    And did you go after anybody else other than those three?

2   A    Subsequently we incorporated the syndicate of lenders led

3   by Carval which is the next -- the next column over.

4   Q    Why did you decide to do that?

5   A    Because we were not confident we would get to acceptable

6   commitment letters from all three of the -- the lenders.  We

7   had issues with -- individual issues with all of them, but --

8   but significant issues with Bank of America and with -- and

9   with Goldman.

10  Q    And so what were you -- what was your concern then as to

11  why -- why you needed to get someone else in -- in -- in the

12  room?

13  A    Our -- our concern was we were headed towards a one horse

14  race and that would give us very limited flexibility in case

15  for some reason we were not able to arrive at acceptable terms

16  with Barclays and recognizing that Carval was a close fourth.

17  We incorporated them back into the process.

18  Q    Let me ask you now about City Exhibit 89.

19       MR. HAMILTON:  And this too, Your Honor, is already

20  in evidence because it was not objected to.

21  Q    What is this document, Mr. Doak?

22  A    This was the briefing materials that we provided to the

23  emergency manager and -- and others providing the real time

24  status update on negotiating commitment letters and -- and the

25  form of the definitive commitment letters that we got back

1  from the four lead potential lenders.

2  Q    Did you also give this to then State Treasurer Andy

3  Dillon?

4  A    Yes.  The -- the working group was -- was the same set of

5  individuals.

6  Q    As the previous dec?

7  A    As the previous dec.  The Director of Michigan Finance

8  Authority, the Treasurer, CFO, other members of the EM staff.

9  Q    All right.  So if we go to the next page of this exhibit

10  which is Page 1 of the dec.

11  A    This is a comparison of the principal economic terms of

12  Barclays and Carval which were at that time developing into

13  our two lead potential commitment letters.

14  Q    And then on Pages 3 and 4 you got the same discussion

15  with respect of Bamil and Goldman Sachs, is that right?

16  A    That's correct.

17  Q    All right.  Go back to Page 1.  Under the Barclays

18  columns, halfway down there's a thing for market flex.  We now

19  have information there on the market flex.  Why is that?

20  A    In their definitive commitment letters, Barclays

21  incorporated in market flex terms into what they -- into their

22  overall commitment.

23  Q    Okay.  If we load to Page 5 of this exhibit, the one

24  that's labeled 5, what is this?

25  A    This is a -- this is a comparison of all in cost analysis

1  of the state of the four proposals.  And for Barclays and for

2  Goldman Sachs.  Both of those institutions anticipated

3  syndicating a portion of the loan subsequently.  So both of

4  them incorporated in market flex provisions to their -- their

5  commitment.  So we ran those proposals both at their, you

6  know, starting no flex point and also at their max flex point.

7  Q    All right.  If you go down to the very bottom, there's a

8  total annual expense row.  What's that?

9  A    Total annual expense was our mathematics for taking the

10  all in rate and incorporating in all of the fees associated

11  with the transaction as well as the interest rate and

12  calculating over a two year period what the raw dollar cost

13  would be of each one of these commitment proposals.

14  Q    All right.  And so if you look for under the max -- max

15  flex column for Barclays you get a total annual expense

16  calculation of 26.3, I assume that's million, is that right?

17  A    Yes.

18  Q    All right.  And that's lower than all the other figures

19  to the right, is that correct?

20  A    That's correct.

21  Q    So even if you get the max max max market flex for

22  Barclays it's still less expense to the City than the others?

23  A    That's correct, yes.  That was our conclusion.

24  Q    All right.  This is dated -- this -- this dec is dated

25  October 3rd, 2013 at 8:00 a.m.  What day of the week was that?

1   Is that Thursday?

2   A     That was Thursday morning.

3   Q     What happened on Friday and over the weekend?

4   A     Friday and over the weekend, we negotiated with Barclays

5   and their representatives to come to a final form of

6   commitment letter.  We also engaged in dialogue -- you know,

7   dialogue with Carval in regards to furthering on their --

8   their commitment as well.

9   Q     All right.  And did Barclays send you its commitment

10  letter, signed by the Barclays representative on Sunday the

11  6th?

12  A     Yes.  At each stage of the process we asked Barclays to

13  -- to bring down their commitment letter and provide us with a

14  executed copy.  This is our way making sure in our process

15  that what we had from them was what they were willing to sign.

16  Q     Now did Mr. Orr sign the document on Sunday evening the

17  6th when you got the signed ones, the signed letter from

18  Barclays?

19  A     No, he did not.

20  Q     All right.  What did you do on Monday the 7th?

21  A     On Monday the 7th, I met -- I start -- I met with members

22  of city council on a one on one basis to brief them on the

23  post-petition financing process and the fact that we would be

24  coming to them shortly with a financing proposal.

25  Q     All right.  And did you meet with each individual member

1   of the city council on Monday and Tuesday of that week?

2   A    Yes, I met with each member of city council on -- on

3   Monday and Tuesday, most on Monday.

4   Q    Was that just one meeting or was it individual meetings

5   with each one?

6   A    It was individual meetings with each one of the city

7   council members, all six.

8   Q    And in those individual meetings with each individual

9   member of the city council, did you provide them with any

10  written materials to explain the process in the terms of the

11  commitments that you had received?

12  A    Yes, we did.  Or yes, I did.

13  Q    All right.  I'd like to ask you about City Exhibit 90,

14  Mr. Doak.  What is this document?

15  A    The -- this is the presentation, the physical briefing

16  materials that I provided to each member of the city council

17  in the one on one meetings that I held with them on October 7th

18  and October 8th.

19       (City's Exhibit 90 was identified)

20  Q    And did you discuss the contents of this document with

21  each member of the city council?

22  A    Yes, I did.

23  Q    During those meetings?

24  A    Yes, I did.

25       MR. HAMILTON:  Your Honor, I would -- the City would

1   move Exhibit 90 into evidence.

2          THE COURT:  Any objections?  It is admitted.

3          (City's Exhibit 90 was admitted)

4   Q    If you'll look at what's numbered Page 4 on this dec,

5   which makes it the fifth page in, next page.  There you go.

6   If you look at the bullet that starts with this confidential

7   process.  Do you see that, Mr. Doak?

8   A    Yes.

9   Q    Could you read that, please?

10  A    This confidential process resulted in a competitive

11  financing commitment on the most favorable terms available in

12  the market.

13  Q    What were you referring to with the phrase, a competitive

14  financing commitment in this bullet?

15  A    I was referring to the -- the -- the deal that we -- we

16  had in hand from Barclays.

17  Q    If we turn to the next page of the exhibit, what does

18  this page show?

19  A    This page shows the savings, the opportunity to the City

20  from -- from moving forward with the -- with the termination

21  of the swaps and putting in place the post-petition financing.

22  Q    All right.  And in the middle column it says annual cost

23  of -- of swap termination load.  And then in Italics it says,

24  indicative all in interest rates.  Do you see that?

25  A    Yes.

1  Q    What -- what did you tell the city council members was

2  meant by indicative all in interest rates?

3  A    I -- we told them that indicative all in interest rates

4  was meant to represent both the interest rate components which

5  could be a base rate plus a -- plus a -- plus a lift.  As well

6  as the fees associated with the deal.  So it's consistent with

7  the all in economics concept.

8  Q    So it includes both the potential interest rates and the

9  fees involved with the loans, is that correct?

10 A    That's correct.

11 Q    All right.  How did you -- why did you choose the ranges

12 that are in here 5 to 9% to discuss with the members of city

13 council?

14 A    I chose the -- the ranges here because I knew that the

15 financing proposal that we had was well within the bounds of

16 this range and I could represent to council members that the

17 financing proposal that we had was within this range without

18 disclosing the specific economics.

19 Q    All right.  So earlier you said it was the interest rate

20 plus a lift is the term you used.  Did you tell each

21 individual council member that there was a market flex

22 provision in the commitment?

23 A    I -- I -- I don't recall whether I discussed market flex

24 with them at -- at this time.

25 Q    But you did tell them that the potential interest rate

1  all in would be somewhere in the range of 5 to 9%, is that

2  right?

3  A    Yes.  I told -- I told them that this range was a -- was

4  an appropriate range and the financing was going to be well

5  within this -- the range that was presented to them.

6  Q    All right.  I'd like now to ask you, Mr. Doak, about City

7  Exhibit 96.  Are you familiar with this document, Mr. Doak?

8  A    Yes.

9  Q    What is it?

10 A    This is the letter from Kevyn Orr to then Treasurer Andy

11 Dillon requesting his approval as is required under 436 for

12 Kevyn to execute the commitment letter, the Barclays

13 commitment letter to proceed forward with the financing.

14    (City's Exhibit 96 was identified)

15 Q    And was this document actually sent to Treasurer Dillon?

16 A    Yes, it was.

17       MR. HAMILTON:  Okay.  Your Honor, the City would

18 move Exhibit 96 into evidence.

19       THE COURT:  Any objections?  It is admitted.

20    (City's Exhibit 96 was admitted)

21 Q    Did you have -- and if we look -- if you'll look at the

22 third page of this exhibit.  And this is an attachment to what

23 the letter that was sent to Mr. Dillon, is that right?

24 A    Yes.

25 Q    And what is this document?

1  A    This is the -- this is the fee letter which is one

2  component of the documentation that we were required to

3  execute at that time to proceed forward.

4  Q    If you'd go to Page 5 of that fee letter.  You'll see --

5  go back one, please.  There -- this -- this fee letter is

6  signed by Barclays, is that right?

7  A    Yes, it is.

8  Q    By Gerbino?

9  A    Yes.

10 Q    And it's not signed yet by -- by Mr. Orr on behalf of the

11 City of Detroit, is that right?

12 A    That's correct.

13 Q    And then the next document that's attached is what is

14 that?  The next -- there we go.  What is that?

15 A    This is the commitment letter for the financing.

16 Q    And if you go to the last page of that document which is

17 Page 10, the signature page, you'll see that one is signed

18 also by Barclays?

19 A    Yes.

20 Q    But not yet signed by Mr. Orr, is that correct?

21 A    That's correct.

22 Q    And this is on Tuesday the 8th when it was sent to Mr.

23 Dillon?

24 A    That's -- yes.

25 Q    All right.  Did you have a discussion with Mr. Dillon

1  about this document, this package on Thursday evening the --

2  the 10th?

3  A     Yes, we did.

4  Q     And I'd now ask you to look at City Exhibit 97.  What is

5  this document, Mr. Doak?

6  A     This is the response that we received from Treasurer

7  Dillon coming out of the prior night's conference call when we

8  asked for his approval for Kevyn Orr to execute the commitment

9  documentation for the Barclays loan and --

10      (City's Exhibit 97 was identified)

11  Q     Is this document Mr. Dillon's approval of the loan and

12  the -- and authorization for the City to enter into the

13  commitment?

14  A     Yes.

15         MR. HAMILTON:  Your Honor, the city would move City

16  Exhibit 97 into evidence.

17         THE COURT:  Any objections?  It is admitted.

18      (City's Exhibit 97 was admitted)

19  Q     And again this exhibit is dated October 11th, that's

20  Friday, right?

21  A     Yes.

22  Q     All right.  So let's look at City Exhibit 94 then.  This

23  is a copy of the commitment letter from Barclays, right?

24  A     Yes.

25      (City's Exhibit 94 was identified)

1  Q    And if you look at the signature -- signature page which

2  is ten pages in, I believe, right there.  We see that it's

3  executed by Kevyn Orr on behalf of the City of Detroit, is

4  that right?

5  A    Yes.

6  Q    When did Mr. Orr sign this document?

7  A    He signed it on the 11th.

8  Q    After you received the approval from Mr. Dillon?

9  A    Yes.

10         MR. HAMILTON:  And, Your Honor, Exhibit 94 is

11  already into evidence, it wasn't objected to.

12         THE COURT:  Thank you.

13  Q    Mr. Doak, could you explain to the Court why the City

14  agreed -- why it entered into the commitment letter and agreed

15  to pay the commitment fee to Barclays before it obtained

16  approval from the Bankruptcy Court of this transaction?

17  A    We -- we moved forward with executing the commitment

18  letter because it was an integral part of the overall Barclays

19  financing.  And it was -- which was the lowest overall cost to

20  the city.  And we were -- would not have the ability to

21  proceed forward with negotiating definitive documentation with

22  Barclays unless we executed the commitment letter.

23  Q    Why did the city --

24         MR. HAMILTON:  Your Honor, I -- I misspoke.  There

25  was an objection to Exhibit 94 which was the signed commitment

1  letter.  The objection was that it's duplicative.  We couldn't

2  find it elsewhere, so we don't think it's duplicative.  But I

3  misrepresented it, it has not been entered into evidence yet.

4  So we would move it into evidence.

5          THE COURT:  Thank you.  Any objections?  Let's just

6  restate for the record what Exhibit 94 is.

7          MR. HAMILTON:  Is -- Exhibit 94, Your Honor, is the

8  commitment fee letter that is executed by both Barclays and by

9  Mr. Orr on behalf of the City of Detroit.

10          THE COURT:  Thank you.  Any objections?

11          MR. MARRIOTT:  I want to just clarify the commitment

12  fee letter, or the commitment letter?

13          MR. HAMILTON:  It's titled commitment letter.  The

14  fee letter is a separate document.

15          MR. MARRIOTT:  Right.  Okay, I just wanted to

16  clarify.  No objection.

17          THE COURT:  It is admitted.

18      (City's Exhibit 94 was admitted)

19  Q    Mr. Doak, can you explain to the Court why the city

20  ultimately decided to select Barclays over all the other

21  potential lenders?  What's -- what's advantageous about the

22  Barclays financing facility?

23  A    The -- the Barclays facility was advantageous over the

24  others because it presented the city with the best overall

25  economics and it was a -- and it was a fully underwritten

1    commitment by a major financial institution that we felt

2    confident would be able to complete the transaction.

3        In addition the other terms that Barclays negotiated for

4    in our process were ones that we felt we were capable of

5    performing -- performing on in the time allotted.  That

6    includes the collateral provisions that they -- that they

7    requested.

8    Q    What was particularly attractive about the collateral

9    provisions in the Barclays financing proposal that you

10   ultimately were able to negotiate?

11   A    The -- the Barclays proposal worked with the indicative

12   term sheet that we provided and was -- and they were willing

13   to move forward with the -- the limited collateral interest

14   that we suggested that the lenders would receive on gaming

15   revenue and income tax revenue.

16       The other proposals that we received most -- all the

17   other proposals were -- were much more complex in regards to

18   what collateral interest parties were looking for.

19   Q    And under the Barclays proposal that you were able to

20   negotiate, what happens with respect to the collateral if the

21   city is unable to get exit financing and the city ends up

22   defaulting at the end of the term of this loan?

23   A    The -- Barclays has limited rights under the documents to

24   -- to utilize up to $4,000,000 a month of gaming tax revenues

25   and $4,000,000 a month of income tax revenues to pay default

1   interest and amortize their position down.  They -- they don't

2   have -- they don't have more expansive rights to the tax

3   streams of the city.

4   Q    So they can't -- can Barclays if -- if the city defaults,

5   can Barclays demand immediate payment of the entire

6   outstanding balance in full and collect the collateral to do

7   that?

8   A    No, that's -- that's not within their rights under the

9   documents.

10  Q    All right.  And is the city confident that in the event

11  it defaults, can't obtain exit financing, it will be able to

12  afford the amortized pay down of the loan in a default status

13  going forward?

14  A    It will require some very difficult choices, but the --

15  but the city is -- is confident that it can -- it can still

16  operate and perform under those terms.

17  Q    If I could ask you, sir, now to look at City Exhibit 98.

18          MR. HAMILTON:  And again, Your Honor, this is a

19  document that is -- that is already in evidence because it was

20  not objected to.

21  Q    Mr. -- Mr. Doak, can you tell us what this document is?

22  A    This is the submission of the post-petition financing to

23  -- to the city council.

24  Q    Was this document in fact -- and its attachments provided

25  to the city council?

1  A    Yes, it was.

2  Q    Okay.  And then if I could ask you, sir, what happened

3  after you submitted the -- the package that included the --

4  the financing proposal and the related letters?  What happened

5  with respect to the city council after you submitted them?

6  A    The city council requested a -- a briefing on the -- on

7  the post-petition financing, so we -- and we provided them

8  with a closed meeting briefing in the subsequent week.

9  Q    And did you attend that meeting?

10  A    Yes, I did.

11  Q    And did you physically provide them with the dec that

12  they requested?

13  A    Yes.  We -- we provided them with briefing materials in

14  the context of that meeting.

15  Q    All right.  If I can ask you, sir, to look at City

16  Exhibit 91.  What is this document?

17  A    These are the briefing materials that we provided to city

18  council in their closed session on the afternoon of October

19  17th.

20     (City's Exhibit 91 was identified)

21     MR. HAMILTON:  Okay.  Your Honor, the -- the city

22  would move Exhibit 91 into evidence.

23     THE COURT:  Any objections?

24     MR. MARRIOTT:  Your Honor, no objection to admission

25  of this exhibit for purposes of indicating what was provided

1  to city council.  There are projections on the back that we

2  lodged objections to yesterday as to their relevance and

3  whether they should be admitted for the truth of the material

4  information contained therein.  But as to -- to the extent the

5  city, and I assume this is true, was using this exhibit for

6  purposes of showing what was provided to city council, no

7  objection.

8          THE COURT:  Is that the purpose of the exhibit, sir?

9          MR. HAMILTON:  That is correct, Your Honor.

10         THE COURT:  All right.  For that limited purpose,

11 Exhibit 91 is admitted.

12     (City's Exhibit 91 was admitted)

13 Q    Mr. Doak, if you'll look at Page 6 of this dec.  Under

14 the -- in the row that's got the heading of pricing, second

15 from the bottom.  The second bullet refers to the market flex

16 provision, or market flex provisions.  Do you see that?

17 A    Yes.

18 Q    What was -- what was discussed with council in the closed

19 session on the 17th regarding this -- this provision?

20 A    We informed them that there was a -- there was a market

21 flex provision in the -- in the Barclays commitment that gave

22 Barclays the -- the flexibility within specific limits to

23 modify the -- the interest rate component of the -- the

24 financing in order to syndicate out a -- a given portion of

25 the overall loan.

1    Q    During that closed session, did you expressly state what

2    the maximum cap was on the market flex?

3    A    No, we did not.

4    Q    Why not?

5    A    Because that's the -- because it was important to not

6    convey the market flex including what the max is in a -- in a

7    forum that could eventually be public because that would

8    defeat the -- the purpose of having the -- the -- the market

9    flex provision.  Financing would likely move to the -- to the

10   all in rate.

11   Q    Now had you already discussed with each of the individual

12   city council members what the interest -- potential interest

13   rate range would be as a result of the market flex?

14   A    In -- in the one on one sessions with the council

15   members, for those who -- who asked about the pricing, we --

16   we had conveyed that the -- that the commitment was -- was

17   well within the range that we had provided which was the 5% to

18   the -- to the 9%.

19   Q    Okay.  Did you also discuss at the closed session with

20   city council, the commitment fee that the city had agreed to

21   pay to -- to Barclays?

22   A    Yes, we did.

23   Q    Did you disclose the amount of that fee during your

24   discussions?

25   A    Yes, we did.

1  Q    What happened after the closed session with city council?

2  What did city council do?

3  A    City council provided us with a -- the staff provided us

4  with a list of questions that we had to respond to over the

5  weekend.

6  Q    And after you responded to those questions what did the

7  council do?

8  A    The council subsequently did not approve the -- the

9  post-petition financing.

10 Q    Is city council approving -- is city council approval of

11 the facility a condition, a closing condition to the facility?

12 A    No.

13 Q    Do you have an understanding as to why it's not a

14 condition to closing?

15 A    The state public law 436 provides for how the City of

16 Detroit operates in the -- in the installation of emergency

17 manager.  And subsequent to a disapproval by city council

18 there is an opportunity for them to provide an alternative and

19 then from there there is a -- there is an emergency loan board

20 decision that can be made to determine what goes forward.

21 Q    Mr. Doak, do you have an opinion as to whether based on

22 the process that you -- you employed and directed, whether or

23 not the post-petition financing facility that the city has

24 agreed to with Barclays, has been substantially and adequately

25 tested by the market?

1  A    Yes, I do.

2  Q    What is your opinion?

3  A    My opinion is that the Barclays financing is the best

4  available to the city under present circumstances and it has

5  been adequately and appropriately tested by a robust

6  competitive and market based solicitation process.

7  Q    And is it your opinion it's the best facility available

8  to the city even if the maximum market flex provision is --

9         THE COURT:  Would you not ask a leading question on

10  this point?

11         MR. HAMILTON:  Sure.

12  Q    Do you have an opinion as to whether or not this facility

13  is the best available to the city even if the market flex

14  provision is fully implemented?

15  A    Yes.

16  Q    What is your opinion?

17  A    My opinion is that even if the market flex provision is

18  fully executed, this is the -- this is the best available

19  financing to the city right now given the circumstances and we

20  have the benefit of knowing from a very competitive process of

21  soliciting a -- from a wide range of financing providers what

22  other economics and associated terms was available.  And I'm

23  confident that even with market flex, no party was -- was

24  willing to provide comparative overall and better terms.

25  Q    And Mr. Doak, do you have an opinion as to whether

1 | unsecured financing is available to the city in this Chapter 9

2 | case?

3 | A    Yes, I do.

4 | Q    What's your opinion?

5 | A    My opinion is that unsecured financing is not available

6 | to the City of Detroit at this time given its current

7 | circumstances.

8 |           MR. HAMILTON:  I have no further questions, Your

9 | Honor.

10 |                CROSS EXAMINATION

11 | BY MR. ARNAULT:

12 | Q    Good morning, Mr. Doak.  How are you?

13 | A    Good morning.

14 | Q    Again, my name is Bill Arnault and I represent Syncora.

15 | I'd like to begin by discussing the initial proposal that you

16 | sent out to prospective lenders regarding the DIP financing.

17 | So the initial proposal that you sent out contemplated that

18 | the DIP financing would be secured, correct?

19 | A    Yes.

20 | Q    And the collateral that the city included in its initial

21 | proposal was income tax revenue, asset proceeds, and the

22 | casino revenues, correct?

23 | A    Yes.

24 | Q    And you would agree with me -- agree with me that it

25 | would be unlikely that a potential lender would remove

1  protections that went out with the city's initial proposal,

2  right?

3  A    I would agree.

4  Q    And as part of this solicitation process, you did not

5  send out a solicitation document that asked parties to return

6  bids for unsecured financing, right?

7  A    No, we did not.

8  Q    And you did not personally ask any prospective lender if

9  it would make the DIP loan on an unsecured basis, right?

10 A    I did not ask that particular question.

11 Q    Now yesterday on direct you testified that you had some

12 discussions with potential lenders before you filed for

13 bankruptcy.  Do you remember that testimony?

14 A    Yes.

15 Q    And you testified that you had conversations with

16 Deutsche Bank, Wells Fargo, Citibank, and JP Morgan, right?

17 A    That's correct.

18 Q    And as we learned yesterday as part of these discussions,

19 you identified four distinct revenue streams that could be

20 used as security to secure any potential lending facility,

21 right?

22 A    Yes.

23 Q    I'd now like to move to your discussions with the city

24 council regarding the Barclays DIP.  As you testified earlier,

25 the Barclays DIP is subject to market flex, right?

1  A    Yes.

2  Q    And as part of this market flex provision, the libor

3  floor can flex up from 1% to 2%, right?

4  A    That's correct.

5  Q    And the spread over libor can flex up from 2.5% to 4.5%,

6  right?

7  A    Yes.

8  Q    So the minimum interest rate on the DIP loan could go as

9  high as 6.5%, right?

10  A    Yes.

11  Q    And as part of the fee letter, Barclays has what is

12  defined as a successful syndication target, isn't that right?

13  A    That's correct.

14  Q    And the terms in the market flex provision allow them to

15  reset the interest rate on the entire loan within the market

16  flex parameters, right?

17  A    Yes, under particular conditions.

18  Q    So for example if Barclays discovers that the only

19  interested takers of the loan are willing to loan –– or

20  willing to take it at 5%, the portion of the loan that is also

21  retained by Barclays also resets to 5%, right?

22  A    If they retained that portion of the loan, yes.

23  Q    Okay.  And the Barclays DIP also contains a commitment

24  fee, isn't that right?

25  A    Yes.

1   Q    And the commitment fee is due regardless of whether or

2   not this deal ever closes, right?

3   A    Yes.

4   Q    And you've already paid half of this commitment fee,

5   correct?

6   A    No, we've paid all of it.

7   Q    Okay.  Okay.  And the terms of the market flex provision

8   and the commitment fee are set forth in the fee letter,

9   correct?

10  A    Yes.

11  Q    And of course the market flex and the commitment fees

12  impact the ultimate cost of the Barclays DIP, right?

13  A    Yes.

14  Q    And when you were evaluating the various proposals, one

15  of the items that you evaluated was the interest rate, right?

16  A    Yes.

17  Q    So interest rate is a factor in evaluating the

18  attractiveness of a particular loan, correct?

19  A    Yes.

20  Q    And you would agree with me that pricing was an important

21  factor when you were evaluating the various proposals, right?

22  A    Yes, it was.

23  Q    In fact you would not have been in a position to

24  recommend the transaction to Mr. Orr if you were not aware of

25  the specifics of the market flex provision, right?

1  A    I think that's correct, yes.

2  Q    Now as you've testified, you said that you eventually

3  submitted the Barclays proposal to city council, right?

4  A    Yes.

5  Q    And under PA 436, if the city council disapproved the

6  Barclays DIP, it then had seven days to submit an alternative

7  proposal that would yield substantially the same financial

8  result or even a better one, right?

9  A    I -- I don't think that's how 436 is written.  They have

10  seven days to submit an alternative proposal.

11  Q    That would yield substantially the same financial result?

12  A    That's not how 436 is written.  They have seven days to

13  submit an alternative proposal.

14  Q    And after you submitted the proposal you had several

15  discussions with the city council members, correct?

16  A    I have -- I'm a little lost on the chronology.  Could --

17  could you provide some --

18  Q    Sure, sure, sure.  So after you submitted the proposal to

19  the city council, you had several discussions with city

20  council members, correct?

21  A    No.

22  Q    You didn't have any discussions with city council members

23  after you submitted the proposal to the city council?

24  A    After we submitted the executed commitment letter to

25  council we had a closed door session with the city council in

1  full.

2  Q    And this is a closed door session, correct?

3  A    Yes.

4  Q    So it was not subject to the Open Meetings Act, correct?

5  A    Well, I -- I'm not familiar with every aspect of the Open

6  Meetings Act, but my understanding was that because this was

7  associated with litigation on a number of levels, the city

8  council and their legal advisors determined that a closed

9  meeting was appropriate.

10  Q    Okay.  And at this closed meeting, the substance of the

11  market flex provision was not provided to the city council,

12  right?

13  A    No, it was not.

14  Q    I'm sorry.  It was not provided, correct?

15  A    That's correct.

16  Q    Okay.  But isn't it true that after you had this closed

17  door meeting that the city council had additional questions

18  about the key terms of the Barclays DIP?

19  A    The staff provided us with a list of questions that they

20  asked Jones, Day and Miller, Buckfire to answer.

21  Q    Okay.  And if we could turn to Syncora Exhibit 233.

22        MR. ARNAULT:  I believe this has already been

23  admitted into evidence.  Can we bring it up, please?

24  Q    Now Syncora Exhibit 233 is an October 20ᵗʰ, 2013 email

25  attaching responses to questions for the city council,

1  correct?

2  A    Yes.

3  Q    And you are a recipient of this email, right?

4  A    Yes.

5  Q    And this document contains responses to the city

6  council's inquiries regarding the post-petition financing,

7  correct?

8  A    Yes.

9  Q    If we could turn to Page 7 of this document, please.

10 Sorry, next page, please.  Yeah.  And if we look at question

11 13, you'll see that the city council asked whether there are

12 any other key terms that the city council should be aware of.

13 Do you see that?

14 A    Yes.

15 Q    And in response the city notes that the primary terms of

16 the financing are in the term sheets, correct?

17 A    Yes.

18 Q    And the city notes the existence of market flex but does

19 not actually disclose the specific terms of the market flex,

20 correct?

21 A    Yes.

22 Q    Now, Mr. Doak, on redirect -- or on direct, you were

23 asked why you did not disclose the terms of the market flex to

24 the city council.  And you stated that you did not want the

25 terms to get out into the market, correct?

13-53846-swr  Doc 2296-9  Filed 12/27/13  Entered 12/27/13 21:20:33  Page 42 of 128
574
13-53846-swr  Doc 2390-9  Filed 12/20/13  Entered 12/20/13 21:20:03  Page 488 of 128    488

 1  A     That's correct.

 2  Q     But I think as we established, this was actually a closed

 3  door meeting, correct?

 4  A     That's correct.

 5  Q     Can we bring up Exhibit 94, please?  I believe this has

 6  also been admitted into evidence.  City Exhibit 94 please.

 7  This is the commitment letter with Barclays, correct?

 8  A     Yes.

 9  Q     And this document actually sets forth the conditions

10  under which you may disclose the fee letter, right?

11  A     Yes.

12  Q     And if we could turn to Page 6, please.  And if you'll

13  look at Section 8, that actually set forth the conditions

14  under which you may share the commitment letter and the fee

15  letter, correct?

16  A     Yes.

17  Q     And little (I) there, states that the commitment and fee

18  letters may be disclosed to the City of Detroit's agents,

19  representatives, officers, directors, and advisors on a need

20  to know basis to the extent you notify such persons of this

21  obligation to keep those documents confidential, correct?

22  A     Yes.

23  Q     And the section also states that the fee letter may be

24  disclosed to the extent required pursuant to applicable law,

25  including any disclosures required to be made to the city

1 | council, correct?

2 | A    It doesn't say that.  What --

3 | Q    I think we go to the next page, please.  Yeah, right at

4 | the top there.

5 |      And we see notwithstanding any of the foregoing with

6 | respect to any disclosures regarding the commitment letter or

7 | the fee letter to the city council or any local emergency

8 | financial assistance loan board as may be required under

9 | Michigan PA 436, or Section 36(a) of the Michigan Home Rule

10 | Act, correct?

11 | A    Okay.

12 | Q    Okay.  And you would agree with me that the city council

13 | are duly elected representatives of the City of Detroit,

14 | correct?

15 | A    They are -- they are -- yes.  They're -- well, I can't

16 | tell you exactly how they fit into the architecture of

17 | governance under 436 at this point, but they're certainly

18 | elected individuals into the city council provisions.

19 | Q    Sure.  Okay.  Moving along, have you ever used the -- the

20 | forward libor curve to take the swaps all the way out to

21 | completion?

22 | A    I think you're asking have I looked at the libor curve

23 | and understand what the implications are and in regards to the

24 | size of payments throughout the entire remaining life,

25 | technical life of the swap.

1  Q    Yes.

2  A    So I have an understanding of that.

3  Q    Okay.  And have you -- have you -- have you done that?

4  A    I -- I -- I have not performed the -- the mathematics.

5  We have others on our team that have.

6  Q    But you have an understanding of what that shows?

7  A    Yes.

8  Q    Similarly with respect to the -- the DIP financing, have

9  you done the same thing?  Have you used the forward libor

10 curve to take -- to take that all the way out?

11 A    Yes.

12 Q    Okay.  And have you compared the two results, the swaps

13 versus the DIP financing to see what that shows?

14 A    No.

15 Q    No.  So you don't know whether the net present cost of

16 the swaps is actually lower than the net present cost of the

17 DIP financing?

18 A    No, I'm -- I think there's a couple problems with your

19 question.  Because as it stands the swaps are in default right

20 now.  So I would -- I would challenge the assumption that you

21 should be looking at the swaps as if they will exist in their

22 current position in place over the next 20 to -- 20 to 30

23 years.  And we -- but we do know that the mark to market

24 liability, the net present value of those -- that swap

25 obligation, you know, comes to the tune of 280,000,000 to

1  $290,000,000 in -- in recent times looking at the libor curve.

2      The economic cost of the swap termination portion of the

3  loan is significantly lower because the principal balance of

4  the loan will be 25 to 18% less and in addition the -- the

5  near term cost on a month to month basis is lower.

6  Q    Okay.  So it sounds like you haven't actually compared --

7  I mean it sounds like you haven't actually compared whether

8  the net present cost of the swaps is lower over time than the

9  net present cost of the DIP financing, is that right?

10 A    Based on --

11 Q    Assuming that the swaps are not terminated.

12 A    Well, the swaps are in default so one would -- one would

13 have to -- one would have to question how -- whether that

14 would be an appropriate analysis to perform.

15 Q    But it's not an analysis that you performed, correct?

16 A    We -- it's -- that is not a particular analysis that --

17 that I had performed.  We do know what the overall economic

18 cost is of the swaps to the end of the life.  Effectively

19 that's the mark to market liability.

20        MR. ARNAULT:  Okay.  No further questions, Your

21 Honor.

22                   CROSS EXAMINATION

23 BY MR. MARRIOTT:

24 Q    Good morning, Mr. Doak.

25 A    Good morning.

1  Q   Vince Marriott of Ballard, Spahr representing EEPK and

2  affiliates.  I have just a few questions for you.  You

3  indicated in your response to previous questions that you did

4  not personally call any potential post-petition lender to ask

5  if they would provide to the city unsecured credit, correct?

6  A   Yes.

7  Q   Yes, that's correct?

8  A   Yes, that -- that's correct.  That would not --

9  Q   I just want to make sure the answer doesn't come in

10 ambiguously.

11 A   Okay.

12 Q   My understanding is that you led the efforts of the city

13 to find post-petition financing, correct?

14 A   Yes, I executed most of the activities and -- and led the

15 process.

16 Q   Okay.  Did you direct anybody else to contact a

17 prospective lender or lenders to ask if they would provide to

18 the city unsecured credit?

19 A   No, I did not.

20 Q   Did anybody do that anyway and report to you the answer?

21 A   Not to my knowledge, no.

22 Q   If we could bring up briefly City 90.

23        THE COURT:  I'm sorry, sir, what number?

24        MR. MARRIOTT:  I'm sorry, City 90.

25 Q   And if we could turn to the -- well, the sixth page

1  including the cover page.  Thank you.  Now if I understood

2  your previous testimony, Mr. Doak, Exhibit 90 was a

3  presentation that you provided to the members of city council,

4  correct?

5  A    Yes.

6  Q    And these were the briefing materials from which you

7  spoke when you met with each of the city council members

8  individually?

9  A    Yes.

10 Q    And your testimony was that in the context of those

11 discussions, you did not indicate to members of city council

12 at least what the substance of any market flex provision would

13 be, but you did provide them with a range of interest rates

14 that could apply to the post-petition financing, is that

15 correct?

16 A    That's correct.

17 Q    And -- and that's what this page reflects, that range of

18 interest rates that you provided to them?

19 A    Yes.  This reflects a range of all end costs for the

20 facility.

21 Q    Okay.  And -- and it could run according to this chart

22 from a low of 5% up to 9%, correct?

23 A    Yes.

24 Q    So the range that you provided to them was one at the low

25 -- the high end was almost twice what the low end was,

1  correct?

2  A    Yes.

3  Q    Now if we could turn to City Exhibit 89.  And -- and

4  first let me just -- well, I understood your earlier

5  testimony, this presentation was provided to among others,

6  emergency manager Orr, correct?

7  A    Yes.

8  Q    And is it fair to say that this presentation was provided

9  to emergency manager Orr to assist him in evaluating the

10  relative merits of the four commitment letters that the city

11  received?

12  A    Yes.

13  Q    Okay.  And if you would flip to the last page of this

14  exhibit.  This is the all end cost analysis whereby the -- the

15  various potential costs of the facilities contemplated by

16  those four commitment letters, was provided to Mr. Orr,

17  correct?

18  A    Yes.

19  Q    With the contemplation that he would use this information

20  to assist him in deciding which if any of these commitment

21  letters to -- or the -- which of any of these commitments to

22  proceed with, correct?

23  A    Yes.  We -- we were not asking him to make a definitive

24  decision at that particular meeting.  But this was to advise

25  him as to the comparative economics of the proposals at that

1  time.

2  Q    Okay.  Now in providing information to Mr. Orr, you

3  didn't provide a range of potential interest rates from 5 to

4  9%.  You provided the actual potential interest rates, market

5  flex, and all under each of the commitments that the city had

6  in hand at that time, correct?

7  A    Yes.

8  Q    Would you have considered yourself adequately advising

9  him on the potential costs of these facilities if instead of

10  giving him the actual interest rates you just gave him a

11  range?

12  A    No.

13  Q    And I believe you also testified on direct that you gave

14  -- you gave two, unless I missed one, two principal reasons

15  for ultimately recommending the Barclays loan to Mr. Orr.  The

16  first you gave was the best economics, correct?

17  A    Yes.

18  Q    Okay.  And this last page of City 89, is a summary

19  depiction of the economics, correct?

20  A    Yes, it is.

21  Q    The second reason you gave if I heard you correctly was

22  that Barclays number one was undertaking to fully underwrite

23  the facility and they were an institution that could -- you

24  felt could close, correct?

25  A    Yes.

1 Q    Okay.  And -- and there was a third and I have trouble

2 reading my own notes, you found the collateral provisions of

3 the Barclays facility to be the most favorable of the

4 commitments you received?

5 A    We -- we did, yeah.  We -- the Barclays facility was the

6 best overall financing that the city had available given all

7 the elements of the commitment.  The economics, the collateral

8 terms, the other lender protections, where they were willing,

9 where we resolved issues and associated with legal opinions,

10 it -- it was the best overall proposal that the city had

11 available.

12        MR. MARRIOTT:  Nothing further.

13                    CROSS EXAMINATION

14 BY MS. GREEN:

15 Q    Good morning, Mr. Doak.  I'm Jennifer Green on behalf of

16 the Retirement Systems for the City of Detroit.

17 A    Good morning.

18 Q    As you understand it the funds related to the quality of

19 life note will be deposited in one lump sum, correct?

20 A    Yes.

21 Q    And those funds will be deposited into the city's general

22 fund account, not into a special re-investment account,

23 correct?

24 A    My current understanding is that it will be deposited

25 into a -- an account that would be appropriately accounted for

```
 1  as a general fund account, however, it most likely will be

 2  deposited into a specific segregated bank account.

 3  Q    And the funds from the quality of life note are not

 4  earmarked for a particular purpose though, correct?

 5  A    They are not earmarked for a particular purpose.

 6  Q    And you can't answer why the city will not commit to

 7  using those proceeds for a particular purpose, correct?

 8  A    I -- I don't -- sorry, can you ask that question again?

 9  Q    You cannot answer why the city will not commit to using

10  the proceeds for a particular purpose, correct?

11  A    I -- I can provide you an answer.

12  Q    What's that?

13  A    I think the -- the -- the number of different projects

14  and revitalization needs that the city has right now are --

15  are extensive and I believe that there is some flexibility

16  that's desired by the -- by the leadership team to deploy the

17  capital in the most efficacious purposes.  And those

18  determinations will most likely be made on a real time basis.

19  Q    Mr. Doak, do you remember being -- being deposed on

20  December 5th of 2013?

21  A    Yes.

22        MR. HAMILTON:  Your Honor, I'm going to object to

23  the relevance of this whole line of inquiry.  I believe you

24  ruled on Friday this isn't relevant.

25        MS. GREEN:  His answer, Your Honor, was actually not
```

1  what I was looking for, that's why I'm bringing up his

2  deposition.  He answered differently at his deposition.

3  That's -- that's why.  I'm not going into the --

4           THE COURT:  So you want to impeach him on an

5  irrelevant point?

6           MS. GREEN:  No.  I -- I -- I didn't think he was

7  going to answer with the purpose.  He said something different

8  about where the funds were going to be deposited in general.

9  I didn't expect him to say anything about the re-investment

10  structure.

11          THE COURT:  Why do we care where the funds will be

12  deposited?

13          MS. GREEN:  Pardon me?

14          THE COURT:  I'm sorry.  Where do we care about where

15  the funds will deposited?

16          MS. GREEN:  He testified previously that they would

17  be deposited into the general fund and that they would not be

18  earmarked for any particular re-investment purpose.

19          THE COURT:  Right.  Why do we care about that?

20          MS. GREEN:  It's not related to what I take his

21  objection to be.  Under the city's proposed order, they are

22  asking for certain findings of fact and conclusions of law

23  relating to the validity of the collateral with respect to the

24  quality of life note.

25          The collateral is the casino revenue and as you are aware

1   several parties have objected to the legality of that

2   collateral.  In order to find -- for this Court to find that

3   that collateral is a valid pledge, I believe that the use of

4   the proceeds for proceeds approved under the gaming act is

5   still a relevant issue, setting aside what the objection is.

6   And I think I understand his is to be more limited than the

7   purpose I'm seeking it for.

8           MR. HAMILTON:  I withdraw the objection, Your Honor,

9   if that's the purpose.

10          THE COURT:  Well, but I -- I would suggest to you

11  that you get to that rather than worry about what specific

12  bank account it happens to land in.

13          MS. GREEN:  But I didn't expect the answer.  I

14  expected something different, Your Honor.

15          THE COURT:  All right.

16  Q    Mr. Doak, do you remember being deposed on December 5th?

17  A    Yes.

18  Q    Can you pull up Exhibit 236, please?  Page 187.  It

19  actually starts on Page 186 at the bottom.  At Line 22, Mr.

20  Doak, if the post-petition financing is approved, is my

21  understanding correct that the city will receive the proceeds

22  as a part of one lump sum?  Yes, that's correct.  Do you

23  recall that testimony?

24  A    Yes.

25  Q    And further down the page on 187, Line 10.  Okay.  What

1  is your understanding of what will happen to the remainder of

2  those funds?  The aspect that is the quality of life note,

3  what will happen to that lump sum?  That will be deposited in

4  the city's general fund.  Do you recall that testimony?

5  A    Yes.

6  Q    And on Page 188.  So as part of the general fund, is it

7  fair to say that those quality of life proceeds are not

8  earmarked for any particular purpose?  Object to form.  You

9  stated they will -- the proceeds will not be placed to the

10 best of my knowledge in a segregated account and that the

11 spending will occur as I understand it, is not going to be

12 from a segregated account.  Do you recall that testimony?

13 A    Yes.

14 Q    Okay.  And the concept of calling it a quality of life

15 note, was the idea --

16 A    Would you like to know why the answer is changed?

17 Q    Sure, why is your answer different today than it was a

18 week ago?

19 A    We've -- we've had subsequent negotiations with one of

20 the objectors, NPFG and we've also had discussions with the

21 city in regards to how the city is going to be administrating

22 the quality of use funds.  There is now in the latest version

23 of the order, some understanding as to how the city will be

24 attempting to track how the proceeds are used and report back

25 to key stakeholders on a monthly basis.

1      I'm also aware of dialogues between Conway, MacKenzie and

2   other city officials in regards to how they want to think

3   about using the funds and they have indicated it's

4   administratively easier for them to potentially track it in a

5   separate account.

6   Q    For clarification purposes, let's pull up the latest

7   order so you can clarify which portion of the order you are

8   referring to.

9   A    I -- I'm not -- sure.

10   Q    Okay.  Can I direct your attention to the first page.  Do

11   you recognize this order as being the one that has recently

12   been amended?  The date is at the bottom.

13   A    So this -- this looks like it's the 16th at 6:10.  And I

14   don't know whether the negotiation with NPFG was completed by

15   that.  In fact I'm -- I'm pretty sure it may not have entered

16   into this particular version of the order.

17   Q    So subsequent to this order, you have re-negotiated a

18   term relating to the use of the proceeds?

19   A    No.  Just how we are going to provide some information

20   and reporting on what we're -- on -- on how we're going to be

21   tracking the -- tracking the spending.

22   Q    Can I direct your attention to Page 7?  (ii), use of the

23   proceeds of the post-petition facility.  Is that paragraph

24   consistent with the negotiation and the amendment that you

25   just referenced?

1    A     Yes.

2    Q     Okay.  So this is the negotiation that you just

3    referenced with NPFG?

4    A     No.

5    Q     No.  So I'm just trying to clarify.  This order does or

6    does not contain the subsequent negotiations and the resulting

7    amendment that you are referencing?

8    A     Given the -- given the time stamp on it, I -- I don't

9    know if it does.  I don't believe it does.  And once again

10   that is -- this is related to a -- a reporting or information

11   -- subsequent information providing requirement to the -- to

12   stakeholders.

13        I -- I don't know if the order itself is going to include

14   a particular provision in regards to what bank accounts are

15   used.  That's my -- my information there is based on dialogue

16   that I've had with city officials and advisors.

17             MS. GREEN:  I'll move on, Your Honor, except that

18   we've all been tailoring our cross examinations based on the

19   details in the proposed order.  This one was filed just two

20   days ago, so we've all been using that as our template.

21        And if there is a purpose of the quality of life note

22   that's been injected back into the case, we may have further

23   questions.  I'm just not sure at this time.

24             THE COURT:  Well, let's just inquire.  Is there a

25   later version of the proposed order than this one?

```
 1              MR. HAMILTON:  I believe -- I think this is the
 2   current one, Your Honor.  I think it's Paragraph 18 is what
 3   she meant to be looking at.
 4              THE COURT:  Eighteen?
 5              MR. HAMILTON:  Eighteen.
 6              MS. GREEN:  So there, just to clarify, there is not
 7   another order that will be filed after this.
 8              MR. HAMILTON:  There was a -- a typo that we found
 9   that we need to correct, but substantively this is the current
10   state of the -- of the order.
11              MS. GREEN:  Thank you.
12   Q    And back to the quality of life note.  The concept for
13   calling it a quality of life note was an idea by a -- an
14   attorney for the City of Detroit, correct?
15   A    That the name first appeared in a document -- in a
16   document that was drafted by Jones, Day.
17   Q    Okay.  And this phrase, quality of life, originated in
18   mid to late August of this year, correct?
19   A    Yes.
20   Q    And it was after the objections to the forbearance
21   agreement and the assumption motion were filed in mid-August?
22   A    I -- I don't know the timing of the objections, but that
23   would --
24   Q    After August 16th?
25   A    Yes.
```

1   Q    Okay.  And this terminology was used in response to

2   concerns related to the Michigan Gaming Revenue Control Act,

3   correct?

4   A    This terminology was used because it appropriately

5   reflected the -- how the funds would be deployed.

6   Q    Well, you had discussions about the Gaming Control Act

7   while you were developing the term sheet, correct?

8   A    Yes.

9   Q    And you incorporated ideas from those discussions when

10  you were formulating the purpose for which the quality of life

11  proceeds could be used, correct?

12  A    Could you state that again?

13  Q    You incorporated certain ideas from these discussions

14  when you were formulating the purpose for which the quality of

15  life proceeds would be used, correct?

16  A    I -- I -- I believe that's accurate, but I -- I'm not

17  quite sure about the concept of formulating the purpose.  But,

18  okay.  I -- I didn't formulate a -- a purpose.  I formulated a

19  construction of the -- the term sheet.

20  Q    And you decided to call the loan that was not going to be

21  used to pay off the swaps, the quality of life loan in August

22  as we established.  But your first awareness of the Michigan

23  Gaming Act was actually back in June, correct, during

24  negotiations by the swap counter parties?

25  A    Yes.

1  Q    So you're generally familiar, or were familiar with the

2  notion that there are limitations on the use of casino revenue

3  under Michigan law?

4  A    Yes.

5  Q    And as you were drafting the term sheet you purposely

6  structured it so that different collateral would secure the

7  quality of life note versus the way that the swap note would

8  be collateralized, correct?

9  A    Yes.

10 Q    And you only offered the casino revenue for the quality

11 of life note collateral because you thought that it would be

12 less controversial given that the marketplace was aware of the

13 arguments that had been made in connection with the assumption

14 motion that had been filed, correct?

15 A    Yes.

16 Q    And in fact even with this collateral structure that you

17 came up with, some potential lenders still had concerns

18 regarding the casino revenue being used as collateral,

19 correct?

20 A    Yes.

21 Q    And I think that you just testified they were concerned

22 about the collateral with respect to both federal and state

23 law, correct?

24 A    Lenders were concerned about how their collateral

25 interest would be structured and formalized, both in the

1    context of state law and in the context of federal law.

2    Q    Okay.  And city council also had concerns with using the

3    casino revenue as collateral due to the gaming act, correct?

4    A    I don't know whether I could affirm that statement.  City

5    council, various city council members voiced their concern in

6    regards to the use of gaming tax revenues in the first place

7    in regards to some of the transactions in -- in 2009.

8    Q    Do you remember meeting with someone named Irv Corley,

9    the executive policy manager of the city council's policy

10   division?

11   A    Yes.

12   Q    Do you remember this concern about the collateral and the

13   casino revenue being raised by Mr. Corley during that meeting?

14   A    It most likely was.

15   Q    Okay.  Can you pull up Exhibit 233?  And you recognize

16   these.  You asked about these earlier.  These are the

17   questions that were sent to you from city council?  Well, this

18   is the cover email, but attached to this are the questions?

19   A    Yes.  This is the Q and A that was provided back to the

20   city council.

21   Q    Okay.  And this -- this casino revenue collateral issue

22   was also raised by the city council in their written questions

23   to you?

24   A    It -- it most likely -- likely was.

25   Q    Okay.

1    A    This was a set of questions prepared by city council

2    staff.

3    Q    Okay.

4    A    So I -- I can't tell you whether it was actually the city

5    council that raised this.

6    Q    Fair enough.  Can I direct your attention to Page 6,

7    Question 9?  Question 9 states, under MCL 432.212, do you

8    understand that that's the Michigan Gaming Act, a reference to

9    that?

10   A    Okay.

11   Q    It lists the restrictions on the use of wagering taxes.

12   Which category allows the use of wagering taxes to secure the

13   swaps or the proposed financing?  The response was, with

14   respect to the swaps, the swap counter parties have made

15   certain legal arguments in support of the pledge of wagering

16   taxes which speak for themselves.

17        In connection with the proposed post-petition financing,

18   the city intends to rely on the Federal Bankruptcy Code to

19   authorize the pledge of collateral including the wagering

20   taxes.  Did you -- did you work on this response to this

21   particular question?

22   A    I did not work on this response.

23   Q    But you understand that the city council's question was

24   what purpose under Michigan law and under which category of

25   the gaming act the casino revenue would be used for, correct?

```
 1            MR. HAMILTON:  Your Honor, at this point I think

 2   we're beyond the competence of the -- of the witness to

 3   answer.  He didn't work on this portion of this unit.

 4            THE COURT:  The objection is sustained.

 5   Q    Do you know who did prepare the responses to the

 6   questions raised by city council?

 7   A    Yes.

 8   Q    And who prepared these responses?

 9   A    Two attorneys from Jones, Day.

10   Q    Okay.  You would agree with me that based on the plain

11   language of the answer since I will not be cross examining an

12   attorney from Jones, Day, that there is no use listed in the

13   response under Michigan law specifically referencing the

14   gaming act?

15            MR. HAMILTON:  Object, Your Honor.  It's calling

16   for --

17            THE COURT:  The objection is sustained.  You -- you

18   can argue that, but --

19            MS. GREEN:  I'll move on.

20   Q    The city council, I believe we already established they

21   were not given a copy of the fee letter?

22   A    That's correct.

23   Q    And you admit that fees are important to you in analyzing

24   the transaction, correct?

25   A    Yes.
```

1 | Q    I believe you were already asked this question about the

2 | market flex provision, but I don't know that anyone asked this

3 | with respect to the fees.  If you didn't know the amount of

4 | the fees associated with the loan, do you agree with me that

5 | you would not be in a position to recommend the $350,000,000

6 | financing to the city?

7 | A    I -- I would agree with you.

8 | Q    Okay.  Can we pull up Exhibit 1003?  Mr. Doak, do you

9 | recognize this email dated August 29th, 2013?  Or it might be

10 | August 30th, there's two.

11 |     (Retirement Systems Exhibit 1003 was identified)

12 | A    I -- I --

13 | Q    Can you pull up the -- the paragraph below it?  The body

14 | of the email.

15 | A    It -- it looks that -- that looks like the letters that

16 | -- email and correspondence we were sending to many of the

17 | potential lenders.

18 | Q    Okay.  And the to and from portion of the email states

19 | that it's an email from you to Bruce Mendelson at Goldman

20 | Sachs?

21 | A    Yes.

22 | Q    And Goldman Sachs was a potential lender with respect to

23 | the post-petition financing, correct?

24 | A    Yes.

25 | Q    And Mr. Mendelson was inquiring, if we go to the next

1  paragraph of the email.  It says Jim, thank you for sending

2  the information over.  We've begun our work and are far along

3  in clearing our internal conflict system.  Is there a data

4  room that you were planning on making available or should we

5  provide a list of diligent questions.  Do you remember this

6  email?

7  A    Not -- not this particular email, but I -- that looks

8  completely consistent with what he might have written to me.

9  Q    And with the work that you were doing to prepare the

10 information that the lenders would need, correct?

11 A    Yes.

12 Q    And your response to him, if we could go to the email

13 directly above that.  Hold off on the due diligence, we have a

14 data room and there's a liquidity piece under development.

15 You did not call the liquidity piece a quality of life

16 improvement piece to Mr. Mendelson, did you?

17 A    No.  That reference, a liquidity piece under development

18 is a reference to the -- the monthly cash flow liquidity

19 forecast that we subsequently provided to all of the potential

20 lenders that signed the NDA.

21 Q    Okay.  Can we also look at email Exhibit 1005?  At the

22 bottom portion dated August 29th, it's an email from you.  Do

23 you recognize that email?

24      (Retirement Systems Exhibit 1005 was identified)

25 A    Yes.

1    Q    And is this another solicitation email to a prospective

2    lender?

3    A    Yes.  In a -- yes, it is.

4    Q    And Mr. Gavin is an investment banker at RW Baird,

5    correct?

6    A    Yes, he is.

7    Q    And you were reaching out to him as a potential source

8    for the post-petition financing?

9    A    Yes.  We -- we -- we were reaching out to RW Baird to see

10   whether they wanted to look at the financing opportunity.

11   Q    And the email states exactly that, we're working on

12   sourcing 350,000,000 post-petition financing for the city, use

13   of proceeds is to financing the swap termination and provide

14   general fund liquidity through the Chapter 9 case.  Do you see

15   that portion?

16   A    Yes.

17   Q    And that's not relating to the liquidity forecast,

18   correct?  That's the actual purpose of -- of the use of the

19   proceeds?

20   A    Yes.  This was sent to him to get a quick understanding

21   as to whether RW Baird wanted to be incorporated into the

22   process and receive the formal invitation.

23   Q    And you also had a conversation with Mr. Gavin relating

24   to the potential post-petition financing shortly after this

25   email, correct?

1   A    Yes.

2   Q    And in this conversation he told you -- let's go to the

3   next portion of the email, please.  The top of the email it

4   says when we spoke I said the counter parties didn't get a

5   bankruptcy opinion.  Is he referring to the phone conversation

6   that you had?

7   A    Yes, he is.

8   Q    Okay.  Further down in the second paragraph as I said on

9   the phone, the counter parties' attorneys did not believe that

10  the pledge survived, but they did what they could get from

11  Oreck.  And attached to this email was a legal opinion from

12  Oreck, correct?

13           MR. HAMILTON:  Your Honor, at this point I think

14  we're talking about double hearsay about what somebody who's

15  not in Court said, somebody else who is not in Court said.  I

16  would object on that ground on this portion of the email.

17           THE COURT:  Well, excuse me again.  Is this exhibit

18  in evidence?

19           MS. GREEN:  Not yet.  I was going to move for its

20  admission after we established certain things relating --

21           THE COURT:  Okay.  Again, it's not proper to ask a

22  witness about the content of a document until it is in

23  evidence.  So on that ground the objection is sustained.

24           MS. GREEN:  Your Honor, I would move for the

25  admission of Exhibit 1005.

1          MR. HAMILTON:  And, Your Honor, we would object to

2   the portion of the exhibit that contains the double hearsay,

3   the portion that's actually currently highlighted on the

4   screen.  We don't object to the statements that this man made

5   to Mr. Doak in response to Mr. Doak's inquiries.  But when

6   this man is -- if they're introducing what this man is saying

7   about what somebody else said that is -- has no relation to

8   the financing that's being sought, that's double hearsay and

9   should not come in.

10         MS. GREEN:  May I respond?  I will be using this

11  particular sentence for its affect on Mr. Doak and what he did

12  afterward, not to establish the truth of the email itself.

13  And so therefore I do not believe I'm using it for the truth

14  of the matter asserted and it's not hearsay.

15         THE COURT:  For that very limited purpose, the Court

16  will overrule the objection and admit into evidence Exhibit

17  1005.

18         (Retirement Systems Exhibit 1005 was admitted)

19         MS. GREEN:  And, Your Honor, I believe that my

20  Exhibit 1003 is already in evidence, the one that I asked him

21  about previously.

22         THE COURT:  Would you like me to check for you?

23         MR. HAMILTON:  No objection, Your Honor.  We don't

24  object to it being admitted into evidence.  It's not into

25  evidence yet, but we don't object.

1        THE COURT:  1003 is --

2        MS. GREEN:  Right, Your Honor.

3        THE COURT:  1003, all right.  1003 is admitted.

4        (Retirement Systems Exhibit 1003 was admitted)

5   Q    If we could pull the portion up that we had up a moment

6   ago.  And attached to this email was a legal opinion from

7   Oreck, correct?

8   A    Most likely.

9   Q    And I think we established when we -- when you testified

10  at your deposition you didn't read the legal opinion, but you

11  knew that it was attached?

12  A    Yes.

13  Q    Okay.  And that Oreck opinion, do you understand that

14  that's the same opinion that was attached to the collateral

15  agreement?

16  A    I don't -- all I know is the Oreck opinion related to the

17  2009 swap amendment.

18  Q    Fair enough.  The portion that we read earlier, as I said

19  on the phone the counter parties' attorneys did not believe

20  that the pledge survived, but they did what they -- did get

21  what they could from Oreck.  And to your knowledge this

22  information was gained through Mr. Gavin's role as a financial

23  advisor to the city in 2009, correct?

24        MR. HAMILTON:  Again, I'm going to object now on

25  relevance grounds.  This has nothing to do with the financing,

1  the post-petition financing facility.  It's not within the

2  scope of his direct.  I -- I don't see how this relates to the

3  post-petition financing facility.

4       MS. GREEN:  Your Honor, I believe that it does

5  relate to the ability of the city to have potentially gotten a

6  better deal.  Yesterday we heard evidence relating to the

7  city's poor bargaining position in relation to the forbearance

8  agreement.  We heard that they had no leverage.  The cards

9  were stacked against them.

10      I think that certain evidence tends to show that after

11 they entered into the agreement they learned information that

12 could have strengthened our case and I want to explore whether

13 this information was used to reconsider their position, to

14 investigate further, things of that nature.

15      THE COURT:  This is arguable.  I'll permit it.  Go

16 ahead.

17 A    Could you ask the question again, please?

18 Q    Sure.  Your understanding was that this knowledge was

19 gained by Mr. Gavin through his role as a financial advisor to

20 the city in 2009, correct?

21 A    I have -- I have no knowledge and do not recall having

22 knowledge at the time as to whether Tom Gavin was or RW Baird

23 was an advisor to the city for the purposes of that

24 transaction.

25 Q    Well, you did -- you do understand that he was a former

13-53846-swr   Doc 2250-9   Filed 12/27/13   Entered 12/27/13 12:20:03   Page 70 of 128
13-53846-tjt   Doc 4390-9   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 76 of 128    516
574

1  financial advisor or consultant for the City of Detroit,

2  correct?

3  A    His -- yes.  His engagement as I understand it has been a

4  standing one related to the water fund and the sewer fund and

5  the debt of DWSD.  I don't know what RW Baird's role was or if

6  they had a role with regards to the 2009 deal.

7  Q    Okay.  Rather than taking this down and pulling your

8  deposition up, I will read it so that we don't have to switch.

9  You recall being deposed on December 5th, correct?

10 A    Yes.

11 Q    Do you recall being asked a question about Mr. Baird and

12 your conversations and your knowledge of his involvement with

13 the City of Detroit?

14       MR. HAMILTON:  Your Honor, could we at least have a

15 page reference so I can --

16       MS. GREEN:  215.

17 Q    Do you recall testifying about that?

18 A    I don't recall that particular -- I don't recall that

19 particular question, but I'm sure you asked it.

20 Q    Do you recall testifying, "he had a recollection, meaning

21 Mr. Gavin, or at least a narrative in regards to the

22 negotiations that occurred amongst the parties in 2009 and he

23 was informing me of a dialogue that he indicated had occurred

24 in the negotiations between the city and its advisors, and the

25 swap counter parties and their advisors, in regard to

1   structuring the collateral agreement and the amendment to the

2   swaps"?

3   A    Yes.

4   Q    Does that change your answer as to whether or not you're

5   -- the context of your conversation was that he was a former

6   financial advisor during the 2009 negotiations?

7   A    Absolutely not.  I didn't know if that was firsthand,

8   secondhand, thirdhand, fourth hand, at the bar (Inaudible).  I

9   -- I didn't know where he came up with this.

10  Q    Okay.  After you spoke to Mr. Gavin and you received this

11  email from him, you then forwarded this information to the

12  city's legal advisors, correct?

13  A    Yes.

14  Q    And why do you share it with -- why did you share it with

15  them?

16  A    I shared it with them --

17       MR. HAMILTON:  At this point I think we're getting

18  into privilege, Your Honor.

19       MS. GREEN:  Perhaps, then I -- with that caveat, if

20  there's a non-privileged answer, I'll take it.

21       THE COURT:  I don't know that we can rely on the

22  witness to know the difference.

23  Q    Without disclosing any potentially attorney/client

24  privileged information, did you have a reason for forwarding

25  this email?  If you can't answer it without disclosing that's

1   fine, sorry.  Just --

2   A    It seemed to be a pertinent conversation to make sure

3   that I was not the only person who was aware of this act that

4   my conversation had occurred.

5   Q    Okay.  And did you share it with the swap counter parties

6   as well?

7   A    No.

8   Q    Do you know if anyone from the city's team shared it with

9   the swap counter parties?

10  A    No.

11  Q    Did you do any further investigation as to whether Mr.

12  Gavin's statements were true?

13  A    No.

14  Q    Did you ask Mr. Gavin for the names of the individuals

15  that allegedly said these statements?

16  A    No.

17  Q    Did you look for any documents where the swap counter

18  parties may have made this admission -- admission in writing?

19  A    No.

20  Q    Did this information cause you in any way to reconsider

21  the deal that had previously been struck?

22  A    In -- my focus at that particular point was on moving

23  forward with the post-petition financing and my area of focus

24  was not on the executed forbearance agreement and where it

25  would go from there.

1  Q    Good point.  Do you know if anyone else on the emergency

2  manager's team or perhaps your colleague Mr. Buckfire used

3  this information as leverage with the swap counter parties?

4  A    I -- I don't know.

5  Q    Do you know after you forwarded this information on to

6  others, do you know if anything was ever done with this

7  information in regards to due diligence that could be

8  performed to look into the story that you were told?

9  A    I don't know.

10  Q    Is it fair to say that this information didn't cause you

11  to re-think the strategy of seeking post-petition financing

12  versus litigating the underlying swap transactions?

13  A    I -- I -- could you ask the question again?  Because

14  I'm --

15  Q    You just testified --

16  A    Is it the whole city or -- or like we -- we had an

17  executed forbearance agreement that provided advantages to the

18  city and, you know, -- and -- and had, you know, various

19  obligations.  And I was working on the -- the financing.

20      If there was to be a reverse of course on the direction

21  we were going on the forbearance optional termination

22  agreement, it would not have come from me.

23  Q    Okay.  There were continued negotiations though related

24  to the forbearance agreement after its initial execution date,

25  correct?  Five amendments?

1  A     Yes.  There has been subsequent amendments.

2  Q     And there's a sixth one in the works, right?

3  A     Yes.

4  Q     And some of those are related to the fact that the city

5  missed the first discount milestone date?

6  A     Sure, yes.

7  Q     And the current size of the discount is a 25% discount

8  until January 1st, I believe?

9  A     Well, the -- without an execution of the Sixth Amendment,

10  we -- we are in the 82 price zone.

11  Q     Okay.  And did you use any of this information as

12  leverage to negotiate yourself back into the 75% price zone?

13  A     This is -- once again I'm focused on the post-petition

14  financing.  And I have not taken a laboring or on the dialogue

15  with the swap counter parties.

16        MS. GREEN:  Understood.  Thank you.  I have no

17  further questions, Your Honor.

18        THE COURT:  All right.  Stand by one second, please.

19  All right.  We'll take our morning recess now and reconvene at

20  10 after 11:00, please.

21     (WITNESS JAMES DOAK WAS TEMPORARILY EXCUSED AT 10:46

22  A.M.)

23        THE CLERK:  All rise.  Court is in recess.

24     (Court in Recess at 10:46 a.m.; Resume at 11:13 a.m.)

25        THE CLERK:  All rise.  Court is in session.  Please

1  be seated.

2      (WITNESS JAMES DOAK RESUMED THE STAND AT 11:13 A.M.)

3          THE COURT:  It appears everyone is present, let's

4  proceed.  Everyone except Ms. Green.

5          MR. HACKNEY:  I think Mr. Doak probably would like

6  to confirm that we're done with him, sir.

7          THE COURT:  Okay.

8          MR. HAMILTON:  No redirect, Your Honor.

9          THE COURT:  All right.  You're all set, sir.

10  A    Okay.

11      (WITNESS JAMES DOAK WAS EXCUSED AT 11:14 A.M.)

12          MR. SHUMAKER:  Good morning, Your Honor.  Greg

13  Shumaker, Jones, Day for the City of Detroit.  The city calls

14  Kevyn Orr to the stand.

15          THE COURT:  While we have a moment, my latest count

16  is 243 minutes left for the city and 319 minutes left for the

17  objecting parties.

18          MS. GREEN:  Thank you, Your Honor.

19          THE COURT:  Please raise your right hand.

20      (WITNESS KEVYN ORR WAS SWORN)

21          THE COURT:  Please sit down.

22                    DIRECT EXAMINATION

23  BY MR. SHUMAKER:

24  Q    Good morning.

25  A    Good morning.

1  Q    Would you please state your name for the record?

2  A    Kevyn D. Orr.

3  Q    What's your current position, Mr. Orr?

4  A    Emergency manager, City of Detroit.

5  Q    Mr. Orr, are you aware of a document or agreement known

6  as the forbearance and optional termination agreement?

7  A    Yes.

8  Q    I'm going to refer to it as the forbearance agreement

9  this morning, is that okay with you?

10 A    Yes.

11 Q    Okay.  What was your role in the negotiation of the

12 forbearance agreement?

13 A    I participated in the negotiations towards the end to

14 final we get to definitive terms.

15 Q    Who led the business and legal negotiations for the city?

16 A    On the business side, it would be Ken Buckfire, the

17 city's investment banker.  And on the legal side attorneys at

18 Jones, Day.

19 Q    Anyone in particular at Jones, Day?

20 A    I believe Corinne Ball and Bruce Bennett.

21 Q    Okay.  Why did you have Mr. Buckfire take the lead on the

22 business negotiations?

23 A    Mr. Buckfire is the city's investment banker of the

24 restructuring effort and had participated in these types of

25 negotiations and financial arrangements before.

1  Q    And when did the -- the swap -- I'm sorry, when did the

2  negotiations relating to the forbearance agreement begin?

3  A    I believe they began in late May throughout June.  I

4  became involved in early June.

5  Q    Okay.  And why did you believe pursuing such an agreement

6  in the May, June time period was important?

7  A    The city was flowing cash flow negative quite severely,

8  almost to the point that we would not have sufficient cash to

9  make -- meet obligations as they became due.

10 Q    Were there any other concerns that you had with regard to

11 the city's position at that time?

12 A    Sure.  In addition to cash flow concerns, I was concerned

13 that we wouldn't be able to provide services to the city.  And

14 that we also were at risk of being in default and might lose

15 access to the casino revenue.

16 Q    Was there any concern about a termination payment under

17 the swaps?

18 A    Yes.  We have been in default and there was quite a large

19 termination payment that could be due as well.

20 Q    Did you have a sense as to how much that termination

21 payment might be?

22 A    At that time I had heard figures somewhere between

23 300,000,000 to 400,000,000.

24 Q    What was your understanding of why the city was facing a

25 termination payment at that time?

1  A    The -- the city had been in default for a number of

2  issues including the declaration of the emergency and the

3  appointment of an emergency manager.  Obviously in the event

4  of default.  And the swap counter parties had been forbearing

5  for some period of time, so the city was at risk at any given

6  time of being declared in default and those parties exercising

7  their remedies.

8  Q    As you started out with these negotiations, what were

9  your objectives?

10  A    Our objectives really were to get the best discount we

11  could over the termination fee that was due to relieve any

12  threat, to losing the casino revenue and to also to the extent

13  we could, reduce the risk of litigation so we could stabilize

14  the city's finances and go cash flow positive.

15  Q    You talk about the cash.  Any particular portion of the

16  city's cash that you were referring to, the casino revenues

17  has come up?

18  A    Yes.  Casino developer revenue, yes.

19  Q    Okay.  Why is access to the casino revenue so important

20  to the city?

21  A    Casino revenue is the single most stable source of

22  revenue available to the city.  And without it the city cannot

23  operate.

24  Q    Could you summarize for the Court how the negotiations

25  progressed from your standpoint?

1   A    Yes.  They progressed at a pace in June and in

2   approximately the June 10th to June 14th time frame.  They

3   became more critical.  There were a number of different

4   sessions that I personally was involved with where

5   negotiations broke down and the parties would try again

6   ultimately reaching an agreement on June 12th or 13th, I

7   believe.

8   Q    So you've mentioned that you got involved towards the

9   end.  What -- what do you mean by that?  You -- what did you

10  personally do?

11  A    Well, the -- the negotiations were going forward

12  principally on the business side from Mr. Buckfire and on the

13  legal side with the attorneys at Jones, Day for some weeks

14  before I got involved.  But personally I began to negotiate

15  what I hoped to be the best possible discount percentage that

16  we could get.

17  Q    I want to talk a little bit -- ask you a few questions

18  about the -- the discount that you referred to.  But focusing

19  right now on negotiations, and you said that Mr. Buckfire at

20  Miller, Buckfire, and Ms. Ball, and Mr. Bennett at Jones, Day,

21  how often did you communicate with them about negotiations

22  during this time frame?

23  A    I -- I communicated either directly or indirectly

24  regularly throughout the June time frame with Mr. Buckfire for

25  a number of days.  We actually sat in the same room and had

1  phone calls off and on several times a day.

2  Q    Do you recall what the opening positions of the city and

3  the swap counter parties were?

4  A    Yeah.  Generally speaking the -- the city wanted to get

5  the maximum discount available, relieve itself of the threat

6  to the casino revenue, release any liens that might -- that

7  the parties have on that revenue.  The swap counter parties

8  wanted to take the position that they were 100% secured and

9  wanted to recover their total amount due.

10 Q    Do you recall what the city's opening position was?

11 A    I recall that by the time I got involved the negotiations

12 were in the 80% range.  And we -- we wanted to push to see if

13 we could get better.

14 Q    Before you got to that position, how would you describe

15 the negotiations between the city and the swap counter

16 parties?

17 A    My understanding that negotiations were arm's length.

18 They were robust.  And they were quite contentious from time

19 to time.

20 Q    Were you coming to an agreement easily?

21 A    No, not at all.

22 Q    Why did you think that was the case?

23 A    Well, I -- I think the parties held very strong positions

24 on both sides.

25 Q    You -- you mentioned the -- the events of default and

 1 | that you were an event of default yourself.  How did those

 2 | events of -- of default affect the negotiations?

 3 | A    Well, I -- I think the swap counter parties wanted to

 4 | press and -- and suggested that they knew we were in default,

 5 | so they wanted us to acknowledge that they were forbearing and

 6 | there was a value to that.  We wanted to press that the city's

 7 | condition was quite dire.  And while there were defaults, we

 8 | had been paying the obligations as they had become due, but

 9 | the risk to the city remained.

10 | Q    What did the -- an event of default allow the swap

11 | counter parties to do?

12 | A    Well, it could have allowed them to trap the casino

13 | revenue.

14 | Q    And you mentioned the termination payment as well?

15 | A    Yes.

16 | Q    Had the -- the swap counter parties attempted to trap the

17 | casino revenues before this time?

18 | A    I don't believe so.

19 | Q    Did you --

20 |      THE COURT:  Excuse me one second.  I have to

21 | interrupt.  We just blew through what is probably the most

22 | significant question in this trial which is what were the

23 | arguments that the city was using to -- in support of its

24 | request to get a discount on the termination fee.

25 |      MR. SHUMAKER:  I am going to get there, Your Honor,

 1  I promise.

 2          THE COURT:  You're going to what?

 3          MR. SHUMAKER:  I am going to get there.

 4          THE COURT:  Okay.

 5          MR. SHUMAKER:  I was -- I was leading up to that.

 6          THE COURT:  Okay.  So this was like a preview.

 7  Okay.  If -- if that's your plan, I will let you pursue it.

 8  Otherwise, I was going to.

 9          MR. SHUMAKER:  Okay.  Hopefully, I'll cover

10  everything that Your Honor is -- is interested in.  And I do

11  recognize what Your Honor is interested in.

12  Q    I believe my question was, Mr. Orr, was why did you think

13  at this time when the negotiations were going on, in the May,

14  June time frame, that the -- the swap counter parties might

15  trap the casino revenues when they hadn't previously?

16  A    Well, there have been multiple events of default as I

17  have mentioned with me as well.  And also to the extent there

18  were other litigation risks, it appeared that -- at least to

19  us, it appeared that the parties had come to sort of a head in

20  their respective positions.

21          We also could not operate on the basis that hope was a

22  strategy for stabilizing the city's finances given the

23  precarious nature that they were going into that we were

24  having a very significant financial crisis at the time.  So

25  the concept that they would forbear indefinitely was not

1  reasonable.

2  Q    And during this time were you -- fair to say that the --

3  the city was -- you started considering thinking about a

4  filing of bankruptcy for the city, correct?

5  A    Yes, I think that's fair.

6  Q    If you were -- if the -- if the possibility of a

7  bankruptcy filing was out there for you, why were you

8  concerned about the banks and the casino revenues?

9  A    Well, I -- I believe in consultation with our attorneys,

10 there was a possibility that the swap counter parties wouldn't

11 be bound for several -- by several provisions of the

12 Bankruptcy Code by the automatic stay and would still be able

13 to exercise their security interest.

14 Q    And do you -- do you recall the -- the provisions that --

15 that were coming into play?

16 A    I don't have the Code in front of me, but I think

17 362(a)(17) and don't quote me on this, there are a lot of

18 attorneys, 546.

19 Q    I'm not trying to quiz you.  I -- is the --

20 A    I just don't remember.

21 Q    Is the term a safe harbor --

22 A    Safe harbor provision, sure.  There's the safe -- I'm

23 just -- I don't remember the specific Code provision.

24 Q    Okay.  And I'm sorry.  What would the -- what would the

25 safe harbor have allowed the banks to do arguably?

1  A    The safe harbor provision allows banks with –- with

2  interest of –- of this kind to execute on their security

3  interests.

4  Q    Around this time of –- of negotiation, was there any

5  interruption in the negotiation process?

6  A    Oh, sure, yeah.

7  Q    And –- and who in your mind interrupted?

8           MR. HACKNEY:  Your Honor, I'd like to interpose an

9  objection if I could.  I think he's about to go down a pathway

10  that I construed the Court to have determined to be collateral

11  by excluding Ms. Schwartzman's testimony.  This is about

12  Syncora and whether it impacted the negotiations that were

13  ongoing and I do think that this is a sufficiently collateral

14  matter that is just not relevant to the proceeding.  But to

15  the extent we're going to delve into it, then it gets into the

16  sort of who said what to whom and why didn't various things

17  happen.

18           MR. SHUMAKER:  Well, Your Honor, the importance of

19  the casino revenues and what Mr. Orr's testifying to is –- and

20  its critical importance was what Syncora was –- was up to and

21  that's why the witness' account of what the city –- how the

22  city approached that issue and what it might do and what it

23  did in order to protect those casino revenues is –- is

24  important.

25           MR. HACKNEY:  Your Honor, to the –- much as when Mr.

1 | Buckfire testified yesterday why he was also heavily involved,

2 | to the extent they want to introduce testimony that Syncora

3 | sought to trap the revenue and that impacted the desire to

4 | conclude the negotiations, I don't have a problem with limited

5 | testimony to that effect.

6 | As you get into the temporary restraining order that was

7 | obtained on an ex parte basis and whether that was

8 | appropriately obtained, or whether we were sitting around

9 | waiting for them to turn a confidentiality agreement to us,

10 | all of the things that were in the testimony that we wanted to

11 | introduce, I think you cross over to a point where it -- it

12 | becomes prejudicial for us to have them tell their side of the

13 | story and I do believe it's also -- I think it's collateral.

14 | MR. SHUMAKER:  And, Your Honor, I -- I don't plan on

15 | going into this in any significant detail.

16 | THE COURT:  Well, I'll let you proceed with the

17 | understanding that you are potentially opening up doors you

18 | don't want to open.  And I'll leave you to decide whether to

19 | take that risk.

20 | Q  Let me switch to this, Mr. Orr.  Let -- let me ask you,

21 | when did you reach a final agreement with -- with the swap

22 | counter parties?

23 | A  We reached an agreement in principal on June, I believe

24 | it was June 13th and actually signed a document, I believe July

25 | 15th it

1   Q    So how long did it take from -- from start to finish?

2   A    Almost a month and a half approximately.

3   Q    Now, in your view as the emergency manager, what benefits

4   does the forbearance agreement provide to the city?

5   A    Well, it gives us access, unfettered access to the cash.

6   It gives us a significant discount over and above the par rate

7   of the termination fee.  It helps us avoid costly and

8   expensive litigation which is a cost drain on the city.

9   Equally important is it helps stabilizes the city's finances

10  and also allows us an opportunity to get at some well needed

11  services to the citizens of the city.

12  Q    Now, so is it fair to say that -- that in your view you

13  achieved your objectives that you started out with in

14  negotiating the forbearance agreement?

15  A    Yes.

16  Q    Now you talked a little bit about a discount on the

17  termination payment, correct?  Do you recall what the original

18  discount percentages were that were negotiated under the

19  forbearance agreement?

20  A    Yes.

21  Q    And -- and what were they?

22  A    The original percentages were -- I believe there was 82,

23  77, and 75.

24  Q    And when you say 82, 77, and 75, what -- what do you

25  mean?

13-53846-swr   Doc 2290-9  Filed 12/26/13  Entered 12/26/13 21:20:03  Page 87 of 128
13-53846-swr   Doc 4310-9  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 533 of
574                                                                            533

1  A    There -- there was a -- a sliding scale related to how

2  quickly you could pay the discount and as you went by certain

3  time frames, the discount began to get reduced.  So initially

4  if you paid it quickly it was 75%, if you paid it less quickly

5  it became 77%.  And if you took out the entire term of the

6  agreement it went to 82%.

7  Q    Okay.  Now, there have been subsequent amendments to the

8  forbearance agreement, correct?

9  A    Yes.

10  Q    And the discount numbers have changed and the -- and the

11  date thresholds have changed, is that correct?

12  A    Yes.

13  Q    And what is your understanding of what the current

14  discount percentages are on the termination payment?

15  A    I want to be clear when I say discount.  It's the amount

16  that you have to pay.  So the discount is actually 25%.  And

17  when I say 82, it's actually 18%.

18  Q    Right.  What -- what are they right now?  As we sit here

19  today December 18th, 2013?

20  A    Twenty-five and 18%.

21  Q    Okay.  And do you know when the city must exercise its

22  rights under the agreement in order to get the 75%, by what

23  date?

24  A    I think we need to exercise them by December 31st.

25  Q    Now did you -- did you approve these discount

1 percentages?

2 A    Yes.

3 Q    How did you arrive at these percentages?

4 A    It was subject to negotiation.  We kept pressing and

5 testing how far we could go and they kept resisting and they

6 would hang up and we'd come back and press and test and

7 finally we got to the point where they said those are the

8 percentages that we're willing to accept.

9    If we don't accept those percentages we would not have a

10 deal.  We pushed back and said, you know, we have to have 25%

11 because we felt that was a fair discount for a secured

12 interest.

13 Q    Okay.  Do you believe the city got a good deal with the

14 discount percentages that you approved?

15 A    I believe we got the best deal available, yes.

16 Q    Why?

17 A    Well, as I said during the negotiations, they had broken

18 down several times, literally broken down.  Phone calls were

19 hung up and the parties did not speak for several days.  And

20 went up -- as I understand it went up to the highest levels of

21 the counter parties organization as far as what they were

22 willing to accept.  And in fact we were prepared to

23 potentially pursue litigation if we had to.

24 Q    I want to -- I want to focus on that in just a bit, but

25 -- but still in the negotiation phase, I want to ask you a

1  question which is in connection with your negotiations, did

2  the swap counter parties ask you on behalf of the city to

3  reaffirm their swaps deal with the city?

4  A    Yes.

5  Q    Did they ask you to reaffirm their collateral rights with

6  regard to the casino revenues?

7  A    Yes.

8  Q    Did you agree to do so?

9  A    No.

10  Q    Why not?

11  A    Well, we -- we felt there were issues with regard to

12  their rights and we don't want to affirm because we're in the

13  midst of negotiations and wanted to preserve our options if

14  those negotiations fell through.

15  Q    During this time of the negotiations, were you looking at

16  the possibility of suing the swap counter parties?

17  A    Yes.

18  Q    Did you receive legal advice regarding the potential

19  claims the city might have against the swap counter parties?

20  A    Yes.

21  Q    From whom?

22  A    From our attorneys.

23  Q    Who were your attorneys?  The law firms, how about that?

24  Okay.

25  A    Attorneys at Jones, Day and also attorneys at Pepper,

1  Hamilton.

2  Q    And that's Mr. Hertzberg at Pepper, Hamilton?

3  A    Yes.

4  Q    Why was Pepper, Hamilton involved?

5  A    We had retained Pepper, Hamilton -- Pepper, Hamilton

6  because issues had been raised regarding a potential conflict

7  with Jones, Day and we didn't want to have any issues

8  regarding whether or not we were pursuing potentially any

9  claims against the swap counter parties zealously.

10 Q    Now were -- were the Jones, Day lawyers and -- and the

11 Pepper, Hamilton lawyers involved in the meetings and

12 communications with the swap counter parties while you were

13 negotiating the agreement?

14 A    Yes.

15 Q    Why did you have -- was -- was -- was Ms. Ball one of the

16 lawyers who participated in those calls?

17 A    Yes.

18 Q    Why did you have both Ms. Ball and Mr. Hertzberg

19 participate in those calls?

20 A    Well, we wanted to make sure that they were fully

21 informed and prepared if those calls broke down from the legal

22 perspective to take appropriate relief.  There may have been

23 other attorneys involved in those discussions as well.  I'm

24 just identifying Ms. Ball, Ms. Bennett, Mr. Hertzberg as the

25 principal ones participating.

1  Q    Did those law firms, did Jones, Day and Pepper, Hamilton

2  prepare any legal analyses of the claims that the city might

3  have against the COPS and the swaps?

4  A    Yes.

5  Q    And those memos were conveyed to you, is that correct?

6  A    Yes, I believe so.

7  Q    Were any legal analyses prepared by Jones, Day or Pepper,

8  Hamilton regarding the pledge of the casino revenues that was

9  a part of the 2009 collateral agreement?

10 A    Yes.

11 Q    Without divulging the substance of the communications,

12 the privileged discussions that you might have had with Jones,

13 Day lawyers and Pepper, Hamilton, what kinds of claims were

14 addressed in the memoranda that you saw and/or heard about?

15      MR. HACKNEY:  Your Honor, I'll just interpose an

16 objection on two fronts here.  The first one is that during

17 the discovery on the forbearance agreement, we were -- we were

18 not actually granted the opportunity to obtain document

19 discovery and they did not provide us a privilege log.

20      But after the testimony of Mr. Orr in which he asserted,

21 I took advice on all these subjects, don't worry, I considered

22 everything and -- and took it into account, I asked counsel to

23 provide a privilege log so the extent to which we could see

24 were memoranda transmitted to Mr. Orr for his consideration.

25 These are complicated legal issues.  These aren't the types of

 1  things that you can just process by having a five minute

 2  conversation with someone.  And I think -- and -- and counsel

 3  for the city refused to do that.

 4      I think that they are now inquiring of testimony of the

 5  witness that I don't have a fair opportunity to cross examine

 6  the witness about.  Even if it's not the substance of the

 7  communication, if they were going to elicit testimony from Mr.

 8  Orr about all the different memoranda and email that he

 9  concluded that he considered as part of his decision, I think

10  it was incumbent upon them to produce such a privilege log so

11  that we could see that it maps up with the decision time frame

12  that's laid out around the negotiation.

13          MR. SHUMAKER:  Your Honor --

14          THE COURT:  You received memoranda from your lawyers

15  outlining claims that the city might have in regard to the

16  COPS and the swaps.

17  A    Yes, claims and defenses, Your Honor.

18          THE COURT:  And you're claiming the privilege as to

19  those memoranda?

20  A    Yes, Your Honor.

21          THE COURT:  And you're claiming the privilege as to

22  those memoranda even though you want to take $270,000,000 from

23  the taxpayers of this city to pay to terminate those swaps?

24  A    I am claiming the privilege, Your Honor.

25          THE COURT:  I don't get it.

1          MR. SHUMAKER:  Well, Your Honor, responding to --

2          THE COURT:  Just because the -- you have the

3   privilege doesn't mean you have to claim it.

4          MR. SHUMAKER:  Well, Your Honor, that's true.  But

5   the -- the city has asserted the privilege and --

6          THE COURT:  I don't get it.  How can I decide

7   whether this was a fair settlement without understanding what

8   the city's assessment of the strength of its claims against

9   the COPS and the swaps were?  How can I do that?

10         MR. SHUMAKER:  Well, Your Honor, you can do that as

11  I think we set forth in the -- our response to the motion in

12  limine on this point that the objectors filed, it's really an

13  objective standard.  And you have the theories laid out by the

14  objectors.  This -- this -- the city has, you know, asserted

15  the privilege, but obviously the consideration of those

16  claims --

17         THE COURT:  Why has the city asserted the privilege?

18         MR. SHUMAKER:  Well, Your Honor, it's not my

19  privilege, but --

20         THE COURT:  I'm asking you.  You're their lawyer.

21  Why have you asserted it?

22         MR. SHUMAKER:  Well, Your Honor, you know, this is a

23  -- it is a well known effort to protect the city with regard

24  to its communications between, you know, its client and its

25  lawyers.  The free exchange of ideas is critical to the

1  system.

2      And we were negotiating with large banks who would love

3  to have the Jones, Day, or the Pepper, Hamilton memoranda

4  revealed for all the world so it would inform their

5  negotiating position.

6          MR. CULLEN:  If I may add one thing, Your Honor.

7  Thomas Cullen for the city.  I think, Your Honor, that one of

8  the reasons we haven't disclosed those memoranda, and we

9  didn't want to disclose those memoranda, is that we may still

10  sue the banks.  If we are in a position of --

11         THE COURT:  All right.  Let's walk down -- let's

12  walk down that road for a second.  Assume the Court denies its

13  approval of this forbearance agreement and you wind up in

14  litigation, right.

15     They're going to file a complaint, or you're going to

16  file a complaint, or the other -- and -- and regardless the

17  other side is going to file a counter claim and sooner or

18  later you're going to file your motions for summary judgment

19  and answers to motions for summary judgment, or trial briefs

20  and answers to trial briefs, it's all going to come out.

21         MR. CULLEN:  Your Honor, perhaps not -- not

22  suggesting to split the baby here, but we did have --

23         THE COURT:  Let's pause.  Let's just take a pause

24  here. It's a little early for lunch, but we're going to take

25  lunch now and I want you to think about how to resolve this

1  issue over lunch.

2          MR. CULLEN:  May I suggest one thing, Your Honor?

3          THE COURT:  Yes.

4          MR. CULLEN:  There was a draft complaint and perhaps

5  the Court could -- we could certainly waive with respect to

6  that if we weren't on the subject matter waiver provision.

7          THE COURT:  Let -- let -- let's reconvene at, it

8  will be 1:15, 90 minutes from now and -- and -- and you think

9  about what position to take that's in the best interest of the

10  city.

11          MR. CULLEN:  I understand, Your Honor.

12          THE COURT:  All right.  We're going to be in recess.

13      (WITNESS KEVYN ORR WAS EXCUSED AT 11:43 A.M.)

14          THE CLERK:  All rise.  Court is in recess.

15      (Court in Recess at 11:43 a.m.; Resume at 1:18 p.m.)

16          THE CLERK:  All rise.  Court is in session.  Please

17  be seated.  Recalling case number 13-53846, City of Detroit,

18  Michigan.

19          THE COURT:  It appears that everyone is here.  Mr.

20  Shumaker.

21          MR. SHUMAKER:  Good afternoon, Your Honor.  Over

22  lunch I have to confess that I was thinking about what Your

23  Honor had told us at the pre-trial conference on Friday about

24  the proponent of a settlement being in a -- an awkward

25  position in its approach to how it discusses or it doesn't --

13-53846-swr   Doc 2390-9   Filed 12/29/14   Entered 12/29/14 21:20:03   Page 96 of 128
574
13-53846-swr   Doc 2390-9   Filed 12/29/14   Entered 12/29/14 21:20:03   Page 96 of 128   542

1   at the same time -- at the same time asking for settlement of

2   the claims, it does not reveal the strengths and the

3   weaknesses in case the -- the Court decides that it can't

4   approve the settlement.  And I've -- and I've kind of -- think

5   we find ourselves in that awkward zone.

6       We interpreted what you were saying, Your Honor, that you

7   did not want to know what Jones, Day or Kevyn Orr, or any of

8   the employees thought about the strengths and weaknesses of

9   the -- the case.  You thought we were asking what did he

10  consider and were memoranda prepared.  Did you receive advice

11  from counsel, were there -- was all of that considered.  So

12  again I stand here awkwardly, or hopefully less so after --

13  after a busy lunch.

14      With regard to what your -- Your Honor has requested, I

15  guess my -- my answer is -- is twofold in nature.  One, we

16  have -- I'm going to admit that there was a bit of scurrying

17  in the lunch and we have pulled together a -- a packet of what

18  I think Your Honor would find under normal circumstances

19  clearly privileged attorney/client communications and

20  attorney/client work product.  And including draft complaints

21  that were prepared.

22      And in trying to figure out what to propose to Your

23  Honor, Rule 502(d) comes to mind of -- of the Federal Rules of

24  Civil Procedure.  I'm not sure -- oh, I'm sorry, the Federal

25  Rules of Evidence which the 502(d) states as Your Honor knows,

1  controlling effect of a Court order.  A Federal Court may

2  order that the privilege or protection is not waived by

3  disclosure connected with the litigation pending before the

4  Court in which event the disclosure is also not a waiver in

5  any other federal or state proceeding.

6      If Your Honor would like us to, we can make a motion or

7  Your Honor could, I imagine issue an order pursuant to 502(d)

8  right now in which we -- the city would provide those to Your

9  Honor and if Your Honor believes that we need to publish those

10 to the world, we will publish those to the world.  If -- if

11 you're able to -- if the Court is --

12         THE COURT:  I don't -- I have to interrupt you here.

13 I don't want you to misunderstand what my request was.  I was

14 not requesting you to disclose privileged information.  My

15 request was that you consider whether maintaining the

16 privilege is in the best interest of the city.  That was my

17 request.

18     If you come to the conclusion it is, and you think you

19 can prove what you need to prove to get this settlement

20 approved, go for it.  I think your challenge is more difficult

21 if you maintain the privilege.  It's not impossible.  That was

22 -- and I apologize to you if I wasn't clear enough on that

23 point.

24         MR. SHUMAKER:  No, no.  Yeah, I was just --

25         THE COURT:  You know, that's -- that's it.  I will

1 say in hindsight now that I understand what the issue was

2 regarding the privilege log that Mr. Hackney had raised, that

3 if I had understood when that motion was addressed briefly as

4 it was the other day, that these memos were the subject of

5 that request for a privilege log, I certainly would have

6 ordered it. And in fact I do order it now, I'm going to

7 change my order on that and order a privilege log.

8       MR. HACKNEY: So I have to clarify for the record,

9 Your Honor, to be very precise, there is actually a -- a

10 meaningful distinction about what you and I were talking about

11 on Friday and this issue. And if I could clarify it.

12       THE COURT: Oh, all right. Go ahead.

13       MR. HACKNEY: On the original forbearance agreement,

14 we were not entitled to any discovery period at the end of our

15 colloquy. And then after Mr. Shumaker indicated that this

16 would be an evidentiary hearing, the Court then said, okay.

17       THE COURT: Right.

18       MR. HACKNEY: I'll let you take depositions. But we

19 weren't allowed to engage in written discovery. And when you

20 engage in written discovery, that's what triggers the

21 privilege log coming back because that's what they withhold.

22     The privilege log you and I were talking about on Friday

23 was with respect to DIP discovery where we were entitled to

24 issues in written discovery and then they did not give us a

25 privilege log.

1       THE COURT:  Okay.  That was -- so that -- that was

2   my disconnect, okay.

3       MR. HACKNEY:  Yes, sir.  And I -- I wanted to

4   clarify that, but on the forbearance agreement after we went

5   through the depositions and there was the repetitive assertion

6   of the privilege, which I understood.  I understand the

7   position that's being taken.

8       What I then said to the city was, I know I haven't been

9   given the right to take written discovery, but given the

10  widespread assertion of the privilege, and the complexity of

11  the issues, won't you please agree to produce to me a

12  privilege log so that what we could do is we can see --

13      THE COURT:  Okay.

14      MR. HACKNEY:  -- the deliberative process.  Because

15  you'll see the memoranda and the email going to Mr. Orr on the

16  relevant issues.

17      You do have to disclose the subject matter of a

18  communication, even if you don't disclose the communication

19  itself.  Then we'd be able to test the proposition that don't

20  worry, I considered the gambit of the issues.  That's the

21  privilege log, it was a voluntary request.

22      My objection today was simply that having rejected that

23  request, I do think that they have now put the objectors in a

24  position where it's difficult to meaningfully cross examine

25  Mr. Orr even on the subject of what he considered.  Because

1   you don't have access to seeing the -- the communications go

2   to him.

3          MR. SHUMAKER:  And if I could address that, Your

4   Honor.  At Mr. Orr's deposition, objectors count on the

5   assumption motion back when it was Your Honor's order was that

6   the city just proffered whoever was going to testify in

7   support of the assumption motion.

8       The -- the objectors' counsel did ask a number of

9   questions about what sort of topics, what sort of claims did

10  you consider Mr. Orr.  And he was allowed to answer those

11  questions.  That is similar to what you would find on a

12  privilege log.

13      But when they went deeper and they started asking what

14  about -- what were the likelihood of success on the merits

15  there, that's when I said that is invading the privilege.

16  That's how I drew the line.

17      And so in effect I think the objectors have the kind of

18  information that they would have received in connection with

19  the privilege log had we -- had there been written discovery

20  in connection with the assumption motion.  And frankly, Your

21  Honor, that was what I was going to be asking Mr. Orr about.

22         THE COURT:  So I -- I take it that it is -- it is

23  still the city's judgment that it is in the best interest to

24  maintain the claim of privilege as to whatever legal memoranda

25  Mr. Orr relied on in coming to this settlement on the -- on

1    the swaps?

2           MR. SHUMAKER:  I have consulted with -- obviously,

3    Your Honor, it's the client, the city's decision.

4           THE COURT:  Right.

5           MR. SHUMAKER:  Mr. Cullen and I were given -- were

6    -- had very little time to speak with Mr. Orr prior to him

7    walking into the courtroom after lunch.  And we simply posited

8    to him what we were going to propose the -- the twofold

9    proposal that I was going to make to Your Honor.  We did not

10   ask do you want to fully waive the privilege which -- which we

11   could do if Your Honor would like us to do that.

12          THE COURT:  Well -- sir?

13          MR. CULLEN:  To -- to be hopefully slightly more

14   clear.  What we said to Mr. Orr, or what we're saying to the

15   Court, is that we're willing to make A, these documents

16   available.  We would like to have a 502(d) order with respect

17   to those documents which would restrict the waiver -- it would

18   make the documents available, but the privilege would not be

19   waived, the documents would be made available --

20          THE COURT:  Available to the Court and to the

21   objecting parties?

22          MR. CULLEN:  And to the objecting parties.  As long

23   as they weren't waived.

24       Now, the other thing because we've changed direction on

25   the nature of the evidence to some degree, we also in the

1   interest of fully informing the Court of the other questions

2   that the Court pressed, one of them being what exactly was

3   conveyed in terms of the -- how are these theories used in the

4   negotiations in -- in detail.

5       What we would propose is the following. And this would

6   save the -- this would address both the Court's issue with

7   respect to the underlying memoranda and with respect to the

8   subject matter of those meetings.

9       We would propose to make Ms. Ball as a percipient witness

10  at those meetings who is charged with Mr. -- charged by Mr.

11  Orr with both formulating those theories and conveying them in

12  negotiations with the other side about potential litigation.

13      I don't know whether we'd call her a rebuttal witness or

14  not, profess to make her available for a deposition on those

15  topics and to authenticate those documents, many of which Mr.

16  Orr would not be in a position to authenticate even if he had

17  -- if he had seen them or not.

18      So what she would do -- what we would do, and propose to

19  the Court, is that we'd make Ms. Ball available for deposition

20  tonight and we'd put her on tomorrow with respect to those

21  issues. And they -- that we would make available for that

22  deposition -- for that deposition, the documents that we have

23  gathered which fit Your Honor's discussion here which are the

24  memos relating to the claims against the banks which were the

25  subject matter of the negotiations.

1    We have -- we may find some more, but we -- as of right

2    now, we have a -- a group of oh, maybe 25 documents that fit

3    that description including two draft complaints.

4         THE COURT:  Including what?

5         MR. CULLEN:  Including two draft complaints.

6         THE COURT:  Mr. Hackney.

7         MR. HACKNEY:  So this is sufficiently material that

8    I -- I do at some -- you know, I don't speak for the objectors

9    and I guess I have one suggestion.

10        Which is, I know the evidence and I question the

11   relevance of Ms. Ball's proffered testimony.  And perhaps I

12   can make a suggestion to the Court.

13        Perhaps the Court might reserve its decision about this

14   until the end of Mr. Orr's cross examination.  And also

15   perhaps until after I've been able to caucus with the

16   objectors.  Because I, based on my knowledge of the record, I

17   do not understand how Ms. Ball's testimony would materially

18   change what we are talking about right now.

19        MS. ENGLISH:  Your Honor, may I speak?

20        THE COURT:  Yes.

21        MS. ENGLISH:  I would just like to make two points

22   here and again I -- I would also echo Mr. Hackney's comments

23   that the objectors would like to caucus on these new

24   developments first.

25        But two points I would like to make.  One, is that I

1  think the assertion of privilege in the depositions of Mr. Orr

2  and Mr. Buckfire were much broader in fact than Mr. Shumaker

3  has represented to the Court.

4     In fact in Mr. Orr's testimony, I just want to read a

5  couple of lines to you, please.  Mr. Hackney asked Mr. Orr

6  about what claims were being settled by the forbearance

7  agreement that the city had against the swap counter parties.

8  He said, and if I ask you to tell me what claims you have,

9  will you tell me or will you assert the privilege?  Mr.

10  Shumaker responded, I would instruct the witness that that may

11  implicate attorney/client communications.  And Mr. Orr then

12  responded, I would have no independent knowledge of what

13  claims the city may have other than discussions I've had with

14  my counsel so I would not answer.  So I think the claim of

15  privilege was much broader.

16     The second point I would like to make is because the

17  assertion of privilege was made so much throughout the city

18  witnesses depositions, the city must be precluded from now

19  admitting privileged as evidence, waiving the privilege and

20  admitting that in trial.  And opening up -- allowing us to

21  take a deposition of Ms. Ball would not be sufficient.

22     We would need to re-depose Mr. Orr and Mr. Buckfire and

23  possibly examine what other witnesses need to be deposed as

24  well as a result of this new development.  Thank you, Your

25  Honor.

1          MR. SHUMAKER:  Your Honor, just to respond quickly

2     on the assertion of privilege.  Let me read another quote,

3     this one from Ms. English at the -- the deposition of Mr. Orr

4     which was question from Ms. English.  "Can you just list for

5     me what the topics were ..."

6          THE COURT:  What page are you on?

7          MR. SHUMAKER:  Page 16, Your Honor, of the objector

8     -- I mean the city's opposition to the objectors motion in

9     limine.  It's Footnote 5.  Ms. English asks, "can you just

10    list for me what the topics were on which you got advice or

11    would you claim the privilege as to just the topics as well?

12    Mr. Orr, maybe I can do it this way.  I think I've said before

13    that in this case for instance your client Ambac, I filled

14    that in, has filed an objection.  Ms. English, yes, it has.

15    Mr. Orr's response, and in this case many objections have been

16    filed and many of the topics listed in those objections,

17    whether it was subordination, prioritization, equitable

18    estoppel, tort, invalidation of liens ab initio, whatever they

19    were, none of those analyses or claims came as a surprise to

20    me and that in some fashion without divulging what I had

21    spoken with to my counsel, in some fashion issues such as

22    those have been discussed and analyzed with my counsel,

23    attorneys, and advisors".

24         I don't think Ms. English is -- is giving you an accurate

25    picture of what happened there.  There was a lot of assertion

1  of privilege because of the awkwardness that Your Honor had

2  noted.

3      And so we were trying to draw the line in a way that was

4  permissible and allowed the objectors to get at the kind -- we

5  talked a little bit about this, Your Honor, in the opposition

6  too which is really it's for Your Honor, it's not for Mr. Orr

7  to decide -- he obviously has to make a decision as to whether

8  -- whether to enter into the agreement, but you have all of

9  the claims spelled out for you.

10     And -- and it's your -- you know, your decision, your

11  objective decision as to whether it was reasonable to

12  compromise those claims.  And we also quoted in that --

13          THE COURT:  Here's the -- here's the difference.

14  You know, I -- I think back to the hundreds or thousands of

15  motions to settle that I have been called upon to determine in

16  the last 28 1/2 years.  And in virtually every one of those

17  cases, everyone knew what the claims were, what the defenses

18  were, what the factual -- the alleged factual bases were for

19  those claims, the alleged factual bases for the defenses, and

20  where the strengths and weaknesses were on either side.

21     I don't have that here.  Not -- not from your brief and

22  not yet at least from Mr. Orr.  I certainly didn't get it from

23  Mr. Buckfire.  So I'm at a loss as to how to evaluate the

24  fairness of the settlement without that data.

25          MR. SHUMAKER:  Well, you may not --

1          THE COURT:  And so I -- and I think the burden is on

2    the city to -- to -- to show the fairness of the settlement,

3    right?

4          MR. SHUMAKER:  Correct, Your Honor.

5          THE COURT:  So you know, this is -- in the end it's

6    your call.  I mean you have to decide how you want to persuade

7    me regarding the fairness of this settlement if you -- and if

8    you fail, the motion is denied.  You don't want that.

9          MR. SHUMAKER:  Understood.

10         THE COURT:  At least I don't think you do.

11         MR. SHUMAKER:  That's correct, Your Honor.  And I

12   guess the -- the -- for the Court's consideration is this.

13   Although this is not your normal 9019 situation.

14       You do -- the Court does know what the -- the subject of

15   the -- of the potential legal attacks are, the -- the swaps

16   and the -- the pledge of the collateral.  And at -- at this

17   stage, given all the different considerations that were going

18   on and that have been described to you with regard to the

19   city's financial condition at the time of May to June and the

20   May numbers came in and they were much worse than anyone

21   thought.  And the -- the city had very limited time.

22       I would suggest that Your Honor you -- there is no full

23   factual record here for you to review because the settlement

24   decision had to be made very quickly under the dire

25   circumstances that Mr. Orr and the city faced.

1    And so you do have the theories.  You do have the

2  subjects.  You do have Mr. Orr who will say that I was given

3  plenty of legal memoranda and -- and emails and -- and

4  counsel.  And then if Your Honor believes that that's not

5  sufficient, I mean I agree that there is a decision that --

6  that -- that we need to make.  And that's why we're trying to

7  find a compromise.

8    THE COURT:  Since you've raised the question, I'm

9  going to say this to you.  Every transaction, including this

10  one, that the city has entered into in connection with these

11  swaps and COPS has been with a gun to its head.

12    That has to stop.  It has to stop.  And -- and I think

13  it's part of a Bankruptcy Judge's role to carefully scrutinize

14  a debtor's request to approve a settlement when that

15  settlement was made with the debtor's -- with a -- with a gun

16  to the debtor's head.  I mean --

17    MR. SHUMAKER:  We dare not agree -- we could not

18  agree to --

19    THE COURT:  Just one more thought.

20    MR. SHUMAKER:  I'm sorry.

21    THE COURT:  And the reason is obvious.  Because, you

22  know, it's not just the debtor who is impacted by this, right.

23  I got a whole courtroom full of people who are impacted by

24  this.

25    So I have to scrutinize this very carefully.  So, you

1 know, if you want me to do that, I'm happy to.  If you -- if

2 you want to take your chances, that's your call.

3          MR. SHUMAKER:  Two responses to that, Your Honor.

4 First, we couldn't be in more complete agreement.  Under the

5 circumstances they were not perhaps ideal given the financial

6 emergency that was in place.

7      Mr. Orr came in in April.  The numbers that Mr. Malhotra

8 and Ernst and Young provided in May showed holy cow, we're

9 running out of time.  And so no one likes to make a decision

10 with a gun to their head, but a big big reason why we believe

11 that this -- this forbearance agreement is necessary and the

12 post-petition financing is needed to finance it, is to

13 stabilize the city.  That is exactly what we're trying to do.

14 We don't -- we know it's not ideal, but this is how we come to

15 -- that's how Mr. Orr came to the -- came to the problem.

16          THE COURT:  You know, stabilizing the city is

17 exactly what motivated the original swaps and COPS.  And it's

18 exactly what motivated the 2009 transaction and look where we

19 are.

20          MR. SHUMAKER:  It's not a great spot, I agree with

21 Your Honor.  But that's why Mr. -- a financial emergency was

22 declared and Mr. Orr was put in to take the steps necessary to

23 right the ship.  And I don't know how he can right the ship

24 without keeping these casino revenues available to the city so

25 they can be used to do bigger and better things as opposed to,

 1  you know, serve as collateral that can be tied up by a couple

 2  of banks for as long as they want.  Which is the -- the

 3  difficult decision Mr. Orr faced.

 4          THE COURT:  Of course, but the question is whether

 5  you're overpaying for that, right?

 6          MR. SHUMAKER:  Yes, Your Honor.

 7          THE COURT:  Or one -- one of the questions.

 8          MR. SHUMAKER:  Yes, Your Honor.

 9          THE COURT:  And that depends -- I don't know why the

10  considerations for that determination in this case should be

11  any different than in any of the other hundreds or thousands

12  that I've dealt with.

13          MR. SHUMAKER:  Understood, Your Honor.  And I guess

14  that's why we -- we tried to come up with a compromise over

15  lunch which was if Your Honor's willing to enter the 502(d)

16  order so that there's no some broad expansive waiver, and if

17  Ms. Ball can get on the stand and explain what -- what the

18  advice that you will see is and how that was communicated to

19  the other side, you clearly are going to be in a much much

20  much better position to be able to determine whether the city

21  is overpaying.

22          THE COURT:  Well, let me ask the -- well, the

23  objecting attorneys have -- or the attorneys for the objecting

24  parties have requested an opportunity to -- to caucus

25  regarding this and I think it is appropriate to grant that.

1   How much time would you like?

2            MR. HACKNEY:  Can we have 20 minutes?

3            THE COURT:  Absolutely.

4            MR. HACKNEY:  Can we reconvene at 2:00, Your Honor?

5            THE COURT:  Yes.  We will reconvene at --

6            MR. HACKNEY:  Yeah.

7            THE COURT:  I'm sorry?

8            MR. HACKNEY:  Whatever works for you.  I'm sorry.

9            THE COURT:  I'm here regardless.  So let's say 2:00.

10  If you find you need a few more minutes, you know, we'll work

11  that out.  In the meantime, I urge -- I urge you all to

12  consult among yourselves on both sides to see what the best

13  way to resolve this is.

14           MR. SHUMAKER:  Thank you, Your Honor.

15           THE CLERK:  All rise.  Court is in recess.

16      (Court in Recess at 1:42 p.m.; Resume at 2:00 p.m.)

17           THE CLERK:  Court is in session.  Please be seated.

18           MR. HACKNEY:  Your Honor, can I approach the podium?

19           THE COURT:  Yes.  Which reminds me, I've been asked

20  to remind everyone again that -- that when you address the

21  Court to speak near a microphone, not only so that it's on the

22  record, but so that the people in the overflow courtrooms can

23  hear as well.

24           MR. HACKNEY:  Will do, Your Honor.  Thank you for

25  that.

1        Your Honor, the objectors have caucused together and what

2   we did was we basically articulated kind of broad principals

3   and order and then determined that there was no objection to

4   my relaying this to the Court on behalf of all of the

5   objectors.

6              THE COURT:  Okay.

7              MR. HACKNEY:  That's the easiest way to operate when

8   you have a lot of people.

9              THE COURT:  Yes.

10             MR. HACKNEY:  So, Your Honor, with respect to the

11  idea that they might produce these memoranda that they're

12  referring to, and then produce Ms. Ball for a deposition in

13  the nighttime tonight that we would -- and then she would then

14  testify tomorrow.

15       The objectors do not believe that that proffered

16  testimony would be relevant.  Because, Your Honor, the record

17  shows, and I can relay additional record evidence that's not

18  yet in the record, but is about to be, moments from now.  But

19  the record for Mr. Buckfire's testimony shows that he was the

20  lead negotiator on the deal.  That he had not evaluated any of

21  the claims of the city and that he was unaware as to whether

22  anyone else had done so either at the time he was negotiating

23  the deal.

24       That he never argued the city's case to the swap counter

25  parties.  And that he never witnessed anyone else do so

 1   either.  That testimony, I think, is -- is compelling

 2   testimony and what they now want to do is they effectively

 3   want to rebut their own case by calling in Ms. Ball to back

 4   and fill and say no, I was -- I was heavily involved in

 5   arguing and threatening the swap counter parties and fully

 6   apprised of all the various issues.

 7       We don't think that Ms. Ball's testimony is sufficient to

 8   contradict the record evidence of Mr. Buckfire's testimony

 9   that he was the lead negotiator on this deal and that he never

10   saw anyone else do this and is unaware of it.  We think that

11   -- that -- that the city --

12           THE COURT:  Well, assuming what you say is true, I

13   don't know that it is, but assuming it is for this -- for this

14   purpose, that doesn't make the testimony inadmissible, does

15   it?

16           MR. HACKNEY:  Well, it would --

17           THE COURT:  It may go to its weight, but does it go

18   to its admissibility?

19           MR. HACKNEY:  I -- well, I think what you would say

20   is that it doesn't make it inadmissible because the two

21   witnesses can contradict each other.  And she can come in and

22   say, oh, here's all the stuff that Mr. Buckfire somehow forgot

23   happened on the deal that he was the lead negotiator on.

24       Okay.  Fine, it's a theoretical matter.  But the idea

25   that we're going to allow a witness who was not disclosed on

1  the list where the city insisted that only those witnesses

2  testify, and that the only other people that could be

3  identified by a date certain were rebuttal witnesses.

4      That they're now going to add a witness as a rebuttal to

5  their own case before their case in chief is done.  That's out

6  of the order and prejudicial to us and now we have to take the

7  rush deposition.

8      But in addition, I think what the Court can do, is the

9  Court can say, I saw Mr. Buckfire testify and I'm not going to

10 allow you to back and fill your way out of that.  And I'm not

11 going to go through extraordinary steps to do it.  And that's

12 our second point.

13     Which is if you decide that given the -- the significance

14 of this settlement and all that goes into it, consistent with

15 the comments that you've made, that you want to hear the

16 testimony and you want to see the documents.  You think that's

17 appropriate to your decision.

18     Then we -- we will understand that.  But then we will

19 say, we have got to do this in an orderly way.  That --

20          THE COURT:  I'm just going to stop you there.

21 Because I -- I view what I want as irrelevant.  It's not my

22 motion.

23          MR. HACKNEY:  Let me rephrase if I could.  If the

24 city decides no, you know, we have to do this.  We -- we are

25 going to give these documents.  We've decided to change our

1  case in response to the Court's comments.  We have to have Ms.

2  Ball testify.  Then our point is that this must be done in an

3  orderly way.

4          THE COURT:  Uh-huh.

5          MR. HACKNEY:  And that means not just a rush

6  deposition of Ms. Ball tonight with the five documents that

7  they picked out and said look at these.  It's let's get order

8  to the discovery.  Let's get order to the -- where the

9  privilege being asserted, where not.

10     Let's take the depositions in an orderly way and Mr. Orr

11 is going to, you know, hate me for saying this, but we will

12 have to re-depose certain witnesses.  I mean when you roll out

13 with these -- these documents --

14         THE COURT:  He won't -- he won't hate you.

15         MR. HACKNEY:  Well --

16         THE COURT:  He may dislike you, but he won't hate

17 you.

18         MR. HACKNEY:  These are --

19         THE WITNESS:  Well, Your Honor.

20         MR. HACKNEY:  We teach our -- at work we teach our

21 daughters that you're not supposed to say hate, but I think

22 that --

23         THE COURT:  Right.

24         MR. HACKNEY:  -- people actually do hate

25 depositions.  The --

1          THE COURT:  All right.  I'll accept that.

2          MR. HACKNEY:  So that -- that was our second point

3    which -- and the only thing we wanted to say though was in

4    support of this idea that if the city changes and says, here

5    you go, here's all the stuff that we relied upon and here's

6    Ms. Ball who was the legal eagle on the deal.

7          You know, we articulated in the motion in limine that we

8    filed a long time ago in anticipation of the first hearing,

9    this was a big issue for us.  Because we had lived through the

10   depositions and had raised the questions and seen the

11   assertion of the privilege.

12         And, you know, I think that the city waiting all the way

13   until the last week, I think on the 9th, even to respond to

14   that in limine motion.  And I think that should factor in

15   somewhat to the Court's consideration of whether if the city

16   decides to go in this fashion, whether it will allow the types

17   of rush depositions that are sometimes appropriate in

18   different contexts where it's like sufficiently not material

19   that you're like oh, we're just going to get it done and

20   you'll have to stay up late and do a cross tomorrow, but you

21   can do it.

22         This is core.  So given that we put this issue out there

23   to try to join issue on the city with it and the city, you

24   know, didn't respond until recently and has now sort of

25   changed its mind and said, far from opposing that motion in

1  limine, now we're thinking about saying we kind of agree with

2  it.  That's a sufficiently material change.  I think it should

3  factor in to your consideration of the time line.  If I can

4  make one last comment.

5      The gun that's to our head in this case from the

6  standpoint of schedule, you know, at first it was the discount

7  posts in the forbearance agreement.  You know, so it's like we

8  got it -- you know, this was the way there was a -- you talked

9  about a gun to the head of the city.  There was a little bit

10 of a gun to all of our heads under the schedule.  Because it's

11 like we have to do this by this time to get this by this time.

12     But then the original hearing was just adjourned for

13 several months and it turned out the discount post extended

14 out by four months when they -- after the hard fought

15 negotiations had only been able to get like six weeks.

16     Now there's -- that's a bit of a gun at our head, is now

17 it really expires on December 31 and so we have to get it

18 done.  And then also is the Barclays commitment expires on

19 January 7th.

20     That's another gun to our head from a scheduling time

21 frame.  And given -- I will say given the holidays, this --

22 these all don't go together very well if we adopt this second

23 course.

24     And what I wanted to say is that if we go this way, I've

25 seen Federal Bankruptcy Judges look at certain parties like

1   potential DIP lenders and ask them about certain provisions in

2   their agreements and ask them, is that -- that January 7ᵗʰ, you

3   know, as firm as it says there in black and white.  And -- and

4   in some instances, Your Honor, and we often heard debtor's

5   counsel as well, but it turns out that -- that it was

6   flexible.

7       And I think that if we -- I know that we don't know which

8   way we're going.  But if we're going to go this second way,

9   can't we have a practical conversation about this?  Because

10  this scheduling gun to our head, and this is isn't a harangue,

11  it's an observation.

12      It's -- it's infected everything.  It's infected how much

13  discovery we did, the scope, the pace of discovery, and it's

14  had an impact on our ability to present the case to you -- to

15  you.  Bless you, Mr. Orr.

16      And I think that you've made observations today about the

17  magnitude of this transaction and its significance that if we

18  could get a little bit of the gun stopped to be pointing at

19  our head as we're considering this idea of what's the schedule

20  going to be, what is the process going to be from the

21  standpoint of discovery.  If we go that second way, I think

22  that will be important to the objectors.  That's all I have to

23  say, Your Honor.  I don't know if other objectors would also

24  like to be heard, but that -- that's the consensus.  Thank

25  you.

1                THE COURT:  Thank you.  Mr. Shumaker.

2                MR. SHUMAKER:  Your Honor, a couple of points.

3   First of all, Mr. Hackney has talked about how important this

4   issue of the assertion of the city's privilege has been to the

5   objectors for a long time.

6        Your Honor should not think that this was anything other

7   than calculated from the beginning.  Back when Mr. Orr was

8   deposed, the first question that Mr. Hackney asked was, Mr.

9   Orr, in the course of negotiating and executing the

10  forbearance agreement, did you receive legal advice?  Answer,

11  yes.

12       And then five questions later, after some predicate, who

13  did you get the legal advice from.  Five questions later, from

14  Mr. Hackney.  Are you waiving the attorney/client privilege in

15  connection with the motion to assume the forbearance

16  agreement?  When that answer was no, that led to about 50

17  questions intended to invade the city's privilege.

18       In that motion in limine, opposition that Mr. Hackney

19  referred to, that the city has put forth, it's been very clear

20  in the -- in the <u>Washington Mutual</u> case, which I believe is in

21  the Bankruptcy Court in one of the districts in New York, the

22  agreement was very clear that with regard to this kind of

23  motion you do not need to waive.

24       So that's one thing.  I think that this -- the notion

25  that this was a surprise and holy cow, this was a tactic.  It

1  was a tactic from the get go.  The second thing, is that this

2  gun is not going away.

3          THE COURT:  Look, everyone uses tactics.  The

4  question when you talk about tactics is, is it -- is it a

5  legitimate tactic, right?

6          MR. SHUMAKER:  Well --

7          THE COURT:  You can't say it was illegitimate.

8          MR. SHUMAKER:  No, and I --

9          THE COURT:  I asked the same questions just before

10 lunch that Mr. Hackney asked in -- in this deposition that you

11 quoted from.

12          MR. SHUMAKER:  I was not suggesting you were

13 undertaking a tactic, Your Honor, not in the least.

14          THE COURT:  Okay.

15          MR. SHUMAKER:  But I -- but I -- but I was -- I was

16 commenting on it because -- because of the awkward position

17 that the city finds itself in.  And it does not believe it

18 needs to waive but --

19          THE COURT:  Well --

20          MR. SHUMAKER:  Appreciate your honest concern.

21          THE COURT:  But as far -- you know, as I've said

22 before, the burden is on -- if you want to -- to put these

23 memos in with this 502(d) order we can talk about that.  If

24 you want to call Ms. Ball, we can talk about how to -- how to

25 properly create an orderly process to do that.

1    But as I said before, this -- this approval will get the

2    closest scrutiny from me and it's your burden.  So, you know,

3    you have to decide what you want to do to -- to meet that

4    burden.

5         MR. SHUMAKER:  Yes, Your Honor.  Perhaps --

6         THE COURT:  And I can tell you, that I agree with

7    Mr. Hackney.  That if -- if we're going to open it up in the

8    -- in the ways that you and Mr. Cullen have -- have suggested,

9    it's not going to be done today and tomorrow.  And I'm not

10   available between December 22nd and January 1st.

11        MR. SHUMAKER:  May I consult with my colleagues,

12   Your Honor, for a minute?

13        THE COURT:  How much time would you like?

14        MR. SHUMAKER:  Ten minutes, Your Honor.

15        THE COURT:  Mr. Hertzberg says you want ten minutes.

16        MR. SHUMAKER:  Yes, please, Your Honor.

17        THE COURT:  We'll be in recess for ten minutes.

18        MR. SHUMAKER:  Thank you, Your Honor.

19        THE CLERK:  All rise.  Court is in recess.

20     (Court in Recess at 2:13 p.m.; Resume at 2:41 p.m.)

21        THE CLERK:  All rise.  Court is in session.  Please

22   be seated.

23        MR. CULLEN:  Good afternoon, Your Honor.

24        THE COURT:  Sir.

25        MR. CULLEN:  The city would like to -- to propose

1  the following.  If that -- if it makes sense to the -- to the

2  Court.

3    Given the Court's guidance, given the procedural posture

4  we're in now, given the concerns of the objectors about the

5  ripeness of the various issues in front of us, and given our

6  need to reach out to other parties to talk about how we can

7  accommodate all of those things, what we would propose is that

8  we and the other parties take tomorrow to try and work out a

9  procedural schedule for your -- Your Honor.

10    We will in that -- in the course of that time, to be

11  frank with all concerned, we'll have to -- we will be reaching

12  out to the -- the counter parties, the Barclays about what we

13  can do with them.

14    In our discussions with the objectors, we will be talking

15  about various things, including the -- the options I've laid

16  forth before the Court and see if we can get the -- we can

17  cabin those in such a way so that we can get the right

18  discovery and the right things in front of the Court.  And --

19  and get to the Court -- do something within the Court's

20  schedule and in a way that will allow us to stop the city

21  paying money on a notional $800,000,000 rather than the amount

22  of 270,000,000, the settlement amount.

23    So that's all the things we're going to try and

24  accomplish tomorrow to make this easier.  I can also tell the

25  Court that we are not deaf to the implications of the Court's

1   questions about the various underlying deals and the history

2   and the issue of -- of -- of gun to the head.

3       The banks who are in the room here and the counter

4   parties in the post-petition financing are also in the -- in

5   the room here.  They have been educated as well.

6       We have asked to the objectors to discuss with us

7   tomorrow among the other things that they would discuss, if --

8   if in their view there is a -- a number, a sweetening of the

9   deal that would make it go away.  It is my suspicion that

10  there is no number that makes all of them disappear, but it's

11  an issue.

12      And we would propose then to report back to the Court on

13  Friday if that would be amenable to the Court's schedule about

14  what we have achieved with respect to all of those procedural

15  and financial constraints to lay at the front of the Court

16  because I think otherwise we're going to have a series of

17  running hand battles while the -- while witnesses sit here

18  that won't be productive for -- for anyone.

19      And I'm sensible to the fact that it's taken a long time

20  for us all to schedule this.  We have a lot of money invested

21  in this -- in this proceeding to date.  We're going to see

22  what we can preserve of that.  That will also be part of what

23  we are -- what we are talking about.

24          THE COURT:  All right.  Mr. Hackney.

25          MR. HACKNEY:  May I have a brief moment, Your Honor?

1           THE COURT:  Sure.  Sir.

2           MR. HACKNEY:  So, Your Honor, I'm going to state

3   what I think the sense of the senate is and perhaps then we

4   can just poll the room and see if any -- if I got it wrong.

5   But I think I -- I think I can say that it is the sense of the

6   objectors that what the city is -- is asking the Court to do

7   is to continue the hearing on its motion until a later date.

8        And I think that the objectors would -- this -- I think

9   the objectors would agree to that continuance.  I will note

10  that there has been a lot of money spent getting ready for

11  this hearing to get it done, but whatever things change and we

12  acknowledge that.

13       So -- but I just offer that, you know, agreeing to a

14  continue it I think is -- is a sign of good faith.  And I also

15  say the objectors I think are willing to meet with the city

16  and hear the city's ideas about how to handle evidence and

17  discovery and so on and so forth.  So we are amenable to that

18  idea.

19       I wanted to offer two -- two points for the Court's

20  consideration.  One of them is that I hope the city will think

21  about the fact that it's not clear the extent to which you can

22  change this evidential record with new evidence.  So I think

23  that should be a consideration for the city.

24       And I also don't want to -- I'm not backing off what I

25  said earlier which is that I think I know what happened with

 1 | respect to this deal and -- and I just wanted to reiterate

 2 | that point.

 3 |     The second one is that having lived under the gun of

 4 | these deadlines before, I would like the city to make sure

 5 | that it's expressing our views about process to the folks that

 6 | are setting these deadlines, whether it's the discount or the

 7 | expiration of a commitment.

 8 |     I -- you know, it will -- it will be a problem for us if

 9 | they come back and say Barclays was very accommodating,

10 | they've extended it from January 7th to January 9th and so we're

11 | going to do all this over the Christmas week.  And then we're

12 | going to come back on January 2nd and do it again.

13 |     That's going to be a problem for the objectors, I think.

14 | And I want to say that now just so it's not a surprise later.

15 | Long way around, if the city is asking for a continuance we

16 | would not object to it.

17 |     We did want to confirm that Friday's hearing would be a

18 | -- in the way of a status conference to report to you on

19 | progress we've made in sorting this puzzle out.  Thank you.

20 |     THE COURT:  Thank you, sir.  Mr. Cullen, to -- to

21 | the extent I heard you say that you are willing to use the

22 | time of any continuance in an attempt to re-negotiate the deal

23 | that you are asking me to approve, I would encourage that as

24 | strongly as I can.

25 |     Because anyone who has been practicing in bankruptcy law

```
 1  as long as we all have, or in litigation even for that matter

 2  knows, that even if -- even if a winning party gets a

 3  judgment, they'll take 75%.  Do you hear what I'm saying?

 4          MR. CULLEN:  I understand you, Your Honor.

 5          THE COURT:  All right.  What time on Friday?

 6          MR. CULLEN:  What time is good for the Court?

 7          THE COURT:  Well, I'm here, so --

 8          MR. CULLEN:  10:00.

 9          THE COURT:  10:00, is that all right with everybody?

10  All right.  I'll see you then.

11          THE CLERK:  All rise.

12          THE COURT:  If it's not this room, ladies and

13  gentlemen, one second.  If it's not this room, we'll post a

14  notice on ECF, otherwise assume it's this room.

15          MR. SHUMAKER:  Thank you, Your Honor.

16          MS. GREEN:  Thank you, Your Honor.

17          THE COURT:  Court is adjourned.

18      (Court Adjourned at 2:50 p.m.)

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-20-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25