# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession*** | represented by | **Bruce Bennett** |
| **City of Detroit, Michigan** | | 555 S. Flower Street |
| 2 Woodward Avenue | | 50th Floor |
| Suite 1126 | | Los Angeles, CA 90071 |
| Detroit, MI 48226 | | (213) 489–3939 |
| WAYNE–MI | | Email: bbennett@jonesday.com |
| Tax ID / EIN: 38–6004606 | | |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237–3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114

(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

*U.S. Trustee*
**Daniel M. McDermott**                represented by **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769

Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Creditor Committee*<br>**Committee of Unsecured**<br>**Creditors**<br>*TERMINATED: 03/03/2014* | represented by | **Brett Howard Miller**<br>1290 Avenue of the Americas<br>40th Floor<br>New York, NY 10104<br>(212) 468–8051<br>Email: bmiller@mofo.com,whildbold@mofo.com<br>*TERMINATED: 03/03/2014* |

**Geoffrey T. Pavlic**
25925 Telegraph Rd.
Suite 203
Southfield, MI 48033–2518
(248) 352–4700
Fax : (248) 352–4488
Email: pavlic@steinbergshapiro.com
*TERMINATED: 03/03/2014*

**Mark H. Shapiro**
25925 Telegraph Rd.
Suite 203
Southfield, MI 48033–2518
(248) 352–4700
Fax : (248) 352–4488
Email: shapiro@steinbergshapiro.com
*TERMINATED: 03/03/2014*

*Creditor Committee*
**Charlene Hearn**
PO Box 6612
Detroit, MI 48206

| | | |
|---|---|---|
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005–3364<br>(202) 408–7004<br>Email: sam.alberts@dentons.com |

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.

Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: wilkins@bwst-law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 12/23/2013 | | 2299 | Transcript regarding Hearing Held 12/17/13 RE: Evidentiary Hearing re. Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post–Petition Financing, (II) Granting Liens and Providing Superpriority Claims Status and (III) Modifying Automatic Stay (DKT#1520); Motion of the Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Releated Relief (DKT#17); Corrected Motion for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Releated Relief (DKT#157). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 03/24/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 2196 Transcript Request, 2203 Transcript Request, 2207 Transcript Request, 2208 Transcript Request, 2216 Transcript Request, 2293 Transcript Request). Redaction Request Due By 01/13/2014. Redacted Transcript Submission Due By 01/21/2014. Transcript access will be restricted through 03/24/2014. (Garrett, Lois) (Entered: 12/23/2013) |
| 12/26/2013 | | 2311 | Transcript regarding Hearing Held 12/20/13 RE: Status Conference. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 03/27/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 2296 Transcript Request). Redaction Request Due By 01/16/2014. Redacted Transcript Submission Due By 01/23/2014. Transcript access will be restricted through 03/27/2014. (Garrett, Lois) (Entered: 12/26/2013) |
| 01/10/2014 | | 2447 | Transcript regarding Hearing Held 01/03/14 RE: Evidentiary Hearing re. Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post–Petition Financing, (II) Granting Liens and Providing Superpriority Claims Status and (III) Modifying Automatic Stay (DKT#1520); Motion of the Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting |

|  |  |  | Releated Relief (DKT#17); Corrected Motion for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Releated Relief (DKT#157). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 04/11/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 2382 Transcript Request, 2405 Transcript Request, 2409 Transcript Request, 2410 Transcript Request, 2412 Transcript Request, 2420 Transcript Request, 2421 Transcript Request, 2446 Transcript Request). Redaction Request Due By 01/31/2014. Redacted Transcript Submission Due By 02/7/2014. Transcript access will be restricted through 04/11/2014. (Garrett, Lois) (Entered: 01/10/2014) |
|---|---|---|---|

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,          .        Docket No. 13-53846
          MICHIGAN,               .
                                  .        Detroit, Michigan
                                  .        December 17, 2013
                     Debtor.      .        9:01 a.m.
. . . . . . . . . . . . . . . .

EVIDENTIARY HEARING RE. MOTION OF THE DEBTOR FOR A FINAL
ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 362, 364(c)(1),
364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and
922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING
LIENS AND PROVIDING SUPERPRIORITY CLAIMS STATUS AND (III)
MODIFYING AUTOMATIC STAY (DKT#1520)

MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING
THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#17)

CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#157)

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  CORINNE BALL
                     222 East 41st Street
                     New York, NY  10017-6702
                     (212) 326-7844

                     Jones Day
                     By:  JEFFREY B. ELLMAN
                     1420 Peachtree Street, N.E., Suite 800
                     Atlanta, GA  30309-3053
                     (404) 581-8309

13-53846-tjt   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 6 of
463
13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 6 of 245        6

APPEARANCES (continued):

                         Jones Day
                         By:  ROBERT W. HAMILTON
                         325 John H McConnell Blvd., Suite 600
                         Columbus, OH  43215-2673
                         (614) 281-3848

                         Jones Day
                         By:  GEOFFREY S. IRWIN
                              GEOFFREY S. STEWART
                              GREGORY SHUMAKER
                              THOMAS CULLEN, JR.
                         51 Louisiana Avenue, N.W.
                         Washington, DC  20001-2113
                         (202) 879-3939

                         Jones Day
                         By:  BRAD B. ERENS
                         77 West Wacker
                         Chicago, IL  60601-1692
                         (312) 269-4050

For Bank of              Cadwalader Wickersham & Taft, LLP
America and              By:  MARK C. ELLENBERG
Merrill Lynch            700 Sixth Street, N.W.
Capital Services:        Washington, DC  20001
                         (202) 862-2000

                         Cadwalader Wickersham & Taft, LLP
                         By:  HOWARD R. HAWKINS
                         One World Financial Center
                         New York, NY  10281
                         (212) 504-6422

For UBS AG:              Bingham McCutchen, LLP
                         By:  JARED R. CLARK
                              EDWIN E. SMITH
                         399 Park Avenue
                         New York, NY  10022-4689
                         (212) 705-7000

For Syncora              Kirkland & Ellis, LLP
Holdings, Ltd.,          By:  STEPHEN C. HACKNEY
Syncora Guarantee,            WILLIAM E. ARNAULT
Inc., and Syncora             RYAN BLAINE BENNETT
Capital Assurance,       300 North LaSalle
Inc.:                    Chicago, IL  60654
                         (312) 862-2000

13-53846-tjt  Doc 4394-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 7 of 245
13-53846-swr  Doc 2299  Filed 12/23/13  Entered 12/23/13 20:12:00  Page 2 of 7
463
7

APPEARANCES (continued):

```
For Ad Hoc              Allard & Fish, PC
COPs Holders:           By:  DEBORAH L. FISH
                        2600 Buhl Building
                        535 Griswold
                        Detroit, MI  48226
                        (313) 961-6141

                        Kramer Levin Naftalis & Frankel, LLP
                        By:  THOMAS MOERS MAYER
                        1177 Avenue of the Americas
                        New York, NY  10036
                        (212) 715-9169

For Detroit             Clark Hill, PLC
Retirement Systems-     By:  JENNIFER K. GREEN
General Retirement      500 Woodward Avenue, Suite 3500
System of Detroit,      Detroit, MI  48226
Police and Fire         (313) 965-8300
Retirement System
of the City of
Detroit:

For Erste               Ballard Spahr, LLP
Europaische             By:  VINCENT J. MARRIOTT, III
Pfandbrief-und          1735 Market Street, 51st Floor
Kommunalkreditbank      Philadelphia, PA  19103-7599
Aktiengesellschaft      (215) 864-8236
in Luxemburg, S.A.:

For David Sole:         Jerome D. Goldberg, PLLC
                        By:  JEROME D. GOLDBERG
                        2921 East Jefferson, Suite 205
                        Detroit, MI  48207
                        (313) 393-6001

For Financial           Weil, Gotshal & Manges, LLP
Guaranty Insurance      By:  ALFREDO R. PEREZ
Company:                700 Louisiana Street, Suite 1600
                        Houston, TX  77002
                        (713) 546-5040

For Ambac               Arent Fox, LLP
Assurance               By:  CAROLINE TURNER ENGLISH
Corporation:            1717 K Street, NW
                        Washington, DC  20036-5342
                        (202) 857-6178
```

APPEARANCES (continued)

```
For U.S. Bank as       Waller Lansden Dortch & Davis, LLP
Trustee for Water      By:  DAVID E. LEMKE
and Sewer Bonds:       Nashville City Center
                       511 Union Street, Suite 2700
                       Nashville, TN  37219
                       (615) 850-8655

For FMS                Schiff Hardin, LLP
Wertmanagement:        By:  RICK FRIMMER
                       233 South Wacker Drive, Suite 6699
                       Chicago, IL  60606-6473
                       (312) 258-5511

For Detroit Retired Lippitt O'Keefe, PLLC
City Employees         By:  RYAN C. PLECHA
Association,           370 East Maple Road, 3rd Floor
Retired Detroit        Birmingham, MI  48009
Police and Fire        (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:


Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1         THE CLERK: All rise. Court is in session. Please

2 be seated. Case Number 13-53846, City of Detroit, Michigan.

3         THE COURT: Good morning. Let me ask participating

4 counsel to put their appearances on the record, please.

5         MS. BALL: Corinne Ball of Jones Day for the City of

6 Detroit.

7         THE COURT: Yes. We should use the lectern mike,

8 please.

9         MS. BALL: Good morning, your Honor. Corinne Ball

10 of Jones Day for the City of Detroit.

11         MR. SHUMAKER: Good morning, your Honor. Greg

12 Shumaker of Jones Day for the City of Detroit.

13         MR. STEWART: Good morning, your Honor. Geoffrey

14 Stewart, Jones Day, City of Detroit.

15         MR. HAMILTON: Good morning, your Honor. Robert

16 Hamilton of Jones Day on behalf of the City of Detroit.

17         MR. IRWIN: Good morning, your Honor. Geoff Irwin,

18 Jones Day, City of Detroit.

19         MR. ELLENBERG: If the Court please, Mark Ellenberg,

20 Cadwalader, on behalf of Bank of America Merrill Lynch.

21         MR. HAWKINS: Good morning, your Honor. Howard

22 Hawkins from Cadwalader for Bank of America Merrill Lynch.

23         THE COURT: I'm sorry, sir. What's your last name?

24         MR. HAWKINS: Hawkins, your Honor. Thank you.

25         MR. CULLEN: Thomas Cullen, Jones Day, City of

1  Detroit.

2       MR. CLARK:  Jared Clark, Bingham McCutchen, UBS AG.

3       MR. HACKNEY:  Good morning, your Honor.  Stephen

4  Hackney on behalf of Syncora Capital Assurance and Syncora

5  Guarantee.

6       MR. ARNAULT:  Good morning, your Honor.  Bill

7  Arnault from Kirkland & Ellis on behalf of Syncora.

8       THE COURT:  What's your last name, sir?

9       MR. ARNAULT:  Arnault.

10      MS. FISH:  Good morning, your Honor.  Deborah Fish

11  from the law firm of Allard & Fish on behalf of the ad hoc

12  COP's.

13      MR. MOERS MAYER:  Good morning, your Honor.  Thomas

14  Moers Mayer of Kramer, Levin, Naftalis & Frankel on behalf of

15  the ad hoc COP's.

16      MS. GREEN:  Jennifer Green on behalf of the

17  Retirement Systems for the City of Detroit.

18      MR. MARRIOTT:  Good morning, your Honor.  Vince

19  Marriott, Ballard Spahr, on behalf of EEPK and affiliates,

20  and I'm here with my colleague, Matthew Summers, and our

21  local counsel, Howard Sher, of Jacob & Weingarten.  Thank

22  you.

23      MR. GOLDBERG:  Good morning, your Honor.  Jerome

24  Goldberg on behalf of interested party David Sole.

25      MR. BENNETT:  Good morning, your Honor.  Ryan

13-53846-swr  Doc 4214-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 11 of 25
13-53846-swr  Doc 2299  Filed 12/23/13  Entered 12/23/13 20:12:06  Page 11 of 25
463
11

1   Bennett on behalf of Syncora.

2          MR. PEREZ:  Good morning, your Honor.  Alfredo Perez

3   on behalf of FGIC.

4          MS. ENGLISH:  Good morning, your Honor.  Caroline

5   English from Arent Fox on behalf of Ambac Assurance

6   Corporation.

7          MR. LEMKE:  Good morning, your Honor.  I'm David

8   Lemke on behalf of U.S. Bank as trustee for the water and

9   sewer bonds.

10         MR. FRIMMER:  Good morning, your Honor.  Rick

11  Frimmer from Schiff Hardin on behalf of FMS Wertmanagement.

12         MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

13  from Lippitt O'Keefe on behalf of the retiree association

14  parties.

15         MR. SMITH:  Good morning, your Honor.  Edwin Smith,

16  Bingham McCutchen, on behalf of UBS AG.

17         THE COURT:  Anyone else?  No?  All right.  Are we

18  ready to proceed then?

19         MR. SHUMAKER:  Your Honor, Greg Shumaker again.  If

20  I might just very quickly on the preliminaries so that your

21  Honor is -- has the latest, the -- over the last few days

22  we've been working with the other side and exchanging a lot

23  of information.  The witness order, so that your Honor knows,

24  is going to be Gaurav Malhotra, Ken Buckfire, Jim Doak, and

25  Mr. Orr.  The city has withdrawn Mr. Moore and submitted an

1  amended order for your Honor in connection with the post-
2  petition financing motion, so we've done that.

3       With regard to the joint statement of facts, I
4  wanted to share with your Honor that the parties have been
5  negotiating in good faith, have not been able to reach an
6  agreement with regard to the post-petition financing facts,
7  so I think we'll need to proceed, but that should be a more
8  limited set than with regard to the assumption motion.

9       With regard to the exhibits, your Honor, last night
10  we filed a consolidated joint exhibit list.  It reflects the
11  exhibits to which there are no objections, and then there are
12  also obviously objections listed for certain documents.  We
13  would propose that your Honor, if you would want to proceed
14  along the same lines as you did with the eligibility hearing,
15  that the exhibits to which there are no objections, that they
16  be admitted for all purposes for purposes of this hearing.

17       THE COURT:  All right.  The Court does order the
18  admission into evidence of the exhibits to which there is no
19  objection as listed in the exhibit list, Docket Entry Number
20  2185.

21       (City Exhibits 1, 2, 4, 5, 6, 7, 13, 18, 19, 30, 47-54,
22       56, 78, 79, 80, 88, 89, 93, 98, 100, 112, 113, 116-139;
23       Syncora Exhibits 201-214, 217, 223, 233-238, 240; FGIC
24       Exhibits 301, 303, 304, 307, 308, 309; Ambac Exhibits
25       401, 402, 403, 405, 406; EEPK Exhibits 801-805;

13-53846-swr  Doc 4214-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 13 of 45
13-53846-swr  Doc 2299  Filed 12/23/13  Entered 12/23/13 20:12:06  Page 13 of 245    13
463

 1    Retirement Systems Exhibits 1012-1015, 1019; Sole

 2    Exhibits 1301, 1303, 1305, 1306, 1308, 1310, 1312, 1314,

 3    1316; NPFG Exhibits 1, 2 received at 9:07 a.m.)

 4         MR. SHUMAKER:  Thank you, your Honor.  Two final

 5    things.  Your Honor may wonder why an amended joint statement

 6    of facts with regard to the assumption motion was filed late

 7    last night.  The only difference with that -- with the one

 8    before was it has updated exhibit numbers for your Honor,

 9    your Honor's convenience, and then I also wanted to mention

10    that we did file this morning the affidavit in connection

11    with the privilege log that you had asked for on Friday.

12         THE COURT:  I saw that, and I did read the amended

13    statement.  Before we proceed, if it's okay with you, I did

14    promise Ms. Fish an opportunity to make her party's position

15    on the record first so that she wouldn't have to stay.  Is

16    that okay?

17         MR. SHUMAKER:  Certainly.

18         MS. FISH:  Thank you, your Honor.  Deborah Fish.

19    Actually, Mr. Mayer is going to speak on --

20         THE COURT:  Okay.

21         MS. FISH:  -- behalf of the ad hoc COP's.  He was

22    admitted in the Eastern District in 2005 in connection with

23    the Venture Holdings case.

24         THE COURT:  Okay.

25         MS. FISH:  Thank you, your Honor.

 1            THE COURT:  Sure.  Go ahead, sir.

 2            MR. MAYER:  Thank you, your Honor.  Again, Thomas

 3    Moers Mayer of Kramer, Levin, Naftalis & Frankel for the ad

 4    hoc COP's, otherwise known as Dexia Credit Local and Nord LB,

 5    holders of approximately $375 million principal amount of

 6    COP's.  I'm at the podium to announce a deal in connection

 7    with our reservation of rights.  A small context.  We believe

 8    that the contract administration agreement of 2006, which was

 9    Exhibit 30 on the city's list -- I'm not sure where it is --

10            THE COURT:  Can I ask you to pause for a moment and

11    turn that microphone so that the head faces more towards you?

12    You can bend that part right by the microphone.

13            MR. MAYER:  Is this better, your Honor?  Sorry.

14            THE COURT:  Well, I don't want you to have to bend

15    over like that, so you can just --

16            MR. MAYER:  Oh, I see.

17            THE COURT:  -- lift up the microphone.  There you

18    go.

19            MR. MAYER:  There we go.

20            THE COURT:  Okay.

21            MR. MAYER:  Thank you.  The record contains what

22    used to be City Exhibit 30, contract administration

23    agreement, which contains a provision, Section 9.1.  We

24    believe that if your Honor approves the forbearance agreement

25    and it consummates and the swap counterparties get money,

13-53846-tjt   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 10 of 245
13-53846-swr   Doc 4304   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 15 of 245   15
463

1    they need to turn it over.  They believe they do not need to

2    turn it over.  This is a dispute that does not require

3    resolution in order for the forbearance agreement to be

4    approved, and the Court does not need to decide this issue

5    or, in our view, anything related to it, and we and the swaps

6    and the city all agree that it does not need to be resolved

7    in connection with this dispute.  We just did not want to be

8    prejudiced by the order that was submitted, and, therefore,

9    we have negotiated the insertion of a new decretal paragraph,

10    which I would propose to read into the record if that's okay.

11    It will not take long.

12          THE COURT:  Sure.  Go ahead.

13          MR. MAYER:  This order does not affect any claims or

14    defenses of any nondebtor party against any other nondebtor

15    party arising under or in connection with Section 9.1 of the

16    contract administration agreement dated June 12th, 2006, as

17    amended, among the Detroit Retirement Systems Funding Trust

18    2006, the service corporations, paren, as defined in the

19    forbearance agreement, close paren, and the other parties

20    thereto, period, end of proposed decretal paragraph.  If this

21    decretal paragraph is inserted into the order and the order

22    contains no provisions materially inconsistent with that

23    paragraph -- and I understand there is no intention to do

24    that -- Dexia and Nord withdraw their objections to the

25    forbearance agreement.  And with that, your Honor, if I may

13-53846-swr   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 16 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 16 of 245   16
463

1  ask if I may be excused.  Ms. Fish will, I think, continue to

2  monitor the proceedings for our clients.

3          THE COURT:  Yes, sir.

4          MR. MAYER:  Thank you very much.

5          MR. HACKNEY:  Your Honor, just a brief preliminary

6  statement if I could before I turn it over to the debtors.

7  On Friday the Court made a number of clarifying comments that

8  I think were helpful to the presentation of the trial today,

9  and we went back from Friday and processed what the Court's

10  result -- comments meant for exhibit lists, presentations of

11  cross-examination, having witnesses not fly here to the City

12  of Detroit because they wouldn't be testifying, but I did

13  want to confirm for the record what I think is an obvious

14  point, but that is that the Court's comments weren't mere

15  suggestions, that the Court's comments were in the way of

16  evidentiary rulings that the Court expects us to abide by

17  under Rule 103 and that the -- you know, the substance of the

18  excluded evidence is apparent from the Court's comments.  I

19  think if we could get confirmation of that, it will

20  streamline today's hearing.

21          THE COURT:  Yes.

22          MR. HACKNEY:  Thank you.

23          MS. ENGLISH:  Good morning, your Honor.  Caroline

24  English from Arent Fox representing Ambac.  I just have one

25  issue I'd like to raise before the debtor starts their case

13-53846-swr   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 17 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 12 of 24   17
463

```
 1    in chief, and it's --

 2            THE COURT:  Sure.  Go ahead.

 3            MS. ENGLISH:  -- with respect to the admissibility

 4    of the exhibits.  We just have one exhibit that the city has

 5    objected to, which, frankly, we think it may be a mistake.

 6    It is the offering circular for the COP's from 2006, which is

 7    signed by a city official, so, therefore, it's a party

 8    admission.

 9            THE COURT:  What number are you referring to?

10            MS. ENGLISH:  Yes.  I'm sorry.  It is Ambac Exhibit

11    Number 404.

12            THE COURT:  Does the city object to 404?

13            MR. SHUMAKER:  It does, your Honor.

14            THE COURT:  Apparently it's not a mistake.

15            MS. ENGLISH:  I'd like to argue for its admission as

16    opposed to having to --

17            THE COURT:  Oh, let me hear what the objection is

18    before --

19            MS. ENGLISH:  Certainly, your Honor.

20            THE COURT:  -- I hear that.  That will streamline

21    matters.

22            MR. SHUMAKER:  The objection, your Honor, is hearsay

23    and authentication.  The document purports to be a document

24    from the 2005 or 2006 time frame.  There's been no sponsoring

25    witness.  There's been no effort to authenticate it.  It is
```

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 18 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:22:10   Page 18 of 245
463
18

 1    hearsay.  It is being offered for the truth of the matter

 2    asserted, and that's why we raised our objection.

 3         MS. ENGLISH:  Your Honor, the document is the

 4    offering circular that was issued with the 2006 COP's.  It is

 5    signed by Roger Short, who was the city's interim finance

 6    director.  It is, therefore, a party admission under Federal

 7    Rule 801, and it should come in and be admissible.  It is a

 8    document --

 9         THE COURT:  Let's break these down.  Is it self-

10    authenticating under the Federal Rules of Evidence?

11         MS. ENGLISH:  Yes.  We believe it is, your Honor.

12         THE COURT:  What rule are you relying on there?

13         MS. ENGLISH:  I'm afraid I don't have that.

14         THE COURT:  Well, I'll tell you what.  Let me ask

15    you to look into that issue.  The second issue is you say

16    it's signed by this individual.  What you mean, of course, is

17    that it is purportedly signed by that individual, but I guess

18    the city is putting you to the test on whether there's really

19    evidence that he signed that, so you need --

20         MS. ENGLISH:  I think we're going to have a real

21    problem, your Honor, if the city is denying the authenticity

22    and validity of the statements made in its offering circular

23    under the securities laws.

24         THE COURT:  Well, I don't hear that at all.  What I

25    hear is that the document that you have identified as Exhibit

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 19 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 19 of 245   19
463

1  404 --

2       MS. ENGLISH:  404, your Honor.

3       THE COURT:  -- there's no evidence of its

4  authenticity, and in the absence of that, it's not

5  admissible.

6       MS. ENGLISH:  I understand, your Honor.

7       THE COURT:  So you can revisit this issue when it

8  comes time to present the objectors' case later.

9       MS. ENGLISH:  Yes.  Thank you, your Honor.

10       THE COURT:  All right.  Let's proceed.  Ms. Ball.

11       MS. BALL:  Thank you, your Honor.  Corinne Ball of

12  Jones Day on behalf of the city.  Good morning.  Your Honor,

13  we're here on two motions.  We seek to advance the

14  operational objectives of the city, motion to approve

15  assumption of the forbearance agreement, and the motion to

16  authorize the liens for the post-petition financing and make

17  the related findings.

18       The motion to approve the assumption -- the

19  forbearance agreement and the swap settlement was filed on

20  July 24th.  Objections were filed on August 16th, and our

21  reply, your Honor, was filed on December 12th.  The motion to

22  approve the granting of liens for post-petition financing and

23  make the related findings was filed on November 5th.

24  Objections were due on November 27th, and our reply was filed

25  on December 10th.  As we stand here this morning and after

13-53846-swr   Doc 2204-10   Filed 12/23/13   Entered 12/23/13 20:22:00   Page 20 of 245
13-53846-tjt   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:22:00   Page 20 of 245
463
20

1   the statements of Mr. Mayer, your Honor, there remain 11

2   objections to the assumption and settlement motion by our

3   count and 11 to the post-petition financing.  But for two

4   casinos and AFSCME, the eight some other objections to the

5   post-petition financing are also objectors to the assumption

6   motion.  We're here on both motions in part due to the

7   objectors' concerns that a 9019 motion allowing the swap

8   banks a secured claim should be tied to the city's ability to

9   realize the swap unwind discount.  Importantly, the

10  forbearance agreement is also contractually tied to the post-

11  petition financing.  You may recall last Friday, your Honor,

12  we reviewed that, in fact, termination of the liens on the

13  casino revenues pursuant to the forbearance agreement is

14  conditioned to the post-petition financing and not

15  surprisingly because both share a lien on the casino

16  revenues.

17          The developments to date, your Honor, the retirees

18  committee is supporting both motions.  We're advised that

19  National and Assured are withdrawing their objections to both

20  motions.  The language changes in the order that Mr. Shumaker

21  referred to that was filed last night were due to resolving

22  the objections of Assured and National.  You heard this

23  morning we will be filing an additional amendment to the

24  order to reflect the language that Mr. Mayer read into the

25  record.

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 21 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:16   Page 16 of 24   21
463

1      Finally, due to the constraints imposed by the
2   mediation process, the agreement by the swap banks to extend
3   the 75-percent option price through year-end, although it has
4   not yet been executed, the swap banks are prepared to
5   represent their agreement to that extension in today's
6   hearing, your Honor, and that they will execute what will
7   become the sixth amendment and what we would hope be
8   available later today.

9      As you heard during eligibility and will hear on a
10   more focused basis in these hearings, these motions address
11   stabilizing the city's working capital, anticipating cash
12   needs, anticipating the impact on the city's core working
13   capital.  In fact, your Honor, with the advice of Messrs.
14   Buckfire and Malhotra, which will be evidence before you, the
15   emergency manager has seen, as he reported in his -- in the
16   eligibility trial, 50 million in cash on hand as a floor
17   beneath which the city should not fall.  Sometimes I think
18   the aviators call that a hard deck.  In this hearing, your
19   Honor, Mr. Malhotra will testify to the cash flow numbers,
20   both actual and forecast, to various scenarios with and
21   without the swap settlement, with and without the post-
22   petition financing.  He'll also testify to the impact of the
23   swap settlement on the city's cash flows, the 50 million hard
24   deck, and the savings to be achieved through the relief
25   sought in both motions before you today.  Mr. Buckfire will

13-53846-tjt   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 23 of 45
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 17 of 245
463
22

 1   testify about the crisis that'll be caused if the casino
 2   revenues are trapped for a substantial period.  Moreover, Mr.
 3   Buckfire will testify that given the termination value of the
 4   swap and the expense of the swap compared to the consent
 5   value, there's clear need to unencumber the casino revenues
 6   in order to provide for the financial future of the City of
 7   Detroit.
 8            In addition, the need to remove or neutralize a
 9   continuing threat to the assured access of the city to casino
10   revenues, which is represented by a costly swap agreement
11   that is in default and has the benefit of a collateral
12   agreement, lock box arrangements, and the bankruptcy safe
13   harbors, which essentially make swap bank remedies and
14   trapping self-executing.  Mr. Buckfire will also review the
15   course of the negotiations with the swap banks.  Mr. Buckfire
16   will testify as to the inability of the city to borrow monies
17   on an unsecured basis and that the casino tax revenues and
18   income tax revenues are the strongest revenue streams
19   available to the city to provide for its financial future.
20            Moving on to Mr. Orr, Mr. Orr will testify as to the
21   litigation options considered by the city and the potential
22   impact of interrupting the city's access to casino revenues,
23   the process of weighing the uncertainty and risk in view of
24   the consequences of trapping the casino revenues for any
25   length of time, and the need to be assured of adequate

13-53846-swr   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 20:32:16   Page 18 of 24
13-53846-tjt   Doc 4304   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 23 of 245

463                                                              23

1  working capital for the city.  Mr. Orr has a responsibility

2  of moving forward.  As emergency manager, he has no interest

3  in justifying past transactions.  He has to assess options

4  and pursue the most stable reasonably reliable path forward

5  in the sound exercise of reasonable business judgment.

6       The assumption represents a question of reasonable

7  exercise of business judgment, and as will be presented in

8  this hearing and in that connection, the validity and

9  enforceability of the forbearance agreement is before the

10  Court in this hearing.

11       Through the testimony of Messrs. Malhotra, Buckfire,

12  Doak, and Orr and the documentary evidence, most of which has

13  already been admitted into evidence this morning, the city

14  believes it will demonstrate the benefits from approving the

15  forbearance and swap settlement and the financing will be

16  made clear as will the benefit from avoiding a potentially

17  broad-ranging litigation that would be lengthy, complex,

18  uncertain, threatening, and certainly expensive.

19       Your Honor, the evidence will establish that the

20  forbearance is an executory contract.  It is a separate

21  agreement which the city is assuming cum onere.  It is a

22  valid and enforceable contract, and on that point, your

23  Honor, I would note that we are in violent agreement with

24  Syncora that the Court has to find that the contract is valid

25  and enforceable to reach assumption.  Moreover, your Honor,

13-53846-tjt   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 24 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 19 of 24   24
463

1   it's not an inside --

2           THE COURT:  One second, please.

3           MR. GOLDBERG:  My apologies.  I'm turning this off.

4   I thought it was off already.

5           THE COURT:  I'm going to ask you to actually turn it

6   over to our court security officer at this point, please.

7           MR. GOLDBERG:  I apologize, your Honor.

8           THE COURT:  Everyone else's electronic devices off

9   or in vibrate mode, please.  You can retrieve it at the

10  break, sir.

11          MR. GOLDBERG:  I apologize.

12          MS. BALL:  Your Honor, although the forbearance

13  agreement represents an agreement between the city, the

14  service corps, and the banks, they're just not insider deals.

15  Mr. Buckfire will testify it was heavily negotiated with swap

16  banks.  Your Honor, the 9019 presents a settlement which

17  falls within the range of reasonableness, and it essentially

18  does allow a secured claim in exchange for forbearance.

19          Turning, your Honor, to the critical assessment that

20  we discussed somewhat on Friday, the 9019 and your Honor's

21  assessment of whether the settlement is fair and equitable,

22  we will turn to the Bard factors, the four factors that your

23  Honor has asked us to reflect upon.  I would point out just

24  as a preliminary, your Honor, you should take -- you might

25  want to take note that the lineup of the objectors suggests

13-53846-swr   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 20 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 20 of 245   25
463

that there are real differences in view as to the probability
of success on any litigation challenging the swaps, their
collateral, or the COP's. We have contract-based objectors.
As defenders, it's not dependent upon the validity of the
swaps, the COP's, and the lien on the casino revenues as to
which they assert consent rights. The remainder of the
objectors led by Ambac argue that the prospects and impact of
litigating validity place the swap settlement outside even
the lowest range of reasonableness, clear divergence of
views, your Honor. Representatives of the retirees and
pension systems echo that validity challenge objection,
surprising because the 1.4 billion raised in the COP's
transaction went to fund the pension systems. Every annual
statement they produced reflect that funding. When it comes
to the central debate and whether swap banks should be
treated secured by special revenues, the litigation issues
you'll hear about will revolve around special revenues. Are
the casino wagering tax revenues special revenues within
Section 901 giving the swap banks a post-petition lien under
Section 928 and an exemption from the Chapter 9 stay by
virtue of Section 922(d)? You'll hear about Act 34, which
focuses on events in 2006. Was entry of the swap valid? As
Act 34 applies to the city, are the service corps the alter
ego of the city, and should they otherwise be disregarded and
the city deemed to be the swap counterparty, thus making the

1    swap invalid?  You'll hear about Section 12 of the Michigan

2    Gaming and Control Act.  Was the pledge of casino revenues to

3    secure antecedent debt with the authorization of that

4    section?  And if it wasn't, was it void or voidable, or was

5    it preempted by the -- was any challenge preempted by the

6    bankruptcy safe harbors?

7            When it turns to the second factors, your Honor

8    instructed us on Friday the focus is the juxtaposition of the

9    quality of the secured creditors' claim, the swap banks as

10   secured against, your Honor, the preserving and protecting

11   the city's cash flow.  There is no doubt that the swap banks

12   are swap participants.  Absent a court decree to the

13   contrary, they are swap participants that have excise taxes

14   as collateral, which is a type of tax specifically referred

15   to in 901's definition of special revenues.  And as your

16   Honor may recall from our debate in August, swap participants

17   enjoy special protections which exempt them from the

18   automatic stay and the stay of Section -- of 922(a) and,

19   moreover, according to some courts, broadly permit swap

20   participants to exercise remedies.  That would be 362(b)(17)

21   and 922(d).

22           In addition, the Bankruptcy Code ties this Court's

23   hands in preventing the Court from issuing orders or

24   providing further -- and providing further that nothing in

25   Title 11 is to interfere with the swap parties terminating,

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 27 of 45
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:42:10   Page 22 of 24      27
463

1   liquidating, et cetera.

2          You'll hear from the swap banks that they have five

3   key factors.  They can terminate, as we just discussed.  They

4   believe they can exercise remedies.  They have a statutory

5   lien on casino revenues, which are special revenues.  They

6   have control over cash collateral through lock box accounts,

7   and, your Honor, they would argue that the safe harbors

8   prevent a challenge.  Thanks to Syncora, we know they have a

9   demonstrated ability to trap the casino revenues.  Your Honor

10  would say -- you've heard the phrase that the operation was a

11  success but that the patient died from the complications.  We

12  think that analogy is apt and captures the city's concerns on

13  the second Bard factor, as Messrs. Buckfire, Malhotra will

14  establish and Mr. Orr will confirm, that cash is a critical

15  lifeline for the city, and that, of course, gets us the third

16  Bard factor, and I don't think there's any doubt, your Honor,

17  that the potential challenges described by Ambac present

18  complicated and unique questions involving municipal finance

19  law in the State of Michigan tied to swap contracts which

20  enjoy ever expanding protection from the impact of bankruptcy

21  as underscored by two Circuit Court decisions in the recent

22  past.

23          Finally, your Honor, turning to the interest of

24  creditors, one thing that we would ask that you bear in mind

25  and we view as very critical in the fourth factor, there was

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 28 of 245
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 28 of 245   28
463

1   no middle ground.  Litigate or settle with a view to

2   protecting and preserving the city's cash.  Enron and its

3   Lehman progeny demand that the swap banks act or that they

4   risk forfeiting their bankruptcy protection.  Your Honor, it

5   is only the forbearance agreement and their post-petition

6   performance under it that has prevented the swap banks from

7   initiating their remedy sequence and calling those bankruptcy

8   protections into play.

9           As to the post-petition financing, your Honor,

10  Messrs. Doak and Buckfire will provide evidence that the

11  unsecured -- that unsecured credit is not available to the

12  city.  I'm sure that comes as no surprise.  Mr. Doak will

13  also testify that following a robust process, the post-

14  petition financing represents the best feasible financing

15  available -- realistically available to the city in its

16  current condition when the city is only able to offer limited

17  collateral and the city has to additionally insist on

18  remedies which preserve the city's ability to operate even in

19  the face of default.  Your Honor, that was a tall order.

20          Mr. Doak will also testify as to the negotiations

21  with potential lenders and Barclays providing the evidence,

22  your Honor, for the findings on good faith.  Mr. Doak as well

23  as Mr. Orr will testify as to the steps taken with the state

24  treasurer, the individual members of the City Council, and

25  the Emergency Loan Board in respect to the financing and

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 29 of 245
13-53846-swr   Doc 2295   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 24 of 245   29
463

1  related items.

2  Your Honor, I will yield to the evidence as we move

3  to witnesses, but I would like to reserve to answer the

4  contract issues, also called the consent issues, and to

5  answer the Court's questions and objectors' argument.

6  THE COURT:  Well, I don't have a question, but I do

7  have a concern that I want to bring to your attention so that

8  you can focus your evidence.  I want to understand, as best

9  you can help me to understand it, what the considerations

10  were that led to the agreement to buy out the swaps at 75

11  percent as opposed to some other percentage.

12  MS. BALL:  Understood, your Honor.  We will do that.

13  Thank you, your Honor.

14  THE COURT:  Anyone on the objecting side want to

15  give an opening statement, or shall we go directly to proofs?

16  All right.

17  MR. STEWART:  Good morning, your Honor.  Geoffrey

18  Stewart, Jones Day.  Our first witness is going to be Gaurav

19  Malhotra.  Before we start, though, I intend, as best I can,

20  to qualify Mr. Malhotra as an expert so we don't have the

21  issues that we had in our last hearing.  I spoke before court

22  today with Mr. Hackney, who may well have objections to that,

23  so we have a procedural question, and maybe instead of

24  speaking for you -- I believe it has to do -- Mr. Hackney may

25  well want to voir dire the witness on his expert credentials,

13-53846-tjt   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 30 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 26 of 24   30
463

1   which we could do in the middle of his direct, or we could

2   wait for Mr. Hackney's cross, as your Honor would prefer.

3          THE COURT:  No.  I think it's in the best interest

4   of all concerned to have a determination regarding his

5   expertise before we hear his proffered expert opinion.

6          MR. STEWART:  Good.  Okay.  Then, your Honor -- so

7   why don't we call the witness, and I'll get --

8          THE COURT:  Yes.  Step forward, please, sir.

9          MR. STEWART:  We'll get that part of it done.

10         THE COURT:  Before you sit down, please raise your

11  right hand.

12          GAURAV MALHOTRA, DEBTOR'S WITNESS, SWORN

13         THE COURT:  All right.  Please sit down over there.

14  Proceed, sir.

15                     DIRECT EXAMINATION

16  BY MR. STEWART:

17  Q   Good morning, Mr. Malhotra.

18  A   Good morning.

19  Q   Would you please, for the record, state your -- give us

20  your name and where you live?

21  A   Gaurav Malhotra, and I live in Chicago, Illinois.

22  Q   And describe for us, if you could, your education.

23  A   I graduated from undergrad in India from University of

24  Delhi and finished my MBA from Case Western Reserve

25  University in 2001 with majors in finance and business

13-53846-tjt   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 26 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:32:16   Page 26 of 245   31
463

1  policy.

2  Q   After your graduation from Case Western Reserve, where

3  did you go to work?

4  A   Ernst & Young.

5  Q   And is that where you still work today?

6  A   That is correct.

7  Q   In the interim, you've been with other groups or other

8  employers?

9  A   Yes.  With other restructuring practices, yes.

10 Q   You just used the word "restructuring."  For the record,

11 tell us what you meant when you used the word

12 "restructuring."

13 A   It involves assessing and developing a business plan for

14 a client for both the short term and the long term.

15 Q   And is that development of a business plan sometimes

16 called financial analysis?

17 A   Yes.

18 Q   Would you call yourself somebody who works in the field

19 of financial analysis?

20 A   Yes.

21 Q   Now, you've been working for the City of Detroit?

22 A   Yes.

23 Q   And for how long?

24 A   For about two and a half years.

25 Q   And tell us just generally speaking what sort of work

1  you've done for the city in those two and a half years?

2  A    Our work has involved -- my work has involved extensive

3  forecasting of cash, the development of short-term and long-

4  term financial projections for the last two-plus years.

5  Q    Have you also done work for other municipalities?

6  A    Yes, I have.

7  Q    What are the other municipalities that you can tell us

8  about?

9  A    The one that's publicly disclosed is Detroit Public

10  Schools in which we did extensive cash flow forecasting as

11  well as we have two other situations in which I'm involved in

12  right now that are municipalities.

13  Q    Okay.  And you cannot -- you're not free to give us the

14  names of your clients in those two other instances?

15  A    No.  Those are confidential.

16  Q    Okay.  In addition to representing municipalities or

17  working for municipalities, what work have you done as a

18  financial analyst for private sector clients?

19  A    I've represented both public and private companies that

20  have been distressed in terms of evaluating and creation of

21  long-term business plans.

22  Q    What are the names of some of those companies?

23  A    Some of the publicly disclosed ones are Delta Airlines,

24  Eagle-Picher, Liberty Medical, going on right now, some of

25  the publicly disclosed ones.

1  Q   Now, have you been engaged by my law firm, Jones Day, to

2  testify as an expert witness in this hearing?

3  A   Yes.

4  Q   And to testify about what?

5  A   To testify about financial analyses related to the City

6  of Detroit.

7  Q   Let me ask you then about your background a little bit.

8  How many years have you worked as a financial analyst?

9  A   Since I graduated from grad school, 13-plus -- almost 13

10  years.

11  Q   Are you a member of any professional associations that

12  focus upon financial analysis?

13  A   Yes.  I'm a chartered financial analyst, a CFA.

14  Q   And is that a qualification for which you have to take a

15  test and be approved by some board?

16  A   Yes.  You have to take tests for three years and be

17  approved.

18  Q   What about other professional organizations?

19          THE COURT:  Excuse me one second.  You have to take

20  tests what, sir?

21          THE WITNESS:  And get approved.

22          THE COURT:  And get approved.  All right.

23          THE WITNESS:  Yes.

24  BY MR. STEWART:

25  Q   And other associations as well?

1   A   Yes.  I'm a member of the Association of Insolvency and

2   Restructuring Advisors as well as the Turnaround Management

3   Association and have completed my tests for the certification

4   of insolvency and restructuring advisors.

5   Q   And who gives that certification?

6   A   It's the Association of Insolvency and Restructuring

7   Advisors.

8   Q   Okay.  And that's pending?

9   A   That's correct.

10   Q   And what remains to be done before that is finished?

11   A   I have to send in my paperwork.

12   Q   Okay.  Tell us, if you could, what knowledge and skills

13   you need in order to do the work of financial analysis.

14   A   You have to be able to assess and evaluate data from

15   multiple sources from a historical perspective in terms of

16   how they come together, how the data cross-checks with each

17   other, and what within that data would be considered as one-

18   time items versus long-term trends, and the evaluation of how

19   that historical performance impacts future performance from a

20   forecast standpoint.

21   Q   And you're able to do that work because of specialized

22   knowledge that you have?

23   A   Yes.

24   Q   What is the specialized knowledge?

25   A   It's my years of experience doing this, my financial

1  education, as well as my business experience in terms of

2  dealing with multiple situations like this.

3  Q   Okay.  Now, in the course of your work for the city, who

4  from the city have you worked with?

5  A   We've worked with the emergency manager.  We've worked

6  with the former CFO, the mayor, the chief of staff, the chief

7  operating officer, department heads, so --

8  Q   Have you worked with the finance director?

9  A   Yes.

10  Q   And the treasurer?

11  A   Yes.

12  Q   Sorry.  Anyone else?

13  A   Various department heads at the city and the CFO and the

14  COO.

15  Q   And what books and records of the city have you had

16  access to and have you relied upon?

17  A   We have relied upon bank statements, the comprehensive

18  annual financial report, the internal operating reports

19  presented by the city.

20  Q   Let me stop you there.  What would be a good example of

21  such an internal operating report?

22  A   It would be a report that would summarize some of the

23  revenues and expenses from an interim standpoint as well as

24  some cash posting activity that is available on an

25  internal -- from an internal standpoint.

13-53846-swr   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 36 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 31 of 24   36
463

1  Q   And what's -- how many internal reports have you looked

2  at if you can count them?

3  A   I would say it's dozens in terms of the number of

4  reports.

5  Q   Have you also looked at the city's budgets?

6  A   Yes.

7  Q   What's the relevance of the budgets to your work?

8  A   Because the budget provides some sort of a framework for

9  providing the projections going forward, and we are able to

10 evaluate the budget in terms of how it compares to the

11 historical performance and the actual performance activity

12 that we have seen over the last two-plus years.

13 Q   Now, you use the term "we."  Are you referring to a group

14 above and beyond yourself?

15 A   Yes.  I have multiple members of my team that are

16 assisting me on this engagement.

17 Q   And how large is the team that reports to you on this

18 engagement?

19 A   It's between ten and fifteen people at any given point in

20 time.

21 Q   Let me ask you this.  Is there a standard and accepted

22 methodology that financial analysts follow in performing

23 their work?

24 A   Yes.

25 Q   Tell us, if you could, what is that standard and accepted

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 37 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 32 of 245   37
463

1  methodology?

2  A    It is the -- it is to study and evaluate the historical

3  performance in detail, to understand what one-time items are

4  impacting the historical performance, what are trends, and

5  are there any other one-time events that are impacting the

6  performance, and then also the process of discussing those

7  trends and observations with the management team, getting

8  their input, and then collectively the combination of using

9  the historical data, the combination of discussions with the

10  management team, coming up with forecasts that are reasonable

11  based on the overall assumptions.

12  Q    And what do you do to test assumptions?

13  A    To test the assumptions, we study as to how those

14  assumptions have played out from a historical standpoint,

15  what the basis of those assumptions are in our view along

16  with the view of the management team.  We also study if there

17  are any anomalies in terms of the assumptions compared to

18  what the historical performance has been.

19  Q    Now, do you use computer software to help you conduct

20  this analysis?

21  A    Yes.

22  Q    What is the computer software?

23  A    We use Excel.

24  Q    Is that a standard computer application that people use

25  in the field of financial analysis?

1   A   Yes.

2   Q   Now, as a result of your work, have you prepared cash

3   flow forecasts for the City of Detroit?

4   A   Yes, we have.

5   Q   And walk us through the steps you followed to prepare

6   these cash flow forecasts.

7   A   We have gone -- we have and I have evaluated bank

8   statements of the city, internal operating reports of the

9   city, the analysis of the CAFR, also discussions with the

10  management team to highlight what the receipts and

11  disbursements activity has been within certain

12  classifications on a historical standpoint in terms of our

13  analysis of the bank statements.  Based on that summary, in

14  conjunction with the budgets and discussions with the

15  management team, we have gone ahead and extrapolated

16  assumptions with respect to what the data would be, for

17  instance, for payroll, for revenues to come up with what we

18  think is a reasonable cash flow forecast for the city.

19  Q   How long, by the way, has it taken you and your team --

20  pardon me -- to prepare these cash flow forecasts?

21  A   Several months.

22          MR. STEWART:  Your Honor, I would move to qualify

23  Mr. Malhotra as an expert witness in the field of financial

24  analysis for the purpose of testifying about the cash flow

25  forecast he has prepared relating to the finances of the City

1    of Detroit.

2         MR. ARNAULT:  Good morning, your Honor.  Bill

3    Arnault on behalf of Syncora.  Just a few questions for the

4    witness.

5                    VOIR DIRE EXAMINATION

6    BY MR. ARNAULT:

7    Q    Good morning, Mr. Malhotra.  How are you?

8    A    Good morning.  Fine.  Thank you.

9    Q    Good to see you again.  Just a few questions about your

10   general background and qualifications.  You've never been

11   qualified as an expert witness before; correct?

12   A    That is correct.

13   Q    And before this case, you've never worked on a Chapter 9

14   case; is that right?

15   A    That is correct.

16   Q    But you have done work in the public sector, it sounds

17   like; right?

18   A    Yes, I have.

19   Q    But those are the two instances that you're not willing

20   to disclose because of confidentiality reasons; correct?

21   A    Two plus the Detroit Public Schools.

22   Q    Okay.

23   A    That's correct.

24   Q    I'm assuming, however, without knowing what those are,

25   that the cash forecasts and the work that you've done for the

1   other two municipalities wasn't on the size or scale of the

2   City of Detroit; is that correct?

3   A   I think Detroit Public Schools, in terms of their general

4   fund budget, was similar to the size of the general fund for

5   the City of Detroit in terms of its magnitude.

6   Q   Really? So the general fund for the Detroit Public

7   Schools is as large as the general fund for the City of

8   Detroit?

9   A   I think it's close enough. I would have to go back and

10   look at the exact number, but I think it's reasonably close.

11   Q   Okay. And all the same assumptions that would go into

12   building the forecast for the City of Detroit, would those

13   also go into the Detroit Public Schools?

14   A   Generally, yes, because they also have -- Detroit Public

15   Schools has significant tax revenues that come in as well as

16   has a significant amount of its fixed obligations in the

17   amount of payroll and other operating expenses, so the

18   overall revenue landscape I would say is similar; however, it

19   gets impacted, of course, by student count. So in terms of

20   magnitude, I think the general fund impact is roughly

21   similar.

22   Q   And the magnitude of the expenses is the same in the

23   Detroit Public Schools as it is for the City of Detroit?

24   A   For the general fund, my recollection is yes, but I can

25   go back and look at the details, but my recollection is that

1  the general fund impact is roughly the same.

2  Q   And correct me if I'm wrong.  My understanding would be

3  that the Detroit Public Schools is just one entity, whereas

4  the City of Detroit has a number of various departments;

5  correct?

6  A   Detroit Public Schools has various departments.  It's not

7  just one department.  It has various departments that roll

8  into the financial profile of Detroit Public Schools.

9  Q   But not as many departments as the City of Detroit;

10  correct?

11  A   I'm not sure as to exactly how many departments the

12  Detroit Public School has right now.

13  Q   And you're not a CPA; is that right?

14  A   That is correct.

15  Q   And you're not an economist, are you?

16  A   I'm not.

17  Q   Okay.  Nor are you an actuary; correct?

18  A   That is correct.

19  Q   Okay.

20        MR. ARNAULT:  Your Honor, we would object to the

21  city's offer of Mr. Malhotra as an expert based on the

22  grounds that he lacks the qualifications and the technical

23  experience to create the cash flow forecast that he will be

24  offering.

25        MR. MARRIOTT:  Your Honor, Vince Marriott, Ballard

13-53846-swr   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 42 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 37 of 245   42
463

1   Spahr, on behalf of EEPK and also the other objectors.  In

2   addition to the qualification issue, Judge, I'd like to make

3   a relevance objection to what sounds to be the opinion

4   testimony that Mr. Malhotra will be giving.  Given the

5   limitations on the scope of this Court's inquiry --

6           THE COURT:  Well, let me ask you to hold on your

7   relevance objection, to the extent it relates to the opinion

8   that will be given, until it is proffered.

9           MR. MARRIOTT:  Very well, your Honor.  Thank you.

10          MR. STEWART:  Your Honor, in response to Mr.

11  Arnault's point, I don't think it's necessary that

12  Mr. Malhotra be an economist or a CPA.  He said he's a

13  certified financial analyst, and he's described at length his

14  credentials.  I think he satisfies the requirements of Rule

15  702, which are fourfold, and I hope that I covered them in

16  that order.  First, that the expert's specialized knowledge,

17  it speaks of scientific, technical or other specialized

18  knowledge without getting into whether it's scientific or

19  even technical.  I believe that it's clear it's specialized,

20  and it's specialized because of its complexity, because of

21  the need to take different data sources into account, and to

22  follow the processes and methods that he described.  And

23  the -- this part of the rule says it would help the trier of

24  fact to understand the evidence or to determine a fact that

25  is in issue.  And understanding Mr. Marriott's objection as

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 43 of 245   43
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 38 of 24
463

1  to relevance, which we'll deal with shortly, I believe the

2  cash flow forecasts we intend to speak about are relevant

3  because they would show the effect upon the city's finances

4  if it were the case that the casino revenues that Ms. Ball

5  mentioned earlier were not available to the city.

6           THE COURT:  All right.  On the qualifications issue,

7  the Court will find that the witness is qualified by his

8  experience and training to proffer to the Court an expert

9  opinion on his cash flow analyses of the City of Detroit, and

10  the objection is overruled.  You may proceed.

11           MR. STEWART:  Thank you, your Honor.

12               DIRECT EXAMINATION (CONTINUING)

13  BY MR. STEWART:

14  Q   So the first exhibit will be Exhibit -- City Exhibit 36.

15  So, Mr. Malhotra, let me ask you about some of your cash flow

16  work that you've done.  On the screen before you is Exhibit

17  36.  Are you able to see it on the monitor there at the

18  witness stand?

19  A   Yes, I am.

20  Q   Okay.  Did you prepare cash flow -- and by the way, what

21  is this document?

22  A   This was the proposal for creditors that was presented on

23  June 14, 2013, by the emergency manager.

24  Q   Okay.  And if you could speak more slowly because the

25  court reporter has to take all of this down, and the faster

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 44 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 39 of 245   44
463

1    you talk, the harder her job gets.

2    A    Sure.

3    Q    And you don't want her --

4         THE COURT:  Thank you for that caution.  And, Mr.

5    Marriott, I don't want you to feel the need to rush the

6    lectern when you want to object, so just pull one of those

7    microphones closer to you, and I'll ask you to make your

8    objection at the time you think it's appropriate from the

9    lectern -- from the table there.

10        MR. MARRIOTT:  Thank you, your Honor.

11        THE COURT:  Okay.

12   BY MR. STEWART:

13   Q    And, Mr. Malhotra, were you at the June 14, 2013,

14   meeting?

15   A    Yes, I was.

16   Q    And what use was made of that document that day?

17   A    It was used to show the city's financial position and its

18   projections over the next ten years and what cash was

19   available for unsecured creditors.

20   Q    Did you prepare any cash flow forecasts that are

21   contained within Exhibit 36?

22   A    Yes, I did.

23   Q    Could you please direct us to those within the exhibit?

24   A    Yes.  They would be, I believe, on pages 57 and 58.

25   Q    Okay.  Can you scroll to those, please?  Let's go to

13-53846-tjt   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 40 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:42:10   Page 40 of 245   45
463

1  page -- you see there's competing page numbering of this

2  exhibit, Mr. Malhotra.  Were you referring to the page that

3  we have before us that appears to be page 49?

4  A   Yes.

5  Q   And you prepared this?

6  A   Yes.

7  Q   What is it?

8  A   It is a summary of the actual cash flows for the city's

9  general fund for -- from July 2012 to May 2013 and a one-

10 month forecast for the month of June 2013 to give a snapshot

11 of fiscal year '13's cash flow activity compared to fiscal

12 year 2012's cash flow activity.

13 Q   And what does the next page show?

14 A   Next page shows the forecasted cash flows for fiscal year

15 2014 on a monthly basis.

16 Q   Did you prepare these cash flow forecasts in the manner

17 you described to us a few minutes ago when I asked you about

18 how you went about your work as a financial analyst?

19 A   Yes.

20 Q   Are there other forecasts that you prepared also in

21 Exhibit 36?

22 A   Yes.

23 Q   Where are those?

24 A   Those should be on pages 97, 98, which broke down the

25 ten-year projections for the city from 2014 to 2023.

1  Q   Okay.  All right.  Thank you.

2         MR. STEWART:  Your Honor, I would move the admission

3  of Exhibit 36, although I think it may actually have been

4  stipulated in as Sole Exhibit 1360.

5         MR. MARRIOTT:  Objection, your Honor.  I'm not sure

6  it was stipulated in, and I think relevance objections and

7  potentially hearsay objections were asserted to it.  Let me

8  explain to you my issue, Judge, and the purposes for which

9  it's being introduced may impact whether the -- how much I

10  object.

11         THE COURT:  I'm sorry, sir.  I do have to ask you to

12  stand while you make your objection and use the microphone as

13  best you can.

14         MR. MARRIOTT:  It might be easier to come to the

15  podium then because --

16         THE COURT:  If that's your preference, that's fine

17  with me.

18         MR. MARRIOTT:  -- the mike then isn't so far from

19  the -- people complain about not being able to hear me

20  without a mike, so -- Judge, given the limitation on the

21  scope of this Court's inquiry with respect to approval of the

22  post-petition financing and the forbearance agreement, it's

23  our contention that Mr. Malhotra can relevantly testify as to

24  the amount that will be payable under the forbearance

25  agreement if the Court approves it and may testify as to the

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 47 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 42 of 245     47
463

1    city's cash savings if the transactions are approved and
2    funded as distinguished from disapproved.  It is our
3    contention that he may not testify and we object to any
4    testimony as to the need or uses of the additional cash flow
5    generated by the proposed transaction nor can he testify as
6    to the city's projected cash balances going forward because
7    imbedded in any such projections are assumptions as to the
8    needs and uses of the city.  We similarly object to any
9    exhibit to the extent it is purported to be introduced for
10   purposes other than those to which we believe Mr. Malhotra
11   can testify; i.e., amount of the payment and cash savings
12   resultant from the transaction; in other words, it's going to
13   cost the city 50 million a year if we don't do this deal, and
14   it will only cost the city $20 million a year if we do.  He
15   can testify as to that.  He can testify as to what it's going
16   to cost under the forbearance agreement if it's approved.
17   But if he gets into net cash balance testimony, if he gets --
18   if we start introducing projections, those projections are
19   built up from needs and uses assumptions, which we have taken
20   out of this hearing as relevant and as to which, if they were
21   relevant, we would have produced witnesses that would have
22   contested some of the assumptions underlying needs and uses
23   and the like in those projections, so we don't object to
24   Mr. Malhotra testifying as to cost of the forbearance
25   agreement and the savings resulting from it, nor do we object

 1   to exhibits insofar as they are introduced solely for the

 2   purpose of reflecting those two numbers, but for any other

 3   purposes and as to any other testimony, we object.

 4          MR. STEWART:  Your Honor, a few responses.  First of

 5   all, I think the forecasts are relevant and material to the

 6   decision of the emergency manager to enter into this

 7   agreement and the reasons why the city submits that the

 8   forbearance agreement should be approved.  As to the fact

 9   that the forecast bundle and assumptions about spending and

10   other things have been given to the witness by others, we

11   don't intend to one way or the other speak about them other

12   than the fact that they are numbers that are part of the

13   city's budgeting and part of this forecasting process.  I

14   don't understand the objection to the extent it seems to

15   suggest that somehow forecasts should be developed that put

16   those numbers to one side because one really cannot put those

17   numbers to one side.  That is the budget, that is the

18   forecast, and so I must have misunderstood the objection to

19   that degree.

20          THE COURT:  Well, but I didn't quite hear in your

21   response how the information in these cash flows bears upon

22   whether these motions should be granted.

23          MR. STEWART:  Well, it demonstrates, first of all,

24   the first cash flows, what financial information was

25   available to those who -- to the emergency manager and to the

13-53846-tjt   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 44 of 245
13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 49 of 245   49
463

1    city when they decided it was necessary or appropriate or

2    proper or advisable to enter into the forbearance agreement,

3    and other cash flows will show what the effect would be upon

4    the city if they had not entered into the forbearance

5    agreement, which corroborates the decision of their business

6    judgment to enter into it.

7         THE COURT:  All right.  Mr. Plecha, you're standing

8    there patiently.  Is there something you want to add to

9    this --

10        MR. PLECHA:  Just briefly, your Honor.

11        THE COURT:  -- without repeating anything that's

12   already been said?

13        MR. PLECHA:  And that's why I rise, your Honor, just

14   so I don't have to rise later so that the parties that are

15   not making live objections can rely on the objections and

16   arguments stated on the record by the objecting parties.

17   Thank you, your Honor.

18        THE COURT:  Yes, sir.  Absolutely.

19        MR. STEWART:  Your Honor, I believe I said this

20   before, but one of the -- one of the points this testimony

21   will make is of critical importance to the city's finances of

22   having access to the casino revenues, which, of course, are

23   the very -- is the very stream of income that is freed up by

24   the forbearance agreement.

25        THE COURT:  Let's dig a little deeper here.  What is

1   the -- you say you offer this to show what information the

2   emergency manager and presumably his advisors had when they

3   were negotiating and deciding to enter into the forbearance

4   agreement.

5          MR. STEWART:  Correct, yes.

6          THE COURT:  What will your evidence show is the link

7   between -- the connection between what's in these forecasts

8   and that decision?

9          MR. STEWART:  It will show that unless the casino

10  revenue is unencumbered and available freely to the city to

11  use to fund its operations and its plans, the city would not

12  have sufficient cash to operate.

13         THE COURT:  Well, but to that Mr. Marriott says

14  that's only true because the city has made decisions to spend

15  its income in -- its other income in other ways, and he

16  points out that this is not a trial on how the city is

17  supposed to be spending its money.

18         MR. STEWART:  Correct.  And the city --

19         THE COURT:  So how do I conduct this trial without

20  opening up that enormous issue and still admit this?

21         MR. STEWART:  Because, your Honor, first of all,

22  we -- as I understood your ruling on Friday, it is that the

23  city's decisions on how it wishes to spend its money are not

24  what we're here to deal with today.  That is why we're not

25  putting proofs on as to that, why we haven't -- for example,

1   why we don't intend to call Mr. Moore.  We're instead taking

2   those as a given.

3        THE COURT:  Well, but isn't this cash flow that very

4   evidence?

5        MR. STEWART:  Well, the cash flow is the evidence of

6   what you have after you've made those expenditures, yes, but

7   that's true, of course, all expenditures, not just

8   restructuring or other ones that have come up, that came up

9   on Friday or that were the subject of other testimony or

10  argument before the Court.  Since cash is fungible and every

11  expenditure made reduces cash to the amount of the

12  expenditure, this is true -- I think my thinking on Mr.

13  Marriott's objection is it would require, if we were to

14  accept it, that we strip the city's budget all the way down

15  to zero balance it and rebuild the entire thing before we go

16  further, but my understanding of your Honor's rulings have

17  been we sort of take the expenditures as we find them, and

18  what we have here is should we approve the assumption of this

19  contract, the settlement agreement, and one of the elements

20  as to should it be assumed is the sound exercise of business

21  judgment by the person who made the decision to enter into

22  it.  And the financial effects of an agreement that is about

23  finances I would submit is very important to analyzing that

24  business judgment.

25       THE COURT:  Mr. Marriott, what I hear Mr. Stewart

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 52 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 47 of 245   52
463

1  saying is that there's nothing inconsistent with admitting

2  this document and limiting the scope of this trial as I

3  proposed because under Section 903 and 904, the Court and,

4  frankly, the objecting parties are required to accept the

5  political decisions that it reflects.

6  MR. MARRIOTT:  Judge, let me respond to that because

7  that exhibit and testimony embedded in that exhibit about

8  needs and uses is exactly the rabbit hole that I believe you

9  declined to go down on Friday, and, therefore, it's exactly

10 the rabbit hole as to which we have withdrawn witnesses that

11 would have provided testimony to that respect.

12 As and to the -- Mr. Stewart also indicated that the

13 finances of the city were important to the emergency

14 manager's decision to enter into the forbearance agreement.

15 The finances of the city is a need -- that's a need-based

16 argument.  It's an argument from here's where we are, here's

17 where we need to be, and, therefore, we're going to enter

18 into the forbearance agreement, therefore, we're going to

19 enter into the DIP.  And it was just that inquiry that was

20 cordoned off on Friday.

21 What I am proposing is left -- and I don't think

22 there's anything inconsistent or budgetary destroying about

23 this -- is Mr. Malhotra can certainly testify, Judge, it's

24 going to cost this under this forbearance agreement.  This is

25 what the city is going to be out of pocket.  The city's cash

1  position, the delta -- forget about the net.  The net starts

2  to get into the need and uses.  The city's cash position will

3  improve if we do this by $30 million.  Now, the city can then

4  argue persuasively or not that this deal was a good idea for

5  $30 million in extra cash that the delta is sufficient

6  justification without getting into needs and uses, and it

7  seems to me, your Honor, that after Friday that's what

8  they're left to, and I don't think there's anything

9  inconsistent about holding them to that and refusing to admit

10  testimony or exhibits that go beyond that from Mr. Malhotra

11  or any other witness.

12      MR. STEWART:  Your Honor, I'm not sure I still

13  understand Mr. Marriott's objection.  As I understood him, he

14  was saying on Friday it was determined that we're not going

15  to go into the city's decisions about what it does and

16  doesn't want to spend money on, that those are something

17  that's beyond what the Court is going to do and beyond what

18  we're here to do this week.  In other words, those

19  expenditures are in the budget.

20      THE COURT:  I'm prepared to rule.  The Court is

21  going to overrule the objection.  It's a long way from the

22  Court will not judge the political decisions of the city on

23  how it will spend its money to considering as evidence what

24  those political decisions were regarding how the city spent

25  its money when those political decisions are relevant to the

13-53846-swr    Doc 2299-10  Filed 12/23/13  Entered 12/23/13 20:32:10  Page 49 of 245
463
13-53846-swr    Doc 2304-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 54 of 245    54

1  issues before the Court, and the Court concludes they clearly

2  are.  You may proceed.

3      MR. STEWART:  Thank you, your Honor.

4      MR. MARRIOTT:  Your Honor, can I -- given your

5  ruling and so I don't totally disrupt the case as it

6  proceeds, if I may assert a standing objection to testimony

7  or exhibits in connection with Mr. Malhotra's presentation

8  here today that go beyond those two areas that I believe are

9  appropriate.

10      THE COURT:  Yes, sir.  We will --

11      MR. MARRIOTT:  Thank you.

12      THE COURT:  We will allow that standing objection.

13      MR. STEWART:  I believe, your Honor, I had moved the

14  admission of Exhibit -- City Exhibit 36.

15      THE COURT:  36?  36 is admitted.

16      MR. STEWART:  Thank you, your Honor.  Your Honor,

17  can I clarify?  Was that the entire exhibit?

18      THE COURT:  Ah, that's a good question.  Thank you.

19  I meant to -- I meant to inquire about that myself.  Your

20  examination justifies the admission into evidence of the

21  pages that you asked the witness about.  Is that your offer?

22      MR. STEWART:  I was going to offer the entire

23  document, your Honor, because he testified about having

24  attended the meeting that the proposal was made.  This was

25  something shared with creditors, and although I didn't

13-53846-tjt   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 55 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 55 of 245    55
463

 1   examine him about the entire document, I think it's certainly

 2   authenticated by the witness, and I think beyond that

 3   objection --

 4          THE COURT:  Well, but what's the relevance of the

 5   rest of this document?

 6          MR. STEWART:  It would have to be for others who are

 7   going to be examining witnesses later, your Honor.  I believe

 8   it is because it is the baseline financial case for the city

 9   that certainly did change between that date and when the

10   forbearance agreement was executed but is relevant because it

11   shows maybe for want of a better word the starting point and

12   explains in detail sort of how the city got to that starting

13   point.

14          THE COURT:  Well, all right.  I'm going to ask you

15   to reserve your offer of the rest of the document until that

16   relevance is more completely established.  Let's review the

17   specific pages to make sure we all agree.  What pages did you

18   ask of the -- ask the witnesses about?

19          MR. STEWART:  Your Honor, like others --

20          THE COURT:  And let's be sure --

21          MR. STEWART:  -- I've been defeated by the number

22   system.

23          THE COURT:  -- we use the precise page numbers and

24   not the conflicting page numbers.

25          MR. STEWART:  Page 49 and 50 of the original

1  numbering.

2          THE COURT:  Yes.  Let's use the original numbering.

3          MR. STEWART:  The original.  Okay.  And then I

4  believe thereafter it was 91.  No.  90 and 91 if I have that

5  correct.

6          THE COURT:  Is that right, sir?  Mr. Malhotra, is

7  that right?

8          THE WITNESS:  Yes, your Honor, that's right.

9          THE COURT:  Those are the original page numbers with

10  your cash flow analyses on them?  Yes?

11          THE WITNESS:  Yes.

12          THE COURT:  Is that right?

13          MR. STEWART:  Yes.  I thought the witness had said

14  "yes."

15          THE WITNESS:  Yes.  And 97 and 98.

16          MR. STEWART:  Well, are you -- okay.  97 and 98,

17  your Honor.

18          THE COURT:  There are three sets of numbers or there

19  are two?  I thought there were two.

20          MR. STEWART:  I thought there were two as well, your

21  Honor --

22          THE WITNESS:  Okay.

23          MR. STEWART:  -- so the witness is saying, your

24  Honor, I guess it's 49 and 50 and 97 and 98.

25          THE COURT:  Is that right, sir?

13-53846-swr   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 57 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:42:10   Page 52 of 245
463
57

1          THE WITNESS:  Yes.  That is correct.

2          THE COURT:  All right.  The Court will admit those

3   four pages only from Exhibit 36 at this time.

4       (City Exhibit 36, pages 49, 50, 97, and 98, received at

5       10:13 a.m.)

6          MR. STEWART:  Thank you.  Can we go to our next

7   exhibit, Exhibit Number 106?

8   BY MR. STEWART:

9   Q   Mr. Malhotra, Exhibit 106 has been put on the screen for

10  you.  Can you tell me what this exhibit is?

11  A   This is the monthly cash flow forecast that was prepared

12  in June of this year.

13  Q   And is there a date in the upper right-hand corner of the

14  document?

15  A   June 21st, 2013.

16  Q   Is that -- does that indicate the date it was prepared?

17  A   Yes.

18  Q   Who prepared this?

19  A   I along with my team and members of the city.

20  Q   And in preparing this, did you follow the same methods

21  and practices and techniques that you described to us earlier

22  when I was questioning you about your background?

23  A   Yes.

24  Q   If I could, let me ask -- and by the way, it's entitled

25  "Project Piston"?

1   A    Yes.

2   Q    What is Project Piston?

3   A    That's the internal project name that we had created at

4   Ernst & Young for this engagement.

5   Q    For your work for the City of Detroit?

6   A    That is correct.

7   Q    Let me direct your attention, if I could, to the last two

8   pages of our exhibit.  That would be page 6 of 7 and 7 of 7.

9   Do you have them before you?

10  A    Yes.

11  Q    What are these?

12  A    These are the monthly cash flow forecasts for fiscal year

13  2014 under a restructuring scenario.

14  Q    And what do you mean when you say "restructuring

15  scenario"?

16  A    I mean that we had removed from the disbursements any

17  payments related to unsecured obligations other than the

18  continuing payment of retiree healthcare from these

19  projections.

20  Q    Okay.  And where does one find any reference in this

21  document to the cost associated with restructuring?

22  A    The investment related to the cost related to the

23  restructuring is highlighted on the last line, which says

24  "cumulative reinvestment expenditures" on that particular

25  page.

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 59 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 54 of 245
463
59

1 Q   And where did that number come from?

2 A   That number came from the work that was given to us by

3 the Conway MacKenzie team.

4 Q   Now, let's look at the rest of your cash flow forecast

5 here, and I'm going to be very brief.  As a general matter,

6 what does it -- what does it present for us?

7 A   What it presents is what the cash position net of

8 distributions of the city would be on a monthly basis

9 throughout fiscal year 2014, and those cash numbers do not

10 include the reinvestment expenditures that are highlighted on

11 the last line of that page.

12 Q   All right.  So in the lower right-hand corner for

13 forecast for fiscal year 2014 --

14        MR. STEWART:  And could we blow that up and

15 highlight it, please, lower right-hand corner?

16 BY MR. STEWART:

17 Q   That is the number you have forecast before reinvestment

18 expenditures?

19 A   That is correct.

20 Q   And the reinvestment expenditures for that fiscal year

21 are a few lines below?

22 A   That is correct.

23 Q   Let's look at the next page, and if you'd tell us what

24 that is.

25 A   The cumulative reinvestment expenditures through fiscal

13-53846-tjt   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 60 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:16   Page 58 of 245   60
463

 1   year 2015 are 480.9 million, which is shown on the last line

 2   of --

 3   Q   Generally, what is this -- what is this page?

 4   A   This page is the monthly cash forecast for fiscal year

 5   2015.

 6   Q   So it's for the next fiscal year?

 7   A   That is correct.

 8   Q   And was it prepared in the same manner as the previous

 9   one we talked about?

10   A   Yes.

11   Q   In the lower right-hand corner it shows a number of 367

12   million.  Do you see that?

13   A   Yes, I do.

14   Q   What is that number?

15   A   That represents the cash balance for the general fund

16   under the restructuring scenario without any reinvestment

17   expenditures.

18   Q   And then there are reinvestment expenditures, however?

19   A   That is correct.

20   Q   And what is that number?

21   A   480.9 on a cumulative basis between '14 and '15.

22   Q   And so both of those numbers are in the lower right-hand

23   corner of that page?

24   A   That is correct.

25           MR. STEWART:  Your Honor, I'd move the admission of

1   Exhibit 106.

2           THE COURT:  Again, are you moving the entire

3   document or just pages 6 and 7?

4           MR. STEWART:  The entire document, your Honor.  In

5   the interest of time, I examined him in detail only about the

6   last two pages.  If you'd like -- I mean I think I asked him

7   the question whether the entire document had been prepared

8   using the techniques and methods that he described to us, and

9   he said it had been.

10          THE COURT:  Well, can you just tell us briefly

11  what -- briefly what the other pages are?

12          THE WITNESS:  The first two pages would be the cash

13  flow scenarios under the base case; that is, if the city had

14  continued, your Honor, to make its unsecured payments per the

15  original schedule.  And it showed the actual months plus what

16  the projected cash flows would look like under the base case.

17  And then the pages 6 and 7 show the cash flows under the

18  restructuring scenario where we pulled out the unsecured

19  payments out for unsecured creditors.

20          THE COURT:  Any objections to the admission of the

21  document?

22          MR. MARRIOTT:  Quick question, your Honor.  Is it

23  correct that this is coming in as part of his opinion

24  testimony?

25          MR. STEWART:  I was actually offering it for what it

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 62 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 57 of 245   62
463

 1   is, which is it's coming in as an exhibit for the city.

 2          MR. MARRIOTT:  I mean otherwise if it's -- if it's

 3   not reflecting his opinion, I think it's hearsay.  If it's

 4   simply reflecting his opinion, then -- I mean if this is

 5   offered as his opinion as to --

 6          THE COURT:  I think it's abundantly clear that it

 7   is.

 8          MR. MARRIOTT:  Okay.  I just wanted to clarify that.

 9   The other thing, your Honor, is -- and I won't do this again,

10   but this would be subject to my standing objection.

11          THE COURT:  Yes, absolutely.

12          MR. STEWART:  And, your Honor, to pretermit the

13   objection, I'm prepared to go into a business record

14   foundation for it that would take care of the hearsay

15   objection, but I wanted to move things along.

16          THE COURT:  Exhibit 106 is admitted.

17      (City Exhibit 106 received at 10:20 a.m.)

18          MR. STEWART:  Thank you, your Honor.

19   BY MR. STEWART:

20   Q   Let's, if we could, now go to our next exhibit, which is

21   Exhibit 111.  And, Mr. Malhotra, before I ask you details

22   about this, I'm going to ask you a couple of background

23   questions.  In connection with the pending motions, were you

24   asked to perform certain financial analyses?

25   A   Yes.

1  Q   And are your analyses reflected on Exhibit 111?

2  A   Yes.

3  Q   What is it that you were asked to do?

4  A   I was asked to prepare three scenarios that -- from a

5  cash standpoint for through fiscal year 2015.

6  Q   And let me ask you scenario by scenario what they are

7  before we get into the substance of this exhibit.  What is

8  scenario number one?

9  A   Scenario number one is the cash balance if the post-

10  petition financing was closed, the swap settlement was

11  completed, and none of the city's casino monies were trapped.

12  Q   I'm going to stop you right there so we have our

13  terminology straight.  You here speak of something called DIP

14  financing.  That's the post-petition financing; correct?

15  A   Yes.

16  Q   And scenario number one assumes that that part of the

17  motion is approved by the Court and that the financing

18  closes; correct?

19  A   Yes.

20  Q   Okay.  Next you have something called a swap settlement.

21  Tell us, please, what you mean when you use the words "swap

22  settlement"?

23  A   I mean the out -- the swaps that are currently out of the

24  money are paid by the DIP financing or the post-petition

25  financing and thereby the city no longer has to pay any swap

1    interest that it's currently scheduled to pay.

2    Q    And is the forbearance agreement that we've been talking

3    about, is that a synonym for the swap settlement?

4    A    Yes.

5    Q    Third, you have something called no casino trap.  What do

6    you mean when you say "no casino trap"?

7    A    I mean that the city continues to have free access to its

8    casino revenues as it always has, and they are not trapped by

9    the swap counterparties.

10   Q    So let me ask you a minute about the casino revenues.

11   What are the casino revenues?

12   A    Those are the revenues the city gets from the three

13   casinos that are in Detroit.

14   Q    And how much are the casino revenues every year?

15   A    Approximately $170 million annually.

16   Q    And why do you refer to them being trapped?

17   A    Because the city is in default under its existing

18   agreements with the swap counterparties, and my understanding

19   is that the swap counterparties have the right to trap those

20   monies.

21   Q    What happens if the monies are trapped?

22   A    If the monies are trapped, the city would lose

23   potentially on an annualized basis $170 million of tax

24   receipts; however, that would get offset by $50 million of

25   swap interest that the city would thereby not make, so it

13-53846-tjt   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 80 of 245
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 65 of 245   65
463

1   would be a net impact of approximately $120 million on an

2   annualized basis in terms of a reduction of cash available to

3   the city.

4   Q   So that was scenario number one.  What is scenario number

5   two?

6   A   Scenario number two represents the forecasted cash

7   balances under the scenario that there is no DIP financing,

8   there is no swap settlement, and the city continues to have

9   access to its casino revenues.

10  Q   And what is scenario number three?

11  A   Scenario three shows the city having no DIP financing, no

12  swap settlements, the casino revenues are trapped, and the

13  city does not make any swap interest payments going forward.

14  Q   Now, something you referred -- I'm going to go briefly to

15  a related matter.  When you spoke about the swap settlement,

16  you mentioned something called swaps payments.

17  A   Yes.

18  Q   What are swaps payments?

19  A   The swap payments I was referring to are the swap

20  interest payments of $4.2 million the city makes every month.

21  Q   Now, if there's a swap settlement, what happens to the

22  swap payments?

23  A   The city will not be required to make those payments

24  going forward.

25  Q   What effect would that have upon the city's cash

1  position?

2  A   The city's cash position would improve for that $4.2

3  million that the city would not have to make in swap interest

4  and would get offset by any interest the city pays on the

5  take-out financing.

6  Q   Now, you mentioned that -- the interest the city pays on

7  the take-out financing.  What is that?

8  A   I was referring to the financing that is used to -- for

9  the swap settlement.  The city would have to pay interest on

10  that, and that would reduce the net impact of the benefit on

11  a monthly basis the city would get from the swap settlement.

12  Q   And have you calculated what the net benefit would be?

13  A   Yes.

14  Q   And what have you concluded?

15  A   In terms of the monthly impact, the amount of swap

16  interest that the city is currently paying is $4.2 million,

17  and the potential interest on the new financing on a monthly

18  basis could be somewhere between $700,000 to about a million

19  five on a monthly basis, so on a net monthly impact, the

20  amount could be -- the benefit of the interest could be as

21  high as $3 million a month, or on the low end the benefit

22  could be about, I think, a million five a month.

23  Q   Have you prepared a demonstrative exhibit to show how

24  your calculations were made?

25  A   Yes.

 1          MR. STEWART:  Could we put up demonstrative Exhibit

 2     141?

 3     BY MR. STEWART:

 4     Q    And could you tell us, once again, how your calculations

 5     work?  But we don't need to redo them all.  You can be brief.

 6     A    Sure.

 7     Q    First of all, what years?  What periods does this relate

 8     to?

 9     A    This refers to fiscal year '14 and fiscal year '15.

10     Q    Okay.  And it shows swap payments.

11     A    That's right.  It shows swap payments of $45 million

12     annually in terms of the approximate payments that have to be

13     made.  The swap termination loan refers to the interest that

14     would be payable on the approximate $227 million of the swap

15     settlement amount at a range of an interest rate ranging from

16     3-1/2 percent, which would equate to the $7.3 million in

17     interest, and roughly -- I think it was about five percent on

18     the $13.6 million.

19     Q    And so you reach a conclusion about cash flow benefits?

20     A    Yes.

21     Q    And that's what appears here, that it is between 31.4 and

22     37.7 million per year for this fiscal year and the next

23     fiscal year?

24     A    Yes, under these assumptions.

25     Q    Okay.  Thank you.  Mr. Malhotra, going back to Exhibit

13-53846-swr   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 68 of 245
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 68 of 245   68
463

1   111, did you prepare -- the numbers that appear on this

2   exhibit, are they the result of cash flow calculations that

3   you performed?

4   A   Yes.

5           MR. STEWART:  Let's put up Exhibit 108, page 1.

6   BY MR. STEWART:

7   Q   Do you see Exhibit 108?

8   A   Yes, I do.

9   Q   What is Exhibit 108?

10  A   Exhibit 108 is the cash flow forecast under the scenario

11  that the DIP financing is completed is the way we had shown

12  it here.

13  Q   In other words, under scenario number one?

14  A   That is correct.

15  Q   Who prepared Exhibit 108?

16  A   I did in conjunction with my team and members of the

17  city's management team.

18  Q   And was it prepared using the same methods and approaches

19  that you testified about earlier?

20  A   Yes.

21  Q   Let's look, if we could, at page 2 of Exhibit 108.  What

22  does page 2 tell us?

23  A   Page 2 is a summary of the cash flows as were shown in

24  the June 14th proposal.

25  Q   Okay.  Now, where is that?

13-53846-tw   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 69 of 245   69
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 64 of 245
463

1  A   It's in the first line that says "funds available for
2  unsecured claims per creditor proposal."
3  Q   So that's referring to the June 14 document?
4  A   That is correct.
5  Q   Okay.  And then you have a series of items below that.
6  Could we -- and I'm going to ask you to describe a few of
7  them.  What is the first one?  It says "retiree healthcare
8  transition cost in CF."  What is that item?
9  A   That represents the estimate for retiree healthcare costs
10  that are in the cash flows that are shown as a DDOT because
11  they were not included in the line item up above to show that
12  retiree healthcare costs, which were an unsecured claim, were
13  being paid out from a liquidity standpoint per the decision
14  of the emergency manager, and that's what we were showing in
15  the first line.
16  Q   And the next line is "higher transportation department
17  subsidy"?
18  A   Those were other cash impact at the Department of
19  Transportation in which the department would likely require a
20  higher subsidy in the next couple of years for -- related to
21  the payment of retiree healthcare and other working capital
22  that was not incorporated in the first line.
23  Q   And next, account payable vendor risk in CF.  What is
24  that?
25  A   That was the cash impact of potential critical vendor

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 70 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:22:10   Page 86 of 245   70
463

1  payments or other potential trade disruption that could have

2  been caused as a result of the bankruptcy filing, so those

3  are, again, cash flow impacts that were not reflected in the

4  first line.

5  Q    And where do these numbers come from?

6  A    They were -- they came together based on discussions with

7  the emergency manager, the other advisors, and the city's

8  management team.

9  Q    We then have a couple of smaller items.  Then we have an

10  item called reinvestment timing change, see memo one below.

11  First of all, what is a timing change?

12  A    A timing change is a -- compared to the original budget,

13  a timing change is when the total amount of the expense or

14  the revenues has not changed; however, the timeline in terms

15  of when that revenue or expense would be realized has been

16  changed.

17  Q    And there's a reference to memo one below?

18  A    That is correct.

19  Q    What is memo one?

20  A    Memo one down below reflects the net impact of changing

21  the expenditures or deferring certain expenditures compared

22  to the original proposal on June 14th and what the latest

23  thinking was to -- with respect to the reinvestment

24  expenditures so that the city could maintain a base level of

25  liquidity over the forecast period.

13-53846-tjt   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 71 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 86 of 245   71
463

1  Q   The next two lines refer to DIP -- the DIP --

2           THE COURT:  Is there something you'd like to say,

3  sir?

4           MR. PEREZ:  Yes, your Honor.  Alfredo Perez.  Your

5  Honor, if he's going to testify about the exhibit, I think he

6  should -- they should proffer it into evidence before they do

7  that.  I've been trying to get the Court's attention, but --

8           MR. STEWART:  Oh, I was going to actually do it

9  after examining him, Judge.  I'm happy to move it now.

10           THE COURT:  If you have an objection, feel free to

11  interrupt.

12           MR. PEREZ:  Yes, your Honor.

13           THE COURT:  I'm sorry, Mr. Stewart.

14           MR. STEWART:  I was actually going to lay this

15  foundation and then move it into evidence to pretermit an

16  objection, but I'm happy to move it right now.

17           THE COURT:  Well, I would only say to you that as a

18  general rule, you shouldn't ask the witness about the

19  contents of a document until it's in evidence, but you're

20  offering Exhibit 108 now?

21           MR. STEWART:  Yes, I do.

22           THE COURT:  Is there any objection to Exhibit 108?

23           MR. PEREZ:  Your Honor, in addition to the

24  objections raised by Mr. Marriott, this exhibit is dated

25  September 16th, so it's well after the July swap settlement

13-53846-swr   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 72 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 87 of 245   72
463

1  agreement, so, your Honor, it could not have been the premise
2  for the political considerations at that time.

3      MS. ENGLISH:  Your Honor, Caroline English.  The
4  same objection also applies to Exhibit Number 111, which was
5  discussed just prior to Exhibit 108.

6      THE COURT:  Okay.  And that has not been offered, so
7  hold that until it is.  We're talking about Exhibit 108 now.

8      MR. STEWART:  Your Honor, in response to the
9  objection, because of the terms of the forbearance agreement,
10 which gives the city the right in certain circumstances to
11 walk away from it, it is relevant what the financial picture
12 is today just as it was when the city chose to enter into the
13 agreement.

14     THE COURT:  I think the relevance is arguable, so
15 the Court will overrule that objection and admit Exhibit 108
16 into evidence.

17     (City Exhibit 108 received at 10:34 a.m.)

18     MR. MARRIOTT:  Your Honor, I'm --

19     THE COURT:  Sir.

20     MR. MARRIOTT:  -- sorry to ask for this
21 clarification again, but is this being offered as a component
22 of his expert opinion?

23     MR. STEWART:  It is.

24     MR. MARRIOTT:  Thank you.

25     MR. STEWART:  In fact, just to simplify it, so will

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 73 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 68 of 245   73
463

 1    the next few opinions, Mr. Marriott, the next few documents.

 2            MR. MARRIOTT:  That's fine.  If you would just tell

 3    me if we get to one that's not.

 4            MR. STEWART:  Okay.

 5            MR. MARRIOTT:  Thank you.

 6            MR. STEWART:  All right.

 7    BY MR. STEWART:

 8    Q   Mr. Malhotra, let's go back to where we were.  There's a

 9    line that says "swap payment savings from settlement."  Do

10    you see that?

11    A   Yes.

12    Q   Okay.  And is that the -- are those the savings you

13    described to us a few minutes ago?

14    A   Yes.

15    Q   And then below that something entitled "refunding bond

16    proceeds drawn from escrow."

17    A   Yes.  Those are $20 million that we've continued to

18    forecast of receiving from the bond proceeds escrow, the

19    escrow agreement that exists with the city today.

20    Q   And so as a result of the --

21            THE COURT:  Excuse me one second.  I want to be sure

22    I follow this.  On the line that says "swap payment savings

23    from settlement" that you just testified about, you've got

24    33.7 for fiscal year '14.  That's our current fiscal year;

25    right?

13-53846-tw   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 74 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 89 of 245   74
463

1          THE WITNESS:  That is correct.

2          THE COURT:  And then you've got 50.6 for '15; right?

3          THE WITNESS:  Yes, your Honor, fiscal year '14.

4          THE COURT:  Are those the two numbers you just

5    testified to when you were showing us this demonstrative

6    exhibit?  I think it was 141.

7          THE WITNESS:  Your Honor, the 50.6 is a gross

8    number, which would compare to the 40, and the 33.7 is for a

9    partial year.  Those numbers would align close to the $45

10   million that was in the first line of the swap payments;

11   however, to compare the two --

12         THE COURT:  Let's go back to 141, please.  That was

13   the demonstrative, wasn't it?

14         MR. STEWART:  Indeed, yes, your Honor.

15         THE COURT:  Okay.  I don't see $50 million on here.

16   What am I missing?

17         THE WITNESS:  The first line, your Honor, of the

18   swap payments was an approximate number that was used here of

19   45 million versus 50.  The payments are $4.2 million a month,

20   and that's how we come up with somewhere between this 45 and

21   $50 million range that we always use, but the swap payments

22   that would -- the swap interest payments that would not be

23   made would be synonymous with that first line of swap

24   payments of $45 million or, as laid out in the cash flows, as

25   you will see, of $50.6 million, so those two numbers ideally

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 76 of 245
463
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 75 of 245   75

 1   should be exactly the same, but that would be -- that's the

 2   line item that's being referred to, your Honor, in that

 3   particular exhibit.

 4   BY MR. STEWART:

 5   Q   So which of the two numbers, 45.9 or 50 million, is the

 6   more accurate number?

 7   A   50 million.

 8           THE COURT:  All right.  Let's just go back to 108,

 9   please.  So the 33.7 and the swap payment savings from

10   settlement for fiscal year -- thank you -- fiscal year 2014

11   is a partial year?

12           THE WITNESS:  That is correct, your Honor.

13           THE COURT:  What part?

14           THE WITNESS:  At the time we were doing this, we

15   would have estimated the closing to be in the November time

16   frame during this scenario.

17           THE COURT:  You may proceed, sir.

18           MR. STEWART:  Thank you.

19   BY MR. STEWART:

20   Q   And so our calculations here, Mr. Malhotra, produce

21   something called net cash flow per DIP financing scenario?

22   That's $87.6 million?

23   A   That is correct.

24   Q   And what does that represent?

25   A   That represents the net cash flow that will actually be

1    generated over the fiscal year 2014 under the scenario where

2    the DIP proceeds were received, the swaps were settled, the

3    city does not make the swap interest payments as well as

4    continues to make the payments as highlighted in the first

5    few line items with respect to ongoing payment of retiree

6    healthcare, accounts payable payments, et cetera.

7    Q    Let's look at the next two pages of Exhibit 108.  Can you

8    tell me what these two pages are?

9    A    Page 3 of 17 represents the monthly cash flow forecast

10   for fiscal year 2014, including two months of actuals for the

11   month of July and August under the DIP financing scenario.

12   Q    And the next page?

13   A    The next page shows the monthly projections through

14   fiscal year 2015 under the same scenario.

15   Q    And what is page 5?

16   A    Page 5 is a summary of the annual receipts and

17   disbursements for fiscal year 2014 through fiscal year 2017

18   under the same scenario.

19   Q    Okay.  And after that are a series of appendices.

20   A    Yes.

21   Q    And without getting into their contents, what are these

22   appendices?

23   A    Those would be supporting schedules that would show the

24   details behind the calculation of the swap interest payments

25   as well as the details with respect to certain other

13-53846-tjt   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 77 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:22:10   Page 92 of 245   77
463

1  subschedules like the reinvestment cost detail broken down in

2  different line items that were included in the first

3  scenario.

4  Q   Now, let's move, if we could, to Exhibit 109, and what is

5  Exhibit 109?

6  A   Exhibit 109 shows the -- is the cash flow forecast

7  through fiscal year 2017 under the scenario where there was

8  no DIP financing and no swap settlement and the casino monies

9  continued to flow to the city.

10  Q   Is this scenario two that you spoke about with respect to

11  Exhibit 111?

12  A   Yes.

13  Q   And who prepared this?

14  A   I did along with my team and members of the management

15  team.

16  Q   And did you prepare it consistent with the methods you

17  used for Exhibit 108?

18  A   Yes.

19  Q   And with the methods you described to us earlier?

20  A   Yes.

21  Q   Look, if we could, at page 2 of this exhibit.  Do you

22  have it before you?

23  A   Yes.

24  Q   Have some items been removed from the part of the

25  document that speaks of funds available for unsecured claims?

1    A    Yes.

2    Q    Why have they been removed?

3    A    Because this scenario had no DIP, and so the DIP proceeds

4    were removed.  So was the financing cost of the DIP financing

5    as well as the swap interest payments in this format will

6    continue to get paid, so the savings line was no longer in

7    this scenario.

8         MR. STEWART:  Your Honor, I'd move the admission of

9    109, and I apologize for not having done it before I asked my

10   last question.

11        MR. PEREZ:  Your Honor, I would make the same

12   objection.  This is in October, which is even further removed

13   from the decision date.

14        THE COURT:  The objection is overruled, and Exhibit

15   109 is admitted.

16      (City Exhibit 109 received at 10:42 a.m.)

17        MR. STEWART:  Put up Exhibit 110.

18   BY MR. STEWART:

19   Q    Mr. Malhotra, what is Exhibit 110?

20   A    Exhibit 110 is the cash flow forecast for fiscal year

21   2017 under the scenario where --

22   Q    Is this just scenario three?

23   A    Yes.

24   Q    And you've already described scenario three to us.

25   A    I have.

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 79 of 245   79
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 94 of 245
463

1    Q    Okay.  Who prepared Exhibit 110?

2    A    I did along with my team and the management team of the

3    city.

4    Q    And did you prepare it using the same methods that you

5    used in the previous two exhibits?

6    A    Yes.

7              MR. STEWART:  Your Honor, I'd move the admission of

8    Exhibit 110.

9              MR. PEREZ:  Same objection, your Honor.

10             THE COURT:  All right.  Exhibit 110 is admitted.

11        (City Exhibit 110 received at 10:43 a.m.)

12   BY MR. STEWART:

13   Q    And if we could go to page 2 of Exhibit 110,

14   Mr. Malhotra.  Once again, there's been a change in the items

15   under "funds available for unsecured claims."  Do these

16   changes or differences simply reflect that the scenario has

17   different assumptions?

18   A    Yes.

19   Q    Let's go, if we could, to Exhibit 111, and this, of

20   course, is the graphic representation that you prepared.

21             MR. STEWART:  And, your Honor, I would move the

22   admission of Exhibit 111 before I ask the witness more

23   detailed questions; however, I could ask one foundational

24   question which might make it simpler.

25   BY MR. STEWART:

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 80 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 76 of 245     80
463

1    Q   Are Exhibits 108, 109, and 110 the calculations that were

2    used to develop the graphic representation of cash position

3    that we see in Exhibit 111?

4    A   Yes.

5           MR. STEWART:  I'd move the admission of the exhibit.

6           THE COURT:  Any objection to 111?

7           MS. ENGLISH:  Objection, your Honor.  Carol English

8    appearing on behalf of Ambac.  Same objection that this

9    document again was prepared in September long after the

10   decision was made to enter into the forbearance agreement.

11          THE COURT:  All right.  That objection is overruled,

12   and Exhibit 111 is admitted.

13       (City Exhibit 111 received at 10:44 a.m.)

14   BY MR. STEWART:

15   Q   Mr. Malhotra, let me now ask you about what Exhibit 111

16   depicts.  First of all, scenario number one, is that the top

17   line of the exhibit?

18   A   Yes.

19   Q   And if I understood you correctly, that shows the city's

20   cash position if the swap settlement occurs; correct?

21   A   Yes.

22   Q   And no trapping of the casino revenues?

23   A   That is correct.

24   Q   And what is the conclusion that you've reached with

25   respect to the city's cash position under that scenario at

1    the end of this fiscal year and also at the end of next

2    fiscal year?

3    A    That the city's liquidity would be in excess of a hundred

4    million dollars of -- through the balance of this calendar --

5    approximately the balance of this calendar year and come down

6    to about $61 million by the end of June 2015 based on the

7    assumptions that were used for these cash flows.

8    Q    Now, let's look at scenario number three.  Is that the

9    bottom line?

10   A    Yes.

11   Q    Okay.  And scenario number three is the scenario where

12   there's no swap settlement and the casino revenues are

13   trapped; is that right?

14   A    That is correct.

15   Q    What conclusions did you reach about the city's cash flow

16   or cash position, I should say, under that scenario at the

17   end of this fiscal year and also at the end of next fiscal

18   year?

19   A    Under that scenario, based on the assumptions we're

20   using, the city would likely run out of cash by the end of

21   this calendar year, face a cash shortfall in excess of a

22   hundred million dollars by about July of 2014 with the cash

23   hole being as high as $284 million by June of 2015.

24   Q    I should have asked you, by the way, about the dotted

25   line that appears, the horizontal dotted line on Exhibit 111.

1  What is that?  What does that depict?

2  A    That is showing what -- when the city's cash balances go

3  below $50 million.

4  Q    And why have you chosen $50 million as the place on

5  Exhibit 111 -- pardon me -- to put that dotted line?

6  A    We use that to represent for about five weeks' worth of

7  payroll and benefits payments, and so essentially to

8  encapsulate what should ideally be some sort of minimum level

9  of liquidity the city should maintain.

10        MR. MARRIOTT:  Objection, your Honor.  This witness

11  was qualified to give cash flow projections, not to give an

12  opinion as to what the appropriate liquidity state of the

13  city is.

14        MR. STEWART:  I simply asked him why he put the line

15  where he put it.

16  BY MR. STEWART:

17  Q    Did that -- did you develop the 50 number or did someone

18  else tell you about it?

19  A    We did.

20        MR. MARRIOTT:  Your Honor, again, same objection.

21  This testimony is now being offered on the basis that $50

22  million is the appropriate liquidity balance for the city,

23  and this witness was not qualified.  I mean he may have done

24  the math after he was told, "This is what we have to be able

25  to pay," but as and to the extent it was his conclusion that

1    $50 million is the appropriate liquidity balance for the

2    city, he hasn't been qualified to give that opinion.

3            MR. STEWART:  I think he testified, Judge, that's

4    five weeks' payroll, and he is qualified to tell us what five

5    weeks' payroll is.  If one is to then say, well, he's not

6    qualified --

7            THE COURT:  Well, but the underlying premise is that

8    five weeks' payroll and benefits are an appropriate minimum

9    liquidity for a municipality of this size.  Yeah, I have to

10   agree that I didn't quite hear his qualifications to make

11   that judgment, so the objection is sustained.  You may try --

12           MR. STEWART:  Let me try it again.

13           THE COURT:  -- of course, to qualify him for that

14   purpose.

15   BY MR. STEWART:

16   Q    Mr. Malhotra, I believe you testified that $50 million is

17   five weeks' payroll and benefits for the city?

18   A    Yes.

19   Q    If the city's cash is below $50 million, what is the --

20   is the city able to make its payroll?

21   A    It depends on the week and the receipts that come in

22   during the week.  It depends on that particular week.

23   Q    Is it in jeopardy of not making its payroll?

24   A    Given the fixed nature of the payments and the timing of

25   when receipts come in, that's what we were highlighting as a

1   risk threshold.

2   Q   In the course of doing financial analysis for the city,

3   you have had occasion to see what its -- how much its

4   expenses happen to be week by week and month by month?

5   A   Yes.

6   Q   And what have you found when it comes to payroll and

7   benefits?

8   A   That the estimate of -- you know, it's five weeks' worth

9   of payroll and benefits -- is $50 million, and when cash has

10  been extremely tight because of lumpiness of payments that

11  come in, for instance, state aid, which come in every other

12  month, there have been low points from an intra-month

13  standpoint on a week-by-week basis where liquidity is tight

14  or has been tight historically.

15  Q   When you say liquidity is tight, what do you mean?

16  A   The cash available for the city to make its ongoing

17  obligations is under pressure because of the amount of cash

18  available compared to the amount of disbursements that need

19  to be made.

20        MR. STEWART:  Your Honor, with that clarification, I

21  guess the $50 million line is a line at which the city's

22  liquidity comes under pressure as he testified to.

23        MR. MARRIOTT:  Your Honor, I'm going to object

24  again.  It comes under pressure only if one assumes that five

25  weeks' worth of payroll is the right number versus four,

13-53846-tjt   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 85 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 80 of 245   85
463

1    versus three, versus six, versus seven.  Again, this witness

2    can testify that he came up with $50 million because he used

3    five weeks of payroll as the appropriate benchmark, but he

4    can't testify and has not been qualified to testify on the

5    basis -- to the effect that five weeks is the right number.

6            MR. STEWART:  Your Honor, I think it goes to weight.

7    I'd like to move on.  50 million is where he says in his

8    analysis liquidity comes under pressure, and I'd leave it at

9    that.

10           THE COURT:  The Court is satisfied that the witness

11   has established his expertise to give an opinion regarding

12   this, and the objection is overruled.

13           MR. STEWART:  Okay.

14   BY MR. STEWART:

15   Q    Finally, Mr. Malhotra, we have the middle scenario,

16   scenario number two.  That's the scenario where there's no

17   swap settlement but also no trapping of the casino monies.

18   A    That is correct.

19   Q    And what did you determine in terms of the city's cash

20   position for the end of this fiscal year and the end of next

21   fiscal year under that scenario?

22   A    Under the assumptions we were using that the scenario

23   where there was no DIP financing and no swap settlement and

24   the city had ongoing access to the casino revenues, the

25   city's liquidity -- the city's cash available for the general

1   fund would be out of cash by roughly March of 2014 and

2   dipping down below that $50 million threshold even earlier

3   than that, and the city would likely have a cash shortfall of

4   $78 million by December of 2014 and approximately $69 million

5   by June of 2015.

6   Q   Now, these were analyses you prepared back in September

7   and October of this year?

8   A   Yes.

9   Q   And a couple of months of actuals have happened since

10  then?

11  A   Yes.

12  Q   To your knowledge, how have actual results affected the

13  conclusions that you show on Exhibit 111?

14  A   Based on the information that we are working with as of

15  now, the cash balances are likely to be lower based on the

16  current assumptions we have compared to the cash flows

17  illustrative on this page.

18  Q   Let's put up Exhibit 115 finally.  What is Exhibit 115?

19  A   Exhibit 115 is an interim working draft of cash flows

20  that we are working on through fiscal year 2015 and '17.

21  Q   And when you say "interim," what do you mean?

22  A   The assumptions -- all of the assumptions with respect to

23  the forecasts have not been approved by the emergency manager

24  yet, which we are working through.

25  Q   Who prepared Exhibit 115?

1    A    It is myself, my team, along with the other advisors.

2    Q    And what -- did you use the same methods and approaches

3    that you used in Exhibits 108, 109, 110, and other cash flows

4    I've asked you about?

5    A    Yes.

6              MR. STEWART:  Your Honor, I'd move the admission of

7    Exhibit 115.

8              THE COURT:  Any objections?

9              MR. PEREZ:  Yes, your Honor.  Same objection, your

10   Honor.  These are dated December 9th, basically last week, so

11   it could not have had anything to do with the political

12   decision.

13             THE COURT:  The Court concludes they are arguably

14   relevant, and -- it is arguably relevant, so Exhibit 115 is

15   admitted.

16        (City Exhibit 115 received at 10:54 a.m.)

17   BY MR. STEWART:

18   Q    If we could look at page 2 of Exhibit 115, Mr. Malhotra,

19   what scenario is this exhibit describing?

20   A    It would be describing scenario one.

21   Q    Scenario number one.  And if we could go to the

22   calendarization, which would be page 2 and page 3, let's

23   start with page -- I'm sorry -- page 3 and page 4, let's

24   start with page 4.  What does this forecast show the city's

25   projected cash position net of distribution as being -- and

13-53846-swr   Doc 2304-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 88 of 245
13-53846-swr   Doc 4304-1   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 88 of 245   88
463

1  that would be the lower right-hand corner of the document --

2  at the end of fiscal year 2015?

3  A    Based on the assumption that we were working with in this

4  interim draft, the cash position would be $6.5 million by

5  June of 2015.

6  Q    Do you know why it is so low?

7  A    Yes.  It's due to new information that we have gotten in

8  the last couple of months.

9  Q    Let's look at page 3 of 13 and to the projection of cash

10  positions for the fiscal year '14.  First of all, what does

11  this predict or forecast that the cash position will be at

12  the end of the year?

13  A    Under these assumptions, it shows that the cash forecast

14  would be $72.9 million at June 2014.

15  Q    And that's less than what Exhibit 111 had forecast?

16  A    Yes.

17  Q    And what's the reason for the lower number?

18  A    The number is lower because of the new information that

19  we received in the last couple of months related to other

20  events that are causing the cash balance to be lower, such as

21  approximately $20 million in incremental retiree healthcare

22  costs because the implementation of the new plans has been

23  pushed back two months compared to what the original

24  forecasts had assumed.  In addition, we have received updated

25  professional fee estimates from some of the advisors,

     1   including using an estimate for the payment of professional

     2   fees for the Retiree Committee that were not in the original

     3   forecast.  In addition, compared to the original forecast

     4   where the swap settlement and DIP financing was likely to be

     5   in the November time frame, these -- that did not happen, so

     6   the city had to make an extra $4 million worth of a swap

     7   interest payment that was not in the original forecast as

     8   well as based on the information given to us by the

     9   investment banker, we are using the full flex terms of the

    10   interest rate under the post-petition financing, so those are

    11   some of the reasons why the cash flows are trending lower

    12   compared to what we had originally thought.  Of course,

    13   there's other ins and outs, but those are the major items.

    14   Q   I noticed that the cash flow -- cash position actual for

    15   November of this fiscal year -- and it's in the middle at the

    16   bottom -- is said to be $107.1 million.

    17   A   That is correct.

    18   Q   Is that higher than originally predicted?

    19   A   It is higher than originally predicted, yes.

    20   Q   Can you tell us why?

    21   A   Yes, because the original forecast did include the city

    22   starting its -- to spend its money on reinvestment

    23   expenditures through the September through November time

    24   frame.  That was budgeted to be approximately $25 million,

    25   which payments have not been made.  The professional fees

1  that have been made to date are roughly $13 million lower

2  than forecast due to timing.  The city is also behind in

3  terms of making certain accounts payable payments because of

4  the classification of the pre-petition and post-petition

5  invoices and the analyses that are going on in the accounts

6  payable department, which are essentially timing related, so

7  I would say those are some of the primary reasons why the

8  cash position from a timing standpoint is better.

9  MR. STEWART:  Thank you.  That's all the questions I

10  have of the witness, your Honor.

11  THE COURT:  All right.  We'll take our morning break

12  now.  For your information, by my calculations, the city has

13  remaining 319 minutes.  The objectors have 477.  We'll be in

14  recess until 11:20, please.

15  THE CLERK:  All rise.  Court is in recess.

16  (Recess at 10:59 a.m., until 11:20 a.m.)

17  THE CLERK:  All rise.  Court is in session.  Please

18  be seated.

19  MR. ARNAULT:  Bill Arnault on behalf of Syncora.

20  CROSS-EXAMINATION

21  BY MR. ARNAULT:

22  Q   Hello again, Mr. Malhotra.  How are you?

23  A   Good.  Thank you.

24  Q   I take it you believe that the testimony that you

25  provided this morning was reliable expert testimony; isn't

13-53846-tjt   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 91 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 86 of 245   91
463

1  that correct?

2  A   Yes.

3  Q   And you believe that the information that you provided

4  this morning is something that the Court can rely upon;

5  correct?

6  A   Yes.

7  Q   You believe that the cash flow forecasts that you

8  provided are forecasts that the Court can rely upon; correct?

9  A   Yes, with those assumptions in there.

10  Q   Yeah.  And the testimony that you provided about the

11  projections and the scenarios that we saw, those incorporated

12  the cash flow forecasts; correct?

13  A   Can you repeat your question, please?

14  Q   Yeah, sure.  So the scenarios that we saw in your

15  testimony, that was based upon the cash flow forecasts that

16  you discussed this morning; correct?

17  A   Yes.

18  Q   If you could turn to City Exhibit 106, please.

19          THE COURT:  Do you want it on the screen, counsel?

20          MR. ARNAULT:  Page 1 on the screen.

21          THE COURT:  You do want it on the screen?

22          MR. ARNAULT:  Yes, please.

23          THE COURT:  Okay.

24          THE WITNESS:  I'm there.

25  BY MR. ARNAULT:

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 92 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 87 of 245   92
463

1   Q   All set?  Okay.  Let's take a look at this first page of

2   City Exhibit 106.  If we look at the title, it says, "Work in

3   process subject to material change."  Do you see that?

4   A   Yes.

5   Q   And that was a true statement at the time; correct?

6   A   Yes.

7   Q   And if we go down and we look at the first paragraph

8   there in red, if we look at the second sentence -- actually,

9   let me back up.  You prepared this document; correct?

10  A   We did in conjunction with the management team and the

11  other advisors, yes.

12  Q   Okay.  And you reviewed this document; correct?

13  A   Yes.

14  Q   Let's take a look at the second sentence of that first

15  paragraph there.  In it you say the information contained

16  herein is not intended to be and should not be relied upon by

17  any third party or as legal, auditing, or accounting advice;

18  correct?

19  A   That's what it says.

20  Q   And that was a true statement at the time you made it;

21  correct?

22  A   That's our standard disclaimer, yes.

23  Q   And that was a true statement at the time you made it;

24  correct?

25  A   Yes.

1    Q    If we move down to the second paragraph and we take a

2    look at the second sentence, you write, "With respect to

3    prospective financial information relative to the client,

4    Ernst & Young, LLP, did not examine, compile, or apply

5    agreed-upon procedures to such information in accordance with

6    attestation standards established by the AICPA, and E&Y

7    expresses no assurance of any kind on the information

8    presented."  That was a true statement at the time; correct?

9    A    Yes.  We did not perform audit procedures.

10   Q    Yeah.  And E&Y expresses no assurance of any kind on the

11   information presented; correct?

12   A    That is correct.  That is what it says, yes.

13   Q    Okay.  If we move down to the last sentence of the second

14   paragraph, it says, "Accordingly, reliance on this report is

15   prohibited by any third party as the projected financial

16   information contained herein is subject to material change

17   and may not reflect actual results"; correct?

18   A    That's what the sentence reads, yes.

19   Q    And that was a true statement; correct?

20   A    Yes.

21   Q    If we could now turn to City Exhibit 108, please.

22   Mr. Malhotra, this is another cash flow forecast; correct?

23   A    That is correct.

24   Q    And it appears as though it was prepared on September 16,

25   2013; is that correct?

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 94 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:42:10   Page 89 of 245   94
463

1   A   Yes.

2   Q   And you prepared this document; correct?

3   A   Yes, under the similar way I explained earlier.

4   Q   I'm sorry.  What was that?

5   A   Yes, in conjunction with my team, the other advisors, and

6   the management team, yes.

7   Q   And you reviewed this document before it went out;

8   correct?

9   A   I did, yes.

10  Q   And if we look at the title, like City Exhibit 106, this

11  document also states that it's a work in progress subject to

12  material change; correct?

13  A   Yes.

14  Q   And that was a true statement at the time; correct?

15  A   That's what it -- yes.  That's what it says.

16  Q   And that was a true statement; correct?

17  A   It includes forecasted information.  Assumptions are

18  always subject to change, so, yes.

19  Q   And if we move down to the first paragraph, and, again,

20  looking at the second sentence there, you say, "Accordingly,

21  the information contained herein is not intended to be and

22  should not be relied upon by any third party or as legal,

23  auditing, or accounting advice"; correct?

24  A   That is correct.  It is not legal, accounting, or audit

25  advice.  That is correct.  That's what it says.

1   Q   Right.  And it also says it should not be relied upon by

2   any third party; correct?

3   A   That's what the sentence reads.  That's correct.

4   Q   And that was a true statement; correct?

5   A   Yes.

6   Q   If we move down to the second paragraph and we look at

7   the second sentence, it says, "With respect to prospective

8   financial information relative to the client, Ernst & Young,

9   LLP, did not examine, compile, or apply agreed-upon

10  procedures to such information in accordance with attestation

11  standards established by the AICPA, and E&Y expresses no

12  assurance of any kind on the information presented."  That

13  was a true statement; correct?

14  A   That's what the sentence reads.  We did not perform audit

15  or attestation procedures on this document.

16  Q   And you express no assurance of any kind on the

17  information presented; correct?

18  A   That's right.  If management assumptions changes, the

19  numbers herein will change.

20  Q   Right.  Okay.  So just so I'm clear, you express no

21  assurance of any kind on the information presented; correct?

22  A   That's what the sentence reads.

23  Q   If we move to the last sentence, it says, "Accordingly,

24  reliance on this report is prohibited by any third party as

25  the projected financial information contained herein is

1  subject to material change and may not reflect actual

2  results."  That statement was correct at the time; correct?

3  A   Yes.  As assumptions change, the numbers herein will

4  change.

5  Q   If we could move to City Exhibit 109, Mr. Malhotra, this

6  is another cash flow forecast; correct?

7  A   That is correct.

8  Q   And this was prepared on October 3rd, 2013; correct?

9  A   Yes.

10 Q   And you prepared this document; correct?

11 A   Yes, in conjunction with the city's management team, the

12 other advisors and my team.

13 Q   And you reviewed this document before it went out;

14 correct?

15 A   I did, yes.

16 Q   And much like the other cash flow forecasts we've seen,

17 the title here says that it's a work in progress subject to

18 material change; correct?

19 A   That is correct.  It's subject to the assumptions

20 changing at any point in time.

21 Q   Okay.  And that was a true statement at the time;

22 correct?

23 A   That is correct.

24 Q   And if we move down again to the second sentence of the

25 first paragraph, it says, "The information contained herein

13-53846-tjt   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 92 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:32:16   Page 92 of 245
463
97

1   is not intended to be and should not be relied upon by any

2   third party or as legal, auditing, or accounting advice";

3   correct?

4   A    Should not be considered as legal, auditing or accounting

5   advice by any third party.  That is correct.

6   Q    And it should not be relied upon by any third party;

7   correct?

8   A    That's what the sentence reads.

9   Q    And that was a true statement at the time; correct?

10  A    That is correct.

11  Q    And, again, I'll try and speed this up a little bit, but

12  if we look at the second sentence of the first paragraph, you

13  again say that with respect to prospective financial

14  information relative to the client, Ernst & Young did not

15  examine, compile, or apply agreed-upon procedures to such

16  information in accordance with attestation standards

17  established by the AICPA, and E&Y expresses no assurance of

18  any kind on the information presented; correct?

19  A    That is correct.  We did not perform audit procedures on

20  the data herein as established by the AICPA, and with respect

21  to the assumptions, if they change, the numbers will change,

22  so we cannot provide any assurance that the numbers will not

23  change because if the assumptions change, the numbers will

24  change.

25  Q    Right.  You couldn't provide any assurance of any kind on

1  the information presented; right?

2  A   That is correct.  That's what the statement says.

3  Q   Finally, if you go to the last sentence, "Reliance on

4  this report is prohibited by any third party as the projected

5  financial information contained herein is subject to material

6  change and may not reflect actual results," that was a true

7  statement; correct?

8  A   Yes.  As all the assumptions change or any of the

9  assumptions change, the data herein will change.

10 Q   If we could go to City Exhibit 110, please.  And, again,

11 Mr. Malhotra, this is another cash flow forecast; correct?

12 A   That is correct.

13 Q   And it was prepared on September 17th, 2013; correct?

14 A   Yes.

15 Q   And you prepared this document; correct?

16 A   Yes, I did, with my team, the other advisors, and the

17 city's management team.

18 Q   And you prepared this document before it went out;

19 correct?

20 A   I analyzed this document before it went out, yes.

21 Q   Okay.  And like the other cash flow forecasts we've seen,

22 it states "work in progress subject to material change";

23 correct?

24 A   The assumptions are subject to material change.  That is

25 correct.

13-53846-tjt   Doc 2304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 99 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:32:10   Page 94 of 245   99
463

1   Q    Okay.  But here it says just "work in progress subject to

2   material change"; correct?

3   A    That's what it says on that page, yes.

4   Q    And that was a true statement at the time; correct?

5   A    That is.

6   Q    And, again, if we look at the first paragraph, second

7   sentence, you write, "Accordingly, the information contained

8   herein is not intended to be and should not be relied upon by

9   any third party or as legal, auditing, or accounting advice";

10  correct?

11  A    That is correct.  The assumptions herein are subject to

12  change and should not be relied upon by any third party as

13  stated here.

14  Q    Right.  It says the information contained herein should

15  not be relied upon by any third party; correct?

16  A    That's what the statement reads based on the information

17  we have here, based on the assumptions that are in here, the

18  fact that the assumptions are always subject to change.

19  Q    Right.  And that was a true statement at the time;

20  correct?

21  A    Yes.  It's a true statement.  The data reflects the

22  assumptions.  The document reflects the data based on the

23  assumptions supporting that data.  If the assumptions change,

24  the numbers will change as well.

25  Q    And if we go down and look at the second sentence in the

13-53846-swr   Doc 4214-10 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 95 of 245
13-53846-swr   Doc 2299-10 Filed 12/28/13 Entered 12/28/13 20:12:16 Page 95 of 245   100
463

1    second paragraph, again, you write, "With respect to

2    prospective financial information relative to the client,

3    Ernst & Young, LLP, did not examine, compile, or apply

4    agreed-upon procedures to such information in accordance with

5    attestation standards established by the AICPA, and E&Y

6    expresses no assurance of any kind on the information

7    presented."  That's a true statement; right?

8    A    That's right.  We did not perform audit procedures.

9    Ernst & Young is a Big Four accounting firm, and this clearly

10   states that we are not providing any audit or assurance-type

11   services for this particular client.

12   Q    Right.  It says that you don't express any assurance of

13   any kind on the information presented; right?

14   A    That is correct.  That's what it reads.

15   Q    And that was a true statement; right?

16   A    Yes.

17   Q    Then, finally, if we go to the last sentence, it

18   states -- or you write, "Reliance on this report is

19   prohibited by any third party as the projected financial

20   information contained herein is subject to material change

21   and may not reflect actual results."  That was a true

22   statement, too; correct?

23   A    That is correct.  If the assumptions change, the data

24   herein will change.

25   Q    If we could go to City Exhibit 115, please.

1  Mr. Malhotra, this is another cash flow forecast; correct?

2  A    That's right.  This is the interim forecast.

3  Q    And this is from December 9th, 2013; correct?

4  A    That is correct.

5  Q    So relatively recent.  And you prepared this document;

6  correct?

7  A    Yes, similar to how I've highlighted earlier.

8  Q    Sure.  And you reviewed this document before it went out;

9  correct?

10  A    This document is still, as I mentioned, an interim draft

11  that has not been approved by the emergency manager yet, but

12  I am -- I have looked at this document and analyzed it before

13  it went out.

14  Q    Right.  Okay.  And, again, if we look at the title, it

15  says, "Work in progress subject to material change"; correct?

16  A    Yes.  The assumptions are subject to material change.

17  Q    If we go to the first paragraph, second sentence, we see

18  the same sentence, "Accordingly, the information contained

19  herein is not intended to be and should not be relied upon by

20  any third party or as legal, auditing, or accounting advice";

21  correct?

22  A    That's what it says, yes.

23  Q    And that's a true statement; right?

24  A    That's what it would have been, yes.  It would be a true

25  statement.

13-53846-swr   Doc 4214-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 97 of 245
13-53846-swr   Doc 2299  Filed 12/28/13  Entered 12/28/13 20:12:16  Page 97 of 245
463
102

1  Q   If we again go to the second paragraph, second sentence,

2  it states or you write, "With respect to prospective

3  financial information relative to the client, Ernst & Young

4  did not examine, compile, or apply agreed-upon procedures to

5  such information in accordance with attestation standards

6  established by the AICPA, and E&Y expresses no assurance of

7  any kind on the information presented."  That's a true

8  statement; right?

9  A   That is correct.  We did not perform audit procedures.

10  Q   And you express no assurance of any kind on the

11  information presented; right?

12  A   The information is based on the assumptions, and we are

13  not providing any assurance on the information presented

14  herein.  That is correct.

15  Q   Finally, you write, "Reliance on this report is

16  prohibited by any third party as the projected financial

17  information contained herein is subject to material change

18  and may not reflect actual results."  That's also a true

19  statement; right?

20  A   If the assumptions change, that is correct, the data will

21  change.

22          MR. ARNAULT:  If we could turn to City Exhibit 36,

23  please, and if we could actually bring up -- it's the second

24  actual page, but it's not page 2 if that makes sense.  That's

25  it.  Thank you.

1    THE COURT:  This page is not in evidence.

2    MR. ARNAULT:  Oh, okay.

3    THE COURT:  Do you want to move it into evidence?

4    MR. ARNAULT:  No, I do not.

5  BY MR. ARNAULT:

6  Q   Then we'll move on to page 97 and 98, which I do believe

7  are in evidence.  And, Mr. Malhotra, just a few quick

8  questions about the projections on this page.  You stated

9  that you prepared these projections; correct?

10 A   That is correct.  In conjunction with the other advisors

11 and the management team, we did.

12 Q   Right.  But the reinvestment expenditures and

13 adjustments, those were actually prepared by Conway

14 MacKenzie; correct?

15 A   Some of those line items, correct, not all of them.

16 Q   Right, but some of them were prepared by Conway

17 MacKenzie; correct?

18 A   Yes.

19 Q   Okay.  If we could turn now to City Exhibit 111, please,

20 and if we could look at the second page, please.  All right.

21 Let's begin by taking a look at scenario number one, please.

22 Scenario one is the scenario where the city obtains DIP

23 financing, makes the swap termination payments, and there is

24 no casino trap; correct?

25 A   That is correct.

13-53846-swr   Doc 4214-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 104 of 245
13-53846-swr   Doc 2299   Filed 12/28/13   Entered 12/28/13 20:12:16   Page 99 of 245
463
104

1   Q   And I assume that to build this forecast, you had to bake

2   in certain assumptions; correct?

3   A   Yes.  The numbers are based on the assumptions, yes.

4   Q   For example, you assume that the interest rate on the DIP

5   financing loan would be five percent; correct?

6   A   That is correct.

7   Q   You are aware, however, that the Barclays DIP is subject

8   to market flex; right?

9   A   That is correct.

10  Q   And the market flex provision of the Barclays DIP means

11  that the minimum interest rate of the DIP loan could increase

12  to 6.5 percent; correct?

13  A   Could you repeat that last question?

14  Q   Sure.  The market flex provision of the Barclays DIP

15  means that the minimum interest rate of the DIP loan could

16  increase to 6.5 percent; correct?

17  A   That is my understanding that it could, but I don't know

18  if that's the minimum floor that's already set --

19  Q   Right.

20  A   -- at 6.5.

21  Q   Sorry.  But if exercised, it could increase to a minimum

22  of 6.5 percent; correct?

23  A   It could.  That is my understanding, yes.

24  Q   Yeah.  And obviously if the interest rate increases to

25  6.5 percent, that would have an impact on this forecast;

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 105 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 16:12:16   Page 105 of 245
463

1  correct?

2  A    That is correct.  The amount of interest would have an

3  impact on the forecast.

4  Q    In fact, the projected incremental cash balances

5  illustrated in the exhibit between scenario one and two would

6  actually be narrower; correct?

7  A    That is correct.

8  Q    In addition to the assumption regarding market flex, this

9  cash balance forecast also includes certain assumptions

10  regarding LIBOR; correct?

11  A    I apologize.  Can we go back to your previous question

12  with respect to the narrower?

13  Q    Sure.

14  A    Would you mind asking that question again?

15  Q    Yeah, of course.  The projected incremental cash balances

16  illustrated in this exhibit would be narrower if the market

17  flex provision was exercised; correct?

18  A    Yes.  The first line would come down in terms of the

19  amount of available cash flow accounting for that increased

20  interest rate, yes.

21  Q    So, in addition to the assumption regarding market flex,

22  this cash balance forecast also includes certain assumptions

23  regarding LIBOR; correct?

24  A    Yes.

25  Q    And I assume that you've utilized a forward LIBOR curve

1  as part of your assumptions; right?

2  A   That would have been the data given to us by the

3  investment banker, Miller Buckfire.

4  Q   Okay.  And the forward LIBOR curve, that's based on

5  interest rates as of today; right?

6  A   That is my assumption, but, like I said, the assumptions

7  on the forward LIBOR assumptions were given to us by Miller

8  Buckfire, so in the assumptions that you see herein, a flat

9  five percent has been used until the default rate of seven

10  percent kicks in.

11  Q   Right.  So the assumptions on the LIBOR curve, those were

12  provided by Miller Buckfire; correct?

13  A   Yes.

14  Q   And you didn't independently test those assumptions;

15  right?

16  A   That is correct.

17  Q   But you would agree with me that the forward LIBOR curve

18  is subject to change; right?

19  A   Like any forward curve, it is.

20  Q   And it's subject to a number of different factors; right?

21  A   I presume so.

22  Q   For example, the actions of the Federal Reserve might

23  impact the forward LIBOR curve; right?

24  A   I don't know if I can comment on that.

25  Q   But you could comment if the interest rates perform

13-53846-swr   Doc 4311-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 107 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 14:12:16   Page 107 of 245
463

 1  differently than the assumptions that Miller Buckfire

 2  provided, that would impact the city's projected cash

 3  balances; correct?

 4  A   Yes.

 5  Q   But you didn't conduct any type of sensitivity analysis

 6  regarding the volatility of the LIBOR curve, did you?

 7  A   No, we did not.

 8  Q   Finally, interest rates will also have an effect on the

 9  cost of the swaps; right?

10  A   Could you rephrase what you mean by "cost of the swaps"?

11  Q   Well, if interest rates increase over time, that's going

12  to decrease the cost of the swaps; right?

13  A   Presumably if you mean the out of the money swap

14  settlement, if the interest rates were to increase, that

15  would have a reduction impact on the out of the money swaps.

16  Q   Right.  And it's an -- if interest rates rise over time,

17  that would increase the cost of the DIP financing; right?

18  A   Yes, compared to what's projected in the forecast within

19  these certain flex terms.  If the interest rates do increase

20  compared to what's assumed in here, the cost of the financing

21  would increase.

22  Q   Right.  So the interest rate -- the rising interest rate

23  would actually have an opposite effect on the cost of the DIP

24  and the cost of the swaps; right?

25  A   The take-out value of the swaps is impacted by the

13-53846-swr    Doc 4304-10    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 108 of 245
13-53846-swr    Doc 2299-1    Filed 12/23/13    Entered 12/23/13 20:12:00    Page 103 of 245    108
463

1   interest rate at that point of time; however, depending on if

2   those swaps have already not been terminated prior to

3   whatever theoretical interest rate time frame you're

4   referring to.

5   Q   Right.  So if they haven't been terminated; right?

6   A   If they haven't been settled, yes.

7   Q   But you didn't conduct any type of sensitivity analysis

8   that would look at where the cost of the DIP and the cost of

9   the swaps would cross over, did you?

10  A   I did not, no.

11          MR. ARNAULT:  No further questions, your Honor.

12          MS. ENGLISH:  Caroline English for Ambac.  I just

13  have maybe two questions is all.  Could we bring 111 back up

14  on the screen, please?  Flip to the next page.

15                    CROSS-EXAMINATION

16  BY MS. ENGLISH:

17  Q   Mr. Malhotra, you testified below that those were the

18  three primary options the city was looking at, the scenario

19  one, two, and three; correct?

20  A   Those are the three scenarios that are illustrative on

21  this page.

22  Q   Okay.  And of those three illustrative scenarios,

23  scenario number one is the only one that includes looking at

24  cash flows based on receiving a DIP loan; is that correct?

25  A   That is correct.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 109 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:03   Page 104 of 245
463

1  Q   And, in fact, sir, isn't it true that when the city was

2  negotiating the forbearance agreement in June of 2013, they

3  never asked Ernst & Young to prepare a cash flow analysis

4  that would look at the cost of funding a litigation with the

5  swap counterparties as opposed to settling with them?

6  A   That is correct.  I don't recall running a scenario like

7  that.

8  Q   I'm sorry.  The last part of your answer?

9  A   You're correct.  I do not recall running a scenario on

10 the litigation costs associated with the swaps transaction.

11 Q   And you didn't run a scenario not only looking at

12 litigation costs, but also you didn't run a scenario that

13 looked at the city getting a DIP loan to finance litigation

14 costs; correct?

15 A   Can you rephrase that question, please?

16 Q   You didn't run any cash flow analysis that looked at the

17 city funding the cost of litigating with the swap

18 counterparties as opposed to settling with them; correct?

19 A   I think that's sort of reflective in that scenario three

20 maybe, unless I'm thinking about this wrong, that if you

21 don't have a DIP and you don't have a swap settlement and you

22 potentially have the risk of your casino monies trapped --

23 Q   Right.  What I'm asking you, though, is at the time the

24 city was negotiating with the swap counterparties this

25 summer, right, did the city ask Ernst & Young to do a cash

1   flow analysis that looked at getting DIP financing and

2   litigating with the swap counterparties instead of settling?

3   A    I cannot recall if we ran a scenario in which the city

4   was receiving DIP financing and not settling the swaps

5   because I thought they were intertwined, that the DIP

6   financing was intertwined with the settlement of the swaps.

7           MS. ENGLISH:  Okay.  Thank you very much.

8                       CROSS-EXAMINATION

9   BY MR. MARRIOTT:

10  Q    Good morning, Mr. Malhotra.

11  A    Good morning.

12  Q    Vince Marriott representing EEPK and affiliates.

13          MR. MARRIOTT:  Could I have demonstrative 140?  Do

14  we have that anywhere?

15          UNIDENTIFIED SPEAKER:  What?

16          MR. MARRIOTT:  Demonstrative Exhibit 140?

17          UNIDENTIFIED SPEAKER:  Oh, 140.

18  BY MR. MARRIOTT:

19  Q    Okay.  Mr. Malhotra, if I understand the intention of

20  this demonstrative exhibit, it's to demonstrate the cash flow

21  benefits to the city if the swap payments are eliminated and

22  the DIP loan is borrowed; correct?

23  A    That is correct.

24  Q    Okay.  I want to understand a couple of things about this

25  to make sure that we verify the cash flow benefit numbers.

1&#x20;&#x20;The swap termination loan line, you see that?  The 7.3

2&#x20;&#x20;million to 13.6 million in fiscal year 2014 and the 7.3

3&#x20;&#x20;million to 13.6 million in fiscal year 2015, are those

4&#x20;&#x20;estimates of the range of interest payments due with respect

5&#x20;&#x20;to the swap termination loan for those two years?

6&#x20;&#x20;A    It would be, yes.  It's the swap interest.  It's the

7&#x20;&#x20;interest payment only on the portion of the DIP financing

8&#x20;&#x20;that would be used to settle the swaps, so it would be the

9&#x20;&#x20;interest on the 227-odd million dollars that would be

10&#x20;&#x20;calculated for fiscal year '14 and '15 and does not include

11&#x20;&#x20;anything else.

12&#x20;&#x20;Q    Okay.  Now, the range, 7.3 to 13.6, is that designed to

13&#x20;&#x20;reflect the market flex provision and the difference in

14&#x20;&#x20;potential minimum interest rates payable under the swap

15&#x20;&#x20;termination loan?

16&#x20;&#x20;A    I would have to check if it includes the maximum flex of,

17&#x20;&#x20;you know, whatever that maximum flex is, but I think this is

18&#x20;&#x20;run at three and a half percent, which is the --

19&#x20;&#x20;Q    The minimum.

20&#x20;&#x20;A    -- the minimum --

21&#x20;&#x20;Q    Right.

22&#x20;&#x20;A    -- and I believe the cap was about six or six and a half

23&#x20;&#x20;percent.  I would have to -- about six percent.

24&#x20;&#x20;Q    So the 13.6 million may or may not reflect maximum flex?

25&#x20;&#x20;A    The maximum flex under a default scenario, I do not think

1   it reflects that total.

2   Q   Okay.  But does it reflect the maximum nondefault flex of

3   a minimum interest rate of 6.5 percent?

4   A   I would just have to do a calculation real quick.  I

5   think it's a little shy of the six and a half, so I think

6   it's closer to five and a half or six percent based on the

7   numbers I'm seeing here.

8   Q   Okay.  So the 13.6 million, in fact, if there was maximum

9   flex, could be higher?

10  A   It depends actually really on the date you picked with

11  respect to the swap settlement amount in terms of the 227

12  million and the corresponding interest on that, so, yes, you

13  are right.  If the interest is higher, that amount would be

14  higher.  However, if the overall take-out amount is lower,

15  that amount would be lower, so it is a factor of not only the

16  amount of interest --

17  Q   Um-hmm.

18  A   -- but also the amount of the swap settlement.

19  Q   But you would agree with me -- and let's get to that

20  point.  You would agree with me that the city is borrowing

21  more or proposing to borrow more under the post-petition

22  financing than just the swap termination loan.  It's also

23  borrowing what it calls the quality of life loan; correct?

24  A   Yes.

25  Q   Okay.  And the total proposed borrowing is 350 million;

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 113 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 114 of 245   113
463

1  correct?

2  A    That is correct.

3  Q    And the city will have an interest cost against the whole

4  350 million, not just the swap termination fees; correct?

5  A    Yeah, but now the illustrative on 1 -- on Exhibit 140

6  compares the swap interest to the swap interest.  The quality

7  of life loan DIP interest would be in addition to that, but

8  it's sort of not reflected in this net analysis over here.

9  Q    Right.  It's not -- and I agree.  It's not reflected,

10  but, in fact, it will be a cost to the city associated with

11  the proposed transaction; correct?

12  A    As the cash flows have shown, the city needs the money,

13  and that requires -- so, yes, it will pay interest on the

14  quality of life loan.  That is correct.

15  Q    And since the quality of life loan and the swap

16  termination loan are a single $350 million loan, in fact, the

17  cash flow benefits to the city are diminished not just by the

18  interest payable on the swap termination fees but also by the

19  interest payable on the quality of life piece; correct?

20  A    No.

21  Q    Why not?

22  A    Because you're also ensuring that you have ongoing

23  collection of your casino revenues.

24  Q    No.  You're not -- let me try to be more clear.  As I

25  understand this demonstrative, it's designed to demonstrate

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:22:00   Page 104 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 114 of 245
463

1  in a very limited sense the difference between the swap

2  payments and the cost to the city of the swap termination

3  loan; correct?

4  A   That is correct.

5  Q   All right.  Isn't it also correct, however, that the city

6  is not just borrowing the swap termination loan in connection

7  with the forbearance agreement and termination of the swaps

8  and the post-petition financing?  It's also borrowing the

9  quality of life loan such that its total borrowings on which

10 it will pay interest is $350 million; correct?

11 A   That is correct.

12 Q   And that total interest cost on $350 million is not

13 reflected on this demonstrative; correct?

14 A   That is correct.

15 Q   Now, the city also has to pay a commitment fee with

16 respect to the post-petition financing; correct?

17 A   Yes, I believe that is correct.

18 Q   And that commitment fee is --

19     MR. STEWART:  Your Honor, if I -- may I -- if he

20 wants to go down this road, I suppose maybe that's his

21 decision.  I thought his objection when I was examining the

22 witness was that this very area was not relevant and

23 certainly is beyond the scope of direct, but maybe he's going

24 somewhere on that, but wasn't this Mr. Marriott's objection

25 an hour and a half ago?

1    MR. MARRIOTT:  It was not, your Honor.  This is

2    precisely what -- the limits of what I believe Mr. Malhotra

3    ought to be allowed to testify to, and that is the cash flow

4    benefits to the city, and that beyond that he's gotten into

5    needs and uses and all of that.  What I'm attempting to

6    demonstrate here is that this is an overstatement of the cash

7    flow benefits to the city at this --

8    THE COURT:  I'll permit that.  Go ahead.

9    BY MR. MARRIOTT:

10   Q   Back to the commitment fee.  You understand that there is

11   a commitment fee payable with respect to the post-petition

12   financing; correct?

13   A   Yes.  I -- yes.

14   Q   And are you aware of the amount of that commitment fee?

15   A   I don't recall off the top of my head.

16   Q   If I were to tell you it's one and a half percent of $350

17   million, would that refresh your recollection?

18   A   That would sound in the ballpark, yes.

19   Q   Okay.  You would agree with me that one and a half

20   percent of 350 million is about $4.3 million?

21   A   Sounds right.

22   Q   Okay.  Is that $4.3 million reflected anywhere on the

23   comparative -- on the cash flow benefit calculation on this

24   demonstrative?

25   A   No, it is not.

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 16:12:00   Page 116 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 116 of 245
463

1        MR. MARRIOTT:  If we could have 111.

2   BY MR. MARRIOTT:

3   Q   Just a couple quick questions on this exhibit.  You run

4   it out to June 2015; correct?

5   A   On this particular chart, yes.

6   Q   Right.  And it doesn't go out past that; correct?

7   A   Not on this chart. That's correct.

8   Q   The post-petition financing, the $350 million, is going

9   to have to be repaid; right?

10  A   Yes.

11  Q   This does not reflect the cash impact of having to repay

12  the $350 million post-petition financing facility; correct?

13  A   This does not include the impact of repaying $350

14  million; however, it does include an assumed amortization of

15  $8 million a month starting in December of 2014, and that

16  would reflect a four-year amortization, so it does not

17  include repaying $350 million over this time frame.

18        MR. MARRIOTT:  Nothing further.

19                       CROSS-EXAMINATION

20  BY MR. GOLDBERG:

21  Q   Good morning, sir.  Jerome Goldberg representing

22  interested party David Sole.

23        MR. GOLDBERG:  I was wondering if 140 could be put

24  up again, please.

25        THE COURT:  I'm sorry, sir.  What number?

13-53846-swr  Doc 4304-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 117 of 245
13-53846-swr  Doc 2299-1  Filed 12/23/13  Entered 12/23/13 20:12:10  Page 116 of 245  117
463

1         MR. GOLDBERG:  140.

2   BY MR. GOLDBERG:

3   Q    Just so I'm clear, sir, you stated that 140, the swap

4   termination loan reflects the interest on the swap

5   termination loan reflective pre-termination, pre-calling in

6   the loan, pre-default on the loan; is that not correct?

7   A    I'm sorry.  I didn't understand your question.

8   Q    Let's be clear.  The city pays an interest rate of three

9   and a half to six and a half percent on the loan until the

10  bankruptcy is over, approximately; is that not correct?

11  A    The city's -- on the DIP financing.

12  Q    Yes, on the DIP financing.

13  A    Yeah.  The city is going to pay the -- once the DIP is

14  closed, the interest rate could be as low as three and a half

15  percent or could be as high as six and a half percent.

16  Q    And once the bankruptcy is over, then there's an

17  automatic termination event on that loan where the city then

18  begins paying a rate of two percent higher than that and with

19  payments of $4 million a month for the swap termination fee

20  and $4 million a month on the quality of life loan; is that

21  not correct?

22  A    The $8 million, which is the four and four that you just

23  referred to, is going to be an all-in number, principal and

24  interest.

25  Q    I'm sorry.  I couldn't hear you, sir.

1  A   The $8 million is designed to be an all-in payment versus

2  just interest.  It's going to be principal and interest

3  combined.  The terms of the default rates are two percent

4  higher, and the Miller Buckfire team can talk to this better

5  with respect to exit financing and the assumptions that go

6  with that.

7  Q   But the figures you're showing here do not factor that in

8  whatsoever in this chart, do they?

9  A   No.  These are specifically --

10  Q   Okay.  That answered that question.  Thank you.

11       MR. GOLDBERG:  Can I see chart -- have chart 108 put

12  up, please -- I mean Exhibit 108, page 2?

13  BY MR. GOLDBERG:

14  Q   I'm looking at the line that says "DIP financing

15  principal interest payments."  It would be the third line

16  from -- on top of total reconciling item -- reconciling

17  items.

18  A   I'm sorry.  Can I see the cover of this packet for a

19  moment so I know which packet this is just -- thank you.

20  Q   Now, in --

21       MR. GOLDBERG:  Thank you.  Very good.  I appreciate

22  it.  If you can take that line all the way across, that would

23  be very helpful, that line and the line below it.

24  BY MR. GOLDBERG:

25  Q   Now, for fiscal year 2015, that reflects payments on the

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 14 of 24
13-53846-swr   Doc 4314   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 119 of 145
463

1    DIP financing of 63.3 million.  Is it fair to say that

2    includes a period of time where the payment is just the

3    interest payment and then the full amortization is kicked in?

4    A   It's shown on the memo two on that page.  42.4 million of

5    that payment is principal on the second to last line of that

6    page, and 20.8 million is interest.

7    Q   Okay.  And then for fiscal year 2016, it shows a payment

8    of $96 million a year; is that not correct?

9    A   Including $76.9 million of principal and $19.1 million of

10   interest.

11   Q   And of that 96 million, 4 million a month is allocated to

12   the swap termination payment; is that not correct?

13   A   I do not know specifically if it's four million.  The way

14   we have modeled it is a total payment of $8 million a month.

15   The split of that between the quality of life loan versus the

16   swap is something that Miller Buckfire will have to talk to.

17   Q   I'm sorry.

18   A   What we have included in the model is $8 million a

19   month --

20   Q   Exactly.

21   A   -- with respect to principal and interest.  Your question

22   about how much of that is the quality of life loan versus the

23   swap settlement, that's a question for Miller Buckfire.

24   Q   Okay.  We'll question Mr. Buckfire.  I mean you haven't

25   looked at the Barclay loan terms?

1   A    Not in detail, no.

2   Q    You haven't looked at how the payments get allocated

3   under the Barclay loan terms?

4   A    I never -- what we have looked at is the $8 million a

5   month for principal and interest in aggregate.  I have not

6   reviewed the split of that towards the quality of life loan

7   versus the swap settlement amount.

8   Q    Okay.  Well, I'd be glad to pull it out.  If it's helpful

9   to pull it out now, we can pull it out, but I can tell you

10  straight up that it reflects $4 million a month allocated to

11  the swap termination.

12          THE COURT:  I have to ask you just to ask a

13  question, please.

14          MR. GOLDBERG:  Okay.  Okay.

15  BY MR. GOLDBERG:

16  Q    Assuming -- assuming that that loan is split at least

17  until the quality of life payment toward -- $4 million toward

18  the swap termination and $4 million to the quality of life,

19  that would mean 48 million is being paid to terminate the

20  swaps; is that not correct?

21  A    No.  Under that assumption, the 48 million is just a

22  repayment of the loan undertaken to settle the swaps.

23  Q    Okay.  That's fair enough.  And 48 million is a repayment

24  to Barclays for paying -- for repaying the -- for paying

25  the -- for terminating the swaps with UBS and Bank of

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 121 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 116 of 245   121
463

1   America; is that not correct?  Is that a fair statement?

2   A   Why don't you -- please, could you rephrase that

3   question?

4   Q   Certainly.  The Barclay loan -- the swap termination part

5   of the Barclay loan is to pay off UBS and Bank of America on

6   the swaps; is that not correct?

7   A   It's to settle the swaps.  That is correct, yes.

8   Q   Okay.  And so assuming that the 96 million, at least for

9   2016, is split four million a month toward the swap

10  termination loan and $4 million toward the quality of life

11  loan, four million times 12 is 48 million.  That means 48

12  million is dedicated to give to Barclay to pay off the

13  satisfied funds that were paid to UBS and Bank of America?

14          MR. STEWART:  Objection, your Honor.  He's making

15  assumptions of facts that are not on the record, and I'm not

16  sure he's phrased this in a proper way if what he's doing is

17  asking this opinion for a witness -- of this witness for an

18  opinion based on new hypotheticals.

19          THE COURT:  I'll permit it if the witness can

20  answer.  Can you answer that question, sir?

21          THE WITNESS:  Under the assumptions that you're

22  highlighting of $4 million a month, if you say $4 million a

23  month is going towards swap settlement over 12 months, that

24  could equate to 48 million bucks -- $48 million.  That's just

25  the math that I would -- I can talk about the 12 times 4, but

1  anything beyond that I would not be comfortable talking

2  about.

3  BY MR. GOLDBERG:

4  Q  No problem.  So would you agree with me then that the

5  figure there when you say swap payment savings from the

6  settlement is deceptive in that, in fact, $48 million is

7  being used to pay off the swaps, so the actual savings,

8  according to you, would be $2.6 million.

9  A  No.

10  Q  Okay.  And, in fact, the $50.6 million, as has been

11  stated previously, is based on a projection of the current

12  LIBOR rate, which is very low; correct?

13  A  No.  That is a fixed payment.

14  Q  The 50.6 million is based on a fixed payment?

15  A  Yeah.  It's the $4.2 million a month that the city has

16  contracted to pay on its swap interest.

17  Q  But isn't that based on the -- a margin of -- between

18  the -- 3.34 margin plus LIBOR and the fixed -- and the fixed

19  interest rate that's paid to the banks?

20  A  I would have to go back and check.

21  Q  Okay.  No problem.  You're not the one who calculated the

22  termination fees.  You said Mr. Buckfire was involved in

23  that?

24  A  I did not calculate the termination fee.

25  Q  And you're not familiar with how that's done?

1   A    The swap settlement fee?

2   Q    Yes.

3   A    I have a general understanding, but I have not been

4   involved in calculating the fee.

5        MR. GOLDBERG:  Okay.  I have no further questions.

6   Thank you.

7        THE COURT:  Any other questions for the witness?

8   Any redirect?

9        MR. STEWART:  Just a few, if I might.

10                   REDIRECT EXAMINATION

11  BY MR. STEWART:

12  Q    Mr. Malhotra, you were asked about market flex.

13  A    Yes.

14  Q    Isn't it the case that 6.5 percent is not the minimum,

15  it's the maximum?

16  A    Yes.

17       MR. STEWART:  Let's put up Exhibit 106, just the

18  first page.

19  BY MR. STEWART:

20  Q    You remember you were asked about some of the disclaimer

21  language that appears on the first page of this exhibit and

22  other exhibits?

23  A    Yes.

24  Q    Does the term "assurance" have a particular meaning

25  within the auditing profession?

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 124 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 124 of 245
463

1   A   Yes, it does.

2   Q   What is that particular meaning?

3   A   It's supposed to relate to audit-type opinions, audit-

4   related specific work as under the guidelines of the AICPA.

5   Q   So when there's reference here to assurance of any kind,

6   that's a reference to auditing assurance?

7   A   Yes.  We are not providing auditing assurance here.

8   Q   Also, there were references here to third parties, about

9   reliance by third parties.  Remember those questions?

10  A   Yes.

11  Q   Okay.  Who's your client in your work for the city?

12  A   The City of Detroit.

13  Q   You're the first party because you're doing the work;

14  right?

15  A   That is correct.

16  Q   The second party is the city; correct?

17  A   Yes.

18  Q   Who's the third party?

19  A   I don't know.

20  Q   By this disclaimer, was E&Y suggesting that the city

21  could not rely upon its work?

22  A   No.  The city could.

23  Q   Now, the work -- you've described how you went about it.

24  Does this --

25          THE COURT:  Excuse me.  Am I a third party?

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 125 of 245
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 125 of 245
463

1    THE WITNESS:  Your Honor, I don't know.

2  BY MR. STEWART:

3  Q   And in preparing your forecasts, did you believe them to

4  be as accurate as you can make them?

5  A   Yes.

6    MR. STEWART:  Thank you.  That's all I have.

7    THE COURT:  Any other questions of the witness?  One

8  second, please.  Could somebody please put Exhibit 108 back

9  up at whatever page it was that Mr. Goldberg was asking

10  about?  Thank you.  You see the line in the middle that says

11  "net cash flow per DIP financing scenario"?

12    THE WITNESS:  Yes, your Honor.

13    THE COURT:  And then there are the four numbers for

14  the fiscal years '14 through '17?

15    THE WITNESS:  Yes, your Honor.

16    THE COURT:  Can you explain to the Court what those

17  four numbers mean?

18    THE WITNESS:  Yes, your Honor.  It would mean that

19  in fiscal year 2014, if the city had completed the DIP

20  financing and settled the swaps, the city would have $87.6

21  million of cash generated in that particular fiscal year.  In

22  year -- fiscal year 2015, there would be $62.9 million of

23  cash used that year of which, your Honor, $42.4 million would

24  be a repayment of principal under the current assumptions

25  that we are using.  In years -- fiscal year 2016, the net

1    cash flow would be $6.6 million generated for the city under

2    the assumption that $76.9 million of principal would be

3    repaid in that particular year subject to the ongoing

4    discussions, and the fiscal year 2017, your Honor, would show

5    a use of $17 million of cash under the scenario that $82.5

6    million of principal was repaid in that particular year.

7           THE COURT:  Can we have a look, please, at Exhibit

8    111, the chart?  Is this a representation of the projected

9    cash balances in these three scenarios taking into account

10   the city's revenue and expenses?

11          THE WITNESS:  Yes, your Honor.

12          THE COURT:  Did you prepare projected cash balances

13   for these three scenarios beyond June of '15?

14          THE WITNESS:  On a monthly basis, your Honor, we did

15   it through June 2015.  We did do it for fiscal year '16 and

16   '17 on an annual basis.

17          THE COURT:  What does scenario one look like for

18   those two subsequent years?

19          THE WITNESS:  Under these assumptions, assuming that

20   the cash flows and the cash balances assumptions with respect

21   to the exit financing are similar to those shown in the

22   previous exhibit, those numbers would get added upon to this

23   cash balance, so I would just have to do the math, your

24   Honor, with respect to the cash flow for fiscal year '16 and

25   fiscal year '17 cumulatively would get added onto that $61

13-53846-swr   Doc 4311-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 127 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 122 of 245   127
463

1  million ending cash balance.

2  THE COURT:  What's the number for '16?

3  THE WITNESS:  For fiscal year '16, your Honor, the

4  net cash flow is $6.6 million positive, so it would become

5  $67 million of ending cash balance.

6  THE COURT:  And for '17?

7  THE WITNESS:  For '17 it would be a negative $17

8  million, so it would be an ending cash number of $50 million.

9  THE COURT:  Thank you.  Were you involved -- may I

10  have your attention, sir?  Were you involved in preparing --

11  were you asked to prepare projections in connection with the

12  city's decision as to how much money to borrow?

13  THE WITNESS:  No.

14  THE COURT:  Were you asked to prepare projections in

15  connection with the city's negotiations over how much money

16  to pay to terminate the swaps?

17  THE WITNESS:  No, your Honor.

18  THE COURT:  In a general sense, what would the line

19  for scenario one look like if instead of paying whatever the

20  current amount is to terminate the swaps -- what is that

21  amount, approximately?

22  THE WITNESS:  Your Honor, I believe it's about

23  approximately $227 million.

24  THE COURT:  227.  All right.  If instead of paying

25  that, what would line 1 look like, for example, if the city

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 128 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 123 of 245   128
463

1   had negotiated a number, say, 150 million?

2        THE WITNESS:  Your Honor, it would have no impact on

3   line 1.

4        THE COURT:  Assuming the same DIP loan amount?

5        THE WITNESS:  Assuming the same DIP loan amount,

6   yes, your Honor, and assuming the amortization remains the

7   same in the latter half of this forecast period, but it would

8   not change that amount assuming the DIP loan was the same.

9        THE COURT:  Where would that extra $77 million go?

10       THE WITNESS:  Your Honor, assuming the DIP amount

11  was the same, the city would have additional cash if the swap

12  settlement amount was then lower if -- assuming the 350

13  million is still the same, and actually the city can get --

14  instead of the net $120 million quality of life loan, the

15  city can actually expand that to 197.  Only under that

16  scenario would the cash be higher as that $350 million is the

17  key number that drives the scenario one way or the other,

18  your Honor.

19       THE COURT:  I don't have any further questions.

20  Anything further for the witness?

21       MR. STEWART:  Only this, Judge.  I think the

22  witness' response to your questions about the future --

23       THE COURT:  I'm sorry.  I do need to ask you to

24  stand by a microphone.

25       MR. STEWART:  I'm sorry, Judge.  When you had asked

1   the witness about the forecast for fiscal 2016 and 2017 and

2   he was responding to you, he was looking at page 5 of 17 of

3   Exhibit 108.

4           THE COURT:  All right.  Is that right, sir?

5           THE WITNESS:  Yes.  That page will reflect the cash

6   balances for --

7           THE COURT:  Okay.

8           THE WITNESS:  -- fiscal year '16 and '17.

9           THE COURT:  Thank you for clarifying that.  All

10  right.  If there's nothing further for the witness, we will

11  break for lunch now and reconvene at two o'clock, please.

12          THE CLERK:  All rise.  Court is in recess.

13     (Recess at 12:18 p.m., until 2:00 p.m.)

14          THE CLERK:  All rise.  Court is in session.  Please

15  be seated.  Recalling Case Number 13-53846, City of Detroit,

16  Michigan.

17          THE COURT:  Before we proceed, we have been asked to

18  provide a little service for Judge Cleland of the District

19  Court, so we need to go off the record, please.

20     (Recess at 2:00 p.m., until 2:02 p.m.)

21          THE COURT:  All right.  Back on the record, please.

22          THE CLERK:  Recalling Case Number 13-53846, City of

23  Detroit, Michigan.

24          THE COURT:  Your next witness, please.

25          MR. LEMKE:  If your Honor please, I'm David Lemke on

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 130 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 125 of 245   130
463

1     behalf of U.S. Bank as trustee for the water and sewer bonds,

2     and counsel have agreed, if your Honor will permit, to let me

3     make a short announcement regarding an objection so that I

4     might be able to be excused.

5           THE COURT:  Yes, sir.  Go ahead.

6           MR. LEMKE:  The trustee filed a limited objection to

7     the post-petition financing motion.  We have resolved that

8     objection with agreeable language with both the city and with

9     Barclays.  That language is found in paragraph 6(b) of the

10    proposed order.  The version that has been filed with your

11    Honor has the correct language with one exception.  There is

12    an "of" that's an extra "of" that's going to be deleted in

13    the first sentence.  It's the middle "of."

14          THE COURT:  Okay.

15          MR. LEMKE:  And with that change then, that -- the

16    language in the order then does resolve the trustee's limited

17    objection to the financing motion, and with your Honor's

18    permission I may stick around for the rest of the day, but if

19    you'll permit, I will excuse myself at the end of the day.

20          THE COURT:  Yes, sir.

21          MR. LEMKE:  Okay.  Thank you, your Honor.

22          MR. CULLEN:  Your Honor, the city -- good afternoon,

23    your Honor.  Thomas Cullen of Jones Day for the city.  The

24    city would now like to call Kenneth Buckfire as our next

25    witness.

13-53846-swr  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 31 of 45
13-53846-swr  Doc 2299  Filed 12/23/13  Entered 12/23/13 20:12:10  Page 126 of 245  131
463

```
 1          THE COURT:  Okay.  One second.  For your
 2   information, the city has 317 minutes left and the objectors
 3   431.  Please raise your right hand.
 4            KENNETH BUCKFIRE, DEBTOR'S WITNESS, SWORN
 5          THE COURT:  All right.  Please sit down.
 6                         DIRECT EXAMINATION
 7   BY MR. CULLEN:
 8   Q    Good afternoon, Mr. Buckfire.
 9   A    Good afternoon.
10   Q    Could you please provide your full name for the record,
11   sir?
12   A    Kenneth Buckfire.
13   Q    And where do you reside?
14   A    New York City.
15   Q    And what's your job?
16   A    I am the co-president of Miller Buckfire & Company, an
17   investment banking firm.
18   Q    And what is the nature of Miller Buckfire's business?
19   A    We advise companies, countries, and municipalities in
20   financial distress.
21   Q    And could you describe your professional background
22   before you came to Miller Buckfire?
23   A    After receiving my MBA from Columbia University in 1987,
24   I went to work as an investment banker specializing in
25   restructuring.  I was with Lehman Brothers in the early part
```

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 132 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 92 of 245   132
463

 1  of my career.  After leaving Lehman Brothers, I joined
 2  Wasserstein Perella to start their financial restructuring
 3  practice, which we did successfully.  In 2002 my then
 4  partner, Henry Miller, and I bought our business from the
 5  successor to Wasserstein Perella and formed Miller Buckfire &
 6  Company.
 7  Q   As an investment banker working in the restructuring
 8  area, have you had occasion to work on issues regarding
 9  restructuring finance?
10  A   Yes.
11  Q   Could you describe what restructuring finance entails for
12  the Court, please?
13  A   Restructuring finance entails raising capital for
14  companies or cities from time to time or countries either in
15  or out of court under conditions where the normal capital
16  markets are simply not available, and that requires a much
17  more tailored and more diagnostic approach to raising capital
18  and particularly if it's in bankruptcy because the conditions
19  of bankruptcy pose an additional burden on the entities
20  issuing capital.
21  Q   When you say "the normal markets are not available," why
22  not, sir?
23  A   Typically an enterprise which -- by this I mean also a
24  country or a municipality which has financial issues is not
25  able to issue debt in the ordinary course or equity in the

13-53846-swr   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 133 of 245
13-53846-swr   Doc 4304-1   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 133 of 245
463
133

1  ordinary course.  There are issues about financial

2  statements, issues about solvency, issues about going

3  concerns, sustainability, and the normal providers of capital

4  are not usually willing to provide capital in the

5  circumstances.

6  Q   How often does an issue of restructuring finance come up

7  in the course of Miller Buckfire's engagements?

8  A    In every engagement, that's a central element.

9  Q   And have you ever been qualified as an expert to testify

10  in the area of restructuring finance?

11  A    Yes, many times.

12  Q   Directionally how many?

13  A    Over 20.

14  Q   And in particular, have you been ever qualified as an

15  expert to testify concerning debtor in possession financing?

16  A    Yes, many times.

17  Q   You have experience and expertise in analyzing a

18  distressed entity's liquidity needs?

19  A    Yes.

20  Q   Do these areas of expertise extend to companies on the

21  brink, if you will, or threatened by bankruptcy as well as

22  those that have declared?

23  A    Yes.

24  Q   Do you have any experience with municipal restructuring?

25  A    Yes.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 34 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 14:11:06   Page 129 of
463
134

1   Q   Could you explain that for me, please?

2   A   My firm did some pro bono work for Harrisburg,

3   Pennsylvania.  We are currently advising a bond insurer in

4   the case of Stockton, California.  We're also advising a bond

5   insurer with respect to Harris County Sports Authority in

6   Texas.  I've also had substantial governmental experience

7   advising both the federal government and a sovereign country

8   on their issues.

9   Q   Since you became engaged by the city early in this year,

10  how much time have you spent familiarizing yourself with the

11  city's financial needs?

12  A   Substantial time.

13  Q   Give me a ballpark.

14  A   Well, personally I probably have spent 75 percent of my

15  time related strictly to the City of Detroit as well as the

16  efforts of my banking team.  We've been very heavily engaged

17  even predating this current engagement in January.  We were

18  first hired to do a 60-day review of the city's financial

19  condition in 2012.  We were reengaged in January of this year

20  to be a general financial advisor, and in the construct of

21  those two engagements we became very familiar with the city's

22  financial condition.

23  Q   And in the course of this -- these engagements, did you

24  have access to the city's books and records?

25  A   We did.

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 135 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 135 of 245
463

1  Q   And did you have access to the assistance of other

2  professionals?

3  A   Yes.  We had substantial interaction with not only the

4  other outside professionals, Ernst & Young and Conway

5  MacKenzie, but also the city's own finance team.

6  Q   Soon after your engagement, did you become familiar with

7  issues regarding something which -- some things which have

8  been called in the course of this case the COP's and the

9  swaps?

10  A   Yes.

11  Q   Did you have an opportunity to --

12        MR. CULLEN:  Oh, before we start getting any

13  further, I'd like to offer Mr. Buckfire as an expert in the

14  area of restructuring finance.

15        MR. HACKNEY:  Your Honor, we do object to that.  I

16  believe there's going to be opinion testimony that's more

17  specific than the general area of restructuring finance, and

18  we do have objections to his qualifications.

19        THE COURT:  What is your objection?

20        MR. HACKNEY:  Our objection, your Honor, is that the

21  witness is not qualified as an expert in sourcing municipal

22  finance and has never done it before.

23        THE COURT:  Is that true, sir?

24        THE WITNESS:  My expertise is in the origin of DIP

25  financing for corporations.  This is the first municipal DIP

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 136 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 16:12:06   Page 136 of 245   136
463

1   financing we have arranged.

2         THE COURT:  What is your assessment on whether the

3   expertise in corporate DIP finance applies to municipal DIP

4   finance?

5         THE WITNESS:  Well, I think it's highly relevant,

6   your Honor, because the sources of capital who could provide

7   this kind of financing are very limited.  There are people

8   who have DIP financing expertise as well as municipal

9   financing expertise.  People who only have municipal

10  financing expertise were not able to assess a DIP financing

11  in this area, so we needed to find people who had both.  And,

12  of course, we know all the sources of DIP financing, and so

13  our expertise was directly applicable to running that process

14  for the city.  The fact that we only had available to act as

15  collateral revenues of the city was the only aspect of

16  municipal finance that was relevant here, but, of course, we

17  dealt with that through the financing process itself.  And

18  this, by the way, I think is the only municipal DIP financing

19  ever done.

20        THE COURT:  All right.  The objection is overruled.

21  The Court will permit the testimony.

22        MR. CULLEN:  Thank you, your Honor.

23  BY MR. CULLEN:

24  Q   With respect to the COP's and the swaps, did you form an

25  opinion of their importance to the city's financial

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 137 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 137 of 245   137
463

1    situation?

2    A    I did.

3    Q    What was that opinion?

4    A    When we were reengaged in January of this year, we began

5    to do an assessment of the financial risks the city faced in

6    order to formulate our strategy in resolving the city's

7    financial condition.  It was at the time evident to us that

8    the default the city already was burdened by under the swaps

9    agreement was a source of financial risk, so we began to

10   study that whole issue with the perspective of eliminating

11   that risk factor from the city's ability to access its cash.

12   Q    Can you describe how the swap transactions worked at the

13   time you became aware of them?

14   A    Well, the original swap transactions, of course, were

15   entered into by the city in 2006.  They were modified in

16   2009, and at that time the swap counterparties were granted a

17   collateral interest in the gaming revenue.  They were granted

18   additional events of default, and they also secured an

19   increase in interest rate effectively leaving the city on the

20   hook for net 45 million or so of cash costs every year while

21   the swaps were in place, but, as I mentioned earlier, not

22   only was it a huge cash burden on the city to keep them in

23   place, but because of the defaults that existed in January,

24   it created a risk that at any time the banks might take

25   advantage of their rights under the agreements and foreclose

1 the city's access to gaming revenue.

2 Q   Let's go back to the 2009 amendment for a moment.  What

3 impact did that amendment have on the hedging function of the

4 swaps?

5        MR. HACKNEY:  And, your Honor, I would interpose an

6 objection.  I think it's fair to ask the negotiator what he

7 understood to be the case, but to actually ask him the truth

8 of the matter would render a legal conclusion out of a

9 witness that is not an attorney, so I would with that caveat

10 make the objection.

11 BY MR. CULLEN:

12 Q   What was your understanding?

13 A   My understanding was as part of that 2009 amendment, the

14 city lost all benefits of the swap.  The swap was intended to

15 protect the city from a rise in interest rates above the base

16 rate, which in this case was around six percent, but the city

17 gave up that right to the banks.  The banks acquired what's

18 called an optional termination right, which meant that if the

19 swap ever went in the money for the city and out of the money

20 for the banks, the banks could terminate, so it was

21 effectively a one-sided arrangement only to the benefit of

22 the banks.

23 Q   And with respect to the other impacts of the 2009

24 amendment, what is your understanding of how the pledge of

25 the casino revenues worked?

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 10:12:06   Page 139 of 245
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 139 of 245
463

1   A   Well, the arrangement that the city agreed to in 2009

2   required the providers of gaming tax revenues, the casinos

3   themself, to transmit their gaming tax revenues into a lock

4   box under the control of U.S. Bank as trustee -- or

5   custodian, rather.  Excuse me.  And only after the account

6   was filled up to a certain amount would the custodian

7   disburse funds to the city after paying, in fact, the banks

8   what they were owed.

9   Q   And did that arrangement for the gathering and

10  distribution of these funds pose any risks for the city?

11  A   It posed substantial risks.

12  Q   Could you explain, please?

13  A   Well, because of the defaults that the city had incurred

14  in the beginning of this year and before this, the swap

15  counterparties at any time theoretically had the right to

16  instruct the custodian to stop distributing the city's share

17  of gaming revenues to the city's general fund, which would

18  have been approximately $120 million a year net of the cost

19  of the swap itself.

20  Q   When was the decision made to enter into negotiations

21  with the swap counterparties for what became the forbearance

22  agreement, which is at issue here?

23  A   Well, beginning in January when we became the financial

24  advisor to the city, we began to study this issue.  There had

25  been attempts made by the banks to enter into a new amendment

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 140 of 245
13-53846-swr   Doc 2295-10   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 93 of 245
463
140

 1   with the city where the city would, you know, cure, quote,

 2   the defaults but give up certain other rights, so we

 3   basically tried to downplay those.  We didn't think those

 4   were in the city's best interest, but in May of this year

 5   when we finally saw the real cash flow numbers that we were

 6   working with, we were very concerned that come June the city

 7   would run out of money.  And we were concerned that if that

 8   was the case, then the ability of the city to survive if the

 9   gaming revenues were lost would be cataclysmic, and in May we

10   decided we had to begin a discussion with the banks.

11   Q   Can you describe the degree of urgency with respect to

12   these negotiations that the May numbers caused?

13   A   Well, after reviewing the financial forecasts with the

14   emergency manager and others, I was directed to immediately

15   begin negotiations with the banks to try to reach some kind

16   of a standstill or forbearance that would stabilize the

17   city's access to its revenues, so on June 4th or thereabouts

18   I had the first meeting with the banks here, Bank of America

19   Merrill Lynch and UBS, to begin that negotiation.

20   Q   When you entered these negotiations, was it with the

21   advice, guidance, collaboration of the emergency manager?

22   A   Well, he was certainly involved in overseeing the

23   process, but I was the lead negotiator for the city and

24   obviously assisted by counsel at Jones Day and Pepper

25   Hamilton.

1  Q   What did you want to accomplish in these negotiations?

2  A   Well, we wanted to accomplish two things.  First, we

3  wanted to preserve the city's access to cash flow.  We

4  couldn't afford the loss of that much cash from the budget.

5  And we also wanted to, if we could, find a way to get rid of

6  the swaps altogether and eliminate them from being considered

7  as part of our overall restructuring plan.

8  Q   And why did you want to get rid of them altogether?

9  A   Well, they were a very high cost financing for the city.

10  One could argue that with a $45 million, you know, annual

11  cash cost and a, you know, termination value of anywhere

12  around $300 million, it was the highest cost capital the city

13  had incurred.  Secondly, by freeing up the gaming tax

14  revenues altogether, that would be made available for the

15  benefit of all the city's creditors, not just the secured

16  parties here.

17  Q   Can you give the Court some sense of the atmosphere, the

18  progress of these negotiations?

19  A   I would say it was one of the most difficult negotiations

20  I've ever had to conduct.

21  Q   Why?

22  A   Well, we had extraordinary time pressure, for number one.

23  We knew that the city's cash position was dire.  There was a

24  strong possibility that the city would decide not to make the

25  June 15th payment to the COP's holders because it would have

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 142 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 93 of 245   142
463

1   no cash, and I was very worried that if we did not have an

2   agreement with the two swap counterparties in place by the

3   time that decision might be taken, they would finally lose

4   their patience and exercise their remedies to protect their

5   own economic position.  At that point, we had at least three

6   defaults under the swap agreement.  They had not exercised

7   any of their remedies.  We were paying them current, but if

8   they knew the city had no more money, I didn't know how long

9   their benevolence or their patience would last, and they

10   might feel they had no choice but to block all of our access

11   to gaming revenues.

12  Q   You said it was difficult because -- you've talked about

13   the time and cash flow issues.  Other things that made it

14   difficult?

15  A   Well, we didn't have a very strong negotiating position.

16   They had a security interest in our gaming revenues.  The

17   city had agreed to it in 2009.  We only had 11 days to try to

18   get to an agreement in principle before the time when the

19   emergency manager might have to make another fairly dramatic

20   decision.  That didn't leave us much to work with, and we

21   didn't really have any good way of preserving our access to

22   gaming revenues without their consent.

23  Q   Who were the actual people that you negotiated with?

24  A   Well, primarily it was negotiated with UBS and BAML,

25   their business people.

1   Q   And what people?  At what level in these organizations?

2   A   Managing directors.

3   Q   And did they have the authority to settle?

4   A   They represented that they did.

5        THE COURT:  What were their names?

6        THE WITNESS:  Jim Nacos from Bank of America Merrill

7   Lynch, and William Chandler from UBS.

8   BY MR. CULLEN:

9   Q   And with respect to the amount of the discount which has

10   been discussed in this case, where did the negotiations go on

11   that number?

12   A   Well, that's what made this negotiation so different.  I

13   didn't have very good cards to play, and we also had no time,

14   so I had to take a fairly aggressive position against the

15   banks by letting them know that we thought the entire

16   transaction, the COP's and the swaps, was very questionable

17   and that if they were forcing us to litigate, we thought we

18   had a really good case, but, frankly, I was taking that

19   position from a negotiating position, not making a legal

20   conclusion, and I basically took the position that we thought

21   that it could happen one of two ways.  If we litigated and we

22   were right, they would get nothing for their secured

23   position, zero, but if they were right, they'd get all of it

24   a hundred percent on the dollar.  And at that time, we

25   thought the value of the swap was $400 million.  It's a very

1    large number.  So we started the negotiation kind of with

2    that background, and I basically said that --

3           THE COURT:  Where would they get $400 million from?

4           THE WITNESS:  Good question.  They would get it from

5    the gaming revenues, your Honor.  They would use their rights

6    to block the gaming revenues, and they would have the right

7    to direct all that gaming revenue to pay themselves back.

8    BY MR. CULLEN:

9    Q   Was that related --

10          THE COURT:  How long would that take?

11          THE WITNESS:  Well, we have about $170 of gaming

12   revenues.  Allowing for interest on the 400 million, four

13   years give or take.  Remember, at the time we were

14   negotiating this, interest rates were lower, and, therefore,

15   the swap termination cost was greater.  Today it's a lot less

16   because rates have moved up.

17   BY MR. CULLEN:

18   Q   So with that backdrop, what was the first number that you

19   came up with?  What was the first number that they came up

20   with?

21   A   Well, we struggled to find an analytical basis for

22   settlement.  We couldn't because there's no good way of doing

23   it, so we basically took the position that if it was binary,

24   zero or a hundred, we'd start at 50 cents on the dollar.

25   Q   And how did that work for us?

13-53846-swr   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 140 of 245
13-53846-swr   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 145 of 245
463

1  A   Well, they were very upset at such a low offer.  They

2  thought that it was aggressive, that it was not giving due

3  credit for their collateral position, and then they responded

4  by asking for, I believe, 89.  And we went through this

5  negotiation for literally nine or ten days and finally

6  arrived at a compromise where we had the low ending 75, which

7  had no other rationale except it was between 50 and 100, and

8  then we agreed on a scale of option prices that would

9  increase.  That would give us -- if it took too long to buy

10 back their option, the price would go up, so we both kind of

11 got what we wanted.  At the time, they did not believe, I

12 don't think, that we would ever find the financing to take

13 advantage of the option.

14 Q   Now, you say that there was a scale and a time period for

15 different gradations in the discount based on how long it

16 took to pay the swaps off.  Why?

17 A   It was just part of the negotiation.  We negotiated this

18 in June.  I believe we originally said it would be 75, and we

19 had until -- I think it was August, and then it would go up

20 the end of September.  December to the end of March would be

21 at the high price.  It was just a way of cutting a deal.

22 Q   And with respect to litigation as a financial option for

23 the city, how did you assess that?

24 A   Well, our first objective was to make sure the city had

25 unimpeded access to the gaming revenues.  I, as a business

1  matter, could not afford to recommend to the emergency

2  manager we take the risk that litigation would be our way of

3  securing our access to gaming revenues because, in fact, they

4  had secured rights.  There was a lock box arrangement.  Even

5  if we were right in the end, it might take months, if not

6  years, to resolve who had control of the gaming revenues, and

7  by that time the city would be dead.  It was not a risk worth

8  taking.

9  Q   Were there other financial alternatives that you

10 identified at the time you were doing this negotiation,

11 financial alternatives to the forbearance agreement?

12 A   Well, we reviewed everything that one could logically

13 consider, novation, finding a new swap party, raising enough

14 cash to pay off the swap pursuant to its terms, but we didn't

15 have any time to do it, and, in fact, I don't believe that

16 anybody in the marketplace would have provided the funds for

17 us to do that given the fact that on June 15th we announced

18 we weren't making the COP's payment, and we were, therefore,

19 in default across our entire capital structure.

20 Q   You say that it was your inference that the swap parties

21 didn't think that you could get financing to take them out.

22 What was the basis for your confidence that you could?

23 A   Well, we've done financings for distressed companies and

24 now cities for many years.  We knew the marketplace extremely

25 well.  We believed that we could construct a financing

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 22:00:23   Page 147 of 245
463
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 12:00:23   Page 147 of 245   147

1   package that would attract interest in the marketplace.  And
2   having done this for 27 years, I felt confident in
3   recommending this course to our client.
4   Q   Can you describe in summary the exchange of consideration
5   under the forbearance agreement?
6   A   Well, the city would -- in exchange for the banks
7   terminating -- exercising their right to terminate, would
8   agree to pay off that swap at a significant discount.  That
9   would realize, rough numbers today, about $75 million of
10  value for the city, which would actually reduce secured
11  claims and increase potential recoveries for all of our other
12  creditors, which is obviously an important issue for us;
13  secondly, would allow the city to have unencumbered access to
14  its gaming revenues, which would allow the rehabilitation and
15  payment of debt service to go forward unimpeded by litigation
16  risk.  Thirdly, it would clear up a major source of
17  controversy in the case and eliminate litigation.
18  Q   In terms of the trapping of this cash during that period,
19  was there any threats?  Did anything come up that intensified
20  your concern about that?
21  A   Yes.  Immediately after the June 15th meeting, we were --
22  my understanding, some of the bond insurers actually put in
23  actions to block our access to gaming revenues.  They
24  instructed U.S. Bank to not distribute our share of the
25  gaming revenues to the city alleging that they had rights

1   that we were not allowed to overcome, and that made my

2   concern even greater because clearly we could not risk losing

3   even two weeks of cash.  We had no money.  We had no other

4   source of funding, and that only made this a higher priority

5   for us.

6   Q   At the time you entered into this deal, the forbearance

7   agreement, was it the best deal you could make?

8   A   In my judgment it was.  Otherwise I wouldn't have

9   recommended it.

10  Q   Did you feel that there might be another round of bidding

11  or trading on this issue after you entered into the deal?

12  A   I did.  I really expected after we ended up filing for

13  bankruptcy that the creditors for whom this deal is a direct

14  benefit would find a reason to come back in and ask for a

15  better price, and it just has never happened.

16  Q   Now, have you addressed the issue -- had you addressed

17  the issue of why not waiting a certain amount of time to

18  consummate this deal, to take out the swap counterparties?

19  A   Well, time is not the city's friend.  We need to file our

20  plan.  We need to begin the reinvestment program.  We need

21  access to cash.  We need stability.  This has to get resolved

22  sooner rather than later, and, frankly, the other reason is

23  interest rates, frankly, have been in our favor.  Now, we've

24  gotten a lot of benefit from the rise in interest rates

25  because it's reduced the total cost of taking out the swap.

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 149 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 94 of 245
463

1   Q   Explain how that works if you would, sir.

2   A   The present value of the swap termination is directly

3   tied to the future interest rate curve.  In the last few

4   months, future interest rate curve has risen from where it

5   was in March of this year, which is close to an all time low.

6   That's why the termination cost to swap has been reduced from

7   about $400 million to around 270 million as we sit here

8   today.  No guarantee that that could not reverse, and,

9   therefore, to take advantage of this discount today and take

10   out the swap at what may well be a relatively low point is a

11   great value to the city.

12   Q   Can you suggest for the Court under today's circumstances

13   what is the value of the discount if the swaps are taken out

14   before the discount goes down?

15   A   Well, goes up.

16   Q   Well, let me ask that question again.  We're all

17   embarrassed for me.  That was a terrible question.  If we

18   take out the swaps before the end of the year, what's the

19   value of the discount?

20   A   The city would be able to take out the swap at a price of

21   75 cents.  That means for a termination cost of $270 million

22   the city would realize a, you know, discount of about $68

23   million.

24   Q   And if we go past that trip date, what would the discount

25   be worth?

1  A    Well, the price would go to 82 on January 1, and that

2  would mean the city would lose $19 million of that discount.

3  Q    How do you plan to finance -- how did you always plan to

4  finance the take-out of the swap counterparties?

5  A    Through a post-petition financing facility.

6  Q    And what was your involvement in deciding to and then

7  seeking that post-petition financing?

8  A    Well, I played a supervisory role in this process, but I

9  did make the recommendation to the emergency manager that

10 this would be the best way to take advantage of the discount

11 and provide additional capital to the city.

12 Q    Did you have any role in the sizing of the loan?

13 A    Yes.

14 Q    What was your role?

15 A    Well, raising capital for an entity is always a multi-

16 factor analysis.  There's no one thing you look at and decide

17 how much to raise.  You don't want to over-borrow because

18 it's expensive, and you don't want more cash than you need.

19 You don't want to under-borrow because you might need the

20 money.  In this case, we had to consider the cost of taking

21 out the swap.  We had to consider the fact that we only had

22 so much collateral to go around, which is a limiting factor

23 as well. We also had to consider, most importantly, the depth

24 of the market for this kind of financing.  This has never

25 been done before.  No one has ever done a post-petition

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 52 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 151 of 245
463
151

1  financing for a municipality, so it's new and different.  We

2  didn't want to have to raise so much money that there would

3  not be enough depth of the market to take it.  And lastly, of

4  course, we had to consider the fact that the city itself

5  needed cash to stabilize its balance sheet and allow it to

6  reinvest.  That led us to the conclusion that around $350

7  million was the right number.  Rough numbers, about 120

8  million would stay with the city as cash, so the net debt

9  number we're talking about here is not that much different

10  from the amount of the swap cost being taken out.

11  Q   And when you say the depth of the market, what does that

12  mean?

13  A   Well, normally when you're raising a debtor in possession

14  financing in today's world, there are dozens if not hundreds

15  of people that are willing to provide debtor in possession

16  financing for small and large cases.  In this case, however,

17  there were two important requirements a lender would have to

18  consider.  One, you've got to be a qualified DIP lender.

19  You've done it before.  You understand the logistics,

20  understand how to do it.  And, secondly, you have to have

21  experience in municipal finance.  That automatically knocks

22  out most of the what I would call nonbank providers of DIP

23  loans.  That means you're talking to people who are

24  effectively banks or investment banks with both capabilities.

25  There are not very many of those.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 152 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 94 of 245   152
463

1    Q   And when you say "not very many," can you give me a sense

2    of the size of the universe?

3    A    Well, we went out to 50 parties, which included nonbanks,

4    of course.  We ended up with proposals from over a dozen, and

5    we ended up with proposals from four, two of which were real

6    banks.

7    Q   And you had debt to the swap counterparties.  You're

8    going to have debt to the post-petition financier.  What's

9    the difference?  Debt debt?

10   A   I have a lot less debt this way.

11   Q   How does that work?

12   A    Well, the city has a right to terminate these swaps at a

13   value of $270 million.  That's the value today.  But we have

14   a right to repay that debt for less than $200 million, so

15   it's a net savings to the city of $70 million, which comes

16   ahead of the unsecured parties, which is, therefore, a net

17   benefit to them.

18   Q   What impact does the forbearance agreement and the post-

19   petition financing have on the other creditors of the city?

20          MR. HACKNEY:  Your Honor, I would interpose an

21   objection on this front.  I think we're now crossing over

22   into the needs and uses debate that I thought we had agreed

23   we would not have a mini trial on on Friday.  I think the

24   witness has testified with respect to his view of the benefit

25   of the forbearance agreement, is talking about the value of

13-53846-swr   Doc 4311-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 153 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 94 of 245   153
463

 1    the DIP and that front, but to go past that into the best

 2    interest of creditors by reference to who's going to get what

 3    and why it would be better I think is right into the mini

 4    trial of how the money is anticipated to be used and what its

 5    anticipated benefit will be.

 6              MR. CULLEN:  I'm asking, your Honor, only in terms

 7    of the financial structure of the city as a debtor at Point A

 8    and their financial structure as a debtor at Point B.  It's a

 9    strictly financial structure kind of question.

10              THE COURT:  Why don't you rephrase the question?

11              MR. CULLEN:  Pardon me?

12              THE COURT:  Please rephrase the question more

13    specifically then.

14              MR. CULLEN:  Sure, sure.

15    BY MR. CULLEN:

16    Q    Comparing the difference in the city's financial

17    structure before and after the execution of the post-petition

18    financing, are there -- is there any impact of the latter

19    structure on creditors?

20    A    Yes.  Yes, there is.

21    Q    Explain, please.

22    A    Well, if the forbearance agreement and post-petition

23    financing are approved, the city will have reduced secured

24    claims, which will allow unsecured claims to get a better

25    recovery.  It will also stabilize cash flows.  We'll no

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:22:00   Page 15 of 24
13-53846-swr   Doc 4314   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 154 of 245
463

1   longer have the risk of losing the gaming revenues, which

2   means the city will have access to that cash flow either for

3   reinvestment or future debt service.

4   Q   Do you have an understanding of the term "working

5   capital"?

6   A   Yes.

7   Q   What is the importance of working capital on an

8   enterprise or a city's balance sheet?

9   A   Working capital allows an enterprise the ability to

10  manage through cyclicality and lags in revenue receipts

11  against expenses.  Expenses tend to get paid on a regular

12  basis.  Revenues can, unfortunately, come in on an irregular

13  basis.  Working capital is normally retained to allow the

14  city to operate in an ordinary course with its creditors on

15  the trade side and make sure it can pay its bills when they

16  come in irrespective of when the revenues come in.

17  Q   Is there a relationship between the portion of the

18  financing which is not directed to taking out the swap

19  counterparties and the concept of working capital?

20  A   Yes.  When we sized the loan, we determined that the city

21  really needed to maintain two to three months of cash on its

22  balance sheet in order to be able to operate in the ordinary

23  course.  $120 million is roughly that number.

24  Q   And in the process of going out to seek this DIP

25  financing, did you consider the idea of seeking unsecured

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 155 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 96 of 245   155
463

1  financing?

2  A    We thought about it and dismissed it as impractical.

3  Q    When you say you dismissed it as impractical, why is

4  that?

5  A    Well, again, based on my experience, I've never seen any

6  post-petition financing be done on an unsecured basis.

7  Lenders in this field always want security.  They're not

8  going to take what I would call plan risk.  If they were an

9  unsecured lender, they would be taking that.  And I don't

10  think there's any case that I'm aware of where that's been

11  done.

12       MR. HACKNEY:  Your Honor, I would renew my objection

13  to this limited opinion testimony and move to strike it.  I

14  understand the Court's prior ruling with respect to his

15  general expertise, but when you go a step further and you

16  say, "Based on my experience in the non-municipal context,

17  I've decided that we have no chance of getting unsecured

18  financing here in the municipal context," the lack of

19  experience sourcing municipal financing just seems

20  particularly germane.

21       THE WITNESS:  Well, we did test this.  Sorry.

22       MR. CULLEN:  He gets a turn.

23       THE WITNESS:  I'm sorry.  Apologize.

24       THE COURT:  Yeah.  We don't usually let witnesses

25  respond to evidentiary objections.  No.  The objection is

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 156 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 95 of 241   156
463

 1   overruled.  The Court is satisfied that the witness has

 2   sufficient experience to provide the -- to provide the Court

 3   with reliable information on this.

 4           MR. CULLEN:  Thank you, your Honor.

 5   BY MR. CULLEN:

 6   Q   Make it clear.  You've been at this for 27 years; is that

 7   correct?

 8   A   That's correct.

 9   Q   Is it your testimony that there has never been, in your

10   experience, a post-petition financing that was unsecured?

11   A   I have never placed such a financing nor am I aware of

12   one, but in this case we actually tested the hypothesis of

13   whether one could even be available because in July before we

14   actually started --

15   Q   Let's question and answer.

16   A   Okay.  Sorry.

17   Q   How did you test the hypothesis?

18   A   Well, recognizing this would be the first time the city

19   had ever done it, we wanted to go and test the market early

20   to find out, well, could we even do it, would it be

21   practical, and so in July we contacted a very limited number

22   of major banks, and we asked them would they be willing to

23   provide debtor in possession financing to the city if and

24   when that became necessary to do so.  And we actually got

25   responses back indicating that they might be willing to do

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 157 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 96 of 245   157
463

1  it, but not on any basis except security being granted.

2           MR. PEREZ:  Objection, your Honor.  That's just

3  blatant hearsay, what he testified to.

4           THE COURT:  You'd have them bring in representatives

5  of each of the banks to testify?

6           MR. PEREZ:  No, I wouldn't, your Honor, but it is

7  hearsay, your Honor.

8           MR. CULLEN:  It's a normal part -- can I -- I'll

9  just ask him another question to lay a foundation if the

10 Court wants me to or --

11          THE COURT:  No.  The Court will overrule the

12 objection.

13 BY MR. CULLEN:

14 Q   Normal part of your function in going out and getting DIP

15 financing is testing the market; is that correct?

16 A   Yes.

17 Q   Okay.  And you did that here, as you testified?

18 A   Yes, we did.

19 Q   I'd like to show you a document which has not been

20 admitted into evidence, I think objected to on hearsay

21 grounds, the Exhibit 61, City 61, letter from JPMorgan.  I'm

22 going to move this into evidence after I show it to him.  Do

23 you want to object now and then have me do it?

24          MR. PEREZ:  No, no.

25          MR. CULLEN:  How do you want to do it?

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 158 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 163 of 245
463

1    THE COURT:  Well, let's have the witness identify

2  it, and then you can move for its admission.

3  BY MR. CULLEN:

4  Q   Can you just take a look at that, please?

5    MR. CULLEN:  No.  Don't put it up yet.  We haven't

6  gotten --

7  BY MR. CULLEN:

8  Q   Can you identify that, sir?

9  A   Yes, I can.

10  Q   Tell us what it is.

11  A   Well, we -- as I testified earlier, we'd gone to a

12  handful of major banks and asked them if they'd provide post-

13  petition financing for the city.  JPMorgan was one of the

14  banks we asked, and this was their response.

15    MR. CULLEN:  Could I move the admission of City 61,

16  please?

17    THE COURT:  Any objections?

18    MR. HACKNEY:  Yeah.  I object.  I mean this is

19  classic hearsay.

20    MR. PEREZ:  Yes.

21    THE COURT:  What's the purpose of offering it?

22    MR. CULLEN:  This is what he got back when he tested

23  the market.  It speaks directly to the issue of whether

24  JPMorgan was telling him that it might be available or might

25  not on an unsecured basis.  It's the result of his testing of

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 159 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 96 of 245
463

1   the market which corroborates his testimony which was

2   objected to earlier.

3          THE COURT:  The Court will admit it for the purpose

4   of showing the response that he got.

5       (City Exhibit 61 received at 2:40 p.m.)

6          THE COURT:  And that's 61, did you say?

7          MR. CULLEN:  61.

8   BY MR. CULLEN:

9   Q   If I could go to the fourth page of the exhibit, which is

10  page 1 of the confidential memorandum attached to the

11  correspondence -- do you have that, sir?

12  A   Yes.

13  Q   And if you could read out for the Court what JPMorgan was

14  telling you in -- under the third shaded heading, the second

15  paragraph beginning "The keys."

16  A   The entire --

17  Q   Can you read --

18  A   The entire paragraph?  I can read it, yeah.

19  Q   Yeah.

20  A   "The keys to any DIP financing and to the city's ongoing

21  access to capital will be the strength of the security

22  interest in certain of the city's general fund revenues and

23  the ability to restore investor confidence and achieve access

24  to the capital markets for the DIP financing take-out."

25          MR. HACKNEY:  Your Honor, I'd move to strike this

1  testimony.  We're now reading the words of someone else and

2  asking Mr. Buckfire what they mean.  I don't think it's

3  appropriate.

4        MR. PEREZ:  And I think it also goes beyond the

5  extent that you allowed it in, your Honor, because now

6  it's --

7        THE COURT:  No.

8        MR. PEREZ:  -- going for the truth of the matter.

9        THE COURT:  No.  It's not being offered for the

10  truth.  It's being offered to show that this is the -- the

11  significance of this is the legal significance that this is

12  what the city got when it inquired.  Go ahead and read it.

13        THE WITNESS:  "The city does not currently have

14  market access on its own credit, and we believe it is

15  unlikely the city will regain market access immediately upon

16  emergence from bankruptcy, at least not without paying an

17  extraordinarily high market premium if access could be

18  achieved."

19  BY MR. CULLEN:

20  Q    In performing your, as you testified, customary function

21  of testing the market with respect to the features of a

22  proposed financing, what would you -- what did you conclude

23  when you received this?

24  A    That we would not be able to raise financing unless we

25  had collateral to offer to the marketplace, and we'd gotten

13-53846-swr   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 161 of 245
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 161 of 245
463

1   this response in early July.  We had gone out in June well in

2   advance of having to actually decide whether or not we needed

3   a DIP at all.

4           MR. CULLEN:  You can take it down.

5   BY MR. CULLEN:

6   Q   With respect to the DIP bidding process, what would you

7   call that?  What would be your word, easier --

8   A   The solicitation process.

9   Q   The solicitation process.  With respect to the

10  solicitation process, what was your role?

11  A   Supervisory.

12  Q   And when you say "supervisory," what does that actually

13  entail?

14  A   Well, my partners, Ms. Corio and Mr. Doak, were primarily

15  responsible for managing the process.  They would let me know

16  from time to time how it was going.  They would from to time

17  ask me a question about how this might relate to other

18  aspects of our planning and our bankruptcy process, but

19  pretty much they ran the entire thing.

20  Q   Okay.  And in the terms of the solicitation itself, was

21  there a template or guideline sent out?

22  A   Yes.  We'd sent out a request for proposal, which had an

23  attachment called an indicative term sheet we asked people to

24  respond to.

25  Q   And what was the function of that term sheet?

13-53846-swr   Doc 2394-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 162 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:11:03   Page 96 of 245   162
463

1   A    We wanted to guide people who might have an interest in

2   lending to the city to what, in fact, we thought we could

3   offer so they wouldn't waste their time in proposing things

4   we did not want to or could not offer.  We also wanted to

5   make sure that if they did want to propose something

6   different, they knew they were going to be offering something

7   off of a baseline that everybody else hopefully would respond

8   directly to.

9   Q    Did you have any role in assessing the bids that actually

10  came in?

11  A    No.

12  Q    Do you have any basis for opining as to whether or not

13  the city got a good deal in this DIP financing?

14  A    Yes.  Based on the proposal we received, I think the city

15  got a highly competitive and low cost financing.

16  Q    Okay.  When you say based on the proposal you received

17  you had a highly competitive and low cost answer, what leads

18  you to that conclusion?  Could you unpack that for me,

19  please?

20  A    Well, we asked in excess of 50 people for proposals.  We

21  got back over a dozen.  We ended up, I think, with four or

22  five that were fully committed to and proposed by lenders,

23  and we picked the cheapest one.

24  Q    Did at various -- were there various Syncora proposals

25  throughout this period?

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 164 of 245
13-53846-swr   Doc 4304   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 163 of
463

1  A    There were at least two.

2  Q    Can you describe the first one?

3  A    Well, the first one was not responsive to our term sheet

4  or RFP, but on its face it was extremely expensive.  I think

5  it required something like $70 million in fees to the lenders

6  in exchange for making a DIP loan.  And we had concerns

7  beyond that about whether or not they really could perform

8  their role.  We asked them directly if they'd ever made a DIP

9  loan before.  The answer was no.  We were concerned about

10  their own financial condition, the fact that they were

11  willing to expose potentially $350 million of cash to a loan

12  to the city that would represent a material portion of their

13  cash reserves.  I would be surprised if they would actually

14  be allowed to do that.  In any case, they weren't willing to

15  respond to the RFP or the term sheet we put out nor were they

16  willing to propose it on a basis we thought could be

17  competitive.

18  Q    And was there a later Syncora bid or offer?

19  A    Well, the understanding is they provided one to the City

20  Council after we announced we had decided to work with

21  Barclays, and the terms of that one were also very expensive.

22          MR. CULLEN:  That's all I have, your Honor.

23                          CROSS-EXAMINATION

24  BY MR. HACKNEY:

25  Q    Good afternoon, Mr. Buckfire.  My name is Steve Hackney.

1  We've had the chance to meet before at your deposition, I

2  think.  Nice to see you again.

3  A    Good afternoon.

4  Q    I'm going to be asking you some questions today.  I think

5  some of them may sound familiar, but we'll see how it goes.

6  Your firm, Miller Buckfire, is employed by the city as its

7  investment banker; isn't that correct?

8  A    Yes.

9  Q    And the forbearance agreement that I think is already in

10 evidence at Exhibit 8 is the document that you led the

11 negotiation of the business terms of; isn't that correct?

12 A    That's correct.

13 Q    Now, your role in connection with the agreement was to

14 negotiate its business terms on behalf of the City of

15 Detroit; isn't that right?

16 A    That's correct.

17 Q    The decision to enter into this agreement on behalf of

18 the city was made by Mr. Orr; correct?

19 A    Correct.

20 Q    Now, Mr. Buckfire, you have negotiated a few deals in

21 your lifetime as an investment banker; isn't that correct?

22 A    Yes.

23 Q    As a negotiator, you need to have an understanding of the

24 financial needs and desires of your client as well as the

25 counterparty with whom you're negotiating; isn't that

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 66 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 165 of 245
463

1  correct?

2  A   Yes.

3  Q   You also have to have some understanding of the legal

4  framework in order to negotiate effectively; isn't that

5  right?

6  A   Yes.

7  Q   Now, I'd like to discuss your state of mind as you're

8  entering into your first round of negotiations with the swap

9  counterparties.  One thing that you understood was that there

10  were events of default under the collateral agreement that

11  would allow the swap counterparties to trap cash if they

12  chose to do so; correct?

13  A   Yes.

14  Q   You also believe that the swap counterparties could

15  declare a termination event and potentially be paid

16  approximately $400 million; isn't that right?

17  A   Yes.

18  Q   And your understanding was that they could do so

19  unilaterally; isn't that right?

20  A   Yes.

21  Q   And your understanding was also that there was no other

22  party out there that could direct the swap counterparties'

23  actions; isn't that correct?

24  A   Yes.

25  Q   Your understanding also was that FGIC and Syncora had no

1    rights under the collateral agreement; isn't that correct?

2    A    Yes.

3    Q    And your understanding on these points remained

4    consistent all the way up until the execution of the

5    forbearance agreement on July 15, 2013; isn't that right?

6    A    Yes.

7    Q    Now, I'd like to ask you about a couple things that you

8    did not understand to be true at the time that you were

9    conducting these negotiations.  First, you did not understand

10   that the collateral agreement and the cash trapping were

11   securing the city's obligation to the service corporations

12   and the service corporations' obligations to the swap

13   counterparties under the swap; correct?

14          MR. CULLEN:  I'll object to the form of that

15   question.  It seems a little complicated for a lay witness.

16          MR. HACKNEY:  Your Honor, this is already in

17   evidence in the statement of facts in terms of the nature

18   of --

19          THE COURT:  If the witness doesn't understand the

20   question, he can say so, but I'll permit it.  Go ahead, sir.

21          THE WITNESS:  Would you mind repeating it?

22   BY MR. HACKNEY:

23   Q    Yeah, sure.  You did not understand that the collateral

24   agreement and the cash trapping associated with the

25   collateral agreement were securing the city's obligation to

1  the service corporations and the service corporations'

2  obligations to the swap counterparties under the swap;

3  correct?

4  A   That's a very complicated question.

5  Q   I'll represent to you it's not the first time I've asked

6  it to you, but if you'd like to take a look at your

7  deposition, I'm happy to --

8  A   No.  That's fine.  I've done a lot of depositions, so I

9  can't remember all of them.

10 Q   That's okay.  Isn't what I'm saying correct?  You did not

11 understand that to be the case?

12 A   That's correct.

13 Q   And you also did not understand that the collateral

14 agreement ultimately secured the termination payment that

15 might be made under the swaps; correct?

16 A   No.  The cash from the gaming revenues was, in fact, the

17 security for the swaps.  That was the whole point of the

18 collateral agreement.

19         MR. HACKNEY:  If I can approach, your Honor?

20         THE COURT:  Sure.

21         MR. HACKNEY:  Your Honor --

22 BY MR. HACKNEY:

23 Q   Mr. Buckfire, these are a copy of your two depositions in

24 this case.  They're separated by a little tab two.  I'd like

25 you to look at the first deposition, which was at page 113,

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 168 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 163 of 245   168
463

 1   line 23.  Tell me when you have it, sir.  You have that page

 2   and line, sir?

 3   A   No.  I see it.

 4   Q           "Question:  Did you understand that the

 5           collateral agreement and the cash trapping were

 6           securitizing the city's obligations to the service

 7           corporations and the service corporations'

 8           obligations to the swap counterparties under the

 9           swap?

10               No.

11               Question:  Did you understand that the

12           collateral agreement, what it was ultimately

13           securing was the termination payment that might be

14           made under the swaps?"

15           And then there was an objection, and then you

16   answered, "No."  Were you asked those questions, and did you

17   give those answers, sir?

18   A   I did.

19   Q   In negotiating this agreement, you never considered

20   whether the casino revenues constituted special revenues

21   under the Bankruptcy Code; isn't that correct?

22   A   That's correct.

23   Q   You also did not evaluate whether the city had claims

24   against the swap counterparties; correct?

25   A   I was advised there might be a risk of that.

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 164 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 96 of 245   169
463

1  Q   My question was that you did not consider, you did not

2  evaluate whether the city had claims against the swap

3  counterparties; correct?

4  A   Correct.

5  Q   And this is important.  And you don't know whether anyone

6  else working for the city had evaluated whether the city had

7  claims against the swap counterparties; isn't that correct?

8  A   You lost me.  You want to try the question again?

9  Q   I've already established that you didn't evaluate any

10  claims; correct?

11  A   Correct.

12  Q   But you also didn't know whether anyone else had

13  evaluated whether the city had claims against the swap

14  counterparties; isn't that correct?

15  A   That's correct.

16  Q   Now, your testimony was that access to these casino

17  revenues is an issue of life or death for the city, I

18  believe, or words to that effect; isn't that right?  It was a

19  very important issue.

20  A   Yes.

21  Q   Now, your retention dates back to January -- Miller

22  Buckfire's retention dates back to January of 2013; isn't

23  that right?

24  A   That's correct.

25  Q   Now, despite the fact that this was an important issue --

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 170 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 165 of 245   170
463

1   and I assume you recognized it one at the earliest times of

2   your retention; is that right?

3   A    Yes, in January.

4   Q    But isn't it true that you did not attempt to engage the

5   swap counterparties in negotiation in January, February,

6   March, April, or May of 2013; isn't that correct?

7   A    That's correct.

8   Q    And you delayed negotiating with the swap counterparties

9   even though it was your understanding dating back to January

10  2013 that their patience was wearing thin; correct?

11  A    That's correct.

12  Q    Now, at the time your firm reengaged, you got yourself

13  back up to speed on the relevant issues, including the state

14  of play on the swap; isn't that correct?

15  A    Correct.

16  Q    Your understanding at that time was that the swap

17  counterparties had had the right to terminate the swap dating

18  back to March of 2012; isn't that right?

19  A    Correct.

20  Q    And during the 14-month period between March 2012 and the

21  end of May 2013, you understood that the swap counterparties

22  had never terminated the swap; isn't that right?

23  A    That's right.

24  Q    And your understanding also was that during that same 14-

25  month period, they had never demanded that cash be trapped;

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 171 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 166 of 245
463
171

1  isn't that correct?

2  A   That's correct.

3  Q   And in addition to that, the swap counterparties never

4  communicated to you that they would terminate the swap if

5  resolution was not reached by a certain date; isn't that

6  correct?

7  A   Correct.

8  Q   Now, the initial meeting with the swap counterparties on

9  June 4, 2013, was held at the behest of the city; isn't that

10 correct?

11 A   That's correct.

12 Q   During those meetings, you told the swap counterparties

13 that the city was going to fight to stop them from trapping

14 cash or words to that effect; isn't that correct?

15 A   That was the second part of the meeting.

16 Q   During this time period, you told them that; correct?

17 A   After we explained the financial condition of the city to

18 them, yes.

19 Q   But you did not describe what claims the city would

20 litigate aggressively to the swap counterparties; isn't that

21 right?

22 A   That's correct.

23 Q   And you did not express the city's views on the merits of

24 the litigation; isn't that right?

25 A   That's correct.

1  Q   And you never attempted to argue the merits of why the

2  swap counterparties wouldn't be able to trap cash; isn't that

3  correct?

4  A   That's correct.

5  Q   And you don't recall anyone else doing so on behalf of

6  the city either.  Isn't that also correct?

7  A   Yes.

8  Q   Between June 11th and the July 15th execution of the

9  forbearance agreement, you never attempted to argue the

10  merits of the city's case to the swap counterparties; isn't

11  that correct?

12  A   That's correct.

13  Q   And you never witnessed anyone else do so on behalf of

14  the city either; isn't that right?

15  A   That's correct.

16  Q   Now, prior to the agreement in principle being struck,

17  neither you nor anyone else at Miller Buckfire performed

18  analysis of what interest rates were likely to be in the

19  future; isn't that correct?

20  A   I don't understand that question.  We, of course, looked

21  at the LIBOR forward curve to try to determine what our

22  interest rate risk would look like.

23  Q   Let me direct your attention to page 22 of your

24  deposition --

25  A   Which one?

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 173 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 164 of 245   173
463

1  Q  -- line 4.  It's the first one, page 122, line 4.  Do you

2  have that, sir?

3  A  I do.

4  Q  Page 122, line 4,

5          "I have a broader question, which is at anytime

6          prior to June 11th, did you or anyone else at Miller

7          Buckfire, to your knowledge, perform an analysis of

8          what interest rates were likely to do in the future?

9              Answer:  No."

10      Were you asked that question?  Did you give that

11  answer?

12  A  I did.

13  Q  And prior to June 11th, you didn't study any forward

14  LIBOR curves; isn't that right?

15  A  That's correct.

16  Q  In fact, as of the execution date of the forbearance

17  agreement on July 15, 2013, neither you nor anyone else at

18  Miller Buckfire had undertaken an assessment of what interest

19  rates were likely to do in the future; isn't that correct?

20  A  That's correct.

21  Q  Now, by June 11th, you have struck an agreement in

22  principle that involves three key parts, according to your

23  testimony, swap counterparties will allow the casino revenue

24  to continue to flow, the city will be granted an option to

25  direct the termination of the swap, and the termination value

1  will be at a discount to the one provided for in the swap; is

2  that correct?

3  A    That's correct.

4  Q    Now, I understand that you're not an attorney, but you

5  are a sophisticated businessman who -- and you're probably

6  glad that you're not an attorney, so --

7  A    I'll stipulate I'm not an attorney.

8  Q    There you go.  But you -- I understand that you are not

9  an attorney, but you are a sophisticated businessman who

10  deals with legal documents on a regular basis; isn't that

11  right?

12  A    Yes.

13  Q    And your understanding of one of the benefits of the

14  forbearance agreement is that the swap counterparties have

15  waived their right to trap cash in exchange for the other

16  things that they got; isn't that correct?

17  A    Yes.

18  Q    I'd like to ask you some questions about the service

19  corporations now if I could.  The service corporations are

20  also a party to the forbearance agreement; isn't that

21  correct?

22  A    You're beyond my knowledge.  I never studied the service

23  corporations.

24  Q    I'm just -- so let's go in baby steps.  I know that's

25  true and that you were unfamiliar with them, and we're going

13-53846-swr   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 16:12:10   Page 97 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 175 of 245
463

1   to get to that, but baby steps.

2   A   I'm still unfamiliar with --

3   Q   To this day.  Okay.  You do understand that they are

4   parties to the forbearance agreement; isn't that correct?

5   A   Yes.

6   Q   But the service corporations were not at any of the

7   meetings in early June that led to the agreement in principle

8   with the swap counterparties; isn't that right?

9   A   Yes.

10  Q   And you never engaged in any arm's length negotiations

11  with the service corporations; isn't that correct?

12  A   Yes.

13  Q   And you never witnessed anyone else do so either;

14  correct?

15  A   Correct.

16  Q   Your understanding was that the service corporations were

17  controlled by the city; correct?

18  A   Yes.

19  Q   And your understanding was that the city was acting on

20  behalf of the service corporations in connection with the

21  forbearance agreement; isn't that right?

22  A   Yes.

23  Q   In fact, your understanding is that Mr. Orr directed the

24  service corporations to execute the agreement, and that's

25  what they did; right?

1   A   Yes.

2   Q   I'd like to ask you a couple brief questions about

3   Syncora and FGIC, which is during this first half of June

4   when you're negotiating the business terms of the forbearance

5   agreement, you did not invite Syncora to participate in those

6   negotiations; isn't that correct?

7   A   That's correct.

8   Q   And you also did not invite Federal Guaranty Insurance

9   Company, affectionately known of as FGIC, to participate in

10  those negotiations, did you?

11  A   That's correct.

12  Q   And to your knowledge, no one else did either; isn't that

13  right?

14  A   Yes.

15  Q   Now, your understanding that you testified to on direct

16  was that as part of the 2009 restructuring that led to the

17  collateral agreement -- you remember that testimony?

18  A   I do.

19  Q   Your understanding was that the swap counterparties

20  obtained the right to walk away from the swaps if interest

21  rates ever looked like they were going into territory where

22  it might be positive for the city and the service

23  corporations.  Isn't that your testimony?

24  A   That's my understanding.

25  Q   And you understand that that's called an optional early

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 177 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 97 of 245   177
463

1    termination under the swap; right?

2    A    Yes.

3    Q    You know that's distinct from an early termination;

4    right?

5    A    Yes.

6    Q    And you understand obviously that when the swap

7    counterparties exercise an optional early termination, they

8    take nothing from the service corporations; correct?

9    A    I don't know that.

10   Q    You don't know that to be true?

11   A    I've never studied the service corporations or what their

12   rights are.

13   Q    My point was that when the swap counterparties exercise

14   this optional early termination, they are paid nothing.  That

15   was the point of your testimony about --

16   A    Yes.  That's right.

17   Q    That's the walk-away; right?

18   A    That's correct.

19   Q    But they get paid nothing; right?

20   A    Well, if they terminate the swap, then by definition they

21   would be paying nothing to the city.

22   Q    They would be paying nothing to the city, but they would

23   also be paid nothing; correct?

24   A    Well, that's right.

25   Q    Now, as we stand here today, I believe you testified the

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 178 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 179 of 245
463
178

1   swap counterparties are very much in the money with the

2   swaps; correct?

3   A    Correct.

4   Q    And isn't it a fact that the swap counterparties have

5   never threatened to you that they were going to exercise an

6   optional early termination; isn't that correct?

7   A    That's correct.

8   Q    And that's because it wouldn't be economically rational

9   to terminate a swap on an optional early basis and be paid

10  nothing when the swaps are substantially in the money;

11  correct?

12  A    No, because the optional termination event would only

13  take place when they were out of the money, not in the money.

14  Q    Let me direct your attention to page 151, line 2.  Do you

15  have that in front of you, sir?

16  A    I do.

17  Q    Let me take us -- let me back you up to page 150, line

18  17.  You have that, sir?

19  A    I'm sorry.  What page are you on again?

20  Q    That's okay.  Page 150, line 17.  Page 150, line 17.  Do

21  you have it, Mr. Buckfire?

22  A    Yes, I do.

23  Q    All right.  "Question:  And obviously the swap

24  counterparties have never threatened to exercise an optional

25  early termination, correct," and there was an objection, and

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 47 of 24
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 47 of 245 179
463

1    then I said "to you?"

2           "Answer:  No.

3           Question:  That wouldn't make sense, would it?

4           Answer:  Not as long as you're being paid on

5        time.

6           Question:  And also why would you terminate a

7        swap on an optional early basis and be paid nothing

8        when it is worth, by your testimony, approximately

9        $300 million; correct?"

10       And there was an objection.

11          "Answer:  It wouldn't be economically rational."

12       Were you asked those questions?  Did you give those

13 answers?

14 A   Yeah, but you're confusing optional termination versus

15 their right to terminate in the event of a default.  Optional

16 termination refers to their right to terminate at any time,

17 which rationally they would only do if the swap moved against

18 them where instead of the city owing them money, they would

19 owe the city money.

20 Q   I agree with you 100 percent.

21 A   Good.

22 Q   Now, your understanding is that in exchange for all the

23 consideration, the swap counterparties termination rights are

24 being discounted to somewhere between 75 percent and 82

25 percent depending on when the option is exercised; isn't that

13-53846-swr  Doc 2299-10  Filed 12/23/13  Entered 12/23/13 20:12:10  Page 97 of 245
13-53846-swr  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 180 of 245  180
463

1  correct?

2  A   That's correct.

3  Q   Now, I wanted to follow up on something that you said on

4  your direct testimony, which was you testified that this

5  is -- that this was one of the most hard-fought negotiations

6  of your entire career; is that right?

7  A   Yes.

8  Q   And you have, I will say, quite a distinguished career, I

9  think it was noted on your direct examination.  I'm assuming

10  that you've been in a lot of hard-fought negotiations.  Is

11  that fair?

12  A   That's fair.

13  Q   But is it your testimony that a negotiation that lasted a

14  week that basically went you opened at 50 and then you guys

15  ended around 75 where you had no analytical basis to

16  challenge the swap counterparties was one of the hardest

17  fought negotiations of your life?

18  A   Yes.

19  Q   And there were also very hard-fought negotiations around

20  the dates on which those discounts would increase; correct?

21  A   That's correct.

22  Q   And the initial negotiation led to the 75 percent date

23  expiring on August 30; correct?

24  A   Correct.

25  Q   So they only gave you six weeks of time to really get

1   that big August 30 75-percent discount rate; correct?

2   A   Correct.

3   Q   And then we had the objections, and this hearing got all

4   involved; isn't that right?

5   A   That's right.

6   Q   And somewhere along the line, the swap counterparties

7   managed to extend that 75-percent discount rate that you had

8   fought so hard for by four months; isn't that correct?

9   A   Correct.

10  Q   Did you handle those negotiations as well?

11  A   No.

12  Q   Okay.  I'd like to ask you some questions, if I could,

13  sir, about the post-petition financing.  To begin, the

14  agreement with Barclays contains a provision for market flex;

15  correct?

16  A   Correct.

17  Q   And under the terms of the market flex, the LIBOR floor

18  can be increased from one percent to two percent, and the

19  margin above that can be increased from two and a half

20  percent to four and a half percent; correct?

21  A   Correct.

22  Q   And I just want to emphasize that's a floor, a LIBOR

23  floor; correct?

24  A   That's right.

25  Q   So if the interest rates in the future go up above two

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 182 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 97 of 245   182
463

1  percent, the interest rate could continue to rise with it.

2  It just means it couldn't be lower than six and a half

3  percent if the full amount of the market flex is expired --

4  is implemented; correct?

5  A    Yes.

6  Q    And so if the market flex provision is fully implemented,

7  the interest rate on the DIP financing loan would increase

8  from three and a half percent to a minimum of six and a half

9  percent; correct?

10  A    Correct.

11  Q    Now, in addition to the market flex provision, Barclays

12  will also receive a commitment fee; right?

13  A    Correct.

14  Q    And when evaluating the various proposals that you all

15  received at Miller Buckfire, you evaluated the costs of those

16  proposals; isn't that correct?

17  A    Correct.

18  Q    And the cost of this facility was an important factor in

19  Miller Buckfire's evaluation of the proposals; isn't that

20  right?

21  A    Yes.

22  Q    Now, I'd like to go back and touch on these issues with

23  respect to unsecured financing.  Let me ask you a question,

24  Mr. Buckfire.  Do you remember that you opined that it was

25  not feasible for the city to obtain unsecured financing

1  during these cases?  Do you remember that testimony?

2  A    I do.

3  Q    What is your understanding of the nature of the unsecured

4  credit there?

5  A    The promise to the city to repay.

6  Q    How would it be treated in a subsequent bankruptcy in the

7  plan?

8  A    Well, if it was an unsecured promise to repay, it would

9  be treated as a general unsecured obligation.

10  Q    That's right.  Your understanding is that it would be

11  treated just like my -- or some COP's that I hold; right?

12  A    Potentially, yes.

13  Q    And so what would happen is they would lend the money at

14  a hundred cents on the dollar, and they would lend $350

15  million to the city, but then they'd immediately just be in

16  the throngs with all the unsecured creditors who are likely

17  to get far less than that; correct?

18  A    No.  That's not what they would ask for.  You would

19  ask -- they certainly would have asked for priority in

20  payment as part of a plan.

21  Q    Because they'd be treated as an administrative expense;

22  right?

23  A    Presumably.  That's what they would ask for --

24  Q    And you under -- well --

25  A    -- but there was no one to ask.

13-53846-swr   Doc 4311-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 184 of
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 179 of 245   184
463

1   Q   There was no one to ask?

2   A   We already tried that.

3   Q   Okay.  Because -- and you also understand, by the way,

4   that it's my understanding that a debtor cannot confirm a

5   plan of adjustment unless it pays off all of its

6   administrative expenses; isn't that right?

7   A   Correct.

8   Q   In fact, it's my understanding that your firm is

9   providing services to these debtors during the bankruptcy

10  case; correct?

11  A   We're the investment banker to the city.

12  Q   Right.

13  A   That's correct.

14  Q   Pursuant to a service contract; isn't that right?

15  A   That's correct.

16  Q   And your service contract is not secured; isn't that

17  right?

18  A   That's correct.

19  Q   And neither are any of the other professionals' service

20  contracts secured; right?

21  A   That's correct.

22  Q   And, in fact, isn't the total amount of the fees to the

23  service professionals currently ballparked in the area of $95

24  million?

25  A   That's an estimate that's floating around, yes.

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 185 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 185 of 245
463

1   Q   And that's all unsecured amounts; correct?

2   A   Correct.

3   Q   But all of those folks, I assume yourself included,

4   expect those to be treated as administrative expenses and

5   paid in full; correct?

6   A   It's a risk we accept by being professionals who work

7   with bankrupt companies and cities.

8   Q   Now, the City of Detroit is your first engagement on

9   behalf of a Chapter 9 debtor in the context of an actual

10  Chapter 9 proceeding; isn't that correct?

11  A   That's true.

12  Q   Prior to this case, you had no personal experience

13  sourcing municipal financing; isn't that correct?

14  A   That's correct.

15  Q   And, in fact, to your knowledge, no one at Miller

16  Buckfire has previous experience sourcing municipal debt on

17  behalf of a municipality; isn't that right?

18  A   That's correct.

19  Q   Now, as part of the city's first proposal -- okay -- and

20  I'm talking in late August when you send out the RFP.  Okay?

21  That's what I mean by the first proposal.

22  A   Well, we think of it as the second proposal, but go

23  ahead.

24  Q   Are you thinking of the one in July?

25  A   The one in June.

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 186 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 186 of 245
463
186

1   Q   The one in June?  I'll come back to that in a second

2   because I'll ask a similar question there, but let's deal

3   with the second proposal then.  With respect to the second

4   proposal, it began by -- it included within it offering as

5   collateral income tax revenues, wage tax revenues, and asset

6   proceeds; isn't that right?

7   A   Yes.

8   Q   And do you agree that your colleague, Mr. Doak, is also

9   someone who you view as having great expertise in the field

10  of sourcing financing?

11  A   Yes.

12  Q   Okay.  Wouldn't you agree that when you go out to the

13  market with a proposed collateral, that it's unlikely that

14  the people whom you solicit are going to call you back and

15  say, "I will take less collateral"?

16  A   That's possible.

17  Q   Isn't it likely?

18  A   No.  It's possible.

19  Q   Okay.  So if Mr. Doak said it's likely, you would

20  disagree with him?

21  A   I'm not sure we're saying anything different.  It's just

22  completely off market to expect a debtor to raise money on an

23  unsecured basis.

24  Q   To your knowledge, before going out to the prospective

25  lenders with a term sheet in late August that proposed

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 187 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 181 of 245   187
463

1  collateral, Miller Buckfire did not attempt to test the

2  market for the availability of unsecured credit; isn't that

3  correct?

4  A   Aside from what we did in June, that's correct.

5  Q   Let me direct you to the second deposition you gave, sir,

6  which is at page 23, line 22.  Do you have that, sir?

7  A   Yes.

8  Q            "Question:  Okay.  Before going out to

9              prospective lenders with a term sheet that proposed

10             collateral, was any effort made to test the market

11             for the availability of unsecured credit?

12            Answer:  Not to my knowledge.

13            Question:  You didn't make any phone calls to

14             see whether anybody would offer unsecured credit?

15            Answer:  No."

16            Were you asked those questions?  Did you give that

17  answer, sir?

18  A   I did.

19  Q   Now, in fact, your role in the process of soliciting and

20  negotiating post-petition proposals was very limited; isn't

21  that right?

22  A   That's correct.

23  Q   And your role was supervisory only to Mr. Doak; right?

24  A   Correct.

25  Q   Principal responsibility for the post-petition financing

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 188 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 183 of 245   188
463

 1 | was with Mr. Doak; isn't that right?

 2 | A   Correct.

 3 |       MR. HACKNEY:  Now, just -- I'd like to, if I could,

 4 | impose upon the city perhaps to put this document up again,

 5 | which was the JPMorgan letter that we received -- or

 6 | whomever, yes.  Thank you.  It's City's Exhibit 61.

 7 | BY MR. HACKNEY:

 8 | Q   That's the JPMorgan document that you were talking about

 9 | earlier.  Do you remember that?

10 | A   I do.

11 |       MR. HACKNEY:  And if I could impose on someone to

12 | flip to what I think is called page 1 of the document but is

13 | really page 4 --

14 | BY MR. HACKNEY:

15 | Q   Do you see that there?  That was what you were going back

16 | for -- back and forth with Mr. Cullen on.  You see that?

17 | A   I do.

18 | Q   So I want to focus your attention on something up at the

19 | top there, which is that language that says, "The City of

20 | Detroit is seeking potential debtor in possession financing."

21 | By the way, I'll make a quick note.  Isn't it true that a

22 | city is not a debtor in possession?

23 | A   It's nomenclature.  We refer to it as debtor in

24 | possession.  That's correct.

25 | Q   In your experience, all of your prior sourcings had been

13-53846-swr   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 189 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 98 of 245   189
463

1   on behalf of debtors in possession; isn't that right?

2   A    That's right.

3   Q    Okay.  And so you used the common nomenclature even

4   though a city is not a debtor in possession; correct?

5   A    That's right.

6   Q    If you look at the second sentence there, it says, "The

7   city and its advisors have identified four distinct revenue

8   streams to be used as security to secure any potential

9   lending facility"; right?

10  A    Correct.

11  Q    And that's JPMorgan.  They're writing back to you about

12  what they understand you've made inquiry of them about;

13  correct?

14  A    Correct.

15  Q    And so isn't it fair to say, Mr. Buckfire, that that

16  proposal that you sent out there also suggested collateral to

17  the market?

18  A    But no one ever raises debtor in possession financing

19  without collateral.

20  Q    My question was isn't it true that when you sent that

21  letter out --

22  A    Yeah.

23  Q    -- it proposed collateral to the market?

24  A    Yes, it did.

25  Q    Now, take a look down at the second paragraph under

13-53846-swr   Doc 2394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 190 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 185 of 245   190
463

1  "general fund" that you were focusing on with Mr. Cullen that

2  says, "the keys to any DIP financing."  Do you see that?

3  A   I do.

4  Q   Now, the line you quoted I want to focus on.  It says,

5  "The city does not currently have market access on its own

6  credit."  Do you see that?

7  A   I do.

8  Q   And at the time that the city and you sent this to

9  JPMorgan, the city was not in bankruptcy; correct?

10 A   No.

11       MR. CULLEN:  Objection, your Honor.  Sent what to

12 JPMorgan?

13       MR. HACKNEY:  Whatever the solicitation was that

14 generated this response.

15       THE COURT:  Just clarify the question for the

16 witness.

17       MR. HACKNEY:  Sure.

18 BY MR. HACKNEY:

19 Q   At the time that you sent the solicitation that generated

20 this response, the city was not in bankruptcy; correct?

21 A   That's correct.

22 Q   In fact, as of the time you got the response, the city

23 was still not in bankruptcy; correct?

24 A   That's correct.

25 Q   And so when JPMorgan said the city does not currently

13-53846-swr   Doc 2199-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 94 of 245
13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 94 of 245   191
463

1   have market access on its own credit, it was referring to the

2   pre-bankruptcy City of Detroit; correct?

3   A    Read the rest of the sentence.  The rest of --

4   Q    I'm going to.  That's where I'd like to take you next.

5   "We believe it is unlikely that the city will regain market

6   access immediately upon emergence from bankruptcy"; correct?

7   A    Correct.

8   Q    They did not address the concept of being paid on an

9   administrative basis like your firm is during the pendency of

10  the bankruptcy; isn't that correct?

11  A    That's correct.

12          MR. HACKNEY:  Your Honor, I have finished the lead

13  questioner portion of the examination and would tender the

14  podium to my objector colleagues.

15          THE COURT:  Okay.

16          MS. ENGLISH:  Good afternoon.  Caroline English on

17  behalf of Ambac Assurance Corporation.

18                         CROSS-EXAMINATION

19  BY MS. ENGLISH:

20  Q    Good afternoon, Mr. Buckfire.

21  A    Good afternoon.

22  Q    Mr. Hackney did a great job of ruining my outline, so I

23  have -- I had 40 questions, and I now have 4.  Okay?

24  A    Okay.

25  Q    Isn't it true, Mr. Buckfire, that when you went into the

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 192 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 98 of 245   192
463

1  negotiations with the swap counterparties, you went in under

2  the assumption that the swap counterparties had valid liens?

3  A   Yes.

4  Q   And isn't it also true that you never discussed with the

5  swap counterparties any legal arguments that the city might

6  have had with respect to the validity of their liens?

7  A   That's correct.

8  Q   Isn't it also true that you never discussed any of the

9  city's legal arguments or claims against the swap

10 counterparties with Mr. Orr?

11 A   That's correct.

12 Q   And, in fact, you were not even aware of what claims the

13 forbearance agreement was settling and releasing; isn't that

14 true?

15 A   That's correct.

16         MS. ENGLISH:  Thank you.

17                    CROSS-EXAMINATION

18 BY MR. MARRIOTT:

19 Q   Good afternoon, Mr. Buckfire.

20 A   Good afternoon.

21 Q   Vince Marriott.  Nice to see you again.  I think I --

22 Mr. Hackney did even better with my outline.  You

23 testified -- I believe you testified earlier that the city --

24 you ultimately recommended the Barclays proposal to the

25 emergency manager on the basis that it was -- and I think

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 193 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 193 of 245
463   193

1  your phrase was "the cheapest one."  Do you recall that

2  testimony?

3  A   I do.

4  Q   In order to evaluate among alternatives what's the

5  cheapest one, you have to know what the cost of each of the

6  alternatives is; correct?

7  A   Correct.

8  Q   I mean otherwise there's no basis to make a comparison;

9  correct?

10  A   Correct.

11      MR. MARRIOTT:  I have nothing further.  Anyone else?

12      MR. GOLDBERG:  Yes.  I just need a minute, sir.

13  Sorry.

14                  CROSS-EXAMINATION

15  BY MR. GOLDBERG:

16  Q   Mr. Buckfire, you testified that the 2009 arrangement was

17  a one-sided arrangement only to benefit of the banks; is that

18  not correct?  Wasn't that your words?

19  A   Yes.  The only benefit the city got was to cure the

20  default that existed at the time.

21  Q   Okay.  Have you looked at similar cases that have been

22  filed by the SEC against -- in connection with interest rate

23  swaps around the country, sir?

24  A   No.

25  Q   Have you looked at cases filed against Bank of America in

13-53846-swr   Doc 4194-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 94 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 189 of 245
463
194

1  connection with wrongdoing with regard to municipal interest

2  rate swaps?

3  A    No.

4        MR. GOLDBERG:  Your Honor, I have a copy here of a

5  report on the municipal securities market.  I've marked it as

6  Sole 1328.  It's a report by the U.S. Securities and Exchange

7  Commission.  I'd like to move for entry as evidence as a

8  public report.

9        MR. CULLEN:  No objection, your Honor.

10        MR. GOLDBERG:  You know, I can --

11        THE COURT:  It is admitted.

12    (Sole Exhibit 1328 received at 3:21 p.m.)

13        MR. GOLDBERG:  For simplification purposes -- it's a

14  140-page report.  There's a specific section that I'm

15  interested in that I'll be looking at, so -- if it's okay

16  with your Honor.

17        THE COURT:  What do you mean, "looking at"?

18        MR. GOLDBERG:  That I'll be questioning the -- Mr.

19  Buckfire concerning this section.

20        THE COURT:  Have you ever heard of this report?

21        THE WITNESS:  No, your Honor.

22        THE COURT:  I can't permit you to question the

23  witness about a report he's never seen.

24        MR. GOLDBERG:  Your Honor, what I'm questioning him

25  about isn't about the content of the report.  It's simply

13-53846-swr  Doc 2299-10  Filed 12/23/13  Entered 12/23/13 20:12:00  Page 195 of 245
13-53846-swr  Doc 4304-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 195 of 245
463

1   that the report indicates various actions that have been

2   taken by the SEC in connection with interest rate swaps, and

3   it goes to whether a proper investigation in this case was

4   taken.  In other words, what the issue in this case, is my

5   understanding --

6           THE COURT:  You can ask him -- you can ask him if he

7   investigated anything you'd like to ask him --

8           MR. GOLDBERG:  Okay.

9           THE COURT:  -- but you can't confront him with a

10  report he's never seen.

11          MR. GOLDBERG:  Okay.  No problem, your Honor.

12  BY MR. GOLDBERG:

13  Q   Did you do any investigation into whether the city

14  officials were properly informed of the dangers of the --

15  hedging derivatives in 19 -- in 2006 when they first went

16  into account?

17  A   No.

18  Q   Did you do any investigation into whether the city

19  officials were ever properly informed of the potential

20  dangers of hedging derivatives of interest rate swaps on a

21  city like Detroit in 2009?

22  A   No.

23  Q   Did you take a look at who was the swap advisor?

24  A   No.

25  Q   Did you take a look at whether the -- one swap advisor

13-53846-swr   Doc 2309-10   Filed 12/23/13   Entered 12/23/13 20:32:00   Page 196 of 245
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 196 of 245
463

1 | was employed for both counterparties at the time these deals

2 | took place?

3 | A    No.

4 | Q    Did you take a look at who paid the swap advisor?

5 | A    No.

6 | Q    Are you aware of questions concerning the LIBOR?  Did you

7 | do any investigation as to whether there were problems with

8 | the application of the LIBOR in this case considering that

9 | the LIBOR -- that UBS, for example, has admitted to

10 | wrongdoing in connection with manipulation of the LIBOR?

11 | A    No.

12 | Q    Are you aware of UBS admitting to wrongdoing in

13 | connection with the LIBOR?

14 | A    I've read newspaper reports about that.

15 | Q    Okay.  In light of those newspaper reports, did you

16 | consider looking into the effect of this considering that the

17 | LIBOR was the index to which the swaps was tied?

18 | A    No.

19 | Q    Did you look into the fact that the City of Detroit was

20 | actually in litigation -- that the SEC had done an

21 | investigation of interest rate swaps with regard to the water

22 | board, the Detroit Water Board?

23 | A    I'm not aware of that.

24 | Q    Did you call in the SEC, which is the body that basically

25 | investigates these matters, between January of 2012 and May

1    of 2012?  Did you make a call to the SEC to see -- "Come to

2    Detroit.  Give us a hand taking a look and investigating

3    these," in light of the consequences for the City of Detroit?

4    A    We weren't engaged by the city during that period.

5    Q    I'm sorry.  In January of 2013 to --

6    A    No.

7    Q    -- May 2013.

8    A    No, we didn't call the SEC.

9    Q    Okay.  You indicated that the interest rate has become

10   more favorable based on -- I don't want to misstate it --

11   based on the future interest rate?

12   A    Interest rates have increased since March of this year.

13   Q    What interest rates have increased?

14   A    Both forward LIBOR and forward treasuries.

15   Q    The LIBOR has increased since March of this year?

16   A    As has the treasury rate, yes.

17          MR. GOLDBERG:  May I approach the witness, your

18   Honor?

19          THE COURT:  With what, sir?

20          MR. GOLDBERG:  This is a chart on LIBOR rates that

21   charts LIBOR rates historically and for this year and that

22   reflects what the current three-month LIBOR rate is as of

23   December of this year.

24          THE COURT:  You may ask the witness if he's familiar

25   with that.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 198 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 193 of 245   198
463

1      MR. GOLDBERG:  Okay.

2  BY MR. GOLDBERG:

3  Q   How did you make the --

4      MR. GOLDBERG:  I'll do this a little -- I appreciate

5  that, your Honor.

6      THE COURT:  Okay.

7  BY MR. GOLDBERG:

8  Q   How did you make the determination that LIBOR rates had

9  gone down between March of this year and this current -- and

10 December, the three-month LIBOR rate?

11 A   I didn't testify to that.  I said LIBOR rates have gone

12 up.

13 Q   Have gone up.  I apologize.  How did you -- strike that.

14 How did you make the determination -- you're specifically

15 talking about the three-month LIBOR; correct?

16 A   No.  I'm talking about the LIBOR curve, which is reported

17 publicly on the Bloomberg News Services, which goes out

18 effectively 20 or 30 years.

19 Q   Okay.  So you're not saying that the LIBOR -- the three-

20 month LIBOR is going down.  You're saying that the LIBOR

21 curve --

22 A   The curve itself has shifted up.

23 Q   Okay.  Okay.  I appreciate the clarification.  Mr.

24 Buckfire, in the months that you were in Detroit from January

25 to May of 2013 or to the present, have you had a chance to go

1  around the city and take a look at our neighborhoods?

2  A    Yes.

3  Q    Have you witnessed the absolute devastation in

4  neighborhoods all across the city?

5  A    Yes, sir.  I grew up here.

6  Q    Where did you grow up?

7  A    I'm well-aware of the condition of the city.

8  Q    I'm sorry.  Where did you grow up?

9  A    Northwest side.

10  Q    So the northwest side doesn't look like it did 30 years

11  ago, does it?

12  A    No, it doesn't.

13  Q    Boarded up buildings everywhere, isn't it?

14  A    Yes.

15  Q    Did you look into the effect of subprime lending by banks

16  like Bank of America and UBS on causing this devastation in

17  the City of Detroit?

18  A    No.

19  Q    Are you aware that Detroit led the country in subprime

20  loans from the period of 2004 to 2009?

21  A    No.

22  Q    Are you aware that according to city reports the city --

23          MR. CULLEN:  Objection.  Go ahead.

24          THE COURT:  Sir?

25          MR. CULLEN:  Finish your question.

13-53846-swr   Doc 4311-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 200 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 195 of 200
463

1        MR. GOLDBERG:  Thank you.

2        MR. CULLEN:  I was going to object to the relevance

3   of this line.

4        THE COURT:  What is the relevance?

5        MR. GOLDBERG:  The relevance is that we're talking

6   about fairness.  We're talking about paying banks, two banks

7   that had a major role in causing the financial crisis in the

8   city through their mortgage lending practices are now going

9   to be getting hundreds of millions of dollars and have

10  already received hundreds of millions of dollars.  I think it

11  goes to the equitable question as to whether or not they are

12  entitled to this --

13       THE COURT:  It's arguable.  I'll permit you to --

14       MR. GOLDBERG:  Thank you.

15       THE COURT:  -- pursue it.  Go ahead.

16  BY MR. GOLDBERG:

17  Q   Are you aware that the City of Detroit had 69,000

18  mortgage foreclosures from 2004 to -- 2005 to 2009?

19  A   I didn't know the exact number.  I knew it was a lot.

20  Q   Are you aware that the city -- that 40,000 of those

21  buildings will remain vacant according to a report issued by

22  the City of Detroit?

23  A   Yes.

24  Q   Are you aware that the bulk of those foreclosures were a

25  direct product of subprime lending?

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 201 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 196 of 245
463

1   A   I did not know that.

2   Q   Have you looked at the Wall Street -- Senate Select

3   Committee on Wall Street and the Financial Crisis which

4   documents the role of the banks in predatory lending

5   practices?

6   A   No.

7   Q   Clearly you never raised that to Bank of America.

8   A   Not specifically, no.

9   Q   Okay.  And you are aware that Bank of America had one of

10   the largest subprime lending units since Countrywide.  You

11   are aware of that.

12   A   I am aware of that.

13   Q   And I'm sure you're aware that they have many, many loans

14   in the City of Detroit if you're a financier?

15   A   Yes.

16   Q   You're also aware that UBS has been implicated in

17   subprime lending to a great extent, more than any other

18   foreign bank?

19         MR. CULLEN:  Objection, your Honor.  Implicated?

20         MR. GOLDBERG:  I'm asking if he's aware of it.

21         THE COURT:  Yeah.  What do you mean by "implicated"?

22   Clarify the question, please.

23         MR. GOLDBERG:  Okay.  Sure.  One second.  I'm sorry.

24   BY MR. GOLDBERG:

25   Q   In 2008 UBS had to write off $19 billion in bad debt

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 202 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 99 of 245
463
202

1   because of its role in subprime lending.

2   A   I'm not aware of that.

3   Q   Are you aware that the Detroit Retirement Board filed an

4   action against both UBS and Bank of America for fraudulent

5   mortgage securities and the detrimental affect they had on

6   the Retirement Board?

7   A   No.

8   Q   I want to correct that.  It was the Police and Fire

9   Retirement System who filed the action -- I apologize -- to

10  correct the record.  They filed a class action in May of

11  2009, and among the entities named were Merrill Lynch, Bank

12  of America as successor to Merrill Lynch, and UBS.

13  A   I didn't know that.

14  Q   Are you aware that Chase Bank just was compelled by the

15  U.S. government to pay $19 billion in damages for its role in

16  subprime lending and predatory lending practices?

17  A   Yes.

18  Q   You never considered any of these factors in terms of how

19  you would approach Bank of America and UBS?

20  A   No.

21  Q   I just have a couple more questions.  You were involved

22  with the Barclay -- in negotiating the Barclay loan deal

23  itself; correct?

24  A   No.

25  Q   Are you familiar with the terms of the Barclay loan deal?

13-53846-swr   Doc 2294-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 203 of 245
13-53846-swr   Doc 2294-10   Filed 12/23/13   Entered 12/23/13 22:00:23   Page 203 of 245
463
203

1   A   In general, yes.

2   Q   So is it fair to say that under the Barclay loan deal,

3   once the bankruptcy is over, once the bankruptcy is over,

4   there's a termination event where the entire swap termination

5   gets called in; correct?

6   A   I'm sorry.  I don't understand.

7   Q   Okay.  Let me clarify that, that once the bankruptcy is

8   over, the interest on the Barclay -- the 350 million loan

9   rises by two percentage points; correct?

10  A   If we haven't repaid it in full, that's correct.

11  Q   Okay.  And that the -- and it's pledged by a four -- that

12  the swap termination part of the loan is paid by a $4 million

13  a month payment?

14  A   I don't recall specifically if that's there.  We have to

15  pay the loan off at bankruptcy exit.  We intend to do that.

16  Q   Okay.  And that that's secured by our city tax dollars?

17  A   I'm sorry.  Secured by what?

18  Q   By city income tax dollars?

19  A   Yes.

20  Q   Okay.  In the motion that was filed by the city in

21  connection with the approval of the DIP financing, they cited

22  that the city income tax revenues totaled about $232 million.

23  Does that sound correct?

24  A   Yes.

25  Q   So $48 million a year would be 20 percent of our tax

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 204 of 245
13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 199 of 245   204
463

1  dollars being diverted to pay Barclays to pay off UBS and

2  Bank of America?

3  A   I'm sorry.  I think your math is incorrect.  Are you

4  confusing the current swap with the Barclays post-petition --

5  A   No.

6  Q   -- financing?

7  Q   No.  I'm calculating the payments post-bankruptcy based

8  on $48 million a year being used to pay off the Barclay loan,

9  the swap termination portion of the Barclay loan.

10 A   I'd have to look at the terms you're referring to, but in

11 any case those are penalty provisions.  We expect to pay off

12 the loan in full upon exit.

13 Q   Okay.  I'm just saying that the -- it's secured.  It

14 means for the people of Detroit, the people that are going to

15 be here after this bankruptcy is over, 20 percent of our

16 tax -- income tax dollars are going to be diverted to pay off

17 a loan -- pay off a loan from Barclays to pay off UBS and

18 Bank of America.  Is that a correct statement?

19 A   The city has over a billion dollars in revenues.  You're

20 talking about a penalty provision, which is highly unlikely

21 to be in effect because we intend to pay off the post-

22 petition financing upon exit with more advantageous

23 financing.

24 Q   Oh, you do.  Okay.  Sounds good.

25 A   But I don't understand what you're talking about.

1  Q   You're going to get more, but you don't have that

2  financing in place, correct, sir?

3  A   That's correct.  We don't.

4  Q   And what's pledged right now is that 20 percent -- is

5  that $4 million a year is pledged post-bankruptcy.

6          MR. CULLEN:  Objection.  Asked and answered.

7          THE COURT:  I'll permit it again.  Go ahead.

8  BY MR. GOLDBERG:

9  Q   Is that what's pledged?

10  A   Could you repeat the question?

11  Q   What's pledged right now is that post-bankruptcy, $4

12  million a year secured by income tax revenues from the people

13  of Detroit is going to be used to pay off a loan from

14  Barclays to pay off a swap termination event in order to --

15  to the benefit of UBS and Bank of America?

16  A   If we haven't been able to repay it any other way, that's

17  right.

18  Q   And, in fact, according to Doak, my understanding is that

19  once the quality of life portion is paid off, then there will

20  be eight million.  Eight million a month is going to be

21  sucked from income tax revenues to pay off the swap

22  termination; is that correct?

23          MR. CULLEN:  Objection.  Using one witness testimony

24  to question another.

25  BY MR. GOLDBERG:

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 206 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 16:12:10   Page 201 of 245
463

1  Q   Well, I mean is that correct?

2           MR. GOLDBERG:  I shouldn't have --

3           THE COURT:  The objection is --

4           MR. GOLDBERG:  I shouldn't have --

5           THE COURT:  The objection is sustained.  Please

6  rephrase.

7           MR. GOLDBERG:  Yeah.  I'll phrase it differently.

8  BY MR. GOLDBERG:

9  Q   That once the quality of life portion of the 350 million

10 Barclay loan is paid off, then $8 million a month will be set

11 aside from Detroit income tax revenue or be secured by income

12 tax revenue to pay off this loan in order -- which is the

13 swap termination part of the loan; is that correct?

14 A   I believe so.

15 Q   Okay.  So 96 -- another 40 percent of our tax revenues

16 will be going to pay off UBS and Bank of America.

17 A   Only that portion of the city's revenues.

18          MR. GOLDBERG:  Okay.  I have no further questions,

19 your Honor.

20          THE COURT:  Any further questions by objectors?

21                     CROSS-EXAMINATION

22 BY MS. GREEN:

23 Q   Good afternoon, Mr. Buckfire.  Jennifer Green on behalf

24 of the Retirement Systems for the City of Detroit.  I have

25 very few questions as well since the first set of objecting

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 16:12:10   Page 202 of 245
463
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 207 of 245   207

1  parties have asked all of my questions.  You admit that the

2  quality of life loan proceeds are really intended to provide

3  adequate working capital; correct?

4  A    That's one way of looking at it, yes.

5  Q    And I think you previously characterized it as a true

6  working capital facility; correct?

7  A    That's correct.

8  Q    And you admit that the title of the loan as a quality of

9  life loan is actually not the best choice of words; correct?

10 A    You know, it's nomenclature.  If you have working capital

11 to allow reinvestment in the city, that supports quality of

12 life.

13 Q    Isn't it true that you have previously testified that the

14 title of this loan is probably not the best choice of words

15 because it should be called a working capital loan instead?

16 A    From a banking perspective, that's what it is.

17 Q    And you understand that under PA 436 it provides a

18 process for City Council to review and vote upon the post-

19 petition financing; correct?

20 A    Yes.

21 Q    And City Council also can develop its own alternative

22 proposal under PA 436?

23 A    I'm sorry.  I didn't hear that.

24 Q    City Council can develop its own alternative proposal to

25 the post-petition financing?

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 208 of 245
13-53846-swr   Doc 2259-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 203 of 245   208
463

1   A    Yes.

2   Q    But you did not personally meet with City Council;

3   correct?

4   A    No.

5   Q    And you don't know what documents City Council was

6   provided with; correct?

7   A    No.

8   Q    So you don't know if they were provided with the fee

9   letter?

10   A    I don't know.

11   Q    And you don't know if they were provided with information

12   relating to the market flex provision or the applicable

13   interest rates?

14   A    I don't know.

15   Q    And according to you, the reason these documents were not

16   provided to City Council is because you kept this very close

17   to people who really needed to know in order to ostensibly

18   protect the city's ability to raise the lowest cost

19   financing; isn't that right?

20           MR. CULLEN:  Objection, your Honor.  I believe she

21   just asked him if he knew what was provided.  He said he

22   didn't know, and now she's asking him why something wasn't

23   provided.  I think she's undermined the premise of her

24   question.

25           MS. GREEN:  Your Honor, those are his words from his

1   deposition.  I can pull out his deposition transcript.  He

2   answered it at the deposition.

3           THE COURT:  I'll permit it.  Go ahead.

4   BY MS. GREEN:

5   Q   Do you need me to rephrase the question or repeat it?

6   A   Please repeat it.

7   Q   According to you, the reason these documents were not

8   provided to City Council was because you were keeping it very

9   close to people who really needed to know in order to protect

10  the city's ability to raise the lowest cost financing;

11  correct?

12  A   That's correct.

13  Q   But you're aware, aren't you, that the Barclays

14  commitment letter expressly permits the commitment letter and

15  the fee letter both to be disclosed to City Council; correct?

16  A   I don't know that.

17  Q   Are you familiar with the Barclays commitment letter?

18  A   I haven't reviewed it in quite some time.

19          MS. GREEN:  Can we pull up City Exhibit 94, page 6,

20  paragraph 8, please?

21  BY MS. GREEN:

22  Q   Sub 3 in that paragraph, I'd like to draw your attention

23  to that portion.  Do you recognize this document, Mr.

24  Buckfire?

25  A   I read it a long time ago.  I haven't seen it recently.

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 210 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 205 of 245 210
463

1  Q   All right.  Do you see the portion where it says, "This

2  commitment letter and fee letter may be disclosed to the

3  extent required pursuant to applicable law, including any

4  disclosures required to be made to the city -- to the City

5  Council or any local emergency financial assistance loan

6  board pursuant to Michigan PA 436"?

7  A   I do.

8  Q   Okay.  So you could have shared the fee letter with City

9  Council?

10  A   Yes.

11  Q   And you thought City Council didn't need to know the fee

12  and interest rate terms because you didn't consider City

13  Council to be a decision-maker; correct?

14  A   That's correct.

15  Q   And you used those terms even though you disagreed with

16  me that PA 436 actually requires City Council to vote on the

17  post-petition financing; correct?

18  A   That's correct.

19  Q   And compliance with PA 436 --

20          THE COURT:  Ms. Green, would you slow down --

21          MS. GREEN:  Yes.  I'm sorry, your Honor.

22          THE COURT:  -- your questions for me, please?

23          MS. GREEN:  Standing order for me to slow down.

24  BY MS. GREEN:

25  Q   Compliance with PA 436 is also a condition to closing

13-53846-swr   Doc 4311-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 211 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 206 of 245
463

1   under the loan documents; correct?

2   A   I believe so, yes.

3   Q   And the Emergency Loan Board also has to approve the

4   post-petition financing under the terms of the loan; correct?

5   A   That's my understanding.

6   Q   But the post-petition financing documents were not

7   actually submitted to the Emergency Loan Board until November

8   6th; right?

9   A   I don't know.  I believe that's right.

10  Q   And to your knowledge, the Emergency Loan Board has not

11  yet voted --

12  A   That's correct.

13  Q   -- nor has a date been set?

14  A   That's my understanding.

15  Q   And your understanding is also that the Emergency Loan

16  Board is actually waiting for this Court to rule first before

17  it will vote on the post-petition financing?

18  A   That's my understanding.

19         MS. GREEN:  I don't have any further questions, your

20  Honor.

21         MR. CULLEN:  I don't have any questions, your Honor.

22         THE COURT:  Stand by one second, please.  I have

23  just a few questions for you, sir.  I ask this.  Are you

24  familiar with interest rate swap transactions generally?

25         THE WITNESS:  I am.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 212 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:05   Page 20 of 24
463
212

1          THE COURT:  Have you ever negotiated on behalf of

2     one party or another for an interest rate swap?

3          THE WITNESS:  It's infrequent in my line of work,

4     but I have done it twice.

5          THE COURT:  In the ordinary course of investigating

6     and negotiating an interest rate swap, do the parties

7     investigate the financial ability of the other party to pay

8     as required under the swap should it go that way?

9          THE WITNESS:  Yes.

10         THE COURT:  In your work for the city here, did you

11    investigate whether the city's swap counterparties in 2005

12    and 2006 investigated the ability of the city to pay should

13    interest rates go down as dramatically as they wound up

14    doing?

15         THE WITNESS:  Right.  We did not investigate that.

16         THE COURT:  And it's your testimony that as a matter

17    of ordinary due diligence the swap counterparties would have

18    and should have performed that investigation; is that right?

19         THE WITNESS:  Yes.

20         THE COURT:  Do you have an opinion on whether the

21    obligations on the city that resulted from the dramatic and

22    longstanding reduction of interest rates contributed to its

23    need to file bankruptcy?

24         THE WITNESS:  Yes.

25         THE COURT:  What is your opinion?

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 213 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 208 of 245   213
463

1      THE WITNESS:  Well, go back to the original

2  transactions, your Honor.  When the city borrowed a billion

3  four to finance the pension plan, some of it was fixed --

4      THE COURT:  To do what, sir?

5      THE WITNESS:  They took the proceeds and put it into

6  the pension plans.  A portion of it was fixed rate; a portion

7  was floating.  But then for whatever reason in their business

8  judgment they put on a fixed rate swap, which converted the

9  entire thing to fixed rate, which eliminated any value they

10  would have otherwise received from a decline in interest

11  rates.  That was a poor idea, and I don't know why they did

12  it, but the fact is that because interest rates then declined

13  so rapidly beginning in 2007, it put an enormous cash burden

14  on the city because the fixed rate, if I recall correctly,

15  was about $50 million a year.  When interest rates were much

16  higher, the net cash cost to the city was not 50.  It would

17  be some fraction of that, call 10, but then when rates went

18  down, it became unsustainable.  And, in fact, from 2007 to

19  2013, you know, it sucked hundreds of millions of dollars out

20  of the city for no real benefit.

21      THE COURT:  So what's your answer to my question

22  about the extent to which it contributed to the bankruptcy?

23      THE WITNESS:  I think it had a great deal to do with

24  the bankruptcy, your Honor, because of that loss of cash over

25  the intervening period of time and because after the

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 214 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 209 of 245
463

1  disastrous decision in 2009 to pledge their collateral, it

2  exposed the city to the loss of that collateral if they

3  defaulted, which, indeed, they did.

4          THE COURT:  The city borrowed approximately how much

5  through the COP's?

6          THE WITNESS:  Approximately a billion four, and they

7  took out 800 million initial amount against the underlying

8  securities on the swap.

9          THE COURT:  What does that mean?

10          THE WITNESS:  They had interest rate swaps on $800

11  million of underlying debt.  Sorry for using technical

12  jargon.

13          THE COURT:  Did all of the proceeds go to the

14  pension funds?

15          THE WITNESS:  Well, there's some dispute about that.

16  I don't have the facts in my head, but I believe that some of

17  it did not go to the pension funds.

18          THE COURT:  Did you or are you aware whether anyone

19  investigated where the money went that didn't go to the

20  pension funds?

21          THE WITNESS:  I believe that that's been looked at

22  by other consultants of the city.  I do not know what the

23  result of their investigation is.

24          THE COURT:  Has anyone else on behalf of the city,

25  to your knowledge, investigated whether the swap

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 215 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 216 of 245
463

1    counterparties knew the city would not be able to pay if

2    interest rates dropped as low and as dramatically as they

3    did?

4              THE WITNESS:  I don't know.

5              THE COURT:  All right.  Any further questions for

6    the witness?  All right.  Sir, you may step down.

7              MR. ELLENBERG:  Your Honor, may I ask a --

8              THE COURT:  You may.

9              MR. ELLENBERG:  If the Court please, Mark Ellenberg

10   on behalf of Bank of America Merrill Lynch.

                          CROSS-EXAMINATION

11

12   BY MR. ELLENBERG:

13   Q    Good afternoon, Mr. Buckfire.

14   A    Good afternoon.

15   Q    Mr. Buckfire, when the city entered into a floating rate

16   bond, that left them exposed to fluctuations in interest

17   rates; is that correct?

18   A    That's correct.

19   Q    And had interest rates gone up, that would have

20   dramatically increased the cost to the city?

21   A    Correct.

22   Q    And so if they did nothing else, they would have, in

23   effect, been speculating on interest rates; is that correct?

24   A    That's correct.

25   Q    Now, the fixed rate swap -- I'm sorry -- the interest

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 216 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 216 of 245
463

1   rate swap that was entered into exchanged a fixed rate for a
2   floating rate?
3   A    Correct.
4   Q    And the city was paying the fixed rate under that swap?
5   A    Yes.
6   Q    And Bank of America Merrill Lynch or UBS was paying the
7   floating rate?
8   A    Correct.
9   Q    So the swap effectively transferred the interest rate
10  risk from the city to the two banks?
11  A    Correct.
12  Q    And what it did was fix the city's interest rate cost at
13  approximately five percent?
14  A    That's correct.
15  Q    And no matter which direction interest rates moved in,
16  the city's interest rate cost stayed the same.  It was five
17  percent.
18  A    That's correct.
19  Q    So the fact that the interest rates, in fact, went down
20  did not change the deal the city struck.  They struck a deal
21  to have a guaranteed five-percent interest rate associated
22  with those bonds?
23  A    That's correct.
24  Q    And so it was the synthetic equivalent of issuing fixed
25  rate debt?

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 217 of
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:16   Page 212 of 245    217
463

1   A    That's correct.

2           MR. ELLENBERG:  Thank you.

3           THE COURT:  Okay.  Let's take our afternoon recess

4   now, and we will reconvene at 4:10.  For your information, I

5   show the city has 274 minutes left and the objecting parties

6   378.

7           THE CLERK:  All rise.  Court is in recess.

8       (Recess at 3:48 p.m., until 4:10 p.m.)

9           THE CLERK:  All rise.  Court is in session.  Please

10  be seated.

11          THE COURT:  Looks like everyone is here.  Before we

12  proceed with the next witness, I'd like to ask someone from

13  counsel for the city about this question that was raised

14  about approval by the loan board.  Who volunteers?

15          MR. HAMILTON:  I'll try it, your Honor.  Robert

16  Hamilton of Jones Day on behalf of the city.

17          THE COURT:  So the matter isn't to be submitted to

18  the loan board for its approval until after this Court gives

19  its approval?

20          MR. HAMILTON:  No, your Honor.  As Mr. Buckfire

21  testified on cross and as Mr. Doak will testify, we already

22  submitted it to the loan board in early November.  It is our

23  understanding that the loan board will issue its -- whether

24  it approves it or not, it is waiting for this Court -- our

25  understanding is that it is waiting for this Court to issue

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 218 of
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 213 of 245
463
218

1    its ruling on whether it's going to approve the post-petition

2    financing facility before it issues -- before the loan board

3    issues its ruling.  We expect that we would get the ruling

4    from the board promptly after this Court issues its ruling,

5    and it is a condition to closing.

6          THE COURT:  Well, is there any chance that we're

7    wasting our time here?

8          MR. HAMILTON:  Logically, that's a hypothetical

9    possibility.  That's not our expectation.  Our expectation is

10   that it will receive the board's approval once this Court

11   approves it.

12         THE COURT:  Who's on this board?

13         MR. HAMILTON:  I used to know the answer to that

14   question, and I have blocked it out of my mind.  I can get

15   you that answer in just a second.

16         MR. ERENS:  Apologize, your Honor.  Brad Erens.  I

17   did not previously provide an appearance, but I can answer

18   your questions.  A couple things.  First of all, there are

19   three members of the Emergency Loan Board.  One is the

20   individual who previously provided the consent letter from

21   the Department of Treasury for this transaction to go

22   forward, so that individual was acting in a different

23   capacity with a different hat, but that is one of three

24   members who's already approved this transaction.

25         THE COURT:  Who's that?

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 16:12:00   Page 219 of 245
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 219 of 245
463

1    MR. ERENS:  I don't believe I have the name, but we
2    do have as an exhibit the approval from the treasury.
3         MR. HAMILTON:  Andy Dillon.
4         MR. ERENS:  Okay.  It was Mr. Dillon then.  The two
5    other members of the loan --
6         THE COURT:  He's still on the loan board even though
7    he has resigned as treasurer?
8         MR. ERENS:  I don't believe -- I think he --
9         THE COURT:  Is there something the matter, Letrice?
10        THE CLERK:  Someone was speaking from the pod phone.
11        THE COURT:  I'm sorry.
12        THE CLERK:  Someone was speaking from the phone,
13   from the pod phone.
14        THE COURT:  Oh, we can't have that.
15        THE CLERK:  I'm just going to turn it down.
16        THE COURT:  One second, sir.  Okay.
17        MR. ERENS:  Apologize, your Honor.  It's my
18   understanding Mr. Dillon is still a member of the loan board
19   at least.  And I'm not actually sure, while he has tendered
20   his resignation, if that's yet effective, although I'm not
21   sure.  I think it may be effective at the end of the year or
22   sometime in January.  In any case, the other two members --
23   and I don't have their names -- of the Emergency Loan Board
24   are gubernatorial at-will appointees, so the point of that is
25   that the administration has already expressed its support,

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 220 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 213 of 220
463

1   okay, for this loan, but --

2           THE COURT:  Well, but why are they waiting?

3           MR. ERENS:  Well, there's a couple of reasons, your

4   Honor.  I think the technical legal reason is because the

5   liens that are being granted pursuant to this facility are a

6   creature of federal statute and your Honor's approval, and

7   the state has concluded that for them to approve the

8   transaction, those liens actually have to be in existence and

9   approved.  They're not in existence and approved yet because

10  the way the Emergency Loan Board --

11          THE COURT:  What's the point of their approval if

12  the liens are in place by the time they give their approval?

13          MR. ERENS:  My understanding of the way they're

14  thinking about it is right now those liens don't exist, and

15  the way the statutes work, they have to approve the terms and

16  conditions of the financing, and until those liens exist

17  pursuant to a Bankruptcy Court order, there's nothing for

18  them to approve.

19          THE COURT:  Did someone in the attorney general's

20  office give them this idea?

21          MR. ERENS:  That I can't speak to.  I'm not

22  obviously involved in the internal legal considerations of

23  the Emergency Loan Board.

24          THE COURT:  Does this board have an attorney?

25          MR. ERENS:  I'm not sure the board has an attorney

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 16:12:00   Page 221 of 245
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 221 of 245
463

 1   assigned solely to the loan board, but the board apparently

 2   is advised by counsel to the state or state agencies.

 3           THE COURT:  Who?

 4           MR. ERENS:  I'm not sure, your Honor.

 5           THE COURT:  You get my concern.

 6           MR. ERENS:  Oh, absolutely.

 7           THE COURT:  What are we going to do about it?

 8           MR. ERENS:  Well, again, the Emergency Loan Board

 9   has to meet.  Okay.  It has to make considerations.  The

10   administration is in support of the transaction, as we know,

11   through the Department of Treasury letter, and we have every

12   expectation the Emergency Loan Board will approve the

13   transaction.

14           THE COURT:  If it's a mere formality, fine, you

15   know, we'll proceed, but if there's any chance that they're

16   not going to approve this and we're wasting three days of

17   trial with really expensive lawyers --

18           MR. ERENS:  Understood, your Honor.  I guess I would

19   say the city is relying on a couple things, that one of the

20   three members had already approved it in a different

21   capacity, the administration is supportive of the

22   transaction, and that the other two members are at-will

23   appointees of the governor.

24           THE COURT:  Well, all right.  I'm going to ask for a

25   more complete report from Jones Day or an attorney for the

13-53846-swr   Doc 2259-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 21 of 24
13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 222 of 245
463

1   city on what the prospects are for loan board approval in

2   terms of how it perceives its role here, when it will

3   exercise that role, who's on the loan board because it's

4   unfair to everyone in this courtroom for us to be proceeding

5   for it just to be disapproved by the state's administrative

6   process after we're done, assuming it's approved.

7           MR. ERENS:  Certainly understand, your Honor.  I

8   guess I could say from the city's perspective, we obviously

9   would not be pursuing this court hearing if we didn't have

10  every expectation that it would be approved, but we are not

11  the Emergency Loan Board.  So we will work on a full --

12          THE COURT:  I want a report tomorrow morning.

13          MR. ERENS:  Okay.  Thank you.  At the start of the

14  hearing?

15          THE COURT:  If you can.

16          MR. ERENS:  Okay.  Thank you.

17          THE COURT:  All right.  Next witness, please.

18          MR. HAMILTON:  Good afternoon, your Honor.  Robert

19  Hamilton of Jones Day on behalf of the city.  The city calls

20  James Doak to the stand.

21          THE COURT:  Step forward, please, sir, and raise

22  your right hand.

23              JAMES DOAK, DEBTOR'S WITNESS, SWORN

24          THE COURT:  Please sit down over there.  You may

25  proceed.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 223 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 218 of 245   223
463

1                          DIRECT EXAMINATION

2   BY MR. HAMILTON:

3   Q   Sir, can you say your full name for the record, please?

4   A   James Leland Doak.

5   Q   And, Mr. Doak, where do you live?

6   A   I live in New Canaan, Connecticut.

7   Q   And where are you currently employed?

8   A   I'm currently employed at Miller Buckfire & Co., an

9   investment bank that is owned by Stifel Financial

10   Corporation.

11   Q   Sir, did you get a degree from college?

12   A   Yes, I did.

13   Q   What was your degree in?

14   A   I have a degree in social studies from Harvard College.

15   Q   When did you graduate from Harvard College?

16   A   1994.

17   Q   And did you pursue post-graduate work?

18   A   Yes, I did.

19   Q   What post-graduate work did you do?

20   A   I received two degrees from Harvard University in 2000, a

21   JD from Harvard Law School and an MBA from Harvard Graduate

22   School of Business.

23   Q   Approximately how long have you had experience in the

24   investment banking industry?

25   A   I've had over 15 years of experience.

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 224 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 219 of 245
463

1   Q   Where did you start that experience?

2   A   My experience started with the financial analyst program

3   at Goldman Sachs where I worked in the investment banking

4   division.

5   Q   Where did you go after you worked at Goldman Sachs?

6   A   After Goldman Sachs, I returned to the JD/MBA program,

7   and upon graduating from the JD/MBA program at Harvard

8   University, I took employment with Wasserstein Perella & Co.

9   and its restructuring group in 2000.

10  Q   And at some point did that restructuring group become

11  what was -- what is now known as Miller Buckfire?

12  A   Yes.

13  Q   And have you worked at that restructuring group under its

14  prior name and as Miller Buckfire ever since?

15  A   That's correct.

16  Q   Okay.  And what is your current position at Miller

17  Buckfire?

18  A   I am a managing director.

19  Q   And how long have you been a managing director at Miller

20  Buckfire?

21  A   Approximately four years.

22  Q   Okay.  And so you've had then -- looks like if I total it

23  up right, about 13 years of experience at Miller Buckfire and

24  its predecessor; is that right?

25  A   That's correct.

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 225 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 226 of 245   225
463

1   Q   Okay.  Can you describe for the Court what your

2   experience has been at Miller Buckfire in soliciting and

3   arranging financing and other capital transactions for

4   entities that are in financial distress?

5   A   Over the last 13 years, I've worked on well over a dozen

6   engagements for borrowers, in some cases debtors, and

7   stakeholders around financially distressed enterprises and

8   other entities.  At the core, if not the periphery of every

9   one of those situations, has been a process of soliciting,

10  marketing, amending or extending credit to distressed

11  entities.  In some cases it was sourcing financing for a

12  borrower.  In other cases it was sourcing financing for a

13  buyer, and in some cases it was negotiating, you know,

14  additional time on a credit facility with an existing set of

15  stakeholders.

16  Q   All right.  Can you describe just generally for the Court

17  what the process of soliciting and arranging a financing

18  facility for an entity in distress involves?

19  A   The process of soliciting financing for an entity in

20  distress has several different phases that you have to take

21  into account.  There's a considerable amount of planning

22  initially, and hopefully you have a fair amount of time to do

23  that.  Sometimes you don't.  But in that time, you have to

24  evaluate what the financial condition is of the entity, what

25  the markets look like as far as the markets that you're going

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 226 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 22 of 245   226
463

1    to go into, and determine, based on the financial condition

2    in the market, what type of process you believe is going to

3    best work, how broadly that process should go, who are the

4    key parties, who are the relevant markets and submarkets of

5    the debt capital markets that you should be going to, and you

6    have to work through that process design concept.

7         Once you have a sense of what your process design is

8    and you've prepared whatever materials you think are

9    necessary to introduce parties to the process, you begin

10   with, to the extent you can do it and you have the time, a

11   competitive solicitation process where you're informing

12   would-be providers of financing as to the nature of the

13   opportunity and the type of process that you are going to ask

14   them to participate in.  From there you frequently have a --

15   anywhere from a very short period to an extended period of

16   due diligence and back and forth getting the lenders informed

17   of the overall process.  At some point, depending on the

18   nature of the process and how robust it is and how much time

19   it is, you will ask for responses from the would-be providers

20   of financing so that you can make assessments as to how many

21   parties should continue on in the process and whether you

22   should have then one stage or multiple stages.

23        Eventually, you select key parties and best

24   financing providers to move on to final stages, and

25   eventually you engage in detailed negotiation with one or

13-53846-swr    Doc 4304-10    Filed 04/29/14    Entered 04/29/14 22:00:23    Page 227 of 245
13-53846-swr    Doc 2299-1    Filed 12/23/13    Entered 12/23/13 20:12:06    Page 22 of 24
463
227

1  more parties in order to get to a best possible outcome.  All

2  along that process, depending on the nature of the situation,

3  there's also very critical elements here as far as keeping

4  the relevant stakeholders and decision-makers informed as to

5  how the process is going to go so that they're able to make

6  those decisions at key moments, and then depending on the

7  nature of the situation, there are other stakeholders around

8  the process that you're going to at least have to provide

9  some background recognizing how they may fit into the overall

10  transaction.

11  Q   All right.  And over the course of your 13 years at

12  Miller Buckfire engaging in this process, do you believe that

13  you have developed specialized knowledge in conducting such

14  processes?

15  A   Yes.

16  Q   Can you give the Court some idea of how you use that

17  specialized knowledge in conducting these processes?

18  A   The specialized knowledge that someone gains from going

19  through multiple financing processes is -- allows one to

20  anticipate how a financing process will likely develop,

21  anticipate the reaction of would-be lenders and structure

22  both the process and also the invitation, introduction, and

23  information they'll be receiving so that the lenders will

24  best be able to absorb the information and provide productive

25  responses for you to run the process.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 228 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 223 of 245   228
463

1        Another critical element from my years of experience

2   is the -- is learning how to interpret the signals and

3   massaging that one gets back from potential lenders, how to

4   interpret their questions when it comes to due diligence

5   calls, what they think is important, what they think is not

6   important, whether they're really interested or whether

7   they're less interested, how to interpret the written

8   submissions that they provide and whether they're complete,

9   what they leave in, what they take out, what they add, and

10  interpreting how the process is going to progress based on

11  how those letters look.  Then as one moves along and engages

12  in detailed negotiation with parties and detailed dialogue

13  with parties, over the years you begin to get a better sense

14  of whether parties are -- you know, parties are negotiating

15  in earnest.  Occasionally parties are negotiating to get out

16  basically of where they managed to find themselves, and you

17  have to learn who's -- which entities are really interested

18  in getting to the end point in a financing.

19  Q   Mr. Doak, have you ever been qualified to provide expert

20  testimony on -- with respect to post-petition financing in a

21  bankruptcy case prior to this proceeding?

22  A   Yes, I have.

23  Q   On how many occasions?

24  A   On two occasions in one particular bankruptcy.

25  Q   Which case was that?

1  A    That was the bankruptcy of <u>Allied Holdings Corporation</u> in

2  2006 through -- 2005 through 2007 in Georgia.

3  Q    In which Bankruptcy Court was that?

4  A    Maybe the Northern District of Georgia.  It was the

5  courthouse in Atlanta.  It was Ray Mullins' courtroom.

6  Q    Okay.  And what was the nature of your expert testimony

7  in that case?

8  A    The nature of my expert testimony included the

9  superiority of a replacement debtor in possession facility

10  and extension of additional borrowings that occurred mid-

11  case, and then nine months later the replacement of the DIP

12  facility that was negotiated and approved with a convertible

13  DIP exit facility that was provided by another lender and the

14  superiority of that particular proposal at that time to allow

15  the company to emerge eventually from Chapter 11.

16  Q    Did you also give expert testimony in the <u>Lenox</u> case?

17  A    In the bankruptcy of the <u>Lenox Group</u>, which was in the

18  Southern District of New York, Judge Gropper's court, I

19  provided expert testimony in regards to the comparative

20  recoveries for stakeholders in two competing -- basically two

21  competing bids for the company.

22  Q    All right.  And when did your engagement with the City of

23  Detroit begin here?

24  A    Miller Buckfire's engagement with the City of Detroit

25  began in January of 2013.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 230 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 223 of 245
463

1  Q   When did you start working on the matter?

2  A   I began working at the inception of the engagement and

3  began working in October and November of 2012, which was the

4  time frame of the solicitation run by the city and the state

5  seeking financial advisors.

6  Q   And during that period to date, have you had access to

7  the city's books and records in providing investment banking

8  services to the city?

9  A   Yes.

10  Q   And have you had access to the city's outside advisors

11  and the city's finance personnel?

12  A   Yes.

13       MR. HAMILTON:  Your Honor, at this time, I would

14  proffer Mr. Doak and ask him to be qualified as an expert in

15  soliciting and negotiating financing facilities for entities

16  in financial distress.

17       THE COURT:  Any objections?

18       MR. ARNAULT:  Permission to voir dire the witness,

19  your Honor?

20       THE COURT:  Okay.

21                 VOIR DIRE EXAMINATION

22  BY MR. ARNAULT:

23  Q   Good afternoon, Mr. Doak.  How are you?

24  A   I'm fine.  Thank you.

25  Q   Good.  My name is Bill Arnault, and I represent Syncora.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 231 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 226 of 245   231
463

1   I just have a few questions for you about your background and

2   some of your qualifications.  So to begin, you've only been

3   involved with one Chapter 9 case in your career; right?

4   A    That's correct.

5   Q    And that one Chapter 9 case is this one; right?

6   A    That's correct.

7   Q    And to the best of your knowledge, Miller Buckfire has

8   only been engaged on one occasion by an issuer to structure

9   and solicit municipal debt; right?

10  A    There was an element of the -- our Foxwoods restructuring

11  assignment, which I worked on, where there was tax-fee debt

12  that -- or tax-exempt debt that was in the municipal market,

13  so restructuring that and reissuing that was part of that

14  assignment, but this would be the only financing for a

15  municipality that I'm aware of that we've engaged in.

16  Q    Okay.  And the DIP loan at issue in this case is your

17  first attempt at sourcing and structuring municipal debt;

18  right?

19  A    Yes.  It's my first personal attempt at sourcing and

20  soliciting and structuring municipal debt.

21  Q    It follows then that you've never attempted to source

22  unsecured financing on behalf of a Chapter 9 debtor; right?

23  A    No, I have not.

24       MR. ARNAULT:  Your Honor, we object to the offer of

25  Mr. Doak as an expert witness on the grounds that he lacks

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 23 of 24
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 22 of 245   232
463

 1    the necessary qualifications in the Chapter 9 context to

 2    testify about structuring and sourcing post-petition

 3    financing.

 4            MR. HAMILTON:  I would say two things, your Honor.

 5    One, there's got to be a first time for everybody, and nobody

 6    is an expert by counsel's standard because this is really the

 7    first contested municipal DIP that we're aware of.  Second,

 8    you've already ruled on this in connection with Mr. Buckfire

 9    on this very same objection.  We're not proffering him as an

10    expert on Chapter 9 finance.  We're proffering him as an

11    expert on solicitation and negotiation of post-petition -- or

12    of financing facilities for entities in distress generally.

13            THE COURT:  Well, we had a little more complete

14    record when we qualified Mr. Buckfire than we do for this

15    witness.  For example, what, in your judgment, might form the

16    basis for any difference in the experience necessary to

17    properly represent a municipal debtor as opposed to a

18    commercial debtor in a Chapter 11 case who's looking for DIP

19    financing?

20            THE WITNESS:  I think there are many elements of

21    similarity associated with sourcing of financing in this

22    context, and there are certainly many that differ.  The

23    critical elements of similarity include the universe of

24    potential investors who are looking at this situation, how

25    they review any credit because there if it's not this, it's

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 233 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:06   Page 228 of 245   233
463

1  Puerto Rico, but if it's not Puerto Rico, it's a Chapter 11
2  DIP financing, and if it's not that, it's a corporate
3  distress situation.  They are focused on risk and return.
4  They're focused on plays on capital structures, and they're
5  focused on structuring, you know, maximum protection with
6  maximum return.  And those elements that are present in the
7  corporate setting are present here as well.  The other
8  critical elements that are similar are the essential nature
9  associated with planning of the overall process, doing the
10 analytics to understand what you should be asking for and
11 what sort of information you can provide parties in a time
12 frame to achieve a goal in an environment of extraordinary
13 information uncertainty.  I mean that's what investment
14 bankers for distressed companies and borrowers and debtors,
15 you know, face on an everyday basis, and that's -- you know,
16 certainly here in spades when it comes to working through the
17 challenges associated with sourcing financing in an uncertain
18 operating prospect.  There are certainly differences.  There
19 are -- but, you know, the different -- here we have -- you
20 know, we have a different type of debtor, so the type of
21 remedies that parties are going to want is different.  The
22 types of ways that the debt will get formally issued and
23 approved are going to be different, but that's going to be
24 the same if -- that sort of difference is the same if you
25 look at something with United States assets, and at the same

 1   time it may have overseas assets, and so you have to get into

 2   what sort of security interest you think you can really

 3   provide people and whether you have to pledge stock because

 4   you can't pledge assets, so, you know, I don't profess to be

 5   an expert in Chapter 9, but the concepts here that we have

 6   from Chapter 11 and, more importantly, just all around

 7   distress and how you get rescues done, exits done, DIP

 8   financings done, they're all very applicable to this

 9   particular circumstance.

10          THE COURT:  All right.  The Court will qualify the

11   witness as an expert in sourcing financing in municipal

12   cases.

13          MR. HAMILTON:  Thank you, your Honor.

14              DIRECT EXAMINATION (CONTINUING)

15   BY MR. HAMILTON:

16   Q   Mr. Doak, what did you do starting in about May with

17   respect to the process of soliciting financing proposals for

18   the City of Detroit?

19   A   At that time, recognizing that the city's liquidity was

20   very challenged and we had the potential of a Chapter 9 if

21   restructuring negotiations didn't proceed, we wanted to have

22   a better understanding of whether additional liquidity would

23   be available for the city both on a pre-petition basis or on

24   a --

25          THE COURT:  Mr. Doak, I have to stop you.  The

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 235 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 236 of 245   235
463

1   question was what did you do.

2           THE WITNESS:  Okay.  In May we determined it was

3   appropriate to contact several leading institutions to ask

4   them for their thoughts on whether financing would be

5   available for the city on both a pre-petition and post-

6   petition basis.

7   BY MR. HAMILTON:

8   Q   How many did you contact?

9   A   We contacted four institutions.

10  Q   How did you decide which institutions to contact?

11  A   We contacted leading institutions, large investment

12  banks, that we thought brought both municipal financing

13  expertise and also distressed situation expertise to the

14  table.

15  Q   What were the four that you contacted?

16  A   We contacted JPMorgan, Citibank, Wells Fargo, and

17  Deutsche Bank.

18  Q   What did you tell them?

19  A   We informed them that we wanted to have a preliminary

20  dialogue with them about some financing ideas associated with

21  the city and its restructuring process.

22  Q   Did you meet with each one of those four?

23  A   Yes, we did.

24  Q   And what happened as a result of those meetings?  What

25  happened with Deutsche Bank?

1  A   With Deutsche Bank, we had a preliminary meeting, and

2  then subsequently they -- the dialogue with them did not

3  continue.  It was a process that they weren't really -- there

4  wasn't enough information for them to respond to something or

5  provide a response, so they declined to continue the

6  dialogue.

7  Q   What happened with Wells Fargo?

8  A   Wells Fargo expressed a concern over the very high

9  profile nature of the overall situation and declined an

10  opportunity to continue a dialogue.

11  Q   What happened with Citi?

12  A   Citi -- we had a few more conversations, and eventually

13  when we sent an e-mail to them as well as the other three

14  asking for their best thoughts as to where -- their

15  interpretation of where we were in process and what might be

16  available, they submitted a written notice back to us.

17  Q   And what did they say in that notice?

18  A   They indicated that they were not --

19        MR. PEREZ:  Your Honor, it calls for hearsay.

20        THE COURT:  I'll permit it.  Go ahead, sir.

21        THE WITNESS:  Okay.  The letter indicated that Citi

22  was not prepared to work towards extending credit to the

23  city.  They expressed a concern about casino revenues and

24  lending based on casino revenues and cash flow capacity, and

25  they also expressed a general concern about the high profile

13-53846-swr   Doc 4394-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 237 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:00:23   Page 237 of 245   237
463

1  nature of Detroit and also the fact that there was swap

2  terminations involved in the process which they thought was

3  another bad sort of public element of the overall process.

4  BY MR. HAMILTON:

5  Q    What happened with JPMorgan?

6  A    JPMorgan also submitted a written response somewhat

7  lengthier that indicated that they were not willing to work

8  towards any sort of lending at this time, but they wanted to

9  be helpful or I think they -- we believe they wanted to be

10  helpful, so they extended some of -- they extended a letter,

11  and they provided some of their thoughts on how we could

12  potentially raise financing in the future.

13  Q    Do experts in the field of restructuring finance

14  reasonably rely on such responses that -- such as the one you

15  got from JPMorgan Chase when you reach out for initial

16  expressions of interest?

17  A    Yes, we do.

18  Q    And you reasonably rely on those responses in forming

19  your opinion on what sources of financing are available to

20  your client?

21  A    Yes, we do.

22  Q    Okay.

23       MR. HAMILTON:  At this point, your Honor, I'd like

24  to ask the witness about Exhibit -- City's Exhibit 61, and if

25  we could turn to what I believe everybody has identified as

1   the fourth page of the exhibit.

2   BY MR. HAMILTON:

3   Q   Mr. Doak, is this the fourth page of the letter that you

4   got back from JPMorgan that you just described?

5   A   Yes, it is.

6   Q   All right.  And can we -- I want to focus on the first

7   paragraph if we could blow that up.  Could you explain to the

8   Court what the context is -- of the first two sentences of

9   that paragraph are as to what you had contacted or how you

10  had described to JPMorgan what you were looking for?

11  A   We indicated to JPMorgan that we were examining whether

12  the debtor in possession financing would potentially be

13  available for the city as well as any other financing may be

14  available for the city recognizing we hadn't made a

15  determination yet on Chapter 9, so this is their recitation

16  back to us as to what they thought we had asked of them, and

17  they indicate here, I think, you know, appropriately, that we

18  were seeking potential debtor in possession financing should

19  we decide to restructure under court supervision.  They then

20  outline that there's four distinct revenue streams that we

21  had identified to be used as security to secure any potential

22  lending facility.

23  Q   What were the four revenue streams that you had

24  identified to JPMorgan Chase?

25  A   The revenue streams that we had identified were the

1    casino gaming tax revenues, the income tax revenues, the

2    utility tax revenues, and also the water and sewer revenues.

3    Q    Why had you identified the utility tax revenues and the

4    water and sewer revenues?

5    A    The water and sewer revenues were identified because one

6    element of a potential DIP that we were exploring was whether

7    there was immediate interest savings that the water fund and

8    sewer fund could take advantage of with a debtor in

9    possession facility, so this would be refinancing existing

10   special revenue debt with lower interest rate special revenue

11   debt.  The utility tax revenues we had identified because at

12   the time the city was in the process of raising the financing

13   for the public lighting authority, and that financing process

14   had stalled, so we wanted to know whether there was a way to

15   use what was already out there in legislation that the

16   utility taxes should go to a PLA debt vehicle and see whether

17   that could be incorporated into a debtor in possession

18   facility.

19   Q    All right.  Now, if we can go to the paragraph towards

20   the bottom of the page, the second paragraph under the last

21   heading, and blow that up, when you received this letter and

22   you read that paragraph, Mr. Doak, did that contribute to

23   forming your opinion on what type of financing would be

24   available to the City of Detroit?

25   A    Yes, it did.  It informed and also confirmed, you know,

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 240 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 233 of 245   240
463

1    our understanding that the city's access to financing on an

2    immediate pre-petition basis was simply not there and that on

3    a go forward basis it was going to be important to provide

4    security interests for any would-be lender to convince them

5    to provide the city with additional financing.

6    Q   All right.  At some point after the bankruptcy petition

7    for the City of Detroit was filed, did you become involved in

8    the process of soliciting and negotiating the post-petition

9    financing facility with Barclays?

10   A   Yes.

11   Q   All right.  How would you characterize your role in that

12   process, Mr. Doak?

13   A   I was one of the lead bankers at Miller Buckfire, if not

14   the lead banker at Miller Buckfire, working on the post-

15   petition financing process.  My role extended from planning

16   the overall process, developing the initial solicitation

17   materials, developing the universe of potential lenders we

18   would contact to actually contacting those lenders, providing

19   them information, and assisting them in their substantive and

20   structural due diligence for the process.

21   Q   How did you develop the list of parties to contact?

22   A   We made the determination to solicit a broad range of

23   commercial institutions and alternative financing providers

24   that were active in providing credit to distressed

25   situations.

1  Q   All right.  At this time, I'd like to ask you, sir, about

2  what's been marked as City's Exhibit 56.

3          MR. HAMILTON:  And it's my understanding, your

4  Honor, this has already been admitted into evidence earlier

5  this morning because there was no objection.

6          THE COURT:  Which number, sir?

7          MR. HAMILTON:  56.

8  BY MR. HAMILTON:

9  Q   Mr. Doak, what is this document?

10 A   This is the introductory materials and e-mail that we

11 sent to Barclays.  They received the materials on -- late on

12 Tuesday, September 3rd.  That's approximately four days after

13 the bulk of the initial parties participating in the process

14 received their materials.  The parties that received this had

15 executed a nondisclosure agreement so that they could receive

16 these materials, which included private information that was

17 not otherwise available in the debt capital markets, and in

18 this case, as with the others, Barclays received an

19 introductory letter describing the process, a model term

20 sheet for the financing that was designed by the city's

21 advisors and team, and also a copy of the executed swap

22 forbearance agreement.  And at that time, we had not yet

23 completed the liquidity forecast that we wanted to use for

24 the financing.  That was completed probably several days

25 later, so they and other parties received the forecast at

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 242 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 20:12:16   Page 23 of 245   242
463

1  that particular time.

2  Q   All right.  And if you look at the last two pages of this

3  exhibit because it has attachments to it, is this the

4  introductory cover letter that's described in your e-mail to

5  Barclays?

6  A   Yes.  This is the cover letter that we sent to all the

7  parties who participated in the process and executed a

8  nondisclosure agreement, and you can see in this cover letter

9  we highlight both a check-in concept on September 6th and

10  also an initial deadline to provide us with an indicative

11  term sheet on September 16th.

12  Q   And if you look at the second page of this exhibit --

13          MR. HAMILTON:  If we bring that up -- no, the second

14  page -- just the second page of the exhibit, page after the

15  e-mail.

16  BY MR. HAMILTON:

17  Q   What is this document, Mr. Doak?

18  A   This is the indicative or model term sheet that we

19  provided to the potential sources of financing to provide

20  them with some sort of background and insight as to the type

21  of financing that the city was looking to source.

22  Q   All right.  And if you look at the second -- the next

23  page, page 2 and page 3 of this document, you'll see a

24  section down for collateral and priority.  Do you see that?

25  A   Yes.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 243 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:10   Page 238 of 243
463

1 Q   And it indicates the collateral for both the swap

2 termination loan and the quality of life loan on the next

3 page; is that right?

4 A   That's correct.

5 Q   Why did you include this collateral package in the

6 indicative term sheet that you sent out to all 50 of the

7 potential lenders that you contacted?

8 A   We provided this collateral package because it was --

9 after a substantial dialogue, we determined that unless we

10 provided the parties with some guidance as to what sort of

11 collateral arrangement the city thought it could possibly

12 agree to, we would get back from parties a very wide range of

13 responses.

14 Q   Did you think there was a benefit to the city to

15 specifying what collateral the city was interested in

16 discussing in the initial package that was sent out to

17 lenders?

18 A   Yes.

19 Q   What is that benefit?

20 A   Benefit was that it clarified the discussion with

21 parties.  It focused them on what we felt was the key

22 provisions that we could deliver, and it also allowed us to

23 move the process along, you know, at the time frame -- within

24 the time frames that we felt we needed to hit in order to

25 secure the financing in time to address the forbearance

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 244 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 16:12:06   Page 233 of 244
463

1  agreement.

2  Q    What does that mean?  What was the time frame -- how is

3  that relevant to what you were putting in the indicative term

4  sheet?

5  A    This was the -- because this was the -- one of the first

6  if not the first post-petition financing for a municipality,

7  and even -- while we were dealing with very sophisticated

8  parties potentially looking at the financing, they -- we did

9  not have the time to attempt to educate and dialogue with

10  every one of them from ground zero as to what sort of

11  potential collateral arrangements we could provide and how a

12  potential post-petition financing facility could possibly

13  work, so it was helpful for us to provide this particular

14  guidance because we had concerns about, you know, what we

15  could receive back and find acceptable from the parties.

16  Q    All right.  And then can you describe just briefly and

17  quickly and generally what then occurred between -- in the

18  month of September after you sent out that package to the 50

19  potential lenders?

20  A    We sent out the package to the 50 potential -- sorry.  We

21  contacted 50 lenders.  We sent out the package all told to

22  around 40 because that was the -- the parties had to execute

23  NDA's to receive the materials.  We then engaged in calls and

24  other forms of communication with those potential parties

25  getting to September 16th, which was a key time frame for

 1   potential parties to submit back to us their indications of

 2   interest in providing financing for the city.

 3   Q   All right.  And at this time I'd like to ask you, Mr.

 4   Doak, about what's been marked as City's Exhibit 88.

 5         MR. HAMILTON:  If we could bring that up -- this one

 6   is also already in evidence, your Honor, based on your ruling

 7   this morning because there was no objection.

 8   BY MR. HAMILTON:

 9   Q   What is this document, Mr. Doak?

10   A   This was a briefing document that we created for the

11   benefit of the city's team of -- city's leadership and

12   advisors and also other key stakeholders who were

13   participating and monitoring the financing process, and --

14   Q   Who did you provide this document to?

15   A   This document was provided to Treasurer Dillon; the

16   director of the Michigan Finance Authority, Tom Saxton.  It

17   was provided to Kevyn Orr and the emergency manager's office.

18   Jim Bonsall, the city's CFO, also received it as well as Gary

19   Brown, other members of the EM staff, and then the city's

20   advisor -- some of the city's advisors also had it.

21   Q   Why did you provide it to State Treasurer Dillon?

22   A   We provided it to State Treasurer Dillon because we

23   anticipated that his approval of a commitment letter would

24   probably be required as the process went along as well as

25   approval of the ELB over the course of the process, and by

13-53846-swr   Doc 2299-10   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 246 of
463
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 24 of 45   246

 1  providing him with the periodic updates, it would make

 2  eventually coming to him for approval, you know, all the more

 3  easier as it would be as far as bringing him in potentially

 4  an extremely short time period.  In addition, he's the -- he,

 5  at the time, was the treasurer of the state.  That gave him a

 6  very broad knowledge of the municipal financing activities

 7  that were taking place, you know, across the state with other

 8  municipalities, and he brought that experience to the table,

 9  as did Tom Saxton in his role as director of the Michigan

10  Finance Authority.

11  Q   All right.  If we go to the second page of this document,

12  it lists a number of different entities under the heading of

13  "Traditional."  What does that mean, "traditional"?

14  A   These are potential lenders who we categorized as

15  traditional financial institutions, commercial banks,

16  investment banks, and the like, entities that are regularly

17  in the business of extending and syndicating credit

18  facilities.

19  Q   And if we turn to page -- or turn to the next page of the

20  exhibit, we now have a much longer list of entities under the

21  heading of "alternative."  Can you tell the Court what does

22  "alternative" mean?

23  A   This is -- that is short for the alternative financing

24  providers.  The debt capital markets have changed

25  substantially over the last decade, especially around

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 24 of 45
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 10:12:00   Page 247 of 245
463
247

1  distressed situations.  Credit is now more frequently

2  provided by these nontraditional institutions whether they

3  are hedge funds or other sort of entities that aggregate

4  assets and spin them out into syndicated vehicles, but these

5  entities tend to work in different manners than the

6  traditional ones, and so we thought that this grouping would

7  be of assistance to the parties that we provided this to.

8       In addition, considering we had the EM and the

9  treasurer and the director of the finance authority,

10  "traditional" also meant, you know, entities that they had

11  most frequently spent more time with, right --

12  Q   Okay.

13  A   -- and "alternatives" were people more from our universe.

14  Q   When you say "our universe," you mean the financial

15  restructuring universe?

16  A   The financial restructuring universe.

17       THE COURT:  Excuse me.  I think it's in all of our

18  best interests to stop now for the day, so let's do that, and

19  we'll reconvene at nine o'clock tomorrow morning, please.  I

20  do need to remind everyone that while you are free to leave

21  your boxes of exhibits or whatever you like here in the

22  courtroom, the courtroom will be locked.  There will,

23  however, be other people in the courtroom, maintenance, IT,

24  housekeeping, et cetera, so it's at your own risk.

25       MR. HAMILTON:  Thank you, your Honor.

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 243 of 245
13-53846-swr   Doc 2299-1   Filed 12/23/13   Entered 12/23/13 20:12:00   Page 248 of
463

1          THE COURT:  We'll be in recess.

2          THE CLERK:  All rise.

3       (Proceedings concluded at 5:00 p.m.)

13-53846-swr   Doc 4304-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 249 of 245
13-53846-swr   Doc 2299   Filed 12/23/13   Entered 12/23/13 16:12:10   Page 244 of 245 249
463

INDEX

| WITNESSES: | Direct | Voir Dire | Cross | Redirect |
|---|---|---|---|---|
| Gaurav Malhotra | 26/39 | 35 | 86/104 106/112 | 119 |
| Kenneth Buckfire | 127 | | 159/187 188/189 202/211 | |
| James Doak | 219/230 | 226 | | |

| EXHIBITS: | Received |
|---|---|
| City Exhibits 1, 2, 4, 5, 6, 7, 13, 18, 19, 30 47-54, 56, 78, 79, 80, 88, 89, 93, 98, 100, 112, 113, 116-139 | 9 |
| City Exhibit 36 (pages 49, 50, 97, 98) | 53 |
| City Exhibit 61 | 155 |
| City Exhibit 106 | 58 |
| City Exhibit 108 | 68 |
| City Exhibit 109 | 74 |
| City Exhibit 110 | 75 |
| City Exhibit 111 | 76 |
| City Exhibit 115 | 83 |
| Syncora Exhibits 201-214, 217, 223, 233-238, 240 | 9 |
| FGIC Exhibits 301, 303, 307, 308, 309 | 9 |
| Ambac Exhibits 401, 402, 403, 405, 406 | 9 |
| EEPK Exhibits 801-805 | 9 |
| Retirement Systems Exhibits 1012-1015, 1019 | 9 |
| Sole Exhibits 1301, 1303, 1306, 1308, 1310, 1312, 1314, 1316 | 9 |
| Sole Exhibit 1328 | 190 |
| NPFG Exhibits 1, 2 | 9 |

   I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett       December 23, 2013
_____    _____
Lois Garrett

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .        Docket No. 13-53846
        MICHIGAN,              .
                              .        Detroit, Michigan
                              .        December 20, 2013
              Debtor.          .        10:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. STATUS CONFERENCE
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day |
| | By:  THOMAS CULLEN, JR. |
| | 51 Louisiana Avenue, N.W. |
| | Washington, D.C.  20001-2113 |
| | (202) 879-3768 |
| | |
| | Pepper Hamilton, LLP |
| | By:  ROBERT S. HERTZBERG |
| | 4000 Town Center, Suite 1800 |
| | Southfield, MI  48075-1505 |
| | (248) 359-7333 |
| For Detroit | Clark Hill, PLC |
| Retirement Systems- | By:  ROBERT D. GORDON |
| General Retirement | 151 South Old Woodward, Suite 200 |
| System of Detroit, | Birmingham, MI  48009 |
| Police and Fire | (248) 988-5882 |
| Retirement System | |
| of the City of | |
| Detroit: | |
| For Erste | Ballard Spahr, LLP |
| Europaische | By:  VINCENT J. MARRIOTT, III |
| Pfandbrief-und | 1735 Market Street, 51st Floor |
| Kommunalkreditbank | Philadelphia, PA  19103-7599 |
| Aktiengesellschaft | (215) 864-8236 |
| in Luxemburg, S.A.: | |
| For David Sole: | Jerome D. Goldberg, PLLC |
| | By:  JEROME D. GOLDBERG |
| | 2921 East Jefferson, Suite 205 |
| | Detroit, MI  48207 |
| | (313) 393-6001 |

13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 02:00:03  Page 25 of
13-53846-swr  Doc 2311-10  Filed 12/26/13  Entered 12/26/13 09:30:03  Page 25 of 251
463

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

13-53846-tjt Doc 4314-10 Filed 04/29/14 Entered 04/29/14 02:00:23 Page 25 of
13-53846-swr Doc 2311 Filed 12/26/13 Entered 12/26/13 09:30:08 Page 251 of
463        252

1    THE CLERK: All rise. Court is in session. Please

2    be seated. Case Number 13-53846, City of Detroit, Michigan.

3    MR. CULLEN: May it please the Court, your Honor,

4    Thomas Cullen of Jones Day representing the city. As your

5    Honor strongly suggested, we have been meeting with the

6    various stakeholders over the past day. Accordingly and in

7    the interest of bettering the swap settlement, the parties in

8    interest are attending court-ordered mediation under the

9    mediation program that your Honor has established Monday and

10   Tuesday of next week, and Ms. Ball and Mr. Hertzberg will be

11   attending that mediation on behalf of the city's legal team.

12   If the city is, as it hopes, successful in bettering

13   the swap settlement, the city will promptly file an amended

14   motion setting forth the revised terms of its agreement and

15   bring that amendment before the -- that amended agreement

16   before the Court at your Honor's earliest convenience. With

17   the understanding that your Honor is unavailable until

18   January 2nd, the city will plan to produce Mr. Orr for a

19   deposition on December 31st in Washington, D.C., and will

20   make Mr. Orr available to testify at a continuation of this

21   week's hearing on the first date your Honor is available.

22   Mr. Orr will be, in such event, fully prepared to testify

23   with respect to the city's decision to enter into any such

24   agreement which results from this process.

25   At the same time and in the interim, we're doing, as

13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 02:00:23  Page 253 of
13-53846-swr  Doc 2311  Filed 12/26/13  Entered 12/26/13 09:30:03  Page 2 of 19    253
463

1  we're bound to do, whatever is necessary to protect the city

2  residents and interests and to preserve the city's ability to

3  take whatever course of action it ultimately deems necessary.

4  Indeed, the city, through Pepper Hamilton, is issuing

5  litigation hold notices to UBS, BAML, Orrick, Clark Hill, and

6  Lewis & Munday as well as to the COP banks with the intention

7  of preserving the city's ability to fully and completely

8  litigate its rights should an appropriate agreement not be

9  obtained.  To the extent that the city determines that such

10  interests are best served by seeking preliminary or other

11  relief from this Court, the city will do so expeditiously.

12  That's all I have, your Honor.

13      THE COURT:  Thank you, sir.  Would anyone like to be

14  heard regarding this matter?

15      MR. MARRIOTT:  Good morning, your Honor.  Vince

16  Marriott, Ballard Spahr, on behalf of EEPK and affiliates.  I

17  would just like to ask the debtor to confirm that it does

18  not --

19      THE COURT:  Excuse me one second.

20      MR. MARRIOTT:  Yes.

21      THE COURT:  I just need you to listen to this.

22      MR. CULLEN:  I'm very sorry, your Honor.

23      THE COURT:  That's okay.  Go ahead, sir.

24      MR. CULLEN:  I apologize, Vince.

25      MR. MARRIOTT:  That's fine.  I would just like the

13-53846-tjt  Doc 4311-10  Filed 04/29/14  Entered 04/29/14 02:00:23  Page 25 of 43
13-53846-swr  Doc 2311-10  Filed 12/26/13  Entered 12/26/13 09:30:03  Page 25 of 43   254
463

1   debtor to confirm that at any continued hearing on this

2   matter, it will be producing no witnesses that it has not

3   previously identified, no documents that it has not

4   previously produced other than any revised agreement.

5          MR. CULLEN:  That is certainly our intention, your

6   Honor.

7          THE COURT:  All right.  Thank you.  Would anyone

8   else like to be heard regarding this matter?  No?  It would

9   be the Court's intention -- yes.  Yes or no?

10          MR. GORDON:  Thank you, your Honor.  Robert Gordon

11  of Clark Hill on behalf of the Retirement Systems.  Number

12  one, the proposal that's been made, just for the record,

13  wasn't conveyed to any of us before just now, so we're trying

14  to process -- I don't know why an e-mail couldn't have gone

15  out last night.

16          THE COURT:  Do you want a minute to process it?

17          MR. GORDON:  Could we?

18          THE COURT:  Absolutely.

19          MR. GORDON:  I would appreciate that.  I would like

20  to caucus.

21          THE COURT:  Go right ahead.

22          MR. GORDON:  Can we caucus for a moment because I'd

23  like to get some --

24          THE COURT:  Well, all right.  Fair enough.  How much

25  time would you like?

13-53846-tjt  Doc 4311-10  Filed 04/29/14  Entered 04/29/14 02:00:23  Page 25 of
13-53846-swr  Doc 2311  Filed 12/26/13  Entered 12/26/13 09:30:03  Page 5 of 19   255
463

1       MR. GORDON:  Just five minutes even.

2       THE COURT:  Ms. Green says five minutes.  Okay.

3       MR. GORDON:  Would that be okay?

4       THE COURT:  On the safe side, we'll reconvene at

5   10:15.

6       MR. GORDON:  Thank you, your Honor.

7       THE CLERK:  All rise.  Court is in recess.

8     (Recess at 10:04 a.m. until 10:15 a.m.)

9       THE CLERK:  Court is in session.  Please be seated.

10  Recalling Case Number 13-53846, City of Detroit, Michigan.

11      MR. MARRIOTT:  Judge, the objectors caucused, and we

12  were in the process of sort of discussing with the debtor a

13  somewhat modified schedule.  Maybe I'll let you know what we

14  were discussing.  Apparently Mr. -- we had hoped that Mr.

15  Orr's deposition could be a day earlier than the 31st if the

16  hearing were going to start on the 2nd because of the

17  intervening holiday and the need to get a transcript and

18  review it and prepare.  Apparently Mr. Orr is not available

19  any earlier than the 31st, so our next proposal was that

20  trial recommence, if it is to recommence, on the 3rd rather

21  than the 2nd.  We don't know, frankly, whether it would

22  conclude the day it started because there's both witnesses,

23  and there is argument, and the debtor is -- has indicated a

24  reluctance to start on the 3rd if it meant we would not

25  finish until the following Monday, but it's the objectors'

13-53846-tjt  Doc 4313-10  Filed 04/29/14  Entered 04/29/14 02:00:23  Page 256 of
13-53846-swr  Doc 2311-10  Filed 12/26/13  Entered 12/26/13 09:30:03  Page 6 of 13    256
463

 1   view that we need at least a business day between Mr. Orr's

 2   deposition and the commencement of the trial.

 3           The other issue that we had which we did not have

 4   the opportunity to raise with the debtor yet but I'll raise

 5   now was a deadline by which if the debtor is going to file a

 6   revised agreement that it be done so, and what we were going

 7   to propose to the debtor was that it be noon on Friday, the

 8   27th.  They have not had a chance to react to that because I

 9   had not communicated that to them.

10           And the third would be that if -- presumably I mean

11   I'll know because I'm in the mediation, but there are parties

12   who are not -- who are objectors that are not in the

13   mediation who will not know whether we come out of Tuesday

14   with a resolution or not, and the third suggestion would be

15   that the debtor communicate by close of business on Tuesday

16   whether it will be filing a revised motion by midday on

17   Friday.  Those were our thoughts.  We've communicated some of

18   them to the debtor but not all.

19           MR. CULLEN:  Your Honor, our main objective here is

20   to get this done as quickly as possible, and if we could get

21   it all done on the 3rd, that would be -- that would be fine

22   with us, but we're -- you know, it's always at my back I hear

23   times winged chariot hurrying near for the city here.

24           And with respect to some indication of where we are

25   at the end of Tuesday, the world probably doesn't end if the

13-53846-tjt  Doc 4311-10  Filed 04/29/14  Entered 04/29/14 02:00:23  Page 257 of
13-53846-swr  Doc 2311-10  Filed 12/26/13  Entered 12/26/13 09:30:03  Page 257 of 19
463
257

1   discussions leaked over or there were things to be done, so I

2   would -- the city would commit to give some kind of a status

3   at that time, and we will certainly --

4           THE COURT:  All right.  But on that I would ask you

5   to communicate to the attorneys who have appeared here in

6   connection with this proceeding but not by filing in the

7   court file.

8           MR. MARRIOTT:  Yes, your Honor.  That would be fine.

9   And in any notice that we give we will attempt to give them

10  sufficient information while not revealing the nature of

11  anything that should remain confidential is still --

12          THE COURT:  Right.

13          MR. MARRIOTT:  -- negotiable within the mediation.

14  With respect to the last date, it's certainly not

15  unreasonable to propose the 27th as an absolute drop dead

16  date.  We'll certainly attempt to have it as soon as we can

17  possibly have it.

18          THE COURT:  Okay.  Regarding the hearing, it doesn't

19  feel likely -- it's possible, but it doesn't feel likely that

20  if we started on January 3rd we would conclude on January

21  3rd.  How much of a problem is that?  As far as I'm

22  concerned, we could continue to Saturday, the 4th.  I don't

23  know about the availability of the building.

24          MR. MARRIOTT:  I'm not allergic to Saturday, your

25  Honor, so that would be -- that would be fine with us as

13-53846-tjt Doc 4311-10 Filed 04/29/14 Entered 04/29/14 02:30:03 Page 25 of 9
13-53846-swr Doc 2311-10 Filed 12/26/13 Entered 12/26/13 09:30:03 Page 25 of 19    258
463

1   well.

2          THE COURT:  Anybody want to be heard about that

3   question?

4          MR. GORDON:  Your Honor, again, Robert Gordon for

5   the record.  If we had to pour over from the 3rd to the 4th

6   on that Saturday, we are amenable to that, so we were fine

7   with that suggestion.

8          If I may raise one other issue that was omitted in

9   the discussion here, but we had the discussion when we

10  caucused, the suggestion that Mr. Orr's deposition should

11  take place in Washington, D.C., where none of the creditors

12  are except for Ambac's counsel pretty much is, I would

13  suggest, offensive to some of us who are here in Detroit.  He

14  is the emergency manager of the City of Detroit.  They have

15  suggested this in the past, and we suggested that he should

16  be here, and we continue to suggest that he should be here.

17  He has accommodated us in the past.  I don't think we should

18  all have to go to D.C., your Honor.

19         THE COURT:  I wondered if you were going to bring

20  that up.

21         MR. GORDON:  Yes, your Honor.  Yes.

22         THE COURT:  What's the issue with D.C.?

23         MR. CULLEN:  We were, your Honor, trying to

24  calculate out the number of participants in this deposition

25  from various places, and we have a lot of New York, we have a

13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 02:00:23  Page 259 of
13-53846-swr  Doc 2311-10  Filed 12/26/13  Entered 12/26/13 09:30:03  Page 25 of 19   259
463

1   lot of Philadelphia, we have some Chicago, and we have one

2   cross-examining party from Detroit.  And the witness has been

3   deposed in both places, Washington and Detroit, back and

4   forth.  It just seemed to us in terms of the overall travel

5   budget of the matter that Washington was as convenient as any

6   other place for the counsel involved.  If it's -- the world

7   doesn't end either way, but that was our thinking.

8           THE COURT:  Thank you, sir.  Anyone else besides Mr.

9   Gordon want to be heard on this?

10          MR. GORDON:  I'll let Mr. Goldberg speak, but I just

11  wanted to clarify there's at least three parties in Detroit.

12  There are the retiree associations, there's Mr. Goldberg, and

13  there's the Retirement Systems, so there's at least three

14  here, your Honor.  And, as I said, other than counsel for

15  Ambac, I don't believe any other counsel is in D.C.

16          MR. GOLDBERG:  Jerome Goldberg appearing on

17  interested party, David Sole.  I also find it offensive that

18  the emergency manager for the City of Detroit -- we have to

19  go to Washington to depose the representative for the City of

20  Detroit, and it's burdensome, and burdens are always

21  relative.  I would submit that the burden on some of us in

22  Detroit is a little greater than the burden that it is on

23  some of these institutions that can afford it more, but more

24  important than that is the fact that he's representing

25  Detroit.  He should be in Detroit.

13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 23:00:23  Page 260 of
13-53846-swr  Doc 2311  Filed 12/26/13  Entered 12/26/13 09:30:05  Page 12 of 15  260
463

1    THE COURT:  I agree.  His deposition should be in

2    the City of Detroit, and the Court so orders.  From the

3    city's perspective, what's the problem with going over to

4    January 7th should January 4th -- I'm sorry -- January 6th --

5    what's the problem with going to January 6th should January

6    4th, a Saturday, not be feasible for the building?

7         MR. HERTZBERG:  Your Honor, Robert Hertzberg, Pepper

8    Hamilton.  It is -- I've been an active participant in this,

9    and I'm not available after that weekend for a week, so the

10   thought was if we started on the 2nd, we would easily be done

11   with the 2nd and with the 3rd available if the Court had that

12   scheduled.  When it became a problem for the objectors that

13   they wanted one business day, the thought was if we pushed

14   over to the weekend.  It happens to be my scheduling problem.

15        THE COURT:  Well, all right.  I will inquire of the

16   building regarding its availability on the 4th, but, frankly,

17   if I'm advised that it will create extraordinary expense for

18   the judiciary to turn the utilities on and have all of the

19   security services available, with all respect to Mr.

20   Hertzberg, we may have to go to Monday, the 6th.  I certainly

21   agree with the objecting parties that with a deposition on

22   the 31st, it is not appropriate to start on January 2nd, so

23   with that one open issue, I think we are in agreement on

24   everything else.  All right.  I trust you'll work out the

25   time of your deposition.  Anyone want to bring up anything

13-53846-tjt   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 261 of
13-53846-swr   Doc 2311   Filed 12/26/13   Entered 12/26/13 09:30:05   Page 11 of 15    261
463

1    further at this time?

2          MR. MARRIOTT:  Can I ask, Judge, where we ended up

3    on the filing of the motion if there's an amended motion to

4    be filed?

5          THE COURT:  I heard that there was a commitment to

6    that.

7          MR. MARRIOTT:  By Friday?  I mean on Friday?  Is

8    that --

9          MR. CULLEN:  You said the 27th; right?

10          MR. MARRIOTT:  Is that the 27th?  Whatever the

11    27th --

12          MR. CULLEN:  Yeah.  Whatever you said, the 27th

13    seems sensible to us.

14          THE COURT:  That's what I heard.  Friday, the 27th.

15          MR. MARRIOTT:  Okay.

16          THE COURT:  All right.  Thank you.  We're in recess.

17          THE CLERK:  All rise.  Court is adjourned.

18      (Proceedings concluded at 10:25 a.m.)

13-53846-tjt  Doc 431-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 262 of
13-53846-swr  Doc 2811  Filed 12/26/13  Entered 12/26/13 09:30:05  Page 12 of 13    262
463

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    December 26, 2013
_____         _____
Lois Garrett

13-53846-tjt Doc 431-10 Filed 04/29/14 Entered 04/29/14 02:00:23 Page 263 of
13-53846-swr Doc 2311 Filed 12/26/13 Entered 12/26/13 09:30:05 Page 13 of 13 263
463

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,       .       Docket No. 13-53846
        MICHIGAN,              .
                               .       Detroit, Michigan
                               .       January 3, 2014
                 Debtor.       .       9:00 a.m.
. . . . . . . . . . . . . . . .

EVIDENTIARY HEARING RE. MOTION OF THE DEBTOR FOR A FINAL
ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 362, 364(c)(1),
 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and
922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING
LIENS AND PROVIDING SUPERPRIORITY CLAIMS STATUS AND (III)
           MODIFYING AUTOMATIC STAY (DKT#1520)

MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING
  THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
    TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
   RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#17)

CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
    ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
    TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
   RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#157)

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:       Jones Day
                      By:  GREGORY SHUMAKER
                           THOMAS CULLEN, JR.
                      51 Louisiana Avenue, N.W.
                      Washington, D.C.  20001-2113
                      (202) 879-3768

                      Jones Day
                      By:  CORINNE BALL
                      222 East 41st
                      New York, NY  10017-6702
                      (212) 326-7844

13-53846-swr  Doc 2447  Filed 01/16/14  Entered 01/16/14 14:14:40  Page 1 of 200
13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 264 of
463                                                                            264

APPEARANCES (continued):

```
For the Debtor:        Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For Ambac              Arent Fox, LLP
Assurance              By:  CAROLINE TURNER ENGLISH
Corporation:           1717 K Street, NW
                       Washington, DC  20036-5342
                       (202) 857-6178

For Syncora            Kirkland & Ellis, LLP
Holdings, Ltd.,        By:  WILLIAM E. ARNAULT
Syncora Guarantee,          RYAN BLAINE BENNETT
Inc., and Syncora      300 North LaSalle
Capital Assurance,     Chicago, IL  60654
Inc.:                  (312) 862-3062

For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For Detroit            Clark Hill, PLC
Retirement Systems-    By:  JENNIFER K. GREEN
General Retirement     500 Woodward Avenue, Suite 3500
System of Detroit,     Detroit, MI  48226
Police and Fire        (313) 965-8300
Retirement System
of the City of         Clark Hill, PLC
Detroit:               By:  ROBERT D. GORDON
                       151 South Old Woodward, Suite 200
                       Birmingham, MI  48009
                       (248) 988-5882

For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  ALFREDO R. PEREZ
Company:               700 Louisiana Street, Suite 1600
                       Houston, TX  77002
                       (713) 546-5040

For David Sole:        Jerome D. Goldberg, PLLC
                       By:  JEROME D. GOLDBERG
                       2921 East Jefferson, Suite 205
                       Detroit, MI  48207
                       (313) 393-6001
```

13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 265 of
13-53846-swr  Doc 2447-10  Filed 01/16/14  Entered 01/16/14 14:44:46  Page 2 of 200
463                                                                         265

APPEARANCES (continued):

```
For FMS                Schiff Hardin, LLP
Wertmanagement:        By:  JEFFREY D. EATON
                       233 South Wacker Drive, Suite 6600
                       Chicago, IL  60606
                       (312) 258-5573


For Detroit Retired    Lippitt O'Keefe, PLLC
City Employees         By:  RYAN C. PLECHA
Association,           370 East Maple Road, 3rd Floor
Retired Detroit        Birmingham, MI  48009
Police and Fire        (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:


For Bank of            Cadwalader Wickersham & Taft, LLP
America and            By:  HOWARD R. HAWKINS
Merrill Lynch          One World Financial Center
Capital Services:      New York, NY  10281
                       (212) 504-6422


For UBS AG:            Bingham McCutchen, LLP
                       By:  JARED R. CLARK
                            EDWIN E. SMITH
                       399 Park Avenue
                       New York, NY  10022-4689
                       (212) 705-7000


For Barclays           Cravath, Swaine & Moore, LLP
Capital, Inc.:         By:  RICHARD LEVIN
                       Worldwide Plaza
                       825 Eighth Avenue
                       New York, NY  10019-7475
                       (212) 474-1978


Court Recorder:        Kristel Trionfi
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068


Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 266 of
13-53846-swr  Doc 2447-10  Filed 01/16/14  Entered 01/16/14 14:14:40  Page 3 of 200    266
463

1        THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Calling Case Number 13-53846, City of Detroit,

3  Michigan.

4        THE COURT:  Good morning.  One second, please.

5  Well, since it's a new day, let's put our appearances on the

6  record, please.

7        MR. SHUMAKER:  Good morning, your Honor, and happy

8  new year.  Greg Shumaker of Jones Day for the City of

9  Detroit.

10       MS. BALL:  Good morning, your Honor.  Corinne Ball

11  of Jones Day also for the City of Detroit.

12       MR. HERTZBERG:  Good morning, your Honor.  Robert

13  Hertzberg, Pepper Hamilton, on behalf of the City of Detroit.

14       MR. CULLEN:  Good morning, your Honor.  Thomas

15  Cullen of Jones Day on behalf of the City of Detroit.

16       MS. ENGLISH:  Good morning, your Honor.  Caroline

17  English from Arent Fox on behalf of Ambac Assurance

18  Corporation.

19       MR. ARNAULT:  Good morning, your Honor.  Bill

20  Arnault from Kirkland & Ellis on behalf of Syncora.

21       MR. MARRIOTT:  Good morning, your Honor.  Vince

22  Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

23       MS. GREEN:  Good morning, your Honor.  Jennifer

24  Green on behalf of the Retirement Systems for the City of

25  Detroit and Robert Gordon on behalf of the Retirement Systems

1   as well.

2          MR. PEREZ:  Good morning, your Honor.  Alfredo

3   Perez, Weil Gotshal, on behalf of FGIC.

4          MR. GOLDBERG:  Good morning, your Honor.  Jerome

5   Goldberg on behalf of interested party David Sole.

6          MR. EATON:  Good morning, your Honor.  Jeffrey Eaton

7   on behalf of FMS from Schiff Hardin.  Thank you.

8          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

9   on behalf of the retiree association parties.

10          MR. BENNETT:  Good morning, your Honor.  Ryan

11   Bennett of Kirkland & Ellis on behalf of Syncora.

12          MR. HAWKINS:  Good morning, your Honor.  Howard

13   Hawkins from Cadwalader on behalf of Bank of America Merrill

14   Lynch.

15          MR. SMITH:  Good morning, your Honor.  Edwin Smith,

16   Bingham McCutchen, on behalf of UBS AG.

17          MR. CLARK:  And, your Honor, Jared Clark, Bingham

18   McCutchen, on behalf of UBS AG.

19          THE COURT:  Are we ready to continue with the

20   witness' testimony?

21          MS. ENGLISH:  Good morning, your Honor.  Caroline

22   English from Arent Fox.  If I could just raise one

23   preliminary matter before we get started this morning -- and

24   by the way, Mr. Hackney is not here regrettably today.  He

25   does send his apologies to the Court that he can't be with

13-53846-tjt   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 23:00:23   Page 262 of
13-53846-swr   Doc 2447-10   Filed 01/16/14   Entered 01/16/14 14:14:40   Page 36 of
463
268

 1   us.  We, the rest of the objector counsel, will do the best

 2   to fill his shoes.  We did take Mr. Orr's deposition on

 3   Tuesday, which was replete with a lot of substantive and

 4   detailed new information that we received, and we just

 5   received that transcript yesterday.  We anticipate that today

 6   his direct examination and cross will also contain a lot of

 7   substantive and detailed information.  The objectors would

 8   like to request that in order to fully synthesize all of this

 9   information and incorporate it into our closing argument

10   presentations, that we'd be able to do those presentations on

11   Monday.  That would also give us the opportunity to get

12   organized among us, make sure we don't duplicate, and so

13   forth.

14        THE COURT:  Is there any objection to that?

15        MR. SHUMAKER:  Your Honor, we were hoping to

16   conclude today if that was possible given the time

17   constraints that your Honor had put on both sides'

18   presentation.

19        THE COURT:  Sir, did you want to be heard on this?

20        MR. GOLDBERG:  Your Honor, I also have a witness,

21   Wallace Turbeville, who I believe would be short testimony,

22   but he was not available today.  He did come out and was

23   prepared to testify when the case was adjourned on December

24   18th.  He could not be available today.  He is available

25   Monday, and if it was possible to bring him, I think he

13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 269 of
13-53846-swr  Doc 2447-0  Filed 01/16/14  Entered 01/16/14 14:10:40  Page 26 of 200
463
269

1    speaks to some of the substantive issues relative to whether

2    a factual predicate could be made on the issues of equitable

3    subordination.

4           THE COURT:  Who is he, please?

5           MR. GOLDBERG:  His name is Wallace Turbeville.  He

6    was a former investment banker for Goldman Sachs, worked in

7    the derivative division, and we would ask to -- you know, we

8    would seek to qualify him as an expert and have provided an

9    expert report, and he has been deposed by the other side as

10   well.

11          MR. HERTZBERG:  Your Honor, Robert Hertzberg.  In

12   regard to Mr. Turbeville, we deposed him.  It was a lengthy

13   deposition.  I assume that the cross-examination by myself

14   and by the swap banks is going to be lengthy.  If he is

15   brought in Monday, then we're going to probably need an extra

16   day then.  I would suggest that he didn't show today.  We all

17   made arrangements to be here today and that we planned on

18   concluding today, we're prepared to close, and that the

19   witnesses should not be allowed on Monday.

20          THE COURT:  Let me ask you to step back to the

21   lectern, sir.  I take it none of the other objecting parties

22   have witnesses, or let me just ask.  Do you?

23          MR. PEREZ:  Your Honor, Alfredo Perez.  I don't have

24   any witnesses, but there are several exhibits that are self-

25   authenticating that I would want to put into the record.

13-53846-swr  Doc 2447  Filed 01/16/14  Entered 01/16/14 14:14:40  Page 7 of 200
463
13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 270 of
270

```
 1        THE COURT:  Okay.  No other witnesses except for
 2   this one.  Well, it really does impose upon everyone here
 3   that he's not here today.  As I previously indicated to you
 4   or think I may have indicated to you, I'm not available
 5   myself beginning on Tuesday of next week, so Monday was going
 6   to be the last day.  How long do you think your direct
 7   examination of him would be?
 8        MR. GOLDBERG:  I don't think my direct would be more
 9   than an hour.  I can't speak to what their cross would be.
10   As they did say, I will acknowledge they did a very lengthy
11   deposition of him.  I just was not able to produce him today.
12   I made an effort to, and I'm just asking -- you know, I
13   obviously respect whatever the Court, you know, deems.  If I
14   could have brought him today, I would have.  He did come out
15   previously and was prepared to testify.
16        THE COURT:  Where is he from?
17        MR. GOLDBERG:  New York.
18        THE COURT:  Well, all right.  Let's hold on all of
19   these questions and see what progress we do make here today,
20   and let's begin with the witness' -- or continue with the
21   witness' testimony.
22        MR. GOLDBERG:  Thank you, your Honor.
23        MR. SHUMAKER:  Thank you, your Honor.  Again, Greg
24   Shumaker of Jones Day for the city.  Your Honor, if I might
25   ask as a preliminary matter, does your Honor have a minute
```

1    tally?

2              THE COURT:  I do.  By my count, the city has 215

3    minutes left and the objecting parties 319.

4              MR. SHUMAKER:  Wonderful.  Thank you.

5              KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

6                        DIRECT EXAMINATION

7    BY MR. SHUMAKER:

8    Q   Good morning, Mr. Orr.

9    A   Good morning, Mr. Shumaker.

10   Q   Mr. Orr, when we were last together on December 18th, you

11   told the Court that you had received legal advice from your

12   lawyers at Jones Day and Pepper Hamilton while you and your

13   team were negotiating the forbearance agreement.  Do you

14   recall that testimony?

15   A   Yes.

16   Q   Did they prepare legal analyses regarding the types of

17   claims that the city had against the swap counterparties or

18   the swap banks for you?

19   A   Yes.

20   Q   Did they prepare memoranda for you?

21   A   Yes.

22   Q   Did they prepare any complaints for you?

23   A   Yes.

24   Q   Were these memoranda and complaints in writing?

25   A   Yes.

13-53846-tjt  Doc 4314-10  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 272 of
13-53846-swr  Doc 2447  Filed 01/16/14  Entered 01/16/14 14:14:40  Page 9 of 200   272
463

1    Q    Did all of the legal advice that you received during the

2    negotiation of the forbearance agreement come in writing?

3    A    No.

4    Q    How else did you get legal advice from your team?

5    A    Via e-mails and through telephone calls.

6    Q    And when was this advice provided to you?

7    A    Advice regarding the potential claims against the swap

8    counterparties was provided to me from the time immediately

9    after I was appointed throughout the time we were negotiating

10   the forbearance agreement.

11   Q    So both before and during the negotiations of the

12   forbearance agreement; is that correct?

13   A    Yes.

14   Q    And in particular, who provided it to you generally?

15   A    Generally, Corinne Ball at Jones Day as well as David

16   Heiman.  I believe there was Joel Telpner in the New York

17   office and later Mr. Hertzberg from the Pepper Hamilton firm.

18   Q    Were there any other firms that gave you advice?

19   A    Jones Day, Pepper -- local -- city's long-time counsel,

20   Miller Canfield, was also involved.

21   Q    Did this advice include the claims that the city might

22   have against the banks that were the swap counterparties?

23   A    Yes.

24   Q    With regard to the swaps and the COPs?

25   A    Yes.

13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 273 of
463
13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 273 of   273

1    Q    How about with regard to the pledge of the casino

2    revenues?

3    A    Yes.

4    Q    Were the claims that they address, that the lawyers

5    address, used to help negotiate the discounts that were found

6    in the original forbearance agreement?

7    A    Yes, I believe so.

8    Q    What were the arguments that the city was using to get

9    the discount percentages in the original forbearance

10    agreement?

11    A    The city's --

12    Q    Let me start with regard to the COPs and the swaps.

13    A    Okay.  The city's arguments generally centered around

14    theories that the underlying agreements, meaning the COPs and

15    the swaps, were void ab initio for a number of different sub-

16    theories and also that they had been fraudulently produced.

17    Q    Let's start with the first there, the void ab initio

18    arguments.  Could you describe for the Court the basis for

19    that claim, the legal basis, if you will, at first?

20    A    Yes.  It was my understanding that the legal basis for

21    the void ab initio claims was that the city did not have the

22    authority to enter into the underlying COPs, 2005 and 2006;

23    that, in fact, state law prohibited the indebtedness as well

24    as the fact that with regard to the swaps itself that they

25    were -- the revenue stream under state law was improperly

 1   dedicated to pay them and that under state law these

 2   underlying agreements were void ab initio.

 3   Q    Okay.  You say state law.  Do you recall which state law

 4   was implicated?

 5   A    Yes.  There was one argument that the Revised Municipal

 6   Finance Act, Act 34 of 2001, was violated because the city's

 7   structure in the 2005 and 2006 COPs was an attempt to do an

 8   end-around that law by interposing the service corporations

 9   and the service contracts.

10   Q    What was the issue with the structure that was used with

11   regard to the COPs and the swaps?

12   A    It was my understanding that Act 34 prohibited the city's

13   borrowing for a number of reasons.  The city had reached its

14   debt limit at that time.  It could not do the direct

15   borrowing because of the revenue stream used to pay, and so

16   the city created a structure whereby the service corporations

17   were put in between the city -- allegedly put in between the

18   city and the borrowing, and that supposedly dealt with the

19   issue under Act 34.

20   Q    And what were the issues that were identified with regard

21   to the service corporations?

22   A    There were issues surrounding the service corporations

23   through creation as independent companies and whether or not

24   that structure actually insulated the city from the

25   restrictions of Act 34, whether or not the service

13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 27 of 200
13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 27 of 200   275
463

 1  corporations were acting independently or were merely an

 2  instrumentality of the city in some fashion, and whether or

 3  not they exercise independent judgment.

 4  Q   If the service corporations were not legitimate, what did

 5  that mean legally?  What was your understanding of what that

 6  meant legally?

 7  A   It was explained to me, and it was my understanding that

 8  if they were not acting legitimately, that the city was

 9  essentially the borrower, and, therefore, the whole structure

10  fell, and, consequently, the underlying COPs were

11  inappropriate and unauthorized and they were void, of no

12  effect.

13  Q   Now, did you conduct or have anyone conduct a factual

14  investigation into this claim --

15  A   Yes.

16  Q   -- this potential claim against the banks?

17  A   Yes.

18  Q   And who did you have undertake that investigation?

19  A   Mr. Hertzberg and his team at Pepper Hamilton.

20  Q   Anyone else?

21  A   Jones Day initially was involved in an investigation.  I

22  believe that -- Miller Canfield as well.

23  Q   Now, what were the results of their factual

24  investigation?  What do you recall were the results of that

25  investigation?

13-53846-swr   Doc 4214-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 27 of 200
13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 27 of 200
463
276

1  A    Well, I recall that it was explained to me that there
2  were serious questions regarding the underlying indebtedness
3  and the structure of the transaction for the COPs; that there
4  were potential claims that the city could bring to invalidate
5  them in their entirety; that they could be void, not
6  voidable, and that there was a claim to be made that the
7  entire transaction would fall.
8  Q    Let me ask you, going a little deeper there, what facts
9  did you learn about the service corporations that were
10 helpful or not so helpful?
11 A    Well, it went back and forth.  On the one hand, there
12 were facts that the service corporations were not truly
13 independent.  There were city employees that were on their
14 boards and directors.  It appears that they took instructions
15 from the city in one fashion.  On the other hand, the service
16 corporations had been constructed, as I understood it, based
17 upon advice of counsel from Lewis & Munday.  There were legal
18 opinions that actually analyzed the structure before it went
19 into place that said that it was valid and appropriate, an
20 qualified opinion that said that it would not violate Act 34.
21 The parties had apparently created it very carefully and very
22 meticulously based upon that legal opinion going forward.  In
23 fact, the legal opinion as well as other facts mentioned that
24 service corporations were authorized by the Home Rule City
25 Act.  The city had in place 21 service corporations in other

1  areas.  In fact, throughout the state they had been used by

2  other municipalities, and so there was a balance between

3  whether or not this was an inappropriate use of the service

4  corporations or an entirely appropriate use of the service

5  corporations based upon the legal analysis of counsel back in

6  2004 and 2005.

7  Q   When did you learn about the operations of the service

8  corporations?

9  A   Well, I learned that the service corporations were there

10  principally to facilitate the transaction and that they met

11  all of the legal rules of having by-laws and articles, so on

12  and so forth.  They were a little skinny on the operating

13  rules in terms of having minutes and board minutes and things

14  of that like, so while they were structured appropriately, it

15  was unclear that they were operating appropriately.

16  Q   How about with regard to the City Council?  Did they have

17  any involvement in the service corporations?

18  A   Yes.  There was a strong debate at City Council about the

19  appropriateness of the COPs.  At the time in 2005 and again

20  in 2006 there were briefings.  City Council actually approved

21  and authorized a transaction by City Council ordinance.

22  Despite those debates, the transactions went forward, both

23  2005 and 2006.

24  Q   And after this investigation was conducted, what did you

25  view as the strengths of the void ab initio claim?

1  A    I viewed that there were strong claims that the service

2  corporation structure was designed to circumvent Act 34 as a

3  matter of law and that there were serious questions about the

4  appropriateness of the swaps -- of the COPs and, therefore,

5  the swaps.  I also understood that under the Home Rule City

6  Act, service corporations were specifically authorized.  They

7  had been -- the structure had been created and it tracked

8  fairly closely the advice of counsel that had been given to

9  the city, city's long-time counsel at Lewis & Munday, several

10 opinions, as a matter of fact, that it was appropriate; that

11 the city, in fact, had borrowed $1.44 billion to fund the

12 pensions, so they actually had gotten value in that

13 structure; and that despite some of the concerns about the

14 structure, specifically with the swaps, at least for the 2005

15 series, the city had made a profit.  It made in the span of

16 eight months about $40 million, tens of millions of dollars,

17 so that although the structure was questionable with regard

18 to the swaps, the city actually functioned and the city

19 actually made money.

20 Q    And based upon all that you learned from the fact

21 investigation and from your lawyers, what did you view -- how

22 did you view the chances of success on the void ab initio

23 claim?

24 A    The chances were debatable in that there were strong

25 arguments or arguments to be made that the service

13-53846-swr   Doc 4710   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 279 of 200
13-53846-swr   Doc 4710-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 279 of 200   279
463

1   corporations were inappropriate, but then there were clear

2   facts that they were authorized.  They were approved by City

3   Council, authorized by state law, approved by City Council,

4   were authorized pursuant to the recommendation of unqualified

5   legal opinion of the attorneys, and the structure itself

6   actually performed, made money for the city.  As a

7   consequence, I viewed the claims as more or less 50/50.

8   There were strong legal arguments, but there were also

9   countervailing factual arguments.

10  Q   Let me ask you about the fraud -- potential fraud claims

11  that you say were identified.  What was your understanding?

12  What was the basis for a potential fraud claim?

13  A   Well, there were a number of legal theories that were

14  discussed under a potential fraud claim, but the general

15  basis was that the counterparties -- excuse me -- to the

16  swaps had superior knowledge than the city, and in designing

17  the transaction and making representations to the city that

18  the transactions were low risk, that they would be beneficial

19  and an adequate hedge against interest rate variability for

20  the city, that they knew or should have known that that was

21  inaccurate; that these were very potentially volatile

22  instruments, could expose the city to a lot of damages both

23  on the interest rates and that they'd designed more or less a

24  ticking time bomb into the structure; that by designing the

25  termination fee to be based upon the interest rate

```
 1    fluctuation, but to also be linked to the potential credit
 2    rating of both the COPs and the COPs' insurers, that if that
 3    rating went down, it gave the counterparties the option to
 4    declare a termination event and saddle the city with a very
 5    large termination fee.
 6              There was also a concern that the counterparties at
 7    some of the times that were related to these transactions had
 8    engaged in fairly well-publicized LIBOR price fixing.  UBS,
 9    in particular, had admitted impropriety in a multi-country, I
10    believe, settlement with Department of Justice, a U.K.
11    regulator, I believe a Swiss regulator as well; that some of
12    their offices around the world had engaged in inappropriate
13    LIBOR price fixing and that consequently the structure they
14    created -- there is an argument that they fraudulently
15    created it so that they could reap a profit from the city by
16    manipulating the LIBOR rate.
17  Q    Did you have a factual investigation conducted into these
18    kinds of fraud claims?
19  A    Yes.
20  Q    And by whom?
21  A    By the same attorneys, those at Pepper Hamilton, to an
22    extent Jones Day, Miller Canfield.
23  Q    Was there anything specific to the city in terms of the
24    facts that concerned you regarding the city's relationship
25    with the swap banks?
```

1   A   Yes, on both sides.  On the one hand, here again, the

2   city's then chief financial officer that had very strongly

3   advised for the city to enter into these transactions

4   eventually took a job -- senior level job at one of the

5   counterparties; that some on the City Council had had a

6   strong debate --

7           THE COURT:  Who was that, sir?

8           THE WITNESS:  Pardon me, sir.

9           THE COURT:  Who was that?

10          THE WITNESS:  That was Sean Werdlow, your Honor, had

11  taken that position.  The City Council -- some City Council

12  persons, in particular, had strongly opposed it.  Eventually,

13  I believe, they passed it on a majority vote -- I believe it

14  was six to three -- and, in fact, had enacted two

15  ordinances -- or enacted an ordinance supporting it.

16  BY MR. SHUMAKER:

17  Q   Do you know how the factual investigation was conducted?

18  A   Well, I don't know the exact details of it, but my

19  understanding is that the attorneys pored over a number of

20  documents, went through a number of city records, looked over

21  a number of public filings to both examine the LIBOR scandal,

22  looked over United States filings.  I believe there was some

23  investigation into Federal Reserve reports that compared, for

24  instance, at Bank of America its stated LIBOR rate that it

25  was making overseas as opposed to its Eurodollar rate that

13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 282 of
463
13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 282 of 282

 1    was being reported here in the Federal Reserve and that there

 2    was a difference.  The two should track, but there was a

 3    difference between the two, so my understanding was that the

 4    investigation focused principally on a lot of documentation

 5    and other federal records as well as the -- I'll call it a

 6    plea agreement, but the agreement that was entered into with

 7    the Department of Justice and the overseas regulators.

 8    Q    Based on what you learned from this investigation, what

 9    did you consider the strengths and weaknesses of the fraud

10    claims to be?

11    A    I considered there to be strong -- I say strong, but the

12    LIBOR bid rigging scandal with UBS and what appeared to be

13    involvement by Bank of America based upon the analysis of the

14    interest rate spreads was certainly an indication of a fraud

15    claim.  On the other hand, the fact that the city had

16    approved the transaction, again, the swaps and the COPs

17    transaction; the fact that after their own investigation the

18    city's resistance -- they'd approved it on a six to three

19    vote, majority vote; the fact that here again they had

20    received legal advice as to the appropriateness of the

21    transaction and had passed an ordinance to approve it said

22    that the balance between the two raised serious questions

23    about whether or not you would prevail on a claim.

24    Q    Was there anything that you recall that indicated that

25    the city may have benefitted from the swaps?

1    A    Yes.

2    Q    What was that?

3    A    Well, it appeared that the city, as I said before, made

4    tens of millions of dollars on the swaps initially and, in

5    fact, on the contract it was paying out a great deal of

6    money, but there appeared to be some benefit to the city.

7    Q    And when you say "initially," what time frame are you

8    talking about?

9    A    2005, 2006.

10   Q    And based on all of this, what did you view the chances

11   of success on a fraud claim?

12   A    Here again, I viewed -- while there were certainly

13   arguments that could be made going forward that the fraud

14   claim, unlike the ab initio, also was factually intensive,

15   there were facts, as with any claim, that we did not know and

16   would not know until we pursued litigation, sometimes costly

17   and expensive litigation that would take a long period of

18   time.  There was certainly the risk that we would even have

19   to go overseas to potentially pursue some of the facts if we

20   were to litigate the question and incur the expense of doing

21   that, perhaps millions or tens of millions of dollars in

22   expense, and so on balance the thought was that certainly

23   these questions arose, and the conduct of UBS -- the admitted

24   conduct of UBS, in particular, and the -- what appeared to be

25   the conduct of Bank of America raised serious questions.  The

13-53846-swr   Doc 4710   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 28 of 200
13-53846-swr   Doc 4710   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 28 of 200   284
463

1   issue of the factual analysis and the city's approval of the
2   transactions, again, raised questions about whether or not we
3   would ultimately prevail.
4   Q   Now, you've testified before to the Court about what
5   we've referred to as the casino revenues.  You recall that
6   testimony?
7   A   Yes.
8   Q   Did your advisors identify any claims relating to the
9   casino revenues?
10  A   Yes.
11  Q   And what were those claims?
12  A   Under the state's Gaming Act, there was an argument that
13  the pledge of the casino revenue in 2009 to -- as collateral
14  for the COPs was inappropriate under Section 12 of the Gaming
15  Act.  It was my understanding there were certain limited uses
16  of the gaming revenue -- approved uses by state law and that
17  there was an argument that to pledge it for collateral was
18  inappropriate.
19  Q   Do you recall why it was inappropriate to pledge the
20  collateral in this manner?
21  A   Yes.  It was my understanding with counsel that there
22  were certain specified uses under the Gaming Act generally
23  for programs, street patrol officers, educational programs,
24  or improve the quality of life in the city; that it did not
25  specify the use of gaming revenue as collateral for an

1  unrelated debt.

2  Q   Now, did your team conduct a factual investigation into

3  this particular claim?

4  A   Yes, they did.

5  Q   And who conducted that investigation?

6  A   Here again, principally Pepper Hamilton, but Jones Day

7  and Miller Canfield were involved as well.

8  Q   Could you share with us what the factual findings were of

9  that investigation?

10  A   Yes.  They found that there was questions raised about

11  the pledge of the casino revenue as collateral, but they also

12  found that there were another legal opinion by counsel that

13  it was an appropriate pledge of collateral and that the City

14  Council, I think, passed two ordinances with regard to the

15  2009 pledge, one finding that it was an appropriate use of

16  funds, another finding the legislative history behind it and

17  that, in fact, the pledge was designed to meet one of the

18  requirements under the Gaming Act.  I don't remember the

19  exact section, but that it was an appropriate use to enhance

20  the quality of life for the citizens of the city.

21  Q   Do you recall whether the factual investigation uncovered

22  any evidence that the state was aware of the pledge of the

23  casino revenues?

24  A   Yes.

25  Q   And what was that?

1    A    There was a letter from the Gaming Board, state Gaming

2    Board, where the city had sent -- apparently had sent to the

3    state an explanation of the structure of the transaction, and

4    the state had written back saying that they didn't see any

5    problems with the structure or that the parties did not have

6    to apply for a license.

7    Q    Based upon these facts and the legal arguments that you

8    were apprised of, how did you view the strengths and

9    weaknesses of this potential claim under -- relating to the

10   Gaming Act and the pledge of the casino revenues?

11   A    Here again, there were arguments to be made that under

12   the plain language of the Gaming Act the pledge of the casino

13   revenue as collateral was inappropriate and unauthorized, but

14   there were also arguments to be made that based upon advice

15   of counsel, the City Council approving the transaction and

16   adopting two ordinances in connection with the transaction

17   attempting to specify why it met the requirements of the

18   Gaming Act, the state, having had an opportunity to weigh in

19   and point out inappropriateness -- any inappropriateness,

20   actually declined to do so and essentially approved the

21   transaction without the structure of it, without the actual

22   transaction itself, raised serious questions about whether or

23   not you would ultimately prevail.

24   Q    Based on all that you learned, how did you view the

25   chances of success of such a claim?

1    A    I felt that there were arguments to be made clearly that

2    the pledge of the casino revenue was inappropriate and was

3    fraudulently induced perhaps, but, on the other hand, there

4    were all these other factors which appeared to suggest that

5    the city and the organizers of the pledge took great pains to

6    make sure that it was appropriately structured and that

7    parties that had an opportunity to weigh in both at the city

8    and the state level to say that it was unappropriate did not.

9    In fact, they raised no concern.

10    Q    Did you identify or did your team identify any other

11    claims relating to the casino revenues?

12    A    Yeah.  There were potential claims, without going into

13    the actual theories, surrounding the -- whether or not the

14    revenue was appropriately used.

15    Q    Was there anything relating to how the casino revenues

16    might be treated under the Bankruptcy Code?

17    A    Yes.

18    Q    And what was that?

19    A    Well, there was a discussion as to whether or not these

20    revenues would be classified as special revenues, and,

21    therefore, it is my understanding entitled to certain

22    treatment under the Bankruptcy Code as an after-acquired lien

23    and that the interest of the counterparties would continue

24    even after a petition date and have a security interest.  I

25    believe in 1999, even before the current situation, the City

1  Council had passed an ordinance classifying casino revenue as

2  excise taxes, and there was an argument to be made that they

3  would qualify as special revenues.

4  Q   Now, you pointed out that -- what the opinion said.  I

5  take it that you had a factual investigation conducted in

6  connection with this claim; is that right?

7  A   Yes.

8  Q   And who conducted that investigation?

9  A   Here again, that was conducted by the city's attorneys,

10  Pepper Hamilton, Jones Day, and Miller Canfield.

11  Q   And what other facts do you recall relating to the claim?

12  A   Here again, there was another legal opinion from a well-

13  known firm, Orrick, which specifically addressed the

14  bankruptcy question and found that -- I believe the statement

15  in one of the paragraphs of that opinion was that upon

16  briefing, a fact-finder would conclude that these qualified

17  as special revenues entitled to the protection in the

18  Bankruptcy Code.  There was -- there were, as I said, the

19  ordinance before in 1999 and the city's behavior as if they

20  did qualify in that regard as excise taxes.

21  Q   You say 1999.  Could you --

22  A   Um-hmm.

23  Q   Could you be mistaken on the date?

24  A   I think there was one -- I think I saw one City Council

25  ordinance.  I could be mistaken on the date.  I think it

1   was --

2   Q   How about 2009?

3   A   Maybe it was -- maybe it was two -- I'm sorry.  Maybe it

4   was 2009.

5   Q   Just wanted to be clear.

6   A   Thank you.

7   Q   Based on the factual investigation and what you learned,

8   how did you view the strengths and weaknesses of this claim

9   relating to whether the casino revenues qualified as special

10  revenues under the Bankruptcy Code?

11  A   For all the arguments, again, that these casino revenues

12  were not special revenues under the Code, it was a little bit

13  involved, and I relied on counsel to a degree, but here we

14  had the advice of counsel, a legal opinion, strong legal

15  opinion again.  At each of these stages, there were legal

16  opinions supporting the structure that went through the

17  rationale, their analysis that specifically the City Council

18  attempted to treat these casino revenues as excise taxes

19  unrelated to the emergency management or this bankruptcy.

20  This happened prior to that; that the parties appeared to

21  work very hard to try to create a structure that certainly

22  raised questions in everybody's minds, but they did at each

23  stage -- they did it very carefully and meticulously with

24  advice of counsel -- that there was a question whether or not

25  we would prevail.

1   Q    Excuse me.  After considering these strengths and

2   weaknesses and the facts that you were apprised of, how did

3   you view the chances of success of such a claim?

4   A    I tried to balance the probability that on these claims

5   there'd be more factual investigation; that there were

6   certainly arguments that casino revenues did not qualify as

7   special revenues, but weighed against those arguments were my

8   understanding from counsel that excise taxes were

9   specifically included in the definition of special revenues

10   in the Bankruptcy Code and that the intent of the parties was

11   that the lien of the counterparties would continue even if

12   there was a bankruptcy event and that they relied on advice

13   of counsel to create the structure and also secure the

14   alleged security interest.

15   Q    So aside from bringing these claims that you've

16   described, the void ab initio claims or the fraud claims

17   relating to the COPs and the swaps or the pledge or special

18   revenues arguments relating to the casino revenues, did you

19   consider taking any other courses of action in connection

20   with the swaps and the COPs or the casino revenues in the

21   May, June time frame?

22   A    Yes.

23   Q    And what were those?

24   A    We considered, one, doing nothing, continuing the status

25   quo, but our projections showed that that was -- would be

 1  fairly catastrophic to the city; that we were running out of

 2  money.

 3  Q   I wasn't clear.  What projections are you talking about?

 4  A   Cash flow projections that we would get from the

 5  investment bankers and Ernst & Young.  We considered

 6  litigation, had to factor in the potential length of time and

 7  the out-of-pocket expense of the city, which could be

 8  millions of dollars per year, even tens of millions of

 9  dollars in total as the years went on.  I think there was

10  also a provision in the collateral agreement that if we did

11  not prevail we'd be responsible for the attorneys' fees of

12  the other side as well.  We considered whether or not I could

13  exercise my authority under 436.  There's a provision in 436

14  where I can invalidate contracts in and of themselves

15  administratively as the emergency manager and whether that

16  would be appropriate to revoke what were the -- they were

17  called the irrevocable letters of instruction both to the

18  casinos as well as to U.S. Bank as trustee, but the risk of

19  taking that course of action was that we would probably

20  create litigation anyway; that people would not stand by if I

21  sought to revoke those letters and inform the casinos and

22  U.S. Bank to start paying all the revenue directly to the

23  city, and we considered the risk of even some sort of

24  structured litigation just going after initial claims maybe

25  on a summary judgment motion but as well as full-blown

1   litigation going forward.

2   Q   I'm sorry.  You talked about the irrevocable

3   instructions.  Could you elaborate on what the irrevocable

4   instructions were?

5   A   Yes.  It was my understanding in connection with the 2009

6   collateral agreement the city issued -- caused to be issued

7   irrevocable letters of instruction to the casinos that they

8   would pay the casino revenue to the trustee, and there was a

9   mechanism, which may have been discussed earlier -- a

10  mechanism that allowed a certain amount of money to be swept

11  on a daily basis and paid on the 1st to the city, then on the

12  15th paid into an account where the trustee would notify the

13  city typically at the end of the month that it had an

14  obligation to pay a certain sum, about $4 million a month,

15  back into a holdback account, and then the trustee would

16  release the rest of the revenue for that month to the city,

17  and those letters of instruction instructed the casinos how

18  to participate in that mechanism.  And there was another

19  letter -- letters of instruction which instructed the bank

20  that it was to continue this process, this structure,

21  until -- unless and until the counterparties authorized them

22  to stop, so that's why they were called irrevocable letters

23  of instruction.

24  Q   Thank you.  You indicated that you considered litigation.

25  Did you have complaints prepared during this time period?

1    A    Yes, yes.

2    Q    And by whom?

3    A    Pepper Hamilton, Mr. Hertzberg's team.

4    Q    Did you consider at any time talking to other third-

5    parties or agencies about what could be done about the COPs,

6    the swaps, the casino revenues?

7    A    Yes.

8    Q    What was that?

9    A    I actually spoke with the Security and Exchange

10   Commission about the transaction and whether there was -- if

11   we were going to go into litigation, there was an opportunity

12   to have some federal investigation and prosecution.

13   Q    Do you recall when you talked to the SEC?

14   A    I don't.  It was generally in this time frame.  It might

15   have been later.

16   Q    Now, you on the 18th previously testified that the

17   negotiations for the initial forbearance agreement took place

18   in late May through early June until an agreement in

19   principle was hammered out; is that correct?

20   A    Yes.

21   Q    And Mr. Buckfire was the lead negotiator for that effort;

22   is that right?

23   A    Yes.

24   Q    And Ms. Ball and other Jones Day lawyers were the lead on

25   the legal side; is that right?

1   A   Yes.

2   Q   To your knowledge, were the legal claims that you've

3   described this morning for the Court ever communicated to the

4   swap banks during the negotiations of the forbearance

5   agreement?

6   A   Yes.  It was my understanding that while the negotiations

7   had gotten heated in the June 10th through the June 14th time

8   frame on the business side with Mr. Buckfire and myself in

9   those days leading up to the June 14th presentation, that,

10  likewise, on the legal side for some time my attorneys had

11  been in pretty strong negotiations with the attorneys, I

12  believe, at Cadwalader representing -- and other firms

13  representing the counterparties.

14  Q   Which attorneys on your team were doing that?

15  A   Ms. Ball, Corinne Ball; David Heiman; I believe Joel

16  Telpner out of the New York office; and later Mr. Hertzberg.

17  Q   Why did you have them do that --

18  A   Well --

19  Q   -- the claims to the swap banks?

20  A   Well, we wanted to make sure that the counterparties were

21  aware we were prepared, if negotiations broke down, to pursue

22  litigation; that we had thought about the litigation; and

23  that we were not, in a sense, bluffing.  If things did not

24  result in a settlement, we were going to have to pursue

25  litigation.  We didn't have a choice.

1  Q   Were you hoping that those -- the communication of those

2  claims would somehow affect the discount percentages?

3  A   Yes.

4  Q   Why was that?

5  A   Well, my understanding was initially the counterparties

6  took a fairly strong position that they had a secured

7  interest.

8          MS. ENGLISH:  Objection, your Honor.  I believe

9  Mr. Orr is now starting to testify about what his attorneys

10  told swap counterparties in conversations and discussions

11  that he was not present at, so I have an objection on hearsay

12  grounds.

13          THE COURT:  The objection is overruled.  You may

14  proceed, sir.

15          THE WITNESS:  It was my understanding that the swap

16  counterparties felt strongly that they had a secured

17  interest -- certainly that's what I experienced on the

18  business side -- and that this whole structure had been

19  vetted and approved by all parties at the time it was entered

20  into and that parties had been performing for years under it

21  and that they felt they had a strong legal position.  And we

22  wanted to make sure that they understood that we felt,

23  despite the performance of the parties and the legal opinions

24  and approvals before, that we believe there was an

25  opportunity for us to litigate that issue and perhaps

1 undermine the security interest.

2 BY MR. SHUMAKER:

3 Q   Now, if the city had filed those claims, there were

4 significant upsides for the city; correct?

5 A   Yes.

6 Q   What were those upsides?

7 A   The upsides were as great as invalidating the entire

8 transaction, recovering all payments that had been made over

9 those years, particularly under the swap contract going

10 forward and perhaps even recovering damages.

11 Q   And you said invalidating the swaps.  What would that

12 have meant for the city?

13 A   Well, it would have gotten the city out from under the

14 termination fee risk.  It would have released the lien on the

15 casino revenue.  It perhaps would have allowed the city to

16 recover tens of millions or hundreds of millions of dollars

17 in the payments that it made throughout the life of the

18 swaps.

19 Q   Were there downsides to pursuing litigation?

20 A   Yes.

21 Q   What were they?

22 A   The downsides were if we did not prevail that the swap

23 contract, for instance, would have been validated.  The city

24 would have had an obligation and a termination event

25 because -- my point was a termination event -- there are a

1   number of other termination events -- that they would have

2   had an immediate obligation to pay hundreds of millions of

3   dollars to the swap counterparties.  We would have incurred

4   the litigation expense, out-of-pocket expense of that

5   litigation.  We would have had an obligation to pay the

6   litigation expense perhaps of the counterparties as well and

7   that, more importantly, frankly, from the city's perspective,

8   the single largest most secure source of revenue for the city

9   would have been imperiled, and we would have not had

10  stability in the city's finances or an ability to both plan

11  operationally strategically for the city or in any other

12  manner.

13  Q   Did you have any understanding of how long it might take

14  to pursue this kind of litigation?

15  A   Yes, generally.  With most litigation it's -- someone

16  said about war, you know, the best laid plans go to "H" after

17  the first shot, and with litigation you can have strategies

18  and plans in place, but litigation sometimes takes on a life

19  of its own despite what you think you're going to do, so part

20  of the risk that I was trying to assess with the advice of my

21  counsel was if we pursued it, what was the probability that

22  we were going to be able -- the likelihood that we were going

23  to be able to stabilize the city's finances during the course

24  of litigation.

25  Q   You mentioned the potential cost of such litigation.

 1  What was your understanding of how much it might cost and
 2  based on what?
 3  A    Well, suffice it to say that the counterparties are
 4  sophisticated counterparties with excellent legal counsel.
 5  They have the finances and the wherewithal to fund litigation
 6  to defend.  They certainly have the ability to pursue
 7  defenses and perhaps claims against the city.  The city would
 8  be up against a well-financed adversary or adversaries.  The
 9  cost to the city, while they were estimates, could be a
10  million dollars a month on average.  Even half a million a
11  month was somewhere between six to $12 million a year to the
12  city.  If they prevailed, in addition to the termination fee,
13  we'd have an obligation to pay those legal fees.  If it went
14  over for a period of years, those years were years that we
15  would not be able to use a portion or maybe some of that
16  revenue to stabilize the city's finances or to get to the
17  reinvestment and reform that we're trying to get to now.  We
18  certainly would not be able to push out a plan of reinvention
19  for the city during this time if the litigation didn't stay
20  the trap of the casino revenue.
21  Q    Did you consult with your lawyers regarding how much the
22  litigation might cost?
23  A    Yes.
24  Q    How about the duration of litigation?  Did you discuss
25  that with your lawyers?

1  A   Yes.

2  Q   What would happen -- what would the consequences be if

3  the city lost on the legal claims you've described?

4  A   The consequences would be quite severe.  The casino

5  revenue approaches $200 million on a billion dollar budget.

6  Our tax revenue we hope to maintain at a steady state, but 20

7  percent of the city's budget could go away.  If that happened

8  to the city, you could not cut enough services.  The city is

9  down from a high in 2000 of roughly 22,000 FTE's to about

10 9,600.  You can't cut -- you can't cut any more to make up

11 $200 million in losses.

12 Q   Does the forbearance agreement or the agreement that

13 you're asking the Court to approve, does it settle the legal

14 claims that you've described here this morning against the

15 swap banks?

16 A   Yes.

17 Q   If the forbearance agreement is not approved, do you

18 understand what will occur vis-a-vis the parties?  When I say

19 "the parties," I mean the city and the swap banks.

20 A   Well, the parties revert back to the status quo prior to

21 the forbearance agreement, and the city remains at risk of

22 a -- of having to deal with a termination event payment.

23 Q   Now, do you recall when you signed the initial

24 forbearance agreement?

25 A   Yeah.  Approximately back some time ago, in June, I

1   believe.

2   Q   June or July?

3   A   July, yeah.  I believe it was July, yeah.

4   Q   And do you believe that that forbearance agreement was in

5   the best interest of the city?

6   A   Yes.

7   Q   On December 18th, you were initially testifying about

8   that forbearance agreement that was executed in July, and you

9   explained the discount percentages to the Court.  Do you

10  recall that?

11  A   Yes.

12  Q   Do you recall the range of 75 to 82 percent?  Does that

13  sound familiar?

14  A   Yes.

15  Q   At the Court's suggestion, you reopened negotiations with

16  the swap banks in connection with mediation; correct?

17  A   Yes.  We were ordered to mediation.

18  Q   Did you discuss the potential legal claims that the city

19  might have against the swap banks with your counsel before

20  these renegotiations?

21  A   I discussed them before the renegotiations and during the

22  mediation.

23  Q   Did you share or explain these legal claims with the

24  mediators?

25  A   Yes.  Generally, yes.

13-53846-swr   Doc 4214-10 Filed 01/10/14 Entered 01/10/14 14:24:00 Page 301 of 200
13-53846-swr   Doc 4214-10 Filed 01/10/14 Entered 01/10/14 14:24:00 Page 301 of 200   301
463

1   Q    And why did you do that?

2   A    The mediation is confidential, but I did that to relay --

3   we did that in the room to relay to the mediators that we

4   felt, here again, that there were arguments to be made

5   against the swap counterparties and their interest and to

6   make sure they understood that, you know, we -- in these

7   renegotiations there were reasons -- good reasons for us to

8   renegotiate the percentages that we originally agreed to.

9   Q    How were the negotiations conducted in the course of the

10  mediation?

11  A    There was one plenary session for five to ten minutes on

12  the morning of the 23rd.  Then the parties -- each of the

13  groups, the city, the counterparties, I assume -- I didn't

14  see them go into a separate room, but I assume the insurers

15  and some of the creditors went out into separate breakout

16  rooms.  The mediators would shuttle back and forth between

17  the parties during the day.

18  Q    Did you negotiate the new agreement directly, or was that

19  done by the mediators?

20  A    That was done by the mediators.

21  Q    And a new agreement was reached; correct?

22  A    Yes.

23  Q    And what -- if you will, could you share the terms of

24  that new agreement with the Court?

25  A    Yeah.  The substantive terms essentially mean the same.

1    The number for the termination fee payment went down to a

2    whole number of $165 million.

3    Q    Now, I'd like to show you Exhibit 141 if I could.  Well,

4    let me --

5            MR. SHUMAKER:  Before you put it up -- before you

6    put it up -- your Honor, this is the sixth amendment to the

7    forbearance agreement.  It has not been admitted into

8    evidence, so I don't want to show the witness yet.  And I'm

9    not sure whether the objectors have any objection to its

10   being admitted into evidence.

11           THE COURT:  Are you offering it?

12           MR. SHUMAKER:  Yes, your Honor, we are.

13           MS. ENGLISH:  We have no objection.

14           THE COURT:  All right.  Exhibit 141 is admitted.

15           MR. SHUMAKER:  Thank you, your Honor.

16      (City Exhibit 141 received at 9:55 a.m.)

17   BY MR. SHUMAKER:

18   Q    Mr. Orr, could you take a look at Exhibit 141 there and

19   tell us whether you recognize that document?

20   A    Could we --

21           MR. SHUMAKER:  Can you flip to the next page, too,

22   Steve --

23           THE WITNESS:  Next one.

24           MR. SHUMAKER:  -- and the next one?

25           THE WITNESS:  And the next one.

1    THE COURT:  And one more.  Okay.  And there may be

2    another one.

3    THE WITNESS:  Yes.

4    MR. SHUMAKER:  Okay.

5    THE WITNESS:  Okay.  Yes.  I recognize the exhibit.

6    BY MR. SHUMAKER:

7    Q   Okay.  And what is it?

8    A   It's the sixth amendment to the forbearance and optional

9    termination agreement.

10   Q   Okay.  And, again, you talk that -- talked about this

11   agreement having a new number and new terms.  Can you share

12   with the Court or summarize for the Court what the terms are

13   of this sixth amendment?

14   A   Yeah.  Generally the terms remain the same.  It reduces

15   the amount of the termination fee payment by $65 million to a

16   whole number -- set number of $165 million, and it extends

17   the time to execute on the agreement until, I believe,

18   further down, January 31st, 2014.

19   Q   Now, the new number is a fixed number, as you say;

20   correct?

21   A   Yes.

22   Q   Why was a fixed number negotiated when the prior

23   agreement, which is in the original forbearance agreement,

24   that was based on discount percentages?  Was that done?

25   A   The original agreement was negotiated at arm's length

13-53846-swr   Doc 4244-10 Filed 01/10/14 Entered 01/10/14 22:00:23   Page 36 of 200
13-53846-swr   Doc 4244-10 Filed 01/10/14 Entered 01/10/14 22:00:23   Page 36 of 200
463
304

 1  bilaterally between the parties, and the general concern was
 2  that there be a percentage reduction to allow the interest
 3  rate float to occur in the agreement but based on percentages
 4  so that the parties at some way were still bound to the
 5  benefit of their bargain, what they had negotiated.  During
 6  the course of the day in the mediation, we at the city
 7  decided that it was best that we were going to try to finally
 8  bring this to a close, that we not be subject to market rate
 9  fluctuations and that we get to a set number so that that
10  number is firm irrespective of whether interest rates go up
11  or interest rates go down, that we have a firm number that we
12  can plan on and that we can adjust, and the mediators in the
13  afternoon came back to us and said that was the best possible
14  result we could achieve is going to a whole number.
15  Q   Could you -- and the whole number was 165 million?
16  A   Yes.
17  Q   How did you -- could you explain to the Court how that
18  figure was arrived at?
19  A   Yes.  We sat in a room for several hours during the
20  morning.  The mediators came in, Judge Perris, Judge Rosen,
21  late morning, asked us what we thought would be a fair
22  number.  We gave it to them.  Several hours passed.  I think
23  we broke for lunch.  They came back again that afternoon and
24  said that we weren't going to be able to achieve the number
25  that we wanted based upon their discussions with the

13-53846-swr   Doc 4214-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 30 of 200
13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:14:40   Page 2 of 200   305
463

 1  counterparties and that the best number -- I'm not sure they
 2  gave us all the reasons, but the best number we could hope to
 3  achieve was roughly $165 million.  There was some discussion
 4  about whether or not that would be a fixed number or we would
 5  have a percentage.  We called our investment bankers to try
 6  to get some idea about what market interest rates were doing
 7  and what the trend might be during the course of the coming
 8  weeks.  We initially rebuffed that number.  I believe the
 9  mediators came back in and strongly suggested that was the
10  best number we were going to achieve in this process or we
11  were headed to perhaps months if not years of litigation.  We
12  counseled amongst ourselves, said we would accept the number
13  but only as a whole number, only as a fixed rate.  Towards
14  eight o'clock at night the mediators called us into a room
15  with the counterparties on the other side to make sure
16  everybody understood that we were dealing with a fixed
17  number, this was going to be a net to the city and that that
18  was the final agreement.
19  Q   And what was your initial proposal to the mediators for
20  the banks?
21  A   Our number?
22  Q   Yeah, the initial range.
23  A   Initial range was 145 to 150 million.
24  Q   And that's the number you did not -- were not able to
25  get?

13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 306 of 306
13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 306 of 306
463
306

1    A    Yes.

2    Q    Do you believe that the new agreement is a better

3    agreement for the city?

4    A    Yes.

5    Q    Why?

6    A    It's $65 million less than the original agreement, which

7    is significant to the city.  We will reduce the post-petition

8    financing requests that we have from our -- for our lenders

9    as a consequence.  That's less debt to the city.  It reduces,

10   again, for all the reasons before -- our interest expense is

11   based on an $800 million notional amount in the original

12   document.   It reduces to the actual interest of this amount

13   of the post-petition financing.  It finally resolves this

14   issue, the whole sordid tale of the swaps, once and for all.

15   It relieves us of potential litigation expense as well and

16   actually reduces our interest carry from roughly 50 million a

17   year to somewhere in the neighborhood of 15 to $16 million a

18   year depending upon what eventually we get, and it provides

19   us, more importantly with the city, an opportunity to finally

20   do some reasonable strategic planning based upon a certain

21   revenue stream for years to come so that we can get to the

22   reinvention plan that we're trying to push out.

23   Q    So do you believe this new improved agreement is in the

24   best interest of the city?

25   A    Yes.

13-53846-swr  Doc 2247-10  Filed 01/10/14  Entered 01/10/14 14:24:00  Page 436 of 200
13-53846-swr  Doc 2247-10  Filed 01/10/14  Entered 01/10/14 14:24:00  Page 436 of 200
463
307

1   Q   I want to ask you a few questions about the post-petition

2   financing.  When you signed the forbearance agreement, the

3   initial forbearance agreement, in July, the city did not have

4   the money needed to finance the deal; correct?

5   A   Yes.

6   Q   All right.  And how does the city propose to pay the 165

7   million that you've just described?

8   A   We're going to borrow it.

9   Q   And back in the time that the post-petition financing was

10  being solicited and negotiated, what was your involvement in

11  that process?

12  A   After we entered into the agreement in principle and the

13  first forbearance and optional termination agreement, I

14  instructed our investment bankers to canvass the marketplace

15  to see what terms and availability was out there in the

16  capital markets for a loan to the city.  They'd actually done

17  some of that already.

18  Q   What were your instructions to your team?

19  A   To get the best deal that we could from the capital

20  markets.

21  Q   And who was your team?

22  A   It was principally Ken Buckfire and Jim Doak of Miller

23  Buckfire.

24  Q   And what did you consider to be the most important

25  factors in the financing to you in selecting a lender for the

13-53846-swr   Doc 4214-10 Filed 01/10/14 Entered 01/10/14 14:24:40   Page 308 of
13-53846-swr   Doc 4214-10 Filed 01/10/14 Entered 01/10/14 14:24:40   Page 308 of
463                                                                      308

1  city?

2  A    Lowest rate possible, overall rate under any set of

3  circumstances, certainty of lending, the ability of the

4  lender to actually come through without any ancillary or

5  other risk, pretty straightforward transaction, didn't want

6  any exotics or any significant conditions in the agreement

7  that could create a change in the structure of the

8  transaction, and the ability to close fairly quickly.

9  Q    Did you give any instructions to Mr. Buckfire, Mr. Doak,

10  or anyone on your team regarding whether the financing should

11  be secured or unsecured?

12  A    Yes.

13  Q    And what were those instructions?

14  A    We initially discussed whether we could obtain

15  unsecured -- the financing in an unsecured capacity as a

16  loan.  They had canvassed some of the lenders -- potential

17  lenders in the capital markets and came back with a report

18  that that was unlikely.

19  Q    I'm sorry.  Did you indicate what -- did you tell us

20  what -- why they believed that --

21  A    Yes, yeah.

22  Q    -- your understanding as to why they --

23          MR. MARRIOTT:  Objection, your Honor.  This is

24  hearsay testimony.  Mr. Doak and Mr. Buckfire have already

25  given testimony on precisely this point.  We know what they

1  thought.  We know why they thought it.

2          THE COURT:  The objection is overruled.  Go ahead,

3  sir.

4          THE WITNESS:  Yes, sir.  Mr. Doak and Mr. Buckfire

5  told me that the reality is we're in bankruptcy.  We're a bad

6  credit risk.  We've been defaulting.  Our credit rating has

7  been driven down and that nobody is going to lend to us

8  without some form of security interest.

9  BY MR. SHUMAKER:

10  Q   Did you review any reports from Miller Buckfire during

11  the solicitation process?

12  A   Yes.

13  Q   I'd like to show you a document, Exhibit 88, please, and

14  ask you, Mr. Orr, is that document familiar to you?

15  A   Yes.

16  Q   And what is it?

17  A   This is one of the initial documents regarding post-

18  petition financing discussion that was generated by Miller

19  Buckfire.

20  Q   Was it prepared for your review?

21  A   Yes.  For me and the entire team, yes.

22  Q   I'd like to take you to --

23          MR. SHUMAKER:  This document, your Honor, is already

24  in evidence.

25  BY MR. SHUMAKER:

13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 73 of 200
463
13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 73 of 200   310

1    Q    -- page 5, if you will.

2         MR. SHUMAKER:  Steve, if you could go -- page 5 of

3    the document.

4    BY MR. SHUMAKER:

5    Q    Do you see that page, Mr. Orr?

6    A    Yes.

7    Q    And up at the top it says "Post-petition financing all-in

8    cost analysis."  Do you see that?

9    A    Yes.

10   Q    What did that mean to you when you read it?

11   A    This was a comparison of the potential lenders and what

12   all-in costs if you put in the amount of the loan, if you put

13   in any fees, if you put in any variability between the

14   interest costs for the swap termination loan versus the

15   quality of life loan and whatever other fees any of these

16   lenders were proposing, what that total cost could be, the

17   exposure to the city.

18   Q    You see the -- at the top of the columns across the page

19   the names BAML, Barclays, Goldman, CarVal, Fundamental,

20   Jefferies.  What were those -- what were those names?

21   A    These are all the names of the potential lenders that

22   responded to a solicitation, I believe.  The solicitation had

23   gone out previously and had gotten somewhere in the

24   neighborhood -- I think they sent out approximately 50

25   solicitations.  They got roughly close to three dozen

```
 1   responses.  They had gone through the responses and tried to
 2   pull out the handful of best responses that they had
 3   received.
 4   Q   And what did this show you?  What did this page show you?
 5   A   This page showed that considering all the potential
 6   lending and the various factors that went into lending that
 7   Barclays was the cheapest money.
 8   Q   Okay.  And at the bottom half of the middle box there,
 9   you see two rows.  One, it says difference from lowest all-in
10   rate and difference from lowest all-in expense.  Do you see
11   that?
12   A   Yes.
13   Q   And there are dashes underneath Barclays?
14   A   Yes.
15   Q   What did that indicate to you?
16   A   That there was no difference between the rates.
17   Q   And was Barclays the best lender based upon this
18   analysis?
19   A   Yes.  Overall they were the best lender.
20   Q   Ask you to take a look at Exhibit 89, please, which is
21   also in evidence.  Mr. Orr, do you recognize this document?
22   Turn the page.
23   A   Yes.
24   Q   And what is this document?
25   A   This is a comparison, I believe, of approximately five
```

1 lenders on the back page, I believe, of the commitment

2 letters that the previous lenders had actually provided to

3 Miller Buckfire.

4 Q   Okay.  Turn your attention to page 5 of the document.

5 A   Yes.

6 Q   Now, there are a smaller number of banks or financial

7 institutions across the top row there of the columns.  Do you

8 see that?

9 A   Yes.  It said five, but it's four.

10 Q   Yeah.  And it says Barclays, CarVal, BAML, and Goldman.

11 Do you see that?

12 A   Yes.

13 Q   Do you recall how they were selected?

14 A   Yes.  I think, based upon -- it was a winnowing down

15 process based upon the responses to the original

16 solicitation.  The analysis that you showed me before that

17 the -- Miller Buckfire did an analysis of the terms under the

18 actual commitment letters that the parties were proposing,

19 and these four potential lenders were selected as the best.

20 Q   And then the shaded box at the bottom of the page, what

21 did that indicate to you?

22 A   This was an analysis of the average all-in cost based

23 upon the various commitment letters from each of the lenders.

24 Q   And did it indicate which lender had proposed the best

25 package for the city?

13-53846-swr   Doc 4210   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 313 of
463
13-53846-swr   Doc 4210   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 50 of 200   313

1  A   Yes.

2  Q   And who was that?

3  A   Barclays.

4        MR. SHUMAKER:  You could take that down.

5  BY MR. SHUMAKER:

6  Q   During this solicitation process for the post-petition

7  financing, Mr. Orr, did anyone ever tell you that there was a

8  bank or a financial institution that was willing to lend to

9  the city on an unsecured basis?

10 A   No.

11 Q   Did you expect anyone to offer the city unsecured money?

12 A   No.

13        MR. MARRIOTT:  Objection.  Relevance.

14        THE COURT:  Overruled.

15 BY MR. SHUMAKER:

16 Q   Why not?

17 A   The city had -- prior to the appointment of an emergency

18 manager, had suffered a number of credit rating downgrades.

19 With the appointment of the emergency manager, that was an

20 event of default under a number of different financial

21 instruments.  Once we declared bankruptcy, it is highly

22 unlikely that anyone is going to loan to a bankrupt entity

23 without a senior secured status.  That would be reckless.

24 Q   Did you believe the post-petition financing process

25 yielded the best deal for the city?

13-53846-swr   Doc 4244-10 Filed 01/10/14 Entered 01/10/14 22:00:23 Page 313 of 420
13-53846-swr   Doc 4244-10 Filed 01/10/14 Entered 01/10/14 22:00:23 Page 313 of 420   314
463

1    A    Yes.

2    Q    Why?

3    A    The city needs to stabilize its finances once and for

4    all.  It needs to get out from under this whole swap contract

5    as soon as possible so it stops the sweep of its casino

6    revenue, the quarterly payments, and the risk that the

7    termination fee and termination event would be declared and

8    the casino revenue would be trapped.  The city cannot plan

9    unless it removes this potential risk from the table so that

10   any plans that it does make both at an operational level or

11   now that we're in bankruptcy for a plan of adjustment level

12   are credible and realistic.  If we don't do that, we are

13   constantly living with the risk that at any given time that

14   we've already suffered a termination event, a termination

15   event can be declared, which would certainly create a risk of

16   a trap of the revenue or a risk of significant full-blown

17   litigation, and that's no way to plan.

18   Q    How about the financial terms of the deal?  Do you

19   believe those are the best that the city can obtain?

20   A    Yes.  My understanding is that we went through a very

21   fulsome and lengthy process with a number of lenders.  There

22   were terms which were worse for the city financially; that

23   Barclays proposed all-in the best terms that the city could

24   achieve at this time.

25   Q    How does the new $165 million agreement affect the city's

13-53846-swr   Doc 2214-10 Filed 01/10/14 Entered 01/10/14 14:24:40   Page 31 of 200   315
13-53846-swr   Doc 2214-10 Filed 01/10/14 Entered 01/10/14 14:24:40   Page 31 of 200
463

 1  request for post-petition financing?

 2  A   It would appear to make it more attractive because we're

 3  going to reduce the request dollar for dollar for the

 4  termination loan that we requested originally down to 165

 5  million.

 6  Q   So how much financing are you looking to obtain for the

 7  city?

 8  A   165 million for the termination fee and another 120

 9  million for the quality of life loan, $285 million total.

10  Q   And how long do you believe that the Barclays commitment

11  is available to the city?

12  A   We believe that the Barclays commitment will remain

13  available through January 2014.

14  Q   Did you have any reporting obligations under state law

15  with respect to obtaining the post-petition financing?

16  A   Yes.

17  Q   And what were those reporting obligations?

18  A   There was a question as to whether or not we had to seek

19  approval from the Treasury Department for the loan.  Given

20  the history of the transaction, we wanted to be very careful,

21  so while there was some debate amongst my team as to whether

22  or not we had to ask Treasury for approval, I decided that in

23  an abundance of caution we should do that.

24  Q   Let me show you Exhibit 96, which is also in evidence.

25  Mr. Orr, do you recognize this document despite its fairly

13-53846-swr   Doc 4214-10  Filed 01/10/14  Entered 01/10/14 14:14:00   Page 33 of 200
13-53846-swr   Doc 4214-10  Filed 01/10/14  Entered 01/10/14 14:14:00   Page 33 of 200   316
463

1  small font size?

2  A    Yeah.  Can you --

3  Q    You see it?

4  A    Yes.  Can you turn --

5  Q    And let's turn to page 2, if you would.

6  A    Yes.

7  Q    Mr. Orr, is that your signature?

8  A    Yes, it is.

9  Q    What is this document?

10 A    This document is a request to the state's Treasury

11 Department that they approve the city's financing with

12 Barclays, including the commitment fee that was to be paid to

13 Barclays.  There's a provision in the emergency manager

14 statute, 436, that I don't have to seek the approval of

15 Treasury if I'm engaging in transactions that are subject to

16 competitive bidding, which this was significantly, but here

17 again, just to be careful, I wanted to make sure that I had

18 Treasury's approval to enter into the commitment fee and the

19 actual transaction.

20 Q    And I'm sorry.  Were there attachments to this letter?

21 A    I believe so.  I believe we attached the commitment

22 letter and the proposal, yes.

23 Q    Okay.

24 A    Yes.

25 Q    And did -- and this was to Treasurer Dillon, correct, the

1    letter?

2    A    Yes.

3    Q    Did Treasurer Dillon approve of the Barclay -- paying the

4    Barclays commitment fee?

5    A    Yes.  Treasurer Dillon responded to this letter and

6    approved the payment of the commitment fee and the Barclays

7    transaction.

8    Q    I'd like to show you Exhibit 97.  Do you recognize this

9    document, Mr. Orr?

10         MR. SHUMAKER:  It's in  evidence, your Honor.

11         THE WITNESS:  Yes, I do.

12   BY MR. SHUMAKER:

13   Q    And what is this document?

14   A    This is Treasurer Dillon's response to me noting that

15   under the 436 I did not have to seek Treasury approval but

16   recognizing that in an abundance of caution it was

17   appropriate for them to approve the transaction, nonetheless.

18   Q    And Mr. Dillon in the third paragraph of this letter --

19         MR. SHUMAKER:  If you could blow that up, please.

20   BY MR. SHUMAKER:

21   Q    -- provided reasons why he believed this was appropriate

22   for the city; correct?

23   A    Yes.

24   Q    And did you agree with the reasons that he sets forth

25   here?

1   A   Yes.  I knew that Treasurer Dillon going back to 2012 in

2   connection with the Detroit Reform Program in November had

3   been concerned about this transaction, the swaps in

4   particular, and that the amount of debt that the city was

5   carrying, the termination fee risk, the interest carried, the

6   multiplier on the notional amount, and I knew he understood

7   what it would mean to the city, and, quite frankly, I was

8   hoping that he would recognize that although I was taking a

9   belt and suspenders approach to the transaction, that I

10  wanted to be sure that for all time both here, in the future,

11  but also for the lender that everyone understood that this

12  was a final transaction to deal with this issue and it was

13  approved by the state.

14  Q   And on the prior Exhibit 96, you indicated that you had

15  attached the commitment -- the Barclays commitment letters;

16  correct?

17  A   Yes.

18  Q   Had you signed the Barclays commitment letters when you

19  sent them to Mr. Dillon?

20  A   No.

21  Q   When did you sign the Barclays commitment letter?

22  A   After receiving this letter from Treasurer Dillon.

23  Q   Mr. Orr, did you submit the Barclays proposal to City

24  Council?

25  A   Yes.

13-53846-swr   Doc 4210   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 319 of
13-53846-swr   Doc 4447-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 33 of 200   319
463

1  Q   Why did you do that?

2  A   City Council's approval is required, we believe, and they

3  have the opportunity to propose an alternative transaction.

4  Q   Is it required under the emergency manager statute?

5  A   I don't think it's the emergency manager statute.

6  Q   Okay.  What statute is it?  Do you recall?

7  A   I think it's the Home Rule City statute.

8  Q   Okay.  What happened after you submitted the Barclays

9  proposal to City Council?

10  A   I instructed our team to go through the transaction with

11  City Council.  I believe there was some discussion that a

12  potential lender had come in after this process, selection

13  process, and was proposing a loan via City Council.  They

14  debated that and vetted it and ultimately decided not to

15  propose it as an alternative transaction.

16  Q   And who made that proposal?  Do you recall?

17  A   I think it was Syncora.

18  Q   Did the City Council approve the Barclays proposal?

19  A   Did they approve it?

20  Q   Yes.

21  A   No.

22  Q   What happened once the City Council disapproved the

23  proposal?

24  A   Well, that's the only proposal that's available, and I

25  believe, under the Home Rule Act, Home Rule City Act, it goes

13-53846-swr   Doc 4244-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 57 of 200
13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 57 of 200
463
320

1  to the Emergency Loan Board.

2  Q    Did the --

3  A    Yeah, the Emergency Loan Board.

4  Q    Did the City Council ever submit an alterative proposal

5  to the one that was reflected in the Barclays proposal?

6  A    No.

7  Q    Did you submit the Barclays proposal to anyone else for

8  their review or approval?

9  A    To the Emergency Loan Board.

10  Q    Okay.  Let me show you Exhibit 100, please.  Mr. Orr,

11  what is this document?

12  A    This is a transmission document from Miller Canfield to

13  the Local Emergency Financial Assistance Loan Board or, as I

14  call it, Emergency Loan Board.

15  Q    And why did you -- did you instruct Miller Canfield to

16  send this letter?

17  A    Yes.

18  Q    Why?

19  A    A question was raised as to whether or not the board

20  would ultimately approve the transaction, and I believe those

21  questions were raised in connection with the approval we're

22  requesting here, and so to remove that question from this

23  process, we submitted it to the board for their approval.

24  Q    Do you know whether the Emergency Financial Assistance

25  Loan Board has approved the Barclays proposal?

1  A   Yes, they have.

2        MR. SHUMAKER:  Your Honor, we would like to -- I'd

3  like to show the witness City Exhibit Number 142.  It has not

4  been moved into evidence.  I would do so now.

5        THE COURT:  Any exhibit -- any objection to Exhibit

6  142?

7        MS. ENGLISH:  No objection, your Honor.

8        THE COURT:  It is admitted.

9     (City Exhibit 142 received at 10:19 a.m.)

10       MR. SHUMAKER:  Would you put that up, please?

11 BY MR. SHUMAKER:

12 Q   Mr. Orr, do you recognize this document?

13 A   Yes.

14 Q   And what is this document?

15 A   This is the loan board's order approving the transaction.

16 Q   And what is your understanding, generally speaking, of

17 what this order provides?

18 A   The order provides -- authorizes the city to enter into a

19 transaction not to exceed 350 million for the purpose of

20 dealing with the swap termination payment as well as the

21 quality of life loan.  The order recognizes that it is

22 subject to the Bankruptcy Court's approval of the transaction

23 to be operative.

24 Q   Now let me turn your attention -- direct your attention

25 to paragraph 7 on page 6 of the document.  Can you see that

 1  first sentence there, Mr. Orr?

 2  A   Yes.

 3  Q   Is that what you're referring to?

 4  A   Yes.

 5  Q   Could you read it for the record, please?

 6  A   "This order of approval is conditioned upon approval by

 7  the Bankruptcy Court of the motion by the city for an order

 8  approving a post-petition financing, granting liens,

 9  providing superpriority claim status, and modifying the

10  automatic stay in the bankruptcy case entitled In re. City of

11  Detroit, Michigan, Debtor, Case Number 13-53846."

12  Q   Is it your understanding, Mr. Orr, that this order would

13  cover the new $165 million agreement that you've described?

14  A   Yes.  The order specifically says that the total

15  aggregate amount of the loan cannot exceed 350 million, and

16  we're asking for less than that.

17          MR. SHUMAKER:  Thank you, Mr. Orr.  That's all I

18  have.

19          THE COURT:  All right.  I think we'll take our

20  morning recess at this time and reconvene, please, at 10:45.

21          THE CLERK:  All rise.  Court is in recess.

22      (Recess at 10:21 a.m., until 10:47 a.m.)

23          THE CLERK:  All rise.  Court is in session.  Please

24  be seated.

25          MS. ENGLISH:  Good morning again, your Honor.  Good

```
 1  morning, Mr. Orr.
 2          THE COURT:  Good morning.  You may --
 3          THE WITNESS:  Good morning.
 4          THE COURT:  -- proceed.
 5          MS. ENGLISH:  Before I get into my -- the substance
 6  of my cross-examination, there's a preliminary issue we'd
 7  like to raise, but to do that we're going to just ask a few
 8  foundational questions of Mr. Orr.
 9          THE COURT:  Okay.
10                      CROSS-EXAMINATION
11  BY MS. ENGLISH:
12  Q   Mr. Orr, you were testifying during your direct
13  examination as to the assessments that had been made with
14  respect to the claims the city could bring and the strengths
15  and weaknesses of those claims; is that right?
16  A   Yes.
17  Q   Now, isn't it true that you yourself have made no
18  independent assessment of the city's claims and the strengths
19  and weaknesses of those claims apart from what your attorneys
20  have shared with you; is that right?
21  A   Yes.
22  Q   Okay.  In fact, in your August 30th deposition -- do you
23  remember that day?
24  A   To a degree.
25  Q   It's awhile back.  I know.
```

1   A    Yeah.

2   Q    Okay.  At that time, do you recall that you told us no

3   less than ten times that you had made no independent

4   assessments of the claims at issue whatsoever?

5   A    If you say so.

6   Q    Okay.  And on your December 31st deposition, just a

7   little -- few days ago, earlier this week, you testified

8   again repeatedly -- I think it was six or seven times -- you

9   made no independent analyses on the claims and the strengths

10  and weaknesses; is that right?

11  A    Yes.

12  Q    Okay.  And so you admit you had no independent knowledge

13  or assessment of the various arguments, for example,

14  challenging the validity of the swaps contracts?

15  A    I relied on the advice and suggestions of my attorneys

16  and my investment advisors, yes.

17  Q    Okay.  And you made no independent assessment as to the

18  strength of the claim that the pledge of casino revenues was

19  invalid under the Gaming Act; correct?

20  A    Yes.

21  Q    You made no independent analysis as to whether estoppel

22  was a valid defense to the argument that the casino revenue

23  pledge was invalid; correct?

24  A    Yes.

25  Q    You didn't independently assess whether there were any

13-53846-swr   Doc 2414-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 325 of
13-53846-swr   Doc 2414-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 325 of 200   325
463

1   validity issues with respect to the COPs, did you?

2   A    No.

3   Q    And in terms of the swap counterparties' likelihood of

4   obtaining protections under the Bankruptcy Code, such as

5   through the safe harbor protections, you didn't independently

6   analyze those issues, did you?

7   A    No.

8   Q    Now, while you performed no independent analyses of the

9   various legal claims and defenses, you've testified that you

10  did receive legal analyses from your lawyers on all of these

11  issues; is that right?

12  A    Yes.

13  Q    And many of those analyses took -- were in written form.

14  They were in e-mails and written memoranda and the like; is

15  that right?

16  A    Yes.

17  Q    Okay.  And you reviewed those e-mails and memoranda and

18  considered the communications from your attorneys in forming

19  the knowledge that you've testified about here today;

20  correct?

21  A    Yes.

22  Q    And you are, nevertheless, continuing to claim that the

23  attorney-client privilege protects all of those documents and

24  communications from being disclosed in the course of these

25  proceedings; is that right?

1   A   Yes.

2   Q   Okay.  And, in fact, you have refused to produce any such

3   legal memoranda or similar documents; is that right?

4   A   In consultation with my attorneys, yes.

5   Q   Okay.

6       MS. ENGLISH:  Your Honor, the objectors would like

7   to raise a motion that Mr. Orr, through his testimony today,

8   has waived the privilege.  He has testified that his only

9   information, his only knowledge comes from his attorneys, and

10   he has similarly testified as to what that knowledge is, what

11   those analyses were, all the way down to testifying what his

12   attorneys told him about their discussions with the swap

13   counterparties.  We believe this is a subject matter waiver

14   of the privilege, and we'd like to ask for production of all

15   of the analyses Mr. Orr reviewed and has relied on to come to

16   his testimony today.  We'd like to ask for a continuance so

17   that we can get those documents, review them.  We would be

18   able to do that over the weekend, if necessary, and come back

19   on Monday, but we think there is a subject matter waiver

20   here, and we're entitled to these documents.

21       As a footnote to my motion, I would also add that a

22   privilege log was produced by the city late last night

23   despite the fact that we've been asking for one for months

24   really.  We got it late last night.  It contains only, I

25   believe, 22 documents, just a select number of documents.

13-53846-swr   Doc 4247-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 337 of 200
13-53846-swr   Doc 4247-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 337 of 200   327
463

1   The city has basically been picking and choosing what

2   information they'll give us, what information they're

3   logging, and they're playing games with the privilege.  That

4   just should not be permissible.  We know for a fact that

5   there are documents that Mr. Orr has relied on that are not

6   logged in this privilege log, so I would like to ask for --

7          THE COURT:  For instance?

8          MS. ENGLISH:  For instance, your Honor, there was

9   actually a document that was claimed to be privileged by the

10  city that was inadvertently produced that goes directly to

11  the assessment of one of these claims that we have seen, and

12  it is not on the log.  Thank you, your Honor.

13         THE COURT:  May I see the log?

14         MR. SHUMAKER:  May I approach, your Honor?

15         THE COURT:  Yes, please.

16         MR. SHUMAKER:  Your Honor, Greg Shumaker, Jones Day,

17  for the City of Detroit.  There's been no waiver and nor is

18  one required in order to proceed.  Mr. Orr has an

19  understanding.  He obviously has legal and financial advisors

20  that he relies upon.  That does not place the advice at

21  issue.  He has an understanding based upon investigations

22  made and theories advanced.  And I'm not certain which

23  inadvertently produced document Ms. English is referring to,

24  although I'm certain that the fact that it was inadvertently

25  produced means that she should have returned it as opposed to

13-53846-swr   Doc 4147-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 33 of 200
463
13-53846-tjt   Doc 4244-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 336 of   328

1    now saying it's not on the privilege log.  I don't know which
2    one that is, but this is not all of the privileged documents
3    ever produced by the legal -- Mr. Orr's legal team, but it is
4    the ones that related to the negotiation of the forbearance
5    agreement.

6            THE COURT:  Anything further, sir?

7            MR. SHUMAKER:  No.  That's all, your Honor.

8            THE COURT:  Any reply?

9            MS. ENGLISH:  Just to answer the question about the
10   document that was produced, it was a document that was
11   produced, I believe, to the Retirement Systems, was used in a
12   deposition.  Subsequent to the use of that document in the
13   deposition, the counsel for the city claimed that it was
14   privileged, it was an inadvertent production, and asked for
15   the document back, so --

16           THE COURT:  Does anyone remember what that document
17   was?

18           MS. ENGLISH:  You want to speak to that?

19           THE COURT:  Ms. Green.

20           MS. GREEN:  Yes.  It was a document used during the
21   deposition of Mr. Orr on December 12th, and actually I
22   believe it was also used at his December 9th -- it was a one-
23   page document, and I don't see anything on the list that
24   appears to be the same document --

25           THE COURT:  Do you remember --

```
 1          MS. GREEN:  -- although it's hard to tell.

 2          THE COURT:  Do you remember what it was?

 3          MS. GREEN:  It was a one-page document.  There was a

 4   flow chart on the front.  The second page was a bullet point

 5   list of legal issues.  And it was clawed back on the grounds

 6   of privilege; however, at his deposition Mr. Orr actually

 7   said he did not know who wrote the document.  He'd never seen

 8   the document.  And when it was clawed back, they told me that

 9   it was because Mr. Orr had reviewed it in a meeting, so --

10          THE COURT:  All right.

11          MS. GREEN:  -- it doesn't make sense.

12          THE COURT:  Ms. English, anything further?

13          MS. ENGLISH:  No, your Honor.

14          THE COURT:  All right.  I'll take this under

15   advisement, and we'll take a break until -- let's see -- the

16   clock runs a little fast, but that's all right -- 11:15.

17          THE CLERK:  All rise.  Court is in recess.

18       (Recess at 10:56 a.m. until 11:27 a.m.)

19          THE CLERK:  All rise.  Court is in session.  Please

20   be seated.

21          THE COURT:  The Court concludes that it must deny

22   the motion to find a general waiver of the attorney-client

23   privilege here and to order the production of attorney-

24   client -- otherwise attorney-client privileged memoranda and

25   other kinds of documents.  It is true, as Ms. English points
```

1  out, that Mr. Orr has testified here today that the

2  information that he has and about which he has testified

3  concerning the claims and defenses that the city might have

4  in relation to these transactions came largely from, if not

5  entirely from his attorneys.  That observation, of course,

6  could be made in virtually every case in which a trustee in

7  bankruptcy or other proponent of a settlement seeks court

8  approval, and yet it simply cannot be the law that simply by

9  filing and pursuing a motion to approve a settlement, a party

10  is subject to a general waiver of the attorney-client

11  privilege as to all claims and defenses that the party

12  considered in proposing the settlement.  Such a view of the

13  law would, in a very real way, not only discourage

14  settlements, but it would also give an unfair -- grossly

15  unfair advantage to the proposing party's opponents in the

16  litigation should the settlement not be approved, and so that

17  simply can't be the law.  So for these reasons, the motion is

18  denied.  You may proceed with your cross-examination.

19        UNIDENTIFIED SPEAKER:  Judge Rhodes, I speak as a

20  citizen.  It's clear --

21        THE COURT:  All right.  We're going to be in recess.

22     (Recess at 11:30 a.m., until 11:32 a.m.)

23        THE CLERK:  All rise.  Court is in session.  Please

24  be seated.

25        THE COURT:  You may proceed.

13-53846-swr  Doc 4244-10  Filed 04/29/14  Entered 04/29/14 14:24:00  Page 331 of 200  331
13-53846-swr  Doc 4244-10  Filed 01/10/14  Entered 01/10/14 14:24:40  Page 33 of 20
463

1      MS. ENGLISH:  Thank you, your Honor, for the

2  consideration of our motion.  We just have one point of

3  clarification.  Does your ruling allow us to question Mr. Orr

4  as to the substance of the documents listed on the privilege

5  log?

6      THE COURT:  It's very hard for me to answer that

7  question in the abstract.  I would suggest that you ask

8  whatever questions you'd like to ask, and if the city

9  objects, we'll consider it on a case-by-case or question-by-

10  question basis.

11      MS. ENGLISH:  Okay.  We appreciate that.  We may

12  come back to that a little later having just received the

13  privilege log last night.

14      THE COURT:  Okay.

15      MS. ENGLISH:  We'll get to that.  Okay.  Thank you.

16  BY MS. ENGLISH:

17  Q   Hello again, Mr. Orr.

18  A   Good morning.  Good morning.

19  Q   Mr. Orr, you are serving as the emergency manager of the

20  City of Detroit; correct?

21  A   Yes.

22  Q   And before you became the emergency manager, you were a

23  practicing lawyer for about 30 years; isn't that right?

24  A   Yes.

25  Q   And, in fact, you --

13-53846-swr   Doc 4244-10 Filed 01/10/14  Entered 01/10/14 14:24:40   Page 93 of 200
13-53846-swr   Doc 4244-10 Filed 01/10/14  Entered 01/10/14 14:24:40   Page 332 of 200   332
463

1    THE COURT:  Excuse me one -- excuse me one second.
2  Mr. Orr, you have my permission, if there are any further
3  outbursts like this, to exit the courtroom promptly as you
4  and your security people see fit even through this door back
5  here.
6    THE WITNESS:  Thank you.
7    THE COURT:  All right.  You may proceed.
8    MS. ENGLISH:  Do we want to move that bookshelf?
9    THE COURT:  He'll figure it out.
10    MS. ENGLISH:  Okay.  I don't want you tripping over
11  it on your way out.
12  BY MS. ENGLISH:
13  Q   Okay.  Practicing lawyer for about 30 years; correct?
14  A   Yes.
15  Q   And part of that time, you were a partner with Jones Day
16  for about ten years in the litigation and restructuring area;
17  right?
18  A   Yes.
19  Q   Okay.  Jones Day is the law firm that's here representing
20  you and the city today; correct?
21  A   Yes.
22  Q   And it's fair to say, isn't it, that you have substantial
23  experience in the area of restructuring and bankruptcy; isn't
24  that right?
25  A   Yes.

1   Q   Okay.  You've worked on a number of cases pending in

2   Bankruptcy Court where a settlement was presented for

3   approval under Rule 9019, haven't you?

4   A   Yes.

5   Q   So you understand what Rule 9019 requires and the factors

6   that a court needs to evaluate in deciding whether to approve

7   a settlement under that rule?

8   A   Yes.

9   Q   You understand what it means for a debtor to exercise

10  his, quote, "reasonable business judgment" when making

11  decisions in the course of a bankruptcy case, don't you?

12  A   Yes.

13  Q   Now, in past cases, I imagine you probably counseled a

14  number of restructuring clients and debtors in bankruptcy as

15  to when to settle, when to cut a deal, versus when to

16  litigate; is that right?

17  A   Yes.

18  Q   And when you counsel clients in this regard, you

19  generally want them to be fully informed as to what the

20  claims and defenses are that they might either litigate or

21  settle; correct?

22  A   Yes.

23  Q   Okay.  And you want to make sure that your clients

24  understand the strengths and weaknesses of their litigation

25  positions; right?

13-53846-swr   Doc 4244-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 133 of 200
13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:40   Page 134 of 200   334
463

1   A   Yes.

2   Q   Now, in this matter, you are now the one who's exercising

3   your reasonable business judgment in making decisions for the

4   City of Detroit; correct?

5   A   Yes.

6   Q   Okay.  And you were the one who decided on the city's

7   behalf that this settlement reflected in the forbearance

8   agreement was in the city's best interest; isn't that right?

9   A   Yes.

10  Q   So you're the one exercising your best judgment to

11  determine that the forbearance agreement is a good deal for

12  the city; correct?

13  A   Yes.

14  Q   Now, I want to start with a subject that I think we can

15  agree on.  It's correct, isn't it, that the service

16  corporations have swap contracts with the swap

17  counterparties; right?

18  A   Yes.

19  Q   The city itself does not have a direct swap contract with

20  the swap counterparties; correct?

21  A   Yes.

22  Q   But you do understand that the city has contracts with

23  the service corporations, contracts that we refer to as the

24  service contracts; correct?

25  A   Yes.

1   Q   And you understand that pursuant to those service

2   contracts, the city has hedge-related payments that it has to

3   make to the service corporations, and then the service

4   corporations use that money to make their hedge payments to

5   the swap counterparties; correct?

6   A   Yes.

7   Q   Okay.  So you're aware that the service corporations

8   depend on the city to make payments of their various

9   obligations that they have under the COPs and the swaps;

10  right?

11  A   Yes.

12  Q   And to your knowledge, the service corporations don't

13  have any independent sources of income to pay those

14  obligations; isn't that true?

15  A   Yes.

16  Q   So you recognize and admit that through the service

17  contracts, the city itself took on swap obligations, didn't

18  it?

19  A   That's one of the allegations, yes.

20  Q   Well, in fact, you admit that's the case, that the city

21  has taken on through the service contracts swap obligations;

22  correct?

23  A   Yes.

24  Q   Okay.  Now, I want to talk about the events that led up

25  to your negotiations with the swap counterparties in the

1   summer.  Up until that time, isn't it true that the swap

2   counterparties never actually threatened to terminate the

3   swap contracts?

4   A   They sent a notice of a termination event, but -- they

5   sent a notice of a termination event.  I don't know if that

6   constitutes a threat.

7   Q   Okay.  Do you recall being deposed on August 30th?

8   A   Yes.

9   Q   And do you recall at that time in response to a

10  question -- I believe it was Mr. Hackney that was asking you

11  at the time -- that you said the swap counterparties had

12  never actually threatened to terminate at that time?

13  A   Yes.

14  Q   Okay.  And they never threatened to bring any claims

15  against the city either, had they?

16  A   No.

17  Q   Okay.  And the swap counterparties at that point had

18  never actually trapped the casino revenues in the accounts at

19  U.S. Bank, had they?

20  A   No.

21  Q   Okay.  You believe, nevertheless, that reaching an

22  agreement with the swap counterparties was, to use your

23  words, crucial; isn't that right?

24  A   Yes.

25  Q   Okay.  And you believe that any delay in getting a deal

13-53846-swr   Doc 4214-10  Filed 01/10/14  Entered 01/10/14 22:00:23  Page 437 of 200
13-53846-swr   Doc 4214-10  Filed 01/10/14  Entered 01/10/14 14:24:40  Page 437 of 200   337
463

1  done that might put the casino revenue at risk, in your view,

2  was dangerous for the City of Detroit; isn't that right?

3  A   Yes.

4  Q  Okay.  Now, as the emergency manager for the City of

5  Detroit, you regularly review cash flow forecasts for the

6  city's finances; right?

7  A   Yes.

8  Q  In fact, at times you review them on a daily basis, don't

9  you?

10  A   Yes.

11  Q  Okay.  And as you headed into negotiations with the swap

12  counterparties in the spring and summer of 2013, you were

13  reviewing the city's cash flow projections so that you

14  understood the city's revenue streams and financial

15  condition; correct?

16  A   Yes.

17  Q  And those projections indicated to you that there was a

18  chance that if the city continued in a steady state and took

19  no corrective action, it could run out of cash by the end of

20  the year; correct?

21  A   Yes.

22  Q  Okay.  And yet you called in Mr. Buckfire to negotiate a

23  deal with the swap counterparties in June that took just

24  essentially one week; correct?

25  A   It took a -- started before that, but essentially a week

 1   in earnest, yes.

 2   Q   Now, isn't it true that as you headed into the

 3   negotiations with the swap counterparties, you hadn't

 4   formulated a back-up plan in the event you couldn't get a

 5   deal with them?

 6   A   We would have to sue them.

 7   Q   You didn't actually have a back-up plan that you were

 8   ready to implement, though, at that time, did you?

 9   A   No.

10   Q   And, in fact, you said just now that you would sue them,

11   but isn't it true that you actually didn't know at that time

12   back in June if you were really prepared to sue them or not?

13   A   The June 10th week?

14   Q   Yes.

15   A   No.  We were prepared.

16   Q   Were you?

17   A   Yeah.

18   Q   Okay.  I'm going to have to ask you to look at your

19   deposition transcript, okay --

20   A   Okay.

21   Q   -- because I believe you told me something different in

22   August, so if you could look at your August transcript --

23   it's the August 30th date --

24   A   Um-hmm.

25   Q   -- on page 280 -- okay.  If you look -- so roughly in the

1  middle of the page -- this was me deposing you at this point.

2  I asked you, "If you hadn't gotten a deal, were you prepared

3  to sue them?" meaning the swap counterparties, and there was

4  an intermittent objection, but then you answered me, and you

5  said, "I don't know."  See that?

6  A    Um-hmm.

7  Q    You recall that --

8  A    Um-hmm.

9  Q    -- question and that answer?

10  A    Yes.

11  Q    Okay.

12        THE COURT:  What lines were those, please?

13        MS. ENGLISH:  Oh, I'm sorry, your Honor.  It's lines

14  9 through 14 on page 280.

15  BY MS. ENGLISH:

16  Q    And at this time -- we're back in June 2013 now -- you

17  don't recall ever having seen a draft complaint that was put

18  together at that time, do you?

19  A    I don't recall.

20  Q    Before I get into the sort of nitty gritty of the

21  negotiations, I want to ask you about the assumptions and the

22  goals you had going into the negotiations.  Your assumption

23  going into the negotiations was that there were events of

24  default under the swaps that had occurred such that the swap

25  counterparties could unilaterally terminate the swaps and

1  demand a sizeable termination payment from the service

2  corporations; correct?

3  A    Yes.

4  Q    And another assumption you had was that the swap

5  counterparties could instruct the custodian to trap the cash,

6  trap the casino revenues; right?

7  A    Yes.

8  Q    And so one of your objections -- or one of your

9  objectives, rather, in these negotiations was to make sure

10  that the swap counterparties couldn't trap the casino

11  revenues; correct?

12  A    Yes.

13  Q    And another one of your objectives was to get a discount

14  on the termination liability you were facing?

15  A    Yes.

16  Q    And a third objective you had was you wanted to obtain an

17  option that would allow you to direct when the termination

18  would occur and when you'd have to pay that termination

19  payment; correct?

20  A    Yes.

21  Q    Okay.  Now, prior to the June 4th meeting, which sort of

22  kicked off these negotiations, you discussed these objectives

23  with Mr. Buckfire; right?

24  A    I believe so.

25  Q    Okay.  But you're aware, aren't you, that Mr. Buckfire

 1   has said he never discussed any of the legal claims or the

 2   strengths of the legal positions of the city with you before

 3   he went into those negotiations?

 4          MR. SHUMAKER:  Objection, your Honor.  Confronting

 5   the witness with another's testimony is improper.

 6          THE COURT:  The objection is sustained.

 7   BY MS. ENGLISH:

 8   Q   All right.  Let's talk now about the negotiations of the

 9   forbearance agreement, and I want to zero in on the June

10   negotiations for now.  Okay?

11   A   Yes.

12   Q   Mr. Buckfire was the lead negotiator for the city when it

13   came to negotiating the business terms of the forbearance

14   agreement; correct?

15   A   Yes.

16   Q   And you personally did not participate in any face-to-

17   face meetings that were held with the swap counterparties at

18   that time; right?

19   A   Correct.

20   Q   So basically what happened is is that you authorized

21   Mr. Buckfire to negotiate the best possible deal he could

22   with the swap counterparties, and then that's what he did;

23   right?

24   A   Yes.

25   Q   And so about a week later, he comes out of the

13-53846-swr  Doc 4214-10  Filed 01/10/14  Entered 01/10/14 14:24:00  Page 34 of 200
13-53846-swr  Doc 4214-10  Filed 01/10/14  Entered 01/10/14 14:24:00  Page 34 of 200   342
463

1   negotiations, and he says, "Mr. Orr, this is the best deal
2   I'm able to get out of these swap counterparties, and it's my
3   advice we take it."  Essentially true?
4   A   Essentially, yes.
5   Q   And so that was a week later, so now we're about June
6   11th; correct?
7   A   Yes, approximately.
8   Q   Okay.  I'd like to draw your attention to Syncora Exhibit
9   230.
10          MS. ENGLISH:  Travis, if we could have that pulled
11  up.
12  BY MS. ENGLISH:
13  Q   Can you see it okay?
14  A   Yes, yes.
15  Q   All right.  So you recognize this document, don't you,
16  Mr. Orr?
17          MS. ENGLISH:  Travis, if you can just scroll all the
18  way to the bottom so Mr. Orr can see the whole thing.
19  Thanks.
20          THE WITNESS:  Yes.
21  BY MS. ENGLISH:
22  Q   Okay.  Now, this is an e-mail that you sent to state
23  Treasurer Andy Dillon; correct?
24  A   Yes.
25  Q   And it was sent on June 12th; right?

1    A    Yes.

2    Q    Okay.  Now, your e-mail attaches -- or forwards, rather,

3    an e-mail that's on the lower half of the page that was from

4    Mr. Buckfire to you; is that right?

5    A    Yes.

6    Q    Mr. Buckfire's e-mail to you indicates basically the

7    state of negotiations at this point in time; right?

8    A    Yes.

9    Q    Okay.  And he's telling you in this e-mail that there's

10   just a very narrow gap left between the city's final offer of

11   75 percent and the swap counterparties' final offer of 77

12   percent.  Do you recall that?

13   A    Yes.

14   Q    Okay.   And he tells you in this e-mail that he thinks it

15   is, quote, "now time for you to enter the negotiations to

16   close this very narrow gap"; is that right?

17   A    Yes.

18   Q    And in forwarding this e-mail to Mr. Dillon, you

19   characterize this remaining gap as being, quote, "not

20   material"; correct?

21   A    Yes.

22   Q    And so then if I understand this e-mail, you would have

23   had a conversation later in the day -- it looked like it was

24   scheduled for four o'clock -- with the swap counterparties;

25   is that right?

1   A   I believe so.

2   Q   And then we know that you actually did close the deal at

3   75 percent; correct?

4   A   Yes.

5   Q   Okay.  Now, I understand that your direct involvement

6   face to face with the swap counterparties would have came --

7   was limited and came towards the end, but I do want to ask

8   you about the back and forth you personally had.  Okay?

9   A   Yes.

10  Q   When you were participating in the negotiations, they

11  were only by phone; right?

12  A   Yes.

13  Q   Okay.  And in those phone calls, you don't ever recall

14  articulating the position to the swap counterparties that the

15  swaps were invalid or void, do you?

16  A   No.

17  Q   And you can't recall ever discussing on those calls that

18  the swap counterparties' liens were invalid or not secured;

19  correct?

20  A   Correct.

21  Q   You never debated the validity of the swap

22  counterparties' secured position with any representatives of

23  the swap counterparties, did you?

24  A   Me personally?

25  Q   You personally.

13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 345 of
463
13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 345 of 200   345

1  A   No.

2  Q   No.  And on those calls, Mr. Buckfire didn't either, did

3  he?

4  A   Not that I recall.

5  Q   In fact, you do not believe that you had any discussions

6  with the swap counterparties about the city's potential legal

7  arguments against them at all, do you?

8  A   No.  I don't recall so.

9  Q   Now, you testified on direct that your attorneys had

10  argued legal claims to the swap counterparties outside of

11  your presence; correct?

12  A   Yes.

13  Q   You weren't on any calls or in any meetings where that

14  type of discussion occurred; right?

15  A   No.

16  Q   And the only reason you know that might have happened is

17  from what your attorneys told you; is that right?

18  A   Yes.

19  Q   Okay.  And you're claiming attorney-client privilege,

20  though, with respect to what your attorneys told you

21  directly, aren't you?

22  A   Yes.

23  Q   None of your attorneys are testifying in this matter, are

24  they, to your knowledge?

25  A   To my -- no, not to the best of my knowledge.

1    Q    Okay.  All right.  Now, the service corporations, there

2    are two entities, you understand, that are service

3    corporations, one called the Detroit General Retirement

4    Systems Service Corporation and one called the Detroit Police

5    and Fire Retirement Systems Service Corporation; is that

6    right?

7    A    Yes.

8    Q    These two service corporations are both parties to the

9    forbearance agreement; isn't that correct?

10   A    Yes.

11   Q    And it's been your position, has it not, that the service

12   corporations are legally separate and distinct entities from

13   the city; is that right?

14   A    Yes.

15   Q    And you assume that there must have been some

16   negotiations with the service corporations in June before

17   they signed onto the forbearance agreement; is that right?

18   A    Yes.

19   Q    But you didn't have any negotiations with the service

20   corporations, did you?

21   A    No.

22   Q    And you're not actually aware of anyone else who did

23   either; right?

24   A    No.

25   Q    And you never directed anybody on your team to negotiate

13-53846-swr   Doc 4244-10  Filed 01/10/14  Entered 01/10/14 14:24:00   Page 347 of
463
13-53846-swr   Doc 4244-10  Filed 01/10/14  Entered 01/10/14 14:24:00   Page 347 of   347

1  with the service corporations; correct?

2  A   No.  I directed them to close the deal.

3  Q   Did you direct them to negotiate directly with the

4  service corporations?

5  A   No.

6  Q   Okay.  You also aren't aware of any negotiations that

7  would have taken place between the service corporations and

8  the swap counterparties; is that right?

9  A   Yes.

10  Q   Okay.  Now, you understand that the composition of the

11  service corporations' board of directors includes three city

12  officers and at least one City Council member?

13  A   Yes.

14  Q   And, in fact, Ms. Cheryl Johnson is the person who signed

15  the forbearance agreement.  You know that to be true; right?

16  A   Yes.

17  Q   Okay.  And she is the president of the two service

18  corporations; isn't that right?

19  A   I believe so.

20  Q   And she's also the city's finance director; correct?

21  A   I believe she was the city's finance director.

22  Q   At that time?

23  A   Yes.

24  Q   Okay.  And you didn't -- but you didn't speak with her

25  about the forbearance agreement, did you?

13-53846-swr   Doc 4244-10 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 348 of
13-53846-swr   Doc 4244-10 Filed 01/10/14 Entered 01/10/14 14:24:40 Page 95 of 200   348
463

```
 1   A    No.
 2   Q    And you didn't talk to her about whether or not she
 3   should sign it, any conversations like that?
 4   A    No.
 5   Q    Okay.  You don't know who got her signature on the
 6   forbearance agreement, do you?
 7   A    No.
 8   Q    Okay.  Is she also the one who signed the new amendment,
 9   by the way?
10   A    I don't know.  I didn't see her signature.
11   Q    Okay.  All right.  Also, I'm still in June here.  Okay?
12   Going back to when you were negotiating, now, the swaps that
13   were in place operated to hedge against interest rate risk on
14   the COPs; correct?
15   A    Yes.
16   Q    Okay.   And prior to entering into the forbearance
17   agreement, prior to negotiating the forbearance agreement, is
18   it your testimony that the city had evaluated potential
19   future interest rate moves?
20   A    Can you repeat the question?
21   Q    Did the city evaluate potential future interest rate
22   moves and how that would affect your liability on the swaps?
23   A    Yes.
24   Q    And it's true that to the extent any such analysis was
25   done, that was done by Miller Buckfire; correct?
```

13-53846-swr   Doc 4244-10  Filed 01/10/14  Entered 01/10/14 22:00:23  Page 349 of
13-53846-swr   Doc 4244-10  Filed 01/10/14  Entered 01/10/14 14:24:40  Page 96 of 200   349
463

1    A    Yes, I believe it would have been.

2    Q    Okay.  And your understanding is that this was done and

3    was something that was considered in entering into the

4    forbearance agreement; correct?

5    A    Yes.

6    Q    Okay.  Would it surprise you to know that Mr. Buckfire

7    testified they never did any such analysis?

8    A    Yes.

9          MR. SHUMAKER:  Objection, your Honor.

10         THE COURT:  Sustained.

11   BY MS. ENGLISH:

12   Q    Now, I want to turn your attention to the original deal

13   that you got in June.  That deal in the original forbearance

14   agreement had the option to terminate the swaps at the city's

15   election for a discounted termination amount; is that right?

16   A    Yes.

17   Q    Okay.  And the discount ranged from 75 percent during an

18   early time period and then graduated up to 82 percent if it

19   was exercised at a later time period; correct?

20   A    Yes.

21   Q    The total termination liability that the city potentially

22   faces fluctuates over time, doesn't it?

23   A    Yes.

24   Q    Okay.  And the amount of the termination payment will

25   depend on what interest rates are on the day the termination

13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 350 of 200
13-53846-swr   Doc 4214-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 350 of 200   350
463

1  payment is due; correct?

2  A    Not now.

3  Q    Not now; correct.  Under the swaps contracts, under the

4  city's original obligations before you entered into this

5  deal --

6  A    Yes.

7  Q    -- your termination payment liability at any given point

8  in time would change based on what the interest rates were on

9  any given day; correct?

10  A    Yes.

11  Q    Okay.  So to determine the termination amount, you'd have

12  to peg it on -- peg what it actually was on the day you

13  exercised your option to terminate under the original deal;

14  right?

15  A    Yes.

16  Q    Now, we can agree, can't we, that, generally speaking, as

17  interest rates rise, the total termination liability of the

18  city decreases; correct?

19  A    Yes.

20  Q    And you also have a general understanding, don't you,

21  that the trend over the last several months has been, in

22  fact, that interest rates have been on the rise; correct?

23  A    They've gone up and down, but that may be true about the

24  general trend.

25  Q    In fact, it is true about the general trend.  If we look,

1  say, over the last six months, interest rates have generally

2  risen during that period; isn't that true?

3  A    Generally, yes.

4  Q    And the effect of that rise in interest rates has been

5  that over, say, the last six months the termination payment

6  liability that the city would face has come down; correct?

7  A    Yes.

8  Q    So, for example, at the time you originally negotiated

9  the forbearance agreement in June, the termination liability

10 was estimated to be between 300 and $400 million; is that

11 right?

12 A    Yes.

13 Q    Okay.  And now you're aware, aren't you, that the city

14 has stipulated that as of -- let's take November 29th, the

15 end of November, the total termination liability had dropped

16 from somewhere in the 300 millions down to 278 million,

17 approximately; is that right?

18 A    Approximately.

19 Q    And as of -- if we look as of year end, so December 31st,

20 a few days ago, the total termination liability as of that

21 date has now dropped down to $247 million, approximately; is

22 that right?

23 A    I haven't looked at it as of December 31st, but if that's

24 the trend, I would say that's right.

25 Q    Okay.

13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 353 of 200
13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 353 of 200
463
352

     1         MS. ENGLISH:  Your Honor, I would note -- I think --

     2    did we have a stipulation filed yesterday?  So yesterday the

     3    parties filed a stipulation that had three termination

     4    liability dates.

     5         THE COURT:  I saw that.  Thank you.

     6         MS. ENGLISH:  Okay.  Thanks.

     7    BY MS. ENGLISH:

     8    Q   Now, we all remember all too well we were here two weeks

     9    ago.  You were sitting right there, and we were in the middle

    10    of the trial on this matter, and the trial halted.  And we

    11    took a break for awhile, and you went off and had some

    12    renegotiations with the swap counterparties trying to get a

    13    better deal; right?

    14    A   Yes.  We were ordered to mediation.

    15    Q   Right.  You weren't otherwise planning on engaging in

    16    reopening negotiations with the swap counterparties; were

    17    you?

    18    A   No.

    19    Q   So just to set the stage, the renegotiations happened on

    20    December 23rd and 24th; correct?

    21    A   Yes.

    22    Q   And those negotiations resulted in a new deal, which is

    23    principally, if I can sum up the key points, that the city

    24    will pay a fixed amount of 165 million to terminate the swaps

    25    on or before January 31st; correct?

1  A   Yes.

2  Q   So gone is the percentage deal we had originally, and now

3  we're looking at a fixed fee; correct?

4  A   Yes.

5  Q   Okay.  It's true, isn't it, that your only goal in going

6  into these negotiations was to reduce the amount of the

7  termination payment and maintain the general structure of the

8  deal you already had in place; correct?

9  A   Yes.

10  Q   Okay.  At the same time, you don't know if you actually

11  determined what the total payment liability was on December

12  23rd when you went into those negotiations.

13  A   During the course of those negotiations, we called Jim

14  Doak and Miller Buckfire and inquired about a range of the

15  potential termination, so we had that call and discussed it.

16  Q   Okay.  Before you went into the negotiations on the 23rd,

17  did you have an analysis done to say, "What's our current

18  termination payment liability as I head into these

19  negotiations?  What's my bottom line I'm working with?"  You

20  didn't do that; right?

21  A   No.  I don't recall analysis.

22  Q   And so during the negotiations, you were working with an

23  understanding that the total termination liability as of that

24  time would have been in the high 200 millions; is that right?

25  A   Yes, approximately.

1    Q    Okay.  And you were also working with the understanding

2    that 75 percent of that termination amount would be

3    equivalent to roughly $230 million; right?

4    A    Approximately, yes.

5    Q    So fair to say that was the benchmark you were working

6    with that you were trying to improve on; correct?

7    A    Yes.

8    Q    Okay.  Now, we know subsequently from the city's

9    stipulation that as of 12-23 the total termination liability

10   was approximately 256 million, which would make a 75-percent

11   payment on that approximately 190 million; is that true?

12   A    I haven't seen the stipulation, but I'll take your math

13   as true, yes.

14   Q    Okay.  And those numbers that I just gave you, you didn't

15   have those on the 23rd; right?

16   A    We had the general numbers but not those specific

17   numbers.

18   Q    Okay.  Also, before going into the negotiations on the

19   23rd, you did not ask Miller Buckfire to run an analysis that

20   looked at trending interest rates and how they might affect

21   your termination payment liability going into the future;

22   correct?

23   A    Yes.

24   Q    You didn't have an updated LIBOR curve analysis, for

25   example, in front of you to inform your negotiations?

13-53846-swr   Doc 4244-10   Filed 04/29/14   Entered 04/29/14 14:24:00   Page 355 of
13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 92 of 200   355
463

1  A   That's correct.

2  Q   And to the extent that LIBOR rates rise, the termination

3  payment is going to come down; right?

4  A   Yes.

5  Q   But you don't know whether it would have affected your

6  settlement decisions if a LIBOR curve analysis had been

7  provided to you that reflected, in fact, that interest rates

8  were going to rise?

9  A   Correct.

10  Q   All right.  Now, the only negotiations that led to this

11  new deal were on December 23rd and 24th; right?

12  A   Yes.

13  Q   After we broke from the trial on the 18th, you didn't

14  have any discussions in that intervening time period between

15  the 18th and the 23rd?

16  A   Me personally?

17  Q   Yeah.

18  A   No.

19  Q   And you don't know that anybody else on behalf of the

20  city did either; right?

21  A   I think there was a conference on that Friday, but I

22  don't know.

23  Q   You're referring to the status conference in front of

24  Judge Rhodes?

25  A   Yes.

1   Q   Okay.

2   A   Um-hmm.

3   Q   And you testified that the mediation basically -- you

4   didn't really get -- you didn't get in a room with the swap

5   counterparties and debate your arguments with them; right?

6   A   Correct.

7   Q   You were basically on a room sort of off on your own, and

8   the mediator went back and forth; is that right?

9   A   Yes.  The mediators went back and forth.

10  Q   Okay.  And did you have -- you didn't have any direct

11  negotiations with any of the other parties that were present

12  at the mediation; correct?

13  A   Correct.

14  Q   In fact, when I asked you about this a couple days ago,

15  you couldn't even remember the names of any other person that

16  was there on behalf of any other party; right?

17  A   Mr. Marriott and Mr. Gordon but not all of them, yes.

18  Q   And that's because Mr. Marriott stopped your deposition

19  and said, "Hey, wait a minute.  Don't you remember me?";

20  right?

21  A   Part of the usual suspects.

22  Q   Usual suspects.  Okay.  All right.  Now, in the course of

23  your negotiations, you testified on direct that your first

24  proposal was a settlement in the range of about 150 million;

25  right?

1   A    Yes.

2   Q    And you were thinking of a percentage number that fell in

3   the range of 50 to 60 percent as your first offer; is that

4   right?

5   A    Yes.

6   Q    You didn't come in with a first offer lower than 50

7   percent?

8   A    No.

9   Q    You didn't make it your goal to get to a 50-percent deal

10  because you started higher than that; right?

11  A    We would have taken a 50-percent, but, correct, yeah.

12  Q    Typically if you offer more than 50 percent, you're not

13  going to get to 50 percent; right?

14  A    Yeah.

15  Q    Now, you consider the new deal that you got to be

16  materially better than the first deal; right?

17  A    Yes.

18  Q    And that's because you think it reduces the optional

19  termination payment by tens of millions of dollars; right?

20  A    Yes.

21  Q    In fact, you testified you think it's a savings of $65

22  million?

23  A    Yes.

24  Q    The reason you went for a fixed rate, you testified, is

25  that you wanted to avoid the risk associated with interest

1  rate fluctuations; correct?

2  A    The reason we went for a whole number.

3  Q    Yes.

4  A    Yes.

5  Q    Okay.  So by way of example, you thought if interest

6  rates went down, your termination fee might go up if you were

7  using a percentage deal; right?

8  A    Yes.

9  Q    And the flip side of that is that if interest rates went

10  up, your termination liability using a percentage deal would

11  have gone down; right?

12  A    Yes.

13  Q    Before agreeing to change the deal to a fixed amount, you

14  didn't ask Miller Buckfire to run an interest rate analysis

15  so you could predict where you'd be at the end of January,

16  did you?

17  A    No.  As I said, we had a conversation with Jim Doak -- a

18  couple of conversations that afternoon, but I wouldn't call

19  it a full-blown analysis.

20  Q    Okay.  And based on those conversations and the city's

21  general understanding, there was a general expectation that

22  in the future interest rates might increase and the

23  termination liability might come down; isn't that true?

24  A    There was a general understanding that they might go up

25  or they might go down.

1  Q   The option to terminate the 165 million expires on
2  January 31st; correct?
3  A   Yes.
4  Q   And you didn't estimate what your total termination
5  liability would be on January 31st, did you?
6  A   No.
7  Q   But you did estimate that if you went back to the date of
8  the original motion to approve your original forbearance
9  agreement, 165 million would be somewhere in the neighborhood
10 of 62, 63 percent of your termination liability; right?
11 A   Yeah.  We didn't estimate.  We calculated that number off
12 of the original motion.
13 Q   Okay.  So you're working with the understanding I think
14 165 million is in the neighborhood of a 62-percent, 63-
15 percent deal; correct?
16 A   Yes.
17 Q   Okay.  And on that basis, you're comparing that 62, 63
18 percent to the original 75 percent, and you're thinking I'm
19 getting a much better deal here; right?
20 A   Yes.
21 Q   Now, as you mentioned, the deal only lasts until January
22 31, but the old deal had a runway period that didn't expire
23 until June 2014; is that correct?
24 A   Yes.
25 Q   You negotiated the shortened expiration date so you could

1   get the deal done as soon as possible and avoid making the

2   swaps payments that would come due in March; right?

3   A    Yes.

4   Q    But you didn't do any analysis that would compare the

5   cost of the swaps payments upcoming versus the savings that

6   you might gain from a decreasing termination payment;

7   correct?

8   A    Yes.

9   Q    Now, during the December negotiations that occurred last

10  week, there weren't any representatives of the service

11  corporations there either; right?

12  A    Not on behalf of the city; correct.

13  Q    On behalf of the city or on behalf of the service

14  corporations?

15  A    No.  There was no one in our room.  I assume there was no

16  one else from the service corporations in any of the other

17  rooms.

18  Q    Did you see any representative of the service

19  corporations at any time during the negotiations on the 23rd

20  or 24th?

21  A    No.

22  Q    Okay.  And did you have any discussions or any

23  negotiations with any representatives of the service

24  corporations last week?

25  A    No.

13-53846-swr   Doc 4244-10   Filed 04/29/14   Entered 04/29/14 14:24:00   Page 361 of
13-53846-swr   Doc 4244-10   Filed 01/10/14   Entered 01/10/14 14:24:00   Page 98 of 200   361
463

1   Q   To your knowledge, did anyone on behalf of the city
2   engage in any negotiations with the service corporations?
3   A   Not that I know of.
4   Q   Do you have any knowledge that anyone on behalf of the
5   service corporations negotiated with the swap counterparties
6   at all?
7   A   Not that I know of.
8   Q   Do you even know whether the service corporations have
9   agreed to the sixth amendment to the forbearance agreement?
10  A   I'm not sure.
11  Q   As of Tuesday, you didn't know whether they had agreed to
12  it or not; correct?
13  A   Correct.
14  Q   I want to turn now to talk a little bit about the claims
15  and defenses that are being settled by the forbearance
16  agreement.  You testified on direct that you definitely
17  considered whether the swap obligations were void ab initio
18  under Act 34; correct?
19  A   Yes.
20  Q   Now, do you recall in your August deposition that I asked
21  you questions about that very potential argument?
22  A   I don't recall.
23  Q   You don't recall me asking you if you had considered the
24  argument that the swaps were void under Act 34?
25  A   No.  I don't recall, but I'm happy to look at the

1  deposition.

2  Q  Okay.  Do you not recall that when I asked you about Act

3  34, you couldn't tell me for sure whether it was considered?

4  You just said it was, quote, more likely than not that it had

5  been one of the issues that had been considered.  You don't

6  remember that?

7  A  If you say so.  I just don't recall.

8  Q  Should we look at your testimony to see that?

9  A  Sure.

10  Q  Okay.  So why don't we pull up the 8-30 deposition

11  transcript?  And I'm going to look at page 277, line 12 to

12  18.  And do you see -- admittedly this went on for a couple

13  of pages.  We had some back and forth banter about this, but

14  you'll see starting at line 12 I say, "Sitting here today,

15  you don't have an independent recollection for sure that Act

16  34 was looked at; isn't that correct?"  And you say

17  repeatedly, "It's more likely than not."  You were never able

18  to give me a definitive answer that it was actually something

19  you considered; correct?

20  A  Yes.

21  Q  Okay.  And the same was true of the argument that the

22  pledge of casino revenues was invalid under the Gaming Act,

23  isn't it?

24  A  Yes.

25  Q  You've testified here today that was definitely one of

1  the arguments you looked at and considered; right?

2  A   Yes.

3  Q   But in August you couldn't tell me that for sure.  You

4  said more likely than not that was something that was among

5  the list of things that was considered; correct?

6  A   Yes.

7  Q   When you were deposed on Tuesday of this week and you

8  were pressed to describe the substance of each of these

9  claims that you testified on direct were considered, there

10 were times at which you didn't know the details of the

11 arguments, and you got confused, weren't there?

12 A   Yes.  We talked about that.

13 Q   All right.  So, for example, when I asked you to describe

14 the basis for the claim that the pledge of casino revenue was

15 invalid under the Gaming Act, in the course of your answers,

16 you repeatedly started referencing Act 34, didn't you?

17 A   In that discussion I was talking about Section 18 because

18 I was looking at the 18-percent tax in the Gaming Act as

19 opposed to Section 12, but, yes, we had that discussion about

20 Act 34 versus the Gaming Act.

21 Q   You mixed them up several times, didn't you?

22 A   Yes.

23 Q   Yeah.  And, in fact, you testified that your

24 understanding of the weakness of the casino revenue pledge

25 argument was that the City Council had cited to provisions of

1   Act 34 about tax relief in their ordinance; correct?

2   A    Yes.

3   Q    And when I asked you about the vulnerability of the liens

4   on post-petition casino revenue under the Bankruptcy Code,

5   Section 928, you talked about an Orrick legal opinion

6   blessing the validity of the liens; right?

7   A    Yes.

8   Q    But you seemingly did not understand that the Orrick

9   opinion explicitly expressed no opinion under Section 928;

10  correct?

11  A    Well, there are two paragraphs on page 3 of that opinion,

12  one where they talk about it would be -- classifies as excise

13  taxes and possibly special revenues, and in the paragraph

14  under that they go into but we're not going to comment on

15  928.

16  Q    Right.  They did not express an opinion --

17  A    Right.

18  Q    -- on the applicability of 928; correct?

19  A    Yes.

20  Q    Okay.  When I asked you about the argument that the swaps

21  obligations were void ab initio because the city failed to

22  comply with Act 34, in the context of those discussions, you

23  referred me back and started referencing the Gaming Act,

24  didn't you?

25          MR. SHUMAKER:  Objection, your Honor.  Ms. English

1  is quizzing the witness on what the deposition testimony was.

2  If she has a question for him and then there's an

3  inconsistency, she could confront him with it, but this is an

4  improper line of questioning.

5       MS. ENGLISH:  Your Honor, in lieu of designating 40

6  pages of a deposition transcript that clearly showed Mr. Orr

7  does not understand the substance of these arguments, I am

8  trying to elicit testimony here today just to show the

9  highlights of how he got confused, and he couldn't testify as

10  to what these arguments really entailed.  He started mixing

11  them up.  He was great with the buzz words, but when you

12  asked him questions about what they actually involved, he

13  didn't know.

14       THE COURT:  Well, it's fine to have the witness

15  testify concerning what he previously testified to, but I

16  think the more proper procedure is to ask him if you asked

17  this question and if he gave this answer rather than to try

18  to summarize it for him.

19       MS. ENGLISH:  Okay.  Thank you, your Honor.

20  BY MS. ENGLISH:

21  Q   All right.  Why don't we do exactly that?  We'll look at

22  a couple of references from the deposition transcript.  So I

23  think you have the December 31 transcript in front of you.

24  Okay.  If you look on page 82 of your transcript --

25       MS. ENGLISH:  And, Travis, you could bring this up,

 1  too, if you have it handy.

 2          MR. SHUMAKER:  Your Honor, same objection.  Running

 3  through the deposition testimony is improper.  If she wants

 4  to ask this question and she gets a different answer from the

 5  witness, she can then bring this up as inconsistent, but just

 6  running through all these questions is improper.

 7          THE COURT:  Well, it's not hearsay.  He's a

 8  representative of the city, so the deposition can be used for

 9  any purpose, so I'll permit it.

10          MS. ENGLISH:  Thank you, your Honor.

11  BY MS. ENGLISH:

12  Q   So I just want to run through just a couple of examples.

13  Okay.  So on page 82, do you see starting let's say around

14  line 9 you're being asked about arguments as to voidness or

15  invalidity of the swap obligations?  Do you see that?

16  A   Um-hmm.

17  Q   And then do you see in your answer, lines 12 to 14, that

18  you reference that there could be arguments made that the

19  swap obligations were not properly authorized under the

20  Gaming Act?

21  A   Um-hmm.

22  Q   Okay.  And just another few lines later towards the

23  bottom of that page, line 23, I asked you, "So your

24  understanding is that the Gaming Act imposes conditions on

25  swap obligations?"  And you thought it might.

1    A    Yes.

2    Q    Okay.  Now, as to the Act 34 arguments, you don't even

3    know whether or not the requirements of Act 34 were, in fact,

4    followed; correct?

5    A    Correct.

6    Q    Okay.  You testified on direct that you had a concern

7    about estoppel arguments that could be raised; correct?

8    A    Yes.

9    Q    But you don't have an understanding that the doctrine of

10   estoppel is inapplicable to void ab initio claims?

11   A    That's correct.

12   Q    Another defense that you testified to, I believe, was

13   safe harbor protections; is that right?

14   A    Yes.

15   Q    Okay.  Yet you don't have an understanding as to whether

16   the swap counterparties even meet the definition of, quote,

17   "swap participant" under the Bankruptcy Code; isn't that

18   right?

19   A    That's correct.

20   Q    And, in fact, you testified that the city has not even

21   developed a position with respect to that; correct?

22   A    Yes.

23   Q    Now, you testified -- on your direct examination, Mr.

24   Shumaker asked you a number of questions about evaluating the

25   strengths and weaknesses of all of the claims you looked at

1  and how you assessed your likelihood of success, the city's
2  likelihood of success; right?
3  A    Yes.
4  Q    Okay.  It's true, is it not, that for every single claim
5  you looked at, you assessed the city's odds as 50/50?
6  A    Yes.
7  Q    Not a single claim that you said 75/25?
8  A    No.
9  Q    Not a single claim you said 80/20?
10 A    Correct.
11 Q    Every single claim was just a toss-up in your mind;
12 correct?
13 A    Yes.
14 Q    It's true, isn't it, that back in June 2013 you really
15 wanted to get a deal done with the swap counterparties?  You
16 really didn't want to have to litigate with them; correct?
17 A    Yes.
18 Q    You had -- at that time and subsequently, you've had a
19 lot of cash flow forecasts put together by E&Y showing you
20 various scenarios; correct?
21 A    Yes.
22 Q    Some show with the DIP.  Some show no DIP.  Some show
23 cash trapped.  Some show the settlement payments.  Some show
24 the continued swap monthly payments; correct?
25 A    Yes.

13-53846-swr   Doc 2444-10   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 369 of 200
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 14:00:23   Page 906 of 200 369
463

1   Q    All of these options were shown?

2   A    Yes.

3   Q    You never asked for a single cash flow analysis that

4   showed getting post-petition financing and litigating with

5   the swap counterparties as opposed to settling with them, did

6   you?

7   A    Yes.

8   Q    Yes, you did, or, yes, you agree you didn't ask for that?

9   A    We did not get that, yes.

10  Q    Now, if you were successful in a litigation against the

11  swap counterparties, that would mean you could void all of

12  the city's swap obligations and the swap counterparties'

13  liens altogether; correct?

14  A    Potentially, yes.

15  Q    Okay.  It would also mean that the swap counterparties

16  would not have the ability to trap the city's access to

17  casino revenue; correct?

18  A    Certainly, yes.

19  Q    And it's your understanding that if the city were

20  successful on its void ab initio argument, it could then

21  recover potentially all of the swap payments it had made to

22  the swap counterparties; correct?

23  A    Potentially, yes.

24  Q    And given that those swap payments are roughly in the

25  neighborhood of $50 million a year, we're talking about

1  hundreds of millions of dollars, aren't we?

2  A    Potentially, yes.

3          MS. ENGLISH:  That's all I have, Mr. Orr.  Thank you

4  very much.

5          THE WITNESS:  Sure.

6          MS. ENGLISH:  I spoke too soon.

7          THE COURT:  Oh, well --

8          MS. ENGLISH:  I'm reminded --

9          THE COURT:  Go ahead then.

10          MS. ENGLISH:  -- that I referenced -- sorry?

11          THE COURT:  Go ahead then.

12          MS. ENGLISH:  I'm reminded that I referenced Syncora

13  Exhibit 230, and I would like to move that into evidence,

14  please.

15          THE COURT:  Any objection to Exhibit 230?

16          MR. SHUMAKER:  No objection, your Honor.

17          THE COURT:  It is admitted.

18          MS. ENGLISH:  Thank you, your Honor.

19      (Syncora Exhibit 230 received at 12:18 p.m.)

20          THE COURT:  How long will you be, sir?

21          MR. ARNAULT:  Maybe 15 minutes, perhaps less.

22          THE COURT:  Anyone else?  All right.  We're going to

23  take our lunch break now then, and we will reconvene at two

24  o'clock, please.

25          THE CLERK:  All rise.  Court is in recess.

1    (Recess at 12:19 p.m. until 2:02 p.m.)

2         THE CLERK:  All rise.  Court is in session.  Please

3    be seated.

4         THE COURT:  Looks like everyone is here.  You may

5    proceed, sir.

6         MR. ARNAULT:  Thank you, your Honor.  Before we

7    begin, I've been asked by my fellow objectors to obtain a

8    minute count if that's okay.

9         THE COURT:  Yes.  It'll take me a minute to do that.

10   Why don't you proceed, and then when I'm ready to give it to

11   you, I will give it to you?

12        MR. ARNAULT:  Sounds good.  Thank you, your Honor.

13                    CROSS-EXAMINATION

14   BY MR. ARNAULT:

15   Q   Good afternoon, Mr. Orr.  How are you?

16   A   Good afternoon.  I'm fine.

17   Q   My name is Bill Arnault, and I represent Syncora.  We met

18   the other day at your deposition.

19   A   Yes.

20   Q   So to begin, I'd like to just go over a few questions

21   about your understanding of the objectives and some of the

22   effects of the forbearance agreement, and I know Ms. English

23   asked you some of those questions, but I just want to link

24   that with the forbearance agreement and the sixth amendment.

25   A   Yes.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 372 of
13-53846-swr   Doc 2444-1   Filed 01/10/14   Entered 01/10/14 14:40:23   Page 109 of 200   372
463

1   Q   So to begin, your understanding is that the forbearance

2   agreement releases all claims that the swap counterparties,

3   the service corporations, and the city may have against one

4   another; right?

5   A   Yes.

6   Q   In addition, it is also your understanding that the

7   forbearance agreement resolves any defaults that exist under

8   the collateral agreement and the amended swaps; right?

9   A   Yes.

10   Q   And the result of the forbearance agreement is that the

11   city and the swap counterparties will be able to perform

12   under the forbearance agreement without being subject to any

13   liability to any third parties; correct?

14   A   With the exception of any possible regulatory or criminal

15   enforcement, yes.

16   Q   Mr. Orr, you took a deposition in this case; correct?

17   A   Yes.

18   Q   And at that deposition you told the truth; correct?

19   A   Yes.

20   Q   All right.  If you could flip to page 141 of your August

21   30th deposition --

22   A   Yes.

23   Q   If you could look at line 14 through 20, please.  Just

24   let me know when you're there.

25   A   Page 131?

1  Q    Page 141.

2  A    141.

3  Q    Line 14.

4  A    Yes.

5  Q            "Question:  Okay.  And the result of the

6            forbearance agreement is that the city will be able

7            to perform under the forbearance agreement without

8            being subject to any liability to any third party?

9            Answer:  That is my understanding.

10            Question:  And so will the swap counterparties;

11            correct?

12            Answer:  That is my understanding."

13        Were you asked those questions, and did you give

14  that response?

15  A    Yes.

16  Q    And so that immunity from liability, that's one of the

17  values of this agreement to both the city and the swap

18  counterparties; right?

19  A    Yes.

20  Q    Now, moving on to some of your objectives as part of the

21  negotiations, as part of the initial negotiations, one of

22  your objectives was to get the swap counterparties to waive

23  their cash strapping rights on an interim basis so that the

24  city could access the casino revenues; right?

25  A    Yes.

1  Q   And that was still an objective in the most recent round
2  of negotiations; right?
3  A   Yes.
4  Q   A second objective was that you wanted to modify the swap
5  to get a discount on the termination amount; right?
6  A   Yes.
7  Q   And a third objective was that you wanted to obtain an
8  option about when you could direct the termination of the
9  swap; correct?
10  A   Yes, generally, yeah.
11  Q   And you achieved these three objectives in the
12  forbearance agreement; right?
13  A   Yes.
14  Q   And you achieved these three objectives in the sixth
15  amendment; right?
16  A   Yes.
17  Q   You would agree with me that another benefit of the
18  forbearance agreement is that from the city -- a benefit from
19  the city's standpoint is that it provides the city with
20  interim access to the casino revenues; right?
21  A   Yes.
22  Q   And your understanding is that during the forbearance
23  period, the swap counterparties have temporarily relinquished
24  the right to direct cash trapping so long as the optional
25  termination period is pending; correct?

1    A    Yes.

2    Q    And you understand that cash passes through the general

3    receipt subaccount on a monthly basis; right?

4    A    Yes.

5    Q    And we can agree that between July 15th and whenever the

6    option is exercised or expires, there is cash that is --

7    either already has or will flow through the cash trap to the

8    city; right?

9    A    The cash trap?

10   Q    Yeah.  It will flow through the cash trap to the city;

11   correct?

12   A    Yes.  The general receipts account, yes.

13   Q    Yeah.  There will be money that will flow to the city;

14   correct?

15   A    Yes.

16   Q    And we can also agree that if the option expires, the

17   city is under no obligation to put the cash that it received

18   in the interim back into the general receipt subaccount;

19   right?

20   A    Yes.

21   Q    Now, you are familiar with the idea that two different

22   contracts can be part of one integrated transaction; right?

23   A    Yes.

24   Q    And your understanding is that the forbearance agreement

25   is part of the same subject matter as the collateral

 1  agreement and the swaps agreement; right?

 2  A   Same subject matter?

 3  Q   Yes.

 4  A   Yes.

 5  Q   Finally, just a few more questions about the forbearance

 6  agreement.  Over the past few weeks, it's been suggested at

 7  various times that if the city was not able to reach an

 8  agreement with the swap counterparties, that it would instead

 9  choose to sue them; right?

10  A   It might.

11  Q   Because the city has various claims against the swap

12  counterparties; right?

13  A   Yes.

14  Q   And these potential claims against the swap

15  counterparties could be considered an asset for purposes of

16  bankruptcy; correct?

17  A   Claims can be considered assets for purposes of

18  bankruptcy, yes.

19  Q   And here the forbearance agreement would resolve those

20  claims; correct?

21  A   Yes.

22  Q   Now, you submitted the terms of the forbearance agreement

23  to the governor for approval; right?

24  A   To the treasurer.

25  Q   But you don't recall ever submitting the forbearance

1 agreement to the City Council for approval; right?

2 A   The forbearance agreement?

3 Q   Yeah, the forbearance agreement.

4 A   No, I don't recall that.

5 Q   And you never submitted the sixth amendment to the City

6 Council for approval; right?

7 A   No, I don't recall that.

8        MR. ARNAULT:  Thank you, Mr. Orr.  No further

9 questions, your Honor.

10                 CROSS-EXAMINATION

11 BY MR. MARRIOTT:

12 Q   Good afternoon, Mr. Orr.

13 A   Good afternoon, Mr. Marriott.

14 Q   Thank you for restoring me to the ranks of the usual

15 suspects.  I am not going to ask you any questions about the

16 forbearance agreement.  I want to focus on the Barclays

17 transaction.

18 A   Um-hmm, yes.

19 Q   Now, Mr. Orr, you made the ultimate decision to accept

20 the Barclays proposal for the post-petition financing that

21 the city is now seeking authorization to borrow; correct?

22 A   Yes.

23 Q   And when you were asked earlier on direct what factors

24 you considered in making the selection, the first factor you

25 indicated was the cost of the various alternatives available

13-53846-swr   Doc 2444-10   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 93 of 200
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 14:40:23   Page 378 of
463
378

1  to you; correct?

2  A   Yes.

3  Q   And, in fact, the cost of financing is an important

4  factor in deciding whether or not to undertake a financing

5  transaction; correct?

6  A   Yes.

7  Q   And, indeed, it would be imprudent to accept a financing

8  proposal if you did not know what the cost of the financing

9  would be; correct?

10  A   It might be.

11  Q   Well, it might be or it would be?

12  A   Generally, yes.

13      MR. MARRIOTT:  Can we have Exhibit 89?

14  BY MR. MARRIOTT:

15  Q   Mr. Orr, I believe you testified on direct that you used

16  this document as part of your decision-making process in

17  selecting the Barclays commitment over the other commitments

18  the city received; correct?

19  A   Yes.

20  Q   And if we could turn to page 5 of Exhibit 89, we see here

21  that an entire page is devoted to a cost comparison of the

22  four commitments you were considering; correct?

23  A   Yes.

24  Q   Now, for two of the four commitments, including Barclays,

25  there is a reference to market flex; correct?

1   A   Yes.

2   Q   And market flex provides to a lender the flexibility to

3   increase the minimum interest rate on a loan if that is

4   necessary to attract interest from other potential

5   participants in the loan; correct?

6   A   It's a process that allows the potential participant

7   bidders to increase the rate, yes.

8   Q   So that the -- so that Barclays, if it exercised the

9   market flex as necessary to find other interested

10  participants in the transaction, could raise the minimum

11  interest rate; correct?

12  A   Those participants could bid above the minimum rate, yes.

13  Q   Which would result in the loan bearing interest above the

14  original minimum rate; correct?

15  A   Yes.

16  Q   Okay.  And Exhibit 89 informs you of both the existence

17  of a market flex term -- of both the existence of a market

18  flex term in the Barclays and the Goldman commitments and

19  also specifies the scope of the market flex; correct?

20  A   Yes.

21  Q   Okay.  And so looking at the Barclays column, which is

22  the far left, the lowest minimum interest rate on the loan is

23  3.5 percent, but the minimum could rise as high as 6.5

24  percent under the market flex provisions; correct?

25  A   Yes.

1    Q    And, in fact, this chart accurately reflects what the
2    Barclays interest rate range could be under the proposal
3    before the Court today; correct?
4    A    Yes.
5         MR. MARRIOTT:  Could we put up Exhibit 94?
6    BY MR. MARRIOTT:
7    Q    Mr. Orr, if you would look at 94, which has been
8    admitted, this is the Barclays commitment letter.  Do you
9    recognize it?
10        MR. MARRIOTT:  Maybe you could scroll through it.
11        THE WITNESS:  Just to the back page.
12   BY MR. MARRIOTT:
13   Q    You actually have hard copies there if that would be
14   easier for you to --
15   A    I just wanted to check my signature.  That's all.
16   Q    That's fine.
17   A    That's all.  You can just flip to it.
18   Q    Run out of pages?
19   A    Yeah.  Which number?  I'll just --
20   Q    A signature is on page 10.
21   A    Mr. Marriott, if you represent this is a true copy with
22   my signature, that's fine.
23   Q    There it is.  Success.
24   A    Okay.
25   Q    Okay.  Now, although the commitment letter and the term

1  sheets attached to it mention market flex, I'm correct, am I

2  not, that the commitment letter does not disclose the scope

3  of the market flex?

4  A   I believe that's correct.

5  Q   Okay.  And, in fact, the scope of the market flex was set

6  forth in a separate fee letter with Barclays; correct?  Let

7  me help.

8  A   Yeah.

9        MR. MARRIOTT:  Could we put up Exhibit 93?

10       THE WITNESS:  Yeah.  Take me to it.  I believe

11  that's correct.  I just haven't seen the provision recently.

12       MR. MARRIOTT:  Okay.  Maybe we could scroll through.

13  I can tell you when to stop.

14       THE WITNESS:  There you go.

15       MR. MARRIOTT:  Okay.  Stop right there.

16  BY MR. MARRIOTT:

17  Q   This is -- do you recognize this as the fee letter with

18  Barclays?

19  A   I believe so.

20  Q   All right.  And do you see where this is the place where

21  the scope of the market flex is set forth?

22  A   Yes.

23  Q   Okay.  Now, you're familiar with Michigan Public Act 436;

24  correct?

25  A   Yes.

1  Q   And, in fact, that's the statute under which you are

2  appointed; correct?

3  A   Yes.

4  Q   And I think your direct testimony might have been a

5  little ambiguous on this point, but it's under PA 436 that

6  you are required to submit to City Council certain proposed

7  acts that you are considering on behalf of the city; right?

8  A   Yes.

9  Q   And one of those things that requires submission to City

10 Council is a transaction such as the proposed Barclays

11 transaction for the borrowing of money; correct?

12 A   Yes.

13 Q   And, in fact, you made a submission to City Council with

14 respect to the Barclays proposed post-petition financing;

15 correct?

16 A   Yes.

17       MR. MARRIOTT:  Could we bring up Exhibit 98?  Next

18 page.

19 BY MR. MARRIOTT:

20 Q   Now, is this, in fact, that submission under PA 436 to

21 City Council with respect to the Barclays proposal?

22 A   Yes, I believe so.

23 Q   And you can work from memory or you can take time to

24 scroll through it, whichever you prefer.

25 A   Okay.

1  Q   But Exhibit 98, the submission to City Council, did not

2  include a copy of the fee letter that we just reviewed,

3  Exhibit 93; correct?

4  A   I believe that's correct.

5  Q   Just the term sheets that were attached to the commitment

6  letter; correct?

7  A   Can you scroll to the first page, please, just the cover

8  memo, the very first page?  Yes.

9  Q   Okay.  Now, other than this communication to City Council

10  regarding the proposed Barclays financing, which does not

11  include the fee letter which has the substance of the market

12  flex provision, did you personally otherwise communicate to

13  City Council the substance of the market flex provision that

14  was contained in the fee letter?

15  A   No.

16  Q   To your knowledge, did anybody else?

17  A   Not that I know of.

18  Q   Now, City Council ultimately declined to approve the

19  Barclays financing and passed a resolution to that effect;

20  correct?

21  A   I believe so.

22      MR. MARRIOTT:  Could we go to Exhibit 96?

23  BY MR. MARRIOTT:

24  Q   Mr. Orr, you testified on direct regarding this exhibit,

25  which, as I understand it, is a submission you made to the

1  then treasurer of the State of Michigan seeking approval for

2  the proposed Barclays loan; correct?

3  A   Yes.

4  Q   And I think you testified that you weren't sure whether

5  you needed it, but you thought out of an abundance of caution

6  it made sense to ask for it; correct?

7  A   Yes.  We thought we didn't need it, but in an abundance

8  of caution we asked for it, yes.

9  Q   Okay.  And if you would turn to pages -- first page 4 of

10 this exhibit, now, you did include the fee letter in your

11 submission to the treasurer, but you then had redacted the

12 market flex provisions; correct?

13 A   Yes.

14 Q   And to your knowledge, were the -- was the substance of

15 the market flex provisions otherwise communicated to the

16 treasurer?

17 A   Not to my knowledge.

18 Q   Just a couple other quick ones.  I believe you testified

19 on direct that the commitment from Barclays as we sit -- as

20 you understand it, expires 1-31-14.

21 A   I believe so.

22 Q   Okay.  And the loan will be reduced from 350 million to

23 285 million; is that correct?

24 A   Yes.

25 Q   Do you know if Barclays -- well, let me ask the question

 1   this way first.  Has there been an amendment to the

 2   commitment letter to extend the termination date to 1-31 and

 3   to reduce the amount of the loan to 285 million?

 4   A   I don't know.

 5   Q   Do you know whether in the absence of such an amendment

 6   Barclays has otherwise indicated its agreement to those two

 7   provisions?

 8   A   It is my understanding that they have agreed to those

 9   provisions.

10        MR. MARRIOTT:  Okay.  I have nothing further.  Thank

11   you.

12                     CROSS-EXAMINATION

13   BY MS. GREEN:

14   Q   Good afternoon, Mr. Orr.  I'm Jennifer Green on behalf of

15   the Retirement Systems for the City of Detroit.

16   A   Good afternoon, Mrs. Green.

17   Q   I think you previously described the city was in sort of

18   a panic mode when you embarked on the first round of

19   negotiations with the swap counterparties back in June of

20   2013; correct?

21   A   I didn't say it was a panic mode, but I said our

22   financial condition was dire.

23   Q   I think you'd gotten some financial reports that were

24   worse than you expected; correct?

25   A   Yes, um-hmm.

13-53846-swr   Doc 2444-10   Filed 01/10/14   Entered 01/10/14 14:40:23   Page 93 of 200
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 386 of 386
463

1  Q   I think you used the words cash crisis and a potential
2  payless payday, things of that nature?
3  A   Yes.
4  Q   And so you -- or, rather, Ken Buckfire on the city's
5  behalf called up the swap counterparties, and you started the
6  negotiations at 50 cents on the dollar; correct?
7  A   Not exactly.  It's my understanding that discussions
8  regarding a discount to the potential termination payment had
9  been going on for some time, months before I got here, but
10 they became in earnest in the May through June time frame.
11 Q   Okay.  And the amount that you started the negotiations
12 at was around 50 cents on the dollar; correct?
13 A   I believe generally, yes.
14 Q   And then you ended up at 75, roughly?
15 A   Yes.
16 Q   Now let's fast forward to the present.  The city has
17 filed bankruptcy.  There are some protections in place as a
18 result of that; correct?
19 A   Yes.
20 Q   And you have the forbearance agreement in place, and I
21 think, as you just testified, the casino revenue is not in
22 danger of being trapped currently; correct?
23 A   Not presently.
24 Q   Okay.  And then we have the evidentiary hearing that
25 we're all here for today, and you might recall on the 18th

1    when the judge, Judge Rhodes, stopped the proceedings, and I

2    think at your deposition you used the words and sort of

3    admonished the parties that 75 cents on the dollar is

4    something you might take if you actually have a judgment in

5    your hand.  Do you remember that testimony?

6    A    Yes, I do.

7    Q    Okay.  And you were here, and you were sitting on the

8    witness stand when that happened?

9    A    Yes.

10   Q    And we were ordered to go into mediation?

11   A    Yes.

12   Q    And so you'd gained a little different leverage in

13   negotiating position compared to where you were back in June;

14   correct?

15   A    Yes, I think that's fair.

16   Q    Okay.  And then you started out the mediations on the

17   23rd, and you started at 50 cents on the dollar again; right?

18   A    Roughly, yes.

19   Q    Which was the same amount you started at back in June?

20   A    Roughly, yes.

21   Q    Okay.  I think you testified that you became EM in March

22   of 2013; correct?

23   A    Yes.

24   Q    But you knew before officially commencing your role as

25   emergency manager that the swaps and the access to the casino

 1   revenue were both significant issues with respect to the
 2   city's financial stability; correct?
 3   A    Yes.
 4   Q    So you knew coming in that the swap agreements themselves
 5   had to be dealt with kind of up front?
 6   A    I thought they were a significant issue to be dealt with,
 7   yes.
 8   Q    But you knew that the swap agreements had been entered
 9   into many years earlier in '05 and '06; right?
10   A    Yes.
11   Q    And the collateral agreement was back in '09?
12   A    Yes.
13   Q    And you didn't have any protocol in place for how you
14   would investigate the claims or defenses related to those
15   documents; correct?
16   A    When you say -- well, when you say "protocol," there was
17   an investigation of potential claims related to those
18   documents, but I don't know if I would call it a protocol.
19   Q    Well, I think you said earlier that you looked into the
20   City Council records, you did some legal analysis, and you
21   looked at some other public records; correct?
22   A    Yes.  My team and I looked at a number of different
23   records, yes.
24   Q    Okay.  But you didn't compile a list of, for instance,
25   city employees or officials that were involved in the swap

1  agreements or the collateral agreement itself; correct?

2  A    No.  I think there were records that showed the city

3  employees as well as the City Council people and the

4  discussions they had about those agreements.

5  Q    Fair enough.  You didn't interview any of those people?

6  A    No.

7  Q    Okay.  And you didn't interview any of the financial

8  consultants who may have advised the city in connection with

9  either the swap agreements or the collateral agreements;

10  correct?

11  A    Not that I know of.

12  Q    And you didn't interview any of the City Council staff

13  members or anything of that nature?

14  A    I wouldn't call it an interview, but I did have

15  conversations with at least one staffer, which was more

16  casual, but I wouldn't call it an interview, so, yes, that's

17  correct.

18  Q    Okay.  Did you attempt to gather any of the relevant

19  documents such as internal notes or memorandums relating to

20  the negotiations from '09 or '05 or '06 or anything of that

21  nature?

22  A    I don't know.

23  Q    I believe you testified the biggest weakness to the claim

24  regarding the invalidity of the casino revenue pledge was the

25  opinion letter, the legal opinion letter, the City Council

1  ordinance, the letter from the state gaming board, and at

2  your deposition you called it the acquiescence of the parties

3  to the transaction and the fact that nobody raised

4  objections.  Do you recall identifying those things as

5  weaknesses?

6  A    Yes.

7  Q    Okay.  But you don't actually know if anyone raised

8  objections back in '09 or '05 or '06; correct?  You didn't

9  interview any of the people that were involved?

10  A    No.  I think objections were raised to the transaction by

11  City Council people if not others, but they were voted upon

12  and overruled.

13  Q    And I believe you also had stated that the state gaming

14  board letter was something that you looked at in respect to

15  the casino revenue pledge; correct?

16  A    Yes.

17  Q    And I think at your deposition you mentioned it like four

18  or five times that that was something that you had relied

19  upon --

20  A    That was an issue, yes.

21  Q    -- in coming to your conclusion?

22  A    Yes.

23       MS. GREEN:  Can we pull up Exhibit 11, please, City

24  Exhibit 11?

25  BY MS. GREEN:

1   Q   And you recognize this as the collateral agreement from

2   2009; correct?

3   A   Yes.

4   Q   And if we scroll to the very end of the collateral

5   agreement, I believe it's page 71.  And this is a copy of the

6   letter that you've been referring to from the state gaming

7   board; correct?

8   A   Yes.

9   Q   And if we could blow that letter up just a little bit --

10  it's dated June 18th, 2009.  The subject line states,

11  "Irrevocable instructions directing the three licensed

12  Detroit casinos to electronically transfer city taxes to a

13  custodial account."  Do you see that, Mr. Orr?

14  A   Yes.

15  Q   And the irrevocable instructions that it references, in

16  the top line it states, "We're in receipt of a letter from

17  the city's outside gaming counsel transmitting to and

18  advising the board of certain irrevocable instructions."  Do

19  you see that?

20  A   Yes.

21  Q   And those irrevocable instructions are the ones, as you

22  understand, that tell the three casinos to wire certain funds

23  to U.S. Bank; correct?

24  A   Yes.

25  Q   And you might recall all of this from your deposition.

1  We went through, and just prior to this letter attached to

2  the collateral agreement there are three separate sets of

3  irrevocable instructions each identifying certain funds to be

4  transferred electronically to U.S. Bank; correct?

5  A   Yes.

6  Q   And after each of those irrevocable instructions, there's

7  a confirmation letter from the casino saying, yes, we got

8  your letter, and, yes, we will do as we are told.

9  A   I believe so.

10  Q   Okay.  So we won't have to go through all of those again.

11  And as the letter states, they received those irrevocable

12  instructions; right?

13  A   Yes.

14  Q   But this letter nowhere states anything about, for

15  instance, signing off on the casino revenue pledge in

16  general; correct?

17  A   Yes.

18  Q   Nowhere does it say that the gaming board has reviewed

19  the validity of the city's pledge of the casino revenue and

20  that for purposes of securing the city's financial

21  obligations under the collateral agreement, that's all well

22  and good under Michigan law.  Doesn't say that; right?

23  A   It does not say that.

24  Q   And it doesn't say that the city is hereby authorized to

25  pledge the casino revenue and that this transaction fully

1  complies with Section 12 of the Gaming Act; right?

2  A    Correct.

3  Q    In fact, it doesn't say anything about Section 12 of the

4  Gaming Act, does it?

5  A    No.  It just mentions the Gaming Act generally.

6  Q    Okay.  We discussed that you did not do interviews with

7  any people that may have been involved in the swap

8  transactions or the collateral agreement; correct?

9        MS. GREEN:  Can we pull up Exhibit 1005?

10  BY MS. GREEN:

11  Q    Mr. Orr, this has been admitted into evidence as Exhibit

12  1005.  Can you take a moment and read the top paragraph of

13  this e-mail and tell me if you have seen this e-mail before?

14  A    Okay.

15  Q    As you can see at the top, it's dated September 4th,

16  2013.  At the top it says, "Thanks.  I'll share with Jones

17  Day."

18  A    Um-hmm.

19  Q    I realize that you're no longer performing as an attorney

20  for Jones Day, but was this ever, indeed, shared with you,

21  this e-mail?

22  A    No.

23  Q    And you read the substance of the e-mail from Thomas

24  Gavin?

25  A    I just read it.

1   Q   Okay.  So Jones Day never forwarded this e-mail to you?

2   A   I don't recall ever seeing this e-mail.

3   Q   So then Miller Buckfire also never forwarded the e-mail

4   to you, to your knowledge?

5   A   I don't recall ever seeing the e-mail.

6   Q   Does it surprise you to learn that the swap

7   counterparties themselves may have thought that the casino

8   pledge wouldn't survive the bankruptcy filing?

9   A   No.

10  Q   Does it surprise you that the first time you're hearing

11  about this is in the evidentiary hearing when maybe you could

12  have used this during the mediation last week?

13  A   No.  At this point, nothing surprises me.

14  Q   Would you have conducted a different factual

15  investigation last week or maybe used it as leverage when you

16  were negotiating your new terms?

17  A   Maybe, maybe not.

18  Q   With respect to the privilege log that was just produced

19  yesterday, I have just a few follow-up questions, and I know

20  your Honor said you'd permit some limited questions.  Since

21  it's a new document, we don't have copies, but I do have an

22  electronic copy that our trial consultant can pull up so you

23  can follow along, Mr. Orr.

24          THE COURT:  Let's put an exhibit number on it.

25          MS. GREEN:  I can move -- I just didn't know if

1  you'd want it moved or not yet.  I wasn't sure if you were

2  going to permit more questions.

3          THE COURT:  It's up to you whether to offer it into

4  evidence or not.  I just want an exhibit number on it since

5  we are displaying it to the witness for identification

6  purposes.

7          MS. GREEN:  Okay.  It would be 1018, I believe, but

8  I can confirm that.  I just wasn't sure if you were going to

9  let me get any questions out before they objected to

10  privilege, so I didn't have a number on it yet.  Wasn't going

11  to assume.

12          THE COURT:  All right.  1018 it is.

13      (Retirement Systems Exhibit 1018 marked at 2:33 p.m.;

14      changed at 2:35 p.m. to Retirement Systems Exhibit 1023)

15  BY MS. GREEN:

16  Q   Do you recognize this document, Mr. Orr?

17  A   No.

18  Q   Do you recognize -- if you look at the substance, does

19  any of that ring a bell as to documents that you would have

20  reviewed in connection with this matter?

21  A   I've never seen the privilege log, but I may have

22  reviewed some of these documents.

23  Q   Okay.  If you could scroll down to entry number eight --

24  and I apologize because I would have asked you this at your

25  deposition a few days ago, but we didn't have this, so

1  there's a draft letter authored by Jones Day requesting

2  attorney general opinion.  Do you see that entry?

3  A    Yes.

4  Q    And this was done back in May of 2013?

5  A    Yes.

6  Q    Which individual at the AG's office did you make this

7  request to?

8  A    I don't recall a request ever being made.

9  Q    So this was a draft letter, but it was never sent?

10  A    As far as I know, yes.

11  Q    Do you know the substance of the letter?  Was it asking

12  an opinion that the pledge was invalid?

13  A    No.  I don't know the substance of the letter.

14  Q    Was it a letter asking the pledge was valid?

15  A    I don't recall seeing --

16  Q    Don't know at all.

17  A    -- the draft letter.

18  Q    Did you have any conversations with the attorney

19  general's office about seeking an opinion about the legality

20  of the casino revenue pledge?

21  A    No.

22  Q    Did someone else from your team investigate this as a

23  potential defense to raise in connection with the swap

24  termination payment amount negotiations?

25  A    I believe they did, but I didn't have any personal

 1   involvement with the letter or the draft.

 2   Q   So you --

 3            THE COURT:  We already have a 1018.  What is the

 4   next number?  Do we know?

 5            ATTORNEYS:  1023.

 6            MS. GREEN:  I guess we've admitted a lot more.

 7            THE COURT:  Sorry?

 8            MS. GREEN:  1023.

 9            THE COURT:  1023.  Okay.

10      (Retirement Systems Exhibit 1023 marked at 2:35 p.m.)

11   BY MS. GREEN:

12   Q   The next one I have a question on is slightly below that

13   at the bottom.  I think it's entry ten.  There's a draft

14   emergency manager order declaring the city's pledge of

15   wagering tax property under the 2009 collateral agreement

16   illegal and void.

17   A   Yes.

18   Q   Now, you're a lawyer, but you haven't been serving as a

19   lawyer in your EM capacity; correct?

20   A   Correct.

21   Q   Did you draft this order?

22   A   No.

23   Q   What was the basis for the draft order?

24   A   I'm not sure.

25            MR. SHUMAKER:  Objection, your Honor.  The witness

1   has said he didn't draft it, and it could call for privileged

2   communications.

3            MS. GREEN:  I'll restate my question.

4   BY MS. GREEN:

5   Q    Have you ever read a draft order on these -- on this

6   topic?

7   A    No.

8   Q    Do you know who did draft an order that would have

9   ostensibly eventually been signed by you?  Do you know who

10  drafted the order?

11  A    No, I don't know.

12  Q    And you have no idea what the basis as to why the

13  collateral agreement would be illegal and void would be in

14  your draft order?

15  A    No.  I think as part of our litigation strategy I'd

16  instructed our attorneys to prepare various lines of attack,

17  but I never saw the actual draft order.

18  Q    In preparing for the legal negotiations -- or I'm

19  sorry -- the negotiations relating to the swap termination

20  payment, you didn't have a debriefing with Ken Buckfire

21  heading into the negotiations where you sat him down and you

22  advised him of all the various legal defenses and claims;

23  correct?

24  A    Not that I recall.

25  Q    Okay.  And would it surprise you to know that your lead

1  negotiator went into the negotiations assuming that all of

2  the liens were valid?

3  A    No.

4  Q    Who is Brent Hartzell?

5  A    Brent Hartzell is a city employee in the budget

6  department.

7  Q    And he reports to you on budget issues; correct?

8  A    Reports through the finance director and CFO to me.

9  Q    Okay.

10  A    He's an indirect report.

11  Q    And you've had opportunities to work with him over the

12  2014 fiscal year budget?

13  A    Yes.

14  Q    Do you recognize --

15        MS. GREEN:  Let's pull up Exhibit 1007, please.

16        MR. SHUMAKER:  Your Honor, there is an objection.

17        MS. GREEN:  Your Honor, I would move --

18        MR. SHUMAKER:  There's an objection standing for

19  this document.

20        MS. GREEN:  Sustained for this?

21        MR. SHUMAKER:  No.

22        ATTORNEY:  Standing.

23        MR. SHUMAKER:  Standing.

24        MS. GREEN:  Yeah.  I would move for its admission,

25  your Honor, and that's why I turned around to look at you to

1    object, so --

2              MR. SHUMAKER:  I'm sorry.  The exhibit is Number --

3              MS. GREEN:  1007.

4              MR. SHUMAKER:  -- 1007.  Relevance is the objection,

5    your Honor.

6              THE COURT:  What is the document?

7              MS. GREEN:  It's a memo regarding the budget for

8    2014 from the interim budget director to the emergency

9    manager.  He signed it.

10             THE COURT:  Are you offering it?

11             MS. GREEN:  I was just going to, and then he

12   objected.

13             THE COURT:  All right.  Why don't you establish the

14   foundation?  Then we'll see if there's -- what the objection

15   is.

16   BY MS. GREEN:

17   Q   And did Mr. Hartzell, indeed, give you a memo on October

18   24th relating to the October -- I'm sorry -- the fiscal year

19   2014 budget for the city?

20   A   Many memos come back.  I don't know if it's October 24th,

21   but he very well may have.

22   Q   Okay.  Do you recall signing a memo where $95 million

23   was moved out of the general fund to a restructuring fund?

24   A   Yes.

25   Q   Okay.

1      MS. GREEN:  I would move for its admission, your

2  Honor.

3      MR. SHUMAKER:  Same objection, your Honor.

4  Relevance.

5      THE COURT:  All right.  The objection is overruled.

6  Exhibit 1004 -- is that the number?

7      MS. GREEN:  1007.

8      THE COURT:  1007 is admitted.

9      (Retirement Systems Exhibit 1007 received at 2:39 p.m.)

10 BY MS. GREEN:

11 Q   And is this the memo that we just discussed, Mr. Orr?

12 A   Yes.

13 Q   Okay.  And on the first page the top sentence says that

14 certain debt service appropriations for the pension

15 obligation certificates and limited tax obligation debt -- do

16 you read that right there in the first paragraph?

17 A   Yes.

18 Q   It says it's being reallocated for general operational

19 restructuring purposes.

20 A   Yes.

21 Q   Okay.  And in the second paragraph it talks about how for

22 fiscal year 2014 there's going to be 95 million shifted from

23 certain appropriations in the general fund to a general

24 restructuring fund.  Do you see that?

25 A   Yes.

13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 94 of 200
13-53846-swr   Doc 4344-10   Filed 04/29/14   Entered 04/29/14 12:00:23   Page 402 of 200
463

1  Q   And if we scroll through the document, there are

2  various -- we'll wait for it to scroll.  There are certain

3  funds being taken away from the police and fire and certain

4  other funds from City Council and recreation department and

5  public lighting and finance department and things of that

6  nature and being moved to a restructuring fund; correct?

7  A   Yes.

8  Q   And then you signed this document on October 25th?

9  A   Yes.

10       MS. GREEN:  I don't have anything further, your

11  Honor.

12       THE COURT:  One second, please, sir.

13       MR. GOLDBERG:  Certainly, if I may.

14       THE COURT:  And I promised you this earlier.  By my

15  count, the city has 143 minutes remaining and the objecting

16  parties 227.

17       MR. GOLDBERG:  Thank you, your Honor.  Jerome

18  Goldberg appearing on behalf of interested party David Sole.

19                    CROSS-EXAMINATION

20  BY MR. GOLDBERG:

21  Q   Good afternoon, Mr. Orr.

22  A   Good afternoon, Mr. Goldberg.

23  Q   Mr. Orr, for the court-ordered mediation for December

24  23rd and December 24th, isn't it true that the order from

25  Judge Rosen mandated that the parties were to have

 1  individuals there with settlement authority?

 2  A   Yes.

 3  Q   And isn't it true that you testified in your deposition

 4  that, in fact, Judge Rosen informed you that the banks did

 5  not have someone with settlement authority there on December

 6  23rd?

 7  A   Yes.  At least one of them, yes.

 8  Q   And that, in fact, he had to threaten to hold them in

 9  contempt of court just to get them to agree to even this

10  settlement.  Is that not true?

11  A   He threatened to enter a default judgment.

12  Q   I'm sorry.  Default judgment.  Now, just to be clear, the

13  $165 million swap termination loan with Barclays, is that

14  subject to similar terms to the previous swap termination

15  loan?

16  A   Yes.

17  Q   So the interest rate would be anywhere from 6.5 to 8.5

18  percent -- 5.5 to 8.5 percent?

19  A   Yes.  Whatever was on the chart, yes.

20  Q   Okay.  I mean it's true that once bankruptcy is over,

21  once the bankruptcy is ended and the loan becomes due, the

22  interest rate goes up an extra two percent; correct?

23  A   Well, there's a mechanism by which the interest rate can

24  go up, yes.

25  Q   So it could go up from anywhere -- depending on what the

1  final interest rate was on the first loan, it could go up --

2  it could be 5.5 percent or up to 8.5 percent; correct?

3  A   If that's the math, yes.

4  Q   And the loan -- the $165 million loan is pledged by a $4

5  million a month pledge secured against income tax revenue?

6  A   Yes.

7  Q   And, in fact, that amounts to $48 million per year, four

8  million times twelve; correct?

9  A   Yes.

10  Q   And do you recall that in the city's motion, it indicated

11  that the city's income tax revenue for this year was

12  approximately $232 million?

13  A   If that was in the motion, I'll stand by it, yes.

14  Q   Okay.  So what we're talking about is for approximately

15  the next four years paying 20 percent of city income tax

16  revenue to pay off Barclays and UBS -- UBS and Bank of

17  America through Barclays.  Is that not correct?

18  A   Roughly, yes.

19  Q   And, in fact, 165 million at 8.5-percent interest would

20  be approximately 30 million in interest.  Does that sound

21  right to you?

22  A   Approximately that range.

23  Q   Okay.  So we'll be paying -- up to $195 million over the

24  next four years from city tax revenues will be diverted to

25  pay off UBS -- to pay off two banks, UBS and Bank of America,

13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 94 of 200
13-53846-swr   Doc 4144   Filed 04/29/14   Entered 04/29/14 14:40:23   Page 405 of
463
405

1   through Barclays?

2   A   It could, yes.

3   Q   Okay.  And those payments are going to be going on after

4   you're gone as emergency manager and probably gone from

5   Detroit.  Is that not true?

6   A   There's an expectation that there would be an exit

7   facility financed that they could.

8   Q   But as of this point, there is no exit facility in place?

9   A   That is correct.

10  Q   Okay.  In contrast, the -- I believe the testimony in

11  the -- both depositions was that the swap payments, the

12  hedging payments from 2008 to 2012 totaled -- I believe it

13  was $247 million.  Do you recall that figure?

14  A   Approximately that amount of money.

15  Q   I can show you your deposition, but we're in --

16  A   Yeah.  That's fine, yeah.

17  Q   -- the ballpark; right?

18  A   Yeah, um-hmm.

19  Q   And that in 2013 it would be about another 45 to 50

20  million.  Is that a fair statement?

21  A   That's a fair statement.

22  Q   So we're talking about $300 million having been paid to

23  UBS and Bank of America since 2008 on the hedging

24  derivatives, on the interest rate swaps?

25  A   Since when?

1  Q   Since 2008.

2  A   Roughly that amount.

3  Q   Okay.  And that -- and in addition to that, if the city

4  was successful in its litigation in recovering -- in getting

5  the swaps declared void ab initio, as you testified,

6  potentially that amount could be recovered; correct?

7  A   Yes.

8  Q   And, in fact -- and any amounts moving forward,

9  termination amounts in the neighborhood of 200 million also

10 would be eliminated?

11 A   Yes.

12 Q   So rather than paying $165 million, we could be

13 recovering up to $300 million?

14 A   Yes.

15 Q   I wanted to talk a little bit -- go over a little bit

16 the -- and I won't go into great detail because I thought you

17 testified quite well about what -- the claims that the city

18 is making.  One of them is fraud based on problems with the

19 LIBOR as documented relative to UBS.  Is that not correct?

20 A   Yes.

21 Q   Another one was that the counterparties -- and I'm

22 talking about the equitable claims or claims around fraud,

23 breach of contract based on the implied breach of the fair

24 dealing and also unjust enrichment claims.  One of them --

25 another was that the counterparties had superior knowledge to

 1   the city when they entered into this complex financial

 2   transaction and had a duty to clearly make the terms of this

 3   transaction clear to the city; correct?

 4   A    Yes.

 5   Q    That they misrepresented that there was a low risk of

 6   default or termination in connection with the swaps?

 7   A    Yes.

 8   Q    That they did not explain to the city that the -- the

 9   potential dangers that a termination event could hold to the

10   city, meaning that it would immediately call in potentially

11   tens of millions or hundreds of millions in interest

12   payments; correct?

13   A    Interest payments and the termination fee, yes; correct.

14   Q    Yes, yes.  I'm sorry.  Correct.  And that the city was,

15   as you described it, a ticking bomb for this kind of default

16   based on a lowering of bond rating based on the city's

17   financial history?

18   A    Yes.

19   Q    Are you aware that representatives of Fitch Ratings

20   Service and Standard & Poor's were at the table when the

21   swaps were being voted on or being debated in City Council?

22   A    I didn't know it was Fitch and S&P, but I had heard that

23   ratings agencies were present.

24   Q    And they encouraged the city?  They were supportive of

25   the transaction?

1   A   I don't know that.

2   Q   Okay.  And, in fact, it was these same rating agencies

3   that triggered the default in 2009 by the lowering of the

4   city's bond rating; correct?

5   A   I know the ratings were lowered.  I don't know if it was

6   S&P and Fitch.

7   Q   Okay.  You testified earlier that the chief financial

8   officer of the city, Sean Werdlow, took a job with -- I

9   believe it was with SBS.  Are you aware that he took that job

10  in November of 2005?

11  A   Yes.

12  Q   And that was within five months after the swaps were

13  completed?

14  A   Yes.

15  Q   And you testified that that at least raises a red flag;

16  correct?

17  A   It raises concern, yes.

18  Q   You testified that you spoke with the SEC about their

19  involvement in investigating these matters, and I believe in

20  your deposition you testified that they were willing to have

21  further discussions; is that correct?

22  A   Yes.

23  Q   And I'm not going to try to do a big impeachment here.  I

24  mean you know that I asked you about that issue in -- August

25  30th, and at that point you testified that there hadn't been

1   discussions as of that date.

2   A    Right.

3   Q    So these discussions must have taken place between August

4   30th and the present date?

5   A    I believe that's fair.

6   Q    Okay.  I asked you before in Exhibit 1328, which has been

7   admitted -- I want to clarify the record.  It says in the

8   record it was admitted over objection.  I think the record

9   indicates there wasn't an objection to that, but either way,

10  Exhibit 1328 is the July 31st, 2012, SEC report on municipal

11  securities markets.  You have not -- you're not sure if you

12  read that report or not?

13  A    That's correct.

14  Q    Okay.  Are you aware that that report documents seven

15  enforcement actions by the SEC against municipalities in

16  similar situations to Detroit, including Jefferson County,

17  Alabama, and Orange County, California, both cities that

18  entered bankruptcy?

19  A    As I said, I hadn't read the report.  I'm aware that

20  there were enforcement actions.

21  Q    And are you aware that it all -- that there were five

22  other settled enforcement actions by the SEC against major

23  financial institutions, including Bank of America, UBS,

24  JPMorgan, Wachovia, and GE Funding?

25  A    I'm aware the SEC had settled several other

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 410 of
13-53846-swr   Doc 2144-1   Filed 01/10/14   Entered 01/10/14 11:00:23   Page 74 of 200
463

1  investigations, yes.

2  Q   Okay.  Have you familiarized yourself with the 2011 SEC

3  final judgment against UBS, which actually -- where one of

4  the -- one of the transactions that was raised in that

5  judgment was actually one dealing with the water board?  Have

6  you familiarized yourself with that judgment?  I did raise it

7  to you in your previous deposition.

8  A   Yeah, you did.  Yes, sir, you did.  I'm not aware of that

9  one in particular.

10  Q   Okay.  Are you aware that that judgment specifically

11  raises some of the issues that you raised, the fact that the

12  duty to disclose by a financial institution includes not

13  disclosing relevant information to a municipality in

14  connection with an interest rate swap because of the lack --

15  uneven knowledge of the parties?

16  A   I'm aware of the concept, although not that particular

17  investigation.

18  Q   Fair enough.  Are you aware that pursuant to the

19  Bankruptcy Code, the SEC has a right to intervene in a

20  Chapter 9 bankruptcy?

21  A   Yes.

22  Q   If the SEC was to intervene both in this bankruptcy and

23  in the litigation, that would dramatically lower the cost of

24  litigation on behalf of the city, would it not?

25  A   It might or it might not.

1   Q   Well, the SEC has -- as a government agency, has people

2   with expertise in litigating these areas.  You would agree

3   with that, would you not?

4   A   Yes, but sometimes agencies don't necessarily represent

5   the same interest as a principal litigant.

6   Q   Okay.  And the SEC, just to be clear, could actually

7   intervene not just in a lawsuit but in the bankruptcy

8   proceedings on fairness where the question of equitable

9   subordination could be addressed.  Is that not correct, if

10  you know?

11  A   I believe the SEC has the ability to intervene as an

12  interested party.  I don't know if in particular to your

13  question.

14  Q   Okay.  That's a good answer.  You probably know more than

15  I know about it.  Have you spoken with a representative --

16  strike that.  The Obama administration has people assigned to

17  work with you in terms of lending support in conjunction with

18  the emergency management and getting out of bankruptcy.  Is

19  that not true?

20  A   The federal government has assigned a specific treasury

21  officer as a liaison for the federal government as part of

22  the operational restructuring.  I don't know if his role or

23  specific delegation of authority includes the authority to

24  involve themselves in the bankruptcy.

25  Q   And who is that individual?

13-53846-swr   Doc 2344-10   Filed 01/10/14   Entered 01/10/14 14:22:00   Page 94 of 200
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 412 of
463

1   A    Don Graves.

2   Q    Don Graves?

3   A    Um-hmm.

4   Q    Have you spoken with him about potential federal

5   involvement or SEC involvement in the question of trying to

6   recover on the interest rate swaps?

7   A    Not that particular question.

8   Q    Okay.  You would acknowledge that the gap between the

9   floating interest rate and the fixed interest rate that's the

10  basis for the derivative payment dramatically changed in

11  approximately 2008.  Is that not correct?

12  A    Yes.  2008, 2009, yes.

13  Q    And that was due to a precipitous drop in interest rates?

14  A    Yes.  There are a number of reasons, but, yes, that was

15  why.

16  Q    And, in fact, what happened was the LIBOR rate at that

17  point and since that point has been around .5 percent to --

18  added to a .3-percent and 3.4 -- .34-percent margin, it's the

19  difference between that and the 6.3-percent fixed interest

20  rate that the city pays the banks that leads to the POC --

21  the pension obligation interest rate payment; correct?

22  A    Generally the concept, yes.  The numbers are approximate

23  in terms of where LIBOR was versus the rate of the interest,

24  yes.

25  Q    Right.  I mean and generally the -- are you familiar with

1   interest rate swaps, with the machinations of them?

2   A    I am now, yes.

3   Q    And generally speaking, the idea under the best

4   circumstances would be that the floating rate and the fixed

5   interest rate stay relatively stable so that the -- and the

6   fixed rate so that the parties don't face this calamitous

7   change that occurred in 2008 in the City of Detroit?

8   A    I suppose for stability, but it depends upon which

9   rate -- which side of the swap you're on.

10  Q    No question about it.  And we were on the wrong side of

11  the swap.

12  A    We were on the right side for a little while, and then we

13  were very much on the wrong side.

14  Q    All right.  And would you agree with me that the

15  precipitous drop in interest rates in 2008 was a product of

16  the financial crisis that occurred throughout the U.S. with

17  the collapse of Goldman Sachs, the subprime mortgage crisis,

18  and the -- and just generally the financial crisis that

19  occurred in the country in 2007, 2008?

20  A    Yes.  There was a financial meltdown for a number of

21  reasons that have been written about, including that, I

22  suppose.

23  Q    And, in fact, the reduction of interest rates to near

24  zero was part of the Federal Reserve's bailout of the banks

25  in order to try to stimulate the banks and keep them moving

1  during that period.

2  A    Yes.

3  Q    Would you agree with that?

4  A    In the last few months of '08 and '09 I think the federal

5  government bought back $1.75 trillion of securities, QE1.

6  Q    Exactly.  Are you aware that the City of Detroit

7  experienced 67,000 mortgage foreclosures between 2005 and

8  2007 according to a City of Detroit report?

9  A    I'd read that report somewhere.  I'm not sure where I

10  read it, and I think you and I have discussed it before, too.

11  Q    And, in fact, the report notes that the -- 73 percent of

12  all mortgage loans entered into in the city during that

13  period were subprime loans, meaning they were at least three

14  percent above the prime rate?

15  A    I think that's generally correct.

16  Q    And that, in fact, it was the subprime crisis, the

17  subprime -- the imposition of so many subprime loans that

18  precipitated this foreclosure -- in part precipitated this

19  foreclosure epidemic in Detroit?

20  A    I read reports that demonstrated there were

21  disproportionate foreclosures in the City of Detroit.

22  Q    Okay.  Are you aware that the report noted that of the

23  67,000 properties foreclosed between 2005, 2007, as of

24  January 2009, 65 percent remain vacant?

25  A    I don't know if I know those specific numbers, but I

1    remember hearing that there were -- there are obviously a lot

2    of vacant properties, yes.

3    Q    Have you considered as part of the equitable challenge to

4    UBS and Bank of America in connection with the swaps that

5    the -- that both of them were prime -- had tremendous

6    involvement in the subprime lending crisis, and, in fact,

7    they ended up benefitting from their own misdoings, in

8    essence, by causing the crisis that led to this drop in

9    interest rates from which they now have profited to the tune

10   of $300 million?

11   A    I'm aware of allegations in that regard.

12   Q    Okay.  As emergency manager and especially when you enter

13   into an agreement like this, I believe the way Judge Rhodes

14   put it, it's your duty -- and it's examined to see -- to make

15   sure that it's in the best interest of the estate or of the

16   debtor, which is the City of Detroit.

17   A    Yes.

18   Q    And, of course, the City of Detroit is the residents of

19   Detroit; correct?

20   A    That includes the residents of Detroit.

21   Q    Primarily it includes the residents even over creditors;

22   isn't that --

23   A    The interest of the residents is of grave concern, yes.

24   Q    Don't you think the residents would stand to benefit more

25   from a 500 -- potential $500 million recovery than to see 20

1  percent of their tax dollars turned over to two banks that

2  helped contribute to the destruction of their neighborhoods?

3  A   If the claims were successful and you're able to achieve

4  that kind of result, that would certainly provide a benefit,

5  but in the meantime you might not have the stability and

6  revenue stream that you need to help reinvent and restructure

7  the city.

8  Q   But, in fact, the revenue stream is going to be decreased

9  over the next four years just by paying off the swap

10  termination.

11  A   The revenue stream will be dedicated to pay off some of

12  the debt, the money we borrow to deal with the swap

13  termination, but it will free up other revenue that we can

14  use to go forward.

15  Q   Okay.  Give me one minute.  I'm almost done.  I find it

16  interesting your testimony that under PA 436 at least

17  potentially you would have had authority to abrogate the

18  contracts that let -- with UBS -- that allowed UBS to trap

19  revenue in connection with the interest rate swaps.  Is that

20  what you testified to?

21  A   Yes, the irrevocable letters of instruction.

22  Q   And you indicated that you didn't pursue that or didn't

23  act on that because of your concerns about litigation over

24  it?

25  A   Well, it's part of the overall settlement.  That was one

1  of the issues that we were concerned about.

2  Q   In fact, though, there are numerous contracts that -- as

3  the emergency manager, that you've acted within your power to

4  abrogate.  Is that not correct?

5  A   I've abrogated some, yes.

6  Q   I mean there are union contracts that were abrogated

7  because of the --

8  A   Yes.

9  Q   You've taken the position and won that position in this

10 court that you have the right to even go after pensions in

11 deference to the -- despite the guarantees in the Michigan

12 Constitution.

13 A   I'm not trying to go after pensions.  I'm trying to

14 rationalize the environment so we can pay them on a going

15 forward basis on a reasonable number.

16 Q   No.  I appreciate that, but I'm just saying that there's

17 been a tremendous amount of litigation over that issue, has

18 there not?

19 A   Yes.

20         MR. GOLDBERG:  Okay.  I have no further questions.

21 Thank you, Mr. Orr.

22         THE COURT:  Any other questions on the objectors'

23 side?  Any redirect?

24         MR. SHUMAKER:  No redirect, your Honor.

25         THE COURT:  All right, sir.  You are excused.

1        THE WITNESS:  Thank you, your Honor.

2     (Witness excused at 3:00 p.m.)

3        THE COURT:  Does the city have any further

4   witnesses?

5        MR. SHUMAKER:  We do not, your Honor, but

6   Mr. Hertzberg would like to address you.

7        THE COURT:  Mr. Hertzberg.

8        MR. HERTZBERG:  Yes, your Honor.  During the break

9   this morning, I spoke with Mr. Goldberg -- excuse me -- in

10  regard to Mr. Turbeville, his proposed witness.  I thought we

11  had an understanding that we would counter-designate on the

12  deposition that was taken and submit it in that fashion

13  because Mr. Turbeville was not available to appear today, and

14  based upon that I have someone -- I have had someone in my

15  office doing that.  Mr. Goldberg tells me now that he is

16  confused and that's not what he understood.  We have no

17  further witnesses at this point.  We are in the process of

18  counter-designating the deposition for submission, and I

19  think it's totally unfair and prejudicial to have him bring a

20  witness in on Monday.  We've been aware of this date set by

21  the Court as far back as two weeks ago that this would be the

22  date continued for the hearing on approval of the assumption.

23  The Court has been aware that other people, including myself,

24  have had scheduling issues but has held us to the schedule,

25  and I'd ask that the Court do the same here.

1          THE COURT:  Sir.

2          MR. GOLDBERG:  First of all, your Honor, I want to

3     make clear that there was a misunderstanding.  I was not

4     agreeing to counter-designate.  I was just saying that if the

5     Court was not inclined to allow Mr. Turbeville to testify in

6     person, then I would be, you know, open to the idea that we

7     would allow us to bring in his testimony through depositions,

8     and I apologize if there was a misunderstanding with

9     Mr. Hertzberg.  We've tried to cooperate with him very much

10    on this issue.

11         As far as his appearance, I feel Mr. Turbeville's

12    appearance would be helpful on the issues that were raised by

13    Mr. Orr in this deposition in terms of creating a factual

14    predicate for the Court to be -- to make the determination as

15    whether or not there's a basis to move these equitable issues

16    forward later on in the bankruptcy in a fuller trial.  As I

17    stated, I did -- Mr. Turbeville did come in for the previous

18    hearing.  He is not -- he was not available today, as I made

19    clear to them, and was open about it.  He is available to

20    come in Monday, and we are prepared to bring him in, you

21    know, and that's all I can say, your Honor.  I appreciate the

22    Court's -- whatever ruling the Court makes.  That's the

23    situation, and, you know, he's actually doing this based on

24    us paying his airfare without even charging us for the

25    appearance, which is a very -- which is a gesture that we

 1   appreciate, but, on the other hand, I appreciate the

 2   scheduling concerns of the Court and whatever the Court

 3   rules, but I just really want to make clear that there was no

 4   intent to mislead Mr. Hertzberg, and if the Court wanted us

 5   to do it through deposition, I would be happy to do it that

 6   way or however the Court decides.  Thank you.

 7          MR. HERTZBERG:  Your Honor, one last thing.

 8          THE COURT:  Sir.

 9          MR. HERTZBERG:  We were not made aware until

10   yesterday that he would not be here today, so it's not like

11   we were put on notice two weeks ago either, so I think the

12   proper way to proceed is to have the parties designate

13   portions out of the deposition for submission to the Court

14   for review.

15          THE COURT:  All right.  In the circumstances, I

16   agree that submission of the appropriate portions of the

17   transcript of his deposition is the better approach here than

18   to delay these proceedings.  And if there are no other

19   witnesses, we should discuss how to proceed with closing

20   arguments.  Is the city ready to proceed now, or do you want

21   to start afresh on Monday morning?  And just so we have a

22   count again, I'm showing 143 minutes for the city and 207 for

23   the objecting parties.

24          MS. ENGLISH:  Your Honor, just before we start

25   talking about closing arguments, I think we do have a few

13-53846-swr   Doc 4144-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 163 of 200
13-53846-swr   Doc 2144-7   Filed 01/10/14   Entered 01/10/14 11:40:23   Page 421 of 200
463
421

1   things on our side of the table to take care of.

2          THE COURT:  Oh, yes.  That was mentioned to me.

3   You're right.

4          MS. ENGLISH:  Okay.  So, first of all, now that the

5   city has rested, the objectors would like to bring a motion

6   for a directed finding that the city has not presented

7   evidence to meet its burden under 9019.  As the Court knows,

8   the Court needs to make an objective evaluation of the claims

9   and defenses that are being settled in order to determine

10  whether this is a fair and equitable settlement.  The Court

11  needs to make an independent analysis.  Based on the evidence

12  that has been presented by the city, the only evidence that

13  is before the Court really on the claims and defenses is

14  Mr. Orr's testimony as to what his attorneys told him, so

15  we've got a hearsay problem, and we've got a privilege

16  problem because they have not produced any of the underlying

17  pieces of paper, the evidence, on privilege grounds, so we

18  think, therefore, that the evidence is not before the Court

19  on which you can actually make a reasoned, objective,

20  independent analysis yourself, and they haven't met their

21  burden under 9019, so we'd move for a directed finding.

22  Thank you.

23         MR. SHUMAKER:  Your Honor, Greg Shumaker of Jones

24  Day for the City of Detroit.  Obviously we disagree

25  wholeheartedly with any motion.  We believe Mr. Orr has laid

13-53846-swr   Doc 2314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 93 of 200
13-53846-swr   Doc 4144   Filed 01/10/14   Entered 01/10/14 12:00:23   Page 422 of
463

1   out in great detail today all of the claims that he

2   considered, the strengths, the weaknesses, the factual bases,

3   and although your Honor can and will make an objective

4   assessment as to whether the settlement of those claims is

5   reasonable, there is no reason to grant a motion for directed

6   verdict because we think there's more than sufficient

7   evidence for the Court to find that the motion can be

8   assumed -- I mean that the forbearance agreement can be

9   assumed and approve it under Bankruptcy Rule 9019.  And we

10  also firmly believe, as I stated before, that the city is not

11  required to waive privilege in order to carry its burden.

12          THE COURT:  All right.  The Court will decline to

13  render judgment at this time under the applicable rule.  Are

14  there any other matters on the objectors' side?

15          MR. PEREZ:  Your Honor, Alfredo Perez on behalf of

16  FGIC.  Your Honor, we would move into evidence FGIC's Exhibit

17  305, which is the rehabilitation order pursuant to which FGIC

18  went into rehabilitation, and FGIC Exhibit 306, which is the

19  order approving the FGIC plan of rehabilitation.  Your Honor,

20  I had been carrying certified copies with me.  I just didn't

21  bring them today, so if I could substitute those on Monday --

22  they're self-authenticating under Rule 90 --

23          THE COURT:  Any objections to 305 and 6?

24          MR. SHUMAKER:  Yes, your Honor.  I have no idea what

25  the relevance might be.

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 160 of 200
13-53846-swr   Doc 2444-1   Filed 01/10/14   Entered 01/10/14 14:40:23   Page 423 of
463

 1          MR. PEREZ:  Your Honor, the relevance is as follows.

 2    In connection with their argument as it relates to their

 3    ability to terminate the swap provision, they rely on Section

 4    6 of the swap agreements, and they basically say that FGIC

 5    has waived its right to assert its control rights because of

 6    the fact that it's defaulted since it has -- since their

 7    ratings was decreased, et cetera.  Pursuant to these orders,

 8    those defaults are cured, and we don't have -- we're not

 9    bound by those things, your Honor, so it's, in essence, a

10    contract amendment to our insurance policy.

11          THE COURT:  All right.  That's arguable.  The Court

12    will admit Exhibits 305 and 306.

13          (FGIC Exhibits 305 and 306 received at 3:08 p.m.)

14          MS. ENGLISH:  I've got one exhibit as well.  You'll

15    recall at the very start of these proceedings, I wanted to

16    address the admissibility of Ambac Exhibit 404, and the

17    objection that was raised by the city at that time was that

18    it -- was to authentication.  This is a document that was

19    produced by the city that was logged in its data room.  It is

20    self-authenticating under both 90 -- Rule 901 and Rule 902 in

21    that it is a public record that was posted on the Municipal

22    Securities Rulemaking Board, which is a site operating in

23    conjunction with the SEC regulating the municipal market.  It

24    is also a book, pamphlet, or other publication purporting to

25    be issued by a public authority, namely the city.

1          THE COURT:  Okay.

2          MR. SHUMAKER:  Your Honor, the city withdraws its

3   objection.

4          THE COURT:  Exhibit 404 is admitted

5      (Ambac Exhibit 404 received at 3:09 p.m.)

6          MR. GOLDBERG:  Your Honor, I also had a number of

7   exhibits to which there were objections that I'd like to

8   address.

9          THE COURT:  Go ahead, sir.

10         MR. GOLDBERG:  Maybe I'll begin with the easiest

11  one.

12         THE COURT:  Actually, if you could go in numerical

13  order, that would be the easiest thing.

14         MR. GOLDBERG:  On, no problem.  Okay.  If you don't

15  mind, your Honor, I just left one document.

16         THE COURT:  Sure.

17         MR. GOLDBERG:  1302 I'll withdraw, your Honor.  1307

18  is a newspaper article, and it along with -- and I cite

19  several newspaper articles throughout this 1307.  I cite an

20  article on 1317 on termination fees, 1318.  I would submit

21  that we are not submitting these articles for the truth of

22  the matter asserted.  The articles are being submitted

23  essentially to give background evidence on the scope of the

24  interest rate swap and LIBOR scandal; in other words, on

25  background articles on this -- issues that go to whether or

13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 162 of 200
463
13-53846-swr   Doc 2144-10   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 425 of 200   425

1  not a record can be made to move forward on these issues to a

2  trial later on, as I believe is the standard articulated by

3  your Honor in your ruling at the pretrial.

4      In <u>Yarborough</u> versus <u>City of Warren</u>, which is 383 F.

5  Supp. 676, the Court in the Eastern District discussed

6  specifically how newspaper articles, if they're not

7  introduced for the purposes of the truth of the matter

8  asserted but as background evidence, as background to a

9  greater understanding of viewing the concerns that are at the

10  base of the litigation, can be admissible, and that's the

11  basis for the various newspaper articles that we were

12  submitting. They discuss the LIBOR scandal. They discuss

13  the ISDAfix articles. They discuss problems with termination

14  fees, and essentially they're to help the Court get a

15  background and overview on the scope of this problem to put

16  it -- help put it into the context of the particulars.

17  They're not being -- we're not asking for their admission for

18  the truth of the matter asserted, especially relative to

19  whether or not these issues occurred in this case, but they

20  go, again, to whether a record can be made at this point in

21  the proceedings to move forward on these issues to go to

22  trial later on in the bankruptcy, and so that's the basis for

23  the newspaper articles that we cited.

24      THE COURT: Any others? Any other exhibits you want

25  to offer now?

 1         MR. GOLDBERG:  Sure.  1321 is a final judgment on

 2    UBS municipal bond rigging.  We would ask the Court to take

 3    judicial notice of that judgment pursuant to 90 -- to the

 4    Rules of Evidence 902.

 5         1324 is a public report by the U.S. Senate.  It's

 6    not an expert report.  It's a public report, published --

 7    public report by the U.S. Senate subcommittee on Wall Street

 8    and the financial crisis.  You know, it's admissible as a

 9    public report under the hearsay exceptions, and your Honor

10    has already declared that -- ruled that the issue of the

11    subprime lending crisis and its impact on the city is at

12    least arguably relevant in this case.

13         1325, again, is a Detroit Retirement Fund lawsuit

14    against UBS.  We, again, would ask the Court to take judicial

15    notice that it fits under the judicial notice requirements of

16    902.

17         1326 is, again, a public report by the City of

18    Detroit Planning & Development Department, Neighborhood

19    Stabilization, on the impact on the housing crisis in

20    Detroit.  They objected on the basis of relevance and

21    completeness.  We have attached the complete report to the --

22    to our exhibits and have provided the complete report to the

23    city prior to this proceeding, not just today, I mean when

24    the exhibits were provided, and we believe that it's clearly

25    a public report under the hearsay exceptions under 803.

1       And the Sean Werdlow biography, again, it's for

2   basically background information, but, you know, we can

3   withdraw that.  There's been testimony as to that issue.

4   Those are the exhibits that I request, all the newspaper

5   articles.  I would also say that newspaper articles are self-

6   authenticating under FRE 901.

7       MR. HERTZBERG:  As to the exhibits -- excuse me --

8   that he's moved into -- or asked the Court to move into

9   evidence, we object on hearsay as to the newspaper articles

10  and on relevancy basis.  As to Number 26, which is the

11  Planning & Development Department, Neighborhood Stabilization

12  Program, we object on relevancy grounds.  On 1324, which is

13  the "Wall Street and Financial Crisis:  The Anatomy of a

14  Financial Collapse," we object on hearsay and relevancy

15  grounds also, your Honor.  And going back to the newspaper

16  articles, I'm confused at exactly what Mr. Goldberg was

17  saying when he said that this is for use at future litigation

18  possibly, the articles.  I didn't fully understand what he

19  was saying, but they're hearsay, they're not relevant to this

20  proceeding, and they have no evidentiary value for this

21  Court.

22       THE COURT:  How about the two court papers, which I

23  think were 1321 and 1325?

24       MR. HERTZBERG:  Our objections to those are based

25  upon relevance, your Honor.  They're not relevant to the

13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 14:22:00   Page 96 of 200
463
13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 14:22:00   Page 428 of 428

1   assumption motion and whether it should be approved or not

2   under 9019.

3           THE COURT:  One second.  All right.  The Court will

4   overrule the objections as to 1321, 1324, 1325, and 1326 and

5   conclude that their relevance is arguable, and because in the

6   case of 1324 it is a public document, the hearsay objection

7   is overruled.

8        (Sole Exhibits 1321, 1324, 1325, and 1326 received at

9        3:18 p.m.)

10          THE COURT:  Did you want to address the newspaper

11  articles further in response to Mr. Hertzberg's argument?

12          MR. GOLDBERG:  I just wanted to clarify that I was

13  not suggesting they're for use in future litigation.  I was

14  simply trying to express what I believe was what the Court

15  declared in its pretrial order where it essentially said that

16  this proceeding is not the trial on the substance of these

17  issues.  It's a trial to determine whether a sufficient basis

18  can be laid to move forward on these issues later in the

19  bankruptcy, and it's for that reason that I feel they

20  contribute to the Court's ability to make that kind of a

21  judgment because they are essentially background issues --

22  background articles on the issues that we've been speaking on

23  in here whether it's LIBOR fraud, whether it's SEC

24  intervention, whether it's municipal bond rigging, all these

25  kind of issues that actually Mr. Orr talked about were being

13-53846-swr   Doc 4414-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 166 of 200
13-53846-swr   Doc 2444-1   Filed 01/10/14   Entered 01/10/14 14:40:23   Page 429 of
463

1  considered in the city's litigation, and that's the reason,

2  so they're not being offered for the truth of the matter.  I

3  didn't want to make clear that's future litigation -- I'm

4  talking about that they're relevant to the particular

5  proceeding that we are in right now in order to help the

6  Court make a proper ruling on whether there's enough to have

7  these issues move forward.  Thank you.

8  MR. HERTZBERG:  Your Honor, one last thing.  One,

9  articles of this nature are purely propaganda, and, second, I

10  don't believe the Court needs help through the use of

11  newspaper articles in making its decision on whether to

12  approve this assumption motion.  They're hearsay and

13  shouldn't be admitted.

14  THE COURT:  The Court will sustain the city's

15  objections to 1307, 1317, and 1318 on the grounds of hearsay.

16  Anything further before closing arguments?

17  MR. SHUMAKER:  Your Honor, before closing, with your

18  indulgence, the city has asked counsel for Barclays to

19  address the Court regarding the terms of the -- of Barclays'

20  commitment letter very briefly.

21  THE COURT:  Okay.

22  MR. LEVIN:  Good afternoon, your Honor.  Richard

23  Levin, Cravath, Swaine & Moore, appearing for Barclays

24  Capital, Inc., the lender in the proposed transaction.  Your

25  Honor, I'd like to address what Mr. Shumaker said, but I want

13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 67 of 70
13-53846-swr   Doc 2444-1   Filed 01/10/14   Entered 01/10/14 14:41:00   Page 96 of 200
463
430

1  to make a preliminary point first, if I may.  There was a

2  colloquy between Mr. Goldberg and Mr. Orr about the terms of

3  the loan.  I'd like to be clear that Barclays will be bound

4  by the documents, not by what happens in a colloquy in the

5  courtroom, and we're not -- I didn't necessarily agree with

6  all of the colloquy.  I don't think they're consistent with

7  the documents.

8         Turning to the amendment based on the events of the

9  last few weeks, Barclays is giving two things and asking the

10  city to give two things, and we have an oral agreement that

11  is currently being documented.  We expect to have it

12  documented by the beginning of the week.  Barclays is

13  extending its commitment date from January 7, 2014, to

14  January 31, 2014, and is clarifying that in the fee letter

15  the definition of successful syndication was syndicating at

16  least $175 million of the loan, which was half of the

17  original 350.  That is going to be changed to 50 percent of

18  the actual loan amount, so it drops it significantly under

19  the circumstances.  The city is agreeing not to borrow more

20  than 285 million, and the city is agreeing that if the swap

21  termination payment is less than 165 million, the swap

22  termination loan will be reduced dollar for dollar so that

23  there will be 120 million on the quality of life loan and

24  then whatever is necessary to pay the swap termination fee up

25  to 165 million.

1          THE COURT:  Thank you, sir.

2          MR. LEVIN:  Thank you, your Honor.

3          THE COURT:  So do we want to proceed with closing

4    argument now or begin Monday morning?

5          MS. BALL:  Your Honor, I'm reminded that in opening

6    we were advised by Mr. Hackney that the objectors deserve

7    three and three quarter hours for their closing, and at that

8    time we asked to reserve our right to respond to their

9    closing given the length of it.  If that accords the Court,

10   that's what we would like to do.

11         THE COURT:  Okay.

12         MS. BALL:  It would be most helpful.

13         THE COURT:  That's fine.  All right.  So let's start

14   with the objectors' closing argument on Monday morning, and I

15   probably gave you this already, but let me give it to you

16   again.  I'm showing 207 minutes left for the objecting

17   parties and 143 for the city.

18         MS. BALL:  Thank you, your Honor.  Are we agreed

19   that the record of evidence is closed as we proceed?

20         THE COURT:  Yes.

21         MR. MARRIOTT:  Your Honor, can I ask for a

22   clarification here?  It's not typical that the party with the

23   burden goes second.  Normally, the party with the burden goes

24   first.  It seems as though the city, if I understood what Ms.

25   Ball just said, is looking to reverse and have the objectors

1　go first.　I think we're entitled to have the city go first,

2　hear their arguments, and address them in response.

3　　　　　THE COURT:　Are you concerned that they will make an

4　argument that you are not already aware of?

5　　　　　MR. MARRIOTT:　Well, Judge, there's been an awful

6　lot of evidence that has come in, and there are various ways

7　to present that evidence as part of argument.　And we may be

8　in a position, depending upon how they present certain

9　evidence as part of their argument, to rebut it in our

10　argument, and I think it's their burden to go forward, and

11　it's our ability to hear their arguments, make our own, and

12　rebut theirs if necessary.

13　　　　　MS. BALL:　Your Honor, Corinne Ball for the record,

14　Jones Day, for the city.　I think that the standard is -- I

15　disagree and would dissent from Mr. Marriott's description.

16　We have a motion, we have an objection, and we have a reply,

17　so if your Honor would prefer, we believe we have the right

18　to ultimately reply.　That is the process.　It certainly is

19　the process of this Court and the rules for submission of

20　papers.　If, however, your Honor is concerned, we could

21　commence closing and then reserve a significant portion of

22　our time to respond to what they may say, which, your Honor,

23　I believe is our right as the movant to have the final reply.

24　　　　　THE COURT:　Well, in the absence of agreement, I

25　think we should follow the ordinary trial process and have

1   closing argument with the moving party first, so that would

2   be on the city first, but, like I say, it doesn't matter to

3   me if we do that now or begin first thing Monday morning.

4            MS. BALL:  May I have a moment, your Honor?  If I

5   may, your Honor, I'd like to set out some parameters, but I

6   would also ask the Court if we might reserve some of our time

7   to reply --

8            THE COURT:  Yes, absolutely.

9            MS. BALL:  -- as, in fact, that's why we all had our

10  minutes allocated and tracked.

11           THE COURT:  That's the normal process, so that's

12  what we're going to follow.

13           MS. BALL:  Thank you, your Honor.

14                       CLOSING ARGUMENT

15           MS. BALL:  First of all, I'd like thank your Honor.

16  It has been a lengthy process, and your Honor has played

17  quite a role in reaching what the city regards as a better

18  agreement and a good outcome.  Your Honor, we have before you

19  what is a settlement essentially allowing a secured claim

20  together with a motion to borrow monies to fund the payment

21  of that settled claim and enable the city to move forward

22  with its plans to restore the viability of the City of

23  Detroit.

24           Your Honor, I'm reminded about your statements to

25  us, and I want to set them out for you at the outset.  It is

1  true and you have recognized that any 9019 presents an issue

2  that can be extremely awkward.  Should your Honor not approve

3  it, we would have to litigate it, and we would have to be

4  able to preserve our right to do so, but what should be

5  abundantly clear from these hearings that in this situation

6  that awkwardness is multiplied by a factor of a billion four

7  plus because, your Honor, one of the things the settlement,

8  should you approve it, preserves is the right of the city and

9  interested parties to continue to examine the validity of the

10 COPs and whether or not their claim should be allowed.  All

11 the settlement still preserves those rights, and that is

12 significant in terms of some burden on us in terms of the

13 awkwardness.  As your Honor observed earlier today, if you

14 look at the objectors around the table, should you fail to

15 approve or should you determine not to approve the

16 settlement, the defenders on that litigation are by and large

17 at the objector table.  FGIC, as the insurer, I'm sure would

18 be on the defense, Syncora, the counterparties.  Your Honor,

19 we've already been told since we have indicated that were

20 there to be litigation it makes sense if the settlement is

21 not approved, and your Honor has heard about the voidability,

22 to litigate the COPs and the swaps.  There is a core of

23 common facts that tie those transactions together, and as

24 your Honor has heard, the claims go to the same controlling

25 law, Act 34 and the structure of the transaction.  So, your

13-53846-swr    Doc 2344-10    Filed 01/10/14    Entered 01/10/14 12:00:23    Page 97 of 200
13-53846-swr    Doc 4314-10    Filed 04/29/14    Entered 04/29/14 14:11:00    Page 135 of
463                                                                                           435

1    Honor, the defendants would likely also include the COPs

2    objectors, who have indicated they would involve the pension

3    systems.  So, your Honor, everyone here with the exception of

4    Mr. Goldberg and with the exception of Ms. English's client,

5    does have a real interest in these claims and how they are

6    perceived to go forward.

7          But what I thought was most concerning, your Honor,

8    is that we understand or help -- we should help you

9    understand what is the burden that we movants have to meet.

10   I think we've gone over the Bard factors most recently

11   reaffirmed in Footnote 6 in the Greektown case, Greektown

12   Casino case, this summer, but let's not forget what we also

13   learned in MQVP at the Sixth Circuit, which is that the Court

14   need not make a precise determination of the outcome since an

15   exact judicial determination would defeat the whole purpose

16   of compromising the claim.  Similarly, your Honor, we learned

17   in -- really through Judge Spector's opinions in Dow Corning

18   we know two things -- three things actually.  The Court need

19   only reach a conclusion that the proposed settlement

20   represents even the lowest point in the range of

21   reasonableness more recently cited in In re. Fodale in

22   February of this past year.  The second thing we know is that

23   the law favors compromise, and the third thing that we know,

24   which was actually established in Drexel in New York but

25   relied upon heavily by Judge Spector in Dow Corning, was that

1   a court may approve a settlement even if it believes that the

2   trustee or debtor in possession would ultimately be

3   successful at trial.  Your Honor, that is the burden that we

4   faced.  It was not to put on a mini trial but to provide your

5   Honor with a sense of the claims that were examined, the

6   facts relating to those claims, both good and bad, and the

7   strengths and weaknesses of those claims.

8           Your Honor, in this case, we have two kind of

9   competing issues, which seem to come to rest on the second of

10  the Bard factors.  Your Honor, by that I mean we not only

11  have the probability of success on the merits.  We also have

12  the continuing concern about the viability of the city, the

13  need to get on with it, not having time and not being in a

14  position of asking the residents to wait while we litigate

15  and during the term of that litigation are unable to enter

16  the capital markets and start restoring the viability of the

17  city.  Your Honor, in some respects, it's kind of

18  collectability or the second Bard factor in reverse, and I

19  think it's very important, but what I had also wanted to

20  point out to your Honor, the objectors' argument is -- and we

21  agree with them largely -- that these claims are largely

22  documentary.  We agree with them, but, your Honor, they

23  cannot turn and say these claims are largely documentary, but

24  there is no evidence except for Mr. Orr.  That clearly is

25  erroneous.  The documents -- and I am prepared to go through

them on a level that would demonstrate to your Honor the

strengths and weaknesses to which Mr. Orr referred -- are

also very amply supported by the evidence before you.

And what do I have on the other hand, your Honor,

before I do that?  Let's see.  We have lawyers who are

speculating that there was no threat to the city, that there

was no threat to the casino revenues, so why do the

settlement, yet, on the other hand, in answer to that

speculation, we have the testimony of Mr. Orr that he

considered doing nothing, and he determined, due to the cost

of this piece of paper and the constant threat of default,

that that was not a sustainable course of action for the

city; that they had to initiate a new approach.

We also, your Honor, have evidence regarding,

although they may choose to ignore it, what would the city

look like had it chose to litigate?  In fact, Mr. Malhotra

talked about a litigation forecast.  He didn't call it that.

Your Honor, he called it the no trapping, no DIP scenario or

scenario two in his three scenarios.  Your Honor may recall

that even on that scenario, which would be the equivalent of

obtaining an injunction to maintain the status quo during the

pendency of a litigation, we were in below Mr. Orr's hard

deck of 50 million by the second week of February, and we

were again in critical cash condition before long.  It is

true -- it is absolutely true because the city is dedicated

1   to getting on to help the residents of Detroit that those

2   forecasts did include starting the reinvestment during that

3   time period, but, your Honor, the reinvestments during that

4   time period were not substantial.  My understanding of the

5   evidence before you, your Honor, they were layered in over

6   fiscal year 2014 and were roughly 60 million, so we do know

7   what the city would look like with litigation.  We did look,

8   and we did present that evidence to the Court as opposed to

9   not looking at it.

10       Your Honor, there is absolutely no witness and no

11  evidence that litigation was compatible with the post-

12  petition financing.  What do we have instead?  Instead we

13  have the testimony of Mr. Buckfire and Mr. Doak and Mr. Orr

14  that unsecured credit was not available; that the casino

15  revenues were a critical collateral item for going forward

16  with any financing, among others, the letter of JPMorgan,

17  Exhibit 61, your Honor, that they were critical if we were

18  going to get financing, so I think we did put on evidence

19  that litigation was not compatible with a post-petition

20  financing; that, in fact, stability of the city was not

21  achievable if 20 percent of its revenues -- and I think both

22  Mr. Orr and Mr. Malhotra established that casino revenues are

23  the most stable and the largest single component of the city

24  revenues -- would be necessary as collateral.  So, your

25  Honor, so far nothing but speculation.  We have no witness

13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 14:00:23   Page 97 of 200
13-53846-swr   Doc 4311-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 439 of 200
463                                                                    439

1  and no evidence from the objectors that any expert or other

2  party would have advised the city in light of all this not to

3  do this deal.  In fact, we have contrary evidence.  We have

4  many contrary statements regarding the need to move forward,

5  regarding the significance, if you will, your Honor, of

6  restoring stability to the city so that it could be in a

7  position to move forward and to propose a plan of adjustment.

8      Your Honor, we would think we should just stop for a

9  moment.  We do not debate that there are clearly litigable

10  claims involved in settling this secured claim.  We have

11  acted carefully to actually preserve some of them for going

12  forward so that other intercreditor issues can be fully

13  explored as we move forward in this Chapter 9.  Our

14  recognition of the strength of these claims has been

15  reaffirmed by each of the first, second, third, fourth, and

16  fifth amendments to the FOTA's, which are Exhibits -- City

17  Exhibits 50 to 54, in which we at every turn preserve the

18  right of the city to go forth and litigate if the benefits

19  weren't going to be realized and have the opportunity to talk

20  to our creditors and to constantly reevaluate this.  In fact,

21  your Honor, those amendments took us through September 23rd,

22  which is a date you may recall.  On that date, your Honor, we

23  adjourned to a date to be determined, and with that, your

24  Honor, we acquired another -- I would call it walk right

25  because we had failed to obtain approval of the FOTA within

1   75 days.  So we were constantly aware and constantly

2   reevaluating and pursuing these situations because, as Ms.

3   Green pointed out, June was a very difficult time for the

4   city.  It was.  I don't think it has terrifically improved.

5   I think the financing and getting this casino revenue

6   question behind us is probably groundbreaking insofar as it

7   enables the city to move forward with what it has to do, and

8   to put what has clearly been a nonadvantageous deal behind it

9   would be a good thing, but perhaps we should take some time.

10  What have the objectors pointed out?  Well, on cash they keep

11  pointing out what was June, what was June, what was June, but

12  as I said, your Honor, the evidence in the record established

13  that we continued looking at this throughout and that, in

14  fact, again, the last look at your Honor's insistence earlier

15  this month.

16          They also pointed, your Honor -- and I think it was

17  also Ms. Green -- that in June cash was very low, but, gee,

18  now cash is upwards of roughly a hundred million at the end

19  of October.  And I think, your Honor, it's hovered about that

20  level.  How did it get there?  As your Honor is well aware,

21  11 million a month was from casino revenues.  The banks, in

22  fact, did forbear.  On the do nothing scenario, which

23  Mr. Orr, the emergency manager, in the city's interest

24  thought was terrifically short-sighted if he was going to

25  move the city forward, we got them to forbear.  We did get

13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 14:11:40   Page 97 of 200
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 441 of 441
463

the casino revenues.  We had your Honor's assistance because
we clearly had people who would have appreciated a different
outcome on the casino revenues, some of whom are here
objecting, so, your Honor, we do have some cash, but even so,
what do we know from Mr. Malhotra in Exhibits 108 through
111?  We know that the city's cash, even taking that into
account, remains tight without the post-petition financing
and remains stressed as long as it's paying interest on an
obligation that's measured by 800 million with no
countervailing benefit.  After 2009, what has the evidence
established through documents?  It's established that the
hedge had zero benefit to the city by virtue of the optional
termination which would have enabled the counterparties to
terminate the hedge and walk, and the city would never have
gotten an asset from this, so it's clearly a one-way street
where we were paying 50 million a year where alone for a
fraction of that amount, certainly even when we were
measuring it at 230, was 17 million a year, and obviously now
with the intervention of your Honor in mediation would be
even less at 165, but perhaps we should turn to Ambac and
their objection.  Ambac, as the lead invalidity objector,
would have the Court see invalidating the swap under Act 34
as a certain and swift outcome in litigation yet even Ambac
admits that the key steps to the Act 34 claims -- and they go
to both the COPs and the swaps -- focus on the future of the

1  service contract, and they focus on the legitimacy of the

2  service corps themselves.  That seems to me, your Honor, that

3  may not be a judgment on the verdict, and one would

4  inevitably think that we have to look to the contracts, which

5  are also in evidence before you today.

6          Mr. Orr this morning alluded to some of the key

7  evidence.  He told your Honor there were facts suggesting

8  that a claim to invalidate the COPs and swaps because of a

9  failure to comply with Act 34 might succeed were premised on

10  the operation of the service corporation, no meetings, no

11  employees.  In fact, the service corps' address, according to

12  the service contracts, which are in evidence, Exhibits 128

13  and 129, are care of a law firm, Lewis & Munday.  We also

14  have the service contract terms which are in evidence as

15  Exhibits 128 and 129.  It is true that the only service

16  mentioned in the service contract, your Honor, is that the

17  service corp shall fund payments to enable debt service --

18  don't use the word "debt" -- to enable payments required on

19  the certificates of participation.  It also has a very

20  bizarre provision that upon the city bankruptcy, there's an

21  acceleration clause for -- measures the liquidated damages as

22  all amounts due under the COPs, so clearly the strength of

23  the claim -- the evidence of strengths of those claims are

24  before you.  However, there are other facts, and one of which

25  I have to thank Ms. English for putting into evidence just

13-53846-swr   Doc 2314-10   Filed 01/10/19   Entered 01/10/19 14:11:00   Page 96 of 200
13-53846-swr   Doc 4447   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 143 of 443
463

 1   earlier.  Your Honor heard about the city ordinance.  You've
 2   heard -- you haven't heard -- and that is in the service
 3   contract -- that the amounts payable are subject to annual
 4   appropriation.  You saw Ms. Green's reappropriating the
 5   appropriations.  Hence, debt limits don't apply, and the
 6   service corporations aren't subject to swap limitations or so
 7   the structure says, and the offering circular introduced by
 8   Ms. English has 12-point huge type in it that this is not
 9   debt of the city.  There is no full faith and credit.  This
10   is merely a service contract, and that's in the offering
11   circular which just got admitted.  There are provisions in
12   the service contract which say it's not indebtedness of the
13   city, it's not a general obligation.  The sole remedies of
14   the trust which issued the certificates of participation are
15   to sue on a contract and then seek mandamus for an
16   appropriation, so we have a lot of difficult facts to
17   overcome.  And it's interesting that we have differing views
18   on estoppel.  Maybe, maybe not.  So, your Honor, I think
19   you've seen -- you've had a fair amount of evidence on the
20   validity, the void point, and I guess we saw our first cases
21   from the objectors on void ab initio two days ago, and none
22   of them -- none of them dealt with the derivative, and none
23   of them dealt with this type of situation with a certificates
24   of participation issued by a trust.  It's not as if there
25   were a clear path there that this has been done before, this

13-53846-swr   Doc 2314-10   Filed 01/10/19   Entered 01/10/14 14:22:00   Page 144 of 200
13-53846-swr   Doc 4314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 98 of 200   444
463

1  could be done in short order.

2       Fraud, your Honor.  You've heard what it would take.

3  I think that no one would stand here and tell your Honor that

4  any fraud lawsuit of this magnitude could be commenced and

5  concluded within a matter of weeks.  Certainly that would

6  take a fair bit of time, so I think, your Honor, that

7  evidence has been before you both through Mr. Orr and from

8  Mr. Goldberg's submissions, that it would take a fair bit.

9  UBS clearly had multiple roles here.  The former CFO of the

10  city did join SBS, the predecessor in interest to Bank of

11  America, but, on the other hand, your Honor, the city did

12  raise a billion four on this structure, and the city did --

13  forgive me, but there's no debate that the city at the time

14  thought it had saved the city's pensions and restored their

15  financial viability, so clearly there were benefits, and

16  clearly those benefits would be taken into account.

17       I also am struck by how easily the objectors would

18  have your Honor disregard the trend in bankruptcy on a number

19  of fronts.  Your Honor, I think that I'm referring -- if we

20  went to the special revenue argument, Mr. Orr has testified.

21  Documents were also clear.  The briefs are also clear that

22  when the Gaming Control Act was enacted in the mid- to late

23  '90s, they defined gaming revenues as an excise tax.  That

24  action was totally independent of what happened in 2009.

25  Section 901(2), 902(2)(E), expressly includes excise taxes as

13-53846-swr   Doc 2314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 145 of 200
463
13-53846-swr   Doc 4144   Filed 04/19/14   Entered 04/14/14 14:40:23   Page 98 of 200      445

1   a form of special revenue.  What's interesting here is that
2   we heard about the legislative history that was, frankly, the
3   subject of Judge Bennett's opinion in one of the Jefferson
4   County decisions, and what he was really focused on in that
5   decision, your Honor, is what was the extent of the term
6   operating and maintenance expenses, so he did focus on the
7   legislative history that dealt with project debt and what the
8   meaning of operational expenses were, but what no one has
9   brought to your attention, as far as I know, is the
10  legislative history surrounding the evolution of the
11  definition of special revenues in Chapter 9.  In 1988 when
12  Chapter 9 was amended on the special revenues point -- thank
13  you to our sister city, Cleveland, among others, who were in
14  very desperate difficulties at the time -- the legislative
15  history in the Senate report were crystal clear that an
16  excise tax includes a tax on a particular activity such as a
17  motel -- use of a motel or hotel room, sale of alcoholic
18  beverages, and, your Honor, I think it's pretty clear from
19  Collier's at least, in looking at that legislative history,
20  has determined that gaming revenues are certainly likely
21  there, and both the Senate and the House share that same
22  provision.  What is funny is that the vulnerability -- those
23  would be the good facts, your Honor, on the special revenues.
24  It was argued somewhat by my colleagues from Syncora this
25  past summer.  Now, what do we have in the good facts?  City

1  code calls them excise taxes.  We have the plain meaning.

2  The legislative history clearly indicates gaming revenues

3  should be within there.  But your Honor also has the bad

4  facts.  They're documentary as well as testamentary.  The

5  collateral agreement, City's Exhibit 11.  Think about it,

6  your Honor, and I think that's the vulnerability.  It doesn't

7  operate where the special revenues directly pay the debt, and

8  928 doesn't say that has to happen, but, no, that was one of

9  the bad facts, and clearly that's in front of you, and we did

10  think about it, but at the end of the day overcoming the

11  simple plain meaning and a very clear legislative history

12  that gaming revenues should be available, it seems to us

13  gave -- put some hurdles between ourselves and setting aside

14  these liens.

15      When it came to the Gaming Act alone, your Honor, we

16  are overcoming a fair bit of evidence also in front of you in

17  terms of the city ordinances, in terms of the opinion of

18  corporation counsel, the opinion of Lewis & Munday.  What do

19  we have contrary to that evidence, which, in fact, the city

20  had to look at because it was dealing with throughout this

21  whole period what happens to 20 percent of its revenues and

22  how long would it take them to litigate it?  We have a

23  lawsuit that says pledges of gaming taxes are only allowed

24  for its roughly five to six purposes.  They can be used for

25  these permitted purposes, one of which, your Honor, is

13-53846-swr  Doc 2314-10  Filed 01/10/14  Entered 01/10/14 22:00:23  Page 447 of 200
13-53846-swr  Doc 2444  Filed 01/29/14  Entered 01/29/14 14:40:23  Page 46 of 200  447
463

 1  program design to enhance quality of life and otherwise

 2  relieve the citizens of a tax burden.  Well, we have

 3  everybody finding that paying the pensions for the public

 4  service employees of City of Detroit was a program, was part

 5  of a program to enhance quality of life.  Is it black and

 6  white on either side?  No.  We don't think so.  We thought it

 7  was litigable.  Were there good facts?  Yes.  Were there bad

 8  facts?  Yes.  I think we presented both of those to your

 9  Honor both as a matter of documents, the opinion of Lewis &

10  Munday.  All the elements are of it are in City Exhibit 133,

11  Schedule A.  The opinion of the corporation counsel is in the

12  same place.  The ordinances giving a statutory lien totally

13  contrary -- totally contrary to what I viewed as an

14  intermeddler e-mail from someone who was not there and did

15  not talk to anyone.  The counterparties did have a statutory

16  lien, and they did have the opinion of Orrick, and it speaks

17  for itself.  And that's in front of you as opposed to the

18  commentary from a former investment banker advisor of the

19  city.

20          Finally, your Honor, at least on the big point,

21  which we view the big point as the void or voidability point,

22  it's interesting that on this structure that hasn't been used

23  before, on a source of revenues that haven't been

24  collateralized before or attacked, that we could so readily

25  dismiss void or voidable.  Let's talk about what that means,

1    and what does that mean in the context of dealing with what,

2    your Honor, are very protected financial contracts in

3    bankruptcy.  We have three circuit decisions within the past

4    24 months that suggest the issue of void versus voidable is

5    not entirely clear.  Moreover, we do have the Eighth Circuit

6    telling us unjust enrichment clearly voidable, clearly can't

7    go near a swap with that.  Somehow the objectors are telling

8    us that we should rely on one Bankruptcy Court opinion from

9    out of district that has been called into question by the

10   same circuit in which that Bankruptcy Court sits and by two

11   other circuits.  Your Honor, can't say it's not litigable,

12   but the concept that it would be a slam dunk in the face of

13   very well-healed adversaries seems to us a bit of an

14   overstatement.  In fact, your Honor heard about the

15   strategies that the city considered to act outside of Chapter

16   9 to sue in the early days when bankruptcy was not upon us.

17   The safe harbors were one of those reasons.

18         Your Honor, to rely on Judge Gonzalez, who I have

19   the utmost respect for, in one of his earliest opinions in

20   Enron when he said the facts surrounding a transaction are

21   critical, and we need to look at them to see if it really is

22   a financial transaction -- in that case, it was a dividend

23   under Oregon law.  He would later try the same thing when

24   holders of commercial paper would seek and pressured and

25   duressed and put a gun to the head of Enron saying redeem our

1  commercial paper because we're hearing all kinds of rumors

2  that Enron is going to fail, and Judge Gonzalez looked at it

3  and said, you know, this isn't an ordinary financial

4  situation.  This is gun to the head.  This is terrible.  And

5  he, in fact, said that they were not protected, and, in fact,

6  the estate should go forth and sue these banks that got paid

7  on their commercial paper, actually redeemed it very, very

8  early.

9       The Second Circuit resoundingly reversed Judge

10  Gonzalez and has taken the point of view which has since been

11  reflected by both the Eighth Circuits and Judge Easterbrook

12  in the Seventh that this is an area that requires almost

13  preemption.  I would say the Second Circuit's decision is

14  more on the preemption side of it, and, your Honor, by way of

15  background, that would be -- I will find you the cite, your

16  Honor, the Enron Second Circuit opinion.  The Eighth Circuit

17  was in Commercial Industries, which we have cited in our

18  papers, and the Seventh Circuit was Lancelot Industries where

19  Easterbrook affirmed.  Again, putting state law labels does

20  not automatically get you around suing to set aside a

21  transaction, but, your Honor, litigable.  We don't disagree.

22  We thought it was litigable.  We also thought that we had

23  already experienced -- and, fortunately, with your Honor's

24  assistance, we're able to overcome what happens when your

25  casino revenues are trapped because sure enough it happened

 1   when someone got instructions, and that boiled down for us to

 2   how would our swap counterparties be entitled to do that in

 3   this situation?  Are they within the exception to the

 4   automatic stay of 362(b)(17), which applies to two categories

 5   of claimants?  It applies to swap participants and financial

 6   participants.  Your Honor, there's no doubt in my mind the

 7   swap counterparties are financial participants.  Also, your

 8   Honor, there's no doubt, at least for purposes of a swap

 9   definition for bankruptcy only, that any agreement

10   providing -- and that's in 101.53(b)(6) -- anyone providing

11   credit support or enhancement for a swap, that credit

12   enhancement is considered a swap agreement.  In fact, the

13   definition says a swap agreement includes the following, and

14   it gives you a litany, and it includes any credit agreement.

15   So the city's obligations under the collateral agreement as a

16   credit support do make the counterparties at least arguably a

17   swap participant with the city, so I think we do have -- we

18   did have a risk under 362(b)(17).  We countered that.  We

19   went and said, well, what would it look like if we could get

20   an injunction to maintain the status quo and keep getting

21   those revenues?  Your Honor, there was no answer there

22   because we couldn't get a financing or at least we found no

23   ability to get the financing in the face of that.

24          Moreover, your Honor, what if someone were to ask

25   you to issue that injunction or enjoin?  Your Honor, we

thought about the roadblocks that have been erected against
Bankruptcy Courts dealing with certain kinds of contracts
and, in particular, 362(o) and 560.  362(o) basically says
that Bankruptcy Courts cannot issue a stay against swap
participants if they're doing critical actions.  Your Honor,
I'm going to be very careful here because if this isn't
approved, you know we will have an answer to this one as
well, but it is a roadblock as is 560, which says as long as
swap participants are liquidating, terminating, or
accelerating by reason of a bankruptcy filing, there are very
strong limitations in what the Bankruptcy Court or the
Bankruptcy Code can do.  Is it a closed door?  No.
Litigable.  But, your Honor, I think we've put evidence
before you regarding that statute, regarding the operation of
the collateral agreement, regarding the history in this case
with Syncora.  What would it mean?  Your Honor kind of meant
the following.  If we were to decide to litigate, I'm going
to ask your Honor, I think, about one other characteristic
here, what the bank's choice is going to be.  And to this,
your Honor, I'm turning to the insurers.  Had the city
decided to litigate, the insurers could simply for the life
of their swap, much like the COP holders for the life of the
COPs, continue to try to collect payments from Syncora and
FGIC, all interesting for the swap counterparties, and we all
know FGIC, despite its plan, which by the way, your Honor,

1   we're not conceding those orders were enforceable on the

2   city, still would have given the bank some recovery, some

3   recovery which they have given us estimates of, which not

4   surprisingly are in the 60- to 65-percent range, but, your

5   Honor, what would we have?  We'd be fighting, so it's not

6   whether or not the banks are going to terminate.  We would be

7   fighting with Syncora and with FGIC because under their

8   insurance policies, they would have to defend.  And, your

9   Honor, as I said, if we went into the validity issues, we

10  would likely add all the COPs holders, and I'm sure they

11  would add the pensions, so, your Honor, the incentive to

12  settle and the prospects for litigation for the city were

13  evaluated and extremely so, and I think, your Honor, the

14  documents -- most of the good facts and bad facts are in the

15  governing ordinances and the documents that have been put in

16  evidence before you and, as you've heard from Mr. Orr, were

17  very much a part of his thinking in approaching and going

18  forward with the settlement.  All this, your Honor, against

19  the backdrop of what is our burden.  In the Sixth Circuit,

20  lowest range of reasonableness, your Honor.  And did we

21  apprise you of what the claims were, good facts, bad facts,

22  and that a judgment was made?  Your Honor, that is not the

23  burden of a trial.  It's not the burden of a mini trial.

24  Bard tells us that.  Greektown tells us that.  I don't think

25  there's any doubt, your Honor, that this would be a complex

1  and expensive litigation.  I think you've heard about it.  I

2  think I have shared with you, your Honor, as did the review

3  of the claims and the documents that it would involve many of

4  the constituents in this case if there were to be such a

5  litigation, and it would do it under a circumstance where the

6  city's cash lifeline was in question and under threat.  If

7  this settlement is to be approved -- and we urge the Court to

8  approve it -- that lawsuit, at least as far as it goes to the

9  COPs, remains extant, and many of these issues can still be

10  reconsidered.  We do not mean in proposing the settlement,

11  your Honor, to in any way denigrate the importance of

12  intercreditor issues.  We understand them, and we understand

13  that creditors have different agendas.  We are, however,

14  dedicated to keeping moving forward and deferring to

15  intercreditor issues when they don't defer -- when they don't

16  threaten the stability and viability of the city in terms of

17  its working capital and its finances.  And I think this

18  settlement, your Honor, demonstrates that differing decision

19  matrix.

20        As to the post-petition financing, your Honor, I

21  think that we have met our burden.  Clearly we have

22  established through the testimony of Messrs. Doak and

23  Buckfire that unsecured credit was not available, which was

24  corroborated by their very early market tests.  Your Honor

25  may recall Exhibit 61, the letter from JPMorgan.  In fact,

13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 14:00:23   Page 154 of 200
13-53846-swr   Doc 4144   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 191 of 200   454
463

1    the letter from JPMorgan said the keys to any DIP financing

2    and to the city's ongoing access to capital will be the

3    strength of the security interest in certain of the city's

4    general fund revenues, and it goes on to list specifically

5    the casino revenues.  I think that the evidence has shown

6    that the city followed a robust competitive process

7    contacting over 50 people.  The city solicited 50 traditional

8    alternative sources of financing, received 16 lending

9    proposals, and ultimately negotiated commitment proposals

10   with four parties.  Your Honor, the detail of that is set

11   forth in the city's Exhibits 88 and 89, and you've heard

12   testimony from both Mr. Doak and Mr. Buckfire from Miller

13   Buckfire as well as Mr. Orr.  They also testified that on an

14   all-in cost basis, the Barclays proposal was the most

15   advantageous available to the city.  You've heard evidence on

16   that point from Mr. Buckfire, you've heard evidence on that

17   point from Mr. Doak and again today from Mr. Orr, and that

18   that remains true even if the market flex is fully executed

19   that it is the best available financing.

20           I think the evidence has also shown this morning and

21   through the testimony of Mr. Doak that the city complied with

22   Public Act 436 and the Home Rule City Act.  Both were clearly

23   involved.  PA 436 required the emergency manager to submit

24   the financing proposal to the City Council.  The emergency

25   manager did that.  Not only did he do that, he directed his

investment bankers to meet with each individual member of the
City Council and give them an opportunity to review the
situation and ask questions, and City Exhibit 90, your Honor,
clearly shows that the briefing materials did include an all-
in cost model and that, in fact, the testimony of Mr. Doak
would show that the range used in those materials did include
the market flex and that even if it was fully flexed, the
resulting range would be well within the materials shared
with the council members.  I think that was in Exhibit 90 and
in Mr. Doak's testimony.

Separately from that, the proposal was officially
transmitted to the City Council.  As your Honor knows, they
considered briefly an alternative financing and declined the
city's proposed financing but never proposed an alterative.
Your Honor, I think that satisfied Mr. Orr's burden under
436.  He then had to deal with the Home Rule City Act, and in
that connection, as your Honor noted back on December 18th,
there was an Emergency Loan Board hearing on December 20th,
and on that day, as is clear from City Exhibit 141, the
Emergency Loan Board did approve of the city's financing
proposal, and your Honor was also very correct that Treasurer
Clinton is the chair of that body, and, in fact, his
designee, Tom Saxton, is one of the signatories on that
order.  So with that I think, your Honor, that we have
clearly met our burden on the financing.  We are happy to

13-53846-swr   Doc 2314-10   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 456 of 200
13-53846-swr   Doc 2444   Filed 01/10/19   Entered 01/10/19 14:44:00   Page 193 of 200
463

1 answer any additional questions, but we think we have met the

2 requirements for granting a lien and to enable your Honor to

3 enter the findings regarding the city's good faith.

4 Your Honor, the one point that I would like to make

5 before reserving the remainder of my time to respond is that

6 we've heard a lot of questions today about what documents

7 said and what did you understand them to mean. I think, your

8 Honor, when it comes to the forbearance agreement, it speaks

9 for itself. It is not an amendment or a waiver. It does not

10 modify the swaps. It, in essence, is an agreement strongly

11 supported by New York law to forbear, and the banks have, in

12 fact, been forbearing. Your Honor, it's an agreement that

13 changed radically in 2009. It changed radically in 2009 when

14 the four swap agreements were amended. You may ask why are

15 there four. Well, remember, there are two service corps, two

16 swap providers. Two times two is four, so that when Syncora

17 and FGIC consented to the 2009 deal -- and that consent with

18 its exhibits is also in evidence before you -- they consented

19 not once, but, your Honor, they consented four times, and

20 that amendment added what has been called the optional

21 termination provision. And I think, your Honor, that changed

22 the nature of these transactions, and it is that optional

23 termination -- it is not Section 6 -- which the forbearance

24 agreement operates on, and perhaps it would be helpful -- I

25 know your Honor has already gotten the architecture of the

13-53846-swr Doc 2444-10 Filed 01/10/14 Entered 01/10/14 22:00:23 Page 457 of 200
13-53846-swr Doc 1114 Filed 04/29/14 Entered 04/29/14 14:40:23 Page 457 of 200
463

1  service corps and gotten the architecture of the collateral

2  agreement and the trapping of revenues, but maybe just a

3  minute on the architecture of the swap would be helpful.

4  Swaps usually have three components.  They have the ISDA

5  master agreement which everyone uses.  They then have a

6  schedule, which takes things in or out or adds things to the

7  ISDA master schedule, which actually tailor the deal to what

8  the two counterparties want to do.  And then, thirdly, they

9  have a confirmation.

10      In this circumstance, the insurer provisions are all

11  in the amended schedules as is the optional termination.  The

12  general termination right is Section 6 of the ISDA master,

13  which then keys into these schedules.  What the forbearance

14  agreement is doing, although it is clear at least to us --

15  we're in default, we can't pay -- that should the banks want

16  to declare a termination event under Section 6, they probably

17  could have absent the forbearance agreement, but they didn't.

18  They are forbearing, and, your Honor, they're going to a

19  provision in the amended schedules which says that they can

20  terminate at any time, but they can't get paid anything from

21  the service corps.  That's what it says.

22      By way of understanding contrasts in the insurer

23  role, we turn to the confirmation in the same swaps, the

24  third piece.  The confirmation provides that, gee, you know,

25  the service corps have a termination right, too, an optional

13-53846-swr   Doc 2314-10   Filed 01/10/14   Entered 01/10/14 22:00:23   Page 195 of 200
463
13-53846-swr   Doc 2444-10   Filed 01/10/14   Entered 01/10/14 14:40:23   Page 458 of 200   458

 1  termination right, but it says right there with the insurer

 2  consent, the service corps may terminate, but then some

 3  provisions aren't present in sections in the optional

 4  termination provisions of the amended swaps, which for one

 5  are 5-X in the UBS swaps and 5-2 for the SBS, now BAML,

 6  swaps.

 7          Your Honor, I think that the consent issues have

 8  been briefed at length.  I think that the law is clear that a

 9  forbearance is not an amendment at least under New York law.

10  And if your Honor has questions about how these swap

11  agreements work together, that's fine, but I also would point

12  out to your argument -- your Honor there are two other

13  arguments that I think the briefs have responded to.  One of

14  those is is this really an end run or an amendment.  Is this

15  really an end run to the fact that the service corps aren't

16  supposed to pay anything, and is it really not within the

17  optional termination because it's an impermissible assignment

18  of the right of the banks?  I think that's been briefed very

19  well not only by the banks but by ourselves, and I think the

20  answer to that is, your Honor, it is not a sale or

21  assignment.  The banks retain the rights to exercise whatever

22  they want under their swap agreements.  They only agreed to

23  forbear for a temporary period.  Certainly there has been no

24  assignment, and certainly the city does not have the

25  exclusive right to do anything.

1     Finally, your Honor, it's very interesting, at least

2  from a contractual construction point of view, that certain

3  of the objectors argue that the presence of an integration

4  clause, if you went to law school in the past ten years -- if

5  you went to law school in the past -- earlier twenty years,

6  it would have been a merger clause -- that the presence of an

7  integration clause, which is intended to exclude parol

8  evidence, ties different agreements together and says they're

9  one agreement.  Actually, your Honor, I think we need to look

10  at that one.  Here it was clearly intended to exclude parol

11  evidence.  Moreover, your Honor, forbearance agreement

12  involves the service corporations, the city, and the swap

13  counterparties.  The collateral agreement involves the city,

14  the swap counterparties, and the service corporations.  These

15  other agreements that the objectors would have us say are

16  part of one integrated agreement, different agreements,

17  different parties, different times by design and by consent,

18  so we do think it is a bit of a reach to try to integrate the

19  swap, the collateral agreement, the contract administration

20  agreement into what is merely a forbearance agreement.

21     Your Honor, with that I think that we have met our

22  burden both for the financing and for your Honor's approval

23  of the 9019.  I would be happy to answer any questions, and I

24  would like to reserve time to respond to the objectors.

25     THE COURT:  Thank you.  Stand by, please.

1      MS. BALL:  Your Honor, as a matter of housekeeping,

2  my apologies -- I do have the Enron cite.

3      THE COURT:  Go ahead.

4      MS. BALL:  The Eighth Circuit cite is 913 Fed. 2d

5  846, Contemporary Industries.  No.  That's -- I'm sorry.

6  Contemporary Industries is 564 Fed. 3d at 985, and the Enron

7  decision, your Honor, Enron, too -- oh, this is -- excuse me,

8  your Honor.  Oh, this is the opinion, your Honor.  My

9  apologies.  It's Enron Creditors Recovery versus Alfa at 651

10  Fed. 2d 329, Second Circuit, 2011.  Your Honor, the Lancelot

11  decision is also in our papers, and the Contemporary

12  Industries, as I said, is 564 Fed. 3d, and that's the Eighth

13  Circuit, 2012.

14      THE COURT:  Thank you.  All right.  By my count the

15  city now has 93 minutes remaining.  Anything else for today?

16      MR. HAWKINS:  Your Honor, a point of order.

17      THE COURT:  Sir.

18      MR. HAWKINS:  Howard Hawkins for Merrill Lynch.  We

19  intend to speak briefly on behalf of the motion.  Would your

20  Honor prefer that be Monday morning or right now?

21      THE COURT:  It's your choice, sir.

22      MR. HAWKINS:  We'd prefer Monday morning, your

23  Honor, I think, and my partner, Mark Ellenberg, who couldn't

24  be here today because of the snow, would like to give the

25  closing.  Much as I would enjoy doing it, he's probably

1 better to do it.

2     THE COURT:  All right.  Thank you, sir.  We'll

3 permit that.

4     MR. HAWKINS:  So we would do it first before the

5 objectors on Monday?

6     THE COURT:  Yes, you would.

7     MR. HAWKINS:  Thank you, your Honor.

8     THE COURT:  Anything else for today?  All right.  I

9 will see you all nine o'clock Monday morning in this room.

10     MS. ENGLISH:  Thank you, your Honor.

11     THE CLERK:  All rise.  Court is adjourned.

12     (Proceedings concluded at 4:17 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | 9 | 61/109 | | |
| | | 115/123 | | |
| | | 140 | | |

| | | | | |
|---|---|---|---|---|
| Closing Argument by Ms. Ball | | | 171 | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| City Exhibit 141 | | | 40 |
| City Exhibit 142 | | | 59 |
| Syncora Exhibit 230 | | | 108 |
| FGIC Exhibits 305 and 306 | | | 161 |
| Ambac Exhibit 404 | | | 162 |
| Retirement Systems Exhibit 1007 | | | 139 |
| Retirement Systems Exhibit 1023 | | 135 | |
| Sole Exhibits 1321, 1324, 1325, 1326 | | | 166 |

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    January 10, 2014
_____        _____
Lois Garrett