# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

***Debtor In Possession***
**City of Detroit, Michigan**
2 Woodward Avenue
Suite 1126
Detroit, MI 48226
WAYNE–MI
Tax ID / EIN: 38–6004606

represented by **Bruce Bennett**
555 S. Flower Street
50th Floor
Los Angeles, CA 90071
(213) 489–3939
Email: bbennett@jonesday.com

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237–3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114

(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

*U.S. Trustee*
**Daniel M. McDermott**

represented by **Sean M. Cowley (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769

Email: Richard.A.Roble@usdoj.gov

| | | |
|---|---|---|
| *Creditor Committee*<br>**Committee of Unsecured Creditors**<br>*TERMINATED: 03/03/2014* | represented by | **Brett Howard Miller**<br>1290 Avenue of the Americas<br>40th Floor<br>New York, NY 10104<br>(212) 468−8051<br>Email: bmiller@mofo.com,whildbold@mofo.com<br>*TERMINATED: 03/03/2014* |
| | | **Geoffrey T. Pavlic**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033−2518<br>(248) 352−4700<br>Fax : (248) 352−4488<br>Email: pavlic@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| | | **Mark H. Shapiro**<br>25925 Telegraph Rd.<br>Suite 203<br>Southfield, MI 48033−2518<br>(248) 352−4700<br>Fax : (248) 352−4488<br>Email: shapiro@steinbergshapiro.com<br>*TERMINATED: 03/03/2014* |
| *Creditor Committee*<br>**Charlene Hearn**<br>PO Box 6612<br>Detroit, MI 48206 | | |
| *Retiree Committee*<br>**Official Committee of Retirees** | represented by | **Sam J. Alberts**<br>1301 K Street, NW<br>Suite 600, East Tower<br>Washington, DC 20005−3364<br>(202) 408−7004<br>Email: sam.alberts@dentons.com |
| | | **Paula A. Hall**<br>401 S. Old Woodward Ave.<br>Suite 400<br>Birmingham, MI 48009<br>(248) 971−1800<br>Email: hall@bwst−law.com |
| | | **Claude D. Montgomery**<br>620 Fifth Avenue<br>New York, NY 10020<br>(212) 632−8390<br>Email: claude.montgomery@dentons.com,docketny@dentons.com |
| | | **Carole Neville**<br>1221 Avenue of the Americas<br>25th Floor<br>New York, NY 10020<br>(212) 768−6889<br>Email: carole.neville@dentons.com |
| | | **Matthew Wilkins**<br>401 S. Old Woodward Ave. |

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 01/17/2014 | | 2512 | Transcript regarding Hearing Held 01/13/14 RE: Evidentiary Hearing re. Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. Sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post–Petition Financing, (II) Granting Liens and Providing Superpriority Claims Status and (III) Modifying Automatic Stay (DKT#1520); Motion of the Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Releated Relief (DKT#17); Corrected Motion for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Releated Relief (DKT#157). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 04/18/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 2456 Transcript Request, 2461 Transcript Request, 2462 Transcript Request, 2466 Transcript Request, 2467 Transcript Request, 2468 Transcript Request, 2470 Transcript Request, 2478 Transcript Request, 2481 Transcript Request). Redaction Request Due By 02/7/2014. Redacted Transcript Submission Due By 02/14/2014. Transcript access will be restricted through 04/18/2014. (Garrett, Lois) (Entered: 01/17/2014) |
| 01/18/2014 | | 2521 | Transcript regarding Hearing Held 01/16/14 RE: Bench Opinion. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 04/21/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 2489 Transcript Request, 2490 Transcript Request, 2491 Transcript Request, 2493 Transcript Request, 2494 Transcript Request, 2496 Transcript Request, 2499 Transcript Request, 2502 Transcript Request, 2503 Transcript Request, 2504 Transcript Request, 2505 Transcript Request, 2506 Transcript Request, 2507 Transcript Request, 2508 Transcript Request, 2510 Transcript Request, 2514 Transcript Request). Redaction Request Due By 02/10/2014. Redacted Transcript Submission Due By 02/18/2014. Transcript access will be restricted through 04/21/2014. (Garrett, Lois) (Entered: 01/18/2014) |
| 04/04/2014 | | 3772 | Transcript regarding Hearing Held 04/02/14 RE: Notice of Presentment of Order by Debtor in Possession City of Detroit (#2921); Order to Show Cause Why Expert Witness Should Not Be |

| | | | Appointed (#3170); Motion to Adjourn Hearing Regarding the Debtor's Motion for Entry of an Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving a Settlement and Plan Support Agreement and Granting Related Relief Hearing (#3287); Ex Parte Motion to Extend re. Disclosure Statement Approval Schedule (#3317). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 07/7/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 3574 Transcript Request, 3609 Transcript Request, 3622 Transcript Request, 3633 Transcript Request). Redaction Request Due By 04/25/2014. Redacted Transcript Submission Due By 05/2/2014. Transcript access will be restricted through 07/7/2014. (Garrett, Lois) (Entered: 04/04/2014) |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,         .       Docket No. 13-53846
        MICHIGAN,                .
                                 .       Detroit, Michigan
                                 .       January 13, 2014
                      Debtor.    .       9:13 a.m.
. . . . . . . . . . . . . . . . .

EVIDENTIARY HEARING RE. MOTION OF THE DEBTOR FOR A FINAL
ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 362, 364(c)(1),
364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and
922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING
LIENS AND PROVIDING SUPERPRIORITY CLAIMS STATUS AND (III)
MODIFYING AUTOMATIC STAY (DKT#1520)

MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING
THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#17)

CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#157)

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  CORINNE BALL
                       222 East 41st
                       New York, NY  10017-6702
                       (212) 326-7844

For Bank of            Cadwalader Wickersham & Taft, LLP
America and            By:  MARK C. ELLENBERG
Merrill Lynch          700 Sixth Street, N.W.
Capital Services:      Washington, DC  20001
                       (202) 862-2200

13-53846-swr   Doc 2312-11 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 6 of 79
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 22:47:07   Page 1 of 179
290                                                                          6

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee, Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP<br>By: RYAN BLAINE BENNETT<br>300 North LaSalle<br>Chicago, IL 60654<br>(312) 862-3062 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By: JENNIFER K. GREEN<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI 48226<br>(313) 965-8300<br><br>Clark Hill, PLC<br>By: ROBERT D. GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI 48009<br>(248) 988-5882 |
| For Erste Europaische Pfandbrief-und Kommunalkreditbank Aktiengesellschaft in Luxemburg, S.A.: | Ballard Spahr, LLP<br>By: VINCENT J. MARRIOTT, III<br>1735 Market Street, 51st Floor<br>Philadelphia, PA 19103-7599<br>(215) 864-8236 |
| For David Sole: | Jerome D. Goldberg, PLLC<br>By: JEROME D. GOLDBERG<br>2921 East Jefferson, Suite 205<br>Detroit, MI 48207<br>(313) 393-6001 |
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP<br>By: ALFREDO R. PEREZ<br>700 Louisiana Street, Suite 1600<br>Houston, TX 77002<br>(713) 546-5040 |
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By: CAROLINE TURNER ENGLISH<br>1717 K Street, NW<br>Washington, DC 20036-5342<br>(202) 857-6178 |

13-53846-tjt   Doc 4311-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 7 of 79
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 22:47:07   Page 2 of 17
290
7

APPEARANCES (continued):

For Detroit Retired      Lippitt O'Keefe, PLLC
City Employees           By:  RYAN C. PLECHA
Association,             370 East Maple Road, 3rd Floor
Retired Detroit          Birmingham, MI  48009
Police and Fire          (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:


Court Recorder:          Letrice Calloway
                         United States Bankruptcy Court
                         211 West Fort Street
                         21st Floor
                         Detroit, MI  48226-3211
                         (313) 234-0068

Transcribed By:          Lois Garrett
                         1290 West Barnes Road
                         Leslie, MI  49251
                         (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

13-53846-tjt   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 8 of 79
13-53846-swr   Doc 2312   Filed 01/17/14   Entered 01/17/14 13:47:37   Page 8 of 179
290
8

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  First, my apologies for being late.  Are

4  we ready to proceed with the closing arguments?

5                    CLOSING ARGUMENT

6    MR. ELLENBERG:  If the Court please, Mark Ellenberg,

7  Cadwalader Wickersham & Taft, representing Merrill Lynch and

8  speaking today on behalf of both of the swap providers.

9    Your Honor, this morning I'd like to focus on

10  certain aspects of the settlement which I think deserve a

11  little more attention than they've gotten in the hearing so

12  far and also talk about some apparent misconceptions about

13  the swaps, but the bottom line is that there is no genuine

14  question that the settlement agreement is extremely

15  beneficial to the city, particularly given the alternatives,

16  and that it is, accordingly, well within the zone of

17  reasonableness.

18    I'd also like to note at the very beginning that

19  we're very aware of what's at stake in this case and that the

20  case is going to have an impact on the city and perhaps on

21  other parties, and we've been very careful to manage our

22  relationship with the city with those broader interests in

23  mind.  And specifically in both 2009 and 2013 we attempted an

24  orderly and cooperative resolution with the city rather than

25  the reflexive exercise of remedies, and, indeed, today we

1    remain the only party in this courtroom who has managed to
2    reach an agreement with the city.
3          The first key point I'd like to make about the
4    settlement is that the swap counterparties can always look to
5    insurance.  FGIC and Syncora have fully guaranteed the
6    payment obligations of the service corporations under the
7    swap agreements.  The swap counterparties would not
8    rationally agree to a settlement with the city that results
9    in a recovery lower than their recovery from the insurers,
10   and the city recognized this.  And it is notable that the
11   policies waive any of all defenses both at law and in equity.
12   Thus, even if the liens were not valid, even if the swaps
13   were not valid, even if the COPs were not valid, we're
14   entitled to collect each periodic payment from the insurers
15   if the service corporations fail to make them.
16          That would give us a floor of approximately 65
17   cents, and the only reason it's not 100 cents is because FGIC
18   is in rehabilitation.  This means that the city effectively
19   pushed us to the lowest number that we would ever accept.
20   And parenthetically, as of Friday, interest rates are down a
21   bit from where they were on December 23rd, and so the city's
22   decision to lock the payment at 165 is actually favorable to
23   them at the moment.  Had they continued to float it, it would
24   be slightly higher today.
25          The second key point I'd like to make is that the

1   insurers were called upon -- if the insurers were called upon

2   to make swap payments to us, they would be subrogated to our

3   right -- our rights, including our right to trap the casino

4   revenues.  We've seen this movie before.  Syncora attempted

5   to trap the casino revenues even before they had subrogated

6   to our rights.  The FOTA, the settlement agreement,

7   eliminates the subrogation claims of the swap providers -- of

8   the monolines, rather, because the swap providers have agreed

9   that they will not make any claims under their policies once

10  the settlement agreement becomes effective.  This provides

11  the insurers with a free release from all of their

12  obligations under the swap insurance policies.  The city

13  asked for this, and it's of great benefit to the city.

14  First, it eliminates the threat of trapping that was just

15  discussed, and, second, by giving the insurers a release of

16  the swaps for free -- normally an insurer pays for a

17  commutation of insurance liabilities.  They're getting it for

18  free, and that effectively frees up additional resources for

19  the city to take advantage of in plan negotiations.

20          The third point I'd like to make is that there were

21  strong rationales for the swaps once the COP structure was

22  decided upon.  Prior to the COPs transactions, the city had

23  failed to meet its obligation under state law to fund certain

24  pension obligations.  It was required by state law to fund

25  that obligation with interest.  The COPs were a means by

 1  which the city could meet that legal obligation, and they

 2  ended up providing $1.4 billion in cash to the pension plans.

 3  The COPs transaction, thus, did not increase the city's

 4  obligations.  It merely was a method for meeting an

 5  obligation that the city already had.

 6          It's also very clear that the city completely

 7  understood the transactions it was entering into in 2005,

 8  2006, and 2009.  The transactions were thoroughly debated by

 9  the City Council, and, indeed, the City Council ultimately

10  passed ordinances permitting the transactions to go forward

11  and authorizing the liens that were granted in 2009.  The

12  city was represented by Michigan bond counsel, Lewis &

13  Munday, and special swap counsel, Orrick Herrington.  Also,

14  in each case the city had two independent outside financial

15  advisors, one for the COPs aspect of the transaction and a

16  separate one for the swaps.  And, finally, there was an

17  extensive legislative authorization process and unqualified

18  opinions covering the authorization, validity, and

19  enforceability of the liens, including in 2009 the lien on

20  the casino revenues, were granted.

21          The swaps were entered into in conjunction with this

22  COPs financing, and the floating rate protected by the swaps

23  was, indeed, the city's idea.  What the public record shows

24  is that the decision to issue floating COPs in 2005 was --

25          THE COURT:  I'm not sure why you're telling me all

1   of this.

2           MR. ELLENBERG:  I think, your Honor, because the

3   agreement -- the transaction has been heavily criticized

4   during the hearing, and it's -- that criticism is being used

5   to attack the validity of the transaction and, therefore, the

6   validity of the settlement agreement.

7           THE COURT:  So, what?  Merrill Lynch is doing this

8   out of the goodness of its heart?

9           MR. ELLENBERG:  I didn't say that, your Honor.

10  Obviously we have a self-interest in achieving the outcome

11  we're achieving, but we are doing it responsibly and in a way

12  that is not only good for us but good for the city.  There is

13  such a thing as a win-win transaction, and there is such a

14  thing as the lesser evil --

15          THE COURT:  Okay.  So argue that.

16          MR. ELLENBERG:  -- and that's what we're trying to

17  reach.  But the ultimate point, your Honor, is that the swaps

18  fully, completely, and effectively protected the service

19  corporations and derivatively the city from interest rate

20  risk.  The swaps fix the floating rate -- turn the floating

21  rate into an effective fixed rate of approximately six

22  percent, which is in the stipulated facts at pages 8 through

23  9, and that was always true.  It was true when they entered

24  into the swaps.  It was true the day they went into

25  bankruptcy.

13-53846-swr   Doc 2312   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 13 of 179
13-53846-swr   Doc 4211   Filed 04/29/14   Entered 04/29/14 13:27:00   Page 13 of 79
290
13

1          THE COURT:  Termination fee have that effect, sir?

2          MR. ELLENBERG:  The only aspect of the swap which

3    changed with interest rates was the termination fee, but the

4    termination fee is only payable if there's a termination.

5    The amount --

6          THE COURT:  So the answer to my question is no?

7          MR. ELLENBERG:  Well, the amount the city paid on

8    the COPs never changed.  The termination fee did change based

9    on interest rates.  Sometimes it was in the city's favor;

10   sometimes it was not.  But the reason for entering into the

11   transaction was to fix the interest cost associated with the

12   COPs, and the swaps fully and completely did that.

13         THE COURT:  Well, let's just nail this down.

14         MR. ELLENBERG:  Right.

15         THE COURT:  Is it your position that the city's

16   present termination liability, whatever it is, 200 million

17   give or take a little bit, has the effect of fixing, to use

18   your word, the interest rates?

19         MR. ELLENBERG:  No, your Honor.  The swap

20   transaction itself is what fixed the rates.  The termination

21   payment arises only because a termination event has occurred.

22   That is an aspect of the transaction, but it's not the

23   purpose for which it was entered into.

24         THE COURT:  So it's of no economic benefit to the

25   city?

1     MR. ELLENBERG:  The termination payment, no, is not

2  of economic benefit to the city, but the overall transaction

3  was.

4     THE COURT:  And yet by this settlement it's to be

5  paid or at least a good portion of it.

6     MR. ELLENBERG:  Yes, your Honor, because the city

7  made a decision to take the benefits that the swaps did give

8  them, and this was part of the transaction.  And the

9  additional point, your Honor, is that this --

10     THE COURT:  I raise this because you said this here

11  today, and you said it during the trial that the purpose of

12  the swaps transaction was to fix interest rates.

13     MR. ELLENBERG:  Yes.

14     THE COURT:  And to some extent, that's true, but to

15  a great extent it's also not true.  And I want -- and I want

16  the public to understand that.

17     MR. ELLENBERG:  Well, your Honor, it fixed the

18  interest cost.  It absolutely did that.

19     THE COURT:  To some extent it did.

20     MR. ELLENBERG:  Yes.  When you view the COPs and the

21  swaps together, the effect was absolutely to fix the interest

22  rate cost.  When there's a termination event, then this

23  additional liability arises.  There's no question about that.

24  But it should also be noted that the COP -- the swap

25  providers themselves hedge the interest rate risk that they

13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 13:22:00   Page 15 of 79
13-53846-swr   Doc 2512-1   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 16 of 179    15
290

1 took on through the swap agreement. That is what traders do.

2 And so any payment they received from the city, they simply

3 passed on to their hedge, and the termination agreement

4 itself, your Honor, is not profit as it's been characterized

5 here. It's to compensate the swaps -- the swap providers for

6 having to replace the hedge when the city terminates the swap

7 agreement because at that point they become unbalanced. And

8 if we could pull up City Exhibit 1 for just a minute and go

9 to page 12 --

10         THE COURT: Is it on your screen?

11         MR. ELLENBERG: Yes.

12         THE COURT: Okay. What do I need to get this screen

13 functional? Turn it on?

14         UNIDENTIFIED SPEAKER: Yes. Reboot.

15         THE COURT: Okay. We're all set.

16         MR. ELLENBERG: All right. If we go to page 12,

17 which is up, and look at the definition of market quotation,

18 you will see -- is there a way to blow that up? You will see

19 within that definition in parentheses the term "replacement

20 transaction." And what the definition says is that quotes

21 are to be obtained to obtain the cost of entering into a

22 replacement transaction, and that's what the termination

23 payment is. It's compensation to the swap providers for the

24 loss they incur when the city end of the swap is terminated

25 because it leaves them with an unbalanced book. It's been

1  described in this case as profit.  It is not profit to us.

2  It's what we need to do to cover, in essence.  It's analogous

3  to the UCC concept of cover.  We have to get back into

4  balance by replacing the trade.  And, indeed, your Honor,

5  that is why there are safe harbors in the Bankruptcy Code

6  because swaps don't exist on an island in isolation.  They

7  are always part of a chain of transactions, and the concern

8  of Congress was that there would be a domino effect on the

9  entire chain from the default of a single party.

10         The next point, your Honor, is that the swap

11  providers did an appropriate credit analysis when entering

12  into the swap agreement.  When the swaps were entered into,

13  the swap providers considered the ability of the service

14  corporations to pay them, and if you look at page 22 of the

15  offering circular put into evidence by Ambac, you will see

16  the rating shown with insurance and without insurance, so

17  everyone was -- had a full credit analysis in front of them.

18  And even though the city was investment grade, both the swap

19  providers and the city determined that credit enhancement

20  would be necessary to make the transactions viable.

21  Accordingly, FGIC and Syncora were called upon to issue

22  policies of insurance, which they did, and they were both

23  rated AAA at the time.  The insurance not only protected the

24  swap providers, it protected the city and the service

25  corporations against the city's own credit.  As the swaps

 1    were written in 2005 and 2006, they contained a double
 2    trigger for termination.  First, there had to be a downgrade
 3    of the insurers below A-.  Only if there were an insurer
 4    downgrade would the city's credit rating matter, and, thus,
 5    in 2009 when the city's credit rating was downgraded, that
 6    only was a termination event because, in addition, the
 7    swap -- the insurance providers had also been downgraded.
 8    Even then the service corporations had 30 days to provide a
 9    replacement insurer.  In lieu of that, they provided a
10    different kind of credit enhancement.  They provided the
11    liens on the casino revenues.
12          The next point I'd like to make is that the
13    objectors are attacking the settlement agreement only to
14    serve their broader agendas with the city.  Indeed, they
15    recognize the value of this agreement to the city, and that's
16    why they're trying to hold it hostage.  They hope it's going
17    to benefit them in plan negotiations.
18          Ambac is the sole objector to challenge the validity
19    of the liens and the underlying transaction, and that depends
20    entirely on disregarding the service corporations.  This
21    objection obviously runs into the teeth of the opinions that
22    were given, as described by Mr. Orr during his testimony, and
23    this is also not a unique structure.  It's been used by other
24    municipalities, including municipalities in Michigan, and,
25    indeed, Ambac itself has wrapped a transaction that uses

13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 18 of 79
13-53846-swr   Doc 2512-1   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 18 of 79     18
290

service corporations for Dearborn Heights, and we cite to
that in Footnote 21 of our statement in support of the
settlement.

In addition, your Honor, this transaction would be
protected by the safe harbors. Section 560 of the Code
permits a swap participant or a financial participant to
exercise its right to liquidate, terminate, or accelerate a
swap agreement, and that right shall not be stayed, avoided,
or otherwise limited by operation of any provision of this
title or by order of a court. And there's no question that
the security agreement itself is a swap agreement because the
definition of "swap" in the Code includes not only the basic
swap agreement but any collateral agreement or security
agreement related to the swap agreement, so both the swap
agreements and the collateral agreement are swap agreements
within the meaning of Section 560 and Section 362(b)(17),
which is the removal of the automatic stay with respect to
termination and setoff.

Now, Ambac has questioned whether perhaps the safe
harbor applies because they suggest that the swap providers
did not have their swap directly with the city, and,
therefore, they don't qualify as swap participants under the
Code. Well, first of all, they're also financial
participants, but aside from that, for the reason I just
said, the collateral agreement itself is deemed a swap

1    agreement for purposes of the Code, so that really is a

2    nonissue.

3         Ambac also relies very heavily on the <u>Enron</u> decision

4    issued by Judge Gonzalez, but that's really a very narrow

5    decision.  That doesn't remotely support the broad

6    proposition that they're urging.  The sole question in <u>Enron</u>

7    was whether a payment by the debtor to redeem its own stock

8    within 90 days of the petition was a settlement payment that

9    would be immunized from preference avoidance under Section

10   546(g) of the Code.  What the Court found was that since the

11   debtor was insolvent at the time of the payment, under

12   applicable state law it was an improper dividend because

13   dividends should not be paid when a company is insolvent, and

14   a payment to redeem stock is a dividend.

15        The important point is that under Section 546(g),

16   you have to find there is a settlement payment.  And the Code

17   definition of "settlement payment" is very vague, and it

18   depends -- it's a circular definition that depends on the

19   market understanding of the term "settlement payment."  And

20   the Court concluded that the market doesn't have an

21   expectation that illegal dividends would be settlement

22   payments.  The question here would be completely different.

23   It would be whether this is a swap agreement within the

24   meaning of Section 560 and Section 362(b)(17).  There is no

25   ambiguity in the definitions involved there.  They're black

1  and white, they've objective, and the swap agreements and the

2  collateral agreement clearly fit within those depositions

3  (sic), so the issue addressed in <u>Enron</u> really is not

4  applicable here at all.

5      THE COURT:  So your position is that even if the

6  Court were to find that the entire transaction were -- was

7  illegal under state law, this Court would be powerless to

8  grant any relief resulting from that finding?

9      MR. ELLENBERG:  Yes, your Honor, because --

10      THE COURT:  How about in state court?

11      MR. ELLENBERG:  Absolutely not.  That would be

12  preempted, your Honor, and --

13      THE COURT:  No court anywhere has the authority to

14  hold an agreement or a transaction illegal under state law if

15  it involves swap agreements.

16      MR. ELLENBERG:  You could find it illegal, your

17  Honor.  What you couldn't --

18      THE COURT:  I'm sorry.  You could what?

19      MR. ELLENBERG:  You could find it illegal.  What

20  you -- or void.  What you couldn't do is find it -- what you

21  couldn't do is enjoin our rights under Section 560 and

22  Section 362(b)(17), and that's because --

23      THE COURT:  Rights arising from the transaction

24  found to be illegal under state law?

25      MR. ELLENBERG:  Yes, and that's because, again,

```
 1   Congress was --
 2            THE COURT:  That's quite extraordinary.
 3            MR. ELLENBERG:  I understand, your Honor, but
 4   Congress was concerned about the contagion effect, which
 5   would flow --
 6            THE COURT:  About what?
 7            MR. ELLENBERG:  The contagion effect, the domino
 8   effect, that would flow from the disruption of a link in the
 9   chain.
10            THE COURT:  More concerned about that than the
11   illegality of the transaction?
12            MR. ELLENBERG:  Your Honor, it's a very broad
13   statute.
14            THE COURT:  Your answer to my question is "yes"?
15            MR. ELLENBERG:  Yes.  And, of course, your Honor, as
16   Ms. Ball noted in her closing, this trial is not a trial of
17   these particular issues.  It's about what the issues are.
18   This is the argument we would make.
19            THE COURT:  Right.  Okay.
20            MR. ELLENBERG:  And the final point I want to make
21   about that, your Honor, is that throughout all its arguments
22   Ambac ignores again that we have FGIC and Syncora backing us
23   up, and, thus, our floor is 65 cents.  Even if all their
24   arguments were correct, that's where we end up, and that goes
25   to whether this is a reasonable settlement agreement.
```

1    Last, your Honor, I'd like to address the objections
2    of Syncora and FGIC, which are based on what they assert to
3    be consent rights over our ability to terminate the swaps.
4    The first point is that everyone in this case seems to agree
5    that that issue needs to be decided as part of this hearing.
6    It's one of the few things everyone here seems to agree on,
7    and we certainly agree with that.  It would not make sense
8    for the Court to approve this transaction and then find out
9    that the city couldn't, indeed, execute it because of Syncora
10   or FGIC's consent right.  And I have to say that the
11   arguments put forward with respect to the consent right are
12   barely colorable.  In fact, I'm not sure they're colorable at
13   all.  First of all, we're using the optional termination
14   provision in the swap agreements, a provision that was added
15   in 2009 and specifically consented to by the insurers.  And
16   they actually concede in Section 23 of the stipulated facts
17   that on its face that optional termination provision does not
18   give them a consent right.  There are other terminations
19   where they did have a consent right before they were
20   downgraded, but this one doesn't give them a consent right,
21   and the gyrations they go to to try and import a consent
22   right into a provision that clearly doesn't give them one I
23   just don't think are colorable, your Honor.  We've gone over
24   them extensively in the brief.  I don't want to repeat them
25   here, but I just -- I hate to use the word "frivolous"

1   because I think lawyers overuse it, but I really have to say

2   in this case I think their consent right arguments are

3   frivolous.

4       So, again, your Honor, I think when this is viewed

5   as a whole and when the alternatives are considered, this

6   transaction is absolutely in the best interest of the city,

7   is well within the range of reasonableness, and it should be

8   approved.  Thank you.

9       THE COURT:  Thank you, sir.

10      MS. ENGLISH:  Good morning, your Honor.  Caroline

11  English from Arent Fox on behalf of Ambac Assurance

12  Corporation.  Before I begin, I would like to give the Court

13  a little bit of a road map of what we have planned on our

14  side of the courtroom here.

15      THE COURT:  Okay.

16      MS. ENGLISH:  As you know, we have many objectors

17  here, some who are aligned and some who are not necessarily

18  aligned.  Our briefs all set forth the arguments that we

19  believe lead to a conclusion that this motion should not be

20  approved.  We have some different arguments, some overlapping

21  arguments.  We've tried to organize ourselves so we don't

22  duplicate, and, therefore, we sort of assigned point people,

23  if you will, on the various arguments.

24      I'm going to begin this morning, and I'm going to

25  begin with an overview of the evidence that came in on the

13-53846-swr   Doc 4814-11   Filed 04/29/14   Entered 04/29/14 13:22:00:23   Page 24 of 79
13-53846-swr   Doc 2812-1   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 19 of 179   24
290

1  swaps portion, the swaps settlement, and then I'm also going
2  to be arguing the two state law issues, one, that the swap
3  obligations are void ab initio under Act 34 and, two, that
4  the liens of the swap counterparties are void because they
5  did not comply with the Gaming Act.  Then Mr. Gordon will
6  take it over from me, and he will be focused on the
7  Bankruptcy Code-related claims, that there is no lien on the
8  post-petition acquired casino revenues and the arguments of
9  special revenue, special excise tax, et cetera.  After Mr.
10 Gordon, Mr. Perez will be arguing on more fact-related
11 issues, issues specific to the swaps insurers, including
12 consent rights, order and release issues, and 365 issues.
13 Mr. Perez will also transition us into focusing on some DIP
14 arguments.  Specifically, he'll be addressing the good faith
15 finding that needs to be made.  Then Mr. Marriott will be
16 addressing the Court with respect to issues under 364(c) and
17 Public Act 436.  After that Ms. Green will have a short
18 presentation with respect to the proposed order on the DIP
19 financing, and then Mr. Bennett will be speaking with respect
20 to prudential concerns and the best interest of creditors.
21 Following Mr. Bennett, Mr. Goldberg will be speaking with
22 respect to the issues that have been raised in the David Sole
23 objection, and following that we have reserved some time for
24 any other objectors who need a few last-minute words.
25          We have, your Honor -- as of Friday's count, we had

1   207 minutes left.  We have structured this down to 205

2   minutes, so if all goes according to plan, we're going to get

3   out of here two minutes early.

4           THE COURT:  Okay.

5           MS. ENGLISH:  I think, your Honor, we've passed up

6   my PowerPoint deck, and it should be also on the screen

7   hopefully in front of you.  Our trial consultant has given me

8   the clicker, so we'll see if I can be so technologically

9   inclined this morning.

10                      CLOSING ARGUMENT

11          MS. ENGLISH:  All right.  In overviewing the

12  evidence that we heard come in over the three days of trial

13  testimony, we think it is clear that the evidence showed that

14  this deal was done very hastily, and hasty decisions don't

15  make for the best judgment, and they don't make for the best

16  results.  Mr. Buckfire testified he was under extraordinary

17  time pressure.  In fact, they did this deal in one week's

18  time.  They opened negotiations with the swap counterparties

19  on June 4th, and they had a deal on June 11th.  Mr. Buckfire

20  also testified that he went into these negotiations with,

21  quote, "not very good cards to play."  You know, your Honor

22  mentioned at one point in the trial that the city needs to

23  stop acting with a gun to its head.  We feel this is just

24  another example of that kind of decision-making.  The city

25  panicked.  They thought they were in dire financial straits.

1   They might run out of money very soon.  This was a bad deal

2   that they were in, and they wanted to get out of it, so they

3   leaped forward into negotiations in a panic mode.  And doing

4   a deal quickly, again, does not make for the best judgment,

5   and the result, frankly, reflects this.

6          Now, let's look at -- Mr. Buckfire said that he

7   didn't have very good cards to play when he went into the

8   negotiations.  Let's look at what his cards were.  This is

9   testimony from the official trial transcript.  He said he

10  thought the swap counterparties could trap the casino

11  revenues.  He said he thought the swap counterparties were

12  secured, they had secured rights.  He said he went in under

13  the assumption that the swap counterparties had valid liens.

14  When he was asked about what claims the city had, what were

15  the arguments, the legal arguments that the city had to argue

16  against the swap counterparties' positions, he didn't know

17  what they were.  He testified he didn't even know if an

18  evaluation of those claims had been done.  He went into these

19  negotiations completely unprepared.  He was unarmed.  He was

20  handicapped from being able to negotiate with the swap

21  counterparties aggressively.  And this problem was

22  exacerbated in the negotiations by the fact that Mr. Orr

23  deferred completely to Mr. Buckfire.  He testified on cross-

24  examination he sent Mr. Buckfire into these negotiations.  He

25  hadn't had a conversation with him about the legal positions

 1   and the arguments.  Sent him and said, "Get the best deal you
 2   can."  Mr. Buckfire goes in, a week later comes out and says,
 3   "This is the best deal I can get.  Let's go with it."
 4            The evidence revealed that there was not a serious
 5   consideration given to a litigation strategy.  Mr. Malhotra
 6   testified that Ernst & Young was never asked to run cash flow
 7   analysis that showed a litigation strategy, and Mr. Orr
 8   confirmed that they never asked Mr. Malhotra or Ernst & Young
 9   to do that.  Now, in her closing argument, Ms. Ball suggested
10   that there was, in fact, a cash flow analysis that was run
11   showing a litigation strategy, and what she pointed to was --
12   I think it was Exhibit 111 that showed the three lines going
13   across, right, that Mr. Malhotra testified to.  What did
14   those three lines show?  The first one showed DIP financing
15   and a settlement.  Second line showed no DIP financing, no
16   settlement, no trap.  Third line, no DIP financing, no
17   settlement, cash trap.  Where was the line that showed DIP
18   financing, no settlement?  It's the fourth obviously missing
19   line on the chart.  What has happened here is the city tied
20   in their minds the idea of post-petition financing to getting
21   the swaps deal done.  Ms. Ball mentioned also in closing
22   argument that, in fact, the city believed the casino
23   revenues -- freeing up the casino revenues by doing this deal
24   was critical to getting post-petition financing.  Where was
25   the evidence on that?  Nobody testified to that,

13-53846-swr   Doc 2314-11  Filed 01/17/14  Entered 01/17/14 13:47:07  Page 28 of 79
13-53846-tjt   Doc 4314-11  Filed 04/29/14  Entered 04/29/14 14:22:00:23  Page 28 of 79   28
290

1  Mr. Buckfire, Mr. Malhotra, Mr. Doak, Mr. Orr.  Nobody

2  testified that freeing up the casino revenue was going to be

3  necessary to secure DIP financing in bankruptcy nor are there

4  any documents that show this would be necessary, and, in

5  fact, when they went out to look for post-petition financing,

6  they got several proposals from several banks offering post-

7  petition financing not secured by casino revenue but secured

8  by income tax revenues and asset proceeds.  Proof is in the

9  pudding.  There was no need to free up the casino revenue to

10  get post-petition financing.  There was no need to link these

11  two together.  The problem is the city managers didn't have

12  before them the documents they needed to show that litigating

13  was a real possibility.  They were just moving too quickly,

14  and they weren't thinking through all of the options that

15  were available to it.

16        Now, I want to show you the analysis that the city

17  didn't do.  I'm not an accountant.  I don't run cash flow

18  analyses.  But this analysis comes straight from the evidence

19  that was put forth at trial.  Remember the original deal

20  here.  The original deal is $350 million in DIP financing;

21  right?  230 million of that was for the swaps, to terminate

22  the swaps, and that was going to be secured by income tax and

23  asset proceeds, 230 million.  And the other piece of it was

24  120 million for reinvestment.  That's going to be secured by

25  casino revenues.  They call that the quality of life portion

1  of the loan so that it fits within the authorized uses under

2  the Gaming Act.  And, as I said, we know that they did get

3  several offers in, including the Barclays deal that they

4  agreed to, that included $230 million secured by income tax

5  and asset proceeds.

6        Now, on the left side of my screen here is the

7  proposed settlement that we have today.  We are now looking

8  at post-petition financing of 285 million, and the reason

9  that's come down from the original 350 is because now we're

10  looking at a swaps portion of this that's 165 million.  The

11  120 million for reinvestment has stayed the same.  if we back

12  out of that the swaps-related cost of this financing, we back

13  out the 165 million, the result at the bottom there is

14  they're going to have 120 million to spend on their

15  reinvestment programs.

16        Now let's look at the right side of the screen.  The

17  city has demonstrated they can get financing to the tune of

18  $230 million secured by income tax and asset proceeds, so

19  let's assume that's what they get in their post-petition

20  financing, just that portion of the Barclays loan.  Let's

21  assume that they don't get the other $120 million portion

22  because maybe the banks aren't going to be willing to loan as

23  long as the casino revenue is tied up in litigation; right?

24  So let's assume they just get the 230.  Now let's back out

25  that the swaps-related cost.  Well, the swaps-related cost in

this scenario is the cost of litigating.  Mr. Orr testified

they were budgeting -- maybe it would cost them a million

dollars a month to litigate these issues.  Now, I'm going to

come back to this.  I think that's not credible, and we'll

talk -- I want to talk a little bit later about the

litigation costs and our assessment, but let's just assume

for right now that it's going to cost them a million dollars

a month to litigate these issues, and it's going to take them

six months to do it, $6 million.  You back that out of the

230, and now we've got $224 million to spend on reinvestment

and to provide extra liquidity for the city.  The city comes

out better.  And even my little asterisk at the bottom, let's

credit the city's argument that they are concerned the cash

might get trapped, the casino revenue might get trapped

during litigation.  Now, I'm going to come back to this a

little bit, too.  I think that's, frankly, not a realistic

fear.  I think the city would be able to get an injunction

that preserved the status quo and didn't have the casino

revenue trapped, but let's say I'm wrong.  Let's say the

casino revenue gets trapped during the course of that

litigation.  That's $15 million a month in casino revenue

over six months.  We're talking $90 million.  Let's back that

out of the number.  Now we're looking at a result of 134

million to spend on reinvestment and liquidity, still more

than on the settlement side.  Again, this is the analysis

13-53846-swr   Doc 2814-11  Filed 01/17/14  Entered 01/17/14 13:47:07  Page 31 of 79   31
13-53846-swr   Doc 2812-11  Filed 01/17/14  Entered 01/17/14 13:22:00:23  Page 26 of 179
290

1    that we see no evidence that the city ever did.

2              THE COURT:  Where does the six months come from?

3              MS. ENGLISH:  Six months is our estimate.  Your

4    Honor, the Bankruptcy Court has shown it is able to move

5    through these issues presented, weighty issues, very

6    expeditiously.  The arguments that we are talking about

7    raising in a litigation are pure legal issues.  They could be

8    resolved on summary judgment.  They would require no

9    discovery.  We think six months on the outside is the length

10   of time it would take to try this case.

11             THE COURT:  So not including appeals obviously?

12             MS. ENGLISH:  Correct.

13             THE COURT:  So under this analysis, if the city is

14   going to settle instead of litigate, looking at the numbers

15   here, there's got to be a reasonable and a credible

16   assessment that the claims have significant vulnerability if

17   they're actually going to settle and get to these numbers

18   that are worse, so that begs the question.  Was there a

19   credible assessment done of the city's legal arguments?  We

20   heard Orr testify that he did no independent assessment of

21   the claims.  He did not independently analyze any of the

22   legal claims or the defenses.  The totality of his testimony

23   is what his attorneys told him their assessments were.

24             Then we have the issue where the city claimed the

25   attorney-client privilege, so we have Orr's testimony as to

what his attorneys told him, and we have no underlying

documents.  We have no way to test the testimony, no analyses

that were provided.  All we got was a privilege log that

covers only, quote, selected documents, says right on the

title, only selected documents that the city chose to log.

Notably, those documents include not a single document that

shows as going to Mr. Kevyn Orr.  The log shows only five e-

mails over a ten-month period, March to December.  Is it

credible that Mr. Orr actually received analyses from his

lawyers that walked through the legal claims and the

defenses, and he used those analyses to inform the

negotiations?

Mr. Orr also testified that he viewed every single

claim that could potentially be raised -- and I think he

testified to four independent claims -- every single one, in

his mind, was a -- was 50-50 odds.  It was a toss-up.  If we

believe Mr. Orr that the claims were truly assessed as having

50-percent odds of success, we've still got a problem, and

that problem is that the settlement they've done, the deal

they've cut, doesn't reflect 50-50 odds.  Now, first, as sort

of a footnote, we've got four independent claims here.  If

it's true that we've got 50-50 odds on each of them times

four each -- any of which alone would invalidate the swap

transactions, it's not really that bad odds.  Does it justify

a settlement that is now looking at 60-, 70-percent on the

```
 1    dollar?

 2          So let's, again, take Mr. Orr's testimony.  He

 3    believed that the assessments were 50-percent chance of

 4    success, so in June what happens?  Mr. Buckfire goes into the

 5    negotiations and starts at 50 percent and negotiates up.

 6    That doesn't reflect the legal assessment here.  The original

 7    deal they cut was at 75 percent.  That's 25 percent higher

 8    than how they assessed the merits of their claims.  And then,

 9    your Honor, you indicated to them 75 percent seemed a little

10    high, sent them off, renegotiate, cut a deal that more -- is

11    more tailored to the assessment of the legal claims and

12    defenses here.  So what happens?  They go into the

13    negotiations, and now they're beginning at close to 60

14    percent.  Mr. Orr testified that he believed he was starting

15    somewhere in the range of 50 to 60 percent.  The number he

16    was using in his head was roughly 150 million.  As of the

17    date he's negotiating, that's 59 percent.  That's where he

18    starts, and then he goes up.  He ultimately gets to a number

19    for the new deal at 62 to 62 -- 3 percent is what he

20    believes.  We're still looking at a number that doesn't match

21    their assessment of the claims.  We think this history of

22    negotiations shows that they were trying to get a deal done

23    at any cost.  They were trying to check off the list.

24          THE COURT:  Okay.  Let me pin you down --

25          MS. ENGLISH:  Sure.
```

1    THE COURT:  -- with a number.  What do you think was

2    the highest reasonable number to settle with the swaps?

3    MS. ENGLISH:  That is putting me on the spot now,

4    isn't it, your Honor?  Can I say it's a hundred percent?

5    It's a slam dunk?  Probably not.  Nothing is a slam dunk in

6    the world of litigation, is it?  But the truth is -- and I'm

7    going to be walking through two of these claims, and then Mr.

8    Gordon is going to walk through of them -- through several of

9    them, and we think they are very, very strong.  I would have

10   to give them very, very high marks, certainly not 50 percent,

11   not even 75 percent, your Honor.  I would give them a mark

12   higher than that.  These are very strong, very clean issues.

13       THE COURT:  What's your number?

14       MS. ENGLISH:  I'm not going to give you a number,

15   your Honor, and I know you respect me for that.  Okay.  I

16   want to look just for a minute here specifically at the

17   December negotiations.  Okay?  The city basically put itself

18   in a box in June.  It did the deal really fast, got the best

19   deal they thought they could get, weren't really armed in the

20   negotiations, came out with 75 percent.  The problem is that

21   when your Honor sent them back into negotiations in December,

22   they just couldn't pull themselves out of that box, and, in

23   fact, they didn't really try.  Mr. Orr did not go into those

24   December negotiations armed to bear, ready to refight the

25   fight, ready to negotiate as best he could.  He didn't take

1   that time between the 18th when we recessed and the 23rd when

2   he went into mediation and pull together -- get his legal

3   ducks in a row, pull together the analyses, review the

4   liability that he was facing and get ready to go in there.

5   He wasn't armed.  He wasn't prepared.  He still hadn't

6   requested or reviewed any cash flows with the litigation

7   strategy.  He still hadn't requested or reviewed an interest

8   rate analysis so that he could forecast termination payment

9   liability.  He testified quite clearly he didn't actually

10  even know the current termination liability that the city was

11  facing on the day he was negotiating.  That to me is a big

12  problem if you go into negotiations and don't even know your

13  potential liability that you're negotiating against.

14          Then we have this change from the percentage deal.

15  First we were looking at a discount of 25 percent.  Now we're

16  looking at a fixed number, 165 million.  This removes the

17  city's ability to take advantage of interest rates which

18  Mr. Orr agreed are, generally speaking, on the rise, and so

19  by switching it out from a percentage deal and now looking at

20  a fixed fee deal that's going to close by the 31st,

21  potentially this new deal could be the same as the old deal,

22  could even be worse, and let me show you what I mean by this.

23          First of all, I want to point out that the number in

24  the bottom right of the screen that shows a number for

25  January 31st is a hypothetical number.  That's not a real

1  number.  None of us knows what the number is going to be on
2  the 31st, so I don't want to mislead anyone with that, but I
3  do want to walk through a possible result here, so let's look
4  at the first line, the one that starts way over on November
5  29th.  This is a stipulated number in the record.  The city
6  has stipulated that as of November 29th, the total
7  termination payment liability was $277.7 million.  Then if we
8  look at the next number, December 10th, this number comes out
9  of the city's supplement to its motion where it argues that
10 the $165 million it's agreed to is 62 percent of the total
11 termination liability as of December 10th, so that would make
12 that number, easy math here, 266 million.  If we just look at
13 that trajectory there, we've got a loss of roughly a million
14 dollars a day, and if we follow that down, if that were to
15 remain the current trend, follow that down to January 31st,
16 we're going to be looking at a total termination payment
17 liability of 211.4 million, which at that point in time would
18 make the $165 million deal 78 percent, 78 cents on the
19 dollar.
20         Let's look at the second line.  These two numbers
21 are based on the recent stipulation that the city entered
22 into.  They stipulated that on December 23rd, the day that
23 Mr. Orr was negotiating the new deal, the total termination
24 liability as of that date was 256 million.  That would make
25 165 million on that date roughly 64 percent.  The city also

1  stipulated that on December 31st at the close of the year-
2  end, the total termination payment liability was $247
3  million.  That would render as of that date the 165 million
4  67 percent.  Again, if we follow the trajectory down to
5  January 31st, that line also ends up at a 78-percent figure.
6  That line ends up with projecting a possible total
7  termination liability of 212.1 million, and 165 million would
8  be 78 cents on the dollar of that.

9          This causes us great concern.  Again, we don't know
10  what the number is going to be on January 31st, but the point
11  is that by removing the percentage deal, the discount that
12  was negotiated, we may have undone the good of the original
13  deal and made it worse.  That means also, of course, that,
14  you know, Mr. Orr didn't assess this and doesn't know if this
15  deal is going to be better, and we don't know if this deal is
16  going to be better.  And it means the Court also doesn't know
17  if this deal is going to be better.  How can the Court assess
18  today whether this is a fair and equitable settlement of
19  claims if the termination payment deal could be 62 cents on
20  the dollar or perhaps it could be 78 cents on the dollar?

21          Now, I'm going to transition now to talking about
22  the two legal arguments.  This is the test under Rule 9019
23  which the Court is very familiar with.  You know, Ms. Ball
24  asked in her closing argument what is the city's burden.  The
25  city's burden is quite simply this.  The city has to put

13-53846-swr   Doc 2814-11   Filed 04/29/14   Entered 04/29/14 13:47:07   Page 38 of 79      38
13-53846-swr   Doc 2812-11   Filed 01/17/14   Entered 01/17/14 13:22:00:23   Page 38 of 79
290

1    forth enough evidence, testimony, facts, documents, for the

2    Court itself to make an independent and objective analysis as

3    to the strengths and weaknesses of the claims that are being

4    settled and, thus, to determine whether the settlement amount

5    is fair and equitable.  The Court well knows -- I don't need

6    to tell you this, but the Court well knows it can't just

7    rubber stamp what Mr. Orr wants to do or what the city wants

8    to do.  A fair and objective analysis must be done after

9    looking at all the evidence.  You have to say, your Honor,

10   yes, settling these claims at 62 percent or 78 percent makes

11   sense to me under the evidence that's in front of me.  This

12   represents a fair and equitable settlement.

13        Okay.  These are the two claims I would like to

14   discuss now, first that the swaps are void ab initio because

15   they were unauthorized under Act 34 and, second, that the

16   liens on the casino revenues are invalid and void ab initio

17   because they were not authorized under the Gaming Act.  As I

18   mentioned, Mr. Gordon is going to speak to some of the other

19   legal claims.

20        The Revised -- the Michigan Revised Municipal

21   Finance Act, which we refer to as Act 34, specifically allows

22   municipalities to enter into swap transactions, but in order

23   to do so, it imposes a number of conditions and requirements

24   on cities if they choose to engage in swaps.  This is, of

25   course, because swaps are widely recognized to be inherently

1    risky transactions.  Among the risks is the fact that cities

2    often don't anticipate or appreciate termination liability

3    they may ultimately face.  The state legislature imposed

4    parameters on how cities can engage in swap transactions

5    specifically so that they could mitigate and address some of

6    these risks.  Here the city, in undertaking the swap

7    obligations back in 2005 and 2006, did not follow those

8    requirements of Act 34.  There's really no dispute as to

9    this, so I don't intend to spend a lot of time on this

10   because in none of their papers that the city filed or the

11   swap counterparties filed do they dispute that Act 34 was, in

12   fact, not followed.

13          The crux of the problem here goes to the structure

14   of the transaction.  Under Section 317(4) of the Revised

15   Municipal Finance Act, in order to undertake a swap

16   obligation, structurally it has to be done as a limited tax

17   full faith and credit pledge or entered into in connection

18   with a municipal security.  Here the transactional documents

19   themselves state they are not -- it's not a full faith and

20   credit pledge.  Moreover, the definitions set out in Act 34

21   for a municipal security don't line up here with the

22   structure of the transaction.

23          Now, before -- just before I dive into the nitty-

24   gritty of the argument, it's very important here that we

25   understand the substance of the transaction, and the

 1  substance is that it is inescapable that the city undertook
 2  swap obligations.  Mr. Buckfire testified, quote, unquote,
 3  the city entered into swap transactions.  Mr. Orr testified,
 4  yes, these are the city's swap obligations.  I have up here
 5  on this slide some of the language out of the service
 6  contract, in particular, the highlighted portion under
 7  Section 8(c).  The city will be obligated to make service
 8  payments in respect of hedge payables.  The city was entering
 9  into swap transactions.

10       Now, there's two ways to look at this, two views of
11  the world.  Here's view number one.  In the middle we've got
12  the service corporations.  As we know, the service
13  corporations have swap contracts with the swap counterparties
14  on the far right side of the screen.  The city then, through
15  its service contracts, took on mirror image swap obligations
16  to the service corporations, so under this view of the world,
17  the city has swap obligations that run to the service
18  corporations pursuant to the service contracts.

19       There's a second view of the world.  Here the
20  service corporations are viewed as a mere pass-through.  The
21  swap obligations of the city actually are viewed as running
22  to the swap counterparties, which really gives rise to why
23  the city has brought this deal for your Honor's approval in
24  the first place.  They're doing a deal now to resolve the
25  swap obligations that run to the swap counterparties.

1    Under either scenario, under either view, the city
2  has swap obligations, and, therefore, it had to comply with
3  Act 34.  The service corporations here were basically used to
4  do -- to accomplish something indirectly that the city
5  couldn't do directly.  If the city is going to take on swap
6  obligations, it has to comply with Act 34.  They can't -- the
7  city cannot set up a service corporation to take on swap
8  obligations and not comply with Act 34 if it's going to then
9  bind the city to those swap obligations.
10    The city has argued, hey, wait a minute.  Home Rule
11  City Act allows cities specifically to set up service
12  corporations.  There's nothing unlawful about having a
13  service corporation, and they're right.  However, there is
14  something very unlawful about having a service corporation
15  and setting it up in this way to bind the city.  The whole
16  point of using service corporations is what we call off
17  balance sheet financing.  They take on their own obligations.
18  They have their own sources of revenue, and they pay those,
19  and those obligations are not run through the city.  Here, if
20  I can just go back -- whoops -- here's the problem on the
21  left side of the screen, that left swap obligations arrow.
22  Here the service corporations were engaging in their swap
23  obligations with the swap counterparties but then bound the
24  obligations back to the city.  Mr. Orr testified specifically
25  he knows the service corporations don't have any other source

1   of revenue.  These are the city's obligations, and that's the
2   problem with this.

3           Now, I want to address -- sort of pause for a moment
4   and address the city's argument that there might be a bigger
5   problem here, might not just be about the service
6   corporations taking on swap obligations and putting them over
7   on the city.  It might be that the service corporations were
8   used unlawfully to evade the debt limit, and that would
9   render everything invalid; right?  Now we're looking not only
10  at the swap obligations.  Now we're looking at the COPs as
11  well.  That's not the argument that is in front of your Honor
12  today.  In fact, the city has specifically preserved that
13  claim that the COPs could potentially be invalid for another
14  day.  That's not being litigated here.  So all of the smoke
15  about, oh, my gosh, what if the service corporations were
16  used unlawfully to evade the debt limits and it renders all
17  of the COPs invalid, and before you know it this litigation
18  is going to take on a life of its own.  Now everybody on this
19  side of the courtroom is going to be a defendant in this
20  litigation.  We're going to have claims.  We're going to have
21  counterclaims.  We're going to have parties and
22  counterparties, and before you know it, it's going to be
23  huge.  We've got to settle this right away because this
24  litigation is going to be so messy.  That's not actually
25  what's being settled today.  That litigation, if it happens

1   at all, that messy litigation, has been completely preserved

2   for another day.  That's not being released in this

3   settlement.  The only thing that's being released here are

4   claims against the swap counterparties.  Our only argument

5   that we are asserting here today is that the swap obligations

6   themselves are void ab initio because the swap transactions

7   didn't comply with the swap requirements under Act 34.

8          Now, I want to just run through -- I believe there

9   are -- we've basically heard four defenses.  The claim is the

10  swap obligations are void ab initio because they didn't

11  comply with Act 34.  We've basically heard in the evidence

12  and sometimes not through the evidence but just from Ms.

13  Ball's argument four potential defenses that the city says

14  draw into question the strength of the city's legal claim

15  and, therefore, makes it reasonable to settle.  The first

16  purported defense that they raise is service corporations

17  don't have to comply with Act 34.  They are separate and

18  distinct entities.  I think I've already sort of answered

19  this defense.  It's irrelevant because whether your view of

20  the world is that the city took on swap obligations to the

21  service corporations or to the swap counterparties, it's the

22  city that still has swap obligations here that don't comply

23  with Act 34.  But even more to the point, the evidence

24  doesn't bear out their argument.  In neither the June

25  negotiations nor the December negotiations were the service

1    corporations anywhere to be found.  I mean Mr. Buckfire even

2    testified he was still to this day unfamiliar with the

3    service corporations.  They weren't in the room.  They

4    weren't doing negotiations.  Nobody even knows how -- whether

5    and how they negotiated with any party or how they signed the

6    agreement.  To say that they are -- to conclude that the

7    service corporations are not controlled by the city, not

8    affiliated with the city, doesn't match up with the evidence

9    that we heard.

10        The second purported defense raised to the claim

11   that the swaps don't comply with Act 34 and are, therefore,

12   void is that the city didn't actually have to comply with Act

13   34 because there's home rule power in the State of Michigan,

14   and home rule allows it to take on swaps however it would

15   like to.  Well, home rule doesn't work that way.  Home rule

16   doesn't mean municipalities can do whatever they want to do.

17   Home rule powers are specifically limited, and I've thrown up

18   here just three bullet points, the Home Rule Charter, the

19   Home Rule City Act, and the Michigan Constitution, all of

20   which specifically say home rule is limited.  It is subject

21   to the Michigan state Constitution, Michigan state statutes.

22   Act 34 is such a limitation on municipal power.  It is a

23   limitation that says if you're going to enter into swap

24   transactions, great.  Here's how you do it.

25        The question here becomes whether Act 34 preempts a

1   municipality's ability to enter into swaps under any -- in
2   any other manner.  We briefed this pretty extensively in our
3   brief, and there's really been no arguments thrown up against
4   it.  These are the <u>Llewellyn</u> factors for preemption, and
5   what's key to our case here are the second, third, and fourth
6   bullets on the slide, whether preemption of a field
7   regulation can be implied from the legislative history,
8   whether the state regulatory scheme itself is so pervasive
9   that it makes clear that it preempts a municipality --
10  municipal power, and whether the nature of the subject matter
11  demands uniformity, and here all of these factors weigh in
12  favor of a finding that cities cannot enter into swaps
13  outside of Act 34.  Act 34 was clearly put in place -- and
14  the legislative history bears this out -- to protect the
15  credit of the state and its municipalities.  It prohibits a
16  municipality from issuing debt or obligations except in
17  accordance with Act 34.  The legislative scheme is all-
18  encompassing.  The provisions are wide-ranging, and the
19  supervision by the state is all-encompassing, and the act
20  specifically includes a section on swap obligations.  That
21  section, Section 317, is itself all-encompassing.  It imposes
22  numerous prerequisites to entry into interest rate swaps,
23  including specified terms that must be in the agreement,
24  approval, review, compliance enforcement by the Treasury
25  Department, adoption of debt and swap management plans that

1   incorporate analyses of risk and cost and benefits, reporting

2   and disclosure requirements.  This regulatory scheme is both

3   so broad and so detailed that it's clearly intended not as an

4   optional means for which a city could enter into swaps but

5   the required means by which they can enter into swaps.

6          The subject matter also speaks to this.  The purpose

7   of Act 34 was to protect the credit and solvency of the State

8   of Michigan as a whole by protecting its municipalities from

9   entering into risky transactions.  The notion that home rule

10  might provide a defense to a claim that the swaps are void

11  because they didn't comply with Act 34 simply lacks merit.

12         The third possible defense that's been raised to the

13  claim that the swap obligations are void, this comes down --

14  this potential defense is the defense of estoppel, and it

15  comes from Mr. Orr's testimony that there are countervailing

16  facts basically.  The city got a benefit from the swap

17  obligations.  There were City Council findings rendered when

18  they entered into the obligations.  There were legal

19  opinions.  All of these are facts that could potentially give

20  rise to an estoppel claim.  Notably, the city mentions this

21  in its paper.  The swap counterparties do not argue estoppel

22  in their papers, interestingly.  The problem here is it's

23  black letter law that estoppel -- the doctrine of estoppel is

24  wholly inapplicable to challenges that municipal acts are

25  void ab initio or ultra vires, outside the municipal's --

1   municipality's authority.  There's a Supreme Court case on

2   point, <u>Pullman's Palace</u>, that talks about if a contract is

3   ultra vires, it is wholly void, of no legal effect, and

4   neither party, quote, "can be estopped by assenting to it or

5   by acting upon it to show that it was prohibited by those

6   laws."  There's also Michigan state cases that say

7   specifically the doctrine of estoppel is inapplicable to

8   ultra vires acts, and those cases are cited in our brief, so

9   there is no estoppel defense here whatsoever.

10        Finally, the fourth and last defense to a claim that

11   the swaps are void ab initio is something that Ms. Ball spent

12   quite a bit of time on in her closing argument, and we also

13   heard this morning from the counsel for the swap

14   counterparties.  The idea -- I think your Honor said it this

15   morning yourself.  The idea that you could have a transaction

16   that is rendered void, that is void under state law, that

17   could, nevertheless, be not only enforceable but protected in

18   bankruptcy -- I think you called it extraordinary, and I

19   agree.  In fact, I think it's kind of absurd, to be perfectly

20   honest.  I think this is a point of logic.  If you have an

21   obligation that under state law is void, a nullity, of no

22   legal effect, then that same transaction, because you call it

23   something, can't suddenly get protections in bankruptcy.  And

24   Judge Gonzalez in the <u>Enron</u> case -- notably, this is the only

25   opinion on this point.  The swap counterparties' lawyer said

1    this morning, you know, it's a very narrow holding.  He's

2    right.  It is a very narrow holding, and it is directly on

3    point to this case.  Judge Gonzalez looked at the underlying

4    transaction under Oregon law, and Oregon law was very clear

5    that that transaction done in that manner was void under

6    state law, and so he concluded where the transaction is

7    rendered void by state law, it is a nullity, and the purpose

8    of the safe harbor provisions cannot be implicated.  The

9    transaction is void.  The treatment of the financial

10   instrument is the result of state law voiding the entire

11   transaction.  If it is determined that the transaction

12   violated state law, the agreement would be a nullity and have

13   no legal effect.  As a consequence, the transfer would not

14   have been made under or in connection with the swap agreement

15   and could not be protected from avoidance under the

16   Bankruptcy Code.

17          Ms. Ball raised three cases in her closing argument

18   out of the Eighth Circuit, the Northern District of Illinois,

19   and the Second Circuit.  None of these cases even remotely

20   call into question the idea that a void transaction cannot be

21   protected by the safe harbors.  None of them call into

22   question the reasoning of the Enron decision, and that's

23   because in none of those cases was there even an allegation

24   made that the underlying transaction was void under state

25   law, none of them.  I can go through those in more detail if

1    your Honor would like.

2         THE COURT:  Well, I'm more interested in how you

3    deal with the precise language of Section 560 of the

4    Bankruptcy Code.

5         MS. ENGLISH:  Well, the point is that if the swap

6    transaction itself is void, okay, Supreme Court law and

7    Michigan law say if you've got a municipal contract that

8    exceeds the scope of municipal authority, that is ultra vires

9    and, therefore, void ab initio, it's as though the

10   transaction never took place, never happened.  It is of no

11   legal effect, so there is no swap agreement to protect.

12   There are no swap obligations to protect under the safe

13   harbor provisions.  The swap counterparties have no legal

14   position to be protected by the safe harbors.

15        So the question is could the city -- based on these

16   four defenses, could the city have reasonably second-guessed

17   the strength of the legal argument that the swap obligations

18   were void ab initio based on these four defenses, which were

19   the only defenses we heard about?  Can the Court reasonably

20   second-guess the strength of this argument based on these

21   defenses?  The bottom line is that none of these so-called

22   weaknesses or roadblocks that the city has thrown up actually

23   call into question the strengths of the -- the strength of

24   the city's claim that the swaps are void.  There are no facts

25   in evidence and no argument made that Act 34 was actually

followed.  There's no legitimate argument that the city could
enter into swaps without complying with Act 34.  The fact
that the service corporations may be viewed as separate
entities is irrelevant.  The doctrine of estoppel is wholly
inapplicable to claims of void ab initio, and the safe
harbors in bankruptcy cannot save a void transaction that
doesn't qualify as a swap in the first place.  Without any
meaningful defense, how could Mr. Orr say that this claim
gets a 50-50 assessment, 50-50 odds, it's just a toss-up?
How can the Court conclude that settling this claim at 62
cents on the dollar or maybe even 78 cents on the dollar is
fair and equitable?

        Now I'm going to move to my second argument, and
that is that the liens on the casino revenue are also void
because, just as the swap obligations were not entered into
in accordance with the state statute, the pledge of the
casino revenue was also not authorized by a state statute,
and I'm talking specifically about the Gaming Act.  The
Gaming Act has a specific list of authorized uses of casino
revenue.  None of them involve financial obligations or
collateralization of financial obligations or swap
obligations.

        Here's the list.  Under the Gaming Act, casino
revenue may be used only for hiring, training, deployment of
patrol officers, neighborhood and downtown economic

development programs designed to create jobs, public safety
programs, emergency medical services, fire department
programs, street lighting, anti-gang and youth development
programs, other programs designed to contribute to the
improvement of quality of life in the city, relief to
taxpayers, capital improvements, road repairs. Not a single
one in that list that says hedge interest rates,
collateralize a financial obligation.

What are the city's defenses here as to the argument
that the pledge of casino revenue didn't meet any of those
authorized uses? They have two. The first is that it's
permissible under subsection little (v). That's the section
that says other programs are designed to contribute to the
improvement of quality of life in the city. Statutory
construction dictates when you have items in a list like we
do here and you see the first several there talk about
programs, economic development programs, public safety
programs, youth development programs, we're talking about
community betterment programs, programs that provide
services. Is this a program that provides for community
betterment or services? No. It's a swap obligation to pay
banks an interest rate.

Ms. Ball argued for the first time in her closing
argument that, hey, look, the pensions are a program, so it
can be an authorized use under this section because they're

 1  related to the pensions.  Notably, Mr. Orr never testified to
 2  that, not in deposition, not in trial, not a single piece of
 3  paper, not a single piece of evidence or testimony that shows
 4  this -- that was the defense that was considered that led
 5  them to their assessment of 50-50 odds.  This came for the
 6  first time in closing argument from Ms. Ball.
 7  Notwithstanding that, the pensions are not the program here.
 8  There was no money in the swap obligations that was going to
 9  the Retirement Systems.  Retirees weren't getting the benefit
10  of this.  This was swapping interest that the city was liable
11  for under a financial agreement, didn't better off the
12  retirees.  This is not a pension program.

13          The argument that the city and the swap
14  counterparties did mention in their briefs was that this is
15  an authorized use of casino revenue in that it would improve
16  the quality of life in the city because if they hadn't
17  pledged the casino revenue in 2009, the city was facing
18  massive liability, and that ultimately would trickle down,
19  and it would affect the quality of life in the city.  Your
20  Honor, that, we respectfully submit, is just too attenuated.
21  If you start to read the Gaming Act that any financial hit to
22  the city might ultimately affect quality of life of the
23  residents of the city and, therefore, might qualify as a
24  quality of life improvement program, we should just -- it
25  renders the entire Gaming Act meaningless.  Having a list of

1 specified uses just gets thrown out the window.

2          As to the tax relief prong, that's the second

3 defense they raise.  Okay.  Well, it's authorized under the

4 factor that says you can use casino revenue to provide relief

5 to the taxpayers of the city from one or more taxes or fees

6 imposed by the city.  We've not heard actually anyone

7 seriously argue this defense, and I submit it's because the

8 language of the statute is very clear.  Use of casino revenue

9 in this way must be to relieve taxpayers from a tax that's

10 been imposed.  There was no such tax that was -- that had

11 been imposed and then was relieved by the pledge of casino

12 revenue, so we submit that this use also doesn't work.

13          So here again, we've not heard any arguments that

14 cast any meaningful doubt on the city's claims that the liens

15 were unauthorized by the Gaming Act and, therefore, invalid

16 or void, so we asked the question again.  Is Mr. Orr's 50-50

17 assessment on this claim credible?  Can the Court view the

18 settlement that's been presented today as reasonable based on

19 this claim that's being settled?

20          I've discussed on the two claims I've addressed that

21 we believe the probability of success is high.  I didn't give

22 you a number, but fair to say we think it is very strong.

23          Let's look at what the rewards of litigation would

24 be.  If these two claims were successful, it would mean that

25 the swap obligations are a nullity, void ab initio, no swap

13-53846-swr   Doc 2812-11   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 49 of 79
13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 13:22:00:23   Page 54 of 79   54
290

1  obligations, and it would mean that there are no liens.  The

2  swap counterparties don't have any liens on the casino

3  revenue.  What does this mean for the city?  It means the

4  casino revenue cannot be trapped.  It means the city is free

5  to use its casino revenue for quality of life improvement

6  programs and initiatives.  It means the city is relieved from

7  having to pay monthly swap payments to the swap

8  counterparties.  It means the city does not face any

9  liability for a swaps termination payment, and it means that

10  the swap counterparties will owe the city hundreds of

11  millions of dollars.  Mr. Orr testified to that.  There's

12  going to be a disgorgement claim if the city wins to get the

13  swap payments back.  This deal should have the swap

14  counterparties paying the city, not the city paying the swap

15  counterparties.

16        THE COURT:  How much?

17        MS. ENGLISH:  He keeps wanting a number from me.

18  The swap payments were about $50 million a year, and this is

19  stretching back a number of years.  I haven't looked into the

20  statute of limitations on this, but Mr. Orr agreed it would

21  be hundreds of millions.

22        THE COURT:  I won't press you on the number anymore,

23  but where do the swap counterparties go if the city wins on

24  all of this?

25        MS. ENGLISH:  Well, I don't know the answer to that,

13-53846-tjt   Doc 4314-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 55 of 79
13-53846-swr   Doc 2812-1  Filed 01/17/14  Entered 01/17/14 13:47:07  Page 56 of 179   55
290

1   but if the swap obligations in the first place were void and

2   of no legal effect, the result of that is that typically you

3   unwind the transaction and restore people back to their

4   original position.

5           THE COURT:  Does that put the pension plans at risk?

6           MS. ENGLISH:  Not on the swap obligations, your

7   Honor, no, it doesn't.  Pensions did not benefit in any way

8   from the swap payments that were made.

9           THE COURT:  Except indirectly as they supported the

10  COPs transaction.

11          MS. ENGLISH:  Again, your Honor, let's -- I don't

12  want to get carried away here as Ms. Ball has done with the

13  idea that we have to unwind everything and look at the COPs'

14  validity right now.  They're not settling that claim right

15  now.  They've reserved the ability to pursue that claim

16  later.  The only thing that's being settled is the swap

17  obligation.

18          One of the factors the Court has to consider is the

19  complexity, expense, and delay of litigating, of course.

20  What's the tradeoff?  If you don't settle, what are you

21  looking at?  And I think I touched on some of this earlier

22  on.  These are pure legal issues that we've presented.  They

23  require no discovery and could be resolved on summary

24  judgment.  We think they could be resolved very quickly in

25  this court.  We think an injunction in order to prevent the

13-53846-swr    Doc 4314-11   Filed 04/29/14   Entered 04/29/14 13:22:03   Page 56 of 79
13-53846-swr    Doc 2512-1   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 51 of 79    56
290

 1   swap counterparties from being able to trap the casino

 2   revenue during the pendency of the litigation is likely given

 3   that the probability of success on the merits is high and

 4   clearly the balance of hardships would tip in the city's

 5   favor, so ultimately we think the analysis comes out that the

 6   litigation cost would be relatively low given the nature of

 7   the issues.  They can get their post-petition financing

 8   secured by income tax and asset proceeds just as they've

 9   shown they can do, which will support ample post-petition

10   financing while they litigate.

11         Given the strength of the city's claims against the

12   swap counterparties, we submit that the settlement on the

13   terms proposed in the current forbearance agreement is far

14   too rich.  Moreover, we don't actually know what the

15   settlement means.  Mr. Orr doesn't know.  We don't know.

16   Your Honor doesn't know.  It could be the 62 percent Mr. Orr

17   thought it was.  It could also be much more.  By agreeing to

18   a fixed rate without doing an interest rate analysis and

19   without knowing what the termination payment is going to look

20   like on January 31st, we've all been handicapped, and we

21   submit that the Court can't conclude under these facts and

22   circumstances whether this settlement is actually fair and

23   reasonable.  I think that'll conclude my presentation.  Thank

24   you.

25         THE COURT:  Thank you.

1          CLOSING ARGUMENT

2          MR. GORDON:  Good morning, your Honor.  Robert

3    Gordon of Clark Hill on behalf of the Retirement Systems.

4          THE COURT:  Should I not press you for a number

5    either?

6          MR. GORDON:  I'd prefer you didn't, but we can

7    certainly talk about that along the way.

8          THE COURT:  Okay.

9          MR. GORDON:  I apologize, your Honor.  The title

10   page on this does not reflect the updated date of January

11   13th.  I have hard copies that do, though.  It kept changing,

12   your Honor.

13         Your Honor, my comments are going to address

14   specifically and directly the swap settlement and certain

15   arguments that have been put forward both by the Retirement

16   Systems and by Ambac, as Ms. English has referred to.  Of

17   course, those comments then indirectly address the post-

18   petition financing to the extent that that financing is

19   seeking financing to fund a settlement that we don't believe

20   should be approved.

21         Your Honor, as Ms. English has also indicated, we

22   are addressing the settlement under Rule 9019, and the

23   question under that rule is whether the settlement is fair

24   and equitable.  And, of course, courts have used -- whether

25   it's fair and equitable -- I'm sorry -- and whether it's in

1   the best interest of creditors, and, of course, courts have

2   used the four-factor test to assess what is fair and

3   equitable in the best interest of creditors. I will be

4   addressing those factors specifically as they apply to two

5   arguments, specifically that the settlement fails in treating

6   the swap counterparties as likely secured creditors. It

7   fails under Bankruptcy Code Section 552 and under Sections

8   902 and 928 of the Bankruptcy Code.

9           Under the four-factor test, your Honor, the

10   Retirement Systems submit that the forbearance agreement

11   should not be approved. In summary on this page, we indicate

12   that the first factor is the probability of success, and we

13   submit that the probability of the city being successful in

14   challenging the swap counterparties' asserted liens in the

15   post-petition casino tax revenues is very high.

16           The complexity, expense, and delay of litigation is

17   the next factor. In that regard, the issues briefed and

18   described below are straightforward and primarily legal

19   issues capable of being resolved by the Court on summary

20   disposition, so the expense and delay are minimal.

21           Interest of creditors and proper deference to the

22   reasonable views is the next factor. We would submit that

23   the reasonable views espoused by numerous large and important

24   creditors in opposing the forbearance agreement should be

25   given proper deference. The interest of creditors militates

13-53846-swr Doc 2814-11 Filed 04/29/14 Entered 04/29/14 13:22:23 Page 59 of 79
13-53846-swr Doc 2312-1 Filed 01/17/14 Entered 01/17/14 13:47:07 Page 54 of 179   59
290

1   in favor of litigating to avoid an unwarranted windfall to

2   one set of creditors to the detriment of all other creditors.

3          And, finally, the last factor is the difficulties of

4   collection, and we would submit that that really doesn't have

5   much applicability in this situation or with respect to the

6   arguments that I'm addressing.

7          Starting with the probability of success, your

8   Honor, the Retirement Systems submit that the city should

9   have sued for declaratory relief and/or lien avoidance with

10  respect to the swaps asserted liens and that they should have

11  done so because there are a host of compelling legal

12  arguments here, the first being, of course, as Ms. English

13  has referred to, that the -- and this is the first of the

14  ones that the Retirement Systems have also articulated, is

15  that the casino revenue liens are entirely invalid under the

16  Michigan Gaming Act.  Moreover, however -- and this is what

17  we will -- I will be addressing -- is that even if the casino

18  revenue liens were valid under the Michigan Gaming Revenue

19  Act pre-petition, those liens do not survive the bankruptcy

20  filing under Section 552(a) of the Bankruptcy Code because,

21  number one, they are consensual liens, not statutory liens,

22  and the post-petition casino revenues are not proceeds of

23  those pre-petition consensual liens.  That's sort of the

24  Section 552 argument.  And then, number two, that the casino

25  revenues are not special excise taxes and, therefore, are not

1   special revenues under Section 902(2) of the Bankruptcy Code,

2   and, thus, the liens are not special revenue liens under

3   Section 928(a) of the Bankruptcy Code.  That's the 902, 928

4   argument that I will refer to.  Your Honor -- and I will deal

5   with those both separately, but, your Honor, ultimately when

6   we go through these arguments, which I think are very strong,

7   there is no reason to treat the swap counterparties as

8   secured creditors with respect to the casino revenues

9   acquired post-petition.

10          So let's start with Section 552 if we may.  Section

11  552(a) provides that property acquired by the debtor after

12  the bankruptcy filing is not subject to a lien resulting from

13  a security agreement entered into by the debtor prior to the

14  petition date.  That is the cutoff provision of Section

15  552(a).  Section 552(a), as indicated in the County of Orange

16  case, quote, "should be viewed broadly given the goal of

17  facilitating a fresh start for the debtor," end quote.  As

18  the Court knows, Section 552(a) applies only to liens arising

19  out of, quote, "any security agreements," end quote, which

20  has been interpreted to mean consensual liens, and,

21  therefore, Section 552(a)'s cutoff does not apply to

22  statutory liens and other types of liens.  Not surprisingly,

23  therefore, the emergency manager and the swap counterparties

24  claim that the swaps -- I'll call them the swaps or the swap

25  counterparties -- have a statutory lien.  They do not.

1    Section 101(53) of the Bankruptcy Code defines a

2  statutory lien as a -- and I quote -- "lien arising solely by

3  force of a statute on specified circumstances or conditions,

4  but does not include security interest or judicial lien,

5  whether or not such interest or lien is provided by or is

6  dependent on a statute and whether or not such interest or

7  lien is made fully effective by statute," end quote.  So even

8  if a security interest or a lien is dependent on a statute to

9  be fully effective, that doesn't make it a statutory lien.

10 The lien must arise solely by force of a statute.

11    The District Court in Orange County cited the

12 legislative history to Section 101(53) of the Bankruptcy Code

13 and stated, quote, "A statutory lien is only one that arises

14 automatically and is not based on an agreement to give a

15 lien," end quote.  The Orange County court also cited the

16 authority under Collier on Bankruptcy, which distinguished

17 statutory liens from security interests by stating, quote,

18 "If the lien arises by force of statute, without any prior

19 consent between the parties, it will be deemed a statutory

20 lien.  If the creation of the lien is dependent upon an

21 agreement, it is a security interest even though there's a

22 statute which may govern many aspects of the lien," end

23 quote.  This language is very important, as you will see.

24    Here, as of early 2009, your Honor, there were no

25 statutes or ordinances authorizing or creating the casino

 1   revenue liens until the parties agreed upon all of the key
 2   terms and presented a term sheet to City Council, which then
 3   adopted Ordinance 05-09 for the express purpose of
 4   authorizing the collateral agreement, so let's look at the
 5   history of the events.  On March 31, 2009, the city and the
 6   counterparties enter into a nonbinding term sheet for the
 7   collateral agreement.  On May 26, 2009, the City Council
 8   adopts Ordinance 05-09 which adds Article 16 to Chapter 18 of
 9   the City Code specifically to implement the term sheet and
10   facilitate the city's entering into the collateral agreement.
11   Section 18-16-4 of the City Code, which was added by
12   Ordinance 05-09, provides in part as follows, and we have the
13   different sections here.  Section -- Subsection F recites
14   that the parties entered into a settlement.  Subsection H
15   discusses settlement terms.  Subsection N states, and I
16   quote, "This Ordinance is adopted for the purpose of
17   implementing the transactions contemplated by the term sheet,
18   and when this Ordinance becomes effective and implemented by
19   one or more resolutions as herein provided and the definitive
20   documents (defined below) are executed and delivered, the
21   complete agreement of the city and the 2006 counterparties
22   shall be expressed thereby," end quote.
23        Then on June 23, 2009, the City Council passes a
24   resolution authorizing the city to enter into the collateral
25   agreement and other transaction documents, and on June 26 the

1 transaction documents are executed. Thus, it is clear, your

2 Honor, that Ordinance 05-09 merely facilitated the

3 transaction, and the genesis of the casino revenue liens is

4 in the collateral agreement itself, and we've highlighted the

5 section of the collateral agreement that required the

6 authorizing ordinance to be implemented -- adopted in order

7 to create the lien, but it is provided in the first instance

8 in Section 4.1 of the collateral agreement.

9         Put another way, the casino revenue liens are not

10 created automatically and solely by force of an existing

11 general statute. To the contrary, Ordinance 05-09 was

12 created in part specifically to authorize and implement the

13 collateral agreement and the liens arising thereunder. In

14 this case, but for the collateral agreement, your Honor,

15 there would be no lien on the casino revenue. Thus, the

16 liens clearly do not constitute statutory liens.

17         There's also one other interesting argument to take

18 into consideration here, although it's not necessary to this

19 point. You will note that the argument that the casino

20 revenue liens are statutory liens is solely predicated on the

21 effect of Ordinance 05-09. Implicit in that argument then is

22 that 05-09 is a statute. However, we would submit that there

23 is a substantial open question as to whether an ordinance is

24 even the equivalent of a statute for purposes of creating a

25 statutory lien, and we cite the case -- it's not a bankruptcy

13-53846-tjt   Doc 2314-11   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 64 of 79
13-53846-swr   Doc 4814-11   Filed 04/29/14   Entered 04/29/14 13:22:00:23   Page 60 of 179   64
290

1    case, but we cite the case of <u>Rental Property Owners</u>

2    <u>Association</u> versus <u>City of Grand Rapids</u>, 455 Mich. 246, 247,

3    a 1997 case, where they -- and there's a quote there, "A

4    municipal ordinance is preempted by state law if 1) the

5    state's -- the statute completely occupies the field that the

6    ordinance attempts to regulate, or 2) the ordinance directly

7    conflicts with a state statute," end quote, so you see from

8    the language there that there is a distinction being made

9    between statutes and ordinances that we think ought to be

10   considered as well.

11        So if the casino revenue liens arise by consensual

12   liens and not by statutory lien, the next question that one

13   has to ask under the Bankruptcy Code is whether Section

14   552(b)'s exception to the cutoff under 552(a) applies.  The

15   exception there is -- provides that if property acquired by a

16   debtor post-petition constitutes the proceeds, products, or

17   offspring of pre-petition collateral, then the pre-petition

18   lien would continue to reach that collateral or those -- that

19   property acquired post-petition.  Here we've briefed it

20   extensively.  It merits very little discussion.

21        The post-petition casino revenues acquired by the

22   city clearly are not proceeds of the swap counterparties'

23   pre-petition collateral.  The casino tax revenues that are

24   acquired post-petition simply don't arise from the only

25   collateral that the swap counterparties claim that they have,

13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 13:22:07   Page 65 of 79
13-53846-swr   Doc 2512-11   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 66 of 79   65
290

1  which is the pre -- which is just the casino tax revenues, so

2  post-petition casino tax revenues are not offspring of pre-

3  petition casino tax revenues.  They are products and

4  offspring of the operation of the casinos themselves and the

5  levying of the taxes post-petition.

6           So the next issue, your Honor, is -- since the liens

7  do not survive under Section 552, the question is whether

8  there is an exception under Section 902 and 928 of the

9  Bankruptcy Code as being liens on special revenues, so let's

10 turn to that, if we may.  The emergency manager and the swap

11 counterparties contend that the swap counterparties' asserted

12 liens are liens and special revenues protected under Section

13 928.  They are wrong.  Section 902 -- I'm sorry.  Hang on a

14 second.  Did I go too far?  I did.  I apologize.  Section

15 902(2) defines special revenues as inter alia, quote,

16 "special excise taxes imposed on particular activities or

17 transactions," end quote.  The emergency manager and the swap

18 counterparties have argued that the casino revenues are

19 excise taxes, and, therefore, they're special revenues under

20 Section 902(2)(B) of the Bankruptcy Code.  What they gloss

21 over critically is the word "special."  Not all excise taxes

22 qualify due to the inclusion of the word "special."  And I

23 heard both the emergency manager and counsel for the

24 emergency manager on January 3 say to this Court that the

25 casino revenues are excise taxes; therefore, they're special

```
1   revenues, not mentioning the word "special" at all.  The
2   placement of the word "special" before "excise tax" in
3   Section 902(2)(B) of the Bankruptcy Code was done to
4   illustrate Congress' intention that Section 928(a) only apply
5   to special revenues that secure the payment of special
6   revenue bonds.  As the Court in the Heffernan case stated,
7   and I quote, "According to Congress, comma" -- sorry -- the
8   intent, quote, "is to define special revenues to include the
9   revenues derived from a project or from a specific tax levy,
10  where such revenues are meant to serve as security to the
11  bondholders," end quote, and they are citing the legislative
12  history in that regard.  Consistent with this notion that
13  special revenues and the protections of Section 928(a) apply
14  only to revenues that support specific bond finance projects,
15  there was a report submitted in connection with the
16  legislative process that illustrates the situations in which
17  excise taxes should be considered special, and, therefore,
18  special revenues, and this report was drafted by Mr. Richard
19  Levin and Lawrence King.  I don't know if they're Mr.
20  Bennett's personal pantheon of great practitioners along with
21  Justice Cardozo, but I think they're fairly authoritative
22  figures.  So they write, and I quote, "Hotel-motel taxes,
23  meal taxes, and the license fees are included in special
24  excise taxes.  They are often imposed for particular
25  purposes.  For example, hotel-motel excise or meal tax might
```

1  be imposed in a particular area of a municipality or
2  throughout a city to finance the construction and operation
3  of a convention center," and the last sentence of this
4  paragraph is important.  "Bonds secured by the special excise
5  tax are issued to finance the construction."  I want to read
6  on for just a moment, and I quote again from the report,
7  "Property, sales, and income taxes would generally not be
8  considered special revenues.  However, some exceptions may
9  exist, for example, where a special property tax is levied
10  and collected for the specific purpose of paying principal
11  and interest coming due on bonds issued in connection -- in
12  conjunction with the levy of the -- in conjunction with the
13  levy of the property tax, the revenues may constitute special
14  revenues.  In these cases, there is generally a prohibition
15  under state law on using the special tax revenue for any
16  purpose other than the payment of the bonds.  However, where
17  the revenue may be used for other purposes, it should not
18  constitute special revenues," end quote.
19      So were the casino revenues levied for a specific
20  project here?  That's the next question.  The answer is no.
21  Section 12(3)(a) of the Gaming Revenue Act identifies eight
22  general categories of purposes for which a wagering tax may
23  be used by a city.  It does not specify a specific purpose or
24  project to which the proceeds of a wagering tax may be used.
25  So now we look to the City Code to see if there's some

1    special purpose why these particular casino tax revenues were

2    levied in this instance.  Section 18-14-3 of the City Code

3    creates the wagering tax levy by the city.  Section 18-14-10

4    entitled "Use of Proceeds" merely states that the proceeds

5    from the wagering tax can be used for any purpose under the

6    Gaming Revenue Act.  No specific purpose is identified.

7            As such, your Honor, the casino revenues constitute

8    general excise taxes, not special excise taxes, and are not

9    special revenues under Section 902(2)(B) of the Bankruptcy

10   Code.  Moreover, the granting of a lien in the casino

11   revenues in favor of the swap counterparties does not change

12   the nature of the casino revenues as general excise taxes.

13   Therefore, Section 928's protection of liens and special

14   revenues does not apply to any asserted lien of the swap

15   counterparties in the casino revenues.

16           Now, it's interesting.  On page 34 of the city's

17   omnibus reply, all they say in response to this is that this

18   argument isn't -- and I quote, "This is not free from doubt,"

19   end quote, but that's not the standard under Rule 9019, your

20   Honor.  The question is likelihood.  Is it likely that this

21   argument is correct, not that it's free from doubt.  It's

22   likelihood.  And we would submit that the clear likelihood is

23   that the casino revenues are not special revenues.

24           I heard this morning the swap counterparties'

25   counsel say that they have insurance for their claim.  I

13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 13:22:00:23   Page 69 of 79
13-53846-swr   Doc 2512-1   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 84 of 179   69
290

1  would say so what.  That doesn't mean that they or their

2  insurers are entitled to be treated as secured creditors.

3        Your Honor, the analysis that we just went through

4  under 902 is very much consistent with the well-recognized

5  purposes as to what 928 was adopted in the Bankruptcy Code

6  for.  A leading treatise indicates that Section 928(a) should

7  only apply to liens on special revenues that secure revenue

8  bonds that finance the project from which the revenue is

9  derived, and we cite Collier on Bankruptcy for that.

10       In the County of Orange case, it was stated by the

11  Court that the goal was to remove the risk that revenue

12  bondholders would be stripped of their liens on revenue

13  acquired by the debtor after the commencement of a

14  municipality's Chapter 9 case pursuant to Section 552(a) of

15  the Bankruptcy Code.  Collier's states, and I quote, "The

16  effect is to prevent a -- prevent special revenues that

17  secure an issue of revenue bonds from being diverted to be

18  available for the municipality's general expenses or

19  obligations," end quote.  That's essentially what's

20  threatened here.  Here, your Honor, the swap agreements bear

21  no relation to the development of the casinos that generate

22  the casino revenue and, therefore, bear no relation to the

23  policy and intended class of protected claim holders under

24  Section 928(a) of the Bankruptcy Code.  The rationale for

25  Section 928(a) to encourage bond financing investment in

1  municipal programs or projects by protecting the holders of
2  those bonds is simply not implicated with respect to the swap
3  counterparties and their asserted lien claims.  So that deals
4  with the probability issues, your Honor.

5  I would submit it's a bit astonishing if you look at
6  the papers filed by the emergency manager and the swap
7  counterparties how little space they devote to these issues.
8  They, instead, gloss over these issues, I would submit.

9  The complexity -- then the other factors that need
10  to be considered, there's the complexity, expense, and delay
11  of litigation.  Your Honor, here, as I've indicated, these
12  issues are straightforward and primarily legal in nature.
13  You may recall actually the Court at the beginning of the
14  swap matters back in August asked whether there was any need
15  for an evidentiary hearing because the issues seemed to be
16  legal in nature, and it was only when the emergency manager's
17  team suggested that they need to put witnesses on that
18  suddenly it turned into an evidentiary hearing.  This is not
19  highly fact-intensive.  These issues are susceptible to
20  resolution, I would submit, on summary disposition.  For
21  these reasons, the litigation of these issues should not
22  constitute a significant expense, particularly relative to
23  the overall expense of the case and the dollars at stake in
24  this matter.  Similarly, in that context, these issues could
25  have been and still could be litigated in a very quick

13-53846-swr   Doc 2814-11   Filed 04/29/14   Entered 04/29/14 13:47:07   Page 71 of 79
13-53846-swr   Doc 2312-11   Filed 01/17/14   Entered 01/17/14 13:22:00:23   Page 86 of 179   71
290

1    fashion, so the delay in administration of this case is not a
2    factor.  In fact, at the pace that this case has been going,
3    I would submit that these issues could have been litigated
4    three or four or five times over by now.
5         So what is the response of the emergency manager to
6    these issues?  I would submit not much.  It is recited in a
7    mechanical and pro forma way that the expense and delay of
8    litigating should be avoided, and a settlement provides,
9    quote, unquote, financial stability.  I don't know how
10   layering on $165 million of new debt on the city stabilizes
11   the city's finances.  That boggles my mind.  I don't
12   understand that at all.
13        And then let's look at the proverbial expense and
14   delay that the emergency manager articulates in an anemic
15   sort of way.  As I've mentioned, the expense relative to
16   saving $165 million cannot be a concern in this situation is
17   not persuasive, and the delay is not an issue either.  Ms.
18   English has indicated that with respect to the arguments
19   under Act 34 and so forth that the litigation may take up to
20   six months, and that may well be.  I would submit for these
21   issues maybe six weeks.  It does not take that long to
22   litigate these issues.  I heard on January 3 counsel for the
23   city make reference to that oft cited standard under the W.T.
24   Grant case that a settlement under Rule 9019 only needs to
25   meet the lowest point in the range of reasonableness.  I

13-53846-swr   Doc 2814-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 72 of 79
13-53846-swr   Doc 2812-11   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 87 of 179    72
290

1  really question whether that court ever thought that what it

2  stated in that regard would become the standard under Rule

3  9019 for all settlements that debtors bring before courts,

4  but I would submit that that shouldn't be the target, the

5  lowest point in the range of reasonableness, and it shouldn't

6  be a self-fulfilling prophecy.  And in any event, I don't

7  think this settlement even comes close to the lowest point in

8  the range of reasonableness for all the reasons I've stated

9  and the reasons that Ms. English has stated this morning.  I

10  would submit that the city and its creditors deserve far, far

11  better.

12       Your Honor, I don't know why the emergency manager,

13  quite frankly, is pushing this deal.  Often you can at least

14  see some reasons.  I don't see them in this case at all.  On

15  December 18th, the Court suggested to the emergency manager

16  that his team go back to the drawing board, and they emerged

17  several days later with a revised settlement that is

18  remarkable in its obstinacy because it doesn't take to heart

19  the Court's direction and puts back before this Court a

20  settlement that fundamentally continues to ignore the

21  arguments that are being put forward by parties such as Ms.

22  English and myself against the swaps positions and is not

23  substantially or meaningfully better than the original deal

24  and, indeed, may be worse by the time the case -- by the time

25  the transaction would close.  That's all I have, your Honor.

```
 1    Thank you.
 2              THE COURT:  Thank you, sir.
 3              MR. PEREZ:  Should I go, your Honor, or are you
 4    going to take a break?  Go forward?
 5              THE COURT:  Sorry?
 6              MR. PEREZ:  Should I go forward?
 7              THE COURT:  Yes.
 8              MR. PEREZ:  Okay.  Your Honor, Alfredo Perez on
 9    behalf of FGIC.
10              THE COURT:  Let me just caution you about this
11    little time limitation I do have.  I need to break at about
12    quarter till or ten till twelve for a judges' meeting that I
13    have at noon.
14              MR. PEREZ:  No problem, your Honor.  I will probably
15    be the briefest of all of the speakers, so I can't imagine
16    I'd be more than about 20 minutes.  Your Honor, as a
17    housekeeping matter, I do have copies of the -- certified
18    copies of the order and the plans, whenever I need to
19    substitute that in the record.  Those were Exhibits, I
20    believe, 305 and 306 --
21              THE COURT:  Okay.  Thank you, sir.
22              MR. PEREZ:  -- that were entered in, and I just
23    didn't have them at the time.
24                        CLOSING ARGUMENT
25              MR. PEREZ:  Your Honor, I'm only going to address a
```

13-53846-tjt   Doc 4814-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 74 of 79
13-53846-swr   Doc 2312-1   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 89 of 179   74
290

```
 1   couple of things in connection with particularly the
 2   forbearance agreement and the insurance rights with respect
 3   to the forbearance agreement.  Ms. Ball indicated that what
 4   we had was here the allowance of a secured claim, and I think
 5   it's a lot more than the allowance of a secured claim.  First
 6   of all, your Honor, the parties -- the swap counterparties
 7   and the city seek to terminate pursuant to the early
 8   termination provisions.  They don't seek to terminate
 9   pursuant to the early termination provisions of Section 6
10   but, rather, through the optional termination provisions.
11   And, your Honor, pursuant to those provisions, the swap
12   counterparties cannot terminate and cannot receive a payment.
13   The optional termination provision explicitly provides -- and
14   that's found on part 5(xx) of City Exhibit 133 -- that for
15   the avoidance of doubt, in no event will Party B owe any
16   money to Party A in connection with the election by Party A
17   to exercise the swap termination, so, in fact, just because
18   it's the city as opposed to the service corporations, which
19   are, in fact, the parties to the swaps that are making the
20   payment, that doesn't change the result.  There is no way
21   that the swap counterparties can terminate under that
22   provision and receive payment.
23           And, your Honor, the testimony from Mr. Buckfire is
24   directly on point.  He confirmed that if you use the optional
25   termination provisions, the right to walk away without
```

1   receiving payment, and if you look on the transcript of

2   December 17th, page 173, lines 13 to 24, again page 174,

3   lines 12 to 13, and page 175, lines 15 through 19, they

4   cannot terminate pursuant to that optional termination

5   provision and receive payment.  So obviously, your Honor,

6   that begs the question why is it that they're terminating

7   under Section 5(xx) as opposed to the optional termination

8   provision under Section 6?  And the reason is is that under

9   Section 6 it's clear that they cannot terminate without our

10  consent, so they're trying to shoehorn themselves in a

11  provision which says they can't receive any money, yet

12  they're receiving $165 million, and the provision that they

13  can use, which would -- in which they are entitled to receive

14  money, they can't do that without our consent, your Honor, so

15  we believe that the forbearance agreement, in essence,

16  modifies the swaps.  They're not entitled to modify the swaps

17  transaction without our consent and that, in essence, what

18  they're doing is they're modifying it against our economic

19  interest, which they're not allowed to do.

20          Furthermore, your Honor, the proposed transaction

21  and specifically the order in connection with the proposed

22  transactions goes way beyond approving a settlement under 19,

23  goes way beyond approving the assumption of a contract under

24  365.  It basically grants a third-party injunction against

25  our clients.  Section G -- I'm sorry.  Paragraph G of the

1 proposed order basically has the Court make a finding that

2 the parties' entry into and performance under the forbearance

3 agreement does not violate any law, including the Bankruptcy

4 Code, does not give rise to any claim against the parties

5 thereto except as expressly provided in the orders, and

6 paragraph 4, paragraph 5, paragraph 7 all make similar types

7 of findings that, in essence, immunize the swap

8 counterparties from any potential claims that we may have.  I

9 mean as the Court is aware, the -- under the Dow Corning case

10 in the Sixth Circuit, generally speaking, third-party

11 injunctions against and third-party releases are not

12 permissible except under unusual circumstances in the plan

13 context.  We're not in the plan context.  There's no evidence

14 as to the unusual circumstances, so that would be

15 impermissible at this point.

16         Additionally, your Honor, they're using Rule 9019 to

17 extinguish third-party rights.  There is -- there are many

18 cases, and probably the best one is the one cited in the

19 materials.  It's called SportsStuff, and let me just read to

20 you the provision in SportsStuff because they're going much

21 farther than they really should be going in the context of a

22 9019.  You heard previously them saying that you have to make

23 a determination as to our consent rights in order to rule on

24 this motion.  I think it was repeated by Mr. -- counsel for

25 the swap counterparties this morning.  I didn't quite hear

1  it, but I think he did repeat that, but in SportsStuff it

2  says a settlement between only two parties to a multi-party

3  lawsuit is not a settlement, and a procedure to approve a

4  compromise under 9019 cannot be used to impose an injunction

5  on a nonsettling party. And it basically -- and it goes on,

6  and that's precisely what I believe they are trying to do

7  here.

8        THE COURT:  I'm a little confused.  Do you agree

9  that the issue of consent rights should be determined now or

10  not?

11        MR. PEREZ:  I don't think the Court can determine

12  that.  I don't think that's before the Court, your Honor.  I

13  don't think that in the context of a 9019 or in the context

14  of a 365 the Court can determine the rights as between a

15  third-party to that settlement.  It's got to be -- it's got

16  to be an open issue, your Honor.

17        THE COURT:  Well, but the parties can consent to

18  that.  That's why I asked.  Do you consent to it or not?

19        MR. PEREZ:  We do not consent to that, your Honor,

20  absolutely not.  And, your Honor, there's lots of cases --

21  and several of them are cited, including the D.J. Christie

22  case, which you can't -- you can't, in essence, decide things

23  in order to prejudice people's rights, and the same thing is

24  true, your Honor, in the context of 36 --

25        THE COURT:  Well, but how can I determine whether

 1   it's appropriate for the city to enter into the forbearance

 2   agreement without determining your client's consent rights?

 3           MR. PEREZ:  Well, your Honor, I think the <u>Orion</u> case

 4   speaks to that, and let me just read the provision of the

 5   <u>Orion</u> case, which I think is very important.  And this is in

 6   the context of 365, and it was, in essence, my next argument.

 7   It says, "Finally, it's important to keep in mind that the

 8   bankruptcy court's business judgment" -- because, in essence,

 9   that's what you're going to be doing; you're going to be

10   determining whether their business judgment in assuming this

11   contract was appropriate -- "in deciding a motion to assume

12   is just that -- a judgment of the sort a businessman would

13   make.  In no way is this decision a formal ruling on the

14   underlying disputed issues, and thus will receive no

15   collateral estoppel effect.  In a given case, the bankruptcy

16   court might decide it would be beneficial for the trustee or

17   the debtor-in-possession to assume a certain contract.  The

18   court thinks it unlikely that a court would hold the debtor

19   breached the contract, and thus assuming the contract would

20   be good 'business judgment.'  This 'business judgment' could

21   turn out to be wrong, however, if a letter -- if a later fact

22   finder in an adversary proceeding decides that the underlying

23   contract was in fact breached.  In such a case, the judge's

24   wrong decision is simply an error of business judgment, not a

25   legal error."  So, your Honor, you might be making a

1   preliminary decision on that.  You might be informing

2   yourself as to the facts, but you're not making a decision on

3   the merits, and that issue is going to be left for another

4   day.

5         And, your Honor, there are -- the Orion case, which

6   I read from, is probably the leading case on it, and there

7   are several other cases, Big Rivers, GI Industries, which

8   also address this issue and including the issue of the

9   enforceability of the contract.  We've submitted proposed

10  language in the order which would, in essence, leave

11  everybody's rights -- and it would -- and it would, in

12  essence, undo many of the findings that they're asking you to

13  make in connection with, in essence, taking away our third-

14  party rights.

15        Finally, your Honor, is the question of the harm.

16  In essence, this is a balancing of the harms, and there is

17  harm to the insurers as a result of this.  We have very long

18  dated obligations.  Some of them go out for more than 20

19  years.  The swaps were intended to insure against that risk,

20  and sometimes there was -- in fact, there was at one time

21  where there was a payment made by the insurance to the city

22  because the interest rates were in their favor, so to that

23  extent, taking away the hedge, in essence, does that.  Ms.

24  Ball argued that in 2009 the city had, in essence, done away

25  and that the hedge had been undone, but, your Honor, that's

13-53846-swr   Doc 2812-11   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 80 of 179
13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 14:22:00:23   Page 96 of 179   80
290

1     only in the case under this provision that they're trying to

2     shoehorn themselves where the city would be receiving a

3     payment, not where the city would be paid.  It was never

4     contemplated, and if you read the plain language of that

5     section of the amended schedule, Section 5(xx), it was never

6     contemplated that the swap insurance would be receiving a

7     payment.  It was always contemplated that the city would be

8     receiving a payment, and if that were the case, they could

9     have easily gone out and hedged again cheaper than they've

10     done -- than they've done -- than they would have done

11     because of that.

12          Additionally, your Honor, the contract

13     administration agreement, Section 6.9.2, basically gives the

14     swap insurers broad consent rights, and what the city and the

15     swap counterparties are doing is is they're just trampling

16     through our consent rights as a result of amending -- in

17     essence, amending the swaps, taking out the provisions that

18     are helpful, and trying to shoehorn themselves in a provision

19     that simply doesn't work.

20          Finally, your Honor, unrelated to the swaps but more

21     related to the DIP, the Court, in essence, instructed us

22     to -- that we couldn't address the issue of need and that we

23     couldn't address the issue of use of funds.  If those two

24     things are not in the record in connection with the financing

25     motion, I question how the Court can make a good faith

 1    finding if there's no evidence on any of the -- on any of

 2    those two issues.  Thank you, your Honor.

 3              THE COURT:  Thank you, sir.

 4              MR. MARRIOTT:  Good morning, your Honor.  What time

 5    did you say you needed to break?

 6              THE COURT:  I need to break at a quarter till or ten

 7    till, approximately.

 8              MR. MARRIOTT:  All right.  I think that works for

 9    me.

10              THE COURT:  Excellent.

11                        CLOSING ARGUMENT

12              MR. MARRIOTT:  Your Honor, Vince Marriott, Ballard

13    Spahr, on behalf of EEPK and affiliates.  I'm going to ask

14    you to switch gears in your head now from forbearance

15    agreement to DIP because what I'm going to be talking about

16    is the DIP, and what I'm going to be addressing are two

17    process issues and whether or not the city cleared two

18    gateway hurdles to obtaining the relief they seek with

19    respect to the post-petition financing.

20              Your Honor, one of these gateway hurdles arises

21    under the Bankruptcy Code and one under state law, and each

22    is designed to protect the integrity of the process so that

23    creditors and other stakeholders are not unduly or

24    unnecessarily prejudiced by the city's efforts to obtain

25    post-petition secured financing from Barclays on the terms it

1   proposes here.

2           The Bankruptcy Code gateway issue is contained in

3   364(c) with conditions, approval of secured post-petition

4   financing on a demonstration by the debtor that unsecured

5   financing is not available.  The state gateway issue is

6   contained in PA 436, which both requires the emergency

7   manager to submit a proposed financing to City Council for

8   approval or disapproval and entitles the City Council to

9   attempt to find an alternative transaction that is at least

10  economically equivalent to what the emergency manager

11  proposes.

12          THE COURT:  Sir, I'm advised that in the overflow

13  courtroom they can't hear you very well.  Can I ask you to

14  turn the microphone more towards you?

15          MR. MARRIOTT:  Yes.  Hopefully that's better.

16          THE COURT:  Yes.  That sounds better.

17          MR. MARRIOTT:  Seems better in here.

18          THE COURT:  Yes.  Go ahead.

19          MR. MARRIOTT:  All right.  I'm going to begin with

20  the Bankruptcy Code and Section 364, and the statute provides

21  specifically that it is a condition to seeking approval of

22  secured post-petition financing or -- and/or financing which

23  has a superpriority administrative expense that the debtor

24  have been unable to obtain unsecured credit.  It is the

25  burden of the debtor to demonstrate that it is unable to

13-53846-tjt   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 83 of 179
13-53846-swr   Doc 2512-1   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 98 of 179   83
290

1  obtain such credit, and that burden cannot be met unless the

2  debtor demonstrates it actually attempted to do so, and there

3  are a great number of cases to this effect.  The L.A. Dodgers

4  case, a recent case out of the District of Delaware, 457

5  Bankruptcy Reporter 308, "The Court may not approve any

6  credit transaction under subsection (c) of Section 364 unless

7  the debtor demonstrates that it has attempted, but failed, to

8  obtain unsecured credit under section 364(a) or (b)."

9  Another recent case out of the Southern District of New York,

10 MSR Hotels & Resorts, 2013 Westlaw 5716897, "The standard

11 here does not permit a debtor to purposely choose not to seek

12 financing on better terms on the basis that they themselves

13 subjectively believe that financing they've obtained is the

14 best terms possible."  I'll skip a few of these, drop down to

15 In re. Ames Department Store, 115 Bankruptcy Reporter 34, "A

16 court, however, may not approve any credit transaction under

17 subsection (c) unless the debtor demonstrates that it has

18 reasonably attempted, but failed, to obtain unsecured credit

19 under sections 364(a) or (b)."  Sorry.

20       Your Honor, the testimony of Mr. Doak was clear.

21 The city did not ask a single lender whether it would provide

22 unsecured credit.  Mr. Doak testified,

23             "Question:  As part of the solicitation process,

24             you did not send out a solicitation document that

25             asked parties to return bids for unsecured

13-53846-swr  Doc 4314-11 Filed 04/29/14 Entered 04/29/14 22:00:23  Page 84 of 79
13-53846-swr  Doc 2312-11 Filed 01/17/14 Entered 01/17/14 13:47:07  Page 90 of 179   84
290

```
 1          financing; right?
 2              Answer:  No, we did not.
 3              And did you personally ask any prospective
 4          lender -- and you did not personally ask any
 5          prospective lender if it would make the DIP loan on
 6          an unsecured basis; right?
 7              Answer:  I did not ask that particular
 8          question."
 9          On further cross, he was asked,
10              "Question:  My understanding is that you led the
11          efforts of the city to find post-petition financing;
12          correct?
13              Answer:  Yes.
14              Okay.  Did you direct anybody else to contact a
15          prospective lender or lenders to ask if they would
16          provide to the city unsecured credit?
17              No, I did not.
18              Did anybody do that anyway and report to you the
19          answer?
20              Not to my knowledge, no."
21          Your Honor, indeed, when the city approached
22      prospective lenders, it did so with an indicative term sheet
23      that proposed to provide lenders all the collateral that
24      ended up being part of the Barclays deal as well as a
25      superpriority administrative expense that is also part of the
```

13-53846-swr   Doc 2814-11 Filed 04/29/14   Entered 04/29/14 22:00:23   Page 85 of 179
13-53846-swr   Doc 2812-11 Filed 01/17/14   Entered 01/17/14 13:47:07   Page 86 of 179   85
290

1   Barclays deal.

2         Your Honor, a brief excerpt from City Exhibit 56,

3   the collateral swap termination loan.  They describe the

4   collateral as income tax revenues, asset proceeds collateral,

5   quality of life loan, swap termination loan, asset proceeds,

6   income tax revenues, quality of life loan, casino taxes, and

7   asset proceeds collateral and a junior lien on the income

8   tax, and all the loans were going to have a 364(c) and 503

9   superpriority administrative expense status.  This is what

10   went out to prospective lenders.  This, of course, put the

11   rabbit in the hat and essentially reduced to zero the chances

12   that any lender would make a proposal without collateral or

13   without a superpriority administrative expense.  Mr. Doak

14   himself acknowledged this.  He was asked,

15         "So the initial proposal that you sent out

16         contemplated that the DIP financing would be

17         secured; correct?

18         Yes.

19         And the collateral that the city included in its

20         initial proposal was income tax revenue, asset

21         proceeds, and casino revenues; correct?

22         Yes.

23         And you would agree with me that it would be

24         unlikely that a potential lender would remove

25         protections that went out with the city's initial

1    proposal; right?

2         Answer:  I would agree."

3         The city has attempted to overcome this failure to

4    even ask for unsecured credit by offering as opinion

5    testimony the view of Mr. Buckfire and Mr. Doak that such

6    credit would not have been available in any event.

7         I'll point out, Judge, that as an initial matter --

8    this is not under 364(c) but 364(d), which has a comparable

9    requirement that the debtor demonstrate that better credit is

10   not available, that -- and this is the Reading Tube Industry

11   cases.  The court could not find that the debtor met its

12   evidentiary burden based solely on opinion testimony of the

13   chairman of the debtor's board, an individual with extensive

14   financing experience and business acumen, that less onerous

15   financing was not available where the debtor did not engage

16   in an effort to approach other potential lenders.

17   Essentially the Court -- you're being asked to do something

18   that the Reading Tube court declined to do, and that is

19   accept testimony from an individual who, notwithstanding

20   extensive financing experience and business acumen, really

21   shouldn't be making opinion testimony on this issue when all

22   you really actually have to do is go out and ask.

23        More specifically, Judge, the availability of

24   unsecured credit to a Chapter 9 municipal debtor is simply

25   not presently amenable to expert testimony that should be

1  accorded any weight.  First, both Mr. Buckfire and Mr. Doak

2  acknowledged that neither has had any past experience in

3  sourcing municipal debt.  This was his testimony to that

4  effect.  Mr. Doak,

5        "Prior to this case, you had no personal

6        experience sourcing municipal financing; isn't that

7        correct?

8        That's correct."

9     Mr. Buckfire,

10        "My expertise is in the origin of DIP financing

11        for corporations.  This is the first municipal DIP

12        financing we have arranged."

13     Indeed, Mr. Buckfire testified that nobody has done

14  this before.  This has never been done before.  Nobody has

15  ever done a post-petition financing for a municipality, so

16  it's new and different.  Because no one has any experience in

17  sourcing municipal debt for a Chapter 9 debtor, there are no

18  antecedents to provide supporting facts or data for an

19  opinion.  Under those circumstances, the prudent course would

20  be to ask.  After a certain amount of no's, Mr. Doak or

21  Mr. Buckfire could perhaps have opined that they had

22  sufficient data points to conclude that further inquiry would

23  be futile, yet, as noted, neither Mr. Doak nor anyone else on

24  his team approached a single lender about providing unsecured

25  credit.  Indeed, Mr. Doak went out to market with a proposed

 1   collateral package, which surely frustrated any effort to

 2   obtain unsecured creditors -- credit.  In other words, as a

 3   practical matter, no data was available from which to form a

 4   basis for an opinion on the availability of unsecured

 5   municipal credit to the city.

 6        As a result of this failure to seek any input from

 7   the municipal markets at all and, thus, lacking any facts

 8   whatsoever upon which to base any opinion, Mr. Buckfire and

 9   Mr. Doak are simply expressing their own personal views on

10   the subject of available unsecured credit, which is simply

11   not helpful to the Court.  As Judge Spector of this Court has

12   observed citing to the Supreme Court's Daubert case, "It is

13   not sufficient for the expert's testimony to be based merely

14   upon subjective belief or unsupported speculation," and

15   that's in the Dow Corning case, 237 Bankruptcy Reporter 364

16   at 367.

17        Now, if we could put Exhibit 61 up.  Ms. Ball in her

18   argument made reference to City Exhibit 61 in support of

19   meeting the city's burden with respect to the lack of

20   availability of unsecured credit, and Exhibit 61 was a

21   document produced by JPMorgan.  As evidence of the lack of

22   availability of unsecured credit, however, this exhibit

23   suffers from two infirmities.  The first is that, like the

24   indicative term sheet that was sent to prospective lenders,

25   the city communication to JPMorgan to which Exhibit 61 was a

1  response indicated from the outset that the city would be

2  providing collateral.  This is indicated in the document

3  itself at the top there.  The city and its advisors have

4  identified four distinct revenue streams to be used as

5  security to secure any potential lending facility, so, again,

6  out of the box and when approaching JPMorgan the city was

7  putting the rabbit in the hat.

8         Could we go back to -- Mr. Buckfire, in his

9  testimony, confirmed this point.  When he was asked by Mr.

10 Hackney when the city sent whatever it sent to JPMorgan

11 soliciting the response that Exhibit 61 constituted, he

12 indicated that, "So isn't it fair to say" --

13         "Question:  So isn't it fair to say,

14         Mr. Buckfire, that the proposal that you sent out

15         there also suggested collateral to the market?"

16         Some colloquy, then my question was,

17         "Isn't it true that when you sent that letter

18         out --

19         Yeah.

20         -- it proposed collateral to the market?

21         Answer:  Yes, it did."

22         Now, the second issue, your Honor, is as and to the

23 extent that the city wants to use Exhibit 61 generated by

24 JPMorgan as evidence of what was available in the market,

25 they are actually asking the judge to rely on the opinion of

1  JPMorgan, but JPMorgan wasn't here to testify.  JPMorgan

2  wasn't here to be cross-examined.  Therefore, JPMorgan is not

3  in a position to provide opinion testimony to this Court on

4  the availability of unsecured credit.

5        In short, your Honor, having failed to take the

6  simple step of genuinely testing the market for the

7  availability of unsecured credit, the city has failed to meet

8  its burden under Section 364(c) to demonstrate the

9  unavailability of such credit.

10        Second gateway issue, your Honor, is PA 436.  Oops.

11  This should be back to the -- Judge, Section 19 of PA 436,

12  which is what is up on the screen, provides that the

13  emergency manager must submit a proposal to borrow money to

14  the Detroit City Council.  Now, that requirement is in

15  Section 12(u).  They list various parts of Section 12.  The

16  requirement that a borrowing be submitted is Section 12(u),

17  which then has ten days to approve or disapprove.  In

18  addition, the City Council is given the opportunity if it

19  does not approve the proposal -- this is in 19(2) -- to seek

20  and propose an alternative with the same or presumably better

21  financial result.

22        Mr. Orr did, in fact, submit the Barclays proposal

23  to City Council.  This was City Exhibit 98.  But such

24  submission was incomplete.  It did not include the fee

25  letter, which was City Exhibit 93.  The fee letter -- it is

1  the fee letter which set forth what has been called market

2  flex, and your Honor may recall that market flex was the

3  ability that Barclays has if the loan is approved to go out

4  and to syndicate the loan to other lenders, and if it is

5  necessary to achieve a successful syndication, it is entitled

6  to raise the minimum interest rate under the facility from

7  3.5 percent up to 6.5 percent so that the market flex

8  provision and the specifics of it demonstrate a significant

9  variability in what might end up being the minimum interest

10  rate on the loan from 3.5 percent to 6.5 percent.

11      Other than the fact that there was market flex, the

12  substance of it was never provided to counsel.  This was

13  clear from the testimony of both Mr. Doak and Mr. Orr.  Mr.

14  Doak testified that,

15      "In discussions with City Council, the substance

16      of the market flex provision was not provided to the

17      City Council; right?

18      Answer:  No, it was not.

19      Question:  The city notes the existence of

20      market flex but does not actually disclose the

21      specific terms of the market flex; correct?

22      Answer:  Yes."

23      Mr. Orr testified first correctly that he provided

24  to City Council his submission, Exhibit 98.

25      THE COURT:  I'm sorry to interrupt you, sir, but,

1  again, I've been asked --

2          MR. MARRIOTT:  Oh, I'm sorry.

3          THE COURT:  -- to ask you to adjust the microphone

4  again and try to stay closer to it.

5          MR. MARRIOTT:  I apologize.  I get wrapped up in my

6  own argument.  Referring to Exhibit 98, which, as I

7  mentioned, was the -- Mr. Orr's submission under Act 436 to

8  the City Council,

9          "But Exhibit 98, the submission to City Council,

10          did not include a copy of the fee letter that we

11          just reviewed, which was Exhibit 93; correct?

12          I believe that's correct.

13          Just the term sheets that were attached to the

14          commitment letter; correct?

15          Yes."

16          And the term sheets, your Honor, did not contain the

17  scope of the market flex.  It merely identified that there

18  was market flex.  It was the fee letter that provided the

19  substance of the market flex.

20          "Now, other than this communication to City

21          Council regarding the proposed Barclays financing,

22          which does not include the fee letter, which has the

23          substance of the market flex provision, did you

24          personally otherwise communicate to City Council the

25          substance of the market flex provision that's

13-53846-tjt   Doc 2814-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 93 of 179
13-53846-swr   Doc 2512-1   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 88 of 179   93
290

1        contained in the see letter -- in the fee letter?

2            Answer:  No.

3            To your knowledge, did anybody else?

4            Not that I know of."

5        And Mr. Doak confirmed that he didn't.

6            Now, Judge, it goes without saying, but each of Mr.

7    Doak, Mr. Buckfire, and Mr. Orr confirmed it anyway.  The

8    cost of a credit facility is a key component in the

9    evaluating the attractiveness of the facility.  Mr. Doak,

10            "And you would agree with me that pricing was an

11            important fact when you were evaluating the various

12            proposals; right?

13            Answer:  Yes, it was."

14        Mr. Buckfire,

15            "And the cost of this facility was an important

16            factor in Miller Buckfire's evaluation of the

17            proposals; isn't that right?

18            Answer:  Yes."

19        Mr. Orr, who made the ultimate decision to accept

20    the financing,

21            "When you were asked earlier on direct what

22            factors you considered in making the selection, the

23            first factor you indicated was the cost of the

24            various alternatives available to you; correct?

25            Yes.

1          And, in fact, the cost of financing is an

2          important factor in deciding whether or not to

3          undertake a financing transaction; correct?

4          Answer:  Yes."

5     In keeping with the importance of knowing the true

6  cost of a financing facility and evaluating it, the testimony

7  makes clear that neither Mr. Buckfire nor Mr. Orr would

8  recommend -- I'm sorry -- neither Mr. Buckfire nor Mr. Doak

9  would recommend and Mr. Orr would not approve a financing as

10 to which they did not know the true cost.

11         Testimony of Mr. Doak,

12         "In fact, you would not have been in a position

13         to recommend the transaction to Mr. Orr if you were

14         not aware of the specifics of the market flex

15         provision; right?

16         Answer:  I think that's correct, yes."

17         Mr. Buckfire,

18         "Question:  I believe you testified earlier that

19         you ultimately recommended the Barclays proposal to

20         the emergency manager on the basis that it was --

21         and I think your phrase was 'the cheapest one.'  Do

22         you recall that testimony?

23         I do.

24         In order to evaluate among alternative what's

25         the cheapest one, you have to know what the cost of

13-53846-swr    Doc 2814-11  Filed 04/29/14  Entered 04/29/14 22:00:23   Page 95 of 179
13-53846-swr    Doc 2812-11  Filed 01/17/14  Entered 01/17/14 13:47:07   Page 90 of 179   95
290

1        each of the alternatives is; correct?

2            Correct.

3            I mean otherwise there's no basis to make a

4        comparison; correct?

5            Answer:  Correct."

6        And Mr. Orr, "And, indeed" --

7            "Question:  And, indeed, it would be imprudent

8        to accept a financing proposal if you did not know

9        what the cost of the financing would be; correct?

10           Answer:  It might be.

11           Well, it might be or it would be?

12           Generally, yes."

13       Now, the city -- let me first say, having said that

14   they wouldn't recommend a facility if they didn't know the

15   true cost and Mr. Orr saying he wouldn't approve a facility

16   if he didn't know the true cost, this is exactly what they

17   asked of City Council in supposedly complying with PA 436.

18   They recommended and sought approval of a facility as to

19   which they failed to disclose the true potential cost and

20   asked the city to do something that all three of them

21   indicated they would be unwilling to do.

22       Now, the city attempts to gloss over this failure by

23   stating that in meetings with council members -- Ms. Ball

24   referred to this in her argument -- Mr. Doak provided to such

25   members a range of possible rates.  This was in Exhibit 90.

1    This is page 6 of Exhibit 90, including the cover page.  This
2    is the range that the city testified to and that Ms. Ball was
3    arguing from, and it's in the middle there.  And the argument
4    is that this range covered the upside of the market flex,
5    yet, your Honor, a range is not what was provided to Mr. Orr,
6    but, rather, the actual terms of the market flex.  If we
7    could have Exhibit 89, and if we could go to page 6, which is
8    the last page.  Well, maybe one more page.  This is what was
9    provided to Mr. Orr.  This doesn't just have some
10   hypothetical range.  This shows the actual terms of the
11   market flex so that he had available to him the specific
12   information.  And if we could go back to the PowerPoint.  And
13   this is what Mr. Doak says.  Mr. Doak testified that merely
14   having a range of possible interest rates without knowing the
15   actual possible interest rate would be insufficient for him
16   to make a recommendation to the emergency manager.
17            "Okay.  Now, in providing information to
18            Mr. Orr, you didn't provide a range of potential
19            rates from five to nine percent.  You provided the
20            actual potential interest rates, market flex and
21            all, under each of the commitments that the city had
22            in time -- had in hand at the time; correct?
23            Yes.
24            Would you have considered yourself adequately
25            advising him on the potential costs of these

1    facilities?  Instead of giving him the actual

2    interest rates, you just gave him a range?

3         Answer:  No."

4    Moreover, your Honor, when the time came ten days

5    later to prevent a -- to present a briefing to City Council

6    on the Barclays transaction itself, the only substantive rate

7    information given was the low end of the possible rate on the

8    Barclays loan, 3.5 percent.  And if we could go to Exhibit

9    91, which are the materials presented to City Council at that

10   time for that briefing -- look at Exhibit 91.  Under

11   "Pricing" on page 6 of that LIBOR plus 250 basis points, 100

12   basis points, floor; i.e., 3.5 percent as the minimum rate,

13   what do they say about market flex?  Subject to market flex.

14   Don't say what it is.  Don't see any interest rate ranges

15   there.  The only number available to City Council is 3.5

16   percent.

17        Now, Judge, one response to this might be, well,

18   City Council said no anyway.  They just would have said no

19   more vigorously if they'd known the complete interest rate

20   provisions for the Barclays proposal, so no harm.  Well,

21   there are two responses to that, your Honor.  The first is

22   appointment of an emergency manager is an extraordinary step

23   involving the shifting of control over a city from its

24   elected representatives to a state appointee with only a

25   limited reserved role for those elected representatives.  One

1  such limited reserved role is the ability to approve or
2  disapprove borrowings by the city.  The integrity of that
3  limited role is undermined if the emergency manager is
4  permitted to withhold material information when seeking such
5  approval or disapproval.

6          Moreover, just as an example, what if the City
7  Council had instead said yes thinking the interest rate was
8  3.5 percent only to find out later that due to market flex it
9  had jumped to 6.5 percent?  A transparent process would
10 prevent that sort of outcome from happening.  A process where
11 material terms are kept from City Council invites such an
12 outcome, if not here, the next time with something else, and
13 highlights the need for the emergency manager to make full
14 disclosure.

15         Now, second, Section 19 does not just give City
16 Council the ability to approve or disapprove.  There is the
17 corollary right to seek an alternative proposal that would
18 yield the same or better financial result.  The City Council
19 has -- if the City Council has withheld from it material
20 information about the true cost of the loan proposal put
21 forth by the emergency manager, its ability to exercise this
22 right is frustrated, what's its target?  How will it know
23 it's found a better deal if it doesn't know the material
24 terms of the deal before it?  It may well have been
25 impossible for City Council to find an equivalent or better

1  financing proposal at 3.5 percent, and that's all it knew in

2  terms of what its target might be.  If it had known it might

3  go up to 6.5 percent, it might have had a better shot at

4  finding a proposal that it could present as at least as good.

5       Accordingly, your Honor, in sum, the city has failed

6  to satisfy its second gateway hurdle either.  It has not

7  really complied with PA 436 because it really did not provide

8  to City Council all the material terms of the proposal it was

9  asking it to approve and the proposal that the City Council

10 had the right to try to seek an alternative for.  Both for

11 this reason and because of the city's failure to meet is

12 burden under 364(c) to demonstrate the unavailability of

13 unsecured credit, it's our position, your Honor, that the

14 city's motion to approve post-petition financing should be

15 denied.

16       THE COURT:  Thank you, sir.  Stand by, please.  All

17 right.  We'll break for lunch now.  I'm showing 82 minutes

18 left for the objecting parties' arguments.  We'll reconvene

19 at 1:30, please.

20       THE CLERK:  All rise.  Court is in recess.

21    (Recess at 11:44 a.m., until 1:30 p.m.)

22       THE CLERK:  All rise.  Court is in session.  Please

23 be seated.  Recalling Case Number 13-53846, City of Detroit,

24 Michigan.

25       THE COURT:  It appears that everyone is here.  Let's

13-53846-swr  Doc 4211  Filed 04/29/14  Entered 04/29/14 13:27:00  Page 100 of 175
13-53846-swr  Doc 2511  Filed 01/17/14  Entered 01/17/14 13:47:07  Page 95 of 175  100
290

1    proceed.

2              MS. GREEN:  Good afternoon, your Honor.  Jennifer

3    Green on behalf of the Retirement Systems for the City of

4    Detroit.  Before I begin, can I just confirm how much time we

5    have left?

6              THE COURT:  I'm showing 82 minutes.

7              MS. GREEN:  And one additional housekeeping matter

8    before I begin.  I just wanted to inform the Court that the

9    deposition transcripts for the witnesses who were not called

10   live have been provided to the court clerk as of this

11   morning.

12             THE COURT:  Okay.  Let me just be sure I have the

13   ones you're thinking about.  I have Mr. Turbeville.

14             MS. GREEN:  Yes.

15             THE COURT:  Mr. Corley.

16             MS. GREEN:  Yes.  There were only two.

17             THE COURT:  Oh, those are the two.  Okay.

18             MS. GREEN:  You have them both.

19             THE COURT:  Actually, one more housekeeping matter.

20   It would help me if I could have hard copies of the other

21   PowerPoint slideshows that were used during closing

22   arguments --

23             MS. GREEN:  Yes, your Honor.

24             THE COURT:  -- if those are available.

25             MS. GREEN:  How many copies would you like?

13-53846-swr   Doc 4211   Filed 04/29/14   Entered 04/29/14 13:27:00   Page 101 of 175
13-53846-swr   Doc 2311   Filed 01/17/14   Entered 01/17/14 13:47:37   Page 96 of 170     101
290

1          THE COURT:  Just the one is fine.

2          MS. GREEN:  Just one.  Okay.

3                    CLOSING ARGUMENT

4          MS. GREEN:  This morning Ms. English addressed the

5   validity of the casino revenue pledge as it relates to the

6   assumption motion, and I will be addressing the validity of

7   that pledge as it relates to the financing motion.

8   Specifically, I'm addressing the proposed order submitted by

9   the city in connection with its financing motion and whether

10  the city has carried its burden of showing the validity of

11  the pledge in support of the proposed Barclays loan.

12         So let's start by taking a look at the proposed

13  order itself.  The proposed order the city seeks to have

14  entered by this Court states that the city is authorized to

15  grant perfected security interests in and liens on the

16  quality of life bond collateral, which is the casino revenue.

17  And the picture here is of the proposed order, page 3.  The

18  proposed order also requests that this Court find the pledge

19  of the casino revenue to be valid, binding, enforceable and

20  nonavoidable.  Thus, the city has the burden of establishing

21  that its pledge of the casino revenue as collateral is valid

22  and enforceable, but in order to do so, the city must first

23  establish, number one, that the casino revenue can be pledged

24  as collateral for a financial obligation of the city, and,

25  number two, if it can be pledged, that the purpose for which

 1    the city intends to use those quality of life funds in this

 2    case complies with Section 12 of the Gaming Act.

 3           And with respect to this first issue, the glaring

 4    problem with the city's proposed order is that the city has

 5    not once during this proceeding taken the position that the

 6    pledge of the casino revenue is actually permissible, yet it

 7    seeks this Court to order that it is, indeed, permissible.

 8    For example, you may recall that during the city's closing

 9    arguments on January 3rd, the city emphasized how low the

10    burden is for the city to seek approval of the swap

11    settlement under the business judgment standard, and the city

12    urged this Court that the lowest point of reasonableness is

13    all that is necessary under that standard.  And in support of

14    its theory of the case, the city has argued that in order to

15    prevail, all it has to establish is that there's a chance

16    that the casino revenue lien is invalid; that there's

17    arguments on both sides; and that while there may be doubt as

18    to whether the casino revenue can even be pledged in the

19    first place, it is this doubt and this uncertainty that is

20    causing it to settle in the first place.  And this

21    uncertainty might be acceptable, although the objecting

22    parties don't agree, but it might be acceptable under a Rule

23    9019 analysis or under a business judgment analysis, but this

24    uncertainty, which is now all that is in the evidentiary

25    record, does not satisfy the burden the city must establish

13-53846-swr   Doc 4211   Filed 04/29/14   Entered 04/29/14 13:22:09   Page 103 of 175
13-53846-swr   Doc 2311   Filed 01/17/14   Entered 01/17/14 13:47:37   Page 98 of 175   103
290

1  for this Court to enter an order with findings that the city
2  is actually authorized to pledge the casino revenue.  The 50-
3  50 chance that you've heard all about is not enough, for
4  instance, to demonstrate to this Court that the casino
5  revenue can actually be pledged in compliance with Michigan
6  law.

7          And the second issue is, even assuming this Court
8  were to find that generally the casino revenue can be used as
9  collateral for a financial obligation of the city, a separate
10  issue is that the quality of life proceeds must actually be
11  used for one of the eight enumerated purposes under the
12  Gaming Act, and, once again, the city has boxed itself sort
13  of into this impossible position.  It's argued that the scope
14  of your review was so narrow that it does not have to concern
15  itself with how the funds are used, but the problem with that
16  is the city is now stuck with a record that is barren of any
17  facts or testimony sufficient to enable this Court to satisfy
18  itself that the funds will, indeed, be used in compliance
19  with Section 12 of the Gaming Act.  And, in fact, not only is
20  the record barren of any testimony averring that the funds
21  will be used for any particular purpose, the only affirmative
22  testimony on point actually came from Ken Buckfire, who
23  admitted the funds would be used only as working capital,
24  nothing more, and, you know, not for any particular quality
25  of life program.  So as we will see in the next few slides,

13-53846-swr   Doc 4211-11   Filed 04/29/14   Entered 04/29/14 13:22:00   Page 104 of 170
13-53846-swr   Doc 2311-2   Filed 01/17/14   Entered 01/17/14 13:47:37   Page 99 of 105
290
104

1   there's nothing in the record to establish either of these

2   two elements to the case.

3          This morning Ms. English went over the Gaming Act

4   and the eight enumerated purposes, so I will not reread them

5   into the record.  Subsection 5 is the section that the city

6   is seeking to hang its hat on, and it states that other

7   programs that are designed to contribute to the improvement

8   of the quality of life in the city.  Notably, as Ms. English

9   stated this morning, hiring, training, deployment of street

10   patrol officers, public safety programs, things of that

11   nature, are specifically provided for in the Gaming Act, and

12   yet rather than commit to any of those purposes, the city has

13   said that it wants to fall within the catch-all of the

14   improvement of the quality of life for the citizens in the

15   City of Detroit.  But as admitted by the city and its

16   witnesses, there's nothing in the Gaming Act and in those

17   eight provisions in particular that permits the funds to be

18   used as security for a loan, and Kevyn Orr admitted as much

19   during his direct exam.  And we have quoted here his

20   testimony where he states, "Under the state's Gaming Act,

21   there was an argument that the pledge of the casino revenue

22   in 2009 to -- as collateral for the COPs was inappropriate.

23   Section 12 of the Gaming Act.  It was my understanding there

24   were certain limited uses of the gaming revenue -- approved

25   uses by state law and that there was an argument that to

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 13:22:00   Page 105 of 179
13-53846-swr   Doc 2312   Filed 01/17/14   Entered 01/17/14 13:22:07   Page 100 of 279
290
105

pledge it for collateral was inappropriate."  And when he was
asked by his counsel why it was inappropriate, Mr. Orr
explained, "there were certain specified uses under the
Gaming Act generally for programs, street patrol officers,
educational programs, or improve the quality of life in the
city," but he admitted the act did not specify the use of
gaming revenue as collateral for an unrelated debt.

       And you may also recall that Mr. Orr mentioned that
weaknesses with respect to the pledge of the casino revenue
claim was that there were legal opinions in support of the
pledge and that City Council had voted and even passed an
ordinance supporting the pledge.  Notably, with respect to
the post-petition financing, there is no such legal opinion
opining that the casino revenue pledge is appropriate, and
City Council resoundingly voted down the proposed Barclays
loan.

       To add to this uncertainty, the city has never been
willing to commit what it will use the funds for in writing
in any of its papers.  What we have on the screen for you is
the actual motion that was filed in support, and it is
Document Number 1520 on the docket, and the city would only
go so far as to state that the quality of life note, quote,
"may ultimately be used to fund reinvestment initiatives such
as police, fire, and blight."  The word "may" is the same if
you continue into the proposed order that the city has filed

13-53846-swr   Doc 4311-11   Filed 04/29/14   Entered 04/29/14 13:22:00   Page 106 of 79
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:22:07   Page 101 of 106
290

1  on the docket.  It just states that after the loan is closed,
2  then the city will provide some sort of report regarding what
3  the funds are used for, not before closing and not before
4  this Court is being asked to enter an order that actually
5  signs off on the validity of the pledge.  In other words, the
6  city just says to the Court, "Trust us.  We'll use it for a
7  good purpose, and we'll report back 30 days after closing."
8  And, again, the problem with this is that the city is asking
9  for this Court to approve the use of the casino revenue
10  without having first confirmed to the Court that it will use
11  it for one of the purposes specified in the Gaming Act.

12      Furthermore, the city's own witnesses and documents,
13  which make up the evidentiary record in this hearing,
14  demonstrate that no such quality of life usage is guaranteed
15  to occur in this case.  Ken Buckfire, the city's investment
16  banker, admitted that the quality of life loan proceeds are
17  really intended to provide adequate working capital and that
18  the Barclays financing is a true working capital facility.
19  he also admitted the title of the loan as a quality of life
20  loan is actually not the best choice of words because it
21  probably should have just been called a working capital loan.

22      And internal e-mails such as this one also
23  demonstrate that the proceeds are not intended to provide an
24  improvement of the quality of life for the citizens of
25  Detroit but, rather, to provide general fund liquidity, which

1    is consistent with Mr. Buckfire's prior testimony.  And here
2    we have an August 29th e-mail that says use of the proceeds
3    is to financing the swap termination and provide general fund
4    liquidity through the Chapter 9 case.
5            Jim Doak from Miller Buckfire also admitted that
6    this moniker "quality of life" was created by Jones Day
7    attorneys in late August of 2013 after they had had
8    discussions relating to the restrictions in the Gaming Act,
9    and he testified that they were aware of these limitations
10   under Michigan law and that they had attempted to structure
11   the loan in such a way that the casino revenue pledge would
12   be less controversial.  And he also testified that some
13   lenders were still concerned about the casino revenue pledge
14   as was City Council.  In fact, City Council had asked a
15   question in writing when they were doing their due diligence
16   into the Barclays loan, and they asked a question about under
17   the Gaming Act, which lists the restrictions on the use of
18   the wagering taxes, which category allows the use of wagering
19   taxes to secure the swaps or the proposed financing, and the
20   portion that's highlighted there, the city's answer was, "In
21   connection with the proposed post-petition financing, the
22   city intends to rely on the federal Bankruptcy Code to
23   authorize the pledge of collateral, including the wagering
24   taxes," which is not an answer, and in addition to their
25   motion, their proposed order, Jim Doak's testimony, Ken

13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 108 of 79
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:42:07   Page 103 of 279
290

1  Buckfire's testimony, their internal e-mails and now this

2  written response to City Council, there has never been a

3  commitment to use the funds for any particular purpose.

4       The deposition that was filed today is one of Mr.

5  Irvin Corley.  He was the executive policy manager tasked

6  with actually conducting the due diligence for City Council

7  in relation to the Barclays financing, and he testified at

8  his deposition that the emergency manager's consultants

9  indicated to him during this due diligence period that the

10  state gaming law would not allow the gaming tax to be used as

11  a pledge and that there were concerns involving using the

12  casino revenue as a pledge.

13       In conclusion, there's nothing in the evidentiary

14  record to support the city's position that the casino revenue

15  can be pledged as collateral in general in any case, nor is

16  there any evidence that the quality of life funds in this

17  case under the Barclays loan will actually be used for a

18  quality of life purpose as required by the Gaming Act, and,

19  in fact, the only affirmative evidence in the record

20  clarifies that the funds are going to be used as nothing more

21  than straight working capital throughout the Chapter 9 case.

22  And the city made its bed by arguing that the scope of this

23  Court's review is so narrow that it need not concern itself

24  with how the funds are going to be used, but now the city has

25  to lie in that bed, and, as a result, we're stuck with a

13-53846-swr   Doc 2314-11   Filed 04/19/14   Entered 04/19/14 22:00:23   Page 104 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 109 of
290

```
 1  record that is barren of any facts that would satisfy this
 2  Court that the funds will be used in a purpose in accordance
 3  with Michigan law.
 4          THE COURT:  Thank you.
 5          MS. GREEN:  Thank you, your Honor.
 6                    CLOSING ARGUMENT
 7          MR. BENNETT:  Good afternoon, your Honor.  Ryan
 8  Bennett with Kirkland & Ellis, and I represent Syncora.  Your
 9  Honor, my colleague, Stephen Hackney, sends along his
10  regards.  This morning Mrs. Hackney gave birth to a beautiful
11  baby daughter.  Steve is at home in Chicago with the family.
12          So today in my closing, your Honor, I'd like to
13  focus on the process that the emergency manager undertook in
14  connection with the proposed DIP financing transaction.  The
15  objectors have decided to spend some time on this issue
16  because we believe that the process surrounding the DIP
17  financing is important both with respect to approval of the
18  pending DIP motion and also with respect to the overall
19  bankruptcy case.
20          The focus of my presentation, therefore, is on the
21  flaws in the debtor's approach to date and how such
22  shortcomings impact the finding of reasoned business judgment
23  that the city is requesting from your Honor.  In addition,
24  I'd like to briefly offer some thoughts on the overall
25  process and how the debtor's handling of the DIP financing
```

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 105 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 105 of 179   110
290

1   and -- has the potential to frustrate plan confirmation.  In

2   both the Section 364 and Chapter 9 context, the process is

3   just as important as the substance, and to date we feel like

4   there have been a number of flaws in the emergency manager's

5   process made evident by the lack of any consensus around a

6   Chapter 9 plan to date among the debtor and any of its

7   creditor constituencies.

8           In sum, the purpose of my closing is not just to

9   identify flaws, though, your Honor, but, rather, to outline a

10  better process based on both the purpose and policies behind

11  Chapter 9 and how other municipal debtors have handled their

12  Chapter 9 cases in the past, specifically <u>Orange County</u>.  In

13  particular -- and I know the Court shares my view -- I think

14  it's important that this process be one that focuses on

15  consensus, something that has been clearly and unfortunately

16  absent from the transaction in the debtor's overall process

17  to date.

18          THE COURT:  You're going to argue that any such loan

19  should be in the context of plan confirmation?

20          MR. BENNETT:  Come again, your Honor.

21          THE COURT:  You're going to argue that any such loan

22  should be in the context of plan confirmation?

23          MR. BENNETT:  That's part of my argument, your

24  Honor, yes.

25          THE COURT:  Well, then I hope you'll address why

1    Congress would have made Section 364 applicable in Chapter 9.

2              MR. BENNETT:  Sure, and that'll come up in the

3    context of the <u>Orange County</u> discussion, your Honor.  Thank

4    you.  So as your Honor clearly stated in the -- that its

5    review in relation to the DIP motion will not include the

6    city's proposed uses and needs of the DIP financing, and

7    while that is a limited scope of review and we certainly

8    respect it, the debtor still must show how it's exercised

9    sound business judgment in soliciting, negotiating, and

10   executing the DIP, particularly at this point in its case.

11   The Court itself -- or the city itself acknowledged that

12   review of the DIP motion pursuant to 364 requires the Court

13   to analyze its business judgment.  Specifically, the city

14   noted that for the DIP motion to be approved, the city's

15   business judgment cannot run afoul of the provisions of and

16   policies underlying the Bankruptcy Code, and the main policy

17   and purpose underlying Chapter 9 is to allow a municipal

18   debtor to continue its operations while it refinances or

19   adjusts its creditors' claims with minimum in some -- in most

20   cases no loss to creditors.

21             So to ascertain whether the debtor's business

22   judgment is reasonable, it's important to look at the DIP

23   motion in the context of the broader proceedings.  As a

24   threshold matter, Syncora agrees that Detroit needs help.

25   Many of its citizens need help, but the focus of this Chapter

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 14:22:00   Page 112 of 179
13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 14:22:00   Page 112 of 179
290
112

 1   9 case is a limited one.  As this Court recognized in its

 2   eligibility ruling, the debtor's focus here and now should be

 3   on building consensus around a confirmable Chapter 9 plan, a

 4   plan that adjusts Detroit's balance sheet and allows it to

 5   have access to liquidity going forward.  Substantial

 6   borrowing and spending may be necessary for the city's

 7   ultimate revitalization, but this case is first and foremost

 8   a debt adjustment process.  As noted, Chapter 9 is and has

 9   always been a forum to restructure municipal debts in a

10   consensual fashion where possible.  This is a Bankruptcy

11   Court sitting in Chapter 9.  It's not some type of an

12   emergency triage center for municipal ailments.  It has a

13   focus, which is debt adjustment through a plan, and we

14   believe that should be the debtor's focus, particularly one

15   that's built around and focused on consensus.  The city's

16   decision, unfortunately, is, instead --

17          THE COURT:  What in the Bankruptcy Code says that

18   there is a consensus required before the city can borrow

19   money?  364 doesn't require that.

20          MR. BENNETT:  No, but --

21          THE COURT:  If Congress intended that, they would

22   not have made 364 applicable in Chapter 9 but would have made

23   a permissive provision of plans to borrow money.

24          MR. BENNETT:  Yeah.  Your Honor, I think it's a

25   sequence issue and really that, you know, 364 is available to

1  debtors in Chapter 9.  No doubt about it.  But the key factor

2  here is that the debtor, for whatever reason, decided to

3  proceed forward with this 364 request before ever having any

4  consensus developed in the case.  As Mr. Ellenberg said --

5          THE COURT:  What's the problem with that?

6          MR. BENNETT:  It's actually creating angst and

7  frustration in the bankruptcy case so that because of this,

8  for whatever reason, hurried request, we have no consensus in

9  the case.  As Mr. Ellenberg said, his clients are the only

10  ones to date that have reached any kind of agreement with

11  this debtor when the real focus of this process and this case

12  should be on forming consensus around a Chapter 9 plan.

13  Instead, we've had the opposite.  We've had an alienation of

14  consensus, and --

15          THE COURT:  So the Court should deny the motion

16  because it's impeding consensus on the plan?

17          MR. BENNETT:  The Court should deny the motion for

18  that reason because it's a -- it represents a bad exercise of

19  the debtor's business judgment or, alternatively, the Court

20  could adjourn the motion to be heard in connection with the

21  Chapter 9 plan once the city then focuses on consensus.  Now,

22  there are additional risks, and I will get into that

23  momentarily, but, your Honor, so far the date has really --

24  the focus has really been on these piecemeal motions, these

25  one-off transactions that have really all worked against the

1   consensus that we all want to reach in the context of this

2   Chapter 9 case.  The assumption motion was the first example.

3   Then we had the Public Lighting Authority motion as the next,

4   and now the DIP is the latest iteration.  What's next?  Will

5   it be the art collection?  Will it be the DWSD?  I don't know

6   what other, you know, more transactions need to be negotiated

7   on this one-off basis outside of the creditor body's

8   consensus and protections that are afforded to it through a

9   Chapter 9 process.

10          THE COURT:  I will ask you what I asked Mr.

11  Hackney --

12          MR. BENNETT:  Um-hmm.

13          THE COURT:  -- when you raised the same issue about

14  public lighting.  Is it your position that the people of the

15  City of Detroit have to wait for safe lighting for a plan of

16  adjustment?

17          MR. BENNETT:  Your Honor, if the emergency manager

18  wants to implement initiatives, he can under state law.  All

19  right.  Like your Honor has recognized, like the debtor has

20  argued multiple times, 904 provides for that opportunity.

21  All right.  He does not need to come to the Bankruptcy Court

22  if that's what he's trying to do.  And if that -- and if he

23  has -- now, he does, to a degree, do so at his peril to the

24  extent -- and as I'll talk about with the Fano decision out

25  of the Ninth Circuit, to the extent you're alienating value

13-53846-swr   Doc 2312-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 115 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:47:37   Page 116 of 179
290

 1   to the detriment of creditors outside of a plan, you do

 2   create potential confirmation problems down the road, but to

 3   the extent the emergency manager needs to focus on

 4   initiatives such as public lighting, such as police, he can.

 5   He's protected.  You know, he has the -- he has the -- you

 6   know, like I said earlier, this is a limited forum, I think

 7   your Honor has recognized.  The thing is that he keeps coming

 8   back to you for things like good faith findings, for, you

 9   know, various other Chapter 9 bankruptcy relief that

10   implicates issues such as -- you know, that would really put

11   us more appropriately focused on a Chapter 9 plan.  Now,

12   again, like I said --

13           THE COURT:  So the answer to my question, if I

14   understand you correctly, was if the emergency manager

15   decides that authorization from the Court is either necessary

16   or appropriate, then, yes, the citizens of Detroit have to

17   wait for plan confirmation?  Do I have that right?

18           MR. BENNETT:  Yes, your Honor.  I think that's the

19   appropriate use.  Your Honor doesn't have to.  Okay.  Your

20   Honor can enter an order approving this stuff now, as you're

21   fully aware.  There is a problem, though, there.  Number

22   one --

23           THE COURT:  I'm asking you -- I'm asking your

24   client's position on these questions.

25           MR. BENNETT:  Yep.

13-53846-swr   Doc 2314-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 116 of 179
13-53846-swr   Doc 2312   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 116 of 179
290

1     THE COURT:  So the citizens of Detroit have to wait

2  for safe lighting when the city manager -- or the city

3  emergency manager decides that it's necessary or appropriate

4  to get court permission because that then would have to wait

5  for plan confirmation?

6     MR. BENNETT:  If the citizens -- if the City of

7  Detroit wants to get out of bankruptcy quick -- in an

8  expedient fashion, then it should wait before it gets that

9  type of relief because what this is doing -- what these one-

10  off motions are doing is creating angst and discontent among

11  the creditor pool and potentially alienating --

12     THE COURT:  What about the safety of the citizens?

13     MR. BENNETT:  Pardon?

14     THE COURT:  What about the safety of the citizens?

15     MR. BENNETT:  Like I said, then Mr. Orr doesn't need

16  to come to your Honor for the relief; right?  He can just

17  implement initiatives in his governance capacity of the city.

18  The emergency manager statute is very broad.

19     THE COURT:  So in deciding between necessary and

20  appropriate process in Bankruptcy Court and citizen safety,

21  he's got to choose one or the other?

22     MR. BENNETT:  If he wants to move forward on an

23  initiative for the benefit of the citizens, he can do so

24  outside of Bankruptcy Court.  To the extent he wants to come

25  to Bankruptcy Court, he needs to remember what the focus is

1   about, and it's about debt adjustment through a plan with the

2   protections associated with a plan and plan confirmation.

3   These one-off approaches outside of that context are

4   stretching out this process and potentially --

5           THE COURT:  How is it stretching out the process?

6           MR. BENNETT:  -- endanger -- your Honor, we're six

7   months into this bankruptcy case, and there is zero consensus

8   at this point among the city --

9           THE COURT:  What about the process?

10          MR. BENNETT:  -- and its creditors.  The city should

11  have been focused on a plan up front instead of spending all

12  this money and focus on these one-off transactions that are

13  the antithesis to it, that really are alienating creditors in

14  the process, so the --

15          THE COURT:  Where's the evidence of that?

16          MR. BENNETT:  Well, the fact we don't have any

17  consensus standing here.

18          THE COURT:  Where's the evidence of that?

19          MR. BENNETT:  None has been announced, none that I'm

20  aware of, your Honor.

21          THE COURT:  Wasn't there a major announcement by the

22  mediators today of a consensus?

23          MR. BENNETT:  There was an announcement about a

24  potential deal around art.  I don't know if anyone, including

25  the potential beneficiaries of that deal, are on board with

13-53846-swr   Doc 2314-11   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 118 of 179
13-53846-swr   Doc 2512-11   Filed 01/29/14   Entered 01/29/14 22:00:23   Page 118 of 179
290

1    that arrangement.  I mean it was just a kind of --

2            THE COURT:  Well, but it's progress.

3            MR. BENNETT:  Potentially.  I don't know, your

4    Honor.

5            THE COURT:  All progress is potential until it's

6    done.

7            MR. BENNETT:  Um-hmm.  Now, I'm trying to make

8    some -- I'm trying to understand why the -- hang on -- excuse

9    me -- why the city is focused on going forward with these

10   what I've called piecemeal motions.  There we go.

11           THE COURT:  Okay.

12           MR. BENNETT:  And --

13           THE COURT:  One second, sir.  Okay.  Go ahead, sir.

14           MR. BENNETT:  Okay.  Sure.  And a lot of it is --

15   comes out of some of what Mr. Buckfire said during his

16   testimony that time is not the city's friend, it's got to

17   move forward with this forbearance agreement, yet that record

18   failed to establish really anything that sounded persuasive

19   in terms of why the city should move forward with this

20   transaction right now, both the forbearance agreement and the

21   DIP, recognizing that they both are contractually tied.

22   Mr. Buckfire noted the delay between executing the

23   forbearance agreement in June and the present day worked in

24   favor of the city as interest rate -- rising interest rates

25   have reduced the swap termination payment.  He also conceded

1  that it would be economic irrational -- economically

2  irrational for the swap counterparties to exercise their

3  optional early termination right as long as they were in the

4  money.  He recognized that, so I don't know where the rush

5  comes from in the context of needing to have this forbearance

6  agreement and DIP dealt with now versus in the plan once

7  we've got some consensus around the table, your Honor.  The

8  city -- the evidence at trial failed to show that.

9        You know, we also hear things about that there's

10 this 18-month term for Mr. Orr, you know, and that's used in

11 various contexts to describe why the case needs to move

12 faster and transactions such as the DIP and the forbearance

13 agreement need to be expedited, and, you know, Mr. Orr's

14 testimony, Mr. Buckfire's testimony supported that, that

15 that's the city position, but the key thing is is that Orr's

16 term does not expire in 18 months.  The City Council can

17 remove him by two-thirds vote, but even if they were -- okay.

18 And we know who the City Council is.  And even if they

19 were -- okay -- we know, you know, what their position is on

20 a lot of issues, but even if they were to remove him, the

21 governor can put somebody new in place -- all right --

22 because the governor can decide that the emergency situation

23 has not been fixed, and we can -- and we can remain in

24 emergency management until the consensus is developed and the

25 case is executed.

1      Now, as a result of this kind of hurried approach,

2  right, to the forbearance agreement and the DIP financing,

3  you also have just some breakdowns in just the process around

4  the DIP in general, as Mr. Marriott pointed out earlier;

5  right?  We've got a clear hole in the approach where the city

6  failed to look for unsecured financing where in a scenario

7  like this, it probably -- I would think that that would be a

8  probable course where you've got administrative superpriority

9  status available to you, designated revenue streams.  That

10  would seem to be at least something worth asking a couple

11  questions.

12      THE COURT:  What's hurried about the Court's

13  consideration of a motion in -- a DIP motion that was filed

14  on the first day five months later?

15      MR. BENNETT:  I'm sorry.  Can you say that one more

16  time?  I apologize.

17      THE COURT:  What's hurried about the Court's

18  consideration of a motion that was filed on the first day of

19  the case five months later?

20      MR. BENNETT:  What's hurried about it is that it's

21  ahead of the plan, which is the main focus of a Chapter 9

22  case and should be all of our focus.  And it's distracting,

23  and it's taking away the city's resources, and it's

24  alienating its creditor constituents where all that energy

25  could be focused on the end game, which is a Chapter 9 plan.

1          Now, as further evidence that the city's approach --

2    the emergency manager's approach to the transactions are

3    outside of its sound business judgment, the City Council, the

4    only elected officials involved in the DIP process and

5    arguably the people most familiar with the interests of the

6    citizens of Detroit, emphatically rejected the DIP financing.

7    City Council made detailed findings with respect to the

8    proposed DIP financing, and they filed those on the docket,

9    and I'm sure your Honor has reviewed them.  Among those

10   findings are that the proposed DIP financing transaction is

11   an extremely complex deal on a number of fronts.  It does not

12   seem to be in the best interest of the city.  The DIP appears

13   to be, quote --

14          THE COURT:  I actually have not reviewed that

15   document.  Is it in evidence here?

16          MR. BENNETT:  It is.  It's EEPK Exhibit 805.

17          THE COURT:  805?  Thank you.

18          MR. BENNETT:  The DIP appears to be putting the

19   interests of lenders before the interests of the city and

20   residents, end quote.  The goal seems to be to ensure

21   protection of the lenders at the detriment of all other

22   interested parties, end quote.  The presentation -- or the

23   resolution goes on.  The city still moves forward

24   notwithstanding the City Council's political decision in that

25   regard.

13-53846-swr    Doc 2314-11    Filed 04/29/14    Entered 04/29/14 13:22:00:23    Page 122 of 179
13-53846-swr    Doc 2512    Filed 01/17/14    Entered 01/17/14 13:22:07    Page 91 of 179
290
122

1    Now, notably the city has correctly pointed out that
2  in the course of the process, my client, Syncora, did provide
3  a DIP proposal to the City Council, and, now, unlike
4  Barclays, my client is an incumbent creditor in this case,
5  and unlike the swap counterparties, we are long in Detroit.
6  We are going to be here, and we're not looking to exit.  All
7  right.  And so we had to look at the various alternatives
8  that were in front of us at the time understanding that we,
9  unlike the debtor, do not dictate the process and approach,
10  and we needed to explore contingency plans.
11        THE COURT:  Better than Barclays' deal?
12        MR. BENNETT:  The city determined it was not, it was
13  not better, and the City Council -- I'm sorry.
14        THE COURT:  I'm asking you.
15        MR. BENNETT:  I do think our deal was better than
16  the Barclays deal, yeah --
17        THE COURT:  How?
18        MR. BENNETT:  -- your Honor.  Because, among other
19  things, we had a lower -- well, let's see.  What did we do?
20  We had a -- we did not put restrictions on the asset sales,
21  on the city's ability to make asset sales and what would
22  happen with those proceeds, including -- and we also improved
23  our rate so that it was consistent with Barclays' rates,
24  reduced the fees that we'd previously put in there, but I
25  believe there was a determination that for whatever reason we

1   were not up to snuff in terms of our --

2          THE COURT:  I want to make sure I understand your

3   position.  Is it your position that the city, in proposing

4   this lending, did not exercise sound business judgment

5   because there was a better offer on the table --

6          MR. BENNETT:  No.

7          THE COURT:  -- from your client?

8          MR. BENNETT:  No, your Honor, no.

9          THE COURT:  Oh, all right.

10          MR. BENNETT:  This is merely a footnote.  I think

11   this is -- we would want -- we want this DIP denied.  We want

12   no DIP in the case, all right, not ours, not anybody's, but

13   we recognize --

14          THE COURT:  No DIP?  Okay.  Why did you offer one

15   then?

16          MR. BENNETT:  No.  That was where I was going with

17   my point is that we did it because we did it as a contingency

18   plan because we knew that -- we knew that we didn't control

19   the process and it was likely that even when we make our

20   objections here, were -- you know, were it to be

21   unsuccessful, and if we've got an alternative in place, which

22   is an alternative DIP, it gives us a fallback.  Like I said,

23   we're an incumbent creditor, so -- so I mentioned earlier

24   Orange County, so the only other major DIP post-petition

25   financing in Chapter 9 that we've been able to locate is

120

Orange County, and it was a significant number, 278 million, back in '95. Now, the difference, though, is notable in the context of when you compare where Orange County was in the context of its Chapter 9 cases versus where Detroit is today, so in Orange County, unlike the present case, the DIP financing had significant creditor support. It did not prejudice creditor recoveries and was negotiated in a transparent manner as part of a settlement that facilitated a resolution of all claims -- nearly all claims in the case. The Orange County proposal came later in the case, in the bankruptcy case, and closer to a plan, and a plan which provided for full creditor recovery. That's the significant difference, your Honor. Here you have creditors who to date have just seen the June 21 proposal which shows their unsecured recoveries getting significant impaired, and Orange County, on the other hand, had a scenario where those creditors got a hundred cents on the dollar.

Now, in further contrast -- I mean at this point the city's DIP has virtually no support, no creditor support, and was negotiated behind closed doors with little transparency, and there's almost no claims except those of the swap counterparties and at the same time allows 285 million to come on top of the capital stack to the prejudice -- to the potential prejudice and the prejudice of creditor recoveries, so this takes me to what I mentioned earlier, which is the

13-53846-swr Doc 2314-11 Filed 01/14/14 Entered 01/14/14 13:22:00 Page 125 of 79
290

1   part about where I talk about how debtor's plan confirmation

2   prospects are being permanently prejudiced.  As courts have

3   recognized, preplan expenditures by a Chapter 9 debtor may

4   threaten the debtor's ability to confirm a plan of

5   adjustment, and this is specifically the Ninth Circuit

6   decision in <u>Fano</u> where the <u>Fano</u> -- where the water authority

7   took -- the irrigation authority took money during the case

8   and before the plan and spent it toward improvements for

9   the -- excessive improvements toward the irrigation facility

10  and then came later to the Bankruptcy Court in the context of

11  its plan and said, "Look, your Honor, we only have 'X' amount

12  of dollars left for creditor recovery, and that's what the

13  recovery should be."  Here we're concerned that a similar

14  situation is going on.  Because you have a part of the loan,

15  at least, that's being used to fund improvements or

16  rehabilitation and by so doing incumbering previously

17  unincumbered collateral, we're creating a situation where

18  there may be potential problems down the road when that

19  collateral has been incumbered and, thus, removed from

20  creditor recoveries, and -- all outside of the context of a

21  Chapter 9 plan.

22          We don't think the debtor should be able to carry

23  out this reinvestment initiative largely at the expense of

24  creditors outside of the plan.  The city's creditors, its

25  retirees, they're entitled to the protections of a Chapter 9

13-53846-swr   Doc 2512-11   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 126 of 179
13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 126 of 179   126
290

1    plan, and outside of that context, there's significant

2    opportunity for prejudice where the creditors do not have the

3    ability to buy in with voting, with -- do not have the

4    fundamental protections as best -- for best interest of

5    creditors, for fair and equitable.  Those tests -- those

6    protections are not available, and there's a risk that

7    creditors' interest can be prejudiced in the process.

8         You know, I think it's important to note that

9    Detroit's creditors, unlike stakeholders in a traditional

10   Chapter 11 reorganization, do not stand to benefit from the

11   city's additional borrowings under the quality of life note.

12   Indeed, pursuant to the DIP motion, new borrowings will be

13   layered on top of existing creditors and used to fund civic

14   improvements and services which will not inure to a large

15   portion of the city's creditors' benefits.  This is unlike a

16   scenario in Chapter 11 where creditors -- pre-petition

17   creditors might be receiving new stock, right, of the

18   reorganized company.

19        THE COURT:  Won't the city's revitalization enhance

20   its ability to pay its debts back?

21        MR. BENNETT:  That's not been clear to us from the

22   testimony, your Honor.  It looks as if this money is going

23   out the door and not turned into any type of revenue-

24   generating alternative, at least not for purposes of paying

25   off our claim or for plan recovery on any of our claims,

1   certainly not for purposes of the presentation that was given
2   to us on June 21 either.  In that scenario, our recovery was
3   fixed as of that date, so whatever the city did with its
4   value and alienated that value, it did not inure to our
5   benefit.

6           So, your Honor, in closing, we think that the city's
7   business judgment would be more appropriately and responsibly
8   exercised by abandoning this current tack of engaging in one-
9   off preplan transactions that consistently result in
10  substantial opposition and extensive litigation, discovery
11  and appeals, instead focus on building consensus around a
12  plan of adjustment that adjusts the city's balance sheet and
13  cash flows enabling it to access the liquidity it needs to
14  rehabilitate after it gets out of bankruptcy.  This Court
15  should deny the DIP and the forbearance agreement motions or
16  at least adjourn them to be consistent with plan -- to be
17  commensurate with plan confirmation.  Barclays is not going
18  anywhere.  If they do, then we can just work our way down Mr.
19  Doak's list till we find somebody who wants to stick around,
20  but it was pretty clear that Barclays is focused on the exit
21  financing, and this can get rolled in -- this ultimately is
22  part of a plan.  The DIP should and would be exit financing.
23  The swap counterparties, they're not going anywhere either.
24  They're on their sixth amendment, and they're not going to
25  trap cash.  And if they try to trap cash, trust me, Mr.

1  Hertzberg can get a TRO.  Okay.  We know from experience.

2  And so I don't see the -- we don't see the imminent threat,

3  and we think that the proper course really for this city for

4  its citizens would be to secure the rehabilitation through a

5  rapid -- a more expedient exit from Chapter 9 rather than

6  trying to do the rehabilitation during Chapter 9 prior to the

7  exit.  That's all I have, your Honor.

8          THE COURT:  Thank you, sir.

9          MR. BENNETT:  Thank you, sir.

10                  CLOSING ARGUMENT

11          MR. GOLDBERG:  Good afternoon, your Honor.  Jerome

12  Goldberg appearing on behalf of interested party, David Sole.

13  I first wanted to begin by -- your Honor asked Ms. English, I

14  believe, what the disgorgement amount was that would be being

15  pursued if the city was able to succeed in that, and I

16  believe the testimony of Mr. Orr was that that amount was 247

17  million covering the amount that was paid on the swaps from

18  2008 to 2012, and that's also documented in the June 14th

19  financial report.  I think that's 1316, Exhibit -- our

20  Exhibit 1316.  It also included approximately 50 million that

21  was paid this year, so it would be in the neighborhood of

22  $300 million in terms of recovering on what has already been

23  paid on the interest rate swaps.

24          In addition, your Honor, at the hearing on --

25  pretrial hearing on December 13th, your Honor laid out how

1    the Court's role in this proceeding is to determine whether

2    the settlement is fair and equitable and whether it is in the

3    best interest of the estate as a whole.  Your Honor stated

4    you look at -- the Court looks at what the impact of the

5    settlement might have on the plan process on the city and

6    public's interest in reconstruction and revitalization.  Your

7    Honor, I would submit that the -- paying $165 million in a

8    termination amount that goes really to two banks through a

9    third bank, Barclays, at an interest rate that's anywhere

10   from 5.5 to 8.5. percent totaling, as Mr. Orr testified,

11   approximately $30 million to pay off this loan with a $4.2

12   million breakage fee for a total of about $200 million hardly

13   will help the citizens of Detroit in the revitalization

14   process moving forward.  In fact, what it does is pledge 20

15   percent of income tax revenues for the next four years of $4

16   million a month or $48 million a year, and in the city's

17   motion -- and Mr. Orr acknowledged this on testimony -- the

18   city's income tax revenue is approximately 232 million.  It

19   means that 20 percent of income tax revenues that can be used

20   for revitalization and reconstruction of the city, that can

21   be used to turn the lights on, get the busses running,

22   providing services and also pay pensioners and workers what

23   they're due instead will be diverted to UBS and Bank of

24   America through Barclays.  I submit that that is not -- I

25   mean especially when you balance that against a potential

1   recovery of $300 million, it hardly feels to me like that is

2   in the best interest of the citizens of the city and

3   reconstruction and revitalization.

4          In his testimony, the other objectors have

5   eloquently, you know, gone through many of the issues that

6   were raised in terms of why the swap agreements can be

7   challenged on the basis of statutory grounds whether under

8   the Bankruptcy Code or under the state law.  I would just

9   remind the Court that Mr. Orr also testified that the city

10  had drawn up a complaint not just dealing with those issues

11  but raising, rather, what I would call equitable issues.  He

12  testified that the city -- testified that his attorneys drew

13  up a complaint against UBS and Bank of America alleging,

14  among other counts, fraud, unjust enrichment, and breach of

15  contract based on a breach of the implied duties of good

16  faith and fair dealing and that they were ready to file that

17  complaint if no agreement was reached.  The fact that they

18  were ready to file that complaint indicates that they believe

19  that it was a substantive complaint; that there was a basis

20  for that complaint to move forward, and I believe that kind

21  of satisfies the standard, at least initially, in this motion

22  whether this motion was to determine whether a factual

23  predicate in a summary way of what the claim would be.  The

24  fraud count was, in part, based on problems with the LIBOR

25  index, as testified to by Mr. Orr, and is documented based on

1  UBS's admission of fraud in dealing with the LIBOR, which is

2  well-documented.

3         In addition, the claims were based on the following

4  scenarios:  one, that the counterparties had superior

5  knowledge when they entered into this complex financial

6  transaction with the city and had a duty to make clear the

7  terms of the transaction; that the counterparties

8  misrepresented that there was a low risk of default and

9  termination in connection with the swaps; that Bank of

10 America and UBS did not explain to the city the potential

11 dangers that a termination event would mean for the city --

12 i.e., that the city could immediately have to pay tens of

13 millions or hundreds of millions in interest payments and the

14 termination fee; that the city was a ticking time bomb, as

15 Mr. Orr described it, for a default based on the lowering of

16 the city's bond rating because of the city's financial

17 history; and that the fact that the city's chief financial

18 officer, Sean Werdlow, took a job with SBS, one of the

19 counterparties at the time, who was backed up by Merrill

20 Lynch, approximately five months after the swaps were

21 transacted raising a red flag.

22         It should be noted that in -- Sole Exhibit 1328 is

23 the July 31st, 2012, SEC Report on the Municipal Market --

24 Securities Market.  All of these claims that the city was

25 drawing up in its complaint to go after the swap

13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 132 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:27:07   Page 132 of 179
290

1   counterparties for disgorgement to recover -- to at least

2   disallow or subordinate the claims and even to go after a

3   recovery of the money that's already been paid, the 300

4   million that's been paid to the counterparties, are

5   consistent with what is reported in this report, in this SEC

6   report, and I would urge your Honor to take a look at pages

7   approximately 92 to 105 of that report, which deals with

8   swaps specifically.  That report outlines a series of SEC

9   actions that have been carried out against -- around these

10  issues.  It lays out the actions that have been taken out

11  that led to settlements, and they included settlements

12  against -- in the Orange County case.  They included

13  settlements in Jefferson County.  They included settlements

14  and judgments against five -- enforcement actions against

15  five major financial actions, Bank of America, UBS, JPMorgan,

16  Wachovia Bank, and GE Funding Capital, for their role in

17  interest rate swaps.  And most of these actions dealt with

18  the precise issues alleged by the city, lack of transparency

19  to the inequality, the difference when you're dealing with a

20  financial transaction of this magnitude between a

21  municipality and a bank in terms of understanding it,

22  misrepresentation of the risk of -- that are incurred by a

23  termination event that can have drastic effects, especially

24  in a city like Detroit, which, as Mr. Orr stated, was a

25  ticking time bomb because of its precarious financial

1    situation.  It detailed potential bribery.  That was an issue

2    in <u>Jefferson County</u>, improper dealings with the -- with city

3    officials in the context of securing the swaps, and it

4    detailed also issues dealing with municipal bond rigging.  In

5    fact, another exhibit that we've attached to -- that's been

6    admitted in this case is a final judgment -- it's Sole

7    1321 -- on UBS municipal bond rigging that, interestingly

8    enough, one of the bonds cited was one of the Water Board

9    bonds in Detroit.

10           Based on the fact that, again, the -- at this stage,

11   as your Honor indicated, the proceeding was not to take

12   testimony to prove these claims but to say whether a

13   predicate had gone -- was made to move forward on these

14   claims, and we believe the Orr testimony, when viewed in the

15   context of similar claims that have been carried out in

16   connection with municipal bonds and especially interest rate

17   swaps all over the country lays that predicate to move

18   forward and to not resolve this case and remove the swaps

19   from the purvey and jurisdiction of the Bankruptcy Court at

20   this time.

21           But there's another issue that I think is important

22   to look at when we examine the swaps to put them in their

23   proper context.  In <u>Pepper</u> v. <u>Litton</u>, 308 U.S. 295, the U.S.

24   Supreme Court held that the Bankruptcy Court -- that this

25   Court -- the Supreme Court has held that for many purposes,

13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 134 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 129 of 279

290

1  courts of bankruptcy are essentially courts of equity, and

2  their proceedings inherently are proceedings in equity.  They

3  have been invoked to that end so that fraud will not prevail;

4  that substance will not give way to form; that technical

5  considerations will not prevent substantial justice from

6  being done.  A claim which has been disallowed may be later

7  rejected in part according to the equities in the case.

8  Disallowance or subordination in light of equitable

9  considerations may originally be made.

10      In examining the equities involved with the swap, I

11  think you can't separate them from the context in which these

12  swaps took place.  The fact is Mr. Orr testified -- and it's

13  well-documented -- that these swaps became a disaster for the

14  City of Detroit beginning in 2008, and what happened in 2008?

15  As Mr. Orr acknowledged, there was a financial collapse that

16  took place in this country and that he admitted -- and I

17  think it was somewhat enlightened in his admission -- that it

18  was in part a product of the subprime predatory lending

19  policies carried out by the major banks across the U.S.  And,

20  in fact, the precipitous drop in interest rates occurred when

21  the government intervened and the Federal Reserve intervened

22  to stimulate the banks, essentially bail them out of their

23  failed policies and their fraudulent policies, and one of the

24  asterisks of the bailout, as Mr. Orr testified, was the

25  purchase of $1.7 trillion in mortgage securities.  In other

13-53846-swr   Doc 2314-11   Filed 04/19/14   Entered 04/19/14 22:00:23   Page 135 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:47:37   Page 135 of 179   135
290

1   words, what happened in 2008 and the reason these swaps

2   became a disaster for the city was that interest rates went

3   down precipitously.  They went down to zero, virtually zero,

4   and it was that gap between the floating rate tied to the

5   LIBOR and the fixed rate that caused the disaster that cost

6   the city $300 million already and potentially will cost the

7   city $500 million if this agreement is approved.

8           Exhibit 1326 to the motion hearing is a report by

9   the City of Detroit Planning & Development Department,

10  Neighborhood Stabilization Program Plan, and what it

11  indicates is Detroit almost more than any other city was

12  devastated by the subprime lending policies of the major

13  banks.  And if there's any question that there was fraud

14  involved in these policies, I call your attention to Exhibit

15  1324, which is excerpts from the Senate Subcommittee Report

16  on Wall Street and the Financial Crisis.

17          The Exhibit 26 notes that from 2004 to 2006 73

18  percent of new mortgages written in Detroit were subprime

19  mortgages.  In 2006 that means they're three percent above

20  the prime.  As of 2006, 29,000 adjustable rate mortgages or

21  nine percent of all existing mortgages reset triggering

22  higher payments for loan recipients, and in the case of

23  Detroit, many of these loan recipients were on a fixed

24  income.  It resulted from 2005 to 2007 in the City of Detroit

25  experiencing 67,000 mortgage foreclosures with two-thirds of

1   the homes foreclosed upon staying vacant.  It was this
2   imposition of subprime lending on Detroit that caused the
3   financial collapse in many ways, the immediate collapse in
4   the City of Detroit, and the idea -- the idea that the same
5   banks who participated in these lending practices that had
6   such a devastating consequence on the City of Detroit are now
7   to be paid $165 million with a pledge of 20 percent tax
8   revenues is inequitable and unconscionable.

9          In fact, my client, Mr. Sole, is here today.  He
10  asked me to intervene in this case because he not only is a
11  City of Detroit retiree facing a reduction of his benefits,
12  as is his wife, but he lives on a block on the east side of
13  Detroit which was a thriving residential block ten years ago,
14  but today there are five families -- five homes left standing
15  out of twenty on that block.  The home next to his is boarded
16  up on the right; it's boarded up on the left.  Across the
17  street there are two boarded up and a third one that's
18  occupied by a flock of wild dogs because they didn't -- the
19  banks didn't even bother boarding it up after foreclosure.

20         That's the impact of this crisis that's being felt
21  by the people of the city, and I think in viewing the
22  equities of this case it can't be separated.  It isn't just
23  about numbers.  It isn't just about form.  It isn't just
24  about detail.  And as a court of equity, it's important to
25  view how are we going to move Detroit forward, and moving --

13-53846-swr   Doc 2314-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 137 of 9
13-53846-swr   Doc 2312-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 137 of 179   137
290

 1  Detroit would not move forward if the banks who helped
 2  precipitate this crisis through their lending policies become
 3  the beneficiaries of 165 million -- really 200 million in a
 4  loan that takes them out of the bankruptcy when there's a
 5  potential to go after them, and I was excited when I heard
 6  Orr actually raise that.
 7          The last point I would raise, in pursuing this
 8  litigation, Emergency Manager Orr said that he could bring
 9  in -- that he had contacted the SEC, and under the Bankruptcy
10  Code specifically in Chapter 9 the SEC could intervene into
11  this bankruptcy.  It could help conduct the investigation of
12  these swaps and these lending practices.  The cost wouldn't
13  just be on the city, but they would come in, and the
14  government could come in and aid us in that if a request was
15  made.  Unfortunately, that request was not made till after
16  August 30th, but I'm glad to hear that the request has been
17  made and they've indicated interest, based on his own
18  testimony.
19          Let me just end by saying there are a number of
20  cases that I could cite that show how -- BKB Properties
21  versus SunTrust Bank.  It's a 2009 U.S. District, Lexis
22  16284, where the Court then -- in the U.S. Eastern District
23  the Court allowed a fraud in the inducement claim based on
24  the fact that the bank was a far more sophisticated entity
25  that brought a sub -- a swap transaction and allowed that to

1    be a basis and indicator of a claim for fraudulent

2    inducement. in <u>Yellowstone Mountain Club</u> versus <u>Official</u>

3    <u>Committee of Unsecured Creditors</u>, 2009 Bankruptcy, Lexis

4    2047, the Court allowed a claim for equitable subordination

5    to go forward on the basis that the creditor, the bank --

6    that its policies relative to the entity who was -- received

7    the loan was at a far unequal basis and, in fact, that they

8    could see no basis for laying out this loan except the greed

9    of the bank, and that was a basis for finding equitable

10    subordination.

11            So I will end here, your Honor. I appreciate it. I

12    think this has been a very important proceeding for the

13    Court, and I appreciate that the Court treated it with the

14    significance it belies because the question here is whether

15    the banks -- at a time when the people of Detroit are facing

16    terrible services, when we're barely surviving, when our

17    lights aren't on, when services are being cut, when retirees

18    are fearing the loss of pensions, to sit back and make a

19    payment of 165 million to UBS and Bank of America, banks with

20    a history of subprime lending that helped cause this crisis,

21    seems unconscionable and will not allow the city to go

22    forward. If this is examined, it's going to cause a great

23    deal of consternation in the city, and we would hope that the

24    Court rejects this and allows the Court to move forward to

25    deal with these issues in the bankruptcy proceedings in a

13-53846-swr   Doc 2314-11   Filed 01/19/14   Entered 01/19/14 13:22:00   Page 439 of 79
13-53846-swr   Doc 2512-11   Filed 01/29/14   Entered 01/29/14 14:22:00:23   Page 139 of 139
290

1   proper examination of the whole issue.  Thank you.

2           THE COURT:  Thank you, sir.  Any other remarks from

3   objecting parties?

4           MS. ENGLISH:  Could we just --

5           THE COURT:  How much time is left?

6           MS. ENGLISH:  Could we just have five minutes, your

7   Honor?

8           THE COURT:  I'm sorry.

9           MS. ENGLISH:  Could we just have five minutes to

10  make sure we're done?

11          THE COURT:  But to answer the question, you have 25

12  minutes remaining.

13          MS. ENGLISH:  Okay.  Thank you, your Honor.

14          THE COURT:  All right.  I'll just sit here while you

15  decide.

16          MS. ENGLISH:  That's fine.  Thank you.  Thank you

17  for the time, your Honor.  Mr. Marriott would like to address

18  the Court.

19          MR. MARRIOTT:  Good afternoon.  I'm sorry.

20          THE COURT:  And you may proceed, sir.

21          MR. MARRIOTT:  Good afternoon again, your Honor.

22  Vince Marriott, EEPK.  I wanted to briefly address one point

23  that you made in response to Mr. Bennett's argument, which

24  was how can -- in effect, how can you ask the city to choose

25  between the safety of its citizens and its creditors.  And I

```
 1   just wanted to indicate that we're not callous, and we're not
 2   suggesting that the city play Russian roulette with its
 3   citizens.  It is not our position that the city should just
 4   become starved for cash and collapse.  If you recall, before
 5   this hearing commenced, the Court ruled that under Section
 6   904 of the Bankruptcy Code it was not the province of this
 7   Court to pass judgment on the need of the city for borrowed
 8   funds or for the uses to which the city planned to put those
 9   funds.  As a result, the objectors, although ready to do so,
10   put in no evidence on those issues.  I just think it is
11   important to know -- to put in context the arguments we've
12   made today that had we been entitled to put that evidence in,
13   we would have put evidence in that, in our view, there's not
14   an immediate need for funds to meet what the city is
15   immediately capable of doing, and so we are not -- we would
16   have, had that issue been amenable to evidence from the
17   objectors -- I just think it's important for the Court to
18   know that we are not operating from a perspective that it's
19   choose between the citizens and the banks.  We believe, based
20   on our own analysis, that the city is actually not at this
21   time confronted with that choice.
22           THE COURT:  All right.  Thank you.  Anything
23   further?  All right.
24           MS. ENGLISH:  Thank you.
25           THE COURT:  All right.  Will the city be giving a
```

13-53846-swr   Doc 2512-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 61 of 79
13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 13:22:00   Page 141 of
290

1  rebuttal argument?

2         MS. BALL:  Yes, your Honor.

3         THE COURT:  All right.  Before we do that, we'll

4  take a 20-minute recess and reconvene at 2:50, please.

5         THE CLERK:  All rise.  Court is in recess.

6      (Recess at 2:32 p.m., until 2:52 p.m.)

7         THE CLERK:  All rise.  Court is in session.  Please

8  be seated.

9         THE COURT:  Looks like everyone is here.  You may

10  proceed.

11         MS. BALL:  Good afternoon, your Honor.  Corinne Ball

12  of Jones Day for the city.  Your Honor, may I inquire as to

13  how much time we have?

14         THE COURT:  Sixty-eight minutes.

15         MS. BALL:  Thank you, sir.

16                  REBUTTAL ARGUMENT

17         MS. BALL:  Your Honor, we have before you today two

18  motions, one to approve forbearance and optional termination

19  agreement and the other to approve a post-petition financing.

20  The point of these motions is to enable the city to

21  rationalize its debt structure and restore viability to the

22  city by eliminating its most costly obligation and obtaining

23  financing on a cost-effective basis to move forward.

24         Your Honor, these matters are before you as core

25  matters under 28 U.S.C. 157(b)(2)(A), (B), which is the

1  allowance of claims, your Honor, (C) the obtaining credit,

2  (K) the extent of the lien, and (O) the adjustment of debtor

3  and creditor.

4      Your Honor, I'd like to take some time, since the

5  evidence here after three days but more so of voluminous

6  documents may have escaped even Ms. English's notice as to

7  some points that might help the Court where there was

8  evidence for points where she suggested that there weren't,

9  but I must admit, as you know, we agree with Ms. English and

10  Mr. Gordon to the extent that we fully understand -- and we

11  think we do -- one of his arguments that there are litigable

12  claims here.  We do not disagree.  I think we just, in the

13  context of the city and its current circumstance, may have a

14  different conclusion as to what's in the best interest of the

15  city.

16      But with that, your Honor, I'd like to start with

17  the post-petition financing and address the objections of

18  Mr. Marriott that we did not demonstrate that unsecured

19  credit was not available, the objections of Mr. Perez that

20  the good faith findings aren't merited, Mr. Marriott that we

21  didn't comply with 436, and a new one from Ms. Green on the

22  authority for granting liens, which, as your Honor may

23  recall, the authority that we are seeking for the provision

24  of this pledge are authority to pledge under 364(c) as a

25  matter of federal law.

1   Finally, your Honor, in terms of the purpose of
2   Chapter 9 and Mr. Bennett's comments, I think we are really
3   reminded -- and we will get there because we did talk about
4   it in our reply -- the primary purpose of Chapter 9 is to
5   restore viability of the city, and by that it means the
6   provision of public services at the level it deems necessary,
7   meaning the city, not its creditors.  Well, your Honor, with
8   that, moving ahead, I think the evidence has shown that
9   unsecured credit is not available to the City of Detroit and
10  the post-petition financing is the best financing available.
11  Your Honor, we have excerpted opinions from Mr. Doak and
12  Mr. Buckfire.  And I would point out to your Honor that your
13  Honor did qualify Mr. Doak as an expert in sourcing financing
14  in municipal cases, and, your Honor, the reference for that
15  is December 17th's hearing transcript at 250, lines 10
16  through 12, despite some questions from Mr. Marriott on that
17  point.  Mr. Buckfire also qualified as an expert in
18  restructuring finance on December 17th at 131, lines 12,
19  through 132, lines 21.
20      In addition, your Honor, I would point out that
21  during December 18th's hearing Mr. Buckfire, after being
22  qualified as an opinion, was asked,
23          "Question:  And in the process of going out to
24          seek this DIP financing, did you consider the idea
25          of seeking unsecured financing?

13-53846-swr   Doc 2512-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 144 of 79
13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 14:22:00:23   Page 135 of 179   144
290

1        Answer:  We thought about it and dismissed it as

2        impractical.

3        Question:  When you said you dismissed it as

4        impractical, why is that?

5        Answer:  Well, again, based on my experience,

6        I've never seen any post-petition financing done on

7        an unsecured basis.  Lenders in this field always

8        want security.  They're not going to take what I

9        would call plan risk.  If there were an unsecured

10        lender, they would be taking that, and I don't think

11        there's any case I'm aware of where that's been

12        done."

13        Your Honor, if we move ahead, I think we've had the

14  discussions regarding the JPMorgan Exhibit 61.  This was one

15  of the preliminary market tests that Mr. Buckfire testified

16  to, and it is true that they did identify general revenue

17  sources.  I think the document speaks for itself, but it

18  clearly was another information point that informed the

19  opinion of Mr. Doak -- Messrs. Doak and Buckfire.  And we

20  find it interesting, your Honor, that no objector could bring

21  in any witness, expert or otherwise, who would tell this

22  Court that their bank or financial institution was willing to

23  lend on an unsecured basis.  Indeed, as your Honor elicited

24  from Mr. Bennett, the proposal from Syncora was secured as

25  well and on that same basis with the exception of asset

1   proceeds.

2          Your Honor, then in discussing this with Mr. Orr,

3   who ultimately had to make the decision, and it's his

4   business judgment, we excerpted the evidence where it is

5   clear that Mr. Orr had also discussed the basis and the

6   credit available and what he was looking for.  And, your

7   Honor, I think he was quite clear that he was looking for the

8   best deal available for the city.  If we move ahead -- and I

9   think Mr. Marriott mentioned the next exhibit, which was City

10  Exhibit 88 -- we think the evidence has shown that the city

11  has undertaken a robust competitive process.  The terms and

12  conditions of the post-petition financing are fair and

13  reasonable, reflect the city's best business judgment, and

14  are supported by reasonably equivalent -- excuse me --

15  equivalent value and fair consideration.  The evidence does

16  establish that the city solicited 50 banks and financial

17  institutions.  It received 16 lending proposals.  And as your

18  Honor can see from page 5 of City Exhibit 88, the Barclays

19  proposal was by far the strongest proposal.  Even after that,

20  the city would go on, as was clear from City Exhibit 89, to

21  fully negotiate four commitment letters, and, your Honor, all

22  of those were also secured.  And what I wanted to take time

23  with page 5 of this exhibit to share with your Honor is

24  please note that Barclays again, even with flex, is by far

25  the best proposal.  And one might suggest to you, your Honor,

 1   that, indeed, the fact of including a flex provision, which

 2   the two most competitive lenders did, in fact, do, as you can

 3   see from this exhibit, confirms that unsecured debt would not

 4   have been possible if even, in fact, on a secured basis we

 5   would have market flex to this extent.

 6        I do want to add on a happier note that Mr. Orr also

 7   testified on December 18th that he was confident that we

 8   would be able to arrange exit financing for this loan rather

 9   than the scenario outlined by Mr. Goldberg.  That four-year

10   scenario outlined again by Mr. Goldberg, your Honor may

11   recall, was a product of a limitation that we couldn't

12   possibly have a lender who was enforcing against the city in

13   any way that would inhibit the city's ability to provide

14   services.  So, your Honor, I think the evidence has

15   established that the Barclays proposal is the best available.

16   In fact, I've excerpted for your Honor's benefit the

17   testimony of Jim Doak to that effect and, again, underscore

18   that we provided limited collateral.  It was a fully

19   underwritten commitment by a major financial institution, and

20   it was the most advantageous.  In fact, Mr. Doak would go on

21   to tell us that even with the market flex, it would still be

22   the most advantageous proposal, and, in fact, he's confident

23   that no party was willing to provide comparative overall

24   better terms.

25        Moving on to the issues raised by Mr. Marriott under

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 13:22:00   Page 147 of 79
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 147 of 147
290

1    436, your Honor, the city believes and has demonstrated that

2    the City Council received more than adequate and sufficient

3    information to assess the Barclays proposal, and for your

4    Honor's benefit we have identified those portions of Mr.

5    Doak's testimony where he confirms in his meetings with the

6    individual City Council members -- and, your Honor, the

7    materials for those meetings were City Exhibit 90 -- that he,

8    in fact, did say that the range, even with market flex, was

9    well within the range described to in those materials, and

10   that range, your Honor, was five to nine percent, which more

11   than covered the market flex ranges that we've just gone over

12   on Exhibits 89 and 90.  He also -- again, they did it with

13   the City Council in closed session.

14        Mr. Doak would then go on to tell us that not only

15   did he talk about the market flex, but, although Mr. Marriott

16   is adamant that he didn't give them the fee letter, which is

17   true, Mr. Doak has testified that he discussed the commitment

18   fee that the city agreed to pay with Barclays.  "And did you

19   disclose it?"  And he said, "Yes, I did."  So, your Honor, I

20   think --

21        THE COURT:  Well, but did he testify that he

22   disclosed to the City Council members the market flex

23   process?

24        MS. BALL:  He said -- no, your Honor.  He said that

25   he assured the individual members of the City Council that

1  the interest rates that would result from the Barclays
2  proposal were well within the range that he provided in his
3  materials, which were five to nine percent, which was, in
4  fact, the range of the market flex, your Honor, if you were
5  to look --
6        THE COURT:  So without disclosing the market flex
7  process --
8        MS. BALL:  He did --
9        THE COURT:  -- the consequences, how is that
10 consistent with what PA 436 requires?
11       MS. BALL:  He disclosed the range of possible
12 consequences should flex be invoked, five percent being where
13 no flex was invoked, which would be the best outcome to the
14 city, and nine percent, which would be the range and the all-
15 in cost should the flex be invoked with the fee.  So I think
16 if the City Council were thinking about an alternate
17 proposal, they knew the range that this proposal would,
18 indeed, cost.  That was discussed as was the commitment fee,
19 and, your Honor, we do think that is sufficient for that
20 purpose.  Your Honor may recall that market flex -- there's
21 some commercial sensitivity around market flex, and perhaps
22 we were a little over-sensitive to that, as your Honor's
23 later ruling would confirm, but in terms of the consequences
24 and impact of this Barclays proposal, the spreads were, in
25 fact -- at the bookends of the proposal were, in fact,

1  discussed with City Council members as was the commitment

2  fee.

3        In addition, your Honor, beyond going through the

4  process Mr. Marriott described, which was giving the City

5  Council notice of the proceeding, which, as we said, there

6  were two series of meetings, individual meetings and then the

7  closed session, City Council would then have time to submit

8  an alternate proposal.  The City Council did not approve the

9  post-petition financing, as your Honor is aware, but it did

10  not offer any alternate proposals either.  In that case, the

11  next step indicated under the Home Rule City Act was for the

12  emergency manager to seek approval from the Emergency Loan

13  Board.  And, your Honor, we have excerpted an image of the

14  order of the Emergency Loan Board, which was entered on

15  December 20th after hearing, approving this post-petition

16  financing with certain conditions.  Primary among the

17  conditions, your Honor, is your Honor's approval.  Paragraph

18  7 of that order authorizes the city to issue bonds in an

19  amount not to exceed 350, in fact, recognizes at that time

20  that the transaction might be shifting with the swap parties

21  and, indeed, further qualifies its approval and conditions it

22  on your Honor's approval of the settlement.

23        THE COURT:  Can you please pull the microphone

24  closer to you?

25        MS. BALL:  Of course.  My apologies.  With that,

13-53846-swr   Doc 2314-11   Filed 01/17/14   Entered 01/17/14 13:22:07   Page 45 of 79
13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 150 of
290

1  your Honor, I think that we would conclude that we have met
2  our burden on the post-petition financing.  We seek your
3  Honor's authorization under 364(3) to grant the liens and the
4  priority claims that are described in our papers.  We also,
5  based on the robust process that we followed, seek your
6  Honor's findings that the process was, in fact, in good
7  faith.  The matters raised by Ms. Green when she excerpted
8  the financing orders talk about the grant of a lien under
9  Section 364, your Honor, and that authorization under federal
10 law.  As your Honor is well aware, 364 continued in 1978 what
11 had long been a tradition certainly as far back as 34, the 34
12 Act, and, again, the 37 Act, and then the Chandler Act, of
13 certificates of indebtedness being issued by states, and it
14 is very clear that as a matter of federal law, a Bankruptcy
15 Court can issue and authorize liens that are prior to other
16 liens, and it is a federal question within your powers under
17 Section 364, and that is the foundation of what we seek and
18 not to comply with the Gaming Board.  Actually, your Honor,
19 there is no statute governing income taxes either, and in
20 this case -- and we are reminded of your Honor's observation
21 that Section 901 included Section 364(c), (d), and (e) for a
22 reason, and it was in recognition that, yes, in fact,
23 municipalities may need to borrow, and it is that authority
24 that we're asking you to grant us.
25          THE COURT:  So your position is that even if state

1   law prohibits the granting of a lien in whatever property,

2   Section 364 authorizes the Bankruptcy Code to allow the

3   debtor to grant such a lien?

4           MS. BALL:  We think it provides independent

5   authority, and I'm not sure that anyone has established that

6   it's prohibited, your Honor, at least no evidence in this

7   hearing that state law prohibits it, but we do think that the

8   position is that we're asking for it to be authorized as a

9   matter of federal bankruptcy law.

10          THE COURT:  Any cases on that?

11          MS. BALL:  No, your Honor, just the long history of

12  the certificates of indebtedness.  And, in fact, as your

13  Honor is well-aware, superpriority claims and superpriority

14  liens only exist in bankruptcy and nowhere else and certainly

15  would not be permitted under state law.  If your Honor gives

16  me a minute, there may be cases, the reason why I am

17  struggling on that one, your Honor, but if you give me five

18  minutes and we have time, I will get you some.  I am told

19  there are cases.  That argument was not in the Retirement

20  Systems reply or supplemental reply, so it is not in our

21  papers, but we will endeavor, as I move through the

22  assumption motion, to get those cases.

23          Moving on, your Honor, I think that Mr. Bennett's

24  point we actually did cover in our reply.  He suggests that

25  the context for post-petition financing should be a plan, and

1   the standards should be confirmation standards.  We disagree

2   with both propositions.  However, we did point out -- and I

3   would point to paragraphs 49 and 50 of our reply -- that just

4   in responding to objectors' concerns that they should have

5   weighed a plan, Chapter 9 is about the payment of creditors

6   and provision of essential services.  We, in fact, point out

7   that, no, that's not the case.  The fundamental purpose of

8   Chapter 9 is to provide municipal services, and it's the

9   viability of the city.  And in that case, your Honor, we

10  would point you to the Mount Carbon case, 242 B.R. 18, from

11  the District Court of Colorado in 1988, which is cited in our

12  reply, and, your Honor, I would note when Mr. Bennett cites

13  Fano, he neglected to advise you -- and I'm sorry -- it's

14  Bankruptcy Court, District of Colorado, 1999 -- he neglected

15  to advise you that the Ninth Circuit decided four cases that

16  day, the same day that they decided Fano in 1940.

17  Interestingly, Fano was the one case where there was evidence

18  that the irrigation district -- it was not a city; it was an

19  irrigation district -- was eminently solvent, had the power

20  to increase taxes, and did nothing, did not even explore it,

21  and so their plan was not approved.  However, as the three

22  cases that are discussed in Footnote 10 on page 25 of our

23  reply, decided three other cases that day, all of them the

24  plans were approved, so I think we have to look at Fano in

25  the context of its unique facts, your Honor, which are that

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 153 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:22:07   Page 148 of 290
153

1    you had a very solvent situation where there was no evidence

2    that they had attempted to increase taxes in the face of

3    evidence that they could afford to, and certainly in the

4    three companion cases decided that day written by the same

5    circuit judge he went the other way in the other three cases.

6            With that, your Honor, perhaps we can move on to the

7    approval of the forbearance and optional termination

8    agreement, which, your Honor, we seek two things, your

9    approval under Section 365 to assume the forbearance

10   agreement, and implicit in that, your Honor, is the

11   settlement of claims and the allowance of the secured claim

12   of the swap counterparties in the amount of 165 million.  We

13   and Ms. English, Mr. Gordon, Mr. Goldberg see things very

14   similar.  These are litigable claims, and they may, in fact,

15   be litigated.  They have one advantage, however, that my

16   client does not.  The emergency manager has to live in the --

17   has to live in the real world of providing services to the

18   residents of Detroit every day, and he has to address -- we

19   thought of it almost, your Honor, as the missing third column

20   in Ms. English's PowerPoint.  She assumed that we would win,

21   and we would hope if we sued we would win, but she didn't

22   address what happens if the city loses, what would be the

23   real impact, and yet that possibility and those consequences

24   were things that the emergency manager had to consider

25   because, in fact, he would have to live with it, so I would

 1    think, your Honor, that the luxury of litigation -- and I

 2    don't use that phrase lightly because we have all invested

 3    somewhat heavily into what the prospects for litigation is

 4    here, and I would like to move on to offer some of our

 5    observations which tend to suggest that no outcomes are

 6    certain, no outcomes are near certain, and no outcomes are

 7    quick.

 8            Certainly the issues regarding the validity of the

 9    COPs and swaps were reviewed.  We have excerpted for your

10    Honor's benefit the city exhibits that really focus on the

11    service corps, and the one -- two of them, in particular, may

12    be of interest to you, your Honor.  Those are the

13    transactional documents, which are Exhibits 120, 121, which

14    are the service contracts themselves as well as the offering

15    circular, which is Ambac 404.  There is one -- well,

16    actually, there are two -- four service contracts that they

17    cover the obligations to the COPs and swaps.  They're not

18    separate.  They're really not separate provisions.  It's the

19    same funding.  It's the same provisions.  The argument, on

20    the other hand, one, they were authorized.  We have

21    ordinances.  We have opinions.  The opinions are appended to

22    the offering circular that Ambac put into evidence.  We have

23    service contracts that say this is not indebtedness of the

24    city.  You have no recourse but suing as contract vendor.

25    You are left to the annual appropriation process as opposed

1   to full faith and credit.  It was clearly dealt with as a

2   nondebt obligation of the city outside of Article 34.  That

3   evidence supports that proposition; however, in litigation

4   the service corps should be disregarded and Act 34 and its

5   debt limits retroactively applied to declare the swaps and

6   COPs void ab initio.  It is true -- and Ms. English is

7   absolutely right -- that this settlement still preserves the

8   right to continue to look at this transaction in a number of

9   ways, 2005, 2006.  The only thing it settles is the swaps and

10  terminates the swaps.  A lot of other things can be looked

11  at, and, your Honor, the order, I think, is fairly clear on

12  that.  We do not -- Ms. English is right.  We do not share

13  her view of estoppel.  We think the cases, once you get

14  beyond the mid-20th century cases, are -- and your Honor used

15  words differently -- I was somewhat impressed -- illegal

16  versus ultra vires could be a very important difference for

17  estoppel.  Intra vires versus ultra vires could be a very

18  important difference.  And here, because we're talking about

19  the facts and the representations made by the city regarding

20  the service contracts, your Honor, I think we'd have to take

21  that into account that it's not certain, but I would disagree

22  with Ms. English that it is as easy to just sue the swaps and

23  not have the core common facts, core common documents, core

24  provisions when you're coming to Act 34 not involve the COPs.

25  It seems to us that it is the entire transaction and

1   structure, and it is not very realistic to think that one

2   could only attach the swaps.

3        As to issues regarding the validity of the COPs and

4   swaps in terms of the challenges premised on fraud and

5   unconscionability, I think it was quite clear that Mr. Orr

6   understood those claims, evaluated those claims, ranging

7   from -- I think he called it LIBOR price fixing as opposed to

8   LIBOR manipulation, superior knowledge, the ticking time bomb

9   and even the personnel question when former city CFO Werdlow

10  joined the swap bank.  Clearly those things are looked at.  I

11  also think the downsides to those claims, which involve the

12  duration, difficulty, and fact-intensive nature of any such

13  trial, weighed heavily on his mind.

14       When it came to issues regarding the validity of the

15  pledge of the casino revenues, they were also reviewed.

16  Again, we would view the role of estoppel here somewhat

17  differently from Ms. English, and the reason we would do that

18  here is because clearly on the finding of the pledge, there

19  were findings of fact by the City Council at a legislative

20  hearing, and those findings of fact are unlike one would say

21  the mid-20th century void ab initio cases which are premised

22  on knowledge of the law.  Here there was a finding of fact,

23  and, in fact, your Honor, there was also an opinion by a

24  well-known law firm who opined that the pledge was proper.

25  And in addition to that, of course, we had the letter from

13-53846-swr   Doc 2314-11   Filed 01/14/14   Entered 01/14/14 22:00:23   Page 157 of 79
13-53846-swr   Doc 2512   Filed 01/29/14   Entered 01/29/14 13:22:07   Page 157 of 179
290

1  the executive director of the Gaming Commission, who said

2  there were no compliance issues that they saw.

3        THE COURT: Well, but let me ask this. Is there any

4  Michigan case law that prohibits a city on the grounds of

5  estoppel from asserting the illegality of a transaction?

6        MS. BALL: Your Honor, there is substantial case

7  law, and it's actually coming up in another litigation before

8  you, that says the only party that has standing to assert the

9  illegality of that position is the state treasurer under Act

10 34. So, your Honor, I am not aware of cases --

11        THE COURT: That's a different question. I'm

12 asking --

13        MS. BALL: I'm not aware of cases of any private

14 citizen where that has been held.

15        THE COURT: I'm not sure what you mean by "private

16 citizen." My question was is there any case law that

17 prohibits a city from asserting the illegality of a

18 transaction that it entered into on the grounds of estoppel?

19        MS. BALL: Your Honor, when you're dealing with an

20 intra vires, yes, Highland Park, and when you're dealing with

21 a factual representation, yes. If the city was clearly

22 involved in a misrepresented factual situation, there are

23 cases, your Honor, and they would actually be more applicable

24 to the validity of the pledge of casino revenues perhaps than

25 the Act 34 questions, although I think that disregarding the

1  service corporations is a bit complicated.  So, yes, we do

2  know that there are cases where a city where it was intra

3  vires, which meant a city official went beyond their

4  authority, and where there was a fact-finding where a city

5  was estopped from going forward.  There are cases.  There are

6  not such cases, your Honor, that I am aware of in the void ab

7  initio area, which is a distinction here.

8          Your Honor, I wanted to go on to another point that

9  Ms. English made, and I was concerned because she had

10  suggested that the pension obligations were not part of the

11  2009 ordinances, and, indeed, they were.  And, in fact, our

12  next slide highlights the ordinance, which is also in

13  evidence, that talks about the pledge being necessary as

14  incident of the pension funding program, so I think it was in

15  evidence, and it was not something that came out of the clear

16  blue sky, but obviously, your Honor, there are at least two

17  ordinances.  There's a legislative hearing here, and there

18  are a number of opinions, so I'm not surprised.

19          In terms of the issues regarding the special

20  revenues, your Honor, we looked at that.  Are casino revenues

21  special revenues?  It was studied.  I think we were in the

22  camp that there's an issue when you have a definition of

23  special revenues which has some five different kinds of

24  special revenues, only one of which appears to be for a

25  construction project and others of which are very different,

1   and they include special excise taxes.  We were struck by the

2   plain meaning.  After all, the Gaming Control Board Act is a

3   1996 event, and it used the term "excise taxes" entirely

4   independent of whatever might later happen in 2009.

5        We also were a little confused by Mr. Gordon because

6   we think the argument that we and the banks are making is

7   they are squarely within that plain meaning, and they are

8   squarely within the consensual security agreement arrangement

9   described in 922(a) -- 928(a), which, your Honor, actually --

10  Mr. Gordon put it up in his PowerPoints -- provides that a

11  lien granted to -- pursuant to a security agreement will

12  continue post-petition.  Clearly the collateral agreement is

13  a security agreement, and clearly the banks, if there are

14  special revenues, we have excise taxes that are pledged

15  pursuant to a security agreement, and, your Honor, we're

16  dealing with two very plain meaning arguments.

17       THE COURT:  Mr. Gordon distinguishes between excise

18  taxes and special excise --

19       MS. BALL:  Special excise taxes, your Honor.

20       THE COURT:  -- taxes.

21       MS. BALL:  Your Honor, we can find no case that

22  distinguishes or distinguishes as to use, and even Mr. Gordon

23  ended up using two treatises, and we're not aware of where

24  they have been applied.  And, your Honor, we think --

25       THE COURT:  Well, but does the reading you propose

13-53846-swr   Doc 2312-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 161 of 179
13-53846-swr   Doc 2312-11   Filed 01/17/14   Entered 01/17/14 13:22:07   Page 161 of 179   160
290

1    read the word "special" out of the Code?

2         MS. BALL:  I think "special" is back -- we think

3    it's included here because it is on a particular activity.

4    We think the casino revenue taxes are special because they

5    are an excise tax on a particular activity, and because

6    they're on that particular activity of gaming, we think they

7    are within the meaning of special.  We don't read it out.

8         THE COURT:  Isn't an excise tax, by definition, a

9    tax on a particular activity?

10        MS. BALL:  Your Honor, I think that the legislative

11   history tells us that it does include those, but, your Honor,

12   I think that's as close as we can get to is reading the words

13   "legislative history" in the statute, and I don't think we're

14   asking you to read the word "special" out, but I do think

15   that one has to be incredibly cognizant of the various types

16   of secured debt that are currently outstanding not only as

17   special excise taxes but as we have here, state intercept

18   secured loans and many other types.  This should not be

19   construed, we would think, your Honor, to prohibit a city

20   from financing itself.

21        THE COURT:  Can you give me an example of an excise

22   tax that is not a special excise tax?

23        MS. BALL:  Sure.  Smoking, tobacco.  I think taxes

24   on gasoline and cigarettes are often considered excise taxes,

25   and I think they're pretty general.  It's not a particular

 1   activity.  And if you think about how they're used, I think

 2   they are different.  That's not a municipal activity.

 3          THE COURT:  If it's in relation to an activity, it's

 4   special, but if it's in relation to a product, it's not?

 5          MS. BALL:  I would think, your Honor, if it's not a

 6   particular product for a particular use in a city within a

 7   municipality, yeah, I think we're having trouble if we're

 8   talking about a general product that goes beyond a

 9   municipality.  And those are called excise taxes, and, in

10   fact, your Honor, they exist in 507 where we use the word

11   somewhat differently.

12          Your Honor, we also were confronted by the opinion

13   of a fairly well-known major law firm that did apply, and, of

14   course, this opinion made it into evidence through the

15   Retirement Systems.

16          THE COURT:  What's the relevance of it, though?

17          MS. BALL:  Your Honor, it's something you -- it's a

18   fact that you would have to overcome.  It would be something

19   that Mr. Orr, as emergency manager, considered.  He had to

20   consider the views that were considered at the time if he was

21   now going to attack them and rethink them, and --

22          THE COURT:  Well, but if the question --

23          MS. BALL:  -- he couldn't just disregard it.

24          THE COURT:  If the question is a question of law,

25   what difference does it make that some lawyer expressed an

13-53846-swr   Doc 4311-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 162 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:44:07   Page 96 of 179
290
162

1   opinion on it at an earlier date?

2          MS. BALL:  Your Honor, I think it's a matter of

3   diligence.  If it is something as we've had, we can

4   demonstrate through the colloquy we've just had as to what

5   does the word "special" mean, then I think one would do

6   diligence and see what other experts in the area have said,

7   and this would fall into that category of diligence.  He did

8   look.  He should look, and, in fact, those who would be --

9          THE COURT:  So its weight depends on its persuasive

10  value?

11         MS. BALL:  I think so, your Honor --

12         THE COURT:  All right.

13         MS. BALL:  -- as much as a treatise if one would

14  think about it --

15         THE COURT:  All right.  All right.

16         MS. BALL:  -- certainly not less.  If we were to

17  move on, your Honor, I think that in evaluating the

18  litigation, the emergency manager had to reconcile the safe

19  harbors and what they would mean here.  You've heard from the

20  banks earlier today somewhat what the difference means

21  between void and voidable, and, in fact, we have a very

22  different view.  We think that it was an illegal dividend in

23  Contemporary Industries in the Eighth Circuit.  The question

24  before Judge Gonzalez was also an illegal dividend.  I think

25  we have cases now on the non-Bankruptcy Court issues that you

13-53846-swr   Doc 2312-11   Filed 04/19/14   Entered 04/19/14 13:42:00   Page 163 of 179
13-53846-swr   Doc 4314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 163 of 179   163
290

1   raised with the banks and with Mr. Ellenberg when you asked

2   about this.  Right now we do have two cases going neck and

3   neck in the Seventh Circuit.  Your Honor may recall <u>SemCrude</u>,

4   which was a case in Delaware, and we have Bettina White as

5   the trustee of <u>SemCrude</u> bringing a case post-Chapter 11 as

6   the litigation trust to avoid matters, and, in fact, she is

7   being -- her actions were totally disallowed as being

8   preempted by the safe harbors.  We have another case pending,

9   your Honor, and that is the <u>Tribune</u> case, also a litigation

10   trust, also seeking to move post-confirmation of a Chapter 11

11   plan to avoid payments that clearly everyone agreed that

12   during the bankruptcy were safe harbored.  That one is on

13   appeal, and the appeal has not yet been decided, so, your

14   Honor, I think there is still a question not only as to the

15   void and voidable and the doubt cast on <u>Enron</u>, but in answer

16   to your question, which is where are we going with state law,

17   what if we tried to go to a different forum -- as you know,

18   in fact, the city, before the safe harbors attached, did go

19   to state court and did seek relief and, in fact, had very

20   seriously considered the importance of not being in

21   bankruptcy to avoid those safe harbors.  Your Honor, the cite

22   for the <u>SemCrude</u> case is <u>White</u> versus <u>Barclays Bank</u> at 49

23   B.R. 196.  It's in our reply.  And the <u>Tribune</u> case, which is

24   on appeal in the Seventh Circuit going the other way, is also

25   in our reply, your Honor.  If you give me a minute, I can

1  find you that one, but it is on appeal to try to reverse that

2  ruling and be able to go forward and attack in state court

3  what it could not attack in the Bankruptcy Court.  Moving

4  ahead --

5          THE COURT:  Well, but from a -- apart from the case

6  law, from the standpoint of just pure logic --

7          MS. BALL:  Okay.

8          THE COURT:  -- why should the safe harbors be

9  permitted to protect a transaction that under state law is

10  void ab initio?  It's as if under state law the transaction

11  did not exist.

12          MS. BALL:  Your Honor, there is a concern -- and I

13  think Mr. Ellenberg tried to express it, and I think the

14  legal term for it is coming through most strongly as

15  preemption in the Second Circuit's ruling in _Enron_, which is

16  that state law has to give way to federal law where there is

17  an area where Congress has decided to act and exercise its

18  bankruptcy power.  And when it comes to contracts that are

19  traded not only across the country and across state lines but

20  globally, Congress intervened for many -- I think the term is

21  often qualified financial contracts, your Honor, settlements,

22  margin payments, swaps, forwards, commodity contracts, on the

23  theory that this is not an area that states should be

24  intervening in.  These products operate in a market which as

25  2008 -- as fast as the world melted down when we all saw how

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 165 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 22:27:07   Page 166 of 179   165
290

1    interconnected we were, that it should be preempted, and, in

2    fact, that's what's suggested by Enron and again by Judge

3    Easterbrook's affirmance of the Lancelot case.  In fact, we

4    even have that view being taken when you have a clear Ponzi

5    scheme as in the Peterson case in the Seventh Circuit, but

6    the logic is really that Congress has spoken.  This is an

7    area that's critical to systemically important financial

8    institutions because of their interdependence, and they have

9    acted and do not believe that states should be meddling in

10   this area.  Do we have a case that says, yes, we have a void

11   ab initio under --

12           THE COURT:  Why is it meddling -- why is it meddling

13   when you're talking about state control over a municipality

14   and what it can and can't do?

15           MS. BALL:  Because we actually have a swap which

16   goes far beyond that municipality and probably involves

17   multiple other parties beyond that municipality.  Your Honor,

18   we would have to go back to was there anything -- and I think

19   we're getting back to was this voidable, was it void ab

20   initio, and what does illegal really mean because it's not

21   clear to me that illegal is one or the other when you say

22   that, and I would think if we do have to litigate this -- and

23   we may -- and, in fact, we may -- that we would be agreeing

24   with Ms. English as this morning that this is an issue that

25   is undecided.  It is still undecided, your Honor, but it does

1   put us in the position of the city, when you think of
2   complexity, duration, and expense, of evaluating how much
3   time are we going to have to spend -- how much time and money
4   are we going to have to spend litigating over whether or not
5   we have the right to litigate?  And I think that certainly to
6   that extent it was a very valid concern for us because it is
7   unclear.  No one could guarantee that those casino revenues
8   would be safe, and because, as I stand here now, I don't know
9   whether we will be seeking an injunction from your Honor --
10  we believe, yeah, maybe there are arguments, and we were
11  prepared through Mr. Hertzberg and his firm to go after them,
12  but, your Honor, how much time and how much appellate -- not
13  even on the substance, just figuring out do we have a right
14  to litigate before we even get to the substance, and that was
15  a concern in this context for the city because there is no
16  doubt here -- and I think Mr. Buckfire may have made it too
17  clear -- that in looking at the litigation, it had to be
18  reconciled with the needs of the city, and what were really
19  realistically available options for the city at the time, and
20  what did the city do to preserve its rights should
21  circumstances change going forward, and perhaps we should
22  turn to talking about that with your Honor's permission.
23          THE COURT:  Sure.  Go ahead.
24          MS. BALL:  Thank you.  Turning to the next -- I
25  think this is the slide that, yes, Ms. English is right.  I

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 13:22:00   Page 167 of 179
13-53846-swr   Doc 2514   Filed 01/17/14   Entered 01/17/14 13:27:07   Page 167 of 179
290
167

```
 1   do view this as a litigation forecast, and I do view it that
 2   way because I have seen no evidence of a loan to fund
 3   litigation, and I've seen no evidence that anyone would make
 4   a loan when what Mr. Orr testified as 20 percent of the
 5   city's revenues are under a tremendous cloud.  It seems
 6   pretty speculative to me, but what does seem rational to us
 7   is to look at if we could hope for the best and maintain the
 8   status quo during litigation, what would it look like, and we
 9   did not think while we were litigating over 20 percent of our
10   revenues that it was feasible to get a loan, and no one has
11   come forward with any evidence to the contrary, that even
12   that put us in a very delicate position, not impossible, not
13   impossible, your Honor -- nothing is impossible -- but very
14   delicate.  In fact, Mr. Malhotra testified -- and your Honor
15   may recall that you qualified Mr. Malhotra as an expert
16   twice, once in the field of financial analysis and once as to
17   his expert opinion on cash flow analysis, and, your Honor, he
18   shared with us without the DIP loan if we didn't obtain
19   financing and we had the status quo, that we were in jeopardy
20   as early as March.  He talked about what I called the hard
21   deck, the 50 million operating capital requirements, that
22   that's in jeopardy even earlier, and he reestablished Kevyn's
23   concern and leveled the emergency manager's concern about the
24   hard deck at 50 million.  It's interesting, your Honor, that
25   he had these concerns, and this is our cash, and this is
```

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 168 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:42:07   Page 163 of 179
290
168

1  where our cash stands.  And if we go back to Mr. Malhotra's
2  chart, with the benefit of having, thanks in part -- large
3  part to your Honor's ruling on August 28th, with having the
4  casino revenues for June, July, August, September, October,
5  November, December -- that's $77 million we otherwise
6  wouldn't have had, and this is still where we would be, so,
7  your Honor, I don't think it can be taken lightly, and I do
8  think that that was much on Mr. Buckfire's mind.  We had a
9  lot of back and forth about whether or not -- what did Mr.
10 Orr do, what did he think, and, in fact, he would tell us
11 that he had a very significant concern if he didn't step in
12 and do something that this situation would quickly get out of
13 hand.  In fact, I think he testified that he considered doing
14 nothing, and he determined that that would be fairly
15 catastrophic because the city was running out of money.  I'll
16 get to the point made by Ms. English because perhaps June was
17 a pinch point, which is what she has suggested, but for
18 cities whose income is cyclical, there are always pinch
19 points, which is why we want the DIP financing for working
20 capital, as Mr. Buckfire testified.  So it was very much on
21 Mr. Orr's mind, and it's interesting that no objecting party
22 has offered any rebuttal evidence with respect to financing
23 litigation or moving forward.
24       We actually, your Honor, did have the experience,
25 remember, of the casino revenues being trapped for a minor

1   period before we were in bankruptcy, and we did have to sue

2   to get them back, so the concern was real, having had the

3   Syncora experience.  In fact, Mr. Orr further testified that

4   if you were unable to get casino revenues, the consequences

5   would be quite severe, and here, your Honor, is what he had

6   to think about if the city lost, the third column not in the

7   Ambac chart.  The single largest most secure source of

8   revenue would have been imperiled.  Your Honor, I think that

9   that was very important to him.

10          And, your Honor, I would just like to point out for

11  the moment that Ms. English has talked about us rushing and

12  rushing to June, and I wanted to spend just a few minutes on

13  that because, as your Honor is aware -- let's go back --

14  June, low point for the city, no doubt -- in fact, dire was

15  the testimony -- did the deal, agreed in principle in a week,

16  took a month to document it, but, your Honor, what

17  Ms. English neglected to point out to you is that there was a

18  very pressing need for protection for the city.  The Syncora

19  experience totally demonstrated that we needed protection.

20  We needed some assurance that these revenues would be

21  available to the city, but that wasn't turtle up.  We had an

22  escape valve.  And, in fact, City Exhibits 50 to 54 confirm

23  that we kept that escape valve alive until we had another

24  one.  Your Honor, by that I mean that we had a right to walk

25  should we perceive the benefits of this agreement were no

longer necessary for the city. We kept that alive first

through fifth amendments, which took us to September 23rd.

Thereafter, the forbearance agreement itself, which is City

Exhibit 18, Section 1.3(m), for reference -- your Honor, we

had a right to walk because we failed to get an order within

75 days of filing, so until December 24th when we committed

before the mediator to not litigate and stay with this deal

until after 1-31 if your Honor were to fail to approve it, we

did have an escape valve, and we did go back, and if

situation changed, there was a way to do this. I would

suggest to your Honor that the fundamental key for us is we

agree that the challenges are litigable. I think we disagree

on the difficulty of establishing the claims, and we disagree

on the timing and expense it will take, but footnote, your

Honor, we do not agree that rushing is deciding anything

ahead of the plan. The city's residents should not have to

wait to stabilize the city's finances.

        We also think it is fairly important to your Honor

that you can determine that the issues before you right now

are properly before you. We are asking you to approve

assumption of the forbearance agreements -- agreement, not

the swap, not the service contracts. They're all contracts

with different parties at different times. It is an

executory contract, and we think, your Honor, there is no

doubt in our mind -- and we would urge that the cases would

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 71 of 79
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:47:07   Page 166 of 171
290

1    suggest that there should be no doubt in your mind -- that

2    matters regarding the assumption of a contract and a

3    settlement under 9019 -- and I can focus on the post-_Stern_

4    cases if that would be more helpful -- are clearly properly

5    before you as is the allowance of a claim, as is the

6    adjustment of debtor-creditor.

7         Your Honor, we think that your decision on the

8    eligibility motion has confirmed what the cases tell us,

9    which is if our matters are properly before you, then you

10   have the ability to decide them, and that's what we are

11   asking you to do here.  There is no doubt in our mind, your

12   Honor, that 365 and assumption is within your core authority.

13   We think that the Sixth Circuit has recently affirmed that in

14   a case called _In re. G.A.D., Inc._, 340 Fed. 3d 331, and that

15   was just this fall.  Similarly, the Seventh Circuit has said

16   that rejection of a contract is clearly core.  It's 365 even

17   though it involves state law issues, and that was decided --

18   that was affirmed by the Seventh Circuit in 2012, and that is

19   _Lakewood Engineering & Manufacturing Company_, and it is

20   reported -- excuse me, your Honor -- at -- it's reported in a

21   lower court decision, 49 B.R. 306, and the particular point I

22   would urge you to look at is on 312.  It was later affirmed

23   by the Seventh Circuit in 2012, and cert was denied by the

24   Supreme Court, 133 Supreme Court 1790.

25        Similarly, your Honor, the Third Circuit has had two

1   cases post-<u>Stern</u> where 9019 settlements affecting state court

2   were found to be core.  One was <u>New Century TRS Holdings,</u>

3   <u>Inc.</u>, which is 213 Westlaw 5944049.  Third Circuit decided

4   that on November 17, 2013.  And its second decision is <u>Lazy</u>

5   <u>Days' RV Center, Inc.</u> at 213 Westlaw 3886735, which was also

6   decided by the Third Circuit in 2013.

7          Interestingly, there's another one, your Honor, on

8   the extent of liens and your power to decide state law issues

9   regarding the extent of liens, their priority and their scope

10  and termination, and interestingly, your Honor, that's an art

11  case.  It's <u>In re. Salander O'Reilly Galleries</u>, 453 B.R. 106,

12  and it's in the Bankruptcy Court in New York, 2011, and would

13  be later affirmed by the Southern District.  We think, your

14  Honor, that all parties here have agreed that the issues to

15  approve these 365, 9019 include the enforceability and

16  validity of the forbearance agreement.  In fact, one of

17  Syncora's lead cases, <u>In re. III Enterprises, Inc.</u>, which was

18  affirmed under the name <u>Pueblo Chemical</u>, actually holds, and

19  I quote, "The issue of existence and enforceability of the

20  underlying contract are threshold issues, the resolution of

21  which is absolutely essential to adjudication of the motion."

22  Your Honor, that case distinguishes <u>Orion</u>.  I would

23  distinguish <u>Orion</u> on multiple grounds here.  The facts in

24  <u>Orion</u>, as you may recall, your Honor, the underlying contract

25  was between Showtime and <u>Orion</u>.  There was a default, and

13-53846-swr   Doc 2814-11   Filed 04/29/14   Entered 04/29/14 14:22:00:23   Page 163 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 14:47:09   Page 163 of 179
290
173

1    Showtime was enforcing the default.  There are no defaults

2    under the forbearance agreement.  We have no problems with

3    the forbearance agreement, and that's the agreement that

4    we're talking about, and, in fact, because of that, knowing

5    that, in fact, there is a contract, it has become a critical

6    predetermination.

7         We also thought it would be interesting to your

8    Honor to think about another case that was affirmed by the

9    Third Circuit.  Mr. Perez brought SportsStuff to your

10   attention.  SportsStuff is reminiscent of the channeling

11   injunction cases, but they got it wrong there, but that's not

12   the proposition I would like you to think about with

13   SportsStuff.  What I'd like you to think about is let's first

14   start with a case called RNI Wind Down Corp., 348 B.R. 286,

15   Bankruptcy Court, Delaware, 2006.  That court was called upon

16   to determine whether an objector to a settlement who asserted

17   a consent right -- whether or not their consent right was

18   necessary and whether, in fact, it was legitimate.  That

19   court determined that the objector was not a necessary party

20   to amend the settlement agreement, and consideration of Rule

21   9019 in the face of adjudicating that objector's consent

22   rights more or less was a core proceeding.  That decision

23   would be affirmed by the Third Circuit at 359 Fed. Appendix

24   352.  Interestingly, if you think about SportsStuff just a

25   little bit differently, there you had objectors to a

1    settlement -- you know, a channeling injunction wasn't under
2    plan the way we usually think about it -- and the issue was
3    could the court decide whether or not those objectors had
4    rights and should pay attention to it, and you know what?
5    That's exactly what it did.  So in terms of your ability to
6    reach the decision, <u>SportsStuff</u> would suggest that, yes, you
7    can, and, yes, you should.  Similarly, <u>RNI Wind Down</u>, yes, it
8    is within your power to do this, your Honor, to figure out
9    whether these consent rights and to determine that the
10   forbearance and optional termination agreement is a valid and
11   enforceable contract and that that's all core.  There's no
12   doubt in our mind -- and this gets to another point raised by
13   Mr. Perez -- that settlements always have collateral
14   consequences on third parties.  There are cases to that
15   effect -- multiple cases to the effect.  Allowing a secured
16   claim by definition adjusts debtor-credit relationships.  I
17   would point out here, however, your Honor, that we were able
18   to resolve the reservation of rights objection that was made
19   by the ad hoc COPs holders represented by Mr. Tom Mayer and
20   that that provision was added to the order, which was filed
21   with your Honor before we started this hearing and, in fact,
22   read into the record on one of those early days by Mr. Mayer.
23   So, your Honor, we think they're core.  We think they're
24   appropriately here.  We think they are incredibly contract
25   centric.  They are legal.  There is no ambiguity.  There is

1    just interpretation.  And with that, your Honor, I would

2    recommend that you might take heed of an admission by the

3    insurers.  In fact, the insurers admit the express terms of

4    the optional early termination provision did not require

5    their consent, and that's in paragraph 23 of the amended

6    statement of stipulated facts.

7            Your Honor, it's also very clear that 2009 changed

8    the world, and with that, your Honor, I would turn to the

9    optional early termination provision.  We've excepted the

10   one -- excerpted the one that's between UBS and GRS.  As you

11   know, there are four amended swaps schedules, one for GRS,

12   one for police and fire, one for UBS, one for Syncora -- I

13   mean one for UBS, one for BAML.  Here's the optional

14   termination provision, no insurer consent.  The confirmation

15   would have it.  2009 did change the world, but let's take a

16   minute and think about what Mr. Perez said of -- when I think

17   of his telling us that it's an end-run argument, almost

18   ironic in some respects because he's saying, you know, the

19   COPs are valid, the swaps are valid, the service corps are

20   real, it worked for that purpose, but we should disregard the

21   service corps when it comes to the swaps and the optional

22   termination, and we should construe it as an end-run.  Your

23   Honor, this is not a situation where people were not

24   represented by counsel.  This is a contract between extremely

25   sophisticated financial parties.  They knew what they were

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 14:22:00   Page 176 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 13:22:07   Page 97 of 179
290
176

doing.  And I think that the service corps are different

until someone establishes to the contrary from the city and

that this is exactly what was contemplated is that the

service corps would not pay them and the service corps are

not paying the swap counterparties -- whoops -- the city is.

In fact, your Honor, I think it was so clear -- and you and I

have had this discussion once before -- that in that fateful

summer, that June 26 of 2009, the insurers would consent to

the optional termination rights.  Your Honor, this is just

the very first paragraph of the waiver and consent of

insurer, in this case, Syncora, and what we've highlighted,

your Honor, is the exact same amended schedule that I just

reviewed the optional termination provision from, and you

will see that that amended schedule is Romanette iv in this

paragraph, and there is an express consent to it.

          Your Honor, I think it is also disappointing, maybe

a little ironic -- I guess perhaps I am being too overly

sensitive.  One of the things we kept hearing on closing is,

well, the city -- maybe it should just do nothing and it

should continue funding, and we actually heard it from Mr.

Perez that FGIC will suffer harm.  The harm FGIC suffers is

if the city doesn't continue paying the most expensive piece

of debt it possibly has, that FGIC will be harmed.  FGIC is a

very sophisticated party, and I assume Syncora would join

FGIC in these arguments.  It has a separate insurance policy

13-53846-swr   Doc 2514-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 177 of 179
13-53846-swr   Doc 4311   Filed 04/29/14   Entered 04/29/14 14:22:23   Page 177 of 179
290
177

1  from the COPs from the insurance policy it had from the
2  swaps, and if, in fact, it would be harmed by the termination
3  of the swaps, which it consented to -- and we think it's
4  clear that they did consent to it -- why should the city and
5  its residents be tasked with protecting Syncora and FGIC?
6  Heaven sakes.  We would think that they would be able to go
7  out and buy their own replacement swap once this swap is
8  terminated.  They consented to it.  If they'd like swap
9  protection, the markets are there.  They're free to go.  I
10  don't see why the residents should be delayed or the city
11  should be burdened with protecting them against their own
12  insurance contracts.

13         Moving on, your Honor, I think that the city has
14  demonstrated that the settlement with the swap counterparties
15  which allows a secured claim for 165 million satisfies the
16  Bard test.  As I said, we agree it's litigable, and, in fact,
17  they may yet be litigated.  Of the remaining ten objectors,
18  eight are potential litigating parties.  Many are involved in
19  other pending litigations before you.  The fact that no one
20  would give you a number they would accept other than I
21  respect Mr. Goldberg for his answer is not surprising to us.
22  It's difficult to number, and I think the real issues if we
23  continue through the Bard factors are the difficulty, if any,
24  to be encountered in the matter of collection.  Everyone
25  erases that, your Honor, but you asked us to think about in

1  the context of that _Bard_ factor the strength of the secured

2  position and what it would take really to undermine it, and

3  in this one, your Honor, we did look at the position and the

4  city's ability to sustain litigation to attack it.  This is

5  one of those things where collection became survival, would

6  we live to collect and how much and who would take it up and

7  who would benefit and who would be -- what would be

8  sacrificed in order to get there.  I guess the analogy here

9  is, your Honor, even if the operation were to be a success,

10  there had to be a concern, and we think it does fit into the

11  second _Bard_ factor, that the patient could die on the

12  operating table despite the operation's success.

13      In terms of the complexity, expense, inconvenience,

14  and delay, your Honor may recall that Mr. Orr testified that

15  he estimated costs -- Ms. English reminded us this morning --

16  at roughly a million a month or six to twelve million a year.

17  That's expensive.  As to duration, I think he estimated that

18  it would be a different duration of months between the fraud

19  claim advocated by Mr. Goldberg and some of the others, but

20  the full appellate prospects he has certainly suggested and

21  we would agree and urge your Honor to consider would take far

22  longer than six months.  And that cloud over this asset, 20

23  percent of the city's revenues would continue.

24      I have adjusted the fourth _Bard_ factor, your Honor,

25  because I think in Chapter 9 it's important, and I guess this

```
 1   is where I and Mr. Bennett would part company one more time.
 2   Chapter 9 is about restoring viability to municipalities.
 3   It's about adjusting debt so they can provide services to
 4   their residents, and I think the cases on that are pretty
 5   clear, and we went over some of them that are found in
 6   paragraphs 49 and 50 of our reply on the financing.
 7        If we just want to take a moment, we used to have
 8   objection, wait to see if we have the dollars to reap the
 9   discount.  Those objections are gone.  Wait for the retiree
10   committee to weigh in.  Well, they did weigh in.  They're
11   supporting this motion.  We have then the remaining group,
12   your Honor, and we had a lot of more information, more
13   discovery.  Well, there was more information, and there was
14   more discovery.  In five months people could learn a lot.
15   And now we're left with two kind of camps of objectors, those
16   who feel that given the strength of the claims, that the deal
17   does not reflect the strength of the claims against the
18   banks, but, as I think you heard from the banks this morning,
19   it's the banks and the insurers versus those who are arguing
20   it's really a matter of consent and the powers of this Court.
21   But, your Honor, it is uncontroverted that this settlement
22   will reduce net debt.  Right now that debt, your Honor --
23   we'll get there in a minute, but it's going to reduce it by
24   that discount and that linear equation, speculation,
25   unsupported -- totally unsupported speculation about 78
```

 1    percent still doesn't controvert its reduction in net debt.

 2    And, your Honor, as we know, interest rates have gone down

 3    all this week since -- last week since Janice Yellen's

 4    confirmation, so you can imagine -- and, in fact, I know

 5    what's happened to our swap termination costs, and I would

 6    suggest, your Honor, that in light of the interest rate moves

 7    and the LIBOR curve moves, which we'll come to in a minute,

 8    that it is clear there is going to be a reduction in our net

 9    debt.  It should be a substantial one.

10        What is also crystal clear is that this deal will

11    substantially improve the cash flow of the city.  Your Honor

12    may recall that when the post-petition financing was still at

13    the 350 level, the cash flow savings were 33 million a year.

14    They obviously are going to be improved by the improvement of

15    the sixth amendment and the improved deal even beyond that,

16    so there's no controverted evidence that this will clearly

17    improve the cash flow of the city.  It will give --

18        THE COURT:  I can give you about five more minutes.

19        MS. BALL:  Thank you, your Honor.  I think I'm kind

20    of done other than the next slide, your Honor.  We have

21    met -- we've met our burden, I think, under 9019.  The range

22    of reasonableness I think is the test that we would urge your

23    Honor to consider.  And, your Honor, in the context that

24    there's clearly a policy in favor of settlement, as was

25    recognized by these same cases, your Honor, I wanted to do

13-53846-swr   Doc 2514-11   Filed 01/17/14   Entered 01/17/14 13:22:00   Page 81 of 179
13-53846-swr   Doc 2812   Filed 04/29/14   Entered 04/29/14 14:22:00   Page 181 of
290

1    one last, which is the LIBOR curve, and if your Honor would

2    permit me, and then I'm done.

3           Your Honor, the LIBOR curve itself is a reflection

4    of the market's view of interest rates.  By the way, that

5    curve changes constantly.  The objectors have presented no

6    evidence that interest rates can be predicted with any degree

7    of certainty.  In fact, the city's experience would suggest

8    that it has suffered mightily from trying to take away and

9    bet on interest rates.  We also have the testimony, contrary

10   to Ms. English's representations, that Kevyn Orr did, in

11   fact, as the emergency manager, during the mediation, call

12   his investment bankers several times to try to get an idea of

13   what was going to happen to interest rates during the coming

14   weeks, so he did inform himself as to what would happen.

15   And, your Honor, if you want some understanding of what

16   Miller Buckfire knew about the LIBOR curve, I think they had

17   a very interesting exchange, Mr. Doak did, which I've

18   highlighted for you, with Mr. Arnault on behalf of Syncora,

19   and I think that Mr. Doak was quite clear that they move a

20   lot, and it is, in fact, the market's expectation of what

21   will happen to interest rates.  And, your Honor, I don't

22   think anyone can predict interest rates accurately, never

23   mind predict movements in the LIBOR curve, and with that,

24   your Honor, we would ask respectfully that you grant us an

25   order authorizing the post-petition financing and authorizing

13-53846-swr   Doc 2314-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 182 of 179
13-53846-swr   Doc 2512   Filed 01/17/14   Entered 01/17/14 14:47:07   Page 97 of 179
290
182

1  the assumption of the forbearance and optional termination

2  agreement.

3      THE COURT:  Thank you.

4      MS. BALL:  Thank you.

5      THE COURT:  I would propose, counsel, to reconvene

6  this Thursday, the 16th, at 2 p.m. for the Court's decision.

7  Any objection to that?  All right.  Hearing none, we'll be in

8  recess.  What?

9      MR. PLECHA:  Can I just make one point of

10 clarification, your Honor?  Ryan Plecha on behalf of the

11 retiree association parties.  We have not --

12     THE COURT:  If it's a matter of clarification, yes.

13 If it's a matter of argument, no.

14     MR. PLECHA:  It is not  It's just pure

15 clarification.  The retiree association parties, who were the

16 party that said the Court should wait and see for the Retiree

17 Committee's response, still has a live objection, and it is

18 objecting to both the swap and the forbearance agreement --

19     THE COURT:  Thank you, sir.

20     MR. PLECHA:  -- and the DIP.  Thank you.

21     THE COURT:  All right.  We'll be in recess.

22     THE CLERK:  All rise.  Court is adjourned.

23     (Proceedings concluded at 4:01 p.m.)

13-53846-swr   Doc 2314-11  Filed 01/17/14   Entered 01/17/14 13:27:07   Page 183 of 79
13-53846-swr   Doc 2314-11   Filed 01/17/14   Entered 01/17/14 13:22:00:23   Page 173 of 179   183
290

INDEX

|                                      | Page |
|--------------------------------------|------|
| Closing Argument by Mr. Ellenberg    | 4    |
| Closing Argument by Ms. English      | 21   |
| Closing Argument by Mr. Gordon       | 53   |
| Closing Argument by Mr. Perez        | 69   |
| Closing Argument by Mr. Marriott     | 77   |
| Closing Argument by Ms. Green        | 97   |
| Closing Argument by Mr. Bennett      | 105  |
| Closing Argument by Mr. Goldberg     | 124  |
| Rebuttal Argument by Ms. Ball        | 137  |

WITNESSES:

    None

EXHIBITS:

    None

        I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett              January 17, 2014

_____      _____

Lois Garrett

13-53846-swr Doc 2314-11 Filed 01/17/14 Entered 01/17/14 13:22:00 Page 184 of 179
13-53846-swr Doc 2312-11 Filed 01/17/14 Entered 01/17/14 13:22:00 Page 97 of 79 184
290

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE: CITY OF DETROIT,          .          Docket No. 13-53846
      MICHIGAN,                 .
                          .          Detroit, Michigan
                          .          January 16, 2014
              Debtor.          .          2:00 p.m.
. . . . . . . . . . . . . . .


BENCH OPINION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          Jones Day
                       By:  GREGORY SHUMAKER
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

                       Jones Day
                       By:  CORINNE BALL
                       222 East 41st
                       New York, NY  10017-6702
                       (212) 326-7844

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For UBS and Bank          Warner, Norcross & Judd, LLP
of America                By:  SCOTT WATSON
Merrill Lynch:            111 Lyon Avenue, NW - Suite 900
                       Grand Rapids, MI  49503
                       (616) 752-2465

For UBS AG:              Bingham McCutchen, LLP
                       By:  JARED R. CLARK
                       399 Park Avenue
                       New York, NY  10022-4689
                       (212) 705-7770

13-53846-tjt  Doc 4314-11  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 105 of
13-53846-swr  Doc 2521  Filed 01/16/14  Entered 01/16/14 13:10:03  Page 1 of 29    185
290

APPEARANCES (continued):

```
For Syncora              Kirkland & Ellis, LLP
Holdings, Ltd.,          By:  WILLIAM E. ARNAULT
Syncora Guarantee,       300 North LaSalle
Inc., and Syncora        Chicago, IL  60654
Capital Assurance,       (312) 862-3062
Inc.:

For Detroit              Clark Hill, PLC
Retirement Systems-      By:  JENNIFER K. GREEN
General Retirement       500 Woodward Avenue, Suite 3500
System of Detroit,       Detroit, MI  48226
Police and Fire          (313) 965-8300
Retirement System
of the City of           Clark Hill, PLC
Detroit:                 By:  ROBERT D. GORDON
                         151 South Old Woodward, Suite 200
                         Birmingham, MI  48009
                         (248) 988-5882

For Erste                Ballard Spahr, LLP
Europaische              By:  VINCENT J. MARRIOTT, III
Pfandbrief-und           1735 Market Street, 51st Floor
Kommunalkreditbank       Philadelphia, PA  19103-7599
Aktiengesellschaft       (215) 864-8236
in Luxemburg, S.A.:

For David Sole:          Jerome D. Goldberg, PLLC
                         By:  JEROME D. GOLDBERG
                         2921 East Jefferson, Suite 205
                         Detroit, MI  48207
                         (313) 393-6001

For Financial            Williams, Williams, Rattner &
Guaranty Insurance         Plunkett, PC
Company:                 By:  MARK R. JAMES
                         380 N. Old Woodward Ave., Suite 300
                         Birmingham, MI  48009
                         (248) 642-0333

For Ambac                Arent Fox, LLP
Assurance                By:  CAROLINE TURNER ENGLISH
Corporation:             1717 K Street, NW
                         Washington, DC  20036-5342
                         (202) 857-6178

For FMS                  Schiff Hardin, LLP
Wertmanagement:          By:  RICK FRIMMER
                         233 South Wacker Drive, Suite 6600
                         Chicago, IL  60606
                         (312) 258-5573
```

13-53846-tjt  Doc 4314-11  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 106 of
13-53846-swr  Doc 25211  Filed 01/18/14  Entered 01/18/14 13:10:03  Page 2 of 29
290                                                                          186

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Lippitt O'Keefe, PLLC By: RYAN C. PLECHA 370 East Maple Road, 3rd Floor Birmingham, MI 48009 (248) 723-6263 |
| Court Recorder: | Letrice Calloway United States Bankruptcy Court 211 West Fort Street 21st Floor Detroit, MI 48226-3211 (313) 234-0068 |
| Transcribed By: | Lois Garrett 1290 West Barnes Road Leslie, MI 49251 (517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

```
 1              THE CLERK:  All rise.  Court is in session.  Please

 2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

 3              THE COURT:  Counsel, may I ask you to put your

 4    appearances on the record at the lectern, please?

 5              MS. BALL:  Good afternoon, your Honor.  Corinne

 6    Ball, Jones Day, for the City of Detroit.

 7              MR. SHUMAKER:  Good afternoon, your Honor.  Greg

 8    Shumaker of Jones Day for the City of Detroit.

 9              MR. HERTZBERG:  Robert Hertzberg, Pepper Hamilton,

10    City of Detroit.

11              MS. ENGLISH:  Good afternoon, your Honor.  Caroline

12    Turner English from Arent Fox for Ambac.

13              MR. ARNAULT:  Good afternoon, your Honor.  Bill

14    Arnault from Kirkland & Ellis on behalf of Syncora.

15              MR. MARRIOTT:  Good afternoon, your Honor.  Vince

16    Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

17              MR. GORDON:  Good afternoon, your Honor.  Robert

18    Gordon and Jennifer Green, Clark Hill, on behalf of the

19    Detroit Retirement Systems.

20              MR. JAMES:  Good afternoon, your Honor.  Mark James

21    of Williams, Williams, Ratter & Plunkett on behalf of

22    Financial Guaranty Insurance Company.

23              MR. GOLDBERG:  Good afternoon, your Honor.  Jerome

24    Goldberg on behalf of interested party, David Sole.

25              MR. CLARK:  Your Honor, Jared Clark, Bingham
```

13-53846-tjt  Doc 4314-11  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 108 of
13-53846-swr  Doc 2521  Filed 01/16/14  Entered 01/16/14 13:10:03  Page 4 of 9  188
290

1   McCutchen, UBS AG.

2        MR. PLECHA:  Good afternoon, your Honor.  Ryan

3   Plecha from Lippitt O'Keefe on behalf of the retiree

4   association parties.

5        THE COURT:  Anyone here on behalf of Bank of America

6   Merrill Lynch?

7        MR. WATSON:  Good afternoon, your Honor.  Scott

8   Watson, Warner, Norcross & Judd, on behalf of UBS and Bank of

9   America Merrill Lynch.

10        THE COURT:  Okay.  Thank you, sir.  Is there anyone

11   on the phone that would like to place an appearance on the

12   record?

13        MR. FRIMMER:  Your Honor, this is Rick Frimmer from

14   Schiff Hardin on behalf of FMS.

15        THE COURT:  Did we get that?  Okay.  This matter is

16   before the Court on two motions.  The first is the motion to

17   approve the city's assumption of its optional termination

18   agreement -- forbearance agreement and optional termination

19   agreement with the swap counterparties.  This was negotiated

20   in large part pre-petition and then amended post-petition.

21   The second matter that's before the Court is a motion to

22   approve the city's request for certain post-petition

23   financing.  The Court will address that first motion first.

24        The motion is a bit of a hybrid motion in that it is

25   a motion to assume an executory contract and also to approve

13-53846-tjt  Doc 4314-11  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 189 of
13-53846-swr  Doc 2521  Filed 01/16/14  Entered 01/16/14 13:10:03  Page 5 of 29
290                                                                    189

1   a settlement under Rule 9019.  Of course, the motion to

2   approve the assumption is to be adjudged under Section 365 of

3   the Bankruptcy Code.  It's unnecessary to linger over the --

4   whether the standards of Section 365 apply or Rule 9019

5   applies.  The Court concludes it's the same business judgment

6   test regardless.  It is appropriate, therefore, to consider

7   the following factors upon which the Court notes the parties

8   appear to agree.  The first is the likelihood of the success

9   of any potential litigation that might result if the

10   settlement is denied.  The second is the complexity, expense,

11   and delay of such litigation.  The third is any collection

12   issues that appear, and the fourth involves the interests of

13   the city's creditors and its residents.

14        The parties have cited to the Court several cases

15   that describe in more detail the Court's obligation when

16   approval of a settlement is requested.  In particular, those

17   authorities cited by Ms. English, Ambac's attorney, appear to

18   concisely state what the Court's burden is, so, for example,

19   the Sixth Circuit's decision in In re. MQV, Inc., 477 Federal

20   Appendix 310, 313, Sixth Circuit, 2012, is cited, quoted,

21   "When determining whether to approve a proposed settlement,

22   the bankruptcy court may not rubber stamp the agreement or

23   merely rely on the trustee's word that the settlement is

24   reasonable.  Reynolds versus Commissioner of Internal

25   Revenue, 861 F.2d 469, 473, Sixth Circuit, 1988.  Rather, the

13-53846-tjt  Doc 4312-11  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 190 of
13-53846-swr  Doc 2521  Filed 01/16/14  Entered 01/16/14 13:10:03  Page 6 of 29
290

1  bankruptcy court is charged with an affirmative obligation to

2  apprise itself of the underlying facts and to make an

3  independent judgment as to whether the compromise is fair and

4  equitable," close quote.

5        In <u>In re. Rankin</u>, 438 Federal Appendix 420, 426,

6  Sixth Circuit, 2011, the Court quoted at some length from the

7  Supreme Court's decision in <u>Protective Committee for</u>

8  <u>Independent Stockholders of TMT Trailer Ferry, Inc.</u> v.

9  <u>Anderson</u>, 390 U.S. 414, 1968.  Quote, "There can be no

10  informed and independent judgment as to whether a proposed

11  compromise is fair and equitable until the bankruptcy judge

12  has appraised -- apprised himself of all of the facts

13  necessary for an intelligent and objective opinion of the

14  probabilities of ultimate success should the claim be

15  litigated.  Further, the judge should form an educated

16  estimate of the complexity, expense, and likely duration of

17  such litigation, the possible difficulties of collecting on

18  any judgment which might be obtained, and all other factors

19  relevant to a full and fair assessment of the wisdom of the

20  proposed compromise.  Basic to this process in every

21  instance, of course, is the need to compare the terms of the

22  compromise with the likely rewards of litigation."

23        In light of these authorities, the Court has

24  undertaken the required inquiry.  It has gone to some length

25  to form an intelligent and objective opinion of the

1  probabilities of the ultimate success of any proposed
2  litigation that the city might undertake, and the Court will
3  review that in a moment.

4           First, to review the proposed settlement in the
5  forbearance and optional termination agreement, this
6  agreement permits the termination of the swap agreements upon
7  payment by the city of $165 million plus so-called breakage
8  costs of $4.2 million.  The counterparties agree to forbear
9  from terminating the swaps and from trapping gaming revenues
10 prior to the city's optional termination.  The total
11 termination liability on the swaps as of December 31st, 2013,
12 was $247 million.  The $165 million settlement amount
13 represents approximately 67 percent of that amount.  The
14 termination liability, of course, is dependent upon interest
15 rates, which have changed from time to time during the course
16 of these proceedings and even, of course, since December
17 31st, 2013.  Regardless, under the most recent settlement
18 that the city asked the Court to approve, the settlement
19 amount remains at this $165 million amount or $169.2 million
20 amount.  The agreement would allow the city continued access
21 to the casino revenues of approximately $15 per month and
22 permits it to unwind the swap contracts at this discounted
23 price.  It also obviously eliminates potential litigation
24 between the city and the swap counterparties, UBS and Bank of
25 America Merrill Lynch.

13-53846-tjt  Doc 4314-11  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 192 of
290
13-53846-swr  Doc 2521  Filed 01/16/14  Entered 01/16/14 13:10:03  Page 9 of 29    192

1    So the Court will now review the likelihood of

2  success of any of the various claims that the city might make

3  against the swap counterparties and those swap

4  counterparties' various defenses in that litigation all in

5  the event, of course, that this motion is denied.

6    Initially, the city might well claim that the swap

7  counterparties' lien on the casino revenue pursuant to the

8  2009 collateral agreement is void under state law because the

9  purpose for which the casino revenue was pledged is not a

10  permissible purpose under MCL Section 432.212, the Michigan

11  Gaming Control and Revenue Act.  Under that Act, the

12  permissible uses are, (i) The hiring, training, and

13  deployment of street patrol officers; (ii) Neighborhood and

14  downtown economic development programs designed to create

15  local jobs; (iii) Public safety programs such as emergency

16  medical services, fire department programs, and street

17  lighting; (iv) Anti-gang and youth development programs; (v)

18  Other programs that are designed to contribute to the

19  improvement of the quality of life in the city; (vi) Relief

20  to the taxpayers of the city from one or more taxes or fees

21  imposed by the city; (vii) The costs of capital improvements;

22  and, (viii) Road repairs and improvements.

23    The city might claim, therefore, that this statute

24  does not permit gaming revenues to be used as security for a

25  loan, especially as security for a loan that does not fit one

1   of these permissible uses under the Gaming Act.

2           In defense to this claim, the swap counterparties

3   might well argue that the pledge of the casino revenue here

4   in this case was permissible under Subpart (v) of MCL Section

5   432.212 as a program designed to contribute to the

6   improvement of the quality of life in the city and Subpart

7   (vi) as relief to the taxpayers of the city from one or more

8   taxes or fees imposed by the city.  They would argue that

9   this is evidenced by Detroit City Code Sections 18-16-1

10  through 4.  These municipal code sections provide that the

11  pledge was necessary because the city was in default on the

12  swap agreement in January of 2009 and was facing the threat

13  of a large termination payment.  Moreover, Section 4(k)

14  specifically provides that, one -- quote, "one, pledging the

15  wagering tax property will improve the quality of life in the

16  city beyond what it would be in the absence of such action;

17  and, two, pledging the wagering tax property will

18  increase" -- sorry -- "will reduce taxes levied or imposed by

19  the city or to be levied or imposed by the city from what

20  they would be in the absence of such action," close quote.

21          In addition to these City Council findings, the

22  executive director of the Michigan Gaming Control Board

23  stated in a 2009 letter to the city's outside gaming counsel

24  that, "Upon review of this matter, I do not find any

25  compliance issues at this time."  Finally, in addition, the

1    swap counterparties would point to an opinion letter from

2    Lewis & Munday, a law firm retained by the city in 2009,

3    stating that the pledge of the casino revenue, quote, "will

4    constitute authorized purposes," close quote, under the

5    Michigan Gaming and Control Act.

6              Now, to these responses by the swap counterparties,

7    the city might respond that the connection between curing the

8    default under the swap agreement in 2009 and improving the

9    quality of life of the city -- of the citizens of Detroit is

10   a tenuous connection.  They would -- or the city would

11   further argue that it is not at all clear that the

12   legislative findings by the Detroit City Council or the

13   opinion letters of the attorneys can validate the collateral

14   agreement if it otherwise represents an impermissible use of

15   the casino revenues under the Michigan Gaming and Control

16   Act.  In a second claim that the city might make, the city

17   might argue that the casino revenue lien did not survive the

18   filing of the bankruptcy petition, so under this claim, the

19   city would argue that even if the swap counterparties' lien

20   on the casino revenues is valid under state law, that lien

21   does not survive the bankruptcy filing under Section 552(a)

22   of the Bankruptcy Code because it is not a statutory lien and

23   is not proceeds.

24             In response, the swap counterparties might argue

25   that the collateral agreement did create a statutory lien in

13-53846-tjt   Doc 3211   Filed 04/8/44   Entered 04/8/44 23:00:23   Page 195 of 29
13-53846-swr   Doc 2521   Filed 01/16/14   Entered 01/16/14 13:10:03   Page 11 of 29   195
290

1    the casino revenue because it was created by the enactment of

2    the City Council of Municipal Code Sections 18-16-1 through

3    7.  In response to that argument by the swap counterparties,

4    the city might respond that the City Council only enacted

5    these sections to effectuate the terms of the collateral

6    agreement to which the parties had already agreed.  For

7    example, Section 18-16-12 states, quote, "All obligations of

8    the city under this ordinance and the definitive documents

9    are contractual obligations," close quote.

10         The city would further argue here that even if the

11   lien does survive -- or excuse me -- does not survive the

12   filing of the petition under Section 552 -- I'm sorry.  I

13   have my party wrong here.  The swap counterparties would

14   argue that even if the lien does not survive the filing of

15   the petition under Section 552, the lien would survive the

16   filing of the bankruptcy petition under Section 928 of the

17   Bankruptcy Code.  That section provides, quote,

18   "Notwithstanding section 552(a), special revenues acquired by

19   the debtor after the commencement of this case shall remain

20   subject to any lien resulting from any security agreement

21   entered into by the debtor before the commencement of the

22   case"; thus, the swap counterparties would argue that the

23   lien may survive if the casino revenues constitute special

24   revenues.

25         In response to that, the city would argue that the

13-53846-tjt  Doc 4314-11  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 196 of 291
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 19:10:03  Page 12 of 29
290
196

1   definition of "special revenues" in Section 902(2)(B) does

2   not apply to casino revenues because casino revenues were not

3   created specifically for the purpose of financing the

4   collateral agreement.  Special revenues, the city would note,

5   include special excise taxes under Section 902(b)(2), but the

6   casino revenues constitute general excise taxes.

7           The city would further argue that the Bankruptcy

8   Code safe harbors for swap agreements in several sections of

9   the Bankruptcy Code, including Section 362(b)(17) and Section

10  560, do not apply to either the swap agreement or to the 2009

11  collateral agreement.  Thus, the city would argue that the

12  swap counterparties may not trap the casino revenue during

13  the pendency of the bankruptcy case.  Section 362(b)(17)

14  provides in pertinent part that the automatic stay does not

15  operate as a stay of the exercise by a swap participant or a

16  financial participant of any contractual right related to any

17  swap agreement.  Similarly, Section 560 provides in pertinent

18  part that the exercise of any contractual right of any swap

19  participant to cause the liquidation, termination, or

20  acceleration of one or more swap agreements shall not be

21  stayed, avoided, or otherwise limited by operation of any

22  provision of this title or by any order of a court or

23  administrative agency in any proceeding under this title.

24  The city would claim that these safe harbors do not apply,

25  however, because the safe harbors only protect swap

13-53846-tjt  Doc 431-11  Filed 04/8/44  Entered 04/8/44 21:00:23  Page 197 of 29
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 13:10:03  Page 13 of 25
290
197

 1 participants, as that term is defined in Section 101(53C),

 2 quote, "An entity that, at the time of the filing of the

 3 petition, has an outstanding swap agreement with the debtor,"

 4 close quote.  The city would claim that if the swap

 5 counterparties had a valid swap agreement with anyone, it was

 6 with the service corporations, not the city.

 7 The swap counterparties would respond in defense to

 8 this claim that they were actually in an agreement with the

 9 city.  The city controlled the service corporations, they

10 would maintain, and remains responsible for any of the

11 service corporations' obligations under the swap agreement

12 and the collateral agreement.

13 The city would also claim that the swap harbors do

14 not apply if the swap agreement and the collateral agreement

15 are void ab initio; that is to say, from the beginning.  The

16 idea is here that if the agreements are void from the

17 beginning, ab initio, under state law, they are simply not

18 swap-related -- there are simply no swap-related contractual

19 rights to enforce.  Moreover, if the swap counterparties'

20 alleged rights are avoided, it will be by operation of state

21 law, not by any court proceeding under the Bankruptcy Code.

22 On the other hand, the swap counterparties would

23 argue in defense that this argument by the city ignores the

24 purpose of the safe harbors, which is to protect the

25 nationwide derivatives markets from the bankruptcy of a

13-53846-tjt  Doc 4311  Filed 04/89/14  Entered 04/89/14 23:00:23  Page 198 of 25
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 13:10:03  Page 14 of 25
290
198

single party.  In response to that, the city would argue that
the problem with this defense is a logic problem.  They would
ask how can the safe harbors protect contractual rights that
do not exist under state law?  While a distinction must be
drawn or may be drawn between void and voidable agreements,
the city argues that it has litigable claims that the swap
agreement and the collateral agreement are void and have been
from the outset.

Of course, the advantageous result to the city and
the reason to pursue this claim is that if its claim to
invalidate the collateral agreement is sustained, it would
free up the gaming revenue for use in providing city services
and also perhaps to allow this property -- these revenue --
these gaming revenues to serve as collateral for loans.

In the absence of the settlement, the city might
also pursue a potential claim challenging the underlying swap
agreements themselves.  The city would argue that the swaps
themselves are invalid because the city did not comply with
the Revised Municipal Finance Act called Act 34, MCL Section
141.2101 and following.  Specifically, MCL Section 141.2317,
which governs swap transactions entered into by
municipalities, requires either (a) that the interest under
the agreement constitutes a limited tax full faith and credit
pledge from the general funds of the municipality or (b)
subject to any existing contracts, the interest under the

1  agreement shall be payable from any available money or
2  revenue sources, including revenues that shall be specified
3  in the agreement, securing the municipal security in
4  connection with which the agreement is entered into.  And the
5  city would contend that neither of those conditions for a
6  city to enter into a swap transaction were met here.

7        In response, the swap counterparties would assert
8  that Act 34 does not apply because the swap agreements were
9  between the swap counterparties and the service corporations,
10  not the city.  In response to that, the city might argue that
11  the service corporations are a sham and should be
12  disregarded, and they would also assert that the agreement
13  between the city and the service corp. is itself a swap
14  agreement as that term is broadly defined in the Bankruptcy
15  Code.

16        In response -- in partial response to at least the
17  argument that service corporations are a sham, the swap
18  counterparties might argue the doctrine of in pari delicto or
19  unclean hands may prevent the city from arguing that the
20  service corporations should be disregarded.  As noted, the
21  city might also claim that the agreements between the service
22  corporations and the city were themselves swap agreements
23  covered by Act 34 but that the service contracts are
24  themselves unenforceable because they, too, fail to comply
25  with Act 34.  The swap counterparties might argue that the

13-53846-tjt  Doc 4312-11  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 200 of
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 13:10:03  Page 16 of 29
290
200

1  city has powers under the Home Rule Act which could

2  independently authorize the swap agreements, and, of course,

3  the swap counterparties would certainly argue that the same

4  safe harbor provisions of the Bankruptcy Code that the Court

5  discussed earlier in connection with the city's challenge to

6  the collateral agreement apply to protect the swap agreements

7  themselves.

8         The city's challenge to invalidate the swap

9  agreements has potentially very advantageous consequences for

10 the city.  If successful, not only would the city be released

11 from any obligation to the swap counterparties, but the city

12 might also recover the alleged $300 million that it has

13 already paid to the swap counterparties.  In response, of

14 course, the swap counterparties might have an in pari delicto

15 defense to that claim.

16        As we drill down further here, we find a question

17 that the parties did not actually address, and that is what

18 if the collateral agreement is found to be void under the

19 Michigan Gaming Act or that it does not survive the

20 bankruptcy filing under Sections 552 and 928 but that the

21 swap agreement is enforceable?  The question may become will

22 the city then be able to treat the termination liability as

23 an unsecured claim and impair it in the plan process, or will

24 the safe harbor provisions require the city to pay the claim

25 in full even though it's unsecured?  It appears to the Court

13-53846-tjt  Doc 3151-11  Filed 04/89/14  Entered 04/89/14 21:00:23  Page 201 of 21
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 19:10:03  Page 201 of 29
290
201

1  that it is more likely that Section 560 of the Bankruptcy

2  Code does require the termination claim to be paid in full

3  even if it is unsecured.  This makes much higher, of course,

4  the stakes of the city's claim that the swap agreements are

5  void under Act 34.

6      There is also, as Mr. Goldberg argued, a potentially

7  broader series of challenges to the swap agreements and the

8  collateral agreement, for that matter, as well, that they

9  were induced by fraud, are subject to equitable

10 subordination, or that they were unconscionable.  And, of

11 course, the readily identifiable defense to these by the swap

12 counterparties would be that the city was well-represented in

13 these transactions, that these transactions were negotiated

14 at arm's length, and that there was no fraud or coercion or

15 undue influence or any wrongdoing on their part.

16     The Court must emphasize, having outlined these

17 various claims and defenses, that it is not for the Court at

18 this time to decide these issues, and that's true even though

19 the depth of the parties' presentations on them were just

20 about as if motions for summary judgment were before the

21 Court.  Rather, the Court is simply to evaluate the

22 likelihood of success.  The Court has carefully considered

23 that question and has determined that the city is reasonably

24 likely to succeed on its challenges to the collateral

25 agreement under the Gaming Act and the Bankruptcy Code.  The

1  Court further concludes that the city is reasonably likely to
2  succeed on its challenge to the swap agreements under PA 34.
3  As to the city's other potential claims, while they are
4  certainly not frivolous, their likelihood of success is less
5  apparent on the record before the Court at this time.

6         The Court will now review the other factors to be
7  taken into account in determining whether to approve this
8  settlement.  Addressing the delay, complexity, and cost of
9  the litigation, the Court must conclude, of course, that
10 these are substantial considerations here.  Certainly the
11 issue of the validity of the trap of the casino revenues can
12 be promptly resolved by this Court through summary judgment.
13 It is less clear, of course, how quickly appeals would be
14 resolved.  The same can be said concerning the city's
15 challenge to the swap agreements under Public Act 34.  Any
16 other challenges, however, that the city might pursue are
17 very fact-intensive and would require substantial discovery,
18 some perhaps even international in scope, and that litigation
19 might take years if the city decides to pursue that.  The
20 expenses, especially the legal expenses, of filing a lawsuit
21 challenging the collateral agreement and the underlying swap
22 agreements, for filing a motion for a preliminary injunction,
23 and for filing a motion for summary judgment on the legal
24 issues involved in challenging these agreements would be
25 undoubtedly substantial but, given the amount of money at

13-53846-tjt   Doc 4311   Filed 04/29/14   Entered 04/29/14 21:00:23   Page 203 of
13-53846-swr   Doc 2521   Filed 01/16/14   Entered 01/16/14 19:10:03   Page 19 of 29   203
290

1  stake, relatively insignificant.

2      Addressing now the issue of collectibility, the

3  Court concludes that nothing in the record suggests that this

4  is any issue here except that, as noted earlier, if the swap

5  counterparties are unsecured and if their claims are not

6  protected by Section 560 of the Bankruptcy Code, their

7  termination fee may be subject to impairment through the plan

8  of adjustment.

9      Addressing now the interest of the public and

10 creditors, in weighing this factor, the Court considers the

11 fact that the city is requesting the Court's approval to

12 replace its old obligations under the swap agreements and the

13 collateral agreement, which the city concedes as to which it

14 has litigable claims against the enforcement of them, with

15 new obligations that would be fully protected both by

16 security interests and by court approval.  The Court stated

17 earlier and states again that it will not participate in or

18 permit the city to perpetuate the very kinds of hasty and

19 imprudent financial decision-making that led to the

20 disastrous swaps and COPs transactions.  Those practices have

21 already caused great harm to the city's creditors and to its

22 citizens.  In the Court's view, one goal of this Chapter 9

23 case is to end these practices so that the city can truly

24 recover from its past mistakes and move forward, and the

25 Court intends to conduct itself accordingly.  In case

parenthetically this dicta needs any further clarification,
let me state that the Court intends to carefully scrutinize
the feasibility of any plan of adjustment.

At the same time, it is also true that the residents
of the city have an interest in city leadership that focuses
all of its attention on the city's future and its
revitalization. This is, indeed, a very important
consideration, as the Court has previously emphasized. And
let there be no doubt that litigation can be very
distracting, and the Court must also consider that several
creditors have objected to this motion, and their views and
the depth of their views are very important in the Court's
analysis.

On balance, the Court concludes that the motion to
assume the forbearance agreement should be denied. The Court
rationally balances the city's claims against the swap
parties with the swap parties' defenses to those claims,
considers the complexity of the litigation and the expense
and time of it and the interests of the city's residents and
creditors. In so doing, it must conclude that the $169
million settlement to the swap counterparties is just too
high a price to pay for the city to put this issue behind it.
It is higher than the highest reasonable number. If it were
close, the Court would approve it, but by any rational
analysis, it's not close. The Court looked for every way it

13-53846-tjt  Doc 4311  Filed 04/89/14  Entered 04/89/14 21:00:23  Page 205 of
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 13:10:03  Page 21 of 29    205
290

1   could to approve the settlement.  As the city argued, the law
2   prefers settlements.  But it could not find a way.  It's just
3   too much money, and the Court must insist that any settlement
4   be rational, as the law itself requires.  In its eligibility
5   opinion, the Court found that the city had entered into a
6   series of bad deals to solve its financial problems.  The law
7   says that when the city filed this bankruptcy, that must
8   stop.  It also says that this Court must be the one to stop
9   it, if necessary.  It is necessary here.  Accordingly, the
10  motion is denied.  In these circumstances, it is unnecessary
11  to address the consent rights issue.
12          Turning now to the motion for post-petition
13  financing, 11 U.S.C., Section 364(c), provides, "If a trustee
14  is unable to obtain unsecured credit allowable under section
15  503(b)(1) of this title as an administrative expense, the
16  court, after notice and a hearing, may authorize the
17  obtaining of credit or the incurring of debt - (1) with
18  priority over any or all administrative expenses of the kind
19  specified in section 503(b) or section 507(b) of this title;
20  (2) secured by a lien on property of the estate that is not
21  otherwise subject to a lien."  The city seeks to borrow $285
22  million from Barclay and to grant Barclay a lien in casino
23  revenues, income tax revenues, utility tax revenues, and
24  water and sewerage revenue.  Of that amount, $165 million was
25  proposed to go to the swap counterparties to settle that

13-53846-tjt Doc 4311 Filed 04/29/14 Entered 04/29/14 21:00:23 Page 206 of
290
13-53846-swr Doc 2521 Filed 01/16/14 Entered 01/16/14 13:10:03 Page 22 of 29   206

1   claim or those claims, and $120 million would go for quality
2   of life improvements, which may include increase in police
3   staffing, purchase of emergency vehicles, blight removal, and
4   updating the city's technology resources.  Because the motion
5   to assume the forbearance agreement and settlement agreement
6   is denied, the request for the loan to fund that settlement
7   must be denied as well.  However, the Court finds that the
8   request for approval to borrow $120 million on a secured
9   basis should be granted with conditions.  Specifically, the
10  Court finds that the city has established by a preponderance
11  of the evidence that this loan is in the best interest of the
12  city; that it needs the money; that the terms are market
13  terms and the best available to the city; that they were
14  negotiated in good faith; and that they were negotiated at
15  arm's length.  Indeed, the Court finds that there was no
16  substantial contradictory evidence on these points.
17          The objecting parties raise these arguments:  one,
18  the city did not attempt to obtain an unsecured loan; two,
19  the city did not provide the City Council with sufficient
20  information to evaluate the loan and did not comply with the
21  legal requirements for disclosure to the City Council; three,
22  the city has not adequately explained the proposed use of the
23  quality of life loan proceeds; and, four, this approval
24  should await the plan confirmation process.
25          With respect to the first objection, the Court

13-53846-tjt  Doc 4311  Filed 04/8/14  Entered 04/8/14 21:00:23  Page 207 of
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 19:10:03  Page 23 of 29   207
290

 1   concludes that the city has adequately established that the

 2   unsecured credit would not have been available to the city.

 3   The objecting parties cite cases holding that the city was

 4   required to actually attempt to obtain unsecured credit and

 5   that the city did not do that here.  The Court finds these

 6   cases unpersuasive because they impose a requirement that is

 7   simply not in the statutory language of Section 364(c).  That

 8   section simply requires the Court to find that the debtor has

 9   established by a preponderance of the evidence that it is

10   unable to obtain unsecured credit.  There are, of course,

11   many ways to prove that fact.  Showing that the debtor

12   actually attempted and failed to do that is only one way to

13   prove it.  In this case, the Court concludes that there was

14   credible evidence that the city is unable to obtain unsecured

15   credit.  That evidence makes sense, in the Court's

16   experience, and it was uncontradicted in the evidence.

17   Accordingly, the Court finds that the city has established by

18   a preponderance of the evidence that it is unable to obtain

19   unsecured credit.

20          With respect to the second objection, Public Act

21   436, Sections 19(1) and (2), require the emergency manager to

22   submit his proposed action to the City Council.  The City

23   Council then has a period of time to propose comparable or

24   better terms for the action.  Plainly, the adequacy of the

25   disclosure to the City Council should be determined based on

13-53846-tjt  Doc 4311-1  Filed 04/89/14  Entered 04/89/14 21:00:23  Page 208 of 29
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 19:10:03  Page 24 of 29
290
208

1  whether the disclosure by the emergency manager allowed the

2  city to take advantage of its statutory opportunity to

3  propose an alternative.  Here the Court concludes that the

4  disclosures that the city made to City Council, especially as

5  they pertained to the proposed interest rates, were

6  sufficient to permit it to evaluate the loan and for the City

7  Council to go out into the marketplace to attempt to obtain

8  an alternative.  Accordingly, the Court concludes that there

9  was substantial compliance with PA 436, and this objection is

10  overruled.

11      It is next asserted that the city has not adequately

12  explained the uses of the loan proceeds.  In the Court's

13  view, this objection overlaps with the question of the

14  conditions that the Court has determined must be placed on

15  the loan.  The problem arises because the record is

16  contradictory on what the proceeds of this loan would be used

17  for.  In recognition of the limitations on the use of gaming

18  revenues under state law, some evidence suggests that the

19  city will use the proceeds for, quote, "quality of life,"

20  close quote, purposes.  Other evidence, however, suggests

21  that the proceeds will simply be working capital.  The city

22  contends that even if gaming revenue is provided as security,

23  the limitations of the Gaming Act do not apply because

24  Section 364 authorizes this Court to approve the loan without

25  regard for any state law limitations.  The Court rejects this

view of its authority under Section 364 and concludes that

any offer of security for a loan under Section 364 must

comply with state law unless, of course, Section 364

expressly provides otherwise.  As the city points out, the

Court can, under Section 364, give a senior or priming lien

to existing liens which might be or would be in derogation of

state law; however, nothing in Section 364 suggests that a

Court can allow a municipality to use its property in

violation of state law.  The Court does conclude that

offering gaming revenue as security for a loan would comply

with the Gaming Control Act but only if the proceeds of the

loan that are so secured are used as limited by state law.

Accordingly, if this loan is secured by gaming revenues, the

proceeds must be used for the purposes identified in the

Gaming Act.  The Court must caution the city here, however.

While the Act does permit the use of gaming revenues to

improve quality of life in the city, that authorization

cannot be applied so broadly that it effectively eliminates

the statutorily imposed limitations.  Specifically, nothing

in the Act authorizes proceeds to be used for working

capital.  To enforce this state statutory limitation, the

Court will condition this approval on a process by which the

city gives 14 days' written and filed notice of its intent to

use the proceeds during which interested parties can object

on the grounds that the proposed use is not consistent with

13-53846-tjt  Doc 4314-11  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 210 of
13-53846-swr  Doc 2521  Filed 01/18/14  Entered 01/18/14 19:10:03  Page 26 of 29  210
290

1   the Gaming Act.  The Court would then schedule a prompt

2   hearing and promptly resolve the objection.  Consistent with

3   Section 904, however, the Court will not review any aspect of

4   the use of the proceeds other than its compliance with the

5   Gaming Act.

6          In the alternative, of course, subject to Barclays'

7   approval, the city could use as security other property for

8   this loan such as other revenue streams that carry with them

9   no such restrictions under state law.  In that event, the

10  Court -- excuse me.  In that event, the process that the

11  Court outlined would not be necessary and would not be

12  imposed.

13         The Court further cautions the city that if it does

14  decide to pursue only the quality of life loan at this time,

15  it may want to consider whether under state law it is

16  necessary to present the revised loan to the City Council

17  under PA 436 and to the Emergency Loan Board for its

18  approval.  This caution, however, is not intended to be a

19  ruling on this issue.

20         Finally, the Court will overrule the objection that

21  this loan should be approved only in the context of plan

22  confirmation.  The city has determined out of necessity to

23  pursue this loan now.  Section 364 of the Bankruptcy Code

24  certainly permits the city to do that.  Under Section 904 it

25  is not for this Court to review the city's political and

1  governmental decisions, which pursuing this loan plainly is.
2  Accordingly, this objection is overruled.

3       Finally, the Court must emphasize that the parties
4  should not interpret this Court's denial of this particular
5  settlement to mean that they should not continue to attempt
6  to resolve these issues through negotiations.  They
7  absolutely should.  The Court agrees that the settlement of
8  the swaps claims is better for everyone than litigation and
9  hopes that everyone still agrees with that.  If the city
10  feels the need to pursue immediate litigation, so be it, but
11  even so, litigation and negotiation can and should be pursued
12  at the same time.  In any event, the Court strongly
13  encourages the parties to continue to negotiate.

14       At this time, the Court is going to conduct a closed
15  conference with counsel, and so I'm going to ask everyone in
16  the courtroom who is not an attorney in the case to leave the
17  courtroom.  We're also going to shut down the closed circuit
18  feeds and turn off CourtCall.

19       (Proceedings concluded at 2:49 p.m.)

13-53846-tjt  Doc 4314-11  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 212 of
13-53846-swr  Doc 2521  Filed 01/16/14  Entered 01/16/14 15:10:03  Page 28 of 29  212
290

INDEX

WITNESSES:

      None

EXHIBITS:

      None


          I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                        January 18, 2014
_____          _____
Lois Garrett

13-53846-tjt Doc 431-11 Filed 04/29/14 Entered 04/29/14 21:00:23 Page 213 of
13-53846-swr Doc 2521 Filed 01/18/14 Entered 01/18/14 19:10:03 Page 29 of 29    213
290

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                             .        Detroit, Michigan
                             .        April 2, 2014
                Debtor.       .        9:00 a.m.
.  .  .  .  .  .  .  .  .  .  .  .  .  .


         HEARING RE. NOTICE OF PRESENTMENT OF ORDER BY:
         DEBTOR IN POSSESSION CITY OF DETROIT (#2921);
     ORDER TO SHOW CAUSE WHY EXPERT WITNESSES SHOULD NOT BE
     APPOINTED (#3170); MOTION TO ADJOURN HEARING REGARDING
     THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER, PURSUANT TO
      SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY
        RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT
     AGREEMENT AND GRANTING RELATED RELIEF HEARING (#3287);
        EX PARTE MOTION TO EXTEND RE. DISCLOSURE STATEMENT
                 APPROVAL SCHEDULE (#3317)
          BEFORE THE HONORABLE STEVEN W. RHODES
           UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:       Jones Day
                      By:  BRAD ERENS
                      77 West Wacker Drive
                      Chicago, IL  60601
                      (312) 269-4050

                      Jones Day
                      By:  THOMAS CULLEN
                      51 Louisiana Ave., N.W.
                      Washington, DC  20001-2113
                      (202) 879-3924

                      Jones Day
                      By:  HEATHER LENNOX
                      222 East 41st Street
                      New York, NY  10017
                      (212) 326-3837

                      Pepper Hamilton, LLP
                      By:  ROBERT S. HERTZBERG
                      4000 Town Center, Suite 1800
                      Southfield, MI  48075-1505
                      (248) 359-7333

13-53846-tjt  Doc 4317-1  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 12 of 47
13-53846-swr  Doc 3771  Filed 04/04/14  Entered 04/04/14 10:40:33  Page 1 of
290                                                                      214

APPEARANCES (continued):

| | |
|---|---|
| For Erste Europaische Pfandbrief-und Kommunalkreditbank Aktiengesellschaft in Luxemburg, S.A.: | Ballard Spahr, LLP<br>By: VINCENT J. MARRIOTT, III<br>1735 Market Street, 51st Floor<br>Philadelphia, PA  19103-7599<br>(215) 864-8236 |
| For the Official Committee of Retirees: | Dentons US, LLP<br>By: SAM J. ALBERTS<br>1301 K Street, NW, Suite 600, East Tower<br>Washington, DC  20005<br>(202) 408-7004 |
| | Dentons US, LLP<br>By: CAROLE NEVILLE<br>1221 Avenue of the Americas, 25th Floor<br>New York, NY  10020-1089<br>(312) 632-8390 |
| For the State of Michigan: | Dickinson Wright<br>By: STEVEN HOWELL<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI  48226-3425<br>(313) 223-3033 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By: ROBERT GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Associa- tion and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Zucker &<br>  Freedman, P.C.<br>By: BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By: CAROL CONNOR COHEN<br>1717 K Street, NW<br>Washington, DC  20036-5342<br>(202) 857-6054 |

APPEARANCES (continued):

For FMS:               Schiff Hardin, LLP
Wertmanagement:        By:  RICK FRIMMER
                       233 South Wacker Drive
                       Chicago, IL  60606-6473
                       (312) 258-5511

For Detroit Retired    Lippitt O'Keefe, PLLC
City Employees         By:  RYAN C. PLECHA
Association,           370 East Maple Road, 3rd Floor
Retired Detroit        Birmingham, MI  48009
Police and Fire        (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For Syncora            Kirkland & Ellis, LLP
Holdings, Ltd.,        By:  STEPHEN HACKNEY
Syncora Guarantee           NOAH ORNSTEIN
Inc., and Syncora      300 North LaSalle
Capital Assurance,     Chicago, IL  60654
Inc.:                  (312) 862-3062

For Bank of            Davis, Polk & Wardwell, LLP
America:               By:  MARSHALL S. HUEBNER
                       450 Lexington Avenue
                       New York, NY  10017
                       (212) 450-4099


Court Recorder:        Kristel Trionfi
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE CLERK:  Court is in session.  Please be seated.
2  Case Number 13-53846, City of Detroit, Michigan.
3    THE COURT:  Good morning.  I'd like to begin with
4  the notice of presentment regarding the financing order,
5  please.
6    MR. ERENS:  Good morning, your Honor.  Brad Erens,
7  E-r-e-n-s, of Jones Day on behalf of the city.  Your Honor,
8  we're pleased to be here for hopefully approval of the
9  quality of life financing that your Honor previously approved
10  on a preliminary basis in January.  We presented the revised
11  order to you as part of our notice of presentment.  We do
12  have some objections.  I think most of the objections relate
13  to procedurally where we are.  It's the city's view that,
14  again, your Honor approved this loan subject to presentment
15  of an order that comported with your ruling on January 16th,
16  and that's what we did.  The objections take the position
17  that this is a completely new financing.  For the reasons we
18  set forth in our reply to those objections, that's not the
19  case.  If your Honor has any questions, we're happy to answer
20  them.
21    Your Honor issued an order on March 24th asking us
22  to provide additional information.  We attached that as
23  exhibits to our reply.  We filed blacklines of the financing
24  documents.  We provided a schedule of expenditures and budget
25  as Exhibit F to the reply to the objections, and we provided

1 some other information just showing that the loan is no

2 different than the portion of the loan previously sought and

3 approved by your Honor on January 16th, so to the city that's

4 where we are. Again, happy to answer any questions or we can

5 just go to the objections, but we'd reserve time to reply.

6 THE COURT: All right. Thank you. Who would like

7 to be heard regarding this?

8 MR. MARRIOTT: Good morning, your Honor. Vince

9 Marriott, Ballard Spahr, representing EEPK and affiliates,

10 although I rise on behalf of a group of objectors and will

11 speak on their behalf as well as my own clients.

12 Mr. Erens is correct. Our objection to the proposed

13 order for the latest iteration of post-petition financing was

14 procedural. In other words, it is our view that the city

15 needs to proceed by motion rather than by mere presentment of

16 a proposed order. The presentment comes some six weeks after

17 the hearing on the original proposed financing and is with

18 respect to a different loan than the city was proceeding with

19 respect to the last time around. This Court may have offered

20 guidance to the city the last time around as to what it would

21 approve, but what the Court indicated it would approve then

22 was not the loan the city had at the time. In other words,

23 the Court was not approving this loan because this loan did

24 not exist six weeks ago. That matters, your Honor, because

25 circumstances have changed from where they were the last time

 1   the city filed a motion seeking approval of post-petition

 2   financing, and the city should be required to make a case for

 3   this loan under present circumstances, not a different loan

 4   under prior circumstances.

 5         Now, what are the present circumstances and why do

 6   they require a new showing by the city following a new motion

 7   and a new hearing?  Well, for one thing, Judge, we're six

 8   months past the RFP that went out with respect to the prior

 9   financing, which, in any event, was for a different loan,

10   different purposes, different amount.  A determination that

11   the terms and conditions reflected in the loan -- new loan

12   are the best available to the city for a smaller loan with a

13   different purpose today can't be made from the record of the

14   last hearing.

15         Judge, moreover, because the uses of the loan are

16   not the same, questions as to need and structure arise that

17   the city should have to address.  Specifically, no part of

18   this loan is being used to retire existing debt.  Its only

19   use now is for what the city used to call quality of life

20   purposes but which it indicated at the last hearing was

21   really for working capital purposes.  Nonetheless, the loan

22   is still structured as a term loan with all the proceeds

23   advanced at once rather than as a revolving credit, which is

24   far more typical of short-term working capital financing.

25   This results in what is likely to be unnecessary interest

13-53846-tjt  Doc 4317-1  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 219 of 219
13-53846-swr  Doc 3471  Filed 04/04/14  Entered 04/04/14 10:40:13  Page 6 of 7
290

1  expense since the city will be paying interest on loan

2  proceeds that it is not using until it -- unless it expends

3  all of the loan proceeds on the day of funding, which there's

4  no evidence it will do, which leads your Honor to an even

5  more fundamental question, which is whether at this stage of

6  the case with confirmation three and a half months away under

7  the present schedule it needs to borrow any money at all or

8  this will just result in expense but no benefit.

9        The Court requested that the city provide a schedule

10  of proposed expenditures to support the new loan.  To my

11  understanding of schedule, the city did not do that.  The

12  city provided you with illustrative but not binding

13  categories of potential expenditures.  The real question,

14  your Honor, at this stage of the case is how much of these

15  proceeds can actually be spent between now and the end of the

16  case when the loan comes due.  Are there any, quote, unquote,

17  shovel ready projects?  If so, what are they, how much will

18  they cost, and why would the city be borrowing and paying

19  interest on more than those shovel ready costs, if any?

20        In short, Judge, the case that the city made the

21  last time around doesn't make the case for this loan this

22  time around.  Accordingly, the city should not be permitted

23  to proceed by presentment of a form of order but should be

24  required to proceed in the normal fashion by motion and a

25  hearing, and that's our view.

1    THE COURT:  Thank you, sir.  Would anyone else like
2  to be heard?  Response, please.
3    MR. ERENS:  Thank you, your Honor.  I guess we heard
4  two points, two main points in the objections.  One is
5  somewhat new or at least a little different than what was
6  filed, which is why is the city doing this now, especially
7  with confirmation arguably on the horizon.  There are clear
8  answers to that, your Honor.  Again, that wasn't really the
9  main point of the filed objection, but we will respond.  The
10  city has numerous projects that it really needs to attend to.
11  I think it's sort of obvious to everybody that there is a lot
12  of work to be done in the city.  This loan originally, from
13  the city's perspective, was scheduled to close at the end of
14  2013, of course, subject to the court process.  It couldn't
15  be guaranteed that that was the case, but the city had
16  projects ready to go back then and has projects ready to go
17  right now and is in the position that actually it has
18  deferred this infrastructure spending for some time and it is
19  ready to go the date the loan closes.
20    In terms of the argument that the loan is just being
21  used for working capital, I don't quite understand that, your
22  Honor.  We did provide a schedule, again, at your request to
23  indicate what the city intends to use the money for, and,
24  again, the illustrative examples are police and fire, fleet,
25  maintenance, repair, staffing.  This is not working capital

1  in the sense of just funding deficits and the like.  We have
2  actual hard asset projects that are ready to go, also blight
3  removal, another major category.  So with respect to that
4  type of issue, again, the city would simply say we're ready
5  to go.  We have projects that we want to spend the money on,
6  and we will be spending the money on those projects if and
7  when the loan closes.

8       With respect to the issues about why now with
9  confirmation so close, again, it's the same issue.  I mean
10 this is money that the city intends to spend, and it has
11 deferred these types of projects for some time and would like
12 to go forward.

13      With respect to the procedural issue, I guess, which
14 is what was really in the filed objection, the notice of
15 presentment has now been out for approximately -- I believe
16 we filed it on March 6, so it's not like we filed the notice
17 of presentment and were here two days later.  This process
18 has been out there now for more than three weeks.  I guess I
19 would say, one, a motion was not something we think was
20 required based on the Court's prior ruling.  Your Honor
21 preliminarily approved the loan.  But, nonetheless, we don't
22 really see the prejudice.  We filed the order.  The parties
23 responded with the objection that they responded to, and
24 we're now at the hearing.

25      With respect to the record, which I suppose is the

1   other aspect that was raised, does the record reflect -- or

2   does the record support, I suppose I should say, the entry of

3   the order, we think, yes, your Honor, clearly it does.  The

4   record reflected a process whereby the city solicited

5   interest in this loan.  Parties were asked and some did

6   submit proposals just for this portion of the loan rather

7   than the entirety of the loan at the time, which, again, was

8   the swap portion and then this portion.  And it is the city's

9   and its advisors' collective wisdom that this is the best

10  loan available for this portion of the financing, the quality

11  of life financing.  The Barclays offer has always been the

12  best offer, and there's no reason to believe there is a

13  better offer out there.  I suppose the issue about

14  confirmation cuts both ways in the sense of this loan is

15  really only expected to be out for a relatively short period

16  of time from now until confirmation, so if you think about

17  it, if the city were to go out and solicit interest in a new

18  process, which would take a lot of time, it probably means

19  the loan would not actually close before confirmation.  And

20  we don't expect to get a better deal, but we would have to

21  pay another commitment fee for a new loan, and with the loan

22  only being out for a short period of time, it's unrealistic

23  really to believe that the city would save money through a

24  new process.  I can go through those details if you'd like to

25  understand better, but a commitment fee for a new process

1   would almost invariably eat up any benefit to a party

2   offering a lower price, but, again, the city doesn't believe

3   a lower price is out there, and that's reflected in the

4   testimony that was given to your Honor back, I believe, in

5   December and January and based on the collective wisdom of

6   the city and its advisors.

7        So, your Honor, we're ready to go.  We're eager to

8   go.  We've got projects to fund, and we are hopeful that you

9   will approve the loan at this time.  Thank you.

10       THE COURT:  All right.  Thank you.  Stand by,

11  please.  Okay.  Would anyone else -- are you all set?

12       MR. ERENS:  Yes, I think so.

13       THE COURT:  Okay.  Would anyone else like to be

14  heard?  All right.  The Court is going to enter the order

15  that was submitted by the city or an order with minor

16  modifications to it if that's appropriate at this point in

17  time.  The Court will overrule the objections at this time.

18  As the Court sees it, there are three such objections.  One

19  is as to the adequacy of the record previously made to

20  justify the present loan and the present order approving that

21  loan.  The second is as to the timing of this loan, and the

22  third is the question of whether the procedure that the city

23  has employed for the entry of this order violates any of the

24  procedural rights of the objecting parties.

25       The Court concludes that the record is adequate,

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 20:00:23  Page 224 of
13-53846-swr  Doc 3772  Filed 04/04/14  Entered 04/04/14 10:40:13  Page 11 of  224
290

1  indeed, more than adequate to support the Court's approval of
2  the loan as it presently has been requested.  The loan, as it
3  has been requested now, is sufficiently similar to the
4  loan -- the portion of the loan that the Court previously
5  approved that there is, in the Court's conclusion, no need
6  for any further development of the record in order to justify
7  this present loan.  The considerations that led the Court to
8  approve the loan the last time, in the Court's view, still
9  apply and still support the approval of the loan.

10       As to the timing, the Court concludes that the
11  record does establish a certain urgency to obtain these funds
12  to begin the projects that the city feels the need to
13  commence at this time.  This Court has previously held that
14  the city is service delivery insolvent.  It is not providing
15  sufficient services to meet the basic needs of its citizens,
16  and this loan will provide the city with the means to begin
17  to make up that deficit, and it's important and urgent for
18  the city to do that.  The city recognizes that importance and
19  that urgency, and the time to begin is now, if not before
20  now.

21       As to the procedural rights of the objecting
22  parties, the Court concludes that the process that the city
23  has employed, this notice of presentment process, has given
24  all of the objecting parties a fair opportunity to object and
25  to be heard regarding the relief that the city seeks here.

1  Could the city have filed a new motion?  Of course it could
2  have, but was it required to in order to provide the
3  objecting parties with a sufficient opportunity to understand
4  what the city was trying to do and to object to it if they
5  did object?  It did, so you may submit an appropriate order.

6          MR. ERENS:  All right.  Thank you very much, your
7  Honor.  Your Honor mentioned minor modifications.  Is that
8  something your Honor intends to do or directions?

9          THE COURT:  If you're satisfied with the order that
10  was attached to the notice, that's fine.  I just didn't know
11  if there were changes that needed to be made in the meantime.

12          MR. ERENS:  I don't believe so, your Honor, but we
13  will confirm and get back to your chambers.

14          THE COURT:  Okay.

15          MR. ERENS:  Thank you.

16          THE COURT:  Let's turn our attention to the order to
17  show cause why an expert witness should not be appointed.
18  Who'd like to be heard regarding this matter?

19          MR. CULLEN:  I'll go first, your Honor.

20          THE COURT:  All right.

21          MR. CULLEN:  Thomas Cullen of Jones Day representing
22  the city.  May it please the Court, good morning, your Honor.
23  I'd like to emphasize at least two things with respect to the
24  city's response to this.  Number one, we were basically
25  meaning to affirm the Court's broad discretion to do what the

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 226 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 10:40:23  Page 13 of 77  226
290

1  Court feels it needs to build the record we all need to
2  accomplish our common work here.  We made certain suggestions
3  that we thought could be included in such an order, which we
4  thought furthered some of those objectives.  These are not
5  must things, of course.  These are considered things within
6  the Court's broad authority, which we recognize under 706,
7  and we think the overall process is a good one.  And we think
8  that if the Court gets the experts that it needs or the
9  stature of person that the record might need for this that
10  those people will be the kind of people who set their own
11  agenda to some degree.

12      I thought it was -- I think it might be necessary
13  for us to address some of the talk about the city trying to
14  hijack the process or something of the sort, and if I could
15  digress briefly, what happened was is that we were working on
16  a draft 706 order to submit to the Court at the time the
17  Court's order came down and had been thinking about the issue
18  for some time.  And in order to look at the feasibility of
19  that, we had gone out to talk to what we thought was a
20  preeminent expert who had refused to be a paid expert because
21  he thought it inconsistent with his scholarly integrity, and
22  he made the handsome offer that is reflected in our papers.
23  That happened before the Court's order came down.  So far
24  from trying to hijack the process, I was left in -- we were
25  left in a position where we'd done some thinking about this.

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 20:00:23  Page 227 of 227
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 10:40:13  Page 14 of 77
290

1    We'd contacted an eminent individual who made a handsome

2    offer, and I could either be cute about that or share that

3    with the Court, which is what we decided to do.  But the

4    basic message is that we think that the input of such expert

5    or experts would be useful to the Court.  We think that a

6    procedure here, because we have a fast track, as other

7    motions will indicate this morning -- the procedure here

8    requires some thought, and that's why we suggested the mini

9    hearing, joint deposition, deposition in front of the Court,

10   call it what you will, I think clearly within the Court's

11   powers under 706 to get the expert's views in front of the

12   Court and the parties in an open forum subject to cross-

13   examination but at a point prior to the actual confirmation

14   hearing so that we could -- all the parties and the Court

15   could use those views, which would be part of the record, to

16   inform our positions and to, as we said in our papers, enrich

17   the record and direct our questioning and our focus better as

18   we move forward.  That's where we were coming from with these

19   things.  It is all in aid of -- we've got a common job of

20   work here.  It's a hard job.  Outside help from eminent

21   individuals beholden to no one is a great idea to help us all

22   do our work on behalf of the city, so that's -- we're in

23   favor.  We think it's within the Court's authority.  It's

24   within the Court's authority to do it any of the which ways

25   suggested to the Court, so we submit these ideas to the

1   Court's discretion and prudence.

2           THE COURT:  Thank you, sir.

3           MR. MARRIOTT:  Good morning again, your Honor.

4   Vince Marriott, EEPK and affiliates, again speaking for a

5   larger group.  We filed a comment as well as a suggested

6   edited version of both orders.  Our concern, as we expressed

7   in our papers, is not with the idea of the court-appointed

8   expert but with the scope that that appointment would

9   involve.  Our concern is that feasibility narrowly defined is

10  too limiting a scope for such an expert.  Determining whether

11  or not the city can meet or can reasonably be expected to

12  meet the obligations under its plan tends to push the plan

13  process in a direction toward the city limiting itself to the

14  minimum possible, the less the plan provides the city will do

15  for creditors and itself.

16          THE COURT:  I'm not sure I understand why that's so.

17  I assume that parties who object to the plan on the grounds

18  that the plan does not meet the best interest of creditors

19  test will submit evidence of that, and that issue will have

20  to be dealt with as part of the plan confirmation process.

21          MR. MARRIOTT:  We will submit evidence of that,

22  Judge, but because the requirements of the Bankruptcy Code

23  tie feasibility and best interest of creditors together,

24  they're really two sides of the same coin.  It seems to us

25  that limiting the expert's scope to feasibility and not

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 229 of
13-53846-swr  Doc 3772  Filed 04/04/14  Entered 04/04/14 16:46:13  Page 16 of  229
290

having the expert also look at issues relative to best

interest such as, yes, the city -- what the city proposes to

do works, but so would other things that would be better for

creditors and result in a greater return to creditors, would

be better for the city and result in a better revitalization

of the city --

THE COURT:  No, but here's what --

MR. MARRIOTT:  I think all the --

THE COURT:  Here's what motivated me to suggest

this, and it is precisely the argument you've just made.  I

have doubted that any creditor will argue that the city's

plan is not feasible.  Quite to the contrary, creditors will

argue that the city can do more.  And it was that lack of

adversary process as to feasibility together with the

extraordinary importance of feasibility that led me to

suggest this.  I have no doubt but that the adversary process

will work fully as to the best interest of creditors test.

What concerns me and what led to this hearing this morning is

whether the adversary process will work as to feasibility.

MR. MARRIOTT:  And our concern is sort of a

corollary, which is if the expert is limited to feasibility

narrowly construed --

THE COURT:  Um-hmm.

MR. MARRIOTT:  -- that that will push the process

toward, for want of a better word, privileging feasibility

1   over best interests, and it is our view that you can't

2   privilege feasibility over best interests, that they are

3   joined at the hip, both are required to confirm a plan, and

4   that if there is to be a court-appointed expert on one piece

5   of the whole, that to prevent that from being privileged and

6   to give the Court and the parties the opportunity to explore

7   independently best interests as well, that the scope of the

8   expert's engagement really should be both. And I don't know

9   that it meaningfully burdens the expert beyond feasibility

10  only. The expectation is the expert is going to be looking

11  at what the city plans to do and in looking at what the city

12  plans to do will no doubt have views as to whether or not the

13  city could be doing different things that would result in

14  better outcomes. And our concern, again, is pushing the

15  process toward feasibility, being put on a pedestal and best

16  interest being secondary -- and that would be an outcome

17  that, in our view, would be not only inconsistent with

18  Chapter 9 but would result in a confirmation process that was

19  not going to lead to the best possible result. Do you have

20  any other questions of what we submitted? I think it's

21  relatively self-explanatory.

22          Oh, the other thing -- I'm sorry. I should make one

23  other point. The other thing that concerned us about the

24  form of order was that it suggested that the expert, whatever

25  his or her scope, would consult with the city only.

13-53846-tjt   Doc 4374-11   Filed 04/29/14   Entered 04/29/14 20:00:23   Page 231 of
13-53846-swr   Doc 3772   Filed 04/04/14   Entered 04/04/14 10:40:13   Page 18 of   231
290

1          THE COURT:  Yeah.  I agree with you about that, and
2     that's a change that will have to be made.
3          MR. MARRIOTT:  Okay.  That was the other thing.
4          THE COURT:  Right.
5          MR. MARRIOTT:  Do you have anything further for me,
6     your Honor?
7          THE COURT:  No, just to thank you for the
8     suggestions you and the city and the others made in response
9     to my order to show cause.  I found many of them to be very
10    helpful and will incorporate many of them in the final order.
11         MR. MARRIOTT:  There may be others who wish to speak
12    who I was --
13         THE COURT:  Sure.
14         MR. MARRIOTT:  -- not speaking on behalf of.
15         MR. ALBERTS:  Good morning, your Honor.  Sam Alberts
16    from Dentons on behalf of the Official Committee of Retirees.
17    We join in with the statements that have been made by Mr.
18    Marriott about the concern of balance.  I would just like to
19    add one other point on that.  I think that it is important
20    that if this Court were to retain an expert for himself --
21    and I understand the purpose of it and the desire to keep a
22    close eye on whether feasibility truly is met or whether or
23    not it's just being sort of sloughed off to the side to cut a
24    deal, but there is an issue of perception, and I think that
25    this case is very visible.  There is a lot of concern in the

community that the process is fair and that the various
interests of the party are being perceived equally by those
that are involved in the process. And what I would suggest
is that it is important for this expert not just to focus on
the feasibility side of the test but also the best interest
side because in addition to giving, I think, that expert a
more fulsome view of the case and what may be truly doable
and feasible, it will also give, I think, more confidence to
people who are looking at this process that the expert is
truly looking at the right issues in a balanced way. And I
realize that in normally the adversarial process the city
would be arguing on one side. We'd be arguing on the other.
The Court has its own experts. I think that people are going
to want to know that this Court is being informed in a
balanced way, so I would rise to suggest that is another
reason for expanding the scope.

Now, with that said, I don't think the scope should
be as an uber-expert, and I don't think that's what the Court
was suggesting, some expert that would override all of the
other experts in this case, but as someone who was helping to
inform the Court. So with that, your Honor, unless the Court
has any questions --

THE COURT: Yeah. It is the Court's intent that
this expert, assuming we can find one, would be treated in
all practical senses like the other experts.

13-53846-tjt Doc 4374-11 Filed 04/29/14 Entered 04/29/14 22:09:23 Page 233 of
13-53846-swr Doc 3742 Filed 04/04/14 Entered 04/04/14 16:40:13 Page 20 of 233
290

```
 1          MR. ALBERTS:  Okay.  Thank you very much, your
 2   Honor.
 3          MR. HOWELL:  Good morning, your Honor.
 4          THE COURT:  Mr. Howell.
 5          MR. HOWELL:  Steven G. Howell, Dickinson Wright,
 6   special assistant attorney general appearing on behalf of the
 7   State of Michigan.  We are here this morning to support the
 8   Court's order.  We share the Court's concern on feasibility.
 9   We have expressed that concern numerous times to the city and
10   to the other parties that we have spoken to during the course
11   of this case.  We have pushed on that issue on a regular
12   basis.  We believe that the greatest opportunity for success
13   in this case exists now, and we must get it right the first
14   time.  We believe that the success achieved must be long-term
15   and lasting.  Feasibility is the key to that.  And we defer
16   to the Court to judge best what it feels is most helpful in
17   coming to its decision, and so, your Honor, we stand in
18   support of the Court's entry of an order for an expert on
19   feasibility.  Thank you, your Honor.
20          THE COURT:  Thank you, sir.
21          MR. GORDON:  Good morning, your Honor.  Robert
22   Gordon on behalf of the Detroit Retirement Systems.  I'll be
23   brief.  I will presume that the Court has seen our papers as
24   well.  We suggested some wordsmithing around some of the
25   order to make clear what retentions are relevant, both the
```

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 234 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 21 of 71
290

1    applicants and the applicants' firm and things of that

2    nature.  We also generally express concern about the

3    nomination process and other things that would ensure an

4    arm's length process.

5         The only other thing I wanted to mention is that we

6    do join in the general concern about elevating feasibility

7    over best interests.  I certainly understand and would

8    respect the Court's concern about a lack of adversarial

9    process with respect to the feasibility issue itself, but we

10   would just simply urge the Court to consider ways to make

11   sure that feasibility does not become the end-all, be-all and

12   elevate it over the other issues, so we just wanted to

13   join --

14        THE COURT:  I do have a couple of questions for you

15   about issues that I think your paper raised.  As a general

16   matter, I think that any party who has information that the

17   expert decides in his or her judgment he or she needs ought

18   to cooperate with that expert.  I take it there couldn't be

19   any objection to that.

20        MR. GORDON:  None, your Honor.

21        THE COURT:  Okay.  The question then becomes what to

22   order, if anything, about how such requests for information

23   are actually accomplished and how the responses to those

24   requests for information are actually accomplished.  It

25   strikes me as potentially cumbersome to involve the Court

 1   every time an expert wants something from a party and that we

 2   ought to be able to devise some less formal but nevertheless

 3   properly transparent process to do that, so that's my goal --

 4   excuse me -- that's my goal for that.  It doesn't seem to me

 5   to be appropriate or even necessary to prohibit ex parte

 6   communications, per se, between the expert and the parties to

 7   the extent the expert in his or her judgment wants

 8   information to go directly to the party.  I do think it's

 9   appropriate to prohibit ex parte communication between the

10   expert and the Court, and I indicated, I think, in one of the

11   suggested orders that any of those kinds of communications

12   ought to be in writing.  Are we together so far?

13           MR. GORDON:  Yes, your Honor, although I think

14   I've -- in certain situations I could imagine where the

15   expert may have -- I'm actually sort of thinking out loud,

16   and I shouldn't be doing that and may be saying something

17   against my own interest, but I would want the expert to have

18   some flexibility to be able to confer with you.  It is the

19   court-appointed expert, and I understand that in other cases

20   there has been some methodology in limited circumstances for

21   communication with the Court, so I'm less troubled about that

22   than I am about --

23           THE COURT:  Well, I appreciate that, but --

24           MR. GORDON:  Sure.

25           THE COURT:  -- as Mr. Alberts has pointed out,

1  everything -- everyone is watching everything we do here.

2          MR. GORDON:  Yes, your Honor.

3          THE COURT:  So I'm going to -- I want to try to

4  devise some means by which the expert can expeditiously

5  obtain the information needed to do the job that is at the

6  same time as transparent as possible, and, of course, any

7  such communications are subject to discovery, depositions or

8  cross-examination, et cetera.  Okay.

9          The other question I had for you, the one you

10  mentioned about the actual selection process, it will be --

11  it would be extremely helpful to me to have input in the

12  selection process.  Again, the question becomes how to

13  balance the need to do this expeditiously with the importance

14  of that input, so what I'm thinking of doing is inviting a

15  small subset of you all to participate with me in the

16  interview process and to do that interview actually in open

17  court on the record so that anyone who's interested can at

18  least sit in on if not participate in the interviews.  And I

19  certainly agree with whoever made the comment that this

20  interview is not a Daubert hearing.  To the extent we need a

21  Daubert hearing, we can do that later.  This is just a

22  selection interview.  Okay.

23          MR. GORDON:  Agreed.

24          THE COURT:  So what I'm thinking of is one

25  representative of the city to participate and two

1    representatives from the objecting parties' side, so I want
2    to ask the city to nominate someone, and I want all of you on
3    the objecting side to meet and confer and nominate four
4    attorneys from a cross-section of you from which I will
5    select two.  Is there any objection to that?  So I and three
6    of you will interview this person -- or these applicants, I
7    should say.  So we'll set a deadline for the applications.  I
8    will narrow the field down to the -- I don't know -- three or
9    four or five to be interviewed, and then we'll conduct the
10   interviews.  Sir.
11         MR. ALBERTS:  Your Honor -- I apologize, your Honor.
12   When you say the nomination of four, you mean four attorneys
13   to help the Court interview the witness.  Does the Court also
14   ask from the other parties to -- or give us an opportunity to
15   nominate potential experts as well, or is that --
16         THE COURT:  Well, I have very mixed feelings about
17   that specific question.  My concern is that, as some of you
18   observed in your papers, if a party nominates a witness,
19   there's a public perception of some kind of connection, and I
20   don't want that, so my preference would be for you to solicit
21   applications yourselves if that's what you want to do.  Now,
22   I will forewarn you when you do that that one of the
23   interview questions will be, "Who have you spoken to about
24   this nomination?" so I mean eventually it's all going to come
25   out.

1          MR. ALBERTS:  Right.

2          THE COURT:  But I think the optics of it are better

3    if we follow that route rather than you make nominations.  I

4    know the rule allows for that.  I don't think it requires

5    that, though.

6          MR. ALBERTS:  Okay.  I appreciate that, your Honor.

7    So if an expert witness or somebody may be interested, they

8    should contact the Court directly?

9          THE COURT:  They should submit an application.

10         MR. ALBERTS:  Yeah.  Okay.  Thank you very much,

11   your Honor.

12         THE COURT:  Yeah.

13         MS. PATEK:  Good morning, your Honor.  Barbara Patek

14   on behalf of the public safety unions.  And I think a lot of

15   what I'm going to say is going to be addressed, but I did

16   want to, for the record, make a couple of comments on behalf

17   of the public safety unions because we are the group who

18   stands, I think, on both sides of the feasibility

19   determination.  And I think with the process that the Court

20   has indicated is going to be put in place, a lot of our

21   concerns are going to be addressed, but I think mainly what I

22   wanted to say is obviously there are a number of tremendous

23   advocates in this courtroom, and we're all advocates for our

24   particular constituency.  And I think that it's very

25   important that this expert be truly independent if there can

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 239 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 26 of  239
290

```
 1   be such a thing and, you know, that economics, as we know, if
 2   that's the direction we're going, is not a science in the
 3   same way that calculus or chemistry is a science.  And given
 4   the city's great political latitude in terms of framing the
 5   feasibility question, one thing that the public safety unions
 6   do not want to see get lost in the mix is the idea that it's
 7   not just are the dollars and cents there to pay what has to
 8   be paid going forward, which is obviously important to us
 9   because if we're going to make an agreement with the city, we
10   want to know that we're going to continue to be paid, but the
11   flip side of that, as the Court recognized in its eligibility
12   opinion and in the comments it made earlier today about the
13   service delivery insolvency, is that particularly in the case
14   of public safety, you're dealing with a group of people who
15   the record in front of the Court says, you know, the morale
16   is low.  They're underpaid.  They're undermanned.  They're
17   working in very difficult conditions, and they're now facing
18   not only cuts in their paychecks but in their pensions going
19   forward.  And I think the need -- included in the need to
20   provide those essential services has to be that human part of
21   the equation.  And I'm not talking about as a sympathy factor
22   but is the city going to be able to keep and retain a high
23   quality group of people to continue to perform those
24   services, and I think those are my comments, for the record.
25   Thank you, your Honor.
```

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 240 of
13-53846-swr   Doc 3742   Filed 04/04/14   Entered 04/04/14 16:48:13   Page 27 of 77   240
290

1          THE COURT:  Thank you.

2          MS. CONNOR COHEN:  Carol Connor Cohen from Arent Fox

3    for Ambac Assurance Corporation.  Your Honor, I will be very

4    brief.  I just want to return briefly to the feasibility,

5    best interest issue.  I think that -- and we very much

6    appreciate your Honor's comments that you will view this

7    independent expert like the other experts in the case, but

8    the reality is that the independent expert is going to be

9    likely viewed as somehow more independent, more influential

10   because he or she is independent and not, you know, one of

11   the parties', you know, hired guns, to use a pejorative

12   phrase.  And for that reason, we think it really is important

13   that the independent expert look at both sides of the coin,

14   look at both feasibility and best interest, because if

15   they're only looking at whether the city can make the plan

16   work and not whether the city has also done everything it can

17   do, it's likely to skew the analysis, and that's all I want

18   to say.  Thank you.

19         THE COURT:  Thank you.  Would anyone else like to be

20   heard?  Mr. Cullen.

21         MR. CULLEN:  Briefly, your Honor.  With respect to

22   the small issue of how to arrange the communications, it's

23   between the expert and the parties.  It seems to me that

24   there are two alternatives available, one slightly more

25   formal, one slightly less.  One is that the experts and the

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 241 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 28 of
290                                                                    241

```
 1    parties could just keep a log of contacts and the nature of
 2    the contacts and then make those logs available at a given
 3    time.  If that's -- if that provides insufficient control or
 4    is thought to, then we could just have the expert or the
 5    parties memorialize in a brief letter or note when such
 6    contacts occurred, either one, so then you'd have kind of
 7    real time notice of what was going on.
 8              THE COURT:  Um-hmm.
 9              MR. CULLEN:  Either would be acceptable to the city.
10    I think either would be workable without putting a logjam in
11    the process.  And with respect to the interview process, I
12    assume that one of the -- one of the other things it won't be
13    like is a confirmation hearing that won't be -- you know, no
14    French kissing in high school as an objection or anything of
15    that nature, but also with respect to --
16              THE COURT:  I won't ask you what you meant by that.
17              MR. CULLEN:  Well, let's not reminisce, your Honor,
18    but the -- but I think that in the nomination process or in
19    the identification process -- and I would regard what we did
20    with Professor Glaeser as more of an identification than a
21    nomination, but that's terminology.  But there may be other
22    people that come to us, and we might encourage them to -- we
23    might encourage them to apply as well.
24              THE COURT:  Um-hmm.
25              MR. CULLEN:  And I would -- and I would urge the
```

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 242 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:46:13  Page 29 of 71   242
290

1   Court, as it thinks about these things -- and maybe it's

2   responsive to what the parties have said -- that it may help

3   the Court to have more than one, and it may be interesting or

4   not interesting to the Court that some might offer or prefer

5   to do it pro bono.  I think that's an -- I think that's an

6   interesting point for the Court to wrestle with.  All right.

7   Thank you, your Honor.

8           THE COURT:  All right.  Sir.

9           MR. FRIMMER:  Good morning, your Honor.  Rick

10  Frimmer, Schiff Hardin, representing FMS.  More of an

11  observation than anything else, as you correctly point out,

12  the world is sort of watching.  Ever since the docket

13  reflected the order to show cause, I know I have and I'm sure

14  other people have heard from many industry professionals

15  wanting to know how they get in on the action, so to speak.

16  I would suggest to your Honor that you're going to be

17  inundated with RFP's.

18          THE COURT:  Um-hmm.

19          MR. FRIMMER:  So I was wondering whether you had any

20  thoughts about what -- the paradigm qualifications you're

21  looking for and whether you intend to narrow the field.  Are

22  you looking for an academic, financial industry type folks?

23  It just might be helpful to narrow it if you had notions

24  about that --

25          THE COURT:  Um-hmm.

13-53846-tjr  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 243 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 33 of
290
243

1          MR. FRIMMER:  -- because -- or else you may have

2     hundreds of responses to your RFP.

3          THE COURT:  Thank you.  To be less flip, again, I'm

4     of two minds on the subject.  On the one hand, I'm interested

5     in efficiency, which I think is the concern you're expressing

6     here.  On the other hand, I don't want to be so efficient

7     that I exclude by definition someone who might be really

8     good, and I'm not sure that academic versus nonacademic makes

9     sense, so so far in my thinking I've declined to be any more

10    specific than I outlined in the proposed order.

11         MR. FRIMMER:  As I say, mine is just an observation

12    that the --

13         THE COURT:  Thank you.

14         MR. FRIMMER:  -- panel of three, so to speak, that

15    ultimately will assist you are going to have to weed through

16    probably three categories of folks that are going to respond

17    to this.  You know, some may be what I would refer to -- what

18    I could refer to as urban planner types.

19         THE COURT:  Right.

20         MR. FRIMMER:  Some -- most, I think, will be the

21    kind of financial advisory firms that do M&A work and all of

22    whom will be eminently qualified to --

23         THE COURT:  Yeah.

24         MR. FRIMMER:  -- numbers, so to speak.

25         THE COURT:  Right.  And you raise a good point.  The

13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 31 of 71
13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 20:00:23  Page 244 of
290
244

1  urban planning person who can look at the city's assumptions

2  may not be the same person who can look at the Excel

3  spreadsheet on the cash flows and projections.

4        MR. FRIMMER:  That's my point.

5        THE COURT:  So that's why I sort of left open the

6  possibility in the order that it may be two experts or maybe

7  more.  I don't know.  I'm open to what makes sense --

8        MR. FRIMMER:  Well, again --

9        THE COURT:  -- without burdening the process --

10        MR. FRIMMER:  Yeah, and without delay.

11        THE COURT:  -- and without compromising the

12  efficiency we all need.  Thank you.

13        MR. FRIMMER:  So I made the point.  I mean it's

14  really more for you to think about, but --

15        THE COURT:  Thank you.

16        MR. FRIMMER:  -- you know, the consequences are

17  that, you know, if the panel -- that three-person panel along

18  with your Honor -- if it's more of an academic type, that

19  person will have to likely retain the numbers crunchers.  If

20  it's a numbers cruncher, they'll probably have to work with

21  an urban planner because -- I think the city noted this in

22  their papers, and I think this was a perfectly legitimate

23  observation that feasibility, if you will, broadened or not,

24  still involves not only the question on do the numbers add up

25  but also the underlying assumptions --

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 245 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 10:40:13  Page 2 of 7  245
290

1        THE COURT:  Right.

2        MR. FRIMMER:  -- from a planning standpoint --

3        THE COURT:  Correct.

4        MR. FRIMMER:  -- so that's why I pointed it out.

5        THE COURT:  Thank you, sir.  I think there was one

6    more or a couple more.  Okay.  Sir.

7        MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

8    on behalf of the retiree association parties.  I rise briefly

9    just to suggest to the Court that on the creditors' side, it

10   may be prudent to increase the number above two for the wide

11   array of creditors in this case without getting cumbersome,

12   but I think limiting it to two could possibly have a negative

13   impact, and to maybe allow the creditors to caucus and

14   suggest a number that's above two but in the realm of

15   efficiency I think would be prudent.

16       THE COURT:  Okay.

17       MR. PLECHA:  Thank you.

18       THE COURT:  No.  That's fine.  If you all think we

19   can do this efficiently with more than two on your side, I'm

20   certainly willing to consider that.  Mr. Alberts, was there

21   something further you wanted to say?

22       MR. ALBERTS:  No.  Mr. Plecha had said his own

23   piece.

24       THE COURT: He said it.  Okay.  All right.  Well,

25   let's see.  Today is Wednesday.  By Monday or Tuesday of next

1  week, can you get me your suggestions to serve on the

2  interview committee?  I do want to get the solicitation order

3  out today, so I will make the revisions to that and get that

4  entered today, and then we'll set a deadline for the

5  applications and an interview date.  All right.

6        We will next turn our attention to the motion to

7  adjourn tomorrow's hearing.

8        MR. HACKNEY:  Your Honor, good morning.  Stephen

9  Hackney on behalf of Syncora.  I rise on behalf of a number

10  of parties.  I think a large majority of the objectors have

11  joined in the motion.  I'd like to briefly run through the

12  rationale behind the motion and then also bring one

13  additional concern to the Court's attention that has sort of

14  come into focus this week with the depositions rather than

15  waiting to spring it on you tomorrow if we do go forward.

16        The continuance we've requested -- we've asked for a

17  continuance on the order of seven to ten days, and it's

18  principally in the -- principally of the view of just

19  allowing us better time to prepare and organize the hearing.

20  While we've had the term sheet, as you know, since early

21  March, we did not have the rather lengthy legal briefs that

22  were filed until a week ago Friday.  We did not have the

23  settlement agreement itself and the proposed order until late

24  last Wednesday.  And as you know, these are detailed complex

25  documents in their own right that in themselves relate to

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:09:23  Page 247 of
290
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 10:40:23  Page 34 of 77   247

1  other detailed and complicated contracts, and so our point

2  was just a simple one, which is that we believe a short

3  continuance also taking in light of the fact that we were

4  just in depositions on Monday will allow the parties to

5  better prepare their arguments and also better organize the

6  hearing, for example, by doing things like reaching some

7  agreement about -- with respect to the prior hearing, which

8  exhibits should still come in and which portions of that

9  hearing people think should be applicable to this hearing and

10  which should not.  That's something that's more efficiently

11  done outside of the courtroom rather than trying to negotiate

12  it in front of you and having there be ambiguity about what's

13  in evidence and what isn't until we start the hearing, so

14  that is an example of a mechanical benefit that we could get

15  from a short adjournment.  There won't be any prejudice to

16  the city by a short adjournment, your Honor, because, of

17  course, they will --

18          THE COURT:  Didn't I already suggest that I didn't

19  see any reason why everything in the prior hearing can't be

20  considered evidence in this hearing?

21          MR. HACKNEY:  What I took your statement to mean at

22  the last hearing was you had a colloquy with Mr. Hertzberg

23  where he said the prior hearing should come in in its

24  entirety, and I thought that you said can't it all just be

25  submitted and then I'll decide which of it is relevant and

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 248 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:23  Page 35 of 71  248
290

1   which of it is not, but I may have misunderstood your point.

2   I know there are times where in bench trials, right, you --

3           THE COURT:  Well, I said that in utter agreement of

4   what Mr. Hertzberg was saying, not to suggest anything

5   different.

6           MR. HACKNEY:  Okay.  Well, I misunderstood then.  I

7   would note, I guess, for example, Mr. Buckfire testified at

8   length in the prior hearing about the prior forbearance

9   agreement.  That's the type of thing where there may be

10  portions of Mr. Buckfire's testimony that are still relevant.

11  It seems to me that there are large portions of his testimony

12  that might not be relevant.  My suggestion is that it would

13  be better for the parties to have clarity, to the extent they

14  can, about what they're contending from the prior hearing and

15  what they're not.

16          Your Honor, it's a short continuance, and it's a

17  small point, which is just that there is a lot going on in

18  this motion.  It's very important.  It's complicated.  I can

19  tell you, as one of the lawyers that's preparing on it, that

20  it was just to make an argument that we think that we can put

21  the hearing together for you better if we have a little

22  additional time.

23          I do want to raise something that is more important

24  and more substantial.  I don't want to wait till tomorrow to

25  bring it to your attention, assuming I lose my adjournment

1    motion.  There is a -- there's an emerging issue that's

2    important and that is factually intensive that relates to the

3    service corporations, so if you go back to the original term

4    sheet, what I would submit was less clear in that term

5    sheet -- it was clear the liens were all going to be released

6    on the collateral.  I would submit that the injunction and

7    how the service corps were going to be handled was less clear

8    to me.  You'll then see that a wave of objections come in

9    that are raising points about the structuring problems

10   relating to the service corporations trying to understand now

11   you're not including these service corporations, how are you

12   deciding their rights.  And this goes to the core of the

13   motion because the city's goal here is to free up the gaming

14   collateral, and the lien is on the gaming collateral that's

15   held at least in the first instance -- and this is hotly

16   debated -- by the service corporations, so this is an

17   important issue.

18         Now, if I can say something that I would say is a

19   little bit of a recurring issue in this case is there's a

20   tendency by the city to file these motions that are a bit

21   threadbare when it comes to sort of the rationale of

22   relatively complicated legal issues.  Then the objections do

23   a lot of work that try and suss out what all the objections

24   are, and then right before the hearing the city will file

25   very lengthy, very detailed briefs detailing all of these

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 250 of
290
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 3 of 7    250

1    things, what their responses are, what their thinking was

2    about why they can do what they're doing in the motion.  And

3    that happened certainly on the first forbearance agreement.

4    I would say it's happened again here because the original

5    motion was basically like this settlement is basically the

6    same as the other settlement, so all the reasons from the

7    first settlement rationale in that hearing, they all apply,

8    and it basically just quoted all the different parts of the

9    transcript from that hearing.  But then when we all pointed

10   out, no, no, no, there are major structural and legal

11   differences here that you have to take account of, then what

12   we get back are 90 pages of briefs a week ago Friday that do

13   go into a lot of different issues that you will not see in

14   the prior pleadings.  Of equal importance, though, is the

15   fact that this service corp question -- on a week ago Friday

16   when they filed their briefs, the city came out with a new

17   rationale for why you can decide the rights of the service

18   corporations, and it was somewhat twofold.  The first thing

19   they said is, well, the service corporations have acquiesced

20   in the motion, so they haven't objected, so you can do

21   whatever you want to them.  And then the flip side of that,

22   they said, well, the service corporations are a shell, and so

23   you can disregard them and do whatever you want with their

24   rights.  Those were the two rationales.

25          Now, let me first note that this issue is a big

1  ticket issue in the COP and validity lawsuit.  This is one of
2  the city's core allegations in that lawsuit, so this is not
3  some kind of modest, you know, factual issue.  This has
4  implications for many different things.  Many large financial
5  issues kind of relate to this structure, the use of the
6  service corps at the center of this structure, the nature of
7  the composition of the service corps, which have city
8  employees, city council members, et cetera.  I'm sure that
9  you've seen a lot of the pleadings on this.  And I should
10  note also that this issue is further contentious by the fact
11  that the city and the swap counterparties themselves disagree
12  between each other with respect to this issue of the service
13  corporations because, of course, the swap counterparties in
14  their brief do a pretty thorough job establishing the
15  legality and vitality of the service corporations, so it
16  isn't just me saying that this is a big ticket disagreement
17  issue that has wide-ranging implications.  You can actually
18  see it in their briefs.
19          This issue is, you know, further nuanced a bit by
20  the fact that the service corporations were apparently
21  sufficiently alive and well in July of last year to sign up
22  to the forbearance agreement and represent that they were
23  validly existing and authorized to enter into the agreement
24  but now are apparently sham corporations that are lying there
25  dormant and incapable of doing anything, and I would say it's

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 252 of
290
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 10:40:23  Page 39 of 77  252

 1   also further -- raises important due process questions like,

 2   for example, my review of the motion that was filed, and I

 3   will -- I've checked this personally.  I believe others in my

 4   office have checked it.  I don't think that motion was served

 5   on the service corporations, so making this acquiescence

 6   argument when the motion itself wasn't served on the service

 7   corporations I think has significant due process issues, and

 8   it's complicated further by the fact that in the COP and

 9   validity case recently, the service corporations' counsel

10   appeared and negotiated a stipulation about what they are

11   going to do in that case.  And I don't know what the story is

12   behind how that law firm was retained or how it came to

13   represent the service corporations.  My point is simple.

14   There is a lot going on here with respect to the service

15   corporations, and I think that my view coming into today's

16   hearing was to say to you that if tomorrow's hearing is not

17   going to decide the rights of the service corporations,

18   including not obliterate their liens or bind them to

19   agreements they haven't signed, then I don't think that this

20   is a basis to continue the hearing.  But if the city's

21   rationale of acquiescence or the fact that they're a shell

22   corporation is something that they are going to attempt to

23   put forward despite the fact that neither of the witnesses

24   that we deposed this week have any firsthand knowledge about

25   the service corporations -- both were clear that they

13-53846-tjt   Doc 4374-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 253 of
290
13-53846-swr   Doc 3742   Filed 04/04/14   Entered 04/04/14 16:40:13   Page 40 of 77    253

1  disclaimed any knowledge -- there isn't any documentary

2  evidence on the exhibits that have been disclosed.  If they

3  are going to attempt to have you base your ruling on those

4  rationales or make findings about those things, then I think

5  we have to all take a step back and consider, wait a second,

6  how is this going to work from the standpoint of discovery

7  and litigating this issue, does it need to be coordinated

8  with the other proceeding, et cetera.  That was the way I saw

9  this breaking down.  I didn't want to stand up and say that

10  tomorrow because you can see the way it dovetails with our

11  continuance motion.  To the extent you agree it is an issue,

12  you can see it could affect the schedule, and that was what I

13  wanted to bring to your attention.  Thank you.

14         THE COURT:  Thank you, sir.

15         MR. MARRIOTT:  Your Honor, Vince Marriott on behalf

16  of EEPK.  I just want to, before the city has their

17  opportunity, emphasize the significance of this issue of

18  whether or not the service corporations are shells.  That

19  allegation was made in support of approval of the settlement

20  agreement for the first time that I'm aware of in the city's

21  omnibus response to objections.  It is significant to the

22  validity of litigation where billions of dollars are -- well,

23  nominal billions are at issue where an allegation has been

24  made in support of invalidity that the service corporations

25  existed only on paper and are shams.  Insofar as the city

     1   intends at the hearing on the settlement agreement to seek
     2   approval of the settlement agreement in part on the basis
     3   that the service corporations are shell corporations, that
     4   has implications far beyond the settlement agreement.  It is
     5   a complex factual and legal question as to which we would be
     6   entitled to significant discovery.  When I asked Mr. Orr at
     7   his deposition on Monday whether the city intended to
     8   introduce evidence at the hearing on the swap settlement in
     9   support of the assertion that the service corporations are
    10   shell entities, his response was, "I don't know."
    11         Insofar as the city wants to reserve the ability to
    12   argue and present evidence on that point in connection with
    13   the settlement agreement, we think that it has to be stopped
    14   and we have to have a discovery schedule to deal with that
    15   specific issue.  If the city is prepared to say, no, we will
    16   not seek a finding on that point and we will not seek
    17   approval of the settlement agreement on the basis in whole or
    18   in part of an allegation that the service corporations are
    19   shell corporations, then I -- then this concern goes away.
    20         THE COURT:  Thank you, sir.
    21         MR. HERTZBERG:  Your Honor, Robert Hertzberg on
    22   behalf of the city, Pepper Hamilton.  Unlike counsel prior to
    23   me, I'm not going to do my opening statement today on the
    24   service corp issues.  I'd like to address first a couple of
    25   the issues raised and then get into some of the allegations

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 255 of
290
13-53846-swr  Doc 3772  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 42 of  255

1   made in the motion.

2          First, counsel for Syncora was concerned that we

3   didn't follow the proper process on service of the motion to

4   compromise on the service corps.  If you look at the

5   docket -- and I'm sure he could have looked at the docket --

6   he would have seen that we served Lewis & Munday with the

7   motion on March 12th and that they're the registered agents.

8   We also have served Butzel Long, who's now appeared on behalf

9   of the service corps in the COPs litigation, as soon as they

10  appeared with this motion also, so service isn't an issue.

11         Second, I want to clear up another misunderstanding

12  that was put on the record.  Mr. Hackney indicated that they

13  have seen the term sheet since early March.  In fact, Syncora

14  has had the term sheet since mid-February.  As I indicated at

15  the prior hearing, we gave it to them or the bank -- we

16  authorized the banks to give it to Syncora in mid-February,

17  and they did.  So when they stand up today and say that we've

18  had the term sheet since March, it's a little disingenuous,

19  to say the least.

20         In regard to the service corporations, Mr. Marriott

21  indicates to the Court that the motion or the omnibus reply

22  all of a sudden indicated that the service corps were shams.

23  Well, in fact, the COPs complaint, as we call it, which was

24  filed on January 31st of this year, had an allegation that

25  the service corporations were shams in it, so it didn't just

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:09:23  Page 256 of
290
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:46:13  Page 43 of 71   256

 1   come in.  This has been a known fact that it was the city's
 2   position in the COPs complaint as early as January 31st.  We
 3   are only seeking in the settlement an injunction against the
 4   service corps suing.
 5         Now, let's address some of the issues raised
 6   actually in the motion now and a little background.  The
 7   depositions, as required, were taken on Monday at my offices
 8   of Mr. Gaurav Malhotra and Mr. Kevyn Orr.  They had their
 9   time.  Each party -- several parties examined the witnesses
10   on the depositions.  And shortly thereafter on Monday the
11   rough drafts of the transcripts were sent out by the court
12   reporter, Monday, the same day as the depositions.  Second,
13   on yesterday, Tuesday, the actual final drafts or final
14   deposition transcripts came out.
15         The settlement agreement that they complain about
16   not having adequate time to examine was served on -- as we
17   told the Court it would be, on March 26, and one of the
18   complaints is -- and by the way, they make an issue about a
19   supplemental settlement agreement being filed the next day.
20   As everyone knows and just to point out for the Court's
21   benefit the reason a supplemental was filed, there was a
22   corruption in the document.  The document is identical.
23   There was some corruption when it got filed in the document
24   itself.  Nothing changed.  Not a word on the document
25   changed.  So it was filed on the 26th like we promised the

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 257 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:46:13  Page 44 of 77   257
290

1    Court.  They claim they haven't had time to adequately review

2    the settlement agreement, a 28-page settlement agreement.

3    When you look at the actual settlement agreement, if you take

4    out the signature pages and that, it's really a 20-page

5    agreement, 20 pages.  These are some of the largest most

6    preeminent law firms in the country who have come before this

7    Court and said they can't get through a 20-page settlement

8    agreement in eight days prior to a hearing on the settlement.

9    I'm just not buying that, your Honor.  It's not that hard,

10   especially when it almost identically tracks the term sheet

11   previously produced.

12          Their second basis for the adjournment is that there

13   was massive discovery dumped on them and they haven't had an

14   opportunity to sort their way through it.  Once again,

15   massive law firms, preeminent law firms in the country,

16   haven't had the opportunity to do this.

17          What was produced?  Well, first, let's back up to

18   the depositions.  Only four of the documents or e-mails that

19   were produced were actually used at the depositions of the

20   two witnesses.  Second, here's the documents that were

21   produced.  The Court can look at them.  I would suggest to

22   the Court that over 95 percent of these are simply minor e-

23   mails that say, "We'll do a conference call at four."  "No.

24   How about two?  How about tomorrow?  Can we talk about this

25   issue?"  There's not substance in these.  We, through an

1  overabundance of caution, produced a mass of e-mails.

2  There's nothing in them except for about ten of them.  If the

3  Court is willing, we would give this to the Court.  I bet you

4  the Court could get through these in a one- to two-hour

5  period, but they'll tell you they haven't had adequate time

6  to get through this stuff.  I'm not buying that, your Honor.

7  There's nothing in there that couldn't be reviewed within a

8  two-hour period at most.

9         They say that novel claims are involved here, and

10  that's why they need an adjournment.  There's nothing novel

11  here.  It's an $85 million settlement that has a borrow order

12  in it and provides for releases.  There's nothing novel.

13  They've all seen it before in their career a hundred times.

14         They claim that there's -- Syncora points out or

15  claims there's two material differences from the term sheet,

16  and then they tell you in the motion to adjourn what they

17  are.  One is the use of the words "specified plan."  Yes,

18  it's a definitional term, but what it defines is already

19  something that was in the term sheet, so it only puts in a

20  definitional term.

21         Second, they claim that the settlement diminishes

22  the obligation of the city to make payment.  That's not what

23  it says.  The city is 100 percent obligated to make payment.

24  There was only a provision put in that the city would use its

25  best efforts if the money became trapped within the holding

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 12:00:23  Page 259 of
13-53846-swr  Doc 3772  Filed 04/04/14  Entered 04/04/14 16:46:13  Page 46 of 259
290

1   accounts.  Nothing changed, your Honor, no material
2   differences, one adding a term to a definition, the other
3   making sure the city uses its best efforts.
4           Then they complain about the blackline order, that
5   there's this massive blacklined order that they haven't had
6   an opportunity to get through.  One, we did it as a courtesy
7   to the Court and to the parties to give the blackline order
8   well before the hearing.  This was a courtesy.  We had no
9   obligation to do it.  We did it eight days before to give
10  them the opportunity so if there is an issue at the hearing,
11  they can come before the Court and raise the issue or discuss
12  it with us in advance.  While they were busy preparing,
13  especially Syncora, all these different motions, DIA
14  subpoena, public lighting appeal briefs, motion to adjourn
15  the disclosure, motion to adjourn this, they could have been
16  reviewing these documents or the 20-page settlement
17  agreement.  They've had more than adequate opportunity.
18          Then they allege that we didn't produce the draft
19  term sheets and the settlement agreements.  This Court
20  specifically said we did not have to produce them.  At the
21  hearing in which the Retiree Committee requested them in
22  number two of their request, the Court specifically said we
23  do not have to produce the items set forth in number two.
24  That was term sheets and settlement agreements.  So when we
25  produced this stack of documents, we took out the drafts of

 1  the term sheet and the drafts of the settlement agreements

 2  because you said we didn't have to produce them, and we

 3  didn't.

 4       Syncora has objected to everything in this case.

 5  They've taken the carpet bombing approach.  Everything that

 6  the city tries to accomplish, they move to adjourn or they

 7  object to or they raise issues at the hearing.  The service

 8  corps are not an issue before the Court tomorrow.  They've

 9  been properly served.  Court have any questions?

10       THE COURT:  So just to pin you down on this --

11       MR. HERTZBERG:  Okay.

12       THE COURT:  -- it's not the city's intent to request

13  a finding as a result of the hearing on this motion, the

14  motion to approve the settlement, that the service corps are

15  shell or sham corporations.

16       MR. HERTZBERG:  No, your Honor.

17       THE COURT:  That's correct?

18       MR. HERTZBERG:  That's correct.

19       THE COURT:  Thank you.

20       MR. HUEBNER:  Good morning, your Honor.  For the

21  record, I'm Marshall Huebner of Davis, Polk & Wardwell on

22  behalf of Bank of America.  Your Honor, suffice it to say

23  that we find the procedural motion before us to be rather

24  without merit and do take a little bit of exception to the

25  opening argument on one issue at tomorrow's hearing that they

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 261 of
13-53846-swr  Doc 3772  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 48 of  261
290

 1   took a shot at today, so let me be very surgical and precise

 2   with respect to what's actually up today.

 3          Number one, my memory, your Honor, is exactly as

 4   yours.  I thought you actually were quite clear in your

 5   ruling when we were actually before you properly about the

 6   scheduling of this hearing that all the evidence from the

 7   prior multi-day trial could, in fact, be used and was

 8   admissible.  They're welcome to use whatever they like.  I

 9   actually don't think it'll be the focus of tomorrow's

10   hearing.  It's just not an open issue.  And to suggest that

11   really it would go much better for you if we all just took a

12   bunch of days and fought about this, that's what the month

13   was for.  As a reminder, your Honor denied the debtor's

14   request to expedite this hearing and, in fact, set it for

15   substantially longer than is required either by the local

16   rules or by the national rules, and they've had 31 days to

17   prepare for this hearing.  To say now the day before, "We

18   haven't had time yet," is really totally inappropriate.

19          Number two, your Honor, the fact that Mr. Hackney

20   didn't tether his argument about the service corporations in

21   any of the documents but just said it kind of shows you what

22   you need to know, which is that he's just throwing dust in

23   your eyes, and it's not really there, and let me explain why

24   quite precisely.  Number one, there's a substantial section

25   of the term sheet called "Concerning the Service

1   Corporations."  What was originally agreed to is exactly what
2   is going forward tomorrow.  Number two, there's specific
3   sections of the order that did not change that were filed
4   almost a month ago that addressed the service corporations.
5   Nothing is new.  Three, there is a section of the debtor's
6   brief, the opening brief, that is 42 pages long and actually
7   measurably longer than their reply brief, contrary to what
8   was suggested to you, that addresses the service
9   corporations.  And, four, most importantly, is exactly the
10  colloquy you just had.  There is no finding of any kind about
11  the service corporations and whether or not they're shams
12  because unsurprisingly, your Honor, we disagree very
13  vehemently.  Our view, as you know, on the merits, were they
14  ever to be reached, which they are not because this is a 9019
15  settlement, is that the transactions were appropriate, the
16  liens were appropriate, the service corporations were
17  appropriate.  Their view is to the contrary, and that's what
18  we've settled.  So if Mr. Marriott stood up and said, "Your
19  Honor, here it is.  Paragraph 39 of the order says I hereby
20  find the service corporations are shells, and we're not ready
21  to litigate tomorrow and it's not fair.  They just snuck it
22  into the order," maybe that would be a legitimate basis for
23  an improper motion to reconsider your scheduling order,
24  improper, by the way, for lots of reasons, including the fact
25  that a week ago there was a contested discovery hearing, and

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 263 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 50 of  263
290

 1   your Honor ruled on precisely with even more exactitude and

 2   delineation what the schedule would be for this hearing,

 3   including what day things were being filed and by when the

 4   depositions were, and it was very finely reticulated.  And so

 5   what do they actually have; right?  What they actually have

 6   is we'd like a little more time.  And to reiterate and not at

 7   great length but some of what Mr. Hertzberg said -- and also

 8   I should note that, you know, the schedule that your Honor

 9   set, we should not actually lose sight of its generosity.

10   The reply briefs, which, as we all know, are often filed 48

11   hours before a contested hearing, were filed 13 days before

12   the contested hearing.  Oftentimes plan support agreements,

13   all sorts of documents are filed five days before a voting

14   deadline or ten days before a voting deadline, and there are

15   hundreds or even thousands of pages of documents that

16   sophisticated law firms need to digest to appear at

17   confirmation.  This is one settlement agreement.  And by the

18   way, the two examples that they chose were -- they actually

19   proved the case.  I'm not sure I could have come up with

20   better examples of how nothing has changed.  What are their

21   two examples?  The term sheet says the debtors shall keep

22   paying the monthly amounts and the counterparties shall

23   receive it.  And in doing the documentation they said, you

24   know, "Once we've paid it, we can't promise that you'll

25   receive it.  What if a nuclear bomb hits the custodian and

 1   the money is just vaporized; right?"  So we said, "Okay.  You
 2   know what?  That's reasonable.  You can't promise who you
 3   don't control, so just say 'best effort.'  We're fine with
 4   that."  That's an example of a radical change that a party
 5   makes a motion to a federal court, needs to adjourn a
 6   hearing?  And the second one, your Honor, on specified plan,
 7   I'm actually holding -- and I will not go through it because
 8   I think it would not be necessary unless the Court wanted it,
 9   but I have a color blackline showing how every single concept
10   basically of specified plan is right there in the term sheet.
11   The term sheet said we'll vote in favor of a plan that
12   provides the treatment contained herein, and then sprinkled
13   throughout the term sheet are these chunky sections that say
14   what a plan has to say.  We just put them in one place and
15   used a defined term with a few other relatively minor
16   changes, and so the notion that, you know, the Court should
17   essentially pass the deadline for even making a motion to
18   reconsider, they should have a third or a fourth bite at the
19   scheduling of this hearing is really entirely inappropriate.

20           You know, leaving aside the content of this, I would
21   also note that the notion that Kirkland & Ellis, which has
22   potentially the largest litigation department in the United
23   States, actually filed a pleading that said there were 516
24   pages of discovery, not 516,000, not 516 million, 516 pages,
25   total pieces of paper, and eight days is not sufficient for

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 265 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 52 of
290                                                            265

1    us to prepare for a hearing, I could not have signed that

2    pleading, and I'll leave it at that.

3           But suffice it to say, your Honor, that the

4    depositions happened.  Everyone got to ask all the questions

5    they wanted.  They were not particularly cut off in time.

6    Nobody left the hearing angry and frustrated, as far as we

7    can -- the depositions -- they put the documents they wanted

8    to in front of the witnesses proving that they had time to do

9    what they wanted to, and this like fifth bite at the apple to

10   move it onto their schedule.  None of their substantive

11   arguments bear any weight, and they've had so much more time

12   than the debtors asked for or that any rule requires, and

13   there is no factual basis.

14          The last thing I would say in terms of the proposed

15   order, your Honor, which, again, we could walk through right

16   now if it were helpful to the Court, but to be clear, we went

17   out and tried to resolve objections.  We listened hard.  We

18   e-mailed everybody, including the remaining objectors, and

19   said, "Please communicate with us.  We want to work things

20   out wherever we can narrow issues, wherever we can take your

21   language."  So we're twice being penalized for doing the

22   right thing.  Probably 90 or 80 or 70 percent of the

23   relatively minimal changes in the blackline order were to

24   resolve other objections, and two of them are now resolved,

25   and so it's a double courtesy.  One, we had a highly

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 266 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 53 of 71    266
290

 1   communicative process to narrow the hearing as much as
 2   possible, and we're still working on language with Mr.
 3   Marriott, for example, and with others to try to further
 4   resolve everything we can.  I will stay up all night.  I'm
 5   here in Detroit.  Let me make a public announcement.  We want
 6   to resolve everything we can.  But to say that because we had
 7   the extreme courtesy to everybody to say in case you're
 8   interested, here's the current version of the order mostly
 9   because we're taking relatively minor changes to address
10   others' concerns, now the whole hearing should be adjourned,
11   it's crazy.

12          So, your Honor, it's a very troubling motion in
13   addition to the fact that they, frankly, slipped in a bunch
14   of oral argument about the service corporations, which really
15   has no place.  There's no finding about them.  There's one
16   narrow injunction.  They were properly served.  We're all in
17   Detroit.  We're ready to go.  This is a 9019 settlement.  We
18   know what the facts are, and we'd like to proceed tomorrow.
19   Thank you.

20          THE COURT:  Thank you.  Would anyone else like to be
21   heard?

22          MR. HACKNEY:  Do you mind if I respond?

23          THE COURT:  No, no.  Go ahead, sir.

24          MR. HACKNEY:  There were a number of things that
25   were said.  I'd like to just try and confine my response to

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 20:00:23  Page 267 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 54 of 77   267
290

some of the more important ones.  The first thing I wanted to
follow up on, your Honor, is that the notion of acquiescence,
the idea that the service corps have acquiesced in the motion
and haven't objected and asserted their rights, is something
that I think is highly connected to the allegation that they
are a shell corporation because both of these -- both of
these parties are saying --

        THE COURT:  Okay.  But I invite you to make that
argument at the hearing.

        MR. HACKNEY:  Fair enough.  And I raise it today to
not surprise you at the hearing.  That's part of how I view
my role as an officer of the court because I do think it is a
big issue, and it is an argument that we will be raising.

        The second thing I wanted to say, your Honor, is
that there's no question that we -- if we have to, we can try
up a hearing at anytime.  You can try up something in an
hour.  You could try it up tomorrow.  You can pick an issue,
and we'll show up and try the issue to you.  But I am someone
who is experienced in trial work, and I do have the judgment
and experience to make suggestions to the Court about how we
can better organize things, and this was my professional
judgment.  These things have come in.  The devil is in the
details with a lot of these pleadings, and remember it's easy
for Mr. Huebner to say it's all clear as a bell.  They're the
ones that are doing all of this drafting.  They're the ones

1  that have been in control of these documents for a long time.

2  Remember, we heard that this was a big emergency on April

3  2nd, but they didn't actually give us the settlement

4  agreement for over three and a half weeks, so the way the

5  schedule is being described here I think is kind of

6  misleading.  It's like we're supposed to understand

7  everything about the settlement agreement and the revised

8  order from the term sheet even though there are changes and

9  even though we don't have the legal rationale until they give

10  us their reply briefs.  I view it -- I'm living it -- as

11  being much more compressed than the way it is being

12  portrayed, and I will add this.  This is a big motion.  You

13  may recall from the last time we were in front of you you

14  asked Mr. Hertzberg what is the emergency.  That was my

15  argument.  What's the emergency?  You asked Mr. Hertzberg

16  that.  I don't think he really answered the question.  I

17  think he said this agreement drives the plan, and I think

18  what you have to understand is that whether the -- if the

19  agreement were continued one month or two months, it has no

20  impact on the cash flow of the city because they're going to

21  comply with the terms of the collateral agreement as they've

22  been doing to date through the end of the plan, and then

23  there are different ways they pay off the remainder, so

24  there's no emergency from the standpoint of the city or

25  relating to this motion.  What they want to do is they want

 1  to take this very controversial settlement agreement that is

 2  a settlement between only parties A and B of a complicated

 3  structure that everyone has agreed is complicated and has

 4  many different parties involved and that we assert that this

 5  settlement between A and B trods upon the rights of C and the

 6  rights of D and that that itself is a controversial concept

 7  in the area of Rule 9019 -- what I'm saying is not disputed.

 8  They want to -- it's not disputed in the sense that that's --

 9  these are controversial legal issues.  They want to take this

10  agreement around, and they want to bang away at retirees and

11  bang away at bondholders and say, "Now we've got you.  We're

12  going to cram you down.  And we're going to use this impaired

13  assenting class, and we're going to -- and that's what we're

14  going to do, so you better get in the boat."  So this is very

15  important, and that is why we are suggesting that we

16  shouldn't just kind of sidle into court with part of the

17  theory that's emerged ten days ago being, "Oh, the service

18  corporations that are manned by city employees and city

19  council members, they've acquiesced in the city's motion to

20  destroy their liens and to bind them to the agreement as if

21  they had signed it even though they haven't."  That's a big

22  issue, and neither of them have said because they can't,

23  "Well, we're not asking you to make that finding."

24          One last point, and then I'll sit down.  Thank you

25  for your patience.  I have to take exception to the notion

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 270 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 10:40:13  Page 57 of 77  270
290

```
 1    that Syncora is a carpet bomber; that we are a terrorist.
 2    You know, you saw public statements by the city this week
 3    demeaning Syncora and saying Syncora is throwing the kitchen
 4    sink at everything and, you know, Syncora is just -- this is
 5    their scorched earth strategy.  You know, we asked for a one-
 6    week continuance.  Mr. Huebner says he couldn't even deign to
 7    sign that pleading, and the city's press statements say that
 8    we're engaged in a scorched earth litigation strategy.  You
 9    know, in the disclosure statement context, we get a bunch of
10    material dumped on us three days before our objection is due,
11    and we put a motion in in advance of that saying, "Shouldn't
12    there be some adjustment to the schedule here?"  And that is
13    decried as well as more scorched earth litigation from
14    Syncora.  And what I would say here, your Honor, is that
15    there are many times when you are asserting your legal rights
16    that it may not be popular to do so but that the way the
17    legal system works is that you have to assert those rights in
18    order to be heard on them, and it may not be popular or it
19    may not be what the city wants us to do, but I think it's
20    unfair.  I think the constant ad hominem attacks against
21    Syncora as if we are, you know, committing war crimes when we
22    submit these briefs to the Court, I think it's unhealthy, and
23    I take exception to that suggestion that we've done anything
24    improper in the way we've proceeded in this court.
25             THE COURT:  Thank you.  All right.  The Court will
```

59

1  take this under advisement for ten minutes, and we'll
2  reconvene at 10:35, please.
3          THE CLERK:  All rise.  Court is in recess.
4      (Recess at 10:29 a.m., until 10:40 a.m.)
5          THE CLERK:  All rise.  Court is in session.  Please
6  be seated.  Recalling Case Number 13-53846, City of Detroit,
7  Michigan.
8          THE COURT:  The Court concludes that the record does
9  not establish cause to adjourn tomorrow's hearing.
10  Accordingly, the motion to adjourn it is denied.  Since the
11  city has agreed that the issue of whether the service
12  corporations are shell corporations or sham corporations will
13  not be a matter for litigation tomorrow, all that remained to
14  the argument for the adjournment that the Court heard was a
15  matter of convenience and not a matter of addressing any
16  specific issue of prejudice or harm by proceeding tomorrow,
17  so, in the Court's view, this does not establish cause.
18          Let's turn our attention to --
19          MR. HERTZBERG:  Your Honor --
20          THE COURT:  Sir.
21          MR. HERTZBERG:  -- one thing I just want to clarify.
22  Is the record from the prior hearing in evidence for
23  tomorrow?
24          THE COURT:  It is.
25          MR. HERTZBERG:  Okay.  Thank you.  And all the

```
 1   exhibits that were introduced?

 2            THE COURT:  Yes.

 3            MR. HERTZBERG:  Thank you.

 4            THE COURT:  Let's turn our attention now to the

 5   final hearing regarding the schedule for the disclosure

 6   statement approval.  Before we do that, however, I'd like to

 7   ask you all to consider a matter of personal favor for me.

 8   In your arguments to the Court, let's keep the war analogies

 9   to a minimum, if not eliminate them from our discussion

10   altogether.  Phrases like "scorched earth" and "nuclear" and

11   "carpet bombing" really are not necessary or appropriate in a

12   courtroom context, so let's just not use them.  Okay.

13            MR. ORNSTEIN:  Good morning, your Honor.  Noah

14   Ornstein from Kirkland & Ellis on behalf of Syncora.

15   Unfortunately, with accommodating that favor, I'll have to

16   redo my entire opening.

17            THE COURT:  And let me guess.  You'd like an

18   adjournment to do that.

19            MR. ORNSTEIN:  Appreciate it.  No, your Honor.  I'll

20   try to keep the presentation very short.  There are a number

21   of people I know who would like to get up and speak also.

22   Your Honor, we really do think this is ultimately about

23   efficiency and fairness.

24            THE COURT:  Could you pull that microphone closer to

25   you --
```

13-53846-tjt Doc 4374-11 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 62 of 71
13-53846-swr Doc 3742 Filed 04/04/14 Entered 04/04/14 10:40:23 Page 62 of 71   273
290

1          MR. ORNSTEIN:  Certainly; certainly.

2          THE COURT:  -- or aimed more towards you?

3          MR. ORNSTEIN:  And I'll kneel a little, too.

4          THE COURT:  There you go.

5          MR. ORNSTEIN:  We really do think it's about

6 efficiency and fairness, your Honor.  Your Honor, typically a

7 debtor files a robust or a somewhat robust disclosure

8 statement and then the 28-day clock begins to click even if

9 that disclosure statement does require that it be

10 supplemented.  Your Honor, that wasn't the case here.  On

11 February 21st the city filed a disclosure statement that was

12 substantially and materially incomplete by its own terms, and

13 then the city did not provide disclosures on a rolling basis,

14 as I believe it said it would, thereafter.  And then on March

15 31st, your Honor, 38 days later, the city filed what is a

16 monster of a disclosure statement amendment, hundreds and

17 hundreds of pages of new material for parties to digest and

18 reconcile to understand.  The city did, of course, obtain an

19 extension, as is appropriate, but it was only a two-day

20 extension.  And, your Honor, we have made substantial efforts

21 to review the amended disclosure statement and the plan, of

22 course, and to form an educated view on the whys and hows and

23 the implications of the many changes, but, your Honor, we

24 don't think that there is enough time presently in the

25 schedule for parties to really figure out what they

13-53846-tjt  Doc 4311  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 274 of
290
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 61 of 71  274

1    reasonably still need to know, what all those implications

2    truly are, and we think that the process, for the city's

3    benefit also, will be benefitted by having some more time for

4    parties to be able to make those determinations, to actually

5    be able to confer with the city to produce refined objections

6    so that hopefully the issues around information gaps are

7    substantially narrowed from where they might be today if

8    parties were to file their objections, and ultimately we

9    think that will lead to what should be a smoother disclosure

10   statement hearing.

11          Your Honor, we think it's reasonable and required

12   that parties do have a reasonable period for review of the

13   disclosure statement.  It is effectively a new document that

14   we've now had in our hands for 48 hours, and we don't think

15   that the request for two weeks is unreasonable.  We are

16   willing, of course, and open to being constructive around

17   scheduling, but we do think it is warranted, your Honor, that

18   there be an extension of the timetable to permit parties to

19   do the work they need to do around the disclosure statement.

20          THE COURT:  Thank you.

21          MR. MARRIOTT:  Good morning again, your Honor.

22   Vince Marriott, EEPK.  I rise in part to make a point that I

23   made last time we were here, which is that this case really

24   isn't the City versus Syncora.  There are large groups of

25   constituencies that have views regarding how the city has

1    conducted the case that are not altogether positive.  I think

2    your order to show cause regarding an expert was interesting

3    because of the responses.  I think the responses illuminated

4    some interesting things about the dynamics of this case.  I

5    thought it was of particular interest to see so many of the

6    constituencies grasping at the idea of an expert as a

7    lifeline for somebody who might actually take a hard look at

8    assets and operations with an eye toward maximizing creditor

9    recoveries within the context of recovery for Detroit.

10        Monday the city filed a revised plan and disclosure

11   statement, which, while bearing structural similarities to

12   the previous plan, is materially different and worse for

13   creditors economically.  It is a plan that, you know, at

14   least as of 8 a.m. this morning has the support of no major

15   constituency.  We are eight months into this case, and the

16   city has just filed a plan that moves backwards away from

17   consensus rather than towards it.  In my view, this is

18   because the city has not engaged in a collaborative effort

19   toward consensus but, rather, has been trying to beat

20   creditors into submission.

21        There needs to be, in my view anyway, some sort of

22   reset here.  A selected and appropriately charged court-

23   appointed expert would be one element of such a reset which

24   would bring creditors back into the process in a way that

25   they have not been for awhile.  The other would be putting an

 1  end to city-created unrealistic, inefficient, and unfair time
 2  frames within which to respond to complex documents affecting
 3  billions of dollars of claims and the future of Detroit.  If
 4  the plan process is going to continue with moving target
 5  plans and disclosure statements, creditors and parties in
 6  interest should at least have a reasonable period of time to
 7  respond to each iteration.  This is a major change from what
 8  was there before.  Tacking a couple of days on to review
 9  hundreds of pages just is not affording to creditors and
10  ultimately to the Court the sort of review and comment that
11  this case really calls for.  Thank you.
12          THE COURT:  I appreciate the depth of concern that
13  your comments reflect, but my question to you is we're
14  talking about a disclosure statement which, in my experience,
15  admittedly in Chapter 11, not in Chapter 9, but,
16  nevertheless, material, I think, is that of all of the papers
17  in a case, the disclosure statement may be the least
18  important in that nobody but the lawyers who are retained to
19  object to it actually read it, so what are we talking about
20  here?
21          MR. MARRIOTT:  I have an answer to that, your Honor,
22  which doesn't directly rebut what you just said.  The answer
23  to that is this.  The disclosure statement approval, while
24  perhaps in a vacuum, is a relatively -- is relatively less
25  consequential than, of course, confirmation.

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 21:00:23  Page 277 of
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 10:40:13  Page 64 of 77   277
290

1          THE COURT:  Um-hmm.

2          MR. MARRIOTT:  It, nevertheless, begins a process,

3   including solicitation, and where this plan process will

4   break down is if we have a disclosure statement and a plan

5   that changes materially again.

6          THE COURT:  It undoubtedly will when and if

7   settlements are reached.

8          MR. MARRIOTT:  Correct.  And sending out something

9   that's --

10         THE COURT:  If our --

11         MR. MARRIOTT:  But once we -- once solicitation --

12         THE COURT:  If we adjourn confirmation every time

13  there's a settlement, we'll never get there.

14         MR. MARRIOTT:  But once the plan -- once the plan

15  has gone out for solicitation -- first of all, we know that

16  this plan is -- doesn't work for anybody because it's worse

17  than the last plan, and nobody was happy with the last plan.

18  It seems to me to be not advantageous to the process to keep

19  it moving to then start soliciting a plan that is just --

20  can't use a martial metaphor here but that will prompt

21  vigorous --

22         THE COURT:  Thank you.

23         MR. MARRIOTT:  -- opposition from all concerned.  It

24  just seems to -- the point I'm making is although the request

25  here for a two-week extension is focused --

 1          THE COURT:  Isn't a better answer to that for you
 2   all to get serious in mediation?
 3          MR. MARRIOTT:  Judge, it would be unwise for me to
 4   comment on the success of the mediation process so far.
 5          THE COURT:  Then I'll withdraw my question.
 6          MR. MARRIOTT:  But the two-week extension sought
 7   here as and to the extent that it would -- and it would
 8   require a rollout of some of the other dates, although
 9   nominally with respect to disclosure statement alone, in
10   fact, preserves, at least in my view, the integrity of the
11   process insofar as, you know, rushing to approve a disclosure
12   statement that relates to a plan that is going to result in
13   vigorous and extended opposition seems unproductive.
14          THE COURT:  But if I take that to its logical
15   conclusion, we don't send out a disclosure statement or a
16   plan for balloting until when?  A whole lot more people agree
17   to it?
18          MR. MARRIOTT:  Well, I understand, Judge, that any
19   argument can prove too much, and I can certainly understand
20   how mine could as well, but in the context of a -- what
21   amounts to a whole new plan and a whole new disclosure
22   statement filed two days ago --
23          THE COURT:  Um-hmm.
24          MR. MARRIOTT:  And when I say "whole new," I
25   understand that there are structural similarities --

1    THE COURT:  Right.

2    MR. MARRIOTT:  -- but economically it's meaningfully

3  different, and the disclosure statement has been meaningfully

4  supplemented by an exhibit package and by significant other

5  documents that without arguing to you now that we need to

6  keep rolling it and rolling it and rolling it, it seems to me

7  it makes sense to do it this time for that reason.

8    THE COURT:  And just for the record, even though I

9  retracted the question, I will clarify it that when I meant

10  you all should get serious about mediation, I meant the city,

11  too, but still the question is withdrawn.

12    MR. MARRIOTT:  Okay.  Other questions?

13    THE COURT:  No.  Thank you.

14    MR. MARRIOTT:  Thank you.

15    MS. NEVILLE:  Carole Neville from Dentons on behalf

16  of the Retiree Committee.  Your Honor, we second what Mr.

17  Marriott has just said, but on a much more mundane level, we

18  sent the city a very detailed commentary on the original

19  disclosure statement --

20    THE COURT:  Um-hmm.

21    MS. NEVILLE:  -- and got back on March 28th we'll

22  either fix this or we won't and then two days later got a

23  major revision.  Just on a mundane level, I would have to

24  file a very voluminous objection to disclosure that can be

25  resolved if we had a little bit more time.  In two days or

1 three days, whatever we have left, I can't go back to Mr.

2 Bennett and Ms. Lennox -- and we've been working very hard on

3 the retiree solicitation package -- and resolve all of the

4 issues that I raised, and they're serious. There are

5 seriously misleading statements in the disclosure statement

6 that we would like to have fixed.

7    THE COURT: Um-hmm.

8    MS. NEVILLE: So I'm asking for more time just for

9 what you normally do in a disclosure statement is to resolve

10 the objections that we have.

11    THE COURT: Um-hmm. Thank you.

12    MR. CULLEN: Good morning, your Honor. Thomas

13 Cullen, Jones Day, for the city. A couple of observations.

14 All of this has occurred within the context of your Honor's

15 March 6th order, which I have in front of me here, which the

16 city understood and I think we all understood established a

17 schedule that had several characteristics. One, it was very

18 close-knit in terms of the relationship of one day to another

19 in the process. Number two, it was geared to get us to a

20 conclusion with the plan and to put pressure on the parties

21 to get to conclusions on various aspects of the plan because

22 the city needs to move through this process. Number three,

23 it's a very demanding schedule. It's hard on the horses.

24 There's no doubt about it. I take that as an agricultural

25 rather than a military, but --

13-53846-tjt Doc 4374-11 Filed 04/29/14 Entered 04/29/14 22:00:23 Page 281 of
290
13-53846-swr Doc 3742 Filed 04/04/14 Entered 04/04/14 10:40:13 Page 68 of 77 281

 1          THE COURT:  I'm never going to hear the end of this,
 2   am I?
 3          MR. CULLEN:  I'm sorry, your Honor.  Part of the
 4   process --
 5          THE COURT:  Why is Mr. Hertzberg laughing the
 6   loudest?
 7          MR. HERTZBERG:  I just heard it.  I didn't hear it
 8   the first time.  Mr. Erens had to tell me.
 9          THE COURT:  Okay.
10          MR. CULLEN:  And so as part of this, you know, kind
11   of iterative process -- and this came up at the original
12   hearing -- February 21st the original plan, March 6th the
13   order, March 14th the deadline for parties to make objections
14   and issues, and we got a lot.  We got a lot of objections and
15   issues, and we've been working hard to respond to those.  And
16   I think that as the Court's order says in the block in the
17   middle on page 1 that this is only part of the process
18   between the parties of sharing information about the plan and
19   what can and can't be done with respect to the plan.  It is
20   going on alongside a process of mediation, and that process
21   of mediation has been vigorous, has consumed a lot of time,
22   has consumed a lot of emotion on both sides, but has been
23   going on at a fairly vigorous rate.  So it's been going on on
24   two levels at that time, and the voluminousness of the
25   objections led to a voluminous amount of changes.  And what

 1   we thought and came to your Honor with was the idea that

 2   incorporating these changes took us longer than we thought.

 3   We were going to miss our deadline by a couple of days, so we

 4   moved a couple of the other deadlines by the same couple of

 5   days attempting to maintain the integrity of your Honor's

 6   schedule.

 7          One of the particularly chewy items of disclosure

 8   has been the plain language disclosure to go to the retirees

 9   or the people who aren't financial professionals, and Ms.

10   Lennox, as was pointed out on our side, has been taking the

11   lead on that and working hard at that.  We're hoping -- we're

12   trying to make progress on that.  With the best faith in the

13   world, it is very difficult to make lawyers think like real

14   people, so we're working at that, and we hope to -- we do

15   hope to have some progress on that, but what we're afraid of

16   here with respect to this motion -- and we are sympathetic to

17   the demands on everyone.  This has been a demanding process,

18   but it has been a demanding process for the city beyond the

19   realm of the professionals as well, and we'd like to move it

20   along.  And we would not like to do things in this schedule

21   that would actually push off the solicitation date, that

22   would push off the other dates that really drive attention to

23   the plan.

24          I would note in passing that nearly all of the

25   objections to the disclosure fly into the teeth of 1125.

13-53846-tjt   Doc 4374-11   Filed 04/29/14   Entered 04/29/14 22:00:23   Page 283 of
13-53846-swr   Doc 3742   Filed 04/04/14   Entered 04/04/14 16:40:13   Page 72 of 283
290

1    Apparently the disclosure is adequate enough for everybody to

2    say they don't like it, and 1125 really says is there

3    adequate information to give the parties a meaningful basis

4    to say yes or no.  And what they're telling you is with

5    respect to the current configuration of the plan, there's

6    adequate information.  It tells me no.  We're hoping to

7    change that in the course of the mediation process and

8    continuing negotiation.  We're hoping to have emendations and

9    settlements to the plan as we move forward.  That's what

10   we're all working on, but as of right now, the plan, as your

11   Honor has said, has served that at least modest function set

12   forth in the statute, which is have I told you enough to let

13   you know whether or not you want to say yes or no.  Well,

14   that, unfortunately, is, yes, I know enough to say no.  So

15   what we're trying to do here is maintain the integrity of the

16   Court's schedule while recognizing we have an iterative

17   multi-level process going on, recognizing that we're going to

18   want to change the plan.  We want this not to be the last

19   iteration of this, I think.  I think that the parties -- all

20   the parties want it not to be the last iteration, but the

21   parties also want -- and the Court's schedule does this -- a

22   balance between a fair consideration of the alternatives

23   available to the city and the parties and the need to push

24   this along, the need to put the pressure of time and process

25   on those parties, so that's all I have, your Honor.

1          THE COURT:  Thank you.  All right.  The Court is

2     going to take this under advisement and look at the issue of

3     whether there is a bit of slippage in the schedule that we

4     can take advantage of here but to maintain at the same time

5     the confirmation hearing schedule that we have established,

6     so I will issue a new scheduling order if that's appropriate

7     hopefully by the end of today.

8          Before we conclude, however, I do want to have a

9     conversation with Ms. Lennox.  Will you approach the lectern,

10    please?  Since you have been nominated as the point person

11    for the city on retiree disclosure issues --

12         MS. LENNOX:  Yes, sir.

13         THE COURT:  Is that a fair nomination?

14         MS. LENNOX:  That is a fair nomination.

15         THE COURT:  It has been widely reported by the press

16    that retirees who vote for the plan will receive more under

17    the plan than retirees who vote against the plan or not to

18    accept the plan.  After spending an hour with a really bright

19    law clerk diving into the weeds of your plan and disclosure

20    statement, we came to the conclusion that while that may be

21    true in some circumstances, it is not true in all

22    circumstances.  Is that correct?

23         MS. LENNOX:  Let me explain how certain provisions

24    of the plan work, and it all has to do --

25         THE COURT:  Well, I don't want the explanation.

13-53846-tjt  Doc 4374-11  Filed 04/29/14  Entered 04/29/14 22:00:23  Page 285 of
290
13-53846-swr  Doc 3742  Filed 04/04/14  Entered 04/04/14 16:40:13  Page 72 of  285

 1    What I want from you is your commitment again --

 2             MS. LENNOX:  Yes.

 3             THE COURT:  -- that in whatever explanation you

 4    provide to the retirees and to the public as to what retirees

 5    will be paid and when and under what circumstances some may

 6    receive more of a cut than others, it is perfectly

 7    understandable.

 8             MS. LENNOX:  I commit to that, your Honor.  And, in

 9    fact, I am not doing this in a vacuum.  I am doing this --

10    I've been having three weeks of discussion with the Retiree

11    Committee counsel, the pension fund counsel, counsel for the

12    retiree associations, counsel for the safety unions, and

13    counsel for AFSCME.  They've all seen the drafts.  I've

14    received several rounds of comments on them for this exact

15    reason.  We all want to be sure that what we give to people

16    is clear, accurate, and understandable, so I would expect to

17    be filing something with the Court in the near term for the

18    Court's approval to get the process started.  That document

19    will undoubtedly change between now and the disclosure

20    statement hearing as the plan changes, and I think we have

21    made significant progress.  I think there's one technical

22    issue that we're trying to work through now, but, please, I

23    want the Court to be assured that the city is not taking it

24    upon itself to do this without the input from the affected

25    parties, and we take the Court's --

```
 1          THE COURT:  And I appreciate that, but I'm
 2   reconsidering here as I think about this my decision to let
 3   go of my question to you --
 4          MS. LENNOX:  Okay.
 5          THE COURT:  -- because I'm concerned about the press
 6   reporting of the plan because people will make decisions
 7   probably much more on what they read in the newspaper than
 8   what they read in the disclosure statement; right?
 9          MS. LENNOX:  I think, unfortunately, that's true.
10          THE COURT:  So I mean is it accurate what the press
11   has reported that under your present plan --
12          MS. LENNOX:  Under the present plan --
13          THE COURT:  -- simply and straightforwardly, if a
14   retiree votes to reject the plan, they will receive less
15   pension?
16          MS. LENNOX:  No.  The decision is based on a class
17   vote.  The class vote determines whether the outside funding
18   comes in or not.
19          THE COURT:  All right.  Well, to the extent you can
20   work with the media to correct any misimpressions they have
21   about not only how the plan deals with these claims but any
22   other claims, it's in everyone's best interest to have
23   accurate reporting.
24          MS. LENNOX:  I wholeheartedly agree, your Honor.
25          THE COURT:  So I encourage you to deal with those
```

1  people.

2       MS. LENNOX:  We do deal with them on a daily basis,

3  and we do answer their calls.  I can certainly see if there's

4  an education --

5       THE COURT:  Well, but this is more than just

6  answering their calls.  This is taking a proactive --

7       MS. LENNOX:  Active education session.

8       THE COURT:  -- approach in contacting reporters

9  whose stories need correction.

10      MS. LENNOX:  Understood, your Honor.

11      THE COURT:  My own dealing with them is that --

12  suggests that they want to report accurately, and they're

13  doing the best they can, and they're by and large doing a

14  really good job.

15      MS. LENNOX:  I don't disagree, your Honor.

16      THE COURT:  But there are occasionally details that

17  need correction, and they're happy to do that when you help

18  them --

19      MS. LENNOX:  Understood.

20      THE COURT:  -- or when they are helped, yeah.

21      MS. LENNOX:  We'll devise a plan to reach out --

22      THE COURT:  All right.  Anything else for today?

23  Yes, ma'am.

24      MS. NEVILLE:  Your Honor, I'd like to add to what

25  Ms. Lennox has said because we have been working very closely

1  on that supplement, and it is very clear what happens to the

2  retirees when they vote.  The document that has been filed is

3  not, and that is why I really wanted more time.

4            THE COURT:  I agree with you.

5            MS. NEVILLE:  And the press is reporting on that.

6            THE COURT:  I agree with you.  It literally took my

7  really bright law clerk and I an hour to wade through this to

8  try to figure out what retirees will be paid.  It was very

9  complex --

10           MS. NEVILLE:  Right.

11           THE COURT:  -- and it won't work.

12           MS. NEVILLE:  The supplement we've been working on

13 is really clear --

14           THE COURT:  Okay.  Thank you.

15           MS. NEVILLE:  -- but this document isn't.

16           THE COURT:  Right.  All right.  Anybody else have

17 anything for today?  All right.  We're in recess.

18      (Proceedings concluded at 11:09 a.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    April 4, 2014
_____             _____
Lois Garrett