# CITY OF DETROIT, MICHIGAN

Response from J.P. Morgan

STRICTLY PRIVATE AND CONFIDENTIAL

CITY'S
EXHIBIT

**061**

J.P.Morgan

# Disclaimer

This presentation was prepared exclusively for the benefit and internal use of the J.P. Morgan client to whom it is directly addressed and delivered (including such client's affiliates, the "Client") in order to assist the Client in evaluating, on a preliminary basis, the feasibility of possible transactions referenced herein. The materials have been provided to the Client for informational purposes only and may not be relied upon by the Client in evaluating the merits of pursuing transactions described herein. No assurance can be given that any transaction mentioned herein could in fact be executed.

Information has been obtained from sources believed to be reliable but J.P. Morgan does not warrant its completeness or accuracy. Opinions and estimates constitute our judgment as of the date of this material and are subject to change without notice. Past performance is not indicative of future results. Any financial products discussed may fluctuate in price or value. This presentation does not constitute a commitment by any J.P. Morgan entity to underwrite, subscribe for or place any securities or to extend or arrange credit or to provide any other services.

J.P. Morgan's presentation is delivered to you for the purpose of being engaged as an underwriter, not as an advisor, (including, without limitation, a Municipal Advisor (as such term is defined in Section 975(e) of the Dodd-Frank Wall Street Reform and Consumer Protection Act)) . The role of an underwriter and its relationship to an issuer of debt is not equivalent to the role of an independent financial advisor. The primary role of an underwriter is to purchase, or arrange for the purchase of, securities in an arm's-length commercial transaction between the issuer and the underwriter. An underwriter has financial and other interests that differ from those of the issuer. If selected as your underwriter, J.P. Morgan will be acting as a principal and not as your agent or your fiduciary with respect to the offering of the securities or the process leading to issuance (whether or not J.P. Morgan or any affiliate has advised or is currently advising the Client on other matters). Any portion of this presentation which provides information on municipal financial products or the issuance of municipal securities is given in response to your questions or to demonstrate our experience in the municipal markets. We encourage you to consult with your own legal and financial advisors to the extent you deem appropriate in connection with the offering of the securities. If you have any questions concerning our intended role and relationship with you, we would be happy to discuss this with you further.

This communication shall not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the securities in any state or jurisdiction in which such an offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction.

This material is not a product of the Research Departments of J.P. Morgan Securities LLC ("JPMS") and is not a research report. Unless otherwise specifically stated, any views or opinions expressed herein are solely those of the authors listed, and may differ from the views and opinions expressed by JPMS's Research Departments or other departments or divisions of JPMS and its affiliates. Research reports and notes produced by the Research Departments of JPMS are available from your Registered Representative or at http://www.morganmarkets.com. JPMS's policies prohibit employees from offering, directly or indirectly, a favorable research rating or specific price target, or offering to change a rating or price target, to a subject Client as consideration or inducement for the receipt of business or for compensation. JPMS also prohibits its research analysts from being compensated for involvement in investment banking transactions except to the extent that such participation is intended to benefit investors.

J.P. Morgan makes no representations as to the legal, tax, credit, or accounting treatment of any transactions mentioned herein, or any other effects such transactions may have on you and your affiliates or any other parties to such transactions and their respective affiliates. You should consult with your own advisors as to such matters.

**IRS Circular 230 Disclosure:** JPMorgan Chase & Co. and its affiliates do not provide tax advice. Accordingly, any discussion of U.S. tax matters included herein (including any attachments) is not intended or written to be used, and cannot be used, in connection with the promotion, marketing or recommendation by anyone not affiliated with JPMorgan Chase & Co. of any of the matters addressed herein or for the purpose of avoiding U.S. tax-related penalties.

This presentation does not carry any right of publication or disclosure, in whole or in part, to any other party, without the prior consent of J.P. Morgan. Additional information is available upon request.

J.P. Morgan is the marketing name for the investment banking activities of JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC (member, NYSE), J.P. Morgan Securities plc (authorized by the FSA and member, LSE) and their investment banking affiliates.

CITY OF DETROIT, MICHIGAN

J.P.Morgan

Miller Buckfire
601 Lexington Avenue, 22nd Floor
New York, NY 10022

Dear Norma, Ken and Jim,

Thank you for the opportunity to share with you our thoughts in regards to the City of Detroit and its potential financing options. Given our significant presence within the greater Detroit metropolitan area and more broadly, the State, we value our partnerships within Michigan and look forward to assisting in the financial recovery efforts related to the City. In addition to our commitment to the City and State as detailed below, we have provided within this memo our view on the options presented to us by your firm as well as additional items to consider as the City embarks on its plan towards regaining financial stability.

J.P. Morgan is an active corporate citizen locally; in 2012, the Firm employed over 4,600 residents in Michigan and nearly 1,200 in Wayne County alone. The firm paid more than $351 million in wages and benefits to Michigan employees, remitted more than $11.2 million in state and local employee withholding tax and paid nearly $15.5 million in state and local taxes in 2012. The Firm contributed $4.3 million to Michigan charities in 2012 and most recently, the JPMorganChase Foundation announced that it is granting City Connect Detroit $500,000 to provide 350 low-income Detroit youth with paid employment experiences this summer. In April, we awarded $1.5 million in grants to three Detroit Public Schools to create "community hubs" on campus where students and parents can access social, educational and financial services, including job training and financial literacy programs.

J.P. Morgan has also continued to consistently support the State. Over the past two years, we have purchased more than $450 million in competitively issued par (over 55% of the State's competitively issued par during this time period). We also commit $390 million in credit facilities to the State (through the Michigan Finance Authority) and the Michigan State Building Authority, as well as an additional $227 million to the Michigan State Housing Development Authority and $90 million to the University of Michigan. Our Michigan municipal underwriting credentials are also strong; since 2005, J.P. Morgan ranks as the #2 senior manager of all municipal debt underwritten in the State.

Should the City and its advisory team wish to follow-up on matters raised in the discussion that follows, or should our understanding of any of the facts or assumptions discussed be incorrect or benefit from clarification, please do not hesitate to advise us.

Thank you for your consideration and we look forward to further dialogue as you move forward.

Sincerely,

The J.P. Morgan Team

The City of Detroit (the "City") is seeking potential debtor-in-possession financing ("DIP Financing") should the decision be made to accomplish the City's restructuring under court supervision. The City and its advisors have identified four distinct revenue streams to be used as security to secure any potential lending facility. For purposes of our discussion that follows, we view any financing plan has having two distinct parts with separate solutions: 1) water and sewer, and 2) general fund. Based on the City's Proposal for Creditors released on June 14, 2013 (the "City Proposal"), the relative risk profiles of those two solutions, including bankruptcy, credit, political, financial and operational risks, are distinctly different and present unique DIP financing challenges. Our suggested ideas that follow are designed to restore market confidence, provide for certainty of execution at cost-effective borrowing rates and position the City for future growth and financial stability.

The General Fund suffers from a structural deficit of approximately $100 million per year and is burdened by large pension and OPEB liabilities and a shrinking tax base. The City does not currently have the ability to access the capital markets on its own credit and its ability to increase taxes is severely restricted. There exists considerable uncertainty among creditors and stakeholders, including pensioners, around the City's current and future fiscal plans with widespread speculation as to the probability of a Chapter 9 bankruptcy filing. Any filing will have numerous interested parties and few precedent cases, which has the potential to result in a prolonged, complex and likely contentious legal proceeding.

Additionally, an important facet of the City Proposal is the inclusion of all unsecured bondholders on parity with unfunded pension and OPEB liabilities. This approach introduces a variety of additional risks for any potential DIP lender beyond just credit and financial risks that need to be thoroughly evaluated.

After careful review of the City Proposal and considerable internal discussion and analysis of the risk profile associated with a General Fund DIP Financing, J.P. Morgan is unfortunately not in a position to offer General Fund DIP Financing for the City at this stage in the restructuring process. However, should the City ultimately decide to file for Chapter 9 bankruptcy protection, we would welcome future discussions regarding how we may be able to provide financing as part of the City's plan to emerge from bankruptcy.

While we are not in a position to provide DIP Financing for the General Fund, we at least wanted to share some of our thoughts on a potential financing approach that may be of value for the City and its advisors to consider. In our analysis, we took into consideration the limited history of municipal bankruptcies and attempted to draw on our prior experiences with somewhat similar cases, such as the dire financial challenges faced by New York City in the 1970s and the City of Philadelphia in the early 1990s.

The keys to any DIP Financing, and to the City's ongoing access to capital, will be the strength of the security interest in certain of the City's General Fund revenues and the ability to restore investor confidence and achieve access to the capital markets for the DIP Financing takeout. The City does not currently have market access on its own credit and we believe it is unlikely that the City will regain market access immediately upon emergence from bankruptcy, at least not without paying an extraordinarily high market premium if access could be achieved.

Given the ongoing challenges to restore investor confidence, we would offer up the New York City fiscal crisis as a useful parallel. In that event, New York City did not have market access and the State of New York stepped in to lend credibility and create some separation between New York City and investors. The local New York City sales tax was abolished and reimposed as a state tax, dedicated to the newly created Municipal Assistance Corporation (MAC). The MAC became the vehicle to essentially finance on behalf of New York City until market access could be regained many years later.

Along these lines, we would suggest the creation of a new state entity in Michigan, or simply using the existing Michigan Finance Authority, to become the financing vehicle on behalf of the City. Certain of the

City's General Fund revenues, such as the wagering tax revenues and income taxes revenues, for example, could be intercepted at the state-level (similar to the Distributable State Aid structure) and pledged on a super-priority lien for the benefit of the DIP lender. Implementation of this approach would:

- Likely require state enabling legislation
- Restructure the City's General Fund tax revenues but not increase taxes
- Facilate the City's ongoing access to the capital markets
- Provide for certainty of execution upon emergence from bankruptcy
- Offer the City the most cost-effective access to capital

Under this approach, all unsecured creditors could have defaulted bonds exchanged for new short-term notes instead of the unsecured notes outlined in the City Proposal. The Exchange Notes would be subordinate to any DIP Financing still outstanding at the time of the closing of the restructuring. After full repayment of the DIP Financing, the Exchange Notes could have a first lien on pledged revenues, which would make the exchange more attractive to current creditors. A bond issuance by the Michigan Finance Authority or new entity would repay the DIP Financing and possibly the Exchange Notes.

### Water and Sewer Bridge and/or DIP Financing

As mentioned earlier, we view the City's water and sewer (W&S) credits as separate and distinct from the General Fund with a completely different risk profile. There have been positive signals to the market that the W&S revenues are secured/bankruptcy remote as "special revenues" and that the City has no intention of bringing them into any bankruptcy proceeding, as further evidenced in the City Proposal. Bankruptcy opinions have been delivered to this effect during the course of recent City W&S bond offerings, but no case law or precedent has been established in Michigan courts. However, there will continue to be some uncertainty surrounding the W&S credits until a court ruling firmly validates the special revenue nature under the bankruptcy code. As evidenced by the recent Moody's and S&P actions downgrading the senior lien W&S revenue bonds to "B1" and "BB-", respectively, at this point in time Moody's and S&P do not appear to exhibit the same degree of confidence in the special revenue status of the W&S revenues as Fitch. Additionally, S&P cites concerns over the potential restructuring of DWSD and/or a negotiated exchange, which in S&P's view is tantamount to a default. We expect Fitch could likely distribute similar commentary in the near term. Bondholder reaction so far is still evolving with the W&S bonds initially trading at a premium then trading slightly under par value prior to the S&P downgrade announcement. We expect further deterioration in trading value in light the S&P announcement.

The City has opportunities to create near-term cashflow savings by refunding callable bonds with a short-term or floating rate instrument in order to take advantage of the short-end of the currently steep tax-exempt yield curve. To facilitate this, J.P. Morgan has developed two financing solutions for the City to consider. We believe that the City is best served by waiting to proceed with a refinancing until a determination has been made regarding a Chapter 9 filing and the subsequent validation by the court of the special revenue status of the W&S revenues and there is clarity on the DWSD restructuring or negotiated exchange. The proposed financing solutions below are predicated on this assumption, and both financing structures are subject to review and opinion of Bond Counsel.

*Alternative 1: Traditional Underwriting of Floating Rate Notes (FRNs)*

Once the financing order validates the special revenue status of the W&S revenues and there is clarity on the DWSD restructuring or negotiated exchange, we expect investor appetite to be strong in order to place new debt into the market to effect a refinancing. In the current market and assuming a restoration of the W&S system's prior investment grade ratings, a 2Y or 3Y FRN structure would achieve committed short-term financing that takes advantage of low floating rates. Our proposed approach would be a "soft-put" structure that establishes an initial 2Y or 3Y rate with a long term amortization that fits within the existing indenture requirements and maintains financing flexibility to roll or refinance in the future. In the event of City failure to pay the purchase price on the 2Y or 3Y put date (either through retirement or

J.P.Morgan

rollover), there is no event of default but rather a step-up interest rate to the maximum rate allowable under state law.

This financing approach is a very common and cost-effective financing vehicle in the municipal market. Indicative pricing levels (based on current market levels and subject to change, as well restoration of the W&S system's prior investment grade ratings) would be 1M LIBOR + 300 basis points for a 2Y structure and 1M LIBOR + 375 basis points for a 3Y structure. J.P. Morgan will work with the City to determine the optimal mandatory put dates for the refinancing based on expected revenue projected so there is no breach in the Department's Required Combined Coverage tests. We believe these rates would allow the City to refinance approximately $450 million of existing W&S bonds for debt service savings. Note this does not include the refinancing of $288 million of the Series 2006D Sewer Bonds that are currently placed as FRNs with a credit spread considerably lower than the indicative levels estimated above.

### Alternative 2: JPM Syndicated Credit Facility

Again, once a financing order establishes the security of the W&S revenues and there is clarity on the DWSD restructuring or negotiated exchange, we believe that certain institutions, including J.P. Morgan through JPMorgan Chase Bank, N.A., may have an interest in acting as lenders on a portion of the loan facility. The ultimate size, structure, covenants and terms of any transaction would be determined by potential lenders in consultation with the City and its advisors upon the satisfactory completion of lender's due diligence, would be mutually acceptable to the lenders and the City, and would be based upon market conditions at the time of the transaction. Several important credit and structural considerations would likely need to be raised in order to fully evaluate lender appetite, including, but not limited to, the following:

- Would the counterparty be the City/DWSD or a successor agency such as the Metropolitan Area Water and Sewer Authority as contemplated in the City Proposal?
- Updated financial information on the Department would be needed. The most recently publicly available disclosure of the Department is the June 30, 2012 audited financial statements. Additionally, potential lenders would need to review the monthly meeting minutes and the financial performance reports of the Department's Finance Committee.
- What assurance can the Emergency Manager and the State Attorney General provide to potential lenders that the ultimate source of repayment would have a perfected, consensual, statutory and super-priority lien on revenues and that payment would continue post-petition unabated in accordance with the terms of the transaction?
- What assurances could be given that the Emergency Manager or a post-petition judge could not secure another creditor or stakeholder senior to the transaction?
- How could the renegotiation or restructuring of other City obligations (such as OPEB obligations) impact the security or Department or successor agency?
- What legislative action could be taken to limit the ability and authority of the Emergency Manager to change the security, adherence to the transaction or governance of the Department or successor agency and its associated governing board?
- While the Emergency Manager has been appointed to an initial 18-month term, what assurances can be given that the Emergency Manager will remain in place until the City emerges from bankruptcy?
- We understand the current monthly flow of funds for the Department to first pay operation and maintenance expenses in "a sum identified by the Department, in its sole discretion, as sufficient to provide for the payment of the next month's expenses of administration and operation" of the Department. Can the City provide a detailed five-year forecast of such operation and maintenance expenditures?

While we have a significant amount of due diligence and open issues to close before any sort of commitment could be made, including approval to engage local Michigan counsel to assist us with the

J.P.Morgan

CITY OF DETROIT, MICHIGAN

legal analysis of several state law issues, J.P. Morgan remains committed to exploring a DIP financing secured by W&S revenues with the City and its advisors.

The City has expressed interest in transferring/leasing the DWSD to a new regional entity or private sector third party with the goal of creating a structure to allow for payment to the General Fund of the City in the form of PILOT or lease payments. We offer some considerations to effect such a transaction, including any required changes in debt structures or bondholder consents:

- **Defeasance.** A defeasance of the remaining bonds not currently callable or advance refundable would cost approximately $2.84 billion for the water credit and $3.26 billion for the sewer credit, representing a premium of $358 million and $503 million over par, respectively. These figures are based on current market conditions and subject to change. Additionally, approximately $531 million in principal amount of SRF loans remain outstanding, bringing the total defeasance cost to approximately $6.6 billion.

- **No action from bondholders.** In conversations with the City's financial advisor, it has been noted preliminarily that the current legal structure might allow for the existing water and sewer indentures to essentially be absorbed/assumed by the newly created regionally entity with no action required by bondholders and no defeasance of the existing bonds. While this would likely be the most cost-effective solution, further diligence is required on the legal implications and viability.

- **Consent.** The City could seek consent from current W&S bondholders to amend their current indentures and to form a new ownership entity. Current investors would need some motivation to consent, which could include closing the existing senior lien or other refinements to the existing credit structure.

- **Exchange as part of any bankruptcy proceeding.** Based on our conversation with the City's financial advisor, the City is unlikely to willingly incur any significant additional costs to either defease bonds our purchase bondholder consent. It therefore appears likely that the City will either 1) conclude that it is unlawful to transfer the outstanding debt to a new entity, or 2) use the bankruptcy proceedings to offer current holders redemption of outstanding water and sewer bonds at par or possibly negotiate an exchange of their bonds for new bonds of the successor entity with substantially similar terms and revenue pledge to those of the currently outstanding bonds.

- **Regional considerations.** Given that the suburban customers make up a larger percentage of the revenue base of the water and sewer system as compared to the City itself, certain regional considerations are likely to arise around the equitable distribution of residual revenues of the system. The composition of the governing board of the new regional entity will likely have an effect on the negotiations related to any reorganization and ultimately the PILOT/lease payments to be directed to the City.

Should the City and its financing team wish to follow-up on matters raised in the above discussion, or should our understanding of any of the facts or assumptions discussed be incorrect or benefit from clarification, please do not hesitate to advise us. Further, if the City and its team wish to continue to explore a financing related to the Water and Sewer systems, we would be happy to pursue the engagement of Michigan counsel to begin the due diligence process described above.

Thank you for your consideration, and we look forward to further dialogue as you move forward.

4

J.P.Morgan

J.P.Morgan

July 5, 2013

City of Detroit, Michigan

Attn: Kevyn Orr, Emergency Manager

Re: Disclosures by J.P. Morgan Securities LLC
    Pursuant to MSRB Rule G-17

Dear Mr. Orr:

We are writing to provide you, as the Emergency Manager of the City of Detroit, Michigan ("Issuer"), with certain disclosures, as required by the Municipal Securities Rulemaking Board ("MSRB") Rule G-17 as set forth in MSRB Notice 2012-25 (May 7, 2012)[1].

J.P. Morgan Securities LLC ("J.P. Morgan") proposes to serve as an underwriter, and not as a financial advisor or municipal advisor, in connection with the potential issuance of municipal securities (the "Bonds") by or for the benefit of the Issuer.

Although J.P. Morgan is not being engaged as financial advisor for the Issuer, the State of Michigan or any other municipal entity in connection with our current discussions with you, as part of our services as underwriter, J.P. Morgan may provide advice concerning the structure, timing, terms, and other similar matters concerning the issuance of the Bonds.

I. Disclosures Concerning the Underwriters' Role:

(i) MSRB Rule G-17 requires an underwriter to deal fairly at all times with both municipal issuers and investors.

(ii) The underwriters' primary role is to purchase the Bonds with a view to distribution in an arm's-length commercial transaction with the Issuer. The underwriters have financial and other interests that differ from those of the Issuer.

(iii) Unlike a municipal advisor, the underwriters do not have a fiduciary duty to the Issuer under the federal securities laws and are, therefore, not required by federal law to act in the best interests of the Issuer without regard to their own financial or other interests.

(iv) The underwriters have a duty to purchase the Bonds from the Issuer at a fair and reasonable price, but must balance that duty with their duty to sell the Bonds to investors at prices that are fair and reasonable.

(v) The underwriters will review the official statement for the Bonds in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws, as applied to the facts and circumstances of this transaction[2].

---

[1] Interpretive Notice Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities (effective August 2, 2012).

[2] Under federal securities law, an issuer and/or conduit obligor of securities has the primary responsibility for disclosure to investors. The review of the official statement by the underwriters is solely for purposes of satisfying the underwriters' obligations under the federal securities laws and such review should not be construed by an issuer or a conduit obligor as a guarantee of the accuracy or completeness of the information in the official statement.

5

J.P.Morgan

CITY OF DETROIT, MICHIGAN

## II. Disclosures Concerning the Underwriters' Compensation:

The underwriters will be compensated by a fee and/or an underwriting discount that will be set forth in any bond purchase agreement to be negotiated and entered into in connection with the issuance of the Bonds. Payment or receipt of the underwriting fee or discount will be contingent on the closing of the transaction and the amount of the fee or discount may be based, in whole or in part, on a percentage of the principal amount of the Bonds. While this form of compensation is customary in the municipal securities market, it presents a conflict of interest since the underwriters may have an incentive to recommend to the Issuer a transaction that is unnecessary or to recommend that the size of the transaction be larger than is necessary.

## III. Additional Conflicts Disclosures:

J.P. Morgan has identified the following additional potential or actual material conflicts:

- Conflicts of Interest/Ordinary Course Business Relationships

    o J.P. Morgan and its affiliates comprise a full service securities firm and a commercial bank engaged in securities trading and brokerage activities, as well as providing investment banking, asset management, financing, and financial advisory services and other commercial and investment banking products and services to a wide range of corporations and individuals. In addition, J.P. Morgan and its affiliates may currently have and may in the future have investment and commercial banking, trust and other relationships with parties that may relate to assets of, or be involved in the issuance of securities and/or instruments by, the Issuer and its affiliates.

    o In the ordinary course of their respective businesses, J.P. Morgan and its affiliates have engaged, and may in the future engage, in transactions with, and perform services for, the Issuer and its affiliates for which they received or will receive customary fees and expenses. Under certain circumstances, J.P Morgan and its affiliates may have certain creditor and/or other rights against the Issuer and its affiliates in connection with such transactions and/or services.

    o In the ordinary course of their various business activities, J.P. Morgan and its affiliates, officers, directors and employees may purchase, sell or hold a broad array of investments and may actively trade securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of customers. Such investment and trading activities may involve or relate to assets, securities and/or instruments of the Issuer (whether directly, as collateral securing other obligations or otherwise) and/or persons and entities with relationships with (or that are otherwise involved with transactions by) the Issuer. J.P. Morgan and its affiliates also may communicate independent investment recommendations, market advice or trading ideas and/or publish or express independent research views in respect of such assets, securities or instruments and at any time may hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and instruments.

- Conflicts of Interest/Refunded Bonds

    o As of the date hereof, J.P. Morgan owns a substantial portion of certain outstanding bonds of the Issuer in its role as a market maker in municipal securities, and would therefore receive a substantial portion of the proceeds of the Bonds if the bonds owned by J.P. Morgan were refunded.

- Other Conflicts of Interest Disclosure

    o J.P. Morgan may place Bonds in J.P. Morgan's or an affiliate's tender option bond program to be held for the account of J.P. Morgan or the affiliate, as the case may be.

    o If JPMorgan Chase Bank, N.A, an affiliate of J.P. Morgan, provides any form of interim lending financing to the Issuer, this affiliate may receive a portion of the proceeds from issuance of the Bonds if the Bonds refund any portion of the interim loan.

CI   OF DETROIT, MICHIGAN

If you or any other Issuer officials have any questions or concerns about these disclosures, please make those questions or concerns known immediately to the undersigned. In addition, you should consult with the Issuer's own financial and/or municipal, legal, accounting, tax and other advisors, as applicable, to the extent you deem appropriate.

It is our understanding that you have the authority to bind the Issuer by contract with us, and that you are not a party to any conflict of interest disclosed herein relating to the subject transaction. If our understanding is incorrect, please notify the undersigned immediately.

**We are required to seek your acknowledgement that you have received this letter.** Accordingly, please send me an email to that effect or, sign and return the enclosed copy of this letter to me at the address set forth below. Depending on the structure of the transaction that the Issuer decides to pursue, or if additional potential or actual material conflicts are identified, we may be required to send you additional disclosures regarding the material financial characteristics and risks of such transaction and/or describing those conflicts. At that time, we also will seek your acknowledgement of receipt of any such additional disclosures.

We look forward to working with you and the Issuer in connection with the potential issuance of the Bonds. Thank you.

Sincerely,

J.P. MORGAN SECURITIES LLC

By:
Jamison Feheley

Acknowledgement:

CITY OF DETROIT, MICHIGAN

_____
Kevyn Orr, Emergency Manager

Date: _____

CITY OF DETROIT, MICHIGAN

7

J.P.Morgan

ATTORNEY-CLI... PRIVILEGED
Not Subject to Disclosure Under
Freedom of Information Act
Subject to Common Interest Agreement

CITY'S
EXHIBIT
088

# Post-Petition Financing Discussion

September 26, 2013



MILLER BUCKFIRE
A Stifel Company

Attorney-Client Privileged
Not Subject to Disclosure Under
Freedom of Information Act
Subject to Common Interest Agreement

# Post-Petition Financing Contact Log Summary

| Lender Name | C.A. Sent | C.A. Signed | 9/6 Check In | Data Room | Term Sheet | Not Interested |
|---|---|---|---|---|---|---|
| **Traditional** | | | | | | |
| Amalgamated Bank | ✓ | ✓ | | | | |
| Bank of America | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Barclays | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Citi | ✓ | ✓ | ✓ | N/A | N/A | ✓ |
| Credit Suisse | ✓ | ✓ | ✓ | | | |
| Deutsche Bank | ✓ | ✓ | ✓ | | ✓ | |
| GECC | ✓ | ✓ | ✓ | N/A | N/A | ✓ |
| Goldman Sachs | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Jefferies | ✓ | ✓ | ✓ | | ✓ | |
| JPMorgan | ✓ | ✓ | ✓ | N/A | N/A | ✓ |
| Morgan Stanley | ✓ | ✓ | N/A | N/A | N/A | ✓ |
| UBS | ✓ | ✓ | ✓ | ✓ | | |
| Wells Fargo | ✓ | ✓ | N/A | N/A | N/A | ✓ |
| **Total Traditional** | 13/13 | 13/13 | 9/13 | 4/13 | 6/13 | 5/13 |

MILLER BUCKFIRE
A Stifel Company

ATTORNEY-CLIENT PRIVILEGED
NOT SUBJECT TO DISCLOSURE UNDER
FREEDOM OF INFORMATION ACT
SUBJECT TO COMMON INTEREST AGREEMENT

# POST-PETITION FINANCING CONTACT LOG SUMMARY

| Lender Name | C.A. Sent | C.A. Signed | 9/6 Check In | Data Room | Term Sheet | Not Interested |
|---|---|---|---|---|---|---|
| **Alternative** | | | | | | |
| Ableco/Cerberus | ✓ | | | | | |
| Anchorage | ✓ | ✓ | | | | |
| AMBAC | ✓ | ✓ | ✓ | ✓ | ✓(1) | |
| Apollo Global Management | ✓ | ✓ | | | | |
| Ares Management | ✓ | ✓ | | | | |
| Assured Guaranty | ✓ | ✓ | ✓ | ✓ | ✓(1) | |
| Avenue Capital | ✓ | ✓ | ✓ | | ✓ | |
| Canyon | ✓ | | | | | |
| Carlyle | ✓ | | | | | |
| CarVal Investors | N/A | N/A | N/A | | ✓ | |
| Centerbridge | ✓ | ✓ | | | N/A | ✓ |
| Chrome Mountain | ✓ | ✓ | ✓ | | | |
| CSG Investments | ✓ | ✓ | | | | |
| Davidson Kempner Partners | N/A | N/A | N/A | N/A | N/A | ✓ |
| Elliott Associates | ✓ | ✓ | | | | |
| FGIC | ✓ | ✓ | | ✓ | ✓(2) | |
| Flagstar | ✓ | ✓ | ✓ | | ✓ | |
| Fundamental Advisors (Fortress) | ✓ | ✓ | ✓ | | | |
| GSO Capital | N/A | N/A | N/A | N/A | N/A | |
| Hudson Bay Capital | ✓ | ✓ | ✓ | | | |
| Knighthead | ✓ | ✓ | | | | ✓ |
| KKR | ✓ | ✓ | ✓ | | | |
| Mason Capital | ✓ | ✓ | | | | |
| Moore Capital | ✓ | ✓ | | | | |
| National (MBIA) | ✓ | ✓ | ✓ | ✓ | ✓(1) | |
| Oaktree | ✓ | ✓ | | | | |
| Och-Ziff Capital | ✓ | | | | | |
| Orix | ✓ | | | | | |
| PIMCO | ✓ | ✓ | | | | |
| RBC Capital Markets | N/A | N/A | ✓ | N/A | ✓ | ✓ |
| RW Baird | N/A | N/A | N/A | N/A | N/A | ✓ |
| Silverpoint | ✓ | ✓ | | | ✓ | |
| SVP | ✓ | ✓ | N/A | N/A | N/A | |
| Syncora | ✓ | ✓ | | | ✓(2) | ✓ |
| Tennenbaum Capital | ✓ | ✓ | | | | |
| TPG | ✓ | | | | | |
| US Bank | ✓ | N/A | N/A | N/A | N/A | ✓ |
| **Total Alternative** | 33/37 | 27/37 | 12/37 | 4/37 | 9/37 | 7/37 |
| **Grand Total** | 46/50 | 40/50 | 21/50 | 8/50 | 15/50 | 12/50 |

(1) AMBAC, Assured Guaranty and National (MBIA) submitted a joint proposal.
(2) Syncora and FGIC submitted a joint proposal.

MILLER BUCKFIRE
A Stifel Company

ATTORNEY-CLIENT PRIVILEGED
Not Subject To Disclosure Under
Freedom Of Information Act
Subject To Common Interest Agreement

# POST-PETITION FINANCING ALL-IN COST ANALYSIS[1]

## Swap Termination Facility ($MM)

| | BAML 9/16/13 | Barclays 9/16/13 | Goldman 9/16/13 | CarVal 9/16/13 | Fundamental 9/16/13 | Jefferies 9/16/13 | PIMCO 9/16/13 | SCAI & FGIC 9/16/13 |
|---|---|---|---|---|---|---|---|---|
| Facility Size | $230 | $230 | $230 | $230 | $230 | $230 | $230 | $230 |
| **Interest Expense** | | | | | | | | |
| LIBOR Floor | 1.00% | 1.00% | 1.00% | N/A | 1.50% | N/A | 1.00% | 2.00% |
| LIBOR Spread - Max | 6.25% | 2.50% | 5.00% | 6.25% | 7.00% | N/A | 8.75% | 4.75% |
| Market Flex | TBD | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Interest Rate | 7.25% | 3.50% | 6.00% | 6.50% | 8.50% | 4.25% | 9.75% | 6.75% |
| Annual Interest Expense | $16.7 | $8.1 | $13.8 | $15.0 | $19.6 | $9.8 | $22.4 | $15.5 |
| Rate Tax Status | Taxable | Taxable | Taxable | Tax-Exempt | Not Specified | Taxable | Tax-Exempt | Tax-Exempt |
| **Fees** | | | | | | | | |
| Underwriting Fees[2] | 2.00% | 1.25% | 2.50% | TBD | N/A | 2.00% | 3.00% | 1.50% |
| OID[2] | N/A | N/A | 1.25% | 5.00% | 2.00% | N/A | N/A | N/A |
| Exit Fee[2] | N/A | N/A | 2.00% | N/A | N/A | N/A | 2.00% | N/A |
| Total Fees | 2.00% | 1.25% | 5.75% | 5.00% | 2.00% | 2.00% | 5.00% | 1.50% |
| Weighted-Average Term (yrs) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Annual Fees (Spread) | 1.00% | 0.63% | 2.88% | 2.50% | 1.00% | 1.00% | 2.50% | 0.75% |
| Implied Annual Fees | $2.3 | $1.4 | $6.6 | $5.8 | $2.3 | $2.3 | $5.8 | $1.7 |
| **All-in Cost** | | | | | | | | |
| All-in Rate | 8.25% | 4.13% | 8.88% | 9.00% | 9.50% | 5.25% | 12.25% | 7.50% |
| Total Annual Expense | $19.0 | $9.5 | $20.4 | $20.7 | $21.9 | $12.1 | $28.2 | $17.3 |

(1) Excludes unused availability fees, breakup fees and administrative fees. Assumes LIBOR of 0.25% as of September 13, 2013.
(2) Fees annualized based on weighted average term.

MILLER BUCKFIRE
A Stifel Company

ATTORNEY-CLIE... PRIVILEGED
NOT SUBJECT TO DISCLOSURE UNDER
FREEDOM OF INFORMATION ACT
SUBJECT TO COMMON INTEREST AGREEMENT

# POST-PETITION FINANCING ALL-IN COST ANALYSIS(1)

## Quality of Life Facility ($MM)

| | BAML 9/16/13 | Barclays 9/16/13 | Goldman 9/16/13 | CarVal 9/16/13 | Fundamental 9/16/13 | Jefferies 9/16/13 | PIMCO 9/16/13 | SCAI & FGIC 9/16/13 |
|---|---|---|---|---|---|---|---|---|
| Facility Size | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 |
| **Interest Expense** | | | | | | | | |
| LIBOR Floor | 1.00% | 1.00% | 1.00% | N/A | 1.50% | N/A | 1.00% | 2.00% |
| LIBOR Spread - Max | 6.25% | 2.50% | 5.00% | 6.25% | 7.00% | N/A | 8.75% | 4.75% |
| Market Flex | TBD | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Interest Rate | 7.25% | 3.50% | 6.00% | 6.50% | 8.50% | 4.25% | 9.75% | 6.75% |
| Annual Interest Expense | $8.7 | $4.2 | $7.2 | $7.8 | $10.2 | $5.1 | $11.7 | $8.1 |
| Rate Tax Status | Taxable | Taxable | Taxable | Tax-Exempt | Not Specified | Taxable | Tax-Exempt | Tax-Exempt |
| **Fees** | | | | | | | | |
| Underwriting Fees(2) | 2.00% | 1.25% | 2.50% | TBD | N/A | 2.00% | 3.00% | 1.50% |
| OID(2) | N/A | N/A | 1.25% | 5.00% | 2.00% | N/A | N/A | N/A |
| Exit Fee(2) | N/A | N/A | 2.00% | N/A | N/A | N/A | 2.00% | N/A |
| Total Fees | 2.00% | 1.25% | 5.75% | 5.00% | 2.00% | 2.00% | 5.00% | 1.50% |
| Weighted-Average Term (yrs) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Annual Fees (Spread) | 1.00% | 0.63% | 2.88% | 2.50% | 1.00% | 1.00% | 2.50% | 0.75% |
| Implied Annual Fees | $1.2 | $0.8 | $3.5 | $3.0 | $1.2 | $1.2 | $3.0 | $0.9 |
| **All-in Cost** | | | | | | | | |
| All-in Rate | 8.25% | 4.13% | 8.88% | 9.00% | 9.50% | 5.25% | 12.25% | 7.50% |
| Total Annual Expense | $9.9 | $5.0 | $10.7 | $10.8 | $11.4 | $6.3 | $14.7 | $9.0 |

(1) Excludes unused availability fees, breakup fees and administrative fees. Assumes LIBOR of 0.25% as of September 13, 2013.
(2) Fees annualized based on weighted average term.

MILLER BUCKFIRE
A Stifel Company

# POST-PETITION FINANCING ALL-IN COST ANALYSIS[1]

| | BAML 9/16/13 | Barclays 9/16/13 | Goldman 9/16/13 | CarVal 9/16/13 | Fundamental 9/16/13 | Jefferies 9/16/13 | PIMCO 9/16/13 | SCAI & FGIC 9/16/13 |
|---|---|---|---|---|---|---|---|---|
| **Total Facility ($MM)** | | | | | | | | |
| **All-in Facility** | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 |
| **All-in Spread** | | | | | | | | |
| Swap Termination Facility | 6.25% | 2.50% | 5.00% | 6.25% | 7.00% | N/A | 8.75% | 4.75% |
| Quality of Life Facility | 6.25% | 2.50% | 5.00% | 6.25% | 7.00% | N/A | 8.75% | 4.75% |
| Blended All-In Spread | 6.25% | 2.50% | 5.00% | 6.25% | 7.00% | N/A | 8.75% | 4.75% |
| **All-in Rate** | | | | | | | | |
| Swap Termination Facility | 8.25% | 4.13% | 8.88% | 9.00% | 9.50% | 5.25% | 12.25% | 7.50% |
| Quality of Life Facility | 8.25% | 4.13% | 8.88% | 9.00% | 9.50% | 5.25% | 12.25% | 7.50% |
| Blended All-In Rate | 8.25% | 4.13% | 8.88% | 9.00% | 9.50% | 5.25% | 12.25% | 7.50% |
| Total Annual Expense | $28.9 | $14.4 | $31.1 | $31.5 | $33.3 | $18.4 | $42.9 | $26.3 |
| **Difference from Lowest All-In Rate** | 4.13% | - | 4.75% | 4.88% | 5.38% | 1.13% | 8.13% | 3.38% |
| **Difference from Lowest All-In Expense** | $14.4 | - | $16.6 | $17.1 | $18.8 | $3.9 | $28.4 | $11.8 |
| **Additional Fees** | | | | | | | | |
| Unused Revolver Fee | N/A | N/A | N/A | 3.25% | N/A | N/A | N/A | N/A |
| Admin Fee per Annum | $40k | N/A | N/A | N/A | TBD | N/A | N/A | $25k |
| Default Rate | 2.00% | 2.00%-6.00% | 2.00% | 2.00% | 4.00% | 3.50% | 2.00% | 2.00% |
| Breakup Fee | N/A | N/A | N/A | 1.25% | N/A | N/A | N/A | N/A |

(1) Excludes unused availability fees, breakup fees and administrative fees. Assumes LIBOR of 0.25% as of September 13, 2013.



MILLER BUCKFIRE
A Stifel Company

ATTORNEY-CLIENT PRIVILEGED
NOT SUBJECT TO DISCLOSURE UNDER
FREEDOM OF INFORMATION ACT
SUBJECT TO COMMON INTEREST AGREEMENT

# POST-PETITION FINANCING PROPOSAL COMPARISON
## Full Facility Proposals

| | BAML | BARCLAYS | GOLDMAN SACHS |
|---|---|---|---|
| Commitment/Underwriting Structure | • STL: $230mm; partial underwrite and best efforts for Merrill swap payoff portion<br>• QoL: $120mm<br>• Sole arranger | • STL: $230mm<br>• QoL: $120mm | • STL: $225mm<br>• QoL: $125mm |
| Tenor | • Earliest of dismissal, plan effective date, 2 years after closing<br>• Option to convert to exit financing | • Earliest of dismissal, plan effective date, 2.5 years after closing | • Earliest of dismissal, plan effective date, 7 years after closing |
| Defaulting Lenders | • N/A | • N/A | • N/A |
| Pricing/Default Pricing | • L + 500 bps (100 bps LIBOR floor)<br>• 200 bps default pricing | • L + 250 bps (100 bps LIBOR floor)<br>• 200 bps-600 bps default pricing | • L + 450-500 bps (100 bps LIBOR floor)<br>• 200 bps default pricing |
| Fees | • 2% Upfront fee<br>• Admin: $40k/year | • 1.25% commitment fee (min $750k) | • 2.5% lead arranger fee<br>• 1% conversation loan to exit facility fee |
| OID | • N/A | • N/A | • 1% - 1.5% OID |
| Amortization | • N/A | • None | • Following 2 years the loan will amortize $4 million per month less interest paid |
| Covenants | • Monthly reporting requirements for casino and income tax revenues<br>• $120mm minimum LTM casino revenues<br>• $160mm minimum LTM income taxes | • N/A | • No additional debt that has the same or senior payment priority<br>• No asset sales without repaying of DIP<br>• City shall deposit all pledged income and wage tax revenues with an Administrative agent |
| Collateral/Priority | • Addition of casino developer payments for QoL and potential DSA 4th lien in EoD for both | | • STL: Priority lien on income tax revenue<br>• QoL: Priority lien on wagering tax revenue and second priority loan on income tax revenue |
| Optional Repayment | • N/A | • Year 1: par + make-whole par thereafter | • N/A |
| Prepayment Premium/Repayment | • Similar to term sheet | • Similar to term sheet | • Similar to term sheet |
| Various Other Conditions | • State/federal tax exemption<br>• No MAC; reps and warranties<br>• Will hold up to $235mm to pay UBS swaps; will not fund commitments in order to pay Merrill swaps | • Similar to term sheet<br>• Proposed additional replacement swap transaction<br>• Expressed interest in leading exit facility | • Call protection of 102% in first year and 101% in second year<br>• Authorization of the Emergency Loan Board<br>• Consent by the City |

MILLER BUCKFIRE
A Stifel Company

ATTORNEY-CLIENT PRIVILEGED
Not Subject to Disclosure Under
Freedom of Information Act
Subject to Common Interest Agreement

# POST-PETITION FINANCING PROPOSAL COMPARISON
## Full Facility Proposals

| | AMBAC/AGM/NPFG | CarVal | Fundamental | Jefferies | PIMCO |
|---|---|---|---|---|---|
| | STL: $230mm (lesser of $250mm or 73% Mid-Market amount); QoL: $120mm (up to $160mm) | STL: $242mm (OID); QoL: $126mm ($120mm at 98% OID) | STL: $235mm ($230mm at 98% OID); QoL: $122mm ($120mm at 98% OID) | STL: $230mm; QoL: $120mm | STL: $250mm; QoL: $120mm |
| | Earliest of dismissal, plan effective date, 2 years after closing; Extension possible | Earliest of dismissal, plan effective date, 2 years after closing (no later than 12/1) | Earliest of dismissal, plan effective date, 2 years after closing; One year extension option (2% fee) | 5 years after closing date; 2 years after close is the optional call date | Earliest of dismissal, plan effective date, 2 years after closing |
| | STL: N/A; QoL: $50mm; quarterly draws upon certain lender approvals | Can fund QoL up to six months after closing | N/A | N/A | N/A |
| | 200 bps below the most favorable bona fide offer; 200 bps default pricing | L + 625 bps; 200 bps default pricing | L + 700 bps - 1150 bps (150 bps LIBOR floor); 400 bps default pricing | Prior to option call date 3.5% for tax-exempt (4.25% otherwise); After 3% for tax-exempt (3.5% otherwise) | L + 875 bps (100 bps LIBOR floor); 200 bps default pricing |
| | Trustee fees only | Breakup fee 1.25%; 50% of fee for unused portion | N/A | 2% Commitment fee; Work fee ($0.25mm) | 3% Commitment fee |
| | N/A | 5% OID | 2% OID | N/A | N/A |
| | None | None | None | Following the optional call date that the bonds will amortize $4 million per month | None |
| | No G.O. or DWSD impairment; Deviate from disbursement budget by 10%; Minimum liquidity; 13-week and 12-month cash flow forecasts; weekly cash flow updates | N/A | Minimum monthly casino and income tax revenues | No additional debt that has the same or senior payment priority; No asset sales without repaying of DIP; Not modify tax rates | Both affirmative (access to budgets) and negative (issuance of debt) covenants; City shall deposit all pledged income and wagering tax revenues with an Administrative agent |
| | Addition of 2nd and 4th lien on DSA, effective if case is dismissed or following EtoD | Similar to term sheet | All asset sales; Addition of pledged parking revenues and blight revenues (grant reimbursement); Addition of DSA junior lien; Negative pledge on other unencumbered assets | STL: Priority lien on income tax revenue and asset sales; QoL: Priority lien on wagering tax revenue and asset sales and second priority lien on income tax revenue | STL: Superpriority lien on income tax revenue, asset sales, and all assets; QoL: Priority lien on wagering tax revenue and asset sales and second priority lien on income tax revenue |
| | N/A | N/A | N/A | N/A | N/A |
| | Similar to term sheet | Similar to term sheet | Similar to term sheet | Similar to term sheet | Similar to term sheet |
| | Proposed GO and DWSD restructuring terms and liens; refinanced/insured credit | QoL state/federal tax exemption; Statutory lien required; Partnered with Quasar Road, Monarch and Stone Lion; Also proposed new structure | Similar to term sheet | Authorization of the Emergency Loan Board; Consent by the City; Predicated on ability to contact several potential buyers | Approval of the DIP Budget; Authorization of the Emergency Loan Board; Consent of the City |

MILLER BUCKFIRE
A Stifel Company

ATTORNEY-CLIENT PRIVILEGED
NOT SUBJECT TO DISCLOSURE UNDER
FREEDOM OF INFORMATION ACT
SUBJECT TO COMMON INTEREST AGREEMENT

# POST-PETITION FINANCING PROPOSAL COMPARISON
### PARTIAL FACILITY PROPOSALS

| | AMALGAMTED | CANYON CAPITAL | DEUTSCHE BANK |
|---|---|---|---|
| | ▪ STL: $0mm<br>▪ QoL: $20mm | ▪ STL: $0mm (up to $230mm)<br>▪ QoL: $126mm ($120mm at 95% OID) | ▪ $180mm for existing swap termination<br>▪ Ability to upsize to full financing need to include QOL |
| | ▪ Earliest of dismissal, plan effective date, 2 years after closing | ▪ Earliest of dismissal, plan effective date, 2 years after closing | ▪ Up to 5 years<br>▪ Extended facility up to 10 years |
| | ▪ N/A | ▪ N/A | ▪ N/A |
| | ▪ TBD based on final structure<br>▪ TBD default pricing | ▪ L + 500 bps (100 bps LIBOR floor)<br>▪ 200 bps default pricing | ▪ Same as current swap terms<br>▪ Ability to amend |
| | ▪ N/A | ▪ N/A | ▪ No upfront fees |
| | ▪ N/A | ▪ 5% OID | ▪ 10% effective OID |
| | ▪ Some TBD amount on a monthly or quarterly basis | ▪ None | ▪ Ability to postpone amortization until maturity |
| | ▪ N/A | ▪ N/A | ▪ N/A |
| | ▪ QoL: Super-priority, statutory lien on casino revenues and income taxes; lock-box structure | ▪ Similar to term sheet | ▪ Super-priority lien on income tax revenues and asset sales |
| | ▪ N/A | ▪ Non-call until maturity; 105% thereafter | ▪ Redeem at market within 2 years<br>▪ $200mm after 2 years |
| | ▪ No $10mm threshold for asset sales<br>▪ Similar additional borrowings covenant as term sheet | ▪ Similar to term sheet | ▪ N/A |
| | ▪ Similar to term sheet | ▪ Similar to term sheet | ▪ May only require amendment to current documents<br>▪ Non-appealable order from Bankruptcy Court |

MILLER BUCKFIRE
A Stifel Company

ATTORNEY-CLIENT PRIVILEGED
NOT SUBJECT TO DISCLOSURE UNDER
FREEDOM OF INFORMATION ACT
SUBJECT TO COMMON INTEREST AGREEMENT

# POST-PETITION FINANCING PROPOSAL COMPARISON

## PARTIAL FACILITY PROPOSALS

| | FLAGSTAR | HUDSON BAY | SILVERPOINT |
|---|---|---|---|
| COMMITMENT / FACILITY / STRUCTURE | • $30mm pro rata participation in the Loans | • QoL: $120mm<br>• Hudson Bay will fund $30mm of the Quality of Life Loan | • STL: $230mm<br>• QoL: $120mm<br>• Silver Point contemplates providing up to $100mm of the loans on a pro-rata basis |
| TENOR | • Earliest of dismissal, plan effective date, 2 years after closing | • Earliest of dismissal, plan effective date, 2 years after closing | • Earliest of dismissal, plan effective date, 2 years after closing |
| DEFAULT RATE | • N/A | • N/A | • N/A |
| PRICING / DEFAULT PRICING | • No less than 475 bps | • L + 800 bps (100 bps LIBOR floor)<br>• 200 bps default pricing | • STL & QoL: L + 925 bps (LIBOR floor 50 bps)<br>• 300 bps default pricing |
| FEES | • 0.75% upfront fee<br>• 0.50% on undrawn portions | • 1% Facility fee | • 3% closing fee<br>• work fee ($0.1mm)<br>• 2.5% commitment fee |
| OID | • N/A | • 2% OID | • N/A |
| AMORTIZATION | • Interest only 2 years<br>• Full amortization in 6 years | • None | • None |
| MATERIAL COVENANTS | • N/A | • No additional debt that has the same or senior payment priority<br>• No asset sales without repaying of DIP | • No additional debt that has the same or senior priority<br>• Other covenants would be considered |
| COLLATERAL | • Similar to term sheet | • QoL: Superpriority lien on wagering tax revenue and second priority lien on income tax revenue and asset sales | • STL: Priority lien on income tax revenue and asset sales<br>• QoL: Priority lien on wagering tax revenue and asset sales and second priority lien on income tax revenue |
| COMMON REPRESENTATION | • N/A | • N/A | • N/A |
| MANDATORY PREPAYMENTS / AMENDED BORROWING | • Similar to term sheet | • Similar to term sheet | • Similar to term sheet |
| MATERIAL CLOSING CONDITIONS / OTHER | • Similar to term sheet | • Completion of customary confirmatory due diligence. Completion of Swap Termination Loan on specified terms | • Customary closing conditions |

**MILLER BUCKFIRE** *A Stifel Company*

ATTORNEY-CLIENT PRIVILEGED
NOT SUBJECT TO DISCLOSURE UNDER
FREEDOM OF INFORMATION ACT
SUBJECT TO COMMON INTEREST AGREEMENT

# DRAFT POST-PETITION FINANCING TIMELINE

## AS OF SEPTEMBER 24, 2013

### SEPTEMBER 2013

| S | M | T | W | Th | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

### OCTOBER 2013

| S | M | T | W | Th | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

### NOVEMBER 2013

| S | M | T | W | Th | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**PRIOR WEEKS (August 19-30)**
- Contact potential lenders and introduce process (MB)
- Provide NDA to potential lenders (JD)
- Provide RFP/proposed term sheet to NDA lenders (MB)
- Schedule calls between potential lenders and City working team (MB, JD, MFA)
- Facilitate additional diligence and meetings, if necessary (MB)

**WEEK 3 (Sep 9)**
- **Indications of interest due (Sep 16)** (MB, JD, MFA)
- Recommend lender(s) to lead process (MB, JD)
- Provide data room access on lender-by-lender basis (MB)
- Facilitate additional diligence for selected lenders (MB, JD)

**WEEK 4 (Sep 23)**
- Ask Selected Lenders to prepare Commitment Letters (MB)
- Provide data room access on lender-by-lender basis (MB)
- Facilitate additional diligence for selected lenders (MB, JD)
- Selected Lenders draft Commitment Letter (Lenders)

**WEEK 5 (Sep 30)**
- Receive draft Commitment Letters from Selected Lenders (MB, JD, MFA)
- Negotiate Commitment Letters (Lenders, JD, MB)

**WEEK 6 (Oct 7)**
- **Execute Commitment Letter and pay Commitment Fee (if required) (October 7)** (City)
- File Post-Petition Financing motion (Oct 8-9) (JD)
- Begin City Council approval process (Oct 8-9) (City, JD, MB)
- Brief ELB (City, MFA, JD, MB)
- Begin documentation (JD, Lender, MB, City, MFA)

**WEEK 7 (Oct 14)**
- Continue documentation (JD, Lender, City, MFA)
- City Council approval period concludes (City, JD, MB)

**WEEK 8 (Oct 21)**
- Finalize documentation (JD, Lender, City, MFA)
- **File amended Post-Petition Financing motion (Oct 21 for 23-day notice)** (JD)
- City Council alternative period concludes (City, JD, MB)
- ELB review and approval process (City, JD, MB, MFA)
- **Eligibility Trial (Oct 23)** (JD)

**WEEK 9 (Oct 28)**
- Respond to Post-Petition Financing objections (JD)
- Continue Eligibility Trial, as required (JD)

**WEEK 10 (Nov 4)**
- Continue Eligibility Trial, as required (JD)
- Entry of Eligibility Order (JD)

**WEEK 11 (Nov 11)**
- **Potential Hearing on Post-Petition Financing Motion (Nov 14)** (JD)
- Entry of Post-Petition Financing Order (JD)
- Closing and funding of financing (Lender, JD, MB, City, MFA)
- **Notice of payment of swap settlement to UBS and BAML (Nov 15)** (JD, MB, City)

**WEEK 12 (Nov 18)**
- **Payment of swap settlement (Nov 20)** (JD, MB, City)

City – City of Detroit    JD – Jones Day    MB – Miller Buckfire    MFA – Michigan Finance Authority

MILLER BUCKFIRE
A Stifel Company



[ DRAFT ]

# DETROIT POST-PETITION FINANCING

Commitment Letter Summaries

[ October 3, 2013 – 8 AM ]



**CITY'S
EXHIBIT
089**

# COMMITMENT LETTER COMPARISON

## PRINCIPAL ECONOMIC TERMS

| | **BARCLAYS** | **CARVAL** |
|---|---|---|
| **STRUCTURE** | ■ Up to $350mm in Notes<br>■ Sole lead arranger, bookrunner and syndication agent<br>■ Sole right to exit financing | ■ $400mm Bond Purchase Facility<br>■ Up to $235mm initial purchase<br>■ Up to $165mm but not less than $122mm 6 month delayed draw<br>■ Sole and exclusive purchase agent |
| **COMMITMENT/ TARGET HOLD** | ■ Full commitment<br>■ Target hold: 50% | ■ Full commitment<br>■ Target hold of greater than 50% |
| **TENOR** | ■ Earliest of dismissal, plan effective date, 2.5 years after closing | ■ Earliest of dismissal, plan effective date, 2 years after closing<br>■ Option for exit facility |
| **PRICING** | ■ L + 250 bps (100 bps LIBOR floor)<br>■ Tax exemption of interest to be determined | ■ L + 725 bps for first year<br>■ L + 775 bps after first year<br>■ 2% OID<br>■ Margin subject to confirmation of tax exempt status |
| **MARKET FLEX** | ■ 100 bps Market Flex of LIBOR floor<br>■ 200 bps Market Flex of average interest rate | ■ No Flex |
| **COMMITTED FEES & EXPENSES** | ■ 125 bps commitment fee (min $750k)<br>■ 75 bps exit financing fee (even if provided by alternative source)<br>■ City responsible for out-of-pocket expenses | ■ City responsible for out-of-pocket expenses |
| **CONDITIONAL FEES** | ■ N/A | ■ 125 bps breakup fee<br>■ Unused fee of 50% of applicable interest rate<br>■ 200 bps extension fee for optional exit facility |
| **AMORTIZATION** | ■ None prior to maturity | ■ None |
| **OPTIONAL REDEMPTION** | ■ Year 1: par + make-whole through end of Year 1<br>■ Thereafter: par | ■ None |

# COMMITMENT LETTER COMPARISON
## KEY LEGAL TERMS

| | **BARCLAYS** | **CARVAL** |
|---|---|---|
| **SELECTED COVENANTS** | ■ Minimum wagering and income tax revenue levels to be agreed upon<br>■ City cannot cease to be under control of Emergency Manger for over 5 days | ■ Customary affirmative and negative covenants<br>■ No amendments to alter income tax laws resulting in revenues less than 175% of maximum annual debt service |
| **COLLATERAL** | ■ STL: Priority lien on income tax revenue - $4mm<br>■ QoL: Priority lien on wagering tax revenue and second priority lien on income tax revenue - $4mm | ■ Priority lien on income tax revenues - $8mm<br>  – Subject to annual escalations to be agreed upon |
| **MANDATORY PREPAYMENTS** | ■ Asset sale proceeds in excess of $10mm | ■ Asset sale proceeds in excess of $10mm |
| **LIMITATION ON BORROWINGS** | ■ TBD | ■ TBD |
| **REPORTING REQUIREMENTS** | ■ TBD | ■ City shall file monthly accounting of all asset sales with proceeds of $5mm or greater |
| **COLLATERAL ADMIN.** | ■ City shall deposit all pledged tax revenues in a lockbox account | ■ City shall deposit all pledged tax revenues in a lockbox account |
| **MATERIAL CLOSING CONDITIONS** | ■ Approval by Emergency Manager in compliance with Act 436 and Act 279<br>■ Emergency Loan Board authorization under 36a | ■ Emergency Loan Board authorization under Section 36a<br>■ Authorization under 436<br>■ Best efforts to obtain approvals under 36a(7)<br>■ No MAC; representations and warranties |
| **OTHER** | ■ N/A | ■ Best efforts to obtain a rating subsequent to funding |

MILLER BUCKFIRE
A Stifel Company
13-53846-tjt   Doc 4324-9   Filed 04/30/14   Entered 04/30/14 18:11:27   Page 25 of 28

# COMMITMENT LETTER COMPARISON

## PRINCIPAL ECONOMIC TERMS

| | BAML | GOLDMAN SACHS |
|---|---|---|
| **STRUCTURE** | ■ $350mm issuance of Financial Recovery Bonds<br>■ QIB Private placement | ■ $350mm Loans<br>■ Lead arranger, bookrunner and syndication agent |
| **COMMITMENT/ TARGET HOLD** | ■ Full commitment<br>■ Target hold: 0% | ■ Full commitment<br>■ Target hold: 0% |
| **TENOR** | ■ Earliest of dismissal, plan effective date, 2 years after closing | ■ Earliest of dismissal, plan effective date, 7 years after closing (subject to extension option) |
| **PRICING** | ■ L + 625 bps (100 bps LIBOR floor)<br>■ Applicable margin less 50 bps if tax exempt<br>■ 2% OID | ■ L + 500 bps (100 bps LIBOR floor)<br>■ 2% OID<br>■ 6 months after emergence<br>  – 100 bps increase<br>  – Call premium of 101% - 102% |
| **MARKET FLEX** | ■ N/A | ■ 175 bps Market Flex of average interest rate<br>  – Up to 50% of Market Flex interest increase may be in form of OID on 4 year average life<br>■ 1% - 3% Market Flex of call premium after emergence |
| **COMMITTED FEES & EXPENSES** | ■ City responsible for all transaction expenses | ■ 125 bps arranging fee<br>■ 100 bps fee after 2 years or at emergence<br>■ City responsible for out-of-pocket expenses<br>■ Agency fee to be determined |
| **CONDITIONAL FEES** | ■ N/A | ■ N/A |
| **AMORTIZATION** | ■ N/A | ■ Following 2 years the loan will amortize $4 million per month less interest paid |
| **OPTIONAL REDEMPTION** | ■ N/A | ■ Call premium of 101% |

MILLER BUCKFIRE
A Stifel Company
13-53846-tjt   Doc 4324-9   Filed 04/30/14   Entered 04/30/14 18:11:27   Page 26 of 28

# COMMITMENT LETTER COMPARISON
## KEY LEGAL TERMS

| | **BAML** | **GOLDMAN SACHS** |
|---|---|---|
| **SELECTED COVENANTS** | ■ $120mm minimum LTM wagering tax revenue<br>■ $160mm minimum LTM income tax revenue | ■ Customary affirmative and negative covenants<br>■ Compliance with milestones to be determined<br>■ No additional debt except junior indebtedness and other material contracts to be agreed upon |
| **COLLATERAL** | ■ STL: Priority lien on income tax revenue - $4mm<br>■ QoL: Priority lien on wagering tax revenue and casino developer payments, second priority lien on income tax revenue - $4mm<br>■ DSA 4th priority lien pari passu for both Bonds | ■ STL: Priority lien on income tax revenue - $4mm<br>■ QoL: Priority lien on wagering tax revenue and second priority lien on income tax revenue - $4mm |
| **MANDATORY PREPAYMENTS** | ■ Asset sale proceeds in excess of $10mm | ■ N/A |
| **LIMITATION ON BORROWINGS** | ■ City may issue limited tax general obligation bonds junior in payment priority | ■ N/A |
| **REPORTING REQUIREMENTS** | ■ Monthly reporting requirements for wagering tax and income tax revenues | ■ Weekly report of wagering and income tax revenues<br>■ Monthly report from Emergency Manager<br>■ Statement of forecasted wagering and income taxes through maturity date<br>■ Audited financial statements for 3 fiscal years prior to closing date |
| **COLLATERAL ADMIN.** | ■ City shall deposit all pledged tax revenue to a trustee bank | ■ City shall deposit all pledged tax revenues in a lockbox account |
| **MATERIAL CLOSING CONDITIONS** | ■ Emergency Manager authorization under Section 36a<br>■ Legislation amending Section 36a approving grant of liens on Income Tax Revenue<br>■ No MAC; Representations and warranties<br>■ Credit rating from S&P and Moody's | ■ Authorization of the Emergency Loan Board<br>■ Consent by the City |
| **OTHER** | ■ Right to terminate or delay commitment due to adverse market event | ■ N/A |

MILLER BUCKFIRE A Stifel Company  13-53846-tjt   Doc 4324-9   Filed 04/30/14   Entered 04/30/14 18:11:27   Page 27 of 28

# ALL-IN COST ANALYSIS[1] ($MM)

| | Barclays | | | | Goldman | |
|---|---|---|---|---|---|---|
| | **No Flex** | **Max Flex** | **CarVal** | **BAML** | **No Flex** | **Max Flex** |
| **Facility Size** | $350 | $350 | $350 [2] | $350 | $350 | $350 |
| **Interest Expense** | | | | | | |
| LIBOR Floor | 1.00% | 2.00% | N/A | 1.00% | 1.00% | 1.00% |
| LIBOR Spread | 2.50% | 4.50% | 7.50% [3] | 6.25% [4] | 5.00% | 5.88% |
| **Interest Rate** | **3.50%** | **6.50%** | **7.74%** | **7.25%** | **6.00%** | **6.88%** |
| **Annual Interest Expense** | **$12.3** | **$22.8** | **$27.1** | **$25.4** | **$21.0** | **$24.1** |
| **Fees** | | | | | | |
| Commitment Fees | 1.25% | 1.25% | N/A | N/A | 1.25% | 1.25% |
| Duration Fee | N/A | N/A | N/A | N/A | 1.00% | 1.00% |
| OID | N/A | N/A | 2.00% | 2.00% | 2.00% | 5.50% |
| Exit Fee | 0.75% | 0.75% | N/A | N/A | N/A | N/A |
| **Total Fees** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **4.25%** | **7.75%** |
| Weighted-Average Term (yrs) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **Annual Fees (Spread)** | **1.00%** | **1.00%** | **1.00%** | **1.00%** | **2.13%** | **3.88%** |
| **Implied Annual Fees** | **$3.5** | **$3.5** | **$3.5** | **$3.5** | **$7.4** | **$13.6** |
| **Average Annual All-in Cost** | | | | | | |
| **All-in Rate** | **4.50%** | **7.50%** | **8.74%** | **8.25%** | **8.13%** | **10.75%** |
| **Total Annual Expense** | **$15.8** | **$26.3** | **$30.6** | **$28.9** | **$28.4** | **$37.6** |

(1) Excludes unused availability fees and breakup fees. Assumes LIBOR of 0.24% as of October 2, 2013.

(2) Option to borrow up to $400mm.

(3) Weighted average for two years of LIBOR + 725 bps in the first year and LIBOR + 775 bps in the second year.

(4) Applicable margin less 50 bps if tax exempt.

5