# DETROIT POST-PETITION FINANCING

Briefing Materials Prepared for City Council Closed Session

October 17, 2013



CITY'S
EXHIBIT
091

# TABLE OF CONTENTS

1. Discussion

2. Financing Term Sheets

MILLER BUCKFIRE
A Stifel Company
13-53846-tjt   Doc 4324-11   Filed 04/30/14   Entered 04/30/14 18:11:27   Page 2 of 41

# DISCUSSION

# SITUATION OVERVIEW

- Over the last month, the Office of the Emergency Manager and financial and legal advisors to the City of Detroit ("City" or "Detroit") have conducted a competitive process to source financing for the City

- The City contacted over 50 commercial lending institutions, investment banks and investment funds, seeking proposals for up to $350 million in Post-Petition Financing (the "Financing")

- The City indicated to potential lenders that the Financing would be used principally to fund: i) the City's obligations with respect to the certain optional swap terminal rights under the Forbearance and Optional Termination Agreement (the "Forbearance Agreement") and ii) the City's reinvestment initiatives

- The City proposed a two-loan or bond facility structure, consisting of a "Swap Termination Note" and a "Quality of Life Note", addressing each principal use, but indicated that it would be willing to consider alternative structures

  – The Swap Termination Note would be sized to meet the City's financing needs with respect to the exercise of its termination rights under the Forbearance Agreement, currently estimated to be approximately $210,000,000

  – Quality of Life Note, constituting the remaining $140,000,000 of the Financing, would be used for purposes permitted by law, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City

- After review and negotiation between the City and prospective lenders, the Emergency Manager, in consultation with the City's advisors, chose a financing proposal from Barclays Capital as the most advantageous based on structure and pricing

- As required under Michigan Public Act 436 of 2012, the proposed financing has been submitted to the Detroit City Council, which has 10 days to approve or disapprove the financing

MILLERBUCKFIRE A Stifel Company 13-53846-tjt   Doc 4324-11   Filed 04/30/14   Entered 04/30/14 18:11:27   Page 4 of 41

# BACKGROUND TO THE TRANSACTION

- The City raised approximately $1.4 billion through the issuance of certificates of participation to fund its pension trusts in 2005 and 2006

  – $800 million of the certificates were floating rate instruments

  – To fix the effective interest rate the City would have to pay over the next 30 years, the City entered into corresponding interest swaps (the "Swaps") with Bank of America Merrill Lynch and UBS (the "Swap Counterparties")

    • The Swap Counterparties committed to pay the City a floating rate matching the coupon on the floating rate instruments.  The City committed to pay the Swap Counterparties a fixed rate payment

    • In an event of default, the Swap Counterparties have the right to terminate the Swaps and demand the City pay the Mark-to-Market value of the Swaps

- A decline in the City's credit rating in 2009 created an event of default under the Swaps

  – The City and Swap Counterparties negotiated an amendment and a collateral agreement

  – As part of these agreements, the Swaps received a security interest in the City's gaming tax revenues and a custodial arrangement was set up that gathers and directs the City's gaming tax revenues.  The gaming tax revenues are released to the City as long as the City performs its obligations under the Swaps

- In early 2012, an additional credit downgrade again led to an event of default under the Swaps

  – The City and the Swap Counterparties began discussions, but no agreements were executed

  – Subsequent events, including the finding of a financial emergency and the appointment of an emergency manager, also qualified as events of default

- In May 2013, recognizing the City's financial distress and limited projected liquidity and the approaching onset of active restructuring process, the City sought to settle with the Swap Counterparties

4

# BACKGROUND TO THE TRANSACTION (CONT'D.)

- After extensive negotiation, on July 15 the Emergency Manager executed the Forbearance Agreement with the Swap Counterparties, agreeing that:

  – The City will continue to pay its obligations under the Swaps and agrees not to challenge the Swaps

  – The City has access to the gaming tax revenues

  – The City can elect to voluntarily terminate the Swaps at a discount to the Mark-to-Market value if it can raise the required cash to fund the payment. *This is the primary reason the City began the process of soliciting financing and the largest single use of financing proceeds*

  – As the Court approval process for the Forbearance Agreement has been delayed, the City and the Swap Counterparties have agreed to push back the deadline dates associated with the discounted payoff:[1]

    • Up and through December 31, 2013, the City can retire the Swaps at 75% of the MTM value

    • From January 1, 2014 through June 30, 2014, the City can retire the Swaps at 82% of the MTM value

  – The Forbearance Agreement runs through September 30, 2014 (this date has also been extended). If the Swaps are outstanding at that time, the City and the Swap Counterparties will have to negotiate next steps

- The Bankruptcy Court has not yet ruled on whether the City can assume the Forbearance Agreement

  – A number of parties have objected to the Forbearance Agreement for a variety of stated reasons. Many parties included the absence of a financing commitment as a reason for their objections

  – The Court must (1) approve the Forbearance Agreement, (2) determine that the City is eligible for Chapter 9 protection and (3) approve the Financing, before the City can close on the Financing

---

(1) Terms herein are currently under discussion with the Swap Counterparties and would be reflected in an additional amendment to the Forbearance Agreement.

MILLER BUCKFIRE *A Stifel Company* 13-53846-tjt   Doc 4324-11   Filed 04/30/14   Entered 04/30/14 18:11:27   Page 6 of 41

# SELECTED ECONOMIC TERMS OF THE FINANCING[1]

| | |
|---|---|
| **FACILITY SIZE & STRUCTURE** | ▪ Up to $350 million comprised of two Notes:<br>– Swap Termination Note – Approximately $210 million based on current Swap valuations<br>– Quality of Life Note – Approximately $140 million (remainder of facility) |
| **COMMITMENT** | ▪ Fully underwritten: Subject to terms, Barclays has committed to fund the full amount of the Financing |
| **MATURITY** | ▪ Earliest of (i) dismissal of the Chapter 9 case, (ii) effective date of a Plan of Adjustment under Chapter 9, and (iii) 30 months from Closing of the Financing |
| **AMORTIZATION** | ▪ None prior to maturity |
| **OPTIONAL REDEMPTION** | ▪ Year 1: Redeemable at par plus a make-whole through end of Year 1<br>▪ Thereafter: Redeemable at par |
| **PRICING** | ▪ LIBOR + 250 bps (100 bps LIBOR floor)<br>▪ Pricing is subject to market flex provisions<br>▪ Tax exemption of interest to be determined |
| **EXPENSES** | ▪ City responsible for out-of-pocket expenses |

(1) Council members should review Emergency Manager Order 17 and attachments, received October 11, 2013, for a more comprehensive description of the Financings.



13-53846-tjt   Doc 4324-11   Filed 04/30/14   Entered 04/30/14 18:11:27   Page 7 of 41

# SELECTED LEGAL TERMS OF THE FINANCING[1]

| | |
|---|---|
| **COLLATERAL** | ■ Swap Termination Note: Priority lien on income tax revenues<br>– In a Default, Noteholders can collect up to $4 million a month to pay interest and principal<br>■ Quality of Life Note: Priority lien on wagering tax revenue and second priority lien on income tax revenue<br>– In a default, Noteholders can collect up to $4 million a month to pay interest and principal |
| **COLLATERAL ADMINISTRATION** | ■ City shall deposit all pledged tax revenues in a lockbox account |
| **MANDATORY PREPAYMENTS** | ■ Asset monetization net proceeds in excess of $10 million<br>■ Asset monetizations are not required and cannot be forced by the Noteholders |
| **SELECTED COVENANTS** | ■ City wagering and income tax revenue must each be above $30 million for any rolling three-month period<br>■ City cannot cease to be under control of an Emergency Manager for a period of thirty days, unless a Transition Advisory Board or a consent agreement with the State has been established |
| **MATERIAL CLOSING CONDITIONS** | ■ Approval by Emergency Manager in compliance with Act 436 and Act 279<br>■ Emergency Loan Board authorization under 36a |

(1) Council members should review Emergency Manager Order 17 and attachments, received October 11, 2013, for a more comprehensive description of the Financings.



# USE OF PROCEEDS

| SWAP TERMINATION NOTE | QUALITY OF LIFE NOTE |
|---|---|
| ▪ Net proceeds of the Swap Termination Note will fund the termination payment of the Swaps<br><br>▪ The termination payment will be calculated immediately in advance of the payment date per the terms of the Swap Settlement, based on the Forward LIBOR Curve (the capital market's expectations for future short term interest rates)<br><br>▪ As of September 30, 2013, the MTM value of the Swaps was $277.3 million (75% would be $208 million) | ▪ Identified uses of the net proceeds from the Quality of Life Note and the net savings in debt service from retiring the Swaps include:<br><br>– Blight remediation<br>– Public Safety Hiring, Fleet and Other Capital Expenditures<br>– Citywide Information Technology Infrastructure<br>– Finance functions improvement, IT and reorganization<br>– GSD Capital Expenditures and Space Consolidation<br>– Planning and Development transition<br>– Public Lighting Department decommissioning expenditures |

# PROCESS OVERVIEW

| OCTOBER 2013 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | Th | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| NOVEMBER 2013 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | Th | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| DECEMBER 2013 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | Th | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| OCTOBER | NOVEMBER |
|---|---|
| ■ City Council reviews Financing | ■ Hearing on Forbearance Agreement |
| ■ City and Barclays finalize definitive documentation | ■ Hearing on Post-Petition Financing Motion |
| ■ City files Post-Petition Financing Motion | ■ Emergency Loan Board approval |
| ■ Chapter 9 Eligibility Hearings and Trial | ■ Closing and funding of Financing |
| | ■ Payment of Swap Termination |

MILLER BUCKFIRE
A Stifel Company

# FINANCING TERM SHEETS

City of Detroit
$350,000,000 Post-Petition Bond Financing
Summary of Indicative Terms and Conditions of Quality of Life Note

*Set forth below is a summary of certain key terms for the Quality of Life Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Quality of Life Note and related documentation.*

1. PARTIES AND TRANSACTIONS

| | |
|---|---|
| Issuer: | The City of Detroit (the "City").  On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes.  The order for relief has not yet been entered; objections are pending. |
| Purchaser and Sole Lead Arranger: | Barclays Capital Inc. |
| Note Agent: | Barclays Capital Inc. |

2. TYPE AND AMOUNT OF FACILITY

| | |
|---|---|
| Type and Amount: | A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Note" or the "Note" and, together with (i) the Swap Termination Note or (ii) the Replacement Swap Transaction, as applicable (as selected by the City), the "Post-Petition Facility") in an aggregate principal amount of up to $350,000,000, minus the amount of the Swap Termination Note (as defined in the Swap Termination Note Term Sheet) or the Upfront Amount in respect of the Replacement Swap Transaction (each as defined in the Replacement Swap Transaction Term Sheet), as applicable (the "Facility Amount"). |
| Purposes: | Proceeds from the issuance of the Quality of Life Note shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Note Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City. |

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the QOL Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the QOL Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the QOL Note Documents and the issuance of the Swap Termination Note are satisfied and the Swap Termination Note shall have been issued in accordance with the terms of the ST Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Swap Termination Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| | |
|---|---|
| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Quality of Life Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax |

Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Quality of Life Note Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Note on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Note on a first-priority basis.

The QOL Note Documents will require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Quality of Life Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

The QOL Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month, all of which shall be applied to redeem the Swap Termination Note until such Note is paid in full and thereafter, such amounts (in addition to $4 million per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Note. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

Super-Priority of    Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2),

| | |
|---|---|
| Note: | the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any QOL Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any QOL Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the QOL Note Documents); entry of an order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Wagering Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Wagering Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established. |
| Remedies: | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis |

on a level debt basis equivalent to $4 million per month (or, following repayment in full of the Swap Termination Note, $8 million per month, as set forth above under the heading "Collateral"), plus the pro-rata proceeds of any Asset Proceeds Collateral.

Prohibition of Additional Borrowings:

The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Quality of Life Note or the Swap Termination Note.

## 5. CERTAIN OTHER PROVISIONS

Documentation:

Each in form and substance satisfactory to the Purchaser:

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of

Note terms and conditions

- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into QOL Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "QOL Note Documents".

| | |
|---|---|
| Conditions Precedent: | Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the QOL Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form |

and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Swap Termination Note (the "ST Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Swap Termination Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any QOL Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary | The City acknowledges that the transactions described in this |

| | |
|---|---|
| Relationship: | document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| Yield Protection, Taxes and Other Deductions: | The QOL Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the QOL Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the QOL Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities |

or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase Agreement.<br><br>George E. Zobitz, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700<br>jzobitz@cravath.com |
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>AFillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and |

the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

City of Detroit
$350,000,000 Post-Petition Bond Financing
Summary of Indicative Terms and Conditions of Swap Termination Note

*Set forth below is a summary of certain key terms for the Swap Termination Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Swap Termination Note and related documentation.*

1. PARTIES AND TRANSACTIONS

| | |
|---|---|
| Issuer: | The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending. |
| Purchaser and Sole Lead Arranger: | Barclays Capital Inc. |
| Note Agent: | Barclays Capital Inc. |

2. TYPE AND AMOUNT OF FACILITY

| | |
|---|---|
| Type and Amount: | A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Note" or the "Note" and, together with the Quality of Life Note, the "Post-Petition Facility") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended, the "Forbearance Agreement") to terminate the underlying swaps. The sum of the amount of the Swap Termination Note and the amount of the Quality of Life Note shall not exceed $350,000,000 (the "Facility Amount"). |
| Purposes: | The Swap Termination Note may be used by the City to pay amounts required under the Forbearance Agreement to terminate the underlying swaps as approved by the Bankruptcy Court. |

13-53846-tjt   Doc 4324-11   Filed 04/30/14   Entered 04/30/14 18:11:27   Page 23 of 41

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the ST Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the ST Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the ST Note Documents and the issuance of the Quality of Life Note are satisfied and the Quality of Life Note shall have been issued in accordance with the terms of the QOL Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Quality of Life Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| | |
|---|---|
| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Swap Termination Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on: (i) the Asset Proceeds Collateral and (ii) income tax revenues of the City (the "Pledged Income Tax Revenue" and together with the Asset Proceeds Collateral, the "Swap Termination Note Collateral"). The lien on the Asset Proceeds Collateral shall also secure the Quality of Life Note on |

a pari passu basis. The Quality of Life Note shall be secured by a second lien on the Pledged Income Tax Revenue.

The ST Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the ST Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

|  |  |
|---|---|
| Super-Priority of Note: | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any ST Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any ST Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the ST Note Documents); entry of an |

order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established.

Remedies:

Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month, plus the pro-rata proceeds of any Asset Proceeds Collateral.

Prohibition of
Additional
Borrowings:

The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Swap Termination Note or the Quality of Life Note.

## 5. CERTAIN OTHER PROVISIONS

Documentation:  Each in form and substance satisfactory to the Purchaser:

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of Note terms and conditions
- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Swap Termination Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into ST Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "ST Note Documents".

Conditions Precedent: Usual for municipal financings and Chapter 11 debtor-in-possession financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the ST Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Quality of Life Note (the "QOL Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Quality of Life Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap

|                          | Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements. |
|--------------------------|

Authority to Borrow:

Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act.

City Consent to
Jurisdiction:

The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

Restrictions on
Dismissal of
Bankruptcy Case:

The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any ST Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

Absence of Fiduciary
Relationship:

The City acknowledges that the transactions described in this document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet.

Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice.

| | |
|---|---|
| Yield Protection, Taxes and Other Deductions: | The ST Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the ST Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the ST Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities. |
| Purchaser Contacts: | John Gerbino, Managing Director James Saakvitne, Managing Director Peter Joyce, Director Barclays Capital Inc. 745 Seventh Avenue, 19th Floor New York, NY 10019 212 526 3466 john.gerbino@barclays.com james.saakvitne@barclays.com peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase |

Agreement.

George E. Zobitz, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
212 474 1000
F 212 474 3700
jzobitz@cravath.com

Michigan Counsel:    Ann D. Fillingham, Esq.
James P. Kiefer, Esq.
Courtney F. Kissel, Esq.
Dykema Gossett PLLC
Capitol View
201 Townsend Street, Suite 900
Lansing, MI 48933
517 374 9100
F 517 374 9191
AFillingham@dykema.com
jkiefer@dykema.com
ckissel@dykema.com

Governing Law:    Michigan.

Jurisdiction and    The Bankruptcy Court, unless the Bankruptcy Court does not have
Venue:    jurisdiction, in which case, the parties shall consent to the non-
exclusive jurisdiction of the courts of the State of New York and the
United States District Court located in the Borough of Manhattan in
New York City and of the courts of the State of Michigan and the
United States District Court for the Eastern District of Michigan.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                        :   Chapter 9
:
CITY OF DETROIT, MICHIGAN,    :   Case No. 13-53846
:
               Debtor.    :   Hon. Steven W. Rhodes
:
-----------------------------------------------------x

## NOTICE OF FILING OF FEE LETTER IN CONNECTION WITH MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

**PLEASE TAKE NOTICE THAT** the City of Detroit, Michigan

("Detroit" or the "City"), in connection with the *Motion of the Debtor for a Final*

*Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1),364(C)(2), 364(E), 364(F),*

*503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II)*

*Granting Liens and Providing Superpriority Claim Status and (III) Modifying*

*Automatic Stay* (Docket No. 1520), hereby files the Fee Letter dated as of October

6, 2013 (the "Fee Letter"), between Barclays Capital Inc. and the City.  A copy of

the Fee Letter is attached hereto as Exhibit A.

**CITY'S EXHIBIT**

**093**

Dated: November 18, 2013

Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens (IL 6206864)
JONES DAY
77 West Wacker
Chicago, Illinois 60601-1692
Telephone: (312) 782-3939
Facsimile: ( 312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY

NYI-4556111v1
-2-
13-53846-tjt  Doc 4324-11  Filed 04/30/14  Entered 04/30/14 18:21:37  Page 34 of 9
13-53846-swr  Doc 1761  Filed 11/18/13  Entered 11/18/13 16:21:37  Page 2 of 9
41

# CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Notice of Filing of Fee Letter was filed and served via the Court's electronic case filing and noticing system on this 18th day of November, 2013.

/s/ David G. Heiman

**EXHIBIT A**

BARCLAYS CAPITAL INC.

**PERSONAL AND CONFIDENTIAL**

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

$350,000,000 Post-Petition Bond Financing—Fee Letter

Dear Ms. Corio:

Reference is made to the Commitment Letter dated the date hereof (the "Commitment Letter") between the City of Detroit, Michigan (the "City" or "you") and Barclays Capital Inc. ("Barclays", "we" or "us"). Terms used but not defined in this letter agreement shall have the meanings assigned to them in the Commitment Letter (including the exhibits thereto). This Fee Letter is the "Fee Letter" referenced in the Commitment Letter. By accepting the Commitment Letter, you agree to pay (or cause to be paid) the fees set forth in this Fee Letter in accordance with the other terms and conditions set forth therein.

1.      Post-Petition Facility

As consideration for Barclays's commitment with respect to the Post-Petition Facility under the Commitment Letter and agreement under the Commitment Letter to structure, arrange and syndicate the Post-Petition Facility, you agree to pay to Barclays, solely for its own account, a commitment fee (the "Commitment Fee") equal to the sum of (a) 1.25% of the aggregate principal amount of the Quality of Life Note and (b) 1.25% of the aggregate principal amount of the Swap Termination Note; provided, however, that the aggregate Commitment Fee in respect of the Post-Petition Facility shall be no less than $750,000. The Commitment Fee shall be earned in full on the date upon which the City delivers its signed signature page to the Commitment Letter to Barclays, regardless of whether any debt is issued or whether the transactions contemplated by the Commitment Letter are consummated, and shall be due and payable to Barclays as follows: (a) 50% on the date hereof and (b) 50% on the earlier of (i) 60 days from the date hereof and (ii) the Closing Date. You acknowledge that a subsequent fee in an amount to be determined by Barclays and agreed to by you shall be required in respect of any additional facility or any amendment to the Post-Petition Facility entered into between you and Barclays (or its affiliate) that has the effect of extending the Maturity Date of the Quality of Life Note or the Swap Termination Note. Further, you acknowledge that, in the event we or our affiliates act in any other capacity with respect

to the Post-Petition Facility, any fees owed to us in connection therewith that are agreed to by you shall be in addition to any fees payable to us hereunder.

The Participants' (including the Purchaser's) several commitments to provide the Post-Petition Facility are conditioned upon the payment on or prior to the Closing Date of the fees described in this Section 1 and any other fees required to be paid under the Commitment Letter, but the consummation of the Transactions is not a condition of the payment of the fees.

## 2. Fees Generally; Expenses

All fees payable hereunder will be payable in U.S. dollars in immediately available funds to the Purchaser, the Arranger, the Note Agent and/or the other Participants (as applicable) for their own accounts, or as directed by them, in any such case, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes) and will not be subject to reduction by way of setoff or counterclaim. You agree that, once paid, the fees or any part thereof payable hereunder or under the Term Sheets shall not be refundable under any circumstances regardless of whether the transactions contemplated by the Commitment Letter are consummated or the Post-Petition Financing Order is entered by the Bankruptcy Court. All fees payable hereunder shall not be subject to any contingency or condition (except as expressly set forth in this Fee Letter) and shall be in addition to reimbursement of Barclays's out-of-pocket expenses (to the extent required to be reimbursed under the terms of the Commitment Letter). You agree that we may, in our sole discretion, share all or any portion of the fees payable hereunder to us with any other Participant.

## 3. Market Flex

You hereby agree that the Purchaser may, after consultation with you, make any or all of the following changes, which will be approved by the Bankruptcy Court in the Post-Petition Financing Order and will require no additional authorizations or approvals, to the Post-Petition Facility (in respect of either or both of the Quality of Life Note and the Swap Termination Note, to be determined in the sole discretion of the Purchaser), at any time, and from time to time (including after the Closing Date), if the Purchaser determines, in its discretion and in consultation with you, that (i) such changes are reasonably necessary to facilitate the Successful Syndication (as defined below) of the Post-Petition Facility within 90 days after the Closing Date or (ii) a Successful Syndication on the terms set forth in the Term Sheets is unable to be achieved within 90 days after the Closing Date:

(i) the LIBOR floor may be increased by up to 1.00% per annum; and

(ii) the weighted average interest rate margins under the Post-Petition Facility (taken as a whole) may be increased by up to 2.00% per annum.

2

In the event that the Closing Date has occurred and the Note Documents have been executed and delivered prior to the Successful Syndication of the Post-Petition Facility, you hereby agree, at your own expense, to take all such action as may be required in order to effect any amendments to the Post-Petition Facility, or other changes, as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to this Section 3. You further agree to reasonably cooperate with us with regard to immaterial changes requested by potential Participants prior to the Successful Syndication of the Post-Petition Facility. The Purchaser's commitment in the Commitment Letter is subject to the agreements set forth in this Section 3, and the provisions of this Section 3 will survive the closing of the Post-Petition Facility and the execution and delivery of the Note Documents.

For purposes hereof, a "Successful Syndication" shall mean one in which the Purchaser and its affiliates are able to achieve a targeted hold level of no more than $175,000,000 of the Post-Petition Facility (taken as a whole).

4.    General

This Fee Letter shall not be assignable by you, and your rights and obligations hereunder may not be assigned or delegated, without the prior written consent of Barclays, and any attempted assignment without such consent shall be void. This Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of Barclays and you. This Fee Letter may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Fee Letter by facsimile transmission or other electronic transmission (in "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Fee Letter. This Fee Letter, the Commitment Letter and the Term Sheets are the only agreements that have been entered into among us with respect to the Post-Petition Facility and set forth the entire understanding of the parties with respect thereto. This Fee Letter, the Commitment Letter and the Term Sheets supersede all prior understandings, whether written or oral, between us with respect to the Post-Petition Facility. This Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Fee Letter and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Fee Letter and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of Michigan. Barclays may perform the duties and activities described hereunder through any of its affiliates and the provisions of Section 4 of the Commitment Letter shall apply with equal force and effect to any of such affiliates so performing any such duties or activities.

In addition, please note that neither the Purchaser nor the Arranger nor any of their respective affiliates provides tax, accounting or legal advice.

You agree that you will not disclose, directly or indirectly, this Fee Letter or the contents hereof other than as permitted by the Commitment Letter.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any commitment, undertaking or obligation on the part of Barclays or its affiliates to purchase any note or provide any financing in respect of the Post-Petition Facility; such an obligation shall arise only under the Commitment Letter (subject to the conditions and limitations set forth therein) if accepted in accordance with its terms.

The provisions of this Fee Letter will survive the expiration or termination (including, if applicable, in the event the Post-Petition Financing Order is not entered by the Bankruptcy Court) of the Commitment Letter (including any extensions thereof) and the funding of the Post-Petition Facility.

[The remainder of this page intentionally left blank]

Please confirm that the foregoing is our mutual understanding by signing and returning to Barclays an executed counterpart of this Fee Letter.

Very truly yours,

BARCLAYS CAPITAL INC.

By _____

Name: John Gerbino
Title: Managing Director


Accepted and agreed to as of
the date first written above:

THE CITY OF DETROIT, MICHIGAN

By _____
Name: KEVYN D. ORR
Title: EMERGENCY MANAGER

5