

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 1126
DETROIT, MICHIGAN 48226
PHONE 313•224•3703
FAX 313•224•4413
WWW.DETROITMI.GOV

CITY OF DETROIT
OFFICE OF THE EMERGENCY MANAGER

October 8, 2013

Michigan State Treasurer Andy Dillon
Austin Building
430 W. Allegan Street
Lansing, MI 48922

Dear Treasurer Dillon:

I am writing to apprise you of the City of Detroit's efforts to procure financing during its on-going chapter 9 bankruptcy proceedings. I am pleased to inform you that we have reached agreement on the material terms of a secured financing transaction with Barclays Capital Inc. ("Barclays") that will provide the City with up to $350,000,000 of secured financing and will allow the City to:

- Satisfy its obligations in connection with certain swap agreements pursuant to the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, and UBS AG and Merrill Lynch Capital Services, Inc. (the "Forbearance Agreement"), if and when the Forbearance Agreement is ultimately approved by the United States Bankruptcy Court for the Eastern District of Michigan; and

- Advance certain key investment and restructuring initiatives of the City, including blight removal, public safety and upgrades to technology infrastructure.

The material terms of the Barclays lending proposal are attached to this correspondence (the "Barclays Financing Proposal").

As you and your staff are aware, the City's efforts in this regard have been on-going for many weeks, during which time the City and its advisors have reached out to numerous potential funding sources, and ultimately received high-level lending proposals from more than a dozen interested parties. After significant review of the various lending proposals, and after numerous meetings and conference calls between the City's advisors and potential lending sources, I believe that the Barclays Financing Proposal is the best financing opportunity for the City based on its terms, conditions and pricing structure.

As you are aware, pursuant to Section 12(1)(u) of Public Act 436 of 2012 ("PA 436"), prior to proceeding to a closing of any financing transaction with Barclays, my office is required to submit the Barclays Financing Proposal to the Detroit City Council ("City Council"), which has 10 days to approve or disapprove the transaction. Should City Council disapprove the Barclays Financing Proposal, City Council has 7 days to propose to the local emergency financial assistance loan board an alternative proposal "that would yield substantially the same financial result as" the Barclays Financing Proposal. The local emergency financial assistance loan board would then have 30 days from the date of submission from City Council to approve either the Barclays Financing Proposal or City Council's alternative financing proposal. I intend to submit the Barclays Financing Proposal to City Council in the near-term for approval consistent with PA 436.

In connection with Barclays' commitment to provide financing under the Barclays Financing Proposal, the City has agreed to pay Barclays a commitment fee (the "Commitment Fee") in excess of $50,000, which will be earned on the date the City executes the Barclays commitment letter, with 50% paid on the date of execution, and the remaining 50% due on the closing of the transaction. Pursuant to Section 12(3) of PA 436, "if a potential contract involves a cumulative value of $50,000 or more," such contract is subject to competitive bidding unless otherwise authorized by the State Treasurer.

KEVYN D. ORR, EMERGENCY MANAGER

CITY'S
EXHIBIT
096

Given the robust marketing process that has proceeded to date with respect to the City's financing efforts, I believe that the Barclays Financing Proposal, including the Commitment Fee, was subject to competitive bidding. Nevertheless, out of an abundance of caution, I am requesting your authorization to proceed with payment of the Commitment Fee. Given the time sensitive nature of the City's rights under the proposed Forbearance Agreement, if approved, it is imperative that the City proceed in earnest with the Barclays Financing Proposal. Consequently, your prompt attention to this matter is greatly appreciated.

Please do not hesitate to contact me with any questions or concerns regarding this matter.

Sincerely,

Kevyn D. Orr
Emergency Manager
City of Detroit

BARCLAYS CAPITAL INC.

**PERSONAL AND CONFIDENTIAL**

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

<u>$350,000,000 Post-Petition Bond Financing—Fee Letter</u>

Dear Ms. Corio:

Reference is made to the Commitment Letter dated the date hereof (the "Commitment Letter") between the City of Detroit, Michigan (the "City" or "you") and Barclays Capital Inc. ("Barclays", "we" or "us"). Terms used but not defined in this letter agreement shall have the meanings assigned to them in the Commitment Letter (including the exhibits thereto). This Fee Letter is the "Fee Letter" referenced in the Commitment Letter. By accepting the Commitment Letter, you agree to pay (or cause to be paid) the fees set forth in this Fee Letter in accordance with the other terms and conditions set forth therein.

1.    Post-Petition Facility

As consideration for Barclays's commitment with respect to the Post-Petition Facility under the Commitment Letter and agreement under the Commitment Letter to structure, arrange and syndicate the Post-Petition Facility, you agree to pay to Barclays, solely for its own account, a commitment fee (the "Commitment Fee") equal to the sum of (a) 1.25% of the aggregate principal amount of the Quality of Life Note and (b) 1.25% of the aggregate principal amount of the Swap Termination Note; provided, however, that the aggregate Commitment Fee in respect of the Post-Petition Facility shall be no less than $750,000. The Commitment Fee shall be earned in full on the date upon which the City delivers its signed signature page to the Commitment Letter to Barclays, regardless of whether any debt is issued or whether the transactions contemplated by the Commitment Letter are consummated, and shall be due and payable to Barclays as follows: (a) 50% on the date hereof and (b) 50% on the earlier of (i) 60 days from the date hereof and (ii) the Closing Date. You acknowledge that a subsequent fee in an amount to be determined by Barclays and agreed to by you shall be required in respect of any additional facility or any amendment to the Post-Petition Facility entered into between you and Barclays (or its affiliate) that has the effect of extending the Maturity Date of the Quality of Life Note or the Swap Termination Note. Further, you acknowledge that, in the event we or our affiliates act in any other capacity with respect

to the Post-Petition Facility, any fees owed to us in connection therewith that are agreed to by you shall be in addition to any fees payable to us hereunder.

The Participants' (including the Purchaser's) several commitments to provide the Post-Petition Facility are conditioned upon the payment on or prior to the Closing Date of the fees described in this Section 1 and any other fees required to be paid under the Commitment Letter, but the consummation of the Transactions is not a condition of the payment of the fees.

## 2. Fees Generally; Expenses

All fees payable hereunder will be payable in U.S. dollars in immediately available funds to the Purchaser, the Arranger, the Note Agent and/or the other Participants (as applicable) for their own accounts, or as directed by them, in any such case, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes) and will not be subject to reduction by way of setoff or counterclaim. You agree that, once paid, the fees or any part thereof payable hereunder or under the Term Sheets shall not be refundable under any circumstances regardless of whether the transactions contemplated by the Commitment Letter are consummated or the Post-Petition Financing Order is entered by the Bankruptcy Court. All fees payable hereunder shall not be subject to any contingency or condition (except as expressly set forth in this Fee Letter) and shall be in addition to reimbursement of Barclays's out-of-pocket expenses (to the extent required to be reimbursed under the terms of the Commitment Letter). You agree that we may, in our sole discretion, share all or any portion of the fees payable hereunder to us with any other Participant.

## 3. Market Flex

2

4.  <u>General</u>

        This Fee Letter shall not be assignable by you, and your rights and
obligations hereunder may not be assigned or delegated, without the prior written consent
of Barclays, and any attempted assignment without such consent shall be void. This Fee
Letter may not be amended or any provision hereof waived or modified except by an
instrument in writing signed by each of Barclays and you. This Fee Letter may be
executed in any number of counterparts, each of which shall be deemed an original and
all of which, when taken together, shall constitute one agreement. Delivery of an
executed counterpart of a signature page of this Fee Letter by facsimile transmission or
other electronic transmission (in "pdf" or "tif" format) shall be effective as delivery of a
manually executed counterpart of this Fee Letter. This Fee Letter, the Commitment
Letter and the Term Sheets are the only agreements that have been entered into among us
with respect to the Post-Petition Facility and set forth the entire understanding of the
parties with respect thereto. This Fee Letter, the Commitment Letter and the Term Sheets
supersede all prior understandings, whether written or oral, between us with respect to the
Post-Petition Facility. This Fee Letter is intended to be solely for the benefit of the
parties hereto and is not intended to confer any benefits upon, or create any rights in
favor of, any person other than the parties hereto. This Fee Letter and any claims,
controversy, dispute or cause of action (whether in contract or tort or otherwise) based
upon, arising out of or relating to this Fee Letter and the transactions contemplated
hereby shall be governed by, and construed in accordance with, the laws of the State of
Michigan. Barclays may perform the duties and activities described hereunder through
any of its affiliates and the provisions of Section 4 of the Commitment Letter shall apply
with equal force and effect to any of such affiliates so performing any such duties or
activities.

        In addition, please note that neither the Purchaser nor the Arranger nor any
of their respective affiliates provides tax, accounting or legal advice.

3

DTPPF00001370

You agree that you will not disclose, directly or indirectly, this Fee Letter or the contents hereof other than as permitted by the Commitment Letter.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any commitment, undertaking or obligation on the part of Barclays or its affiliates to purchase any note or provide any financing in respect of the Post-Petition Facility; such an obligation shall arise only under the Commitment Letter (subject to the conditions and limitations set forth therein) if accepted in accordance with its terms.

The provisions of this Fee Letter will survive the expiration or termination (including, if applicable, in the event the Post-Petition Financing Order is not entered by the Bankruptcy Court) of the Commitment Letter (including any extensions thereof) and the funding of the Post-Petition Facility.

[The remainder of this page intentionally left blank]

4

Please confirm that the foregoing is our mutual understanding by signing and returning to Barclays an executed counterpart of this Fee Letter.

Very truly yours,

BARCLAYS CAPITAL INC.

By _____
Name: John Gerbino
Title: Managing Director

Accepted and agreed to as of
the date first written above:

THE CITY OF DETROIT, MICHIGAN

By _____
Name:
Title:

5

# BARCLAYS CAPITAL INC.

**PERSONAL AND CONFIDENTIAL**

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

### $350,000,000 Post-Petition Bond Financing—Commitment Letter

Dear Ms. Corio:

You have advised Barclays Capital Inc. ("Barclays," or the "Purchaser"), that the City of Detroit, Michigan (the "City" or "you") filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case").

Capitalized terms used but not defined herein are used with the meanings assigned to them in Exhibit A and Exhibit B attached hereto, as applicable (collectively with all exhibits attached thereto, the "Term Sheets" and, together with this letter, collectively, the "Commitment Letter"). As used herein, the term "Transactions" means, collectively, the entering into and funding of the Post-Petition Facility, the consummation of certain other transactions contemplated by the Commitment Letter and the Fee Letter (as defined below) and all other related transactions, including the payment of fees and expenses in connection therewith.

## 1.    Commitments, Titles and Roles

You hereby appoint Barclays, and Barclays hereby agrees to act, as exclusive note agent (in such capacity, the "Note Agent") for the Post-Petition Facility. You hereby appoint Barclays to act, and Barclays hereby agrees to act, as sole lead arranger, sole bookrunner and sole syndication agent (in such capacities, the "Arranger"), for the Post-Petition Facility. Each of the Arranger and the Note Agent will have the rights and authority customarily given to financial institutions in such roles. In connection with the Transactions, the Purchaser is pleased to advise you of its commitment (the "Commitment") to provide a senior secured superpriority chapter 9 debtor financing facility under section 364(c) of the Bankruptcy Code in the aggregate principal amount of up to $350,000,000, which comprises a Quality of Life Note and a Swap Termination Note on

the terms and subject to the conditions set forth in this Commitment Letter, the Term Sheets and the Fee Letter.

Our fees for services related to the Post-Petition Facility are set forth in a separate fee letter (the "Fee Letter") entered into between you, the Note Agent and the Purchaser on the date hereof. As consideration for the execution and delivery of this Commitment Letter by the Purchaser, you agree to pay or cause to be paid the fees and expenses set forth in this Commitment Letter and in the Fee Letter as and when payable in accordance with the terms hereof and thereof.

No additional agents, arrangers, bookrunners or post-petition lenders may be appointed or engaged without our written consent. It is agreed that in the event additional agents, arrangers, bookrunners or post-petition lenders are appointed or engaged, the Arranger will have primary authority for managing the syndication of the Post-Petition Facility with sole "left side" placement in any and all marketing materials or other documentation used in connection with the Post-Petition Facility. In addition, the economics allocated to Barclays shall not be less than the economics allocated to any other agent, arranger, bookrunner or post-petition lender and no agent, arranger, bookrunner or post-petition lender shall be entitled to more favorable terms and conditions than those applicable to Barclays.

## 2.    Conditions Precedent

The Purchaser's commitments and the Note Agent's agreements hereunder are subject to the conditions set forth in this Section 2 and in the Term Sheets under the headings "Conditions Precedent."

The Purchaser's commitments hereunder and the Purchaser and the Note Agent's agreements to perform the services described herein are further subject to the following conditions: (i) the Purchaser and the Note Agent shall not have become aware after the date hereof of any information or other matter not previously disclosed and not otherwise publicly available to them that either of them reasonably determines to be material and adverse relative to the information or other matters disclosed to them prior to the date hereof; (ii) the Purchaser's satisfaction that there is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of you; and (iii) your performance of (x) all your obligations hereunder to provide information and otherwise assist in the efforts to syndicate the Post-Petition Facility, and (y) compliance with all your obligations hereunder and under the Fee Letter to pay fees and expenses.

## 3.    Syndication

The Arranger reserves the right to syndicate all or a portion of the Post-Petition Facility by assigning or selling participations in the Quality of Life Note and the Swap Termination Note (the "Notes") to a group of banks, financial institutions and other institutional lenders (together with Barclays, the "Participants") identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). Notwithstanding the foregoing, unless otherwise agreed by you in writing, no assignment by the Purchaser of its

2

commitments hereunder prior to the Closing Date will reduce or release the Purchaser's obligations to purchase the Notes under the Post-Petition Facility on the Closing Date in the event any assignee shall fail to do so on the Closing Date. For the avoidance of doubt, the syndication may occur, in whole or in part, after the Closing Date. The Arranger will lead the syndication and exclusively manage all aspects of the syndication, including determining the timing of all offers to prospective Participants, the acceptance of commitments, the amounts offered and the compensation provided to each Participant from the amounts to be paid to the Arranger pursuant to the terms of this Commitment Letter and the Fee Letter and will determine the final commitment allocations. You hereby acknowledge and agree that the Arranger will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Arranger or the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

You agree to actively assist the Arranger until 90 days after the Closing Date (the "Syndication Period"), in completing timely and orderly syndications satisfactory to the Arranger. Such assistance shall include (a) direct contact during the syndications between you, your agents, representatives and advisors, on the one hand, and the proposed Participants, on the other hand, (b) the hosting, with the Arranger, of one or more meetings of or telephone conference calls with prospective Participants at times and locations to be mutually agreed upon, (c) upon the request of the Arranger, your using commercially reasonable efforts to assist the Arranger in procuring a credit rating in respect of the Post-Petition Facility from Standard & Poor's Rating Services and Moody's Investors Service, Inc. and (d) there being no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City being issued, offered, placed or arranged. Notwithstanding anything to the contrary contained in this Commitment Letter or the Fee Letter or any other letter agreement or undertaking concerning the financing of the transactions contemplated hereby to the contrary, the completion of the syndication of the Post-Petition Facility shall not constitute a condition to the commitments hereunder or the purchase of the Notes on the Closing Date.

## 4.    Information

To assist the Arranger in its syndication efforts, during the Syndication Period, you agree to promptly prepare and provide to the Arranger all information with respect to you and the Transactions in form and substance satisfactory to the Arranger, including such financial information and projections as the Arranger may reasonably request in connection with the structuring, arrangement and syndication of the Post-Petition Facility. You represent, warrant and covenant that: (i) all information (other than the Projections (as defined below)) that has been or will be made available to the Arranger, the Note Agent, the Participants or any of their respective affiliates directly or indirectly by or on behalf of the City or its agents or representatives in connection with the Transactions is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the projections and other forward looking information (the "Projections") that have been or will be made available directly or indirectly to the Arranger, the Participants or any of their respective affiliates by or on behalf of the City or its agents or representatives have been and will be prepared in good faith upon assumptions that are believed

3

by you to be reasonable when made and when made available to the Arranger, the Participants and their respective affiliates. You agree that if at any time prior to the Closing Date, and thereafter during the Syndication Period, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then you will promptly supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances in which statements are made. You understand that in providing services pursuant to this Commitment Letter, the Purchaser and the Note Agent may use and rely on the information and Projections without independent verification thereof.

## 5.    Indemnification and Expenses

To induce the Purchaser and the Note Agent to enter into this Commitment Letter and the Fee Letter and to proceed with the documentation of the Post-Petition Facility, you hereby agree, to the extent permitted by law, to indemnify upon demand and hold harmless the Note Agent, the Arranger, the Purchaser, each participant and their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its agents, representatives, employees, creditors or any other person or entity (whether or not the City is a party to such action, suit proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Commitment Letter, the Fee Letter, the Post-Petition Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Post-Petition Facility (whether or not the transactions contemplated hereby or by the Fee Letter are consummated), and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing; provided that you will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense to the extent the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment). Regardless of whether the Closing Date occurs or any QOL Note Documents or ST Note Documents (collectively, the "Note Documents") are executed and delivered or any notes are purchased or extensions of credit are made under the Post-Petition Facility, you agree, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or under the Fee Letter or the administration, amendment, modification or waiver of any of the Commitment Letter, the Fee Letter, the Note Documents or the definitive documentation in respect of the Post-Petition Facility. It is further agreed that the Purchaser, the Note Agent and the Arranger shall only have liability to you with respect to the Post-Petition Facility, the Fee Letter and this Commitment Letter and not to any other person. No Indemnified Person will have any liability (whether in

4

contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Commitment Letter, the Fee Letter, the Post-Petition Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Post-Petition Facility, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Commitment Letter, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to you or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

Your indemnity and reimbursement obligations under this Section 5 will be in addition to any liability that you may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of you and the Indemnified Persons.

Neither the Purchaser, the Note Agent, the Arranger nor any other Indemnified Person will be responsible or liable on any theory of liability to you or any other person or entity for any indirect, special, punitive or consequential damages (collectively "Consequential Damages") which may be alleged or otherwise claimed as a result of or in connection with this Commitment Letter, the Fee Letter, the Post-Petition Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Post-Petition Facility. The City will not be responsible or liable on any theory of liability to any Indemnified Party or any other person or entity for any Consequential Damages which may be alleged or otherwise claimed as a result of or in connection with this Commitment Letter, the Fee Letter, the Post-Petition Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Post-Petition Facility; provided that nothing contained in this sentence shall otherwise limit your indemnity obligations to the extent set forth in this Section 5, including any Consequential Damages.

The City's obligation to indemnify or to pay any expense or other obligation set forth herein or to cause any such expense or other obligation to be paid shall be joint and several.

6. **Assignments**

This Commitment Letter may not be assigned by you without the prior written consent of the Purchaser (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the parties hereto and the Indemnified Persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person (including your employees or creditors) other than the parties hereto (and any Indemnified Person). The Purchaser may assign its commitments and agreements hereunder, in whole or in part, to any of its affiliates or any Participant (including without limitation as provided in Section 3 above); however the Purchaser shall not be released from the portion of its commitment hereunder so assigned until after the Closing Date unless you and the Purchaser agree in writing. The Purchaser and the Note Agent reserve the right to employ the services of their respective

affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Purchaser in such manner as they and their respective affiliates may agree in their sole discretion. This Commitment Letter may not be amended or any term or provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto.

## 7. USA PATRIOT Act Notification

The Purchaser and the Note Agent notify you and your agents and representatives that, pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, supplemented or modified from time to time, the "Patriot Act") they and each Participant may be required to obtain, verify and record information that identifies you and your agents and representatives, including the name, address and tax identification number of each such person and other information that will allow the Purchaser, the Note Agent and each Participant to identify each such person in accordance with the Patriot Act and other applicable "know your customer" and anti-money laundering rules and regulations. This notice is given in accordance with the requirements of the Patriot Act and is effective for the Note Agent, the Purchaser and each Participant.

## 8. Sharing Information; Affiliate Activities; Absence of Fiduciary Relationship

Please note that this Commitment Letter, the Fee Letter and any written or oral communications provided by the Note Agent, the Purchaser, the Arranger or any of their respective affiliates in connection with the Transactions are exclusively for the information of the City and may not be disclosed by you, directly or indirectly, to any other person or entity (including, without limitation, other potential providers or arrangers of financing) or circulated or referred to publicly without the Purchaser's prior written consent except: (i) this Commitment Letter and the Fee Letter and such communications may be disclosed to your agents, representatives, officers, directors and advisors on a "need-to-know" basis to the extent you notify such persons of their obligation to keep this Commitment Letter, the Fee Letter and such communications confidential and such persons agree to hold the same in confidence, (ii) this Commitment Letter and the existence and contents hereof (but not the Fee Letter or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in syndication or marketing materials) may be disclosed in any syndication or other marketing material in connection with the Post-Petition Facility to the extent such materials are requested by the Arranger, and (iii) after providing prior written notice to the Purchaser and with appropriate redactions as reasonably requested by the Purchaser, this Commitment Letter and the Fee Letter may be disclosed to the extent required pursuant to applicable law (including any disclosures required to be made by the City to the City Council or any local emergency financial assistance loan board pursuant to Michigan P.A. 436 or Section 36a of the Michigan Home Rule Act), compulsory legal process or as required by the Bankruptcy Court; provided that you agree to take, or cause to be taken, such actions as may be necessary to prevent the Fee Letter and the provisions regarding fees payable under this Commitment Letter and any other confidential commercial information from becoming publicly available, including, without limitation, the filing of a motion or an ex parte request seeking an order authorizing you or your agents or representatives, as applicable, to file the Fee Letter under seal and seeking approval of the

Bankruptcy Court to limit any such disclosure to the in camera review of the judge presiding over the Bankruptcy Case (and his or her judicial clerks). Notwithstanding any of the foregoing, with respect to any disclosures regarding the Commitment Letter or the Fee Letter to the City Council or any local emergency financial assistance loan board as may be required under Michigan P.A. 436 or Section 36a of the Michigan Home Rule Act, the City agrees to request that the City Council or local emergency financial assistance loan board keep such disclosures confidential, and the City agrees to limit such disclosures, in consultation with the Purchaser, to the minimum disclosure necessary in seeking any necessary approvals for the Transactions.

You acknowledge that Barclays and its affiliates are full service securities firms and as such may from time to time effect transactions, for their own account or the account of customers, and may at any time purchase, sell, hold or vote long or short positions and investments in securities, loans, commodities, currencies, derivative transactions (including total return swaps and credit default swaps), indebtedness, or options thereon, of you. With respect to any securities and/or financial instruments so held by Barclays, any of its affiliates or any of their respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights in its sole discretion. Barclays and its affiliates will have economic and other interests that are different from or conflict with those of the City regarding the transactions contemplated hereby, and you acknowledge and agree that Barclays has no obligation to disclose such interests to you. You further acknowledge and agree that nothing in this Commitment Letter, the Fee Letter or the nature of services provided hereunder or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between Barclays, on the one hand, and you, your agents or your representatives, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against Barclays for breach of fiduciary duty or alleged breach of fiduciary duty and agree that Barclays will have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your agents, representatives, employees or creditors. You acknowledge and agree that the Transactions (including the exercise of rights and remedies hereunder and under the Fee Letter) are arms' length commercial transactions and that Barclays is acting solely as principal and in its own best interests. You acknowledge and agree that you have consulted and are relying on your own legal, accounting, regulatory and tax advisors and other experts and advisors to the extent you have deemed appropriate to determine whether the Transactions are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby and are responsible for making your own independent investigation and appraisal of the Transactions (including, without limitation, with respect to any consents needed in connection with the transactions contemplated hereby). Any review by Barclays or its representatives of you, the Transactions, the other transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of Barclays and shall not be on behalf of you or any of your agents, representatives or creditors. In addition, you acknowledge that Barclays may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information concerning you and companies that may be the subject of the Transactions and Barclays's affiliates will be entitled to the benefits afforded to Barclays hereunder, provided that any such communication shall be subject to the Confidentiality Agreement dated September 3, 2013 between Barclays Capital Inc. and the City (the "Confidentiality Agreement"). You

7

acknowledge and agree that Barclays does not have any obligation or liability to you or your agents or representatives with respect to the transactions contemplated hereby except those obligations or liabilities expressly set forth herein or in any other express writing executed and delivered by Barclays and you or any such agent or representative.

Consistent with Barclays's policies to hold in confidence the affairs of its customers, it will not use or disclose confidential information obtained from you by virtue of the Transactions in connection with Barclays's performance of services for any of its other customers (other than as permitted to be disclosed under this Section 8) and any such information shall remain at all times subject to the terms of the Confidentiality Agreement. Furthermore, you acknowledge that neither Barclays nor any of its affiliates have an obligation to use in connection with the Transactions, or to furnish to you, confidential information obtained or that may be obtained by Barclays from any other person.

Please note that Barclays and its affiliates do not provide tax, accounting or legal advice.

9.  **Waiver of Jury Trial; Governing Law; Submission to Jurisdiction; Surviving Provisions; Miscellaneous**

**ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, SUIT, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY HERETO ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO IN THIS COMMITMENT LETTER OR EITHER OF THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER IS HEREBY IRREVOCABLY WAIVED BY THE PARTIES HERETO. THIS COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) WILL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN.** Each of the parties hereto hereby irrevocably and unconditionally (i) submits, for itself and its property, (a) during the pendency of the Bankruptcy Case, to the exclusive jurisdiction of the Bankruptcy Court and (b) after the Bankruptcy Case has been closed, to the non-exclusive jurisdiction of (1) the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and (2) the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan and, in each case of the foregoing, any appellate court from any such court, in any action, suit, proceeding or claim arising out of or relating to this Commitment Letter, the Fee Letter, the Transactions or the other transactions contemplated hereby or thereby, the performance of services contemplated hereunder or under the Fee Letter, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action, suit, proceeding or claim may be heard and determined in such court: provided that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (ii) waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any action, suit, proceeding or claim arising out of or relating to this Commitment Letter, the Fee Letter, the Transactions or the other transactions contemplated hereby or thereby or the performance of services

8

contemplated hereunder or under the Fee Letter in any such court, (iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of any such action, suit, proceeding or claim in any such court and (iv) agrees to commence any such action, suit, proceeding or claim in such courts, as applicable. The parties hereto agree that service of any process, summons, notice or document by registered mail addressed to you, the Note Agent or the Purchaser, as applicable, shall be effective service of process for any such action, suit, proceeding or claim brought in any such court. You agree, on behalf of yourself and your agents and representatives, that the foregoing provisions of this paragraph shall also apply to your agents and representatives to the same extent as to you, and the Arranger's obligations hereunder are being made in reliance on the foregoing.

This Commitment Letter is issued for your benefit only and no other person or entity (other than the Indemnified Persons) may rely hereon. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among you, the Note Agent and the Purchaser with respect to the Post-Petition Facility and set forth the entire understanding of the parties with respect thereto.

The provisions of Sections 3, 5, 8 and this Section 9 of this Commitment Letter will survive any termination or completion of the arrangements contemplated by this Commitment Letter or the Fee Letter, including without limitation whether or not the Note Documents are executed and delivered and whether or not the Post-Petition Facility is made available or any of the Notes under the Post-Petition Facility is purchased.

**10.     Acceptance; Termination**

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission (e.g., "pdf" or "tif") will be as effective as delivery of a manually executed counterpart hereof.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to Barclays the enclosed copy of this Commitment Letter, together, if not previously executed and delivered, with the Fee Letter on or before 5:00 p.m., New York City time, on October 11, 2013, whereupon this Commitment Letter and the Fee Letter will become binding agreements between you, the Note Agent, and the Purchaser. If not signed and returned as described in the preceding sentence by such date, this offer will terminate on such date. In the event the Closing Date has not occurred on or prior to January 7, 2013, the Commitment shall terminate on such date. In the event of a material breach by you or a failure of a condition under this Commitment Letter or the Fee Letter, then this Commitment Letter and the commitments hereunder shall automatically terminate unless the Purchaser shall, in its sole discretion, agree to an extension or waiver, as applicable.

*[The remainder of this page is intentionally left blank.]*

9

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

**BARCLAYS CAPITAL INC.**

By:_____
  Name:  John Gerbino
  Title:   Managing Director

Accepted and agreed to as of
the date first written above:

**THE CITY OF DETROIT, MICHIGAN**

By: _____
  Name:
  Title:

**BARCLAYS CAPITAL INC., as Note Agent**

By:_____

    Name:  John Gerbino
    Title:   Managing Director

[Signature Page to Commitment Letter]

## Quality of Life Note Term Sheet

### See Attached

*Set forth below is a summary of certain key terms for the Quality of Life Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Quality of Life Note and related documentation.*

1. PARTIES AND TRANSACTIONS

Issuer:

The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending.

Purchaser and Sole
Lead Arranger:

Barclays Capital Inc.

Note Agent:

Barclays Capital Inc.

2. TYPE AND AMOUNT OF FACILITY

Type and Amount:

A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Note" or the "Note" and, together with (i) the Swap Termination Note or (ii) the Replacement Swap Transaction, as applicable (as selected by the City), the "Post-Petition Facility") in an aggregate principal amount of up to $350,000,000, minus the amount of the Swap Termination Note (as defined in the Swap Termination Note Term Sheet) or the Upfront Amount in respect of the Replacement Swap Transaction (each as defined in the Replacement Swap Transaction Term Sheet), as applicable (the "Facility Amount").

Purposes:

Proceeds from the issuance of the Quality of Life Note shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Note Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City.

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the QOL Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the QOL Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the QOL Note Documents and the issuance of the Swap Termination Note are satisfied and the Swap Termination Note shall have been issued in accordance with the terms of the ST Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Swap Termination Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| | |
|---|---|
| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Quality of Life Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax |

Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Quality of Life Note Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Note on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Note on a first-priority basis.

The QOL Note Documents will require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Quality of Life Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

The QOL Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month, all of which shall be applied to redeem the Swap Termination Note until such Note is paid in full and thereafter, such amounts (in addition to $4 million per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Note. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

Super-Priority of            Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2),

| | |
|---|---|
| Note: | the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any QOL Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any QOL Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the QOL Note Documents); entry of an order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Wagering Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Wagering Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established. |
| Remedies: | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis |

on a level debt basis equivalent to $4 million per month (or, following repayment in full of the Swap Termination Note, $8 million per month, as set forth above under the heading "Collateral"), plus the pro-rata proceeds of any Asset Proceeds Collateral.

| | |
|---|---|
| Prohibition of Additional Borrowings: | The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Quality of Life Note or the Swap Termination Note. |

## 5. CERTAIN OTHER PROVISIONS

| | |
|---|---|
| Documentation: | Each in form and substance satisfactory to the Purchaser: |

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of

Note terms and conditions

- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into QOL Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "QOL Note Documents".

**Conditions Precedent:** Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the QOL Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form

and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Swap Termination Note (the "<u>ST Note Documents</u>") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Swap Termination Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "<u>Swap Agreements</u>"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any QOL Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary | The City acknowledges that the transactions described in this |

| | |
|---|---|
| Relationship: | document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| Yield Protection, Taxes and Other Deductions: | The QOL Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the QOL Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the QOL Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities |

or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase Agreement.<br><br>George E. Zobitz, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700<br>jzobitz@cravath.com |
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>AFillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and |

the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

## Swap Termination Note Term Sheet

**See Attached**

City of Detroit
$350,000,000 Post-Petition Bond Financing
Summary of Indicative Terms and Conditions of Swap Termination Note

*Set forth below is a summary of certain key terms for the Swap Termination Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Swap Termination Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

| | |
|---|---|
| Issuer: | The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending. |
| Purchaser and Sole Lead Arranger: | Barclays Capital Inc. |
| Note Agent: | Barclays Capital Inc. |

## 2. TYPE AND AMOUNT OF FACILITY

| | |
|---|---|
| Type and Amount: | A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Note" or the "Note" and, together with the Quality of Life Note, the "Post-Petition Facility") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended, the "Forbearance Agreement") to terminate the underlying swaps. The sum of the amount of the Swap Termination Note and the amount of the Quality of Life Note shall not exceed $350,000,000 (the "Facility Amount"). |
| Purposes: | The Swap Termination Note may be used by the City to pay amounts required under the Forbearance Agreement to terminate the underlying swaps as approved by the Bankruptcy Court. |

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the ST Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the ST Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the ST Note Documents and the issuance of the Quality of Life Note are satisfied and the Quality of Life Note shall have been issued in accordance with the terms of the QOL Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Quality of Life Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| | |
|---|---|
| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Swap Termination Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on: (i) the Asset Proceeds Collateral and (ii) income tax revenues of the City (the "Pledged Income Tax Revenue" and together with the Asset Proceeds Collateral, the "Swap Termination Note Collateral"). The lien on the Asset Proceeds Collateral shall also secure the Quality of Life Note on |

a pari passu basis. The Quality of Life Note shall be secured by a second lien on the Pledged Income Tax Revenue.

The ST Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the ST Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

| | |
|---|---|
| Super-Priority of Note: | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any ST Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any ST Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the ST Note Documents); entry of an |

order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established.

**Remedies:**

Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month, plus the pro-rata proceeds of any Asset Proceeds Collateral.

**Prohibition of Additional Borrowings:**

The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Swap Termination Note or the Quality of Life Note.

## 5. CERTAIN OTHER PROVISIONS

Documentation:     Each in form and substance satisfactory to the Purchaser:

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of Note terms and conditions
- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Swap Termination Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into ST Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "ST Note Documents".

| | |
|---|---|
| Conditions Precedent: | Usual for municipal financings and Chapter 11 debtor-in-possession financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the ST Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Quality of Life Note (the "QOL Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Quality of Life Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults. |

The Purchaser agrees, in connection with any termination of the Swap

Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any ST Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary Relationship: | The City acknowledges that the transactions described in this document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |

Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice.

| | |
|---|---|
| Yield Protection, Taxes and Other Deductions: | The ST Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the ST Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the ST Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities. |
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase |

Agreement.

George E. Zobitz, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
212 474 1000
F 212 474 3700
jzobitz@cravath.com

Michigan Counsel:     Ann D. Fillingham, Esq.
James P. Kiefer, Esq.
Courtney F. Kissel, Esq.
Dykema Gossett PLLC
Capitol View
201 Townsend Street, Suite 900
Lansing, MI 48933
517 374 9100
F 517 374 9191
AFillingham@dykema.com
jkiefer@dykema.com
ckissel@dykema.com

Governing Law:        Michigan.

Jurisdiction and      The Bankruptcy Court, unless the Bankruptcy Court does not have
Venue:                jurisdiction, in which case, the parties shall consent to the non-
exclusive jurisdiction of the courts of the State of New York and the
United States District Court located in the Borough of Manhattan in
New York City and of the courts of the State of Michigan and the
United States District Court for the Eastern District of Michigan.



RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

October 11, 2013

**BY ELECTRONIC MAIL**

Kevyn D. Orr, Emergency Manager
City of Detroit
2 Woodward Ave., Suite 1126
Detroit, MI 48226

Dear Mr. Orr:

Thank you for your October 8, 2013, correspondence, a copy of which is enclosed for reference. In your capacity as Emergency Manager for the City of Detroit, you have requested my approval, pursuant to Section 12(3) of Public Act 436 of 2012, the Local Financial Stability and Choice Act, to execute with Barclays Capital Incorporated a contract (commitment fee) valued at $50,000.00 or more.

Section 12(3) of the Act, provides as follows:

> (3) Except as otherwise provided in this subsection, any contract involving a cumulative value of $50,000.00 or more is subject to competitive bidding by an emergency manager. However, if a potential contract involves a cumulative value of $50,000.00 or more, the emergency manager may submit the potential contract to the state treasurer for review and the state treasurer may authorize that the potential contract is not subject to competitive bidding.

I have reviewed the information you submitted regarding the need for the proposed contract. The potential benefits to the City from the proposed contract are threefold: first, the secured financing in question could provide the City access to certain revenues presently subject to lien, such as casino revenues; second, such financing would afford the City additional resources from which to make remittances to creditors, including retirees; and third, it would provide critical resources to invest in the City's infrastructure and related restructuring initiatives.

I note that, technically, the Act does not require my approval in this instance. As you indicated in your letter to me, the "robust marketing process" that preceded the selection of Barclays Capital Incorporated, satisfied, in your view, the competitive bidding process contemplated by the Act. For example, the City issued a request for proposals and received responses from 15 firms. After these responses were evaluated against rigorous selection criteria, Barclays Capital Incorporated was deemed to be the most qualified respondent.

CITY'S
EXHIBIT
**097**

Kevyn D. Orr
October 11, 2013
Page Two

I agree fully with your assessment that the proposed contract was, in fact, subject to competitive bidding. However, given the significance of the proposed contract to the financial revitalization of the City, it will be beneficial to avoid any questions that otherwise might arise. Therefore, your request pursuant to Section 12(3) of the Act is approved.

Sincerely,

Andy Dillon
State Treasurer

Enclosure



CITY OF DETROIT
OFFICE OF THE EMERGENCY MANAGER

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 1126
DETROIT, MICHIGAN 48226
PHONE 313•224•3703
FAX 313•224•4433
WWW.DETROITMI.GOV

October 8, 2013

Michigan State Treasurer Andy Dillon
Austin Building
430 W. Allegan Street
Lansing, MI 48922

Dear Treasurer Dillon:

I am writing to apprise you of the City of Detroit's efforts to procure financing during its on-going chapter 9 bankruptcy proceedings. I am pleased to inform you that we have reached agreement on the material terms of a secured financing transaction with Barclays Capital Inc. ("Barclays") that will provide the City with up to $350,000,000 of secured financing and will allow the City to:

- Satisfy its obligations in connection with certain swap agreements pursuant to the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, and UBS AG and Merrill Lynch Capital Services, Inc. (the "Forbearance Agreement"), if and when the Forbearance Agreement is ultimately approved by the United States Bankruptcy Court for the Eastern District of Michigan; and
- Advance certain key investment and restructuring initiatives of the City, including blight removal, public safety and upgrades to technology infrastructure.

The material terms of the Barclays lending proposal are attached to this correspondence (the "Barclays Financing Proposal").

As you and your staff are aware, the City's efforts in this regard have been on-going for many weeks, during which time the City and its advisors have reached out to numerous potential funding sources, and ultimately received high-level lending proposals from more than a dozen interested parties. After significant review of the various lending proposals, and after numerous meetings and conference calls between the City's advisors and potential lending sources, I believe that the Barclays Financing Proposal is the best financing opportunity for the City based on its terms, conditions and pricing structure.

As you are aware, pursuant to Section 12(1)(u) of Public Act 436 of 2012 ("PA 436"), prior to proceeding to a closing of any financing transaction with Barclays, my office is required to submit the Barclays Financing Proposal to the Detroit City Council ("City Council"), which has 10 days to approve or disapprove the transaction. Should City Council disapprove the Barclays Financing Proposal, City Council has 7 days to propose to the local emergency financial assistance loan board an alternative proposal "that would yield substantially the same financial result as" the Barclays Financing Proposal. The local emergency financial assistance loan board would then have 30 days from the date of submission from City Council to approve either the Barclays Financing Proposal or City Council's alternative financing proposal. I intend to submit the Barclays Financing Proposal to City Council in the near-term for approval consistent with PA 436.

In connection with Barclays' commitment to provide financing under the Barclays Financing Proposal, the City has agreed to pay Barclays a commitment fee (the "Commitment Fee") in excess of $50,000, which will be earned on the date the City executes the Barclays commitment letter, with 50% paid on the date of execution, and the remaining 50% due on the closing of the transaction. Pursuant to Section 12(3) of PA 436, "if a potential contract involves a cumulative value of $50,000 or more," such contract is subject to competitive bidding unless otherwise authorized by the State Treasurer.

KEVYN D. ORR, EMERGENCY MANAGER

Given the robust marketing process that has proceeded to date with respect to the City's financing efforts, I believe that the Barclays Financing Proposal, including the Commitment Fee, was subject to competitive bidding. Nevertheless, out of an abundance of caution, I am requesting your authorization to proceed with payment of the Commitment Fee. Given the time sensitive nature of the City's rights under the proposed Forbearance Agreement, if approved, it is imperative that the City proceed in earnest with the Barclays Financing Proposal. Consequently, your prompt attention to this matter is greatly appreciated.

Please do not hesitate to contact me with any questions or concerns regarding this matter.

Sincerely,

Kevyn D. Orr
Emergency Manager
City of Detroit

| **From:** | Eunice Hayes |
|---|---|
| **Sent:** | Friday, October 11, 2013 7:47 PM |
| **To:** | Bonsall, James; Cockrel, Kenneth; Cockrel, Kenneth; Jenkins, Saunteel; Jones, Brenda; Naglick, John; Penn, Shani; Roberson, Portia; Spivey, Andre; Tate, James; Watson, Jo Ann; Winfrey, Janice M. |
| **Cc:** | Boyd, Angela; Brown, Thelma; Hurley, Alex; Logan, Latosia; Polk, Cherie; Searcy, Latia; Simmons, Jerline |
| **Subject:** | EM Order #17   PA436 Submission of Postpetition Financing to City Council |

**SENT ON BEHALF OF EMERGENCY MANAGER KEVYN D. ORR**

All,

Please see attached information relative to the above subject.

**Attachments:**
1. EM Transmittal Letter to City Council
2. Emergency Manager Order #17
3. Secured Financing - Summary of Indicative Terms and Conditions
4. Proposed City Council Resolution

Feel free to contact this office should you have any questions.

Thank you,

Eunice Hayes
Executive Assistant to the Emergency Manager
Office of the Emergency Manager
1126 Coleman A. Young Municipal Center
Detroit, Michigan 48226
(313) 224-3703 (Office)
(313) 530-2993 (Cellular)
hayese@detroitmi.gov

Dave Bing, Mayor


EM Transmittal
Letter to City ...


EM Order
7_Secured Financing


Barclays Terms &
Conditions (S...


Proposed City
Council Resoluti...

CITY'S
EXHIBIT
098

1



CITY OF DETROIT
OFFICE OF THE EMERGENCY MANAGER

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 1126
DETROIT, MICHIGAN 48226
PHONE 313•224•3703
FAX 313•224•4433
WWW.DETROITMI.GOV

## MEMORANDUM

To:     All City Council Members

From:   Kevyn D. Orr, Emergency Manager
        City of Detroit

Date:   October 11, 2013

Re:     Emergency Manager's Order No. 17
        Approval of Postpetition Financing

Pursuant to Section 12(1)(u) of the Local Financial Stability and Choice Act, Act No. 436, Public Acts of Michigan, 2012 ("Act 436") the Emergency Manager has proposed to seek approval from the Detroit City Council and the State Local Emergency Financial Assistance Loan Board to issue Financial Recovery Bonds (the "Bonds"), in an aggregate principal amount not to exceed $350,000,000, in one or more series, pursuant to Section 36a of the Home Rule City Act, Act No. 279, Public Acts of Michigan 1909, as amended, to provide postpetition financing for the City of Detroit (the "Secured Financing")

A portion of the proceeds of the Bonds will be used to finance a swap termination payment to UBS AG and Merrill Lynch Capital Services, Inc. pursuant to a certain Forbearance and Optional Termination Agreement (the "Forbearance Agreement") dated as of July 15, 2013 among the City of Detroit, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation on one hand, and UBS AG and Merrill Lynch Capital Services, Inc. on the other. The remaining proceeds of the Bonds will be used to finance expenditures which are designed to contribute to the improvement of the quality of life in the City.

Pursuant to Section 19 of Act 436, the Emergency Manager hereby submits his Order No. 17 Approval of the Postpetition Financing (the "Order") describing the terms and conditions and parameters for the Secured Financing to the Detroit City Council for consideration. Under Section 19(1) of Act 436, the City Council has 10 days from the date of submission of the Order to approve or disapprove the Secured Financing. If the City Council does not act within this period, the Secured financing will be considered approved by the City Council and the Emergency Manager may proceed to obtain approval of the Secured Financing from the State Local Emergency Financial Assistance Loan Board. If the City Council disapproves the Secured Financing within the period provided under Section 19(1) of Act 436 as described above, the City Council is required, pursuant to Section 19(2) of Act 436, to submit an alternative proposal to the State Local Emergency Financial Assistance Loan Board within 7 days of such disapproval, which such alternative proposal shall "yield substantially the same financial result as the" Secured Financing. Pursuant to Section 19(2) of Act 436, the State Local Emergency Financial Assistance Loan Board would then choose between the City Council's alternative proposal and the Secured Financing.

KEVYN D. ORR, EMERGENCY MANAGER

Please do not hesitate to contact my office with any questions or concerns regarding the matters addressed herein. We look forward to your prompt response to this matter.

Sincerely,

Kevin D. Orr

Emergency Manager, City of Detroit

Attachments

cc: Mayor Dave Bing
    Portia Roberson, Corporation Counsel
    James Bonsall, Chief Financial Officer
    Janice Winfrey, City Clerk
    Shani Penn, Chief of Staff



# EMERGENCY MANAGER
# CITY OF DETROIT

## ORDER No. 17

## APPROVAL OF POSTPETITION FINANCING

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas,* on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager ("EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor and City Council; and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Pursuant to section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of [PA 436], including, but not limited to, orders for the timely and satisfactory implementation of a financial and operating plan" or "to take actions, or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan;" and

Section 12(1)(a) of PA 436 authorizes the EM, "notwithstanding any charter

1

DTPPF00019626

provision to the contrary," to "[a]nalyze the factors and circumstances contributing to the financial emergency of the local government and initiate steps to correct the condition;" and

Section 12(1)(b) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[a]mend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended;" and

Section 12(1)(c) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[r]eceive and disburse on behalf of the local government all federal, state, and local funds earmarked for the local government. These funds may include, but are not limited to, funds for specific programs and the retirement of debt;" and

Section 12(1)(g) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[m]ake, approve, or disapprove any appropriation, contract, expenditure, or loan...;" and

Section 12(1)(u) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary" to "authorize the borrowing of money[, subject to Section 19 of PA 436,] by the local government as provided by law" (a "Proposed Transaction"); and

Section 12(1)(ee) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government. The power of the [EM] shall be superior to and supersede the power of any of the foregoing officers or entities;" and

Pursuant to section 19(1) of PA 436, the EM, before executing the Proposed Transaction, "shall submit the [Proposed Transaction] to the governing body of the local government [which] shall have 10 days from the date of submission to approve or disapprove the [Proposed Transaction]. If the governing body of the local government does not act within 10 days, the [Proposed Transaction] is considered approved by the governing body of the local government and the emergency manager may then execute the [Proposed Transaction];" and

Pursuant to Section 19(2) of PA 436, "[i]f the governing body of the local government disapproves a [Proposed Transaction] within 10 days, the governing body of the local government shall, within 7 days of its disapproval of the [Proposed Transaction], submit to the local emergency financial assistance loan board an alternative proposal that would yield substantially the same financial result as the [Proposed Transaction]. The local emergency financial assistance loan board shall have 30 days to review both the alternative proposal submitted by the governing body of the local government and the [Proposed Transaction] and to approve either the alternative proposal submitted by the governing body of the local government or the [Proposed Transaction].

2

DTPPF00019627

The local emergency financial assistance loan board shall approve the proposal that best serves the interest of the public in that local government;" and

Pursuant to section 36a of the Home Rule City Act, Public Act 279 of 1909 (the "Home Rule City Act"), the City is authorized to issue on or more series of Financial Recovery Bonds; and

On July 18, 2013 (the "Petition Date"), the City filed a petition for relief pursuant to chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

In its bankruptcy case, the City filed its Motion for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (III) Granting Related Relief (the "Settlement Motion"), which motion is currently pending before the Bankruptcy Court; and

Pursuant to the Settlement Motion, the City is seeking the Bankruptcy Court's approval of the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended, the "Forbearance Agreement"), pursuant to which, if approved by the Bankruptcy Court, the City would have the option to have UBS AG and Merrill Lynch Capital Services, Inc. terminate certain swap agreements (the "Swap Agreements") with the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation at a market discount rate; and

On or around October 7, 2013, the City reached agreement on the material terms of a secured financing transaction, which such material terms are identified on the term sheets attached hereto as Exhibit A (the "Term Sheets"), with the lenders party to such Term Sheets (the "Lenders"); and

The EM believes that it is in the best interests of the City and its residents to obtain secured financing consistent with the Term Sheets ("Secured Financing") to address the objectives of PA 436, advance its chapter 9 restructuring efforts and promote the health, safety and welfare of the residents of the City consistent with the restructuring proposals set forth in the City's June 14, 2013, Proposal for Creditors; and

The EM anticipates using the Secured Financing to restructure and eliminate certain of the City's debts and fiscal obligations, including, but not limited to, the obligations of the City in connection with the Swap Agreements. The EM also expects to use the Secured Financing to advance certain key investment initiatives of the City, including,

3

but not limited to, essential investments in blight removal, public safety and technology infrastructure; and

The EM further believes that (a) it is necessary and appropriate in connection with the City's restructuring efforts, and to promote the goals of the such restructuring, to pursue the Secured Financing; (b) the City should be authorized, consistent with the terms of this Order, to negotiate, document, and execute such documents as may be necessary or appropriate to effectuate the Secured Financing and to consummate the transactions contemplated by the Term Sheets; and (c) pursuing the foregoing will directly benefit the City, its creditors, residents, and other interested parties.

It is hereby ordered that:

1. Notwithstanding any ordinance or resolution of the City the contrary, the Term Sheets are hereby approved in all respects in accordance with this Order. The Secured Financing shall be issued pursuant to this Order as one or more series of Financial Recovery Bonds pursuant to section 36a of the Home Rule City Act, Public Act 279 of 1909 (the "Home Rule City Act").

2. The Secured Financing shall be issued in an aggregate principal amount not to exceed $350,000,000 and is payable AND SHALL BE SECURED as provided in the Term Sheets. The Secured Financing shall have a final maturity no later than 3 years from the date of issuance. The annual interest rate on the Secured Financing shall not exceed the maximum rate permitted by law. The Secured Financing shall be sold at a price not less than 80% of the principal amount of the Secured Financing.

3. The City's Chief Financial Officer, Finance Director, financial advisors, consultants, outside legal advisors, and other officers and employees of the City as applicable (collectively, the "Authorized Parties") are hereby authorized and directed, on behalf of, and in the name of, the City, to take all actions as may be deemed advisable by such parties, under applicable law or otherwise, to authorize the Secured Financing, including any actions required under PA 436 set forth above and any actions required under the Bankruptcy Code in the City's bankruptcy case.

4. The Authorized Parties are hereby authorized to file this Order, the Term Sheets and all other documents necessary or advisable with the local emergency financial assistance loan board created under the emergency municipal loan act, 1980 P.A. 243, MCL 141.931 to 141.942 for approval pursuant to the Home Rule Act. The Authorized Parties are further authorized in connection with the Secured Financing to make determinations of useful life as needed to issue a portion of the Secured Financing as federal tax exempt.

5. The Authorized Parties are hereby authorized to negotiate, document, revise, and amend any Financing Documents (as defined below) as may be necessary or

4

appropriate to effectuate the Secured Financing and to consummate the transactions contemplated by the Term Sheets.

6. The Finance Director, or such other party as the EM may designate, is hereby authorized to execute and deliver from time to time on behalf of the City such documents, agreements, instruments, certificates, and notices as may be advisable, desirable, appropriate, or otherwise necessary in connection with and to effectuate the Secured Financing (collectively, the "Financing Documents"), each of which shall be in such form and substance as may be acceptable to the EM.

7. Notwithstanding any ordinance or resolution of the City the contrary, the entry into the Financing Documents by the City, and the City's incurrence of indebtedness thereunder shall be, and hereby are, authorized, ratified, and approved. It is determined to be a necessary public purpose for the health, safety, and welfare of the citizens of the City to enter into the Secured Financing.

8. Notwithstanding any ordinance or resolution of the City the contrary, the City may grant security interests to the Lenders as set forth in the Term Sheets to secure the City's obligations in connection with the Secured Financing. Any and all actions taken or to be taken by the City consistent with this paragraph 8 are hereby authorized, ratified, and approved.

9. Notwithstanding any ordinance or resolution of the City the contrary, the City may grant a claim in favor of the Lenders in respect of the obligations owing by the City under the Financing Documents with priority over all other postpetition claims and all prepetition unsecured claims, pursuant to 11 U.S.C. §§ 364(c), 503 and 507(a)(2), and subject to the approval of the Bankruptcy Court. Any and all actions taken or to be taken by the City consistent with this paragraph 9 are hereby authorized, ratified, and approved.

10. The City hereby appoints Barclays Capital, Inc. to serve as the City's arranger to raise the capital necessary for the City to exit from bankruptcy protection and the city is hereby authorized to pay such fees and expenses to Barclays Capital, Inc. as may be agreed by the City in exchange for such services.

11. For any portion of the Secured Financing, if it is necessary or advisable, the Authorized Parties are hereby authorized to enter into an undertaking for the benefit of the holders and beneficial owners of the Secured Financing pursuant to Rule 15c2-12 of the U.S. Securities and Exchange Commission, and the same is authorized to approve and execute such undertaking prior delivery of such financing.

12. The City hereby covenants for any debt issued pursuant to this Order as federally tax-exempt that, to the extent permitted by law, the City shall take all actions within its control necessary to maintain the exemption of the interest on the debt from general federal income taxation (as opposed to alternative minimum or other

5

indirect taxation) under the Internal Revenue Code of 1986 (the "Code"), including, but not limited to, actions relating to the rebate of arbitrage earnings, if applicable, and the expenditures and investment of notes proceeds and moneys deemed to be debt proceeds.

13. The City's Finance Director, Chief Financial Officer or such other party as the EM may designate, is hereby authorized and directed, from time to time and in the name and on behalf of the City to, pay any fees, costs, and expenses as may be required under the Term Sheets or as may be required under any of the Financing Documents.

14. All lawful actions previously taken by any officer, representative, or agent of the City, including financial advisors, consultants, and outside legal advisors, in the name or on behalf of the City in connection with the matters contemplated by this Order, and each of the same hereby is, adopted, ratified, confirmed, and approved in all respects.

15. Pursuant to section 19 of PA 436, the Term Sheets are hereby submitted to the City of Detroit City Council ("City Council"), and City Council is hereby instructed to review the Term Sheets for the Secured Financing, and to either approve or disapprove the Secured Financing in accordance with the Term Sheets within 10 days from the date hereof.

16. Nothing in this Order shall be interpreted as contrary to Federal law.

17. This Order is effective immediately upon the date of execution below.

18. If any component of this Order is declared illegal, unenforceable, or ineffective by a court of competent jurisdiction, such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

19. The EM may modify, amend, rescind, replace, supplement, or otherwise revise this Order at any time.

20. This Order shall be distributed to the Mayor, City Council members and all department heads.

6

Dated: October 11, 2013

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc:    State of Michigan Department of Treasury
Mayor David Bing
Members of Detroit City Council

DTPPF00019632

## City of Detroit
### $350,000,000 Post-Petition Bond Financing
### Summary of Indicative Terms and Conditions of Quality of Life Note

*Set forth below is a summary of certain key terms for the Quality of Life Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Quality of Life Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

| | |
|---|---|
| Issuer: | The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending. |
| Purchaser and Sole Lead Arranger: | Barclays Capital Inc. |
| Note Agent: | Barclays Capital Inc. |

## 2. TYPE AND AMOUNT OF FACILITY

| | |
|---|---|
| Type and Amount: | A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Note" or the "Note" and, together with (i) the Swap Termination Note or (ii) the Replacement Swap Transaction, as applicable (as selected by the City), the "Post-Petition Facility") in an aggregate principal amount of up to $350,000,000, minus the amount of the Swap Termination Note (as defined in the Swap Termination Note Term Sheet) or the Upfront Amount in respect of the Replacement Swap Transaction (each as defined in the Replacement Swap Transaction Term Sheet), as applicable (the "Facility Amount"). |
| Purposes: | Proceeds from the issuance of the Quality of Life Note shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Note Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City. |

| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the QOL Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "<u>Maturity Date</u>"). |
|---|---|
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "<u>Post-Petition Financing Order</u>"), authorizing the Post-Petition Facility, authorizing the City to enter into the QOL Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the QOL Note Documents and the issuance of the Swap Termination Note are satisfied and the Swap Termination Note shall have been issued in accordance with the terms of the ST Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
|---|---|
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
|---|---|
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Swap Termination Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Quality of Life Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax |
|---|---|

Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Quality of Life Note Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Note on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Note on a first-priority basis.

The QOL Note Documents will require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Quality of Life Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

The QOL Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month, all of which shall be applied to redeem the Swap Termination Note until such Note is paid in full and thereafter, such amounts (in addition to $4 million per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Note. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

Super-Priority of        Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2),

| | |
|---|---|
| Note: | the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any QOL Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any QOL Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the QOL Note Documents); entry of an order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Wagering Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Wagering Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established. |
| Remedies: | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis |

DTPPF00019637

on a level debt basis equivalent to $4 million per month (or, following repayment in full of the Swap Termination Note, $8 million per month, as set forth above under the heading "Collateral"), plus the pro-rata proceeds of any Asset Proceeds Collateral.

| | |
|---|---|
| Prohibition of Additional Borrowings: | The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Quality of Life Note or the Swap Termination Note. |

## 5. CERTAIN OTHER PROVISIONS

| | |
|---|---|
| Documentation: | Each in form and substance satisfactory to the Purchaser: |

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of

Note terms and conditions

- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Note Collateral, including lifting of automatic stay and "good faith" finding

- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into QOL Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law

- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "QOL Note Documents".

Conditions Precedent:

Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the QOL Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form

and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Swap Termination Note (the "ST Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Swap Termination Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any QOL Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary | The City acknowledges that the transactions described in this |

| | |
|---|---|
| Relationship: | document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet.

Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| Yield Protection, Taxes and Other Deductions: | The QOL Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the QOL Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the QOL Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities |

or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase Agreement.<br><br>George E. Zobitz, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700<br>jzobitz@cravath.com |
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>AFillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and |

the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

*Set forth below is a summary of certain key terms for the Swap Termination Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Swap Termination Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

Issuer:

The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending.

Purchaser and Sole Lead Arranger:

Barclays Capital Inc.

Note Agent:

Barclays Capital Inc.

## 2. TYPE AND AMOUNT OF FACILITY

Type and Amount:

A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Note" or the "Note" and, together with the Quality of Life Note, the "Post-Petition Facility") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended, the "Forbearance Agreement") to terminate the underlying swaps. The sum of the amount of the Swap Termination Note and the amount of the Quality of Life Note shall not exceed $350,000,000 (the "Facility Amount").

Purposes:

The Swap Termination Note may be used by the City to pay amounts required under the Forbearance Agreement to terminate the underlying swaps as approved by the Bankruptcy Court.

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the ST Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the ST Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the ST Note Documents and the issuance of the Quality of Life Note are satisfied and the Quality of Life Note shall have been issued in accordance with the terms of the QOL Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
|---|---|
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Quality of Life Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Swap Termination Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on: (i) the Asset Proceeds Collateral and (ii) income tax revenues of the City (the "Pledged Income Tax Revenue" and together with the Asset Proceeds Collateral, the "Swap Termination Note Collateral"). The lien on the Asset Proceeds Collateral shall also secure the Quality of Life Note on |

a pari passu basis. The Quality of Life Note shall be secured by a second lien on the Pledged Income Tax Revenue.

The ST Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the ST Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

| | |
|---|---|
| Super-Priority of Note: | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any ST Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any ST Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the ST Note Documents); entry of an |

order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established.

**Remedies:** Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month, plus the pro-rata proceeds of any Asset Proceeds Collateral.

**Prohibition of Additional Borrowings:** The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Swap Termination Note or the Quality of Life Note.

## 5. CERTAIN OTHER PROVISIONS

Documentation:    Each in form and substance satisfactory to the Purchaser:

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of Note terms and conditions
- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Swap Termination Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into ST Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "ST Note Documents".

|                          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |
| ------------------------ | ----------------------------------------- |
| Conditions Precedent:    | Usual for municipal financings and Chapter 11 debtor-in-possession financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the ST Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Quality of Life Note (the "QOL Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Quality of Life Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults. |

The Purchaser agrees, in connection with any termination of the Swap

Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

**Authority to Borrow:** Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act.

**City Consent to Jurisdiction:** The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder.

**Restrictions on Dismissal of Bankruptcy Case:** The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any ST Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

**Absence of Fiduciary Relationship:** The City acknowledges that the transactions described in this document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet.

Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice.

| | |
|---|---|
| Yield Protection, Taxes and Other Deductions: | The ST Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the ST Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the ST Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities. |
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase |

Agreement.

George E. Zobitz, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
212 474 1000
F 212 474 3700
jzobitz@cravath.com

Michigan Counsel:     Ann D. Fillingham, Esq.
                      James P. Kiefer, Esq.
                      Courtney F. Kissel, Esq.
                      Dykema Gossett PLLC
                      Capitol View
                      201 Townsend Street, Suite 900
                      Lansing, MI 48933
                      517 374 9100
                      F 517 374 9191
                      AFillingham@dykema.com
                      jkiefer@dykema.com
                      ckissel@dykema.com

Governing Law:        Michigan.

Jurisdiction and      The Bankruptcy Court, unless the Bankruptcy Court does not have
Venue:                jurisdiction, in which case, the parties shall consent to the non-
                      exclusive jurisdiction of the courts of the State of New York and the
                      United States District Court located in the Borough of Manhattan in
                      New York City and of the courts of the State of Michigan and the
                      United States District Court for the Eastern District of Michigan.

**RESOLUTION OF THE CITY COUNCIL OF THE
CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN
APPROVING THE EMERGENCY MANAGER OF THE
CITY OF DETROIT ORDER NO. 17
APPROVAL OF POSTPETITION FINANCING**

By Council Member _____

WHEREAS, on October 11, 2013, pursuant to Section 12(1)(u) of the Local Financial Stability and Choice Act, Act No. 436, Public Acts of Michigan, 2012, ("Act 436"), Kevyn D. Orr, the Emergency Manager of the City of Detroit (the "Emergency Manager"), filed with this City Council his Order No. 17 Approval of Postpetition Financing (the "Order"); and

WHEREAS, the Order proposes the issuance of Financial Recovery Bonds (the "Bonds") by the City of Detroit, in one or more series, under Section 36a of the Home Rule City Act, Act No. 279, Public Acts of Michigan, 1909, as amended ("Act 279"), to provide certain postpetition financing for the City upon the terms and conditions and parameters of the Order (the "Secured Financing"); and

WHEREAS, under Section 36a of Act 279, approval of the issuance of the Bonds and the terms and conditions of the Secured Financing must be provided by the State Local Emergency Financial Assistance Loan Board (the "Emergency Loan Board"); and

WHEREAS, the City Council has reviewed the Order and terms and conditions for the issuance of the Bonds and the Secured Financing; and

WHEREAS, the City Council desires to adopt this resolution to indicate its approval of the issuance of the Bonds and the Secured Financing pursuant to Section 19(1) of Act 436, as a precondition for the Emergency Manager to seek approval of the terms and conditions for the issuance of the Bonds and the Secured Financing by the Emergency Loan Board.

NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, PURSUANT TO ACT 279 AND ACT 436, AS FOLLOWS:

Section 1. Pursuant to Section 19(1) of Act 436, the City Council hereby approves the terms and conditions of the issuance of the Bonds and the Secured Financing as set forth in the Emergency Manager's Order, attached hereto as Exhibit A.

Section 2. All resolutions or parts of resolutions or other proceedings of the City of Detroit in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 3. This Resolution shall take effect immediately upon its adoption by the City Council.

# EXHIBIT A
## "Secured Financing - Summary of Indicative Terms and Conditions"