**BARCLAYS CAPITAL INC.**

PERSONAL AND CONFIDENTIAL

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

**Engagement Letter for Exit Financing**

Dear Ms. Corio:

The City of Detroit, Michigan (the "City" or "you") has advised Barclays Capital, Inc. ("Barclays" and together with the City, the "Engagement Parties") that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears Case No. 13-53846 (the "Bankruptcy Case").

You have further advised us that you currently anticipate that the City will issue (or another entity will issue on behalf of the City) notes or bonds or similar securities or evidences of indebtedness, through public distribution or private placement or otherwise (the "Exit Notes"), pursuant to a plan of adjustment in the Bankruptcy Case or otherwise (the "Exit Financing"), the proceeds of which will be used to repay debt incurred during the Bankruptcy Case (including, without limitation, the Post-Petition Facility but excluding debt in respect of the Detroit Water and Sewerage Department) and, if necessary, pay other debt and claims outstanding at the time the City exits the Bankruptcy Case.

1. Engagement

(a)    This letter agreement (this "Engagement Letter") is to confirm your and our understanding with respect to our engagement in respect of the Exit Financing.

(b)    Subject to the terms and conditions of this Engagement Letter, you agree that Barclays will have the right (but not the obligation) to act as exclusive and sole bookrunner, underwriter and/or placement agent (or any similar role applicable to the specific form of Exit Financing) with respect to the Exit Financing as set forth in this Engagement Letter. Pricing in respect of the Exit Financing will reflect competitive market rates as of the time of the Exit Financing.

-1-

[3430711]

DTPPF00012973

EEPK
Exhibit
804

(c)      You shall have no right to appoint any other financial institution to act as bookrunner, underwriter and/or placement agent (or any similar role applicable to the specific form of Exit Financing), no other financial institution shall have any title or role, and no other financial institution shall receive any consideration, in each case, in connection with the Exit Financing, including with respect to any direct sale or other form of transaction.

(d)      Barclays's advertising name will appear at the bottom center of the front page of any offering or information memorandum related to the Exit Financing. Barclays shall have the sole responsibility, subject to input from the City, to (i) establish the schedule for investor meetings, (ii) coordinate all pre-marketing activity, (iii) coordinate roadshow logistics, (iv) coordinate the final determination of the interest rate to be recommended in connection with the Exit Financing, (v) coordinate the final allocation of any commitments or notes issued in connection with the Exit Financing, (vi) if applicable, act as billing and delivery agent and (vii) if applicable, act as stabilization agent.

(e)      Our engagement hereunder, and our right to act in respect of the Exit Financing, is on an exclusive basis. During the term of this Engagement Letter (which shall continue until terminated pursuant to Section 9), you and your agents and representatives will not approach, initiate, solicit or enter into any discussions or negotiations with or mandate or appoint any bank or financial institution or other person or entity to arrange or participate in any Exit Financing, including, without limitation, through the issuance, offering or sale of any debt securities (whether or not similar to the Exit Financing) to, or the incurrence of loans from, any third parties, in each case except through Barclays or its designated affiliates. Notwithstanding anything herein to the contrary, to the extent the City violates this Section 1(e), Barclays' sole and exclusive remedy is the fee provided for in Section 6(c) hereof.

(f)      Notwithstanding any other provision of this Engagement Letter, you acknowledge that Barclays will not render any tax, accounting, legal or regulatory advice in connection with any Exit Financing, and you acknowledge that you will consult with and rely on your own advisors regarding those matters.

2.     Cooperation

(a)      In connection with the Exit Financing, the City will co-operate fully with Barclays and its counsel in connection with, and cause its agents, representatives and advisors to be reasonably available for, due diligence and drafting meetings and make available to Barclays any other documentation Barclays may reasonably request in respect of the Exit Financing, subject to applicable laws and regulations governing the provision and disclosure of such information.

(b)      In anticipation of the final sale of the Exit Notes to Barclays in respect of a distribution subject to Paragraph (b) of Securities and Exchange Commission Rule 15c2-12, as amended ("**Rule 15c2-12**"), but only if Rule 15c2-12 is applicable to such offering and sale, the City shall prepare a preliminary official statement (the "**Preliminary Official Statement**"), in the form required by then-current market

- 2 -

[[3430711]]

DTPPF00012974

practice and in order to comply with all securities and state laws requirements at the time of the sale date and the delivery date of the Exit Notes. The City shall, by no later than the date required by then-current market practice or securities or state law requirements (i) deliver to Barclays, in such manner as Barclays and its counsel shall reasonably request, a sufficient number of copies of the Preliminary Official Statement in "final" form as required by Paragraph (b)(1) of Rule 15c2-12. The City shall deliver, or shall cause to be delivered, to Barclays, at or prior to the delivery date of the Exit Notes, a sufficient number of copies of the final Official Statement in substantially the form of the Preliminary Official Statement with only such changes and insertions therein from the Preliminary Official Statement as shall have been approved by Barclays, to enable Barclays to comply with Rule 15c2-12. The City will not be required to provide any "10b-5 representations" with respect to the Preliminary Official Statement, but shall only be required to deem the Preliminary Official Statement final in accordance with the terms of Rule 10b-5. For the avoidance of doubt, the City shall be required to provide customary "10b-5 representations" with respect to the final Official Statement.

(c)    To the extent required by law, the City will enter into one or more agreements or other legally binding continuing disclosure obligations for the benefit of the holders of the Exit Notes, obligating the City to provide secondary market disclosure as required by Rule 15c2-12.

(d)    The City will furnish such information, will execute and deliver such instruments and documents and will take such other action in cooperation with Barclays as Barclays may reasonably request at no cost to the City to: (i) qualify the Exit Notes for offer and sale under the "Blue Sky" or other securities laws and regulations of such states and other jurisdictions of the United States of America as Barclays may (in its sole discretion) designate; (ii) determine the eligibility of the Exit Notes for investment under the laws of states and other jurisdictions as Barclays may (in its discretion upon consultation with, and agreement of the City) designate, and to provide for the continuance of such qualifications or exemptions in effect for so long as required for distribution of Exit Notes; and (iii) allow Barclays to sell the Exit Notes, each in accordance with in accordance with market practice and securities and state law at such time.

(e)    The City shall engage nationally recognized bond counsel ("Bond Counsel") and Bond Counsel shall provide, at closing, an opinion, reasonably acceptable to Barclays, with respect to the validity of the Exit Notes and, if applicable, the exclusion from gross income of the owners of the Exit Notes of interest payable on the Exit Notes, for federal income tax purposes and to the effect that the Exit Notes are exempt from registration under the Securities Act and the related financing documents are exempt from qualification under the Trust Indenture Act of 1939, as amended.

(f)    The City shall, to the extent required by law, properly and timely file, with the assistance of Bond Counsel, Form 8038-G with the Internal Revenue Service pursuant to Section 149(e) of the Internal Revenue Code.

-3-

[[34307111]]

DTPPF00012975

(g)    The City shall, if applicable, provide a non-arbitrage certificate or tax regulatory agreement prepared by Bond Counsel, which shall set forth the facts, estimates and circumstances sufficient to satisfy the criteria which are necessary under the Internal Revenue Code, to support the opinion of Bond Counsel that the interest on the Exit Notes is excludable from gross income to the beneficial owners thereof under the Internal Revenue Code, if such Exit Notes are issued on a tax-exempt basis.

(h)    If the Exit Notes are issued on a tax-exempt basis, the City shall make all customary covenants required by Barclays with respect to the tax-exempt status of the Exit Notes, including, without limiting the foregoing, covenants to the effect that (i) the City will not take, or omit to take, any action lawful and within its power to take, which action or omission would cause interest on any Exit Note to become subject to federal income taxes, (ii) the City will not permit any of the proceeds of the Exit Notes to be used in any manner that would cause any Exit Notes to constitute a "private activity bond" within the meaning of Section 141 of the Internal Revenue Code, (iii) the City will not permit any of the proceeds of the Exit Notes or other moneys to be invested in any manner that would cause any Exit Note to constitute an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code or a "hedge bond" within the meaning of Section 149(g) of the Internal Revenue Code and (iv) the City will comply with the provisions of Section 148(f) of the Internal Revenue Code relating to the rebate of certain investment earnings at periodic intervals to the United States of America.

(i)    Documentation in respect of the Exit Financing will contain such conditions precedent, representations, warranties, events of default and other terms and conditions as may be agreed among the parties, and which are customary for transactions of this nature.

(j)    The City shall provide such additional legal opinions, instruments and other documents as Bond Counsel, Barclays or Barclays's counsel may reasonably request in order to conform to then-current market practice, or to satisfy Barclays's internal policies or to comply with all securities, tax and state laws requirements and all other laws, rules and regulations applicable to a public offering of this type.

3.    <u>Clear Market</u>

You agree that you will ensure that no mandate or authorization to arrange any Exit Financing in the capital or financial markets shall be awarded to any financial institution or group of financial institutions other than to Barclays in accordance with this Engagement Letter. Notwithstanding anything herein to the contrary, to the extent the City violates this Section 3, Barclays' sole and exclusive remedy is the fee provided for in Section 6(c) hereof.

4.    <u>No Commitment</u>

(a)    Barclays shall not be obliged by this Engagement Letter to underwrite, purchase, syndicate or place the Exit Notes or any other debt or provide any other financing. If an offering of Exit Notes is undertaken, or any other debt financing is arranged, the

- 4 -

[[3430711]]

DTPPF00012976

contractual arrangements will be reflected in one or more underwriting, purchase, credit or other agreements between the City and the parties thereto (each, a "**Financing Agreement**"). You acknowledge that Barclays will have no obligation to buy or place the Exit Notes or to arrange or participate in the making of any other financing available, in each case, except upon signing of such definitive agreements.

(b)     The execution of any Financing Agreement will be subject, in the complete discretion of Barclays, to, among other things, (i) satisfactory completion of a due diligence review, (ii) the receipt of all necessary internal and external approvals (including internal commitment committee approval), (iii) market conditions which, in Barclays's judgment, are satisfactory, and (iv) compliance by the City with this Engagement Letter and such definitive agreements. Each Financing Agreement will be consistent with this Engagement Letter to the extent permitted by law and otherwise will include the final terms of the financing, including the transaction size, structure and pricing terms, as well as other reasonable and customary terms and conditions agreed to by the City, including provisions relating to indemnity, conditions precedent for the agreement to become effective and certain termination events. The provisions of this Section 4(b) shall remain effective until a Financing Agreement is executed and thereafter this Section 4(b) shall be superseded by such Financing Agreement to the extent provided for therein.

5.     <u>Conflicts of Interest</u>

You acknowledge that Barclays is engaged in securities trading and brokerage activities, as well as providing investment banking and financial advisory services. In the ordinary course of trading and brokerage activities and the production of research, Barclays and its affiliates may at any time hold positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt securities of entities that may be involved in the transactions contemplated hereby. You acknowledge and agree that Barclays may be prevented, by reason of law, duties of confidentiality owed to other persons, the rules of any regulatory authority or Barclays's internal controls, from using or disclosing to you any information known to Barclays in connection with this Engagement Letter or the transactions contemplated hereby. You agree, so as expressly to override any duties, obligations or restrictions which would otherwise be implied by law or regulation, that in carrying out this Engagement Letter, Barclays will not be required to have regard to or rely on any material information from other clients which is confidential which may be relevant to you or any material information obtained by Barclays while acting for another client which has interests which conflict with your interests in relation to the transactions contemplated hereby.

6.     <u>Fees; Expenses</u>

(a)     You agree to pay to Barclays an aggregate underwriting discount, placement fee, initial purchaser's discount or arrangement fee with respect to the Exit Financing (the "**Underwriting Spread**") equal to (i) in the event the Exit Financing receives at least one investment grade public rating from either Moody's Investors Service or Standard & Poor's, 0.50% of the aggregate principal amount of the Exit Financing and (ii)

- 5 -

[[3430711]]

DTPPF00012977

EEPK 804-005

otherwise, 0.75% of the aggregate principal amount of the Exit Financing, in each case to be deducted from the gross proceeds thereof.

(b) In addition to the Underwriting Spread, whether or not an Exit Financing is completed or any financing is arranged, you shall pay all reasonable and documented out-of-pocket costs and expenses of Barclays, if any, in connection with the Exit Financing, including the reasonable fees, expenses and disbursements of legal counsel. You agree that you shall be responsible for all your own legal, accounting and other agents' or advisors' fees and costs, including all other expenses related to the transactions contemplated hereby.

(c) In the event that you or any person on behalf of you completes an Exit Financing or any bond, note, bank, bridge or other syndicated credit or other financing in lieu of the Exit Financing (collectively, the **"Alternative Financing"**) the proceeds of which are to be used in whole or in part to repay debt incurred during the Bankruptcy Case (including, without limitation, the Post-Petition Facility) and/or pay other debt and claims outstanding at the time the City exits the Bankruptcy Case, in each case, without providing Barclays the right to provide, arrange, place or underwrite such Exit Financing or Alternative Financing, then you agree, unless Barclays has terminated this Engagement Letter or breached its obligation to provide the Exit Financing on the terms set forth herein, to pay to Barclays an amount equal to 0.75% of the aggregate outstanding amount of the Post-Petition Facility immediately prior to the time the City exits the Bankruptcy Case, which payment will be made on the date of the closing of such Exit Financing or Alternative Financing from the proceeds of thereof.

(d) To the extent applicable, all amounts payable hereunder are exclusive of value-added tax or any similar taxes (**"VAT"**). All amounts charged or required to be reimbursed hereunder will be invoiced together with VAT, where required, and such VAT shall be for your account. In addition, all such amounts shall be paid free and clear of, and without any deduction or withholding for or on account of, any current or future taxes, levies, imposts, duties, charges or other deductions or withholdings levied in any jurisdiction from or through which payment is made or where the payer is located unless such deduction or withholding is required by applicable law, in which event, you agree to pay additional amounts so that the persons entitled to such payments will receive the amount that such persons would otherwise have received but for such deduction or withholding.

7.  Information

(a) You agree to use your best efforts, to the extent permitted by law, to (a) furnish or cause to be furnished to Barclays such information as Barclays may reasonably request for inclusion in any document to be used in connection with the Exit Financing (all such information so furnished being the **"Information"**), (b) provide all information to Barclays and its advisors as Barclays shall, and such advisors shall, reasonably request in connection with legal and business due diligence, and (c) furnish or cause to be furnished to Barclays all information concerning the transactions contemplated hereby and the operations and affairs of the City which is,

- 6 -

[[3430711]]

DTPPF00012978

in the opinion of Barclays, material to the proper performance under this Engagement Letter and all such further information as Barclays may reasonably request. You recognize and confirm that Barclays (a) will rely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Engagement Letter without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and (c) will not make an appraisal of any assets or liabilities of the City. You will promptly advise Barclays in writing if you become aware that any Information previously provided has become inaccurate or misleading in any material respect or is required to be updated in any material respect.

(b)     Barclays may share any Information and any other information or matters relating to you and the transactions contemplated hereby with any of their affiliates, and any such affiliate may likewise share information relating to you and the transactions contemplated hereby with Barclays, in each case, on a confidential and need-to-know basis in connection with the transactions contemplated hereby.

8.     Indemnity

(a)     You agree to indemnify and hold harmless Barclays (in each case, for itself and for each Indemnified Party) and its affiliates and their respective directors, officers, employees, agents and controlling persons (Barclays and each such person being an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses whatsoever, joint or several, to which any such Indemnified Party may become subject caused by, relating to or arising out of any untrue statement or alleged untrue statement of a material fact contained in the final Official Statement, furnished or made available by you or your agents or representatives or the omission or the alleged omission to state therein a material fact necessary in order to make the statements therein not misleading, in the light of the circumstances under which they were made; provided, however, that the City will not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of or is based upon an untrue statement or omission or alleged untrue statement or omission made in the Official Statement either (a) in reliance upon and in conformity with written information supplied to the City by Barclays specifically for inclusion therein, unless the City has independent knowledge as to the truth of such written information, or (b) contained under the captions "BOOK-ENTRY ONLY SYSTEM," "TAX EXEMPTION," "RATINGS," or "UNDERWRITING" or similarly titled sections except to the extent that information under such captions was based upon information supplied by, or solely within the independent knowledge of, the City, and will reimburse each Indemnified Party to the extent permitted by law for all expenses (including counsel fees and expenses) as they are incurred by an Indemnified Party in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto and whether or not such claim, action or proceeding is initiated or brought by or on behalf of the City and whether or not the City is a party thereto. You shall not be liable to any Indemnified Party under clause (ii) of the foregoing indemnification provision to the extent that any loss, claims, damage, liability or expense which is determined by a non-

- 7 -

[3430711]

DTPPF00012979

EEPK 604-007

appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's willful misconduct or gross negligence. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the City or any of its agents or representatives related to or arising out of the appointment of Barclays pursuant to, or the performance by Barclays of the services contemplated by, this Engagement Letter except to the extent that a non-appealable judgment of a court of competent jurisdiction determines that any loss, claim, damage or liability has resulted from Barclays's willful misconduct or negligence, including, without limitation, any material omission or misstatement provided by Barclays provided by it to the City for inclusion into the final Official Statement. In no event shall any Indemnified Party be liable for consequential damages which may be alleged to arise out of or in connection with this Engagement Letter or the transactions contemplated hereby or relating or in any way arising from any proposed or actual use of the proceeds from the Exit Financing or any related matter.

(b) You agree to notify Barclays promptly after becoming aware of the assertion against you or any of your agents or representatives, or after receipt of notice of the assertion against any other person, of any claim or the commencement of any such action or proceeding relating to any transaction contemplated by this Engagement Letter or its engagement hereunder.

(c) You agree that, without Barclays's prior written consent, you will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which (i) Barclays or any other Indemnified Party is an actual or potential party to such claim, action or proceeding or (ii) indemnification could be sought under the indemnification provision of this Engagement Letter (whether or not Barclays or any other Indemnified Party is an actual or potential party to such claim, action or proceeding) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding and does not include a statement as to an admission of fault, culpability or failure to act by or on behalf of any Indemnified Party. Except as set forth above, you further agree that you have no right to settle, compromise, negotiate, consent, make any representation or do anything on behalf of Barclays in any pending or threatened claim, action or proceeding.

(d) Neither Barclays nor any of its affiliates shall be liable hereunder for any action, failure to act or breach of this Engagement Letter by any person other than itself and nothing in this Engagement Letter or the nature of our services shall be deemed to create a fiduciary or agency relationship between Barclays or its affiliates, on the one hand, and the City or any of its agents or representatives, on the other hand. Furthermore, you agree that you will not institute, support and participate in claims in respect of this Engagement Letter brought personally against any employee, partner, servant or agent of Barclays.

- 8 -

[3430711]

DTPPF00012980

9. Termination

This Engagement Letter shall terminate on the closing of an Exit Financing or an Alternative Financing. This Engagement Letter may be terminated at any time by Barclays upon at least three business days' prior written notice thereof to that effect. The provisions contained herein relating to confidentiality, the payment of fees, any accrued rights and liabilities and indemnification will survive any such termination.

10. Miscellaneous

(a) You acknowledge and agree that Barclays has been retained to act for the City to the extent provided herein.

(b) This Engagement Letter may not be assigned by you without the prior written consent of Barclays.

(c) You agree that this Engagement Letter including, without limitation, any advice rendered hereunder, is for your confidential use only and will not be disclosed by you to any person other than to your agents, representatives, officers, directors and advisors in connection with the Exit Financing on a confidential and "need to know" basis, except that, following your acceptance hereof, and after providing prior written notice to Barclays and with appropriate redactions as reasonably requested by Barclays, you may make such public disclosures of the terms and conditions hereof as you are required by law, court of law (including the Bankruptcy Court) or legal or regulatory process to make (including as required under Michigan P.A. 436 or Section 36a of the Michigan Home Rule City Act). You agree that you will permit Barclays to review and approve any reference to Barclays contained in any press release, filing or similar public disclosure made in connection herewith or any such press release, filing or public disclosure required to be reviewed and/or approved by Barclays under any applicable law or regulation prior to public release. You acknowledge that Barclays may, at its option, place an announcement in such newspapers and periodicals as it may choose describing its role in connection with the Exit Financing.

(d) This Engagement Letter shall be governed by, and construed in accordance with, the laws of the State of Michigan.

(e) This Engagement Letter is issued for your benefit only and no other person or entity (other than the Indemnified Persons) may rely hereon.

(f) Each of the Engagement Parties hereby irrevocably and unconditionally:

(i) submits, for itself and its property, (a) during the pendency of the Bankruptcy Case, to the exclusive jurisdiction of the Bankruptcy Court and (b) after the Bankruptcy Case has been closed, to the non-exclusive jurisdiction of (1) the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and (2) the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan and, in each case of the foregoing, any appellate court from any

- 9 -

[[3430711]]

DTPPF00012981

EEPK 804-009

such court, in any action, suit, proceeding or claim arising out of or relating to this Engagement Letter or the transactions contemplated hereby, the performance of services contemplated hereunder, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action, suit, proceeding or claim may be heard and determined in such court; provided that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction,

    (ii)    waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any action, suit, proceeding or claim arising out of or relating to this Engagement Letter, the transactions contemplated hereby or the performance of services contemplated hereunder in any such court,

    (iii)    waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of any such action, suit, proceeding or claim in any such court,

    (iv)    agrees to commence any such action, suit, proceeding or claim in such courts, as applicable and

    (v)    agrees that service of any process, summons, notice or document by registered mail addressed to the City or Barclays, as applicable, shall be effective service of process for any such action, suit, proceeding or claim brought in any such court.

(g)    You agree, on behalf of yourself and your agents and representatives, that the foregoing provisions of Section 10(f) above shall also apply to your agents and representatives to the same extent as to you, and Barclays's obligations hereunder are being made in reliance on the foregoing.

(h)    **EACH OF THE ENGAGEMENT PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, SUIT, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY HERETO ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO IN THIS ENGAGEMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER.**

(i)    If any term, provision, covenant or restriction in this Engagement Letter is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. You and Barclays shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid and enforceable provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

[3430711]]

DTPPF00012982

(j)     This Engagement Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this letter by facsimile transmission shall be as effective as delivery of a manually signed counterpart hereof.

*[The remainder of this page intentionally left blank]*

[[3430711]]

DTPPF00012983

EEPK 804-011

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Barclays a duplicate copy of this Engagement Letter enclosed herewith.

Very truly yours,

BARCLAYS CAPITAL INC.

by

Name: John Gerbino
Title:  Managing Director

Accepted and agreed to as of
the date first written above:

THE CITY OF DETROIT, MICHIGAN

By

Name:  KEVYN D. ORR
Title:  EMERGENCY MANAGER

[[3430711]]

DTPPF00012984

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



In re:

City of Detroit, Michigan,

Debtor.

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

_____/

Notice of Filing by Detroit City Council of
Resolution Regarding The Emergency Manager's
Post-Petition Financing Proposal

Now Comes the Detroit City Council and hereby gives notice of the adoption of the

attached Resolution Regarding The Emergency Manager's Post-Petition Financing Proposal, and

its filing with this Court.

October 25, 2013

By:  Saunteel Jenkins, President
Detroit City Council

EEPK
Exhibit
805

# TRUE COPY CERTIFICATE

Form C of D—16-CR

STATE OF MICHIGAN,) ss.

    City of Detroit

### CITY CLERK'S OFFICE, DETROIT

I,      *Janice M. Winfrey*      , City Clerk of the City of Detroit, in said

State, do hereby certify that the annexed paper is a TRUE COPY OF    **RESOLUTION**

adopted (passed) by the City Council at session of

                  October 25,               20 13

and approved by Mayor

                                      20

as appears from the Journal of said City Council in the office of the City Clerk of Detroit, aforesaid; that I have compared the same with the original, and the same is a correct transcript therefrom, and of the whole of such original.

         In Witness Whereof, I have hereunto set my hand and affixed the corporate seal of said City, at Detroit, this_____ 25th

day of _____ October _____ A.D. 20 13

                                       CITY CLERK

**A RESOLUTION BY COUNCIL MEMBER** _____

## RESOLUTION REGARDING THE EMERGENCY MANAGER'S
## POST PETITION FINANCING PROPOSAL

**WHEREAS**     On October 11, 2013, the Emergency Manager Kevyn Orr (EM) filed with the City Clerk for transmission to the City Council *Order No. 17 – Approval of Post-Petition Financing* for the issuance of Financial Recovery Bonds (Secured Financing) pursuant to Sec. 36a of the Home Rule City Act, 279 PA of 1909, as part of the EM's ongoing restructuring and settlement strategies being advanced through the City's Chapter 9 bankruptcy proceedings, *In Re City of Detroit*, United States Bankruptcy Court for the Eastern District of Michigan, Case No. 13-53846. More specifically, the financing from the proposed transaction would refinance the interest rate Swap Agreements at 75% to 82% of their purported value and include additional financing to provide the City of Detroit with funds to use for City service improvement projects; and

**WHEREAS**     The proposed Debtor-in-Possession Financing transaction is an extremely complex deal on a number of fronts that does not seem to be in the best interest of the City.   The key terms include a maximum principal aggregate amount of $350 million dollars at a floating interest rate with a maturity date no later than two and one half years from the date of issuance, although it is quite possible that the loans would mature as early as November 2014.   Essentially, if the proposed transaction is consummated the City will be taking a fixed rate loan and swapping it for a variable rate loan putting the City in the same predicament that the original Swaps were supposed to cure, and seems to primarily benefit the two Swap counterparties Bank of America and UBS; and

**WHEREAS**     It cannot be emphasized enough that this lending is of a very temporal nature; the maturity date of the loans is estimated by the Emergency Manager to be some time between November 2014 and May 2016. There is no guarantee that replacement funding will be available by this lender or any other lender when these loans mature in as little as one year placing the City into a very foreseeable default position triggering onerous default penalty provisions; and

**WHEREAS**     Miller Buckfire has indicated that the City will save approximately $35M per year in financing costs by accepting this deal; however, these savings are achieved by making interest only payments on these new loans. The City's underlying principal debt will not decrease under this proposal; rather, it is a mere stop gap measure until permanent financing is found; and

**WHEREAS**     It has been indicated that the impetus for this transaction is to ensure the continued flow of casino tax revenues to the City throughout the bankruptcy process; however, this seems to disregard Judge Rhodes' order

that essentially accomplished the same thing by providing that the casino revenue is the property of the bankruptcy estate and therefore subject to the automatic stay; and

**WHEREAS**      This Post-Petition financing appears to be an attempt to keep the Swaps out of the bankruptcy proceeding instead of challenging the Swaps counterparties' tenuous status as secured creditors. The counterparties' senior creditor status was achieved by pledging the casino wagering taxes to collateralize the underlying Swap agreements. According to MCL 432.212(2), the use of casino wagering taxes for such a pledge appears impermissible. Rather than seeking a declaration of this position by the Court, this deal would transform a soft liability into a firm liability at a time in the interest rate cycle when the Swap liability could actually start to decline; and

**WHEREAS**      Not unlike the Swap Agreements that have been universally recognized as a bad deal for the City, Barclays is requiring the City to pledge its major revenue in order to secure this transaction. The City will have to pledge not only its casino wagering tax revenue but also its income tax revenue. These are the City's two most stable general fund revenue sources. Barclays is also requiring prepayment of any asset monetization net proceeds over $10M. This would give Barclays too much power and control over the City's revenues and future and limits the City's ability to negotiate or resolve other claims in bankruptcy; and

**WHEREAS**      Municipal Market Advisors support the thought that proposed financing is more advantageous to the financiers. They indicate that the loans seem to be "a very good deal for the lender and the swap counterparties but less so for the [C]ity's unsecured creditors and its residents. The seeming lack of a tangible recovery plan that improves Detroit's revenues over the period of the loans renders us skeptical about the [C]ity's ability to repay an amount of this magnitude in a short time frame without causing additional stress to the detriment of city residents and unsecured creditors that may have their recoveries tied to the [C]ity's financial performance."[1]; and

**WHEREAS**      The default provisions within the proposed agreement are very aggressive and easily triggered. The default provisions are broad and include the following: the agreement calls for the City to remain under some level of state control, *i.e.*, emergency manager, consent agreement, or transition advisory board. Additionally, a mere assertion by any person or entity acting on behalf of or having jurisdiction over the City that any Quality of Life loan is not binding, would trigger a default; and

**WHEREAS**      The $350M Post-Petition Financing includes a Quality of Life Loan; these newly borrowed funds are proposed to be used to make certain unspecified improvements in City government. From the information provided thus far, it appears that none of the proceeds will be used to create new

---

[1] *Bond Buyer*, October 21, 2013, "Detroit Council Rejects DIP Loan"

revenue. If the City is ever to achieve a stronger financial position, strengthening revenues and revenue collection under the City's control is key. Additional revenues will improve the quality of life for citizens as it will provide funds for City services. It is difficult without additional information to determine whether the use of these funds would be prudent investments. Additionally, it would be unwise to incur more debt to facilitate the payment of costly consultants; and

WHEREAS
Pursuant to Sec. 19 of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, City Council had the authority to approve or disapprove this proposed transaction within ten (10) days from the date of submission by the EM, or by October 21, 2013. If Council votes to disapprove, it must submit an alternative proposal to the local emergency financial assistance loan board that would yield substantially the same financial result for the City as the EM's proposal within seven (7) days of its disapproval. If Council does not act, within the ten (10) day timeframe, the EM's proposed transaction is considered approved under the relevant statute; and

WHEREAS
Upon receipt of the proposal, City Council, in addition to its own individualized study of the transaction, requested its Legislative Policy Division (LPD) to review the documents related to the proposed transaction. LPD immediately consulted with the City's financial and legal consulting firms principally responsible for crafting the transactional documents on the City's behalf, Miller Buckfire and Jones Day. Since the beginning of LPD's review, numerous questions have been submitted to the consultants and although some information has been provided, a host of uncertainties and unanswered questions remain; and many of these questions simply cannot be answered adequately within the short window allotted for City Council's consideration under the aforementioned statute. Additionally, many critical issues remain unresolved until decisions by the Bankruptcy Court or other courts are made; and

WHEREAS
Despite Council's diligent efforts, the complexities of the proposed transaction coupled with its uniqueness (to date the single largest municipal bankruptcy filed in the United States), and the precedent setting ramifications of decisions related to this bankruptcy financing instrument, the lack of available independent subject matter experts in municipal financing arrangements of this type to properly vet the transaction, combine to make it impractical to meet the compressed statutory deadline in any competent, meaningful way; and

WHEREAS
In addition to not being able to properly vet the proposed transaction given the information provided, the abbreviated timeframe also constrains Council's authority to propose a reasonable or credible alternate proposal under MCL 141.1559(2); and

WHEREAS
Based on the foregoing information, it appears that the deal being brokered is being done in order to set a precedent for how municipal

EEPK 805 005

bankruptcies work to facilitate future bankruptcies in other cities rather than to broker the best deal for the City of Detroit, thus putting the interests of lenders before the interests of the City and its residents. The goal seems to be to ensure the protection of the lenders at the detriment of all other interested parties. By settling all claims against the counterparties, the City would surrender any ability to challenge the legality of any of the actions taken regarding the original Swap Agreement, as well as any ability to challenge the City's receivership status, the counterparties' creditor status or the appropriateness of the pledging of revenues; and

**WHEREAS**     The City Council has received an alternative to the proposed Post-Petition Financing. The proposal attempted to improve upon some of the terms of the proposal proffered by the Emergency Manager. The untimely receipt of the proposal, however, does not allow City Council to obtain the expertise necessary to properly vet the alternative proposal. The seven (7) day limitation created by P.A. 436 of 2012 places an unrealistic time frame in which to solicit and consider a counteroffer to a proposal that took months to create. **NOW THEREFORE BE IT**

**RESOLVED**    That the Detroit City Council is in receipt of *Order No. 17 – Approval of Post-petition Financing* for the issuance of Financial Recovery Bonds (Secured Financing) which has triggered the provisions of Sec. 19 of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, granting City Council the authority to vote on the proposed transaction; and **BE IT FURTHER**

**RESOLVED**    If obtained, it is strongly urged that any funds from the Quality of Life Loan be used to strengthen revenues and revenue collections by improving the collection systems for income tax, property tax and the property assessment. Hardware improvements as well as staffing level increases in the Finance Department and the Law Department will send a message to non-payers that not paying what is owed is no longer an option; and **BE IT FURTHER**

**RESOLVED**    That the Detroit City Council has voted to disapprove Mr. Orr's proposed transaction and would ask that Judge Rhodes determine whether counterparties are indeed secured creditors in light of the Michigan statute that prohibits the use of wagering taxes in transactions collateralizing swap agreements and whether the instant settlement with the counterparties are in the best interest of the City in light of surrounding circumstances as discussed above; and **BE IT FINALLY**

**RESOLVED**    That a copy of this resolution be forwarded to Judge Steven Rhodes, Governor Rick Snyder, State of Michigan Department of Treasury, Emergency Manager Kevyn Orr, Municipal Loan Board and Mayor Dave Bing.

October 25, 2013

EEPK 805-007

From: "Doak, James" <james.doak@millerbuckfire.com>
Sent: 8/30/2013 8:12:13 PM
To: "'Mendelsohn, Bruce'" <Bruce.Mendelsohn@gs.com>
CC: "Corio, Norma" <norma.corio@millerbuckfire.com>;"Haggard, Kevin"
           <kevin.haggard@millerbuckfire.com>;"Willens, Kevin" <kevin.willens@gs.com>;"Wang, Freda"
<Freda.Wang@gs.com>;"Berube, Greg" <Gregory.Berube@gs.com>;"Greene, Steven"
<Steven.Greene@gs.com>;"Utz, David" <David.Utz@gs.com>;"Marken, Sanjay"
<sanjay.marken@millerbuckfire.com>;"Herman, Kyle"    <kyle.herman@millerbuckfire.com>;"Fea, Vincent"
        <vincent.fea@millerbuckfire.com>;David A Hall <dahall@jonesday.com>;"Brad B. Erens"
<bberens@JonesDay.com>;Timothy Hoffmann <thoffmann@JonesDay.com>
Subject: City of Detroit RFP

Hold off for now on the due diligence.


We have a data room and there's a liquidity piece under development.




From: Mendelsohn, Bruce [mailto:Bruce.Mendelsohn@gs.com]
Sent: Friday, August 30, 2013 3:37 PM
To: Doak, James
Cc: Corio, Norma; Haggard, Kevin; Willens, Kevin; Wang, Freda; Berube, Greg;
Greene, Steven; Utz, David
Subject: Re: City of Detroit RFP


Jim, thank you for sending this information over. We have begun our work and
are far along in clearing our internal conflicts system. Is there a data room
that you are planning on making available, or should we provide a list of
diligence questions? Thanks,


From: Doak, James [mailto:james.doak@millerbuckfire.com]
Sent: Thursday, August 29, 2013 06:32 PM
To: Mendelsohn, Bruce [IBD]
Cc: Corio, Norma <norma.corio@millerbuckfire.com>; Haggard, Kevin
<kevin.haggard@millerbuckfire.com>
Subject: City of Detroit RFP


Pursuant to your non-disclosure agreement with the City of Detroit (the
"City"), attached please find materials related to a potential post-petition
financing ("Financing") for the City.


We have attached:

An introductory letter describing our process

A model term sheet providing potential terms for the Financing

The City's swap forbearance agreement

We anticipate circulating a liquidity forecast incorporating the Financing, use of proceeds and a repayment scenario, early next week.

Thank you in advance for your efforts.

The Miller Buckfire Team

James Doak

Managing Director

Miller Buckfire | A Stifel Company

................................................................................

Direct: +1.212.895.1829 | Fax: +1.212.895.1835

E-mail: james.doak@millerbuckfire.com | www.millerbuckfire.com

................................................................................

601 Lexington Avenue, 22nd Floor | New York, NY 10022

Disclaimer: The information contained in this email message is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us and destroy the original message. Thank you

Goldman Sachs is not acting as a municipal advisor and this message and any opinions, views or information contained herein are not intended to be, and do not constitute, "advice" within the meaning of Section 15B of the Exchange Act of 1934. See the http://www.gs.com/disclaimer/afg/ for important information regarding this message and your reliance on information contained in it. This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. See the http://www.gs.com/disclaimer/email/ for further information on confidentiality and the risks inherent in electronic communication.



COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1100
DETROIT, MICHIGAN 48226
PHONE: 313•224•6260 TTY:311
FAX: 313•224•2827
WWW.DETROITMI.GOV

CITY OF DETROIT
BUDGET DEPARTMENT
ADMINISTRATION

RECEIVED

TO:    Kevyn Orr, Emergency Manager

FROM:   Brent Hartzell, Interim Budget Director

DATE:   October 24, 2013

RE:   **Request for Amendment to the FY 2014 Budget of the City of Detroit
(with appropriation revisions in consultation with Ernst & Young)**

At your direction, debt service appropriations for pension obligation certificates and limited tax general obligation debt for which principal and interest are not being remitted during the Chapter 9 bankruptcy filing are to be reallocated for general operational restructuring purposes. These debts include pension obligation certificates and several obligations backed by limited tax general obligation revenues.

Accordingly, pursuant to your authority under Emergency Order 12 and section 12(1)(b) of Michigan Public Act 436 of 2012, the Budget Department requests that you amend the City's FY 2014 Budget to shift $95,686,548 from various appropriations in the General Fund (see attached resolution) to the general restructuring account (Appropriation 13224). A subsequent amendment will reallocate authority within grant and enterprise funds to the extent necessary. Once decisions are made in placing specific authority within designated agencies, reallocation amendments from the restructuring account will also be required.

Confirmation of your intent and approval of this reallocation are hereby requested.

cc: Shani Penn, Chief of Staff to the Emergency Manager
    Sonya Mays, Senior Advisor to the Emergency Manager
    Gary Brown, Chief Operating Officer
    John Naglick, Finance Director and Acting Chief Financial Officer
    Portia Roberson, Corporation Counsel
    City Council Members
    Irvin Corley, City Council Legislative Policy Division
    Adam Hollier, Legislative Liaison, Mayor's Office

**BY THE EMERGENCY MANAGER:**

**RESOLVED,** pursuant to Emergency Order 12 and section 12(1)(b) of Michigan Public Act 436 of 2012 and to ensure legal authorization of additional costs for restructuring activities, that the FY 2014 Budget of the City of Detroit be and is hereby amended as follows:

FROM LTGO-SERVICED INDEBTEDNESS:

| | |
|---|---:|
| Decrease Appropriation No. 00852, Claims Fund (Insurance Premium) | $ 13,630,500 |
| Decrease Appropriation No. 00993, DDA Bonds 1997 | $ 1,369,400 |
| Decrease Appropriation No. 12129, 800 MHz Project Debt Service | $ 34,953,272 |

FROM PENSION OBLIGATION CERTIFICATES:

| | |
|---|---:|
| Decrease Appropriation No. 00024, Central Data Processing (ITS) | $ 314,898 |
| Decrease Appropriation No. 00028, Administration (DPW) | $ 48,199 |
| Decrease Appropriation No. 00058, Administration (Finance) | $ 80,924 |
| Decrease Appropriation No. 00060, Assessments Division (Finance) | $ 370,326 |
| Decrease Appropriation No. 00061, Purchasing Division (Finance) | $ 107,998 |
| Decrease Appropriation No. 00063, Treasury Division (Finance) | $ 248,405 |
| Decrease Appropriation No. 00064, Executive Mgmt. and Support (Fire) | $ 256,683 |
| Decrease Appropriation No. 00065, Ordinance Enforcement (Fire) | $ 472,482 |
| Decrease Appropriation No. 00067, Emergency Medical Services (Fire) | $ 2,223,265 |
| Decrease Appropriation No. 00068, Administration (DHWP) | $ 126,812 |
| Decrease Appropriation No. 00096, Executive Office (Mayor) | $ 264,113 |
| Decrease Appropriation No. 00102, Parking Violations Bureau (Muni. Pkg.) | $ 272,260 |
| Decrease Appropriation No. 00105, Administration (Human Resources) | $ 108,407 |
| Decrease Appropriation No. 00106, Personnel Selection (Hum. Resources) | $ 28,391 |
| Decrease Appropriation No. 00108, Labor Relations (Hum. Resources) | $ 130,266 |
| Decrease Appropriation No. 00111, Police Commission (Police) | $ 312,798 |
| Decrease Appropriation No. 00112, Police Executive (Police) | $ 729,631 |
| Decrease Appropriation No. 00115, Human Resources Bureau (Police) | $ 290,215 |
| Decrease Appropriation No. 00118, Criminal Investigation Bureau (Police) | $ 4,675,247 |
| Decrease Appropriation No. 00119, Management Services Bureau (Police) | $ 793,726 |
| Decrease Appropriation No. 00123, Administration (PLD) | $ 89,419 |
| Decrease Appropriation No. 00127, Engineering (PLD) | $ 123,781 |
| Decrease Appropriation No. 00128, Street Lighting (PLD) | $ 707,857 |
| Decrease Appropriation No. 00129, Operating Division (PLD) | $ 143,790 |
| Decrease Appropriation No. 00131, Heat and Power Production (PLD) | $ 197,200 |
| Decrease Appropriation No. 00181, Conduct of Elections (Elections) | $ 257,109 |
| Decrease Appropriation No. 00182, Investigation of Complaints (Ombuds.) | $ 66,287 |
| Decrease Appropriation No. 00183, Land Use Controls (BZA) | $ 28,274 |
| Decrease Appropriation No. 00226, Budget Dept. Operations (Budget) | $ 116,077 |
| Decrease Appropriation No. 00245, Accounts Div.-Administration (Finance) | $ 391,146 |
| Decrease Appropriation No. 00247, Accounts-City Income Tax Ops. (Finance) | $ 273,977 |
| Decrease Appropriation No. 00250, Protection of Human Rights (Hum. Rights) | $ 29,334 |
| Decrease Appropriation No. 00261, Auditing Operations (Auditor Gen.) | $ 92,231 |
| Decrease Appropriation No. 00265, City Clerk Ops. (City Clerk) | $ 97,553 |
| Decrease Appropriation No. 00269, City Legislative Functions (Council) | $ 282,263 |
| Decrease Appropriation No. 00277, Detroit Bldg. Authority (Non-Dept.) | $ 70,169 |
| Decrease Appropriation No. 00393, District Court (36th Dist. Ct.) | $ 216,825 |

| | | |
|---|---|---|
| Decrease Appropriation No. 00537, Rape Counseling Unit (Police) | $ | 23,074 |
| Decrease Appropriation No. 00715, Vehicle Mgmt. and Supply (Fire) | $ | 125,606 |
| Decrease Appropriation No. 00718, Fire Fighting Operations (Fire) | $ | 7,260,078 |
| Decrease Appropriation No. 00760, Commun. & Systems Support (Fire) | $ | 241,690 |
| Decrease Appropriation No. 00832, Dept. Accounting Operations (Finance) | $ | 116,377 |
| Decrease Appropriation No. 00833, Employee Services (Hum. Resources) | $ | 307,364 |
| Decrease Appropriation No. 00854, Hearings & Policy Dev. (Hum. Rsrcs.) | $ | 9,810 |
| Decrease Appropriation No. 00880, Police Athletic League (Police) | $ | 25,035 |
| Decrease Appropriation No. 00883, Development-City (PDD) | $ | 24,249 |
| Decrease Appropriation No. 00910, City Engineer (DPW) | $ | 66,966 |
| Decrease Appropriation No. 00922, Council President Office (Council) | $ | 7,203 |
| Decrease Appropriation No. 00923, Council Member Office 1 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00924, Council Member Office 2 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00925, Council Member Office 3 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00926, Council Member Office 4 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00927, Council Member Office 5 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00928, Council Member Office 6 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00929, Council Member Office 7 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00930, Council Member Office 8 (Council) | $ | 6,216 |
| Decrease Appropriation No. 04739, General Revenue-Non-Dept. (Non-D) | $ | 201,732 |
| Decrease Appropriation No. 09112, Enhanced E-911 (Police) | $ | 295,941 |
| Decrease Appropriation No. 10082, Operations (Police) | $ | 14,120,763 |
| Decrease Appropriation No. 10151, Casino Municipal Services (Fire) | $ | 258,904 |
| Decrease Appropriation No. 10152, Casino Municipal Services (Police) | $ | 531,685 |
| Decrease Appropriation No. 10397, Board of Ethics (Non-Dept.) | $ | 13,886 |
| Decrease Appropriation No. 11040, Administration (Police) | $ | 127,683 |
| Decrease Appropriation No. 11041, Technical Services Bureau (Police) | $ | 2,235,657 |
| Decrease Appropriation No. 11042, Legal Affairs/Training (Police) | $ | 865,209 |
| Decrease Appropriation No. 11159, Blight Violations Adjudic. (DAH) | $ | 41,333 |
| Decrease Appropriation No. 11195, Risk Management Council (Auditor Gen.) | $ | 16,695 |
| Decrease Appropriation No. 11656, Recreation Mgmt. (Recreation) | $ | 49,083 |
| Decrease Appropriation No. 11657, Busin. Ops. & Suppt. Svcs. (Recreation) | $ | 24,213 |
| Decrease Appropriation No. 11663, Recreation Operations (Recreation) | $ | 225,803 |
| Decrease Appropriation No. 11665, Belle Isle Operations (Recreation) | $ | 8,433 |
| Decrease Appropriation No. 11825, Administration (GSD) | $ | 76,777 |
| Decrease Appropriation No. 11830, Facilities & Grounds Maint. (GSD) | $ | 327,551 |
| Decrease Appropriation No. 11831, Inventory Management (GSD) | $ | 36,422 |
| Decrease Appropriation No. 12146, Business License Center (BSEE) | $ | 36,353 |
| Decrease Appropriation No. 12153, Fleet Management (GSD) | $ | 761,572 |
| Decrease Appropriation No. 12154, General Services-Street Fund (GSD) | $ | 211,958 |
| Decrease Appropriation No. 13125, Media Services/Comunic. (Non-Dept.) | $ | 49,669 |
| Decrease Appropriation No. 13152, Street Maint. Garage (GSD) | $ | 131,603 |
| Decrease Appropriation No. 13161, Environmental Affairs Dept. (BSEE) | $ | 24,618 |
| Decrease Appropriation No. 13168, Real Estate & GIS (PDD) | $ | 35,474 |
| Decrease Appropriation No. 13174, Strategic Planning/Grants (Recreation) | $ | 6,482 |
| Decrease Appropriation No. 13336, Ground Maintenance (GSD) | $ | 222,123 |
| Decrease Appropriation No. 13530, Office of the Inspector General (OIG) | $ | 79,902 |
| Decrease Appropriation No. 13532, Homeland Security Ops. (Police) | $ | 15,489 |
| Decrease Appropriation No. 13567, Animal Control (Police) | $ | 109,668 |

RSCD 1007-003

Decrease Appropriation No. 13608, Pension & Employee Benefits (Non-Dept.) $  244,371
Decrease Appropriation No. 13637, Elected Officials Compensation (Non-Dept.) $  136,725

TO GENERAL RESTRUCTURING NEEDS:
Increase Appropriation No. 13224, Restructuring Consolidation          $  95,686,548

**AND BE IT FURTHER RESOLVED;** that the Finance Director be and is hereby authorized to increase the necessary accounts and honor vouchers in accordance with the forgoing communication and regulations of the City of Detroit.

_10/25/13_

Kevyn Orr
Emergency Manager
City of Detroit

_PAC in general fund_

_pay advisers for some of the creditors_

_letter received last Friday dated Oct 24_

| | |
|---|---|
| **From:** | James Bonsall |
| **Sent:** | Wednesday, October 09, 2013 10:53 PM |
| **To:** | James Doak; Kevyn Orr |
| **Subject:** | RE: Budget |

Kevin

Spivey was about payroll. Irv was about some DIP items and brief. He wanted to tell me he is going to ask some questions of the team a) overall memo on item b) no conflicts from Jones Day (albeit worded differently), benefits of the dip. He seemed supportive.

Kind Regards

Jim

Jim Bonsall
Chief Financial Officer
City of Detroit - Mayor's Office
Coleman A. Young Municipal Center
2 Woodward Ave., Suite 1126
Detroit, Mi 48226
Phone: (313) 224-3382
Cell: (313) 815-0503
Email: bonsallj@detroitmi.gov
>>> Kevyn Orr 10/9/2013 12:26 PM >>>

Jim,

I spoke with Spivey yesterday and am meeting with him next week so I'll cover him.

I would give Irv the 40,000 foot level briefing about the DIP and refer to the June 14th presentation as far as which initiatives will be pursued with the QoL.

Kevyn


>>> "Doak, James " <james.doak@millerbuckfire.com> 10/9/2013 10:36 AM >>>
I spent about 70 minutes with Irv yesterday on the DIP.

He was attentive and engaged.

He was interested in having a better sense of what reinvestment initiatives are being planned with the QoL loan.

I am at the courthouse and could join in any discussions.


Sent from my Android phone using TouchDown (www.nitrodesk.com)

-----Original Message-----
**From:** James Bonsall [bonsallj@detroitmi.gov]
**Received:** Wednesday, 09 Oct 2013, 10:29am
**To:** Kevyn Orr [OrrK@detroitmi.gov]; Doak, James (Miller Buckfire) [james.doak@millerbuckfire.com]
**Subject:** Budget


Gents
.irv and the future chairman of council have asked to meet me after the council meeting today  irv
said wants to discuss dip. No idea what spivey wants.
Any guidance for irv?

Kind Regards

1

DTPPF00019241
RSCD 1013-001

Jim Bonsall
Chief Financial Officer
City of Detroit
Office: (313) 224-3382
Cell:     (313) 815-0503
Email: bonsallj@detroitmi.gov

Disclaimer: The information contained in this email message is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us and destroy the original message. Thank you

TEXT.htm

2

RSCD
Exhibit
1014

From: CN=David A Hall/O=JonesDay
Sent: 10/20/2013 5:21:37 PM
To:
irvin@detroitmi.gov;davidw@detroitmi.gov;spiveyan@detroitmi.gov;watsonj@detroitmi.gov;kenneth.cockrel@d
etroitmi.gov;bjones@detroitmi.gov;tatej@detroitmi.gov;jenkinssa@detroitmi.gov
CC: CN=Brad B. Erens/O=JonesDay@JonesDay;"Doak, James"
<james.doak@millerbuckfire.com>;CN=Robert J.
Graves/O=JonesDay@JonesDay;orrk@detroitmi.gov;mayss@detroitmi.gov;CN=Bruce
Bennett/O=JonesDay@JONESDAY;CN=Heather Lennox/O=JonesDay@JonesDay
BCC: CN=David A Hall/O=JonesDay
Subject: Responses to Inquiries of City Council Regarding Postpetition Financing

All,

Please find attached responses to the inquiries of City Council related to the
City's proposed postpetition financing.  Please let us know if you have further
questions.  Many thanks.

Best regards,

David

David A. Hall • Associate 77 WEST WACKER • CHICAGO, IL 60601
DIRECT 312.269.4207 • FAX 312.782.8585 • MOBILE 312.543.6678
DAHALL@JONESDAY.COM

==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege.  If
you received this e-mail in error, please delete it from your system without
copying it and notify sender by reply e-mail, so that our records can be
corrected.
==========

Attachment: CHI_1907995_3_Questions for Consultants on Detroit DIP Financing October 2013.DOCX

DTPPF00020357
RSCD 1014-001

**City Council October 16, 2013 Questions for Consultants on $350M Post-Petition Financing for Closed Session**

PRIVILEGED & CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION

1.  Are the Post Petition Financing fixed rate loans or variable interest rate loans?

> **City Response:**
>
> **They are variable rate loans.**

    a.  Why does the financing include a variable interest rate when interest rates are starting to creep upwards, thereby creating a risk that the City would eventually pay additional costs on the financing by the maturity date? This appears to be unfavorable to the City.

> **City Response:**
>
> **The Purchaser proposed a floating/variable interest rate calculated at a spread (2.5%) above a base rate of 30-day LIBOR. While 30-day LIBOR may increase, it is currently at 0.18%. It is unlikely that 30-day LIBOR will exceed the contractual floor of the base rate of 1.0% over the life of this loan.**
>
> **Banks such as the purchaser fund their loans with variable rates, so they prefer to charge variable rates. In addition, the City likely would have to pay a higher interest rate to obtain a fixed rate, particularly given the City's current credit rating.**

    b.  Wouldn't a fixed rate be better for budgeting purposes? The City may not have sufficient cash reserves to protect itself against interest rate spikes under a variable rate.

> **City Response:**
>
> **It is unlikely that over the life of this loan that cash reserves will be made insufficient by changes in interest rates.**

    c.  When the $350 M PPF takes place what will the payments be for the city? Do these payments represent interest and principal? All interest and no principal? Or possibly not even covering the interest cost so that the principal actually will be increasing in the short term (1 to 2 years)? What is included in the 10 year forecast for the repayment of the $350 M PPF and/or the final replacement debt? Or what is the repayment schedule over the life of the PPF and/or replacement financing??

> **City Response:**

1

DTPPF00020358
RSCD 1014-002

The City will make a monthly payment. These payments will represent interest. Absent an event of default, the post-petition financing does not have any scheduled principal payments until maturity. The payments will cover the full interest cost; the principal balance will not accrete. The 10-year forecast did not include the post-petition financing or the final replacement debt. The revised post-petition cash projection does include post-petition financing. The revised cash projection includes an assumption that the City repays the post-petition financing from gaming tax and income tax proceeds, beginning in late 2014. The terms of the replacement financing, including amortization/repayment provisions, have not yet been determined.

2. If SWAPs are terminated the City will have to assume the interest payment on the POCs, what is the current payment that the City will have to assume? If the POCs principal is devalued through bankruptcy to $.10 on the dollar, what interest payment would the City have to make?

    **City Response:**

    **The POCs are unsecured obligations, and, as such, are not entitled to any payments, including interest payments, during the chapter 9 proceeding. The treatment of the POCs under a plan of adjustment for the City has yet to be determined, but it currently is assumed that the POCs will receive substantially the same treatment as the City's other unsecured creditors. The City's June, 2013 proposal to creditors contemplated a plan of adjustment that provided that the City's roughly $18 billion in unsecured debt share pro rata in recovery from an approximately $2.0 billion non-recourse note with an interest rate on that note to be determined.**

3. If the POCs principal is devalued through bankruptcy to $.10 on the dollar and the SWAPs are **not** terminated, what interest payment would SWAP Counterparties have to make? Would that impact the payment the City would owe to the SWAP Counterparties? Is the SWAP Counterparties' obligation to the POC holders eliminated?

    **City Response:**

    **The POCs and SWAPs are different transactions, although they are related. If the SWAPs are not terminated, then the City will continue to owe a monthly payment to the SWAP Counterparties that fluctuates based on, among other things, interest rates and is approximately $4.2 million per month.**

4. On page 2 of the Term Sheet it indicates three potential events that cause the loans to mature. Will you please give an estimated date under each of these events.

    **City Response:**

DTPPF00020359
RSCD 1014-003

The three events that cause maturity of the loan are (a) dismissal of the chapter 9 bankruptcy case; (b) the effective date of a plan of adjustment for the City; and (c) 2-1/2 years from the closing date of the loan.

We do not expect that the chapter 9 case will be dismissed. The EM has targeted the Fall of 2014 for the effective date of a plan of adjustment for the City. The expected closing date for the loan is towards the end of this year, so 2-1/2 years would be mid-2015.

a. What happens if the City is not in a financial position to refinance the notes at time of maturity? At that point, if the City can't repay the loan on its own, it's stuck with renegotiating the financing notes with Barclays in a weaken position. Isn't there the potential, and it is a distinct possibility to occur, that the City could find itself in the position that the debt service on the $350 PPF could become $8 M per month, or $96 M per year? Which would be substantially greater than the current $50 M per year on the swaps?

City Response:

The City was able to obtain the loan on favorable terms during the chapter 9 case even though it has not legally discharged the debt it intends to discharge under a plan of adjustment. As a result, we would expect, although we cannot guaranty, that the City will be in an even stronger position to obtain a loan to refinance this loan upon its emergence from chapter 9, at a time when the City may be shedding approximately $16 billion in unsecured obligations.

5. What are the assumed interest rates expected to be when the proposed financing matures. What will the anticipated refinancing costs and terms be at that time?

City Response:

If the post-petition financing is not repaid at maturity, the financing will be in default and the interest rate can increase 2.0%. As indicated in the question 4 above, the bondholders could collect default interest and retire the debt with the remainder of the $96 million a year. With respect to the costs of refinancing the post-petition financing, an underwriter would most likely charge a placement fee or an underwriting discount consistent with market standards as part of a placement or underwriting process.

The interest rate of any refinancing will depend on prevailing interest rates and conditions in the capital markets, as well as the City's plan of adjustment, its pro forma debt levels and the terms of the replacement financing (such as duration and collateral). One of the purposes of the larger restructuring process is to reset the City's obligations to a manageable level and the City's plan of

3

DTPPF00020360
RSCD 1014-004

adjustment, which will incorporate the repayment or refinancing of the post-petition financing, must meet certain tests associated with feasibility.

6. The legality of pledging the casino revenue is currently before the bankruptcy court. Could it be more favorable for the City to wait for any ruling from Judge Rhodes on the legality of using wagering taxes for security purposes before entering into another financing deal?

**City Response:**

**It is not clear that such a strategy would be more favorable, and this strategy would introduce financial and litigation risk to the City. Moreover, the legality of the casino revenue pledge is not directly before bankruptcy court. What currently is before the bankruptcy court is a proposed compromise that, among other things, provides for a potential discounted payoff of the SWAPs based upon the allegation that the pledge of the gaming revenue to secure the SWAPs may not have been valid under state law. However, the bankruptcy court is not required, in connection with the proposed settlement, to actually rule as to whether the pledge of casino revenues was legally valid.**

**The City and its advisors considered the City's various options prior to entering into the proposed settlement. These options included, among other things, litigating whether the casino revenue pledge was invalid. Litigation is always uncertain, costly, and time consuming. If the City chose to litigate and won, the SWAPs would be unsecured obligations of the City. However, if the City litigated and lost, the SWAPs would be fully secured obligations which the City would have to satisfy in full. In addition, the SWAP counterparties have alleged that the automatic stay in the chapter 9 case does not apply to their transaction, and, if that position also were upheld, these parties could be entitled to keep all casino revenues in order to pay their debt, thereby depriving the City of a vital source of revenue and seriously jeopardizing its ability to have sufficient funds to operate. Prior to a ruling by the bankruptcy court on this issue, and potentially any appeals of that ruling, the status of the gaming revenue also would be uncertain.**

**Given these issues, the City ultimately determined that the proposed settlement with the SWAP counterparties was its best course of action.**

a. If the Judge were to rule in favor of using the wagering taxes as security, is it in the best interest of the City to terminate the SWAPs?

**City Response:**

4

**Again, the legality of the casino revenue pledge is not directly before the bankruptcy court. However, if the bankruptcy court ruled the pledge were valid, then the City would have to fully honor its obligations under the SWAP transaction.**

b. If the Judge were to rule it's illegal to use the wagering taxes as security, then the swaps become unsecured debt and the position the counterparties becomes the same as other unsecured parties. At the time would it be more for the City to renegotiate the swaps? What is the benefit to the City to proceed with this transaction prior to a Court determination that this debt may be unsecured?

**City Response:**

**Again, the legality of the casino revenue pledge is not directly before the bankruptcy court. However, if the bankruptcy court ruled the pledge were invalid, then the SWAP counterparties would be unsecured creditors in the bankruptcy case, although the SWAP obligation could continue to fluctuate based on interest rates.**

c. The term sheet indicates the financing could mature when the bankruptcy case is dismissed. What assurance do we have that the proposed financing wouldn't be issued before Judge Rhodes rules on the legality of the bankruptcy petition?

**City Response:**

**A condition precedent to the financing is that the bankruptcy court rule in favor of the City on the issue of eligibility. As a result, the financing will not close before a ruling by the bankruptcy court on the eligibility issue.**

7. On August 28, 2013, Judge Rhodes entered an order regarding casino revenues and the automatic stay. The order provides that the casino revenue is the property of the bankruptcy estate and therefore subject to the automatic stay. This has been interpreted by some to make the casino revenue available to all creditors which strips away SWAP counterparties' security interest. If this is correct, why are we treating the SWAP counterparties as secured parties?

**City Response:**

**This is not correct. The ruling does not make the casino revenue available to all creditors of the City.**

8. Let's assume that the waiting approach is adopted and it takes 6 months to get a determination on the swaps as secured or unsecured debt. At six months the city's cost would be about $25M, how much would interest rates have to increase to offset the cost of waiting the 6 months?

5

**City Response:**

**The City has determined that there is considerable risk associated with litigating the validity of the casino revenue pledge and does not intend to abandon its current legal and financial strategy.**

9. Under MCL 432.212 (2), lists the restrictions on the use of wagering taxes. Which category allows the use of wagering taxes to secure the SWAPs or the proposed financing?

**City Response:**

**With respect to the SWAPs, the SWAP counterparties have made certain legal arguments in support of the pledge of wagering taxes, which speak for themselves. In connection with the proposed post-petition financing, the City intends to rely on the federal bankruptcy code to authorize the pledge of collateral, including the wagering taxes, to the purchaser.**

10. The interest rate swaps currently are working as designed to allow the City to pay a synthetic fixed rate rather than a variable rate. Why is there such an urgent need to terminate the swaps? Why not just do debtor-in-possession financing for generating cash for the reinvestment initiatives?

**City Response:**

**The swaps are enormously expensive for the City. If the financing is approved, and the SWAPs terminated as a result, the City will save over $35 million per year in financing costs, in addition to the approximately $70 million one-time discount that the City will capture by paying off the SWAPs by the first milestone under the proposed settlement agreement.**

11. Why does page 2 of 17 of the cash flows show negative cash flows even with the Post Petition financing?

**City Response:**

**This question references the Project Piston Cash Flow Forecast - through FY 2017 (DIP Financing Scenario), dated 9/10/13 7:35 PM. Page 2 reconciles cash flow differences from the Creditors Proposal to the DIP forecast. In FY2014, the projected cash flow has been improved $57.6 million, principally because the post-petition financing is raised.**

**In FY2015, the cash flows are $94.8 million negative compared to the Creditors Proposal. The two largest reasons for the variance between the scenarios are (1) inclusion of the City's prospective OPEB spending and (2) repayment of the**

6

post-petition financing consistent with the conservative assumptions laid out in other answers herein (default interest, pay down from $8 million/month of tax revenues). For the same reasons FY2017 is comparatively negative. One should note (1) that the general fund cash balances remain positive throughout the forecast period, (2) in each year of the forecast the City is saving $50 million from having settled the Swaps and (3) at the end of FY 2017 the post-petition debt balance would be down to around $150 million.

12. Would all or a portion of the Post Petition Financing be issued on a tax exempt basis?

**City Response:**

**It is possible that the Quality of Life loan may be tax exempt. Analysis of this issue is ongoing.**

13. The term sheet attached to Mr. Orr's order says it "is a summary of certain key terms for the Swap Termination Note". Are there other "key terms" City Council should be aware of?

**City Response:**

**The primary terms of the financing are in the term sheets. It should be noted, however, that the amount of "market flex" is not in the term sheet. In addition, as part of the arrangement, the City has retained Barclays to act as an exclusive arranger for potential exit financing in connection with the City's emergence from chapter 9. However, the City is entitled not to use Barclays for such purpose, but must pay a fee as "liquidated damages" in that event.**

14. Can you explain the inconsistency we see in the Collateral section of the Term Sheet and the "Certain other Provisions" section in the use of wagering taxes as collateral?

**City Response:**

**We do not see an inconsistency.**

15. Isn't it problematic for the City moving forward if state revenue sharing, wagering taxes, and income taxes are being used as collateral at the same time for security purposes?

**City Response:**

**The City believes, after a significant market testing, that obtaining credit without a pledge of collateral would be extremely difficult and expensive. As such, the City believes that the collateral pledged for the different loans secured by these revenue streams is what has been required for the City to borrow the funds it has needed. If the City's credit rating improves, which should occur as a result of its chapter 9 proceeding, then the City will be in a better position to**

7

DTPPF00020364
RSCD 1014-008

again be able to borrow on an unsecured basis. Additionally, the City will not be prevented from using wagering and income tax revenue during the life of the post-petition financing (other than the mandatory monthly paydown following an event of default, if any).

16. Per the term sheet, why is the City indemnifying Barclays from liability when there is pending litigation regarding LIBOR manipulation?

    **City Response:**

    **We are not aware of the details of any potential litigation against Barclays that may involve the City. The indemnification by the City of Barclays relates only to the proposed transaction.**

17. Isn't there the potential, and it is a distinct possibility to occur, that the City could find itself in the position that the debt service on the $350 PPF could become $8M per month, or $96M per year? This would be substantially greater than the current $50M per year on the SWAPs.

    **City Response:**

    **The possibility would only occur if the City defaulted on the proposed loan. Additionally, even after an event of default under the postpetition financing, while the payment would be higher, the City would be reducing the principal value of the loan by $8 million per month. In the status quo, the City will continue to pay amounts close to $50 million a year in connection with the SWAPs, year after year, without reducing the City's ultimate obligations in connection therewith, until and unless short term rates rise very significantly, or the City negotiates a termination payment, likely to approach the full value of the mark-to-market liability.**

18. What are the allocations to the general fund and other funds of the swap termination or Forbearance Agreement, and this $350 Post Petition financing?

    **City Response:**

    **Each of these transactions involves, as to the City, the general fund. The City is currently analyzing specific allocation options, but use of these funds will provide support for the various operational restructuring initiatives described in the June 14th Creditor Proposal.**

19. How does this proposed financing affect the vested pensioners?

    **City Response:**

DTPPF00020365
RSCD 1014-009

There is no direct tie between the proposed financing and pensioners. However, if the City is able to obtain the financing, there will be substantial savings to the City generally. It also will permit the City to invest in its infrastructure, thereby improving the City for the potential benefit of all interested parties, including pensioners.

20. What specific projects or functions will be funded by the $140M proceeds from the Quality of Life Loan? Please provide an itemized list with estimated costs for each item.

City Response:

The City is currently analyzing specific allocation options, but use of the Quality of Life proceeds will provide support for certain of the various operational restructuring initiatives described in the June 14th Creditor Proposal.

Finally, at the closed session, it was asked whether the City could pursue only the Swap Termination Loan and not the Quality of Life Loan. The agreements with Barclays contemplate both loans and do not contemplate only one loan. In addition, it is not the intention of the City to pursue only one loan.

9

DTPPF00020366
RSCD 1014-010