UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        April 28, 2014
                Debtor.         .        10:01 a.m.
. . . . . . . . . . . . . . . .


HEARING RE. (#3954) COURT'S RULING ON MATTER TAKEN UNDER
ADVISEMENT RE. JOINT MOTION TO AMEND THE SOLICITATION
PROCEDURES ORDER FILED BY CREDITORS ASSURED GUARANTY
MUNICIPAL CORP., BERKSHIRE HATHAWAY ASSURANCE
CORPORATION, (#3943) CORRECTED MOTION (RELATED
DOCUMENT(S)); (#3932) MOTION FOR ENTRY OF AN ORDER
ESTABLISHING SUPPLEMENTAL PROCEDURES FOR SOLICITATION
AND TABULATION OF VOTES TO ACCEPT OR REJECT PLAN OF
ADJUSTMENT WITH RESPECT TO PENSION AND OPEB CLAIMS FILED
BY DEBTOR IN POSSESSION CITY OF DETROIT, MICHIGAN,
(#4202) HEARING RE. ALL FILED OBJECTIONS TO WRITTEN
DISCOVERY TO BE HELD ON 4/28/2014 AT 10:00 AM,
COURTROOM 100, U.S. COURTHOUSE, 231 W. LAFAYETTE,
DETROIT, MI  48226 (RE: FOURTH AMENDED ORDER
ESTABLISHING PROCEDURES, DEADLINES AND HEARING DATES
RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT), MATTER
(#4202) HEARING RE: FINAL APPROVAL OF THE DISCLOSURE
STATEMENT (RE. FOURTH AMENDED ORDER ESTABLISHING
PROCEDURES, DEADLINES AND HEARING DATES RELATING TO
THE DEBTOR'S PLAN OF ADJUSTMENT)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  DAVID HEIMAN
                     North Point
                     901 Lakeside Avenue
                     Cleveland, OH  44114-1190
                     (216) 586-7175

                     Jones Day
                     By:  HEATHER LENNOX
                     222 East 41st Street
                     New York, NY  10017
                     (212) 326-3837

APPEARANCES (continued):

                          Jones Day
                          By:  BRUCE BENNETT
                          555 South Flower Street, Fiftieth Floor
                          Los Angeles, CA  90071
                          (213) 243-2382

                          Jones Day
                          By:  GEOFFREY IRWIN
                          51 Louisiana Avenue, N.W.
                          Washington, D.C.  20001-2113
                          (202) 879-3768

For U.S. Bank as          Waller Lansden Dortch & Davis, LLP
Trustee for Water         By:  DAVID E. LEMKE
and Sewer Bonds:          Nashville City Center
                          511 Union Street, Suite 2700
                          Nashville, TN  37219
                          (615) 850-8655

For Assured               Chadbourne & Parke, LLP
Guaranty Municipal        By:  SAMUEL S. KOHN
Corp.:                    30 Rockefeller Plaza
                          New York, NY  10112
                          (212) 408-1060

For UAW:                  Cohen Weiss & Simon, LLP
                          By:  BABETTE CECCOTTI
                          330 West 42nd Street
                          New York, NY  10036
                          (212) 356-0227

For County of             Dechert, LLP
Macomb, Michigan:         By:  ALLAN S. BRILLIANT
                          1095 Avenue of the Americas
                          New York, NY  10036
                          (212) 698-3600

For Erste                 Ballard Spahr, LLP
Europaische               By:  VINCENT J. MARRIOTT, III
Pfandbrief-und            1735 Market Street, 51st Floor
Kommunalkreditbank        Philadelphia, PA  19103-7599
Aktiengesellschaft        (215) 864-8236
in Luxemburg, S.A.:

For the Official          Dentons US, LLP
Committee of              By:  CAROLE NEVILLE
Retirees:                 1221 Avenue of the Americas, 25th Floor
                          New York, NY  10020-1089
                          (312) 632-8390

APPEARANCES (continued):

```
For the State of     Dickinson Wright, PLLC
Michigan:            By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  ROBERT D. GORDON
General Retirement   151 South Old Woodward, Suite 200
System of Detroit,   Birmingham, MI  48009
Police and Fire      (248) 988-5882
Retirement System
of the City of
Detroit:

For Detroit Retired  Lippitt O'Keefe Gornbein, PLLC
City Employees       By:  RYAN C. PLECHA
Association,         370 East Maple Road, 3rd Floor
Retired Detroit      Birmingham, MI  48009
Police and Fire      (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  STEPHEN HACKNEY
Syncora Guarantee    300 North LaSalle
Inc., and Syncora    Chicago, IL  60654
Capital Assurance,   (312) 862-2157
Inc.:

For the Detroit      Honigman, Miller, Schwartz & Cohn, LLP
Institute of Arts    By:  ARTHUR O'REILLY
Museum:              2290 First National Building
                     660 Woodward Avenue
                     Detroit, MI  48226
                     (313) 465-7628

For the Attorney     State of Michigan
General:             Department of Attorney General
General:             By:  ERIC RESTUCCIA
                     525 W. Ottawa Street
                     Lansing, MI  48933
                     (517) 373-1124
```

```
Court Recorder:       Kristel Trionfi
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1     THE CLERK:  Court is in session.  Please be seated.

2  Case Number 13-53846, City of Detroit, Michigan.

3     THE COURT:  I'd like to start with the hearing on

4  the disclosure statement, please.

5     MR. HEIMAN:  Good morning, your Honor.  David

6  Heiman, Jones Day, on behalf of the city.  More good news

7  today.  As everyone knows, we filed our third amended plan of

8  adjustment and disclosure statement on Friday evening.  Since

9  the last hearing, we have continued our forward momentum and

10  over the past week have reached additional agreements, most

11  significantly with the Retirees' Committee.  So I want -- as

12  I did the last time, I want to be very careful about

13  characterizing agreements that still have some loose ends and

14  on noncore issues.  And counsel are here to the extent I

15  overstate anything, so I would welcome any corrections to

16  anything I say, but I'd like to, again, recount for you where

17  we believe we stand as we proceed to confirmation.

18       Again, on the financial creditors' side, we have

19  concluded our discussions or hearings on the swaps as well as

20  the UTGO creditors.  The UTGO creditors still require a

21  settlement agreement, which is in the markup stages and I'm

22  confident will be concluded in short order.

23       With respect to the retiree side of the case, we

24  have, I think, set the table for Classes 10, 11, and 12 now,

25  so let me detail that, Class 10 being PFRS.  We have

1   agreements with the retirees' association, as we reported

2   last week.  That's been converted to a more formal term

3   sheet.  We have the agreement with the pension systems, and

4   now we have the agreement on PFRS with the Retirees'

5   Committee.

6         With respect to GRS, we have the agreement with the

7   Retirees Committee, again, with some loose ends still needing

8   to be addressed.  We have an agreement with the GRS pension

9   systems also with some loose ends to be addressed.  And we

10   have now the affirmation of the coalition of unions,

11   including AFSCME, that has voted to approve the core elements

12   of the deal.  So I think we have a -- very much of a

13   consensus building on these important issues.  And we also

14   have resolved the OPEB healthcare issues that are found in

15   Class 12 in the plan, and that agreement is with the

16   Retirees' Committee.

17         So, again, I will say we still have some heavy

18   lifting to do, a lot of work to do.  Even on those -- in

19   those areas where we've reached agreements, we expect to have

20   sessions this week.  It is our hope and expectation that we

21   will file -- subject to your Honor's mandate, we will make

22   corrections, make last-minute changes, and file hopefully the

23   final documents on Friday of this week so that we can stay

24   within the time frame for the Court's scheduled solicitation

25   and confirmation process.

1        If I may take another minute or two, we at the city

2   and on behalf of Kevyn Orr would like to acknowledge certain

3   people and entities because we view this as a momentous

4   occasion as we embark upon what we hope will ultimately be a

5   relatively smooth confirmation process, although we know we

6   still have some areas of disagreement, so I want to first say

7   that all parties that have come to the negotiating table have

8   stretched themselves, including the city.  We have all come

9   to find common ground and I believe have found it in a manner

10  that reflects the best interest of all of those parties who

11  have reached agreement.  It was not easy.  In fact, it was --

12  it sometimes seemed to be impossible, but we are here today

13  with the sun beginning to shine on the City of Detroit and

14  its -- the people who work and live here, so we do think it's

15  a very important step.  And, again, I do not want to

16  mischaracterize anything.  We have a long process to go

17  through, a lot of work, and it will take some continued

18  persistence to get through this, but we are, I think, much

19  further along than any of us had reason to anticipate, so we

20  are quite pleased by that and want to thank all parties who

21  came to the table in good faith and worked so hard to get

22  here.

23        Also, on behalf of Kevyn Orr and the city, I want to

24  make some acknowledgements about what is clearly

25  unprecedented in these cases.  First, I'll start with the

1    charitable foundations, who have, under the leadership of
2    Judge Rosen, stepped up to the plate here in a way that has
3    never happened, as far as we know of, in corporate or
4    nonprofit America, and they have, as the Court knows,
5    committed to fund $370 million over a period of time.  I'd
6    like to thank the DIA, who has also committed to contribute a
7    hundred million dollars, another unprecedented event.  And,
8    finally, Governor Snyder and the state -- and, of course,
9    this is subject to legislative approval, so I really need to
10   be careful here, but that the state has agreed to put in a
11   $350 million sum over 20 years, so all of that adds up to
12   $820 million without which over a 20-year period, which
13   may -- some of the scheduled payments may change and so
14   forth, but that's the value of what's been put in here.
15   Quite incredible, unprecedented, and all was earmarked for
16   pensions.  So it should be clear to everybody in the
17   courtroom and outside the courtroom that we could not have
18   done this or would not have been here today without those
19   commitments.
20         I'd like to thank the mediators.  I should first
21   thank your Honor for establishing the mediation process at
22   the outset of these cases.  I can attest personally to what
23   is an unbelievable amount of heart and soul that was put into
24   this on a 24-7 basis by Judges Rosen, Roberts, and Eugene
25   Driker dedicated to the retirees as well as Judge Daniel and

1    by Judges Rosen and Perris on the financial creditors' side.

2    And by the way, we still have some mediations to go on the

3    financial creditors' side.

4        So it's -- to use the words of a teenager, it is an

5    awesome position that we're in today, and we're just so

6    thankful to be here and also thankful to your Honor for the

7    strong hand that you have provided in advancing this process

8    swiftly and decisively, and without that I am confident we

9    also wouldn't be here today.

10       With that I'd like -- unless your Honor has any

11    questions, I'd like to turn the proceedings over to Mr.

12    Bennett.

13       THE COURT:  Thank you, sir.  Before you begin, sir,

14    it occurs to me that I should take advantage of the opening

15    that Mr. Heiman just gave me to comment as well to commend

16    those who have worked as hard as they all have in reaching

17    the settlements that have been reached.  I certainly agree

18    with the assessment that it is extraordinary and

19    unprecedented in the history of bankruptcy.  At the same time

20    and without minimizing any of that, I, once again, strongly

21    encourage those who are still involved in settlement

22    negotiations and who have not yet achieved settlements to

23    continue to work hard and in good faith to achieve those

24    settlements, and at the same time I, as I did recently,

25    encourage those who will become involved in the regional

1  water authority discussions to pursue those with all vigor

2  and good faith and to follow the example that was previously

3  set by the settlements that are in place.  They certainly

4  establish that with hard work and good faith, nothing is

5  impossible.  The word just doesn't exist in this case, so

6  they should proceed on the basis that, yes, with the right

7  terms, a regional water authority is in everyone's best

8  interest.

9        MR. BENNETT:  Thank you, your Honor.  And, as Mr.

10  Heiman said, this entire week I think is devoted to different

11  negotiations with different constituents in an effort to try

12  to achieve additional settlements.  It would be great to have

13  a one-day confirmation hearing.

14        Okay.  Where we are on the disclosure statement.

15  What was filed on Friday --

16        THE COURT:  Well, I have to stop you there because

17  even if everyone settles, as I have said before, the burden

18  will be on you to prove feasibility.  If you can do that in a

19  day, great.

20        MR. BENNETT:  Well, hopefully we'll be in a position

21  to do that in a day.  A lot has to happen to get from here to

22  there, however.  Your Honor, again, we filed a disclosure

23  statement that has lots of blacklining.  It is -- for the

24  most part, implements the settlements that Mr. Heiman

25  described.  It does not affect a lot of classes.  It does

1   significantly affect the retiree classes.  We did get a few
2   comments over the weekend, and there were objections that
3   were filed with the Court.  Let me address a few of them to
4   try to shorten the hearing because I think we can do that,
5   and then I think we need to hear from some people if there
6   are remaining comments and concerns.
7           First of all, there was an objection filed by FGIC.
8   Out in the hallway this morning, we reached an agreement that
9   will adopt most of their language.  There are two exceptions.
10  First, there is a statement in the middle of the proposed
11  language that attributes to the city the view that they could
12  not -- that the city could not sell art free and clear of
13  liens.  The city actually hasn't taken a position on that
14  subject.  And in addition, the sentence is a little bit
15  simplistic because even if one could sell something free and
16  clear, that begs the question or leaves open the question of
17  what happens to the proceeds because the interests you're
18  selling free and clear of don't go away.  They attach to the
19  proceeds.  So we said we were taking that sentence out, and
20  that's acceptable to FGIC.  In addition, at the very end of
21  the language -- the very end of the proposed language,
22  there's a description of the conditionality of the four
23  indications of interest that they collected.  We've added
24  language to the end of it to point out that it's not just
25  conditioned on the completion of due diligence, it's

1    conditioned on the offerors being completely satisfied with

2    everything that they find and still being willing to go

3    forward.  So with those two changes, we'll accept the FGIC

4    changes, and I think that objection is resolved.

5         Secondly, we received an informal communication from

6    the DWSD trustee with five suggestions, I think it was.  The

7    last one was right.  The suggestion of the language that I

8    agreed to before the hearing that we didn't get in we'll put

9    in.  We just made a clerical error.  But there are, I think,

10   a handful of other issues that the trustee for the DWSD debt

11   might want to raise where, quite frankly, we disagree with

12   the changes that they propose either because we believe they

13   are unnecessary or just not helpful.

14        And lastly, with respect to the UTGO settlement,

15   there is a statement in the plan that's -- excuse me -- in

16   the disclosure statement that says the settlement is subject

17   to approval under Bankruptcy Rule Section 9019.  The UTGO

18   creditors want to clarify that that means subject to 9019 in

19   the context of the confirmation hearing and not separately,

20   and we will make that clarification at the end of that

21   sentence.

22        The only other filed objection I'm aware of is the

23   objection filed by Dechert on behalf of Macomb County, and

24   the disclosure statement is our -- my response to that is the

25   disclosure statement is our disclosure statement, and they

1  did not propose -- they said that they thought that some

2  parts of it were declarative statements that they thought

3  should be somehow softened to suggest that they were only the

4  city's position, but they did not propose where and they did

5  not propose specific changes, so I suppose we'll hear from

6  Mr. Brilliant or one of his colleagues on that, but otherwise

7  I think there may well be comments, but I think that deals

8  with the ones that are at least on file.  And I'll respond

9  after the last --

10         THE COURT:  Thank you, sir.

11         MR. BENNETT:  Thank you, your Honor.

12         THE COURT:  Who'd like to be heard, please?

13         MR. MARRIOTT:  Good morning, your Honor.  Vince

14  Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

15  My understanding at the last hearing was that all of our

16  objections to the disclosure statement as it then existed

17  were overruled except for a request that we had that the

18  disclosure statement more fairly indicate what the likely

19  recoveries for unsecured creditors based on the B notes would

20  be.  We don't have any new objections to the latest version

21  of the disclosure statement, and I think that the language

22  that the debtor has put in vis-a-vis the recovery values

23  based on B notes are reasonably close to what we believe them

24  in reality to be, close enough that we're not going to press

25  that objection any further, so as to the disclosure

1 | statement, I guess I'm saying that I surrender, and -- but

2 | not as to the plan.

3 | And not to rain on today's parade, but I thought it

4 | only fair to indicate that our view is that the settlements

5 | that were reached with labor at large have probably

6 | themselves rendered the plan in its current form

7 | unconfirmable because it now creates a disparity in treatment

8 | between similarly situated creditors, labor and other

9 | unsecured creditors, that really can't be defended, and that

10 | will be a large part of confirmation.

11 | THE COURT: Okay. Thank you, sir. Would anyone

12 | else --

13 | MR. BRILLIANT: Your Honor, this is Allan Brilliant

14 | on the phone on behalf of Macomb County. Is this a good time

15 | for me to speak?

16 | THE COURT: Go ahead, sir. Yes, absolutely.

17 | MR. BRILLIANT: You know, for the record, Allan

18 | Brilliant on behalf of Macomb County by and through its

19 | county agency, Anthony V. Marrocco, the Macomb County Public

20 | Works Commissioner. Thank you, your Honor, for allowing me

21 | to appear by phone.

22 | Overall, your Honor, we think the disclosure

23 | statement is a much fairer and much better disclosure

24 | statement than the previous drafts and only had, you know,

25 | really one minor comment. And, you know -- you know, given,

1  you know, all that's occurred during the weekend and having

2  to reach our clients, we really didn't have an opportunity

3  over the weekend to propose language, but all we would

4  suggest, your Honor, is that on page 21 in the section where

5  it talks about GRS pension funding, in the second paragraph

6  in five below after the sentence, "As employees and retirees

7  of a City department, DWSD employees and retirees participate

8  in the GRS with other non-uniform city employees and

9  retirees," and then add the language, "It is the city's

10  position that," colon, and then, you know, just include the

11  next, you know, two paragraphs either indented or however

12  stylistically, you know, the debtors think is appropriate.

13  And then right before -- after the second paragraph and

14  before, you know, six, we would propose that language be

15  added that say, "Parties, including Macomb County, by and

16  through its county agency, Anthony V. Marrocco, the Macomb

17  County Public Works Commissioner, you know, may dispute and

18  contest such positions at the confirmation hearing, you know,

19  relating to such issues," and then just cross-reference the

20  risk factor that's at 14 and say, "See, you know -- you

21  know -- you know -- you know, IV.G."  That's all we would

22  suggest, your Honor.  We recognize it's the debtor's

23  disclosure statement, and this is their position, but we just

24  think fair disclosure would let parties know that at least at

25  this point in time there are parties that dispute their

1  rendition of the facts and -- you know, and maybe dispute it

2  at the confirmation hearing.  And we did hear your Honor's

3  comments regarding the mediation, and, you know, hopefully

4  things can be resolved prior to the confirmation hearing, but

5  at this point in time when the disclosure statement goes out,

6  you know, we think a fair, you know, disclosure would, you

7  know, include the fact that parties may dispute these issues.

8          THE COURT:  Thank you, sir.  Would anyone else like

9  to be heard?

10          MR. LEMKE:  Good morning, your Honor.  David Lemke

11  on behalf of U.S. Bank as trustee for the water and sewer

12  bonds.  Your Honor, I appreciate Mr. Bennett's comment.  It

13  does resolve one of our continuing objections, and that is I

14  understand they will include the description we've provided

15  of the election.  The waiver election, of course, like I

16  said, is contingent upon how you rule on the motion to strike

17  that.

18          We do have a couple of other items.  We had not had

19  a chance to speak with debtor's counsel or city's counsel

20  since yesterday afternoon when we sent them our additional

21  comments, and so I didn't know until I heard Mr. Bennett say

22  so that none of the other comments that we made were being

23  accepted, so I will walk through those if that's the

24  appropriate thing to do, your Honor.  So one of the things

25  we've asked for -- and it would be in addition to definition

1  number 207, which is the plan supplement definition, and this

2  is in the plan -- I'm walking through the plan right now --

3  is we did ask that they provide the -- as plan supplements

4  that they provide the new DWSD bond documents and the new

5  existing rate DWSD bond documents as a plan supplement within

6  30 days or no later than 30 days prior to the voting deadline

7  on the plan, and the reason for that, your Honor, is we would

8  like the -- we'd like to have our own opportunity -- we'd

9  certainly like the ad hoc committee to have a sufficient

10  opportunity but also have other holders have an adequate

11  opportunity to review the new DWSD plan documents.  As the

12  debtor has said repeatedly in the plan and has said in open

13  court, they're not changing the bond documents except with

14  respect to interest in call protection and potentially this

15  argument over the funding of the GRS UAAL, but we would still

16  like to see those and have an opportunity to go through them

17  and make sure there aren't any substantial or substantive

18  material changes, so we're asking for that 30 days.  And the

19  way you can -- we can fix that, I think, is if they just add

20  that as that a plan supplement or plan supplements containing

21  those new documents will be filed no later than 30 days prior

22  to the voting deadline in the definition of plan supplement.

23       The other place that we had a comment -- and this is

24  in the plan -- I'm on -- I'm just looking at the redline, so

25  I don't know how to reference, and I only attached the pages

1   that I'm concerned about.  It's page 42 of the redlined plan.

2   The section is Section 9.  I can't remember what the article

3   is right now, but it's insurance policies, and it's a

4   description of what happens to the city's insurance policies,

5   lower case.  And we just simply ask that they add a sentence

6   in there in the plan description of the insurance policies

7   that is already in the disclosure statement, but we would

8   like that -- the plan and the disclosure statement to be

9   consistent in that regard.  It's probably more important that

10  it be in the plan since that is the operative document, so

11  we're asking that the sentence be added in this subparagraph

12  9 that says, "For the avoidance of doubt, no Bond Insurance

13  Policies" -- and that's a defined term -- "shall be construed

14  as City insurance policies," period.  "Nothing in this

15  Section or the Plan impairs, modifies, affects, or otherwise

16  alters the right of any party under any Bond Insurance

17  Policy," period.  And, again, that's just language that's

18  already been agreed to in the disclosure statement, and we

19  would ask that it be also put in the plan.

20          We have a similar issue in the plan, and this is on

21  page 51 of the redline of the plan, and there's a Provision I

22  called cancellation of existing bonds and bond documents.

23  And, again, we are simply asking that language be inserted in

24  this description which is identical to what's in the

25  disclosure statement, but they're not identical right now.

1  The disclosure statement has some additional language in it
2  that we've all agreed to, and we're just asking that that
3  same additional language be moved over to this provision in
4  the plan as well, so it would insert -- it would match the
5  disclosure statement at page 71, and basically it just simply
6  references that nothing in the section that we're referring
7  to, nothing in Section III.D.7, Roman Numeral III.D.7 of the
8  plan, which is the release provision of the plan, or in any
9  other provision of the plan impairs, modifies, affects, or
10 otherwise alters the rights of bondholders and bond agents
11 with respect to claims under applicable bond insurance
12 policies or against the bond insurers.

13       We have a similar issue on page 55 of the redline of
14 the plan, your Honor.  It is a subsection G, Limitations on
15 Amounts to be Distributed to Holders of Allowed Claims
16 Otherwise Insured, and in the disclosure statement -- they've
17 agreed to language in the disclosure statement on this exact
18 same provision that we just simply want them to include in
19 this one as well, and it's just a parenthetical.  It says,
20 "Except for the immediately preceding sentence" -- well, let
21 me back up.  It's the very last sentence of that section,
22 "For the avoidance of doubt, comma, except for the
23 immediately preceding sentence," which is what we want added,
24 comma, "this section shall not apply to Bond Insurance
25 Policies or Swap Insurance Policies."  And, again, it's

1    already in the disclosure statement, but we would like it in

2    the plan as well, and that -- it is in the disclosure

3    statement already at page 74.  And my references to page

4    numbers, again, are always to the redline, so -- then on page

5    57 of the plan there is a subsection 3 called Allocation of

6    Distributions.  And this actually needs to be added to both

7    the disclosure statement, which is on page 76 of the

8    disclosure statement -- it says right now -- this section

9    says that all distributions to holders of allowed claims that

10   have components of principal and interest shall be deemed to

11   apply first to the principal amount of the claims and then to

12   interest.  We think we're in agreement that that's not

13   applicable to the DWSD bonds.  They're not doing anything to

14   change how those payments are applied under the bond

15   documents, so when interest payments come in, they get

16   applied to interest, and when principal payments come in,

17   they get applied to principal, so all we're asking is that

18   there simply be a proviso at the beginning of that section

19   that says, "except with respect to distributions on account

20   of DWSD bond claims," then all holders to distribution, so it

21   would follow just to make clear there's no confusion

22   somewhere down the road as to how those payments were

23   supposed to be applied.

24           Next on the plan, your Honor, and this is on page --

25   it's actually page 145 of 393 if you look at the docket

1    pages.  It's a description.  It's a summary of the principal
2    terms of the new DWSD bonds, and they have -- one, two,
3    three, four -- five columns that basically lay out the
4    principal, the interest rate, the maturity dates, the pre-
5    payment terms, and the other terms, and this is on the new
6    DWSD bonds.  We've simply asked that they also add in here in
7    the description similar language that they have previously
8    about how accrued and unpaid interest will be paid on the new
9    bonds as of the distribution date.  And so all we've simply
10   requested is that they either add it to one of these existing
11   boxes or they just create a new box that -- and I won't read
12   it.  It's fairly long, but it just basically brings forward
13   that accrued and unpaid interest as of the distribution date
14   with respect to DWSD bonds will either be paid in cash on the
15   distribution date or will be added to the principal amount of
16   the new DWSD bonds, and so if they will do that, that would
17   be helpful so that the summary has everything we think that's
18   pertinent in it.

19          We have the same comment on the next page -- or it's
20   on page 147 of 393 in the plan.  This is the summary
21   description of the new existing rate DWSD bonds, so we're
22   simply asking that that exact same language I just referenced
23   also be added to the summary of these -- of the description
24   here or the summary of these -- the new existing rate bonds.
25   So that's on the plan, your Honor.

1          We have some comments on the disclosure statement,

2    some of which I've already addressed, but if I could just go

3    through it quickly, we would like the disclosure statement to

4    also have a proviso that the plan supplement containing the

5    new DWSD bonds and the new existing rate DWSD bond documents

6    will be filed no later than 30 days prior to the voting

7    deadline.  We had asked on page 31 of the disclosure

8    statement that they insert the attached election language,

9    which I now understand from Mr. Bennett's comments they will

10   add, so we appreciate that.  We had asked that that also be

11   included on page 48 of the disclosure statement, again, the

12   redline, page 48.

13         And then in the disclosure statement on page 59 it

14   is in -- again, it's in the section regarding the insurance

15   policies.  It's paragraph 9.  It starts at the bottom of page

16   58 of the redline disclosure statement.  It goes over to page

17   59.  We simply ask that to be cleaned up to also be

18   consistent with the plan, and specifically there is a

19   sentence that says, "Nothing in this section or the plan,"

20   and it currently says "is intended to," but we had asked that

21   it be changed, and I thought they had agreed, so that now it

22   would say, "Nothing in this section or the plan impairs,

23   modifies, affects, or otherwise alters the right of any party

24   under any Bond Insurance Policy."

25         In page 71 of the disclosure statement, the redline,

1   there's a paragraph I, Cancellation of Existing Bonds and

2   Bond Documents.  It's the exact same comment I made with

3   respect to the plan, so we just need those two provisions,

4   the one in the disclosure statement and the one in the plan,

5   to be identical, and it is with respect to that nothing in

6   this section of the plan -- nothing in Section Roman Numeral

7   III.D.7 of the plan or in any other provision of the plan

8   impairs any rights under the bond insurance policies.

9           Finally, your Honor, on the disclosure statement, it

10  is -- on page 76 of the redline, it is the same comment I had

11  with respect to the allocation of distributions.  In other

12  words, we want to add at the beginning of that Subsection C

13  except with respect to distributions on account of DWSD bond

14  claims, then all distributions will be made principal first

15  and then interest, so we're just asking that that same change

16  be made in the disclosure statement.

17          And then the final comment I have -- and we did not

18  address this with the city in our written comments on Sunday.

19  I hadn't actually picked up on it until this morning, but we

20  just want to make clear -- and I did talk to one of the

21  city's counsel.  I think we'll get this clarified, but I'll

22  say it on the record, and that is this interest that will

23  accrue prior to the distribution date on the new securities

24  is either going to be paid in cash or rolled into the

25  principal balance of the new securities, and that's fine.  We

1  understand that that's the -- that's what they intend to do.

2  But if you looked at the definition of distributions and

3  distributions date, they contemplate there could be multiple

4  distribution dates, and we just wanted to make clear that

5  they won't continue to roll interest forward after the

6  initial new securities are issued.  It will only be done one

7  time potentially, and that is interest that's accrued up to

8  that issuance date, and from thereafter it gets paid in

9  accordance with its terms.  I've talked to counsel.  He

10  assured me that that is not what was intended, but we will

11  work on just tweaking the language a little bit to make sure

12  there's no misunderstanding going forward.

13        So with that, your Honor, I think that's all the

14  comments I had to the plan and disclosure statement.  I

15  appreciate it.  Thank you.

16        THE COURT:  Thank you.

17        MR. KOHN:  Good morning, your Honor.  Samuel Kohn of

18  Chadbourne & Parke on behalf of Assured Guaranty Municipal

19  Corp.  Your Honor, I just want to state on the record that,

20  as Mr. Heiman said, the UTGO settlement is in documentation

21  form.  Under the agreement, the plan and disclosure statement

22  are to be in form and substance approved by the UTGO -- by

23  the parties to the settlement.  It's still the documentation

24  stage.  There are some elements that we would have believed

25  should have been in the plan and disclosure statement, but if

1  it's going to be -- so if the settlement is not going to be

2  finalized or the documentation is not going to be finalized

3  before the solicitation, we just want to state on the record

4  there are a number of provisions such as limited releases,

5  exculpations, and post-confirmation jurisdiction provisions

6  which we believe are going to ultimately have to be in the

7  plan.  Thank you, your Honor.

8            THE COURT:  All right.  Thank you.

9            MR. GORDON:  Good morning, your Honor.  Robert

10  Gordon on behalf of the Detroit Retirement Systems.  Your

11  Honor, one concern we have is sort of a larger version of

12  what was just expressed by counsel for the UTGOs.  Mr. Heiman

13  indicated that there is a settlement with not only the

14  retirement -- Retiree Committee but also with the pensions,

15  and that had been something that was reported in the papers a

16  few days ago.  However, for various reasons, there are

17  certain issues that we're still tasked with ironing out,

18  including restorations, the concept of restoration of

19  benefits.  You'll notice in the global settlement referenced

20  in the disclosure statement with respect to the Retiree

21  Committee, the committee has deferred to the retirement

22  systems to iron out the restoration piece, but obviously both

23  parties are concerned about that issue, so, as a result, the

24  settlement or the terms upon which we are in agreement

25  between the city and the pension systems is not yet in the

1    disclosure statement in full.  There certainly is the global

2    settlement described with the Retiree Committee, but there

3    hasn't been a description of the settlement and all of its

4    terms with the pension systems, so that will obviously be

5    something that will be incorporated we hope in the coming

6    days between now and the target date of Friday to submit a

7    finalized version, but the document will change a bit, so I

8    wanted to alert the Court to that.

9            As Mr. Heiman also said, we've all been stretched a

10   bit, and so there are a few nits that I haven't had the

11   chance to discuss with Jones Day, and I apologize for that,

12   but hopefully, again, those things can be dealt with in the

13   coming days.  For example, the disclosure statement still

14   talks about a return on investment assumption of that shall

15   not be higher than 6.75 percent.  Well, it is 6.75 percent,

16   and it should reflect that.  There's still references to

17   something called a variable annuity concept.  That has gone

18   away in favor of what we're calling the restoration concept,

19   and there are things of that nature.  There's also reference

20   to governance provisions and things that are still being

21   negotiated.  So, your Honor, it may very well be that those

22   things will all be reflected in this document by Friday in a

23   way that we're all comfortable with, but I wanted to suggest

24   or ask the Court whether it was possible to have a status

25   conference on Friday to discuss where we are on these things

1  because they aren't in there yet, and we don't know what
2  they're going to look like.

3  There's another reason why I'm asking that question
4  as well, and, again, this is something that we haven't had a
5  chance to speak at length with counsel for the city about.
6  And I notice the concern of the Retiree Committee as well.  I
7  won't put words in their mouth.  I'll let them speak for
8  themselves, but I think we both had this concern.  The
9  settlements that are being reached are settlements that
10  support what I would call Plan A, which is a plan where the
11  state contribution is made and the DIA settlement is
12  implemented and so forth.  The settlements are not a
13  settlement that also would support, if those things don't
14  happen, the Plan B where all those monies do not come in.  So
15  we're stuck in a strange place where we're being asked to
16  support ultimately the plan, Plan A, but there's a deadline
17  coming up to object to the plan, and if we otherwise don't
18  have some mechanism, we are going to be required to pursue a
19  parallel path where we would still be filing plan objections
20  as if Plan B is still in play.  There are ways we could deal
21  with that.  Perhaps we could submit a plan objection to
22  counsel for the city without filing it so they are not
23  blindsided.  At some point at least they have it.  There's
24  also issues about -- in this regard, your Honor, the vote
25  tabulation deadline is three days before trial, so neither

1   the Retiree Committee nor the pension systems will know

2   whether the beneficiaries have voted, which way they voted

3   and whether we actually have to have -- gear up for trial

4   because we won't know whether Plan A is being supported or

5   whether we're faced with a Plan B, again, so these are issues

6   that I would love to have the opportunity to discuss with the

7   Jones Day firm, and I think those are things we could do

8   between now and Friday.  Again, I apologize that we haven't

9   ironed these things out before then.  We've all been working

10  very hard on trying to achieve the settlements that have been

11  referenced by Mr. Heiman, but those are things that are still

12  out there for now.

13      THE COURT:  Well, of course, the other contingency

14  is that the state legislature doesn't act on its piece of

15  this before confirmation.  What strikes me as the appropriate

16  way to handle that, at least in part, is to say that if we

17  don't have that piece in place by that time, that any votes

18  that came in from retirees in favor of the plan will be

19  counted as "no" votes on the presumption that without that

20  they would not have voted in favor of the plan.

21      MR. GORDON:  Right; right.

22      THE COURT:  What do you think of that?

23      MR. GORDON:  I think that that's a real issue.  I

24  have not been dealing with the ballots themselves directly,

25  but my understanding is there's not a place on there to

1  check, yes, I vote for it if it's Plan A, and, no, I don't

2  vote for it if it's Plan B.  It's just not in there, and I

3  could see that as being very confusing, so --

4          THE COURT:  Well, under law they vote for the city's

5  plan --

6          MR. GORDON:  Right.

7          THE COURT:  -- not another plan.

8          MR. GORDON:  That's right.  That's right.

9          THE COURT:  Anything further, sir?

10         MR. GORDON:  No.  Thank you, your Honor.

11         THE COURT:  Would anyone else like to be heard

12  regarding the disclosure statement?

13         MS. CECCOTTI:  Your Honor --

14         THE COURT:  Yes, ma'am.

15         MS. CECCOTTI:  Yes.  Babette Ceccotti, Cohen, Weiss

16  & Simon, LLP, for the UAW, if this is an appropriate time.  I

17  would like to express our concern as well to particularly the

18  last matter that Mr. Gordon raised.  There is a place on your

19  scheduling order for supplemental objections, but I found

20  myself asking the same question similar to Mr. Gordon

21  regarding how -- whether that would be a sufficient mechanism

22  under the scheduling order, so we have the same concern

23  regarding the alternative A, alternative B issue.

24         THE COURT:  Well, thank you.  The supplemental

25  objection process was not really designed to deal with this

1   issue, so I think we are going to have to be creative somehow

2   to figure out how to deal with this issue.

3           MS. NEVILLE:  Good morning, your Honor.  Carole

4   Neville on behalf of the Retiree Committee.  Your Honor,

5   we're not going to go through all the little changes that we

6   have, but we have agreed with Ms. Lennox and Mr. Bennett to

7   work to make the notice, the disclosure statement, and the

8   plan all jibe and to embody the agreement, and hopefully

9   we'll have a final agreement by Friday.

10          July 18th was the date that we had reserved for

11  supplemental objections based on the vote, so we have to take

12  a look at that one and the July 11th deadline, and then the

13  May 12th deadline is the first deadline for filing objections

14  to confirmation, so we intend to work with Mr. Bennett and

15  Ms. Lennox and Mr. Heiman about the proper dates.

16          THE COURT:  Thank you.  I appreciate that.

17          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha,

18  Lippitt O'Keefe Gornbein, on behalf of the retiree

19  association parties.  I just rise briefly to inform the Court

20  that the Retired Detroit Police and Fire Fighters Association

21  does have an executed term sheet, which does address

22  governance as well as restoration issues, so we would be

23  asked to be involved in the process on that going forward to

24  confirm that it complies with the term sheet that we do have

25  executed with the city.  Thank you.

1    THE COURT:  Thank you, sir.  Anyone else either here

2    or on the phone?  Apparently not.  Mr. Bennett.

3    MR. BENNETT:  Okay.  Your Honor, let me try to

4    resolve as many of these as possible quickly.  With respect

5    to the Macomb County comment, I think I'd like to propose to

6    deal with Mr. Brilliant's suggestion by accepting half of it.

7    And if your Honor has the marked version, the page reference

8    Mr. Brilliant gave you was to the clean version.  On the

9    marked version, the place where he was seeking the insert is

10   at the bottom of page 23 to say that it's the city's

11   position, and then that would apply to all words following

12   "applicable" and the next paragraph.  I think that's what

13   we'll do.  I don't think we'll put in Macomb County's

14   position because there will be a hundred positions.  Again,

15   this is the city's disclosure statement, and Macomb I don't

16   even think is a creditor, but we will say it's the city's

17   position.  If Macomb has a different position, they can deal

18   with it in pleadings.  If they want to send a letter to

19   people who are receiving the disclosure statement, they're

20   free to do so.

21   THE COURT:  All right.  The Court will sustain your

22   position on that and overrule the balance of Macomb County's

23   objection to the disclosure statement.

24   MR. BENNETT:  Thank you, your Honor.  With respect

25   to Mr. Lemke's changes, I freely concede that they all are

1  kind of minor, and they are, but I think the most important
2  point is is that he's seeking a whole bunch of plan changes.
3  And for better or for worse -- and I'm not going to go into
4  settlement communications, but the record in this case shows
5  that the city has progressively improved the treatment of
6  DWSD bondholders, been receptive to a vast array of comments
7  and suggestions from them and have incorporated them into the
8  plan, and we still haven't gotten to "yes," so what I would
9  say to Mr. Lemke is is that he didn't have any material
10  changes to the disclosure statement, so the disclosure
11  statement is, of course, adequate by definition.  He would
12  like to plan -- say the plan different things, and I will say
13  to Mr. Lemke on the record because I can tell him what my
14  settlement position is is that if we ever make a deal, he can
15  have all the plan changes on these topics that he asked for,
16  but we don't have a deal, and we're kind of done changing the
17  plan, and this is a disclosure statement hearing, so I
18  would -- with respect to Mr. Lemke's comments to the plan, I
19  would refer them to the mediation session that is now
20  scheduled for Friday, but the disclosure statement is
21  adequate, and we would stand on what it says.  With respect
22  to all of his comments, they are all covered very well in the
23  disclosure statement.
24            THE COURT:  Well, let me just ask with regard to new
25  bond documents --

1        MR. BENNETT: Oh, that's a good point. We have said

2  in this courtroom also on the record -- I'll say it again

3  today -- there will be no changes other than the changes that

4  were described in the plan. Creating something like 300 sets

5  of documents contingent upon how this comes out strikes us as

6  a waste of money. The same means the same. See, I just said

7  it again on the record. And if it so happens that the plan

8  is confirmed in its current form between the time of the

9  confirmation and the effective date, these documents will be

10  generated. And if they're not the same, your Honor will have

11  to decide whether they're the same or not. And, frankly, I

12  don't think you're going to have any such disputes to deal

13  with because those will be very simple questions to deal

14  with.

15        THE COURT: Right. So the process that you foresee

16  is to give counsel an opportunity to review the bond

17  documents before they are actually issued so that he can

18  review them at that time?

19        MR. BENNETT: That's correct, your Honor.

20        THE COURT: With an opportunity to file a motion if

21  issues regarding whether they are the same can't be resolved?

22        MR. BENNETT: Which anyone would have if there was

23  any way the city was not implementing the plan in accordance

24  with the terms of the plan.

25        THE COURT: All right. With that understanding on

1   the record here, the Court will overrule the objections to

2   the disclosure statement and defer to plan confirmation the

3   objections to language in the plan itself, although, frankly,

4   I have to say that anything in the plan that clarifies intent

5   is welcome.

6           MR. BENNETT:  I appreciate that, your Honor.  With

7   respect to the comments of Mr. Gordon and the other retiree

8   representatives, a couple of different things.  First of all,

9   it's understandable given that everyone had a busy weekend,

10  but the plan has in it what I will refer to as the AFSCME

11  solution because it's something that I worked out with AFSCME

12  and Ms. Levine, and it does provide that in the event what

13  are now defined as the initial funding conditions are not

14  met, "yes" votes become "no" votes with respect to

15  pensioners, so that is actually the solution that is in the

16  plan and in the disclosure statement, and it's fairly

17  prominent.  I think when people go over it again, they'll see

18  it.  Now, that does raise a -- the issue raised by the AFL's

19  lawyer, Ms. Ceccotti, on the phone, which is how we're going

20  to deal with the fact that we have what we believe is a deal

21  with virtually all, not quite all, of the retiree

22  representatives that's contingent on something -- a number of

23  things happening in the future.  Clearly, the city would --

24  wants to save money and aggravation and would like not to be

25  dealing with an avalanche of hypothetical briefing, so -- and

1   I agree that your Honor's schedule was not contemplated for
2   this twist where there would be people who for all intents
3   and purposes had settled around the plan and would only
4   object if later on a whole bunch of things didn't happen and
5   the city was continuing on the road of trying to confirm that
6   plan as opposed to something different that would deal with
7   those changed developments.  Your Honor, I think this would
8   benefit from additional discussion among the parties with a
9   view to trying to arrange something where people could really
10  put their pencils down on all of these contingencies until
11  the last possible moment, in which event there may have to be
12  lots of changes, including schedule changes, that would
13  result if we wind up in a situation where, frankly, right now
14  we don't contemplate and largely don't want to contemplate,
15  so let us work on that with all the relevant players and come
16  back to you with a proposal, but it's going to -- we're going
17  to try very hard to make it one that simplifies people's
18  lives as opposed to make it more complicated.
19          THE COURT:  Well, as you're having those
20  discussions, I have an idea -- and, frankly, I don't know
21  where I got it from or even that it's a hundred percent
22  accurate -- that the state legislature will be in session
23  through May and then not again until later in August or
24  something like that.
25          MR. BENNETT:  I'm not exactly sure, but I think Mr.

1  Howell knows the dates exactly, so may I surrender the podium
2  to him?
3          THE COURT:  Um-hmm.  If you have solid information
4  on that, that would be helpful.
5          MR. HOWELL:  Good morning, your Honor.  Steven G.
6  Howell, Dickinson Wright, special assistant attorney general
7  for the State of Michigan.  My understanding is the
8  legislation -- legislature will be in session into
9  approximately mid-June --
10          THE COURT:  Mid-June.
11          MR. HOWELL:  -- and will be moving forward as
12  quickly as possible to get legislation introduced and passed
13  before the end of the session in June because, in fact, there
14  is then summer recess, and there will be elections this fall,
15  and I think the legislature comes back only for approximately
16  two weeks between then and the election date, so the goal is
17  to try to get all that done before the end of the --
18          THE COURT:  Okay.
19          MR. HOWELL:  -- June session.
20          THE COURT:  So the question that we all have to
21  confront in our scheduling is what to do if we don't have
22  this legislation by that mid-June date.
23          MR. BENNETT:  That's correct.
24          THE COURT:  All right.  Well, let me ask you -- I
25  will accept your offer to consult with other counsel and see

1   what creative solutions you can come up with to address that

2   contingency.

3           MR. BENNETT:  Okay.  I think that's it.  I don't

4   think we require any additional rulings from your Honor.  I

5   will be here, meaning in this building, on Friday, and so if

6   there is a need for a status conference, I'm sure I can

7   arrange to break from mediation to have one, but we will get

8   this document turned with the limited changes we've discussed

9   today and such additional clarifying comments that are worked

10  out mainly with the people that deals have been reached with,

11  and I appreciate your Honor's consideration.

12          THE COURT:  I am not actually available on Friday.

13  I could be available on Monday, although it would be terribly

14  inconvenient.  Let me ask you, Mr. Bennett, or you, Mr.

15  Heiman, to take the responsibility of notifying my office on

16  Friday whether a further status conference or hearing on this

17  is necessary, and then I'll take it from there on figuring

18  out how to address whatever issues there are that are left.

19          MR. BENNETT:  Thank you, your Honor.

20          THE COURT:  All right.  So I look forward to what I

21  hope will be a final draft of the disclosure statement for my

22  review within the time I've set.  Okay.  Stand by one second.

23  I'm going to rule later on the open issue regarding the

24  balloting for the bond issue that you addressed earlier.  In

25  the meantime, though, I want to turn our attention to what

1  objections to written discovery, either interrogatories or
2  requests for production, you'd like me to resolve at this
3  time.

4       MR. HACKNEY:  Your Honor, good morning.  Stephen
5  Hackney on behalf of Syncora.  Perhaps I can give you a
6  little bit of a status of what's happened around what was
7  previously the April 25th deadline, and I'll alert you
8  perhaps, if I could, to certain issues out there about what
9  the deadline moves mean, but there are potentially two issues
10  that are up today.  Your order says that you'll resolve all
11  objections today that have been filed by April 25th.  The two
12  objections that I've seen are Syncora's objections and
13  responses to the city's document requests to us and to their
14  interrogatories to us.  In addition, the state attorney
15  general has objected to one document request that Syncora
16  sent to the attorney general on the subject of the opinion
17  regarding the art.  We weren't sure if your order is sort of
18  self-actualizing in the sense that if objections are filed,
19  we're going to stand up and argue them, so what we did is we
20  filed a motion on the AG point, which is --

21       THE COURT:  It was my intent to resolve them here
22  today.

23       MR. HACKNEY:  Chop wood.  That's what I figured,
24  so -- and let me give you a status, if I could, also.  We
25  have, I believe, resolved issues with Christie's about their

1  subpoena, so I don't anticipate motion practice there.

2          THE COURT:  Okay.

3          MR. HACKNEY:  We, with the help of the state -- and

4  there are a number of individuals we thanked in our motion --

5  issues two through six relating to revenue sharing and other

6  matters, I think we've worked that out.  And then we've also

7  been working with counsel to the DIA and have gotten through

8  a number of thorny issues on that as well, so we're really

9  just down to this issue on the attorney general's opinion.  I

10  was going to propose to start there.  Then I was going to

11  talk more about Syncora's objections to the city's discovery

12  to us.  Mr. Irwin and I have ongoing conversations about

13  that, and I will tell you it isn't clear necessarily that we

14  can't still resolve them, but I'll get to that in a moment.

15  I was going to start with the AG.

16          So, your Honor, you know, the art has been a sort of

17  noteworthy highly publicized part of the case, and from our

18  standpoint it's a really important part of the case because

19  what we've all been doing here both from the parochial

20  standpoint of just the creditor that you represent but also

21  someone who's part of this larger process is trying to figure

22  out how does Detroit deal with the challenges that it faces

23  and also give a reasonable recovery to creditors.  And

24  there's been a lot of evidence and testimony already, I

25  think, in eligibility, and there will be, I'm sure, at

1   confirmation about Detroit's many challenges on the subject

2   of crime and blight and so on and so forth, and I know you're

3   familiar with that.  But the city does have one very powerful

4   asset that does come from its, you know, more glorious

5   history when it wasn't in -- manufacturing powerhouse, and

6   that is this art collection, and so when you think about

7   something that could be transformative of the city and also

8   give creditors a substantial recovery, it is what is believed

9   to be a multi-billion dollar art collection sitting in the

10  center of the city.

11          Now, the city is proposing to address this issue

12  surrounding the art collection in a way that from our

13  standpoint yields far less value than could be gotten both

14  for the city and its creditors and obviously takes that value

15  and allocates it to one particular class of creditors, which

16  I would say is kind of a separate issue.  Our philosophy on

17  this has been obviously we'll air to you our disagreements

18  with the way that's been handled, but from a process

19  standpoint, we think that we should have transparency around

20  the issues related to the value of the art, the provenance

21  and ownership of the art, and the attorney general's opinion,

22  kind of the three parts of the art story, so that the city's

23  creditors, its citizens, and the Court understand exactly

24  what decision is being made with respect to this art and why

25  it's being made, and that's why we've taken discovery of

1    Christie's and the DIA to learn about value and provenance,

2    and that's why we took -- submitted discovery to the attorney

3    general.

4         When you -- I don't know if you've had a chance to

5    review the privilege log, but if you look at the privilege

6    log -- okay.  Well, this is kind of important, and let me

7    focus on what's in dispute.  What the attorney general came

8    back to us and said was our production is the opinion and a

9    common interest agreement we have with the DIA and another

10   document -- a letter from the Senate majority leader

11   requesting the opinion, so they didn't produce documents, in

12   our view, that kind of go around or would have gone into the

13   opinion, led to its origination.

14        THE COURT:  Let me just ask you to pause there and

15   tell me specifically what documents you want from them.

16        MR. HACKNEY:  Yes, I will, your Honor.  I appreciate

17   that.  So if I could -- I thought we attached this to our

18   motion, but if we haven't, I would be happy to give you my

19   copy.

20        THE COURT:  That would be the most convenient thing.

21        MR. HACKNEY:  Yeah.  If I can approach.

22        THE COURT:  Sure.  Thank you.  Okay.  Go ahead.

23        MR. HACKNEY:  Your Honor, what you're holding there

24   is a privilege log, and the privilege log, I think,

25   identifies -- I think it's 14 communications, and the

1    communications are all, I think, e-mails, and they sometimes

2    have memoranda and other documents attached to them.  But the

3    privilege log is very interesting because just to give you

4    some sense of kind of the timing here, if I'm not mistaken, I

5    believe Kevyn Orr was appointed in mid-March of 2013.  The

6    first document on that log is from mid-April of 2013, and it

7    is a document that goes from Honigman Miller, the DIA's

8    counsel, to the attorney general, and it appears to attach a

9    memorandum that we don't know what it says but I'm going to

10   guess says here are a bunch of good reasons why the city

11   should not be allowed to sell the art.  This is before

12   there's been a request for an opinion on this subject by the

13   Senate majority leader.  It's at a time when Mr. Orr is just

14   getting on the job, and the DIA has already retained counsel

15   and is now working with the attorney general on a subject

16   that is going to have a huge implication for the city.  It's

17   doing so at a time that it is operating under an operating

18   agreement with the city where it's the city's agent with

19   respect to the maintenance of the art collection.  And one of

20   the provisions of that operating agreement says you, DIA, you

21   will not do anything to encumber our title to this art.

22   That's one of the promises that the DIA made in its operating

23   agreement with the city.  So we would like to obtain these

24   communications between counsel for the DIA and the attorney

25   general to understand what was said and understand where the

1   attorney general's opinion came from, why it says what it

2   says, what went into what it says.

3         THE COURT:  Well, but again let me ask you to pause

4   there with this more fundamental question.  In court

5   proceedings like this, what weight does the law give to an

6   attorney general's opinion?  Is it worth anything more or

7   less than a brief that the attorney general might write in

8   support of whatever the position is or in support of whatever

9   the issue is that's before the Court on the law, and isn't it

10  sufficient to protect your client's rights or interests to

11  have that brief and respond to that brief in the normal

12  course just like any other brief?

13        MR. HACKNEY:  Yeah.  You know, it's a very fair

14  question.  I almost feel like posing it back to you since

15  you're the decider, but the -- but here's -- let me talk

16  about it a little bit.

17        THE COURT:  If you do that, I will ask you to brief

18  that question.

19        MR. HACKNEY:  Well, we --

20        THE COURT:  I'm not familiar with attorney general

21  opinions.  It's not anything I have any experience with, so I

22  don't know what value they --

23        MR. HACKNEY:  Yeah.

24        THE COURT:  -- the law says they are entitled to.

25  It feels like it's just another party in the case who came to

1   a conclusion, and the legal conclusion in it will be

2   evaluated --

3           MR. HACKNEY:  Yeah.

4           THE COURT:  -- along with all the other legal

5   conclusions of all the other briefs.

6           MR. HACKNEY:  Well, this is what I would say about

7   that, your Honor.  I think -- I was thinking about this as

8   well because there was kind of a question in my mind, which

9   is does the attorney general's opinion -- you know, it

10  embodies a bunch of legal concepts, and we have a bunch of

11  lawyers around here, more than you probably would want, but

12  we can argue -- we can argue the legal arguments back and

13  forth just as you suggest.

14          THE COURT:  Right.

15          MR. HACKNEY:  But I also suspect that what the city

16  will do is that they will actually introduce the opinion into

17  evidence and say this informs our business judgment, so to

18  speak, about how we've gone about dealing with this --

19  dealing with the art at large, and that's why what we're

20  doing in seeking the foundation and state support is really

21  the best under the circumstances, and it is in our best -- in

22  the best interest of creditors.  And I think it is a little

23  bit like the 9019 hearing we had before you where I wasn't

24  sure whether you'll actually decide the provenance issues

25  with respect to the art or whether you will defer and allow

 1 just evidence of dispute to come into the record and then use

 2 that to inform your decision, but I have a suggestion for

 3 you, which is these are very important questions.  I

 4 apologize.  I don't have a definitive answer for you, but

 5 this is just the discovery stage.  And my recommendation and

 6 our motion says let's get it all out there and have it, and

 7 then however it plays out is how it plays out, but I think

 8 the issue is significant enough that we would want as much

 9 transparency as possible.  And what our motion says that we

10 filed today -- I don't know if you've had a chance.  We filed

11 it late on Friday, but what our motion says is there can't be

12 a common interest, which is the sole basis for withholding

13 these documents that the attorney general has declined to

14 produce.  We've said there can't be a common interest between

15 the attorney general and the DIA because there certainly

16 isn't a common interest between the attorney general and the

17 city.  They've taken nonidentical positions with respect to

18 what can be done with the art.  The DIA is an agent of the

19 city.  It is a contractor with the city via the operating

20 agreement that it performs under.  It has a contractual duty

21 not to incumber the art.  So we don't think there's a

22 sufficient similarity of interest between these parties even

23 though it's maybe counter-intuitive not to think that the DIA

24 doesn't have an interest in seeing the art not sold, but from

25 a legal standpoint we don't believe they can have a common

1   interest.

2          And, by the way, I would note that these

3   communications I've given to you, they're all from April and

4   May and June.  The common interest agreement isn't signed

5   until December, long after.  Now, common interest agreements

6   can have retroactive effect, but there isn't any evidence in

7   the record right now that this common interest to work

8   together on this important issue was struck back at the time

9   that the communications were actually happening.  And that's

10  it on our motion.  We think we should get these documents out

11  there and see them and understand them.  Admittedly, they

12  will be subject to a lot of different types of issues like

13  the ones we just discussed about how this actually plays into

14  the case, and I will continue to give more thought to that.

15  That's my argument on the art, your Honor.  I'd be happy to

16  cede the podium to Mr. O'Reilly, I know is here from the

17  Honigman firm, but I would like to get up and speak with you

18  again on the subject of our objections to the city's

19  discovery.

20          THE COURT:  Okay.

21          MR. HACKNEY:  Thank you, your Honor.

22          MR. O'REILLY:  Good morning, your Honor.  Arthur

23  O'Reilly from the Detroit Institute of Arts, which is, of

24  course, as you know, the nonprofit entity that has since 1885

25  managed and been a steward and a co-trustee of that entity.

1  The museum that exists today is commonly known as the Detroit
2  Institute of Arts, but it began as the Detroit Museum of
3  Arts.
4           The motion that Mr. Hackney filed was filed late on
5  Friday, 11 p.m. or so, and so we haven't had an opportunity
6  to respond or actually consider the arguments.  And, frankly,
7  the Detroit Institute of Arts, at least, is a nonparty to
8  that motion.  The subpoena was issued to the state attorney
9  general, who has a common interest and a common interest
10 agreement with the DIA, but in a three-party discussion the
11 DIA hasn't to date been part of the discussions that Mr.
12 Hackney has had with the state attorney general.  Prior to
13 coming in today, I did mention to Mr. Hackney that I was
14 willing to talk over whether there's a resolution that made
15 sense under the circumstances that got him what he needed,
16 but given the pace of things and the short timeline in which
17 we've had to deal with these issues, we didn't reach any
18 resolution there today, and I don't know if he's currently
19 willing to go down that path, but I do think makes a lot of
20 sense.  We, the Honigman firm, and the DIA have been working
21 with Mr. Hackney, I believe, pretty well in trying to create
22 the type of transparency that he's talked about on the
23 restrictions, on the valuation, and to the extent that
24 there's nonprivileged documents that might be provided to him
25 as part of this exchange, we'd be happy to work with him to

1    get those resolved.  There are a lot of issues, I think, that

2    are deep within his motion that really can't be adequately

3    addressed in this type of weekend-type time frame.  Among

4    other things, he mentioned that there's no record evidence of

5    whether or not there's a retroactive effect to this

6    agreement.  Well, fine and good, but nobody at least to this

7    proceeding has had an opportunity to do that.

8         I would suggest, though, that your Honor -- and I'm

9    happy to answer any questions that you might have about this

10   or the motion as a whole, but I do suggest that it might make

11   sense for Mr. Hackney and we and the attorney general to sit

12   down to figure out if there's a pathway that makes some more

13   sense here, but if there are other questions that your Honor

14   has, I'm happy to address them.  The state attorney general,

15   Mr. Restuccia, the assistant attorney general, is here as

16   well to address the motion.

17        THE COURT:  Well, I guess my question for you would

18   be since the subpoena or the request for documents was issued

19   to the attorney general for documents in the attorney

20   general's control, do you have any standing?  Does your

21   client have any --

22        MR. O'REILLY:  Well, we have standing in the sense

23   that the attorney general has been attempting to protect and

24   comply with our common interest, and that's why he's here.  I

25   was here because to the extent that we could work out an

 1   agreement, it would make sense for the three parties, Mr.

 2   Hackney, the state attorney general, and myself, to address

 3   those issues.

 4           THE COURT:  All right.

 5           MR. O'REILLY:  However, at least in part, I would

 6   think that if -- to the extent that we don't have standing in

 7   terms of this motion that's been filed, I guess a procedural

 8   mechanism would be for the DIA to actually file its own

 9   motion for a protective order or some other remedy, but I

10   didn't think that your Honor really needed more motions or

11   more paper on the issue.

12           THE COURT:  Well, does your client object to the

13   production of these documents and, if so, why?

14           MR. O'REILLY:  Well, my client does object to the

15   production of some of them, at least, and --

16           THE COURT:  Why?

17           MR. O'REILLY:  Because, at least in part, there's a

18   common interest that the attorney general and the DIA have

19   and that we worked at least towards a portion of this

20   period --

21           THE COURT:  All that tells me is that you have a

22   potential legal argument to object.  I'm asking you why you

23   object.

24           MR. O'REILLY:  Because they're privileged, your

25   Honor, at least in part.

1          THE COURT:  Well, but you can waive the privilege.

2   Why do you object?

3          MR. O'REILLY:  I'm sorry?

4          THE COURT:  You can waive the privilege.  I'm asking

5   you why you object.  What's in it for you?

6          MR. O'REILLY:  Well, and I object to at least the

7   production of some of them.

8          THE COURT:  Why?

9          MR. O'REILLY:  Some of them actually contain

10  internal communications that actually were inadvertently

11  given to the attorney general, so it shouldn't have had it in

12  the first place.  They agreed to produce -- to destroy them

13  at the time, but for whatever reason that didn't happen.  You

14  know that old story.  So at least as to that -- and, frankly,

15  I don't know if Mr. Hackney has taken a position on that.

16         THE COURT:  Can you identify which line item in this

17  privilege log that might be?

18         MR. O'REILLY:  I believe it's Number 11 in the

19  privilege log.  There's a note there that says inadvertent

20  production, and that piece, I believe, should not be part of

21  this record at all.  Things happen, and I don't know --

22         THE COURT:  All right.

23         MR. O'REILLY:  -- that Mr. Hackney has taken a

24  position.

25         THE COURT:  Thank you.

1        MR. O'REILLY:  But at least as to some of the

2    documents and particularly attachments thereto, we would be

3    happy to look at them.  Frankly, I haven't seen them in a

4    very long time, so I haven't been able to decide whether or

5    not there is a basis to say to Mr. Hackney these we'll be

6    willing to give to you.  Thank you, your Honor.

7        MR. RESTUCCIA:  Good morning, your Honor.  Eric

8    Restuccia from the Attorney General's Office appearing on

9    behalf of Attorney General Bill Schuette.  I should clarify

10   also that I'm appearing on behalf of him in his own name.

11   Obviously there have been assistant attorneys general who've

12   been representing the State of Michigan, but insofar as I

13   appear, it's on his behalf.  The objection that the attorney

14   general filed was consistent with the common interest

15   agreement that was established with the attorneys for the

16   Detroit Institute of Art, and we wanted to honor that

17   agreement.  That's the basis on which we had filed our

18   objections, although you did ask -- you kind of cut to the

19   heart of the question, what is the sensitive nature of the

20   communications with the Detroit Institute of Art.  Our

21   objections when we filed were more -- were broader than just

22   these specific items because, of course, the internal --

23   because the subpoena requested all documents and

24   communications, and that would include the internal

25   communications between the attorneys themselves, and that

1   seems to me something that the attorney general would want.

2   I mean his deliberative process internally wouldn't make

3   sense.  But with respect to the Detroit Institute of Art,

4   there were several items which really were internal or things

5   that were generated by the attorneys for the Detroit

6   Institute of Art, and so we wanted to honor the agreement to

7   protect things that they had generated internally.  That was

8   the basis on which we had filed the privilege, but with

9   respect to the attorney general, these -- for its internal

10  communications, we think that the objection is important.

11  With respect to the communications with the Detroit Institute

12  of Art, I mean really in a way we want to ensure the Detroit

13  Institute of Art that we're acting consistent with this

14  agreement.

15          THE COURT:  Do you have this agreement?

16          MR. RESTUCCIA:  Yes, I do.

17          THE COURT:  May I see it?

18          MR. RESTUCCIA:  Yes.

19          THE COURT:  Have you seen this, Mr. Hackney?

20          MR. HACKNEY:  I have.

21          MR. RESTUCCIA:  May I approach, your Honor?

22          THE COURT:  Please.  Thank you.  And so what in here

23  suggests that it was intended to cover or did cover documents

24  provided before the execution of the agreement?

25          MR. RESTUCCIA:  It's paragraph K that talks about

1    materials exchanged prior to the execution of the agreement,

2    and the basis of the -- I'm sorry.  And then the basis of

3    then the objection is that the interests became allied at

4    which -- at the point in time at which the attorney general

5    concluded that the artwork for the city is held really in

6    trust for the interest of the people of Michigan, and at that

7    point the interests of the DIA and the attorney general were

8    then identical.

9         THE COURT:  So the DIA, through counsel, went to the

10   attorney general and said, "We'd like to help you come to the

11   conclusion that this art is covered by a trust.  Here's our

12   legal research."  The attorney general reviewed that research

13   and presumably did some of his own or with the assistance of

14   staff, came to the same conclusion, and now asserts that

15   those previous documents provided are protected.

16        MR. RESTUCCIA:  That's right.  The question comes

17   then at what point in time the attorney general has reached

18   his conclusion.  Obviously the information provided by the

19   Detroit Institute of Arts was then factual.  Much of it is

20   factual, but there's also some legal analysis that was

21   provided, but the attorney general drew his own independent

22   conclusion on these questions.

23        THE COURT:  Perhaps you can help me at least

24   preliminarily with my earlier question about what weight the

25   law gives to an attorney general's opinion.

1    MR. RESTUCCIA:  Well, the status of Michigan law is
2  that it is binding on state agencies in the absence of a
3  controlling legal opinion.  The attorney general in this
4  litigation has been -- has put forward his conclusion really
5  as a matter for the Court's consideration.  In other words,
6  this is an opinion that he believes is the proper one about
7  its disposition, but for this Court ultimately, as for the
8  Michigan courts, it's considered persuasive authority.
9    THE COURT:  All right.  Let me return this to you.
10  Chris.  Anything further, sir?
11    MR. RESTUCCIA:  No, your Honor.
12    THE COURT:  Mr. Hackney.
13    MR. HACKNEY:  Just briefly, your Honor, I think the
14  problem is that when you begin communicating with somebody
15  and sharing privileged information with them, you have to
16  know that you have the common interest at the time in
17  addition to the fact that you have to strike the agreement.
18  You have to not only have the common interest, but you also
19  have to come to the agreement before you do the
20  communicating.  What you can't do is send information that's
21  sensitive to someone that may be your adversary -- you don't
22  know because they haven't done their work yet -- and then
23  when it turns out great for you, then later say, "Ah, well,
24  retroactively, had we known you would get to that conclusion,
25  we would have had a common interest the whole time and,

 1    therefore, we'll have our agreement go back in time."  And
 2    that's one thing that the cases are clear about is that you
 3    have to have the common interest agreement before you engage
 4    in the communications.  I don't think the record supports
 5    that here.  And there is the separate problem that I don't
 6    think that they can have a common interest agreement between
 7    themselves even if they write down that they do because I
 8    think they are differently situated with respect to the art,
 9    and you -- under the Sixth Circuit, you have to have a common
10    legal interest, and so they haven't made that showing, so we
11    would ask for the production, your Honor.
12          I would also note -- I haven't asked them to log
13    internal communications between and among the attorneys
14    general, and I'm not moving on that basis.  I'm focused on
15    these documents.  We have also asked them to confirm that
16    there are no other communications because the communications
17    stop abruptly on June 13th, and we were at least curious as
18    to whether they really just stopped communicating for about
19    the last year right after the opinion, but that's subject to
20    cleanup from counsel, but even within the attachments you'll
21    see there are factual attachments here, answers to questions
22    that the attorney general poses, facts that are provided that
23    they're considering, so we think the best course is to get
24    this produced, get it out into the light.
25          THE COURT:  All right.  I'm going to take a ten-

1  minute recess and come back out with a decision on this.

2           THE CLERK:  All rise.

3           THE COURT:  So that'll be -- that's all right.

4  That'll be 11:35 we'll say.

5           THE CLERK:  Court is in recess.

6       (Recess at 11:23 a.m., until 11:37 a.m.)

7           THE CLERK:  All rise.  Court is in session.  Please

8  be seated.  Recalling Case Number 13-53846, City of Detroit,

9  Michigan.

10          THE COURT:  Syncora has requested an order requiring

11 the attorney general to produce the documents identified in

12 the attorney general's privilege log dated April 25th, 2014.

13 These documents reflect communications from counsel for the

14 Detroit Institute of Arts to the attorney general and

15 communications from the Attorney General's Office back to

16 counsel for the Detroit Institute of Arts.  The time frame is

17 from April 12, 2013, through June 13, 2013.  The basis of the

18 objection to the request for these documents is the common

19 interest privilege.

20          The Court concludes that the claim of privilege

21 should be overruled and that Syncora's request for an order

22 compelling the production of these documents should be

23 granted.  Plainly, the extent to which the art held by the

24 Detroit Institute of Arts should be taken into account in

25 evaluating whether the city's plan meets the best interest

1   test of the Bankruptcy Code is a substantial issue in the

2   case, one that has not been pre-judged or determined by the

3   Court at all, and, of course, this ruling should not be

4   construed to suggest one way or the other how the Court will

5   or may rule on that substantive issue of confirmation.

6          The common interest privilege, however, requires a

7   common legal interest, and the Court is unpersuaded that at

8   the time these documents were exchanged there was any common

9   legal interest between the attorney general of the State of

10  Michigan and the Detroit Institute of Arts.  The client on

11  whose behalf the Honigman firm produced these documents or

12  received them from the attorney general is the corporate

13  entity that maintains and manages the collection for the city

14  as a result of a contract with the city.  Nothing in the

15  record to this point anyway, in any event, suggests that that

16  contract requires this entity to take a position one way or

17  the other on the issue on which the attorney general

18  expressed his opinion ultimately.

19         More fundamentally, the fact that parties align in

20  presenting their arguments to the Court does not by itself

21  mean that they have a common legal interest.  Much more has

22  to be shown than that, and whatever that more is has not been

23  shown of record here.  More than that, at the time these

24  documents were produced, the record now does establish that

25  the attorney general had no formal position on the issue.

1 That only manifest itself later after the attorney general

2 did come to a conclusion, and these documents were produced

3 before there was even an alignment of positions, so for all

4 these reasons, the claim of privilege is disallowed and

5 overruled, and the motion is granted.

6         Now, we do have this one little open issue about

7 whether one or more documents were inadvertently produced and

8 should have been destroyed.  I'm going to trust counsel to

9 work all of that out.  And I want to return your log to you,

10 sir.

11         MR. HACKNEY:  Your Honor, just --

12         THE COURT:  One second.  Did you want to be heard,

13 sir?

14         ATTORNEY:  Oh, no.

15         THE COURT:  Okay.

16         ATTORNEY:  Thank you, your Honor.

17         MR. HACKNEY:  Your Honor, one last issue.  I don't

18 want to take up your time with issues that actually aren't

19 live issues, but this is sufficiently important, I think, to

20 the schedule, I kind of want to explain why we did what we

21 did on filing our answers to discovery and interrogatories.

22 And I will skip to the end and say Mr. Irwin and I have hopes

23 yet that we can resolve these objections.  We had two meets

24 and confer last week.  We hope to do additional ones, and so

25 I don't anticipate --

1          THE COURT:  When will you be doing those?

2          MR. HACKNEY:  I think we're going to do one right

3  after court today and keep working through them, but we

4  need --

5          THE COURT:  Well, I don't want to -- I don't want to

6  hear you if your preference is to try to work it out.  If you

7  want me to rule, I'm prepared to rule on anything, but if

8  your preference is to try to work it out and reserve what yet

9  can't be resolved --

10         MR. HACKNEY:  Yeah.

11         THE COURT:  -- in the meantime for another day,

12  that's fine with me, too.

13         MR. HACKNEY:  I would like to do that as well, but I

14  do want to see if I can address -- and I will, but I want to

15  ask you a question about your schedule because we were the

16  only party that filed our discovery answers on April 25th,

17  and I told the city that I was of the view that they had to

18  as well and that the May 6 date is now the date that you and

19  I had previously discussed about when you'll hope to complete

20  discovery.  And I told them that because I said I want to get

21  their objections now so I can see what they're not going to

22  produce so we can spend this time period wrestling, as it

23  were, and bringing motions to you to compel production of any

24  documents they are objecting to, and I also want to get their

25  interrogatory responses.  And when you and I had talked at

1  the last hearing that was part of a larger scheduling issue,

2  but we talked about the fact that it's hard to complete

3  discovery on the day that you provide your document

4  objections because if your objections are sustained, then,

5  yeah, maybe you'll be done, but if your objections are

6  overruled, then you have to go collect and produce those

7  documents.  And I had thought that what you did was you moved

8  not the date to respond to written discovery requests but the

9  date to comply with them back.

10       THE COURT:  No, no.  That deadline is the deadline

11 to produce documents to which there is no objection or to

12 object to documents as to which there is an objection, my

13 thought being that I would schedule a prompt hearing on those

14 objections with the expectation that to the extent I

15 sustained -- well, to the extent that I overruled any

16 objections and, therefore, required the production of

17 documents, that would be done immediately.

18       MR. HACKNEY:  Okay.

19       THE COURT:  That's how I want to proceed.

20       MR. HACKNEY:  Okay.  Well, that's helpful then.  I

21 did not understand that, but we did get ours out early and

22 on -- you know, what we thought was on time, and we'll

23 continue to work through them.  And if we can't, we'll

24 probably be before you on the 12th with respect to those,

25 which is --

1          THE COURT:  All right.  All right.

2          MR. HACKNEY:  Thank you, your Honor.

3          THE COURT:  All right.  Would anyone else like to be

4   heard regarding any interrogatory objections or document

5   production objections?  No?  Yes?  Maybe?

6          MR. IRWIN:  Your Honor, Geoff Irwin.  Mr. Hackney's

7   recitation is consistent with our discussions.  That's all

8   I --

9          THE COURT:  All right.

10          MR. IRWIN:  -- really need to add at this point.

11          THE COURT:  Okay.  All right.  On the schedule for

12   today we have this corrected motion 3932, motion for entry of

13   order establishing supplemental procedures for solicitation

14   and tabulation of votes regarding pension and OPEB claims.

15   Has that been resolved?

16          MS. LENNOX:  I do think it's largely been -- oh, for

17   the record, your Honor, Heather Lennox of Jones Day on behalf

18   of the city.  I do think this has largely been resolved.  As

19   I indicated last time, we've been working with the Retiree

20   Committee, the two systems, AFSCME, public safety unions and

21   others, on the language.  I believe that the parties have

22   reached agreement on these forms of documents in large

23   measure.  As Ms. Neville indicated, we're going to take the

24   next couple of days, do a clean read, these against the plan

25   against the disclosure statement, just to make sure

1  everything is perfectly consistent, so they may change in

2  nonmaterial ways, but I believe this is done.

3        I also want to note -- we didn't say it last time,

4  but there's a notation on the ballots that the numbers on the

5  ballots are estimates.  Only the retirement systems

6  themselves can determine final pensions, and the calculations

7  are being done by two different actuaries to give to the

8  balloting agents.  The actuaries are working very closely

9  together.  The data is very similar, but there may be minor

10 changes, and so that's why I just wanted to point out to the

11 Court that these are estimates that'll be on the ballots.

12        THE COURT:  Okay.

13        MS. LENNOX:  Other than that, I do think that,

14 barring somebody contradicting me, we have reached agreement

15 on these documents.

16        THE COURT:  All right.  We'll note this matter as

17 resolved.  If you need my help with anything, you can let my

18 office know, and we'll get on the phone and figure something

19 out.

20        MS. LENNOX:  Thank you, your Honor.

21        THE COURT:  All right.  Stand by, please.  All

22 right.  Mr. Gordon, something further?

23        MR. GORDON:  Thank you, your Honor.  I just wanted

24 to add in response to what Ms. Lennox just reported that my

25 comments from earlier still apply obviously.  We're still,

1  you know, finalizing the terms of the settlement with the

2  retirement systems, so that could affect something in her

3  documents, but I don't know at this time.

4          THE COURT:  All right.

5          MR. GORDON:  Thank you.

6          THE COURT:  All right.  I want to turn my attention

7  then to my ruling regarding the joint motion to amend the

8  solicitation procedures order that was filed by Assured and

9  others.  This ruling is going to be a little bit rough.

10 Somehow I got it in my head that this matter would be

11 resolved.  Apparently it has not.  Is that correct?

12         MR. KOHN:  Correct, your Honor.

13         THE COURT:  So I'll do the best I can here.  As I

14 understand the plan provision at issue in the broadest terms,

15 it says something like this.  On the ballot, these

16 bondholders will be given two choices to make.  One is

17 whether to vote for or against the plan, and the other is to

18 make a certain election, an election which the city, at

19 least, contends provides the creditors concerned here better

20 treatment.  The plan further provides that a party making

21 this election waives any and all objections that that party

22 might have to the plan, and that waiver applies not only as

23 to plan treatment in the class as to which the election is

24 made but also as to plan treatment that that same creditor

25 might have in classes in which the election is not made.  It

1  is my further understanding that under the plan, if the class

2  accepts the plan, the creditors in the class who made the

3  election get the election, but if the class does not accept

4  the plan, the creditors in the class do not get the election.

5  And a consequence of that is that a creditor who has made the

6  election but doesn't get it because the class didn't accept

7  the plan is construed as having objected to the plan -- is

8  construed as having waived objections to the plan.  In

9  response to that, Mr. Bennett, on behalf of the city, offered

10  then to allow such a creditor who otherwise would have lost

11  the right to object because he or she accepted the -- or

12  because he or she made the election but they didn't get the

13  election because the class did not accept the plan then to

14  object.  And now I want to pause and ask Mr. Bennett if I've

15  got that substantially correct.

16          MR. BENNETT:  Your Honor, you have it exactly

17  correct.

18          THE COURT:  All right.  All right.  Well, then I am

19  going to sustain Assured's objection to that for the

20  following reason.  And at this point I will preliminarily say

21  that the cases that the parties have cited on both sides I

22  didn't find particularly helpful because none of them dealt

23  with this precise kind of treatment with elections and

24  waivers, and certainly as a general matter the case law

25  supports the proposition that it is not coercive or at least

1  not unlawfully coercive for a plan to offer better treatment

2  to a party that accepts it.  The problem with this is

3  actually mostly administrative.  The administrative problem

4  is that it forces the creditor who makes the election to,

5  nevertheless, file an objection because of the possibility

6  that the plan may -- the class may not accept the plan, and

7  the creditor is under a deadline to file an objection.  In

8  the alternative, the Court could extend the objection

9  deadline for those people, but we won't know that until the

10  end of the voting time, and that has the substantial

11  likelihood of delaying our confirmation process, and that's

12  unacceptable.  So because of the inherent inefficiency that

13  this imposes upon creditors or the inherent inefficiency that

14  it imposes upon the Court and its process, the Court will not

15  permit it and will leave it to the city and these creditors

16  to try to work out some alternative that accomplishes what

17  the city wants to accomplish, which is to get votes, that

18  does not impose unduly on the efficiency of this Court's

19  process.  I'm not sure that the language that the bondholders

20  have requested the Court to impose is the only -- or the only

21  necessary solution to that, so I'm going to ask you all to

22  try to work that out.  Are you willing to try to do that?

23          MR. LEMKE:  Yes, your Honor.

24          THE COURT:  Mr. Bennett?

25          MR. BENNETT:  Yes, your Honor.

1        THE COURT:  All right.  So when you do that, you may
2   submit an order, sir, that comports with your agreement and
3   the Court's ruling.  Okay?  Okay.  Good.  All right.
4   Anything else for today?  All right.  We'll be in recess.
5        THE CLERK:  All rise.
6     (Proceedings concluded at 11:56 a.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    May 1, 2014
_____             _____
Lois Garrett