## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
---------------------------------------------  x
                                               :
In re                                          :          Chapter 9
                                               :
CITY OF DETROIT, MICHIGAN,                     :          Case No. 13-53846
                                               :
                        Debtor.                :          Hon. Steven W. Rhodes
---------------------------------------------  x
```

## DEBTOR'S OBJECTION AND BRIEF IN OPPOSITION TO MOTION FOR RELIEF FROM AUTOMATIC STAY FILED BY NATHANIEL BRENT

The City of Detroit ("City") files this Objection and Brief in Opposition ("Objection) to the Motion for Relief from Automatic Stay ("Motion") filed by Nathaniel Brent ("Mr. Brent").  In support of this Objection, the City respectfully represents as follows:

## I.     INTRODUCTION

Mr. Brent seeks relief from the automatic stay to continue a lawsuit brought under 42 U.S.C. § 1983 against the City of Detroit's Police Department and two of its officers. Mr. Brent, however, did not file a proof of claim in the City's bankruptcy case; therefore, he is enjoined and barred from pursuing his alleged claims against the City and its officers.  Further, this Court previously referred to mediation any pending actions under 42 U.S.C. § 1983 brought against the City or its employees.  Thus, if Mr. Brent were allowed to continue pursuing his allegations notwithstanding his failure to file a proof of claim, the appropriate forum is in the bankruptcy court-ordered mediation and not the

federal district court.  Finally, Mr. Brent does not demonstrate cause supporting the requested relief, and in fact, no cause exists for relief from the stay.

## II.  BACKGROUND

### A.  Mr. Brent's § 1983 Action

The incident at the center of Mr. Brent's lawsuit allegedly took place on January 17, 2010, when one of Mr. Brent's children arrived at a Detroit Police station barefoot and wearing only a pair of shorts.  *See* Order at 1 [Doc. No. 113 in District Court Lawsuit].  After interviewing the child, Detroit Police Officer Donald Coleman transmitted a report to the Department of Human Services ("DHS") which described the boy's situation.  *Id.*  The DHS investigated the report by, among other things (1) visiting Mr. Brent's home, (2) referring the Brent family to the Judson Center;[1] and (3) filing a petition with the Family Division of the Third Judicial Circuit Court for Wayne County ("Family Court"), which sought authority for the removal of Mr. Brent's five children from his home.  *Id.*  On February 16, 2010, Mr. Brent's name was placed on Michigan's Central Registry for "physical neglect."  *Id.*  All five children were removed from the home, placed into emergency shelters.  *Id.*  Guardians *ad litem* were appointed for the children and counsel were appointed for the parents.  *Id.*  A trial was subsequently conducted and the children were released to their parents but were ordered to remain

---

[1] The Judson Center is a "non-profit, community-based human service center that provides several types of support services to families, including family preservation services." Defendant Judson Center and Wendolyn Greene's Brief in Support of Their Motion for Judgment on the Pleadings and/or for Summary Judgment at 1. [Doc. No. 65 in District Court Lawsuit].

under the supervision of the DHS. *Id.* Finally, on September 10, 2010, after finding that

(1) the conditions within the Brent home had improved, (2) the parents had been

cooperative during the investigation, and (3) the children's needs were being met, the

Family Court terminated its supervision over the matter. *Id.* at 3-4.

On or about February 22, 2011, *pro se* plaintiff, Mr. Brent, filed a complaint in the

United States District Court for the Eastern District of Michigan ("District Court"), Case

No. 11-10724 ("District Court Lawsuit") against over 20 defendants,[2] including the City

of Detroit Police Department, one named officer and other unnamed John/Jane Doe

officers. Mr. Brent, relying on 42 U.S.C. § 1983, challenged the constitutionality of

certain provisions of the child protection laws of the State of Michigan. Mr. Brent later

filed an amended complaint adding Detroit police officer Michael Bronson as a

defendant. Amended Complaint at 7 [Doc. No. 114 in District Court Lawsuit]. The

Amended Complaint is attached as **Exhibit 1**.

Over the course of the last few years, several of the defendants and counts have

been dismissed. *See* Orders [Doc. Nos. 113, 163, 171, 190 in District Court Lawsuit]. On

---

[2] Mr. Brent identified the following persons and entities as Defendants in the case: (1) the
State of Michigan and the Wayne County Departments of Human Services (collectively
referred to as "DHS"); (2) current and former employees of the Wayne County DHS
Child Protection and Foster Care Departments (Mia Wenk, Shevonne Trice, Heather
DeCormier-McFarland, Monica Sampson, Charlotte McGehee, and Joyce Lamar); (3)
Noel Chinavare and Michael Chinavare (temporary guardian appointees of Brent's male
children); (4) agencies under contract with the Wayne County DHS (Methodist
Children's Home, Judson Center, and Children's Center of Wayne County); (5)
Wendolyn Greene (an employee of the Judson Center); (6) the Detroit Police
Department; (7) Officer Emina Biogradlija and unnamed John/Jane Doe officers; and (8)
Wayne County Family Court judges and referees (Judy Hartsfield, Leslie Smith, Anthony
Crutchfield and Nicolas Bobak). Order at 1.

July 22, 2013, the City file a Notice of Suggestion of Pendency of Bankruptcy Case and Application of the Automatic Stay which provided, among other things, that the City would not take any action in the District Court Lawsuit while the automatic stay remained in effect. [Doc. No. 186 in District Court Lawsuit].

**B.      The City's Bankruptcy Case**

On July 18, 2013 (the "Petition Date"), the City filed a petition for relief in this Court, commencing its chapter 9 case.  Mr. Brent filed a notice of appearance in the City's bankruptcy case on July 23. [Doc. No. 101].  On November 21, this Court entered its Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof ("Bar Date Order"). [Doc. No. 1782]. The Bar Date Order established 4:00 p.m., Eastern Time, on February 21, 2014 as the general bar date ("General Bar Date"). Bar Date Order ¶ 4. The Bar Date Order further provided that an entity that fails to file a proof of claim by the applicable Bar Date "shall be forever barred, estopped and enjoined from…asserting any claim against the City or property of the City…" *Id.* ¶ 22.

On December 24, 2013, this Court entered the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims ("ADR Order") which approved the Alternative Dispute Resolution Procedures attached as Annex 1. [Doc. No. 2302]. ADR Order ¶ 6.  The ADR Order provides that:

> Notwithstanding anything in this Order, the "ADR
> Procedures" that this Order approves (Annex 1), or in the
> ADR Procedures Motion, all lawsuits alleging claims against
> the City, its employees or both under 42 U.S.C. § 1983 that
> are pending in the United States District Court are referred to
> Chief United States Judge Gerald Rosen for mediation under
> such procedures as he determines.

ADR Order ¶ 20.

On April 21, 2014, Mr. Brent filed the Motion. [Doc. No. 4211]. The Motion seeks relief from the automatic stay for Mr. Brent's case against the "Debtor and some of its employees in which Mr. Brent seeks to establish liability and damages for violations of his civil rights under 42 U.S.C. § 1983." Motion ¶4.

## III.  ARGUMENT

### A.  Mr. Brent is Barred, Estopped and Enjoined from Pursuing his Claims against the City and its Police Officers

Mr. Brent failed to file a proof of claim in the City's bankruptcy case. As a result, under the Bar Date Order, Mr. Brent is "forever barred, estopped and enjoined from…asserting any claim against the City or property of the City…" Bar Date Order ¶ 22. The Bar Date Order thus provides that Mr. Brent may not prosecute the District Court Lawsuit against the City or the City's police officers. As such, no cause exists to grant the Stay Motion because the Bar Date Order specifically prohibits the continuance of the District Court Lawsuit against the City and its police officers.

### B.  Mr. Brent's Claims Were Referred to Mediation

If this Court were to allow Mr. Brent to continue the pursuit of his alleged claim against the City and its police officers notwithstanding his failure to file a proof of claim,

the appropriate forum is mediation and not the District Court. The ADR Order provides

that "all lawsuits alleging claims against the City, its employees or both under 42 U.S.C.

§ 1983 that are pending in the United States District Court are referred to Chief United

States Judge Gerald Rosen for mediation under such procedures as he determines." The

District Court Lawsuit must be referred to Chief Judge Rosen for mediation because it

was pending when the ADR Order was entered and it alleges claims against the City and

its employees under 42 U.S.C. § 1983. *See e.g.*, Amended Complaint at 1, 61 [Doc. No.

114 in District Court Lawsuit]. Mr. Brent should not be granted relief from the automatic

stay because the District Court Lawsuit was referred to mediation.

## C.     No Cause Exists to Grant Relief from Stay

Finally, under the factors generally applied to stay motions in this circuit, there is

no cause for relief from stay. Section 362(a) of the Bankruptcy Code provides in relevant

part that:

> a petition filed under . . . this title . . . operates as a stay,
> applicable to all entities, of . . . the commencement or
> continuation . . . of a judicial, administrative, or other action
> or proceeding against the debtor that was or could have been
> commenced before the commencement of the case under this
> title, or to recover a claim against the debtor that arose before
> the commencement of the case . . . .

11 U.S.C. § 362(a). The automatic stay "is one of the fundamental debtor protections

provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors.

It stops all collection efforts, all harassment, and all foreclosure actions." *Javens v. City*

*of Hazel Park (In re Javens)*, 107 F.3d 359, 363 (6th Cir. 1997) (quoting H.R. REP. NO.

95-595, at 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296). On July 25, 2013,

this Court entered an order confirming the protections of sections 362, 365 and 922 of the

Bankruptcy Code and an order extending such protections to Non-Officer Employees.[3]

[Doc. Nos. 166 & 167]. This Court also entered an order extending the automatic stay to

certain actions or claims for damages brought against any former Detroit Public Safety

Union Member,[4] including any retiree. *See* Order Pursuant to Section 105(a) of the

Bankruptcy Code Extending the Chapter 9 Stay to Any Action or Claim for Damages

Brought Against Any Former Detroit Public Safety Union Member, Including Any

Retiree, Which Arises out of the Good Faith Performance of His or Her Duties While

Employed by the City ¶ 2. [Doc. No. 1744]. Whether they are current or former members

of the Detroit Police Department, Mr. Brent's claims against the individual City police

officers are subject to the automatic stay.

Section 362(d) of the Bankruptcy Code authorizes a bankruptcy court to grant

relief from the automatic stay in limited circumstances. *See* 11 U.S.C. § 362(d). In

particular, section 362(d)(1) of the Bankruptcy Code provides that a party in interest may

---

[3] "Non-Officer Employees" is defined as employees of the City that are neither City officers nor inhabitants of the City. Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor ¶ 24. [Doc. No. 56].

[4] "Detroit Public Safety Unions" is defined as the Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association and the Detroit Police Command Officers Association. *See* Motion of the Detroit Public Safety Unions Pursuant to Section 105(a) of the Bankruptcy Code For Entry of an Order Extending the Chapter 9 Stay to Any Action or Claim for Damages Brought Against Any Former Detroit Public Safety Union Member, Including Any Retiree, Which Arises out of the Good Faith Performance of His or Her Duties While Employed by the City at 1. [Doc. No. 1081].

obtain relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. §362(d)(1).

"The Bankruptcy Code does not define 'cause' as used in [section] 362(d)(1). Therefore, under [section] 362(d), 'courts must determine whether discretionary relief is appropriate on a case by case basis.'" *Chrysler LLC v. Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.)*, 382 B.R. 90, 106 (Bankr. E.D. Mich. 2008) (*quoting Laguna Assocs. L.P. v. Aetna Casualty & Surety Co. (In re Laguna Assocs. L.P.)*, 30 F.3d 734, 737 (6th Cir. 1994)). The determination of whether to grant relief from the automatic stay "resides within the sound discretion of the Bankruptcy Court." *Sandweiss Law Center, P.C. v. Kozlowski (In re Bunting)*, No. 12-10472, 2013 WL 153309, at *17 (E.D. Mich. Jan. 15, 2013) (*quoting In re Garzoni*, 35 F. App'x 179, 181 (6th Cir. 2002)).

> To guide the bankruptcy court's exercise of its discretion . . . the Sixth Circuit identifies five factors for the court to consider: (1) judicial economy; (2) trial readiness; (3) the resolution of the preliminary bankruptcy issues; (4) the creditor's chance of success on the merits; and (5) the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors.

*Bunting*, 2013 WL 153309, at *17 (*quoting Garzoni*, 35 F. App'x at 181) (internal quotation marks omitted). In determining whether cause exists, however, "the bankruptcy court should base its decision on the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code." *Plastech*, 382 B.R. at 106 (*quoting In re C & S Grain Co.*, 47 F.3d 233, 238 (7th Cir. 1995)). In that regard, a primary purpose of bankruptcy is the centralization of claims against the debtor for

determination by the bankruptcy court through the claims allowance process. *See In re Hermoyian*, 435 B.R. 456, 464 (Bankr. E.D. Mich. 2010) (stating that an underlying policy of the Bankruptcy Code is the provision of a centralized forum for claims resolution and orderly distribution of assets). Further, the automatic stay benefits the creditor body at large by ensuring their equal treatment and preventing a race to the courthouse. *See* H.R. REP. NO. 95-595, at 340 (1977) ("The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.").

Here, consideration of these factors confirms that no cause (much less sufficient cause) exists to justify relief from the automatic stay to allow the District Court Lawsuit to proceed. With respect to the first and last factors, the interests of judicial economy and costs to the bankruptcy estate weigh heavily in favor of denying the Motion. Through the ADR Order, this Court has already established a procedure to resolve § 1983 claims by their referral to mediation before Chief Judge Rosen. Further, as a result of Mr. Brent's failure to file a proof of claim, he is forever barred from pursuing or recovering anything on account of his alleged claims. Mr. Brent thus has no chance of prevailing and it would be a waste of the City's resources to continue the District Court Lawsuit. Finally, it does not appear as if there is a trial date set in the District Court Lawsuit as the case had been stayed, against all defendants, from late July 2013, to April 2014, due to the pendency of an appeal before the Sixth Circuit. *See* Order Staying Case [Doc. No. 188 in District

Court Lawsuit].    In sum, no cause exists to grant Mr. Brent relief from the automatic stay to continue the District Court Lawsuit.

**IV.**    <u>**CONCLUSION**</u>

WHEREFORE, the City respectfully requests that this Court: (a) deny the Motion; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: May 5, 2014                         Respectfully submitted,

By: /s/Stephen S. LaPlante
Jonathan S. Green (P33140)
Stephen S. LaPlante (P48063)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street Fiftieth Floor
Los Angeles, California 90071

Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY OF DETROIT

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 5, 2014, he caused a true and correct copy of the ***DEBTOR'S OBJECTION AND BRIEF IN OPPOSITION TO MOTION FOR RELIEF FROM AUTOMATIC STAY FILED BY NATHANIEL BRENT*** to be served upon the party listed below, via First Class United States mail:

Nathaniel Brent
538 South Livernois
Detroit, MI 48209

Dated: May 5, 2014

By: /s/Stephen S. LaPlante
Stephen S. LaPlante
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
laplante@millercanfield.com



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHANIEL H. BRENT,

        Plaintiffs,

v

WAYNE COUNTY DHS, STATE OF MICHIGAN
DEPARTMENT OF HUMAN SERVICES, MIA WENK,
SHEVONNE TRICE, HEATHER DECORMIER-MCFARLAND,
MONICIA SAMPSON, CHARLOTTE MCGEHEE, JOYCE LAMAR,
METHODIST, EMINA BIOGRADLIJA, MICHAEL BRONSON
DETROIT POLICE DEPARTMENT,TWO  Unknown Detroit Police Officers,
THE CHILDREN'S CENTER, CHILDREN'S HOME, JUDSON CENTER,
WENDOLYN GREENE

        Defendants.

**FILED**

DEC 7 - 2011

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

No. 2:11-CV-10724

HON. JULIAN ABELE COOK

MAG. MONA K. MAJZOUB

---

Nathaniel H. Brent, In Pro Per
538 South Livernois
Detroit, MI 48209
(313) 841-4591

---

Joseph T. Froehlich (P71887)
Attorney for Defendants Wayne County Dept. of Human
Services, State of Michigan Dept. of Human Services,
Mia Wenk, Shevonne Trice, Heather Decormier-McFarland,
Monica Sampson, Joyce Lamar, Nicolas Bobak, Anthony
Crutchfield, Charlotte McGehee, Judy Hartsfield, Leslie Smith
Michigan Department of Attorney General
Public Employment, Elections & Tort Division

Brian C. Kelly (P63133)
Brian R. Meyer (P66599)
Steven M. Wolock (P38497)
Attorneys for Defendant Children's
Center of Wayne County
28400 Northwestern Hwy,3rdFl.
Southfield, MI 48034-1839
(248) 354-4030

Robert L. Duty (P30706)
Attorney for Methodist Children's
Home
39577 Woodward Avenue
Suite 300
Bloomfield Hills, MI 48304-2820

1

Amy C. Monopoli (Not Sworn)
Mark J. Zausmer (P31721)
P.O. Box 30736
Lansing, MI 48909
(517) 373-6434

Attorneys for Defendants Judson
Center, Wendolyn Greene
31700 Middlebelt Road
Suite 150
Farmington Hills, MI 48334-2374
(248) 851-4111

Jerry L. Ashford (P47402)
Attorney for Defendants Detroit Police Department
and Emina Biogradlija
Detroit City Law Department
660 Woodward Ave.
Suite 1650
Detroit, MI 48226-3491
(313) 224-4550

John A. Schapka
Co-Defense Counsel for Defendants
Detroit Police Dept and Emina
Biogradlija
1650 First National Building
Detroit, MI 48226
(313) 224-4550 ext. 23142

Richard L. Hamlyn (P28013)
Attorneys for Defendants Noel A. Chinavare,
and Michael A. Chinavare, only
P.O. Box 250625
Franklin, MI 48025
(248) 562-7723

## PLAINTIFF's FIRST AMENDED COMPLAINT, REQUEST FOR DAMAGES AND JURY DEMAND

**I.**                                     **Introduction**

1.   This is a civil rights action brought pursuant to 42 U.S.C. § 1983 challenging the

constitutionality of certain provisions and portions of the Child Protection Law of

the State of Michigan, both facially and as applied against Plaintiff.  Plaintiff also

seeks an injunction prohibiting Defendants from enforcing the challenged

provisions in the future, as well as a declaration that those provisions are

unconstitutional.

2

2.  This is a civil rights action brought pursuant to 42 U.S.C. § 1983 in which the Plaintiff seeks compensatory and punitive damages against the Defendants in their individual capacities and compensatory damages against the County and Municipal Defendants for violation of the Plaintiff's rights guaranteed to him under the First, Second, Fourth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution and under Art. I § 6, 11, 13 and 17 of the 1963 Constitution of the State of Michigan.

3.  This is a civil rights action brought pursuant to 42 U.S.C. § 1985 in which the Plaintiff seeks compensatory and punitive damages against the Defendants for conspiring to violate Plaintiff's Fourth, Ninth, and Fourteenth Amendment rights, and for conspiring to retaliate against Plaintiff for exercising his right to trial by jury protected by Seventh, Ninth, and Fourteenth Amendments of the United States Constitution.

4.  Plaintiff further seeks declaratory relief that as applied by the Defendants § 722.628(2); § 750.138 MCL; § 750.350a(1) MCL et seq; § 712A.1 et seq. MCL; § 712A.2 et seq MCL; § 712A.14 MCL; § 712A.15 MCL; § 24.271 et seq MCL and PSM 713-1, PSM 713-3, PSM 713-8, PSM 713-11, PSM 715-2, PSM 715-3 of the Children's Protective Service Manual and the State of Michigan and/or Wayne County and City Protocol for Emergency Removal and Placement of Minors (together with other statutes and procedure which may be identified in the course of this action referred to collectively as hereafter as the "Statutes and Protocols") violated Plaintiff's rights guaranteed them under the First, Fourth and

3

Fourteenth Amendments to the United States Constitution and under Art. I, § 11 and 17(1) of the Constitution of the State of Michigan.

5. Plaintiff further seeks permanent injunctive relief prohibiting Defendants from engaging in the conduct declared to be in violation of the Plaintiff's constitutionally protected rights and from enforcing Statutes and Protocols in the manner complained of herein.

**II.**                                    **Jurisdiction**

1. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), because Plaintiff and his children reside in this district, the greater majority of defendants reside within the district, and a substantial part of the events or omissions giving rise to the claim occurred within the district.

**III.**                                    **Parties**

1. Plaintiff Nathaniel Brent is a citizen of the United Stated and at the commencement of this action was a resident of Wayne County Michigan with his principle address in Detroit Michigan located within the Eastern District of Michigan. Plaintiff Nathaniel Brent is the parent of the minors A.L.B., R.A.B, J.A.B. (female), S.A.B, and J.A.B. (male) who all reside in Wayne County and are located within the Eastern District of Michigan.

**4**

2.  On and before February 18, 2010, Plaintiff Nathaniel Brent was the parent of and had legal care, control and custody of all five minor children and they all resided together at the family home in Detroit, Michigan.

3.  Defendant Wayne County Department of Human Services is a Department primarily funded through Wayne County Michigan, and is capable of suing and being sued.

4.  Defendant State of Michigan Department of Human Services is a division of the State of Michigan, and is capable of suing and being sued.  At all times material Michigan Department of Human Services was the State agency charged with the enforcement of the provisions of the Child Protection Law and is being sue for declaratory relief as well as injunctive relief.

5.  Defendant Mia Wenk was at all times material to this action, a child protective services "CPS" caseworker for the Wayne County DHS Child Protection Department.  She is sued in both her official and individual capacity.

6.  Defendant Shevonne Trice was at all time material to this action, a foster care "FC" caseworker for Wayne County DHS Foster Care Department. She is sued in both her official and individual capacity.

7.  Defendant Heather Decormier-McFarland at all time material was a Wayne County DHS intern. She is sued in both her official and individual capacity.

8.  Defendant Monica Sampson was at all time material to this action, a Wayne County Child Protective Services supervisor of Mia Wenk. She is sued in both her official and individual capacity

5

9.  Defendant Charlotte McGehee was at all times material to this action, a Wayne County Foster Care supervisor of Shevonne Trice. She is sued in both her individual and official capacity.

10. Defendant Joyce Lamar was at all times material to this action was the Wayne County Sectional supervisor of Charlotte McGehee and Monica Sampson. She is sued in both her individual and official capacity.

11. Defendant Methodist Children's Home was at all times material a contracted agency to Michigan and Wayne County DHS and is being sued both in it official (as a state actor) and individual capacity.

12. Defendant Judson Center and its subsidiaries Families First and Family Reunification at all times material was contracted "service providers" of Michigan and Wayne County DHS and are sued in both their official (state actor) and individual capacities.

13. Defendant Wendolyn Greene also known as Wendolyn Anderson at all time material to this action was an employee of Judson center. Ms Anderson acted as both therapist to J.A.B. (female) and S.A.B. during their placement at Davenport shelter as well as Team Leader for the Family Reunification team assigned to the family after the children were returned to the home. She is sued in both her official (state actor) and individual capacity.

14. Defendant The Children's Center at all time material was allegedly contracted by Wayne County DHS to provide foster care and supervision of Plaintiff's minor daughters. The agency is being sued in both its official (state actor) and individual capacity.

6

15. Defendant Detroit Police Department is a police department existing and operating according to the laws of the State of Michigan within the Eastern Judicial District of the State of Michigan and is capable of suing and being sued.

16. Individual Officers Emina Biogradlija, Michael Bronson and officers John/Jane Doe are being sued in their official and individual capacities.

## IV. ALLEGATIONS AND CAUSE OF ACTION AGAINST MICHIGAN DEPARTMENT OF HUMAN SERVICES

### A.                    ALLEGATIONS

1. The Michigan Department of Human Services (Mich DHS) is the state agency responsible for the enforcement of the Child Protection Law (MCL 722.621 et al)

2. Plaintiff challenges specific provisions of this law as unconstitutional both facially and as applied to Plaintiff.

3. MCL 722.627(4) allows for the department (or its subordinate counties) to arbitrarily place a person's name upon the Central Registry without any due process of law. In Plaintiff's case Plaintiff was given no form of hearing or any other legitimate means to contest this adverse action prior to his name being placed on the central registry.

4. As this subsection was applied to Plaintiff the required notification (when Plaintiff finally acquired a copy of it months later) only stated that Plaintiff's name was placed on the Central Registry for "physical neglect" with no further explanation of who the alleged victim was or how Plaintiff allegedly neglected them.

5. MCL 722.627(6) requires only a preponderance of evidence to keep a person's name on the central registry during an appeal. This 50/50 chance of error does not adequately

7

protect the fundamental liberties lost by the person listed nor does it promote any integrity or reliance as to the accuracy of this registry.

6. MCL 722.627(7) is blatantly unconstitutional on its face as it requires the person attempt to have his name removed from the registry to prove beyond **any** doubt there is no evidence of abuse of neglect. This is directly contrary to the belief that a person is innocent until proven guilty. Further this provision places life sentence on the accused without them ever having been convicted or accused of a crime.

7. Fundamental liberties that are infringed upon and/or are lost by having ones name on the central registry include but are not limited to: loss of employment and volunteer opportunities in any area regarding children (such as working in a daycare or school), adoption options, becoming a relative care giver f a relatives child becomes a court ward, being able to adopt, involvement in youth related programs (such as Boy Scouts and Civil Air Patrol)

8. In the instant case Plaintiff has and continues to suffer the effects of being placed on the Central Registry. Prior to his name being placed on the central registry Plaintiff actively volunteered with Civil Air Patrol teaching children between the ages of 12-21 emergency services, aerospace education, and leadership skills. As a result of being listed on the registry Plaintiff can no longer enjoy this liberty.

9. Plaintiff potentially will suffer as he cannot become a relative care giver and/or foster parent if any of his nieces, nephews or grandchildren should require such care, nor can he adopt and/or care for his own blood relations if the unthinkable happens and they are for some reason left without parents.

8

10. The above provisions further violates Plaintiff's equal protection rights, as before someone is placed on Michigan's sex offender registry they **must** first be convicted of a crime. Further unlike the Central Registry a sex offender can petition to have his name removed after a specified period of time although he was convicted of a crime.

11. The "structured decision-making tool" identified repeatedly in MCL 722.628d currently approved for use is unconstitutionally prejudicial in that it uses factors regarding past false and/or unsubstantiated allegations, the number of children in the home and the simple fact an allegation was made as determining factors to determine what category the parents should be placed.

12. As applied to Plaintiff to be placed on the central registry it requires seven points. Plaintiff's families' score was eight. Two points were given due to the fact there was a current complaint. Two points were given due to past false and/or unsubstantiated complaints made against the family (last being seven years prior). One point was given due to Plaintiff's family consisting of more than three children. Of the other three points one was due to Ms. Wenk not asking the parents about any "social support" (Ms. Wenk has admitted this to be the case) and two points were given due to Ms. Wenk fraudulently claiming the "Housing was physically unsafe" (Ms. Wenk has admitted there were no physical concerns regarding the home.

13. It should be noted that in Plaintiff's case although he was allegedly placed on the central registry for "physical neglect" the structured decision making tool (Family risk assessment) states that the parents provided adequate physical care for the children.

14. Due to the fundamental freedoms at risk, the Equal Protection Clause of the Fourteenth Amendment placement on the central registry demand conviction of a crime before such

9

occurs; Michigan currently has several suitable offenses listed in the criminal code, the least of these offenses being MCL 750.145 which is a misdemeanor offense. This would adequately safeguard the accused rights as well as give greater credibility and reliance on the registry.

15. Alternatively in the very least the Due Process Clause of the Fourteenth Amendment requires a decision based on clear and convincing evidence is required to adequately safeguard the accused rights before depriving him for life of fundamental liberties.

### B.                          Cause of action

1. Plaintiff seeks declaratory relief against the State of Michigan Department of Human Services declaring that the above statutory on policy provision are unconstitutional facially and/or as applied to Plaintiff under 42 U.S.C. § 1983.

2. Plaintiff further seeks injunctive relief prohibiting the further enforcement of these unconstitutional provisions under 42 U.S.C. § 1983.

3. Plaintiff seeks to have Michigan's Central Registry declared unconstitutional on its face and as applied to Plaintiff, and that Plaintiff's name be removed from this unconstitutional registry under 42 U.S.C. § 1983.

### V.   Allegations and cause of action against Wayne County Department of Human Services

### A.                          Allegations

1. Wayne County Department of Human Services (Wayne DHS) is the agency in Wayne County Michigan responsible for Child Protective Services (CPS) and Foster Care (FC).

2. Wayne DHS's primary funding source is through county funds with reimbursements paid by the State of Michigan through state and/or federal funds.

10

3. Wayne DHS must follow the requirements of the Child Protection Law the written policies and procedures distributed by Mich DHS in the execution of the CPS and FC programs.

4. Wayne DHS has an affirmative duty to ensure its agents are properly trained and supervised.

5. Wayne DHS also makes its own policy that is required to comply with the above standards.

6. Defendants Wenk, Sampson, Decormier, Trice, McGehee, and Lamar were all agents of Wayne DHS.

7. Discovery will reveal that Wayne County DHS has a long standing agreement with Wayne County Circuit Court Family Division to issue ex-party order to remove children without any emergency present and without any sworn statement being offered to support the order in direct violation of the Fourth Amendment's requirement that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

8. The procedure used by Wayne DHS and the court eliminates any judicial involvement in the issuing of these orders. A CPS worker writes the order and has it rubber stamped with the name of Judge Leslie Kim Smith. No testimony is given and no judge reviews the request. Further these "orders" do not contain the state seal that is required for **any** warrant and/or subpoena issued by the court.

9. These orders further do not state who is authorized to execute them, does not indicate the person that "authorized" it, contains contradictory statements regarding "reasonable

11

efforts" and numerous other errors, contradictions, and omissions that would make it readily apparent to any person viewing the document that it is not valid.

10. In the instant case Wayne DHS agent Mia Wenk simply faxed her request to the court for approval.

11. This conspiracy between the court and Wayne DHS (and its agents) is one that has been in existence long before any order was issued or proceeding started regarding Plaintiff and his family.

12. Discovery will show that Wayne DHS and its agents know these orders are invalid, and have third parties (primarily Detroit Police) execute these fraudulent orders in an attempt to avoid liability.

13. Discovery will show that Wayne DHS and its agents knew that these third parties were not authorized to execute **any** order issued by the Family Court.

14. The conspiracy between the Family Court and Wayne DHS does not stop at the initial removal of the children, as shown by the record of this case.

15. Obvious examples of this is the fact that the Court does not even question why the children are not present at the hearing immediately following the removal of the child although the law and the court rules requires their attendance absent a prior ruling by the court, the court simply approves any request made by Wayne DHS without question (this is especially true in the instant case where the court approved physiological evaluations for all the children without cause),and the court taking an active role in prosecuting the case, tampering with witnesses and preventing parents from presenting a defense.

16. Discovery will reveal that Wayne DHS and the Family Court routinely conspires to falsify court records and other documents in order to fraudulently receive federal funds.

12

17. Discovery will show that it is common practice in Wayne DHS to falsify documents, commence fishing expeditions after the original allegations are proven false and/or unsubstantiated, give false testimony, deny parents of their constitutional rights, and fabricate evidence to support fraudulent claims.

18. These facts are obvious in the instant case as stated in claims against the individual agents.

19. One example of the attempts to fabricate evidence during a fishing expedition is that on March 30, 2010 Wayne DHS asked the court to authorize psychiatric evaluations on Plaintiff's male children. The court granted this request over objections and specified that the evaluations were to be done at JAC and that they were not admissible during the adjudication hearing. As a result Wayne DHS did not fulfill the order. Although they argued that it was needed due to claims that the youngest child was suicidal he was never received a psychiatric evaluation at JAC in fact only one child to received one and it did not occur until well after the children were returned home.

20. Wayne DHS unconstitutionally holds natural parents to a much higher standard than foster care placements. Particular to the case at bar Plaintiff's children were removed from his home and his name was placed on the Central Registry because Wayne DHS agents believed he had an ugly home, he owned firearms, he home schooled his children, and he exercised his Fourth Amendment rights (no allegations were made that any child was harmed). However there is solid evidence and admissions that Ms. Stokes of Methodist gave Plaintiff's son medication that had been expired for well over a year, refused to let him see a medical doctor and this resulted in the child needing emergency treatment when he began coughing up blood after weeks of neglect. In contrast to how

13

Plaintiff was treated, the children were forced to stay at Methodist against their will and Ms. Stokes was not placed on the central registry despite the fact that MCL 722.628d(4) requires that her name be entered on the registry.

21. Discovery and the instant case will show that it is common practice of Wayne DHS and its agents to use the custody and safety of the children as bargaining chips to coerce the parents to forfeit their constitutional rights.

22. Discovery and the instant case will show Wayne DHS routinely conspires with their contractual agents and other to violate parental rights without any due process of law.

23. Any claims that their actions are done for "the protection of children" is proven as a mere pretense in the instant case due to their direct and indirect abuse and neglect of Plaintiff's children, and lack of caring for their needs.

24. Discovery will show that Wayne DHS's true motivation is to fraudulently obtain funds through reimbursements under title IV-E of the Social Security act.

25. Discovery will show that Wayne DHS routinely submits false, and/or fraudulent documentation of compliance in order to receive these federal funds.

26. Pursuant to Wayne DHS documents the foster care of Plaintiff's children was funded through Title IV-E of the Social Security Act although the children were not adjudicated state wards, were not attending school, and no efforts were being made to reunify the family.

27. This claim is further supported by the historical fact that Wayne DHS receives more Title IV-E funding per year than the rest of the State of Michigan combined and approximately three times that of the next highest recipient Oakland County.

14

28. One example of Wayne DHS's abuse/neglect of children and their attempts to fabricate evidence is that after Plaintiff's children were removed from his home, Plaintiff's youngest child (who was ten years old) was separated from the rest of his sibling to intentionally traumatize him. When the child panicked over being all alone he was taken to Children's Hospital for "evaluation". The child was there for over four hours before the parents were contacted. To coerce consent the Wayne DHS agent falsely claimed that a court order was in place if Plaintiff refused to consent. After the evaluator determined that the child's reaction was directly related to him being removed from his home and then separated from his siblings, the child was then placed back with his two brothers. Wayne DHS refused to follow the evaluators recommendations that 1) the child be returned to his parents and 2) the child receive outpatient therapy to address his adjustment disorder caused by the trauma.

29. Another example of Wayne DHS's neglect of the children is the fact that although throughout the investigation and court proceedings they claimed they had concerns regarding the speech impediment of the youngest child; they refused to provide him with any services to address this even after it was court ordered until May 12, 2010. At this point the child had gone almost three months outside of the home without any services to address his alleged needs.

30. Wayne DHS's attempts to label Plaintiff's children as educationally impaired also has motivations based in financial concerns as this would entitle them to receive yet additional federal funds for the children

31. Wayne DHS further violated Plaintiff's due process right in regards to the appeal process in his attempt to have his name removed from the central registry. In particular Wayne

15

DHS failed to conduct a second line supervision review of the denial of Plaintiff's

request, failed to state with any specific why the request was denied, and forced Plaintiff

to request what pursuant to law was to be an automatic review hearing. These are not

discretional tasks but are mandated by written policy and/or statute

### B.                             Cause of action

1. Wayne DHS is further liable to Plaintiff for damages and penalties under Tile 42 U.S.C. §
   1983 for their violations of Plaintiff's Second, Fourth and Fourteenth amendment rights.

2. Wayne DHS is liable to plaintiff for damages and penalties under 42 U.S.C. §1985 for
   conspiring (through its agents) with others to deprive Plaintiff of his constitutional rights.

3. Wayne DHS is liable to Plaintiff for damages and penalties for their gross negligence of
   not properly training and supervising its employees.

4. Wayne DHS through the acts of its agents are liable to Plaintiff for damages and penalties
   for the intentional infliction of emotional distress over the breakup of his family caused
   by their direct actions in intentionally violating Plaintiff's rights and falsifying documents
   in order to execute the injury to Plaintiff.

5. Wayne DHS is liable to Plaintiff under 42 U.S.C. §1983 for the denial of Plaintiff's
   procedural and substantive due process rights in connection with his request to have his
   name removed from the central registry.

### VI.   Allegations and cause of action against Mia Wenk

### A.                             Allegations

1. Ms. Wenk did not act within her statutory authority as she had not received mandatory
   training as set forth in MCL 722.628(17) prior to becoming involved with plaintiff and
   his family.

**16**

2. In alternative and/or in addition to allegation 1 Ms. Wenk violated her statutory duty to protect the statutory and constitutional rights of plaintiff's family by violating Plaintiff's and his children's rights protected under the Fourth Amendment, fourteenth amendment, second amendment, and MCL 750.539d as well as other rights as described below.

3. On January 17, 2010 Wayne County DHS received a report that Plaintiff's son ran away from home and arrived at the Detroit Police Station wearing only a pair of shorts.

4. It is against controlling written policy to investigate runaway situations (PSM 712-6)

5. Ms. Wenk lacked any authority to conduct an investigation regarding Plaintiff and his family when the original complaint received on January 17, 2010 contained no allegations of child abuse or child neglect. In fact the complaint only alleges that a child ran away because he didn't like the discipline his parents gave him for his misconduct, and specifically states that the child was not harmed. (PSM 712-8)

6. Alternatively Ms. Wenk lost any authority to investigate when the source of the complaint (Officer Donald Coleman) informed her on January 19, 2010 at 11:18 A.M. that the incident in question was solely attributable to poor decision making on the part of the youth.

7. Ms. Wenk falsified the investigative report in an attempt to justify an investigation. In particular Ms. Wenk fraudulently claimed the Officer Coleman informed her that Robert was in special Education and had been kick out of school on several occasions. In fact Robert had been home schooled since 2003.

8. Pursuant to the policies and procedures governing her actions (PSM 712-4), as well as her own testimony, Ms. Wenk did not start her investigation until such time as she contacted the Mother (Sherrie Brent) on January 19, 2010 at 5:38 P.M.

9. When Ms. Wenk first contacted Plaintiff's family she did not make any claims that the family was being investigated for child abuse and/or child neglect. In fact she claimed she just wanted to assure Robert was alright after being in the cold so that she could close her case file. This is in violation of her requirement to provide "the specific complaints or allegations made against the individual" as required under MCL 722.628(2).

10. On January 20, 1010 Ms. Wenk was giving limited consent to enter the living room area of Plaintiff's home for the purpose of speaking with Robert to ensure his medical needs were meet as a result of his exposure to the cold three days prior.

11. During the interview of Robert, Plaintiff objected to the further questioning of Robert when the scope of the questions went beyond the consent given and became leading in nature thereby removing any consent for further questioning of Robert.

12. Ms. Wenk then demanded that she be allowed to question Robert in his bedroom outside of the presence of either parent. Plaintiff again objected and Ms. Wenk stated that he had no authority to object because the law required her actions. This violated Plaintiff's parental rights under the 14th amendment as well as his fourth amendment right to be free from unreasonable search and seizer.

13. Unbeknownst to the Plaintiff at the time Ms. Wenk interrogated his other four children while she was upstairs with Robert further violating Plaintiff's 14th and Fourth Amendment rights.

14. It is well established that interviewing a child on private property without parental consent is a violation of the forth, and14th amendments and a violation of the parental rights (Doe v. Heck 327 F.3d 492 (7th Cir 2003)

15. Unbeknownst to Plaintiff at the time, after concluding her interrogations of the children, Ms. Wenk ordered Robert to show her the house, including those areas Robert was restricted for accessing such as the basement and James' bedroom. Ms. Wenk did not seek consent from either parent although they were both present in the home.

16. Prior to Ms. Wenk going upstairs with Robert, she had no probable cause nor were any exigent circumstances present reliving her of the requirement of obtaining a warrant. (Calabretta v. Floyd, 189 F.3d 808 (9th Cir. 1999).)

17. On the evening of January 20, 2010, Ms. Wenk had a discussion with her supervisor Ms. Sampson. During this discussion it was determined that the allegations contained in the complaint subject to the investigation were unsubstantiated, However they decided to keep the investigation open to find other allegations for which for which they could substantiate abuse or neglect.

18. It is against the controlling written policy for the allegations to be changed after the case is assigned for investigation (PSM 712-5)

19. Any new allegations of abuse and/or neglect are required to go through the same screening process prior to being assigned for investigation (PSM 712-8)

20. As a mandated reporter Ms. Wenk was required by law to report her suspicions for initial intake and screening in the same manner as any other mandated reporter (MCL 722.623)see also PSM 718-9 and AHP 602-4

21. As Ms. Wenk was the source of any new allegations, any investigation could not be performed by her or through any local office in which she had any professional connection and was required to be transferred to a different local office for screening and investigation (PSM 712-6)

22. On January 21, 2010 Ms. Wenk again contacted Ms. Brent requesting for her, and her supervisor to return to the home with the sole purpose to "Ask Robert a couple of questions so they can close the case"

23. Ms. Wenk did not inform Ms. Brent or Plaintiff that the scope of her investigation had changed or that there were new and/or additional allegations of abuse and/or neglect.

24. Upon entry to the home Ms. Wenk kept the parents preoccupied while Ms. Sampson and Ms. Decormier went upstairs to take photos without Plaintiff's knowledge or consent.

25. It was later admitted by Ms. Wenk that the true purpose of the visit to Plaintiff's home on January 21, 2010 was to take photos of the interior of the home to support allegations against the parents that at that point had not been asserted.

26. This conspiracy to take photos of the home without parental knowledge and/or consent not only violated Plaintiff's well established rights guaranteed under the 4th and 14th amendments but also constituted a felony under MCL 750.539d as well as a violation of the controlling training manual that states *"Photos of private body parts or the interior of the home cannot be taken without permission, a search warrant or court authority."* (Michigan Child Welfare Law Manual 2.10.2)

27. Pursuant to the investigative report Ms. Wenk and Ms. Sampson determined the disposition and category of the case on the evening of January 21, 2010, when they decided to put Families First in the home. Neither informed the family of this decision.

28. A referral to Families First is only appropriate when there is an imminent risk of the children being removed from the home. (PSM 714-1) i.e. a category I or II case.

29. On January 26, 2010 Ms. Wenk falsified her "Risk Assessment" for the family to support her predetermined outcome. In particular Ms. Wenk claimed the family had little or no

**20**

social support, and the Home was physically unsafe. Ms. Wenk later admitted that she never inquired of either parent concerning their social support, and that at the time the petition was filed she was unaware of any physical or health risk to the children posed by the home.

30. The category of the case **after** finding a preponderance of evidence is based upon the results of the Risk Assessment (PSM 713-11)

31. On February 9, 2010 Ms. Wenk telephone Plaintiff's home and spoke with Plaintiff.ms. Wenk inquired if Plaintiff had any Indian heritage. Plaintiff responded in the affirmative and informed Ms. Wenk he had a paternal uncle that lived on the Allegany Indian Reservation in New York. Ms. Wenk did make this inquiry to any other family member.

32. Ms. Wenk was required to make this inquiry of all family members within three business days of being assigned to the case. Setting her deadline at the latest of January 21, 2010. (NAA 200)

33. Ms. Wenk was required to document all efforts to determine if the Plaintiff's children were "Indian Children" in the investigation summary.(NAA 225)

34. Pending determination Ms. Wenk was required to treat the case as if the children were Indian children (NAA 205)

35. Pursuant to the investigative summary Ms. Wenk made no further inquiries regarding the Indian Heritage of the children prior to her petitioning the court and testifying that there was no Indian heritage.

36. During the phone conversation on February 9 2010, Ms. Wenk stated that she was not going to refer the family for any counseling services. Contradictory to this assertion Families First is a counseling based program.

21

37. Although it was determined by Ms. Wenk and Ms. Sampson of January 21, 2010 to refer the family to Family First Ms. Wenk did not complete the referral until February 16, 2010. This also marked her 30 day deadline for the completion of the investigation, disposition of the case, and **service agreements**(PSM 713-9)

38. When Families First informed Ms. Wenk that the parent had informed them not to visit the home on February 16, 2010 but would allow the visit the following day, Ms. Wenk coerced Families First into violating their own policies and making an unannounced visit to Plaintiff's home. Ms. Wenk never spoke with the family to explain the purpose of the Families First referral or how this counseling program was to address any concerns of Wayne County DHS.

39. Ms. Wenk placed Plaintiff's name on the Central Registry as a person reasonable for Physical Neglect, with no evidence of child neglect as defined by MCL 722.622, never informing Plaintiff of the allegations against him and not allowing Plaintiff any opportunity to contest these allegations, violating Plaintiff's procedural and substantive due process rights. Ms. Wenk further did not inform Plaintiff of this decision as required by MCL 722.627(4) and PSM 713-13.

40. The Placement of Plaintiff's name on the Central registry is also in violation of MCL 722.628d (1)(d) and (2)(c) in that it has been admitted Plaintiff was not placed on the registry for the allegations contained in the report but rather for allegations made by Ms. Wenk that were never assigned for investigation.

41. Pursuant to Court records after Families First informed Ms. Wenk that the family refused their unannounced intrusion, Ms. Wenk instructed them to make no further efforts and that she intended to file a petition and remove the children from the home.

42. On February 17, 2010 Ms. Wenk again contacted the family to inform them that a Team Decision Meeting (TDM) was to be held on February 18, 2010. Ms. Wenk unequivocally denied any request to reschedule the meeting to facilitate the family's attendance at the meeting by stating the meeting will happen with or without you. Having no other alternative Plaintiff reluctantly agreed to participate via speaker phone.

43. During this phone conversation Ms. Wenk admitted that there were no problems with the way Plaintiff choice to raise his children.

44. During the TDM on February 18, 2010 Ms. Wenk as well as other Wayne County DHS employees refused to explain what services were being offered and/or what their intended purpose of these "services" was.

45. When Plaintiff stated he could not agree to services until he understood Ms. Wenk and the other Wane Co DHS employees interpreted that as a refusal of services.

46. No one at the TDM made any claims that a child had or would be harmed, at best they simply claimed that the children deserved better.

47. After the TDM Ms. Wenk prepared an emergency removal order which she had rubber stamped with Judge Kimberly Smiths name by a probation officer.

48. Ms. Wenk knew that Judge Smith did not review or personally approve this order.

49. Ms. Wenk knew at the time that there was no immediate threat to any child's heath or welfare that would warrant an ex-party order to remove the children.

50. Ms. Wenk knew or should have known at the time that emergency removal procedure could **only** be utilized in an emergency situation. (PSM 715-2)

51. Waiting 28 days from her last visit to the home to remove the children or attempt to provide services does not constitute an emergency.

23

52. Ms. Wenk knew that the information she was providing in support of the order was 28 days old and did not reflect the current conditions.

53. Ms. Wenk intentionally withheld material information relevant to **any** removal order, such as; the Indian heritage of the children, the staleness of her information, her being informed that the firearms were secured, that no one had inspected the home since January 21, 2010, that the parents were not given opportunity to voluntarily place the children in a relative's home (i.e. maternal grandparents), that the home had been repaired, that reasonable efforts were not made under the circumstances, that there was no known risks to the children's health or safety, and any perceived risk to the children were entirely speculative.

54. Upon receiving the fraudulent order to remove the children Ms. Wenk then provided false information to the Detroit Police to elicit their aide in executing the order. In particular pursuant to Officer Biogradlija's sworn testimony Ms. Wenk claimed that several attempts had been made to remove the children prior to her seeking the aide of the Detroit Police.

55. Ms. Wenk knew or should have known that the Detroit Police had no legal authority to execute a civil order to remove Plaintiff's children from his home and that the proper law enforcement agency to execute a civil order entered in the Wayne County Juvenile Court was the Wayne Country Sherriff's Department.

56. After the children were removed from Plaintiff's home Ms. Wenk conspired with other Wayne County DHS employees to intentionally further traumatize Plaintiff's youngest son (James) by intentionally separating him from his siblings. The purpose for this as shown by the DHS documentation was to justify having James "evaluated" by a

24

physiatrist in an effort to fabricate evidence against the Plaintiff. After this evaluation James was then placed in the same placement as his two brothers. (this claim is based on information presently known as well as that anticipated will become known as a result of discovery)

57. In her petition dated February 18, 2010 Ms. Wenk intentionally made false claims that the Parents had forced Robert to leave the home, and the home was unsafe. Ms. Wenk was well aware after being informed by Officer Coleman, Robert, both parents, and all of Plaintiff's other children that Robert in fact ran away and was not forced to leave by the parents. Further Ms. Wenk later admitted that she was aware of no health or safety risk posed by the home at the time the children were removed.

58. Ms. Wenk did not have authority to file a petition without the prosecuting attorney first refusing to file the petition and Ms. Wenk documenting the reasons for the refusal. (PSM 715-3)This was not done in the instant case.

59. Ms. Wenk's stated reason for the removal of the children in her petition was since the parent argued with the department it was in the children's "best interest" to be removed from the home.

60. Ms. Wenk acknowledged that neither parent was responsible for any abuse or neglect of their children by the simple fact that neither parent was named as a respondent (person responsible) in her petition.

61. Discovery will show a pattern of conduct by Ms. Wenk and Wayne County DHS to abuse their authority not to protect children but rather to force their will upon the parents, and if the parents refuse to submit then the children are removed because they claim it's "in the best interest of the child".

25

62. One of the more extreme cases is that of *In re Godboldo minor* in that case Ms. Wenk removed a child from the home because the parent choice to follow the advice of a medical doctor for the treatment of her child that differed from the opinion of Ms. Wenk regarding controversial medication that the parent and the doctor thought was harmful to the child. Even though the child was removed even the court refused to put the child on this medication.

63. On February 19, 2010 during the preliminary hearing Ms. Wenk, as the complaining witness, intentionally gave false and misleading testimony in support of her petition. This includes but is not limited to Ms. Wenk's claims that "the home is unfit, with lack of proper furnishings, and provision, and clothing, and food for the children, that there's educational neglect for the children that's occurred since 2002..." Ms. Wenk also falsely testified that there was no Native American heritage for any of the children.

64. Ms. Wenk denied Plaintiff of his ability to call witnesses on his behalf at this hearing by instructing the children's placements not to bring the children to the court for the hearing.

65. Ms. Wenk violated Plaintiff's parental rights by instructing Wolverine to conduct a physical exam on his male children without his knowledge or consent and absent any court order or exigent circumstances. These exams were conducted while Plaintiff was at the Preliminary hearing on February 19, 2010.

66. Prior to any order being issued Ms. Wenk arranged for all of Plaintiff's children they have a psychological evaluation and for James to have Psychiatric follow up after the physiological was done. Ms. Wenk fraudulently claimed she had authority for this, did not give the parents any notification and provided the evaluators with false information in an attempt to fabricate evidence.

26

67. This is especially outrages when James had already been evaluated at Childrens Hospital and Wayne County DHS refused to provide the follow up treatment recommended at the Hospital for his adjustment disorder caused by the forced removal from the home and separation from his family.

68. On February 22, 2010 Ms. Wenk Spoke to Plaintiff via telephone. During this conversation Ms. Wenk stated that the purpose of families first was "to see what all the family needed". This demonstrates that her actions were not narrowly tailored to address problems but rather nothing more than a fishing expedition.

69. During this same conversation Plaintiff asked what was necessary to facilitate the return of his children. Ms. Wenk refused to give any specific requirement and simply stated Plaintiff needed to "cooperate". This directly violated Plaintiff's right to know what was required for him to regain custody of his children. This further demonstrates that Ms. Wenk's actions were not to protect any child but rather were intended to force Plaintiff to submit to her will.

70. On February 24, 2010 Ms. Wenk again gave false and misleading testimony to support her petition before the court. This includes but is not limited to: Ms. Wenk's claims that she entered the home on February 18, 2010, she personally took the photographs on January 21, 2010, and that no significant changes to the home occurred between January 21, 2010 and February 18, 2010. Ms. Wenk in later hearings admitted she did not enter the home on February 18, 2010 and had no knowledge of the condition of the home at that time, and that she did not leave the living room area of Plaintiff's home on January 21, 2010 and did not take the photos.

27

71. During her testimony on February 24, 2010 Ms. Wenk admitted that she had no safety concerns for the children on January 20, 2010, and her safety concern for them on January 21, 2010 was the presence of firearms in the home that she had no knowledge of whether or not they were secured. This is a direct violation of Plaintiff's second amendment right to keep and bear arms, as there is no allegation anyone in the home had or would in any way misuse the firearms.

72. Ms. Wenk knowingly falsified her testimony on February 24, 2010 to the extent she claimed she claimed the Plaintiff's home had no kitchen ceiling. Ms. Wenk later admitted that she did not personally view this and many other conditions she claimed were present in the home.

73. Ms. Wenk further violated Plaintiff's well established rights by converting his legally exercising of his right to own firearms, his right to privacy, and his right to educate his children into offenses against his children. (Miller v. United States 230 F.2d 486 (9th Cir 1956)

74. Ms. Wenk again violated Plaintiff's right to call and question witnesses by again instructing the children's placements not to bring the children to the February 24, 2010 hearing.

75. Absent a court order stating that the presence of the children was not required Ms. Wenk had no authority to make the decision to exclude the children (whom were also parties to the case) from the proceedings.

76. On March 12, 2010 Ms. Wenk failed in her affirmative duty to inform the court that the home was suitable for the children when she had reliable information that the home was inspected by Ms. Trice on March 10, 2010 and was deemed suitable for the children.

28

(PSM 715-3) Discovery will reveal that Ms. Wenk intentionally mislead the court and she was given reliable information by her co-workers that the home was suitable, further it will reveal that Ms. Wenk attempted to avoid and disregard any information that was contrary to her petition.

77. Ms. Wenk continued her fishing expedition against the parents and on April 16, 2010 she again had a probation officer rubber stamp Judge Smith's name on documents and filed them. This document was an amended petition the no motion or any other request for its admission was made nor was the document signed by any attorney of record in the case. This is a blatant act of fraud is the document claims to be approved by a Judge that never even seen the document.

78. This amended petition added a new allegation the James had high lead sometime in the past. No investigation of this allegation was ever authorized and/or screened nor did Ms. Wenk conduct an investigation as is required by written policy before adding allegations to an amended petition. (PSM713-9 and PSM 715-3) Ms. Wenk has admitted that she did not speak to any one that had any firsthand knowledge of the issues that occurred in 2005, and did not even question any family member regarding these events. This is a blatant violation of her duties and denied Plaintiff of his substantive and procedural due process rights. Further this new allegation was simply a child had a medical problem in the past and was treated by medical personal for that issue at the time.

79. Throughout the court proceedings between March 30, 2010 and May 13, 2010 Ms. Wenk's definition of "cooperate" she used became perfectly clear as to mean that the parents were required to forfeit any and all right and submit to her personal discretion and

will. It is also apparent from these records Ms. Wenk in conspiracy with other defendants intended to hold the children hostage to facilitate this goal.

80. During her testimony on May 12, 2010 Ms. Wenk admitted that the reason the children were removed from the home was not due to the condition of the home but rather because one child had a speech impediment and there were firearms in the home. Ms. Wenk further admitted that there were no concerns that required the children to be removed from the home.

81. Ms. Wenk also admitted that the deciding factor to remove the children was not based on safety concerns for the children but rather that the parents were exercising their rights and would not "cooperate" with the department.

82. On May 12, 2010 Ms. Wenk also gave false testimony concerning the basement bedroom. In particular Ms. Wenk made false claims that there was no bed frame, no dresser and attempted to portray the room as a small cubby with barely enough room for a mattress. In fact the room was eight foot by eight foot not including the closet which was three foot by three foot. This exceeds the space requirements for a "foster care" bedroom and there are no requirements under Michigan law for a parental home bedroom. Further the room was completely furnished with a nine draw dresser a bed frame that contained three drawers, a small desk and a two drawer night stand.

83. Ms. Wenk has admitted that she never entered this basement bedroom, or the bathroom that she made false allegations regarding.

84. More specifically the children would be allowed to return home only if the parents waived their rights to trial, to challenge the need for any services, and followed any and all recommendations made by any other source regarding **any** decision regarding their

children including but not limited to choices regarding education, medical care, extra circular activities, ect. In essence the parents were not to act as parents but rather puppets of Wayne County DHS.

85. As stated above and as will be further demonstrated by discovery Ms. Wenk's actions were not to protect a child but rather to punish Plaintiff for exercising his rights and for challenging her authority.

86. As shown above and will be further demonstrated through discovery Ms. Wenk's actions were intentional and with reckless disregard for Plaintiff's rights, were extreme and outrageous, and caused Plaintiff extreme emotional distress. (Intentional infliction of emotional distress)

87. As shown above and will be further supported after discovery Ms. Wenk was grossly negligent in her affirmative duties to follow proper procedure, protect the rights of Plaintiff, make efforts to reunify the family, ect that was the direct and or proximate cause of injury to the Plaintiff. (Gross negligence)

88. As shown above and will be further supported after discovery Ms. Wenk conspired with other defendant's to intentionally violate Plaintiff's rights under the Fourth, Fourteenth and Second Amendments. (42 U.S.C 1983)

89. As shown above and will be further supported after discovery Ms. Wenk conspired with other defendant's to intentionally commit a felony under MCL 750.539d and 750.539e entitling Plaintiff to relief under MCL 750.539h.

90. All acts complained of performed by Ms. Wenk were done under the guise of her authority as a Wayne County DHS protective Services Worker (State Actor)

31

91. Discovery will show that the motivating factors for Ms. Wenk's actions was due to her dislike of Plaintiff exercising his rights to educate his children, own firearms, and challenge the unlawful conduct of the defendants. Further motivation for the removal and detainment of Plaintiff's children were the anticipation of Federal Funds to be received for the care of his children while in "Protective Custody".

**B.**              **Cause of action**

1. Ms. Wenk is both officially and personally liable to Plaintiff under 42 U.S.C § 1983 for her violations of Plaintiff's rights under the Second, Fourth and Fourteenth Amendments

2. Ms. Wenk is liable to Plaintiff under 42 U.S.C. § 1985 for conspiring with others to deprive Plaintiff his constitutional rights and furthering those actions through her false testimony and withholding of information from the Juvenile Court, and her false testimony at the Administrative hearing to further the conspiracy to deny Plaintiff of his due process rights.

3. Ms. Wenk is liable to Plaintiff for the intentional emotional distress caused by her willful acts to remove Plaintiff's children from his home without cause and conspiracy to deprive Plaintiff of his association with his children in retaliation of Plaintiff exercising his rights.

4. Ms. Wenk is liable to Plaintiff for gross negligence for her willful and wanton disregard of her duties to protect the rights of the Plaintiff causing him injury.

**VII.**   **Allegations and cause of action against Monica Sampson**

**A.**              **Allegations**

1. As Ms. Wenk's direct supervisor Ms. Sampson had an affirmative duty to properly supervise and train her subordinates

32

2. Ms. Sampson did not act within her statutory authority as she had not received mandatory training as set forth in MCL 722.628(17) prior to becoming involved with plaintiff and his family.

3. Ms. Sampson has admitted that she has not received any training regarding Forth Amendment Rights.

4. On January 20, 2010 Ms. Sampson and Ms. Wenk had a discussion regarding the complaint filed on January 17, 2010 concerning Plaintiff's Family. During this meeting it was determined that the allegations in the complaint were unsubstantiated.

5. Although it had already been determined that the allegations assigned for investigation were unsubstantiated, Ms. Sampson "authorized" Ms. Wenk to conduct a fishing expedition on Plaintiff's family because "it seemed like there was something going on in the home". This is contradictory to PSM 711-2 which specifically states the purpose of the field investigation is limited to the investigation of the allegations contained in the complaint.

6. Discovery will expose that during this conversation Ms. Sampson made the decisions to fraudulently gain entry in Plaintiff's home, take photographs of his home without his knowledge and/or consent, not to inform the family of any new allegations until after they conducted the search and photo shoot of the home, and to deny Plaintiff and his family of their rights under the Fourth and Fourteenth amendments as well as MCL. 750.539d and their own written policies.

7. On January 21, 2010 Ms. Sampson, Ms. Wenk and Ms. Decormier were allowed to enter the living room area of Plaintiff's home for the specific purpose of questioning Robert

33

concerning the events of January 17, 2010. None of these defendants asked Robert any questions regarding January 17, 2010.

8. Upon entry of the home Ms. Sampson and Ms. Decormier proceeded directly to the staircase leading to the upstairs. Plaintiff immediately objected to them entering the staircase, to which Ms. Sampson replied that Plaintiff did not have any right to refuse since they were there "on behalf of the children". Ms Sampson then demanded Robert escorts them upstairs. Ms. Wenk stayed in the living room area asking Plaintiff questions regarding homeschooling.

9. Ms. Sampson directed Ms. Decormier to take photos of only those things that may support their fishing expedition against the parents, and not to give a true representation of the home.


10. When Ms. Sampson and Ms. Decormier returned from the upstairs Ms. Sampson began arguing with Plaintiff about his rights to home school his children. During the confusion Ms. Decormier entered the kitchen area unbeknownst to Plaintiff.

11. Plaintiff's oldest daughter noticed Ms. Decormier taking photos in the kitchen and informed the parents. Plaintiff immediately objected and informed the Defendants present in the home that absent a court order they were required to have the consent of the parents before taking photos inside his home.

12. Ms. Sampson responded to Plaintiff's objections by stating that although she should have informed the parents as a "courtesy" she did not need their consent since they were there "on behalf of the children"

13. Ms. Sampson's claim is contradictory of the requirements of MCL 750.539d as well as the training she should have received stated in Michigan Child Welfare Law Manual 2.10.2 and over a century of case law defining Forth Amendment Rights which all require consent prior to taking photos inside a home absent a court order and/or exigent circumstances.

14. Ms. Sampson had ample opportunity to obtain a warrant prior to her unlawful search of Plaintiff's home and no exigent or emergency conditions were present relieving her of this requirement.

15. None of Plaintiff's children made any request for defendants to enter or photograph Plaintiff's home. Nor were any of the children ever questioned concerning the "condition" of the home prior to their removal from the home.

16. During the argument regarding Plaintiff's Fourth Amendment Rights Ms. Decormier entered the Plaintiff's basement and took additional photos. After she finished the three defendants left Plaintiff's home with Ms. Sampson instructing Ms. Decormier to take one last Photograph of the front hallway area when they exited the home.

17. Ms. Sampson and Ms. Wenk they determined the disposition of the case including the category and what services were to be put in place without given Plaintiff or any family member any knowledge of the allegations against them, any opportunity to present evidence in their favor, or any input as to what they thought was best for their own family.

18. This determination was made contrary to their own written policies that requires that the risk assessment determine the category of the case (PSM 713-11)

35

19. This determination was made arbitrarily with a complete disregard for the definition of "child neglect" and "child abuse" found in MCL 722.622 that requires that there be harm or threatened harm to a child's health or welfare by a parent. In fact there has been no claim that any of Plaintiff's children had or would be harmed while they were in the custody of their parents.

20. Ms. Sampson falsified her entry on the investigative summary for January 21, 2010. In particular as stated above there was no discussion regarding the home or firearms. (It was admitted by Ms. Wenk that the firearms were not mentioned as a concern until February 18, 2010) Further as stated above the only conversation Plaintiff had with Ms. Sampson on January 21, was augments regarding his home schooling and Fourth Amendment rights. Further no discussion occurred "after the assessment" as the defendants left Plaintiff's home immediately after Ms. Decormier finished photographing the home.

21. Ms. Sampson's falsification of this record was to support the predetermined outcome of the investigation of which she had no authority to conduct.

22. Ms. Samson continued her fishing expedition when she contacted Farmington Public Schools to inquire about the parents' rights to home schooling their children.

23. Despite her acknowledgement that the parents were well within their rights, Ms Sampson saw fit to add false allegations that the children were removed from public school due to request that the children be tested and given an I.E.P. Ms. Samson's claim had already been thoroughly investigated by Wayne County D.H.S. in 2003 and found to be meritless after someone from Southgate Public Schools made repeated false allegations of abuse and neglect against the parents and the parents removed their children from their school

36

system due to the manor the children were being discriminated against as a result of them living in Detroit.

24. Ms. In conducting this fishing expedition Ms. Sampson failed to comply with the requirement of PSM 712-6 which requires consultation with the school district the children reside in (in the instant case Detroit) instead Ms. Sampson decided to use her contacts in the Farmington community.

25. On or about February 16, 2010 Ms. Sampson was the supervisor that approved the placement of Plaintiff's name on the central registry. This was done with no meaningful opportunity for Plaintiff to be heard to contest any allegation, or for that matter even know what the allegations against him were. This violates Plaintiff's procedural and substantive due process rights protected under the Fourteenth Amendment.

26. Neither Ms. Sampson nor Ms. Wenk ever informed Plaintiff that his name was placed on the central registry nor did they inform him of any specific reasons for the placement. This notification is required under both MCL 722.627 as well as PSM 713-13.

27. The Placement of Plaintiff's name on the Central registry is also in violation of MCL 722.628d (1)(d) and (2)(c) in that it has been admitted Plaintiff was not placed on the registry for the allegations contained in the report but rather for allegations made by Ms. Wenk that were never assigned for investigation.

28. Ms. Sampson was personally present during the tape recorded T.D.M. held on February 18, 2010. During this meeting Ms. Sampson again acknowledged she should have informed the parents prior to taking photos but again claimed she did not need anyone's consent.

29. Ms. Sampson as well as the other defendants present refused to address Plaintiff's claims that they had violated his rights under the constitution, their own policies and Michigan law. In fact all of Plaintiff's claims were rejected by statements such as "we are beyond that point".

30. As with the other defendants present at the TDM Ms. Sampson refused to state any specific harm or threatened harm that would befall any of the children as a result of their claims.

31. The TDM ended with Ms. Sampson hanging up the phone on Plaintiff and his wife. This is demonstrative that it was Ms. Sampson in control of the meeting and not an impartial "facilitator" as required by their policy and the consent order of *Dwayne B. v Granholm*.

32. Ms. Sampson also participated in the recorded phone conversation between Plaintiff and Ms. Lamar in which Plaintiff informed them that repairs had been done to the home. Despite this knowledge both still approved the removal of the children from the home.

33. During the conversation with Ms. Lamar and Ms. Sampson both refused to inform Plaintiff were the mold was allegedly located in his home. This fact is self evidence that the decisions were not to help the family or protect the children.

34. Based on Ms. Sampson's claims Ms. Lamar refused to investigate Plaintiff's claims regarding the unlawful conduct of Defendants Sampson, Wenk and Decormier.

35. Pursuant to Ms. Wenk's statements it was Ms. Sampson that decided that Plaintiff was not entitled to review his CPS record in April of 2010. This denied Plaintiff of any meaningful discovery to contest either the Family Court proceedings or the placement of his name on the central registry. Further this violated Plaintiff's right to review these records guaranteed under both MCL 722.627 and DHS SRM 131

38

36. Ms. Samson as a complaining witness intentionally gave false and/or misleading testimony to support her decision to place Plaintiff on the central registry on July 25, 2011. In particular Ms. Samson claimed that all the children had lead poisoning at the time of the investigation, Plaintiff consented to the taken of photos, and DHS policy allowed for the continuation of the investigation after they determined the allegations were unsubstantiated. Further Ms. Sampson exaggerated her observations during her unlawful search of the home to support her findings and beliefs.

37. During her testimony Ms. Sampson admitted that her decision at least in part was based upon the prior unsubstantiated claims against the parents.

**B.**         **Cause of action**

1. Ms. Sampson violated Plaintiff's Fourth Amendment Right to be free of unreasonable search and seizer when she conspired used deceit to gain entry to Plaintiff's home, instructed her subordinates to take photos of the home without parental knowledge and/or consent, repeatedly informed Plaintiff he could not object to the unlawful intrusion, and supported the removal of Plaintiff's children from his home without probable cause to believe the children were at any risk of harm. Ms. Sampson is liable to Plaintiff in both her official capacity as a Wane County Department of Human Services supervisor and in her personal capacity under 42 U.S.C. §1983

2. Ms. Sampson violated Plaintiff's procedural and substantive due process rights protected by the Fourteenth Amendment when she conspired with Ms. Wenk to conduct a fishing expedition when she knew that the allegations contained in the report assigned for investigation were already determined to be unsubstantiated, falsified records to support her fishing expedition, gave false testimony to support her decision to place Plaintiff's

39

name on the Central Registry, refused to inform Plaintiff that his name was Placed on the central registry, denied Plaintiff access to the CPS records, and conspired to deny Plaintiff's privacy rights making her liable to Plaintiff under 42 U.S.C. §1983

3. Ms. Sampson is liable to Plaintiff under 42 U.S.C § 1985 for conspiring with defendants Wenk and Decormier to enter his home to violate his Fourth Amendment Rights, furthering this conspiracy with defendant Lamar to deny Plaintiff any right of grievance regarding their unlawful actions, conspiring to remove the children from Plaintiff's care when she knew of no threat to the children's safety, conspiring with other Wayne County DHS employees during the TDM to deny Plaintiff of any meaningful opportunity to be heard, and conspiring to remove the children and holding them hostage not for the children's safety but to force the parent to submit to their will, ext.

4. Ms. Sampson is liable to Plaintiff for the intentional infliction of emotional distress caused by her fishing expedition and conspiracy to remove plaintiff's children without cause and in retaliation of Plaintiff exercising his rights.

5. Ms. Sampson is liable to Plaintiff for her gross negligence in her duties to properly train and supervise her subordinates and her duties to protect the rights of Plaintiff.

**VIII.   Allegations and cause of action against Heather Decormier-McFarland**

   **A.         Allegations**

1. Ms. Decormier had no authority to be involved in any investigation regarding Plaintiff and his family as she did not have her mandated training pursuant to MCL 722.628(17) prior to becoming involved in the investigation.

2. Ms. Decormier violated her affirmative duty of protecting the rights of the families subject to a CPS investigation.

**40**

3. On January 21, 2010 Ms. Decormier entered Plaintiff's home with Ms. Wenk and Ms. Sampson for the limited purpose of "asking Robert a couple of questions" regarding him running away from home on January 17, 2010. Ms. Decormier was identified as an intern with Wayne County DHS that was there to observe the questioning of Robert.

4. This was just a pretense for the true purpose of taking photos of Plaintiff's home without his knowledge or consent.

5. Once in the home Ms. Decormier proceeded directly to the staircase leading to the upstairs with Ms. Sampson. Plaintiff objected to them entering the staircase and his objections were rejected by Ms. Sampson.

6. Ms. Decormier and Ms. Sampson then proceeded upstairs to take photos of Plaintiff's home. None of the three defendants present ever asked for consent or informed Plaintiff or his wife of their intent to take these photos.

7. When Ms. Decormier and Ms. Sampson returned from the upstairs while Ms. Sampson distracted the parents Ms. Decormier snuck into the kitchen area unbeknownst to the parents.

8. Ms. Decormier then began taken photos of the kitchen, during this time Plaintiff's oldest daughter noticed this activity when Ms. Decormier took a photo that includes her in the photo and notified the parents.

9. Plaintiff immediately objected and informed all present that consent or a court order was required to take photos inside Plaintiff's home.

10. Despite Plaintiff's objections Ms. Decormier proceeded to open the door leading into the basement and entered the basement to take photos of the basement while Plaintiff was still arguing his constitutional rights with Ms. Sampson.

41

11. Upon completion of her taken Photos of the basement the three defendants left Plaintiff's home with Ms. Decormier taking one final picture of the front hall area of Plaintiff's home from the outside porch area of the home.

12. Discovery will show that Ms. Decormier was well aware that the intent of the visit was to secretly take photos of Plaintiff's home without his knowledge or consent, and was a coconspirator to Ms. Wenk and Ms. Sampson.

13. Ms. Decormier later gave intentionally false and misleading testimony during the administrative hearing on July 25, 2011. In particular Ms. Decormier grossly misrepresented her observations during the unlawful search of Plaintiff's home such as claiming there was no ceiling in the basement bedroom, she also intentionally led the hearing officer to believe that there was parental knowledge and consent to take photos, and falsified the order in which the photos were taken.

**B.**                                    **Cause of action**

1. Ms. Decormier is liable to Plaintiff both in her official capacity as a Wayne County DHS intern and personally for her violations of Plaintiff's Fourth Amendment right to be free of unreasonable search and seizer by searching Plaintiff's home and taken photographs of his home without any consent, court order or exigent circumstances. Under 42 U.S.C. § 1983

2. Ms. Decormier is liable to Plaintiff under 42 U.S.C. § 1985 for conspiring with Ms. Sampson and Ms. Wenk to fraudulently enter Plaintiff's home for the purpose of violating his Fourth Amendment Rights.

3. Ms. Decormier is liable to Plaintiff under 42 U.S.C. § 1985 for providing false testimony to further the conspiracy against Plaintiff.

42

## IX.    Allegations and cause of action against Shevonne Trice

### A.                          Allegations

1. Ms. Trice had no authority to be involved with Plaintiff's family in the instant case as she lacked the mandatory training under MCL 722.628(17) prior to being involved with the family or providing services.

2. In alternative and/or in addition to this lack of training Ms. Trice violated her affirmative duty to protect the rights of Plaintiff and his family.

3. On February 18, 2010 Plaintiff's children were forcibly removed from his home by Detroit Police under the direction of Ms. Wenk.

4. On February 19, 2010 the Children were placed in "Protective Custody" of the Wayne County Circuit Court Family Division with the children being placed with Wayne County DHS for their care and supervision.

5. On or about February 24, 2010 Ms. Trice was appointed as the Wayne County Foster Care Worker for Plaintiff's family.

6. Following the preliminary hearing on February 24, 2010 Plaintiff and his wife requested that since the department refused to release the children to the parent that they all be placed with their maternal grandparents. Ms. Trice responded that "they won't allow that" without any further explanation of who "they" were or any reason the placement was unacceptable.

7. On or about March 3, 2010 Ms. Trice placed Plaintiff's male children in the home of Michael and Noel Chinavare whom at the time lived in Monroe County Michigan.

8. Ms. Trice placed Plaintiff's female children in the home of Wendy and Thomas Chinchak.

43

9. Pursuant to FOM 722-14 when a child is placed in a different county, supervision of the child should be directed by the county that the child is located in and it was the responsibility of Ms. Trice to attempt to achieve this and document what was done.

10. Instead when Ms. Trice placed the children she gave the Chinavares a document that claimed they were the temporary guardians of the children. Ms. Trice had no authority to write such a document as there was no parental consent or any court order authorizing this guardianship.

11. This fraudulent document in essence stripped Plaintiff of all his parental rights for any decision making for his children without any due process of law.

12. This document served no legitimate purpose as FOM 722-2 requires that school enrolment be authorized using the DHS-714 school enrolment form and FOM 722-11 requires medical authorization to done through the use of the DHS-3762 medical authorization card.

13. The true purpose of this document was later revealed to be for the purpose furthering the conspiracy of violating Plaintiff's constitutional rights by eliminating the need of parental consent and/or court order for non-routine medical and educational decisions.

14. This was also part of the ongoing conspiracy to fabricate evidence started by Ms. Wenk and Ms. Sampson that had at this point now spread to include Ms. Trice as well as the Chinavares.

15. It is Plaintiff's belief that other co-conspirators will be revealed during the course of discovery.

16. On March 10, 2010 Ms. Trice personally inspected Plaintiff's home and found it to be suitable for the children to return.

17. Ms. Trice reportedly informed Ms. Wenk of this fact prior to the March 12, 2010 hearing.

18. On March 25, 2010 Ms. Chinavare after authorizing the blood lead test that Wayne

County DHS sought on James requested all the children be removed from her home. The

Chinchaks followed suits and requested the removal of the other children from their

home.

19.  On March 26, 2010 Plaintiff and his wife meet with Ms. Trice regarding the request

made for the children to be removed from their placements. When the parents requested

the children be returned to the home Ms. Trice responded again with the phrase "they

won't allow it" with no further explanation.

20. During Plaintiff's conversations with Ms. Trice on March 26, 2010 Ms. Trice admitted

that there was no reason the children could not return to Plaintiff's home and further

stated if it were up to her the children would already be home.

21. After the discussion with Ms. Trice Plaintiff's male children were placed at Wolverine

Shelter and his female children placed at Davenport shelter.

22. On March 29, 2010 a TDM was held for the alleged purpose of determining the

appropriate placement for the children. A simple listening of the tape reveals that this was

a predetermined outcome and nothing said at this meeting had any bearing on the

determination that had already been made by the various Wayne County DHS co-

conspirators.

23. Defendants Trice and McGehee were present at this TDM

24. During this TDM Plaintiff's oldest son that was less than 2 weeks away from his 17th

birthday specifically asked why he was in "protective custody" no one present at the

**45**

TDM would answer his question. He also unequivocally stated he didn't want their

protection and wanted to return to his parental home.

25. It was acknowledged by the defendants that the children were not receiving proper care

while in foster care. In particular it was admitted that James had yet to receive the court

ordered hearing and speech evaluation, that Jamie had yet to have her heart condition

checked and that Robert still needed a reevaluation for his curved spine.

26. During the TDM was the first mention of a "plea deal" for the return of the children.

27. The predetermined outcome of this TDM was that the three male children were to be

placed in residential care and the two female children were to be placed in a foster home.

Plaintiff and his wife strongly objected to this decision.

28. At the TDM Plaintiff personally handed Ms. Trice a written request for his children's

foster care records. To this day this request has yet to be fulfilled, although Plaintiff has

been able to acquire bits and pieces of these records.

29. The determination made at the TDM is in contradiction to the requirements of FOM 722-

3 that requires that considerations be first to return the children home and then to place

the children with a sibling or other suitable relative. Neither of these options was even

considered by the defendants present at this meeting.

30. Even if the original removal of the children were somehow justified at this point a

determination had been made, by Wayne County DHS, that the home was safe for the

children, therefore refusing to even consider returning the children was a blatant violation

of Plaintiff's right to the care custody and control of his children and to have his children

reside with him.

31. It is well documented that the **only** reason the children remained in foster care is because the parents were exercising their right to trial and Wayne County DHS through its agents such as Ms. Trice was holding the children hostage to coerce the parents into forfeiting this right.

32. Despite the fact that at the TDM it was admitted that James had yet to have a proper hearing evaluation, the following day on March 30, 2010 Ms. Trice reported to the court that this test had already been completed. This is evidence of Ms. Trice and her co-conspirators intentions to deceive the court and deny Plaintiff of his fundamental rights.

33. On March 30, 2010 the Court again ordered that James receive speech services. At this point James had not attended any documented speech training since being removed from plaintiff's home. This fact demonstrates the lack of concern for the children's well being by the Wayne County DHS defendants.

34. The Court further ordered that Ms. Trice complete the interstate compact request to allow the children to be placed with their maternal grandparents that at this point Ms. Trice and Ms. Wenk repeatedly refused the parents and grandparents request for such.

35. At this hearing on March 30, 2010 the terms of the "plea deal" was stated such as the children would immediately be returned to the parents if the parents forfeited their right to trial, and accepted **any** referred services. No specific services were mentioned nor what the intended outcome of these services claimed.

36. There has been no explanation as to why the children were not safe to return home absent the parents forfeiting their right to trial, and no alternative besides the parents forfeiting this right was acceptable. This is in and of itself evidence that the children were being held hostage not for their protection, but to coerce the parents to forfeit their rights.

37. On March 30, 2010 Ms. Trice intentionally falsified DHS 69c forms for all the children to justify not retuning the children to the home. In particular although she personally knew this to be false Ms. Trice claimed that all the children remained at risk if returned to the home.

38. On or about April 5, 2010 Ms. Trice transferred Plaintiff's male children to Methodist Children's Home. This was done without parental or court consent and in violation of their own written policies and the consent agreement of *Dwayne B. v Granholm* in that there is not documentation of any specific services to be given at the residential care that could not be given by the parent or any other placement, no documentation specifying why other placement would not meet the child's specific needs, and no signed authorization from the county director authorizing the placement.

39. On or about April 7, 2010 Ms. Trice had Plaintiff, during a family visit, sign documents authorizing access to the children's medical records for the purpose of continuing medical care.

40. Pursuant to the email between Ms. Trice and Ms. Wenk the true purpose was to allow Ms. Wenk access to these records to continue her fishing expedition against Plaintiff.

41. On or About April 5, 2010 Ms. Trice made a referral to Judson Center for "grief counseling" for Plaintiff's female children. Ms. Trice fraudulently claimed this was court ordered.

42. This counseling was not authorized by the court or the parents.

43. During a family visit on April 14, 2010 the parents noticed Robert was extremely ill and was being given medication that had expired approximately a year and a half before hand.

48

44. The parents immediately reported this to Ms. Trice whom was present at the visitation.

45. Ms Trice ignored her affirmative duty to report this medical neglect as required by both written policy as well as statute.

46. Ms. Trice's dereliction of her duty resulted in Robert having to go AWOL from his placement two days later when he began coughing up blood.

47. On or about April 26, 2010 a Foster Care Review hearing was held in which Ms. Trice was present.

48. At this hearing it was determined that since in foster care the children's medical and educational needs were not being met, that the medical neglect of Robert must be reported and investigated, that neither the parents or the children were receiving any services designed to reunify the family, and that the children would be returned to the parents after the issue of trial was resolved.

49. Despite the determinations made by the review board Ms. Trice still refused to report the medical neglect of Robert (that was still ongoing)provide any serviced designed to reunify the family, or address the medical and educational needs of the children.

50. On April 28 Ms. Trice transferred Plaintiff's female children to the home of Renee Samples, and transferred supervision of their placement to The Children's Center.

51. Ms. Trice provided Plaintiff with the telephone number of Ms. Samples so he could maintain phone contact with his daughters.

52. There has been no explanation given as to why the children were replaced to a different foster home rather being returned to the parents or alternatively placed with their grandparents.

53. There has been no legitimate explanation given for the transfer of supervision when Ms. Samples was licensed through Wayne County DHS and the children were not adjudicated court wards.

54. Ms. Trice conspired with Methodist, and the Children's Center to again violate Plaintiff's parental rights. In particular on or about May 2, 2010 a conference was held to determine the visitation schedule for the family, however neither the children nor the parents were allowed to participate in this conference, and the terms were strictly dictated to them after the conference.

55. In essence this determination to change the time and place of visitation was made without any input allowed from any real party of interest (parents and children) and simply another forced control method of the defendants conspiracy.

56. On or About May 2, 2010 Ms. Trice in conjunction with Methodist Children's Home formulated and approved a "Residential Initial Service Plan" and a "Parent-Agency Treatment and Service Plan" for each of Plaintiff's male children.

57. The Plaintiff was denied any opportunity to participate in this planning.

58. One of the plans specifically states the reason Plaintiff was not allowed to participate was "The wardship of the child is pending. The parents have requested a trial to contest the removal of their children from the parental home."

59. This statement is self evident that Ms. Trice conspired with Methodist to violate Plaintiff's Parental Rights in retaliation for Plaintiff exercising his right to trial.

60. This statement also proves that Ms. Trice, Wayne County DHS and Methodist all lacked any authority to "authorize" any purposed "treatment" or services absent parental consent and/or court order as the children had not been adjudicated as wards of the court.

50

61. On or about June 2, 2010 at a court hearing Ms. Trice finally acknowledged to the court that the home had been suitable for the return of the children since at least March 10, 2010. As a result of this belated admission the court returned the children to the home, and ordered FRP (Family Reunification Program) to be put in place.

62. Pursuant to testimony at the hearing the purpose of FRP was to address the issues caused by the lengthy separation of the children from their parents. However the referral made by Ms. Trice was a further conspiracy to attempt to force Plaintiff to bend to their will in regards to educational and mental health decisions for his children, neither of which were at issue before the Family Court.

63. As later discovered Ms. Trice, The Children's Center and Judson Center were also conspiring to intimidate and force the parents to accept all responsibility for the unlawful acts of the defendants.

64. After the children were returned to the Plaintiff's home Ms. Trice refused to release Plaintiff's daughters from being listed in Foster Care.

65. Ms. Trice's explanation for this was that she could not release them until The Children's Center was paid.

66. Contrary to this statement made to the parents, on August 26, 2010 Ms. Trice testified it was an unknown computer problem that prevented the correction. However Ms. Trice did finally release the girls on or about September 3, 2010.

67. As a direct result of Ms. Trice's actions Plaintiff was denied much needed benefits for his children placing a financial hardship on the family, Further since the children were still listed in foster care Plaintiff had to attend several hearings to defend against child support

payments for daughters due to a third party (either Ms. Samples and/or The Childrens Center) receiving the benefits Plaintiff was being denied for his children.

68. Also in furtherance of their conspiracy Ms. Trice falsified her testimony on August 26, 2010 in that she unequivocally claimed that James high lead level was the result of lead base paint in Plaintiff's home.

69. Contrary to her statements it should be known that neither Wayne County DHS nor the Court ever saw fit to have the home tested for lead, and the children were returned to the home without such being done.

70. Evidence proves that James lead levels went up from March 25, 2010 (35 days after he was removed from the home) to June 8, 2010(3days after his return to the home) which indicates his exposure occurred while in foster care and not in Plaintiff's home.

71. There has been no evidence presented to indicate James had any lead in his blood at or near the time he was removed from his parental home.

72. From approximately June 15 through September 10 Plaintiff made numerous complaints to Ms. Trice (as well as to FRP) regarding the conflict of interest and the inappropriate behavior of Ms. Greene. These complaints all were simply passed off and ignored.

73. Documentation shows that Ms. Greene's involvement with the family was intentional for the continuance of the fishing expedition and violation of Plaintiff's rights.

74. On or about September 2, 2010 Ms. Trice along with Ms. Evans of The Children's Center and Ms. Harris of FRP made a visit to Plaintiff's home.

75. The intent of this visit was nothing more than a fishing expedition to see how the parents were going to present their case at the September 10, 2010 hearing, and to attempt to convince them not to contest anything presented.

52

**B.**                          **Cause of action**

1. Ms. Trice is liable to Plaintiff both her in official capacity as a Wayne County Foster Care Worker and personally for her violations of Plaintiff Fourteenth Amendment rights to the care custody and control of his children, and denying him of any opportunity to be involved in the decision making for his children's medical educational and "treatment" needs without due process of law under 42 U.S.C. § 1983.

2. Ms. Trice is liable to Plaintiff under 42 U.S.C. § 1985 for conspiring with others to deny Plaintiff of his Fourteenth Amendment Rights in an effort to prevent Plaintiff from exercising his fundamental right to trial.

3. Ms. Trice is liable to Plaintiff under 42 U.S.C. §1986 in that she knew of others intent to violate Plaintiff's rights and took no action to prevent or correct it.

4. Ms. Trice is liable to Plaintiff for intentionally inflicting emotional distress upon Plaintiff by unlawfully withholding custody of his children when she personally knew that the children were at no risk of harm in Plaintiff's care, which caused Plaintiff extreme emotional distress due to his forced separation and limited contact with his children.

5. Ms. Trice is liable to Plaintiff for her gross negligence in performing her duties including but not limited to her duty to protect Plaintiff's rights and her duty to report the neglect of Plaintiff's children while in foster care.

6. Ms. Trice is liable to Plaintiff under MCL 722.633(1) for the damages caused from her failure to report the medical neglect of Plaintiff's son, including but not limited to medical expenses and emotional distress suffered by Plaintiff as a result of her failure.

**X.**   **Allegations and cause of action against Charlotte McGehee**

    **A.**                          **Allegations**

53

1. Ms. McGehee had no authority to be involved with Plaintiff's family in the instant case as she lacked the mandatory training under MCL 722.628(17) prior to being involved with the family or providing services.

2. In alternative and/or in addition to this lack of training Ms. McGehee violated her affirmative duty to protect the rights of Plaintiff and his family.

3. Ms. McGehee was the direct supervisor of Ms. Trice and was responsible to ensure Ms. Trice was properly trained and supervised.

4. On or about March 26, 2010 Ms. Trice was attempting to give Plaintiff a copy of the physiological examinations that had been conducted on his children. Ms McGehee prevented this by physically removing the documents from the package that Ms. Trice presented to the parents.

5. This act violated Plaintiff's right to know the mental health concerns of his children.

6. This further violated Plaintiff's due process rights as these same documents were used both at the TDM held on March 29, 2010 and the hearing on March 30, 2010, and denied Plaintiff of any reasonable opportunity to review these documents prior to them being used.

7. Plaintiff's counsel was not given a copy of these documents until during the hearing on March 30, 2010.

8. Ms. McGehee was personally present at the TDM on March 29, 2010. She refused to answer the question of why the children were in foster care and why they could not be returned to the parental home.

9. This not only violates Plaintiff's right to know what was required for the children to be returned to him but also violated the children's right to know why they were in care.

54

10. Ms. McGehee was the decision maker that determined to place the male children in residential care and the females in a foster home.

11. Ms. McGehee's decisions were contradictory to established law and policy, and were done with malice and complete disregard for whether an injury occurred.

12. The basis for her decision was the furtherance of the conspiracy to hold Plaintiff's children hostage in an effort to force the parents to forfeit their right to trial.

13. To support her decision Ms. McGehee cosigned Ms. Trice's falsified DHS 69c forms that make the vague claim that the children remained at risk if returned to the parents.

14. Ms. McGehee was well aware that the maternal grandparents were willing and capable to care for all five children if they could not be returned to the parents.

**B.**        **Cause of action**

1. Ms. McGehee is liable to Plaintiff both in her official capacity as a Wayne County DHS supervisor and personally for her violations of Plaintiff's fourteenth amendment rights to review his children's records and be intelligently involved in any decision making concerning their care under 42 U.S.C. § 1983.

2. Ms. McGehee is also liable under 42 U.S.C. § 1983 for her denial of Plaintiff's due process rights by withholding documents from him that were to be used to determine the future placement of his children as well as presented to the court, and for falsifying documents.

3. Ms. McGehee is liable to Plaintiff under 42 U.S.C. § 1985 for her involvement in the conspiracy to hold Plaintiff's children hostage to coerce the plaintiff into forfeiting his right to trial.

4. Ms. McGehee is liable to Plaintiff for the grossly negligent manor she performed her duties in respect to returning the children to the home and protection of plaintiff's rights.

5. Ms. McGehee is liable to Plaintiff for intentional infliction of emotional distress for her involvement in the hostage taken of Plaintiff's children that was done with malice, complete disregard for whether an injury occurred, and caused Plaintiff severe emotional distress as a result of the separation from his children.

## XI.   Allegations and cause of action against Joyce Lamar

### A.                          Allegations

1. Ms. Lamar had no authority to be involved with Plaintiff's family in the instant case as she lacked the mandatory training under MCL 722.628(17) prior to being involved with the family or providing services.

2. In alternative and/or in addition to this lack of training Ms. Lamar violated her affirmative duty to protect the rights of Plaintiff and his family.

3. Ms. Lamar was the Wayne County DHS Central Service Facility sectional supervisor in charge of children's protective services and foster care, and was the direct supervisor of defendants Ms. Sampson and Ms. McGehee.

4. As a sectional supervisor Ms. Lamar was responsible for the proper training and supervision of her subordinates.

5. On February 18, 2010 Plaintiff spoke with Ms. Lamar via telephone conference to complain of numerous rights violations and criminal conduct of her subordinates. In particular Plaintiff made complaints regarding the unlawful intrusion and photographing of his home, the fishing expedition performed by Ms. Wenk and Ms. Sampson and the unfairness of the TDM that had just been held.

6. Ms. Lamar has an affirmative duty to conduct an objective investigation of any allegation of employee misconduct regardless of its source, and the affirmative duty to report the criminal conduct to the appropriate law enforcement agency. (AHP 602-2)

7. Instead of Ms. Lamar conducting an objective investigation she began to personally defend the actions of her subordinates.

8. When Plaintiff inquired of Ms. Lamar and Ms. Sampson where the alleged mold was located in Plaintiff's home, Ms. Lamar in a fit of rage responded "you live in the house you know where the mold is."

9. This statement demonstrates that Ms. Lamar lacked any concern for Plaintiff or his children's well being. Alternatively and/or additionally it shows she knew the claims made by Wenk and Sampson were exaggerations at best.

10. Although Plaintiff had informed both Ms. Sampson and Ms. Lamar that repairs had been done to the home, because Plaintiff wished to exercise his Fourth Amendment Rights both co-signed Ms. Wenk's "Protective Services/Foster Care Petition Application and Information Record".

11. A review of this document shows that Ms. Wenk Ms. Sampson and Ms. Lamar should not be involved in **any** child protective proceedings. In particular though all three reviewed and signed this document, the only child listed as "included in this complaint" is Plaintiff's oldest child that no allegations concerning his care was ever made. Next between the three of them they apparently could not determine what type of complaint this was since neither neglect nor abuse is marked, the document does not state whether it is mandated or none mandated, further the document claims to be a supplemental application however no previous petition was ever filed (this could be interpreted as fraud

57

as it does not seek temporary wardship and a supplemental petition is only after a child is already adjudicated a ward of the court), then the recommendations is completely blank as to what the agency was seeking (i.e., detainment, writ, placement, dismissal). This gives serious concerns that if these allegedly trained professionals cannot figure out how to complete a document written in plain English should they be determining how to address any concerns regarding the protection of children and the integrity of a family unit.

12. All three of the defendants that signed this document are all parties to further fraud and fabrication as the document claims Plaintiff only has an eighth grade education.

13. Pursuant to an email between Ms. Wenk and Ms. Trice, Ms. Lamar was also intimately involved in the conspiracy to have the Chinavares have James Tested for lead without any parental consent as part of their fishing expedition and attempts to fabricate evidence against Plaintiff.

14. Discover will show that Ms. Lamar was personally involved in many other of the unlawful violations of Plaintiff's rights and was well aware of and condoned the illegal and unlawful conduct of her subordinates.

**B.**                              **Cause of Action**

1. Ms. Lamar is liable to Plaintiff under 42 U.S.C. § 1983 both in her capacity as a Sectional Supervisor, and personally for her intentional violation of Plaintiff's rights to the care custody and control of his children, and for retaliating against Plaintiff for him asserting his Fourth Amendment Rights.

2. Ms. Lamar is liable to Plaintiff under 42 U.S.C. § 1985 for conspiring with other to deny Plaintiff of his Fourteenth amendment rights to the care and custody of his children,

58

Retaliating against Plaintiff for exercising his Second and Fourth Amendment Rights,

Furthering the conspiracy by attempting to cover up the violations of her subordinates.

3. Ms. Lamar is liable to Plaintiff for gross negligence in that she refused to perform

objective investigations of Plaintiff's allegations, failed to protect Plaintiff's

constitutional and statutory rights, failed to report criminal conduct of her subordinates,

failed to properly train and supervise her subordinates.

4. Ms. Lamar is liable to Plaintiff for intentional infliction of emotional distress in that her

conduct was intentional with a complete disregard of Plaintiff's rights, or if Plaintiff

would suffer injury as a result of the forced breakup of his family. Any reasonable person

would have known that the removal of Plaintiff's children would and did cause him

extreme emotional damage.

**XII.   Allegations and cause of action against the Detroit Police Department and individual officers Emina Biogradlija, Michael Bronson, and two unknown officers**

**A.                    Allegations**

1. Pursuant to Wayne DHS records Ms. Wenk's first contact regarding this case was to

Officer Emina Biogradlija on January 18, 2010.

2. Officer Biogradlija at that point in time had no personal knowledge regarding the case.

3. This first contact demonstrates a prior relationship between Wenk and Biogradlija before

the Detroit Police were involved in the removal of Plaintiff's children.

4. On February 18, 2010 Detroit police arrived at the home of Plaintiff.

5. Officer Michael Bronson approached and knocked on the door, Plaintiff answered.

6. Officer Bronson announced they had a warrant to remove Plaintiff's Children.

7. Plaintiff requested to see the warrant.

8. Officer Bronson refused and state that they were going to secure the area first. He then pushed his way past Plaintiff and entered the home.

9. Officer Emina Biogradlija followed behind him.

10. Plaintiff seen two other Detroit Police officers in uniform and holding shotguns in his front yard.

11. Plaintiff again asked to see this warrant.

12. Approximately five minute later two unidentified officers entered Plaintiff's home.

13. One of these new officers a tall blonde female was in possession of what they called the warrant and showed it to Plaintiff.

14. The other of these officers (approximately Five foot 4 tall) kept unsnapping and snapping his holster while Plaintiff looked at this "warrant".

15. Upon first glance Plaintiff immediately challenged the legitimacy of this document, as it did not bear the court's seal nor did it have a judge's name on its face.

16. Upon further examination of this "warrant" Plaintiff challenged it for several other reasons, such as the "signature" was a rubber stamp, it had the wrong description for all of Plaintiff's children, it made contradictory statement regarding "reasonable efforts", it did not specify who was authorized to execute it, no date of entry of order, no hearing date set, and gave blanket permission to enter premises **anywhere** in the United States.

17. Any reasonable person that simply views this "warrant" would recognize it for the fraud it is.

18. Any reasonable Police officer would have verified the legitimacy of this "warrant" when the mistakes and omissions were so obvious. This is especially true when the "order" did not expire for 30 days.

60

19. Despite Plaintiff's objections and challenges the officers still removed Plaintiff's children.

20. Plaintiff felt compelled to comply for fear of safety of himself and his family.

21. Plaintiff's youngest child (who was ten years old) attempted to hold onto his mother. The tall blonde officer ripped him from his mother and pushed him out the front door.

22. Detroit Police Department policy states clearly that is it not the job of the DPD to serve civil orders.

23. When Plaintiff followed the officers outside, he noticed several other police cars and officers holding shotguns around his house and on the street.

24. No official report was made by the officers for this unlawful search and seizure of Plaintiff's home and children. Pursuant to Officer Biogradlija's testimony the officers were advised not to make a report.

**B.**                                  **Cause of action**

1. The Detroit Police Department, Officer Biogradlija, Officer Bronson and the unknown Officers are jointly and severally liable to Plaintiff under U.S.C. § 1983 for the forced entry into Plaintiff's home without a valid warrant and the forced removal of Plaintiff's children violating Plaintiff's Fourth and Fourteenth Amendment rights.

2. The Detroit Police Department, Officer Biogradlija, Officer Bronson and the unknown Officers are jointly and severally liable to Plaintiff under U.S.C. § 1985 for conspiring with Wayne DHS and Ms. Wenk to violate Plaintiff's Fourth and Fourteenth Amendment Rights.

3. The Detroit Police Department, Officer Biogradlija, Officer Bronson and the unknown Officers are jointly and severally liable to Plaintiff for the intentional infliction of

61

emotional distress caused by their forced entry into Plaintiff's home, the excessive show of force the physical removal of Plaintiff's children, and the physical assault of the Plaintiff by officer Bronson.

4. The Detroit Police Department is liable to Plaintiff for their gross negligence in failing to properly train and supervise their employees.

## XIII.   Allegations and cause of action against Methodist Children's Home

### A.                          Allegations

1. Methodist Children's Home as relevant to the instant case is a residential care facility licensed and regulated by the State of Michigan for the care, treatment, and detainment of court and state wards.

2. On or about April 5, 2010 Plaintiff's three minor male children were placed at Methodist against the will of the children and the parents by Wayne County DHS.

3. Methodist in this case was a state actor in the same manner as any other detention, correctional, hospital or institutional facility charged with the care of persons in state custody.

4. Methodist in the least owed Plaintiff and his children the same duty of care as if they were the state itself.

5. The initial placement of Plaintiff's children at Methodist was done in violation of Plaintiff's and his children's rights as this was not court ordered, without parental consent, and these children had not been adjudicated as court wards.

6. The initial placement was also done in violation of the applicable regulations, and court decree in *Dwayne B. v Granholm.* In that no approval was given by the County Director, no specific services to be given were identified, and no claim that those services could

not be meet in a less restrictive environment such as foster home or parental home placement.

7. Methodist had an independent regulatory duty to individually evaluate the individual children, and insure the placement was appropriate prior to accepting the placement. This was not done.

8. Upon arrival to this Placement, Methodist began counseling services for the children without any court order and/or parental knowledge or consent.

9. This "counseling" did not have any specifically identified focus or need.

10. Shortly after arriving at Methodist, Plaintiff's son (Robert) became ill and this condition worsened over time.

11. On or about April 14, 2010 during a family visit the parent became very concerned for Robert's condition as his cough seemed excessively violent and unproductive.

12. Robert showed the parents the "medication" that he was given at Methodist by Ms. Marry Ann Stokes (the facility nurse). The marking on the package clearly showed that the expiration date was October of 2008.

13. The parents reported this to Ms. Trice of Wayne DHS immediately and expressed their concerns for all their children's safety.

14. On April 15, 2010 Plaintiff spoke with Ms. Stokes, and expressed his concerns for his son. Plaintiff clearly stated the Robert should be seen by a doctor as soon as possible and if his condition worsened he needed emergency care.

15. On April 16, 2010 Robert's condition worsened to the point he was now coughing up blood. His requests to see a physician were denied and after a few hours of these denials Robert took himself to Botsford Hospital.

16. Medical records from Botsford show that Robert was in fact coughing blood, and he was diagnoised with acute bronchitis and acute pharyngitis.

17. Discovery has revealed that Ms. Stokes has admitted that she did not keep records on any of the children and what treatment they were given.

18. Discovery has also revealed that Ms. Stokes gave Plaintiff's other children prescription medication without the children being seen by a medical doctor.(i.e. antibiotics, immunizations, inhalers, and emergency breathing treatments)

19. Robert's condition improved for a time after his visit to Botsford but again worsened.

20. Robert's and Plaintiff's requests for him to be seen by a physician were repeatedly denied the entire time he remained at Methodist.

21. Although Methodist claims to have a licensed physician on staff Plaintiff's children were never seen by this physician.

22. Ms. Stokes as a registered nurse did not have the authority to diagnosis and treat Plaintiff's children. Her doing so without documented consultation with a physician not only violated the children's rights but also violated Plaintiff's Fourteenth and Ninth Amendment rights to ensure his children's well being.

23. On or about April 20, 2010 Plaintiff's youngest child was taken by Methodist to Midwest medical facility for a hearing evaluation. Plaintiff requested that he also receive his doctor recommended retesting for lead at the same facility.

24. This request was based on the previous test done one March 25, 2010 at Midwest in which James was identified as having an elevated lead level in his blood.

25. Due to varying testing techniques and laboratory conditions blood lead tests are not an accurate indication of progress unless they are done in the same facility.

64

26. Ms. Stokes denied Plaintiff's request. Choosing instead to have Methodist conduct the test.

27. Before trial while the defendant's (including Methodist) was attempting to "convince " the parents to take a plea deal, a staff member from Methodist intentionally drove slowly past Plaintiff's home with Plaintiff's youngest child as a passenger to inflict emotional distress upon Plaintiff.

28. Methodist also interfered with Plaintiff's ability to visit with his children. Examples are that on April 28, 2010 James did not appear for the "family visit" until the last 10 minute of the visit due to Methodist deciding to schedule him for other activities when he was supposed to be at this scheduled visit. Methodist was also routinely late, sometimes as much as 40 minutes, bringing the children to their visits. As the family only got one hour per week to spend as a family this caused great stress upon the Plaintiff and the family as a whole.

29. When James was returned to the Parents in June of 2010 the parents had James tested at Midwest and discovered that James' lead levels had increased while in Methodist's care.

30. Methodist has been on its current site since approximately 1925 and as such there is a high likelihood that the facility contains lead contamination.

31. Methodist in conspiracy with Wayne DHS denied Plaintiff of his parental rights to make the decisions regarding the medical, mental health and educational decisions in retaliation of Plaintiff exercising his right to trial.

32. Methodist in conspiracy with Wayne DHS refused to allow Plaintiff to be involved in the planned treatment of his children in retaliation of Plaintiff exercising his right to trial.

65

33. Methodist has specifically stated in at least one of these service plans that the reason they did not involve the parents was that the parents requested trial.

34. These "service plans" also show both Wayne DHS's and Methodist's intentions not to inform the parents as the parents are excluded from the distribution of these documents that required their signature.

35. To avoid the parents consent requirement Methodist falsely stated "parent not available".

36. Methodist in conspiracy with Wayne DHS refused Plaintiff's family any planning or services designed to reunify the family in retaliation for Plaintiff exercising his right to trail.

37. Plaintiff's children did not attend school the entire time they were placed at Methodist.

38. Plaintiff's youngest son received no structured educational service while he was at Methodist.

39. Federal Law and the consent agreement (Dwayne B. v Granholm) require that the children be enrolled in a public school within 5 days of placement.

40. Unbeknownst to Plaintiff Methodist through Mr. Freeman authorized an I.E.P. to be conducted on Plaintiff's youngest child without any parental knowledge, consent or involvement, and without any court order authorizing such.

41. Mr. Freeman fraudulently signed the authorization as the child's parent or legal guardian. No court has ever assigned him or Methodist such authority.

42. Records indicate that Methodist was paid through the use of Title IV-E social security funds that they were not entitled to as a matter of law, at least in part due to the fact the children were not attending an approved school, and no efforts to reunify the family were made.

43. At no time while the children at Methodist were they adjudicate court or state wards and Plaintiff never lost any of his parental rights.

44. Plaintiff has never been adjudicated as an unfit parent in any court.

45. Plaintiff has had to bear the burden and expenses caused by the medical and educational neglect of his children while they were placed at Methodists, this burden are still ongoing.

**B.**                    **Cause of action**

1. Methodist is liable to Plaintiff under 42 U.S.C. 1983 for intentionally denying Plaintiff's parental rights protected under the Fourteenth and Ninth Amendments, and retaliating against Plaintiff for exercising his rights.

2. Methodist is liable to Plaintiff under 42 U.S.C. 1985 for conspiring with Wayne DHS to intentionally denying Plaintiff's parental rights protected under the Fourteenth and Ninth Amendments, and retaliating against Plaintiff for exercising his rights.

3. Methodist is liable to Plaintiff for intentional infliction of emotional distress.

4. Methodist is liable to Plaintiff for their gross negligence in the medical and educational care of his children, and their gross negligence to their affirmative duty to make efforts to reunify the family.

**XIV.  Allegations and cause of action against Judson Center and Wendolyn Greene (aka Wendolyn Anderson)**

**A.**                    **Allegations**

1. Judson Center is a private agency contracted by the State and local DHS agencies to provide services to families on behalf of those DHS agencies.

2. Judson Center has numerous programs including those relevant to the instant case Families First and Family Reunification Program (FRP)

**67**

3. Pursuant to Judson Center's web site "The Families First program works to prevent children from entering the foster care system by providing counseling and other support services within the home.

4. As shown on the same site" The Family Reunification Program (FRP) provides in-home counseling to children and families who are being reunited after an out-of-home placement.

5. Pursuant to Michigan DHS's website the purpose of Families first is: "The program is part of the state's services designed to meet the Reasonable Efforts (P.L. 96-272) requirements of Title IV-E of the federal Social Security Act. Public Act 82 of 2001 (FY 2002 FIA Appropriations Act)"

6. FRP alone has an annual allotment of $19,065,798.00 through state contracts with DHS that are 100% federally funded under Title IV-E of the social security act.

7. On February 16, 2010 Ms. Wenk made a phone referral to Families First and spoke with a Mr. James Oaks.

8. Discovery will reveal that Ms. Wenk's prior two attempts were rejected by Families First, and Ms. Wenk then sought a different contact to accept it.

9. At the time this referral was accepted no one had visited Plaintiff's home since January 21, 2010, and no other services had been offered to the family.

10. A referral to Families First is **only** appropriate in situations that removal of the children is imminent.

11. Ms. Roshanda Williams of Families First contacted Plaintiff's wife by phone. Ms. Brent explained to her that the family could not meet with them that day but the following day would be fine.

68

12. Ms. Williams then handed the phone to her supervisor Mr. Oaks and Ms. Brent again stated the following day would be fine. Mr. Oaks stated he would have Ms. Williams call to set up a time and hung up.

13. Pursuant to Ms. Williams' testimony, after Mr. Oaks finished speaking to Ms. Brent he called and spoke with Ms. Wenk of Wayne DHS. Somehow during this conversation Ms. Wenk convinced Mr. Oaks to violate Families First's policies and make an unannounced visit to Plaintiff's home.

14. Any reasonable person would have known that making an unannounced visit right after they were told not to come to the home would have been confrontational at best. This is further supported by Ms. Wenk's testimony felt she needed to accompany them to the home "for a smooth transition"

15. Mr. Oaks and Ms. Williams arrived at Plaintiff's home and entered the fenced curtilage of his home without any consent. When Plaintiff stated that they had already been told not to come out Mr. Oaks claimed they were not told that. As Plaintiff was standing right next to his wife when she informed them not to come out Plaintiff called Mr. Oaks a liar and told them to leave his property. Plaintiff then reentered his home and closed the door. Families' First still proceeded to reach Plaintiff front door and placed a flyer into the door jam.

16. It has been admitted by Ms. Williams sworn testimony that both her and Mr. Oaks was well aware they were not welcome and had been instructed not to come to Plaintiff's home before their unwarranted trespass on Plaintiff's property.

69

17. Discovery will reveal that the purpose of this unannounced visit was intended to fail and justify the removal of the children this intended failure was to meet the "reasonable efforts" requirement before the children could be removed.

18. This is supported by Ms. William's testimony that after Plaintiff refused their unannounced intrusion they were instructed by Wayne DHS not to make any further efforts and that WAYNE DHS was filling a petition and removing the children.

19. As Michigan DHS in essence considers Families First and extension of themselves to meet federal mandates, funding for Families First is paid primarily through state and federal funds, and Ms. Wenk in the very least encouraged Families First to make the unannounced visit, Families First was State actors for the purpose of 42 U.S.C § 1983 and §1985.

20. Further Families First conspired with Wayne DHS to commit fraud in order to show "reasonable efforts" to obtain federal funds.

21. Families First also conspired with Wayne County DHS in an attempt to unlawfully enter Plaintiff's home, and fabricate evidence to use against him during the Family Court proceeding. Indeed the Family Court record has much testimony of how the parents "refused services".

22. On or About April 5, 2010 Judson Center received a referral from Ms. Trice of Wayne DHS to provide counseling for Plaintiff's daughters. Ms Wendolyn Anderson-Greene (Ms. Greene) was assigned to the case.

23. Ms. Greene meets with Plaintiff's daughter whom initially refused to participate in this counseling. Ms. Greene then contacted Plaintiff via telephone to have him convince the girls to participate.

24. Ms. Greene told Plaintiff that the counseling was court ordered. Plaintiff attempted to correct her and informed her that the only "court ordered" counseling was to determine parenting time, and since the court had entered several orders since then regarding visitation that order was no longer valid. Plaintiff further informed Ms. Greene that he would not authorize any counseling for his children absent a request from his children to him, as he did not see a need for it at the time.

25. After the conversation with Plaintiff Ms. Greene coerced the children into participating by claiming if they did not "it will be harder for you to go home".

26. During this time the two girls were pre-trial detainees being held against their will at Davenport Shelter.

27. Ms. Greene has admitted that she has never seen any court order authorizing this counseling.

28. Ms. Greene was a state actor similar to a doctor that provided care to state prisoners, as in the instant case both the parents and the children were at the complete mercy of the state to protect both the Plaintiff's and children's rights.

29. When the girls were transferred from Davenport to the home of Renee Samples this "court ordered counseling" inexplicably stopped.

30. Evidence shows and discovery will further support that the true purpose of this "counseling" was the furtherance of the conspiracy to fabricate evidence against the family and find **anything** that wasn't right with the family's interactions.

31. In doing these acts Ms. Greene and Judson Center directly violated Plaintiff's parental right to direct the mental health care of his children, and conspired with Wayne DHS to do so.

32. On June 4, 2010 all the children were returned to the Plaintiff and FRP services were ordered for the family.

33. Plaintiff would first challenge that forcing FRP upon the family does not meet the "narrowly tailored" or "less intrusive" requirements for intrusion into the private family life in light of the testimony of Ms. Evans that "There are literally no problems" with the family or how they interacted.

34. As both FRP was ordered by the court to provide services for the family and the family was compelled by this court order to accept them all the actions of FRP in their involvement with the family can fairly be attributable to the state, thus FRP are state actors.

35. The Court did not specify what the purpose of FRP was or how it was intended to address any problem or help the family.

36. The referral made top FRP by Ms. Trice in part states "The FRP team will provide the family with family counseling and will review behavioral management, appropriate discipline techniques, structure, coping skills and parenting skills." It further states "The FRP team will explore the family's plan for the children's education in the fall and assist them with establishing a plan for them."

37. None of these "concerns" were reason for adjudication and had already been addressed as well within the parents' right and were appropriate.

38. The progress reports made by FRP and Ms. Greene makes clear the true purpose was to convince the parents to accept responsibility for the defendants' actions and to convince the parents to give up their right to home school their children and enroll them in the failing public school system.

39. Shortly after FRP was put in place Ms. Greene was transferred to FRP and assigned to Plaintiff's family as her first family.

40. All members of the family objected to this as inappropriate since Ms. Greene was formerly the "grief counselor" for the girls, and the family (especially Plaintiff) already felt Ms. Greene had violated their rights.

41. The family's objections were denied as FRP claimed no one else was available.

42. On or about June 17, 2010 Ms. Green made her first visit to Plaintiff's home. Immediately she attempted to convince the entire family that Robert was to blame for all the children being removed from the home. This was outrageous and in no way can be looked at as anything more than an intentional infliction of emotional distress and to create problems within the family.

43. During one visit Ms. Greene demanded to speak with the children outside of the parents' presence. Over the parents' objections, the parents were compelled to comply as these "services" were court ordered, and due to the implicit threats that if the parents did not comply the children would be removed from their home.

44. After this visit by Ms. Greene Plaintiff's children informed Plaintiff that Ms. Greene was being very persistent trying to get the children to claim they did not want to live in the parental home.

45. At yet another visit Ms. Greene badgered Ms. Brent in an attempt to get her to say she would enroll the children in public school

46. At yet another of these "therapeutic" sessions Ms. Greene attempted to create marital discord by having the parents tell each other something they have been afraid to ever tell

73

the other. Ms. Greene would not accept the parents' statements that they had an open and honest relationship and were not in fear of each other.

47. Plaintiff made several requests to FRP and Ms. Trice that Ms. Greene be removed from the case due to her seemingly trying to undermine the family, all these requests went denied.

48. At each and every visit made by FRP, Plaintiff asked the same question "How are we supposed to benefit from these services?" The only sort of answer anyone from FRP or Wayne DHS would answer is "Benefit is subjective"

49. The "goals" stated in the service plan were simple a guise as all these "goals" were addressed and completed by the parents long before FRP was referred to the family. In particular it is a matter of record that all repairs had been made to the home by the parents with no assistance before the children were removed from the home, and at the very least Wayne DHS admits they were completed as of March 10, 2010, and the parents had always maintained the children's "safety, medical, and physiological needs." Thus these goals were nothing more than a farce in an attempt to document they "helped" the family.

50. FRP further falsified and or misrepresented fact in their progress reports examples of this are that Plaintiff claimed the reason the children were removed was Robert running away, James not getting recommended medical treatment for his elevated lead (his lead never reach a level that required anything other than monitoring) and too many inaccuracies to mention in this pleading.

51. Ms. Greene intentionally falsified her testimony on August 26, 2010 examples of this is her claim that the parents refused to take the children for their court ordered psychiatric evaluations. Contrary to this claim she was in possession of and read from Robert's

74

Psychiatric that Plaintiff personally took him to. Wayne DHS decided they no longer wanted them for the other two boys and did not schedule them.

52. On September 2, 2010 FRP the Children's Center and Wayne DHS all made a joint visit to Plaintiff's home. The sole purpose of this visit was to coerce the parents into not presenting any evidence at the next hearing or contesting anything. When the parents refused the next hearing started and ended without any opportunity to present any evidence or testimony and the referee recommended the jurisdiction be terminated.

53. This shows that FRP, the Children's Center, Wayne DHS and the Family Court were all in conspiracy to deprive the Plaintiff of his right to be heard during the proceedings, denying Plaintiff's procedural and substantive due process rights.

**B.**                                       **Cause of action**

1. Judson Center is liable to Plaintiff for damages and penalties under 42 U.S.C.§ 1983 for the intentional trespass of Families First onto Plaintiff's property denying Plaintiff's Fourth, Ninth and Fourteenth Amendment rights to be free from unwarranted and unreasonable intrusion of his home and privacy.

2. Judson Center is liable to Plaintiff for damages and penalties for the conspiracy between Families First and Wayne DHS to violate Plaintiff's Fourth, Ninth and Fourteenths Amendment rights to privacy, as well as the conspiracy to deprive Plaintiff of the care custody and control of his children through their intentional acts under U.S.C. § 1985

3. Judson Center and Ms. Greene are jointly and severally Liable to Plaintiff under 42 U.S.C.§1983 for violating Plaintiff's Ninth and Fourteenth Amendment right to direct the mental health care of his children.

75

4. Judson Center and Ms. Greene are jointly and severally liable to Plaintiff under 42 U.S.C. § 1985 for conspiring with Wayne DHS to violate Plaintiff's right to guide the mental health care of his children.

5. Judson Center and Ms. Greene are jointly and severally liable to Plaintiff under 42 U.S.C. § 1983 for the unlawful interrogation of Plaintiff's children voluntary parental consent for such.

6. Judson Center and Ms. Greene are jointly and severally liable to Plaintiff under 42 U.S.C. § 1985 for conspiring with Wayne DHS to unlawfully interrogate Plaintiff's children to further their unconstitutional fishing expedition and fabrication of evidence.

7. Judson Center is liable to Plaintiff for intentional infliction of emotional distress for the will acts of Families First of uninvited intruding upon the sanctity of Plaintiff's home to intentionally cause conflict.

8. Judson Center and Ms. Greene are jointly and severally liable to Plaintiff for the intentional infliction of emotional distress for Ms. Greene's outrageous conduct during the time she was the FRP team Leader, that was intended to cause problems for the family, both are also liable for their joint refusal to remove her from the family's case.

## XV.   Allegations and cause of action against The Children's Center

### A.                          Allegations

1. On or about April 28, 2010 the supervision of Plaintiff's daughters was transferred by Wayne DHS to the Children's Center.

2. Pursuant to the signed agreements this transferred all legal responsibility held by Wayne DHS to the Children's Center.

3. The terms of this contract in essence makes any actions and/or inactions by the Childrens Center actions of Wayne DHS and therefore The Children's Center are state actors.

4. On or about May 5, 2010 a conference between the Children's Center, Renee Samples, Wayne DHS and Methodist to determine the new parental visiting time schedule. Plaintiff and his wife were not informed of this conference.

5. The result of this conference was that the visitation was changed from Wednesdays at the DHS office to Thursdays at the Children's Center.

6. When Plaintiff was informed of this he attempt to explain he may have difficulties with the new schedule. The response from the Children's Center was this was the new schedule whether he liked it or not and if he didn't attend it would show he didn't want to see his children.

7. When the parents arrived at the first visitation session at the Children's Center on or about May 6, 2010, The parents questioned why their sons were not present and complained that this was supposed to be a family visit with the entire family, The Children's Center supervisor (Ms. Thornton) responded that if the parents didn't stop complaining she would suspend all visitation. The parents and two daughters were then ushered into a room that was an approximately six by seven feet office. Shortly thereafter Plaintiff's sons arrived and the family was moved to a conference room and the Foster mother and the Children's center staff accompanied them.

8. This "family visit" would be more appropriately categorized as a case planning conference as the parents were not allowed to visit with their children.

9. The first order of business at the "visit" was a review of the case in which the supervisor noted that a plea deal had been offered.

77

10. This supervisor then made very disturbing statements to the parents in front of their children to the effect that if they loved their children they would take the plea deal.

11. When the parents stated they would not admit to false allegations the supervisor then announced that all phone contact between the parents and their daughters must stop immediately. This was decision was objected to by the parents, the children and the foster parent.

12. The reason given at the time was that "supervised visitation" also included "supervised phone contact". Contrary to this claim their own documentation shows that the true reason for this decision was that the parents were exercising their rights and encouraging their children to do the same.

13. Prior to this decision Plaintiff had been allowed to maintain phone contact with his children at every other placement.

14. On May 13, 2010 the court ordered that the service plan be completed and served upon counsel no later than May 27, 2010. The parents were not allowed to participate in the formulation of this plane, and Plaintiff's counsel was not served a copy of this plan until moments before the hearing on June 2, 2010.

15. Plaintiff met with Ms. Kali Evans of the Children's Center on June 1, 2010 to obtain a copy of this service plan.

16. After reviewing the plan Plaintiff asked Ms. Evan two specific questions. 1) Why no services were being offered to reunify the family, and 2) why the children were to stay in foster care.

17. In response to the first question Ms. Evans stated there were no services to offer since the family already addressed everything prior to trial.

18. In response to the second Ms. Evans stated that since the parent didn't accept the plea deal the children were staying in foster care.

19. In response to these answers Plaintiff made a statement to the effect that she could explain this to the court in the morning.

20. At the hearing the following (June 2, 2010) day Ms. Evans rejected her service plan in its entirety and recommended the children be returned to the home with FRP services in place.

21. Ms. Evans made this recommendation for FRP despite the fact that she testified that there were no problems to address with the family.

22. Pursuant to the child specific contracts between Wayne DHS and The Children's Center the contract expired on May 28, 2010, in that the contract specifically states "This agreement is good for 30 days from effective date" The effective date is clearly identified as April 28, 2010.

23. At that point in time the Children's Center had no further authority in the instant case. The Children's Center has not provided Plaintiff with any decimation showing this contract had been extended, although they have allegedly provided Plaintiff with all documents contained in the children's records and all contracts regarding them.

24. This being the case all visits made to Plaintiff's home (announced and unannounced), and the interrogations of him and his children after June 4, 2010 were all conducted under false pretenses in violation of Plaintiff's Fourth and Fourteenth Amendment rights. This would include the June 2, 2010 photo taking expedition of Plaintiff's home, the surprise inspection of June 28, 2010; the July 22, 2010 scheduled progress visit, and the September 2, 2010 intimidation visit.

25. All communications between the Children's Center and other parties such as Wayne DHS and FRP in respect to Plaintiff and his family, in which the Children's Center was obtaining information, were done under fraudulent pretenses and violated Plaintiff's statutory rights to the confidentiality of these records. These would include the numerous telephone calls, in person meetings, fax transmissions, ECT that occurred between May 29, 2010 and September 20, 2010.

26. Ms. Evans further falsified her records to qualify for payment in that her entry for August 31, 2010 did not occur on that day. Records show the Plaintiff and his family were engaged in other activities (such as medical appointments and court ordered speech) that date and could not have met with her. Ms. Evens did visit the home on September 2, 2010; however this was not in the month of August and would not have entitled them to payment. Payment for this was made through Federal Title IV-E funds.

27. This is also during the same relevant time that the Plaintiff's daughters were fraudulently listed as foster children in order for the Children's Center to receive payment.

**B.**                                    **Cause of action**

1. The Children's Center is liable to Plaintiff under 42 U.S.C. § 1983 for the acts of their agents in denying Plaintiff of his right of association with his children without due process of law, for retaliating against Plaintiff for exercising his constitutional rights, for turning Plaintiff's court ordered right to visitation into a bargaining chip to prevent Plaintiff for exercising his free speech and grievance rights, repeated violations of his Fourth Amendment right by entering his home and question persons in his home without any legitimate authority to do so, ect.

80

2. The Children's Center is liable to Plaintiff under 42 U.S.C. § 1985 for conspiring with other persons and/or agencies to deny Plaintiff's due process, and parental right protected by the Fourteenth Amendment, His privacy rights guaranteed under the Fourth and Ninth Amendments, Infringement of his First Amendment right by threat, ect.

3. The Children's Center is liable to Plaintiff for their intentional infliction of emotional distress for their outrageous behavior regarding Plaintiff's telephone contact with his children, attempting to "convince" plaintiff to accept a plea deal ect.

4. The Children's Center is liable to Plaintiff for gross negligence in that while denying plaintiff of his rights and conspiring against him they were grossly negligent in their affirmative duty to help reunify the family.

## XVI.                                   Relief requested

### UPON THE FOREGOING CAUSES OF ACTION, PLAINTIFF PRAYS THE COURT FOR THE FOLLOWING RELIEF

1. Assert jurisdiction over this action;

2. Declare the Statutes, Policies and Practices complained of herein unconstitutional facial and/or as applied to the Plaintiff.

3. Enter an order of injunction prohibiting any further use and/or enforcement of the unconstitutional Statutes, Policies, and Practices complained of herein.

4. Award Plaintiff actual damages that incurred as a direct or proximate result of Defendants' actions and/or inactions.

5. Award Plaintiff compensatory damages against Defendants in their individual capacities;

6. Award Plaintiff punitive damages on all causes of action, to the extent allowable by law;

81

7. Order that the Central Registry and all DHS records be expunged of any records of this cause of action, including but not limited to the removal of Plaintiff name as a perpetrator and the destruction of unlawfully obtained photographs

8. Award Plaintiff nominal damages for violation of his constitutional rights.

9. Award Plaintiff his costs of litigation, including reasonable attorneys' fees and expenses under 42 U.S.C. § 1988 and as otherwise provided by law or equity

10. Grant such other and further relief as the Court deems proper

PLAINTIFF DEMANDS TRIAL OF THIS ACTION BY JURY

I certify that the above is true to the best of my knowledge and belief or as specifically stated will be proven as a result of discoverable evidence.

Respectfully submitted                          Dated: December 7, 2011

Nathaniel H. Brent in pro per
538 South Livernois
Detroit, Mi. 48209
(313) 841-4591

82

**UNITED STATES DISTRICT COURT**
**EATERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NATHANIEL H. BRENT                          Case No. 2:11-CV-10724

    Plaintiff                          HON. JULIAN ABLE COOK

v.                                        MAG. MONA K. MAJZOUB

**FILED**

WAYNE COUNTY DEPARTMENT OF HUMAN SERVICES, *et al*

DEC 7 - 2011

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

**Certificate of service**

I Victoria Brent certify that I served: **PLANTIFF'S FIRST AMMENDED COMPLAINT, REQUEST FOR DAMAGES AND JURY DEMAND:** by mailing via U.S. Mail on December 7, 2011, upon the following:

Joseph T. Froehlich                Mark J. Zausmer                  Jerry L. Ashford
Assistant Attorney General         31700 Middlebelt Road           660 Woodward Avenue
PO Box 30736                       Suite 150                       Suite 1650
Lansing, Mi. 48909                 Farmington Hills, Mi. 48334     Detroit, MI 48226


Robert L. Duly                     Brian C. Kelly                  Richard L. Hamlyn
39577 Woodward Avenue              28400 NorthwesternHwy           P.O. Box 250625
Suite 300                          Third Floor                     Franklin, MI 48025
Bloomfield Hills, MI 48304         Southfield, MI 48034


Dated December 7, 2011

Victoria Brent
26249 Stanford
Inkster, MI 48141