**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |

-------------------------------------------------------

**OBJECTION OF JAMIE S. FIELDS TO THE CITY OF DETROIT'S FOURTH
AMENDED PLAN OF ADJUSTMENT DATED MAY 5, 2014**

## A. PRELIMINARY STATEMENT

COMES NOW creditor and Detroit Police Department (DPD) uniformed retiree; City of Detroit resident; JAMIE S. FIELDS, attorney acting *in pro per,* hereby objects to the Fourth Amended Plan for the Adjustment of Debts ("Plan") dated May 5, 2014 (Doc. 4392). The Plan does not satisfy all applicable confirmation provisions as set forth in the Bankruptcy Code ("Code"). The Plan is patently unconfirmable in that it fails to comply with the following Sections of the Bankruptcy Code: 1122 (classification); 1129(a) (3) (good faith); 903 (reservation of state power); 943(b) (4) (prohibited by law); 943(b) (7) (best interest of the creditors and feasibility); and 1129(b) (unfair discrimination). These objections will be discussed *seriatim*.

## B. ARGUMENT

"…Whether it be in the field of sports or in the halls of the legislature it is not consonant with American traditions of fairness and justice to change the ground rules (pension benefits) in the middle of the game." *Hickey v. Pension Board of City of Pittsburg,* 378 Pa. 300, A. 2d 238 (Pa. 1954).

**1. The Plan Does Not Comply with the Provisions of 1122 (Classification of Claims) and 1129(a) (3) (good faith).**

Claims may not be classified solely to manipulate class voting. See e.g., *In re Barakat*, 99 F.3d 1520, 1525 (9th Cir. 1996). This is precisely what the City has done. Members of Class 11 (GRS) who vote to accept the Plan may receive up to a 20% reduction in their pension benefits and the elimination of their escalator (COLA). A substantial number of members in Class 10 (PFRS) (who do not receive COLA) will retain their current pension in toto whether they accept or reject the Plan. The remaining members of Class 10 who vote to accept the Plan will have a *di minimis* overall reduction when compared to most members of Class 11. By combining Class 11 (GRS) and Class 10 (PFRS) for voting purposes the City "manufactured" an artificially impaired class. This fails to satisfy 943(b) (1), and contravenes the good faith requirement of section 1129(a) (3).

Many GRS members either did not participate in the Annuity Savings Fund (ASF), or retired prior to the recoupment period (2003-2013). If those GRS members accept the Plan their pension will be reduced to a far lesser degree than those subject to ASF recoupment. Such a *di minimis* impairment for the purpose of achieving a forced confirmation over the objection of a creditor is improper.[1] See e.g., *In re Swartville, LLC* 2012 BL 211034, 2 (Bankr. E.D.N.C. Aug. 17, 2012).

Vote manipulation by the gerrymandering of classes "seriously undermines" the "critical confirmation requirements set out in 1129(a) (8) (acceptance by all impaired classes) and 1129(a) (10) (acceptance by at least one impaired class in the event of a 'cram down')." *John Hancock Mutual Life Insurance Co. v. Route 37 Bus. Park Associates,* 987 F.2d 154, 158 (3d Cir. 1993).

**2.  The City Is Prohibited by Law from Taking Action Necessary to carry out the Plan and, therefore, it does Not Comply with the Requirements of Sections 903 (reservation of state law) and 943(b) (4) (cannot be prohibited by law).**

Michigan has chosen to control its political subdivisions by making it unconstitutional to diminish or impair accrued pension benefits and by requiring that those benefits be annually funded. See *Mich. Const. Art. 9, Section 24* ("Pension Clause").  The fact that a municipality is in bankruptcy does not alter the State's control over the municipality.

The City proposes post-bankruptcy to violate State law by forbearing on their required annual pension contributions until 2023 and proposing to pay less than their constitutionally required contribution until 2033. Congress did not intend to provide municipal debtors with dispensation to ignore State laws governing their conduct simply because those laws may make it harder for them to adjust their debts. Such adjustment cannot be done at the expense of State law. Section 903 of the Bankruptcy Code makes this clear.

---

[1] While the elimination and/or the reduction of COLA is a significant and not a *di minis* pension devaluation, however, it is di minimis when compared to others in the voting Class that may lose an additional 20% ASF recoupment. In addition, approximately 30% of those in Class 11 will suffer no diminishment of pensions regardless of their acceptance or rejection of the Plan.

Moreover, Section 903 must also be read in the context of Chapter 9 as a whole. Sections 109 (c) (2), 903 and 904 all reflect a healthy respect for State sovereignty. The final safeguard of State sovereignty is 943(b) (4), which requires, as a condition of confirmation of a Plan, that "the debtor is not prohibited by law from taking any action necessary to carry out the plan." This means state law.

From the outset, Congress was aware that municipal bankruptcy laws created significant potential for interference in State affairs; thus, the first such law contained a provision similar to Section 903. Legislative history from the 1934 Act explains that this language was put into the law "as a further limitation upon Federal power and in respect for the rights and responsibilities of the States," S. COMM. ON THE JUDICIARY, REP. No. 407, at 2 (1934). Under the plain terms of Section 903 and its legislative history (dating back to its inception), the States retain control over their political subdivisions even during a Chapter 9 case. State control is so absolute that the legislative history indicates that "withdrawal of State consent at any time will terminate the case."

It is clear that the scope of the State's consent includes State consent to the terms of the City's Plan for Adjustment of Debts. See *U.S. v Bekins*, 304 U.S. 27 (1934). The Code viz-a-viz Section 903 reflects this principle. The statute must be read as a whole. *Corley v. United States*, 556 U.S. 303,314 (2009), Section 109(c)(2) specifically addresses State consent to authorize a filing, but does not address the interplay between State law and control reflected in Section 903 after a petition is filed. If Congress only sought to limit State control at the incipient stage of its grant of authority to file a bankruptcy petition, it would not have included Section 903 in the Code. These provisions must be read in conjunction with one another.

Bankruptcy courts may feel, and rightly so, that their authority is lessened by the limitations of Sections 903 and 943(b) (4), in comparison to the broad authority they enjoy under other Chapters of the Code. But it is the will of Congress and must be given effect. Congress did not envision or intend that Chapter 9 become a haven for municipalities that seek to ignore and break State laws and constitutional provisions to adjust their debts. Without the control that Section 903 provides for through State law, a municipal debtor would be free to violate any and every State law once it filed a Chapter 9 petition. If construed otherwise, the whole rationale of Section 903, a healthy respect for State control over their subdivisions and a State's fiscal affairs, is lost and the constitutionality of Chapter 9 as a whole is thrown into doubt.

Assuming arguendo, that 943(b)(4) does not prohibit the impairment of pensions in bankruptcy, the logical interpretation of the purpose of 943(b)(4) is that it applies after an obligation is restructured in Chapter 9, not necessarily to the restructuring itself.

In *Sanitary & Improvement Dist. #7*, 90 B.R. at 974-75, bondholders challenged a proposed Plan that would have restructured their bonds, and replaced them with bonds that provided for a buy-back by the municipality at less than the full nominal value of the bonds. The court concluded that 943(b) (4) did not prevent a restructuring of the bonds. "To create a federal statute based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debt is not," the court concluded, "a logical or necessary result." *Id*. at 974. The court ruled that the restriction applied to the bonds as restructured, not to the restructuring itself. *Id*. at 975.

In *Sanitary*, the Court allowed the restructuring of the bonds in bankruptcy but rejected the Plan, which allowed the redemption of the bonds during the first six months following confirmation at a value which was approximately ten percent less than their actual present value, which was prohibited by state law, and therefore was prohibited by Section 943(b) (4) of the Code. The City of Detroit's proposal, to not fund its pension contributions as required, until 2023[2] is prohibited by Michigan law and, therefore also by Sections 903 and 943(b) (4) of the Code.

**a. The Michigan Constitutional Pension Provision (Const. Art. 9, Section 24) Contains Two Independent Clauses: Accrued Pensions Shall Not be Diminished or Impaired; and A Requirement that Those Benefits be Annually Funded.**

Reading both clauses of the *Michigan Const. Art. 9, Section 24*, as having no independent force or meaning and as being merely co-extensive with each other, violates the rules of statutory construction. It would render the second paragraph of *Mich. Const. Art. 9, Section 24* meaningless surplusage. See, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). See also, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 668–69 (2007).

It does not follow, nor has it been argued, that this Court's ruling that pensions can be impaired in bankruptcy, has any effect on the second paragraph of *Mich, Const. Art. 9, Section 24* post-bankruptcy on the requirement that accrued pension benefits must "be annually funded" in the year they were earned. *Sanitary* was not allowed to redeem bonds in violation of state law post-bankruptcy and the City of Detroit - post-bankruptcy – should not be able to ignore Michigan law by not fully funding their annual pension obligations in the year that they are earned.

---

[2] Even in the event that the State pledge is forthcoming those monies would not fully fund the City's required normal annual retirement system contribution. The City proposes making no contribution until 2023 and less than the required contribution until 2033.

The Michigan Supreme Court in addressing the annual funding requirement stated "In the years prior to the 1963 Mich. Constitution, the Legislature did not always make adequate appropriations to maintain (the state pension system) …on an actuarially sound basis…the practical effect of this underfunding was that many pensioners had accumulated years of service for which insufficient money had been set aside in the pension reserve fund to pay the benefits their years of service entitled." *Kosa v Treasury State of Michigan*, 408 Mich. 356, 365, (1980).

The *Kosa* Court analyzed the history of the legislation by looking to the constitutional debates. It noted that a "clear distinction must be drawn between the right to receive pension benefits and the funding method adopted by the Legislature to assure that the monies are available for the payments of such benefits." *Id* at 371. *Art. 9, Section 24* "expressly mandates (municipalities) to fund all public employee pension systems to a level **which includes unfunded accrued liabilities**" which are "the estimated amounts which will be needed according to actuarial projections to fulfill presently existing pension obligations…." *Shelby Twp Police & Fire Retirement Bd. V Shelby Twp*, 438 Mich 247, 255-256 (1991) (emphasis added) quoting *Kosa* at 364. See also, *Musselman v. Governor of Mich.*, 533 N.W.2d 237, 243 (Mich. 1995). (School district's failure to fully fund its pension obligations violated the Michigan Constitution). An examination of the constitutional debates, reveals the framers' intent was to create a clear obligation of municipalities to annually fully fund their pension and retirement systems. This is illustrated by the following:

"[This] section is an attempt to rectify, in part, policies which have permitted sizeable deficiencies to pile up in retirement systems in this state. Under this section, accruing liability in each fiscal year must be funded during that year, thus keeping any of these systems from getting farther behind than they are now." [2 Official Record, Constitutional Convention 1961, p 3402].

The City of Detroit is required to *fully* fund pension benefits in the year earned. Proposing to not do so, while trying to supplant their required contributions with a lesser contribution from the state and foundations, is the same type of financial chicanery that put the City in its current position.

PFRS was 112.6% funded in 2001 and 103% funded in 2002.[3] In 2002, Kwame Kilpatrick was elected Mayor of the City of Detroit and the City started using monies that were meant to fund its annual required pension contributions to fund "other projects"[4] and to pay for on-going operating expenses. It was a house of cards, in essence, the City was robbing Peter to pay Paul.

The City in its proposed Plan, in a striking display of chutzpah, is now asking the Court's permission, not only to substantially reduce retiree pensions and health care, but to allow it to forbear from its obligations to annually fund its retirement system. The City has proposed a Plan that allows it to rob *both* Peter *and* Paul. This is not a Plan that this Court should endorse.

The City wishes to continue, with the Court's approval, its fiscal "sleight of hand" continuing to ignore the City's well-documented structural inefficiencies, instead looking for an "easy fix" on the backs of the most vulnerable – the retirees who's hard and honest labors built the City.

### b. The Plan Is Not in the Best Interests of Creditors 943(b) (7).[5]

There is a significant amount of subjectivity on the confirmation of a Chapter 9 Plan (*i.e.*, the "best interests of creditors" and "fair and equitable" test). Thus, impairment under a Chapter 9 plan is not constrained by objective considerations of valuation or the "absolute priority rule," but rather involves the particular facts and circumstances of the debtor. The City "bears the burden of satisfying the confirmation requirements of 943(b) by a preponderance of the evidence." *Pierce Cnty. Housing Auth.*, 414 B.R. 702, 715 (2009).

---

[3] Gabriel Roeder Smith Audit (PFRS Annual Reports 2001-2002),
[4] In 2010 PFRS was 92% funded but largely because of the City's disastrous interest rate bet in which they borrowed 1.5 billion dollars to shore up the City's retirement system.
[5] This is not the same requirement found in 1129(a) (7) (A), "best interest" test that applies in chapter 11. *In re City of Colorado Springs Spring Creek General Improvement District*, 187 B.R. 683, 690 (Bankr. D. Colo. 1995). "Section 1129(a) (7) (A) of the Bankruptcy Code, does not apply in Chapter 9."

The 'best interest' test has been described as a "floor requiring a reasonable effort at payment of creditors." *Pierce Cnty* at 718. The best interest test applies to all individual creditors, *Bank of Am. v. 203 North LaSalle Street*, 526 U.S. 434, 441 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan"). Thus, "[i]f even one dissenting member of an impaired class would get less under the Plan than in a hypothetical liquidation, the fact that the class as a whole approved the Plan is immaterial."

Consequently, the "best interests" test "is one of the strongest protections individual creditors have. It stands as an 'individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation." See, *In Re Bonner Mall Partnership*, 2 F.3d 899, 914 n.35 (9th Cir. 1993) ("**Creditors are given guarantees as individual creditors under the best interests test**.") (Emphasis in original).

As the legislative history makes clear, the same holds true in Chapter 9. The Supreme Court has held that "minorities under the various reorganization sections cannot be deprived of the benefits of the statute by reason of a waiver, acquiescence or approval by the other members of the class. [T]he fact that the vast majority of security holders may have approved a Plan is not the test of whether that Plan satisfies the statutory standard. The former is not a substitute for the latter. They are independent." *Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943).

In *Kelley*, A "very small minority" of bondholders objected to their treatment. *Id.* The Court ruled that a Plan that impairs and discharges debt based upon a static "snapshot" of the debtor's current assets and liabilities does not satisfy the "best interests" test. The City has provided less than a "snapshot." The City's Plan and Disclosure Statement is silent on many valuable assets owned by the City and does not discuss future revenues that are likely to be generated or increased from improved efficiencies.

For example, the City only collects half of property taxes owed ("Half of Detroit Property Owners Don't Pay Taxes," Detroit News, 2-21-13); business owners owe millions in back taxes ("Detroit Takes Aim at Tax Deadbeats but it is not Clear who Owes," Detroit Free Press, 12-18-12); the City fails to collect much of the non-resident income taxes it is owed on a yearly basis ("Who Cares if you Don't Pay Detroit Income Taxes?" Crains, 4-20-12) (quoting from a Conway McKenzie report that in 2009 alone Detroit did not collect 155 million in non-resident income taxes it was owed) and; some City Enterprise operations (revenue generating departments) are indefensibly inefficient ("Detroit Spends More to Issue Parking Tickets than it Collects," Fox News, 3-20-14). The Plan does not state how much delinquent revenue is owed. The City is required to devote a "fair" amount of "probable future revenues" for "satisfaction of creditors."

Allowing a city to keep all of its assets while being discharged of its debts is the principal source of the moral hazard problem in municipal bankruptcy.[6] Some of the assets that the City "cherry-picked" to disclosure to creditors are in the public trust (Campus Martius, Hart Plaza) however, other assets that the City omitted from its Disclosure Statement are not necessary to the City's mission, e.g., golf courses (Rackham in Huntington Woods, Chandler, Palmer, Rouge Park and Belle Isle Driving Range in Detroit), Marinas (Riverside, Erma Henderson) an amphitheater (Chene Park), and cemeteries (Gethsemane, Mt. Hazel, Forest Hill). One asset disclosed by the City, a half interest in the Detroit-Windsor Tunnel which the City claimed generates 1 million dollars annually, would command significant bids if offered for sale (70-100 million), (WSJ, "If Detroit Tunnel Goes on the Block, Canadian Neighbor wants it," 7-22-13). Those City assets that are not necessary to the City's mission, should be on the "table," especially if such sale or monetization helps the City resolve its decade's long structural deficiencies as part of an overall plan.

---

[6] University of Chicago Law School, "When Cities Go Broke" Randal C. Picker (1993) "moral hazard problem-the tendency of debtors to prefer to devote their resources to their own interests instead of repaying their debts."

The City and its creditors can only reach agreements if there is mutual trust. "[Bankruptcy laws] are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction." See *In re Tully*, 818 F2d 106, 110 (1st Cir 1987) (affirming the district court's denial of a discharge in a Chapter 7 where the debtor exhibited reckless indifference to the truth).

Dishonest participation in the bankruptcy system undermines its central aims—debtor relief and equitable redistribution. The City owns thousands of assets of minimal value that the City should not have to individually disclose. But one would be hard pressed to justify the City's failure to inform creditors of the existence of so many City owned valuable assets. "Overlooked" in the City's Disclosure were many valuable assets (e.g., Marinas, Golf Courses, entertainment venue, etc.) and while acknowledging some assets diminished their value (e.g., Windsor-Detroit Tunnel, etc.). These non-disclosures or incomplete disclosures hardly appear to be innocuous omissions.

a. **To meet the "Best Interests of Creditors" Confirmation Requirement, the City's Plan Must Maximize the Value of its Assets to Enhance Creditor Recoveries**

In evaluating whether a Plan meets the "best interests of creditors" courts consider whether "it affords all creditors the potential for the greatest economic return from debtor's assets." *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (2012). Legislative history indicates that "[c]reditors must be provided, under the plan, the going concern value of their claims. The going concern is that value is intended to provide more of a return to creditors than the liquidation value if the city's assets could be liquidated like those of a private corporation." *Senate Report No. 95-989, 95th Cong., 2d Sess*. 113 (1978). Courts have construed section 943(b) (7) "as requiring that a proposed plan provide a better alternative for creditors than what they already have.'" *Pierce Cnty*. 414 B.R. at 718, citing *Mount Carbon*, 242 B.R. at 34.

More specifically, case law indicates that the "best interests of creditors" standard requires a Chapter 9 debtor to prove that it has maximized the value of its primary assets and utilized its powers under state law to enhance creditor recoveries. For example, in the context of eligibility, a court noted that "[a] commercial party can hardly "negotiate in good faith" regarding unpaid obligations if it . . . refuses to acknowledge or throw into the negotiating equations a large and significant asset it holds." *In re Sullivan Cnty. Refuse Dist.*, 165 B.R. 60, 78 (Bankr. D. N.H. 1994).

**b.  Application of the Best Interests of Creditors Test Requires the City to Maximize the Value of City owned Art to Enhance Creditor Recoveries.**

The City owns and has spent considerable funds accumulating and maintaining a significant asset, the true value of which is unknown but has been speculated to be in the billions of dollars range. Christies was hired by the City to appraise the DIA's art collection. They appraised 2,773 works or art or 5% of the approximately 66,000 total works and valued the appraised art between 454 million dollars and 867 million dollars.

If we accept Christie's appraisal of a portion of the DIA collection near the low end at 500 million dollars – and interest rates return to normal levels of 6% - the yearly interest on 500 million would be approximately 30 million dollars. Assuming that the museum is open 2,000 hours a year – ignoring indirect costs such as facility maintenance – keeping the appraised art on display costs $15,000 an hour. If five people view the art per hour it costs $3,000 per hour to provide the experience for every visitor. The DIA only exhibits 5,000 works of its 66,000 artwork collection at any one time.[7] Yes, communities benefit from famous paintings, but they benefit more from safer streets, good public transportation, timely trash removal and well lit neighborhoods.

---

[7] DIA website "fact sheet" states it displays 5,000 artworks.

The City finds itself in the unique position of owning a valuable asset that can be monetized because it is not essential to its delivery of core services that ensure the health, safety or welfare of its citizens. See *Public Act 436, the Local Financial Stability and Choice Act*, MCL § 141.1541, et seq. ("PA 436") § 12(r) (giving the EM the authority to use or transfer assets of the City, as long as such use or transfer does not endanger the health, safety, or welfare of residents).

A Bankruptcy Court cannot interfere with the delivery of City services (Section 904 recognizes this reality), even in situations such as in the City of Detroit where activities of the municipal body are largely the cause of the "insolvency." Despite the broadening of the traditional definition of "municipal insolvency" to include "service insolvency," this Court should not ignore the fact that the City has previously misspent copious amounts of revenues meant for public services, and that money alone does not equate into good services. This fundamental postulate is persistently ignored by the City. The City's Plan - throw money at a problem, based on a vague opaque notion that it will result in improvement - is not a "Plan" that this Court should endorse.

**3. The City's Plan does not Contain Benchmarks or Concrete Projections to address the "Insolvency of Municipal Services" and therefore is not feasible, 943 (b) (7).**

The Stockton Court defined "service-delivery insolvency" as the inability to fund essential services as "required for the health, safety and welfare of the community." The Stockton court considered national crime statistics, including police response times. Detroit has also offered evidence of "service insolvency," including a purported DPD 58 minute police response time which the Court quoted in its eligibility ruling. While capturing news headlines there was only one problem - it was not true. Three months prior to the eligibility trial, the City disputed its own evidence regarding the purported 58 minute police response times unequivocally stating it was not true ("Detroit Chief: Crime Stats Off" Det. News, 8-8-13). The misinformation was widely reported by the local and national media as well as the subject of derision by late night comedians.

The City's machinations has been an odd bit of Kabuki Theater. While complaining of "deplorable services" officials continue to make self-laudatory statements on how their leadership have improved services. The City has the third highest per capita ratio of police officers to citizens of the top twenty-five most populous cities, therefore, the question that should be addressed is "how many additional officers are needed?[8]  Rodney Dangerfield was once asked, "How do you like your wife?" His answer was, "Compared to what?" If the City was serious about improving services it would have included metrics and benchmarks (e.g., police, fire, etc.) in its disclosure.

Without benchmarks we are left with anecdotes and few hard facts.  The EM and Mayor come up with pithy anecdotes regarding poor municipal services at the drop of a hat – the underlying truth of which is often undeniable – but fail to answer the basic question of why are services so bad when Detroit's general fund budget is much larger than more populous cities?[9].

In his novel "*The Sun Also Rises*," Ernest Hemingway answers, "How do you go bankrupt? Two ways: Gradually, then suddenly." Detroit makes his point.  From 2008-2012 the City annually spent 100 million dollars more than revenues. Post-petition the City still has a penchant for overspending, hiring a police chief at $225,000 annually - the highest chief's salary in the country. New York pays its police chief, who had previously served as Chief of the Los Angeles Police Department, and has a record of unparalleled success, $205,180.  Bankruptcy does not provide a magic bullet to ensure good choices are made, however, a detailed realistic Plan would provide a workable roadmap for the future. The City finds itself in bankruptcy because it spent and continues to spend money like a "drunken sailor" and now, having run out of taxpayer monies, the City wishes to continue their reckless spending and mismanagement on the backs of its retirees.

---

[8] It should be noted that New York City reduced police personnel by 20% between 1999 and 2009 and the crime rate declined by 44%.  From January 1, 2002 through March 31, 2014 crime in Detroit is down by over 35%.
[9] Detroit is the 18th most populous city. Its budget is twice as large (1.1 billion dollar) as Charlotte, NC (561 million dollars).

The broad variation in the cost of the delivery of municipal services between cities does not seem to be driven by exogenous factors (e.g., spending does not generally correlate with population, per capita income, geographic size, labor conditions or differences in workloads). Studies lead to the conclusion that management and policy choices are what matter. **Research shows Cities spend what they spend because they choose to spend it.**[10]

**4. The City's Plan is not feasible, 943 (b) (7).**

The "feasibility test," requires a finding by the Court that confirmation of the Plan is not likely to be followed by the need for further financial reorganization. See e.g., *In re Belco Vending, Inc.,* 67 B.R. 234, 236 (Bankr. D. Mass. 1986). A Plan is not feasible when if implemented, it is "likely to be followed by… the need for further financial reorganization, of the debtor or any successor to the debtor under the plan," in violation of Section 1129 of the Bankruptcy Code. The feasibility standard encompassed in Section 1129(a) (11) examines, among other things, the proponent's ability to consummate the provisions of the proposed plan. See *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989). ("This definition [of feasibility] has been slightly broadened and contemplates whether the debtor can realistically carry out its Plan…….and whether the Plan offers a reasonable prospects of success and is workable").

Those Cities that exited bankruptcy without a feasible Plan quickly found themselves in fiscal distress again. The city of Mack's Creek, Missouri, for example, filed for bankruptcy in 1998, then for a second time in 2000, and in 2012 the city was dissolved altogether. Westminster, Texas filed in 2000, and then again only four years later. Prichard, Alabama filed for bankruptcy at the end of 1999, came out of bankruptcy in 2007, and in 2009 found itself again in bankruptcy proceedings.

---

[10] White Paper, David Edwards, *IBM, Smarter, Faster, Cheaper, an Operations Efficiency Benchmark Study of 100 American Cities* (2011).

"The court should consider evidence of the municipality's tax base, its services requirements to its inhabitants…" See 5 NORTON, 90:20. This Court has said it's "particularly important" to determine whether the Plan is feasible, to assure the delivery of municipal services. The City should not be afforded a presumption that spending large amounts of monies on public safety, etc. wills improve services. Based on the City's recent checkered history, the City should have to overcome the presumption - that the money dedicated toward improving public services will not improve services, and will in actuality only shield monies otherwise be available to creditors.

**5. The City's Plan Unfairly Discriminates in Violation of 1129(b).**

**a. The City had Fully Funded Jamie S. Fields Pension and Future Escalator Payments (COLA) at the Time he Retired**

As previously discussed, the City is required to fully fund the pension benefits that accrue in a given year in that same year. If they had complied with this obligation there would be no pension shortfall at all and pension obligations would be fully funded. The City did comply with this obligation prior to Fields retirement in 2010, therefore, his pension, including COLA, has been fully funded.[11]

The "collateral," (pension system's funding level) determines the extent of the retiree's priority. The assets of the system belong to its members and are not City assets and are fully protected to the extent they are funded, but unsecured to the extent of any deficiency. The City may choose how it spends any revenues or donations (e.g., state funding, etc.,) including funding its retirement systems. Even if state/foundation money is forthcoming it will not provide the City's required total annual pension system funding obligation. The City is not relieved post-bankruptcy from fully funding PFRS annually as required by the Michigan Constitution and Michigan law.

---

[11] In 2010 PFRS was 92% funded. The pension of all retirees were fully funded. The system had not fully paid for the active employees because they were only required by the Michigan Constitution (*Art. 9, Section 24*) to fund pension credits earned on an annual basis and many active employees had not reached vested status at that point.

**b. The City failed to examine less onerous methods to reduce Other Post-Employment Benefits (OPEB) (Health Care, Dental, Vision) short of terminating City sponsored retiree health care benefits as required by the Code.**

The City provided health care coverage for retirees in accordance with terms set forth in union contracts or provisions found in *Section 13, Article 8 of the Detroit Code of Ordinances*. The Plan can only be confirmed over the objection of a creditor if it "does not discriminate unfairly" with respect to objecting creditors in accordance with 1129(b). A lack of unfair discrimination mandates that disparate treatment of a particular class of creditors is reasonable, necessary, proposed in good faith and proportionate to its rationale. The City has no justification to provide the proposed inferior treatment of the holders of Class 12 (OPEB) claims as compared to other creditors.

Among the actions that the City must show for Plan confirmation is that prior to terminating retiree OPEB it reviewed the City's health care benefits administration for inefficiencies and equivalent savings. The record fails to demonstrate that the City considered alternative strategies before terminating retiree health care benefits. The City has made no showing that the draconian retiree health care cuts were necessary to achieve the savings required. The City should not be allowed to impose health care cuts, foreclose on their other viable options, and use said foreclosure to abrogate duly bargained for health care whether in or out of bankruptcy.

In a Memorandum and Audit Report from the City of Detroit Auditor General, Mark Lockridge, to Emergency Manager Kevyn Orr dated August 20, 2013 – one month after the City filed its bankruptcy petition on July 18, 2013 – the Auditor General recommended ways that the City of Detroit could substantially reduce its health care obligations. Instead of adopting these recommendations, that would have resulted in significant cost savings, as well as more humane treatment of retirees, the City chose instead to terminate all retiree health care either oblivious to or not concerned with the consequent human suffering that action would cause.

Among the Auditor General's findings: the City of Detroit had 48 bargaining units; 11 health insurance providers; 58 program options; 15 systems; over 10,000 medical payroll deduction codes, 40,000 total employer payroll deduction codes and an average of 56,000 transactions per month. In addition, the Auditor General found that only seven employees were involved in administrating employee and retiree benefits using antiquated systems without many of the checks and balances (e.g., potential for duplicate payments, costly late transfers of retirees from active status, etc.) one would expect in a system costing the city 15 million dollars a month to administer. The Auditor General made a multitude of recommendations, that if implemented could have potentially saved the City the equivalent cost savings being realized currently, without unnecessary jeopardizing the health and well-being of retirees.

### c. The City's Plan Proposed Treatment of PFRS and GRS Accrued Pension Benefits Unfairly Discriminates in Violation of 1129 (b).

The Code provides that a plan may not "unfairly discriminate" among classes of creditors holding claims of equal priority. So what level of discrimination is fair? Despite media reports of City retirees being treated more "favorably" the truth belies this assertion. As previously discussed, the assets of the retirement system do not belong to the City. The assets of the retirement system belong to active employees and retirees who are members of the retirement system. To the extent that the retirement system is funded member's pensions are secured. The City's Plan proposes to pay nothing toward the UAL[12]. The holders of general obligation bonds, on the other hand, are slated to receive approximately a 20% recovery. This discriminatory treatment is "unfair," made even more so, given the competing equities between the retirees and the bondholders.

---

[12] The City asserts the UAL is 3.5 billion dollars while the systems dispute this figure. However, in terms of the City's Bankruptcy this dispute is immaterial insofar as the City's Plan proposes to pay **nothing** toward their UAL liabilities or far inferior treatment that other unsecured creditors have been proposed.

## C.  DENIAL OF THE PLAN OF ADJUSTMENT WOULD NOT HARM THE CITY

Hoping to escape financial disaster, in 1991 the city of Bridgeport, Connecticut filed for bankruptcy. Bankruptcy, the city officials thought, would relieve the city's debt burden, and facilitate recovery. The state of Connecticut, however, objected. The state officials did not believe a bankruptcy court to be the proper venue to solve Bridgeport's problems, and they believed bankruptcy could do more harm than good. Richard Blumenthal, then Connecticut's attorney general, explained to Congress the reasons for the state's objection: [13]

"The solutions offered by Chapter 9 — a restructuring of debt obligation — may help smaller cities or towns that face short term, totally unanticipated financial calamities, such as natural disaster or an unexpected exorbitant judgment from a lawsuit. However, the bankruptcy process provides no solution to a major city facing long term, endemic problems involving erosion of its tax base, loss of manufacturing jobs, and a decaying infrastructure, all which require, in addition to substantial cash, significant structural changes and long term programs that are well beyond the scope of Chapter 9."

An underlying theme is that allowing the City of Detroit to proceed is the only way that it will emerge from its current financial situation.  There is no reason to believe this is the case.  A Chapter 9 is fundamentally different from a Chapter 11 where the alternative is most likely liquidation of the company's assets.  That is not true in situations involving municipal debtors where it is much more difficult for creditors to execute upon any judgment that may be obtained. Thus, denial of the Plan will not result in the collapse of the City.  In fact, denial of the City's Plan may actually speed the restructuring process.  Denying confirmation may actually speed up the process by forcing the City to negotiate and come up with a realistic plan.

---

[13] Economic Distress in Our Cities: Bridgeport Connecticut, Field Hearing Before the Committee on Banking, Finance and Urban Affairs of the House of Representatives , 102 Congress, 2nd Sess. 161-2 (1992). (Statement of Richard Blumenthal).

Bankruptcy is not the exclusive means for cities to address their financial problems. In fact, some commentators believe that non-bankruptcy options provide better ways for cities to restructure. For example, in 2003, Pittsburgh was faced with a $34 million budget deficit and total debts of $879 million. The state created a financial board to oversee the city's finances, and bankruptcy was avoided. A similar result was achieved for the City of New York in the 1970's. Thus, cities in severe financial distress can, and do, recover outside of bankruptcy. See, e.g., *Omer Kimhi, Chapter 9 of the Bankruptcy Code: A Solution in Search of a Problem*, 27 Yale J. on Reg. 351 (2010) 22 Id. at 389. 23 Id.

### D. RESERVATION OF RIGHTS

Jamie S. Fields reserves all rights to object to the Plan on any and all grounds, including, without limitation, those not mentioned in this Objection.

### E. CONCLUSION

For all of the foregoing reasons it is respectfully requested that the Court denies confirmation of the City's Plan or grant such other and further relief as the Court deems appropriate under the circumstances.

/s/ Jamie S. Fields\
Jamie S. Fields (P-52808)\
555 Brush\
Detroit, Mich. 48226\
(313) 570-3906

Date: May 5, 2014