UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

In re:

                                        )
CITY OF DETROIT, MICHIGAN,              ) Chapter 9
                                        )
                                        ) Case No. 13-53846
                                        )
            Debtor.                     ) Hon. Steven W. Rhodes

---

### *AMICUS CURIAE* BRIEF BY THE SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION

Mark H. Shapiro, Esq.
Bar No. 43134
STEINBERG SHAPIRO & CLARK
25925 Telegraph Road
Suite 203
Southfield, MI 48033
Telephone: (248) 352-4700
E-mail: shapiro@steinbergshapiro.com

Mark N. Berman, Esq.
NIXON PEABODY LLP
(MA Bar No. 040360
 admitted in the ED MI)
100 Summer Street
Boston, MA 02110-2131
Telephone: (617) 345-1000
E-mail: mberman@nixonpeabody.com

Robert N. H. Christmas, Esq.
(NY Bar No. 2186609
 admitted in the ED MI)
NIXON PEABODY LLP
437 Madison Avenue
New York, NY 10022-7039
Telephone: (212) 940-3000
E-mail: rchristmas@nixonpeabody.com

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT. ........................................................................ 1

II.   INTERESTS OF THE *AMICUS CURIAE*. ............................................... 3

III.  SUMMARY OF ARGUMENT. ................................................................... 4

IV.  BACKGROUND. ......................................................................................... 5

      A.    **General Description of the Use of Bonds Issued to Finance Municipalities** ................................................................................. 5
      B.    **GO Bonds Issued by Detroit.** ...................................................... 8
      C.    **Detroit's LTGO Bonds** ................................................................ 8
      D.    **The Plan of Adjustment** ............................................................. 9

V.   ARGUMENT. ............................................................................................. 9

      A.    **The Legislative History and Structure of Chapter 9 is Contrary to the City's Proposed Cramdown of an 87-90% Loss to LTGO Bondholders** ....... 10
      B.    **Past Practice Under Chapter 9** ................................................. 10
      C.    **Plain Language of the Statute** .................................................. 11
      D.    **Best Interests of Creditors** ....................................................... 12
      E.    **The Plan of Adjustment Cannot Be Confirmed, because its Proposed Treatment of the LTGO Bonds is Unfairly Discriminatory** ......................... 14

VI.  CONCLUSION. ........................................................................................ 15

i

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT. ................................................................................. 1

II.     INTERESTS OF THE *AMICUS CURIAE*. ......................................................... 3

III.    SUMMARY OF ARGUMENT. ........................................................................... 4

IV.     BACKGROUND. ................................................................................................. 5

      A.      <u>General Description of the Use of Bonds Issued to Finance Municipalities</u> .................................................................................... 5

      B.      <u>GO Bonds Issued by Detroit</u>. ..................................................... 8

      C.      <u>Detroit's LTGO Bonds</u> ................................................................ 8

      D.      <u>The Plan of Adjustment</u> .............................................................. 9

V.      ARGUMENT. ...................................................................................................... 9

      A.      <u>The Legislative History and Structure of Chapter 9 is Contrary to the City's Proposed Cramdown of an 87-90% Loss to LTGO Bondholders</u> ....... 10

      B.      <u>Past Practice Under Chapter 9</u> .................................................. 10

      C.      <u>Plain Language of the Statute</u> ................................................... 11

      D.      <u>Best Interests of Creditors</u> ......................................................... 12

      E.      <u>The Plan of Adjustment Cannot Be Confirmed, because its Proposed Treatment of the LTGO Bonds is Unfairly Discriminatory</u> ......................... 14

VI.     CONCLUSION. ................................................................................................. 15

i

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*In the Matter of Sanitary & Improvement Dist., #7,*
　　98 B.R. 970 (Bankr. D. Neb. 1989) ...........................................................15

*In re Armstrong World Indus., Inc.,*
　　432 F.3d 507 (3d Cir. 2005)...................................................................19

*In re City of Stockton, Cal.,*
　　486 B.R. 194 (Bankr. E.D. Cal. 2013) ............................................14, 18

*In re DBSD North America, Inc.,*
　　634 F.3d 79 (2d Cir. 2010)....................................................................19

*In re Mount Carbon Metropolitan District,*
　　242 B.R. 18 (Bankr. Colo. 1999) .........................................................16

*In re SPM Manufacturing Corp.,*
　　984 F.2d 1305 (1st Cir. 1993) ..............................................................19

STATE CASES

*Chemical Bank & Trust Co. v. Oakland County et al.,*
　　264 Mich. 673 (1933) ...........................................................................17

*Citizens for Protection of Marriage v. Board of State Canvassers et al,*
　　263 Mich. App. 487 (2004)....................................................................16

*Citizens Protecting Michigan's Constitution et al v. Secretary of State et al,*
　　280 Mich. App. 273 (2008)....................................................................16

*John Wittbold & Co. (Municipal Investors Ass'n et al., Interveners)*
*v. City of Ferndale et al.,*
　　281 Mich. 503 (1937) ...........................................................................17

*McKeighan v. Grass Lake Township Supervisor,*
　　234 Mich. App. 194 (1999)..............................................................16, 17

FEDERAL STATUTES

11 U.S.C. § 363 .........................................................................................14

11 U.S.C. § 943(b)(1) ..................................................................................6

11 U.S.C. § 943(b)(7) .........................................................................5, 15, 16

ii

11 U.S.C. § 1129(b)(1) ...............................................................................6, 17

Rules

Fed. Bankr. P. 9019.................................................................................18

Other Authorities

6 *Collier on Bankruptcy* ¶ 943.03[7][a] ..................................................15

"A New Perspective on Unfair Discrimination in Chapter 11," 72 Am. Bankr. L.J. 227
(Spring, 1998) ...............................................................................19

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 263 (1977) ...........................13

http://business.financialpost.com/2013/07/19/how-detroits-mega-bankruptcy-could-
hammer-the-900-billion-gold-standard-of-the-muni-bond-market/. ...................1, 9

http://www.msrb.org/Municipal-Bond-Market/About-Municipal-Securities/Types-of-
Municipal-Securities.aspx...............................................................7

https://www.sec.gov/news/studies/2012/munireport073112.pdf...................1

## I.    PRELIMINARY STATEMENT.

General obligation bonds ("GO Bonds") are a critical component of the municipal bond market.  Municipalities, including the City of Detroit (the "City" or "Detroit") and virtually all other municipalities in the State of Michigan and throughout the United States, depend upon the municipal bond market, and GO Bonds in particular, to fund their daily operations as well as to fund infrastructure and other projects that do not produce a revenue stream that could otherwise be utilized to service bond principal and interest payments.  Police and fire stations, courthouses, schools and the general day to day operations of the municipality all fall into this category.

Municipalities also depend upon the municipal bond market to borrow for longer terms and at lower interest rates than might otherwise be available to them.  In order to do so, municipalities must provide investors in municipal bonds[1] with a reasonable risk profile.  The risk profile for GO Bonds is premised upon the municipal investor's understanding that GO Bonds are the 'gold standard'[2] in municipal finance, *i.e.*, (a) a low risk of default over a term that may extend to thirty years or more and (b) recoveries upon default that will be substantial and with little or no loss of principal.

---

[1] "Municipal securities, particularly tax-exempt municipal securities, are largely held by an individual or 'retail' investor base.  Households as a group have represented the largest single category of owner of municipal debt outstanding for the past six consecutive years.  Individual investors today hold over 75% of the outstanding principal amount of municipal securities directly or indirectly (through mutual, money market, closed-end, and exchange-traded funds." *Report on the Municipal Securities Market*, p.112, U.S. Securities and Exchange Commission, July 31, 2012 (the "SEC Report").  A copy can be found at https://www.sec.gov/news/studies/2012/munireport073112.pdf.

[2] "How Detroit's mega bankruptcy could hammer the $900-billion 'gold standard' of the muni-bond market," 2014 National Post, a division of Postmedia Network Inc.  A copy can be found at http://business.financialpost.com/2013/07/19/how-detroits-mega-bankruptcy-could-hammer-the-900-billion-gold-standard-of-the-muni-bond-market/.

1

It is in this context that the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)(hereinafter, the "Plan of Adjustment")[3] threatens the reasonable expectations of investors in municipal bonds, and GO Bonds in particular. The basic premise upon which municipalities, the municipal bond market and the investors in municipal bonds have operated is that GO Bonds backed by the full faith and credit of the issuing municipality and the municipality's taxing power are, while subject to adjustment in terms of the timing of payments and interest rates, not subject in a chapter 9 case to a reduction in the principal amount owed without the consent of the bondholders. When viewed in the context of (i) legislative history, (ii) the municipality not being subject to liquidation in a chapter 9 case where its assets would be distributed to creditors, and (iii) prior chapter 9 experience and state case law precedent (in this case, Michigan), GO bondholder expectations of substantial recovery upon default can only be viewed as reasonable. Therefore, a ruling that the Plan of Adjustment's proposed reduction of 87-90% in principal can be crammed down on the holders of claims arising from GO Bonds issued by the City of Detroit and backed by a pledge of the "limited tax, full faith, credit and resources of the City" would send shockwaves throughout the municipal bond market. The predictable result is that the confidence of investors in the gold standard of GO Bonds would be shattered which, in turn, will require municipalities in the future to offer more generous terms, *i.e.*, higher interest rates and a lien on specified collateral, in order to attract sufficient investors to purchase their bonds and thereby fund their operations and critical infrastructure needs. Ultimately, these higher costs must and will be passed along to the municipalities' taxpayers in the form of higher taxes. The impact cannot be underestimated.

---

[3]Case No. 13-53846, Docket No. 4392.

The City's chapter 9 case is a watershed event and has forced parties to address issues seldom dealt with in the context of a municipal bankruptcy case. The *amicus* has found no municipal chapter 9 case on record that has proposed as harsh a treatment for the holders of GO Bonds as that proposed by the City's Plan of Adjustment.

## II.    INTERESTS OF THE *AMICUS CURIAE*.

The Securities Industry and Financial Markets Association (SIFMA) brings together the shared interests of hundreds of securities firms, banks and asset managers. SIFMA's mission is to develop policies and practices which strengthen financial markets and which encourage capital availability, job creation and economic growth while building trust and confidence in the financial industry. SIFMA has offices in New York and Washington, D.C. and is the U.S. regional member of the Global Financial Markets Association.

When investors in municipal bonds experience a result that is at odds with their reasonable expectations, a disruption in the market can be expected. Such a result is antithetical to SIFMA's mission, as it would weaken financial markets and discourage capital availability with a resultant loss of jobs and a stifling of economic growth. If the City's Plan of Adjustment is confirmed in its present form with an 87-90% reduction in GO Bond principal, it will disrupt the entire municipal bond market that is relied upon by municipalities, not only in the State of Michigan but throughout the United States.

SIFMA believes that the legislative history of our municipal bankruptcy laws, the wording of the statute itself, and the holdings of Michigan case law regarding the rights of GO bondholders clearly establish the rights of holders of the City's GO Bonds to better treatment than that proposed to be forced upon them. There is simply no justification for why their reasonable expectations of substantial recovery should be shattered, with the resultant harm not

3

only to them, but to those that depend upon municipal finance generally, including municipalities and taxpayers. SIFMA therefore asks that the Court consider its views as set forth in this *amicus curiae* brief.

## III. SUMMARY OF ARGUMENT.

The legislative history of chapter 9 makes it clear that Congress intended to allow a municipality to "adjust" its payments to bondholders by extending the time for payment on the debt, but not for the municipality to reduce the principal amount of its bond obligations without the consent of those bondholders, *i.e.*, by cramdown. This stands to reason, as the structure of chapter 9 of the Bankruptcy Code makes it clear that the opportunity to adjust the distressed municipality's debts is not the traditional "fresh start" provided by the other chapters of the Bankruptcy Code. Unlike a chapter 7 or 11 debtor, the chapter 9 municipality cannot be forced to liquidate its assets, cannot provide creditors with equity interests going forward, and has both a perpetual existence and perpetual taxing power. Instead of liquidation and going concern values being the touchstone for determining the minimum and maximum reorganization value distributable to creditors (as for a chapter 11 debtor's business), chapter 9 does not provide for appraisal of the municipal debtor's assets -- and instead focuses on the municipal debtor's longer-term outlook to determine the extent of its ability to adjust and thereby satisfy creditor claims.

Against the backdrop of that legislative history, Section 943(b)(7) of the Bankruptcy Code requires that the plan of adjustment in a chapter 9 case be "in the best interests of creditors" in order to be confirmed. Though the phrase "in the best interests of creditors" is not defined in the Bankruptcy Code, the leading treatise on bankruptcy law, *Collier on Bankruptcy*, states that it

4

means that the plan of adjustment must present creditors with a better result than they would obtain outside of the chapter 9 context.

Given that the claims of the holders of the LTGO Bonds (as defined below), classified into Class 7 of the Plan of Adjustment, have the right under state law to a mandamus remedy of turnover to them of the first monies budgeted by the City, there is no reasonable basis upon which to find that the City's proposal to pay Class 7 bondholders only 10-13% of what they are owed, is in their best interests. The Class 7 bondholders would do significantly better if simply left to their rights under Michigan law.

Furthermore, as the City proposes to satisfy the Class 7 Claims with a substantially less remunerative treatment than other general unsecured claims, the City's Plan of Adjustment must be seen as unfairly discriminating against the holders of Class 7 Claims. Accordingly, the Plan of Adjustment cannot be confirmed, as it violates Sections 1129(b)(1) and 943(b)(1) of the Bankruptcy Code, which require that the Plan of Adjustment not unfairly discriminate against claims that are the subject of the debtor's cramdown attempt.

IV.     **BACKGROUND.**

A.      **General Description of the Use of Bonds Issued to Finance Municipalities.**

There are several types of securities employed to finance municipalities in the United States. Two broad groups of municipal securities emerge, as explained by The Municipal Securities Rulemaking Board:[4]

**General Obligation Bonds**

---

[4]http://www.msrb.org/Municipal-Bond-Market/About-Municipal-Securities/Types-of-Municipal-Securities.aspx. Congress passed the Securities Acts Amendments of 1975, which, among other things, created the Municipal Securities Rulemaking Board. It is a self-regulatory organization subject to the SEC's oversight. SEC Report at p. 33.

5

The term "general obligation" typically refers to a bond issued by a state or local government that is payable from general funds of the issuer, although the precise source and priority of payment for general obligation bonds may vary considerably from issuer to issuer depending on applicable state or local law. Most general obligation bonds are said to entail the "full faith and credit" (and in many cases the taxing power) of the issuer, depending on applicable state or local law. General obligation bonds issued by local units of government often are payable from (and in some cases solely from) the issuer's *ad valorem* taxes, while general obligation bonds issued by states often are payable from appropriations made by the state legislature.

### Revenue Bonds

"Revenue bond" is the term used generally to describe a bond that is payable from a specific source of revenue and to which the full faith and credit of an issuer with taxing power is not pledged. The issuer of a revenue bond is not obligated to pay principal and interest on its bonds using any source other than the source(s) specifically pledged to the bond. Revenue bonds are payable from identified sources of revenue and do not permit the bondholders to compel taxation or legislative appropriation of funds not pledged for payment of debt service. Pledged revenues may be derived from operation of the financed project, grants or excise or other specified non-ad-valorem taxes. Generally, no voter approval is required prior to issuance of such obligations. If the specified source(s) of revenue become inadequate, a default in payment of principal or interest may occur. Various types of pledges of revenue may be used to secure interest and principal payments on revenue bonds. The nature of these pledges may differ widely based on the type of issuer, type of revenue stream, and other factors.

The municipal bond market is, without risk of exaggeration, truly enormous, and plays a vital role in governmental operations.

The municipal securities market is critical to building and maintaining the infrastructure of our nation. State and local governmental entities issue municipal securities to finance a wide variety of public projects, to provide for cash flow and other governmental needs, and to finance non-governmental private projects (through the use of "conduit" financings).[5]

The municipal securities market is also an extremely diverse market, with close to 44,000 state and local issuers..."[6]

---

[5] SEC Report at p. i.

[6] SEC Report at p. 1.

> In 2011, there were over one million different municipal bonds
> outstanding compared to fewer than 50,000 different corporate
> bonds. These municipal bonds totaled $3.7 trillion in principal,
> while corporate (and foreign) bonds and corporate equities
> outstanding totaled $11.5 trillion and $22.5 trillion, respectively."[7]

GO Bonds have long been considered the "gold standard" of municipal securities.[8] As GO Bonds are understood in the financial marketplace to carry little risk of default, and in the context of default, little risk that principal will not be repaid, through issuing GO Bonds municipalities are able to borrow at low interest rates to finance their operations or infrastructure needs. As far as the *amicus curiae* is aware, there is virtually no recent history of chapter 9 plans of adjustment being confirmed over the objection of an impaired class of GO Bonds. However, should this "gold standard" be broken by Detroit's use of chapter 9, municipalities – not only in Michigan, but throughout the United States – can expect to suffer higher interest rates in order to find buyers for their GO Bonds. The GO Bonds will necessarily reflect a higher risk profile that will travel with those municipal securities, and fewer GO Bond investors will be found to purchase those GO Bonds, as the higher risk will exclude whole categories of investors who are only permitted to invest in bonds with the highest ratings. The result will necessarily be higher costs to municipalities and, therefore, higher taxes for taxpayers.[9]

---

[7]SEC Report at p. 5.

[8]http://business.financialpost.com/2013/07/19/how-detroits-mega-bankruptcy-could-hammer-the-900-billion-gold-standard-of-the-muni-bond-market/. *See also "Detroit bankruptcy bond fight a watershed for municipal market,"* reported by Karen Pierog and Tom Hals (Thomson Reuters, Feb. 17, 2014) ("Investors always have considered the full faith and credit pledge by cities, school districts and other issuers to pay off those bonds 'sacrosanct ....'").

[9]*Id.*

**B.      GO Bonds Issued by Detroit.**[10]

Consistent with the generalized description above, the City has issued several different

types of municipal securities.  This *amicus* brief will focus on one particular type of GO Bond

issued by the City, *i.e.*, the Limited Tax General Obligation Bonds (the "LTGO Bonds").  The

claims arising from the LTGO Bonds are designated in the Plan of Adjustment as Class 7.[11]

Prior to the filing of its chapter 9 Petition and pursuant to Resolutions duly passed by its

City Council as the City's governing body, the City borrowed money from investors in the

LTGO Bonds issued pursuant to authority granted to the City by the Revised Municipal Finance

Act, Mich. Comp. Laws Ann.  §141.2101 *et seq.*, referred to as "Act 34" .

**C.      Detroit's LTGO Bonds.**

Act 34 allows a municipality to issue bonds in order to finance its operations and

infrastructure needs, but establishes strict guidelines that must be followed in doing so.  In this

instance, the City pledged to pay the principal and interest due on the LTGO Bonds as a "first

budget obligation" and also agreed to use "ad valorem taxes" in order to do so.

The City has collected, continues to collect and, as its Fourth Amended Disclosure

Statement (the "Disclosure Statement") makes clear,[12] will in the future collect *ad valorem* taxes

---

[10]A fuller description of the LTGO Bonds (as defined below) is contained in the Amended
Complaint filed by the bond insurer for the LTGO Bonds to initiate Adversary Proceeding No. 13-05310
(Docket No. 57 filed December 23, 2013). The *amicus curiae* asks that this Court take judicial notice of
the factual averments made in the pleadings filed in that adversary proceeding. The *amicus curiae* will not
attempt to repeat herein all of the content and arguments made in the adversary proceeding, in which this
Court has taken under advisement the arguments made in connection with motions the City has filed
seeking to dismiss the Amended Complaint.  However, certain references to the particulars of the LTGO
Bonds as set forth in that Amended Complaint are inevitable.

[11]The LTGO Bonds are more fully described in the City's Fourth Amended Disclosure Statement
(Docket #4391), Section VII B 2(b), pp. 102-103.

[12]Docket #4391, pp. 95 and 171.

from residents of the City. However, the City stopped paying interest or principal amortization on the LTGO Bonds once it became a debtor in this chapter 9 case.

### D. The Plan of Adjustment.

The City has filed its Plan of Adjustment proposing to impair the LTGO Bonds, treating each as a general unsecured obligation of the City. The Disclosure Statement filed in connection with the City's Plan of Adjustment describes the LTGO Bond claims as Allowed Class 7 Claims in the Estimated Aggregate Allowed Amount of $163,543,187[13], and the Plan of Adjustment allows the Class 7 Claims in that amount.[14] The Plan of Adjustment provides for the cancellation of the LTGO Bonds and distribution in their place of Unsecured Pro Rata Shares of New B Notes[15] in an aggregate principal amount estimated in the Disclosure Statement to be between ten and thirteen percent (10-13%) of the Allowed Class 7 Claims, but could be lower.[16]

## V. ARGUMENT.[17]

Given the indisputable significant public interest in a properly functioning municipal bonds market, in fact the absolute need for such a market to make sufficient funds available to municipalities to fund their operations and infrastructure needs, and the justified reliance investors in municipal bonds have placed on the "gold standard" of GO Bonds, this Court should

---

[13]Docket #4391, p. 34.

[14]Docket #4392, p. 30.

[15]Docket #4392, pp. 30 and 48-49.

[16]Docket #4391, p. 34 and footnote 5.

[17]In the interest of brevity, the *amicus curiae* will not duplicate all of the facts and arguments already advanced in favor of recognizing the LTGOs as secured obligations, including via statutory lien, equitable lien, trust and constructive trust, or as special revenues pledged to them, but will reference and adopt the factual averments and arguments made in the adversary proceeding filed by the bond insurer of the LTGO Bonds. *See* Amended Complaint of Ambac Assurance Corporation for Declaratory Judgment, filed in case number 13-05310, Doc. No. 57 (filed December 23, 2013) and Ambac Assurance Corporation's Opposition to Defendants' Motion to Dismiss, filed in case number 13-05310, Doc. No. 89 (filed February 11, 2014).

not endorse by its confirmation the City's Plan of Adjustment because it is at fundamental odds with the legislative history of chapter 9, the words of the statute itself and past practice under the statute. The havoc such a confirmation would heap on the municipal bond market can be avoided by recognizing that the confirmation standards the City's Plan of Adjustment must meet are simply lacking. The City's Plan cannot be confirmed, because it is not in the best interests of creditors, nor should it be confirmed where it exhibits a grossly discriminatory treatment of the claims of the holders of GO Bonds. Denying confirmation would break no new legal ground, would be consistent with the expectations of creditors and would allow the municipal bond market to properly function for the benefit of the municipalities and taxpayers it serves.

### A. The Legislative History and Structure of Chapter 9 is Contrary to the City's Proposed Cramdown of an 87-90% Loss to LTGO Bondholders.

A municipal unit cannot liquidate its assets to satisfy its creditors totally and finally. Nor can it reorganize by issuing equity to creditors in exchange for debt. Therefore, the primary purpose of chapter 9 is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to creditors. H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 263 (1977).

### B. Past Practice Under Chapter 9.

As far as the *amicus curiae* can determine, there is no modern precedent for a bankruptcy court to confirm by cramdown a plan of adjustment that impairs a class of GO bondholder claims through a significant reduction, let alone an 87-90% reduction in the principal amount of those claims. Such a result would therefore represent a significant departure from historical practice and is inconsistent with the legislative history of the country's municipal bankruptcy laws and the laws of the State of Michigan upon which the LTGO Bond holders have relied.

10

C.    **Plain Language of the Statute**.

Even the word chosen by Congress to describe the process for a commercial business or individual, *i.e.*, "Reorganization," is different from the words used by Congress to describe the process for a municipality, *i.e.*, "Adjustment of Debts of a Municipality." This use of "adjustment" is consistent with the expectation, based upon the legislative history mentioned in the preceding section, that bond holders may anticipate an adjustment of the timing of payments of the bond debt but not a reduction in the principal amount.

The use of the word "adjust," in contrast to the use of the word "reorganize" in the Bankruptcy Code's reference to a chapter 11 process is significant. In fact, the basic structure of these two chapters of the Bankruptcy Code is entirely different. Chapter 11 allows for the wholesale reorganization of the debtor's debt and equity, with the equity ownership of the reorganized business available to the holders of the fulcrum security which is often the class of unsecured claims. That possibility cannot occur in the chapter 9 context where creditors cannot "own" the municipality. Chapter 11 contemplates creditors having the right to propose a plan, while chapter 9 forbids it. Furthermore, a regular feature of chapter 11 practice involves a sale of assets pursuant to Section 363 of the Bankruptcy Code that takes place either within or outside of a plan context. In contrast, liquidation under chapter 9 is not a permissible alternative, so creditors are not able to posit the possibility of a plan where the proceeds of asset sales are provided to them. As a result, the standard by which the "best interests of creditors" is tested in a chapter 9 case does not look to the liquidation value of the debtor municipality's assets as it does in a chapter 11 context.

11

**D.**   **Best Interests of Creditors**.

In order to confirm the Plan of Adjustment, Section 943(b)(7) requires the court to find

that "the plan is in the best interests of creditors …." Just what constitutes the best interests of

creditors is not explained by the text of the statute, and has not been the subject of extensive case

analysis. The leading treatise on bankruptcy law explains it as follows:

> The concept should be interpreted to mean that the plan must be
> better than the alternative that creditors have. In the chapter 9
> context, the alternative is dismissal of the case, permitting every
> creditor to fend for itself in the race to obtain the mandamus
> remedy and to collect the proceeds … [t]he test is designed to
> protect the dissenting minority of a class that has accepted the plan
> …"

6 *Collier on Bankruptcy* ¶ 943.03[7][a] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

What case law exists interpreting or applying the chapter 9 "best interests of creditors"

test is consistent with this explanation. *See In the Matter of Sanitary & Improvement Dist., #7*,

98 B.R. 970 (Bankr. D. Neb. 1989) ("Section 943(b)(7) as amended in 1988 simply requires the

Court to make a determination of whether or not the plan as proposed is better than the

alternatives."); *In re Mount Carbon Metropolitan District*, 242 B.R. 18 (Bankr. Colo.

1999)("[t]he best interest" requirement of § 943(b)(7) is generally regarded as requiring that a

proposed plan provide a better alternative for creditors than what they already have.").

Viewing the proposed Plan of Adjustment from the perspective of the Class 7 Claims

held by the LTGO bondholders, there can be little doubt that the Plan is not in their best interests.

The City proposes to exchange the existing LTGO Bonds with new bonds. In each instance, the

new bonds are calculated to deliver value equal to only 10-13% of the principal amount of the

LTGO Bonds. In contrast to the City's Plan of Adjustment, Michigan law defines a clearly

better alternative for the holders of the LTGO Bonds.

The provisions of the LTGO Bonds and the Resolutions under which they were issued make clear that the City is required "as a first budget item" to pay the LTGO Bonds, and Michigan law requires that the City budget so provide. Under these circumstances, Michigan law is well settled that mandamus is the remedy available to the holders of the LTGO Bonds and that the mandamus remedy, while resting in the sound discretion of the state judiciary, would be appropriate. *See Citizens Protecting Michigan's Constitution et al v. Secretary of State et al,* 280 Mich. App. 273 (2008); *Citizens for Protection of Marriage v. Board of State Canvassers et al,* 263 Mich. App. 487 (2004); *McKeighan v. Grass Lake Township Supervisor,* 234 Mich. App. 194 (1999); *John Wittbold & Co. (Municipal Investors Ass'n et al., Interveners) v. City of Ferndale et al.,* 281 Mich. 503 (1937); *Chemical Bank & Trust Co. v. Oakland County et al.,* 264 Mich. 673 (1933).

Under Michigan law, issuance of a writ of mandamus is proper where "(1) the plaintiff has a clear legal right to performance of the specific duty sought to be compelled, (2) the defendant has the clear legal duty to perform such act, and (3) the act is ministerial, involving no exercise of discretion or judgment." *McKeighan v. Grass Lake Township Supervisor,* 234 Mich. App. 194 (1999) quoting *Tuscola Co. Abstract Co., Inc. v. Tuscola Co. Register of Deeds,* 206 Mich. App. 508, 510-511 (1994). The holders of the City's LTGO Bonds have a clear legal right under Michigan law to have the City perform as required in the Bond Resolutions; the City has a clear legal duty to perform as promised; and the acts legally required, *i.e.,* payment of the LTGO Bonds as a first budget item, are purely ministerial involving no exercise of discretion or judgment.

13

### E. The Plan of Adjustment Cannot Be Confirmed, Because its Proposed Treatment of the LTGO Bonds is Unfairly Discriminatory.

When a municipal debtor seeks to confirm a plan of adjustment via cramdown, as the City will propose should the holders of the LTGO Bonds designated as Class 7 Claims not consent by the requisite majorities, Section 1129(b)(1) of the Bankruptcy Code, as incorporated by Section 901 into chapter 9, requires the court to find that "the plan does not discriminate unfairly ... with respect to each class of claims ... that is impaired under ... the plan." Such a finding cannot be made when the Court compares the proposed treatment of the Class 7 Claims to other classes of claims designated by the Plan of Adjustment as general unsecured claims. As set forth above, the City proposes to issue new bonds to the holders of Class 7 Claims, which new bonds have an "Estimated Percentage Recovery" of 10-13%. In contrast, the Class 10 Claims for PFRS Pension Claims are to receive a 39% distribution (without counting the outside funding that is dedicated only to the payment of Class 10 and 11 Claims; 59% counting that outside funding); Class 11 Claims for GRS Pension Claims are to receive a 48% distribution (without counting the outside funding that is dedicated only to the payment of Class 10 and 11 Claims; 60% counting that outside funding), and Class 15 Convenience Claims are to receive an "Estimated Percentage Recovery" of 25%.[18] Each of these classes of creditor claims is composed of general unsecured claims. As a result, there is simply no basis upon which the Class 7 claims should receive a distribution that is so disproportionately less than the recovery of

---

[18] *See* Fourth Amended Disclosure Statement (Docket # 4391) Section II B. pp. 34-42). In addition, trade vendors who extended unsecured credit to the City prior to the chapter 9 filing have surely been paid in full during this chapter 11 case, as the City had every right to do. That is why they are not otherwise provided for in the City's Plan of Adjustment. However, as noted by Bankruptcy Judge Klein in his *City of Stockton* decision regarding a proposed Rule 9019 settlement and then payment in full at the settlement amount of a disputed tort claim, the fact that a creditor receives such treatment is a relevant consideration at confirmation in the context of a plan of adjustment proposed to be confirmed by cramdown. *See In re City of Stockton, Cal.*, 486 B.R. 194, 199-200 (Bankr. E.D. Cal. 2013).

14

other general unsecured creditors. While the City may be permitted to discriminate amongst classes at the same level of priority, it cannot do so unfairly.

The City may posit that the disparity in treatment is justified because the more favorable treatment of the Class 10 and 11 pension obligations is the result of contributions being made by the State of Michigan and others ("Third-Party Contributions") that are directed only to those pension claims. However, that argument ignores the fact that the Third-Party Contributions are made on the condition that certain assets of the City, *i.e.*, artwork at the Detroit Institute of Arts, which would otherwise be available to be sold or otherwise used to make plan payments to general unsecured creditors are not being used for that purpose. As a result, the Third-Party Contributions are distinguishable from the type of gifts that have been relied upon by other courts to justify disparate treatment amongst classes of creditors.[19] Confirmation of the Plan of Adjustment under such circumstances could only result in a perception in the municipal bond market that the LTGO bondholders are being treated unfairly and militate against GO Bond investment in the future. Given that all eyes in the bond market are on Detroit, this all but certain effect on demand for GO Bonds, with resultant higher borrowing costs, would have a significant negative impact well beyond this case, on municipalities and taxpayers across the United States.

## VI.    CONCLUSION.

The *amicus curiae* is cognizant of the difficulties faced by the City in putting together a

---

[19]*See In re SPM Manufacturing Corp.,* 984 F.2d 1305 (1st Cir. 1993); *In re DBSD North America, Inc.,* 634 F.3d 79 (2d Cir. 2010); *In re Armstrong World Indus., Inc.,* 432 F.3d 507, 512 (3d Cir. 2005). *See also generally,* "A New Perspective on Unfair Discrimination in Chapter 11," 72 Am. Bankr. L.J. 227(Spring, 1998).

15

plan of adjustment that allows it to deliver essential services to residents of the City while also repaying obligations to creditors. However, the *amicus curiae* also believes that the rights of LTGO Bondholders, including by state statute, in tax revenues, and under the Bankruptcy Code, cannot be ignored or diminished in that effort. The City's Plan of Adjustment, because it ignores and diminishes those rights, cannot be confirmed.

STEINBERG SHAPIRO & CLARK

/s/ Mark H. Shapiro
Mark H. Shapiro, Esq. (BAR NO. 43134)
25925 Telegraph Road
Suite 203
Southfield, MI 48033
Telephone: (248) 352-4700
E-mail: shapiro@steinbergshapiro.com

16

NIXON PEABODY LLP

/s/ Mark N. Berman
Mark N. Berman, Esq.
(MA Bar No. 040360
 admitted in the ED MI)
100 Summer Street
Boston, MA 02110-2131
Telephone: (617) 345-1000
E-mail: mberman@nixonpeabody.com

/s/ Robert N. H. Christmas
Robert N. H. Christmas, Esq.
(NY Bar No. 2186609
admitted in the ED MI)
437 Madison Avenue
New York, NY 10022-7039
Telephone: (212) 940-3000
E-mail: rchristmas@nixonpeabody.com

Dated: May 12, 2014

For *Amicus Curiae*:

Securities Industry and Financial Markets Association
(SIFMA)

17