UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | In Proceedings Under Chapter 9 |
| Debtor. | Hon. Steven W. Rhodes |

## OAKLAND COUNTY'S OBJECTION TO CONFIRMATION OF THE CITY OF DETROIT, MICHIGAN'S PROPOSED FOURTH AMENDED PLAN OF ADJUSTMENT

Oakland County, Michigan ("Oakland County"), a contingent creditor and party in interest in the above-captioned case, by and through its undersigned counsel, hereby files its Objection To Confirmation Of The City of Detroit, Michigan's (the "City") Proposed Fourth Amended Plan Of Adjustment [Docket No. 4392] (the "Plan"), and in support thereof states as follows:

### INTRODUCTION

1.      Nothing can be more vital to a thriving commercial 21st century metropolis than the providing of clean, safe water and sewerage service in an efficient and sufficient manner.  Yet, notwithstanding this essential need, the City appears willing to engage in a game of chance, jeopardizing the DWSD, and thus the region, by putting the DWSD's operations at risk.  It does so by, among other things, stripping necessary funds from the water and sewer system at the expense of a healthy DWSD. While the City has many needs to address, none can be more important than public

health, safety, and welfare, including, the maintenance of a structurally and fiscally sound water and sewer system.

2.     While the City's judgment in putting the water and sewerage systems at risk are qualitatively clearly questionable, it further attempts to do so through means which are not permitted as a matter of law, requiring DWSD funding beyond those expenses necessary for its operations and to fund the City's negotiated "settlements" reached without the benefit of the involvement of those parties who essentially fund the DWSD, its wholesale and retail customers.

3.     Lastly, the City's Plan and projections regarding the DWSD are based on numerous flawed assumptions which call into question the ability of the City to actually fund what it proposes to fund, thus undermining the Plan's feasibility.

4.     For the reasons set forth herein, the City's Plan cannot be confirmed.

## BACKGROUND

## I.     THE DETROIT WATER AND SEWERAGE DEPARTMENT

5.     The Detroit Water and Sewerage Department ("DWSD") is a department (i.e., Enterprise Fund (as defined in the Plan)) of the City of Detroit government.  The DWSD is responsible for the water supply and the control and treatment of wastewater for residential, commercial, governmental, institutional and industrial customers at a retail level within the City.  The DWSD also serves over 125 wholesale suburban customers, many of whom, in turn, service their own retail customers.

6.     It is estimated that the DWSD provides water and sewer services to over four (4) million individual residents of southeast Michigan, most of whom reside in Oakland, Macomb, and Wayne Counties.

7.     The DWSD is one of the largest municipal water and sewerage departments in the nation.

8.     Notwithstanding its size and importance to the region, the DWSD has posted operating losses each year for the last seven (7) years, including, on average approximately $200 million a year loss for fiscal years ending 2009 – 2013, evidencing significant and recurring operational and/or fiscal mismanagement.

9.     Historically, the DWSD has a demonstrated pattern of ignoring and/or deferring much needed capital improvements.  These capital improvements are needed to correct existing deficiencies and known problems.  Failure to confront and resolve these infrastructure needs on a current basis dramatically increases the costs of future repairs.

10.     The DWSD has significant critical capital improvement needs over the next 10 years.  Most of these needs are on-going in order to maintain the water and wastewater system in good repair for reliable service.  These needs are in addition to the capital improvements associated with likely required future initiatives and regulatory changes.

11.     Without funding for these critical capital improvement needs, the DWSD is in jeopardy of interrupting, in whole or in part, operations and/or being unable to

provide water and sewer services to the public-at-large in much of Southeast Michigan in accordance with regulatory requirements and industry standards.

## II.    OAKLAND COUNTY

12.    Oakland County is a party to several contracts with the City pursuant to which the City, through the DWSD, provides water and sewer services for and on behalf of, Oakland County.  Such services are, in turn, utilized by residents and business located in the 62 cities, villages and townships located throughout Oakland County.

13.    Accordingly, Oakland County (and its municipal customers) relies upon the DWSD to provide vital water and sewer services to a significant portion of the approximately 1 million individual residents and numerous businesses located throughout Oakland County.

14.    There is no short term viable replacement for water and sewer services if the DWSD, for any reason, was unable to provide such services to its customers.

## OBJECTIONS

## I.    THE PLAN DOES NOT SATISFY THE STATUTORY REQUIREMENTS FOR CONFIRMATION.

15.    Section 943(b) of the Bankruptcy Code establishes the requirements for confirmation of a plan of adjustment in a chapter 9 case.  11 U.S.C. § 943(b).  The burden is on the City to prove by a preponderance of the evidence that it has satisfied each of those requirements.  See In re Pierce County Hous. Auth., 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) ("The debtor bears the burden of satisfying the confirmation

4

requirements of § 943(b) by a preponderance of the evidence.") (citing <u>In re Mount Carbon Metro. Dist.</u>, 242 B.R. 18, 31 (Bankr. D. Colo. 1999)); <u>see also</u> <u>In re Corcoran Hospital District</u>, 233 B.R. 449, 452 (Bankr. E.D. Cal. 1999).

16.     Although mediation between the City and Oakland County is ongoing with regard to issues relating to the DWSD, it is clear that the City has not met, and cannot possibly meet, its burden of proof.  In fact, the Plan does not satisfy several of the fundamental criteria for confirmation under section 943(b).

**A.     The Plan Is Not Feasible.**

17.     First and foremost, the Plan is not feasible as required by section 943(b)(7) of the Bankruptcy Code.  11 U.S.C. § 943(b)(7).

18.     All parties agree that the DWSD is a critical component of the Plan including the success or failure thereof.  Indeed, the Plan (although improperly – see Section I.B. below) provides that the DWSD will be responsible for paying in excess of $428.5 million on or before June 30, 2023 to fund the City's "settlement" with holders of GRS Pension Claims, while neither the City as a whole nor its departments will fund any amounts to the GRS through 2023.  See Plan at Section II.B.3.r.ii.A.

19.     However, notwithstanding the critical importance of the DWSD, the City's Plan fails to make sufficient funding available to the DWSD for operations.  In addition to lack of funding, the City proposes to unlawfully "take" money from the DWSD to fund non-DWSD expenses - the City's $428.5 million "settlement" with the holders of GRS Pension Claims.  Such proposed payment would make the DWSD an "involuntary participant" in the otherwise voluntary "grand bargain".  <u>See</u> Section I.B. below.

20.     The Code does not define feasibility in Chapter 9 nor does it specify what factors the Court should consider in determining whether the Plan is feasible. Moreover, due to the relative rarity of Chapter 9 cases, there is dearth of case law specifically addressing the issue.    The few courts considering the issue and commentators seem to agree that the "feasibility" requirement operates as a "ceiling" on a chapter 9 debtor preventing the debtor from promising more than it can deliver. See  Mount Carbon, 242 B.R. at 34; 6 Collier On Bankruptcy, ¶ 943.03[7] (Lawrence P. King, ed., 16th ed. 2014).

21.     The Mount Carbon Court held that a "feasibility" determination requires a Court to "evaluate whether it is probable that the debtor can **both** pay pre-petition debt **and provide future public services at the level necessary to its viability as a municipality**".  Mount Carbon, at 35 (emphasis added).

22.     In drawing an analogy to cases under Chapter 11, the Mount Carbon Court further explained that –

> a Chapter 9 feasibility finding should 'prevent confirmation of visionary schemes which promise creditors . . . more under a proposed plan than the debtor can possibly attain after confirmation.' A plan should offer a reasonable prospect of success and be workable. In Chapter 9, this requires a practical analysis of whether the debtor can accomplish what the plan proposes and provide governmental services. Although success need not be certain or guaranteed, more is required than mere hopes, desires and speculation.   The probability of future success will depend upon reasonable income and expense projections. As with plans proposed under Chapter 11, if performance of a Chapter 9 plan is based upon deferred payments, projections of future income and expenses must be based upon

reasonable assumptions and must 'not be speculative or conjectural.'

Mount Carbon, at 35 (internal citations omitted).

23.     Ultimately, the Mount Carbon Court determined that the Debtor's proposed plan was not feasible based, in part, on the fact that the Debtor's revenue projections "represent[ed] an ideal scenario and fail[ed] to anticipate any fluctuation, deviation, or upset" and, therefore, were not sufficiently reliable. Id., at 37-38.

24.     Here, the Plan, specifically relating to the DWSD, is nothing more than the City's "visionary scheme" and is not feasible for, minimally, the following reasons:

> i.     *The DWSD capital improvement needs are not adequately addressed in the Plan.*

25.     The City's Plan, which includes $2.9 billion in funding for its proposed Capital Improvement Program ("CIP") over the next 10 years, fails to appropriately budget for the very significant capital improvements that are necessary to maintain the water and wastewater systems in good repair and provide reliable service. Oakland County believes that the City's proposed funding for CIP is insufficient.

26.     Moreover, upon information and belief, the representatives of the DWSD were not consulted in connection with the financial issues and the "path forward" with respect to the DWSD.

27.     The City, at Exhibit M to the Plan, indicates that it relies upon a 10-year study completed by OHM Advisors (the "OHM Report") for purposes of estimating the funding needs of the City's CIP. However, the OHM Report, by its own terms, deems itself to be insufficient and limited by "affordability constraints". **Exhibit A**, OHM

7

Report ("The piping costs that are allocated only to the City of Detroit could have been estimated at significantly higher costs, but were limited by the recognition that affordability is a serious constraint.")

28.     Moreover, representatives of Oakland County (along with representatives of Macomb and Wayne Counties) reviewed the OHM Report and the City's CIP and determined that the OHM Report and the CIP were severely deficient in terms of the magnitude and cost of the desperately needed capital improvements within the DWSD system.

29.     Specifically, the proposed CIP is, upon information and belief, deficient, minimally, in regard to the inspection, rehabilitation and/or replacement needs of:

    a.  Wastewater treatment plant facilities;

    b.  Wastewater pumping stations;

    c.  Large diameter sewers;

    d.  Water treatment plant facilities;

    e.  Water pump stations/reservoirs;

    f.  Water transmission pipelines; and

    g.  Detroit retail water mains and system.

30.     In addition, in the next 10 to 20 years and beyond, new regulatory requirements and initiatives will likely be put in-place and may require significant expense for upgrades, improvements and expansions related to long-term sewer overflow control, energy management, air quality regulations, water treatment plant disinfection, and wastewater treatment effluent limits.

8

31.     In addition, upon information and belief, the operation and maintenance budget contemplated by the City has not been reliably identified and, upon information and belief, Oakland County believes it to be not sufficient to operate the DWSD efficiently and reliably.

32.     The DWSD continues to maintain its systems, at best, on an "as needed basis" only, failing to adequately inspect, service, and maintain systems in accordance with normal industry standards.

33.     The City's proposed CIP financing acknowledges that it does not even include the already deficient requirements as proposed by the OHM Report in fiscal years 2014-17 (the OHM Report is $86 million short in fiscal years '14 and '15 and $96 million short in fiscal years '16 and '17).

34.     Capital improvements which are deferred pursuant to the City's projections will likely cause catastrophic failures that will compromise public health, safety, and welfare.

35.     Without significant additional funding for critical capital improvements and maintenance, DWSD's operations risk a substantial likelihood of a material interruption in services.

> ii.    *The DWSD's financials demonstrate significant risk to its continued operational survival thereby jeopardizing the DWSD and the City as a whole.*

36.     The DWSD is a standalone business unit with exceedingly high fixed costs.   Accordingly, any deviation from projected revenues or expenses results in significant risk to its continued operations and existence.

37.     The DWSD has lost on average approximately $200 million a year for the last 5 years.  However, despite such significant annual operating losses, the City proposes to saddle the DWSD with an additional approximately $43 million a year to fund the City's "settlement" with the GRS.

38.     One of the principal reasons for the filing of the Chapter 9 proceedings was the significant legacy costs, including retiree benefits, which the City had incurred. While the Plan has taken some steps to address these concerns (although from the perspective of Oakland County, not enough), the same cannot be said with respect to the DWSD's burden with respect to such costs.  As a consequence of the proposed Plan, the City will enjoy an approximate 10% ratio between Retiree Obligations and Salaries/Wages/Fringes during the next decade while the DWSD will be saddled with a similarly calculated ratio of 60%, the same approximate level the City as a whole suffered at the time it decided to file for bankruptcy.  Thus, the DWSD under the Plan continues to be saddled with the same legacy costs which, among other things, forced the City into bankruptcy.  A ratio of this magnitude is inappropriate for any reasonably functioning business.

39.     Even if and to the extent the City could be looked to to supplement the DWSD operations in the event of a catastrophic event that jeopardizes the health, welfare, and safety of 4 million individuals, the City's budget is so tight that funding simply would not be available.

40.     Because businesses' and individuals' willingness to locate in the City is contingent upon a solid, well-funded infrastructure, the City's proposed increased

revenue sources (i.e., municipal income and property taxes) will simply not materialize if the DWSD is at serious risk of failure or fails; thus, jeopardizing the success and feasibility of the Plan.

>    iii.    *The City's financial projections for the DWSD are not reliable.*

41.    The Plan uses fiscal year end 2014 budgeted figures as the base year assumption for the 10 year DWSD Financial Projections contained in Exhibit M.  The year end 2014 budgeted revenues for water and sewer are 7.8% ($27.7 million) and 15.9% ($70.1 million), respectively, higher than year-end 2013 figures.  However, no explanation is given for such large increases.  Additionally, since each subsequent year of the model after 2014 builds on the 2014 numbers, to the extent 2014 numbers are wrong (inflated), the entire model will be artificially inflated.

42.    The City's DWSD Financial Projections fail to account for the fact that the City of Flint is presently no longer purchasing water from the DWSD.  The projections have the City of Flint as a customer through fiscal year 2016.

43.    Uncollectable revenues place a strain on the DWSD's income and cash flow.  The City's projections fail to resolve over $140 million of delinquent accounts existing as of February 2014 (out of a total $170 million in accounts receivable).  Moreover, the City of Detroit owes $28 million to the DWSD – for post-filing services.

>    iv.    *The City's debt service assumptions are flawed.*

44.    The Plan also fails to establish a financially viable DWSD in the context of the capital markets for future borrowings and credit facilities. As currently drafted, the Plan does not allow for the DWSD to achieve an investment grade rating, does not

allow for access to the capital market to issue bonds at a reasonable interest rate, and causes the DWSD to pay significantly more than currently budgeted for debt service on the forecasted bond issues (if there is market access at all).

45.     Presently, all the major rating agencies have lowered the ratings on the DWSD debt to below investment grade, and all with negative outlooks. At these rating and outlook levels, there will very limited market access, if any, and any capital borrowing likely would be at very onerous rates – well above that assumed in the Plan.

46.     There is nothing to suggest that the Plan would correct this situation.  To the contrary, there is evidence to suggest the bond rating, market access, and ability to borrow at reasonable interest rates would all be significantly impaired as a consequence of the confirmation of the Plan.

47.     As Fitch has noted in their report from February 28, 2014: "Fitch sees no apparent reason for DWSD bondholders to accept any impairment…Should the POA (Plan of Adjustment) be confirmed as filed and thereby result in impairment to bondholders, Fitch would almost certainly view the action consistent with a distressed debt exchange and downgrade the rating on the bonds to 'D'."  **Exhibit B**.  The Standard & Poor's March 25, 2014 rating action to CCC reflects this exact methodology as well.  **Exhibit B**.

48.     The rating criteria from the rating agencies for the DWSD are all clear that the Plan will cause significant and long-lasting damage to the ratings of the DWSD and limit its capital market access for quite some time. There is little to no chance that the

ratings of the DWSD will reach the "A" rating category in the near-term as contemplated by the Plan.

49. In light of the foregoing, the Plan significantly overstates the ability of DWSD to access the market and the debt service for its sizeable capital program will be considerably higher. The interest rate assumption embedded in the financial projections for the DWSD is approximately 4.63%. This level of interest does not appear to be achievable in the current environment, and would correspond to "A" rating of the DWSD. As noted, there is little evidence to suggest that the DWSD could achieve an investment grade rating in the near-term, let alone an "A" rating.

50. The result of the foregoing will be significantly higher interest rates than projected in the Plan resulting in significantly higher debt services costs.

**B.     The Plan Is Not Proposed In Good Faith And Violates Applicable State Law.**

51. Through the Plan, the City seeks to compel the DWSD to participate in the "grand bargain" and fund a substantial portion of the City's "settlement" with holders of GRS Pension Claims. Unlike other third party participants in the "grand bargain", which have the option of participating in funding certain of the City's needs under the Plan and going forward, the DWSD, and thus ultimately the rate payers who fund DWSD's operations are being compelled under the Plan to unlawfully fund the City's "settlement" with the holders of GRS Pension Claims, which the City negotiated without having the necessary funding available to consummate such settlement. The City's proposed payment scheme categorically violates state and local law with regard

to the operation of the DWSD in that it requires DWSD revenue to be used for purposes unrelated to the operation of the DWSD. Moreover, the Plan provisions regarding the DWSD CVRs further violate local and state law for the same reason. Thus, the Plan cannot be confirmed.

52. Section 1129(a)(3) of the Bankruptcy Code (made applicable by sections 901(a) and 943(b)(1) of the Code) requires a plan proponent to prove that a plan "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

53. The requirement of good faith has been a critical component of municipal restructuring since the earliest enactment of Chapter IX. See American United Mut. Life Ins. Co. v. Avon Park, 311 U.S. 138, 144-46 (1940) (reversing order of confirmation for, among other things, lack of good faith); Town of Belleair v. Groves, 132 F.2d 542, 543 (5th Cir. 1942) (affirming denial of confirmation and dismissal of case on bad faith grounds where the proposed plan did not "embod[y] a fair and equitable bargain openly arrived at and devoid of overreaching"); Kaufman County Levee Imp. Dist. No. 4 v. Mitchell, 116 F.2d 959, 960 (5th Cir. 1941) (affirming denial of confirmation where "the plan was unfair and discriminated in favor of the bondholders owning lands and against those who did not")

54. Courts have not hesitated to deny confirmation of proposed plans of adjustment where the debtor seeks to abuse the restructuring process or achieve results not consistent with the purposes of the Bankruptcy Code. See, e.g., Ault v. Emblem Corp. (In re Wolf Creek Valley Metro. Dist. No. IV), 138 B.R. 610, 618-19 (D. Colo. 1992)

(reversing confirmation order on grounds that proposed plan singled out one landowner for discriminatory treatment while unduly benefitting another landowner); In re Pierce County Hous. Auth., 414 B.R. 702, 719-20 (Bankr. W.D. Wash. 2009) (denying confirmation due to lack of good faith where the proposed plan would have limited creditor recoveries from other sources and hence "does not indicate a sincere attempt by the Debtor to readjust its debts by maximizing the creditors' recovery"); Mount Carbon, 242 B.R. at 39-42 (denying confirmation where the plan unduly benefitted one landowner and was inconsistent with the purpose of chapter 9).

55.     The Mount Carbon Court explained that, when considering good faith in the Chapter 9 context, "[b]rrowing from the good faith analysis of Chapter 11 and Chapter 13, it is easy to conclude that the Court should consider the totality of the circumstances". Mount Carbon, at 40-41. "The factors which a Court should examine in each chapter include: (1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair. Id., see also Pierce County, 414 B.R. at 720 (citing same four (4) factors and explaining that a good faith determination requires an evaluation of the totality of the circumstances to determine whether a plan is proposed with honesty and sincerity and whether a plan's terms are fundamentally fair).

56. A plan "satisfies the purpose of Chapter 9" if it is "consistent with the governmental nature and obligations of the Chapter 9 debtor" and allows the debtor to continue to provide public services. Mount Carbon, at 41.

57. Here, the City's Plan has not been proposed in good faith and is in violation of Michigan law regarding operation of the DWSD and the setting of water rates.

58. The right of a Michigan city to own and operate a water supply system for the benefit of both its residents and nonresidents is set forth in the Michigan Constitution. Michigan Constitution Article 7, Section 24 provides:

> Subject to this constitution, any city or village may acquire, own or operate, within or without its corporate limits, public service facilities for supplying water, light, heat, power, sewage disposal and transportation to the municipality and the inhabitants thereof.
>
> **Services outside corporate limits**
>
> Any city or village may sell and deliver heat, power or light without its corporate limits in an amount not exceeding 25 percent of that furnished by it within the corporate limits, except as greater amounts may be permitted by law; may sell and deliver water and provide sewage disposal services outside of its corporate limits in such amount as may be determined by the legislative body of the city or village; and may operate transportation lines outside the municipality within such limits as may be prescribed by law.

Mich. Const. Art 7, § 24.

59. The Michigan Legislature has, by statute, established a methodology pursuant to which a municipality may set its water rates for both residents and nonresidents. Specifically, M.C.L. 123.141(2) requires that water sold by a municipal

utility "shall be at a rate which is based on the **actual cost of service** as determined under the utility basis of rate-making." M.C.L. 123.141(2) (emphasis added).

60.     The Detroit City Charter clearly and unequivocally confirms that revenues generated by the providing of water and sewer services by the DWSD may only be used to pay expenses incurred in providing such services.  Specifically, Section 7-1203 of the Charter provides -

> ### Sec. 7-1203. Limitation on Funds.
>
> All moneys paid into the city treasury from fees collected for water, drainage or sewerage services **shall be used exclusively for the payment of expenses incurred in the provision of these services**, including the interest of principal of any obligations issued to finance the water supply and sewerage disposal facilities of the city, and shall be kept in separate funds.

61.     The United States District Court for the Eastern District of Michigan has recognized that the City may not use DWSD revenues for purposes that do not directly benefit the DWSD.  See **Exhibit C**, March 23, 2007 opinion by Honorable John Feikens. See also Davis v. City of Detroit, 269 Mich. App. 376, 379, 711 N.W.2d 462 (2005) (Explaining that the Detroit City Charter forbids the city from profiting from the sale of water and requires that all revenues therefrom be used only to fund the activity itself.)

62.     The Plan clearly violates M.C.L. 123.141(2), Detroit Charter Section 7-1203, and other applicable law.

    i.     *Treatment of GRS Pension Claims.*

63.     With regard to treatment of GRS Pension Claims, the Plan provides that, during "the Fiscal Years from the Effective Date through Fiscal Year 2023, annual

contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. [and that t]he exclusive sources for such contributions shall be certain City sources, **pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million**, a portion of the State Contribution and certain DIA Proceeds." <u>See</u> Plan at Section II.B.3.r.ii.A. (emphasis added).

64.    The Disclosure Statement further explains that –

> *It is not contemplated that the City will make contributions to GRS or PFRS through June 30, 2023 other than the contributions from DWSD to GRS.*

See Disclosure Statement at Section II.A.2. (emphasis added).

65.    The City claims that the DWSD is only funding its allocable share of the GRS Pension Claims, <u>See</u> Disclosure Statement at Section II.A.2 Page 22 ("DWSD will make payments to GRS on account of all of its full allocable share of the GRS UAAL . . . ."). However, it is clear that the $428.5 million payments contemplated to be made by the DWSD will be used to fund the City's pension liabilities to the GRS under the Plan necessitated, not by the operation of the DWSD, but rather through the fiscally irresponsible administering of the GRS. Any further contribution to the GRS after 2023 (over a thirty year period) by the City is an obligation so far into the future, and subject to so many variables, so as to be illusory and should not be relied on by this Court. Moreover, even assuming that the $428.5 million payment is, in fact, the DWSD's pro rata share of the obligations to the GRS, requiring it to be accelerated, when the City bears absolutely no burden, is without legal authority and undermines any suggestion

that the DWSD is only paying its proportionate share. This amount effectively exceeds the DWSD's "allocable share" and includes payments of expenses having nothing to do with the DWSD's operations.

*ii.    DWSD CVRs.*

66.    The Plan also unlawfully proposes to pay funds generated through a "Qualifying DWSD Transaction" to holders of both GRS Pension Claims and PFRS Pension Claims.

67.    Specifically, in Sections II.B.3.q.ii.D. and II.B.3.r.ii.E, the Plan proposes to "issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G." See Plan at Sections II.B.3.q.ii.D. and II.B.3.r.ii.E .

68.    The "DWSD CVR" is defined as "a single series of contingent value rights certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction." See Plan at Section I.A.112.

69.    Section IV.G. of the Plan provides that the "Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities: (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.r.ii.C. to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS." See Plan at Section IV.G. Payments on account of the DWSD CVR have nothing to do with the operation of the DWSD.

70.    The use of DWSD revenues or transaction proceeds to fund (i) the City's "settlement" with holders of GRS Pension Claims and (ii) the DWSD CVR payable to holders of Pension Claims, both of which are purposes outside of the DWSD operations, is a clear and unequivocal violation of state and local law.  Thus, the Plan may not be confirmed.

iii.    *Lack of electoral approval.*

71.    Pursuant to the Request for Information distributed by the City on or about March 25, 2014, the City, through the Plan, the City requests proposals from private parties for a "public-private partnership of the operation and management of the Detroit Water and Sewerage Systems" in the form of an operating and management agreement and/or other structure such as a long-term lease and concession agreement or sale.  These actions (i.e., taxing and/or sale of property) would require electoral approval which the City has neither obtained nor evidenced the ability to obtain.  See Charter of City of Detroit § 7-1204, County of Jackson v City of Jackson, 302 Mich. App. 90, 98-99 (Mich. Ct. App. 2013).

72.    The City has failed to obtain any of the requisite electoral approvals in violation of Section 943(b)(4) and (6).

iv.    *Lack of good faith.*

73.    In light of all of the foregoing issues with regard to the certain failure of the DWSD, it is clear that the Plan has not been proposed in good faith.

74.    Moreover, the City lacked good faith in the course of negotiating the terms of the Plan regarding the DWSD and the potential formation of a regional water

authority with Oakland County by, among other things, failing to adequately disclose necessary information to reasonably inform Oakland County of the financial and operational condition of the DWSD and precluding access to key DWSD officials.

75. Notwithstanding the apparent consensus that the DWSD represents an important component of any plan of adjustment as the DWSD (or some variation thereof) will provide vital services to millions of residents throughout Southeast Michigan, the City simply sought to impose unilateral terms with regard to such authority upon Oakland County.

76. The City has also stated that the required payment to be made by any authority to the DWSD is not open to negotiation.

77. The City's actions sought to force Oakland County to make critical billion-dollar decisions impacting millions of residents in Oakland County which Oakland County refused to do without the opportunity to perform comprehensive and professional due diligence.

78. Rather than reasonably determining whether adequate funding was available to fund payments to the City's creditors, including negotiated settlements with the holders of GRS Pension Claims, the City committed to such settlements and is now attempting to back into the amount of money needed by arbitrarily requiring, directly, the DWSD, and, indirectly, Oakland County (through illegal rate increases and/or failure of water services) to fund payments which the City does not have to spend and without the benefit of open and informed negotiations.

79.     The City's conduct in negotiating with regard to the DWSD clearly lacked good faith.  See Black's Law Dictionary (9th ed. 2009)(In its most basic sense, "good faith" means honesty in purpose, faithfulness to one's duty or obligation, observance of concepts of fair dealing, and the absence of intent to defraud or to seek unconscionable advantage.); see also In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074 (9th Cir. 2002) (citing In re Corey, 892 F.2d 829, 835 (9th Cir. 1989)) (Explaining that in order to determine good faith, a court must inquire into the totality of circumstances surrounding the plan, the application of the principle of fundamental fairness in dealing with creditors, and whether the plan itself will fairly achieve a result consistent with the objectives and purposes of the Code.); In re Kemp, 134 B.R. 413, 414-15 (Bankr. E.D. Cal. 1991); In re Jasik, 727 F.2d 1379, 1383 (5th Cir. 1984).

### C.     The Plan Contains Overly Broad And Inappropriate Third-Party Releases

80.     The Plan, at Sections D.5.-7., contains inappropriate and overly broad third party releases, injunctions, and exculpations (the "Third-Party Release").  The Plan should not be confirmed unless the Third-Party Release is removed from the Plan.

81.     The Bankruptcy Code does not authorize general non-debtor releases. In re Dow Corning Corp., 280 F.3d 648, 656 (6th Cir. 2002); In re Pacific Lumber Co., 584 F.3d 229, 253 (5th Cir. 2009) (striking non-debtor releases, except for the creditors' committee and its members, from plan); In re Metromedia Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir. 2005). Instead, the Code expressly provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any

other entity for, such debt." 11 U.S.C. § 524(e); see also Pacific Lumber Co., 584 F.3d at 253 (stating that the "fresh start § 524(e) provides to debtors is not intended to" absolve third parties from tort claims).

82.     Courts approve non-consensual third-party releases only when such releases are justified by exceptional circumstances. Dow Corning, 280 F.3d at 658; see also Metromedia, 416 F.3d at 143 (stating that "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan"); In re Zenith Electronics Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999) (approving third-party releases that were necessary to the debtor's reorganization); In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

83.     In Dow Corning, the United States Court of Appeals for the Sixth Circuit held that bankruptcy courts may enjoin non-consenting creditors' claims against a nondebtor when seven factors are present: (1) an identity of interests between the debtor and the third party; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization; (4) the impacted creditors have overwhelmingly voted for the plan; (5) the plan provides a mechanism to substantially all classes affected by the injunction; (6) the plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) the bankruptcy court made a record of specific factual findings to support its conclusions. Dow Corning, 280 F.3d at 658.

84. The City has not and cannot satisfy its burden with regard to the <u>Dow Corning</u> factors. Thus, the Third-Party Release should be stricken or confirmation should be denied.

## II.   RESERVATION OF RIGHTS.

85. Oakland County hereby reserves and preserves all of its rights, remedies, and arguments in connection with this Objection to the Plan, including, but not limited to, with respect to the finalization of the exhibit of contracts to be rejected (i.e., Exhibit II.D.6 – to be filed by the City no later than five Business Days prior to the Voting Deadline), and reserves all right(s) to supplement this Objection and to be heard before the Court with regard to the arguments set forth in this Objection, as well as reserves the right to make any other applicable arguments, including those raised in other objections and/or other joinders to the objections raised by other parties with respect to the Plan.

86. Specifically, by way illustration and not limitation, this Objection is based upon the City's representation that it intends to assume its contracts with Oakland County. To the extent the City cannot or decides not to assume such contracts, Oakland County will have additional objections to the Plan.

## III.   CONCLUSION

87. The Plan suffers from numerous legal and factual impediments to confirmation. Certain of the more significant Plan deficiencies have been highlighted herein; other deficiencies exist and will be more fully developed as discovery progresses. The financial condition of the DSWD remains questionable, at best, after the

execution of the Plan. The assumptions in the Plan regarding necessary capital improvements, increased operating revenues, decreased operating costs, reduced costs of debt service, and monies to be available to fund its capital improvement needs are overly optimistic, in some cases inaccurate, and fail to consider capital market conditions and realities. Accordingly, the Plan is not feasible. Moreover, the Plan is not proposed in good faith and violates applicable law in several material respects. For all these reasons, the Plan cannot be confirmed.

WHEREFORE, Oakland County respectfully requests, for all the reasons contained herein, that this Honorable Court deny confirmation of the Plan in its present form.

Respectfully Submitted,

Dated: May 12, 2014

**CARSON FISCHER, P.L.C.**

By: */s/ Joseph M. Fischer*
Joseph M. Fischer (P13452)
Robert A. Weisberg (P26698)
Christopher Grosman (P58693)
4111 Andover Road, West – 2nd Floor
Bloomfield, Michigan 48302-1924
Telephone: (248) 644-4840
Facsimile: (248) 644-1832
JFischer@CarsonFischer.com
RWeisberg@CarsonFischer.com
CGrosman@CarsonFischer.com

*Counsel for Oakland County, Michigan*

**<u>SUMMARY OF EXHIBITS</u>**


Exhibit A      -      OHM Report

Exhibit B      -      Reports of Credit Ratings Agencies

Exhibit C      -      March 23, 2007 Opinion by Honorable John Feikens

Exhibit D      -      Certificate of Service

1



DRAFT

# DWSD 10-Year CIP

An Independent Estimate of the 10-Year Capital Improvement Program

September 24, 2013











# Table of Contents

Summary ..........................................................................................................................1

Introduction ....................................................................................................................6

Assumptions.....................................................................................................................7

    General Assumptions.................................................................................................7

    Wastewater Treatment Assumptions (ARCADIS) .........................................................8

    Wastewater Pumping Stations and CSO Control Facilities (Wade Trim).......................9

    Water Distribution and Sewage Collection (Applied Science, Inc.) ................................10

    Water Treatment, Pumping Stations and Reservoirs (CDM Smith Michigan, Inc.).........12

    Wholesale Customer Water Meters Assumptions (ARCADIS)........................................14

    IT Project Assumptions (ARCADIS) ...............................................................................15

List of Tables and Figures

Table 1 - Summary of Independent Financial Projections for 10-Year CIP...........................2

Figure 1 - Historical & Projected DWSD CIP Expenditures for Sewage Disposal ..................3

Figure 2 - Historical & Projected DWSD CIP Expenditures for Water Supply .......................4

Figure 3 - Historical & Projected DWSD Total CIP Expenditures for
        Water Supply & Sewage   Disposal....................................................................5

Appendices

Appendix A - Sewerage - Independent Financial Projections for Detroit Water and Sewerage
        Department 10-Year Capital Improvement Plan

Appendix B - Water - Independent Financial Projections for Detroit Water and Sewerage
        Department 10-Year Capital Improvement Plan

Appendix C - General - Department Wide IT and Energy Optimization - Independent Financial
        Projections for Detroit Water and Sewerage Department 10-Year Capital
        Improvement Plan

# Detroit Water and Sewerage Department
# Independent Estimate of 10-Year Capital Improvement Program

## Summary

A 10-Year Capital Improvement estimate was developed for the Detroit Water and Sewerage Department (DWSD), on behalf of the Detroit Emergency Manager, as summarized in Table 1.  A summary of the program is provided in Figures 1 through 3, which show the proposed magnitude of capital expenditure over the 10-year period, compared to the prior history.  The historical data shows a major increase in spending that occurred from 2000 through 2009.  This included major spending on rehabilitation and replacement programs, particularly at the water and wastewater treatment plants. Also, new CSO control facilities, a new/reconstructed water treatment plant and a new system-wide SCADA system were constructed during this period.

The 10-year projection consists primarily of rehabilitation and replacement programs, focused on infrastructure that was not addressed in the prior decade.  In particular, the piping systems will require significant reinvestment, especially within the City of Detroit.  The piping costs that are allocated only to the City of Detroit could have been estimated at significantly higher costs, but were limited by the recognition that affordability is a serious constraint.

# Exhibit B - Reports of Credit Ratings Agencies



**Fitch Downgrades Detroit, MI's Sr and Sub Water Revs & Sewer Revs; Negative Watch Maintained**  Ratings  Endorsement Policy

28 Feb 2014 5:04 PM (EST)

Fitch Ratings-Chicago-28 February 2014: Fitch Ratings has downgraded the following ratings on the city of Detroit, Michigan (the city) bonds issued on behalf of the Detroit Water and Sewerage Department (DWSD) listed below. In addition, Fitch maintains the Rating Watch Negative on the bonds:

--$1.1 billion senior lien water revenue bonds to 'BB+' from 'BBB+';
--$565 million second lien water revenue bonds to 'BB' from 'BBB'.
--$1.6 billion senior lien sewer revenue bonds to 'BB+' from 'BBB+';
--$788 million second lien sewer revenue bonds to 'BB' from 'BBB'.

SECURITY

Senior lien water and sewer bonds are separately secured by a first lien on net revenues of each water and sewer system (the systems). Second lien bonds are separately secured by a second lien on the net revenues of each system after payment of senior lien bonds.

KEY RATING DRIVERS

BELOW INVESTMENT-GRADE RATING REFLECTS WEAK OPERATIONS: The system continues to exhibit weak financial performance, with fiscal 2013 unaudited results missing forecasts. Fitch believes financial improvement over the near term is unlikely given recent disclosure regarding the full scope of customer delinquencies. Fitch's concerns about delinquencies are further exacerbated by the city's status as a bankrupt entity.

UNCERTAINTY DRIVES THE WATCH: A key assumption underpinning Fitch's ratings is that water/sewer bondholders are legally protected from impairment under Chapter 9 given the clear intent of the bankruptcy code to carve out debt supported by special revenues. Nonetheless, there remains uncertainty surrounding the city Emergency Manager's (the EM) attempt to impair system bondholders under the city's Plan of Adjustment (the POA), including removal of the call provision and subordination of bondholder security interest combined with threatened reduction in interest coupon. Fitch believes that there is no legal basis to compel bondholders to accept such impairment as proposed in the POA.

SEPARATE OPERATIONS: All system funds and accounts are maintained separate and distinct from other city funds including the city's general fund. Excess system funds are invested by the bond trustee for and at the direction of DWSD.

HIGHLY LEVERAGED DEBT PROFILE: The systems' debt load is expected to remain elevated for the foreseeable future. Borrowing needs for sewers are moderate and for water, minimal.

EXPANSIVE SERVICE TERRITORY: The systems provide essential services to a broad area. The water system covers roughly 43% of Michigan's population, with over 70% of operating revenues coming from wealthier suburban customers. The sewer system includes roughly 30% of Michigan's population, with over 50% of operating revenues coming from suburban customers.

STRONG RATE-ADJUSTMENT HISTORY: The governing body has instituted virtually annual rate hikes in support of financial and capital needs. While there have been recent changes in the city's governance structure through the appointment of the EM, Fitch does not view this change as a concern at this time.

RATING SENSITIVITIES

IMPAIRMENT OF BONDHOLDERS: Fitch would almost certainly view the court's confirmation of the POA as filed, or a similar variation whereby bondholders are impaired, as a distressed debt exchange leading to a ratings downgrade to as low as 'D'.

WEAKENED FINANCIAL PROFILE: DWSD's inability to maintain at least breakeven operations would likely result in a further downgrade.

SUSTAINED RATE INCREASES AND IMPROVED COLLECTIONS: Management's ability to consistently increase rates while improving residential retail collections will be important in maintaining the rating.

CREDIT PROFILE

CHAPTER 9 LEGAL PROTECTIONS AND SEPARATION FROM CITY OPERATIONS

The ratings continue to consider Fitch's view that there is substantial protection provided to the DWSD's system debt as it constitutes special revenue obligations under Chapter 9 of the bankruptcy code. The ratings also consider a separation of system funds from other city funds as required under city charter and the bond ordinance; billing and collection of rates and charges by DWSD; relative autonomy by the department's governing structure to oversee the affairs of the system without undue influence by the city; and retention of surplus funds by the system.

DWSD is an enterprise fund of the city and therefore is not entirely free from potential city influence. Any actions taken that directly or indirectly change this historical paradigm could exert immediate and significant credit pressure on system bonds.

NEGATIVE WATCH MAINTAINED ON CITY'S PROPOSED POA

The Negative Watch continues to reflect uncertainty regarding potential event risks related to the EM's actions that attempt to impair DWSD bondholders. The filing of the POA is just another step in the process but does provide more insight on exactly how the city plans to treat all creditors.

Fitch sees no apparent reason for DWSD bondholders to accept any impairment (including voting for the POA) given the very strong legal position of this debt within Chapter 9 bankruptcy proceedings. Should the POA be confirmed as filed and thereby result in impairment to bondholders, Fitch would almost certainly view the action consistent with a distressed debt exchange and downgrade the rating on the bonds to 'D'.

The POA proposes various impairments to DWSD bondholders either if a transaction transferring operation of DWSD's assets to a regional utility authority (the GLWA) is effected or DWSD remains a department of the city. The POA provides that the holders of water and sewer operating revenue bonds would be offered competing exchange bonds (class 1B and 1D claims in the case of water and sewer bondholders, respectively) whether existing bondholders were issued exchange bonds or the bonds were cash defeased subsequent

to confirmation of the POA. For bondholders receiving exchange bonds, the security interest would also be impaired, as bondholders' current security pledge would be subordinated to a new transfer payment from GLWA to the city, with no cap of the transfer payment specified in the POA.

Bondholders voting against the POA would be impaired as a result of receiving different interest coupons than currently held, with such coupons virtually guaranteed to be lower than the existing coupons; bondholders voting for the POA may elect to receive exchange bonds with coupons that are the same as the existing bonds' coupons.

Impairments to bondholders under the POA scenario where DWSD remains a department of the city are essentially identical as under the GLWA transfer. The only exception is that existing DWSD bonds could be reinstated prior to the effective date of the POA as opposed to being cash defeased.

## WEAK FINANCIALS AND UNCERTAINTY DRIVE DOWNGRADE

The system's fiscal 2013 audited results are unavailable. The delay is due to unresolved issues relating to the city's bankruptcy filing and the application of appropriate financial accounting and related disclosures in this scenario. Recently issued DWSD unaudited results for fiscal 2013 show all-in sewer bond debt service coverage (DSC, including senior, subordinate and junior lien state revolving fund debt) at 0.95x as calculated by Fitch, well below its original projection of 1.22x. DSC for the water bonds was slightly higher at 1.14x but also below prior expectations of 1.29x.

The decrease in DSC is primarily due to a decline in retail and wholesale revenues. The sewer system met its sum-sufficient rate covenant for fiscal 2013 largely due to the bond documents' exclusion from net revenues non-cash annual OPEB accrued expenses (totaling $13.6 million). This approach differs from Fitch's calculation of DSC which incorporates financial accruals. Bond ordinance debt service coverage based on the unaudited results for sewer was 1.02x and for water was 1.24x.

Significant delinquencies by city retail customers likely also account for some of the revenue decline. While the system has experienced above-average delinquencies for several years, new delinquent account information provided by DWSD reveals the severity of the problem. Approximately 65% of the city's residential water and sewer customers are at least 60 days delinquent as of Jan. 3, 2014. Fitch believes the recent disclosure in conjunction with challenges to remedy this issue in the already pressured operating environment supports a below investment-grade credit profile. Management reports addressing the delinquency problem is a top priority and has begun implementation of more timely shut-offs.

Fitch believes the system's liquidity metrics likely remain below average although unrestricted cash balances for fiscal 2013 have not been fully reported. As of the most recent financial audit (fiscal 2012), days cash on hand was a relatively low 131 days for sewer and 183 days for water.

DWSD estimates that fiscal 2014 revenues to date are running below budgeted levels, again, due to lower system billings. The systems' operating expenses are estimated to be under budget as a result of attrition and other non-personnel cuts. DSC for fiscal 2014 is projected to total 1.3x for sewer and 1.35x for water. However, Fitch believes DWSD may have difficulty achieving the level of revenue growth forecasted assuming base year revenues from 2013 unaudited results. Consequently, Fitch expects fiscal 2014 DSC to be lower than DWSD's projections, possibly significantly.

Sewer system revenues are likely to perform closer to projections starting in fiscal 2015 because of a recently adopted process to simplify rate setting for all suburban sewer customers. Under the new process, suburban customers will have one fixed-rate to pay on a monthly basis, eliminating fluctuations that are typical with volumetric charges. Currently, volumetric charges account for approximately 65% of the suburban sewer bill.

## LOSS OF LARGEST WATER CUSTOMER INTERMEDIATE TERM PRESSURE

DWSD is poised to lose its largest wholesale customer when the 35-year contract to sell water to Flint, MI expires on April 16, 2014. Flint accounted for $22 million (or 6%) of the system's total billed revenue for fiscal 2013. Flint's departure from the system is expected to happen sometime over the next three to five years, adding pressure to DWSD's already narrow finances.

The rating assumes relative stability in the wholesale customer base. Management maintains that there are few viable options other than DWSD for most wholesale customers to purchase treated water. The system's ability to absorb the revenue impact from losing its largest customer and maintain all-in sum-sufficient DSC is key to stability in underlying credit quality.

## SYSTEM LEVERAGE REMAINS HIGH

Fitch expects leverage for both systems to remain high for the foreseeable future. DWSD's sewer debt profile is relatively weak with long-term debt per customer totaling a high $3,830 for sewer and $2,079 for water. Principal payout is slow with only 28% of sewer debt maturing in 10 years; 26% for water.

The systems' 2015-2019 capital improvement plans (CIP) total approximately $505 million each for water and sewer. Near-term debt issuances totaling $128 million for sewer is expected in fiscal 2015 with $155 million for water in fiscal 2016.

The water CIP is largely unchanged from the previous plan and the sewer CIP reflects a 31% decrease in planned spending. Capital cost containment reflects management efforts to preserve cash by deferring certain projects for approximately 18 months. Management has also planned the deferral of certain capital projects while it completes and implements a strategic facilities plan (SFP) during fiscal 2014. The SFP will prioritize future capital investments.

## BROAD SERVICE AREA ENHANCES SYSTEM STABILITY

The water system is a regional provider serving around 4.2 million people or nearly 43% of Michigan's population, including the city's population of over 700,000. The system serves the city on a retail basis and 124 communities through 84 wholesale contracts. The service territory consists of an area of 138 square miles in Detroit and 981 square miles in eight counties.

The sewer system is a regional provider serving around 2.8 million people or nearly 30% of Michigan's population, including the city. The system serves the city on a retail basis and 76 communities through 22 wholesale contracts. The service territory consists of an area of 138 square miles in Detroit and 850 square miles in three counties.

Population and customer growth for both systems have experienced modest annual declines for a number of years. Detroit's population in particular has experienced continuous decline, but suburban areas have picked up most of the migration.

## CONSISTENT SYSTEM RATE INCREASES

The board has consistently raised rates to meet financial and capital needs. However, unfavorable operating conditions (including very high delinquencies) and rising fixed costs have muted the positive revenue impact. For fiscal 2013, the board raised charges 9.9% and 6.7% for city retail and suburban wholesale customers, respectively. For fiscal 2014, DWSD implemented 4% increases on July 1 and another 4% increase has been proposed for fiscal 2015. Annual increases of 4% are preliminarily forecast for fiscals 2016-2019.

Rate flexibility is hampered by weak income levels in the city. Retail rates for the sewer system well exceed Fitch's 1% of median household income (MHI) affordability benchmark (1.8%) given the weak MHI within the city. The water system's retail rates remain around Fitch's MHI.

Contact:

Primary Analyst
Adrienne M. Booker
Senior Director
+1-312-368-5471

Fitch Ratings, Inc.
70 W. Madison Street
Chicago, IL 60602

Secondary Analyst
Doug Scott
Managing Director
+1-512-215-3725

Committee Chairperson
Jessalynn Moro
Managing Director
+1-212-908-0608

Media Relations: Elizabeth Fogerty, New York, Tel: +1 (212) 908 0526, Email: elizabeth.fogerty@fitchratings.com.

Additional information is available at 'www.fitchratings.com'.

In addition to the sources of information identified in Fitch's Revenue-Supported Rating Criteria, this action was additionally informed by information from Creditscope.

Applicable Criteria and Related Research:

--'Revenue-Supported Rating Criteria' (June 2013);
--'U.S. Water and Sewer Revenue Bond Rating Criteria' (July 2013);
--'2014 Water and Sewer Medians' (Dec. 2013);
--'2014 Outlook: Water and Sewer' (Dec. 5, 2013).

**Applicable Criteria and Related Research:**
2014 Outlook: Water and Sewer Sector
2014 Water and Sewer Medians
U.S. Water and Sewer Revenue Bond Rating Criteria
Revenue-Supported Rating Criteria

**Additional Disclosure**
Solicitation Status

ALL FITCH CREDIT RATINGS ARE SUBJECT TO CERTAIN LIMITATIONS AND DISCLAIMERS. PLEASE READ THESE LIMITATIONS AND DISCLAIMERS BY FOLLOWING THIS LINK: HTTP://FITCHRATINGS.COM/UNDERSTANDINGCREDITRATINGS. IN ADDITION, RATING DEFINITIONS AND THE TERMS OF USE OF SUCH RATINGS ARE AVAILABLE ON THE AGENCY'S PUBLIC WEBSITE 'WWW.FITCHRATINGS.COM'. PUBLISHED RATINGS, CRITERIA AND METHODOLOGIES ARE AVAILABLE FROM THIS SITE AT ALL TIMES. FITCH'S CODE OF CONDUCT, CONFIDENTIALITY, CONFLICTS OF INTEREST, AFFILIATE FIREWALL, COMPLIANCE AND OTHER RELEVANT POLICIES AND PROCEDURES ARE ALSO AVAILABLE FROM THE 'CODE OF CONDUCT' SECTION OF THIS SITE. FITCH MAY HAVE PROVIDED ANOTHER PERMISSIBLE SERVICE TO THE RATED ENTITY OR ITS RELATED THIRD PARTIES. DETAILS OF THIS SERVICE FOR RATINGS FOR WHICH THE LEAD ANALYST IS BASED IN AN EU-REGISTERED ENTITY CAN BE FOUND ON THE ENTITY SUMMARY PAGE FOR THIS ISSUER ON THE FITCH WEBSITE.

Copyright © 2014 by Fitch Ratings, Inc., Fitch Ratings Ltd. and its subsidiaries.



**STANDARD & POOR'S**
**RATINGS SERVICES**
**McGRAW HILL FINANCIAL**

# RatingsDirect®

..............................................................................................................................

# Detroit Water And Sewer Revenue Bond Ratings Lowered To 'CCC' On Vulnerability To Default; Remains On Watch Negative

**Primary Credit Analyst:**
Scott D Garrigan, Chicago (1) 312-233-7014; scott.garrigan@standardandpoors.com

**Secondary Contact:**
Corey A Friedman, Chicago (1) 312-233-7010; corey.friedman@standardandpoors.com

CHICAGO (Standard & Poor's) March 25, 2014--Standard & Poor's Ratings Services said that it has lowered its ratings on Detroit's water and sewer revenue bonds to 'CCC' from 'BB-'. The ratings remain on CreditWatch with negative implications, indicating that Standard & Poor's could lower them further within 90 days as the city moves through the bankruptcy process.

"We lowered our rating because we view the obligations as currently vulnerable to nonpayment," said Standard & Poor's credit analyst Scott Garrigan. In Standard & Poor's view, the city's Plan of Adjustment indicates that the treatment of the water- and sewer-related debt classes could involve an exchange offer where investors receive less value than the promise of the original securities. We view such an exchange as tantamount to a default.

"We could remove the rating from CreditWatch, or even raise the rating," said Mr. Garrigan, "if we determine that there is a diminished likelihood of an exchange offer involving less value than the original promise." In determining this, we will consider the answers to additional information as we consider appropriate, based on our criteria.

RELATED CRITERIA AND RESEARCH

Related Criteria
• Criteria For Assigning 'CCC+', 'CCC', 'CCC-', And 'CC' Ratings, Oct. 1, 2012

13-53846-tjt   Doc 4627   Filed 05/12/14   Entered 05/12/14 16:05:03   Page 35 of 45

Related Research
- Rating Implications Of Exchange Offers And Similar Restructurings, May 12, 2009


Complete ratings information is available to subscribers of RatingsDirect at www.globalcreditportal.com and at spcapitaliq.com. All ratings affected by this rating action can be found on Standard & Poor's public Web site at www.standardandpoors.com. Use the Ratings search box located in the left column.  Alternatively, call one of the following Standard & Poor's numbers: Client Support Europe (44) 20-7176-7176; London Press Office (44) 20-7176-3605; Paris (33) 1-4420-6708; Frankfurt (49) 69-33-999-225; Stockholm (46) 8-440-5914; or Moscow 7 (495) 783-4009.

**Exhibit C - March 23, 2007 Opinion by Honorable John Feikens**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff and Counter-Defendant,

vs.
                                   Civil Action No. 77-71100
                                   Honorable John Feikens

STATE OF MICHIGAN,

      Defendant and Cross-Plaintiff
      And Cross-Defendant,

vs.

CITY OF DETROIT, a municipal corporation, and
DETROIT WATER AND SEWERAGE DEPARTMENT,

      Defendant and Cross-Plaintiff,

vs.

ALL COMMUNITIES AND AGENCIES UNDER
CONTRACT WITH THE CITY OF DETROIT FOR
SEWAGE TREATMENT SERVICES, *et al.*

_____

**OPINION AND ORDER REGARDING 800 MHZ
RADIO CONTRACT COST ALLOCATION**

On December 18, 2006, I issued an order adopting the finding of the Special Master that

the approximately $38.8 million paid by the Detroit Water and Sewerage Department (DWSD)

to the City of Detroit for its share of the 800mhz radio contract exceeded the amount it should

have paid relative to the City of Detroit. Detroit has moved for reconsideration of that decision,

and the parties have submitted briefing regarding the proper allocation. As explained below, I

find the total charges attributable to DWSD for the radio system total $14,630,000.

**I. MOTION FOR RECONSIDERATION**

Detroit contends that the Special Master found at the outset that its allocation method was

appropriate, and therefore it was inappropriate for this Court to interpret the Special Master's

report as finding an improper calculation. (Mot. at 2.) It seeks to have this Court reconsider its

adoption of the finding of improper allocation.

Detroit misstates the Special Master's findings.  He stated only that the initial allocation "may" have been appropriate – language Detroit quoted in its motion.  However, since Detroit seeks to revisit the Special Master's findings in some detail and precision, I note the Special Master was unequivocal on the point that the Special Administrator's approval of the radio contract was in violation of a standing order of this Court, in that the radio contract was never submitted to the Infrastructure Management Group (IMG) for its review.  (Report and Recommendation, 21.)  The Special Master also noted that following this Court's order would have resulted in a review of the allocation before the contract was put into place – which I note might have avoided this controversy altogether.  I find it very surprising that Detroit wishes me to reconsider the exact findings of the Special Master as to allocation, since that highlights the question of whether this Court ought to adopt his finding regarding disobedience of this Court's order.  Despite Detroit's invitation to revisit the report, and because recent oversight meetings demonstrate that DWSD is taking more care in submitting all qualifying contracts for IMG's review, I will not proceed down that path.

I read the Special Master's report as finding that a reallocation of the costs of the radio system ought to be done, and that necessitates the underlying conclusion that the original method of allocation resulted in the Detroit Water and Sewerage Department paying more than its share of the radio system.  Therefore, I DENY the motion for reconsideration, and turn to the issues regarding that reallocation.

## II.  STANDING

Detroit argues that Wayne, Macomb, and Oakland counties have no standing to make

2

filings regarding the radio contract.  (Detroit Br. of January 4, 2007 at 5.)  Detroit's theory is essentially that because the money spent for the radio system would have been spent on other projects that would benefit the counties had the radio contract not been built, there is no effect on the rates.  (Id. at 5-6.)  The lack of effect on the rates, this theory posits, creates an inability of the suburbs to show injury in fact, a requirement explained in cases including Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

This argument is fatally flawed.  At its essence, the radio contract allocation question is a question of whether the DWSD and its customers paid more for the radio system than can be justified given the benefit they receive from the system.  That DWSD would have used the money, or will use any repayment, to fund projects that benefit the paying customers more than the radio system benefits them does not deprive customers of standing; it demonstrates it.  As long as the ratepayers are billed for debt service for a project that insufficiently benefitted them, which is the concern here, those ratepayers are being injured, and therefore meet that requirement for standing.

## III.  NON-ALLOCATION ARGUMENTS

In the briefs I requested regarding allocation, the parties make a number of arguments that I do not consider relevant to that question, and I will not address them here.[1]

## IV.  ALLOCATION

All parties agree that DWSD paid 60 percent of the infrastructure costs of the radio

---

[1]I will note these arguments range from the reasonable to the laughable (including the suggestion that sewer services are not crucial to restore rapidly in emergency situations, despite the obvious health risks created by either having standing sewage in homes or turning our waterways into sewers).

3

project, or approximately $38.7 million.  (Detroit Br. of Jan. 4, 2007, 4; Macomb Br. of Jan. 4, 2007, 1; Oakland Br. of Jan. 4, 2007, 2; Wayne Br. of Jan. 4, 2007, 2.)  Before indicating what costs I believe are properly assessed against DWSD, and thus what repayment is needed by the City of Detroit, I wish to make some preliminary observations.

First, any review of these costs indicates an overpayment by DWSD.  One notable example of an unreasonable factor in DWSD's attempted justification of the infrastructure cost allocation is the consideration of operation and maintenance.  (See Field Declaration at 6.) Operation and maintenance is not considered a capital expense.  See Water Environment Federation, Financing and Charges for Wastewater Systems 28-9 (2004) (discussing operation and maintenance charges as separate from and different from "capital-related budgets.").  Therefore, any allocation of radio infrastructure, a capital expense, should not include costs of operation and maintenance of that system, which is handled entirely differently.

On the other hand, it is proper to add to the calculation those costs attributable to the addition of usage by the State of Michigan's Public Safety Communication System (MPSCS).  I understand some suburban customer's argument that because MPSCS is a taxpayer-funded system, and all residents of southeast Michigan are taxpayers, they ought to be allowed to use the state's system for free.  Even if I agreed with the argument, as with many things in life, the fact is that what ought to have happened here and what did happen here are different.  The state government did not agree to allow the City of Detroit and DWSD to attach infrastructure to MPSCS towers, or otherwise benefit from the MPSCS infrastructure, for free.   Instead, there were certain costs to using MPSCS infrastructure, though those costs were vastly lower than would have been necessary to construct a stand-alone system with duplicate towers.  Since

4

DWSD is responsible for the out-City use that made this accommodation necessary, I must take MPSCS costs into consideration when determining what the overall share of the radio system that should be borne by DWSD.

With those points out of the way, I will turn to what I feel is an appropriate allocation of the system costs for DWSD to bear. I will discuss each point in turn, but begin with a summarizing table:

| Reason for Cost | Amount[2] |
|---|---|
| Augmentation of City radio infrastructure with hardware and software to allow it to connect to the MPSCS | $581,000 |
| Provision by the City of equipment to augment existing MPSCS towers to support additional DWSD loading | $900,000 |
| One-time reimbursement fee to the State for MPSCS infrastructure use | $250,000 |
| Cost for DWSD subscribers or state users to use City infrastructure inside Detroit, using usage data, less an allocation for the benefit of the City of Detroit | $6,399,000 |
| Cost of adding three voice channels for MPSCS use | $6,500,000 |
| **TOTAL COST ALLOCATED TO DWSD** | **14,630,000** |
| **TOTAL REIMBURSEMENT** | **24,070,000** |

As explained above, costs attributable to MPSCS should be considered as part of the allocation of DWSD's share of the system. As part of the deal worked out with the State of Michigan, DWSD had to make its system and the MPSCS interoperable. According to the Field declaration, the approximate amount to augment the City's radio infrastructure with the hardware and software it needed to connect to the MPSCS system was $581,000, and therefore I

---

[2]I note these are approximate figures, as were most of the figures in the briefs.

5

include it in the cost of the DWSD allocation. (Detroit Br. of January 4, 2007, Exh. 1.) Similarly, the equipment needed to make the towers outside of the City limits compatible with carrying DWSD radio calls is appropriately allocated to DWSD, and the Field declaration sets that amount at approximately $900,000. (Id.) The one-time fee required by the State to allow use of the MPSCS infrastructure was $250,000, and for the reasons I have just stated, this too is properly allocated as a DWSD expense.

I now come to the two sizable charges. The first charge is the approximate cost of having DWSD or state users use infrastructure inside the City of Detroit, . Actual usage data for five months showed an average of approximately 18 percent of total call durations were attributable to non-City talkgroups. (Field Declaration 6.) Using that data, the cost for DWSD subscribers to use City infrastructure inside Detroit is approximately $8.1 million, which is appropriately charged to DWSD as a cost. (Id. at 7.) However, I note that even if the calls are being made by non-City talkgroups, since the state of Michigan serves all of the citizens of Southeast Michigan, those calls are likely for the benefit of City residents, at least in part. Therefore, I have adjusted the $8.1 million figure to reflect the City's calculation that 21 percent of the citizens in the service area are City residents, and therefore assumed a cost to DWSD of $6,399,000 for that item.

Finally, I come to the $6.5 million cost of adding voice channels for MPSCS use. The Field declaration stated that the cost of adding three channels that are necessary to accommodate the MPSCS system was approximately $6.5 million. These channels are essentially akin to necessary infrastructure to allow the MPSCS usage, and therefore are appropriately charged to DWSD. (Field declaration, 6-7.)

6

No other charges appear to me to be appropriate. The total of the above charges is $14,630,000. Given that $38.7 million was what DWSD has paid, the difference is approximately $24,070,000. I hereby ORDER representatives of both the City and DWSD, as well as any other party that wishes to participate, to attend a conference on April 11, 2007 at 2:00 P.M., to determine both the precise (instead of approximate) figure to be repaid, as well as the payment method. I note this Court would be amenable to an agreement that allows this figure to be repaid over time.

## V. CONCLUSION

The total charges attributable to DWSD for the radio system total approximately $14,630,000. A conference regarding possible methods for repayment of the resulting $24,070,000 is hereby set for April 11, 2007. **IT IS SO ORDERED.**


Date:  March 23, 2007                    s/John Feikens

                                         United States District Judge

```
+--------------------------------------------+
|              Proof of Service              |
|                                            |
| I hereby certify that the foregoing order  |
| was served on the attorneys/parties of     |
| record on March 23, 2007, by U.S. first    |
| class mail or electronic means.            |
|                                            |
|                         s/Carol Cohron     |
|                         Case Manager       |
+--------------------------------------------+
```

7

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| In re: | ) | Case No. 13-53846 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | In Proceedings Under |
| | ) | Chapter 9 |
| Debtor. | ) | |
| | ) | Hon. Steven W. Rhodes |
| | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I, Joseph M. Fischer, hereby certify that the foregoing *Oakland County's Objection To Confirmation Of The City of Detroit, Michigan's Proposed Fourth Amended Plan Of Adjustment* was filed and served via the Court's electronic case filing and noticing system on this 12th day of May, 2014.

       */s/ Joseph M. Fischer*
       Joseph M. Fischer (P13452)

1