_____

In re:                                        )
                                              )
                                              )     Case No. 13-53846
CITY OF DETROIT, MICHIGAN                     )
                                              )     Chapter 9
          Debtor                              )
                                              )     Hon. Steven W. Rhodes
_____ )

**OBJECTION OF COUNTY OF MACOMB, MICHIGAN, BY AND
THROUGH ITS COUNTY AGENCY, THE MACOMB COUNTY
PUBLIC WORKS COMMISSIONER, AND THE MACOMB INTERCEPTOR
DRAIN DRAINAGE DISTRICT TO FOURTH AMENDED PLAN
FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT AND
THE ASSUMPTION OF SEWER CONTRACTS**

County of Macomb, Michigan, a Michigan Constitutional corporation, by and through its

County Agency, Anthony V. Marrocco, the Macomb County Public Works Commissioner

("Macomb"), and the Macomb Interceptor Drain Drainage District (the "MIDDD," and together

with Macomb, the "Macomb Parties"), creditors and parties in interest in the above-captioned

Chapter 9 bankruptcy case, hereby object[1] to the Fourth Amended Plan for the Adjustment of

Debts of the City of Detroit [Docket No. 4392] (the "Plan"),[2] and, to the assumption of the OMI-

Detroit Agreement (as defined below) and any other contracts related to the provision of sewer

services to Macomb County.

---

[1]   The Macomb Parties file this objection in accordance with the deadline for objections to the Plan pursuant to the Fourth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Docket No. 4202] (the "Scheduling Order"). The Macomb Parties have not had an opportunity to take any depositions. Moreover, although the Macomb Parties have received document discovery from the Debtors, the volume of that production (over 31,000 documents comprised of over 250,000 pages) has made impossible any meaningful review prior to the May 12, 2014 objection deadline. The Macomb Parties reserve all rights to file a supplemental objection on or prior to the July 18, 2014 deadline set in the Scheduling Order, or such later deadline as the Court may set by subsequent order.

[2]   Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

19270619

## PRELIMINARY STATEMENT

Through a series of agreements detailed below, the citizens of Macomb pay for wastewater disposal services administered by the Detroit Water and Sewerage Department (the "DWSD"). The DWSD is a public service monopoly that exists for the benefit of the citizens who use its services. Because this monopoly's consumers are particularly vulnerable to being overcharged for the services that it supplies, and because the DWSD has historically been mismanaged, it is subject to stringent public oversight to help ensure that it is managed and operated for the benefit of those who use its services, and not for the sake of any other interest. To that end, various laws and court orders regulate the operation and oversight of the DWSD and collectively direct that the assets and operations of the DWSD, in particular its revenues, cannot be diverted for non-DWSD purposes.

Recognizing that the reorganization of a municipality and its departments is not like the reorganization of a private business, the provisions of Chapter 9 of the Bankruptcy Code include special requirements designed in part to preserve and protect the efficacy of local laws in regulating the municipality's affairs. Of particular relevance here are certain local laws designed to ensure that public service monopolies controlled by the municipality will continue to be operated solely for the benefit of the citizens they serve and not be co-opted for other purposes. In this regard, section 943(b)(4) of the Bankruptcy Code directs that the Court may confirm a municipality's plan only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4). In addition, under section 943(b)(6), the debtor is required to either obtain "any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan" or to provide that "such provision is expressly conditioned on such approval." 11 U.S.C. § 943(b)(6). Critically, the Court has no authority to suspend these provisions; they are mandatory requirements designed to

2

preserve the integrity of state and local regulation of the municipality's affairs. In addition to these requirements, the Court must also determine that the municipality's plan "is in the best interests of creditors and is feasible." 11 U.S.C. § 943(b)(7), and likewise satisfies other applicable confirmation criteria.

The Debtor's plan in this case violates these requirements. First, through the Plan, the City of Detroit (the "<u>Debtor</u>" or the "<u>City</u>") indisputably intends to use the assets and operations of the DWSD, including in particular cash flow that must, by law, be devoted to the provision of wastewater disposal services, to fund various shortfalls in its other obligations contrary to applicable nonbankruptcy law. Second, the Plan fails to provide for or condition these dispositions on necessary regulatory or electoral approval. Third, the plan is not feasible.

Fourth, the diversion of the DWSD's revenues to purposes other than the provision of wastewater disposal services necessarily will cause the rates for these services to rise, severely prejudicing the citizens of Macomb County who are being asked to subsidize the City's obligations. The City attempts, by the Plan, to affect rates and rate protocols which, pursuant to certain District Court orders and the DWSD's by-laws, is a task exclusively reserved for the DWSD's governing board, the Detroit Board of Water Commissioners. Thus, the Plan violates section 1129(a)(6) of the Bankruptcy Code.

Worse, the inevitable and improper rate increases would be exacerbated by the sale (or similar disposition) of DWSD assets and operations to a private investor. After all, the interest of any private investor can only be to earn a profit, not provide public wastewater disposal services at cost. At a bare minimum, these dispositions cannot be accomplished unilaterally without the requisite regulatory and electoral approvals. Because the Plan does not provide for these approvals, it cannot be approved.

Finally, the Plan unfairly discriminates among general unsecured creditor classes, including Class 14 in which the MIDDD Claim (as defined below) is likely to be classified, and otherwise violates applicable confirmation criteria. Thus, the Plan does not meet the requirements of section 1129(b) and thus cannot be confirmed over the objection of dissenting classes of unsecured creditors.

## BACKGROUND

A.     **Macomb's Relationship with the Debtor**

1.      Macomb is a party to the Wastewater Disposal Services Contract (the "Macomb-OMI Agreement"), dated as of September 30, 2009, between Macomb and Oakland-Macomb Interceptor Drain Drainage District ("OMI"). OMI, in turn, is a party to the Wastewater Disposal Services Contract (the "OMI-Detroit Agreement"), dated October 22, 2009, between OMI and the City, by its Board of Water Commissioners.

2.      Prior to its entry into the Macomb-OMI Agreement, Macomb, through the Macomb County Wastewater Disposal District (the "MCWDD"), was a direct wholesale customer of the DWSD with respect to the collection, transportation, and treatment of Macomb's wastewater by the DWSD. Pursuant to a purchase agreement dated October 22, 2009, the Debtor transferred to OMI ownership of the interceptors, pump stations, meters, and appurtenant facilities owned by the Debtor in Macomb County, commonly known as the ITC Corridor Interceptor, the Oakland Arm Interceptor, and the Avon Arm Interceptor.

3.      Pursuant to the Macomb-OMI Agreement, OMI transports wastewater from Macomb and Oakland County ("Oakland") to Detroit for treatment and disposal, and Macomb pays OMI for those services at rates based upon rates that the DWSD charges OMI, plus costs and charges incurred by OMI for providing the services. Pursuant to the OMI-Detroit Agreement, OMI is a wholesale "First Tier Customer" of the DWSD, and the DWSD charges

4

OMI for wastewater flow delivered to the DWSD system at rates established by the Debtor through its cost allocation and rate design processes. Accordingly, any fluctuations in rates charged by DWSD to OMI under the OMI-Detroit Agreement flow directly through to the ratepayers in Macomb County pursuant to the rate structure under the Macomb-OMI Agreement. Moreover, the OMI-Detroit Agreement specifically provides that Macomb is an intended third party beneficiary of that OMI-Detroit Agreement and that Macomb, on behalf of the MCWDD, has the status of a "Tier 1 Customer" of the DWSD.

4. Revenues from the Counties and municipalities within the Counties for water and sewer services account for approximately 65% of total DWSD revenue.

B. **History of Mismanagement**

5. DWSD ratepayers have historically paid higher rates than necessary due, in part, to a history of corruption and mismanagement that has diverted capital from DWSD systems. The most recent highly-publicized example of such mismanagement occurred during the tenure of former mayor Kwame Kilpatrick. In 2001, in United States v. City of Detroit, E.D. Mich. Case No. 77-7110—a case relating to the DWSD's compliance with the federal Clean Water Act that had been pending since 1977 (the "Clean Water Act Case")—the United States District Court for the Eastern District of Michigan (the "District Court") entered an order appointing Kilpatrick (like the two mayors that preceded him) Special Administrator of the DWSD. In 2002, Kilpatrick appointed Victor Mercado as director of the DWSD and his former Deputy Chief of Staff, Derrick Miller, as Chief Administrative Officer. As the First Superseding Indictment dated December 15, 2010 charges, Kilpatrick, Mercado, Miller, and Kilpatrick's father, Bernard, conspired to extort municipal contractors by coercing them to include contractor Bobby Ferguson in public contracts and/or by rigging the award of public contracts to ensure Ferguson obtained a portion of the revenue from those contracts. As a result, Ferguson obtained

5

tens of millions of dollars from municipal contractors, which Ferguson shared with Kilpatrick and the other members of the enterprise. After trial and conviction, Kilpatrick was sentenced to 28 years in prison, Ferguson was sentenced to 21 years, and Bernard Kilpatrick was sentenced to 15 months. Mercado and Miller plead guilty to conspiracy and tax evasion counts, respectively, and await sentencing.

6. As a result of the criminal conduct of the former mayor and his accomplices, Macomb County, through MIDDD, is owed not less than $26 million in damages for overcharges relating to the repair of the collapse of the Macomb Interceptor Sewer at 15 Mile Road in the City of Sterling Heights (the "MIDDD Claim").[3] Prior to the filing of this Chapter 9 case, MIDDD filed suit to collect the MIDDD Claim against the Debtor in the Circuit Court for the County of Macomb. Macomb Interceptor Drain Drainage District v. City of Detroit, Case No. 13-1904-CZ.

C.      **Current DWSD Governance**

7. In 2011 and 2012, in response to the historic mismanagement of the DWSD, the District Court entered orders in the Clean Water Act Case concerning the governance of the DWSD (the "DWSD Governance Orders"), which orders were incorporated into the DWSD's by-laws. Pursuant to the DWSD Governance Orders, among other things: (1) the Board of Water Commissioners (the "Board"), made up of four residents of Detroit, and one resident from each of the Counties, has sole authority for setting and approving wholesale water and sewerage rates, (2) the Director, upon authorization by the Board, has final authority to approve, among other things, the DWSD budget subject to the approval of rates by the Board, and (3) Board approval must be sought for procurements that exceed specified monetary

---

[3]      On May 2, 2014, MIDDD timely filed a proof of claim with respect to the MIDDD prior to the bar date for governmental claims.

thresholds. <u>See</u> By-Laws for the Detroit Water and Sewerage Department Board of Water Commissioners, Article XVIII.

D. **Negotiations Regarding a Regional Water Authority**

8. Also as a result of previous mismanagement, the City and the Counties discussed the creation of a regional water and sewer authority (a "<u>Regional Authority</u>") to take over water and sewer service from the DWSD, which would give the Counties a greater share in the governance of the system. These discussions began months prior to the filing of the Debtor's Chapter 9 case. In August 2013, the Emergency Manager, through its financial advisor, Miller Buckfire, submitted a draft lease and term sheet to Macomb, Oakland, and Wayne County (the "<u>Counties</u>") containing its proposal for the Regional Authority. The proposal was on its face, unacceptable to the Counties. The parties, however, continued negotiating and, in January 2014, the Debtor and the Counties made progress toward a memorandum of understanding (the "<u>MOU</u>") that included two key elements: (1) a base lease payment from the Regional Authority to the Debtor, and (2) the assumption of the DWSD pension liabilities by the Regional Authority. The Debtor, however, proposed that the lease payment should be $47 million per year on a "take it or leave it" basis. The Counties requested certain financial due diligence relating to the peremptory $47 million demand, as well as data regarding the amount of pension liabilities. The Debtor, however, failed to produce vital information in response to diligence requests, and the Debtor and Counties fundamentally disagreed regarding the details of the lease payment and pension assumption. Thus, the Counties did not sign the MOU.

E. **Potential Private Transaction**

9. On or about March 25, 2014, the Debtor distributed a Request for Information (the "<u>RFI</u>") to potential private operators of the DWSD's water and sewer systems. The RFI requests proposals from private parties for a "public-private partnership of the operation

7

and management of the Detroit Water and Sewage Disposal Systems" in the form of an operating and management agreement. The RFI also states that the Emergency Manager will consider structures such as a long-term lease and a concession agreement or sale.

        F.      **The Plan and Disclosure Statement**

        10.     After filing several prior iterations of its plan of adjustment and accompanying disclosure statement, the Debtor filed the Plan and Fourth Amended Disclosure Statement with respect to the Plan [Docket No. 4391] (the "Disclosure Statement") on May 5, 2014. Also on that date, the Court entered an order approving the Disclosure Statement [Docket No. 4401].

        11.     The Plan proposes to implement the Debtor's settlement (the "GRS Settlement") with the General Retirement System for the City of Detroit (the "GRS"). DWSD employees and retirees participate in the GRS along with employees and retirees of other City departments, other than police and firefighters. Pursuant to the GRS Settlement, the City's unfunded actuarial accrued liabilities ("UAAL") in the GRS pension fund assertedly are $2.037 billion (Disclosure Statement at 12). The UAAL would be funded, in part, by a payment by the DWSD of UAAL attributed to it by the City over 9 years, rather than over a much longer period of time (the "DWSD Pre-Funding"). See Disclosure Statement at 21. That funding would be derived from rates charged by the DWSD to its customers, including Macomb, through June 20, 2023. See id. For the first ten years following the bankruptcy, the DWSD, a public service monopoly which derives approximately 65% of its total revenues from suburban communities outside the Debtor's corporate limits, would be the sole City department contributing to the GRS system for *all* Detroit retirees and employees. The Debtor proposes that a portion of GRS UAAL will be funded by proceeds of a "settlement" regarding the Detroit Institute of Arts,

pursuant to which the State of Michigan and certain charitable foundations are expected to contribute $258.4 million over the ten-year period.

12.     According to the Debtor, the amount of GRS UAAL allocable to the DWSD is $428.5 million (Disclosure Statement at 59), which the Debtor proposes to be paid by the DWSD in installments of $65.4 million in 2015, and $45.4 million in each of the years 2016 through 2023.  (See Plan Exhibit II.B.3.r.ii.A).  Those payments would be vastly greater than the DWSD's recent total pension contributions of:  $11.6 million in 2009, $11.4 million in 2010, $19.7 million in 2011, $10.9 million in 2012, and $24.3 million in 2013.  See Disclosure Statement at 89.

13.     The Plan also provides for the establishment of a "Restoration Trust" for the acknowledged purpose of potentially restoring certain pension benefits otherwise compromised pursuant to the Plan for both the GRS and the Police and Fire Retirement System for the City of Detroit (the "PFRS").  See Plan at 47.  The Restoration Trust would hold the "DWSD CVR," which is a "single series of contingent value right certificates representing the right to receive 50% of the net proceeds resulting from a 'Qualifying DWSD Transaction.'  Plan at 9.  The Plan defines "Qualifying DWSD Transaction" as "a potential transaction involving the transfer to a third party of a majority of the assets of, or the operation and management of, the City's water and/or sewage disposal systems currently operated by the DWSD."  Plan at 19.  In other words, not only would the DWSD be required, at the expense of the Counties, to fund shortfalls in the GRS pension, but the Plan envisions that the sale or other potential disposition of the DWSD's assets would restore ostensibly compromised benefits of the GRS and the PRFS, i.e. benefits that cannot be funded due to the funding shortfalls of both pension systems.  The contemplated benefit could only come at the expense of ratepayers.

9

14.     Although the potential creation of a Regional Authority was included in prior iterations of the Plan and Disclosure Statement, the Debtor removed the concept after concluding that negotiations had run their course.  See Disclosure Statement at 145.  On April 17, 2014, however, the Court entered an order [Docket No. 4156] requiring the Debtor and the Counties to mediate the issue of whether to create a Regional Authority and all other issues related to the DWSD.  Thus, a Regional Authority may return as a component of the Plan, and, although unclear, may be considered a "third party" for purposes of the definition of "Qualifying DWSD Transaction."  Assuming it is, 50% of any sale proceeds, lease payments, or payments pursuant to a management contract received by the DWSD under either a Regional Authority structure or a public-private partnership shall be paid into the City's General Fund, and 50% will be allocated to the GRS pension fund and PFRS pension fund (even though no DWSD employee is a PFRS employee), and none of such funds will be retained by the DWSD for use in its water and sewer systems.

15.     In addition, the Plan provides for the impairment of bonds secured by the DWSD water and sewer revenues, which is likely to significantly increase the cost of future borrowings.

## ARGUMENT

16.     A Chapter 9 plan, to be confirmed, must meet the requirements of section 1129 of the Bankruptcy Code incorporated into Chapter 9 through section 901(a), and the additional requirements of section 943(b), including (1) that "the debtor is not prohibited by law from taking any action necessary to carry out the plan," 11 U.S.C. § 943(b)(4); (2) that the debtor either obtain "any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan" or "such provision is expressly conditioned on such approval," 11 U.S.C. § 943(b)(6); and (3) that "the plan is in the best interests of

10

creditors and is feasible," 11 U.S.C. § 943(b)(7). These requirements are intended to address federalism concerns that "resonate loudly in chapter 9 bankruptcies." In re New York City Off-Track Betting Corp., 434 B.R. 131, 149 (Bankr. S.D.N.Y. 2010); see also Jonathan J. Spitz, Federalism, States, and the Power to Regulate Municipal Bankruptcies: Who May Be a Debtor Under Section 109(c), 9 Bankr. Dev. J. 621, 638 (1993) ("[I]t is widely recognized that Tenth Amendment concerns may be avoided only by cooperation between the states and the federal government, and such recognition is weaved extensively throughout the Bankruptcy Code."). In fact, as the court observed in In re New York City Off-Track Betting Corp., there is "no instance where respect for State law is more paramount than in a municipal bankruptcy case under chapter 9 of the Bankruptcy Code." In re New York City Off-Track Betting Corp., 434 B.R. at 149.

17.     In contravention of these transcendent and foundational provisions of federal law, the Plan violates various state and City laws, and certain aspects of the Plan require electoral approval that has not been obtained or provided for. Moreover, the Plan, as currently proposed, is infeasible and otherwise does not meet applicable confirmation criteria. Thus, the Plan does not meet the requirements of sections 943 and 1129, and thus cannot be confirmed.

**I.     The Plan's Proposed Use of DWSD Moneys Is Unfair and Unlawful.**

18.     The Plan's requirement that the DWSD pre-fund its alleged allocable share of GRS UAAL, while all other GRS-participating City departments will cease contributions to the GRS for at least ten years, is a transparent and improper contrivance designed to enable the Debtor to force suburban users of water and sewer services to subsidize its plan of adjustment by artificially raising water and sewage rates. Although the Debtor attempts to couch the DWSD Pre-Funding as a mere payment of accrued expenses of DWSD administration, and thus an obligation of ratepayers, the Plan actually compels the DWSD to pay

11

much more than its share of GRS UAAL on a present value basis. Accordingly, through artificially inflated rates, suburban ratepayers will be forced to subsidize City obligations that are unrelated to the DWSD. The Debtor's attempt to finance debts that are unrelated to the DWSD by leveraging its ability—through a municipal monopoly with long-term wholesale contracts with the Counties—to obtain revenue from outside the City limits is highly inequitable and violates Michigan and Detroit law, DWSD governance, and the Debtor's contracts with the Counties.

       A.      <u>The Plan Violates Michigan and Detroit Law.</u>

       19.     As the DWSD acknowledges in materials posted to its website, it is a not-for-profit entity and that "[b]y law, DWSD can only recover the cost for provision of its service." <u>See</u>, <u>e.g.</u>, http://www.dwsd.org/downloads_n/about_dwsd/fact_sheet/dwsd_fact_sheet.pdf. Section 123.141(2) of the Michigan Compiled Laws (the "<u>MCL</u>") provides that the price charged by a city that contracts to sell water outside of its territorial limits "shall be at a rate which is based on the actual cost of service determined under the utility basis of ratemaking." Moreover, section 7-1203 of the Charter of the City of Detroit (the "<u>City Charter</u>") provides that "[a]ll moneys paid into the city treasury from fees collected for water, drainage or sewerage services shall be used exclusively for the payment of expenses incurred in the provision of these services…" Charter of the City of Detroit § 7-1203.[4] The Plan's proposal with respect to DWSD funding of UAAL runs afoul of these state and local laws.

---

[4] The District Court has found that the term "applicable nonbankruptcy law" in the Bankruptcy Code includes a municipal charter. <u>See</u> <u>Taunt v. Lyons (In re Lyons)</u>, 1999 U.S. Dist. LEXIS 20240, *30-32 (E.D. Mich. 1999) (agreeing with prior District Court ruling that a municipal charter may serve as the source of applicable nonbankruptcy law within the meaning of section 541(c)(2)). Section 943(b) requires that a debtor not be prohibited "by law" from taking any action necessary to carry out the plan. Because the phrase "by law" has no qualifying words before it, it is necessarily broader than the term "applicable nonbankruptcy law" and thus includes the City Charter.

20.     Even assuming that the $428.5 million of UAAL that the Debtor asserts is allocable to the DWSD is accurate (which Macomb contests),[5] it does not appear from the Disclosure Statement that the number reflects any discount to adjust for the DWSD's payment over 9 years rather than a far longer period of time.  Thus, the City's assertion that the DWSD "will not be paying any more than its actual, full, allocable share of the GRS UAAL" is inaccurate.  Disclosure Statement at 21.  It is axiomatic that, due to the time value of money, a dollar today is worth more than a dollar in the future.  Accordingly, the present value of the $428.5 million exacted from the DWSD under the Debtor's proposed 9-year payment stream necessarily is greater than the present value of $428.5 million paid over a longer period. Historically, the GRS UAAL has been amortized over a rolling 30-year period.  Payment of the $428.5 million over 30 years rather than 9 years would result in considerably less value being "contributed" by the DWSD on a present-value basis.  Thus, the Debtor's proposal results in the DWSD paying more than its allocable share of the GRS UAAL, which overpayment will be passed on to ratepayers through increased rates.  The Debtor's characterization of the DWSD Pre-Funding amount as an accrued DWSD administration expense is nothing more than a gimmick to do indirectly what it cannot do directly, *i.e.* use DWSD revenues to fund other City debts.[6]

21.     Because the Plan would inevitably force the DWSD to charge ratepayers more than the actual cost of service—the cost of the DWSD's funding obligations have to come from somewhere—the Plan violates section 123.141(2) of the MCL.  Moreover, the overpayment

---

[5]     Neither the Plan nor the Disclosure Statement contains any information whatsoever regarding the Debtor's calculation of the $428.5 million of GRS UAAL it claims is allocable to the DWSD or the assumptions underlying that calculation.  Macomb believes that amount is excessive and that it will so demonstrate through evidence, including expert testimony, at the confirmation hearing.

[6]     Michigan courts have consistently ruled that governmental bodies may not do indirectly what they cannot do directly.  See, e.g., Blank v. Dep't of Corrections, 222 Mich.App. 385, 397 (Mich.App. 1997); In re Dembek, 145 Mich.App. 185, 196 (Mich.App. 1985).

13

would be used to cover the City's obligation to fund the GRS pensions for non-DWSD employees. Thus, the Plan does not comply with the City Charter's directive that moneys collected from ratepayers be used <u>exclusively</u> for payment of DWSD expenses.

22. An even more conspicuous misuse of DWSD revenues is the proposed use of the DWSD CVR to fund the Restoration Trust. The Plan contemplates that the Debtor may enter into a "Qualifying DWSD Transaction"[7] pursuant to which a third party would buy, lease, or otherwise operate the DWSD system in exchange for payments from that third party. The cost of these payments would inevitably be passed on to ratepayers in the form of increased fees. Pursuant to the Plan, the DWSD CVR would provide the Restoration Trust with the right to receive 50% of the net proceeds of a Qualifying DWSD Transaction. From the Restoration Trust, those proceeds may be allocated among the GRS and PFRS pension funds. The remaining 50% of net proceeds would be paid to the City's General Fund. <u>See</u> Plan at 9, 31-33. Thus, not only would proceeds of fees charged to ratepayers be used to restore benefits to non-DWSD employees of the GRS, but they would be used to restore benefits in the PFRS fund—the financing, operations, and purposes of which are wholly unrelated to the DWSD or its

---

[7]    As the Disclosure Statement explains, the only "Qualifying DWSD Transaction" that is currently contemplated in the Plan is the potential "Public-Private Partnership" involving either a management agreement or a sale or long-term lease of the DWSD system to a private party. <u>See</u> Disclosure Statement at 145. For several reasons, the Public-Private Partnership, and its proposed use of proceeds, do not comply with applicable law.    First, any Public-Private Partnership will require the private entity to make some sort of payments to the City, in the form of a management fee, a payment of purchase price, or a lease payment. Moreover, of course, on top of making payments to the City, any private entity that operates the DWSD system will seek to make a profit. The cost of the private entity's payments to the City, as well as its profit-seeking activities, would be—indeed must be—passed on to ratepayers through increased rates. As discussed above, the benefit of these increased rates would be diverted from the DWSD and into pension funds through the DWSD CVR, as well as to the general City coffers, violating State and City law. Second, as discussed above, the increased rates would be a thinly disguised tax on ratepayers despite the requirement of the electoral vote for which the Plan does not provide. Similarly, section 7-1204 of the City Charter would require an electoral vote to sell or lease the DWSD system or franchise it through a management agreement. Third, the Public-Private Partnership may require the Debtor to assume and assign the OMI-Detroit Agreement to the private party, which cannot be done without the consent of Macomb pursuant to section 365(c)(1) of the Bankruptcy Code, made applicable in Chapter 9 through section 901. Macomb does not consent to that assumption and assignment. Thus, the Public-Private Partnership cannot be consummated and must be removed from the Plan.

employees—and for any other purpose that the City sees fit. Because any payments from a private party would be, directly or indirectly, "moneys paid into the city treasury from fees collected for water, drainage, or sewerage services," the Debtor's Plan plainly violates the City Charter, which requires that such moneys be used "exclusively for the payment of expenses incurred in the provision of these services." Charter of the City of Detroit § 7-1203.

23. Moreover, the intended use of DWSD moneys for City purposes other than DWSD costs would be prohibited under the reasoning of Freeland v. City of Sturgis, 248 Mich. 190 (1929). There, plaintiff ratepayers brought suit against the city for misapplying revenues from a city-owned hydroelectric plant by using the funds for general city expenses rather than for capital improvements or debt service. The Supreme Court of Michigan ruled that the actions of the city were clearly illegal, violating a state statute that prohibited the use of a municipally owned public utility to fund the general expenses of the city, and that the plaintiffs, as large ratepayers, were threatened with substantial injury. See id. at 192-95.

24. Like the ratepayers in Freeland, the Counties, which contribute 65% of the total revenues to the DWSD, will suffer substantial injury if the Debtor is allowed to overcharge DWSD ratepayers, or misappropriate the proceeds of a transaction involving the DWSD, and use those funds for non-DWSD City obligations. Moreover, as in Freeland, applicable statutory law, i.e., section 123.141(2) of the MCL and section 7-1203 of the City Charter, forbids such overcharging and misappropriation of funds. Accordingly, the Plan does not comply with applicable law, and thus does not meet the requirement for confirmation of a Chapter 9 plan under section 943(b)(4).

B.     The Plan Provides For A Disguised Tax On Suburban Ratepayers That Has Not Been Properly Approved.

25. As a matter of economic substance the inevitable increased rates for suburban ratepayers due to the DWSD Pre-Funding and payments pursuant to a "Qualifying

15

DWSD Transaction" constitute an impermissible tax on suburban ratepayers for non-DWSD purposes. As shown above, the DWSD Pre-Funding would be used to pay obligations that are unrelated to the DWSD, and the Debtor's acknowledged purpose with respect to the contemplated payments under a Qualifying DWSD Transaction is to contribute 50% of the net proceeds to the General Fund. Thus, both of these measures are designed to raise general revenue for the City, and the portion of those increased fees charged to ratepayers that would cover non-DWSD expenses would bear no relationship to the cost or value of the service provided. Under the rationale of cases such as Bolt v. City of Lansing, 459 Mich. 15 (1998) and County of Jackson v. City of Jackson, 302 Mich. App. 90, 98-99 (Mich Ct. App. 2013), the increased rates to be paid pursuant to this arrangement would be disguised taxes. Although a city's power to tax is only as expressly permitted by the State Constitution or State statute, see Butcher v. Grosse Ile Tp., 387 Mich. 42, 77 (Mich. 1972) ("the municipality has absolutely no inherent power to tax and any power of taxation must be delegated to it, either by the constitution itself of by the legislature"), the City has no constitutional or statutory authority to tax water and sewer services.

26.     Even if the City did have such authority, under the Michigan constitution, any tax must be voted upon by qualified electors. The requisite electoral approval has not been obtained, and the Plan does not condition the consummation of a public-private partnership on the outcome of such an election. Accordingly the Plan conflicts with section 943(b)(6) of the Bankruptcy Code, and thus cannot be confirmed.

C.     The Plan Violates DWSD By-Laws And The Wholesale Contracts.

27.     In addition being irreconcilable with applicable nonbankruptcy law, the proposed overpayment of UAAL by the DWSD violates the DWSD Governance Orders incorporated into the DWSD By-Laws, as well as the City's agreement with OMI. The article of

the DWSD By-Laws implementing the DWSD Governance Orders provides that the DWSD, "acting through its Director upon authorization by the Board, shall have final authority to approve … the budget for the Department," subject to the approval of wholesale rates by the Board. By-Laws for the Detroit Water and Sewerage Department Board of Water Commissioners, Article XVIII. Contrary to this requirement, it appears from the Disclosure Statement that the DWSD Director and Board would have no say in the Plan that nonetheless purports to control the future of their own department. Thus, upon information and belief, the Plan proposes to allow the City, acting through the Emergency Manager, to usurp the authority of the DWSD Director and Board by setting, at least in part, the budget for the DWSD and dictating how rates would be set in the future.

28. In fact, the Plan explicitly incorporates a provision regarding rate setting protocols, and states that the City may seek to implement a rate stability program for City residents. See Plan at 44. By purporting to set rates and/or rate setting protocols without Board approval, the Plan violates the DWSD Governance Orders and section 1129(a)(6) of the Bankruptcy Code, made applicable in Chapter 9 through section 901(a), which requires either such approval or that the Plan be conditioned on such approval. As section 1129(a)(6) makes clear, the Court does not have jurisdiction to set rates or permit the delegation of rate-setting authority contrary to applicable nonbankruptcy law.

29. Moreover, the increased rates to counties to fund the overpayment of UAAL on rates charged to OMI would breach the OMI-Detroit Agreement, which the Debtor asserts that it intends to assume under the Plan. See Disclosure Statement at 89. Article 20.01 of the OMI-Detroit Agreement provides that "[r]ates shall be reasonable in relation to the costs incurred by the City for the provision of the Services." As the Plan contemplates using ratepayer funds to subsidize the pension obligations of non-DWSD City departments—which are not costs

17

associated with providing "Services" as that term is defined in the OMI-Detroit Agreement—the Plan would result in rates that would be unreasonable in relation to the DWSD's costs. Accordingly, the Debtor's proposal for DWSD funding of the GRS UAAL would cause an immediate breach of the OMI-Detroit Agreement upon emergence.

        D.      The DWSD Pre-Funding Is Practically Imprudent.

        30.     In addition to being unlawful and inconsistent with DWSD governance and the wholesale contracts, the DWSD Pre-Funding is not a sound exercise of business judgment. Although the Disclosure Statement states that the DWSD would pay only its allocable share of the GRS UAAL until June 30, 2023, and that the GRS pension plan will be frozen as of June 30, 2014, the Plan also provides that after June 30, 2023 "the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount." Plan at 33. Thus, the DWSD could pre-fund its alleged allocable share of GRS UAAL but, because it is a part of the "City," may be required later to pay yet again if, for example, any of the parties that are to provide the Outside Funding default on their obligation, or the City lands in another bankruptcy. The Plan does not appear to grant a release or novation of the DWSD's pension funding responsibility in exchange for its payments.

        31.     Because nothing in the Plan prevents pensioners from attempting to hold the DWSD responsible for the full amount of any GRS UAAL, the DWSD could be forced to pay twice for those obligations, an expense which would have to be passed on to ratepayers. Allowing the DWSD to pay its share of UAAL over a longer period of time would reduce the unwarranted exposure of the DWSD and its ratepayers in this regard.

**II.   The Plan Is Not Feasible.**

        32.     The Debtor bears the burden of proving that the Plan meets the requirements for confirmation, including the feasibility requirement of section 943(b)(7). See In

18

re Mount Carbon Metro. Dist., 242 B.R. 18, 31 (Bankr. D. Colo. 1999). To determine whether a Chapter 9 plan is feasible, the Court must "evaluate whether it is probable that the debtor can both pay pre-petition debt and provide future public services at the level necessary to its viability as a municipality." Id. at 35.

33. Under the Plan, the DWSD would be obligated to make a payment in 2015 of $65.4 million for GRS UAAL, a payment of approximately $49.8 million greater than its average total pension expense over the past 5 years, and payments of $45.4 million in each of the years 2016 through 2023, or payments of $29.8 million greater than the recent 5-year average total pension expense. Moreover, as discussed above, the Plan calls for the DWSD to substantially overpay UAAL for the benefit of non-DWSD employees. The result is that the DWSD budget would be severely strained and substantial capital would leave the DWSD system to benefit parties other than ratepayers. Moreover, as discussed above, the overcharging of Macomb and Oakland due to the DWSD Pre-Funding would breach the OMI-Detroit Agreement, potentially causing a termination of that agreement and, in turn, a loss by DWSD of substantial revenue. At a minimum, the DWSD Pre-Funding would lead to litigation over appropriate rates, which may well result in rates set a level lower than needed to meet the DWSD Pre-Funding obligations. Either event would cause the DWSD to have less cash flow than necessary to operate its system to provide necessary public services. Thus, the Plan is not feasible.

34. Further, the Plan is not feasible because the DWSD would not have sufficient cash flow to cover necessary capital improvements. According to forecasts developed by the Counties led by the Macomb County Office of Public Works, the spending necessary for capital improvements to the DWSD's water and sewer systems over the next ten years may be as much as $3.4 billion (exclusive of improvements to the Detroit retail system). This is nearly a third higher than the forecasted ten-year capital expense of $2.6 billion (including improvements

19

to the Detroit retail system) provided in the capital needs plan developed for the Emergency Manager by OHM Advisors. See Disclosure Statement at Exhibit M. These capital improvements identified by the Counties are needed to maintain the viability of the DWSD's systems and thus its ability to continue to provide essential public services to ratepayers. Every dollar of value that leaves the system to pay UAAL for non-DWSD employees threatens that viability, and thus the feasibility of the Plan with respect to maintenance of the DWSD system.[8]

35.     In addition, as Macomb intends to show at the confirmation hearing, the Plan's impairment of the Water and Sewer Bonds will negatively affect the DWSD's credit rating. According to the Disclosure Statement, capital improvement spending will be heavily dependent on financing through bond issuance. See Disclosure Statement at Exhibit M. The effect of the Plan on the DWSD's credit rating, however, threatens to render financing unavailable or the cost of debt prohibitively expensive. Thus, the Plan's impairment of the bonds jeopardizes the DWSD's ability to continue to provide those critical public services.

36.     For all of the above reasons, the Debtors cannot meet their burden of proving feasibility by showing that the Plan would allow the DWSD to continue to provide continuous public services over the long term. Thus, the Court should find that it cannot be confirmed.

**III.   The Debtor Cannot Assume or Assign Sewer Contracts With Macomb.**

37.     Section 365(a) of the Bankruptcy Code allows debtors to assume executory contracts unless otherwise provided in sections 365(b), (c), and (d). The Debtor has indicated that it intends to assume all wholesale sewer and water contracts, including the OMI-

---

[8]     Macomb has no information regarding the "rate stability program for City residents" contemplated in the Plan. See Plan at 44. To the extent that program would require the Counties to bear a disproportionate share of DWSD costs when compared to City residents, Macomb submits that would violate applicable law. Moreover, any rate stability program that allows City residents to avoid paying bills for DWSD services may affect cash flows in a way that would make the Plan not feasible. Thus, Macomb reserves the right to supplement its objection to the Plan regarding the proposed rate stability program.

Detroit Agreement, and those contracts do not currently appear on a schedule of rejected contracts. The Debtor, however, cannot assume or assign the OMI-Detroit Agreement or any ancillary agreement, because the Debtor cannot cure defaults and provide adequate assurance of future performance as required by section 365(b), and falls within the exception to assumption in section 365(c).

38. As discussed above, the use of DWSD funds for non-DWSD purposes would cause the Debtor to immediately default on the OMI-Detroit Agreement upon emergence from bankruptcy. As the Plan itself would create the default, there would be no way for the Debtor to cure the default or provide adequate assurance of future performance as required by section 365(b)(1) of the Bankruptcy Code. See In re Metromedia Fiber Network, Inc., 335 B.R. 41 (Bankr. S.D.N.Y. 2005) (no adequate assurance where debtor had not constructed necessary fiber networks to perform under contract); In re Southern Biotech, Inc., 37 B.R. 311 (Bankr. M.D. Fla. 1983) (no adequate assurance where trustee could not perform contract in accordance with good and sound medical practice). Accordingly, the Debtor may not assume the OMI-Detroit Agreement, or any other agreements that require reasonable rate setting.

39. Moreover, section 365(c)(1) of the Bankruptcy Code provides that a debtor may not assume or assign any executory contract if (1) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor; and (2) such party does not consent to such assumption or assignment. See In re Kazi Foods of Michigan, Inc., 473 B.R. 887, 890 (Bankr. E.D. Mich. 2011) (finding that better view of section 365©(1) standard is that debtor cannot assume contract if it cannot be assigned without consent). Under Michigan law, a contract may not be assigned without consent of the counterparty if it "involve[s] such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations

performed by him alone." Detroit Postage Stamp Service Co. v. Schermack, 146 N.W. 144 (Mich. 1914). In contracting with the DWSD, a municipal not-for-profit monopoly with the special skills and knowledge necessary to operate its own systems, the members of the OMI relied on the identity of the DWSD and intended that the obligations be performed by the DWSD alone. Accordingly, Michigan law would not allow assumption of that agreement. Moreover, Macomb does not consent to the assumption of the OMI-Detroit Agreement or any related agreements under the current Plan. Thus, those contracts cannot be assumed.

**IV. The Plan Unfairly Discriminates Against Non-Pensioner Unsecured Creditors.**

40. MIDDD holds the MIDDD Claim, a general unsecured claim of not less than $26 million classified in Class 14. In the event that Class 14 does not vote in favor of the Plan, which is likely, the Debtors will be required to meet the "cramdown" requirements of section 1129(b), including that the Plan does not "discriminate unfairly." 11 U.S.C. § 1129(b)(1). The Plan cannot meet this requirement, because the Plan provides vastly better treatment to pensioners in Classes 10 and 11 than creditors of the same priority in Class 14. According to the Disclosure Statement, Classes 10 and 11 would recover between 40-60% of their claims,[9] while Class 14 would recover only 10-13% of their claims. See Disclosure Statement at 39-41.

41. In In re Dow Corning Corp., 244 B.R. 696 (Bankr. E.D. Mich. 1999), the court adopted a standard under which a "rebuttable presumption" arises if there is

> (1) a dissenting class; (2) another class of the same priority; and (3) a
> difference in the plan's treatment of the two classes that results in either
> (a) a materially lower percentage recovery for the dissenting class
> (measured in terms of the net present value of all payments), or (b)
> regardless of percentage recovery, an allocation under the plan of

---

[9] The Macomb Parties disagree with this calculation, and submit that recoveries to Classes 10 and 11 under the Plan are significantly higher.

materially greater risk to the dissenting class in connection with its proposed distribution.

Id. at 701-03.

42.      Here, Class 14 is likely to be a dissenting class, and Classes 10 and 11 (and several other classes) have the same priority.  The difference between the high end of the range of Class 14's projected recovery and the low end of the proposed recoveries to Classes 10 and 11 is 27%, or double the high end of the Class 14 range.  Accordingly, the Court should apply a rebuttable presumption of unfair discrimination.  For the Debtor to rebut that presumption, it must show that "outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain." Id. at 702.  Here, there is no evidence at all the holders of pension claims would be entitled to a greater distribution outside of bankruptcy than general unsecured claims.  Accordingly, the Debtor cannot rebut the presumption and the Court should deny confirmation of the Plan due to unfair discrimination.

**V.      The Plan's Exculpation Clause Impermissibly Releases Certain Third Parties.**

43.      Article III.D.6. of the Plan provides that various parties will be exculpated from liability relating to any postpetition acts or omissions in connection with, relating to, or arising out of the Debtors' restructuring and this chapter 9 case other than gross negligence and willful misconduct.  See Plan at 42.  Those parties include not only the Debtor and its Related Entities, but a laundry-list of non-debtor third parties.  Moreover, the exculpation is not tied to acceptance of the Plan, and therefore the Plan contemplates that non-consenting parties in interest would be bound by it.  The exculpation clause is impermissible and should not be approved.

44.      In In re Washington Mut., Inc., 442 B.R. 314 (Bankr. D. Del. 2011), the court explained that exculpation clauses are permissible only to exculpate estate fiduciaries from

actions taken in a bankruptcy case. See id. at 350-51. In the context of a Chapter 11 case of a corporate entity, such fiduciaries include only the estate professionals, the statutory committees and their members, and the debtors' directors and officers. Id. Here, under the same reasoning, the exculpation must be similarly limited to the estate professionals, the Retiree Committee and its members, the Retiree Professionals, and the City's decision-makers. Any effort to include parties other than those estate fiduciaries in the exculpation clause is merely an attempt to extend non-consensual releases to non-debtors. See id.

45.     Under Sixth Circuit law enjoining a non-consenting creditor's claim against a non-debtor is considered a "dramatic measure to be used cautiously," and to be allowed only in appropriate "unusual circumstances." Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir. 2002). Such "unusual circumstances" only exist where the bankruptcy court finds the following seven factors are present:

1)      There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

2)      The non-debtor has contributed substantial assets to the reorganization;

3)      The injunction is essential to the reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

4)      The impacted class, or classes, has overwhelmingly voted to accept the plan;

5)      The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

6)       The plan provides an opportunity for those claimants who choose not to settle to recover in full; and

7)      The bankruptcy court made a record of specific findings that support its conclusion.

Id.

46.     Here, the exculpation clause provides inappropriate releases to the State of Michigan and the State Related Entities, the DIA Funding Parties and their Related Entities, the CFSEM Supporting Organization and its Related Entities, the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, the postpetition officers of the Detroit Police Command Officers Association, GRS and its postpetition professional advisors, PFRS and its postpetition professional advisors, and Gabriel, Roeder, Smith & Company.  Although some of those parties (the State and the DIA Funding Parties, for instance) intend to contribute assets to the reorganization, there is no evidence that, outside of the indemnity under the DIA Settlement to be entered into as part of the Plan, any of those parties have such an identity of interest with the Debtor such a suit against them will be, in essence, a suit against the Debtor or deplete the assets of the estates.  Nor is there any evidence that the reorganization hinges on those parties being free from suits.  Although it is too early to tell whether any classes will vote to accept the Plan, the Plan does not provide for payment in full of the classes affected by the proposed injunction, nor does it provide an opportunity for claimants who choose not to settle to recover in full.  Accordingly, the Plan does not meet the seven-factor Dow Corning test for permissible non-consensual injunctions in favor of non-debtors, and thus the Plan cannot be confirmed.

*[Remainder of Page Left Intentionally Blank]*

25

WHEREFORE, for the foregoing reasons, the Macomb Parties request that the Court deny confirmation of the Plan.

Dated:  May 12, 2014                    Respectfully submitted,

                                       DECHERT LLP

                                       By:____/s/ Allan S. Brilliant_____
                                       Allan S. Brilliant
                                       G. Eric Brunstad
                                       James M. McGuire
                                       Stephen M. Wolpert
                                       1095 Avenue of the Americas
                                       New York, NY 10016
                                       Telephone: (212) 698-3500
                                       Facsimile: (212) 698-3599
                                       allan.brilliant@dechert.com
                                       stephen.wolpert@dechert.com

                                       *Attorneys for County of Macomb, Michigan by and through its County Agency, Anthony V. Marrocco, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District*