# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### (DETROIT)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **CITY OF DETROIT, MICHIGAN,** | ) | **CASE NO.: 13-53846** |
| | ) | |
| | ) | **CHAPTER 9** |
| Debtor. | ) | |
| | ) | **Hon. Steven W. Rhodes** |
| | ) | |

_____

## THE DWSD BOND TRUSTEE'S OBJECTION TO THE CITY'S FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
_____

**WALLER LANSDEN DORTCH &
  DAVIS, LLP**
David E. Lemke (TN13586)
Michael R. Paslay (TN11092)
Ryan K. Cochran (TN25851)
Courtney M. Rogers (TN25664)
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Phone: (615) 244-6380
Fax: (615) 244-6804
david.lemke@wallerlaw.com
mike.paslay@wallerlaw.com
ryan.cochran@wallerlaw.com
courtney.rogers@wallerlaw.com

**BODMAN PLC**
Robert J. Diehl, Jr. (MI31264)
Jaimee L. Witten (P70068)
1901 St. Antoine Street, 6th Floor
Detroit, Michigan 48226
Phone: (313) 393-7597
Fax: (313) 393-7579
rdiehl@bodmanlaw.com
jwitten@bodmanlaw.com

*Attorneys for U.S. Bank National Association, as Trustee for the DWSD Bonds*

## TABLE OF CONTENTS

**SUMMARY OF THE ARGUMENT** .......................................................................... 1

**BACKGROUND** ........................................................................................................ 5

**I.      MICHIGAN LAW RESTRICTS THE USE OF THE SYSTEMS' REVENUES**....... 5

      A.      The Revenue Bond Act, Ordinances, and Charter mandate the separation of the
            Systems' Revenues from the City's general operating funds. ................................. 5

      B.      The Revenue Bond Act and the Ordinances provide the Holders with valuable
            property rights that protect the full payment of the DWSD Bonds. ....................... 7

      C.      The Indentures incorporate the property rights granted under the Revenue Bond
            Act, Ordinances, and Charter. ............................................................................. 8

**PROCEDURAL HISTORY** ..................................................................................... 10

**II.     THE PLAN PROPOSES TO IMPAIR THE DWSD BONDS.** ................................... 10

**ARGUMENT** ........................................................................................................... 13

**III.    THE CITY BEARS THE BURDEN OF PROOF.** ...................................................... 13

**IV.     MICHIGAN LAW GRANTS THE HOLDERS PROPERTY RIGHTS THAT ARE
       ENTITLED TO PROTECTION IN BANKRUPTCY**.................................................. 14

**V.      CHAPTER 9 EXPLICITLY PROTECTS THE HOLDERS' RIGHTS IN THE NET
       REVENUES OF THE SYSTEMS.** ............................................................................ 17

**VI.     THE PLAN DOES NOT MEET THE CONFIRMATION REQUIREMENTS OF
       § 943.** ......................................................................................................................... 18

      A.      The Plan does not satisfy the requirements of § 943(b)(1) and (2) because it alters
            the terms of the City's bargain with the Holders and strips the Holders' liens on
            the Net Revenues. .............................................................................................. 18

            i.      *The UAAL Surcharge violates § 928(a)* ................................................... 19

            ii.     *The Plan violates §§ 927 and 1111(b) by eliminating call protections.* .... 21

      B.      Section 943(b)(4) bars the City from altering its bargain with the Holders in
            contravention of Michigan law. .......................................................................... 24

      C.      The Plan violates the best interests of creditors test under § 943(b)(7). ............... 25

      D.      The Plan is not conditioned upon the necessary regulatory and electoral approvals,
            as required by § 943(b)(6) ................................................................................... 29

            i.      *The City is not complying with the requirements of the Revenue Bond Act.*
                          ................................................................................................................... 30

            ii.     *The RMFA also requires regulatory approval* ......................................... 31

**VII.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT DOES NOT COMPLY
       WITH THE REQUIREMENTS OF § 1129 .** ............................................................. 32

      A.      The Plan violates § 1129(b)(2)(A)(i) because the Holders do not retain their
            prepetition liens and the proposed UAAL Surcharge payments increase the
            Holders' risk of nonpayment. ............................................................................. 32

i

B.     The Plan violates § 1129(b)(2)(A)(i) because it fails to pay the Holders an appropriate rate of interest. ........................................................... 34

C.     The Plan fails to give the Holders the indubitable equivalent of their Claim under § 1129(b)(2)(A)(iii)........................................................... 37

D.     The Plan is not "fair and equitable" under § 1129(b)(1) because it violates the absolute priority rule. ........................................................... 39

E.     The Plan does not comport with the regulatory rate-setting requirements of § 1129(a)(6). ........................................................... 39

**VIII.   THE PLAN CANNOT BE CONFIRMED BECAUSE IT FAILS TO PAY THE HOLDERS AND THE TRUSTEE THE FULL AMOUNT OF THEIR CLAIMS AND OTHERWISE VIOLATES THE CODE. ........................................................... 41**

A.     The Plan fails to provide for postpetition interest even though the Holders are oversecured. ........................................................... 41

B.     The Plan was not proposed in good faith. ........................................................... 41

C.     The Plan fails to provide for the payment of the Trustee's fees and expenses. ..... 42

**IX.   THE PLAN IMPROPERLY ATTEMPTS TO WAIVE STAY REQUIREMENTS. ........................................................... 45**

**RESERVATION OF RIGHTS ........................................................... 46**

**CONCLUSION ........................................................... 47**

11839144

U.S. Bank National Association, in its capacity as trustee (the "***Trustee***") for those certain bonds issued by the City[1] for the DWSD[2] to finance and refinance improvements to the City's Water Supply System (the "***Water System***") and the City's Sewage Disposal System (the "***Sewage System***," together with the Water System, the "***Systems***"), hereby files its Objection to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* (Doc. 4392) (the "***Plan***").[3]

## SUMMARY OF THE ARGUMENT

The Plan fails to satisfy the chapter 9 confirmation requirements with respect to the DWSD Bond Claims. The DWSD Bonds are special revenue bonds issued by the City to finance the Systems pursuant to Michigan's Revenue Bond Act.[4] The City adopted the Ordinances and entered into the Indentures (and other DWSD Bond Documents) pursuant to the requirements imposed by the Revenue Bond Act. The DWSD Bonds are limited recourse obligations and are not general obligations of the City. The DWSD Bonds are secured by a pledge of and statutory

---

[1] Capitalized terms not defined herein bear the meaning ascribed to such term in the Plan (as defined herein).

[2] The City issued and has outstanding twenty-four series of water bonds (the "***Water Bonds***") pursuant to Ordinance No. 30-02, as amended and restated by Ordinance No. 01-05 (as so amended and restated, the "***Water Ordinance***"), and under that certain Trust Indenture, dated as of February 1, 2013 (the "***Water Indenture***"). The Water Bonds include senior lien bonds, junior lien bonds, and the DWSD Revolving Water Bonds, which are the most junior of the Water Bonds. As of July 18, 2013 (the "***Petition Date***"), the aggregate amount outstanding of the Water Bonds was over $2.5 billion. (Claim No. 1340). The City issued and has outstanding forty-two series of sewer bonds (the "***Sewer Bonds***," together with the Water Bonds, the "***DWSD Bonds***," and the holders thereof, the "***Holders***") pursuant to Ordinance No. 27-86, as amended and supplemented by Ordinance No. 7-87, Ordinance No. 38-92, Ordinance No. 3-93, Ordinance No. 31-95, Ordinance No. 16-97, Ordinance No. 24-97, and Ordinance No. 36-99, and as further amended and restated by Ordinance No. 18-01 (as so amended, supplemented and restated, the "***Sewer Ordinance***," together with the Water Ordinance, the "***Ordinances***"), and under that certain Trust Indenture, dated as of June 1, 2012 (the "***Sewer Indenture***," together with the Water Indenture, the "***Indentures***"). The Sewer Bonds include senior lien bonds, second lien bonds, and the DWSD Revolving Sewer Bonds, which are the most junior of the Sewer Bonds. As of the Petition Date, the aggregate amount outstanding of the Sewer Bonds was over $3.2 billion. (Claim No. 1339). The Ordinances and Indentures are attached as Exhibits B through E to *The DWSD Bond Trustee's Response to the Motion of the City of Detroit Water and Sewerage Department for an Order, pursuant to § 105, Amending and Clarifying the Fee Review Order dated September 11, 2013* (Doc. 4323) (the "***Fee Motion Response***").

[3] The *Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* (Doc. 4391) (the "***Disclosure Statement***") was also filed on May 5, 2014.

[4] To the extent not previously defined, the capitalized terms in this summary are defined later in the Objection.

1

liens on the Net Revenues of the Systems in accordance with the Revenue Bond Act, Ordinances and Indentures, and are paid from the Net Revenues generated by the Systems.[5]

The pledge and statutory liens are part of a larger bundle of property rights granted to the Holders pursuant to the Revenue Bond Act, Ordinances, and Indentures that are designed to maintain the financial viability of the Systems and to preserve the value of the liens on the Net Revenues, inasmuch as the Net Revenues are the source of payment to the Holders. Among other things, the Revenue Bond Act, Ordinances and Indentures require the City to raise utility rates and control costs in a manner that provides sufficient Revenues to administer, operate and maintain the Systems, to repay all of the DWSD Bond obligations, and to finance the Systems' capital needs. Moreover, the Revenue Bond Act, Ordinances and Indentures restrict the sums that may be paid prior to the obligations due under the DWSD Bond Documents to assure that sufficient Net Revenues will exist to pay all of the City's obligations under the DWSD Bond Documents. Under these restrictions, the DWSD may only pay the *current* expenses of administering, operating, and maintaining the Systems before it makes principal and interest payments on the DWSD Bonds. Finally, under Michigan law, the Systems' Revenues must be segregated from other funds of the City and may only be used for payment of costs related to the Systems. While the DWSD is not a separate legal entity from the City, the Systems are "enterprise funds" that are treated as stand-alone enterprises. In essence, Michigan law established self-sustaining Systems that are intended to be maintained separate and apart from the rest of the City's finances and operations.

The rights granted to the Holders under Michigan law and the DWSD Bond Documents are property rights that are protected in bankruptcy. The Bankruptcy Code in general recognizes

---

[5] In addition to the Net Revenues, the DWSD Bonds are also secured by other Pledged Assets that include certain of the funds and accounts established by the Ordinances, and investments in, and income or gains on, those funds. Further, certain of the DWSD Bonds are insured by monoline insurance policies.

that the Fifth Amendment protects state law property interests in bankruptcy. More specifically,

though, chapter 9 contains provisions expressly designed by Congress to "ensure that [special]

revenue bondholders receive the benefit of their bargain with the municipal issuer and that they

will have unimpaired rights to the project revenues pledged to them" at all times. S. REP. NO.

100-506, at 12 (1988). In 1988, Congress enacted certain amendments to chapter 9 to establish

predictability in the municipal bond market by providing exceptions to the Bankruptcy Code[6]

provisions which might otherwise prevent holders of special revenue bonds from receiving "the

benefit of their bargain." Sections 922 and 928 were enacted to ensure that the payment of

special revenue indebtedness from the pledged special revenues will not be interrupted by a

chapter 9 proceeding, and that the bondholders' liens on the pledged special revenues will

continue after a chapter 9 filing. Similarly, §§ 927 and 1111(b)[7] ensure that: (a) special revenue

debt remains non-recourse and the pledged special revenues are not used for general obligations

of the municipality so as to avoid violating state law distinctions between special revenue and

general obligation financing;[8] and (b) the claims of holders of special revenue bonds are paid in

full as allowed secured claims. In essence, the 1988 Amendments were enacted to prevent

impairment of special revenue debt.

In addition, § 943(b)(1) and (2) explicitly require that a plan comply with all provisions

of the Bankruptcy Code that are made applicable to chapter 9 under §§ 103(f)[9] and 901 and all

the provisions in chapter 9; this includes §§ 922, 927, 928, and 1111(b). Similarly, § 943(b)(4)

and (b)(6) require that all replacement debt issued under the Plan comply with applicable state

---

[6] Unless otherwise set forth herein, "section" or "§" refers to the relevant section of 11 U.S.C. § 101, *et seq.* (the "***Bankruptcy Code***").

[7] Section 1111(b) is incorporated into chapter 9 pursuant to § 901. Sections 927 and 1111(b) read together require that all special revenue debts be paid from special revenues and not general funds.

[8] Both the Senate and the House reports show that Congress enacted the 1988 Amendments to (1) protect the benefit of the bargain of special revenue bondholders, and (2) ensure that pledged revenue funds were not used for the general obligations of a municipality. *See* S. REP. NO. 100-506, at 12.

[9] Section 943(b)(1) references § 103(e) but is intended to reference subsection (f).

law protections. In combination, all of these provisions carry out Congress's mandate that special revenue bondholders receive the benefit of their bargain under a chapter 9 plan.

The Plan, as currently proposed, denies the Holders the benefit of their bargain under the Revenue Bond Act and the DWSD Bond Documents. In short, the Plan proposes to impermissibly lower the interest rates payable on approximately $2.25 billion of the DWSD Bonds and to strip certain of the Holders of their bargained-for "call protections" without compensating the affected Holders for the loss of such protections. The Plan also proposes to impermissibly strip the Holders' liens on the Net Revenues by no less than $428,500,000[10] by treating the UAAL Surcharge as an operating expense and paying it ahead of debt service on the DWSD Bonds. The City proposes to impair the DWSD Bonds even though the Systems are solvent and capable of paying the Holders in full in accordance with the terms of the DWSD Bond Documents, and even though the proposed impairment of the DWSD Bonds is not necessary to make the Plan feasible or otherwise confirm the Plan.

The Plan structure violates both Michigan law and the Bankruptcy Code statutory regime established to protect the financing of public improvements and to ensure that the pledged revenue bondholders have unimpaired rights in the project revenues pledged to them by impermissibly impairing the DWSD Bonds. Accordingly, as set forth in detail below, the Plan does not meet the confirmation requirements of § 943(b)(2), (4), (6), and (7). In addition, even if the DWSD Bonds were subject to impairment, the City cannot satisfy the "cramdown" requirements under § 1129(b), which is incorporated into chapter 9 by §§ 901 and 943(b)(1).

---

[10] As will be discussed in further detail below, the actual amount of the UAAL Surcharge is a question of fact that will need to be determined through discovery. Therefore, the Trustee reserves the right to contest the amount of the UAAL Surcharge, as well the propriety and priority of its payment as proposed by the City.

<center>**BACKGROUND**</center>

**I.     MICHIGAN LAW RESTRICTS THE USE OF THE SYSTEMS' REVENUES.**

1.      Michigan's Revenue Bond Act of 1933 (the "***Revenue Bond Act***") authorizes Michigan public corporations, like the City, to construct, own, operate, improve and finance public improvements like the Systems.  Michigan public corporations are further authorized to adopt ordinances to exercise these powers.  MICH. COMP. LAWS § 141.106 (2002).  Pursuant to the authority granted by the Revenue Bond Act, the City adopted the Ordinances and issued the DWSD Bonds to finance the costs of the Systems.  The City also entered into the Indentures in furtherance of the issuance of the DWSD Bonds and enacted specific provisions in its City Charter (the "***Charter***") relating to the Systems.

>    A.     The Revenue Bond Act, Ordinances, and Charter mandate the separation of the Systems' Revenues from the City's general operating funds.

2.      The Revenue Bond Act requires that from the beginning the Systems' financing and operations be segregated from the City's general operations, directing that when financing a public improvement system, the "[m]oney received from the sale of bonds shall be used solely for the payment of project costs."  MICH. COMP. LAWS § 141.116 (2002).  The Revenue Bond Act also requires:

>    a.     That rates for services be sufficient to provide for the payment of administration, operation, and maintenance expenses and interest and principal on the bonds when due and payable.  MICH. COMP. LAWS § 141.121(1).  *See also* Sewer Ordinance § 9(b) (mirroring the requirement that rates be set to cover the enumerated expenses of the Systems and not for other purposes); Water Ordinance § 9(B) (same).

>    b.     That revenues of the systems be segregated from other funds and accounts of the borrower.  MICH. COMP. LAWS § 141.122.

>    c.     The order and priority of payments to be made from the revenues: **first, to current expenses of administration, operation, and maintenance; second, to the payment of principal and interest on the bonds payable from those revenues**; third, to sums necessary for "additional accounts as

<center>5</center>

may be required" by the ordinance; and fourth, to surplus. MICH. COMP. LAWS § 141.122 (emphasis added); *see also Alan v. Cnty. of Wayne*, 200 N.W.2d 628, 642 n.21 (Mich. 1972) (recognizing that MICH. COMP. LAWS § 141.122 "ensure[s] that revenues . . . pledged to pay the bonds will be properly applied."). *See also* Sewer Ordinance § 12(B) (mirroring these provisions); Water Ordinance § 12(B) (same).

3.      If any "surplus" exists, it may be disposed of by the governing body of the municipal corporation as provided in the Revenue Bond Act. MICH. COMP. LAWS § 141.122. With respect to the Systems and the DWSD Bonds, the Ordinances require that all Revenues of the Systems remain within the Systems by providing that even any surplus funds be used for "purposes related to the System." *See* Sewer Ordinance § 13(F); Water Ordinance § 13(F) (same).

4.      Like the Revenue Bond Act and the Ordinances, the Charter also explicitly prohibits the City from taking the Revenues out of the Systems and requires that the Systems' Revenues be segregated from other funds:

> All moneys paid into the city treasury from fees collected for water, drainage or sewerage services **shall be used exclusively** for the payment of expenses incurred in the provision of these services, including the interest of principal of any obligations issued to finance the water supply and sewerage disposal facilities of the city, and shall be kept in separate funds.

City Charter of Detroit § 7-1203 (2012) (emphasis added); *see also Davis v. City of Detroit*, 711 N.W.2d 462, 465 (Mich. Ct. App. 2005) (holding that the "the Detroit City Charter forbids the city from profiting from the sale of water and requires that all revenues therefrom be used only to fund the activity itself.") (citing City Charter of Detroit § 7-1503, which was the predecessor to Charter § 7-1203).

6

B.    The Revenue Bond Act and the Ordinances provide the Holders with valuable property rights that protect the full payment of the DWSD Bonds.

5.    The Revenue Bond Act and the Ordinances protect the Holders by mandating that the Net Revenues (as defined below) be sufficient to pay the obligations owed to the Holders, and by pledging the Net Revenues to the Holders and securing the bond obligations with a statutory lien. MICH. COMP. LAWS § 141.121; Water Ordinance § 5(A); Sewer Ordinance § 5(a).

6.    The Revenue Bond Act provides for the creation of a pledge and statutory lien in favor of the Holders by:

a.    allowing the authorizing ordinance to "pledge any funds . . . for the payment of the bonds . . . and create a statutory first lien in favor of the holders of the bonds," MICH. COMP. LAWS § 141.107(4); and

b.    mandating the "creat[ion] in the authorizing ordinance a lien, by this act made a statutory lien, upon the net revenues pledged to the payment of the principal of and interest upon such bonds, to and in favor of the holders of such bonds," MICH. COMP. LAWS § 141.108.

7.    Under the Revenue Bond Act, net revenues are "the revenues of a public improvement remaining after deducting the reasonable expenses of administration, operation and maintenance of the public improvement." MICH. COMP. LAWS § 141.103(g).

8.    In accordance with the Revenue Bond Act, the Ordinances provide that "[t]he payment of [the DWSD Bonds] is secured by a statutory lien, which is hereby created, upon the whole of the Pledged Assets," Water Ordinance § 5(A); Sewer Ordinance § 5(a) (same), and the "Pledged Assets" include the Net Revenues. Water Ordinance § 1; Sewer Ordinance § 1. The Ordinances constrain what may be deducted from the Revenues. *See* Sewer Ordinance § 1 (Net Revenues "means Revenues except for those Revenues [credited/transferred] to the Operation and Maintenance Fund"); Water Ordinance § 1 (Net Revenues "means, for any period of time to, all Revenues during such period of time, except for those Revenues transferred to the Operation and Maintenance Fund."). Both Ordinances further limit the Revenues that may be set aside in

7

the Operation and Maintenance Fund to "a sum sufficient to provide for the payment of the **next month's expenses of administration and operation** of the System (including Ancillary Obligation Fees and Expenses) and such **current expenses for the maintenance thereof as may be necessary** to preserve the same in good repair and working order."  Water Ordinance § 12(B) (emphasis added); Sewer Ordinance § 12(B) (same).

9.      Thus, the "***Net Revenues***" are the gross Revenues of each System minus (a) the next month's expenses of administration and operation of each System and (b) the current expenses for the maintenance of each System.  This can be depicted as follows:



10.      The Net Revenues, which are collateral for the DWSD Bonds, are further safeguarded by statutory protections that require, among other things, that rates charged for services be sufficient to pay for the expenses and maintenance of the public improvement, as well as the principal and interest on any bonds issued to finance the public improvement.  MICH. COMP. LAWS § 141.121(1).  If the public improvement does not generate revenues sufficient to pay the foregoing expenses and debt service, the Revenue Bond Act requires that rates be revised to provide sufficient revenues.  MICH. COMP. LAWS § 141.121(2).

C.      The Indentures incorporate the property rights granted under the Revenue Bond Act, Ordinances, and Charter.

11.      The Indentures confirm the fiscally separate nature of the Systems and the property rights afforded to the Holders under both the Revenue Bond Act and the Ordinances:

      a.      "Pledged Assets," which include the Net Revenues, Water Indenture art. I; Sewer Indenture art. I (same),"are pledged to the Trustee for the payment of the Securities in accordance with the terms and provisions of the

Ordinance" and "will immediately be subject to the lien of such pledge," Water Indenture § 2.01; Sewer Indenture § 2.01 (same).

b. The Net Revenues of the Systems "shall be . . . held in trust pursuant to the terms of this Indenture." Water Indenture § 2.03; Sewer Indenture § 2.03 (same).

c. Each lien, which constitutes a "statutory lien . . . granted pursuant to Act 94, [(the Revenue Bond Act),]" continues until [the DWSD Bonds] are defeased and the "Trustee's fees, costs, and expenses" are paid. Water Indenture §§ 4.01−4.02; Sewer Indenture §§ 4.01−4.02.

12. The Indentures also define and limit permitted uses of Systems' Revenues and keep all Revenues segregated from the General Fund for use solely within each respective System. The Indentures require the same accounts established under the Ordinances and also specify the same priority of payments as set forth in the Ordinances. *See* Water Indenture §§ 2.02−2.03 (specifying that the Revenues be expended in the order of operating and maintenance expenses, debt service, replacement funds, rate stabilization fund (if established), improvement and extension fund, and surplus funds); Sewer Indenture §§ 2.02−2.03 (same). The Indentures also restrict the uses of the monies deposited in each fund, including the surplus fund, to applications within the Systems.[11]

13. Taken together, the Revenue Bond Act, Ordinances, Charter, and Indentures establish the Holders' property interests in the Systems' Net Revenues. These interests cannot be impaired and are, in fact, expressly protected by chapter 9 of the Bankruptcy Code.

---

[11] The Indentures also specify allowable transfers of the Systems' Revenues between funds, all of which require the funds to remain within the Systems. *See* Water Indenture § 2.03 ("As of the first day of each month, amounts credited to the Receiving Fund shall be transferred seriatim into the Operation and Maintenance Fund, the Bond Interest and Redemption Funds, Debt Service Accounts, Reserve Accounts, Extraordinary Repair and Replacement Reserve Fund and Improvements and Extension Fund, all of which are held by the Trustee . . . ."); Sewer Indenture § 2.03 (same). Similarly, the Indentures restrict the uses of monies deposited in each fund, including the surplus fund, to applications within the Systems. *See* Water Indenture §§ 2.04−2.10 (specifying uses of monies in each fund and requiring that any monies in the surplus fund be used only for "purposes related to the System," thus creating a completely closed system); Sewer Indenture § 2.04−2.10 (same).

9

# PROCEDURAL HISTORY

## II.      THE PLAN PROPOSES TO IMPAIR THE DWSD BONDS.

14.      Under the Plan, the DWSD Bond Claims are separately classified on a CUSIP-by-CUSIP basis and each CUSIP is classified as "Impaired" or "Unimpaired." (Plan at 27).[12]  The Plan has 337 different Classes of the DWSD Bonds.  With respect to the 186 Classes of Allowed DWSD Bond Claims that are designated as "Unimpaired," the Plan provides the Claims will be Reinstated on the Effective Date.  (*Id.*).  With respect to the 151 Classes of Allowed DWSD Bond Claims that are designated as "Impaired," the Plan provides that the City may elect to satisfy the Claims in Cash or the City may issue one of two New Securities to the Holders, namely: the New Existing Rate DSWD Bonds or the New DWSD Bonds.  The City will issue the New Existing Rate DWSD Bonds only to those Holders who affirmatively elect to receive them and whose Class accepts the Plan.  All of the other Holders will receive the New DWSD Bonds.

15.      The New Existing Rate DWSD Bonds will be issued in the same principal amount and with the same interest rate as the DWSD Bonds they are replacing.  (Plan, Ex. I.A.186).  However, the Plan will strip call protections that exist on certain of the DWSD Bonds.[13]  There are 151 CUSIPS representing over $2.2 billion in outstanding principal amount of the DWSD Bonds with "no-call" periods that extend beyond July 1, 2015, for which call protection will be eliminated if such Holders elect to receive the New Existing Rate DWSD Bonds.  The Plan provides that the City may prepay the New Existing Rate DWSD Bonds *at any time without penalty or premium*.  (*Id.*).

---

[12] The Plan provides that the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bonds Claims will be deemed allowed and Reinstated.  (Plan at 28).  These bonds are also improperly impaired by the UAAL Surcharge.

[13] Certain of the DWSD Bonds have "call protections," meaning they cannot be voluntarily redeemed by the City before a date certain, which is referred to as the "no-call period."

16.     The New DWSD Bonds will also be issued in the same principal amount as the DWSD Bonds they are replacing.  (Plan, Ex. I.A.186).  However, the New DWSD Bonds will be issued with new (lower) interest rates based on the Interest Rate Reset Chart.[14]  (*See* Plan, Exs. I.A.168; I.A.186).  The call protections on the existing DWSD Bonds that are being replaced by the New DWSD Bonds will also be materially modified.  The New DWSD Bonds will be payable in full *at any time on or after* the earlier of five years from the date of issuance or the date upon which the (original) DWSD Bonds exchanged for them would have matured.  (Plan, Ex. I.A.186).  There are 31 CUSIPS representing over half a billion dollars in outstanding principal amount of the DWSD Bonds with no-call periods that extend beyond July 1, 2020.

17.     Finally, on the Effective Date, the City will assume the obligations related to the Prior GRS Pension Plan, as modified by the Plan.  (Disclosure Statement at 11).  The Prior GRS Pension Plan will be closed to new participants, and no pension benefits will continue to accrue after the Effective Date.  (Disclosure Statement at 11).  The Plan provides that from the Effective Date through Fiscal Year 2023, annual contributions shall be made to the Prior GRS Pension Plan in the total approximate amount of $700,000,000 (the "***GRS UAAL***").[15]  (Plan at 33; Disclosure Statement at 36).

18.     The exclusive sources of payment to the Prior GRS Pension Plan from the Effective Date through fiscal year ending June 30, 2023, are: the DIA, the State of Michigan, certain charitable foundations (*i.e.*, the "Grand Bargain"), the City's share of the millage

---

[14] The principal amount of the Holders' New DWSD Bonds and the New Existing Rate DWSD Bonds shall include the amount of the Holders' DWSD Bonds.  (Plan, Exs. I.A.186, I.A.188).  At the City's option, the principal amount may also include an amount equal to accrued and unpaid interest as of the Distribution Date, or the City may pay the accrued interest in Cash.  (Plan at 27).

[15] The GRS UAAL is the result of a variety of practices by the Retirement Systems, including, inaccurate investment return and actuarial assumptions and certain actions that resulted in dissipation of fund assets, including alleged bribery and misappropriation of assets for personal gain.  (Disclosure Statement at 11).

collected under the UTGO settlement, and payments by the DWSD in the amount of $428,500,000. (Plan, Ex. II.B.3.r.ii.A).

19.     According to the City, the $428,500,000 to be paid by the DWSD "constitute[s] its full allocable share of the GRS UAAL" and will fund all of "the underfunded GRS liabilities allocable to DWSD that will have accrued as of June 30, 2014" (such "allocable" amount hereafter referred to as the "***UAAL Surcharge***"). (Disclosure Statement at 62).  However, notwithstanding the City's statement that the UAAL Surcharge is the DWSD's "full allocable share of the GRS UAAL," even after the initial nine-year period ending fiscal year June 30, 2023, is completed and the DWSD has paid the full amount of $428,500,000, the City may thereafter recalculate the DWSD's allocable share[16] of the GRS UAAL, and require the DWSD to make additional payments into the Prior GRS Pension Plan. (*Id*. at 22).  Therefore, the UAAL Surcharge is only the floor with respect to how much money the City may ultimately extract from the DWSD to pay its alleged allocable share of the GRS UAAL.

20.     The City also proposes that the UAAL Surcharge be paid from each System's Operation and Maintenance Fund as an "operating expense." (*Id*.).  By making this $428,500,000 payment as an operating expense, it will be paid ahead of debt service on all of the DWSD Bonds, including the DWSD Bonds that are categorized under the Plan as "Unimpaired."[17]

---

[16] The City claims that the DWSD will never pay more than 100% of its allocable share of the GRS UAAL. However, the total dollar amount the DWSD may have to pay for its share could increase if investment and actuarial assumptions with respect to the Prior GRS Pension Plan turn out to be inaccurate over the next nine years.  In addition, when a City employee retires, all of that employee's retirement benefits are allocated to the last City department the employee worked in (*i.e.*, retired from).  Accordingly, if employees with vested retirement benefits are transferred from other departments to the DWSD prior to their retirement, the DWSD's pro rata share may increase.  There may be an infinite number of other ways the City could subsequently conclude that the DWSD's allocable share of the GRS UAAL exceeds $428,500,000.

[17] It is the Trustee's position that all of the DWSD Bonds are impaired as a result of the City's proposed payment of the UAAL Surcharge as an operating expense of the Systems.

21. For the first nine years after the Effective Date, the DWSD is the only City department making a contribution to the GRS UAAL. The rest of the City will benefit from a moratorium on paying their ratable shares of the GRS UAAL. (Plan at 33; Disclosure Statement at 22). From the information disclosed to the Trustee to date, it is far from clear how the UAAL Surcharge was derived, whether it is truly the DWSD's allocable share, and whether it constitutes (a) "prefunding" or "catch-up" or (b) "accelerated funding" or "disproportionate catch-up," of the GRS UAAL.[18] What is clear is that the UAAL Surcharge is not a current expense of the Systems.

22. By terminating or limiting call protection, lowering interest rates, and inserting the UAAL Surcharge ahead of the Systems' debt service payments and diminishing the Net Revenues, the Plan impairs all of the DWSD Bonds by impermissibly altering the property interests granted to the Holders under Michigan law and the DWSD Bond Documents, which interests are protected by the Bankruptcy Code.

## ARGUMENT

## III. THE CITY BEARS THE BURDEN OF PROOF.

23. The City bears the burden of proving, by a preponderance of the evidence, that the Plan satisfies all requirements for confirmation. *In re Valley Health Sys.*, 429 B.R. 692, 709 n.41 (Bankr. C.D. Cal. 2010) ("The debtor bears the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence."); *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 855–56 (Bankr. D.S.C. 2012) (noting, in a chapter 9 proceeding, the debtor must meet the requirements of § 943(b) by a preponderance of the evidence); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) (same). As will be set forth in detail below, the City does not and cannot satisfy this burden, and the Plan may not be confirmed.

---

[18] The determination of the DWSD "allocable" share of GRS UAAL will be the subject of discovery.

## IV. MICHIGAN LAW GRANTS THE HOLDERS PROPERTY RIGHTS THAT ARE ENTITLED TO PROTECTION IN BANKRUPTCY.

24. State law determines the nature and extent of property interests that must be protected in a bankruptcy:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.

*Butner v. United States*, 440 U.S. 48, 55 (1979) (citation and quotation omitted); *In re City of Detroit*, 504 B.R. 191, 247 (Bankr. E.D. Mich. 2013) (noting that under *Butner* bankruptcy courts are required to protect property interests). Under Michigan law, property is defined quite broadly and includes more than simply "title." *Lookholder v. Ziegler*, 91 N.W.2d 834, 838 n.7 (Mich. 1958). It consists of a "bundle of rights," including "the right to use, the right to mortgage, [and] the right to lease . . . ." *NACG Leasing v. Dep't of Treasury*, 843 N.W.2d 891, 892 n.8 (Mich. 2014) (citation and quotation omitted). A property interest in an income or revenue stream is also permitted. *Royal Oak Twp. v. City of Berkley*, 16 N.W.2d 83, 85 (Mich. 1944) (recognizing property rights in a future income stream); *Eastbrook Homes, Inc. v. Treasury Dep't*, 820 N.W.2d 242, 249 (Mich. Ct. App. 2012), *leave to appeal denied*, 821 N.W.2d 890 (2012), *reconsideration denied*, 825 N.W.2d 77 (2013) (a "right to income derived from [] property" may be a property right) (citations omitted).

25. The Holders have protected property interests consisting of both their statutory liens in the Net Revenues generated by the Systems *and* the statutory restrictions on the use of those Revenues. Michigan law provides that a lien is an interest in the property subject to the lien. *Cook v. Landmark Delta, LLC*, No. 306421, 2013 WL 5629629, at *1 (Mich. Ct. App. Oct.

15, 2013) ("A lien provides the lienor with an interest in the property that has been improved.")
(citing *Old Kent Bank of Kalamazoo v. Whitaker Constr. Co.*, 566 N.W.2d 1, 2 (Mich. Ct. App.
1997)); *Spencer v. PNC Mortg.*, No. 307925, 2013 WL 951273, at *2 (Mich. Ct. App. Feb. 26,
2013) (describing a recorded lien as "an interest in the property").

26.     The Revenue Bond Act authorized the City to pledge the Systems' Net Revenues
to secure repayment of the DWSD Bonds and required that the Ordinances create liens, which
are statutory liens under the Revenue Bond Act, on the Net Revenues pledged to payment of the
DWSD Bonds.   MICH. COMP. LAWS §§ 141.107a(1)(a), 141.108.   The Ordinances and the
Indentures provide such liens on the Net Revenues.   Water Ordinance §§ 5(A), 7(A); Sewer
Ordinance §§ 5(a), 7(a) (same); *see also* Water Indenture § 2.01 (same); Sewer Indenture § 2.01
(same).  The Net Revenues remain subject to the liens until the DWSD Bonds are paid in full.
MICH. COMP. LAWS § 141.109.

27.     The Revenue Bond Act, Ordinances, Charter, and Indentures all provide for
closed Systems with Revenues that can only be used within the Systems.  They further prioritize
the payments that can be made from those Revenues, and sharply define the items which may be
paid from the Revenues prior to debt service on the DWSD Bonds.   MICH. COMP. LAWS
§§ 141.103(g), 141.107(2); *see also* Water Ordinance §§ 1, 12(B) ("Pledged Assets" includes
"Net Revenues"); Sewer Ordinance §§ 1, 12(b) (same); Water Indenture § 2.01–2.02, 2.10;
Sewer Indenture § 2.01–2.02, 2.10.[19]

---

[19] Both the Revenue Bond Act and the Ordinances also create an express trust in the Net Revenues of the Systems,
which further demonstrates that the intent of the state law is to set aside the Net Revenues solely for the benefit of
the Holders and restrict the ability to alter claims against the Net Revenues.  Section 141.138 of the Revenue Bond
Act explicitly provides that an ordinance "may provide for . . . the payment and security of the bonds including
provision that funds, including the proceeds of the bonds, which are trust funds under the ordinance, may be held in
trust by the trustee for the primary benefit and payment of the holders of the bonds." MICH. COMP. LAWS § 141.138.
The Ordinances authorize the pledge of the Net Revenues to the Holders for payment of the DWSD Bonds.  *See*
Water Ordinance §§ 1, 5 (providing that "the payment of Secured Obligations is secured by . . . the whole of the
Pledged Assets" where "Pledged Assets" includes "Net Revenues"); Sewer Ordinance § 1, 5 (same).  Consistently,

28.     The United States Supreme Court has consistently protected property interests granted to creditors to protect the repayment of debt. *See, e.g., United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) (creditor's lien on property securing a debt is "property right of the same creditor in the collateral"); *Armstrong v. United States*, 364 U.S. 40, 44–46 (1960) (materialmen with liens on boat hulls under construction had compensable property interests protected by Fifth Amendment); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 594–95 (1935) (Bankruptcy Act amendment which would deprive mortgagee of its state law rights "to retain [its] lien until the indebtedness thereby secured is paid" constituted Fifth Amendment taking); *see also Americredit Fin. Servs., Inc. v. Nichols (In re Nichols)*, 440 F.3d 850, 854 (6th Cir. 2006) (noting Supreme Court recognizes that a creditor has a property right "in the collateral that secures the debt," which is "subject to the Fifth Amendment's prohibition against taking property without just compensation," and contract right and property right together "constitute the 'bundle of rights' held by the secured creditor") (citing, in part, *United States v. Sec. Indus. Bank*, 459 U.S. at 75); *In re Kamstra*, 51 B.R. 826, 829 (Bankr. W.D. Mich. 1985) ("Liens created by state law are enforceable interests compensable under the Fifth Amendment.").

29.     Because Federal law, including the confirmation standards incorporated in chapter 9, demands protection of the Holders' state-law property interests, this Court "should take whatever steps are necessary to ensure that [the Holders] are afforded in federal bankruptcy court the same protection [they] would have under state law had no bankruptcy ensued." *Butner*, 440 U.S. at 56. Nothing in the Bankruptcy Code allows these rights to be impaired.

---

the Indentures provide for a trust in the Revenues of the Systems in favor of the Holders. Water Indenture § 2.03 (providing that the Net Revenues of the System "shall be . . . held in trust pursuant to the terms of this Indenture"); Sewer Indenture § 2.03 (same). Under Michigan law, that means that the Holders have property interests in the Revenues of the Systems. *See Fisher v. Hampton Transp. Co.*, 98 N.W. 1012, 1013 (Mich. 1904) (holding "the beneficiary [under a valid trust] has an enforceable equitable interest in the property"); *In re Estate of White*, Nos. 279866, 279867, 281420, 2008 WL 4927106, at *5 (Mich. Ct. App. Nov. 18, 2008) (same).

## V. CHAPTER 9 EXPLICITLY PROTECTS THE HOLDERS' RIGHTS IN THE NET REVENUES OF THE SYSTEMS.

30. The Net Revenues are "special revenues" as that term is defined in § 902(2).[20] As such, chapter 9 provides the DWSD Bonds with specific protections for the Holders' property rights in the Net Revenues. In particular, §§ 903, 922(d), 927, 928, 943, and 1111(b), which is incorporated into chapter 9, all work together to specifically protect the interests of the Holders against impairment of any type and at all times.

31. Congress enacted the 1988 Amendments[21] to chapter 9 with the specific intent to remedy the conflicts between special revenue financing and the then-existing Bankruptcy Code. The Senate report shows that Congress enacted the 1988 Amendments to protect the benefit of the bargain of special revenue bondholders, and to ensure that pledged special revenue funds were not used for the general obligations of a municipality. *See* S. REP. NO. 100-506, at 12. That is, even when a bankruptcy filing has occurred, the 1988 Amendments "insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, namely, they will have unimpaired rights to the project revenues pledged to them." S. REP. NO. 100-506, at 12. In enacting the 1988 Amendments, Congress intended to establish predictability in the marketplace by providing exceptions to the Bankruptcy Code provisions which might otherwise prevent holders of special revenue bonds from receiving "the benefit of their bargain." *In re Heffernan Mem'l Hosp.*, 202 B.R. 147, 148 (Bankr. S.D. Cal. 1996) ("The 1988 Amendments were intended to preserve a dichotomy between general obligation and special revenue bonds for the collective benefit of bondholders (to secure the benefit of their bargain), municipalities (to

---

[20] *See, e.g. Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* (Doc. 11, Ex. B at 22–23).

[21] The "***1988 Amendments***" refer to the Municipal Bankruptcy Amendments, Pub. L. No. 100597, 102 Stat. 3028 (1988) and its amendments, which were drafted, *inter alia*, to assure capital markets that "liens on 'special revenue' [would] not be extinguished, that prepetition payments on bonds and notes [would] be free from the taint of possible preference attack, and that revenue bonds [would] not be transformed into general obligation bonds." *The Handbook of Municipal Bonds* 154-55 (Sylvan G. Feldstein & Frank J. Fabozzi eds., 2008).

maintain the effectiveness of the revenue financing vehicle) and taxpayers (to ensure that revenue obligations were not transformed into general obligations) (citing generally to H.R. Rep. 100-1011, at 6–7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4115, 4120–4121).

32.     Simply put all Net Revenues must be used to pay the DWSD Bonds according to their terms, including contractual rates of interest and call protection.  Moreover, the City cannot invade the lien on the Net Revenues by paying amounts ahead of debt service that are not proper expenses of administration and operation of the Systems.  There is nothing in the Bankruptcy Code that permits a municipal debtor at confirmation to diminish the special revenue liens and state law restrictions on the uses of special revenues that are protected throughout the case.

33.     The Plan clearly attempts to alter the benefit of the bargain between the City and the Holders.  Instead of honoring the terms of the DWSD Bond Documents, the City seeks to lower the interest rates payable on many of the DWSD Bonds, eliminate or materially change call protections, and impair the lien by encroaching upon the Net Revenues to pay the UAAL Surcharge.  Permitting these actions abrogates the Holders' bargained-for and statutorily protected property rights, contradicts Congressional intent embodied in chapter 9, and violates the confirmation provisions of chapter 9.  Chapter 9 does not allow such a result, and thus, the Plan cannot be confirmed.

## VI.     THE PLAN DOES NOT MEET THE CONFIRMATION REQUIREMENTS OF § 943.

### A.     The Plan does not satisfy the requirements of § 943(b)(1) and (2) because it alters the terms of the City's bargain with the Holders and strips the Holders' liens on the Net Revenues.

34.     Section 943(b)(2) requires that the Plan comply with the requirements of all sections of chapter 9, which include §§ 903, 927, and 928.  *See Barnwell Cnty. Hosp.*, 471 B.R. at 867 ("Section 943(b)(2) requires as a condition to confirmation that the plan comply with the

provisions of chapter 9.”); *In re Bamberg Cnty. Mem'l Hosp.*, No. 11-03877, 2012 WL 1890259, at *6 (Bankr. D.S.C. May 23, 2012).  In addition, § 943(b)(1) requires that the Plan comply with the provisions in title 11 made applicable to chapter 9 by §§ 103[(f)] and 901; section 1111(b) is one of these sections.  11 U.S.C. § 901.

<blockquote>i. *The UAAL Surcharge violates § 928(a).*</blockquote>

35. The Plan violates § 928 with respect to the UAAL Surcharge.  Section 928(a) preserves a creditor's lien on "special revenues" acquired by the municipal debtor after it files a bankruptcy petition.[22]  As stated above, the Holders have a statutory lien on the Net Revenues. *See* Water Ordinance § 5(A); Sewer Ordinance § 5(a).  Net Revenues are defined to encompass all Revenues "except for those Revenues transferred to the Operation and Maintenance Fund." Water Ordinance § 12(B); Sewer Ordinance § 12(B).  The Ordinances limit the amount of the Systems' Revenues that may be set aside in the Operation and Maintenance Fund to "a sum sufficient to provide for the payment of **next month's expenses of administration and operation** of the System (including Ancillary Obligation Fees and Expenses) and such **current** expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order."  Water Ordinance § 12(B) (emphasis added); Sewer Ordinance § 12(B) (same).

36. The UAAL Surcharge does not fit within the description of expenses eligible to be paid from the Operation and Maintenance Fund.  According to the City, the UAAL Surcharge is ostensibly the DWSD's share of the GRS UAAL.  The GRS UAAL is the unfunded accrued liability that the City owes to the Prior GRS Pension Plan due to prior erroneous investment and actuarial assumptions and past improper pension plan practices.  On June 14, 2014, the Prior

---

[22] *See* H.R. Rᴇᴘ. 100-1011, at 7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4115, 4121 ("New section [928] leaves the legal and contractual limitations of revenue bonds and state law intact without otherwise altering Bankruptcy Code provisions with respect to nonrecourse financing.").

11839144

GRS Pension Plan will be "frozen." No new pension benefits will accrue to existing City employees, including the DWSD employees, and no new employees will be added to the Prior GRS Pension Plan after June 14, 2014. Thus, the GRS UAAL is an accrued long-term liability of the City that can be amortized over as many as thirty years.[23] To the extent the UAAL Surcharge is the DWSD's ratable share of the GRS UAAL, the UAAL Surcharge is also an accrued long term liability that can be amortized over thirty years. It is not, under any circumstances, the "next month's expenses of administration and operation of the System[s]" or "such current expenses for the maintenance [of the Systems] as may be necessary to preserve the same in good repair and working order."[24] Accordingly, it cannot be paid out of the Operation and Maintenance Funds of the Systems prior to debt service on the DWSD Bonds without impermissibly stripping the Holders' liens on the Net Revenues in violation of §§ 928(a) and 943(b)(2).

37. Further, paying the UAAL Surcharge as an operating expense is not critical to the effectuation or feasibility of the Plan. The UAAL Surcharge, to the extent it accurately reflects the DWSD's allocable share of the GRS UAAL, can be paid after debt service. The City's projections show that there are ample Net Revenues to make the UAAL Surcharge payments after payment of true operating expenses and all of the obligations under the DWSD Bond Documents. If actual Revenues are lower, or actual operating expenses are higher, in future years than projected, the City has the statutory duty to raise rates for the Systems' services as necessary to generate sufficient Revenues to pay all of the costs of services, including the

---

[23] "[T]he maximum acceptable amortization period [for unfunded actuarial accrued liabilities] is 30 years." *See Governmental Accounting Standards Board, Statement No. 27 of the Governmental Accounting Standards Board Accounting for Pensions by State and Local Governmental Employers* 6 (No. 116-C Nov. 1994).

[24] *See, e.g. Cnty. of Orange v. Ass'n of Orange Cnty. Deputy Sheriffs*, 192 Cal. App. 4th 21, 34 (Cal. Ct. of App. 2d Dist. 2011) ("'[UAAL] does not represent a debt that is payable today.'") (citing *Bandt v. Bd. of Retirement*, 136 Cal. App. 4th 140, 157 (2006)) (brackets in original); *Gabriel Roeder Smith & Company, The General Retirement System of the City of Detroit: 75th Annual Actuarial Valuation* E-8 (Apr. 4, 2014) (with a valuation date of June 30, 2013) ("Unfunded actuarial accrued liabilities do not represent a bill payable immediately. . . .").

operating expenses, debt service on the DWSD Bonds, and the UAAL Surcharge.  It is the City that controls its destiny in making the UAAL Surcharge payments.  By making the UAAL Surcharge payments ahead of debt service, the City is not only violating the Revenue Bond Act, Ordinances, Indentures, and the protections afforded the Holders under chapter 9, but it is shifting the risk that the City will not properly manage the Systems going forward to the Holders.  That risk lies properly with the City.

38.     The City is also the party that has chosen to amortize the UAAL Surcharge over a nine-year period rather than the thirty-year period permitted by accounting rules.[25]  The City has made this choice so that it can make agreed upon payments to the retirees in the Prior GRS Pension Plan, while at the same time allowing the rest of the City departments to enjoy a 9-year holiday from making their contributions toward the GRS UAAL, further disproportionately shifting to the DWSD and the Holders the burden of paying the GRS UAAL and making Plan payments to the retirees.

ii.     *The Plan violates §§ 927 and 1111(b) by eliminating call protections.*

39.     When Congress enacted the 1988 Amendments, it acted to "insure that revenue bondholders receive the benefit of their bargain with the municipal issuer . . . ."  S. REP. NO. 100-506, at 12.  By eliminating or limiting the no-call protections, the City is denying the Holders the "benefit of their bargain" and violating one of the fundamental tenets of chapter 9.[26]

---

[25] *See supra* note 23.  Further, this accelerated amortization is contrary to the City's standard UAAL amortization practice. *See Gabriel Roeder Smith & Company, The General Retirement System of the City of Detroit: 75th Annual Actuarial Valuation* E-2 (Apr. 4, 2014) (with a valuation date of June 30, 2013) ("Unfunded actuarial accrued liabilities are amortized over a 30-year period . . . to produce contribution amounts (principal & interest) which are level percent-of-payroll contributions." (emphasis omitted).

[26] The DWSD Bonds have not been accelerated.  Generally, the DWSD Bonds that have call protection do not provide a specific premium or liquidated damage for breach of the call protection.  However, certain of the DWSD Bonds that are presently under no-call protection contain call premiums once they become callable.  These future call premiums will also be lost under the Plan.  As stated above, the Plan provides for the elimination of call protection on the New Existing Rate DWSD Bonds and to limit call protection on the New DWSD Bonds to the earlier of "(a) the date that is five years after the date such New DWSD Bonds are issued or (b) the date upon which

11839144
13-53846-tjt   Doc 4647   Filed 05/12/14   Entered 05/12/14 18:15:24   Page 24 of 52

40.     The no-call provisions assure the Holders of the subject DWSD Bonds that they will receive their bargained-for rate of return during the no-call period.  The call protections also resulted in the interest rates on the subject DWSD Bonds being lower than if they had been issued without call protections.[27]  Thus, the call protections benefit not only the Holders, but also benefitted the City.  Having reaped the benefits of the call protections to date, the City now proposes to strip the call protection from the subject DWSD Bonds because the City erroneously believes it can refinance the subject DWSD Bonds at lower interest rates.

41.     Even if chapter 9 allowed changes to be made to special revenue debt, the Plan violates §§ 927 and 1111(b) by eliminating or limiting the Holders' call protections.

42.     Bankruptcy courts have allowed damage claims incurred by creditors due to early debt repayment in both the context of contractual prepayment premiums and in the context of no-call provisions.   While each provision compensates creditors for similar damages, they are analyzed separately.  Courts have analyzed and allowed prepayment premiums as secured claims under § 506(b) when creditors are oversecured and when the contract provides for a reasonable premium.[28]  No-call claims are analyzed as claims allowable under § 502.  In short, the existence

---

the DWSD Bonds for which such New DWSD Bonds were exchanged pursuant to the Plan would have matured." (Plan, Exs. I.A.186; I.A.188).

[27] Where there are not any call protections, lenders build in a higher rate of return to compensate them for the risk that the sums borrowed will be prepaid early and not provide the anticipated return.  *See Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Ass'n (In re Premier Entm't Biloxi LLC)*, 445 B.R. 582, 629 (Bankr. S.D. Miss. 2010) (noting that no-call provisions are built into documents in order to preserve a stream of income over a fixed period of time for the lender) (citations and quotations omitted); *In re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 712 (Bankr. D. Md. 1993) ("In this case, when the loan agreements were signed, [the creditor/lender] could anticipate a potential loss of interest income if the Debtors prepaid their loan.")

[28] See *In re Outdoor Sports Headquarters, Inc.*, 161 B.R. 414, 424 (Bankr. S.D. Ohio 1993) ("[A]ctual damages are measured by the difference between: 1) the market rate of interest on the prepayment date, and 2) the contract rate, for the remaining term of the loan, then discounted to arrive at present value."); *In re Imperial Coronado Partners, Ltd.*, 96 B.R. 997, 1001 (B.A.P. 9th Cir. 1989).   Michigan courts have recognized that creditors should be compensated when a creditor's rights to an uninterrupted stream of payments is impermissibly repaid.  *See Eyde v. Empire of Am. Fed. Savs. Bank*, 701 F. Supp. 126, 128–29 (E.D. Mich. 1988) (recognizing that "a prepayment premium insures the lender against loss of his bargain if interest rates decline").

of a no-call provision gives rise to a damage claim regardless of whether the contract provides a specific methodology for determining the amount of damages.

43.     In the chapter 11 context, bankruptcy courts have recognized that a secured creditor may be entitled to an allowed claim for damages resulting from breach of a no-call provision.  *See Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Ass'n (In re Premier Entm't Biloxi LLC)*, 445 B.R. 582, 627, 636–46 (Bankr. S.D. Miss. 2010); *In re Calpine Corp.*, 365 B.R. 392, 399 (Bankr. S.D.N.Y. 2007).  In *Premier Entertainment*, the bankruptcy court found that: (a) the lenders were entitled to allowance of an unsecured claim for damages incurred as a result of the breach of a no-call provision, and (b) despite the absence of any provision in the indenture requiring payment of a premium upon repayment in the no-call period the lenders are entitled to a monetary award of expectation damages.  445 B.R. at 636.  Similarly, in *Calpine*, although the indentures did not specify a prepayment premium, the secured lenders "still have an unsecured claim for damages for the Debtors' breach of the agreements."  365 B.R. at 399.[29]

44.     Inside the chapter 9 context, however, § 927 prohibits claims payable from special revenues from being treated as recourse claims.  Therefore, allowing the Holders an allowed unsecured claim is not the answer in this case.  Section 1111(b), which is incorporated into chapter 9, applies to special revenue debt but is modified by § 927.  In effect, § 1111(b) with § 927 requires that the City pay the Holders the full amount of their Claims, including any damages for loss of call protections, as an allowed Secured Claim.  To provide the Holders with the benefit of their bargain and to comply with the requirements of chapter 9, the affected Holders must be granted an allowed Secured Claim for the damages caused by the loss of call protection, and that allowed Secured Claim must be paid in full from the Systems' Net

---

[29] The Holders of the DWSD Bonds containing future call premiums are also entitled to an allowed Claim for losing the future premiums at the end of the existing no-call periods.

Revenues, together with the other obligations owing by the City under the DWSD Bond Documents. Thus, as currently proposed, the Plan is not confirmable because it fails to compensate the Holders for the elimination of call protection.

      B.      <u>Section 943(b)(4) bars the City from altering its bargain with the Holders in contravention of Michigan law.</u>

45.     Section 943(b)(4) allows confirmation of a plan only when "the debtor is not prohibited by law from taking any action necessary to carry [it] out . . . ." Thus, under § 943(b)(4), a city "may not, for example, issue bonds as part of a plan that will not conform to all state law requirements for such bonds." *In re City of Columbia Falls, Mont., Special Improvement Dist. No. 25*, 143 B.R. 750, 760 (Bankr. D. Mont. 1992) (citing *Matter of Sanitary & Improvement Dist., No. 7*, 98 B.R. 940, 974–75 (Bankr. D. Neb. 1989)); *see* 5 Norton Bankr. L. & Prac. 3d § 90.20 ("[T]he debtor must not be prohibited by law from taking any action necessary to carry out the plan.").

46.     The Revenue Bond Act and Ordinances, as discussed above, provide that the DWSD Bonds must be secured by a statutory lien on the Net Revenues. *See generally* MICH. COMP. LAWS § 141.107(2); Water Ordinance § 5(A); Sewer Ordinance § 5(a). The Ordinances limit what can be paid from the Systems' gross Revenues in determining the Net Revenues.

47.     The City may deduct only administration and operation expenses in an amount sufficient to make next month's payments and only an amount of *current* expenses necessary for maintenance to preserve the Systems in good repair and working order. As discussed herein, the Revenue Bond Act, Ordinances, and Charter cannot be altered by the Plan. Because the Plan seeks to change the restrictions on the use of the gross Revenues of the Systems by providing for payment of the UAAL Surcharge ahead of debt service on the new bonds, it does not leave the

Holders' lien intact and does not comply with Michigan law.[30]  Because the Plan proposes to issue securities that do not comply with Michigan law, § 943(b)(4) bars confirmation.

        C.      The Plan violates the best interests of creditors test under § 943(b)(7).

        48.     A chapter 9 plan cannot be approved unless it is "in the best interests of creditors." 11 U.S.C. § 943(b)(7).  The City's plan is not in the best interest of the Holders.

        49.     The legislative history of § 943(b)(7)'s "best interests of creditors" test counsels that "in making such a determination, it is expected that the court will be guided by standards set forth in *Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943), and *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563 (9th Cir. 1940)."  H.R. REP. 95-595, at 549 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6465 (footnotes omitted).

        50.     Congress's reference to *Fano* and *Kelley* is instructive.  In *Fano*, the Ninth Circuit held that the debtor must show that it cannot honor its current obligations to creditors in order to satisfy the standard.  114 F.2d at 565–66 (reversing plan confirmation because the debtor failed to show "why the tax rate should not have been increased" or "that the taxing power was inadequate to raise the taxes to pay [the creditors]").  In *Kelley*, the U.S. Supreme Court reversed the district court's ruling that a municipal debtor's proposed plan was "fair and equitable" and in "the best interests of the creditors."  319 U.S. at 417.  The *Kelly* court held that the court below did not meet its obligation to make express findings of fact based on current and projected revenues and expenses to ascertain whether the debtor could meet its obligations.  *Id*. at 420.

        51.     The best interests standard requires both that the debtor must make reasonable efforts to meet its obligations and that its plan must provide the creditors with better treatment than they would receive if the case were dismissed.  *Cnty. of Orange v. Merrill Lynch & Co. (In*

---

[30]  In addition, as discussed below, the failure to leave the Holders' lien intact results in a violation of § 1129(b)(2)(A)(i).

*re Cnty. of Orange)*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (citing 4 Collier on

Bankruptcy, ¶ 943.07 (7) (15th ed. 1995)). It requires that "a proposed plan provide a better

alternative for creditors than what they already have." *In re Mount Carbon Metro. Dist.*, 242

B.R. 18, 34 (Bankr. D. Colo. 1999). The City acknowledges this argument, stating that "[t]o

satisfy this 'best interests of creditors' test, a chapter 9 debtor must establish that confirmation of

its proposed plan of adjustment, more likely than not, would leave the debtor's creditors in a

better position than would dismissal of the debtor's chapter 9 bankruptcy case." (Disclosure

Statement at 78).

52.     The standard ensures that a proposed plan "affords *all* creditors the potential for

the *greatest economic return* from the debtor's assets." *Barnwell Cnty. Hosp.*, 471 B.R. at 869

(emphasis added); *see Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'ship*, 526

U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to creditors holding impaired claims,

even if the class as a whole votes to accept the plan."); *Bonner Mall P'ship v. US Bancorp*

*Mortgage Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 914 n.35 (9th Cir. 1993) ("Creditors are

given guarantees as *individual creditors* under the best interests test."); *ACC Bondholder Grp. v.*

*Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 367 (S.D.N.Y.

2007) ("the best interests test . . . is designed to protect the individual creditors even in the face

of majority support for a plan."). Accordingly, it requires an examination of the Plan's treatment

of, not creditors generally or collectively, but each of the creditors, including the Holders of the

DWSD Bond Claims.

53.     The Plan does not meet the best interests standard. Outside of a chapter 9

proceeding, the Revenue Bond Act, Ordinances, Charter, and Indentures would bar payment of

the UAAL Surcharge from the Operations and Maintenance Funds, and prevent reductions in the

interest rates, and elimination or limitation of the call protections. Therefore, the Plan does not provide a better alternative for the Holders than what they already have.

54. Moreover, the Plan does not afford the Holders the potential for the greatest economic return from the Systems. The Systems are solvent and able to pay all of the obligations due under the DWSD Bonds, including contract interest through any contractual no-call periods. The City appears to agree with this conclusion. According to the Plan and Disclosure Statement, the Plan is feasible even if the City realizes $0 in interest savings. (*See, e.g.* Disclosure Statement at 63 ("Based on the City's analysis, the resetting of interest rates on the New DWSD Bonds pursuant to the Interest Rate Reset Chart will save the City between $0 and $320 million on a net present value basis.")). Similarly, there is nothing in the Plan or Disclosure Statement to suggest that the proposed interest savings the City says will result from termination or limitation of call protections is necessary for the Plan to be feasible or otherwise confirmable. Finally, there is nothing in the Plan or Disclosure Statement to support a conclusion that payment of the UAAL Surcharge as an operating expense, as opposed to after debt service, is necessary for the Plan to be feasible or otherwise confirmable. If the UAAL Surcharge is paid after the obligations due on the DWSD Bonds, as it should be, it will still reduce the GRS UAAL to the same extent as if it were made from the Operation and Maintenance Fund of each System.

55. Courts have long held that solvent debtors cannot use the equitable powers of the Bankruptcy Code to alter or impair the rights of their secured creditors. *Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re: Dow Corning Corp.)*, 456 F.3d 668, 671 (6th Cir. 2006) (holding that "absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights," And the secured

creditors "ought to be granted the benefit of their bargains."); *In re BWP Transp., Inc.*, 462 B.R. 225, 236 (Bankr. E.D. Mich. 2011) (denying confirmation of a solvent debtor's plan because it did not propose to pay the secured creditor its contractual fees, expenses and interest rates, which were permitted by Michigan law). Otherwise, "the benefit derived from any reduction in the contract rate would not inure to the creditors but would instead be a windfall to the debtor." *In re Consol. Operating Partners L.P.*, 91 B.R. 113, 116–17 (Bankr. D. Colo. 1988); *In re Courtland Estates Corp.,* 144 B.R. 5, 9 (Bankr. D. Mass. 1992) ("use of [a different rate] would merely provide an undeserved windfall to the Debtor"). *See also* KPMG, City of Detroit Water Fund, Basic Financial Statements, at 4–5 (June 30, 2012) (evincing the Water System's solvency); KPMG, City of Detroit Sewage Disposal Fund, Basic Financial Statements, at 4–5 (June 30, 2012) (evincing the Sewage System's solvency).

56. While it is true that the DWSD is not a separate legal entity from the City, the Systems are, in fact, separate enterprise funds that are to be segregated from the City's general fund and operations. The Revenues of the Systems must be segregated from other funds and accounts of the borrower. MICH. COMP. LAWS § 141.122. The Charter explicitly requires that the Systems' Revenues be used exclusively for the payment of expenses incurred in the provision of water and sewer services, including the payment of the obligations issued to finance the Systems. City Charter of Detroit § 7-1203 (2012) (emphasis added); *see also Davis v. City of Detroit*, 711 N.W.2d 462, 465 (Mich. Ct. App. 2005) (holding that the "the Detroit City Charter forbids the city from profiting from the sale of water and requires that all revenues therefrom be used only to fund the activity itself.") (citing City Charter of Detroit § 7-1503, which was the predecessor to Charter § 7-1203). *See supra* Section I(A)(2)–(4). In addition to the limitations

on the use of Systems' Revenues, the DWSD Bonds are also limited recourse obligations payable from the Revenues.

57.     For purposes of evaluating the City's proposed treatment of the DWSD Bonds under the Plan, the Court should consider the DWSD and the Systems independently from the rest of the City's general fund and general obligations.  In doing so, the Systems are clearly solvent.  Therefore, the City should not be permitted to eliminate any of the Holders' rights.  In this instance to do so would clearly violate the best interests test as to the Holders.

58.     Finally, as stated elsewhere in this Objection, even if the Systems did not currently generate sufficient revenues to pay the contract rates of interest on all of the DWSD Bonds through their no-call dates, the City has the statutory mandate to raise rates as necessary to cover the costs of services, including debt service at the current interest rates.  The City has made no showing that it could not raise rates and increase the Revenues to an appropriate level.

59.     Because the City cannot establish that impairing the DWSD Bonds complies with the § 947(b)(7) best interests test, the Plan cannot be confirmed.

    D.    <u>The Plan is not conditioned upon the necessary regulatory and electoral approvals, as required by § 943(b)(6).</u>

60.     Section 943(b)(6) requires the City to either condition its Plan upon or obtain in advance "any regulatory or electoral approval necessary under applicable nonbankruptcy law." "Section 943(b)(6) requires regulatory or electoral approval for any action to be taken under the plan that would require such approval in the absence of the chapter 9 case." *Barnwell Cnty. Hosp.*, 471 B.R. at 868.  At first glance, the Plan appears to condition the consummation of the Plan on receipt of the requisite regulatory approvals, but closer review shows that the contingency is illusory:

**A.    Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of [the] following conditions have been satisfied **or waived** in accordance with Section III.B:

. . . .

5.    All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked . . . .

6.    Any legislation that must be passed by the Michigan Legislature to effect any term of the Plan shall have been enacted.

. . . .

**B.    Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A. **may be waived in whole or part at any time by the City in its sole and absolute discretion**.

(Plan at 39–40) (emphasis added).

61.    Nothing in chapter 9 or the Bankruptcy Code gives the City power to "waive" § 943(b)(6)'s requirement. *Barnwell Cnty. Hosp.*, 471 B.R. at 868–69 (§ 943(b)(6)'s "condition cannot be waived."). As shown below, to issue new bonds, the City must meet the requirements set forth in the Revenue Bond Act and the Revised Municipal Finance Act (the "***RMFA***"). Congress specifically contemplated that needed regulatory or electoral approval for "the incurring of indebtedness" in enacting § 943(b)(6). *See* H.R. REP. 100-1011, at 8-9 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4115, 4122–23. Because the City has not yet satisfied the requirements of the Revenue Bond Act and the RMFA nor conditioned the Plan upon meeting those requirements, the Plan cannot be confirmed under § 946(b)(6).

>    *i.    The City is not complying with the requirements of the Revenue Bond Act.*

62.    The Revenue Bond Act provides specific procedures that municipalities must comply with to raise funds for public improvements. *See* MICH. COMP. LAWS § 141.101 *et seq.*;

*Yurek v. City of Sterling Heights*, 194 N.W.2d 474, 475 (Mich. Ct. App. 1971) (same). To issue

new bonds under the Revenue Bond Act, the City must publish notice of its intent to do so and

allow its constituents forty-five days to raise a petition signed by "10% or 15,000 of the

registered electors, whichever is less," to request a referendum on the proposed issuance. MICH.

COMP. LAWS § 141.133. If the petition is raised, the bond issuance is put on hold unless and

until the voters approve it. *Id.*; *see also Smith, Hinchman & Grylls Assocs., Inc. v. River Rouge

Pub. Bldg. Auth.*, 132 N.W.2d 682, 686 (Mich. 1965) (noting that the Revenue Bond Act's

referendum provision creates "the possibility that sale of bonds and realization of revenue from

that source may never occur because of intervention of a referendum.").[31]

ii.     The RMFA also requires regulatory approval.

63.     The RMFA does not allow a municipality to issue any municipal security unless

the Michigan Department of Treasury has granted prior written approval of the issuance or

granted qualified status to the municipality. MICH. COMP. LAWS § 141.2303. Because the City

has neither qualified status nor Department approval[32] for issuance of new bonds, it cannot issue

bonds under the RMFA. Because the City has neither obtained the needed approval to issue the

New DWSD Bonds or the New Existing Rate DWSD Bonds nor made the Plan contingent upon

such approval, the Plan cannot be confirmed under § 943(b)(6). *See In re City of Colorado

Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 692, 695 (Bankr. D. Colo. 1995)

---

[31] There are only two exemptions—refunding bonds and "bonds issued to comply with an order of a court . . . to prevent or limit pollution of the environment." *See* MICH. COMP. LAWS § 141.133. Neither exception is applicable in this instance.

[32] The Michigan Department of Treasury may condition approval on an investment grade rating, credit enhancement or municipal bond insurance, and may deny approval if the conditions are not met. MICH. COMP. LAWS § 141.2303(7)(d). Since the Plan contemplates neither credit enhancement nor bond insurance, it is entirely unclear what rating the New DWSD Bonds or the New Existing Rate DWSD Bonds may receive. For example, Standard and Poor's recently lowered the DWSD Bonds to "junk" status on "vulnerability to default," stating, "the city's Plan of Adjustment indicates that the treatment of the water- and sewer-related debt classes could involve an exchange offer where investors receive less value than the promise of the original securities. We view such an exchange as tantamount to a default." *See* Standard and Poor's, *Detroit Water and Sewer Revenue Bond Ratings Lowered to "CCC" On Vulnerability to Default; Remains on Watch Negative* (Mar. 25, 2014) (*see* Fee Motion Response (Doc. 4323, Ex. F)).

(holding that improvement district debtor's plan could not be confirmed because it proposed issuance of new bonds when state law mandated electoral approval that had not been obtained and the plan was not conditioned upon such approval being later obtained).

## VII. THE PLAN CANNOT BE CONFIRMED BECAUSE IT DOES NOT COMPLY WITH THE REQUIREMENTS OF § 1129 .

64.     Even if the Court were to determine that special revenue debt is subject to impairment in a chapter 9 proceeding, the Plan still cannot be confirmed because it does not comply with the requirements of § 1129.  Section 1129(b)(1) requires that even in a "cramdown scenario" impaired creditors must vote to accept or reject the plan.  Although the votes are yet to be tallied, there may be Impaired Classes of DWSD Bonds Claims that will have not accepted the Plan.  Accordingly, the Trustee raises the following objections.

### A.     The Plan violates § 1129(b)(2)(A)(i) because the Holders do not retain their prepetition liens and the proposed UAAL Surcharge payments increase the Holders' risk of nonpayment.

65.     "To qualify as fair and equitable under this subsection[, 1129(b)(2)(A)(i),] as to a class of secured claims, a plan must provide: (i) that the holders of such claims retain the liens securing such claims . . . ." *In re Brice Rd. Devs., L.L.C.*, 392 B.R. 274, 285 (B.A.P. 6th Cir. 2008) (quoting § 1129(b)(2)(A)(i)).[33]  This lien retention provision requires keeping the terms and conditions of the creditors' security agreement in place and avoiding disruption of the bargained-for rights accompanying interests in property and collateral.  *See Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 50 (E.D. Pa. 1996) (court "will not allow substantial disruption of bargained for rights which accompany interests in property and collateral").

---

[33] As an alternative to lien retention, a plan may provide for the realization by a secured creditor of the "indubitable equivalent" of its claim.  *See In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 486 n.12 (Bankr. E.D. Mich. 1995) (citing § 1129(b)(2)(A) and noting that "in lieu of [the lien or cash payments] requirement[s], the plan can . . . give creditors 'the indubitable equivalent of their claims'").  As discussed below, the Plan does not provide the Trustee with the indubitable equivalent of its Claim.

66.     In § 928, Congress specifically provided for application of the lien retention provision to liens held by revenue bondholders in chapter 9 cases.  *See Sanitary & Improv. Dist., No. 7*, 98 B.R. at 974 ("Chapter 9 of the Bankruptcy Code was recently amended as was Section 522 of the Bankruptcy Code to assure that the lien on a stream of payments from the governmental entity to revenue bondholders was not cut off by the filing of the bankruptcy . . . ."); S. REP. NO. 100-506, at 12-13 (1988) (confirming that the purpose of § 928 is to "insure that revenue bondholders . . . will have unimpaired rights to the project revenues pledged to them").

67.     Where a creditor has a senior secured claim, it cannot be concluded that the secured claimant will "retain the lien" as required by § 1129(b)(2)(A)(i) where the lien is made subject or subordinate to other claims in the same collateral.  *See, e.g.*, *In re N. Valley Mall, LLC*, 432 B.R. 825, 829–30 (Bankr. C.D. Cal. 2010) (section 1129(b)(2)(A)(i) is not satisfied where the creditor's lien is not retained until the creditor is "paid in full"); *In re Ford Prods. Corp.*, 159 B.R. 693, 695 (Bankr. S.D.N.Y. 1993) (plan failed to satisfy § 1129(b)(2)(A)(i) where senior secured claimants were made junior to other interests in the same property); *In re Cottonwood Corners Phase V LLC*, No. 11-11-12663 JA, 2012 WL 566426, at *23 (Bankr. D.N.M. Feb. 17, 2012) (modification of lenders rights as to liens fails to satisfy § 1129(b)(2)(A)(i) requirement that lenders maintain its liens).  The UAAL Surcharge violates § 1129(b)(2)(A)(i) because it subordinates the Holders' liens in the Net Revenues to payments to the retirees.

68.     Further, the City's proposal to make the UAAL Surcharge does not meet the requirements of § 1129(b)(2)(A)(i) because it increases the risk of nonpayment by modifying or abrogating critical covenants.  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 167 (Bankr. D.N.J.

2010) (holding that "the [modified] covenants must serve to protect the lenders' security position" and "insure the safety of the principal.").

69.     The Revenue Bond Act, Ordinances, and Indentures all contain covenants requiring that the Systems' Revenues be kept within the Systems and applied in a specific manner.  *See* MICH. COMP. LAWS § 141.122 (specifying that the Revenues must be applied first to operation and maintenance, next to debt service, and next to set asides or surplus funds used for the Systems); Sewer Ordinance § 12 (same); Water Ordinance § 12 (same); Water Indenture §§ 2.02–2.03 (same); Sewer Indenture §§ 2.02–2.03 (same).

70.     The Plan's proposal to make the UAAL Surcharge *before* debt service does not "insure the safety of the principal" securing the DWSD Bonds as required by § 1129.  *See TCI 2 Holdings, LLC*, 428 B.R. at 167.  Instead, the Plan's proposed transaction depletes the Pledged Assets securing the DWSD Bonds and increases the risk of nonpayment (since bond payments can only be made out of Pledged Assets) without the Holders receiving any value in return for those payments.

71.     Here, the Plan subordinates the Holders' liens on the Net Revenues by transferring those revenues to the Prior GRS Pension Plan before paying the obligations to the Holders under the DWSD Bond Documents.  Eliminating restrictions on the use of gross revenues reduces the Net Revenues, and alters property rights without compensation.  The Holders do not, under the Plan, "retain the liens" they had prepetition, and the treatment of them does not comply with § 1129(b)(2)(A)(i).

B.     The Plan violates § 1129(b)(2)(A)(i) because it fails to pay the Holders an appropriate rate of interest.

72.     Section 1129(b)(2)(A)(i)'s lien retention provision also requires that a plan provide holders of secured claims with "cash payments totaling at least the allowed amount of

[the secured] claims." Since the Holders are secured by the Net Revenues in an amount sufficient to pay their Claims in full, § 1129(b)(2)(A)(i) requires the Holders retain their lien and receive cash payments "of a value, as of the effective date of the plan" equal to their allowed Claim. The Plan, which not only seeks to use the property pledged and set aside to the Holders for the payment of the DWSD Bonds, but also attempts to reduce the amounts payable by "resetting" the interest rates to a below market rate, fails this test.

73.     In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), the Supreme Court considered the method of deciding the interest rate required in the cramdown of a secured creditor in a chapter 13 proceeding. The Court rejected the coerced loan, presumptive contract rate, and cost of funds approaches and adopted a simpler, formula approach. The formula approach in *Till* began with the national prime rate, "which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower," and then adjusted the rate to account for the risk of nonpayment since "bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers." *Id.* at 478-79. The *Till* plurality identified "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan" as risk adjustment factors. *Id.* at 479. The *Till* court "[did] not decide the proper scale for the risk adjustment" but observed that the selected rate should be "high enough to compensate the creditor for its risk but not so high as to doom the plan." *Id.* at 480.

74.     The *Till* plurality explicitly distinguished cramdown interest rates in chapter 13 cases, where there is "no free market of willing cramdown lenders," from those in commercial chapter 11 cases where "numerous lenders advertise financing for Chapter 11 debtors in possession." *Id.* at 476 n.14. Accordingly, the plurality stated that "when picking a cramdown

11839144

rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id*.

75.     Relying on the teachings of *Till* and prior precedent, the Sixth Circuit and courts in other circuits have developed and utilized a two-step analysis:  (1) ascertain whether there is an efficient market that would determine the appropriate cramdown interest rate, and, if so, use that rate; (2) if no efficient market exists, then, apply the factors that an efficient market would consider in determining an appropriate interest rate and use a *Till*–like formula methodology to set a rate.  *See Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005).

76.     In *American HomePatient*, the Sixth Circuit addressed the appropriate cramdown rate of interest under §1129(b)(2)(A)(i).  The Sixth Circuit "decline[d] to blindly adopt *Till*'s endorsement of the formula approach . . . in the Chapter 11 context" concluding that "the market rate should be applied in Chapter 11 cases where there exists an efficient market."  *Id.* at 568.

77.     The Trustee expects the evidence will show that there will be an efficient market for the New DWSD Bonds and that the interest rates proposed in the Interest Rate Reset Chart for the New DWSD Bonds are not market rates of interest.  Indeed, the City has presented no evidence of how it determined the "reset" interest rates, and these rates have changed with each iteration of the City's plan of adjustment.[34]  Nor has the City demonstrated that the reset rates use

---

[34] The Trustee has sought both formal and informal discovery on the methodology behind the Interest Rate Reset Chart, and, thus far, has been provided with only the following description in the Disclosure Statement:

> The rate curve used in developing the Interest Rate Reset Chart is a yield curve indicative of the pro forma credit profile of DWSD and reflects the pro forma interest rates that would provide the bondholders with a par recovery based on existing maturities.  In determining the curve, the City analyzed multiple factors, including: a review of DWSD's pro forma projections, restructured obligations and relevant prospective metrics, including leverage, coverage, the size of DWSD and the economic strength of the underlying communities; evaluation of comparable situations; available relevant published market indices and composite yield curves; and discussions with capital market participants.

a justifiable *Till*-like formula. These rates do not meet the requirements of § 1129(b), and the Plan cannot be confirmed.[35]

C.   The Plan fails to give the Holders the indubitable equivalent of their Claim under § 1129(b)(2)(A)(iii).

78.    To provide the "indubitable equivalent" under § 1129(b)(2)(A)(iii), a creditor must receive collateral with a value "too evident to be doubted" that is equivalent to the creditor's existing collateral. *In re Walat Farms, Inc.*, 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987) (Spector, Bankr. J.) (quoting Webster's Ninth New Collegiate Dictionary (1985)). The debtor must prove, by a preponderance of the evidence, that the indubitable equivalent has been provided. *Matter of Atlanta S. Bus. Park, Ltd.*, 173 B.R. 444, 447-48 (Bankr. N.D. Ga. 1994) (citing *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters, Ltd. II)*, 994 F.2d 1160, 1165 n.26 (5th Cir. 1993)).

79.    Because the Plan proposes that the rapidly amortizing UAAL Surcharge be made ahead of debt service, the Plan diminishes the Holders' lien on the Net Revenues. Accordingly, the Plan fails to provide the Holders with the indubitable equivalent of their Claim, cannot comply with § 1129(b)(2)(A), and cannot be confirmed. Under well-settled case law, "new collateral with a value less than the value of the originally-pledged collateral cannot be 'completely compensatory,'" and, therefore, fails the indubitable equivalent prong of § 1129(b). *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 319 (B.A.P. 10th Cir. 2006).

80.    Where a plan seeks to alter collateral, a secured creditor receives the "indubitable equivalent" of its claim only if the altered collateral does not increase the creditor's exposure to

---

(Disclosure Statement at 63 (formatting removed)).

[35] The Trustee reserves its rights to amend and supplement this argument with information obtained in discovery, which is not yet complete.

risk. *Id*. Whether altered collateral met the "indubitable equivalent" standard was addressed in *Investment Company of the Southwest*, where the Bankruptcy Appellate Panel of the Tenth Circuit held:

> Evidence of the requisite indubitable equivalent is present if, under the treatment proposed in the Plan, there is no reasonable doubt that [the secured creditor] will receive the full value of what it bargained for when it made its contract with Debtor. When a plan proposes to substitute or alter collateral, however, a secured creditor receives the indubitable equivalent of its claim only if the substituted collateral does not increase the creditor's exposure to risk. Where collateral is substituted, two attributes of the substituted collateral—its *value* and the degree of *risk* that it imposes on the secured creditor—determine whether the new collateral is sufficiently "safe" and "completely compensatory."

> New collateral with a value less than the value of the originally-pledged collateral cannot be "completely compensatory." Similarly, new collateral with a value projected to be equal to, or even more than, the original collateral is not "completely compensatory," if the new collateral is so much riskier than the original collateral that there is a substantially greater likelihood that the secured creditor will not ultimately be paid.

*Id*.

81.     Similarly, in *United States v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648 (B.A.P. 9th Cir. 1994) the Bankruptcy Appellate Panel of the Ninth Circuit explained:

> where the creditor is earmarked to receive *part* of its collateral, it will be a rare case in which the creditor will have received the indubitable equivalent of its claim. Any such plan will be subject to extremely close scrutiny to insure that the creditor will actually receive the indubitable equivalent of its secured claim.

*Id.* at 660, *aff'd, Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)*, 85 F.3d 1415 (9th Cir. 1996). Because the Plan proposes that the Holders receive less valuable collateral they are not receiving an indubitable equivalent.

D. **The Plan is not "fair and equitable" under § 1129(b)(1) because it violates the absolute priority rule.**

82.     The Plan should not be confirmed because the treatment provided for the GRS Pension Claims violates the absolute priority rule as set forth in § 1129(b)(1).  "[A]bsent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest."  *Dow Corning*, 456 F.3d at 672 (stating that a plan cannot be confirmed unless its meets the absolute priority rule) (citing *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 115 (1939)).  Accordingly, if a plan does not provide for the full satisfaction of a class of claims, such plan may not provide any recovery to junior classes.

83.     In this case, the Plan violates the absolute priority rule by providing payments to Class 11 while not fully satisfying the DWSD Bond Claims.  In particular, as discussed further below, the Holders will receive less than their contract rate of interest, and are not compensated for loss of call protection.  Put simply, the Plan currently provides that the Holders may not have their Claims fully satisfied while, at the same time, their collateral is used to pay the unsecured Claims in Class 11, which Claims are junior in priority to the DWSD Bond Claims.  This payment scheme violates the absolute priority rule and renders the Plan unconfirmable.

E. **The Plan does not comport with the regulatory rate-setting requirements of § 1129(a)(6).**

84.     Under § 1129(a)(6),[36] where a governmental regulatory commission has jurisdiction, after confirmation of a plan, over rates, then, for the plan to be confirmed, the debtor must either procure approval of the rates set forth in its plan or expressly condition the plan upon approval of the rates.  11 U.S.C. § 1129(a)(6).  The Systems' rates are set by the DWSD Board of Water Commissioners (the "***BOWC***"), which has "sole authority for setting and approving

---

[36] Section 1129(a)(6) is applicable in chapter 9 proceedings.  11 U.S.C. § 901(a).

wholesale water and sewerage rates," and authority, subject to approval of the City Council, for retail water and sewerage rates. *See* By-Laws for the BOWC art. XVIII § 2 (adopted Apr. 23, 1997, as amended from time to time through Jan. 24, 2012); City Charter § 7-1202; *see also City of Novi v. City of Detroit¸* 446 N.W.2d 118, 125 (Mich. 1989) ("The rate-making authority of a municipal utility is expressly reserved to the legislative body given the power to set rates under the municipal charter.").[37]

85.     The Plan provides that the "DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues," but it does not make provision to garner the approval of the BOWC for rate-setting prior to confirmation of the Plan nor condition confirmation of the Plan upon approval of the rates. (Plan at 44). This does not meet the requirements of § 1129(a)(6), and the Plan cannot be confirmed.

---

[37] Kenneth Buckfire, the City's witness, similarly testified at the eligibility hearing that the Systems' rates cannot simply be set by the City but are subject to regulation:

> Ms. Brimer:  So you testified yesterday that -- in connection with reviewing Water and Sewage again, that one avenue of generating additional revenue could not be increasing water rates because -- well, let me stop there. Is that correct?  Do you recall? You testified that the city could not increase water and sewage rates because of utility laws, that it's a regulated industry, and so it just could not arbitrarily increase rates; correct?
> Mr. Buckfire:  Correct.
>                                    . . . .
> Ms. Brimer: So on the one hand, you certainly took into consideration the legal—the authority of the city to raise the utility rates in connection with Water and Sewage; correct?
> Mr. Buckfire: Correct, not a source of cash.

Transcript, *Hearing re: Eligibility Trial*, Doc. 1501 at 168, 169 (Oct. 25, 2013).

**VIII.** **THE PLAN CANNOT BE CONFIRMED BECAUSE IT FAILS TO PAY THE HOLDERS AND THE TRUSTEE THE FULL AMOUNT OF THEIR CLAIMS AND OTHERWISE VIOLATES THE CODE.**

A.      The Plan fails to provide for postpetition interest even though the Holders are oversecured.

86.      The Plan should be amended to expressly provide for the payment of postpetition interest on the DWSD Bonds.   With respect to postpetition interest, the Plan provides, in pertinent part:

> **Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law**, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes.

(Plan at 53 (emphasis added)).   Pursuant to § 506(b),[38] oversecured creditors are entitled to the payment of postpetition interest.   *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242–49 (1989); *Dow Corning*, 456 F.3d at 681.   Notwithstanding the foregoing, the City has not expressly provided that the Holders' Claims will be entitled to the payment of postpetition interest.   (*See* Plan at 53).   However, under § 506(b) and the Plan's provision that postpetition interest will be paid as "required by applicable bankruptcy law," the Holders should receive full payment on their postpetition interest.

B.      The Plan was not proposed in good faith.

87.      The Plan should not be confirmed because it fails to comply with the good faith requirement set forth in § 1129(a)(3),[39] which has been interpreted to require a plan: (a) be designed to fairly achieve a result consistent with the objectives and purposes of the Bankruptcy

---

[38] Section 506(b) is applicable in cases pending under chapter 9.  11 U.S.C. § 901(a).

[39] *See* 11 U.S.C. § 943(b)(1) (requiring a chapter 9 debtor to comply with the Bankruptcy Code provisions incorporated into chapter 9 through §§ 103[(f)] and 901).

11839144

Code; (b) be proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected; and (c) to deal with the debtor's creditors with fundamental fairness. *In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992); *see also In re Nikron, Inc.*, 27 B.R. 773, 778 (Bankr. E.D. Mich. 1983) ("A plan is proposed in good faith when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.") (internal quotation marks and citation omitted). In addition, a plan proposed under chapter 9 must comport with the governmental nature and obligations of the chapter 9 debtor. *Mount Carbon*, 242 B.R. at 41.

88. In this case, the Plan does not satisfy the good faith requirement because the Plan is not designed to fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code, and it does not comport with the City's governmental nature and obligations. As set forth herein, the Plan seeks to impair special revenue financing obligations in contravention of the design and purpose of chapter 9 of the Bankruptcy Code. In addition, the Plan seeks to impair the DWSD Bonds even though the proposed impairments are not necessary (according to the City's own projections) for the Plan to be feasible or otherwise confirmable, as discussed in more detail *supra* at Section VI(C). The Plan fails the good faith requirement and cannot be confirmed.

C. The Plan fails to provide for the payment of the Trustee's fees and expenses.

89. Pursuant to the DWSD Bond Documents, the Trustee is charged with assuring prompt compliance with all of the requirements, duties, and obligations of the City and the DWSD with respect to the Systems and the DWSD Bonds, and with performing such other

duties as may be provided in a Supplemental Action.[40]  *See* Water Ordinance § 19; Sewer Ordinance § 20.  Among other powers, the Trustee may intervene on behalf of the Holders in any judicial proceeding to which the City or the DWSD is a party that, in the opinion of the Trustee and its counsel, has a substantial bearing on the interests of the Holders.  Water Indenture § 6.03; Sewer Indenture § 6.03.  The Trustee may exercise its powers and perform its duties by and through, *inter alia*, attorneys and employees, and the Trustee is "entitled to rely on advice of counsel and other professionals concerning all matters of such trusts, powers and duties."  Water Indenture § 6.01(a); Sewer Indenture § 6.01(a)(same).

90.  An indenture trustee is entitled to payment of reasonable fees and reimbursement for reasonable expenses, including attorneys' fees, incurred in connection with exercising its powers and performing its duties.  *See, e.g.*, *In re W.T. Grant Co.*, 119 B.R. 898, 900 (S.D.N.Y. 1990) ("[W]here [an indenture trustee's] fees are sought pursuant to a contractual right to payment, compensation is to be determined in accordance with the contractual provision."); *In re Worldwide Direct, Inc.*, 334 B.R. 112, 129 (Bankr. D. Del. 2005) ("If the indenture trustee fulfills its duties, it is entitled to reimbursement of its expenses, including attorneys' fees, in accordance with the terms of the indenture."); *see also* Norton Creditors' Rights Handbook § 15:9, Payment of the Indenture Trustee (2012) ("An indenture trustee is contractually entitled to payment for performance of its duties regardless of whether its efforts conferred benefit on an estate of a debtor.").

91.  The Indentures provide the Trustee with a right to payment of fees and reimbursement for expenses:

---

[40] A "**Supplemental Action**" includes resolutions and ordinances of the City Council, sale orders, and other documents executed by the City's Finance Director pursuant to a City Council resolution or ordinance.  *See* Water Indenture, Art. I *Supplemental Action*; Sewer Indenture, Art. 1 *Supplemental Action*.

> The Trustee shall be entitled to payment and/or reimbursement for reasonable fees for its ordinary services rendered hereunder and all advances, counsel fees and other ordinary expenses reasonably made or incurred by the Trustee in connection with such ordinary services. If it becomes necessary that the Trustee perform extraordinary services, it shall be entitled to reasonable extra compensation therefor, and to reimbursement for reasonable extraordinary expenses in connection there with. . . .

Water Indenture § 6.02; Sewer Indenture § 6.02 (same).

92.     The Trustee's ordinary and extraordinary fees and expenses, including the fees and expenses of its counsel and other professionals, are costs of administration of the Systems. Historically, the Systems have paid such fees and expenses from the Revenues of the Systems deposited into the respective Operation and Maintenance Fund for each System, which are "used to pay the expenses of administration and operation of the System . . . ." Water Ordinance, § 13(B); Sewer Ordinance, §13(B); *see also* Water Indenture § 2.04(c); Sewer Indenture, § 2.04(c).

93.     Both before and since the Petition Date, the Trustee has provided both ordinary and extraordinary services, and incurred ordinary and extraordinary expenses, in fulfilling its duties under the DWSD Bond Document. Such duties include attempting to assure prompt compliance with all of the requirements, duties and obligations of the City and the DWSD with respect to the Systems and the DWSD Bonds. In performing its duties under the DWSD Bond Documents, the Trustee has engaged counsel, financial advisors, and other consultants as contemplated by the DWSD Bond Documents.

94.     The Plan proposes an inappropriate treatment of the Trustee's fees and expenses with respect to the DWSD Bond Claims. It proposes that "[a]ny Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed." (Plan at 27). However, the Trustee's fees and expenses are already included in the

<div align="center">44</div>

Class of Allowed DWSD Bond Claims, and, accordingly, must be paid in full in accordance with the DWSD Bond Documents on or before the Distribution Date under the Plan. The Plan impermissibly attempts to separate the Trustee's fees and expenses into a Class of Claims separate and distinct from the DWSD Bond Claims. Further, to the extent the City Reinstates the DWSD Bond Claims, the Indentures require that the Trustee's professionals' fees and expenses be paid. Thus, the Trustee's professionals' fees and expenses are due to be paid in Cash on the Distribution Date.[41]

## IX.　　THE PLAN IMPROPERLY ATTEMPTS TO WAIVE STAY REQUIREMENTS.

95.　　Embedded in the Plan is the City's motion to have this Court waive Bankruptcy Rule 3020(e)'s automatic 14-day stay of the Confirmation Order. FED. R. BANKR. P. 3020(e) ("An order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."). (*See also* Plan at 59 ("The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).")).

96.　　The City seeks to waive the stay to impede the creditors' ability to appeal the Plan after confirmation "because [it is] well aware of the caselaw involving equitable and statutory mootness." *In re Chemtura Corp.*, No. 09-11233 REG, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010). The City's purpose for seeking this waiver, however, directly conflicts with the legislative intent of Rule 3020(e)'s automatic stay, which expressly states that the purpose of "[s]ubdivision (e) is . . . *to provide sufficient time for a party to request a stay pending appeal* of an order confirming a plan under chapter 9 . . . of the Code *before the plan is implemented and an appeal becomes moot*." *In re The Heritage Organization, L.L.C.*, 375 B.R.

---

[41] As set forth in the Fee Motion Response, (Doc. 4323 at 15–18), the Trustee has agreed to consent to prospective application of the *Fee Review Order* (Doc. 810) to the Trustee's professionals' fees and expenses as more fully set forth therein.

230, 315 n.103 (Bankr. N.D. Tex. 2007) (emphasis added); *see also* 9-3020 Collier on Bankruptcy, ¶ 3020.05 (same). Courts have also recognized that the legislative intent behind Rule 3020(e) is to provide parties to a bankruptcy proceeding with a "built-in opportunity to move for a stay pending appeal . . . ." *In re Pac. Gas & Elec. Co.*, Nos. C-02-1550 VRW, 01-30923DM, 2002 WL 32071634, at *3 (N.D. Cal. Nov. 14, 2002) (denying a request for stay of proceedings because such relief would be duplicative of Bankruptcy Rule 3020(e)); *see also The Heritage Org*, 375 B.R. at 315 (the stay provides parties "sufficient time to file a procedurally appropriate motion and request for expedited hearing").

97. The Trustee objects and asks the Court to deny the City's request. If the Court does not deny the City's request in full, the Trustee then alternatively requests that the Court use its discretion to shorten but not eliminate the stay. *See* FED. R. BANKR. P. 3020 advisory committee's note ("the court may order that the stay under Rule 3020(e) is for a fixed period less than [14] days."); *Chemtura*, 2010 WL 4607822, at *2 (balancing debtors' and creditors' interests and shortening, but not eliminating, the stay).

## <u>RESERVATION OF RIGHTS</u>

The Trustee reserves its right to amend, modify and/or supplement this Objection at a later date. In addition, the Trustee reserves all of its rights and remedies with respect to the DWSD Bond Claims. Nothing in this Objection shall be deemed to be a waiver of any procedural, substantive or other rights, privileges or remedies available with respect to the DWSD Bond Claims, all of which are reserved, as well as any claim against any third party, including, but not limited to, against any Bond Insurers or with respect to any Bond Insurance Policy.

## CONCLUSION

The Plan cannot be confirmed. The City's proposal to eliminate the DWSD Bonds' call protection, reset interests rates at below market levels, and carve $428,500,000 from the Holders' lien to fund the UAAL Surcharge is prohibited by Michigan law and the Bankruptcy Code. The Trustee's objections to the Plan can be remedied by the City, and if the City were to do so it would go a long way towards instilling confidence of the capital markets in the City.

Respectfully submitted this the 12th day of May, 2014.

<div style="margin-left: 40%">

*/s/ David E. Lemke*
David E. Lemke (TN13586)
Michael R. Paslay (TN11092)
Ryan K. Cochran (TN25851)
Courtney M. Rogers (TN25664)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Phone: (615) 244-6380
Fax: (615) 244-6804
david.lemke@wallerlaw.com
mike.paslay@wallerlaw.com
ryan.cochran@wallerlaw.com
courtney.rogers@wallerlaw.com

– and –

Robert J. Diehl, Jr. (MI31264)
Jaimee L. Witten (P70068)
BODMAN PLC
1901 St. Antoine Street, 6th Floor
Detroit, Michigan 48226
Phone: (313) 393-7597
Fax: (313) 393-7579
rdiehl@bodmanlaw.com
jwitten@bodmanlaw.com

*Attorneys for U.S. Bank National Association, as*
*Trustee for the DWSD Bonds*

</div>

47

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing Objection to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter and that it was delivered, by overnight service to the below recipients on this the 12th day of May, 2014:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

*Counsel to the City*

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

*Counsel to the City*

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Counsel to the Retiree Committee*

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

*Counsel to the City*

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

*Counsel to the Retiree Committee*

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 768-6800

*Counsel to the Retiree Committee*

48

*/s/ David E. Lemke*
David E. Lemke (TN13586)
Michael R. Paslay (TN11092)
Ryan K. Cochran (TN25851)
Courtney M. Rogers (TN25664)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Phone: (615) 244-6380
Fax: (615) 244-6804
david.lemke@wallerlaw.com
mike.paslay@wallerlaw.com
ryan.cochran@wallerlaw.com
courtney.rogers@wallerlaw.com

*Attorneys for U.S. Bank National Association, as Trustee for the DWSD Bonds*

49