# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### (DETROIT)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | CASE NO.: 13-53846 |
| | ) | |
| | ) | CHAPTER 9 |
| Debtor. | ) | |
| | ) | Hon. Steven W. Rhodes |
| | ) | |

_____

**OBJECTION OF THE AD HOC COMMITTEE OF DWSD BONDHOLDERS
TO THE CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT AND
JOINDER TO THE DWSD BOND TRUSTEE'S OBJECTION TO THE
CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT**

_____

The Ad Hoc Committee (the "**Ad Hoc Committee**")[1] as holders of those certain bonds (the "**DWSD Bonds**" and the holders of such, the "**DWSD Bondholders**") issued by the City of Detroit (the "**City**") for the Detroit Water and Sewerage Department (the "**DWSD**") to (a) finance and refinance improvements to the City's Water Supply System (the "**Water System**") and (b) finance and refinance improvements to the City's Sewage Disposal System (the "**Sewerage System**," together with the Water System, the "**Systems**"), hereby files its objection (this "**Objection**") to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* (Doc. 4392) (the "**Plan**")[2] and joins the *DWSD Bond Trustee's Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* (the "**DWSD Trustee Objection**"), filed contemporaneously herewith by U.S. Bank National Association, in its capacity as trustee for the DWSD Bonds (the "**Trustee**").

---

[1] The Ad Hoc Committee members are BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

## PRELIMINARY STATEMENT

The members of the Ad Hoc Committee manage several of the largest, most well-known mutual funds in the country. These mutual funds are household names among individual investors, many of whom are Michigan residents, who invest in tax-free mutual funds to save for retirement, college, and other long-term investment goals.

The members of the Ad Hoc Committee collectively have over 240 years of experience investing in debt issued by states, municipalities, and other tax-exempt issuers throughout the country, with over $399 billion loaned to such issuers throughout the country, and approximately $9.67 billion loaned to municipalities and other tax-exempt issuers throughout Michigan. These loans have helped Michigan and countless other municipalities and tax-exempt issuers, such as hospitals and universities, invest in infrastructure construction and improvements like the Systems, the construction of which would not have been possible without loans at the relatively low-cost interest rates accessible through the large, municipal market of tax-exempt financing. Loans like the DWSD Bonds are the backbone of municipal finance.

Between them, the members of the Ad Hoc Committee hold approximately $1.332 billion of the total of approximately $5.272 billion of DWSD Bonds.[3] These holdings are spread across virtually every CUSIP of the DWSD Bonds.

The Ad Hoc Committee files this objection to the Plan because the Plan disregards the Subordination Agreements (as defined below) that benefit the senior DWSD Bonds, resulting in a violation of section 510(a) of the Bankruptcy Code and the absolute priority rule, and because the Plan seeks to impermissibly release claims between non-debtor parties, including claims against the State of Michigan (the "**State**"), with respect to such agreements. In addition, the City's Plan proposes to impair the fully secured DWSD Bonds by making a number of

---

[3] This amount excludes the approximately $482 million of SRF Junior Lien Bonds, as defined below.

substantial changes to the current DWSD Bonds that will allow the City to strip revenues out of the Systems – i.e., to alter the DWSD Bonds' collateral and other rights – and the Ad Hoc Committee joins in the DWSD Trustee Objection and adopts and incorporates by reference herein the authorities cited in the DWSD Trustee Objection.

For these reasons, as further described below, the proposed Plan cannot be confirmed.

<u>**JOINDER**</u>

1.      The City has issued over $5.5 billion of DWSD Bonds.  The DWSD Bonds are special revenue bonds that are payable from the net revenues of the Systems.  The DWSD Bonds are secured by first and second priority statutory liens on all net revenues of the Systems.  As is further described in the DWSD Trustee Objection, the Bankruptcy Code expressly protects these state law property interests in special revenue bonds and provides the DWSD Bondholders with a bundle of rights to ensure that the DWSD Bonds are not impaired under the Plan.  *See* DWSD Trustee Objection.

2.      The DWSD Bonds, which the City has agreed are fully secured debt instruments, are impaired by the Plan in primarily three substantive ways.

3.      First, the Plan provides that $428.5 million be funded out of the Systems over the next nine years (the "**UAAL Surcharge**") to finance the "grand bargain" that the City has reached with its retirees.  The UAAL Surcharge will be used to fund pension payments to <u>all</u> City employees (not just DWSD employees) and excuses the City from any obligation to fund its shortfall.  The Ad Hoc Committee expects to show at confirmation that this $428.5 million estimate of DWSD's share of the pension liabilities is overstated, and that the UAAL Surcharge does not constitute current operating expenses of the Systems that permissibly can be paid ahead

of the DWSD Bonds (and, in some circumstances, may not be a permitted transfer of the Systems' revenues at all).

4. Second, the Plan proposes absurdly low interest rates for many of the DWSD Bonds. These interest rates cannot be justified by any reasonable market comparables of investments with similar risk profiles, or, if applicable, the methodology of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), or *Bank of Montreal v. Official Committee of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005). While the discovery process has just begun, it appears that the City has merely taken a single "A" rated bond yield curve and has applied that to the DWSD Bonds. As the Ad Hoc Committee expects to show at the confirmation hearing, this is not an appropriate methodology and the City cannot support the interest rates proposed by the Plan. In fact, if interest rates are adjusted for current market conditions and the market's view of the DWSD Bonds' risk profile (as is required to "cram down" the DWSD Bonds under section 1129(b)), the Ad Hoc Committee expects that, in many cases, the Bonds are entitled to <u>higher</u> interest rates than the current contract rate. *See* DWSD Trustee Objection, ¶¶ 72-77.

5. Third, the Plan impermissibly strips call protection from many series of the DWSD Bonds, leaving them callable the day after the Plan becomes effective.[4] As the Ad Hoc Committee expects to show at the confirmation hearing, call protection is a critical component of risk management and returns for municipal debt, particularly for investors like mutual funds that invest in municipal securities to buy and hold them. For the reasons further set out in the DWSD Trustee Objection, the removal of call protection from the DWSD Bonds constitutes an impermissible impairment of the DWSD Bonds. *See* DWSD Trustee Objection, ¶¶ 1-22, 24-33,

---

[4] Certain DWSD Bonds have "call protection," meaning they cannot be voluntarily redeemed by the City before a date certain, which is referred to as the "no call period."

34, 39-44.  Even if the Court were to rule that the DWSD Bonds may be impaired, the Ad Hoc Committee expects to show that the City must provide substantial compensation to holders for removal of the call protection.

6.      For these reasons, and the other reasons set forth in the DWSD Trustee Objection, confirmation of the Plan should be denied.

**ADDITIONAL OBJECTIONS:**

I.      **THE PLAN VIOLATES THE SUBORDINATION AGREEMENTS CONTAINED IN THE INDENTURE, AND THEREFORE CANNOT BE CONFIRMED.**

7.      The DWSD Bond Documents[5] authorize and provide for multiple series of water and sewer revenue bonds that hold different priorities of liens on the net revenues of each System.[6]  In addition, the Ordinances provide for claim subordination of the junior classes of bonds:

> **Whenever any principal (and premium, if any) of and interest on Securities of a Priority . . . . is due and is not made when due**, then until such Payment is made or provision made for the payment thereof to the satisfaction of the Holders of such Securities . . . **no Payment shall be made directly or indirectly on or in respect of any Securities of lower Priorities**.

---

[5] The  DWSD Bond Documents principally consist of the DWSD Ordinances and Indentures.  The Ordinances are: (i) that certain Water Ordinance 01-05, dated January 26, 2005 (the "**Water Ordinance**"); and (ii) that certain Sewer Ordinance 18-01, dated October 18, 2001 (the "**Sewer Ordinance**").  The "Indentures" are: (i) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Water Supply System), dated as of February 1, 2013, among the City and Trustee, the Water and Sewage Department (the "**Water Indenture**"); and (ii) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Sewage Disposal System), dated as of June 1, 2012, among the City, Water and Sewage Department, and the Trustee  (the "**Sewer Indenture**").  The Sewer Ordinance, Sewer Indenture, Water Ordinance and Water Indenture shall be collectively referred to herein as the "**DWSD Bond Documents**".

[6] *See* Water Ordinance, §5; Water Indenture, §§ 2.03, 2.11; Sewer Ordinance, § 5; and Sewer Indenture, §§ 2.03, 2.11.

*See* Water Ordinance, § 6(B); Sewer Ordinance, § 2.12 (together, the "**Subordination Agreements**") (emphasis added). In short, the Bond Documents provide that the liens and claims of the DWSD Junior Bonds (defined herein) are subordinate to the senior DWSD Bonds, and the claims of the DWSD Junior Bonds cannot be paid if there is any amount of principal, interest or premium remaining outstanding on the senior DWSD Bonds.

8. Currently, there are three priorities of water and sewer revenue bonds that were issued under the Ordinances and Indentures. The DWSD Bonds consist of first and second lien bonds (the "**First Lien DWSD Bonds**" and the "**Second Lien DWSD Bonds**").[7] In addition, the City has issued "**SRF Junior Lien Bonds**" (as defined in the respective Water Ordinance and Sewer Ordinance) that have a third lien priority and a third claim priority. The SRF Junior Lien Bonds are held by the State and were issued for the purpose of providing improvements to the Systems by accessing the State's Revolving Fund.[8]

9. The Plan fails to enforce the agreements subordinating the liens and claims of the SRF Junior Lien Bonds and the Second Lien DWSD Bonds (together, the "**DWSD Junior Bonds**"). Proper enforcement would require that a portion of the consideration from the junior classes of bonds be directed to the senior classes to compensate the impaired classes of senior DWSD Bonds for the economic loss caused by the Plan's imposition of lower interest rates and removal of call protection. Instead, the Plan disregards the Subordination Agreements, providing that all SRF Junior Lien Bonds will be reinstated at their current interest rates, and providing for

---

[7] *See* supra note 5; *see also* Plan, Interest Rate Reset Chart at Ex. I.A.168. The "Second Lien DWSD Bonds" are DWSD Bonds that hold second priority liens on the net revenues of the Systems and are referenced as holding a "second" lien in the Plan.

[8] *See* Water Indenture, § 1 (definition of "SRF Junior Lien Bonds"); Sewer Indenture, § 1 (definition of "SRF Junior Lien Bonds"); *see also* Michigan Department of Environmental Quality, http://www.michigan.gov/deq/0,1607,7-135-3307_3515_4143---,00.html (last visited May 7, 2014). The SRF Junior Lien Bonds are referred to under the City's Plan as the DWSD Revolving Bonds.

various treatments of the Second Lien DWSD Bonds (allegedly reinstating some and impairing others).

10. The City's Plan cannot simply ignore the Subordination Agreements by issuing new bonds and stripping the DWSD Bondholders of their rights under the Subordination Agreements. Section 510(a) of the Bankruptcy Code, made applicable to this proceeding by section 901(a), provides that: "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). The Plan must enforce the Subordination Agreements between two third parties.

11. Should the Court confirm the Plan despite its failure to enforce the Subordination Agreements, the Plan cannot provide the State a release of DWSD Bondholder claims. The City has not and cannot establish any basis to grant the State a release of DWSD Bondholder claims. *See In re Dow Corning Corp.*, 280 F. 3d 648, 658 (6th Cir. 2002) (authorizing third party releases only upon evidence that all seven enumerated factors are established to enjoin a non-consenting creditor's claims against a nondebtor); *see also In re SL Liquidating, Inc.*, 428 B.R. 799 (S.D. Ohio 2010); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 142 (Bankr. D.N.J. 2010) (plan may not release senior lienholders' rights under an intercreditor agreement with junior lender). Even assuming such a release is permissible, in no event could it be made binding on a DWSD Bondholder unless such bondholder voted "yes" on the Plan. Indeed, DWSD Bondholders that do not vote "yes" on the Plan with respect to a specific class will continue to maintain their state law claims arising under the Subordination Agreements against the holders of the SRF Junior Bonds – e.g., the State – with respect to such Bonds.

12.     The Plan is patently unconfirmable inasmuch as it seeks to pay junior DWSD Revolving Bonds in Classes 1B and 1C in full, while impairing Class 1A by providing less than full recovery to senior holders of DWSD Bond Claims.  The Plan denies holders of Class 1A Claims the full value of their claims upon the Effective Date of the Plan, proposing to change certain interest rates and call protections, and proposing to alter the DWSD Bondholders' collateral and other rights.

13.     The Plan is not fair and equitable because it violates the absolute priority rule as set forth in section 1129(b) by providing payments to Classes 1B and 1C while not fully satisfying the DWSD Bond Claims.  "By incorporating the fair and equitable standard in § 1129(b) of the [Bankruptcy] Code, Congress codified the "absolute priority rule," which provides that "absent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest."  *In re Dow Corning Corp.*, 456 F.3d 668, 672 (6th Cir. 2006) (citing *Case v. L.A. Lumber Prods. Co*., 308 U.S. 106, 115 (1939)).

14.     A plan of adjustment cannot be confirmed if it seeks to provide any recovery to junior classes when it does not provide for the full satisfaction of a senior class of claims.  *See e.g., In re Monarch Beach Venture, Ltd*., 166 B.R. 428, 436 (C.D. Cal. 1993) (reasoning that the absolute priority rule is an implicit part of the "fair and equitable" formula); *In re Miami Center Associates, Ltd*., 144 B.R. 937 (Bankr. S.D. Fla. 1992) (holding that absolute priority is an implicit requirement of 1129(b) and not just of an individual subsection); *In re Lakeside Global II, Ltd*., 116 B.R. 499, 511–12 (Bankr. S.D. Tex. 1989) (recognizing that the fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in

reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders); *In re Elijah*, 41 B.R. 348 (Bankr. W.D. Mo. 1984) (a plan proposing that a creditor's first lien be substituted with a junior lien on other collateral violated the absolute priority rule because it subordinated the senior creditor to junior creditors).

15.    The DWSD Bondholders' status as secured creditors should have no bearing on their entitlement to the protections of the absolute priority rule.    The legislative history is consistent with supporting case law recognizing the absolute priority rule under section 1129(b) applies to <u>all</u> creditors:

> The general principle of the subsection [1129(b)] permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan ... Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder, *but the principle is the same* (emphasis added).

Report of the Comm. on the Judiciary, United States House of Representatives, to Accompany H.R. 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 at 413 (1977).[9]    Section 1129(b) "codifies the absolute priority rule from the dissenting class on down." *Id*.

16.    Put simply, the Plan provides that the holders of senior DWSD Bonds will not have their claims satisfied while at the same time using the collateral in which they have a senior lien to make distributions to the Junior DWSD Bonds.    Payment of Junior DWSD Bonds prior to satisfaction of the senior DWSD Bonds violates the absolute priority rule and renders the Plan unconfirmable.

---

[9] *But see In re TCI 2 Holdings, LLC*, 428 B.R. at 168–69 (absolute priority rule does not apply to secured claims); *In re Mut. Life Ins. Co. v. Paradise Springs Assocs. (In re Paradise Springs Assocs.)*, 165 B.R. 913, 920–21 (Bankr. D. Ariz. 1993) (same).

## RESERVATION OF RIGHTS

The Ad Hoc Committee reserves its right to amend, modify and/or supplement this Objection at a later date. In addition, the Ad Hoc Committee reserves all of its rights and remedies with respect to the DWSD Bond Claims. Nothing in this Objection shall be deemed to be a waiver of any procedural, substantive or other rights, privileges or remedies available with respect to the DWSD Bond Claims, all of which are reserved, as well as any claim against any third party, including, but not limited to, against any Bond Insurers or with respect to any Bond Insurance Policy.

## CONCLUSION

WHEREFORE, for the reasons stated herein and in the DWSD Trustee Objection, and for such other reasons as may be stated at any hearing, or in any supplemental briefing, the Ad Hoc Committee respectfully requests that this Court (i) deny confirmation of the City's Plan, and (ii) provide such other and further relief as is just and equitable.

Respectfully submitted this 12th day of May, 2014.

/s/ *Amy Caton*
Amy Caton, Esq.
Greg Horowitz, Esq.
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
acaton@kramerlevin.com


and

STEINBERG SHAPIRO & CLARK
Geoffrey T. Pavlic, Esq.
25925 Telegraph Road
Suite 203
Southfield, MI 48033
Tel: (248) 352-4700
Fax: (248) 352-4488
pavlic@steinbergshapiro.com

*Attorneys for Nuveen Asset Management, and BlackRock Financial Management, Inc., members of the Ad Hoc Bondholder Committee*

/s/ *William W. Kannel*
William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com


and

ANDREW J. GERDES, P.L.C.
Andrew J. Gerdes, Esq.
321 W. Lake Lansing Rd.
P.O. Box 4190
East Lansing, MI 48826-4190
Tel: (517) 853-1300
Fax: (517) 853-1301
agerdes@gerdesplc.com

*Attorneys for Fidelity Management & Research Company, Eaton Vance Management, and Franklin Advisers, Inc., members of the Ad Hoc Bondholder Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Objection to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter and that it was delivered, by overnight service to the below recipients on this the 12th day of May, 2014:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

*Counsel to the City*

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

*Counsel to the City*

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Counsel to the Retiree Committee*

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

*Counsel to the City*

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

*Counsel to the Retiree Committee*

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 768-6800

*Counsel to the Retiree Committee*

/s/ *William W. Kannel*

William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com

*Attorneys for Fidelity Management &
Research Company, Eaton Vance
Management, and Franklin Advisers, Inc.,
as members of the Ad Hoc Committee of
DWSD Bondholders*

In re:                                    )
                                          )
CITY OF DETROIT, MICHIGAN,                )          CASE NO.:  13-53846
                                          )
                                          )          CHAPTER 9
            Debtor.                       )
                                          )          Hon. Steven W. Rhodes
                                          )

---

**OBJECTION OF THE AD HOC COMMITTEE OF DWSD BONDHOLDERS
TO THE CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT AND
JOINDER TO THE DWSD BOND TRUSTEE'S OBJECTION TO THE
CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT**

---

The Ad Hoc Committee (the "**Ad Hoc Committee**")[1] as holders of those certain bonds

(the "**DWSD Bonds**" and the holders of such, the "**DWSD Bondholders**") issued by the City of

Detroit (the "**City**") for the Detroit Water and Sewerage Department (the "**DWSD**") to (a)

finance and refinance improvements to the City's Water Supply System (the "**Water System**")

and (b) finance and refinance improvements to the City's Sewage Disposal System (the

"**Sewerage System**," together with the Water System, the "**Systems**"), hereby files its objection

(this "**Objection**") to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit*

*(May 5, 2014)* (Doc. 4392) (the "**Plan**")[2] and joins the *DWSD Bond Trustee's Objection to the*

*Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* (the "**DWSD Trustee**

**Objection**"), filed contemporaneously herewith by U.S. Bank National Association, in its

capacity as trustee for the DWSD Bonds (the "**Trustee**").

---

[1] The Ad Hoc Committee members are BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

<u>**PRELIMINARY STATEMENT**</u>

The members of the Ad Hoc Committee manage several of the largest, most well-known mutual funds in the country. These mutual funds are household names among individual investors, many of whom are Michigan residents, who invest in tax-free mutual funds to save for retirement, college, and other long-term investment goals.

The members of the Ad Hoc Committee collectively have over 240 years of experience investing in debt issued by states, municipalities, and other tax-exempt issuers throughout the country, with over $399 billion loaned to such issuers throughout the country, and approximately $9.67 billion loaned to municipalities and other tax-exempt issuers throughout Michigan. These loans have helped Michigan and countless other municipalities and tax-exempt issuers, such as hospitals and universities, invest in infrastructure construction and improvements like the Systems, the construction of which would not have been possible without loans at the relatively low-cost interest rates accessible through the large, municipal market of tax-exempt financing. Loans like the DWSD Bonds are the backbone of municipal finance.

Between them, the members of the Ad Hoc Committee hold approximately $1.332 billion of the total of approximately $5.272 billion of DWSD Bonds.[3] These holdings are spread across virtually every CUSIP of the DWSD Bonds.

The Ad Hoc Committee files this objection to the Plan because the Plan disregards the Subordination Agreements (as defined below) that benefit the senior DWSD Bonds, resulting in a violation of section 510(a) of the Bankruptcy Code and the absolute priority rule, and because the Plan seeks to impermissibly release claims between non-debtor parties, including claims against the State of Michigan (the "<u>**State**</u>"), with respect to such agreements. In addition, the City's Plan proposes to impair the fully secured DWSD Bonds by making a number of

---

[3] This amount excludes the approximately $482 million of SRF Junior Lien Bonds, as defined below.

substantial changes to the current DWSD Bonds that will allow the City to strip revenues out of the Systems – i.e., to alter the DWSD Bonds' collateral and other rights – and the Ad Hoc Committee joins in the DWSD Trustee Objection and adopts and incorporates by reference herein the authorities cited in the DWSD Trustee Objection.

For these reasons, as further described below, the proposed Plan cannot be confirmed.

<u>**JOINDER**</u>

1.      The City has issued over $5.5 billion of DWSD Bonds.  The DWSD Bonds are special revenue bonds that are payable from the net revenues of the Systems.  The DWSD Bonds are secured by first and second priority statutory liens on all net revenues of the Systems.  As is further described in the DWSD Trustee Objection, the Bankruptcy Code expressly protects these state law property interests in special revenue bonds and provides the DWSD Bondholders with a bundle of rights to ensure that the DWSD Bonds are not impaired under the Plan.  *See* DWSD Trustee Objection.

2.      The DWSD Bonds, which the City has agreed are fully secured debt instruments, are impaired by the Plan in primarily three substantive ways.

3.      First, the Plan provides that $428.5 million be funded out of the Systems over the next nine years (the "**UAAL Surcharge**") to finance the "grand bargain" that the City has reached with its retirees.  The UAAL Surcharge will be used to fund pension payments to <u>all</u> City employees (not just DWSD employees) and excuses the City from any obligation to fund its shortfall.  The Ad Hoc Committee expects to show at confirmation that this $428.5 million estimate of DWSD's share of the pension liabilities is overstated, and that the UAAL Surcharge does not constitute current operating expenses of the Systems that permissibly can be paid ahead

of the DWSD Bonds (and, in some circumstances, may not be a permitted transfer of the Systems' revenues at all).

4.    Second, the Plan proposes absurdly low interest rates for many of the DWSD Bonds.  These interest rates cannot be justified by any reasonable market comparables of investments with similar risk profiles, or, if applicable, the methodology of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), or *Bank of Montreal v. Official Committee of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005).  While the discovery process has just begun, it appears that the City has merely taken a single "A" rated bond yield curve and has applied that to the DWSD Bonds.  As the Ad Hoc Committee expects to show at the confirmation hearing, this is not an appropriate methodology and the City cannot support the interest rates proposed by the Plan.  In fact, if interest rates are adjusted for current market conditions and the market's view of the DWSD Bonds' risk profile (as is required to "cram down" the DWSD Bonds under section 1129(b)), the Ad Hoc Committee expects that, in many cases, the Bonds are entitled to <u>higher</u> interest rates than the current contract rate.  *See* DWSD Trustee Objection, ¶¶ 72-77.

5.    Third, the Plan impermissibly strips call protection from many series of the DWSD Bonds, leaving them callable the day after the Plan becomes effective.[4]  As the Ad Hoc Committee expects to show at the confirmation hearing, call protection is a critical component of risk management and returns for municipal debt, particularly for investors like mutual funds that invest in municipal securities to buy and hold them.  For the reasons further set out in the DWSD Trustee Objection, the removal of call protection from the DWSD Bonds constitutes an impermissible impairment of the DWSD Bonds.  *See* DWSD Trustee Objection, ¶¶ 1-22, 24-33,

---

[4] Certain DWSD Bonds have "call protection," meaning they cannot be voluntarily redeemed by the City before a date certain, which is referred to as the "no call period."

34, 39-44.  Even if the Court were to rule that the DWSD Bonds may be impaired, the Ad Hoc Committee expects to show that the City must provide substantial compensation to holders for removal of the call protection.

6.     For these reasons, and the other reasons set forth in the DWSD Trustee Objection, confirmation of the Plan should be denied.

<b><u>ADDITIONAL OBJECTIONS:</u></b>

I.     <b><u>THE PLAN VIOLATES THE SUBORDINATION AGREEMENTS CONTAINED IN THE INDENTURE, AND THEREFORE CANNOT BE CONFIRMED.</u></b>

7.     The DWSD Bond Documents[5] authorize and provide for multiple series of water and sewer revenue bonds that hold different priorities of liens on the net revenues of each System.[6]  In addition, the Ordinances provide for claim subordination of the junior classes of bonds:

> **Whenever any principal (and premium, if any) of and interest on Securities of a Priority . . . . is due and is not made when due**, then until such Payment is made or provision made for the payment thereof to the satisfaction of the Holders of such Securities . . . **no Payment shall be made directly or indirectly on or in respect of any Securities of lower Priorities**.

---

[5] The  DWSD Bond Documents principally consist of the DWSD Ordinances and Indentures.  The Ordinances are: (i) that certain Water Ordinance 01-05, dated January 26, 2005 (the "**Water Ordinance**"); and (ii) that certain Sewer Ordinance 18-01, dated October 18, 2001 (the "**Sewer Ordinance**").  The "Indentures" are: (i) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Water Supply System), dated as of February 1, 2013, among the City and Trustee, the Water and Sewage Department (the "**Water Indenture**"); and (ii) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Sewage Disposal System), dated as of June 1, 2012, among the City, Water and Sewage Department, and the Trustee  (the "**Sewer Indenture**").  The Sewer Ordinance, Sewer Indenture, Water Ordinance and Water Indenture shall be collectively referred to herein as the "**DWSD Bond Documents**".

[6] *See* Water Ordinance, §5; Water Indenture, §§ 2.03, 2.11; Sewer Ordinance, § 5; and Sewer Indenture, §§ 2.03, 2.11.

*See* Water Ordinance, § 6(B); Sewer Ordinance, § 2.12 (together, the "**Subordination Agreements**") (emphasis added). In short, the Bond Documents provide that the liens and claims of the DWSD Junior Bonds (defined herein) are subordinate to the senior DWSD Bonds, and the claims of the DWSD Junior Bonds cannot be paid if there is any amount of principal, interest or premium remaining outstanding on the senior DWSD Bonds.

8.     Currently, there are three priorities of water and sewer revenue bonds that were issued under the Ordinances and Indentures. The DWSD Bonds consist of first and second lien bonds (the "**First Lien DWSD Bonds**" and the "**Second Lien DWSD Bonds**").[7] In addition, the City has issued "**SRF Junior Lien Bonds**" (as defined in the respective Water Ordinance and Sewer Ordinance) that have a third lien priority and a third claim priority. The SRF Junior Lien Bonds are held by the State and were issued for the purpose of providing improvements to the Systems by accessing the State's Revolving Fund.[8]

9.     The Plan fails to enforce the agreements subordinating the liens and claims of the SRF Junior Lien Bonds and the Second Lien DWSD Bonds (together, the "**DWSD Junior Bonds**"). Proper enforcement would require that a portion of the consideration from the junior classes of bonds be directed to the senior classes to compensate the impaired classes of senior DWSD Bonds for the economic loss caused by the Plan's imposition of lower interest rates and removal of call protection. Instead, the Plan disregards the Subordination Agreements, providing that all SRF Junior Lien Bonds will be reinstated at their current interest rates, and providing for

---

[7] *See supra* note 5; *see also* Plan, Interest Rate Reset Chart at Ex. I.A.168. The "Second Lien DWSD Bonds" are DWSD Bonds that hold second priority liens on the net revenues of the Systems and are referenced as holding a "second" lien in the Plan.

[8] *See* Water Indenture, § 1 (definition of "SRF Junior Lien Bonds"); Sewer Indenture, § 1 (definition of "SRF Junior Lien Bonds"); *see also* Michigan Department of Environmental Quality, http://www.michigan.gov/deq/0,1607,7-135-3307_3515_4143---,00.html (last visited May 7, 2014). The SRF Junior Lien Bonds are referred to under the City's Plan as the DWSD Revolving Bonds.

various treatments of the Second Lien DWSD Bonds (allegedly reinstating some and impairing others).

10.     The City's Plan cannot simply ignore the Subordination Agreements by issuing new bonds and stripping the DWSD Bondholders of their rights under the Subordination Agreements.  Section 510(a) of the Bankruptcy Code, made applicable to this proceeding by section 901(a), provides that: "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  The Plan must enforce the Subordination Agreements between two third parties.

11.     Should the Court confirm the Plan despite its failure to enforce the Subordination Agreements, the Plan cannot provide the State a release of DWSD Bondholder claims.  The City has not and cannot establish any basis to grant the State a release of DWSD Bondholder claims.  *See In re Dow Corning Corp.*, 280 F. 3d 648, 658 (6th Cir. 2002) (authorizing third party releases only upon evidence that all seven enumerated factors are established to enjoin a non-consenting creditor's claims against a nondebtor); *see also In re SL Liquidating, Inc.*, 428 B.R. 799 (S.D. Ohio 2010); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 142 (Bankr. D.N.J. 2010) (plan may not release senior lienholders' rights under an intercreditor agreement with junior lender).  Even assuming such a release is permissible, in no event could it be made binding on a DWSD Bondholder unless such bondholder voted "yes" on the Plan.  Indeed, DWSD Bondholders that do not vote "yes" on the Plan with respect to a specific class will continue to maintain their state law claims arising under the Subordination Agreements against the holders of the SRF Junior Bonds – e.g., the State – with respect to such Bonds.

## II.    THE PLAN'S FAILURE TO ENFORCE THE SUBORDINATION AGREEMENTS VIOLATES THE ABSOLUTE PRIORITY RULE.

12.    The Plan is patently unconfirmable inasmuch as it seeks to pay junior DWSD Revolving Bonds in Classes 1B and 1C in full, while impairing Class 1A by providing less than full recovery to senior holders of DWSD Bond Claims.  The Plan denies holders of Class 1A Claims the full value of their claims upon the Effective Date of the Plan, proposing to change certain interest rates and call protections, and proposing to alter the DWSD Bondholders' collateral and other rights.

13.    The Plan is not fair and equitable because it violates the absolute priority rule as set forth in section 1129(b) by providing payments to Classes 1B and 1C while not fully satisfying the DWSD Bond Claims.   "By incorporating the fair and equitable standard in § 1129(b) of the [Bankruptcy] Code, Congress codified the "absolute priority rule," which provides that "absent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest."  *In re Dow Corning Corp.*, 456 F.3d 668, 672 (6th Cir. 2006) (citing *Case v. L.A. Lumber Prods. Co*., 308 U.S. 106, 115 (1939)).

14.    A plan of adjustment cannot be confirmed if it seeks to provide any recovery to junior classes when it does not provide for the full satisfaction of a senior class of claims.  *See e.g., In re Monarch Beach Venture, Ltd*., 166 B.R. 428, 436 (C.D. Cal. 1993) (reasoning that the absolute priority rule is an implicit part of the "fair and equitable" formula); *In re Miami Center Associates, Ltd*., 144 B.R. 937 (Bankr. S.D. Fla. 1992) (holding that absolute priority is an implicit requirement of 1129(b) and not just of an individual subsection); *In re Lakeside Global II, Ltd*., 116 B.R. 499, 511–12 (Bankr. S.D. Tex. 1989) (recognizing that the fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in

reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders); *In re Elijah*, 41 B.R. 348 (Bankr. W.D. Mo. 1984) (a plan proposing that a creditor's first lien be substituted with a junior lien on other collateral violated the absolute priority rule because it subordinated the senior creditor to junior creditors).

15.     The DWSD Bondholders' status as secured creditors should have no bearing on their entitlement to the protections of the absolute priority rule.   The legislative history is consistent with supporting case law recognizing the absolute priority rule under section 1129(b) applies to <u>all</u> creditors:

> The general principle of the subsection [1129(b)] permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan ... Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder, *but the principle is the same* (emphasis added).

Report of the Comm. on the Judiciary, United States House of Representatives, to Accompany H.R. 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 at 413 (1977).[9]   Section 1129(b) "codifies the absolute priority rule from the dissenting class on down." *Id*.

16.     Put simply, the Plan provides that the holders of senior DWSD Bonds will not have their claims satisfied while at the same time using the collateral in which they have a senior lien to make distributions to the Junior DWSD Bonds.  Payment of Junior DWSD Bonds prior to satisfaction of the senior DWSD Bonds violates the absolute priority rule and renders the Plan unconfirmable.

---

[9] *But see In re TCI 2 Holdings, LLC*, 428 B.R. at 168–69 (absolute priority rule does not apply to secured claims); *In re Mut. Life Ins. Co. v. Paradise Springs Assocs. (In re Paradise Springs Assocs.)*, 165 B.R. 913, 920–21 (Bankr. D. Ariz. 1993) (same).

## RESERVATION OF RIGHTS

The Ad Hoc Committee reserves its right to amend, modify and/or supplement this Objection at a later date. In addition, the Ad Hoc Committee reserves all of its rights and remedies with respect to the DWSD Bond Claims. Nothing in this Objection shall be deemed to be a waiver of any procedural, substantive or other rights, privileges or remedies available with respect to the DWSD Bond Claims, all of which are reserved, as well as any claim against any third party, including, but not limited to, against any Bond Insurers or with respect to any Bond Insurance Policy.

## CONCLUSION

WHEREFORE, for the reasons stated herein and in the DWSD Trustee Objection, and for such other reasons as may be stated at any hearing, or in any supplemental briefing, the Ad Hoc Committee respectfully requests that this Court (i) deny confirmation of the City's Plan, and (ii) provide such other and further relief as is just and equitable.

Respectfully submitted this 12th day of May, 2014.


/s/ *Amy Caton*

Amy Caton, Esq.
Greg Horowitz, Esq.
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
acaton@kramerlevin.com


and

STEINBERG SHAPIRO & CLARK
Geoffrey T. Pavlic, Esq.
25925 Telegraph Road
Suite 203
Southfield, MI 48033
Tel: (248) 352-4700
Fax: (248) 352-4488
pavlic@steinbergshapiro.com

*Attorneys for Nuveen Asset Management, and*
*BlackRock Financial Management, Inc.,*
*members of the Ad Hoc Bondholder Committee*


/s/ *William W. Kannel*

William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com


and

ANDREW J. GERDES, P.L.C.
Andrew J. Gerdes, Esq.
321 W. Lake Lansing Rd.
P.O. Box 4190
East Lansing, MI 48826-4190
Tel: (517) 853-1300
Fax: (517) 853-1301
agerdes@gerdesplc.com

*Attorneys for Fidelity Management &*
*Research Company, Eaton Vance*
*Management, and Franklin Advisers, Inc.,*
*members of the Ad Hoc Bondholder Committee*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Objection to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter and that it was delivered, by overnight service to the below recipients on this the 12th day of May, 2014:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

*Counsel to the City*

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

*Counsel to the City*

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Counsel to the Retiree Committee*

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

*Counsel to the City*

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

*Counsel to the Retiree Committee*

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 768-6800

*Counsel to the Retiree Committee*

/s/ *William W. Kannel*
William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com

*Attorneys for Fidelity Management &
Research Company, Eaton Vance
Management, and Franklin Advisers, Inc.,
as members of the Ad Hoc Committee of
DWSD Bondholders*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### (DETROIT)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **CITY OF DETROIT, MICHIGAN,** | ) | **CASE NO.: 13-53846** |
| | ) | |
| | ) | **CHAPTER 9** |
| **Debtor.** | ) | |
| | ) | **Hon. Steven W. Rhodes** |
| | ) | |

_____

## OBJECTION OF THE AD HOC COMMITTEE OF DWSD BONDHOLDERS TO THE CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT AND JOINDER TO THE DWSD BOND TRUSTEE'S OBJECTION TO THE CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT

_____

The Ad Hoc Committee (the "**Ad Hoc Committee**")[1] as holders of those certain bonds (the "**DWSD Bonds**" and the holders of such, the "**DWSD Bondholders**") issued by the City of Detroit (the "**City**") for the Detroit Water and Sewerage Department (the "**DWSD**") to (a) finance and refinance improvements to the City's Water Supply System (the "**Water System**") and (b) finance and refinance improvements to the City's Sewage Disposal System (the "**Sewerage System**," together with the Water System, the "**Systems**"), hereby files its objection (this "**Objection**") to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* (Doc. 4392) (the "**Plan**")[2] and joins the *DWSD Bond Trustee's Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* (the "**DWSD Trustee Objection**"), filed contemporaneously herewith by U.S. Bank National Association, in its capacity as trustee for the DWSD Bonds (the "**Trustee**").

_____

[1] The Ad Hoc Committee members are BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

The members of the Ad Hoc Committee manage several of the largest, most well-known mutual funds in the country. These mutual funds are household names among individual investors, many of whom are Michigan residents, who invest in tax-free mutual funds to save for retirement, college, and other long-term investment goals.

The members of the Ad Hoc Committee collectively have over 240 years of experience investing in debt issued by states, municipalities, and other tax-exempt issuers throughout the country, with over $399 billion loaned to such issuers throughout the country, and approximately $9.67 billion loaned to municipalities and other tax-exempt issuers throughout Michigan. These loans have helped Michigan and countless other municipalities and tax-exempt issuers, such as hospitals and universities, invest in infrastructure construction and improvements like the Systems, the construction of which would not have been possible without loans at the relatively low-cost interest rates accessible through the large, municipal market of tax-exempt financing. Loans like the DWSD Bonds are the backbone of municipal finance.

Between them, the members of the Ad Hoc Committee hold approximately $1.332 billion of the total of approximately $5.272 billion of DWSD Bonds.[3] These holdings are spread across virtually every CUSIP of the DWSD Bonds.

The Ad Hoc Committee files this objection to the Plan because the Plan disregards the Subordination Agreements (as defined below) that benefit the senior DWSD Bonds, resulting in a violation of section 510(a) of the Bankruptcy Code and the absolute priority rule, and because the Plan seeks to impermissibly release claims between non-debtor parties, including claims against the State of Michigan (the "**State**"), with respect to such agreements. In addition, the City's Plan proposes to impair the fully secured DWSD Bonds by making a number of

---

[3] This amount excludes the approximately $482 million of SRF Junior Lien Bonds, as defined below.

substantial changes to the current DWSD Bonds that will allow the City to strip revenues out of the Systems – i.e., to alter the DWSD Bonds' collateral and other rights – and the Ad Hoc Committee joins in the DWSD Trustee Objection and adopts and incorporates by reference herein the authorities cited in the DWSD Trustee Objection.

For these reasons, as further described below, the proposed Plan cannot be confirmed.

<u>**JOINDER**</u>

1.      The City has issued over $5.5 billion of DWSD Bonds. The DWSD Bonds are special revenue bonds that are payable from the net revenues of the Systems. The DWSD Bonds are secured by first and second priority statutory liens on all net revenues of the Systems. As is further described in the DWSD Trustee Objection, the Bankruptcy Code expressly protects these state law property interests in special revenue bonds and provides the DWSD Bondholders with a bundle of rights to ensure that the DWSD Bonds are not impaired under the Plan. *See* DWSD Trustee Objection.

2.      The DWSD Bonds, which the City has agreed are fully secured debt instruments, are impaired by the Plan in primarily three substantive ways.

3.      First, the Plan provides that $428.5 million be funded out of the Systems over the next nine years (the "**UAAL Surcharge**") to finance the "grand bargain" that the City has reached with its retirees. The UAAL Surcharge will be used to fund pension payments to <u>all</u> City employees (not just DWSD employees) and excuses the City from any obligation to fund its shortfall. The Ad Hoc Committee expects to show at confirmation that this $428.5 million estimate of DWSD's share of the pension liabilities is overstated, and that the UAAL Surcharge does not constitute current operating expenses of the Systems that permissibly can be paid ahead

of the DWSD Bonds (and, in some circumstances, may not be a permitted transfer of the Systems' revenues at all).

4.      Second, the Plan proposes absurdly low interest rates for many of the DWSD Bonds.  These interest rates cannot be justified by any reasonable market comparables of investments with similar risk profiles, or, if applicable, the methodology of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), or *Bank of Montreal v. Official Committee of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005).  While the discovery process has just begun, it appears that the City has merely taken a single "A" rated bond yield curve and has applied that to the DWSD Bonds.  As the Ad Hoc Committee expects to show at the confirmation hearing, this is not an appropriate methodology and the City cannot support the interest rates proposed by the Plan.  In fact, if interest rates are adjusted for current market conditions and the market's view of the DWSD Bonds' risk profile (as is required to "cram down" the DWSD Bonds under section 1129(b)), the Ad Hoc Committee expects that, in many cases, the Bonds are entitled to <u>higher</u> interest rates than the current contract rate.  *See* DWSD Trustee Objection, ¶¶ 72-77.

5.      Third, the Plan impermissibly strips call protection from many series of the DWSD Bonds, leaving them callable the day after the Plan becomes effective.[4]  As the Ad Hoc Committee expects to show at the confirmation hearing, call protection is a critical component of risk management and returns for municipal debt, particularly for investors like mutual funds that invest in municipal securities to buy and hold them.  For the reasons further set out in the DWSD Trustee Objection, the removal of call protection from the DWSD Bonds constitutes an impermissible impairment of the DWSD Bonds.  *See* DWSD Trustee Objection, ¶¶ 1-22, 24-33,

---

[4] Certain DWSD Bonds have "call protection," meaning they cannot be voluntarily redeemed by the City before a date certain, which is referred to as the "no call period."

34, 39-44. Even if the Court were to rule that the DWSD Bonds may be impaired, the Ad Hoc Committee expects to show that the City must provide substantial compensation to holders for removal of the call protection.

6.       For these reasons, and the other reasons set forth in the DWSD Trustee Objection, confirmation of the Plan should be denied.

## ADDITIONAL OBJECTIONS:

I.    **THE PLAN VIOLATES THE SUBORDINATION AGREEMENTS CONTAINED IN THE INDENTURE, AND THEREFORE CANNOT BE CONFIRMED.**

7.       The DWSD Bond Documents[5] authorize and provide for multiple series of water and sewer revenue bonds that hold different priorities of liens on the net revenues of each System.[6]   In addition, the Ordinances provide for claim subordination of the junior classes of bonds:

> **Whenever any principal (and premium, if any) of and interest on Securities of a Priority . . . . is due and is not made when due**, then until such Payment is made or provision made for the payment thereof to the satisfaction of the Holders of such Securities . . . **no Payment shall be made directly or indirectly on or in respect of any Securities of lower Priorities**.

---

[5] The  DWSD Bond Documents principally consist of the DWSD Ordinances and Indentures.  The Ordinances are: (i) that certain Water Ordinance 01-05, dated January 26, 2005 (the "**Water Ordinance**"); and (ii) that certain Sewer Ordinance 18-01, dated October 18, 2001 (the "**Sewer Ordinance**").  The "Indentures" are: (i) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Water Supply System), dated as of February 1, 2013, among the City and Trustee, the Water and Sewage Department (the "**Water Indenture**"); and (ii) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Sewage Disposal System), dated as of June 1, 2012, among the City, Water and Sewage Department, and the Trustee  (the "**Sewer Indenture**").  The Sewer Ordinance, Sewer Indenture, Water Ordinance and Water Indenture shall be collectively referred to herein as the "**DWSD Bond Documents**".

[6] *See* Water Ordinance, §5; Water Indenture, §§ 2.03, 2.11; Sewer Ordinance, § 5; and Sewer Indenture, §§ 2.03, 2.11.

*See* Water Ordinance, § 6(B); Sewer Ordinance, § 2.12 (together, the "**Subordination Agreements**") (emphasis added). In short, the Bond Documents provide that the liens and claims of the DWSD Junior Bonds (defined herein) are subordinate to the senior DWSD Bonds, and the claims of the DWSD Junior Bonds cannot be paid if there is any amount of principal, interest or premium remaining outstanding on the senior DWSD Bonds.

8. Currently, there are three priorities of water and sewer revenue bonds that were issued under the Ordinances and Indentures. The DWSD Bonds consist of first and second lien bonds (the "**First Lien DWSD Bonds**" and the "**Second Lien DWSD Bonds**").[7] In addition, the City has issued "**SRF Junior Lien Bonds**" (as defined in the respective Water Ordinance and Sewer Ordinance) that have a third lien priority and a third claim priority. The SRF Junior Lien Bonds are held by the State and were issued for the purpose of providing improvements to the Systems by accessing the State's Revolving Fund.[8]

9. The Plan fails to enforce the agreements subordinating the liens and claims of the SRF Junior Lien Bonds and the Second Lien DWSD Bonds (together, the "**DWSD Junior Bonds**"). Proper enforcement would require that a portion of the consideration from the junior classes of bonds be directed to the senior classes to compensate the impaired classes of senior DWSD Bonds for the economic loss caused by the Plan's imposition of lower interest rates and removal of call protection. Instead, the Plan disregards the Subordination Agreements, providing that all SRF Junior Lien Bonds will be reinstated at their current interest rates, and providing for

---

[7] *See* supra note 5; *see also* Plan, Interest Rate Reset Chart at Ex. I.A.168. The "Second Lien DWSD Bonds" are DWSD Bonds that hold second priority liens on the net revenues of the Systems and are referenced as holding a "second" lien in the Plan.

[8] *See* Water Indenture, § 1 (definition of "SRF Junior Lien Bonds"); Sewer Indenture, § 1 (definition of "SRF Junior Lien Bonds"); *see also* Michigan Department of Environmental Quality, http://www.michigan.gov/deq/0,1607,7-135-3307_3515_4143---,00.html (last visited May 7, 2014). The SRF Junior Lien Bonds are referred to under the City's Plan as the DWSD Revolving Bonds.

various treatments of the Second Lien DWSD Bonds (allegedly reinstating some and impairing others).

10.     The City's Plan cannot simply ignore the Subordination Agreements by issuing new bonds and stripping the DWSD Bondholders of their rights under the Subordination Agreements.  Section 510(a) of the Bankruptcy Code, made applicable to this proceeding by section 901(a), provides that: "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  The Plan must enforce the Subordination Agreements between two third parties.

11.     Should the Court confirm the Plan despite its failure to enforce the Subordination Agreements, the Plan cannot provide the State a release of DWSD Bondholder claims.  The City has not and cannot establish any basis to grant the State a release of DWSD Bondholder claims. *See In re Dow Corning Corp.*, 280 F. 3d 648, 658 (6th Cir. 2002) (authorizing third party releases only upon evidence that all seven enumerated factors are established to enjoin a non-consenting creditor's claims against a nondebtor); *see also In re SL Liquidating, Inc.*, 428 B.R. 799 (S.D. Ohio 2010); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 142 (Bankr. D.N.J. 2010) (plan may not release senior lienholders' rights under an intercreditor agreement with junior lender). Even assuming such a release is permissible, in no event could it be made binding on a DWSD Bondholder unless such bondholder voted "yes" on the Plan.  Indeed, DWSD Bondholders that do not vote "yes" on the Plan with respect to a specific class will continue to maintain their state law claims arising under the Subordination Agreements against the holders of the SRF Junior Bonds – e.g., the State – with respect to such Bonds.

## II. THE PLAN'S FAILURE TO ENFORCE THE SUBORDINATION AGREEMENTS VIOLATES THE ABSOLUTE PRIORITY RULE.

12.      The Plan is patently unconfirmable inasmuch as it seeks to pay junior DWSD Revolving Bonds in Classes 1B and 1C in full, while impairing Class 1A by providing less than full recovery to senior holders of DWSD Bond Claims.  The Plan denies holders of Class 1A Claims the full value of their claims upon the Effective Date of the Plan, proposing to change certain interest rates and call protections, and proposing to alter the DWSD Bondholders' collateral and other rights.

13.      The Plan is not fair and equitable because it violates the absolute priority rule as set forth in section 1129(b) by providing payments to Classes 1B and 1C while not fully satisfying the DWSD Bond Claims.   "By incorporating the fair and equitable standard in § 1129(b) of the [Bankruptcy] Code, Congress codified the "absolute priority rule," which provides that "absent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest."  *In re Dow Corning Corp.*, 456 F.3d 668, 672 (6th Cir. 2006) (citing *Case v. L.A. Lumber Prods. Co*., 308 U.S. 106, 115 (1939)).

14.      A plan of adjustment cannot be confirmed if it seeks to provide any recovery to junior classes when it does not provide for the full satisfaction of a senior class of claims.  *See e.g., In re Monarch Beach Venture, Ltd*., 166 B.R. 428, 436 (C.D. Cal. 1993) (reasoning that the absolute priority rule is an implicit part of the "fair and equitable" formula); *In re Miami Center Associates, Ltd*., 144 B.R. 937 (Bankr. S.D. Fla. 1992) (holding that absolute priority is an implicit requirement of 1129(b) and not just of an individual subsection); *In re Lakeside Global II, Ltd*., 116 B.R. 499, 511–12 (Bankr. S.D. Tex. 1989) (recognizing that the fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in

reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders); *In re Elijah*, 41 B.R. 348 (Bankr. W.D. Mo. 1984) (a plan proposing that a creditor's first lien be substituted with a junior lien on other collateral violated the absolute priority rule because it subordinated the senior creditor to junior creditors).

15.    The DWSD Bondholders' status as secured creditors should have no bearing on their entitlement to the protections of the absolute priority rule.   The legislative history is consistent with supporting case law recognizing the absolute priority rule under section 1129(b) applies to <u>all</u> creditors:

> The general principle of the subsection [1129(b)] permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan ... Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder, *but the principle is the same* (emphasis added).

Report of the Comm. on the Judiciary, United States House of Representatives, to Accompany H.R. 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 at 413 (1977).[9]   Section 1129(b) "codifies the absolute priority rule from the dissenting class on down." *Id*.

16.    Put simply, the Plan provides that the holders of senior DWSD Bonds will not have their claims satisfied while at the same time using the collateral in which they have a senior lien to make distributions to the Junior DWSD Bonds.  Payment of Junior DWSD Bonds prior to satisfaction of the senior DWSD Bonds violates the absolute priority rule and renders the Plan unconfirmable.

---

[9] *But see In re TCI 2 Holdings, LLC*, 428 B.R. at 168–69 (absolute priority rule does not apply to secured claims); *In re Mut. Life Ins. Co. v. Paradise Springs Assocs. (In re Paradise Springs Assocs.)*, 165 B.R. 913, 920–21 (Bankr. D. Ariz. 1993) (same).

## RESERVATION OF RIGHTS

The Ad Hoc Committee reserves its right to amend, modify and/or supplement this Objection at a later date.  In addition, the Ad Hoc Committee reserves all of its rights and remedies with respect to the DWSD Bond Claims.  Nothing in this Objection shall be deemed to be a waiver of any procedural, substantive or other rights, privileges or remedies available with respect to the DWSD Bond Claims, all of which are reserved, as well as any claim against any third party, including, but not limited to, against any Bond Insurers or with respect to any Bond Insurance Policy.

## CONCLUSION

WHEREFORE, for the reasons stated herein and in the DWSD Trustee Objection, and for such other reasons as may be stated at any hearing, or in any supplemental briefing, the Ad Hoc Committee respectfully requests that this Court (i) deny confirmation of the City's Plan, and (ii) provide such other and further relief as is just and equitable.

Respectfully submitted this 12th day of May, 2014.


/s/ *Amy Caton*
Amy Caton, Esq.
Greg Horowitz, Esq.
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
1177 Avenue of the Americas
New York, New York  10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000
acaton@kramerlevin.com


and

STEINBERG SHAPIRO & CLARK
Geoffrey T. Pavlic, Esq.
25925 Telegraph Road
Suite 203
Southfield, MI 48033
Tel: (248) 352-4700
Fax: (248) 352-4488
pavlic@steinbergshapiro.com

*Attorneys for Nuveen Asset Management, and
BlackRock Financial Management, Inc.,
members of the Ad Hoc Bondholder Committee*


/s/ *William W. Kannel*
William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com


and

ANDREW J. GERDES, P.L.C.
Andrew J. Gerdes, Esq.
321 W. Lake Lansing Rd.
P.O. Box 4190
East Lansing, MI 48826-4190
Tel: (517) 853-1300
Fax: (517) 853-1301
agerdes@gerdesplc.com

*Attorneys for Fidelity Management &
Research Company, Eaton Vance
Management, and Franklin Advisers, Inc.,
members of the Ad Hoc Bondholder Committee*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Objection to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter and that it was delivered, by overnight service to the below recipients on this the 12th day of May, 2014:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

*Counsel to the City*

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

*Counsel to the City*

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Counsel to the Retiree Committee*

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

*Counsel to the City*

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

*Counsel to the Retiree Committee*

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 768-6800

*Counsel to the Retiree Committee*

/s/ *William W. Kannel*

William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com

*Attorneys for Fidelity Management &
Research Company, Eaton Vance
Management, and Franklin Advisers, Inc.,
as members of the Ad Hoc Committee of
DWSD Bondholders*

In re:                              )

                                  )

CITY OF DETROIT, MICHIGAN,     )     CASE NO.: 13-53846

                                  )

                                  )     CHAPTER 9

       Debtor.                 )

                                  )     Hon. Steven W. Rhodes

                                  )

---

**OBJECTION OF THE AD HOC COMMITTEE OF DWSD BONDHOLDERS
TO THE CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT AND
JOINDER TO THE DWSD BOND TRUSTEE'S OBJECTION TO THE
CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT**

---

The Ad Hoc Committee (the "**Ad Hoc Committee**")[1] as holders of those certain bonds (the "**DWSD Bonds**" and the holders of such, the "**DWSD Bondholders**") issued by the City of Detroit (the "**City**") for the Detroit Water and Sewerage Department (the "**DWSD**") to (a) finance and refinance improvements to the City's Water Supply System (the "**Water System**") and (b) finance and refinance improvements to the City's Sewage Disposal System (the "**Sewerage System**," together with the Water System, the "**Systems**"), hereby files its objection (this "**Objection**") to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* (Doc. 4392) (the "**Plan**")[2] and joins the *DWSD Bond Trustee's Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* (the "**DWSD Trustee Objection**"), filed contemporaneously herewith by U.S. Bank National Association, in its capacity as trustee for the DWSD Bonds (the "**Trustee**").

---

[1] The Ad Hoc Committee members are BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

## PRELIMINARY STATEMENT

The members of the Ad Hoc Committee manage several of the largest, most well-known mutual funds in the country. These mutual funds are household names among individual investors, many of whom are Michigan residents, who invest in tax-free mutual funds to save for retirement, college, and other long-term investment goals.

The members of the Ad Hoc Committee collectively have over 240 years of experience investing in debt issued by states, municipalities, and other tax-exempt issuers throughout the country, with over $399 billion loaned to such issuers throughout the country, and approximately $9.67 billion loaned to municipalities and other tax-exempt issuers throughout Michigan. These loans have helped Michigan and countless other municipalities and tax-exempt issuers, such as hospitals and universities, invest in infrastructure construction and improvements like the Systems, the construction of which would not have been possible without loans at the relatively low-cost interest rates accessible through the large, municipal market of tax-exempt financing. Loans like the DWSD Bonds are the backbone of municipal finance.

Between them, the members of the Ad Hoc Committee hold approximately $1.332 billion of the total of approximately $5.272 billion of DWSD Bonds.[3] These holdings are spread across virtually every CUSIP of the DWSD Bonds.

The Ad Hoc Committee files this objection to the Plan because the Plan disregards the Subordination Agreements (as defined below) that benefit the senior DWSD Bonds, resulting in a violation of section 510(a) of the Bankruptcy Code and the absolute priority rule, and because the Plan seeks to impermissibly release claims between non-debtor parties, including claims against the State of Michigan (the "**State**"), with respect to such agreements. In addition, the City's Plan proposes to impair the fully secured DWSD Bonds by making a number of

---

[3] This amount excludes the approximately $482 million of SRF Junior Lien Bonds, as defined below.

substantial changes to the current DWSD Bonds that will allow the City to strip revenues out of the Systems – i.e., to alter the DWSD Bonds' collateral and other rights – and the Ad Hoc Committee joins in the DWSD Trustee Objection and adopts and incorporates by reference herein the authorities cited in the DWSD Trustee Objection.

For these reasons, as further described below, the proposed Plan cannot be confirmed.

<u>**JOINDER**</u>

1. The City has issued over $5.5 billion of DWSD Bonds. The DWSD Bonds are special revenue bonds that are payable from the net revenues of the Systems. The DWSD Bonds are secured by first and second priority statutory liens on all net revenues of the Systems. As is further described in the DWSD Trustee Objection, the Bankruptcy Code expressly protects these state law property interests in special revenue bonds and provides the DWSD Bondholders with a bundle of rights to ensure that the DWSD Bonds are not impaired under the Plan. *See* DWSD Trustee Objection.

2. The DWSD Bonds, which the City has agreed are fully secured debt instruments, are impaired by the Plan in primarily three substantive ways.

3. First, the Plan provides that $428.5 million be funded out of the Systems over the next nine years (the "**UAAL Surcharge**") to finance the "grand bargain" that the City has reached with its retirees. The UAAL Surcharge will be used to fund pension payments to <u>all</u> City employees (not just DWSD employees) and excuses the City from any obligation to fund its shortfall. The Ad Hoc Committee expects to show at confirmation that this $428.5 million estimate of DWSD's share of the pension liabilities is overstated, and that the UAAL Surcharge does not constitute current operating expenses of the Systems that permissibly can be paid ahead

of the DWSD Bonds (and, in some circumstances, may not be a permitted transfer of the Systems' revenues at all).

4. Second, the Plan proposes absurdly low interest rates for many of the DWSD Bonds. These interest rates cannot be justified by any reasonable market comparables of investments with similar risk profiles, or, if applicable, the methodology of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), or *Bank of Montreal v. Official Committee of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005). While the discovery process has just begun, it appears that the City has merely taken a single "A" rated bond yield curve and has applied that to the DWSD Bonds. As the Ad Hoc Committee expects to show at the confirmation hearing, this is not an appropriate methodology and the City cannot support the interest rates proposed by the Plan. In fact, if interest rates are adjusted for current market conditions and the market's view of the DWSD Bonds' risk profile (as is required to "cram down" the DWSD Bonds under section 1129(b)), the Ad Hoc Committee expects that, in many cases, the Bonds are entitled to <u>higher</u> interest rates than the current contract rate. *See* DWSD Trustee Objection, ¶¶ 72-77.

5. Third, the Plan impermissibly strips call protection from many series of the DWSD Bonds, leaving them callable the day after the Plan becomes effective.[4] As the Ad Hoc Committee expects to show at the confirmation hearing, call protection is a critical component of risk management and returns for municipal debt, particularly for investors like mutual funds that invest in municipal securities to buy and hold them. For the reasons further set out in the DWSD Trustee Objection, the removal of call protection from the DWSD Bonds constitutes an impermissible impairment of the DWSD Bonds. *See* DWSD Trustee Objection, ¶¶ 1-22, 24-33,

---

[4] Certain DWSD Bonds have "call protection," meaning they cannot be voluntarily redeemed by the City before a date certain, which is referred to as the "no call period."

34, 39-44.  Even if the Court were to rule that the DWSD Bonds may be impaired, the Ad Hoc

Committee expects to show that the City must provide substantial compensation to holders for

removal of the call protection.

6.      For these reasons, and the other reasons set forth in the DWSD Trustee Objection,

confirmation of the Plan should be denied.

**ADDITIONAL OBJECTIONS:**


I.      **THE PLAN VIOLATES THE SUBORDINATION AGREEMENTS CONTAINED IN
        THE INDENTURE, AND THEREFORE CANNOT BE CONFIRMED.**

7.      The DWSD Bond Documents[5] authorize and provide for multiple series of water

and sewer revenue bonds that hold different priorities of liens on the net revenues of each

System.[6]  In addition, the Ordinances provide for claim subordination of the junior classes of

bonds:

> **Whenever any principal (and premium, if any) of and interest on
> Securities of a Priority . . . . is due and is not made when due,** then until
> such Payment is made or provision made for the payment thereof to the
> satisfaction of the Holders of such Securities . . . **no Payment shall be
> made directly or indirectly on or in respect of any Securities of lower
> Priorities**.

---

[5] The  DWSD Bond Documents principally consist of the DWSD Ordinances and Indentures.  The Ordinances are:
(i) that certain Water Ordinance 01-05, dated January 26, 2005 (the "**Water Ordinance**"); and (ii) that certain
Sewer Ordinance 18-01, dated October 18, 2001 (the "**Sewer Ordinance**").  The "Indentures" are: (i) that certain
Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department
(Water Supply System), dated as of February 1, 2013, among the City and Trustee, the Water and Sewage
Department (the "**Water Indenture**"); and (ii) that certain Trust Indenture, Relating to the Outstanding Secured
Obligations of the Detroit Water and Sewerage Department (Sewage Disposal System), dated as of June 1, 2012,
among the City, Water and Sewage Department, and the Trustee  (the "**Sewer Indenture**").  The Sewer Ordinance,
Sewer Indenture, Water Ordinance and Water Indenture shall be collectively referred to herein as the "**DWSD Bond
Documents**".

[6] *See* Water Ordinance, §5; Water Indenture, §§ 2.03, 2.11; Sewer Ordinance, § 5; and Sewer Indenture, §§ 2.03,
2.11.

*See* Water Ordinance, § 6(B); Sewer Ordinance, § 2.12 (together, the "**Subordination Agreements**") (emphasis added). In short, the Bond Documents provide that the liens and claims of the DWSD Junior Bonds (defined herein) are subordinate to the senior DWSD Bonds, and the claims of the DWSD Junior Bonds cannot be paid if there is any amount of principal, interest or premium remaining outstanding on the senior DWSD Bonds.

8. Currently, there are three priorities of water and sewer revenue bonds that were issued under the Ordinances and Indentures. The DWSD Bonds consist of first and second lien bonds (the "**First Lien DWSD Bonds**" and the "**Second Lien DWSD Bonds**").[7] In addition, the City has issued "**SRF Junior Lien Bonds**" (as defined in the respective Water Ordinance and Sewer Ordinance) that have a third lien priority and a third claim priority. The SRF Junior Lien Bonds are held by the State and were issued for the purpose of providing improvements to the Systems by accessing the State's Revolving Fund.[8]

9. The Plan fails to enforce the agreements subordinating the liens and claims of the SRF Junior Lien Bonds and the Second Lien DWSD Bonds (together, the "**DWSD Junior Bonds**"). Proper enforcement would require that a portion of the consideration from the junior classes of bonds be directed to the senior classes to compensate the impaired classes of senior DWSD Bonds for the economic loss caused by the Plan's imposition of lower interest rates and removal of call protection. Instead, the Plan disregards the Subordination Agreements, providing that all SRF Junior Lien Bonds will be reinstated at their current interest rates, and providing for

---

[7] *See supra* note 5; *see also* Plan, Interest Rate Reset Chart at Ex. I.A.168. The "Second Lien DWSD Bonds" are DWSD Bonds that hold second priority liens on the net revenues of the Systems and are referenced as holding a "second" lien in the Plan.

[8] *See* Water Indenture, § 1 (definition of "SRF Junior Lien Bonds"); Sewer Indenture, § 1 (definition of "SRF Junior Lien Bonds"); *see also* Michigan Department of Environmental Quality, http://www.michigan.gov/deq/0,1607,7-135-3307_3515_4143---,00.html (last visited May 7, 2014). The SRF Junior Lien Bonds are referred to under the City's Plan as the DWSD Revolving Bonds.

various treatments of the Second Lien DWSD Bonds (allegedly reinstating some and impairing others).

10.    The City's Plan cannot simply ignore the Subordination Agreements by issuing new bonds and stripping the DWSD Bondholders of their rights under the Subordination Agreements.  Section 510(a) of the Bankruptcy Code, made applicable to this proceeding by section 901(a), provides that: "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  The Plan must enforce the Subordination Agreements between two third parties.

11.    Should the Court confirm the Plan despite its failure to enforce the Subordination Agreements, the Plan cannot provide the State a release of DWSD Bondholder claims.  The City has not and cannot establish any basis to grant the State a release of DWSD Bondholder claims. *See In re Dow Corning Corp.*, 280 F. 3d 648, 658 (6th Cir. 2002) (authorizing third party releases only upon evidence that all seven enumerated factors are established to enjoin a non-consenting creditor's claims against a nondebtor); *see also In re SL Liquidating, Inc.*, 428 B.R. 799 (S.D. Ohio 2010); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 142 (Bankr. D.N.J. 2010) (plan may not release senior lienholders' rights under an intercreditor agreement with junior lender). Even assuming such a release is permissible, in no event could it be made binding on a DWSD Bondholder unless such bondholder voted "yes" on the Plan.  Indeed, DWSD Bondholders that do not vote "yes" on the Plan with respect to a specific class will continue to maintain their state law claims arising under the Subordination Agreements against the holders of the SRF Junior Bonds – e.g., the State – with respect to such Bonds.

## II. THE PLAN'S FAILURE TO ENFORCE THE SUBORDINATION AGREEMENTS VIOLATES THE ABSOLUTE PRIORITY RULE.

12.     The Plan is patently unconfirmable inasmuch as it seeks to pay junior DWSD Revolving Bonds in Classes 1B and 1C in full, while impairing Class 1A by providing less than full recovery to senior holders of DWSD Bond Claims.  The Plan denies holders of Class 1A Claims the full value of their claims upon the Effective Date of the Plan, proposing to change certain interest rates and call protections, and proposing to alter the DWSD Bondholders' collateral and other rights.

13.     The Plan is not fair and equitable because it violates the absolute priority rule as set forth in section 1129(b) by providing payments to Classes 1B and 1C while not fully satisfying the DWSD Bond Claims.   "By incorporating the fair and equitable standard in § 1129(b) of the [Bankruptcy] Code, Congress codified the "absolute priority rule," which provides that "absent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest."  *In re Dow Corning Corp.*, 456 F.3d 668, 672 (6th Cir. 2006) (citing *Case v. L.A. Lumber Prods. Co*., 308 U.S. 106, 115 (1939)).

14.     A plan of adjustment cannot be confirmed if it seeks to provide any recovery to junior classes when it does not provide for the full satisfaction of a senior class of claims.  *See e.g., In re Monarch Beach Venture, Ltd*., 166 B.R. 428, 436 (C.D. Cal. 1993) (reasoning that the absolute priority rule is an implicit part of the "fair and equitable" formula); *In re Miami Center Associates, Ltd*., 144 B.R. 937 (Bankr. S.D. Fla. 1992) (holding that absolute priority is an implicit requirement of 1129(b) and not just of an individual subsection); *In re Lakeside Global II, Ltd*., 116 B.R. 499, 511–12 (Bankr. S.D. Tex. 1989) (recognizing that the fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in

reorganization plans, placing secured creditors' rights first, those of unsecured next, and

subordinating the interests of stockholders); *In re Elijah*, 41 B.R. 348 (Bankr. W.D. Mo. 1984) (a

plan proposing that a creditor's first lien be substituted with a junior lien on other collateral

violated the absolute priority rule because it subordinated the senior creditor to junior creditors).

15.     The DWSD Bondholders' status as secured creditors should have no bearing on

their entitlement to the protections of the absolute priority rule.   The legislative history is

consistent with supporting case law recognizing the absolute priority rule under section 1129(b)

applies to <u>all</u> creditors:

> The general principle of the subsection [1129(b)] permits confirmation
> notwithstanding nonacceptance by an impaired class if that class and all
> below it in priority are treated according to the absolute priority rule. The
> dissenting class must be paid in full before any junior class may share
> under the plan ... Treatment of classes of secured creditors is slightly
> different because they do not fall in the priority ladder, *but the principle is
> the same* (emphasis added).

Report of the Comm. on the Judiciary, United States House of Representatives, to Accompany

H.R. 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 at 413 (1977).[9]   Section 1129(b)

"codifies the absolute priority rule from the dissenting class on down." *Id*.

16.     Put simply, the Plan provides that the holders of senior DWSD Bonds will not

have their claims satisfied while at the same time using the collateral in which they have a senior

lien to make distributions to the Junior DWSD Bonds.  Payment of Junior DWSD Bonds prior to

satisfaction of the senior DWSD Bonds violates the absolute priority rule and renders the Plan

unconfirmable.

---

[9] *But see In re TCI 2 Holdings, LLC*, 428 B.R. at 168–69 (absolute priority rule does not apply to secured claims); *In re Mut. Life Ins. Co. v. Paradise Springs Assocs. (In re Paradise Springs Assocs.)*, 165 B.R. 913, 920–21 (Bankr. D. Ariz. 1993) (same).

## RESERVATION OF RIGHTS

The Ad Hoc Committee reserves its right to amend, modify and/or supplement this Objection at a later date. In addition, the Ad Hoc Committee reserves all of its rights and remedies with respect to the DWSD Bond Claims. Nothing in this Objection shall be deemed to be a waiver of any procedural, substantive or other rights, privileges or remedies available with respect to the DWSD Bond Claims, all of which are reserved, as well as any claim against any third party, including, but not limited to, against any Bond Insurers or with respect to any Bond Insurance Policy.

## CONCLUSION

WHEREFORE, for the reasons stated herein and in the DWSD Trustee Objection, and for such other reasons as may be stated at any hearing, or in any supplemental briefing, the Ad Hoc Committee respectfully requests that this Court (i) deny confirmation of the City's Plan, and (ii) provide such other and further relief as is just and equitable.

Respectfully submitted this 12th day of May, 2014.


/s/ *Amy Caton*
Amy Caton, Esq.
Greg Horowitz, Esq.
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
acaton@kramerlevin.com


and

STEINBERG SHAPIRO & CLARK
Geoffrey T. Pavlic, Esq.
25925 Telegraph Road
Suite 203
Southfield, MI 48033
Tel: (248) 352-4700
Fax: (248) 352-4488
pavlic@steinbergshapiro.com

*Attorneys for Nuveen Asset Management, and BlackRock Financial Management, Inc., members of the Ad Hoc Bondholder Committee*

/s/ *William W. Kannel*
William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com


and

ANDREW J. GERDES, P.L.C.
Andrew J. Gerdes, Esq.
321 W. Lake Lansing Rd.
P.O. Box 4190
East Lansing, MI 48826-4190
Tel: (517) 853-1300
Fax: (517) 853-1301
agerdes@gerdesplc.com

*Attorneys for Fidelity Management & Research Company, Eaton Vance Management, and Franklin Advisers, Inc., members of the Ad Hoc Bondholder Committee*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Objection to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter and that it was delivered, by overnight service to the below recipients on this the 12th day of May, 2014:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

*Counsel to the City*

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

*Counsel to the City*

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Counsel to the Retiree Committee*

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

*Counsel to the City*

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO
PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

*Counsel to the Retiree Committee*

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 768-6800

*Counsel to the Retiree Committee*

/s/ *William W. Kannel*
William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com

*Attorneys for Fidelity Management &
Research Company, Eaton Vance
Management, and Franklin Advisers, Inc.,
as members of the Ad Hoc Committee of
DWSD Bondholders*

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
(DETROIT)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **CITY OF DETROIT, MICHIGAN,** | ) | **CASE NO.: 13-53846** |
| | ) | |
| | ) | **CHAPTER 9** |
| **Debtor.** | ) | |
| | ) | **Hon. Steven W. Rhodes** |
| | ) | |

---

**OBJECTION OF THE AD HOC COMMITTEE OF DWSD BONDHOLDERS
TO THE CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT AND
JOINDER TO THE DWSD BOND TRUSTEE'S OBJECTION TO THE
CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT**

---

The Ad Hoc Committee (the "**Ad Hoc Committee**")[1] as holders of those certain bonds (the "**DWSD Bonds**" and the holders of such, the "**DWSD Bondholders**") issued by the City of Detroit (the "**City**") for the Detroit Water and Sewerage Department (the "**DWSD**") to (a) finance and refinance improvements to the City's Water Supply System (the "**Water System**") and (b) finance and refinance improvements to the City's Sewage Disposal System (the "**Sewerage System**," together with the Water System, the "**Systems**"), hereby files its objection (this "**Objection**") to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* (Doc. 4392) (the "**Plan**")[2] and joins the *DWSD Bond Trustee's Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* (the "**DWSD Trustee Objection**"), filed contemporaneously herewith by U.S. Bank National Association, in its capacity as trustee for the DWSD Bonds (the "**Trustee**").

---

[1] The Ad Hoc Committee members are BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

The members of the Ad Hoc Committee manage several of the largest, most well-known mutual funds in the country. These mutual funds are household names among individual investors, many of whom are Michigan residents, who invest in tax-free mutual funds to save for retirement, college, and other long-term investment goals.

The members of the Ad Hoc Committee collectively have over 240 years of experience investing in debt issued by states, municipalities, and other tax-exempt issuers throughout the country, with over $399 billion loaned to such issuers throughout the country, and approximately $9.67 billion loaned to municipalities and other tax-exempt issuers throughout Michigan. These loans have helped Michigan and countless other municipalities and tax-exempt issuers, such as hospitals and universities, invest in infrastructure construction and improvements like the Systems, the construction of which would not have been possible without loans at the relatively low-cost interest rates accessible through the large, municipal market of tax-exempt financing. Loans like the DWSD Bonds are the backbone of municipal finance.

Between them, the members of the Ad Hoc Committee hold approximately $1.332 billion of the total of approximately $5.272 billion of DWSD Bonds.[3] These holdings are spread across virtually every CUSIP of the DWSD Bonds.

The Ad Hoc Committee files this objection to the Plan because the Plan disregards the Subordination Agreements (as defined below) that benefit the senior DWSD Bonds, resulting in a violation of section 510(a) of the Bankruptcy Code and the absolute priority rule, and because the Plan seeks to impermissibly release claims between non-debtor parties, including claims against the State of Michigan (the "**State**"), with respect to such agreements. In addition, the City's Plan proposes to impair the fully secured DWSD Bonds by making a number of

---

[3] This amount excludes the approximately $482 million of SRF Junior Lien Bonds, as defined below.

substantial changes to the current DWSD Bonds that will allow the City to strip revenues out of the Systems – i.e., to alter the DWSD Bonds' collateral and other rights – and the Ad Hoc Committee joins in the DWSD Trustee Objection and adopts and incorporates by reference herein the authorities cited in the DWSD Trustee Objection.

For these reasons, as further described below, the proposed Plan cannot be confirmed.

<u>**JOINDER**</u>

1.       The City has issued over $5.5 billion of DWSD Bonds.  The DWSD Bonds are special revenue bonds that are payable from the net revenues of the Systems.  The DWSD Bonds are secured by first and second priority statutory liens on all net revenues of the Systems.  As is further described in the DWSD Trustee Objection, the Bankruptcy Code expressly protects these state law property interests in special revenue bonds and provides the DWSD Bondholders with a bundle of rights to ensure that the DWSD Bonds are not impaired under the Plan.  *See* DWSD Trustee Objection.

2.       The DWSD Bonds, which the City has agreed are fully secured debt instruments, are impaired by the Plan in primarily three substantive ways.

3.       First, the Plan provides that $428.5 million be funded out of the Systems over the next nine years (the "**UAAL Surcharge**") to finance the "grand bargain" that the City has reached with its retirees.  The UAAL Surcharge will be used to fund pension payments to <u>all</u> City employees (not just DWSD employees) and excuses the City from any obligation to fund its shortfall.  The Ad Hoc Committee expects to show at confirmation that this $428.5 million estimate of DWSD's share of the pension liabilities is overstated, and that the UAAL Surcharge does not constitute current operating expenses of the Systems that permissibly can be paid ahead

of the DWSD Bonds (and, in some circumstances, may not be a permitted transfer of the Systems' revenues at all).

4.      Second, the Plan proposes absurdly low interest rates for many of the DWSD Bonds.  These interest rates cannot be justified by any reasonable market comparables of investments with similar risk profiles, or, if applicable, the methodology of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), or *Bank of Montreal v. Official Committee of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005).  While the discovery process has just begun, it appears that the City has merely taken a single "A" rated bond yield curve and has applied that to the DWSD Bonds.  As the Ad Hoc Committee expects to show at the confirmation hearing, this is not an appropriate methodology and the City cannot support the interest rates proposed by the Plan.  In fact, if interest rates are adjusted for current market conditions and the market's view of the DWSD Bonds' risk profile (as is required to "cram down" the DWSD Bonds under section 1129(b)), the Ad Hoc Committee expects that, in many cases, the Bonds are entitled to <u>higher</u> interest rates than the current contract rate.  *See* DWSD Trustee Objection, ¶¶ 72-77.

5.      Third, the Plan impermissibly strips call protection from many series of the DWSD Bonds, leaving them callable the day after the Plan becomes effective.[4]  As the Ad Hoc Committee expects to show at the confirmation hearing, call protection is a critical component of risk management and returns for municipal debt, particularly for investors like mutual funds that invest in municipal securities to buy and hold them.  For the reasons further set out in the DWSD Trustee Objection, the removal of call protection from the DWSD Bonds constitutes an impermissible impairment of the DWSD Bonds.  *See* DWSD Trustee Objection, ¶¶ 1-22, 24-33,

---

[4] Certain DWSD Bonds have "call protection," meaning they cannot be voluntarily redeemed by the City before a date certain, which is referred to as the "no call period."

34, 39-44.  Even if the Court were to rule that the DWSD Bonds may be impaired, the Ad Hoc

Committee expects to show that the City must provide substantial compensation to holders for

removal of the call protection.

6.      For these reasons, and the other reasons set forth in the DWSD Trustee Objection,

confirmation of the Plan should be denied.

**ADDITIONAL OBJECTIONS:**

I.      **THE PLAN VIOLATES THE SUBORDINATION AGREEMENTS CONTAINED IN THE INDENTURE, AND THEREFORE CANNOT BE CONFIRMED.**

7.      The DWSD Bond Documents[5] authorize and provide for multiple series of water

and sewer revenue bonds that hold different priorities of liens on the net revenues of each

System.[6]  In addition, the Ordinances provide for claim subordination of the junior classes of

bonds:

> **Whenever any principal (and premium, if any) of and interest on Securities of a Priority . . . . is due and is not made when due**, then until such Payment is made or provision made for the payment thereof to the satisfaction of the Holders of such Securities . . . **no Payment shall be made directly or indirectly on or in respect of any Securities of lower Priorities**.

---

[5] The  DWSD Bond Documents principally consist of the DWSD Ordinances and Indentures.  The Ordinances are: (i) that certain Water Ordinance 01-05, dated January 26, 2005 (the "**Water Ordinance**"); and (ii) that certain Sewer Ordinance 18-01, dated October 18, 2001 (the "**Sewer Ordinance**").  The "Indentures" are: (i) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Water Supply System), dated as of February 1, 2013, among the City and Trustee, the Water and Sewage Department (the "**Water Indenture**"); and (ii) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Sewage Disposal System), dated as of June 1, 2012, among the City, Water and Sewage Department, and the Trustee  (the "**Sewer Indenture**").  The Sewer Ordinance, Sewer Indenture, Water Ordinance and Water Indenture shall be collectively referred to herein as the "**DWSD Bond Documents**".

[6] *See* Water Ordinance, §5; Water Indenture, §§ 2.03, 2.11; Sewer Ordinance, § 5; and Sewer Indenture, §§ 2.03, 2.11.

*See* Water Ordinance, § 6(B); Sewer Ordinance, § 2.12 (together, the "**Subordination Agreements**") (emphasis added). In short, the Bond Documents provide that the liens and claims of the DWSD Junior Bonds (defined herein) are subordinate to the senior DWSD Bonds, and the claims of the DWSD Junior Bonds cannot be paid if there is any amount of principal, interest or premium remaining outstanding on the senior DWSD Bonds.

8.     Currently, there are three priorities of water and sewer revenue bonds that were issued under the Ordinances and Indentures. The DWSD Bonds consist of first and second lien bonds (the "**First Lien DWSD Bonds**" and the "**Second Lien DWSD Bonds**").[7]   In addition, the City has issued "**SRF Junior Lien Bonds**" (as defined in the respective Water Ordinance and Sewer Ordinance) that have a third lien priority and a third claim priority. The SRF Junior Lien Bonds are held by the State and were issued for the purpose of providing improvements to the Systems by accessing the State's Revolving Fund.[8]

9.     The Plan fails to enforce the agreements subordinating the liens and claims of the SRF Junior Lien Bonds and the Second Lien DWSD Bonds (together, the "**DWSD Junior Bonds**"). Proper enforcement would require that a portion of the consideration from the junior classes of bonds be directed to the senior classes to compensate the impaired classes of senior DWSD Bonds for the economic loss caused by the Plan's imposition of lower interest rates and removal of call protection. Instead, the Plan disregards the Subordination Agreements, providing that all SRF Junior Lien Bonds will be reinstated at their current interest rates, and providing for

---

[7] *See* supra note 5; *see also* Plan, Interest Rate Reset Chart at Ex. I.A.168. The "Second Lien DWSD Bonds" are DWSD Bonds that hold second priority liens on the net revenues of the Systems and are referenced as holding a "second" lien in the Plan.

[8] *See* Water Indenture, § 1 (definition of "SRF Junior Lien Bonds"); Sewer Indenture, § 1 (definition of "SRF Junior Lien Bonds"); *see also* Michigan Department of Environmental Quality, http://www.michigan.gov/deq/0,1607,7-135-3307_3515_4143---,00.html (last visited May 7, 2014). The SRF Junior Lien Bonds are referred to under the City's Plan as the DWSD Revolving Bonds.

various treatments of the Second Lien DWSD Bonds (allegedly reinstating some and impairing others).

10.     The City's Plan cannot simply ignore the Subordination Agreements by issuing new bonds and stripping the DWSD Bondholders of their rights under the Subordination Agreements.  Section 510(a) of the Bankruptcy Code, made applicable to this proceeding by section 901(a), provides that: "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  The Plan must enforce the Subordination Agreements between two third parties.

11.     Should the Court confirm the Plan despite its failure to enforce the Subordination Agreements, the Plan cannot provide the State a release of DWSD Bondholder claims.  The City has not and cannot establish any basis to grant the State a release of DWSD Bondholder claims.  *See In re Dow Corning Corp.*, 280 F. 3d 648, 658 (6th Cir. 2002) (authorizing third party releases only upon evidence that all seven enumerated factors are established to enjoin a non-consenting creditor's claims against a nondebtor); *see also In re SL Liquidating, Inc.*, 428 B.R. 799 (S.D. Ohio 2010); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 142 (Bankr. D.N.J. 2010) (plan may not release senior lienholders' rights under an intercreditor agreement with junior lender).  Even assuming such a release is permissible, in no event could it be made binding on a DWSD Bondholder unless such bondholder voted "yes" on the Plan.  Indeed, DWSD Bondholders that do not vote "yes" on the Plan with respect to a specific class will continue to maintain their state law claims arising under the Subordination Agreements against the holders of the SRF Junior Bonds – e.g., the State – with respect to such Bonds.

12.    The Plan is patently unconfirmable inasmuch as it seeks to pay junior DWSD Revolving Bonds in Classes 1B and 1C in full, while impairing Class 1A by providing less than full recovery to senior holders of DWSD Bond Claims.  The Plan denies holders of Class 1A Claims the full value of their claims upon the Effective Date of the Plan, proposing to change certain interest rates and call protections, and proposing to alter the DWSD Bondholders' collateral and other rights.

13.    The Plan is not fair and equitable because it violates the absolute priority rule as set forth in section 1129(b) by providing payments to Classes 1B and 1C while not fully satisfying the DWSD Bond Claims.  "By incorporating the fair and equitable standard in § 1129(b) of the [Bankruptcy] Code, Congress codified the "absolute priority rule," which provides that "absent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest."  *In re Dow Corning Corp.*, 456 F.3d 668, 672 (6th Cir. 2006) (citing *Case v. L.A. Lumber Prods. Co*., 308 U.S. 106, 115 (1939)).

14.    A plan of adjustment cannot be confirmed if it seeks to provide any recovery to junior classes when it does not provide for the full satisfaction of a senior class of claims.  *See e.g., In re Monarch Beach Venture, Ltd*., 166 B.R. 428, 436 (C.D. Cal. 1993) (reasoning that the absolute priority rule is an implicit part of the "fair and equitable" formula); *In re Miami Center Associates, Ltd*., 144 B.R. 937 (Bankr. S.D. Fla. 1992) (holding that absolute priority is an implicit requirement of 1129(b) and not just of an individual subsection); *In re Lakeside Global II, Ltd*., 116 B.R. 499, 511–12 (Bankr. S.D. Tex. 1989) (recognizing that the fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in

reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders); *In re Elijah*, 41 B.R. 348 (Bankr. W.D. Mo. 1984) (a plan proposing that a creditor's first lien be substituted with a junior lien on other collateral violated the absolute priority rule because it subordinated the senior creditor to junior creditors).

15.     The DWSD Bondholders' status as secured creditors should have no bearing on their entitlement to the protections of the absolute priority rule.   The legislative history is consistent with supporting case law recognizing the absolute priority rule under section 1129(b) applies to <u>all</u> creditors:

> The general principle of the subsection [1129(b)] permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan ... Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder, *but the principle is the same* (emphasis added).

Report of the Comm. on the Judiciary, United States House of Representatives, to Accompany H.R. 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 at 413 (1977).[9]   Section 1129(b) "codifies the absolute priority rule from the dissenting class on down." *Id*.

16.     Put simply, the Plan provides that the holders of senior DWSD Bonds will not have their claims satisfied while at the same time using the collateral in which they have a senior lien to make distributions to the Junior DWSD Bonds.  Payment of Junior DWSD Bonds prior to satisfaction of the senior DWSD Bonds violates the absolute priority rule and renders the Plan unconfirmable.

---

[9] *But see In re TCI 2 Holdings, LLC*, 428 B.R. at 168–69 (absolute priority rule does not apply to secured claims); *In re Mut. Life Ins. Co. v. Paradise Springs Assocs. (In re Paradise Springs Assocs.)*, 165 B.R. 913, 920–21 (Bankr. D. Ariz. 1993) (same).

## RESERVATION OF RIGHTS

The Ad Hoc Committee reserves its right to amend, modify and/or supplement this Objection at a later date. In addition, the Ad Hoc Committee reserves all of its rights and remedies with respect to the DWSD Bond Claims. Nothing in this Objection shall be deemed to be a waiver of any procedural, substantive or other rights, privileges or remedies available with respect to the DWSD Bond Claims, all of which are reserved, as well as any claim against any third party, including, but not limited to, against any Bond Insurers or with respect to any Bond Insurance Policy.

## CONCLUSION

WHEREFORE, for the reasons stated herein and in the DWSD Trustee Objection, and for such other reasons as may be stated at any hearing, or in any supplemental briefing, the Ad Hoc Committee respectfully requests that this Court (i) deny confirmation of the City's Plan, and (ii) provide such other and further relief as is just and equitable.

Respectfully submitted this 12th day of May, 2014.

/s/ *Amy Caton*

Amy Caton, Esq.
Greg Horowitz, Esq.
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
acaton@kramerlevin.com


and

STEINBERG SHAPIRO & CLARK
Geoffrey T. Pavlic, Esq.
25925 Telegraph Road
Suite 203
Southfield, MI 48033
Tel: (248) 352-4700
Fax: (248) 352-4488
pavlic@steinbergshapiro.com

*Attorneys for Nuveen Asset Management, and BlackRock Financial Management, Inc., members of the Ad Hoc Bondholder Committee*

/s/ *William W. Kannel*

William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com


and

ANDREW J. GERDES, P.L.C.
Andrew J. Gerdes, Esq.
321 W. Lake Lansing Rd.
P.O. Box 4190
East Lansing, MI 48826-4190
Tel: (517) 853-1300
Fax: (517) 853-1301
agerdes@gerdesplc.com

*Attorneys for Fidelity Management & Research Company, Eaton Vance Management, and Franklin Advisers, Inc., members of the Ad Hoc Bondholder Committee*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Objection to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter and that it was delivered, by overnight service to the below recipients on this the 12th day of May, 2014:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

*Counsel to the City*

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

*Counsel to the City*

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Counsel to the Retiree Committee*

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

*Counsel to the City*

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO
PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

*Counsel to the Retiree Committee*

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 768-6800

*Counsel to the Retiree Committee*

/s/ *William W. Kannel*
William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com

*Attorneys for Fidelity Management &
Research Company, Eaton Vance
Management, and Franklin Advisers, Inc.,
as members of the Ad Hoc Committee of
DWSD Bondholders*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### (DETROIT)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **CITY OF DETROIT, MICHIGAN,** | ) | **CASE NO.: 13-53846** |
| | ) | |
| | ) | **CHAPTER 9** |
| **Debtor.** | ) | |
| | ) | **Hon. Steven W. Rhodes** |
| | ) | |

_____

**OBJECTION OF THE AD HOC COMMITTEE OF DWSD BONDHOLDERS
TO THE CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT AND
JOINDER TO THE DWSD BOND TRUSTEE'S OBJECTION TO THE
CITY'S FOURTH AMENDED PLAN OF ADJUSTMENT**

_____

The Ad Hoc Committee (the "**Ad Hoc Committee**")[1] as holders of those certain bonds (the "**DWSD Bonds**" and the holders of such, the "**DWSD Bondholders**") issued by the City of Detroit (the "**City**") for the Detroit Water and Sewerage Department (the "**DWSD**") to (a) finance and refinance improvements to the City's Water Supply System (the "**Water System**") and (b) finance and refinance improvements to the City's Sewage Disposal System (the "**Sewerage System**," together with the Water System, the "**Systems**"), hereby files its objection (this "**Objection**") to the _Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)_ (Doc. 4392) (the "**Plan**")[2] and joins the _DWSD Bond Trustee's Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit_ (the "**DWSD Trustee Objection**"), filed contemporaneously herewith by U.S. Bank National Association, in its capacity as trustee for the DWSD Bonds (the "**Trustee**").

---

[1] The Ad Hoc Committee members are BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

The members of the Ad Hoc Committee manage several of the largest, most well-known mutual funds in the country. These mutual funds are household names among individual investors, many of whom are Michigan residents, who invest in tax-free mutual funds to save for retirement, college, and other long-term investment goals.

The members of the Ad Hoc Committee collectively have over 240 years of experience investing in debt issued by states, municipalities, and other tax-exempt issuers throughout the country, with over $399 billion loaned to such issuers throughout the country, and approximately $9.67 billion loaned to municipalities and other tax-exempt issuers throughout Michigan. These loans have helped Michigan and countless other municipalities and tax-exempt issuers, such as hospitals and universities, invest in infrastructure construction and improvements like the Systems, the construction of which would not have been possible without loans at the relatively low-cost interest rates accessible through the large, municipal market of tax-exempt financing. Loans like the DWSD Bonds are the backbone of municipal finance.

Between them, the members of the Ad Hoc Committee hold approximately $1.332 billion of the total of approximately $5.272 billion of DWSD Bonds.[3] These holdings are spread across virtually every CUSIP of the DWSD Bonds.

The Ad Hoc Committee files this objection to the Plan because the Plan disregards the Subordination Agreements (as defined below) that benefit the senior DWSD Bonds, resulting in a violation of section 510(a) of the Bankruptcy Code and the absolute priority rule, and because the Plan seeks to impermissibly release claims between non-debtor parties, including claims against the State of Michigan (the "**State**"), with respect to such agreements. In addition, the City's Plan proposes to impair the fully secured DWSD Bonds by making a number of

---

[3] This amount excludes the approximately $482 million of SRF Junior Lien Bonds, as defined below.

substantial changes to the current DWSD Bonds that will allow the City to strip revenues out of the Systems – i.e., to alter the DWSD Bonds' collateral and other rights – and the Ad Hoc Committee joins in the DWSD Trustee Objection and adopts and incorporates by reference herein the authorities cited in the DWSD Trustee Objection.

For these reasons, as further described below, the proposed Plan cannot be confirmed.

<u>**JOINDER**</u>

1.     The City has issued over $5.5 billion of DWSD Bonds.  The DWSD Bonds are special revenue bonds that are payable from the net revenues of the Systems.  The DWSD Bonds are secured by first and second priority statutory liens on all net revenues of the Systems.  As is further described in the DWSD Trustee Objection, the Bankruptcy Code expressly protects these state law property interests in special revenue bonds and provides the DWSD Bondholders with a bundle of rights to ensure that the DWSD Bonds are not impaired under the Plan.  *See* DWSD Trustee Objection.

2.     The DWSD Bonds, which the City has agreed are fully secured debt instruments, are impaired by the Plan in primarily three substantive ways.

3.     First, the Plan provides that $428.5 million be funded out of the Systems over the next nine years (the "**UAAL Surcharge**") to finance the "grand bargain" that the City has reached with its retirees.  The UAAL Surcharge will be used to fund pension payments to <u>all</u> City employees (not just DWSD employees) and excuses the City from any obligation to fund its shortfall.  The Ad Hoc Committee expects to show at confirmation that this $428.5 million estimate of DWSD's share of the pension liabilities is overstated, and that the UAAL Surcharge does not constitute current operating expenses of the Systems that permissibly can be paid ahead

of the DWSD Bonds (and, in some circumstances, may not be a permitted transfer of the Systems' revenues at all).

4.    Second, the Plan proposes absurdly low interest rates for many of the DWSD Bonds.  These interest rates cannot be justified by any reasonable market comparables of investments with similar risk profiles, or, if applicable, the methodology of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), or *Bank of Montreal v. Official Committee of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005).  While the discovery process has just begun, it appears that the City has merely taken a single "A" rated bond yield curve and has applied that to the DWSD Bonds.  As the Ad Hoc Committee expects to show at the confirmation hearing, this is not an appropriate methodology and the City cannot support the interest rates proposed by the Plan.  In fact, if interest rates are adjusted for current market conditions and the market's view of the DWSD Bonds' risk profile (as is required to "cram down" the DWSD Bonds under section 1129(b)), the Ad Hoc Committee expects that, in many cases, the Bonds are entitled to <u>higher</u> interest rates than the current contract rate.  *See* DWSD Trustee Objection, ¶¶ 72-77.

5.    Third, the Plan impermissibly strips call protection from many series of the DWSD Bonds, leaving them callable the day after the Plan becomes effective.[4]  As the Ad Hoc Committee expects to show at the confirmation hearing, call protection is a critical component of risk management and returns for municipal debt, particularly for investors like mutual funds that invest in municipal securities to buy and hold them.  For the reasons further set out in the DWSD Trustee Objection, the removal of call protection from the DWSD Bonds constitutes an impermissible impairment of the DWSD Bonds.  *See* DWSD Trustee Objection, ¶¶ 1-22, 24-33,

---

[4] Certain DWSD Bonds have "call protection," meaning they cannot be voluntarily redeemed by the City before a date certain, which is referred to as the "no call period."

34, 39-44.  Even if the Court were to rule that the DWSD Bonds may be impaired, the Ad Hoc Committee expects to show that the City must provide substantial compensation to holders for removal of the call protection.

6.     For these reasons, and the other reasons set forth in the DWSD Trustee Objection, confirmation of the Plan should be denied.

**ADDITIONAL OBJECTIONS:**

I.     **THE PLAN VIOLATES THE SUBORDINATION AGREEMENTS CONTAINED IN THE INDENTURE, AND THEREFORE CANNOT BE CONFIRMED.**

7.     The DWSD Bond Documents[5] authorize and provide for multiple series of water and sewer revenue bonds that hold different priorities of liens on the net revenues of each System.[6]  In addition, the Ordinances provide for claim subordination of the junior classes of bonds:

> **Whenever any principal (and premium, if any) of and interest on Securities of a Priority . . . . is due and is not made when due**, then until such Payment is made or provision made for the payment thereof to the satisfaction of the Holders of such Securities . . . **no Payment shall be made directly or indirectly on or in respect of any Securities of lower Priorities**.

---

[5] The  DWSD Bond Documents principally consist of the DWSD Ordinances and Indentures.  The Ordinances are: (i) that certain Water Ordinance 01-05, dated January 26, 2005 (the "**Water Ordinance**"); and (ii) that certain Sewer Ordinance 18-01, dated October 18, 2001 (the "**Sewer Ordinance**").  The "Indentures" are: (i) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Water Supply System), dated as of February 1, 2013, among the City and Trustee, the Water and Sewage Department (the "**Water Indenture**"); and (ii) that certain Trust Indenture, Relating to the Outstanding Secured Obligations of the Detroit Water and Sewerage Department (Sewage Disposal System), dated as of June 1, 2012, among the City, Water and Sewage Department, and the Trustee  (the "**Sewer Indenture**").  The Sewer Ordinance, Sewer Indenture, Water Ordinance and Water Indenture shall be collectively referred to herein as the "**DWSD Bond Documents**".

[6] *See* Water Ordinance, §5; Water Indenture, §§ 2.03, 2.11; Sewer Ordinance, § 5; and Sewer Indenture, §§ 2.03, 2.11.

*See* Water Ordinance, § 6(B); Sewer Ordinance, § 2.12 (together, the "**Subordination Agreements**") (emphasis added). In short, the Bond Documents provide that the liens and claims of the DWSD Junior Bonds (defined herein) are subordinate to the senior DWSD Bonds, and the claims of the DWSD Junior Bonds cannot be paid if there is any amount of principal, interest or premium remaining outstanding on the senior DWSD Bonds.

8. Currently, there are three priorities of water and sewer revenue bonds that were issued under the Ordinances and Indentures. The DWSD Bonds consist of first and second lien bonds (the "**First Lien DWSD Bonds**" and the "**Second Lien DWSD Bonds**").[7] In addition, the City has issued "**SRF Junior Lien Bonds**" (as defined in the respective Water Ordinance and Sewer Ordinance) that have a third lien priority and a third claim priority. The SRF Junior Lien Bonds are held by the State and were issued for the purpose of providing improvements to the Systems by accessing the State's Revolving Fund.[8]

9. The Plan fails to enforce the agreements subordinating the liens and claims of the SRF Junior Lien Bonds and the Second Lien DWSD Bonds (together, the "**DWSD Junior Bonds**"). Proper enforcement would require that a portion of the consideration from the junior classes of bonds be directed to the senior classes to compensate the impaired classes of senior DWSD Bonds for the economic loss caused by the Plan's imposition of lower interest rates and removal of call protection. Instead, the Plan disregards the Subordination Agreements, providing that all SRF Junior Lien Bonds will be reinstated at their current interest rates, and providing for

---

[7] *See* supra note 5; *see also* Plan, Interest Rate Reset Chart at Ex. I.A.168. The "Second Lien DWSD Bonds" are DWSD Bonds that hold second priority liens on the net revenues of the Systems and are referenced as holding a "second" lien in the Plan.

[8] *See* Water Indenture, § 1 (definition of "SRF Junior Lien Bonds"); Sewer Indenture, § 1 (definition of "SRF Junior Lien Bonds"); *see also* Michigan Department of Environmental Quality, http://www.michigan.gov/deq/0,1607,7-135-3307_3515_4143---,00.html (last visited May 7, 2014). The SRF Junior Lien Bonds are referred to under the City's Plan as the DWSD Revolving Bonds.

various treatments of the Second Lien DWSD Bonds (allegedly reinstating some and impairing others).

10.     The City's Plan cannot simply ignore the Subordination Agreements by issuing new bonds and stripping the DWSD Bondholders of their rights under the Subordination Agreements.  Section 510(a) of the Bankruptcy Code, made applicable to this proceeding by section 901(a), provides that: "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  The Plan must enforce the Subordination Agreements between two third parties.

11.     Should the Court confirm the Plan despite its failure to enforce the Subordination Agreements, the Plan cannot provide the State a release of DWSD Bondholder claims.  The City has not and cannot establish any basis to grant the State a release of DWSD Bondholder claims. *See In re Dow Corning Corp.*, 280 F. 3d 648, 658 (6th Cir. 2002) (authorizing third party releases only upon evidence that all seven enumerated factors are established to enjoin a non-consenting creditor's claims against a nondebtor); *see also In re SL Liquidating, Inc.*, 428 B.R. 799 (S.D. Ohio 2010); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 142 (Bankr. D.N.J. 2010) (plan may not release senior lienholders' rights under an intercreditor agreement with junior lender). Even assuming such a release is permissible, in no event could it be made binding on a DWSD Bondholder unless such bondholder voted "yes" on the Plan.  Indeed, DWSD Bondholders that do not vote "yes" on the Plan with respect to a specific class will continue to maintain their state law claims arising under the Subordination Agreements against the holders of the SRF Junior Bonds – e.g., the State – with respect to such Bonds.

## II. THE PLAN'S FAILURE TO ENFORCE THE SUBORDINATION AGREEMENTS VIOLATES THE ABSOLUTE PRIORITY RULE.

12.     The Plan is patently unconfirmable inasmuch as it seeks to pay junior DWSD Revolving Bonds in Classes 1B and 1C in full, while impairing Class 1A by providing less than full recovery to senior holders of DWSD Bond Claims.  The Plan denies holders of Class 1A Claims the full value of their claims upon the Effective Date of the Plan, proposing to change certain interest rates and call protections, and proposing to alter the DWSD Bondholders' collateral and other rights.

13.     The Plan is not fair and equitable because it violates the absolute priority rule as set forth in section 1129(b) by providing payments to Classes 1B and 1C while not fully satisfying the DWSD Bond Claims.   "By incorporating the fair and equitable standard in § 1129(b) of the [Bankruptcy] Code, Congress codified the "absolute priority rule," which provides that "absent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest."  *In re Dow Corning Corp.*, 456 F.3d 668, 672 (6th Cir. 2006) (citing *Case v. L.A. Lumber Prods. Co*., 308 U.S. 106, 115 (1939)).

14.     A plan of adjustment cannot be confirmed if it seeks to provide any recovery to junior classes when it does not provide for the full satisfaction of a senior class of claims.  *See e.g., In re Monarch Beach Venture, Ltd*., 166 B.R. 428, 436 (C.D. Cal. 1993) (reasoning that the absolute priority rule is an implicit part of the "fair and equitable" formula); *In re Miami Center Associates, Ltd*., 144 B.R. 937 (Bankr. S.D. Fla. 1992) (holding that absolute priority is an implicit requirement of 1129(b) and not just of an individual subsection); *In re Lakeside Global II, Ltd*., 116 B.R. 499, 511–12 (Bankr. S.D. Tex. 1989) (recognizing that the fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in

reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders); *In re Elijah*, 41 B.R. 348 (Bankr. W.D. Mo. 1984) (a plan proposing that a creditor's first lien be substituted with a junior lien on other collateral violated the absolute priority rule because it subordinated the senior creditor to junior creditors).

15.     The DWSD Bondholders' status as secured creditors should have no bearing on their entitlement to the protections of the absolute priority rule.   The legislative history is consistent with supporting case law recognizing the absolute priority rule under section 1129(b) applies to <u>all</u> creditors:

> The general principle of the subsection [1129(b)] permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan ... Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder, *but the principle is the same* (emphasis added).

Report of the Comm. on the Judiciary, United States House of Representatives, to Accompany H.R. 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 at 413 (1977).[9]   Section 1129(b) "codifies the absolute priority rule from the dissenting class on down." *Id*.

16.     Put simply, the Plan provides that the holders of senior DWSD Bonds will not have their claims satisfied while at the same time using the collateral in which they have a senior lien to make distributions to the Junior DWSD Bonds.   Payment of Junior DWSD Bonds prior to satisfaction of the senior DWSD Bonds violates the absolute priority rule and renders the Plan unconfirmable.

---

[9] *But see In re TCI 2 Holdings, LLC*, 428 B.R. at 168–69 (absolute priority rule does not apply to secured claims); *In re Mut. Life Ins. Co. v. Paradise Springs Assocs. (In re Paradise Springs Assocs.)*, 165 B.R. 913, 920–21 (Bankr. D. Ariz. 1993) (same).

## RESERVATION OF RIGHTS

The Ad Hoc Committee reserves its right to amend, modify and/or supplement this Objection at a later date. In addition, the Ad Hoc Committee reserves all of its rights and remedies with respect to the DWSD Bond Claims. Nothing in this Objection shall be deemed to be a waiver of any procedural, substantive or other rights, privileges or remedies available with respect to the DWSD Bond Claims, all of which are reserved, as well as any claim against any third party, including, but not limited to, against any Bond Insurers or with respect to any Bond Insurance Policy.

## CONCLUSION

WHEREFORE, for the reasons stated herein and in the DWSD Trustee Objection, and for such other reasons as may be stated at any hearing, or in any supplemental briefing, the Ad Hoc Committee respectfully requests that this Court (i) deny confirmation of the City's Plan, and (ii) provide such other and further relief as is just and equitable.

Respectfully submitted this 12th day of May, 2014.

/s/ *Amy Caton*
Amy Caton, Esq.
Greg Horowitz, Esq.
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
acaton@kramerlevin.com


and

STEINBERG SHAPIRO & CLARK
Geoffrey T. Pavlic, Esq.
25925 Telegraph Road
Suite 203
Southfield, MI 48033
Tel: (248) 352-4700
Fax: (248) 352-4488
pavlic@steinbergshapiro.com

*Attorneys for Nuveen Asset Management, and BlackRock Financial Management, Inc., members of the Ad Hoc Bondholder Committee*

/s/ *William W. Kannel*
William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com


and

ANDREW J. GERDES, P.L.C.
Andrew J. Gerdes, Esq.
321 W. Lake Lansing Rd.
P.O. Box 4190
East Lansing, MI 48826-4190
Tel: (517) 853-1300
Fax: (517) 853-1301
agerdes@gerdesplc.com

*Attorneys for Fidelity Management & Research Company, Eaton Vance Management, and Franklin Advisers, Inc., members of the Ad Hoc Bondholder Committee*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Objection to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter and that it was delivered, by overnight service to the below recipients on this the 12th day of May, 2014:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

*Counsel to the City*

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

*Counsel to the City*

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Counsel to the Retiree Committee*

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243 2382
Facsimile: (213) 243 2539

*Counsel to the City*

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

*Counsel to the Retiree Committee*

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 768-6800

*Counsel to the Retiree Committee*

/s/ *William W. Kannel*
William W. Kannel, Esq.
Adrienne K. Walker, Esq.
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
wwkannel@mintz.com
awalker@mintz.com

*Attorneys for Fidelity Management &
Research Company, Eaton Vance
Management, and Franklin Advisers, Inc.,
as members of the Ad Hoc Committee of
DWSD Bondholders*