## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| | ) |

## COPS HOLDERS' OBJECTION TO CONFIRMATION OF THE FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

The creditors and parties in interest identified in footnote 1 (collectively, the "Objectors"),[1] by their undersigned attorneys, object to confirmation of the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* (the "Plan") [Docket No. 4392][2] and, in support of this Objection, state the following:

### I.    Introduction

1.      In 2005, the City was facing an outstanding unfunded pension liability (the "UAAL") of about $1.7 billion that was burdening the City. Facing lawsuits from the Retirement Systems to enforce the City's payment obligations and orders by the Wayne County Circuit Court mandating that the City comply with its constitutional and statutory obligations to fund the UAAL, which orders were affirmed by the Michigan Court of Appeals,[3] in 2005, the

---

[1] The creditors and parties in interest submitting this Objection are: Hypothekenbank Frankfurt AG; Hypothekenbank Frankfurt International S.A.; Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.; Deutsche Bank AG, London; Dexia Crédit Local; Dexia Holdings, Inc.; and FMS Wertmanagement AöR.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan. All references to "Section" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

[3] On June 2, 2005, the Michigan Court of Appeals affirmed orders issued on December 5, 2003 and December 17, 2004 by the Wayne County Circuit Court granting motions for summary disposition

1

City structured and implemented a transaction to raise the necessary funds through the issuance of the COPs (the "Pension Funding Transaction"). That effort was highly successful and raised $1.44 billion, which sum was transferred to the Retirement Systems, benefitted the City's employees and retirees, and correspondingly reduced the UAAL facing the City.[4] The Objectors collectively hold Class 9 COP Claims in the aggregate amount of approximately $1 billion, which is approximately 70% of all Class 9 COP Claims.

2.      Despite the significant benefit conferred upon the City and the Retirement Systems by the Pension Funding Transaction and the fact that the claims asserted by the Retirement Systems against the City would be at least $1.44 billion larger had the Pension Funding Transaction not occurred, the City seeks to cram down a Plan that provides Objectors and other holders of Class 9 COP Claims with almost no recovery whatsoever. At the same time, the Plan provides nearly payment in full on account of the unsecured claims of the very Retirement Systems and pensioners which benefitted from the Pension Funding Transaction. The Plan reflects the City's decision to favor the claims and interests of the Retirement Systems and pensioners (as well as other politically favored interest groups) over similarly situated creditors and parties in interest notwithstanding the fundamental bankruptcy prohibition against unfair discrimination and notwithstanding the powerful tools available to the City in bankruptcy to once and for all gain control over its intractable pension obligation problems.

3.      While the City's choice to seek confirmation of a Plan that favors the unsecured PFRS Pension Claims and GRS Pension Claims (collectively, the "Pension Claims") over

_____

*mandating* the City comply with its UAAL obligations. *See Board of Trustees of the Policemen/Firemen Retirement System of the City of Detroit v. City of Detroit*, Nos. 253343 and 260069, 2005 Mich. App. LEXIS 1387 (Mich. App. Ct. June 2, 2005).

[4] In order to take advantage of then-permissible longer amortization periods, the 2006 COPs were issued on June 12, 2006, and refinanced a portion of the 2005 COPs.

similarly situated capital markets creditors may be politically expedient, that does not provide a legally cognizable excuse from compliance with the Bankruptcy Code's explicit requirements for confirmation, including the prohibition against unfair discrimination.

4. The Plan unfairly discriminates by, according to the City's calculations, paying Class 10 PFRS Claims 59% and paying Class 11 GRS Claims 60%, while only paying 0-10% to the holders of Class 9 COP Claims.[5] (Fourth Amended Disclosure Statement with respect to the Plan ("Disclosure Statement" or "DS") at pp. 35–39.) Courts have consistently refused to confirm plans over the objection of creditors facing such gross discrimination. Moreover, Objectors anticipate that they will be able to demonstrate that the disparity in treatment is substantially greater than stated in the Disclosure Statement because, among other things, it appears the amount of the Pension Claims have been substantially and materially overstated by the City.

5. The discrimination does not just consist of a difference in percentage recovery. The Plan also unfairly discriminates by providing a more certain source of recovery for the Pension Claims, which for the first nine years is exclusively from Foundations, the DIA Corp., and the State, than is provided to holders of all other unsecured claims, including Class 9 COP Claims, which are to be paid exclusively from the City's future revenue. (Id.) This discrimination in the source of payments to be made subjects Class 9 COP Claims and other unsecured claims held by non-labor creditors to substantially more risk of non-payment than exists for the Retirement Systems. The Plan also proposes to pay the bulk of the Retirement Systems' claims more quickly – over 20 years – versus 30 years for general unsecured claims.

---

[5] Through the COP litigation, the City seeks to invalidate the COPs. Under the Plan, the City provides holders of Class 9 COP Claims with the option to settle the claims asserted in the COP Litigation in exchange for an allowed claim of 40% of the aggregate unpaid principal amount owed to each settling COPs holder.

3

(*Id.*)  The extreme discrimination proposed in the Plan is unfair and is legally impermissible under the Bankruptcy Code.

6.     In addition to the grossly unfair discrimination, the Plan proposes to squander the City's valuable non-core assets and the unique opportunity this bankruptcy case presents to monetize those assets.  The City owns an art collection that is likely worth billions of dollars, owns the DWSD, which, if proper efforts were undertaken to monetize the same, likely would generate hundreds of millions of dollars in additional cash or future revenue, and owns valuable real estate, parking facilities, and accounts receivable.  However, the City is poised to irrevocably transfer its art collection in exchange for consideration having a present value of a mere $300 million (which amount is to be paid solely to GRS and PFRS), direct 50% of whatever value is obtained from monetization of the DWSD (should a monetization actually occur) solely to the Retirement Systems through the DWSD CVR (while retaining the rest of the value for itself), and retain all of its other valuable non-core assets for itself.

7.     On top of all of this, the City proposes to divert $1.4 billion of its future tax revenue to revitalization efforts while failing to share any increases to revenue that may result from those revitalization efforts with any non-labor creditors or parties in interest and failing to demonstrate that this very substantial expenditure will have the effect of reversing the City's decline.

8.     This bankruptcy case presents the City with a unique opportunity to address the root causes of the City's decades long decline.  A properly designed plan would take full advantage of that unique opportunity and the effect of doing so would be to benefit the City's existing and future citizens, as well as the City's creditors.  However, the Plan has been proposed and the City has sought to have the Plan confirmed on an unprecedented timeline for the sake of

4

a politically motivated, and hence artificial, deadline.  As a result of this politically motivated deadline, the City is on the precipice of a hurried exit from bankruptcy, without any real plan for reversing the City's decline.

9.     A plan that simply throws enormous sums of money at certain symptoms of the City's decline without addressing the root causes of that decline (which is precisely what the Plan proposes to do) is not in the interests of creditors or the City's current and future citizens who are interested in real long-term solutions, rather than short term fixes that will only temporarily mask the continued decline of the City.  More time under the protection of this Court and hard work by the Emergency Manager and his team (or a new team of financial advisors with experience in municipal finance and prior successes in municipal restructuring) would allow the City to fully develop and propose real solutions to the root causes of the City's decline, which, in turn, would permit the City to propose a plan that benefits both creditors and the City's citizens.

10.     In short, the Plan is unconfirmable on its face, and in any event, will not accomplish for the City or its citizens the revitalization for which it purports to lay the foundation.

## II.     The Plan Does Not Satisfy the Statutory Requirements for Confirmation

11.     Sections 943(b) and 901 of the Bankruptcy Code establish the requirements for confirmation of a plan of adjustment in a chapter 9 case.  The burden is on the City to prove by a preponderance of the evidence that it has satisfied each of those requirements.  *See, e.g., In re Jefferson Cnty., Ala.*, Case No. 11-05736-TBB, Dkt. No. 2248 at 5-6 (Bankr. N.D. Ala. Nov. 22, 2013); *In re Barnwell Cnty. Hosp.,* 471 B.R. 849, 855 (Bankr. D.S.C. 2012); *In re Valley Health Sys.,* 429 B.R. 692, 709 n.41 (Bankr. C.D. Cal. 2010); *In re Pierce County Hous. Auth.,* 414 B.R.

702, 715 (Bankr. W.D. Wash. 2009) ("The debtor bears the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence") (citing *In re Mount Carbon Metro. Dist.,* 242 B.R. 18, 31 (Bankr. D. Colo. 1999)).

12. The Plan, on its face, establishes that the City cannot meet its burden of proof because the Plan fails to satisfy several elements required for confirmation. Among other things, the Plan (a) does not satisfy the requirements of section 1129(b)(1) of the Code because it unfairly discriminates in favor of the Retirement Systems' claims and against the claims of general creditors and parties in interest, including the COPs holders; and (b) does not satisfy the requirements of sections 943(b)(7), 1129(b)(1), and 1129(a)(3) of the Code because it is not in the best interests of creditors, is not fair and equitable, and has not been proposed in good faith because it squanders the value of the City's non-core assets, spends a disproportionate amount of future revenue on revitalization efforts without any demonstration that doing so will reverse the City's decline or providing creditors with any part of the benefits that the City might realize from those investments, and provides creditors with less than they would receive if the bankruptcy case was dismissed. Objectors believe that discovery currently being conducted will confirm these objections.

A. **The Plan Unfairly Discriminates Against Holders of Class 9 COP Claims**

13. Section 901(a) incorporates into chapter 9 cases the requirement that a plan of adjustment comply with, among other provisions, section 1129(b), *i.e.,* the cram-down provision. Section 1129(b)(1) provides that a plan may not "unfairly discriminate" against a class of dissenting claimants. "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes. ... Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.,* 68 B.R. 618, 636

6

(Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988). The burden is on the City to prove that the Plan does not discriminate unfairly. *In re Armstrong World Indus., Inc.,* 348 B.R. 111, 122 (D. Del. 2006); *In re Sentry Operating Co. of Tex., Inc.,* 264 B.R. 850, 853 (Bankr. S.D. Tex. 2001).

14.    This Court and many others have adopted the rebuttable presumption test first proposed in an article by Professor Bruce A. Markell[6] in the American Bankruptcy Law Journal (the "Markell Test"). *See In re Dow Corning,* 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999), *aff'd in relevant part,* 255 B.R. 445 (E.D. Mich. 2000), *aff'd in part and remanded Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),* 280 F.3d 648 (6th Cir. 2002) (citing Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L. J. 227 (1998)); *In re Tribune Co.,* 472 B.R. 223, 241 (Bankr. D. Del. 2012); *In re Armstrong,* 348 B.R. at 121; *In re Unbreakable Nation Co.,* 437 B.R. 189, 202 (Bankr. E.D. Pa. 2010); *In re Quay Corp., Inc.,* 372 B.R. 378, 386 (Bankr. N.D. Ill. 2007); *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 231 (Bankr. D. N.J. 2000).

15.    Under the Markell Test, a rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the ***net present value of all payments***), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

---

[6] Professor Markell was later appointed as a United States Bankruptcy Court Judge for the District of Nevada, and served a term as a member of the Bankruptcy Appellate Panel for the United States Court of Appeals for the Ninth Circuit. He has since retired and joined the faculty at Florida State University College of Law.

DMEAST#188873391v.2

*Dow Corning*, 244 B.R. at 702 (emphasis supplied); *Armstrong,* 348 B.R. at 121.[7]  If there is an allegation of a materially lower percentage recovery, the presumption can be rebutted only "by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain."  *Dow Corning*, 244 B.R. 702; *Armstrong*, 348 B.R. at 121; *In re Lernout & Hauspie Speech Prods., N.V.,* 301 B.R. at 661 (applying the Markell Test). A demonstration that the risk allocation is similar to the risk assumed by the parties before bankruptcy can rebut the presumption that a discriminatory risk allocation was unfair.  *Dow Corning*, 244 B.R. at 702.  Since COP Claims and Pension Claims are unsecured claims and COP Claims dissent from the treatment proposed by the Plan, a presumption of unfair discrimination arises if COP Claims receive a materially lower distribution or face a materially greater risk than Pension Claims.

---

[7] Professor Markell wrote:

> Under the third factor, discrimination is presumptively unfair in two circumstances. First, unfairness is presumptively present if the plan specifies materially different percentage recoveries for two classes having the same priority.  If, for example, a plan gave an assenting class of trade creditors consideration, measured in terms of present value, equal to ninety percent of their claims, while giving a dissenting class of bank deficiency claims consideration worth only five percent, unfairness would presumptively exist.  Second, a plan that allocates to dissenting classes plan consideration containing risks materially greater than those assumed under the plan by other similar assenting classes is also presumptively unfair.  This second presumption exists even if the plan pays each class the same percentage recovery on its prepetition claims.  This latter type of unfairness could occur, for example, if a plan allocated common stock to a dissenting class of trade creditors, while giving short term secured notes to an assenting insider class of unsecured creditors.

*Markell* at 249–50.

DMEAST#188873391v.2

### 1. The Plan Unfairly Discriminates Against Class 9 COP Claims By Providing Them a Materially Lower Percentage Recovery as Compared to Pension Claims

16.     The following table of leading cases on unfair discrimination shows that while courts sometimes will confirm plans with relatively minor differences in the recovery between classes of similar claims, courts consistently reject plans that propose "grossly disparate" treatment of classes of equal priority claims such as what is proposed in the Plan.

| Case | Dissenting Class % Recovery | Preferred Class % Recovery | Conclusion |
|---|---|---|---|
| *In re Crosscreek Apartments, Ltd.,* 213 B.R. 521 (Bankr. E.D. Tenn. 1997) | 50% | 100% | Unfair Discrimination |
| *In re Cranberry Hill Assocs., LP,* 150 B.R. 289 (Bankr. D. Mass. 1994) | 50% | 100% | Unfair Discrimination |
| *In re Barney & Carey Co.,* 170 B.R. 17 (Bankr. D. Mass. 1994) | 15% | 100% | Unfair Discrimination |
| *In re Tucson Self-Storage, Inc.,* 166 B.R. 892 (B.A.P. 9th Cir. 1994) | 10% | 100% | Unfair Discrimination |
| *In re Aztec Co.,* 107 B.R. 585 (Bankr. M.D. Tenn. 1989) | 3% | 100% | Unfair Discrimination |
| *In re Caldwell,* 76 B.R. 643 (Bankr. E.D. Tenn. 1988) | 22.7% | 100% | Unfair Discrimination |
| *In re Snyders Drug Stores, Inc.,* 307 B.R. 889 (Bankr. N.D. Ohio 2004) | 0% | 6–7% | Unfair Discrimination |
| *In re Graphic Commc'ns, Inc.,* 200 B.R. 143, 147 (Bankr. E.D. Mich. 1996) | 10% | 100% | Unfair Discrimination |

DMEAST#188873391v.2

| Case | Dissenting Class % Recovery | Preferred Class % Recovery | Conclusion |
|---|---|---|---|
| *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984) | 15% | 30% | Unfair Discrimination |
| *In re Corcoran Hosp. Distr.*, 233 B.R. 449 (Bankr E.D. Cal. 1999)[8] | 50% over 15 years | Majority of 50% paid over 5 years, remainder paid over 15 years | No Unfair Discrimination |
| *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr. D. N.J. 2000) | 76% | 80% | No Unfair Discrimination |
| *In re Unbreakable Nation Co..*, 437 B.R. 189 (Bankr. E.D. Pa. 2010) | 1.25% | 1.75% | No Unfair Discrimination |

17.     Here, the estimated recoveries of Class 9 COP Claims and the Pension Claims could not be more "grossly disparate"-- even as calculated by the City.   The Disclosure Statement estimates the recovery percentage for Class 9 COP Claims, Class 10 PFRS Claims, and Class 11 GRS Claims as follows:

|  | Class 9 COP Claims | Class 10 PFRS Claims | Class 11 GRS Claims | Recovery Difference |
|---|---|---|---|---|
| **City's Estimated Percentage Recovery** | 0-10% | 59% | 60% | 49% and 50%, respectively |

18.     Although fact and expert discovery is necessary to determine the actual amount of discrimination, Objectors anticipate that they will be able to demonstrate that the disparity in treatment is substantially greater than stated in the Disclosure Statement because, among other

---

[8] *In re Corcoran Hospital District*, 233 B.R. 449 (Bankr. E.D. Cal. 1999), confirmed a plan which paid 50% over five years to a single-creditor class and 50% over 15 years to unsecured creditors generally, provided that general unsecured creditors could not receive more than 20% of their 50% under certain conditions.  *Corcoran*'s preferred class obtained what appeared to be a superior recovery only because it had settled litigation by agreeing to reduce the net amount of its unsecured claim and waiving any administrative claim.

10

things, it appears the amount of the Pension Claims have been substantially and materially overstated by the City.[9] In fact, Objectors believe that discovery may demonstrate that the Pension Claims are being paid in full or almost in full.

19. The Plan's disparate treatment of the COP Claims in Class 9 and the Pension Claims in Classes 10 and 11 fails under the Markell Test used within this District because the City cannot rebut the presumption of unfair discrimination, based on the materially lower percentage afforded to COP Claims. Outside of bankruptcy, COP Claims would be entitled to the same recovery as Pension Claims. The City's proposed disparate treatment of COP Claims is inconsistent with one of the fundamental purposes of the Bankruptcy Code: equality in treatment of similarly situated creditors.

---

[9] The Plan provides that PFRS Pension Claims are allowed at $1,250,000,000 and that GRS Pension Claims are allowed at $1,879,000,000. Plan §§ II.B.3.q.i and II.B.3.r.i. The City appears to have calculated the Pension Claims by simply using the 2013 unfunded actuarially accrued liability or "UAAL" for the Retirement Systems. The UAAL does not reflect the *accrued* pension benefits that the City *actually owes* to pension beneficiaries at a point in time. Instead, the UAAL reflects the actuarial present value of the *projected* benefits of each individual between that individual's entry age and his assumed exit age. That is, it takes into account assumptions about each active employee's future length of employment, future pay increases, and cost of living escalators in order to determine what the pension plan is likely to owe the participant by the time the participant retires. The Emergency Manager could have eliminated these rights without resorting to Chapter 9, s*ee AFT Michigan v. State*, No. 313960, 2014 Mich. App. LEXIS 69 (Mich. Ct. App. Jan 14, 2014) ("§ 24 [of the Michigan Constitution] protects only those pension benefits that have already accrued, not future benefits"). Therefore, there is no valid claim for such future, unaccrued benefits in the City's bankruptcy. By improperly equating UAAL with a claim, the City has artificially inflated the amount of the Pension Claims in Classes 10 and 11. Further, even if future benefits were properly part of the Pension Claims, they are being satisfied by new "hybrid pension plans" called the GRS Hybrid Pension Formula and the PFRS Hybrid Pension Formula. The value that is attributable to the Hybrid Plans should reduce the amount of the Pension Claims. The cumulative effect of the City's approach is to substantially understate the full extent of the City's massive discrimination against other unsecured classes, including Class 9 COP Claims, by artificially decreasing the cents-on-the-dollar recovery for the Pension Claims.

DMEAST#188873391v.2

### 2. The Plan Allocates Significantly More Risk With Respect to Recovery Under the Plan to the Holders of COP Claims

20.     The Plan also unfairly discriminates by providing a more certain source of recovery to the holders of Pension Clams than is provided to the holders of COP Claims. Stated differently, the Plan places materially greater risk of recovery to COP Claims in connection with the City's proposed distribution under the Plan.

21.     Under the Plan, during the first 20 years after confirmation, PFRS Pension Claims will be paid primarily from two sources, and GRS Pension Claims will be paid primarily from three sources:

- DIA Settlement. Under the DIA Settlement, the City will irrevocably transfer the Collection to the DIA Corp., in exchange for $816 million, consisting of $365 million to be paid by Foundations over a 20-year period, $100 million to be raised by the DIA Corp. over a 20-year period, and a $350 million contribution from the State. The Plan further provides that the proceeds from the DIA Settlement will be exclusively earmarked for pension claims.

- DWSD CVR. Due to the City's so-called Global Settlement with the Retiree Committee, the City has agreed to issue the DWSD CVRs to the Restoration Trust for the sole benefit of holders of pension claims. The DWSD CVRs entitles the pension claims to 50% of the net proceeds of any DWSD monetization that occurs within seven years of the Effective Date of the Plan.

- DWSD Allocable Share. DWSD will make administrative and restructuring payments equal to approximately $428.5 million to GRS.

22.     All other similarly situated creditors, such as COP Claims, however, are provided a much less certain source of recovery. Specifically, COP Claims are to be paid over a longer period of time (*i.e.,* 30 years, rather than 20 years) at a very low interest rate (*i.e.*, 4% for the first 20 years and 6% for the final ten years) entirely from the City's *future* revenues. The City has had 60 years of failed economic policies, mismanagement, and rampant political corruption. Holders of COP Claims should be paid ratably from the same assets on the same timetable as the

DMEAST#188873391v.2

Pension Claims, and should not be singled out and forced to "trust" that things will be different in Detroit.

23.     For these reasons, the Plan violates Section 1129(b) and cannot be confirmed.

**B.      The Plan Does Not Satisfy the Best Interests of Creditors Test and is Not Fair and Equitable**

24.     The City must prove that the Plan is in the best interests of creditors, 11 U.S.C. 943(b)(7), and, if a class of creditors votes to reject the Plan, the City must also prove that the Amended Plan is fair and equitable.  11 U.S.C. §§ 901(a) & 1129(b)(1).

25.     The "best interest of creditors" test embodies the core requirement that a proposed plan provide a recovery to each dissenting creditor that is superior to that otherwise available to the creditor.  This basic protection for dissenting creditors has been part of the statutory bankruptcy law for well over a century.  The earliest bankruptcy laws specifically required that both corporate plans of reorganization (Chapter XI of the Bankruptcy Act),[10] and municipal plans of adjustment (Chapter IX of the Bankruptcy Act)[11] be in the "best interest of creditors."

26.     In the 1978 overhaul of the Bankruptcy Act, Congress specifically articulated that in chapter 11, satisfaction of what was previously termed the "best interests" test required the debtor to show that a dissenting creditor would receive or retain under the plan "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7).  The legislative history explains that this provision "incorporates the former

---

[10] *See* 30 Stat. 544, 55th Cong., 2d Sess., ch. 541, § 541, § 12(d)(1) (1898) ("The judge shall confirm a composition if satisfied that (1) it is for the best interests of creditors. . . .").

[11] *See* 50 Stat. 655, 75th Cong., 1st Sess., ch. 657, § 83(e)(1) (1937) ("At the conclusion of the hearing, the judge shall make written findings of fact and conclusions of law thereon, and shall enter an interlocutory decree confirming the plan if satisfied that (1) it is fair, equitable, and for the best interests of creditors and does not discriminate unfairly in favor of any creditor or class of creditors. . . .").

'best interests of creditors' test found in chapter 11, but spells out precisely what is intended." H.R. Rep. No. 95–595, 1st Sess. 412 (1977).

27. At the same time, for municipal restructurings under chapter 9, Congress maintained the historic "best interests" terminology in Section 943(b)(7). The legislative history notes that the newly-formulated chapter 11 test "is phrased in terms of liquidation of the debtor. Because that is not possible in a municipal case, the test here is phrased in its more traditional form, using the words of art 'best interests of creditors.'" H.R. Rep. No. 95–595, 1st Sess. 400 (1977).

28. In so doing, Congress has directed the courts to apply the "traditional" analysis developed in *Kelley* and *Fano,* two Depression-era decisions from the Supreme Court and the Ninth Circuit, respectively:

> The best interests of creditors test does not mean liquidation value as under chapter XI of the Bankruptcy Act. In making such a determination, it is expected that the court will be guided by standards set forth in *Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943) and *Fano v. Newport Heights Irrigation District*, 114 F.2d 563 (9th Cir. 1940), as under present law, the bankruptcy court should make findings as detailed as possible to support a conclusion that this test has been met.

124 Cong. Rec. H 11, 100 (Sept. 28, 1978), S 17, 417 (Oct. 6, 1978); *see* 5 Norton Bankr. L. & Prac. 3d § 90:20 (2014) ("The legislative history suggest that determination of the best interests of creditors in a Chapter 9 case may be guided by reference to two cases.") (citing *Kelley* and *Fano*).

29. In *Kelley*, the debtor proposed a plan that would provide bondholders a recovery of approximately 57 cents on the dollar. *Kelley*, 319 U.S. at 417–18. A "very small minority" of bondholders objected. *Id.* The Supreme Court reversed an order of confirmation on the grounds that the bankruptcy court had not made findings of fact that would enable it to conclude, among

other things, that the plan was in the best interests of creditors.  In particular, the Supreme Court

held that it was necessary for the bankruptcy court to assess the debtor's ability to pay claims

from future tax revenues:

> [W]here future tax revenues are the only source to which creditors can look for
> payment of their claims, considered estimates of those revenues constitute the
> only available basis for appraising the respective interests of different classes of
> creditors.  In order that a court may determine the fairness of the total amount of
> cash or securities offered to creditors by the plan, the court must have before it
> data which will permit a reasonable, and hence an informed, estimate of the
> probable future revenue available for satisfaction of creditors.

*Id.* at 420.

30.    Similarly, in *Fano*, the Ninth Circuit reversed an order of confirmation, and

sustained the objection of a single dissenting bondholder to a plan accepted by 90% of

bondholders, on the grounds the plan was not in the best interests of creditors.  The Ninth Circuit

concluded that payment of 62.5 cents on the dollar to bondholders "would be highly unjust"

because there was no "reason why the tax rate should not have been increased sufficiently to

meet the [debtor's] obligations."  *Fano*, 114 F.2d at 565–66.  The plan in *Fano* failed the best

interests test, in part, because the debtor owned "assets in value many times the indebtedness, all

in most excellent physical and almost new condition."  *Id.*

31.    The common theme underlying *Kelley* and *Fano* is consideration of the municipal

debtor's ability to pay.  Under those cases*,* a plan that impairs and discharges debt based upon a

static "snapshot" of the debtor's current assets and liabilities does not satisfy the "best interests"

test.  Rather, to achieve confirmation over the objection of a dissenting impaired creditor, the

debtor must prove that the plan devotes a "fair" amount of "probable future revenues" for

"satisfaction of creditors."  *Kelley*, 319 U.S. at 420.

32.     Congress recognized precisely this point, and expanded it to include a more general inquiry into what a municipal debtor could "reasonably" be expected to do "under the circumstances," in the legislative history to the bill that served as the precursor of chapter 9:

> Fair and equitable has additional [content] in Chapter IX.  The petition must exercise its taxing power to the fullest extent possible for the benefit of its creditors, *Fano v. Newport Heights Irr. Dist.,* 144 F.2d 563 (9th Cir. 1940).  ***The court must find that the amount proposed to be paid under the plan was all that the creditors could reasonably expect under the circumstances.***

H.R. rep. 94–686, 1st Sess. 33 (1975) (emphasis supplied).

33.     From *Kelley*, *Fano*, and the legislative history a straightforward question emerges: does the proposed plan of adjustment provide dissenting creditors with "all that could reasonably be expected in all the existing circumstances?"  *See, e.g., West Coast Life Ins. Co. v. Merced Irrigation Dist.,* 114 F.2d 654, 678 (9th Cir. 1940) ("[T]he only question before this court is whether or not the 51.501 [cents] on the dollar is all that could reasonably be expected in all the existing circumstances."); *Berkins v. Lindsay-Strathmore Irrigation Dist.,* 114 F.2d 680, 685 (9th Cir. 1940) ("It seems clear to us that the 59.978 cents on the dollar of principal amount of their bonds is all that the bondholders can reasonably expect in the circumstances.").

34.     The "best interests" test also has been interpreted as an inquiry into whether "a proposed plan provide[s] a better alternative for creditors than what they already have."  *In re Mount Carbon Metro. Dist.,* 242 B.R. 18, 34 (Bankr. D. Colo. 1999) (citing 4 COLLIER ON BANKRUPTCY ¶ 943.03[7] (15th ed. 1999)) (*dicta* due to the fact that the parties had stipulated that the plan at issue satisfied the "best interests" test).  So phrased, the test:

> require[s] a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case.  On the basis of a flexible standard, creditors can hope to receive a reasonable recovery in a chapter 9 case, and the municipality can retain sufficient tax revenues to provide the services that its inhabitants require.

6 COLLIER ON BANKRUPTCY ¶ 943.03[7] (16th ed. 2013); *see also* 5 NORTON, *supra*, § 90:20 ("The basic consideration is reasonableness. The court should consider evidence of the municipality's tax base, its services requirements to its inhabitants, and the level to which taxes can be raised to fund the plan").

35.     Indeed, "since the test is designed to protect the dissenting minority of a class that has accepted the plan, one must not be so carried away with the potentially adverse consequences of the alternative to a chapter 9 plan that one reaches the conclusion that any plan is better than the alternative." 6 COLLIER ON BANKRUPTCY ¶ 943.03[7]. Rather, the "best interests" standard establishes "a floor requiring a reasonable effort at payment of creditors by the municipal debtor." *In re Pierce County Hous. Auth.,* 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (quotation omitted). A plan that makes little or no effort to repay creditors over a reasonable period of time may not be in the best interests of creditors. *Id.*

36.     Stated in its most straightforward terms, the "best interests" test in chapter 9 requires the debtor to prove that a proposed plan "affords all creditors the potential for the greatest economic return from the debtor's assets." *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D. S.C. 2012) (approving plan that allowed debtor to realize going concern value of assets and distributed that value to creditors through a sale of assets "for a fair price"); *In re Connector 2000 Assn.,* 447 B.R. 752, 765–66 (Bankr. D. S.C. 2011); *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D. N.H. 1994).

37.     The Plan proposed by the City squanders its extremely valuable non-core assets, all of which could be monetized by the City. Among other things, as discussed below, the City squanders the value of its art collection, DWSD, real estate, and accounts receivable. It is clear that the City could pay substantially more than it proposes to pay to creditors while maintaining

services and, outside of bankruptcy, creditors would recover much more by realizing the value of the City's future revenues as well as the value of the City's non-core assets. As a result, the Plan is not in the best interests of creditors and is not fair and equitable.

## 1. The Art Collection

38. Detroit owns in excess of 65,000 works of art that are collected and displayed or stored in the City-owned Detroit Institute of Arts and off-site storage facilities (the "Collection"), which the Disclosure Statement touts as one of the top six art collections in the United States. (DS at p. 97.) The vast majority of the Collection is not publicly displayed but, instead, is maintained in storage facilities.

### a. The Christie's Appraisal

39. After commencing this case, the City retained Christie's to appraise only a small subset of the Collection – art the City identified as having been purchased, entirely or in part, with City funds. As a result, of the over 65,000 works in the Collection, Christie's considered only 2,773 works (4.3%) of the Collection and completed a full appraisal for only 1,741 works (2.7%) of the Collection. (DS at pp. 97, 156–57.) Christie's concluded that the limited subset of the Collection it appraised had a value between $454 million and $867 million. (DS at pp. 156–57.) The City has not obtained a valuation for the vast majority (nearly 96%) of the Collection.

### b. The DIA Settlement

40. To "settle" claims surrounding the Collection, the City proposes to irrevocably transfer the Collection to the DIA Corp., the non-profit organization that currently operates the museum known as the Detroit Institute of Arts (the "Museum") for the City, in exchange for a nominal amount of $816 million, consisting of $365 million to be paid by Foundations over a 20 year period, $100 million to be raised by the DIA Corp. over a 20 year period, and a potential

$350 million contribution from the State.  These long-term contributions have a net present value of less than $300 million and, if the Plan is confirmed, the City would receive a payment for the entire Collection that is substantially less than the low end of the value range determined by Christie's for less than 4% of the Collection. [12]  The DIA Settlement has been commonly referred to as the "Grand Bargain."

41.     Moreover, upon transfer to the DIA Corp., the Collection will not subject to any liens, security interests or other mechanism by which title to the Collection would revert to the City in the event of a default by the Foundations, State, or the DIA Corp.  Instead, in the event of a default, the City's sole remedy under the proposed settlement will be the very unattractive (and, likely, unsuccessful) remedy of suing the Foundations.  (Exhibit I.A.92 to the Plan.)

### c.     The Plan Fails to Maximize the Value of the Collection

42.     On April 9, 2014, Financial Guaranty Insurance Company along with other COPs holders, including Objectors, filed a Motion for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Collection (corrected at Docket No. 3925) (the "Art Due Diligence Motion").   The Art Due Diligence Motion indicates that a process run by Houlihan Lokey resulted in four preliminary indications of interest offering up to $2 billion for the entire Collection and between $895 million to $1.473 billion for small subsets of the Collection (ranging from only 116 works in the Collection to all Chinese works in the Collection). (Art Due Diligence Motion at p. 7.)  These proposals indicate that the Collection has a value vastly in excess of the consideration resulting from the DIA Settlement (which has a present value of a

---

[12]  It is unclear what portion of the $350 million in funds the City hopes to obtain from the State constitutes consideration for the Collection and what portion constitutes consideration for releases for claims retirees, the Retirement Systems, or the City may have directly against the State.  (DS at pp. 28–29, 66, 158.)   The present value calculation assumes that the State Contribution is in exchange for releases from the holders of Pension Claims rather than consideration for the Collection.

DMEAST#188873391v.2

mere $300 million) and that is proposed to be paid to the Retirement Systems in exchange for the City irrevocably transferring the entire Collection to the DIA Corp. Objectors believe that fact and expert discovery is likely to confirm that the Collection has a realizable value well in excess of the Grand Bargain consideration.

43.     In a chapter 11 case, it is inconceivable that a court would confirm a plan that permitted a debtor to transfer an art collection for consideration that is at least $1.7 billion (and likely much more) less than its fair market value.   It is equally inconceivable that by enacting chapter 9 Congress intended to allow municipalities to shield unencumbered non-core assets owned by the City from creditors without distributing the fair value of those assets to creditors. Indeed, by adopting the fair and equitable, best interests of creditors, and good faith requirements for confirmation, such an unfair result is precisely what Congress has prohibited.

44.     The legislative history of chapter 9 is clear that this Court must find that the amount proposed to be paid under the plan is all that the creditors could reasonably expect under the circumstances. H.R. Rep. 94–686, 1st Sess. 33 (1977).  Moreover, the City must prove that it has made a reasonable effort to repay creditors and that it has acted in good faith.   It is impossible for the City to meet its evidentiary burden and prove that it has made the requisite reasonable effort to repay creditors, that the Plan provides all that creditors could reasonable expect to receive, or that the City has acted in good faith, where the City is intentionally squandering an asset worth billions of dollars without having subjected that asset to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) ("the best way to determine value is exposure to a market").

DMEAST#188873391v.2

**d.     The DIA Settlement Also Fails the Standard Established by Bankruptcy Rule 9019**

45.     Alternatively, to the extent that the DIA Settlement is a settlement subject to Bankruptcy Rule 9019, the DIA Settlement is not fair and equitable, is not in the best interests of the estate, and the City's request for approval of the same should be denied.

46.     In considering a request to approve a settlement pursuant to Bankruptcy Rule 9019, the Court must make an independent judgment as to whether the compromise is fair and equitable and in the best interests of the estate. *Protective Comm. For Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988); *Olson v. Anderson (In re Anderson)*, 377 B.R. 865, 870-871 (6th Cir. BAP 2007).

47.     The Sixth Circuit Court of Appeals has stated that "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *Reynolds*, 861 F.2d at 473. "Whether the compromise is effected separately or in the body of a reorganization plan will not affect the approval analysis required of the bankruptcy court." *In re Dow Corning*, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996)

48.     The court must weigh the conflicting interests of all relevant parties and consider the following factors: (1) the probability of success on the merits of litigation, (2) the litigation's complexity, (3) the litigation's attendant expense, inconvenience, and delay, and (4) the views of creditors. *Bard v. Sicherman (In re Bard)*, 49 F. App'x 528, 530 (6th Cir. 2002); *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988); *In re Rankin*, 396 B.R. 203, 208 (E.D. Mich. 2008) (*citing Anderson*, 377 B.R. at 870–71). The Court also is to consider the

paramount interest of the creditors and give a proper deference to their reasonable views. *In re Fodale*, 2013 WL 663729 at * 6, No. 10-69502 (Bankr. E.D. Mich. Feb. 21, 2013).

49.     In the Disclosure Statement, the City asserts that the DIA Settlement resolves claims asserted by (a) the Michigan Attorney General, in an opinion dated June 13, 2013 (Opinion No. 7272), that even though all of the works in the Collection are owned by the City, that ownership is subject to a charitable trust and (b) the DIA Corp. that the Collection is subject to the public trust doctrine.  (DS at pp. 97, 158.)

50.     Further, although not mentioned in the Disclosure Statement, the City previously asserted that certain works in the Collection were subject to restrictions imposed by donors that effectively prevent the City from selling them.  Specifically, at a hearing conducted by this Court on January 22, 2014, counsel to the City asserted that:

> As to the rest of it, there's a big reason not to look at all of it, and that is … that the rest of it came via gifts.  When art museums get gifts, they frequently get-- we have an analogy in law school.  We talk about a bundle of sticks being property, and each artwork can be viewed as a bundle of sticks.  When the art museum gets art from donors, very frequently they don't get all the sticks.  They get the art subject to limitations, and if the limitations and restrictions aren't complied with, the art goes back to the donor or someplace else.

(Docket No. 2562, Jan 22, 2014 Hr'g Tr at 12:15-24.)

51.     While these assertions are the subject of intensive fact discovery currently being conducted by Objectors and others, and will need to be more fully addressed in a Supplemental Objection after that discovery is completed as permitted by the Scheduling Order, it is apparent from publicly available documents that the DIA Corp.'s assertion that the Collection is subject to the public trust doctrine is easily dismissed as meritless and the State's assertion of a charitable trust is factually and legally flawed.

22

52.     Addressing the DIA Corp.'s assertion that the Collection is subject to the public trust doctrine, that assertion should be rejected (as it was in footnote 8 of the Michigan Attorney General's opinion) because there are no cases in Michigan that have applied the public trust doctrine outside of the natural resources context.  *See Glass v. Goeckel*, 703 N.W.2d 58 (Mich. 2005) (finding that the shores of the Great Lakes below the ordinary high water mark were held in public trust).

53.     Turning to the Michigan Attorney General's opinion, the foundation for the entire argument is that a charitable trust was created upon the formation of the Detroit Museum of Arts (the "<u>DMA</u>") in 1885.  To begin with, the opinion ignores the fact that in 1885, the year that the DMA was incorporated, charitable trusts were invalid under Michigan law.  *See Chicago Bank of Commerce v. McPherson*, 62 F.2d 393, 395 (6th Cir. 1932) ("For nearly a hundred years prior to 1907 charitable trusts were not recognized by the laws of Michigan"); *Hopkins v. Crossley*, 132 Mich. 612, 614-18 (Mich. 1903) (invalidating attempt by nonprofit to place its remaining assets in charitable trust because charitable trusts were not recognized under Michigan law); *Trs of the First Soc'y of the Methodist Episcopal Church of Newark v. Clark*, 3 N.W. 207, 215 (Mich. 1879) (noting that charitable trusts were not permitted because they were "not fully expressed and clearly defined").

54.     Michigan did not begin recognizing charitable trusts until 1907, twenty-two years after the DMA was formed.  1907 Act § 1 ("[n]o gift, grant, bequest, or devise to . . . charitable . . . uses which shall in other respects be valid under the laws of this State, shall be invalid by reason of the indefiniteness or uncertainty of the persons designated as the beneficiaries thereunder in the instrument creating the same").

55.     There are no facts indicating that the DMA took any action to place its assets in charitable trust at some point after 1907.  There was no unequivocal declaration that the DMA held the art in trust for named purposes and there was not a conveyance of property to a trustee with intent to pass legal title and absolute control of the property subject to the declared purpose of the trust.  *Harmon v. Harmon*, 303 Mich. 513, 521 (Mich. 1942) ("A trust is created only if *the settlor* properly manifests an intention to create a trust.").

56.     Likewise, no evidence has been developed indicating that when the DMA sold its assets to the City in 1919 that it did so with the intent of forming a charitable trust or that the City took the assets as a substitute trustee.  There are no documents creating a trust and no evidence that the DMA made an explicit declaration of trust.  In fact, to the contrary, the statute that authorized DMA to transfer its assets, expressly provided that it could do so "upon such terms, in such manner and at such time as may be agreed upon."  1919 Act § 20.

57.     Moreover, the vast majority of the works in the Collection were acquired after 1919, and no evidence has been developed to date indicating that the City took any action to subject works so acquired to a charitable trust.  It is also notable that neither the City nor the DIA Corp. are listed on the Michigan Attorney General's registry of charitable trusts.  Thus, while discovery is ongoing and necessary to fully brief the issues, there are substantial and readily apparent factual and legal flaws in the Michigan Attorney General's opinion.

58.     Similarly, with respect to restrictions allegedly imposed upon the transfer of individual works in the Collection, the City has not identified which works in the Collection are subject to such restrictions and the existence and scope of these alleged restrictions are also the subject of discovery currently being conducted.  It is unclear whether the City or the DIA Corp. has undertaken any investigation into the existence or extent of these alleged restrictions.

DMEAST#188873391v.2

59.     Based on the foregoing, there is an extremely high probability of success for establishing in any litigation that the Collection is not subject to the public trust doctrine or held in charitable trust.  Moreover, by the time of the Plan confirmation trial, Objectors and other creditors are likely to have already conducted all discovery necessary as to those issues and, thus, the issues in such litigation would primarily be legal ones that could easily be resolved on cross-motions for summary judgment. As a result, such litigation is not likely to be expensive or result in undue delay and, given the billions of dollars that appear to be at stake, the cost of such litigation would pale in comparison to the potential return for the City, its creditors, and its citizens.  It is not reasonable for the City to walk away from billions of dollars in value under the facts and legal analysis applicable to the weak charitable trust argument articulated by the Michigan Attorney General or the, to date, wholly unsubstantiated argument that the works in the Collection are subject to restrictions on alienation imposed by donors that in the aggregate materially affect the realizable value of the Collection.[13]

### 2.     DWSD

60.     Similarly, although on a scale measured by hundreds of millions of dollars rather than billions of dollars, the DWSD's water and sewer systems are a very valuable asset.  The DWSD's water system had historical net revenues between $138 million and $180.9 million

---

[13] The Michigan Attorney General's opinion appears to be an attempt by the State to position the City to avail itself of the benefits of bankruptcy and, thereby, avoid paying its substantial obligations, while protecting the Collection from being sold or otherwise monetized for the benefit of creditors and the City's residents.  The Governor appointed Kevyn Orr, a bankruptcy lawyer, as Emergency Manager in March 2013 and knew that a bankruptcy filing was imminent.  It cannot be a coincidence that the Michigan Attorney General issued his opinion on June 13, 2013, one day before the Emergency Manager released his Proposal for Creditors.  Further, it is notable that the Michigan Attorney General does not conclude the Collection is held in trust for the benefit of the citizens of the City but, instead, argues the Collection is held in charitable trust for "the people of Michigan."  Objectors believe discovery will reveal that the Museum is disproportionately attended and otherwise utilized by people that live outside of the City and that the State's position with respect to the Collection is not based upon what is best for the City or its residents but, instead, is based upon what is good politics for elected officials representing citizens of the State who do not live, work, or reside in the City.

DMEAST #188873391v.2

between 2007 and 2011, and DWSD's sewer system had net revenues of between $172.2 million and $206.1 million between 2007 and 2011. The bankruptcy case presents the City with a unique opportunity to monetize this asset, thereby ensuring competent management and proper maintenance of the systems for the benefit of the City's citizens, and resulting in a steady and predictable stream of income for the benefit of both creditors and the City's citizens. However, the Plan makes clear that the City presently has no plan for monetizing this valuable asset despite having spent months on a failed attempt to negotiate a deal with the five counties surrounding the City to form a Great Lakes Water Authority ("GLWA").

61. Early in the case, numerous creditors urged the City to pursue a public-private partnership ("P3") transaction in addition to pursuing the formation of a GLWA. However, for reasons that are unclear, the City declined to pursue a P3 transaction until very recently and, as a result of this delay, is seeking to confirm a plan that does nothing to monetize this asset despite the unique opportunity that the bankruptcy case provided for doing just that.

62. Moreover, as discussed in section II.,A., *supra.*, addressing unfair discrimination, even if DWSD is monetized during the next seven (7) years, the Plan provides that the benefits will go exclusively to the Retirement Systems.

### 3. City Owned Real Estate

63. The City owns 60,000 parcels of vacant land and approximately 7,800 of the 78,000 vacant structures within the City limits. (DS at p. 97.) The Disclosure Statement indicates that the City intends to spend $440.3 million over the next six fiscal years to remediate residential blight (the "Blight Initiative"). (DS at pp. 161–62.) The Plan is silent as to what the City intends to do with the real estate once it remediates blight and appears not to provide any

return to creditors from the City's substantial real estate holdings and the very substantial sum of money the City intends to spend removing blight.

64.     The City owned real estate, like the massive undervaluing of the Collection and refusal to pursue a P3 transaction for DWSD until too late, represents another missed opportunity for the City to create value for creditors and benefit its citizens by so doing.  Simply removing blight from real estate is not an adequate plan for fixing one of the fundamental and most visible issues facing the City.

65.     Indeed, the lack of any plan for dealing with the real estate after blight is removed appears to be just another squandered opportunity by the City to derive value from its assets for creditors while improving the City for its current and future citizens and reversing the unabated decline that has plagued the City for decades.  The net effect of these missed opportunities is the real risk that the same problems that have plagued the City during the decades of decline will continue unabated in the future.

### 4.     Accounts Receivable

66.     Upon information and belief, the City is owed tens of millions of dollars from various sources.  The City refused to include more information in its Disclosure Statement concerning these accounts receivable, such as the identity of the obligors, the basis for the receivable being owed to the City, and the City's belief of the collectability of the same.  As a result, Objectors have propounded discovery to the City seeking to obtain this information.

67.     The Plan does not propose to pay any value to general creditors based upon these receivables.  The City's apparent decision to abandon the value of these receivables is yet more evidence that the Plan does not meet the best interest of creditors test, is not fair and equitable, and demonstrates the City's bad faith in proposing the Plan.

**5.** **The Plan Improperly Diverts $1.4 Billion of Future Revenue to Revitalization Efforts Without Any Evidence Such Will Fix the Root Causes of the City's Decline and Without Giving Creditors a Share of Any Revenue Increase Resulting from the Revitalization Efforts**

68. In addition to the failure to monetize assets worth billions of dollars, the Plan proposes to divert nearly $1.4 billion of future revenue to reinvestment in the City. While some reinvestment presumably is advisable for the City, there is no evidence that the money the City proposes to spend will have the effect of reversing the City's long decline and effectively address the root causes of that decline. The City also has failed to provide any evidence as to how, when, or where it plans to spend that money, a detailed budget for the expenditures, or what controls will be put in place to minimize waste and fraud.

69. A plan that simply throws enormous sums of money at certain symptoms of the City's decline without addressing the root causes of that decline (which is precisely what the Plan appears to do) is not in the interests of any creditors or the City's current and future citizens who are interested in real long-term solutions, rather than short term fixes that will only temporarily mask the continued decline of the City.

70. More time under the protection of this Court and hard work by the Emergency Manager and his team (or a new team of financial advisors with greater experience in municipal finance and prior successes in municipal restructuring) would allow the City to fully develop and propose real solutions to the root causes of the City's decline, which, in turn, would permit the City to propose a plan that benefits both creditors and the City's citizens.

**6.** **The Plan Fails to Ensure Operational Improvements Will be Made**

71. Several City departments or organizations, including the Department of Transportation, the General Services Division, the Grant Department, and the 36th District Court are projected to have significant operating deficits under the Plan and City's projections.

72.     Objectors believe that a proper Plan would take advantage of the unique opportunity presented by the bankruptcy case and the appointment of the Emergency Manager to improve the efficiency of the operation of these departments and organizations, as well as collection rates on receivables, fines, and taxes.

73.     Such operational improvements would result in additional funds being available for creditors as well as provide a significant benefit to citizens by ensuring City government operates efficiently and effectively upon emerging from bankruptcy and does not immediately slide back into the mismanagement that contributed to the City's decline.

### 7.     Outside of Bankruptcy, The City Could be Compelled to Pay the COP Claims by Levying Additional Taxes

74.     If confirmation of the Plan was denied and the City's bankruptcy case was dismissed, the Contract Administrator would be permitted to file a lawsuit and obtain a judgment against the City for its failure to pay the COP Claims.

75.     The City would be required to pay any resulting judgment against it and, if the City failed to use existing funds and revenues or monetize non-core assets to pay such a judgment, a court could compel the City to raise the funds through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961. MICH. COMP. LAWS SERV. §§ 600.101, *et seq.*

76.     Discovery is likely to demonstrate that the result of such a levy would be payment in full of the COP Claims or, at the very least, substantially more than the Plan proposes to pay.[14] As a result, the Plan does not provide a better alternative for creditors than what they already have, is not in the best interests of creditors, and is not fair and equitable.

---

[14] In addition, the Objectors believe that they will be able to demonstrate that even if a court refused to order a tax levy and the City refused to sell non-core assets to pay a judgment, the holders of COP Claims would be better off holding a judgment outside of bankruptcy for a substantial number of years and then collecting.

DMEAST#188873391v.2

## C.     The Plan Has Not Been Proposed in Good Faith

77.     Section 1129(a)(3) of the Bankruptcy Code requires the City to prove that the Plan "has been proposed in good faith." 11 U.S.C. § 1129(a)(3). Good faith requires, at a minimum, that the Plan "treat all interested parties fairly and that the efforts used to confirm the plan must comport with due process." *Mount Carbon*, 242 B.R. at 39.

78.     The requirement of good faith has been a critical component of municipal restructuring since the earliest enactment of Chapter IX. *See Avon Park*, 311 U.S. at 144-46 (reversing confirmation order for, among other things, lack of good faith); *Town of Belleair v. Groves*, 132 F.2d 542, 543 (5th Cir. 1942) (affirming denial of confirmation and dismissal where proposed plan did not "embod[y] a fair and equitable bargain openly arrived at and devoid of overreaching"); *Wright v. City of Coral Gables*, 137 F.2d 192 (5th Cir. 1943) (reversing confirmation order where debtor used chapter 9 process "to bludgeon into submission those with whom the city had not been able to make settlements satisfactory to itself"); *Kaufman County Levee Imp. Dist. No. 4 v. Mitchell*, 116 F.2d 959, 960 (5th Cir. 1941) (affirming denial of confirmation where the "plan was unfair and discriminated in favor of the bondholders owning lands and against those who did not.").

79.     More recent decisions have also not hesitated to deny confirmation of proposed plans of adjustment on the basis of lack of good faith. *Ault v. emblem Corp. (In re Wolf Creek Valley Metro. Dist. No. IV)*, 138 B.R. 610, 618-19 (D. Colo. 1992) (reversing confirmation on basis that proposed plan singled out one landowner for discriminatory treatment while unduly benefitting another landowner); *Pierce County*, 414 B.R. at 719-20 (denying confirmation where plan would have limited sources of creditor recoveries and did not "indicate a sincere attempt by the Debtor to readjust its debts by maximizing the creditors' recovery"); *Mount Carbon*, 242

30

B.R. at 39-42 (denying confirmation where the plan unduly benefitted one landowner and was inconsistent with the purpose of chapter 9).

80.     Here the City's (i) insistence on transferring a Collection worth billions of dollars in exchange for a promise to pay from the Foundations, the DIA Corp., and State having a present value of $300 million, (ii) insistence on discriminatory treatment unduly benefiting one creditor over another, (iii) refusal to monetize its other valuable non-core assets, and (iv) insistence on diverting $1.4 billion of future tax revenue to revitalization efforts while not proposing a plan to fix the root causes of the City's decline is the antithesis of the good faith required by the Bankruptcy Code.  *In re Val-Mid Assocs.*, Case No. 4:12-bk-20519-EWH, 2013 Bankr. LEXIS 2521 at *9 (Bankr. D. Ariz. June 14, 2013) ("Knowingly sacrificing prospectively significant value demonstrates a lack of good faith within the totality-of-circumstances analysis of 1129(a)(3)"); *In re Multiut Corp.*, 449 B.R. 323, 342 (Bankr. N.D. Ill. 2011) (failure to maximize value for creditors "directly bears on the Plan's good faith"); *Pierce County*, 414 B.R. at 719-20 (same).

### D.     The Plan is Not Feasible and Lacks Adequate Means of Implementation Because It Lacks Proper Mechanisms to Ensure Proper Execution

81.     Objectors do not assert that the Plan is not feasible economically.  In fact, the Plan proposes to pay so much less than the City actually can afford to pay to all unsecured creditors except the Retirement Systems, the Plan clearly is feasible from a purely economic viewpoint. Nonetheless, the Plan is not feasible from an execution standpoint because there are inadequate mechanisms to ensure future City leaders do not engage in the same flawed decision making and are not hampered by the same insurmountable obstacles to reform and improvement of City government that greatly contributed to the City's dramatic decline and, ultimately, bankruptcy.

DMEAST#188873391v.2

82. The report issued by the Detroit Financial Review Team on or about February 19, 2013, detailed numerous problems with the City's financial and operational structure and its lack of proper or effective accounting controls. Moreover, the Financial Review Team's report detailed the numerous impediments, including, among other things, the City Charter and the cumbersome organizational structure of City government, that hampered the ability of City officials to enact reforms necessary to provide municipal services in a more efficient and cost effective manner.

83. The Plan does not address these issues or provide for any of the structural reforms recommended by the Financial Review Team. As a result, the Plan lacks adequate means of implementation, is not feasible, and puts the City at substantial risk of encountering financial distress as the result of mismanagement, the inability to operate efficiently and in a cost effect manner in the future, and the inability of City government to adjust in an effective and efficient manner to future circumstances.

**E. The Plan Release and Injunction Provisions May Impermissibly Limit the Rights of Holders of Claims to Recover from Non-Debtor Entities**

84. The Plan contains an impermissibly broad release and injunction that may preclude holders of COP Claims from pursuing their claims against third parties, including claims against PFRS and GRS, in the event that the City prevails in the COP Litigation. Specifically, the Plan provides that:

> All Entities that have been, are or may be holders of Claims against the City, along with their Related Entities … shall be permanently enjoined from taking any of the following actions against **or affecting** the City or its property …
>
> > 1. commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against **or affecting** the City or its property (including (A) all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice . . .

32

*    *    *

5.    proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan. . . .

(Plan at pp. 41–42).

85.    To the extent that this injunction would preclude claims against non-debtor third parties, such as the claims of the COPs holders against the Retirement Systems, it constitutes an impermissible release of those claims.

86.    *In re Dow Corning Corporation*, 280 F.3d 648, 658 (6th Cir. 2002) is the controlling authority in the Sixth Circuit regarding whether a non-consensual injunction of third-party claims may be approved as part of a plan. *Dow Corning* warns that such permanent injunctions are drastic measures to be used cautiously and requires satisfaction of all of the following seven factors in order to enjoin a non-consenting creditor's claims against a non-debtor: (1) there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free of indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) the impacted class, or classes, has overwhelmingly voted to accept the plan; (5) the Plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) the Plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) the bankruptcy court made a record of specific factual findings that support its conclusions. *Dow Corning*, 280 F.3d at 658.

33

87. None of these factors are satisfied here. There is no identity of interest between the City and the Retirement Systems, and the Retirement Systems have not contributed any assets (let alone substantial assets) to the Plan.

88. The injunction is not essential to reorganization, and the holders of COP Claims are only being paid 0%–10%, substantially less than is to be distributed to the Retirement Systems. As to the fourth factor, holders of Class 9 COP Claims will vote overwhelmingly to reject the Plan.

89. Accordingly, if and to the extent that the injunction provision is broad enough to preclude the claims that the holders of COP Claim are seeking to assert against the Retirement Systems in the COP Litigation or that Objectors may assert against other third parties, there is no valid basis for so doing.

**F. The Plan Improperly Proposes to Redistribute B Notes Based Upon the Decision of this Court in the COPs Litigation, Effectively Negating Objectors' Appellate Rights**

90. Section II.B.3.p.iii.B of the Plan provides a mechanism by which New B Notes will be set aside and distributed to Holders of Allowed COP Claims which have not accepted the Plan COP Settlement. Specifically, the Plan provides that on the Effective Date, the City will establish a Disputed COP Claims Reserve which will be funded with New B Notes in an amount to be calculated in accordance with the Plan. If a Disputed COP Claim becomes Allowed, the Holder of such Allowed Claim will be sent a Distribution from the Disputed COP Claims Reserve. As all plans do, the Plan provides for a final release of the New B Notes upon the occurrence of certain events. However, unlike typical plan provisions, Section II.B.3.p.iii.B of the Plan arguably provides for a release of the New B Notes prior to a final determination on the allowance of the COP Claims. Specifically, Plan provision II.B.3.p.iii.B.2 provides that:

Upon the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims resolving all objections to the Disputed COP Claims and after all Distributions on account of Allowed COP Claims have been made or provided for, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows …

91.     Based on the forgoing, upon entry of an order by the Court resolving the COP Litigation or sustaining any other objection to the COP Claims, but before entry of a Final Order, the City may be authorized to finally distribute the New B Notes to itself and holders of Allowed Claims in other classes, thereby depriving COP Claim Holders of a distribution in the event their claims are deemed Allowed by an appeals court pursuant to a Final Order.  If that were the case, the Plan would run afoul of section 1129(a)(3), requiring that a plan be proposed in good faith and section 943(b)(7), requiring that the Plan be in the best interests of creditors.

92.     Depriving COP Claim Holders of their appeal rights by essentially making any appeal moot – by virtue of the fact that the New B Notes would no longer be available to satisfy Allowed COP Claims – clearly constitutes bad faith and is certainly not in the interests of creditors.  Accordingly, even if this Court confirms the Plan, the Plan should be modified to make clear that the New B Notes may not be distributed to any entity other than a COP Claim Holder until a Final Order is issued regarding the allowance of all COP Claims.

### G.     Additional Objections to Confirmation

93.     In addition to the foregoing objections, Objectors also objects to a number of additional provisions in the Plan.

94.     First, the exculpation provisions in the Plan are improper.  It is well settled that an exculpation provision can only be applied to estate fiduciaries:  estate professionals, creditors' committees and their members, and a debtor and its decisional makers.  *In re Wash. Mut., Inc.,* 442 B.R. 214, 350–51 (Bankr. D. Del. 2011).  Here, the City proposes an exculpation provisions that includes, among others, the City's Related Entities (including members of the City Council

35

and the Mayor), the State, the State Related Entities, the Exculpated Parties (as defined in Article I.A.132 of the Plan), the DIA Funding Parties and their Related Entities (including within the definition of the "Released Parties"), and the CFSEM Supporting Organization and its Related Entities (also defined within the definition of the Released Parties). (Plan at pp. 11, 19, 42.) None of these parties are fiduciaries of the estate and, therefore, cannot be included under the exculpation provision of the Plan.

95. Second, under the Plan, Class 5 COP Swap Claims are listed as impaired. (Plan at p. 26.) However, as detailed in the *Objection of Certain COPs Holders to Debtor's Motion to Approve Settlement and Plan Support Agreement with Swap Counterparties* filed on March 17, 2014, as Docket No. 3040, which is incorporated by reference, the Swap Counterparties do not have secured claims, and the payment of the $85 million proposed by the Plan (the full amount which the swap counterparties have agreed to accept) is not impairment at all. *See, e.g., Connecticut Gen. Life Ins. Co. v. Hotel Assocs. (In re Hotel Assocs)*, 165 B.R. 470, 475–76 (B.A.P. 9th Cir. 1994); *In re Dunes Hotel Associates*, 188 B.R. 174, 181 (Bankr. D.S.C. 1995) (holding an "*artificially created* or *preserved*" claim relied upon in seeking plan confirmation "demonstrate[d] a lack of good faith" and was an improper attempt to manipulate confirmation); *In re Daly*, 167 B.R. 734, 736-37 (Bankr. D. Mass. 1994) (*citing In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127, 130–32 (8th Cir.1993)). Accordingly, if the holders of Class 5 Swap Claims vote in favor of confirmation, this class cannot be the impaired accepting class required for a cram down.

96. Finally, the Plan seeks waiver of the 14-day stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). The City makes no effort to justify waiving the 14-day stay, much less demonstrate "cause." By waiving the 14-day stay, the City will be entitled to

consummate the Plan, which in turn severely jeopardizes objecting parties' right to an appeal due to the City's ability to argue equitable mootness. There is absolutely no necessity for the City to have the 14-day stay waived.

## III. Reservation of Rights

97.     The Objectors reserve the right, among other things, to (a) amend or supplement this objection, in accordance with the Scheduling Order, in the event that the City further amends the Plan, based upon voting, or based upon facts or information obtained through discovery, (b) join in any objection to the Plan filed by any other creditor or party in interest, to the extent such objection is not inconsistent with the arguments set forth herein; and (c) raise any additional objections to the Plan not incorporated herein.

DMEAST#188873391v.2

## IV.    Conclusion

98.    The Plan unfairly discriminates in favor of the Retirement Systems and against the general claims of capital markets creditors and parties in interest, fails to provide a reasonable recovery to COPs holders, including the Objectors, in light of the City's valuable non-core assets and likely future tax revenue, provides less than the COPs holders would be likely to recover if confirmation were denied and the City's bankruptcy case was dismissed, and lacks an adequate mechanism to ensure that the City abides by the Plan in the event it is confirmed.  Accordingly, confirmation of the Plan should be denied.

WHEREFORE, the Objectors request that this Court deny confirmation and grant them such other and further relief as is just and proper.

38

Dated:  May 12, 2014.                              Respectfully submitted,


/s/ Deborah L. Fish                               /s/ Matthew G. Summers
Deborah L. Fish                                   Matthew G. Summers, Esquire
ALLARD & FISH, P.C.                               BALLARD SPAHR LLP
2600 Buhl Building                                919 North Market Street, 11th Floor
535 Griswold                                      Wilmington, Delaware 19801
Detroit, MI 48226                                 Tel:  (302) 252-4428
Tel:  (313) 309-3171                              Fax:  (302) 252-4466
E-mail:  dfish@allardfishpc.com                   E-mail: summersm@ballardspahr.com

-and-                                             Vincent J. Marriott, III, Esquire
                                                  BALLARD SPAHR LLP
Thomas Moers Mayer                                1735 Market Street, 51st Floor
Jonathan M. Wagner                                Philadelphia, Pennsylvania 19103
KRAMER LEVIN NAFTALIS                             Tel:  (215) 864-8236
& FRANKEL LLP                                     Fax: (215) 864-9762
1177 Avenue of the Americas                       E-mail: marriott@ballardspahr.com
New York, NY 10036
Tel:  (212) 715-9169                              -and-
E-mail:  tmayer@kramerlevin.com
           jwagner@kramerlevin.com                Howard S. Sher, Esquire (P38337)
                                                  JACOB & WEINGARTEN, P.C.
*Counsel for Dexia Crédit Local*                  Somerset Place
*and Dexia Holdings, Inc.*                        2301 W. Big Beaver Road, Suite 777
                                                  Troy, Michigan 48084
                                                  Tel:  (248) 649-1200
/s/ Rick L. Frimmer                               Fax:  (248) 649-2920
Rick L. Frimmer                                   E-mail:  howard@jacobweingarten.com
J. Mark Fisher
Frederick J. Sperling                             *Counsel for Hypothekenbank Frankfurt AG,*
Paul E. Greenwalt                                 *Hypothekenbank Frankfurt International S.A.,*
SCHIFF HARDIN LLP                                 *and Erste Europäische Pfandbrief- und*
233 South Wacker Drive                            *Kommunalkreditbank Aktiengesellschaft in*
Suite 6600                                        *Luxemburg S.A.*
Chicago, IL 60606
Tel:  (312) 258-5500
E-mail:  rfrimmer@schiffhardin.com
           fsperling@schiffhardin.com
           pgreenwalt@schiffhardin.com

*Counsel for FMS Wertmanagement AöR*

_/s/ Kenneth E. Noble_
Kenneth E. Noble
John J. Ramirez
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Tel:  (212) 715-9393
E-mail:  Kenneth.noble@kattenlaw.com
          john.ramirez@kattenlaw.com

_Counsel for Deutsche Bank AG, London_

DMEAST#188873391v.2

## CERTIFICATE OF SERVICE

I, Matthew G. Summers, state that on May 12, 2014, I filed a copy of the foregoing Objection to Plan Confirmation with the Clerk of Court using the Court's ECF system and I hereby certify that the Court's ECF system has served all registered users that have appeared in the above-captioned case. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*/s/ Matthew G. Summers*
Matthew G. Summers
E-mail: summersm@ballardspahr.com

DMEAST#188873391v.2