M. Natasha Labovitz
My Chi To
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Berkshire Hathaway Assurance Corporation*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 9 |
| | ) | |
| **CITY OF DETROIT, MICHIGAN,** | ) | Case No. 13-53846 |
| | ) | |
| **Debtor.** | ) | Hon. Steven W. Rhodes |

**OBJECTION OF BERKSHIRE HATHAWAY ASSURANCE
CORPORATION TO CONFIRMATION OF FOURTH AMENDED
<u>PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND .......................................................................... 4

OBJECTION AND LEGAL DISCUSSION ................................................... 12

    A.    Confirmation Requirements.................................................... 12

    B.    The Plan Is Not In The Best Interests Of Creditors Under 11
          U.S.C. § 943(B)(7)................................................................... 13

    C.    The Plan Has Not Been Proposed In Good Faith Under 11 U.S.C. §
          1129(A)(3). ............................................................................. 16

    D.    The Plan Is Not Fair And Equitable Under 11 U.S.C. §
          1129(B)(2)(A). ........................................................................ 17

          i.    The Plan Does Not Provide Holders Of DWSD Bond
              Claims With Deferred Payments With A Value, As Of
              The Plan Effective Date, Of At Least The Value Of Their
              Interest In The Pledged Revenues and Therefore Fails to
              Meet the Requirements Of 11 U.S.C. § 1129(B)(2)(A)(I). ........ 19

          ii.    The Plan Does Not Provide Holders Of DWSD Bond
              Claims With The Indubitable Equivalent Of Their Claims
              And Therefore Fails To Meet The Requirements Of 11
              U.S.C. § 1129(B)(2)(A)(III). .................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Bank of N.Y. Mellon v. Jefferson Cnty., Ala.* (*In re Jefferson Cnty., Ala.*),
   482 B.R. 404 (Bankr. N.D. Ala. 2012) ........................................................ 15

*Crestar Bank v. Walker* (*In re Walker*),
   165 B.R. 994 (E.D. Va. 1994) ................................................................... 17

*F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc.* (*In re Inv. Co. of the Sw., Inc.*),
   341 B.R. 298 (B.A.P. 10th Cir. 2006) ....................................................... 21

*Fano v. Newport Heights Irr. Dist.*,
   114 F.2d 563 (9th Cir. 1940) ............................................................. 13, 14

*In re Dow Corning Corp.*,
   255 B.R. 445 (E.D. Mich. 2000) ............................................................... 16

*In re Kemp*,
   134 B.R. 413 (Bankr. E.D. Cal. 1991) ...................................................... 17

*In re Mount Carbon Metro. Dist.*,
   242 B.R. 18 (Bankr. D. Colo. 1999) .......................................................... 14

*In re Pierce Cnty. Hous. Auth.*,
   414 B.R. 702 (Bankr. W.D. Wash. 2009) ............................................. 12, 14

*In re Trenton Ridge Investors, LLC*,
   461 B.R. 440 (Bankr. S.D. Ohio 2011) ...................................................... 12

*Kelley v. Everglades Drainage Dist.*,
   319 U.S. 415 (1943) ........................................................................... 13, 14

*Met. Life Ins. v. Murel Holding Corp.* (*In re Murel Holding Corp.*),
   75 F.2d 941 (2d Cir. 1935) ........................................................................ 21

**Statutes**

11 U.S.C. § 901 .................................................................................. 12, 16

11 U.S.C. § 922 ........................................................................................ 4

11 U.S.C. § 928 ........................................................................................ 4

11 U.S.C. § 943 ..................................................................... 3, 12, 13, 16

11 U.S.C. § 1129 ............................................................................. *passim*

Detroit, Mich. Water & Sewerage Dept.,
  Amended & Restated Bond Ordinance No. 18-01 (2001).......................................... 5, 6

Detroit, Mich. Water & Sewerage Dept.,
  Amended & Restated Bond Ordinance No. 01-05 (2001).......................................... 5, 6

**Other Authorities**

124 Cong. Rec. H 11,100 (daily ed. Sept. 28, 1978) ...................................................... 13

124 Cong. Rec. S 17,417 (daily ed. Oct. 6, 1978) .......................................................... 13

4 Collier on Bankruptcy ¶ 943.03 (Lawrence P. King, ed. 15th ed. 1999)...................... 14

7 Collier on Bankruptcy ¶ 1129.04 (Alan N. Resnick & Henry J. Sommer eds.,
  16th Ed. 2014)................................................................................................................ 20

H.R. Rep. No. 100-1011, at 7-8 (1988) ........................................................................... 4

S.R. Rep. No. 100-506, at 12 (1988) ............................................................................... 4

Berkshire Hathaway Assurance Corporation ("BHAC"), by and through its undersigned counsel, hereby files this Objection to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 4392] (the "Plan").[1] In support of this Objection, BHAC respectfully submits as follows:

## PRELIMINARY STATEMENT

1.        BHAC is a secondary insurer of the payment when due of regularly scheduled principal and interest payments for three series of DWSD Sewer Bonds and two series of DWSD Water Bonds with an aggregate principal amount of approximately $755 million (collectively, the "BHAC Insured Bonds").[2]  BHAC continues to support in principle the view that the City should accomplish its restructuring in a manner that, within the bounds of the law, will maximize value available for distribution to all constituents.  This Plan, however, falls short of that goal and should not be confirmed.

2.        It is undisputed that the DWSD Bond Claims, including the claims arising under the BHAC Insured Bonds, are fully secured under section 506 of the Bankruptcy Code.  The DWSD Water and Sewer Bonds, including the BHAC Insured Bonds, are secured by valid and perfected statutory liens on DWSD revenues (net of operating expenses), which revenues have been fully sufficient to pay debt service on these bonds,

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement.

[2]    The BHAC Insured Bonds consist of DWSD Sewer Bonds Series 2001(C-2), 2001(E) and 2006(A), and DWSD Water Bonds Series 2001-C and 2005-B.  BHAC also insures, as a secondary insurer, Detroit Retirement Systems Funding Trust Certificates of Participation with a par value of approximately $10 million.

and according to the City's own projections would be fully sufficient to continue to honor these bonds without the need to restructure them. Therefore, holders of the DWSD Bond Claims are entitled to full satisfaction of all principal, interest and other amounts provided for under the underlying documentation in accordance with section 506 of the Bankruptcy Code.

3.      It also is undisputed that the Plan impairs the DWSD Bond Claims, including claims arising under the BHAC Insured Bonds. As a result, the Plan can be confirmed only if (i) each class of DWSD Bond Claims accepts the Plan or (ii) the Plan is found to satisfy the "cram-down" requirements of section 1129(b) of the Bankruptcy Code, including that the Plan be "fair and equitable" to holders of these secured claims. *See* 11 U.S.C. § 1129(b) (plan may be crammed down only if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan").

4.      As there is no indication that the parties entitled to vote the DWSD Bond Claims will accept the Plan as currently configured,[3] the City almost certainly will be required to resort to cram-down, at which point it is the City's burden to demonstrate that these requirements have been met. The City has not met, and will not be able to meet, this burden. Simply put, the Plan's treatment of DWSD Bond Claims does not provide holders of these claims with full value as the Bankruptcy Code requires. As described below, the Plan provides holders of certain DWSD Bond Claims with new bonds having

---

[3]      BHAC reserves the right to assert its right to vote the claims arising under the BHAC Insured Bonds.

the same nominal face amounts as their existing bonds, but with features that will make the new bonds worth less than their face amounts—and therefore less than the allowed amounts of the secured DWSD Bond Claims—on the effective date of the Plan.[4] This is an illusory promise of payment in full that fails to meet the strict conditions imposed by the Bankruptcy Code for confirming a plan over the objection of a class of secured creditors. In addition, the Plan does not satisfy the separate confirmation requirements that it is in the best interests of creditors (as required under section 943(b)(7) of the Bankruptcy Code) and that it was proposed in good faith (as required under section 1129(a)(3) of the Bankruptcy Code).

5.     BHAC recognizes that special revenue bonds such as the DWSD Water and Sewer Bonds can be—and indeed have been—impaired in chapter 9 cases where the pledged revenues are clearly insufficient to cover debt service. However, in cases such as this where special revenue bonds are fully secured, there is no legal basis for confirming a plan that does not provide bondholders with the full value of their allowed claims. BHAC is not aware of any chapter 9 case in which this was done over the objection of bondholders, and doing so for the first time in this case would not only be clearly

---

[4]     The remaining DWSD Bond Claims, including claims arising under BHAC Insured Bonds with an aggregate principal amount of approximately $265 million, are proposed to be reinstated and are treated as "unimpaired" under the Plan. As with the other DWSD Bond Claims, however, these so-called "unimpaired" claims will in fact be impaired by the proposed accelerated funding of DWSD's alleged share of underfunded GRS liabilities, as further described below.

inequitable but also set a precedent at odds with the law and with established expectations of municipal finance market participants.[5]

## FACTUAL BACKGROUND

6.     In connection with the remarketing of the BHAC Insured Bonds in 2008, BHAC issued financial guaranty insurance policies for the benefit of holders of these bonds (the "BHAC Policies").  The BHAC Policies guarantee the scheduled payment, when due, of the principal of and interest on the BHAC Insured Bonds subject to the failure of the primary insurer to make such payments under the primary insurance policies related to these bonds.[6]  As an inducement to providing the BHAC Policies and in connection with its role as bond insurer, BHAC was afforded certain rights by the City and the ability to enforce certain remedies against the City under documents relating to the BHAC Insured Bonds (the "Bond Documents").[7]  The rights and remedies provided in the Bond Documents include, among others, a consent right over any annulment of the

---

[5]     Congress intended special revenue bonds, such as the DWSD Water and Sewer Bonds, to be provided with heightened protections in bankruptcy proceedings.  *See, e.g.*, 11 U.S.C. § 922(d) (automatic stay does not apply to special revenue liens); *id.* at § 928 (special revenues remain subject to liens during pendency of case).  *See also* H.R. Rep. 100-1011, at 7-8 (special revenue bonds protected from conversion to general obligation bonds); S.R. Rep. No. 100-506, at 12 (pledged special revenues not to be used for the general obligations of a municipality).

[6]     National Public Finance Guarantee Corporation is the primary insurer for DWSD Sewer Bonds Series 2001(C-2) and 2006(A).  Financial Guaranty Insurance Company is the primary insurer for DWSD Sewer Bonds Series 2001(E) and DWSD Water Bonds Series 2001-C and 2005-B.

[7]     These documents include, but are not limited to, the Sale Order, the Supplement to Prior Sale Orders and the Bond Ordinance applicable to each series of BHAC Insured Bonds.

4

BHAC Insured Bonds or any amendment to the terms governing the BHAC Insured Bonds.

7.     The revenues securing the DWSD Water and Sewer Bonds, including the BHAC Insured Bonds, have always been sufficient to service these bonds.  By way of example, in 2013, net DWSD revenues were approximately $831.9 million, while the total amount owed on debt service was only approximately $353.4 million.  Disclosure Statement at 99-100.  The City's 10-year projections further show that net DWSD revenues are anticipated to be sufficient to service DWSD secured debt.  *See* Disclosure Statement Ex. M (Revenue Requirement Projections from 2014-2023 project revenue surpluses—after operating expenses and debt service—ranging from approximately $70 million to over $250 million annually).

8.     The Water and Sewer Bond Ordinances governing the DWSD Water and Sewer Bonds set out a "payment waterfall" for DWSD revenues.  The revenues are paid first

> to the Operation and Maintenance fund, a sum sufficient to provide for the payment of the next month's expenses of administration and operation of the System (including Ancillary Obligation Fees and Expenses) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order[.]

Detroit, Mich. Water & Sewerage Dept., Amended & Restated Bond Ordinance No. 01-05 (2001) ("Water Bond Ordinance"), at § 12(B); Detroit, Mich. Water & Sewerage Dept., Amended & Restated Bond Ordinance No. 18-01 (2001) ("Sewer Bond Ordinance"), at § II.12(B).  Immediately subsequent in the waterfall, revenues are paid

5

> to the Senior Lien Bond Debt Service Account, an amount
> that, when added to amounts then on deposit in such
> account, shall equal the Debt Service Installment
> Requirement for Senior Lien Obligations as of the first day
> of such month[.]

Water Bond Ordinance, at § 12(B); Sewer Bond Ordinance, at § II.12(B).  After DWSD

revenues have been allocated in accordance with the entire payment waterfall, any

"[a]mounts remaining . . . as of the last day of each Fiscal Year shall be credited to the

Surplus Fund."  Water Bond Ordinance, at § 13(A); Sewer Bond Ordinance, at §

II.13(A).  The Surplus Fund:

> May, at the option of the Commissioners, be used and
> applied for any purposes related to the [DWSD Systems];
> provided, however, that if and whenever there should be
> any deficit in the Operation and Maintenance Fund or in
> any Interest and Redemption Fund (including any Reserve
> Account therein) then transfers shall be made from the
> Surplus Fund to such funds in the priority and order named
> in [the payment waterfall] to the extent of any such deficit.

Water Bond Ordinance, at § 13(F) (emphasis in original); Sewer Bond Ordinance, at §

II.13(F) (emphasis in original).  This closed system for DWSD revenues makes clear that

(i) such revenues may only be used to pay certain current operating and maintenance

expenses prior to servicing debt and (i) DWSD revenues may not be used for any

expenses outside of the DWSD systems.

9.     On July 18, 2013, the City filed a voluntary petition for relief with this

Court under chapter 9 of the Bankruptcy Code.  Since that date, the City has continued to

pay debt service as and when due on the DWSD Water and Sewer Bonds.

10.     Before the applicable bar date, BHAC filed a proof of claim in this chapter 9 case setting forth the basis for its claim for (i) all of its rights to payment and other rights and claims, including, without limitation, any rights of subrogation with respect to the BHAC Insured Bonds and (ii) all other rights and claims arising under or with respect to the Bond Documents [Proof of Claim #1158].

11.     On February 21, 2014, the City filed a plan for the adjustment of its debts and a related disclosure statement [Docket Nos. 2708 and 2709].  On March 14, 2014, BHAC advised counsel for the City in writing of BHAC's belief that the proposed disclosure statement was deficient in numerous identified respects.

12.     The City filed amended plans and amended disclosure statements on March 31, 2014 [Docket Nos. 3380 and 3382], April 16, 2014 [Docket Nos. 4140 and 4141] and on April 25, 2014 [Docket Nos. 4271 and 4272].  On April 7, 2014, BHAC filed its Limited Objection to Motion of the City of Detroit for Approval of the Proposed Disclosure Statement [Docket No. 3856].  The Disclosure Statement and Plan were filed on May 5, 2014, and this Court approved the Disclosure Statement on May 5, 2014 [Docket No. 4401].

13.     The Plan purports to maximize the value of the City's assets through, among other methods, the replacement of DWSD Water and Sewer Bonds with new bonds having the same face amount but less favorable economic and credit support terms.

14.     Under the Plan, holders of DWSD Bond Claims will receive, in satisfaction of their claims, either (i) new bonds with the same principal amounts but

lower interest rates[8] (and, for certain classes, more limited call protection) or (ii) for any class that votes in favor of the Plan, new bonds with the same principal amounts and interest rates but without any call protection.[9] Plan at II.B.3.a.ii.B; *see also* Ex. I.A.186; Ex. I.A.188.[10]

15. The City explains that its basis for lowering interest rates was "a yield curve indicative of the pro forma credit profile of DWSD [reflecting] the pro forma interest rates that would provide the bondholders with a par recovery based on existing maturities." Disclosure Statement at 63. The City further notes that it created this yield curve based on (1) "[a] review of DWSD's pro forma projections, restructured obligations and relevant prospective credit metrics," (2) an "[e]valuation of comparable situations," (3) "[a]vailable relevant published market indices and composite yield

---

[8]  Existing interest rates on the BHAC Insured Bonds range from 3.00% to 5.75% per annum.  The Plan lowers the interest rates on certain BHAC Insured Bonds by as little as 0.57% and as much as 3.96%.  Plan Ex. I.A.168 (Interest Rate Reset Chart).

[9]  The BHAC Insured Bonds maturing on or before July 1, 2018 are not subject to redemption prior to maturity.  Fixed-rate BHAC Insured Bonds maturing on or after July 1, 2019 may not be redeemed until July 1, 2018, at which time they may be redeemed at a redemption price equal to 100% of principal plus accrued interest as of the redemption date.

[10]  Plan Exhibits 186 and 188, along with Exhibit 168, set forth the general terms of the proposed new bonds, but the documentation evidencing the new bonds has not yet been filed.  Without knowing the exact terms of the new bonds, it is not possible to determine their market value.

curves" and (4) "[d]iscussions with capital market participants." *Id.* None of this underlying information, however, has been made publicly available.[11]

16.     In addition, the Plan contemplates that a substantial part of the revenues currently providing collateral for the DWSD Water and Sewer Bonds will be diverted to other uses, to the obvious detriment of holders of new DWSD bonds issued under the Plan. Specifically, the Plan requires DWSD to fund, on an accelerated basis and prior to payment of debt service on the new bonds, its alleged share of underfunded GRS liabilities totaling $428.5 million through 2023. Plan at II.B.3.r.ii.A; *see also* Ex. II.B.3.r.ii.A (DWSD to contribute $65.4 million in 2015 and $45.4 million each year from 2016 to 2023). The City fails to disclose exactly what will be paid from DWSD revenues to GRS after the expiration of the nine-year period other than noting without factual support that the payments may be small. *See* Disclosure Statement at 22 ("After the initial 9-year period through June 30, 2023 is completed . . . DWSD will remain responsible for its allocable share of GRS UAAL but is expected to have very small contributions, if any, to make to the GRS on account of this liability."). Notably, the Plan as drafted places absolutely no limit on such further payments—which will fall in priority

---

[11]     BHAC, along with other insurers, requested such information from the City on April 11, 2014. *See* DWSD Discovery Parties' First Set of Joint Requests for the Production of Documents to Debtor the City of Detroit, Michigan, at Request No. 28 [Docket No. 4041]. On May 6, 2014, the City produced an unorganized mass of documents in response to all parties' requests, which is now the subject of a clawback motion. *See* Motion to Compel Full Clawback of Debtor's Document Production and Related Relief [Docket No. 4560].

ahead of payments on the new bonds, thereby further stripping these bonds of revenues currently forming their collateral.

17.     DWSD is the only division of the City required to make such an accelerated payment in order to fully fund its share of the GRS liabilities.  *See* Plan, Exhibit II.B.3.r.ii.A.  It is currently estimated that, as of June 2023, the non-DWSD portion of the GRS pension plan will be only 63% funded, while the pension plan as a whole, including the DWSD contribution proposed under the Plan, will be 73% funded. The Plan, therefore, effectively subsidizes the entire GRS pension plan with the collateral it strips from the DWSD revenues.

18.     In an apparent effort to justify this collateral-stripping, the City asserts without further explanation that "DWSD is permitted to, and historically has, paid its contributions to GRS from the water system's and sewage disposal system's respective 'Operation and Maintenance Fund[.]'"  *Id.* at 22.  However, the City has not provided any evidence showing (i) that it has, in fact, ever made such contributions to GRS from the Operation and Maintenance Fund; (ii) why, even if such contributions had been historically made by the Operation and Maintenance Fund, an additional accelerated payment should be made by the fund, thereby causing the leakage of collateral securing the new bonds; (iii) how, exactly, the $428.5 million would be used by GRS (specifically, whether any portion would ***not*** be used to fund pension contributions but instead be used to pay administrative costs or professional fees); (iv) why these contributions should be accelerated over a nine-year period rather than paid over a longer period of time; and (v) what basis there is for the City's unsupported reassurance that there will be minimal

GRS contributions required after the initial nine-year period. Without this evidence, the City surely does not meet its burden of demonstrating that the proposed GRS contributions do not constitute an inappropriate diversion of collateral (if it were ever possible to do so).

19. Even if payment of the GRS contributions is permitted, the combined effect of the features of the new bonds—reduced interest rates, impairment of call protection terms and leakage of collateral value in the form of accelerated GRS contributions with priority over bond payments—is that the new bonds will be worth less than their face amount on the effective date of the Plan. In other words, even if the new bonds have the same principal amounts as the existing bonds, they will be worth less than the allowed amounts of the secured DWSD Bond Claims to which the holders of these claims are entitled. This alone renders the Plan unconfirmable under applicable cram-down requirements as described below. Further, the City does not explain why DWSD Bond Claims must be impaired in the first place or whether the City has explored alternatives that do not involve modifying the terms of the existing bonds or that would provide full value or other treatment satisfactory to the DWSD stakeholders.

20. In sum, as described in this Objection, the Plan is unconfirmable because its proposed treatment of DWSD Bond Claims, which are fully secured, does not meet the "best interests of creditors" test and was not proposed in good faith and, significantly, is not "fair and equitable" to holders of DWSD Bond Claims.

## OBJECTION AND LEGAL DISCUSSION

### A.    Confirmation Requirements

21.    In order for the Plan to be confirmed, it must meet each of the requirements listed in section 943(b) of the Bankruptcy Code, including the requirement that the Plan is in the best interests of creditors under section 943(b)(7).  11 U.S.C. § 943(b).  In addition, a number of confirmation requirements from section 1129(a) of the Bankruptcy Code are incorporated by reference in chapter 9, including the requirements that the Plan was proposed in good faith under section 1129(a)(3) and that the Plan can be confirmed only if, with respect to each class of claims, the class either accepts the plan, the claims are unimpaired or the Plan is "fair and equitable" to the impaired, non-accepting class.  11 U.S.C. § 943(b)(1) (plan must comply "with the provisions of this title made applicable by sections 103(e) and 901 of this title"); § 901(a) (incorporating by reference, among others, sections 1129(a)(3), 1129(b)(1) and 1129(b)(2)(A)).  The City bears the burden of proving these requirements by a preponderance of the evidence.  *See In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 459-62 (Bankr. S.D. Ohio 2011) (proponent of plan must prove each requirement of sections 1129(a) and 1129(b) by preponderance of evidence); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) (proponent of chapter 9 plan must prove each requirement of section 943).

22.    As described below, the City has not met, and cannot meet, its burden of proof with respect to several confirmation requirements, including, among others, the requirements that the Plan (i) is in the best interests of creditors under section 943(b)(7)

of the Bankruptcy Code, (ii) was proposed in good faith under section 1129(a)(3) of the Bankruptcy Code and (iii) is fair and equitable to holders of DWSD Bond Claims under section 1129(b)(1) of the Bankruptcy Code.[12]  Therefore, the Plan should not be confirmed.

**B.    The Plan Is Not In The Best Interests Of Creditors Under 11 U.S.C. § 943(B)(7).**

23.    The City fails to show why—despite the fact that the DWSD Bond Claims are fully secured—the Plan's proposed impairment of DWSD Bond Claims satisfies the "best interests of creditors" test.  The legislative history of chapter 9 states that a determination of the best interests of creditors should be done with reference to two court decisions:  *Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943), and *Fano v. Newport Heights Irrigation District*, 114 F.2d 563 (9th Cir. 1940).  124 Cong. Rec. H 11,100 (daily ed. Sept. 28, 1978); 124 Cong. Rec. S 17,417 (daily ed. Oct. 6, 1978).

24.    In *Fano*, the debtor, Newport Heights Irrigation District issued bonds in order to construct an irrigation system.  *Fano*, 114 F.2d at 563-64.  In the debtor's subsequent reorganization, it filed a plan that proposed impairing the bondholders' claims by reducing both the bonds' principal amount and interest rate.  *Id.* at 564.  The Ninth

---

[12]    In light of the ongoing discovery process and the fact that key plan documents, including documentation evidencing the new bonds, are not yet available, BHAC reserves the right to object to the confirmation of the Plan on any additional ground based on information and documents yet to be produced or made available by the City.  BHAC also joins in the objections to confirmation of the Plan filed by other insurers of DWSD Bond Claims including, among other arguments, that by violating the Water and Sewer Ordinances, the Plan is unconfirmable under section 943(b)(4) of the Bankruptcy Code.

15

Circuit held that the plan was not in the best interests of creditors where the debtor "owns debt free . . . assets in value many times the indebtedness, all in most excellent physical and almost new condition" that constitute the "security of the bondholders" and where the debtor had not shown "why the tax rate should not have been increased sufficiently to meet the District's obligations." *Id.* at 565-66.

25. The Supreme Court's decision in *Kelley* likewise considered how a court should determine the best interests of creditors in a municipal adjustment of debts. *Kelley*, 319 U.S. 415. The Court stated that, in considering whether a plan is in the best interests of creditors, a court "must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for the satisfaction of creditors." *Id.* at 420. The Court further noted that "where . . . different classes of creditors assert prior claims to different sources of revenue, there must be a determination of the extent to which each class is entitled to share in a particular source, and of the fairness of the allotment to each class in the light of the probable revenues to be anticipated from each source." *Id.*

26. Under the Bankruptcy Code, more recent court decisions have clarified this standard, explaining that, in order to satisfy the "best interests of creditors" test, a "proposed plan [must] provide a better alternative for creditors than what they already have" and that a municipal debtor must make "a reasonable effort at payment of creditors." *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999) (citing 4 Collier on Bankruptcy ¶ 943.03[7] (Lawrence P. King, ed. 15th ed. 1999)); *see also In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 718.

27.     Where revenues securing bonds are insufficient to service the debt, the undersecured nature of those bonds "may . . . affect how the claims of the [bond] holders are treated under any restructuring of the [municipality's] indebtedness." *Bank of N.Y. Mellon v. Jefferson Cnty., Ala.* (*In re Jefferson Cnty., Ala.*), 482 B.R. 404, 418 (Bankr. N.D. Ala. 2012). However, where, as was the case in *Fano* and as is the case here, pledged revenues are sufficient to cover debt service, a plan that does not provide bondholders with the full value to which they are entitled does not satisfy the "best interests of creditors" test.

28.     It is undisputed that the DWSD Bond Claims, including the claims arising under the BHAC Insured Bonds, are secured by valid and perfected statutory liens on DWSD revenues (net of operating expenses), which revenues have been fully sufficient to pay debt service on these bonds, and according to the City's own projections would be fully sufficient to continue to honor these bonds. Despite these projections, however, the Plan provides holders of DWSD Bond Claims with new bonds secured by liens on DWSD revenues with the same face amounts as their existing bonds, but with reduced interest rates and/or no, or more limited, call protection, and subject to significant collateral impairment as a result of the accelerated funding of DWSD's alleged share of underfunded GRS liabilities with priority over bond payments. These features will make the new bonds worth less than their face amounts—and therefore less than the allowed amounts of the secured DWSD Bond Claims—on the effective date of the Plan. In essence, the City's proposed Plan treatment for the DWSD Bond Claims is to take fully

secured claims, pay them less than full value despite having the ability to satisfy them in full, and redistribute value instead to unsecured creditors.

29.     The City does not explain why DWSD Bond Claims must be impaired in the first place or whether the City has explored alternatives that do not involve modifying the terms of the existing bonds or that would provide full value or other treatment satisfactory to the DWSD stakeholders.  As a result, the City has not satisfied its burden of proving that the proposed impairment of the DWSD Bond Claims is in the best interests of creditors as required by section 943(b)(7) of the Bankruptcy Code.

**C.      The Plan Has Not Been Proposed In Good Faith Under 11 U.S.C. § 1129(A)(3).**

30.     The Plan should not be confirmed on the further ground that the Plan has not been proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.  11 U.S.C. § 1129(a)(3) (expressly adopted in chapter 9 cases pursuant to 11 U.S.C. § 901).  When, "based on the totality of the circumstances," a plan fails to "achieve a result consistent with the objectives and purposes of the Bankruptcy Code," it must be rejected as having not been proposed in good faith.  *In re Dow Corning Corp.*, 255 B.R. 445, 498 (E.D. Mich. 2000) *aff'd and remanded on other grounds*, 280 F.3d 648 (6th Cir. 2002).

31.     As discussed above, it is clear that the DWSD Bond Claims are fully secured and that, based on the City's own projections, revenues securing these claims are sufficient to service the debt.  The City's "failure…to use the full reach of its disposable resources to repay creditors is evidence that [the Plan] is not proposed in good faith[.]"

16

*Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1001 (E.D. Va. 1994) (citing *In re Kemp*, 134 B.R. 413, 415 (Bankr. E.D. Cal. 1991)).  By failing to explain why the DWSD Bonds Claims must be impaired in the first place or whether the City has explored alternatives that do not involve modifying the terms of the existing bonds or that would provide full value or other treatment satisfactory to the DWSD stakeholders, the City has failed to satisfy its burden of proving that the Plan was proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.

**D.      The Plan Is Not Fair And Equitable Under 11 U.S.C. § 1129(B)(2)(A).**

32.      Even if this Court finds that the City has met its burden of showing that the Plan is in the best interests of creditors and was proposed in good faith, the Plan is still not confirmable over the objection of the parties entitled to vote the DWSD Bond Claims because it is not fair and equitable under section 1129(b)(1) of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(b)(1).

33.      With regard to secured claims such as the DWSD Bond Claims, section 1129(b)(2)(A) of the Bankruptcy Code provides three alternative methods for achieving "fair and equitable" treatment.  A secured creditor is offered "fair and equitable" treatment under a proposed plan, which therefore can be confirmed over the creditor's objection, if that plan provides:

> (i)  (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

*See id.* at § 1129(b)(2)(A).

34.     Because the Plan does not purport to sell the collateral securing the DWSD Bond Claims, the Plan can be confirmed only if it provides holders of these claims with either (i) a continuing security interest in water or sewer revenues, as applicable, and deferred cash payments totaling at least the allowed amount of their claims, of a value, as of the effective date of the Plan, of at least the value of their interest in the pledged revenues or (ii) the indubitable equivalent of their claims. *Id.* As discussed below, the City has not shown, and cannot show, that the Plan satisfies either standard.

**i.** **The Plan Does Not Provide Holders Of DWSD Bond Claims With Deferred Payments With A Value, As Of The Plan Effective Date, Of At Least The Value Of Their Interest In The Pledged Revenues and Therefore Fails to Meet the Requirements Of 11 U.S.C. § 1129(B)(2)(A)(I).**

35.     Under the Plan, holders of DWSD Bond Claims will receive, in satisfaction of their claims, either (i) new bonds with the same principal amounts but lower interest rates (and, for certain classes, more limited call protection) or (ii) for any class that votes in favor of the Plan, new bonds with the same principal amounts and interest rates but without any call protection.  In addition, the Plan requires DWSD to fund, on an accelerated basis and prior to payment of debt service on the new bonds, its alleged share of underfunded GRS liabilities.

36.     The reduction of interest rates means that the proposed new bonds are less valuable than the current ones.  The City explains that it created "a yield curve" in order to "provide the bondholders with a par recovery based on existing maturities," and lowered interest rates based on that curve.  Disclosure Statement at 63.  However, the City has not provided any of the underlying information on which it relied to adjust interest rates.  All other terms being equal, a bond with a lower interest rate is worth less than the same bond with a higher interest rate.

37.     The elimination of call protection means that the proposed new bonds are less valuable than the current ones.  Holders of DWSD Bond Claims may elect to receive bonds with the same principal amounts and interest rates but without any call protection.  As with the reduction of interest rates, eliminating (or limiting) call protection affects the market value of a bond: a bond with call protection is worth more than the same bond

15

with no (or limited) call protection.  *See* 7 Collier on Bankruptcy ¶ 1129.04[2][a][v]

(Alan N. Resnick & Henry J. Sommer eds., 16th Ed. 2014) ("[L]oans have different rates

depending, for example, on whether they are recourse or nonrecourse, or whether they

may be pre-paid without penalty.").

   38. The impairment of collateral means that the proposed new bonds are less

valuable than the current ones.  The Plan's requirement that DWSD fund, on an

accelerated basis and prior to payment of debt service on the new bonds, its share of

underfunded GRS liabilities diminishes the collateral otherwise available for these bonds,

thereby impairing their value.  A bond secured by collateral is worth more than the same

bond secured by more limited collateral.

   39. Although the new bonds will have the same face amounts as the existing

bonds and will retain a lien on DWSD revenues, the other features enumerated above will

make them worth less than the allowed amounts of the DWSD Bond Claims to which

holders of these claims are entitled.  Despite having the statutory burden of proof, the

City has not shown, and cannot show, that the new bonds (with lower interest rates and/or

no or more limited call protection, as well as significant collateral impairment resulting

from the accelerated funding of DWSD's share of underfunded GRS liabilities) satisfy

the requirements of section 1129(b)(2)(A)(i) of the Bankruptcy Code.

ii.      **The Plan Does Not Provide Holders Of DWSD Bond Claims With The Indubitable Equivalent Of Their Claims And Therefore Fails To Meet The Requirements Of 11 U.S.C. § 1129(B)(2)(A)(III).**

40.      The concept of "indubitable equivalence" was first suggested by Judge Learned Hand in *Metropolitan Life Insurance v. Murel Holding Corp.* (*In re Murel Holding Corp.*), 75 F.2d 941, 942 (2d Cir. 1935), and later adopted in the Bankruptcy Code. *See* 11 U.S.C. § 1129(b)(2)(A)(iii). Interpreting a predecessor statute to the Bankruptcy Code, which stated a plan must "provide adequate protection" for secured creditors, Judge Hand held:

> It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Murel*, 75 F.2d at 942. As the concept has been adopted in the Bankruptcy Code, the "indubitable equivalent" standard has been interpreted to require "both the absence of any reasonable doubt that the secured creditor will receive the payments to which it is entitled, and that the changes forced upon the objecting creditor are 'completely compensatory,' meaning the objecting creditor is ***fully compensated for the rights it is giving up***." *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc.* (*In re Inv. Co. of the Sw., Inc.*), 341 B.R. 298, 324 (B.A.P. 10th Cir. 2006) (emphasis added).

41.    The Plan does not provide **any** compensation for the rights proposed to be taken away from holders of DWSD Bond Claims.  As described above, holders of DWSD Bond Claims will receive new bonds under the Plan that are not worth the allowed amount of these claims.  Therefore, the City has not shown, and cannot show, that the Plan provides holders of DWSD Bond Claims with the indubitable equivalent of their claims.

*[remainder of page intentionally left blank]*

WHEREFORE, BHAC respectfully requests that this Court deny confirmation of the Plan for the reasons set forth in this Objection and grant BHAC such further relief as this Court deems just and proper.

Dated: New York, New York
       May 12, 2014

Respectfully submitted,

/s/ My Chi To

DEBEVOISE & PLIMPTON LLP

M. Natasha Labovitz
My Chi To
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
nlabovitz@debevoise.com
mcto@debevoise.com

*Attorneys for Berkshire Hathaway Assurance Corporation*