# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------------x

|  |  |
|---|---|
| In re | : Chapter 9 |
|  | : |
| CITY OF DETROIT, MICHIGAN, | : Case No. 13-53846 |
|  | : |
| Debtor. | : Hon. Steven W. Rhodes |
|  | : |
|  | : |

-----------------------------------------------------------x

## OBJECTION OF FINANCIAL GUARANTY INSURANCE COMPANY TO PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

US_ACTIVE:\44450069\10\45259.0007

# **Table of Contents**

FACTUAL BACKGROUND ..............................................................................................2

THE COURT SHOULD DENY CONFIRMATION OF THE PLAN ...........................4

    I.     THE PLAN IS NOT IN THE BEST INTERESTS OF CREDITORS
           BECAUSE IT FAILS TO MAXIMIZE VALUE ......................................................4

         A.     The Plan Fails to Maximize the Value of the DIA Assets ...........................6

         B.     The Plan Fails to Maximize the Value of City-Owned Real Estate ..........10

    II.    THE PLAN IS NOT IN THE BEST INTERESTS OF CREDITORS
           BECAUSE IT FAILS TO PROVIDE CREDITORS A BETTER
           ALTERNATIVE
           THAN WHAT THEY WOULD HAVE OUTSIDE OF BANKRUPTCY ...........11

    III.   THE PLAN DOES NOT SATISFY THE CRAMDOWN
           REQUIREMENTS BECAUSE IT IS UNFAIR AND DISCRIMINATES
           AGAINST CLASS 9 ..........................................................................................12

         A.     The Plan Unfairly Discriminates Against COP Claims by
                Providing Other Unsecured Creditors of the Same Priority
                Substantially Greater Recoveries ...............................................................14

         B.     The Plan is Not Fair and Equitable With Respect to Class 9....................19

    IV.   THE PLAN IS NOT FEASIBLE ........................................................................21

    V.    THE PLAN WAS NOT PROPOSED IN GOOD FAITH ....................................22

    VI.   THE PLAN SHOULD NOT EXCULPATE
           THE RETIREMENT SYSTEMS FROM LIABILITY IN
           CONNECTION WITH THE 2005 AND 2006 COPS TRANSACTIONS ..........24

CONCLUSION............................................................................................................25

US_ACTIVE:\44450069\10\45259.0007

Financial Guaranty Insurance Company ("**FGIC**") files this objection (the "**Objection**") to the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, dated May 5, 2014* [Docket No. 4392] (as may be amended or supplemented, the "**Plan**").[1] In support of this Objection, FGIC respectfully states as follows:

---

**The Plan <u>cannot</u> be confirmed for at least the following nine reasons**:

- The Plan is <u>**not in the best interests of creditors**</u> because it <u>**fails to maximize the value of non-core City assets**</u>, including the DIA Assets and City owned real estate.

- The DIA Settlement is a <u>**fraudulent transfer**</u> under Michigan law.

- The DIA Settlement is <u>**not fair, equitable or reasonable**</u>.

- The Plan is <u>**not in the best interests of creditors**</u> because it <u>**fails to provide creditors with a better alternative than**</u> what they would have <u>**outside of chapter 9**</u>.

- The Plan <u>**unfairly discriminates**</u> against Class 9 by providing materially higher and less risky recoveries to other Classes of the same priority.

- The Plan is <u>**not fair and equitable**</u> with respect to Class 9 because it <u>**fails to maximize the value of non-core City assets**</u> and <u>**diverts**</u> certain <u>**transaction proceeds to enhance the recoveries of other Classes**</u> of the same priority.

- The Plan is <u>**not feasible**</u> because it <u>**fails to establish the City's ability to make future payments**</u> under the Plan in the event the COPs are invalidated and the <u>**Retirement Systems are forced to disgorge the COPs transaction proceeds**</u>.

- The Plan is <u>**not feasible**</u> because it <u>**fails to establish a post-Effective Date governance structure**</u> that ensures the Plan will be implemented.

- The City has <u>**not proposed**</u> the Plan <u>**in good faith**</u>, as the City is trying to use the Plan simultaneously as a sword to force certain creditors to accept unreasonably low and uncertain recoveries and a shield to retain its most valuable assets.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

US_ACTIVE:\44450069\10\45259.0007

# FACTUAL BACKGROUND

1.      Prior to the commencement of this chapter 9 case, FGIC issued financial guaranty insurance policies guarantying the payment of the principal of and interest on certain COPs (approximately $1.1 billion in aggregate principal amount of which were outstanding as of the Petition Date)[2] and DWSD Bonds (approximately $512 million in aggregate principal amount of which were outstanding as of the Petition Date).[3]

2.      On July 18, 2013, the City filed a petition for relief under chapter 9 of the Bankruptcy Code in the Bankruptcy Court.

3.      On May 5, 2014, the City filed the Plan.  The Plan classifies the DWSD Bonds Claims related to the DWSD Bonds FGIC insured in Classes 1A-5-1A-21, 1A-96-1A-112, and 1A-243 and the COP Claims related to the COPs that FGIC insured in Class 9.  (Plan Ex.I.A.110, § II.B.1.)

4.      A central component of the Plan is the irrevocable transfer of the DIA Assets to DIA Corp. in exchange for the DIA Proceeds, pursuant to the DIA Settlement.  The DIA Proceeds, as well as the State Contribution (on which the DIA Settlement is contingent), will be earmarked toward recoveries for Holders of Pension Claims in Classes 10 and 11.[4] Assuming receipt of the full amount of the State Contribution and the DIA Proceeds, the City

---

[2] A detailed description of the COPs transaction structure, including the relevant COPs transaction documents, is set forth in *FGIC's Motion to Intervene Pursuant to Rule 7024 of the Federal Rules of Bankruptcy Procedure and Section 1109(b) of the Bankruptcy Code*, filed on March 17, 2014 in the COP Litigation [Docket No. 11] (the "**Motion to Intervene**"), as well as in FGIC's proofs of claim numbered 1195 and 1190.

[3] Detailed descriptions of the relevant DWSD Bond transaction structures, including the relevant transaction documents, are set forth in FGIC's proofs of claim numbered 1185 and 1191.

[4] The terms of the DIA Settlement and the State Contribution Agreement are described in greater detail in the Plan and the Disclosure Statement and in Section I.A below.  (Plan §§ II.B.3.q.ii, II.B.3.r.ii, IV.E, IV.F, Ex. I.A.91, Ex. I.A.268; DS §§IV.E, IV.F, VI.E.)

US_ACTIVE:\44450069\10\45259.0007
2

projects that Holders of PFRS Pension Claims in Class 10 will recover 59% in cash and Holders of GRS Pension Claims in Class 11 will recover 60% in cash, each on a net present value basis. (Disclosure Statement ("**DS**") § II.B, Ex. K at 3.)  Assuming the City is unsuccessful in the COP Litigation and the COP Claims are allowed in full, Holders of COP Claims in Class 9 will receive their Unsecured Pro Rata Share of New B Notes, which the City projects will yield a recovery of 10% on a net present value basis.  (Plan § II.B.3.p.iii.B; DS §II.B, Ex. K at 3.)[5]

       5.       On April 21, 2014, this Court entered the *Fourth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 4202] (the "**Scheduling Order**"), establishing July 11, 2014 as the deadline for submitting votes in respect of the Plan (the "**Voting Deadline**").  The Scheduling Order also established May 12, 2014 as the deadline for parties other than individual bondholders and individual retirees to file objections to the Plan.  Pursuant thereto, FGIC files this Objection.[6]

---

[5] A more detailed description of the terms of the Plan, including the treatment of creditors, is set forth in the Plan as well as the Disclosure Statement.

[6] FGIC reserves all rights to supplement or amend this Objection, including, without limitation, pursuant to paragraphs 18 and 19 of the Scheduling Order, which provide for parties to file supplemental plan objections and pretrial briefs in respect of plan confirmation.  FGIC reserves the right to make additional arguments (or join any arguments of other objecting parties) in support of its objection to confirmation of the Plan, including without limitation, that the Plan should not be confirmed because (i) the releases and injunctions set forth in the Plan are improper, (ii) the releases set forth in the settlements and compromises contemplated by the Plan are improper, (iii) the Plan unfairly discriminates against Class 9 by providing Class 8 (UTGO Bond Claims) materially higher and less risky recoveries, (iv) the Plan is not in the best interests of creditors because it fails to provide for a reasonable restructuring of the City's operations that maximizes value, (v) the Plan COP Settlement is not fair, equitable or reasonable and fails to satisfy the standards for approving settlements pursuant to Bankruptcy Rule 9019 and (vi) the Plan's treatment of DWSD Bonds is improper.  In addition, FGIC is not presenting any evidence in support of this Objection at this time, but will do so pursuant to its pre-trial brief to be submitted in advance of the Confirmation Hearing and as part of the evidentiary record developed at such hearing.

3

## THE COURT SHOULD DENY CONFIRMATION OF THE PLAN

6.      The Court may only confirm the Plan if it complies with each and every element of section 943(b) of the Bankruptcy Code, including those provisions of section 1129 applicable in chapter 9 cases. 11 U.S.C. §943(b). The City bears the burden of proving, by a preponderance of the evidence, that the Plan satisfies these requirements.[7] *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) (*citing In re Mount Carbon Metro. Dist.* 242 B.R. 18, 31 (Bankr. D. Colo. 1999)). Although the City has yet to articulate its legal arguments in support of confirmation, it is clear from the face of the Plan and the Disclosure Statement that the City is incapable of satisfying this burden because: (1) the Plan does not maximize the value of City assets; (2) the compromises and settlements in the Plan are not reasonable; (3) the Plan does not provide creditors with a better alternative than what they would have outside of chapter 9; (4) the Plan unfairly discriminates against, and is not fair and equitable to, dissenting creditors; (5) the Plan is not feasible; and (6) the Plan has not been proposed in good faith.

## I.      THE PLAN IS NOT IN THE BEST INTERESTS OF CREDITORS BECAUSE IT FAILS TO MAXIMIZE VALUE

7.      Section 943(b)(7) provides that a chapter 9 plan of adjustment must be "in the best interests of creditors." 11 U.S.C. § 943(b)(7). Courts have construed section 943(b)(7) as setting a "floor requiring a reasonable effort at payment of creditors by the municipal debtor." *Pierce Cnty. Housing Auth.*, 414 B.R. at 718 (*citing Mount Carbon*, 242 B.R. at 34; 6-943

---

[7] Neither the Court nor the City should construe the schedule set forth in the Scheduling Order – which provides that parties' objections to the Plan are due before the City has filed its arguments in support of confirmation – as in any way shifting this burden of proof. Although the Scheduling Order does not explicitly require the City to file a legal brief in support of confirmation, and instead provides deadlines by which the City must file responses to timely Plan objections (*see* Scheduling Order ¶¶ 8, 19), FGIC submits that, in order to satisfy its burden of proof, the City must address each and every confirmation requirement, whether or not objected to.

US_ACTIVE:\44450069\10\45259.0007

4

Collier on Bankruptcy ¶ 943.03 ("A plan that makes little or no effort to repay creditors over a reasonable time may not be in the best interest of creditors.")).

8.      Making a reasonable effort to repay creditors over a reasonable time means "afford[ing] all creditors the potential for the greatest economic return from [the] Debtor's assets." *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012) (approving a chapter 9 plan providing for a sale of substantially all of the debtor's assets "for a fair price" as being in the best interests of creditors because it allowed the debtor to realize going concern value for its assets and distribute that value to its creditors); *In re Bamberg Cnty. Mem'l Hosp.*, Case No. 11-03877, 2012 WL 1890259, at *8 (Bankr. D.S.C. May 23, 2012) (same); *In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011) (approving a chapter 9 plan that provided for the issuance of amended and restated bonds that would be paid from certain revenues of the debtor as being in the best interests of creditors).  Although a municipal debtor is not required to liquidate, a chapter 9 plan must maximize the value of the municipality's assets to enhance creditor recoveries.  *See* S. R. No. 95-989, 95th Cong., 2d Sess. 113 (1978) ("Creditors must be provided, under the plan, the going concern value of their claims. The going concern value . . . is intended to provide more of a return to creditors than the liquidation value if the city's assets could be liquidated like those of a private corporation."); *see also Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 565-66 (9th Cir. 1940) (holding that a chapter 9 plan failed the best interest of creditors test where the debtor (i) owned "assets in value many times the indebtedness, all in most excellent physical and almost new condition" and (ii) failed to make a "sufficient showing that [its] taxing power was inadequate to raise the taxes to pay" prepetition claims.

US_ACTIVE:\44450069\10\45259.0007

5

9.      Originally, the City understood its obligation to provide creditors with the greatest recovery possible, as evidenced in its June 14, 2013 Proposal for Creditors, where the City described its restructuring objectives as including "[m]aximiz[ing] recoveries for creditors" and "[g]enerat[ing] value from City assets where it is appropriate to do so." (City of Detroit: Proposal for Creditors, attached as Exhibit A to the *Declaration of Kevyn D. Orr*, filed July 18, 2013 [Docket No. 11] (the "**Proposal for Creditors**") at 41.) The City's Plan, however, has abandoned these objectives and fails to maximize the value of at least two significant categories of City assets: (1) the DIA Assets and (2) City-owned land.

## A.      The Plan Fails to Maximize the Value of the DIA Assets

10.      The Plan provides for the transfer of the DIA Assets to DIA Corp., to be held in perpetual charitable trust in the City, purportedly as a comprehensive settlement regarding disputes related to the rights of the City, the Retirement Systems, DIA Corp. and the State with respect to the DIA Assets. (Plan § IV.F, Ex. I.A.91.) In exchange, twelve Foundations and DIA Corp. will provide the DIA Proceeds – $466 million in contributions to the Retirement Systems over a 20-year period. *Id.* Even if the Foundations default, the DIA assets will remain in trust with DIA Corp. (DS § IV.F.2.) This transaction, which has a present value of (at best) approximately $300 million, does not maximize the value of the DIA Assets.[8]

---

[8] Pursuant to the State Contribution Agreement, the State has agreed (subject to the fulfillment of multiple conditions) to contribute to the Retirement Systems lump sum payments in the aggregate amount of $194.8 million (which is equal to the net present value of $350 million over 20 years, using a discount rate of 6.75%). (Plan Ex. I.A.268 at 2.) Although the Disclosure Statement indicates that the State's contribution is "in support of the DIA Settlement," it also explicitly notes that the State is providing the contribution "in exchange for certain releases to be contained in the Plan," and *not* in exchange for the transfer of the Art. (DS § VIII.L.7(b).) Accordingly, the State Contribution should be disregarded for purposes of evaluating the Plan's treatment of the DIA Assets. However, even taking the State Contribution into account, for the reasons set forth herein and as will be evidenced at trial, the Plan *still* significantly undervalues the DIA Assets.

(i)    *The DIA Proceeds Fall Below the Christie's Range*

11.    The net present value of the DIA Proceeds the City would receive pursuant to the Plan in exchange for the transfer of the *entire* collection comprising the DIA Assets is only approximately $300 million (using a 5% discount rate). This is substantially below the low end of the range of the estimated value assessed by the City's appraiser, Christie's, with respect to only 4% of the DIA Assets. Christie's appraisal estimated the value of 2,773 (4%) of the 65,000 works in the collection to be between $454 million and $867 million. (DS § VIII.L.7(a).)[9]

(ii)    *The Market Value of the DIA Assets Far Exceeds the DIA Proceeds*

12.    In addition, market indicators confirm that the DIA Proceeds significantly undervalue the DIA Assets. After exposing publicly-available information about the DIA Assets to the market, Houlihan Lokey ("**Houlihan**"), FGIC's financial advisor, procured four indications of interest (collectively, the "**Proposals**") in acquiring or monetizing all or a portion of the DIA Assets for as much as $2 billion – up to $1.7 billion more than the DIA Proceeds. (*See* Spencer Decl. ¶¶11-13;[10] DS § VIII.L.7(a).) The potential transactions described in the Proposals range from an outright sale of all of the DIA Assets for $1.75 billion, to a sale of only a portion of the DIA Assets (*i.e.* 116 pieces, or 0.2%) for $896 million to $1.473 billion, or a sale of all Chinese works for up to $1 billion. (Spencer Decl. at ¶ 12-13; DS § VIII.L.7(a).) In addition, one of the Proposals contemplates using the DIA Assets as collateral for a $2 billion

---

[9] FGIC is referencing the Christie's valuation range to illustrate the point that the DIA Proceeds are significantly less than the value of the DIA Assets; however, FGIC disagrees that the Christie's valuation accurately reflects the value of the DIA Assets (which FGIC believes is much higher) and reserves all rights to argue that a different valuation of the DIA Assets or valuation methodology is appropriate.

[10] Declaration of Stephen Spencer, Exhibit 5 to the *Corrected Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts*, dated April 9, 2014 [Docket No. 3025].

non-recourse loan to the City.  (Spencer Decl. at ¶ 12-13; DS § VIII.L.7(a).)  When assessing the

DIA Settlement and whether it maximizes value in accordance with the best interests test, the

Court should give these Proposals, any resulting binding offers, and any other evidence

presented by FGIC and other objecting parties regarding the market value of the DIA Assets

serious consideration, as the Supreme Court has recognized that market exposure is the best way

to determine value.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526

U.S. 434, 457 (1999) (noting that "[u]nder a plan granting an exclusive right, making no

provision for competing bids or competing plans, any determination that the price was top dollar

would necessarily be made by a judge in bankruptcy court, whereas the best way to determine

value is exposure to a market").

        13.     Indeed, at the Confirmation Hearing, parties will provide evidence to show

that the value of the DIA Settlement is so low that it amounts to a fraudulent transfer under

Michigan law.  Michigan law provides that a transfer is constructively fraudulent where (i) there

is a creditor with a claim predating the transfer, (ii) the debtor was insolvent at the time of the

transfer, and (iii) the debtor received less than reasonably equivalent value in exchange for the

transferred property.  Mich. Comp. Laws § 566.35.  There is no question that the City is

insolvent and has significant prepetition claims pending against it.  *See In re City of Detroit,

Mich.*, 504 B.R. 97, 113, 169 (Bankr. E.D. Mich. 2013) (finding the City insolvent and noting

that "[t]he evidence [presented in support of the City's eligibility] was overwhelming that the

City is unable to pay its debts as they become due").  As discussed above, and as will be

demonstrated further at the Confirmation Hearing, the City will receive in exchange for its

transfer of the DIA Assets proceeds far less than the reasonably equivalent value of such assets.[11]

---

[11] As a result, the Plan also violates section 943(b)(4), which requires the City to prove that it is not
prohibited by State law from taking any action necessary to carry out the Plan.  11 U.S.C. § 943(b)(4).

US_ACTIVE:\44500089\10\45259.0007

14.    Any attempt by the City to justify the discounted consideration to be received in exchange for the transfer DIA Assets on the basis that the City is resolving alleged disputes pursuant to the DIA Settlement is unsupported.  Pursuant to section 1123(b)(3)(A) (made applicable in chapter 9 by sections 901(a) and 943(b)(1)), a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor."  11 U.S.C. § 1123(b)(3)(A).  As the City recognized in the Disclosure Statement, "[t]he standards for approving settlements as part of a plan of reorganization are the same as standards for approving settlements under Fed. R. Bankr. P. 9019."  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 135 (Bankr. D.N.J. 2010) (*citing In re Nutritional Sourcing Corp.,* 398 B.R. 816, 832 (Bankr. D. Del. 2008)); *see* DS § III.F.1, VI.F.  In considering approval of a settlement under Bankruptcy Rule 9019, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable."  *In re McInerney*, 499 B.R. 574, 582 (Bankr. E.D. Mich. 2013) (*citing Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988)); *see also In re City of Detroit, Michigan*, Bench Op. Jan. 16, 2014 6:25-7:4.  In addition, "the Court is required to exercise independent judgment regarding the factors relevant to the reasonableness of the settlement."  *McInerney*, 499 B.R. at 595.  In evaluating whether a settlement is fair, equitable and reasonable, courts in the Sixth Circuit generally consider four factors:  (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views.  *Bard v. Sicherman (In re Bard)*, 49 F. App'x 528, 530 (6th Cir. 2002)

US_ACTIVE:\44450089\10\45259.0007

9

(citations omitted); *see also In re City of Detroit, Michigan*, Bench Op. Jan. 16, 2014 7:5-22; (DS § VIII.L.3.(d)).  The City, as the proponent of the DIA Settlement, has the burden of establishing that the settlement, including the consideration the City would receive, is fair, equitable and reasonable taking into account these considerations.  *McInerney*, 499 B.R. at 583.

15.     Thus far, the City has offered little explanation of the claims or issues to be resolved pursuant to the DIA Settlement, or information relating to the above-identified factors that courts rely on in evaluating a proposed settlement.  Accordingly, the City has not even come close to meeting its burden of establishing that the DIA Settlement is fair, equitable and reasonable.  FGIC reserves all rights to respond to any argument the City may in the future raise in this regard.

### B.     The Plan Fails to Maximize the Value of City-Owned Real Estate

16.     According to the Disclosure Statement, the City owns approximately 60,000 parcels of vacant land and approximately 10% of the 78,000 vacant structures within City limits.  (DS § VII.A. 5(b).)  Although the Disclosure Statement mentions the City's efforts to "address blight, remove vacant structures and encourage beneficial uses of City-owned land," (*id.*) any proposed monetization or other treatment of this real estate is conspicuously absent from the Plan.  The City speculates, without basis, that the vast majority of City-owned parcels have "limited present commercial value," (*id.*) but creditors will demonstrate at trial that the land actually has significant value.  In order to make a reasonable effort to repay creditors, the Plan must include a strategy for monetizing this asset to enhance creditor recoveries.  *C.f. In re Sullivan Cnty. Reg'l Refuse Disposal Dist.* 165 B.R. 60, 78 (Bankr. D.N.H. 1994) (noting that, in the context of eligibility, "[a] commercial party can hardly 'negotiate in good faith' regarding unpaid obligations if it . . . *refuses to acknowledge or throw into the negotiating equations a large and significant asset it holds*") (emphasis added); *Fano*, 114 F.2d at 565-66 (concluding

US_ACTIVE:\44450089\10\45259.0007

that where, among other things, the debtor owned "assets in value many times its indebtedness," the plan was not in best interests of creditors).  Because the Plan fails to do so, it is not in the "best interests of creditors" within the meaning of section 943(b)(7).

## II. THE PLAN IS NOT IN THE BEST INTERESTS OF CREDITORS BECAUSE IT FAILS TO PROVIDE CREDITORS A BETTER ALTERNATIVE THAN WHAT THEY WOULD HAVE OUTSIDE OF BANKRUPTCY

17.    Courts have also construed section 943(b)(7)'s best interests of creditors test "as requiring that a proposed plan provide a better alternative for creditors than what they already have."  *Mount Carbon*, 242 B.R. at 34; *see also Matter of Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) (section 943(b)(7) "requires the Court to make a determination of whether or not the plan as proposed is better than alternatives").  Generally, the only alternative to confirmation of a plan of adjustment is dismissal of the chapter 9 case, leaving creditors to exercise any state law remedies they have against the municipality.  *In re Cnty. of Orange*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) ("In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds.") (*quoting* 4 *Collier on Bankruptcy*, ¶ 943.03(7) (15th ed. 1995)); *Matter of Sanitary & Improvement Dist., No. 7*, 98 B.R. at 975 ("The alternative to a confirmation of a plan similar to the one before the Court is dismissal of the case. That would permit the parties to go back to state court and permit the state judge to order the debtor to levy sufficient taxes to pay all prepetition bonds plus accrued interest in full.").

18.    Outside of bankruptcy, the City's unsecured creditors (including Holders of COP Claims) could file lawsuits and obtain judgments against the City for failure to pay any unsecured claims that arise (including COP Claims).  Pursuant to the Revised Judicature Act of 1961, to the extent the City failed to pay such judgments from another source, the City would be

US_ACTIVE:\44450089\10\45259.0007

required to assess and collect taxes equal to the amounts owed. MCL 600.6093(1).[12] The

evidence presented at the Confirmation Hearing will likely show that, in order to avoid raising

taxes, the City, acting rationally and with due care, would seek to monetize its valuable assets

that are not essential to the health, safety or welfare of its residents, including the DIA Assets

and City-owned land, resulting in higher recoveries for unsecured creditors, including Holders of

COP Claims, than under the Plan. In addition, the evidence is likely to show that, even if the

City (i) did not monetize its non-core assets and (ii) as a practical matter, would not be able to

raise taxes in the near-term sufficient to satisfy in full judgments obtained by unsecured

creditors, Holders of COP Claims would *still* be better off if the chapter 9 case was dismissed.

This is because, under the Plan, recoveries for recipients of the New B Notes (including Holders

of COP Claims) are capped at an unreasonably low level (10%, pursuant to the City's

projections). Accordingly, Holders of COP Claims would be better off outside of bankruptcy,

where they would retain the right to collect on any unpaid judgments and, thus, be able to

enhance their recoveries to the extent the City is ultimately able to increase its tax revenues.

Thus, the Plan is not in the "best interests of creditors" as required by section 943(b)(7).

## III. THE PLAN DOES NOT SATISFY THE CRAMDOWN REQUIREMENTS BECAUSE IT IS UNFAIR AND DISCRIMINATES AGAINST CLASS 9

19.     Although the Voting Deadline has not yet expired, it appears likely that

Class 9 (among others) will vote to reject the Plan. In this scenario, the Plan may only be

confirmed if it complies with the "cramdown" requirements set forth in section 1129(b) of the

---

[12] FGIC reserves the right to argue that, outside of chapter 9, creditors could also seek to enforce judgments against the City by forcing the sale of City assets that are not connected with any public function of the City. *See e.g. City of Sanford v. Dofnos Corp.*, 115 Fla. 795, 797-98 (1934) (holding that a municipality "equally with a private corporation, may have its property taken in execution in payment of the judgment if payment is not otherwise made, where the property levied upon and sought to be sold under execution is unconnected with any public function resting upon the municipal government"); 28 U.S.C. § 1610(a)(2) (providing that property used for commercial activity is exempt from the immunity from attachment or execution generally afforded to property of a foreign state in the United States).

US_ACTIVE:\44450089\10\45259.0007

12

Bankruptcy Code. *See* 11 U.S.C. § 943(b)(1) (requiring that a chapter 9 plan comply with the provisions of title 11 made applicable by sections 103(e) and 901); *id.* § 901 (making (among others) sections 1129(a)(8), 1129(b)(1), and 1129(b)(2)(A) and (B) applicable in chapter 9 cases); *id.* § 1129(b)(1) (providing that if not all impaired classes have accepted the plan in accordance with section 1129(a)(8), the plan may only be confirmed if it complies with the requirements of section 1129(b)(1)); *see also In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 458 (Bankr. S.D. Ohio 2011) ("Confirmation of a nonconsensual plan 'is commonly known in bankruptcy parlance as a "cramdown" because the plan is crammed down the throats of the [non-accepting] class(es) of creditors.'") (*quoting Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 906 (9th Cir. 1993)).

20.     Section 1129(b)(1) requires that a plan not discriminate unfairly against, and be fair and equitable with respect to, each class of impaired claims that has not accepted the plan.  11 U.S.C. § 1129(b)(1).  Class 9 is designated as impaired by the Plan.  (Plan § II.B.1.)  Thus, if Class 9 rejects the Plan, the City bears the burden of proving, by a preponderance of the evidence, that the Plan does not discriminate unfairly, and is fair and equitable, with respect to Class 9.  *In re Dow Corning Corp.*, 244 B.R. 696, 700 (Bankr. E.D. Mich. 1999) ("The Proponents have the burden of proving all elements of § 1129(b)(1) by a preponderance of the evidence."); *see also Pierce Cnty. Housing Auth.*, 414 B.R. at 715 (noting that the debtor in a chapter 9 case bears the burden of satisfying the confirmation requirements of section 943(b), which incorporates the requirements of section 1129(b)).  For the reasons that follow, the Plan cannot be confirmed over the dissent of Class 9.

US_ACTIVE:\44450089\10\45259.0007

## A. The Plan Unfairly Discriminates Against COP Claims by Providing Other Unsecured Creditors of the Same Priority Substantially Greater Recoveries

21.     As "[t]he Bankruptcy Code lacks any criteria or standards for determining whether a plan unfairly discriminates" against a dissenting class of creditors, bankruptcy courts have developed various tests to decide this issue. *Dow Corning Corp.*, 244 B.R. at 700. In the Eastern District of Michigan, the prevailing standard is the presumption-based standard, first adopted in *Dow Corning*:[13] Pursuant to this test, a presumption of unfair discrimination arises where there exists:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of the percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Dow Corning* 244 B.R. at 702 (*citing* Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227, 228 (1998)); *see also In re Dow Corning Corp.*, 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999) (applying the presumption-based standard in a sister opinion); *In re BWP Transport, Inc.*, 462 B.R. 225, 231 (Bankr. E.D. Mich. 2011) (applying the *Dow Corning* presumption-based standard).[14] Once established, the presumption of unfairness resulting from a significant recovery differential may only be rebutted by the plan proponent

---

[13] Courts in other jurisdictions have adopted this test as well. *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121-22 (D. Del. 2006); *In re Tribune Co.*, 472 B.R. 223, 242 (Bankr. D. Del. 2012); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010); *In re Unbreakable Nation Co.*, 437 B.R. 189, 202 (Bankr. E.D. Pa. 2010); *In re Quay Corp., Inc.*, 372 B.R. 378, 386 (Bankr. N.D. Ill. 2007); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228-32 (Bankr. D.N.J. 2000).

[14] Although the district court considered and affirmed the *Dow Corning* bankruptcy court's finding (in its 244 B.R. 705 opinion) that the plan did not unfairly discriminate against a particular class, in doing so the district court did not explicitly address the bankruptcy court's use of the presumption-based standard. However, since *Dow Corning*, courts in this and other districts have applied the presumption-based standard.

US_ACTIVE:\44456089\10\45259.0007

14

proving that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the preferred class had infused new value into the reorganization, which offset its gain. *Id.* A plan proponent may only overcome the presumption of unfair treatment based on different risk allocation by proving that such allocation was consistent with the risk assumed by parties prepetition. *Id.*

22. The facts here establish a presumption of unfair discrimination under the *Dow Corning* standard: (1) Class 9 (COP Claims) will reject the Plan; (2) Classes 10 and 11 (PFRS Pension Claims and GRS Pension Claims, respectively) are of the same priority;[15] and (3) Class 9 is receiving under the Plan a materially lower percentage recovery than each of Classes 10 and 11 and a materially riskier form of distribution.

23. Specifically, the City projects that Holders of PFRS Pension Claims will recover **59%** and Holders of GRS Pension Claims will recover **60%**, while Holders of COP Claims will recover **only 10%**, in each case on a net present value basis. (DS § II.B, Ex. K at 3.)[16] Taking the City's projections at face value, the Plan provides a materially lower recovery for Class 9. FGIC and other objecting creditors will prove at the Confirmation Hearing that the differential in recoveries to these Classes is actually greater than the City projects.

---

[15] For purposes of the unfair discrimination test, "the appropriate inquiry focuses on discrimination among categories of creditors who hold similar legal claims against the debtor, *i.e.* 'Administrative Claims,' 'Secured Claims,' 'Priority Claims,' etc." *BWP*, 462 B.R. at 231 (*quoting Corestates Bank, N.A. v. United Chem. Techs., Inc.* 202 B.R. 33, 47 n. 12 (E.D. Pa. 1996)); *Trenton Ridge*, 461 B.R. at 495 (same). Thus, "all of the secured creditors are considered to have the same priority level," and the same holds true for creditors holding administrative claims, priority claims or unsecured claims. *BWP*, 462 B.R. at 231. COP Claims and Pension Claims are both unsecured contract claims; accordingly, COP Clams and Pensions Claims are of the same priority. *See infra* ¶¶ 24-25.

[16] The Forty-Year Projections attached to the Disclosure Statement as Exhibit K assume that the City loses the COP Litigation and the COP Claims are allowed in full. Accordingly, the City cannot purport to justify the disparity in estimated percentage recoveries or risk allocation between the Pension Claims and the COP Claims on the basis that the COP Claims are Disputed.

24.     The City cannot rebut the presumption of unfairness created by this disparity because, outside of chapter 9, Holders of COP Claims in Class 9 would have the same remedy – a claim for breach of contract – and the same priority and recovery prospects as Holders of Pension Claims in Classes 10 and 11.  *See* COP Service Contracts § 4.02(b) ("The obligations of the City hereunder, including its obligation to make Contract Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City."); *Detroit*, 504 B.R. at 153-54, 161 (concluding that "pension benefits are a contractual obligation of the municipality" and "the only remedy for impairment of pensions is a claim for breach of contract.").  Outside of chapter 9, the Contracts Clauses of the United States Constitution and the Michigan Constitution prohibit the City from impairing its contractual obligations, including both pension benefits and the City's obligation to make payments under the COP Service Contracts.  U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . law impairing the obligation of contracts"); Mich. Const. art. I, § 10 ("No . . . law impairing the obligation of contract shall be enacted"); Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.").  Similarly, although PA 436 gives an emergency manager some authority to impair the City's contractual obligations when it is in receivership, COP Claims and Pension Claims are both explicitly exempt.  PA 436 § 12(1)(j) (providing that an emergency manager may "[r]eject, modify, or terminate 1 or more terms and conditions of an existing contract"); *id.* at §11(1)(b) (requiring the emergency manager's financial and operating plan to provide for "[t]he payment in full of . . . contract obligations in anticipation of which bonds, notes and municipal securities

are issued"); *id.* at § 12(m)(ii) ("The emergency manager shall fully comply with . . . section 24 of article IX of the state constitution of 1963.").

25.     Accordingly, outside of chapter 9, COP Claims and Pension Claims share the same legal rights against the City and, thus, the same prospects for recovery on breach of contract claims.[17]  Indeed, in interpreting Article IX, Section 24 of the Michigan Constitution in the context of eligibility, the Court specifically rejected the argument that, under Michigan law, "pension benefits are entitled to greater protection than contract claims," and held that, even if they were, this would not be recognized by the Bankruptcy Code.  *Detroit*, 504 B.R. at 153, 161. Notably, in so holding, the Court adopted ***the City's*** interpretation of Article IX, Section 24 of the Michigan Constitution as "simply extending the protection of the federal and state contracts clauses to cover public pensions" and "elevat[ing] public pensions to *the same* level of constitutional protection that applied to 'obligations of contract' under the Contracts Clause." (*City of Detroit's Consolidated Reply to Objections to the Entry of an Order for Relief*, dated September 6, 2013 [Docket No. 0765] § V.B (emphasis added).)  Accordingly, the City cannot now attempt to justify the Plan's preferential treatment of Classes 10 and 11 by relying on a purported special protection for Pension Claims under Michigan law, which the City itself has denied exists.

26.     In addition, the Plan allocates materially greater risk to Class 9 than to Classes 10 and 11 in connection with each Class's proposed distribution.  The Plan provides that Holders of COP Claims will receive their Unsecured Pro Rata Share of New B Notes, which provide for interest-only payments for 10 years and amortization payments beginning 11 years after the Effective Date, payable solely from the City's General Fund.  (Plan § II.B.3.p.iii, Ex.

---

[17] The City has not asserted that Classes 10 and 11 are providing new value to the City, offsetting their preferential treatment.  To the extent the City raises this argument, FGIC reserves all rights to respond.

US_ACTIVE:\44450089\10\45259.0007

I.A.183.)  In contrast, for the first 10 years after the Effective Date, recoveries for Classes 10 and 11 will be funded by proceeds from the DIA Settlement and the State Contribution Agreement as well as pension-related, administrative and restructuring payments received from the DWSD. (*Id.* at §§ II.B.3.q.ii.A, II.B.3.r.ii.A.)  Thus, a significant portion of the near-term recoveries for Classes 10 and 11 will be funded by third parties, and are not dependent on the future financial condition of the City.  In addition, during this initial 10-year period, the Plan further bolsters recoveries for Classes 10 and 11 by providing for (i) an increase in the pension benefits payable to Holders of Pension Claims in the event the funding ratios of the Retirement Systems exceed certain thresholds (*id.* at §§ II.B.3.q.ii.C, II.B.3.r.ii.C, Ex.II.B.3.q.ii.C, Ex. II.B.3.r.ii.C) and (ii) Holders of Pension Claims to receive (through a Restoration Trust) 50% of the proceeds of any Qualifying DWSD Transaction that occurs within seven years of the Effective Date (*id.* at §§ II.B.3.q.ii.D, II.B.3.r.ii.E, IV.G).[18]  As will be demonstrated in the evidence presented at the Confirmation Hearing, these facts render the recovery prospects for Class 9 significantly riskier, by comparison.

27.     The City cannot overcome this presumption of unfair treatment by showing that the risk allocation is consistent with the risk assumed by the parties before the Chapter 9 Case because, as explained above and as will be presented in further detail in the evidence at trial, Holders of COP Claims and the Holders of Pensions Claims all entered into

---

[18] Although not explicitly addressed in the Plan, the Disclosure Statement indicates that the remaining 50% of the proceeds of a Qualifying DWSD Transaction will go to the City, and further suggests that the City may distribute such proceeds to Holders of Allowed Claims in Classes 7 (Limited Tax General Obligation Bond Claims), 13 (Downtown Development Authority Claims) or 14 (Other Unsecured Claims).  (DS § VIII.L.3.(d).ii.)  To the extent the City intends to distribute proceeds of a Qualifying DWSD Transaction to Holders of Allowed Claims in Classes 7, 13 or 14, and not to Holders of COP Claims in Class 9, FGIC submits that this constitutes impermissible unfair discrimination pursuant to section 1129(b)(1) under the standards articulated above, and reserves all rights to supplement this argument.

US_ACTIVE:\44560089\10\45259.0007

unsecured contractual relationships with the City, and, thus, enjoy the same legal rights and protections against the impairment of such rights outside of chapter 9. Thus, Holders of COP Claims and Holders of Pension Claims assumed the same level of risk with respect to the City's ability to satisfy their claims.

### B. The Plan is Not Fair and Equitable With Respect to Class 9

28. Section 1129(b)(2)(B) provides that a plan is "fair and equitable" with respect to a dissenting, impaired class of unsecured claims if no holder of any claim junior to such class will receive or retain any property under the plan. 11 U.S.C. § 1129(b)(2)(B). This is commonly referred to as the "absolute priority rule." The fair and equitable standard, however, is not limited to satisfaction of the absolute priority rule,[19] particularly in chapter 9 cases. H.R. Rep. No. 94-686, 94th Cong., 1st Sess. 33 (1975) ("Fair and equitable has additional consent [sic] in Chapter IX."). Congress has interpreted the standard as requiring the bankruptcy court to find, among other things, that (1) the amount proposed to be paid under a chapter 9 plan is all that creditors can "reasonably expect under the circumstances," and (2) the chapter 9 plan embodies "a fair and equitable bargain, openly arrived at." *Id.; (see also* DS § V.C.1.(a).i). The Court cannot reach these findings with respect to the City's Plan.

29. As set forth above in more detail, *see supra* Sections I and III.A, unsecured creditors have a reasonable expectation, based on applicable law, that they will share pro rata, on a *pari passu* basis, in distributions from the City, and that such distributions will be generated pursuant to a strategy that maximizes the value of the City's non-core assets. Indeed, this expectation was confirmed prepetition by the City in its Proposal for Creditors, which

---

[19] *In re Dow Corning Corp.*, 244 B.R. 678, 694 (Bankr. E.D. Mich. 1999) (noting that "there is more to 'fairness' than the absolute priority rule . . . as demonstrated by the fact that the list of requirements under § 1129(b)(2) is not exhaustive").

13-53846-tit    Doc 4660    Filed 05/12/14    Entered 05/12/14 22:00:59    Page 21 of 29
US_ACTIVE:\44450089\10\45259.0007

promised as much. (Proposal for Creditors at 14 (describing restructuring objectives as including "[m]aximiz[ing] recoveries for creditors" and "[g]enerat[ing] value from City assets where it is appropriate to do so"); *see also Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c)*, filed July 18, 2013 [Docket No. 14] (noting that, "as set forth in the [Proposal for Creditors], whatever decisions the City ultimately reaches with respect to potential asset sales, the City has proposed that its unsecured creditors will share in the value of certain of such sales . . . with a pro rata distribution").) The Plan falls short of these expectations in many ways, most significantly with respect to the treatment of the DIA Assets and City-owned real estate.

30. Without justification, the City has refused to implement (or even investigate, for that matter) transactions that could generate significantly greater value from the DIA Assets. *See supra* Section I. Instead, the City has opted to pursue a purported "settlement" of largely unidentified disputes regarding the DIA Assets, in exchange for a significantly discounted payment, which is being diverted to Holders of Pension Claims who are receiving enhanced recoveries.[20] *See supra* Section III.A. Just as egregious is the City's speculation that City-owned land and buildings are of "limited present commercial value," (DS § VII.A. 5(b)), and its failure to describe whether such property has any potential future value or whether the City has taken or will take any steps to monetize this asset.

31. The Plan and, in particular, its treatment of these key assets is anything but an openly arrived at, fair and equitable bargain. As a result, the Plan is not fair and equitable.

---

[20] The Plan also diverts 50% of the proceeds of any Qualifying DWSD Transaction within seven years of the Effective Date to Holders of Pensions Claims, further enhancing their recoveries, as discussed in Section III.A above.

US_ACTIVE:\44450089\10\45259.0007

## IV.    THE PLAN IS NOT FEASIBLE

32.    Section 943(b)(7) provides that a chapter 9 plan must be feasible. 11 U.S.C. § 943(b)(7). Courts have construed section this requirement as imposing a "ceiling which prevents the Chapter 9 debtor from promising more than it can deliver." *Pierce Cnty. Housing Auth.*, 414 B.R. at 718 (*citing Mount Carbon*, 242 B.R. at 34). In determining the feasibility of a chapter 9 plan, courts must "evaluate whether it is probable that that the debtor can both pay pre-petition debt and provide future public services at the level necessary to its viability as a municipality." *Mount Carbon*, 242 B.R. at 34. Further, "a [chapter 9] plan should offer a reasonable prospect of success and be workable." *Id.* at 35. Where, as here, "performance of a Chapter 9 plan is based upon deferred payments, projections of future income and expenses must be based on reasonable assumptions." *Id.*

33.    The City has failed to establish the feasibility of the Plan for several reasons. First, the City does not address the real possibility that, in the event the COP Litigation is successful in invalidating the COPs, the Retirement Systems could be forced to disgorge the over $1.4 billion of proceeds they received pursuant to the 2005 and 2006 COPs transactions, resulting in a significant increase in the Retirement Systems' unfunded status. *See* Section VI below. In this scenario, there is no evidence that the City could make contributions sufficient to fund recovery levels promised to holders of Pension Claims in the Plan. *See In re Colorado Springs Spring Creek General Improvement Dist.*, 177 B.R. 684, 690 (Bankr. D. Colo. 1995) (municipal debtor failed to demonstrate feasibility of future payments under a chapter 9 plan where debtor failed to "assess the possibility and effect of any foreseeable decrease in the assessed value of the property in the District upon the District's ability to perform under the Amended Plan").

US_ACTIVE:\44450089\10\45259.0007

21

34.     Second, the City has not provided sufficient assurance that whoever is running the City after the Effective Date (*i.e.* an emergency manager or the City Council and the Mayor) will be required to implement the Plan or adhere to the assumptions on which it is based. Although the Plan provides for the establishment of a financial oversight board "to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that should result in more efficient and effective delivery of services to City residents," (Plan § IV.U) this vague provision is insufficient to guaranty that future governing bodies will implement the Plan and will not, for example, decide to triple the budget for the reinvestment initiatives described in Section IX and Exhibit I of the Disclosure Statement. The City has admitted that the details of the post-Effective Date governance structure "are still being developed" and may require legislation. (Hr'g Tr. 181:6-16, Apr. 17, 2014.) However, without these details, it is impossible to assess whether the Plan has a reasonable chance of success or is workable. In fact, the Court has recognized that "it will be very hard to find feasibility unless the mayor and, in his judgment, the city council fully supports the plan and the city's commitments under the plan and the city's means of implementing the plan." (*Id.* at 183:9-13.) The uncertainty surrounding the City's post-Effective Date governance is particularly troubling for creditors who will receive delayed recoveries under the Plan pursuant to the New B Notes, which pay only interest for the first 10 years. (Plan Ex. I.A.183.) Accordingly, the City has not met its burden of proving that the Plan is feasible as required by section 943(b)(7).

## V.     THE PLAN WAS NOT PROPOSED IN GOOD FAITH

35.     Section 1129(a)(3) of the Bankruptcy Code (which is incorporated in chapter 9 cases pursuant to sections 901(a) and 943(b) of the Bankruptcy Code) requires a plan proponent to prove that its plan "has been proposed in good faith." 11 U.S.C. § 1129(a)(3). Courts will find that a plan has been proposed in good faith where (i) a debtor showed a

US_ACTIVE:\44450089\10\45259.0007

fundamental fairness in dealing with its creditors, (ii) the debtor proposed a plan with honesty and good intentions, and with a basis for expecting that a reorganization can be effected, and (iii) the proposed plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *See In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992) (describing these requirements). Furthermore, for a chapter 9 plan of adjustment to have been proposed in good faith, it must realize the value of the debtor's assets and maximize the economic return to creditors with the funds that are made available from such assets. *See Barnwell Cnty. Hosp.*, 471 B.R. at 866 (finding that chapter 9 plan was proposed in good faith because it "allow[ed] the Debtor to realize [the going concern value of its assets] and to distribute it to its creditors" and "maximize[d] the economic return to the Debtor's creditors of available funds in the most practicable way"); *Bamberg Cnty. Mem'l Hosp.*, 2012 WL 1890259 at *5-6 (same). In a chapter 9 case, courts will also look at how the debtor is using the bankruptcy process and, in particular, whether the debtor is attempting not only to restructure its debts, but also to provide the highest possible return to creditors. *See Connector 2000 Ass'n,* 447 B.R. at 763 (finding 1129(a)(3) satisfied where the debtor was "using chapter 9 to restructure its debts and provide its creditors the potential for the greatest economic return from Debtor's assets" and its plan "afford[ed] all creditors the potential for the greatest economic return from Debtor's assets").

36.     The City's proposed Plan is an abuse of the chapter 9 process, and does not maximize the value of the City's assets or returns to creditors, and thus, it has not been filed in good faith. FGIC does not dispute that the City is in dire need of relief under the Bankruptcy Code – indeed, FGIC did not object to the City's petition for chapter 9 relief. And FGIC recognizes that any confirmable plan of adjustment will most likely involve impairment of

US_ACTIVE:\44450089\10\45259.0007

creditors' claims. FGIC, however, objects to the manner in which the City seeks to take advantage of this relief.

37.     Consistent with *In re Connector 2000*, a good faith proposal must involve a trade-off – in exchange for a discharge of its creditors' claims, a debtor must take actions to ensure its creditors recover as much as possible. As discussed, however, the City's efforts to maximize the value of its assets are deficient – if not entirely lacking. *See supra* Section I. Moreover, by discriminating unfairly against certain creditors (*see supra* Section III.A), the City is cherry picking those claimants it believes are entitled to preferential treatment. This is contrary to one of the principal tenets of bankruptcy law – equal treatment of creditors. 7-1122 Collier on Bankruptcy P 1122.03 (2014) ("One of the cardinal principles underlying bankruptcy law is equality of treatment of similarly situated creditors."). The City's one-sided approach, which uses its proposed Plan as a sword to cut certain of its debts and a shield to retain the value of all of its significant assets, is at odds with the purposes of chapter 9 and fundamentally unfair to the City's creditors. Accordingly, the City's Plan was not proposed in good faith and does not satisfy the requirements of section 1129(a)(3).

## VI.    THE PLAN SHOULD NOT EXCULPATE THE RETIREMENT SYSTEMS FROM LIABILITY IN CONNECTION WITH THE 2005 AND 2006 COPS TRANSACTIONS

38.     As set forth in greater detail in the Motion to Intervene, in the event the City is successful in invalidating the COPs pursuant to the COP Litigation, FGIC submits that the Retirement Systems should be required to disgorge the $1.4 billion of proceeds they received as a result of the 2005 and 2006 COPs transactions. (Motion to Intervene, Ex. 6 ¶ 178.) FGIC objects to Section III.D.6 of the Plan, to the extent it purports to exculpate the Retirement

US_ACTIVE:\44450089\10\45259.0007

Systems from liability in connection with any action seeking disgorgement of the COPs transactions proceeds.[21]

### CONCLUSION

39. Based upon the foregoing, FGIC respectfully submits that the Plan cannot be confirmed because, among other things, (i) the Plan is not in the best interests of creditors because it fails to maximize the value of non-core City assets, (ii) the DIA Settlement is a fraudulent transfer, (iii) the DIA Settlement is not fair, equitable, or reasonable, (iv) the Plan is not in the best interests of creditors because it fails to provide creditors a better alternative than what they would have outside of bankruptcy, (v) the Plan unfairly discriminates against Class 9 by providing materially higher and less risky recoveries to other Classes of the same priority, (vi) the Plan is not fair and equitable with respect to Class 9 because it fails to maximize the value of non-core City assets and diverts certain transaction proceeds to enhance the recoveries of other Classes, (vii) the Plan is not feasible because it fails to establish the City's ability to make future payments under the Plan in the event the COPs are invalidated and the Retirement Systems are forced to disgorge the COPs transaction proceeds, (viii) the Plan is not feasible because it fails to establish a post-Effective Date governance structure that ensures the Plan will be implemented and (ix) the City has not proposed the Plan in good faith. Accordingly, FGIC requests that the Court deny confirmation of the Plan and grant such other and further relief as the Court may deem just and proper.

---

[21] FGIC also objects to the City's request for a waiver of the 14-day automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). (*See* Plan § VIII.J. (providing that "[t]he Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e)").) The City has not provided any justification for such relief and it should not be granted.

US_ACTIVE:\44450089\10\45259.0007

25

Dated: May 12, 2014
Houston, Texas

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

– and –

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance
Company*

US_ACTIVE:\44450089\10\45259.0007

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2014 the *Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts if the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all registered users that have appeared in this Chapter 9 proceeding.

 /s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  alfredo.perez@weil.com

Dated:  May 12, 2014

US_ACTIVE:\44450089\10\45259.0007