**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| | : |
| In re: | : Chapter 9 |
| | : |
| CITY OF DETROIT, MICHIGAN, | : Case No. 13–53846 |
| | : |
| Debtor. | : Hon. Steven W. Rhodes |
| | : |

# NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION'S OBJECTION TO FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................1

BACKGROUND ......................................................................................4

ARGUMENT .........................................................................................15

I.     THE PLAN CANNOT BE CONFIRMED BECAUSE CHAPTER 9 PROTECTS
       SPECIAL REVENUE DEBT FROM IMPAIRMENT.......................................15

II.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT FAILS THE BEST
       INTERESTS TEST.................................................................................21

       A.     Dissenting DWSD Creditors are Protected by the "Best Interests" Test..............22
       B.     The Plan Does Not Provide DWSD Bondholders With a Recovery Better
              Than The Alternatives...................................................................23

III.   THE PLAN CANNOT BE CONFIRMED BECAUSE IT FAILS TO SATISFY
       THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 1129(B). ...................28

       A.     The Plan Unfairly Discriminates Against Impaired DWSD Bondholders. ...........29
       B.     The Plan is Not Fair and Equitable with Respect to the Dissenting DWSD
              Bond Classes Because it Does Not Provide DWSD Bondholders What
              They Can Reasonably Expect Under the Circumstances......................................33
       C.     The Plan Does Not Satisfy The Requirements of Section 1129(b)(2)(A). ............36
              1.     The Cramdown Interest Rates for the DWSD Bonds Are
                     Inadequate to Provide DWSD Bondholders with the Present Value
                     of their Claims...............................................................................37
              2.     The Plan Cannot be Confirmed Because it Fails to Treat the
                     DWSD Bondholders' Claim Arising from the Call Violation..................41
              3.     The Revenue Diversion Impermissibly Strips the DWSD
                     Bondholders' Liens.........................................................................46

IV.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT WAS NOT
       PROPOSED IN GOOD FAITH.................................................................50

2776785.1

# TABLE OF AUTHORITIES

**Page**

C̲ASES

ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia
    Commc'ns Corp.),
    361 B.R. 337 (S.D.N.Y. 2007) .......................................................23, 30

Anchor Resolution Corp. v. State Street Bank and Trust Co. of Conn. (In re
    Anchor Resolution),
    221 B.R. 330 (Bankr. D. Del. 1998) ....................................................42

Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
    526 U.S. 434 (1999) ............................................................................23

Bank of Montreal v. Official Comm. Of Unsecured Creditors (In re
    American HomePatient, Inc.),
    420 F.3d 559 (6th Cir. 2005) .........................................................37, 38

Corestates Bank, N.A. v. United Chem. Techs., Inc.,
    202 B.R. 33 (E.D. Pa. 1996) ..........................................................49, 50

Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv.
    Corp.,
    679 F.2d 264 (1st Cir. 1982) ...............................................................35

Fano v. Newport Heights Irrigation District,
    114 F.2d 563 (9th Cir. 1940) ......................................................24, 25, 26

Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Assoc. (In re
    Imperial Coronado Partners, Ltd.),
    96 B.R. 997 (9th Cir. B.A.P. 1989) ................................................41, 42

In re Bamberg Cnty. Mem'l Hosp.,
    2012 WL 1890259 (Bankr. D.S.C. May 23, 2012) ...........................27

In re Barnwell Cnty. Hosp.,
    471 B.R. 849 (Bankr. D.S.C. 2012) ....................................................27

*In re Big Buck Brewery & Steakhouse, Inc.,*
  No. 04-56761, Confirmation Hr'g Tr. [Doc. No. 789] (Bankr. E.D. Mich.
  October 19, 2005) ..................................................................................38

*In re Brice Road Devs., L.L.C.,*
  392 B.R. 274 (6th Cir. B.A.P. 2008) ...................................................38

*In re BWP Transport, Inc.,*
  462 B.R. 225 (Bankr. E.D. Mich. 2011).....................................*passim*

*In re Chemtura Corp.,*
  439 B.R. 561 (Bankr. S.D.N.Y. 2010)..................................................45

*In re Connector 2000 Ass'n, Inc.,*
  447 B.R. 752 (Bankr. D.S.C. 2011)......................................................27

*In re Corcoran Hosp. Dist.,*
  233 B.R. 449 (E.D. Cal. 1999) ............................................................34

*In re Dow Corning Corp.,*
  244 B.R. 696 (Bankr. E.D. Mich. 1999)...............................30, 35, 36, 45

*In re Dow Corning Corp.,*
  456 F.3d 668 (6th Cir. 2006) .........................................................35, 45

*In re Griswold Bldg., LLC,*
  420 B.R. 666 (Bankr. E.D. Mich. 2009).........................................38, 50

*In re Jefferson Cnty.,*
  474 B.R. 228 (Bankr. N.D. Ala. 2012) ................................................20

*In re Olde Prairie Block Owner, LLC*
  464 B.R. 337 (Bankr. N.D. Ill. 2011) ..................................................49

*In re Outdoor Sports Headquarters, Inc.,*
  161 B.R. 414 (Bankr. S.D. Ohio 1993) ...............................................42

*In re Pierce Cnty. Hous. Auth.,*
  414 B.R. 702 (Bankr. W.D. Wash. 2009)...........................3, 21, 23, 51

*In re River East Plaza, LLC,*
  669 F.3d 826 (7th Cir. 2012) ..............................................................36

iii

In re Sch. Specialty, Inc.,
  2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013)...........................................45

In re Trevarrow Lanes, Inc.,
  183 B.R. 475 (Bankr. E.D. Mich. 1995)...........................................................21

In re Wermelskirchen,
  163 B.R. 793 (Bankr. N.D. Ohio 1994)............................................................50

Kelley v. Everglades Drainage District,
  319 U.S. 415 (1943)..............................................................................24, 25, 26

Lorber v. Vista Irr. Dist.,
  127 F.2d 628 (9th Cir. 1942) .......................................................................26, 33

Lorber v. Vista Irr. Dist.,
  143 F.2d 282 (9th Cir. 1944) .............................................................................34

Matter of Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,
  791 F.2d 524 (7th Cir. 1986) .............................................................................35

Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Ass'n (In re Premier Entm't
  Biloxi LLC),
  445 B.R. 582 (Bankr. S.D. Miss. 2010).............................................................42

RadLAX Gateway Hotel, LLC v. Amalgamated Bank,
  132 S. Ct. 2065 (2012).......................................................................................36

Ruskin v. Griffiths,
  269 F.2d 827 (2d Cir. 1959) ..............................................................................35

Schroeder v. New Century Liquidating Trust (In re New Century TRS
  Holdings, Inc.),
  407 B.R. 576 (D. Del. 2009)..............................................................................30

The Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.),
  482 B.R. 404 (Bankr. N.D. Ala. 2012)...........................................19, 28, 48, 49

Till v. SCS Credit Corp.,
  541 U.S. 465 (2004).....................................................................................38, 39

W. Coast Life Ins. Co. v. Merced Irr. Dist.,
  114 F.2d 654 (9th Cir. 1940) .............................................................................26

iv

## STATUTES

11 U.S.C. § 922(d) ........................................................................2, 15

11 U.S.C. § 927 ...............................................................................16

11 U.S.C. § 928(a) ..........................................................................15

11 U.S.C. § 928(b) ..........................................................................16

11 U.S.C. § 943(b)(4) ......................................................................14

11 U.S.C. § 943(b)(7) ...........................................................21, 22, 23

11 U.S.C. § 1129(a)(7) ....................................................................22

11 U.S.C. § 1129(b)(2)(A)(i) .....................................................*passim*

MCL § 141.103 ..................................................................................7

MCL § 141.107(2) .............................................................................6

MCL § 141.107(4) .............................................................................7

MCL § 141.120(1) ......................................................................41, 43

MCL § 141.120(3) ................................................................41, 44, 46

MCL § 141.122(1)(a) ...................................................................9, 47

MCL § 440.9109(4)(m) ......................................................................7

Pub. L. No. 100-597, 102 Stat. 3028 (1988)...................................17

Revenue Bond Act of 1933, Act No. 94 ............................................4

## OTHER AUTHORITIES

6 Collier on Bankruptcy ¶ 943.03[1][f] (16th ed. 2013)..................33

6 Collier on Bankruptcy ¶ 943.03[7][a] (16th ed. 2013) .......22, 24, 26

6 Collier on Bankruptcy ¶ 943.03[7][b] (16th ed. 2013)..................24

124 Cong. Rec. H 11,100 (Sept. 28, 1978); S 17,417 (Oct. 6, 1978)......24

Brian Chappatta & Chris Christoff, <u>Detroit Water, Sewer Bonds Downgraded Deeper Into Junk</u>, Bloomberg News (Mar. 25, 2014), http://www.bloomberg.com/news/2014-03-25/detroit-water-sewer-bonds-downgraded-deeper-into-junk.html ..................................................................12

H.R. Rep. No. 100-1011 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 4115 ...............18

H.R. Rep. No. 95-595 (1977)..................................................................................22

<u>Rating to Bondholder Security After Detroit</u>, Fitch Ratings, May 1, 2014.............40

Robert Amdursky, <u>The 1988 Municipal Bankruptcy Amendments: History, Purposes, and Effects</u>, 22 Urb. Law 1, 20 (1990)...............................................20

S. Rep. No. 100-506, at 12 (1988), <u>Report to Accompany S. 1863</u> ......................17

2776785.1

National Public Finance Guarantee Corporation ("National"), by and through its undersigned attorneys, respectfully submits this objection (the "Objection") to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Doc. No. 4392] (the "Plan"), and in support hereof, states as follows:[1]

## PRELIMINARY STATEMENT

1.     Since his appointment, the Emergency Manager and his team of advisors have viewed the special revenues of the DWSD systems as a source of money for the General Fund and payment for General Fund creditors.  From June 2013 when Mr. Orr first unveiled his "ask" until the present Plan, the City has devised and pursued any number of paths, each attempting to create and extract value out of the water and sewer systems' (the "Systems") revenues for the General Fund at the expense of the Systems' debt holders (the "DWSD Bondholders"), the DWSD Bond Insurers, the Systems' ratepayers and the Counties.  The Plan is simply the City's latest attempt to create value through debt impairment (where none is required or legally permissible) and to extract that value for the City's benefit.

2.     The Plan impairs special revenue debt of the solvent Systems (the DWSD Bonds) in order to siphon DWSD revenues to fund certain of the City's

---

[1] Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Plan.

General Fund creditors (the GRS Pension Claims and the City's bankruptcy professionals). Through impairment, the City hopes to create "interest rate savings" that can be used to fund its settlement with the GRS trustees and the Retiree Committee (which settlements will require the Systems to pay $428.5 million over nine years) or for other unspecified System-related purposes.

3. To achieve its objectives, the City seeks to, among other things, (i) cram down below-market interest rates (the "Cramdown Rates") on the DWSD Bonds based upon a yield curve that bears no relation to the Systems' (or the City's) actual credit quality, (ii) strip call protection from the DWSD Bonds (the "Call Violation") and (iii) subordinate the DWSD Bondholders' liens to $428.5 million of newly-imposed fixed payments that do not qualify as "operation and maintenance expense" (the "Revenue Diversion").

4. As much as the City would like to impair the DWSD Bonds to create value to fund its pension settlement and legal costs, there is no legal basis to support impairment of any of the DWSD Bonds.

5. First, special revenue bonds are intended to be unaffected by a municipal debtor's general fund insolvency. Special revenue debt (like the DWSD Bonds) is uniquely protected in chapter 9 and entitled to greater rights than other secured debt. See, e.g., 11 U.S.C. § 922(d). Not all secured debt is treated equally in chapter 9. The Bankruptcy Code and relevant legislative history make clear that

2776785.1

special revenue bonds should not be impaired in bankruptcy (as a result of general fund insolvency) and should receive the benefit of their bargain. Here, the Systems' revenues are more than sufficient to pay the DWSD Bonds per their terms. The City can cite to no precedent for impairing *fully secured* special revenue debt on a non-consensual basis; none exists.

6. <u>Second</u>, the best interests of creditors test (as applied to special revenue debt in chapter 9) leads to the necessary conclusion that holders of the DWSD Bonds are entitled to full payments per their contractual terms from the Systems' revenues. The City cannot demonstrate that the Plan offers a recovery that is better than the realistic alternatives. <u>See</u> <u>In re Pierce Cnty. Hous. Auth.</u>, 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (the "best interests" test is "generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have."). The City cannot forcibly impair the DWSD Bonds and satisfy the best interests test.

7. <u>Third</u>, even if the Bankruptcy Court were to conclude that section 1129(b)[2] applies to the DWSD Bonds (that is, fully-secured special revenue debt payable from the Systems' revenues), the Plan cannot be confirmed because it unfairly discriminates between and among the holders of the DWSD Bonds and

---

[2] Unless otherwise noted, all "section" references herein are references to the relevant section(s) of the Bankruptcy Code.

other secured obligations and because it is not fair and equitable. Impaired DWSD Bondholders can and should reasonably expect to receive more under the circumstances than what the Plan provides. The Plan fails to provide that the DWSD Bondholders will (i) receive payment in full of their allowed claims on a present value basis (by imposing below-market interest rates) or (ii) retain their liens (instead subordinating their liens to fund the $428.5 million Revenue Diversion).

8. <u>Finally</u>, the Plan cannot be confirmed because it is not proposed in good faith with respect to the DWSD Bonds. The proposed Plan treatment of the DWSD Bondholders violates the Bankruptcy Code. For all of these reasons, the Plan cannot be confirmed.

## **BACKGROUND**

### **The DWSD Bonds**

9. As of the Petition Date, the City owed (i) approximately $2.784 billion relating to nineteen series of bonds serviced from the City's sewage disposal fund (the "<u>DWSD Sewer Bonds</u>") and (ii) approximately $2.485 billion relating to twenty series of bonds serviced from the City's water fund (the "<u>DWSD Water Bonds</u>," and together with the DWSD Sewer Bonds, the "<u>DWSD Bonds</u>"). Disclosure Statement at 99-100. The City issued each series of DWSD Bonds pursuant to the Revenue Bond Act of 1933, Act No. 94, Public Acts of Michigan,

2776785.1

1933, as amended (the "Enabling Act"), an amended and restated ordinance of the City Council,[3] a bond resolution of the City Council and a sale order of the Finance Director of the City. Of the approximately $5.3 billion in DWSD Bonds, approximately $4.2 billion are insured and the remaining $1.1 billion are uninsured.

10. National insures twelve of the outstanding series of DWSD Sewer Bonds and eleven of the outstanding series of DWSD Water Bonds.[4] In addition, the Water System Bonds are secured by a Trust Indenture, dated as of February 1, 2013, among the City, DWSD and U.S. Bank National Association, as trustee, and the Sewer System Bonds are secured by a Trust Indenture, dated as of June 1,

---

[3] The City issued the DWSD Water Bonds pursuant to Ordinance No. 30-02, as amended and restated by Ordinance No. 01-05 (as so amended and restated, the "Water Ordinance"). The City issued the DWSD Sewer Bonds pursuant to Ordinance No. 27-86, as amended and restated by Ordinance 18-01 (as so amended and restated, the "Sewer Ordinance", and together with the Water Ordinance, the "Bond Ordinances"). The relevant portions of the Water Ordinance and Sewer Ordinance discussed in this Objection are identical in substance.

[4] National also issued sureties or reserve fund policies on fifteen of the outstanding series of DWSD Bonds and DWSD Revolving Bonds, in some instances on a series of bonds on which National is not the primary insurer. See the National proofs of claim for more information—claim nos. 1029, 1031, 1040, 1046, 1070, 1077, 1084, 1091, 1034, 1042, 1067, 1095, 1099, and 3638 (the "National Proofs of Claim"). The National Proofs of Claim set forth (i) claims for subrogation and/or reimbursement on account of principal and interest due on the DWSD Bonds that may be unpaid under the Plan, and (ii) direct contractual claims for the reimbursement of National's charges, fees, costs, losses, liability and expenses, including professional fees that have been incurred in this chapter 9 case ("National's Fees and Expenses").

5

2012, among the City, DWSD and U.S. Bank National Association, as trustee. A chart setting forth the DWSD Sewer Bonds and DWSD Water Bonds insured by National is attached hereto as Exhibit A.[5]

11.    Unlike the City's General Fund debt, the Enabling Act and the Bond Ordinances provide that the DWSD Bonds are not general obligations of the City, but are payable solely from the "Pledged Assets" of the relevant System. MCL § 141.107(2); Bond Ordinances § 6(a) ("Secured Obligations are not general obligations of the City and shall be payable solely from Pledged Assets as provided in this Section . . . .").

12.    The Pledged Assets of a System include the "Net Revenues" and amounts available in certain funds and accounts established under the related Bond Ordinance. Bond Ordinances § 1. Under each Bond Ordinance, "Net Revenues" of a System means all revenues of the City from such System, except for those revenues transferred to the Operation and Maintenance Fund (the "O&M Fund")

---

[5] National also insures several series of Unlimited Tax General Obligation Bonds classified in Class 8 under the Plan (the "UTGO Bond Claims"). Pursuant to the terms of the UTGO Settlement, National has agreed to support the Plan, solely with respect to the UTGO Bond Claims, subject to the completion of definitive documentation (the "UTGO Settlement Agreement"). Accordingly, assuming the UTGO Settlement Agreement is executed, National does not object to the treatment of the UTGO Bond Claims. National reserves its right to object to the treatment of the UTGO Bond Claims, and any other aspect of the Plan that could affect the treatment of the UTGO Bond Claims, in the event that the UTGO Settlement Agreement is not finalized, is not approved by this Court or is breached by the City or any other party thereto.

6

established under such Bond Ordinance to provide for the operation and maintenance of the related System.[6] Id. There is no dispute that the DWSD Bonds constitute "special revenue" bonds within the meaning of chapter 9, and the DWSD Bonds have received current principal and interest payments from the Systems' revenues during the bankruptcy case consistent with section 922 of the Bankruptcy Code.

13. The DWSD Bonds are secured by a first-priority lien on such Pledged Assets under the Enabling Act and the Bond Ordinances. MCL § 141.107(4); Bond Ordinances § 5(A). Section 5(A) of each Bond Ordinance states that the payment of the obligations secured thereunder "is secured by a statutory lien, which is hereby created, upon the whole of the Pledged Assets subject to the use and application thereof in accordance with this Ordinance." Since transfers of security interests by the City are not within the scope of Article 9 of the UCC, no further action is necessary to establish or perfect the security interest created by the Bond Ordinances. MCL § 440.9109(4)(m).

14. The first-priority lien on the Pledged Assets secures the "Secured Obligations" under the Bond Ordinances, which include all principal and interest

---

[6] Under the Enabling Act, as implemented by each Bond Ordinance, "Revenues" also includes certain amounts payable under certain hedges with respect to the bonds and investment earnings on amounts in certain funds and accounts established under such Bond Ordinance. MCL § 141.103; Bond Ordinances § 1.

2776785.1

on the DWSD Bonds of the related System,[7] as well as the City's repayment obligations to its Bond Insurers, including National.[8]

15.    Both the Enabling Act and each Bond Ordinance specifically delineate only a limited carve-out from the Pledged Assets for amounts necessary

---

[7] "Secured Obligations" are defined as "all *Securities*, Ancillary Obligations and Ancillary Obligation Fees and Expenses." Bond Ordinances § 1 (emphasis added). "Securities" are defined as "all Senior Lien Bonds and all Junior Lien Bonds." Id. "Senior Lien Bonds" are defined as "all Securities issued under this Ordinance that have a senior lien on Pledged Assets." Id. "Junior Lien Bonds" are defined as "all Securities issued under this Ordinance other than Senior Lien Bonds." Id.

Thus, the definition of "Secured Obligations" can be restated in part as "all [DWSD Bonds], Ancillary Obligations and Ancillary Obligation Fees and Expenses."

[8] "Ancillary Obligations" are defined as "any Reimbursement Obligation" which is in turn defined as "the City's repayment obligations under a *Financial Facility*, and does not include the obligation to pay fees and expenses in the ordinary course of the transaction." Bond Ordinances § 1 (emphasis added). A "Financial Facility" is defined as "any *Credit Enhancement*, Liquidity Facility or combined Credit and Liquidity Facility." *Id.* (emphasis added). "Credit Enhancement" is defined as "any Credit Facility and any *Bond Insurance*." Id. (emphasis added). "Bond Insurance" is defined as "any policy of insurance, contract of suretyship, guaranty or other agreement intended to protect Holders of particular Securities from loss arising from a failure of the City to timely pay principal (and premium, if any) of and interest on such Securities and pursuant to which the provider thereof is repaid solely as subrogee without creating any additional payment obligations (other than the payment of a premium or annual fee.)." Id. Finally, "Ancillary Obligation Fees and Expenses" are defined as "any fees and expenses in connection with any . . . Financial Facility in the ordinary course of the transaction." Id.

Thus, the definition of "Secured Obligations" can be restated in part as "all [DWSD Bonds], [the City's repayment obligations under the Bond Insurance policies], and [any fees and expenses in connection with any Bond Insurance policies]."

8

for operation and maintenance of the related System. Under the applicable waterfall, revenues of each System (collectively, the "Revenues") are transferred seriatim into a series of funds and accounts, "but only within the respective limitations and only if the maximum amount within such limitation has been credited to the preceding fund or account." Bond Ordinances § 1. To that end, Revenues are only transferred into the O&M Fund in an amount "sufficient to provide for the payment of *the next month's* expenses of administration and operation of the System . . . and such *current* expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order." Id. at § 12B (emphasis added).[9] Accordingly, Revenues transferred to the O&M Fund are strictly limited to the next month's expenses of administration/operation and current maintenance expenses as necessary to preserve the System in good repair (the "O&M Expenses"). It is only these limited O&M Expenses transferred to the O&M Fund on a monthly basis that fall outside the scope of the DWSD Bondholders' first-priority lien. Bond Ordinances § 1 (definition of "Pledged Assets"). The City is not permitted to make payments which do not constitute O&M Expenses as allowed under the DWSD Bond Documents, nor to accelerate

---

[9] Similarly, the Enabling Act provides that Revenues are to be deposited into a separate first priority fund "for the payment for the next succeeding period of all current expenses of administration and operation and the current expenses for that period for maintenance as may be necessary to preserve [the system] in good repair and working order." MCL § 141.122(1)(a).

9

the payment of O&M Expenses beyond those incurred for the next month (let alone for future years).

16.     The DWSD is governed by a seven-member board consisting of four City residents and three representatives of the counties to which the Systems provide services. Each System's funds and accounts are maintained separate from other City funds, including the City's General Fund. Neither System's indebtedness may be paid from the City's General Fund. Similarly, the City may not use System revenues for non-System purposes. Each System discloses their respective financial and operating information on a regular basis and provides audited financial statements separate from those of the City.

**Proposed Plan Treatment**

17.     The Plan classifies DWSD Bond Claims in Classes 1A-1 through 1A-337, with each CUSIP of DWSD Bond Claims separately classified. Plan Art.II.B.3.a, Ex.I.A.110. One hundred eighty-six of the DWSD Bond Claim classes are purportedly unimpaired by the Plan.[10] Plan Ex. I.A.110. The Plan impairs the remaining DWSD Bond Claim classes. Id.

---

[10]  The Plan designates certain Class 1A Claims (DWSD Bond Claims) as "unimpaired" even though the Plan alters the rights of DWSD Bondholders in at least two significant respects. Section 1124 of the Bankruptcy Code provides that a class of claims is deemed to be "impaired" under a plan unless the plan "leaves unaltered the legal, equitable and contractual rights" to which such claim entitles the holder thereof. 11 U.S.C. § 1124. Here, the Plan alters DWSD Bondholders' rights by requiring the DWSD to direct $428.5 million of pledged revenues, ahead

18.     At the option of the City, subject to the election discussed below, the holders of impaired DWSD Bonds will either receive "New DWSD Bonds" having a principal amount equal to the outstanding principal amount of current DWSD Bonds[11] or cash in the amount of principal and interest through the Distribution Date. Plan Art.II.B.3.a.ii.B. The New DWSD Bonds (i) will accrue interest at Cramdown Rates set forth in an "Interest Rate Reset Chart" appended to the Plan and (ii) may be repaid, prepaid or redeemed (as applicable) at any time after the earlier of (a) five years after the date of issuance and (b) the date upon which the corresponding current DWSD Bond would have matured. Plan Ex. I.A.186.

19.     The City has stated that the Cramdown Rates reflect the current market interest rates for comparable municipal debt for an utility rated somewhere between "A" and "BBB." Disclosure Statement Hr. Tr. 144:6-145:1, Apr. 27, 2014. Currently, however, the Systems (and the DWSD Bonds) have a "junk"

---

of the payment of DWSD debt, in violation of the DWSD Bond Documents. See section III.C.3 below. Moreover, the Plan contemplates a "Qualifying DWSD Transaction" involving the transfer to a third party of a majority of the assets of, or the operation and management of the DWSD. Any such transaction, without the consent of DWSD Bondholders and National, alters DWSD Bondholders' rights and thus impairs their claims. Section 18(D) of the Water Ordinance, for example, states that "[t]he city will not sell, lease or dispose of the System or any substantial part thereof until all Outstanding Securities have been paid in full as to both Principal and Interest." Section 19(d) of the Sewer Ordinance contains an identical prohibition.

[11] The City has reserved the right to pay interest through the Distribution Date in either cash or as additional principal on the New DWSD Bonds.

rating from the three (3) ratings agencies (Standard & Poor's, Moody's and Fitch Ratings).[12]

20.    Each Holder of an impaired DWSD Bond Claim in a class that votes to accept the Plan may elect to receive "New Existing Rate DWSD Bonds" instead of New DWSD Bonds. Plan Art.II.B.3.a.ii.B. Class acceptance is a condition to any holder within a class keeping their existing interest rate in exchange for waiving call protection. According to the City, the New Existing Rate DWSD Bonds will have the same payment terms as the current DWSD Bonds (including the same interest rate) except that the New Existing Rate DWSD Bonds may be prepaid or redeemed at any time without premium or penalty—meaning that the holders of such DWSD Bonds that elect to keep their existing contractual rate of interest will waive their contractual call protection, for which such holders paid a premium (in the form of accepting lower yields) at the time such bonds were sold.[13] Plan Ex.I.A.188. Approximately $761 million of the outstanding DWSD Bonds are not callable as of the date hereof.

---

[12] Brian Chappatta & Chris Christoff, <u>Detroit Water, Sewer Bonds Downgraded Deeper Into Junk</u>, Bloomberg News (Mar. 25, 2014), http://www.bloomberg.com/news/2014-03-25/detroit-water-sewer-bonds-downgraded-deeper-into-junk.html.

[13] The City's effort to "strip" the call protection is addressed below in section III.C.3.

21.     With respect to the DWSD Bonds the City has targeted for impairment, such impairment will result in (i) the imposition of the Cramdown Rates and/or (ii) the stripping of call protection via the Call Violation.  DWSD Bondholders will only retain their existing interest rates if their impaired class of DWSD Bond Claims accepts the Plan.  Moreover, the Plan contemplates that, even if class acceptance occurs, only those holders of DWSD Bonds which have elected to keep their existing interest rates will do so.  Holders of DWSD Bonds in the same class that either do not make the election or do not vote will receive the Cramdown Rates, resulting in the likely outcome of different interest rates (and different Plan treatment) for holders in the same class.  The City is soliciting votes in respect of approximately $2.2 billion of DWSD Bonds selected for impairment, some of which is uninsured and widely held.  Holders within a class who do not vote will receive the lower Cramdown Rates regardless of whether their class accepts.  The default treatment under the Plan is the New DWSD Bonds bearing the Cramdown Rates.

22.     In respect of all DWSD Bonds, the Plan requires the DWSD to divert $428.5 million of Revenues on account of "pension-related, administrative and restructuring payments" to the Prior GRS Pension Plan (the Revenue Diversion) to fund distributions to Class 11 GRS Pension Claims (Plan Art.II.B.3.r.ii.A), and likely to fund chapter 9 professional fees.

2776785.1

23.     Additionally, the Plan permits a "Qualifying DWSD Transaction" under which a majority of the assets, or operations and management of, the Systems could be transferred to an unknown third party, in violation of the DWSD Bond Documents.[14]   In connection with the Qualifying DWSD Transaction, the City will issue pursuant to the Plan the "DWSD CVR" to a "Restoration Trust." Plan Art.IV.G.  The DWSD CVR will entitle the Restoration Trust to 50% of the net proceeds received by or distributable to the City's General Fund on account of the Qualifying DWSD Transaction.[15]  Id.  The Plan's description of a Qualifying DWSD Transaction is so vague it precludes any meaningful analysis or response at this time, other than the general objections raised herein.[16]  See Plan Art. I.A.224.

24.     At its core, the Plan is no more than an attempt by the City to divert value from the DWSD for the benefit of the City's General Fund and to the

---

[14] Section 18(D) of the Water Ordinance, for example, states that "[t]he City will not sell, lease or dispose of the System or any substantial part thereof until all Outstanding Securities have been paid in full as to both principal and interest." Section 19(d) of the Sewer Ordinance contains an identical prohibition.

[15] If a Qualifying DWSD Transaction does not occur prior to the seventh anniversary of the Effective Date of the Plan, the Plan provides that the DWSD CVR will terminate and expire.  Plan Art.IV.G.

[16] National reserves the right to argue that the Plan is unconfirmable under section 943(b)(4) because the ultimate terms of any Qualifying DWSD Transaction, or any other Plan transaction, violate state law.  See 11 U.S.C. § 943(b)(4) (a plan cannot be confirmed if the debtor is prohibited by applicable law from taking any action necessary to carry out the plan).

14

detriment of the holders and insurers of the DWSD Bonds.  For the reasons set forth below, the Bankruptcy Court should deny confirmation of the Plan.

## ARGUMENT

## I. THE PLAN CANNOT BE CONFIRMED BECAUSE CHAPTER 9 PROTECTS SPECIAL REVENUE DEBT FROM IMPAIRMENT.

25.     Special revenue debt, like the DWSD Bonds, is intended to remain unaffected by the insolvency of a municipality and its general fund.  The plain language of the Bankruptcy Code, the relevant legislative history, and applicable case law confirm this conclusion.

26.     The Bankruptcy Code contains various provisions that are only applicable to special revenue debt and serve to protect special revenue financing from impairment and from the reach of the City to support its General Fund.

27.     Section 922(d) prevents the application of the automatic stay to the payment of debt secured by pledged special revenues—thus permitting the continued payment of special revenue debt by the City during its chapter 9 proceeding.  See 11 U.S.C. § 922(d).  Additionally, section 928(a) ensures that the DWSD Bondholders' liens on special revenues survive the bankruptcy filing and attach to postpetition special revenues.  See 11 U.S.C. § 928(a).  Indeed, the only exception to the protection afforded special revenue debt under section 928(a) is for the deduction of "necessary operating expenses" during the course of the

15

chapter 9 proceeding.[17]  See 11 U.S.C. § 928(b).  Section 927 confirms that the benefit of remaining unimpaired by general fund insolvency comes with a burden—recourse for claims payable from special revenues is limited to such revenues.  See 11 U.S.C. § 927.

28.  Taken together, sections 922, 927 and 928 compel the conclusion that debt secured by special revenues (which are sufficient to pay such debt) must be paid in accordance with such debt's contractual terms and remain unaffected by the general fund insolvency of a municipality.  Here, the Systems' Revenues are more than sufficient to pay the DWSD Bonds per their terms.[18]

29.  In essence, chapter 9 embodies the "deal" between and among municipal creditors under state law.  General fund creditors only look to the general fund and special revenue creditors look only to their revenues, without recourse to the general fund.  The legislative history of the special revenue provisions in chapter 9 confirms the intent of Congress in this regard.

---

[17]  The carve-out set forth in section 928(b) is designed to ensure that a municipality's general funds are not diverted into maintaining a project or system from which the municipality's general fund will derive no benefit.  The City proposes to use this shield as a sword to benefit its General Fund with special revenues diverted from the Systems.

[18]  See Disclosure Statement, Exhibit M at 5 (projecting debt service coverage through 2023 exceeding 100%).  In addition, the Revenues are more than sufficient to pay National's Fees and Expenses, which should be paid out of the Revenues no later than the Effective Date of the Plan.

16

30.     Prior to 1988, all municipal bonds were generally treated equally under chapter 9, regardless of whether they were special revenue or general obligation bonds.   In 1988, however, Congress passed "An Act to Amend the Bankruptcy Law to Provide Special Revenue Bonds, and for Other Purposes." Pub. L. No. 100-597, 102 Stat. 3028 (1988).

31.     The stated purpose of the 1988 amendments was to "protect the future effectiveness of revenue bond financing against the possibility of an adverse judicial determination in connection with a municipal bankruptcy."   S. Rep. No. 100-506, at 12 (1988), Report to Accompany S. 1863 (hereinafter "S. Rep.").   To achieve this objective, Congress determined that special revenue bonds should be unaffected by the general fund insolvency of a municipality: "Finally, the amendments insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, namely, they will have *unimpaired rights* to the project revenue pledged to them."   Id. (emphasis added).

32.     These amendments were designed to guarantee municipalities' open access to capital markets by ensuring that dedicated revenues will not be diverted in chapter 9.   See 6 Collier on Bankruptcy, ¶ 928.01 (16th ed. 2013).   In fact, Congress was specifically concerned about the impact chapter 9 proceedings could have on the municipal bond market absent the codified amendments:

> Proponents of the legislation argue that in the absence of the changes
> contained therein, municipalities—particularly the small to medium-

sized cities—may have trouble raising money through special revenue bonds, disrupting the municipal finance market and harming the municipalities. **Lenders may be reluctant to advance funds for projects, particularly in municipalities that are having some financial difficulties, when the possibility exists that the lien securing repayment could be avoided if the municipality files bankruptcy**. Proponents argue that bond rating agencies may downgrade the creditworthiness of certain special revenue bonds because of what could happen in a bankruptcy.

H.R. Rep. No. 100-1011, at 5 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 4115, 4119

(hereinafter "<u>H.R. Rep.</u>") (emphasis added). The proponents of the changes to the

Bankruptcy Code were worried precisely about what the City is trying to do here—

reducing payments on special revenue debt to divert special revenues to the

General Fund:

> [A] municipality often has enterprise[s] with separate funds, and except to the extent specifically permitted, the funds derived from one source are often legally unavailable for other enterprises or for general governmental purposes. Thus, for example, water receipts may be legally unavailable under nonbankruptcy law for general governmental purposes except to the extent that provision is made by law for payments by the water department in lieu of local property taxes. Although the various enterprises are not separate entities, they are operated almost as if they were. In many cases, they are managed by separate autonomous governing boards. **If a municipality is unable to meet its obligations for general governmental purposes, and for that reason files a bankruptcy petition, the assets of its water department should not be reached to pay general creditors of the municipality unless they could be reached under applicable nonbankruptcy law.**

S. Rep. at 8-9 (emphasis added).

33. Thus, by virtue of the 1988 amendments, chapter 9 preserves the

18

protections that special revenue bonds provide to both bondholders <u>and</u> issuers. See <u>The Bank of N.Y. Mellon v. Jefferson Cnty.</u> (<u>In re Jefferson Cnty.</u>), 482 B.R. 404, 432-36 (Bankr. N.D. Ala. 2012). As noted in the senate report accompanying the 1988 amendments, "[t]he current difficulties with the Bankruptcy Code are most readily apparent when analyzing the potential consequences to revenue bond financing. This is an area of great concern to municipalities." S. Rep. at 4.

34. Indeed, Congress acted specifically to ensure the separation of special revenues from the municipality's general fund. The inclusion of sections 927 and 928 in the 1988 amendments to the Bankruptcy Code was intended to mitigate (a) the effect of section 552 (limiting the post-petition application of a security interest) on a pledge of special revenues, and (b) the operation of new section 1111(b)(2)'s "deemed recourse" of secured debt, which could transform revenue bonds into general obligation bonds.[19]

35. As the Court observed in <u>In re Jefferson County</u>, the 1988 amendments were enacted to maintain the pre-bankruptcy status quo for special revenue debt. <u>In re Jefferson Cnty.</u>, 482 B.R. at 433-36 (finding that "the overall

---

[19] S. Rep. at 5, 8 ("Section 552(b) may permit general creditors of the municipality to seek payment from the pledged revenues and prohibit the specified payment of pledged revenues to the bondholders. . . . Section 1111(b) can be interpreted as converting revenue bondholders from creditors with rights to certain specific revenues into general creditors with a claim against the full faith and credit of the municipality.").

2776785.1

goal [of the 1988 amendments] was to retain as much as possible the pre-bankruptcy status of pledged special revenue financing transactions involving municipalities"); see also In re Jefferson Cnty., 474 B.R. 228, 267 (Bankr. N.D. Ala. 2012) (citing S. Rep at 3-4 and finding that the legislative history "explicitly sets forth the Congressional intent that the goal was to more closely conform chapter 9 to the workings of municipal finance, not commercial finance"); 6 Collier on Bankruptcy, ¶ 902.03 (16th ed. 2013) ("One of the principal purposes behind the 1988 Amendments was the desire to protect liens on special revenues granted under revenue bonds . . . ."); Robert Amdursky, The 1988 Municipal Bankruptcy Amendments: History, Purposes, and Effects, 22 Urb. Law 1, 20 (1990) (noting that the 1988 amendment provided "a significant degree of assurance that full and timely payment of secured municipal creditors will not be impaired by the filing of a petition under Chapter 9"). Prior to and during this chapter 9 case, the City has paid the DWSD Bonds in accordance with their terms, as required by the Bankruptcy Code.

36. The Plan, by contrast, seeks to turn the protection afforded special revenue debt on its head. No other municipal debtor has sought to impair special revenue debt, including San Bernardino, Stockton and Vallejo. This type of impairment has not been done for good reason—the Bankruptcy Code does not permit it. Therefore, the Plan cannot be confirmed because it would impose non-

2776785.1

consensual impairment on the DWSD Bonds.

## II. THE PLAN CANNOT BE CONFIRMED BECAUSE IT FAILS THE BEST INTERESTS TEST.

37.     The "best interests" test is "generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have." In re Pierce Cnty. Hous. Auth., 414 B.R. at 718 (quoting In re Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999)). The debtor has the burden of proving that the best interests test is satisfied. 11 U.S.C. § 943(b)(7) ("The court shall confirm the plan if— . . . (7) the plan is in the best interests of creditors and is feasible."); Pierce Cnty., 414 B.R. at 715 (citing Mount Carbon, 242 B.R. at 31); see also Disclosure Statement at 78 ("[T]he debtor bears the burden of proving, by a preponderance of the evidence, that its plan of adjustment satisfies the best interests of creditors test . . . ."); In re Trevarrow Lanes, Inc., 183 B.R. 475, 479 (Bankr. E.D. Mich. 1995) (same).

38.     The City cannot satisfy the best interests of creditors test because the proposed Plan does not provide a better alternative than what the holders of the DWSD Bonds already have. The DWSD Bonds are special revenue bonds, secured by a first-priority lien on the Systems' Revenues, which (by the City's own projections) are more than sufficient to pay the existing DWSD Bonds in accordance with their terms. The City cannot strip away revenues from approximately $2.2 billion of DWSD Bonds in order to fund its GRS pension

21

settlement (along with a material portion of the City's bankruptcy professional fees) and satisfy the best interests requirements of section 943. Application of the best interests test to the DWSD Bonds necessarily leads to the conclusion that the Plan cannot impose non-consensual impairment on the DWSD Bondholders.

## A. Dissenting DWSD Creditors are Protected by the "Best Interests" Test.

39. The "best interests" test is a core confirmation requirement in both chapter 11 and chapter 9 cases. Although the language used in the chapter 9 and chapter 11 statutory provisions differs,[20] the legislative history indicates that the purpose of the "best interests" test remains the same in both chapter 9 and chapter 11 cases. See 6 Collier on Bankruptcy ¶ 943.03[7][a] (16th ed. 2013) ("[T]he [best interests] test is designed to protect the dissenting minority of a class that has accepted the plan . . . .").[21]

_____

[20] In chapter 11, the "best interests" test is embodied in section 1129(a)(7), which states that a dissenting creditor must "receive or retain . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7). In chapter 11 "the [best interests] test is phrased in terms of liquidation of the debtor." H.R. Rep. No. 95-595, at 400 (1977). "Because that is not possible in a municipal-case, the test [in section 943(b)(7)] is phrased in its more traditional form, using the words of art 'best interest of creditors.'" Id.

[21] Notably, in its opposition to plan confirmation in the City of Stockton bankruptcy case, Jones Day, on behalf of certain creditors, has taken the position that the "best interests" test is an individual creditor protection in chapter 9, just like it is in chapter 11, and requires a municipal debtor to maximize creditor

40.     Specifically, the "best interests" test "protects the interests of dissenters within a class by placing a floor on the bargain agreed to by the majority." ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337, 364 (S.D.N.Y. 2007) ("If even one dissenting member of an impaired class would get less under the Plan than in a hypothetical liquidation, the fact that the class as a whole approved the Plan is immaterial."). Ultimately, the purpose of the "best interests" test is to protect individual creditors "even in the face of majority support for a plan". Id. at 364, 367 ("[S]ection 1129(a)(7) is one of the strongest protections individual creditors have . . . ."); see also Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 471 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

### B.     The Plan Does Not Provide DWSD Bondholders With a Recovery Better Than The Alternatives.

41.     A proposed plan meets the "best interests" test under section 943(b)(7) only if the debtor has made a "reasonable effort" at providing a recovery for creditors that is better than the realistic alternatives. Pierce Cnty., 414 B.R. at

---

recoveries from all available resources. See In re City of Stockton, Case No. 12-32118, Summary Objection of Franklin High Yield Tax Free Income Fund and Franklin California High Yield Municipal Fund to Confirmation of First Amended Plan of Adjustment of Debts of City of Stockton, California (November 15, 2013) (Bankr. E.D. Cal. Feb. 26, 2014) [Doc. No. 1273].

718 (describing the test as a "floor requiring a reasonable effort at payment of creditors by the municipal debtor") (quoting Mount Carbon, 242 B.R. at 34); see also Disclosure Statement at 78 ("A chapter 9 debtor satisfies the best interests of creditors test if its plan of adjustment makes a reasonable effort to provide a recovery for creditors."). Accordingly, "[a] plan that makes little or no effort to repay creditors over a reasonable period of time may not be in the best interest of creditors." 6 Collier on Bankruptcy ¶ 943.03[7][a] (16th ed. 2013).

42. In making this determination, courts "must apply the test to require a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case." 6 Collier on Bankruptcy ¶ 943.03[7][b] (16th ed. 2013). The legislative history indicates that courts should use Kelley v. Everglades Drainage District, 319 U.S. 415 (1943) and Fano v. Newport Heights Irrigation District, 114 F.2d 563 (9th Cir. 1940) as guides for evaluating whether a chapter 9 debtor's plan is in the best interests of creditors.[22] The prevailing theme from both Kelley and Fano is that a court should consider the municipal debtor's future ability to pay creditors when applying the "best interests" test, and the ultimate

---

[22] See 124 Cong. Rec. H 11,100 (Sept. 28, 1978); S 17,417 (Oct. 6, 1978) ("The best interests of creditors test [under section 943(b)] does not mean liquidation value as under chapter XI of the Bankruptcy Act. In making such a determination, it is expected that the court will be guided by standards set forth in [Kelley] and [Fano], as under present law, the bankruptcy court should make findings as detailed as possible to support a conclusion that this test has been met.").

determination should turn on a fair allocation of the debtor's resources.

43.     In <u>Kelley</u>, the Supreme Court reversed an order of confirmation and remanded for the lower court to make additional findings to conclude that the plan was, among other things, in the best interests of creditors. <u>Kelley</u>, 319 U.S. at 417-18. A minority of bondholders objected to the plan, which provided for a recovery of 57 cents on the dollar for bondholders. <u>Id.</u> at 417. The Supreme Court held that the lower court was required to assess evidence regarding probable future revenues that would be available to make payments under the plan as well as make a determination regarding "the extent to which each class [was] entitled to share in a particular source." <u>Id.</u> at 420 ("And where, as here, different classes of creditors assert prior claims to different sources of revenue, there must be a determination of the extent to which each class is entitled to share in a particular source, and of the fairness of the allotment to each class in the light of the probable revenues to be anticipated from each source.").

44.     In <u>Fano</u>, the Ninth Circuit reversed confirmation of a plan as not being in the best interests of creditors when the debtor attempted to allocate the costs of infrastructure improvements to bondholder claimants. <u>Fano</u>, 114 F.2d at 565-66. The plan was approved by 90% of bondholders and sought to pay 62.5 cents on the dollar, but an individual dissenting bondholder objected. <u>Id.</u> at 564. The court held that the plan could not be confirmed as in the best interests of creditors, when

the debtor owned "assets in value many times the indebtedness" and it would be "highly unjust to allocate their cost to the bondholders" when there was no "showing that the taxing power was inadequate to raise the taxes to pay" the bondholders' claims. Id. at 565-66. As Collier observes, the Ninth Circuit's holding explains that "a debtor that had invested heavily in improvements in its facilities at a time when it was unable to pay the claims of its bondholders [could not] rely on its cash-poor position resulting from the investment as a reason why it should pay less to bondholders, because the bondholders should not be required in effect to subsidize the improvements." 6 Collier on Bankruptcy ¶ 943.03[7][a] (16th ed. 2013) (citing Fano, 114 F.2d at 565-66).

45. Courts, dating back to the Kelley and Fano era, have considered whether the amount proposed under the plan "was all that creditors could reasonably expect under the circumstances" when analyzing best interests. W. Coast Life Ins. Co. v. Merced Irr. Dist., 114 F.2d 654, 678 (9th Cir. 1940) (holding, in the context of a "best interests" analysis, "the only question before this court is whether or not the 51.501 cents on the dollar is all that could reasonably be expected in all the existing circumstances"); Lorber v. Vista Irr. Dist., 127 F.2d 628, 639 (9th Cir. 1942) (remanding to district court for additional findings regarding whether 55 cents on the dollar was the maximum the municipality could reasonably pay and stating "the test as to the fairness of the plan is whether or not

the amount to be received by the bondholders is all that they 'can reasonably expect in the circumstances'").

46.     As some courts have articulated, a court's consideration should turn on whether a plan "affords all creditors the potential for the greatest economic return from [the debtor's] assets" when making a "best interests" determination.  <u>In re Barnwell Cnty. Hosp.</u>, 471 B.R. 849, 869 (Bankr. D.S.C. 2012); <u>In re Bamberg Cnty. Mem'l Hosp.</u>, 2012 WL 1890259, at *8 (Bankr. D.S.C. May 23, 2012); <u>In re Connector 2000 Ass'n, Inc.</u>, 447 B.R. 752, 756-66 (Bankr. D.S.C. 2011).

47.     This case law makes clear that the Plan violates the best interests test by failing to provide the DWSD Bondholders with all they can reasonably expect to receive under the circumstances.  The reasonable expectation is that special revenue debt will be paid from and to the fullest extent of the pledged revenues. Where the revenues are sufficient in amount to pay such debt per its terms, the debt should be paid per its terms.  That is the benefit of the bargain, and it is what the Bankruptcy Code requires, and Congress intended, for special revenue debt. Moreover, the DWSD Bondholders can reasonably expect that the System Revenues will not be diverted (to the economic detriment of the DWSD Bond Insurers and DWSD Bondholders) to fund the City's settlement of its General Fund pension obligations or restructuring professional fees in violation of the

27

DWSD Bond Documents.[23]

48.     In fact, the Plan provides the DWSD Bondholders *with less* than they would receive under other possible alternatives, including if the chapter 9 case were dismissed. Outside of chapter 9, the DWSD Bonds would continue to be paid in full per their terms and enjoy their first-priority lien on the Systems' Revenues subject only to necessary operating and maintenance expenses that comply with the DWSD Bond Documents.

## III.  THE PLAN CANNOT BE CONFIRMED BECAUSE IT FAILS TO SATISFY THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 1129(B).

49.     The City has offered no support for its position that it can impair solvent special revenue debt.[24] To the contrary, as set forth in detail above, the Bankruptcy Code's treatment of special revenue debt makes clear that it is intended to remain unimpaired—to be repaid according to its terms, nothing more, nothing less. And it is absolutely clear that a municipal debtor cannot invade pledged special revenues to pay general fund obligations. That which a municipal debtor cannot accomplish directly without violating the Bankruptcy Code should

---

[23] See the discussion in section III.C.3 below—the Revenue Diversion violates the terms of the Enabling Act and the Bond Ordinances.

[24] The City may attempt to rely on dictum from the Jefferson County case, however, in Jefferson County, the court was faced with an insolvent sewer system (revenues could not pay the debt per its terms), which is completely distinguishable from the DWSD Bonds and the Revenues available to pay such bonds at issue here. See Jefferson Cnty., 482 B.R. at 435 n.17.

not be permitted through indirect means such as stripping call protection or reducing contractual rates of interest through "cramdown".

50.    If the Bankruptcy Court nonetheless concludes that section 1129(b) can be applied to the DWSD Bonds (as fully secured special revenue debt), the City has not, and cannot, satisfy the applicable standards.  To cram down the Plan on a dissenting class of impaired creditors, the City must demonstrate that the Plan does not discriminate unfairly and is fair and equitable with respect to such dissenting class.  11 U.S.C. § 1129(b).  Forced to vote on a Plan that will result in debt impairment regardless of how the class or individual holder votes, National expects that one or more impaired DWSD Bond classes will reject the Plan. National will supplement this Objection after the close of discovery, and submits the following roadmap of the Plan's inability to satisfy section 1129(b).

**A.     The Plan Unfairly Discriminates Against Impaired DWSD Bondholders.**

51.    The Plan unfairly discriminates against impaired classes of DWSD Bond Claims and thus cannot be confirmed.  The City has proposed to impair the claims of at least 151 classes of DWSD Bond Claims, while at the same time leaving unimpaired the claims of 186 classes of DWSD Bond Claims.  Moreover, the Plan proposes leave unimpaired the DWSD Revolving Bond Claims and the DSA Bonds (defined below), which are similarly secured with statutory liens.  The

City has offered no legally cognizable justification for this disparate treatment.[25]

52.     Courts in this jurisdiction apply the presumption-based approach when determining whether a plan discriminates unfairly for purposes of section 1129(b).  See In re BWP Transport, Inc., 462 B.R. 225, 230-31 (Bankr. E.D. Mich. 2011); In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999). Under this standard, a rebuttable presumption of unfair discrimination occurs when there is:

(1) a dissenting class;

(2) another class of the same priority; and

(3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

---

[25] In addition to violating section 1129(b)'s unfair discrimination requirement with respect to *rejecting* classes of DWSD Bond Claims, the Plan's disparate treatment of electing and non-electing holders of DWSD Bond Claims in the same *accepting* class also violates section 1123(a)(4) of the Bankruptcy Code.  The Plan provides that holders of DWSD Bond Claims in accepting classes that fail to return an election treatment form will receive the Cramdown Rates, while claimants that return the form and make the appropriate election will receive the New Existing Rate DWSD Bonds.  Courts have refused to confirm plans that contained similar disparate treatments within a class.  In re Adelphia Commc'ns Corp., 361 B.R. at 362-64; see also Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.), 407 B.R. 576, 592-93 (D. Del. 2009).

In re BWP Transport, Inc., 462 B.R. at 231 (quoting In re Dow Corning Corp., 244 B.R. at 702).

53.　　In this case, the Bankruptcy Court must presume unfair discrimination.

54.　　The Plan unfairly discriminates in favor of the DWSD Revolving Bond Claims, which, on information in belief, are all held by the State of Michigan (collectively, the "State DWSD Claims").  Unlike the DWSD Bonds, all of the State DWSD Claims are unimpaired and will be reinstated under the Plan.  The approximately $508 million of State DWSD Claims are junior secured obligations of the DWSD pursuant to their third tier lien positions.  All of the State DWSD Claims have a junior, subordinate lien position to the DWSD Bonds targeted for impairment, and yet, the State DWSD Claims are set to receive superior treatment under the Plan.

55.　　Moreover, the City has proposed superior treatment for a class of its general obligation bonds, in the outstanding amount of approximately $484 million, that are "secured" by a pledge of and statutory lien on Distributed State Aid (the "DSA Bonds").  The DSA Bonds are treated as "secured" under the Plan and are not subject to impairment.  However, the statutory lien securing the DSA bonds is no different than the statutory lien securing the DWSD Bonds.  The interest rates on the DSA bonds are above "market," using the City's own

assumptions regarding the current state of the market.  In fact, if the City were to apply the same Cramdown Rates proposed for the DWSD Bonds to the DSA Bonds, the savings to the City would approximate $84 million (or more, given that the DSA Bonds should enjoy an "AA" rating), which savings would directly benefit the City's General Fund.

56.     Finally, the City cannot justify discrimination among holders of unimpaired and impaired DWSD Bond Claims (which debt is secured by the same liens and bears the same terms) based solely on differences in interest rate.

57.     To rebut the presumption of unfairness due to the material difference in the impaired and unimpaired DWSD Bondholders' recoveries, the City must show that *outside of bankruptcy* "the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain." In re BWP Transport, Inc., 462 B.R. at 231 (quoting In re Dow Corning Corp., 244 B.R. at 702).  Outside of bankruptcy, dissenting DWSD Bondholders would receive the exact same recovery as unimpaired DWSD Bondholders, and the unimpaired DWSD Bondholders are not providing any new value to the City.  Thus, there is no rational basis to distinguish between these two groups of DWSD Bondholders for purposes of the unfair discrimination test.

58.     Nor can the City support its discriminatory treatment on the basis

"that such allocation was consistent with the risk assumed by parties *before the bankruptcy*." Id. (emphasis added). The impaired and unimpaired classes of DWSD Bond Claims assumed and bear the same risk related to the Systems and their Revenues. For all of these reasons, the Plan fails to satisfy section 1129(b)'s unfair discrimination requirement.[26]

> **B. The Plan is Not Fair and Equitable with Respect to the Dissenting DWSD Bond Classes Because it Does Not Provide DWSD Bondholders What They Can Reasonably Expect Under the Circumstances.**

59.    In addition to finding that the Plan does not unfairly discriminate, the Bankruptcy Court must find that the Plan is fair and equitable. In chapter 9, a plan is only fair and equitable if "the amount to be received by the bondholders is all that they can reasonably expect in the circumstances." Lorber v. Vista Irr. Dist., 127 F.2d at 639 (citing W. Coast Life Ins. Co. v. Merced Irr. Dist., 114 F.2d 654 (9th Cir. 1940), cert. denied, 311 U.S. 718 (1941)).[27] The reasonable expectations

---

[26] The Plan also discriminates unfairly by requiring the DWSD to pay $428.5 million over an accelerated nine year period on account of its unfunded pension liabilities. As discussed, *infra*, the DWSD's accelerated payments would relieve the City and the General Fund from paying their fair share of pension obligations during the nine years following the chapter 9 proceeding. This is blatantly discriminatory: no other City department is required to make such accelerated payments; no other secured creditor is being stripped of its lien so that the City may transfer value to a favored creditor group (the GRS Pension Claims).

[27] 6 Collier on Bankruptcy ¶ 943.03[1][f] (16th ed. 2013) ("[T]he fair and equitable rule has additional content in chapter 9 cases. A plan under chapter 9 is fair and

test involves fact-intensive determinations, focusing on the debtor's ability to pay creditors while maintaining essential services and requiring the bankruptcy court to find that the proposed payment to creditors is the maximum the municipality could pay under the circumstances. See Lorber v. Vista Irr. Dist., 143 F.2d 282, 284 (9th Cir. 1944); see also In re Corcoran Hosp. Dist., 233 B.R. 449, 459 (E.D. Cal. 1999). While similar to the best interests of creditors test, the fair and equitable standard imposes a separate requirement on the City, which it cannot satisfy.

60. The reasonable expectation of the DWSD Bondholders is that the DWSD Bonds will be paid in full per their terms from the Systems' Revenues. The facts here are distinguishable from cases where courts have held that a plan was fair and equitable because the proposed payments to bondholders under a plan were the maximum a municipal debtor could reasonably pay. See, e.g., In re Corcoran Hosp. Dist., 233 B.R. at 461 (stating that in other fair and equitable cases courts "looked at the insolvency of the debtor and whether the debtor could, in fact, raise taxes sufficient to pay the bondholders in full. Here, the court has found that the debtor . . . could not raise taxes sufficient to pay more to [its unsecured creditors]."). In this case, the Systems can pay; present and projected Revenues are more than sufficient to pay the DWSD Bonds pursuant to their terms.

---

equitable if 'the amount to be received by the bondholders is all that they can reasonably expect in the circumstances.'").

2776785.1

61.     The expectation of payment in full of the DWSD Bonds in accordance

with their terms is wholly consistent with the Sixth Circuit's pronouncement that

where a debtor can pay its debt according to its terms, it must do so.  See In re

Dow Corning Corp., 456 F.3d 668, 679 (6th Cir. 2006) ("When a debtor is solvent,

then, the presumption is that a bankruptcy court's role is merely to enforce the

contractual rights of the parties, and the role that equitable principles play in the

allocation of competing interest is significantly reduced.").[28]   Indeed, the Dow

Corning court concluded that "absent compelling equitable considerations, *when a

debtor is solvent, it is the role of the bankruptcy court to enforce the creditors'

contractual rights*."  Id. (emphasis added); see also In re BWP Transport, Inc., 462

B.R. at 233 (observing that "[t]he Sixth Circuit has held that when the debtor is

solvent, the 'fair and equitable' requirement for confirmation and the 'absolute

priority rule' mean that, 'absent compelling equitable considerations,' the Chapter

11 plan must pay creditors in full, *in accordance with their pre-petition rights,*

---

[28]  See also Matter of Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 791 F.2d 524,
528 (7th Cir. 1986) ("[I]f the bankrupt is solvent the task for the bankruptcy court
is simply to enforce creditors rights according to the tenor of the contracts that
created those rights; . . ."); Debentureholders Protective Comm. of Cont'l Inv.
Corp. v. Cont'l Inv. Corp., 679 F.2d 264, 269 (1st Cir. 1982) ("Where the debtor is
solvent, the bankruptcy rule is that where there is a contractual provision . . .
providing for interest on unpaid instal[l]ments of interest, the bankruptcy court will
enforce the contractual provision with respect to both instal[l]ments due before and
. . . after the petition was filed."); Ruskin v. Griffiths, 269 F.2d 827, 831 (2d Cir.
1959) (holding that secured creditors were entitled to default interest rate
established in collateral agreement because the debtor was solvent).

*including all of their contractual rights*") (emphasis added)).

62. While the City's General Fund is not solvent, the Systems are solvent and each System has the ability to raise their rates. Therefore, present and projected Revenues are more than sufficient to pay the special revenue debt. National submits that the holding of <u>Dow Corning</u> is analogous and instructive as to how fully secured special revenue debt should be treated in a chapter 9 case. Consequently, the City cannot satisfy the fair and equitable test if it insists on impairing such debt.

**C.    The Plan Does Not Satisfy The Requirements of Section 1129(b)(2)(A).**

63. The Plan's treatment of the DWSD Bonds falls within the ambit of section 1129(b)(2)(A)(i).[29] Therefore, in order to satisfy the fair and equitable test (in addition to the judicial considerations set forth above), the Plan must provide:

> (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

---

[29] The City may try to argue that it is not attempting to cram down the Plan under section 1129(b)(2)(A)(i), but rather that the Plan satisfies the "indubitable equivalent" prong of the fair and equitable test set forth in section 1129(b)(2)(A)(iii). The United States Supreme Court's holding in <u>RadLAX Gateway Hotel, LLC v. Amalgamated Bank</u>, 132 S. Ct. 2065 (2012) clarifies that a debtor may not cram down a plan under section 1129(b)(2)(A)(iii) if section 1129(b)(2)(A)(i), the more specific provision, applies. <u>Id.</u> at 2072; <u>see also</u> In re River East Plaza, LLC, 669 F.3d 826, 833 (7th Cir. 2012). Here, the Plan treatment only implicates section 1129(b)(2)(A)(i).

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; . . . .

11 U.S.C. § 1129(b)(2)(A)(i).

64. The Plan fails to satisfy section 1129(b)(2)(A)(i) in the following respects: (1) the Plan proposes below-market Cramdown Rates that do not provide for the payment in full of the DWSD Bonds on a present value basis, (2) the Plan does not provide for the treatment of the full allowed amount of the DWSD Bond Claims, and (3) the DWSD Bonds do not retain their same lien rights and priority under the Plan.

**1.    The Cramdown Interest Rates for the DWSD Bonds Are Inadequate to Provide DWSD Bondholders with the Present Value of their Claims.**

65. In order to cram down the DWSD Bonds, the Plan must provide the DWSD Bonds with a stream of payments with a present value equal to the value of the DWSD Bonds' collateral, totaling the amount of the DWSD Bondholders' claim. The Sixth Circuit has articulated a two-step analysis for determining the appropriate cramdown interest rate in chapter 11 cases. <u>Bank of Montreal v. Official Comm. Of Unsecured Creditors</u> (<u>In re American HomePatient, Inc.</u>), 420 F.3d 559 (6th Cir. 2005). First, the court determines whether there is an efficient market, and, if so, uses the market interest rate. <u>Id.</u> at 568. If there is no such

efficient market, then the court applies the formula rate (i.e., prime plus approach) advanced by a plurality of the Supreme Court in Till v. SCS Credit Corp., 541 U.S. 465 (2004). See American HomePatient, 420 F.3d at 568.

66. Following the Sixth Circuit's opinion in American HomePatient, courts in the Sixth Circuit have adopted and applied the efficient market approach. See, e.g., In re Brice Road Devs., L.L.C., 392 B.R. 274, 280-81 (6th Cir. B.A.P. 2008) (affirming bankruptcy court's holding that debtor's proposed rate of 6% was "within the range of the rates in an efficient market"). This Bankruptcy Court has also applied the efficient market approach. See In re Big Buck Brewery & Steakhouse, Inc., No. 04-56761, Confirmation Hr'g Tr. [Doc. No. 789], at 147-48, 163 (Bankr. E.D. Mich. October 19, 2005) (recognizing, in a chapter 11 confirmation hearing, American HomePatient's "two tiered approach" and denying confirmation in part because there was "no evidence" that the interest rate proposed by the debtor was appropriate under the American HomePatient framework).

67. In the event this Bankruptcy Court concludes that there is not an efficient market for the cramdown bonds proposed under the Plan, American HomePatient provides that the court should apply the prime plus approach suggested by Till. See In re Griswold Bldg., LLC, 420 B.R. 666, 693 (Bankr. E.D. Mich. 2009). Under Till, the prime plus approach involves looking at the national

prime rate, and then adjusting the prime rate upwards based on various risk factors, including "the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan." Till, 541 U.S. at 479.

68. The Cramdown Rates are fictional. The Systems cannot obtain those interest rates, even when viewed on a stand-alone basis. The Systems will not be "A" rated upon the City's emergence from chapter 9. Nor will the City be able to establish that the Systems should be treated as though they are "A" rated upon emergence from bankruptcy, such that they could access the credit markets and obtain municipal debt at "A" ratings without any debt insurance or other credit enhancement. Each New DWSD Bond will be priced higher than the Cramdown Rates reflected for such bond in the City's "Interest Rate Reset Chart," as the expert testimony and market evidence will show.

69. The evidence will further show that the ratings agencies have taken a dim view of the City's case, and the Plan's proposed treatment of the DWSD Bonds. Standard & Poor's and Moody's Investors Service both set Detroit water and sewer debt underlying ratings to junk status in July before the City's bankruptcy filing. And, shortly after the City filed its initial plan, Fitch Ratings downgraded the DWSD Bonds three notches to junk bond status, citing weak financial performance and uncertainty stemming from the City's attempt to reduce the interest rates on the DWSD Bonds, strip call protection and subordinate the

DWSD Bondholders' lien to create top-line revenue for the City. <u>Rating to Bondholder Security After Detroit</u>, Fitch Ratings, May 1, 2014, attached hereto as <u>Exhibit B</u>.

70. Because "Detroit's proposed treatment of [special revenue] bondholders strains the boundaries of what creditors would have expected to be entitled to in a bankruptcy" and "challenge[s] traditional rating distinctions linked to bondholder security," the Plan's impairment of the DWSD Bonds, according to Fitch, will have a lasting impact on how the municipal market will view the credit quality of the Systems. <u>Id.</u> at 1. If the DWSD Bonds are ultimately impaired, Fitch has indicated that it "will reevaluate its current assumption that utility revenue bond ratings are so well protected as special revenue debt under Chapter 9 that such bonds can be assigned ratings on a stand-alone basis" without consideration of the City's general credit quality. <u>Id.</u> at 2.

71. In its desire to extract value from the Systems for the General Fund, the City's overly-aggressive approach to tax the Counties and DWSD creditors to finance its Plan has also served to alienate the Counties (in addition to the DWSD Bond Insurers and Bondholders, who collectively are critical to Systems ability to access the capital markets for the lowest-cost financing in the future), resulting in greater uncertainty and risk for the long-term viability of the Systems.

72. Based on the foregoing, the appropriate interest rate for each New

DWSD Bond is the existing contract rate or a higher rate.  As the Plan does not provide DWSD Bondholders with the present value of their claims, it cannot be confirmed.

> **2.      The Plan Cannot be Confirmed Because it Fails to Treat the DWSD Bondholders' Claim Arising from the Call Violation.**

73.      In order to confirm the Plan, the City must provide legally required treatment for the entirety of the allowed DWSD Bond Claims.  Most of the DWSD Bonds are not repayable prior to a specified date.  Thus, the allowed DWSD Bond Claims include, *inter alia*, principal <u>and</u> interest through maturity or to the earliest or any subsequent redemption date.  <u>See</u> MCL §§ 141.120(l), 141.120(3).  The City has proposed to reduce unilaterally the DWSD Bondholders' allowed claim by including the Call Violation in the Plan and not providing the DWSD Bondholders with any compensation for the resulting breach.  As such, the Plan violates sections 506(b), 1129(a)(2) and 1129(b)(2)(a)(i) of the Bankruptcy Code.

74.      Courts have consistently held that claims resulting from the prepayment of secured funded debt are charges under section 506(b) and therefore are a component of the secured creditor's allowed secured claim.  <u>See, e.g.</u>, <u>Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Assoc.</u> (<u>In re Imperial Coronado Partners, Ltd.</u>), 96 B.R. 997, 1000 (9th Cir. B.A.P. 1989) ("Here, the prepayment premium is clearly a 'charge provided for under the agreement' and,

41

thus, subject to the reasonableness limitation [of § 506(b)]."); <u>In re Outdoor Sports Headquarters, Inc.</u>, 161 B.R. 414, 424 (Bankr. S.D. Ohio 1993) ("Prepayment charges are encompassed in the term 'charges,' as used in § 506(b).") (collecting cases).

75.     Courts generally impose two requirements for including a charge as part of an allowed secured claim under section 506(b).  First, the charge must be enforceable under state law.  <u>See, e.g.</u>, <u>Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Ass'n</u> (<u>In re Premier Entm't Biloxi LLC</u>), 445 B.R. 582, 618 (Bankr. S.D. Miss. 2010).  Second, the charge must satisfy the reasonableness standard of section 506(b).  <u>See, e.g.</u>, <u>In re Imperial Coronado Partners, Ltd.</u>, 96 B.R. at 1000-01 (9th Cir. B.A.P. 1989); <u>In re Premier Entm't Biloxi</u>, 445 B.R. at 618 (Bankr. S.D. Miss. 2010); <u>Anchor Resolution Corp. v. State Street Bank and Trust Co. of Conn.</u> (<u>In re Anchor Resolution</u>), 221 B.R. 330, 341 (Bankr. D. Del. 1998).

76.     In this case, virtually all of the DWSD Bonds contain prohibitions on early repayment or refinancing of the bonds.  Some DWSD Bond Documents contain an absolute prohibition on early payment while most prohibit early payment or redemption prior to a date specified in the DWSD Bond Documents (the "<u>Early Call Date</u>").  Further, the majority DWSD Bonds have not reached the Early Call Date specified in the DWSD Bond Documents.  None of the DWSD Bond Documents permit acceleration even upon an event of default.

77.     Practices applicable to the pricing of municipal bonds differ somewhat from corporate debt issuances.  Since municipal bonds can be issued on a tax exempt basis, the bonds are usually issued with call protection, instead of make-whole provisions that are typical in the corporate debt market.  However, this call protection has the same value to bondholders as "make whole" provisions in the corporate context.

78.     The DWSD Bonds also enjoy a lien on the pledged revenue streams and this lien secures, among other things, DWSD Bondholders' right to receive full payment of principal and interest through maturity or the Early Call Date.  The Enabling Act contains specific provisions and requirements concerning the refinancing of bonds issued pursuant to its provisions.  Section 141.120(1) of the Enabling Act provides:

> If a borrower has outstanding any bonds issued under this act, it may issue and negotiate new bonds under this act for the purpose of providing for the retirement of those outstanding bonds, in whole or in part.  The new bonds shall be designated "revenue refunding bonds". . . .  The revenue refunding bonds may be issued to include the amount of any premium to be paid upon the calling of the bonds to be refunded, interest to the maturity or the earliest or any subsequent redemption date of the bonds to be refunded, and the cost of issuing the refunding bonds, **or if the bonds are not callable, any premium necessary to be paid in order to secure the surrender of the bonds to be refunded. This section shall not be construed as providing for the redemption of noncallable unmatured bonds without the consent of the holder or holders of the bonds**.

MCL § 141.120(1) (emphasis added).

79.     Section 141.120(3) of the Enabling Act then sets forth specific requirements for "refunding bonds":

> If refunding bonds or bonds issued pursuant to subsection (2) are to be issued and sold for the sole or partial purpose of refunding unmatured noncallable bonds, the latter shall be surrendered and canceled at the time of the delivery to the purchaser of the refunding bonds, or the proceeds of the bonds attributable to the purpose of refunding an outstanding obligation **and sufficient other funds shall be deposited in trust to pay principal and interest to maturity or principal, interest, and redemption premium to the earliest or any subsequent redemption date** together with irrevocable instructions to the paying agent to call the bonds for redemption on that date. The borrower may deposit in trust direct obligations of, or obligations the principal and interest of which are unconditionally guaranteed by, the United States that do not permit redemption at the option of the issuer and the principal and interest on which when due, without reinvestment, provide funds sufficient to pay principal, interest, and call premium, when due, on the bonds being refunded.

MCL § 141.120(3) (emphasis added).

80.     The Enabling Act mandates that in order to refund the DWSD Bonds, adequate provision must be made to pay the "principal and interest to maturity or principal, interest, and redemption premium to the earliest or any subsequent redemption date." MCL § 141.120(3). The City has not—nor can it successfully—contend that this amount is unreasonable and, thus, failing to provide the DWSD Bondholders' a secured claim for the Call Violation violates section 506(b).[30]

---

[30] The Plan also provides that the New Existing Rate DWSD Bonds distributed to electing holders of DWSD Bond Claims in accepting classes will be freely callable

44

81. Moreover, even if the Bankruptcy Court were to conclude that the Call Violation does not give rise to a secured claim under section 506(b), the Plan would still be in violation of the Bankruptcy Code. Because the Systems are solvent, the Bankruptcy Court's primary responsibility is to give effect to the creditors' pre-bankruptcy contractual agreements. See In re Dow Corning, 456 F.3d at 679. Outside the Sixth Circuit, courts have cited Dow Corning in support of the proposition that creditors are entitled to a claim for a debtor's breach of no-call or make-whole provisions. See, e.g., In re Chemtura Corp., 439 B.R. 561 (Bankr. S.D.N.Y. 2010). Citing the Sixth Circuit's Dow Corning decision (among others), the bankruptcy court in Chemtura concluded that, "[a]s matters of bankruptcy law, since we here have a solvent debtor, I think the bondholders are likely to get whatever they're entitled to under state law, [on account of the debtor's breach of the indentures' no-call and make-whole provisions]." Id. at 606; see also In re Sch. Specialty, Inc., 2013 WL 1838513, at *4, 4 n.7, 5 (Bankr. D. Del. Apr. 22, 2013) (concluding that a claim for a make-whole premium, totaling 37% of the term loan, was akin to a claim for liquidated damages under

---

at any time without premium or penalty. The Plan similarly does not take into account the allowed claim of these electing DWSD Bondholders for the removal of call protection. Although section 1129(b) does not apply to these creditors, in addition to violating the best interests test as noted in section II.A above, the Plan violates Bankruptcy Code sections 1129(a)(2) and 506(b) with respect to these creditors.

2776785.1

New York law and should be allowed).

82.    The DWSD Bondholders are similarly entitled under state law to be compensated for "principal and interest to maturity or principal, interest, and redemption premium to the earliest or any subsequent redemption date."   MCL § 141.120(3).    The Plan thus violates state law and DWSD Bondholders' contractual rights by failing to either honor the call provisions or provide them with a claim on account of the Plan's Call Violation.

### 3.    The Revenue Diversion Impermissibly Strips the DWSD Bondholders' Liens.

83.    The Plan does not provide for deferred cash payments equal to the allowed amount of the DWSD Bond Claims.  Nor does the Plan provide that the DWSD Bondholders will retain their liens.  Consequently, the Plan does not satisfy the "fair and equitable" test because section 1129(b)(2)(A)(i) of the Bankruptcy Code expressly requires that the holders of DWSD Bond Claims "retain the liens securing such claims."  See 11 U.S.C. § 1129(b)(2)(A)(i).

84.    Instead of lien retention, the Plan subordinates and strips the lien of the DWSD Bondholders in favor of accelerated pension payments, payments for unrelated professional fees and other administrative costs which are not permissible O&M Expenses.

85. The DWSD Bond holders have liens on all System revenues except for those revenues transferred to the O&M Fund established under such Bond Ordinance to provide for the O&M Expenses of the related System.

86. Revenues are only transferred into the O&M Fund in an amount "sufficient to provide for the payment of *the next month's* expenses of administration and operation of the System . . . and such *current* expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order." Bond Ordinances at § 12B (emphasis added).[31] Therefore, O&M Expenses are strictly limited to the next month's expenses of administration/operation and current maintenance expenses as necessary to preserve the System in good repair. Only these limited current monthly O&M Expenses fall outside the scope of the DWSD Bondholders' first-priority lien.

87. The Revenue Diversion does not fit within the definition of O&M Expenses under the Bond Ordinances or the Enabling Act. The City has provided no evidence that the $428.5 million Revenue Diversion represents the actual pension costs of DWSD employees. Nevertheless, the Plan will obligate the Systems to fund this amount regardless of whether the investment return on the

---

[31] Similarly, the Enabling Act provides that Revenues are to be deposited into a separate first priority fund "for the payment for the next succeeding period of all current expenses of administration and operation and the current expenses for that period for maintenance as may be necessary to preserve [the system] in good repair and working order." MCL § 141.122(1)(a).

2776785.1

Systems' pension assets exceeds projections or the liability assumptions are better than anticipated. Moreover, the $428.5 million amount includes an improper allocation of significant chapter 9 professional fees and administrative costs to the Systems which bear no relation to the Systems' operation or maintenance. National further objects to (i) the acceleration of the proposed pension payments (even assuming the unfunded pension liability of the Systems is determined to be appropriate—which National does not concede), (ii) the fact that the Systems are being forced to fund on an accelerated basis their pension obligations while the City's General Fund enjoys a 10-year pension funding holiday, and (iii) the fact that the static structure of the payment means that the Systems could over-fund their pension obligations (assuming that the funding of pension liability is found to be permitted).

88. The terms of the bond documents control when it comes to operation and maintenance expenses for a utility. This issue was adjudicated in the Jefferson County chapter 9 case, and will be the subject of extensive discovery and potential dispute here. See The Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.), 482 B.R. 404 (Bank. N.D. Ala 2012). In Jefferson County, the bankruptcy court ruled that the determination of what expenses were operating and maintenance expenses could only be made by reference to the underlying bond documents. Id. at 442 ("[A] court should defer to the agreed to pledge and

distributive design representing the business judgments of the parties that is expressed in the contract between them."). The <u>Jefferson County</u> court held that the plain language of the relevant bond documents prevented the municipal debtor from adding extraneous charges to operating expenses. <u>Id.</u> at 419-20, 443-44 (rejecting reserves for depreciation, amortization or future expenses and an estimate for professional fees and expenses).

89. Not only does the City's proposal violate the plain language of section 1129(b)(2)(A)(i), but "[c]ourts have refrained from confirming plans that substantially modify the rights of the creditor through either an open and notorious removal of the liens or the execution of subordination agreements." <u>Corestates Bank, N.A. v. United Chem. Techs., Inc.</u>, 202 B.R. 33, 49 (E.D. Pa. 1996). For example, in <u>Olde Prairie</u>, the debtor proposed to cramdown the secured creditor's claim by providing partial payment in cash and satisfying the remaining portion of the claim with a note secured by a lien on only one component of the secured creditor's prepetition collateral. <u>In re Olde Prairie Block Owner, LLC</u> 464 B.R. 337, 340-41 (Bankr. N.D. Ill. 2011). The court found the plan to be "lien stripping" in violation of the plain language of section 1129(b)(2)(A)(i) and authorized dismissal of the chapter 11 case unless the debtor modified its plan. <u>Id.</u> at 343-44 ("[Section 1129(b)(2)(A)(i)] requires that CenterPoint 'retain the liens securing' its claims, a provision read to refer to all of those liens, even though they

protect only to the extent of the amount of claims established."); <u>see also</u> <u>In re</u> <u>Griswold Bldg., LLC</u>, 420 B.R. 666, 706 (Bankr. E.D. Mich. 2009) (holding that a plan was not fair and equitable when it allowed the debtors to improperly subordinate the lenders priority assignment of leases and rents); <u>In re</u> <u>Wermelskirchen</u>, 163 B.R. 793, 797 (Bankr. N.D. Ohio 1994) (holding a plan was not fair and equitable when the terms of the plan stripped the secured creditor of its liens in the collateral).

90.     The City's Revenue Diversion is similar and should not be approved. Indeed, as noted by the Eastern District of Pennsylvania in <u>Corestates Bank, N.A.</u>, the standard definition of "retain" is to "continue to hold, have, use, recognize, etc., and to keep." <u>Corestates</u>, 202 B.R. at 50 (citing Black's Law Dictionary 1316 (6th ed. 1991)).   The Plan is the antithesis of lien retention, instead imposing an unauthorized, accelerated payment obligation on the DWSD.   This "open and notorious removal of the liens" is a violation of the section 1129(b)(2)(A)(i), and the Plan should not be confirmed.  <u>Id.</u> at 49.

## IV.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT WAS NOT PROPOSED IN GOOD FAITH.

91.     Section 1129(a)(3) applies in chapter 9 cases and requires that a plan be proposed in good faith and not by any means forbidden by law.  "Although the term 'good faith' is not defined in the bankruptcy code, nor is there significant case law exploring its meaning in the context of a Chapter 9 plan, courts have looked to

50

cases interpreting its meaning under Chapter 11 and Chapter 13 for guidance . . . ." In re Pierce Cnty. Hous. Auth., 414 B.R. at 719-20.

92.　For all of the reasons set forth herein, the Plan "does not comport with the provisions and purpose" of chapter 9 as it pertains to treatment of the DWSD Bonds. The Plan's treatment of the DWSD Bonds is inconsistent with chapter 9 and violates 1129(b). The Plan's terms are not fundamentally fair with respect to DWSD Bondholders because the Plan does not honor their contractual entitlements, notwithstanding the vitality and health of the Systems and the sufficiency of the Revenues pledged to support the DWSD Bond Claims. The sole purpose of the DWSD Bonds' treatment under the Plan is to benefit impermissibly creditors of the City's General Fund. As such, the Plan has not been proposed in good faith.

## RESERVATION OF RIGHTS

93.　National reserves the right to supplement this Objection, including asserting additional grounds for objecting to the Plan, based upon amendments and supplements to the Plan (including documents related to the foregoing), expert analysis, and any information received during the course of discovery or replies submitted by the City.

2776785.1

Respectfully submitted by,

**SIDLEY AUSTIN LLP**

Jeffrey E. Bjork
Jessica C.K. Boelter
Gabriel R. MacConaill
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
jbjork@sidley.com
jboelter@sidley.com
gmacconaill@sidley.com

-and-

James Bendernagel
Guy S. Neal
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8041
jbendernagel@sidley.com
gneal@sidley.com

**JAFFE RAITT HEUER & WEISS, P.C.**

By: ___/s/ Paul R. Hage_____
Louis P. Rochkind (P24121)
Paul R. Hage (P70460)
27777 Franklin Road, Suite 2500
Southfield, MI 48034-8214
Telephone: (248) 351-3000
lrochkind@jaffelaw.com
phage@jaffelaw.com

*Counsel for National Public Finance*
*Guarantee Corp.*

Dated: May 12, 2014.

52