# Exhibit A

# Chart of National-Insured DWSD Bonds

## National-Insured DWSD Bonds

| Bond Series | Class |
|---|---|
| Water 1993 | 1A-1 |
| Water 1997A | 1A-2 – 1A-3 |
| Water 2001A | 1A-4 |
| Water 2003A | 1A-22 – 1A-28 |
| Water 2003B | 1A-29 |
| Water 2003C | 1A-30 – 1A-38 |
| Water 2003D | 1A-39 – 1A-47 |
| Water 2004A | 1A-48 – 1A-57 |
| Water 2004B | 1A-58 – 1A-69 |
| Water 2005A | 1A-71 – 1A-86 |
| Water 2005C | 1A-114 – 1A-121 |
| Sewer 1998A | 1A-196 – 1A-205 |
| Sewer 1998B | 1A-206 – 1A-215 |
| Sewer 1999A | 1A-216 – 1A-223 |
| Sewer 2001B | 1A-224 |
| Sewer 2001C2 | 1A-233 – 1A-241 |
| Sewer 2001D | 1A-242 |
| Sewer 2005A | 1A-271 – 1A-291 |

| Sewer 2005B | 1A-293 – 1A-296 |
| Sewer 2005C | 1A-297 – 1A-305 |
| Sewer 2006A | 1A-306 |
| Sewer 2006B | 1A-307 – 1A-316 |
| Sewer 2006C | 1A-317 – 1A-319 |

# National-Issued Surety or Reserve Policies

| Bond Series | Class |
|---|---|
| Water 2001A | 1A-4 |
| Water 2003A | 1A-22 – 1A-28 |
| Water 2003B | 1A-29 |
| Water 2005A | 1A-71 – 1A-86 |
| Sewer 1999A | 1A-216 – 1A-223 |
| Sewer 1999 SRF2 | 1B-5 |
| Sewer 1999 SRF 3 | 1B-6 |
| Sewer 1999 SRF 4 | 1B-7 |
| Sewer 2001D | 1A-242 |
| Sewer 2001E | 1A-243 |
| Sewer 2005A | 1A-271 – 1A-291 |
| Sewer 2005B | 1A-293 – 1A-296 |
| Sewer 2005C | 1A-297 – 1A-305 |
| Sewer 2006A | 1A-306 |
| Sewer 2006B | 1A-307 – 1A-316 |

# Exhibit B

**Rating to Bondholder Security After Detroit, Fitch Ratings, May 1, 2014**



# Rating to Bondholder Security After Detroit
Special Report

Detroit's proposed treatment of bondholders strains the boundaries of what creditors would have expected to be entitled to in a bankruptcy. The proposed plan of adjustment's (PPOA) treatment of utility bonds, as well as the city's suit to invalidate certificates of participation (COPs), will challenge traditional rating distinctions linked to bondholder security.

The recent agreement between bond insurers and the city regarding ULTGO bonds is closer to what we would assume bondholders would receive without an express statutory lien but is still well below full recovery. If special revenue bondholders are impaired as proposed and/or the city's suit to invalidate is successful, there could be a roadmap for a legal strategy in a limited number of other cases.

**Most Detroit Bondholders Vulnerable:** The agreement on the ULTGO bonds stipulates even more substantial impairment for LTGO bondholders. Holders of pension certificates of obligation (COPs) may get a very low recovery at best. Even bonds secured by "special revenues" as defined in the bankruptcy code may be at risk, although the parking system special revenue debt has not been scheduled for impairment. Bonds secured by state distributable aid revenue have also not been impaired, and there is no proposal to do so.

**Operations Trump Security:** Maintaining or restoring essential services should be expected to trump attention to security distinctions when a municipality is distressed to the point of bankruptcy. Rating distinct security structures at levels without any direct linkage to the ULTGO debt will make sense only when that security reflects impregnable legal protection. It remains to be seen whether special revenue status, which could include a statutory lien on dedicated tax revenues, affords that kind of protection. The proposed impairment of the utility debt in the PPOA suggests it may not.

**Nontraditional Security May Be Targeted:** The city is challenging the validity of the COPs it issued to provide funding for the pension plans in the mid-2000s. Should the city prevail, the decision will suggest a legal theory to attack certain other nontraditional securities used by municipalities to avoid adherence to legal requirements related to debt issuance. Fitch Ratings believes most of the commonly used structures are better positioned to survive such a claim.

**Related Research**
Fitch Fundamentals Index - U.S. (April 2014)
Fitch on Detroit (September 2013)

**Analysts**
Amy Laskey
+1 212 908-0568
amy.laskey@fitchratings.com

Thomas McCormick
+1 212 908-0235
thomas.mccormick@fitchratings.com

Richard Raphael
+1 212 908-0506
richard.raphael@fitchratings.com



Public Finance

## Special Revenues May Be Less Special than Assumed

Chapter 9 of the U.S. Bankruptcy Code (the code) explicitly creates a carve-out for so-called special revenues, which would be exempt from an automatic stay and remain subject to pre-petition liens. This should protect enterprise operations from being swept into a bankruptcy caused by general government distress and allow those operations to continue to provide essential services on a stand-alone basis. The first listed definition in section 902 of Chapter 9 is: "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services..." Thus, it is quite clear that a water and sewer system's revenue should be considered special revenue. The provisions have historically been thought to allow ratings of the debt of such utilities to assume the complete isolation of these assets and revenues from the bankruptcy proceedings. This seems to be the clear intent of the provisions of the bankruptcy code.

In the June 2013 proposal to creditors, Detroit's emergency manager (EM) proposed eliminating the call protection from water and sewer bonds and adding a new $50 million payment to the city that would be senior to bondholder repayment. A nonconsensual change to the payment terms and the proposed subordination of the lien to create a top-line revenue for the city would, in our view, constitute an impairment. This proposed impairment of special revenue debt was surprising but viewed by the municipal market as a preliminary and somewhat speculative request, given the clarity in Chapter 9 regarding the treatment of special revenue bondholders. In addition, Detroit has gone to great pains to separate the funds and operations of its utilities. The utility is effectively a regional system that provides water service to nearly 43% of Michigan residents. Detroit residents comprise less than one-half of the system's revenue base. Treating the utility as an asset of Detroit in its bankruptcy seems completely outside the contours of chapter 9, legally and factually.

However, Detroit's PPOA retains the impairment included in the proposal to creditors and threatens to reduce the coupon of any holder of enterprise debt that does not consent to the plan. The code talks about paying only "necessary operating expenses" before revenue bond debt service in bankruptcy, which suggests a paring of expenses that come before debt service. In contrast, the Detroit EM proposes to increase the payments that come before debt service from pre-filing levels.

The impairment, intended to create additional funds for general city operations, effectively seeks to impose a charge on suburban members of the system to support the city operating budget. Not surprisingly, the suburban members are resisting this concept. A waiver of the call protection on the utility debt is not required to maintain the solvency of the utility system.

This approach has not yet been agreed upon either through negotiation or by the bankruptcy judge. If the lien or the call protection on the utility bonds is ultimately impaired, Fitch will reevaluate its current assumption that utility revenue bond ratings are so well protected as special revenue debt under Chapter 9 that such bonds can be assigned ratings on a stand-alone basis without a link to a related municipal ULTGO rating. Consideration of general government credit quality may become a more important factor in rating utility bonds.

We also note that the dilution of "special revenue" status could lead to impairment and pressure on non-utility debt secured by a statutory lien on a dedicated tax. The desire to limit the lien to a sum-sufficient coverage level of the secured debt to free up excess revenues for operations could be irresistible. As noted in our criteria, we do not generally assume that special tax pledges would be considered special revenue and do not rate bonds above the ULTGO rating.

**Related Criteria**
U.S. Local Government Tax-Supported Rating Criteria (August 2012)

13-53846-tjt    Doc 4665-1    Filed 05/12/14    Entered 05/12/14 22:07:51    Page 7 of 10



## General Obligation Strength Can Vary

There is some ambiguity in Chapter 9 about treatment in bankruptcy of property taxes for GO debt service, as special revenues exclude "receipts from general property, sales or income taxes…levied to finance the general purposes of the debtor." Despite a pledge of a voted, dedicated property tax for debt service, Michigan local government ULTGO bonds do not offer bondholders a statutory lien on that revenue stream.

Under a settlement agreement with Assured Guaranty Ltd., Ambac Assurance Corp. and National Public Finance Guarantee Corp., new bonds issued by the Michigan Finance Authority will provide existing ULTGO bondholders with 74% of their original principal. Bond security will include a statutory lien and an acknowledgement that the dedicated property tax constitutes a special revenue under Chapter 9. This result is far more favorable to creditors than the PPOA's original and revised offers of 20% and 15%, respectively.

We believe this outcome demonstrates both the strength provided by the ad valorem tax levied specifically for debt service and the vulnerability resulting from the absence of a statutory lien. It is unlikely in our view that the plan would be confirmed if it allowed taxes approved solely to support debt service to be used for municipal operations in violation of state law. However, the settlement agreement suggests that dedication of the taxes alone is not enough to completely protect bondholders in a bankruptcy proceeding and will not support elevating a rating above the general credit quality of the municipality. Moreover, it results in far less repayment than what utility revenue bondholders will likely receive.

No agreement has been reached yet with LTGO creditors, but the outcome will be even less favorable, despite being offered similar recovery in the PPOA. A "Most Favored Nation" clause in the settlement agreement requires that the rate of recovery for ULTGOs be greater than those of other classes of impaired unsecured creditors.

## Extraordinary Structures Can Survive

Bonds secured by distributable state aid (DSA; the city's share of statewide sales tax payments provided for by the state constitution) are not impaired under the PPOA. The pledged DSA is subject to a perfected statutory lien and trust for the benefit of bondholders. The security thus creates a super lien that a bankrupt municipality cannot seek to impair. Similar structures used in Michigan and elsewhere should support ratings clearly distinct from and not linked to the municipalities' general credit rating.

## Operations Trump Security; Bankruptcy to Remain Rare

Whether or not the PPOA's novel approach to bondholder security stands, the underlying operational strength of the obligor will remain paramount. Fitch notes that public sector obligors go to great lengths to avoid defaulting on bonded debt to the extent they have the capacity to do so. Conversely, obligors whose financial strength is impaired will necessarily face hard decisions, placing less weight on the legal security of their obligations. No matter how much legal fortification there is for the GO pledge, we believe bondholder payments will always be vulnerable where there is extreme financial distress and a desire to reduce fixed costs or divert spending to operations. We think these situations will continue to be rare, as few governments appear to be in such a difficult position, and even those that are may not be willing to accept the title of "bankruptcy."

It was clear from the time of the release of Detroit's proposal to creditors that the city did not intend to repay GO and COP bondholders in full, while employees and retirees saw their future payments reduced. There has been much discussion by city and state leadership about the need for everyone


involved to do their part to aid the city's recovery, and repaying bondholders would have been at odds with this philosophy. Both ULTGO bondholders and retirees have agreed on settlements that provide for substantially greater recovery than originally proposed by the city. Retirees will see very little impairment in pension benefits, although other post-employment benefits will be reduced substantially, while ULTGO bondholders receive 74% of their original debt service. Employees may see the restoration of some of the salary reductions sustained over the past few years..

## Potential COP Invalidation

The city is challenging the validity of the COPs it issued to provide funding for the pension plans in 2005 and 2006. Issuance of this debt notably boosted pension assets, affording the solid funding levels discussed in the previous section of this report. The challenge is based on the city's assertion that the transactions were artifices that allowed the city to exceed the debt limit set by state law and, therefore, are ultra vires, i.e. outside the legal capacity of the municipality and void. This suggests that the city cannot be required to repay the debt. It is not clear how the city can retain proceeds from the debt deposited to the pension fund, whether the pension fund itself could be caused to disgorge the funds remitted, how intervening payments to bondholders should be treated and whether there is any fraud claim available to holders of the debt. It is likely that an equitable outcome provides at least some recovery to bondholders, but that is impossible to estimate. It is one thing to reduce payments to holders of debt, even dramatically, and quite another to claim the debt should never have existed.

Many local governments depend on similar types of debt structures to fund their capital needs. Issuance of COPs or lease revenue bonds through a conduit issuer with no operating responsibilities (thus bankruptcy-remote) is particularly common in states like California, which requires voter approval for GO issuance. In Detroit's case, it was the state's debt limit the COPs strove to avoid. Issuers in other states have crafted various vehicles for a similar purpose.

Should the city prevail, it may create a limited theory to attack unusual or "creative" debt structures to avoid compliance with state laws governing debt issuance. However, the challenge in the Detroit proceeding does not, in our opinion, suggest that all such structures should now be considered vulnerable. Where a legal structure has been established through state legislation or has been tested in judicial proceedings, we believe an ultra vires claim will be much harder to assert, even if the claim is sustained in the Detroit case. For example, California's COP structure has become an established vehicle for financing capital needs. Bonds in Florida that are supported by a covenant to budget and appropriate non-ad valorem revenues are similarly common and have been subject to court validation. In contrast, Detroit's structure was described at the time as novel and does not benefit from either statutory authorization or judicial review of a similar structure in a Michigan court.

The city's attempts to invalidate the pension COPs seem to be at odds with the recent settlement agreement with the swap counterparties for the same COPs. The agreement will provide the counterparties $85 million. In his consideration of previous agreements that would have provided partial repayment to the counterparties, the bankruptcy judge weighed practical considerations — referring to the agreed-upon payments as "just too much money" — over the legal consideration of whether the repayment source under the collateral agreement was a special revenue under Chapter 9 and thereby secured.

ALL FITCH CREDIT RATINGS ARE SUBJECT TO CERTAIN LIMITATIONS AND DISCLAIMERS. PLEASE READ THESE LIMITATIONS AND DISCLAIMERS BY FOLLOWING THIS LINK: HTTP://FITCHRATINGS.COM/UNDERSTANDINGCREDITRATINGS. IN ADDITION, RATING DEFINITIONS AND THE TERMS OF USE OF SUCH RATINGS ARE AVAILABLE ON THE AGENCY'S PUBLIC WEBSITE AT WWW.FITCHRATINGS.COM. PUBLISHED RATINGS, CRITERIA, AND METHODOLOGIES ARE AVAILABLE FROM THIS SITE AT ALL TIMES. FITCH'S CODE OF CONDUCT, CONFIDENTIALITY, CONFLICTS OF INTEREST, AFFILIATE FIREWALL, COMPLIANCE, AND OTHER RELEVANT POLICIES AND PROCEDURES ARE ALSO AVAILABLE FROM THE CODE OF CONDUCT SECTION OF THIS SITE. FITCH MAY HAVE PROVIDED ANOTHER PERMISSIBLE SERVICE TO THE RATED ENTITY OR ITS RELATED THIRD PARTIES. DETAILS OF THIS SERVICE FOR RATINGS FOR WHICH THE LEAD ANALYST IS BASED IN AN EU-REGISTERED ENTITY CAN BE FOUND ON THE ENTITY SUMMARY PAGE FOR THIS ISSUER ON THE FITCH WEBSITE.

Copyright © 2014 by Fitch Ratings, Inc., Fitch Ratings Ltd. and its subsidiaries. One State Street Plaza, NY, NY 10004.Telephone: 1-800-753-4824, (212) 908-0500.  Fax: (212) 480-4435. Reproduction or retransmission in whole or in part is prohibited except by permission.  All rights reserved.  In issuing and maintaining its ratings, Fitch relies on factual information it receives from issuers and underwriters and from other sources Fitch believes to be credible. Fitch conducts a reasonable investigation of the factual information relied upon by it in accordance with its ratings methodology, and obtains reasonable verification of that information from independent sources, to the extent such sources are available for a given security or in a given jurisdiction. The manner of Fitch's factual investigation and the scope of the third-party verification it obtains will vary depending on the nature of the rated security and its issuer, the requirements and practices in the jurisdiction in which the rated security is offered and sold and/or the issuer is located, the availability and nature of relevant public information, access to the management of the issuer and its advisers, the availability of pre-existing third-party verifications such as audit reports, agreed-upon procedures letters, appraisals, actuarial reports, engineering reports, legal opinions and other reports provided by third parties, the availability of independent and competent third-party verification sources with respect to the particular security or in the particular jurisdiction of the issuer, and a variety of other factors. Users of Fitch's ratings should understand that neither an enhanced factual investigation nor any third-party verification can ensure that all of the information Fitch relies on in connection with a rating will be accurate and complete. Ultimately, the issuer and its advisers are responsible for the accuracy of the information they provide to Fitch and to the market in offering documents and other reports. In issuing its ratings Fitch must rely on the work of experts, including independent auditors with respect to financial statements and attorneys with respect to legal and tax matters. Further, ratings are inherently forward-looking and embody assumptions and predictions about future events that by their nature cannot be verified as facts.  As a result, despite any verification of current facts, ratings can be affected by future events or conditions that were not anticipated at the time a rating was issued or affirmed.

The information in this report is provided "as is" without any representation or warranty of any kind. A Fitch rating is an opinion as to the creditworthiness of a security. This opinion is based on established criteria and methodologies that Fitch is continuously evaluating and updating. Therefore, ratings are the collective work product of Fitch and no individual, or group of individuals, is solely responsible for a rating. The rating does not address the risk of loss due to risks other than credit risk, unless such risk is specifically mentioned. Fitch is not engaged in the offer or sale of any security. All Fitch reports have shared authorship. Individuals identified in a Fitch report were involved in, but are not solely responsible for, the opinions stated therein. The individuals are named for contact purposes only. A report providing a Fitch rating is neither a prospectus nor a substitute for the information assembled, verified and presented to investors by the issuer and its agents in connection with the sale of the securities. Ratings may be changed or withdrawn at anytime for any reason in the sole discretion of Fitch. Fitch does not provide investment advice of any sort. Ratings are not a recommendation to buy, sell, or hold any security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature or taxability of payments made in respect to any security. Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities. Such fees generally vary from US$1,000 to US$750,000 (or the applicable currency equivalent) per issue. In certain cases, Fitch will rate all or a number of issues issued by a particular issuer, or insured or guaranteed by a particular insurer or guarantor, for a single annual fee.  Such fees are expected to vary from US$10,000 to US$1,500,000 (or the applicable currency equivalent). The assignment, publication, or dissemination of a rating by Fitch shall not constitute a consent by Fitch to use its name as an expert in connection with any registration statement filed under the United States securities laws, the Financial Services and Markets Act of 2000 of the United Kingdom, or the securities laws of any particular jurisdiction. Due to the relative efficiency of electronic publishing and distribution, Fitch research may be available to electronic subscribers up to three days earlier than to print subscribers.