# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In re<br><br>CITY OF DETROIT, MICHIGAN,<br><br>Debtor. | Chapter 9<br><br>Case No. 13-53846<br><br>Hon. Steven W. Rhodes |

### LIMITED OBJECTION OF MERRILL LYNCH CAPITAL SERVICES, INC. AND UBS AG TO FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT [ECF NO. 4392] OR REQUEST FOR CLARIFICATION WITH RESPECT THERETO

Merrill Lynch Capital Services, Inc. and UBS AG (together, the "Swap Counterparties") submit this limited objection to, or request for clarification with respect to, the Fourth Amended Plan for the Adjustment of Debts for the City of Detroit (the "City") [ECF No. 4392] (the "Plan"). In support thereof, the Swap Counterparties respectfully represent as follows:

**The Swap Settlement Agreement**

On April 15, 2014, this Court entered the *Order (i) Approving the Settlement and Plan Support Agreement with UBS AG and Merrill Lynch Capital Services, Inc.* (the "Settlement Agreement") *Pursuant to Bankruptcy Rule 9019 and (ii) Granting Related Relief* [ECF No. 4094] (the "Approval Order"). Pursuant to the Settlement Agreement, the City agreed, *inter alia*, that it would not propose or support a plan of adjustment that (i) treats the secured swap claims of the Swap Counterparties (the "Secured Claims") any less favorably than provided in the Settlement Agreement or (ii) exculpates any creditor unless the Swap Counterparties are likewise exculpated. One critical component of the Settlement Agreement that was extensively negotiated and specifically tailored is the mutual release provision between the City and the Swap Counterparties (the "Settlement Releases").

While the Swap Counterparties unquestionably support Detroit's restructuring efforts, they file this limited objection solely to the extent that the Plan could be read to be inconsistent with the provisions of the Settlement Agreement and therefore not be a "Specified Plan" (as defined in the Settlement Agreement).[1] The Swap Counterparties have been in active discussions with attorneys for the City to attempt to resolve the Swap Counterparties' few concerns; however, the parties have not yet reached agreement.

Moreover, under the Settlement Agreement, the Swap Counterparties agreed to vote their Secured Claims in favor of (and not object in such capacity to) a Specified Plan. To be a Specified Plan, a plan of adjustment must (i) treat the Secured Claims in a certain manner, (ii) exculpate the Swap Counterparties to the extent the plan exculpates any other creditor and (iii) treat the rights and claims of the Swap Counterparties *no less favorably* than the terms of the Settlement Agreement and the Approval Order. As discussed below, the Swap Counterparties are concerned that the Plan currently fails to meet (ii) and (iii) above and, therefore, is not a Specified Plan. Accordingly, the Swap Counterparties reserve all of their rights under the Settlement Agreement, the Approval Order and applicable law.

**Plan Exculpation**

Article III, Section D.6 of the Plan provides that certain parties will be exculpated from liability in connection with, relating to or arising out of the City's restructuring efforts and the City's Chapter 9 case. The "Exculpated Parties" under the Plan include the General Retirement System for the City of Detroit ("GRS"), the Police and Fire Retirement System for the City of Detroit ("PFRS") and the members of the Official Committee of Retirees. Each of these entities is a creditor of the City. Indeed, most of these parties appear on the City's Second Amended List

---

[1] The Swap Counterparties do not object to confirmation of the Plan to the extent that the Plan is clarified as set forth herein or otherwise determined by the Court to be a Specified Plan.

of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code [ECF No. 1059] (the "Schedules").[2] Moreover, GRS filed a proof of claim (Claim No. 1848), PFRS filed two proofs of claim (Claim Nos. 2327 and 3184) and the two union members of the Official Committee of Retirees filed proofs of claim: AFSCME, AFL-CIO (Claim No. 1321) and International Union, UAW (Claim No. 3420).[3] The Official Committee of Retirees filed various proofs of claim on behalf of the retirees it represents, including on behalf of its members in their capacity as creditors (Claim Nos. 1913, 1738, 3637 and 1737).

A plain reading of the Plan suggests that various creditors are in fact receiving exculpations. However, the City has advised the Swap Counterparties that none of these parties are being exculpated *in their capacities as creditors,* therefore not triggering the City's obligation to similarly exculpate the Swap Counterparties. Since nothing in the Plan limits the exculpation provision in this manner, the Swap Counterparties have requested that the City modify the Plan either to add the Swap Counterparties as "Exculpated Parties" or to expressly limit the exculpation provision, such that the included parties are not being exculpated in their capacities as creditors. The City has so far not agreed to make either modification.

---

[2] The City's two retirement systems are included in the Schedules: the GRS at $2,037,000,000.00, as well as contingent and unliquidated amounts, and the PFRS at $1,437,000,000.00, as well as contingent and unliquidated amounts. In addition, the following members of the Official Committee of Retirees are included in the Schedules as having contingent claims in unliquidated amounts: (i) Edward McNeil; (ii) Michael Karwoski; (iii) Shirley Lightsey; (iv) Robert Shinske; (v) Donald Taylor; (vi) Gail Wilson Turner; (vii) Gail M. Wilson and (viii) AFSCME, AFL-CIO. Further, the GRS Pension Claims and PFRS Pension Claims as defined in the Plan include pension-related claims asserted by, *inter alia*, GRS and PFRS, in addition to current and former employees of the City.

[3] GRS and PFRS were not required to file proofs of claim for pension benefits or unfunded pension liabilities pursuant to the *Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [ECF No. 1782].

### Non-Consensual Third-Party Releases

Article III, Section D.7 of the Plan (the "Plan Releases") provides that each holder of a Claim that votes in favor of the Plan will be deemed to release any claims it may have in any way relating to the City or the Chapter 9 Case against the City, its Related Entities, the State, the State Related Entities and the Released Parties (each as defined in the Plan). The Plan Releases include parties that the Swap Counterparties did not agree to release in the finely articulated and negotiated Settlement Releases. Importantly, this non-reciprocal third-party release is not a typical opt-in or opt-out release that would allow a creditor to vote to accept the Plan without releasing non-debtor parties.[4] Instead, creditors must grant the Plan Releases in order to vote to accept the Plan. The Swap Counterparties assert that the City's failure to prove an opt-out mechanism renders the third-party releases non-consensual and thus appropriate only if the Plan Releases meet the Sixth Circuit's *Dow Corning* standard.[5] Since the factual record has not yet

---

[4] *See, e.g., In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bank. D. Del. 2011) ("[A]ny third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases."); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) ("releases of claims held by creditors who affirmatively indicate their willingness to grant such releases by 'checking a box' on their plan solicitation ballots" are consensual); *In re Recticel North Am., Inc.*, 2010 Bankr. LEXIS 5825 (Bankr. E.D. Mich. Apr. 9, 2010) (confirming plan of reorganization and finding third-party releases to be consensual as against claimholders who had ability to, but did not, opt-out of the releases).

[5] In *Dow Corning*, the Sixth Circuit held that non-debtor releases are a "drastic measure to be used cautiously" and are "only appropriate in 'unusual circumstances.'" *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002). *Dow Corning* established that a bankruptcy court is authorized to enjoin a non-consenting creditor's claims against a non-debtor *only* when seven factors are present:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those

4

been developed to fully assess whether each of the seven *Dow Corning* factors are satisfied, the Swap Counterparties believe that the City has not yet met (and may not be able to meet) its burden.[6]

Moreover, being compelled to grant the Plan Releases, which are broader than the Settlement Releases, would appear to be *less favorable* treatment of the Swap Counterparties' rights and claims as compared to the terms of the Settlement Agreement and the Approval Order. The City cannot credibly argue that the Swap Counterparties' agreement to vote in favor of certain plans of adjustment that treat their rights *no less favorably than the Settlement Agreement* can be used to force the Swap Counterparties to grant additional third-party releases beyond those agreed to in the Settlement Agreement. To avoid this inconsistency, the Swap Counterparties have requested that the City either provide an opt-out mechanism with respect to the Plan Releases or carve the Swap Counterparties out of the non-consensual Plan Releases; however, the City has not yet agreed to do either.

**Plan Injunction and Lien Release**

Finally, the Swap Counterparties object to the Plan to the extent that the injunction contained in Article III, Section D.5 or the release of liens contained in Article IV.K are broader than, or inconsistent with, the Settlement Agreement. The Settlement Agreement and the Approval Order provide the Swap Counterparties with allowed Secured Claims. The Swap

---

claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.* As subsequent case law has made clear, each of the *Dow Corning* factors must be present for the non-debtor releases to be authorized. *See, e.g., In re SL Liquidating, Inc.*, 428 B.R. 799, 802 (Bankr. S.D. Ohio 2010) ("[A]t least in the Sixth Circuit, all of the factors must be present and all the factors are important.").

[6] The Plan Releases cover a substantial number and breadth of non-debtor entities, including the State of Michigan, the Retiree Committee members and professionals, the *yet-unnamed* entities participating in the "DIA Settlement" and numerous "Related Entities" of each of these parties. Given the breadth of this release, it is not clear that factors one and three of *Dow Corning* are satisfied. Additionally, it is not apparent that each of the entities receiving a release has or will contribute assets to the reorganization, as required by prong two of *Dow Corning*.
5

13-53846-tjt    Doc 4668    Filed 05/12/14    Entered 05/12/14 22:18:12    Page 5 of 8

Counterparties have negotiated *post-petition* to have rights as secured creditors against the City, and this Court has approved the parties' heavily negotiated agreement. The City has advised the Swap Counterparties that they agree with the Swap Counterparties on this point and that the Plan is not intended to impair the Swap Counterparties' secured creditor rights; however, the City has so far not agreed to add clarifying language to the Plan.

**Conclusion**

For the reasons set forth above, the Swap Counterparties assert this limited objection to, or request for clarification with respect to, the Plan, and reserve all their rights in connection with the Settlement Agreement and the Approval Order.

Dated: New York, New York
May 12, 2014

                        DAVIS POLK & WARDWELL LLP

                        By:    /s/ Damian S. Schaible

Marshall S. Huebner
Damian S. Schaible
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
marshall.huebner@davispolk.com
damian.schaible@davispolk.com
elliot.moskowitz@davispolk.com

Attorneys for Merrill Lynch Capital Services, Inc.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:    /s/ Kelley A. Cornish

Daniel J. Kramer
Richard A. Rosen
Kelley A. Cornish
Stephen J. Shimshak
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
dkramer@paulweiss.com
rrosen@paulweiss.com
kcornish@paulweiss.com
sshimshak@paulweiss.com

Attorneys for UBS AG

WARNER NORCROSS & JUDD LLP

By:     /s/ Stephen B. Grow

Stephen B. Grow
Charles Ash, Jr.
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, Michigan 49503
sgrow@wnj.com
cash@wnj.com

Attorneys for Merrill Lynch Capital Services,
  Inc. and UBS AG