**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**OBJECTION OF ASSURED GUARANTY MUNICIPAL CORP. TO
CONFIRMATION OF FOURTH AMENDED PLAN FOR THE
<u>ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT (MAY 5, 2014)</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ......................................................................................................... 4

   A.     Statutory Framework of the Existing DWSD Bonds ........................................ 6

   B.     Security for the Existing DWSD Bonds ......................................................... 8

   C.     The DWSD Revenue Waterfall—A Closed Loop ......................................... 9

   D.     Assured is the Sole Party in Interest that Controls the Voting Rights and Remedies in Respect of the Existing DWSD Bonds that it Insures ................. 13

   E.     There is No Dispute that the DWSD Revenues Pledged to the Existing DWSD Bonds are "Special Revenues" and "Pledged Special Revenues" ........ 15

   F.     Plan Treatment of Existing DWSD Bond Claims ......................................... 17

      i.     Interest Rate Cramdown for Some New DWSD Bonds .............................. 17

      ii.    An Election that Results in Disparate Treatment ....................................... 18

   G.     Improper Diversion of DWSD Revenues to GRS Pension Claimants ............. 20

   H.     Further Contingent Payments to Pension Claimants ...................................... 22

JURISDICTION ....................................................................................................... 23

ARGUMENT ........................................................................................................... 23

I.      The Plan Cannot be Confirmed Because it is Not in the Best Interests of Creditors (11 U.S.C. § 943(b)(7)) ........................................................... 23

   A.     In Chapter 9, the "Best Interests of Creditors" Requires that Creditors Receive at Least what they Would Receive if the Case were Dismissed ......... 24

      i.     "Best Interests of Creditors" Requires a Municipal Debtor to Prove that Creditors Will Receive at Least what they Would Outside of Bankruptcy ... 25

      ii.    Cases under Chapter 9's Predecessor Statute and Chapter 9's Legislative History Support the Conclusion that a Plan Must, at a Minimum, Provide Creditors with what they Could Reasonably Expect to Receive if the Plan were Dismissed ............................................................................... 27

   B.     Non-Impairment of Fully Secured Revenue Bond Creditors is Mandated by the 1988 Municipal Bankruptcy Amendments .................................... 30

   C.     DWSD Bondholders May Not be Impaired under the Plan Because they Would be Paid in Full, with Interest, in the Ordinary Course if the Case were Dismissed ........................................................................... 34

II.     The Plan Cannot be Confirmed Because It Does Not Satisfy the Cramdown Requirements (11 U.S.C. § 1129(b)(2)(A)) ........................................... 37

A.      The Plan Does Not Allow the DWSD Bondholders to Retain their Liens and Provide DWSD Bondholders Deferred Cash Payments of a Value, as of the Effective Date, of at Least the Value of their Interest in their Collateral as Required by Sections 1129(b)(2)(A)(i)(I) and (II)..............................................38

    i.      The New DWSD Bonds Do Not Provide the DWSD Bondholders with Appropriate Interest Rates ............................................................39

        (a)    The Plan Cannot be Confirmed Because it Does Not Provide DWSD Bondholders with their Contracted-For Interest Rates ........................................ 40

        (b)    The Plan Cannot be Confirmed under the Efficient Market Test ........................ 44

        (c)    The Plan Cannot be Confirmed under Till's Formula Test ................................. 47

    ii.     The Plan Fails to Provide Value on Account of Call Protection .................52

    iii.    The Plan Partially Strips DWSD Bondholders of their Liens ......................56

B.      The Plan Does Not Provide DWSD Bondholders with the Indubitable Equivalent of their Claims ..................................................................56

III.    The Plan Cannot Be Confirmed Because it is Not Fair and Equitable Under Section 1129(b)(1) and Unfairly Discriminates......................................................60

  A.      It is Not Fair and Equitable to Strip Impaired Secured Creditors of Collateral for the Benefit of Unsecured Creditors ..............................................60

  B.      The Plan Cannot be Confirmed Because it Unfairly Discriminates against Certain Classes of DWSD Claims Insured by Assured (11 U.S.C. § 1129(b)(1))..................................................................63

    i.      Existence of a Dissenting Class ....................................................65

    ii.     Class of the Same Priority..........................................................65

    iii.    Different Treatment Under the Plan ...............................................66

IV.    The Plan Cannot be Confirmed Because it would Break the DWSD "Closed Loop" Mandated by the DWSD Ordinances and the Revenue Bond Act (11 U.S.C. § 943(b)(4)) ................................................................70

  A.      The DWSD Revenue Waterfall Creates a "Closed Loop" that Requires DWSD Revenues be used Only to Benefit the DWSD...................................71

  B.      The Plan Violates the DWSD Closed Loop by Extracting Non-Current GRS UAAL Contributions from the System .....................................72

    i.      Accrued GRS UAAL is Not a Current Expense............................72

    ii.     Section 928(b) Does Not Authorize Payment on Account of GRS UAAL ahead of DWSD Bondholder Debt Service ....................................75

  C.      The Plan Violates the DWSD "Closed Loop" by Forcing the DWSD to Subsidize the Pension Liabilities of the Remainder of the City ........................78

  D.      The Plan Violates the DWSD "Closed Loop" by Allocating the Potential Proceeds of a Qualifying DWSD Transaction to the Pension "Restoration Trust" ................................................................81

ii

V.        The Plan is Not Feasible as a Matter of Law (11 U.S.C. § 943(b)(7)) .................83

VI.      The Plan Cannot be Confirmed Because Impaired Classes are Improperly
Denied the Right to Vote (11 U.S.C. § 1124).......................................................85

CONCLUSION.......................................................................................................................87

iii

# TABLE OF AUTHORITIES

**Cases:**           **Page:**

*In re 20 Bayard Views, LLC,*
445 B.R. 83 (Bankr. E.D.N.Y. 2011) …………………………………………….. 64

*In re Alaska Fur Gallery, Inc.,* No. A09-00196,
2011 WL 4904425 (Bankr. D. Alaska Apr. 29,2011) ………………………………….. 58

*In re Am. Mariner Indus.,*
734 F.2d 426 (9th Cir. 1984) ……………………………………………………………… 57

*In re Armstrong World Indus., Inc.,*
348 BR 111 (D. Del. 2006) ……………………………….…………………………… 67

*In re Aztec Co.,*
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ……………………………………………… 64, 68

*Bank of Montreal v. Official Comm. of Unsecured Creditors*
*(In re Am. HomePatient Inc.),*
420 F.3d 559 (6th Cir. 2005)…………………………………………………………….. 40, 44, 48

*Bank of N.Y. Mellon v. Jefferson Cnty., (Jefferson County II)*    33, 75, 76,
482 B.R. 404 (Bankr. N.D. Ala. 2012)………………………………………………... 77

*In re Barney & Carey Co.,*
170 B.R. 17 (Bankr. D. Mass. 1994)…………………………………………………….. 67

*In re Bloomingdale Partners,*
155 B.R. 961 (Bankr. N.D. Ill. 1993)………………………………………………….. 48

*In re Bryson Props., XVIII,*
961 F.2d 496 (4th Cir. 1992) …………………………………………………………… 60

*In re BWP Transp., Inc.,*    64, 65, 67,
462 B.R. 225 (Bankr. E.D. Mich. 2011) …………………………………………….. 69

*In re Caldwell,*
76 B.R. 643 (Bankr. E.D. Tenn. 1987) ………………………………………………. 68

*In re Chemtura Corp.,*
439 B.R. 561(Bankr. S.D.N.Y. 2010) ……………………………………………….... 52

*In re City of Colorado Springs Spring Creek General Improvement Dist.,*
177 B.R. 684 (Bankr. D. Colo. 1995)…………………………………………………… 84, 85

*In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25,*
143 B.R. 750 (Bankr. D. Mont. 1992)…………………………………………………… 70

*In re City of Detroit, Mich.,*
No. 13-53846, Docket No. 3929 (Bankr. E.D. Mich. Apr. 9, 2014)…………………….. 41

iv

*In re City of Detroit, Mich.*,
No. 13-53846, Docket No. 4548 (Bankr. E.D. Mich. May 8, 2014)…………………….. 6, 42

*Corestates Bank, N.A. v. United Chem. Techs., Inc.*,
202 B.R. 33 (E.D. Pa. 1996)……………………………………………………………... 66

*Corl v. Huron Castings, Inc.*,
544 N.W.2d 278 (Mich. 1996)…………………………………………………………... 54

*In re Cranberry Hill Assocs., L.P.*,
150 B.R. 289 (Bankr. D. Mass. 1993)…………………………………………………… 68

*In re Crosscreek Apartments, Ltd.*,
213 B.R. 521(Bankr. E.D. Tenn. 1997)………………………………………………….. 67

*In re Dow Corning Corp. (Dow Corning I)*,
244 B.R. 678 (Bankr. E.D. Mich. 1999)………………………………………………… 41, 60

*In re Dow Corning Corp. (Dow Corning II)*,
244 B.R. 696 (Bankr. E.D. Mich. 1999)………………………………………………… 64, 67

*In re Dow Corning Corp. (Dow Corning III)*,
244 B.R. 705 (Bankr. E.D. Mich. 1999)………………………………………………… 64

*F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (Inv. Co. of the Sw., Inc.),*
341 B.R. 298 (B.A.P. 10th Cir. 2006)…………………………………………………… 57, 58

*Fano v. Newport Heights Irrigation District,*
114 F. 2d 563 (9th Cir. 1940)…………………………………………………………… 28, 30

*Fed. Nat'l Mortg. Ass'n v. Vil. Green I, GP*, No. 13-2643-STA, 2014 WL 288974
(W.D. Tenn. Jan. 27, 2014) …………………………………………………………... 60, 61

*Freeman v. Laventhol & Horwath,*
915 F.2d 193 (6th Cir. 1990)…………………………………………………………… 44

*General Electric Credit Equities, Inc. v. Brice Road Devs., L.L.C. (In re Brice Road
Devs., L.L.C.)*, 392 B.R. 274 (B.A.P. 6th Cir. 2008)…………………………………… 40, 44, 45

*In re Good*, 413 B.R. 552 (Bankr. E.D. Tex. 2009) ………………………………….. 41, 43

*In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr. D.N.J. 2000)………….. 64, 68

*In re Griswold Bldg.*, 420 B.R. 666 (Bankr. E.D. Mich. 2009)………………………… *Passim*

*In re GSC, Inc.*, 453 B.R. 132 (Bankr. S.D.N.Y. 2011)………………………………… 88

*HSBC Bank USA, Nat'l. Ass'n v. Calpine Corp.*, No. 07 Civ 3088 (GBD),
2010 WL 3835200 (S.D.N.Y. Sept. 25, 2010)………………………………………... 54, 55

*In re Jefferson Cnty., Ala.*, 474 B.R. 228 (N.D. Ala. 2012)……………………………… 16

*Kelley v. Everglades Drainage District*, 319 U.S. 414 (1943) …………………………. 24, 28, 29, 30

*Kelley v. Everglades Drainage Dist.*, 132 F.2d 742 (5th Cir. 1943) …………………… 29

*In re Monnier Bros.*, 755 F.2d 1336 (8th Cir. 1985) ………………………………….. 57, 58

v

*In re Mount Carbon Metro. Dist.,* 242 B.R. 18 (Bankr. D. Colo. 1999)..................... *Passim*

*Official Comm. of Unsecured Creditors v. Dow Corning Corp.*
*(In re Dow Corning Corp.),* 456 F.3d 668 (6th Cir. 2006)................................... *Passim*

*In re Olde Prairie Block Owner, LLC,* 464 B.R. 337 (Bankr. N.D. Ill. 2011).............. 38, 56, 57

*People v. Hardy*, 835 N.W.2d 340 (Mich. 2013)............................................. 73

*People v. Thompson*, 730 N.W.2d 708 (Mich. 2007)...................................... 73

*In re Pierce Cnty. Hous. Auth.,* 414 B.R. 702 (Bankr. W.D. Wash. 2009)................. 24, 26

*Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Ass'n.*
*(In re Premier Entm't Biloxi LLC),* 445 B.R. 582 (Bankr. S.D. Miss. 2010).............. 55

*RadLAX Gateway, Hotel LLC v. Amalgamated Bank*, 132 S.Ct. 2065 (2012)............. 38, 57

*In re River East Plaza, LLC,* 669 F.3d 826 (7th Cir. 2012) ................................ 58, 59

*In re Sanitary & Imp. Dist., No. 7,* 98 B.R. 970 (Bankr. D. Neb. 1989)................... 24, 25, 27, 70

*In re Solutia Inc.,* 379 B.R. 473 (Bankr. S.D.N.Y. 2007) ................................... 54

In re Sparks, 171 B.R. 860 (Bankr. N.D. Ill. 1994)....................................... 57

*Spectrum Health Hosps. v. Farm Bureau Mut. Ins. Co. of Michigan,*
821 N.W.2d 117 (Mich. 2012)............................................................. 73

*Till v. SCS Credit Corp.,* 541 U.S. 465 (2004).............................................. *Passim*

*In re Trenton Ridge Investors, LLC,* 461 B.R. 440 (Bankr. S.D. Ohio 2011) .............. 65

*In re Tribune Co.,* 472 B.R. 223 (Bankr. D. Del. 2012)..................................... 67

*In re Tucson Self–Storage, Inc.,* 166 B.R. 892 (B.A.P. 9th Cir. 1994)..................... 68

*In re Unbreakable Nation Co.*, 437 B.R. 189 (Bankr. E.D. Pa. 2010)...................... 68

*U.S. v. City of Detroit,*
No. 77-1100, Docket No. 2528 (E.D. Mich. Mar. 27, 2013) (Cox, J.)..................... 6

*U.S. v. Winstar*, 518 U.S. 839 (1996)....................................................... 54

**Statutory Authorities:**

11 U.S.C. §§ 101, *et seq.* ................................................................... 76

11 U.S.C. § 403(e)........................................................................... 28

11 U.S.C. § 552............................................................................... 15, 32, 41

11 U.S.C. § 902............................................................................... *Passim*

11 U.S.C. § 922............................................................................... *Passim*

11 U.S.C. § 927............................................................................... 31, 42, 55

11 U.S.C. § 928............................................................................... *Passim*

vi

| | |
|---|---|
| 11 U.S.C. § 943……………………………………………………….. | *Passim* |
| 11 U.S.C. § 1111(b) **………………………………………………...** | 31, 42 |
| 11 U.S.C. § 1124**……………………………………………………** | 5, 37, 85, 86 |
| 11 U.S.C. § 1129…………………………………………………… | *Passim* |
| 28 U.S.C. § 157(b) ………………………………………………… | 23 |
| 28 U.S.C. § 1334…………………………………………………… | 23 |
| 28 U.S.C. § 1408 …………………………………………………... | 23 |
| 28 U.S.C. § 1409…………………………………………………… | 23 |
| Pub. L. No. 100-597, 102 Stat. 3028 (1988) ……………………… | 31 |
| Michigan Compiled Laws § 141.101, *et seq*., as amended……………………… | *Passim* |
| City of Detroit Sewer Bond Ordinance No. 27-1986…………………………… | *Passim* |
| City of Detroit Sewer Bond Ordinance No. 18-2001…………………………… | *Passim* |
| City of Detroit Water Bond Ordinance No. 01-2005…………………………… | *Passim* |

**Legislative History:**

| | |
|---|---|
| H.R. REP. NO. 94-686 (1975)……………………………………………… | 30 |
| H.R. REP. NO. 95-595 (1977)……………………………………………… | 29 |
| S. REP. NO. 100-506 (1988)……………………………………………….. | 2, 32 |
| H.R. REP. NO. 100-1011 (1988)…………………………………………… | 76, 77 |
| 124 CONG. REC. H. 11,100 (Sept. 28, 1978)……………………………….. | 30 |
| 124 CONG. REC. S. 17,417 (Oct 6, 1978)…………………………………… | 30 |
| 134 CONG. REC. S. 12989-90 (daily ed. Sept. 20, 1988)………………………… | 33 |

**Other Authorities:**

| | |
|---|---|
| 4 Collier on Bankruptcy, ¶ 943.03[7] (Lawrence P. King, ed., 15th ed. 1999)…………. | 24, 26 |
| 6 Collier on Bankruptcy ¶ 943.03[7][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014)……………………………………………………………………… | 25 |
| 7 Collier on Bankruptcy ¶ 1124.02[1] (Alan N. Resnick & Henry J. Somme reds., 16th ed. 2014)……………………………………………………………………… | 85 |
| 7 Collier on Bankruptcy ¶ 1124.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014)……………………………………………………………………... | 86 |
| Statistical Release, Federal Reserve, H.15 (519 Selected Interest Rates (May 12, 2014) *available at* http://www.federalreserve.gov/releases/h15/current/h15.pdf. ....................... | 48 |
| Merriam-Webster Online Dictionary MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/current........................................................ | 73, 74 |

Oxford Dictionaries,
http://www.oxforddictionaries.com/us/definition/american_english/current?q=current...  74

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2014)......  73

viii

Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured"),[1] a creditor and party in interest in the above-captioned chapter 9 case of the City of Detroit, Michigan (the "City"), hereby objects to confirmation of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014) [Docket No. 4392] (the "Plan"),[2] and respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The City's Plan cannot be confirmed because it attempts to accomplish what Federal bankruptcy law and Michigan state law are carefully tailored to prevent: the artificial impairment of fully secured revenue bond creditors for the benefit of a municipality's general creditor body.  As chapter 9's legislative history regarding special revenue bonds explains, Congress intended to:

---

[1]     Assured is a monoline insurer that provides financial guarantees to the U.S. public finance market.  Assured and its affiliates insure or reinsure approximately $2.24 billion in gross aggregate principal amount of outstanding bonds issued by the City, including water supply system bonds, sewage disposal system bonds, and unlimited tax general obligation bonds. As described below, Assured controls the voting rights and remedies that may be asserted in respect of the Existing DWSD Bonds that it insures.  As will be set forth in Assured's Notice of Asserted Right to Vote a Claim and brief in support, Assured is deemed to be the sole holder of claims in, among others: Classes 1A-125 through 1A-135, Classes 1A-142 through 1A-145, Classes 1A-148 through 1A-152, Classes 1A-160 through 1A-164, Classes 1A-227 through 1A-231, Class 1A-263, Class 1A-265, Class 1A-266, Class 1A-270, Classes 1A-272 through 1A-277, Class 1A-321, and Class 1A-322.

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan or the Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 4391] (the "Fourth Amended Disclosure Statement" or "Disclosure Statement").

> ensure that revenue bondholders receive ***the benefit of their bargain*** with the municipal issuer and that they will have ***unimpaired rights to the project revenues*** pledged to them.

S. REP. No. 100-506, 100th Cong., 2d Sess. (1988) (emphasis added).

2.     Although all applicable law unambiguously protects fully secured revenue bond creditors from impairment—whether in or outside of bankruptcy—the Plan proposes to impair the fully secured DWSD Bondholders in a myriad of novel ways.  Among its other faults, the Plan proposes to drastically reduce the DWSD Bondholders' bargained-for interest rates, repudiate the DWSD Bondholders' protections against early redemption of the Existing DWSD Bonds and divert the DWSD Bondholders' collateral for the benefit of certain of the City's favored unsecured creditors.  For the reasons set forth herein, the Court should not tolerate the City's effort to undermine the protections afforded fully secured revenue bond creditors, and should instead deny confirmation of the Plan.

3.     First, the Plan is not in the best interests of creditors.  From the earliest days of municipal bankruptcy law, the "best interests of creditors" test has required a plan to provide creditors with at least what they could reasonably expect to receive outside of bankruptcy.  Given that the fully secured DWSD Bondholders can reasonably expect timely payment in full, with interest, outside of bankruptcy (and which they have been receiving to date in bankruptcy), the Plan falls woefully short of that standard.  Indeed, the Plan would mark the first time ***ever*** that fully

2

secured special revenue debt was nonconsensually impaired in a chapter 9 case. Confirmation of the Plan would increase the risk profile and decrease the value of special revenue debt nationwide, and would cause a particularly harsh market reaction with respect to the City's revenue bond debt.

4.     Second, the Plan does not provide for fair and equitable treatment of the DWSD Bondholders.  By any measure, the Plan fails to provide the DWSD Bondholders with an appropriate rate of interest.  Nor does the Plan compensate the DWSD Bondholders for breaching their call protection rights.  Further, the Plan undermines the DWSD Bondholders' liens by diverting a portion of their collateral to certain of the City's other favored unsecured creditors.  The resulting treatment fails to approach, much less meet, the threshold for qualifying as fair and equitable.

5.     Third, the Plan unfairly discriminates against Assured by, among other things, arbitrarily reinstating certain Existing DWSD Bonds and *all* subordinated DWSD Revolving Bonds, while at the same time impairing senior Existing DWSD Bonds insured by Assured.

6.     Finally, and perhaps most egregiously, the Plan unlawfully breaks the "closed loop" established by the DWSD Revenue Waterfall.  Instead of keeping all DWSD revenues within the DWSD for the benefit of the DWSD Systems and their secured creditors, the Plan seeks to divert DWSD Revenues for the benefit of a

3

preferred subset of the City's general unsecured creditors. In so doing, the Plan flagrantly violates numerous provisions of the Bankruptcy Code, Michigan state law, and local Detroit City Ordinances (to say nothing of the DWSD Bondholders' contractual rights).

7.    In sum, the Plan capriciously siphons funds from fully secured revenue bond creditors—whom both the Bankruptcy Code and Michigan state law intended to be completely insulated from the City's General Fund financial troubles—to augment the City's General Fund and pay favored unsecured creditors at the City's whim. Such a plan cannot be confirmed.

## BACKGROUND

8.    Assured insures several series of Existing DWSD Bonds, which are secured by certain DWSD Revenues. As set forth below, the DWSD Revenues securing the Existing DWSD Bonds are "pledged special revenues," as that term is used in section 922(d) of title 11 of the United States Code (the "Bankruptcy Code").

9.    On July 18, 2013, the City filed a voluntary petition for the adjustment of debt under chapter 9 of the Bankruptcy Code.

10.    On February 20, 2014, Assured filed Claim numbers 1166 and 1167, asserting claims arising from the municipal bond insurance policies that Assured

4

issued in connection with the Existing DWSD Bonds that it insures (the "<u>Assured DWSD Claims</u>").

11.     On February 21, 2014, the City filed its initial Plan for the Adjustment of Debts of the City of Detroit and accompanying disclosure statement.   Since then, the City has filed four further iterations of its plan and disclosure statement, the most recent of which, the Fourth Amended Plan [Docket No. 4392] and Fourth Amended Disclosure Statement [Docket No. 4391], were filed on May 5, 2014.[3] As with each iteration of the City's plan and disclosure statement, the current Plan does not propose to fully reinstate each of the Existing DWSD Bonds as contemplated by section 1124 of the Bankruptcy Code.

12.     On April 21, 2014, the Court entered the Fourth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Docket No. 4202] (the "<u>Fourth Amended Procedures Order</u>").

13.     Under the Plan, the Assured DWSD Claims have been classified in Classes 1A-1 through 1A-337 – DWSD Bond Claims.  Assured hereby objects to the Plan's proposed treatment of the Assured DWSD Claims to the extent that the Plan seeks to impair Claims in any such classes.[4]

---

[3]     On May 5, 2014, the Court entered the Order Approving the Proposed Disclosure Statement [Docket No. 4401].

[4]     Assured also insures several series of unlimited tax general obligation bonds (the "<u>UTGO Bonds</u>"), which give rise to claims that have been classified in Class 8 – UTGO Bond Claims.  Pursuant to the terms of the UTGO Settlement Agreement, which Assured continues

5

A.     Statutory Framework of the Existing DWSD Bonds

14.     The Detroit Water and Sewage Department (the "DWSD") is a department of the City responsible for the sewage disposal system (the "Sewage System") and the water supply system (the "Water System" and, together with the Sewage System, the "DWSD Systems") serving the City and much of southeast Michigan. See Disclosure Statement, at 87. The DWSD is a stand-alone, independently managed entity.[5]

15.     In accordance with authorizing resolutions enacted by the City Council of Detroit (the "City Council"), the City's legislative body, and sale orders issued by the City's then finance director, the City issued numerous series of Sewage Disposal System Revenue Bonds and Sewage Disposal System Revenue Refunding Bonds (collectively, the "Sewer Bonds") pursuant to Ordinance No. 27-

---

to negotiate with the City, relating to such Class 8 – UTGO Bond Claims, Assured has agreed to support the Plan, solely with respect to the UTGO Bond Claims. Accordingly, assuming the UTGO Settlement Agreement is executed, Assured does not object to the treatment of Class 8 – UTGO Bond Claims. Assured reserves its right to object to the treatment of Class 8 – UTGO Bond Claims, and any other aspect of the Plan that could potentially affect the treatment of Class 8 – UTGO Bond Claims, in the event that the UTGO Settlement Agreement is not finalized, is not approved by this Court or is breached by the City or any other party thereto.

[5]  See Joinder of the City of Detroit to Motion of the City of Detroit Water & Sewerage Department for an Order Pursuant to 11 U.S.C. § 105, Amending and Clarifying the Fee Review Order Dated September 11, 2013, In re City of Detroit, Mich., No. 13-53846, Docket No. 4548 (Bankr. E.D. Mich. May 8, 2014) ("Although DWSD is part of the City, it maintains a degree of independence with respect to certain functions—such as purchasing, human resources, law and finance . . . ."); see also Opinion & Order Terminating Second Amended Consent Judgment and Closing this Case, United States v. City of Detroit, No. 77-1100, Docket No. 2528 (E.D. Mich. Mar. 27, 2013) (Cox, J.) (recognizing that the DWSD has autonomy with respect to the operations of the DWSD Systems).

6

86, as amended and restated by Ordinance No. 18-01 (the "Sewer Bond Ordinance") and Chapter 141 of the Michigan Public Acts, including Act 94 of 1933, the Revenue Bond Act of 1933 (the "Revenue Bond Act"), Michigan Compiled Laws § 141.101, *et seq.*, as amended.

16.     In accordance with authorizing resolutions enacted by the City Council and sale orders issued by the City's then finance director, the City also issued numerous series of Water Supply System Revenue Bonds and Water Supply System Revenue Refunding Bonds (collectively, the "Water Bonds" and, together with the Sewer Bonds, the "Existing DWSD Bonds") pursuant to Ordinance No. 01-05 (the "Water Bond Ordinance" and, together with the Sewer Bond Ordinance, the "DWSD Bond Ordinances") and Chapter 141 of the Michigan Public Acts, including the Revenue Bond Act, Michigan Compiled Laws § 141.101, *et seq.*, as amended.

17.     In accordance with the Revenue Bond Act and the DWSD Bond Ordinances, the Existing DWSD Bonds were issued for the purpose of financing part of the cost of acquiring and constructing replacements, repairs, extensions and improvements to the DWSD Systems and refunding certain outstanding indebtedness originally issued for such purposes and secured by the revenues of the DWSD Systems.  Additionally, the City, the DWSD and U.S. Bank National Association, as Trustee, entered into (i) a trust indenture relating to the outstanding

7

secured obligations of the Sewage System, dated as of June 1, 2012 (the "Sewer Trust Indenture," a true and correct copy of which is attached hereto as Exhibit "A") and (ii) a trust indenture relating to the outstanding secured obligations of the Water System, dated as of February 1, 2013 (the "Water Trust Indenture," a true and correct copy of which is attached hereto as Exhibit "B" and, together with the Sewer Trust Indenture, the "DWSD Trust Indentures").

18. The DWSD derives income from (i) the rates charged for services, facilities, and commodities furnished by the DWSD Systems and (ii) gains and investment income realized from the investment of amounts in certain funds established by the DWSD Bond Ordinances (the "DWSD Revenues"). See Sewer Bond Ordinance, at § II.1; Water Bond Ordinance, at § 1.

B.     Security for the Existing DWSD Bonds

19. The DWSD Bond Ordinances provide that the Existing DWSD Bonds are "secured by a statutory lien . . . upon the whole of the Pledged Assets subject to the use and application thereof in accordance with [the DWSD Bond Ordinances]." Sewer Bond Ordinance, at § II.5; Water Bond Ordinance, at § 5. The "Pledged Assets" include:

> (i) the DWSD Revenues except for those revenues credited to the Operations and Maintenance Fund created by the DWSD Bond Ordinances;
>
> (ii) the funds and accounts established by or pursuant to the DWSD Bond Ordinances except for the Operation

8

and Maintenance Fund and the Construction Fund and any account thereof;

(iii) investments of amounts credited to any fund, account or subaccount that is Pledged Assets; and

(iv) any income or gain realized from investments that are Pledged Assets.

Sewer Bond Ordinance, at § II.1; Water Bond Ordinance, at § 1. In effect, the liens of the Existing DWSD Bonds attach to all revenues generated by the DWSD Systems, and the proceeds thereof, except for amounts specifically earmarked for administration, operation and maintenance expenses, and certain construction costs. See id.

C.     The DWSD Revenue Waterfall—A Closed Loop

20.     The Revenue Bond Act, the DWSD Bond Ordinances and the DWSD Trust Indentures collectively specify the precise manner in which the DWSD Revenues are to be allocated and used. See Sewer Trust Indenture § 2.03; Water Trust Indenture § 2.03; Sewer Bond Ordinance, at § II.12; Water Bond Ordinance, at § 12; MCL § 141.122.

21.     In particular, the Revenue Bond Act, the DWSD Trust Indentures and the DWSD Bond Ordinances mandate a "payment waterfall" for the DWSD Revenues that creates a "closed loop" under which the DWSD Revenues may only be used for the benefit of the holders of the Existing DWSD Bonds (the "DWSD Bondholders"), holders of DWSD Revolving Bonds and the DWSD Systems (the

9

"DWSD Revenue Waterfall").[6]  See Sewer Trust Indenture; Water Trust Indenture;

Sewer Bond Ordinance; Water Bond Ordinance; MCL §§ 141.103, 141.106,

141.107.

22.    The Revenue Bond Act provides, in relevant part:

(1) In the authorizing ordinance the governing body of the borrower shall provide that the revenues of the public improvement be accounted for separately from the other funds and accounts of the borrower in the following order of recorded priority:

(a) After provision for the payment for the *next succeeding period of all current expenses* of administration and operation and the current expenses for that period for maintenance as may be necessary to preserve the public improvement in good repair and working order.

(b) There shall be next set aside a sum sufficient to provide for the payment of the principal of and the interest upon all bonds payable from those revenues, as and when the bonds become due and payable . . . . In the event that the revenues of any operating year over and above those necessary for the operation and maintenance expenses shall be insufficient to pay the principal of and interest on the bonds maturing in any operating year, then an additional amount sufficient to pay the principal and interest shall be set aside out of the revenues of the next succeeding operating year, after provision for the expenses of operation and maintenance . . . .

---

[6]    There are separate, but identically structured, "payment waterfalls" for the Sewage System and the Water System.  However, for descriptive purposes, these separate "payment waterfalls" will be discussed as a single "payment waterfall" herein (i.e., the DWSD Revenue Waterfall).

10

(c) Next there shall be set aside, in the manner and priority provided by the ordinance, the sum or sums necessary for the additional accounts as may be required.

MCL § 141.122 (emphasis added).

23.     The DWSD Bond Ordinances provide, in relevant part:

All Revenues shall be set aside as collected and credited to the Receiving Fund. As of the first day of each month, amounts credited to the Receiving Fund shall be transferred seriatim into the following funds and accounts but only within the respective limitations and only if the maximum amount within such limitation has been credited to the preceding fund or account:

First: to the Operation and Maintenance Fund, a sum sufficient *to provide for the payment of the next month's expenses of administration and operation of the System* (including Ancillary Obligation Fees and Expenses) and such *current expenses* for the maintenance thereof as may be necessary to preserve the same in good repair and working order;

Second: to the Senior Lien Bond Debt Service Account, an amount that, when added to amounts then on deposit in such account, shall equal the Debt Service Installment Requirement for Senior Lien Obligations as of the first day of such month;

. . .

Fifth: to the Extraordinary Repair and Replacement Reserve Fund, the amount of the Extraordinary Repair and Replacement Minimum Requirement so long as the balance thereof is less than the Extraordinary Repair and Replacement Maximum Requirement . . .

Sixth: to the Improvement and Extension Fund, such amount, if any, that the Commissioners may deem advisable . . . .

11

Sewer Bond Ordinance, at § II.12(B) (emphasis added); Water Bond Ordinance, at § 12(B) (emphasis added). The DWSD Trust Indentures provide for an identical "payment waterfall." See Sewer Trust Indenture § 2.03; Water Trust Indenture § 2.03.

24.     After DWSD Revenues have been allocated in accordance with the DWSD Revenue Waterfall, any "[a]mounts remaining in the Receiving Fund as of the last day of each Fiscal Year shall be credited to the Surplus Fund." Sewer Bond Ordinance, at § II.13(A); Water Bond Ordinance, at § 13(A). The amounts in the Surplus Fund:

> may, at the option of the Commissioners, be used and applied for any purposes related to the [DWSD Systems]; provided, however, that if and whenever there should be any deficit in the Operation and Maintenance Fund or in any Interest and Redemption Fund (including any Reserve Account therein) then transfers shall be made from the Surplus Fund to such funds in the priority and order named in [the DWSD Revenue Waterfall] to the extent of any such deficit.

Sewer Bond Ordinance, at § II.13(F) (emphasis in original); Water Bond Ordinance, at § 13(F) (emphasis in original).

25.     Thus, the DWSD Revenue Waterfall has two features of particular importance that are mandated by law. First, only certain *current* administration, operation and maintenance expenses of the DWSD Systems may be paid from the DWSD Revenues ahead of debt service on the existing DWSD Bonds. Second,

12

DWSD Revenues may never be used other than for the benefit of the DWSD Systems, meaning that DWSD Revenues may never be diverted to the City's General Fund. See Sewer Bond Ordinance, at § II.13(F); Water Bond Ordinance, at § 13(F). The Plan runs afoul of both of these requirements.

D. **Assured is the Sole Party in Interest that Controls the Voting Rights and Remedies in Respect of the Existing DWSD Bonds that it Insures**

26. Assured has the exclusive right to exercise all voting rights and to control and direct remedies with respect to all series of Existing DWSD Bonds that it insures. The DWSD Bond Ordinances provide that DWSD Bondholders:

> (A) . . . representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, may, by suit, action, mandamus or other proceeding, protect and enforce the statutory lien on Pledged Assets and may, by suit, action, mandamus or other proceedings, enforce and compel performance of all duties of the officers of the City, including the fixing of sufficient rates, the collection of Revenues, the proper segregation of the Revenues of the Sewer System and the proper application thereof.
>
> . . .
>
> (C) . . . shall have all other rights and remedies given by Act 94 and by law for the payment and enforcement of the [Existing DWSD Bonds] and the security therefore.

Sewer Bond Ordinance, at § II.7(a); Water Bond Ordinance, at § 7(a). The DWSD Trust Indentures grant DWSD Bondholders of not less than 20 percent of the aggregate principal amount outstanding the right to direct the Trustee to take

13

actions to enforce the provisions of applicable law and the DWSD Trust Indentures.  <u>See</u> Sewer Trust Indenture, at § 5.02; Water Trust Indenture, at § 5.02.

27.    A supplement to the sale orders pertaining to the Existing DWSD Bonds insured by Assured contains insurer protections, including that:

> [Assured] shall be deemed to be the sole holder of the [Existing DWSD Bonds insured by Assured] for the purpose of exercising any voting right or privilege or giving any consent or direction or taking any other action that the holders of the [Existing DWSD Bonds insured by Assured] are entitled to take pursuant to the [DWSD Bond Ordinances] or the Related Documents.

<u>See</u>, <u>e.g.</u>, Composite Sale Order of the Finance Director of the City of Detroit, dated May 14, 2003, pertaining to the Senior Lien Revenue and Revenue Refunding Bonds Series 2003(A) (the "<u>2003(A) Sale Order</u>," a true and correct copy of which is attached hereto as Exhibit "C").

28.    Assured is thus entitled to exercise all voting rights in any proceeding—including this chapter 9 case—with respect to the Existing DWSD Bonds that it insures.  Moreover, because Assured insures at least twenty percent of the outstanding aggregate principal amount of the Existing DWSD Bonds, Assured may exercise the rights and remedies of the DWSD Bondholders, including by protecting and enforcing the lien on Pledged Assets and directing the trustee to take actions to enforce applicable law and the DWSD Trust Indentures.

14

E.   There is No Dispute that the DWSD Revenues
     Pledged to the Existing DWSD Bonds are
     "Special Revenues" and "Pledged Special Revenues"

29.    "Special Revenues," as defined in section 902(2) of the Bankruptcy Code, are afforded special protections during the pendency of a chapter 9 debtor's bankruptcy case.   Section 902(2) of the Bankruptcy Code defines "special revenues" to include "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems."   11 U.S.C. § 902(2)(a).

30.    Generally, the Bankruptcy Code cuts off liens on property acquired by the debtor postpetition.   See 11 U.S.C. § 552(a).   Under section 928 of the Bankruptcy Code, however, special revenues received by the debtor postpetition remain subject to the prepetition lien on such special revenues, see 11 U.S.C. § 928(a), subject only to the payment of necessary operating expenses of the project or system.  See 11 U.S.C. § 928(b).

31.    Furthermore, under section 922(d) of the Bankruptcy Code, the automatic stay does not stay the payment of indebtedness secured by "pledged special revenues."   See 11 U.S.C. § 922(d).   Accordingly, a chapter 9 debtor is required to pay principal and interest on bonds secured by a lien on special

15

revenues during the pendency of its bankruptcy case.  <u>See</u> <u>In re Jefferson Cnty.,</u> <u>Ala.</u>, 474 B.R. 228 (N.D. Ala. 2012) (ruling that the "pledged special revenues" of the debtor are not subject to the automatic stay).

32.     The DWSD Revenues are receipts derived directly and/or indirectly from the ownership and operation of the DWSD Systems, used to provide sewage and water services to the City, the surrounding communities and their residents. Accordingly, the DWSD Revenues are special revenues as defined in section 902(2) of the Bankruptcy Code.  <u>See</u> 11 U.S.C. § 902(2)(a).  Indeed, the City and its Bond Counsel have opined that the DWSD Revenues are "special revenues" as defined in section 902(2).  <u>See</u> City of Detroit, Proposal for Creditors, 25, 122 (June 14, 2013); <u>see also</u>, Official Statement of the City of Detroit, Michigan Water and Sewerage Department Relating to $659,780,000 Sewage Disposal System Revenue and Revenue Refunding Senior Lien Bonds Series 2012-A, at 37-38 (the "<u>DWSD 2012-A Official Statement</u>," a true and correct copy of which, excluding the appendices, is attached hereto as Exhibit "D").  Accordingly, DWSD Bondholders are entitled to the special protections afforded to special revenues creditors under chapter 9.  In fact, the DWSD Revenues have continued to be applied to the payment of principal and interest as and when due on the Existing DWSD Bonds at full contracted rates during the pendency of this case.

16

F.    Plan Treatment of Existing DWSD Bond Claims

i.    *Interest Rate Cramdown for Some New DWSD Bonds*

33.    The Plan classifies the claims arising from the Existing DWSD Bonds (the "Existing DWSD Bond Claims") in Classes 1A-1 through 1A-337. See Plan, at 27.  The Existing DWSD Bond Claims are separately classified by the CUSIP of the corresponding Existing DWSD Bond.  See Plan, at 27.  Not all "Class 1A" claims, however, are treated equally.

34.    Under the Plan, certain CUSIPs of Existing DWSD Bonds will be reinstated in full (the "Reinstated DWSD Bonds").  See Plan, at 27.  Such CUSIPs of Existing DWSD Bonds are purportedly unimpaired by the Plan, and are not permitted to vote to accept or reject the Plan.[7]  See Plan, at 26-27.

35.    The remaining Existing DWSD Bonds, however, are slated to be forcibly exchanged for new bonds with principal amounts equal to the principal amount of the Existing DWSD Bond Claim and reduced interest rates (the "New DWSD Bonds").[8]  The City's proposed interest rates for the New DWSD Bonds

---

[7]    As discussed below, despite statements to the contrary in the Plan, the Reinstated DWSD Bonds will be subordinated to the DWSD GRS Pension Contributions and are, therefore, actually "impaired."

[8]    To the extent the City has not paid accrued interest on the Existing DWSD Bonds in cash, it has reserved the right to increase the principal amount of the New DWSD Bonds by the amount of such accrued but unpaid interest.  See Plan, at 27.  The City has also reserved the right to, if it so chooses, instead satisfy claims arising from the Existing DWSD Bonds by payment in full, in cash.  See id.

17

are set forth in the Interest Rate Reset Chart attached to the Plan as Exhibit I.A.168 (the "Interest Rate Reset Chart").

36. The New DWSD Bonds will retain call protection, but only for the lesser of 5 years or the date upon which the corresponding CUSIP of Existing DWSD Bonds would have matured. See Plan, at 27; Disclosure Statement, at 45. The New DWSD Bonds will allegedly otherwise contain the same terms and conditions as the corresponding Existing DWSD Bonds. See Plan, at 27; Disclosure Statement, at 45. However, the City has not explicitly committed to retaining the current rate covenants and has refused Assured's request to make such a commitment.

37. Despite Assured's repeated requests, the City has provided no explanation for reinstating certain CUSIPs of Existing DWSD Bonds while seeking to directly impair other CUSIPs of Existing DWSD Bonds. See Plan, at 27; Disclosure Statement, at 44-45.

ii. *An Election that Results in Disparate Treatment*

38. The Plan also discriminates between classes of impaired Existing DWSD Bond Claims that vote to accept the Plan and those that do not. See Plan, at 27; Disclosure Statement, at 45. As an alternative to receiving the New DWSD Bonds described above, holders of impaired Existing DWSD Bond Claims may elect (the "DWSD Election") for the City to instead distribute new "existing rate"

18

bonds with a principal amount and interest rate identical to the corresponding Existing DWSD Bond Claims (the "New Existing Rate DWSD Bonds"). See Plan, at 27; Disclosure Statement, at 45. There is, however, a catch. Regardless of whether an individual claimholder makes the DWSD Election, an electing holder of an Existing DWSD Bond Claim will only receive New Existing Rate DWSD Bonds if its class accepts the Plan. See Plan, at 27; Disclosure Statement, at 45. Thus, even the DWSD Bondholders electing to receive New Existing Rate DWSD Bonds will instead receive New DWSD Bonds with an impaired interest rate if their class does not accept the Plan. And even in Classes that do accept the Plan, only holders that have affirmatively made the DWSD Election will receive New Existing Rate DWSD Bonds. All other holders in the same Classes (including holders that have failed to return a ballot) will receive New DWSD Bonds with an impaired interest rate.

39. Further, while New Existing Rate DWSD Bonds will retain the interest rates of the corresponding CUSIP of Existing DWSD Bonds, they will be stripped of all call protections of the corresponding Existing DWSD Bonds, and will also be denied the 5-year call protection of the New DWSD Bonds. See Plan, at 27; Disclosure Statement, at 45. The New Existing Rate DWSD Bonds will allegedly otherwise contain the same terms and conditions as the corresponding Existing DWSD Bonds (although the City has not explicitly committed to retaining

19

the current rate covenants and has refused Assured's request to make such a commitment). See Plan, at 27; Disclosure Statement, at 45.

40. The DWSD Election creates two main problems. First, it forces creditors to vote on the Plan without any assurances of what they will receive if the Plan were to be confirmed. Second, and more important, it will likely result in similarly-situated DWSD Bondholders—and, even DWSD Bondholders within a single secured class—receiving significantly different treatment.

G. Improper Diversion of DWSD Revenues to GRS Pension Claimants

41. The Detroit General Retirement System (the "GRS") operates a single pension plan (the "GRS Pension Plan") that has a single sponsor, the City. See Disclosure Statement, at 105. Although liabilities of the GRS Pension Plan are booked by "division" (the DWSD, the Transportation Fund and the General Fund), the assets of the GRS Pension Plan are not segregated by division. See id.; DWSD 2012-A Official Statement, at 61-66.

42. The GRS has reported that the GRS Pension Plan had, as of June 30, 2013, unfunded actuarial accrued liabilities ("GRS UAAL") of $1.084 billion out of $3.609 billion in total accrued liabilities. See Disclosure Statement, at 12. According to the City, a more realistic total GRS UAAL is $2.037 billion. See id.

43. The GRS UAAL is a legal liability of the City, and not of the DWSD. See DWSD 2012-A Official Statement, at 65 ("The payment obligations to the

20

[GRS Pension Plan] are obligations of the City itself and are not obligations of the [DWSD Systems] or any City Department, such as the [DWSD]").  Nevertheless, the Plan contemplates that the DWSD will make $428.5 million in "pension-related, administrative and restructuring" payments to the GRS Pension Plan over the 9-year period ending June 2023 (the "DWSD GRS Pension Contributions"). See Plan, at 33; Disclosure Statement, at 22, 62.  The City has indicated that it will classify the DWSD GRS Pension Contributions as operation and maintenance expenses of the DWSD to be paid ahead of debt service on the New DWSD Bonds. See Disclosure Statement, at 22.

44.     The DWSD GRS Pension Contributions will purportedly satisfy the DWSD's "full allocable share of GRS UAAL" remaining after the pension modifications contemplated by the Plan.[9]  Disclosure Statement, at 22.  However, $428.5 million is the minimum that the DWSD would be required to contribute under the Plan—the DWSD may be required to contribute additional funds after 2023 if asset investment returns and/or actuarial experience are below projections. See id.  In other words, the DWSD GRS Pension Contributions are a "floor" and not a "ceiling."

---

[9]  Following the close of discovery and the submission of expert reports, Assured reserves the right to supplement this objection with respect to the total amount of the GRS UAAL and the allocation thereof.

45.     In contrast, other divisions of the City are not required to fund their full allocable share of GRS UAAL.  See Plan, Exhibit II.B.3.r.ii.A.  In fact, it is estimated that as of June 2023 the non-DWSD portion of the GRS Pension Plan will be only 63 percent funded, but with the DWSD GRS Pension Contributions, the GRS Pension Plan as a whole will be 73 percent funded.  Consequently, the Plan would effectively cause the DWSD to subsidize the remainder of the City's allocable share of GRS UAAL for at least the next nine years, improperly diverting the DWSD Revenues for the benefit of the City's General Fund.[10]

H.     Further Contingent Payments to Pension Claimants

46.     The Plan also contemplates granting a single series of contingent value right certificates (the "DWSD Pension Restoration CVRs") to a newly created pension "Restoration Trust," which will hold the DWSD Pension Restoration CVRs for the benefit of holders of Pension Claims (both GRS and PFRS pension claims) at the expense of the DWSD and its creditors.  See Plan, at 9, 47.

47.     If the City consummates a Qualifying DWSD Transaction—a potential transaction on unspecified terms involving the transfer to an unspecified third party of a majority of the assets, or operation and management, of the Sewage System or Water System—within seven years of the Effective Date, the DWSD

_____

[10]   Following the close of discovery and the submission of expert reports, Assured reserves the right to supplement this objection with expert actuarial evidence.

22

Pension Restoration CVRs will be entitled to receive 50 percent of the net proceeds received by or distributable to the City's General Fund on account of the Qualifying DWSD Transaction. See Plan, at 9. The remaining 50 percent of the net proceeds will be allocated to the City's General Fund, which the City may, in turn, distribute to other non-DWSD creditors. See Disclosure Statement, at 153. Effectively, through the contribution of the DWSD Pension Restoration CVRs to the pension Restoration Trust, the City seeks to capture the proceeds of any Qualifying DWSD Transaction and distribute such proceeds to the City's pensioners and other favored unsecured creditors.

## JURISDICTION

48. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

### I. The Plan Cannot be Confirmed Because it is Not in the Best Interests of Creditors (11 U.S.C. § 943(b)(7))

49. The Plan cannot be confirmed because it is not in the best interests of creditors as required by section 943(b)(7) of the Bankruptcy Code. Section 943(b) sets forth the requirements for confirmation of a plan of adjustment of a chapter 9 debtor. See 11 U.S.C. § 943(b) ("The court shall confirm the plan if—"). Under

23

943(b)(7) of the Bankruptcy Code, a plan must be "**in the best interests of creditors**" and "feasible." 11 U.S.C. 943(b)(7) (emphasis added).[11]

> A.  In Chapter 9, the "Best Interests of Creditors"
> Requires that Creditors Receive at Least what
> they Would Receive if the Case were Dismissed

50.  A chapter 9 plan of adjustment is only in the best interests of creditors, as required by section 943(b)(7) of the Bankruptcy Code, if it provides each creditor with at least what that creditor would receive if the plan were to be dismissed. This test must be satisfied as to each creditor, depending on their respective expected recoveries absent a plan, rather than as to the creditor body as a whole. See, e.g., In re Sanitary & Imp. Dist., No. 7, 98 B.R. 970, 975 (Bankr. D. Neb. 1989); Kelley v. Everglades Drainage Dist., 319 U.S. 415, 420 (1943). In the case of fully secured revenue bond creditors such as Assured and the DWSD Bondholders, the chapter 9 "best interests of creditors" test therefore requires, at a minimum, timely payment in full of all revenue bond obligations in the full

---

[11] Although the requirements that a plan be in "best interests of creditors" and "feasible" are embedded in a single clause, they are nevertheless different tests with different purposes:

> the "best interest" test acts as a floor requiring a reasonable effort at payment of creditors by the municipal debtor and the "feasibility" requirement sets a corresponding ceiling which prevents the Chapter 9 debtor from promising more than it can deliver.

In re Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999) (quoting 4 Collier on Bankruptcy, ¶ 943.03[7] (Lawrence P. King, ed., 15th ed. 1999)). See also In re Pierce Cnty. Hous. Auth., 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (citing to In re Mount Carbon Metro. Dist., 242 B.R. at 34). Accordingly, regardless of whether the Plan is feasible—which it is not for the reasons discussed below—the City is also required to show that it is in the best interests of the City's creditors. It is not.

24

amounts contracted for (including the contracted-for interest) as and when due. The Plan falls well short of that standard and thus cannot be confirmed.

>    i.   *"Best Interests of Creditors" Requires a Municipal Debtor to Prove that Creditors Will Receive at Least what they Would Outside of Bankruptcy*

51.    Because municipal debtors cannot be liquidated,[12] courts have derived the meaning of section 943(b)(7)'s best interests of creditors test from a federal bankruptcy court's constitutionally limited powers in chapter 9.   As one court reasoned, chapter 9's best interests of creditors test "simply requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives." In re Sanitary & Imp. Dist., No. 7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989).  As another court elaborated:

>    Since creditors cannot propose a plan; cannot convert to Chapter 7; cannot have a trustee appointed; and cannot force sale of municipal assets under state law, their only alternative to a debtor's plan is dismissal.

In re Mount Carbon Metro. Dist., 242 B.R. at 34; see also In re Sanitary & Imp. Dist., No. 7, 98 B.R. at 975 ("The alternative to confirmation of a plan . . . is dismissal of the case.").  Consequently, the chapter 9 best interests of creditors test requires a bankruptcy court to examine whether the "***proposed plan provide[s] a***

---

[12]   See In re Mount Carbon Metro. Dist., 242 B.R. at 33 ("the inability to reorganize cannot result in liquidation of the municipality's assets under Chapter 7."); 6 Collier on Bankruptcy ¶ 943.03[7][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014) ("A municipality cannot be liquidated, its assets sold, and the proceeds used to pay its creditors.").

25

*better alternative for creditors than what they already have.*" In re Mount Carbon Metro. Dist., 242 B.R. at 34 (citing 4 Collier on Bankruptcy, ¶ 943.03[7] (Lawrence P. King, ed., 15th ed. 1999)) (emphasis added); see also In re Pierce Cnty. Hous. Auth., 414 B.R. at 718 (Bankr. W.D. Wash. 2009).

52.     Applying this standard, courts have not hesitated to reject chapter 9 plans of adjustment that refused to pursue reasonable paths to increase recoveries to creditors. In In re Pierce County, a municipal debtor sought to restrict a post-confirmation committee's authority to investigate and pursue certain causes of action that could have potentially benefitted the municipality's creditors. See 414 B.R. at 718-19. The bankruptcy court rejected the plan, finding that it was not in the best interests of creditors to confirm a plan that would limit a party's right to "investigat[e] and possibly pursu[e] all potential sources of recovery already in existence." Id. at 719.

53.     For exactly that reason, the best interests of creditors test poses an insurmountable barrier to impairment of fully secured revenue bond creditors such as Assured. As the courts in In re Pierce County and In re Mount Carbon made clear, the best interests of creditors test requires giving creditors, at a bare minimum, at least what they already have or could reasonably expect to recover. See In re Pierce Cnty. Hous. Auth., 414 B.R. at 718 (citations omitted); In re Mount Carbon Metro. Dist., 242 B.R. at 34 (citations omitted). By definition, a

26

fully secured revenue bond creditor does not need to even investigate potential sources of recovery—payment in full is already within its grasp. Put differently, what a fully secured revenue bond creditor "already has" is an inviolable right to timely payment, in full, of both principal and interest at the contract rate and a valid and enforceable lien on a revenue stream sufficient to ensure such payment.[13] It is thus not in such a fully secured revenue bond creditor's best interests for a bankruptcy court to approve any plan that would deny it payment in full in accordance with the terms of its bonds.

> ii. *Cases under Chapter 9's Predecessor Statute and Chapter 9's Legislative History Support the Conclusion that a Plan Must, at a Minimum, Provide Creditors with what they Could Reasonably Expect to Receive if the Plan were Dismissed*

54. The cases regarding the best interests of creditors test under chapter 9's statutory predecessors and the legislative history of chapter 9 likewise agree that a plan of adjustment is not in the best interests of creditors if it does not, at a minimum, provide creditors with what they could reasonably expect to receive if the plan were dismissed.

---

[13] Consequently, those courts that have allowed unsecured bondholders to be crammed down have stressed that secured revenue bond creditors would be differently-situated. For example, in In re Sanitary & Imp. Dist., No. 7., the bankruptcy court reasoned that impairment of unsecured bondholders was acceptable because they did not have a lien on any assets. See 98 B.R. at 973-74. The court noted, however, that a different result would be required with respect to "a type of claim which is recognized both by state law and by the Bankruptcy Code as a secured claim." Id. at 974.

27

55.     Under Chapter IX of the former National Bankruptcy Act of the United States (the "Bankruptcy Act"), a statutory predecessor to chapter 9, a municipal debtor's "plan of composition" could not be confirmed unless it was, among other things, "in the best interests of creditors."  See Kelley, 319 U.S. at 417 (citing 11 U.S.C. § 403(e)) (a "prerequisite to the adoption of the plan, [is] that it is . . . for the best interests of the creditors . . . .").  In Fano v. Newport Heights Irr. Dist., a case decided under the Bankruptcy Act, the Ninth Circuit confronted the question of whether a municipal plan of composition that impaired bondholders could be confirmed absent evidence that the municipality took reasonable steps to make bondholders whole, including by increasing taxes as necessary or introducing evidence that tax increases were not viable.  See 114 F.2d 563, 564 (9th Cir. 1940). The court rejected the plan, finding that it could not "be said that the plan is . . . for the 'best interest of the creditors' with no sufficient showing that the taxing power was inadequate to raise the taxes to pay them."  Id. at 566.

56.     Three years later, in Kelley, the Supreme Court of the United States faced the question of whether a municipal plan of composition that impaired bondholders could be confirmed.  See 319 U.S. at 417.  Before the Fifth Circuit Court of Appeals, certain bondholders claimed that confirmation of the plan was improper, arguing:

> that the plan is not . . . for the best interest of creditors in
> that the percentage cash payments provided for are not all

28

> the District is reasonably able to pay . . . and that the
> amounts to be received by bondholders '***are not all they
> can reasonably expect, in the circumstances***' . . . .

Kelley v. Everglades Drainage Dist., 132 F.2d 742, 743 (5th Cir. 1943) (emphasis

added) *vacated*, 319 U.S. 415.  The Supreme Court agreed with the petitioners that

the trial court did not sufficiently investigate whether the plan was in the best

interests of creditors, holding that a court cannot make a determination with respect

to the best interests of creditors absent "data which will permit a reasonable, and

hence an informed, estimate of the probable future revenues available for the

satisfaction of creditors."  Kelley, 319 U.S. at 420.  Moreover, the Supreme Court

held that where:

> different classes of creditors assert prior claims to
> different sources of revenue, there must be a
> determination of the extent to which each class is entitled
> to share in a particular source, and of the fairness of the
> allotment to each class in the light of the probable
> revenues to be anticipated from each source.

Id.  In essence, if a creditor has a claim against (indeed in this case a valid and

enforceable lien on) a particular source of revenue, a plan is not in the best

interests of that creditor unless the creditor is made whole from that revenue

source, or evidence is introduced proving that the revenue source is insufficient to

satisfy the creditor's claim.[14]

---

[14] In 1976, chapter IX of the Bankruptcy Act was amended to, among other things, delete the best interest of creditors test from chapter IX of the Bankruptcy Act on the grounds that "it was redundant with the fair and equitable rule."  H.R. REP. No. 95-595, at 400 (1977); see

57.     When the Bankruptcy Code was enacted in 1978 and the best interests of creditors test was reintroduced in its modern form, Congress made clear that the Kelley standard would remain in effect:

> The best interest of creditors test does not mean the liquidation value as under chapter XI of the Bankruptcy Act. In making such a determination, it is expected that the court will be guided by the standards set forth in Kelley v. Everglades Drainage District, 319 U.S. 414 (1943) and Fano v. Newport Heights Irrigation District, 114 F. 2d 563 (9th Cir. 1940) . . . .

124 CONG. REC. H. 11,100 (Sept. 28, 1978); S. 17,417 (Oct 6, 1978).  Accordingly, Congress understood the best interests of creditors test to require that the plan must provide all that the creditors could reasonably expect under the circumstances.  See id.  And, as the court in Kelley made clear, where a creditor has a claim on a revenue source, it can reasonably expect its claim to be satisfied from that revenue source.  See Kelley, 319 U.S. at 420.

## B.     Non-Impairment of Fully Secured Revenue Bond Creditors is Mandated by the 1988 Municipal Bankruptcy Amendments

58.     In 1988, the Bankruptcy Code was amended to provide still further assurances that secured revenue bond debt would not be disturbed by a municipal

---

also H.R. REP. No. 94-686, at 14 (1975) ("The best interest of creditors test formerly found in Chapter IX is deleted as redundant.  The fair and equitable rule in effect incorporates the best interests test, both in Chapter X, where it does not appear explicitly, and in Chapter IX, where it has appeared.").  In explaining how the "best interests of creditors" test was incorporated into the "fair and equitable" test, the House Report drew directly from the standard endorsed by the Supreme Court in Kelley: "[t]he court must find that the amount proposed to be paid under the plan was all that the creditors could reasonably expect under the circumstances."  H.R. Rep. No. 94-686, at 33 (1975).

bankruptcy.  See An Act to Amend the Bankruptcy Law to Provide for Special Revenue Bonds, and for Other Purposes, Pub. L. No. 100-597, 102 Stat. 3028 (1988) (adding, among other things, sections 902(2), 922(d), 927 and 928 of the Bankruptcy Code).  The bargain struck in these amendments can be summarized as follows: revenue bond debt cannot be affected by municipal bankruptcy and, in the event of undersecurity, non-recourse revenue bond creditors, unlike other non-recourse undersecured creditors, may not assert a deficiency claim against the municipality's general fund.  See 11 U.S.C. §§ 922(d) (providing that the automatic stay does not apply to proper application of pledged special revenues), 927 (providing that non-recourse special revenue creditors may not obtain recourse through an election pursuant to section 1111(b) of the Bankruptcy Code), 928 (providing that special revenues acquired by a debtor postpetition remain subject to applicable liens).

59.    Taken together, these amendments have the effect of insulating revenue bond-financed systems from the municipalities that they are associated with, to the benefit of both.  Through revenue bond financing, a financially distressed municipality can finance a project by borrowing funds at interest rates well below what the market might demand for its general obligation bonds, with certainty that its general fund will not be exposed if the revenue bond-financed project fails.  For their part, creditors can invest in important public improvements,

31

secure in the knowledge that their investment will be protected by project revenues if the associated municipality becomes financially distressed.

60.    As explained in the 1988 amendments' legislative history:

> The amendments protect the future effectiveness of revenue bond financing against the possibility of an adverse judicial determination in connection with a municipal bankruptcy. Specifically, the amendments insure that in the event of a municipal bankruptcy, taxpayers will not be required to pay bondholders for bankrupt municipal projects that were intended to be funded exclusively through project revenues. . . . *Finally, the amendments insure [sic] that revenue bondholders receive the benefit of their bargain with the municipal issuer, namely, they will have unimpaired rights to the project revenue pledged to them.*

S. REP. No. 100-506, at 12 (1988) (emphasis added). The legislative history goes on to state that:

> Section 552 of the Bankruptcy Code is currently made applicable to a Chapter 9 case by reference in Section 901(a) of the Bankruptcy Code. Various questions have been raised that a pledge of municipal revenue and the lien created thereby will be terminated in a municipal bankruptcy due to the application of Section 552(a) to Chapter 9. To eliminate the confusion and to confirm various state laws and constitutional provisions regarding the rights of bondholders to receive the revenues pledged to them in payment of debt obligations of a municipality, a new section is provided in the amendments to *ensure that revenue bondholders receive the benefit of their bargain with the municipal issuer and that they will have unimpaired rights to the project revenues pledged to them.*

32

Id.; see also 134 CONG. REC. S. 12989-90 (daily ed. Sept. 20, 1988) (statement of Sen. Dennis DeConcini) ("the amendments ensure that revenue bondholders will receive the benefit of their bargains with the municipal issuer, that is, they will have unimpaired rights to the project revenues pledged to them."). As explained by one court, "what was being done by the 1988 Amendments was altering portions of the Bankruptcy Code that would have potentially changed the pre-bankruptcy structure of special revenue financing." Bank of N.Y. Mellon v. Jefferson Cnty. ("Jefferson County II"), 482 B.R. 404, 434 (Bankr. N.D. Ala. 2012).

61.     In sum, Congress carefully amended the Bankruptcy Code to build a wall of separation between a municipality's general finances and revenue bond-financed projects associated with the municipality. That separation would be ineffective if, at the whim of a distressed municipality, revenue bond creditors could be impaired and their pledged revenues siphoned off for the benefit of the municipality's other favored creditors. A ruling permitting such an impairment would be a fundamental breach of the bargain struck by revenue bond creditors that Congress acted to protect through the 1988 amendments to the Bankruptcy Code. See Fitch Ratings, Special Report: Rating to Bondholder Security After Detroit, at 2 (May 1, 2014), a true and correct copy of which is attached hereto as Exhibit "E" ("If the lien or the call protection on the utility bonds is ultimately

33

impaired, Fitch will reevaluate its current assumption that utility revenue bond ratings are so well protected as special revenue debt under Chapter 9 that such bonds can be assigned ratings on a stand-alone basis without a link to related municipal ULTGO rating.").

C. DWSD Bondholders May Not be Impaired under the Plan Because they Would be Paid in Full, with Interest, in the Ordinary Course if the Case were Dismissed

62. The Plan is not in the best interests of Assured or other DWSD Bondholders because it proposes to pay them less than they already have or could reasonably expect to receive outside of bankruptcy. Such impairment is not permitted by section 943(b)(7) of the Bankruptcy Code.

63. The Plan proposes to impair at least 151 out of 337 classes of DWSD Bondholders falling into Class 1A-1 through 1A-337. See Plan, Exhibit I.A.110. In particular, the Plan proposes to directly impair, through a reduction in the payable rate of interest, approximately $2,224,927,000 of gross par outstanding Existing DWSD Bonds, including approximately $704,975,000 of gross par outstanding Existing DWSD Bonds insured by Assured. See Plan, Exhibit I.A.110.

64. All amounts on such Existing DWSD Bonds have been paid as and when due to date, including during the pendency of this case and the City has never asserted that the DWSD would be unable to continue to pay such amounts

34

from the DWSD Revenues as they come due. Thus, the Existing DWSD Bonds "already have" payment in full and therefore cannot be impaired by the Plan. <u>See</u> <u>In re Mount Carbon Metro. Dist</u>., 242 B.R. at 34. In addition, if the case were to be dismissed, such impaired DWSD Bondholders can reasonably expect to continue to be timely paid in full, at the contracted-for rate of interest. The DWSD Bonds are secured by a lien on the Pledged Assets, which are "special revenues" as defined in the Bankruptcy Code: the DWSD Bondholders that would be impaired under the Plan are secured revenue bondholders. <u>See</u> Sewer Bond Ordinance, at § II.5; Water Bond Ordinance, at § 5. The DWSD Bonds are further secured by contractual pledges under the DWSD Trust Indentures. <u>See</u> Sewer Trust Indenture, at § 2.01; Water Trust Indenture, at § 2.01. Indeed, the City has repeatedly acknowledged that the secured creditors classified in Class 1A are fully secured:

> The only part of that, part of the [P]lan that we intend to seek cramdown on is with respect to the basic 1129(b) treatment of ***oversecured*** debt . . .

Hr'g Tr. at 143:3-6 (Apr. 17, 2014), a true and correct copy of which is attached hereto as Exhibit "F" (emphasis added).[15]

---

[15] Moreover, the Existing DWSD Bonds are fully secured because, according to the "rate covenant" contained in the DWSD Bond Ordinances, the DWSD is required to fix and revise rates as may be necessary to produce, among other things, "the amount [of the DWSD Revenues] required to provide for the payment of Indebtedness coming due for the Fiscal Year of calculation." Sewer Bond Ordinance, at § II.9; Water Bond Ordinance, at § 9.

65. Because the City admits the Existing DWSD Bonds are fully secured by their lien on Pledged Assets, the DWSD Bondholders would not need to "race to the courthouse" in the hopes of obtaining a recovery if the Plan were to be dismissed. Nor would the DWSD Bondholders need to attempt to force the City to raise rates or taxes or take other challenging and potentially futile actions to ensure their repayment. In the absence of the Plan, the status quo is undeniably sufficient to continue to pay the Existing DWSD Bonds in full. Indeed, the City is already, by its own admission, collecting and properly segregating sufficient revenues to satisfy the DWSD Bondholders in the ordinary course and during the pendency of this case. See Disclosure Statement, Exhibit L (depicting the DWSD current and historical financial information); Disclosure Statement, Exhibit M (depicting the DWSD financial projections). Accordingly, what the DWSD Bondholders can "reasonably expect" if the Plan were to be dismissed is what they "already have"— payment in full.[16] Because the DWSD Bondholders can reasonably expect to be paid in full outside of bankruptcy, the Plan is not in their best interests. Indeed, the

---

[16] Indeed, even if the City were to linger in bankruptcy indefinitely before dismissal of the Plan, the DWSD Bondholders would nevertheless be paid in full. The DWSD Revenues are special revenues within the meaning of section 902(2) of the Bankruptcy Code and, therefore, are afforded the special protections of sections 922(d) and 928 of the Bankruptcy Code. See 11 U.S.C. §§ 902(2), 922(d), 928. Notably, the DWSD Revenues have been applied to pay full debt service on the Existing DWSD Bonds during the pendency of this case. To the extent that the alternative to confirmation of the Plan is the indefinite continuation of this bankruptcy case, holders of DWSD Bonds would continue to receive full payment of principal and interest. See 11 U.S.C. §§ 922(d), 928. The City has never disputed this.

36

only proper treatment of the Existing DWSD Bonds is full reinstatement as set forth in section 1124 of the Bankruptcy Code.[17]  See 11 U.S.C. § 1124.

## II.    The Plan Cannot be Confirmed Because It Does Not Satisfy the Cramdown Requirements (11 U.S.C. § 1129(b)(2)(A))

66.    The plan cannot be confirmed because it is not in the best interests of creditors to impair fully secured special revenue debt for the reasons set forth above.  In addition, to the extent that the Court concludes that it can apply the "cramdown" provisions of the Bankruptcy Code to fully secured special revenue debt, the Plan cannot be confirmed over Assured's objection because it does not satisfy the cramdown requirements of section 1129(b)(2)(A) of the Bankruptcy Code.  A plan of adjustment may not be confirmed over the objection of any class of creditors unless it is "fair and equitable" with respect to the nonconsenting creditor class(es).  See 11 U.S.C. § 1129.

67.    A plan is "fair and equitable" with respect to a nonconsenting class of secured creditors only if it provides:

> (i)(I) that the holders of such claims retain the liens securing such claims . . . to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

---

[17]    As described in more detail below, the Plan also cannot be confirmed because it improperly classifies certain classes of Existing DWSD Bond Claims as unimpaired.

37

> (ii) for the sale . . . of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale . . . ; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

68.     Although these cramdown tests are disjunctive, a plan proponent does not have unfettered discretion in choosing which test to apply.  See RadLAX Gateway, Hotel LLC v. Amalgamated Bank, 132 S.Ct. 2065, 2072 (2012).  Where a plan purportedly falls within the specific provisions of clauses (i) or (ii), the catch all "indubitable equivalent" standard is unavailable.  See RadLAX, 132 S.Ct. at 2071-72; In re Olde Prairie Block Owner, LLC, 464 B.R. 337, 342 (Bankr. N.D. Ill. 2011).  Accordingly, where, as here, a plan purportedly allows secured creditors to retain their liens and receive deferred cash payments, a plan proponent must seek confirmation solely under clause (i), and may not secondarily seek confirmation under clause (iii) if confirmation under clause (i) proves to be impossible.

> A.     The Plan Does Not Allow the DWSD Bondholders to Retain their Liens and Provide DWSD Bondholders Deferred Cash Payments of a Value, as of the Effective Date, of at Least the Value of their Interest in their Collateral as Required by Sections 1129(b)(2)(A)(i)(I) and (II)

69.     The Plan cannot be confirmed because it does not provide all DWSD Bondholders, including Assured, with payments that are of a value, as of the

38

Effective Date, of at least the value of their interest in the Pledged Assets and allow DWSD Bondholders to retain their liens in full as required by sections 1129(b)(2)(A)(i)(I) and (II) of the Bankruptcy Code. As described above, the Plan's treatment of most DWSD Bondholders, while complicated on its face, boils down to a simple swap: they will lose their Existing DWSD Bonds and in exchange receive New DWSD Bonds with laughably low interest rates and limited call protection. Although Assured's professionals are in the process of determining exactly how these New DWSD Bonds would be valued, it is painfully clear that the deferred payments the New DWSD Bonds will provide would be significantly less valuable than the DWSD Bondholders' current interests in the Pledged Assets.

      i.    *The New DWSD Bonds Do Not Provide the DWSD Bondholders with Appropriate Interest Rates*

70. "Section 1129(b) of the Bankruptcy Code provides no guidance for calculating the cramdown interest rate required to be paid to confirm a plan of reorganization over a dissenting class of secured claims or unsecured claims." In re Griswold Bldg., 420 B.R. 666, 692 (Bankr. E.D. Mich. 2009). Sixth Circuit precedent, however, establishes three tests for determining an appropriate cramdown rate of interest. First, if the debtor is solvent, a plan must provide creditors with at least their contracted-for rate of interest. See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d

39

668, 680 (6th Cir. 2006). Second, where a debtor is insolvent, "the market rate should be applied . . . where there exists an efficient market." Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient Inc.), 420 F.3d 559, 568 (6th Cir. 2005); see also General Electric Credit Equities, Inc. v. Brice Road Devs., L.L.C. (In re Brice Road Devs., L.L.C.), 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008); In re Griswold Bldg., 420 B.R. at 693. Third, where a debtor is insolvent and:

> no efficient market exists . . . then the bankruptcy court should employ the formula approach endorsed by the Till plurality. This nuanced approach should obviate the concern of commentators who argue that . . . there are instances where no efficient market exists.

In re Am. HomePatient Inc., 420 F.3d at 568; see also In re Brice Road Devs., L.L.C., 392 B.R. at 280; In re Griswold Bldg., 420 B.R. at 693. The Plan cannot be confirmed because the cramdown interest rates for the New DWSD Bonds proposed by the Plan fall well short of what would be required regardless of which approach this Court adopts.

> (a)    The Plan Cannot be Confirmed Because
>         it Does Not Provide DWSD Bondholders
>         with their Contracted-For Interest Rates

71.    The DWSD, which is a solvent, ring-fenced, independently managed, stand-alone enterprise fund,[18] should be required to pay the contract rate of interest

---

[18]    See Motion of the City of Detroit Water & Sewerage Department for an Order, Pursuant to 11 U.S.C. § 105, Amending and Clarifying the Fee Review Order Dated September 11, 2013,

on the New DWSD Bonds.  Under binding Sixth Circuit precedent, when a debtor is solvent, "the bankruptcy judge does not have free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." In re Dow Corning Corp., 456 F.3d at 679 (internal quotation omitted).  Instead, "absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights."  Id. (citation omitted).  Accordingly, where a debtor is solvent, a plan is not fair and equitable as to a fully secured creditor unless it provides that creditor with at least the creditor's bargained-for rate of interest.  See In re Good, 413 B.R. 552, 559 (Bankr. E.D. Tex. 2009) (quoting In re Dow Corning, 244 B.R. 678, 695 (Bankr. E.D. Mich. 1999) ("Dow Corning I") ("the rationale for use of the contract rate is straightforward: A debtor with the financial wherewithal to honor its contractual commitments should be required to do so.").

72.    Although the City is the nominal debtor in this chapter 9 case, the DWSD is the "actual debtor" with respect to the DWSD Bondholders for four

In re City of Detroit, Mich., No. 13-53846, Docket No. 3929 (Bankr. E.D. Mich. Apr. 9, 2014) ("DWSD is a department of the City that has operational independence from the City in the areas of purchasing, human resources, law, and finance, pursuant to an order entered on November 4, 2011 in the case United States of America v. City of Detroit, et. al., United States District Court for the Eastern District of Michigan, Case No. 77-1100."); DWSD 2012-A Official Statement, at 25 ("Pursuant to an Order dated February 11, 2011 . . . that was followed by an Order dated November 4, 2011 . . . issued by the Court in a lawsuit filed by the EPA against the City in 1977, the Department is required to make a number of changes to the manner in which it manages, governs and operates the System, all of which are intended to separate the affairs of the Department from those of the City and to give the Department a greater degree of autonomy than it had previously.").

41

reasons. First, the City admits that "[a]lthough DWSD is part of the City, it maintains a degree of independence with respect to certain functions—such as purchasing, human resources, law and *finance* . . . ."[19] Indeed, applicable law requires that the DWSD's finances remain separate from the City's[20] and provides that the Existing DWSD Bonds are "not included in the general limit of indebtedness prescribed by Michigan law."[21] Second, the Existing DWSD Bonds are secured solely by the revenues of the DWSD Systems.[22] Third, the DWSD Bondholders have no recourse to the City's General Fund or other assets of the City, including pursuant to section 1111(b) of the Bankruptcy Code.[23] Fourth, the Revenue Bond Act, the DWSD Bond Ordinances and the DWSD Indentures create

---

[19] Joinder of the City of Detroit to Motion of the City of Detroit Water & Sewerage Department for an Order Pursuant to 11 U.S.C. § 105, Amending and Clarifying the Fee Review Order Dated September 11, 2013, In re City of Detroit, Mich., No. 13-53846, Docket No. 4548 (Bankr. E.D. Mich. May 8, 2014) (emphasis added).

[20] See MCL § 141.122(1) (requiring that when a public improvement borrows funds, the revenues of that public improvement be kept separately from the municipality); City Charter of Detroit § 7-1203 (2012) (requiring that "all moneys paid into the city treasury from fees collected for water, drainage or sewage services shall be used exclusively for the payment of expenses incurred in the provision of these services, including the interest and principal of any obligations issued to finance the water supply and sewerage disposal facilities of the city, and shall be kept in separate funds.")

[21] Disclosure Statement, at 99; see also MCL § 141.107(3).

[22] See Sewer Bond Ordinance, at § II.5; Water Bond Ordinance, at §5.

[23] See Sewer Bond Ordinance, at § II.5; Water Bond Ordinance, at §5; 11 U.S.C. § 927.

42

a "closed loop" under which the DWSD Revenues can never be used to pay the City's general obligations.[24]

73.    Moreover, as in In re Good, the actual debtor of DWSD Bondholders is solvent and the DWSD Bondholders are fully secured.  See In re Good, 413 B.R. at 559; Disclosure Statement, at 100 (during Fiscal Year 2013, "the [Sewage System] received **net** system revenues of approximately $461.8 million versus expected debt service requirements of approximately $200.0 million" and "the [Water System] received **net** system revenues of approximately $370.1 million versus expected debt service requirements of approximately $153.4 million.").  The DWSD Bondholders are thus entitled to their contract rates of interest under Dow.[25]

74.    The Plan, however, provides for DWSD Bondholders to receive New DWSD Bonds with interest rates that are below—and in a majority of instances significantly below—the contract rate.  See Plan, Exhibit I.A.168.  Accordingly, the Plan is not fair and equitable with respect to the DWSD Bondholders, and cannot be confirmed.

---

[24]    See MCL §§ 141.103, 141.106, 141.107, 141.122; Sewer Bond Ordinance, at §§ II.1, II.5, II.12; Water Bond Ordinance, at §§ 1, 5, 12.

[25]    Notably, payment of the contract rates of interest to the DWSD Bondholders would not prejudice any party.  As set forth below, the DWSD Revenues cannot be used to pay any other Class of creditor except the DWSD Revolving Bondholders, who will be paid in full under the Plan.  See Sewer Bond Ordinance, at §§ II.1, II.5, II.12; Water Bond Ordinance, at §§ 1, 5, 12; Plan, at 28.

43

75.     Even if this Court declines to apply <u>Dow</u>, the Plan cannot be confirmed because it foists on DWSD Bondholders interest rates that are below those that an efficient market would produce.  Under the efficient market approach, the Court must first determine whether an efficient credit market exists.  <u>See</u> <u>In re Griswold</u>, 420 B.R. at 693.  Neither the Bankruptcy Code nor bankruptcy case law defines the term "efficient market" nor specifies how a court should go about determining whether such an efficient market exists.[26]  <u>See id</u>.  Consequently, courts regularly rely on expert opinion in determining whether an efficient market exists.  <u>See id</u>.

76.     If the Court determines that an efficient market exists, the Court must then determine what interest rate that "efficient market would have produced for the loan that the lenders provided."  <u>In re Am. HomePatient, Inc</u>., 420 F.3d at 568. In making that determination, the Court may consider:

> the priority of the lien securing the loan; whether there exists an open, well-developed market for loans of the kind between the debtor and secured creditor; the type of collateral involved; the quality, age, and life expectancy of the collateral; short or long term nature of the proposed term of the loan; and the amount financed.

---

[26]   In the context of municipal bond securities litigation, the Sixth Circuit described an efficient market as "one which rapidly reflects new information in price."  <u>Freeman</u> v. <u>Laventhol & Horwath</u>, 915 F.2d 193, 199 (6th Cir. 1990).

44

In re Brice Road Devs., 392 B.R. at 280-81.

77.     At present, Assured is taking discovery and conducting expert analysis to determine whether an efficient market will exist for some or all of the New DWSD Bonds and, if so, what interest rates such an efficient market would demand.  However, even a cursory comparison to the bonds of other municipal sewer and water systems reveals that the Plan's proposed cramdown interest rates are vastly below what an efficient market would produce.

78.     The new Sewer Revenue Current Interest Warrants (the "JeffCo Sewer Warrants") issued by Jefferson County, Alabama upon its emergence from chapter 9 in December 2013 provide a useful comparison regarding the interest rates that an efficient market would demand for the New DWSD Bonds.  On emergence from bankruptcy, Jefferson County issued the JeffCo Sewer Warrants (with the consent of existing sewer warrant holders) to satisfy claims of prepetition warrant holders.  The JeffCo Sewer Warrants were priced and sold in the market, which produced interest rates ranging from 5.0 to 5.5 percent for senior lien warrants (which had the protection of new bond insurance) and 5.0 to 7.0 percent for junior lien warrants (which were not insured).  See Official Statement of Jefferson County, Alabama Relating to $1,785,486,521.65 Sewer Revenue Warrants Series 2013-A to Series 2013-F, true and correct excerpts of which are attached hereto as Exhibit "G."

45

79.     A comparison between the City's proposed cramdown interest rates for the New DWSD Bonds and the interest rates demanded by the market for the JeffCo Sewer Warrants demonstrates that the City's cramdown interest rates are far below the interest rates that an efficient market would produce.  Not one impaired class of New DWSD Bonds is proposed to have an interest rate greater than or equal to the interest rates of any of the JeffCo Sewer Warrants, despite the fact that the New DWSD Bonds will lack the protection of new bond insurance policies. See Plan, Exhibit I.A.168.  The gulf between the interest rates proposed for the New DWSD Bonds and the market-based interest rates of the JeffCo Sewer Warrants is strikingly large in many instances.  For example, holders of the Assured-insured Series 2001(C-1) Sewer Bonds, CUSIP 2512376J7, will receive New DWSD Bonds with an interest rate of a mere 0.87 percent.  See Plan, Exhibit I.A.168.  Accordingly, even at this early stage, it is plain that the Plan's proposed cramdown interest rates cannot be countenanced under an efficient market theory.[27]

---

[27]     Assured reserves the right to demonstrate in its supplemental brief, after the completion of discovery and expert analysis, whether an efficient market for the New DWSD Bonds exists and, if so, the interest rates it would demand for the New DWSD Bonds.

46

(c)    The Plan Cannot be Confirmed under Till's Formula Test

80.    The Plan's cramdown interest rates are likewise not "fair and equitable" as judged by the "formula approach" approved by a plurality of the Supreme Court in Till, even if this Court finds it is applicable.

81.    As explained by a plurality of the Supreme Court, the "formula approach" for determining an appropriate cramdown interest rate "begins by looking to the national prime rate . . . ." Till v. SCS Credit Corp., 541 U.S. 465, 478-79 (2004).  From there, the formula approach "requires a bankruptcy court to adjust the prime rate" to account for "greater risk of nonpayment . . . ." Id. at 479. An upward adjustment from the national prime rate is required unless the bankruptcy court knows, to a certainty, that the plan under consideration will succeed.  See id. at 479 n.18 ("if the court could somehow be certain a debtor would complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cramdown loans.").  Because such certainty is impossible, the formula approach always results in a "'prime-plus' rate of interest . . . ." Id. at 466.

82.    The appropriate size of the upward risk adjustment from the national prime rate depends upon "such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." Id. at 479.  "Other risk factors to consider include the debt service coverage ratio, the

47

loan-to-value ratio, and the quality of any guarantors." In re Griswold, 420 B.R. at 693 (citing In re Bloomingdale Partners, 155 B.R. 961, 983-84 (Bankr. N.D. Ill. 1993)).

83. After considering all relevant risk factors, courts regularly make upward adjustments from the national prime rate of one percent to three percent. See In re Am. HomePatient, Inc., 420 F.3d at 569 (quoting Till, 541 U.S. at 480) ("courts starting from the prime rate 'have generally approved adjustments of 1% to 3%.'"). Recently, however, this Court determined that a five percent upward adjustment was appropriate under Till's formula approach. See In re Griswold, 420 B.R. at 696 ("Using the formula approach, the Court finds that an appropriate cramdown interest rate under § 1129(b)(2)(A) for the Lender's secured claim is 5% over the prime rate of interest.").

84. As of the date of submission of this objection, the national prime rate of interest is 3.25 percent. See Statistical Release, Federal Reserve, H.15 (519 Selected Interest Rates (May 12, 2014) *available at* http://www.federalreserve.gov/ releases/h15/current/h15.pdf. Accordingly, under the Till formula approach, no cramdown rate of interest below 3.25 percent can be approved. See Till, 541 U.S. at 478-79. Under the Plan, however, 27 out of 42 CUSIPs of impaired New DWSD Bonds for which Assured insures the corresponding Existing DWSD

48

Bonds would bear interest rates below 3.25 percent.[28]  See Plan, Exhibit I.A.168.

Indeed, the Plan contemplates interest rates as low as 0.87 percent with respect to

certain New DWSD Bonds, a mere quarter of the minimum rate permitted by Till.

See Plan, Exhibit I.A.168.  Thus, even if *no* risk adjustment to the national prime

rate were warranted—which the Supreme Court has stated is only appropriate if

success of a plan is a certainty—the Plan would still fail to be fair and equitable by

a wide margin.  The Plan's failure to meet even the lowest possible hurdle posed

by Till is particularly telling given that the formula approach has been roundly

criticized for "systematically *undercompensat[ing]* secured creditors for the true

risks of default."  Till, 541 U.S. at 492 (Scalia, J., dissenting) (emphasis added).

85.  Moreover, although the Plan fails even if no risk adjustment were

appropriate, a significant upward adjustment from the national prime rate would be

required in this case.  Under the Plan, the New DWSD Bonds will be structurally

subordinated to the DWSD GRS Pension Contributions, which would reduce the

debt service coverage ratio of the New DWSD Bonds relative to the Existing

DWSD Bonds.  See Plan at 33; Disclosure Statement, at 22.  The New DWSD

Bonds would also be stripped of any call protection in excess of five years, giving

---

[28]  Assured insures the following classes which will receive New DWSD Bonds with an interest
rate below 3.25 percent: Class 1A-125, Class 1A-126, Class 1A-127, Class 1A-128, Class
1A-129, Class 1A-130, Class 1A-131, Class 1A-142, Class 1A-148, Class 1A-149, Class 1A-
150, Class 1A-151, Class 1A-160, Class 1A-161, Class 1A-227, Class 1A-228, Class 1A-
229, Class 1A-230, Class 1A-263, Class 1A-265, Class 1A-266, Class 1A-272, Class 1A-
273, Class 1A-274, Class 1A-275, Class 1A-321, and Class 1A-322.

49

the City a free option to refinance in the future at the expense of the DWSD Bondholders.  See Plan, at 27; Disclosure Statement at 45.

86.    Compounding the problem, the Plan would represent the first time *ever* that fully secured special revenue debt was nonconsensually impaired in a chapter 9 case.  Such an event would increase the risk profile and decrease the value of special revenue debt nationwide:

> If the lien or the call protection on the utility bonds is ultimately impaired, Fitch will reevaluate its current assumption that utility revenue bond ratings are so well protected as special revenue debt under Chapter 9 that such bonds can be assigned ratings on a stand-alone basis without a link to related municipal ULTGO rating.

Fitch Ratings, Special Report: Rating to Bondholder Security After Detroit, at 2 (May 1, 2014).  The market's perception of Detroit's revenue bond debt would suffer particularly harshly:

> Fitch would almost certainly view the court's confirmation of the [first iteration of the City's plan of adjustment], or a similar variation whereby [DWSD Bondholders] are impaired, as a distressed debt exchange ***leading to a ratings downgrade to as low as D***.

Fitch Ratings, Fitch Downgrades Detroit, MI's Sr and Sub Water Revs & Sewer Revs; Negative Watch Maintained, at 1 (Feb. 28, 2014), a true and correct copy of which is attached hereto as Exhibit "H."   Even the City has admitted, with characteristic understatement, that the New DWSD Bonds "may" be viewed negatively by the market:

50

> Holders of the [New DWSD Bonds and New Existing
> Rate DWSD Bonds] may encounter limited market
> acceptance of City credit upon any attempt to sell City
> obligations, make sales at or near par potentially difficult.
> Holders of City debt after the Effective Date may not be
> able to sell such debt for any price for some time.

See Disclosure Statement, at 83.

87.     All of the risks attendant to the proposed New DWSD Bonds suggest that a substantial upward adjustment from the national prime rate would be required under the Till test.  However, even if the Court were to find that only a modest upward adjustment from the national prime rate were required to compensate DWSD Bondholders for the increased risk of nonpayment, it is likely that every New DWSD Bond interest rate contemplated by the Plan would be found impermissible.  For example, if the Court were to find that a two percent upward adjustment were appropriate—the midpoint of the one to three percent range cited as common by Till—the New DWSD Bonds would be required to bear an interest rate of at least 5.25 percent.  Each and every New DWSD Bond interest rate proposed by the Plan would fail to clear that hurdle, by as much as 4.38 percent.  In short, under the Till formula approach, the Plan's proposed cramdown

51

interest rates fall staggeringly short of being "fair and equitable" to DWSD Bondholders.[29]

   ii. *The Plan Fails to Provide Value on Account of Call Protection*

88. Additionally, the plan is not "fair and equitable" to Assured because it does not provide any value on account of claims arising from Assured's "call protection."

89. Call protection "provisions in bond indentures protect lenders' right to the yield that was expected at the time that they made their loans . . . ." <u>In re Chemtura Corp.</u>, 439 B.R. 561, 596 (Bankr. S.D.N.Y. 2010). Call protection comes in two principal forms. First, "make whole" provisions require the "borrower to pay a premium to compensate the lender for the loss of anticipated interest" when debt is redeemed prior to maturity. <u>Id</u>. at 596. Second, "a no-call provision prohibits the borrower from prepaying the indenture obligations at all, again protecting the lender's yield." <u>Id</u>.

90. As acknowledged in the Interest Rate Reset Chart, many of the Existing DWSD Bonds insured by Assured contain "call protection" in the form of "no call" provisions ("<u>Assured's Call Protection</u>"). <u>See</u> Plan, Exhibit I.A.168. For example, the Series 2012-A Sewer Bonds insured by Assured contain absolute

---

[29] Assured reserves the right to demonstrate in its supplemental brief, after the completion of discovery and expert analysis, the appropriate risk adjustment that would be required under the <u>Till</u> formula, were it to be applied in this case.

prohibitions against early redemption as to some CUSIPs of Series 2012-A Sewer

Bonds, and temporary prohibitions as to other CUSIPs:

> ***Optional Redemption of the Bonds.*** The Bonds
> maturing prior to July 1, 2023 are not subject to optional
> redemption prior to maturity. The Bonds . . . maturing on
> or after July 1, 2023, except for those maturing July 1,
> 2024 and July 1, 2025, are subject to redemption prior to
> maturity at the option of the City . . . on any one or more
> dates on or after July 1, 2022, at a redemption price of
> par plus accrued interest to the date fixed for redemption.
> Bonds maturing on July 1, 2024 and July 1, 2025 are
> subject to redemption prior to maturity at the option of
> the City . . . on any one or more dates on or after July 1,
> 2017, at a redemption price of par plus accrued interest to
> the dates fixed for redemption.

2012-A DWSD Sewer Bond Specimen, at 2-3, a true and correct copy of which is

attached hereto as Exhibit "I."

91.    Because Assured's Call Protection is structured as an absolute

prohibition on prepayment of covered Existing DWSD Bonds during the

applicable no-call periods, no monetary remedy for breach is specified. See id.

Indeed, providing for liquidated damages would have been self-defeating, as it

effectively would have converted the "no call" provisions into potentially less

protective "make whole" provisions.

92.    The City's Plan proposes to violate Assured's Call Protection by (i)

forcibly exchanging, prior to maturity, certain Existing DWSD Bonds that are

subject to Assured's Call Protection for New DWSD Bonds bearing lower rates of

interest or (ii) exchanging, prior to maturity, certain Existing DWSD Bonds that are subject to Assured's Call Protection for New Existing Rate DWSD Bonds stripped of any call protection.  See Plan, at 27.  The Plan does not contemplate providing *any* compensation to Assured for claims arising from the City's breach of Assured's Call Protection.  See id.

93.    Under Michigan law, "[t]he remedy for breach of contract is to place the nonbreaching party in as good a position as if the contract had been fully performed."  Corl v. Huron Castings, Inc., 544 N.W.2d 278, 280 (Mich. 1996). Thus, Assured is, at the very least, entitled to actual monetary damages for any breach.  As the United States Supreme Court has explained, "the failure to specify remedies in a contract is no reason to find the parties intended no remedies at all." See U.S. v. Winstar, 518 U.S. 839, 869 n.15 (1996).

94.    The City can be expected to argue that Assured is not entitled to be compensated for the City's breach of Assured's Call Protection based on cases decided outside of the special revenue debt context in which some courts declined to grant secured creditors the benefit of their call protection on the grounds that a bankruptcy filing accelerates debt, rendering call protection irrelevant.  See In re Solutia Inc., 379 B.R. 473, 488 (Bankr. S.D.N.Y. 2007) (citation omitted); see also

54

<u>HSBC Bank USA, Nat'l. Ass'n</u> v. <u>Calpine Corp.</u>, No. 07 Civ 3088 (GBD), 2010 WL 3835200, at *4 (S.D.N.Y. Sept. 25, 2010).[30]

95.     Such decisions are unpersuasive and inapposite in this case.  Payment of the Existing DWSD Bonds is fully secured by pledged special revenues, which remain payable in the ordinary course as they mature and as interest comes due. <u>See</u> 11 U.S.C. §§ 902, 922(d), 927, 928.  Indeed, the DWSD Bond Documents do not authorize the Existing DWSD Bonds to be accelerated under any circumstances.[31]   <u>See</u>, <u>e.g.</u>, Sewer Bond Ordinance, at § II.7; Water Bond Ordinance, at § II.7; Sewer Trust Indenture, at § 5.01; Water Trust Indenture, at § 5.01.  Accordingly, the City's proposal to forcibly exchange the Existing DWSD Bonds for the New DWSD Bonds is properly characterized as an impermissible early optional redemption of the Existing DWSD Bonds in breach of Assured's Call Protection.  Because the Plan will not provide Assured with any value for the City's proposed breach of Assured's Call Protection, it is not fair and equitable.

---

[30]   <u>But</u> <u>see</u> <u>Premier Entm't Biloxi LLC</u> v. <u>U.S. Bank Nat'l Ass'n.</u> (<u>In re Premier Entm't Biloxi LLC</u>), 445 B.R. 582 (Bankr. S.D. Miss. 2010) (determining that breach of no call provision through a plan gave rise to a compensable claim).

[31]   Indeed, even if acceleration were theoretically permitted under some circumstances, such acceleration could not occur without Assured's express permission, which Assured has not given.  <u>See</u>, <u>e.g.</u>, 2003(A) Sale Order ("The maturity of [Assured insured Existing DWSD Bonds] shall not be accelerated without the consent of [Assured].").

55

iii.    *The Plan Partially Strips DWSD Bondholders of their Liens*

96.    The Plan is also not fair and equitable because it partially strips DWSD Bondholders of their liens.  A Plan cannot be confirmed as fair and equitable under section 1129(b)(2)(A)(i) if it partially strips secured creditors of their collateral.  See In re Olde Prairie Block Owner, LLC, 464 B.R. at 342 ("In any event, it is doubtful that the statute permits a debtor to partially strip a secured lender of its collateral in exchange for a cash payment under § 1129(b)(2)(A)(i) merely because that parcel was valued at one time in the amount offered.").  Here, the Plan proposes to do precisely that.  The Plan nominally allows the DWSD Bondholders to retain their liens on the Pledged Assets.  See Plan, at 27.  However, as described in greater detail below, the Plan would actually strip the DWSD Bondholders' liens with respect to, at a minimum, $428.5 million in DWSD GRS Pension Contributions.  See Plan, at 33, Exhibit II.B.3.r.ii.A; Disclosure Statement, at 22, 62.  Such partial lien stripping is inconsistent with the fair and equitable standard established by section 1129(b)(2)(A)(i).  See In re Olde Prairie Block Owner, LLC, 464 B.R. at 342.  Accordingly, confirmation of the Plan must be denied.

B.    The Plan Does Not Provide DWSD Bondholders
with the Indubitable Equivalent of their Claims

97.    As described above, the City cannot seek confirmation of its Plan over the objection of DWSD Bondholders under section 1129(b)(2)(A)(iii)'s

56

"indubitable equivalent" standard because the City asserts that DWSD Bondholders will retain their liens in the manner contemplated by section 1129(b)(2)(A)(i). See Plan, at 27; RadLAX, 132 S.Ct. at 2072; In re Olde Prairie Block Owner, LLC, 464 B.R. at 342. However, even if the indubitable equivalent standard were applicable here (which it is not), the Plan does not provide DWSD Bondholders with the indubitable equivalent of their claims.

98. "Indubitable equivalence" is a challenging standard to meet—it requires that a plan provide any non-accepting secured creditor with a substitute for its claim that "clearly must both compensate for present value and insure the safety of the principal." In re Monnier Bros., 755 F.2d 1336, 1339 (8th Cir. 1985) (citing In re Am. Mariner Indus., 734 F.2d 426, 433 (9th Cir. 1984)). Indeed, indubitable equivalence requires that a creditor receive new collateral that is "completely compensatory." F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (Inv. Co. of the Sw., Inc.), 341 B.R. 298, 319 (B.A.P. 10th Cir. 2006).[32] Consequently, courts applying the indubitable equivalent standard begin by determining whether

---

[32] See also In re Sparks, 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994) ("So indubitable equivalence requires more than the payment of interest; it requires the protection of the creditor's rights 'to get his money or at least the property.' . . . Two attributes of the substituted collateral, its *value* and the degree of *risk* that it imposes on the secured creditor, determine whether the new collateral is sufficiently 'safe' and 'completely compensatory.' New collateral with a value less than the value of the original collateral cannot be 'completely compensatory.' Similarly, new collateral with a value projected to be equal to, or even more than, the original collateral is not 'completely compensatory' if the new collateral is so much riskier than the original collateral that there is a substantially greater likelihood that the secured creditor will not be paid.")

57

the plan provides an appropriate cramdown interest rate. See In re Monnier Bros., 755 F.2d at 1338-39. As set forth above, the Plan's cramdown interest rates are wholly insufficient.

99. Moreover, even if a plan provides an otherwise-appropriate interest rate, it cannot meet the indubitable equivalent standard if it provides a secured creditor with substitute collateral that is riskier than the secured creditor's existing collateral. See In re River East Plaza, LLC, 669 F.3d 826, 831-3 (7th Cir. 2012) (holding that 30-year treasury bonds could not be substituted for a mortgage lien "because of the different risk profiles of the two forms of collateral, they are not equivalents, and there is no reason why the choice between them should be made for the creditor by the debtor."). [33]

100. Under the Plan, New DWSD Bonds would partially retain a lien on the Pledged Assets, but that lien would be effectively subordinated to $428.5 million in pension, administrative and restructuring payments that the DWSD is to make to the GRS Pension Plan. See Plan, at 33; Disclosure Statement, at 22. The City may contend that such effective subordination constitutes an alteration of the DWSD Bondholders' collateral package such that it would be appropriate to seek

---

[33] See also Inv. Co. of the Sw., Inc., 341 B.R. at 324-26 (holding that a plan did not satisfy the indubitable equivalent standard because elimination of an equity cushion that a creditor enjoyed prepetition increased the creditor's risk of default and non-payment); In re Alaska Fur Gallery, Inc., No. A09-00196, 2011 WL 4904425, at *14 (Bankr. D. Alaska Apr. 29, 2011) (holding that a plan failed to satisfy the indubitable equivalent standard because elimination of cross-collateralization provisions increased the creditor's risk).

58

confirmation of the Plan under the indubitable equivalent test.[34] However, to the extent that the collateral proposed to secure the New DWSD Bonds differs from the collateral securing the Existing DWSD Bonds, it is lesser, riskier and not the indubitable equivalent thereof. In particular, New DWSD Bondholders will be exposed to increased risk of nonpayment because of the diminution of the Pledged Assets caused by the diversion of DWSD Revenues to the DWSD GRS Pension Contributions ahead of debt service on the New DWSD Bonds. Indeed, Fitch Ratings recently released a special report indicating that the Plan's proposed treatment of the Existing DWSD Bonds will result in a negative reevaluation of its ratings of utility revenue bonds nationwide. See Fitch Ratings, Special Report: Rating to Bondholder Security After Detroit, at 2 (May 1, 2014); see also Fitch Ratings, Fitch Downgrades Detroit, MI's Sr and Sub Water Revs & Sewer Revs; Negative Watch Maintained, at 1 (Feb. 28, 2014). Because the collateral securing the New DWSD Bonds will be riskier and valued at less than the collateral securing the Existing DWSD Bonds, the Plan does not provide the DWSD Bondholders with the indubitable equivalent of their claims.

---

[34] The indubitable equivalent standard is most commonly applied when a plan proposes to provide a secured creditor with substitute collateral or otherwise alter the secured creditor's existing collateral. See In re River East Plaza, LLC, 669 F.3d at 831.

## III. The Plan Cannot Be Confirmed Because it is Not Fair and Equitable Under Section 1129(b)(1) and Unfairly Discriminates

### A. It is Not Fair and Equitable to Strip Impaired Secured Creditors of Collateral for the Benefit of Unsecured Creditors

101. In addition to being fair and equitable in the "particular manner specified in 11 U.S.C. § 1129(b)(2) . . . a plan must be fair and equitable in a broad sense." Fed. Nat'l Mortg. Ass'n v. Vil. Green I, GP, No. 13-2643-STA, 2014 WL 288974, at *8 (W.D. Tenn. Jan. 27, 2014) (quoting In re Bryson Props., XVIII, 961 F.2d 496, 505 (4th Cir. 1992)); see also Dow Corning I, 244 B.R.at 694-95 ("The prevailing and better view is that the phrase 'fair and equitable' is as broad as it sounds."). While section 1129(b)(2) of the Bankruptcy Code "makes it clear that the condition that a plan be fair and equitable includes the requirements of § 1129(b)(2)(A)" it "does not make those requirements the sole test for a determination that a plan of reorganization is fair and equitable." In re Griswold Bldg., 420 B.R. at 705. The Plan cannot be confirmed because it is not fair and equitable in a broad sense.

102. Although the absolute priority rule is only explicitly codified in section 1129(b)(2)(B), which governs treatment of unsecured creditors, this Court and other courts in the Sixth Circuit have also applied it for the benefit of secured creditors under broader principles of fairness and equity. See e.g., In re Griswold Bldg., 420 B.R. at 706; Fed. Nat. Mortg. Ass'n, 2014 WL 288974, at *8 (citing In

60

re Dow Corning Corp., 456 F.3d at 672).  For example, in Griswold, the debtor proposed a plan that would have impaired a lender, whose $36 million claim was secured by certain mortgages, each of which contained an assignment of rents and leases.  See id. at 672.  The secured creditor objected to the plan on the grounds that it was not fair and equitable.  See id. at 675.  This Court held that the plan was not fair and equitable, because it (i) proposed to use the lender's cash collateral to pay administrative expense claims, professional fee claims and unsecured claims, all of which were junior in priority to the lender's claim, and (ii) purported to subordinate the lender's existing perfected interest in rents and leases.  See id. at 706.  This Court stated that "it is hard to see how [it] is fair and equitable" to "use the [l]ender's cash collateral to pay claims that have a lower priority under the Bankruptcy Code than the claims of the Lender," or to "[s]ubordinat[e] . . . the Lender's existing perfected assignment of rents and leases."  Id.

103.    The Plan is similarly unfair and inequitable.  Under the Plan, certain fully secured DWSD Bondholders would be explicitly impaired while every class of unsecured creditors, with the exception of holders of subordinated claims, would receive a recovery.  See Plan, at 26-36.  Certain groups of unsecured claimants may receive a similar, if not greater, recovery than the DWSD Bondholders.  See Plan, at 30-32; Disclosure Statement, at 36-39.  Moreover, and in direct violation of the prohibition established by this Court in Griswold,  certain of these unsecured

61

creditors recoveries would be funded directly by the impairment of the DWSD Bondholders: the Plan seeks to reallocate $428.5 million of DWSD Revenues, which would otherwise be available to satisfy the fully secured Existing DWSD Bond Claims to holders of the GRS Pension Claims, an unsecured creditor constituency of an inferior priority and for administrative expenses and professional fees.[35]  See Plan, at 33.

104.  Moreover, the impact of the DWSD Pension Restoration CVRs on the DWSD Bondholders is ambiguous, but could result in further payments to unsecured creditors from the DWSD Bondholders' collateral.[36]  The City is prohibited by law from disposing of the DWSD Systems, or any substantial portion thereof, unless the DWSD Bondholders "have been paid in full as to both principal and interest."  Sewer Bond Ordinance, at § II.19(d); Water Bond Ordinance, at § II.19(d).  Nevertheless, if the City consummates a Qualifying DWSD Transaction within seven years of the Effective Date, any proceeds received by the City will be allocated 50 percent to the holders of the DWSD Pension Restoration

---

[35]  The Disclosure Statement provides that the City will classify these DWSD GRS Pension Contributions as operation and maintenance expenses of the DWSD to be paid ahead of debt service on the New DWSD Bonds.  See Disclosure Statement, at 22.

[36]  Given the term of the DWSD Pension Restoration CVRs, that substantial ambiguity may persist for up to seven years.  See Plan, at 9.  Moreover, section 902(2) of the Bankruptcy Code defines special revenues to include "receipts derived from the . . . disposition of projects or systems . . . ."  11 U.S.C. § 902(2).  Using the DWSD Pension Restoration CVRs to capture value from disposition of the DWSD Systems without the satisfaction in full of the Existing DWSD Bonds would violate the DWSD Systems' pledge of special revenues to the DWSD Bonds.

CVRs (i.e., the holders of Pension Claims), with the remaining 50 percent allocated to the City's General Fund, which the City may, in turn, distribute to other non-DWSD creditors. See Plan, at 9; Disclosure Statement, at 153. None of the proceeds will be allocated to DWSD Bondholders. See id. As with the DWSD GRS Pension Contributions, the granting of the DWSD Pension Restoration CVRs may thus reallocate collateral of the DWSD Bondholders and subordinate or strip the liens that the DWSD Bondholders had in such collateral.[37] Accordingly, the Plan is not fair and equitable, and cannot be confirmed.

B. The Plan Cannot be Confirmed Because it Unfairly Discriminates against Certain Classes of DWSD Claims Insured by Assured (11 U.S.C. § 1129(b)(1))

105. The Plan cannot be confirmed because it unfairly discriminates against Assured and certain similarly-situated DWSD Bondholders and other secured creditors. A plan of adjustment may only be confirmed if it does not discriminate unfairly. See 11 U.S.C. §1129(b)(1). The Plan runs afoul of that restriction in at least three ways. First, the Plan arbitrarily fails to reinstate certain Assured-insured Existing DWSD Bonds, resulting in materially lower recoveries with respect to those Existing DWSD Bonds that are not reinstated compared to those Existing DWSD Bonds that are proposed to be reinstated. Second, the Plan

---

[37] Additionally, if and when a Qualified DWSD Transaction occurs, the allocation proposed under the Plan would also indirectly violate the DWSD Closed Loop because such an allocation could divert funds to which the DWSD Bondholders may be entitled.

63

improperly impairs certain of the DWSD Bondholders while leaving unimpaired holders of DWSD Revolving Bonds, which are secured by the same collateral but subordinated in payment to the Existing DWSD Bonds Claims. Finally, the Plan impermissibly varies the treatment of DWSD Bondholders based on whether they make the DWSD Election and whether their Class votes to accept the Plan.

106. The Bankruptcy Code does not provide a definition for the term "unfair discrimination."[38] See, e.g., In re 20 Bayard Views, LLC, 445 B.R. 83 (Bankr. E.D.N.Y. 2011). However, this Court has adopted a presumption-based standard for unfair discrimination, which gives rise to a rebuttable presumption of unfair discrimination where there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

Dow Corning, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999) ("Dow Corning II"); In re BWP Transp., Inc., 462 B.R. 225, 231 (Bankr. E.D. Mich. 2011). In this

---

[38] Courts have developed various standards to test whether or not a plan unfairly discriminates against certain creditors. See, e.g., In re Dow Corning Corp., 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999) ("Dow Corning III"); In re Aztec Co., 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989). These tests primarily focus on the classification and treatment of claims and interests vis-à-vis other claims and interests. See, e.g., In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 232 (Bankr. D.N.J. 2000) ("The proscription in section 1129(b) against unfair discrimination is a 'horizontal limit on nonconsensual confirmation . . . assuring equitable treatment among creditors who have the same level of priority.'").

64

instance, numerous classes of DWSD Bondholders are impaired, dissent and will receive a materially lower percentage recovery than holders of Reinstated DWSD Bonds or holders of DWSD Revolving Bonds. As such, a presumption of unfair discrimination exists, which the City cannot rebut.

i. *Existence of a Dissenting Class*

107. Assured, as a dissenting DWSD Bondholder, satisfies the first requirement for a presumption of unfair discrimination. Claims arising from Existing DWSD Bonds are separately classified by CUSIP. See Plan, Exhibit I.A.110. As described above, Assured is deemed to be the sole holder of numerous CUSIPs of Existing DWSD Bonds, has sole voting authority with respect to such CUSIPs, and opposes confirmation of the Plan. Accordingly, the first requirement of the Dow Corning unfair discrimination standard is satisfied. See, e.g., In re BWP Transp., Inc., 462 B.R. at 231.

ii. *Class of the Same Priority*

108. All Existing DWSD Bond Claims and DWSD Revolving Bond Claims are secured claims, and thus are considered to have the same priority for purposes of the unfair discrimination test.[39] See In re Trenton Ridge Investors, LLC, 461 B.R. 440, 495 (Bankr. S.D. Ohio 2011) (the purpose behind the unfair

---

[39] Although for purposes of an unfair discrimination analysis all secured claims are presumed to have the same priority, the DWSD Revolving Bonds are *subordinated* in payment to all Existing DWSD Bonds (including the junior lien Existing DWSD Bonds). See Disclosure Statement, at 99-100; Sewer Bond Ordinance, at § II.5; Water Bond Ordinance, at §5.

65

discrimination test is that "a dissenting class will receive value equal to the value given to all other similarly situated classes" and "[i]n the context of unfair discrimination, the phrase 'similarly situated' suggests an 'inquiry focuse[d] on discrimination among categories of creditors who hold similar legal claims against the debtor, [such as] 'Administrative Claims,' 'Secured Claims,' [and] 'Priority Claims'"); Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 47 n. 12 (E.D. Pa. 1996) ("the comparison called for by the unfair discrimination provision of § 1129(b)(1) relates to the *category* of similarly situated claimants" and "[t]he appropriate inquiry focuses on discrimination among categories of creditors who hold similar legal claims against the debtor, i.e. 'Administrative Claims,' 'Secured Claims,' 'Priority Claims,' etc.") (emphasis in original).

109. The second requirement of the Dow Corning standard is likewise satisfied. The Plan creates several classes of Claims that are treated as having the same priority for unfair discrimination purposes: 1A, 1B and 1C, all of which are revenue bond claims secured by the Pledged Assets. Thus, any materially differing treatment between creditors in these classes is presumptively unfair discrimination.

### iii. *Different Treatment Under the Plan*

110. As will ultimately be evidenced by expert testimony that will supplement this objection, DWSD Bondholders whose Existing DWSD Bonds are not "reinstated" under the Plan will receive a materially lower percentage recovery

66

than the holders of the Reinstated DWSD Bonds, as well as the holders of DWSD Revolving Bonds and holders of certain other secured claims.

111.   A presumption of unfair discrimination arises if differing treatment of similarly situated creditors under a plan results in *either*: (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments); *or* (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.  See Dow Corning II, 244 B.R. at 702; BWP Transp., Inc., 462 B.R. at 230-31 (quoting Dow Corning II, 244 B.R. at 702).  Under either test, "Materiality is important because 'the pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is unfair.'"  In re Tribune Co., 472 B.R. 223, 242 (Bankr. D. Del. 2012) (quoting In re Armstrong World Indus., Inc., 348 B.R. 111, 121 (D. Del. 2006)).  Here, the Plan unfairly discriminates by providing certain DWSD Bondholders with a materially lower percentage recovery than other similarly situated DWSD Bondholders.

112.   A number of courts have addressed the issue of what would constitute a materially lower percentage recovery under the Dow Corning standard, all arriving at varying conclusions.[40]  In this instance, certain dissenting DWSD

---

[40] See In re Crosscreek Apartments, Ltd., 213 B.R. 521, 537–38 (Bankr. E.D. Tenn. 1997) (unfair disparity in treatment between similarly situated creditors was approximately 50%); In re Barney & Carey Co., 170 B.R. 17 (Bankr. D. Mass. 1994) (denying confirmation where

67

Bondholders will be afforded a materially lower percentage recovery as compared to other secured creditors in a virtually identical position. For example, Assured is the sole holder of a CUSIP of Existing DWSD Bonds that currently bears an interest rate of 5.50 percent, but under the Plan would be exchanged for New DWSD Bonds bearing a 0.87 percent interest rate. In the same series of Existing DWSD Bonds, there exists a CUSIP currently bearing the same rate of interest—5.5 percent—that would be reinstated under the Plan. By any reasonable measure, a deprivation of more than 84 percent of the interest on a bond is material, particularly when juxtaposed to the Plan's treatment of a virtually identical security that will retain its interest rate in full. The full extent of the materially lower percentage recovery for the Existing DWSD Bonds will be evidenced by expert reports and testimony, as necessary, which will supplement this objection as required by the Fourth Amended Procedures Order.

---

deficiency claim was to be paid 100%, while general unsecured claims were to receive 15% (i.e., 85% disparity)); In re Tucson Self–Storage, Inc., 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) (confirmation denied when disparity in treatment between similarly situated creditors was 90%); In re Cranberry Hill Assocs., L.P., 150 B.R. 289, 290–91 (Bankr. D. Mass. 1993) (unfair disparity in treatment between similarly situated creditors was approximately 50%); In re Aztec Co., 107 B.R. at 590–91 (plan discriminated unfairly by paying insider claims nearly 100% while paying noninsider claims only 3% (i.e., 97% disparity)); In re Caldwell, 76 B.R. 643, 646 (Bankr. E.D. Tenn. 1987) (confirmation denied where credit card debt was to receive 100%, while other unsecured creditors were to receive 22.7%); compare In re Unbreakable Nation Co., 437 B.R. 189, 203 (Bankr. E.D. Pa. 2010) (adopting the "grossly disparate" rule, but finding that the difference between 1.5% and 1.25% in a proposed distribution was not materially different or unfairly discriminatory); In re Greate Bay Hotel, 251 B.R. at 231 (deciding that difference between an 80% and 76% distribution was not a "materially lower percentage of recovery" that would constitute unfair discrimination).

68

113. In addition, the City has also proposed preferential treatment for holders of certain of its general obligation bonds that are secured by Distributable State Aid (the "DSA Bonds"). Under the Plan, the DSA Bonds are proposed to be truly unimpaired—they will be reinstated with no diversion of their pledged collateral. See, Plan, at 28-29. The City provides no explanation for its decision to seek to impair the DWSD Bondholders while reinstating the DSA Bonds in full. Indeed, the City's efforts to impair one secured class—the DWSD Bondholders— while leaving another secured class—holders of DSA Bonds—unimpaired highlights the arbitrary and unfair nature of the Plan's discrimination.

114. The City will not be able to rebut the presumption of unfair discrimination. It is possible that a plan proponent could rebut the presumption of unfairness established by a significant recovery differential by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain. See, e.g., In re BWP Transp., Inc., 462 B.R. at 231. The City cannot satisfy either requirement here. All of the Existing DWSD Bond Claims in Class 1A are in exactly the same secured position, and thus any differing treatment among them is completely baseless. Further, Classes 1B and 1C are also in a similar position as secured creditors, but, if anything, are entitled to a lower recovery than Class 1A claims as

they are subordinated in right of payment to such claims. Additionally, none of the relevant Classes has infused new value into the reorganization over any value provided by any of the creditors in those classes.

## IV. The Plan Cannot be Confirmed Because it would Break the DWSD "Closed Loop" Mandated by the DWSD Ordinances and the Revenue Bond Act (11 U.S.C. § 943(b)(4))

115. The Plan cannot be confirmed because it siphons DWSD Revenues out of the DWSD Revenue Waterfall, for the benefit of non-DWSD constituencies, in violation of Michigan state law and local ordinances. Section 943(b)(4) of the Bankruptcy Code provides that a plan cannot be confirmed if the debtor is prohibited by applicable law from taking any action necessary to carry out the plan. See 11 U.S.C. § 943(b)(4). Although a plan of adjustment may, subject to other limitations imposed by the Bankruptcy Code, issue replacement bonds that modify bondholders' prepetition *contractual* rights, any postpetition debt issuance must conform to all state and local law requirements. See In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25, 143 B.R. 750, 760 (Bankr. D. Mont. 1992); In re Sanitary & Imp. Dist., #7, 98 B.R. at 973-75. Here, the Plan cannot be confirmed because it would break the DWSD Systems' "closed loop" in violation of the Revenue Bond Act, the DWSD Bond Ordinances and section 943(b)(4) of the Bankruptcy Code.

70

A. The DWSD Revenue Waterfall Creates a "Closed Loop" that Requires DWSD Revenues be used Only to Benefit the DWSD

116.  As described above, the DWSD Revenue Waterfall is created by law, not just contract.  See MCL § 141.122; Sewer Bond Ordinance, at § II.12(B) (emphasis added); Water Bond Ordinance, at § 12(B).[41]  The DWSD Revenue Waterfall provides that DWSD Revenues must be used exclusively for, in order of priority: (a) payment of current administrative, operation and maintenance expenses of the DWSD Systems; (b) payment of debt service and debt service reserves for DWSD Bondholders; (c) establishing reserves for extraordinary repairs to the DWSD Systems; and (d) financing extensions and improvements to the DWSD Systems.  See id.  Any surplus DWSD Revenues are recycled back into the DWSD Revenue Waterfall.  Sewer Bond Ordinance, at § II.13(F); Water Bond Ordinance, at § 13(F).  Thus, the legally-mandated DWSD Revenue Waterfall creates a "closed loop" under which no DWSD Revenues are ever to be returned to the City's General Fund or used for the benefit of any party other than the DWSD and the DWSD Bondholders (the "DWSD Closed Loop").

---

[41] Indeed, the rights of DWSD Bondholders were not even memorialized in an indenture until 2012.  See Sewer Trust Indenture, dated June 1, 2012; Water Trust Indenture, dated February 1, 2013.

B.   The Plan Violates the DWSD Closed Loop by Extracting
Non-Current GRS UAAL Contributions from the System

i.   *Accrued GRS UAAL is Not a Current Expense*

117.   The Plan violates the DWSD Closed Loop because the portion of DWSD GRS Pension Contributions attributable to GRS UAAL, which are not current expenses of the DWSD, will be paid from the DWSD Revenues ahead of debt service payments to DWSD Bondholders.

118.   The Plan provides that the DWSD will make $428.5 million in DWSD GRS Pension Contributions, a portion of which is purportedly on account of GRS UAAL.[42]  See Plan, at 33; Disclosure Statement, at 22, 62.  The City has indicated its intent to classify these payments as administration, operation or maintenance expenses of the DWSD, which would be extracted from the DWSD ahead of debt service payments on the New DWSD Bonds.  See Disclosure Statement, at 22.

119.   However, payments on account of GRS UAAL are not eligible for payment from DWSD Revenues ahead of debt service to DWSD Bondholders. The Revenue Bond Act provides only that "payment for the ***next succeeding period of all current expenses*** of administration and operation and the ***current*** expenses for that period for maintenance as may be necessary to preserve the

---

[42]   In addition to "pension-related" payments, the DWSD GRS Pension Contributions would also include "administrative and restructuring" payments.  Plan, at 33.  Assured reserves the right to supplement this objection with respect to such administrative and restructuring payments following the completion of discovery and expert analysis.

72

public improvement in good repair and working order" shall have priority over debt service. MCL § 141.122 (emphasis added).

120. Although the Revenue Bond Act does not define the word "current," the Michigan Supreme Court has explained that "[p]ursuant to MCL 8.3a, undefined statutory terms are to be given their plain and ordinary meaning, unless the undefined word or phrase is a term of art." People v. Thompson, 730 N.W.2d 708, 711 (Mich. 2007); see also MCL § 8.3(a); People v. Hardy, 835 N.W.2d 340, 345 (Mich. 2013); Spectrum Health Hosps. v. Farm Bureau Mut. Ins. Co. of Michigan, 821 N.W.2d 117, 124 (Mich. 2012). Accordingly, a court should consult a lay dictionary to define common words or phrases "because the common and approved usage of a non-legal term is most likely to be found in a standard dictionary." Thompson, 730 N.W.2d at 711; see also Hardy, 835 N.W.2d at 345; Spectrum Health Hosps., 821 N.W.2d at 125 ("In determining the Legislature's intended meaning of the phrase 'taken unlawfully,' we must accord the phrase its plain and ordinary meaning, and we may consult dictionary definitions because the no-fault act does not define the phrase.").

121. The American Heritage Dictionary of the English Language defines "current" as "belonging to the present time." *Current Definition*, The American Heritage Dictionary of the English Language (5th ed. 2014). Merriam-Webster Online Dictionary defines "current" as "happening or existing now:

73

belonging to or existing in the present time." *Current Definition*, MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/current (last visited May 2, 2014). Oxford Dictionaries defines "current" as "belonging to the present time; happening or being used or done now." *Current Definition*, Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/current?q=current (last visited May 2, 2014). Taken collectively, the common meaning of "current" is "happening or belonging to the present time." The DWSD Bond Ordinances, enacted pursuant to the Revenue Bond Act, confirm this interpretation by clarifying that the "next succeeding period of all current expenses" means only "next month's" expenses. Sewer Bond Ordinance, at § II.12(B); Water Bond Ordinance, at § 12(B).

122. The Plan, however, requires the DWSD to make the DWSD GRS Pension Contributions, which are in part accrued expenses (i.e., GRS UAAL) rather than expenses attributable to the next month. The Plan's requirement that the DWSD Revenues be diverted to payment of GRS UAAL ahead of DWSD Bondholder debt service thus runs afoul of the DWSD Closed Loop created by the Revenue Bond Act and the DWSD Ordinances.[43] Consequently, the Plan violates section 943(b)(4) of the Bankruptcy Code and cannot be confirmed.

---

[43] Other courts have strictly construed analogous provisions excluding payment of certain "current expenses" from pledged special revenues. For example, in the Jefferson County chapter 9 case, the court was required to determine whether certain depreciation,

ii.  *Section 928(b) Does Not Authorize Payment on Account of GRS UAAL ahead of DWSD Bondholder Debt Service*

123.  Because any obligation of the DWSD with respect to GRS UAAL is not a "current" administrative, operation or maintenance expense of the DWSD, any priority payment from DWSD Revenues on account of GRS UAAL constitutes an invasion of the DWSD Bondholders' liens.  The City may contend that section 928(b) of the Bankruptcy Code permits such an invasion.  The City would be wrong.

124.  Section 928 of the Bankruptcy Code ensures that "special revenues" acquired by a municipal debtor postpetition remain subject to prepetition liens:

> Special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

11 U.S.C. § 928(a).  This continuing protection is subject to only one limitation: "[a]ny such lien on special revenues . . . derived from a project or system shall be subject to the necessary operating expenses of such project or system . . . ."  11 U.S.C. § 928(b).  Thus, in chapter 9, any pledge of special revenues is effectively

---

amortization and reserve charges could be excluded from special revenue creditors' liens under an indenture that required special revenues be first used to pay all operating expenses "that are then due and that were incurred during the then-current or in any then-preceding calendar month."  Jefferson County II, 482 B.R. at 417.  The court found that they could ***not***, because the charges "were neither incurred in the current month, nor a prior one, and were not payable in the current month, nor a prior one."  Id. at 424.

75

subordinated to the "necessary operating expenses" of the system from which the special revenues are derived.  Id.

125.  The phrase "necessary operating expenses" is not defined by the Bankruptcy Code.  See 11 U.S.C. §§ 101, *et seq.*  Nevertheless, courts have determined that necessary operating expenses are:

> those that are (1) expended to keep the system or project operating in the sense that the system or project is kept in good repair and generating the special revenues, not improvements or enhancements, (2) directly related to the project or system, not unrelated, (3) some, but not all operating expenses, which flow from § 928(b) being a minimum standard, and (4) being paid, which is different from those that may be incurred and paid in a later time period.

Jefferson County II, 482 B.R. at 437 (citing S. REP. No. 100–506, at 22; H.R. REP. No. 100–1011, at 8; REPORT OF THE NATIONAL BANKRUPTCY CONFERENCE ON PROPOSED MUNICIPAL BANKRUPTCY AMENDMENTS, at 21-24, 29-30.).

126.  This interpretation is well-grounded in the legislative history underlying the 1988 amendments to the Bankruptcy Code, which explains that:

> payment of operating expenses—those necessary to keep the project or system going—must be protected so that the project or system can be maintained in good condition to generate the reveue [sic] to repay bondholders (and, importantly, to provide residents of the municipality with the service the project or system is meant to deliver).

76

H.R. REP. No. 100–1011, at 8. The legislative history further clarifies that necessary operating expenses are only those that are "necessary and directly related to the project or system generating the special revenues and are not the expenses of the municipality generally or for other systems or projects." S. REP. No. 100–506, at 23. In short, expenses are "necessary operating expenses" within the meaning of section 928(b) of the Bankruptcy Code if they must be incurred to "keep[] the system or project operating to generate monies to repay the lenders and to deliver the intended service to customers." Jefferson County II, 482 B.R. at 437 (citing H.R. REP. No. 100–1011, at 8; S. REP. No. 100–506, at 22).

127. As an initial matter, the fixed $428.5 million amount of the DWSD's proposed contribution over nine years is at best an estimate, and may or may not relate to the actual amount of GRS UAAL that the DWSD would otherwise be required to contribute. Moreover, the City does not dispute that the DWSD Systems are solvent and self-sustaining. See Disclosure Statement, at 87-92. Indeed, the Plan demonstrates the City's position that the DWSD Systems are not only currently self-sustaining, but would remain so even if significant DWSD Revenues were to be diverted and improperly extracted from, rather than reinvested in, the DWSD Systems. See, e.g., Disclosure Statement, Exhibit M (depicting the City's projected financials if the Plan were implemented). The City thus does not dispute that the DWSD Systems would be able to continue (a) paying

77

the claims of their revenue bondholders and (b) providing services to their customers, regardless of whether the DWSD pays the portion of the DWSD GRS Pension Contributions attributable to GRS UAAL. In short, the DWSD Systems will be able to "keep going" regardless of whether the contributions are made as proposed by the Plan.[44] Accordingly, priority payments on account of GRS UAAL are not "necessary operating expenses" of the DWSD Systems that are chargeable against pledged DWSD Revenues pursuant to section 928(b) of the Bankruptcy Code.

C.   The Plan Violates the DWSD "Closed Loop" by Forcing the DWSD to Subsidize the Pension Liabilities of the Remainder of the City

128.   The Plan also violates the DWSD Closed Loop by diverting DWSD Revenues to subsidize the GRS UAAL attributable to the remainder of the City through at least 2023. The GRS Pension Plan is a single plan with a single sponsor, the City. See Disclosure Statement, at 105. Although its liabilities are booked by "division" (the DWSD, the Transportation Fund, and the General Fund), the assets of the DWSD are not segregated by division. See Disclosure Statement, at 105; DWSD 2012-A Official Statement, at 61-66. Accordingly, all

---

[44]   If the City chooses to reverse course and dispute the self-sustaining status of the DWSD Systems, Assured will, in accordance with this Court's Fourth Amended Procedures Order, supplement this objection to address that point after the completion of discovery and the submission of expert reports.

GRS Pensioners, not just the DWSD's GRS Pensioners, will benefit from the DWSD's GRS Pension Contributions.

129. Relatedly, the Plan requires the DWSD to essentially subsidize the funding of the entire GRS Pension Plan. During the initial 9-year period, the DWSD will make $428.5 million in DWSD GRS Pension Contributions. See Plan, Exhibit II.B.3.r.ii.A. During this period, the remaining contributions to the GRS Pension Plan would at most be $31.7 million from UTGO, $103.6 million from the State, $45.0 million from the DIA, and $109.8 million from an unspecified "other." See Plan, Exhibit II.B.3.r.ii.A. The City itself would make *no* contributions. See id. Indeed, if the City does not receive outside funding from the State or the DIA, "the Plan does not require the City to make up these amounts." Disclosure Statement, at 22. However, if such amounts are not contributed, all GRS Pensioners, including those associated with the DWSD, will see their benefits reduced. See, e.g., Disclosure Statement, at 82. Additionally, upon the City's own admission, the DWSD is required to pay its $428.5 million contribution on an "accelerated" (relative to all other contributing parties, and whether or not all other parties actually make their contribution) 9-year schedule to prevent additional pension cuts, which will benefit all GRS Pensioners, not just GRS Pensioners associated with the DWSD. See Disclosure Statement, at 22 ("If [the] DWSD did not fund its allocable share to the [GRS Pension Plan] in this manner, the cuts to

79

GRS pension beneficiaries would have to be higher than those contemplated in the Plan.").

130. The City asserts that, historically, the DWSD accounted for 30-33 percent of the contributions to the GRS Pension Plan. See Disclosure Statement, at 22. Under the Plan, the DWSD would be by far the largest contributor to the GRS Pension Plan over the next nine years, with contributions totaling approximately 60 percent of total GRS Pension Plan contributions. See Plan, Exhibit II.B.3.r.ii.A. Indeed, the three other parties identified as GRS Pension Plan contributors are not traditional GRS Pension Plan contributors at all.[45] See Plan, Exhibit II.B.3.r.ii.A.

131. Requiring the DWSD to subsidize the GRS Pension Plan violates the DWSD Closed Loop. As described above, the Revenue Bond Act and the DWSD Bond Ordinances (along with the DWSD Indentures) create a "closed loop" under which no DWSD revenues are ever to be returned to the City's General Fund or used for the benefit of any party other than the DWSD or the DWSD Bondholders. See MCL § 141.122; Sewer Bond Ordinance, at § II.12(B) (emphasis added); Water Bond Ordinance, at § 12(B). Under the Plan, however, DWSD contributions to the GRS Pension Plan would fund the non-segregated GRS Pension Plan for at least the next nine years in a manner dramatically

---

[45] Assured has requested that the City produce the documents that govern the GRS Pension Plan, including documents relating to the allocation of GRS Pension Plan assets and liability. Assured reserves the right to supplement this objection with respect to the City's allocation of GRS Pension Plan liabilities following the completion of discovery and expert analysis.

80

disproportionate to the DWSD's allocable share of the GRS UAAL. Worse still, the Plan is clear that the $428.5 million DWSD GRS Pension Contributions are only a "floor." See Disclosure Statement, at 22. The Plan provides that if GRS Pension Plan assets and/or actuarial experience differ from the City's projections (which have historically proven wildly inaccurate) the DWSD may be required to contribute additional funds beyond 2023. See Disclosure Statement, at 22. Conversely, if the DWSD GRS Pension Contributions are "overfunded," the overfunding would not be returned to the DWSD and would instead be applied to satisfy the liabilities of the entire GRS Pension Plan. In effect, the Plan calls for DWSD contributions to the GRS Pension Plan to increase dramatically to allow the remainder of the City to free-ride on the DWSD Revenues, with DWSD Bondholders bearing all of the risk and cost of that free-riding. Because such diversion of DWSD Revenues violates the DWSD Closed Loop, the Plan cannot be confirmed.

### D. The Plan Violates the DWSD "Closed Loop" by Allocating the Potential Proceeds of a Qualifying DWSD Transaction to the Pension "Restoration Trust"

132. The Plan also violates the DWSD "Closed Loop" by allocating the potential proceeds of a Qualifying DWSD Transaction to the pension Restoration Trust. Under the Plan, the City would issue the DWSD Pension Restoration CVRs to the Restoration Trust for the benefit of holders of Pension Claims (both GRS

81

and PFRS pension claims). See Plan, at 9, 47. The City is prohibited by law from disposing of the DWSD Systems, or any substantial portion thereof, unless the DWSD Bondholders "have been paid in full as to both principal and interest." Sewer Bond Ordinance, at § II.19(d); Water Bond Ordinance, at § II.19(d). Nevertheless, the DWSD Pension Restoration CVRs would entitle the Restoration Trust to 50 percent of the net proceeds received by or distributable to the City's General Fund on account of the Qualifying DWSD Transaction, with no provision for prior payment in full of the DWSD Bondholders. See Plan, at 9.

133. Although the ultimate effect of the DWSD Pension Restoration CVRs is currently unclear—the Qualifying DWSD Transaction could occur up to seven years after the Effective Date—the inclusion of the DWSD Pension Restoration CVRs, in the Plan, exacerbates the City's proposed breach of the DWSD Closed Loop. Effectively, through the contribution of the DWSD Pension Restoration CVRs to the pension Restoration Trust, the City seeks to capture the proceeds of a potential Qualifying DWSD Transaction and distribute such proceeds to the City's pensioners, with DWSD Bondholders receiving none of the proceeds.[46] Any funding of the DWSD Pension Restoration CVRs from the disposition of any

---

[46] It is currently unclear what structure the City may use to siphon the proceeds of a Qualifying DWSD Transaction out of the DWSD. If the City were to attempt to use a structure that would classify such proceeds as "operations and maintenance" expenses, such structure would be impermissible because, as discussed above, such proceeds would benefit non-DWSD pension claim holders, including holders of PFRS pension claims, which are wholly unrelated to the DWSD Systems.

82

substantial portion of the DWSD Systems or from DWSD Revenues, whether directly or indirectly, would constitute a breach of the DWSD Closed Loop in violation of the Revenue Bond Act, the DWSD Bond Ordinances and section 943(b)(4) of the Bankruptcy Code.[47]

## V.   The Plan is Not Feasible as a Matter of Law (11 U.S.C. § 943(b)(7))

134.   Ironically, the Plan fails because it promises both too much and too little: too little to DWSD Bondholders, as explained above, but also too much to the intended beneficiaries of the largesse the City seeks to improperly harvest from the DWSD Revenues.  Because the Plan promises too much to its favored junior classes that would benefit from funds diverted from the DWSD Revenues, it is not feasible as required by section 943(b)(7) of the Bankruptcy Code.

135.   Section 943(b)(7) of the Bankruptcy Code provides that, to confirm a chapter 9 plan, the plan must be feasible.  See 11 U.S.C. § 943(b)(7).  The chapter 9 debtor bears the burden of proving that the plan is feasible by a preponderance of the evidence.  In re Mount Carbon Metro. Dist., 242 B.R. at 31.

136.   Of particular relevance to the Plan, a plan of adjustment is not feasible if it calls for creditors to be paid from a revenue source to which they are not

---

[47]   Any funding of the DWSD Pension Restoration CVRs from the DWSD Revenues without the satisfaction in full of the DWSD Bonds would also violate the DWSD Systems' pledge of special revenues to the DWSD Bonds.  Moreover, section 902(2) of the Bankruptcy Code defines special revenues to include "receipts derived from the . . . disposition of projects or systems . . . ."  11 U.S.C. § 902(2).  Accordingly, the pledged special revenues that secure the Existing DWSD Bonds and any New DWSD Bonds should include the proceeds of any disposition of the DWSD Systems.

83

entitled.  See In re City of Colorado Springs Spring Creek General Improvement Dist., 177 B.R. 684, 695-96 (Bankr. D. Colo. 1995).  In Colorado Springs, the court rejected a chapter 9 debtor's plan as infeasible where it called for a single class of claimants to be paid in full from the proceeds of a letter of credit.  See id. at 695.  However, the debtor had previously conveyed all of its interest and rights under the letter of credit pursuant to a trust agreement, which provided that the trustee was "required to hold the Letter of Credit in a collateral fund and draw upon it solely for the purpose of paying the interest and principal on [certain bonds] as they come due."  Id. at 695-96.  The court determined that payment to the single class of creditors from collateral pledged to the benefit of only a subset of those creditors was contrary to the terms of the trust agreement.  See id. at 695. The court therefore held that the plan was not feasible because the plan lacked legal or practical assurance of payment to creditors who were not the intended beneficiaries of the letter of credit.  See id. at 696.

137.  In this case, the Plan promises to pay to holders of GRS Pension Claims in large part from a revenue stream to be diverted in violation of the DWSD Closed Loop.  See Plan, at 33; Disclosure Statement, at 22, 62.  As explained above, the DWSD Revenues may not, as contemplated by the Plan, be diverted to make the DWSD GRS Pension Contributions.  The Plan thus "lack[s] legal or practical assurance [of] payments to" holders of GRS Pension Claims.  In

84

re City of Colorado Springs Spring Creek General Improvement District, 177 B.R. at 695. The City has long been cognizant of this possibility, warning holders of GRS Pension Claims that if the DWSD does not "fund its allocable share to the GRS pension fund in [the manner contemplated by the Plan], the cuts to GRS pension beneficiaries [including DWSD-related beneficiaries] would have to be higher than those contemplated in the Plan." Disclosure Statement, at 22. The Plan cannot be confirmed as feasible where it is based on the City's mere hope that it will somehow be able to extract monies from the DWSD Closed Loop, in violation of Michigan state law and the DWSD Bond Ordinances, to make required Plan payments.

## VI. The Plan Cannot be Confirmed Because Impaired Classes are Improperly Denied the Right to Vote (11 U.S.C. § 1124)

138. The Plan cannot be confirmed because Assured, as the deemed holder of the CUSIPs of Existing DWSD Bonds that will be reinstated, is improperly denied the right to vote its corresponding claims.

139. Whether a class is "impaired" will determine whether the class is required to vote on a plan. See 7 Collier on Bankruptcy ¶ 1124.02[1] (Alan N. Resnick & Henry J. Somme reds., 16th ed. 2014) (observing that under section 1126(f) an "unimpaired" class is presumed to have accepted the plan and is not required to vote.). A creditor's claim or interest is "impaired" under the Bankruptcy Code if any "legal, equitable, or contractual rights to which such claim

85

or interest entitles the holder of such claim or interest" is altered. 11 U.S.C. § 1124. This is an utterly inflexible test that leaves no room for modification of a creditor's rights. See id.; In re GSC, Inc., 453 B.R. 132, 176 (Bankr. S.D.N.Y. 2011) ("Any alteration to the claimant's legal, equitable, or contractual rights under a plan would make that claim impaired.") (citation omitted); 7 Collier on Bankruptcy ¶ 1124.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014) (observing that any alteration of rights, even enhancement, constitutes impairment).

140. Although the City has classified the CUSIPs of Existing DWSD Bonds that will be reinstated as "unimpaired," the holders of such CUSIPs will receive Reinstated DWSD Bonds that will be subordinated to the DWSD GRS Pension Contributions. Under section 1124 of the Bankruptcy Code, the CUSIPs of Existing DWSD Bonds that will be reinstated are therefore "impaired" because the holders' legal, equitable and contractual rights to the DWSD Revenues are altered. See 11 U.S.C. § 1124. Accordingly, Assured, as the deemed holder of the CUSIPs of Existing DWSD Bonds that will be reinstated, should be entitled to vote on account of such corresponding claims. The Plan should not be confirmed because Assured and other similarly-situated creditors are denied the right to vote all of their "impaired" claims.

## CONCLUSION

WHEREFORE, Assured respectfully requests that the Court enter an order denying confirmation of the Plan and granting such other and further relief as may be just and proper.

Dated:  New York, New York
          May 12, 2014               **CHADBOURNE & PARKE LLP**

                             By:  _/s/  Lawrence A. Larose_____
                             Lawrence A. Larose
                             Samuel S. Kohn
                             Eric Daucher
                             30 Rockefeller Plaza
                             New York, NY 10012
                             Telephone:  (212) 408-5100
                             llarose@chadbourne.com
                             skohn@chadbourne.com
                             edaucher@chadbourne.com

                             *Attorneys for Assured Guaranty*
                             *Municipal Corp.*

**Certificate of Service**

I hereby certify that on this 12th day of May 2014, I caused the Objection of Assured Guaranty Municipal Corp. to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014) to be filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated:  May 12, 2014
        New York, New York

                                        **CHADBOURNE & PARKE LLP**

                                        By:  /s/ Lawrence A. Larose
                                        Lawrence A. Larose
                                        Samuel S. Kohn
                                        Eric Daucher
                                          30 Rockefeller Plaza
                                        New York, NY 10012
                                        Telephone:  (212) 408-5100
                                        llarose@chadbourne.com
                                        skohn@chadbourne.com
                                        edaucher@chadbourne.com

                                        *Attorneys for Assured Guaranty Municipal Corp.*