**Exhibit D**

NEW ISSUE (Book-Entry-Only) <span style="float:right">RATINGS: See "RATINGS."</span>

*In the opinion of Clark Hill PLC, Bond Counsel, under existing law, interest on the Series 2012 Bonds (as hereinafter defined) is excluded for federal income tax purposes from gross income under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations, but is taken into account in determining adjusted current earnings for the purpose of computing the federal alternative minimum tax imposed on certain corporations. Such opinion is conditioned on continuing compliance by the City with the Tax Covenants (as hereinafter defined). In the opinion of Bond Counsel, under existing law, interest on the Series 2012 Bonds is exempt from income taxation in the State of Michigan (the "State") and the Series 2012 Bonds are exempt from all taxation in the State except inheritance, estate and transfer taxes. See "TAX MATTERS" and APPENDIX I – "FORM OF OPINION OF BOND COUNSEL."*



**$659,780,000**
# CITY OF DETROIT, MICHIGAN
**Detroit Water and Sewerage Department**
**Sewage Disposal System**
**Revenue and Revenue Refunding Senior Lien Bonds**
**Series 2012A**

**Dated:** Date of Delivery <span style="float:right">**Due:** July 1, as shown on inside cover</span>

The Sewage Disposal System Revenue and Revenue Refunding Senior Lien Bonds, Series 2012A (the "Series 2012 Bonds") are being issued by the City of Detroit, County of Wayne, State of Michigan (the "City") pursuant to Act No. 94, Public Acts of Michigan, 1933, as amended, Ordinance No. 18-01 adopted by the City Council of the City on October 18, 2001 (the "Bond Ordinance"), a Resolution Authorizing the Issuance and Sale of Senior Lien Sewage Disposal System Revenue and Refunding Bonds of the City of Detroit and of Second Lien Sewage Disposal System Revenue and Refunding Bonds of the City of Detroit, adopted by the City Council on July 19, 2011, and approved by the Mayor on July 26, 2011 (the "Bond Resolution"), a Trust Indenture by and among the City, the Detroit Water and Sewerage Department (the "Department") and U.S. Bank National Association, as trustee (the "Trustee") dated as of June 1, 2012 (the "Indenture") and a Sale Order of the Finance Director of the City dated June 20, 2012 (the "Sale Order" and, together with the Bond Ordinance, the Bond Resolution and the Indenture, the "Authorizing Documents"). The Series 2012 Bonds will be held in book-entry form only, fully registered in the name of Cede & Co., as nominee for The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the Series 2012 Bonds. Purchasers will not receive certificates representing their interests in the Series 2012 Bonds. Individual purchases of the Series 2012 Bonds will be made in book-entry form in the principal amount of $5,000 or integral multiples thereof. So long as Cede & Co. is the registered owner of the Series 2012 Bonds, principal of, premium, if any, and interest on the Series 2012 Bonds will be paid directly to Cede & Co., as nominee for DTC, by the Trustee. See "THE SERIES 2012 BONDS – Book-Entry Only System." The Series 2012 Bonds will bear interest from their dated date, payable on each January 1 and July 1, commencing January 1, 2013.

The proceeds of the Series 2012 Bonds will be used, together with other funds of the Department, to (i) finance a portion of the costs of certain capital improvements to the Sewage Disposal System, (ii) refund certain Sewage Disposal System Revenue Bonds, including a portion of the outstanding Sewage Disposal System Revenue and Revenue Refunding Bonds, Series 2003(A) (iii) pay termination amounts with respect to all interest rate swap agreements associated with the Sewage Disposal System Revenue Bonds, (iv) fund the Senior Lien Bond Reserve Account and (v) pay costs of issuing the Series 2012 Bonds. See "PLAN OF FINANCE."

Certain Series 2012 Bonds are subject to mandatory or optional redemption prior to maturity. See "THE SERIES 2012 BONDS – Redemption Provisions."

The principal of and interest on the Series 2012 Bonds are payable solely from the Pledged Assets under the Bond Ordinance (as defined herein), including the Net Revenues (as defined herein) of the City's Sewage Disposal System. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS."

**The Series 2012 Bonds are not general obligations of the City and do not constitute indebtedness of the City for purposes of computing its debt limitations imposed by constitutional, statutory or charter provisions. The Series 2012 Bonds also do not constitute a charge against the general credit or taxing power of the City, nor is the City liable for the payment of the Series 2012 Bonds except from the sources described herein.**

The scheduled payment of principal of and interest on the Series 2012 Bonds maturing July 1 of the years 2016 and 2018, and the Series 2012 Bond maturing July 1, 2039 in the principal amount of $50,000,000 (CUSIP No. 251250AS5) (collectively, the "Insured Series 2012 Bonds") when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Series 2012 Bonds by ASSURED GUARANTY MUNICIPAL CORP.

**THIS COVER PAGE CONTAINS INFORMATION FOR QUICK REFERENCE ONLY. IT IS NOT A SUMMARY OF THE SERIES 2012 BONDS. INVESTORS MUST READ THE ENTIRE OFFICIAL STATEMENT TO OBTAIN INFORMATION ESSENTIAL TO THE MAKING OF AN INFORMED INVESTMENT DECISION.**

*The Series 2012 Bonds are offered when, as and if issued by the City and received by the underwriters listed below (collectively, the "Underwriters"), subject to approval of their legality by Bond Counsel, Clark Hill PLC, Detroit, Michigan, and certain other conditions. Certain legal matters will be passed upon for the City by Krystal A. Crittendon, Corporation Counsel, and Orrick, Herrington & Sutcliffe LLP, Washington, D.C., Disclosure Counsel to the City, and certain legal matters will be passed upon for the Underwriters by Bodman PLC, Detroit, Michigan. The Series 2012 Bonds are expected to be available for delivery through the facilities of DTC on or about June 26, 2012.*

## Goldman, Sachs & Co.

**BMO Capital Markets** <span style="float:right">**J.P. Morgan**</span>

**Morgan Stanley** <span style="float:right">**Siebert Brandford Shank & Co., L.L.C.**</span>

June 20, 2012

## MATURITY SCHEDULE

### $659,780,000
### CITY OF DETROIT, MICHIGAN
### DETROIT WATER AND SEWERAGE DEPARTMENT
### SEWAGE DISPOSAL SYSTEM
### REVENUE AND REVENUE REFUNDING SENIOR LIEN BONDS
### SERIES 2012A

#### $196,650,000 SERIAL BONDS

| Maturity July 1 | Principal Amount | Interest Rate | Yield | CUSIP** |
|---|---|---|---|---|
| 2014 | $5,820,000 | 5.00% | 1.72% | 251250AA4 |
| 2015 | 6,005,000 | 5.00 | 2.12 | 251250AB2 |
| 2016* | 8,880,000 | 5.00 | 2.10 | 251250AC0 |
| 2017* | 6,430,000 | 5.00 | 2.84 | 251250AD8 |
| 2018* | 9,750,000 | 5.00 | 2.93 | 251250AE6 |
| 2019 | 19,930,000 | 5.00 | 3.58 | 251250AF3 |
| 2020 | 13,925,000 | 5.00 | 3.82 | 251250AG1 |
| 2021 | 9,845,000 | 5.00 | 4.07 | 251250AH9 |
| 2022 | 14,860,000 | 5.00 | 4.26 | 251250AJ5 |
| 2023† | 22,275,000 | 5.00 | 4.48 | 251250AK2 |
| 2024‡ | 23,630,000 | 5.50 | 4.20 | 251250AL0 |
| 2025‡ | 32,240,000 | 5.50 | 4.45 | 251250AM8 |
| 2026† | 13,170,000 | 5.25 | 4.73 | 251250AN6 |
| 2027† | 9,890,000 | 5.25 | 4.81 | 251250AP1 |

$120,265,000 5.00% Term Bonds, due July 1, 2032 Yield 5.05% CUSIP 251250AQ9**

$292,865,000 5.25% Term Bonds, due July 1, 2039 Yield 5.30% CUSIP 251250AR7**

$50,000,000 5.00% Term Bonds, due July 1, 2039* Yield 5.00% CUSIP 251250AS5**

---

*   Insured by Assured Guaranty Municipal Corp.
†   Priced at the stated yield to the July 1, 2022 call date.
‡   Priced at the stated yield to the July 1, 2017 call date.
**  Copyright, American Bankers Association. CUSIP data herein are provided by Standard & Poor's, CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. The CUSIP numbers listed above are being provided solely for the convenience of Bondowners only at the time of issuance of the Series 2012 Bonds and the City does not make any representation with respect to such numbers nor undertake any responsibility for their accuracy now or at any time in the future. The CUSIP number for a specific maturity is subject to being changed after the issuance of the Series 2012 Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of such maturity or as a result of the procurement of secondary market portfolio insurance or other similar enhancement by investors that is applicable to all or a portion of certain maturities of the Series 2012 Bonds.



**CITY OF DETROIT**

_____

*MAYOR*
DAVE BING

_____

*CITY COUNCIL*
CHARLES PUGH, President

| | |
|---|---|
| GARY BROWN, President, Pro Tem | KWAME KENYATTA |
| KENNETH V. COCKREL, JR. | ANDRE SPIVEY |
| SAUNTEEL JENKINS | JAMES TATE |
| BRENDA JONES | JOANN WATSON |

_____

*CITY CLERK*
JANICE M. WINFREY

_____

*CHIEF OPERATING OFFICER*
CHRIS BROWN

| | |
|---|---|
| *CHIEF FINANCIAL OFFICER* | *FINANCE DIRECTOR* |
| JACK MARTIN | CHERYL R. JOHNSON |

**DETROIT WATER AND SEWERAGE DEPARTMENT**

_____

*DIRECTOR*
SUE F. McCORMICK

| | |
|---|---|
| *CHIEF OPERATING OFFICER/CHIEF COMPLIANCE OFFICER* | *ASSISTANT DIRECTOR FINANCIAL SERVICES* |
| MATTHEW SCHENK | JAMES GEORGE |

_____

*BOARD OF WATER COMMISSIONERS*
JAMES FAUSONE, Chair

| | |
|---|---|
| FRED BARNES | BRADLEY KENOYER |
| MARY E. BLACKMON | JAMES F. THROWER, Vice-Chair |
| LINDA FORTE | J. BRYAN WILLIAMS |

_____

*SPECIAL SERVICES*

| | |
|---|---|
| CLARK HILL PLC | Bond Counsel |
| ORRICK, HERRINGTON & SUTCLIFFE LLP | Disclosure Counsel |
| ROBERT W. BAIRD & CO. | Financial Advisor |
| THE FOSTER GROUP, LLC | Feasibility Consultant |
| KPMG LLP | Independent Certified Public Accountants |



# DETROIT WATER AND SEWERAGE DEPARTMENT
## POLLUTION CONTROL SYSTEM
### FOR THE
S O U T H E A S T E R N   M I C H I G A N   M E T R O P O L I T A N   A R E A
2012

This Official Statement has been prepared by the City and the Department and provides certain information relating to the City, the Department and its Sewage Disposal System in connection with the sale of the Series 2012 Bonds. This Official Statement is distributed in connection with the sale of the Series 2012 Bonds and may not be reproduced or used, in whole or in part, for any other purpose. No dealer, broker, salesman or other person has been authorized by the City, the Department or the Underwriters to give any information or to make any representations with respect to the City, the Department or its Series 2012 Bonds other than those contained in this Official Statement and, if given or made, such other information or representations must not be relied upon as having been authorized by the City, the Department or the Underwriters. The Underwriters have provided the following sentence for inclusion in this Official Statement: The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

Assured Guaranty Municipal Corp. ("AGM") makes no representation regarding the Insured Series 2012 Bonds or the advisability of investing in the Insured Series 2012 Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Bond Insurance" and APPENDIX K – "Specimen Municipal Bond Insurance Policy."

This Official Statement does not constitute an offer to sell or a solicitation of an offer to buy, nor shall there be any sale of the Series 2012 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Department, the Sewage Disposal System or the City since the date hereof.

Upon issuance, the Series 2012 Bonds will not be registered under the Securities Act of 1933, as amended, and will not be listed on any stock or other securities exchange, and neither the Securities and Exchange Commission nor any other federal, state, municipal or other governmental entity, other than the City or the Department, will have passed upon the accuracy or adequacy of this Official Statement.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE SERIES 2012 BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

This Official Statement contains forward-looking statements, which can be identified by the use of the future tense or other forward-looking terms such as "may," "intend," "will," "expect," "anticipate," "plan," "management believes," "estimate," "continue," "should," "strategy," or "position" or the negatives of those terms or other variations of them or by comparable terminology. In particular, any statements express or implied, concerning future receipts of federal grants or the ability to generate cash flow to service indebtedness are forward-looking statements Investors are cautioned that reliance on any of those forward-looking statements involves risks and uncertainties and that, although the City and the Department management believes that the assumptions on which those forward-looking statements are based are reasonable, any of those assumptions could prove to be inaccurate. As a result, the forward-looking statements based on those assumptions also could be incorrect, and actual results may differ materially from any results indicated or suggested by those assumptions. In light of these and other uncertainties, the inclusion of a forward-looking statement in this Official Statement should not be regarded as a representation by the City or the Department or that their plans and objectives will be achieved. All forward-looking statements are expressly qualified by the cautionary statements contained in this paragraph. Neither the City nor the Department undertakes any duty to update any forward-looking statements.

The order and placement of materials in this Official Statement, including the Appendices, are not to be deemed to be a determination of relevance, materiality or importance and this Official Statement, including the Appendices, must be considered in its entirety.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

INTRODUCTION ...........................................1
    Authorization ...............................................1
    Use of Proceeds ...........................................1
    Security and Source of Payment.................1
    Bond Insurance ...........................................2
    The Department ...........................................2
    Sewage Disposal System .............................3
    Capital Improvement Program ....................3
    Feasibility Report ........................................3
    Continuing Disclosure .................................4
    Changes from the Preliminary
        Official Statement .................................4
    Miscellaneous .............................................4
THE SERIES 2012 BONDS ...........................4
    General ........................................................4
    Book-Entry Only System .............................4
    Redemption Provisions................................5
PLAN OF FINANCE.......................................7
    Estimated Sources and Uses of
        Funds.....................................................7
    System Improvements .................................7
    Plan of Refunding.......................................7
    Swap Termination Payments.......................8
SECURITY AND SOURCES OF
    PAYMENT FOR THE SERIES
    2012 BONDS ...........................................8
    General ........................................................8
    Pledged Assets.............................................9
    Priority of Lien and Payment Status.............9
    Flow of Funds............................................10
    Reverse Flow of Funds..............................11
    Reserve Accounts and Reserve
        Requirements ......................................11
    Certain Other Funds ..................................14
    Rate Covenant ...........................................15
    Enforceability of Rates ..............................16
    Bond Insurance .........................................16
    Additional Bonds.......................................18
    Remedies ...................................................20
OUTSTANDING INDEBTEDNESS .............21
DEBT SERVICE REQUIREMENTS.............22
INTEREST RATE SWAP
    AGREEMENTS .......................................23
    General .....................................................23
THE DETROIT WATER AND
    SEWERAGE DEPARTMENT ................25
    General .....................................................25
    Court Mandated Changes ..........................25
    Application of Financial Stability
        Agreement to the Department.............26

Implementation Status of the
    November 4, 2011 Order ....................26
The Board....................................................27
Management and Personnel ........................29
Management Initiatives...............................31
Employees and Employee
    Bargaining Units..................................32
SPECIAL INVESTOR
    CONSIDERATIONS
    CONCERNING BANKRUPTCY
    RISKS .....................................................33
    General .....................................................33
    Act 4 .........................................................33
    Application of Act 4 to the City .................34
    Treatment of Pledged Assets after a
        City Bankruptcy Filing .......................36
THE SEWAGE DISPOSAL SYSTEM ...........38
    Service Area...............................................38
    Historical Wastewater Volumes.................39
    Retail and Other Billing ............................40
    Wholesale Customers.................................40
    The Plant ...................................................43
    Interceptor System ....................................44
    Collection System .....................................44
    Environmental Matters...............................44
THE CAPITAL IMPROVEMENT
    PROGRAM ..............................................45
    General .....................................................45
    The CIP Funding .......................................47
FINANCIAL PROCEDURES.........................48
    Budget and Accounting Matters.................48
    Collections and Delinquencies...................49
    Cash Management......................................50
    Investment Policy......................................51
    Rates.........................................................51
    "Look-Back" Adjustments .........................53
    Sewage Rate Comparison .........................53
FINANCIAL OPERATIONS ..........................55
    Summary of Historical Revenues
        and Expenses ......................................55
    Fiscal Year 2007-2011 Operations.............56
    Fiscal Year 2013 Budget............................58
    Projected Operations for Fiscal Year
        2012 through 2016..............................58
    Future Bond Issuances ..............................60
PENSION PLAN CONTRIBUTIONS............61
    Detroit's General Retirement System ........61
    DGRS Funding Policy...............................61
    DGRS Asset Allocation and
        Investment Results..............................61

i

# TABLE OF CONTENTS

Summary of Department Member
  Data.................................................62
Sewage Disposal System
  Contributions and Annual
  Pension Cost ...............................62
Funded Status and Funding Progress .........64
SOURCE AND PRIORITY OF
  PENSION PAYMENTS............................64
UAAL Funding.............................................64
Pension Cost Payment Obligation ..............65
Payment of Pension Costs Allocated
  to the Sewage Disposal System ...........65
OTHER POST EMPLOYMENT
  BENEFITS ...............................................66
Plan Description .........................................66
Funding........................................................66
Annual OPEB Costs and Net OPEB
  Obligation ............................................67
Funding Status and Funding
  Progress.................................................68
FEASIBILITY CONSULTANT'S
  REPORT....................................................68
TAX MATTERS.............................................69
Series 2012 Bonds Federal Tax
  Matters ..................................................69

Series 2012 Bonds State Tax Matters ........71
Future Developments .................................71
LITIGATION ..................................................72
Environmental Litigation ...........................72
Constitutionality of Act 4...........................74
Other Litigation..........................................74
Federal Indictments....................................74
BOND INSURANCE RISK FACTORS .........75
CONTINUING DISCLOSURE.......................75
Continuing Disclosure Undertaking...........75
The Disclosure Dissemination Agent.........76
Prior Continuing Disclosure Non-
  Compliance...........................................76
FEASIBILITY CONSULTANT .....................77
FINANCIAL ADVISOR ................................77
SWAP ADVISOR ..........................................77
INDEPENDENT AUDITORS .......................77
VERIFICATION OF
  MATHEMATICAL
  COMPUTATIONS ..................................77
CERTAIN LEGAL MATTERS ......................78
RATINGS.......................................................78
UNDERWRITING .........................................78
MISCELLANEOUS .......................................79

APPENDICES

APPENDIX A  FEASIBILITY REPORT
APPENDIX B  AUDITED FINANCIAL STATEMENTS OF THE SEWAGE DISPOSAL FUND OF
  THE CITY OF DETROIT, MICHIGAN AS OF AND FOR THE YEAR ENDED
  JUNE 30, 2011
APPENDIX C  BOND ORDINANCE AND INDENTURE
APPENDIX D  CHARACTERISTICS OF THE SEWAGE DISPOSAL SYSTEM SERVICE AREA
APPENDIX E  ORDER DATED NOVEMBER 4, 2011, UNITED STATES V. CITY OF DETROIT,
  CASE NO. 77-71100, E.D. MICHIGAN
APPENDIX F  SUMMARY OF THE FINANCIAL STABILITY AGREEMENT
APPENDIX G  OVERVIEW OF THE CITY OF DETROIT'S GENERAL RETIREMENT SYSTEM
APPENDIX H  FORM OF THE CONTINUING DISCLOSURE UNDERTAKING
APPENDIX I  FORM OF OPINION OF BOND COUNSEL
APPENDIX J  BOOK-ENTRY ONLY SYSTEM
APPENDIX K  SPECIMEN MUNICIPAL BOND INSURANCE POLICY

$659,780,000
**CITY OF DETROIT, MICHIGAN**
**Detroit Water and Sewerage Department**
**Sewage Disposal System**
**Revenue and Revenue Refunding Senior Lien Bonds**
**Series 2012A**

## INTRODUCTION

This Official Statement, including the cover page and the appendices attached hereto (the "Official Statement") is provided in connection with the issuance by the City of Detroit, Michigan (the "City") of the Detroit Water and Sewerage Department Sewage Disposal System Revenue and Revenue Refunding Senior Lien Bonds, Series 2012A (the "Series 2012 Bonds"). Certain terms used in this Official Statement and not otherwise defined herein shall have the meanings ascribed thereto in APPENDIX C – "BOND ORDINANCE AND INDENTURE."

**Authorization**

The Series 2012 Bonds are authorized under the Revenue Bond Act of 1933, Act No. 94, Public Acts of Michigan, 1933, as amended (the "Act"), and are being issued pursuant to an Ordinance No. 18-01, adopted by the City Council of the City (the "City Council") on October 18, 2001 (the "Bond Ordinance"), a Resolution Authorizing the Issuance and Sale of Senior Lien Sewage Disposal System Revenue and Refunding Bonds of the City of Detroit and of Second Lien Sewage Disposal System Revenue and Refunding Bonds of the City of Detroit, adopted by the City Council on July 19, 2011, and approved by the Mayor on July 26, 2011 (the "Bond Resolution"), a Trust Indenture by and among the City, the Detroit Water and Sewerage Department (the "Department") and U.S. Bank National Association, as trustee (the "Trustee") dated as of June 1, 2012 (the "Indenture"), as approved by the Board of Water Commissioners (the "Board") on June 4, 2012, and a Sale Order of the Finance Director of the City, dated June 20, 2012 (the "Sale Order" and, together with the Bond Ordinance, the Bond Resolution and the Indenture, the "Authorizing Documents").

**Use of Proceeds**

The proceeds of the Series 2012 Bonds will be used, together with other funds of the Department, to (i) finance a portion of the costs of certain capital improvements to the Department's wastewater treatment and collection system (the "Sewage Disposal System" or the "System"), (ii) refund certain Sewage Disposal System Revenue Bonds, including a portion of the outstanding Sewage Disposal System Revenue and Revenue Refunding Bonds, Series 2003(A), (iii) pay termination amounts with respect to all interest rate swap agreements associated with the Sewage Disposal System Revenue Bonds, (iv) fund the Senior Lien Bond Reserve Account and (v) pay costs of issuing the Series 2012 Bonds. Certain outstanding Sewage Disposal System Revenue Bonds that are being refunded with the proceeds of the Series 2012 Bonds are expected to be purchased by the City pursuant to an Invitation to Tender Bonds and an Offer to Purchase Bonds, each dated May 25, 2012. See "PLAN OF FINANCE."

**Security and Source of Payment**

Pursuant to the Act, all bonds issued and to be issued under the Bond Ordinance (collectively, the "Sewage Disposal System Revenue Bonds") are payable solely from the Pledged Assets, which include the Net Revenues of the Sewage Disposal System and amounts available in certain funds and accounts

established in accordance with the Bond Ordinance. The Sewage Disposal System Revenue Bonds are secured by a statutory lien on Pledged Assets pursuant to the Act and the Bond Ordinance. In addition, the City and the Department will enter into the Indenture with the Trustee to hold in trust the amounts required or permitted to be transferred by the City to certain funds and accounts under the Bond Ordinance for the payment of the Sewage Disposal System Revenue Bonds.

The Bond Ordinance constitutes a contract between the City and the holders of the Sewage Disposal System Revenue Bonds issued thereunder. Under the Bond Ordinance, the City may issue Sewage Disposal System Revenue Bonds secured by a senior lien on Pledged Assets (the "Senior Lien Bonds") and Sewage Disposal System Revenue Bonds secured by a lien on Pledged Assets that is junior to the lien securing all Senior Lien Bonds (the "Junior Lien Bonds"). To date, the City has issued two priorities of Junior Lien Bonds: (i) Junior Lien Bonds secured by a lien on Pledged Assets that is superior to the liens securing all other Junior Lien Bonds (the "Second Lien Bonds"); and (ii) State Revolving Fund ("SRF") Junior Lien Bonds ("SRF Junior Lien Bonds"), which are secured by a lien on Pledged Assets that is junior to the lien securing all other Sewage Disposal System Revenue Bonds. In addition to being subordinate to all other Sewage Disposal System Revenue Bonds, SRF Junior Lien Bonds do not have a debt service reserve fund. See "OUTSTANDING INDEBTEDNESS."

The Series 2012 Bonds will constitute Senior Lien Bonds under the Bond Ordinance and will be issued on parity with all other Senior Lien Bonds. The Series 2012 Bonds will be secured by a lien on Pledged Assets that is senior to the lien securing all Junior Lien Bonds. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS".

**The Series 2012 Bonds are not general obligations of the City and do not constitute indebtedness of the City for purposes of computing its debt limitations imposed by constitutional, statutory or charter provisions. The Series 2012 Bonds also do not constitute a charge against the general credit or taxing power of the City, nor is the City liable for the payment of the Series 2012 Bonds except from the sources described herein.** See "SPECIAL INVESTOR CONSIDERATIONS CONCERNING BANKRUPTCY RISKS."

### Bond Insurance

Concurrently with the issuance of the Series 2012 Bonds, Assured Guaranty Municipal Corp. ("AGM") will issue its Municipal Bond Insurance Policy (the "Policy") for the Series 2012 Bonds maturing July 1 of the years 2016 and 2018, and the Series 2012 Bond maturing July 1, 2039 in the principal amount of $50,000,000 (CUSIP No. 251250AS5) (collectively, the "Insured Series 2012 Bonds"). The Policy guarantees the scheduled payment of principal of and interest on the Insured Series 2012 Bonds when due, as set forth in the form of the Policy included as APPENDIX K. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Bond Insurance", "BOND INSURANCE RISK FACTORS" and APPENDIX K – "Specimen Municipal Bond Insurance Policy."

### The Department

The Department is established under the City Charter. The Department is governed by a seven-member board appointed by the Mayor, known as the Board of Water Commissioners, which meets monthly. Four members of the Board (each being a resident of the City) are appointed by the Mayor. Key executives of the Counties of Macomb, Oakland, and Wayne each nominate a member to the Board for appointment by the Mayor.

2

The Department is responsible for the water supply and the control and treatment of wastewater for most of southeast Michigan through the Water Supply System and the Sewage Disposal System. The Sewage Disposal System is owned by the City and is operated, managed and accounted for by the City as a separate enterprise fund through the Department. All funds and accounts of the Sewage Disposal System are maintained separate from other City funds, including those of the Water Supply System. See "FINANCIAL PROCEDURES – Cash Management" and "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Flow of Funds."

The Department is in the process of implementing a number of changes mandated by the United States District Court, Eastern District of Michigan, Southern Division (the "Court") as part of a lawsuit filed by the United States Environmental Protection Agency (the "EPA") against the City in 1977. All of the changes are intended to separate the affairs of the Department from the City and give the Department greater authority and autonomy to manage and operate the Water Supply System and the Sewage Disposal System. See "THE DETROIT WATER AND SEWERAGE DEPARTMENT" and "LITIGATION – Environmental Litigation."

**Sewage Disposal System**

The Sewage Disposal System's service area covers 850 square miles in Wayne, Oakland and Macomb counties. The Department currently serves an estimated population of 2.8 million, with service being provided on a retail basis within the City and on a wholesale basis to 76 surrounding communities. See "THE SEWAGE DISPOSAL SYSTEM" and APPENDIX A – "FEASIBILITY REPORT."

**Capital Improvement Program**

The Department utilizes a five-year capital improvement program (the "CIP") to improve the reliability of the Sewage Disposal System and to meet regulatory standards as well as to achieve greater operating and maintenance efficiency. The Department annually updates the CIP based on continual monitoring and review of the needs of the Sewage Disposal System.

Over the past ten years, the Department spent approximately $2.32 billion on capital improvements to the Sewage Disposal System. The CIP for the five Fiscal Years ending June 30, 2016, is estimated to cost $571,686,000. See "CAPITAL IMPROVEMENT PROGRAM". The Department has financed the CIP with proceeds of the Sewage Disposal System Revenue Bonds, federal and State grants and revenues of the Sewage Disposal System. A portion of the Series 2012 Bonds will be used to finance certain projects in the CIP. See "PLAN OF FINANCE" and APPENDIX A – "FEASIBILITY REPORT."

The City may from time to time, and at any time, modify the CIP by adding, deleting or modifying the individual projects and by changing the priority scheduling of completing the individual projects, all without notice to or consent of Bondholders.

**Feasibility Report**

The Department has engaged The Foster Group, LLC (the "Feasibility Consultant") to conduct an evaluation of the Sewage Disposal System, including the financial feasibility of completing the CIP. A copy of the Feasibility Consultant's report is included as APPENDIX A. See "FEASIBILITY CONSULTANT'S REPORT" and APPENDIX A.

**Continuing Disclosure**

The Department will enter into a Continuing Disclosure Undertaking (the "Continuing Disclosure Undertaking"), the form of which is attached as APPENDIX H, to assist the Underwriters in complying with the provisions of Rule 15c2-12 ("Rule 15c2-12"), promulgated by the United States Securities and Exchange Commission (the "SEC") and as is in effect on the date hereof, by providing annual financial information and event notices required by Rule 15c2-12. See "CONTINUING DISCLOSURE" and APPENDIX H – "FORM OF CONTINUING DISCLOSURE UNDERTAKING".

**Changes from the Preliminary Official Statement**

This Official Statement includes certain information that was not available for inclusion in the Preliminary Official Statement dated May 31, 2012, as supplemented on June 18, 2012, including the amounts, maturities, interest rates, prices, yields and other terms of the Series 2012 Bonds, sources and uses of the proceeds of the Series 2012 Bonds, and information relating to the Insured Series 2012 Bonds. Purchasers of the Series 2012 Bonds should read this Official Statement in its entirety.

**Miscellaneous**

This Official Statement contains brief descriptions of the Series 2012 Bonds, the System, the CIP, the Authorizing Documents and related matters in connection with the sale of the Series 2012 Bonds. Such descriptions do not purport to be comprehensive or definitive. All references in this Official Statement to documents are qualified in their entirety by reference to such documents and by reference to laws relating to or affecting the enforcement of creditors' rights generally.

Inquiries regarding information about the City and its financial matters contained in this Official Statement may be directed to the Office of Debt Management, Attention: Donita Crumpler, Assistant Debt Manager, 1200 Coleman A. Young Municipal Center, Detroit, Michigan 48226 (telephone: 313-224-7244) or from the Assistant Director Financial Services, James George, Water Board Building, 735 Randolph, Detroit, Michigan 48226 (telephone: 313-964-9220).

## THE SERIES 2012 BONDS

**General**

The Series 2012 Bonds are being sold in authorized denominations of $5,000 or integral multiples thereof and will be in book-entry form. The Series 2012 Bonds have been dated as of their respective original dates of issuance and delivery, and will mature on July 1 in the years and principal amounts and bear interest at the rates set forth on the inside cover of this Official Statement. Interest on the Series 2012 Bonds will accrue from the date of delivery and will be payable semiannually on each July 1 and January 1, commencing January 1, 2013 (each an "Interest Payment Date") to the registered owners as of the 15th day of the month immediately preceding the Interest Payment Date (a "Regular Record Date"). Interest on the Series 2012 Bonds will be computed using a 360-day year and twelve 30-day months. Interest on the Series 2012 Bonds will be payable when due by check or draft mailed by the Trustee or, upon the request of the Owner of $1,000.00, or more in principal amount of the Series 2012 Bonds, by wire transfer.

**Book-Entry Only System**

The Depository Trust Company, New York, New York ("DTC") will act as securities depository for the Series 2012 Bonds. The Series 2012 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Series 2012 Bond will be

4

issued for the Series 2012 Bonds of each series and maturity in the aggregate principal amount of such maturity and will be deposited with DTC.   A description of the DTC procedures is set forth in APPENDIX J.

**Redemption Provisions**

*Optional Redemption*.  The Series 2012 Bonds maturing on or before July 1, 2022 are not subject to redemption prior to maturity.  The Series 2012 Bonds maturing on or after July 1, 2023 are subject to redemption at the option of the City in whole or in part in such order of maturity as the City shall determine and within any maturity by lot, on any date on or after July 1, 2022, at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, except that the Series 2012 Bonds maturing on July 1, 2024 and July 1, 2025 are subject to redemption at the option of the City in whole or in part in such order of maturity as the City shall determine and within any maturity by lot, on any date on or after July 1, 2017, at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption.

*Mandatory Sinking Fund Redemption*.  The Series 2012 Bonds maturing on July 1, 2032 (the "2032 Term Bonds") are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the Sinking Fund established for such purpose under the Bond Ordinance in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth in the following table.

| Redemption Date (July 1) | Principal Amount |
| --- | --- |
| 2028 | $11,010,000 |
| 2029 | 2,780,000 |
| 2030 | 11,710,000 |
| 2031 | 25,225,000 |
| 2032[†] | 69,540,000 |

_____
[†]Final maturity.

The Series 2012 Bonds maturing on July 1, 2039 in the principal amount of $292,865,000 (the "2039 Term Bonds") are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the Sinking Fund established for such purpose under the Bond Ordinance in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth in the following table.

| Redemption Date (July 1) | Principal Amount |
| --- | --- |
| 2034 | $1,470,000 |
| 2035 | 1,440,000 |
| 2036 | 1,400,000 |
| 2037 | 91,340,000 |
| 2038 | 96,105,000 |
| 2039[†] | 101,110,000 |

_____
[†]Final maturity.

The Series 2012 Bonds maturing on July 1, 2039 in the principal amount of $50,000,000, which are also insured by AGM (the "Insured 2039 Term Bonds" and together with the 2032 Term Bonds and the 2039 Term Bonds, the "Term Bonds") are subject to mandatory redemption in part at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest to the date fixed for redemption, from moneys to be deposited by the City in the Sinking Fund established for such purpose under the Bond Ordinance in satisfaction of applicable Mandatory Redemption Requirements, on July 1 in the respective years and principal amounts set forth in the following table.

| Redemption Date (July 1) | Principal Amount |
|---|---|
| 2037 | $15,830,000 |
| 2038 | 16,650,000 |
| 2039[†] | 17,520,000 |

_____
[†]Final maturity.

The principal amount of the Term Bonds to be redeemed on the dates set forth above shall be reduced by the principal amount of Term Bonds of the same series, interest rate and maturity that have been redeemed (other than by application of Mandatory Redemption Requirements) or otherwise acquired by the City and delivered to the Trustee prior to giving the notice of redemption described below. The City may satisfy any Mandatory Redemption Requirement by the purchase and surrender of Term Bonds of the same series, interest rate and maturity in lieu of calling such Term Bonds for mandatory redemption.

*General Redemption Provisions*. Any Series 2012 Bonds to be redeemed will be redeemed only in authorized denominations. The Series 2012 Bonds duly called for redemption will cease to bear interest on and after the date fixed for redemption, whether or not presented for payment, provided that funds are on hand with the Trustee to redeem such Series 2012 Bonds. A registered owner of a Series 2012 Bond selected for redemption in part, upon surrender of such Series 2012 Bond for redemption shall receive without cost a new Series 2012 Bond of the same series and maturity, and in the principal amount of the unredeemed portion of such Series 2012 Bond that was surrendered.

*Notice of Redemption*. The Trustee will mail notice of redemption to the registered owners of the Series 2012 Bonds not less than 30 days prior to the date fixed for redemption. So long as DTC or its nominee is the registered owner of the Series 2012 Bonds, the Trustee will send any notice of redemption only to DTC, as described in APPENDIX J – "BOOK-ENTRY ONLY SYSTEM."

6

# PLAN OF FINANCE

**Estimated Sources and Uses of Funds**

The proceeds of the Series 2012 Bonds are expected to be applied as set forth below:

| Sources | |
|---|---|
| Par Amount of the Series 2012 Bonds | $659,780,000.00 |
| Net Premium/Discount | 9,898,140.70 |
| Other Department funds | |
|     Swap accrued interest | 5,183,480.55 |
|     Accrued interest | 1,051,259.07 |
| Total | $675,912,880.32 |

| Uses | |
|---|---|
| Construction Fund | $196,202,868.97 |
|     Swap Termination Payments | 314,333,100.45 |
|     Swap Accrued Interest | 5,183,480.55 |
| Senior Lien Bond Reserve Account | 14,295,201.50 |
| Series 2012 Escrow Account | 6,975,240.00 |
| Senior and Second Lien Bond and Interest Redemption Fund for Purchased Bonds | 131,123,746.26 |
| Costs of Issuance[1] | 7,799,242.59 |
| Total | $675,912,880.32 |

_____
[1] Costs of issuance include legal fees, Underwriter's discount, printing costs, rating agency fees, bond insurer fees and other costs of issuing the Series 2012 Bonds.

**System Improvements**

A portion of the Series 2012 Bonds will be used to finance a portion of the cost of the CIP, including making certain additional repairs, extensions and improvements to the System. See "THE CAPITAL IMPROVEMENT PROGRAM" and APPENDIX A – "FEASIBILITY REPORT."

**Plan of Refunding**

A portion of the proceeds of the Series 2012 Bonds will be deposited into an escrow account (the "Series 2012 Escrow Account") held by the U.S. Bank National Association, Detroit, Michigan, as Escrow Trustee pursuant to an Escrow Deposit Agreement (the "Escrow Agreement") by and between the City and the Escrow Trustee dated as of the date of issuance of the Series 2012 Bonds, and will be used by the Escrow Trustee to advance refund a portion of the City's Sewage Disposal System Revenue and Revenue Refunding Bonds, Series 2003(A) described in the following table (the "Advance Refunded Bonds") on the redemption date and at the redemption price set forth below. The sufficiency of the amounts deposited in the Series 2012 Escrow Account will be verified by Grant Thornton, LLP, Minneapolis, Minnesota, as verification agent. See "VERIFICATION OF MATHEMATICAL COMPUTATIONS."

| Maturity (July 1) | Principal Amount | Interest Rate | Redemption Date | Redemption Price |
|---|---|---|---|---|
| 2019 | $4,540,000 | 5.000% | July 1, 2013 | 100.00 |
| 2020 | 1,960,000 | 5.000 | July 1, 2013 | 100.00 |

A portion of the proceeds of the Series 2012 Bonds will be used by the City to purchase certain of the City's Sewage Disposal System Revenue Bonds described in the following table (the "Purchased Bonds") pursuant to an Invitation to Tender Bonds and an Offer to Purchase Bonds, each dated May 25, 2012. The Purchased Bonds are expected to be redeemed on the date of issuance of the Series 2012 Bonds.

| Series | Maturity (July 1) | Principal Amount | Interest Rate | Redemption Date | Redemption Price |
|--------|-------------------|------------------|---------------|-----------------|------------------|
| 2001(D-2) | 2032 | $51,135,000 | Variable | June 26, 2012 | 90.00 |
| 2006(D) | 2032 | 70,085,000 | Variable | June 26, 2012 | 75.00 |
| 2003A | 2016 | 3,450,000 | 5.000% | June 26, 2012 | 104.86 |
| 2003A | 2017 | 425,000 | 5.000 | June 26, 2012 | 104.86 |
| 2003A | 2018 | 3,540,000 | 5.000 | June 26, 2012 | 104.86 |
| 2003A | 2019 | 9,045,000 | 5.000 | June 26, 2012 | 104.86 |
| 2003A | 2020 | 5,505,000 | 5.000 | June 26, 2012 | 104.86 |
| 2003A | 2021 | 2,925,000 | 5.000 | June 26, 2012 | 103.25 |
| 2003A | 2022 | 5,430,000 | 5.000 | June 26, 2012 | 103.00 |

**Swap Termination Payments**

A portion of the proceeds of the Series 2012 Bonds will be used to finance the payment of termination amounts with respect to all Sewage Disposal System interest rate swaps, which were terminated by the City on June 20, 2012. See "INTEREST RATE SWAP AGREEMENTS."

## SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS

**General**

Pursuant to the Act, the Sewage Disposal System Revenue Bonds and Ancillary Obligations are self-liquidating obligations of the City, payable solely from the Pledged Assets under the Bond Ordinance. **The payment of the Series 2012 Bonds is secured by a statutory lien, which is created by the Bond Ordinance on the whole of the Pledged Assets (as described below), subject to the use and application thereof in accordance with the Bond Ordinance.** "Ancillary Obligations" are obligations incurred by the City with respect to particular Sewage Disposal System Revenue Bonds and consist of Hedge Obligations and Reimbursement Obligations. Hedge Obligations are payment obligations under a hedge agreement, such as an interest rate swap, other than the fees and expenses to be paid in the ordinary course of the transaction. Reimbursement Obligations are repayment obligations under a credit enhancement or liquidity facility, other than the fees and expenses to be paid in the ordinary course of the transaction. The fees and expenses payable by the City in connection with any hedge agreement, credit enhancement or liquidity facility in the ordinary course of the transaction (the "Ancillary Obligation Fees and Expenses") are treated separately under the Bond Ordinance from payments on Sewage Disposal System Revenue Bonds and Ancillary Obligations and have a different payment priority, as described under "Priority of Lien and Payment Status" below.

In accordance with the City Charter, all funds and accounts of the Sewage Disposal System are separate and distinct from all other City funds. No Sewage Disposal System monies are commingled with general fund or other monies of the City.

In addition, the City and the Department will enter into the Indenture with the Trustee to hold Revenues in certain Funds and Accounts required to be established under the Bond Ordinance for the payment of the Sewage Disposal System Revenue Bonds. Funds and Accounts held by the Trustee under the Indenture will be administered by the Trustee, in specified circumstances upon the direction of the Department, and will cease to be under the direction or control of the City.

**Pledged Assets**

"Pledged Assets" under the Bond Ordinance consist of:

- Net Revenues (defined below);

- the funds and accounts established by or pursuant to the Bond Ordinance except for the Operation and Maintenance Fund and the Construction Fund and any account thereof;

- investments of amounts credited to any fund, account or subaccount that is a Pledged Asset; and

- any income or gain realized from investments that are Pledged Assets to the extent that such income or gain is not a Net Revenue.

"Revenues" are defined in the Bond Ordinance and the Indenture as the revenues of the City from the Sewage Disposal System (construed in accordance with the Act) and include amounts received by the City under its hedge agreements with respect to Sewage Disposal System Revenue Bonds, including any termination payments, and income earned and gains realized from the investment of amounts in the various funds, accounts and sub-accounts established by the Indenture in accordance with the Bond Ordinance (other than the Construction Fund for any Fiscal Year that earnings on the Construction Fund are not transferred to the Receiving Fund by the Board). The Board's current policy is to transfer Construction Fund earnings to the Receiving Fund, and therefore such earnings are included in Revenues. "Net Revenues" are defined in the Bond Ordinance and the Indenture as Revenues except for those transferred to the Operation and Maintenance Fund.

**Priority of Lien and Payment Status**

Sewage Disposal System Revenue Bonds are secured under the Bond Ordinance in accordance with their relative priorities by a statutory lien on Pledged Assets, as described below. The Bond Ordinance permits the City to secure Ancillary Obligations by a lien on Pledged Assets having the same or a lower priority than the lien securing the particular Sewage Disposal System Revenue Bonds to which the Ancillary Obligations relate. Ancillary Obligation Fees and Expenses have a higher payment status than Sewage Disposal System Revenue Bonds and Ancillary Obligations, as described below.

- All Ancillary Obligation Fees and Expenses are paid from Revenues in the Operation and Maintenance Fund on the same basis as operating and administrative fees and expenses of the Sewage Disposal System, with the result being that they are paid before debt service on the Sewage Disposal System Revenue Bonds and before Ancillary Obligations.

- Senior Lien Bonds and related Ancillary Obligations are secured by a first lien on Pledged Assets and rank first in the order of payment from Net Revenues.

9

- Junior Lien Bonds include all Sewage Disposal System Revenue Bonds issued under the Bond Ordinance other than Senior Lien Bonds. To date, the City has issued two priorities of Junior Lien Bonds:

  - Second Lien Bonds and related Ancillary Obligations, which are secured by a lien on Pledged Assets that is senior to the liens securing all other Junior Lien Bonds and second only to the Senior Lien Bonds and their related Ancillary Obligations, and rank second in order of payment from Net Revenues; and

  - SRF Junior Lien Bonds and related Ancillary Obligations, which have the lowest priority lien on Pledged Assets, junior to the liens securing all other Sewage Disposal System Revenue Bonds and their related Ancillary Obligations, and rank last in order of payment from Net Revenues.

**Flow of Funds**

In accordance with the requirements of the Act, the City Charter and the Bond Ordinance, the City has established certain funds and accounts for the Sewage Disposal System under the Indenture to be held in trust by the Trustee. The Bond Ordinance permits the establishment of additional funds for additional priorities of Sewage Disposal System Revenue Bonds.

Pursuant to the Bond Ordinance, all Revenues received by the City are set aside as collected and credited to the Receiving Fund, which shall be held by the Trustee in accordance with the Indenture. As of the first day of each month, amounts credited to the Receiving Fund are transferred seriatim into the following funds and accounts but only within the respective limitations and only if the maximum amount within such limitation has been credited to the preceding fund or account:

First: to the Operation and Maintenance Fund held by a custodian, a sum identified by the Department, in its sole discretion, as sufficient to provide for the payment of the next month's expenses of administration and operation of the Sewage Disposal System (including Ancillary Obligation Fees and Expenses) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order;

Second: to the Senior Lien Bond Debt Service Account, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Senior Lien Bonds and related Ancillary Obligations of the same priority as of the first day of such month;

Third: to the Senior Lien Bond Reserve Account, an amount that when added to all other amounts then on deposit therein shall equal the Reserve Requirement for Senior Lien Bonds;

Fourth: to the Interest and Redemption Fund established for each priority of Junior Lien Bonds, beginning with the Second Lien Bonds and continuing in descending order of priority to, and including, the SRF Junior Lien Bonds, as follows:

First: to the Debt Service Account established for such priority, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Junior Lien Bonds and related Ancillary Obligations of the same priority as of the first day of such month; and

10

> *Second*: to the Reserve Account, if any, established for such priority an amount that, when added to all other amounts then on deposit therein, shall equal the Reserve Requirement for such priority of Junior Lien Bonds;

*Fifth*: to the Extraordinary Repair and Replacement Fund, the amount of the Extraordinary Repair and Replacement Minimum Requirement to the extent that the balance thereof is less than the Extraordinary Repair and Replacement Maximum Requirement, except that an amount withdrawn from such Fund and transferred to the Improvement and Extension Fund as provided in the Indenture, shall be deducted from the Extraordinary Repair and Replacement Maximum Requirement in the Fiscal Year of withdrawal; and

*Sixth*: to the Improvement and Extension Fund, such amount, if any, that the Board may deem advisable; provided that no amount shall be deposited to the Improvement and Extension Fund or credited thereto for so long as a borrowing from the Extraordinary Repair and Replacement Reserve Fund remains unpaid.

Amounts remaining in the Receiving Fund as of the last day of each Fiscal Year shall be transferred to the Surplus Fund to be used for any purposes related to the Sewage Disposal System. The use and application of amounts in the funds and accounts established by the Indenture are set forth in APPENDIX C – "BOND ORDINANCE AND INDENTURE."

**Reverse Flow of Funds**

If amounts in the Receiving Fund are insufficient to provide for current requirements of the Operation and Maintenance Fund and each Interest and Redemption Fund (including the Reserve Account, if any, therein), then any amounts or securities held in the Surplus Fund, the Improvement and Extension Fund and the Extraordinary Repair and Replacement Reserve Fund shall be credited or transferred, first, to the Operation and Maintenance Fund and second, to the particular Interest and Redemption Fund, to the extent of the insufficiency therein from the aforesaid funds in the order listed.

If any principal (and redemption premium, if any) of or interest on Sewage Disposal System Revenue Bonds of a priority or any related Ancillary Obligations become due (whether on a stated or scheduled date, by reason of call for redemption or otherwise), and there are insufficient amounts for the payment thereof in the Interest and Redemption Fund established for such priority of Sewage Disposal System Revenue Bonds and Ancillary Obligations after applying payments in the Reserve Account, if any, established for such priority of Sewage Disposal System Revenue Bonds, then there shall be applied to such payment amounts in each Interest and Redemption Fund established for each lower priority of Sewage Disposal System Revenue Bonds, beginning with the lowest priority and proceeding seriatim in ascending order of priority, until such payments are made in full.

**Reserve Accounts and Reserve Requirements**

Pursuant to the Bond Ordinance, the Indenture establishes a Senior Lien Bond Reserve Account and a Second Lien Bond Reserve Account and authorizes a Reserve Account to be established for other priorities of Junior Lien Bonds, but no such other Junior Lien Bond Reserve Account has been established to date. Accordingly, SRF Junior Lien Bonds are not secured by any Reserve Account. Amounts in a Reserve Account may be used solely for the payment of the principal (and premium, if any) of and interest on the Sewage Disposal System Revenue Bonds and Ancillary Obligations of the priority for which such Reserve Account was established, as to which there would otherwise be a default.

11

The Reserve Requirement for Senior Lien Bonds is the maximum Annual Debt Service on all Senior Lien Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Internal Revenue Code of 1986, as amended (the "Code"). The Reserve Requirement for Second Lien Bonds is the average Annual Debt Service on all Second Lien Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code. If a Reserve Account is established for any other priority of Junior Lien Bonds, the Reserve Requirement for such other Junior Lien Bonds shall be the amount set forth in the supplemental action establishing such Reserve Account, and if no amount is set forth, shall be the average Annual Debt Service on all Junior Lien Bonds of such priority then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code.

Concurrently with the issuance of Sewage Disposal System Revenue Bonds of a priority for which a Reserve Account has been or is being established, the Bond Ordinance and the Indenture require there be credited to such Reserve Account the amount that, when added to the amount on deposit in such account or credited thereto, equals the Reserve Requirement for the Bonds then to be issued and all Bonds of the same priority then outstanding. As of the date of this Official Statement, the funds on deposit in the Senior Lien Bond Reserve Account and Second Lien Bond Reserve Account were sufficient to meet or exceeded the Reserve Requirement for the outstanding Senior Lien Bonds and Second Lien Bonds, respectively. In connection with the issuance of the Series 2012 Bonds, the Department will deposit $16,145,201.50 to the Senior Lien Bond Reserve Account to satisfy the Reserve Requirement of the Senior Lien Bond Reserve Account, which includes a transfer of $1,850,000 from the Second Lien Bond Reserve Fund and $14,295,201.50 from the proceeds of the Series 2012 Bonds. Pursuant to the Bond Ordinance, the Reserve Requirement was calculated based on an interest cost assumption for unhedged variable rate debt of 125% of the 5-year average of the SIFMA Municipal Index.

The Bond Ordinance permits the use of Credit Enhancement to fund any Reserve Account or to substitute for amounts on deposit in a Reserve Account, if the provider is rated in the highest rating category of each Rating Agency then rating the Bonds having the benefit of such Reserve Account, and the City receives an opinion of nationally recognized bond counsel to the effect that such Credit Enhancement will not adversely affect the tax-exempt status of interest on any Bonds. There is no Bond Ordinance requirement that the rating of Credit Enhancement which has been properly credited to a Reserve Account be maintained.

The following table summarizes the funding of the Reserve Requirements for the Senior Lien Bond Reserve Account and Second Lien Bond Reserve Account as of the date of the issuance of the Series 2012 Bonds.

| | Senior Lien Bonds | Second Lien Bonds | Aggregate System |
|---|---|---|---|
| Reserve Requirement | $152,787,913 | $80,328,010 | $233,115,923 |
| Funding Amounts: | | | |
| Cash and Investments[1] | 74,923,009 | 29,039,639 | 103,962,647 |
| Credit Enhancement[2] | 77,869,192 | 51,362,244 | 129,231,435 |
| Total | $152,792,200 | $80,401,882 | $233,194,083 |

[1] Represents amounts in cash and cash equivalents and Permitted Investments with Westdeutsche Landesbank Girozentrale, Bank of America (formerly Nationsbank, N.A.), Morgan Stanley Capital Services Inc. and First Independence Bank.

[2] For series-specific policies represents the lesser of (a) the maximum amount of the policy or (b) the amount of Reserve Requirement allocated to the specific series covered by such policy.

12

As of the date of issuance of the Series 2012 Bonds, the Reserve Requirement for the Senior Lien Bond Reserve Account will be $152,787,913, and will be satisfied with Cash and Investments in the amount of $74,923,009 and Credit Enhancement in the form of the following surety or insurance policies:

(a)     MBIA policy unconditionally guaranteeing the payment of principal of and interest on the Series 1999-SRF2, Series 1999-SRF3 and Series 1999-SRF4 Bonds up to a maximum aggregate available amount of $7,482,000 and with a termination date equal to the earlier of October 1, 2022, or the date on which the City has made all payments required to be made on the three series of related bonds.  Because the applicable Reserve Requirement allocated to the specific series covered by the series specific surety is less than the maximum amount of the surety, the City is currently allocating $7,329,318 of the series specific surety to the Series 1999 SRF Bonds.

(b)     FGIC policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $17,301,095 and with a termination date of July 1, 2029.

(c)     FSA policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $3,618,077 and with a termination date of July 1, 2031.

(d)     FSA policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $51,800,000 and with a termination date equal to the earlier of July 1, 2033, or the date on which the Series 2003(A) and 2003(B) Bonds are no longer outstanding.

As of the date of issuance of the Series 2012 Bonds, the Reserve Requirement for the Second Lien Bond Reserve Account will be $80,328,010, and will be satisfied with Cash and Investments in the amount of $29,039,639 and Credit Enhancement in the form of the following surety or insurance policies:

(a)     MBIA policy unconditionally guaranteeing the payment of the principal of and interest on the Series 2001(D) Bonds up to a maximum aggregate available amount of $7,379,761 and with a termination date equal to the earlier of July 1, 2032, or the date on which the City has made all payments required to be made on the Series 2001(D) Bonds (includes any bonds that are issued to refund the 2001(D) Bonds).  Because the applicable Reserve Requirement allocated to the specific series covered by the series specific surety is less than the maximum amount of the surety, the City is currently allocating $5,817,054 of the series specific surety to the Series 2001(D) Bonds.

(b)     FGIC policy unconditionally guaranteeing the payment of the principal of and interest on the Series 2001(E) Bonds up to a maximum aggregate available amount of $10,605,321 and with a termination date equal to July 1, 2031.  The City is currently allocating the full value of the series specific surety to the Series 2001(E) Bonds.

(c)     MBIA policy unconditionally guaranteeing the payment of the principal of and interest on any Second Lien Bonds up to a maximum aggregate available amount of $22,000,000 and with a termination date equal to the earlier of July 1, 2035 or the date on which the City has made all payments required to be made on the Series 2005(A), Series 2005(B) and Series 2005(C) Bonds.

(d)     FGIC policy unconditionally guaranteeing the payment of the principal of and interest on any Second Lien Bonds up to a maximum aggregate available amount of $17,000,000 and with a termination date of July 1, 2036.

As noted, certain of the Reserve Account requirements currently are satisfied through surety or insurance policies issued by MBIA, FGIC and FSA. The ratings of MBIA and FSA have been downgraded and the ratings of FGIC have been withdrawn. Certain obligations of FGIC have been reinsured by National Public Finance Guarantee Corporation ("National"), pursuant to the restructuring by MBIA and the assignment of certain FGIC obligations to National by MBIA. National has confirmed that each of the FGIC debt service Reserve Account Credit Enhancements listed above is covered by such reinsurance pursuant to the FGIC Reinsurance Agreement.

Although the Bond Ordinance requires that Credit Enhancement used to fund a Reserve Account be rated in the highest rating category of each rating agency at the time of its acquisition, there is no requirement that such rating be maintained. Accordingly, all Credit Enhancements are valued at their full face value for purposes of determining satisfaction of the applicable Reserve Account Requirement, regardless of the provider's rating. If the Credit Enhancement were determined to have no value, as for example, if a court made such a determination in connection with the dissolution of the provider, then the City would be required to replenish the applicable Reserve Account with cash or through a replacement Credit Enhancement Policy, as described herein under "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Flow of Funds" and in APPENDIX C – "BOND ORDINANCE AND INDENTURE."

**Certain Other Funds**

As described in "Reverse Flow of Funds" above, amounts held in certain other funds established under the Indenture may be transferred to the Operation and Maintenance Fund (which is not held under the Indenture) and the Interest and Redemption Fund in the event of a shortfall of Revenues.

Extraordinary Repair and Replacement Fund. The Extraordinary Repair and Replacement Fund is funded by monthly transfers of Revenues in minimum amounts equal to 1/12 of 3% of the budgeted operation and maintenance expense of the Sewage Disposal System for the Fiscal Year, until the balance in such fund equals no greater than 15% of the budgeted operation and maintenance expense of the Sewage Disposal System for such Fiscal Year, minus the amount of any transfer described in the two immediately succeeding sentences. Amounts in the Extraordinary Repair and Replacement Fund may be used to pay costs of making major unanticipated repairs and replacements to the Sewage Disposal System which individually cost or are reasonably expected to cost in excess of $1 million. The Indenture authorizes the Department, on and after the first day of each Fiscal Year, to transfer not more than 50% of the balance in the Extraordinary Repair and Replacement Fund to the Improvement and Extension Fund, but only if in the month of such transfer the full amount of the minimum monthly transfer has been credited to the fund, and the amounts of all prior transfers from the fund to the Improvement and Extension Fund have been restored in full.

Improvement and Extension Fund. The Improvement and Extension Fund is to be used for improvements, enlargements, extensions or betterment to the Sewage Disposal System.

Rate Stabilization Fund. The Bond Ordinance permits the Board to create a Rate Stabilization Fund, the purpose of which is to enable the City to set aside Prior Revenues (as defined below) to augment Revenues in future years in order to satisfy the requirements of the Bond Ordinance with respect to rate covenants related to Sewage Disposal System Revenue Bonds. See "Rate Covenant" below for a description of the restriction on use of transfers from the Rate Stabilization Fund in meeting the rate covenant's coverage requirements. Any funding of the Rate Stabilization Fund is at the sole discretion of the Board. To date, the City has not transferred any funds into the Rate Stabilization Fund.

Only Prior Revenues may be deposited in the Rate Stabilization Fund. "Prior Revenues" are Revenues or Net Revenues only to the extent they may be applied to any lawful purpose of the Sewage Disposal System, in effect limiting Prior Revenues to Net Revenues that, in the Fiscal Year of receipt, exceed the required deposits described above under "Flow of Funds" and the amounts needed to meet the coverage requirements described below under "Rate Covenant." The deposit of Prior Revenues into the Rate Stabilization Fund is limited in any Fiscal Year as described in APPENDIX C - "BOND ORDINANCE AND INDENTURE – Rate Stabilization Fund." Except as taken into account in connection with a coverage determination, amounts on deposit in the Rate Stabilization Fund may be applied for any lawful purpose of the Sewage Disposal System.

**Rate Covenant**

The Bond Ordinance requires that the Board fix and revise rates for sewage disposal service from time to time as may be expected to be necessary to produce the greater of:

1. The amounts required to provide for:

   a. the payment of the expenses for operation and maintenance of the Sewage Disposal System as are necessary to preserve the same in good repair and working order;

   b. the payment of Indebtedness coming due for the Fiscal Year of calculation;

   c. the creation and maintenance of reserves therefor as required by the Bond Ordinance or any ordinance or resolution adopted in accordance with the terms thereof; and

   d. such other expenditures and funds for the Sewage Disposal System as the Bond Ordinance may require; and

2. The Required Combined Coverage (i.e., with respect to the rate covenant, projected Net Revenues for the Fiscal Year of calculation, divided by the Indebtedness coming due for such Fiscal Year). For purposes of the rate covenant, the coverage requirements for determining the Required Combined Coverage are the following percentages:

   | Priority of Indebtedness: | Percentage: |
   |---|---|
   | Senior Lien Indebtedness | 120% |
   | Second Lien Indebtedness (together with Senior Lien Indebtedness) | 110% |
   | SRF Junior Lien Bonds (together with Senior and Second Lien Indebtedness) | 100% |

The Bond Ordinance defines "Indebtedness" as (i) principal of and interest on Sewage Disposal System Revenue Bonds outstanding in the Fiscal Year of calculation, (ii) Reimbursement Obligations, and (iii) amounts payable by the City under a Hedge by reason of the early termination thereof. The City may take into account transfers from the Rate Stabilization Fund in calculating compliance with the rate covenant, but the City shall also comply with the rate covenant by maintaining rate coverage percentages of at least 100% without taking into account any transfers from the Rate Stabilization Fund.

The Bond Ordinance provides that the interest rate on the Sewage Disposal System Revenue Bonds that are Variable Rate Securities (as defined in the Bond Ordinance) shall be calculated as 125% of the annualized average daily rate borne by such Variable Rate Securities for the 12 calendar month period ending immediately before the month of calculation, or if such Variable Rate Securities have been outstanding for less than a full Fiscal Year on the date of calculation, the interest rate shall be calculated as 125% of the average of the BMA (now SIFMA) Municipal Index, for the five-year period ending not

more than one week before the date of calculation. For purposes of determining if Sewage Disposal System Revenue Bonds are Fixed Rate Securities (as defined in the Bond Ordinance), a rate is "fixed" if the economic effect of the Sewage Disposal System Revenue Bond bearing interest at a fixed rate is produced by a Qualified Hedge or by Counterpart Securities (as defined in the Bond Ordinance), and a rate is "variable" if the economic effect of the Sewage Disposal System Revenue Bond bearing interest at a variable rate is produced by a Qualified Hedge. See "DEBT SERVICE REQUIREMENTS."

**Enforceability of Rates**

The Bond Ordinance provides for certain means of enforcement including the right to shut off and discontinue the supply of water to any premises for the nonpayment of sewage disposal rates when due. In addition, the charges for sewage disposal service are a lien on the respective premises of retail customers. See "FINANCIAL PROCEDURES – Collections and Delinquencies." The Act provides that the rates charged for services furnished by any public improvement constructed under the Act shall not be subject to supervision or regulation by any State bureau, board, commissioner or other like instrumentality or agency thereof.

**Bond Insurance**

**The following information has been provided by the Assured Guaranty Municipal Corp. for inclusion in this Official Statement Supplement. Reference is made to APPENDIX K to a specimen of the Municipal Bond Insurance Policy. Neither the City nor the Underwriters make any representation as to its accuracy or completeness.**

*Bond Insurance Policy.* Concurrently with the issuance of the Series 2012 Bonds, AGM will issue its Policy for the Insured Series 2012 Bonds. The Policy guarantees the scheduled payment of principal of and interest on the Insured Series 2012 Bonds when due as set forth in the form of the Policy included as APPENDIX K.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

*Assured Guaranty Municipal Corp.* AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Assured Guaranty Municipal Holdings Inc. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure and structured finance markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

AGM's financial strength is rated "AA-" (stable outlook) by Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business ("S&P") and "Aa3" (on review for possible downgrade) by Moody's Investors Service, Inc. ("Moody's"). An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of AGM in its sole discretion. In addition, the rating agencies may at any time change AGM's long-term rating outlooks or place such ratings on a watch list for possible downgrade in the near term. Any downward revision or withdrawal of any of the above ratings, the assignment of a negative outlook to such ratings or the placement of such ratings on a negative watch list may have an adverse effect on the market price of any security guaranteed by AGM. AGM only guarantees scheduled principal and scheduled interest payments

payable by the issuer of bonds insured by AGM on the date(s) when such amounts were initially scheduled to become due and payable (subject to and in accordance with the terms of the relevant insurance policy), and does not guarantee the market price or liquidity of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

Current Financial Strength Ratings

On March 20, 2012, Moody's issued a press release stating that it had placed AGM's "Aa3" insurance financial strength rating on review for possible downgrade.  AGM can give no assurance as to any further ratings action that Moody's may take.  Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

On November 30, 2011, S&P published a Research Update in which it downgraded AGM's financial strength rating from "AA+" to "AA-".  At the same time, S&P removed the financial strength rating from CreditWatch negative and changed the outlook to stable. AGM can give no assurance as to any further ratings action that S&P may take.  Reference is made to the Research Update, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 and its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2012.

Capitalization of AGM

At March 31, 2012, AGM's consolidated policyholders' surplus and contingency reserves were approximately $3,123,869,658 and its total net unearned premium reserve was approximately $2,275,867,231, in each case, in accordance with statutory accounting principles.

AGM's statutory financial statements for the fiscal year ended December 31, 2011, and for the quarterly period ended March 31, 2012, which have been filed with the New York State Department of Financial Services and posted on AGL's website at http://www.assuredguaranty.com, are incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

Incorporation of Certain Documents by Reference

Portions of the following documents filed by AGL with the Securities and Exchange Commission (the "SEC") that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i)     the Annual Report on Form 10-K for the fiscal year ended December 31, 2011 (filed by AGL with the SEC on February 29, 2012); and

(ii)     the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2012 (filed by AGL with the SEC on May 10, 2012).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, after the filing of the last document referred to above and before the termination of the offering of the Insured Series 2012 Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents.  Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at

17

http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp.: 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Bond Insurance – *Assured Guaranty Municipal Corp*." or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

<u>Miscellaneous Matters</u>

AGM or one of its affiliates may purchase a meaningful portion of the Insured Series 2012 Bonds or any uninsured Series 2012 Bonds offered under this Official Statement and may hold such Insured Series 2012 Bonds or uninsured Series 2012 Bonds for investment or may sell or otherwise dispose of such Insured Series 2012 Bonds or uninsured Series 2012 Bonds at any time or from time to time.

AGM makes no representation regarding the Insured Series 2012 Bonds or the advisability of investing in the Insured Series 2012 Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Bond Insurance."

**Additional Bonds**

The City may not incur any obligations payable from Pledged Assets except for Sewage Disposal System Revenue Bonds, Ancillary Obligations and Ancillary Obligation Fees and Expenses, and no obligations of the City may be secured by a lien on Pledged Assets except as provided in the Bond Ordinance.

<u>Coverage Requirements</u>. The coverage requirements for determining the Required Combined Coverage (i.e., with respect to the Additional Bonds test, projected Net Revenues for the current or next succeeding Fiscal Year or historical Net Revenues for the immediately preceding audited Fiscal Year divided by the maximum Annual Debt Service) for the issuance of additional Sewage Disposal System Revenue Bonds are as follows:

| Priority of Sewage Disposal System Revenue Bonds: | Percentage: |
|---|---|
| Senior Lien Bonds | 120% |
| Second Lien Bonds (together with Senior Lien Bonds) | 110% |
| SRF Junior Lien Bonds (together with Senior Lien and Second Lien Bonds) | 100% |

<u>General Authority</u>. The City may issue Sewage Disposal System Revenue Bonds of any Priority (herein, "Additional Bonds") for repairs, extensions, enlargements, and improvements to the Sewage Disposal System (including repaying amounts withdrawn from the Extraordinary Repair and Replacement Reserve Fund), refunding all or a part of any Outstanding Sewage Disposal System Revenue Bonds and paying the costs of issuing such Additional Bonds, including deposits, if any, to be made to any Reserve Account established or to be established for such Additional Bonds or any other Sewage Disposal System

18

Revenue Bonds, if, but only if, there is Required Combined Coverage under either the Projected Net Revenues Test or the Historical Net Revenues Test.

Projected Net Revenues Test. For purposes of the Projected Net Revenues Test, the Required Combined Coverage means the result produced by dividing the Net Revenues for the current or next succeeding Fiscal Year, by the maximum composite Annual Debt Service in any Fiscal Year on Outstanding Sewage Disposal System Revenue Bonds and the Additional Bonds to be issued.

Projected Net Revenues may include 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the Sewage Disposal System to be paid for in whole or in part from the proceeds of the Additional Bonds. In projecting Net Revenues, the City shall engage the services of and be guided by a consultant of national reputation for advising municipalities with respect to setting rates and charging for the use of sewage disposal systems.

"Annual Debt Service" is a defined term in the Bond Ordinance, and reference should be made to APPENDIX C – "BOND ORDINANCE AND INDENTURE" for the definition and the rules for determining Annual Debt Service. If any Additional Bonds are to be issued to refund Outstanding Sewage Disposal System Revenue Bonds, the Annual Debt Service to be used for determining the Required Combined Coverage shall be the Annual Debt Service on the Additional Bonds to be issued and not the Annual Debt Service on the Sewage Disposal System Revenue Bonds to be refunded.

Historical Net Revenues Test. For purposes of the Historical Net Revenues Test, the Required Combined Coverage means the result produced by dividing the actual Net Revenues for the immediately preceding audited Fiscal Year, by the maximum composite Annual Debt Service in any Fiscal Year on Outstanding Sewage Disposal System Revenue Bonds and the Additional Bonds to be issued.

Instead of the immediately preceding audited Fiscal Year, the City may use any audited Fiscal Year ending not more than sixteen months prior to the date of delivery of such Additional Bonds. If any change in the rates, fees and charges of the Sewage Disposal System has been authorized at or prior to the date of sale of such Additional Bonds, the Net Revenues for the particular preceding Fiscal Year shall be augmented by an amount reflecting the effect of such change had the Sewage Disposal System's billings during such Fiscal Year been at the increased rates.

Net Revenues for the particular preceding audited Fiscal Year also may be augmented by 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the Sewage Disposal System to be paid for in whole or in part from the proceeds of such Additional Sewage Disposal System Revenue Bonds and 100% of any acquisition, extension or connection which was made subsequent to the end of the particular preceding audited Fiscal Year. With respect to augmentation of Net Revenues, the City shall engage the services of and receive the certificate of a consultant of national reputation for advising municipalities with respect to setting rates and charges for the use of sewage disposal systems regarding the existence of such conditions.

Alternate Test for Refundings. The City may issue Sewage Disposal System Revenue Bonds of any Priority without regard to the above tests for the purpose of refunding all or part of Sewage Disposal System Revenue Bonds then Outstanding and paying costs of issuing such additional Sewage Disposal System Revenue Bonds, including deposits which may be made to any Reserve Account established or to be established for such additional Sewage Disposal System Revenue Bonds or any other Sewage Disposal System Revenue Bonds if, but only if: (i) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on (A) the additional Sewage Disposal System

Revenue Bonds to be issued and (B) giving effect to the refunding, all Outstanding unrefunded Sewage Disposal System Revenue Bonds of equal and higher Priority, is less than (ii) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on all Sewage Disposal System Revenue Bonds of equal and higher Priority, without giving effect to the refunding.

**Remedies**

Under the Indenture, if there is a Default (as defined in the Indenture) on any Sewage Disposal System Revenue Bond, the Trustee may pursue any remedy permitted by law and the Bond Ordinance to enforce the performance of or compliance with the provisions of the Indenture.

Upon the happening and continuance of a Default on any Sewage Disposal System Revenue Bond, and if requested to do so by the Holders of at least 20% in aggregate principal amount of the outstanding Sewage Disposal System Revenue Bonds and the Trustee is indemnified as provided in the Indenture and the Bond Ordinance, the Trustee shall exercise such of the rights and powers as the Trustee shall deem most effective to enforce and protect the interests of the Holders.

The Holder or Holders of Sewage Disposal System Revenue Bonds representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, shall have the right at any time, by a written instrument executed and delivered to the Trustee, direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of the Indenture, or any other or any other proceedings under the Indenture; provided, that such direction shall not be otherwise than in accordance with the provisions of law and of the Indenture, and provided that the Trustee shall be indemnified to its satisfaction.

The Holder or Holders of Sewage Disposal System Revenue Bonds representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, may, by suit, action, mandamus or other proceedings, protect and enforce the statutory lien upon Pledged Assets, and may, by suit, action, mandamus or other proceedings, enforce and compel performance of all duties of the officers of the City, including the fixing of sufficient rates, the collection of Revenues, the proper segregation of the Revenues of the Sewage Disposal System and the proper application thereof.

If there is a Default in the payment of the principal (and premium, if any) of and interest on any Sewage Disposal System Revenue Bonds, any court having jurisdiction in any proper action may appoint a receiver to administer and operate the Sewage Disposal System on behalf of the City and, under the direction of the court, perform all of the duties of the officers of the City more particularly set forth herein and in the Act.

A Holder of Sewage Disposal System Revenue Bonds shall have all other rights and remedies given by the Act and by law for the payment and enforcement of the Sewage Disposal System Revenue Bonds and the security therefor.

20

## OUTSTANDING INDEBTEDNESS

The following table sets forth information with respect to outstanding Sewage Disposal System Revenue Bonds as of June 26, 2012, reflecting the issuance of the Series 2012 Bonds.

| Sewage Disposal System Revenue Bonds | Original Principal Amount | Outstanding as of June 26, 2012 |
|---|---|---|
| **Senior Lien Bonds** | | |
| Sewage Disposal System Revenue Bonds, Series 1992-A-SRF[1] | $4,360,000 | $260,000 |
| Sewage Disposal System Revenue Bonds, Series 1992-B-SRF [1] | 1,915,000 | 230,000 |
| Sewage Disposal System Revenue Bonds, Series 1993-B-SRF[1] | 6,603,996 | 1,150,000 |
| Sewage Disposal System Revenue Bonds, Series 1997-B-SRF[1],[2] | 5,430,174 | 2,160,000 |
| Sewage Disposal System Revenue Refunding Bonds, Series 1998-A | 69,000,000 | 65,515,000 |
| Sewage Disposal System Revenue Refunding Bonds, Series 1998-B | 68,955,000 | 65,280,000 |
| Sewage Disposal System Revenue Bonds, Series 1999-SRF1[1] | 21,475,000 | 9,880,000 |
| Sewage Disposal System Revenue Bonds, Series 1999-SRF2[1] | 46,000,000 | 28,110,000 |
| Sewage Disposal System Revenue Bonds, Series 1999-SRF3[1] | 31,030,000 | 15,890,000 |
| Sewage Disposal System Revenue Bonds, Series 1999-SRF4[1] | 40,655,000 | 20,815,000 |
| Sewage Disposal System Revenue Bonds, Series 1999-A | 302,995,178 | 33,510,178 |
| Sewage Disposal System Revenue Bonds, Series 2001(C-1) | 159,970,000 | 153,440,000 |
| Sewage Disposal System Revenue Bonds, Series 2001(C-2) | 127,165,000 | 121,935,000 |
| Sewage Disposal System Revenue and Revenue Refunding Bonds, Series 2003(A) | 599,380,000 | 213,065,000 |
| Sewage Disposal System Revenue Bonds, Series 2003(B) | 150,000,000 | 150,000,000 |
| Sewage Disposal System Revenue Refunding Bonds, Series 2004(A) | 101,435,000 | 74,380,000 |
| Sewage Disposal System Revenue Bonds, Series 2006(C) | 26,520,000 | 26,560,000 |
| Sewage Disposal System Revenue Refunding Bonds, Series 2006(D) | 370,000,000 | 289,430,000 |
| Sewage Disposal System Revenue and Revenue Refunding Bonds, Series 2012A | 659,780,000 | 659,780,000 |
| Total Senior Lien Bonds | $2,792,669,348 | $1,931,390,178 |
| **Second Lien Bonds** | | |
| Sewage Disposal System Revenue Bonds, Series 2001(B) | $110,550,000 | $110,550,000 |
| Sewage Disposal System Revenue Bonds, Series 2001(D-2) | 72,450,000 | 21,315,000 |
| Sewage Disposal System Revenue Bonds, Series 2001(E) | 139,080,000 | 136,150,000 |
| Sewage Disposal System Revenue Bonds, Series 2005(A) | 273,355,000 | 239,265,000 |
| Sewage Disposal System Revenue Refunding Bonds, Series 2005(B) | 40,215,000 | 40,215,000 |
| Sewage Disposal System Revenue Refunding Bonds, Series 2005(C) | 63,160,000 | 57,280,000 |
| Sewage Disposal System Revenue Bonds, Series 2006(A) | 125,000,000 | 123,655,000 |
| Sewage Disposal System Revenue Bonds, Series 2006(B) | 250,000,000 | 246,110,000 |
| Total Second Lien Bonds | $1,073,810,000 | $974,540,000 |
| **SRF Junior Lien Bonds[1]** | | |
| Sewage Disposal System Revenue Bonds, Series 2000-SRF1[2] | $44,197,995 | $23,947,995 |
| Sewage Disposal System Revenue Bonds, Series 2000-SRF2[2] | 64,441,066 | 39,191,066 |
| Sewage Disposal System Revenue Bonds, Series 2001-SRF1 | 82,200,000 | 57,965,000 |
| Sewage Disposal System Revenue Bonds, Series 2001-SRF2 | 59,850,000 | 42,210,000 |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF1 | 18,985,000 | 11,590,000 |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF2[2] | 1,545,369 | 935,369 |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF3[2] | 31,549,466 | 20,554,466 |
| Sewage Disposal System Revenue Bonds, Series 2003-SRF1 | 48,520,000 | 36,415,000 |
| Sewage Disposal System Revenue Bonds, Series 2003-SRF2[2] | 25,055,370 | 17,550,370 |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF1 | 2,910,000 | 2,025,000 |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF2[2] | 18,363,459 | 12,748,459 |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF3[2] | 12,722,575 | 8,832,575 |
| Sewage Disposal System Revenue Bonds, Series 2007-SRF1 | 167,565,000 | 138,200,973 |
| Sewage Disposal System Revenue Bonds, Series 2009-SRF1[3] | 16,785,000 | 8,328,809 |
| Sewage Disposal System Revenue Bonds, Series 2010-SRF1[3] | 4,899,000 | 3,170,406 |
| Total SRF Junior Lien Bonds | $599,589,300 | $423,665,488 |
| **Total Sewage Disposal System Revenue Bonds** | **$4,466,068,648** | **$3,329,595,666** |

[1] Original principal amount reflects the maximum stated amount of the SRF Bonds; the outstanding amount reflects the principal amount of the SRF loan. As the Department draws amounts under the SRF loan, the outstanding principal amounts of the relate SRF Bonds will increase. The maximum amounts on all SRF Bonds are not expected to be fully drawn until Fiscal Year 2013.

[2] Original principal amount has been adjusted to reflect actual draws on the loan, which was less than originally authorized.

[3] Original principal amount is net of principal forgiveness funded by the American Recovery and Reinvestment Act of 2009 (the "ARRA").

SOURCE: The Department.

# DEBT SERVICE REQUIREMENTS

The following table sets forth the annual principal and interest requirements for the outstanding Senior Lien Bonds, Second Lien Bonds, SRF Junior Lien Bonds and the Series 2012 Bonds.

| Fiscal Year Ending June 30[1] | Senior Lien Bonds | | | | | Outstanding Second Lien Debt Service[3] | Outstanding SRF Junior Lien Debt Service[4] | Total System Debt Service |
| | Outstanding Senior Lien Debt Service | Series 2012 Bonds Principal | Series 2012 Bonds Interest | Series 2012 Bonds Total | Total Senior Lien Debt Service[2] | | | |
|---|---|---|---|---|---|---|---|---|
| 2012 | $ 110,552,592 | - | - | - | $ 110,552,592 | $ 63,282,846 | $ 36,041,557 | $ 209,876,996 |
| 2013 | 104,344,144 | - | $34,531,193 | $34,531,193 | 138,875,336 | 55,922,164 | 36,446,969 | 231,244,469 |
| 2014 | 95,926,552 | $5,820,000 | 34,058,163 | 39,878,163 | 135,804,715 | 64,137,648 | 37,208,932 | 237,151,294 |
| 2015 | 96,492,234 | 6,005,000 | 33,767,163 | 39,772,163 | 136,264,396 | 63,722,648 | 37,161,832 | 237,148,875 |
| 2016 | 101,674,084 | 8,880,000 | 33,466,913 | 42,346,913 | 144,020,996 | 54,837,476 | 37,694,029 | 236,552,501 |
| 2017 | 104,620,397 | 6,430,000 | 33,022,913 | 39,452,913 | 144,073,310 | 54,849,434 | 37,629,754 | 236,552,498 |
| 2018 | 101,667,141 | 9,750,000 | 32,701,413 | 42,451,413 | 144,118,554 | 54,844,593 | 37,586,341 | 236,549,487 |
| 2019 | 91,702,804 | 19,930,000 | 32,213,913 | 52,143,913 | 143,846,716 | 55,086,393 | 37,616,725 | 236,549,834 |
| 2020 | 96,886,754 | 13,925,000 | 31,217,413 | 45,142,413 | 142,029,166 | 56,851,451 | 37,669,775 | 236,550,393 |
| 2021 | 90,680,966 | 9,845,000 | 30,521,163 | 40,366,163 | 131,047,129 | 67,749,334 | 37,754,085 | 236,550,548 |
| 2022 | 94,475,229 | 14,860,000 | 30,028,913 | 44,888,913 | 139,364,141 | 59,209,288 | 37,982,135 | 236,555,564 |
| 2023 | 97,041,816 | 22,275,000 | 29,285,913 | 51,560,913 | 148,602,729 | 50,020,056 | 37,929,373 | 236,552,158 |
| 2024 | 90,325,354 | 23,630,000 | 28,172,163 | 51,802,163 | 142,127,516 | 64,568,052 | 29,855,827 | 236,551,396 |
| 2025 | 77,341,391 | 32,240,000 | 26,872,513 | 59,112,513 | 136,453,904 | 70,981,873 | 29,114,345 | 236,550,121 |
| 2026 | 115,518,391 | 13,170,000 | 25,099,313 | 38,269,313 | 153,787,704 | 67,513,431 | 15,250,119 | 236,551,254 |
| 2027 | 119,682,987 | 9,890,000 | 24,407,888 | 34,297,888 | 153,980,875 | 70,397,894 | 12,173,138 | 236,551,906 |
| 2028 | 120,012,256 | 11,010,000 | 23,888,663 | 34,898,663 | 154,910,919 | 69,466,452 | 12,170,428 | 236,547,799 |
| 2029 | 129,264,182 | 2,780,000 | 23,338,163 | 26,118,163 | 155,382,345 | 61,151,536 | 12,164,053 | 228,697,933 |
| 2030 | 88,454,212 | 11,710,000 | 23,199,163 | 34,909,163 | 123,363,375 | 101,017,144 | 12,168,909 | 236,549,428 |
| 2031 | 87,225,526 | 25,225,000 | 22,613,663 | 47,838,663 | 135,064,189 | 100,204,106 | 1,285,125 | 236,553,420 |
| 2032 | 62,180,282 | 69,540,000 | 21,352,413 | 90,892,413 | 153,072,695 | 53,657,143 | 965,875 | 207,695,713 |
| 2033 | 134,912,500 | - | 17,875,413 | 17,875,413 | 152,787,913 | 56,076,800 | 955,688 | 209,820,400 |
| 2034 | - | 1,470,000 | 17,875,413 | 19,345,413 | 19,345,413 | 186,233,275 | 949,938 | 206,528,625 |
| 2035 | - | 1,440,000 | 17,798,238 | 19,238,238 | 19,238,238 | 186,291,150 | 951,750 | 206,481,138 |
| 2036 | - | 1,400,000 | 17,722,638 | 19,122,638 | 19,122,638 | 186,344,000 | - | 205,466,638 |
| 2037 | - | 107,170,000 | 17,649,138 | 124,819,138 | 124,819,138 | - | - | 124,819,138 |
| 2038 | - | 112,755,000 | 12,062,288 | 124,817,288 | 124,817,288 | - | - | 124,817,288 |
| 2039 | - | 118,630,000 | 6,184,275 | 124,814,275 | 124,814,275 | - | - | 124,814,275 |
| Total | $2,210,981,791 | $659,780,000 | $680,926,405 | $1,340,706,405 | $3,551,688,197 | $1,974,416,189 | $576,726,701 | $6,102,831,087 |

[1] Amounts due July 1 are shown as debt service for the preceding Fiscal Year ending June 30 (the amounts actually required to be set aside in that Fiscal Year). For example, debt service payments due July 1, 2012, are shown in the Fiscal Year ending June 30, 2012. All figures are net of capitalized interest.
[2] The interest on the unrefunded portion of the Series 2006(D) Bonds is assumed at 2.73%.
[3] The interest rate on the unrefunded portion of the Series 2001(D-2) Bonds is assumed at 5.01%.
[4] Based on projected drawdown and expenditure of SRF-funded projects.
NOTE: Totals may not add due to rounding.
SOURCE: The Department.

## INTEREST RATE SWAP AGREEMENTS

**General**

In accordance with its Swap Management Plan adopted November 26, 2002, as amended, the City used interest rate swaps as part of prudent fiscal management to limit its interest rate exposure and to lower its overall cost of borrowing. The City was a party to a number of separate interest rate swap agreements that were entered into in conjunction with the issuance of certain variable rate Sewage Disposal System Revenue Bonds, or in anticipation of Sewage Disposal System Revenue Bonds expected to be issued prior to the effective date of the swap. On June 20, 2012, the City terminated all of its outstanding Sewage Disposal System interest rate swaps to eliminate ongoing risks to the Sewage Disposal System. See "PLAN OF FINANCE." The table on the following page provides a brief description of such interest rate swap agreements. See also note 9 in APPENDIX B – "AUDITED FINANCIAL STATEMENTS OF THE SEWAGE DISPOSAL FUND OF THE CITY OF DETROIT, MICHIGAN AS OF AND FOR THE YEAR ENDED JUNE 30, 2011." The City has no other interest rate swaps in effect with respect to the Sewage Disposal System.

Arrangements between the City and the swap counterparty did not alter the City's obligation to pay the principal of and interest on such Sewage Disposal System Revenue Bonds. Net payments received by the City from the swap counterparty under each swap agreement constitute Revenues under the Indenture. The periodic net payments made by the City to the counterparty under each swap agreement, and all termination payments that are payable by the City to the counterparty upon early termination of the swap agreement, constitute Ancillary Obligations of the City under the Indenture. The Bond Ordinance permits the City to secure Ancillary Obligations by a lien on Pledged Assets having the same or a lower priority as the lien securing the related Sewage Disposal System Revenue Bonds. The City secured its Ancillary Obligations under all swap agreements listed in the table on the following page by a lien on Pledged Assets of the same priority as the lien securing the related Sewage Disposal System Revenue Bonds, except for the Ancillary Obligations under the forward hedge swap agreements, which were not secured on a parity with the lien securing the related Sewage Disposal System Revenue Bonds. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Priority of Lien and Payment Status."

Each interest rate swap agreement was subject to termination if one of the parties failed to perform under the terms of the related agreement or if a termination event or an event of default occurred under the related interest rate swap agreement. Among the events of default that could have triggered a termination event was the appointment, pursuant to applicable law, of any body or entity to monitor, review, oversee, make recommendations or to declare a financial emergency with respect to the City. The appointment by the Governor of Michigan (the "Governor") pursuant to Act 4 of the Detroit Review Team and the subsequent execution of the Financial Stability Agreement and the appointment of a Financial Advisory Board (all as defined herein) permitted a counterparty to terminate the related swap under an interest rate swap agreement. None of the counterparties exercised their rights to terminate nor issued a demand for payment with respect to the interest rate swap agreements. The City reached agreement with the counterparties pursuant to which those counterparties agreed not to exercise their rights to terminate the respective swaps prior to the issuance of the Series 2012 Bonds.

Certain of the Underwriters or their affiliates will receive a termination payment from the City as a result of the City terminating its outstanding Sewage Disposal System interest rate swaps.

**City of Detroit**
**Sewage Disposal System Interest Rate Swap Agreements Terminated by the City on June 20, 2012[*]**

| Related Bond Series | Original Notional Amount | Current Notional Amount | Original Termination Date(s) | Termination Payments | Counterparty | Swap Insurer |
|---|---|---|---|---|---|---|
| Series 1998A | $ 69,000,000 | $ 66,800,000 | July 1, 2023 | Senior Lien | JPMorgan Chase Bank | MBIA |
| Series 1998B | 68,955,000 | 66,400,000 | July 1, 2023 | Senior Lien | JPMorgan Chase Bank | MBIA |
| Series 2001C-2 | 127,165,000 | 122,395,000 | July 1, 2029 | Senior Lien | UBS AG | None |
| Series 2001C-2 Mirror Swap | 123,340,000 | 122,395,000 | July 1, 2029 | Senior Lien | UBS AG | None |
| Series 2001D-2 | 72,450,000 | 72,450,000 | July 1, 2032 | Second Lien | Loop Financial Products (Deutsche Bank as CSP) | None |
| Series 2003B | 150,000,000 | 150,000,000 | July 1, 2033 | Senior Lien | UBS AG | FSA |
| Series 2006A | 125,000,000 | 125,000,000 | July 1, 2036 | Second Lien | Loop Financial Products (Deutsche Bank as CSP) | None |
| Series 2006A Mirror Swap | 125,000,000 | 125,000,000 | July 1, 2036 | Second Lien | Loop Financial Products (Deutsche Bank as CSP) | None |
| Series 2006D | 370,000,000 | 359,515,000 | July 1, 2032 | Senior Lien | UBS AG | FSA |
| Sewer Forward Starting SIFMA[1] | 168,750,000 | 168,750,000 | July 1, 2039 | None | Morgan Stanley Capital Services Inc. | None |
| Sewer Forward Starting SIFMA[2] | 56,250,000 | 56,250,000 | July 1, 2039 | None | SBS Financial Products Company, LLC (Merrill Lynch as CSP) | None |

[*] The City has no other interest rate swaps in effect with respect to the Sewage Disposal System.
[1] Forward starting swap that had an effective date of July 2, 2012.
[2] Forward starting swap that had an effective date of July 1, 2012.

# THE DETROIT WATER AND SEWERAGE DEPARTMENT

**General**

The Sewage Disposal System, which provides sewage disposal services to the residents of the City and to a substantial area outside the City, is owned by the City and is accounted for by the City as a separate enterprise fund (the "Sewage Disposal Fund") through the Department. The Department is established under the City Charter and is empowered to supply sewage disposal services within and outside the City. The Sewage Disposal System is accounted for separate and apart from the Water Supply System.

Pursuant to an Order dated February 11, 2011 (the "February 11, 2011 Order") that was followed by an Order dated November 4, 2011 (the "November 4, 2011 Order") issued by the Court in a lawsuit filed by the EPA against the City in 1977, the Department is required to make a number of changes to the manner in which it manages, governs and operates the System, all of which are intended to separate the affairs of the Department from those of the City and to give the Department a greater degree of autonomy than it had previously. See "LITIGATION – Environmental Litigation."

**Court Mandated Changes**

The February 11, 2011 Order required certain changes in the composition of the Board, which have been implemented by the Department. See "The Board" below. The November 4, 2011 Order requires the Department to establish its own divisions of purchasing, human resources, law and finance. Those new divisions will provide services to the Department that, in the past, were provided by the City's departments of Purchasing, Human Resources, Law and Finance. The heads of the Department's new divisions will report to the Director of the Department, not to the directors of the other City departments.

The November 4, 2011 Order sets forth specific hiring and removal procedures for all future Directors of the Department. See "Management and Personnel" below. The November 4, 2011 Order also provides that the Department shall develop its own Department-specific job titles and shall enter into its own collective bargaining agreements with unions that represent its employees instead of being a party to City-wide collective bargaining agreements. The November 4, 2011 Order also struck and enjoined certain provisions in the existing collective bargaining agreements that permit an employee from outside the Department to be transferred into the Department based on seniority and requires that future collective bargaining agreements adopt a seniority system that does not provide for transfer rights across City departments. When the existing collective bargaining agreements expire, the Department is required to have its own collective bargaining agreements that cover Department employees only. See "Employees and Employee Bargaining Units" below.

The November 4, 2011 Order also provides the Department with broader rate setting authority. Under the City Charter, the Board has the authority to establish rates for sewage disposal services. The November 4, 2011 Order requires the By-laws of the Board to be amended to provide for a majority of five votes to approve rates. The City Council, which previously approved all rates, now may vote only on retail rates charged to customers in the City, and will not have the power to vote on rates charged to suburban customers. The By-laws were amended to reflect these changes on January 25, 2012.

Previously, certain contracting and policy-making powers of the Board were subject to approval or rejection by the City Council and approval or veto of the Mayor. The November 4, 2011 Order provides that, notwithstanding anything in the City Charter or state law, the Board shall have the authority to approve legal settlements, claims, collective bargaining agreements, budgets and contracts. The City Council's authority to approve Department contracts is now limited to personal services contracts over

$150,000, goods or commodities contracts over $2,000,000, professional services contracts over $2,000,000 and construction contracts over $5,000,000.

The Department believes that these and other terms of the November 4, 2011 Order will result in greater efficiency in its operations and will enable the Department to perform its tasks in a timely manner. Once the Department has fully complied with the requirements of the November 4, 2011 Order, the Department will request that the Court grant a motion to dismiss the EPA lawsuit based on substantial compliance with the November 4, 2011 Order and any subsequent amendments. See "LITIGATION – Environmental Litigation" and APPENDIX E – "ORDER DATED NOVEMBER 4, 2011, UNITED STATES V. CITY OF DETROIT, CASE NO. 77-71100, E.D. MICHIGAN."

**Application of Financial Stability Agreement to the Department**

On April 4, 2012, the City entered into a consent agreement with the State (the "Financial Stability Agreement"), under which a board has been appointed to oversee the City's finances. For a summary of the Financial Stability Agreement, see APPENDIX F – "SUMMARY OF THE FINANCIAL STABILITY AGREEMENT." The November 4, 2011 Order of the Court requires the Department to take steps to achieve autonomy from the affairs of the City, including legal and financial affairs. If there is a direct conflict between the terms of the Financial Stability Agreement and the November 4, 2011 Order, the Department believes the November 4, 2011 Order provisions govern the Department. As to areas that were not directly addressed by the Court in the November 4, 2011 Order, but which are specifically addressed by the Financial Stability Agreement, the Department has assumed that the provisions of the Financial Stability Agreement are applicable to the Department until the Court provides guidance on this issue. The Department has sought guidance from the Court in the Director's Compliance Report submitted to the Court on May 4, 2012 (the "Director's Compliance Report"), but the Court had not clarified this issue as of the date of this Official Statement.

**Implementation Status of the November 4, 2011 Order**

As reported in the Director's Compliance Report, the Department has made significant progress in implementing the November 4, 2011 Order and is moving toward a self-sustaining model of operations. The Department is undertaking the structural and management changes required by the November 4, 2011 Order, and has created and filled two new positions, the Chief Operating Officer/Chief Compliance Officer and the Director of Security/Integrity Officer. The Department has created a position of Corporate Counsel and is in the process of filling that position. The Department has hired seven new human resources employees who will assist in separating the Department's human resource functions from those of the City. In addition, the Department has engaged EMA, Inc. ("EMA"), a consulting firm that is conducting an organizational assessment that will detail recommended changes to the organizational structure of the Department.

The Department also has made strides in improving its ability to acquire goods and services needed to maintain permit compliance and is undertaking the required actions to negotiate new collective bargaining agreements with its employees. To fully implement the November 4, 2011 Order and create independent procurement, finance and human resource divisions, additional clarity is needed regarding the necessity of review of purchase contracts by the City's Finance Department, the relationship between the Department and the Civil Service Commission as it relates to non-union employees, as well as the ability of the Department to hold its own funds. In addition, although the Department believes the Court's intent was to vest the authority to approve bond issues related to the capital needs of the Department with the Board, the Financial Stability Agreement provides that the approval of the Financial Advisory Board is required for any proposed changes to the City's debt structure or the issuance of new debt after July 20, 2012. Since the November 4, 2011 Order does not address this specific issue, it is not

clear whether and to what extent such provisions of the Financial Stability Agreement may be applicable to the Department. The Department has sought clarifications from the Court regarding these and several other issues raised in the Director's Compliance Report. For a discussion of the Financial Stability Agreement, see "SPECIAL INVESTOR CONSIDERATIONS CONCERNING BANKRUPTCY RISKS."

## The Board

Organizational Changes. Pursuant to the February 11, 2011 Order, the composition of the Board was changed to require three Board members to be representatives of the service area appointed by the Mayor pursuant to a nomination by the Wayne County Executive, the Oakland County Water Resources Commissioner and the Macomb County Public Works Commissioner. The February 11, 2011 Order also mandated certain minimum professional qualifications for each Board member and transformed the Board from a purely volunteer board to one that is compensated and more like a private sector utility.

In order to more efficiently oversee the Department's operations, the Board has adopted a committee structure for the first time in its history. Four committees were established: (i) Operations, Regulatory Compliance and Procurement; (ii) Management Development and Human Resources; (iii) Financial Management and Audit; and (iv) Legal.

In addition to these operational improvements, the Board has focused on integrity in order to set a tone throughout the organization. Within that framework, at the end of 2011, the Board initiated a series of vendor integrity hearings to assess the level and quality of work and to determine the level of culpability of vendors named in the federal indictment in *United States v. Kilpatrick, et al.,* E.D. Mich. Case No. 10-CR-20403.

In addition to his other Board duties, the Chairman of the Board also serves as a member of a committee created to assist the Court in monitoring the Department's efforts to achieve substantial compliance with the Court's orders.

Board Composition. The seven-member Board is appointed by the Mayor and composed of four residents of the City and three representatives of the service area, who are nominated by the Wayne County Executive, the Oakland County Water Resources Commissioner and the Macomb County Public Works Commissioner, respectively. The members serve four-year terms which are staggered so that not more than two members' terms expire each year. Each Board member must be a citizen of the United States and a resident of Michigan and meet certain professional experience qualifications. The Board members are compensated by the Department. The current members of the Board and the year of their original appointment to the Board are as follows:

*James Fausone, Chair (2011)*. Mr. Fausone is a resident of Canton Township. He is a partner in the law firm of Fausone Bohn LLP, of Northville, where he practices business law, municipal law, veterans disability law and environmental law. He previously served as president of an environmental remediation, industrial service, and waste transportation company for three years. Mr. Fausone holds a Bachelor of Science in environmental engineering and a Bachelor of Science in oceanography from the University of Michigan and a Juris Doctor degree from Gonzaga University Law School. He has served as a trustee of Schoolcraft College, Livonia, MI and Canton Public Library. He is a Director of the University of Michigan, College of Engineering – Civil and Environmental Engineering Board, and the Livonia Chamber of Commerce, among other affiliations.

*James F. Thrower, Vice Chair (2010)*. Mr. Thrower is president and CEO of Jamjomar Inc. and the owner of seven McDonald restaurants in Detroit and the surrounding metropolitan area. Following a

career as a defensive back for the Detroit Lions and Philadelphia Eagles, he served as loan executive and executive assistant to the board chairman of the National Association for the Advancement of Colored People ("NAACP"), regional manager of public issues and planning at Michigan Consolidated Gas, and director of community affairs at Stroh's Brewery. Mr. Thrower is affiliated with several corporate and community groups that include the McDonald's Operators National Advertising Committee, National Black McDonalds Operations Association, Ronald McDonald Children's Charities, National Football League Alumni Players Association, NAACP Golden Heritage, and the Omega Psi Phi fraternity. He holds a Bachelor of Arts in English and physical education from East Texas University.

*Mary E. Blackmon (1989).* Mrs. Blackmon is the immediate past President of the Board. She is a retiree of Ameritech, where she served as a director of public relations and associate director of urban and civic affairs. She is a current member of the Wayne County Regional Educational Service Agency Board of Education, where she has served since 1982. Mrs. Blackmon also served for 10 years as a member of the Detroit Board of Education. She has served on several committees for the Southeast Michigan Council of Governments, where she is a vice president and is a graduate of Leadership Detroit. Mrs. Blackmon is active in a number of civic and community organizations.

*Fred Barnes (2011).* Mr. Barnes is a registered professional engineer from Sterling Heights. He owns and operates Fred W. Barnes Associates Inc., a consulting engineering firm. Before starting his company, Mr. Barnes was a senior project engineer with Atwell-Hicks Inc., where he managed engineering projects and supervised engineers, planners, and designers. Mr. Barnes, a former Chief engineer for the Office of the Macomb County Public Works Commissioner, he was involved with the design, operation and maintenance of more than 700 county drains, supervision of two CSO facilities, as well as the review of residential and commercial developments for 24 years. He holds a Bachelor of Science in engineering from the U.S. Military Academy at West Point.

*Linda Forte (2011).* Ms. Forte, a senior vice president at Comerica Inc., brings more than 30 years of business, finance, and commercial banking expertise to the board. A member of Comerica's senior leadership team, she is responsible for defining and driving business strategies that establish Comerica as a leader in diversity and corporate responsibility practices. Ms. Forte holds a Bachelor of Science in education psychology and French from Bowling Green State University and a Master of Business Administration in finance and accounting from the University of Michigan. She serves as a director of the Economic Development Corporation of the City of Detroit and serves on a number of other agency and organization boards as well.

*Bradley Kenoyer (2011).* Mr. Kenoyer brings more than a decade of cross-functional problem-solving experience in delivering customer-driven results to technical and service quality issues for Ford Motor. An honoree of the Ford/Massachusetts Institute of Technology/University of Detroit Mercy program for engineering excellence, Mr. Kenoyer holds a Bachelor of Science in mechanical engineering from Rensselaer Polytechnic Institute and a Master of Science in product development from the University of Detroit Mercy. He has served on the Board of Directors of Preservation Wayne and has volunteered at the Ruth Ellis Center, which provides residential safe space and support services for runway, homeless and at risk youth in Detroit and Southeastern Michigan.

*J. Bryan Williams (2011).* Mr. Williams is an attorney with the Dickinson Wright law firm. Mr. Williams, a resident of Birmingham, practices in the areas of corporate and municipal law. He has served as counsel to the Oakland County Water Resources Commissioner on municipal bond financings, and has significant experience providing counsel to both privately and publicly-held companies. He holds a Bachelor of Arts in economics from the University of Notre Dame and a Juris Doctor degree from the University of Michigan. He is a member of the City of Birmingham Planning Board, and a past member

of the Board of Directors of the Economic Club of Detroit. He is also a past vice chairman of the Detroit Regional Chamber of Commerce.

**Management and Personnel**

The Department's budget for Fiscal Year 2012 provides funding for 2,767 positions, of which 951 positions are classified as strictly Sewage Disposal System and 206 positions are classified as strictly Water Supply System. The remaining 1,606 positions are budgeted in the administrative and support divisions, which provide service to the Sewage Disposal System and the Water Supply Systems. The cost associated with these positions is allocated to the two systems either on the basis of actual time spent on projects or on estimates developed by the Department. The Department estimates that approximately 40% to 50% of the time allocation of the work force in these areas is attributable to the Sewage Disposal System.

The Department's budget for Fiscal Year 2013 reflects steps taken to control operational expenses and identify efficiencies within operations. The Department's approved FTE count for Fiscal Year 2013 reflects a decrease of 525 positions compared to Fiscal Year 2012, including a decrease in the Sewage Disposal System's budgeted positions of 259 positions.

Additional organizational changes will be made after the Department completes its organizational assessment, which is being conducted by the Department with the assistance of EMA. During its on-going 90 day assessment, EMA will interview staff within all levels of the Department and benchmark operations against best-in-class utilities worldwide. In doing this, EMA also will make recommendations for position reclassifications for the Department's workforce and a revised organizational structure. Based on prior experience with other clients, EMA expects to identify areas for improvement that can generate significant savings in the Department's current Operations and Maintenance budget over time.

The Department is currently organized into several operating groups, each headed by an Assistant Director or a Division Manager. Together with the Director and Deputy Director, the heads of the operating groups serve as the Executive Management Team responsible for day-to-day operations of the Department.

The current Director and Deputy Director were appointed by the Board, with the approval of the Mayor, to serve at the pleasure of the Board. The November 4, 2011 Order requires that, in connection with hiring a future Director, a Director search committee be established consisting of a representative from the Mayor's office, a member of the Board who is not a City resident and a member of the City Council appointed by the President of the City Council. The November 4, 2011 Order further establishes that the removal of a Director requires the votes of five Board members or two-thirds of the City Council and the approval of the Mayor. See APPENDIX E – "ORDER DATED NOVEMBER 4, 2011, UNITED STATES V. CITY OF DETROIT, CASE NO. 77-71100, E.D. MICHIGAN." Pursuant to an order dated March 27, 2012, the Court required the Department to create and fill a new position of Chief Operating Officer/Chief Compliance Officer. The Department has filled this position, as noted below.

The Department's key personnel and their qualifications are summarized below.

*Sue McCormick, Director.* Ms. McCormick was appointed by the Board as the Director of the Department on November 17, 2011, and assumed that position on January 3, 2012. Prior to joining the Department, Ms. McCormick was the Public Services Area Administrator for the City of Ann Arbor, Michigan, where she managed that city's entire physical infrastructure, including the water and sewer system. She joined Ann Arbor city government as Water Utilities Director in January 2001. Prior to that, she was employed for 22 years by the Lansing Board of Water and Light, serving as environmental

chemist, environmental laboratory manager, manager of water and steam planning, water technical support manager and business development manager. Ms. McCormick holds a Bachelor of Science in biological science from Lyman Briggs College at Michigan State University. Ms. McCormick is active in the 58,000-member American Water Works Association ("AWWA"), a prominent international organization for water industry professionals. She has served as AWWA-Michigan Director and as an association Vice President.

*Matthew Schenk, Chief Operating Officer/Chief Compliance Officer*. Mr. Schenk was named Chief Operating Officer/Chief Compliance Officer on March 27, 2012, after having served in various roles within Wayne County government, including as Chief of Staff to the County Executive, Assistant County Executive, and Principal Attorney supervising the Municipal Law section of the County's Law Department. Before coming to Wayne County, he worked for the City of Detroit for seven years within both the legislative and executive branches of government, including as Legislative Assistant Corporation Counsel in the Law Department. Mr. Schenk holds a Bachelor of Arts with Honors in Latin American and Caribbean Studies and a Bachelor of Arts with Honors in Residential College Social Sciences, with a focus on U.S. culture and politics and a minor in Economics from the University of Michigan, and a juris doctor degree from Wayne State University.

*Darryl A. Latimer, Deputy Director*. Mr. Latimer was named Deputy Director on February 15, 2010, after having served as Contracts and Grants General Manager since March 2003. Previously, he was the Head Governmental Analyst in Contracts and Grants, leading the Consultant and Local Economic Development Units. Mr. Latimer has been with the Department since 1989, and with the City of Detroit since 1985. Mr. Latimer holds a Bachelor of Science in general studies from Wayne State University and a Master of Science in general business administration from Central Michigan University.

*Samuel A. Smalley, Assistant Director – Wastewater Operations*. Mr. Smalley was named to his current position in October 2010. He joined the Department in June 2007 after serving two years as a customer representative in the Department's customer outreach program. Since May 2008, he has served as the Assistant Director of Asset Maintenance, where he was responsible for maintaining and upgrading the physical assets including infrastructure, facilities, and equipment. Mr. Smalley is a registered professional engineer in California and Michigan, and has over 20 years of experience in the water and wastewater industry. He obtained a Bachelor of Science in civil engineering from San Diego State University, and holds both an F-1 Water Treatment Plant Operator license and an S-1 Water Distribution System Operator license.

*James George, Assistant Director - Financial Services*. Mr. George was appointed to the position of Assistant Director – Financial Services Group in January 2011. He has 23 years of experience in the areas of budgeting, accounting, cash management, contract management, and information systems. Prior to joining the Detroit Water and Sewerage Department, Mr. George served as a Wayne County appointee, with the title of Assistant Director of Management and Budget Department's Assistant Director for five years. From 1987 to 2005, Mr. George worked for the City in various capacities, including Assistant Director – Financial Services and Financial Manager for DWSD. He holds a Bachelor of Arts in accounting from Kerala University, India, and a Masters of Commerce in accounting from Himachel Pradesh University, India.

*Cheryl Dee Porter, Assistant Director - Water Supply Operations*. Ms. Porter was named Assistant Director in September 2008 and has been employed by the Department since March 1996. She holds a Bachelor of Science in chemistry from the University of Michigan, a Juris Doctor degree from the University of Detroit Mercy School of Law and a Masters of Business Administration with a concentration in human resources management from the Madonna University. She began her career with the Department as a junior chemist and has worked her way through the ranks at each level of the

organization. Ms. Porter holds her F1 license for Water Treatment with the State of Michigan. Prior to joining the Department, Ms. Porter was an Analytical Chemist for Blue Planet Technologies, and, earlier, a Research Assistant for the University of Michigan Department of Chemistry. Ms. Porter also participates in various community service activities, having served on the Board of Directors for Intense Mentoring, Inc., a local non-profit committed to attacking poverty through education, and mentoring young people throughout Southeastern Detroit.

*Pa Dada, Assistant Director for Information Technology & Systems Integration & Operations*. Ms. Dada was named Assistant Director in July 2007. Prior to her position, she served as General Manager of the Process Networks and SCADA Systems Division. Prior to joining the department in September 2006, Ms. Dada worked with consulting firms and the automotive industries. Ms. Dada has over 15 years experience in process controls and instrumentation. Ms. Dada holds a Bachelor of Science in electrical engineering with a minor in computer science from the General Motors Institute of Engineering and Management.

*Rodney Johnson, Assistant Director for Commercial Operations and Public Affairs*. Mr. Johnson was named Assistant Director in December 2010. Previously, he was the Meter Operations Manager, where he presided over the Detroit system's conversion to Automated Meter Reading (AMR). He currently holds an S-1 Water Distribution System Operator license with the State of Michigan. Mr. Johnson started working for the City at the Detroit Zoo in 1977 as a Public Service Attendant. He joined the Department in 1981 as a Repair Mechanic and has advanced in position over the years. He holds a Bachelor of Science in management information systems from Wayne State University and a Master of Business Administration from the University of Phoenix. Mr. Johnson is a member of the Department's regional Technical Advisory Committee and the Committee's Analytical Work Group.

Most of the Department's key personnel have considerable managerial experience, either with the Department or with other municipal agencies or large utility systems. Most of the Assistant Directors have significant experience with the Department, each having advanced through the ranks of the Department to his or her present position. The experience and qualifications of the Department's executive staff are commensurate with their duties and responsibilities.

**Management Initiatives**

The Department is working on a number of initiatives designed to enhance and ensure sustainable service levels. The initiatives that have been given the greatest priority by the Department are described below.

The Department is setting up a new governance structure designed to create an operational model that is separate from the City, as required by the November 4, 2011 Order. See "Court Mandated Changes" above. The Department has made progress in this regard, including creating and filling certain new positions and undertaking the required actions to negotiate new collective bargaining agreements with its employees. See "Implementation Status of November 4, 2011 Order" above.

The Department also has engaged a consultant to perform an operational assessment that could result in significant cost savings in the Department's Operations & Maintenance budget. The optimization assessment will compare the Department to world class utility providers and identify effectiveness gaps, provide a calculation of the competitive opportunity gap, identify barriers to achieving that gap and provide a business case and work plan to close the gap. These outcomes of the operational assessment are key components of moving the Department along a strategic course to achieve and maintain compliance with the November 4, 2011 Order and the Clean Water Act while assuring an

31

effective and competitive operation of the Sewage Disposal System.  See "Implementation Status of November 4, 2011 Order" above.

The Department also is in the process of identifying, evaluating and implementing a long-term bio-solids disposal solution that will provide the Plant with sufficient capacity and flexibility to manage solids over the next 20 years in a cost effective and environmentally appropriate manner. The identification of these technologies and the implementation of the recommended strategies is critical to the Department achieving and maintaining compliance with the Clean Water Act.

In addition, the Department has launched a program to replace all retail billing meters in the System and install automatic meter reading devices.  This program is designed to provide more accurate, timely water use information in an efficient manner.  To date, the Department has converted nearly all of the large, commercial and industrial accounts and approximately 75 percent of the residential accounts to automatic meter reading devices.  For more information regarding these initiatives, see APPENDIX A – "FEASIBILITY REPORT."

**Employees and Employee Bargaining Units**

The total number of authorized positions for the Department for Fiscal Year 2012 was 2,767, consisting of 1,050 positions for the Sewage Disposal System and 1,717 for the Water Supply System. As of May 1, 2012, the Department had 2,030 full time equivalent employees, of which approximately 1,863 were represented by the following 20 unions:

- Association of Detroit Engineers, representing 91 employees;

- American Federation of State, County and Municipal Employees ("AFSCME"), Locals 207, 2394 and 2920 representing 1,193 employees;

- Association of Municipal Engineers, representing 25 members;

- Association of Professional Construction Inspectors, representing 31 members;

- Association of Professional and Technical Employees ("APTE"), representing 30 members;

- Building and Construction Trades Council, representing 135 members;

- Building and Construction Trades Foreman, representing 5 members;

- International Union of Operating Engineers, three Locals representing 30 members;

- Senior Accountants, Analysts, and Appraisers Association, representing 75 members;

- Senior Water Systems Chemists Association, representing 41 members;

- Teamsters, representing 36 members;

- International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Locals 2200 and 2334, representing 110 members; and

- Utility Workers of America, Locals 488, 504 and 531, representing 61 members.

Collective bargaining agreements currently are in place for all Department bargaining units, except for APTE, whose agreement expired on May 25, 2012.  The rest of the agreements expire in June or September of 2012.  The November 4, 2011 Order struck and enjoined certain provisions in the existing collective bargaining agreements that permit an employee from outside the Department to be transferred into the Department based on seniority and requires that future collective bargaining agreements adopt a seniority system that does not provide for transfer rights across City departments.  See

"THE DETROIT WATER AND SEWERAGE DEPARTMENT – Organization," "LITIGATION – Environmental Litigation" and APPENDIX E – "ORDER DATED NOVEMBER 4, 2011, UNITED STATES V. CITY OF DETROIT, CASE NO. 77-71100, E.D. MICHIGAN." In addition, the November 4, 2011 Order requires the Department to have in place its own collective bargaining agreements for its employees by the time the existing collective bargaining agreements expire. The Department expects to meet this deadline. The Department has no knowledge of any planned interruption of service from the unionized work force.

## SPECIAL INVESTOR CONSIDERATIONS CONCERNING BANKRUPTCY RISKS

**General**

The rights of the holders of the Series 2012 Bonds and the enforceability of the City's obligation to make payments on the Series 2012 Bonds may be subject to bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights under existing law or under laws enacted in the future.

The City has been experiencing financial challenges in recent years due, in part, to population declines, high unemployment, decreased property values, the financial challenges of the automotive and related industries, the disruptions in the financial markets and the overall economic issues faced by the country. It is the City's intent to arrange its affairs and manage its budget in a manner that will eliminate its current deficit and provide for future balanced financial operations. If, however, the City is unable to successfully implement its efforts, its financial status could deteriorate further and its options to improve its fiscal health may be limited.

The City is a "municipality" as defined under section 101(40) of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). Pursuant to section 109(c) of the Bankruptcy Code, the City can only become a debtor under Chapter 9 of the Bankruptcy Code if, among other things, it is expressly authorized to do so under the laws of the State of Michigan. Under the Bankruptcy Code, creditors are not permitted to commence an involuntary petition against the City. Under Michigan law, the City may voluntarily commence a case under Chapter 9 of the Bankruptcy Code pursuant to the procedures under Public Act 4 of 2011, the Local Government and School District Financial Accountability Act ("Act 4"), discussed below. Under Act 4, the City may file a petition seeking to become a debtor under Chapter 9 of the Bankruptcy Code only if such petition is authorized by the Governor based upon a recommendation by an emergency manager (an "Emergency Manager").

**Act 4**

Act 4 was enacted to assist any Michigan unit of local government in a fiscal emergency to remedy the emergency situation through the implementation of prudent fiscal management. Act 4 replaced the former Act 72, Public Acts of Michigan, 1990, under which emergency financial managers were appointed to oversee the financial operations of a distressed local unit of government. Among the changes made in Act 4, the receiver's title was changed from "emergency financial manager" to "emergency manager" to reflect the broader scope of the receiver's responsibilities under Act 4 to manage and oversee local operations in addition to purely financial matters.

Act 4 imposes a series of prerequisites, including permission of the Governor, before a local unit of government may file for bankruptcy. The State must first conduct a preliminary review of the local unit's financial condition. If a preliminary review of a unit of local government results in a finding of probable financial stress, the Governor must then appoint a review team to conduct a more detailed

review of the financial condition of the unit of local government.  A review team would have full authority to do any of the following:

- Examine the books and records of the unit of local government.

- Utilize the services of other State agencies and employees.

- Negotiate and sign a consent agreement with the chief administrative officer of the unit of local government.

Within 10 days of receiving the report of the review team, the Governor must make one of the following determinations:

- The unit of local government is not in a condition of severe financial stress.

- The unit of local government is in a condition of severe financial stress, but a consent agreement containing a plan to resolve the financial stress has been adopted.

- The unit of local government entered into a consent agreement containing a continuing operations plan or a recovery plan to resolve a financial problem, but materially breached the consent agreement.

- The unit of local government is in a condition of severe financial stress and the unit of government has not entered into a consent agreement, in which case the Governor may declare the unit of local government to be in a non-judicial receivership and appoint an Emergency Manager to oversee operations of the local government unit.

If the Governor concludes that a financial emergency exists, the Governor must provide written notification to the chief administrative officer of the local government unit, who may request a hearing within 10 days after receiving the notice.  After the hearing (or, if no hearing is requested, after the expiration of the 10-day period), the Governor must either confirm or revoke the determination of the existence of a financial emergency.  The local governmental unit may appeal the determination of the existence of a financial emergency within 10 business days of the Governor's confirmation of such determination.  If the Governor confirms the determination, the responsibility for managing the financial emergency is assigned to the Emergency Manager.

### Application of Act 4 to the City

In early December 2011, Governor Rick Snyder directed State Treasurer Andy Dillon (the "Treasurer") to conduct a preliminary review of the City's finances pursuant to Act 4.  On December 21, 2011, the Treasurer, after completing his preliminary review, issued a report in which he made a determination that the City was in a state of "probable financial stress" under Act 4 based on a number of factors set forth in the Treasurer's report.  To comply with Act 4, based on the finding of "probable financial stress," on December 27, 2011, the Governor appointed a 10-member financial review team (the "Detroit Review Team") to undertake a more extensive financial management review of the City.  On March 26, 2012, the Detroit Review Team completed its review and declared the City to be in the state of severe financial stress and recommended that the State and the City negotiate a consent agreement.

On April 4, 2012, the City entered into a consent agreement, herein referred to as the Financial Stability Agreement, under which a nine-member financial advisory board (the "Financial Advisory Board") was appointed to oversee the City's finances.  The Financial Advisory Board members are jointly appointed by the City and the State.

34

In a May 11, 2012, letter, the Corporation Counsel of the City notified the Governor that, because the State owed certain debts to the City prior to the time that the Council adopted its resolution approving the Financial Stability Agreement and the Mayor and the members of the Detroit Review Team executed that agreement, the Financial Stability Agreement is void and unenforceable as a matter of law. The Corporation Counsel cited the Michigan Home Rule City Act, MCL 117.5(1)(f) and Section 2-113 of the 2012 Detroit City Charter as prohibiting the City from entering into contracts with "one who is in default to the City." The Corporation Counsel cited a water bill in the amount of approximately $4.5 million owed by the State to the City, certain revenue sharing moneys in the amount of $224 million owed by the State to the City and possible other debts. In a letter from the Treasurer to the City dated May 16, 2012, the State disputed that it owes such amounts to the City.

On June 1, 2012, Corporation Counsel of the City filed a lawsuit challenging the validity of the Financial Stability Agreement. On June 7, 2012, the State sent a letter to the City stating that this lawsuit brings into question all existing contracts between the City and the State, including an agreement between the City and the State that secures a recent $80 million interim bond financing, which was expected to be refunded by June 27, 2012, the mandatory tender date for the $80 million bond issue. The State warned that, as long as this lawsuit was pending, the refunding could not move forward and therefore, beginning on June 27, 2012, the trustee would be required to withhold the City's revenue sharing payments and apply them to the repayment of the $80 million bond issue until it is paid in full. After receiving this letter, City officials stated that, if the lawsuit was not withdrawn, the City would be unable to make payments related to the City's Pension Obligation Certificates of Participation due on June 15, 2012, and would not have sufficient funds to make payroll. On June 13, 2012, an Ingham County Circuit Court judge dismissed the Corporation Counsel's lawsuit. At this time it is not clear whether Corporation Counsel will appeal that decision. On June 15, 2012, the City made the payments related to its Pension Obligation Certificates of Participation and made payroll. In addition, the Financial Advisory Board held its inaugural meeting on June 15, 2012. In light of the dismissal of the Corporation Counsel's lawsuit, the State and the City are working to address the refunding of the $80 million interim financing.

Absent suspension of Act 4, in the event of a material uncured breach of the Financial Stability Agreement, the Treasurer is authorized under Act 4 to place the City in receivership and recommend that the Governor appoint an Emergency Manager.

Neither the existence of the Financial Stability Agreement nor an appointment of an Emergency Manager would affect the payment of debt service on the Series 2012 Bonds. Under section 18(1) of Act 4, an Emergency Manager is required to develop a financial and operating plan for the City that includes, among other things, a provision for the payment in full of all scheduled debt service requirements on all bonds, notes and municipal securities of the local unit. The treatment of the Pledged Assets in the event that the City was to file a petition for relief under Chapter 9 of the Bankruptcy Code, is discussed below under the caption "Treatment of Pledged Assets after a Bankruptcy Filing."

Act 4 is currently the subject of a citizen effort to invoke a State-wide referendum seeking a veto of the legislation. A number of signed petitions required to invoke the referendum were submitted to the State in February 2012. On April 26, 2012, the Board of State Canvassers split 2-2 on whether to certify the proposed petition and, as a result, the petition was not validated and a referendum was not invoked. On June 8, 2012, the Court of Appeals ordered the Board of State Canvassers to put the issue on the November 6, 2012 ballot, but stayed their decision seeking the opinion of the entire appellate bench on whether the Court should have taken a different view. On June 14, 2012, the full panel of the Court of Appeals declined to convene a special panel to rule on this issue, and as a result, the Court's order directing the Board of State Canvassers to certify the petition and put the issue on the November 6, 2012 ballot stands. Once the Board of State Canvassers certifies the petition, Act 4 will be suspended until the referendum process is concluded. The citizen group opposing the ballot initiative indicated it would

appeal the Court of Appeals order to the Michigan Supreme Court. If an appeal is filed, the Court of Appeals decision could be stayed until the appeal process is concluded. A stay would delay the certification of the petition and the suspension of Act 4 until the stay was lifted.

The constitutionality of Act 4 also is being challenged in a proceeding commenced on June 22, 2011, in the Circuit Court for the County of Ingham, State of Michigan (*Elizabeth Brown et al. v Richard D. Snyder, as Governor of the State of Michigan, and Andrew Dillon, as the Treasurer of the State of Michigan*, Case No. 11-00685-CZ). On November 16, 2011, the Court denied defendants' motion for a stay of the proceedings, which the defendants have appealed. The appeal of the Court's denial of the motion for a stay of proceedings is pending before the Michigan Court of Appeals under Case No. 307291. To date, no decision has been rendered with respect to the appeal, and the City is unable to predict the outcome of the litigation.

On August 12, 2011, the Governor filed an Executive Message with the Michigan Supreme Court requesting immediate review of the question of the Constitutionality of Act 4 under Michigan Court Rule Section 7.305A, which allows a lower court to certify a question to the Supreme Court if the action or proceeding involves a controlling question of public law, and the question is of such public moment as to require early determination. The Supreme Court has not ruled on whether it will grant the expedited review requested by the Governor.

If Act 4 is suspended under the referendum or if it is held to violate the Constitution, a question arises as to the effect such suspension or repeal has upon the predecessor statute, Act 72, which was repealed by Act 4. While the question is not free from doubt, it would appear that the suspension or repeal of Act 4 would result in the reinstatement of Act 72. However, this should not increase the risks of a potential bankruptcy filing by an Emergency Financial Manager under Act 72. While the two statutes have differing provisions, as a practical matter, the powers of the Emergency Manager under Act 4 and the Emergency Financial Manager under Act 72 to file a Chapter 9 bankruptcy petition for the City are similarly circumscribed and controlled ultimately by the State.

In the event that the suspension or repeal of Act 4 is not deemed to reinstate Act 72, the risk of a local government unit filing for bankruptcy is not heightened and may be diminished because, subject to further legislative action, there would be no State statute under which a local government unit could be authorized to file a Chapter 9 bankruptcy.

A default by the City on its other debt or contractual obligations, including the City's Pension Obligation Certificates of Participation, will not cause an event of default or a cross-default under the Bond Ordinance.

**Treatment of Pledged Assets after a City Bankruptcy Filing**

As an initial matter, it is important to note that there have been only a small number of cities that have sought protection under Chapter 9 of the Bankruptcy Code since its inception -- and none in Michigan. Thus, there is limited case law and empirical data regarding the potential array and likely effects on the treatment of bond debt issued under Michigan's bond statutes in a Chapter 9 bankruptcy.

Bond Counsel has opined that the Act expressly creates, and the Authorizing Documents expressly recognize, a statutory first lien in and to the Pledged Assets in favor of the Bondholders for the payment of obligations owed to the Bondholders. Therefore, Pledged Assets received by the City pre-petition (*i.e.,* prior to the filing of a petition for relief under Chapter 9 of the Bankruptcy Code) are subject to the statutory lien created by the Act. While the Bankruptcy Code, in certain instances, prevents holders of <u>consensual</u> liens from claiming as collateral any property acquired by a debtor post-petition (*i.e.*, after

the bankruptcy petition is filed), statutory liens are not so affected under the Bankruptcy Code. Therefore, although the question is not free from doubt due to the limited authoritative case law on the subject, Bond Counsel has opined that, in a case properly decided, any Pledged Assets received by the City post-petition would remain subject to the statutory first lien created under the Act in favor of the Bondholders.

Pursuant to section 362(a) of the Bankruptcy Code, the filing of a bankruptcy petition creates an "automatic stay" that enjoins litigation against the debtor and its property and other efforts by creditors to enforce their claims, pending further order of the bankruptcy court. However, if the Pledged Assets are determined to constitute "special revenues," then section 922(d) of the Bankruptcy Code is implicated, which indicates that the automatic stay does not operate as a stay of the application of pledged special revenues to payment of indebtedness secured by the special revenues. "Special revenues" are defined under Section 902(2) of the Bankruptcy Code to include receipts from the ownership, operation, or disposition of projects or systems that are primarily used to provide transportation, utility, or other services, as well as other revenues or receipts derived from particular functions of the debtor. Accordingly, Bond Counsel has opined that, although the question is not entirely free from doubt, if the City were to become a debtor under Chapter 9 of the Bankruptcy Code, a court having jurisdiction over the case would hold that the Pledged Assets constitute "special revenues" under Bankruptcy Code section 902(2)(A), representing receipts derived directly and/or indirectly from the ownership and operation of the Sewage Disposal System and that, therefore, the payment of the Bonds from the Pledged Assets would continue post-petition unabated in accordance with the terms of the Bonds and the Authorizing Documents.

Section 928(a) of the Bankruptcy Code also provides that a consensual lien in special revenues continues in force with respect to any such special revenues received by a debtor post-petition. Whether a consensual lien in the Pledged Assets exists is an open issue. The Indenture appears to create a consensual lien. However, a writing that merely tracks a statutory grant of a lien does not necessarily create a consensual lien, and it is unclear under Michigan's Uniform Commercial Code whether a consensual lien can be created when there is a statutory scheme that creates a lien. Bond Counsel does not express an opinion on this subject. However, to the extent a consensual lien in the Pledged Assets exists in favor of the Bondholders (and assuming the Pledged Assets constitute special revenues, as discussed above), section 928(a) of the Bankruptcy Code provides further support that the lien or liens of the Bondholders extend to post-petition Pledged Assets.

Section 928(b) of the Bankruptcy Code provides that any consensual lien in special revenues is subject to the payment of necessary operation and maintenance expenses of the project or system. However, this result is no different than would arise if there were only a statutory lien under the Act, since the Authorizing Documents clearly countenance the payment of operation and maintenance expenses out of revenues from the Sewage Disposal System before such revenues become Pledged Assets.

If the Pledged Assets are deemed special revenues, Section 927 of the Bankruptcy Code is also implicated, which provides that holders of claims payable solely from special revenues under applicable non-bankruptcy law shall not have recourse against the debtor on account of such claims. Accordingly, just as is the situation outside of a bankruptcy, the Bondholders must look solely to the Pledged Assets to satisfy their claims. Bondholders cannot assert claims as general unsecured creditors in the City's bankruptcy case in the event that the Pledged Assets are insufficient to satisfy their claims.

If the Pledged Assets are deemed to not be special revenues, then any consensual lien created by the Indenture will not reach post-petition Pledged Assets, but such Pledged Assets would remain subject to the statutory lien of the Bondholders arising under the Act. Moreover, even though the exception to the

37

application of the automatic stay under Section 922(d) of the Bankruptcy Code only applies to special revenues, as secured creditors, in the event that the City did not immediately remit Pledged Assets in accordance with the Authorizing Documents, the Bondholders would nonetheless be entitled to "adequate protection" of their security interest against a decrease in the value of the collateral or any proposed use of or priming lien on the collateral. Such adequate protection may take the form of (among other things) periodic cash payments, additional liens, or such other relief as will result in the realization of the "indubitable equivalent" of the Bondholders' interest in the Pledged Assets.

Under a Chapter 9 plan of adjustment, if the Pledged Assets are deemed property of the estate subject to an enforceable statutory or consensual lien, the City may seek to modify its payment obligations under the Bonds pursuant to and upon confirmation of a Chapter 9 plan of debt adjustment and emergence from bankruptcy. However, in the analogous Chapter 11 arena, there are significant restrictions under existing case law regarding the extent to which such obligations may be modified. Moreover, if the Bondholders, as a class, vote to reject the plan, the plan cannot be approved and confirmed by the bankruptcy court unless it complies with, *inter alia,* sections 1129(b)(1) and (2)(A) of the Bankruptcy Code, which require, among other things, that any plan be "fair and equitable." With respect to the Bondholders, as holders of secured claims in and to the Pledged Assets, "fair and equitable" means, among other things, that the plan: (1) allows the bondholders to retain their lien on the revenues that secure their claim and makes deferred cash payments, with appropriate interest, to the holders of the bonds such that the payments equal the total value of the revenues that secure their claim, as of the effective date of the plan; or (2) proposes to sell the revenues that secure the claims of the bondholders, subject to the bondholders' rights, if any, to bid in their claim at the sale, and provided that the bondholders' lien will attach to the proceeds of the sale; or (3) provides for the bondholders to otherwise receive what the bankruptcy court determines to be the "indubitable equivalent" of their secured claim.

If the Pledged Assets were determined to not be subject to a statutory lien, or a consensual lien in special revenues, then the Bondholders may be deemed unsecured creditors and may be exposed to significant risk of delay and the receipt of only partial payment of their claims under a Chapter 9 plan of debt adjustment. Moreover, there may be delays in payments on the Series 2012 Bonds while the court considers any of the issues discussed above. There may be other possible effects of a bankruptcy of the City that could result in delays or reductions in payments to the holders of the Series 2012 Bonds.

## THE SEWAGE DISPOSAL SYSTEM

The major components of the Sewage Disposal System include the wastewater treatment plant (the "Plant"), a collection system within the City (including approximately 3,000 miles of trunk and lateral sewers), 11 pump stations and three interceptors in the City. The Department believes that the Sewage Disposal System is adequate to meet the current needs of its retail and wholesale customers and to meet the current federal requirements of the EPA under the Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987. The flow of wastewater is monitored and remotely controlled by the System Control Center in the Central Service Facility, which houses the majority of the Department's field maintenance equipment and from which the Department can remotely control most collection system facilities. Some repairs, replacements and major improvements are necessary to improve operations and ensure continued compliance with environmental standards. These repairs, replacements and improvements are part of the Sewage Disposal System's CIP. See "THE CAPITAL IMPROVEMENT PROGRAM."

### Service Area

The Sewage Disposal System presently provides wholesale service through 22 contracts to 76 municipalities in the surrounding metropolitan area and retail service to the customers in the City. Of the

total service area of approximately 850 square miles, 138 square miles are in the City. See "Map of Service Area" on the inside back cover. The Sewage Disposal System currently serves approximately 2.8 million people, or nearly 30% of the population of the State of Michigan, with suburban wholesale customers comprising approximately 75% of the total. See APPENDIX D – "CHARACTERISTICS OF THE SEWAGE DISPOSAL SYSTEM SERVICE AREA." As a matter of general practice, the City does not contract with individual or corporate customers outside the City, but only with municipal entities and public sewage disposal districts or authorities.

Population in the service area has declined over the past decade, after remaining relatively stable in the prior 20 years. The population decline is largely attributable to the recent economic downturn, which has had an adverse effect on the Southeastern Michigan region. Approximately 52% of the Sewage Disposal System's estimated operating revenues for the Fiscal Year ended June 30, 2011, were derived from wholesale customers and the balance from retail customers and miscellaneous other income sources.

**Historical Wastewater Volumes**

The treated wastewater volumes have not changed materially during the last ten years largely due to the fact that less than half of the treated wastewater volumes are related to sanitary volumes that result from customer water use. The majority of treated wastewater volumes are related to the infiltration into the sewer system, or the runoff into the combined sewer system, of wet weather flows. The volatility of wet weather events can dramatically affect the level of flow received at the Plant, irrespective of population levels or water use patterns. After experiencing a significant decline from 2001 to 2008, which was driven in part by the effect of the economic downturn, the billed wastewater volumes have stabilized over the past three years. The billed wastewater volumes for wholesale customers are affected by wet weather events because billed volumes for the majority of these customers are based on metered wastewater volumes. Billed volumes for retail customers are based on metered water volumes. The following table shows estimated service population as well as treated and billed wastewater volumes during the past ten Fiscal Years.

**Sewage Disposal System**
**Treated and Billed Wastewater Volumes**

| | Estimated Population Served | | | Annual Wastewater Treated (mg) | Billed Volume | | |
|---|---|---|---|---|---|---|---|
| Fiscal Year | Suburban Wholesale | Detroit Retail | Total | | Suburban Wholesale (mg) | Detroit Retail (mg) | Total (mg) |
| 2001 | 2,046,900 | 951,300 | 2,998,200 | 253,900 | 122,000 | 44,500 | 166,500 |
| 2002 | n/a | n/a | n/a | 268,600 | 124,500 | 40,200 | 164,700 |
| 2003 | n/a | n/a | n/a | 224,200 | 104,800 | 47,200 | 152,000 |
| 2004 | n/a | n/a | n/a | 240,800 | 117,300 | 45,800 | 163,100 |
| 2005 | n/a | n/a | n/a | 227,200 | 115,200 | 36,800 | 152,000 |
| 2006 | n/a | n/a | n/a | 253,900 | 117,000 | 34,800 | 151,800 |
| 2007 | n/a | n/a | n/a | 244,800 | 117,500 | 32,400 | 149,900 |
| 2008 | n/a | n/a | n/a | 248,600 | 114,200 | 27,800 | 142,000 |
| 2009 | n/a | n/a | n/a | 265,200 | 123,200 | 29,600 | 152,800 |
| 2010 | n/a | n/a | n/a | 225,800 | 100,600 | 27,100 | 127,700 |
| 2011 | 2,093,000 | 714,000 | 2,807,000 | 257,900 | 112,700 | 28,000 | 140,700 |

mg = million gallons
SOURCE: The Department.

Historically, the Sewage Disposal System has expanded with the population increase in the municipalities surrounding the City. It is expected that any additional revenue growth will result from requests by existing wholesale customers to serve major, new manufacturing facilities or from ordinary development within the service area. No expansion of the Sewage Disposal System's service area is expected in the near future.

**Retail and Other Billing**

The Department has been the sole provider of all sewage interception, treatment and disposal services in the City since 1940 and all sewage collection since 1964. The Department has full responsibility for billing and collection of charges from retail customer accounts. The Board sets rates for these customers, which are subject to review and concurrence by the City Council. There are approximately 240,000 retail customer accounts. These customers are billed on a monthly basis and water and sewage charges are included on the same bill. The Department also bills various governmental agencies, including the City, for service. Rate changes, once established, generally become effective the following July 1. For information regarding bill collections, see "FINANCIAL PROCEDURES – Collections and Delinquencies."

**Wholesale Customers**

The Sewage Disposal System receives wastewater from its wholesale customers at sewers owned by the City. The quantity of wastewater discharged is measured with a sewage meter or estimated on the basis of water consumption. In all cases, the municipalities are responsible for the construction and maintenance of their own internal sewerage systems for collecting the wastewater and delivering it to the Sewage Disposal System. Prior to 1968, the municipalities were required to construct their interceptors for connection to a Detroit combined sewer or for connection directly to the Sewage Disposal System interceptor sewer. In 1968, the Department constructed an interceptor system known as the Oakland Macomb Interceptor (the "OMI") to provide service to Macomb County and the Clinton-Oakland District of Oakland County. The Department owned and operated the OMI until 2009, when an agreement was reached to sell it to a new entity jointly managed by Macomb and Oakland Counties, known as the Oakland-Macomb Interceptor Drainage District ("OMID"). See "Settlement Agreements" below.

<u>Wholesale Contracts</u>. Each wholesale district or municipality has executed a sewage disposal agreement with the City which is generally for either an original period of at least 35 years, terminable on one year's notice thereafter unless renewed, or of indefinite duration. The agreements have notice requirements for termination prior to the maximum term of the contract, of from zero to three years. Under the typical contract, the City, subject to certain terms and conditions, is obligated to receive and provide treatment for the wastewater from the municipalities at designated metered points or at mutually agreed locations. The municipality is required to pay for treatment of all wastewater delivered to the Sewage Disposal System at rates related to the cost incurred in providing the service.

The agreements generally include other provisions required for orderly operation of the Sewage Disposal System such as: (1) restrictions on the collection of wastewater from outside the limits of the particular municipality or district without the consent of the City; (2) metering for all new customers and for most other customers; and (3) acceptance by wholesale customers of the State's water quality standards and of appropriate City ordinances for meeting the pollution control standards imposed by the State and federal government. Wholesale customers are billed on either a monthly or quarterly basis.

With respect to the wholesale contracts, user classes can be determined based upon use of different facilities or differences in the degree of use but not differences in location. Specifically, each contract requires the establishment of rates based upon a methodology under which the same rate of

40

return on capital asset rate base is charged to customers in and outside the City. Since Fiscal Year 1980, the City has been permitted to charge the wholesale customers $1,000,000 compounded at 5% annually for costs of indirect service to the Sewage Disposal System provided by the City. The Fiscal Year 2012 rates include charges to wholesale customers of approximately $5.0 million for such costs. Provision for surcharges for those discharging pollutants in excess of normal domestic sewage is also permitted. In all cases, the municipalities are responsible for the construction and financing of sewer mains in such municipalities required to connect with the Sewage Disposal System.

Settlement Agreements. At various times since 1975, several wholesale customers and industrial users have challenged rates established by the Board. The City and certain municipal entities entered into settlement agreements in 1978, 1980, 1982, 1995 and 1999 (collectively, the "Settlement Agreements"). The Settlement Agreements generally set forth rate schedules to be effective during a specified period of time and established principles by which rates are to be developed. Pursuant to the Settlement Agreements and the Amended Consent Judgment (described herein under "LITIGATION – Environmental Litigation"), all existing wholesale contracts were amended to incorporate certain rate schedules and rate making principles and to provide for observance of environmental controls. Contractual provisions regarding rate making methodology are also subject to EPA regulations prescribing the rate making principles which must be followed as a condition to participation in federal grant programs by the City. See "FINANCIAL OPERATIONS – Rates."

In 2009, an additional settlement agreement was negotiated to resolve several outstanding disputes between the Department and its wholesale customers (the "2009 Settlement Agreement"). The terms of the 2009 Settlement Agreement included a reimbursement of $27 million from the City to the Department for the cost of a City-wide 800 Mhz radio system that was financed by the Department, as well as the ownership transfer of the OMI to OMID. The OMID then signed a new 30-year service agreement with the Department. In addition, the other major suburban wholesale customers agreed to enter into new 30-year service agreements with the Department. Pursuant to the 2009 Settlement Agreement, the parties have actively and cooperatively sought federal funding assistance for several infrastructure projects in the region, including repairs to the OMI.

Pursuant to the Settlement Agreements and the wholesale contracts, the Board is responsible for providing treatment and disposal service as may be necessary to conform with all federal, State and local laws and regulations. The customer is required to pay for such service at the rates established by the Board, subject to certain principles including (i) annual review and adjustment, if necessary, to maintain proportionate distribution of all costs among user classes and to generate sufficient revenue to pay the total costs of the Sewage Disposal System and (ii) revenue requirements based on experience and estimates of operating and maintenance expenses, the local share of capital costs, debt service coverage and any obligations imposed by law, and a working capital allowance to cover lags in payments by the customers and by federal and State grant agencies. The Settlement Agreements require the Board to finance, to the maximum extent possible, the local share of capital costs of the Sewage Disposal System from bond proceeds. The Court is expected to resolve any inconsistencies between the Settlement Agreements and the November 4, 2011 Order in any final order of dismissal.

Model Contracts. As part of a partnering process, the Department worked with its wholesale customers to develop new model contracts with standardized contract language. These standardized contracts will ensure that all wholesale customers are treated equitably and will also provide the Department with the same rights and controls across all agreements. The standardized contract language will address items such as contract term lengths, contract renewal, flow limitations, flow enforcement provisions, flow measurement, regulatory compliance, connection points and contract enforcement. All existing contract customers have been advised under the 2009 Settlement Agreement of the terms of the new model contract. The Department is using the new model contract, with appropriate modifications, as

it negotiates new agreements with its wholesale customers. Using the model contract as a basis, the Department has established new contracts for the City of Center Line and the OMID and has initiated contract negotiations with the cities of Grosse Pointe, Grosse Pointe Farms, Grosse Pointe Park, Redford Township, Wayne County #6 as well as the Oakland County Evergreen-Farmington Sewage Disposal System and the Wayne County Rouge Valley Sewage Disposal District.

Longevity. The Department believes that wholesale customers will continue to utilize the Sewage Disposal System because (i) the Plant has the capacity required to provide service to those under contract (ii) federal and State grant agencies have encouraged regional sewage treatment systems and wholesale customers desiring to leave the Sewage Disposal System may not have the benefit of federal grant funds covering a portion of the capital cost of eligible facilities, making such a move economically unfeasible, and (iii) long standing contractual relationships exist between the Sewage Disposal System and its wholesale customers. Moreover, the Department believes that the principles pertaining to the establishment of rates contained in the Settlement Agreements, the Department's commitment to involve and inform the wholesale customers through a customer outreach process and the February 11, 2011 and the November 4, 2011 Orders establishing, in relevant part, a new Board with enhanced wholesale customer representation and a more autonomous Department, should serve to eliminate certain factors which precipitated controversy and litigation in the past. Because of the complex nature of rate setting and cost allocation, however, there can be no assurance that various assumptions which are used in the formulation of future rate increases will not be the subject of controversy and possibly future litigation.

Additionally, for a number of years, a dispute has existed between the City and certain wholesale customers over control of the Sewage Disposal System. Various legislative proposals and resolutions have been introduced periodically in the State legislature that have provided for, or suggested studying, changes in the composition of the Board, or have attempted to legislate changes in the management and control of the Sewage Disposal System. The Department believes that the implementation of the February 11, 2011 Order and the November 4, 2011 Order will successfully deter any future efforts to transfer control of the City's Water Supply System and the Sewage Disposal System. Currently, no legislation is pending which contemplates the transfer of control of the City's Water Supply and Sewage Disposal Systems, and the City expects to oppose any legislative efforts that may arise in the future.

Customer and Regional Water Quality Partnering. Since 1995, the Department has entered into several "partnering" agreements with representatives of its suburban customer communities, establishing a framework for discussion of major issues among Detroit and all of its suburban wholesale customers. The partnering groups have established teams to explore a variety of topics, including flows in the Sewage Disposal System, operating plans and efficiencies, billing protocol, service contracts, sewer rates and communication strategies. The Sewer Rates Work Group reviews issues affecting rates and rate levels and attempts to reach consensus on these issues. Through the Sewer Contracts Work Group, the Department has created the new model contract with standardized contract language as described above.

Wholesale Customer Information. Approximately 52% of the Sewage Disposal System's estimated operating revenues for the Fiscal Year ended June 30, 2011, were derived from wholesale customers and the balance from retail customers and miscellaneous other income sources. The following table lists the Department's wholesale customers as of the date of this Official Statement, the date of initiation of service with the Sewage Disposal System and various details of the contracts. A number of the listed contracts provide for a minimum term and an automatic renewal that may be cancelled with one year's notice, while certain other contracts have an indefinite term which can be terminated by mutual consent or within a specified period of time after notice of termination has been provided.

42

**Wholesale Sewerage Treatment Contracts**

| Wholesale Customers | Total Billed Flow Mcf FY 2011 | Total Billed Revenue FY 2011[1] | Contract Date | Term of Contract |
|---|---|---|---|---|
| OMID | 3,467,283 | 51,216,403 | 2010 | 30 Years |
| Wayne County - Rouge Valley | 3,365,086 | 41,807,733 | 1961 | [5] |
| S. O. C. S. D. D.[2] | 2,972,975 | 35,810,320 | 1962 | 50 Years |
| Evergreen – Farmington | 1,876,971 | 24,951,389 | 1958 | [5] |
| Wayne County – Northeast | 1,620,339 | 19,146,923 | 1961 | [5] |
| Dearborn – West | 567,934 | 6,770,430 | 1961 | [5] |
| Dearborn - East[3],[4] | 489,421 | 6,509,598 | 1957 | [5] |
| Highland Park[3] | 151,053 | 4,490,709 | 1949 | [6] |
| Hamtramck[3] | 64,800 | 3,249,930 | 1941 | [6] |
| Grosse Pointe Farms[3] | 74,990 | 1,857,469 | 1941 | [6] |
| Grosse Pointe Park | 91,839 | 1,151,516 | 1940 | [6] |
| Grosse Pointe[3] | 32,332 | 1,043,154 | 1940 | [6] |
| Dearborn - Northeast[3] | 85,121 | 1,039,811 | 1955 | [6] |
| Melvindale | 71,072 | 868,644 | 1977 | 35 Years |
| Farmington | 57,072 | 800,063 | 2008 | [6] |
| Center Line | 28,775 | 786,684 | 2008 | 15 Years |
| Allen Park | 42,611 | 494,090 | 1974 | [5] |
| Harper Woods[3] | 5,720 | 152,154 | 1958 | [6] |
| Redford Township[3] | 3,230 | 118,285 | 1940 | [6] |
| Wayne County #6[3] | 1,604 | 115,174 | 1950 | [5] |
| Wayne County #3[3] | 286 | 39,926 | 1950 | [5] |

Mcf = Thousand cubic feet.
[1] Billed revenue does not include surcharges to wholesale area industrial users for pollutant discharges in excess of the Bond Ordinance limits or Industrial Waste Control charges.
[2] Southeastern Oakland County Sewage Disposal District.
[3] Billed flow does not include estimated storm drainage and infiltration.
[4] Account currently showing delinquent balances.
[5] Minimum term expired; automatic renewal may be canceled with one year's notice.
[6] Duration is indefinite with no initial term. Contracts with indefinite term are generally terminable either by mutual consent or within a specified period after a notice of termination has been given.
SOURCE: The Department.

## The Plant

The Plant, which is among the largest in the world, was originally constructed in 1940 to provide primary treatment of sewage emanating from the City and surrounding communities, and was improved in the mid 1960s with construction of sludge incinerators and filters, and dry ash handling facilities. The Plant was further improved starting in 1970 when construction commenced on secondary treatment processes, including aerated activated sludge units, final clarifiers and additional primary treatment capacity.

Primary treatment of sewage at the Plant is provided by 16 clarifiers or settling basins. Secondary treatment is provided in one air aeration basin, three oxygen aeration basins and 25 final clarifiers. Removal of phosphorus is accomplished with ferrous chloride (pickle liquor) and polymer feeding mechanisms, which operate in conjunction with the primary treatment processes.

Chlorine gas is used for disinfection of effluent prior to discharge into the Detroit River. Incineration of dewatered sludge occurs in 14 multiple hearth incinerators. The Department engages contractors for disposal of the ash produced by incineration of sludge cake, for screenings from preliminary treatment, and for disposal of a portion of the sludge cake that is not incinerated.

**Interceptor System**

All of the major trunk sewers in the City are connected in some manner to the Detroit River Interceptor, the Oakwood-Northwest Interceptor or the North Interceptor – East Arm, each of which transports the flow to the Plant. See "Map of the Service Area" on the inside back cover of this Official Statement. The North Interceptor – East Arm was placed in service in 1995. This interceptor provides non-overflowing conveyance of separated suburban flows from northern areas. The Evergreen-Farmington permanent connection, which was completed in fiscal 1994, serves Oakland County and transfers flows from Oakland County, which are currently transported by the Oakwood-Northwest Interceptor to the Detroit River Interceptor.

The Department previously owned, operated and maintained the 35 mile Oakland-Macomb Interceptor system in Macomb County. Under the 2009 Settlement Agreement, the Department sold the OMI to the Oakland-Macomb Interceptor Drainage District at a purchase price of approximately $90 million. See "THE WATER AND SEWAGE DEPARTMENT – Wholesale Customers – Settlement Agreements."

**Collection System**

Wastewater is transported via the lateral system into the public sewers and then through the interceptor sewers to the Plant. Wholesale customers own and operate their collection systems and discharge their flow into the Sewage Disposal System interceptor sewers. Approximately 60% of the Sewage Disposal System is drained by gravity with the remainder requiring pumping at least once.

Approximately 98% of the collection system located within the City consists of combined sewers, which transport both sanitary sewage and storm water drainage. Approximately 80% of the wholesale flow comes from combined sewers, with the remaining 20% being from sanitary sewers. Overflows from combined sewers are diminished to a degree by the use of remote controlled regulators, fabridams and control gates, providing controlled and uncontrolled storage of overflows. Plans are being developed to optimize the existing operation to provide additional in-system storage in order to better control combined sewer overflows ("CSO").

**Environmental Matters**

The operation of the System is subject to extensive regulation pursuant to the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 (collectively, the "Clean Water Act"), the Clean Air Act, the Safe Drinking Water Act, the Michigan Natural Resources and Environmental Protection Act (the "Michigan Environmental Code"), and the administrative rules and regulations that have been promulgated pursuant to these statutes. These programs affect many facets of the System including the quality and quantity of wastewater discharged, monitoring and reporting requirements, the process for disposing biosolids, design, construction and operation of treatment and collection facilities, and the handling, storage, and management of hazardous materials.

Included in the regulatory framework established by the Clean Water Act is the National Pollutant Discharge Elimination System ("NPDES") permit program, which requires operation of wastewater treatment facilities according to discharge limitations set forth in permits issued to each facility. The NPDES permit program is administered by the EPA through the Michigan Department of Environmental Quality ("MDEQ"). The NPDES permit sets forth requirements in four general classifications: (1) plant operation and discharge of pollutants, (2) management of the wastewater collection system, including various improvements to control CSO, (3) elements of the Industrial

Pretreatment Program ("IPP"), and (4) residuals management to dispose of solids generated as byproducts of the treatment process. The System's current NPDES permit was reissued on June 28, 2011 and expires on October 1, 2012.

The NPDES permit includes compliance schedules for several capital improvement projects relating to the control of CSOs consistent with the Department's approved Long Term CSO Control Plan (the "CSO Plan"). The Department is generally in compliance with the permit deadlines, although some schedule adjustments are being discussed with MDEQ to address delays that have arisen with respect to certain projects. It is anticipated that these schedule adjustments will be formally incorporated into the new NPDES permit when it is re-issued in October 2012.

Because the Plant is not designed to remove cadmium, copper, lead, PCBs, mercury, or other toxic materials to the levels required by MDEQ, the Department controls these substances primarily through the IPP. The NPDES permit incorporates requirements that the Department administer the IPP to control and regulate wastewater discharge to the Sewage Disposal System, including the adoption of local limits for various pollutants.

The Department is also subject to a number of enforcement related administrative orders and consent judgments, most notably the Second Amended Consent Judgment entered by the Court on August 3, 2000, for Clean Water Act violations dating back to the 1970s. See "LITIGATION – Environmental Litigation." The Second Amended Consent Judgment required the Department to implement certain corrective measures to provide reliable capacity to process and dispose of biosolids. Subsequently, an Administrative Consent Order (the "ACO") issued by the MDEQ on July 8, 2011, identified a series of additional corrective measures to be undertaken by the Department. The ACO specifies the timetable for completing activities relating to dewatering, conveyance, disposal, maintenance and other related items. The Department is undertaking remedial measures consistent with the ACO.

A small portion of the City is served by separate storm sewers that convey storm water runoff directly to receiving waters. The City's separated storm sewer tributary area is approximately 140 acres, which is less than 0.2% of the total area in the City. The City's storm water discharges to the Detroit River and Rouge River are authorized pursuant to the State of Michigan General Storm Water Discharge NPDES permit, and a Certificate of Coverage under this permit was issued to the Department on November 5, 2004. Detroit has developed and submitted a Storm Water Management Program Plan (the "SWMPP") as required by that permit, and updates to the SWMPP are prepared annually. The most recent SWMPP update dated November 2011 establishes the timetable for various pollution prevention activities, as well as monitoring and reporting on the progress being made to control discharges from the City-owned storm sewers.

Additional details regarding these and other regulatory requirements applicable to the System are included in APPENDIX A. See APPENDIX A – "FEASIBILITY REPORT."

## THE CAPITAL IMPROVEMENT PROGRAM

### General

The Department utilizes a five-year CIP to improve the reliability of the Sewage Disposal System, meet regulatory standards as well as to achieve greater operating and maintenance efficiency. The Department annually updates the CIP based on continual monitoring and review of the needs of the Sewage Disposal System. In accordance with the terms of the February 11, 2011 Order, the CIP must be approved by a super majority of at least five Board members. The Department can modify individual

45

projects within the CIP during the year to address changing costs and management decisions on specific project scope as long as the changes are within the basic framework approved by the Board.

The Fiscal Year 2012-2016 CIP was approved by the Board in July 2011. The Department expects to submit the Fiscal Year 2013-2017 CIP to the Board for consideration in July 2012.

The CIP is divided into the following major categories: Plant, Sewer Interceptor System, Combined Sewer System, Lateral Sewer Replacement, and Information Technology. The Plant category is further divided into sub-categories: Primary Treatment, Secondary Treatment, Solids Handling, Disinfection Facilities and General Purpose. The Department has financed its ongoing CIP with proceeds of the Sewage Disposal System Revenue Bonds, federal and State grants and loans and revenues of the Sewage Disposal System.

Over the past ten years, the Department spent approximately $2.3 billion on capital improvements to the Sewage Disposal System. In the past three years, the CIP has undergone significant changes which have resulted in an overall reduction of the program. For more information, see APPENDIX A – "FEASIBILITY REPORT."

The following tables detail the planned expenditures and the projected funding sources for the Fiscal Year 2012-2016 CIP, as approved by the Board in July 2011.

**Capital Improvement Program**
**Projected Expenditure Schedule**

| | Fiscal Year Ending June 30, | | | | | |
| | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|
| Plant | | | | | | |
|   Primary Treatment | $5,342,000 | $18,895,000 | $24,487,000 | $9,646,000 | $1,800,000 | $60,170,000 |
|   Secondary Treatment | 6,811,000 | 7,897,000 | 12,994,000 | 17,847,000 | 6,950,000 | 52,499,000 |
|   Solids Handling | 17,770,000 | 29,227,000 | 24,184,000 | 11,990,000 | 4,950,000 | 88,121,000 |
|   Disinfection Facilities | 2,656,000 | 9,506,000 | 10,130,000 | 7,092,000 | 4,253,000 | 33,637,000 |
|   General Purpose | 18,536,000 | 27,291,000 | 26,056,000 | 14,808,000 | 8,843,000 | 95,534,000 |
|     Subtotal Plant | $51,115,000 | $92,816,000 | $97,851,000 | $61,383,000 | $26,796,000 | $329,961,000 |
| | | | | | | |
| Sewer Interceptor System | $823,000 | $1,300,000 | $150,000 | - | - | $2,273,000 |
| Combined Sewer System | 35,793,000 | 4,828,000 | 15,150,000 | $21,550,000 | $4,252,000 | 81,573,000 |
| Lateral Sewer Replacement | 35,947,000 | 44,200,000 | 20,000,000 | 20,000,000 | 20,000,000 | 140,147,000 |
| Information Technology | 1,882,000 | 2,000,000 | 3,950,000 | 3,450,000 | 6,450,000 | 17,732,000 |
|     Subtotal | $74,445,000 | $52,328,000 | $39,250,000 | $45,000,000 | $30,702,000 | $241,725,000 |
| Total Capital Program | $125,560,000 | $145,144,000 | $137,101,000 | $106,383,000 | $57,498,000 | $571,686,000 |

SOURCE: The Department.

The Fiscal Year 2012-2016 CIP does not reflect any capital expenditures for long-term biosolids management, as the Department had expected to rely on third-party investment by others in biosolids facilities, which would not require any capital expenditures by the Department. This approach is being revisited by the Department and, as a result, the Fiscal Year 2013-2017 CIP will likely reflect an increase in capital expenditures of approximately $225 million for long-term biosolids management, which may require issuance of additional Bonds in Fiscal Year 2015.

46

**The CIP Funding**

The current five-year CIP is estimated to cost $571,686,000. Of this amount, the Department expects that $196,202,900 (approximate net amount) will be financed with proceeds of Sewage Disposal System Revenue Bonds and the balance with Sewage Disposal System revenues, additional SRF loans and funds on hand.

**Sewage Disposal System Capital Improvement Program**
**Projected Funding Sources**

| | Fiscal Year Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
| Existing Improvement and Extension Funds[a] | $97,245,200 | - | - | - | - | $97,245,200 |
| Existing Construction Funds[a] | 30,600,000 | - | - | - | - | 30,600,000 |
| Current Revenues | $32,389,200 | $41,953,800 | $45,887,600 | $68,039,400 | $93,904,800 | 282,174,800 |
| Bond Proceeds | 659,780,000 | - | - | - | - | 659,780,000 |
| Less: Costs of Refunded and Purchased Bonds | (138,099,000) | - | - | - | - | (138,099,000) |
| Less: Swap Termination Payments | (314,333,100) | - | - | - | - | (314,333,100) |
| Issuance Expenses | 3,150,200 | - | - | - | - | 3,150,200 |
| Bond Reserve[b] | (14,295,200) | - | - | - | - | (14,295,200) |
| Net Bond Proceeds Available | $196,202,900 | - | - | - | - | $196,202,900 |
| State Revolving Fund Loans | $27,830,000 | $5,500,000 | $4,400,000 | $4,529,000 | - | $42,259,000 |
| Total Funding Sources[c] | $384,267,300 | $47,453,800 | $50,287,600 | $72,568,400 | $93,904,800 | $648,481,900 |

[a] Balance available June 30, 2011. (Applies only to Fiscal Year 2012).
[b] Amount required to be deposited in the Senior Lien Bond Reserve Account to fund the reserve requirement.
[c] The difference between the total amount available to finance the CIP and the cost of the CIP represents funds available to finance the CIP after Fiscal Year 2016.
SOURCE: The Foster Group, LLC.

*State Revolving Fund Financing.* Many of the CIP projects are funded through loans provided by the State of Michigan Water Pollution Control Revolving Fund, commonly known as the State Revolving Fund or "SRF." The SRF program provides low interest cost (currently 2.5%) funding of projects qualified by the MDEQ.

The SRF loans are evidenced by Sewage Disposal System Revenue Bonds, including the SRF Junior Lien Bonds. Although the City has issued Senior Lien Bonds to evidence SRF loans in the past (together with the SRF Junior Lien Bonds, the "SRF Bonds"), the City expects to issue only SRF Junior Lien Bonds for that purpose in the future. SRF Junior Lien Bonds are different from other types of Sewage Disposal System Revenue Bonds. While other types of Sewage Disposal System Revenue Bonds may amortize over a period not to exceed 40 years, SRF Junior Lien Bonds have a maximum 20 year amortization. The payment priority of SRF Junior Lien Bonds is below that of Second Lien Bonds and the SRF loans and SRF Junior Lien Bonds are not secured by a reserve fund. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Priority of Lien and Payment Status" and " – Reserve Accounts and Reserve Requirements." The City does not receive the full principal amount of SRF bond proceeds upon closing of the related SRF Junior Lien Bond. Rather, the principal amount of the particular SRF Junior Lien Bond is received by the City incrementally, upon submission of draw requests to the Michigan Finance Authority (the "MFA"). The MFA funds its SRF loan obligations to the City and other Michigan municipalities by periodically issuing its own bonds ("MFA Bonds"), which are

47

secured by the City's SRF Junior Lien Bonds and generally similar bonds of other Michigan municipalities (the City and such other municipalities, the "Localities").

Due to federal tax constraints and for other reasons, the MFA does not fully fund its SRF loan obligations. Instead, it issues MFA Bonds at the times and in the amounts necessary to fund its SRF loan obligations based on anticipated draw schedules provided by the Localities. Therefore, the ability of the MFA to meet its SRF loan obligations is dependent upon its access to the capital markets and the accuracy of the anticipated draw schedules with which it is provided.

SRF funding can be additionally constrained by the City's ability to meet the financial reporting requirements imposed by Act 34 and related disclosure required by the MFA. The City's ability to issue bonds or to obtain SRF loans is subject to the provisions of Act 34, which requires Michigan Department of Treasury approval of each bond issue or SRF loan unless the City has met the statutory requirements for issuing bonds without such approval. The Michigan Department of Treasury has withheld approval of SRF loans in the past and may withhold approval of bonds or SRF loans in the future if it determines that the City has not met all applicable requirements of Act 34 or has not adequately addressed any non-compliance. If such approval is withheld, it could impair the City's ability to fund the CIP in accordance with the City's schedule.

The Department expects to issue a new SRF loan concurrently with the issuance of the Series 2012 Bonds. Such loan amount and the related debt service payments are reflected in the projections included herein.

## FINANCIAL PROCEDURES

### Budget and Accounting Matters

Pursuant to the November 4, 2011 Order, starting with the Fiscal Year 2013 budget, the Department's budget is no longer prepared in accordance with the City's requirements and procedures. The new budget development process is similar to the prior process, however, the budget approval process is different, as most expenditures require only Board approval and not the review and approval by the City Council. See "THE DETROIT WATER AND SEWERAGE DEPARTMENT – Court Mandated Changes" and "LITIGATION – Environmental Litigation." The Fiscal Year 2013 budget has been developed and approved by the Board under the new structure. See "FINANCIAL OPERATIONS – Fiscal Year 2013 Budget."

Certain differences should be noted between budget presentation and the financial statements for a given period. The annual budget represents amounts which might be spent in the fiscal year and it records equipment and other long-term purchases against the current period. The financial statements include accrual of expenditures and revenues and depreciation of plant and equipment over the useful life of such capital items.

Generally, the Department pays for various employees, supplies and equipment that are shared between the Water Supply System and the Sewage Disposal System from Water Supply System operations. The Sewage Disposal System is then billed periodically (currently monthly) based on actual operations and an estimate of certain personnel and equipment usage.

Because the Sewage Disposal System is generally self-insured, the Department includes in its annual budget amounts estimated to be sufficient to pay various liability and workers' compensation claims. The financial statements record the expense for such claims in the period when the occurrence of the liability is probable and the amount can be reasonably estimated. In addition, the budget includes

48

amounts necessary to establish and maintain an account designated the "Extraordinary Repair and Replacement Reserve Fund," which has been created for the purpose of providing funds for paying the costs of major unanticipated repairs and replacements to the Sewage Disposal System. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Flow of Funds."

The Department uses an Oracle financial management system that includes general ledger, purchasing, accounts payable, accounts receivables, project accounting and fixed asset applications. These Oracle core financial applications are integrated with third party Oracle-approved software providers for budget preparation, work order and inventory applications.

Since 2010, the Department has used a web-based time and attendance management system for calculating payroll. The Department is in the process of evaluating its current human resources/payroll system.

The City's audited financial statements for the fiscal year ended June 30, 2011, available on the City's website, include an unqualified independent auditors' report with exception of a reference to a scope limitation regarding the valuation of pension investments. The auditors provided the City with a letter that highlights certain internal control material weaknesses and related recommended improvements to the City's internal control environment. The City takes such recommendations seriously. Accordingly, the City has developed plans and has begun executing steps to address each concern identified by the auditors. If the City is unable to improve its financial and management controls in a timely and effective manner, its ability to comply with the financial and reporting requirements and other rules that apply to it would be impaired. The audited financial statements of the Sewage Disposal System for the Fiscal Year ended June 30, 2011, which are included as APPENDIX B, also include the unqualified opinion of the City's auditors.

**Collections and Delinquencies**

Retail Customers. The Department operates a computerized billing system for its approximately 240,000 retail customers. All retail customers are billed monthly and are allowed 20 days to pay, after which a one-time 5% late payment charge is applied.

In order to enforce the payment of retail billings, the Department pursues an aggressive collection program. Retail customers may have their service shut off for non-payment after six months in arrears. Should this occur, services to the related premises are discontinued until a cash deposit equal to the estimated amount of the next bill is made. From June 2011 through April 2012, shutoffs totaled approximately 18,500. Historically, the number of shutoffs during the two quarters ending in December and March are lower as a result of weather conditions making shutoffs more difficult due to the potential of frozen service lines and connections. The City has a right to discontinue the supply of water to any premises for non-payment of water or sewer bills when due. The termination of any services by the City to any residents may be subject to constitutional safeguards regarding due process, including notice and hearing requirements.

In addition, pursuant to the Municipal Water Lien Act, MCL 123.161 et seq., the charges for water and sewage service furnished to a premise become a lien on such premise when the service is provided. If the charges on an account are delinquent, such charges may be collected by placing a lien on the property tax roll. The lien may then be enforced in the same manner as the collection of property taxes and enforcement of a lien for property taxes (assuming proper statutory notice to the party responsible for the payment of the charges). The Department transmits delinquent accounts to the City's Assessor who places the lien on the property. Beginning with commercial accounts on July 1, 2006, and with residential accounts on July 1, 2007, and each year thereafter, the City has transferred the collection

49

of delinquent City real property taxes to Wayne County. The City receives payment for such taxes from Wayne County's delinquent tax revolving fund as of March 1 each year, which is funded by the issuance of Delinquent Taxes Anticipation Notes. If the delinquent real property taxes remain uncollected after three years, the County charges the respective amount of such taxes back to the City.

The Department's computerized billing system produces data on aged accounts receivable and breaks delinquencies into several aged categories. The December 2011 report indicated total retail Sewage Disposal System delinquencies (in excess of 6 months) of approximately $55.4 million. The amount of delinquencies has not caused cash flow problems, as sufficient operating capital has been available to the Sewage Disposal System.

Wholesale Customers. Wholesale customers maintain their own retail billing systems and also pay the Department monthly or quarterly in accordance with contractual agreements. The late payment charge for wholesale customers varies by individual contract, but generally is 5%. In the event of a wholesale customer delinquency, the Department has options available to it under the relevant contractual agreement with such wholesale customer, including the right to obtain a judgment against the wholesale customer. If the wholesale customer does not pay the judgment amount, such amount may be collected by placing lien on the property tax roll of the wholesale customer.

The Sewage Disposal System has not experienced significant problems with wholesale delinquencies. Wholesale delinquencies typically arise from disputed billings, which often can be resolved through negotiation. As of the date of this Official Statement, the City of Highland Park had a delinquent balance of over $8 million. Highland Park is experiencing financial difficulties and since Fiscal Year 2008 has been unable to currently satisfy amounts due to the Department. The City and the Department have met with Highland Park representatives in an attempt to amicably resolve the delinquency but these meetings have not been successful. The City and the Department are exploring further collection options.

Accounting. The allowance for doubtful accounts reflected in the financial statements represents the Department's estimate of the amount of potential uncollectible accounts receivable. Increases in the reserve are netted against revenues reported on the financial statements. The amount reserved is determined based on a formula that takes into account the total amount of accounts receivable as well as specific items within the category, including reserves for disputed billings. Approximately $57.5 million was reserved as an allowance for doubtful accounts as of June 30, 2011. Annual increases in the allowance for doubtful accounts result in bad debt expense for that year, and are reflected as a reduction in revenue for the customer class associated with the reserve. The Settlement Agreements stipulate that bad debt expense associated with a suburban wholesale customer is chargeable to the suburban wholesale class at large, and that bad debt expense associated with a City retail customer is chargeable to the City retail customers only. The Board currently practices a "bad debt" policy which requires a write off of any doubtful accounts older than three years.

**Cash Management**

In accordance with the City Charter, all funds and accounts of the Sewage Disposal System are separate and distinct from all other City funds. No Sewage Disposal System monies are commingled with general fund or other monies of the City.

All Revenues of the Sewage Disposal System are deposited into a lockbox held by a custodian bank. Subsequent to the issuance of the Series 2012 Bonds, all Revenues will be deposited in the "Revenue Receipts Fund" established under the Indenture. All Revenues collected and deposited into the Revenue Receipts Fund will be allocated by the Trustee, at the direction of the Department, to the Sewage

Disposal System Receiving Fund and a Water Supply System receiving fund. The Trustee will then transfer certain funds from the Sewage Disposal System Receiving Fund to the Operation and Maintenance Fund, the Senior Lien Bond Interest and Redemption Fund, Junior Lien Bond Interest and Redemption Fund and other System funds pursuant to the flow of funds under the Bond Ordinance and the Indenture. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Flow of Funds." The Operation and Maintenance Fund will be a custodial account that is controlled by the Department and not the Trustee.

The Department maintains a budget system that monitors and controls funding in accordance with actual funds available. While the budget includes appropriations for specific projects to be funded out of the Improvement and Extension Fund at the beginning of each Fiscal Year, the Department re-authorizes such appropriations and approves the award of a contract for specific projects only when cash is on hand in such fund, which is then fully encumbered in an amount equal to the amount of the award.

**Investment Policy**

Funds in excess of current Sewage Disposal System requirements are invested by the City for the Department in accordance with State law. The City may invest in direct obligations of the United States, obligations of an agency or instrumentality of the United States, repurchase agreements, mutual funds that invest solely in such government obligations and repurchase agreements, certain grades of commercial paper, bankers acceptances of United States banks, and certificates of deposit, savings accounts or depository receipts of savings and loan associations or member banks of the Federal Deposit Insurance Corporation.

The City's investment policy is to provide for effective cash management. The City's investment policy attempts to maintain and protect investment principal while striving to maximize total return on the portfolio consistent with risk limitations, pursuant to guidelines set forth in Act 20, Public Acts of Michigan, 1943, as amended. The City has not experienced material investment-related losses in any City managed funds. As of April 30, 2012, the Sewage Disposal Fund held investments with a total market value of approximately $246,915,836, and the longest investment had a maturity date of October 30, 2019.

**Rates**

Under the City Charter, the Board has the authority to establish rates for sewage disposal service. In accordance with the Act and the November 4, 2011 Order, the retail rates charged to customers in the City are subject to review by and concurrence of City Council. The Board has the sole authority to establish rates to the wholesale suburban customers. In accordance with the February 11, 2011 Order, a super majority of at least five Board member votes is required to approve the wholesale customer rates and recommend to the City Council the retail rates to be charged to the City customers. Certain of the wholesale contracts have specific notice requirements relating to rate changes, generally 90 or 120 days. Public hearings are required to be held prior to action on rate changes. No other statutory procedures are required as a condition precedent to a rate change. Rates, once established, generally become effective the July 1 following their establishment.

Under the Bond Ordinance, the City covenants that the rates shall be fixed and revised from time to time as may be expected to be necessary to produce the greater of (1) the sum of (a) administrative and operation and maintenance expenses of the Sewage Disposal System, (b) debt service on Senior Lien Bonds, (c) creation and maintenance of a debt service reserve for Senior Lien Bonds, (d) debt service on Junior Lien Bonds, if any, including maintenance of a reserve therefor to the extent required by the Bond Ordinance, (e) creation and maintenance of an extraordinary repair and replacement reserve fund; and

51

(f) to provide for such other expenditures and funds for the Sewage Disposal System as the Bond Ordinance and the Act require, and (2) an amount equal to the Required Combined Coverage where the numerator is the Net Revenues projected for the Fiscal Year of calculation and the denominator is the Indebtedness coming for such Fiscal Year.  See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Rate Covenant."  The City has covenanted at all times to fix and maintain such rates for services furnished by the Sewage Disposal System as shall be sufficient to provide for the foregoing.  As a matter of operating policy, the Department has established a debt service coverage policy of fixing rates so that net revenues exceed the debt service coverage requirements of the Bond Ordinance by at least 15 percentage points. This policy may be changed from time to time by the Board without approval of Bondowners or any other party.

Under the Act, rates must be fixed and revised as necessary to comply with the Bond Ordinance. The contracts with wholesale customers typically provide that rates be reasonable in relation to the costs incurred.  The Department maintains a small staff to review and make recommendations on rates for water and sewage service.  The Department routinely retains outside consultants to supplement the efforts of its staff.  The Act also provides that the rates charged by the Sewage Disposal System should not be subject to supervision or regulation by any State bureau, board, commission or like agency or instrumentality of the State.  In addition, the November 4, 2011 Order specifies that the City Council, which previously approved all rates, has the authority to approve only rates charged to retail customers in the City, but has no authority to review or approve rates charged to wholesale suburban customers.  See "THE DETROIT WATER AND SEWERAGE DEPARTMENT – Organization."

The current sewage disposal rates became effective July 1, 2011, and were designed to generate 11.0% more revenue than the previous year's rates.  The Department has developed a new schedule of sewage disposal rates, which is anticipated to take effect on July 1, 2012.  The Board has approved the rate schedule for the suburban wholesale customers and the revenue requirement and the City Council has approved the rates for the City retail customers proposed by the Board.  The new sewage disposal rates are designed to generate 8.5% more revenue than the current rates.  See "FINANCIAL OPERATIONS – Projected Operations for Fiscal Year 2012 through 2016."  The following table presents a summary of the change in the average unit cost (per 1,000 cubic feet) charged by the Department per 1,000 cubic feet for sewage disposal for the last ten years.

**Change in Sewage Disposal Average Unit Cost\***

| Date of Implementation | City Retail | Average Suburban Wholesale |
|---|---|---|
| 7/01/2003 | 10.7% | 7.8% |
| 7/01/2004 | 16.8 | 4.5 |
| 7/01/2005 | 8.4 | 3.0 |
| 7/01/2006 | 11.9 | 5.0 |
| 7/11/2007 | 1.8 | 2.5 |
| 9/03/2008 | 14.8 | 0.0 |
| 7/01/2009 | 16.1 | 8.2 |
| 7/01/2010 | 10.2 | 3.7 |
| 7/01/2011 | 8.9 | 11.8 |
| 7/01/2012 | 6.5 | 8.0 |

_____
\* Charge per thousand cubic feet of billed volume (water sales for retail, metered wastewater for wholesale); includes sewage and storm drainage treatment charges.
SOURCE: The Department.

### "Look-Back" Adjustments

Because rates are set prospectively, the costs and wastewater volumes must be estimated and therefore actual performance may not coincide with the estimates. Therefore, the EPA, in attempting to ensure that user charges are proportional in effect as well as in their design, adopted regulations which require grantees to review the wastewater contributions and revenues of users and user classes, and the total costs of operation and maintenance of the treatment works, and to make appropriate rate adjustments in subsequent rates. While the EPA requires a review not less often than every two years and limits the review to the costs of operation and maintenance, the Department traditionally has followed an annual review policy with actual "look-back" adjustments to Sewage Disposal System users and traditionally has reviewed operating and capital revenue requirements.

In determining the "look-back" adjustment, the Department evaluates the Sewage Disposal System's actual revenue requirement for the Fiscal Year and each customer class's proportionate share of those requirements based on the actual wastewater contributions from each customer. A comparison of these requirements with the billed revenues provides the amount of the "look-back" adjustment. Any look-back adjustments generally appear on the Department's billings in the second succeeding Fiscal Year (e.g., Fiscal Year 2011 adjustments on Fiscal Year 2013 billings, etc.). The manner by which such adjustments are reflected in the audited financial statements changed in Fiscal Year 2008. Prior to Fiscal Year 2008, annual look-back adjustments were reflected in the financial statements for the applicable Fiscal Year (e.g., Fiscal Year 2007 adjustments were reflected in the audited financial statements for Fiscal Year 2007). This approach resulted in a retroactive adjustment to net revenues as part of the financial closing process for each year. For instance, the audited net revenues for Fiscal Year 2007 increased by $14.8 million as a result of the look-back adjustment for Fiscal Year 2007.

Effective in Fiscal Year 2008, the Department changed the manner by which look-back adjustments are reflected in its financial statements. Rather than applying these adjustments retroactively to the Fiscal Year for which the analysis is conducted, the adjustments are applied during the Fiscal Year in which they are reflected in customer bills. This change, coupled with the existence of several extraordinary accounting events, caused the Department and its customers to re-evaluate the manner by which look-back adjustments are calculated. Working collaboratively with customer representatives, in May 2012, the Department finalized a comprehensive review of the look-back adjustment and a calculation of the look-back adjustments for Fiscal Years 2008, 2009 and 2010. As part of this process, the Department included in the rates for the City retail customers a look-back adjustment charge of $20 million per year for 2011, 2012, and 2013, totaling $60 million. A charge of approximately $2 million will be billed to suburban customers during 2013 as a result of this adjustment. See APPENDIX A – "FEASIBILITY REPORT."

### Sewage Rate Comparison

The following table presents a comparison of the current charges for residential sewage disposal services in the 20 largest U.S. cities. Note that such comparisons are not always comparable as the elements included in charges for sewage disposal services are often inconsistent amongst communities. For instance, several of these communities listed below recover some portion of their sewage disposal services through other means, such as property taxes. In addition, several of these communities (including the City) recover costs associated with stormwater drainage in their sewer rate schedules, while others either do not yet have such costs or recover them through other means, such as property taxes. Investors are encouraged to review these survey reports in their entirety to fully understand the context of the comparisons.

As shown in the following table, a recent survey of current charges for residential sewage disposal services in the City shows that they are generally consistent with the average rates in effect in comparably sized cities. The average increase in charges for these communities since Fiscal Year 2005 has been almost 6% annually (or more than twice the rate of inflation) illustrating a trend in the industry requiring communities to address increased environmental and infrastructure challenges. The Department anticipates increasing rates as necessary to continue the funding of the CIP and expects that such increases will be comparable to those in other large metropolitan areas of the country that have wastewater systems of comparable age and are facing infrastructure challenges similar to those of the System.

**Comparison of Annual Retail Sewage Charges**
**in the 20 Largest U.S. Cities, Ranked from Lowest Cost to Highest Cost**

| City | Small[a] | | Medium[b] | | Large[c] | |
|---|---|---|---|---|---|---|
| | Amount | Rank | Amount | Rank | Amount | Rank |
| Chicago | $11.19 | 1 | $149.89 | 1 | $14,989.24 | 1 |
| El Paso | 17.73 | 2 | 227.34 | 3 | 17,341.20 | 2 |
| San Antonio | 20.11 | 3 | 210.38 | 2 | 20,574.68 | 3 |
| Indianapolis | 25.41 | 4 | 290.82 | 5 | 28,993.22 | 7 |
| Louisville | 26.06 | 5 | 312.89 | 6 | 28,281.05 | 5 |
| Phoenix | 26.92 | 6 | 315.76 | 7 | 31,575.76 | 8 |
| San Jose | 27.09 | 7 | 325.62 | 8 | 32,562.00 | 9 |
| Houston | 29.93 | 8 | 509.20 | 14 | 50,803.21 | 16 |
| Fort Worth | 30.90 | 9 | 427.94 | 11 | 42,348.50 | 12 |
| Los Angeles | 32.70 | 10 | 394.36 | 9 | 39,436.20 | 11 |
| **Detroit** | **33.89** | **11** | **411.44** | **10** | **33,191.73** | **10** |
| Dallas | 34.92 | 12 | 279.44 | 4 | 26,339.51 | 4 |
| Philadelphia | 36.47 | 13 | 662.61 | 17 | 28,914.33 | 6 |
| New York | 36.73 | 14 | 492.17 | 13 | 49,216.86 | 14 |
| Columbus | 37.46 | 15 | 462.08 | 12 | 45,889.51 | 13 |
| Jacksonville | 41.39 | 16 | 528.81 | 15 | 49,617.37 | 15 |
| Charlotte | 41.80 | 17 | 537.80 | 16 | 53,601.80 | 17 |
| San Diego | 47.95 | 18 | 676.79 | 18 | 66,173.58 | 18 |
| Austin | 55.50 | 19 | 731.00 | 19 | 66,408.00 | 19 |
| San Francisco | 76.21 | 20 | 1,107.76 | 20 | 110,776.46 | 20 |
| *Average* [d] | *34.55* | | *454.88* | | *42,307.50* | |

[a] Based on water use of 7,500 gallons per month and a 5/8" meter.
[b] Based on water use of 100,000 gallons per month and a 2" meter.
[c] Based on water use of 10,000,000 gallons per month and a 2" meter.
[d] Excluding the City.
SOURCE: Black & Veatch Corporation 2009/2010 Survey.

# FINANCIAL OPERATIONS

## Summary of Historical Revenues and Expenses

The table below shows historical revenue and expenses of the Sewage Disposal System for each of the five Fiscal Years ended June 30, 2007 through June 30, 2011. Net Revenues are derived from audited financial statements of the Sewage Disposal Fund for Fiscal Years ended June 30, 2007 through June 30, 2011. Financial statements and notes thereto for the Fiscal Year ended June 30, 2011, together with the auditors' report thereon, are included in APPENDIX B.

### Summary of Historical Revenues and Expenses
### Fiscal Years 2007-2011

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010[a] | 2011[b] |
| Operating Revenues: | | | | | |
| Retail Billings at FY rate[c] | $130,560,997 | $135,966,630 | $162,813,091 | $167,986,002 | $188,929,588 |
| Wholesale Billings at FY rate[c] | 192,017,693 | 201,722,312 | 219,638,029 | 187,874,924 | 213,888,870 |
| Subtotal | $322,578,690 | $337,688,942 | $382,451,120 | $355,860,926 | $402,818,458 |
| Recorded Look-Back | $14,818,931 | - | - | - | - |
| Other[c] | $9,508,992 | $9,219,889 | $7,675,278 | $9,676,467 | $7,900,617 |
| Total Operating Revenues | $346,906,614 | $346,908,831 | $390,126,398 | $365,537,393 | $410,719,075 |
| Operation and Maintenance Expenses[d] | 199,955,251 | 202,345,947 | 195,530,393 | 197,304,083 | 230,810,741 |
| Net Operating Revenues | $146,951,363 | $144,562,884 | $194,596,005 | $168,233,310 | $179,908,334 |
| Non-Operating Income[f] | 33,562,548 | 27,634,679 | 11,501,806 | 5,881,982 | 12,168,958 |
| Net Revenues[e] | $180,513,911 | $172,197,563 | $206,097,811 | $174,115,292 | $192,077,292 |
| Debt Service Requirements | | | | | |
| Senior Lien Bonds | $106,225,011 | $104,236,900 | $117,875,550 | $117,160,400 | $113,234,500 |
| Senior and Second Lien Bonds | 129,771,479 | 148,284,500 | 168,206,747 | 173,536,200 | 173,189,300 |
| All Bonds, Including SRF Junior Lien | 156,615,637 | 175,248,600 | 195,544,837 | 200,985,100 | 209,063,900 |
| "Old" Debt Service Coverage[g] | | | | | |
| Senior Lien Bonds | 1.70 | 1.65 | 1.75 | 1.49 | 1.70 |
| Senior and Second Lien Bonds | 1.39 | 1.16 | 1.23 | 1.00 | 1.11 |
| All Bonds, Including SRF Junior Lien | 1.15 | 0.98 | 1.05 | 0.87 | 0.92 |
| Adjusted Debt Service Coverage[g] | | | | | |
| Actual Cash Look-Back Recovery[a],[b] | $37,891,955 | $28,410,250 | - | - | - |
| Adjusted Cash Basis Net Revenues | $203,586,935 | $200,607,813 | $206,097,811 | $174,115,292 | $192,077,292 |
| Senior Lien Bonds | 1.92 | 1.92 | 1.75 | 1.49 | 1.70 |
| Senior and Second Lien Bonds | 1.57 | 1.35 | 1.23 | 1.00 | 1.11 |
| All Bonds, including SRF Junior Lien | 1.30 | 1.14 | 1.05 | 0.87 | 0.92 |

---

[a] Fiscal Year 2010 Revenue includes Fiscal Year 2007 look-back adjustment.

[b] Fiscal Year 2011 Retail Revenue includes $20 million in initial allotment of look-back adjustments for Fiscal Years 2008 through 2010.

[c] Net of Bad Debt Expense.

[d] Excludes OPEB and other elements that do not impact net revenues for the purpose of debt service calculations.

[e] Net Revenues that are not required to flow into the Senior Lien Bond Interest and Redemption Funds, the Junior Lien Bond and Interest Redemption Fund or the Extraordinary Repair and Replacement Reserve Fund are available for capital expenditures. The table reflects accounting on an accrual basis in accordance with accounting principles generally accepted in the United States of America and does not necessarily reflect cash available since revenues include accounts receivable and expenditures include a number of "non-cash" items.

[f] For a description of this category, see "Fiscal Year 2007-2011 Operations – Non-Operating Income" below.

[g] "Coverage" calculations include all Net Revenues available for payment of debt service, and include Construction Fund investment earnings. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Pledged Assets" regarding treatment of Construction Fund investment earnings.

SOURCE: The Department.

13-53846-tjt    Doc 4674-9    Filed 05/12/14    Entered 05/12/14 22:37:39    Page 64 of 89

**Fiscal Year 2007-2011 Operations**

The following information summarizes the financial operations of the Sewage Disposal System in Fiscal Years 2007 through 2011.

Operating Revenues. As indicated in the above table, Sewage Disposal System operating revenues (primarily generated from charges for waste water treatment and disposal service) have increased approximately $80 million, or 24%, since Fiscal Year 2007. This increase is primarily attributable to rate increases during that period, as "billable" wastewater volumes in Fiscal Year 2011 were approximately 6% lower than in Fiscal Year 2007, as well as the varying levels of bad debt expense throughout the period. Bad debt expense is recognized in the Department's financial statements based on an analysis of the size and age of accounts receivable and the expected ability of the Department to collect those receivables. Because of variances in these receivable balances (in part attributable to the fact that the Department, through the City, began turning aged receivables to Wayne County for collection pursuant to liens on property taxes) the System recorded a bad debt credit (which increased revenue) of approximately $3.0 million during Fiscal Year 2009, after recording a bad debt debit (which decreased revenue) of $16.1 million during Fiscal Year 2008. The corresponding bad debt expense figures for Fiscal Years 2007, 2010 and 2011 were approximately $15.1 million, $23.0 million and $24.7 million, respectively.

Operation and Maintenance Expenses. Total operation and maintenance expenses in the table do not include expenses associated with accruing liabilities for Other Post-Employment Benefits ("OPEB"), which reflect future cash outlays, nor write-offs of amounts that were originally capitalized in prior years (prior cash outlays). Rather these figures are intended to represent actual annual transfers to the Operation and Maintenance Fund to fund the costs of operating the System. These expenses were stable from Fiscal Year 2007 through 2010, before experiencing a significant increase in Fiscal Year 2011. This increase is primarily attributable to enhanced activities at the Plant to address compliance challenges, and a large increase in wet weather flow volumes that adversely affected variable costs of pumping, chemicals and similar charges. Despite this significant increase, annual operation and maintenance expenses in Fiscal Year 2011 represent an average annual increase of 3.7% compared to those in Fiscal Year 2007.

The relatively stable cost levels are primarily attributable to the cost efficiency and accountability measures implemented by Department management several years ago. A portion of the annual variation in operation and maintenance expenses is associated with the allocation of costs for functions that provide service to both the water and sewer systems. These costs are assigned to the two utilities based on detailed labor distribution systems and overall management policy, and will naturally fluctuate based on where maintenance and related activities are focused. The Department has made and continues to make significant efforts to ensure that financial plans accurately accommodate this issue and that its financial accounting systems accurately report activity for this matter.

Non-Operating Income. The category "Miscellaneous Non-Operating Income (Expense)" reflected in the financial statements is a "net" amount and has historically represented relatively small amounts of non-operating income or certain non-cash write offs. As of 2009, this category also includes "contributions" of assets (including principal forgiveness on SRF Bonds augmented with ARRA funds) and other non-monetary amounts. This category also includes certain amounts related to changes in the net valuation of swap agreements from year to year. These amounts are not included in the analysis of current revenues and expenses (particularly for purposes of calculating coverage levels) as they generally do not have an effect on the amount of cash available for Sewage Disposal System operations or debt service. The presentation in the preceding table is intended to reflect cash elements only and does not reflect any non-cash Miscellaneous Non-Operating Income (Expense) elements.

56

Impact of Look-Back Adjustments. In addition to the variations noted above, the revenues and net revenues shown in the preceding table are affected by look-back adjustments. For example, the 2007 revenues include recording of the Fiscal Year 2007 look-back adjustment of $14.8 million. This "old" presentation reflects the prior approach to accounting for the look-back (see "FINANCIAL PROCEDURES – Look-Back Adjustments") and results in an overall debt service coverage ratio of 1.15. At the bottom of the table, net revenues have been adjusted to reflect the "new" presentation of the look-back adjustments and the resulting debt service coverage ratios. For instance, applying this presentation for Fiscal Year 2007 would remove the $14.8 million adjustment for the Fiscal Year 2007 look-back from 2007, but replace it with the $37.9 million adjustment for the Fiscal Year 2005 look-back, thus increasing net revenues by $23.1 million and coverage ratios, accordingly. As noted in footnote (a), $14.8 million was recovered in (and reflected in revenues for) Fiscal Year 2009, so no further adjustment is necessary for that look-back.

Debt Service Coverage. Debt service coverage levels have been lower than planned for the past three years. Debt service coverage in Fiscal Year 2010 was below 1.1 for Second Lien Bonds and below 1.0 for SRF Junior Lien Bonds. Debt service coverage in Fiscal Year 2011 was below 1.0 for SRF Junior Lien Bonds. The lower than planned debt service coverage levels occurred as a result of, among other things, revenues falling short of targeted levels each year, lower than anticipated wet weather flows in Fiscal Year 2010 and higher than anticipated bad debt expense in Fiscal Year 2011. Operation and maintenance expenses in Fiscal Year 2011 were higher than budgeted as the Department initiated efforts to address compliance issues and experienced a large increase in wet weather flows. Debt service in Fiscal Years 2009 and 2010 was higher than planned as a result of the credit market crisis of 2008, which required adjustments to the Department's debt portfolio that increased the interest expense. Further, the absence of a look-back during this period resulted in a lost opportunity to augment revenues to meet coverage levels. Despite coverage levels of less than 1.0 in Fiscal Years 2010 and 2011, the Department made timely debt service payments by utilizing operating reserve funds. If available balances pledged to bondholders (other than Reserve Accounts) are included in debt service coverage calculations, even though such balances cannot be utilized to comply with the rate covenant or the additional bonds test, coverage on SRF Junior Lien Bonds remained above 130% over the past five years. The table below illustrates the coverage from all available funds, including the cash balances of pledged accounts.

**Summary of Historical Debt Service Coverage Including Cash Balances[a]**
**Fiscal Years 2007-2011**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 |
| Funds Available to Pay Debt Service | | | | | |
| Net Revenue[b] | $203,586,935 | $200,607,813 | $206,097,811 | $174,115,292 | $192,077,292 |
| Available Pledged Account Balances[c] | 77,806,527 | 107,799,772 | 121,006,828 | 91,628,745 | 84,867,716 |
| Total Available Funds for Debt Service | $281,393,462 | $308,407,585 | $327,104,639 | $265,744,037 | $276,945,008 |
| Debt Service Requirements | | | | | |
| Senior Lien Bonds | $106,225,011 | $104,236,900 | $117,875,550 | $117,160,400 | $113,234,500 |
| Senior and Second Lien Bonds | 129,771,479 | 148,284,500 | 168,206,747 | 173,536,200 | 173,189,300 |
| All Bonds, Including SRF Junior Lien | 156,615,637 | 175,248,600 | 195,544,837 | 200,985,100 | 209,063,900 |
| Coverage Including Cash Balances | | | | | |
| Senior Lien Bonds | 265% | 296% | 277% | 227% | 245% |
| Senior and Second Lien Bonds | 217% | 208% | 194% | 153% | 160% |
| All Bonds, Including SRF Junior Lien | 180% | 176% | 167% | 132% | 132% |

[a] For illustrative purposes only. Required Combined Coverage used for the rate covenant and additional bonds tests do not include available balances pledged to bondholders. See Summary of Historical Revenue and Expenses Fiscal Years 2007-2011 for actual historical debt service coverage calculated pursuant to the Bond Ordinance.

[b] Includes actual cash look-back recovery. See Adjusted Cash Basis Net Revenue in Summary of Historical Revenue and Expenses Fiscal Years 2007-2011.

[c] Includes Current Unrestricted Cash and Investment Balances, Improvement & Extension Fund and Extraordinary Repair & Replacement Fund less Required O&M Fund Balances as of June 30 of the prior Fiscal Year (e.g., for June 30, 2011, amount reflects cash and investment balance as of June 30, 2010).

SOURCE: The Department.

Performance Summary.    The Department has made adjustments to its financial planning approaches and assumptions to avoid future poor performance.    Projected sales volumes are being developed with more conservative assumptions, and more of the revenue structure is being transitioned to a fixed charge element.  Operating budgets fully accommodate the ongoing efforts to sustain compliance with environmental regulations. Additionally, the variable rate bonds that were negatively affected by the 2008 credit market crisis have been converted to fixed interest rates resulting in more certain debt service projections. Finally, the Department and its customers have recently concluded deliberations on look-back calculations for 2008 through 2010 and revenues for 2012 and 2013 will be augmented to reflect those results. The Department continues to make significant efforts to ensure that financial plans accurately accommodate each of these issues and that its financial accounting systems accurately report activity for each of these matters.    In addition, in Fiscal Year 2012, the Department began providing monthly financial summary reports to the Board.  The Board is using these reports to monitor the Department's performance and the management utilizes this information to make any necessary changes during the year.

## Fiscal Year 2013 Budget

The Board adopted the Fiscal Year 2013 budget for the Sewage Disposal System on March 7, 2012, and it has been forwarded to the City to be included in the City's budget.  The Fiscal Year 2013 budget contains expenditures or revenue requirements totaling $519.8 million, an increase of approximately $18.5 million, or 3.7%, over the Fiscal Year 2012 budget, primarily due to increases in operation and maintenance expenses and debt service requirements. The Fiscal Year 2013 budget revenues match the overall revenue requirements of $519.8 million, and reflect an increase in revenues from sewer rates and charges of approximately $28 million, or 5.8% compared to revenues from rates and charges contained in the Fiscal Year 2012 budget.  The Fiscal Year 2013 budget also reflects a decrease in miscellaneous and non-operating revenue and was developed using more conservative assumptions regarding billable wastewater volumes.  As a result, the Fiscal Year 2013 rates were designed to achieve an increase in revenue of 8.5% in Fiscal Year 2013 compared to the rates developed to support the Fiscal Year 2012 budget.

## Projected Operations for Fiscal Year 2012 through 2016

The projected financial operations of the Sewage Disposal System shown in the table on the following page include assumptions relating to inflation and to costs associated with the CIP, including debt service on additional bonds and additional operating costs associated with operating new facilities, all assuming application of current federal pollution control standards and compliance schedules and requirements under the Clean Water Act and the Clean Air Act.  The projected revenues shown in the table anticipate normal weather conditions and are based on an analysis of recent historical trends, which indicate a leveling off of recent declines in billed wastewater volumes.   Projected revenues from existing rates are based on data from the first nine months of Fiscal Year 2012, which indicate that year-to-date revenues are within two percent of the original target.  More conservative estimates for non-operating revenues have been made, reflecting lower investment balances and interest rates than originally envisioned by the Fiscal Year 2011-12 financial plan.

The projected additional revenue required reflects the minimum additional amounts that are needed to meet the requirements of the Bond Ordinance and the policies enacted by the Board, given the various assumptions.  The financial plan summarized by these projections is designed to enhance the Sewage Disposal System's balance sheet, reverse the erosion in net assets that has occurred in recent years, and improve the Sewage Disposal System's liquidity position.  The Department has embraced this planning strategy, which will result in higher debt service coverage ratios, as indicated in the following table.  In addition, the Department has indicated that it intends to develop financial plans and Sewage

Disposal System rates that meet financial objectives without utilizing revenues that result from the look-back adjustment.

The operation and maintenance expense projection for Fiscal Year 2012 is based on review of the Fiscal Year 2012 budget and actual expenses for the first nine months of the Fiscal Year, which indicate that operation and maintenance expenses are running at about 95% of the original budget. The Fiscal Year 2013 estimate is based on this information and the Department's Fiscal Year 2013 Budget and serves as a base for the remaining years. The total debt service includes the amounts due on all outstanding Sewage Disposal System Revenue Bonds, and estimated amounts on the Series 2012 Bonds that are being issued to fund the CIP. The projected Net Revenues are divided by the applicable debt service to show estimated coverage. The available balance is applied to non-operating expenses, including payments related to the System's share of the City's Pension Obligation Certificates of Participation ("POCs") renewals and replacements, operating reserves, the Extraordinary Repair and Replacement Reserve Fund and the portion of the CIP funded with revenue financed capital.

The projections set forth in the following table are intended as "forward-looking statements." The City cautions that these projections may and often do differ materially from actual results. Some of the factors that could cause actual results to differ materially from those projected are the Department's ability to execute the CIP as scheduled and within budget, regional climate and weather conditions, and adverse legislative, regulatory or legal decisions (including environmental laws and regulations) affecting the Department's ability to manage the Sewage Disposal System.

59

## Summary of Projected Revenues and Additional Revenue Requirements
### For Fiscal Years 2012-2016

| | Fiscal Year Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| Operating Revenue Under Existing Rates[a] | $453,875,900 | $453,875,900 | $453,875,900 | $453,875,900 | $453,875,900 |
| Projected Revenue from Rate Increases[b] | | | | | |
|   FY 2013:  8.5% | - | 38,724,900 | 38,724,900 | 38,724,900 | 38,724,900 |
|   FY 2014:  8.0% | - | - | 39,486,000 | 39,486,000 | 39,486,000 |
|   FY 2015:  6.5% | - | - | - | 34,660,300 | 34,660,400 |
|   FY 2016:  6.0% | - | - | - | - | 33,948,000 |
| Total Projected Revenue from Sewer Rates | 453,875,900 | 492,600,800 | 532,086,800 | 566,747,100 | 600,695,200 |
| Revenue from Look-Back | 18,900,000 | 23,067,000 | - | - | - |
| Miscellaneous Operating Revenue | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| Projected Non-Operating Revenue | 1,966,300 | 2,258,000 | 1,837,100 | 1,553,600 | 1,591,700 |
|     Total Projected Operating Revenue | 479,742,800 | 522,925,800 | 538,923,900 | 573,300,700 | 607,286,900 |
| Operation and Maintenance Expense[c] | 222,744,500 | 230,323,600 | 236,081,700 | 246,983,700 | 255,533,300 |
| Projected Net Operating Revenues | 256,998,300 | 292,602,200 | 302,842,200 | 326,317,000 | 351,753,600 |
| Senior Lien Debt Service[d] | 110,552,600 | 138,875,300 | 135,804,700 | 136,264,500 | 144,021,000 |
| Second Lien Debt Service[d] | 63,282,800 | 55,922,200 | 64,137,600 | 63,722,600 | 54,837,500 |
| SRF Debt Service[d] | 36,041,600 | 36,447,000 | 37,209,000 | 37,161,900 | 37,694,000 |
|     Total Debt Service | 209,877,000 | 231,244,500 | 237,151,300 | 237,149,000 | 236,552,500 |
| Projected Senior Lien Debt Service Coverage | 232% | 211% | 223% | 239% | 244% |
| Projected Senior Lien and Second Lien Debt | | | | | |
|     Service Coverage | 148 | 150 | 151 | 163 | 177 |
| Projected Total Debt Service Coverage | 122 | 127 | 128 | 138 | 149 |
| Balance for CIP and Other Purposes | $47,121,300 | $61,357,700 | $65,690,900 | $89,168,000 | $115,201,100 |

---

[a]   Revenues for Fiscal Years 2012 - 2016 reflect rates in effect as of the date of this Official Statement.
[b]   Projected additional revenue is developed based upon projected increases in operation and maintenance expense, debt service coverage and certain other requirements that must be met in order to issue additional bonds to finance the CIP.
[c]   Assumes an annual inflation rate of 2.0% after Fiscal Year 2013. Operating expense includes remarketing fees.
[d]   Reflects debt service (principal and interest) on all existing indebtedness, the Series 2012 Bonds and future bonds. Excludes swap interest and debt service on the Advance Refunded Bonds.
SOURCE: The Foster Group, LLC.

## Future Bond Issuances

After the issuance of the Series 2012 Bonds, the Department expects that no additional Sewage Disposal System Revenue Bonds will be issued to finance the Fiscal Year 2012-2016 CIP. The Department may issue additional Sewage Disposal System Revenue Bonds beyond Fiscal Year ending June 30, 2016, to provide for future capital needs of the Sewage Disposal System. In addition, if the Board approves an increase in the Fiscal Year 2013-2017 CIP for long-term biosolids management, additional Sewage Disposal System Revenue Bonds may need to be issued in Fiscal Year 2015 to finance the additional expenditures. See "THE CAPITAL IMPROVEMENT PROGRAM." The Department intends to adjust rates, as appropriate and consistent with the Bond Ordinance and the Board rate covenant policy. The Department plans to issue approximately $30 million of SRF Junior Lien Bonds in the summer of 2012.

# PENSION PLAN CONTRIBUTIONS

## Detroit's General Retirement System

Department employees are members of Detroit's General Retirement System ("DGRS"), which is a contributory single-employer retirement plan. The plan is composed of a defined benefit pension plan and defined contribution plan. The plan provides retirement, disability and survivor benefits to plan members and beneficiaries. Members of the plan include active employees, retirees and beneficiaries. Active members earn service credit that entitles them to receive benefits in the future. Retirees and beneficiaries are those members currently receiving benefits. DGRS is a relatively mature plan in that there are more members receiving current benefits than active members. As of June 30, 2011, there were 7,910 active members, 11,535 members receiving benefits, and 2,074 terminated plan members entitled to, but not yet receiving, benefits. For more information regarding the DGRS, see APPENDIX G – "OVERVIEW OF THE CITY OF DETROIT'S GENERAL RETIREMENT SYSTEM."

Basic pension and disability benefits are funded through employer contributions and investment earnings thereon. The excess of benefits over contributions is funded through investment income, with public capital markets representing the primary source of opportunities to earn investment income.

Benefits are paid monthly, subject to certain minimum and maximum amounts, and are determined according to fixed rates per year of credited service. Pension benefits for all members of DGRS are increased annually by 2.25% of the original pension.

## DGRS Funding Policy

The City has State constitutional and statutory obligations to provide pension funding. The DGRS funding policy provides for periodic employer contributions at actuarially determined rates that, expressed as percentages of annual covered payroll, are sufficient to accumulate sufficient assets to pay benefits when due. The contribution requirements are established and may be amended by the DGRS' board of trustees, in accordance with the City Charter, union contracts and plan provisions, based on information provided by the DGRS' consulting actuary. The City's contribution is set by the City Council in conjunction with its approval of the City's annual budget based on information provided by the DGRS' consulting actuary.

The recommended contribution rate is determined by the DGRS' consulting actuary who uses the entry-age normal actuarial cost funding method. Significant actuarial assumptions used to compute contribution requirements are the same as those used to compute the actuarial accrued liability. Based on the City's current financial condition, there is uncertainty regarding the City's ability to meet its future financial obligations, including its UAAL.

## DGRS Asset Allocation and Investment Results

State statutes impose limitation on what fraction of the total assets of the plan may be invested in assets other than government bonds, investment grade bonds, and certain mortgages. Additional restrictions are imposed on what fraction of the total assets may be invested in foreign securities. The DGRS Board's asset allocation policies comply with applicable state statutes. The DGRS asset allocation policy as of June 30, 2011 calls for 50% in equities; 8% in tactical asset allocation; 21% in fixed income; 10% in real estate; 9% in alternative investments; and 2% in market neutral.

The total fund composite return for the year ended June 30, 2011 was 18.7%. The fund has shown a positive return in the last two years and has continued to recover its investment values post-

recession and 2008-2009 credit crises.  Total plan returns for the fiscal years ended June 30, 2006 through 2011, are shown in the following table.

| Fiscal Year ended June 30 | Total Fund Return[1] |
|---|---|
| 2011 | 18.7% |
| 2010 | 8.0 |
| 2009 | (18.8) |
| 2008 | (4.3) |
| 2007 | 18.9 |
| 2006 | 11.3 |

(1) All returns are annualized and have been determined using the Association for Investment Management and Research (AIMR)-compliant, time-weighted, Global Investment Performance Standard (GIPS) method.
SOURCE: DGRS' audited financial statements.

## Summary of Department Member Data

A summary of the Department's active member data compared to the total DGRS active membership as of June 30, 2010, is set forth below.

|  | Department | Total DGRS (including the Department) |
|---|---|---|
| **Number of Active Members** | 2,041 | 8,072 |
| **% Change in Active Members** | (0.6%) | (6.1%) |
| **Annual Payroll (mm)** | $88.1 | $334.3 |
| **Average Pay** | $43,177 | $41,420 |
| **% Change in Average Pay** | (0.2%) | (0.3%) |

SOURCE:  DGRS' annual actuarial valuation as of June 30, 2010.

A summary of the Department's retired and inactive vested member data compared to the total DGRS active membership as of June 30, 2010, is set forth below.

|  | Retired Members and Beneficiaries | | Inactive Vested Members | |
|---|---|---|---|---|
|  | Department | Total DGRS (including the Department) | Department | Total DGRS (including the Department) |
| **Number** | 2,248 | 11,539 | 337 | 1,629 |
| **Annual Benefits (mm)** | $48.1 | $209.8 | $4.5 | $19.6 |
| **Average Benefits** | $21,416 | $18,178 | $13,486 | $12,038 |
| **% Change in Average Benefit** | 4.1% | 4.3% | 29.1% | 26.8% |

SOURCE:  DGRS' annual actuarial valuation as of June 30, 2010.

## Sewage Disposal System Contributions and Annual Pension Cost

Payments to the pension fund are charged administratively by the City to the Sewage Disposal System and are treated as an administrative expense of the Sewage Disposal System.  These amounts are calculated to be amounts necessary to fund financial benefits as earned (Normal costs) as well as an amount necessary to amortize unfunded actuarial accrued liability ("UAAL").  For employees budgeted

strictly as Sewage Disposal System employees, contributions are made directly to the pension fund. For employees common to the Water Supply System and the Sewage Disposal System, payments are generally made by the Water Supply System, which are then periodically reimbursed by the Sewage Disposal System.

Based upon the June 30, 2010 actuarial valuation, the actuarial required contribution rate for Fiscal Year 2012 for the Department is 25.82% of covered payroll. Beginning with the June 30, 2010 valuation, the valuation results for the Water Supply System and Sewage Disposal System were combined for the purpose of setting contribution rates. The combined contribution rate for the two divisions as of the June 30, 2009 actuarial valuation was computed to be 19.63% of covered payroll for Fiscal Year 2011.

Contributions for the Sewage Disposal Fund equaled $7,684,559 for the fiscal year ended June 30, 2011. The following table sets forth the contributions of the Sewage Disposal Fund to the DGRS for fiscal years 2007 through 2011.

### Sewage Disposal System Contributions to the DGRS

| For the Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|
| **2007** | **2008** | **2009** | **2010** | **2011** |
| $3,841,780 | $6,340,878 | $5,147,752 | $4,490,119 | $7,684,559 |

SOURCE: Sewage Disposal System's audited financial statements.

As set forth in the Sewage Disposal System's audited financial statements, the annual pension cost and the changes in net pension asset allocated to the Sewage Disposal System for the year ended June 30, 2011, were as set forth in the following table.

| | |
|---|---|
| Annual required contributions | $11,016,094 |
| Interest on net pension asset | (6,987,961) |
| Adjustment to annual required contribution | 5,236,793 |
| Annual pension cost | 9,264,926 |
| Contributions made (employer) | 7,684,559 |
| Changes in net pension asset | (1,580,367) |
| Net pension asset, beginning of year | 88,455,199 |
| Net pension asset, end of year | $86,874,832 |

SOURCE: Sewage Disposal System's audited financial statements.

The actuarial methods and significant assumptions used to determine the Sewage Disposal System's annual required contribution ("ARC") for the Fiscal Year ended June 30, 2011, were as set forth in the following table.

| | |
|---|---|
| Valuation date | June 30, 2009 |
| Actuarial cost method | Entry age |
| Amortization method | Level percent |
| Remaining amortization period for unfunded accrued liabilities | 30 years |
| Asset valuation method | 5 year smoothed market |
| Actuarial assumptions: | |
| Investment rate of return | 7.9% |
| Projected salary increases* | 4.0% -8.9% |
| Cost-of-living adjustments | 2.25% |

* Includes inflation rate of 4%.
SOURCE: Sewage Disposal System's audited financial statements.

Beginning with the June 30, 2010 actuarial valuation, the DGRS Board adopted a change in asset valuation method, which recognizes gains and losses in excess of the assumed investment return over a longer period of seven years. In addition, all unrecognized gains and losses from prior years were combined and smoothed over seven years. This change resulted in a decrease of required contribution dollars for Fiscal Year 2012.

As of June 30, 2010, the funding value of assets of DGRS was nearly $992 million greater than the market value. The consulting actuary noted that as that difference is recognized over the next six years, computed contribution rates will continue to increase unless offset by future experience gains. In the absence of future experience gains, computed contribution rates will increase by approximately an additional 16-17% of payroll over the next six years.

**Funded Status and Funding Progress**

As of June 30, 2010, the most recent actuarial valuation date, the DGRS was 87.1% funded on an actuarial basis and approximately 60% funded on a market value of assets basis. The actuarial accrued liability for benefits to all City employees participating in DGRS was $3,719,586,762 and the actuarial value of assets was $3,238,130,553, resulting in a UAAL of $481,456,209. Of this amount, it was estimated that 13% is attributable to the Sewage Disposal System, as stated in the Sewage Disposal System's audited financial statements for Fiscal Year ended June 30, 2011. The covered payroll (annual payroll of all City employees covered by the plan) was $334,343,506 and the ratio of the UAAL to covered payroll was 144.0%.

A schedule of funding progress for the DGRS, which presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits, is included in APPENDIX G – "OVERVIEW OF THE CITY OF DETROIT'S GENERAL RETIREMENT SYSTEM."

## SOURCE AND PRIORITY OF PENSION PAYMENTS

The City annually allocates a portion of the payments it makes to the DGRS to the Sewage Disposal System as an administrative decision and the Sewage Disposal System pays these costs from amounts held under the Indenture. These costs consist of the actuarially allocated portion of (i) Normal cost, (ii) amortization of UAAL and (iii) Service Payments owed by the City to the Service Corporation.

**UAAL Funding**

The City funded certain UAAL of the DGRS through creation of the Detroit General Retirement System Service Corporation (the "Service Corporation"). The City is a party to two Service Contracts, dated May 25, 2005 (the "2005 Service Contract") and June 7, 2006 (the "2006 Service Contract" and together with the 2005 Service Contract, the "Service Contracts"), with the Service Corporation. The GRS is not a party to any of the Service Contracts.

In 2005, the Service Corporation created a funding trust, which issued Pension Certifications of Participation (the "2005 POCs") evidencing undivided proportionate interests in the rights to receive certain payments to be made by the City under the 2005 Service Contract. A portion of the proceeds of the 2005 POCs was irrevocably paid to the DGRS, fully funding $777,240,000 of the UAAL of the DGRS existing at that time.

In 2006, the Service Corporation created a new funding trust, which issued Pension Obligation Certificates of Participation (the "2006 POCs" and, together with the 2005 POCs, the "POCs")

64

evidencing undivided proportionate interests in the rights to receive certain payments to be made by the City under the 2006 Service Contract. A portion of the proceeds of the 2006 POCs was used to optionally redeem certain outstanding 2005 POCs and to extend the amortization schedule for repayment of the UAAL obligations.

Pursuant to the Service Contracts, the City pays Regular Scheduled Payments, Service Charges and certain other payments (collectively, the "Service Payments") to the Service Corporation. Regular Scheduled Payments, in the aggregate, generally correspond to principal and interest costs incurred by the Service Corporation. Service Charges generally reflect the financing costs incurred by the Service Corporation in funding the UAAL. The Service Payments are calculated to be sufficient to make payments on the POCs.

The City entered into certain interest rate exchange agreements (the "POC Swap Agreements") in conjunction with the issuance of the POCs, payments on which also are a part of the Service Payments made by the City to the Service Corporation. For more information on the POC Swap Agreements, see APPENDIX G – "OVERVIEW OF THE CITY OF DETROIT'S GENERAL RETIREMENT SYSTEM – POC Swap Agreements."

Payments made by the City under the Service Contracts are not debt of the City but are contractual obligations.

A proportionate share of the Service Payments, including those related to the POC Swap Agreements, is allocated to the Sewage Disposal System. Were a termination payment to become payable by the Service Corporation on the POC Swap Agreements ("POC Hedge Termination Payable"), it also would be payable as part of the Service Payments, which could be allocated among various City departments, including the Sewage Disposal System. See "Payment of Pension Costs Allocated to the Sewage Disposal System" below.

**The POC Swap Agreements provide that, among other things, the appointment of a review team to make recommendations or declare financial emergencies with respect to a financially distressed local government entity is a termination event. A termination event, if declared, could require the City to make substantial termination payments, a portion of which could be allocated to the Sewage Disposal System. The portion of the termination payments that could be allocated to the Sewage Disposal System was approximately $30 million as of April 30, 2012.** For an overview of the City's Retirement Systems, see APPENDIX G – "OVERVIEW OF THE CITY OF DETROIT'S GENERAL RETIREMENT SYSTEM – POC Swap Agreements."

**Pension Cost Payment Obligation**

The payment obligations to the DGRS are obligations of the City itself and are not obligations of the Sewage Disposal System, the Water Supply System or any City department, such as the Department. Furthermore, the payments under Service Contracts are contractual obligations of the City and are not obligations of the Sewage Disposal System, the Water Supply System or any department of the City.

**Payment of Pension Costs Allocated to the Sewage Disposal System**

Costs (such as Normal costs and UAAL) allocated to the Sewage Disposal System are paid from the Operation and Maintenance Fund as expenses of administration and operation of the Sewage Disposal

System.  The Service Payments are not paid from the Operation and Maintenance Fund but are treated as a non-operating expenditure.[1]

Bond Counsel is of the opinion that POC Hedge Termination Payables are neither expenses of administration and operation of the Sewage Disposal System nor Hedge Obligations as that term is used in the Indenture.  Therefore, POC Hedge Termination Payables may not be paid from the Operation and Maintenance Fund or from amounts credited to any of the Interest and Redemption Funds established by the Indenture.

## OTHER POST EMPLOYMENT BENEFITS

### Plan Description

The Sewage Disposal System employees participate in the Health and Life Insurance Benefit Plan (the "Benefit Plan"), which is a single-employer defined benefit plan administered by the City and the City's Retirement Systems.  The Benefit Plan provides hospitalization, dental care, vision care and life insurance to all officers and employees of the City who were employed on the day preceding the effective date of the Benefit Plan and who continue in the employ of the City on and after the effective date of the Benefit Plan.  Retirees are allowed to enroll in any of the group plans offered by the City to active employees.  The City provides healthcare coverage for substantially all retirees in accordance with terms set forth in union contracts or provisions found in Section 13, Article 8 of the Code of Ordinances.

### Funding

The costs of benefits for the Benefit Plan for the Sewage Disposal System retirees for the Fiscal Year ended June 30, 2011, which are financed on a pay-as-you-go basis, are as follows.

| Benefits | City cost | Retiree cost | Total cost |
|---|---|---|---|
| Hospitalization | $9,184,057 | $1,006,763 | $10,190,820 |
| Dental | 480,378 | - | 480,378 |
| Vision | 75,850 | - | 75,850 |
| Life Insurance | 14,273 | 1,646 | 15,919 |
| | $9,754,558 | $1,008,409 | $10,762,967 |

SOURCE:  Sewage Disposal System's audited financial statements.

A retiree generally is required to pay 10% or 20% of the health insurance premium on a monthly basis.

The costs of benefits for the Supplemental Death Benefit Plan, a pre-funded plan for which funds are held in the City of Detroit Employee Benefit Trust, for the Sewage Disposal System retirees for the Fiscal Year ended June 30, 2011, are set forth in the following table.

---

[1] In connection with the issuance of the 2011 Water System Bonds, the City received legal advice from another bond counsel firm regarding the treatment of the Service Payments.  That firm considered the components of Service Payments made under the Service Contracts and advised the City that the portion of Regular Scheduled Payments and Service Charges corresponding to UAAL and financing costs may be properly paid from the Operation and Maintenance Fund as expenses of administration and operation of the Water Supply System.  For additional information see section captioned "PENSION PLAN AND BENEFITS CONTRIBUTIONS" in the City of Detroit, Michigan Official Statement relating to its 2011 Water System Bonds dated December 20, 2011, and available through the Electronic Municipal Market Access (EMMA) website of the Municipal Securities Rulemaking Board, currently located at http://emma.msrb.org.

| Benefits | City cost | Retiree cost | Total cost |
|---|---|---|---|
| Supplemental Death Benefit Plan | $12,661 | $1,497 | $14,158 |

SOURCE: Sewage Disposal System's audited financial statements.

The City of Detroit Employee Benefit Trust paid death benefits in the amount of $100,599 for Sewage Disposal System retirees for the Fiscal Year ended June 30, 2011.

**Annual OPEB Costs and Net OPEB Obligation**

The Sewage Disposal System's annual OPEB cost (expense) is calculated based on the ARC, an amount actuarially determined in accordance with the parameters of Government Accounting Standards Board's Statement 45. The ARC represents a level of funding that, if paid on an ongoing basis, is projected to cover normal costs each year and amortize any unfunded actuarial liabilities (or funding excess) over a period not to exceed 30 years.

The following table shows the components of the Sewage Disposal System's annual OPEB cost for the year ended June 30, 2011, the amount actually contributed to the plans, and changes in the Sewage Disposal System's OPEB obligation for the retirees of the Sewage Disposal System.

| | Health and Life Insurance Benefit Plan | Supplemental Death Benefit Plan | Total |
|---|---|---|---|
| ARC | $22,224,712 | $90,886 | $22,315,598 |
| Interest on net OPEB obligation | 1,216,653 | 1,786 | 1,218,439 |
| Adjustment to ARC | (1,013,877) | (1,191) | (1,015,068) |
| Annual OPEB Cost (Expense) | 22,427,488 | 91,481 | 22,518,969 |
| Contributions Made | (9,754,558) | (12,611) | (9,767,169) |
| Changes in Net OPEB Obligation | 12,672,930 | 78,870 | 12,751,800 |
| Net OPEB Obligation, beginning of year | 30,416,317 | 35,722 | 30,452,039 |
| Net OPEB Obligation, end of year | $43,089,247 | $114,592 | $43,203,839 |

SOURCE: Sewage Disposal System's audited financial statements.

The annual OPEB cost, the percentage of annual OPEB cost contributed to each plan, and the OPEB obligation for the retirees of the Sewage Disposal System for the three most recent Fiscal Years were as follows.

| | Year ended | Annual OPEB cost | Actual contributions | Percentage of annual OPEB cost contributed | Net OPEB obligation |
|---|---|---|---|---|---|
| Health and Life Insurance Benefit Plan | June 30, 2011 | $22,427,488 | $9,754,558 | 43.5% | $43,089,247 |
| | June 30, 2010 | 20,826,768 | 8,334,710 | 40.1 | 30,416,317 |
| | June 30, 2009 | 16,999,991 | 7,941,293 | 46.7 | 17,924,259 |
| Supplemental Death Benefit Plan | June 30, 2011 | $91,481 | $12,611 | 13.8% | $114,592 |
| | June 30, 2010 | 47,940 | 12,398 | 25.9 | 35,722 |
| | June 30, 2009 | 11,479 | 13,932 | 121.4 | 180 |

SOURCE: Sewage Disposal System's audited financial statements.

**Funding Status and Funding Progress**

As of June 30, 2009, the most recent actuarial valuation date for the Benefit Plan, the actuarial accrued liability for benefits related to all City employees was $4,971,236,281, and the actuarial value of assets was zero, resulting in a UAAL of $4,971,236,281. The covered payroll (annual payroll of all active City employees covered by the plan) was $591,242,616 and the ratio of the UAAL to the covered payroll was 841%. The funding status related to the retirees of the Sewage Disposal System or the entire Department was not available.

As of June 30, 2010, the most recent actuarial valuation date for the Supplemental Death Benefit Plan, the actuarial accrued liability for benefits related to all City employees was $35,186,590 and the actuarial value of assets was $24,067,628, resulting in a UAAL of $11,118,962. The covered payroll (annual payroll of all active City employees covered by the plan) was $567,288,051 and the ratio of the UAAL to the covered payroll was 1.9%. The funding status related to the retirees of the Sewage Disposal System or the entire Department was not available.

Actuarial valuations of the ongoing plans involve estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

## FEASIBILITY CONSULTANT'S REPORT

The Department has engaged The Foster Group, LLC to conduct an evaluation of the Sewage Disposal System, including information about the financial feasibility of completing the CIP. A copy of the report (the "Feasibility Report") summarizing the findings of the Feasibility Consultant's evaluation is included as APPENDIX A. Set forth below are the Feasibility Consultant's findings and conclusions with respect to the financial feasibility of the Series 2012 Bonds. The Feasibility Report should be read in its entirety for a complete understanding of the assumptions, considerations, estimates and calculations upon which these conclusions are based.

- The Department's current wastewater rates are below the average of those in effect in comparably sized cities. While faced with additional capital expenditures to ensure reliability of service, the projected increases in the Department's wastewater rates through 2016 are expected to be comparable to what will be experienced in other large metropolitan areas.

- In addition to the relatively low wastewater rates, the Department's current water rates are competitive with those in effect in comparably sized cities. The supply and price of water, coupled with the availability of wastewater treatment, should continue to be a positive factor in attracting and maintaining industry to the System's service area.

- The Department's financial plan is sound, supported by gradual rate increases, and is expected to be sufficient to adequately fund the CIP and other programs necessary to meet System obligations.

- The Department's current fiscal policies and plans are designed to result in continued improvements in the current financial position of the System, including reported debt service coverage and changes in net assets. The provisions of the November 4, 2011 Order should further enhance these policies.

- The revenues pledged as security for the Series 2012 Bonds are projected to be sufficient to comply with rate covenants required by the Bond Ordinance and the targets established by Board policy.

- Based on the financial projections set forth in the Feasibility Report, the coverage requirements contained in the Bond Ordinance authorizing the issuance of the Series 2012 Bonds have been met.

## TAX MATTERS

**Series 2012 Bonds Federal Tax Matters**

In the opinion of Bond Counsel, based on their examination of the documents described in their opinion, under existing law, the interest on the Series 2012 Bonds (a) is excluded from gross income for federal income tax purposes and (b) is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. It should be noted, however, that with respect to corporations (as defined for federal income tax purposes) such interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations. The opinion is subject to the condition that the City comply with all requirements of the Code that must be satisfied subsequent to the issuance of the Series 2012 Bonds in order that interest thereon be (or continue to be) excluded from gross income for federal income tax purposes. These requirements may include rebating certain earnings to the United States. Failure to comply with any of such requirements could cause the interest on the Series 2012 Bonds to be so included in gross income retroactive to the applicable date of issuance of the Series 2012 Bonds. The City has covenanted to comply with all such requirements. The Bond Counsel will express no opinion regarding other federal tax consequences arising with respect to the Series 2012 Bonds and the interest thereon.

Additional federal tax consequences relative to the Series 2012 Bonds and interest thereon include the following matters. The following is a general description of some of these consequences, but is not intended to be complete or exhaustive, and investors should consult their tax advisors with respect to these matters. For federal income tax purposes: (a) tax-exempt interest, including interest on the Series 2012 Bonds, is included in the calculation of modified adjusted gross income required to determine the taxability of social security or railroad retirement benefits; (b) the receipt of tax-exempt interest, including interest on the Series 2012 Bonds, by life insurance companies may affect the federal income tax liabilities of such companies; (c) the amount of certain loss deductions otherwise allowable to property and casualty insurance companies will be reduced (in certain instances below zero) by 15% of, among other things, tax-exempt interest, including interest on the Series 2012 Bonds; (d) interest incurred or continued to purchase or carry the Series 2012 Bonds may not be deducted in determining federal income tax; (e) commercial banks, thrift institutions and other financial institutions may not deduct their costs of carrying certain obligations such as the Series 2012 Bonds; (f) interest on tax-exempt bonds, such as the Series 2012 Bonds, will be included in effectively connected earnings and profits for purposes of computing the branch profits tax on certain foreign corporations doing business in the United States; and (g) passive investment income, including interest on tax-exempt bonds such as the Series 2012 Bonds, may be subject to federal income taxation for Subchapter S Corporations that have Subchapter C earnings and profits at the close of the taxable year if greater than 25% of the gross receipts of such Subchapter S Corporation is passive investment income.

*Original Issue Discount.* For federal income tax purposes, if the initial public offering price of a Series 2012 Bond as shown on the inside cover of this Official Statement is less than the stated redemption price at maturity, then such Series 2012 Bond is considered to have an "original issue

discount" equal to the difference between such initial offering price and the amount payable at maturity (such Series 2012 Bonds are referred to as "Original Issue Discount Bonds"). The original issue price of each Original Issue Discount Bond will be the initial offering price to the public at which a substantial amount of Original Issue Discount Bonds are sold, and the issue date will be the date on which an Original Issue Discount Bond is first issued to the public.

In the opinion of Bond Counsel, under existing law, the original issue discount on an Original Issue Discount Bond accrued in the hands of a registered owner is treated for federal income tax purposes as tax exempt interest as described below. The registered owner's basis for determining gain or loss on a sale, maturity or other disposition of an Original Issue Discount Bond generally will equal the registered owner's cost, increased by any original issue discount that accrued while the registered owner held the Original Issue Discount Bond as described below. Generally, any gain or loss incurred by a U.S. registered owner on the sale, exchange or payment at maturity of an Original Issue Discount Bond (based on the registered owner's basis) would be taxable as capital gain or loss (assuming the Original Issue Discount Bond is held as a capital asset), which would be long-term or short-term depending on whether the Original Issue Discount Bond was held for more than the applicable period for treatment of long-term capital gain.

Subject to the modification described in the next paragraph for certain subsequent registered owners, the original issue discount accrued in each "accrual period" will equal the original issue price of the Original Issue Discount Bond (increased by the amount of the original issue discount accrued in all prior accrual periods without regard to the modifications discussed in the next paragraph) multiplied by the yield to the maturity of the Original Issue Discount Bond (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) less the interest payable on such Original Issue Discount Bond during such accrual period. For purposes of this paragraph, "accrual period" means a six month period (or shorter period from the date of original issue of the Original Issue Discount Bond) which ends on a day in the calendar year corresponding to the maturity date of the Original Issue Discount Bond or the date six months before such maturity date. The original issue discount so accrued in a particular accrual period will then be considered to accrue ratably on each day of the accrual period.

A modification of the foregoing rules will generally apply to a registered owner who acquired an Original Issue Discount Bond by "purchase" if the cost of the Original Issue Discount Bond to that purchaser exceeds the sum of (a) the original issue price of the Original Issue Discount Bond and (b) the total original issue discount accrued under the rules of the preceding paragraph during the entire period prior to the registered owner's purchase of the Original Issue Discount Bond. In that case, the amount of the original issue discount considered to accrue in an accrual period will equal (i) the amount determined under the rules of the preceding paragraph reduced by (ii) the portion of such excess purchase price allocable to the days beginning on the date of such purchase and ending on the stated maturity date of the Original Issue Discount Bond. Such excess would be allocated so as to equal a constant percentage of the original issue discount accrued on each such day in the remaining period to maturity as described above. For this purpose, a "purchase" is any acquisition of an Original Issue Discount Bond other than one in which the registered owner's basis in such Original Issue Discount Bond is determined by reference to the basis of the Original Issue Discount Bond in the hands of the person from whom acquired (such as a gift).

*Amortizable Bond Premium*. For federal income tax purposes, under existing law, if the initial offering price of a Series 2012 Bond is greater than the stated redemption price at maturity (such bonds are hereafter referred to as "Premium Bonds"), then the difference between a purchaser's cost basis of the Premium Bonds and the amounts payable on the Premium Bonds (other than the payment of the stated interest thereon) constitutes an amortizable bond premium. Such amortizable bond premium is not deductible from gross income, but is treated for federal income tax purposes as an offset to the amount of

stated tax-exempt interest paid on the Premium Bonds and is taken into account by certain corporations in determining adjusted current earnings for the purpose of computing the alternative minimum tax, which may also affect liability for the branch profits tax imposed by Section 884 of the Code.

In general, the amount of amortizable bond premium allocated to each "accrual period" is the excess of the stated interest on a Premium Bond allocable to such accrual period over the product of the bond purchaser's adjusted acquisition price at the beginning of the accrual period multiplied by the discount rate that, when used in computing the present value of all remaining payments to be made on such Premium Bond (including stated interest) produces an amount equal to the holder's basis in the Premium Bonds. For purposes of this calculation, the adjusted acquisition price at the beginning of any accrual period is equal to the purchaser's original basis in the Premium Bond decreased by (i) the amount of bond premium amortized in prior accrual periods and (ii) the amount of any payments previously made on the Premium Bond other than payments of stated interest on such Premium Bond.

The amount of amortizable bond premium allocable to each taxable year is deducted from the bond purchaser's adjusted basis on such Premium Bonds to determine taxable gain upon disposition (including sale, redemption or payment at maturity) of such bonds.

*Market Discount.* Pursuant to amendments made to the Code by the Omnibus Budget Reconciliation Act of 1993, the "market discount rules" of the Code apply to the Series 2012 Bonds. Accordingly, holders acquiring their Series 2012 Bonds subsequent to the initial issuance of the Series 2012 Bonds will generally be required to treat market discount recognized under the provisions of the Code as ordinary taxable income (as opposed to capital gain income). Holders should consult their own tax advisors regarding the application of the market discount provisions of the Code and the advisability of making any of the elections relating to market discount allowed by the Code.

## Series 2012 Bonds State Tax Matters

Bond Counsel is further of the opinion that, under existing law, the Series 2012 Bonds and the interest thereon are exempt from all taxation provided by the laws of the State of Michigan, except inheritance and estates taxes, and taxes on gains realized from the sale, payment or other disposition of the Series 2012 Bonds.

INVESTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE TAX CONSEQUENCES OF THEIR ACQUISITION, HOLDING OR DISPOSITION OF THE SERIES 2012 BONDS.

## Future Developments

No assurance can be given that any future legislation or clarifications or amendments to the Code, if enacted into law, will not contain proposals which could cause the interest on the Series 2012 Bonds to be subject directly or indirectly to federal income taxation, or which could cause the interest on the Series 2012 Bonds to be subject directly or indirectly to State of Michigan income taxation, adversely affect the market price or marketability of the Series 2012 Bonds, or otherwise prevent the holders from realizing the full current benefit of the status of the interest thereon. Further, no assurance can be given that any such future legislation, or any actions of the Internal Revenue Service, including, but not limited to, selection of the Series 2012 Bonds for audit examination, or the course or result of any examination of the Series 2012 Bonds, or other bonds which present similar tax issues, will not affect the market price of the Series 2012 Bonds.

# LITIGATION

## Environmental Litigation

In 1977, the EPA filed a lawsuit against the City in the United States District Court, Eastern District of Michigan, Southern Division, to compel the Department to comply with the requirements of the Clean Water Act. The City, the State and the EPA entered into a Consent Judgment in September 1977, which contained specific effluent requirements and specific dates to bring the City into compliance. In 1977, the Court entered an order adding all communities receiving sewage service from the Department as parties. Since that order, all litigation regarding sewage rates and the operations of the sewage system have been heard in the Court. An Amended Consent Judgment was entered by the Court in April 1980. The Court retained jurisdiction under the Amended Consent Judgment in order to ensure the City's continued compliance. A Second Amended Consent Judgment was entered by the Court on August 3, 2000. The Court retained jurisdiction under the Second Amended Consent Judgment in order to ensure the City's continued compliance.

On January 26, 2011, Oakland County filed a Motion for Appointment of Interim Regional Management Committee. The motion alleged that the Department was unable to maintain compliance with the Clean Water Act and its NPDES permit due to mismanagement in the Department. The motion asked the Court to appoint a new management committee comprised of the Mayor, the drain commissioners of Oakland, Wayne and Macomb Counties and one person selected by the Court to oversee the Department. The City opposed the motion.

On February 11, 2011, the City, Oakland, Wayne and Macomb Counties agreed to a Stipulated Order, which was entered by the Court. The Stipulated Order provided that the three members of the Board that represent the three counties would be nominated by executives of the three counties and appointed by the Mayor and that approval of rates and the CIP would require a vote of five commissioners, not a simple majority. The Stipulated Order also provided that six months after its effective date, the City could file a motion to dismiss the case, provided it was in substantial compliance with the NPDES permit and the Consent Judgments.

On July 8, 2011, the City and MDEQ entered into the ACO to resolve notices of violation issued to the Department concerning operations at the Plant. See "THE SEWAGE DISPOSAL SYSTEM – Environmental Matters."

On July 25, 2011, the City filed a motion to dismiss the case. Macomb County and Oakland County filed their responses objecting to the motion to dismiss, arguing that there were institutional barriers and problems within both the City and the Department that made sustained compliance problematic. The counties asked the Court to enter an order addressing those issues and enjoining certain practices and policies within the City and the Department to ensure sustained compliance. The counties asserted that problems in the City's purchasing, human resources and finance systems made it difficult for the Department to maintain compliance and proposed a restructuring of the Department.

On September 9, 2011, the Court entered an Opinion and Order Denying Without Prejudice the City's motion to dismiss finding that the Department had violated the terms of its NPDES permit after it signed the ACO. The Court appointed a committee to examine the root causes of noncompliance and to make a report to the Court. The committee, consisting of the City's Chief Operating Officer, two members of the City Council and one member of the Board, filed its report with the Court.

On November 4, 2011, the Court entered an order addressing the problems identified by the committee and adopting the plan proposed by the committee. The terms of the November 4, 2011 Order include:

- The Department shall develop an employee training program.

- Furlough days and the corresponding pay cut imposed by the City shall not apply to the Department's employees.

- Beginning July 1, 2012, the Department shall no longer be a party to City-wide collective bargaining agreements. The Department shall execute its own collective bargaining agreements with the unions. The Board, not the City Council, shall have the authority to approve the Department's collective bargaining agreements.

- Until existing collective bargaining agreements expire, any terms in those agreements that prevent the Department from contracting for services by contractors or permit employees outside of the Department to be transferred to the Department based on seniority are enjoined.

- The Department shall reduce the number of job classifications to increase workforce flexibility.

- The committee shall continue to meet to consider whether the Department should make a payment in lieu of taxes to the City's general fund.

- The Department shall have its own divisions of purchasing, human resources, law and finance, in place of the City's departments.

- The City Council's authority over the Department's rates shall be limited to approving rates for Detroit customers. The City Council shall have no authority over suburban rates.

- Notwithstanding anything in the City Charter or state law, the Board shall have authority to approve legal settlements, claims, collective bargaining agreements, budgets and contracts.

- The Court ordered that the Department follow the procurement policy developed by the committee, which, among other things, limits the City Council's approval authority over the Department's contracts to: personal services contracts over $150,000, goods or commodities contracts over $2,000,000, professional services contracts over $2,000,000, construction contracts over $5,000,000, and sale of land or equipment over $2,500,000.

On November 14, 2011, Council 25 of AFSCME ("Council 25") filed a motion to intervene in the case so it could challenge the November 4, 2011 Order. On November 18, 2011, Judge Cox denied the motion. Council 25 has filed a notice of appeal with the Sixth Circuit Court of Appeals. On November 28, 2011, Local 207 of AFSCME and the Senior Accountants, Analysts and Appraisers Association filed a motion to intervene, a motion to dissolve or stay the November 4, 2011 Order and a motion to disqualify Judge Cox. On December 13, 2011, Judge Cox denied the motion to intervene. Subsequently, the International Union of Operating Engineers, Local 324 and UAW Region 1, Local 2200, filed similar motions to intervene on December 29, 2011 and January 4, 2012, respectively. Judge Cox denied both motions on February 23, 2012. These unions have filed appeals with the Sixth Circuit Court of Appeals. As of the date of this Official Statement, all appeals were pending.

The Department has filed periodic updates on its actions to comply with the November 4, 2011 Order, including the Director's Compliance Report dated May 4, 2012. See "THE DETROIT WATER AND SEWERAGE DEPARTMENT – Organization" herein.

**Constitutionality of Act 4**

The constitutionality of Act 4 is being challenged in a proceeding commenced in the Circuit Court for the County of Ingham, State of Michigan. For a description of the case, see "SPECIAL INVESTOR CONSIDERATION CONCERNING BANKRUPTCY RISKS – Act 4."

**Other Litigation**

The Department is involved in numerous other lawsuits related to the System. These lawsuits arise primarily out of personal injuries or property damage, or assert breach of contract claims on construction projects for the System. The Department and its legal counsel have determined an estimated contingent reserve against the potential outcome of such claims or the amount of potential damages.

**Federal Indictments**

On December 15, 2010, Detroit's former Mayor, the former Director of the Department, the president of a construction company that has had contracts and subcontracts on Department projects, the City's former Chief Administrative Officer and the former Mayor's father were indicted by a federal grand jury (Case No. CR-10-20403-NGE, Eastern District of Michigan). On November 16, 2011, a third superseding indictment was issued under such case. The charges include racketeering, conspiracy, bid rigging, extortion, bribery, and obstruction of justice. Some of the charges in the indictment relate to some of the Department's contracts and some of the charges in the indictment are related to other matters that do not involve the Department. Detroit's current Mayor directed the City's attorneys to investigate the persons, contracts and contractors named in the indictment and to determine whether the City has the right to pursue civil litigation against them to recover any money they wrongfully obtained. At this time the Department does not believe that the events described in the indictment will have an adverse effect on the security for the Series 2012 Bonds.

On January 11, 2012, the City and the Department filed its Complaint of Intervening Plaintiff in the Matter of Macomb Interceptor Drainage District v. Kwame Kilpatrick, et al., commenced by OMID against a number of City officials, including former Mayor Kilpatrick, alleging racketeering and corruption, among other claims, relating to the defendants' involvement in the repair of a collapsed sewer interceptor at 15 Mile Road in Sterling Heights, Michigan, which resulted in the Department being overcharged for time, labor and materials required to make the necessary repairs. On May 7, 2012, the U.S. District Court for the Eastern District of Michigan issued an order granting the City and the Department's motion to intervene and directed them to file an intervening complaint limited in scope to the claims directly arising out of the 15 Mile Road project. The City and the Department filed the intervening complaint on May 21, 2012.

On May 9, 2012, the SEC filed a complaint in the U.S. District Court for the Eastern District of Michigan charging former City Mayor Kwame M. Kilpatrick, former City treasurer Jeffrey W. Beasley, and the investment adviser to the City's public pension funds involved in a secret exchange of gifts to peddle influence over the funds' investment process. Kilpatrick and Beasley acted as trustees to the pension funds. SEC seeks disgorgement of ill-gotten gains, penalties, and permanent injunctions, including an injunction against Kilpatrick and Beasley to prohibit them from participating in any decisions involving investments in securities by public pensions.

# BOND INSURANCE RISK FACTORS

In the event of default of the payment of principal or interest with respect to the Insured Series 2012 Bonds when all or some becomes due, the Trustee, on behalf of any owner of the Insured Series 2012 Bonds, shall have a claim under the Policy for such payments. However, in the event of any acceleration of the due date of such principal by reason of optional redemption, but not mandatory sinking fund redemption, the payments are to be made in such amounts and at such times as such payments would have been due had there not been any such acceleration. The Policy does not insure payment of redemption premium, if any. The payment of principal and interest in connection with mandatory or optional prepayment of the Insured Series 2012 Bonds by the City which is recovered by the City from the bond owner as a voidable preference under applicable bankruptcy law is covered by the Policy, however, such payments will be made by AGM at such time and in such amounts as would have been due absent such prepayment by the City unless AGM were to pay such amounts at an earlier date.

Under most circumstances, default of payment of principal and interest does not require acceleration of the obligations of AGM without appropriate consent. AGM may direct and must consent to any remedies exercised on behalf of the holder of the Insured Series 2012 Bonds and AGM's consent may be required in connection with amendments to any applicable bond documents.

In the event AGM is unable to make payment of principal and interest as such payments become due under the Policy, the Insured Series 2012 Bonds are payable solely from the moneys received pursuant to the applicable bond documents. In the event AGM becomes obligated to make payments with respect to the Insured Series 2012 Bonds, no assurance is given that such event will not adversely affect the market price of the Insured Series 2012 Bonds or the marketability (liquidity) for the Insured Series 2012 Bonds.

The obligations of AGM are contractual obligations and in an event of default by AGM, the remedies available may be limited by applicable bankruptcy law or state law related to insolvency of insurance companies.

Neither the City nor the Underwriters have made independent investigation into the claims paying ability of AGM and no assurance or representation regarding the financial strength or projected financial strength of AGM is given. Thus, when making an investment decision, potential investors should carefully consider the ability of the Issuer to pay principal and interest on the Insured Series 2012 Bonds and the claims paying ability of AGM, particularly over the life of the investment. For further information with respect to AGM and the Policy, which includes further instructions for obtaining current financial information concerning AGM, see "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Bond Insurance."

# CONTINUING DISCLOSURE

## Continuing Disclosure Undertaking

In order to assist the Underwriters in complying with Rule 15c2-12 and for the benefit of the Holders and the Beneficial Owners of the Series 2012 Bonds, the City will execute on or before the date of delivery of the Series 2012 Bonds a Continuing Disclosure Undertaking, in which it will covenant to (i) disclose certain financial information and operating data relating to the City by not later than 360 days following the end of the Fiscal Year, commencing with the report for Fiscal Year ending on or after June 30, 2012 (the "Annual Financial Information") and (ii) provide notices of the occurrence of certain enumerated events. The Continuing Disclosure Undertaking requires that the Annual Financial Information be filed with the Municipal Securities Rulemaking Board ("MSRB") by electronic

transmission through the Electronic Municipal Market Access ("EMMA") Dataport of the MSRB. The Continuing Disclosure Undertaking also provides that required notices of events be filed by the City with the MSRB by electronic transmission through the EMMA Dataport. The specific nature of the information to be contained in the Annual Financial Information or the notices of material events is set forth in APPENDIX H – "FORM OF THE CONTINUING DISCLOSURE UNDERTAKING."

Except as described in the Continuing Disclosure Undertaking, the provisions of the Continuing Disclosure Undertaking will create no rights in any other person or entity. The obligation of the City to comply with the provisions of the Continuing Disclosure Undertaking is enforceable by any Beneficial Owner of outstanding Series 2012 Bonds. The right to enforce the provisions of the Continuing Disclosure Undertaking is limited to a right, by action in mandamus or for specific performance, to compel performance of the City's obligations under the Continuing Disclosure Undertaking. Any failure by the City to perform in accordance with the Continuing Disclosure Undertaking will not constitute a Default or an Event of Default under the Indenture, and the rights and remedies provided by the Indenture upon the occurrence of a Default or an Event of Default will not apply to any such failure.

**The Disclosure Dissemination Agent**

In order to provide continuing disclosure with respect to the Series 2012 Bonds in accordance with the Continuing Disclosure Undertaking, the City will enter into a Disclosure Dissemination Agent Agreement ("Disclosure Dissemination Agreement") for the benefit of the Beneficial Owners with Digital Assurance Certification, L.L.C. ("DAC"), under which the City has designated DAC as Disclosure Dissemination Agent.

The Disclosure Dissemination Agent has only the duties specifically set forth in the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent's obligation to deliver the information at the times and with the contents described in the Disclosure Dissemination Agreement is limited to the extent the City has provided such information to the Disclosure Dissemination Agent as required by this Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty with respect to the content of any disclosures or notice made pursuant to the terms of the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty or obligation to review or verify any information in the Annual Financial Information, notice of a listed event, or any other information, disclosures or notices provided to it by the City and shall not be deemed to be acting in any fiduciary capacity for the City, the Beneficial Owners or any other party. The Disclosure Dissemination Agent has no responsibility for the City's failure to report to the Disclosure Dissemination Agent a listed event or a duty to determine the materiality thereof. The Disclosure Dissemination Agent shall have no duty to determine or liability for failing to determine whether the City has complied with the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent may conclusively rely upon certifications of the City at all times.

**Prior Continuing Disclosure Non-Compliance**

The City has entered into a number of continuing disclosure undertakings required by Rule 15c2-12 in connection with bonds previously issued by the City. During the past five years, the City has not complied in all material respects with its obligations under such continuing disclosure undertakings. Specifically, from 1996 until Fiscal Year 2010, the City was unable to provide annual financial information within the time periods specified in the applicable agreements. The continuing disclosure undertakings entered into by the City in connection with its prior bond issuances required filing of annual financial information within a specified time period ranging from 180 to 360 days of the City's Fiscal Year end. The audited financial statements for Fiscal Years 2007 through 2009 were filed on February 26, 2009, November 20, 2009, and May 28, 2010, respectively. In an effort to prevent future filing

delays, in the fall of 2008, the City engaged the services of an outside accounting firm to assist the City in the day-to-day preparation of its financial statements for auditing. The City believes that the actions it has taken to enhance its financial reporting process will enable it to continue to prepare audited financials on a timely basis in the future. The City has timely filed its financial statements for Fiscal Years 2010 and 2011.

In addition, the filings the City made were incomplete as the City filed the audited financial statements but failed to file the required updates to the financial and operating data. In May 2012, the City filed all of the required updates to such financial and operating data. The City is now in compliance in all material respects with its continuing disclosure obligations related to its outstanding bonds. The City also has established new policies and procedures that it believes will ensure full and timely compliance with its continuing disclosure obligations in the future.

A failure by the City to comply with a continuing disclosure undertaking must be reported by the City, in accordance with Rule 15c2-12, and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the Series 2012 Bonds in the secondary market. Consequently, such failure may adversely affect the marketability and liquidity of the Series 2012 Bonds and the market price thereof.

## FEASIBILITY CONSULTANT

The Department has retained The Foster Group, LLC as a Feasibility Consultant to develop reports and studies relating to the Sewage Disposal System and certain financial matters.

## FINANCIAL ADVISOR

Robert W. Baird & Co. has served as financial advisor to the City with respect to the issuance of the Series 2012 Bonds. The financial advisor has not undertaken to make an independent verification of, or to assume responsibility for, the accuracy, completeness or fairness of the information contained in this Official Statement.

## SWAP ADVISOR

Blue Rose Capital Advisors has served as advisor to the City with respect to its interest rate swap agreements. The swap advisor has not undertaken to make an independent verification of, or to assume responsibility for, the accuracy, completeness or fairness of the information contained in this Official Statement.

## INDEPENDENT AUDITORS

The audited financial statements of the Sewage Disposal Fund as of and for the fiscal year ended June 30, 2011, included in APPENDIX B, have been audited by KPMG LLP, independent accountants, as stated in their report also included in APPENDIX B.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

The accuracy of the arithmetical and mathematical computations (a) of the adequacy of the maturing principal amounts of the escrowed securities, together with the interest income thereon, and uninvested cash, if any, to pay when due the principal of, redemption premium and interest on the Refunded Bonds, and (b) relating to the determination of compliance with the regulations and rulings promulgated under Section 148 of the Code, will be verified by Grant Thornton LLP, Minneapolis,

Minnesota, as a condition of delivery of the Series 2012 Bonds. Such verification of arithmetical accuracy and mathematical computations shall be based upon information and assumptions supplied by the City and on interpretations of Section 148 of the Code provided by Bond Counsel.

## CERTAIN LEGAL MATTERS

Legal matters incident to the authorization, issuance and sale of the Series 2012 Bonds will be subject to the approving opinion of Clark Hill PLC, Detroit, Michigan ("Bond Counsel"). Such opinion in substantially the form attached hereto as APPENDIX I will be furnished at the time of delivery of the Series 2012 Bonds. Certain legal matters will be passed upon for the City by Krystal A. Crittendon, Corporation Counsel, and Orrick, Herrington & Sutcliffe LLP, Washington, D.C., Disclosure Counsel to the City, and for the Underwriters by their counsel, Bodman PLC, Detroit, Michigan.

## RATINGS

The Insured Series 2012 Bonds are expected to be assigned ratings of "Aa3" by Moody's Investors Service ("Moody's") and "AA-" by Standard & Poor's, a division of The McGraw-Hill Companies ("S&P"), with the understanding that upon delivery of the Insured Series 2012 Bonds, AGM will deliver the Policy insuring the payment when due of principal and interest on the Insured Series 2012 Bonds. See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2012 BONDS – Bond Insurance" for a discussion of recent rating actions taken with respect to AGM.

The underlying long-term municipal bond ratings on the Insured Series 2012 Bonds and the uninsured Series 2012 Bonds assigned by Fitch Ratings Inc. ("Fitch"), Moody's and S&P are "A-" with a Stable Outlook, "Baa2" on a review for downgrade and "A+" with a Stable Outlook, respectively.

On June 14, 2012, Moody's downgraded the rating of the Senior Lien Bonds from Baa1 to Baa2 and the Second Lien Bonds from Baa2 to Baa3. Both ratings remain on review for downgrade by Moody's. On May 29, 2012, Fitch downgraded the rating of the Senior Lien Bonds from A to A- and the Second Lien Bonds from A- to BBB+, each with a Stable Outlook. On April 9, 2012, Moody's downgraded the rating of the Senior Lien Bonds from A1 to Baa1 and the Second Lien Bonds from A2 to Baa2. On April 1, 2011, Fitch downgraded the rating of the Senior Lien Bonds from AA- to A and the Second Lien Bonds from A+ to A-. On December 20, 2010, Moody's downgraded the rating of the Senior Lien Bonds from Aa3 to A1 and the Second Lien Bonds from A1 to A2.

An explanation of the significance of such ratings may only be obtained from Fitch, Moody's and S&P. There is no assurance that such ratings will continue for any given period of time or that they will not be revised or withdrawn entirely, if in the sole judgment of Fitch, Moody's or S&P, circumstances so warrant. Any such downward revision or withdrawal of a rating may have an adverse effect on the trading value and the market price of the Series 2012 Bonds. The City makes no representations as to the appropriateness of the ratings.

## UNDERWRITING

The Underwriters have agreed, subject to certain conditions, to purchase the Series 2012 Bonds from the City at an aggregate purchase price of $665,876,904.79 (which purchase price includes the aggregated par amount of the Series 2012 Bonds of $659,780,000, plus the net reoffering premium of $9,898,140.70, and less Underwriters' discount of $3,801,235.91). The Underwriters will be obligated to purchase all the Series 2012 Bonds if any are purchased. The Series 2012 Bonds may be offered and sold by the Underwriters to certain dealers at prices lower than the initial public offering prices for the Series 2012 Bonds, and the public offering prices may be changed from time to time. In connection with this

offering, the Underwriters may over allot or effect transactions which stabilize or maintain the market price of the Series 2012 Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.

The Underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage and other financial and non-financial activities and services. Certain of the Underwriters and their respective affiliates have provided, and may in the future provide, a variety of these services to the City and to persons and entities with relationships with the City, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates, officers, directors and employees may purchase, sell or hold a broad array of investments and actively trade securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of their customers, and such investment and trading activities may involve or relate to assets, securities and/or instruments of the City (directly, as collateral securing other obligations or otherwise) and/or persons and entities with relationships with the City. The Underwriters and their respective affiliates may also communicate independent investment recommendations, market color or trading ideas and/or publish or express independent research views in respect of such assets, securities or instruments and may at any time hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and instruments.

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of BMO Financial Corp., which is itself a wholly-owned subsidiary of Bank of Montreal.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Series 2012 Bonds, has entered into negotiated dealer agreements (each, a "Dealer Agreement") with each of UBS Financial Services Inc. ("UBSFS") and Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Series 2012 Bonds, at the original issue prices. Pursuant to each Dealer Agreement (if applicable to this transaction), each of UBSFS and CS&Co. will purchase the Series 2012 Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Series 2012 Bonds that such firm sells.

Morgan Stanley, parent company of Morgan Stanley & Co. LLC, an underwriter of the Series 2012 Bonds, has entered into a retail brokerage joint venture with Citigroup Inc. As part of the joint venture, Morgan Stanley & Co. LLC will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, Morgan Stanley & Co. LLC will compensate Morgan Stanley Smith Barney LLC for its selling efforts with respect to the Series 2012 Bonds.

## MISCELLANEOUS

This Official Statement is not to be construed as a contract or agreement between the City and the purchasers or holders of any of the Series 2012 Bonds. Any statements made in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended merely as an opinion and not as a representation of fact.

79

The information, estimates and expressions of opinion herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall under any circumstances create any implication or permit any inference that there has been no change in the affairs of the City or the System since the date of this Official Statement. Certain projections contained herein are based upon assumptions as to future events and facts, including projections as to future sewage disposal needs, and such projections may not be realized. While assumptions of facts appeared reasonable when made, no warranty is expressed or implied that they will be realized in fact.

The information set forth herein has been obtained from the City and other sources believed to be reliable but the accuracy or completeness is not guaranteed by, and should not be construed as a representation by the Underwriters. Estimates and opinions are included and should not be interpreted as statements of fact. Under no circumstances shall this Official Statement constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2012 Bonds, in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction.

Additional information may be obtained upon request from the Office of Debt Management, Attention: Donita Crumpler, Assistant Debt Manager, 1200 Coleman A. Young Municipal Center, Detroit, Michigan 48226 (telephone: 313-224-7244) or from the Assistant Director Financial Services, James George, Water Board Building, 735 Randolph, Detroit, Michigan 48226 (telephone: 313-964-9220).

The Finance Director has approved this Official Statement pursuant to authority granted in the Authorizing Documents.

CITY OF DETROIT, MICHIGAN


By: /s/ Cheryl R. Johnson
       Finance Director



DETROIT WATER AND SEWERAGE DEPARTMENT


By: /s/ Sue F. McCormick
       Director

80