# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN,

Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

**OBJECTION BY THE DETROIT INSTITUTE OF ARTS TO THE RELIEF REQUESTED IN THE REVISED PROPOSED ORDER FILED IN CONNECTION WITH THE "CORRECTED MOTION OF CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE DIRECTING THE DEBTOR TO COOPERATE WITH INTERESTED PARTIES SEEKING TO CONDUCT DUE DILIGENCE ON THE ART COLLECTION HOUSED AT THE DETROIT INSTITUTE OF ARTS"**

The Detroit Institute of Arts, a Michigan not-for-profit corporation, formerly known as, among other things, Founders Society Detroit Museum of Art ("**DIA Corp.**"), objects to the *Revised Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate With Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts* ("**Revised Proposed Order**") [Docket No. 4519] filed by certain creditors ("**Moving Creditors**"), which expands the relief originally sought in the above-titled motion ("**Motion**") [Docket No. 3925].

## STATEMENT OF INTEREST

1. The DIA Corp. founded what is now known as the Detroit Institute of Arts (the "**Museum**") in 1885. The DIA Corp. currently manages and operates the Museum under a 1997 Operating Agreement ("**Operating Agreement**") with the City of Detroit (the "**City**"), which obligates the DIA Corp. to manage, protect, and preserve the Museum art collection in accordance with the Museum Collections Management Policy and to manage and preserve all records relating thereto. (Ex. 1, Operating Agreement §§ D, D2, F2, F44, H16; Ex. 2, Collections Management Policy ¶ X.) Since its establishment in 1885 and together with the City since 1919, the DIA Corp. has served as trustee of the Museum with the duty to manage, protect, and preserve the Museum art collection for the benefit of the public.

2. The Revised Proposed Order clarifies for the first time that the Moving Creditors seek to force the City to direct the DIA Corp. to provide physical access to up to 12,000 works in the Museum art collection—none of which the DIA Corp. believes can be sold or pledged in the manner proposed in the Motion—and provide the Moving Creditors copies of voluminous and sensitive records. As explained below, the Revised Proposed Order poses serious risks to the collection and records, and imposes an additional burden and expense on the DIA Corp. In addition, the Revised Proposed Order is incompatible with both the City's and the

DIA Corp.'s obligations as co-trustees of the Museum art collection for the benefit of the public.

3. The DIA Corp. therefore has an interest in objecting to the terms of the Revised Proposed Order. *See* 11 U.S.C. § 1109(b); *In re* Koch, 229 B.R. 78, 82 (Bankr. E.D.N.Y. 1999).

## FACTS[1]

4. The Museum art collection totals over 60,000 objects, a large number of which are both valuable and fragile given their age and condition. About 9 percent of this total is displayed in the public galleries with other objects periodically rotated through the galleries or kept in storage for a variety of reasons. Handling of nearly all of these objects requires special care by trained Museum personnel. Removing items from a gallery's walls requires two or three staff members for safety and protection of the works, as well as the closing of the gallery to the public. Examination of objects in storage requires Museum staff to locate, retrieve, show, and return the works. Even when carefully handled, accidents happen; handling even a small number of works has in the past resulted in damage.

5. The records that relate to the Museum and this collection include over a million pages of hard-copy documents, many of which are originals that can be

---

[1] The facts recited in this section are taken from the Declaration of Graham W.J. Beal, attached as Ex. 3, and the other Exhibits attached to this Objection.

more than a half century old. These documents are fragile and require careful handling. The DIA Corp. maintains a separate "object file" for each of the objects. Each file may contain, among other things, documents relating to the object's provenance and acquisition, its history at the Museum, and other information about the object. In addition, and separate from the object files, there are curatorial files, which contain multiple documents relating to the objects that are relevant to the responsible curators. Donor files, organized by donor, not by object, contain information about works that a donor contributed to the Museum and often contain confidential personal information about the donor. Among other things, "Directors' files," kept by directors of the Museum over its 125-year history, also contain information about some of the objects and their acquisition. These files cannot be inspected and hastily copied without risking damage or destruction. Many that are not used in day-to-day Museum operations are stored in the Museum archives and are not well organized or easily accessible.

6. These considerations have led to negotiations and agreements in connection with the City's and the Moving Creditors' previous efforts to examine the collection and the Museum's records during the City's chapter 9 case. The City retained Christie's, an internationally recognized and respected art auction house, to evaluate the approximately 3,000 works in the Museum art collection with a "City of Detroit Purchase" attribution. After discussions with Museum

4

management about how best to handle its evaluation of the works, Christie's reached an agreement with the Museum so as to disrupt Museum operations as little as practicable and with as little risk as possible to the objects.[2] Christie's conducted its evaluation without removing objects from gallery walls, and inspected objects in the public galleries on Mondays, when the Museum is closed to the public, requiring the Museum to bring in additional personnel and pay associated overtime. Inspection of works in storage required a substantial time commitment from the DIA Corp.'s collection management staff, and also involved significant costs to the DIA Corp. Certain documents or summaries were considered as well.

7. Likewise, some of the Moving Creditors and others asked the DIA Corp. to provide access to a large number of Museum records even before confirmation-related discovery began and followed those requests with extensive formal discovery requests. (*See*, *e.g.*, Docket Nos. 3315, 3395, 4038.) Cognizant

---

[2] Although the Operating Agreement does not require the DIA Corp. to submit to audits or inspections under all circumstances, the DIA Corp. worked with Christie's because the City's request was reasonable under the circumstances, because the City had retained Christie's as its agent subject to certain confidentiality restrictions, because Christie's is a credentialed authority in the field, and because the DIA Corp. recognized that it was in the City's best interest to streamline the process. The Moving Creditors' request is wholly different. It is a demand to have the City require the DIA Corp. to grant access to non-credentialed potential buyers who have not been retained by a party to this bankruptcy case and whose qualifications as buyers or appraisers have not been vetted.

of the importance in this chapter 9 case of information about the Museum art collection and of the Court-imposed schedule, the DIA Corp. directed its counsel to work with counsel for the Moving Creditors to provide reasonable access to and copies of requested documents.  The DIA Corp. reached a letter agreement (the "**Discovery Agreement**") (Ex. 4) dated April 17, 2014 with the Moving Creditors after extensive discussion regarding the proper scope of production.  Among other things, the Discovery Agreement referenced a subset of "major works" for which the DIA Corp. would produce or make available object files, donor files, provenance information, insurance values, condition reports, and more.  Despite the burden, the DIA Corp agreed to provide these documents to address the Moving Creditors' concern that the sample size considered by Christie's was not representative of the composition of the entire Museum Art Collection.  As a result of the Discovery Agreement, the DIA Corp. has already produced nearly 90,000 pages of documents and provided access to countless pages of additional documents for the Moving Creditors to inspect.

## PROCEEDINGS ON MOTION

8. The Moving Creditors filed the Motion on April 9, 2014, asking the Court to order the City to cooperate with certain "Interested Parties" who purportedly had made "Proposals" to purchase or lend against all or a portion of the Museum art collection, so that the Interested Parties could conduct due

6

diligence, including inspecting the art and relevant documentation.³ (Motion ¶ 3.) Unlike the Revised Proposed Order, the Motion was not directed at the DIA Corp., and did not appear to seek to impose any burdens on the DIA Corp. beyond those being discussed as part of formal and informal discovery propounded by the Moving Creditors.⁴

9. The City filed an objection ("**City Objection**") [Docket No. 4290] to the Motion on April 28, 2014, asserting that the Motion "provides no real details as to the exact relief requested," but might "go so far as requiring the City to remove the objects from the DIA's walls for inspection." (City Objection ¶ 11.) The City Objection also argues that the additional information the Moving Creditors seek is more properly obtained as part of formal plan discovery.⁵ (*Id*. ¶ 5.)

---

³ The Moving Creditors provide no admissible evidence of the Interested Parties' desire or intent to conduct such due diligence. The only evidence the Moving Creditors submitted was Stephen Spencer's Declaration, which provided only inadmissible hearsay about the Interested Parties' desire or intent. (Motion at Ex. 5, ¶ 15.) Nor have any of the Interested Parties appeared in this case to express their interest.

⁴ Although the Motion generally referred to a need to "review," "analyze," or "access" the art and "certain" documentation, the Moving Creditors did not articulate the extensive and intrusive work proposed in the Revised Proposed Order, which involves physical handling of artwork (front and back) in and out of the galleries and more documents than those agreed to in the Discovery Agreement, and that the DIA Corp. may be directed to bear this burden. What is more, the Moving Creditors do not state that they sought consent from the DIA Corp. as to whom it now appears this Motion was, at least in part, directed.

⁵ Although the City Objection also challenged the legal basis for the Moving Creditors' request, the Motion was not directed at the DIA Corp. and, therefore, it

7

13-53846-tjt    Doc 4675    Filed 05/12/14    Entered 05/12/14 22:39:20    Page 7 of 13

10. On May 1, 2014, the Court issued its *Order Requiring More Specific Proposed Order* [Docket No. 4336], in which the Court found "that the proposed order accompanying the motion lacks specificity" and ordered the Moving Creditors to "file an amended proposed order that states the specific relief that they seek." The Revised Proposed Order clearly states for the first time that the Moving Creditors seek to impose substantial additional documentary and physical discovery burdens on the DIA Corp. as part of a purported "due diligence" process, including by requiring the DIA Corp. to give each of the four Interested Parties physical access to up to 3,000 works of art each to "inspect the front and back of each piece" and to take a "digital photograph of the front and back of each piece." (Revised Proposed Order ¶¶ 3(a)-(c), 5(a), 5(b).)

## **OBJECTION**

11. The DIA Corp. objects to the Revised Proposed Order because of the significant risks it would pose to the Museum art collection and its records and the unwarranted additional burden it would impose on the DIA Corp.

12. The Revised Proposed Order would compel the DIA Corp. (whether directly or indirectly through the City) to provide "physical access to the front and back" of thousands of works of art—a professionally irresponsible, unnecessary, and dangerous undertaking. The risk associated with moving and handling works

---

does not address them in this Objection. It reserves the right to do so when the issue affects the treatment of the DIA Corp. or the Museum art collection.

of art is considerable; moving and handling thousands of works in a compressed timeframe invites disaster. Insurance could not fully compensate for the destruction of objects since those works are unique and irreplaceable and a part of the cultural heritage that the Museum protects. This requested due diligence would also place a strain on the Museum, requiring substantial curator and technician time to comply with professional standards and potentially forcing closure of at least a part of the Museum for extended periods. Moreover, the yard-sale-like physical inspections requested by the Moving Creditors are not necessary. Christie's was not given the right to remove and handle displayed works of art and had only limited access to works of art in storage. As a credentialed and respected auction house, Christie's understood that it would be irresponsible and unnecessary to handle and remove works of art this way.[6]

13. The Moving Creditors' request that the DIA Corp. (whether directly or indirectly through the City) provide additional information and potentially hundreds of thousands of documents would impose a substantial additional burden

---

[6] Although physical inspections might be required if there were an actual sale, nothing suggests that a sale is lawful, imminent, or in process. The Moving Creditors can review the documents the DIA Corp. has already produced that contain information about the provenance and condition of some of the most significant works in the Museum art collection. The Interested Parties can also view the works displayed in the public galleries during regular Museum hours. This access provides more than enough information to obtain a clear preliminary understanding of the works in the collection, which should be all that is necessary before any binding offer process could proceed.

9

on the DIA Corp. As it has shown in discovery to date, the DIA Corp. is willing to cooperate with the Moving Creditors and respond to reasonable requests for documents and information. But by purporting to ask the City in the Revised Proposed Order to force the DIA Corp. to produce documents, the Moving Creditors are essentially asking the Court to address issues that should have merged into the Discovery Agreement. More critically, the specific work that the Moving Creditors request here would unduly interfere with Museum operations and require substantial additional hours of staff, contractor, and attorney support that the charitable non-profit DIA Corp. can ill afford.[7]

---

[7] The DIA Corp. also specifically objects to the request that the City force the DIA Corp. to produce more documents related to the DIA Corp.'s financial condition. The DIA Corp. has already produced audited financial statements to the Moving Creditors, and its financial condition can have little if any relevance to the value of the collection.

## CONCLUSION

14. The DIA Corp. rejects any suggestion that the Museum art collection can be monetized. Yet it recognizes that the issues presented in this bankruptcy case are serious and must be addressed in the sequence and under the procedures this Court has established. Thus, the DIA Corp. has cooperated in good faith with the Moving Creditors in discovery while protecting the Museum and its art collection. The relief the Moving Creditors now seek in the Revised Proposed Order goes too far. If the Court overrules the City's objection, the DIA Corp. asks the Court to fashion an order that will mitigate the risks that the Revised Proposed Order poses to Museum art collection and records and that will protect the DIA Corp. from the additional burdensome discovery sought by the Moving Creditors on behalf of the Interested Parties.

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND
COHN LLP

By: /s/ Arthur T. O'Reilly
    Arthur T. O'Reilly (P70406)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7628
Facsimile: (313) 465-7629
Email: aoreilly@honigman.com

CRAVATH, SWAINE & MOORE LLP

Richard Levin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000

Attorneys for The Detroit Institute of Arts

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the ECF system, and will send notification of such filing to all ECF participants registered in this matter.

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: /s/ Arthur T. O'Reilly
　　　Arthur T. O'Reilly (P70406)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7628
Facsimile: (313) 465-7629
Email: aoreilly@honigman.com