# Exhibit 1B

47. **Society's Duty to Appear Before the Commission.** The *Society* shall appear before the *Commission* for the hearings specified in Subsection G9, *infra*. The *Society's* duly authorized representatives shall also appear before the *Commission* for all other hearings that the *Commission* deems necessary or desirable.

## G. ROLE OF THE COMMISSION

1. **Arts Commission Oversight of Agreement.** Pursuant to Section 7-301 of the *City Charter*, the Arts Department, headed by the *Commission*, shall continue to exercise its mandated responsibility for maintenance and operation of the *DIA*, and shall administer and monitor the performance by the *Society* of the *Society's* obligations, all as provided for in this *agreement*.

2. **Commission to Prescribe the Form of, Receive and Review Society's Reports.**

   (a) The *Commission* shall prescribe the form of the reports to be submitted by the *Society* in accordance with Subsections F37 and F39, *supra*. Additionally, the *Commission* shall also receive and review the reports and financial statements submitted to it by the *Society* as required by Subsections F37 through F40, *supra*.

   (b) The *Commission* shall also receive and review the *Society's* submissions required from time to time by this *agreement*, including those specified in Section F, *supra*.

3. **Commission May Request Additional Information.** From time to time, the *Commission* may reasonably request from the *Society* additional information concerning the operations and management of the *DIA*.

4. **Commission's Duty to Renegotiate Insurance Coverages.** Every three (3) years during the *contract term*, or at such other times as the *Commission* and the *Society* deem appropriate, the *Commission* shall negotiate in good faith with the *Society* about the requirements for the types and limits of insurance listed in Subsections F15 and F16, *supra*.

5. **Commission's Audit Rights.** Once per year, the *Commission* or its designees may audit on demand the operations and records of the *Society*, and the *Commission* or its designees may audit such operations and records at other times on which both the *Commission* and the *Society* agree.

6. **Inspection Rights.** The *Commission* or its designees may on demand conduct an annual inspection of the *City art collection* or any portion thereof specified

13-53846-tjt   Doc 4675-2   Filed 05/12/14   Entered 05/12/14 22:39:20   Page 2 of 34

DIAINSP000321

by the *Commission*, the *DIA building*, the *Frederick lot* and/or the *employee parking lot*, at reasonable time(s) to be arranged by mutual agreement of the *Commission* and the *Society*, but in any event to be commenced no later than fifteen (15) business days after demand is made. Additional inspections may be conducted of the *City art collection* or any specified portion thereof, the *DIA building*, the *Frederick lot* and/or the *employee parking lot* upon request by the *Commission*, at reasonable time(s) to be arranged by mutual agreement of the *Commission* and the *Society*. Neither the *Society* nor the *City* shall unreasonably request or withhold agreement as to inspections or inspection times. Such inspections shall be performed for the purposes of monitoring the status of the *City art collection*, and identifying and requesting that the following types of maintenance be performed by the *Society* with regard to the *DIA building*, the *Frederick lot* and the *employee parking lot*, subject to the availability of funding and to features of the *DIA building* that cannot be modified without incurring unreasonable expense:

(a)     maintenance reasonably necessary to correct or repair substantial structural, heating, plumbing or electrical problems; and

(b)     maintenance reasonably necessary to put the *DIA building*, the *Frederick lot* and/or the *employee parking lot* into the condition that an ordinary and reasonable owner or operator of a leading fine arts museum would maintain its museum.

The *City's* Auditor General shall have the authority to conduct audits of the *DIA properties* consistent with *City Charter* Section 4-205; the Auditor General may request additional audits in coordination with those conducted by the *Commission*, approval of which requests the *Society* shall not unreasonably withhold.

7.     **Commission to Receive, Review and Approve Certain Society Policies and Amendments Thereto.** As provided in Subsection F36, *supra*, the *Commission* shall receive, review and approve certain of the *Society's* policies or amendments thereto. Based upon agreement of the *Commission* and the *Society*, the *Commission* may prescribe the establishment by the *Society* of additional policies consistent with generally recognized and generally followed state-of-the-art practices of leading fine arts museums.

8.     **Commission to Receive, Review and Approve Certain Amendments to Society Articles of Incorporation and Bylaws.** The *Commission* shall receive, review and approve amendments to certain provisions of the *Society's* articles of incorporation and bylaws, as described in Subsection I2, *infra*. The *Society's* articles of incorporation and bylaws, effective as of the *effective date*, shall be

-26-

DIAINSP000322

as set forth in Exhibits 13 and 14 hereto, and the *Commission* shall submit to the *City* Clerk copies of any subsequent amendments to the *Society*'s articles of incorporation and bylaws that the *Commission* receives from the *Society*.

9. **Commission's Hearings.** During the two (2) year transition period after the *effective date*, and in its sole discretion, the *Commission* may require quarterly appearances of the *Society* at hearings and/or meetings with the *Society*, at which the *Society* shall report on and respond to the *Commission's* questions about the state of and operations of the *DIA*. The *Commission* shall have at least one (1) hearing during each of the two (2) years of the transition period. Thereafter, on at least an annual basis, the *Commission* shall hold a hearing at which the *Society* shall report on and respond to the *Commission's* questions about the state of and operations of the *DIA*. The *Commission* may schedule other hearings and/or meetings as it, in its sole discretion, deems necessary or desirable. The *Commission* shall establish the location of, date and time of, as well as the agenda for, any hearing. All such hearings and meetings shall be subject to the provisions of the Michigan Open Meetings Act, M.C.L. § 15.261, *et seq.*

10. **Commission to Review and Approve the Society's Director and Deputy Director of the DIA.** The *Commission* shall have the duty to receive the recommendations of the *Society* concerning candidates for the positions of the *Society's* director of the *DIA* and the *Society's* deputy director of the *DIA*, and the *Commission* and the Mayor of the *City* shall have the authority to approve or disapprove any such candidates, as provided in Subsection K7, *infra*. The *Commission* and the Mayor shall have the authority to remove the *Society's* *DIA* director or the *Society's* *DIA* deputy director but only if both the Mayor and the *Commission* determine that such director or deputy director has engaged in actions that are adverse to the best interests of the *City*, as provided in Subsection K7, *infra*.

11. **Commission to Report to the Mayor.** On at least an annual basis, the *Commission* shall report to the Mayor of the *City* as to the operations and management of the *DIA*.

12. **Commission to Evaluate Society's Services and to Provide Evaluation to the City Council and to the Society.** On an annual basis, the *Commission* shall evaluate the services provided by the *Society* under this *agreement* for the preceding year and shall provide a copy of such evaluation to the *City Council* and to the *Society*.

DIAINSP000323

## H. AGREEMENTS BY THE CITY

1. **City's Pre-Effective Date Liabilities.** The *City* shall remain responsible for all expenses, costs and liabilities incurred by it or arising prior to the *effective date* in connection with the ownership, operation and maintenance of the *DIA* (other than to the extent that such liabilities arose through the negligence or misconduct of the *Society*), which are not otherwise assumed by the *Society*. In furtherance thereof, the *City* shall be solely responsible for all wages and obligations under retirement or other employee benefit plans by reason of employees' *City* service prior to the *effective date*, and severance and termination costs payable to the *City's* employees by reason of their service as such or the termination of that status.

2. **City's Duty to Operate and Maintain Cultural Center Garage.** The *City* will continue to operate and maintain, for the benefit of the *DIA* (including its patrons and employees at the *DIA*) and the other cultural institutions in the vicinity, the *Cultural Center garage*, upon terms and hours determined by the *City*. As of the *effective date*, the *City* has no plan to reduce the hours of operation of the *Cultural Center garage*.

3. **Fees for Central City Services.**

   (a) The Arts Department of the *City* has historically had an annual obligation to pay for certain personnel and central services and external police services (collectively "*annual expenses*"). The *City* no longer imposes on the Arts Department any charges for external police services. After the *effective date*, the *City* shall not impose the *annual expenses* or other charges on the *Society*, except that the *Society* will pay for personnel services provided by the *City* to the extent that such services are used by the *Society*.

   (b) The *City* shall continue to provide police, fire and other municipal services to the *DIA* on the same basis as such services are provided to other cultural and commercial institutions located in the *City*.

4. **Annual Grant by the City.**

   (a) For Fiscal Year 1997-1998, the *City* shall contribute $1,100,000 for the support and operation of the *DIA*. To the extent that any portion of such budgetary appropriation has not been expended by the *City* prior to the *effective date*, the *City* shall provide such remaining funds to the *Society* prior to June 30, 1998 for the support and operation of the *DIA*.

-28-

DIAINSP000324

(b)     During the *contract term*, the *City* agrees that the *Society* may petition the Mayor of the *City* and the *City Council* for a *City* grant to the *DIA*, which shall be discretionary with the *City*.

5.     **City's Duty to Transfer Funds Received by the City for the Benefit of the DIA**. The *City* agrees that all monies delivered to it for the benefit of the *DIA*, including all previously received but unexpended or future (a) donations, gifts and contributions from individuals, corporations, foundations and trusts, if any, and (b) federal, state, regional, county or local tax proceeds and grants from governmental or quasi-public entities, if any, shall be promptly paid to the *Society* for use in connection with the operations of the *DIA*, subject to any terms and conditions of any such monies received.

6.     **City Sale of Certain Bonds.**

(a)     Pursuant to a Resolution duly adopted by the *City Council* on June 10, 1988 and the affirmative vote of the electors of the *City* at a Primary Election held on August 2, 1988, the *City* was authorized to issue its general obligation bonds payable from taxes the *City* is allowed to levy in addition to *City Charter* and statutory limits in an amount necessary to pay the principal of and interest thereon in the principal sum of not to exceed $25,000,000 ("*Maximum Authorized Bonds*") for the purpose of expansion, renovation or rehabilitation of the *DIA* facilities ("*Authorized Improvements*"). In accordance with the foregoing authorization, during the period of 1989 to 1991, the *City* issued three series of its General Obligation (Unlimited Tax) Bonds, portions of which aggregating $8,405,000 in principal amount were allocated to the *Maximum Authorized Bonds* and were issued to pay a portion of the cost of the *Authorized Improvements* and the allocable costs of issuance thereof.

(b)     On or about November 26, 1996, the *City* issued General Obligation (Unlimited Tax) Bonds, Series 1996-A ("*Series 1996-A Bonds*"), $3,000,000 in principal amount of which were allocated to the *Maximum Authorized Bonds* and were slated to be used to pay additional portions of the cost of the *Authorized Improvements* and allocable portion of the costs of issuance thereof. As of the execution date of this *agreement*, $210,065.70 of the *net proceeds* (as hereinafter defined) of the 1989-1991 issues have not been expended, and in addition, $2,982,474.45 of the *net proceeds* of the *Series 1996-A Bonds*, have not been expended (collectively, and as such *net proceeds* may increase as a result of investment thereof, the "*Remaining Proceeds*").

-29-

DIAINSP000325

(c)     $13,595,000 in principal amount of the *Maximum Authorized Bonds* remain unissued as of the execution date of this *agreement* ("*Remaining Authorized Bonds*"). The *City* agrees to use its best efforts to sell the *Remaining Authorized Bonds* in one or more series to finance the costs of the *Authorized Improvements* to benefit the *DIA*, within three (3) years after the *effective date*. If the *City* is unable to sell the *Remaining Authorized Bonds* within the three (3) year period, the *City* will continue to use its best efforts to sell the *Remaining Authorized Bonds* as soon as practicable thereafter.

(d)     The *City* will utilize the *net proceeds* of such future sale or sales of the *Remaining Authorized Bonds* and the *Remaining Proceeds* to pay the costs of all or portions of the *Authorized Improvements* that are designated by the *Society*, subject to the provisions of Subsection F6, *supra*.

(i)     *Net proceeds* of any bond sale shall mean the proceeds of such bond sale, plus investment earnings on such proceeds pending their expenditure, less any investment proceeds that must be rebated to the federal government and less the *pro rata* portion of any expenses incurred with respect to the issuance of such bonds.

(ii)    Prior to their expenditure, the *net proceeds* of any such bond sale shall be held and invested by the *City* pursuant to the procedures established by the *City* to comply with its covenants regarding the use and investment of bond proceeds that were entered into in connection with the *Maximum Authorized Bonds* previously issued and will be entered into in connection with the issuance of the *Remaining Authorized Bonds*.

(e)     The use of the *Remaining Proceeds* and the *net proceeds* of the *Remaining Authorized Bonds* by the *Society* to finance the *Authorized Improvements* shall not be considered a loan to the *Society*, and the *Society* shall have no repayment obligations with respect to such amounts.

7.     **City's Duty to Place Certain Insurance Policies.**

(a)     The *City* shall obtain the insurance coverages listed in this Subsection H7(a) from insurers rated "A" or better by *A.M. Best's Insurance Reports*, and which are authorized to transact insurance in Michigan, as evidenced by a subsisting certificate of authority issued by the

DIAINSP000326

Commissioner of Insurance of Michigan, and the *City* shall be responsible for administering all insurance policies required by this Subsection H7(a) and handling all *claims* thereunder.

(i)  risk of direct physical loss property insurance subject to standard exclusions at 90% of the replacement values and endorsed with an agreed value clause, which insurance is in the amount of Ninety-Five Million Four Hundred Eighty-Two Thousand Two Hundred Ninety-Four Dollars ($95,482,294) for the *DIA building* and Seven Million Six Hundred Eighty-Seven Thousand One Hundred Thirteen Dollars ($7,687,113) for the contents thereof (excluding fine arts), which policy shall be part of the *City's* blanket limit and shall name the *City* as the insured, and the policy shall also name the *Society* as an additional insured with respect to the *DIA building* and contents; and

(ii)  boiler and machinery insurance and extra expense, including coverage for machinery and pressure vessel exposure, covering the *DIA building* and having a single limit of at least One Hundred Million Dollars ($100,000,000) and an extra expense limit of at least One Million Dollars ($1,000,000), which policy shall name the *City* as the insured, and the policy shall also name the *Society* as an additional insured with respect to the *DIA building*.

(b)  Each insurance policy required by Subsection H7(a), *supra*, shall be accompanied by an endorsement that states that the policy shall not be canceled or reduced without thirty (30) days prior written notice to the *City* and the *Society*. The *City* has provided to the *Society*, and will provide at least once annually during the *contract term*, copies of certificates of insurance evidencing the insurance required by Subsection H7(a), *supra*, and the endorsement required by this Subsection H7(b).

(c)  All proceeds of the insurance policies required by Subsection H7(a), *supra*, relating to the *DIA building* or the contents thereof, shall be paid by the *City* to the *Society*, and shall be used, subject to the provisions of Subsection F6, *supra*, solely to remedy the problem resulting in such payment of proceeds (unless otherwise agreed by the *Commission*), including the repair of damaged items and the acquisition of new replacement items, for the benefit of the *DIA*.

(d)  As of the *effective date*, the *City* will cause the *Society* to be designated as an additional named insured and as the sole loss payee under the policies currently in effect for the insurance coverages listed in

13-53846-tjt   Doc 4675-2   Filed 05/12/14   Entered 05/12/14 22:39:20   Page 8 of 34

DIAINSP000327

Subsections F15(a) and F15(b), *supra*, and shall transfer to the *Society* administration of such policies. From and after such designation and transfer, the *Society's* rights and duties concerning such existing policies shall be as set forth in Subsections F15, F17 and F18, *supra*. The *City* shall maintain such coverages through the time of such transfer in accordance with the requirements of Subsections F15, F17 and F18, *supra*, that would otherwise be applicable to the *Society*.

8.  **Modifications to Terms or Conditions of Insurance Policies Required by Subsection H7.** Any increases in or improvements to any of the terms or conditions of the insurance policies required by Subsection H7, *supra*, may be made by the *City*. Any elimination or reduction of any of the terms or conditions of the insurance required by Subsection H7, *supra*, however, may be made by agreement of the *Society* and the *Commission*.

9.  **First-Party Claims in Excess of Insurance Limits.** The *City* agrees that neither the *Society* nor its *associates* will be held responsible for first-party *claims* of the *City*, in excess of the insurance coverages required by Subsections F15(a), F15(b) and H7, *supra*, unless the *claim* arose as a result of negligence of the *Society* or its *associates*, relating to the *DIA building*, the *Frederick lot*, the *employee parking lot*, the *City art collection*, or the operation of the *DIA*.

10. **City's Waiver of Subrogation.** The *City* waives its rights of subrogation and recovery for *claims* against the *Society* and the *Society's associates*, to the extent that the *City* or its *associates* are insured or required to carry insurance for such *claims*. The *City* shall cause each of the insurance policies required by Subsection H7, *supra*, of this *agreement*, to contain a provision whereby the insurer waives any rights of subrogation against the *Society* and the *Society's associates*. If such provision cannot be obtained, then the policies shall name the *Society* as an additional insured, even if not otherwise required by this *agreement*.

11. **Society's Purchase of Utilities.** The *City* agrees that the *Society* may purchase utility services (except for electricity, water and sewage services and regular trash collection services, which are the subject of Subsection F32, *supra*), including steam, telephone services and non-regular trash collection, as well as other support services, goods and commodities, from any provider, based on quality and cost of service and such other factors as the *Society* may deem relevant, and in accordance with the procurement procedures established by the *Society*.

-32-

DIAINSP000328

12. **City's Responsibility for Property Taxes on the DIA Properties and the City Art Collection.** During the *contract term*, the *City* will be responsible for any real or personal property taxes relating to the *DIA properties* and the *City art collection*.

13. **City to Transfer to the Society Certain Tangible Personal Property Assets for DIA Operations.** As of the *effective date*, in consideration of the *Society's* obligations under this *agreement* to the *City*, the *City* will transfer to the *Society*, for continued use in the operation of the *DIA*, certain personal property assets (or, if applicable, the *City's* leasehold interest therein) currently used in the operation of the *DIA* and located at the *DIA building* or at the *DIA's* off-site storage facility located on Lynch Road. These transfers shall be effected by appropriate instruments of transfer, assumption and/or assignment and in accordance with the requirements of the *City Charter* and *City* ordinances. The assets subject to this Subsection H13 include the following categories of personal property:

    (a)   all machinery, equipment, supplies, tools, spare parts, furniture, business machines, shop equipment, laboratory test fixtures, office furniture and equipment and other tangible personal property located at the *DIA building* or at the *DIA's* off-site storage facility located on Lynch Road, including those listed and described on Exhibit 11 hereto, except to the extent disposed of, lost or destroyed prior to the *effective date*; and

    (b)   the vehicles currently used by the *DIA* in the course of its business, which are listed and described on Exhibit 12 hereto.

    Except for the completion of the transfers of the vehicles described in Subsection H13(b), as of the *effective date*, the *City* shall have no obligation to provide *City*-owned or *City*-leased vehicles to the *Society* or the *DIA*. For the sole benefit of the *DIA*, the *Society* shall have the right to sell, transfer, encumber, hypothecate or otherwise dispose of any of the property described in this Subsection H13 as the *Society* deems appropriate, without notice to or consent of the *City*.

14. **Limited Warranties.** Except for the representations and warranties in Section C, *supra*, the property referred to in Subsection H13, *supra*, shall be transferred to the *Society* without warranty or representation of any kind, including any warranty of merchantability or fitness for a particular purpose or any warranty or representation which might otherwise be inherent in a description or in specifications.

-33-

15. **Assumption of Leases and Service Contracts.** To the extent permitted by the terms of the relevant leases or similar agreements, the *City* agrees that the *Society* may assume any leases or similar agreements for copy machines and other equipment used in the operations of the *DIA* and any maintenance and service agreements relating to such equipment or *DIA* operations, and upon such assumption the *City* will assign its rights thereunder to the *Society*.

16. **Use of DIA Records.** The *City* agrees that *DIA records* created by the *City* and currently maintained at the *DIA building* shall continue to be maintained at the *DIA building* in accordance with the laws, rules and regulations governing management and retention of such *City* records. The *City* further agrees that the *Society* may use, add to or dispose of the *DIA records* in accordance with the *Society's* document retention policy required by Subsection F44, *supra*, and any applicable laws, rules and regulations governing management and retention of *City* records.

17. **Society Retains Title to Its Assets.** The *City* agrees that the *Society* shall retain title to and ownership of the *Society properties* and the *Society intellectual property*. The *City* will not have recourse to either the *Society properties* or the *Society intellectual property* for any noncompliance by the *Society* with any of the terms or conditions of this *agreement* or in connection with the *Society's* operation of the *DIA*, so long as the *Society properties* and the *Society intellectual property* continue to be used for the sole benefit of the *DIA*.

## I. ESTABLISHMENT AND GOVERNANCE OF THE SOCIETY; ABOLITION OF JOINT COMMITTEES

1. **Board of Directors; Committees.**

   (a) Not later than the *effective date*, (1) the *Society's* governing members will approve the *Society's* restated articles of incorporation as set forth in Exhibit 13, will approve the *Society's* amended bylaws as set forth in Exhibit 14 and will ratify the Mayor's appointment of the initial members of the board of directors of the *Society* pursuant to Subsection I1(b)(5), *infra*, and (2) the *Society* shall cause such restated articles of incorporation to become effective. If any of the actions contemplated by the preceding sentence do not occur prior to the *effective date*, this *agreement* shall be null and void and of no force or effect whatsoever. As specified in Exhibit 14 hereto, the amended bylaws shall be immediately effective upon effectiveness of such restated articles of incorporation.

-34-

(b)     Upon the effectiveness of such restated articles and amended bylaws:

   (1)     the *Society* will be a nonprofit directorship corporation, the board of directors of which will consist of no more than sixty-eight (68) directors and will meet the requirements of Subsection F25, *supra*, which board of directors will be divided into three (3) classes, serving staggered three (3) year terms;

   (2)     a member of the *Commission* will not be eligible to serve as a member of the *Society's* board of directors;

   (3)     any vacancies occurring on the board of directors from time to time will be filled by the remaining members of the board;

   (4)     the board of directors will have the authority to establish such committees, consisting of members of the board of directors or other individuals, as are necessary or appropriate to assist the *Society* and the board of directors in performing their obligations under this *agreement*; and

   (5)     the appointments of the initial members of the board of directors of the *Society* made by the Mayor of the *City*, as reflected on Exhibit 15 hereto, will immediately become effective. Thereafter, the Board shall be self-perpetuating.

(c)     The *Society* shall deliver to the *Commission* and the Corporation Counsel of the *City* (1) proof of filing prior to the *effective date* of the restated articles of incorporation with the Michigan Department of Consumer & Industry Services, Corporation, Securities and Land Development Bureau, and (2) a certificate of an officer of the *Society* certifying that (A) the amended bylaws have been adopted and (B) the *Society's* governing members have ratified the Mayor's appointment of the initial members of the board of directors of the *Society* pursuant to Subsection I1(b)(5), *supra*.

2.     **Certain Amendments Require Commission Approval.**  Neither the articles of incorporation nor the bylaws of the *Society* may be amended from those set forth in Exhibits 13 and 14 insofar as they relate to the nonprofit status and directorship basis of organization of the *Society* as set forth in Subsection I1(b), *supra*, the organization and structure of the board and the executive committee as set forth in Subsections F25 and I1(b), *supra*, the approval and removal authorities of the Mayor of the *City* and the *Commission* with respect to the *Society's DIA* director and the *Society's DIA* deputy director as set forth in

DIAINSP000331

Subsections G10, *supra*, and K7, *infra*, and the corporate purposes of the *Society*, without the prior authorization of the *Commission*.

3. **Ethical Standards.** The *Society*, and its board of directors, officers and employees, shall comply with the requirements of the Michigan Nonprofit Corporation Act, M.C.L. §§ 450.2101, *et seq.*, as well as the *DIA's* Guidelines for Professional Practices. Prior to modifying the *DIA's* Guidelines for Professional Practices, the *Society* shall submit any proposed modification to the *Commission* for its approval of same.

4. **Abolition of Joint Committees.** All existing joint committees consisting of *City* and *Society* representatives shall be automatically abolished as of the *effective date*, and all *DIA* policies and practices, including those relating to acquisitions and dispositions of works of art, shall be promptly and appropriately modified by the *Society* to reflect the abolition of the joint committees without the approval of the *Commission* being required.

## J. INDEMNITY; ASSUMPTION OF RISK

1. **Indemnification Obligation.** The *Society* agrees at its sole cost to hold harmless, indemnify and defend the *City* and its elected officials, officers, employees, agents, assigns and legal representatives against and from any third-party *claim* which may be imposed upon, incurred by or asserted against the *City* that arises from or relates to the negotiation, execution or performance of this *agreement* by the *Society*, except for *claims* resulting or arising from the malfeasance or gross negligence of the *City* or its elected officials, officers, employees, agents, assigns or legal representatives. This indemnification obligation includes, but is not limited to third-party *claims* arising from:

(a) any negligent or tortious act, error or omission to the extent attributable in whole or in part to the *Society* or its *associates*;

(b) any failure by the *Society* or its *associates* to perform any duty either expressed in or implied by this *agreement*;

(c) any and all bodily injury, personal injury and property damage to an employee of the *City* which arises out of the *Society's* performance under this *agreement*;

(d) any *claim* brought by an employee of the *Society* arising from or relating to his/her employment with the *Society*, including wrongful termination, workers' compensation, unemployment compensation, discrimination, violation of federal or state labor or employment laws, ERISA, bodily

DIAINSP000332

injury, personal injury or defamation, but excluding any *claim* relating to the termination of such employee's employment by the *City*;

(e)    any *claim* brought by a labor organization relating to organizing efforts, unfair labor practices or any other violation of federal or state labor or employment laws arising from or relating to (i) this *agreement* or (ii) any act committed, in whole or in part, by the *Society* during the negotiations of this *agreement* or after the *effective date*, but excluding any *claim* relating to the termination of any employee's employment by the *City*;

(f)    any third-party *claims* (including those of *Society* employees) based upon occurrences after the *effective date* arising from or relating to structural defects of or maintenance deficiencies in the *DIA building*, the *Frederick lot* or the *employee parking lot* or for bodily injury, personal injury or property damage sustained by the *Society* or its *associates* while on or about the *DIA building*, the *Frederick lot* or the *employee parking lot*;

(g)    any *claim* for infringement of a copyright, trademark, patent or other intellectual property right, an artist's rights under the Visual Artists Rights Act of 1990, 17 U.S.C. §106A, or an artist's moral rights, as well as for antitrust, unfair competition or other unfair trade practice, which arises out of the *Society's* activities; or

(h)    any *claim* arising from or related to a contract, either oral or written, or other instrument between the *Society* and any third party.

2.    **Assumption of Risk.** From and after the *effective date*, the *Society* undertakes and assumes all risk of dangerous conditions, if any, on and about the *DIA building*, the *Frederick lot* or the *employee parking lot*. The *Society*, for itself, waives and releases any *claim* against the *City* for bodily injury, personal injury or property damage sustained by the *Society* or its *associates* while on or about the *DIA building*, the *Frederick lot* or the *employee parking lot*.

3.    **Safeguarding of Personal Property.** The *Society* agrees that after the *effective date* it is the responsibility of the *Society* and not that of the *City* to safeguard the personal property transferred pursuant to Subsection H13, *supra*, that the *Society* and its *associates* use while performing this *agreement*, and that the *Society* will hold the *City* harmless for the loss of such personal property after the *effective date*.

4.    **Indemnification Not Limited by Workers' Compensation or Employee Benefit Acts.** The indemnification obligation under Section J shall not be affected by

13-53846-tjt   Doc 4675-2   Filed 05/12/14   Entered 05/12/14 22:39:20   Page 14 of 34

DIAINSP000333

any limitation on the amount or type of damages, compensation, or benefits payable under worker's compensation acts or other employee benefit acts.

5. **Duty to Notify.** The *City* shall notify the *Society* within twenty-one (21) days of the receipt of any *claim* subject to this indemnification provision.

6. **Duty to Cooperate.** The *City* shall cooperate with the *Society* in the defense of any *claim* subject to this indemnification provision.

## K. EMPLOYMENT MATTERS

1. **Employment of Non-Unionized City Employees.**

    (a)    (1)    (A)    On the date that is forty-five (45) days prior to the *effective date* (for purposes of this Subsection K1(a), the "*offer date*"), the *Society* shall offer employment to all non-unionized *City* employees who are actively employed (as defined in Subsection K1(a)(4), *infra*) on the *offer date*. Each such offer shall be conditioned on such employee being *actively employed* on the *effective date*.

                     (B)    Such an offer by the *Society* shall be deemed accepted only if such employee advises the *Society* in writing of his or her acceptance thereof no later than fifteen (15) days prior to the *effective date*. By so accepting such an offer, such employee shall be deemed to have granted permission for the *City* to release to the *Society* such employee's complete employment records with the *City*. The commencement date of any such employee's employment with the *Society* shall be deemed to be the *effective date*. Any such employee who does not so accept such an offer shall be continued in *City* employment in accordance with *City* policies and procedures.

        (2)    (A)    Any non-unionized *DIA City* employee who is not *actively employed* on the *offer date* (an "*Absent Non-Unionized Employee*") shall have the right to provide written notice to the *Society* that he or she is ready and wishes to become employed by the *Society* at the *DIA* (for purposes of this Subsection K1(a), the "*request notice*"), provided that such right shall not apply to any *Absent Non-Unionized Employee* who is not *actively employed* (I) on the execution date of this *agreement* on account of a physical or mental illness or injury lasting one year or more as of the execution date of this *agreement* or (II) on the *offer date* on

DIAINSP000334

account of an unapproved or unexcused absence of more than fifteen (15) days as of the *offer date*.

(B) With regard to any employee described in Subsection K1(a)(2)(A) as to whom such right is applicable (a "*qualified non-unionized employee*"), any such *request notice* must be actually received by the *Society* prior to the *effective date* in order for such *request notice* to be effective. Upon receipt of any *request notice* from a *qualified non-unionized employee* in accordance with this Subsection K1(a)(2), the *Society* shall offer employment to such *qualified non-unionized employee*.

(C) Any offer of employment made by the *Society* to a *qualified non-unionized employee* in accordance with this Subsection K1(a)(2) shall be deemed accepted only if such *qualified non-unionized employee* advises the *Society* in writing of his or her acceptance thereof within the thirty (30)-day period after such offer was made and in fact returns to the active performance of services at the *DIA* within such period. By so accepting such an offer, such *qualified non-unionized employee* shall be deemed to have granted permission for the *City* to release to the *Society* such *qualified non-unionized employee's* complete employment records with the *City*. The commencement date of any such *qualified non-unionized employee's* employment with the *Society* shall be the later of the date on which such *qualified non-unionized employee* in fact returns to the active performance of services at the *DIA* or the *effective date*. Any such employee who does not so accept such an offer shall be continued in *City* employment in accordance with *City* policies and procedures.

(3) The *Society* shall not, however, be obligated to offer employment to the one non-unionized employee operating in the *DIA's City* human resources function.

(4) For purposes of this Subsection K1, a non-unionized employee is considered "*actively employed*" on a given date if the employee is (A) actively performing services at the *DIA* on such date or (B) employed at the *DIA* but absent from work on such date on account of an absence that was (I) approved or excused in accordance with applicable employment policies and procedures (other than an absence on account of a physical or mental illness or injury lasting two (2) weeks or more), including any such approved or excused absence on account of a regularly scheduled

DIAINSP000335

day off, a vacation day, a regular paid sick day (other than on account of a physical or mental illness or injury lasting two (2) weeks or more), a holiday, a funeral leave, a leave for jury duty, a military leave, a suspension or a personal leave, or (II) unexcused but fifteen (15) days or less.

(b) All *City* employees to be offered employment by the *Society* pursuant to Subsection K1(a)(1) or (2), *supra*, shall be offered employment in jobs at levels comparable to their present jobs and with salaries at least equal to their salary levels on the *effective date*, and the *Society* shall hire all those non-unionized *City* employees who accept such offers of employment in accordance with Subsection K1(a)(1) or (2), *supra*. Further, employees who so accept such offers shall receive from the *Society*, as of the date of commencement of their employment, benefits at least equal in the aggregate to the *City* benefits described in Exhibit 16 hereto. The *City* acknowledges that the benefits set forth in Exhibit 16 in the column titled "NPC" are at least equal in the aggregate to the *City* benefits described in Exhibit 16 hereto.

(c) The *City* shall not be required to make any changes in its benefits programs as a consequence of the contents of Exhibit 16 hereto, nor shall the *City* be required to pay any benefits which may become due and owing to former *City* non-unionized employees as a consequence of their service to the *Society* after the *effective date*, except as contemplated by Subsection K3, *infra*. The *City* and the *City's* benefits plans shall, however, continue to be required to pay any benefits due and owing at any time after the *effective date* to former non-unionized *City* employees as a consequence of their service to the *City* prior to *effective date*.

(d) Upon the *Society's* request, the *City* will assist the *Society*, for a two (2) year transition period after the *effective date*, in developing positive employer-employee relations with former *City* non-unionized employees hired by the *Society*.

2. **Employment of Unionized City Employees; Negotiation with Labor Organizations.**

(a)  (1)  (A)  On the date that is forty-five (45) days prior to the *effective date* (for purposes of this Subsection K2(a), the "*offer date*"), the *Society* shall offer employment to all unionized *City* employees who are actively employed (as defined in Subsection K2(a)(4), *infra*) on the *offer date*. Each such offer shall be conditioned on such employee being *actively employed* on the *effective date*.

DIAINSP000336

(B)     Such an offer by the *Society* shall be deemed accepted only if such employee advises the *Society* in writing of his or her acceptance thereof no later than fifteen (15) days prior to the *effective date*. By so accepting such an offer, such employee shall be deemed to have granted permission for the *City* to release to the *Society* such employee's complete employment records with the *City*. The commencement date of any such employee's employment with the *Society* shall be deemed to be the *effective date*. Any such employee who does not so accept such an offer shall be continued in *City* employment in accordance with *City* policies and procedures.

(2)     (A)     Any unionized *City DIA* employee who is not *actively employed* on the *offer date* (an "*Absent Unionized Employee*") shall have the right to provide written notice to the *Society* that he or she is ready and wishes to become employed by the *Society* at the *DIA* (for purposes of this Subsection K2(a), the "*request notice*"), provided that such right shall not apply to any *Absent Unionized Employee* who is not *actively employed* (I) on the execution date of this *agreement* on account of a physical or mental illness or injury lasting one year or more as of the execution date of this *agreement* or (II) on the *offer date* on account of an unapproved or unexcused absence of more than fifteen (15) days as of the *offer date*.

(B)     With regard to any employee described in Subsection K2(a)(2)(A) as to whom such right is applicable (a "*qualified unionized employee*"), any such *request notice* must be actually received by the *Society* prior to the *effective date* in order for such *request notice* to be effective. Upon receipt of any *request notice* from a *qualified unionized employee* in accordance with this Subsection K2(a)(2), the *Society* shall offer employment to such *qualified unionized employee*.

(C)     Any offer of employment made by the *Society* to a *qualified unionized employee* in accordance with this Subsection K2(a)(2) shall be deemed accepted only if such *qualified unionized employee* advises the *Society* in writing of his or her acceptance thereof within the thirty (30)-day period after such offer was made and in fact returns to the active performance of services at the *DIA* within such period. By so accepting such an offer, such *qualified unionized employee* shall be deemed to have granted permission for the *City* to release to the *Society* such *qualified*

-41-

*unionized employee's* complete employment records with the *City*. The commencement date of any such *qualified unionized employee's* employment with the *Society* shall be the later of the date on which such *qualified unionized employee* in fact returns to the active performance of services at the *DIA* or the *effective date*. Any such employee who does not so accept such an offer shall be continued in *City* employment in accordance with *City* policies and procedures.

(3)     The *Society* shall not, however, be obligated to offer employment to the three unionized employees operating in the *DIA*'s *City* accounting function or to the two unionized employees operating in the *DIA*'s *City* human resources function.

(4)     For purposes of this Subsection K2, a unionized employee is considered "*actively employed*" on a given date if the employee is (A) actively performing services at the *DIA* on such date or (B) employed at the *DIA* but absent from work on such date on account of an absence that was (I) approved or excused in accordance with the applicable collective bargaining agreement (other than an absence on account of a physical or mental illness or injury lasting two (2) weeks or more), including, without limitation, any such approved or excused absence on account of a regularly scheduled day off, a vacation day, a regular paid sick day (other than on account of a physical or mental illness or injury lasting two (2) weeks or more), a holiday, a funeral leave, a leave for jury duty, a military leave, a suspension or a personal leave, or (II) unexcused but fifteen (15) days or less.

(b)     All *City* employees to be offered employment by the *Society* pursuant to Subsection K2(a)(1) or (2), *supra*, shall be offered employment in jobs at levels comparable to their present jobs and at their same salary and benefit levels on the *effective date*, and the *Society* shall hire all those unionized *City* employees who accept such offers of employment in accordance with Subsection K2(a)(1) or (2), *supra*.

(c)     The *City* and the *City's* benefits plans shall continue to be required to pay any benefits due and owing at any time after the *effective date* to former *City* unionized employees as a consequence of their service to the *City* prior to the *effective date*.

(d)     (1)     Insofar as they concern *City* employees at the *DIA*, the collective bargaining agreements existing as of the *effective date* between

-42-

the *City* and the various labor organizations representing such *City* employees shall at the *effective date* continue to be in force and effect but shall be between those labor organizations and the *Society* by operation of the successor clauses in those agreements. Any modifications in such collective bargaining agreements as a result of the change in employer, and any other amendments thereto, shall be the subject of negotiations between the *Society* and the labor organizations representing such employees.

(2)   During the period between the execution date and the *effective date* of this *agreement*, (A) the *City* shall not enter into any amendments of any of the collective bargaining agreements between the *City* and the various labor organizations representing *City* employees at the *DIA* insofar as such agreements concern *DIA* employees without the prior written consent of the *Society*, and (B) the *City* shall give the *Society* written notice of any other agreements between the *City* and any such labor organization concerning a covered *DIA* employee.

(3)   During the *contract term*, the *Society* shall have the sole right and duty to negotiate with labor organizations concerning covered *Society* employees as required by law.

(4)   To the extent permitted by law and if agreed to by the *Society* and the applicable labor organization representing covered *DIA* employees in a collective bargaining agreement, or any amendment thereto, executed during the *contract term*, the *Society* shall provide a copy of such agreement or amendment to the *Commission*, which shall submit such agreement or amendment to the *City* Clerk.

(e)   Upon the *Society's* request, the *City* will assist the *Society*, for a two (2) year transition period after the *effective date*, in developing positive labor-management relations with former *City* unionized employees hired by the *Society*.

(f)   The *City* represents and warrants that the terms and provisions of this Subsection K2 have been approved by the applicable labor organizations representing unionized *City* employees at the *DIA*.

-43-

DIAINSP000339

3.    **Limited Right to Return to City Employment.**

(a)    (1)    During the sixteen (16) month period following the *effective date* ("*Initial Return Period*"), any *City* employee who accepts the *Society's* offer of employment pursuant to Subsection K1, *supra*, or Subsection K2, *supra* (each, a "*Transferred Employee*"), shall have an automatic right to return to employment with the *City* in accordance with the terms of this Subsection K3 unless the *Transferred Employee* has been discharged from the *Society's* employment during the *Initial Return Period* or during such period has commenced receiving *City* retirement benefits.

(2)    (A)    In the event that the *Society* has discharged a *Transferred Employee* during the *Initial Return Period* and such discharge becomes final, (I) as a result of discharge of the *Transferred Employee* during the probation period (for unionized employees) or the orientation period (for non-unionized employees), (II) through failure of the *Transferred Employee* to appeal the discharge or (III) through confirmation of the discharge by arbitration pursuant to the *Society's* employment policies and procedures or collective bargaining agreements, as applicable, the *Transferred Employee* shall not have the right to return to *City* employment.

(B)    In the event of reversal of the *Society's* discharge of the *Transferred Employee* pursuant to arbitration under the *Society's* employment policies and procedures or collective bargaining agreements, as applicable, the *Transferred Employee* shall have the right to return to *City* employment in accordance with the terms of this Subsection K3, provided that the *Transferred Employee* so requests a return to *City* employment during the *Initial Return Period* or, in the event the arbitrator's decision is rendered after or less than thirty (30) days prior to the expiration of the *Initial Return Period*, during the thirty (30) days after the arbitrator's decision is rendered.

(3)    In addition, during the two years after the *Initial Return Period*, the *Society* shall provide written notice to any *Transferred Employee* of elimination of his or her position with the *Society*. Such *Transferred Employee* shall thereafter have the right to return to *City* employment in accordance with the terms of this

-44-

DIAINSP000340

Subsection K3, provided that the *Transferred Employee* so requests a return to *City* employment during the thirty (30)-day period after the date of such notice of elimination of his or her position ("*Contingent Return Period*") in accordance with the terms of this Subsection K3.

(b)  (1)  Any *Transferred Employee* eligible to return to *City* employment in accordance with Subsection K3(a), *supra*, who elects to do so, shall, during the time periods provided for in Subsection K3(a), *supra*, hand deliver a written request therefor to the Director of the *City's* Human Resources Department, with hand delivery of a copy to the *Society's* Human Resources Department. By such a request to return to *City* employment, the *Transferred Employee* shall be deemed to have granted permission for the *Society* to release to the *City* such *Transferred Employee's* complete employment records with the Society.

(2)  Each of the *City* and the *Society* shall immediately notify the other upon receipt of any such request for return to *City* employment. The *Society* shall advise the *City* of any discharge by the *Society* of a *Transferred Employee* who has made a written request to return to *City* employment.

(c)  (1)  Each *Transferred Employee* who makes a request to return to *City* employment in accordance with this Subsection K3 shall automatically, without the necessity of any other action, become an employee of the *City* and be terminated from employment with the *Society* for all purposes (including benefits), on the earlier of (A) the date of re-entry into *City* service or (B) the thirtieth (30th) day after the date on which the *Transferred Employee's* request was hand delivered to the Director of the *City's* Human Resources Department (such earlier date, the "*re-transfer date*").

(2)  The *City* shall place such *Transferred Employee* in a position classification, other than at the *DIA* or any of the *DIA* stores, for which the *Transferred Employee* had displacement rights under the applicable collective bargaining agreement or the Civil Service Rules (or in another classification for which the *Transferred Employee* is qualified), at as similar a wage or salary rate as possible to that in effect for such *Transferred Employee* on the day before the *effective date* of the *agreement*.

-45-

DIAINSP000341

(3) The time during which such a *Transferred Employee* was employed by the *Society* from and after the *effective date* shall be counted by the *City* as service with the *City* for purposes of seniority and all benefits.

(4) Effective upon the *re-transfer date* and except as provided in Exhibit 16 hereto, neither the *Society* nor any of the *Society's* benefits plans shall have any obligation whatsoever (including with regard to the period of time during which the *Transferred Employee* was employed by the *Society* from and after the *effective date* but prior to the *re-transfer date*) with respect to any such *Transferred Employee*, except for (A) obligations to such *Transferred Employees* arising from acts or omissions by the *Society* in violation of any law, regulation or collective bargaining agreement from and after the *effective date* but prior to the *re-transfer date* or (B) claims for welfare and other *Society* non-pension benefits incurred from and after the *effective date* but prior to the *re-transfer date* and actually paid on account of such period.

(d) If, during the *Initial Return Period*, a *Transferred Employee* requests in writing a *City service retirement* to begin as soon as administratively feasible after such request, the time during which such *Transferred Employee* was employed by the *Society* from and after the *effective date* shall be counted by the *City* as service with the *City* for purposes of retirement benefits. The *Society* pension benefit of a *Transferred Employee* who requests such a *City service retirement* during the *Initial Return Period,* but who remains employed by the *Society* after beginning to receive such *City service retirement* benefits, shall be based on service and pay with the *Society* only, starting at zero (0) on the *effective date*; but such *Transferred Employee's* service time and seniority with the *City* which existed as of the *effective date* shall not be lost for other *Society* employment benefits and purposes (e.g., retiree medical, retiree dental and vacation time).

(e) Any *Transferred Employee* who does not request a return to *City* employment in accordance with this Subsection K3 before expiration of the time periods provided for in Subsection K3(a), *supra*, shall continue to be considered separated from *City* service by layoff, with applicable rights as in effect on the day before the *effective date*.

-46-

(f)     To the extent that this Subsection K3 may apply to unionized *Transferred Employees*, the *City* represents and warrants that the terms and provisions of this Subsection K3 have been approved by the applicable labor organizations representing such *Transferred Employees*.

4.     **Financial Responsibility for Pensions Earned by Former City Employees.** The *City* shall be financially responsible for only those *City* General Retirement System vested pension benefits which the former *City* employees are entitled to receive as a result of the services they provided as *City* employees in accordance with the applicable retirement regulations in effect while they were *bona fide City* employees prior to the *effective date*, except as contemplated by Subsection K3(c)(3) or (d), *supra*. Any pension amounts deemed payable as a consequence of service provided to the *DIA* under the employment of the *Society* from and after the *effective date*, even if those benefits become pension obligations as a result of utilizing the *City* General Retirement System pension calculation factors, shall be entirely the financial obligation of the *Society* and not that of the *City* or the *City* General Retirement System, except as contemplated by Subsection K3(c)(3) or (d), *supra*.

5.     **IRS Approval of Pension Plan(s).** As soon as reasonably practicable, but in no event later than sixty (60) days after the *effective date*, the *Society* shall request a favorable determination from the Internal Revenue Service (*"IRS"*) as to the tax-qualified status of pension benefit plans(s) which the *Society* will offer *City* employees who elect to join the *Society's* work force at the *DIA*. In the event that the *IRS* does not issue a favorable determination as to the tax-qualified status of the initial pension benefit plan(s) that the *Society* will offer *Transferred Employees,* the *Society* shall be obligated, within a reasonable period of time after the *IRS* rejection, to implement whatever steps may be necessary to obtain a favorable determination from the *IRS*.

6.     **Hiring of Personnel.** During the *contract term*, the *Society* shall hire and employ such personnel as shall, in its judgment, be required to operate, manage and maintain the *DIA* in accordance with the provisions of this *agreement* and, in connection therewith, shall have sole authority and responsibility to determine the personnel policies and practices of the *DIA*, consistent with the *Society's* obligations under Subsections F25 through F27 and F29, *supra.*

7.     **Society's Director and Deputy Director of the DIA.** The *Society* shall recommend to the *Commission* and the Mayor of the *City* candidates for appointment to the positions of the *Society's DIA* director and the *Society's DIA* deputy director. The *Commission* and the Mayor shall have the authority to approve or disapprove any such candidates, as provided in Subsection G10, *supra*. Once approved, the *Society's DIA* director and the *Society's DIA* deputy

13-53846-tjt   Doc 4675-2   Filed 05/12/14   Entered 05/12/14 22:39:20   Page 24 of 34

DIAINSP000343

director shall serve on terms and conditions determined by the *Society*. In addition, the *Society's DIA* director and the *Society's DIA* deputy director may be removed by the Mayor and the *Commission* but only if both the Mayor and the *Commission* determine that such director or deputy director has engaged in actions that are adverse to the best interests of the *City*. If the *Society* disputes any determination made or action taken pursuant to this Subsection K7, the *Society* will have the right to bring any such dispute to arbitration, as contemplated by Subsection M1, *infra*.

8. **Cooperation in Employee Transitions.** The *City* and the *Society* acknowledge that transfers of employees from the *City* to the *Society* and back to the *City* involve difficult regulatory and economic issues. Therefore, the *City* and the *Society* shall work together in good faith to effectuate the intent of Subsections K1 through K3, *supra*, in connection with transfers of employees from the *City* to the *Society* and from the *Society* back to the *City*.

## L. TERM OF AGREEMENT; TERMINATION

1. **Initial Term.** The initial term of this *agreement* commences on the *effective date* and expires on June 30, 2018. The foregoing is not, however, intended to limit the rights of the *City* or the *Commission* under this *agreement*, including any of their rights under the provisions of this *agreement* relating to termination for material breach in accordance with the terms of this Section L and Section M, *infra*, or the Commission's rights of oversight in accordance with Section G, *supra*.

2. **Extensions of Term.** Provided this *agreement* is not earlier terminated pursuant to Subsection L3, *infra*, or by mutual consent of the parties, during the twelve-month period commencing on the sixteenth anniversary of the *effective date* and, if this *agreement* is extended beyond its initial term or any renewal term pursuant to this Subsection L2, during the twelve-month period commencing on the sixth anniversary of the first day of such extended term, the question whether this *agreement* will be extended for an additional ten years beyond the expiration of its then-current term shall be submitted to and voted upon by the *City Council*. Unless, during any such twelve-month period, the *City Council* votes against any such extension, this *agreement* will be extended and continue in effect after its then-current term for an additional ten-year period.

3. **Termination.** The *City* or the *Society* may terminate this *agreement* upon ninety (90) days' prior written notice in the event of a material breach by the other party of its obligations hereunder unless the cure for the material breach is commenced within ninety (90) days of receipt of the notice of termination. All

DIAINSP000344

cures must be completed within a time which is reasonable, depending upon the nature of the breach, and in no event shall a cure period exceed one (1) year, unless the parties otherwise agree in writing. During the cure period described in this Subsection L3, the parties will negotiate in good faith to attempt to resolve the matter or matters in dispute. Failure to complete a cure within a one-year or mutually agreed upon extended period shall be grounds for termination consistent with the terms of this *agreement*.

4.  **Material Breach**.  An uncured breach by the *Society* of any the following provisions may be deemed a material breach by the *City*:

    (a)   Subsections B1-B4;

    (b)   Subsections E2 and E3;

    (c)   Subsections F1-F29, F32-F40, and F42-F47;

    (d)   Subsections I1-I3;

    (e)   Subsections J1 and J3;

    (f)   Subsections K1, K2, K4-K8;

    (g)   Subsection N1; and

    (h)   Subsection O3.

5.  **Cure**. For the purposes of this *agreement*, a breach will be considered to have been "cured" if (a) to the greatest extent practicable, the non-defaulting party is placed in substantially the position as it was vis-a-vis the defaulting party prior to the breach and (b) the defaulting party takes steps that will make it less probable for a similar breach to occur in the future, which steps either have been agreed upon by the parties or have been determined in accordance with Subsection L6 and Section M, *infra*.

6.  **Resolution of Disputes**.

    (a)   If the parties cannot resolve a disagreement with respect to compliance with the terms of this *agreement*, other than a material breach (the procedure concerning which is described in Subsection L6(b), *infra*), the parties shall submit the disagreement to binding arbitration in accordance with Section M, *infra*.

-49-

DIAINSP000345

(b)    In the event a party (the "*complaining party*") alleges that a material breach of this *agreement* by the other party has not been cured within the time specified in Subsection L3, *supra*, the *complaining party* shall give written notice of such allegation to the other party within 45 days after expiration of the cure period. The parties shall then attempt in good faith to resolve the matter or matters in dispute. In the event that the parties, after negotiating in good faith for a period of 30 days, are unable to resolve the disputed matters, a determination of whether an uncured material breach of this *agreement* has occurred shall be resolved as provided in Section M, *infra*. The *complaining party* shall be required to serve upon the other party a written demand for arbitration within 45 days after expiration of such negotiation period. Upon request of either party, in matters that are arbitrated pursuant to Subsections M1 and M2(b) of this *agreement*, the arbitrators shall determine the steps to be taken to cure the material breach.

7.    **Effect of Termination.** Upon the termination of this *agreement*,

(a)    the *Society* shall deliver to the *City* the possession, custody and control of the *DIA building*, the *employee parking lot* and the *City art collection* in no worse condition than they were at the *effective date*, allowing for normal wear and tear or, with respect to the *City art collection*, deterioration which could not be prevented with the exercise of reasonable care in accordance with state-of-the-art practices employed by leading fine arts museums;

(b)    the *Society* shall return to the *City* the title to, possession of, custody of and control of all assets transferred to the *Society* pursuant to Subsection H13, *supra*, and not previously sold or disposed of in accordance with this *agreement* or in the ordinary course of the *Society's* business, or lost or destroyed, together with replacements acquired during the *contract term*. This Subsection is not intended to limit or diminish the *Society's* obligations under this *agreement*. The aggregate value of those items transferred to the *City* pursuant to this Subsection L7(b) shall be substantially equivalent to the value of the items of personal property transferred to the Society as of the *effective date*;

(c)    the *Society's* right to utilize the *City intellectual property* will terminate in accordance with the licensing agreement, which is Exhibit 8 hereto;

(d)    the parties will resolve in good faith, and make payment for, any obligations outstanding under this *agreement* on the date of termination; and

DIAINSP000346

(e)     the *Society* shall retain all of the *Society properties* and the *Society intellectual property*, including the possession, custody and control thereof, which assets shall then continue to be used by the *Society* for the benefit of the *DIA*.

# M. ARBITRATION

1.  **Arbitration.**   Any controversy or *claim* arising out of or relating to this *agreement*, or the alleged breach hereof, other than those described in Subsection M2(a), *infra*, that is not cured by the defaulting party or resolved by the parties shall be resolved by binding arbitration administered by the *AAA* under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Any such controversy or *claim* shall be submitted to a panel of three (3) *AAA* arbitrators. The fees and expenses of the arbitrators shall be shared equally by the parties. The arbitrators shall provide any remedy at law or in equity, if any, they deem appropriate under the circumstances, including termination of this *agreement*, compensatory money damages, specific performance and/or injunctive relief.

2.  **Covenant Not to Sue.**

    (a)     Where a party asserts an uncured or unresolved *claim* arising out of or relating to this *agreement*, based on gross negligence or willful misconduct, the aggrieved party must first present such a *claim* to a panel of three (3) *AAA* arbitrators for a determination based on an evidentiary hearing in accordance with the *AAA's* Commercial Arbitration Rules whether there is a likelihood that there has been gross negligence or willful misconduct. In the event that the arbitrators find that gross negligence or willful misconduct likely occurred, then the aggrieved party may file a civil action or suit at law or in equity against the defaulting party. The arbitrators' finding that gross negligence or wilful misconduct likely occurred shall not be admissible in any ensuing civil action or suit at law or in equity. The fees and expenses of the arbitrators shall be shared equally by the parties.

    (b)     In lieu of initiating a civil action or suit at law or in equity as provided in Subsection M2(a), *supra*, the non-defaulting party may elect to proceed to binding arbitration, which arbitration shall be in accordance with Subsection M1, *supra*.

    (c)     For and in consideration of the mutual obligations, promises and covenants herein undertaken by the parties hereto, the *City* and the

DIAINSP000347

*Society* hereby covenant that, with the exception of actions or suits based upon gross negligence or wilful misconduct in the performance of the terms of this *agreement*, as provided for in Subsection M2(a), *supra*, each will refrain from commencing any civil action or suit, at law or in equity, against the other party on account of any action or cause of action relating to, or that arises in any way, directly or indirectly, out of this *agreement*. In any court action predicated on gross negligence or willful misconduct, the parties reserve the right to seek any and all remedies provided in law or by equity.

## N. NO ASSIGNMENT; NO THIRD-PARTY BENEFICIARIES

1.  **No Assignment.**

    (a)   The *Society* shall not assign its rights, interests or obligations under this *agreement* without the prior written consent of the *City*, as evidenced by a resolution of the *City Council* approving the assignment. The foregoing is not intended, however, to limit the right of the *Society*, consistent with other provisions of this *agreement* (including those of Subsection F28), to enter into subcontracts for the performance of portions of its obligations hereunder, but the *Society* in any event shall remain responsible to the *City* for the performance of all of its obligations hereunder.

    (b)   The *City* shall not assign its rights, interests or obligations under this *agreement* without the prior written consent of the *Society*.

2.  **No Third-Party Beneficiaries.** This *agreement* is for the sole benefit of the parties and their permitted successors and assigns, and no other person shall be deemed to be a third party beneficiary under or entitled to derive any benefit from this *agreement*.

## O. AMENDMENTS; WAIVERS; FURTHER ASSURANCES

1.  **Amendments.** This *agreement* may be amended only by an instrument in writing (a) signed by a duly authorized representative of each party and (b) which has received the approvals required by the *City Charter*.

2.  **Waivers of Performance.** Provisions of this *agreement* may be waived only by an instrument in writing (a) signed by a duly authorized representative of each party and (b) which has received the approvals required by the *City Charter*. Further, a waiver by either party of a breach of any obligation contained in this

DIAINSP000348

*agreement* shall not constitute a waiver of such obligation respecting any subsequent breach of that obligation.

3. **Further Assurances.** From time to time, at the request of either party to this *agreement*, the other party shall take such actions as may be reasonably requested in order to consummate the transactions contemplated by this *agreement*, but the party receiving the request shall be under no obligation to incur any expense, waive any condition to any of its obligations under this *agreement*, or to waive any breach of this *agreement* by the requesting party.

## P. APPLICABLE LAW; RULES OF CONSTRUCTION

1. **Applicable Law.** This *agreement* shall be governed by and construed in accordance with the laws of the State of Michigan.

2. **Contra Proferentum Not Applicable.** The doctrine of *contra proferentum* shall not apply to this *agreement*.

3. **Headings.** The headings in this *agreement* are for convenience only and shall not affect the construction of this *agreement*.

4. **Severability.** If any court, agency, commission, legislative body or other authority of competent jurisdiction declares invalid, illegal or unenforceable any portion of this *agreement*, or its application to any person, that decision shall not affect the validity of the remaining portions of this *agreement*.

## Q. NOTICES

1. **Addresses.** Except as otherwise provided in this *agreement*, all notices and other communications required by or related to this *agreement* shall be in writing and directed as follows:

**To the *Society*:**
Founders Society Detroit Institute of Arts
5200 Woodward Avenue
Detroit, Michigan 48202
Attention: Group Director of Finance and Administration
Telecopier No.: 313-833-0343

-53-

**With a copy to:**
Richard A. Manoogian
Chairman and Chief Executive Officer
Masco Corporation
21001 Van Born Road
Taylor, Michigan 48180
Telecopier No.: 313-374-6134

**To the *City*:**
Deputy Mayor
City of Detroit
1126 City-County Building
Detroit, Michigan 48226
Telecopier No.: 313-224-2129

2.   **Change of Address.** Either party may change its address and/or telecopier number for the purposes of this Section Q upon written notice to the other party.

3.   **Delivery Methods.** The following methods of delivery are acceptable: hand-delivery; telecopier transmission; overnight commercial air courier (such as FedEx or Airborne Express); or mail (either certified, return receipt requested, registered or first-class mail). Any such notice, communication or delivery shall be deemed delivered and effective upon the earlier to occur of the following:

(a)   actual delivery; or

(b)   the same day as confirmed telecopier transmission (or the first business day thereafter if telecopied on a Saturday, Sunday or legal holiday).

## R.   FORCE MAJEURE; OTHER EXCUSED NON-PERFORMANCE

1.   **Force Majeure.** Neither party shall be liable for any delay in performance of any obligation under this *agreement* (other than the payment of money) or any inability to perform an obligation under this *agreement* (other than the payment of money) if and to the extent that such delay in the performance or inability to perform is caused by a *force majeure event*, so long as the party claiming the *force majeure event* is working diligently to terminate the *force majeure event*. A party claiming a *force majeure event* as an excuse for delay or nonperformance under this *agreement* shall provide the other party with prompt notice of the initiation of the *force majeure event*, when it is expected to terminate, and of the termination of such event. A *force majeure event* shall be deemed to be terminated with respect to a particular delay or

-54-

DIAINSP000350

nonperformance when its effects on such future performance have been substantially eliminated.

2.    **Other Excused Non-Performance.**   The *Society* will not be deemed to be in violation of its obligations under this *agreement*, to the extent that the *Society's* failure to comply with such obligations arises because (a) the insurance required by this *agreement* is insufficient to cover any first-party *claims* relating to the *City art collection*, the *DIA building*, the *Frederick lot* or the *employee parking lot*, (b) insufficient funds are available for the *Society* to comply with such obligations because the *City* has not sold the remaining bonds from the August 1988 authorization described in Subsection H6, *supra*, or (c) the deficiency, defect or item to be preserved, maintained, repaired or improved in the *DIA building*, the *Frederick lot* or *employee parking lot* relates to a latent defect of which the *Society* did not have knowledge on the execution date of this *agreement*.

## S.  INTEGRATION CLAUSE

1.    **Integration Clause.**   This *agreement* (including the attached Exhibits), the Abrogation Agreement between the *Society* and the *City* in the form of Exhibit 1 which is being executed contemporaneously with the execution of this *agreement*, and the Licensing Agreement between the *Society* and the *City* in the form of Exhibit 8 which is being executed contemporaneously with the execution of this *agreement* constitute the entire agreement between the parties concerning the subject matter hereof. There are no promises, terms, conditions or obligations other than those contained herein or therein.  This *agreement* (including the attached Exhibits) and such abrogation and licensing agreements supersede all previous agreements, communications, negotiations and representations, whether oral or written between the *City* and the *Society*.

**IN WITNESS WHEREOF**, the *City* and the *Society*, by and through their authorized officers and representatives, have executed this *agreement* as of the date stated on the first page of this *agreement*.

**WITNESSES:**

**CITY OF DETROIT ARTS COMMISSION**

By: _____

         A. Alfred Taubman

Title:    President

**CITY OF DETROIT ARTS DEPARTMENT**

By: _____

         Maurice D. Parrish

Title:    Interim Director

**FOUNDERS SOCIETY DETROIT INSTITUTE OF ARTS**

By: _____

         Richard A. Manoogian

Title:    President

**THIS AGREEMENT IS NOT VALID OR AUTHORIZED UNTIL APPROVED BY RESOLUTION OF THE DETROIT CITY COUNCIL AND SIGNED BY THE PURCHASING DIRECTOR.**

DIAINSP000352

**THIS CONTRACT WAS APPROVED
BY THE CITY COUNCIL ON**

Date:  November 26, 1997

**PURCHASING DIVISION**

By: _Carolyn Abney_ for
    Carolyn Abney
Title:  Purchasing Director

Date: _12/12/97_

**APPROVED BY LAW DEPARTMENT
PURSUANT TO SEC. 6-406 OF THE
CHARTER OF THE CITY OF DETROIT**

By: _Phyllis A. James_
        Phyllis A. James
Title:    Corporation Counsel

**FINANCE DEPARTMENT**

No.: _77009_   Date: _12/12/97_

I hereby certify that an appropriation has
been made to cover the expenses to be
incurred under this Contract.

By: _Valerie Johnson_
        Valerie Johnson
Title:    Finance Director

DET07/75000.1 (version 11 of 72666.10)

DIAINSP000353