# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

|  |  |  |
|---|---|---|
| In re | ) | Case No. 13-53846 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | In Proceedings Under |
|  | ) | Chapter 9 |
| Debtor. | ) |  |
| _____ | ) | Hon. Steven W. Rhodes |

## OBJECTION OF AMBAC ASSURANCE CORPORATION
## TO FOURTH AMENDED PLAN OF ADJUSTMENT OF DEBTS
## OF THE CITY OF DETROIT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND:  MUNICIPAL FINANCE & CHAPTER 9 ................................4

STATEMENT OF FACTS ..........................................................................7

SUMMARY OF ARGUMENTS ...................................................................14

ARGUMENT .........................................................................................17

I.    THE PLAN FAILS TO SATISFY THE BEST INTERESTS OF CREDITORS TEST BECAUSE THE LTGOs WOULD RECEIVE MORE IF THE CASE WERE DISMISSED ..................17

    A.    The Best Interest Test Requires the City to Prove that the LTGOs Recover More Under the Plan Than They Would if the Case Were Dismissed .....................................................17

    B.    LTGOs Would Fare Far Better Outside of Bankruptcy than Under the Plan................................................................19

II.    THE PLAN FAILS THE FAIR & EQUITABLE TEST BECAUSE IT FAILS TO REFLECT THE STRUCTURAL SENIORITY OF LTGOs OVER OTHER CITY DEBT ..................24

    A.    The State Law Seniority of LTGOs Must Be Respected in Bankruptcy..............................................................24

        1.    Chapter 9 Preserves State Law Rights...........................24

        2.    Bankruptcy Courts Recognize Seniority That Is Created by State Statute................................................27

        3.    State Law Seniority Is Not Preempted by the Bankruptcy Code .........................................................31

        4.    A § 510 Subordination Agreement Is Not Required for the Bankruptcy Court to Recognize LTGO Seniority......................................................................33

    B.    The Plan Must Reflect LTGO Seniority .................................37

        1.    The Absolute Priority Rule Dictates that LTGOs Must Receive Full Value Before Junior Creditors Recover ......................................................................37

      2.      At a Minimum, LTGOs Must Be Treated Materially Better than Junior Creditors .........................40

III.    THE PLAN DISCRIMINATES UNFAIRLY AGAINST LTGO CLAIMS ........................................................................44

    A.    There Is a Gross Disparity in the Treatment of LTGO and Pension Claims.........................................................45

    B.    The Gross Disparity in Treatment Cannot Be Justified...........48

    C.    The City Cannot Overcome the Presumption of Unfair Discrimination..............................................................50

    D.    The City Also Cannot Justify the Unfair Discrimination Under the Four-Factor Test......................................52

        1.      There Is No Rational or Legitimate Basis for the Disparate Treatment ......................................52

        2.      The Discrimination Is Not Necessary to Confirm the Plan ...........................................................53

IV.    THE PLAN FAILS TO PROVIDE REASONABLE CREDITOR RECOVERIES .............................................................54

    A.    The City Has a Duty to Maximize Creditor Recoveries in the Plan...................................................................54

    B.    The City Has Not Done Everything Possible to Maximize Creditor Recoveries ................................................56

    C.    The Analysis of Required Creditor Recoveries Must Take Into Account the Expected Financial Rejuvenation of the City Through Reinvestment......................................62

V.    THE CITY COULD EASILY GIVE LTGOs THE TREATMENT THEY DESERVE....................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*American United Mut. Life Ins. Co. v. Avon Park*,
311 U.S. 138 (1940)................................................................18

*Ashton v. Cameron Cnty. Water Imp. Dist. No. 1*,
298 U.S. 513 (1936)................................................................25

*Citibank, N.A. v. Baer*,
651 F.2d 1341 (10th Cir. 1980) ...............................................38

*Consol. Rock Prods. Co. v. Du Bois*,
312 U.S. 510 (1941)................................................................38

*Fano v. Newport Heights Irrigation Dist.*,
114 F.2d 563 (9th Cir. 1940) ............................................54, 63

*Franken Investments, Inc. v. City of Flint*,
218 F. Supp. 2d 876 (E.D. Mich. 2002) ..................................35

*Fulgenzi v. PLIVA, Inc.*,
711 F.3d 578 (6th Cir. 2013) ..................................................31

*In re AM Int'l, Inc.*,
46 B.R. 566 (Bankr. M.D. Tenn. 1985)...............................34, 36

*In re Apex Oil Co.*,
118 B.R. 683 (Bankr. E.D. Mo. 1990)......................................39

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989)..............................45, 52

*In re Bamberg Cnty. Mem'l Hosp.*,
No. 11-03877, 2012 WL 1890259 (Bankr. D.S.C. May 23, 2012) ...................56

*In re Barnwell Cnty. Hosp.*,
471 B.R. 849 (Bankr. D.S.C. 2012)....................................passim

*In re Bishop*,
52 B.R. 470 (Bankr. N.D. Ala. 1985)........................................36

*In re BWP Transp., Inc.*,
 462 B.R. 225 (Bankr. E.D. Mich. 2011) ..................................................45, 50

*In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*,
 177 B.R. 684 (Bankr. D. Colo. 1995) ..................................................26

*In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25*,
 143 B.R. 750 (Bankr. D. Mont. 1992) ..................................................49

*In re City of Detroit, Mich.*,
 504 B.R. 97 (Bankr. E.D. Mich. 2013) ..................................................51

*In re City of Stockton, Cal.*,
 499 B.R. 802 (Bankr. E.D. Cal. 2013) ..................................................26

*In re Connector 2000 Ass'n, Inc.*,
 447 B.R. 752 (Bankr. D.S.C. 2011) ..................................................14, 55

*In re Creekside Landing, Ltd.*,
 140 B.R. 713 (Bankr. M.D. Tenn. 1992) ..................................................45, 46

*In re Deming Hospitality, LLC*,
 No.11-12-13377, 2013 WL 1397458 (Bankr. D.N.M. Apr. 5, 2013) ..........46, 48

*In re Dow Corning Corp.*,
 244 B.R. 696 (Bankr. E.D. Mich. 1999) ..................................................45, 50, 53

*In re Dow Corning Corp.*,
 244 B.R. 678 (Bankr. E.D. Mich. 1999) ..................................................42

*In re Dow Corning Corp.*,
 456 F.3d 668 (6th Cir. 2006) ..................................................38, 53

*In re Eastern Maine Elec. Co-op., Inc.*,
 125 B.R. 329 (Bankr. D. Me. 1991) ..................................................29, 30, 34, 38

*In re EFH Grove Tower Assoc.*,
 105 B.R. 310 (Bankr. E.D.N.C. 1989) ..................................................41

*In re Eisenbarth*,
 77 B.R. 228 (Bankr. D.N.D. 1987) ..................................................52

*In re Graphic Comm'n, Inc.*,
200 B.R. 143 (Bankr. E.D. Mich. 1996).......................................................45, 46

*In re Kitty Hawk, Inc.*,
255 B.R. 428 (Bankr. N.D. Tex. 2000)................................................................33

*In re Lull Corp.*,
162 B.R. 234 (Bankr. D. Minn. 1993)................................................................33

*In re Mihalko*,
87 B.R. 357 (Bankr. E.D. Pa. 1988) ............................................................34, 36

*In re Montgomery Court Apartments, Ltd.*,
141 B.R. 324 (Bankr. S.D. Ohio 1992) .............................................................41

*In re Mt. Carbon Metro Dist.*,
242 B.R. 18 (Bankr. D. Col. 1999)...................................................14, 17, 18, 19

*In re Nat'l Bickford Foremost, Inc.*,
116 B.R. 351 (Bankr. D.R.I. 1990).....................................................................33

*In re New York City Off-Track Betting Corp.*,
434 B.R. 131 (Bankr. S.D.N.Y. 2010)................................................................25

*In re Pierce Cnty. Hous. Auth.*,
414 B.R. 702 (Bankr. W.D. Wash. 2009)........................................14, 17, 54, 55

*In re Redford Roofing Co., Inc.*,
54 B.R. 254 (Bankr. N.D. Ill. 1985) ..................................................................33

*In re Salem Suede, Inc.*,
219 B.R. 922 (Bankr. D. Mass. 1998) ...............................................................42

*In re Sentry Oper. Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ...................................................45, 46, 50

*In re Snyders Drug Stores, Inc.*,
30 B.R. 889 (Bankr. N.D. Ohio 2004).................................................................45

*In re Sunflower Racing, Inc.*,
226 B.R. 673 (D. Kan. 1998)...............................................................................42

-iii-

*In re Tribune Co.*,
   472 B.R. 223 (Bankr. D. Del. 2012) ...................................................................46

*In re Tucson Self-Storage, Inc.*,
   166 B.R. 892 (B.A.P. 9th Cir. 1994) ...........................................................46, 52

*Kelley v. Everglades Drainage Dist.*,
   319 U.S. 415 (1943)....................................................................................18, 55

*Lorber v. Vista Irrigation Dist.*,
   127 F.2d 628 (9th Cir. 1942) ......................................................................54, 55

*Matter of D&F Constr., Inc.*,
   865 F.2d 673 (5th Cir. 1989) .........................................................41, 42, 43, 44

*Matter of Kennedy*,
   158 B.R. 589 (Bankr. D.N.J. 1993) ......................................................41, 42, 44

*Matter of Sanitary & Imp. Dist. No. 7 of Lancaster Cnty., Neb.*,
   96 B.R. 966 (Bankr. D. Neb. 1989) ...................................................................26

*Matter of Sanitary & Imp. Dist. No. 7*,
   98 B.R. 970 (Bankr. D. Neb. 1989) ................................................18, 27, 28, 56

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988).............................................................................................38

*Sanitary & Imp. Dist. 65 of Sarpy Cnty., Neb. v. First Nat. Bank of Aurora*,
   73 B.R. 205 (Bankr. D. Neb. 1986) ............................................................passim

*Schafer v. Schafer,*
   689 F.3d 601 (6th Cir. 2012) .............................................................................32

*Schwab v. Reilly*,
   560 U.S. 770 (2010).............................................................................................35

*Southern Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*,
   252 B.R. 373 (E.D. Tex. 2000)....................................................................30, 38

*Town of Belleair, Fla. v. Groves*, 132 F.2d 542 (5th Cir. 1942) ............................43

*Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*,
   549 U.S. 443 (2007).............................................................................................31

*United States v. Bekins*,
   304 U.S. 27 (1938)...........................................................................................25

*West Coast Life Ins. Co. v. Merced Irrigation Dist.*,
   114 F.2d 654 (9th Cir. 1940) ...........................................................................54

STATE CASES

*Police & Firemen Retirement Sys. of City of Detroit,* 270 Mich. App. 74
   (Mich. Ct. App. 2006)......................................................................................47

*City of Detroit v. City of Highland Park*,
   39 N.W.2d 325 (Mich. 1949)...........................................................................34

*Grand Rapids Indep. Pub. Co. v. City of Grand Rapids*,
   56 N.W.2d 403 (Mich. 1953)...........................................................................35

*Hollstein v. First Nat. Bank of Aurora*,
   231 Neb. 711 (1989) .......................................................................................29

*Mudge v. Macomb County*,
   580 N.W.2d 845 (Mich. 1998)........................................................................35

*Quirk v. Municipal Assistance Corp. for the City of N.Y.*,
   363 N.E.2d 549 (N.Y. 1977)...........................................................................11

*Van Dyke Partners, L.L.C. v. City of Warren*,
   No. 293721, 2010 WL 5383519 (Mich. Ct. App. Dec. 28, 2010).....................34

FEDERAL STATUTES

11 U.S.C. § 101 ......................................................................................................49

11 U.S.C. § 507 ......................................................................................................32

11 U.S.C. § 510 ..........................................................................................24, 33, 34

11 U.S.C. § 901 ......................................................................................................39

11 U.S.C. § 903 ..................................................................................................passim

11 U.S.C. § 943(b)(7).............................................................................................14

11 U.S.C. § 1129 ...............................................................................................passim

**STATE STATUTES**

Mich. Comp. Laws § 38.1140m.............................................................47

Mich. Comp. Laws § 141.2101................................................................7

Mich. Comp. Laws § 141.2103................................................................9

Mich. Comp. Laws § 141.2301................................................................8

Mich. Comp. Laws § 141.2303................................................................8

Mich. Comp. Laws § 141.2701...................................................9, 10, 31

Mich. Comp. Laws § 141.2705.............................................................10

Mich. Comp. Laws § 211.87.................................................................31

Mich. Comp. Laws § 600.6093.............................................................21

Mich. Comp. Laws § 1550...................................................................50

Mich. Comp. Laws § 1551...................................................................50

Mich. Comp. Laws § 1558...................................................................50

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. X.....................................................................7, 25

**OTHER AUTHORITIES**

124 Cong. Rec. 32,407 (1978).............................................................41

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L. J. 227, 254 (1998)..........................................53

H.R. Rep. No. 94-686, 94th Cong., 1st Sess. (1977)...........26, 38, 40, 54

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. (1977)........................25, 54

Ambac Assurance Corporation ("Ambac"), a creditor and party in interest that insures Limited Tax General Obligation ("LTGO") bonds issued by the City of Detroit (the "City"), objects to the Fourth Amended Plan of Adjustment of Debts of the City of Detroit (the "Plan").[1] In support of this Objection, Ambac respectfully submits as follows:

## PRELIMINARY STATEMENT

The Plan's treatment of LTGO debt is nothing short of offensive – it disregards fundamental principles of Chapter 9 and utterly negates the role that state law plays in determining the nature of claims in bankruptcy.

By statute, Michigan assigns LTGO bonds a special status among municipal debt and provides LTGO holders with significant protections and rights that are superior to all unsecured creditors.[2] The State of Michigan has dictated a structure for municipal debt, pursuant to which LTGOs – and no other form of unsecured

---

[1] Unless otherwise defined in this Objection, all capitalized terms shall have the meaning ascribed to them in the Plan or the Fourth Amended Disclosure Statement ("Disclosure Statement" or "Discl. Stmt.").

[2] The LTGOs are secured debt, as has been set forth in Ambac's filings in its adversary proceeding for declaratory judgment, Case No. 13-05310. *See* Amended Complaint, Case No. 13-05310, ECF No. 57, ¶¶ 11, 72-76, 97-100; Opposition to Motion to Dismiss, Case No. 13-05310, ECF No. 89, at 62-65. These arguments are incorporated by reference and will not be restated here so as not to burden the Court with arguments with which it is already familiar. Because the LTGOs are secured, but the Plan fails to classify or treat them as such, the Plan cannot be confirmed. While preserving this argument, for purposes of the remainder of this brief, Ambac will assume in the alternative that the LTGOs are deemed to be unsecured debt.

debt held by the City – have seniority for repayment.[3]  The seniority of LTGOs is explicit:  the Michigan legislature has prescribed that LTGOs are a *"first budget obligation."*  It is also indisputable – the City itself has admitted that, outside of bankruptcy, "the Limited Tax General Obligation Bonds . . . create a "first budget obligation" under [Act 34], which creates a priority."  *See* Discl. Stmt. at 103.  *No other creditor class has the express seniority of the LTGOs, or the protections attendant to that seniority.*

The statutory constraints that create the structural seniority of LTGO debt are not unique to Michigan, but are commonplace in the municipal finance market across the country.  They are designed to enhance affordable and ready access to credit and ensure the financial stability of both the municipalities and the state itself.  The statutory dictates are the embodiment of the state's fiscal control of its municipalities.

While state law has clearly delineated a bundle of legal rights that attach to LTGOs, the City's Plan does nothing to reflect these rights.  To the contrary, the City appears to think that by entering through the courthouse doors, it left Michigan's fiscal controls behind.  The filing of a petition under Chapter 9,

---

[3] The Unlimited Tax General Obligation ("UTGO") bonds, which are general obligation debt similar to the LTGOs, have similar seniority; however, as the UTGO bonds are receiving separate treatment through their consensual agreement with the City, the discussion in the Objection is limited to LTGOs, which are slated to receive only a small fraction of the recovery agreed to for the UTGOs.

2

however, in no way overrides the rights that the state has conferred. Rather, these rights must be honored as required by the Bankruptcy Code.

In maintaining that the seniority of LTGO rights must be honored in the Plan, Ambac is not suggesting that state law trumps the Bankruptcy Code. Crediting LTGOs with the senior status to which they are entitled will not violate the distribution priorities of the Bankruptcy Code. Ambac does not contend that LTGOs cannot legally be impaired, or must be given administrative priority. However, state law does define the nature of claims that are brought forward in bankruptcy for resolution. And here, the state protections for LTGOs define the nature of the LTGO Claims as structurally senior to other unsecured obligations of the City. The Bankruptcy Code thus requires – in order to respect the nature of the underlying state law claims and to protect the state's control over municipal fiscal affairs – that the relative treatment of various debt instruments in a plan must align with the treatment of those instruments under state law.

The City has made absolutely no attempt in the Plan to recognize LTGO seniority over other forms of debt. To the contrary, it treats LTGOs *worse*, relegating them to a measly 10-13% recovery. This not only ignores the bedrock principle that state law determines the nature of claims, but it is also nonsensical in that LTGOs represent less than 1% of the City's total debt, and treating them

consistent with their state law seniority would in no way threaten the feasibility of the City's Plan.

The Plan as currently proposed is not, under any circumstances, confirmable. A plan of adjustment must be in the best interests of creditors and fair and equitable. These threshold standards, at the very minimum, require that debt that is structurally senior to other debt be afforded senior treatment in a plan. A plan that takes a senior debt instrument and throws it to the very bottom of the barrel, while elevating other debt to recoveries some five or six times greater, cannot be confirmed.

## BACKGROUND: MUNICIPAL FINANCE & CHAPTER 9

Municipal finance is fundamentally different from corporate finance. Municipal finance exists to fund public needs and services, not the profit margin of a private enterprise. The players in the municipal area are also different, with different goals. There is an extremely large pool of sellers of municipal debt, consisting of cities, towns, villages, counties, states, and public instrumentalities. Purchasers of municipal debt are risk averse individuals and mutual funds who invest for the long-term. Indeed, municipal credit is particularly sensitive because investors looking for stable low-risk investments have many choices among municipal borrowers with healthy credit.

At the same time, it is critical that states and municipalities be able to access the financial markets at reasonable interest rates to finance their ongoing capital and infrastructure needs; every state has a vital interest in ensuring that this access be maintained. Irresponsible fiscal behavior by one municipality in a state can negatively impact all municipalities and the state and impede their ability to access the market in a cost effective manner, or in some cases, at all. Municipal finance is therefore influenced and shaped by market forces and political dynamics different from those driving corporate finance.

Municipal finance thus utilizes tools that are different from those used in corporate finance. While corporate finance is ruled by private contractual arrangements, municipal finance is constrained by state constitutions and legislation. State statutes restrict the use of certain streams of revenue, create first budget obligations, and establish intercepts of revenue streams to ensure repayment. While these restrictions are often not combined with the explicit granting of a lien, through the force of law they are intended to have the same effect. Specifically, the statutory restrictions operate to create a structure establishing the seniority of specified obligations that will produce a low risk profile and thereby ensure credit is available at a low cost.

The most common municipal finance instrument used to fund the capital needs of municipalities in the United States is general obligation debt. General

obligation debt exists in one form or another in every state and is the cornerstone of municipal finance. It is generally backed by the full faith and credit of the municipality. Additionally, statutory regulation of general obligation debt is usually comprehensive. Statutes provide unique legal protections for general obligation debt to promote repayment. These protections typically include some combination of granting liens on, or otherwise earmarking, specified tax streams, obligating municipalities to raise taxes solely for payment of general obligation debt, requiring the segregation of first monies collected for the payment of general obligation debt, and making officials liable for failing to comply with the statutory protections.

These statutory schemes are intended to provide a structural seniority to ensure the repayment of general obligation debt no matter what the financial condition of a municipality. This structure is a critical component of a state's regulation of the fiscal affairs of its municipalities, as it is needed to protect the vital state interest in maintaining statewide access to the municipal finance market at reasonable interest rates.

Chapter 9 is not intended to preempt or override the fundamental controls a state imposes on the fiscal affairs of its municipalities such as the controls on general obligation debt. To the contrary, § 903 of the Bankruptcy Code requires that bankruptcy courts not interfere with these state requirements. In fact, § 903 is

6

so fundamental to Chapter 9 that its inclusion was necessary for Chapter 9 to survive a Tenth Amendment challenge to its constitutionality. It is essential that a state's regulatory control over the fiscal affairs of its municipalities be respected in Chapter 9. The deference required by § 903 as applied to general obligation bonds means honoring the seniority of municipal general obligation debt. This deference is critical to protecting the regulatory structure established by the states that is designed to protect access to municipal markets at reasonable rates in order to fund critical public needs.

## STATEMENT OF FACTS

### Michigan LTGO Bonds

Michigan law vests LTGO bonds with the typical protections afforded general obligation debt described above, thus ensuring that Michigan municipalities like the City can meet capital market expectations when issuing general obligation bonds and get reasonably priced access to financing. Michigan's statutory protections for these instruments are long-standing, having existed since shortly after the Great Depression. *See* Municipal Finance Act, Act 202 of 1943. These protections are currently contained in the Revised Municipal Finance Act, Mich. Comp. Laws Ann. § 141.2101 *et seq.*, commonly referred to as "Act 34."

7

The purpose of Act 34 is to "protect the credit of the State and its municipalities."  Senate Fiscal Agency Bill Analysis of SB 29 (S-3), at 1 (Apr. 16, 2001).  This goal is served by the provisions of Act 34 that (i) strictly regulate all borrowing and indebtedness by municipalities and (ii) ensure that all general obligation debt, including LTGO debt, is paid in full.

As to the first goal, Act 34 creates a comprehensive and exclusive regime controlling the issuance of municipal debt.  It "prohibit[s] a municipality from *issuing debt or obligations except in accordance with* [Act 34]."  *Id.* at 1 (emphasis added); *see also* Mich. Comp. Laws Ann. § 141.2301 (prohibiting the issuance of municipal securities except pursuant to Act 34).  Act 34 also prohibits municipalities from taking on debt unless they meet strict financial requirements (including the absence of recent payment defaults) and obtain the approval of the Michigan Department of Treasury.  Mich. Comp. Laws Ann. § 141.2303(3), (7). These prerequisites give the market comfort that the issuing municipality has met some supervisory standards for economic solvency and stability before it reaches out to investors.

Second, Act 34 ensures repayment of debt by dictating that a dedicated revenue stream or other security must attach to the debt issuance.  LTGO bonds may be issued only if "payable from or secured by" (i) *ad valorem* real and personal property taxes, (ii) special assessments, (iii) the limited or unlimited full

8

faith and credit pledge of the municipality, or (iv) other sources of revenue described in Act 34 for debt or securities authorized by Act 34. Mich. Comp. Laws §§ 141.2103(*l*). In this way, Act 34 assures the market that a municipality will not issue debt without ensuring it will have concrete and sufficient means to meet the repayment obligations.

Here, the City's LTGO bonds are backed *both* by the full faith and credit of the City and by an identifiable revenue stream designated specifically for debt payment. Full faith and credit means that the City is committing to use its taxing powers to ensure that there will be sufficient funds to pay the debt. The revenue stream pledged for the repayment of LTGOs is *the first ad valorem tax dollars collected by the City*. The City "shall set aside each year from the levy and collection of *ad valorem* taxes as required by this section as a *first budget obligation* for the payment of [LTGOs]." Mich. Comp. Laws §§ 141.2701(3) (emphasis added). Accordingly, there is an identifiable revenue stream in the *ad valorem* taxes designated for LTGO debt payments. Act 34 also ensures that this revenue stream is sufficient to meet all of the required debt payments, as it requires the City to levy *ad valorem* taxes in "[a]n amount such that the estimated collections will be sufficient to promptly pay, when due, the interest on [LTGOs] and the portion of the principal falling due." Mich. Comp. Laws § 141.2701(1)(a). In the event of any prior shortfall, Act 34 additionally requires the City to levy *ad*

*valorem* taxes in "[a]n amount necessary to pay debt service charges or obligations on [LTGOs] . . . falling due in the immediately preceding fiscal year." Mich. Comp. Laws § 141.2701(1)(d).

Act 34 also prescribes the logistics of how the incoming *ad valorem* revenue must be managed and ultimately turned over for payment on the LTGO bonds. "As the taxes are collected, there shall be set aside that portion of the collections that is allocable to the payment of the principal and interest." Mich. Comp. Laws § 141.2701(6). The "portion set aside" must then be held in a specified separate "debt retirement fund." *Id.* Thus, the first monies collected through the *ad valorem* levy must be captured and segregated before they reach the City's general fund. Once these funds are set aside in the segregated fund, Act 34 further requires that they be "accounted for separately" by the City, and "used only to retire the [LTGOs] . . . for which the debt retirement fund was created." Mich. Comp. Laws § 141.2705(1); *see also id.* § 141.2701(d). Act 34 does not permit the fund to be used for any other purposes until the LTGO debt is fully paid. *Id.* § 141.2701(5). Finally, Act 34 prescribes a hefty penalty for any attempt to stray from these statutory controls – any officer who willfully violates these requirements is personally liable to the LTGO bondholders for the resulting injury. *Id.* § 141.2701(7). In the municipal finance market, these statutory controls serve as the functional equivalent of a lien to provide significant protection to the LTGOs.

10

*See, e.g.*, *Quirk v. Municipal Assistance Corp. for the City of N.Y.*, 363 N.E.2d 549, 550-51 (N.Y. 1977) (referring to a similar municipal finance requirement calling for "first revenues" as akin to a "'first lien' on the city's revenues").

The general obligation bonds issued by the City are *the only debt* subject to and benefitting from these strict protective controls found in Act 34. Other unsecured debt of the City, such as the COPs, pensions, other post employment benefits ("OPEB"), and the Downtown Development Authority ("DDA") debt, are not "first budget obligations," not backed by the "full faith and credit" of the City, and not tied to a designated revenue stream that, by statute, must be sufficient to pay the debt. Only general obligation bonds have these protections. In this way, the LTGOs are special. The state has imposed a tightly controlled structure pursuant to which LTGOs are senior to all other unsecured debt of the City.

### Ambac-Insured LTGOs

The total amount of outstanding LTGO bonds issued by the City is approximately $163.5 million in principal. Discl. Stmt. Ex. E. This is a very small amount of the total $18 billion in debt that the City claims to have pre-petition – indeed, it represents less than 1% of that total figure. *See* Proposal for Creditors, dated June 14, 2013 at 23. Of the $163.5 in total LTGO debt, Ambac insures approximately $93 million in principal amount, or roughly 57% of the outstanding LTGOs issued by the City.

11

Under its insurance policies, Ambac is obligated to pay the LTGO holders the full scheduled principal of and interest on the Ambac-insured bonds if the City does not make the required payments. *See* Official Statement for 2004 LTGO and UTGO bonds ("2004 OS"), at 1, *available at* http://emma.msrb.org/MS225270-MS200578-MD389520.pdf; Official Statement for 2005 LTGO bonds ("2005 OS"), at 1, *available at* http://emma.msrb.org/MS236246-MS211554-MD411454.pdf. During the pendency of the case, Ambac has already made significant payments as a result of the City's defaults. Amended Complaint of Ambac Assurance Corporation for Declaratory Judgment, Case No. 13-05310 ECF No. 57 (the "Amended Complaint"), ¶ 8. When Ambac makes those payments, it receives an assignment of rights from the registered owner of the LTGOs and becomes subrogated to the rights of the bondholders. *See* 2004 OS, at 14; 2005 OS, at 13. Ambac also has the right to consent on behalf of the bondholders, the right to control and direct all remedies in the event of a default under the LTGOs, and the right to vote on behalf of all bondholders in bankruptcy proceedings. *See* Finance Director's Sale Order for 2004 LTGO bonds, attached hereto as Exhibit A, ("2004 Sale Order"), at A-1, A-2; Finance Director's Sale Order for 2005 LTGO bonds, attached hereto as Exhibit B, ("2005 Sale Order"), at B-1, B-2.

The City historically issued general obligation debt such as LTGOs to raise capital for important capital projects and improvements in the City. Ambac-

insured LTGOs, which were issued in 2004 and 2005, financed a number of initiatives for improving public safety, police and fire stations, recreation facilities, museums, zoos, public lighting facilities, and other cultural and economic projects. *See, e.g.*, 2004 OS, at 8; 2005 OS, at 8.

## The Plan's Treatment of LTGOs

In complete disregard for the structural seniority of LTGOs that is imposed by Michigan law and is commonplace in the municipal finance market, the City's projected distribution to LTGO holders is only 10-13% of their claims – the *lowest distribution to be made on account of any allowed unsubordinated claim* under the Plan. *See* Discl. Stmt. at 30-42.

The Plan proposes that all existing LTGO bonds will be cancelled, and in exchange, LTGO holders will receive a pro rata share of "New B Notes" to be issued by the City. Discl. Stmt. at 34. Using a 5% discount rate, the City estimates that the present value of the New B Notes is equivalent to 10-13% of the LTGO Claims. Discl. Stmt. at 34 n.5.[4] No principal on the New B Notes becomes due for

---

[4] Given the treatment of LTGOs in this case, any new LTGOs coming out of bankruptcy would be highly discounted in the market and command a very high interest rate. Thus, the 5% discount rate applied by the City is unrealistically low. *Cf.* Discl. Stmt. at 64 (using discount rate of 6.75% to calculate the present value of the State Contribution). If the LTGO recovery was calculated using a market discount rate, the estimated LTGO recovery percentage would drop to an even more appalling level, into the single digits.

the first 10 years, so LTGO holders will receive only meager interest payments

during this period.  Discl. Stmt. at 62.[5]

## SUMMARY OF ARGUMENTS

To be confirmed under Chapter 9, the City's Plan must meet certain

requirements, and the City bears the burden of proving by a preponderance of the

evidence that these requirements are met.  *See*, *e.g.*, *In re Barnwell Cnty. Hosp.*,

471 B.R. 849, 855-56 (Bankr. D.S.C. 2012); *In re Connector 2000 Ass'n, Inc.*, 447

B.R. 752, 761 (Bankr. D.S.C. 2011); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702,

715 (Bankr. W.D. Wash. 2009); *In re Mt. Carbon Metro Dist.*, 242 B.R. 18, 31

(Bankr. D. Col. 1999).  First, the Court must conclude that the Plan "is in the best

interests of creditors and is feasible."  11 U.S.C. § 943(b)(7).  While feasibility sets

a ceiling on creditor recoveries under the Plan, the best interests of creditors

standard imposes the floor.  6 Collier on Bankruptcy ¶ 943.03[7][b] (16th ed.

2013); *Pierce Cnty.*, 414 B.R. at 718; *Mt. Carbon*, 242 B.R. at 34.  In Chapter 9, a

plan of adjustment will cross the "best interest of creditors" threshold only if the

debtor can demonstrate that it has made every effort to maximize creditor

recoveries and that creditors will recover *more* under the proposed plan than they

would were the bankruptcy case to be dismissed.  Second, because not all creditors

---

[5] Certain unsecured claims are paid on a parity with the LTGO Claims including
COP Claims (Class 9), DDA Claims (Class 13), and Other Unsecured Claims
(Class 14).  Yet other unsecured claims are paid a far greater recovery than LTGO
Claims, including pension claims.

have consented to the Plan, the Court must also find that the Plan meets the requirements for "cram-down" under 11 U.S.C. § 1129(b), namely, that the Plan is "fair and equitable" with respect to each class and does not "discriminate unfairly" against any creditor.

The City's Plan is fundamentally flawed in its failure to recognize the structural seniority of LTGOs and, as a result, absolutely *none* of the above confirmation standards can be satisfied with respect to the LTGO bonds:

- **First,** the LTGOs would fare far better outside of bankruptcy were the case to be dismissed. There is no realistic scenario under which LTGO debt would wind up with a scant 10-13% recovery under state law given its substantial protections. The City cannot meet its burden to show that the Plan is in the best interests of creditors when the LTGOs would obviously do so much better outside of bankruptcy.

- **Second,** because the LTGO bonds are structurally senior to the other unsecured debt of the City, they must be treated better than the more junior forms of debt. Under the absolute priority rule, junior debt should not be paid at all if the senior LTGO bonds do not first receive value equal to the full allowed amount of their claims. At a minimum, LTGOs must be treated materially better than junior creditors. Because the Plan does not give senior treatment to LTGOs, the City cannot meet its burden to prove that it is fair and equitable in order to accomplish a cram down on dissenting creditors.

- **Third,** it is axiomatic that given the seniority of LTGOs, the City cannot treat LTGOs *worse* than other unsecured debt. But this is exactly what the City does. Unfunded pension liabilities, for example, are receiving a recovery of approximately 60%, plus an upside recovery under the Plan. The structural position of the LTGO bonds as compared to the pensions cannot warrant such a result. To treat LTGO debt worse is unfair discrimination in the extreme.

- **Finally,** the City also cannot meet its burden to prove the Plan is in the best interests of creditors or fair and equitable because it is not maximizing creditor recoveries or allowing creditors to share in the anticipated future gains from its substantial reinvestment initiatives. The Plan proposes an enormous reinvestment in the City to aid stability, development, and increase efficiencies and revenue. But the City can afford these initiatives only because it is dramatically cutting the debts it owes to its creditors. Principles of fairness and equity – not to mention responsible governance – dictate that if the City is to be revitalized on the backs of creditors, future rewards of that revitalization should be shared with those creditors.

What is more, the City is eminently capable of removing these flaws and affording the LTGOs the treatment they deserve. The LTGOs are a miniscule part of the City's debt. Treating them as senior unsecured debt will not in any way impede the Plan's feasibility, nor will it materially affect other creditor recoveries.

For all these reasons, detailed at length below, the City's Plan cannot be confirmed. At bottom, giving LTGOs a mere 10-13% in the face of the clear superiority of their rights, while less protected creditors walk away with so much more, is an affront not only to LTGO holders but also to the important state rights that Chapter 9 is designed to respect. The benefits afforded LTGO bonds mean something, and that meaning must be recognized and protected in bankruptcy. The City cannot obtain confirmation of a Plan that so blatantly discards Michigan's controls and the special nature of LTGO debt – especially when it can unquestionably afford to give LTGOs proper treatment.

16

# ARGUMENT[6]

## I. THE PLAN FAILS TO SATISFY THE BEST INTERESTS OF CREDITORS TEST BECAUSE THE LTGOS WOULD RECEIVE MORE IF THE CASE WERE DISMISSED.

### A. The Best Interest Test Requires the City to Prove that the LTGOs Recover More Under the Plan Than They Would if the Case Were Dismissed.

In Chapter 9, there is a threshold for minimum creditor recoveries necessary to satisfy the "best interests of creditors" test for confirmation. Specifically, a plan of adjustment is in the best interests of creditors only if it provides creditors with a *better* alternative than what they would receive if the Chapter 9 case were hypothetically dismissed. *See* Discl. Stmt. at 78 (City acknowledges that "debtor must establish that confirmation of its proposed plan of adjustment, more likely than not, would leave the debtor's creditors in a better position than would dismissal"); *see Barnwell Cnty. Hosp.*, 471 B.R. at 869 (plan in best interests of creditors where it is better than the alternative); *Pierce Cnty.*, 414 B.R. at 718-19 (plan must provide a better alternative for creditors than they already have); *Mt.*

---

[6] Ambac reserves the right to supplement this Objection with additional arguments after discovery. Ambac expects that discovery should yield a wealth of additional information yet unknown that will be relevant to plan confirmation and may support further objections. By way of example, Ambac expects that discovery will reveal that the values of the Pension and OPEB Claims quoted in the current Plan are grossly inflated. Similarly, discovery should identify the nature of the claims being afforded administrative status, which may give rise to legal issues regarding whether they properly qualify as such under Chapter 9. Ambac intends to address these and other issues that may be prompted by discovery in its supplemental filing.

*Carbon*, 242 B.R. at 33-34 (the best interests test "require[s] that a proposed plan provide a better alternative for creditors than what they already have"); *Matter of Sanitary & Improvement Dist. No. 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) (best interests of creditors test requires "a determination of whether or not the plan as proposed is better than the alternatives").

This threshold inquiry must be met with respect to *each individual creditor or class* by a showing that *each* such creditor or class is treated better under the plan than it would fare outside of bankruptcy. Discl. Stmt. at 76 (Plan must be "in the 'best interests' *of each Holder of a Claim and each impaired class*") (emphasis added); *see Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 418-19 (1943) (per curiam) (dissenting creditors are not deprived of the protections of confirmation standards, including best interests of creditors, merely because other members of the class consent); *American United Mut. Life Ins. Co. v. Avon Park*, 311 U.S. 138, 148 (1940) ("[T]he fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard."); *Mt. Carbon*, 242 B.R. at 36 (same).

Accordingly, if the City fails to prove that LTGO holders would be able to recover more outside of bankruptcy than the mere 10-13% recovery proposed in the Plan, the Court cannot find that the Plan is in the best interests of creditors, and thus cannot confirm the Plan.

**B.     LTGOs Would Fare Far Better Outside of Bankruptcy than Under the Plan.**

There can be no question but that outside of bankruptcy, where state law rights and remedies would control, LTGO holders would recover far more than they are getting under the Plan, even under the very worst of circumstances. Unless they fare at least as well under the Plan, it cannot be confirmed.

Admittedly, recoveries for most unsecured creditors outside of bankruptcy are often limited, making it relatively easy for a debtor to establish that a plan provides a better alternative than dismissal. *See Mt. Carbon*, 242 B.R. at 34 ("Outside of bankruptcy, general unsecured creditors often have little possibility of being repaid, especially where the municipality's debt burden is too high to be retired by taxes. Therefore, any possibility of payment under a Chapter 9 plan is often perceived by creditors as a better alternative."). But LTGO holders are not most unsecured creditors. LTGOs are special – they have senior rights, unique protections, and extraordinary enforcement mechanisms that other creditors lack. And all of these attributes are explicitly provided and protected by statute in order to implement state regulation of the fiscal affairs of its municipalities. LTGO holders' ability to recover on their claims in the event of a hypothetical dismissal far exceeds that of other unsecured creditors with whom they may be competing.

Most fundamentally, by operation of Act 34, there is a particular revenue stream dedicated for LTGO payments. None of the other unsecured creditors have

this.  The LTGO dedicated revenue stream is comprised of the first *ad valorem* tax dollars collected by the City and they are earmarked for LTGO payment "as the taxes are collected."  Act 34 also provides that LTGOs get paid "first" – it must be the City's "first budget obligation."  No other creditor has the right under state law to be paid "first."  Additionally, *ad valorem* revenue necessary to pay LTGO debt service is not only pledged for LTGO payment, but it is expressly restricted by Act 34 to that use, and cannot be used for any other purpose until the LTGO debt is retired.  The restricted nature of the funds gives the LTGO holders a beneficial property interest in the revenue under state law.[7]  And because they are statutorily restricted, no other unsecured creditor may access these funds outside of bankruptcy until the LTGOs are fully paid.  Moreover, LTGOs are protected by the City's full faith and credit, a protection no other unsecured creditor enjoys.  All of these protections unique to LTGO holders would give them a distinct advantage in a hypothetical race to assert claims under state law.  Indeed, the City concedes that outside of bankruptcy, the LTGOs occupy a senior position to other creditors.  *See*

---

[7] In the adversary proceeding filed by Ambac with respect to its insured general obligation bonds, Ambac explained in detail its beneficial property interests in the *ad valorem* tax revenue collected by the City in an amount equal to the debt service on the general obligation bonds.  *See* Amended Complaint, Case No. 13-05310, ECF No. 57.  Ambac incorporates by reference in this Objection its Amended Complaint and also its Opposition to Defendants' Motion to Dismiss in that case, Case No. 13-05310, ECF No. 89, setting forth those property interest arguments. The failure of the Plan to provide for distribution of tax monies equal to the debt service on the LTGOs during the pendency of the case to the LTGO holders is yet another defect precluding confirmation.

Discl. Stmt. at 103 ("The City believes that the Limited Tax General Obligation Bonds . . . create a 'first budget obligation' under [Act 34], which creates a priority.").

Just as important, the LTGOs' strong substantive rights under state law are buttressed by strong procedural rights for their enforcement that other creditors do not share. Specifically, the LTGO holders could seek an *immediate* order of mandamus directing the City to turn over to them the restricted property taxes. No new taxes would need to be levied and collected to satisfy LTGO claims. Holders of LTGOs are entitled to the first *ad valorem* tax dollars that are already being collected and will continue to be collected by the City. And Act 34 further bolsters this remedy and disincentivizes non-compliance with court orders by imposing personal liability on any City official who fails willfully to adhere to its provisions.

In contrast, all other creditors would have to overcome several procedural hurdles before funds would accumulate for their benefit. They would first have to obtain a money judgment against the City. Then they would have to move to compel the City to levy taxes on account of the judgment, and wait for the taxes to be collected the following year. *See* Mich. Comp. Laws § 600.6093. Tax delinquency would pose a potential risk; while the City could be compelled to levy additional taxes to satisfy judgment creditors, taxpayers may resist paying these new and higher taxes. Only after sufficient new tax revenue was collected would

21

other creditors be in a position to seek an order of mandamus directing the City to turn over those tax receipts. Another risk would then appear because City officials, undeterred by personal liability, could still attempt to frustrate enforcement.

By the time other creditors could navigate all these procedural steps, assuming they could overcome the risks posed by tax delinquencies or the failure of City officials to perform, the LTGOs would be largely paid. The bulk of the LTGO debt service becomes due in 2014 through 2016, and would be satisfied by the *ad valorem* tax revenues collected in those years. By the end of 2014, LTGO holders would have already recovered roughly 33% of their claims, and by the end of 2016, LTGO holders would already have recovered roughly 65% of their claims. Meanwhile, other creditors' enforcement initiatives would just be getting started.

In light of this comparison, it is impossible to imagine the City trying to sideline the LTGO debt with a 10-13% recovery outside of bankruptcy. Furthermore, when the LTGOs' structural seniority is considered in the context of how small the LTGO principal amount is as compared to the City's aggregate debt – less than 1% – the practicalities are such that this result is inconceivable. The City would have a strong fiscal and business incentive, as well as the financial ability, to treat LTGOs in accordance with the law and not default.

Simply put, LTGO indebtedness did not drive the City into bankruptcy and it can be easily managed outside of bankruptcy. The City could, and would be behooved to, negotiate with the LTGO holders for an extension of the repayment term to obtain near-term liquidity relief. Because the debt service on the LTGOs is heavily front-loaded, a mere extension of the payment schedule – a common resolution in the municipal bond market – would confer a significant benefit on the City without the need to impair principal. Market participants have successfully negotiated out-of-bankruptcy workouts of this nature in other situations, including, in Ambac's case, in connection with general obligation debt in the City of Harrisburg, Pennsylvania. And, as the City knows, it was willing and offered to do so here as well. Finally, to get even better terms, the City could, as it did with other bond issues, refinance the LTGOs using distributable state aid-backed bonds issued under the auspices of the Michigan Finance Authority.[8]

In short, the City's proposed Plan does not provide the LTGOs a better alternative than dismissal, and consequently, the City cannot demonstrate that the proposed plan is in the LTGOs' best interests.

---

[8] The refinancing option would not be available to the City's larger creditors such as COPs, pensions, and OPEB because the City is already at its debt limit and cannot take on additional debt.

23

## II. THE PLAN FAILS THE FAIR & EQUITABLE TEST BECAUSE IT FAILS TO REFLECT THE STRUCTURAL SENIORITY OF LTGOS OVER OTHER CITY DEBT.

### A. The State Law Seniority of LTGOs Must Be Respected in Bankruptcy.

The Plan's fundamental defect is its failure to treat LTGOs as structurally senior to other unsecured debt. The City does not dispute that LTGOs are senior debt instruments under state law, but contends that it can simply disregard this seniority once it passes through the doors of bankruptcy court. The City could not be more wrong. Far from abandoning state law rights, the Bankruptcy Code embraces them. As the Court is aware, the Bankruptcy Code routinely looks to state law to determine underlying rights and the nature of claims. In Chapter 9, § 903 expressly defers to and prohibits interference with state controls on municipal finance. State laws that define a structural hierarchy as between unsecured municipal debt are in no way preempted by the Bankruptcy Code. Moreover, the statutorily-created seniority is sufficient – no express subordination agreement under § 510 is required to apply this seniority in bankruptcy. The LTGOs have an incontestable structural seniority under state law, and this seniority must be honored in Chapter 9.

### 1. Chapter 9 Preserves State Law Rights.

Section 903 provides that Chapter 9 "does not limit or impair the power of a state to control, by legislation or otherwise, a municipality of or in such state in the

exercise of the political or governmental powers of such municipality." 11 U.S.C.

§ 903. Underlying this section are strong federalism concerns that protect states'

abilities to regulate municipal debt and require that those state law frameworks be

respected in a Chapter 9 case:

> Principles of federalism, embodied in section 903 of the Bankruptcy
> Code, also *mandate that chapter 9 debtors follow state law*. Section
> 903 of the Bankruptcy Code is the "constitutional mooring" for
> municipal debt readjustment and makes clear that *nothing in chapter 9*
> *should be interpreted to limit a State's power to control its*
> *municipalities*. . . . . As nothing in chapter 9 may be interpreted to
> interfere with the power of a State to control its municipalities, it
> necessarily follows that *debtors under chapter 9 must follow state*
> *laws,* at least those that are not preempted by federal law.

> *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 144 (Bankr.

S.D.N.Y. 2010) (emphasis added); *see also United States v. Bekins*, 304 U.S. 27,

51 (1938) ("The statute is carefully drawn so as not to impinge upon the

sovereignty of the State. *The State retains control of its fiscal affairs*.") (emphasis

added); H.R. Rep. No. 95-595, at 264 (1978) (citing *id.* (same)).[9]

---

[9] Protections against bankruptcy court interference with state governance of
municipal fiscal affairs are so fundamental that they were necessary for Chapter 9
even to pass constitutional muster under the Tenth Amendment. The original
Chapter 9 was struck down in *Ashton v. Cameron Cnty. Water Imp. Dist. No. 1*,
298 U.S. 513 (1936) based on concerns that it interfered too much with the
sovereign power of the states. *See* 6 Collier on Bankruptcy ¶ 903.LH[1] (16th ed.
2013). A revised act was eventually upheld in *United States v. Bekins* based "in
part on the language protecting the state's power," including the provision that was
the predecessor to § 903. *See id.* (citing *Bekins*).

Since the enactment of Chapter 9 and its predecessors, Congress has been steadfastly mindful of the need to continue to protect this constitutional underpinning. In connection with the 1976 amendments to the Bankruptcy Code, Congress reiterated that state law governance of municipal debtors continues in bankruptcy:

> The purpose of [the predecessor to § 903] . . . is to prevent the statute or the court from interfering with the power constitutionally reserved to the State by the Tenth Amendment. This section makes it clear that the chapter may not be construed to limit or impair the power of the State to control, by legislation or otherwise, any municipality, political subdivision or public agency or instrumentality in the exercise of its governmental functions. *Any State law that governs municipalities or regulates the way in which they may conduct their affairs controls in all cases.*

H.R. Rep. No. 94-686, at 557 (1975) (emphasis added).

Courts have unwaveringly recognized the intent of § 903 to protect state fiscal control over municipal debtors. *See, e.g., In re City of Stockton, Cal.*, 499 B.R. 802, 808 (Bankr. E.D. Cal. 2013) ("Providing for, and regulating, elections and methods for approval of local taxes represents state control of the exercise of political or governmental powers of a municipality within the meaning of § 903."); *In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 177 B.R. 684, 693-94 (Bankr. D. Colo. 1995) (Chapter 9 does not displace state requirements for bond issuance.); *Matter of Sanitary & Imp. Dist. No. 7 of Lancaster Cnty., Neb.*, 96 B.R.

966, 967 (Bankr. D. Neb. 1989) ("Section 903 precludes this Court from exercising any control over the expenditures of a municipality.").

Accordingly, as much as the City might wish that it left Michigan law behind as it walked up the courthouse steps, the obligations and controls placed on the City's fiscal affairs by the State of Michigan came along with it. Through Act 34, Michigan legislated a state-wide fiscal policy designed to protect the state and its municipalities. The unique protections that Act 34 provides to LTGOs are intended to ensure that even if a municipality is fiscally distressed, LTGOs will be paid if at all possible. This state policy and expectation followed the City into bankruptcy. Chapter 9 does not permit the City simply to close the door on Michigan control and chart its own course.

### 2. Bankruptcy Courts Recognize Seniority That Is Created by State Statute.

Bankruptcy courts hold that where a state statute provides structural seniority to a particular group of unsecured creditors, the claims of those creditors must be classified separately and treated as senior. *See Sanitary & Imp. Dist. 65 of Sarpy Cnty., Neb. v. First Nat. Bank of Aurora ("District 65")*, 73 B.R. 205 (Bankr. D. Neb. 1986), *aff'd*, 79 B.R. 877 (D. Neb. 1987), *aff'd sub nom.*, *Matter of Sanitary & Imp. Dist. 65 of Sarpy Cnty., Neb.*, 873 F.2d 209 (8th Cir. 1989); *Matter of Sanitary & Imp. Dist., No. 7*, 98 B.R. 970.

In the Chapter 9 case involving the Sanitary and Improvement District 65 of Sarpy County, Nebraska, holders of general obligation bonds sought a declaration of their relative seniority as against the holders of warrants issued by the district. The bankruptcy court ruled in favor of the bondholders, 73 B.R. 205, and the district court affirmed, 79 B.R. 877. Both courts carefully analyzed the respective rights of the bondholders and warrantholders under the governing state statute and concluded that the statute required the "bondholders and warrantholders to be treated differently with regard to payment if and when warrants became due pursuant to the statute and there were insufficient funds available for such payment." *District 65*, 73 B.R. at 209; *accord* 79 B.R. at 879. Specifically, while the statute *required* the district to levy sufficient taxes to pay the bondholders in full on a specific payment schedule, the statute *prohibited* the district from levying taxes on account of the warrants if such tax levy would be unreasonably high as compared with the tax levy on other similar property in the county. *Id.*; *see also Matter of Sanitary & Imp. Dist., No. 7*, 98 B.R. at 974 ("Since state law requires full payment to bondholders, and since a plan cannot be confirmed if it permits a debtor to do something that is prohibited by state law, it cannot be confirmed.").

Having determined that the general obligation bonds were entitled to structural seniority under state law, the district court expressly rejected the argument that "a state-created priority cannot be given effect in a bankruptcy

proceeding." *District 65*, 79 B.R. at 879-80. Accordingly, even though both the bonds and warrants were unsecured obligations, the general obligation bonds had senior status under state law and therefore had to be classified separately and treated senior to the warrants. *Id.*

The warrantholders appealed to the Eighth Circuit, which certified the question of Nebraska law statutory seniority to the Supreme Court of Nebraska. The Supreme Court found "no quarrel" with the reasoning of the bankruptcy and district courts and held that "the statutes of the State of Nebraska do grant a priority in favor of bonds over warrants so as to *require that bonds be fully paid according to their terms prior to utilizing revenues for payment of warrants.*" *Hollstein v. First Nat. Bank of Aurora*, 231 Neb. 711, 718 (1989) (emphasis added). Upon receiving this guidance from the Supreme Court of Nebraska, the Court of Appeals for the Eighth Circuit affirmed the district court's holding that the bondholders were entitled to superior treatment because "the statutes did create a *superior* right in bondholders over warrantholders for repayment purposes." *District 65*, 873 F.2d at 210 (emphasis added).

In other bankruptcy cases as well, courts have found that where a state statute granted senior rights to certain debt, that debt had to be given senior treatment in the plan. *In re Eastern Maine Elec. Co-op., Inc.*, where the debtor was a rural electric cooperative organized pursuant to Maine law, is one such case. 125

29

B.R. 329, 330 (Bankr. D. Me. 1991). The governing Maine statute provided that the cooperative's revenues "shall *first* be applied to expenses, interest and obligations . . . ." *Id.* at 335 n.29 (emphasis added). Thereafter, "[a]ny remaining revenues shall . . . be distributed by the cooperative to its members as patronage refunds . . . ." *Id.* at 335 (emphasis added). Notwithstanding this state law framework, the debtor sought in its proposed plan to treat the patronage class identically with general unsecured creditors. *Id.* at 332. Citing "the legal force of state law," the court held that the patronage debt was structurally junior under state law and "cannot permissibly be treated on a par with [the cooperative's] unsecured debt." *Id.* at 339 & n.51; *see also Southern Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*, 252 B.R. 373, 385-86 (E.D. Tex. 2000) (relying on state law to find that certain claims should be treated as junior to other debt).

These principles apply with equal force here, and require that the structural seniority of the LTGOs be recognized in the Plan. Notably, the seniority given to LTGOs under Michigan law is far more clear than that in *District 65*. In that case, the seniority was inferred from the fact that the district's ability to levy taxes for the payment of warrants was limited, while the ability to levy taxes on account of the bonds was unlimited and unqualified. Here, as in the *Eastern Maine* case, the seniority of LTGOs is express under the terms of the governing state statute: Act 34 dictates that LTGOs must be paid as a "first budget obligation," *i.e.*, prior to any

other indebtedness.  *See* Mich. Comp. Laws § 141.2701(3); Mich. Comp. Laws § 211.87d(6)(e) (payment "as a first budget obligation" means payment "before paying any other budgeted amounts").  State law provides an explicit structural seniority for LTGO debt over other unsecured obligations.  LTGOs must, accordingly, be given more senior treatment under the Plan than unsecured debt that occupies a more junior position under state law.

### 3. State Law Seniority Is Not Preempted by the Bankruptcy Code.

Furthermore, and despite the City's protestations otherwise, the Bankruptcy Code does not preempt recognition of the state law seniority of LTGOs.  In fact, bankruptcy law looks to state law to determine the nature of claims, *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) ("[T]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims."), including whether one unsecured creditor is senior to another unsecured creditor and whether an instrument is debt or equity.  Such a determination does not disturb the Bankruptcy Code priorities or distribution scheme.

The doctrine of conflict preemption "nullifies state law 'to the extent that it actually conflicts with federal law.'"  *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 583-84 (6th Cir. 2013).  Preemption will be found only if "the laws in question conflict such that it is impossible for a party to comply with both laws simultaneously," or "where the enforcement of the state law would hinder or frustrate the full purposes

31

and objectives of the federal law." *Schafer v. Schafer,* 689 F.3d 601, 614 (6th Cir. 2012) (Michigan law that created bankruptcy-specific exemptions solely for Michigan debtors did not conflict with, and was therefore not preempted by, the Bankruptcy Code).

There is absolutely no conflict here. Section 507, the priorities provision of the Bankruptcy Code, applies only in part in Chapter 9 cases. Specifically, only § 507(a)(2) applies, which provides for priority of administrative expenses, which are entitled to be paid in full and in cash at confirmation. But the proposition that LTGOs should be treated as senior unsecured debt does not seek to elevate the treatment of LTGOs to the level of an administrative expense – it merely entitles the LTGOs to be treated as "senior" to other unsecured creditors. Allocating superiority as between classes of unsecured creditors does not conflict with § 507(a)(2) in any way. This precise issue was raised in the *District 65* case, and the court there concluded the same:

> Warrantholders also argue that even if Nebraska law creates a preference for bondholders, a state-created priority cannot be given effect in a bankruptcy proceeding if it conflicts with the priority established in 11 U.S.C. § 507. *The issue presently before the Court does not involve a § 507 priority. The bondholders acknowledge that claims entitled to priority under § 507 have priority over the unsecured claims of those bondholders.*

*District 65*, 79 B.R. at 880 (emphasis added).[10]

Because there is no colorable basis on which preemption could apply, the state law seniority of LTGOs must be respected and reflected in the Plan.

### 4. A § 510 Subordination Agreement Is Not Required for the Bankruptcy Court to Recognize LTGO Seniority.

Finally, the City has argued that the structural seniority of LTGOs under state law need not be observed in bankruptcy because the seniority is not established through an express subordination agreement pursuant to § 510.[11] This argument, just like the City's other attempts to escape Michigan controls, is unavailing.

First, there is simply no support for the notion that the senior status of an unsecured debt can arise solely through a § 510 subordination agreement. The Bankruptcy Code does not say that, nor has any court so held. To the contrary, the case law makes clear that subordination may be established by statute, and that an

---

[10] The City has, in the past, relied on Chapter 11 cases to support its conflict preemption arguments. *See, e.g.*, Memorandum in Support of Defendants' Motion to Dismiss, Case No. 13-05310, ECF No. 83, at 20 n.1 Those decisions are inapposite, however, as they arise from creditor arguments that state law priorities should give them an administrative or wage priority that conflicts with the Bankruptcy Code sections on those priorities. *See, e.g.*, *In re Kitty Hawk, Inc.*, 255 B.R. 428 (Bankr. N.D. Tex. 2000) (administrative priority); *In re Lull Corp.*, 162 B.R. 234 (Bankr. D. Minn. 1993) (wage priority); *In re Nat'l Bickford Foremost, Inc.*, 116 B.R. 351 (Bankr. D.R.I. 1990) (wage priority); *In re Redford Roofing Co., Inc.*, 54 B.R. 254 (Bankr. N.D. Ill. 1985) (wages or administrative expense).

[11] *See, e.g.*, Reply to Ambac's Opposition to Motion to Dismiss, Case No. 13-05310, ECF No. 93, at 26.

agreement is not required. In *E. Maine Elec. Co-op.*, the court expressly rejected

the argument that a § 510 subordination agreement was required: "Contrary to [the

debtor's] view, that conclusion [that the patronage claims are junior to the claims

of the debtor's unsecured creditors] does not require invocation of 11 U.S.C. § 510.

*It springs from the provisions of state law* and [the debtor's] by-laws discussed

above." 125 B.R. at 339 n.51 (emphasis added). Likewise, in *District 65*, there

was no subordination agreement, yet the Eighth Circuit affirmed that superior

rights were created by the operable state statute. 873 F.2d at 210. In other words,

while contracts may give rise to senior treatment pursuant to § 510, this in no way

precludes seniority from being demonstrated through other means, such as through

a state statutory structure like Act 34.

Second, even if a subordination agreement were required, one can readily be

implied. Subordination agreements need not be in writing or even express in order

to be honored in bankruptcy. *See In re Mihalko*, 87 B.R. 357, 360 (Bankr. E.D. Pa.

1988); *In re AM Int'l, Inc.*, 46 B.R. 566, 573 (Bankr. M.D. Tenn. 1985). Instead, a

subordination agreement can either be implied-in-fact, where the parties' conduct

evidences a meeting of the minds, or implied-in-law, where no contract was

intended but the law imposes one to enable justice to be accomplished. *City of

Detroit v. City of Highland Park*, 39 N.W.2d 325, 333-34 (Mich. 1949) (implied-

in-fact contract); *Van Dyke Partners, L.L.C. v. City of Warren*, No. 293721, 2010

34

WL 5383519, at *3 (Mich. Ct. App. Dec. 28, 2010) (implied-in-law contract). Here, the construct imposed by Act 34, along with the conduct of all relevant parties, give rise to both types of implied subordination agreements establishing the seniority of LTGOs over other forms of unsecured debt.

As discussed above, Act 34 imparts a clear structural seniority – this necessarily implies a subordination of non-LTGO debt as a matter of law. All other creditors who extended junior forms of credit to the City are, by law, presumed to be knowledgeable of the Act 34 structure. *See Schwab v. Reilly*, 560 U.S. 770, 772 (2010) (acknowledging "the presumption that parties act . . . with knowledge of the law"); *Franken Investments, Inc. v. City of Flint*, 218 F. Supp. 2d 876, 886 (E.D. Mich. 2002) ("Businesses are deemed knowledgeable of the laws affecting their enterprise.") (internal quotations and citations omitted); *Mudge v. Macomb County*, 580 N.W.2d 845, 856 n.22 (Mich. 1998) ("All parties . . . are presumed to know the law."); *Grand Rapids Indep. Pub. Co. v. City of Grand Rapids*, 56 N.W.2d 403, 407 (Mich. 1953) ("Everyone is presumed to know the law."). In addition to this presumption of knowledge, Act 34's restrictions were in fact fully and publicly disclosed to investors in the Official Statements ("OS") issued in connection with debt instruments.[12] All investors are therefore imputed

---

[12] The OS for the LTGOs emphasizes that the taxing power of the City is pledged for the repayment of the LTGOs as a first budget obligation. *See, e.g.*, 2005 OS, at 5 ("the Bonds will be *full faith and credit* limited tax general obligations of the

with knowledge of the structural seniority of general obligation debt pursuant to Michigan law.

The conduct of other creditors in extending other types of credit to the City with full knowledge of the seniority of LTGOs thus created an implied subordination agreement. *See AM Int'l, Inc.*, 46 B.R. at 572-73 (a creditor's agreement to permit the borrower to use a lockbox security arrangement with another creditor gave rise to an implied subordination); *Mihalko*, 87 B.R. at 365 (subordination agreement implied by the conduct of the creditors in recording liens); *In re Bishop*, 52 B.R. 470, 474 (Bankr. N.D. Ala. 1985) (subordination agreement implied by course of dealing where one creditor acquiesced to priority of another). The City's non-LTGO creditors understood that their debt would necessarily be structurally junior to the general obligation debt. It would be inequitable for those creditors to evade the Michigan statutory scheme and obtain rights equal to LTGOs by the mere fortuity of the City's bankruptcy. An implied subordination agreement is justified both on the facts and on the law.

These arguments apply with particular force to the COPs and DDA claims, each of which are slated to share in recoveries under the New B Notes with the

City" and "payable as to principal and interest as a *first budget obligation*" (emphasis added)). In contrast, the OS for the 2006 COPs expressly distinguish those instruments from GO instruments and make clear that "*neither the faith and credit, taxing power nor any specific revenues of the City are pledged* to the [COPs]." *See* OS for 2006 COPs, at 9 (emphasis added), *available at* http://emma.msrb.org/MS51845-MS258957-MD499854.pdf.

LTGOs. The COPs holders, as sophisticated investors, purchased the COPs with full knowledge of their structural subordination to the LTGOs. The DDA subordination is even more concrete as, by its terms, DDA debt is payable with no interest and only if there is money available to make such payments.[13] No one could reasonably assert that this debt would be thought to be on par with LTGO debt. Consent to subordination must therefore be implied.

### B. The Plan Must Reflect LTGO Seniority.

LTGOs enjoy a structural seniority under Michigan law that must be respected in Chapter 9. This means, quite simply, that the Plan cannot impertinently disregard the LTGOs, relegating them to the bottom of the pile. To meet the requirement that the Plan be "fair and equitable," the Plan must reflect the uncontroverted seniority of LTGO debt as compared to other unsecured debt of the City and must afford it better treatment.

### 1. The Absolute Priority Rule Dictates that LTGOs Must Receive Full Value Before Junior Creditors Recover.

The most commonly discussed proxy for the fair and equitable standard under § 1129(b)(2)(B) is the absolute priority rule. The absolute priority rule requires that unless a dissenting senior creditor receives the full value of its allowed claim, no junior allowed claims may receive any recovery. 11 U.S.C.

---

[13] *See, e.g.*, Discl. Stmt. at 103 (The purported loan to DDA is "payable to the DDA *as general operating funds become available*.") (emphasis added).

§ 1129(b)(2)(B); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988); *In re Dow Corning Corp.*, 456 F.3d 668, 672 (6th Cir. 2006). The Plan violates the absolute priority rule because it does not pay the LTGO Claims their full value, yet makes distributions to junior classes of unsecured creditors.

To be clear, Ambac is not contending that the LTGOs cannot be impaired. The absolute priority rule does not go so far. It does require, however, that full compensation be paid for the entire bundle of rights the LTGO holders are surrendering. *See*, *e.g.*, *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 528 (1941); *Citibank, N.A. v. Baer*, 651 F.2d 1341, 1348 (10th Cir. 1980). This determination must be based upon a consideration of all the facts and circumstances of the case. *Citibank*, 651 F.2d at 1347. Here, the meager recovery for the LTGOs unquestionably does not compensate them fully for the extensive rights they are losing.

The relative seniority of debt for purposes of the absolute priority rule turns on state law. *See* H.R. Rep. No. 94-686, 94th Cong., 1st Sess. (1977) at 32 ("The court determines these [absolute priority rule] priorities *based on State law*.") (emphasis added); *E. Maine Elec. Co-op.*, 125 B.R. at 339 (absolute priority rule was violated where a state statute made one class junior to another, yet the plan provided for equal distributions to both senior and junior classes); *S. Pac. Transp.*, 252 B.R. at 386-87 (determining relative seniority for the purpose of the absolute

38

priority rule based on the intent of "governing Texas law"); *In re Apex Oil Co.*, 118 B.R. 683, 698 (Bankr. E.D. Mo. 1990) ("[T]he laws of both the states of Massachusetts and Wisconsin" determine relative treatment of creditors for the purpose of the absolute priority rule.). Because Michigan state law furnishes LTGO holders with superior rights, the absolute priority rule requires that LTGOs be paid in full before any other unsecured creditor may receive any value under the Plan. *See* 11 U.S.C. § 1129(b)(2)(B).

Initially, the City acknowledged the operation of the absolute priority rule in this case. *See* Disclosure Statement, Case No. 13-53846, ECF No. 2709, at 110 ("unless a dissenting unsecured Class of Claims receives payment in full for its Allowed Claims, no holder of Allowed Claims in any class junior to that Class may receive or retain any property on account of such Claims;" the "fair and equitable standard [is] also known as the 'absolute priority rule'"). The City then reversed itself and, in its current Disclosure Statement, the City now maintains that "the absolute priority rule serves no function in Chapter 9 cases" because "there are no equity holders." Discl. Stmt. at 77. The City has misapprehended Chapter 9 yet again. Of course the absolute priority rule applies in Chapter 9 – it was in fact expressly incorporated with respect to secured and unsecured creditors. *See* 11 U.S.C. § 901(a) (incorporating §§ 1129(b)(2)(A) and (B) of the absolute priority rule as they pertain to secured and unsecured creditors and omitting §

1129(b)(2)(C) pertaining to equity); *In re Jefferson Co., Ala.*, Ch. 9 Case No. 11-05736, ECF No. 2248 (Findings of Fact, Conclusions of Law, and Order Confirming Plan of Adjustment), attached hereto as Exhibit C, at 45- 48 (applying the absolute priority rule to find that the plan is fair and equitable with respect to a number of objecting classes because no holder of a claim "junior" to the objecting classes "shall receive or retain anything under the Plan"); *see also* 6 Collier on Bankruptcy ¶ 943.03[1][f][i][c][iii] (16th ed. 2013) (§ 1129(b)(2) applies in Chapter 9 except with respect to equity).  The legislative history of Chapter 9 also confirms the incorporation of the absolute priority rule.  *See* H.R. Rep. No. 94-686, 94th Cong., 1st Sess. (1977) at 32 ("Fair and equitable is an equitable doctrine.  *It incorporates the absolute priority rule . . . which requires that senior creditors be paid in full before any creditor junior to them may be paid at all*." (emphasis added)).

The absolute priority rule applies in this case and the seniority of state law rights must be recognized.  Therefore, unsecured junior debt cannot receive any recovery unless the LTGOs will be paid the full value of their allowed claims.

### 2. At a Minimum, LTGOs Must Be Treated Materially Better than Junior Creditors.

Short of the absolute priority rule, there can be no question that for the Plan to be deemed "fair and equitable," it must, at a minimum, give the LTGOs materially better treatment than other unsecured debt.

40

The "fair and equitable" standard set forth in § 1129(b) comprises more than just the absolute priority rule and the other specific requirements set forth in that section. *Matter of D&F Constr., Inc.*, 865 F.2d 673, 675 (5th Cir. 1989) ("Section 1129(b)(2) merely states that 'the condition that a plan be fair and equitable with respect to a class *includes* the following requirements . . . .'" (emphasis in original)). As the sponsors of the Bankruptcy Reform Act of 1978 noted, "fair and equitable" has a broader meaning:

> Although many of the factors interpreting 'fair and equitable' are specified in paragraph (2), others, which were explicated in the description of section 1129(b) in the House report, were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to 'fair and equitable' treatment of a dissenting class.

124 Cong. Rec. 32,407 (1978); *see also Matter of Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993) (fair and equitable rule "is an amorphous concept which was purposely left undefined in the Bankruptcy Code").

Section 1129(b)(2) sets the minimum standards a plan must meet; "it is not to be interpreted as requiring that every plan not prohibited be approved." *D&F Constr.*, 865 F.2d at 675. Indeed, "[a] plan may meet the standards of 11 U.S.C. § 1129(b)(2) and still not be 'fair and equitable.'" *In re EFH Grove Tower Assoc.*, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989). To meet the fair and equitable test under § 1129(b)(1), "a plan must *literally* be fair and equitable." *Id.* (emphasis added); *see also In re Montgomery Court Apartments, Ltd.*, 141 B.R. 324, 346

(Bankr. S.D. Ohio 1992) ("In addition to the specific codified requirements of 'fair and equitable,' there is a general requirement that a plan be 'fair and equitable, with respect to each class' of impaired dissenting claims.").  In short, the fair and equitable test is "as broad as it sounds."  *In re Dow Corning Corp.*, 244 B.R. 678, 694 (Bankr. E.D. Mich. 1999).

When assessing a plan's fairness and equity vis-à-vis a dissenting creditor, courts compare the creditor's state law rights and remedies to that creditor's treatment under the plan, and if the plan unfairly strips the creditor of its state law rights, it fails to meet the fair and equitable test and cannot be confirmed.  *See D&F Constr.*, 865 F.2d at 675-76 (court "must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances"); *In re Sunflower Racing, Inc.*, 226 B.R. 673, 687-88 (D. Kan. 1998) (same); *In re Salem Suede, Inc.*, 219 B.R. 922, 934 (Bankr. D. Mass. 1998) (same); *Kennedy*, 158 B.R. at 600 ("[T]he 'implicit' fair and equitable requirement must be applied in the context of the rights of the creditor under state law.").

In fact, the fair and equitable test has been held to mandate that one group of creditors be treated *better* than another group when fairness so requires under the circumstances.  In *Town of Belleair, Florida v. Groves*, a Chapter 9 plan proposed treating landowning and non-landowning bondholders the same and provided for identical recoveries under the plan to the two types of creditors.  132 F.2d 542, 542

(5th Cir. 1942). The court of appeals affirmed the rejection of the plan under the fair and equitable test because landowning bondholders were receiving an additional benefit as a practical consequence of the plan, while non-landowning bondholders received no such benefit. *Id.* The court found that the non-landowning bondholders should therefore have been afforded greater recoveries under the plan – the equal treatment under the plan was neither fair nor equitable under these circumstances. *Id.* at 542-43.

To determine whether the City's Plan is fair and equitable, the Court is required to take into account state law rights and interests and see whether LTGOs are fairly and equitably treated against that backdrop. The conclusion the Court must reach is obvious – the Plan is neither fair nor equitable because the proposed LTGO recovery is far too low in light of the strong state law rights of LTGOs, particularly in comparison with other creditors. *D&F Constr.*, 865 F.2d at 675; *see also Town of Belleair*, 132 F.2d at 542-43. The LTGO holders' state law rights *e.g.*, to payment of the LTGOs as a first budget obligation, to segregation of the *ad valorem* taxes allocated to the LTGOs and restriction in use only for LTGO payment, and to the ability to seek mandamus to recover the restricted taxes immediately – differ dramatically from the state law rights of other unsecured creditors, which have none of these protections. These carefully crafted rights and remedies under state law must be reflected in materially better treatment of the

LTGO Claims under the Plan. *See D&F Constr.*, 865 F.2d at 675 (plan's negative amortization schedule failed to respect creditors' right to immediate recovery under state law); *Kennedy*, 158 B.R. at 600-01 (proposed 20-year payment schedule did not comport with judgment creditor's right to immediate payment under state law). The Plan's proposed LTGO recovery of a mere 10-13% does not comport with Chapter 9's respect for the LTGOs' superior state law rights and remedies.

## III.   THE PLAN DISCRIMINATES UNFAIRLY AGAINST LTGO CLAIMS.

As shown above, the City's Plan is not fair and equitable because it fails to provide LTGOs with a full recovery before paying junior debt, and fails even to accord LTGOs with treatment that is materially better than junior debt. Even worse, the Plan affirmatively discriminates against the LTGOs without justification, providing them with a recovery that is far *less* than the recoveries provided to structurally junior debt. Indeed, even if the rights of the LTGOs were identical to the rights of other unsecured creditors, the Plan's discriminatory treatment would be entirely unacceptable. The Grand Bargain, for example, boasts a recovery of 59-60% for PFRS and GRS Pension Claims (collectively, the "Pension Claims") plus an upside,[14] while the LTGOs are relegated to a measly 10-

---

[14] Even excluding the Outside Funding that is a part of the Grand Bargain, the City's payments on the Pension Claims provide for a 39-40% recovery.

13%. In this regard, the Plan design is completely indefensible, and inescapably fails the unfair discrimination test of § 1129(b)(1).

In determining what constitutes "unfair discrimination" under §1129(b)(1), courts generally apply either the traditional "four factor test" or the newer "rebuttable presumption test."[15] Here, the disparate treatment of the LTGOs and Pensions cannot pass muster, regardless of which test is applied.

A.    **There Is a Gross Disparity in the Treatment of LTGO and Pension Claims.**

Discrimination, or a rebuttable presumption of unfair discrimination, as the case may be, generally exists where the dissenting class and another class with the

---

[15] The "four-factor test" considers: "(1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor could consummate the plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against." *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989); *see also In re Snyders Drug Stores, Inc.*, 30 B.R. 889, 894 (Bankr. N.D. Ohio 2004) (applying four-factor test from *Aztec*); *In re Graphic Comm'n, Inc.*, 200 B.R. 143, 148-49 (Bankr. E.D. Mich. 1996) (same); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 715-16 (Bankr. M.D. Tenn. 1992) (same).

The "rebuttable presumption test" imposes a rebuttable presumption of unfair discrimination where there is a material difference in treatment of two classes of the same priority; the presumption may be overcome by a showing that the respective treatment is consistent with the results the classes would obtain outside of bankruptcy, or that a greater recovery is offset by contributions from a particular class to the reorganization. *See In re BWP Transp., Inc.*, 462 B.R. 225, 231-32 (Bankr. E.D. Mich. 2011); *In re Sentry Oper. Co. of Tex., Inc.*, 264 B.R. 850, 864 (Bankr. S.D. Tex. 2001); *In re Dow Corning Corp.*, 244 B.R. 696, 710-11 (Bankr. E.D. Mich. 1999), *aff'd in part*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd in part and remanded*, 280 F.3d 648 (6th Cir. 2002).

45

same rights are treated materially or grossly differently under the plan. *See In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) ("disparate treatment of classes that have identical legal rights" amounts to unfair discrimination); *see also In re Deming Hospitality*, *LLC*, No.11-12-13377, 2013 WL 1397458, at *5-6 (Bankr. D.N.M. Apr. 5, 2013) (plan is presumptively unfair where there is a "gross disparity" of 73.3% between recoveries); *In re Tribune Co.*, 472 B.R. 223, 243 (Bankr. D. Del. 2012) (defining "grossly disparate treatment" as a difference in recovery of "50% or more"); *Sentry Oper. Co.*, 264 B.R. at 864-65 (rebuttable presumption of unfair discrimination given a material difference between classes of equal rank under state law); *Graphic Commc'ns*, 200 B.R. at 148  (plan's discrimination against objector, in proposing ten percent payment to objector and 100% payment to general trade creditors, was not reasonable, as required for plan confirmation); *Creekside Landing*, 140 B.R. at  716 (proposed 20% payment unfair in light of 40% and 75% payouts to other classes).

The City's Plan creates a clear disparity of treatment between the LTGO Claims and the Pension Claims.  The LTGO Claims are slated to receive only 10-13% on account of their claims, while the City calculates the recovery on the Pension Claims to be *at least* 59-60% (assuming the conditions for the Grand Bargain are met).  Discl. Stmt. at 31, 36-39.  And the 59-60% estimated recovery does *not* take into account the potential receipt of 50% of the net proceeds from a

Qualifying DWSD Transaction.  Discl. Stmt. at 20.[16]  In addition, the recovery

percentages does not take into account the potential restoration of pension benefits

as a result of improvement in the funded status of the Retirement Systems, Discl.

Stmt. at 19, 22, which would further reduce pensioners' losses.[17]  Accordingly, the

magnitude of the disparity – a recovery on the Pension Claims that is at least five-

---

[16] Even without this "extra," moreover, the *actual* recovery percentage for the
Pension Claims is even greater than the percentages reflected in the Disclosure
Statement.  The 59-60% is calculated based on total Pension Claims of $3.129
billion, a number that was calculated using an actuarial interest rate assumption of
6.75%.  That assumption, however, is unreasonably low, and greatly inflates the
amount of the claims.  With a more reasonable interest rate assumption, the total
Pension Claims would be much lower, and the recovery percentage
commensurately higher.

In this regard, the Plan has yet another problem that makes it unconfirmable.  The
City is requiring that the Retirement Systems adopt and maintain an investment
return assumption and discount rate of 6.75% for purposes of determining the GRS
and PFRS assets and liabilities.  *See*, *e.g.*, Discl. Stmt. 36, 38.  This is contrary to
state law, *see*, *e.g.*, *Police & Firemen Retirement Sys. of City of Detroit*, 270 Mich.
App. 74, 80-84 (Mich. Ct. App. 2006); *see also* Mich. Comp. Laws Ann.
§ 38.1140m, and thus the Plan does not satisfy § 943(b)(4).

[17] It also appears that the Plan discriminates unfairly against the LTGOs in its
treatment of OPEB Claims.  In prior versions of the Plan, OPEB Claims (the
amount of which has increased in each iteration from $3.2 billion to $3.33 billion
to $4.1 billion to $4.3 billion) shared pro rata with the LTGO Claims (and others)
in the New B Notes.  In the Plan, the OPEB Claims are to receive a fixed $450
million of New B Notes – an amount that appears to have been calculated based on
the $4.3 billion claim number.  If, however, as Ambac suspects, the OPEB Claims
amount is artificially inflated, then the percentage recovery for the OPEB Claims
will unfairly exceed the recovery for the LTGOs, perhaps significantly.

fold greater than the amount proposed for the LTGOs – is not just significant, it is dramatic.[18]

**B.    The Gross Disparity in Treatment Cannot Be Justified.**

Both the four factor test and the rebuttable presumption test require that the justification for disparate treatment be proportional to the disparity; greater disparity imposes on the debtor a greater burden to justify it. *See In re Deming Hospitality LLC*, 2013 WL 1397458, at *5 ("Regardless of the standard used to determine unfair discrimination, courts agree that if the treatment of substantially similar claims is grossly disparate, it is very difficult for the plan proponent to show fair discrimination.").

There is no legally-cognizable justification for the disparity under the Plan. To be sure, the plight of the retirees is deserving of sympathy. But sympathies for one creditor group cannot justify discrimination against another. This gross disparity can be remedied by increasing the recoveries on the LTGO Claims – an action that can readily be accomplished without jeopardizing the Plan's feasibility, given the very small size of the LTGO class.

---

[18] The LTGOs are further discriminated against because, prior to bankruptcy, they had a debt instrument that was senior to all of the other unsecured creditors. Under the Plan, they are receiving the same recovery – the New B Notes – as the other creditors, without receiving any additional compensation for the senior rights they are losing. This could easily be remedied by, for example, providing the LTGOs with Municipal Finance Authority ("MFA") bonds.

48

The City may contend, however, that the disparity in treatment is justified by the restricted nature of the DIA Proceeds and the State Contribution. It may argue that because the DIA Proceeds and the State Contribution can be used *only* to pay the Pension Claims, and would not otherwise exist, they can be disregarded. But this ignores the fact that money is fungible. These funds will free up an equal amount of City money to be used for other purposes, including distributions to creditors. At a minimum, the DIA Proceeds and the State Contribution represent additional money coming in for the payment of claims, which combined with the City's own money going to the pensions, must be taken into account in equalizing recoveries among classes of unsecured creditors.

Furthermore, the purported restrictions are inappropriate. This is the City's art, an asset in which all creditors are entitled to share. Alternatives for obtaining far greater value from the art are available, none of which would impose artificial restrictions on the use of proceeds that would prevent them from being shared, fairly and equitably, among all unsecured creditors.

The restrictions on the State Contribution are even more suspect. The state is a classic "insider" with full "operational control of the debtors." *In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25*, 143 B.R. 750, 766 (Bankr. D. Mont. 1992) (interpreting "insider" as defined in 11 U.S.C. § 101(31)). The Emergency Manager is indisputably controlled by the state. *See e.g.*, Mich. Comp.

Laws §§ 1550(1); 1551(1); 1558(1).  However laudable one might consider the stated goals of the Grand Bargain, the state's conduct in compelling the debtor it controls to prefer certain creditors over others is akin to that of a corporate parent directing the subsidiary debtor to pay those creditors as might serve the parent's pecuniary goals.  This is impermissible.[19]

### C.  The City Cannot Overcome the Presumption of Unfair Discrimination.

Under the "rebuttable presumption" test – the test that has been applied by the more recent decisions in this Court – a gross disparity of treatment like that existing here will give rise to a presumption of unfair discrimination, which can be overcome by reference to creditors' respective rights under state law and their likely recoveries outside of bankruptcy.  *See BWP Transp.*, 462 B.R. at 231 (citing *Dow Corning*, 244 B.R. at 702) (emphasis added).  The test provides for inherently fair relative treatment of creditors because "'results that would obtain outside of bankruptcy' have to do with the pre-petition status of creditors and their legitimate expectations about relative rights and likelihood of payment."  *Sentry Operating Co.*, 264 B.R. at 864; *see Dow Corning*, 244 B.R. at 702 (focus on respective rights

---

[19] In any event, even if the $816 million in allegedly restricted funds were ignored, the City's own contributions to the Pension Claims alone would amount to unfair discrimination.  The City acknowledges that it intends to contribute $2.816 billion to the Pension Claims over and above the DIA Proceeds and State Contribution, with a present value of $1.038 billion.  This payment still represents a recovery on the Pension Claims far greater than the recovery for the LTGOs.

50

under state law outside of bankruptcy is preferable because it "effectively targets the kind of discrimination or disparate treatment that is commonly understood as being 'unfair'").

Here, far from overcoming the presumption, an evaluation of the parties' respective state law rights magnifies the egregiousness of the unfair discrimination. As has been fully laid out above, LTGOs have undeniably senior rights under state law, and would more likely than not recover in full outside of bankruptcy. In contrast, while the Pension Claims have certain protections under the state constitution, this Court has found that the Pension Claims are based on "contractual rights" not entitled to special protections or a "property interest" in the debtor's assets. *In re City of Detroit, Mich.*, 504 B.R. 97, 153-54 (Bankr. E.D. Mich. 2013). Thus, the state constitutional protections afforded to the Pension Claims are no different from the protections afforded to all other creditors under the state contract clause. The LTGO Claims, however, are additionally entitled to the first *ad valorem* tax dollars collected by the City, supported by cognizable property interests and the City's full faith and credit, and entitled to other special protections under Act 34 that are not afforded to the Pensions. Given the LTGOs'

vastly superior rights under state law, the disparity in treatment between the

LTGOs and the Pension Claims is *especially* "unfair."[20]

### D. The City Also Cannot Justify the Unfair Discrimination Under the Four-Factor Test.

Under the four-factor test, a debtor can justify unfair discrimination if it is

supported by a "rational or legitimate basis" for discrimination" or if the plan could

not be consummated without it. *See, e.g., Aztec*, 107 B.R. at 590. Neither

justification can be established here.

### 1. There Is No Rational or Legitimate Basis for the Disparate Treatment.

No rational or legitimate basis exists that might support the wildly disparate

treatment here. Certainly, neither the debtor's individual preference among

creditors nor public policy can be a basis for disparate treatment. *See In re*

*Eisenbarth*, 77 B.R. 228, 235-36 (Bankr. D.N.D. 1987) (a debtor's mere preference

to pay one creditor more than others "is not sanctioned by the Bankruptcy Code");

*Tucson Self-Storage*, 166 B.R. at 898 (rejecting reliance on public policy favoring

paying small trade creditors to justify less favorable treatment of other creditors).

The rational basis also cannot be found in the legal nature of the LTGOs and the

Pension Claims because the LTGOs, rather than the Pension Claims, are supported

---

[20] The rebuttable presumption test can also be overcome where the debtor provies that the greater recovery is offset by contributions to the reorganization from a particular class, but here, the City has proffered no facts whatsoever to support application of this factor.

by superior rights.  Nor is there a legitimate business rationale, assuming one would be relevant.  Quite the opposite: the City concedes that obtaining access to capital markets will be an essential goal of its post-confirmation governance efforts.  *See* Discl. Stmt. at 69, 160.  This cannot be accomplished while subjecting highly protected general obligation creditors to an unprecedented impairment while preferring bare contractual claims.

### 2. The Discrimination Is Not Necessary to Confirm the Plan.

Likewise, the disparity in treatment is not necessary to confirm the Plan.  As the court noted in *Dow Corning*, "'discrimination is never necessary' in a plan." 244 B.R. at 701 (quoting Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L. J. 227, 254 (1998)).  This is particularly true with respect to the LTGOs, which comprise a mere 1% of the City's claimed $18 billion of debt.

In summary, the Plan's relative treatment of the LTGOs and the Pension Claims constitutes unfair discrimination.  For this defect to be remedied and the Plan to be confirmable, the LTGOs must be treated at least as well as the Pension Claims.  This would require a recovery of at least 59-60% augmented by a potential upside for the LTGOs, the same as the Pension Claims are receiving.

## IV. THE PLAN FAILS TO PROVIDE REASONABLE CREDITOR RECOVERIES.

### A. The City Has a Duty to Maximize Creditor Recoveries in the Plan.

Under both the best interests of creditors test and the fair and equitable test, a proposed plan must provide creditors with "all that they 'can reasonably expect in the circumstances.'" *Lorber v. Vista Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (citing *West Coast Life Ins. Co. v. Merced Irrigation Dist.*, 114 F.2d 654, 678 (9th Cir. 1940)).[21] To that end, and as part of the debtor's duty to propose a plan in good faith, the proposed plan must "indicate a sincere attempt by the Debtor to readjust its debts by *maximizing the creditors' recovery*." *Pierce Cnty.*, 414 B.R. at 719-21 (emphasis added); *see also Barnwell*, 471 B.R. 849 (plan is proposed in good faith where it "maximizes the economic return to the Debtor's creditors").

Maximizing creditor recoveries means maximizing revenue. Thus, a municipal debtor "must exercise its taxing power to the fullest extent possible for the benefit of its creditors." H.R. Rep. No. 94-686, 94th Cong., 1st Sess. (1977); *see, e.g.*, *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 565-66 (9th Cir.

---

[21] The fair and equitable test is a more stringent version of the best interest of creditors test, in that the fair and equitable test "insure[s] that the dissenting members of an accepting class will receive *at least* what they would otherwise receive under the best interest of creditors test."). H.R. Rep. No. 95-595, 1st Sess. 400 (1977) (emphasis added). Because the fair and equitable test is a more stringent version of the best interests test, this section discusses "fair and equitable" and "best interest" case law interchangeably.

54

1940) (court was "unable to find any reason . . . . why it can be said that the plan is 'equitable' and 'fair' and for the 'best interest of the creditors' with no sufficient showing that the taxing power was inadequate to raise the taxes to pay them"). And the Court, in turn, must have evidence before it that, in fact, the debtor has done all it could do in terms of its taxing capacity. *See Kelley*, 319 U.S. at 420-22 (requiring evidence of historical tax, tax rate, and tax delinquency data, property value assessments, and probable effect of changes to tax structure, in order to determine fairness of creditor recoveries); *Lorber*, 127 F.2d at 639 (remanding to district court for factual findings as to reasonable expectations regarding tax collections).

In addition to looking at taxation, the debtor must also look at its assets and ensure that the proposed plan "affords all creditors the potential for the greatest economic return from Debtor's assets." *Connector 2000 Ass'n*, 447 B.R. at 766. In order to cram down its Plan on dissenting creditors, the City must consider possible alternatives for asset monetization that will yield greater creditor recoveries. *See, e.g.*, *Barnwell*, 471 B.R. at 869. A plan that "forestalls" – let alone fails to pursue at all – available avenues to enhancing creditor recoveries is unconfirmable as a matter of law. *Pierce Cnty.*, 414 B.R. at 720.

Notably, the requirement to maximize creditor recoveries is not static – courts do not look only to the debtor's finances at the time of confirmation, but

55

13-53846-tjt    Doc 4677    Filed 05/12/14    Entered 05/12/14 22:56:16    Page 64 of 80

also to its future prospects. Thus, the proposed plan must be aimed at paying creditors over a "reasonable period of time." 6 Collier on Bankruptcy ¶ 943.03[7][a] (16th ed. 2013) (citing *Fano*, 114 F.2d at 565-66). A plan must provide creditors the potential for the "greatest economic return" under the circumstances, "albeit over time." *Barnwell Cnty. Hosp.*, 471 B.R. at 869; *see also In re Bamberg Cnty. Mem'l Hosp.*, No. 11-03877, 2012 WL 1890259, at *8 (Bankr. D.S.C. May 23, 2012) (same); *Matter of Sanitary & Imp. Dist., No. 7*, 98 B.R. at 975 (plan providing for payments to creditors that are a better alternative to dismissal and are feasible "over time" would be confirmable).

Because the Plan fails to afford Ambac and other unsecured creditors the potential for the greatest returns possible under the circumstances, based on an informed estimate of the probable future revenues as the City's financial condition improves, the Plan does not satisfy this standard.

### B.     The City Has Not Done Everything Possible to Maximize Creditor Recoveries.

The City cannot demonstrate that it has done everything possible to maximize its revenues and, consequently, creditor recoveries. It has not adjusted its taxing policies to its tax base and targeted those taxpayers more likely to be able to afford increases. It also has not maximized the revenues that may be raised through the sale, privatization, or other monetization of assets not essential to the provision of adequate public services. To the extent that the City does contemplate

56

monetizing its assets, unsecured creditors (other than the Pension Claims) will receive no benefit from such monetization. The City has similarly failed to adjust fines and fees to generate revenue, or seek to increase state aid and federal grants. And, the City cannot demonstrate that it has cut expenses in a reasonable manner and has eliminated waste and unnecessary costs in providing services to its citizens. All in all, the City's Plan fails to provide creditors with all that they should "reasonably expect" because it fails to take advantage of all means by which the City could increase and share revenue.

The failure to maximize creditor recoveries is most palpable in the City proposal that it retain a significant portion of the upside in the event the COPs are determined to be invalid. Specifically, the pro rata portion of the New B Notes allocable to non-settling COPs holders is to be held in a reserve pending the outcome of the litigation challenging the validity of the COPs. Discl. Stmt. at 35. This reserve amount could be as high as $161.9 million.[22] In the event the COPs Claims are disallowed, the reserve will no longer be needed, and the City intends to capture 35% of it, or up to $56.7 million, to do with as it pleases in its sole discretion. Discl. Stmt. at 35. Simply put, if the City's Plan is feasible in the event the City loses the COPs litigation, then it would be equally feasible if the City

---

[22] If none of the COPs holders settle, the amount of the reserve would be the entire pro rata share of COPs in the pool of $650 million in the New B notes, or approximately 25%: $1,473,000,000 / $5,915,143,187. *See* Discl. Stmt. at 34 n.5.

shared with the creditors the entirety of the upside in the event it wins. The duty to maximize recoveries means that all funds not needed for operations must go to creditors, and the COPs reserve is no exception.

In addition, the City has not exercised its taxing power to the fullest extent possible. Detroit could raise taxes in ways that would not harm it economically and would not cause tax base erosion. The City's bald statement that the "*Emergency Manager has determined* that the City cannot gain additional revenue through the imposition of increased rates and additional taxes," Discl. Stmt. at 94, lacks evidentiary or analytical support. It is particularly suspect given that the City has the burden of showing that it has maximized its taxing power. The City has the legal obligation to adapt its taxing strategy to its demographics in order to target specific activities of those taxpayers who are able to pay higher taxes. For example, the City could impose new taxes such as a reverse commuter tax. In fact, the original February 20, 2014 Disclosure Statement contemplated the imposition of a reverse commuter tax, an initiative apparently abandoned in subsequent amendments. *See* Disclosure Statement, Case No. 13-53846, ECF No. 2709, at 119. And, the City could approach tax exempt entities to enlist them to participate in Payment in Lieu of Taxes (PILOT) programs.[23]

---

[23] To the extent some of these initiatives would require state legislation, the City has an obligation to seek its enactment if doing so would increase creditor recoveries.

The City could also maximize its revenues and increase creditor recoveries by improving its tax collection efforts, but there is no indication that it is doing so. As to property taxes, the City's track record of collection has been so dismal it has been "forced to rely on Wayne County for the funding and collection of delinquent property taxes." *See* Discl. Stmt. at 124; *see also* Discl. Stmt. at 169 ("In 2011, only 53% of City residents and businesses owning taxable property paid property taxes."). While some delinquencies may be due to inability to pay, the lack of meaningful enforcement behind the collection effort removes the incentive to pay even for those who can afford current (and possibly higher) levels of taxation. In addition, the City's collection mechanisms lack such rudimentary safeguards as, for example, the withholding of income taxes at the employer level, leaving the City with the risks and burdens of having to pursue individual delinquent taxpayers. These failures are as wasteful as they are impermissible given the extraordinary level of creditor impairment under the Plan.

The City is similarly failing to maximize other revenues. For example, fines or fees for services, permits, and licenses should be adjusted to generate additional revenues.[24] The City could also seek to increase federal grants. The City has

---

[24] The City's explanation that fees for "services, permits, and licenses" cannot be increased beyond their current levels is not convincing. *See* Discl. Stmt. at 96. The City claims that such fees are capped by the "costs of providing the relevant services," but does not explain how this concept could be applied to, let alone

59

historically failed to maximize revenues from grants due to its limited ability to "discover and apply for more grants." *See, e.g.*, Proposal for Creditors, dated June 14, 2013, at 71. Moreover, "fragmented" grant management and improper "grant reporting" have resulted in "disallowed costs" and poor delivery of grant-funded services. *Id.* at 65, 71.

Nor has the City properly marshaled all of its assets that are not necessary for the provision of public services. Most notably, the value of Detroit's art collection is not being maximized for the benefit of creditors under the Plan. Certain creditors have obtained preliminary proposals that could generate as much as $2 billion from the art, and some of these proposals would allow the art to remain at the DIA as currently contemplated by the "Grand Bargain."[25] The Plan provides for disposition of the art for a small fraction of its apparent actual value.

The Plan fails completely to address other assets, and makes no provision whatsoever for sharing their value with creditors when and if the assets are monetized post-confirmation.[26] For example, the City contemplates a potential

---

limit, permit and license fees that are not accompanied by a readily quantifiable municipal service. *Id.*

[25] *See* Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts, Case No. 13-53846, ECF No. 3923, at 3.

[26] At best, the delay in monetizing these assets is an example of waste and inefficiency that has plagued the City for decades and continues under the watch of

60

"public-private partnership" with respect to its water and sewer services, in order to extract surplus value from the system; the closing of the transaction, if any, is not expected to occur until August 2014.  Discl. Stmt. at 148-49.  The City has committed to using 50% of the net proceeds from this transaction to provide additional recoveries to the Pension Claims, but nothing in the Plan or Disclosure Statement suggests who will receive the remaining net proceeds.

Similarly, while the City apparently intends to monetize City-owned land by working with the Detroit Land Bank Authority and the Michigan Land Bank, the Plan does not provide for the sharing of the proceeds with creditors.  *See* Discl. Stmt. at 97.  The Plan's failure to provide for the sharing of the proceeds of City-owned land is particularly egregious because its value will necessarily increase in the future as blight remediation and other reinvestment initiatives bear fruit.  The City also discusses a potential disposition of its parking assets in Fiscal Year 2015, but makes no mention whatsoever of sharing the proceeds with its creditors.  Discl. Stmt. at 94.  Further, the Plan discusses other non-essential assets, such as the Coleman A. Young Airport and the Joe Lewis Arena (Discl. Stmt. at 98-99),

---

the Emergency Manager.  At worst, the timing is designed to conceal the true value of the assets and delay their monetization until after confirmation so as to shield the proceeds from creditors.

without referring to *any* plans for their disposition, much less the sharing of any value they might have with creditors.[27]

The foregoing discussion demonstrates that, looking merely at its current financial status, the City is not doing everything it can to maximize recoveries to creditors, and thus it cannot meet its duty to propose a plan in good faith that satisfies the best interests and fair and equitable tests.

### C. The Analysis of Required Creditor Recoveries Must Take Into Account the Expected Financial Rejuvenation of the City Through Reinvestment.

When the City's future prospects are reviewed, the City's failure in its duty to maximize creditor recoveries becomes even more apparent. Detroit is the largest city ever to seek bankruptcy protection, and one of the most important urban centers in the United States. After an extended period of economic and population decline, Detroit is in a dire condition that must be remedied. The City intends to do so by spending an enormous amount of money on revitalization and improvements. The size of the reinvestment and the scope of expected improvements are unprecedented, and they come at a cost to unsecured creditors that is simply unheard of in Chapter 9 jurisprudence.

---

[27] Moreover, while the City touts having "adopt[ed] various measures to reduce expenses," *see* Discl. Stmt. at 125, the Disclosure Statement raises serious doubt as to whether all potential steps to reduce expenses have been implemented as required for plan confirmation.

The reinvestment initiatives proposed by the Plan contemplate a reinvestment of approximately $1.4 billion over the course of the next 10 years. Discl. Stmt. at 160. This is *more than twice* the $650 million face amount of the 30-year notes the City proposes to distribute to its non-pension unsecured creditors to discharge billions of dollars of prepetition debt. Discl. Stmt. at 34 n.5, 62. Considerations of fundamental fairness, coupled with core Chapter 9 principles, dictate that if the creditors are going to fund the City's renaissance through lower immediate recoveries, then the City must share with creditors the upside potential it expects to achieve from its long-term revitalization. *See Fano*, 114 F.2d at 565 ("These improvements greatly enhance the value of the District's property and of course of the security of the bondholders, and it would be *highly unjust to allocate their cost to the bondholders, amounting to one third of their investment*.") (emphasis added).[28] Absent a definitive mechanism by which the City shares the upside of its recovery with its most seriously impaired creditors, the City cannot be deemed to have made a "sincere attempt" to maximize creditor returns.

Indeed, the City previously appeared to acknowledge this fundamental reality. In its original Plan, the City proposed to share its reinvestment upside by offering its creditors "soft" notes, payment on which would be due only if the City

---

[28] In comparison, the City's proposed reinvestment here is $1.4 billion, nearly three times *greater* than the $538 million in bonded debt subject to impairment. *See* Discl. Stmt. Exhibit D ($374,661,332 in "unsecured" UTGOs), Exhibit E ($163,543,188 in "unsecured" LTGOs).

63

met certain revenue goals.  In other words, if the revenue specified for repayment was not available, the City would have no obligation to pay.  *See* Disclosure Statement, Case No. 13-53846, ECF No. 2709, at 93-94 (describing the New C Notes).  This feature has been struck from subsequent versions of the Plan, with no replacement or explanation.

The City cannot contend that it has calculated precisely the upside from the reinvestment initiatives and built a reasonable percentage of that upside into the creditor recoveries under the Plan.  Consequently, it cannot establish that it has, "more likely than not" maximized creditor returns over time.  The exact opposite scenario is far more likely:  that the City's projections are conservative and err on the side of caution, or that its proposed cash and contingency reserves will not be needed given the likely returns on reinvestment.  The simple truth is that it is impossible to predict accurately the effect of economic revitalization over the long term – especially over a period of more than 5 years.  The upside from the reinvestment can be expected to arise in a number of ways, none of which can be predicted with certainty.  Most obviously, the revitalization can be expected to result in expansion of the tax base by attracting new City residents, creating jobs, lowering unemployment, increasing wages subject to income tax, and increasing value of real property subject to property taxes.  Discl. Stmt. at 168.  Reduction in blight will not only improve the value of property taxed by the City, but also

increase the value of City-owned land, which the City claims is now of limited commercial value. Discl. Stmt. at 79, 168. In addition, reinvestment in the City's infrastructure and information technology is expected to increase taxes and other revenues by improving collection rates.

The City's massive reinvestment effort can also be expected to result in reduction of the City's expenses over time. Most notably, upgrades to the City's "outdated" IT systems will result in more efficient provision of services. *See* Discl. Stmt. at 94, 118. And reduction in crime and blight will reduce the scope and the attendant costs of emergency services such as police, fire, and EMS. *See* Discl. Stmt. at 121 ("[A]pproximately 60% of the 11,000 to 12,000 fires that the City experiences each year occur in blighted and unoccupied buildings.").

Given the complexity and multi-faceted nature of the expected upside from the reinvestment expenditures, it clearly cannot be quantified with sufficient precision to support the City's implicit assertion that the $650 million in New B Notes offered to non-pension unsecured creditors is all it can afford over the next 30 years. To the extent the upside from reinvestment may, and likely will, exceed the City's expectations, the Plan must contain a mechanism for sharing it with creditors. A properly designed soft note or other similar mechanism can do so without endangering feasibility, because the City would be required to pay only if upside revenues materialize. The City acknowledged as much when it included the

"soft" note concept in the original Plan. The key will be appropriate benchmarking of the City's obligations, and a thoughtful determination of how much of the upside the City should be permitted to retain.

Soft notes, or a similar mechanism for providing creditors with additional recoveries from the anticipated revenue increases resulting from its enormous reinvestment initiative, must be reintroduced in order for the Plan to be confirmable.

## V. THE CITY COULD EASILY GIVE LTGOS THE TREATMENT THEY DESERVE.

The City can easily treat the LTGOs in a manner consistent with the requirements for confirmation and the principles outlined in this Objection.

Treating the LTGOs as senior unsecured claims for the purposes of the absolute priority rule and paying out their full value would not affect the feasibility of the Plan and would not materially affect other creditors' recovery.[29] This is due to the extremely small size of the LTGO Claims as compared with the City's budget and the enormity of the other claims that are proposed to share in the New B Notes issued under the Plan.

- If the LTGOs received full value for their claims in the form of new LTGOs (or MFA bonds) stretched out and amortized along the lines proposed by the City for the New B Notes, the resulting debt service

---

[29] Under the current Plan, the LTGOs' pro rata share of the New B Notes is only 2-3%. *See* Discl. Stmt. at 34 n.5 (valuing the LTGO Claim at $163 million, out of $4.7-$6.1 billion in claims to be paid using the New B Notes).

would represent less than 2% of the City's budget. Using an interest rate of 6.75%, with interest only payments for the first 10 years and principal and remaining interest amortized over the next 20 years on a level basis, yields annual payments of approximately $11 million (out of $1.1 billion of revenue) for the first 10 years and $9-19 million for the next 20 years (representing 0.5%-1.7% of annual revenues, which average $1.3 billion). This minimal additional expense would not adversely affect the Plan's feasibility.

- If the City chose instead to pay the LTGOs in full using a larger portion of the New B Notes to be issued under the Plan (without issuing any additional notes), the recovery of the junior unsecured creditors who also share in the New B Notes would be diminished only minimally. Thus, if the City allocated $163 million of the net present value of the new securities to the LTGO Claims, it would leave approximately $467 million for the remainder of the non-pension unsecured creditors. The resulting recoveries for the junior unsecured creditors would be approximately 7–9%, or within 3 percentage points of what the Plan currently provides. This alternative would reapportion the debt service anticipated in the Plan and would have no effect on the City's net cash flow.

Since the Plan is readily feasible with an appropriate application of the absolute priority rule, it is even more feasible if the Court were to conclude simply that the LTGOs must be treated materially better than other unsecured creditors. At the very worst, the City must and easily could solve the Plan's unfair discrimination problem by treating the LTGOs at least as well as the Pension Claims. In this event, the LTGOs would receive at least a 59-60% recovery, augmented by a potential upside (and in actuality, significantly more in view of the highly inflated Pension Claim numbers).

67

Finally, the City can, and must, turn over to the LTGO bondholders the "first budget obligation" *ad valorem* tax proceeds restricted by Act 34 for the repayment of the LTGOs and in which the LTGO bondholders have equitable property interests.

The Plan's failings with respect to the treatment of the LTGOs are egregious in light of the LTGOs structural seniority under state law and Chapter 9's respect for state control of municipal fiscal affairs. When one considers just how easy it would be for the City to remedy these flaws and provide the relatively small amount of LTGO Claims with proper treatment under the Plan, the conclusion is inescapable. The Court simply cannot confirm this Plan without requiring that the abhorrent LTGO treatment be rectified.

Dated:  May 12, 2014               Respectfully Submitted,

                                   **ARENT FOX LLP**
                                   By:  /s/ Carol Connor Cohen
                                   Carol Connor Cohen
                                   Caroline Turner English
                                   1717 K Street, NW
                                   Washington, DC  20036-5342
                                   (202) 857-6054
                                   Email:  Carol.Cohen@arentfox.com

                                   David L. Dubrow
                                   Mark A. Angelov
                                   1675 Broadway
                                   New York, NY 10019
                                   (212) 484-3900

– and –

**SCHAFER AND WEINER, PLLC**
Daniel J. Weiner (P32010)
Brendan G. Best (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340
Email:  bbest@schaferandweiner.com

*Attorneys for Ambac Assurance Corporation*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____
                              )

In re                            )        Case No. 13-53846

                               )

CITY OF DETROIT, MICHIGAN,    )        In Proceedings Under

                               )        Chapter 9

           Debtor.           )

_____)        Hon. Steven W. Rhodes

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on May 12, 2014, the Objection of Ambac Assurance Corporation to Fourth Amended Plan of Adjustment of Debts of The City of Detroit was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter.

                             Respectfully Submitted,


                             **ARENT FOX LLP**

Dated:  May 12, 2014        By:  /s/ Carol Connor Cohen_____
                              CAROL CONNOR COHEN
                              CAROLINE TURNER ENGLISH
                              1717 K Street, NW
                              Washington, DC  20036-5342
                              (202) 857-6054
                              Carol.Cohen@arentfox.com

                              DAVID L. DUBROW
                              MARK A. ANGELOV
                              1675 Broadway
                              New York, NY 10019
                              (212) 484-3900

and

**SCHAFER AND WEINER, PLLC**

DANIEL J. WEINER (P32010)
BRENDAN G. BEST (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340
bbest@schaferandweiner.com

*Counsel for Ambac Assurance Corporation*